**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 17-cv-5228<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

Plaintiffs,

v.

DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,

Defendants.

## INTRODUCTION

1.       The States of New York, Massachusetts, Washington, Connecticut, Delaware,

District Of Columbia, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania,

Rhode Island, Vermont, and Virginia (the "States") bring this action to protect the States—

including their residents, employers, regulatory systems, and educational institutions—against the

illegal actions of the President and the federal government. On September 5, 2017, the U.S.

Department of Homeland Security ("DHS") issued a Memorandum (the "DHS Memorandum")

ending Deferred Action for Childhood Arrivals ("DACA"), a program that has protected from

deportation approximately 800,000 young people who grew up in this country, most of whom have

known no home other than the United States. Pursuant to the DHS Memorandum, the federal government will only issue renewals for grantees whose terms expire before March 5, 2018, provided they apply for renewal by October 5, 2018. DHS will immediately cease accepting new applications under DACA.

2.      Since 2012, DACA has allowed hundreds of thousands of young people to live, study, and work in the United States, and to become stable and even more productive members of their communities, without fear that they could be arrested and placed in deportation proceedings at any moment. Throughout the country, DACA grantees are employed by various companies and State and municipal agencies, which benefit from their skills and productivity. DACA grantees also contribute significantly to State and local revenues and tax bases. DACA recipients will also lose their eligibility for public and employer-based health insurance programs that reduce the States' health expenditures and promote public health. They also will lose their right to enroll in higher education institutions with in-state admissions preferences and tuition; thus, public universities will be deprived of a means by which they enrich the experience of all students and faculty through diversity and new perspectives.

3.      More than 78 percent of DACA grantees are of Mexican origin, *See* Ex. 1 (USCIS, Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017, June 8, 2017), which is more than double the percentage of people of Mexican origin that comprise of the overall foreign-born population (29 percent) of the United States. *See* Ex. 2 (U.S. Census Bureau, The Foreign-Born Population in the United States).

4.      Ending DACA, whose participants are mostly of Mexican origin, is a culmination of President's Trump's oft-stated commitments—whether personally held, stated to appease some portion of his constituency, or some combination thereof—to punish and disparage people with

2

Mexican roots. The consequence of the President's animus-driven decision is that approximately 800,000 persons who have availed themselves of the program will ultimately lose its protections, and will be exposed to removal when their authorizations expire and they cannot seek renewal. The individuals who have relied on DACA are now more vulnerable to removal than before the program was initiated, as they turned over sensitive information to the federal government in their applications. Despite the federal government's repeated promises that it would not use such information to conduct enforcement measures, the DHS Memorandum does not explain how the government will keep that information secure, nor does it provide any assurances that immigration enforcement agents will not use such information to find and remove those who applied for DACA.

5.      Rescinding DACA will cause harm to hundreds of thousands of the States' residents, injure State-run colleges and universities, upset the States' workplaces, damage the States' economies, hurt State-based companies, and disrupt the States' statutory and regulatory interests. The States respectfully request that this Court invalidate the portions of the DHS Memorandum challenged here. Further, the States ask that the Court enjoin the federal government from using data gathered for the DACA program in immigration enforcement.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Eastern District of New York.

8.      The States bring this action to redress harms to their proprietary interests and their interests as *parens patriae*.

## PARTIES

## PLAINTIFF STATE OF NEW YORK

9.      The State of New York, represented by and through its Attorney General, Eric T. Schneiderman, is a sovereign state of the United States of America.

10.     The Governor is the chief executive officer of the State of New York. The Governor is responsible for overseeing the operations of the State of New York and ensuring that its laws are faithfully executed.

11.     New York is aggrieved by Defendants' actions and has standing to bring this action because of the injuries caused by Defendants' rescission of DACA, including irreparable injuries to its proprietary, sovereign, and quasi-sovereign interests.

12.     The Attorney General is empowered to advance New York's strong and important public policy against unlawful discrimination. New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. And New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. N.Y. Exec. Law § 290.

13.     According to the latest American Community Survey, New York is home to more than 4.4 million foreign-born residents, including an estimated 76,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7(c) (Decl. Essig, Wiehe and Hill). According to the United States Citizen and Immigration Services ("USCIS"), 41,970 initial DACA applications and 53,693 renewal applications from New York have been approved through the first quarter of 2017. New York was the third largest source of DACA applications and approvals in the United States.

14.     New York State has an interest in protecting the economic health and welfare of its residents. More than 91% of DACA grantees are employed. *See* Ex. 5 ¶ 11 (Decl. Wong). They work for some of the largest companies in New York and for small and family-owned business that have a significant impact on local economies in New York. Ex. 5 ¶¶ 21, 36(b) (Decl. Wong). And they provide vital services to New Yorkers in important fields such as healthcare, education, law, and social services. *See* Ex. 6 ¶ 13 (Decl. C.A.); Ex. 11 ¶ 8 (Decl. TFA); Ex 52 MOIA ¶ 8 (Decl. MOIA).

15.     Rescinding DACA will result in disruptions in each of these fields, as companies and non-profits will be forced to terminate qualified and trained employees who have lost employment authorization. One expert estimates that rescinding the DACA program will cost New York State $38.6 billion dollars over the next ten years. *See* Ex.  4, Table 1 (Decl. Brannon).

16.     New York State also has a proprietary interest in maintaining a qualified workforce. Both New York State and municipalities across New York have hired DACA grantees to work in government agencies and institutions because of their specialized skills and qualifications. *See* Ex. 52 ¶ 8 (Decl. MOIA); Ex. 11 ¶ 8 (Decl. TFA). These agencies and institutions have invested significant amounts of time and money to hire and train these DACA grantees.  Accordingly, the agencies and institutions will be adversely affected by DACA's termination as they will lose the value of their investments as well as the services of qualified and trained employees. *See* Ex. 52 ¶ 8 (Decl. MOIA); Ex. 11 ¶ 8 (Decl. TFA).

17.     Rescinding the DACA program will decrease New York State's tax revenues. Through work authorization, DACA grantees more effectively avoid underemployment than their undocumented peers and are able obtain higher wages. *See* Ex. 3 ¶ 4(b) (Decl. Essig, Wiehe and Hill). Higher incomes result in higher tax revenues in New York State. In addition, DACA grantees have increased purchasing power, and report buying cars and homes at significant rates. *See* Ex. 5 ¶ 16 (Decl. Wong). These types of expensive purchases contribute to New York State's tax revenues in the form of sales and property taxes. According to the Institute on Taxation and Economic Policy ("ITEP"), DACA-eligible individuals in New York currently contribute $140 million annually in state and local taxes.  However, the loss in employment that would result from rescinding DACA would decrease contributions from this population by between $55 million and $84 million annually. *See* Ex. 3 ¶ 7(c) (Decl. Essig, Wiehe and Hill).

18.     The DACA program has encouraged thousands of grantees to pursue higher education they would not otherwise have sought. *See* Ex. 5 ¶¶ 18-21 (Decl. Wong). Rescinding DACA will adversely impact current DACA grantees enrolled in colleges and universities who will be unable to plan for the future, apply for and obtain internships, study abroad, simultaneously

work to pay costs and fees, and obtain certain financial aid and scholarships. *See* Ex. 12 ¶¶ 7-8 (Decl. Milliken). Students subject to these conditions may choose to withdraw from their college or university.

19.     New York State's public colleges and universities also will be harmed if DACA is rescinded. Both the State University of New York ("SUNY") and the City University of New York ("CUNY") have encouraged DACA grantees to apply as part of their strong commitment to diversity, equity, and inclusion. *See* Ex. 12 ¶ 10 (Decl. Milliken, CUNY Chancellor), and Ex. 99 (Decl. Johnson, SUNY Chancellor). At CUNY, hundreds of DACA grantees have enrolled in the university, many with the benefit of full scholarships.

20.     Rescinding DACA will cause many high-achieving students to drop out. As a result, New York's public universities will lose the diversity and enrichment this population brings to the school community. Moreover, the public universities will lose the resources they have spent on educating students who ultimately do not graduate. *See* Ex. 12 ¶ 8 (Decl. Milliken).

21.     New York State has an interest in protecting the health of its residents.  Rescinding DACA will harm that interest by increasing the number of uninsured adults in New York and forcing many to avoid medical care unless and until an emergency arises. With the benefit of work authorization, more than 50% of DACA grantees obtain employer-provided health insurance. *See* Ex. 5 ¶ 12 (Decl. Wong). Without DACA, these individuals will be unable to obtain health insurance from employers.

22.     In addition, rescinding DACA may prevent access to Medicaid for current DACA grantees. New York State currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 (Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA); Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013). In contrast, undocumented immigrants without deferred action in New York only have access to limited emergency Medicaid funds. Rescinding DACA will require New York to either alter its

regulatory scheme to fund Medicaid for formerly DACA-eligible immigrants or allow this population to go uninsured and rely on state healthcare funding only in the event of emergencies.

23.     New York State's quasi-sovereign interest in protecting the welfare of its residents includes its interest in protecting family rights. Most DACA grantees live in households with American citizen family members. One expert survey estimates that 73% of DACA grantees live with a citizen sibling, spouse or child.  *See* Ex. 5 ¶ 23 (Decl. Wong).

24.     Rescinding deferred action will lead to increased uncertainty in these mixed-status families, and it will increase the likelihood of splitting DACA grantees from their citizen family members. Moreover, rescission of work authorization of DACA grantees will threaten the financial and housing security of some of these families, especially where the DACA grantee provides financial help to his or her family. *See* Ex. 5 ¶ 16 (Decl. Wong).  New York's interest in protecting the rights of families would clearly be harmed by any decision to rescind deferred action or employment authorization for DACA grantees in New York, thereby subjecting their families to potential separation, financial instability, and housing insecurity.

25.     Many DACA grantees also have families overseas, including parents and siblings. DACA permitted grantees to visit family members for the first time in years, through advance parole.

26.     Rescinding DACA would prevent current grantees in New York from visiting their families abroad.

## PLAINTIFF COMMONWEALTH OF MASSACHUSETTS

27.     The Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state of the United States of America. Massachusetts is aggrieved and has standing to bring this action because of the injuries to the state caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

28.     Massachusetts is home to more than one million immigrants, including an estimated 19,000 or more DACA-eligible residents.[1]  *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

29.     Massachusetts also is home to many of the world's leading universities and businesses. These institutions rely heavily on immigrants, who bring tremendous talent, knowledge, and expertise to academic communities and to the labor force. Many of these immigrants are DACA grantees.

30.     As of March 31, 2017, USCIS had approved 7,934 initial DACA applications and 10,854 renewals for residents of Massachusetts. *See* Ex. 1 (USCIS Data); Ex. 5 ¶ 31 (Decl. Wong). The DACA program has allowed these individuals, many of whom are long-term residents of Massachusetts, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

31.     An estimated 7,252 Massachusetts DACA grantees are employed. *See* Ex. 5 ¶ 32 (Decl. Wong).  An estimated 428 are business owners.  *Id.*  An estimated 3,562 are in school, and 2,547 are currently pursuing a bachelor's degree or higher.  *Id.*, ¶ 33.

32.     Rescinding DACA will harm the ability of Massachusetts colleges and universities, including public universities, to satisfy their educational missions and prepare Massachusetts residents for the workforce. *See* Ex. 61 ¶¶ 5-7 (Decl. UMass).

33.     The nation's leading private universities—many of which are located in Massachusetts will suffer similar harms if DACA is rescinded.  Harvard University, for example, has more than 50 DACA students currently enrolled.  *See* Ex. 96 ¶ 6 (Decl. Masden, Harvard University).  Tufts University has more than 25 DACA students.  *See* Ex. 97 ¶ 8 (Decl. Jeka, Tufts University.)   These students often have had to overcome significant challenges in order to gain acceptance and bring critical perspectives, insights, and experiences to their universities.  *See* Ex.

---

[1] *See* Migration Policy Institute, *Deferred Action for Childhood Arrivals (DACA) Data Tools*, *available at* http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events.

97 ¶ 5 (Tufts Decl.); Ex. 96 ¶ 5 (Harvard Decl.).  They make important and lasting contributions, including through their classroom participation, their extracurricular engagements, and their commitment to independent study and research.  *See* Ex. 97 (Tufts Decl.), ¶ 5; Ex. 96 ¶¶ 7, 12 (Harvard Decl.).  Employment authorization gives these students and their universities an assurance that they may put their talents to use in the United States job market after graduation— something that benefits Massachusetts and the nation as a whole.  *See* Ex. 96 (Harvard Decl.), ¶ 12.  DACA has allowed these students to step outside the shadow of their immigration status and to participate fully as members of academic and campus communities in ways that likely would not be possible otherwise.  *See* Ex. 97 (Tufts Decl.), ¶ 7; Ex. 96 (Harvard Decl.), ¶ 12.  Rescinding DACA will take important opportunities away from DACA students and reintroduce fear and uncertainty into their lives, with significant adverse effects on these students, their universities, and the broader community.  *See* Ex. 97 (Tufts Decl.); Ex. 96  ¶ 13 (Harvard Decl.).

34.     DACA grantees who are Massachusetts residents receive in-state tuition at public universities in the Commonwealth, and are eligible for a variety of scholarships.  *See* Ex. 7 (Mass. Dept. of Higher Education Memorandum, *Residency Status for Tuition Classification Purposes – Deferred Action for Childhood Arrivals*, Nov. 21, 2012); Ex. 61 ¶ 5 (Decl. UMass).  Without the DACA program, talented young immigrants will be less likely to apply to and attend state schools because they will not be able to afford tuition given the lack of available financial assistance and the likelihood that they will not be able to work legally upon graduation. Those who already are attending state schools may be forced to drop out.  *See, e.g.,* ¶ 5 Ex. 61 (University of Massachusetts Decl.); Ex. 72 ¶ 5 (Decl. Teodoro); Ex. 69 ¶¶ 8, 10 (Decl. Mendes); Ex. 60 ¶¶ 6, 9 (Decl. Guevara Decl.).

35.     DACA students in graduate programs at public universities in the Commonwealth, in particular, will be significantly affected because the loss of employment authorization needed for graduate assistantship (research or teaching) will likely mean the loss of tuition waivers and other benefits such as subsidized health, dental, and vision insurance for the students and their families.  Ex. 61 ¶ 5 (UMass Decl.).

36.     In addition, DACA students in both undergraduate or graduate programs, including research and teaching programs, that require students to have employment authorization to complete elements of the program—such as paid internships, residency training, and graduate assistantships—will be severely impacted if DACA is rescinded.  Ex. 61 ¶ 6 (UMass Decl.).

37.     Losing these talented young immigrants will deprive Massachusetts state schools of the special contributions and perspectives they bring to campus communities, both as students and alumni. Ex. 61 ¶ 7 (UMass Decl.). If current DACA students are forced to drop out, the University of Massachusetts also will lose the value of the financial assistance it has granted to and the other resources it has spent educating students who ultimately do not graduate.  *Id*.  Rescinding DACA also will impose additional tangible costs on our state schools, which already have begun to experience disruption as a result of uncertainty over the future of the program and are preparing for the likelihood of increased institutional funds needed to help DACA students meet the loss of employment.  Ex. 61 ¶¶ 8-9 (UMass Decl.).

38.     Rescinding DACA will further deprive Massachusetts of the earning potential of graduates from public universities who are most likely to stay here and join the state's workforce.  Nine out of ten Massachusetts public higher education graduates remain in the state, working or pursuing further education. *See* Ex. 93 (Mass. Dept. of Higher Education, *Time to Lead, The Need for Excellence in Public Higher Education*, Sept. 2012).

39.     Rescinding DACA will cause Massachusetts to lose qualified state employees.  A number of DACA grantees work in government or at state-run institutions. *See, e.g.,* Ex. 70 ¶ 6 (Decl. I.V.); Ex. 61 ¶ 10 (University of Massachusetts Decl.).  Massachusetts has expended time and resources to hire, train, and manage DACA grantees. If these individuals become ineligible to work, Massachusetts will lose the value of its investment and the services of employees who perform important functions for the state.

40.     Rescinding DACA will jeopardize the state's licensing scheme for drivers.  Under DACA, thousands of young Massachusetts residents are able to receive social security cards and thereby have access to driver's licenses, which they depend on to attend heath care appointments,

to commute to work and school, and to attend to other necessities for themselves and their family members.  Ex. 9 (Mass. Registry of Motor Vehicles, *Social Security Number (SSN) Requirements*); *See, e.g.*, Ex. 71 ¶¶ 5-7, 9 (Decl. I.T.); Ex. 69 ¶¶ 7-8 (Decl. Mendes); Ex. 70 ¶¶ 5, 8 (Decl. I.V.).  Rescinding DACA will make it impossible for these individuals to apply for new licenses or renew the licenses they have, leading to a number of potential outcomes, including a decrease in productivity of these residents and an increase in unlicensed drivers on the road.

41.     Rescinding DACA will harm public health and impose additional health care costs on the state. Work authorization allows DACA recipients to access employer-sponsored health benefits. *See, e.g.*, Ex. 72 ¶ 4 (Decl. Teodoro); Ex. 69 ¶¶ 6, 10 (Mendes Decl.).  Without these benefits, more Massachusetts residents are likely to forgo needed health care, including preventive care, which will create more costly health problems in the long run. It also will cause more people to rely on state-funded and/or state-administered public health care and other benefits, and thus impose additional costs on the state. Through its MassHealth Limited and Children's Medical Security Plan programs, Massachusetts offers health care benefits to residents whose immigration status otherwise keeps them from accessing health care benefits and services. In addition, Massachusetts' state-administered Health Safety Net program reimburses hospitals for emergency and urgent services provided to uninsured patients and pays community health centers for certain preventive services, all irrespective of immigration status.

42.     Rescinding DACA will harm the general welfare of Massachusetts DACA grantees and their families. Most DACA grantees live in households with family members who are American citizens. One expert survey estimates that 73% of DACA grantees in Massachusetts live with a citizen sibling, spouse, or child.  *See* Ex. 5 (Wong Decl.), ¶ 34.  Many of these families rely on the income of DACA grantees.  *See, e.g.,* Ex. 69 ¶¶ 6, 10 (Decl. Mendes); Ex. 60 ¶ 5 (Decl. Guevara).  Many DACA grantees also have families overseas, including parents and siblings.  DACA had made it possible for these grantees to visit family members, often for the first time in years. *See, e.g.,* Ex. 72 ¶ 7 (Decl. Teodoro); Ex. 70 ¶ 5 (Decl. I.V.). Rescinding DACA will harm all of these families in profound ways.

43.     Rescinding DACA also will hurt the Massachusetts economy. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the state.  According to one estimate, DACA-eligible residents contribute approximately $24 million annually in state and local taxes in Massachusetts—a contribution that may drop by $9 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that ending DACA would, over a ten-year period, cost the Massachusetts economy $258 million in lost tax revenue and $924.5 million overall.  Brannon Decl., Table 1.

## PLAINTIFF STATE OF WASHINGTON

44.     Washington is aggrieved by Defendants' actions and has standing to bring this action because of the injury to its sovereignty as a state caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

45.     The Governor is the chief executive officer of the State of Washington. The Governor is responsible for overseeing the operations of the State of Washington and ensuring that its laws are faithfully executed.

46.     The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern.

47.     Washington has declared that practices that discriminate against any of its inhabitants because of race, color, or national origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code 49.60.010.

48.     Washington's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

49.     Washington also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

50.     Washington's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Washington's residents, including individuals who suffer indirect injuries and members of the general public.

51.     As of March 2017, Washington is home to more than 17,800 DACA recipients. *See* Ex. 1 (USCIS Data). Participating in the DACA program has allowed these individuals, many of whom are long-term residents of Washington, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

52.     Immigration is an important economic driver in Washington. Many Washington workers are immigrants, and many of those immigrant workers are DACA recipients. *See* Ex. 5 ¶¶ 12, 13 (Decl. Wong) Many companies in Washington are dependent on DACA grantees to operate and grow their businesses. DACA recipients work for our State's largest companies as software engineers, finance professionals, and retail and sales associates, including for Amazon, Microsoft and Starbucks Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90  ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks).

53.     The market for highly skilled workers and employees is extremely competitive. *Id.* Rescinding the work authorization of DACA recipients will inhibit Washington companies' ability to adequately staff their organizations, develop their workforces, and recruit talent. If recruiting efforts are less successful, these companies' abilities to develop and deliver successful products and services may be adversely affected. *Id.*

54.     Rescinding DACA will likewise cause Washington to lose qualified state employees. *See e.g.*, Ex. 56 ¶¶ 2-4 (Decl. Quinonez). Many DACA recipients work in government or at state-run institutions. *See* Ex. 62 ¶ 3 (Decl. Monroe, Dept. of Ecology); Ex. 65 ¶ 3 (Decl. Kaplan, Dept. of Social and Health Svcs.); Ex. 92 ¶ 3 (Decl. Jones, Treasury); Ex. 91 ¶ 3 (Decl.

Garza, Big Bend Community College); Ex. 64 ¶ 3 (Decl. Glatt, Columbia Basin College); Ex. 58 ¶ 4 (Decl. Loera, Washington State University). These employees were hired because of their specialized skills and qualifications.

55.    Washington expended time and funds to hire, train, and manage DACA recipients. If these individuals become ineligible to work, Washington will lose the value of its investment and the services of employees who perform important functions for the state.

56.    Rescinding DACA will harm the ability of Washington universities, including public universities, to satisfy their educational missions and prepare Washington residents for the workforce. According to the Washington Student Achievement Council, the state agency that advances educational opportunities in the state, there are more than 1,400 DACA students in Washington attending institutions of higher education. *See* Ex. 59 ¶ 9 (Decl. Thompson, WSAC).

57.    The University of Washington and Washington State University are the two largest public universities in the State. More than one hundred DACA grantees attend the University of Washington, based in Seattle. *See* Ex. 57 ¶ 4 (Decl. Ballinger, University of Washington). More than 150 DACA grantees attend Washington State University, based in Pullman. *See* Ex. 58 ¶ 4 ( Decl. Loera, Washington State University).

58.    The DHS Memorandum will likely cause some DACA recipients to leave Washington colleges and universities. The cost of a college education may make little sense for students unable to work following graduation. *See,* Ex. 56 ¶ 7 (Decl. Quinonez).  Future DACA students may be prevented from enrolling. These harms damage the educational mission of Washington's institutions of higher education and affect their tuition revenues. *See* Ex. 57 ¶¶ 4-6 (Decl. Ballinger, University of Washington); Ex. 58 ¶¶ 4-8 (Decl. Loera, Washington State University).

59.    Rescinding DACA also will hurt the Washington economy. Stripping DACA recipients of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the state. According to one estimate, DACA-eligible residents contribute approximately $51 million annually in state and local taxes in Washington. *See* Ex. 3 ¶

7(d) (Decl. Essig, Wiehe and Hill); Ex. 55 ¶¶ 5-7 (Decl. Perez ). Another estimate suggests that ending DACA would, over a ten-year period, cost the Washington economy $258 million in lost tax revenue and $6.4 billion in GDP growth. See Ex. 4, Table 1 (Decl. Brannon). DACA recipients average higher earning capacities than their undocumented peers and are able to better participate in our economy, for example by purchasing homes and cars that are taxed by our state and local authorities. *See* Ex. 5 ¶¶ 10-13 (Decl. Wong).

60.     In sum, the DHS Memorandum's rescission of DACA affects Washington's economy, residents, families, educational institutions, state agencies, and businesses.

## PLAINTIFF STATE OF CONNECTICUT

61.     Connecticut is aggrieved by Defendants' actions and has standing to bring this action because of the injury to its sovereignty as a state caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.  Attorney General George Jepsen brings this action on behalf of Connecticut at the request of Governor Dannel P. Malloy to protect the interests of Connecticut and its residents.

62.     Connecticut has an interest, as evidenced by its Constitution and state law, in prohibiting discrimination on the basis of race, color, or national origin. *See* Conn. Const. art. First, § 20; Conn. Gen. Stat. § 46a-58.

63.     Connecticut's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

64.     Connecticut also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

65.     Connecticut's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Connecticut's residents, including individuals who suffer indirect injuries and members of the general public.

66.     As of March 31, 2017, USCIS had approved 4,929 initial DACA applications and 5,882 renewals for residents of Connecticut, for a total of 10,811. *See* Ex. 1 (USCIS Data). The DACA program has allowed these individuals, many of whom are long-term residents of Connecticut, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

67.     Connecticut provides in-state tuition to DACA recipients at its public universities and colleges.  Conn. Gen. Stat. § 10a-29.  The Defendants' actions will likely cause some DACA recipients to leave Connecticut colleges and universities. These harms damage the educational mission of Connecticut's institutions of higher education and affect their tuition revenues.

68.     Rescinding DACA also will hurt the Connecticut economy. Stripping DACA recipients of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the state.

69.     In sum, Defendants' actions affect Connecticut's economy, residents, families, educational institutions, state agencies, and businesses.

### PLAINTIFF STATE OF DELAWARE

70.     The State of Delaware has a strong interest in retaining the DACA program.  USCIS has approved approximately 1,450 initial applications from DACA grantees since 2012. See Ex. 1 (USCIS Data). One expert estimates that of that total, at least 1,256 DACA grantees currently work in Delaware's economy. *See* Ex. 53 (Nicole Prchal Svajlenka, *A New Threat to DACA Could Cost States Billions of Dollars*, Center for American Progress, July 21, 2017)

71.     Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.  If DACA is terminated, these grantees will lose their work authorization.  The resulting loss in employment will cause significant loses

in tax revenue and Gross Domestic Product ("GDP").  Over ten years, Delaware can expect to lose $258 million in tax revenues, and $924.5 million in GDP with the loss of DACA. *See* Ex. 4 Table 1 (Brannon Decl.).

72.     Moreover, rescinding DACA would adversely impact Delaware's public universities.  Currently, about 75 DACA grantees attend Delaware State University ("DSU").  *See* Ex. 81 (Scott Gross, *DSU immigrant students fear Trump's DACA decision*, Delawareonline, Sept. 2 2017). These high achieving students contribute to the university's mission to advance diversity and inclusion. These students would be less likely to continue pursuing their education at DSU if there is no viable employment option available to them upon graduation.

### PLAINTIFF COMMONWEALTH OF DISTRICT OF COLUMBIA

73.     The District of Columbia is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. DC Code § 1-301.81(a)(1).

74.     The District has declared its intent to end discrimination based on race, color, religion, or national origin. DC Code § 2-1401.01.

75.     The District's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

76.     The District also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

77.     The District has a compelling interest in that the Constitution and federal law of the U.S. are enforced and protect their residents as designed. In addition, the District has an interest in protecting its economy and residents.

78.     Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

79.     The District's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of the District's residents, including individuals who suffer indirect injuries and members of the general public.

80.     The District has an interest in protecting its residents' family rights.  Most DACA recipients live in households with American citizen family members.

81.     The rescission of DACA will lead to increased uncertainty in these families, and will increase the likelihood of splitting DACA recipients from their citizen family members. Moreover, the rescission of DACA will make employment of DACA recipients more difficult and will threaten the financial and housing security of some of these families, especially where the DACA recipient is head of household. The District's interest in protecting the rights of families is clearly harmed by the rescission of DACA, and subjects DACA families to potential separation, financial instability, and housing insecurity.

82.     Many DACA recipients also have families overseas, including parents and siblings. DACA permitted these recipients to visit these family members through advance parole. The rescission of DACA will prevent recipients from taking the risk of visiting their families abroad.

83.     Immigrants are an important part of the District's economy. Many of the District's workers and students are immigrants and many of those immigrants are DACA recipients.

84.     Many DACA recipients attend the colleges and universities in the District as post-secondary and graduate students. The rescission of DACA will have an adverse effect on both the students and the colleges and universities. The rescission of DACA will likely cause some DACA recipients to leave District colleges and universities. Future DACA students will likely be prevented from enrolling. These harms damage the educational mission of the District's institutions of higher education and affect their revenues.

85.     DACA recipients also work for the District government and District businesses. The District government and businesses have expended time and funds to hire, train, and manage DACA grantees, and will lose the value of that investment—and in the employees' ongoing labor—if employees are not able to continue to work and travel due to DACA's rescission.

86.     DACA recipients contribute to the District's tax base by, for example, purchasing homes and cars that are taxed by the District. The District will lose tax revenue as a result of the rescission of DACA.

87.     The rescission of DACA affects District residents, families and businesses, as well as harms the District's proprietary interests.

**PLAINTIFF STATE OF HAWAII**

88.     The State of Hawaii represented by and through its Attorney General, is a sovereign state of the United States of America. Hawaii is aggrieved and has standing to bring this action because of the injury to its sovereignty as a state caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

89.     Hawaii is a state of 1.4 million residents, almost 18% of whom are foreign born. *See* Ex. 2.

90.     Almost 600 young people in Hawaii have passed background checks and live and work legally in Hawaii as a direct result of DACA. *See* Ex. 1 (USCIS Data).

91.     Hawaii is home to many places of higher education and businesses, which rely heavily on immigrants, who bring tremendous talent, knowledge, and expertise to academic communities and to the labor force.  Many of these immigrants are DACA grantees.

92.     By the latest available numbers, USCIS had approved 558 initial DACA applications and 1,740 renewals for residents of Hawaii. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Hawaii, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

93.     Rescinding DACA will harm the ability of Hawaii colleges and universities, including public universities, to satisfy their educational missions and prepare Hawaii residents for the workforce. There are currently 13 DACA students enrolled for classes in fall 2017 at the University of Hawaii's ten campuses. *See* Ex. 73 (University of Hawai'i, *UH and State Leaders Respond to DACA Program Termination*, Sept. 5, 2017).

94.     DACA grantees who are Hawaii residents are eligible for certain benefits at the University of Hawaii. According to David Lassner, President of the University of Hawaii, "[o]ver four years ago the University of Hawaii Board of Regents adopted a policy to extend eligibility for resident tuition rates to undocumented students, including but not limited to those who have filed for DACA." *See* Ex. 73 (University of Hawai'i, *UH and State Leaders Respond to DACA Program Termination*, Sept. 5, 2017).

95.     Losing these talented young immigrants will deprive Hawaii state schools of the special contributions and perspectives they bring to campus communities, both as students and alumni. If current DACA students are forced to drop out, the University of Hawaii also will lose the value of the financial assistance it has granted to, and the other resources it has spent, educating students who ultimately do not graduate.

96.     Rescinding DACA will further deprive Hawaii of the earning potential of graduates from public universities who are likely to stay here and join the state's workforce. Ending DACA would cost Hawaii more than $28.8 million in annual GDP losses. *See* Ex. 53 (Center for American Progress, *A New Threat to DACA Could Cost States Billions of Dollars*, Jul. 21, 2017).

97.     Over the next ten years Hawaii also stands to lose $126 million in tax revenues and $451.5 million in further GDP losses if DACA is rescinded.

### PLAINTIFF STATE OF ILLINOIS

98.     The State of Illinois, by and through its Attorney General, Lisa Madigan, is a sovereign state of the United States of America.  Illinois is aggrieved by Defendants' actions and has standing to bring this action because of harm to Illinois' state institutions and economy, including immediate and irreparable injuries to its sovereign and proprietary interests.

99.     Between FY 2012 and FY 2017, 42,376 individuals residing in Illinois have been approved for the DACA program, and 37,039 individuals have renewed a DACA application.  Ex. 1.

100.    Approximately 36,867 DACA recipients work in the state of Illinois and contribute to the Illinois economy. Should those workers be removed from Illinois, the state economy would suffer approximately $2.3 billion in annual GDP loss.  Ex. 53.

101.    ITEP estimates that Illinois would lose approximately $54.7 million in local and state tax revenue if DACA protections are eliminated. Ex. 54 (Misha E. Hill and Meg Wiehe, *State & Local Tax Contributions of Young Undocumented Immigrants*, Institute on Taxation and Economic Policy, April 25, 2017).

102.    Illinois also has enacted laws to enable DACA grantees to participate in the economy professionally. These include providing that no person in Illinois shall be prohibited from receiving a law license solely because he or she is not a citizen and explicitly allowing DACA recipients to apply for a license to practice law within the state of Illinois. 705 Ill. Comp. Stat. 205/2.

103.    Furthermore, Illinois has enacted laws and implemented government programs to support DACA participants.  Elimination of DACA would harm these programs.

104.    For example, Illinois law has been amended to facilitate and encourage the attendance of DACA grantees at public universities in Illinois. DACA participants may obtain in-state tuition to attend Illinois's public universities. 110 Ill. Comp. Stat. 305/7e-5. Illinois's public universities also accept and provide resources for DACA recipients. *See* Ex. 66 (University of Illinois at Chicago, *Resources* for *Undocumented Students*); Ex. 67 (Illinois State University, *Admissions and Financial Aid for Undocumented Student Admissions*; Ex. 68 (University of Illinois, *Undocumented Applicants, Illinois Admissions*).

105.    Furthermore, through the Illinois Dream Act, Public Law No. 97-0233, Illinois law permits anyone with a valid social security number or taxpayer number, including DACA recipients, to participate in state-run college financing programs, such as the State Treasurer's

College Savings Pool, 15 Ill. Comp. Stat. 505/16.5, and the Illinois Prepaid Tuition Plan, 110 Ill. Comp. Stat. 979/45.

106.    Illinois has an interest in ensuring that the investments made in the education of DACA grantees attending Illinois's public universities through scholarships and financial aid are not diminished by a disruption in the DACA program.

107.    A rescission of the DACA program also would disrupt Illinois employers who employ DACA grantees, resulting in economic loss to the state of Illinois and Illinois employers. Furthermore, Illinois would be harmed by the loss of local and state tax revenue due to the removal of DACA program protections for Illinois workers. One expert estimates that rescinding the DACA program will cost Illinois $6.9 billion over the next ten years.  Ex. 3 Table 1 (Decl. Bannon).

### PLAINTIFF STATE OF IOWA

108.    The State of Iowa, represented by and through its Attorney General, Tom Miller, is a sovereign state of the United States of America.  Iowa is aggrieved by Defendants' action and has standing to bring this action because of harm to Iowa's state institutions and economy, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

109.    The State of Iowa has a strong interest in retaining the DACA program.  As of March 31, 2017, USCIS had approved approximately 2,798 initial DACA applications and 2,780 renewals for residents of Iowa, for a total of 5,578.  Ex. 1 (USCIS Data).  One expert estimates that of that total, at least 2,434 DACA grantees currently work in Iowa's economy.  Ex. 53 (Nicole Prchal Svajlenka, *A New Threat to DACA Could Cost States Billions of Dollars*, Center for American Progress, July 21, 2017).

110.    If DACA is terminated, these grantees will lose their work authorization. The resulting loss in employment will cause significant losses in tax revenue and Gross Domestic Product ("GDP").  Over ten years, Iowa can expect to lose $258 million in tax revenues, and $924.5 million in GDP with the loss of DACA.  Ex. 4 Table 1 (Brannon Decl.).

111.    Iowa has an interest, as evidenced by its Constitution and state law, in prohibiting discrimination on the basis of race, color, or national origin.  *See* Iowa Const. art. I, Iowa Code Chapter 216.

112.    Iowa's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

113.    Iowa also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

114.    Iowa's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Iowa's residents, including individuals who suffer indirect injuries and members of the general public.

115.    In sum, Defendants' actions affect Iowa's economy, residents, families, educational institutions, state agencies, and businesses.

### PLAINTIFF STATE OF NEW MEXICO

116.    The State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America.  New Mexico is aggrieved by Defendants' actions and has  standing to bring this action because of the injury to its sovereignty as a state caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

117.    According to the latest American Community Survey, New Mexico is home to more than 211,249 foreign-born residents, of whom approximately 7,000 are DACA-eligible residents.

118.    Foreign-born residents of New Mexico constitute more than 10% of the State's population.  Some 34.4% of the foreign-born New Mexicans—72,652 persons—are naturalized

citizens eligible to vote in New Mexico. In 2010, 8.4% of all business owners in New Mexico were foreign-born, according to the Fiscal Policy Institute.

119.    Immigrants comprised 12.6% of the state's workforce in 2013 (or 122,131 workers), according to the U.S. Census Bureau.

120.    Of the 876,000 recipients of deferred action nationwide, 7,300 live in New Mexico, according to the latest figures provided by the USCIS.

121.    ITEP estimates that New Mexico could lose up to $7.5 million in state and local taxes if DACA were eliminated.

122.    An estimated 5.9% (or 57,438) of registered voters in New Mexico were "New Americans"—naturalized citizens or the U.S.-born children of immigrants who were raised during the current era of immigration from Latin America and Asia which began in 1965—according to an analysis of 2012 Census Bureau data by American Immigration Council.

123.    DACA-eligible residents are estimated to contribute more than $19 million in New Mexico's state and local taxes, a figure of particular importance in a state often ranked as among the poorest in the country. DACA-eligible residents are part of the State's near-majority Latino population, which wields some $24.9 billion in consumer purchasing power, and are also part of the increasing numbers of Asian families in the State.

124.    The 2014 purchasing power of Latinos in New Mexico totaled $23.4 billion—an increase of 374% since 1990. Asian buying power totaled $1.5 billion—an increase of 724% since 1990, according to the Selig Center for Economic Growth at the University of Georgia.

125.    Immigration boosts housing values in communities, and increases in housing values adds to the health of New Mexico's economy. From 2000 to 2010, according to the Americas Society/Council of the Americas, the value added by immigration to the price of the average home was $2,654 in Bernalillo, the State's most populous county.

126.    New Mexico's 37,195 Latino-owned businesses had sales and receipts of $6.5 billion and employed 50,021 people in 2007, the last year for which data is available. The state's

3,321 Asian-owned businesses had sales and receipts of $1.1 billion and employed 10,739 people in 2007, according to the U.S. Census Bureau's Survey of Business Owners.

127.    From 2006 to 2010, there were 11,440 new immigrant business owners in New Mexico, and they had total net business income of $389 million, which makes up 8.9% of all net business income in the state, according to Robert Fairlie of the University of California, Santa Cruz.

128.    New Mexico's 3,711 foreign students contributed $85.1 million to the state's economy in tuition, fees, and living expenses for the 2013-2014 academic year, according to NAFSA: Association of International Educators.

129.    Foreign students contribute to New Mexico's metropolitan areas. From 2008 to 2012, according to the Brookings Institution, 1,848 foreign students paid $17.8 million in tuition and $11.3 million in living costs in the Las Cruces metropolitan area.

130.    Foreign students also contribute to innovation in New Mexico. In 2009, "non-resident aliens" comprised 42.1% of master's degrees and 42.9% of doctorate degrees in science, technology, engineering, and mathematics (STEM) fields, according to the Partnership for a New American Economy.

131.    Latinos in New Mexico paid $2.7 billion in federal taxes and $1.3 billion in state/local taxes in 2013, according to the Partnership for a New American Economy. In particular, foreign-born Latinos paid $463 million in federal taxes and $252 million in state/local taxes.

132.    The federal tax contribution of New Mexico's Latino population included $1.9 billion to Social Security and $441 million to Medicare in 2013. Foreign-born Latinos contributed $356 million to Social Security and $83 million to Medicare that year.

133.    Unauthorized immigrants comprised roughly 4.7% of the state's workforce (or 45,000 workers) in 2012, according to a report by the Pew Hispanic Center. If all unauthorized immigrants were removed from New Mexico, the state would lose $1.8 billion in economic activity, $809.1 million in gross state product, and approximately 12,239 jobs, even accounting for adequate market adjustment time, according to a report by the Perryman Group.

134.    Rescinding DACA in New Mexico will adversely impact current DACA grantees enrolled in New Mexico's colleges and universities.  Without DACA's employment authorization, these students will be unable to plan for the future, apply for and obtain internships, study abroad,

simultaneously work to pay costs and fees, or obtain certain financial aid and scholarships. Without these students, New Mexico's institutions of higher education will suffer loss of enrollment, a reduction in diversity and negative financial consequences.

135.    Significantly, it is common for New Mexico's families to include both U.S.-born and foreign born members.  Rescinding DACA will jeopardize the health, security and stability of New Mexico families by forcing separation and alienation.

136.    New Mexico has a continuing interest in protecting and securing the safety and stability of its families, and that interest mandates the State's involvement in this litigation.

## PLAINTIFF STATE OF NORTH CAROLINA

137.    The State of North Carolina, represented by Attorney General Josh Stein, is a sovereign state of the United States of America.  North Carolina has standing to bring this action because it has suffered and will continue to suffer injuries to its sovereignty as a state caused by Defendants' rescission of DACA.   These harms include injuries to North Carolina's state institutions and economy, including to its sovereign and proprietary interests.

138.    North Carolina has an interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health.

139.    According to USCIS, 27,385 initial DACA applications and 22,327 renewal applications from North Carolina have been approved through the second quarter of 2017. *See* Ex. 1.

140.    Immigration is a vital catalyst to North Carolina's economy.  According to a study conducted by the Latino Migration Project at the University of North Carolina at Chapel Hill, in 1990, only 1.7% of the State's population was foreign-born.  By 2014, that proportion had increased to 7.6%.  This demographic change is due, in large part, to industries' recruitment of foreign-born individuals, primarily of Latin American origin to fill available jobs that have been created as a result of the expansion of North Carolina's economy. *See* Ex. 87 (Latino Migration Project, *DACA Program in North Carolina, Perspectives from Immigrants and Community-Based Organizations*, Jan. 2017).

141.    By 2012, as estimated 350,000 people (44% of the state's immigrant population) did not have legal immigration status. *See* Ex. 81 (Pew Research Center, *U.S. Unauthorized Immigration Population Estimates*, Mar. 2015).

142.    After the institution of the DACA program in 2012, North Carolina had one of the highest application rates to DACA in the nation.  Out of an estimated 26,000 eligible people, 75% had applied to the DACA program.   By June 2014, USCIS had approved almost 21,000 applications. *See* Ex. 1 .

143.    North Carolina has one of the largest undocumented high school populations in the country, with close to 31,000 undocumented students enrolled as of 2015. *See* Ex. 82 (Technician, Immigrants Still Face Obstacles To Go To College Despite DACA, Mar. 2015) . There are a total of 16 public universities in North Carolina, enrolling nearly 225,000 students. *See* Ex. 83 (University of North Carolina, *Our 17 campuses*). Affected students attend these universities, as well as North Carolina's community and technical colleges.   Rescinding DACA permits will cause students currently enrolled to leave North Carolina community and technical colleges and universities.  In addition, future DACA students may be prevented from finishing their high school education or from enrolling in North Carolina's colleges and universities. These harms damage the educational mission of North Carolina's institutions of higher learning and affect their tuition revenues.

144.    According to the 2010 census, North Carolina is the ninth wealthiest state in terms of gross domestic product. *See* Ex. 85( Greyhill Advisors, *GDP By State*).  Charlotte, North Carolina's largest city is the second largest banking center in the United States. *See* Ex. 84 (North Carolina History Project, *Charlotte Soars To Become The Nation's Second Largest Financial Center*). The Research Triangle Park, home to more than 170 companies and federal agencies, is the largest and oldest continuously operating research and science park in the United States. *See* Ex. 86 (Research Triangle Park).  The market to employ skilled workers to fuel these expanding economies is highly competitive.  Rescinding work authorization for DACA recipients will cripple the ability for North Carolina's companies to attract and maintain a robust workforce, adversely

affecting the companies' ability to develop and deliver products and services.  In addition, the inability to maintain a workforce may induce companies to relocate out of North Carolina.

145.    DACA recipients make significant contributions to North Carolina's tax base.  The DACA program has encouraged tens of thousands of individuals to secure driver's licenses, continue their education, obtain employment, secure better employment or benefits, and integrate themselves into the fabric of North Carolina society.

146.    The rescission of DACA creates upheaval in the operation of state-run programs, including programs relating to public benefits and scholarships, as well as in the operation of North Carolina's private economy. One expert estimates that rescinding the DACA program will cost North Carolina 7.8 billion dollars over the next ten years. *See* Ex.  4 (Decl. Brannon, Table 1).

147.    As a result of the DHS Memorandum, North Carolina's residents, families, and businesses will suffer physical and economic harms.  In addition, DHS Memorandum also harms North Carolina's proprietary interests.

## PLAINTIFF STATE OF OREGON

148.    Oregon is aggrieved by Defendants' actions and has standing to bring this action because of its injuries caused by Defendants' rescission of DACA, including immediate, long-term, and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

149.    The Governor is the chief executive officer of the State of Oregon. The Governor is responsible for overseeing the operations of the State of Oregon and ensuring that its laws are faithfully executed.

150.    The Attorney General is the chief legal officer of the State of Oregon. The Attorney General's powers and duties include acting in federal court on matters of public concern and at the request of state agencies and officials.

151.    Oregon has codified its state policy that practices of unlawful discrimination against any of its inhabitants because of religion or national origin are "a matter of state concern," and that such discrimination "menaces the institutions and foundation of a free democratic state." Or. Rev. Stat. § 659A.006.

152.    Oregon's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

153.    Oregon also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

154.    Oregon's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Oregon's residents, including individuals who suffer indirect injuries and members of the general public.

155.    Oregon has a strong interest in promoting employment and business creation and in the tax revenues that result.

156.    Oregon is home to more than 11,000 DACA recipients, many of whom are long-term residents of Oregon. *See* Ex. 1. The DACA program has allowed these individuals to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, obtain employer-based health insurance, among other benefits. Oregon also has many individuals who would have become eligible for DACA in the coming months or years if Defendants had not acted to end the program.

157.    Immigration is an important economic driver in Oregon. Many Oregon workers are immigrants, and many of those immigrant workers are DACA recipients.

158.    Rescinding DACA will harm the ability of Oregon colleges and universities, including public universities, to satisfy their educational missions and prepare Oregon residents for the workforce. Oregon's colleges and universities also prepare students to be the next generation of political, civic, and private and public sector leaders.

159.    Oregon invests in its educational mission by also investing in its DACA recipient students.  It does this by, among other things, offering free comprehensive K-12 education to undocumented students, and, upon graduation from an Oregon high school or GED program,

offering tuition equity (in-state tuition benefits) and access to state financial aid to Oregon residents who are undocumented, including DACA recipients.

160.    Portland State University, based in Portland, Oregon, is a public university that enrolls and in some cases employs DACA recipients. Losing the ability to employ these DACA recipients means the university loses economic and training investments. The potential loss of those enrolled means a loss of graduates and future alumni who would invest their time and talents in the university and community. Other Oregon colleges and universities, including community colleges, also enroll and in some cases employ DACA recipients.

161.    Eastern Oregon University, based in La Grande, Oregon, and Western Oregon University, based in Monmouth, Oregon, are public universities that enroll DACA recipients, and are partner universities with USDream project, which provides scholarships to DACA students from non-tuition equity states to come to Oregon partner universities to study.

162.    The rescission of DACA will likely cause some DACA recipients to leave Oregon colleges and universities, or take longer to complete their course of study because they can no longer work to support their educational expenses that are not covered by financial aid.  The cost of a college education may make little sense for students unable to work following graduation, which may discourage students from enrolling or continuing with their course of study. In one study, more than 90% of the respondent DACA grantees who were in school agreed that because of DACA, they pursued educational opportunities that they previously could not. *See* Ex. 22 (Center for American Progress, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Oct. 18, 2016). These harms damage the educational mission of Oregon's institutions of higher education and affect their tuition revenues.  It also undermines Oregon's investment in and efforts to develop a well-educated workforce that can contribute to the State's economy and competitiveness. The harm is for years to come, not just the short-term.

163.    Rescinding DACA also will hurt the Oregon economy. Stripping DACA recipients of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the state. According to one estimate, DACA-eligible residents contribute

approximately $20 million in state and local taxes in Oregon, and the State would lose approximately $11 million in state and local tax revenue if the DACA program were rescinded. *See* Ex. 54 (Institute on Taxation and Economic Policy, *State and Local Contributions of Young Undocumented Immigrants*, Apr. 2017). It also has been estimated that removing DACA workers would cost Oregon more than $600 million in GDP. *See* Ex. 53 (Center for American Progress, *A New Threat to DACA Could Cost State Billions of Dollars*¸ Jul. 21, 2017). Research shows that DACA recipients average higher earning capacities than their undocumented peers and are able to better participate in our economy, for example by purchasing homes and starting businesses that are taxed by our state and local authorities. *See* Ex. 22.

164.    In sum, Defendants' actions in rescinding DACA adversely and significantly affects Oregon's economy, residents, families, educational institutions, state agencies, and businesses.


## PLAINTIFF STATE OF PENSYLVANIA

165.    The Commonwealth of Pennsylvania, represented by and through its Attorney General, "the chief law officer of the Commonwealth," is a sovereign state of the United States of America.  PA Const., Art. IV, § 4.1.

166.    Pennsylvania was founded by William Penn, an early Quaker and advocate of democracy, immigration and religious freedom and places great value on tolerance, diversity, multiculturalism and an openness to others of different races, religions and nationalities.

167.    The Attorney General of Pennsylvania files this action because Defendants' rescission of DACA, has caused injuries to its sovereign, quasi-sovereign, and proprietary interests.  The Attorney General of the Commonwealth of Pennsylvania also has standing under the *parens patriae* doctrine to protect the people, schools, institutions and economy of Pennsylvania including quasi-sovereign interests such as the general health, comfort and welfare of the citizens of Pennsylvania.  In filing this action, the Attorney General seeks to redress the

injuries to the interests described herein, which are separate from the narrow interests of particular individuals.

168.    Pennsylvania's laws reflect its commitment to its values of diversity, multiculturalism and openness to others of different races and nationalities.  For example, Pennsylvania's Human Relations Act recognizes that an individual's opportunity to obtain employment, public accommodation, housing accommodation and commercial property without discrimination on the basis of "race, color, familial status, … ancestry [and] national origin" is a "civil right" that is "enforceable" under Pennsylvania law.  43 P.S. § 953 ("The opportunity for an individual to obtain employment for which he is qualified, and to obtain all the accommodations, advantages, facilities and privileges of any public accommodation and of any housing accommodation and commercial property without discrimination because of race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, national origin, the use of a guide or support animal because of the blindness, deafness or physical handicap of the user or because the user is a handler or trainer of support or guide animals is hereby recognized as and declared to be a civil right which shall be enforceable as set forth in this act.").  See also 43 P.S. § 955.

169.    Pennsylvania is home to approximately 15,000 DACA-eligible immigrants. *See* Ex. 54.

170.    As of March 31, 2017, initial DACA applications had been accepted for 5,889 young immigrants living in Pennsylvania. *See* Ex. 1.

171.    Of those Pennsylvania DACA recipients, it is estimated that 5,123 are working in Pennsylvania where they generate approximately $357,080,795 of economic activity annually. *See* Ex. 53.

172.    In connection with this significant Pennsylvania economic activity, workers enrolled in DACA generate an estimated $20.7 million in state and local taxes in Pennsylvania each year. *See* Ex. 54.

173.    Among other items set forth herein, Pennsylvania is particularly concerned that, based on the DHS' Memorandum rescinding DACA, immigrants who shared their sensitive,

personal information with the federal government in reliance on DACA's promise that their information would not be used against them in immigration enforcement proceedings will now face exactly that – a federal government that lured these young people to share their personal information and will now break its promise and use that information to deport them.  The DHS Memorandum, notably, fails to honor the federal government's promise to these important economic contributors to Pennsylvania. And Defendants' actions will cause Pennsylvania to lose hundreds of millions of dollars in economic activity – and tens of millions of state and local tax dollars – annually.

## PLAINTIFF STATE OF RHODE ISLAND

174.    The State of Rhode Island, represented by and through its Attorney General, is a sovereign state of the United States of America. Rhode Island is aggrieved by Defendants' actions and has standing to bring this action because of the injury to its sovereignty as a state caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

175.    The State of Rhode Island has prohibited practices that discriminate against any of its inhabitants because of race, color, or national origin. R.I. Gen. Laws § 42-112-1.

176.    Rhode Island's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

177.    Rhode Island also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

178.    Rhode Island's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Rhode Island's residents, including individuals who suffer indirect injuries and members of the general public.

179.    According to the latest American Community Survey, Rhode Island is home to more than 140,000 foreign-born residents. *See* Ex. 79 (Rhode Island State Center, Census Data Bulletin, March 2014).

180.    The Migration Policy Institute estimates that there are 5,000 DACA-eligible residents in Rhode Island. *See* Ex. 80 (Migration Policy Institute, State/County DACA Estimates).

181.    According to USCIS, 1,229 initial DACA applications and 1,733 renewal applications from Rhode Island have been approved through the second quarter of 2017. *See* Ex. 1.

182.    The market for highly skilled workers and employees is extremely competitive. Rescinding the work authorization of DACA grantees will inhibit Rhode Island companies' ability to adequately staff their organizations, develop their workforces, and recruit talent. If recruiting efforts are less successful, these companies' abilities to develop and deliver successful products and services may be adversely affected.

183.    Rhode Island expended time and funds to hire, train, and manage DACA recipients. Rhode Island wastes that time and money, and loses the value of employee labor, if employees are not able to continue to work due to DACA's rescission.

184.    DACA recipients make significant contributions to state and local taxes. DACA recipients average higher earning capacities than their undocumented peers and are able to better participate in our economy, for example by purchasing homes and cars that are taxed by our state and local authorities. According to ITEP, the State of Rhode Island alone will lose $2.6 million in state and local taxes if DACA protections are lost. *See Ex. 54.*

185.    According to the Center for American Progress, Rhode Island will lose more than $61 million in annual GDP as a result of losing DACA workers. *See* Ex. 53.

186.    In sum, the DHS Memorandum's rescission of DACA affects Rhode Island residents, families, and businesses, as well as harms Rhode Island's proprietary interests.

## PLAINTIFF STATE OF VERMONT

187.    The State of Vermont, represented by and through its Attorney General, is a sovereign state of the United States of America.  Vermont is aggrieved by Defendants' actions and has standing to bring this action because of the injury to its sovereignty as a state caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

188.    The Attorney General is empowered to advance Vermont's strong and important public policy against unlawful discrimination. The Common Benefits Clause of Vermont's Constitution provides that government "is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community," not for the "advantage of any single person, family, or set of persons, who are a part only of that community."  Vt. Const., ch. I, art 7.

189.    The State of Vermont has prohibited practices that discriminate against any of its inhabitants because of race, color, national origin, ancestry, and place of birth.  9 V.S.A. § 4502; 21 V.S.A. § 495.

190.    Vermont's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

191.    Vermont also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

192.    Vermont's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Vermont's residents, including individuals who suffer indirect injuries and members of the general public.

193.    According to the latest American Community Survey, Vermont is home to over 26,000 foreign-born residents.[1]

194.    According to United States Citizen and Immigration Services ("USCIS"), 42 initial DACA applications and 162 renewal applications from Vermont have been approved through the second quarter of 2017. Ex. 1 (USCIS Data).

195.    One expert estimates that of that total, at least 37 DACA grantees currently work in Vermont's economy. Ex. 53 (Nicole Prchal Svajlenka, *A New Threat to DACA Could Cost States Billions of Dollars*, Center for American Progress, July 21, 2017). If DACA is terminated, these grantees will lose their work authorization. The resulting loss in employment will cause significant loses in tax revenue and Gross Domestic Product ("GDP"). Over ten years, Vermont can expect to $2,429,910 in GDP with the loss of DACA. *Id.*

196.    The market for highly skilled workers and employees is extremely competitive. Rescinding the work authorization of DACA recipients will inhibit Vermont companies' ability to adequately staff their organizations, develop their workforces, and recruit talent. If recruiting efforts are less successful, these companies' abilities to develop and deliver successful products and services may be adversely affected.

197.    DACA recipients make significant contributions to state and local taxes. DACA recipients average higher earning capacities than their undocumented peers and are able to better participate in our economy, for example by purchasing homes and cars that are taxed by our state and local authorities. According to the Institute on Taxation and Economic Policy ("ITEP"), the State of Vermont alone will lose $48,000 in state and local taxes if DACA protections are lost. *See* Ex. 54 (2017 DACA Tax).

198.    In sum, President Trump's Executive Order rescinding DACA affects Vermont residents, families, and businesses, as well as harms Vermont's proprietary interests.

---

[1] U.S. Census Bureau, Place of birth for the foreign-born population in the United States: Vermont, 2011-2015 American Community Survey 5-Year Estimates; American Immigration Council, Fact Sheet: New Americans in Vermont (Jan. 1, 2015), *available at* https://www.americanimmigrationcouncil.org/research/new-americans-vermont.

## PLAINTIFF COMMONWEALTH OF VIRGINIA

199.    The Commonwealth of Virginia has a strong interest in retaining the DACA program.  USCIS has approved over 12,000 initial applications from DACA grantees since 2012. *See* Ex. 1.

200.    If DACA is terminated, these grantees will lose their work authorization.  The resulting loss in employment will cause significant loses in tax revenue and Gross Domestic Product ("GDP").  Over ten years, Virginia can expect to lose $1.03 billion in tax revenues, and $3.68 billion in GDP with the loss of DACA. *See* Ex. 4, Table 1 (Brannon Decl.).

201.    Moreover, rescinding DACA would adversely impact Virginia's public colleges and universities.  According to the State Council of Higher Education for Virginia, over a thousand DACA grantees attend Virginia's two-year and four-year public institutions of higher learning.  These students would be less likely to continue pursuing their education at those institutions if there is no viable employment option available to them upon graduation.

## DEFENDANTS

202.    Defendant Donald Trump is the President of the United States, and authorized the issuance of the DHS Memorandum that purports to rescind DACA. He is sued in his official capacity.

203.    Defendant DHS is a federal cabinet agency responsible for implementing the DACA program. DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

204.    Defendant USCIS is an Operational and Support Component agency within DHS. USCIS is the sub-agency responsible for administering the DACA program.

205.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is an Operational and Support Component agency within DHS. ICE is responsible for enforcing federal immigration law, including identifying, apprehending, detaining, and removing non-citizens.

206.     Defendant Elaine C. Duke is the Acting Secretary of the Department of Homeland Security. She is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees USCIS and ICE. She is sued in her official capacity.

207.     Defendant the United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

## ALLEGATIONS

**Establishment of the DACA Program**.

208.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum"). *See* Ex. 34 (2012 DACA Memorandum). Under DACA, individuals who were brought to the United States as children and meet specific criteria may request deferred action for a period of two years, subject to renewal.

209.     Deferred action is a well-established form of prosecutorial discretion under which the government forbears from taking removal action against an individual for a designated period. The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *Id.* at 1-2.

210.     The 2012 DACA Memorandum established that an applicant would be considered for an exercise of prosecutorial discretion only by satisfying each of the following criteria:

a. came to the United States under the age of sixteen;

b. had continuously resided in the United States for at least five years preceding the date of the memorandum and is present in the United States on the date of the memorandum;

c. was currently in school, had graduated from high school, had obtained a general education development certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

d.  had not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

e.  was not above the age of thirty.

*Id.* at 1.

211.  USCIS described DACA as follows: "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence." *See* Ex. 14, Question 1 (USCIS Help Center, DACA FAQs).

212.  As the government has recognized, our nation "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future." *See* Ex. 15 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu, Dec. 30, 2016).

**The DACA Application Process**

213.  USCIS affirmatively represented to DACA applicants that "[a]ll individuals who believe they meet the guidelines . . . may affirmatively request consideration of DACA from USCIS through this process," and after USCIS receives the applicant's forms, evidence, supporting documents and application fee, "USCIS will review them for completeness." USCIS further affirmatively represented to DACA applicants that if it determines that the request is complete, USCIS will send the applicant notices of receipt and for needed appointments, and then review the

applications "on an individual, case-by-case basis" and notify applicants of its determination in writing. *See* Ex. 16 (USCIS Help Center, How do I request consideration of DACA?).

214.     In order to apply for the DACA program, applicants had to submit extensive documentation establishing that they meet the eligibility criteria. Applicants had to submit a Form I-765 Application for Employment Authorization, and pay a $495 fee. *See* Ex. 14 at Questions 28-41; *see also* Ex. 17 (USCIS, I-821D, Consideration of Deferred Action for Childhood Arrivals) (explaining that the filing fee for a DACA application cannot be waived).

215.     DACA applicants had to undergo biometric and biographic background checks. When conducting these checks, DHS reviewed the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies." *See* Ex. 14 at Questions 23. If any information "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant will be ineligible for DACA absent "exceptional circumstances." Id. at Question 65.

216.     Once individuals were admitted into the DACA program, internal USCIS "Standard Operating Procedures" dictate that, absent an "Egregious Public Safety" issue, DACA grantees  should not be terminated from the program until the government has provided a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the termination." *See* Ex. 18 at 132, Appendix I (DHS, National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals, Apr. 4, 2013). DHS policy further provided that the grantees of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of participation in the DACA program. *Id.*

217.     At the expiration of their two-year DACA term, grantees could seek renewal. As USCIS has represented, DACA applicants "may be considered for renewal of DACA" if they meet

the guidelines for consideration and meet other criteria which "must be met for consideration of DACA renewal." *See* Ex. 19 (USCIS Help Center, How will USCIS evaluate my request for renewal of DACA?).

**Benefits Provided Under the DACA Program**

218.    DACA confers numerous benefits on DACA grantees. Notably, DACA grantees are granted the right not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect. *See* Ex. 14, Question 9.

219.    DACA grantees also are granted eligibility for work authorization. As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action . . . .'" *Id.*, Question 1.

220.    DACA grantees are eligible to receive certain public benefits. These include Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses or unemployment insurance. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). In the State of Washington, DACA holders also are eligible for certain state financial aid programs and state-funded food assistance. *See* Wash. Rev. Code § 28B.92.010; Wash. Admin. Code §§ 388-400-0050, 388-424-0001, 388-424-0030. In the State of New York, DACA holders are eligible for teaching and nursing licenses. *See* Comm. of Educ. Regs. §§ 59.4; 80-1.3; Ex. 78 (NYS Board of Regents Press Release, Feb. 24, 2016).

221.    DACA enables grantees to secure equal access to numerous other benefits and opportunities on which Americans depend, enabling grantees to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants. *See* Ex. 5 (Wong Decl.).

222.    DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and

give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books." *See* Ex. 15 (Letter from Sec'y Johnson).

223. These positive effects have rippled throughout the States' economies. Rescinding DACA would not only rip away the life-changing benefits to individual DACA grantees, but would also reverse the benefits to the community at large, including innumerable small businesses, non-profits, and governments.[2]

**The Government's Assurances That the Information Provided by DACA Applicants Would be Kept Confidential and Not Used for Enforcement**

224. When the DACA program was first implemented, many eligible young people were reluctant to voluntarily disclose information that could help facilitate their removal from the United States. To encourage applications, DHS repeatedly promised applicants that information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes." Ex. 15 (Letter from Sec'y Johnson).

225. Moreover, the approval notice granting deferred action under DACA lists only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA. Ex. 24 (USCIS, DACA Approval Notice).

226. The government's commitment to the DACA program was further communicated to young people through its publication entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA)" (the "DACA SOP"). Ex. 18. This document sets forth the standards agency applies concerning DACA applications with nearly 150 pages of specific instructions for granting or denying deferred action.

---

[2] *See* e.g., Ex. 20 (Ike Brannon, The Economic and Fiscal Impact of Repealing DACA, the Cato Institute, Jan. 18, 2017) ("The deportation of DACA participants would cost the American economy billions of dollars, as well as billions of tax dollars foregone, while doing little to address the true concerns that Americans may have about unauthorized immigrants"); Ex. 21 (Tom Wong, et al., DACA Grantees' Economic and Educational Gains Continue to Grow, Center for American Progress,  Aug. 28, 2017) (quoting multiple DACA grantees whose small businesses will suffer or even close if DACA is rescinded); Ex. 22 (Tom Wong et al., New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes, Center for American Progress, Oct. 18, 2016) (study showing that 9 percent of DACA grantees work at non-profits, a significant percentage work in education, and 6 percent started their own business, including one owner who employs nine people and hopes to continue to grow and "hire even more people from the community" [internal brackets and quotation marks omitted]).

227.    USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]nformation provided in [a DACA request] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings." Ex. 25 (USCIS Help Center, Will the information I share in my request for DACA be used for immigration enforcement purposes?).

228.    USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]f you have submitted request for consideration of DACA and USCIS decides not to defer your case . . . your case will not be referred to ICE for purposes of removal proceedings." Ex. 26 (USCIS Help Center, If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?).

229.    In the exceptional circumstances when USCIS refers a DACA applicant to ICE, USCIS affirmatively represented to DACA applicants that "information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians." Ex. 27 (USCIS Help Center, If my DACA case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?).

230.    USCIS affirmatively represented to employers of DACA applicants that, except in limited circumstances, if they provide their employees "with information regarding his or her employment to support a request for consideration of DACA . . . . This information will not be shared with ICE for civil immigration enforcement purposes." Ex. 28 (USCIS Help Center, If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?).

231.    The government's representations that information provided by a DACA recipient would not be used against him or her for later immigration enforcement proceedings were unequivocal and atypical. For example, the federal government does not make the same

representations for participants in other similar programs, such as Temporary Protected Status. These assurances were key to the success of the DACA initiative. By making repeated, unique, and strong representations, the federal government induced persons to rely on those representations and apply to become DACA grantees despite the potential risks.

**The Government's Statements Regarding Continuity and Fair Treatment for DACA Grantees**

232.    Numerous public officials from both political parties have reinforced the federal government's promise to provide continuity and fair treatment to DACA grantees, and have recognized that DACA grantees have relied on the government's representations in applying for DACA. For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are 750,000 DACA grantees who have "relied on the U.S. government's representations" about DACA, and asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored." Ex. 15.

233.    On December 8, 2016, then-President-elect Trump stated in an interview with TIME magazine that he would find an accommodation for DACA grantees, stating, "We're going to work something out that's going to make people happy and proud." He further recognized, "[DACA grantees] got brought here at a very young age, they've worked here, they've gone to school here. Some were good students. Some have wonderful jobs. And they're in never-never land because they don't know what's going to happen." Ex. 29 (Michael Scherer, *Person of the Year 2016*, TIME Magazine, Dec. 2016).

234.    Again, on January 18, 2017, then President-elect Trump promised in an interview with Fox & Friends that he was working on a plan to make DACA grantees "very happy." He further stated, "We're working on a plan right now. And that plan, over the next two to three months, is going to come out. And it's a plan that's going to be very firm, but it's going to have a lot of heart." Ex. 30 (Francesca Chambers, *Trump signals he's softening on immigration as he says he's 'working on a plan' that will make DREAMers 'very happy,'* Daily Mail, Jan. 18, 2017).

235.   In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" DACA grantees, who have "organize[d] [their] li[ves] around" the DACA program. Ex. 31 (CNN, *Transcript of CNN Town Hall with Speaker Paul Ryan*, Jan. 12, 2017).

236.   On January 25, 2017, President Trump again stated in an interview with David Muir that "[DACA grantees] shouldn't be very worried. I do have a big heart." Ex. 32 (ABC News, *Transcript of ABC News anchor David Muir interview with Donald Trump*, Jan. 25, 2017).

237.   On March 29, 2017, Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer." Ex. 33 (Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico, Mar. 29, 2017).

238.   On April 21, 2017, President Trump confirmed that his Administration's policy is not to deport DACA grantees, and suggested that they "should rest easy." Ex. 34 (The Associated Press, Transcript of interview with Trump, Apr. 21, 2017).

**President Trump's Statements about Mexicans**

239.   Despite these various and repeated promises to DACA grantees made by the federal government and by President Trump, including a recognition of DACA's value and successes, President Trump has a long history of disparaging Mexicans, who comprise the vast majority of DACA grantees.

240.   In announcing his presidential campaign, then-candidate Trump compared Mexican immigrants to rapists, stating: "When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people." Ex. 35 (Washington Post, *Transcript of Donald Trump's Presidential Bid Announcement*, June 16, 2015).

241.     During the first Republican presidential debate, then-candidate Trump again re-stated his distaste for immigrants from Mexico: "The Mexican government is much smarter, much sharper, much more cunning. And they send the bad ones over because they don't want to pay for them. They don't want to take care of them." Ex. 36 (Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News, Aug. 6, 2015.

242.     Soon after, on August 25, 2015, then-candidate Trump refused to answer questions about immigration from Jorge Ramos, a Mexican-American and the top news anchor at Univision, a Spanish-language news channels. After sending his bodyguard to physically remove Mr. Ramos, then-candidate Trump derisively told Mr. Ramos to "Go back to Univision." Ex. 37 (Phillip Rucker, *First, Trump booted Univision anchor Jorge Ramos out of his news conference. Then things got interesting*, The Washington Post, Aug. 25, 2015).

243.     In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag on Twitter as "criminals" and "thugs."  Ex. 38 (Donald Trump, The protestors in New Mexico were thugs who were flying the Mexican Flag, Twitter, May 25, 2016), and Ex. 39 (Donald Trump, Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals, Twitter, June 4, 2016).

244.     In June 2016, then-candidate Trump impugned the integrity of a federal judge presiding over a lawsuit against one of his businesses because the judge is Hispanic. Suggesting his own opinions are anti-Hispanic, then-candidate Trump commented that Judge Gonzalo Curiel's unfavorable rulings "[H]as to do with perhaps that I'm very, very strong on the border. . . Now, he is Hispanic, I believe. He is a very hostile judge to me." Ex. 40 (Jose A.  DelReal and Katie Zezima, *Trump's personal, racially tinged attacks on federal judge alarm legal experts*, The Washington Post, June 1, 2016).

245.     In an interview with CBS News on June 5, 2016, then-candidate Trump again reiterated his anti-Mexican views, noting that "[Judge Curiel]'s a member of a club or society very strongly, pro-Mexican, which is all fine. But I say he's got bias." Ex. 41 (Transcript of Face the Nation, CBS News, June 5, 2016). Judge Curiel is a member of is the San Diego Chapter of the

La Raza Lawyers Association. *See* Ex. 42 (Michelle Ye Hee Lee, *Trump supporters' false claim that Trump U judge is a member of a pro-immigrant group*, The Washington Post, June 7, 2016).

246.     On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole. At the police station, they stated "Donald Trump was right; all these illegals need to be deported." When asked about the incident, then-candidate Trump failed to condemn the men, instead stating that they were "passionate." Specifically, Trump stated, "[i]t would be a shame . . . I will say that people who are following me are very passionate. They love this country and they want this country to be great again. They are passionate." Ex. 43 (Adrian Walker, *'Passionate' Trump fans behind homeless man's beating?*, The Boston Globe, Aug. 21, 2015).

247.     In October 2016, during a presidential debate,then-candidate Trump responded to a question about immigration by stating: "We have some bad hombres here and we're going to get them out." Ex. 44 (Katie Zezima, *Trump on immigration: There are 'bad hombres' in the United States*, The Washington Post, Aug. 30, 2017).

248.     On January 27, 2017, newly-inaugurated President Trump and Mexico's President Peña Nieto discussed President Trump's proposal for a border wall over the phone. During that transcribed conversation, President Trump again referred to "hombres" stating: "You have some pretty tough hombres in Mexico that you may need help with, and we are willing to help you with that big-league. But they have to be knocked out and you have not done a good job of knocking them out." Ex. 45 (Greg Miller *et. al.*, *Full Transcripts of Trump's Calls with Mexico and Australia*, The Washington Post, Aug. 3, 2017).

249.     On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal judge's order to stop racially profiling Latinos. *See* Ex. 46 (Julie Hirschfield Davis and Maggie Haberman, Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration, The N.Y. Times, Aug. 25, 2017).

250.     Arpaio had been detaining people ostensibly because they had violated the law. But in practice, his office detained huge numbers of individuals solely because they looked Latino,

without any reasonable suspicion of illegal conduct. *See generally Melendres v. Arpaio*, Findings of Fact & Conclusions of Law, 2:07-cv-02513-GMS, ECF Doc. No.579 (D. Az. May 24, 2013). After a federal court enjoined that practice in 2011, Arpaio continued his unlawful and discriminatory practices unabated, "announc[ing] to the world and to his subordinates that he was going to continue business as usual no matter who said otherwise." *United States v. Arpaio*, Findings of Fact & Conclusions of Law, 2:16-cr-01012-SRB, ECF Doc. No. 210 at 13 (D. Az. July 31, 2017). On July 31, 2017, a federal court held Arpaio in criminal contempt, holding that he had willfully acted in "flagrant disregard" of the injunction. *Id.*

251.    Before issuing the pardon, President Trump asked, "Was Sheriff Joe convicted for doing his job?" Ex. 46. After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio "an American patriot." Id.

252.    As President Trump's statements about Mexico and those with Mexican roots show, the President has demonstrated a willingness to disparage Mexicans in a misguided attempt to secure support from his constituency, even when such impulses are impermissible motives for directing governmental policy.

**Trump Administration's Threatening Statements about Deporting Immigrants**

253.    On June 13, 2017, Acting ICE Director Thomas Homan testified in front of the House Appropriations Committee's Subcommittee on Homeland Security, stating as to "every immigrant in the country without papers," that they "should be uncomfortable. You should look over your shoulder. And you need to be worried." *Hearing on the ICE and CBP F.Y. 2018 Budget Before the Subcomm. on Homeland Security of the H. Comm. on Appropriations*, 115th Cong. (2017) 2017 WLNR 18737622. CNN reported that Homan "doubled down" on these statements in an interview later that week, stating that "Trump and his administration have made clear that any undocumented immigrant could be arrested and face deportation proceedings at any time, unless they have current and valid protection under DACA." Ex. 48 (Tal Kopan, ICE Director: Undocumented immigrants 'should be afraid,' CNN, June 6, 2017).

254.    On April 19, 2017, United States Attorney General Jefferson B. Sessions stated in an interview on Fox News' "Happening Now," program—in response to a question regarding the deportation of a DACA recipient—that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported." Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017).

**President Trump Rescinds DACA in Response to the Litigation Threats of a State Found To Have Discriminated Against Latinos/Hispanics Nine Times Since 2012**

255.    On June 29, 2017, the Attorneys General of ten states, led by the State of Texas, sent U.S. Attorney General Sessions a letter threatening to add claims to litigation currently pending in the Southern District of Texas "to challenge both the DACA program and the remaining expanded DACA permits," if the Executive Branch did not agree to end the DACA program by September 5, 2017.

256.    The demand that President Trump eliminate DACA is part of a history of intentional discrimination against Latinos/Hispanics by the State of Texas.

257.    Over the preceding decade, federal courts have repeatedly found the State of Texas liable for engaging in unlawful discrimination based on race and/or national origin.

258.    For example, in *Texas v. United States*, 887 F. Supp. 2d 133, 161 (D.D.C. 2012), three federal judges blocked a Congressional and State House redistricting plan after finding that it "was enacted with discriminatory purpose."

259.    The litigation eventually culminated in a ruling by a three-judge panel on August 15, 2017 finding, again, that the 2010 congressional districts had been created with "racially discriminatory intent" against Latinos and African American voters. *Perez v. Abbott*, SA-11-CV-360, 2017 U.S. Dist. LEXIS 129982, at *55 (W.D. Tex. Aug. 15, 2017).

260. On October 9, 2014, in separate litigation challenging a state voter photo identification ("ID") law, a Texas federal district court judge found that the provision had been "imposed with an unconstitutional discriminatory purpose" and "constitute[d] an unconstitutional poll tax." *Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014).

261. On remand from the Fifth Circuit, a federal district court concluded that the 2011 Legislature intentionally discriminated against minority voters by requiring presentation of a photo ID when casting their ballots. *Veasey v. Abbott*, 2017 U.S. Dist. LEXIS 54253, at *14-18 (S.D. Tex. Apr. 10, 2017).

262. DHS issued the DHS Memorandum rescinding DACA on September 5, 2017, in direct response to the threats of the State of Texas and the other ten states, fulfilling the demand of a State marked with a history of racial discrimination.

**President Trump Backtracks on His Promise and Rescinds DACA**

263. Despite its repeated assurances, the federal government announced that the DACA program will be rescinded and that the government will immediately cease accepting applications under DACA. The federal government will process pending applications on a case-by-case basis. *See* Ex. 74 (DHS, Memorandum Rescinding DACA, September 5, 2017). The federal government will only issue renewals for recipients whose permits expire before March 5, 2018, provided they apply for renewal by October 5, 2018. *Id.* The DHS Memorandum further specifies that the government will not approve any new or pending applications for advanced parole. *Id.*

264. In issuing the DHS Memorandum rescinding DACA, the federal government misleadingly claimed that DACA was unconstitutional, despite no court making that determination. *See* Ex. 75 (DOJ, Attorney General Sessions Remarks on DACA, September 5, 2017).

265. As a result of the DHS Memorandum, after the expiration of DACA grantees' terms, the grantees will immediately face the risk of losing their employment, as well as vital benefits, such as social security cards, driver licenses, financial aid, disability and health benefits, among others. They also may lose their homes and communities if the program is allowed to

expire: an internal White House memo reported on by CNN stated that DHS now is urging DACA recipients "to prepare for and arrange their departure from the United States" when their DACA terms end. Ex. 88 (Tal Kopan & Jim Acosta, *Admin Memo: DACA recipients should prepare for departure from the United States*, CNN, Sept. 5, 2017).

266.     President Trump also has taken affirmative steps to reduce the privacy protections applicable to DACA data. In January 2017, President Trump issued an Executive Order directing all agencies, including DHS, to "ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information." Ex. 76 (Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," Jan. 25, 2017). DHS has confirmed that its new privacy policy, adopted in response to the Executive Order, "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement." Ex. 51 (DHS, *Privacy Policy 2017-01 Questions & Answers,* Apr. 27, 2017).

267.     The DHS Memorandum provides no assurance to DACA grantees, or direction to USCIS and ICE, that information contained in DACA applications or renewal requests cannot be used for the purpose of future immigration enforcement proceedings.

268.     To the contrary, DHS posted public guidance about the impact of the rescission on the same day that the DHS Memorandum was issued, expressly declining to give concrete assurances about how it would use the information provided by DACA applicants. DHS states that although it generally will not "proactively" use information obtained through DACA for enforcement, it reserves the right to change that policy "at any time without notice" and that the policy "may not be relied upon" by any party. Ex. 89 (DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals,* Sept. 5, 2017). DACA grantees thus immediately face the risk that information they provided to the federal government could be used against them at any time, without notice, for purposes of immigration enforcement, including detention or deportation.

## FIRST CAUSE OF ACTION
### (Fifth Amendment – Equal Protection)

269.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

270.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

271.    The DHS Memorandum—together with the President's numerous statements about his intentions towards Mexicans, who comprise the largest population of DACA grantees—target individuals for discriminatory treatment based on their national origin, without lawful justification.

272.    The DHS Memorandum was motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group.

273.    The discriminatory terms and application of the DHS Memorandum cannot be sufficiently justified by federal interests.

274.    Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

275.    Defendants' violation causes ongoing harm to the States and their residents.

## SECOND CAUSE OF ACTION
### (Fifth Amendment – Due Process – Information Use)

276.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

277.    The Due Process Clause of the Fifth Amendment requires that immigration enforcement actions taken by the federal government be fundamentally fair.

278.    Given the federal government's representations about the allowable uses of information provided by DACA applicants, a refusal to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement, including identifying, apprehending, detaining, or deporting non-citizens, is fundamentally unfair.

279.    Through their actions above, Defendants have violated the due process guarantee of the Fifth Amendment.

280.    Defendants' violation causes ongoing harm to the States and their residents.

## THIRD CAUSE OF ACTION
### (Administrative Procedure Act – Substantively Arbitrary and Capricious, Abuse of Discretion, Contrary to Constitution or Statute)

281.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

282.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute. In implementing the DHS Memorandum and rescinding DACA with minimal formal guidance, federal agencies have taken unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

283.    In implementing the DHS Memorandum, federal agencies have acted arbitrarily and capriciously, and otherwise not in accordance with law, and have abused their discretion, in violation of the APA.

284.    Defendants' violation causes ongoing harm to the States' residents.

## FOURTH CAUSE OF ACTION
### (Administrative Procedure Act – Procedurally Arbitrary and Capricious, Notice and Comment)

285.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

286.    The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

287.     DHS is an "agency" under the APA. 5 U.S.C. § 551(1).

288.    The actions that DHS has taken to implement the DHS Memorandum are "rules" under the APA. 5 U.S.C. § 551(4).

289.     In implementing the DHS Memorandum, federal agencies have changed the substantive criteria by which individuals DACA grantees work, live, attend school, obtain credit, and travel in the United States. Federal agencies did not follow the procedures required by the APA before taking action impacting these substantive rights.

290.      With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking. 5 U.S.C. § 553.

291.     The Defendants promulgated and relied upon these rules without authority and without notice-and-comment rulemaking in violation of the APA.

292.     The States will be impacted because they have not had the opportunity to comment on the rescission of DACA.

293.      Defendants' violation causes ongoing harm to the States and their residents.

## FIFTH CAUSE OF ACTION
### (Regulatory Flexibility Act – Failure to Issue Regulatory Flexibility Analyses)

294.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

295.     The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment. 5 U.S.C. §§ 603-604.

296.     "Small entities" for purposes of the RFA includes small businesses, small nonprofits, and small governmental jurisdictions.  5 U.S.C. § 601(6).

297.     The actions that DHS has taken to implement the DHS Memorandum are "rules" under the RFA. 5 U.S.C. § 601(2).

298.     The actions that DHS has taken to implement the DHS Memorandum are likely to have a significant economic impact on a substantial number of small entities.  5 U.S.C. § 602(a)(1).

299.     Defendants have not issued the required analyses of DHS's new rules.

300.     Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

301.     Defendants' violation causes ongoing harm to the States and their residents.

## PRAYER FOR RELIEF

302.     Wherefore, the States pray that the Court:

a.     Declare that the DHS Memorandum rescinding the DACA program is unauthorized by and contrary to the Constitution and laws of the United States;

b.     Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are procedurally unlawful under the APA;

c.     Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are substantively unlawful under the APA;

d.     Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are unlawful under the RFA;

e.     Enjoin Defendants from rescinding the DACA program, pending further orders from this Court;

f.     Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA applicant or member of any DACA applicant's family, or take any action against a DACA applicant's current or former employer; and

g.     Award such additional relief as the interests of justice may require.

DATED: September 6, 2017

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York

By:   */s Lourdes M. Rosado*
Lourdes M. Rosado, Bureau Chief
Sania Khan, Assistant Attorney General
Diane Lucas, Assistant Attorney General
Ajay Saini, Assistant Attorney General
Civil Rights Bureau
Office of the New York State Attorney
General
120 Broadway, 23rd Floor
New York, New York 10271
Lourdes.Rosado@ag.ny.gov
Sania.Khan@ag.ny.gov
Diane.Lucas@ag.ny.gov
Ajay.Saini@ag.ny.gov
Tel. (212) 416-6438
Fax (212) 416-8074

**MAURA HEALEY**
Attorney General for the Commonwealth of
Massachusetts

By:   */s Jonathan B. Miller*
Jonathan B. Miller (Bar No. JM3508)
Genevieve C. Nadeau*
Abigail B. Taylor*
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
jonathan.miller@state.ma.us
genevieve.nadeau@state.ma.us
abigail.taylor@state.ma.us
Tel. (617) 727-2200

**BOB FERGUSON**
Attorney General of the State Washington

By:   */s/ Robert W Ferguson*
Robert W. Ferguson,* WSBA #26004
Attorney General
Colleen M. Melody,* WSBA #42275
Civil Rights Unit Chief
Marsha Chien,* WSBA #47020
Assistant Attorney General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
ColleenM1@atg.wa.gov
MarshaC@atg.wa.gov
Tel. (206) 464-7744

**GEORGE JEPSEN**
Attorney General of the State of Connecticut

By:   */s Mark K. Kohler*
Mark F. Kohler*
Assistant Attorney General
55 Elm Street
Hartford, CT  06106

**KARL A. RACINE**
Attorney General for the District of Columbia

By:   /s Robyn R. Bender
Robyn R. Bender*
Deputy Attorney General
Public Advocacy Division
441 4th Street, NW
Suite 650 North

Washington, DC 20001
Tel. (202) 724-6610
Fax (202) 730-0650

**DOUGLAS S. CHIN**
Attorney General of the State of Hawaii

By:  */s Donna Kalama*
Deputy Attorney General
Donna Kalama*
State of Hawaii, Department of the
Attorney General
425 Queen Street
Honolulu, HI 96813
Tel: (808) 586-1282

**LISA MADIGAN**
Attorney General of the State of Illinois

By:  */s Karyn L. Bass Ehler*
Karyn L. Bass Ehler,*
Chief, Civil Rights Bureau
Harpreet Khera,* Deputy Bureau Chief,
Special Litigation Bureau
Anna Crane,* Assistant Attorney Genera
Caitlyn McEllis,* Assistant Attorney
General
Jeff VanDam,* Assistant Attorney
General
Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Tel. (312) 814-3400
Fax (312) 814-3212

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By:  */s Jeffrey S. Thompson*
Jeffrey S. Thompson*
Solicitor General
Office of the Attorney General of Iowa
1305 E. Walnut Street
Des Moines, IA 50319
Jeffrey.Thompson@Iowa.gov
Tel. 515 281 4419
Fax. 515 281 4209

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By:  */s Tania Maestas*
Tania Maestas,*
Deputy Attorney General
Ari Biernoff,*
Assistant Attorney General
Jennie Lusk,*
Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87501
Tel. (505) 490-4060
Fax (505) 490-4883

**MATTHEW DENN**
Attorney General of the State of Delaware
By:  *s/ Matt Denn*
Attorney General Matt Denn*
Delaware Department of Justice
Carvel State Building
820 N. French St.
Wilmington, DE 19801

**PETER KILMARTIN**
Attorney General of the State of Rhode Island
By: */s Peter Kilmartin*
Peter Kilmartin*
RI Office of the Attorney General
150 South Main Street
Providence, RI 02903

**JOSH STEIN**
Attorney General of the State of North Carolina

By:   */s Sripriya Narasimhan*
      Sripriya Narasimhan*
      North Carolina Department of Justice
      114 W. Edenton Street
      Raleigh, North Carolina 27603
      Tel. (919) 716-6400

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By:   */s Brian De Haan*
      Brian De Haan* #4565396
      Assistant Attorney General
      Trial Attorney
      brian.a.dehaan@doj.state.or.us
      Tel. (971) 673-1880
      Fax (971) 673-5000

**JOSH SHAPIRO**
Attorney General of Commonwealth of
Pennsylvania
By:   */s Jonathan Scott Goldman*
      Jonathan Scott Goldman,*
      Executive Deputy Attorney General,
      Civil Law Division
      Michael J. Fischer,*
      Chief Deputy Attorney General, Impact
      Litigation Section
      Office of Attorney General
      16th Floor, Strawberry Square
      Harrisburg, PA 17120
      Tel. (717) 787-3391

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont
By:   */s Benjamin D. Battles*
      Benjamin D. Battles,* Solicitor General
      Julio A. Thompson,* Assistant Attorney
      General, Civil Rights Unit
      Office of the Vermont Attorney General
      109 State Street
      Montpelier, Vermont 05609
      benjamin.battles@vermont.gov
      Tel. (802) 828-5500
      Fax (802) 828-3187

**MARK R. HERRING**
Attorney General of the State of Virginia
By:   */s Matthew R. McGuire*
      Matthew R. McGuire,*
      Acting Deputy Solicitor General
      202 North Ninth Street
      Richmond, VA 23219

*Pro hac vice* motions will be forthcoming.