# EXHIBIT 10

# The Deferred Action for Childhood Arrivals (DACA) program in North Carolina
## Perspectives from Immigrants and Community-Based Organizations

**The Latino Migration Project**
**University of North Carolina at Chapel Hill**

**Authors:**
Hannah Gill, hgill@email.unc.edu
Sara Peña, sarapena@med.unc.edu

The Latino Migration Project
University of North Carolina at Chapel Hill
Fed Ex Global Education Center
CB #3205, 301 Pittsboro Street
Chapel Hill, NC 27599
http://migration.unc.edu

## Summary

This report evaluates the impact of the Deferred Action for Childhood Arrivals (DACA) program in North Carolina, the state with the highest application rate to DACA in the nation in the first two years of the program (2012-2014). Our research is based on ethnographic data, interviews, and surveys with DACA educators and immigrants in urban and rural areas. We examined the strategies and lessons learned by staff of key organizations involved in DACA implementation efforts. We evaluated the experiences of immigrants during the application process and examined the impact of DACA status on their lives. Our findings suggest that DACA has had a positive impact on immigrants' economic and educational mobility as well as their outlook on living in the United States, indicators that the program is an important facilitator of immigrant integration. At the same time, DACA's impacts have been uneven across immigrant communities due to cost of application, geographic proximity to DACA services, and local level political contexts of immigrant reception. We offer policy recommendations for current and future legalization efforts.



## Introduction

Immigration reform is one of the most critical issues facing policy makers in the United States as the nation experiences demographic change in non-traditional immigrant destinations, unprecedented backlogs and delays in immigration courts, and historic levels of deportations. Despite the importance of resolving these challenges, federal lawmakers have failed to reach a consensus and pass comprehensive legislative action regarding immigration in recent years. In an attempt to provide some relief to one sector of the immigrant population, President Obama signed an executive order in June of 2012 to create The Deferred Action for Childhood Arrivals (DACA) program. DACA provides work authorization and a two-year reprieve from deportation to undocumented immigrants who apply and meet certain criteria. DACA status not only defers deportation, but provides work, travel, and educational opportunities for immigrants. As of June 2015, an estimated 665,000 people had received DACA.[1]

North Carolina had one of the highest application rates to DACA in the nation in the first two years of the program (2012-2014).[2] Out of an estimated 26,000 eligible people (as of August 2013), 75% applied. In absolute numbers, 21,389 people had their DACA applications accepted in North Carolina as of Dec 2013.[3] By June 2014, North Carolina had 23,849 accepted applications and 20,927 approved applications. At least 75% of applicants were from Mexico, reflecting the state's foreign born demographics.[4]

The DACA program has had the potential to have a significant impact in North Carolina, a state with one of the fastest growing immigrant populations in the nation over the past three decades. The foreign-born share of North Carolina's population rose from 1.7% in 1990, to 5.3% in 2000, to 7.6% in 2014 – an estimated total of nearly 800,000 immigrants living in the state.[5] This demographic change is due in large part to industries' recruitment of foreign-born individuals, primarily of Latin American origin, to fill available jobs as North Carolina's economy has expanded in recent decades[6]. Despite a strong demand for migrant labor, U.S. congressional caps on immigrant visas and backlogs in U.S. federal immigration courts have limited migrants' access to legal means of entering the United States. In North Carolina, an estimated 350,000 people (44% of the state's immigrant population-- nearly double the national rate of 26%) did not have legal immigration status in 2012.[7]

A better understanding of DACA's implementation in North Carolina is not only valuable for North Carolinians, it has national implications. Understanding why North Carolina has a higher than average rate of application may provide insights about the local implementation of a federal program. North Carolina also provides important lessons about how local and state legislation impacts the implementation of a federal program or policy. For over a decade NC policy makers have consistently passed restrictive laws toward immigrants, such as the NC Driver's License Law of 2006, which barred immigrants from obtaining a driver's license, or the 2001 NC Community College Board decision to disqualify undocumented immigrants for in-state tuition at public colleges and universities.[8] Other states have adopted similar policies. Immigration enforcement programs such as 287g and Secure Communities that engaged local

2

police in federal deportation processes were piloted in North Carolina before nationwide implementation. By contrast, after DACA was implemented, the North Carolina legislature passed a law in 2012 that enables DACA recipients to obtain a driver's license (47 other states now have similar laws). Finally, policy makers and academics look to North Carolina to understand important questions about new immigrant destinations, transnational connections with Latin America, and the implications of U.S. demographic and political shifts; all factors relevant to the implementation of DACA.

This study investigates a number of questions related to DACA's implementation in North Carolina: How do these policies impact organizations' abilities to make the DACA application process accessible to people with limited transportation in geographically remote parts of the state? How do they impact immigrants' abilities to build relationships with and secure needed documents from public officials to apply to DACA? How do state and local policies that limit mobility, education, and employment make DACA status particularly critical for the well-being of immigrant North Carolinians?

## Understanding the DACA program

The Deferred Action for Childhood Arrivals (DACA) program was established as an executive action by President Obama in June of 2012 and applies specifically to certain people who came to the United States as children. DACA provides work authorization and a two year reprieve from deportation to undocumented immigrants who apply and meet certain criteria and can be renewed. DACA recipients may request a renewal after the two-year grant expires. These criteria include that the applicant:

1. Was under the age of 31 as of June 15, 2012;
2. Came to the United States before reaching the 16th birthday;
3. Has continuously resided in the United States since June 15, 2007, up to the present time;
4. Was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action with USCIS;
5. Had no lawful status on June 15, 2012;
6. Is currently in school, has graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and
7. Has not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

To apply to DACA, the applicant must secure proof of arrival in the U.S. before the age of 16 and continuous presence in the U.S. since at least June 15, 2007. Applicants must complete several forms, pay filing fees of $465, and submit biometric data (fingerprints and photos).

## Methods

We used a mixed-method approach to evaluate institutional and individual experiences with the DACA program in twelve rural and urban counties in all three regions of the state of North Carolina. Our study investigated the early stages of the program, from the inception of DACA in 2012 until its renewal in 2014. At the institutional level, we contacted non-profit and grassroots organizations that provided DACA education and application assistance and invited staff members to participate in interviews. At the individual level, we gathered perspectives of people who had applied to DACA through a survey. Upon discovering that nearly all survey respondents had successfully acquired DACA status, we conducted a small set of additional interviews with individuals who did not obtain DACA status to better understand barriers. We used participatory research methods to engage community stakeholders (such as leaders of community-based service providers and organizations) and immigrant participants in different stages of the process. We talked to key individuals, including immigrant youth, at the beginning to conceptualize the research project and understand the most relevant problems and issues. Organizational stakeholders assisted with survey design, connected researchers to key staff for interviews, reviewed drafts for accuracy and fact checking, and organized public events to disseminate final results.

*Interviews*

Between March 2014 and August 2014, we conducted semi-structured interviews with 14 people who work in 12 different non-profit, religious, and/or grassroots organizations that participated in the organization of DACA workshops/clinics (see appendix 2, "Questions for Organizations"). We chose organizations located in geographically diverse areas of the state, and in urban and rural areas (see map 1). Urban sites included the cities of Chapel Hill, Charlotte, Durham, and Raleigh and rural sites included Surrey and Yadkin counties, Siler City, Kernersville, Buncombe County, and Alamance County. Participants' roles varied from Executive Director to Program Coordinators, and all were involved in the planning and implementation of DACA workshops and clinics. Participants were asked questions regarding how many clinics were organized, how many people attended, and where the clinics or workshops took place. We also asked questions about successes, challenges, and lessons learned.

Between February 2015 and January 2016, we conducted interviews with five individuals who were eligible for DACA but did not apply. These interviewees, three women and two men, were between the ages of 18 and 22, and lived in Orange, Johnston, Alamance, Durham, and Buncombe Counties.

All interviews were conducted by phone or in person in English or Spanish by Latino Migration Project staff. We analyzed interviews by identifying key themes in each, and compared these themes to the survey responses. The interviews provided a deeper understanding of issuers and challenges that individual organizations faced, and provided important context or survey

responses. In addition to interviews, staff participated in DACA informational workshops in several locations around the state and attended meetings of non-profit organizations engaged in immigrant advocacy work in Raleigh and Greensboro.

## Map 1: Organizations that participated in interviews



1) Centro la Comunidad, Burlington
2) NC Justice Center, Raleigh
3) El Puente, Burgaw
4) El Cambio, Surry/Yadkin County
5) Holy Cross Hispanic Ministries, Kernersville
6) El Pueblo, Raleigh
7) Hispanic Family Center, Catholic Charities Raleigh
8) El Centro Hispano, Durham
9) Latin American Coalition, Charlotte
10) Student Action with Farmworkers, Durham
11) Latino Advocacy Coalition, Henderson and Buncombe County
12) El Vínculo Hispano, Siler City

## Map 2: Locations of DACA clinics, as reported by participating organizations



5

*Survey*

We also created a survey in Spanish and English (see appendix 1) for individuals who applied to DACA. Questions addressed how individuals found out about DACA, reasons for applying, barriers to applying, what kinds of legal assistance they solicited and why, and how acquiring DACA status has impacted their lives. Some questions were open-ended, whereas others had multiple option response choices. This anonymous survey was created using Qualtrics software and made available digitally. The survey was provided in Spanish and English (see appendix 1) and disseminated widely through email and social media networks of the Latino Migration Project at UNC Chapel Hill, immigrant serving organizations, grassroots groups, and churches around the state. We also employed four individuals of Latin American origin in different regions of the state to share surveys with their networks through a snowball sampling method. Themes that emerged in the surveys informed many of the questions we asked in our interviews.

## Results

Our findings provided important information about the diverse experiences of organizations that provided DACA services, as well as individuals who engaged in the application process across the state. Below we provide details of results from surveys and interviews.

*Understanding the experiences of organizations*

Community-based organizations that provide services to immigrants and refugees have played an important role in DACA implementation in many ways. Many study participants responded that they participated in free DACA workshops and clinics that provide information and legal assistance. These workshops have been offered by organizations that include community-based non-profits, grassroots groups, or religious/faith organizations. Historically, many of these organizations have provided many types of services such as worship, counseling, and food provision or other similar supports, cultural events, education assistance, leadership training, and voter outreach. The type of organization providing DACA assistance has regional variation in North Carolina: in general, there are more Latino/Hispanic community-based organizations in urban areas of the state where per capita income is relatively high, including Triad cities of Greensboro, Winston Salem and High Point; Triangle cities of Chapel Hill, Durham, Raleigh; and the Charlotte metropolitan area. In more rural parts of the state where there are fewer immigrant advocacy organizations and higher than average poverty rates, religious organizations play an important role in offering services and resources for immigrant communities, and have had to mobilize significant resources to accommodate the high demand for DACA services.

Through our interviews with individuals working in organizations across the state, we were able to map out the extensity and intensity of DACA activities statewide during the two years after the program's inception. The majority of these organizations had organized 6 or more DACA

clinics and workshops, which included interest sessions and application support. Nearly all organizations started workshops in fall 2012 and the majority have continued workshops for the DACA renewal process. We recorded a total of 120 DACA workshops that were offered between 2012 and 2014 in North Carolina by the 12 organizations (many in collaboration with each other) that participated in our interviews and surveys. The majority of these workshops took place between July and December of 2012 (see appendix 3 for locations of workshops). Out of these 120, Catholic Charities Diocese of Raleigh and their affiliates were involved in organizing approximately 95 clinics/workshops in North Carolina as of May 2014, assisting more than 1,500 young adult immigrants to complete their applications. Between August and December of 2012, NC Justice Center staff collaborated with community partners to organize more than 45 legal clinics and personally assist approximately 2,070 young immigrants in preparing their applications for DACA. The Latino Advocacy Coalition in Hendersonville, North Carolina served 681 people through information sessions and legal clinics between 2012 and 2014 (see maps 3 and 4). Several law schools at colleges and universities across the state also offered immigration legal clinics, including the Charlotte Law School, UNC Chapel Hill, Elon University, and NC Central University (see map 2 for locations of these clinics).

Organizations with statewide networks and experience providing legal assistance for immigrants were instrumental for the DACA program in North Carolina. These organizations provided DACA outreach and legal assistance, particularly in the first years of the program when there were fewer people with Board of Immigration Appeals (BIA) accreditation. The organizations provided and/or recruited pro-bono legal assistance and sent teams to rural or under resourced areas to provide assistance. They also worked with the Mexican Consulate, which organized mobile clinics throughout the state to assist people with securing identification documents. An important organization for DACA leadership statewide was the North Carolina Justice Center (NCJC), based in Raleigh, which has offered a variety of legal services and general advocacy for immigrants in NC for decades. The NCJC provided a workshop model and disseminated educational materials that other organizations across the state adopted. Catholic Charities Diocese of Raleigh (CCDR) also played an important role in DACA assistance, particularly in under resourced communities in the eastern part of the state. CCDR has affiliate agencies that organized DACA workshops and/or offer legal assistance to immigrants, located in Greenville, Wilmington, Shallotte, Sanford, Wilson, and Newton Grove.  Between the summer of 2012 and May of 2014, Catholic Charities and agency affiliates around the state had organized 95 clinics or workshops in North Carolina.

Non-profit organizations played an important role because there was no other legally qualified network or infrastructure to assist immigrants in the application process free of cost in the state. Interviewees within organizations described how some immigrant community members were the targets of fraudulent legal practices by "notarios," individuals practicing law without a license in the United States.[9] As trusted spaces, community-based organizations were key places to hold educational events, and staff were familiar with the necessities of providing interpreters, transportation, child care and food during sessions. According to the Center for American Progress, these organizations "have been at the forefront of the DACA process, working to raise awareness about the program, organize DACA clinics and workshops, provide

7

legal services and assistance, and even offer financial assistance to help pay the $465 application fee."[10]

Other sources provided assistance with DACA enrollment efforts across the state. The organization Hispanics in Philanthropy convened workshops and webinars on DACA to provide information and resources to its grantee organizations. The Latino Credit Union, based in Durham with branches across the state, offered loans to immigrants for DACA application fees. A limited number of lawyers around the state also offered pro bono services in conjunction with community or religious organization workshop, or offered "Low-bono" services at a reduced cost to immigrant clients. Finally, grassroots youth "Dreamer" groups across the state have been active in advocating for the expansion of immigrants' rights under DACA. Groups like the NC Dream Team, Students United for Immigrant Equality, and others have lobbied the NC General Assembly and University of North Carolina system administrators to allow DACA recipients to qualify for in-state tuition and refrain from any restrictive new legislation targeting young adults with temporary legal status provided by DACA.

*Lessons Learned*

We asked representatives from non-profit organizations to reflect upon lessons they had learned from their work assisting immigrants with DACA. Their comments addressed several different areas, including the merits of different workshop models, the importance of logistics and event planning, strategies for publicity, and collaborating with other organizations. Above all, collaboration was key to the majority of organizations with whom we communicated. A total of 87.5% of organizational respondents indicated that they had collaborated with another organization. Approximately 60% reported working with The NC Justice Center. All organizations reported that they had legal professionals at clinics. A total of 90% of those legal professionals were employed in non-profit organizations and 10% were from private law firms.

Outreach Models: While DACA activities varied, there were two basic models that organizations in North Carolina have used. Most community-based organizations sponsored workshops or "clinics" which provided information and personal legal assistance for multiple individuals at the same time. Some organizations also created "walk-in" hours in which individuals could seek assistance during set time periods. Some used both models. The majority of organizations interviewed followed the North Carolina Justice Center's community education model that split the workshop into two or three stages over multiple days.  Often there was an initial Stage 1 workshop, or "information day" in which an organization would provide information to potential applicants about DACA eligibility, costs, benefits, how to fill out the form, and collect required documents. Stage 1 presentations were done via video or live. In many cases, staff refrained from giving individual advice at this stage but often provided attendees with a DACA application form at the end.

In Stage 2 of this model**,** applicants who had attended stage 1 events would receive free individualized help reviewing their applications by either a qualified attorney or a representative accredited by the Board of Immigration Appeals (BIA). Applicants were asked to

come at a designated time and sign in. An attorney would review individual circumstances and go over any risks that the person might face and give advice on whether they should apply for DACA. The attorney also made sure that the person had the right proof to meet the requirements. The organizations made copies of the applications and records to store in their office. At this stage, while not common, some people were referred to a private attorney because they had a criminal record or other complicating circumstances.

Interviewees described the importance of providing workshops with multiple stages, as well as holding workshops that focus solely on document acquisition. The walk-in hour model, or individual "office hours" were effective for some organizations in providing personalized legal assistance. The Latin American Coalition in Charlotte offered "walk-in hours" three times a week. For other organizations who depended on volunteers to run workshops, it was challenging to provide training and work with volunteer schedules for large events.  Staff at the Latin American Coalition in Charlotte and El Vínculo Hispano in Siler City found that office hours worked better because they could give more individualized support and there were too many people at events to provide enough support.


"Attention to details": Detailed planning was critical to a successful DACA workshop. All of the staff members we spoke to reported the importance of "learning by doing." Given the possibility of hundreds of attendees, organizers recommended to create a plan in advance, particularly for Stage 2 workshops with individualized attention. They recommended that organization staff make advance phone calls to confirm registrants' attendance, provide attendees with numbers to direct people to individual assistance in an orderly fashion, and provide explicit instructions during the workshop about where to go. One organization provided a list of essential materials and equipment for a DACA workshop that included: copier machine, laptop with internet access, extra copier paper, extra toner or ink, stapler and staples, black ink pens, enough forms, sign-in sheets, microphone, tables and chairs, and restrooms. Key staff to have present at a workshop include volunteers, BIA-accredited volunteers or staff members, an attorney, a background check specialist, crowd control personnel, hospitality services for breakfast, lunch and/or dinner, a translator for birth certificates, and WIFI support services.

Publicity: We asked organizations how they publicized their DACA services and workshops, and which methods worked best. Our informants had varying reports about attendance at DACA workshops: some were attended by more than 100 people, while at others there were only a few people. Organizations used multiple methods, and the most common outreach methods were social media (Facebook, websites, Twitter) and word of mouth. Organizations conducted community outreach most commonly through community centers, churches, non-profit organizations, and churches. Other methods included calling individuals, sending emailing or digital newsletters, radio announcements, and posting flyers. We found that interviewee's perceptions of success of outreach strategies depended on a number of factors: in rural areas where trust was a factor, organizations found that printed materials and posting flyers in restaurants and local business was more effective that the more anonymous forms of social

9

media and the internet. When asked which method worked best, the majority of interviewees replied that "word of mouth" was most effective.

Interviewees reported that it was critical to engage youth in the outreach process and use preferred social media platforms of their generation. In particular, many cited the importance of involving young DACA recipients in the process of reaching new applicants. This strategy was corroborated by the responses we received in the individual surveys when we asked "What is the best way to encourage people to sign up for the program?" One survey respondent replied, "Going out and talking to them about it more! Have people talk about their own experiences about it, that way they can feel like attempting the process!"

*Problems and limitations of applying to DACA*

We asked organization staff if they had any insights to the biggest barriers in applying to DACA. The most common themes in their comments were immigrants' lack of knowledge about the program and the financial burden of the application and legal assistance.  Irene Silva, former director of El Puente, an organization located in one of the most under resourced regions of eastern NC, observed firsthand the difficult decisions that families with several DACA eligible children had to make:

> I think the biggest barrier is money. Even with the credit union loan--there is a Self-Help in Wilmington---people are not taking that step. People bring back the applications to me to review but then they don't file them because of the money. The median household income in Duplin [County] is at federal poverty line, so people can't afford the fee. Families request help from relatives in origin countries for funding. And people have to pay the price again to renew. How does a family afford over $1500 for three kids?"

Interviewees also identified affordability of legal assistance as one of the primary challenges of DACA enrollment. They emphasized the importance of identifying and recruiting more lawyers across the state at private law firms to provide pro-bono services and assist with efforts. Organizational staff commented that it is a major challenge of small non-profit organizations to inform immigrants in their region about DACA, particularly when organizations do not receive any additional federal funding. Staff also spoke of the challenge of helping immigrants access documents needed to prove residency. The process of assembling required evidence, which may consist of school, medical, financial, military or any other records, may be particularly lengthy and difficult for immigrants. Undocumented immigrants have relatively low rates of home ownership, insurance, and access to health care—all interactions with official state actors or agencies that generate official documents indicating presence in the United States. Staff spoke about how important it was to utilize existing relationships with schools and local governments to access their clients' records.

10

**Understanding the experiences of DACA recipients**

*Characteristics of survey respondents*

We conducted a survey with individuals who had applied for DACA. Out of 94 total survey respondents, 23% responded to the survey in Spanish. Approximately half of respondents identified as female, 43% as male. A total of 95% listed Mexico as country of birth. Respondents had varying levels of education: a little over half had a high school diploma or GED, while fourteen percent had no high school diploma. Roughly a quarter had some undergraduate education (see Table 1).  Nearly all respondents had their DACA applications successfully approved, and most had been approved in fewer than six months.

TABLE 1 -- Level of Education of Survey Respondents

| Level of Education | Total # of Respondents | Percent % (N= 94) |
|---|---|---|
| High School Diploma/GED | 51 | 55% (N= 51) |
| Some Undergraduate | 23 | 25% (N=23) |
| No High School Diploma | 13 | 14.13%  (N=13) |
| Undergraduate Degree | 3 | 3%% (N=3) |
| Licenciatura[11] | 1 | 1% (N=1) |
| Pursuing Master's Degree | 1 | 1% (N=1) |
| Master's Degree | 0 | 0 |
| PhD | 0 | 0 |
| No answer | | 1% (N=2) |
| Total | | 100% (N=94) |

*North Carolina residence*

Respondents reported that they lived in one of 33 different towns or cities in the following counties: Stanley, Duplin, Randolph, Orange, Johnston, Sampson, Lenoir, Durham, Northampton, Wayne, Guilford, Henderson, Cabarrus, and Wake.[12] The majority of respondents (64%) lived in the Piedmont, followed by the Coastal Plain (33%). A small percentage lived in the Mountains (2%). The geographic representation of survey respondents is a result of the networks of research staff and consultants (which are strongest in central North Carolina), and point to the importance of further outreach to the western part of the state.

## Map 3: Location of respondent's residence



*Perspectives on the DACA Application Process*

We were interested in understanding how people learned about the DACA program, and what factors motivated them to apply. We asked the open-ended question "how did you find out about DACA?" Out of 83 respondents, 53% replied that explicitly said "news" or "noticias" were the most common way of learning about the program. "Friends/Acquaintances" was the next most common response (12%), followed by "Internet" (7%) and "Family" (6%).  We asked "What motivated you to apply to DACA?" a question to which a respondent could select multiple answers. Out of 93 respondents, the most common responses were "Desire to get a driver's license" (83%), "Pathway to legal status" (69%), "Desire to get a job" (69%), "Family encouraged me to apply (58%) and "Faith leaders encouraged me to apply" (25%). When asked if family members' experiences influenced their decision to apply for DACA, 58% reported "yes" (42% reported "no").

Near the end of the survey we also asked the open-ended question, "What is the most effective way to encourage immigrants to sign up for DACA?" which generated 79 responses. A number of themes emerged in the written responses, illustrating that the question was interpreted by respondents in a couple different ways. Some people wrote about the kinds of messages that might persuade immigrants to apply for DACA. These responses most frequently mentioned how DACA has improved opportunities for recipients. Many people wrote specifically about the ability to further education, get a better job, and acquire a driver's license.

A number of respondents focused on the mode of message dissemination. "Word of mouth" came up most frequently as the best way of encouraging immigrants to sign up for DACA. Others mentioned social media, newspaper, radio, Church, TV, places of employment, and schools. Many people also wrote about the importance of testimonies and engaging people who had already received DACA to talk about their experiences, as part of information sessions, media interviews and documentaries.

Finally, comments emphasized the importance of access to information in rural and under resourced parts of the state.  One respondent wrote, "Have DACA workshops accessible to as many undocumented people as possible. Several immigrants live in rural areas where free immigration assistance is not available. We have to find a way to make services accessible to them as well." Another wrote, "The most effective way to encourage immigrants to sign up for DACA is for it to be free and easy to apply."

Many respondents reported that they had concerns when signing up, commenting that the risk of deportation (for themselves and their family) after giving personal information to authorities was their biggest concern. Trust was a big factor in responses, as the following comment indicates: "I wasn't 100% sure the process actually worked & if it was something I could trust." Another wrote, "I had doubts about how likely my application was to get approved and identifying family members as undocumented by applying for DACA myself." Nevertheless, nearly all respondents (93) applied anyway, were successful, and ultimately had positive comments about the DACA program.

These responses, which supported the findings of our interviews with staff in community-based organizations, suggest that while media sources played an important role in the beginning of the program by informing the general public about DACA, better communication strategies include DACA recipients in outreach and educational processes. It also indicated that the expectation of acquiring a driver's license and legal status continue to be the most influential factors in encouraging people to apply.

*Affordability*

In order to determine the affordability of the DACA process, we asked questions about how recipients paid attorney and application fees. Personal and family funds were the primary means by which applicants paid for the application process. When asked "How did you pay for the application process? (Select all that apply)," 55% of respondents indicated that "Parents/family helped me." A total of 45% reported that they had used "personal funds." Only 6% had secured a loan from a credit union. For those who sought assistance from an attorney, 71% of the 68 people who responded this question reported that they had been charged for their services.

We sought information about where respondents applied for DACA, and who provided assistance. In addition to urban centers, like Charlotte, Winston Salem, Greensboro, and Raleigh, respondents listed smaller towns across the state as the location where they received assistance and filled out their DACA application. Respondents indicated that they had received assistance at non-profit organizations as well as private law firms. Respondents listed the following cities as locations where they filled out the application and/or received assistance:

**Map 4: Location where respondents received DACA assistance and/or filled out the application**



| | | |
|---|---|---|
| 1) Charlotte | 8) Siler City | 15) Newton Grove |
| 2) Monroe | 9) Sanford | 16) Clinton |
| 3) Candor | 10) Raleigh | 17) Fayetteville |
| 4) Asheboro | 11) Clayton | 18) St Paul's |
| 5) Kernersville | 12) Mount Olive | 19) Rockingham |
| 6) Greensboro | 13) Wallace | 20) Jamestown |
| 7) Durham | 14) Wilmington | 21) Hamlett |

We were interested in the type of assistance that people received in filling out their application. Out of the 90 people who responded to the question, "From whom did you receive assistance?" 56% of people replied that an attorney had helped them and 24% replied that they had received assistance as part of a DACA clinic at a community organization (most cited non-profits and churches as the type of community organization). Most of the respondents who had received assistance at a community organization reported that they had filled out the application themselves. Only one person reported that he/she had received assistance from a public notary worker, or "notario." Respondents indicated that they had filled out their application at a range of geographical locations. These responses support the feedback of many of the organization staff we interviewed that non-profits were most effective in helping people with relatively uncomplicated cases to apply for DACA themselves.

14



**Map 5: Where respondents lived ⬤ / where they received DACA assistance ⬤**



Individuals who sought the services of private attorneys shared their motivations in response to the question, "If you chose to use a paid private attorney, why did you choose to do so? (Please select all that apply)." Of the 42 people that responded that they had chosen to use a paid private attorney, they selected the following: "A friend or family member recommended a specific attorney" (60%), "I thought a private attorney would be better/know the law more than a free community resource" (50%), and "I wasn't aware of any free legal resources to help me complete the application" (12%).

Most of the 73 people who responded to a question about why they chose to use a free legal clinic answered that they did so because they had heard about the clinic from a trusted source—church, community center, or friend (40%). For those who received assistance at a community organization or nonprofit legal organization, they heard about this resource primarily through "Church" and "Friends." These responses point to the importance of trusted networks of family, friends, and faith communities in accessing legal resources.

In a different question, we asked, "If you chose to do the application yourself without assistance, why did you choose to do so? Fourteen people responded to this question, indicating that they had completed the application themselves. We asked about the reasons why individuals made this decision, and they had multiple responses. The main reasons focused on the expense of applying: "I could not afford a private attorney," (64%); "I was not aware of any free legal resources" (36%); and "The application looked easy and I didn't think I needed any help" (79%).

Finally, we asked, "Did you experience any problems in the application process that you'd like to share?" The majority of the 85 people who responded to that question didn't list any problems (84%). Those who did cited problems such as the need to present more proof of residency in the U.S. for the application; inability to access a lawyer because he/she was "booked up" or because of lack of funds; or because a lawyer did not fill out forms correctly.

15

Since most of our survey respondents were successful in their DACA applications, we conducted interviews with individuals who did not obtain DACA status to get a better understanding of the problems that North Carolinians faced engaging with the program. See section "Problems with DACA" below.

*The Impact of DACA status on immigrants' lives*

Our study showed that DACA status has had a positive impact on the lives of immigrant respondents in many ways. We asked several questions to better understand those impacts for recipients in North Carolina with respect to educational opportunities, economic and job mobility, and outlook on living in the United States. The first in this series of questions was "If your DACA application was approved, how has your new status impacted your life?" The multiple choice question asked specifically whether DACA status has enabled individuals to acquire a driver's license, travel abroad, further their education, acquire a job or internship, and get a GED or finish high school.  For the 93 people who answered this question, the most popular responses were that DACA status had enabled the acquisition of a driver's license (81%), a job or internship (71%), and had influenced a decision to further education (59%). Fewer people reported that they had traveled abroad (9%) or that it had impacted a decision to get a GED or finish high school (10%). We also provided an open-ended option to enable respondents to identify other impacts of DACA. Some of these comments included the following: "It permitted me to continue studying and open my own store." "I can drive without worrying that they will give me an infraction for not having a license."

A different question was specifically related to the impact of DACA status on individuals' educational opportunities. We found that DACA had a positive educational impact for most of its recipients.  For respondents who answered "yes" to DACA influencing their decision to enroll in and/or continue further education (59% of total sample), we asked the follow up question, "how has it influenced your decision?" and provided a number of different choices, all of which could be selected. Eighty-three people responded to this question. The most popular choices were "It influenced me to continue my degree" (55%), followed by "It has improved my post-graduation career opportunities" (31%) and finally, "it influenced me to finish my degree" (22%).

We also asked a number of questions to better understand how DACA has affected employment.  The first question addressed whether DACA status had helped them find a higher paying job or had impacted current employment by enabling them to secure higher pay, promotions, benefits, or paid internships. Respondents could choose one or more responses or write in a response under "other." A total of 89 people responded to this question with multiple responses. A significant percentage reported that DACA had helped them find higher paying jobs (40%) and/or secure a job with benefits (36%). A smaller percentage reported that DACA had helped secure an increase in pay at a current job (13%) and/or find work in a field of study/interest (16%). DACA had not affected current employment for 25% of respondents.

*Travel abroad*

DACA status permits traveling abroad under certain circumstances with clearance ("advance parole") from U.S. government.[13] We were interested in knowing if respondents had traveled abroad and if they had any problems leaving or entering the U.S. We found that very few people out of the group of respondents had left the country. In the earlier question, "How has your new status impacted your life?" only eight people had indicated that "It enabled me to travel abroad." In a follow up question, we asked "If you have traveled abroad, what was the purpose of your trip?" The question had multiple comments and responses. There were some comments that illustrated immigrants are not informed of all the benefits of DACA, such as "DACA does not permit me to leave the country." Other comments highlighted the additional financial burden of acquiring permission to travel: "I have not been able to travel because you have to fill out an application and pay for it and I haven't had the money to do it," and "I wish I was capable of traveling abroad." For the few who had left the country, the primary purpose of their trip was to "visit family" and "vacation." Only three people indicated they had any problems leaving or entering the U.S.

*Outlook on living in the United States*

We asked how DACA has shaped immigrants' outlook on living in the United States in order to have a better understanding of factors that influence immigrant integration and incorporation in receiving communities, as well as health and well-being. We asked respondents to rate on a scale from 1-3 the following statements:

1- DACA has negatively impacted my outlook on living in the United States
2-DACA has neither negatively nor positively impacted my outlook on living in the United States
3-DACA has positively impacted my outlook on living in the United States.

In this question, answered by nearly all who took the survey (90 respondents), 87% --the overwhelming majority--replied that DACA has positively impacted their outlook on living in the United States. A total of 12% responded that "DACA has neither negatively nor positively impacted my outlook on living in the United States." Only one person answered that DACA had negatively impacted his/her outlook.

*Future legalization*

A final set of questions addressed how people might access information should there be comprehensive immigration reform in the future. Specifically, we asked, "If there were a future immigration reform allowing you to apply for a new or better type of status, where would you seek information about legal resources?" This question assessed how people would seek information about legislation as well as legal resources. Even though most respondents indicated earlier in the survey that they had learned about DACA via news and media outlets, their responses to this question made it clear that lawyers and community organizations were

the primary places they would seek out in the future to get information about immigration reform and legal resources. Out of 85 respondents, "Lawyers/law firm" was the most popular response (36%), followed by "community organizations" (Church, Nonprofits, Hospital) (22%), and "internet" (14%).

When asked "Who would you turn to for help in applying, if anyone?" 58% of the 79 respondents replied "lawyer," followed by "community organization" (23%), which includes non-profit organizations and churches. Respondents provided a number of rationales for why they would turn to a particular resource in the write-in section.  Many shared that they would turn to church/non-profit/community leaders in the future because they had been helpful during the DACA process. Following up on this question, we then asked, "If a free legal resource were available in your community, would you turn to that organization?" Of the 85 people who responded, only 7% said "no."

*"One step closer to the American Dream"*

Finally, we provided a space for respondents to write anything else they wanted to share about their experiences with DACA. For those who shared comments (43 people) nearly all (91%) expressed something positive about DACA. Some of these comments included, "I am grateful for this opportunity and encourage everyone who qualifies to apply," and "I'm grateful for this opportunity and I hope that an immigration reform goes into effect soon so all the people who don't qualify for DACA can adjust their status as well." At the same time, respondents were cognizant of DACA's limitations to a small percentage of the immigrant population and the thousands of people excluded from its benefits. Several others expressed the desire for DACA to last longer than two years. "DACA has definitely opened up many doors for me. I just hope this will be the beginning of great things for all immigrant families who are looking for a better future!"

*Problems with DACA access: perspectives from immigrants who did not apply*

To better understand the problems that immigrants faced in applying to DACA, we interviewed five individuals from different counties across the state who may have been eligible but did not apply. We also heard about the experiences of immigrants who encountered barriers that dissuaded them from applying in interviews with staff members working at non-profit organizations offering DACA services. Their experiences resonated with that of the DACA recipients surveyed, but also elucidated many of the challenges of applying that include cost, inability to access documents, and distrust of government officials and the DACA process.

The experience of Jacki (pseudonym), an 18 year old young woman living in Buncombe County, illustrated how the cost of the application and legal fees prevented her and her three other siblings, all eligible, from applying. "My older brother supports our family here in North Carolina. It would have been thousands of dollars for us to apply and get a lawyer. We just can't afford it."  She was aware of the loans that the Latino Credit Union provided for DACA applicants, but cited the bank's requirement of applying through parents as a limitation for her

family. Another interviewee, Joe (pseudonym), who is 19 years old and lives in Orange County, started the application process through a local non-profit organization but stopped after he learned that his case would require attentional legal attention. "I can't afford the lawyer fees, and my case was complicated because I had lived in a lot of different places and had traffic infractions from driving to my job."

Interviewees also commented on the challenge of collecting the documents needed to apply. In particular, they mentioned how traveling to the United States under difficult conditions, either in a home country or as part of the migratory process, meant that many immigrants no longer possess the required documents that prove identity such as passports or national identity documents, birth certificates with photo identification, or school or military ID with photo. Noemi (pseudonym), a young woman we interviewed who would have qualified for DACA according to USCIS guidelines, described why she lacked documents to apply to DACA. "When I came to the U.S., it was in a state of panic. I left my country (Honduras) at night, with nothing but a few clothes, no passport, nothing. I made it here, but I lost my birth certificate and have no driver's license, no ID, and I can't get them. I can't get DACA because I don't have the records I need." Her comments illustrate how DACA may not be accessible to eligible immigrants in particularly vulnerable situations.

In many cases, young applicants must depend on religious or school officials in their receiving communities in the United States to provide academic records to establish proof that the applicant came to U.S. before his/her 16th birthday. For migrant families who work in agriculture or other seasonal jobs that constantly move locations, securing these records may be difficult or even impossible. One interviewee, a young man in his late teens who had grown up in three different states in a family of migrant farmworkers, shared why he was unable to obtain his school records. "I only spent six months in an elementary school in Florida, and when I contacted the school they said they had no records of my attendance. I have no other proof of being in the country on the dates I needed." As his comments illustrate, children are particularly limited in their ability to prove U.S. residence, as they are rarely signatories or even named in many of the documents permissible for DACA application, such as copies of money order receipts, automobile licenses, deeds, or mortgages, insurance policies and/or rental agreement contracts. Many interviewees spoke about the difficulty of acquiring records from staff in schools and local governments. Vera (pseudonym), a young woman living in Johnston County, described her experiences attempting to acquire a copy of the deed of her family's house from the local municipal offices. "It took many months to finally get a copy of the document. We were passed from office to office at the town, and they would tell us they had so many requests that they could not help us." Staff in city and county governments, including public schools, may be unfamiliar with DACA or unprepared for the volume of requests for documents.

Another factor that complicates immigrants' access to official records are federal immigration enforcement programs such as 287g and Secure Communities that enable local police to help facilitate deportations. These programs have undermined individuals' trust in local, state, and federal government entities, making some immigrants wary of disclosing undocumented status

and applying for DACA.[14] "My parents did not want me and my brother to apply to DACA. They said that we have no reason to have any faith in any person or promise related to the government, given the way that our family and friends have been arrested. And why invest that kind of money in something that you don't know will work?" This sense of distrust, expressed here in this quote from Raul (pseudonym), a young man we interviewed in Alamance County, was a common sentiment heard from all five of the individuals we spoke to who had not applied for DACA.

## Conclusions

Our findings from interviews and surveys with staff from community-based organizations and immigrants point to a number of conclusions about the impact of DACA in North Carolina, why more people applied here than in other states, and what factors contributed to the reasons why an estimated 56,000 potentially eligible youth had not applied by 2014. To summarize:

1) DACA has been important to the integration and well-being of immigrants in North Carolina.
2) Community-based and statewide organizations have played an important role in the implementation of DACA in North Carolina, and provide a critical infrastructure for future legalization efforts.
3) Individuals' ability to apply to the DACA program is limited by income and geographic proximity to organizations offering DACA services.
4) Acquiring a Driver's License is a primary motivation for DACA application in North Carolina.
5) Local level contexts of reception and statewide immigration policies influenced DACA enrollment in North Carolina.
6) DACA has had transnational impacts because it engages families with members living in the United States and in foreign countries of origin.

**1) DACA has been important to the integration and well-being of immigrants in NC.**

A significant number of study participants reported that DACA status was influential in starting or continuing a degree program in an educational institution, either a high school or college. Many participants also reported that DACA helped them secure a job or receive higher pay and benefits at a current job. These finding suggest that eligibility to work legally in the United States (a benefit of DACA status) may incentivize degree completion – an important step in immigrants securing a higher paying job. Additionally, DACA status may encourage employers to increase pay and better support immigrant employees. The overwhelming majority of study participants replied that DACA has positively impacted their outlook on living in the United States, and dramatically reduced stress associated with the fear of deportation. These are all indicators of upward socio-economic mobility and enhanced well-being. These responses point to how DACA may be an important tool for immigrant social integration by enabling more

20

educational and civic participation, expanding immigrants' sense of belonging, and removing the immediate specter of deportation.

**2) Community-based and statewide organizations have played an important role in the implementation of DACA.**

Community-based and statewide organizations and grassroots groups that provide services to immigrants and refugees have played an important role in the implementation of DACA in North Carolina. More than 12 organizations have worked in collaboration to provide free workshops and clinics that provide educational information about DACA and/or legal assistance throughout the application process in North Carolina. This collaboration took the form of co-organizing events and staff trainings, sharing models and materials, and creating spaces to share strategies for document collection. Most of the immigrant study participants had worked with one of these 12 organizations to secure DACA status and indicated a desire to work with these organizations in the future. In particular, organizations with statewide networks and experience providing legal assistance for immigrants were instrumental in recruiting pro-bono legal assistance and traveling to rural and/or under resourced areas to provide assistance in collaboration with local organizations or churches.

We also found that DACA workshops were most successful when consistently held at regularly scheduled times and organized over multiple days so that participants could process the information and have time to collect materials and funds needed to apply. While outreach and publicity strategies varied according to local communities, the most effective strategy according to both organization staff and DACA recipients was "word of mouth" and engaging DACA recipients and their success stories in the outreach process.

**3) DACA is too expensive for many immigrants. Geographical proximity to services further limits access to the DACA program.**

Immigrants living in low income, rural areas of the state faced the greatest barriers to application. Unsurprisingly, lack of mobility and accessibility limit DACA enrollment: we identified the need for more DACA assistance in rural areas, particularly in the southeastern coastal plains and western mountainous regions of the state, where communities experience higher than average levels of poverty and there is a limited infrastructure of support for immigrant residents. Immigrants living in rural areas without access to driver's licenses or public transportation have limited ability to travel to urban areas where most DACA workshops have been offered in North Carolina. Hispanics experience the highest poverty levels of any ethnic or racial group in North Carolina, and members of immigrant communities attempting to enroll in DACA may not be able to afford the relatively costly legal assistance and filing fees. Families with multiple eligible members face particularly difficult challenges. The desire to gain legal status, to further education, and get a job were important motivations for study participants to enroll in DACA. Another major challenge related to accessibility is assembling and securing the documents needed to prove residency. For migrant families who work in

21

agriculture or other seasonal jobs, securing academic and other records may be difficult or even impossible. Many interviewees spoke about the difficulty of acquiring records from staff in schools and local governments.

**4) Acquiring a Driver's License is a primary motivation for DACA application in North Carolina.**

Underscoring immigrants' lack of mobility, one of the most important motivations for applying to DACA was to acquire a driver's license, and 80% of study participants obtained a license after receiving DACA status. The importance of driver's licenses as a primary motivating factor is unsurprising given that most North Carolina counties and municipalities are located in rural places with little or no public transportation, and that undocumented immigrants are barred from obtaining driver's licenses in North Carolina.

**5) Local level contexts of reception and statewide immigration policies influenced DACA enrollment in North Carolina.**

Many barriers to application were directly caused or exacerbated by local and state policies. Our data illustrated how local and state policies impact immigrants' access to information, resources, and records required for DACA application, as well as their trust in the application process. In North Carolina and other states where a social security card is needed to acquire a driver's license, access to photo identification options has been limited or even unavailable. Disproportionately high drop-out rates and low college attendance rates among NC Latinos – one result of NC state policies barring undocumented immigrants from attending public universities at an in-state tuition rate--disadvantage many young immigrants who are not able to provide proof of student status at the time of requesting DACA. Another factor that complicates immigrants' access to official records are federal immigration enforcement programs such as 287g, Secure Communities, and PEP (Priority Enforcement Program) that enable local police to assist with deportations. These programs have undermined individuals' trust in local, state, and federal government entities, making some immigrants wary of disclosing undocumented status and applying for DACA.

**6) DACA involves transnational families.**

An important insight provided by immigrant study participants was that the process of applying to DACA frequently involves whole families, not just an individual. Families make decisions about which members apply based on multiple factors that include budgetary constraints, age and/or seniority of eligible children. Members of extended family networks, like grandparents, aunts, uncles, and cousins; work collectively to fund the legal process and forge relationships with bureaucrats (at schools, medical facilities and other places with official records) in order to assemble documents and learn about the DACA process. Moreover, many immigrant families are part of transnational communities in which people send remittances and engage in regular communication with family members in a country of origin. Similar to other aspects of migrants' lives, funding family members' DACA application may involve a transnational social

22

network that extends to a country of origin, as in the case of relatives in Mexico who remitted money to the U.S. to cover the cost of the application. Relief from deportation has repercussions for migrant countries of origin, where deportees encounter social, educational and economic obstacles to re-integration.

**Policy and programmatic recommendations**

This study of DACA in North Carolina provides a number of insights into the organizational implementation of federal administrative actions at the local level. For example, community-based organizations could facilitate immigrants' ability to protect and store key documents and records needed for programs like DACA and future federal immigration reform in a number of ways. Some of these services might include the provision of copy/scan machines, document archival space, and education about document storage programs accessible by mobile devices. Municipalities and schools should hire bilingual staff and provide training to better facilitate the provision of documents and records to immigrant residents and students.

Insights about how the DACA process has engaged families presents important lessons for organizations, banks, and governmental institutions. For example, non-profit organizations or law firms offering DACA assistance might market their services towards families, not only individuals, and design their DACA counseling services to accommodate families. Banks and credit unions could bundle loans to pay for application fees for multiple members of the same family. The United States Citizenship and Immigration Service Agency (USCIS) could re-conceptualize the application process to accommodate families increase affordability and enhance bureaucratic efficiency for families with several members eligible for DACA.

DACA is a presidential administrative action that currently provides no financial resources for outreach and assistance efforts in states, placing a significant burden on local organizations that may be already limited in staff and resources. Future immigration reforms must engage with and provide funding for community organizations that have been instrumental in DACA efforts. If future legalizations or federal administrative actions remain unfunded, a major challenge for organizations will be to identify, recruit and train more lawyers at private firms to offer affordable services. Future reforms will need to address how resources can be allocated to support localities and regions where immigrants have limited access to information and legal assistance.

Local level studies present important insights into how federal immigration programs can best be implemented effectively and equitably. They deepen our understanding of the impacts of federal programs on individuals and families and provide context for variations in application rates nationwide. As this study in North Carolina has illustrated, programs like DACA positively impact the lives of immigrants and their families in North Carolina by increasing access to educational and professional opportunities, underscoring the importance of the program as a tool of economic development for entire communities. Organizations providing DACA support, as well as immigrants who have participated in the DACA application process, have gained

important experience that will be beneficial to operationalizing future comprehensive immigration reforms, should they occur.

## Acknowledgements

We are grateful to those who contributed to this research across the state, including the Z. Smith Reynolds Foundation, the many young people who participated in the survey, leaders at non-profit organizations and foundations who shared their perspectives, and our colleagues at the University of North Carolina at Chapel Hill.

---

[1] U.S. Citizenship and Immigration Services. "Number of I-821D,Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2015"
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Naturalization%20Data/I821d_performancedata_fy2015_qtr2.pdf

[2] Batalova, Jeanne, Sarah Hooker, and Randy Capps. "DACA at the two-year mark: A national and state profile of youth eligible and applying for deferred action." Washington, DC: Migration Policy Institute. Retrieved November 11 (2014): 2014.

[3] U.S. Citizenship and Immigration Services. "Number of I-82D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2014 First Quarter." August 19, 2014.
http://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA-06-02-14.pdf

[4] Svajlenka, Nicole Prchal and Audrey Singer. "Immigration Facts: Deferred Action for Childhood Arrivals (DACA)." http://www.brookings.edu/research/reports/2013/08/14-daca-immigration-singer. Wednesday, August 14, 2013.

[5] http://factfinder2.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t

[6] Gill, Hannah. *North Carolina and the Latino Migration Experience: New Roots in the Old North State*. UNC Press 2010.

[7] Pew Hispanic Center. "Unauthorized Immigrant Population, by State, 2012."
http://www.pewhispanic.org/interactives/unauthorized-immigrants-2012/

[8] Pew Hispanic Center. "Unauthorized Immigrant Population: National and State Trends, 2010."
http://pewhispanic.org/files/reports/133.pdf pg. 25

[9] Notaries in Mexico and other Latin American countries are required to have more extensive legal training than in the United States. These different legal standards for notaries can create confusion among immigrant communities about who is licensed to assist with immigration applications.

[10] Wong, Tom K., Angela S. Garcia, Marisa Abrajano, David FitzGerald, Karthick Ramakrishnan, and Sally Le. "Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals, or DACA." Center for American Progress. September 2013. pg. 26

[11] Depending on the country, degrees with this title may represent different educational levels.

[12] Using the mapping tool on http://ncpedia.org/geography/regions, we assigned counties to one of three regions in the Eastern Coastal Plain, Western Mountains, and Central Piedmont.

[13] See USCIS.gov "Daca FAQ"

[14] Gill, Hannah. *North Carolina and the Latino Migration Experience: New Roots in the Old North State*. UNC Press 2010.