# EXHIBIT 47

**NewsRoom**

6/13/17 Fed. News Serv. Transcripts (Pg. Unavail. Online)
2017 WLNR 18737622

Federal News Service Transcripts
Copyright (c) 2017 Federal News Service

June 13, 2017

H Approps, Subcommittee on Homeland Security Hearing on the ICE and CBP F.Y. 2018 budget

Witnesses: ICE Acting Director Thomas Homan; CBP Executive Assistant Commissioner Todd Owen; and U.S. Border Patrol Acting Chief Carla Provost testify Time: 10:00:00 Date: 2017-06-13

CARTER: I'm going to call this subcommittee to order. Welcome, everybody. We're glad everyone's here.

And I want to welcome our panel of witnesses. Today we have John Wagner, executive assistant commissioner of CBP for field operations. Chief Carla Provost, acting chief of the Border Patrol. And Thomas Homan, acting director of ICE. Welcome each and every one of you. We appreciate very much your coming here on this important issue.

This subcommittee is holding a hearing on the budget request of two DHS components, ICE and CBP. And this is for couple of reasons. The first is practical. Chairman Frelinghuysen wants all appropriations bills reported out the full committee before the August recess. And given the late submissions from -- these are late submissions for 2018 budget request, we are operating on a compressed schedule in order to meet this objective.

Having both components also provides an opportunity to hear how they operate jointly, and how those operations have a direct impact on the assumptions underlying their budget requests.

Let me state at the outset that I support the proposed budget increases for both CBP and ICE. Thankfully, illegal immigration is down. However, the border is still vulnerable and gaining operational control remains an imperative.

In my opinion, technology solutions that improve situational awareness and infrastructure that slows illegal crossings makes the country safer. Too often the discussion about border security revolves around illegal immigration, which is certainly part of the story.

The rest of the story is that illegal immigrants can exploit vulnerabilities in the nation's border, and if they can do it, so can the terrorist, drug smuggling and human trafficking organizations. This is unacceptable. It's time to change the dynamic and the budget request for CBP and ICE is a start in the right direction. The fiscal year 2018 budget request for CBP is $13.9 billion, an increase of $1.7 billion over the amount provided in fiscal year 2017. This includes $1.7 billion for new physical infrastructure.

There are legitimate questions about the request that require answers. For example, spending is proposed for various types of barriers, but it's unclear where they will be located, or if they can be executed in fiscal year 2018.

Likewise, we need an understanding why more emphasis has not been placed on technology and personnel at points of entry. This is where a vast majority of the illicit drugs and currency enter the United States.

The fiscal year 2018 budget request for ICE is $7.6 billion in discretionary spending, an increase of $1.1 billion over fiscal year 2017. The largest share of the increase supports the detention and removal of an additional 12,055 adult aliens, resulting from robust interior enforcement.

This subcommittee needs to understand if the change in policies and force structure will actually enable this level of enforcement as well as the methodology used to calculate the cost for enforcement and removal operations.

Before I turn to our witnesses for their statements, the text of which will be included in the record, I'd like to recognize the distinguished ranking member, Ms. Roybal-Allard, for any remarks she may wish to make.

ROYBAL-ALLARD: Thank you, Mr. Chairman. And welcome, Director Homan, Chief Provost, and Deputy Executive Assistant Commissioner Wagner.

When the secretary appeared before this subcommittee a few weeks ago I noted that his job was among the most challenging in government. Much of that challenge...

CARTER: We don't hear you on the mike.

ROYBAL-ALLARD: When the secretary appeared before this subcommittee a few weeks ago, I noted that his job was among the most challenging in government. Much of that challenge stems from the difficult mission of your agencies.

One of the greatest challenges is enforcing our immigration laws, while at the same time adhering to our American values. One of the responsibilities of this subcommittee is to provide the oversight of where and how your agencies use taxpayer dollars. There will be times we will disagree on funding priorities, as well as policies, interpretation of law and enforcement priorities, just as I disagreed with some of the prior administration.

Among those disagreements is the president's proposed border wall, because it isn't enough just to ask whether an investment improves homeland security. We must also consider the fact that each additional segment of physical barrier at the border comes at the expense of important priorities, both inside and outside of the department.

We must ask whether the incremental benefits outweigh the detrimental effects, including the cost and the trade-offs.

Another responsibility of this subcommittee is to hold accountable your agencies and any personnel who violate the trust we and you have placed in them. For example, CBP and ICE have significant authority not only over criminal aliens but in the treatment of extremely vulnerable individuals, children and families they apprehend, many of whom are fleeing severely traumatic circumstances.

Emphasizing the need for CBP and ICE to ensure such individuals are treated fairly and humanely and according to appropriate standards is this subcommittee's obligation and should not be interpreted as being at odds with valuing the mission of your agencies.

A further area of disagreement is on immigration enforcement. I completely disagree with the aggressive posture called for by the president's executive orders. One sentence in the witness testimony particularly struck me in this regard. It says, and I quote, "The stepped-up enforcement of our nation's immigration laws in the interior of the United States is critically important to the national security and public safety of the United States," end of quote.

There is no disagreement that we should be removing dangerous individuals, but interior arrests of non-criminals are up 157 percent over the last year. That is not required for national security or public safety, and it has real cost to families and communities all over this country.

One example of those costs is in Los Angeles, where there is an old battery recycling plant. For decades this facility has exposed nearby residents to harmful toxins such as lead and arsenic, impairing the health of their children for the rest of their lives. Some 100,000 people are still at risk from this contamination.

The county has organized volunteers to go door to door in these communities to inform and gather health information, but many of the residents are so frightened of being separated from their families, health professionals fear residents will be too afraid to talk to volunteers.

Also because of current immigration policies, people are afraid to report serious crimes, including domestic violence, and they are less willing to come forward as witnesses to crimes.

Teachers are telling me that children are being traumatized and afraid to go to school, or to just go out and play, for fear their parents will be gone when they return home. The trauma that is being inflicted on entire communities throughout our country cannot be overstated. This is a moral question as much as it is a legal one. And members of the panel, just as other law enforcement entities, have discretion to enforce our laws, you too have discretion in enforcing our immigration laws fairly and justly.

Furthermore, I hope as we discuss these and other important issues, we will all avoid unnecessary and misleading rhetoric suggesting that Secretary Jeh Johnson and the previous administration did not work to protect our borders and enforce our laws.

I hope we will respect efforts of the prior administration to faithfully enforce the law as they understood it, including the efforts of the men and women of CBP and ICE who served during that administration. To try and discredit them only serves to undermine the respect and confidence the American people have in their government and its determination to keep them safe.

I also hope that, given the importance of your mission, when we have areas of disagreement in homeland security investment and policy, it does not call into question the commitment we all share as Americans to defend and protect our country.

Mr. Chairman, I know that this approach that you take in leading this subcommittee, and I very much respect and appreciate your patriotism and your commitment to protecting our homeland.

Thank you, Mr. Chairman, thank you members of the panel, and I look forward to our discussion this morning.

CARTER: We are pleased to have the ranking member of the full committee, Ms. Lowey, here today. Ms. Lowey, would you like to make a statement?

LOWEY: Thank you, Mr. Chairman. And I'd like to thank Chairman Carter, Ranking Member Roybal-Allard, for holding this important hearing, and I want to thank you to our distinguished panelists for being here this morning.

As we wade further into this condensed appropriations season, I have been struck by the notable and at times shocking decreases and eliminations in this administration's budget. I am stunned yet again, but this time by the increases proposed for both ICE and CBP, which are part and parcel of the un-American mass deportation policy this administration is pursuing.

For ICE, the budget requests $1 billion for a surge in detention beds, an increase of $186 million to hire 1,000 additional immigration enforcement officers and 600 support staff. For CBP the budget requests $1.6 billion for, in my judgment, President Trump's boondoggle of a wall, an unnecessary and unreasonably expensive proposition that is based on nothing more than a campaign promise and will not keep us safe.

I want to make something perfectly clear. Democrats will not accept a penny of funding for a new deportation force or a border wall. It appears President Trump and the administration did not take note of the recently enacted bipartisan spending bill in which neither of these items was funded.

If President Trump actually wants the government to function and wants annual appropriation bills enacted into law then he must abandon these outrageous requests.

In addition, President Trump has spoken and tweeted extensively regarding his draconian plan to detain and deport as many people as possible. Let me give you just one example of how unconscionable and unacceptable this approach is.

Last week a young man from my district, Diego Pumonacanella (ph), was detained by ICE. Diego was brought to the United States as a minor by a parent and by all accounts was an upstanding member of the community. This summer Diego was planning to graduate from high school, but instead was separated from his mother, detained on the day of his senior prom, and is now due to be deported.

We have worked to foster a diverse community where people of all backgrounds build a brighter future together. The removal of this teenager violates the fundamental trust between law enforcement and our community.

Increased immigration enforcement of nonviolent offenders -- I mention that again because nonviolent offenders, especially targeted at children like Diego, has a chilling effect on these critical relationships. This radical enforcement policy makes us all less safe.

As I told Secretary Kelly when he testified before this subcommittee last month, the budget does not reflect the serious nature of the threats we face. It's time we move on from campaign rhetoric and start focusing on what is needed to truly keep America family safe. Thank you.

Thank you, Mr. Chairman.

CARTER: Thank you, Ms. Lowey.

All right. We are ready to hear from you on your opening statements. Those opening statements. If you submitted an opening statement, everybody's got a copy of it. What you need to say, you need to condense it down to about five minutes, and the rest of what you have to say of course will be entered into the record.

So Ms. Provost.

PROVOST: Thank you, Chairman Carter, Ranking Member Roybal- Allard.

As the acting chief of the United States Border Patrol, I am honored and privileged to appear before you today to discuss the president's fiscal year 2018 budget. As America's border agency, U.S. Customs and Border Protection is responsible for securing America's borders against all threats, while facilitating the flow of lawful people and goods entering the United States. Today I will discuss how we are using the resources provided by Congress efficiently and effectively, and talk about how the president's fiscal year 2018 budget request supports CBP's continued commitment to securing our

borders by maintaining the right balance of people, technology and infrastructure, often referred to as the three- legged stool.

As an evolution from the three-legged stool, we rely on four interdependent master capabilities of domain awareness, impedance and denial, access and mobility, and mission readiness.

Domain awareness is provided through technology that helps detect, identify and classify. Impedance and denial is provided through border walls designed to deny and deter illicit cross-border activity.

Access and mobility is added infrastructure of accessing patrol roads that enhance our responsible capabilities. And finally, mission readiness is provided through the border patrol agents and their training and tools that provide the law enforcement response.

Our operational capabilities are reinforced by Congress's ongoing support of investments in technology and equipment. Radios are essential for frontline agents, officers and pilots. Border patrol agents may not deploy to the field without a functioning radio.

On that, I would be remiss if I did not express our gratitude to Congress for your strong support in fiscal year 2017 in this area. However, nearly 72,000 units of CBP's radio inventory are obsolete and/or have exceeded their useful life.

The 2018 budget requests $44 million to purchase secure modern communication assets in order to achieve maximum interoperability and functionality. The budget also includes $34.8 million for the tactical aerostats and relocatable towers program to provide border patrol agents with advanced surveillance technology over a wide area.

The budget includes $22.4 million for integrated fixed towers, operations and maintenance, and $17.4 million for procurement, construction and improvements. These and other proven border security technologies help the U.S. Border Patrol fulfill our mission every day.

To fulfill the mandate of executive order 13767, border security and immigration enforcement improvements, the budget funds an increase of $100 million to begin hiring 5,000 additional border patrol agents, beginning with 500 agents from current appropriated staffing levels.

The budget seeks further increase of $23.2 million to fund the initial hiring of 94 additional air and marine operations personnel. This initial hiring surge develops the foundation to increase operational control along the border.

The budget also includes an increase of $17.5 million to support efforts to attract qualified candidates and expedite the hiring process. CBP recruiters will participate in thousands of recruiting events, including those for veterans and transitioning military personnel as a top priority.

With that, I can assure you that our agency is committed to hiring people who have the highest standards of integrity, both personally and professionally.

The budget also includes $25 million to enhance U.S. Border Patrol's operational mobility program. This positively impacts our agents' morale, and we are very thankful for the continued dedication of members of Congress to working collaboratively with us to find solutions to this complicated challenge.

Also included in the budget in support of the executive order is $1.6 billion for a border barrier system, support infrastructure and personnel, and $975 million for border security technology assets and equipment.

CBP has begun taking appropriate steps to deploy a border wall first where it is needed most. The budget provides for 32 miles of new border barrier system and 28 miles of new levee wall system in the Rio Grande Valley sector, where we have a critical operational requirement, as well as 14 miles of secondary replacement barrier system in the San Diego sector.

Coordination and cooperation among all federal, state, local, tribal and binational law enforcement agencies, as well as with the public and private sectors that have a stake in our mission, is paramount. The border environment is dynamic and requires continual adaptation.

This budget supports the border patrol's dedicated men and women, who continue to meet daily challenges with integrity and commitment.

In closing, I would only add that it is my belief that border patrol agents are among the most dedicated and committed law enforcement personnel in America. And we are the finest border security force in the world. It is an honor to work with them, as well as to be their advocate here today.

Thank you for the opportunity to appear before you and for your continued support of CBP. I look forward to your questions.

CORNER: Mr. Wagner.

WAGNER: Thank you, Chairman Carter, Ranking Member Roybal- Allard, and members of the subcommittee. It's an honor to appear before you today. This committee has been a great supporter of CBP, which has really helped the men and women of our organization achieve a complex mission.

So as deputy executive assistant commissioner in the office of field operations, I'm responsible for more than 29,000 employees, including more than 24,000 CBP officers and CBP agriculture specialists at our nation's 300-plus ports of entry in the air, land and sea environments.

These dedicated men and women use state-of-the-art technology, intelligence, risk information and targeting results, coupled with their well honed law enforcement techniques and skills to prevent dangerous people and contraband from entering the United States. They do all this while enabling the movement of legitimate international trade and travel.

The fiscal year 2018 budget supports these efforts by ensuring the men and women of CBP have the resources they need to get the job done. Last fiscal year, CBP officers inspected over 390 million travelers and arrested over 8,000 individuals wanted for serious crimes.

CBP officers also stopped nearly 275,000 inadmissible aliens from entering the United States, which was an increase of 7.6 percent from fiscal year 2015.

The reasons for this range from immigration violations to criminal violations and national security concerns. The fiscal year 2018 budget, which includes funding to improve intelligence and targeting capabilities related to the screening and vetting of immigration populations to international travelers will enhance CBP's ability to secure our borders and keep America safe.

The budget requests include an increase of $14.5 million to expand staffing at CBP's National Targeting Center by 93 positions. Sixty-three of these positions are CBP officers and the remaining are support positions to conduct activities such as the vetting of travelers and cargo, as well as our counter-network activities.

The National Targeting Center operates 24 hours a day, seven days a week. Their mission is to effectively identify passengers and cargo that may pose a threat in all international modes of transportation and ensure those threats are addressed in a sufficient manner at the earliest possible opportunity.

Effective targeting and interdiction prevents inadmissible high- risk passengers, cargo and agriculture, as well as bioterrorism threats from reaching the United States. This ensures our borders are the last line of defense rather than our first.

The budget request also includes $54.9 million for the National Targeting Center to build up better analytical systems and enhance vetting platforms to support -- in support of our counter-network strategy.

In the area of non-intrusive inspection technology, the fiscal year 2018 budget proposes $109.2 million to build upon prior years' investments in our current small-scale and large-scale fleet. CBP officers use this technology to scan for the presence of radiological or nuclear materials in 100 percent of mail and express consignment mail and parcels, 100 percent of truck cargo, and personally owned vehicles arriving from Canada and Mexico, and nearly 100 percent of all arriving maritime containerized cargo.

CBP officers also use this technology to examine cargo conveyances such as sea containers, commercial trucks, and railcars and privately owned vehicles for the presence of contraband without physically opening or unloading them.

Fiscal year 2016, CBP utilized over 300 large-scale nonintrusive inspection systems to image approximately 6.5 million cargo or conveyances in the land, air and sea ports of entry, resulting in our seizing of over 355,000 pounds of narcotics and more than $3.9 million in U.S. currency.

More than 8,000 additional officers, at a labor cost of approximately $1 billion would have been required if physical examinations had been conducted.

The fiscal year 2018 proposed funding will allow CBP to remain on track to ensure our nonintrusive inspection fleet is operating within its service life by fiscal year 2024. The funding will support replacement of 52 large-scale systems and about 600 small-scale systems.

We will deploy these systems where they are best supported by the operational needs and the physical environment. CBP will deploy mostly what we call Z portal systems, that have a proven track record of reliably helping our officers detect contraband at the borders.

So I want to thank members of the subcommittee for your continued support of CBP and for the opportunity to appear before you today, and I'm happy to answer any of your questions.

CARTER: Thank you, Mr. Wagner.

Mr. Homan.

HOMAN: Thank you, sir. I want to read my opening statement that I took time myself to pen this past week.

Chairman Carter, Ranking Member Roybal-Allard and distinguished members of the subcommittee. Thank you for the opportunity to appear before you today to present the President's FY18 budget for U.S. Immigration and Customs Enforcement.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 7

Our mission is to protect America from cross-border crime and illegal immigration that threaten national security and public safety. To carry out our mission, ICE focuses on immigration enforcement, preventing terrorism, and combating transnational criminal threats.

The president's FY18 budget request for ICE includes $7.9 billion to help ICE meet our mission requirements and 1028 to make much-needed investments in immigration enforcement, criminal investigations, workforce expansion and training.

Before we talk dollars and cents, I want to take this opportunity to speak to you about the outstanding men and women of ICE. Just a few weeks ago I joined Americans from across the country to observe national police week in honor of fallen law enforcement officers who gave their lives in the line of duty.

I walked by the marble walls of the National Law Enforcement Officers Memorial, which holds the names of 20,000 men and women who lost their lives protecting others. Among those are the names of 52 officers and agents who served within ICE.

Tragically, two names were added this past year, deportation officer Brian Balliso (ph) and Special Agent Scott McGuire. I met their families, their wives, their children, their parents, who will endure the pain of their loss for a lifetime.

Police week and similar occasions bring us together in shared respect for law enforcement officers who serve and protect us, but too often that respect does not seem to extend to the honorable men and women of ICE.

Unfortunately, the men and women of this law enforcement agency are unfairly vilified for simply doing their jobs. These are good and decent people who leave their families every day to enforce laws they are sworn to uphold, willfully putting themselves in harm's way to keep our communities and our nation safe.

ICE is a professional law enforcement agency focused on public safety and national security, and we enforce laws like every other federal law enforcement agency, state and local. And yet, unlike most other agencies, we do this despite a constant deluge of biased attacks against ICE personnel by those who disagree with the laws we enforce.

While I recognize that people have the right to protest what they don't agree with, I want to emphasize to the public and to the media and to this committee that ICE officers don't write the laws. They enforce laws as enacted by Congress and signed into law by the president. They do not make up policy on the street.

As I said, people have the right to protest, but ICE officers also have rights. ICE officers have the right to do their job professionally without interference. They have a right to uphold the oath they took to enforce the laws of this great nation. They have the right to end their shift safely and return to their families every day. And they have a right to be proud of the enormous contribution they make to our safety and security.

We are all blessed to live in the greatest country on earth, and I can't blame anybody who would want to live here. But we are also a country built on a foundation of the rule of law. Those who choose to enter this country illegally, which is a crime, federal crime, or to overstay a visa have knowingly chosen to break the law.

Meanwhile, millions of people who have become permanent members of our society through our generous legal channels, they show their respect for the rule of law and for the American people.

Even so, aliens who are subject to removal process under law receive extensive due process at great expense to the American taxpayer. If an alien is issued a notice to appear at the OCN (ph) immigration judge at taxpayer expense, they will have an interpreter provided to them at taxpayer expense during their hearings.

If they claim fear of returning to their home country, they will have every opportunity to pursue that claim. If unsuccessful, the alien can appeal the ruling to the Board of Immigration Appeals, a U.S. circuit court of appeals, and even the Supreme Court in some cases.

However, once an alien has pursued the extent of their due process rights, and a federal judge issues a final order of removal, it is ICE's job to enforce that order. If a federal judge's decision is not enforced, there is absolutely no integrity in this entire system.

If you love this country, you must respect its laws and respect those who keep you safe. ICE officers do not do what they do because they hate what is standing in front of them. They do what they do because they love what is behind them.

To that end, ICE welcomes the additional resources requested in the president's FY18 budget request, which will allow us to better fulfill our national security and public safety mission.

During his first two weeks in office, President Trump signed a series of executive orders that laid out the policy groundwork for the department and ICE to carry out the critical work of securing our borders, enforcing our immigration laws and ensuring that individuals who pose a threat to national security or public safety cannot enter or remain in the United States.

The president's budget, if funded by Congress, would provide the additional resources, tools and personnel needed to begin implementing these policies. Reflecting the administration's priorities, the president's budget for ICE reflects a $1.2 billion increase over FY17 enacted budget. This increase in funding is critical for ICE to meet its mission needs.

The president's budget also supports an expansion of our workforce by adding 1,000 law enforcement officers, as well as investigative support staff, including attorneys, to support the increased operational tempo.

The request would also maintain HSI's critical operations abroad and enhance efforts to target and combat dangerous gangs and other criminal organizations.

I want to thank you again for the opportunity to testify today and for your continued support of ICE. I look forward to answering any question you may have at this time.

CARTER: Thank you, Mr. Homan.

We are going to start with our line of questioning. We're going to have a timer on. There will be a little leeway, but I just look through the list of questions I've got and every one of them needs to be answered. I'm sure that we won't get to all of them, but we will submit all of them for an answer because everything that I am concerned about I think everybody else has questions they are concerned about. These are answers that we need to have.

We are a current event in today's world and we have to remember we are a current event and we have to really do serious inquiry. I will begin. Chief Provost, there's been a lot of discussion about how to achieve operational control over the border. How do you define the requirements for operational control over the border, and please discuss them. Do you have a fully validated requirement that is driving the request for funding in FY18 budget?

PROVOST: Thank you for the question, Chairman Carter. So operational control is not something new to the border patrol. As I know you know, we have been utilizing this term for numerous years. We created operational control.

And for us, in its simplest state it is being able to impede and deny entry. If there is an entry made, having a situational awareness until our agents can respond in a time-bound response and come to a law enforcement resolution. That is the simplest term of it.

The four master capabilities I spoke to in my opening statement, of domain awareness, impedance and denial, access and mobility and mission readiness are key to reaching op-con. As you know, the border is very dynamic and there is no one-size-fits-all.

As we go across the border in different areas, it may be a different mixture of those four master capabilities, but experience is that this works for us.

From the time that I joined the border patrol in 1995, we have been utilizing these tools to meet that requirement. So operational control is key. Those four master capabilities are the key to the success of operational control and the right balance in the right places along the border.

CARTER: Because there are requirements that are fully validated right now that are driving this quest.

PROVOST: We utilize the capabilities gap analysis process to identify gaps in simplest of terms along the border, and the C-gap process is a continuous process for a reason. As we apply resources to one area of the border, as you know it may impact other areas of the border.

And through that process we have validated the requirement. And we have different requirements across the border in all of these areas. And as I said before, it is a continuous process, so it is ever-changing and we continue to evaluate the border throughout the year, every year.

CARTER: Well, this next question has multiple parts.

PROVOST: OK.

CARTER: And we will try to keep track of them.

PROVOST: OK.

CARTER: The budget includes $1.6 billion for planning, design and construction of 74 miles of various types of physical barriers, including levee wall, bollard fencing, and potentially a cement wall. Tell us more of your plans for border infrastructure, what types of structures do you propose, and where will they be located strategically.

Where do you anticipate the longest length of barrier? Where does it not make sense to build a wall rather than a fence? From the time you get funds, how long before you start putting steel in the ground? That one I put an X by. That's important.

Do you expect to use multiple contract vehicles as well as contractors? Can the entire $1.6 billion be put on contract by September 30th, 2018? Please be specific as to those projects you can put on contract and address the situation in Texas, where land is mostly privately owned by private people. Lots of parts.

PROVOST: OK. I will do my best to make sure I hit all of them, sir.

So yes, the $1.6 billion that we have requested for fiscal year 2018, as you have stated we have 28 miles of levee wall that we are asking for, and that really fills the gaps where we have current wall in the Rio Grande Valley sector, and then

another 32 miles that we are working within a 52-mile area of determining, making final determination of where that goes. And then as you stated, we also have the secondary wall in San Diego.

Through our C-gap process we have validated that that is our priority area to go for fiscal year 2018. I think it is very clear that the Rio Grande Valley sector area has been an area of exploitation for bad actors in the last couple of years, for us certainly a high priority area for us in an area where we are lacking a lot of infrastructure in general.

So that is an extremely important area for us as well, as well as replacement in San Diego, in an area that has been breached over 800 times. The current fence that is in that area is insufficient, and that is a high risk area for us in the aspect that they have returned on numerous occasions. Traffic returns to that area.

Our transnational criminal organizations will go to the area of easiest access, logistical support, quickest vanishing times, so that is why that area is key to us. And through our planning process that is where we came with -- to that area of wall.

For the longest barrier, it would be those 32 miles in the Rio Grande Valley sector area. The 28 miles is broken up and filling some gaps, along with the gates, which thank you very much for the funding in 2017 to support. Thank you to the committee for those gates. That is imperative for the operations of our agents on the ground in Rio Grande Valley.

There are certainly, and you have heard the secretary say that there are areas where a wall does not make sense. A prime example would be in the Big Band national forest area. There are areas where there are natural barriers and there is no requirement for us for a wall there. There are other areas as well, some of the lakes throughout Texas with Mexico.

So we are taking all of that into consideration as we go through our analysis process of where we have a requirement for impedance and denial.

You asked about the funds and the contracting. Obviously I am no contract specialist, but I know that our team is working very, very closely if given the funding.

So first let me address the prototypes. It is my understanding that we are working to a late summer timeframe for those prototypes to be in for some analysis and review and see how those would possibly add to our toolkit, different barriers. That of course is for this year.

For next year, if -- we are working towards diligently if we receive the funding being able to start in March or April of 2018. Beyond that I would refer you -- I would say I think it would benefit us to have some of our specialists come back and brief your staff more in-depth because that is not my area of subject matter expertise.

CARTER: Well, if that is necessary then would you get them to answer this question for us?

PROVOST: Of course, sir, I will.

CARTER: Because these are large amounts of money.

PROVOST: Certainly.

CARTER: These are important projects. We don't want to be sitting with pots of money out there for long periods of time.

And then the question about the Texas situation. We pride ourselves in Texas on our property rights because we entered this country reserving our property rights, which is very rare as it pertains to the other 50 states. Therefore, we violently fight for our property rights.

PROVOST: Certainly. I apologize that I missed that.

CARTER: There's combination areas down there you're going to have -- if a landowner is not willingly going to enter into a contract to sell you the land then you are going to have to go to court to use condemnation proceedings, eminent domain, to be able to go forward.

And those are long -- having tried those myself -- long, drawn out. And I can say from at least my personal experience very boring to try. But they take time. Time really defines that. So I wanted to...

PROVOST: Yes, sir. If I may, just quickly on that. As I know you know, it is always our -- CBP always works -- tries to work with the landowner to come to a resolution. Condemnation is not where we want to go to, and we will work diligently with all of the stakeholders to try to come to a resolution that works for the landowners first and foremost.

CARTER: Very good. And to finish up this area, a question, a vital question. Congress provided funds for 40 miles of replacement fencing. You answered some of this. When will you begin construction on the replacement fencing, and have you decided -- do you know the exact locations that you want this fencing?

PROVOST Yes, sir. For the FY17 replacement fencing, first, thank you very much. That is going to be hugely beneficial for our agents on the line and their officer safety and being able to replace some outdated fence.

So San Diego, El Paso and El Centro are the areas that we are placing that new -- or excuse me, putting that replacement fence in. So those are the priority areas of old, outdated fencing that is not working for us. It is a risk to the agents for numerous reasons. It is in areas that they have breaches quite often and this would be a huge positive impact for our agents.

So we are going -- first and foremost we have 14 miles in San Diego of primary wall replacement. Two miles in El Centro, 24 miles in the past so that we are replacing.

CARTER: Very good.

Ms. Roybal-Allard.

ROYBAL-ALLARD: Thank you. I think there are more questions then we have time for it. But I would like to start with ICE detention and funding.

Director Homan, the ICE budget request, $3.6 billion for an average daily detention population of 51,379. This includes 48,879 adults and 2,500 individuals in family detention. As an increase of more than 12,000 adult detention beds over the FY 17 level of 36,824.

Meanwhile, the current average daily population of adults in detention is under 34,000. Do you currently think that ICE has a requirement for the 51,379 detention beds in FY18, and if so, what is that based on? Is it a rough estimate or does ICE have a methodology tying detention beds to a particular staffing level, pace of enforcement activity or target population?

HOMAN: That budget is built on the assumption of four-year FY continuing resolution of 2017, along with enhanced for provisional (ph) personnel and beds that weren't funded FY17.

Why do we think we need 51,000 beds? When the team got together and looked at, you know, their model, I think 51,000 is a good number, and let me tell you why.

Part of the new executive order -- what's changed in January under new executive orders, we've opened the aperture up who is -- who we are looking for, who we're looking to arrest and detain or remove. Under the old administration, unless you are a fugitive after 1/1/14, you're off the table. You weren't a priority, we weren't looking for them.

Now we've got 345,000 aliens who were in the country illegally with a final order of removal that (inaudible) as required by a judge that are now people we're looking for.

Our arrests right now are up 50 percent because that aperture has been opened. Our detainers are up over 75 percent. And these are people we put detainers on that will eventually come to our custody.

Secure Communities is back, which means we put detainer on anybody that's illegally in the United States. And 287G, we expect that program, which almost nearly doubled in size, we expect it to nearly triple in size by the end of the year. That's a force multiplier for more law enforcement officers to bring illegal aliens into our custody.

OPFL (ph) has over half a million cases on the docket. They expect to have close to a million by the end of the year. These are also folks that will eventually come into our detention.

Recalcitrant countries was an issue under the last administration. We had 23, 24 countries that we couldn't get travel documents from. Through a lot of hard work for the ICE staff here in headquarters, we are down to 11 countries now, so we got 12, 13 countries back to the table issuing travel documents for thousands of people we are trying to remove.

And overstays. Those overstays, you know, between 600,000, 700,000 overstays in this country that were not a priority, under this new executive order they are. So you can see hundreds of thousands of illegal aliens with final orders, that already had the due process, are now back on the table for law enforcement.

So the intake of new cases for detention are very high. Clearly you can justify 51,000 beds.

ROYBAL-ALLARD: So we are basically talking about young people like Diego that Ms. Lowey was talking about now, that everyone is pretty much being targeted, if I understand. That's what you mean by the open aperture?

HOMAN: The executive orders open the aperture, yes, but we still prioritize criminals and national security threats first. But we look for fugitives that had due process, that had been ordered removed by a federal judge. We have to remove them. That's our job. And those that reenter the country have to be removed. That's a felony.

When you get formally removed from the country, reentry illegally, that's a felony.

ROYBAL-ALLARD: I understand that but I just wanted to make -- get some clarification.

Also in May, the average population in family detention was under 600. The three family detention facilities ICE currently maintains represent fixed cost. That means that we are paying the full rate of -- for 2,500 beds, no matter how many beds are filled.

What are your plans for family detention going forward, and will ICE continue to pay for family detention capacity that isn't being used?

HOMAN: The answer to the last question is it's not (inaudible). I don't think we should be paying for family beds we are not using. We are meeting now, as of last week we are meeting with the vendors for family detention to talk about the future use of family detention.

My goal is to certainly decrease the funding needed for those beds. I think those beds should come at a cheaper price and we are working on that now. Family detention I think is a valuable tool we have. I think family detention serves a purpose. At one time they were full and we weren't allowed to take anybody into custody in family detention.

But it is a consequence for illegal activity. And family detention gives us an opportunity to identify who these folks are, make sure that we put them on some sort of reporting when they're released. They get a full medical so we are not releasing women and children with chickenpox, measles, and we deal with lots of medical issues coming in.

So I think it's a necessary tool to figure out who these people are and should they be released. Most will claim fear and have a hearing in front of the CIS. Some don't get fear, which means if their claims are denied then these are people who we will remove straight from the detention facility to their homeland. So I think it's a valuable tool we've got to sustain.

ROYBAL-ALLARD: Now I believe the average length of stay in family detention is currently around 10 days, and this is largely due to a federal court -- a district court determination that the detention of families with children cannot exceed 20 days unless of facilities are state licensed and non-secure.

When I discussed this with the Secretary Johnson during last year's hearing, he said the department was pursuing state licensure but it was unclear whether the facilities would eventually be non- secure.

What is the current status of pursuing state licensing for family detention facilities, and what, if any, are your plans to satisfy the district court's requirement that family detention be non-secure?

HOMAN: The two family detention centers in Texas, first of all, Karnes did receive a provisional license. When the facility in Dilley was seeking license a grassroots organization in Texas filed an injunction. And the state was looking to -- from licensing them, so it went to the court process.

Licensing did pass the Texas Senate but it stalled in the House, so it's on hold. We'll continue to try to get licensing, those facilities. Berks facility in Pennsylvania does have a license. But the ruling by the court says that it averages 20 days for those who -- for children to be detained for 20 days.

So we will continue to operate within the judge's -- the district court's finding and make sure that on average they are in the facility less than 20 days, unless they are found not to have a fear claim and we are likely to remove them. They may stay in longer. But we will abide by the terms of the circuit court decision.

ROYBAL-ALLARD: One of the things that disturbed me was to hear that ICE plans to end the family case management pilot program, which has only been fully underway for approximately a year. It seems premature to me to pull the plug on a pilot that seems to be working so far.

What have been the specific results of the pilot, and what kind of formal evaluation has ICE carried out? It's my understanding that appearance rates for the participants have been much higher than for families in the traditional ATD program.

You know, are there lessons learned from the pilot that could productively incorporate -- be incorporated into the ATD program?

HOMAN: You're right, it is a pilot. It was a pilot and we -- it was a $12 million pilot, the cost for a full year. But on the metrics of showing up for their hearings and so forth, the metrics are no different. Very similar to those on traditional ATD.

So when you look at the cost, you know, an average day on the family case management program is $35, almost $36 a day and a typical ATD ICE app (ph) is $4 a day. That's eight times the cost of a traditional ATD, which had the same result at the end practically, off by one or two percentage points.

So for the same reason we are here today talking about a budget, I think as long as it doesn't change the metrics of who has shown up in court, as long as they both are equally successful and one is $4 and the other one is $36, we decided that we were going to go with the cheaper alternative.

ROYBAL-ALLARD: Can you provide us with that information...

HOMAN: Yes, ma'am.

ROYBAL-ALLARD: ...to the committee? I'd appreciate it.

CARTER: I'm going to continue in the order that people arrived. Mr. Frelinghuysen. I mean, Fleischmann. I'm sorry.

FLEISCHMANN: Thank you, Mr. Chairman. And to each and every one of our witnesses I want to thank you all for appearing before us today. And I really appreciate the fact that you have been so laudatory of your employees. Thank you very much. They do a very difficult job and (inaudible) for our country and I appreciate that so much.

I have a question for Mr. Wagner. First of all, I was very pleased to see a proposed increase in funding for nonintrusive inspection systems at land ports of entry. I have a two-part question, sir.

Do you have any idea how much contraband goes undetected through our land ports of entry on an annual basis? By several reports, the use of NII is responsible for 90 percent of those interdictions in secondary screening.

Then my final question would be, do you think it would make sense to deploy such proven technology at pre-primary to ensure 100 percent screening of all passenger vehicles, sir?

WAGNER: I don't have an answer on how much goes undetected, but I can certainly agree with the high percentage of narcotics that we do intercept using the technology. It's something we've built up the systems over the last probably 15 years to 20 years or so at our ports of entry.

It's incredibly useful technology. It's an incredible resource- saver and really the safe and efficient way to examine a vehicle or a cargo container. It's really a tremendous asset.

Now whether we could deploy them into a pre-primary type environment, I think it's as much as the facility constraints or the logistics of doing so, or to figure out the time sensitivities and how much traffic and the through-put we could get through.

We are looking at some things with commercial truck traffic and being able to run trucks through -- 100 percent through the scanning to look at what the impact would be and could we actually accomplish that in the right amount of time.

For passenger vehicles, I think the logistics of doing so would be a challenge. I think operationally we like to be able to do that. It's just the time and the resources that would be needed as well as the physical layout of where to put that equipment in those vehicle lanes. But it's certainly a strategy that would be worth talking about some more.

FLEISCHMANN: Thank you.

Would either of the other witnesses like to supplement to his answer?

PROVOST: Not specific to the ports but as you know, we use NII as well at our checkpoints and they have certainly been a benefit to us in the border patrol as well.

FLEISCHMANN: Thank you very much.

Mr. Chairman, I know a lot of people want to ask so I'll yield back, sir.

CARTER: Thank you.

Ms. Lowey.

LOWEY: Thank you very much, Mr. Chairman. And Director Homan, before I asked my question I want to say I really appreciated your eloquent statement regarding the good and decent people of ICE. And I also appreciated your saying that the ICE officers don't write the laws. They are charged with enforcing the laws, and I get that as well and I appreciate it.

Director Homan, ICE has been the target of significant criticism in recent months regarding enforcement actions at and near sensitive locations -- churches, schools, courthouses. Since the beginning of the year could you share with us how many times has supervisory approval been given for enforcement actions at sensitive locations? How many times have such actions occurred without supervisory approval, based on exigent circumstances?

HOMAN: Well, that's an easy answer. Zero. As far as I am concerned, as far as the information I have available to me, nobody has been arrested at a school, no one's been arrested at a hospital.

Now courthouses aren't a part of the sensitive location policy. Courthouses is a place we should be arresting people, and let me tell you why.

When I came in this building today, there is a metal detectors and security guards to keep the staff and congressmen safe in this building. The judges have the same thing in courthouses. Why would I not want the same thing for the men and women of ICE to arrest a criminal alien behind the wire when they know we don't have weapons?

The only people we arrest in courthouses are those that are a threat to public safety. We don't arrest witnesses. We don't arrest victims. We go to a courthouse looking for one person that has a public safety conviction, to arrest them in a safe location. That is my job, to keep my officers safe, so that is the best place to arrest them.

And as far as the churches and the schools, I see the media reports too. Here's a situation what's happening. You go to a big city like Los Angeles or New York, where the aliens are being instructed by many people not to answer their doors, not to work with us, not to answer our questions, there's county jails that won't give us access to the jails.

I have to arrest these people. That's my job. So we're going to arrest them in the public. That's my job. We have to arrest them. If I can't get it in the privacy, security and safety of a jail then I've got to go to their home or wait for them to leave their home.

If you're in a big city like Los Angeles or New York and you pull a car over to arrest a target, chances are you're going to be within two blocks of a school, a church or something. So all of a sudden the media says we arrested somebody dropping the child off at school. No, we arrested them three blocks near the school, near a place of worship, going to church, doesn't make any difference whether he's arriving or departing or waiting at the bus stop on the way to school, he's a target. Is that correct? HOMAN: Your question, there's a lot of factors to consider. Is he arrested in a parking lot, school? We probably wouldn't do that. Is he...

LOWEY: I mean, this is a student who is obeying the law. And I can remember many discussions -- I've worked on this issue a long time -- not 33 years, long as you have -- and the whole idea here -- which I agree with -- that if people are disrupting the public, if they've committed a crime, if they're a danger to the community. But here if you have a student who's walking to school, waiting at a bus stop, you have somebody who's ready to arrest them. Is that correct?

HOMAN: I want to make something clear. The case you're talking about, no one knew there was a problem. The officers, you know, certainly aren't going to go and go arrest somebody just so he can't go to a prom. That's not what we do.

You know, Americans expect us to foster compliance with the law. And to do that, we've got to have, you know, a robust and diversified enforcement. There should be no one that violates the law. And this young gentleman, by entering the country illegally, committed a crime. That's a crime, 8 USC 1325. He committed a crime by entering this country illegally.

He has due process through several channels of judicial process, had his day in court, as due process, and was ordered removed. So we're talking about somebody that's had his due process. He lost his case. And because we don't like the results of that case, we forget about it. Well, if we -- there would be no integrity in the system if we don't uphold the rulings of a judge. I don't know where else in the American justice system any other agency is told to ignore a judge's ruling. It doesn't happen anyplace else but in our context.

I think it's important -- this is a country of laws. We need to stand by the laws. The country I grew up in, if you're violating the law, he should be uncomfortable. He should be looking over his shoulder if he's in this country in violation of the law and has been ordered removed. He should be worried that he's going to be arrested. There should be no population of persons that are in this country illegally, violated the law, then had a final decision from a judge, to feel comfortable that he doesn't have to worry about somebody arrested them.

The IRS doesn't want to audit everybody, but we all know it's a possibility. The highway patrol can't arrest everybody for speeding, but we speed, we know it's a possibility we could stop. It should be no different with immigration enforcement. We're a law enforcement agency that enforces the law. And we shouldn't play favorites.

LOWEY: How many -- within the New York area, how many individuals are you pursuing, roughly?

HOMAN: In New York, I have no idea.

LOWEY: Well, what I'm trying to get to -- I'm assuming there's a priority. And for many years that I've been involved in this issue, if there are people that really are dangerous to the welfare of their community, if they've committed a felony, if they've committed a crime, there's a priority. And I just wondered where a student who's going to school working hard, hopefully get to work, where is he on a priority list?

HOMAN: Our priority is threats to community safety, public safety, criminal aliens. After that, along with that, national security...

LOWEY: So you've arrested everybody who's a threat to the community, public safety, so you're going after a student who's graduating and is law-abiding?

HOMAN: It's not law-abiding. He violated the law and was told by an immigration judge you must leave. And he failed to do so. And...

LOWEY: To be continued. My time is up.

HOMAN: You know, you can help me, ma'am. Let's talk about New York state. If I had access to the county jails, if people honored by detainer, I could arrest people in the safety and statute of a county jail. But since I can't, I have to go to the neighborhoods. That's what puts fear in the immigrant community is my officers knock on doors in their neighborhoods.

If I had access to the county jail, I'd have less officers in the community. If I had access to the county jail, I arrest the bad guy in the county jail and not goes to a home where I'm probably going to find other people here illegally that I'm going to take into custody.

So all these folks that don't want us in county jails, they need to think about they're putting their communities at risk. Number one, the criminal alien is going to go back in that community, and I don't think the immigrant community wants a child molester or somebody who's been arrested six times for DUI in their communities. I don't. I think they want the communities to be safe, too.

So the more access I have to the jails, the more detainers that are honored, the less the situation you described will be happening.

LOWEY: Thank you. Thank you, Mr. Chairman.

CARTER: Ms. Lowey, when I was a senior in high school and graduated from high school, on the way to graduation, one of my best friends was stopped for a routine police stop for a parking -- for having a busted tail light. And he had a warrant for his arrest for parking tickets. And they arrested him. And the reason I know this is because he came down to the 700 of us in our class and took up a collection. And we paid his parking tickets so he could graduate. So that had nothing to do with immigration.

RUPPERSBERGER: That's a good Texas story.

CARTER: It's true. And I'd give you his name, but he's still alive and he probably doesn't want me to. LOWEY: Is he a judge?

CARTER: No, he's not a judge, but he's very prominent guy. Let's see who's next. Mr. Newhouse?

NEWHOUSE: Thank you, Mr. Chairman and Ranking Member. Also want to thank Director Homan and Deputy Commissioner Wagner, as well as Chief Provost for being here, discussing your budget priorities. I also want to express my thanks to the men and women that you represent and for the efforts that they put forth everyday to keep our country safe, so if you could relay that message, I'd be thankful.

Just got a couple of questions. First of all, for Mr. Wagner and Ms. Provost, certainly I believe one of the ways to patrol and protect our borders is through the use of technology. And I think you both have talked about that a little bit this morning, specifically the small unmanned aerial systems, or UAS's, have the ability to support your efforts, both CBP mission and operations, in I think very safe and practical ways. They can be more effective certainly than a manned piece of equipment that also can get into environments where you wouldn't want to send something else that may be a higher value asset.

So tell me how far off are we where technology and CBP can rapidly deploy a UAS to support immediate CBP operations and fill a significant gap in operational surveillance that exists today?

PROVOST: Certainly, if I may. First and foremost, from the basis point side of the House, we're very excited to start piloting and utilizing small UAS's. And appreciate the funding support that we have had here in '17 and the request we have for '18, as well.

Certainly a tool that benefits our men and women on the ground. This is something that we have been working with our partners and Air and Marine operations for some time. And we have reached a point where we think these small UAS's are going to be very beneficial for our men and women on the ground, something that they can deploy and literally see what's over the next hill, which of course impacts officer safety on whether or not you know you have a group that are of individuals that may be armed or may not be, so that type of situational awareness for our men and women on the front line, it's a wonderful tool for them.

UAS's in general, the larger ones, as well, Air and Marine operations support us in that venue for detection capability and they have proven beneficial to us over the years. And certainly a technology that we continue to utilize and continue to request support in due to the benefits that we have seen in previous years.

NEWHOUSE: Good, good. Thank you. I also want to note the critical role the CBP plays in our trade and economic successes, with the responsibility for the entry of goods in the United States. When it comes to the implementation of the Trade Facilitation and Trade Enforcement Act, that's a huge responsibility. I can only imagine the daunting task, the thousands of containers and trucks and every other vehicle that comes into our country. But protecting that fair and competitive environment is very important. And as you work on that, could you briefly talk about some of the challenges you see and specifically how we can help you?

WAGNER: Sure, I think the challenges are in the volume, like you mentioned, of goods coming in and trying to sift and sort our what we would have concerns with and, you know, expediting the ones we don't have concerns about. And it's trying to strike that balance between what gets held up for inspection and what we build a simplified, automated path through entering the country. And really, that's what we focused on, you know, using a lot of advanced information, using our national targeting center to build system to triage through all of the volumes and reams of information we have access to and try to point out the things we have concerns with.

Now, how do we come up with better ways to identify what those concerns are? It's going to be based on intelligence, going to be based on past practice, practice experience, and information we receive from either the law enforcement community, intelligence community, or right from the trade community themselves, as well, and trying to find ways to address what those concerns may be at any point in that process of that container coming to the U.S.

Sometimes it's of such concern we might ask for it to be inspected overseas before it's even put onboard the ship and headed this way. Other times it's going to be at the port of entry we're going to open it and inspect it there. Other ports it might be at a different premises to do that.

So I know there is requests in the budget for additional staff in our office of trade to help with some of the expertise and the rulemaking and the analysis of information and regulatory work to be able to do that. So I think it's covered for now in what the budget request has.

NEWHOUSE: OK, yeah. Well, we continue to look forward to ways that we can be of assistance in that. Director Homan, first of all, thanks for your comments about the role and the job of your ICE agents. Appreciate it. It's a difficult task. Sometimes you probably feel like you're sweeping sand into the ocean, but -- talked a little bit about some of the concerns that have been raised around the country from some of the previous questions.

And I just wanted to allow you to highlight, first of all, those individuals who have DACA status. And just to be honest with you, I come from an area that many of my local schools, my communities, certainly there's a -- I guess you could say a higher level of concern and fear, really, in a large part of the population. So could you possibly give us a little insight into ICE's enforcement priorities as it relates to particularly that DACA population?

HOMAN: DACA recipients are not a target of enforcement. They maintained their deferred status. There has been reports of us arresting DACA recipients, a few, and in each of those cases, they have violated the terms of their deferred action, which means they committed a crime and did something to violate the status. So we are not as part of our operations targeting anybody in DACA status that's fulfilling their obligation within the deferred action requirements.

NEWHOUSE: Good, thank you very much for that clarification. Thank you, Mr. Chairman. I yield back my time.

CARTER: Mr. Cuellar?

CUELLAR: Thank you, Mr. Chairman. First of all, I want to thank all of y'all. I know y'all have a difficult job, and I appreciate what you all do. I've had the opportunity to honor Border Patrol agents for the work that they've done, CBP officers for the new customer service that they've been providing. I need to work now on ICE, and maybe we can work on that, Tom.

But I really appreciate your men and women. I know it's difficult. I want to ask a local question, Mr. Wagner, dealing with Laredo. As you know, back in May 21st, less than a month ago, there was severe weather that damaged the World Trade Bridge. The World Trade Bridge, as you know, is the largest cargo bridge that we have in the country. Typically we get 14,000 trailers a day. That's over 2 million trucks a year through the Laredo bridges. And that's over $204 billion. And 51 percent of all the trucks coming into the state of Texas come through one port and that's Laredo.

It did -- and I met with Hagerson (ph), with Greg Alvarez (ph), and -- of course everybody knows Mr. Hagerson (ph). And of course, Mr. Skinner (ph), great leadership that you have down there. And we met with the private sector, see how we can move this along.

What I'm asking is, as we try to get the capacity -- because we're not at 100 percent capacity -- it's going to take a while -- I'm concerned about the technology and the infrastructure and make sure that FDA is also responsive. But if we're going to rebuild this again, let's do it right. And I'm asking you all to -- or asking you to see if you can put the latest non-intrusive technology, because if there's any port that brings money to our Treasury, it is the port of Laredo.

So I'm just asking you, what are your plans to add the -- to put it back into capacity? And what's the -- if you can please give us the latest technology that you have there, because I've been hearing that we're not going to get the best technology and like to give you that opportunity.

WAGNER: Sure, let me check into what technology we have scheduled for the rebuild. It may be a case where we're just trying to get it up and running and get back to restore full operations from that really devastating storm. Thankfully,

the port of entry was closed at the time when that storm hit, because it did quite tremendous damage to that operation. And we agree, it's an incredibly important crossing for us, you know, the busiest for truck crossings that we have, and we just can't afford to have it out of operation.

So that being said, we're looking at some new truck screening technology. We're looking at piloting some things a little south of you, down in the valley. But let me make sure we do have a plan to upgrade that. CUELLAR: Why don't we sit down maybe later and we can...

WAGNER: And I'll talk with Mr. Hagerson (ph) again, because we had spoken last week about what some of those plans involved. And, you know, what is the right technology we can put back into building this out to be a state-of-the-art port?

CUELLAR: All right, thank you. Chief Provost, let me ask you a couple questions. Air Marine. My experience with air marine, with all due respect to the folks who work there, is when we were trying to get an alternative base for one of the AUVs, you know, from Corpus -- not taking anything away from Corpus -- said find another place, because there was issues -- I think they were landing only, what, 60 percent or less in Corpus. They came up, but they ended up 200, 300 miles away from the border. It's not exactly what I had in mind.

Then lately they've been trying to move away from Laredo away from the border. And I keep saying, hey, you're supposed to be at the border. I know San Antonio, and I represent -- it's a beautiful place, but try to stay at the border.

Then finally the last thing is, in talking to Border Patrol -- and I've spent a lot of time with the Border Patrol, since I live there -- they've been -- a lot of complaints -- I mean, there's a lot of complaints that air marine will work 8:00 to 5:00, but then at night time -- and, Judge, you've been there and I've been there -- and I think everybody's been there at night -- I don't think it's fair to the men and women in green to be there at night time and have Air Marines say, oh, for whatever reason we're not going to work at night time.

I think if our men are going to be out there at night time, Border Patrol, then Air Marines should be providing that support. Now, Operation Phalanx, which I hope that you all do -- and I think we added the money -- I hope that you all do push that -- National Guard is ready to do that, the Texas Guard is ready to do that. But I just have a problem with the Air Marine saying they're not going to do any work at night time.

PROVOST: So we work very closely with Air and Marine at headquarters. And we provide a requirement to Air and Marine annually of flight hour requirements that we have across the entire border. And it is true that they do not have the capability to meet our full requirement.

Of the flight hours that they have, they have consistently over the years provided the majority of those hours to the border security mission and in support of Border Patrol operations. But those hours have not been able to meet our full requirement. Thus why it's very important in relation to their requests within the budget, your support there is much appreciated to assist them in having more capability to meet those requirements that we have for the border security mission.

We're working very closely with them. The commissioners had us convene a working group. We're bringing in our agents from the field, as well as headquarters personnel, to try to address some of these issues better. In relation to Operation Phalanx, as you mentioned, that has been a huge support for us in the past with National Guard support and certainly benefited us. We are committed to continuing to work with Department of Defense, if that meets their requirement, to help support our mission. We will work with them in that arena going forward.

CUELLAR: Mr. Chairman, just on the levee, since that's in my district, can I ask a quick question? I got a few seconds left.

CARTER: Yes, you may.

CUELLAR: OK, on the levee, as you know, that's on my southern part of my area. Back some years ago, Senator Cornyn, myself, JD Salinas, the county judge, and myself came up with this idea about the levee. Now there's some folks who are saying that FEMA and the International Boundary Water Commission, because we're looking at this for flooding, they're saying -- and maybe you can provide this information at a later time -- they're saying that all the levee requirements have been met, there's the flooding requirement have been met. I'd like to maybe follow up, because my time is up, talk to you about the issue of FEMA, the International Boundary and Water Commission, and of course then issues with the Valley Wildlife Corridor and the Santa Ana National Wildlife Refuge, Bentsen-Rio Valley Grande, because we don't -- and the World Birding Center, I just don't want them to be on the other side of the levee or how we're going to address that issue on that.

So I know my time is up. I want to be cognizant. But I do want to follow up on the levee, because I -- like I said, we came up with this idea, but now there are some folks who are saying that there's really no need for the flooding rationale. And that was one of the reasons why agreed to that back 80 years ago, whenever that came up with.

PROVOST: Just quickly -- and I will ensure that we come and brief you in more detail on this -- just want to, of course, reaffirm that we are committed and we work very closely with IBWC and all of the partners in any location to ensure whether it's environmental, flooding, the land issues that we work hand-in-hand with and we are committed to doing that going forward, we will get you a more in-depth brief.

CUELLAR: If you can have them come in, because they're saying something else. Thank you, Mr. Chairman.

PROVOST: OK, all right.

CARTER: And I have a real interest in that, too, so we'd like to be included in that conversation in my office.

PROVOST: Yes, sir.

CARTER: Mr. Taylor? I believe it's Mr. Taylor. Mr. Taylor?

TAYLOR: Thank you, Mr. Chairman. I just want to reiterate what my colleagues have already said, that we truly appreciate all the work that -- the hard work that the men and women do at each one of your places, of course. It's thankless. Sometimes you get maligned for just doing your job. And we appreciate you, and I think if laws need to be changed, we should do that, right? You guys just enforce it. So I appreciate you.

Director Homan, a couple quick things on the -- when does ICE anticipate obligating fiscal year '17 funding for expansion of beds? Do you have a master plan that identifies specific locations? And what factors would you use to identify those locations?

HOMAN: We have been working on the expansion plan. We have -- right now we have access to over 40,000 beds. We're actually at 42,000 in detention back in November, I think. We've identified beyond that 20,000 more beds that would be available that we could bring online. But what we're trying to do is, for our ICE dedicated and owned facilities, we would like to expand that. That's a long- term plan, because they have PBNDS 2011 standards. So right now, about 60 percent of our populations are in ICE owned and dedicated facilities, the plan is to get up to like 80 percent by the end of next year.

But we do have about 20,000 beds we have identified that could be turned on. But of course, the biggest issue is they got to be appropriate. They've got to -- good medical care, good mental health care. They've got to meet the standards -- at least the U.S. marshal standards. For a lot of these beds that we can bring on are going to be beds. We keep aliens in custody less than seven days, so standards can be a little bit less than what we have in PBNDS '11, but we have a plan that we can execute.

TAYLOR: What's the factors that you use to identify locations?

HOMAN: We try to get as many as we can near the southern border, because it's easier for the quick removals and it's more cost- effective to remove somebody from Texas. Right now, we're trying to build a hub and spoke model. We're working with some contractors on doing the hub and spoke model. You know, we need beds in New York, because we arrest people in New York, we arrest people in every major metropolitan area.

But we got to get them more hub and spoke, so we get people to a transit site. So when we do removal flight, instead of flying to eight different locations to pick people to remove them, as the get closer to the removal process, we go to a hub and remove them from the hub. That's something we're currently drawing up the plans on that now.

TAYLOR: One quick follow-up on the use of the GPS bands that use to monitor. Are they effective, efficient and will they replace the need for some beds, as well?

HOMAN: Detention is always best if you want removal, because if we have custody of them and they get order removal, we can remove them. Ankle bracelets can help make them accountable to show up in immigration court. But in the end, if they choose to cut the bracelet off, we have to go find them, and many times we don't find them.

So I will say, detention is always the best if you want a removal. I mean, it just makes sense. Ankle bracelet is the second best option. So we certainly do -- we're over 70,000 ATD people now, so it's certainly an alternative for those we can't detain. Maybe have a health issue that we can't address in detention and we'll release them on ankle bracelet. And let's say, it's got good response rate for showing up in immigration court. But when it comes to removal, it's much less than the detention.

TAYLOR: Thank you. Chief Provost, quickly, when I was down at the border recently, I saw about six or seven different types of fencing or wall throughout the different -- you know, the border. And with the exception of, of course, Mr. Cuellar's area, with McAllen with the levee in it, is there sort of a standard practice now or desired fencing? Because some of them, of course, were very easily penetrated and some of them were not. Is there a best practice, best standard that we're going to use moving forward?

PROVOST: So I believe you saw the product of numerous years and various attempts at different barrier systems, and depending upon funding and all different things throughout the years. Of what we currently have in our toolkit, the steel bollard wall is a preferred wall of what we currently have in our toolkit. And as the prototypes come out, we support innovation -- as I said before, the wall that we put in, for instance, the secondary wall in San Diego, when we put it in, worked at that timeframe, but they have -- the TCOs have become more advanced, more advanced technology -- makes it easier to breach. So we look forward to seeing what comes out of the prototypes and if we can add to that toolkit for options, since the border is very different and different areas require different type of barrier.

TAYLOR: Thank you, Mr. Chairman.

CARTER: Mr. Ruppersberger?

RUPPERSBERGER: Yeah, I want to thank you all for being here. And it's a shame that you have to defend a lot of these things that are occurring in our country. I blame Congress for where we are right now. Our Senate passed an immigration bill without amnesty, and we couldn't get it on the floor in the House. So we have to keep trying, because this issue is splitting our country.

And we know a lot of the things that are alleged to have happened isn't who we are as Americans. But I really respect the fact -- I was a former police officer when I was going to law school in Ocean City, Maryland, in the summer. I was a prosecutor for nine years. So I understand law enforcement and where you are. And you have to stand behind your people, and they are putting their lives on the line. They're in dangerous situations. And you have a mission. And you have bosses. And the boss you have right now is the president of the United States, who won his election a lot on the visual wall issue, where Mexico was going to pay. I don't think that's going to happen.

And, you know, we all know that there are other -- there's other technology that can do a lot better than a wall in certain situations and a wall might work or not work. But I want to get into this and get to the port real quick, because I represent the port of Baltimore.

Where a lot of these problems are, and I think if I was advising this president, is with what you have to do, it's -- you have a reputation as bad guys coming to get, breaking up families, you're doing what you think is your job, because you're being ordered to do that. If I was advising the president, I think he could help bring this country together by saying that we are going after the bad guys, and that's what you have said.

And yet my office -- and I'm sure other offices -- are getting complaints that if you have a DWI and you're arrested, you're gone, and your family can stay here. You're breaking up families. And DWI or traffic is not really considered to be the type of people that I think are hurting our country.

And so I want to ask you this -- and then I want to get to the port -- as far as we're concerned on ICE, what is your exact policy? If you pick somebody up who has a DWI, is that enough to have them taken away, put in jail, and sent back to their country? What is the policy?

HOMAN: If they're illegally in the United States, yes.

RUPPERSBERGER: Everybody's illegal. There are 11 million. So that's an issue you can use on every time you arrest somebody. What is the actual policy? Because...

HOMAN: If someone has a conviction of a DUI, I consider them a public safety threat and they should be removed.

RUPPERSBERGER: OK, so that is the policy? How about a traffic violation?

HOMAN: That's less of a priority, but if they're in a country illegally, they should be removed if they've had the due process.

RUPPERSBERGER: There are 11 million illegals in this country. So that's not going to ultimately solve the problem. But I don't think that's your problem, because you have been hired to enforce. And I understand that. And again, I feel that you shouldn't be defending it. I mean, we are the policymakers. The president is the president of the United States. And I'm saying this. I respect that you have a job and a mission, until you're told otherwise that you have to move forward with that.

Now, you do have an obligation as the boss to make sure -- and same if you're a police chief or sheriff or whatever -- that your people, when you have the power of arrest, that you do it the right way, that you're not abusive or anything of that nature. That's your mission right there and you have to do that, and I understand that.

So I just want to say this, that, you know, Congress has to do something. Eleven million illegals in this country, we're not to going to have everybody leave. I mean, and how we handle things, we're going to be judged down the road. And the quicker that we can resolve this, the better. But that's not your issue. But let me get to the port of Baltimore...

HOMAN: Sir, can I address one comment you made? The one comment you made, which I hear all the time is, ICE separating families. When an American family, U.S. citizen family, when someone gets arrested, that family gets separated by law enforcement. It isn't the fault of law enforcement that people get separated. It's the fault of the perpetrator.

So if someone entered this country illegally and knows he's in the country illegally, and is found to be in the country illegally, ordered removed from the country, and chooses to have a child in this country that's a U.S. citizen by virtue of his birth, he put himself in that position. So ICE is not separating that family.

If we allow every illegal alien who entered this country and give birth to a U.S. citizen, and all of a sudden now we can't separate families, he gets to stay, then you lost control of the border.

RUPPERSBERGER: You're doing your job. I understand that. It's up to us to decide where we're going as Congress. And we have not been able to follow through on this.

Politically, look, unfortunately, we have a lot of politics in this country. We're split. I hope my -- I try to be partisan -- I mean, bipartisan -- and I think, really, you should be American first and Republican, Democrat second. On both sides of the aisle, we're not real good at that at this point. And this issue has to be resolved.

And let me get to the port real quick. You know, there are other areas other than the southern border. And I agree that we must be able to work and protect our borders, as all countries need to, and that's for the safety of our country. Now, there are other ways, though, that illegal drugs, arms, contraband, and even weapons of mass destruction can come in. I know that there are 47 million 20-foot containers that are processed through American ports on an annual basis. That's a lot. And this opens up the opportunity for bad guys to bring in a lot of serious issues that we have there.

Now, again, I represent the port of Baltimore, which every port is a huge economic engine for wherever they're located. And the coastal ports right now are coping with severe shortage in Customs and Border Protection agents. And it's compromising security, reducing throughout and limiting hours of operation.

Now, I've been told that in order to maintain full service at the port -- say the Port of Baltimore, that I represent, we'll need to subsidize homeland security for additional personnel. And these agreements are being negotiated through the reimbursable services program known as 599 program. I don't know if you're familiar with it or not. OK.

Now, in my opinion, this is an unreasonable request. Transferring these costs for the federal government to the state and local governments I think is outrageous. You know, we swore an oath to protect our Constitution and defend our country. That's what the federal government does. That's why we pay federal taxes.

And when we pay these taxes, we expect protection from our federal government. Now, your agents have the experience to thwart terrorist attacks better than probably state and local, maybe -- I shouldn't say that. Maybe they're good at it, too. But we need you there. We need to have your expertise.

The president's budget request more than $300 million to assist Customs and Border Protection to staff up. However it's unclear where those agents are going to be assigned. I believe all ports should be staffed on a fair and level playing field, and the Port of Baltimore is seeing major growth, especially with the Panama Canal issues that are happening.

My question. Can you clarify how much of this supplemental funding will go towards additional Customs and Border Patrol staff at domestic ports, specifically ports that are expanding, since the reopening of the Panama Canal? Number two, is there available equipment which could effectively -- and Cuellar got into this for a while -- could be a force multiplier? In other words, what technology do you need so that we can make do with fewer agents?

And I know there's technology, like with the containers to try to find out if there's nuclear weapons or those type of things.

WAGNER: So there's no -- in the '18 budget request, there's no increase in staffing for the ports of entry. We're currently operating at about 1,400 vacancy rate based on the positions that were provided to us in 2014, the 2,000 extra. That's based on our workload staffing model. That's an annual assessment we do of the workload and how many hours it takes to do that work.

There's still a current shortfall above and beyond the 1,400 of about 2,500 positions based on that workload assessment. So we're in agreement on the need for staffing. We're in agreement that we have a large number of vacancies that we're trying to fill right now. And we need to fill those before we can come back and ask for more above and beyond that. We need to do a better job at filling those vacancies.

Now, as far as the reimbursable services agreements, what those allow us to do is to provide services above and beyond what we're already providing. So if an entity comes to us and says, we'd like expanded service at this location for this purpose, what would it cost us to pay the overtime of the officers to be there to do that? It allows us to provide that cost to see if it fits in with that business entity's operating model.

RUPPERSBERGER: And that's my rule. I believe that should be the federal government paying for it. But I understand that's not your call. You need the money and you're just implementing.

WAGNER: Right, it's just a way for us to...

RUPPERSBERGER: It comes back to Congress again.

WAGNER: It's a way for us to expand the service that we probably have to deny, just because we can't stretch the resources that far.

RUPPERSBERGER: I understand.

WAGNER: And then as far as the equipment, let me get back to you on what we have on the Port of Baltimore and what we've got lined up for there.

RUPPERSBERGER: OK, got it. Make sure you get back.

WAGNER: I will.

RUPPERSBERGER: OK, got it. Thank you. Yield back.

CARTER: Palazzo?

PALAZZO: Thank you, Mr. Chairman. And I just want to echo the comments made by many of my colleagues thanking you for your service and your sacrifice and trying to keep American families safe and enforcing the law and maintaining integrity. I think that's an awesome and expected approach from your organization.

Can I ask -- and this is in general for any of the three -- what's -- when I was on the homeland security authorizing committee, we talked about operational control. What percentage of operational control do we have on our borders at this time? I think it was below 50 percent a couple years ago, but I'm not sure.

PROVOST: So the Border Patrol over the last couple of years had moved away from operational control to a risk methodology, where we began looking at the border as whether or not an area was low, medium or high risk. Kind of building from where we used to work off of OPCON. As a whole, from the Border Patrol perspective, we are at a medium risk across the southwest border. Each different AOR falls into a different area.

PALAZZO: So what actually does the medium risk mean? I mean, you know, you are missing 50 percent of all crossings or what...

PROVOST: It is a mixture of quantitative and qualitative, so we look at numbers, of course. And similar to -- as Chairman Carter stated, when we talk border security, and operational control of the border, it isn't just immigration flow, illegal immigration flow. There are many other factors in there. So we take those...

PALAZZO: And can you expand on that? That was another question I would have is, what are the types of threats crossing our border? I mean, we always seem to be thinking of the people coming across to work in nurseries or, you know, to find jobs in some form of agricultural community. But what are some of the other threats that we as Americans should be aware of? And that's why we need to secure our border and protect Americans and our families.

PROVOST: So we have many criminal aliens, meaning individuals who have beyond -- to Mr. Homan's point, the fact that they are violating the law by entering the country illegally, they have committed some other crime, as well. So those individuals, of course, are our top priority for us if we come in contact with criminal aliens to get them prosecuted and properly removed.

PALAZZO: So there's drug trafficking, there's sex trafficking...

PROVOST: There's drug trafficking.

PALAZZO: There's gun trafficking.

PROVOST: Yes, sir.

PALAZZO: There's all kinds of threats coming across our border. What about foreign nationals and possible people that are, you know, may want to do us harm? Have you all apprehended any?

PROVOST: We have. Those numbers are small. But that is something that is a top priority for us. And we work very closely with our partners at ICE and DOJ, Department of Justice, as well, when it comes to any individuals of specific interests there, yes.

PALAZZO: You mentioned -- so there's authorization and appropriations for 5,000 additional agents. And you mentioned hiring surge. How long is it going to take your agency to advertise, identify, vet, train 5,000 additional agents?

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

PROVOST: That is a very good question. And of course, for fiscal year '18, we have asked for funding to support the hiring of 500 additional Border Patrol agents. Similar to what Mr. Wagner stated, we are below where we had been at our highest level, with our 21,370. We are down about 1,800 agents right now.

So that with an additional 5,000 is going to take us a little bit of time to do. But we are ramping up our recruitment and our hiring efforts, have been working very closely with our human resource management team and some of the funding that you all have provided has been supporting that effort.

It is a top priority for us to ensure that we get the best quality people and ensure that we have no lowering of standards. So it's going to take us a little bit of time to do that. Five hundred is a good start for us in fiscal year 2018.

PALAZZO: Thanks, Chief. And one of the reasons I asked that is because I know that the National Guard has been utilized on past occasions. And I think the National Guard still has probably an active role, and I think it started with Operation Jumpstart, with President Bush, and then President Obama also added additional National Guard members.

And I think when you said surge, I'm thinking the surge that we did in Iraq and Afghanistan with National Guard troops. And we were extremely successful in turning the tide of the war in both of those countries. And I see in the Guards, what, 400,000 people in the National Guard, 300,000 in reserve component. I see a resource just sitting there for you to -- I mean, I know they can't do law enforcement functions, but they can do everything else. They can do intelligence, surveillance, reconnaissance. They can do vertical and horizontal construction.

I mean, I think that's just a huge augmentation that's sitting there, ready and waiting, and all you have to do is ask.

PROVOST: They certainly have supported us in the past. And they currently support us in many fashions. To your point, ultimately, we need to get to where we have the Border Patrol agents with that law enforcement capability on the border to be able to reach that operational control we're talking about.

PALAZZO: Right. And that's the long-term solution. And I would just like to continue to argue, look at the National Guard. I know whether it's Air or Army National Guard or any state, you would have thousands of people volunteering immediately to come down there and to help secure our border in any form or fashion. And because they've served overseas and they're willing to protect Americans here at home, as well. So, thank you.

CARTER: Mr. Price?

PRICE: Thank you, Mr. Chairman. Welcome to all of you. Mr. Homan, I'd like to focus in on the question of enforcement priorities and what kind of discretion the agency has in determining whom to detain and deport.

I've supported efforts for years. And at one point I was chairman and then ranking member of this subcommittee, supported efforts for years, like the priority enforcement program that utilizes what we acknowledge are limited immigration enforcement resources to prioritize individuals who have committed serious crimes and who pose an immediate threat to their communities.

And I'm not saying that provides a free pass to anybody, but it does assume that the discretion that you have will be exercised in this direction. President Trump has said much the same thing, that he wants to focus on deporting dangerous criminals. But I would say there's a good deal less focus in the actual way enforcement has gone.

I understand earlier this morning you said that the budget will allow you to interpret -- to implement Trump's enforcement priorities. Maybe interpret is the right word. We maybe need a reiteration of what you take those priorities to be.

According to your own recently released data, 21,360 immigrants were arrested from January through March. That's an increase of 32.5 percent from the same period in 2016. The arrest of immigrants with no criminal records more than doubled during this timeframe. In the Atlanta ICE field office, which covers my state, there were nearly 700 arrests of these immigrants with no records, as compared to 137 arrests during the same period in 2016.

So even at this accelerated rate, deportations are only a fraction of the millions who are here illegally. There will always be that situation. Therefore, priorities must be set. Discretion, whether recognized or not, will be exercised.

The president has said there will be priorities. Yet I'm baffled by Secretary Kelly's portrayal of the department's action, as if he had no discretion whatsoever, that he's simply following the law. He got pretty defensive about this. I'm quoting him here. "If lawmakers do not like the laws we're charged to enforce, that we are sworn to enforce, then they should have the courage and the skills to change those laws. Otherwise they should shut up and support the men and women on the frontlines."

Believe me, Congress isn't trying to antagonize the secretary. We're simply acknowledging, as we have ever since the beginning of this department, that discretion exists, discretion is necessary, discretion is being used. What we want to know is how. Isn't discretion of some sort inevitable? We're not going to deport every immigrant. What can you tell us about your current guiding criteria for the exercise of discretion? What is your order -- what is the order of removal strategy? And if you and the secretary believe Congress must, quote, "change the laws" to give you discretion, what do you suggest we do?

HOMAN: Well, as I testified earlier, the priorities within the executive order are listed. We prioritize criminals and national security threats first. Then we look at fugitives, those who entered the country illegally, been ordered removed by an immigration judge -- which means they've had their day in court and their due process -- have been ordered removed by a federal judge, and they fail to depart. We call them immigration fugitives. They're someone that are also a priority, which weren't a priority in the past administration, unless they became a fugitive after January 1, 2014. And that took over 400,000 people off the table who had their day in court that we basically weren't looking for.

Also, those that have been ordered removed were removed and re- entered to the United States, which is a federal felony. They're also priorities. The aperture is open, so when we find illegal aliens, first of all, we're not out doing sweeps or raids looking for illegal aliens. We go out looking for the targets I just described to you, but if we find somebody here in the country illegally, we're going to put them in front of an immigration judge. That's our job. And I think it's the right thing to do.

As far as the numbers you quoted, there has been a significant increase in non-criminal arrests because we weren't allowed to arrest them in the past administration. We were arresting criminals, so you see an uptick in criminals a little bit. Moderate. But you see more of an uptick in non-criminals because we're going from zero to 100 under a new administration.

And when we talk about non-criminals and criminal aliens in the United States, most of the criminal aliens we find in the interior of the United States, they entered as a non-criminal. If we wait for them to violate yet another law against the citizens of this country, then it's too late. We shouldn't wait for them to become a criminal. But once they do, we'll prioritize them. But non-criminal enforcement is important because if there's no consequence to illegal activity and entering this country, as long as you can get by the Border Patrol, the fine men and women of the Border Patrol -- I serve them, honored to wear the green a long time ago -- we can't send the message, get by the Border Patrol, get in the interior, as long as you don't go break another law, you're home free? Then you're never going to gain control of the border.

PRICE: But that -- by that standard, you're talking about every immigrant in the country without papers.

HOMAN: As I said earlier, if you're in this country illegally and you committed a crime by entering this country, you should be uncomfortable. You should look over your shoulder. And you need to be worried.

PRICE: So what is this prioritization of people who have committed serious crimes? What does it mean? Does it mean anything?

HOMAN: Absolutely. We still prioritize criminal national security threats. And what we're saying is, but no population is off the table. When you start taking entire populations off the table, then you've destroyed the foundation of law enforcement.

I mean, if we don't enforce the law, then that's not the country I grew up in, sir. If you violate the law, you should be held accountable. And the reason Congress passed laws is to protect this country. And like I said, if we don't -- we're a sovereign country. We need to decide who comes in and out of this country. If we don't hold people accountable for entering this country illegally, then what are we all doing?

PRICE: Well, this isn't a question of securing the borders. I think we agree on that premise. It's a question of how our enforcement resources, limited resources -- actually, pretty severely limited resources, when you consider 11 million people here without papers -- you know, how are those to be deployed? And are we to set any priorities at all in terms of the danger to the community posed by certain classes of individuals?

It seems to me you're saying both things here. You're saying, yes, we're prioritizing those dangerous folks, but by the way, we're going after everybody.

HOMAN: I mean, we do prioritize who goes first, who should we look at first. Prioritization doesn't mean, OK, here's what we're looking for and everybody else forget about. We look for these people first, but these people should be on the table.

I mean, it's meaningful enforcement. We do prioritize. The numbers speak for themselves. But if we're really serious about criminal aliens and making sure we get them off the street, then Congress can certainly help me dealing with sanctuary cities that don't want to help us with criminal aliens, give me access to jails that don't want to help me remove criminal aliens, and doing things that helps me put the men and women of ICE -- put them in a safer position. Rather than the rest of the illegal aliens and criminal alien in a county jail, in a safety and security county jail, they got to go knock on a door.

And it's only a matter of time before one of the men and women of ICE don't go home at night because they had to go arrest a criminal alien in a home rather than getting them in a county jail in a sanctuary city that the sanctuary city is -- are a danger to the men and women of ICE. And so you can certainly help me if we want to target more criminals. Congress is certainly positioned to help me do that.

PRICE: These are limited resources. These are hard choices, I would grant you. But it seems to me over the years there's been a bipartisan agreement for the most part that people who pose a danger of the community should be on the priority list for enforcement, for detention, and deportation.

And the notion that, on the other hand, everybody's a danger, you seem to be suggesting that it's almost an indiscriminate danger posed by the entire immigrant population, then you're talking about for every dollar that's diverted toward that larger population, you're talking about a dollar that's not spent going after dangerous people. And so governing is about hard choices. And we're looking for some specific indication of how you're making those choices.

And if the law needs to be changed to address your priorities, then how should we change it?

HOMAN: First of all, I want to be clear, we do prioritize criminals and national security threats. We prioritize. Which means they're more important to us. They come first. But prioritization doesn't mean everybody else is off the table, we don't take any action. There has to be enforcement of immigration law on the borders or we're going -- you can't argue with the fact that -- that the operation tempo we have right now has had a significant impact on illegal immigration on the southern border. It's working.

I've been doing this for 33 years. If there's not a consequence to deterrence the illegal activity is not going to cease. We finally have that and it's working. So we do prioritize criminals and national security threats, but again, when you enter this country, sir, illegally, you are violating the laws of this country. It is a crime. You need to be held accountable.

We will certainly make sure they get their due process. They'll see a judge. We spend billions of dollars a year on border security, detention, immigration judges, attorneys. And at the end, when a federal judge makes a decision, that decision needs to mean something or the whole system has no integrity. That what I'm trying to explain. So prioritization absolutely does happen.

As far as legislation to keep the men and women of ICE safer, in my opinion, sanctuary cities are a danger to law enforcement officers. It's a danger to communities. Jails that don't honor our detainers. Jails -- Cook County, Chicago, Chicago has significant criminal rates right now. It's the history of this city. They got -- crime is running rampant. Are they doing everything they can to solve their crime issue? No. Why not? Because ICE officers, federal law enforcement officers aren't allowed to enter Cook County jail.

Federal law enforcement can't walk into Cook County jail to talk to somebody that's, number one, illegally in the United States, committed a crime entering these United States illegally, and committed yet another crime against a citizen, and my officers aren't allowed to go in the jail to apprehend that subject so he doesn't go back on the street to reoffend. Recidivism rate runs around, what, 40 percent to 55 percent. They're going to reoffend.

So there are certainly things Congress can do to help me keep the men and women of ICE safe, keep our communities safe, and drive down the crime rate.

PRICE: Mr. Chairman, I'm sure my time is expired. Sanctuary cities, as you know, is a very loose, porous term that applies to lots of situations. Let me just say that if the idea is that ICE should have access to knowledge and access beyond just knowledge, to people who have committed serious crimes who are being released from our penal system, then you get no quarrel from me and I think from most people.

But if you're suggesting that in various other ways local law enforcement needs to be the long arm of ICE, you know as well I do that will compromise their access and their work with local communities. It will make their job infinitely more difficult. And there's plenty of good law enforcement to that effect.

Thank you, Mr. Chairman.

CARTER: Thank you, Mr. Price. I'm going to go to Mr. Culberson next. And I'm going to have to surrender the chair to Mr. Culberson. I've got to leave. We've gone over. Everybody but Mr. Fleischmann has gone over today our five minutes. And I intended that. You are a very important part of what we do in this department. And thank you for what you do, all of you. I can tell you from experience of 35 years that it is dangerous for an officer to approach a resident. In fact, I believe more officers are killed or injured going to domestic disturbances than probably any other single events, when they're just fighting in the house, and yet the officer gets killed.

And so when you make it unfortunate that the only way they can do their job is go interfere with families, they are at higher risk sometimes than any other place where they go and do their job. So -- in defense of what Mr. Homan is saying,

I agree with him. And it makes absolutely no sense to me over my experience of multiple jails that I had oversight over, that they don't allow people to interview in jails.

But that's a different question. And I wanted to end by saying I agree with everything you had to say. I've got to go. God bless you. Thank you for what you do.

Mr. Culberson, thank you.

CULBERSON: Thank you, Judge. Director Homan, Commissioner Wagner, Chief Provost, I want to thank you on behalf of the people of the United States for your service in protecting us. Director Homan, you're exactly right. We're a nation of laws. And if the law is not enforced, if there's no consequence to illegal activity, there's no way to get it under control.

I'm reminded of the very first inscription on the first coin ever minted in the Republic of Mexico was liberty and law, because our liberty does depend on law enforcement. And deeply appreciate the commitment of each and every one of your officers have to keeping us all safe by enforcing the law.

And a great example of that is the fact that I've seen just from the president's open and very close direction that the law is going to be enforced and the border secured that I've seen numbers that illegal crossings have declined by as much as 70 percent since January. Is that accurate?

PROVOST: Those numbers have declined dramatically. The lowest numbers we've seen in several years.

CULBERSON: It is encouraging that the president's executive order -- that the border will be secured and the laws enforced and that countries that refuse to issue travel documents to people that are in the United States illegally that are going to be deported, that countries that will not issue travel documents to those individuals, that that's going to be a pre-condition to any negotiation or discussion with those countries.

And I heard you mention, Director Homan, that there used to be 23 to 24 recalcitrant countries, and that's now down to about 11, just enforcing the law, just common sense. Works.

And the definition of sanctuary cities is actually very clear cut. There was a law passed, David, in 1996 that the -- was passed for the specific purpose of stopping sanctuary cities from shielding people in the country illegally. It's title eight of the U.S. Code, section 1373, and it says in pertinent part that federal, state or local government entity or official may not prohibit or -- and here's the key part -- in any way restrict sharing information about people in their custody, their immigration status, with federal authorities.

When Kate Steinle was murdered last summer, it affected me and I know everyone in the country very, very deeply. I chair the Commerce, Justice, Science Appropriations Subcommittee. Have worked for years to see that our border is secured and our law is enforced. And when I discovered 1373, I worked quietly and very effectively with Attorney General Loretta Lynch -- and this is not widely known -- but I persuaded her last summer to change Department of Justice policy last July, and the Department of Justice issued new guidelines that they notified -- DOJ notified every county, city, and state in the country that if they did not comply with 1373, they were considered a sanctuary jurisdiction and they would forfeit all their federal law enforcement grant money.

PRICE: Will the gentleman yield?

CULBERSON: Yes, sir.

PRICE: I understand very well what's in the law. And I understand very well the obligation of local jurisdictions to share information with immigration authorities about criminals who have been in custody who are being released. And the whole origin of the focus on dangerous criminals, you may remember years ago came when we found that tens of thousands of people were being released from America's prisons at all levels without immigration even knowing who they were. This was with -- I remember ICE Commissioner Julie Myers' testimony and the aftermath of that, this was the beginning of this effort.

But when I say sanctuary cities is a very porous definition, I'm referring to some pretty significant experience in the state of North Carolina and other places where people use that term to cover all sorts of exercises of discretion by local law enforcement that local law enforcement testifies very convincingly that it needs.

CULBERSON: Yeah, we're not talking about making local law enforcement that arm of federal law enforcement. And specifically this is a very narrow and precise definition that local and state jurisdictions cannot interfere in any way with sharing information with federal authorities about illegals in their custody.

So I made certain that the previous administration, Attorney General Lynch, changed the Department of Justice's federal grant policy and notified every jurisdiction in the country that unless they comply 100 percent of the time with 1373, that they would lose their eligibility for federal law enforcement grants and that policy with all the jurisdictions were notified last summer. They had a chance to cure it. They did not do it.

And when the new administration came in -- and frankly, one of the principal reasons that President Trump won the election was his promise to the country that our laws would be enforced, our border would be secure, our nation will be respected again, that the flag, our men and women in uniform and the military and our men and women in uniform in law enforcement will be respected.

Law enforcement is the foundation of all our liberties. And the Department of Justice inspector general at my request certified the top 10 sanctuary jurisdictions in the country, which includes the entire state of California, so this summer, the state of California will lose a minimum of $68 million, $69 million in federal law enforcement grant money, unless they repeal their state law shielding illegal aliens in state jails, in state prisons in California.

The state of Connecticut will lose all their federal law enforcement grant money this summer unless they repeal their law. New Orleans already changed their policy. As you said, the recalcitrant countries that refused to issue travel documents have already changed their policy. New Orleans has folded, and they have changed their sanctuary policy.

Miami-Dade changed their policy, so they agreed that if -- they didn't want to lose the federal money. New York City will lose $15 million this summer. Philadelphia will lose $1.7 million this summer. Cook County will lose a minimum of $3.7 million this summer. Milwaukee will lose about $1 million. And Clark County, Nevada, will lose $1.7 million.

Receiving federal money is not -- you know, receiving federal model is optional. And the policy that I was able to institute as chairman of the CGS Subcommittee and that President Trump and Attorney General Sessions and the president of the United States have now broadened to homeland security grants, as well, if you want federal money, follow federal law. It's very simple. We do this with our kids. My money, my rules. This is very simple.

So, Director Homan, I wanted to ask you. I've given you a copy of the memo that I'm prepared to list the initial 10 sanctuary jurisdictions that I already had certified as ineligible for federal law enforcement grants. Under the president's executive order, how many additional jurisdictions are you -- do you believe that you could identify that are in violation of 1373 that would no longer be eligible for federal law enforcement grants or homeland security grants?

HOMAN: I don't have that number in front of me, but I think it's well over 100 that have some sort of policy where they don't honor detainers or allow us access to the jails. I have to get back to you on the exact number.

CULBERSON: And you're in the process of identifying those right now so that they could be certified by the attorney general?

HOMAN: Yes. We got what we call the decline detainer report, which was a requirement through the executive order that we started. We pulled it back because there was some data issues with it. We've been meeting with the National Sheriff's Association last few weeks. We're really close to a final product. And that will help us identify those jurisdictions that don't cooperate.

CULBERSON: And it's important to note that the California judge that blocked temporarily President Trump's executive order on enforcing our immigration laws, who was appointed by President Obama, this judge in California explicitly upheld the ability of the administration to enforce section 1373, this law that the attorney general, at my request, used to certify these initial 10. There's about -- you say 100 sanctuary jurisdictions that you're working on right now to -- if I could, as soon as you have that list available, if you'd share it with me, I'd be grateful, because I'll be sure to help you expedite the certification of those jurisdictions so they don't -- it's their choice.

If they want to shield criminal illegal aliens in their custody from being deported from the United States, don't ask for federal money. Those days are over. You cannot receive federal money and shield dangerous criminals from being deported. I very grateful to you for the good work that you do to protect people of the United States and your officers and doing all that you can to help ensure that there are no more Kate Steinles. It means a great deal. HOMAN: Thank you very much for the comments and thank you for your work, but I'd be remiss if -- it's not really me. It's the 20,000 American patriots that work for ICE that put their lives on the line every day to uphold the laws of this country. So thanks to them.

CULBERSON: We deeply appreciate each and every one of you. And we've got your back. Thank you very much.

Dr. Harris?

HARRIS: Thank you very much. And also, you know, thanks to you as members of the law enforcement community of the United States, you don't get as much appreciation some days as you deserve.

Acting Director Homan, I think I'll leave the committee and write a letter the president suggesting they take the word acting from in front of your title, because you obviously have a command of what needs to be done. And I see -- you know, you are a former law enforcement -- local jurisdiction, I guess New York City I think it said in your biography.

In your mind, is there this dichotomy between the way the rank- and-file law enforcement want to think about cooperating with ICE and the way the political leadership does? You know, I'm in a jurisdiction -- my resident county executive decided he wants to be a sanctuary jurisdiction. So he doesn't want to cooperate with local ICE. And I agree with you, I think that makes it more dangerous.

But I understand the political grandstanding. I get it. At the local level, when you talk to the men and women who are out on the streets every day trying to protect us, trying to protect Americans, do they also resent interacting with ICE? Or do they actually welcome the fact that there's some part of law enforcement that they're entrusted with, there's some part you're entrusted with, and that the cooperation should exist between those two?

HOMAN: I can't speak for every street cop. I was a law enforcement officer, patrolman, not New York City, upstate New York. However, in my 33 years, the officer on the street want to work with ICE. When they run into someone that's

a criminal, a threat to the community, if they have an option of removing that threat, not only from the community, but from the United States, most law enforcement officers want to take that opportunity.

And I'll tell you, even though there are some restrictions in some counties and some cities about cooperation, I can tell you for a fact we have -- we're working with some sheriffs and some chiefs and not on record, but they may not honor the detainers, but they're going to call us before we release somebody. They're trying to do the right thing out of really tough situations.

So I think a law enforcement officer, to want to go into a life of law enforcement and put a badge on your chest every day, I think the rule of law means something to these people. And...

HARRIS: No, thank you. Look, I agree with that. Everyone knows -- I mean, I'm the son of immigrants. My parents came to this country because it was the country of the rule of law, which separates us from a lot of other countries in the world.

HOMAN: And many of my law enforcement officers came in as immigrants or they're children of immigrants, but they did the right thing. They followed the law. They become citizens. And that's all we're asking. I mean, the country I grew up in, law enforcement was respected and revered. And in the constant every morning reading the press about ICE officers and separating families and putting fear in communities, it's unfair to the men and women that chose to serve their country.

HARRIS: Sure. No, you know that Gustavo Torres, you know, over at CASA, basically said you terrorize people. I mean, basically called our law enforcement terrorists. It's stunning, just stunning to me. I want to thank you. Again, thank you for the service and the service of the men and women who serve under you.

You know, with regards to this idea of dangerous criminals, not dangerous criminals, gee, if somebody gets caught drunk driving, maybe we should just look the other way. You are aware that according to the CDC study in 2011, you drive drunk 80 times before you're caught, 80 times. So in fact, someone who's in this country illegally who's caught drunk driving has probably threatened Americans 80 times by getting behind the wheel. And this is CDC. This is not made up.

That's someone who came to this country and decided to repetitively break the law. And I'm just going to disagree with the people who think that we should someone turn the other way, because that's a minor crime of some kind. It's not. It might be minor until they kill someone. And then all of a sudden, you know, it's too late for the outrage.

HOMAN: Two points. I hear a lot of folks say, well, it's just a misdemeanor compared to a felony. Well, look, if I had my choice, I had someone who committed a white-collar bank fraud that's a felony or someone that committed a public safety misdemeanor, the misdemeanor is more important to me to get them off the street, first of all.

And second of all, people say, well, it's just a misdemeanor. It really doesn't mean anything. Well, that depends on what side of that misdemeanor you're on. If you're a victim of that misdemeanor, if you're a victim of identity theft or theft out of your vehicle or assault, that's a misdemeanor, if you're a victim of that, if you're on that side of that misdemeanor, it's certainly meaningful.

HARRIS: And not only that, I'd offer that people who commit serious crimes aren't always arrested for the serious crime. I mean, that's the broken window policy in New York. I mean, you have to -- if you want to eliminate crime generally, you have to have more or less a zero tolerance. And I appreciate that you're going to have that.

Now, I do want to end on just one topic. This idea of sanctuary campuses. Because, you know, just to extend what Mr. Culberson has talked about, you know, jurisdictions that take federal dollars and then choose not to cooperate

with federal law enforcement, obviously we have this issue now of these universities who issue fairly global statements, University of Pennsylvania, you can go -- you can search it online, just basically say, look, we're not going to allow ICE on campus, basically.

And it doesn't say only to go after someone who's a DACA or a potential DACA. It's just, no, they're not allowed on campus. So I have a question for you. Where else are you not allowed to go, which is a relatively public place? I mean, it's just curious that, you know, these urban universities, they spread over large parts of -- so there are zones where you're not allowed to actually physically be present, according to their policies? Are there other places in general where you're not allowed to be?

HOMAN: Well, sir, as far as campuses, if they want to call themselves sanctuary campus and won't allow us to go arrest a public safety threat, national security threat, then we'll just get a warrant to go on campus anyways.

I've seen a lot of media reports where schools are -- you know, high schools and elementary schools go we're going to create a policy where ICE is not allowed to arrest anybody on campus, that's where the mixed messaging is coming from. We don't arrest people in schools, in grade schools and high schools. We don't do it.

So who's putting the fear in the immigrant communities? These groups that are mixed messaging what ICE does. There's no reason to pass a policy that ICE won't arrest somebody in elementary school. We wouldn't do it anyways. And that's why I have a sense of location policies.

Like I said, the 20,000 men and women that work for ICE, they're law enforcement professionals, but they have hearts. Do they feel bad about what's going on in central America? Yeah. I've been to Central America. Those countries aren't as nice. The United States is much nicer. And I can't blame anybody from wanting to come here.

But you can't want to be a part of this country and not respect us laws. You can't have it both ways. You want to be a part of this country? Follow the law. Respect the law. And we'll accept that. But you can't have it both ways. You can't say I want to be a part of the greatest country on Earth, but I want to ignore their laws. You can't have it both ways. That's not the America I grew up in.

HARRIS: Thank you all very much. And I yield back.

CULBERSON: Thank you very much, Dr. Harris.

I just can't tell you how much we -- the people of the United States I know appreciate what you've just said is so true. We trust the good hearts and the good sense of our men and women in uniform, each and every one of you. We're so grateful for your service, whether you be in the military or in law enforcement. We trust your good hearts and your good sense to do the right thing for the right reasons. That is the America we grew up in. What a comfort. That's precisely why Donald Trump won this election. One of the major reasons. People want to see the laws enforced and our men and women in uniform respected.

I wanted to ask if you could, Director Homan, about the -- an inspector general's report that came out under the previous administration regarding fingerprints and individuals who had been in the country illegally that DHS fingerprint database against which aliens are checked was incomplete. And according to the inspector general, the incomplete database under the previous administration, there were at least 858 individuals from countries of concern who were granted U.S. citizenship, despite the fact that these individuals lied about having alternate identities, made fraudulent statements, or concealed important information from adjudicators. These individuals had been ordered deported or removed under their alternate identities.

Yet when they concealed their identity, these individuals, because of the incomplete database under the previous administration, were granted citizenship. The inspector general reported that some of these individuals went on to hold security clearances, and one even worked in law enforcement. I wanted to ask you, sir, because the law as I understand it says that these individuals, once DHS identifies these folks, that you can refer them to the Department of Justice for revocation proceedings, and it's mandatory for DOJ to revoke their citizenship and to deport them.

Of those that were investigated, under, again, the previous administration, the inspector general said only 28 cases have been referred to the Department of Justice for revocation proceedings, and ICE decided to administratively close another 90 cases, again, under the previous administration. So under President Trump's leadership, the law is going to be enforced, our men and women in uniform respected, our nation of laws is going to be restored as the foundation for all our liberty, does ICE plan to investigate all of the remaining individuals identified in that inspector general's report, and any other individual that obtained naturalization through fraud or concealment of their identity?

And if you could tell us how many of those you're going to refer to the DOJ and keep me posted so I can help back you up as chairman of the Commerce, Justice, Science Appropriations Subcommittee to ensure these folks are revoked, have their citizenship revoked and are deported.

HOMAN: Of course. I'd have to get an update on where we're at on that initiative. I know we're working very closely with CIS to identify those folks. And of course, again, we got to prioritize who's within that group, so those that may be in a position to affect national security or some sort of critical infrastructure, they'll be dealt with first.

But I am surprised by the numbers you presented of cases that are administratively closed. That's something I'll take back with me today and I'll get back to you on that by -- I certainly think...

HARRIS: Thank you.

HOMAN: Yep. We're certain looking into and leaning forward on that.

HARRIS: Thank you very much. Ms. Roybal-Allard?

ROYBAL-ALLARD: Thank you, Mr. Chairman. First of all, let me just say that, you know, I have law enforcement in my own family. So I have firsthand knowledge of the dedication and the courage of law enforcement officers, the dangers that they face, and the sacrifices that not only they make, but their families.

But that doesn't mean that we as elected officials and members of Congress shouldn't question, challenge, get clarification, or recommendations on policies and laws. And as policymakers and doing so, we shouldn't need to apologize for doing so.

And the fact is that as was mentioned by another member of this committee, part of the reason that we're in this situation is because Congress itself isn't doing its job. Much of this could be addressed by passing comprehensive immigration reform.

And the result of not doing what we have an obligation to do results in what some of the things that Mr. Culberson has said, which really goes in many ways contrary to the very thing that we're trying to do. By taking federal money away from local law enforcement only is going to make it harder for law enforcement to go after the real criminals, the murderers, the rapists, the drug lords. And so this is just an example of what the consequences are of Congress not doing its job.

Having said that, many of the questions that I already have, have already been asked. But I would like to ask you, Mr. Wagner, regarding the issue of credible fear claims and CBP policies. The number of individuals and families attempting

to cross our southern border has decreased over the last several months, but many of those still coming are desperately fleeing violence in their homes and their countries, violence that is often directly targeted at them and their families.

The CBP southwest border apprehensions in the second quarter of this fiscal year were 56 percent lower than the first quarter. However, the number of credible fear applications dropped by only 21 percent, and the percentage of positive credible fear determinations was largely unchanged at 77 percent. Earlier this year, there was a significant number of reports of CBP officers at ports of entry turning away individuals attempting to claim credible fear. This was documented in the press and more recently in a report by Human Rights First based on firsthand interviews.

According to that report, some of the individuals turned away were subsequently subjected to kidnapping, rape and robbery. And in some cases, individuals were allegedly being told they are not welcome, while in other cases asylum seekers were instructed to try again another day when the port was less busy. It is my understanding that CBP is legally required to process credible fear claims when they are presented, and it is not authorized to turn back individuals claiming fear even temporarily. In addition to commenting on those allegations, what steps can be taken or have been taken to ensure this is not occurring or continuing to occur at the ports of entry, such as, is there training or other guidance, reminding CBP personnel how they are required to treat individuals who express fear?

WAGNER: Sure. It was a question really of the space available to process people. And our facilities were at capacity to be able to take more people in, go through the processing, and turn them over to ICE after that. And the building was full, and we could not humanely and safely and securely hold any more people in our space.

The ports of entry converted administrative space to be able to hold people in as comfortable a manner as we could. You know, we converted a lot of space to be able to do that. The ports of entry just do not have the kind of space to hold large volumes of people during the processing and then holding them until they're picked up.

So we worked a process out with the Mexican authorities to be able to limit how many people a day could come across the border into our facility to be able to be processed. But it was a question of us not wanting to do it. It was a question of us not having the space to be able to do it safely and humanely and providing space in Mexico for them to wait until the space freed up on our side to be able to move people into it.

ROYBAL-ALLARD: OK. And can you elaborate a little bit more on what some of the contingency plans you have to have established to mitigate the limiting factors that you just talked about?

WAGNER: So like we demonstrated, working with Border Patrol and with ICE, that we could set up temporary facilities, like we did in Tornillo and Donna, Texas, that we can quickly set up temporary space to house people humanely and securely while they're awaiting processing and then awaiting to be picked up. Those facilities are not needed right now, so they've been taken down, but we're well prepared to be able to set them up on fairly short notice should a surge of migrants return to the southwest border.

ROYBAL-ALLARD: So it wasn't an issue of officers not knowing what the law was. It was more of an issue of capacity?

WAGNER: It was an issue of capacity and being able to put people into the facility without being overrun or having unsafe and unsanitary conditions. But I can tell you, we converted a lot of administrative space, such as this room, to temporarily house people for a day or so, so they could await being processed and await going through those procedures we need to do before we hand them off to ICE.

You know, we converted a lot of space. We had people sleeping in hallways and conference rooms and building temporary showers and temporary bathing facilities for people to be able to do that. ROYBAL-ALLARD: OK. And, Director Homan, we've heard that in most cases ICE is no longer paroling individuals with positive credible fear determinations

while they await an asylum hearing. Is that accurate? And if so, can you explain the rationale for detaining these individuals seeking asylum? And to the extent that ICE is placing a heavier burden on detained persons to show they are not a flight risk or a risk to the community, what is the standard for how that can be demonstrated?

HOMAN: If I could, just expanding on John Wagner's statement, you know, that's why we're here today about the budget is ICE in need of more beds, because the reason CBP was in the position they were in, because I couldn't take custody of everybody. We were full. So that's why they had to make contingency plans and that didn't help anybody, which is one of the reasons we're asking for more beds and situations like that.

As far as parole, the instructions are follow the rule of law. People will be paroled if they can establish their identity that they're not a flight risk or safety risk. A lot of these people who get credible fear show up at ports, they don't have a passport, they don't want to provide addresses where they're going. We can't verify them addresses.

So if we can verify they're not a public safety threat, and they're not a flight risk, they'll be paroled, but, you know, many times they're not able to do that. And that's their burden. So the law hasn't changed...

ROYBAL-ALLARD: Is there a standard?

HOMAN: No, again, it was lack of bed space and under prior administration we took an easier stance. Now, you know, my instructions to the field is follow the law. If they can establish identity, if they can establish where they're going, and we can verify that, and they're not a threat to community, then parole is an option. But we got to make sure we know who they are and where they're going and they're not a threat.

CULBERSON: Thank you. Dr. Harris?

HARRIS: Thank you very much.

Mr. Homan, how many counties in the United States are what you consider sanctuary counties? I guess if we define them as not cooperating with detainer requests.

HOMAN: You know, I should know that number. I just don't. I think it's well over 100 we've identified, but I can get back to you.

HARRIS: OK, if you can get back to me, I'd appreciate it.

HOMAN: I have that on my desk, so I can get back to you before the end of the day.

HARRIS: Please, if you can. You know, I find it's interesting, because the claim is made that the sanctuary counties have lower crime. And that'll fit just perfectly with Mr. Culberson's position, because if you have less crime, you don't need federal money. I mean, federal money is kind of scarce. You know, if you want to be a sanctuary jurisdiction and claim you have less crime, that's great. Let's send less federal money there. More for the other jurisdictions.

HOMAN: What I think is even more significant, sir, is those jurisdictions that don't allow me access to their jails. But on the other hand, they get SCAAP scat funding from DOJ for housing people in the country illegally. It does not make sense to me that one hand of the government wants to give them money to hold them, the other hand of government is not allowed access to the jails.

HARRIS: No, I agree. I know...

CULBERSON: Will the gentleman first? For the record, I want to make it clear that the policy I had instituted last summer cuts off SCAAP funding, Byrne JAG funding, and COPS funding to every sanctuary jurisdiction in the United States. If you want federal money, follow federal law.

HARRIS: Thanks. Again, Mr. Homan, the idea of visa overstays, I mean, the list -- you know, fiscal year '16, I mean, you have visa overstays from countries in the hundreds from countries that have rampant terrorist activity or terrorist training grounds. What is the -- what is ICE doing to find and repatriate individuals who have overstayed their visas? Because I think in some cases from some countries, this could really be a threat.

HOMAN: We get data from CBP and from SEVIS on those that overstay their visas. They're prioritized within homeland security investigations. They'll look at a series of factors which I can't discuss here. And what makes them a priority for national security, they'll take those cases for further investigation and immediate action.

Those that don't rise to that level of national security are given to our law enforcement support center, fugitive operations center in Burlington, Vermont, to run through databases to see if they have criminal history and see if they're a danger to the community, and they'll be prioritized.

A lot of them that don't fall within those ranks were not worked over the past years. I've committed to this secretary that is something we're going to do now. So non-immigrant visa overstays are now something that we're going to be actively working. HSI will take the priority cases, national security. ERO will take public safety first. But everybody else will be on the table.

HARRIS: And is it -- I mean, how successful are you at finding the people who are visa overstays? I assume that if you're a terrorist and you come here on a visa overstay, you're going to make yourself hard to find. I mean, is it -- how successful can we be in finding the people who don't want to be found when there are visa overstay? HOMAN: Actually, we just did an operation where we targeted -- I think it was 1,500 visa overstays. I mean, you're right. Some of them have left the country, but there's no report on it. And some have adjusted their status in the records, CIS were not caught up. Many we can't find. Many -- they're in the wind.

Anybody that rises to the level of we think has a national security concern or public safety concern, they're worked right away. We'll pull out all stops to try to locate them. And the targeting center is very good at that. I can't say we arrest them all, but we take a serious look at that.

But I would say, out of all the visa overstays, many are in the wind. And we're looking for them. And there -- you know, a lot of them come to the country with no intent of leaving. Of course, they came here and overstayed a visa, because rather than crossing a border, they can do it that way, which we've learned our lessons from 9/11 about...

HARRIS: Absolutely.

HOMAN: ... in regard to visas.

HARRIS: No, thank you very much. And yield back.

CULBERSON: Thank you, Dr. Harris.

PRICE: Thank you, Mr. Chairman. I want to seek a little further clarification on this sanctuary cities question. I think it'll be to our benefit to have that. But I want to make a couple of points before I do that.

First of all, I want to associate myself with Ms. Roybal-Allard's comments about the high esteem and respect in which we hold our military, our law enforcement, including immigration enforcement. That's not what our questions are about, and I think it's not such a good idea to suggest otherwise or imply otherwise.

I, as a representative of a district in North Carolina known for low crime rates and for effective law enforcement, regularly confer with law enforcement. I think I'm considered a strong supporter. Had a meeting with law enforcement from around the district, oh, about a month ago, and I must say, the questions I raised about so-called sanctuary cities and how vague that definition is, those come from those people. That's the source of my questions. This isn't something I just dreamed up. They're also, by the way, very concerned about the administration's proposed cuts in grant funding under FEMA and many other issues.

But, please, the questions we raise about the rule of law and about law enforcement are not about whether we respect law enforcement or respect the sacrifices and the risks that people take. I hope everybody understands that.

Secondly...

HOMAN: Sir, can I respond to that?

PRICE: In just a moment. Secondly, the rule of law. There have been some suggestion here today that the law is the law is the law. Well, the rule of law is a basic principle of this country, and again, we take this principle -- with our House democracy partnership, we take this in to work with legislatures in developing countries all over the world.

But the rule of law has many aspects. Yes, it's about maintaining border security. It's about maintaining a legal and safe immigration system. The rule of law is also about respecting the roles of law enforcement at various levels, taking seriously questions about when there might be tensions or might be conflicts between the duties, the priorities of local law enforcement and federal law enforcement, including immigration enforcement. That's a legitimate discussion under the rubric of the rule of law.

The rule of law is also about being honest and clear about what discretion exists under the law and insisting on accountability for the way that discretion is being exercised. That's what my questions were about. No question this is a part of elaborating what the rule of law means and should mean in our country.

Now, speaking of the law, we've talked about 8 USC 1373, sanctuary cities. It prohibits policies that prevent communications with ICE about immigration status. My understanding is that complying with a detainer request is not required under the law. It's not a violation of 8 USC 1373. That doesn't mean that it shouldn't be done, but we need to make clear about what's in the law.

And just underscores my point, what sanctuary cities means, how it's defined is a matter of some dispute and some question. So that brings me to my question, which is basically what do you have in mind here? The easy case, the easy case for all of us, I expect, is the felon who has done his time and who's released, there's no question I should know about that person and that -- I would expect in almost every case, a detainer will be placed and deportation will be sought.

There are some not so easy cases, though. And at the end of that spectrum would be somebody picked up for a routine traffic violation. Are you looking to be informed about that person? Are you looking to issue a detainer against that person, someone apprehended in that kind of way? Or are people caught up in sweeps where some criminal activity might be involved, but they're also innocent bystanders, and so on? There are some difficult cases here.

And rather than dismissing them, I think we need some clarity and some accountability of what -- if the administration is going to change not just the law, but the implementation and the interpretation of the law, we have a perfect right, indeed, we have an obligation to ask what that means.

HOMAN: Well, I can respond to the first part of your question, sir. In no way did I suggest or imply that anybody in this committee did not respect the law enforcement work at ICE. If you heard during my oral statement, I think I put the blame pretty much squared on the groups in the media, mixed messaging what we're doing. I respect everybody on this committee.

But I must say, during opening statements in this committee, I heard two things, what ICE is doing is un-American, and un-American enforcement is exactly the words, and unconscionable. That's what I take difference to, is that the men and women of ICE are very American and what they're doing is not un-American. They're enforcing the laws enacted by this Congress.

On the rule of law accountability, we certainly want to be held accountable. And as I've explained before, we do prioritize what we do. You know, criminals in recent -- criminals and public safety threats and national security threats still are the priority. And we make sure they're a priority.

When the E.O. was first rolled out, we did an operation in five states, and I came up on the Hill here and met with like 50 congressional representatives that claimed that we were just out arresting anybody we could find. I showed them the same numbers. I can tell you today, 75 percent of those people we arrested had a criminal history. So the men and women of ICE are executing the mission within the priorities.

And as far as prosecutorial discretion, the men and women of ICE exercise prosecutorial discretion every day. I can mention one operation we did in California on MS-13 gang members. And other people during the service of those warrants were found that weren't gang members, but they were illegally in the United States, several of them were recent mothers, had babies in arms, we didn't take them into custody. We did the mail out NTA.

When we out arresting last year family groups and UACs that have final orders out known as Operation Border Guard and Border Resolve, you heard about us out arresting these families, destroying communities. What you didn't hear was that 27 families we walked away from, because they had infants -- breast-feeding infants. So the men and women of ICE exercise prosecutorial discretion every day.

PRICE: I am very -- I commend you for that answer. Of course you do. And it's commonsense. It's compassion. And it's absolutely necessary to exercise that kind of discretion. My only point in raising this was to say, OK, if discretion is being exercised, then it's not off-limits to ask you about it.

HOMAN: No, sir.

PRICE: Or to question the priorities. And it's not an answer to say, well, we're just enforcing the law. If you don't like what we're doing, change the law. That is not -- you know, the appropriate response here is to tell me what you just told me about the way you've exercised discretion. And we can talk about the basis on which you're doing that.

HOMAN: I don't think I've made a statement if you don't like the law, change it. What I said...

PRICE: I'm referring to your secretary's comment. HOMAN: Well, I stand by the secretary. He's committed to the rule of law and he stands by the men and women of ICE and CBP. They -- look, no one is looking for an apology. I guess we're all looking for recognition that what the men and women of our agencies do is extremely dangerous. They're enforcing the laws. And they're true Americans. And to use comments like un-American enforcement and unconscionable, I think

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

it's unfortunate that -- you know, we can't -- I'm not saying, sir, anybody in this committee is vilifying the men and women of law enforcement. But all you got to do is pick up the paper every day and read the stories about CBP and ICE about what we do.

And I'm just trying to get the message out, it's just as important to educate people what we don't do as to educate them what we do, do, because there is prioritization, there is a mission. We're -- you know, our job is to execute the mission when the framework provided us. I don't decide what that framework was. You know, again, I don't write the laws. I didn't write the executive orders. Our job is to execute the mission within the framework provided us. And I think we're doing pretty close to a perfect job of that.

PRICE: I appreciate your acknowledgement that no one here is casting aspersions on the character or motives of your men and women in uniform. We, I think, uniformly respect their role and respect their patriotism and all the sacrifices they're making daily. Could you address my sanctuary cities matter?

HOMAN: Sanctuary cities, I think, in my opinion, raises serious officer safety and community safety issue. For every person that I can't arrest in a county jail in a sanctuary city means that a law enforcement officer has to knock on the door of a home to arrest somebody that has a criminal history when they could have arrested them in the safety and security and privacy of a county jail.

PRICE: OK, but my question had to do with what you have in mind here in terms of whom you're seeking information on, whom you're looking to issue detainers. And you remember, I raised the question about people picked up in -- for minor traffic violations or people picked up incidentally in the process of a sweep, something of that sort.

HOMAN: We'll issue detainers on anybody in the country illegally. What I would like, though, is especially those who are public safety threat to get that information quickly. So what I don't want is someone that's a public safety threat to walk out of that county jail and hit the street when they could have been handed to our custody. So the new detainer form that has been issued looks for those who are in the country illegally.

What action we take on that detainer depends on the -- you know, the case and the factors within that case. But we're looking to enforce immigration law. Of course, our priority is the criminals first, but if you're asking me are we going to put detainers on people that have not been convicted of a crime, yes, we will.

PRICE: And the implications of that for you expect of local law enforcement and whom you might choose to label a sanctuary city, pin that label on?

HOMAN: I think that -- first of all, I don't think sanctuary cities is defined just strictly under 1373. I think sanctuary cities -- I take a much broader definition of sanctuary cities that those that don't cooperate -- like, they can share information with us, but they're lesser willing to turn these people over to us, I call that not cooperating, cooperation...

PRICE: All right, but who are those people? That's the question. Who are those people? What's the universe here?

HOMAN: Sir, it depends -- if you're in Cook County, it's everybody. It's criminal aliens and non-criminals. If you're in California, they'll turn over people that are significant criminals, maybe murder and rape, but for aggravated assault, armed robbery, we don't see those people. Everybody jurisdiction is different on what level cooperation they give us.

PRICE: I'm understanding. I understand that. What I'm asking you is, what is your expectation? And how are you going to identify non-cooperation in terms of a sanctuary city's concept? What is your expectation, your demand of these localities?

CULBERSON: Well, if I could, Mr. Price, if I may, Director Homan, very quickly, if the gentleman would yield, the law says they cannot -- local jurisdictions cannot interfere in any way. So 99 percent compliance with the request for information with federal authorities is not sufficient. It's 100 percent required.

PRICE: I understand that the law is about communications, not about detainer requests. What I'm asking is what is ICE's expectation going to be about the communications request? Is this going to be a broad sweep, anyone that comes into touch with the law enforcement? Is it going to be something more focused on people coming out of the penal system or something in between?

CULBERSON: If I may, Director Homan, to help with this, because I did the legal research on this personally to figure this out, David, and the federal grant program -- excuse me, the federal law that you're attempting to enforce has to have some reasonable relationship to the federal grant program. In this case, I've got jurisdiction over all the federal law enforcement grant money. 1373 was passed for the purpose of ensuring cooperation and communication between federal and local law enforcement. So you can tie, for example -- it's actually up to ICE and the secretary's discretion to identify those jurisdictions that are not cooperating...

PRICE: That's exactly my question. What is the...

CULBERSON: If you're not cooperating, you render yourself ineligible for federal grants.

PRICE: And is not cooperating just something for which there's no definition available at present? Or can we anticipate what this is going to look like?

CULBERSON: Director and the secretary have that discretion.

HOMAN: If we know there's somebody in the country illegally in violation of the law, we place the detainer on them, we expect cooperation with that law enforcement agency. Now, we do have discretion. Not everybody we have -- that we look out in a county jail we'll take custody of. Again, you've got limited resources. We want the criminals first. But a lot of people released from the county jails may have an arrest without a conviction. That's as important as a conviction, I think so.

We got to remember, we're talking about a county jail. They're in the county jail for some reason. So they're in the county jail because they violated some municipal law or some crime, so these are people we're interested in.

So, again, my job is to enforce the immigration law. So I certainly would like anybody that's in the county jail that's in violation of immigration law to be turned over to me with the priority on criminals. Now, if a jurisdiction comes to me -- like I explained earlier, they don't honor a detainer, they're going to call me on the significant criminal for the release and they're not going to hold them the minute past they normally will, but they're going to call us, certainly I would welcome that. That's better that nothing.

But I would like full cooperation. I mean, for 60 years, every law enforcement agency in this country accepted detainers. It's the only has arisen in the last two years. So I certainly would like people to help me enforce the law. I mean -- we're not asking them to be immigration officers. We're asking them for communication on somebody that's here in violation of the law that can be turned over to us to take action.

PRICE: I know our time is expiring here, but of course, we understand what you just expressed in terms of what your priorities would be. I do think it leaves a lot of uncertainty, though, as to what you might label uncooperation and what therefore might bring a municipality or a county under the label of a sanctuary jurisdiction and therefore put in jeopardy their support for various programs that they value.

Speaking of the rule of law, part of the rule of law is predictability and certainty and accountability. And I hope we're not looking for an overly broad discretion on the part of ICE to slap that label on a jurisdiction. I think, in fact, we have a right to expect and demand a precise notion of what you regard as permissible behavior under the law and what would lead you to designate a sanctuary city.

Right now, I can just tell you, there's lots of uncertainty and anxiety about this among municipalities that have a wide range of practice. It is not -- one size does not fit all. And so going forward, we are going to need some clarity on this.

CULBERSON: Thank you, Mr. Price. I can tell you that the 1373, the definition of sanctuary cities is, in the first instance, very clear under 1373 that local and state jurisdictions cannot interfere in any way. So it is a 100 percent compliance requirement that 100 percent of the time state and local jurisdictions have to share information with ICE.

Under the directive that the president has issued, the -- this is all designed to encourage cooperation. And all of us I know respect law enforcement. All the laws that we pass are designed to encourage local and federal law enforcement officers to communicate, cooperate, because the goal is public safety, which we're all devoted to. We're all here to make sure that our constituents and our fellow citizens are safe and secure. And we deeply appreciate your commitment to that and, again, it's the local jurisdiction's decision to walk away from the federal money. If they choose to -- if they want to be a sanctuary city, that's their decision. Just don't ask for federal money. Those days are over.

Yes, ma'am?

ROYBAL-ALLARD: I just want to emphasize what's being said. We really do need clarification as to what is going to be considered a sanctuary city, because I know that, for example, some of the cities in California may cooperate if somebody is in jail, just as Mr. Homan has said, they will do that, but they have refused to -- when they stop somebody for other reasons, a traffic violation or something, they have refused to ask if that person or anybody that happens to be in the vehicle or wherever they're at, if -- for their immigration status. And in some cases, where police have said, no, we're not going to ask people about their immigration status because it -- then they're not going to want to work with us with crimes, they have been tagged as a sanctuary city, where they may cooperate in the jails, but they will not cooperate by asking immigration status when they stop.

So to me, that's just another example of why we need clarity as to what designates a sanctuary city.

CULBERSON: Director Homan?

HOMAN: I understand the confusion. And, sir, I'm not trying to avoid the question. DHS leadership is working with DOJ leadership to try to come up with an operational meaning of what we're going to consider for operational reasons the sanctuary cities. So that's still in discussion.

As soon as we, you know, get some closer to clarity, we certainly will share it with you, but that's something that we're struggling with, right? We all understand 1373, but operationally what does it mean to us? So DHS is working with DOJ to come up with some sort of clear operational instructions to law enforcement agency on what a sanctuary city is and how we define it.

CULBERSON: But it begins with cooperation.

HOMAN: It begins with cooperation. And one thing I can, sir, to 1373, not only sharing the information, but allow us access to the jails.

CULBERSON: Right.

HOMAN: Because secure communications -- if someone gets arrested and they take their fingerprints, those fingerprints are bounced off DHS databases. We'll drop a detainer on someone we have a record on. However, if you're illegally in the United States, you never were encountered by the Border Patrol or ICE before, we're not going to get a feedback from DHS database. So you can be in the country illegally, and we won't have your fingerprints.

That's why we need access to the jails to talk about people who when they came into custody they claim they were foreign born. We need to talk to those folks and find out, do you have status or not have status? Because a lot of criminal aliens we have not encouraged before, so we need to make sure we get into the jails and talk to these folks who are lacking the biometric information to make sure we don't release those folks to the street, too.

So information sharing has to include access to the jails, because a lot of people -- we call them foreign born no match. We don't know who they are. We need to get in there and do an interview and find out who they are.

CULBERSON: So I think it's fair to say we all agree that the starting point is cooperation and sharing information 100 percent of the time. Director Homan, is that basically accurate?

HOMAN: Yes.

CULBERSON: So if jurisdiction fails to cooperate, fails to share information 100 percent of the time, they're going to be considered a sanctuary jurisdiction under the guidelines issued by the DOJ last summer. I had this done last summer. I just didn't make a lot of waves about it.

And by the way, the other part of the policy that DOJ put in place at my request is that local law enforcement agencies have to certify under oath that they are cooperating 100 percent of the time or they're in violation of the False Claims Act, which is a felony punishable by five years in prison. Therefore, the city of Santa Clara -- Santa Clara County, which was a party to the litigation that led to the order of the judge in San Francisco, did not even apply for SCAAP funding, COPS funding, or Byrne JAG funding. They dropped their application because they knew they were a sanctuary jurisdiction. They didn't even bother to ask for the federal money. And that's their decision. If you want to protect criminal illegal aliens in your custody, don't ask for federal money, because you're not going to get it.

One final question, if you could, Director Holman. In addition to identifying for all of us those 100 jurisdictions that you consider sanctuaries -- because the goal here is to protect lives, so there's no more Kate Steinles. How many jurisdictions like Santa Clara County either did not apply for federal funding or changed their policy, like Miami-Dade or New Orleans? And I want to thank for the record their county commissioners in Miami-Dade County and the city council in New Orleans for changing their policy to cooperate, because that's saving lives, isn't it?

HOMAN: Yes, I have to get back to the information. I know we've had some jurisdictions come back to the table and are now cooperating, especially after the first iteration of the declined detainer report went out. So we'll definitely get back to you that information, who's now cooperating, when they weren't, and what changed since the executive order.

I know we track that, because we report on the declined detainer report, at least the last iteration, so I'll get back to you as soon as we can on that information.

CULBERSON: And I want to stress, Ms. Roybal-Allard and Mr. Price, the goal is for these jurisdictions to change their policy. We don't want them to walk away from their federal money. We want them to protect lives and property by changing their policy and cooperating. That's the goal. It's the goal we all share.

HOMAN: Absolutely. And my goal is, again, protecting lives. I mean, I need to do everything I can to every law enforcement agent and officer that works for ICE to lessen the risk of their jobs. If they can arrest a criminal alien inside the safety of a jail rather than knocking on a door, that's the right thing to do, not only for public safety, but for the officer safety.

CULBERSON: But we deeply appreciate your service to the country, each and every one of you, and please convey to your officers, the men and women in the field that you represent how strongly this subcommittee supports their work, how much we admire and appreciate them, and God bless you. And thank you very much for all that you do.

We'll have additional records that will be submitted -- additional questions that will be submitted for the record from Chairman Carter and members of the subcommittee. With that, the committee is adjourned. Thank you very much.

END

(C) COPYRIGHT 2017, CQ TRANSCRIPTIONS, CQ ROLL CALL INC., 77 K STREET NE; WASHINGTON, DC - 20002-4681, USA. ALL RIGHTS RESERVED. ALL MATERIALS HEREIN ARE PROTECTED BY UNITED STATES COPYRIGHT LAW AND MAY NOT BE REPRODUCED, DISTRIBUTED, TRANSMITTED, DISPLAYED,PUBLISHED OR BROADCAST WITHOUT PRIOR WRITTEN PERMISSION OF CQ ROLL CALL. YOU MAY NOT ALTER OR REMOVE ANY TRADEMARK, COPYRIGHT OR OTHER NOTICE FROM COPIES OF THE CONTENT. FOR INFORMATION ON SUBSCRIBING TO FNS, PLEASE CALL 202-650-6599 OR EMAIL SALES@CQROLLCALL.COM. THIS IS A RUSH TRANSCRIPT. ------------------------


---- Index References ----

Company: CBP CARBON INDUSTRIES INC; CQ ROLL CALL INC; JUDGE GROUP INC (THE); LANDSHUTER BRAUHAUS AG PRIVATBRAUEREI; MR PRICE GROUP LTD

News Subject: (CIS (1CI65); Crime (1CR87); Criminal Law (1CR79); Emerging Market Countries (1EM65); Immigration & Naturalization (1IM88); Legal (1LE33); Police (1PO98); Prisons (1PR87); Smuggling & Illegal Trade (1SM35); Social Issues (1SO05); United Nations (1UN54); World Organizations (1IN77))

Region: (Americas (1AM92); California (1CA98); Central America (1CE62); District of Columbia (1DI60); Florida (1FL79); Illinois (1IL01); Latin America (1LA15); Louisiana (1LO72); Maryland (1MA47); Mexico (1ME48); Nevada (1NE81); North America (1NO39); North Carolina (1NO26); Pennsylvania (1PE71); Texas (1TE14); U.S. Mid-Atlantic Region (1MI18); U.S. Midwest Region (1MI19); U.S. New England Region (1NE37); U.S. Southeast Region (1SO88); U.S. Southwest Region (1SO89); U.S. West Region (1WE46); USA (1US73); Vermont (1VE77))

Language: EN

Other Indexing: (U.S. Customs) (Carla Provost; Skinner; Todd Owen; Ruppersberger; Carter; Trump; Scott McGuire; Brian Balliso; Jeh Johnson; Newhouse; John Wagner; John Wagner; Thomas Homan; Kelly; Greg Alvarez; Diego Pumonacanella; Taylor; Cornyn; Hagerson; Frelinghuysen; Cuellar; Donald Trump; Barack Obama; Kate Steinles; Carla Provost; Todd Owen; George Bush; Carter; Gustavo Torres; Harris; Fleischmann; John Wagner; Thomas Homan; Price; Julie Myers; Culberson; Kelly; Kate Steinle; Loretta Lynch)

Keywords: Hearings; Homeland Security

Word Count: 28410

**News**Room