*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



June 15, 2012

MEMORANDUM FOR:   David V. Aguilar
Acting Commissioner, U.S. Customs and Border Protection

Alejandro Mayorkas
Director, U.S. Citizenship and Immigration Services

John Morton
Director, U.S. Immigration and Customs Enforcement

FROM:   Janet Napolitano
Secretary of Homeland Security

SUBJECT:   Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the
Department of Homeland Security (DHS) should enforce the Nation's immigration laws against
certain young people who were brought to this country as children and know only this country as
home. As a general matter, these individuals lacked the intent to violate the law and our ongoing
review of pending removal cases is already offering administrative closure to many of them.
However, additional measures are necessary to ensure that our enforcement resources are not
expended on these low priority cases but are instead appropriately focused on people who meet
our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of
prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of
  this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education
  development certificate, or is an honorably discharged veteran of the Coast Guard or
  Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple
  misdemeanor offenses, or otherwise poses a threat to national security or public safety;
  and
- is not above the age of thirty.

AR 00000001

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

AR 00000002

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

3

# The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others

The Department of Homeland Security's proposed policy to prioritize the removal of certain aliens unlawfully present in the United States would be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of U.S. citizens and legal permanent residents would also be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of recipients of deferred action under the Deferred Action for Childhood Arrivals program would not be a permissible exercise of DHS's enforcement discretion.

November 19, 2014

MEMORANDUM OPINION FOR THE SECRETARY OF HOMELAND SECURITY
AND THE COUNSEL TO THE PRESIDENT

You have asked two questions concerning the scope of the Department of Homeland Security's discretion to enforce the immigration laws. First, you have asked whether, in light of the limited resources available to the Department ("DHS") to remove aliens unlawfully present in the United States, it would be legally permissible for the Department to implement a policy prioritizing the removal of certain categories of aliens over others. DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year. DHS's proposed policy would prioritize the removal of aliens who present threats to national security, public safety, or border security. Under the proposed policy, DHS officials could remove an alien who did not fall into one of these categories provided that an Immigration and Customs Enforcement ("ICE") Field Office Director determined that "removing such an alien would serve an important federal interest." Draft Memorandum for Thomas S. Winkowski, Acting Director, ICE, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* at 5 (Nov. 17, 2014) ("Johnson Prioritization Memorandum").

Second, you have asked whether it would be permissible for DHS to extend deferred action, a form of temporary administrative relief from removal, to certain aliens who are the parents of children who are present in the United States. Specifically, DHS has proposed to implement a program under which an alien could apply for, and would be eligible to receive, deferred action if he or she is not a DHS removal priority under the policy described above; has continuously resided in the United States since before January 1, 2010; has a child who is either a U.S. citizen or a lawful permanent resident; is physically present in the United

1

States both when DHS announces its program and at the time of application for deferred action; and presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Draft Memorandum for Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and Others* at 4 (Nov. 17, 2014) ("Johnson Deferred Action Memorandum"). You have also asked whether DHS could implement a similar program for parents of individuals who have received deferred action under the Deferred Action for Childhood Arrivals ("DACA") program.

As has historically been true of deferred action, these proposed deferred action programs would not "legalize" any aliens who are unlawfully present in the United States: Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time. *See generally Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999) (describing deferred action). Under decades-old regulations promulgated pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ 1103(a)(3), 1324(a(h)(3), aliens who are granted deferred action—like certain other categories of aliens who do not have lawful immigration status, such as asylum applicants—may apply for authorization to work in the United States in certain circumstances, 8 C.F.R. § 274a.12(c)(14) (providing that deferred action recipients may apply for work authorization if they can show an "economic necessity for employment"); *see also* 8 C.F.R. § 109.1(b)(7) (1982). Under DHS policy guidance, a grant of deferred action also suspends an alien's accrual of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I), provisions that restrict the admission of aliens who have departed the United States after having been unlawfully present for specified periods of time. A grant of deferred action under the proposed programs would remain in effect for three years, subject to renewal, and could be terminated at any time at DHS's discretion. *See* Johnson Deferred Action Memorandum at 2, 5.

For the reasons discussed below, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be permissible exercises of DHS's discretion to enforce the immigration laws. We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion.

## I.

We first address DHS's authority to prioritize the removal of certain categories of aliens over others. We begin by discussing some of the sources and limits of

DHS's enforcement discretion under the immigration laws, and then analyze DHS's proposed prioritization policy in light of these considerations.

### A.

DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, Congress established a comprehensive scheme governing immigration and naturalization. The INA specifies certain categories of aliens who are inadmissible to the United States. *See* 8 U.S.C. § 1182. It also specifies "which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Id.* (citing 8 U.S.C. § 1227); *see* 8 U.S.C. § 1227(a) (providing that "[a]ny alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien" falls within one or more classes of deportable aliens); *see also* 8 U.S.C. § 1182(a) (listing classes of aliens ineligible to receive visas or be admitted to the United States). Removal proceedings ordinarily take place in federal immigration courts administered by the Executive Office for Immigration Review, a component of the Department of Justice. *See id.* § 1229a (governing removal proceedings); *see also id.* §§ 1225(b)(1)(A), 1228(b) (setting out expedited removal procedures for certain arriving aliens and certain aliens convicted of aggravated felonies).

Before 2003, the Department of Justice, through the Immigration and Naturalization Service ("INS"), was also responsible for providing immigration-related administrative services and generally enforcing the immigration laws. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress transferred most of these functions to DHS, giving it primary responsibility both for initiating removal proceedings and for carrying out final orders of removal. *See* 6 U.S.C. §§ 101 *et seq.*; *see also Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS "now reside" in the Secretary of Homeland Security and DHS). The Act divided INS's functions among three different agencies within DHS: U.S. Citizenship and Immigration Services ("USCIS"), which oversees legal immigration into the United States and provides immigration and naturalization services to aliens; ICE, which enforces federal laws governing customs, trade, and immigration; and U.S. Customs and Border Protection ("CBP"), which monitors and secures the nation's borders and ports of entry. *See* Pub. L. No. 107-296, §§ 403, 442, 451, 471, 116 Stat. 2135, 2178, 2193, 2195, 2205; *see also Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services*, 69 Fed. Reg. 60938, 60938 (Oct. 13, 2004); *Name Change of Two DHS Components*, 75 Fed. Reg. 12445, 12445 (Mar. 16, 2010). The Secretary of Homeland Security is thus now "charged with the administration and

3

enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action. This discretion is rooted in the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and it reflects a recognition that the "faithful[]" execution of the law does not necessarily entail "act[ing] against each technical violation of the statute" that an agency is charged with enforcing. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Rather, as the Supreme Court explained in *Chaney*, the decision whether to initiate enforcement proceedings is a complex judgment that calls on the agency to "balanc[e] . . . a number of factors which are peculiarly within its expertise." *Id.* These factors include "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831; *cf. United States v. Armstrong*, 517 U.S. 456, 465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "'[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan'" (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985))). In *Chaney*, the Court considered and rejected a challenge to the Food and Drug Administration's refusal to initiate enforcement proceedings with respect to alleged violations of the Federal Food, Drug, and Cosmetic Act, concluding that an agency's decision not to initiate enforcement proceedings is presumptively immune from judicial review. *See* 470 U.S. at 832. The Court explained that, while Congress may "provide[] guidelines for the agency to follow in exercising its enforcement powers," in the absence of such "legislative direction," an agency's non-enforcement determination is, much like a prosecutor's decision not to indict, a "special province of the Executive." *Id.* at 832–33.

The principles of enforcement discretion discussed in *Chaney* apply with particular force in the context of immigration. Congress enacted the INA against a background understanding that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal quotation marks omitted). Consistent with this understanding, the INA vested the Attorney General (now the Secretary of Homeland Security) with broad authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3). Years later, when Congress created the Department of Homeland Security, it expressly charged DHS with responsibility for "[e]stablishing national immigration enforcement policies and

AR 00000007

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities." Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. The INA expressly authorizes immigration officials to grant certain forms of discretionary relief from removal for aliens, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b. But in addition to administering these statutory forms of relief, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499. And, as the Court has explained, "[a]t each stage" of the removal process—"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—immigration officials have "discretion to abandon the endeavor." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483 (quoting 8 U.S.C. § 1252(g) (alterations in original)). Deciding whether to pursue removal at each of these stages implicates a wide range of considerations. As the Court observed in *Arizona*:

> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. . . . The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

132 S. Ct. at 2499.

Immigration officials' discretion in enforcing the laws is not, however, unlimited. Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). These limits, however, are not clearly defined. The open-ended nature of the inquiry under the Take Care Clause—whether a particular exercise of discretion is "faithful[]" to the law enacted by Congress—does not lend itself easily to the application of set formulas or bright-line rules. And because the exercise of enforcement discretion generally is not subject to judicial review, *see*

5

*Chaney*, 470 U.S. at 831–33, neither the Supreme Court nor the lower federal courts have squarely addressed its constitutional bounds. Rather, the political branches have addressed the proper allocation of enforcement authority through the political process. As the Court noted in *Chaney*, Congress "may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. The history of immigration policy illustrates this principle: Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons. When Congress has been dissatisfied with Executive action, it has responded, as *Chaney* suggests, by enacting legislation to limit the Executive's discretion in enforcing the immigration laws.[1]

Nonetheless, the nature of the Take Care duty does point to at least four general (and closely related) principles governing the permissible scope of enforcement discretion that we believe are particularly relevant here. First, enforcement decisions should reflect "factors which are peculiarly within [the enforcing agency's] expertise." *Chaney*, 470 U.S. at 831. Those factors may include considerations related to agency resources, such as "whether the agency has enough resources to undertake the action," or "whether agency resources are best spent on this violation or another." *Id.* Other relevant considerations may include "the proper ordering of [the agency's] priorities," *id.* at 832, and the agency's assessment of "whether the particular enforcement action [at issue] best fits the agency's overall policies," *id.* at 831.

Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. *See id.* at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers"). In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. *Cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting

---

[1] *See, e.g.*, Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 503–05 (2009) (describing Congress's response to its dissatisfaction with the Executive's use of parole power for refugee populations in the 1960s and 1970s); *see also, e.g., infra* note 5 (discussing legislative limitations on voluntary departure and extended voluntary departure).

AR 00000009

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney*, "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'"). Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws. *But see, e.g.*, *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

Finally, lower courts, following *Chaney*, have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis. *See, e.g.*, *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676–77 (D.C. Cir. 1994). That reading of *Chaney* reflects a conclusion that case-by-case enforcement decisions generally avoid the concerns mentioned above. Courts have noted that "single-shot non-enforcement decisions" almost inevitably rest on "the sort of mingled assessments of fact, policy, and law . . . that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp.*, 37 F.3d at 676–77 (emphasis omitted). Individual enforcement decisions made on the basis of case-specific factors are also unlikely to constitute "general polic[ies] that [are] so extreme as to amount to an abdication of [the agency's] statutory responsibilities." *Id.* at 677 (quoting *Chaney*, 477 U.S. at 833 n.4). That does not mean that all "general policies" respecting non-enforcement are categorically forbidden: Some "general policies" may, for example, merely provide a framework for making individualized, discretionary assessments about whether to initiate enforcement actions in particular cases. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (explaining that an agency's use of "reasonable presumptions and generic rules" is not incompatible with a requirement to make individualized determinations). But a general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses "special risks" that the agency has exceeded the bounds of its enforcement discretion. *Crowley Caribbean Transp.*, 37 F.3d at 677.

## B.

We now turn, against this backdrop, to DHS's proposed prioritization policy. In their exercise of enforcement discretion, DHS and its predecessor, INS, have long

employed guidance instructing immigration officers to prioritize the enforcement of the immigration laws against certain categories of aliens and to deprioritize their enforcement against others. *See, e.g.*, INS Operating Instructions § 103(a)(1)(i) (1962); Memorandum for All Field Office Directors, ICE, et al., from John Morton, Director, ICE, *Re: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011); Memorandum for All ICE Employees, from John Morton, Director, ICE, *Re: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); Memorandum for Regional Directors, INS, et al., from Doris Meissner, Commissioner, INS, *Re: Exercising Prosecutorial Discretion* (Nov. 17, 2000). The policy DHS proposes, which is similar to but would supersede earlier policy guidance, is designed to "provide clearer and more effective guidance in the pursuit" of DHS's enforcement priorities; namely, "threats to national security, public safety and border security." Johnson Prioritization Memorandum at 1.

Under the proposed policy, DHS would identify three categories of undocumented aliens who would be priorities for removal from the United States. *See generally id.* at 3–5. The highest priority category would include aliens who pose particularly serious threats to national security, border security, or public safety, including aliens engaged in or suspected of espionage or terrorism, aliens convicted of offenses related to participation in criminal street gangs, aliens convicted of certain felony offenses, and aliens apprehended at the border while attempting to enter the United States unlawfully. *See id.* at 3. The second-highest priority would include aliens convicted of multiple or significant misdemeanor offenses; aliens who are apprehended after unlawfully entering the United States who cannot establish that they have been continuously present in the United States since January 1, 2014; and aliens determined to have significantly abused the visa or visa waiver programs. *See id.* at 3–4. The third priority category would include other aliens who have been issued a final order of removal on or after January 1, 2014. *See id.* at 4. The policy would also provide that none of these aliens should be prioritized for removal if they "qualify for asylum or another form of relief under our laws." *Id.* at 3–5.

The policy would instruct that resources should be directed to these priority categories in a manner "commensurate with the level of prioritization identified." *Id.* at 5. It would, however, also leave significant room for immigration officials to evaluate the circumstances of individual cases. *See id.* (stating that the policy "requires DHS personnel to exercise discretion based on individual circumstances"). For example, the policy would permit an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations to deprioritize the removal of an alien falling in the highest priority category if, in her judgment, "there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority." *Id.* at 3. Similar discretionary provisions would apply to

AR 00000011

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

aliens in the second and third priority categories.[2] The policy would also provide a non-exhaustive list of factors DHS personnel should consider in making such deprioritization judgments.[3] In addition, the policy would expressly state that its terms should not be construed "to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities," and would further provide that "[i]mmigration officers and attorneys may pursue removal of an alien not identified as a priority" if, "in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id.* at 5.

DHS has explained that the proposed policy is designed to respond to the practical reality that the number of aliens who are removable under the INA vastly exceeds the resources Congress has made available to DHS for processing and carrying out removals. The resource constraints are striking. As noted, DHS has informed us that there are approximately 11.3 million undocumented aliens in the country, but that Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country. *See* E-mail for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Shahoulian, Deputy General Counsel, DHS, *Re: Immigration Opinion* (Nov. 19, 2014) ("Shahoulian E-mail"). The proposed policy explains that, because DHS "cannot respond to all immigration violations or remove all persons illegally in the United States," it seeks to "prioritize the use of enforcement personnel, detention space, and removal assets" to "ensure that use of its limited resources is devoted to the pursuit of" DHS's highest priorities. Johnson Prioritization Memorandum at 2.

In our view, DHS's proposed prioritization policy falls within the scope of its lawful discretion to enforce the immigration laws. To begin with, the policy is based on a factor clearly "within [DHS's] expertise." *Chaney*, 470 U.S. at 831. Faced with sharply limited resources, DHS necessarily must make choices about which removals to pursue and which removals to defer. DHS's organic statute itself recognizes this inevitable fact, instructing the Secretary to establish "national

---

[2] Under the proposed policy, aliens in the second tier could be deprioritized if, "in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority." Johnson Prioritization Memorandum at 4. Aliens in the third tier could be deprioritized if, "in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority." *Id.* at 5.

[3] These factors include "extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child or a seriously ill relative." Johnson Prioritization Memorandum at 6.

AR 00000012

immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And an agency's need to ensure that scarce enforcement resources are used in an effective manner is a quintessential basis for the use of prosecutorial discretion. *See Chaney*, 470 U.S. at 831 (among the factors "peculiarly within [an agency's] expertise" are "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all").

The policy DHS has proposed, moreover, is consistent with the removal priorities established by Congress. In appropriating funds for DHS's enforcement activities—which, as noted, are sufficient to permit the removal of only a fraction of the undocumented aliens currently in the country—Congress has directed DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Security Appropriations Act, 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251 ("DHS Appropriations Act"). Consistent with this directive, the proposed policy prioritizes individuals convicted of criminal offenses involving active participation in a criminal street gang, most offenses classified as felonies in the convicting jurisdiction, offenses classified as "aggravated felonies" under the INA, and certain misdemeanor offenses. Johnson Prioritization Memorandum at 3–4. The policy ranks these priority categories according to the severity of the crime of conviction. The policy also prioritizes the removal of other categories of aliens who pose threats to national security or border security, matters about which Congress has demonstrated particular concern. *See, e.g.*, 8 U.S.C. § 1226(c)(1)(D) (providing for detention of aliens charged with removability on national security grounds); *id.* § 1225(b) & (c) (providing for an expedited removal process for certain aliens apprehended at the border). The policy thus raises no concern that DHS has relied "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658.

Further, although the proposed policy is not a "single-shot non-enforcement decision," neither does it amount to an abdication of DHS's statutory responsibilities, or constitute a legislative rule overriding the commands of the substantive statute. *Crowley Caribbean Transp.*, 37 F.3d at 676–77. The proposed policy provides a general framework for exercising enforcement discretion in individual cases, rather than establishing an absolute, inflexible policy of not enforcing the immigration laws in certain categories of cases. Given that the resources Congress has allocated to DHS are sufficient to remove only a small fraction of the total population of undocumented aliens in the United States, setting forth written guidance about how resources should presumptively be allocated in particular cases is a reasonable means of ensuring that DHS's severely limited resources are systematically directed to its highest priorities across a large and diverse agency, as well as ensuring consistency in the administration of the removal system. The proposed policy's identification of categories of aliens who constitute removal

AR 00000013

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities is also consistent with the categorical nature of Congress's instruction to prioritize the removal of criminal aliens in the DHS Appropriations Act.

And, significantly, the proposed policy does not identify any category of removable aliens whose removal may not be pursued under any circumstances. Although the proposed policy limits the discretion of immigration officials to expend resources to remove non-priority aliens, it does not eliminate that discretion entirely. It directs immigration officials to use their resources to remove aliens in a manner "commensurate with the level of prioritization identified," but (as noted above) it does not "prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." Johnson Prioritization Memorandum at 5. Instead, it authorizes the removal of even non-priority aliens if, in the judgment of an ICE Field Office Director, "removing such an alien would serve an important federal interest," a standard the policy leaves open-ended. *Id.* Accordingly, the policy provides for case-by-case determinations about whether an individual alien's circumstances warrant the expenditure of removal resources, employing a broad standard that leaves ample room for the exercise of individualized discretion by responsible officials. For these reasons, the proposed policy avoids the difficulties that might be raised by a more inflexible prioritization policy and dispels any concern that DHS has either undertaken to rewrite the immigration laws or abdicated its statutory responsibilities with respect to non-priority aliens.[4]

## II.

We turn next to the permissibility of DHS's proposed deferred action programs for certain aliens who are parents of U.S. citizens, lawful permanent residents ("LPRs"), or DACA recipients, and who are not removal priorities under the proposed policy discussed above. We begin by discussing the history and current practice of deferred action. We then discuss the legal authorities on which deferred

---

[4] In *Crane v. Napolitano*, a district court recently concluded in a non-precedential opinion that the INA "mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not 'clearly and beyond a doubt entitled to be admitted.'" Opinion and Order Respecting Pl. App. for Prelim. Inj. Relief, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23) (quoting 8 U.S.C. § 1225(b)(2)(A)). The court later dismissed the case for lack of jurisdiction. *See Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 8211660, at *4 (N.D. Tex. July 31). Although the opinion lacks precedential value, we have nevertheless considered whether, as it suggests, the text of the INA categorically forecloses the exercise of enforcement discretion with respect to aliens who have not been formally admitted. The district court's conclusion is, in our view, inconsistent with the Supreme Court's reading of the INA as permitting immigration officials to exercise enforcement discretion at any stage of the removal process, including when deciding whether to initiate removal proceedings against a particular alien. *See Arizona*, 132 S. Ct. at 2499; *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483–84. It is also difficult to square with authority holding that the presence of mandatory language in a statute, standing alone, does not necessarily limit the Executive Branch's enforcement discretion, *see, e.g.*, *Chaney*, 470 U.S. at 835; *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973).

11

action relies and identify legal principles against which the proposed use of deferred action can be evaluated. Finally, we turn to an analysis of the proposed deferred action programs themselves, beginning with the program for parents of U.S. citizens and LPRs, and concluding with the program for parents of DACA recipients.

### A.

In immigration law, the term "deferred action" refers to an exercise of administrative discretion in which immigration officials temporarily defer the removal of an alien unlawfully present in the United States. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)); *see* USCIS, *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ("USCIS SOP"); INS Operating Instructions § 103.1(a)(1)(ii) (1977). It is one of a number of forms of discretionary relief—in addition to such statutory and non-statutory measures as parole, temporary protected status, deferred enforced departure, and extended voluntary departure—that immigration officials have used over the years to temporarily prevent the removal of undocumented aliens.[5]

---

[5] Parole is available to aliens by statute "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Among other things, parole gives aliens the ability to adjust their status without leaving the United States if they are otherwise eligible for adjustment of status, *see id.* § 1255(a), and may eventually qualify them for Federal means-tested benefits, *see id.* §§ 1613, 1641(b)(4). Temporary protected status is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. *Id.* § 1254a. Deferred enforced departure, which "has no statutory basis" but rather is an exercise of "the President's constitutional powers to conduct foreign relations," may be granted to nationals of appropriate foreign states. USCIS, Adjudicator's Field Manual § 38.2(a) (2014). Extended voluntary departure was a remedy derived from the voluntary departure statute, which, before its amendment in 1996, permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure. *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days). Some commentators, however, suggested that extended voluntary departure was in fact a form of "discretionary relief formulated administratively under the Attorney General's general authority for enforcing immigration law." Sharon Stephan, Cong. Research Serv., 85-599 EPW, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation* at 1 (Feb. 23, 1985). It appears that extended voluntary departure is no longer used following enactment of the Immigration Act of 1990, which established the temporary protected status program. *See U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 33446, 33457 (June 11, 2010) (proposed rule) (noting that "since 1990 neither the Attorney General nor the Secretary have designated a class of aliens for nationality-based 'extended voluntary departure,' and there no longer are aliens in the United States benefiting from such a designation," but noting that deferred enforced departure is still used); H.R. Rep. No. 102-123, at 2 (1991) (indicating that in establishing temporary protected status, Congress was "codif[ying] and supersed[ing]" extended voluntary departure). *See generally* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 5–10 (July 13, 2012) ("CRS Immigration Report").

AR 00000015

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

The practice of granting deferred action dates back several decades. For many years after the INA was enacted, INS exercised prosecutorial discretion to grant "non-priority" status to removable aliens who presented "appealing humanitarian factors." Letter for Leon Wildes, from E. A. Loughran, Associate Commissioner, INS at 2 (July 16, 1973) (defining a "non-priority case" as "one in which the Service in the exercise of discretion determines that adverse action would be unconscionable because of appealing humanitarian factors"); *see* INS Operating Instructions § 103.1(a)(1)(ii) (1962). This form of administrative discretion was later termed "deferred action." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484; *see* INS Operating Instructions § 103.1(a)(1)(ii) (1977) (instructing immigration officers to recommend deferred action whenever "adverse action would be unconscionable because of the existence of appealing humanitarian factors").

Although the practice of granting deferred action "developed without express statutory authorization," it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (internal quotation marks omitted); *see id.* at 485 (noting that a congressional enactment limiting judicial review of decisions "to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]" in 8 U.S.C. § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations"); *see also, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"). Deferred action "does not confer any immigration status"—i.e., it does not establish any enforceable legal right to remain in the United States— and it may be revoked by immigration authorities at their discretion. USCIS SOP at 3, 7. Assuming it is not revoked, however, it represents DHS's decision not to seek the alien's removal for a specified period of time.

Under longstanding regulations and policy guidance promulgated pursuant to statutory authority in the INA, deferred action recipients may receive two additional benefits. First, relying on DHS's statutory authority to authorize certain aliens to work in the United States, DHS regulations permit recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]"). Second, DHS has promulgated regulations and issued policy guidance providing that aliens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42

13

(May 6, 2009) ("USCIS Consolidation of Guidance") (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (providing that an alien is "unlawfully present" if, among other things, he "is present in the United States after the expiration of the period of stay authorized by the Attorney General").[6]

Immigration officials today continue to grant deferred action in individual cases for humanitarian and other purposes, a practice we will refer to as "ad hoc deferred action." Recent USCIS guidance provides that personnel may recommend ad hoc deferred action if they "encounter cases during [their] normal course of business that they feel warrant deferred action." USCIS SOP at 4. An alien may also apply for ad hoc deferred action by submitting a signed, written request to USCIS containing "[a]n explanation as to why he or she is seeking deferred action" along with supporting documentation, proof of identity, and other records. *Id.* at 3.

For decades, INS and later DHS have also implemented broader programs that make discretionary relief from removal available for particular classes of aliens. In many instances, these agencies have made such broad-based relief available through the use of parole, temporary protected status, deferred enforced departure, or extended voluntary departure. For example, from 1956 to 1972, INS implemented an extended voluntary departure program for physically present aliens who were beneficiaries of approved visa petitions—known as "Third Preference" visa petitions—relating to a specific class of visas for Eastern Hemisphere natives. *See United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977). Similarly, for several years beginning in 1978, INS granted extended voluntary departure to nurses who were eligible for H-1 visas. *Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978). In addition, in more than two dozen instances dating to 1956, INS and later DHS granted parole, temporary protected status, deferred enforced departure, or extended voluntary departure to large numbers of nationals of designated foreign states. *See, e.g.*, CRS Immigration Report at 20–23; Cong. Research Serv., ED206779, *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12–14 (1980). And in 1990, INS implemented a "Family Fairness" program that authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ("IRCA"). *See* Memorandum for Regional Commissioners,

---

[6] Section 1182(a)(9)(B)(i) imposes three- and ten-year bars on the admission of aliens (other than aliens admitted to permanent residence) who departed or were removed from the United States after periods of unlawful presence of between 180 days and one year, or one year or more. Section 1182(a)(9)(C)(i)(I) imposes an indefinite bar on the admission of any alien who, without being admitted, enters or attempts to reenter the United States after previously having been unlawfully present in the United States for an aggregate period of more than one year.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

INS, from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) ("Family Fairness Memorandum"); *see also* CRS Immigration Report at 10.

On at least five occasions since the late 1990s, INS and later DHS have also made discretionary relief available to certain classes of aliens through the use of deferred action:

*1. Deferred Action for Battered Aliens Under the Violence Against Women Act.* INS established a class-based deferred action program in 1997 for the benefit of self-petitioners under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902. VAWA authorized certain aliens who have been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf. *Id.* § 40701(a) (codified as amended at 8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)). The INS program required immigration officers who approved a VAWA self-petition to assess, "on a case-by-case basis, whether to place the alien in deferred action status" while the alien waited for a visa to become available. Memorandum for Regional Directors et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997). INS noted that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action." *Id.* But because "[i]n an unusual case, there may be factors present that would militate against deferred action," the agency instructed officers that requests for deferred action should still "receive individual scrutiny." *Id.* In 2000, INS reported to Congress that, because of this program, no approved VAWA self-petitioner had been removed from the country. *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 106th Cong. at 43 (July 20, 2000) ("H.R. 3083 Hearings").

*2. Deferred Action for T and U Visa Applicants.* Several years later, INS instituted a similar deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464. That Act created two new nonimmigrant classifications: a "T visa" available to victims of human trafficking and their family members, and a "U visa" for victims of certain other crimes and their family members. *Id.* §§ 107(e), 1513(b)(3) (codified at 8 U.S.C. § 1101(a)(15)(T)(i), (U)(i)). In 2001, INS issued a memorandum directing immigration officers to locate "possible victims in the above categories," and to use "[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal" to prevent those victims' removal "until they have had the opportunity to avail themselves of the provisions of the VTVPA." Memorandum

AR 00000018

for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001). In subsequent memoranda, INS instructed officers to make "deferred action assessment[s]" for "all [T visa] applicants whose applications have been determined to be bona fide," Memorandum for Johnny N. Williams, Executive Associate Commissioner, INS, from Stuart Anderson, Executive Associate Commissioner, INS, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002), as well as for all U visa applicants "determined to have submitted *prima facie* evidence of [their] eligibility," Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* at 5 (Oct. 8, 2003). In 2002 and 2007, INS and DHS promulgated regulations embodying these policies. *See* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (promulgated by *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 67 Fed. Reg. 4784, 4800–01 (Jan. 31, 2002)) (providing that any T visa applicant who presents "*prima facie* evidence" of his eligibility should have his removal "automatically stay[ed]" and that applicants placed on a waiting list for visas "shall maintain [their] current means to prevent removal (deferred action, parole, or stay of removal)"); *id.* § 214.14(d)(2) (promulgated by *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007)) ("USCIS will grant deferred action or parole to U-1 petitioners and qualifying family members while the U-1 petitioners are on the waiting list" for visas.).

3. *Deferred Action for Foreign Students Affected by Hurricane Katrina.* As a consequence of the devastation caused by Hurricane Katrina in 2005, several thousand foreign students became temporarily unable to satisfy the requirements for maintaining their lawful status as F-1 nonimmigrant students, which include "pursuit of a 'full course of study.'" USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005) (quoting 8 C.F.R. § 214.2(f)(6)), *available at* http//www.uscis.gov/sites/default/files/USCIS/Humanitarian/Special%20Situations/Previous%20Special%20Situations%20By%20Topic/faq-interim-student-relief-hurricane-katrina.pdf (last visited Nov. 19, 2014). DHS announced that it would grant deferred action to these students "based on the fact that [their] failure to maintain status is directly due to Hurricane Katrina." *Id.* at 7. To apply for deferred action under this program, students were required to send a letter substantiating their need for deferred action, along with an application for work authorization. Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* at 1–2 (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_11_25_05_PR.pdf (last visited Nov. 19, 2014). USCIS explained that such

AR 00000019

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

requests for deferred action would be "decided on a case-by-case basis" and that it could not "provide any assurance that all such requests will be granted." *Id.* at 1.

*4. Deferred Action for Widows and Widowers of U.S. Citizens.* In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. citizens. USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated a visa petition on the spouse's behalf. Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009). "In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens," USCIS issued guidance permitting covered surviving spouses and "their qualifying children who are residing in the United States" to apply for deferred action. *Id.* at 2, 6. USCIS clarified that such relief would not be automatic, but rather would be unavailable in the presence of, for example, "serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons." *Id.* at 6.[7]

*5. Deferred Action for Childhood Arrivals.* Announced by DHS in 2012, DACA makes deferred action available to "certain young people who were brought to this country as children" and therefore "[a]s a general matter . . . lacked the intent to violate the law." Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("Napolitano Memorandum"). An alien is eligible for DACA if she was under the age of 31 when the program began; arrived in the United States before the age of 16; continuously resided in the United States for at least 5 years immediately preceding June 15, 2012; was physically present on June 15, 2012; satisfies certain educational or military service requirements; and neither has a serious criminal history nor "poses a threat to national security or public safety." *See id.* DHS evaluates applicants' eligibility for DACA on a case-by-case basis. *See id.* at 2; USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 11 ("DACA Toolkit"). Successful DACA applicants receive deferred action for a

---

[7] Several months after the deferred action program was announced, Congress eliminated the requirement that an alien be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain his or her eligibility for lawful immigration status. Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009). Concluding that this legislation rendered its surviving spouse guidance "obsolete," USCIS withdrew its earlier guidance and treated all pending applications for deferred action as visa petitions. *See* Memorandum for Executive Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, et al., *Re: Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

AR 00000020

period of two years, subject to renewal. *See* DACA Toolkit at 11. DHS has stated that grants of deferred action under DACA may be terminated at any time, *id.* at 16, and "confer[] no substantive right, immigration status or pathway to citizenship," Napolitano Memorandum at 3.[8]

Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice.[9] On the contrary, it has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens. For example, as Congress was considering VAWA reauthorization legislation in 2000, INS officials testified before Congress about their deferred action program for VAWA self-petitioners, explaining that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," such that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." H.R. 3083 Hearings at 43. Congress responded by not only acknowledging but also expanding the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be "eligible for deferred action and work authorization." Victims of Trafficking and

---

[8] Before DACA was announced, our Office was consulted about whether such a program would be legally permissible. As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis. We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

[9] Congress has considered legislation that would limit the practice of granting deferred action, but it has never enacted such a measure. In 2011, a bill was introduced in both the House and the Senate that would have temporarily suspended DHS's authority to grant deferred action except in narrow circumstances. *See* H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011). Neither chamber, however, voted on the bill. This year, the House passed a bill that purported to bar any funding for DACA or other class-wide deferred action programs, H.R. 5272, 113th Cong. (2014), but the Senate has not considered the legislation. Because the Supreme Court has instructed that unenacted legislation is an unreliable indicator of legislative intent, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969), we do not draw any inference regarding congressional policy from these unenacted bills.

18

AR 00000021

Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).[10]

Congress demonstrated a similar awareness of INS's (and later DHS's) deferred action program for bona fide T and U visa applicants. As discussed above, that program made deferred action available to nearly all individuals who could make a prima facie showing of eligibility for a T or U visa. In 2008 legislation, Congress authorized DHS to "grant . . . an administrative stay of a final order of removal" to any such individual. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)). Congress further clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action." *Id.* It also directed DHS to compile a report detailing, among other things, how long DHS's "specially trained [VAWA] Unit at the [USCIS] Vermont Service Center" took to adjudicate victim-based immigration applications for "deferred action," along with "steps taken to improve in this area." *Id.* § 238. Representative Berman, the bill's sponsor, explained that the Vermont Service Center should "strive to issue work authorization and deferred action" to "[i]mmigrant victims of domestic violence, sexual assault and other violence crimes . . . in most instances within 60 days of filing." 154 Cong. Rec. 24603 (2008).

In addition, in other enactments, Congress has specified that certain classes of individuals should be made "eligible for deferred action." These classes include certain immediate family members of LPRs who were killed on September 11, 2001, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain immediate family members of certain U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694. In the same legislation, Congress made these individuals eligible to obtain lawful status as "family-sponsored immigrant[s]" or "immediate relative[s]" of U.S. citizens. Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361; Pub. L. No. 108-136, § 1703(c)(1)(A), 117 Stat. 1392, 1694; *see generally Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2197 (2014) (plurality opinion) (explaining which aliens typically qualify as family-sponsored immigrants or immediate relatives).

Finally, Congress acknowledged the practice of granting deferred action in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (codified at

---

[10] Five years later, in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960, Congress specified that, "[u]pon the approval of a petition as a VAWA self-petitioner, the alien . . . is eligible for work authorization." *Id.* § 814(b) (codified at 8 U.S.C. § 1154(a)(1)(K)). One of the Act's sponsors explained that while this provision was intended to "give[] DHS statutory authority to grant work authorization . . . without having to rely upon deferred action . . . [t]he current practice of granting deferred action to approved VAWA self-petitioners should continue." 151 Cong. Rec. 29334 (2005) (statement of Rep. Conyers).

AR 00000022

49 U.S.C. § 30301 note), which makes a state-issued driver's license or identification card acceptable for federal purposes only if the state verifies, among other things, that the card's recipient has "[e]vidence of [l]awful [s]tatus." Congress specified that, for this purpose, acceptable evidence of lawful status includes proof of, among other things, citizenship, lawful permanent or temporary residence, or "approved deferred action status." *Id.* § 202(c)(2)(B)(viii).

### B.

The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed. It is one of several mechanisms by which immigration officials, against a backdrop of limited enforcement resources, exercise their "broad discretion" to administer the removal system—and, more specifically, their discretion to determine whether "it makes sense to pursue removal" in particular circumstances. *Arizona*, 132 S. Ct. at 2499.

Deferred action, however, differs in at least three respects from more familiar and widespread exercises of enforcement discretion. First, unlike (for example) the paradigmatic exercise of prosecutorial discretion in a criminal case, the conferral of deferred action does not represent a decision not to prosecute an individual for past unlawful conduct; it instead represents a decision to openly tolerate an undocumented alien's continued presence in the United States for a fixed period (subject to revocation at the agency's discretion). Second, unlike most exercises of enforcement discretion, deferred action carries with it benefits in addition to non-enforcement itself; specifically, the ability to seek employment authorization and suspension of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). Third, class-based deferred action programs, like those for VAWA recipients and victims of Hurricane Katrina, do not merely enable individual immigration officials to select deserving beneficiaries from among those aliens who have been identified or apprehended for possible removal—as is the case with ad hoc deferred action—but rather set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status.

While these features of deferred action are somewhat unusual among exercises of enforcement discretion, the differences between deferred action and other exercises of enforcement discretion are less significant than they might initially appear. The first feature—the toleration of an alien's continued unlawful presence—is an inevitable element of almost any exercise of discretion in immigration enforcement. Any decision not to remove an unlawfully present alien—even through an exercise of routine enforcement discretion—necessarily carries with it a tacit acknowledgment that the alien will continue to be present in the United States without legal status. Deferred action arguably goes beyond such tacit acknowledgment by expressly communicating to the alien that his or her unlawful

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

presence will be tolerated for a prescribed period of time. This difference is not, in our view, insignificant. But neither does it fundamentally transform deferred action into something other than an exercise of enforcement discretion: As we have previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residence or citizenship, and is revocable at any time in the agency's discretion.

With respect to the second feature, the additional benefits deferred action confers—the ability to apply for work authorization and the tolling of unlawful presence—do not depend on background principles of agency discretion under DHS's general immigration authorities or the Take Care Clause at all, but rather depend on independent and more specific statutory authority rooted in the text of the INA. The first of those authorities, DHS's power to prescribe which aliens are authorized to work in the United States, is grounded in 8 U.S.C. § 1324a(h)(3), which defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]." This statutory provision has long been understood to recognize the authority of the Secretary (and the Attorney General before him) to grant work authorization to particular classes of aliens. *See* 8 C.F.R. § 274a.12; *see also Perales v. Casillas*, 903 F.2d 1043, 1048–50 (5th Cir. 1990) (describing the authority recognized by section 1324a(h)(3) as "permissive" and largely "unfettered").[11] Although the INA

---

[11] Section 1324a(h)(3) was enacted in 1986 as part of IRCA. Before then, the INA contained no provisions comprehensively addressing the employment of aliens or expressly delegating the authority to regulate the employment of aliens to a responsible federal agency. INS assumed the authority to prescribe the classes of aliens authorized to work in the United States under its general responsibility to administer the immigration laws. In 1981, INS promulgated regulations codifying its existing procedures and criteria for granting employment authorization. *See Employment Authorization to Aliens in the United States*, 46 Fed. Reg. 25079, 25080–81 (May 5, 1981) (citing 8 U.S.C. § 1103(a)). Those regulations permitted certain categories of aliens who lacked lawful immigration status, including deferred action recipients, to apply for work authorization under certain circumstances. 8 C.F.R. § 109.1(b)(7) (1982). In IRCA, Congress introduced a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002), to be enforced primarily through criminal and civil penalties on employers who knowingly employ an "unauthorized alien." As relevant here, Congress defined an "unauthorized alien" barred from employment in the United States as an alien who "is not . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). Shortly after IRCA was enacted, INS denied a petition to rescind its employment authorization regulation, rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act." *Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46092, 46093 (Dec. 4, 1987). Because the same statutory phrase refers both to aliens authorized to be employed by the INA and aliens authorized to be so employed by the Attorney General, INS concluded that the only way to give effect to both references is to conclude "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the

21

requires the Secretary to grant work authorization to particular classes of aliens, *see, e.g.*, 8 U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's authority to grant work authorization to other classes of aliens. Further, and notably, additional provisions of the INA expressly contemplate that the Secretary may grant work authorization to aliens lacking lawful immigration status—even those who are in active removal proceedings or, in certain circumstances, those who have already received final orders of removal. *See id.* § 1226(a)(3) (permitting the Secretary to grant work authorization to an otherwise work-eligible alien who has been arrested and detained pending a decision whether to remove the alien from the United States); *id.* § 1231(a)(7) (permitting the Secretary under certain narrow circumstances to grant work authorization to aliens who have received final orders of removal). Consistent with these provisions, the Secretary has long permitted certain additional classes of aliens who lack lawful immigration status to apply for work authorization, including deferred action recipients who can demonstrate an economic necessity for employment. *See* 8 C.F.R. § 274a.12(c)(14); *see also id.* § 274a.12(c)(8) (applicants for asylum), (c)(10) (applicants for cancellation of removal); *supra* note 11 (discussing 1981 regulations).

The Secretary's authority to suspend the accrual of unlawful presence of deferred action recipients is similarly grounded in the INA. The relevant statutory provision treats an alien as "unlawfully present" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I) if he "is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). That language contemplates that the Attorney General (and now the Secretary) may authorize an alien to stay in the United States without accruing unlawful presence under section 1182(a)(9)(B)(i) or section 1182(a)(9)(C)(i). And DHS regulations and policy guidance interpret a "period of stay authorized by the Attorney General" to include periods during which an alien has been granted deferred action. *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); USCIS Consolidation of Guidance at 42.

The final unusual feature of deferred action programs is particular to class-based programs. The breadth of such programs, in combination with the first two features of deferred action, may raise particular concerns about whether immigration officials have undertaken to substantively change the statutory removal system rather than simply adapting its application to individual circumstances. But the salient feature of class-based programs—the establishment of an affirmative application process with threshold eligibility criteria—does not in and of itself cross the line between executing the law and rewriting it. Although every class-wide deferred action program that has been implemented to date has established

---

regulatory process, in addition to those who are authorized employment by statute." *Id.*; *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

certain threshold eligibility criteria, each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria. *See supra* pp. 15–18. Like the establishment of enforcement priorities discussed in Part I, the establishment of threshold eligibility criteria can serve to avoid arbitrary enforcement decisions by individual officers, thereby furthering the goal of ensuring consistency across a large agency. The guarantee of individualized, case-by-case review helps avoid potential concerns that, in establishing such eligibility criteria, the Executive is attempting to rewrite the law by defining new categories of aliens who are automatically entitled to particular immigration relief. *See Crowley Caribbean Transp.*, 37 F.3d at 676–77; *see also Chaney*, 470 U.S. at 833 n.4. Furthermore, while permitting potentially eligible individuals to apply for an exercise of enforcement discretion is not especially common, many law enforcement agencies have developed programs that invite violators of the law to identify themselves to the authorities in exchange for leniency.[12] Much as is the case with those programs, inviting eligible aliens to identify themselves through an application process may serve the agency's law enforcement interests by encouraging lower-priority individuals to identify themselves to the agency. In so doing, the process may enable the agency to better focus its scarce resources on higher enforcement priorities.

Apart from the considerations just discussed, perhaps the clearest indication that these features of deferred action programs are not per se impermissible is the fact that Congress, aware of these features, has repeatedly enacted legislation appearing to endorse such programs. As discussed above, Congress has not only directed that certain classes of aliens be made eligible for deferred action programs—and in at least one instance, in the case of VAWA beneficiaries, directed the expansion of an existing program—but also ranked evidence of approved deferred action status as evidence of "lawful status" for purposes of the REAL ID Act. These enactments strongly suggest that when DHS in the past has decided to grant deferred action to an individual or class of individuals, it has been acting in a manner consistent with congressional policy "'rather than embarking on a frolic of its own.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139

---

[12] For example, since 1978, the Department of Justice's Antitrust Division has implemented a "leniency program" under which a corporation that reveals an antitrust conspiracy in which it participated may receive a conditional promise that it will not be prosecuted. *See* Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008)*, *available at* http://www.justice.gov/atr/public/criminal/239583.pdf (last visited Nov. 19, 2014); *see also* Internal Revenue Manual § 9.5.11.9(2) (Revised IRS Voluntary Disclosure Practice), *available at* http://www.irs.gov/uac/Revised-IRS-Voluntary-Disclosure-Practice (last visited Nov. 19, 2014) (explaining that a taxpayer's voluntary disclosure of misreported tax information "may result in prosecution not being recommended"); U.S. Marshals Service, *Fugitive Safe Surrender FAQs*, *available at* http://www.usmarshals.gov/safesurrender/faqs.html (last visited Nov. 19, 2014) (stating that fugitives who surrender at designated sites and times under the "Fugitive Safe Surrender" program are likely to receive "favorable consideration").

AR 00000026

(1985) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375 (1969)); *cf. id.* at 137–39 (concluding that Congress acquiesced in an agency's assertion of regulatory authority by "refus[ing] . . . to overrule" the agency's view after it was specifically "brought to Congress'[s] attention," and further finding implicit congressional approval in legislation that appeared to acknowledge the regulatory authority in question); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (finding that Congress "implicitly approved the practice of claim settlement by executive agreement" by enacting the International Claims Settlement Act of 1949, which "create[d] a procedure to implement" those very agreements).

Congress's apparent endorsement of certain deferred action programs does not mean, of course, that a deferred action program can be lawfully extended to any group of aliens, no matter its characteristics or its scope, and no matter the circumstances in which the program is implemented. Because deferred action, like the prioritization policy discussed above, is an exercise of enforcement discretion rooted in the Secretary's broad authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed, it is subject to the same four general principles previously discussed. *See supra* pp. 6–7. Thus, any expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects considerations within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute. *See supra* pp. 6–7 (citing *Youngstown*, 343 U.S. at 637, and *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). Immigration officials cannot abdicate their statutory responsibilities under the guise of exercising enforcement discretion. *See supra* p. 7 (citing *Chaney*, 470 U.S. at 833 n.4). And any new deferred action program should leave room for individualized evaluation of whether a particular case warrants the expenditure of resources for enforcement. *See supra* p. 7 (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37 F.3d at 676–77).

Furthermore, because deferred action programs depart in certain respects from more familiar and widespread exercises of enforcement discretion, particularly careful examination is needed to ensure that any proposed expansion of deferred action complies with these general principles, so that the proposed program does not, in effect, cross the line between executing the law and rewriting it. In analyzing whether the proposed programs cross this line, we will draw substantial guidance from Congress's history of legislation concerning deferred action. In the absence of express statutory guidance, the nature of deferred action programs Congress has implicitly approved by statute helps to shed light on Congress's own understandings about the permissible uses of deferred action. Those understandings, in turn, help to inform our consideration of whether the proposed deferred action programs are "faithful[]" to the statutory scheme Congress has enacted. U.S. Const. art. II, § 3.

AR 00000027

## C.

We now turn to the specifics of DHS's proposed deferred action programs. DHS has proposed implementing a policy under which an alien could apply for, and would be eligible to receive, deferred action if he or she: (1) is not an enforcement priority under DHS policy; (2) has continuously resided in the United States since before January 1, 2010; (3) is physically present in the United States both when DHS announces its program and at the time of application for deferred action; (4) has a child who is a U.S. citizen or LPR; and (5) presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. You have also asked about the permissibility of a similar program that would be open to parents of children who have received deferred action under the DACA program. We first address DHS's proposal to implement a deferred action program for the parents of U.S. citizens and LPRs, and then turn to the permissibility of the program for parents of DACA recipients in the next section.

## 1.

We begin by considering whether the proposed program for the parents of U.S. citizens and LPRs reflects considerations within the agency's expertise. DHS has offered two justifications for the proposed program for the parents of U.S. citizens and LPRs. First, as noted above, severe resource constraints make it inevitable that DHS will not remove the vast majority of aliens who are unlawfully present in the United States. Consistent with Congress's instruction, DHS prioritizes the removal of individuals who have significant criminal records, as well as others who present dangers to national security, public safety, or border security. *See supra* p. 10. Parents with longstanding ties to the country and who have no significant criminal records or other risk factors rank among the agency's lowest enforcement priorities; absent significant increases in funding, the likelihood that any individual in that category will be determined to warrant the expenditure of severely limited enforcement resources is very low. Second, DHS has explained that the program would serve an important humanitarian interest in keeping parents together with children who are lawfully present in the United States, in situations where such parents have demonstrated significant ties to community and family in this country. *See* Shahoulian E-mail.

With respect to DHS's first justification, the need to efficiently allocate scarce enforcement resources is a quintessential basis for an agency's exercise of enforcement discretion. *See Chaney*, 470 U.S. at 831. Because, as discussed earlier, Congress has appropriated only a small fraction of the funds needed for full enforcement, DHS can remove no more than a small fraction of the individuals who are removable under the immigration laws. *See supra* p. 9. The agency must therefore make choices about which violations of the immigration laws it

AR 00000028

will prioritize and pursue. And as *Chaney* makes clear, such choices are entrusted largely to the Executive's discretion. 470 U.S. at 831.

The deferred action program DHS proposes would not, of course, be costless. Processing applications for deferred action and its renewal requires manpower and resources. *See Arizona*, 132 S. Ct. at 2521 (Scalia, J., concurring in part and dissenting in part). But DHS has informed us that the costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees. *See* Shahoulian E-mail; *see also* 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH). DHS has indicated that the costs of administering the deferred action program would therefore not detract in any significant way from the resources available to ICE and CBP—the enforcement arms of DHS—which rely on money appropriated by Congress to fund their operations. *See* Shahoulian E-mail. DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify non-priority aliens and focus their resources on pursuing aliens who are strong candidates for removal. *See id.* The proposed program, in short, might help DHS address its severe resource limitations, and at the very least likely would not exacerbate them. *See id.*

DHS does not, however, attempt to justify the proposed program solely as a cost-saving measure, or suggest that its lack of resources alone is sufficient to justify creating a deferred action program for the proposed class. Rather, as noted above, DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity by enabling those parents of U.S. citizens and LPRs who are not otherwise enforcement priorities and who have demonstrated community and family ties in the United States (as evidenced by the length of time they have remained in the country) to remain united with their children in the United States. Like determining how best to respond to resource constraints, determining how to address such "human concerns" in the immigration context is a consideration that is generally understood to fall within DHS's expertise. *Arizona*, 132 S. Ct. at 2499.

This second justification for the program also appears consonant with congressional policy embodied in the INA. Numerous provisions of the statute reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 85-1199, at 7 (1957)). The INA provides a path to lawful status for the parents, as well as other immediate relatives, of U.S. citizens: U.S. citizens aged twenty-one or over may petition for parents to obtain visas that would permit them to enter and permanently reside

AR 00000029

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

in the United States, and there is no limit on the overall number of such petitions that may be granted. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *see also Cuellar de Osorio*, 134 S. Ct. at 2197–99 (describing the process for obtaining a family-based immigrant visa). And although the INA contains no parallel provision permitting LPRs to petition on behalf of their parents, it does provide a path for LPRs to become citizens, at which point they too can petition to obtain visas for their parents. *See, e.g.*, 8 U.S.C. § 1427(a) (providing that aliens are generally eligible to become naturalized citizens after five years of lawful permanent residence); *id.* § 1430(a) (alien spouses of U.S. citizens become eligible after three years of lawful permanent residence); *Demore v. Kim*, 538 U.S. 510, 544 (2003).[13] Additionally, the INA empowers the Attorney General to cancel the removal of, and adjust to lawful permanent resident status, aliens who have been physically present in the United States for a continuous period of not less than ten years, exhibit good moral character, have not been convicted of specified offenses, and have immediate relatives who are U.S. citizens or LPRs and who would suffer exceptional hardship from the alien's removal. 8 U.S.C. § 1229b(b)(1). DHS's proposal to focus on the parents of U.S. citizens and LPRs thus tracks a congressional concern, expressed in the INA, with uniting the immediate families of individuals who have permanent legal ties to the United States.

At the same time, because the temporary relief DHS's proposed program would confer to such parents is sharply limited in comparison to the benefits Congress has made available through statute, DHS's proposed program would not operate to circumvent the limits Congress has placed on the availability of those benefits. The statutory provisions discussed above offer the parents of U.S. citizens and LPRs the prospect of permanent lawful status in the United States. The cancellation of removal provision, moreover, offers the prospect of receiving such status

---

[13] The INA does permit LPRs to petition on behalf of their spouses and children even before they have attained citizenship. *See* 8 U.S.C. § 1153(a)(2). However, the exclusion of LPRs' parents from this provision does not appear to reflect a congressional judgment that, until they attain citizenship, LPRs lack an interest in being united with their parents comparable to their interest in being united with their other immediate relatives. The distinction between parents and other relatives originated with a 1924 statute that exempted the wives and minor children of U.S. citizens from immigration quotas, gave "preference status"—eligibility for a specially designated pool of immigrant visas—to other relatives of U.S. citizens, and gave no favorable treatment to the relatives of LPRs. Immigration Act of 1924, Pub. L. No. 68-139, §§ 4(a), 6, 43 Stat. 153, 155–56. In 1928, Congress extended preference status to LPRs' wives and minor children, reasoning that because such relatives would be eligible for visas without regard to any quota when their LPR relatives became citizens, granting preference status to LPRs' wives and minor children would "hasten[]" the "family reunion." S. Rep. No. 70-245, at 2 (1928); *see* Act of May 29, 1928, ch. 914, 45 Stat. 1009, 1009–10. The special visa status for wives and children of LPRs thus mirrored, and was designed to complement, the special visa status given to wives and minor children of U.S. citizens. In 1965, Congress eliminated the basis on which the distinction had rested by exempting all "immediate relatives" of U.S. citizens, including parents, from numerical restrictions on immigration. Pub. L. No. 89-236, § 1, 79 Stat. 911, 911. But it did not amend eligibility for preference status for relatives of LPRs to reflect that change. We have not been able to discern any rationale for this omission in the legislative history or statutory text of the 1965 law.

AR 00000030

immediately, without the delays generally associated with the family-based immigrant visa process. DHS's proposed program, in contrast, would not grant the parents of U.S. citizens and LPRs any lawful immigration status, provide a path to permanent residence or citizenship, or otherwise confer any legally enforceable entitlement to remain in the United States. *See* USCIS SOP at 3. It is true that, as we have discussed, a grant of deferred action would confer eligibility to apply for and obtain work authorization, pursuant to the Secretary's statutory authority to grant such authorization and the longstanding regulations promulgated thereunder. *See supra* pp. 13, 21–22. But unlike the automatic employment eligibility that accompanies LPR status, *see* 8 U.S.C. § 1324a(h)(3), this authorization could be granted only on a showing of economic necessity, and would last only for the limited duration of the deferred action grant, *see* 8 C.F.R. § 274a.12(c)(14).

The other salient features of the proposal are similarly consonant with congressional policy. The proposed program would focus on parents who are not enforcement priorities under the prioritization policy discussed above—a policy that, as explained earlier, comports with the removal priorities set by Congress. *See supra* p. 10. The continuous residence requirement is likewise consistent with legislative judgments that extended periods of continuous residence are indicative of strong family and community ties. *See* IRCA, Pub. L. No. 99-603, § 201(a), 100 Stat. 3359, 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a)(2)) (granting lawful status to certain aliens unlawfully present in the United States since January 1, 1982); *id.* § 302(a) (codified as amended at 8 U.S.C. § 1160) (granting similar relief to certain agricultural workers); H.R. Rep. No. 99-682, pt. 1, at 49 (1986) (stating that aliens present in the United States for five years "have become a part of their communities[,] . . . have strong family ties here which include U.S. citizens and lawful residents[,] . . . have built social networks in this country[, and] . . . have contributed to the United States in myriad ways"); S. Rep. No. 99-132, at 16 (1985) (deporting aliens who "have become well settled in this country" would be a "wasteful use of the Immigration and Naturalization Service's limited enforcement resources"); *see also Arizona*, 132 S. Ct. at 2499 (noting that "[t]he equities of an individual case" turn on factors "including whether the alien has . . . long ties to the community").

We also do not believe DHS's proposed program amounts to an abdication of its statutory responsibilities, or a legislative rule overriding the commands of the statute. As discussed earlier, DHS's severe resource constraints mean that, unless circumstances change, it could not as a practical matter remove the vast majority of removable aliens present in the United States. The fact that the proposed program would defer the removal of a subset of these removable aliens—a subset that ranks near the bottom of the list of the agency's removal priorities—thus does not, by itself, demonstrate that the program amounts to an abdication of DHS's responsibilities. And the case-by-case discretion given to immigration officials under DHS's proposed program alleviates potential concerns that DHS has

AR 00000031

abdicated its statutory enforcement responsibilities with respect to, or created a categorical, rule-like entitlement to immigration relief for, the particular class of aliens eligible for the program. An alien who meets all the criteria for deferred action under the program would receive deferred action only if he or she "present[ed] no other factors that, in the exercise of discretion," would "make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. The proposed policy does not specify what would count as such a factor; it thus leaves the relevant USCIS official with substantial discretion to determine whether a grant of deferred action is warranted. In other words, even if an alien is not a removal priority under the proposed policy discussed in Part I, has continuously resided in the United States since before January 1, 2010, is physically present in the country, and is a parent of an LPR or a U.S. citizen, the USCIS official evaluating the alien's deferred action application must still make a judgment, in the exercise of her discretion, about whether that alien presents any other factor that would make a grant of deferred action inappropriate. This feature of the proposed program ensures that it does not create a categorical entitlement to deferred action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

Finally, the proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action. As noted above, the program uses deferred action as an interim measure for a group of aliens to whom Congress has given a prospective entitlement to lawful immigration status. While Congress has provided a path to lawful status for the parents of U.S. citizens and LPRs, the process of obtaining that status "takes time." *Cuellar de Osorio*, 134 S. Ct. at 2199. The proposed program would provide a mechanism for families to remain together, depending on their circumstances, for some or all of the intervening period.[14] Immigration officials have on several

---

[14] DHS's proposed program would likely not permit all potentially eligible parents to remain together with their children for the entire duration of the time until a visa is awarded. In particular, undocumented parents of adult citizens who are physically present in the country would be ineligible to adjust their status without first leaving the country if they had never been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a) (permitting the Attorney General to adjust to permanent resident status certain aliens present in the United States if they become eligible for immigrant visas). They would thus need to leave the country to obtain a visa at a U.S. consulate abroad. *See id.* § 1201(a); *Cuellar de Osorio*, 134 S. Ct. at 2197–99. But once such parents left the country, they would in most instances become subject to the 3- or 10-year bar under 8 U.S.C. § 1182(a)(9)(B)(i) and therefore unable to obtain a visa unless they remained outside the country for the duration of the bar. DHS's proposed program would nevertheless enable other families to stay together without regard to the 3- or 10-year bar. And even as to those families with parents who would become subject to that bar, the proposed deferred action program would have the effect of reducing the

AR 00000032

occasions deployed deferred action programs as interim measures for other classes of aliens with prospective entitlements to lawful immigration status, including VAWA self-petitioners, bona fide T and U visa applicants, certain immediate family members of certain U.S. citizens killed in combat, and certain immediate family members of aliens killed on September 11, 2001. As noted above, each of these programs has received Congress's implicit approval—and, indeed, in the case of VAWA self-petitioners, a direction to expand the program beyond its original bounds. *See supra* pp. 18–20.[15] In addition, much like these and other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests. Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States—would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided. During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs. Although DHS has indicated that there is no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail. We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause. In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion. But because the size of DHS's proposed program corresponds to the size of a popula- tion to which Congress has granted a prospective entitlement to lawful status

---

amount of time the family had to spend apart, and could enable them to adjust the timing of their separation according to, for example, their children's needs for care and support.

[15] Several extended voluntary departure programs have been animated by a similar rationale, and the most prominent of these programs also received Congress's implicit approval. In particular, as noted above, the Family Fairness policy, implemented in 1990, authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens granted legal status under IRCA—aliens who would eventually "acquire lawful permanent resident status" and be able to petition on behalf of their family members. Family Fairness Memorandum at 1; *see supra* pp. 14–15. Later that year, Congress granted the beneficiaries of the Family Fairness program an indefinite stay of deportation. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030. Although it did not make that grant of relief effective for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." *Id.* § 301(g). INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status. *See supra* p. 14.

AR 00000033

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is nevertheless only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence. And although we are aware of no prior exercises of deferred action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten—potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5 & 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considerations—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community—that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

**2.**

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those

31

AR 00000034

discussed above: Like the program for the parents of U.S. citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses and children); *id.* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition—as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the

AR 00000035

proposed program, because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

## III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.

<div align="right">

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

</div>

AR 00000036

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

November 20, 2014

MEMORANDUM FOR:   León Rodríguez
Director
U.S. Citizenship and Immigration Services

Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

FROM:   Jeh Charles Johnson
Secretary

SUBJECT:   **Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1

AR 00000037

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3] Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1] Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See,* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2] INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization"); * INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3] In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas.  Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

2

AR 00000038

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country  since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security.  Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

## A.    Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis.  The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years.  On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.**  DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today.  The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981).  That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**.  The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments.  This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014.  Beginning on that date, USCIS should issue all work

3

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.** In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

## B.   Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

4

the Immigration and Nationality Act.[4] Deferred action granted pursuant to the program shall be for a period of three years. Applicants will pay the work authorization and biometrics fees, which currently amount to $465. There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement. As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal. Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only an Act of Congress can confer these rights. It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law. This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

5

had lost or misplaced the documents explaining her absence, and that Brooks failed to attend the scheduled conference. There is no basis to infer that retaliation based on Brooks's months-old complaints against a supervisor who no longer worked at HISD was the "but for" reason for the decision to terminate her, particularly given the decision to reinstate.

### H. The Lost Pay Claims

[25] Brooks claims that she had additional responsibilities in December 2011 and January 2012 while the head of her group was absent, but that she was not paid extra salary. She claims that HISD's failure to pay more was retaliatory.

The summary judgment evidence supports HISD's stated reason for denying Brooks pay at a managerial rate. Tracy Amadi, not Brooks, was the interim head of the group, and Brooks did not take on her former manager's duties. (Docket Entry No. 22, Ex. B, Welch Affidavit, ¶ 15; Ex. B–6). The evidence shows that Brooks did not have the computer access necessary to perform the duties she claims to have been assigned. (Docket Entry No. 22, Ex. B, Welch Affidavit, ¶ 15). Brooks has not identified or presented summary judgment evidence supporting an inference that HISD's stated reason was a pretext for retaliation.

[26] Brooks also claims that HISD's refusal to pay her for April 5, 2012, is evidence of retaliation. Brooks was on medical leave from March 27 to April 4, 2012. She did not return on April 5, but instead saw a doctor, who gave her another note. She gave this note to HISD on April 6. HISD paid Brooks for all of the days she was out sick, except for April 5. (Docket Entry No. 22, Ex. I–2). HISD did not pay her for that day because she was absent without contemporaneous medical justification, which HISD's rules require. Brooks has not pointed to or submitted evidence showing that HISD's stated reason for not paying her for that day was false or a pretext for retaliation.

### IV. Conclusion

HISD's motion for summary judgment, (Docket Entry No. 22), is granted. Final judgment is entered by separate order.



**State of TEXAS, et al., Plaintiffs,**

v.

**UNITED STATES of America,
et al., Defendants.**

**Civil No. B–14–254.**

United States District Court,
S.D. Texas,
Brownsville Division.

Signed Feb. 16, 2015.

**Background:** States and state officials sought injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents, and to prevent expansion of Deferred Action for Childhood Arrivals (DACA) program. Plaintiffs filed motion for preliminary injunction.

**Holdings:** The District Court, Andrew S. Hanen, J., held that:

(1) State of Texas sufficiently alleged injury, as element for Article III standing;

(2) States' parens patriae action was not ripe;

(3) States sufficiently alleged standing based on federal abdication;

(4) judicial review of directive was available under Administrative Procedure Act (APA);

(5) presumption of judicial unreviewability under APA, for agency action committed to agency discretion by law, was inapplicable; and

(6) States showed a substantial likelihood of success on merits of claim that Secretary's directive was subject to APA's notice and comment requirements.

Motion granted.

**1. Federal Courts ⟐2101, 2104**

The case or controversy requirement in Article III limits the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.   U.S.C.A. Const. Art. 3, § 2, cl. 1.

**2. Federal Courts ⟐2201**

Plaintiffs, as the parties invoking the court's jurisdiction, bear the burden of satisfying the Article III case or controversy requirement by demonstrating that they have standing to adjudicate their claims in federal court.   U.S.C.A. Const. Art. 3, § 2, cl. 1.

**3. Federal Civil Procedure ⟐103.2, 103.3**

The irreducible constitutional minimum for Article III standing contains three elements: (1) plaintiff must have suffered a concrete and particularized injury that is either actual or imminent; (2) plaintiff must show that there is a causal connection between the alleged injury and the complained-of conduct, essentially, that the injury is fairly traceable to the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  U.S.C.A. Const. Art. 3, § 2, cl. 1.

**4. Federal Civil Procedure ⟐103.2**

For prudential standing, plaintiffs must come within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

**5. Federal Civil Procedure ⟐103.4**

For prudential standing, plaintiff must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.

**6. Administrative Law and Procedure ⟐668**

To demonstrate standing for judicial review under the Administrative Procedure Act (APA), the plaintiff must show that it has suffered or will suffer a sufficient injury in fact.  5 U.S.C.A. § 702.

**7. Administrative Law and Procedure ⟐666**

Demonstrating prudential standing for judicial review under the Administrative Procedure Act (APA) requires showing that the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute in question, and for this prudential standing inquiry, it is not necessary for a court to ask whether there has been a congressional intent to benefit the would-be plaintiff.  5 U.S.C.A. § 702.

**8. Administrative Law and Procedure ⟐665.1**

The requisite showing of prudential standing for judicial review under the Administrative Procedure Act (APA) is not made if the plaintiff's interests are so mar-

ginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. 5 U.S.C.A. § 702.

**9. Administrative Law and Procedure ☞668**

Plaintiffs seeking review of agency action under the Administrative Procedure Act's (APA) procedural provisions are presumed to satisfy the necessary requirements for standing, and thus, they need not show the agency action would have been different had it been consummated in a procedurally valid manner; the courts will assume this portion of the causal link. 5 U.S.C.A. § 702.

**10. Federal Civil Procedure ☞103.2 Federal Courts ☞2078**

Questions regarding constitutional standing and prudential standing implicate the court's subject-matter jurisdiction, and thus, challenges to standing are evaluated as a motion to dismiss for lack of subject-matter jurisdiction. U.S.C.A. Const. Art. 3, § 2, cl. 1; Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**11. Federal Courts ☞2078, 2080**

When evaluating subject-matter jurisdiction on a motion to dismiss, the court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**12. Federal Courts ☞2078, 2081**

A facial challenge to subject-matter jurisdiction consists of only a motion to dismiss for lack of subject-matter jurisdiction, without any accompanying evidence; for this challenge, the court is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. Fed.Rules Civ. Proc.Rule 12(b)(1), 28 U.S.C.A.

**13. Federal Courts ☞2080, 2082**

When making a factual attack on the court's subject-matter jurisdiction, the challenging party submits affidavits, testimony, or other evidentiary materials to support its claims, and a factual attack requires the responding plaintiff to submit facts through some evidentiary method and prove by a preponderance of the evidence that the trial court does have subject matter jurisdiction.

**14. Federal Civil Procedure ☞103.2 Federal Courts ☞2101**

To satisfy Article III's case or controversy requirement, it is not necessary for all plaintiffs to demonstrate standing; rather, one plaintiff with standing is sufficient. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**15. States ☞192**

A direct and genuine injury to a State's own proprietary interests may give rise to Article III standing. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**16. Injunction ☞1505**

State of Texas sufficiently alleged injury, as element for Article III standing, in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; State alleged that it would have to make all-or-nothing choice to either allow DAPA beneficiaries to apply for driver's licenses, causing State to suffer financial losses, or drastically restructure a state program by

denying driver's licenses to all individuals that relied on employment authorization documentation, which restructuring would significantly intrude into an area traditionally reserved for State's judgment. U.S.C.A. Const. Art. 3, § 2, cl. 1; V.T.C.A., Transportation Code § 521.142.

**17. Injunction ⟷1505**

States sufficiently alleged a causal connection between alleged injury to them and complained-of conduct, as element for Article III standing in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; States alleged that they would either incur financial losses from making driver's licenses available to DAPA beneficiaries or would be required to drastically restructure their driver's license programs, the alleged injury would be directly caused by DAPA program, and there was no speculation as to probability of alleged injury occurring. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**18. Injunction ⟷1505**

States sufficiently alleged redressability, as element for Article III standing in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; States alleged that they would either incur financial losses from making driver's licenses available to DAPA beneficiaries or would be required to drastically restructure their driver's license programs, DAPA would provide its beneficiaries with the necessary legal presence and documentation to allow them to apply for driver's licenses in most states, and without this status or documentation, these beneficiaries would be foreclosed from seeking driver's licenses. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**19. Injunction ⟷1505**

States were not merely pleading a generalized grievance, as would preclude prudential standing in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; States alleged that DAPA program would directly injure their proprietary and fiscal interests by creating a new class of individuals that was eligible to apply for state driver's licenses.

**20. Injunction ⟷1505**

States sufficiently alleged that they came within zone of interests to be protected by the immigration statutes at issue, as required for prudential standing in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; States alleged that DAPA program undermined Immigration and Nationality Act (INA)

provisions enacted to protect the States, and that Congress had entrusted DHS with duty to enforce immigration laws, including duties to guard the border and remove illegal aliens present in the country. Immigration and Nationality Act, §§ 103(a)(1, 5), 237, 8 U.S.C.A. §§ 1103(a)(1, 5), 1227.

**21. States ⟜190**

Parens patriae permits a state to bring suit to protect the interests of its citizens, even if it cannot demonstrate a direct injury to its separate interests as a sovereign entity.

**22. States ⟜190**

Parens patriae recognizes the interests that the state has in the well-being of its populace and allows it to bring suit when those interests are threatened.

**23. States ⟜190**

States are not barred from suing the federal government based on a parens patriae theory, provided that the states are seeking to enforce, rather than prevent the enforcement of, a federal statute.

**24. States ⟜190**

Although seeking adherence to a federal statute is a necessary component for a state's parens patriae suit against the federal government, it alone is not enough; in addition, states must identify a quasi-sovereign interest that is harmed by the alleged under-enforcement.

**25. States ⟜190**

A state's quasi-sovereign interest in protecting the economic well-being of its citizens from a broad range of injuries supports a parens patriae action against the federal government, to enforce a federal statute.

**26. States ⟜190**

States sufficiently alleged a quasi-sovereign interest in protecting the economic well-being of their citizens, as required for a parens patriae action against the federal government to enforce federal immigration statutes, in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; states alleged that DAPA program would create a discriminatory employment environment that would encourage employers to hire DAPA beneficiaries instead of those with lawful permanent status in United States. Immigration and Nationality Act, §§ 103(a)(1, 5), 237, 8 U.S.C.A. §§ 1103(a)(1, 5), 1227.

**27. States ⟜190**

States' parens patriae action against the federal government, to enforce federal immigration statutes, was not ripe for adjudication, in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; Executive Branch had not yet promulgated regulations barring DAPA beneficiaries from participating in Affordable Care Act's (ACA) employer health insurance mandate, which regulations allegedly would create a discriminatory employment environment that would encourage employers to hire DAPA beneficiaries instead of those with lawful permanent status in United States. Immigration and Nationality Act, §§ 103(a)(1, 5), 237, 8

U.S.C.A.   §§ 1103(a)(1,   5),   1227;   26 U.S.C.A. §§ 4980H, § 5000A(d)(3).

**28. Injunction ⟷1505**

   States' allegations failed to support redressability, as element for special solicitude standing to sue the federal government under Supreme Court's *Massachusetts v. E.P.A.* decision based on sovereign or quasi-sovereign interests, in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; the States' alleged indirect injury to their financial resources, from federal government's failure to secure the borders, would not be redressed because putative DAPA beneficiaries had already been in the country for approximately five years, the States' requested injunctive relief would maintain the status quo, and the status quo already included costs associated with presence of putative DAPA beneficiaries.

**29. Injunction ⟷1505**

   States' allegations, that reports made by federal government and third-parties concerning federal government's actions had encouraged illegal immigration, failed to support redressability, as element for special solicitude standing to sue the federal government under Supreme Court's *Massachusetts v. E.P.A.* decision based on sovereign or quasi-sovereign interests, in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which

would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; the decision to immigrate illegally would be motivated by innumerable factors, apart from reported information or misinformation about DAPA program.   U.S.C.A. Const. Art. 3, § 2, cl. 1.

**30. Injunction ⟷1505**

   States sufficiently alleged that the federal government had claimed total preemption of State police powers with respect to immigration, as element for States' standing based on federal abdication, in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents.

**31. Injunction ⟷1505**

   States sufficiently alleged that the federal government had abdicated its duty to enforce the immigration laws, as element for States' standing based on federal abdication, in action seeking injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; for example, DHS Secretary had announced that DHS would not enforce immigration laws as to over four million illegal aliens eligible for DAPA program, based on prosecutorial discretion and lack

of financial resources, and that absent extraordinary circumstances, illegal aliens rejected from DAPA program would not be deported.

**32. Aliens, Immigration, and Citizenship ☞140**

Ordering of priorities, by Secretary of Department of Homeland Security (DHS), for enforcement of immigration laws was not subject to judicial second-guessing, because the government's enforcement priorities and its overall enforcement plan were not readily susceptible to the kind of analysis the courts were competent to make.

**33. Constitutional Law ☞2620**

As a general principle, the decision to prosecute or not prosecute an individual is, with narrow exceptions, a decision that is left to the Executive Branch's discretion, under constitutional separation of powers.

**34. Administrative Law and Procedure ☞706**

Courts generally refrain from injecting themselves into decisions involving agency non-enforcement for three main reasons: (1) these decisions ordinarily involve matters particularly within an agency's expertise; (2) an agency's refusal to act does not involve that agency's coercive powers requiring protection by courts; and (3) an agency's refusal to act largely mirrors a prosecutor's decision to not indict.

**35. Administrative Law and Procedure ☞706**

Absent abdication by an agency, decisions by agencies to not take enforcement action are rarely reviewable under the Administrative Procedure Act (APA). 5 U.S.C.A. §§ 702, 704.

**36. Aliens, Immigration, and Citizenship ☞141**

**Constitutional Law ☞2553**

Under constitutional separation of powers, decisions by Secretary of Department of Homeland Security (DHS) with respect to enforcement of immigration laws, i.e., how to marshal DHS resources, how to best utilize DHS manpower, and where to concentrate the agency's activities, were discretionary decisions solely within the purview of the Executive Branch and not reviewable by the Judicial Branch, to the extent that the decisions did not violate any statute or the Constitution.

**37. Constitutional Law ☞2620**

Under separation of powers, the Constitution allows the President to execute the laws, not make them.

**38. Constitutional Law ☞2340**

Under constitutional separation of powers, Congress, and Congress alone, has the power to legislate in the field of immigration. U.S.C.A. Const. Art. 1, § 8, cl. 4.

**39. Constitutional Law ☞2340**

Under constitutional separation of powers, the conditions for entry or removal of every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, and the grounds on which such determinations should be based, are matters solely for the responsibility of the Congress. U.S.C.A. Const. Art. 1, § 8, cl. 4.

**40. Injunction ☞1092**

To support the equitable remedy of a preliminary injunction, the plaintiff must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the plaintiff will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that

the injunction will not disserve the public interest.

**41. Injunction ⬦1563, 1572**

While a preliminary injunction should not be granted unless the plaintiff, by a clear showing, carries his burden of persuasion on each of the four factors that must be established to obtain preliminary injunction, the plaintiff need not prove his case.

**42. Injunction ⬦1074**

The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.

**43. Injunction ⬦1074, 1568, 1584**

Given the limited purpose of a preliminary injunction, which purpose is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits, and given the haste that is often necessary if the parties' positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.

**44. Injunction ⬦1093**

The court's analysis, when a preliminary injunction is sought, requires a balancing of the probabilities of ultimate success on the merits with the consequences of court intervention at a preliminary stage.

**45. Injunction ⬦1096, 1570**

To show a substantial likelihood of success on the merits, as element for preliminary injunction, the plaintiff must present a prima facie case, but need not show a certainty of winning.

**46. Administrative Law and Procedure ⬦665.1**

When a party challenges the legality of agency action, a finding that the party has standing will not, alone, entitle that party to a decision on the merits.

**47. Administrative Law and Procedure ⬦666, 668**

A plaintiff asserting that he has been adversely affected or aggrieved by agency action, as basis for judicial review under the Administrative Procedure Act (APA), must establish that the injury he complains of falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.  5 U.S.C.A. § 702.

**48. Administrative Law and Procedure ⬦704**

Two conditions must be satisfied for agency action to be final, as basis for judicial review under the general review provisions of the Administrative Procedure Act (APA): (1) the action must mark the consummation of the agency's decision-making process, i.e., it must not be of a merely tentative or interlocutory nature, and (2) the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.  5 U.S.C.A. § 704.

**49. Aliens, Immigration, and Citizenship ⬦155**

Directive from Secretary of Department of Homeland Security (DHS), regarding implementation of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents, marked the consummation of agency's decisionmaking process, as element for final agency action that was subject to judicial review under general review provisions of Administra-

tive Procedure Act (APA); directive ordered immediate implementation of certain measures to be taken under DAPA program, and for about three months the directive had been in effect, with action taken pursuant to it.  5 U.S.C.A. § 704.

**50. Aliens, Immigration, and Citizenship**
⬤155

Directive from Secretary of Department of Homeland Security (DHS), regarding implementation of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents, was an action from which legal consequences would flow, as element for final agency action that was subject to judicial review under general review provisions of Administrative Procedure Act (APA); mandatory language was used throughout the directive, it required United States Citizenship and Immigration Services (USCIS) and Immigration and Customs Enforcement (ICE) to take certain actions, and DAPA program conferred upon its beneficiaries the right to stay in the country lawfully.  5 U.S.C.A. § 704.

**51. Administrative Law and Procedure**
⬤666, 668

The key inquiry regarding zone of interest, as requirement for judicial review under the Administrative Procedure Act (APA) in proceeding brought by an aggrieved party, is whether Congress intended for plaintiff to be relied upon to challenge agency disregard of the law.  5 U.S.C.A. § 702.

**52. Administrative Law and Procedure**
⬤666

The zone of interest test for judicial review under the Administrative Procedure Act (APA) in a proceeding brought

by an aggrieved party, is not especially demanding.  5 U.S.C.A. § 702.

**53. Administrative Law and Procedure**
⬤666

In cases where the plaintiff is not itself the subject of the contested regulatory action, the zone of interest test for judicial review under the Administrative Procedure Act (APA), in a proceeding brought by an aggrieved party, denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.  5 U.S.C.A. § 702.

**54. Aliens, Immigration, and Citizenship**
⬤155

State of Texas would be adversely affected and was within zone of interests protected by federal immigration law, as required for judicial review under the Administrative Procedure Act (APA), with respect to directive from Secretary of Department of Homeland Security (DHS) implementing program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; DAPA program authorized a new status of legal presence along with numerous other benefits for a substantial number of individuals who were currently, by law, removable or deportable, and the acts of Congress deeming these individuals removable were passed in part to protect the State and its residents.  5 U.S.C.A. §§ 702, 704.

**55. Aliens, Immigration, and Citizenship**
⬤103
**States** ⬤18.43

Under the doctrine of preemption, the States are deprived of the ability to protect themselves or institute their own laws

to control illegal immigration and, thus, they must rely on the Immigration and Nationality Act (INA) and federal enforcement of the same for their protection. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

### 56. Administrative Law and Procedure ☞706

There is a rebuttable presumption that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion and, consequently, unsuitable for judicial review. 5 U.S.C.A. § 701(a)(2).

### 57. Aliens, Immigration, and Citizenship ☞155

Presumption of judicial unreviewability, under Administrative Procedure Act (APA), for agency action committed to agency discretion by law did not apply to directive from Secretary of Department of Homeland Security (DHS), implementing program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; while DHS characterized the DAPA program as exercising prosecutorial discretion, DHS was acting affirmatively to the extent that DAPA program could be characterized as non-enforcement of immigration laws, by enacting a wide-reaching program that awarded legal presence and bestowed benefits to individuals Congress had deemed deportable or removable. 5 U.S.C.A. § 701(a)(2).

### 58. Aliens, Immigration, and Citizenship ☞142, 155

Assuming the applicability of presumption of judicial unreviewability, under Administrative Procedure Act (APA), for agency action committed to agency discretion by law, the presumption was rebutted, as to directive from Secretary of Department of Homeland Security (DHS), implementing program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; immigration statutes that DHS claimed were discretionary actually contained detailed and mandatory commands that circumscribed the discretion of DHS with respect to admission and removal, and Secretary's delegated authority to establish enforcement policies and priorities did not extend to establishing a national rule or program of awarding legal presence and benefits, such as the right to work, to over four million individuals who fell into the category that Congress deemed removable. 5 U.S.C.A. § 701(a)(2); 6 U.S.C.A. § 202(4, 5); Immigration and Nationality Act, §§ 103(a)(3), 212, 235(a)(1, 3), (b)(2)(A), 237, 240(c)(2)(A, B), (e)(2), 8 U.S.C.A. §§ 1103(a)(3), 1182, 1225(a)(1, 3), (b)(2)(A), 1227, 1229a(c)(2)(A, B), (e)(2).

### 59. Statutes ☞1407

The word "shall" in a federal statute indicates a congressional mandate that does not confer discretion, i.e. one that should be complied with to the extent possible and to the extent that resources allow.

### 60. Statutes ☞1407

The word "shall" in a federal statute does not divest the Executive Branch of its inherent discretion to formulate the best means of achieving the statute's objective, but it does deprive the Executive Branch of its ability to directly and substantially contravene statutory commands.

### 61. Statutes ☞1407

Use of the term "may" in a federal statute indicates a Congressional grant of

discretion to the Executive Branch to either accept or not accept the statute's goal.

**62. Administrative Law and Procedure**
**⟐701**

An agency's decision to consciously and expressly adopt a general policy that is so extreme as to amount to an abdication of its statutory responsibilities does not warrant the presumption of judicial unreviewability, under the Administrative Procedure Act (APA), of agency action committed to agency discretion by law. 5 U.S.C.A. § 701(a)(2).

**63. Aliens, Immigration, and Citizenship**
**⟐142**

Past practice by immigration officials, in deferring removal of illegal immigrants, did not create a source of power for the Department of Homeland Security (DHS) to implement a program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents.

**64. Administrative Law and Procedure**
**⟐394**

The Administrative Procedure Act's (APA) exemptions from notice and comment requirements for rulemaking must be narrowly construed. 5 U.S.C.A. § 553.

**65. Administrative Law and Procedure**
**⟐382.1, 394**

A rule's effect on agency discretion is the primary determinant in characterizing a rule as substantive, and therefore subject to the Administrative Procedure Act's (APA) notice and comment requirements for rulemaking. 5 U.S.C.A. § 553.

**66. Administrative Law and Procedure**
**⟐382.1, 394**

Any rule that narrowly constricts the discretion of agency officials by largely

determining the issue addressed is a "substantive rule," which is subject to Administrative Procedure Act's (APA) notice and comment requirements for rulemaking. 5 U.S.C.A. § 553.

**67. Administrative Law and Procedure**
**⟐382.1, 394**

A "substantive rule," which is subject to the Administrative Procedure Act's (APA) notice and comment requirements for rulemaking, is generally characterized as one that establishes a standard of conduct which has the force of law. 5 U.S.C.A. § 553.

See publication Words and Phrases for other judicial constructions and definitions.

**68. Administrative Law and Procedure**
**⟐382.1, 394**

A "general statement of policy," which is exempt from Administrative Procedure Act's (APA) notice and comment requirements for rulemaking, is best characterized as announcing the agency's tentative intentions for the future. 5 U.S.C.A. § 553(b)(3)(A).

See publication Words and Phrases for other judicial constructions and definitions.

**69. Injunction ⟐1496**

States showed a substantial likelihood of success on the merits, as element for preliminary injunction, as to their claim under the Administrative Procedure Act (APA) that the directive from Secretary of Department of Homeland Security (DHS), for implementation of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expansion of Deferred Action for Childhood Arrivals (DACA) program, was a substantive rule or legislative rule that was not exempt from APA's notice and comment requirements for rulemaking; directive, at a minimum, severely restricted any discretion regarding grants or denials of deferred

action to illegal immigrants, and directive was a massive change in immigration policy that changed the legal status and employability of DAPA beneficiaries, though DHS labeled DAPA as guidance and the directive referred to decisions being made on "case-by-case basis" and with "discretion." 5 U.S.C.A. §§ 551(4, 5), 553(b)(3)(A).

**70. Administrative Law and Procedure** ⟺**382.1, 394**

The label that the agency puts upon its given exercise of administrative power is not conclusive as to whether it is a substantive rule, which is subject to Administrative Procedure Act's (APA) notice and comment requirements for rulemaking; rather, the focus is what the agency does in fact. 5 U.S.C.A. § 553.

**71. Administrative Law and Procedure** ⟺**382.1, 394**

A rule is a "legislative rule," which is subject to Administrative Procedure Act's (APA) notice and comment requirements for rulemaking, if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy. 5 U.S.C.A. § 553.

> See publication Words and Phrases for other judicial constructions and definitions.

**72. Injunction** ⟺**1103, 1104, 1106**

Speculative injuries are not enough to show irreparable harm, as element for issuance of preliminary injunction, and there must be more than an unfounded fear on the part of the plaintiff; thus, courts will not issue a preliminary injunction simply to prevent the possibility of some remote future injury, and the plaintiff must show a presently existing actual threat.

**73. Injunction** ⟺**1496**

States' alleged injuries, from humanitarian crisis along the southern border of Texas and elsewhere, and the alleged exacerbation of costs that Texas would incur to provide health care for illegal immigrants, involved possible and remote future injuries that did not constitute irreparable harm, as element for preliminary injunction to prevent implementation, pursuant to directive from Secretary of Department of Homeland Security (DHS) which had not complied with Administrative Procedure Act's (APA) notice and comment requirements, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expansion of Deferred Action for Childhood Arrivals (DACA) program. 5 U.S.C.A. § 553.

**74. Injunction** ⟺**1496**

States sufficiently alleged that they would suffer irreparable harm, as element for preliminary injunction to prevent implementation, pursuant to directive from Secretary of Department of Homeland Security (DHS) which had not complied with Administrative Procedure Act's (APA) notice and comment requirements, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expansion of Deferred Action for Childhood Arrivals (DACA) program; States alleged that legalizing the presence of millions of illegal immigrants was a virtually irreversible action once taken, making it substantially difficult, if not impossible, for States to retract any benefits or driver's licenses provided to DAPA beneficiaries. 5 U.S.C.A. § 553.

**75. Injunction** ⟺**1104, 1106**

To constitute irreparable harm, as element for issuance of preliminary injunction, plaintiff's injury need not have already been inflicted or certain to occur; a strong threat of irreparable injury before a trial on the merits is adequate for a preliminary injunction to issue.

**76. Injunction ⟞1078, 1109**

The award of a preliminary injunction is never strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff, but is rather a matter of sound judicial discretion, requiring careful balancing of the interests of, and possible injuries to, the respective parties.

**77. Injunction ⟞1109**

If there is reason to believe that a preliminary injunction issued prior to a trial on the merits would be burdensome, the balance tips in favor of denying preliminary injunctive relief.

**78. Injunction ⟞1100, 1563**

Plaintiffs seeking a preliminary injunction have the burden to show that if granted, a preliminary injunction would not be adverse to public interest, and if no public interest supports granting preliminary injunctive relief, such relief should ordinarily be denied, even if the public interest would not be harmed by a preliminary injunction.

**79. Injunction ⟞1100**

An evaluation of the public interest should be given considerable weight in determining whether a motion for a preliminary injunction should be granted.

**80. Injunction ⟞1496**

Balancing of harms weighed in favor of granting States' motion for preliminary injunction to prevent implementation, pursuant to directive from Secretary of Department of Homeland Security (DHS) which had not complied with Administrative Procedure Act's (APA) notice and comment requirements, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expansion of Deferred Action for Childhood Arrivals (DACA) program, with respect to legal status of illegal immigrants; DHS and government officials would not be excessively burdened and might not be harmed at all, since DHS could continue to prosecute or not prosecute illegally-present individuals as current laws dictated, States would bear the costs of issuing driver's licenses and other benefits once DAPA beneficiaries, armed with Social Security cards and employment authorization documents, sought those benefits, and it would be substantially difficult, if not impossible, for States to retract those benefits. 5 U.S.C.A. § 553.

**81. Injunction ⟞1496**

Public interest in Executive Branch compliance with Administrative Procedure Act's (APA) notice and comment requirements weighed in favor of preliminary injunction to prevent implementation, pursuant to directive from Secretary of Department of Homeland Security (DHS), of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expansion of Deferred Action for Childhood Arrivals (DACA) program, with respect to legal status of illegal immigrants. 5 U.S.C.A. § 553.

**82. Constitutional Law ⟞976**

While the court is mindful of its constitutional role to ensure that the powers of each branch of government are checked and balanced, nevertheless, if there is a non-constitutional ground upon which to adjudge the case, it is a well-established principle governing the prudent exercise of the court's jurisdiction that normally the court will not decide a constitutional question.

————

Andrew Stephen Oldham, Adam Nicholas Bitter, Angela V. Colmenero, Arthur D'Andrea, John Campbell Barker, Scott A.

**604**                    **86 FEDERAL SUPPLEMENT, 3d SERIES**

Keller, Texas Attorney General's Office, Austin, TX, Peter Margulies, Roger Williams University School of Law, Bristol, RI, Joseph C. Chapelle, Peter J. Rusthoven, Barnes & Thornburg LLP, Indianapolis, IN, for Plaintiffs.

Kathleen R. Hartnett, Kyle Renee Freeny, U.S. Dept. of Justice, Washington, DC, Daniel David Hu, Office of the U.S. Attorney's Office, Houston, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

ANDREW S. HANEN, District Judge.

This is a case in which twenty-six states or their representatives are seeking injunctive relief against the United States and several officials of the Department of Homeland Security to prevent them from implementing a program entitled "Deferred Action for Parents of Americans and Lawful Permanent Residents."[1] This program is designed to provide legal presence to over four million individuals who are currently in the country illegally, and would enable these individuals to obtain a variety of both state and federal benefits.

The genesis of the problems presented by illegal immigration in this matter was described by the United States Supreme Court decades ago:

Sheer incapability or lax enforcement of the laws barring entry into this country, coupled with the failure to establish an effective bar to the employment of un-

documented aliens, has resulted in the creation of a substantial "shadow population" of illegal migrants—numbering in the millions—within our borders.

The Attorney General recently estimated the number of illegal aliens within the United States at between 3 and 6 million. In presenting to both the Senate and House of Representatives several Presidential proposals for reform of the immigration laws—including one to "legalize" many of the illegal entrants currently residing in the United States by creating for them a special statute under the immigration laws—the Attorney General noted that this subclass is largely composed of persons with a permanent attachment to the Nation, and that they are unlikely to be displaced from our territory.

"We have neither the resources, the capability, nor the motivation to uproot and deport millions of illegal aliens, many of whom have become, in effect, members of the community. By granting limited legal status to the productive and law-abiding members of this shadow population, we will recognize reality and devote our enforcement resources to deterring future illegal arrivals." Joint Hearing before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary and the Subcommittee on Immigration and

---

**1.** The Plaintiffs include: the State of Texas; State of Alabama; State of Arizona; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Kansas; State of Louisiana; State of Montana; State of Nebraska; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of South Dakota; State of Utah; State of West Virginia; State of Wisconsin; Attorney General Bill Schuette, People of Michigan; Governor Phil

Bryant, State of Mississippi; Governor Paul R. LePage, State of Maine; Governor Patrick L. McCrory, State of North Carolina; and Governor C.L. "Butch" Otter, State of Idaho. The States of Tennessee and Nevada were added in the latest Amended Complaint. All of these plaintiffs, both individuals and states, will be referred to collectively as "States" or "Plaintiffs" unless there is a particular need for specificity.

Refugee Policy of the Senate Committee on the Judiciary, 97th Cong., 1st Sess., 9 (1981) (testimony of William French Smith, Attorney General).

This situation raises the specter of a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents. The existence of such an underclass presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law.

*Plyler v. Doe,* 457 U.S. 202, 218–19 & n. 17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Thus, even in 1982, the Supreme Court noted in *Plyler* that the United States' problems with illegal immigration had existed for decades. Obviously, these issues are still far from a final resolution.

Since 1982, the population of illegal aliens in this country has more than tripled, but today's situation is clearly exacerbated by the specter of terrorism and the increased need for security.[2] Nevertheless, the Executive Branch's position is the same as it was then. It is still voicing concerns regarding its inability to enforce all immigration laws due to a lack of resources. While Congress has not been

idle, having passed a number of ever-increasing appropriation bills and various acts that affect immigration over the last four decades (especially in the wake of the terrorist attacks in 2001), it has not passed nor funded a long term, comprehensive system that resolves this country's issues regarding border security and immigration. To be sure, Congress' and the Executive Branch's focus on matters directly affecting national security is understandable. This overriding focus, however, does not necessarily comport with the interests of the states. While the States are obviously concerned about national security, they are also concerned about their own resources being drained by the constant influx of illegal immigrants into their respective territories, and that this continual flow of illegal immigration has led and will lead to serious domestic security issues directly affecting their citizenry. This influx, for example, is causing the States to experience severe law enforcement problems.[3] Regardless of the reasons behind the actions or inaction of the Executive and Legislative Branches of the federal government, the result is that many states ultimately bear the brunt of illegal immigration.

This case examines complex issues relating to immigration which necessarily in-

---

**2.** The Court uses the phrases "illegal immigrant" and "illegal alien" interchangeably. The word "immigrant" is not used in the manner in which it is defined in Title 8 of the United States Code unless it is so designated. The Court also understands that there is a certain segment of the population that finds the phrase "illegal alien" offensive. The Court uses this term because it is the term used by the Supreme Court in its latest pronouncement pertaining to this area of the law. *See Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 2497, 183 L.Ed.2d 351 (2012).

**3.** *See Arizona v. United States,* as quoted on p. 637 of this opinion. For example, as the

Court writes this opinion, Brownsville police have been investigating the kidnapping of a local university student. The student was reportedly kidnapped at gunpoint by a human trafficker a few miles from this Courthouse and forced to transport the trafficker and an alien who had just crossed the border (the Rio Grande River) from the university campus to their destination. *See* Tiffany Huertas, *UT–Brownsville Students on Alert Following Reported Gunpoint Kidnapping,* Action 4 News, Feb. 4, 2015, http://www.valleycentral.com/news/story.aspx?id=1159456# .VNfHn-bF-wE.

AR 00000056

volve questions of federalism, separation of powers, and the ability and advisability, if any, of the Judiciary to hear and resolve such a dispute.

Chief Justice Roberts wrote in *National Federation of Independent Business v. Sebelius:*

> We [the judiciary] do not consider whether the [Patient Protection and Affordable Care] Act embodies sound policies. That judgment is entrusted to the Nation's elected leaders. We ask only whether Congress has the power under the Constitution to enact the challenged provisions.
>
> \*   \*   \*
>
> Nearly two centuries ago, Chief Justice Marshall observed that "the question respecting the extent of the powers actually granted" to the Federal Government "is perpetually arising, and will probably continue to arise, as long as our system shall exist." In this case, we must again determine whether the Constitution grants Congress powers it now asserts, but which many States and individuals believe it does not possess.

—— U.S. ——, 132 S.Ct. 2566, 2577, 183 L.Ed.2d 450 (2012) (quoting *McCulloch v. Maryland,* 17 U.S. 316, 404, 4 Wheat. 316, 4 L.Ed. 579 (1819)).

## I.  *THE ISSUES BEFORE AND NOT BEFORE THE COURT*

Although this Court is not faced with either a Congressional Act or an Executive Order, the sentiment expressed by these Chief Justices is nonetheless applicable. The ultimate question before the Court is: Do the laws of the United States, including the Constitution, give the Secretary of Homeland Security the power to take the action at issue in this case? Nevertheless, before the Court begins to address the issues raised in this injunctive action, it finds that the issues can best be framed by emphasizing what is not involved in this case.

First, this case does not involve the wisdom, or the lack thereof, underlying the decision by Department of Homeland Security ("DHS") Secretary Jeh Johnson to award legal presence status to over four million illegal aliens through the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA," also referred to interchangeably as the "DHS Directive" and the "DAPA Memorandum") program. Although the Court will necessarily be forced to address many factors surrounding this decision and review the relationship between the Legislative and Executive Branches as it pertains to the DHS Secretary's discretion to act in this area, the actual merits of this program are not at issue.

Second, with three minor exceptions, this case does not involve the Deferred Action for Childhood Arrivals ("DACA") program. In 2012, DACA was implemented by then DHS Secretary Janet Napolitano. The program permits teenagers and young adults, who were born outside the United States, but raised in this country, to apply for deferred action status and employment authorizations. The Complaint in this matter does not include the actions taken by Secretary Napolitano, which have to date formalized the status of approximately 700,000 teenagers and young adults. Therefore, those actions are not before the Court and will not be addressed by this opinion. Having said that, DACA will necessarily be discussed in this opinion as it is relevant to many legal issues in the present case. For example, the States maintain that the DAPA applications will undergo a process identical to that used for DACA applications and, therefore, DACA's policies and procedures will be instructive for the Court as to DAPA's implementation.

AR 00000057


Third, several of the briefs have expressed a general public perception that the President has issued an executive order implementing a blanket amnesty program, and that it is this amnesty program that is before the Court in this suit. Although what constitutes an amnesty program is obviously a matter of opinion, these opinions do not impact the Court's decision. Amnesty or not, the issues before the Court do not require the Court to consider the public popularity, public acceptance, public acquiescence, or public disdain for the DAPA program. As Chief Justice Roberts alluded to above, public opinions and perceptions about the country's policies have no place in the resolution of a judicial matter.

Finally, both sides agree that the President in his official capacity has not directly instituted any program at issue in this case. Regardless of the fact that the Executive Branch has made public statements to the contrary, there are no executive orders or other presidential proclamations or communique that exist regarding DAPA. The DAPA Memorandum issued by Secretary Johnson is the focus in this suit.

That being said, the Court is presented with the following principle issues: (1) whether the States have standing to bring this case; (2) whether the DHS has the necessary discretion to institute the DAPA program; and (3) whether the DAPA program is constitutional, comports with existing laws, and was legally adopted. A negative answer to the first question will negate the need for the Court to address the latter two. The factual statements made hereinafter (except where the Court

is discussing a factual dispute) should be considered as findings of fact regardless of any heading or lack thereof. Similarly, the legal conclusions, except where the Court discusses the various competing legal theories and positions, should be taken as conclusions of law regardless of any label or lack thereof. Furthermore, due to the overlap between the standing issues and the merits, there is by necessity the need for a certain amount of repetition.

## II. *HISTORY OF THIS LITIGATION*

On November 20, 2014, Jeh Johnson, in his position as Secretary of the DHS, issued multiple memoranda to Leon Rodriguez, Director of the United States Citizenship and Immigration Services ("USCIS"), Thomas S. Winkowski, Acting Director of the United States Immigration and Customs Enforcement ("ICE"), and R. Gil Kerlikowske, Commissioner of the United States Customs and Border Protection ("CBP"). One of these memoranda contained an order establishing a new program utilizing deferred action to stay deportation proceedings and award certain benefits to approximately four to five million individuals residing illegally in the United States. The present case, filed in an attempt to enjoin the rollout and implementation of this program, was initiated by the State of Texas and twenty-five other states or their representatives. Specifically, the States allege that the Secretary's actions violate the Take Care Clause of the Constitution and the Administrative Procedure Act ("APA"). *See* U.S. Const. art. II, § 3; 5 U.S.C. §§ 500 *et seq.*[4] The States filed this suit against DHS Secretary Johnson and the

---

**4.** Most authorities seem to indicate that the original Constitution the "Take Care Clause" actually was the "take Care Clause" with the

"T" in "take" being lowercase. The Court will use upper case for the sake of consistency.

individuals mentioned above, as well as Ronald D. Vitiello, the Deputy Chief of the United States Border Patrol, and the United States of America.[5] In response to Plaintiffs' suit, the Defendants have asserted two main arguments: (1) the States lack standing to bring this suit; and (2) the States' claims are not meritorious.

Multiple *amici curiae* have made appearances arguing for one side of this controversy or the other. Several separate attempts have been made by individuals— at least one attempt seemingly in support of Plaintiffs, and one in support of Defendants—to intervene in this lawsuit. Both the States and the Government opposed these interventions. Because the Court had already implemented a schedule in this time-sensitive matter that was agreed to by all existing parties, it denied these attempts to intervene without prejudice. Permitting the intervention of new parties would have been imprudent, as it would have unduly complicated and delayed the orderly progression of this case. *See* Fed. R.Civ.P. 24(a)(2), (b)(3). Further, this Court notes that the interests of all putative intervenors are more than adequately represented by the Parties in this lawsuit.[6] As suggested by Fifth Circuit authority, the Court has reviewed their pleadings as if they were *amici curiae*. *See Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir.1984) (*per curiam* ).

## III. *BACKGROUND*

### A. Factual Background

For some years now, the powers that be in Washington—namely, the Executive Branch and Congress—have debated if and how to change the laws governing both legal and illegal immigration into this country. This debate has necessarily included a wide-ranging number of issues including, but not limited to, border security, law enforcement, budgetary concerns, employment, social welfare, education, positive and negative societal aspects of immigration, and humanitarian concerns. The national debate has also considered potential solutions to the myriad of concerns stemming from the millions of individuals currently living in the country illegally. To date, however, neither the President nor any member of Congress has proposed legislation capable of resolving these issues in a manner that could garner the necessary support to be passed into law.[7]

On June 15, 2012, DHS Secretary Janet Napolitano issued a memorandum creating the DACA program, which stands for "Deferred Action for Childhood Arrivals." Specifically, Secretary Napolitano's memorandum instructed her Department heads to give deferred action status to all illegal immigrants who:

1. Came to the United States before age sixteen;

2. Continuously resided in the United States for at least five years prior to

---

**5.** All of these Defendants will be referred to collectively as the "Government" or the "Defendants" unless there is a particular need for specificity.

**6.** While one set of the putative intervenors is allegedly covered by Secretary Johnson's memorandum and may be affected by this ruling, there was no intervention as a matter of right because there is no federal statute that gives them an unconditional right to intervene nor does this lawsuit involve property

or a transaction over which they claim a property interest. *See* Fed.R.Civ.P. 24(a).

**7.** Indeed this Court has received *amici curiae* briefs from many members of Congress supporting the States' position and at least one supporting the Government's position. Additionally, many officials of local political units and entities have also filed *amici curiae* briefs supporting one side of this controversy or the other.

June 15, 2012 and were in the United States on June 15, 2012;

3. Were then attending school, or had graduated from high school, obtained a GED, or were honorably discharged from the military;

4. Had not been convicted of a felony, significant misdemeanor, multiple misdemeanors, or otherwise pose a threat to national security; and

5. Were not above the age of thirty.

Doc. No. 38, Def. Ex. 19 (June 15, 2012 DACA Memorandum issued by Secretary Napolitano). This Directive applies to all individuals over the age of fifteen that met the criteria, including those currently in removal proceedings as well as those who are newly-encountered by the DHS. In addition, DHS employees were instructed to accept work authorization applications from those individuals awarded deferred action status under DACA. While exact numbers regarding the presence of illegal aliens in this country are not available, both sides seem to accept that at least 1.2 million illegal immigrants could qualify for DACA by the end of 2014. Doc. No. 38, Def. Ex. 21; Doc. No. 64, Pl. Ex. 6. Of these individuals, approximately 636,000 have applied for and received legal presence status through DACA. Doc. No. 38, Def. Ex. 28. Both of these figures are expected to rise as children "age in" and meet the program's education requirements. Doc. No. 38, Def. Ex. 6; Doc. No. 64, Pl. Ex. 6. Estimates suggest that by the time all individuals eligible for DACA "age in" to the program, approximately 1.7 million individuals will be eligible to receive deferred action. Doc. No. 38, Def. Ex. 21; Doc. No. 64, Pl. Ex. 6.

A review of the DACA program, however, would not be complete without examining the number of individuals who have applied for relief through the program but were denied legal status: of the approximately 723,000 DACA applications accepted through the end of 2014, only 38,000—or about 5%—have been denied. Doc. No. 38, Def. Ex. 28. In response to a Senate inquiry, the USCIS told the Senate that the top four reasons for denials were: (1) the applicant used the wrong form; (2) the applicant failed to provide a valid signature; (3) the applicant failed to file or complete Form I–765 or failed to enclose the fee; and (4) the applicant was below the age of fifteen and thus ineligible to participate in the program. Doc. No. 64, Pl. Ex. 29 at App. P. 0978. Despite a request by the Court, the Government's counsel did not provide the number, if any, of requests that were denied even though the applicant met the DACA criteria as set out in Secretary Napolitano's DACA memorandum. The Government's exhibit, Doc. No. 130, Def. Ex. 44, provides more information but not the level of detail that the Court requested.

The States contend and have supplied evidence that the DHS employees who process DACA applications are required to issue deferred action status to any applicant who meets the criteria outlined in Secretary Napolitano's memorandum, and are not allowed to use any real "discretion" when it comes to awarding deferred action status.[8] Similarly, the President of the National Citizenship and Immigration Services Council—the union that represents the individuals processing the DACA applications—declared that the DHS manage-

---

**8.** In their latest filing with the Court, the Government repeated these four reasons given to Congress and added a fifth: dishonesty or fraud in the application process, which of course is implied in any application process.

Because the Government could not produce evidence concerning applicants who met the program's criteria but were denied DACA status, this Court accepts the States' evidence as correct.

ment has taken multiple steps to ensure that DACA applications are simply rubber-stamped if the applicants meet the necessary criteria. *See* Doc. No. 64, Pl. Ex. 23 at 3 (Dec. of Kenneth Palinkas, President of Nat'l Citizenship and Immigration Services Council) (hereinafter "Palinkas Dec."). The States also allege that the DHS has taken steps to ensure that applications for DAPA will likewise receive only a *pro forma* review.[9]

On November 20, 2014, following in his predecessor's footsteps, Secretary Johnson issued a memorandum to DHS officials instructing them to implement the DAPA program and expand the DACA program in three areas. That memorandum, in pertinent part, states the following:

### B. Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis. The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years. On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS)

announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.** DACA will apply to all otherwise eligible immigrants who enter the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today. The current age restriction excludes those who were older than 31 on the date of the announcement (*i.e.,* those who were born before June 15, 1981). That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years.** The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments. This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014. Beginning on that date, USCIS should issue all work authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work

---

9. The DHS' own website states that, pursuant to the discretion granted to the DHS Secretary, its officers can use their discretion to "prevent [DACA] qualifying individuals from being apprehended, placed into removal proceedings, or removed." *Consideration of Deferred Action for Childhood Arrivals Process, Frequently Asked Questions,* Official Website of the Dept. of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last updated Feb. 11, 2015). Clearly the discretion that exists belongs to the Secretary, who exercised it by delineating the DACA criteria; but if an applicant meets the DACA criteria, he or she will not be removed. President Obama has stated

that if the DAPA applicant satisfies the delineated criteria, he or she will be permitted to remain in the United States. *See* Press release, Remarks by President Barack Obama in the President's Address to the Nation on Immigration (Nov. 11, 2014). The DHS even provides a hotline number that individuals can call to make sure they can terminate removal proceedings if they otherwise meet the criteria for relief under DACA. *Consideration of Deferred Action for Childhood Arrival Process, Frequently Asked Question,* Official Website of the Dept. of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last updated Feb. 11, 2015).

authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.** In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.[10]

## C. Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;
- have continuously resided in the United States since before January 1, 2010;
- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;
- have no lawful status on the date of this memorandum;
- are not an enforcement priority as reflected in the November 20, 2014 *Policies for the Apprehension, Detention and Removal of Undocu-*

*mented Immigrants Memorandum;* and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of the Immigration and Nationality Act. Deferred action granted pursuant to the program shall be for a period of three years. Applicants will pay the work authorization and biometrics fees, which currently amount to $465. There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement. As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal. Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly

---

**10.** The removal of the age cap, the program's three-year extension, and the adjustment to the date of entry requirement are the three

exceptions mentioned above to the general proposition that the DACA program is not at issue in this case.

encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only an Act of Congress can confer these rights. It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law. This memorandum is an exercise of that authority.

Doc. No. 1, Pl. Ex. A (November 20, 2014 DAPA Memorandum issued by Secretary Johnson). (emphasis in original). The Government relies on estimates suggesting that there are currently 11.3 million illegal aliens residing in the United States and that this new program will apply to over four million individuals.[11]

Deferred action is not a status created or authorized by law or by Congress, nor has its properties been described in any relevant legislative act. Secretary Johnson's DAPA Memorandum states that deferred action has existed since at least the 1960s, a statement with which no one has taken issue. Throughout the years, deferred action has been both utilized and rescinded by the Executive Branch.[12] The practice has also been referenced by Congress in other immigration contexts. *See, e.g.,* 8 U.S.C. §§ 1154(a)(1)(D)(i)(II), 227(d)(2). It was described by the United States Supreme Court in *Reno v. American–Arab Anti–Discrimination Committee* as follows:

> To ameliorate a harsh and unjust outcome, the INS may decline to institute

---

11. This 11.3 million figure is based upon a 2009 study from the Pew Research Center. The number appears to have increased since then, with a 2013 study finding that 11.7 million illegal immigrants resided in the United States in 2012. *Population Decline of Unauthorized Immigrants Stalls, May Have Reversed,* Pew Research Center (Sept. 23, 2013). An estimated sixty percent of these illegal immigrants reside in California, Florida, Illinois, New Jersey, New York, and Texas—with Texas being the only state whose illegal immigrant population increased between 2007 and 2011. *Id.* The Court will rely on the 11.3 million figure, however, since it is the one cited by the Parties.

12. The deferred action practice was apparently rescinded in 1979, and reinstituted in the 1981 INS Operating Manual. The 1981 program was then rescinded in 1997. Nevertheless, after that date, the concept seems to have been used by all subsequent administrations.

proceedings, terminate proceedings, or decline to execute a final order of deportation. This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action. A case may be selected for deferred action treatment at any stage of the administrative process. Approval of deferred action status means that, for the humanitarian reasons described below, no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated.

525 U.S. 471, 484, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (quoting 6 C. Gordon, S. Mailman & S. Yale–Loehr, Immigration Law and Procedure § 72.03[2][h] (1998)). It is similarly defined in 8 C.F.R. § 274a.12(c)(14).

### D.  Factual Contentions

Secretary Johnson supported the implementation of DAPA with two main justifications. First, he wrote that the DHS has limited resources and it cannot perform all of the duties assigned to it, including locating and removing all illegal aliens in the country. Secretary Johnson claimed that the adoption of DAPA will enable the DHS to prioritize its enforcement of the immigration laws and focus its limited resources in areas where they are needed most. Second, the Secretary reasoned

that humanitarian concerns also justify the program's implementation.

Plaintiffs maintain that the Secretary's justifications are conditions caused by the DHS, are pretexts, or are simply inaccurate. Regarding resources, Plaintiffs argue that the DHS has continued to be funded at record levels and is currently spending millions to create the enormous bureaucracy necessary to implement this program.[13] The States additionally maintain that the DAPA program was: politically motivated and implemented illegally. The first proposition is not the concern of the Court; the second is. To support the latter proposition, the States quote President Obama at length. First, they quote the President's statements made prior to the implementation of DAPA stating that he, as President, did not have the power under the Constitution or the laws of this country to change the immigration laws. On these occasions, he asserted that only Congress could implement these changes in this area of the law. From these statements, the States reason that if the President does not have the necessary power to make these changes, then the DHS Secretary certainly does not.

The States claim that following the announcement of the DAPA program, the President's rhetoric dramatically shifted. They cite statements made after the announcement of DAPA in which the President is quoted as saying that because Congress did not change the law, he changed it unilaterally. The States argue that the

---

13.  At oral argument, Defendants maintained that the fees charged to process DAPA applications will cover the cost of the program, but had to concede that the DHS was already expending large sums of money to implement DAPA and as of yet had not received any fees. According to the declaration of one INS employee, the DHS plans to begin construction of a service center that will employ 700 DHS employees and 300 federal contract employees. *See* Doc. No. 64, Pl. Ex. 23 at 3 ("Palin-

kas Dec."). His statement that the DHS is shifting resources away from other duties in order to implement this program is certainly reasonable, especially since the USCIS admitted that it is shifting staff to meet the DAPA demand. *Executive Actions on Immigration: Key Questions and Answers*, U.S. Customs & Immigration Enforcement, http://www.uscis.gov/immigrationaction (last updated Jan. 30, 2015). *See id.*

DAPA program constitutes a significant change in immigration law that was not implemented by Congress. Agreeing with the President's earlier declarations, the States argue that only Congress can create or change laws, and that the creation of the DAPA program violates the Take Care Clause of the Constitution and infringes upon any notion of separation of powers. Further, they assert that the President has effectuated a change in the law solely because he wanted the law changed and because Congress would not acquiesce in his demands.

Obviously, the Government denies these assertions.

### E.  Legal Contentions

This case presents three discrete legal issues for the Court's consideration. First, the Government maintains that none of the Plaintiffs have standing to bring this injunctive action. The States disagree, claiming that the Government cannot implement a substantive program and then insulate itself from legal challenges by those who suffer from its negative effects. Further, the States maintain that Secretary Johnson's DAPA Directive violates the Take Care Clause of the Constitution; as well as the Administrative Procedure Act ("APA") and the Immigration and Naturalization Act ("INA"). In opposition to the States' claims, the Government asserts that it has complete prosecutorial discretion over illegal aliens and can give deferred action status to anyone it chooses. Second, the Government argues that discretionary decisions, like the DAPA program, are not subject to the APA. Finally, the Government claims that the DAPA program is merely general guidance issued to DHS employees, and that the delineated elements of eligibility are not requirements that DHS officials are bound to honor. The Government argues that this flexibility, among other factors, exempts DAPA from the requirements of the APA.

### IV.  STANDING

#### A.  Legal Standard

##### 1.  Article III Standing

**[1–3]**  Article III of the United States Constitution requires that parties seeking to resolve disputes before a federal court present actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. This requirement limits "the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Plaintiffs, as the parties invoking the Court's jurisdiction, bear the burden of satisfying the Article III requirement by demonstrating that they have standing to adjudicate their claims in federal court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001). The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, a plaintiff must demonstrate that they have "suffered a concrete and particularized injury that is either actual or imminent." *Massachusetts v. E.P.A.*, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). Second, a plaintiff must show that there is a causal connection between the alleged injury and the complained-of conduct—essentially, that "the injury is fairly traceable to the defendant." *Id.* Finally, standing requires that it "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

AR 00000065

### 2. Prudential Standing

**[4, 5]** In addition to these three constitutional requirements, "the federal judiciary has also adhered to a set of 'prudential' principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Many opinions refer to these principles as being under the banner of "prudential" standing. *See, e.g., Bennett v. Spear,* 520 U.S. 154, 164, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). First, the Supreme Court has held that when the "asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone does not warrant exercise of jurisdiction." *Id.* Rather, these "abstract questions of wide public significance" are more appropriately left to the representative branches of the federal government. *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Second, the plaintiffs must come within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge,* 454 U.S. at 475, 102 S.Ct. 752 (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). Finally, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 474, 102 S.Ct. 752 (quoting *Warth,* 422 U.S. at 499, 95 S.Ct. 2197).

### 3. Standing Under the Administrative Procedure Act

**[6–8]** The APA provides that a "person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. This right of judicial review extends to agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. To demonstrate standing under the APA, the plaintiff must show that it has suffered or will suffer a sufficient injury in fact. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). The plaintiff must also demonstrate prudential standing under the APA, which requires showing that "the interest sought to be protected by the complainant [is] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.* (quoting *Data Processing,* 397 U.S. at 152, 90 S.Ct. 827). For this prudential standing inquiry, it is not necessary for a court to ask "whether there has been a congressional intent to benefit the would-be plaintiff." *Nat'l Credit Union Admin.,* 522 U.S. at 488–89, 118 S.Ct. 927. Rather, if the plaintiff's interests are "arguably within the 'zone of interests' to be protected by a statute," the prudential showing requirement is satisfied. *Id.* at 492, 118 S.Ct. 927. This requisite showing is not made, however, if the plaintiff's interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

**[9]** When seeking review of agency action under the APA's procedural provisions, Plaintiffs are also operating under a favorable presumption. They are presumed to satisfy the necessary requirements for standing. *See Mendoza v. Perez,* 754 F.3d 1002, 1012 (D.C.Cir.2014). Specifically, as stated by the D.C. Circuit, "[p]laintiffs asserting a procedural rights challenge need not show the agency action would have been different had it been con-

summated in a procedurally valid manner—the courts will assume this portion of the causal link." *Id.*

### B.   Resolution of Standing Questions

[10–12] Questions regarding constitutional and prudential standing implicate the court's subject-matter jurisdiction; thus challenges to standing are evaluated as a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1). When evaluating subject-matter jurisdiction, the court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming,* 281 F.3d at 161. The court's analysis also depends on whether the challenging party has made a "facial" or "factual" attack on jurisdiction. *See Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir.1981). A facial challenge consists of only a Rule (12)(b)(1) motion without any accompanying evidence; for this challenge, the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Id.*

[13, 14] Conversely, when making a factual attack on the court's jurisdiction, the challenging party submits affidavits, testimony, or other evidentiary materials to support its claims. *Id.* A factual attack requires the responding plaintiff "to submit facts through some evidentiary method" and prove "by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Id.* Here,

Defendants submitted a number of exhibits in support of their attack on Plaintiffs' standing to bring this suit in federal court. Therefore, for the purposes of ruling on Defendants' challenge, the Plaintiffs bear the burden to prove by a preponderance of the evidence that they possess the requisite standing required by Article III. It is not necessary, however, for *all* Plaintiffs to demonstrate standing; rather, "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 52 n. 2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). Thus Plaintiffs' suit may proceed as long as one Plaintiff can show by a preponderance of the evidence that it fulfills the necessary requirements to show standing.

### C.   Analysis

#### 1.   Article III Standing

##### a.   Injury

The States allege that the DHS Directive will directly cause significant economic injury to their fiscal interests. Specifically, Texas argues that the DHS Directive will create a new class of individuals eligible to apply for driver's licenses,[14] the processing of which will impose substantial costs on its budget. Plaintiffs rely on Texas' driver's license program to demonstrate how the costs associated with processing a wave of additional driver's licenses will impact a state's budget. Texas' undocumented population is approximately 1.6 million, and Plaintiffs' evidence suggests that at least 500,000 of these individuals will be eligible for deferred ac-

---

**14.** Some driver's license programs, like that in Arkansas, provide that individuals with deferred action status will be eligible to apply for a driver's license. *See, e.g.,* Ark.Code Ann. § 27–16–1105. Other programs, like the one in Texas, provide that a license will be issued to individuals who can show they are author-

ized to be in the country. *See, e.g.,* Tex. Transp. Code Ann. § 521.142. Employment authorization—a benefit that will be available to recipients of DAPA—is sufficient to fulfill this requirement. Thus under either statutory scheme, DAPA will make its recipients eligible to apply for state driver's licenses.

tion through DAPA. Doc. No. 64, Pl. Ex. 14 ¶ 33; Pl. Ex. 24 ¶ 6. Under current Texas law, applicants pay $24.00 to obtain a driver's license, leaving any remaining costs to be absorbed by the state. *See* Tex. Transp. Code Ann. § 521.421. If the majority of DAPA beneficiaries currently residing in Texas apply for a driver's license, it will cost the state $198.73 to process and issue each license, for a net loss of $174.73 per license. Doc. No. 64, Pl. Ex. 24 ¶ 8. Even if only 25,000 of these individuals apply for a driver's license— approximately 5% of the population estimated to benefit from the DHS Directive in Texas—Texas will still bear a net loss of $130.89 per license, with total losses in excess of several million dollars. *Id.* These costs, Plaintiffs argue, are not unique to Texas; rather, they will be similarly incurred in all Plaintiff States where DAPA beneficiaries will be eligible to apply for driver's licenses.

In addition to these increased costs associated with processing a wave of additional driver's licenses, a portion of the States' alleged injury is directly traceable to fees mandated by federal law. *See* REAL ID Act of 2005, Pl. 109–13, 119 Stat. 231 (2005). Following the passage of the REAL ID Act in 2005, states are now required to determine the immigration status of applicants prior to issuing a driver's license or an identification card. *Id.* To verify immigration status, states must submit queries to the federal Systematic Alien Verification for Entitlements (SAVE) program and pay $0.50–$1.50 for each applicant processed. SAVE Access Methods & Transaction Charges, USCIS. In Texas, estimates suggest that the state pays the federal government on average $0.75 per driver's license applicant for

SAVE verification purposes. Doc. No. 64, Pl. Ex. 24 ¶ 5. Thus by creating a new group of individuals that are eligible to apply for driver's licenses, the DHS Directive will increase the costs incurred by states to verify applicants' immigration statuses as required by federal law.[15]

[15] As Defendants concede, "a direct and genuine injury to a State's own proprietary interests may give rise to standing." Doc. No. 38 at 23; *see also, e.g., Clinton v. City of N.Y.,* 524 U.S. 417, 430– 31, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (negative effects on the "borrowing power, financial strength, and fiscal planning" of a government entity are sufficient injuries to establish standing); *Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ.,* 584 F.3d 253, 261 (6th Cir.2009) (school districts had standing "based on their allegation that they must spend state and local funds" to comply with federal law). Defendants in this case argue, however, that the projected costs to Plaintiffs' driver's license programs are "self-inflicted" because the DHS Directive does not directly require states to provide any state benefits to deferred action recipients, and because states can adjust their benefit programs to avoid incurring these costs. Doc. No. 38 at 21–22. This assertion, however, evaluates the DHS Directive in a vacuum. Further, this claim is, at best, disingenuous. Although the terms of DAPA do not compel states to provide any benefits to deferred action recipients, it is clear that the DHS Directive will nonetheless affect state programs. Specifically, in the wake of the Ninth Circuit's decision in *Arizona Dream Act Coalition v. Brewer,* it is apparent that the federal government will compel compli-

---

**15.** In a procedural rights case, the size of the injury is not important for defining standing; rather it is the fact of the injury. "The litigant has standing if there is some possibility that

the requested relief will prompt the injury causing party to reconsider the decision." *Massachusetts v. E.P.A.,* 549 U.S. at 518, 525– 26, 127 S.Ct. 1438.

ance by all states regarding the issuance of driver's licenses to recipients of deferred action. 757 F.3d 1053 (9th Cir.2014).

In *Arizona Dream Act Coalition v. Brewer*, the plaintiffs, DACA beneficiaries, sought an injunction to prevent the defendants from enforcing an Arizona policy that denied driver's licenses to recipients of deferred action. *Id.* at 1060. Necessary for the imposition of an injunction, the Ninth Circuit examined whether the plaintiffs were likely to succeed on the merits of their case, and focused on the fact that Arizona's driver's license program permitted other non-citizens to use employment authorization documents to obtain driver's licenses—the same documentation that would be conferred upon DAPA recipients. *Id.* at 1064. Finding that this policy likely discriminated against similarly-situated parties in violation of the Equal Protection Clause, the court enjoined the defendants from denying driver's licenses to deferred action beneficiaries. *Id.* at 1069.

More importantly, the Ninth Circuit in *Arizona* also considered whether the denial of driver's licenses to deferred action recipients was preempted by the Executive Branch's determination that deferred action recipients were also authorized to work in the United States. *Id.* at 1063. Stating that "the ability to drive may be a virtual necessity for people who want to work in Arizona," the court noted that more than 87% of Arizona's workforce depended on personal vehicles to commute to work. *Id.* at 1062. Although not the basis for its finding, the court addressed preemption at length. It reasoned that the defendants' policy of denying driver's licenses to deferred action recipients "interferes with Congress's intention that the

Executive determine when noncitizens may work in the United States" and would be preempted by federal law. *Id.* at 1063. Reinforcing this position, the concurring opinion argued that the majority should have not merely discussed it, but should have included this reasoning as part of its holding since there was no question that federal law required the issuance of driver's licenses to deferred action recipients. *Id.* at 1069–75. The Government filed briefs in that case arguing that all of Arizona's attempts to avoid these expenses were preempted. Doc. No. 54, Pl. Ex. 3.

Although the Ninth Circuit's opinion in *Arizona* is not necessarily binding on the majority of Plaintiffs in this case, it nonetheless suggests that Plaintiffs' options to avoid the injuries associated with the DHS Directive are virtually non-existent and, if attempted, will be met with significant challenges from the federal government.[16] The federal government made it clear in *Arizona* (and would not retreat from that stance in this case) that any move by a plaintiff state to limit the issuance of driver's licenses would be viewed as illegal. As held by the Ninth Circuit in *Arizona*, denying driver's licenses to certain recipients of deferred action violated the Equal Protection clause, and would likely be preempted by DAPA, as well. *See id.* at 1067. This conclusion would be particularly persuasive in Texas since its driver's license program—like Arizona's—permits applicants to rely on federal employment authorization documentation to show legal status in the United States. If Texas denied driver's licenses to beneficiaries of the DHS Directive, as suggested by the Government here, it would immediately be sued for impermissibly discriminating against similarly-situated parties that rely

---

**16.** The Ninth Circuit opinion is binding on Arizona, Idaho, and Montana, the Plaintiff States located in the Ninth Circuit. There-fore, the Government's argument with respect to these states is totally meritless.

on employment authorization documentation to apply for driver's licenses. *See id.* at 1064. Even if Texas could structure its driver's license program to avoid these impermissible classifications, the court in *Arizona* strongly suggested that the denial of driver's licenses to deferred action recipients would be preempted by the Executive Branch's intent that deferred action recipients work while they remain in the United States. Therefore, if Texas or any of the other non-Ninth Circuit States sought to avoid an Equal Protection challenge and instead denied driver's licenses to all individuals that rely on employment authorization documentation, they would be subjecting themselves to a different but significant challenge on federal preemption grounds. As stated above, Arizona, Idaho, and Montana—the Plaintiff States that fall within the Ninth Circuit's jurisdiction—do not even have the option of trying to protect themselves.[17]

[16] Setting aside these legal questions, this all-or-nothing choice—that Texas either allow the DAPA beneficiaries to apply for driver's licenses and suffer financial losses or deny licenses to all individuals that rely on employment authorization

documentation—is an injury in and of itself. An injury cannot be deemed "self-inflicted" when a party faces only two options: full compliance with a challenged action or a drastic restructure of a state program. *See Texas. v. United States,* 497 F.3d 491, 496–98 (5th Cir.2007) (finding that Texas had standing on the basis of a "forced choice": after federal regulations, Texas either had to comply with an administrative procedure it thought was unlawful or forfeit the opportunity to comment on proposed gaming regulations). Further, the necessary restructuring to ensure constitutional compliance would require Texas to deny driver's licenses to individuals it had previously decided should be eligible for them—a significant intrusion into an area traditionally reserved for a state's judgment. This illusion of choice—instead of protecting the state from anticipated injuries—merely places the states between a rock and hard place.

Defendants also argue that the projected injuries to Plaintiffs' driver's license programs are merely generalized grievances that are shared by all the states' citizens, and as such are insufficient to support standing in this case. The cases

---

**17.** Also, it is not a defense to the Plaintiffs' assertion of standing to argue that it is not the DAPA program causing the harm, but rather the Justice Department's enforcement of the program. Both departments are a part of the United States and work for the same branch of the federal government.

The Court additionally notes that while the Government claimed preemption on the one hand, it correctly notes that the actual Circuit decision was based upon equal protection. Thus, it argues that the Government is not ultimately causing the States' injuries; rather, it is the Constitution. This is not accurate. This distinction is not convincing for several reasons. First, if the Government enforced the INA as written, these applicants would not be in the states to apply. Second, the Government is still maintaining and asserting its right of preemption to prevent the states

from enforcing the INA provisions requiring removal of these individuals and instead is using that power to force a state's compliance with these applications. Third, whether or not the Constitution is involved, it is ultimately the combination of the REAL ID Act and DAPA combined with the failure to enforce the INA that will compel the complained-about result. It is the implementation of the DACA program that has been causing and the implementation of the DAPA program that will cause these damages when they intersect with the REAL ID Act. Stated another way, without DAPA there are no damages, and without the REAL ID Act, there are less damages. Finally, the Government has also not indicated that it will refrain from litigation or aiding litigants to compel the States to issues licenses and incur these expenses once DAPA is instituted.

AR 00000070

that Defendants cite for this contention, though, are easily distinguishable. In these cases, the plaintiffs broadly alleged general harm to state revenue or state spending. *See Commonwealth of Pa. v. Kleppe*, 533 F.2d 668, 672 (D.C.Cir.1976) (Pennsylvania's "diminution of tax receipts [was] largely an incidental result of the challenged action" and was not sufficient to support standing); *People ex rel. Hartigan v. Cheney*, 726 F.Supp. 219, 226 (C.D.Ill.1989) (Illinois' alleged injury of "decreased state tax revenues and increased spending on social welfare programs" not sufficient to support standing). When, however, an action directly injures a state's identifiable proprietary interests, it is more likely that the state possesses the requisite standing to challenge the action in federal court. *See Wyo. v. Okla.*, 502 U.S. 437, 448, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (Wyoming had standing to challenge a state statute for direct and undisputed injuries to specific tax revenues); *Sch. Dist. of City of Pontiac*, 584 F.3d at 261–62 (school district had sufficient injury to demonstrate standing when compliance with No Child Left Behind forced plaintiffs to spend state and local funds). Here, Plaintiffs have shown that their projected injuries are more than "generalized grievances"; rather, Plaintiffs have demonstrated that DAPA will directly injure the proprietary interests of their driver's license programs and cost the States badly needed funds. In Texas alone, the state is projected to absorb significant costs. If the majority of the DHS Directive beneficiaries residing in the state apply for driver's licenses, Texas will bear directly a $174.73 per applicant expense, costing the state millions of dollars.

On a final note, it is important to reiterate the federal government's position in front of the Ninth Circuit in *Arizona*—a position that it has not retreated from in the present case: a state may not impose its own rules considering the issuance of driver's licenses due to claims of equal protection and preemption. Although the federal government conceded that states enjoy substantial leeway in setting policies for licensing drivers within their jurisdiction, it simultaneously argued that the states could not tailor these laws to create "new alien classifications not supported by federal law." Doc. No. 64, Pl. Ex. 3 at 11. In other words, the states cannot protect themselves from the costs inflicted by the Government when 4.3 million individuals are granted legal presence with the resulting ability to compel state action. The irony of this position cannot fully be appreciated unless it is contrasted with the DAPA Directive. The DAPA Directive unilaterally allows individuals removable by law to legally remain in the United States based upon a classification that is not established by any federal law. It is this very lack of law about which the States complain. The Government claims that it can act without a supporting law, but the States cannot.

The contradictions in the Government's position extend even further. First, driver's license programs are functions traditionally reserved to state governments. Even the DHS recognizes this reservation. The DHS teaches naturalization applicants preparing for their civics examination that driver's license programs are clearly a state interest. *See* Study Materials for the Civics Test, USCIS.[18] Of the sample civics questions, the DHS provides the following question and lists five acceptable answers:

---

**18.** This website can be accessed at http://www.uscis.gov/citizenship/learners/study-test/ study-materials-civics-test.

42.   Under our Constitution, some powers belong to the states.   What is *one* power of the states?

- *provide schooling and education*
- *provide protection (police)*
- *provide safety (fire departments)*
- *give a driver's license*
- *approve zoning and land use.*

*Id.* (emphasis added).[19]

Nonetheless, the DHS through its DACA Directive directly caused a significant increase in driver's license applications and the costs incurred by states to process them; DAPA, a much larger program, will only exacerbate these damages. These injuries stand in stark contrast to the Government's public assertion that driver's license programs fall in the realm of "powers [that] belong to the states." *Id.*

The Government's position is further undermined by the fact that a portion of Plaintiffs' alleged damages associated with the issuance of driver's licenses are fees mandated by federal law and are paid to the Government.   As discussed above, the REAL ID Act requires states to pay a fee to verify the immigration status of each driver's license applicant through the federal SAVE program.   *See* REAL ID Act of 2005, Pl. 109–13, 119 Stat. 231 (2005); SAVE Access Methods & Transaction Charges, USCIS.[20]   The fees associated with this program, combined with the federal government's creation of the possibility of four to five million new driver's license applicants, give rise to a situation where states must process an increased amount of driver's license applications and remit a significant portion of their funds to the federal government as required by the REAL ID Act. Further, the states have no choice but to pay these fees.   If they do not, their citizens will lose their rights to access federal facilities and to fly on com-

---

19.   *Id.*

20.   The SAVE price structure chart may be accessed at http://www.uscis.gov/save/getting-started/save-access-methods-transaction-charges.

It was suggested that the original Real ID Act might have been subject to attack because of the burden it placed upon the states.   *See* Patrick R. Thiessen, *The Real ID Act and Biometric Technology: A Nightmare for Citizens and the States That Have to Implement It,* 6 J. Telecomm. & High Tech. L. 483 (2008) (hereinafter *"REAL ID and Biometric Technology"*).   These fees have always been a source of objections and opposed by both conservative and liberal groups alike:

The Act is also opposed by groups as diverse as the CATO Institute, a libertarian think tank, and the American Civil Liberties Union ("ACLU"), an organization designed to defend and preserve the individual liberties guaranteed under the Constitution, both of which testified in opposition to the Real ID Act in New Hampshire. The CATO Institute's opposition is based on what it characterizes as the *federal government*

*blackmailing the states.* The CATO Institute has highlighted the fact that the states are being *forced to comply with the Real ID Act because a noncompliant state's citizens will be barred from air travel, entry to federal courthouses, and other federal checkpoints.* ACLU opposition is based on *the high cost of implementation being imposed on the states,* its belief that it will not actually prevent terrorism, and the diminished privacy Americans will experience because of the compilation of personal information. Barry Steinhardt, Director of ACLU's Technology and Liberty Project, stated:

It's likely the costs for Real ID will be billions more than today's estimate [$11 billion]—but no matter what the real figure is, Real ID needs to be repealed.   *At a time when many state budgets and services are already stretched thin, it is clear that this unfunded mandate amounts to no more than a tax increase in disguise.*

*Id.* at 490–91 (emphasis added) (citations omitted).   Under DAPA and DACA, the States are facing a new unfunded matter—one which is levied by the DHS and enforced by the Justice Department.

mercial airlines.[21]

Another ironic aspect of the Government's argument exists again at the intersection of the DAPA Directive and the REAL ID Act. Those supporting the passage of the REAL ID Act asserted that the Act would prevent illegal immigration by making it more difficult for individuals with no legal status to get state driver's licenses. *See REAL ID and Biometric Technology*, at 492.[22] While the REAL ID Act recognized that individuals with deferred action status would be eligible to obtain driver's licenses, it seems almost without argument that the drafters of the Act did not foresee four to five million individuals obtaining deferred action by virtue of one DHS Directive, especially when the yearly average of deferred action grants prior to DACA was less than 1,000. Therefore, DAPA arguably undercuts one of the very purposes of the REAL ID Act, and will certainly undermine any deterrent effect or security benefit that may have motivated passage of the Act.

b.   Causation

Establishing causation can be difficult where the plaintiff's alleged injury is caused by "the government's allegedly unlawful regulation (or lack of regulation) of *someone else....*" *Lujan*, 504 U.S. at 562, 112 S.Ct. 2130 (emphasis in original). In

the cases cited by the Government, causation depends on the decisions made by independent actors and "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation...." *Id.* Essentially, establishing causation requires the plaintiff to show that the alleged injury is not merely "remote and indirect" but is instead fairly traceable to the actions of the defendant. *Florida v. Mellon*, 273 U.S. 12, 18, 47 S.Ct. 265, 71 L.Ed. 511 (1927).

The Supreme Court has declined to find that a plaintiff had standing sufficient to bring suit in federal court when it merely speculates as to whether the defendant's action would cause the alleged harm. *See id.* at 17–18, 47 S.Ct. 265. In *Florida v. Mellon*, the plaintiff sought to enjoin the federal government from collecting an inheritance tax in Florida, arguing that it would cause Florida residents to remove property from the state, thereby "diminishing the subjects upon which the state power of taxation may operate." *Id.* The Supreme Court held that whether the defendants' actions would cause individuals to act in such a way that would produce injury to the state was "purely speculative, and, at most, only remote and indirect." *Id.* at 18, 47 S.Ct. 265.

---

21.   *REAL ID and Biometric Technology*, at 486 n.14.

22.   Defenders of the Real ID Act have been able to deflect some of the criticism from various groups by arguing that the Act is necessary to prevent illegal immigration and to prevent terrorism. For instance, Representative Sensenbrenner referenced the fact that Muhammad Atta, one of the 9/11 hijackers, came over to the United States on a six-month visa, but still was able to obtain a six-year driver's license in Florida. *Supporters also argue that the Act will prevent illegal immigration by making it more difficult for illegal immigrants to get state driver's licenses.* Moreover, supporters contend that asylum

seekers should bear the burden of proving a valid cause for asylum, which is required under the Real ID Act because a terrorist will not be able to easily gain residency status by claiming asylum. Supporters also argue that a true national database, which would be susceptible to hackers, is not required because the states will send electronic queries to each other that will be answered with the individual state's database.

*REAL ID and Biometric Technology*, at 497 (emphasis added) (citations omitted). Due to DAPA, the Real ID Act will not be used to prevent illegal immigration, but rather, together, they form a basis to compel a reward for illegal immigration.

[17] Here, unlike Florida's injury in *Mellon,* the alleged harm to Plaintiffs' driver's license programs would be directly caused by the DHS Directive. Further, there is no speculation as to the probability of its occurrence; rather, it is like watching the same play performed on a new stage. The DACA Directive, implemented in 2012, permitted its recipients to receive the status or documentation necessary to subsequently apply for driver's licenses. *See Access to Driver's Licenses for Immigrant Youth Granted DACA,* NILC (Dec. 2014) ("DACA recipients who obtain an employment authorization document and a Social Security number have been able to obtain a license in almost every state").[23] Similarly, the DAPA Directive also provides its recipients with the status and the documentation necessary to apply for a driver's license in most states. *See* Ark.Code Ann. § 27–16–1105 (proof of deferred status sufficient to apply for driver's license); Tex. Transp. Code Ann. § 521.142 (employment authorization documentation sufficient for driver's license application). Aside from furnishing the status or documents necessary to apply for a driver's license, the DAPA Directive will also provide an incentive for its applicants. The Directive permits and encourages its beneficiaries to apply for work authorization for the period that they will be granted deferred status in the United States. For individuals in the United States who commute to work, driving is the most common mode of transportation. In 2013, it was estimated that 86.3% of the United States' workforce commuted to work in private vehicles.[24] *See Commuting in*

*America 2013: The National Report on Commuting Patterns and Trends,* American Association of State Highway and Transportation Officials (Oct.2013).[25] This is especially true in the states that are Plaintiffs in this case, as none of them have extensive mass transit systems. In sum, the federal government's actions in *Arizona,* and its refusal to disclaim future such actions in this case, establish that it will seek to force Texas (and other similarly-situated states) into these changes. Further, some portion of Plaintiffs' alleged injuries are fees mandated by federal law that are required to be paid by states directly to the federal government—damages that are a virtual certainty. Plaintiffs—or at least Texas—have clearly met their burden of showing that their alleged injuries have been and will be directly "traceable" to the actions of the Defendants. Far from a generalized injury or "pie in the sky" guesswork, Plaintiffs have demonstrated a direct, finite injury to the States that is caused by the Government's actions. Given that Plaintiffs have shown that they stand to suffer concrete and particularized consequences from Defendants' actions, they have pled an injury sufficient to demonstrate standing in this Court.

c. Redressability

[18] The redressability prong of the standing analysis examines whether the remedy a plaintiff seeks will redress or prevent the alleged injury. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Of this three-prong standing analysis, the question of

---

**23.** A PDF of this article may be accessed at http://www.nilc.org/document.html?id=1120.

**24.** The Ninth Circuit in *Arizona Dream Act Coalition v. Brewer* similarly noted that the majority of the workforce relies on private vehicles to commute to work. 757 F.3d at 1062. Specifically, the court highlighted that

approximately 87% of Arizona's workforce commuted to work by car. *Id.*

**25.** A PDF of this study may be accessed at http://traveltrends.transportation.org/Documents/CA10–4.pdf.

redressability is easiest for this Court to resolve. The remedy Plaintiffs seek will undoubtedly prevent the harm they allege will stem from Defendants' DHS Directive. DAPA provides its beneficiaries with the necessary legal presence and documentation to allow them to apply for driver's licenses in most states; without this status or documentation, these beneficiaries would be foreclosed from seeking a driver's license. Therefore enjoining the implementation of the DHS Directive would unquestionably redress Plaintiffs' alleged harm.

Plaintiffs (or at least one Plaintiff) has clearly satisfied the requirements for Article III standing.

### 2. Prudential Standing

[19] In addition to fulfilling the Article III standing requirements, Plaintiffs have also satisfied the requirements of prudential standing. As discussed above, the States have not merely pled a "generalized grievance" that is inappropriate for the Court's resolution. Rather, the States have shown that the DAPA program will directly injure their proprietary interests by creating a new class of individuals that is eligible to apply for state driver's licenses. When this class applies for driver's licenses, the States will incur significant costs to process the applications and issue the licenses—costs that the States cannot recoup or avoid. Instead of a "generalized grievance," the States have pled a direct injury to their fiscal interests.

[20] Second, Plaintiffs' claims come within the "zone of interests" to be protected by the immigration statutes at issue in this litigation. The Supreme Court has stated time and again that it is the duty of the federal government to protect the border and enforce the immigration laws.[26] The Government has sought and obtained rulings that preempt all but token participation by the states in this area of the law. The basis for this preemption was that the states' participation was not wanted or required because the federal government was to provide a uniform system of protection to the states. The fact that DAPA undermines the INA statutes enacted to protect the states puts the Plaintiffs squarely within the zone of interest of the immigration statutes at issue.

Further, Congress has entrusted the DHS with the duty to enforce these immigration laws. 8 U.S.C. § 1103(a)(1). The DHS' duties include guarding the border and removing illegal aliens present in the country. 8 U.S.C. §§ 1103(a)(5), 1227. DAPA, however, is certainly at odds with these commands. These duties were enacted to protect the states because, under

---

**26.** For example, in *Plyler v. Doe,* all nine justices on the Supreme Court agreed that the United States was not doing its job to protect the states. In his concurring opinion, Justice Powell stated that:

Illegal aliens are attracted by our employment opportunities, and perhaps by other benefits as well. This is a problem of serious national proportions, as the Attorney General has recently recognized. Perhaps because of the intractability of the problem, Congress—vested by the Constitution with the responsibility of protecting our borders and legislating with respect to aliens—has not provided effective leadership in dealing with this problem.

457 U.S. at 237–38, 102 S.Ct. 2382 (Powell, J., concurring) (citations omitted). The dissenters in *Plyler,* while disagreeing with the result, did not disagree about who is duty bound to protect the states:

A state has no power to prevent unlawful immigration, and no power to deport illegal aliens; those powers are reserved exclusively to Congress and the Executive. If the Federal Government, properly chargeable with deporting illegal aliens, fails to do so, it should bear the burdens of their presence here.

*Id.* at 242 n. 1, 102 S.Ct. 2382 (Burger, J., dissenting).

our federal system, they are forbidden from protecting themselves.

Finally, Plaintiffs are not resting their claim for relief solely on the rights and interests of third-parties. Rather, the States are seeking to protect their own proprietary interests, which they allege will be directly harmed by the implementation of DAPA. Thus Plaintiffs have similarly satisfied their burden to show prudential standing.

### 3. Standing under the APA

Relying on the APA, Plaintiffs assert not only a basis for standing but also an argument on the merits. Because these concepts are closely intertwined, the Court will address both in its discussion of the merits. Nevertheless, for the reasons stated above and the reasons articulated below, the States have APA standing as well.

### D.  Other Grounds for Standing

The States have asserted three additional bases for standing: (1) *parens patriae* standing; (2) *Massachusetts v. E.P.A.* standing; and (3) abdication standing. Following the Supreme Court's decision in *Massachusetts v. E.P.A*, these theories seem at least indirectly related to the *parens patriae* claim discussed below. There is, however, ample evidence to support standing based upon the States' demonstration of direct injury flowing from the Government's implementation of the DAPA program. Since the States have, or at least Texas has, shown a direct injury, as well as for the reasons discussed below, this Court either rejects or refuses to rely solely on either of the *parens patriae* or *Massachusetts v. E.P.A.* theories as the basis for Plaintiffs' standing. Both the Parties and *amici curiae*, however, have briefed these theories in depth; thus the Court is compelled to address them.

### 1.  *Parens Patriae*

**[21, 22]**  Plaintiffs also rely on the doctrine of *parens patriae* to establish an independent basis for standing in their suit against Defendants. *Parens patriae* permits a state to bring suit to protect the interests of its citizens, even if it cannot demonstrate a direct injury to its separate interests as a sovereign entity. *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Meaning literally "parent of the country," *parens patriae* recognizes the interests "that the State has in the well-being of its populace" and allows it to bring suit when those interests are threatened. *Id.* at 602, 102 S.Ct. 3260; *Black's Law Dictionary* 1287 (10th ed.2014). Here, the States allege that the DHS Directive will injure the economic interests of their residents, necessitating a *parens patriae* suit to ensure that those interests are protected from the consequences of the Government's actions.

Defendants, relying primarily on the Supreme Court's opinion in *Massachusetts v. Mellon*, contend that the States' invocation of *parens patriae* is misplaced. They claim states cannot maintain a *parens patriae* suit against the federal government since the federal government is the ultimate protector of the citizens' interests. *See* 262 U.S. 447, 485–86, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). In *Massachusetts v. Mellon*, Massachusetts brought a *parens patriae* suit to challenge the constitutionality of the Maternity Act, arguing that the burden of funding the Act fell disproportionately on industrial states like Massachusetts. *Id.* at 479, 43 S.Ct. 597. Holding that the federal government is the supreme *parens patriae*, the Court stated that "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Id.* Thus, Defendants argue

that the States' suit should be similarly barred since the federal government's right to protect citizens' interests trumps that of the states.

Defendants' succinct argument, however, ignores an established line of cases that have held that states may rely on the doctrine of *parens patriae* to maintain suits against the federal government. *See, e.g., Wash. Utilities and Transp. Comm'n v. F.C.C.*, 513 F.2d 1142 (9th Cir.1975) (state regulatory agency relied on *parens patriae* to bring suit against F.C.C. and U.S.); *Kansas ex rel. Hayden v. United States*, 748 F.Supp. 797 (D.Kan.1990) (state brought suit against U.S. under *parens patriae* theory); *Abrams v. Heckler*, 582 F.Supp. 1155 (S.D.N.Y.1984) (state used *parens patriae* to maintain suit against the Secretary of Health and Human Services). These cases rely on an important distinction. The plaintiff states in these cases are not bringing suit to *protect* their citizens *from* the operation of a federal statute—actions that are barred by the holding of *Massachusetts v. Mellon. See, e.g., Wash. Utilities and Transp. Comm'n*, 513 F.2d at 1153; *Kansas ex rel. Hayden*, 748 F.Supp. at 802; *Abrams*, 582 F.Supp. at 1159. Rather, these states are bringing suit to *enforce* the rights guaranteed by a federal statute. *Id.* For example, in *Kansas ex rel. Hayden v. United States*, the governor of Kansas brought a *parens patriae* suit to enforce the provisions of the Disaster Relief Act, which provided for the disbursement of federal funds to aid areas deemed a "major disaster." *Kansas ex rel. Hayden*, 748 F.Supp. at 798. Specifically, the governor brought suit to enforce the statute after he alleged that the area in question was wrongfully denied status as a "major disaster area" when the procedural mechanisms for making that decision were ignored. *Id.* at 799. Similarly, in *Abrams v. Heckler*, New York's attorney general brought a *parens patriae* suit to enforce the provisions of a Medicare statute after a final rule issued to implement the statute deprived New York Medicare recipients of a significant amount of funds. *Abrams*, 582 F.Supp. at 1157. Arguing that the final rule misinterpreted the provisions of the statute and thus exceeded statutory authority, the attorney general sought to have the Medicare funds distributed in compliance with the statute. *Id.*

**[23–25]** Consequently, Defendants' rebuttal to the States' *parens patriae* argument is not as simple as they would suggest. States are not barred outright from suing the federal government based on a *parens patriae* theory; rather, provided that the states are seeking to *enforce*—rather than prevent the enforcement of—a federal statute, a *parens patriae* suit between these parties may be maintained. In the instant case, the States are suing to compel the Government to enforce the federal immigration statutes passed by Congress and to prevent the implementation of a policy that undermines those laws. Though seeking adherence to a federal statute is a necessary component for a state's *parens patriae* suit against the federal government, it alone is not enough; in addition, states must identify a quasi-sovereign interest that is harmed by the alleged under-enforcement. *See Alfred L. Snapp*, 458 U.S. at 601, 102 S.Ct. 3260 ("to have such [*parens patriae*] standing the State must assert an injury to what has been characterized as a 'quasi-sovereign interest'"). The defining characteristics of a quasi-sovereign interest are not explicitly laid out in case law; rather, the meaning of the term has undergone a significant expansion over time. *See Com. of Pa. v. Kleppe*, 533 F.2d 668, 673 (D.C.Cir. 1976). Although the earliest recognized quasi-sovereign interests primarily concerned public nuisances, the doctrine ex-

panded rapidly to encompass two broad categories: (1) a state's quasi-sovereign interest "in the health and well-being—both physical and economic—of its residents"; and (2) a state's quasi-sovereign interest in "not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp*, 458 U.S. at 607, 102 S.Ct. 3260. In particular, courts have consistently recognized a state's quasi-sovereign interest in protecting the economic well-being of its citizens from a broad range of injuries. *See, e.g., Alfred L. Snapp*, 458 U.S. at 609, 102 S.Ct. 3260 (discrimination against Puerto Rican laborers injured economic well-being of Puerto Rico); *Wash. Utilities and Transp. Comm'n*, 513 F.2d at 1152 (increased rates for intrastate phone service would injure the economic well-being of the state); *Abrams*, 582 F.Supp. at 1160 (changes to Medicare that would decrease payments to New York recipients is sufficient injury to economic well-being); *Alabama ex rel. Baxley v. Tenn. Valley Auth.*, 467 F.Supp. 791, 794 (N.D.Ala.1979) (relocation of executive and administrative offices would damage the economic well-being of Alabama by decreasing available jobs and injuring state economy).

[26] Here, the States similarly seek to protect their residents' economic well-being. Specifically, Plaintiffs allege that the DHS Directive will create a discriminatory employment environment that will encourage employers to hire DAPA beneficiaries instead of those with lawful permanent status in the United States.[27] To support this assertion, Plaintiffs focus on the interplay between the DHS Directive and the Affordable Care Act passed in 2010. Be-

ginning in 2015, the Affordable Care Act ("ACA") requires employers with fifty or more employees to offer adequate, affordable healthcare coverage to their full-time employees. Patient Protection and Affordable Care Act, 26 U.S.C. § 4980H. If an employer with fifty or more employees chooses not to offer health insurance to its full-time employees, it instead incurs a monetary penalty. *Id.* Currently, ACA requires that employers provide health insurance only to those individuals that are "legally present" in the United States. *Id.* at § 5000A(d)(3). The definition of "legally present," however, specifically excludes beneficiaries of the 2012 DACA Directive. If an employer hires a DACA beneficiary, it does not have to offer that individual healthcare nor does it incur a monetary penalty for the failure to do so. *See* 45 C.F.R. § 152.2(8). The States argue that the Obama Administration is expected to promulgate similar regulations that will also bar beneficiaries of the DAPA Directive from participating in the ACA's employer insurance mandate. This exclusion, the States argue, will exacerbate unemployment for its citizens because it will create an employment environment that will encourage employers to discriminate against lawfully present citizens. Since the ACA's exclusion of DAPA beneficiaries makes them more affordable to employ, employers will be inclined to prefer them over those employees that are covered by the terms of the ACA. *Id.*

[27] The States' alleged injury to their citizens' economic well-being is within the quasi-sovereign interests traditionally protected by *parens patriae* actions. *See, e.g.,*

---

27. In addition to the injuries stemming from the alleged creation of a discriminatory employment environment, certain portions of the States' briefs—as well as various *amici* briefs—detail a number of encumbrances suffered by their residents due to the lack of immigration enforcement, such as increased costs to healthcare and public school programs. Few—if any—of these allegations have actually been specifically pled by the Parties as a basis for *parens patriae* standing.

**628**        **86 FEDERAL SUPPLEMENT, 3d SERIES**

*Alfred L. Snapp,* 458 U.S. at 609, 102 S.Ct. 3260; *Wash. Utilities & Transp. Comm'n,* 513 F.2d at 1152; *Kansas ex rel. Hayden,* 748 F.Supp. at 802; *Abrams,* 582 F.Supp. at 1160; *Alabama ex rel. Baxley,* 467 F.Supp. at 794. The States' challenge, however, is premature. Although some expect that the Obama Administration will promulgate regulations barring DAPA beneficiaries from participating in the ACA's employer insurance mandate, it has yet to do so. *See A Guide to the Immigration Accountability Executive Action,* Immigration Policy Center (Dec. 22, 2014)[28] ("[T]he Obama Administration *will* promulgate regulations to exclude DAPA recipients from any benefits under the Affordable Care Act, much as it did in the aftermath of the DACA announcement.") (emphasis added); *DACA and DAPA Access to Federal Health and Economic Support Programs,* NILC (Dec. 10, 2014)[29] (the Obama Administration "issued regulations that deny access to health coverage under the ACA for DACA recipients and *is expected* to do the same for DAPA recipients") (emphasis added); Michael D. Shear & Robert Pear, *Obama's Immigration Plan Could Shield Five Million,* N.Y. Times (Nov. 19, 2014)[30] (quoting Stephen W. Yale–Loehr, professor of immigration law at Cornell, for assertion that it "*appears*" that these individuals will be barred from health benefits under ACA) (emphasis added). Discouraging the resolution of controversies that are not ripe, the Supreme Court has held that courts should avoid "entangling themselves in abstract disagreements . . . until an administrative decision has been formalized and

its effects felt in a concrete way. . . ." *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 807–08, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). Here, the administrative decision from which the States' alleged economic injury will flow has not been formalized. Thus, the States' *parens patriae* suit is not ripe for adjudication.

### 2. *Massachusetts v. E.P.A.* Claims

Clearly, in addition to the traditional Article III standing, Plaintiffs can also pursue their direct damage claims under the ambiguous standards set forth in *Massachusetts v. E.P.A.* In *Massachusetts,* the Supreme Court held that Massachusetts had standing to seek redress for the damages directly caused to its interests as a landowner. Similarly, the States have standing because the Defendants' actions will allegedly cause direct damage to their proprietary interests. Consequently, no matter how one reads *Massachusetts v. E.P.A.,* it strengthens the conclusion that the States do have standing to sue for direct damages.

Nevertheless, separate and apart from their direct damage claim (for which at least Texas has standing) and somewhat related to the *parens patriae* basis for standing, the States also assert standing based upon the continual non-enforcement of the nation's immigration laws, which allegedly costs each Plaintiff State millions of dollars annually. The evidence in this case supplies various examples of large, uncompensated losses stemming from the

---

**28.** This article may be accessed at http://www.immigrationpolicy.org/special-reports/guide-immigration-accountability-executive-action.

**29.** A PDF of this article may be accessed at http://allianceforcitizenship.org/wp-content/uploads/2014/12/DAPA-DACA-and-fed-health-economic-supports.pdf.

**30.** This article may be accessed at http://www.nytimes.com/2014/11/20/us/politics/obamacare-unlikely-for-undocumented-immigrants.html?_r=0.

fact that federal law mandates that states bear the burdens and costs of providing products and services to those illegally in the country. These expenses are most clearly demonstrated in the areas of education and medical care, but the record also contains examples of significant law enforcement costs.

a.  Argument of the States and *Amici*

The States and some *amici* briefs argue that the Supreme Court's holding in *Massachusetts v. E.P.A.* supports the States' assertion of standing based on their injuries caused by the Government's prolonged failure to secure the country's borders. Whether negligently or even with its best efforts, or sometimes, even purposefully, the Government has allowed a situation to exist where illegal aliens move freely across the border, thus allowing—at a minimum—500,000 illegal aliens to enter and stay in the United States each year.[31] The federal government is unable or unwilling to police the border more thoroughly or apprehend those illegal aliens residing within the United States; thus it is unsurprising that, according to prevailing estimates, there are somewhere between 11,000,000 and 12,000,000 illegal aliens currently living in the country, many of whom devote the limited resources in each state to one extent or another. Indeed, in many instances, the Government intentionally allows known illegal aliens to enter and remain in country. When apprehending illegal aliens, the Government often processes and releases them with only the promise that they will return for a hearing if and when the Government decides to hold one.[32] In the meantime, the states—with little or no help from the Government— are required by law to provide various services to this population.[33] Not surprisingly, this problem is particularly acute in many border communities. According to the States' argument, this situation is exacerbated every time the Government or one of its leading officials makes a pro-amnesty statement or, as in the instant case, every time the DHS institutes a program that grants status to individuals who have illegally entered the country.

b.  Analysis

The States' argument is certainly a simplification of a more complex problem. Regardless of how simple or layered the analysis is, there can be no doubt that the failure of the federal government to secure the borders is costing the states— even those not immediately on the border—millions of dollars in damages each year. While the Supreme Court has recognized that states "have an interest in mitigating the potentially harsh economic

---

**31.** Michael Hoefer, et al., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2010*, U.S. DHS, Feb. 2011.

**32.** The Court was not provided with the "no-show" rates for adult illegal aliens who are released and later summoned for an immigration hearing. It has been reported, however, that the immigration hearings for last year's flood of illegal immigrant children have been set for 2019. Further, reports also show that there is a 46% "no-show" rate at these immigration hearings for children that were released into the population. *Challenges at the Border: Examining the Causes, Consequences,*

and *Responses to the Rise in Apprehensions at the Southern Border: Hearing Before the S. Homeland Sec. Comm.,* 113th Cong. (July 9, 2014) (statement of Juan Osuna, Director of the Executive Office for Immigration Review). Thus, for these children that the Government released into the general population, despite a lack of legal status, the States will have to bear the resulting costs for at least five more years—if not forever, given the rate of non-compliance with appearance notices.

**33.** *See, e.g., Plyler,* 457 U.S. at 224–25, 102 S.Ct. 2382; *Toll v. Moreno,* 458 U.S. 1, 16, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982).

effects of sudden shifts in population,"[34] the federal government has effectively denied the states any means to protect themselves from these effects. Further, states suffer these negative effects regardless of whether the illegal aliens have any ties or family within the state, or whether they choose to assimilate into the population of the United States.[35] The record in this case provides many examples of these costs. Evidence shows that Texas pays $9,473 annually to educate each illegal alien child enrolled in public school.[36] In Texas, 7,409 unaccompanied illegal immigrant children were released to sponsors between October of 2013 and September of 2014. Thus, in that period alone, Texas absorbed additional education costs of at least $58,531,100 stemming from illegal immigration. Further, this figure addresses only the newly-admitted, unaccompanied children; it by no means includes all costs expended during this period to educate all illegal immigrant children residing in the state. Evidence in the record also shows that in 2008, Texas incurred $716,800,000 in uncompensated medical care provided to illegal aliens.

These costs are not unique to Texas, and other states are also affected. Wisconsin, for example, paid $570,748 in unemployment benefits just to recipients of deferred action. Arizona's Maricopa County has

similarly estimated the costs to its law enforcement stemming from those individuals that received deferred action status through DACA. That estimate, which covered a ten-month period and included only the law enforcement costs from the prior year, exceeded $9,000,000.

To decrease these negative effects, the States assert that the federal government should do two things: (1) secure the border; and (2) cease making statements or taking actions that either explicitly or impliedly solicit immigrants to enter the United States illegally. In other words, the Plaintiffs allege that the Government has created this problem, but is not taking any steps to remedy it. Meanwhile, the States are burdened with ever-increasing costs caused by the Government's ineffectiveness. The frustration expressed by many States and/or *amici curiae* in their briefing is palpable. It is the States' position that each new wave of illegal immigration increases the financial burdens placed upon already-stretched State budgets.

It is indisputable that the States are harmed to some extent by the Government's action and inaction in the area of immigration. Nevertheless, the presence of an injury alone is insufficient to demonstrate standing as required to bring suit in

---

**34.** *Plyler,* 457 U.S. at 228, 102 S.Ct. 2382.

**35.** *Id.* While most Americans find the prospect of residing anywhere but the United States unthinkable, this is not a universally-held principle. Many aliens are justly proud of their own native land and come to the United States (both legally and illegally) because our economy provides opportunities that their home countries do not. Many of these individuals would be satisfied with working in the United States for part of the year and returning to their homeland for the remainder. This arrangement is often unfeasible for illegal aliens, though, because of the risk of apprehension by authorities when traveling back and forth across the border. Re-

gardless, many illegal aliens have no intention of permanently immigrating, but rather seek to be able to provide for their families. The Supreme Court in *Arizona* noted that 476,405 aliens are returned to their home countries every year without a removal order. 132 S.Ct. at 2500. Many others return outside of any formal process. *See also,* footnotes 41 and 42 and the text accompanying footnote 42.

**36.** This figure presumes the provision of bilingual services. If bilingual services are not required, the cost is $7,903 annually per student.

federal court. A plaintiff must still be able to satisfy all of the elements of standing—including causation and redressability—to pursue a remedy against the one who allegedly caused the harm.

Not surprisingly, the States rely, with much justification, on the Supreme Court's holding in *Massachusetts v. E.P.A.* to support standing based on these damages. 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). In *Massachusetts*, the Supreme Court held that states have special standing to bring suit for the protection of their sovereign or quasi-sovereign interests. *Id.* at 520, 127 S.Ct. 1438. Justice Stephens quoted a prior decision from Justice Kennedy, stating to the effect that states "are not relegated to the role of mere provinces or political corporations but retain the dignity, though not the full authority, of sovereignty." *Id.* at 519, 127 S.Ct. 1438 (quoting *Alden v. Maine*, 527 U.S. 706, 715, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)) The majority concluded that Massachusetts, in its role as a landowner, suffered (or would suffer) direct damages from the EPA's refusal to act under the Clean Air Act. *Id.* at 519, 526, 127 S.Ct. 1438. Massachusetts' status as a landowner, however, was only the icing on the cake. *See id.* at 519, 127 S.Ct. 1438. This status reinforced the Supreme Court's conclusion that "[Massachusetts'] stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal jurisdiction." *Id.* Without explicitly delineating formal elements, the majority seemed to recognize a special form of "sovereignty standing" if the litigant state could show: (1) a procedural right to challenge the act or omission in question and (2) an area of special state interest. *See id.* at 518–26, 127 S.Ct. 1438. With regard to the latter, Justice Stephens concluded that states have standing to file suit to protect the health and welfare of their citizens since our structure of government mandates

that they surrender to the federal government: (1) the power to raise a military force; (2) the power to negotiate treatises; and (3) the supremacy of their state laws in areas of federal legislation. *Id.* at 519, 127 S.Ct. 1438.

The States conclude that Justice Stephens' holding is equally applicable to their situation. First, the States have no right to negotiate with Mexico or any other country from which large numbers of illegal aliens immigrate; thus the States cannot rely on this avenue to resolve or lessen the problem. Second, the States cannot unilaterally raise an army to combat invaders or protect their own borders. Third, the federal government ardently defends against any attempt by a state to intrude into immigration enforcement—even when the state seeks to enforce the very laws passed by Congress. Therefore, the States reach the same conclusion as the Supreme Court did in *Massachusetts v. E.P.A.* They have the power to sue the federal government in federal court to protect their quasi-sovereign interests in the health, welfare, and natural resources of their citizens.

The States lose badly needed tax dollars each year due to the presence of illegal aliens—a clear drain upon their already-taxed resources. These damages, the States argue, are far greater and more direct than the damages stemming from air pollution in *Massachusetts*. Thus, they conclude that they should similarly have standing. This Court agrees to the actual existence of the costs being asserted by Plaintiffs. Even the Government makes no serious attempt to counter this argument, considering that the Government's lack of border security combined with its vigilant attempts to prevent any state from protecting itself have directly led to these damages. Causation here is more direct than the attenuated causation chain

patched together and accepted by the Supreme Court in *Massachusetts*.

Nevertheless, standing in *Massachusetts* was not dependent solely on damages flowing from the lax enforcement of a federal law; the Supreme Court also emphasized the procedural avenue available to the state to pursue its claims. *See id.* at 520, 127 S.Ct. 1438. Specifically covering the section under which Massachusetts' claim was brought, the Clean Air Act provided that "[a] petition for review of action of the Administrator in promulgating any ... standard under section 7521 of this title ... may be filed only in the United States Court of Appeals for the District of Columbia." Clean Air Act, 42 U.S.C. § 7607(b)(1). The States claim that the APA gives them a similar procedural avenue. The APA states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (emphasis in original). Section 703 of the APA specifically authorizes a suit like this case where the States seek a mandatory injunction. 5 U.S.C. § 703. Finally, Section 704 provides a cause of action for a "final agency action for which there is no other adequate remedy in a court...." 5 U.S.C. § 704. It is appropriate to note that the Government has asserted that there is absolutely no remedy, under any theory, for the Plaintiffs' suit—seemingly placing the States' suit squarely within the purview of Section 704.

The Government counters this contention, however, by arguing that the DAPA program is an exercise of discretion and merely informational guidance being provided to DHS employees. Since it argues that discretion is inherent in the DAPA program, the Government concludes that it not only prevails on the merits of any APA claim, but that this discretion also closes the standing doorway that the States are attempting to enter.[37] The Court will ad-

---

**37.** *See* 5 U.S.C. § 701. There is some authority in the immigration context that a private immigration organization cannot attack immigration decisions via the APA. *See Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C.Cir.1996). These decisions are based primarily on a lack of "prudential standing" rather than on the requirements of the APA. However, for those directly affected by a federal agency action, these decisions are inapplicable. In this context, the Government in places conflates the issue of standing with that of reviewability.

> Standing to seek review is a concept which must be distinguished from reviewability. In *Association of Data Processing Serv. Organizations, Inc. v. Camp*, the Court defined

dress these assertions in a separate part of the opinion because they are not the key to the resolution of the indirect damages contemplated in this section regarding standing under *Massachusetts v. E.P.A.*

It has been recognized that the resources of states are drained by the presence of illegal aliens—these damages unquestionably continue to grow. In 1982, the Attorney General estimated that the country's entire illegal immigrant population was as low as three million individuals. *See Plyler v. Doe*, 457 U.S. at 218–19, 102 S.Ct. 2382. Today, California alone is reported to have at least that many illegal immigrants residing with its borders. Among the Plaintiff States, the only difference with regard to the population of illegal immigrants residing within each is that the population is not evenly distributed.[38] The Government does not dispute the existence of these damages, but instead argues that widespread and generalized damages—such as those suffered by all taxpayers collectively—do not provide a basis for one to sue the Government. The States concede that the cases cited by the Gov-

ernment certainly stand for that proposition; but they argue that the new rules announced in *Massachusetts v. E.P.A.* give them, in their role as states, "special solicitude" to bring an action to protect the resources of their citizens. Turning to the dissent, the States similarly find support for this new form of standing from Chief Justice Roberts' statement that the majority opinion "adopts a new theory of Article III standing for States...." *Id.* at 539–40, 127 S.Ct. 1438 (Roberts, J., dissenting).

[28] The Court recognizes that the Supreme Court's opinion in *Massachusetts* appears to establish new grounds for standing—a conclusion the dissenting opinions goes to lengths to point out. Nevertheless, the Court finds that *Massachusetts* did not abandon the traditional standing requirements of causation and redressability—elements critical to the damages discussed in this section. The Court finds that the Government's failure to secure the border has exacerbated illegal immigration into this country. Further, the record supports the finding that this lack of enforcement, combined with this

---

"standing" in terms of a two-part test. First, the complainant must allege "that the challenged action has caused him injury in fact, economic or otherwise." Second, "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."
Reviewability presumes that the standing prerequisite has been satisfied and then adds the element of the courts' power to judge a certain administrative decision. Correspondingly, "unreviewable" administrative actions are those which will not be judicially scrutinized, despite the fulfillment of all prerequisites such as standing and finality, either because Congress has cut off the court's power to review or because the courts deem the issue "inappropriate for judicial determination."
Even "unreviewable" administrative action may be judicially reviewed under exception-

al circumstances, such as whether there has been a clear departure from the agency's statutory authority.
*Statutory Preclusion of Judicial Review*, 1976 Duke L.J. 431, 432 n. 4 (1976) (citations omitted). The States have seemingly satisfied these two standing requirements, but that alone does not allow the Court to review the DHS' actions.

**38.** The Court notes that, while twenty-six states or their representatives are Plaintiffs herein, thirteen states and many municipalities have filed *amici* briefs on the Government's behalf. One of the arguments raised in their brief is that DAPA may eventually change the presence of illegal aliens in this country into an economic positive, an opinion based upon a number of studies. Doc. No. 81; *see also* Doc. No. 121 (*amici* brief filed by the Mayors of New York and Los Angeles, *et al.*).

country's high rate of illegal immigration, significantly drains the States' resources.[39]

Regardless, the Court finds that these more indirect damages described in this section are not caused by DAPA; thus the injunctive relief requested by Plaintiffs would not redress these damages. DAPA applies only to individuals who have resided in the United States since 2010. If the DHS enforces DAPA as promulgated, this group has already been in the country for approximately five years. Therefore, the costs and damages associated with these individuals' presence have already been accruing for at least a five-year period. The relief Plaintiffs seek from their suit is an injunction maintaining the status quo—however, the status quo already includes costs associated with the presence of these putative DAPA recipients. If the Court were to grant the requested relief, it would not change the presence of these individuals in this country, nor would it relieve the States of their obligations to pay for any associated costs. Thus, an injunction against DAPA would not redress the damages described above.

The States also suggest that the special sovereign standing delineated in *Massachusetts* encompasses three other types of damages that will be caused by DAPA. First, the continued presence of putative DAPA recipients will increase the costs to which the States are subjected.[40] Specifically, the States allege that, because

DAPA recipients will be granted legal status for a three-year period, those who have not already pursued state-provided benefits will now be more likely to seek them. Stated another way, DAPA recipients will be more likely to "come out of the shadows" and to seek state services and benefits because they will no longer fear deportation. Thus, the States' resources will be taxed even more than they were before the promulgation of DAPA.

Regardless of whether the States' prediction is true, the Constitution and federal law mandate that these individuals are entitled to state benefits merely because of their presence in the United States, whether they reside in the sunshine or the shadows. Further, aside from the speculative nature of these damages, it seems somewhat inappropriate to enjoin the implementation of a directive solely because it may encourage or enable individuals to apply for benefits for which they were already eligible.

The States' reply, though supported by facts, is not legally persuasive. The States rightfully point out that DAPA will increase their damages with respect to the category of services discussed above because it will increase the number of individuals that demand them. Specifically, the Plaintiffs focus on two groups. First, there are many individuals each year that self-deport from the United States and return to their homeland.[41] The States

---

**39.** The Government, though not necessarily agreeing that it has failed to secure the border, concedes that many costs associated with illegal immigration must be borne by the states, particularly in the areas of education, law enforcement, and medical care.

**40.** This discussion does not include direct costs to the state, such as the costs associated with providing additional driver's licenses, which were discussed in a prior section. This Court does not address the issue as to whether some or all of these damages might be

recoverable under the theory of "abdication standing" because that ruling is not necessary to grant this temporary injunction.

**41.** As stated earlier in a footnote, many individuals voluntarily return to their homeland. *See* DHS, Office of Immigration Statistics, Immigration Enforcement Actions: 2013, at 1 (Sept.2014). In fact, in the years 2007 through 2009, more illegal immigrants self-deported back to Mexico than immigrated into the United States.

suggest, with some merit, that DAPA will incentivize these individuals to remain in the United States.

Second, the States focus on the individuals that would have been deported without the legal status granted by DAPA, alleging that their continued presence in this county will increase state costs. The States argue that the DHS has decided it will not enforce the removal statutes with regards to at least 4,300,000 people plus hypothetically millions of others that apply but are not given legal presence. They conclude in the absence of the DAPA program, the DHS in its normal course of removal proceedings would have removed at least some of these individuals. Thus DAPA will allow some individuals who would have otherwise been deported to remain in the United States. The Government has made no cogent response to this argument. Were it to argue against this assertion, the Government would likely have to admit that these individuals would not have been deported even without DAPA—an assertion that would damage the DHS far more than it would strengthen its position.

The States are correct that there are a number of individuals that fall into each category. Immigration experts estimate that 178,000 illegal aliens self-deport each year.[42] Though the DHS could likely calculate the number of individuals deported and estimate the number that self-deported over the past five years (and used those figures to estimate those who would in the near future) that would have otherwise qualified for DAPA relief, that evidence is not in the record. It is reasonable to conclude, however, that some of these individuals would have self-deported or been removed from the country. The absence of these individuals would likely reduce the states' costs associated with illegal immigration.

The Government has not directly addressed the suppositions inherent in this argument, but it and at least two sets of *amici curiae* have suggested a response. Specifically, they suggest that any potential reduction in state costs that could have been anticipated in the absence of DAPA will be offset by the productivity of the DAPA recipients and the economic benefits that the States will reap by virtue of these individuals working, paying taxes, and contributing to the community.

This Court, with the record before it, has no empirical way to evaluate the accuracy of these economic projections, and the record does not give the Court comfort with either position. Yet, these projections do demonstrate one of the reasons why the Court does not accept the States' argument for standing on this point. A theory without supporting evidence does not support a finding of redressability. Based upon the record, the presence of damages or offsetting benefits is too speculative to be relied upon by this or any other court as a basis for redressability.

**[29]** The last category of damages pled by Plaintiffs that falls within *Massachusetts'* "special solicitude" standing is predicated upon the argument that reports made by the Government and third-parties concerning the Government's actions have had the effect of encouraging illegal immigration. The Government does not deny that some of its actions have had this effect, but maintains that its actions were legal and appropriate. In other words, these actions may have had the unintended effect of encouraging illegal immigration, but that does not create a damage model

---

**42.** DHS, Office of Immigration Statistics, Immigration Enforcement Actions: 2013, at 1 (Sept. 2014).

that would satisfy either the causation or redressability requirements of standing.

Nevertheless, a myriad of reasons support a court's abstention from intervention when damages are premised upon the actions of third-parties motivated by reports (and misreports) of governmental action.[43] The Court will address only two.

The First Amendment protects political debate in this country. Enjoining that debate, or finding damages predicated upon that debate, would be counter-productive at best and, at worst, a violation of the Constitution. The crux of the States' claim is that the Defendants violated the Constitution by enacting their own law without going through the proper legislative or administrative channels. One cannot, however, consistently argue that the Constitution should control one aspect of the case, yet trample on the First Amendment in response to another. Speech usually elicits widely-differing responses, and its ramifications are often unpredictable. Clearly, reports of governmental activity, even if they are biased, misleading, or incorrect, are protected speech—despite the fact that they may have the unintended effect of inspiring illegal immigration.

Second, a lawful injunction that would cure this problem cannot be drafted. Unquestionably, some immigrants are encouraged to come to the United States illegally based upon the information they receive about DACA and DAPA. Reports of lax border security, minimal detention periods following apprehension, and the ease of missing immigration hearings may also encourage many to immigrate to this country illegally. Individuals may also be encouraged to immigrate illegally because they have been told that the stock market is

doing well, or that the United States' economy is doing better than that of their homeland, or because the United States has better schools or more advanced medical care. The decision to immigrate illegally is motivated by innumerable factors, and a court would be jousting at windmills to craft an injunction to enjoin all of these activities.

Statements and reports about the implementation of DACA and DAPA may very well encourage individuals to try to reach the United States by any means, legal or otherwise. Further, it is undisputed that illegal immigration strains the resources of most states. This side-effect, however, is too attenuated to enjoin DAPA's implementation. The States have not shown that an injunction against DAPA would redress these particular damages.

### E.  Standing Created by Abdication

#### 1.  The Factual Basis

The most provocative and intellectually intriguing standing claim presented by this case is that based upon federal abdication.[44] This theory describes a situation when the federal government asserts sole authority over a certain area of American life and excludes any authority or regulation by a state; yet subsequently refuses to act in that area. Due to this refusal to act in a realm where other governmental entities are barred from interfering, a state has standing to bring suit to protect itself and the interests of its citizens.

The States concede, here, that the regulation of border security and immigration are solely within the jurisdiction of the United States—an assertion the United

---

**43.**  In a different case held before this Court, a DHS official confirmed under oath the existence of this unintended consequence. *See* footnote 110.

**44.**  "Abdication" is defined as "[t]he act of renouncing or abandoning ... duties, usually those connected with high office...." *Black's Law Dictionary* 4 (10th ed.2014).

States agrees with and has repeatedly insisted upon in other cases. However, rather than enforcing laws pertaining to border security and immigration, the Government, through DAPA, has instead announced that it will not seek to deport certain removable aliens because it has decided that its resources may be better used elsewhere. In sum, the States argue that the Government has successfully established its role as the sole authority in the area of immigration, effectively precluding the States from taking any action in this domain and that the DHS Secretary in his memorandum establishing DAPA has announced that except for extraordinary circumstances, the DHS has no intention of enforcing the laws promulgated to address millions of illegal aliens residing in the United States.

[30] The facts underlying the abdication claim cannot be disputed. In *Arizona v. United States,* the federal government sued Arizona when the state tried to enforce locally enacted immigration restrictions. *Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). The Supreme Court upheld the Government's position, holding that federal law preempted the state's actions. *Id.* at 2495. Nonetheless, the Supreme Court, in doing so, still recognized the states' plight due to federal preemption in the area of immigration:

> The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States. Arizona bears many of the consequences of unlawful immigration. Hundreds of thousands of deportable aliens are ap-

prehended in Arizona each year. Unauthorized aliens who remain in the State comprise, by one estimate, almost six percent of the population. And in the State's most populous county, these aliens are reported to be responsible for a disproportionate share of serious crime.

Statistics alone do not capture the full extent of Arizona's concerns. Accounts in the record suggest there is an "epidemic of crime, safety risks, serious property damage, and environmental problems" associated with the influx of illegal migration across private land near the Mexican border. Phoenix is a major city of the United States, yet signs along an interstate highway 30 miles to the south warn the public to stay away. One reads, "DANGER—PUBLIC WARNING—TRAVEL NOT RECOMMENDED/Active Drug and Human Smuggling Area/Visitors May Encounter Armed Criminals and Smuggling Vehicles Traveling at High Rates of Speed." The problems posed to the State by illegal immigration must not be underestimated.

These concerns are the background for the formal legal analysis that follows. The issue is whether, under preemption principles, federal law permits Arizona to implement the state-law provisions in dispute.

*Id.* at 2500. Despite this expression of empathy, the Supreme Court held, with minor exceptions, that states are virtually powerless to protect themselves from the effects of illegal immigration.[45] *Id.* Hold-

---

**45.** Though clearly pre-dating DACA and DAPA, courts from a variety of jurisdictions have similarly expressed sympathy for the plight of the states that bear the brunt of illegal immigration. *See, e.g., Arizona v. United States,* 104 F.3d 1095 (9th Cir.1997); *California v. United States,* 104 F.3d 1086 (9th

Cir.1997); *New Jersey v. United States,* 91 F.3d 463 (3d Cir.1996); *Padavan v. United States,* 82 F.3d 23 (2d Cir.1996); *Chiles v. United States,* 69 F.3d 1094 (11th Cir.1995), *cert. denied,* 517 U.S. 1188, 116 S.Ct. 1674, 134 L.Ed.2d 777 (1996). These courts invariably denied the states the relief they sought

ing that States cannot even exercise their civil power to remove an illegal alien, the majority opinion stated that "Immigration and Customs Enforcement (ICE), an agency within the Department of Homeland Security, is responsible for identifying, apprehending, and removing illegal aliens." *Id.* at 2495. The Government continues to take the position that "even State laws relating to matters otherwise within the core of the police power will generally be preempted ... Arizona (or any other State) may not substitute its judgment for the federal government's when it comes to classification of aliens." Brief for the United States as Amicus Curiae at 14–16, *Arizona v. Brewer*, 757 F.3d 1053 (9th Cir.2014). As made clear in this DACA-

related brief, the Government claims total preemption in this area of the law. Thus, the first element of an abdication claim is established.

[31] To establish the second element necessary for abdication standing, the States assert that the Government has abandoned its duty to enforce the law. This assertion cannot be disputed. When establishing DAPA, Secretary Johnson announced that the DHS will not enforce the immigration laws as to over four million illegal aliens eligible for DAPA, despite the fact that they are otherwise deportable. DHS agents were also instructed to terminate removal proceedings if the individual being deported qualifies for relief under the DAPA criteria. Further, the DHS has

since inadequate immigration enforcement did not supply a basis for standing. *Id.* Indeed, as recently as 2013, another court dismissed similar claims by the State of Mississippi. *See Crane v. Napolitano*, 920 F.Supp.2d 724 (N.D.Tex.2013).

Three things were constant in all of these cases. In each, the courts expressed sympathy with the plight of the states. Second, the courts held that the states could not recover indirect costs they suffered as a result of *ineffective* enforcement. This is identical to the ruling this Court made in the prior section regarding damages stemming from the provision of services like education and medical care. Third, none of these cases, however, held that a state was absolutely precluded from ever bringing suit concerning immigration enforcement issues.

Three important factors separate those cases from the present one—any one of which would be considered a major distinction. The presence of all three, however, clearly sets this case apart from those cited above. First, with the exception of *Crane*, none of the cases involved the Government announcing a policy of non-enforcement. Here, the DHS has clearly announced that it has decided not to enforce the immigration laws as they apply to approximately 4.3 million individuals—as well as to untold millions that may apply but be rejected by the DAPA program. The DHS has announced that the DAPA program confers legal status upon its recipients and, even

if an applicant is rejected, that applicant will still be permitted to remain in the country absent extraordinary circumstances. There can be no doubt about this interpretation as the White House has made this clear by stating that the "change in priorities applies to everybody." *See* footnote 88. Because of this announced policy of non-enforcement, the Plaintiffs' claims are completely different from those based on mere ineffective enforcement. This is abdication by any meaningful measure.

Second, the plaintiffs in the above-cited cases did not provide proof of any direct damages—rather, the plaintiffs in these cases only pled *indirect* damages caused by the presence of illegal aliens. Conversely, in the present case, Texas has shown that it will suffer millions of dollars in *direct* damages caused by the implementation of DAPA.

Finally, with the exception of *Crane* (in which this issue was not raised), the above-cited cases pre-date the REAL ID Act of 2005. The REAL ID Act mandates a state's participation in the SAVE program, which requires that a state pay a fee to verify an applicant's identity prior to issuing a driver's license or an identification card. By creating a new class of individuals eligible for driver's licenses and identification cards, individuals that the INA commands should be removed, DAPA compounds the already federally-mandated costs that states are compelled to pay.

also announced that, absent extraordinary circumstances, it will not even deport illegal aliens who apply for DAPA and are rejected. The record does not contain an estimate for the size of this group, but hypothetically the number of aliens who would otherwise be deported if the INA were enforced is in the millions. Secretary Johnson has written that these exemptions are necessary because the DHS' limited funding necessitates enforcement priorities. Regardless of the stated motives, it is evident that the Government has determined that it will not enforce the law as it applies to over 40% of the illegal alien population that qualify for DAPA, plus all those who apply but are not awarded legal presence. It is not necessary to search for or imply the abandonment of a duty; rather, the Government has announced its abdication.

The Government claims, however, that its deferred action program is merely an exercise of its prosecutorial discretion. Any justifications regarding abdication, though, are not a necessary consideration

for standing. This inquiry may be necessary to a discussion on the merits, but standing under a theory of abdication requires only that the Government declines to enforce the law. Here, it has.[46]

The Government claims sole authority to govern in the area of immigration, and has exercised that authority by promulgating a complex statutory scheme and prohibiting any meaningful involvement by the states. As demonstrated by DACA and DAPA, however, the Government has decided that it will not enforce these immigration laws as they apply to well over five million people, plus those who had their applications denied. If one had to formulate from scratch a fact pattern that exemplified the existence of standing due to federal abdication, one could not have crafted a better scenario.

### 2. The Legal Basis

The Government has not seriously contested the Plaintiffs' factual basis for this claim—nor could it. Turning from the

---

**46.** In the absence of these declarations of abdication, an examination of relevant DHS statistics might be instructive, but apparently the DHS is not very forthcoming with this information. The author of a recent law review article detailed the trouble she experienced in trying to get deferred action numbers from the Government. Finally, after numerous attempts, her conclusions were:

> While the grant rate for deferred action cases might cause alarm for those who challenge the deferred action program as an abuse of executive branch authority, it should be clear that regardless of outcome, the number of deferred action cases considered by ICE and USCIS are quite low … Even doubling the number of legible deferred action grants produced by USCIS and ICE between 2003 and 2010 (118 plus 946) yields less than 1,100 cases, or less than 130 cases annually.

Shoba S. Wadhia, *Sharing Secrets: Examining Deferred Action and Transparency in Immigration Law*, 10 U.N.H. L.Rev. 1, 47 (2011) (hereinafter "Sharing Secrets"). *See also,*

Leon Wildes, *The Deferred Action Program of the Bureau of Citizenship and Immigration Services: A Possible Remedy for Impossible Immigration Cases*, 41 San Diego L.Rev. 819 (2004). Other statistics suggest the deferred action rate between 2005 and 2010 ranged between a low 542 to an annual high of 1,029 individuals. Regardless, DACA has raised that number to an annual average over the years 2012–2014 to over 210,000 and if DAPA is implemented in a similar fashion, the average for the next three years will be in excess of 1.4 million individuals per year. The Court is not comfortable with the accuracy of any of these statistics, but it need not and does not rely on them given the admissions made by the President and the DHS Secretary as to how DAPA will work. Nevertheless, from less than a thousand individuals per year to over 1.4 million individuals per year, if accurate, dramatically evidences a factual basis to conclude that the Government has abdicated this area—even in the absence of its own announcements.

facts of this claim to the applicable law, the concept of state standing by virtue of federal abdication is not well-established. It has, however, been implied by a number of opinions, including several from the Supreme Court. The abdication theory of standing is discussed most often in connection with a *parens patriae* claim. It has also been discussed as providing APA standing, and in some contexts is relied upon as the exclusive basis for standing. Traditionally, *parens patriae* actions were instituted by states seeking to protect the interests of their citizens, as well as for protection of their own quasi-sovereign interests. One of this principle's few limitations stems from the notion that the federal government, rather than a state, has the superior status in the role as a parent. In other words, the federal government was the supreme *parens patriae*. Thus a state can rely on *parens patriae* to protect its interests against any entity or actor—except the federal government. As explicitly noted by the dissent in *Massachusetts v. E.P.A.:*

> A claim of *parens patriae* standing is distinct from an allegation of direct injury. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448–449, 451, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). Far from being a substitute for Article III injury, *parens patriae* actions raise an additional hurdle for a state litigant: the articulation of a "quasi-sovereign interest" "*apart* from the interests of particular private parties." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) (cited *ante*, at 1454). Just as an association suing on behalf of its members must show not only that it represents the members but that at least one satisfies Article III requirements, so too a State asserting quasi-sovereign interests as *parens patriae* must still show that its citizens

satisfy Article III. Focusing on Massachusetts's interests as quasi-sovereign makes the required showing here harder, not easier. The Court, in effect, takes what has always been regarded as a *necessary* condition for *parens patriae* standing—a quasi-sovereign interest—and converts it into a *sufficient* showing for purposes of Article III.

What is more, the Court's reasoning falters on its own terms. The Court asserts that Massachusetts is entitled to "special solicitude" due to its "quasi-sovereign interests," *ante*, at 1455, but then applies our Article III standing test to the asserted injury of the Commonwealth's loss of coastal property. *See ante*, at 1456 (concluding that Massachusetts "has alleged a particularized injury *in its capacity as a landowner*" (emphasis added)). In the context of *parens patriae* standing, however, we have characterized state ownership of land as a "nonsovereign interes[t]" because a State "is likely to have the same interests as other similarly situated proprietors." *Alfred L. Snapp & Son, supra,* at 601, 102 S.Ct. 3260.

On top of everything else, the Court overlooks the fact that our cases cast significant doubt on a State's standing to assert a quasi-sovereign interest—as opposed to a direct injury—against the Federal Government. As a general rule, we have held that while a State might assert a quasi-sovereign right as *parens patriae* "for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them." *Massachusetts v. Mellon*, 262 U.S. 447, 485–486, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (citation omitted); see also *Alfred*

*L. Snapp & Son, supra*, at 610, n. 16, 102 S.Ct. 3260.

*Massachusetts*, 549 U.S. at 539, 127 S.Ct. 1438 (Roberts, J., dissenting). Following this assertion, Chief Justice Roberts described the majority opinion as bestowing upon the states "a new theory of Article III standing. . . ." *Id.* at 1466. Expounding further on this point, Chief Justice Roberts quoted a footnote from *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez* stating that:

> [T]he fact that a State may assert rights under a federal statute *as, parens patriae* in no way refutes our clear ruling that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government."

*Massachusetts*, 549 U.S. at 540 n. 1, 127 S.Ct. 1438 (quoting *Alfred L. Snapp*, 458 U.S. at 610 n. 16, 102 S.Ct. 3260) (citations omitted).

As demonstrated by *Massachusetts'* conflicting opinions regarding the limitations of *parens patriae* standing, it is difficult to determine how long the law has permitted a state to rely upon this doctrine to show standing in a suit against the federal government. This interpretation may be well established, as asserted by Justice Stephens in the majority opinion, or it may be unprecedented, as described by the four dissenters. Regardless of its longevity, it is a rule delineated by the Supreme Court of the United States and which this Court is bound to follow. *See, e.g.,* Bradford Mank, *Should States Have Greater Standing Rights than Ordinary Citizens?: Massachusetts v. EPA's New Standing Test for States,* 49 Wm. & Mary L.Rev. 1701 (2008).

The concept of abdication standing, however, has not been confined to *parens patriae* cases. Specifically, the States rely on the Supreme Court's opinion in *Heckler v. Chaney*, which involved a decision by the FDA not to take certain enforcement actions regarding the drugs used in lethal injections administered by the states. 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Upholding the agency's decision not to act, the Supreme Court noted that they were not presented with "a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 n. 4, 105 S.Ct. 1649 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C.Cir.1973)).

The States claim that, unlike the FDA's action at issue in *Heckler*, the DAPA program is a total abdication and surrender of the Government's statutory responsibilities. They contend that the DAPA Directive basically concedes this point, and this Court agrees. The DAPA Memorandum states that the DHS cannot perform all the duties assigned to it by Congress because of its limited resources, and therefore it must prioritize its enforcement of the laws. This prioritization necessitated identifying a class of individuals who are guilty of a violation of the country's immigration laws, and then announcing that the law would not be enforced against them. The DAPA Memorandum concludes that, for the DHS to better perform its tasks in one area, it is necessary to abandon enforcement in another.

In response, the Government maintains its overall position: it is immaterial how large the putative class of DAPA beneficiaries is because DAPA is a legitimate exercise of its prosecutorial discretion. Earlier in this opinion, this Court held that Plaintiffs have standing based upon the direct damages they will suffer following the implementation of DAPA. Nevertheless, based upon the Supreme Court's opinion in *Heckler*, and the cases discussed below, this Court also finds that Plaintiffs have

standing because of the DHS' abdication of its statutory duties to enforce the immigration laws.

The *Heckler* Court is not alone in addressing abdication standing. Again not involving the *parens patriae* doctrine, the Fifth Circuit has addressed the concept of abdication in a similar suit involving the same parties. *See Texas v. United States,* 106 F.3d 661 (5th Cir.1997). In *Texas v. United States,* the Fifth Circuit held that abdication did not exist for several reasons. *Id.* at 667. First, it noted that Texas did not argue that the Government was "mandating" that it take any action with respect to undocumented aliens. *Id.* This fact situation is dissimilar to the one presently before the Court. Here, the States put forth evidence that demonstrates that the Government has required and will require states to take certain actions regarding DAPA recipients. Further, the Government has not conceded that it will refrain from taking similar action against the remaining Plaintiffs in this case. Second, the Fifth Circuit in *Texas* held that the Government's failure to effectively perform its duty to secure the border did not equate to an abdication of its duty. *Id.*

Plaintiffs contend that these distinctions made by the Fifth Circuit in *Texas* are noticeably absent in the present case. The DHS unilaterally established the parameters for DAPA and determined that it would not enforce the immigration laws as they apply to millions of individuals—those that qualify for DAPA and surprisingly even those that do not. Thus, the controlling but missing element in *Texas* that prevented a finding of abdication is not only present in this case, but is factually undisputed.[47] Further, if one accepts the

Government's position, then a lack of resources would be an acceptable reason to cease enforcing environmental laws, or the Voting Rights Act, or even the various laws that protect civil rights and equal opportunity. Its argument is that it has the discretion to cease enforcing an act as long as it does so under the umbrella of prosecutorial discretion. While the Court does not rule on the merits of these arguments, they certainly support the States' standing on the basis of abdication.

In regards to abdication standing, this case bears strong similarities to *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973). In *Adams,* the Secretary of Health, Education and Welfare adopted a policy that, in effect, was a refusal to enforce Title VI of the Civil Rights Act of 1964. *Id.* at 1161. Specifically, the Secretary refused to effectuate an end to segregation in federally-funded public education institutions. *Id.* In *Adams,* as in the case before this Court, the Government argued that the "means" of enforcement is a matter of absolute agency discretion, and in the exercise of that discretion it chose to seek voluntary compliance. *See id.* at 1162. Rejecting this argument and holding that the Secretary had abdicated his statutory duty, the D.C. Circuit noted that:

> [t]his suit is not brought to challenge HEW's decisions with regard to a few school districts in the course of a generally effective enforcement program. To the contrary, *appellants allege that HEW has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty. We are asked to interpret the statute and determine whether HEW has correctly construed its enforcement obligations.*

---

**47.** Obviously, the Government disputes whether these facts equate to abdication, but it does not dispute the underlying facts themselves—nor could it, as these facts are set out in writing by the DHS Secretary in the DAPA Memorandum.

A final important factor distinguishing this case from the prosecutorial discretion cases cited by HEW is the nature of the relationship between the agency and the institutions in question. HEW is actively supplying segregated institutions with federal funds, contrary to the expressed purposes of Congress. *It is one thing to say the Justice Department lacks the resources necessary to locate and prosecute every civil rights violator; it is quite another to say HEW may affirmatively continue to channel federal funds to defaulting schools. The anomaly of this latter assertion fully supports the conclusion that Congress's clear statement of an affirmative enforcement duty should not be discounted.*

*Id.* (emphasis added).

In the present case, Congress has clearly stated that illegal aliens should be removed. Like that at issue in *Adams*, the DHS program clearly circumvents immigration laws and allows individuals that would otherwise be subject to removal to remain in the United States. The policy in *Adams* purported to seek voluntary compliance with Title VI. In contrast, the DHS does not seek compliance with federal law in any form, but instead establishes a pathway for non-compliance and completely abandons entire sections of this country's immigration law. Assuming that the concept of abdication standing will be recognized in this Circuit, this Court finds that this is a textbook example.

**F.  Conclusion**

Having found that at least one Plaintiff, Texas, stands to suffer direct damage from the implementation of DAPA, this Court finds that there is the requisite standing necessary for the pursuit of this case in federal court. Fulfilling the constitutional requirements of standing, Texas has shown that it will suffer an injury, that this injury is proximately caused by the actions of the Government, and that a favorable remedy issued by the Court would prevent the occurrence of this injury.[48] This Court also finds that Texas' claim has satisfied the requirements of prudential standing: Plaintiffs' suit is not merely a generalized grievance, the Plaintiffs' fall within the "zone of interest" pertaining to the immigration statutes at issue, and Plaintiffs' suit is not based merely on the interests of third-parties.

Finally, for the various reasons discussed above and below, it is clear that Plaintiffs satisfy the standing requirements as prescribed by the APA. Thus even "unreviewable" administrative actions may be subject to judicial review under exceptional circumstances, such as when there has been a clear departure from the agency's statutory authority. *See Manges v. Camp*, 474 F.2d 97, 99 (5th Cir.1973). With regard to APA standing, this Court emphasizes that there is a difference between the standing required to bring a lawsuit and that necessary for APA reviewability. Although traditional standing refers to the ability of a plaintiff to bring an action, APA "reviewability" concerns the ability of the Court to actually review and grant relief regarding the act or omission in question on either procedural or substantive grounds. This Court will ad-

---

**48.**  The Court has also found that the Government has abdicated its duty to enforce the immigration laws that are designed, at least in part, to protect the States and their citizens. While many courts, including the United States Supreme Court, have suggested that the abdication of duty gives rise to standing, this Court has not found a case where the plaintiff's standing was supported solely on this basis. Though not the only reason, the Court finds Plaintiffs (at least Texas) have standing pursuant to this theory, as well.

dress these redressability issues as part of its discussions on the merits.

Having reached the conclusion that standing exists for at least one Plaintiff, the Court turns to the merits.

## V. *THE MERITS OF THE STATES' CLAIMS*

As previously noted, this opinion seeks to address three issues: standing, legality, and constitutionality. Having concluded that at least one Plaintiff, the State of Texas, has standing, the Court now addresses the merits of the States' claims regarding the DAPA program.

### A. Prosecutorial Discretion and Agency Prioritization

A basic issue intrinsically interwoven in most of the arguments presented in this case warrants attention before proceeding. It does not resolve any of the ultimate remaining questions, but the Court nevertheless finds it important. Just as the Government has been reluctant to make certain concessions, prosecutorial discretion is an area where the States, possibly in fear of making a bigger concession than intended, are reluctant to concede. As discussed above, one of the DHS Secretary's stated reasons for implementing DAPA is that it allegedly allows the Secretary to expend the resources at his disposal in areas he views as deserving the most attention. He has set forth these priorities as follows:

1. Priority 1: threats to national security, border security, and public safety;

2. Priority 2: misdemeanants and new immigration violators;

3. Priority 3: other immigration violations.

*See* Doc. No. 38, Def. Ex. 5 (Nov. 20, 2014 Memorandum, "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants").[49]

The law is relatively clear on enforcement discretion and, thus, the Court will not address it at length. Nevertheless, because the DHS has so intertwined its stated priorities with the DAPA program as justification for its alleged exercise of discretion, the Court finds it helpful to point out some basic legal principles.

**[32]** The law is clear that the Secretary's ordering of DHS priorities is not subject to judicial second-guessing:

> [T]he Government's enforcement priorities and ... the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to make.

*Reno*, 525 U.S. at 490, 119 S.Ct. 936 (quoting *Wayte v. United States*, 470 U.S. 598, 607–08, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)).

**[33]** Further, as a general principle, the decision to prosecute or not prosecute an individual is, with narrow exceptions, a decision that is left to the Executive Branch's discretion. *Heckler*, 470 U.S. at 831, 105 S.Ct. 1649 (citing a host of Supreme Court opinions). As the Fifth Circuit has stated:

---

49. Interestingly, this memorandum, which is different from the DAPA Memorandum (although dated the same day), states: "Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens in the United States who are not identified as priorities herein." The DAPA recipients arguably fall under Priority 3, but the Secretary's DAPA Memorandum seems to indicate he thinks otherwise. Despite this admonition, the DAPA Memorandum instructs DHS officials not to remove otherwise removable aliens. In fact, it also instructs ICE officials to immediately stop enforcement procedures already in process, including removal proceedings.

The prosecution of criminal cases has historically lain close to the core of the Article II executive function. The Executive Branch has extraordinarily wide discretion in deciding whether to prosecute. Indeed, that discretion is checked only by other constitutional provisions such as the prohibition against racial discrimination and a narrow doctrine of selective prosecution.

*Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 756 (5th Cir.2001).

[34, 35] The Judiciary has generally refrained from injecting itself into decisions involving the exercise of prosecutorial discretion or agency non-enforcement for three main reasons. First, these decisions ordinarily involve matters particularly within an agency's expertise. Second, an agency's refusal to act does not involve that agency's "coercive" powers requiring protection by courts. Finally, an agency's refusal to act largely mirrors a prosecutor's decision to not indict. *Heckler*, 470 U.S. at 821–32, 105 S.Ct. 1649. This is true whether the suit is brought under common law or the APA. Absent abdication, decisions to not take enforcement action are rarely reviewable under the APA. *See, e.g., Texas*, 106 F.3d at 667.

[36] Consequently, this Court finds that Secretary Johnson's decisions as to how to marshal DHS resources, how to best utilize DHS manpower, and where to concentrate its activities are discretionary decisions solely within the purview of the Executive Branch, to the extent that they do not violate any statute or the Constitution.

The fact that the DHS has virtually unlimited discretion when prioritizing enforcement objectives and allocating its limited resources resolves an underlying current in this case. This fact does not, however, resolve the specific legal issues presented because the general concept of prosecutorial discretion—or Defendants' right to exercise it—is not the true focus of the States' legal attack.[50] Instead, Plaintiffs argue that DAPA is not within the Executive's realm (his power to exercise prosecutorial discretion or otherwise) at all; according to Plaintiffs, DAPA is simply the Executive Branch legislating.

[37–39] Indeed, it is well-established both in the text of the Constitution itself and in Supreme Court jurisprudence that the Constitution "allows the President to execute the laws, not make them." *Medellin v. Texas*, 552 U.S. 491, 532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008). It is Congress, and Congress alone, who has the power under the Constitution to legislate in the field of immigration. *See* U.S. Const. art. 1, § 8, cl. 4; *Plyler*, 457 U.S. at 237–38, 102 S.Ct. 2382. As the Supreme Court has explained, "[t]he conditions for entry [or removal] of every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determinations should be based, have been recognized as matters *solely for the responsibility of the Congress....*" *Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (emphasis added).

Just as the states are preempted from interfering with the "careful balance struck by Congress with respect to unauthorized employment," for example,[51]

50. The States obviously question the soundness of Defendants' alleged exercise of discretion. Their complaint also questions whether this program can be characterized or justified as an exercise of discretion at all.

51. *Arizona*, 132 S.Ct. at 2505.

Plaintiffs argue that the doctrine of separation of powers likewise precludes the Executive Branch from undoing this careful balance by granting legal presence together with related benefits to over four million individuals who are illegally in the country. It is the contention of the States that in enacting DAPA, the DHS has not only abandoned its duty to enforce the laws as Congress has written them, but it has also enacted "legislation" contrary to the Constitution and the separation of powers therein. Finally, the States complain that the DHS failed to comply with certain procedural statutory requirements for taking the action it did.

The Court now turns to those issues.

### B. Preliminary Injunction

**[40, 41]** To support the "equitable remedy" of a preliminary injunction, the Plaintiff States must establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the [States] will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause [Defendants]; and (4) that the injunction will not disserve the public interest." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir.2014) (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir.1998)). While a preliminary injunction should not be granted unless the plaintiff, "*by a clear showing*" carries his burden of persuasion on each of these four factors, *see Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (citation omitted) (emphasis in the original), the plaintiff "need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n. 11 (5th Cir.1991); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (emphasizing that a party "is not required to prove his

case in full at a preliminary injunction hearing").

**[42–44]** The "generally accepted notion" is that the "purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir.1975) (citations omitted); *see also Camenisch*, 451 U.S. at 395, 101 S.Ct. 1830 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). "Given this limited purpose, and given the haste that is often necessary if [the parties'] positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* The Court's analysis requires "a balancing of the probabilities of ultimate success on the merits with the consequences of court intervention at a preliminary stage." *Meis*, 511 F.2d at 656; *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974) ("'[T]he most compelling reason in favor of (granting a preliminary injunction) is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act.") (quotation marks and citations omitted).

### 1. Preliminary Injunction Factor One: Likelihood of Success on the Merits

**[45]** The first consideration in the preliminary injunction analysis is the likelihood that the plaintiff will prevail on the merits. The Fifth Circuit has previously stated that the likelihood required in a given case depends on the weight and strength of the other three factors. *See Canal Auth.*, 489 F.2d at 576–77. Although some doubt has been cast on this

"sliding scale" approach, it is clear that, at a minimum, the plaintiff must demonstrate a "substantial case on the merits." *See, e.g., Southerland v. Thigpen,* 784 F.2d 713, 718 n. 1 (5th Cir.1986). Thus, to meet the first requirement for a preliminary injunction, the States "must present a prima facie case," but "need not show a certainty of winning." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.3 (3d ed.2014) (hereinafter "Wright & Miller").

### a. The Administrative Procedure Act

The States complain that the implementation of DAPA violates the APA. 5 U.S.C. §§ 501 *et seq.* Specifically, the States assert that DAPA constitutes a "substantive" or "legislative" rule that was promulgated without the requisite notice and comment process required under Section 553 of the APA.[52] Defendants concede that DAPA was not subjected to the APA's formal notice-and-comment procedure. Instead, they argue that DAPA is not subject to judicial review and, even if reviewable, is exempt from the APA's procedural requirements.

### i. Judicial Review Under the Administrative Procedure Act

**[46]** When a party challenges the legality of agency action, a finding that the party has standing will not, alone, entitle that party to a decision on the merits. *See Data Processing,* 397 U.S. at 173, 90 S.Ct. 838 (Brennan, J., concurring). Thus, before proceeding to the merits of Plaintiffs' claim, the Court must ensure that the agency action at issue here is reviewable under the APA.

Subject to two exceptions described below, the APA provides an avenue for judicial review of challenges to "agency action." *See* 5 U.S.C. §§ 701–706. Under Section 702, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Section 702 contains two requirements. First, the plaintiffs must identify some " 'agency action' that affects [them] in the specified fashion; it is judicial review 'thereof to which [they are] entitled.' " *Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (quoting 5 U.S.C. § 702). "Agency action," in turn, is defined in the APA as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). When, as here, judicial review is sought "not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.' " *Lujan,* 497 U.S. at 882, 110 S.Ct. 3177 (citing 5 U.S.C. § 704, which provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review").

**[47]** To obtain review under Section 702, Plaintiffs must additionally show that they are either "suffering legal wrong" because of the challenged agency action, or are "adversely affected or aggrieved by [that] action within the meaning of a relevant statute." 5 U.S.C. § 702. A plaintiff

---

**52.** The States also claim that DAPA substantively violates the APA in that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" under 5 U.S.C. § 706. If accurate (and all other requirements under the APA are satisfied), Section 706 would require that the Court "hold unlawful and set aside" the DAPA program. 5 U.S.C. § 706.

claiming the latter, as the States do here, must establish that the "injury he complains of (*his* aggrievement, or the adverse effect *upon him* ) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan*, 497 U.S. at 871, 110 S.Ct. 3177 (citing *Clarke*, 479 U.S. at 396–97, 107 S.Ct. 750).

### (1) Final Agency Action

[48, 49] The Supreme Court has identified two conditions that must be satisfied for agency action to be "final." First, "the action must mark the consummation of the agency's decisionmaking process . . .—it must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178, 117 S.Ct. 1154 (internal quotations marks and citations omitted). One need not venture further than the DHS Directive itself to conclude that it is not "of a merely tentative or interlocutory nature." Secretary Johnson ordered immediate implementation of certain measures to be taken under DAPA. For instance, he ordered ICE and CBP to "immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the . . . criteria . . . to prevent the further expenditure of enforcement resources." Doc. No. 1, Pl. Ex. A at 5. Secretary Johnson further instructed ICE

to "review *pending* removal cases, and seek administrative closure or termination" of cases with potentially eligible deferred action beneficiaries. *Id.* (emphasis added). The DHS has additionally set up a "hotline" for immigrants in the removal process to call and alert the DHS as to their eligibility, so as to avoid their removal being effectuated.[53] USCIS was given a specific deadline by which it "should begin accepting applications under the new [DACA] criteria": "no later than ninety (90) days from the date of [the Directive's] announcement." *Id.* at 4. As of the date of this Order, that deadline is less than a week away.[54] Moreover, the DHS is currently obtaining facilities, assigning officers, and contracting employees to process DAPA applications.[55] Thus, the DHS Directive has been in effect and action has been taken pursuant to it since November of 2014.

[50] Under the second condition identified by the Supreme Court, to be "final," the agency's action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178, 117 S.Ct. 1154 (internal quotation marks and citations omitted). As evidenced by the mandatory language throughout the

---

**53.** *See, e.g., Frequently Asked Questions, The Obama Administration's DAPA and Expanded DACA Programs*, NILC, at http://www.nilc.org/dapa&daca.html (last updated Jan. 23, 2015).

**54.** Defendants have not indicated any intention to depart from the deadline established in the DHS Directive. To the contrary, the DHS' website states in bold, red font that it will begin accepting applications under the new DACA criteria on February 18, 2015. *See Executive Actions on Immigration*, Official Website of the Dept. of Homeland Security, at http://www.uscis.gov/immigrationaction (last updated Jan. 30, 2015). A deadline by which USCIS should begin accepting applications

for DAPA was also provided in the DHS Directive: no later than 180 days from the date DAPA was announced. Thus, USCIS must begin accepting applications by mid-May of this year.

**55.** Doc. No. 64, Pl. Ex. 23 (Palinkas Dec.) ("USCIS has announced that it will create a new service center to process DAPA applications. The new service center will be in Arlington, Virginia, and it will be staffed by approximately 1,000 federal employees. Approximately 700 of them will be USCIS employees, and approximately 300 of them will be federal contractors.").

AR 00000099

DAPA Memorandum requiring USCIS and ICE to take certain actions, the Secretary's Directive clearly establishes the obligations of the DHS and assigns specific duties to offices within the agency. Additionally, DAPA confers upon its beneficiaries the right to stay in the country lawfully. Clearly, "legal consequences will flow" from Defendants' action: DAPA makes the illegal presence of millions of individuals legal.

Two other factors confirm that the DAPA Directive constitutes final agency action. First, the Government has not specifically suggested that it is not final. To the contrary, the DHS' own website declares that those eligible under the new DACA criteria may begin applying on February 18, 2015. Finally, the 2012 DACA Directive—which was clearly final and has been in effect for two and a half years now—was instituted in the same fashion, pursuant to a nearly identical memorandum as the one here. Indeed, Secretary Johnson in the DAPA Memorandum "direct[s] USCIS to establish a process, *similar to DACA*" for implementing the program. Doc. No. 1, Pl. Ex. A (emphasis added). This experience—and the lack of any suggestion that DAPA will be implemented in a fashion different from DACA—serves as further evidence that DAPA is a final agency action. Based upon the combination of all of these factors, there can be no doubt that the agency action at issue here is "final" in order for the Court to review it under the APA.

### (2) The Zone of Interests

**[51–53]** To challenge Defendants' action under the APA, Plaintiffs must additionally show: (1) that they are "adversely affected or aggrieved, i.e. injured in fact," and (2) that the "interest sought to be protected by the [Plaintiffs] [is] arguably within the zone of interests to be protected or regulated by the statute in question." *Clarke*, 479 U.S. at 395–96, 107 S.Ct. 750 (internal quotation marks and citations omitted). The key inquiry is whether Congress "intended for [Plaintiffs] to be relied upon to challenge agency disregard of the law." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); *see also Clarke*, 479 U.S. at 399, 107 S.Ct. 750 ("The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision."). The test is not "especially demanding." [56] *Id.* As the Supreme Court in *Clarke* held:

> In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are *so marginally related to or inconsistent with the purposes implicit in the statute* that it cannot reasonably be assumed that Congress intended to permit the suit.... [T]here *need be no indication of con-*

---

**56.** The *Clarke* Court noted that, although a similar zone of interest test is often applied when considering "prudential standing" to sue in federal court (as already discussed in this opinion), the zone of interest test in the APA context is much less demanding than it is in the prudential standing context. 479 U.S. at 400 n. 16, 107 S.Ct. 750 (stating that the invocation of the zone of interest test in the *standing* context "should not be taken to mean that the standing inquiry under whatev-

er constitutional or statutory provision a plaintiff asserts is the same as it would be if the 'generous review provisions' of the APA apply"). This Court, in its consideration of prudential standing concerns, already found Plaintiffs to be within the zone of interest of the relevant immigration laws, which DAPA contravenes. Thus, based on the less-demanding nature of the APA's zone of interest test, the Court need not go into great detail in this part of its analysis.

**650**      **86 FEDERAL SUPPLEMENT, 3d SERIES**

*gressional purpose to benefit the would-be plaintiff.*

*Id.* at 399–400, 107 S.Ct. 750 (citations removed) (emphasis added).

[54]   As described above in great detail, it is clear that at least one Plaintiff, the State of Texas, (and perhaps some of the other States if there had been time and opportunity for a full development of the record), will be "adversely affected or aggrieved" by the agency action at issue here.   DAPA authorizes a new status of "legal presence" along with numerous other benefits to a substantial number of individuals who are currently, by law, "removable" or "deportable."   The Court finds that the acts of Congress deeming these individuals removable were passed in part to protect the States and their residents. Indeed, over the decades there has been a constant flood of litigation between various states and the federal government over federal enforcement of immigration laws. The states have been unsuccessful in many of those cases and have prevailed in only a few.   Regardless of which side prevailed and what contention was at issue, there has been one constant: the federal government, under our federalist system, has the duty to protect the states, which are powerless to protect themselves, by enforcing the immigration statutes.   Congress has recognized this:

> States and localities can have significant interest in the manner and extent to which federal officials enforce provisions of the Immigration and Nationality Act (INA) regarding the exclusion and removal of unauthorized aliens.[57]

Similarly, the Supreme Court has recognized that the states have an interest in the enforcement or non-enforcement of the INA:

> Since the late 19th century, the United States has restricted immigration into this country.   Unsanctioned entry into the United States is a crime, and those who have entered unlawfully are subject to deportation.   But despite the existence of these legal restrictions, a substantial number of persons have succeeded in unlawfully entering the United States, and now live within various States, including the State of Texas.

*Plyler,* 457 U.S. at 205, 102 S.Ct. 2382 (citations omitted).   Finally, the Department of Justice has likewise acknowledged that the states' interests are related to and consistent with the purposes implicit within the INA:

> Unlawful entry into the United States and reentry after removal are federal criminal offenses.[58]
>
> . . . .
>
> To discourage illegal immigration into the United States, the INA prohibits employers from knowingly hiring or continuing to employ aliens who are not authorized to work in the United States.
>
> . . . .
>
> The federal immigration laws encourage States to cooperate with the federal government in its enforcement of immigration laws in several ways.   The INA provides state officials with express authority to take certain actions to assist federal immigration officials.   For example, state officers may make arrests for violations of the INA's prohibition against smuggling, transporting or harboring aliens. . . . And, if the Secretary determines that an actual or imminent

---

**57.**   *See, e.g.,* Kate M. Manuel, Cong. Research Serv., R43839, *State Challenges to Federal Enforcement of Immigration Law: Historical Precedents and Pending Litigation* 2 (2014).

**58.**   As the Supreme Court held in *Arizona v. United States,* it is the job of ICE officers to remove those who violate Sections 1325 and 1326.   *See* 132 S.Ct. at 2500.

mass influx of aliens presents urgent circumstances requiring an immediate federal response, she may authorize any state or local officer ... to exercise the powers, privileges or duties of federal immigration officers under the INA.

Congress has also authorized DHS to enter into agreements with States to allow appropriately trained and supervised state and local officers to perform enumerated functions of federal immigration enforcement. Activities performed under these agreements ... "shall be subject to the direction and supervision of the [Secretary]."

The INA further provides, however, that a formal agreement is not required for state and local officers to "cooperate with the [Secretary]" in certain respects.... Even without an agreement, state and local officials may "communicate with the [Secretary] regarding the immigration status of an individual," or "otherwise cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States".... To further such "cooperat[ive]" efforts to "communicate," Congress has enacted measures to ensure a useful flow of information between DHS and state ... agencies.

Brief for the United States in Opposition on Petition for Writ of Certiorari at 2–6, *Arizona v. United States*, 132 S.Ct. 2492 (2012) (No. 11–182), 2011 WL 5548708 (citations omitted).

[55] According to estimates available to the Court, at least 50–67% of potentially-eligible DAPA recipients have probably violated 8 U.S.C. § 1325.[59] The remaining 33–50% have likely overstayed their permission to stay. Under the doctrine of preemption, the states are deprived of the ability to protect themselves or institute their own laws to control illegal immigration and, thus, they must rely on the INA and federal enforcement of the same for their protection. *See Arizona*, 132 S.Ct. at 2510 (reaffirming the severe limit on state action in the field of immigration). Despite recognizing the inability of states to tackle their immigration problems in a manner inconsistent with federal law, the Supreme Court in *Arizona* noted:

> The National Government has significant power to regulate immigration. With power comes responsibility, and the sound exercise of national power over immigration depends on the Nation's meeting its responsibility to base its laws on a political will informed by searching, thoughtful, rational civic discourse. Arizona may have understandable frustrations with the problems caused by illegal immigration while that process continues, but the State may not pursue policies that undermine federal law.

*Id.* (emphasis added).

The responsibility of the federal government, who exercises plenary power over immigration, includes not only the passage of rational legislation, but also the *enforcement* of those laws.[60] The States and their

---

**59.** *See, e.g.,* David Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 Yale L.J. Online 167, 171 (2012) (citing *Modes of Entry for the Unauthorized Migrant Population*, PEW Hisp. Center 3 (May 22, 2006), at http://pewhispanic.org/files/factsheets/19.pdf). (Mr. Martin served as General Counsel of the INS from 1995–1997,

and as Principal Deputy General Counsel of the DHS from 2009–2010.). *See also* Andorra Bruno, Cong. Research Serv., R41207, *Unauthorized Aliens in the United States: Policy Discussion* 2 (2014) (hereinafter "Bruno, *Unauthorized Aliens in the United States*").

**60.** Congress exercises plenary power over immigration and the Executive Branch is charged with enforcing Congress' laws. *See*

residents are entitled to nothing less. DAPA, no matter how it is characterized or viewed, clearly contravenes the express terms of the INA. Under our federalist system, the States are easily in the zone of interest contemplated by this nation's immigration laws.

### (3) Exceptions to Review

Although the Court easily finds the agency action at issue here final and that the States fall within the relevant zone of interests in order to seek review, Defendants claim that review is nevertheless unavailable in this case because the APA exempts the DHS action from its purview.

There are two exceptions to the general rule of reviewability under the APA. First, agency action is unreviewable "where the statute explicitly precludes judicial review." 5 U.S.C. § 701(a)(1). This exception applies when "Congress has expressed an intent to preclude judicial review." *Heckler*, 470 U.S. at 830, 105 S.Ct. 1649.[61] Second, and arguably more relevant to the present case, even if Congress has not affirmatively precluded judicial review, courts are precluded from reviewing agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This second exception was first discussed in detail by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). There, the Court interpreted the exception narrowly, finding it "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* at 410,

*Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.") (internal quotation marks and citations omitted). Just like the states, albeit for a different reason, the Executive Branch "may not pursue policies that undermine federal law."

91 S.Ct. 814 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). Subsequently, in *Heckler v. Chaney*, the Supreme Court further refined its interpretation of Section 701(a)(2). Distinguishing the exception in Section 701(a)(1) from that in Section 701(a)(2), the Court stated:

> The former [§ 701(a)(1) ] applies when Congress has expressed an intent to preclude judicial review. The latter [§ 701(a)(2) ] applies in different circumstances; even where Congress has not affirmatively precluded review, *review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.* In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely. This construction avoids conflict with the "abuse of discretion" standard of review in § 706—if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion."

470 U.S. at 830, 105 S.Ct. 1649 (emphasis added).

Relevant to the present issue, the Supreme Court then exempted from the APA's "presumption of reviewability" nonenforcement decisions made by an agency. *Id.* at 831, 105 S.Ct. 1649 (disagreeing with the lower court's "insistence that the 'narrow construction' of § (a)(2) required application of a presumption of reviewability

**61.** The Government has not pointed the Court to any statute that precludes reviewability of DAPA. As there is no statute that authorizes the DHS to implement the DAPA program, there is certainly no statute that precludes judicial review under Section 701(a).

even to an agency's decision not to under-take certain enforcement actions"). The Court distinguished the availability of re-view for the type of agency action in *Overton Park* from the challenged agency deci-sions in *Heckler*:

> *Overton Park* did not involve an agen-cy's refusal to take requested enforce-ment action. It involved *an affirmative act of approval under a statute that set clear guidelines* for determining when such approval should be given. Refusals to take enforcement steps generally in-volve precisely the opposite situation, and in that situation we think the pre-sumption is that judicial review is not available.

*Id.* (emphasis added).

[56] Thus, according to the *Heckler* Court, there is a "rebuttable presumption" that "an agency's decision not to prosecute or enforce, whether through civil or crimi-nal process, is a decision generally commit-ted to an agency's absolute discretion" and, consequently, unsuitable for judicial review. *Id.* An "agency's refusal to insti-tute proceedings" has been "traditionally committed to agency discretion," and the enactment of the APA did nothing to dis-turb this tradition. *Id.* at 832, 105 S.Ct. 1649.

Underlying this presumption of unre-viewability are three overarching concerns that arise when a court proposes to review an agency's discretionary decision to re-fuse enforcement. First, "an agency deci-sion not to enforce often involves a compli-cated balancing of a number of factors which are particularly within its exper-tise[,]" and the agency is "far better equipped than the courts to deal with the many variables involved in the proper or-dering of its priorities." *Id.* at 831–32, 105 S.Ct. 1649. These factors or variables that an agency must assess in exercising its enforcement powers include "whether a violation has occurred, ... whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831, 105 S.Ct. 1649. Due to circumstances be-yond its control, an agency "cannot act against each technical violation of the stat-ute it is charged with enforcing." *Id.* For obvious reasons, this has application in the criminal and immigration contexts. Con-sequently, the deference generally accord-ed to "an agency's construction of the stat-ute it is charged with implementing" and the "procedures it adopts" for doing so (under general administrative law princi-ples) [62] is arguably even more warranted when, in light of the above factors, the agency chooses not to enforce the statute against "each technical violation." *Id.* at 831–32, 105 S.Ct. 1649.

Second, an agency's refusal to act gener-ally does not "infringe upon areas that courts often are called upon to protect[,]"

---

62. The *Heckler* Court cited *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), and *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). For instance, in discussing deference to agen-cy interpretation, the Supreme Court stated in *Vermont Yankee*:

> But this much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances, the administra-tive agencies should be free to fashion their own rules of procedure and to pursue meth-ods of inquiry capable of permitting them to discharge their multitudinous duties. In-deed, our cases could hardly be more ex-plicit in this regard.

435 U.S. at 543, 98 S.Ct. 1197 (internal quo-tations and citations omitted).

AR 00000104

including individual liberty or property rights. In other words, a non-enforcement decision ordinarily does not involve an exercise of governmental "*coercive* power" over an individual's rights. *Id.* at 832, 105 S.Ct. 1649 (emphasis in original). By contrast, when an agency does take action exercising its enforcement power, the action in and of itself "provides a focus for judicial review." *Id.* Because the agency "must have exercised its power in some manner," its action is more conducive to review "to determine whether the agency exceeded its statutory powers." *Id.* (citing *FTC v. Klesner*, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138 (1929)).

Lastly, the *Heckler* Court compared agency non-enforcement decisions to the exercise of prosecutorial discretion in the criminal context—decisions that plainly fall within the express and exclusive province of the Executive Branch, which is constitutionally charged to "take Care that the Laws be faithfully executed." *See id.* ("Finally, we recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'to take Care that the Laws be faithfully executed.'") (quoting U.S. Const. art. II, § 3).

[57] While the Court recognizes (as discussed above) that the DHS possesses considerable discretion in carrying out its duties under the INA, the facts of this case do not implicate the concerns considered by *Heckler* such that this Court finds itself without the ability to review Defendants' actions. First, the Court finds an important distinction in two terms that are commonly used interchangeably when discussing *Heckler's* presumption of unreviewability: "non-enforcement" and "inaction." While agency "non-enforcement" might imply "inaction" in most circumstances, the Court finds that, in this case, to the extent that the DAPA Directive can be characterized as "non-enforcement," it is actually affirmative *action* rather than inaction.

The Supreme Court's concern that courts lack meaningful focus for judicial review when presented with agency *inaction* (see *Heckler*, 470 U.S. at 832, 105 S.Ct. 1649) is thus not present in this situation. Instead of merely refusing to enforce the INA's removal laws against an individual, the DHS has enacted a wide-reaching program that awards legal presence, to individuals Congress has deemed deportable or removable, as well as the ability to obtain Social Security numbers, work authorization permits, and the ability to travel.[63] Absent DAPA, these individuals would not receive these benefits.[64] The DHS has not instructed

63. *See, e.g., Frequently Asked Questions, The Obama Administration's DAPA and Expanded DACA Programs,* NILC, at http://www.nilc.org/dapa & daca.html (last updated Jan. 23, 2015) (instructing potential DAPA/DACA beneficiaries that "[o]nce [their] work permit arrives," to look up their local Social Security office at www.ssa.gov to apply for Social Security numbers). The official website for the Social Security Administration offers information for noncitizens, explaining that noncitizens "authorized to work in the United States by the Department of Homeland Security

(DHS) can get a Social Security number.... You need a Social Security number to work, collect Social Security benefits and receive some other government services." *Social Security Numbers for Noncitizens,* Official Website of the Social Security Administration (Aug.2013), http://www.ssa.gov/pubs/EN-05-10096.pdf.

64. The States raised, but did not address at length, the tax benefit issue perhaps because this is an expense that the federal taxpayers must bear. Nevertheless, it is clear from the

its officers to merely refrain from arresting, ordering the removal of, or prosecuting unlawfully-present aliens. Indeed, by the very terms of DAPA, that is what the DHS *has* been doing for these recipients for the last five years [65]—whether that was because the DHS could not track down the millions of individuals they now deem eligible for deferred action, or because they were prioritizing removals according to limited resources, applying humanitarian considerations, or just not removing these individuals for "administrative convenience." [66] Had the States complained only of the DHS' mere failure to (or decision not to) prosecute and/or remove such individuals in these preceding years, any conclusion drawn in that situation would have been based on the *inaction* of the agency in its refusal

to enforce. In such a case, the Court may have been without any "focus for judicial review." *See Heckler,* 470 U.S. at 832, 105 S.Ct. 1649.

Exercising prosecutorial discretion and/or refusing to enforce a statute does not also entail bestowing benefits. Non-enforcement is just that—not enforcing the law.[67] Non-enforcement does not entail refusing to remove these individuals as required by the law *and then* providing three years of immunity from that law, legal presence status, plus any benefits that may accompany legal presence under current regulations. This Court seriously doubts that the Supreme Court, in holding non-enforcement decisions to be presumptively unreviewable, anticipated that such "non-enforcement" decisions would include

---

testimony of IRS Commissioner John A. Koskinen presented to the Senate Finance Committee that the DAPA recipients would be eligible for earned income tax credits once they received a Social Security number. *See* Testimony of IRS Commissioner John A. Koskinen on February 3, 2015 before Senate Finance Committee that DAPA confers another sizable benefit in addition to those that directly affect the States due to certain tax credits. *See also* "Taxpayer Identification Number Requirements of Eligible Individuals and Qualifying Children Under the EIC," FTC A–4219, 19 XX WL 216976, and Chief Counsel Advice, IRS CCA 200028034, 2000 WL 33116180 (IRS CCA 2000). One way to estimate the effect of this eligibility is to assign as an earned income tax credit the sum of $4,000 per year for three years (the number of years for which an individual can file) and multiply that by the number of DAPA recipients. If, for instance, that number is 4.3 million, if calculated accurately, the tax benefits bestowed by DAPA will exceed $50,000,000,000. Obviously, such a calculation carries with it a number of assumptions. For example, it is somewhat unlikely that every DAPA recipient would actually claim or qualify for these credits. Nevertheless, the importance lies not in the amount, but in the fact that DAPA makes individuals eligible at all. Bestowing a tax benefit on individuals

that are otherwise not entitled to that benefit is one more reason that DAPA must be considered a substantive rule.

**65.** In order to qualify for DAPA, an unlawfully-present alien must have "continuously resided in the United States since before January 1, 2010." Doc. No. 1, Pl. Ex. A at 4. Thus, expected beneficiaries of DAPA have been present in the country illegally for *at least* five years, yet the DHS (whether knowingly or unknowingly/intentionally or unintentionally) has not acted to enforce the INA's removal provisions against them during those years.

**66.** *See* 8 C.F.R. § 274a.12(c)(14) (defining deferred action as "an act of administrative convenience to the government which gives some cases lower priority").

**67.** *See, e.g., In re Aiken Cnty.,* 725 F.3d 255, 266 (D.C.Cir.2013) (explaining that prosecutorial discretion includes the decision to not *enforce* a law, but does not include the discretion not to *follow* a law). The law requires these individuals to be removed. The DHS could accomplish—and has accomplished—non-enforcement of the law without implementing DAPA. The award of legal status and all that it entails is an impermissible refusal to *follow* the law.

the affirmative act of bestowing multiple, otherwise unobtainable benefits upon an individual. Not only does this proposition run afoul of traditional exercises of prosecutorial discretion that generally receive judicial deference, but it also flies in the face of the very concerns that informed the *Heckler* Court's holding. This Court finds the DHS Directive distinguishable from the non-enforcement decisions to which *Heckler* referred, and thus concludes that *Heckler's* presumption of unreviewability is inapplicable in this case.

### (4) If Applicable, the Presumption is Rebutted

[58] Assuming *arguendo* that a presumption of unreviewability applied in this case, the Court nonetheless finds that presumption rebutted. Notably, in *Heckler*, after listing the above-addressed concerns underlying its conclusion that an agency's non-enforcement decisions are presumed immune from review under Section 701(a)(2), the Supreme Court emphasized that any non-enforcement decision "is only presumptively unreviewable." The presumption "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33, 105 S.Ct. 1649. Drawing on its prior analysis of Section 701(a)(2)'s exception in *Overton Park*, the Supreme Court elaborated on instances when the presumption may be rebutted:

Thus, in establishing this presumption in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue. How to determine when Congress has done so is the question left open by *Overton Park*.

*Id.* at 833, 105 S.Ct. 1649.

#### b. The Applicable Statutory Scheme

Here, the very statutes under which Defendants claim discretionary authority [68] actually compel the opposite result. In particular, detailed and mandatory commands within the INA provisions applicable to Defendants' action in this case circumscribe discretion. Section 1225(a)(1) of the INA provides that "[a]n alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). All applicants for admission "shall be inspected by immigration officers." *Id.* § 1225(a)(3). "[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [of the INA]." *Id.* § 1225(b)(2)(A).[69]

---

**68.** As detailed below, the Defendants claim that Congress granted them discretion under two statutory provisions: 8 U.S.C. § 1103 and 6 U.S.C. § 202.

**69.** It is understood that unauthorized aliens enter the United States in three main ways: (1) [S]ome are admitted to the United States on valid nonimmigrant (temporary) visas (e.g., as visitors or students) or on border-crossing cards and either remain in the country beyond their authorized period

of stay or otherwise violate the terms of their admission; (2) some are admitted based on fraudulent documents (e.g., fake passports) that go undetected by U.S. officials; and (3) some enter the country illegally without inspection (e.g., by crossing over the Southwest or northern U.S. border).

Bruno, *Unauthorized Aliens in the United States* at 2.

Section 1229a provides for removal proceedings. In these proceedings, if the alien is an applicant for admission, the burden of proof rests with the alien to establish that he or she is "clearly and beyond doubt entitled to be admitted and is not inadmissible under section 1182" of the INA. 8 U.S.C. § 1229a(c)(2)(A). Alternatively, the alien has the burden of establishing "by clear and convincing evidence" that he or she is "lawfully present in the United States pursuant to a prior admission." *Id.* § 1229a(c)(2)(B). An alien is "removable" if the alien has not been admitted and is inadmissible under Section 1182, or in the case of an admitted alien, the alien is deportable under Section 1227. *Id.* § 1229a(e)(2). Section 1182 classifies and defines "Inadmissible Aliens." Inadmissible aliens are ineligible to receive visas and ineligible to be admitted to the United States. Among the long list of grounds for inadmissibility are those related to health, crime, and security. Section 1227 classifies and defines individuals who are deportable. Potential DAPA beneficiaries who entered unlawfully are inadmissible under Section 1182 and the law dictates that they should be removed pursuant to the authority under Sections 1225 and 1227. Those potential recipients who entered legally, but overstayed their legal permission to be in the United States fall under Section 1227(a)(1). Thus, regardless of their mode of entry, DAPA putative recipients all fall into a category for removal and no Congressionally-enacted statute gives the DHS the affirmative power to turn DAPA recipients' illegal presence into a legal one through deferred action, much less provide and/or make them eligible for multiple benefits.[70]

The Government must concede that there is no specific law or statute that authorizes DAPA. In fact, the President announced it was the failure of Congress to pass such a law that prompted him (through his delegate, Secretary Johnson) to "change the law." [71] Consequently, the Government concentrates its defense upon the *general* discretion it is granted by law.

While there is no specific grant of discretion given to the DHS supporting the challenged action, Congress has conferred (and the DHS relies upon) two general grants of discretion under 8 U.S.C. § 1103(a)(3) (the "INA Provision") and 6 U.S.C. § 202 (the Homeland Security Act of 2005 ("HSA")) (the "HSA Provision").[72] Under the first of these provisions, the INA provides:

> [The Secretary] shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

8 U.S.C. § 1103(a)(3). Under the latter of these provisions, the HSA provides in relevant part:

---

**70.** In rejecting an agency's claimed use of prosecutorial discretion as justifying its inaction, the D.C. Circuit has emphasized:

> [P]rosecutorial discretion encompasses the discretion not to *enforce* a law against private parties; it does not encompass the discretion not to *follow* a law imposing a mandate or prohibition on the Executive Branch.

*In re Aiken County,* 725 F.3d at 266 (emphasis in original).

**71.** *See* Press Release, Remarks by the President on Immigration—Chicago, IL, The White House Office of the Press Secretary (Nov. 25, 2014).

**72.** Despite using the name of the Acts throughout, the Court will refer to the codified provisions of the INA and the HSA, as provided for in Title 8 and Title 6, respectively.

The Secretary, acting through the Under Secretary for Border and Transportation Security, shall be responsible for the following:

(1) Preventing the entry of terrorists and the instruments of terrorism into the United States.

(2) Securing the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.

(3) Carrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the date on which the transfer of functions specified under section 251 of this title takes effect.

(4) Establishing and administering rules, in accordance with section 236 of this title, governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.

(5) Establishing national immigration enforcement policies and priorities.

6 U.S.C. § 202.

The INA Provision is found in the "General Provisions," Subchapter I, of Title 8, which provides definitions of terms used throughout the INA and identifies the general powers and duties of the DHS Administration.[73] The HSA Provision establishes the "responsibilities" of the DHS Secretary. The INA thus gives the DHS Secretary the authority (and indeed directs the Secretary) to establish regulations that he deems necessary to execute the laws passed by Congress. The HSA delegates to the Secretary in Section 202(4) the authority to establish and administer rules that govern the various forms of acquiring *legal* entry into the United States under 6 U.S.C. § 236 (dealing with visas). *See* 6 U.S.C. § 202(4). Expected DAPA recipients, who by definition are already illegally present, are not encompassed by subsection 4 of HSA Provision. They are not aliens seeking visas or other forms of permission to come to the United States. Instead, the individuals covered by DAPA have already entered and either achieved that entry illegally, or unlawfully overstayed their legal admission.

The HSA, through subsection 5 of the HSA Provision, makes the Secretary responsible for establishing enforcement policies and priorities. The Government defends DAPA as a measure taken to prioritize removals and, as previously described, the DAPA Memorandum mentions or reiterates some of the Secretary's priorities. The States do not dispute that Secretary Johnson has the legal authority to set these priorities, and this Court finds nothing unlawful about the Secretary's priorities. The HSA's delegation of authority may not be read, however, to delegate to the DHS the right to establish a national rule or program of awarding *legal presence*—one which not only awards a three-year, renewable reprieve, but also awards over four million individuals, who fall into the category that Congress deems removable, the right to work,

---

**73.** (It is in Title I of the Immigration and          Nationality Act (Section 103)).

obtain Social Security numbers, and travel in and out of the country.[71] A tour of the INA's provisions reveals that Congress clearly knows how to delegate discretionary authority because in certain instances it has explicitly done so. For example, Section 1227 (involving "Deportable Aliens") specifically provides:

> (d)(1) If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, *the Secretary may grant the alien an administrative stay* of a final order of removal under section 1231(c)(2) of this title until

>> (A) the application for nonimmigrant status under such subparagraph (T) or (U) is approved; or

>> (B) there is a final administrative denial of the application for such nonimmigrant status after the exhaustion of administrative appeals.

> (2) the denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

> (3) During any period in which the administrative stay of removal is in effect, the alien shall not be removed.

> (4) Nothing in this subsection may be construed to limit the authority of the Secretary of Homeland Security or the Attorney General to grant a stay of removal or deportation in any case not described in this subsection.

8 U.S.C. § 1227(d).

In the above situations, Congress has expressly given the DHS Secretary the discretion to grant or not grant an administrative stay of an order of removal. Thus, when Congress intended to delegate to the Secretary the right to ignore what would otherwise be his statutory duty to enforce the removal laws, it has done so clearly. *See, e.g., F.C.C. v. NextWave Personal Communications, Inc.,* 537 U.S. 293, 302, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003) (holding that when Congress has intended to create exceptions to bankruptcy law requirements, "it has done so clearly and expressly"); *Franklin Nat'l Bank v. New York,* 347 U.S. 373, 378, 74 S.Ct. 550, 98 L.Ed. 767 (1954) (finding no indication that Congress intended to make the phase of national banking at issue there subject to local restrictions, as it had done by express language in other instances); *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 485, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) ("Congress . . . demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and . . . the language used

---

**74.** If implemented like DACA, the DAPA program will actually be more widespread. The DHS has published notice that even those who were not granted DACA "will not be referred to ICE for purposes of removal . . . except where DHS determines there are exceptional circumstances" (assuming their cases did not involve a criminal offense, fraud, or a threat to national security or public safety). *See Frequently Asked Questions, Consideration of Deferred Action for Childhood Arrivals Process*, Official Website of the Dept.

of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions# DACA% 20process (last updated Dec. 4, 2014). According to the President, DAPA will be implemented in the same fashion. Thus, as long as you are not a criminal, a threat to security, or fraudulent, and if you qualify under these programs, you receive legal presence and are allowed to stay in the country; if you do not qualify, you still get to stay.

**660**      **86 FEDERAL SUPPLEMENT, 3d SERIES**

to define the remedies under RCRA does not provide that remedy.").

The DHS cannot reasonably claim that, under a general delegation to establish enforcement policies, it can establish a blanket policy of non-enforcement that also awards legal presence and benefits to otherwise removable aliens. As a general matter of statutory interpretation, if Congress intended to confer that kind of discretion through the HSA Provision (and INA Provision) to apply to all of its mandates under these statutes, there would have been no need to expressly and specifically confer discretion in only a few provisions. The canon of statutory construction warning against rendering superfluous any statutory language strongly supports this conclusion. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).

Despite this, the Government argues that the INA Provision and the HSA Provision, combined with inherent executive discretion, permits the enactment of DAPA. While the Government would not totally concede this point in oral argument, the logical end point of its argument is that the DHS, solely pursuant to its implied authority and general statutory enforcement authority, could have made DAPA applicable to all 11.3 million immigrants estimated to be in the country illegally. This Court finds that the discretion

given to the DHS Secretary is not unlimited.

Two points are obvious, and each pertain to one of the three statutes (5 U.S.C. § 701, 6 U.S.C. § 202, and 8 U.S.C. § 1103) at issue here. The first pertains to prosecutorial discretion and the INA Provision and the HSA Provision. The implementation of DAPA is clearly not "necessary" for Secretary Johnson to carry out his authority under either title of the federal code. The Secretary of the DHS has the authority, as discussed above, to dictate DHS objectives and marshal its resources accordingly. Just as this Court noted earlier when it refused the States standing to pursue certain damages, the same is true here. The DAPA recipients have been present in the United States for at least five years; yet, the DHS has not sought them out and deported them.[75]

The Court notes that it might be a point of discussion as to what "legal presence" constitutes, but it cannot be questioned that DAPA awards some form of affirmative status, as evidenced by the DHS' own website. It tells DACA recipients that:

*[Y]ou are considered to be lawfully present in the United States ... and are not precluded from establishing domicile in the United States. Apart from immigration laws, "lawful presence," "lawful status," and similar terms are used in*

---

**75.** The implementation of DAPA is not a necessary adjunct for the operation of the DHS or for effecting its stated priorities. In fact, one could argue given the resources it is using and manpower it is either hiring or shifting from other duties, that DAPA will actually hinder the operation of the DHS. *See Executive Actions on Immigration,* Official Website of the Dept. of Homeland Security, http://www.uscis.gov/immigrationaction (last updated Jan. 30, 2015) ("USCIS will need to adjust its staffing to sufficiently address this new workload. Any new hiring will be funded through application fees rather than ap-

propriated funds.... USCIS is working hard to build capacity and increase staffing to begin accepting requests and applications...."). *See also* Doc. No. 64, Pl. Ex. 23 (Palinkas Dec.) ("USCIS has announced that it will create a new service center to process DAPA applications.... and it will be staffed by approximately 1,000 federal employees. Approximately 700 of them will be USCIS employees, and approximately 300 of them will be federal contractors."). However, such considerations are beside the point for resolving the issue currently before the Court.

various other federal and state laws.[76] It is this affirmative action that takes Defendants' actions outside the realm of prosecutorial discretion, and it is this action that will cause the States the injury for which they have been conferred standing to seek redress.

The second obvious point is that no statute gives the DHS the power it attempts to exercise. As previously explained, Section 701(a)(2) of the APA forbids reviewability of acts "committed to agency discretion by law." The Government has pointed this Court to no law that gives the DHS such wide-reaching discretion to turn 4.3 million individuals from one day being illegally in the country to the next day having lawful presence.

The DHS' job is to enforce the laws Congress passes and the President signs (or at least does not veto). It has broad discretion to utilize when it is enforcing a law. Nevertheless, no statute gives the DHS the discretion it is trying to exercise here.[77] Thus, Defendants are without express authority to do so by law, especially since by Congressional Act, the DAPA recipients are illegally present in this country. As stated before, most, if not all, fall into one of two categories. They either illegally entered the country, or they entered legally and then overstayed their permission to stay. Under current law, regardless of the genesis of their illegality, the Government is charged with the duty of removing them. Subsection 1225(b)(1)(A) states unequivocally that the DHS "shall order the alien removed from the United States without further hearing or review...." Section 1227, the corresponding section, orders the same for aliens who entered legally, but who have violated their status. While several generations of statutes have amended both the categorization and in some aspects the terminology, one thing has remained constant: the duty of the Federal Government is to effectuate the removal of illegal aliens. The Supreme Court most recently affirmed this duty in *Arizona v. United States:* "ICE officers are responsible for the identification, apprehension, and removal of illegal aliens." 132 S.Ct. at 2500.

[59–61] Notably, the applicable statutes use the imperative term "shall," not the permissive term "may." [78] There are

---

**76.** *See Frequently Asked Questions, Consideration of Deferred Action for Childhood Arrivals Process,* Official Website of the DHS, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last updated Feb. 11, 2015) (emphasis added). *See also* Doc. No 38, Def. Ex. 6 at 11 (U.S. Citizenship and Immigration Services (USCIS), Deferred Action For Childhood Arrivals (DACA) Toolkit: Resources for Community Partners (2014)). This response clearly demonstrates that the DHS knew by DACA (and now by DAPA) that by giving the recipients legal status, it was triggering obligation on the states as well as the federal government.

**77.** Indeed, no law enacted by Congress expressly provides for deferred action as a form of temporary relief. Only regulations implemented by the Executive Branch provide for deferred action. That is not to say that deferred action itself is necessarily unlawful—an issue on which this Court need not touch.

**78.** The Court additionally notes that in 8 U.S.C. § 1227 ("Deportable Aliens") Congress uses both "may" and "shall" within the same section, which distinguishes the occasions in which the Secretary has discretion to award a stay from removal from when he is required to remove an alien. For instance, in § 1227(a), an alien "shall" be removed upon order of the Secretary if he or she is in one of the classes of deportable aliens. In § 1227(d), however, Congress provides circumstances when the Secretary "may" award an administrative stay of removal. *See Lopez v. Davis,* 531 U.S. 230, 241, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001) ("Congress' use of the permissive 'may' ... contrasts with the legislators' use of the mandatory 'shall' in the very

those who insist that such language imposes an absolute duty to initiate removal and no discretion is permitted.[79]   Others take the opposition position, interpreting "shall" to mean "may."[80]   This Court finds both positions to be wanting.  "Shall" indicates a congressional mandate that does not confer discretion—i.e., one which should be complied with to the extent possible and to the extent one's resources allow.[81]   It does not divest the Executive Branch of its inherent discretion to formulate the best means of achieving the objective, but it does deprive the Executive Branch of its ability to directly and substantially contravene statutory commands.  Congress' use of the term "may," on the other hand, indicates a Congressional grant of discretion to the Executive to either accept or not accept the goal.

In the instant case, the DHS is tasked with the duty of removing illegal aliens. Congress has provided that it "shall" do this.  Nowhere has Congress given it the option to either deport these individuals or give them legal presence and work per-

mits.  The DHS does have the discretion and ability to determine *how* it will effectuate its statutory duty and use its resources where they will do the most to achieve the goals expressed by Congress.  Thus, this Court rejects both extremes.  The word "shall" is imperative and, regardless of whether or not it eliminates discretion, it certainly deprives the DHS of the right to do something that is clearly contrary to Congress' intent.

**[62]** That being the case, this Court finds that the presumption of unreviewability, even if available here, is also rebuttable under the express theory recognized by the *Heckler* Court.  In *Heckler*, the Supreme Court indicated that an agency's decision to " 'consciously and expressly adopt[ ] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities," would not warrant the presumption of unreviewability.  470 U.S. at 833 n. 4, 105 S.Ct. 1649 (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir.1973)).[82]

same section."); *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359–60, 15 S.Ct. 378, 39 L.Ed. 450 (1895) ("[I]n the law to be construed here, it is evident that the word 'may' is used in special contradistinction to the word 'shall.' ").

**79.**  See the plaintiffs' contentions as recounted in the court's Memorandum Opinion and Order dated April 23, 2013, in *Crane v. Napolitano*, No. 3:12–cv–03247–O, 2013 WL 1744422, at *5 (N.D.Tex. Apr. 23, 2013).

**80.**  *See, e.g., Matter of E–R–M & L–R–M*, 25 I & N Dec. 520 (BIA 2011).

**81.**  *See Lopez*, 531 U.S. at 241, 121 S.Ct. 714 (distinguishing between Congress' use of the "permissive may" and the "mandatory shall" and noting that "shall" "imposes discretionless obligations").

**82.**  In *Adams*, as noted above in the abdication discussion, the agency-defendants (including executive officials of Health, Education, and

Welfare (HEW)) were sued for not exercising their duty to enforce Title VI of the Civil Rights Act because they had not been taking appropriate action to end segregation in schools receiving federal funds, as required by the Act.  Defendants insisted that enforcement of Title VI was committed to agency discretion and thus that their actions were unreviewable.  The Court first noted that the agency-discretion-exception in the APA is a narrow one, citing *Citizens to Preserve Overton Park*.  It found that the statute provided "with precision the measures available to enforce" Title VI and thus the terms of the statute were "not so broad as to preclude judicial review."  Like Defendants here, the defendants in *Adams* relied on cases in which courts declined to interfere with exercises of prosecutorial discretion.  Rejecting defendants' reliance on those cases, the court emphasized: "[t]hose cases do not support a claim to absolute discretion and are, in any event, distinguishable from the case at bar."  Unlike the cases cited, Title VI required the agency to enforce the Act and also set forth specific

Since *Heckler* and *Adams*, it has clearly been the law that "[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *See Texas,* 106 F.3d at 667. That is not the situation here. This Court finds that DAPA does not simply constitute *inadequate* enforcement; it is an announced program of non-enforcement of the law that contradicts Congress' statutory goals. Unlike the Government's position in *Texas v. U.S.*, the Government here is "doing nothing to enforce" the removal laws against a class of millions of individuals (and is additionally providing those individuals legal presence and benefits). *See id.* Furthermore, if implemented exactly like DACA (a conclusion this Court makes based upon the record), the Government has publicly declared that it will make no attempt to enforce the law against even those who are denied deferred action (absent extraordinary circumstances).[83] Theoretically, the remaining 6–7 million illegal immigrants (at least those who do not have criminal records or pose a threat to national security or public safety) could apply and, thus, fall into this category.[84] DAPA does not represent mere inadequacy; it is complete abdication.

The DHS does have discretion in the manner in which it chooses to fulfill the expressed will of Congress. It cannot, however, enact a program whereby it not only ignores the dictates of Congress, but actively acts to thwart them. As the Government's own legal memorandum—which purports to justify DAPA—sets out, "the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences." *See* Doc. No. 38, Def. Ex. 2 at 6 (OLC Op.) (citing *Heckler*, 470 U.S. at 833, 105 S.Ct. 1649 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers")). The DHS Secretary is not just rewriting the laws; he is creating them from scratch.

### c. Past Uses of Deferred Action

Defendants argue that historical precedent of Executive-granted deferred action justifies DAPA as a lawful exercise of discretion. In response, the Plaintiffs go to great lengths to distinguish past deferred action programs from the current one, claiming each program in the past was substantially smaller in scope. The Court need not decide the similarities or differences between this action and past ones, however, because past Executive practice does not bear directly on the legality of what is now before the Court. Past action previously taken by the DHS does not make its current action lawful. President Truman in *Youngstown Sheet & Tube Co. v. Sawyer*, similarly sought "color of legality from claimed executive precedents," arguing that, although Congress had not expressly authorized his action, "practice of

---

enforcement procedures. The INA removal provisions at issue here are no different and, like those at issue in *Adams*, are not so broad as to preclude review.

**83.** *See Frequently Asked Questions, Consideration of Deferred Action for Childhood Arrivals Process,* Official Website of the Dept. of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions# DACA% 20process (last updated Dec. 4, 2014).

**84.** *See also* Press Release, Remarks by the President on Immigration—Chicago, IL, The White House Office of the Press Secretary (Nov. 25, 2014) (*"[T]he way the change in the law works* is that we're reprioritizing how we enforce our immigration laws generally. So not everybody qualifies for being able to sign up and register, *but the change in priorities applies to everybody."*). (Court's emphasis). Thus, as under the DACA Directives, absent exceptional circumstances, the DHS is not going to remove those who do not qualify for DAPA either.

prior Presidents has authorized it." 343 U.S. at 648, 72 S.Ct. 863. The Supreme Court firmly rejected the President's argument finding that the claimed past executive actions could not "be regarded as a precedent, much less an authority for the present [action]." *Id.* at 649, 72 S.Ct. 863; *see also Professionals & Patients for Customized Care v. Shalala,* 56 F.3d 592, 596 n. 27 (5th Cir.1995) ("[T]he fact that we previously found another FDA compliance policy guide to be a policy statement [and thus not subject to the APA's formal procedures] is not dispositive whether CPG 7132.16 is a policy statement.").

[63] The Supreme Court was again faced with the argument that action taken by the President was presumptively lawful based on the "longstanding practice" of the Executive in *Medellin,* 552 U.S. at 530–32, 128 S.Ct. 1346. There, the Federal Government cited cases that held, "if pervasive enough, history of congressional acquiescence can be treated as a gloss on Executive power vested in the President by § 1 of Art. II." *Id.* at 531, 128 S.Ct. 1346 (internal citations and quotations marks omitted). The supreme Court, however, distinguished those cases as involving a narrow set of circumstances; they were "based on the view that 'a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned,' can 'raise a presumption that the [action] had been [taken] in pursuance of [Congress'] consent.'" *Id.* (quoting *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)). In these "narrowly" construed cases cited by the government there, the Court had upheld the (same) Executive action involved in each as "a particularly

longstanding practice . . . . [g]iven the fact that the practice [went] back over 200 years, and [had] received congressional acquiescence throughout its history. . . ." *Id.* In *Medellin,* the Supreme Court clarified that, even in those cases, however, "the limitations on this source of executive power are clearly set forth and the Court has been careful to note that 'past practice does not, by itself, create power.'" *Id.* at 531–32, 128 S.Ct. 1346. Thus, the *Medellin* Court found that President Bush's "Memorandum [was] not supported by a 'particularly longstanding practice' of congressional acquiescence . . ., but rather [was] what the United States itself [had] described as 'unprecedented action.'" *Id.* at 532, 128 S.Ct. 1346. Here, DAPA, like President Bush's Memorandum/directive issued to state courts in *Medellin,* is not a "longstanding practice" and certainly cannot be characterized as "systematic" or "unbroken." Most importantly, the Court is not bound by past practices (especially ones that are different in kind and scope)[85] when determining the legality of the current one. Past practice by immigration officials does not create a source of power for the DHS to implement DAPA. *See id.* at 531–32, 128 S.Ct. 1346. In sum, Defendants' attempt to find a source of discretion committed to it by law (for purposes of Section 701(a)(2)) through Congress's alleged acquiescence of its past, smaller-scaled grants of deferred action is unpersuasive, both factually and legally.

### i. Rulemaking Under the APA

Neither party appears to contest that, under the APA, the DAPA Directive is an agency "rule,"[86] and its issuance therefore

---

**85.** A member of the President's own Office of Legal Counsel, in advising the President and the DHS on the legality of DAPA, admitted that the program was unprecedented in that it

exceeded past programs "in size." *See* Doc. No. 38, Def. Ex. 2 at 30 (OLC Memo).

**86.** While Defendants in one place assert in passing that the DAPA Directive is not a rule,

represents "rulemaking." *See* 5 U.S.C. § 551(4) (" '[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency…."); *id.* § 551(5) (" '[R]ule making' means agency process for formulating, amending, or repealing a rule."). Thus, it is clear that the rulemaking provisions of the APA apply here. The question is whether Defendants are exempt from complying with specific procedural mandates within those rulemaking provisions.[87]

Section 553 of Title 5, United States Code, dictates the formal rulemaking procedures by which an agency must abide when promulgating a rule. Under Section 553(b), "[g]eneral notice of proposed rule making shall be published in the Federal Register." 5 U.S.C. § 553(b). The required notice must include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* Upon providing the requisite notice, the agency must give interested parties the opportunity to participate and com-

ment and the right to petition for or against the rule. *See id.* § 553(c)-(e).

[64] There are two express exceptions to this notice-and-comment requirement, one of which Defendants argue applies in this case. Pursuant to Section 553(b)(3)(A), the APA's formal rulemaking procedures do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(3)(A). On the other hand, if a rule is "substantive," this exception does not apply, and all notice-and-comment requirements "must be adhered to scrupulously." *Shalala,* 56 F.3d at 595. The Fifth Circuit has stressed that the " 'APA's notice and comment exemptions must be narrowly construed.' " *Id.* (quoting *United States v. Picciotto,* 875 F.2d 345, 347 (D.C.Cir.1989)).

The APA does not define "general statements of policy" or "substantive rules"; however, the Case law in this area is fairly well-developed and provides helpful guidelines in characterizing a rule. With that said, the analysis substantially relies on the specific facts of a given case and, thus, the results are not always consistent. Here, Plaintiffs' procedural APA claim turns on whether the DAPA Directive is a substantive rule or a general statement of policy.[88]   If it is substantive, it is "unlaw-

---

87. Interestingly, the legal memorandum from the President's Office of Legal Counsel, whose opinion the Defendants have cited to justify DAPA, in no way opines that the DHS may ignore the requirements of the APA.

it is in the context of distinguishing a substantive rule from a statement of policy. [*See* Doc. No. 38 at 45 ("[T]he Deferred Action Guidance is not a rule, but a policy that 'supplements and amends … guidance'…. *Further,* unlike *substantive rules,* a general statement of policy is one 'that does not impose any rights or obligations'….").]. There can be no doubt that the DAPA Directive is a rule within the meaning of § 551 of the APA. Instead, the issue focuses on whether the rule is substantive, subjecting it to the formal procedural requirements for rule making, or whether it is exempt from those requirements.

88. Defendants specifically assert that the DAPA Directive is a general statement of policy. They do not argue that it is an "interpretative rule[ ]" or a "rule[ ] of agency organization, procedure, or practice" under § 553(b)(3)(A). Nor do they cite the other exception provided for in § 553(b)(3)(B) ("[W]hen the agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the

ful, for it was promulgated without the requisite notice-and-comment." *Id.*

This Circuit, following guidelines laid out in various cases by the D.C. Circuit, utilizes two criteria to distinguish substantive rules from nonsubstantive rules:

> First, courts have said that, unless a pronouncement acts prospectively, it is a binding norm. Thus . . . a *statement of policy may not have a present effect:* "a 'general statement of policy' is one that does not impose any rights and obligations". . . . The second criterion is whether a purported policy statement genuinely leaves the agency and its decisionmakers free to exercise discretion. The court [in *Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C.Cir. 1987)] further explained that "*binding effect*, not the timing, . . . *is the essence of criterion one*" In analyzing these criteria, we are to give some deference, "albeit 'not overwhelming,' " to the agency's characterization of its own rule.

*Id.* (emphasis added) (citations omitted).

[65–67] The rule's effect on agency discretion is the primary determinant in characterizing a rule as substantive or nonsubstantive. *Id.* ("While mindful but suspicious of the agency's own characterization, we follow the D.C. Circuit's analysis . . . , focusing primarily on whether the rule has binding effect on agency discretion or severely restricts it."). For instance, rules that award rights, impose obligations, or have other significant effects on private interests have been found to have a binding effect on agency discretion and are thus considered substantive. *Id.* n. 19 (citing *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir.1983)). A rule, while not binding per se, is still considered substantive if it "severely restricts" agency discretion. Put another way, any rule that "narrowly constrict[s] the discretion of agency officials by largely determining the issue addressed" is substantive. *Id.* n. 20. Lastly, a substantive rule is generally characterized as one that "establishes a standard of conduct which has the force of law." *Id.* (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 847 F.2d 1168, 1174 (5th Cir.1988)).

[68] In sharp contrast to a substantive rule, a general statement of policy does not establish a binding norm, nor is it "finally determinative of the issues or rights to which it is addressed." *Shalala*, 56 F.3d at 596. A general statement of policy is best characterized as announcing the agency's "tentative intentions for the future." *Id.* Thus, it cannot be applied or relied upon as law because a statement of policy merely proclaims what an agency seeks to establish as policy.[89] *See id.*

### (1) The Government's Characterization of DAPA

[69] Both parties[90] acknowledge that, in line with the Fifth Circuit's analysis

---

public interest."). Thus, this Court will confine its analysis to whether the Directive is a general statement of policy or substantive rule.

**89.** The Fifth Circuit in *Panhandle Producers* further defined a general statement of policy: When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. An agency cannot escape its responsibility to present

evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.

847 F.2d at 1175.

**90.** Although Plaintiffs strenuously insist that Defendants "mislabel" the DAPA Directive and that an agency's characterization of its own rule is "self-aggrandizement," they apparently agree that the agency's characterization is at least relevant to the analysis. *See*

above, the starting point in determining whether a rule is substantive or merely a statement of policy is the DHS' own characterization of the DAPA Directive. Defendants insist that the Directive is "a policy that 'supplements and amends ... guidance' for the use of deferred action." [Doc. No. 38 at 45]. In their briefings before the Court, Defendants label DAPA "Deferred Action Guidance."[91] The Court finds Defendants' labeling disingenuous and, as discussed below, contrary to the substance of DAPA. Although Defendants refer to DAPA as a "guidance" in their briefings and in the DAPA Memorandum, elsewhere, it is given contradictory labels. For instance, on the official website of the DHS, DAPA is referred to as "a new Deferred Action for Parents of Americans and Lawful Permanent Residents *program*."[92]

The DHS website does use the term "guidelines" in describing DAPA's criteria;

however, this is only in the context of a "list" of guidelines that candidates must satisfy in order to qualify for DAPA (or the newly expanded DACA).[93] Thus, not only does this usage of the term "guidelines" not refer to the DAPA program itself, but it is also a misnomer because these "guidelines" are in fact requirements to be accepted under these programs. Throughout its description of DAPA, the DHS website also refers to the various "executive actions" taken in conjunction with the implementation of the DAPA Directive as "initiatives." *Id.* ("On November 20, 2014, the President announced a series of executive actions. . . . These initiatives include. . . ."). For example, the site states that "USCIS and other agencies and offices are responsible for implementing these initiatives as soon as possible." *Id.* The term "initiative" is defined in Black's Law Dictionary as:

> Doc. No. 64 at 38 (citing *Shalala*, 56 F.3d at 596, where the Fifth Circuit states that an agency's characterization of its own rule, while not conclusive, is the starting point to the analysis).

**91.** The DHS may have a number of reasons for using the language and specific terms it uses in the DAPA Memorandum—whether to assure itself, the public and/or a future reviewing court that it need not comply with formal agency rulemaking procedures, or simply because it is standard language used in its other memoranda. The Court, however, finds substance to be more important than form in this case. The DHS' actions prove more instructive than its labels.

   Moreover, the Court notes that it is not bound by any decision a different court may have reached regarding the characterization of a *prior* DHS/INS memorandum (e.g., the Ninth Circuit's opposing holdings in *Nicholas v. INS*, 590 F.2d 802 (9th Cir.1979) and *Mada–Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir.1987)). For one, past DHS/INS memoranda, including the operating instructions reviewed in the 1970s and 80s by the Ninth Circuit, have been expressly superseded by

subsequent DHS memoranda or instructions. Further, both Ninth Circuit opinions (each dealing with a different INS memorandum) support this Court's findings on the characterization of DAPA. Finally, as the Fifth Circuit has held, a prior court ruling that characterizes an agency's rule as a general statement of policy is not dispositive in determining the characterization of that agency's current rule. *See Shalala*, 56 F.3d at 596 n. 27 ("'[T]he fact that we previously found another FDA compliance policy guide to be a policy statement is not dispositive whether [the current FDA compliance policy guide] is a policy statement."). This rule would be especially applicable to a directive that changes the current law.

**92.** *Executive Actions on Immigration*, Official Website of the Dept. of Homeland Security, http://www.uscis.gov/immigrationaction (last updated Jan. 30, 2015) (emphasis added); *see also*, Doc. No. 1, Pl. Ex. A ("In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows. . . .").

**93.** *See, e.g., id.* (listing out the new DACA criteria and including as the last criterion, "meet all the other DACA guidelines").

An electoral process by which a percentage of voters can *propose legislation* and compel a vote on it by the legislature or by the full electorate. Recognized in some state constitutions, the initiative is one of the few methods of direct democracy in an otherwise representative system.

*Black's Law Dictionary* (9th ed.2009) (emphasis added) (the sole definition offered for "initiative"). An "initiative," by definition, is a legislative process—the very thing in which Defendants insist they have not partaken.

What is perhaps most perplexing about the Defendants' claim that DAPA is merely "guidance" is the President's own labeling of the program. In formally announcing DAPA to the nation for the first time, President Obama stated, "I just took an action to change the law." [94] He then made a "deal" with potential candidates of DAPA: "if you have children who are American citizens . . . if you've taken responsibility, you've registered, undergo a background check, you're paying taxes, you've been here for five years, you've got roots in the community—*you're not going to be deported. . . . If you meet the criteria, you can come out of the shadows . . . .*" [95]

**[70]** While the DHS' characterization of DAPA is taken into consideration by this Court in its analysis, the "label that the . . . agency puts upon its given exercise of administrative power is not . . . conclusive; rather, it is what the agency does in fact." *Shalala*, 56 F.3d at 596 (internal quotation marks omitted) (citing *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir.1979)). Thus, the Court turns its attention to the primary focus of its analysis: the substance of DAPA. Nevertheless, the President's description of the DHS Directive is that it changes the law.

### (2) Binding Effect

The Fifth Circuit in *Shalala* propounded as a "touchstone of a substantive rule" the rule's binding effect. The question is whether the rule establishes a "binding norm." *Id.* at 596. The President's pronouncement quoted above clearly sets out that the criteria are binding norms. Quoting the Eleventh Circuit, the *Shalala* Court emphasized:

The key inquiry . . . is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy *so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criteria.* As

---

**94.** Press Release, Remarks by the President on Immigration—Chicago, IL, The White House Office of the Press Secretary (Nov. 25, 2014) ("But what you're not paying attention to is the fact that I just took action to change the law. . . . [t]he way the change in the law works is that we're reprioritizing how we enforce our immigration laws generally. So not everybody qualifies for being able to sign up and register, but the change in priorities applies to everybody.").

**95.** President Obama, Remarks in Nevada on Immigration (Nov. 20, 2014) (emphasis added). (Court's emphasis). *See also* Doc. No.

64, Pl. Ex. 26 (Press Release, Remarks by the President in Immigration Town Hall–Nashville, Tennessee, The White House Office of the Press Secretary (Dec. 9, 2014) ("What we're also saying, though, is that for those who have American children or children who are legal permanent residents, that you can actually register and submit yourself to a criminal background check, pay any back taxes and commit to paying future taxes, *and if you do that, you'll actually get a piece of paper that gives you an assurance that you can work and live here without fear of deportation.*") (emphasis added)).

long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm.

*Id.* at 596–97 (quoting *Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1377 (11th Cir.1983)). In this case, upon application, USCIS personnel working in service centers (established for the purpose of receiving DACA and DAPA applications), need only determine whether a case is within the set-criteria. If not, applicants are immediately denied.

Despite the DAPA memorandum's use of phrases such as "case-by-case basis" and "discretion," it is clear from the record that the only discretion that has been or will be exercised is that already exercised by Secretary Johnson in enacting the

DAPA program and establishing the criteria therein. That criteria is binding. At a minimum, the memorandum "severely restricts" any discretion that Defendants argue exists. It ensures that "officers will be provided with *specific* eligibility criteria for deferred action." Doc. No. 1, Pl. Ex. A at 5 (emphasis added). Indeed, the "Operating Procedures" for implementation of DACA [96] contains nearly 150 pages [97] of specific instructions for granting or denying deferred action to applicants.[98] Denials are recorded in a "check the box" standardized form, for which USCIS personnel are provided templates.[99] Certain denials of DAPA must be sent to a supervisor for approval before issuing the denial.[100] Further, there is no option for granting DAPA to an individual who does not meet each criterion.[101] With that crite-

**96.** There is no reason to believe that DAPA will be implemented any differently than DACA. In fact, there is every reason to believe it will be implemented exactly the same way. The DAPA Memorandum in several places compares the procedure to be taken for DAPA to that of DACA. [*See, e.g.,* Doc. No. 1, Ex. 1 at 5 ("As with DACA, the above criteria are to be considered for all individuals encountered . . . .")].

**97.** The Court was not provided with the complete Instructions and thus cannot provide an accurate page number.

**98.** *See* Doc. No. 64, Ex. 10 (National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA), (Form I–821D and Form I–765)).

**99.** *See id.* Defendants assert that "even though standardized forms are used to record decisions, those decisions are to be made on a case-by-case basis." [Doc. No. 130 at 34]. For one, the Court is unaware of a "form" or other process for recording any discretionary denial based on factors other than the set-criteria (to the extent that such a denial is even genuinely available to an officer). Further, the means for making such discretionary decisions are limited considering the fact that applications are handled in a service center and decisions regarding deferred action are

no longer made in field offices where officers may interview the immigrant.

**100.** *See id.* at 96.

**101.** Defendants argue that officers retain the ability to exercise discretion on an individualized basis in reviewing DAPA applications as evidenced by the last factor listed in DAPA's criteria ("present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate"). Evidence of DACA's approval rate, however, persuades the Court that this "factor" is merely pretext. As previously noted, there is every indication, including express statements made by the Government, that DAPA will be implemented in the same fashion as DACA. No DACA application that has met the criteria has been denied based on an exercise of individualized discretion. Whether Plaintiffs' or Defendants' calculations are correct, it is clear that only 1–6% of applications have been denied at all, and all were denied for failure to meet the criteria (or "rejected" for technical filing errors, errors in filling out the form or lying on the form, and failures to pay fees), or for fraud. *See, e.g.,* Doc. No. 64, Pl. Ex. 29 at App. p. 0978; *id.* Pl. Ex. 23 at 3 (Palinkas Dec.) (citing a 99.5% approval rate for all DACA applications from USCIS reports).

ria set, from the President down to the individual USCIS employees actually processing the applications, discretion is virtually extinguished.

In stark contrast to a policy statement that "does not impose any rights and obligations" and that "*genuinely* leaves the agency and its decisionmakers free to exercise discretion," the DAPA Memorandum confers the right to be legally present in the United States and enables its beneficiaries to receive other benefits as laid out above. The Court finds that DAPA's disclaimer that the "memorandum confers no substantive right, immigration status, or pathway to citizenship" may make these rights revocable, but not less valuable. While DAPA does not provide legal permanent residency, it certainly provides a legal benefit in the form of legal presence (plus all that it entails)—a benefit not otherwise available in immigration laws. The DAPA Memorandum additionally imposes specific, detailed and immediate obligations upon DHS personnel—both in its substantive instructions and in the manner in which those instructions are carried out. Nothing about DAPA "*genuinely* leaves the agency and its [employees] free to exercise discretion." In this case, actions speak louder than words.

### (3) Substantive Change in Existing Law

**[71]** Another consideration in determining a rule's substantive character is whether it is essentially a "legislative rule." A rule is "legislative" if it "supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C.Cir.2014) (citations omitted).

The DAPA program clearly represents a substantive change in immigration policy. It is a program instituted to give a certain, newly-adopted class of 4.3 million illegal immigrants not only "legal presence" in the United States, but also the right to work legally and the right to receive a myriad of governmental benefits to which they would not otherwise be entitled.[102] It does more than "supplement" the statute; if anything, it contradicts the INA. It is, in effect, a new law. DAPA turns its beneficiaries' illegal status (whether resulting from an illegal entry or from illegally over-

---

Other sources peg the acceptance rate at approximately 95%, but, again, there were apparently no denials for those who met the criteria.

The Court in oral argument specifically asked for evidence of individuals who had been denied for reasons other than not meeting the criteria or technical errors with the form and/or filing. Except for fraud, which always disqualifies someone from any program, the Government did not provide that evidence. Defendants claim that some requests have been denied for public safety reasons (e.g. where the requestor was suspected of gang-related activity or had a series of arrests), or where the requestor had made false prior claims of U.S. citizenship. Public safety threats and fraud are specifically listed in the Operation Instructions as reasons to deny relief, however. More importantly, one of the criterion for DAPA is that the individual

not be an enforcement priority as reflected in another November 20, 2014 Memorandum ("Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants"). That DHS memorandum lists a threat to public safety as a reason to prioritize an individual for removal in the category, "Priority 1" (the highest priority group). *See* Doc. No. 38, Def. Ex. 5 at 5 (Nov. 20, 2014, Memorandum, "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants").

**102.** One could argue that it also benefits the DHS as it decides who to remove and where to concentrate their efforts, but the DHS did not need DAPA to do this. It could have done this merely by concentrating on its other prosecutorial priorities. Instead, it has created an entirely new bureaucracy just to handle DAPA applications.

staying a lawful entry) into a legal presence. It represents a massive change in immigration practice, and will have a significant effect on, not only illegally-present immigrants, but also the nation's entire immigration scheme and the states who must bear the lion's share of its consequences. *See Shalala*, 56 F.3d at 597 (concluding the agency's policy guidance was not a binding norm largely because it did "*not represent a change in [agency] policy and [did] not have a significant effect* on [the subjects regulated]"). In the instant case, the President, himself, described it as a change.

Far from being mere advice or guidance, this Court finds that DAPA confers benefits and imposes discrete obligations (based on detailed criteria) upon those charged with enforcing it. Most importantly, it "severely restricts" agency discretion.[103] *See Community Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C.Cir. 1987) ("[C]abining of an agency's prosecutorial discretion can in fact rise to the level of a substantive . . . rule.").

In sum, this Court finds, both factually based upon the record and the applicable law, that DAPA is a "legislative" or "substantive" rule that should have undergone the notice-and-comment rule making procedure mandated by 5 U.S.C. § 553. The DHS was not given any "discretion by law" to give 4.3 million removable aliens what the DHS itself labels as "legal presence." *See* 5 U.S.C. § 701(a)(2). In fact the law *mandates* that these illegally-present individuals be removed.[104] The DHS has adopted a new rule that substantially changes both the status and employability of millions. These changes go beyond mere enforcement or even non-enforcement of this nation's immigration scheme. It inflicts major costs on both the states and federal government. Such changes, if legal, at least require compliance with the APA.[105] The Court therefore finds that, not only is DAPA reviewable, but that its adoption has violated the procedural requirements of the APA. Therefore, this Court hereby holds for purposes of the temporary injunction that the implementa-

---

**103.** This is further evidenced by the "plain language" of the DAPA Directive. *See Shalala*, 56 F.3d at 597 (considering the policy's plain language in determining its binding effect). Without detailing every use of a mandatory term, instruction, or command throughout Secretary Johnson's memorandum, the Court points to a few examples:

(1) When detailing DAPA and its criteria, the Secretary states: "I hereby direct US-CIS to establish a process. . . . Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics. . . . Each person who applies . . . shall also be eligible to apply for work authorization. . . ."

(2) When explaining the expansion of DACA, the Secretary states: "I hereby direct USCIS to expand DACA as follows . . . DACA will apply . . . The current age restriction . . . will no longer apply. . . . The period for which DACA and the accompanying employment authorization is granted will be extended to three-year

increments, rather than two-year increments. This change shall apply to all first-time applicants. . . . USCIS should issue all work authorization documents valid for three years. . . ."

**104.** The Court again emphasizes that it does not find the removal provisions of the INA as depriving the Executive Branch from exercising the inherent prosecutorial discretion it possesses in enforcing the laws under which it is charged. Whether or not Defendants may exercise prosecutorial discretion by merely not removing people in individual cases is not before this Court. It is clear, however, that no *statutory* law (i.e., no express Congressional authorization) related to the removal of aliens confers upon the Executive Branch the discretion to do the opposite.

**105.** This Memorandum Opinion and Order does not rule on the substantive merits of DAPA's legality.

tion of DAPA violates the APA's procedural requirements and the States have clearly proven a likelihood of success on the merits.

### 2. Preliminary Injunction Factor Two: Irreparable Harm

In addition to showing a likelihood of success on the merits of at least one of their claims, the Plaintiff States must also demonstrate a "likelihood of substantial and immediate irreparable injury" if the injunction is not granted, and the "inadequacy of remedies at law." *O'Shea v. Littleton*, 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

**[72]** It is clear that, to satisfy this factor, speculative injuries are not enough; "there must be more than an unfounded fear on the part of [Plaintiffs]." Wright & Miller § 2948.1. Thus, courts will not issue a preliminary injunction "simply to prevent the possibility of some remote future injury." *Id.* Instead, the Plaintiff States must show a "presently existing actual threat." *Id.; see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ("We agree … that the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.") (internal citations omitted). The Plaintiffs' injury need not have already been inflicted or *certain* to occur; a strong threat of irreparable injury before a trial on the merits is adequate for a preliminary injunction to issue. *See, e.g.,* Wright & Miller § 2948.1.

**[73]** Plaintiffs allege that they will suffer two "categories" of irreparable injuries if this Court declines to grant a preliminary injunction. First, according to Plaintiffs, the DAPA Directive will cause

a humanitarian crisis along the southern border of Texas and elsewhere, similar to the surge of undocumented aliens in the summer of 2014. *See* Doc. No. 5 at 25–26. The State of Texas specifically points to the economic harm it experienced in the last "wave" of illegal immigration allegedly caused by DACA. *See id.* at 26 ("Texas paid almost $40 million for Operation Strong Safety to clean up the consequences of Defendants' actions."). Texas additionally complains of the millions of dollars it must spend each year in providing uncompensated healthcare for these increasing numbers of undocumented immigrants.

The Court finds primarily, for the reasons stated above, this claimed injury to be exactly the type of "possible remote future injury" that will not support a preliminary injunction. For the same reasons the Court denied standing to Plaintiffs on their asserted injury that DAPA will cause a wave of immigration thereby exacerbating their economic injuries, the Court does not find this category of alleged irreparable harm to be immediate, direct, or a presently-existing, actual threat that warrants a preliminary injunction. *See, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (noting that standing considerations "obviously shade into those determining whether the complaint states a sound basis for [injunctive] relief," and that, even if a complaint presents an existing case or controversy under Article III, it may not also state an adequate basis for injunctive relief). The general harms associated with illegal immigration, that unfortunately fall on the States (some of whom must bear a disproportionate brunt of this harm), are harms that may be exacerbated by DAPA, but they are not immediately caused by it.[106]

---

**106.** Indeed, Chief Kevin Oaks, Chief of the         Rio Grande Valley Sector of U.S. Border Pa-

Whether or not Defendants' implementation of DACA in 2012 actually contributed to the flood of illegal immigration experienced by this country in 2014—an issue not directly before this Court—injuries associated with any future wave of illegal immigration that may allegedly stem from DAPA are neither immediate nor clear. *Lyons,* 461 U.S. at 102, 103 S.Ct. 1660 (citing *O'Shea,* 414 U.S. at 496, 94 S.Ct. 669, in which the Court denied a preliminary injunction because the "prospect of future injury rested 'on the likelihood that [plaintiffs] [would] again be arrested for and charged with violations' " and be subjected to proceedings; thus, the "threat to the plaintiff was not sufficiently real and immediate to show an existing controversy simply because they anticipate" the same injury occurring in the future). The law is clear that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.* Consequently, this Court will exclude Plaintiffs' first category of injuries from the Court's determination of irreparable injury.

[74, 75] Plaintiffs additionally allege that legalizing the presence of millions of people is a "virtually irreversible" action once taken. *See* Doc. No. 5 at 25–28. The Court agrees. First, there are millions of dollars at stake in the form of unrecoverable costs to the States if DAPA is implemented and later found unlawful in terms of infrastructure and personnel to handle the influx of applications. Doc. No. 64, Pl. Ex. 24. The direct costs to the States for providing licenses would be unrecoverable if DAPA was ultimately renounced. Further, and perhaps most importantly, the Federal Government is the sole authority for determining immigrants' lawful status and presence (particularly in light of the Supreme Court's holding in *Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012)) and, therefore, the States are forced to rely on the Defendants "to faithfully determine an immigrant's status." Once Defendants make such determinations, the States accurately allege that it will be difficult or even impossible for anyone to "unscramble the egg." *Id.* Specifically, in Texas and Wisconsin, as this Court has already determined, through benefits conferred by DAPA, recipients are qualified for driver's licenses, in addition to a host of other benefits.[107]

The Court agrees that, without a preliminary injunction, any subsequent ruling that finds DAPA unlawful after it is implemented would result in the States facing the substantially difficult—if not impossible—task of retracting any benefits or licenses already provided to DAPA beneficiaries. This genie would be impossible to put back into the bottle. The Supreme Court has found irreparable injury in the form of a payment of an allegedly unconstitutional tax that could not be recovered

---

trol, testified before this Court in Cause No. B–14–119 that in his experience, it has been traditionally true that when an administration talks about amnesty, or some other immigration relief publicly, it increases the flow across the border and has an adverse effect on enforcement operations. As of the time he testified, on October 29, 2014, he stated that the DHS was preparing for another surge of immigrants given the talk of a change in immigration policy. *See* Test, of Kevin Oaks, Cause No. B–14–119 (S.F.172–176).

**107.** For example, in Texas, these individuals, according to Plaintiffs, would also qualify for unemployment benefits (citing Tex. Lab.Code § 207.043(a)(2)); alcoholic beverage licenses (citing 16 Tex. Admin. Code § 33.10); licensure as private security officers (citing 37 Tex. Admin. Code § 35.21); and licensure as attorneys (citing Tex. Rules Govern. Bar Adm'n, R. II(a)(5)(d)).

if the law at issue was ultimately found unlawful. *See Ohio Oil Co. v. Conway*, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972 (1929). There, the Court held that "[w]here the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted and the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable ... the injunction usually will be granted." *Id.* at 814, 49 S.Ct. 256.

Similarly, here, any injury to Defendants, even if DAPA is ultimately found lawful, will be insubstantial in comparison to Plaintiffs' injuries. A delay of DAPA's implementation poses no threat of immediate harm to Defendants.[108] The situation is not such that individuals are currently considered "legally present" and an injunction would remove that benefit; nor are potential beneficiaries of DAPA—who are under existing law illegally present—entitled to the benefit of legal presence such that this Court's ruling would interfere with individual rights. Preliminarily enjoining DAPA's implementation would in this case merely preserve the status quo that has always existed.

According to the authors of Wright & Miller's Federal Practice and Procedure:

Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted, the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered. Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief. *Therefore, if a trial on the merits can be conducted before the injury would occur, there is no need for interlocutory relief.* In a similar vein, a preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief.

Wright & Miller § 2948.1 (emphasis added).

Here, the Government has required that USCIS begin accepting applications for deferred action under the new DACA criteria "no later than ninety days from the date of" the announcement of the Directive. Doc. No. 1, Pl. Ex. A. The Directive was announced on November 20, 2014. Thus, by the terms of the Directive, USCIS will begin accepting applications no later than February 20, 2015. Further, as already mentioned, the DHS' website provides February 18, 2015 as the date it will begin accepting applications under DACA's new criteria, and mid-to-late May for DAPA applications. The implementation of DAPA is therefore underway. Due to these time constraints, the Court finds that a trial on the merits cannot be conducted before the process of granting deferred action under the DAPA Directive begins. Without a preliminary injunction preserving the status quo, the Court concludes that Plaintiffs will suffer irreparable harm in this case.

3. Preliminary Injunction Factors Three and Four: Balancing Hardship to Parties and the Public Interest

[76, 77] Before the issuance of an injunction, the law requires that courts "balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542,

---

**108.** To the contrary, if individuals begin receiving benefits under DAPA but DAPA is later declared unlawful, Defendants, just like the States, would suffer irreparable injuries.

107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Thus, in addition to demonstrating threatened irreparable harm, the Plaintiffs must show that they would suffer more harm without the injunction than would the Defendants if it were granted. The award of preliminary relief is never "strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," but is rather "a matter of sound judicial discretion" and careful balancing of the interests of—and possible injuries to—the respective parties. *Yakus v. United States*, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). If there is reason to believe that an injunction issued prior to a trial on the merits would be burdensome, the balance tips in favor of denying preliminary relief. *See Winter*, 555 U.S. at 27, 129 S.Ct. 365 ("The policy against the imposition of judicial restraints prior to an adjudication of the merits becomes more significant when there is reason to believe that the decree will be burdensome.") (quoting Wright & Miller § 2948.2).

[78, 79] The final factor in the preliminary injunction analysis focuses on policy considerations. Plaintiffs have the burden to show that if granted, a preliminary injunction would not be adverse to public interest. *Star Satellite, Inc. v. Biloxi*, 779 F.2d 1074, 1079 (5th Cir.1986). If no public interest supports granting preliminary relief, such relief should ordinarily be denied, "even if the public interest would not be harmed by one." Wright & Miller § 2948.4. "Consequently, an evaluation of the public interest should be given considerable weight in determining whether a motion for a preliminary injunction should be granted." *Id.*

[80] Here, the Plaintiffs seek to preserve the status quo by enjoining Defendants from acting. The Court is not asked to order Defendants to take any affirmative action. *See* Wright & Miller § 2948.2 (noting that one significant factor considered by courts when balancing the hardships is whether a mandatory or prohibitory injunction is sought—the latter being substantially less burdensome to the defendant). Further, the Court's findings at the preliminary injunction stage in this case do not grant Plaintiffs all of the relief to which they would be entitled if successful at trial. *See id.* (explaining that if "a preliminary injunction would give plaintiff all or most of the relief to which the plaintiff would be entitled if successful at trial," courts are less likely to grant the injunction). Indeed, as detailed below, the Court is ruling on the likelihood of success for purposes of preliminary relief on only one of the three claims (and that one being a procedural, not a substantive claim) brought by Plaintiffs. Thus, neither of the usual concerns in considering potential burdens on a defendant in granting a preliminary injunction is applicable here. Preliminarily enjoining Defendants from carrying out the DAPA program would certainly not be "excessively burdensome" on Defendants. *See id.*

Additional considerations suggest that the Government would not be harmed at all by the issuance of a temporary injunction before a trial is held on the merits. The DHS may continue to prosecute or not prosecute these illegally-present individuals, as current laws dictate. This has been the status quo for *at least* the last five years [109] and there is little-to-no basis to conclude that harm will fall upon the De-

---

**109.** Obviously, this has been the status quo for at least the last five years with respect to the specific individuals eligible for DAPA. Given that DAPA is a program that has never been in effect, one could also conclude that enjoining its implementation would preserve the status quo that has *always* existed.

fendants if it is temporarily prohibited from carrying out the DAPA program. If a preliminary injunction is issued and the Government ultimately prevails at a trial on the merits, it will not be harmed by the delay; if the Government ultimately loses at trial, the States avoid the harm that will be done by the issuance of SAVE-compliant IDs for millions of individuals who would not otherwise be eligible.

If the preliminary injunction is denied, Plaintiffs will bear the costs of issuing licenses and other benefits once DAPA beneficiaries—armed with Social Security cards and employment authorization documents—seek those benefits. Further, as already noted, once these services are provided, there will be no effective way of putting the toothpaste back in the tube should Plaintiffs ultimately prevail on the merits. Thus, between the actual parties, it is clear where the equities lie—in favor of granting the preliminary injunction.

This is not the end of the inquiry; in fact, in this case, it is really the tip of the iceberg. Obviously, this injunction (as long as it is in place) will prevent the immediate provision of benefits and privileges to millions of individuals who might otherwise be eligible for them in the next several months under DAPA and the extended-DACA. The Court notes that there is no indication that these individuals will otherwise be removed or prosecuted. They have been here for the last five years and, given the humanitarian concerns expressed by Secretary Johnson, there is no reason to believe they will be removed now. On the other hand, if the Court denies the injunction and these individuals accept Secretary Johnson's invitation to come out of the shadows, there may be dire consequences for them if DAPA is later found to be illegal or unconstitutional. The DHS—whether under this administration or the next—will then have all perti-nent identifying information for these immigrants and could deport them.

[81] For the members of the public who are citizens or otherwise in the country legally, their range of interests may vary substantially: from an avid interest in the DAPA program's consequences to complete disinterest. This Court finds that, directly interested or not, the public interest factor that weighs the heaviest is ensuring that actions of the Executive Branch (and within it, the DHS—one of the nation's most important law enforcement agencies) comply with this country's laws and its Constitution. At a minimum, compliance with the notice-and-comment procedures of the APA will allow those interested to express their views and have them considered.

Consequently, the Court finds, when taking into consideration the interests of all concerned, the equities strongly favor the issuance of an injunction to preserve the status quo. It is far preferable to have the legality of these actions determined before the fates of over four million individuals are decided. An injunction is the only way to accomplish that goal.

The Court finds that Plaintiffs' injuries cannot be redressed through a judicial remedy after a hearing on the merits and thus that a preliminary injunction is necessary to preserve the status quo in this case. While recognizing that a preliminary injunction is sometimes characterized as a "drastic" remedy, the Court finds that the judicial process would be rendered futile in this case if the Court denied preliminary relief and proceeded to a trial on the merits. If the circumstances underlying this case do not qualify for preliminary relief to preserve the status quo, this Court finds it hard to imagine what case would.

## C.  Remaining Claims

[82]  In this order, the Court is specifically not addressing Plaintiffs' likelihood of success on their *substantive* APA claim or their constitutional claims under the Take Care Clause/separation of powers doctrine. Judging the constitutionality of action taken by a coequal branch of government is a "grave[ ]" and "delicate duty" that the federal judiciary is called on to perform. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009) (citations omitted). The Court is mindful of its constitutional role to ensure that the powers of each branch are checked and balanced; nevertheless, if there is a non-constitutional ground upon which to adjudge the case, it is a "well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question." *Id.* at 205, 129 S.Ct. 2504 (quoting *Escambia Cnty. v. McMillan*, 466 U.S. 48, 51, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984) (*per curiam*)). In this case, the Plaintiffs brought substantive and procedural claims under the APA in addition to their constitutional claim to challenge the Defendants' actions. All three claims are directed at the same Defendants and challenge the same executive action. Thus, the Court need only find a likelihood of success on one of these claims in order to grant the requested relief. This "constitutional avoidance" principle is particularly compelling in the preliminary injunction context because the Court is not abstaining from considering the merits of Plaintiffs' constitutional claim altogether. It is only declining to address it now.[110]

Consequently, despite the fact that this ruling may imply that the Court finds differing degrees of merit as to the remaining claims, it is specifically withholding a ruling upon those issues until there is further development of the record. As stated above, preliminary injunction requests are by necessity the product of a less formal and less complete presentation. This Court, given the importance of these issues to millions of individuals—indeed, in the abstract, to virtually every person in the United States—and given the serious constitutional issues at stake, finds it to be in the interest of justice to rule after each side has had an opportunity to make a complete presentation.

## VI.  *CONCLUSION*

This Court, for the reasons discussed above, hereby grants the Plaintiff States' request for a preliminary injunction. It hereby finds that at least Texas has satisfied the necessary standing requirements that the Defendants have clearly legislated a substantive rule without complying with the procedural requirements under the Administration Procedure Act. The Injunction is contained in a separate order. Nonetheless, for the sake of clarity, this temporary injunction enjoins the implementation of the DAPA program that awards legal presence and additional benefits to the four million or more individuals potentially covered by the DAPA Memorandum and to the three expansions/additions to the DACA program also contained

---

**110.**  Given the dearth of cases in which the Take Care Clause has been pursued as a cause of action rather than asserted as an affirmative defense (and indeed the dearth of cases discussing the Take Care Clause at all), a complete record would no doubt be valuable for this Court to decide these unique claims.

It also believes that should the Government comply with the procedural aspects of the APA, that process may result in the availability of additional information for this Court to have in order for it to consider the substantive APA claim under 5 U.S.C. § 706.

AR 00000128

**678**          **86 FEDERAL SUPPLEMENT, 3d SERIES**

in the same DAPA Memorandum.[111] It does not enjoin or impair the Secretary's ability to marshal his assets or deploy the resources of the DHS. It does not enjoin the Secretary's ability to set priorities for the DHS. It does not enjoin the previously instituted 2012 DACA program except for the expansions created in the November 20, 2014 DAPA Memorandum.



**Mario Luis Gonzalez PLIEGO, Petitioner**

**v.**

**Amanda Leigh HAYES, Respondent.**

**Civil Action No. 5:14–CV–00169.**

United States District Court, W.D. Kentucky, Paducah Division.

Signed Jan. 21, 2015.

**Background:** Father, a Spanish citizen, filed petition seeking return of his child under Hague Convention on the Civil Aspects of International Child Abduction, as implemented by the International Child Abduction Remedies Act (ICARA).

**Holdings:** The District Court, Thomas B. Russell, Senior District Judge, held that:

(1) father waived psychotherapist-patient privilege;

(2) Turkey was child's habitual residence;

(3) father had custody rights under laws of Turkey and was exercising those rights;

(4) mother failed to establish affirmative defense of consent;

(5) mother failed to establish that return of child to Turkey would place child in intolerable situation; and

(6) mother failed to establish "grave risk of harm" affirmative defense.

Petition granted.

**1. Privileged Communications and Confidentiality** ⬠312

Confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under the psychotherapist-patient privilege.

**2. Privileged Communications and Confidentiality** ⬠323

Where a plaintiff seeks garden variety emotional damages the psychotherapist-patient privilege remains intact and is not waived.

**3. Privileged Communications and Confidentiality** ⬠323

Non-garden variety claims that would constitute a waiver of the psychotherapist-patient privilege include: a cause of action for intentional or negligence infliction of emotional distress, an allegation of a mental injury or disorder, a claim of severe emotional distress, or a plaintiff's offer of expert testimony to support a claim of emotional distress.

**4. Privileged Communications and Confidentiality** ⬠323

Father put his mental health in issue, in his action seeking return of his child under International Child Abductions Remedies Act (ICARA), thus waiving psy-

---

**111.** While this Court's opinion concentrates on the DAPA program, the same reasoning applies, and the facts and the law compel the same result, to the expansions of DACA contained in the DAPA Directive.

**134**          **809 FEDERAL REPORTER, 3d SERIES**

ties laws."); *cf. Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614, 633 (4th Cir.1999) ("[State] law governs the award of prejudgment interest in a diversity case."); *Martin v. Harris,* 560 F.3d 210, 220 (4th Cir.2009) (explaining that "the allowance of prejudgment interest is a substantive provision").

On a NYLL wage claim, such as this one, an award of prejudgment interest is mandatory. Prior to 2011, the source of that statutory right was Section 5001 of New York's Civil Practice Law and Rules, which provides that prejudgment "[i]nterest shall be recovered upon a sum awarded ... because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." N.Y.C.P.L.R. § 5001(a) [22]; *see Santillan v. Henao,* 822 F.Supp.2d 284, 298 (E.D.N.Y. 2011) ("Section 5001 of New York's Civil Practice Law and Rules governs the calculation of prejudgment interest for violations of the state's Labor Law."); *see also Mallis,* 717 F.2d at 693–94 (holding that "[i]n light § 5001(a)'s mandatory nature," even a failure to request such interest in the complaint or during trial does not constitute a waiver of the right to prejudgment interest under the statute). Effective April 9, 2011, New York also amended its statutes governing civil actions asserting wage claims to explicitly provide for awards of prejudgment interest. *See* N.Y. Lab. Law §§ 198(1–a), 663(1). Accordingly, with regard to the NYLL claims, the district court did not have discretion to decline to award prejudgment interest.

## IV.

In sum, for the foregoing reasons, we reverse the district court's decision denying prejudgment interest under the FLSA

and NYLL and remand so that the district court may award prejudgment interest. We otherwise affirm.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*



**State of TEXAS; State of Alabama; State of Georgia; State of Idaho; State of Indiana; State of Kansas; State of Louisiana; State of Montana; State of Nebraska; State of South Carolina; State of South Dakota; State of Utah; State Of West Virginia; State Of Wisconsin; Paul R. Lepage, Governor, State of Maine; Patrick L. McCrory, Governor, State of North Carolina; C.L. "Butch" Otter, Governor, State of Idaho; Phil Bryant, Governor, State of Mississippi; State of North Dakota; State of Ohio; State of Oklahoma; State of Florida; State of Arizona; State of Arkansas; Attorney General Bill Schuette; State of Nevada; State of Tennessee, Plaintiffs–Appellees,**

**v.**

**UNITED STATES of America; Jeh Charles Johnson, Secretary, Department of Homeland Security; R. Gil Kerlikowske, Commissioner of U.S. Customs and Border Protection; Ronald D. Vitiello, Deputy Chief of U.S. Border Patrol, U.S. Customs and Border Protection; Sarah R. Saldana, Director of U.S. Immigration and Cus-**

---

**22.** The rule contains an exception for equitable actions, *see* N.Y.C.P.L.R. § 5001(a), but an action seeking damages for unpaid overtime

is legal in nature, *see Shannon v. Franklin Simon & Co.,* 181 Misc. 939, 43 N.Y.S.2d 442, 444 (N.Y.Sup.Ct.1943).

**TEXAS v. U.S.**                                        **135**
Cite as 809 F.3d 134 (5th Cir. 2015)

toms Enforcement; **Leon Rodriguez,** **Director of U.S. Citizenship and Im-** **migration Services, Defendants–Ap-** **pellants.**

No. 15–40238.

United States Court of Appeals, Fifth Circuit.

Nov. 9, 2015.

Revised Nov. 25, 2015.

**Background:** States and state officials sought injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents, and to prevent expansion of program of Deferred Action for Childhood Arrivals (DACA). The United States District Court for the Southern District of Texas, Andrew S. Hanen, J., 86 F.Supp.3d 591, granted preliminary injunction based on likelihood of success on claim that DAPA's implementation would violate Administrative Procedure Act's (APA) notice-and-comment requirements, and denied an emergency stay, 2015 WL 1540022. Government appealed and filed motion to stay the preliminary injunction or narrow its scope pending appeal. The Court of Appeals, 787 F.3d 733, denied the motion.

**Holdings:** Thereafter, the Court of Appeals, Jerry E. Smith, Circuit Judge, held that:

(1) States were entitled to special solicitude when determining whether they had Article III standing;

(2) State of Texas satisfied injury element for Article III standing;

(3) judicial review was available under APA;

(4) Texas was likely to succeed on merits of claim that policy-directive exemption from APA notice and comment requirements was inapplicable;

(5) Texas was likely to succeed on merits of claim that agency-rule exemption from APA notice and comment requirements was inapplicable;

(6) Texas was likely to succeed on merits of substantive APA claim; and

(7) nationwide preliminary injunction was warranted.

Affirmed.

King, Circuit Judge, filed a dissenting opinion.

**1. Aliens, Immigration, and Citizenship** ⚖=771

Although as a general rule it is not a crime for a removable alien to remain present in the United States, it is a civil offense. Immigration and Nationality Act, §§ 212(a)(9)(B)(i), 237(a)(1)(A, B), 8 U.S.C.A. §§ 1182(a)(9)(B)(i), 1227(a)(1)(A, B).

**2. Federal Courts** ⚖=3616(2)

Court of Appeals reviews a preliminary injunction for abuse of discretion.

**3. Injunction** ⚖=1092

A preliminary injunction should issue only if the movants establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.

**4. Federal Courts ⊜3616(2)**

As to each element of the district court's preliminary-injunction analysis, findings of fact are subject to a clearly-erroneous standard of review, while conclusions of law are subject to broad review and will be reversed if incorrect.

**5. Federal Civil Procedure ⊜103.2**

The parties invoking federal jurisdiction have the burden of establishing standing.

**6. Federal Civil Procedure ⊜103.3**

When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.

**7. Federal Civil Procedure ⊜103.2**
   **Federal Courts ⊜2101**

The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**8. Injunction ⊜1505**

States were entitled to special solicitude when determining whether they had Article III standing to seek injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; States were not normal litigants for purposes of invoking federal jurisdiction, parties' dispute turned on proper construction of notice and comment requirements in Administrative Procedure Act (APA), States were within zone of interests of Immigration and Nationality Act (INA),

and DAPA affected States' quasi-sovereign interests, which States depended on federal government to protect, by imposing substantial pressure on them to change their laws for issuing and subsidizing driver's licenses. U.S.C.A. Const. Art. 3, § 2, cl. 1; 5 U.S.C.A. §§ 553, 702, 704; V.T.C.A., Transportation Code §§ 521.142(a), 521.181, 521.421(a).

**9. States ⊜18.3, 190**

States have a sovereign interest in the power to create and enforce a legal code, and pursuant to that interest, states may have Article III standing based on: (1) federal assertions of authority to regulate matters they believe they control; (2) federal preemption of state law; and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**10. Aliens, Immigration, and Citizenship ⊜101**
   **States ⊜18.43**

When the states joined the union, they surrendered some of their sovereign prerogatives over immigration, and they cannot establish their own classifications of aliens.

**11. Injunction ⊜1505**

State of Texas satisfied injury element for Article III standing to seek injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent resi-

dents; Texas would incur significant costs in issuing driver's licenses to DAPA beneficiaries, even if there would be offsetting benefits of a different type, arising from different transactions.   U.S.C.A. Const. Art. 3, § 2, cl. 1; V.T.C.A., Transportation Code §§ 521.142(a), 521.181, 521.421(a).

**12.  Federal Civil Procedure** ⟶103.2

Once injury is shown, as element for standing, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant; standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury, and standing analysis is not an accounting exercise.

**13.  Injunction** ⟶1505

State of Texas established that its alleged injury, from incurring significant costs in issuing driver's licenses to beneficiaries of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), was fairly traceable to DAPA, as element for Article III standing to seek injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of DAPA program, which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; there was little doubt that many DAPA beneficiaries would apply for driver's licenses because driving was a practical necessity in most of Texas, and while Texas could avoid financial loss by requiring applicants to pay full costs of licenses, it could not avoid injury altogether.   U.S.C.A. Const. Art. 3, § 2, cl. 1;   V.T.C.A.,   Transportation   Code §§ 521.142(a), 521.181, 521.421(a).

**14.  Federal Civil Procedure** ⟶103.2

The possibility that a plaintiff could avoid injury by incurring other costs does not negate standing.

**15.  Injunction** ⟶1505

State of Texas satisfied redressability element for Article III standing to seek injunctive relief against United States and officials of Department of Homeland Security (DHS), to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; enjoining DAPA based on procedural Administrative Procedure Act (APA) claim could prompt DHS to reconsider the program, and enjoining DAPA based on substantive APA claim would prevent altogether Texas's injury from incurring significant costs in issuing driver's licenses to DAPA beneficiaries.   U.S.C.A. Const. Art. 3, § 2, cl. 1; 5 U.S.C.A. §§ 553, 706(2).

**16.  Administrative Law and Procedure**
⟶666

Persons suing under Administrative Procedure Act (APA) must satisfy not only Article III's standing requirements, but an additional test, under which the interest they assert must be arguably within the zone of interests to be protected or regulated by the statute that they say was violated; that test is not meant to be especially demanding, and is applied in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable.   U.S.C.A. Const. Art. 3, § 2, cl. 1; 5 U.S.C.A. § 702.

**17.  Aliens, Immigration, and Citizenship**
⟶155

The interests that Texas sought to protect at least arguably fell within zone of interests of Immigration and Nationality Act (INA), as required for Texas's suit for judicial review under Administrative Pro-

cedure Act (APA) to prevent implementation, pursuant to directive from Secretary of Department of Homeland Security (DHS), of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; pervasiveness of federal regulation did not diminish the importance of immigration policy to Texas, and Congress had explicitly allowed states to deny public benefits to illegal aliens.  5 U.S.C.A. § 702; 8 U.S.C.A. § 1621.

**18. Administrative Law and Procedure**
**☞651**

A well-settled presumption favors interpretations of statutes that allow judicial review of administrative action, and courts will accordingly find an intent to preclude such review only if presented with clear and convincing evidence.  5 U.S.C.A. § 701(a).

**19. Administrative Law and Procedure**
**☞651**

The strong presumption favoring judicial review of administrative action is rebuttable, and the presumption fails when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct.  5 U.S.C.A. § 701(a).

**20. Administrative Law and Procedure**
**☞651**

Establishing unreviewability of administrative action is a heavy burden, and where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling.  5 U.S.C.A. § 701(a).

**21. Administrative Law and Procedure**
**☞651**

Whether and to what extent a particular statute precludes judicial review of administrative action is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.  5 U.S.C.A. § 701(a).

**22. Aliens, Immigration, and Citizenship**
**☞155**

Provision of Immigration and Nationality Act (INA), stating that no court had jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien, did not rebut the presumption of reviewability of administrative action, relating to issuance of directive, by Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; INA provision was not general jurisdictional limitation but rather applied only to three discrete actions that Attorney General might take, which were not at issue in Texas's APA challenge to directive for DAPA program, and Texas was not bringing a cause or claim by or on behalf of any alien, and instead was asserting its own right to APA's procedural protections.  Immigration and Nationality Act, § 242(g), 8 U.S.C.A. § 1252(g); 5 U.S.C.A. §§ 553, 701(a).

**23. Aliens, Immigration, and Citizenship**
**☞155**

Directive by Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal

presence for illegal immigrants who were parents of citizens or lawful permanent residents, was not excepted from judicial review under Administrative Procedure Act (APA), as an exercise of prosecutorial discretion; DAPA was much more than nonenforcement, since it would affirmatively confer lawful presence and associated benefits on a class of unlawfully present aliens, and the directive provided a focus for judicial review, inasmuch as DHS must have exercised its power in some manner. 5 U.S.C.A. § 701(a)(2).

**24. Aliens, Immigration, and Citizenship** ⟺211

Secretary of Department of Homeland Security (DHS) has broad discretion to decide whether it makes sense to pursue removal of illegal aliens at all.

**25. Administrative Law and Procedure** ⟺701

The general exception to judicial review under Administrative Procedure Act (APA), for action committed to agency discretion, remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise. 5 U.S.C.A. § 701(a)(2).

**26. Administrative Law and Procedure** ⟺701

Where an agency decides to undertake an enforcement action, that decision itself provides a focus for judicial review under the Administrative Procedure Act (APA), inasmuch as the agency must have exercised its power in some manner; the decision at least can be reviewed to determine whether the agency exceeded its statutory powers. 5 U.S.C.A. § 701(a)(2).

**27. Administrative Law and Procedure** ⟺701

The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under the "committed to agency discretion by law" exception to judicial review under the Administrative Procedure Act (APA), unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised. 5 U.S.C.A. § 701(a)(2).

**28. Constitutional Law** ⟺2580

A nonjusticiable political question was not presented in action by State of Texas against United States and officials of Department of Homeland Security (DHS), asserting violation of Administrative Procedure Act (APA) and seeking injunctive relief to prevent implementation, pursuant to directive from DHS Secretary, of program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; Texas maintained that DAPA's grant of lawful presence and accompanying eligibility for benefits was a substantive rule that had to go through notice and comment under APA before it imposed substantial costs on Texas and that DAPA was substantively contrary to law, and Texas was not seeking to require the DHS Secretary to enforce the immigration laws or change his priorities for removal, or inviting the court to formulate or rewrite immigration policy. 5 U.S.C.A. §§ 553, 702, 706(2).

**29. Federal Courts** ⟺2571

A federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.

**30. Aliens, Immigration, and Citizenship** ⟺155

Consultation between federal and state officials is an important feature of the immigration system, and the Adminis-

trative Procedure Act's (APA) notice-and-comment process, which is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making, facilitates that communication. 5 U.S.C.A. § 553.

### 31. Administrative Law and Procedure ⬅394

The Administrative Procedure Act's (APA) notice and comment exemptions must be narrowly construed. 5 U.S.C.A. § 553.

### 32. Administrative Law and Procedure ⬅394

Courts evaluate two criteria to distinguish policy statements, which are exempt from Administrative Procedure Act's (APA) notice and comment requirements, from substantive rules, which are not exempt: (1) whether any rights and obligations are imposed, and (2) whether the agency and its decision-makers are genuinely left free to exercise discretion. 5 U.S.C.A. § 553(b)(3)(A).

### 33. Administrative Law and Procedure ⬅394

An agency pronouncement will be considered binding as a practical matter, for purposes of determining whether it is a policy statement that is exempt from Administrative Procedure Act's (APA) notice and comment requirements, if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding. 5 U.S.C.A. § 553(b)(3)(A).

### 34. Aliens, Immigration, and Citizenship ⬅155

Texas was likely to succeed on merits of its claim, as factor for issuance of preliminary injunction, that exemption from Administrative Procedure Act's (APA) notice and comment requirements, for policy statements, did not apply to directive from

Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; while directive facially purported to confer discretion, evidence was presented that nothing about DAPA genuinely left agency and its employees free to exercise discretion. 5 U.S.C.A. § 553(b)(3)(A).

### 35. Injunction ⬅1102

A fundamental principle of preliminary injunctions is that an injunction is of no help if one must wait to suffer injury before the court grants a preliminary injunction.

### 36. Injunction ⬅1496

State of Texas was likely to succeed on merits of its claim, as factor for issuance of preliminary injunction, that exemption from Administrative Procedure Act's (APA) notice and comment requirements, for agency rules of procedure or practice, did not apply to directive from Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; DAPA conferred lawful presence on 500,000 illegal aliens residing in Texas, forcing the state to choose between spending millions of dollars to subsidize driver's licenses or amending its statutes. 5 U.S.C.A. § 553(b)(3)(A); V.T.C.A., Transportation Code §§ 521.142(a), 521.181, 521.421(a).

### 37. Administrative Law and Procedure ⬅394

The substantial impact test is the primary means by which courts look beyond the label "procedural" to determine

whether an agency rule is of the type Congress thought appropriate for public participation under the Administrative Procedure Act's (APA) notice and comment requirements, and an agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply.  5 U.S.C.A. § 553(b)(3)(A).

**38. Administrative Law and Procedure ⬤394**

To avoid carving the heart out of the notice and comment provisions of the Administrative Procedure Act (APA), courts construe the public-benefits exemption from the notice and comment requirements very narrowly as applying only to agency action that clearly and directly relates to "benefits" as that word is used in the exemption.  5 U.S.C.A. § 553(a)(2).

**39. Injunction ⬤1496**

State of Texas was likely to succeed on merits of its claim, as factor for issuance of preliminary injunction, that public-benefits exemption from Administrative Procedure Act's (APA) notice and comment requirements did not apply to directive from Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; DAPA did not clearly and directly relate to public "benefits" as that term was used in the exemption, since United States Citizenship and Immigration Services (US-CIS), the agency tasked with evaluating DAPA applications, was not an agency managing benefit programs, and persons who met the DAPA criteria did not directly receive the kind of public benefit that had been recognized, or was likely to have

been included, under the exemption.  5 U.S.C.A. § 553(a)(2).

**40. Federal Courts ⬤3549**

The Court of Appeals may affirm the district court's judgment on any grounds supported by the record.

**41. Courts ⬤89, 92**

Alternative holdings are binding precedent and not obiter dictum.

**42. Administrative Law and Procedure ⬤131, 134**

The fact that the agency previously reached its interpretation through means less formal than notice and comment rulemaking does not automatically deprive that interpretation of the judicial deference otherwise due, and instead, the court considers factors such as the interstitial nature of the legal question, the related expertise of the agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the agency has given the question over a long period of time.  5 U.S.C.A. §§ 553, 706(2).

**43. Administrative Law and Procedure ⬤435**

*Chevron* deference requires the courts to accept an agency's reasonable construction of a statute as long as it is not patently inconsistent with the statutory scheme.

**44. Administrative Law and Procedure ⬤435**

An agency construction that is manifestly contrary to a statutory scheme could not be persuasive under the *Skidmore* test, which affords agency constructions less deference than does *Chevron*.

**45. Administrative Law and Procedure ⬤438(29)**
**Aliens, Immigration, and Citizenship ⬤155**
**Injunction ⬤1496**

Assuming that *Chevron* deference was applicable to directive from Secre-

**142**         **809 FEDERAL REPORTER, 3d SERIES**

tary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents, Texas was likely to succeed on merits of claim, as factor for preliminary injunction in action asserting substantive claim under Administrative Procedure Act (APA), that Congress had directly addressed lawful presence and work authorizations through Immigration and Nationality Act's (INA) unambiguously specific and intricate provisions.  5 U.S.C.A. § 706(2); 6 U.S.C.A. § 202(5); Immigration and Nationality Act, §§ 103(a)(3), (g)(2), 274A(h)(3), 8 U.S.C.A. §§ 1103(a)(3), (g)(2), 1324a(h)(3).

**46. Administrative Law and Procedure**
    &#x21AA;438(29)
    **Aliens, Immigration, and Citizenship**
    &#x21AA;154
    **Injunction** &#x21AA;1496

Assuming that *Chevron* deference was applicable to directive from Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents, Texas was likely to succeed on merits of claim, as factor for preliminary injunction, that DAPA was not a reasonable construction of Secretary's authority under Immigration and Nationality Act (INA); DAPA was manifestly contrary to INA statutory scheme, which expressly and carefully provided legal designations allowing defined classes of aliens to be lawfully present, which enacted intricate process for illegal aliens to derive lawful immigration classification from their children's immigration status, and which specified classes of aliens eligible and ineligible

for work authorization, and Congress had identified narrow classes of aliens eligible for deferred action.  5 U.S.C.A. § 706(2); 6 U.S.C.A. § 202(5); Immigration and Nationality Act, §§ 103(a)(3), (g)(2), 274A(h)(3), 8 U.S.C.A. §§ 1103(a)(3), (g)(2), 1324a(h)(3).

**47. Statutes** &#x21AA;1377

The "expressio unius est exclusio alterius" canon of construction provides that to express or include one thing implies the exclusion of the other, or of the alternative.

    See publication Words and Phrases for other judicial constructions and definitions.

**48. Administrative Law and Procedure**
    &#x21AA;305

Regardless of how serious the problem an administrative agency seeks to address, it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.

**49. Administrative Law and Procedure**
    &#x21AA;432

*Chevron* deference is warranted only when Congress has left a gap for the agency to fill pursuant to an express or implied delegation of authority to the agency.

**50. Aliens, Immigration, and Citizenship**
    &#x21AA;155
    **Injunction** &#x21AA;1496

State of Texas demonstrated substantial threat of irreparable injury, as factor for preliminary injunction in action asserting procedural and substantive claims under Administrative Procedure Act (APA), as to directive from Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal

presence for illegal immigrants who were parents of citizens or lawful permanent residents; DAPA beneficiaries would be eligible for driver's licenses and other benefits, and a substantial number of DAPA beneficiaries would take advantage of that opportunity.   5 U.S.C.A. §§ 553, 706(2).

**51. Aliens, Immigration, and Citizenship**
⬤155

**Injunction** ⬤1496

Threatened injury if preliminary injunction was denied outweighed any harm that would result if injunction was granted, as factor supporting preliminary injunction in action by State of Texas asserting procedural and substantive claims under Administrative Procedure Act (APA), as to directive from Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; costs for driver's licenses and other benefits for DAPA beneficiaries were more substantial than proffered vague harms from obstructing a core Executive Branch prerogative and offending separation-of-powers and federalism principles.   5 U.S.C.A. §§ 553, 706(2).

**52. Aliens, Immigration, and Citizenship**
⬤155

**Injunction** ⬤1496

Preliminary injunction would not disserve the public interest, as factor supporting preliminary injunction in action by State of Texas asserting procedural and substantive claims under Administrative Procedure Act (APA), as to directive from Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal

immigrants who were parents of citizens or lawful permanent residents; public had an interest in protecting separation of powers by curtailing unlawful Executive Branch action, and that interest could not be effectively vindicated after trial on merits, given the difficulty of restoring the status quo ante if DAPA were to be implemented.   5 U.S.C.A. §§ 553, 706(2).

**53. Injunction** ⬤1496

Nationwide preliminary injunction was warranted, in action by State of Texas and some other States asserting procedural and substantive claims under Administrative Procedure Act (APA), as to directive from Secretary of Department of Homeland Security (DHS), for program of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which would provide legal presence for illegal immigrants who were parents of citizens or lawful permanent residents; Constitution required uniform rule of naturalization, Congress had instructed that immigration laws should be enforced vigorously and uniformly, and there was substantial likelihood that geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among States.   U.S.C.A. Const. Art. 1, § 8, cl. 4; 5 U.S.C.A. §§ 553, 706(2).

**54. Federal Courts** ⬤2015

Constitution's vesting of district courts with the judicial power of the United States is not limited to the district wherein the court sits but extends across the country, and thus, it is not beyond the power of a district court, in appropriate circumstances, to issue a nationwide injunction.   U.S.C.A. Const. Art. 3, § 1.

**55. Administrative Law and Procedure**
⬤305

Courts expect Congress to speak clearly if it wishes to assign to an agency

144        809 FEDERAL REPORTER, 3d SERIES

decisions of vast economic and political significance, and agency announcements to the contrary are greeted with a measure of skepticism.

————————

Scott A. Keller, Solicitor (argued), J. Campbell Barker, Deputy Solicitor General, Angela Veronica Colmenero, Esq., Assistant Attorney General, April L. Farris, Matthew Hamilton Frederick, Deputy Solicitor General, Andrew S. Oldham, Deputy General Counsel, Alex Potapov, Charles Eugene Roy, Assistant Attorney General, Austin, TX, for Plaintiffs–Appellees.

Scott R. McIntosh, Beth S. Brinkmann, Esq., Jeffrey A. Clair, Esq., Kyle R. Freeny, Kathleen Roberta Hartnett, William Ernest Havemann, Trial Attorney, Benjamin C. Mizer, Solicitor (argued), U.S. Department of Justice, Washington, DC, for Defendants–Appellants.

Noah Guzzo Purcell, Office of the Solicitor General for the State of Washington, Olympia, WA, for Amici Curiae State of Washington, State of California, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Maryland, State of Massachusetts, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Vermont, District of Columbia and State of Virginia.

Michael Bekesha, Paul Orfanedes, Esq., Judicial Watch, Incorporated, Washington, DC, for Amicus Curiae Judicial Watch, Incorporated.

Leif A. Olson, Olson Firm, P.L.L.C., Humble, TX, Ilya Shapiro, Esq., Cato Institute, Washington, DC, for Amici Curiae Cato Institute and Professor Jeremy Rabkin.

Steven James Lechner, Esq., Mountain States Legal Foundation, Lakewood, CO, for Amicus Curiae Mountain States Legal Foundation.

Jeremy W. Shweder, New York, N.Y., for Amici Curiae Mayor Bill De Blasio, of New York City, Mayor Eric Garcetti, of Los Angeles, City of Alexandria, Mayor Ed Pawlowski, of Allentown, Pennsylvania, Mayor Kasim Reed, of Atlanta, Mayor Steve Adler, of Austin, Texas, Mayor Stephanie Rawlings–Blake, City Council of Baltimore, Maryland and City of Bell, California.

Jay A. Sekulow, Esq., American Center for Law & Justice, Washington, DC, for Amici Curiae Certain Members of Congress, American Center for Law and Justice and Committee to Defend the Separation of Powers.

James Davis Blacklock, Senior Counsel, Austin, TX, for Amici Curiae Governor of Texas, Governor of Louisiana, Governor of New Jersey and Governor of South Dakota.

Seth Paul Waxman, Paul Reinherz Wolfson, WilmerHale, Washington DC, for Amici Curiae Representative Nancy Pelosi, Democratic Leader, Representative Steny Hoyer, Democratic Whip, Representative James E. Clyburn, Assistant Democratic Leader, Representative Xavier Becerra, Democratic Caucus Chair, Representative Joseph Crowley and Democratic Caucus Vice–Chair.

Matthew James Ginsburg, Washington, DC, for Amicus Curiae American Federation of Labor–Congress of Industrial Organizations.

Elizabeth Bonnie Wydra, Chief Counsel, Washington, DC, for Amici Curiae Michael Barnes, Former Representative of Maryland, Howard Berman, Former Representative of California, Victor H. Fazio, Former Representative of California, Charles Gonzalez, Former Representative of Tex-

as, James A. Leach, Former Representative of Iowa, George Miller, III, Former Representative of California, Silvestre Reyes, Former Representative of Texas, David Skaggs, Former Representative of Colorado, Henry A. Waxman, Former Representative of California and Raymond Lahood.

Clifford M. Sloan, Skadden, Arps, Slate, Meagher & Flom, L.L.P., Washington, DC, for Amici Curiae American Apparel, Incorporated, Capital City Fruit, Incorporated, Farmers Investment Company, Latin–American Chamber of Commerce of Utah, Marek Brothers Construction, Incorporated, New Solutions Group, L.L.C., and Nisei Farmers League.

Benjamin Gross Shatz, Manatt, Phelps & Phillips, L.L.P., Los Angeles, CA, for Amici Curiae Church World Service, Reverend Gradye Parsons, Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.), Leadership Conference of Women Religious, Disciples Home Missions and Sisters of Mercy of the Americas.

Chirag Gopal Badlani, Hughes Socol Piers Resnick & Dym, Limited, Chicago, IL, for Amici Curiae Major Cities Chiefs Association, Police Executive Research Forum, Chief Art Acevedo, City of Austin, Texas, Police Department, Chief Charlie Beck, Los Angeles, California, Police Department and Chief David Bejarano, Chula Vista, California, Police Department.

Bradley S. Phillips, Munger, Tolles & Olson, L.L.P., Los Angeles, CA, for Amici Curiae David Abraham, Professor of Law, University of, Miami School of Law, Muneer I. Ahmad, Clinical Professor of Law, Yale Law School, Raquel Aldana, Professor of Law, University of the Pacific McGeorge School of Law, Farrin R. Anello, Visiting Assistant Clinical Professor, Seton Hall University School of Law and Roxana Bacon, Visiting/Adjunct/Lecturer

Professor of Immigration Law, University of Miami, Syracuse University, University of Arizona, Arizona State University.

Nina Perales, Esq., San Antonio, TX, Adam Paul KohSweeney, Esq., Gabriel Markoff, Esq., O'Melveny & Myers, L.L.P., San Francisco, CA, Linda J. Smith, DLA Piper, L.L.P. (US), Los Angeles, CA, for Amici Curiae Jane Doe # 1, Jane Doe # 2 and Jane Doe # 3.

Stephen Blake Kinnaird, Paul Hastings, L.L.P., Washington, DC, for Amici Curiae Senator Richard Blumenthal, Senator Christopher A. Coons, Mazie K. Hirono and Senator Sheldon Whitehouse.

Alexandre I. Afanassiev, Esq., Angelique Marie Montano, Quan Law Group, P.L.L.C., Houston, TX, for Amicus Curiae Congressman Al Green.

Matthew E. Price, Jenner & Block, L.L.P., Washington, DC, for Amici Curiae American Federation of Teachers, First Focus, National Education Association, Aspira, Educators for Fair Consideration, Hispanic Association of Colleges and Universities, Pomona College and Scholarship Foundation of St. Louis.

Jonathan Weissglass, Altshuler Berzon, L.L.P., San Francisco, CA, Karen Cassandra Tumlin, National Immigration Law Center, Los Angeles, CA, for Amici Curiae ACLU of Nevada, Action North Carolina, Advancement Project, Aim for Equity and Alabama Coalition for Immigrant Justice.

James Peterson, Judicial Watch, Incorporated, Washington, DC, for Amicus Curiae State Legislators for Legal Immigration.

Michael Meriwether Hethmon, Senior Counsel, Dale Wilcox, Immigration Reform Law Institute, Washington, DC, for Amici Curiae Immigration Reform Law Institute, Federation for American Immigration Re-

form, Remembrance Project and National Sheriffs' Association.

Lawrence John Joseph, Washington, DC, for Amicus Curiae Eagle Forum Education and Legal Defense Fund, Incorporated.

William Jeffrey Olson, Esq., Vienna, VA, for Amici Curiae Citizens United, Citizens United Foundation, English First Foundation, English First, Trea Senior Citizens League, United States Justice Foundation, Lincoln Institute for Research and Education, Abraham Lincoln Foundation for Public Policy Research, Incorporated, United States Border Control Foundation, Policy Analysis Center, Conservative Legal Defense and Education Fund and Institute on the Constitution.

Ernest Young, Apex, NC, for Amicus Curiae Ernest Young.

Appeal from the United States District Court for the Southern District of Texas.

Before KING, SMITH, and ELROD, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The United States[1] appeals a preliminary injunction, pending trial, forbidding implementation of the Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA"). Twenty-six states (the "states"[2]) challenged DAPA under the Administrative Procedure Act ("APA") and the Take Care Clause of the Constitution;[3] in an impressive and thorough Memorandum Opinion and Order issued February 16, 2015, the district court enjoined the program on the ground that the states are likely to succeed on their claim that DAPA is subject to the APA's procedural requirements. *Texas v. United States,* 86 F.Supp.3d 591, 677 (S.D.Tex.2015).[4]

The government appealed and moved to stay the injunction pending resolution of the merits. After extensive briefing and more than two hours of oral argument, a motions panel denied the stay after determining that the appeal was unlikely to succeed on its merits. *Texas v. United States,* 787 F.3d 733, 743 (5th Cir.2015). Reviewing the district court's order for abuse of discretion, we affirm the preliminary injunction because the states have standing; they have established a substantial likelihood of success on the merits of their procedural and substantive APA claims; and they have satisfied the other elements required for an injunction.[5]

I.

A.

In June 2012, the Department of Homeland Security ("DHS") implemented the Deferred Action for Childhood Arrivals program ("DACA").[6] In the DACA Memo

---

**1.** This opinion refers to the defendants collectively as "the United States" or "the government" unless otherwise indicated.

**2.** We refer to the plaintiffs collectively as "the states," but as appropriate we refer only to Texas because it is the only state that the district court determined to have standing.

**3.** We find it unnecessary, at this early stage of the proceedings, to address or decide the challenge based on the Take Care Clause.

**4.** We cite the district court's opinion as "Dist. Ct. Op., 86 F.Supp.3d at ——."

**5.** Our dedicated colleague has penned a careful dissent, with which we largely but respectfully disagree. It is well-researched, however, and bears a careful read.

**6.** Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al. 1 (June 15, 2012) (the "DACA Memo"), http://www.dhs.gov/xlibrary/assets/s

to agency heads, the DHS Secretary "set[ ] forth how, in the exercise of . . . prosecutorial discretion, [DHS] should enforce the Nation's immigration laws against certain young people" and listed five "criteria [that] should be satisfied before an individual is considered for an exercise of prosecutorial discretion." [7]  The Secretary further instructed that "[n]o individual should receive deferred action . . . unless they [sic ] first pass a background check and requests for relief . . . are to be decided on a case by case basis." [8]  Although stating that "[f]or individuals who are granted deferred action . . . , [U.S. Citizenship and Immigration Services ('USCIS') ] shall accept applications to determine whether these individuals qualify for work authorization," the DACA Memo purported to "confer[ ] no substantive right, immigration status or pathway to citizenship." [9]

At least 1.2 million persons qualify for DACA, and approximately 636,000 applications were approved through 2014.  Dist. Ct. Op., 86 F.Supp.3d at 609.

[1]  In November 2014, by what is termed the "DAPA Memo," DHS expanded DACA by making millions more persons eligible for the program [10] and extending "[t]he period for which DACA and the accompanying employment authorization is granted . . . to three-year increments, rather than the current two-year increments." [11]  The Secretary also "direct[ed] USCIS to establish a process, similar to DACA," known as DAPA, which applies to "individuals who . . . have, [as of November 20, 2014], a son or daughter who is a U.S. citizen or lawful permanent resident" and meet five additional criteria.[12]  The Secretary stated that, although

---

1–exercising–prosecutorial–discretion-individuals-who-came-to-us-as-children.pdf.

**7.** *Id.* (stating that an individual may be considered if he "[1] came to the United States under the age of sixteen; [2] has continuously resided in the United States for a[t] least five years preceding [June 15, 2012] and is present in the United States on [June 15]; [3] is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the [military]; [4] has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety;  and [5] is not above the age of thirty").

**8.** *Id.* at 2.

**9.** *Id.* at 3.

**10.** Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Leon Rodriguez, Dir., USCIS, et al. 3–4 (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf.

**11.** *Id.* at 3. The district court enjoined implementation of the following three DACA expansions, and they are included in the term

"DAPA" in this opinion: (1) the "age restriction exclud[ing] those who were older than 31 on the date of the [DACA] announcement . . . will no longer apply," *id.;*  (2) "[t]he period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments," *id.;*  (3) "the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010," *id.* at 4. Dist. Ct. Op., 86 F.Supp.3d at 677–78 & n. 111.

**12.** DAPA Memo at 4 (directing that individuals may be considered for deferred action if they "[1] have, on [November 20, 2014], a son or daughter who is a U.S. citizen or lawful permanent resident;  [2] have continuously resided in the United States since before January 1, 2010;  [3] are physically present in the United States on [November 20, 2014], *and* at the time of making a request for consideration of deferred action with USCIS;  [4] have no lawful status on [November 20, 2014];  [5] are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum;  and [6] present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate").

"[d]eferred action does not confer any form of legal status in this country, much less citizenship[,] it [does] mean[ ] that, for a specified period of time, an individual is permitted to be *lawfully present* in the United States." [13]   Of the approximately 11.3 million illegal aliens[14] in the United States, 4.3 million would be eligible for lawful presence pursuant to DAPA. Dist. Ct. Op., 86 F.Supp.3d at 612 n. 11, 670.

"Lawful presence" is not an enforceable right to remain in the United States and can be revoked at any time, but that classification nevertheless has significant legal consequences.  Unlawfully present aliens are generally not eligible to receive federal public benefits, *see* 8 U.S.C. § 1611, or state and local public benefits unless the state otherwise provides, *see* 8 U.S.C.

§ 1621.[15]  But as the government admits in its opening brief, persons granted lawful presence pursuant to DAPA are no longer "bar[red] . . . from receiving social security retirement benefits, social security disability benefits, or health insurance under Part A of the Medicare program." [16]   That follows from § 1611(b)(2)–(3), which provides that the exclusion of benefits in § 1611(a) "shall not apply to any benefit[s] payable under title[s] II [and XVIII] of the Social Security Act . . . to an alien who is *lawfully present* in the United States as determined by the Attorney General. . . ." (emphasis added).   A lawfully present alien is still required to satisfy independent qualification criteria before receiving those benefits, but the grant of lawful presence removes the categorical bar and

---

13.  *Id.* at 2 (emphasis added).

14.  Although "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States," it is a civil offense. *Arizona v. United States*, —— U.S. ——, 132 S.Ct. 2492, 2505, 183 L.Ed.2d 351 (2012); *see* 8 U.S.C. §§ 1182(a)(9)(B)(i), 1227(a)(1)(A)–(B).  This opinion therefore refers to such persons as "illegal aliens":

> The usual and preferable term in [American English] is *illegal alien*.  The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook.  The problem with *undocumented* is that it is intended to mean, by those who use it in this phrase, "not having the requisite documents to enter or stay in a country legally."  But the word strongly suggests "unaccounted for" to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.
>
> More than one writer has argued in favor of *undocumented alien* . . . [to] avoid[ ] the implication that one's unauthorized presence in the United States is a crime. . . .  Moreover, it is wrong to equate illegality with criminality, since many illegal acts are not criminal.  *Illegal alien* is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence "illegal").

BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 912 (Oxford 3d ed.2011) (citations omitted).  And as the district court pointed out, "it is the term used by the Supreme Court in its latest pronouncement pertaining to this area of the law." Dist. Ct. Op., 86 F.Supp.3d at 605 n. 2 (citing *Arizona v. United States*, —— U.S. ——, 132 S.Ct. 2492, 2497, 183 L.Ed.2d 351 (2012)).  "[I]llegal alien has going for it both history and well-documented, generally accepted use." Matthew Salzwedel, *The Lawyer's Struggle to Write*, 16 SCRIBES JOURNAL OF LEGAL WRITING 69, 76 (2015).

15.  Those provisions reflect Congress's concern that "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates" and that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601.  Moreover, the provisions incorporate a national policy that "aliens within the Nation's borders not depend on public resources to meet their needs" and that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." *Id.*

16.  Brief for Appellants at 48–49 (citing 8 U.S.C. § 1611(b)(2)–(3)).

thereby makes otherwise ineligible persons eligible to qualify.

"Each person who applies for deferred action pursuant to the [DAPA] criteria . . . shall also be eligible to apply for work authorization for the [renewable three-year] period of deferred action." DAPA Memo at 4. The United States concedes that "[a]n alien with work authorization may obtain a Social Security Number," "accrue quarters of covered employment," and "correct wage records to add prior covered employment within approximately three years of the year in which the wages were earned or in limited circumstances thereafter."[17] The district court determined—and the government does not dispute—"that DAPA recipients would be eligible for earned income tax credits once they received a Social Security number."[18]

As for state benefits, although "[a] State may provide that an alien who is *not lawfully present* in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a)," § 1621(d), Texas has chosen not to issue driver's licenses to unlawfully present aliens.[19] Texas maintains that documentation confirming lawful presence pursuant to DAPA would allow otherwise ineligible aliens to become eligible for state-subsidized driver's licenses. Likewise, certain unemployment compensation "[b]enefits are not pay-

able based on services performed by an alien unless the alien . . . was *lawfully present* for purposes of performing the services . . . ."[20] Texas contends that DAPA recipients would also become eligible for unemployment insurance.

## B.

The states sued to prevent DAPA's implementation on three grounds. First, they asserted that DAPA violated the procedural requirements of the APA as a substantive rule that did not undergo the requisite notice-and-comment rulemaking. *See* 5 U.S.C. § 553. Second, the states claimed that DHS lacked the authority to implement the program even if it followed the correct rulemaking process, such that DAPA was substantively unlawful under the APA. *See* 5 U.S.C. § 706(2)(A)–(C). Third, the states urged that DAPA was an abrogation of the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

The district court held that Texas has standing. It concluded that the state would suffer a financial injury by having to issue driver's licenses to DAPA beneficiaries at a loss. Dist. Ct. Op., 86 F.Supp.3d at 616–23. Alternatively, the court relied on a new theory it called "abdication standing": Texas had standing because the United States has exclusive authority over immigration but has refused to act in that

---

**17.** Brief for Appellants at 49 (citation omitted) (citing 42 U.S.C. § 405(c)(1)(B), (4), (5)(A)–(J); 8 C.F.R. § 1.3(a)(4)(vi); 20 C.F.R. §§ 422.104(a)(2), 422.105(a)).

**18.** Dist. Ct. Op., 86 F.Supp.3d at 654 n. 64; *see also* 26 U.S.C. § 32(c)(1)(E), (m) (stating that eligibility for earned income tax credit is limited to individuals with Social Security numbers); 20 C.F.R. §§ 422.104(a)(2), 422.107(a), (e)(1).

**19.** TEX. TRANSP. CODE § 521.142(a) ("An applicant who is not a citizen of the United States

must present . . . documentation issued by the appropriate United States agency that *authorizes the applicant to be in the United States* before the applicant may be issued a driver's license." (emphasis added)).

**20.** TEX. LAB.CODE § 207.043(a)(2) (emphasis added); *see also* 26 U.S.C. § 3304(a)(14)(A) (approval of state laws making compensation not payable to aliens unless they are *"lawfully present* for purposes of performing such services" (emphasis added)).

area. *Id.* at 636–43. The court also considered but ultimately did not accept the notions that Texas could sue as *parens patriae* on behalf of citizens facing economic competition from DAPA beneficiaries and that the state had standing based on the losses it suffers generally from illegal immigration. *Id.* at 625–36.

The court temporarily enjoined DAPA's implementation after determining that Texas had shown a substantial likelihood of success on its claim that the program must undergo notice and comment. *Id.* at 677. Despite full briefing, the court did not rule on the "Plaintiffs' likelihood of success on their *substantive* APA claim or their constitutional claims under the Take Care Clause/separation of powers doctrine." *Id.* On appeal, the United States maintains that the states do not have standing or a right to judicial review and, alternatively, that DAPA is exempt from the notice-and-comment requirements. The government also contends that the injunction, including its nationwide scope, is improper as a matter of law.

## II.

[2–4] "We review a preliminary injunction for abuse of discretion." [21] A preliminary injunction should issue only if the states, as movants, establish

(1) a substantial likelihood of success on the merits, (2) a substantial threat of

irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.[22]

"As to each element of the district court's preliminary-injunction analysis ... findings of fact are subject to a clearly-erroneous standard of review, while conclusions of law are subject to broad review and will be reversed if incorrect." [23]

## III.

The government claims the states lack standing to challenge DAPA. As we will analyze, however, their standing is plain, based on the driver's-license rationale,[24] so we need not address the other possible grounds for standing.

[5–7] As the parties invoking federal jurisdiction, the states have the burden of establishing standing. *See Clapper v. Amnesty Int'l USA*, —— U.S. ——, 133 S.Ct. 1138, 1148, 185 L.Ed.2d 264 (2013). They must show an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* at 1147 (citation omitted). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will

---

**21.** *Sepulvado v. Jindal,* 729 F.3d 413, 417 (5th Cir.2013).

**22.** *Id.* (quoting *Byrum v. Landreth,* 566 F.3d 442, 445 (5th Cir.2009)).

**23.** *Id.* (quoting *Janvey v. Alguire,* 647 F.3d 585, 591–92 (5th Cir.2011)).

**24.** We did not reach this issue in *Crane v. Johnson,* 783 F.3d 244 (5th Cir.2015). There, we concluded that neither the State of Mississippi nor Immigration and Customs Enforcement ("ICE") agents and deportation officers had standing to challenge DACA. *Id.* at 255.

We explicitly determined that Mississippi had waived the theory that Texas now advances:

In a letter brief filed after oral argument, Mississippi put forward three new arguments in support of its standing, [including] (1) the cost of issuing driver's licenses to DACA's beneficiaries.... Because Mississippi failed to provide evidentiary support on these arguments and failed to make these arguments in their opening brief on appeal and below, they have been waived. *Id.* at 252 n. 34.

prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006).

### A.

[8] We begin by considering whether the states are entitled to "special solicitude" in our standing inquiry under *Massachusetts v. EPA*. They are.

The Court held that Massachusetts had standing to contest the EPA's decision not to regulate greenhouse-gas emissions from new motor vehicles, which allegedly contributed to a rise in sea levels and a loss of the state's coastal land. *Massachusetts v. EPA*, 549 U.S. at 526, 127 S.Ct. 1438. "It is of considerable relevance that the party seeking review here is a sovereign State and not . . . a private individual" because "States are not normal litigants for the purposes of invoking federal jurisdiction." *Id.* at 518, 127 S.Ct. 1438.[25]

The Court identified two additional considerations that entitled Massachusetts "to special solicitude in [the Court's] standing analysis." *Id.* at 520, 127 S.Ct. 1438.[26] First, the Clean Air Act created a procedural right to challenge the EPA's decision:

> The parties' dispute turns on the proper construction of a congressional statute, a question eminently suitable to resolution in federal court. Congress has moreover authorized this type of challenge to EPA action. That authorization is of critical importance to the standing inquiry: "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." "In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." We will not, therefore, "entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws."[27]

Second, the EPA's decision affected Massachusetts's "quasi-sovereign" interest in its territory:

> When a State enters the Union, it surrenders certain sovereign prerogatives. Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot ne-

---

**25.** The dissent, throughout, cleverly refers to the states, more than forty times, as the "plaintiffs," obscuring the fact that they are sovereign states (while referring to the defendants as the "government"). *See* Dissent, *passim*.

**26.** The dissent attempts to diminish the considerable significance of the "special solicitude" language, which, to say the least, is inconvenient to the United States in its effort to defeat standing. The dissent protests that it is "only a single, isolated phrase" that "appears only once." Dissent 193–94.

The dissent, however, avoids mention of the Court's explanation that "[i]t is of considera-

ble relevance that the party seeking review here is a sovereign State." *Massachusetts v. EPA*, 549 U.S. at 518, 127 S.Ct. 1438. In light of that enlargement on the "special solicitude" phrase, it is obvious that being a state greatly matters in the standing inquiry, and it makes no difference, in the words of the dissent, "whether the majority means that states are afforded a relaxed standing inquiry by virtue of their statehood or whether their statehood, in [and] of itself, helps confer standing." Dissent at 193.

**27.** *Massachusetts v. EPA*, 549 U.S. at 516–17, 127 S.Ct. 1438 (citations omitted).

gotiate an emissions treaty with China or India, and in some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted.

These sovereign prerogatives are now lodged in the Federal Government, and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable to the "emission of any air pollutant from any class or classes of new motor vehicle engines, which in [the Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."[28]

Like Massachusetts, the instant plaintiffs—the states—"are not normal litigants for the purposes of invoking federal jurisdiction," *id.* at 518, 127 S.Ct. 1438 and the same two additional factors are present. First, "[t]he parties' dispute turns on the proper construction of a congressional statute,"[29] the APA, which authorizes challenges to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Similarly, the disagreement in *Massachusetts v. EPA* concerned the interpretation of the Clean Air Act, which provides for judicial review of "final action taken[ ] by the Administrator." 42 U.S.C. § 7607(b)(1). Further, as we will explain, the states are within the zone of interests of the Immigration and Nationality Act ("INA");[30] they are not asking us to "entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws."[31]

In enacting the APA, Congress intended for those "suffering legal wrong because of agency action" to have judicial recourse,[32] and the states fall well within that definition.[33] The Clean Air Act's review provision is more specific than the APA's, but the latter is easily adequate to justify "special solicitude" here. The procedural right to challenge EPA decisions created by the Clean Air Act provided important support to Massachusetts because the challenge Massachusetts sought to bring—a challenge to an agency's decision *not to act*—is traditionally the type for which it is most difficult to establish standing and a justiciable issue.[34] Texas, by contrast, challenges DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens. Because the states here challenge DHS's decision to act, rather than its decision to remain inactive, a procedural right similar to that created by the Clean Air Act is not necessary to support standing. *See* 5 U.S.C. § 704.

As we will show, DAPA would have a major effect on the states' fiscs, causing

---

**28.** *Id.* at 519–20, 127 S.Ct. 1438 (alteration in original) (citation omitted) (quoting 42 U.S.C. § 7521(a)(1)).

**29.** *Id.* at 516, 127 S.Ct. 1438.

**30.** *See infra* part IV.

**31.** *Massachusetts v. EPA*, 549 U.S. at 516–17, 127 S.Ct. 1438 (citation omitted).

**32.** 5 U.S.C. § 702.

**33.** *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 694, 696 n. 13 (10th Cir.2009) (holding that New Mexico

was entitled to "special solicitude" where one of its claims was based on the APA); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241–42 (10th Cir.2008) (holding that Wyoming was entitled to special solicitude where its only claim was based on the APA).

**34.** *See Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (observing that "refusals to take enforcement steps" generally are subject to agency discretion, and the "presumption is that judicial review is not available.").

millions of dollars of losses in Texas alone, and at least in Texas, the causal chain is especially direct: DAPA would enable beneficiaries to apply for driver's licenses, and many would do so, resulting in Texas's injury.

**[9]** Second, DAPA affects the states' "quasi-sovereign" interests by imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses.[35] "[S]tates have a sovereign interest in 'the power to create and enforce a legal code.' " [36] Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control,[37] (2) federal preemption of state law,[38] and (3) federal interference with the enforcement of state law,[39] at least where "the state statute at issue regulate[s] behavior or provide[s] for the administration of a state program" [40] and does not "simply

purport[ ] to immunize [state] citizens from federal law." [41] Those intrusions are analogous to pressure to change state law.[42]

**[10]** Moreover, these plaintiff states' interests are like Massachusetts's in ways that implicate the same sovereignty concerns. When the states joined the union, they surrendered some of their sovereign prerogatives over immigration.[43] They cannot establish their own classifications of aliens,[44] just as "Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] cannot negotiate an emissions treaty with China or India." [45] The states may not be able to discriminate against subsets of aliens in their driver's license programs without running afoul of preemption or the Equal Protection Clause;[46] similarly, "in some circumstances[, Massachusetts's] exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-

**35.** *See, e.g.,* Tex. Transp. Code § 521.142(a) (specifying the requirements for licenses), .181 (providing for the issuance of licenses), .421(a) (setting the fees for licenses); Dist. Ct. Op., 86 F.Supp.3d at 616–17 (finding that Texas subsidizes its licenses).

**36.** *Tex. Office of Pub. Util. Counsel v. FCC,* 183 F.3d 393, 449 (5th Cir.1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)).

**37.** *See id.*

**38.** *See, e.g., Crank,* 539 F.3d at 1242; *Alaska v. U.S. Dep't of Transp.,* 868 F.2d 441, 443–44 (D.C.Cir.1989); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.,* 766 F.2d 228, 232–33 (6th Cir.1985); *cf. Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (commenting that "a State has standing to defend the constitutionality of its statute" but not relying on that principle).

**39.** *See Crank,* 539 F.3d at 1241–42; *Celebrezze,* 766 F.2d at 232–33; *cf. Maine v. Taylor,* 477 U.S. 131, 137, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (observing in another

context that "a State clearly has a legitimate interest in the continued enforceability of its own statutes").

**40.** *Virginia ex rel. Cuccinelli v. Sebelius,* 656 F.3d 253, 269 (4th Cir.2011).

**41.** *Id.* at 270.

**42.** *See Crank,* 539 F.3d at 1241–42 (reasoning that Wyoming was entitled to "special solicitude" where its asserted injury was interference with the enforcement of state law).

**43.** *See generally Arizona v. United States,* 132 S.Ct. at 2498–2501.

**44.** *See Villas at Parkside Partners v. City of Farmers Branch,* 726 F.3d 524, 536 (5th Cir. 2013) (en banc).

**45.** *Massachusetts v. EPA,* 549 U.S. at 519, 127 S.Ct. 1438.

**46.** The Ninth Circuit has suggested that, *see Ariz. Dream Act Coal. v. Brewer,* 757 F.3d 1053, 1061–67 (9th Cir.2014), but we need not decide the issue.

empted." [47] Both these plaintiff states and Massachusetts now rely on the federal government to protect their interests. [48] These parallels confirm that DAPA affects the states' "quasi-sovereign" interests.

The significant opinion in *Arizona State Legislature v. Arizona Independent Redistricting Commission,* — U.S. —, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015), announced shortly before oral argument herein, reinforces that conclusion. The Court held that the Arizona Legislature had standing to sue in response to a ballot initiative that removed its redistricting authority and vested it instead in an independent commission. *Id.* at 2665–66. The Court emphasized that the legislature was "an institutional plaintiff asserting an institutional injury" to what it believed was its constitutional power to regulate elections. *Id.* at 2664. So too are the states asserting institutional injury to their lawmaking authority. The Court also cited *Massachusetts v. EPA* as opining that the state in that case was "entitled to special solicitude in our standing analysis." *Id.* at 2664–65 n. 10 (quoting *Massachusetts v. EPA,* 549 U.S. at 520, 127 S.Ct. 1438).

The United States suggests that three presumptions against standing apply here. The first is a presumption that a plaintiff lacks standing to challenge decisions to confer benefits on, or not to prosecute, a third party. But the cases the government cites for that proposition either did not involve standing; [49] concerned only nonprosecution (as distinguished from both nonprosecution and the conferral of benefits); [50] or merely reaffirmed that a plaintiff must satisfy the standing requirements. [51]

The second presumption is against justiciability in the immigration context. None of the cases the government cites involved standing [52] and include only general language about the government's authority over immigration; without a specific discussion of standing, they are of limited relevance. [53]

The third presumption is that "[t]he [Supreme] Court's standing analysis … has been 'especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'" [54] We decide this appeal, however, without resolving the constitutional claim.

Therefore, the states are entitled to "special solicitude" in the standing inquiry. We stress that our decision is limited to these facts. In particular, the direct, substantial pressure directed at the states and

**47.** *Massachusetts v. EPA,* 549 U.S. at 519, 127 S.Ct. 1438.

**48.** *See id.*

**49.** *See Chaney,* 470 U.S. at 823, 105 S.Ct. 1649; *United States v. Cox,* 342 F.2d 167, 170 (5th Cir.1965) (en banc).

**50.** *See Linda R.S. v. Richard D.,* 410 U.S. 614, 615–16, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

**51.** *See Henderson v. Stalder,* 287 F.3d 374, 384 (5th Cir.2002) (Jones, J., concurring).

**52.** *See Arizona v. United States,* 132 S.Ct. at 2497; *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 886, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); *Plyler v. Doe,* 457 U.S. 202, 205, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Fiallo v. Bell,* 430 U.S. 787, 788, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Mathews v. Diaz,* 426 U.S. 67, 69, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). In the other case the government cites, "we assume[d], without deciding, that the plaintiffs have standing." *Texas v. United States,* 106 F.3d 661, 664 n. 2 (5th Cir.1997).

**53.** We address justiciability in part V.B, *infra.*

**54.** *Ariz. State Legislature,* 135 S.Ct. at 2665 n. 12 (final alteration in original) (quoting *Raines v. Byrd,* 521 U.S. 811, 819–20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)).

the fact that they have surrendered some of their control over immigration to the federal government mean this case is sufficiently similar to *Massachusetts v. EPA*, but pressure to change state law may not be enough—by itself—in other situations.

### B.

[11]   At least one state—Texas—has satisfied the first standing requirement by demonstrating that it would incur significant costs in issuing driver's licenses to DAPA beneficiaries.   Under current state law, licenses issued to beneficiaries would necessarily be at a financial loss.   The Department of Public Safety "shall issue" a license to a qualified applicant.   TEX. TRANSP. CODE § 521.181.   A noncitizen "must present … documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States."   *Id.* § 521.142(a).

If permitted to go into effect, DAPA would enable at least 500,000 illegal aliens in Texas[35] to satisfy that requirement with proof of lawful presence[56] or employment authorization.[57]   Texas subsidizes its licenses and would lose a minimum of $130.89 on each one it issued to a DAPA beneficiary.[58]   Even a modest estimate would put the loss at "several million dollars."   Dist. Ct. Op., 86 F.Supp.3d at 617.

Instead of disputing those figures, the United States claims that the costs would be offset by other benefits to the state.   It theorizes that, because DAPA beneficiaries would be eligible for licenses, they would register their vehicles, generating income for the state, and buy auto insurance, reducing the expenses associated with uninsured motorists.   The government suggests employment authorization would lead to increased tax revenue and decreased reliance on social services.

[12]   Even if the government is correct, that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs.[59]   "Once injury is shown, no attempt

---

55.   *See* Dist. Ct. Op., 86 F.Supp.3d at 616.

56.   *See* TEX. DEP'T OF PUB. SAFETY, VERIFYING LAWFUL PRESENCE 4 (2013), https://www.txdps. state.tx.us/DriverLicense/documents/verifying LawfulPresence.pdf (listing an acceptable document for a "Person granted deferred action" as "Immigration documentation with an alien number or I-94 number"); DAPA

57.   *See* TEX. DEP'T OF PUB. SAFETY, *supra* note 56, at 3 (stating that an "Employment Authorization Document" is sufficient proof of lawful presence); Dist. Ct. Op., 86 F.Supp.3d at 616 n. 14 (explaining that "[e]mployment authorization" is "a benefit that will be available to recipients of DAPA").

58.   *See* Dist. Ct. Op., 86 F.Supp.3d at 617. Some of those costs are directly attributable to the United States.   Under the REAL ID Act of 2005, Pub.L. No. 109–13, div. B, 119 Stat. 302 (codified as amended in scattered sections of Titles 8 and 49 U.S.C.), Texas must verify each applicant's immigration status through DHS, *see* 6 C.F.R. § 37.11(g),

.13(b)(1), or the state's licenses will no longer be valid for a number of purposes, including commercial air travel without a secondary form of identification, *REAL ID Enforcement in Brief*, U.S. DEPARTMENT OF HOMELAND SECURITY (July 27, 2015), http://www.dhs.gov/real-id-enforcement-brief.   Texas pays an average of 75¢ per applicant to comply with that mandate.   *See* Dist. Ct. Op., 86 F.Supp.3d at 617.

59.   *See, e.g., L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 656–59 (9th Cir.2011) (holding that a hospice had standing to challenge a regulation that allegedly increased its costs in some ways even though the regulation may have saved it money in other ways or in other fiscal years); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570–75 (6th Cir.2005) (concluding that a patient had standing to sue designers, manufacturers, and distributors of a medical device implanted in his body because it allegedly increased risk of medical problems even though it had not malfunctioned and had benefited him); *Markva v. Haveman*, 317 F.3d 547, 557–58 (6th Cir.

is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury." [60] "Our standing analysis is not an accounting exercise. . . ." [61]

The one case in which we concluded that the costs of a challenged program were offset by the benefits involved a much tighter nexus. In *Henderson*, 287 F.3d at 379–81, we determined that taxpayers lacked standing to challenge a Louisiana law authorizing a license plate bearing a pro-life message, reasoning that the plaintiffs had not shown that the program would use their tax dollars, because the extra fees paid by drivers who purchased the plates could have covered the associated expenses. The costs and benefits arose out of the same transaction, so the plaintiffs had not demonstrated injury.

Here, none of the benefits the government identifies is sufficiently connected to the costs to qualify as an offset. The only benefits that are conceivably relevant are the increase in vehicle registration and the decrease in uninsured motorists, but even those are based on the independent decisions of DAPA beneficiaries and are not a direct result of the issuance of licenses. Analogously, the Third Circuit held that sports leagues had standing to challenge New Jersey's decision to license sports gambling, explaining that damage to the leagues' reputations was a cognizable injury despite evidence that more people would have watched sports had betting been allowed. *NCAA*, 730 F.3d at 222–24. The diminished public perception of the leagues and the greater interest in sports were attributable to the licensing plan but did not arise out of the same transaction and so could not be compared.

In the instant case, the states have alleged an injury, and the government predicts that the later decisions of DAPA beneficiaries would produce offsetting benefits. Weighing those costs and benefits is precisely the type of "accounting exercise," *id.* at 223, in which we cannot engage. Texas has shown injury.

## C.

[13] Texas has satisfied the second standing requirement by establishing that its injury is "fairly traceable" to DAPA. It is undisputed that DAPA would enable beneficiaries to apply for driver's licenses, and there is little doubt that many would do so because driving is a practical necessity in most of the state.

[14] The United States urges that Texas's injury is not cognizable, because the state could avoid injury by not issuing licenses to illegal aliens or by not subsidizing its licenses. Although Texas could avoid financial loss by requiring applicants to pay the full costs of licenses, it could not avoid injury altogether. "[S]tates have a sovereign interest in 'the power to create and enforce a legal code,' " [62] and the possibility that a plaintiff could avoid injury

60. 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.4, at 147 (3d ed.2015) (footnote omitted).

2003) (deciding that grandparents had standing to challenge a requirement that they pay more for Medicaid benefits than would similarly situated parents, even though the grandparents may have received more of other types of welfare benefits).

61. *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir.2013).

62. *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir.1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)).

by incurring other costs does not negate standing.[63]

Indeed, treating the availability of changing state law as a bar to standing would deprive states of judicial recourse for many *bona fide* harms. For instance, under that theory, federal preemption of state law could never be an injury, because a state could always change its law to avoid preemption. But courts have often held that states have standing based on preemption.[64] And states could offset almost any financial loss by raising taxes or fees. The existence of that alternative does not mean they lack standing.

Relying primarily on *Pennsylvania v. New Jersey*, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam), the United States maintains that Texas's injury is self-inflicted because the state voluntarily chose to base its driver's license policies on federal immigration law. In *Pennsylvania v. New Jersey, id.* at 664, 666, 96 S.Ct. 2333 the Court held that several states lacked standing to contest other states' laws taxing a portion of nonresidents' incomes. The plaintiff states alleged that the defendant states' taxes injured them because the plaintiffs gave their residents credits for taxes paid to other states, so the defendants' taxes increased the amount of those credits, causing the plaintiffs to lose revenue. *Id.* at 663, 96 S.Ct. 2333. The Court flatly rejected that theory of standing:

In neither of the suits at bar has the defendant State inflicted any injury upon the plaintiff States through the imposition of the [challenged taxes]. The injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures. Nothing required Maine, Massachusetts, and Vermont to extend a tax credit to their residents for income taxes paid to New Hampshire, and nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey. No State can be heard to complain about damage inflicted by its own hand.

*Id.* at 664, 96 S.Ct. 2333.

The more recent decision in *Wyoming v. Oklahoma*, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), also informs our analysis. There, the Court held that Wyoming had standing to challenge an Oklahoma law requiring some Oklahoma power plants to burn at least 10% Oklahoma-mined coal. *Id.* at 447, 112 S.Ct. 789. The Court explained that Wyoming taxed the extraction of coal in the state and that Oklahoma's law reduced demand for that coal and Wyoming's corresponding revenue. *Id.* The Court emphasized that the case involved an "undisputed" "direct injury in the form of a loss of specific tax revenues." *Id.* at 448, 112 S.Ct. 789. It rejected Oklahoma's contention "that Wyoming is not itself engaged in the commerce affected, is not affected as a consumer, and thus has not suffered the type of direct injury cognizable in a Commerce Clause action," *id.*,

**63.** *See Texas v. United States*, 497 F.3d 491, 497 (5th Cir.2007). The dissent theorizes that if "forcing Texas to change its laws would be an injury because states have a 'sovereign interest in the "power to create and enforce a legal code," ' " then *Pennsylvania v. New Jersey*, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam), must be wrongly decided. Dissent at 195 n. 16. The dissent posits that Pennsylvania (there) and Texas

(here) faced pressure to change their laws, so their Article III standing *vel non* must be the same. But the dissent ignores a key distinction between *Pennsylvania v. New Jersey* and the instant case: As we explain below, the pressure that Pennsylvania faced to change its laws was self-inflicted; Texas's is not.

**64.** *See, e.g., Crank*, 539 F.3d at 1242; *Alaska*, 868 F.2d at 443–44; *Celebrezze*, 766 F.2d at 232–33.

concluding that Wyoming's loss of revenue was sufficient, *id.* at 448–50, 112 S.Ct. 789. The Court did not cite *Pennsylvania v. New Jersey* or discuss the theory that Wyoming's injury was self-inflicted.

Both the *Pennsylvania v. New Jersey* plaintiffs and Wyoming structured their laws in ways that meant their finances would have been affected by changes in other states' laws. Because the tax credits in *Pennsylvania v. New Jersey* were based on taxes paid to other states, any tax increases in other states would have decreased the plaintiffs' revenues, and any tax cuts would have had the opposite effect. Analogously, Wyoming's tax was based on the amount of coal extracted there, so any policies in other states that decreased demand for that coal would have diminished Wyoming's revenues, and any policies that bolstered demand would have had the opposite effect.

In other words, the schemes in both cases made the plaintiff states' finances dependent on those of third parties—either resident taxpayers or coal companies—which in turn were affected by other states' laws. The issues in *Pennsylvania v. New Jersey* and *Wyoming v. Oklahoma* were thus similar to the question here, but the Court announced different results. The two cases are readily distinguishable, however, and, based on two considerations, *Wyoming v. Oklahoma* directs our decision.

First, Texas and Wyoming sued in response to major changes in the defendant states' policies. Texas sued after the United States had announced DAPA, which could make at least 500,000 illegal aliens eligible for driver's licenses and cause millions of dollars of losses; Wyoming sued after Oklahoma had enacted a law that cost Wyoming over $1 million in tax revenues. *See id.* at 445–46 & n. 6, 112 S.Ct. 789. Conversely, the *Pennsylvania v. New Jersey* plaintiffs sued not because of a change in the defendant states' laws but because they believed that *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975), had rendered the defendants' laws unconstitutional. *See Pennsylvania v. New Jersey*, 426 U.S. at 661–63, 96 S.Ct. 2333. The fact that Texas sued in response to a significant change in the defendants' policies shows that its injury is not self-inflicted.

Second, the plaintiffs' options for accomplishing their policy goals were more limited in this case and in *Wyoming v. Oklahoma* than in *Pennsylvania v. New Jersey*. Texas seeks to issue licenses only to those lawfully present in the United States, and the state is required to use federal immigration classifications to do so. *See Villas at Parkside Partners*, 726 F.3d at 536. Likewise, Wyoming sought to tax the extraction of coal and had no way to avoid being affected by other states' laws that reduced demand for that coal.[65]

**65.** It follows that the dissent's unsubstantiated claim that "Pennsylvania, like Texas, tied its law to that of another sovereign, whereas *Wyoming did not*" (emphasis added), is obvious error. Dissent at 195 n. 16. The dissent ignores our explication of Texas's and Wyoming's policy goals. We do not assert that those states cannot change their laws to avoid injury from changes in the laws of another state. Rather, we demonstrate that Texas and Wyoming cannot both change their laws to avoid injury from amendments to another

sovereign's laws *and* achieve their policy goals.

For example, although, as we have said but the dissent overlooks, Wyoming easily could have avoided injury from changes in Oklahoma's laws by abandoning entirely its tax on coal extraction, it would have surrendered its policy goal of taxing extraction in the first place. Similarly, Texas could avoid financial loss by increasing fees, not subsidizing its licenses, or perhaps not issuing licenses to lawfully present aliens, but the consequence

By way of contrast, the plaintiff states in *Pennsylvania v. New Jersey* could have achieved their policy goal in myriad ways, such as basing their tax credits on residents' out-of-state incomes instead of on taxes actually paid to other states. That alternative would have achieved those plaintiffs' goal of allowing their residents to avoid double taxation of their out-of-state incomes, but it would not have tied the plaintiffs' finances to other states' laws. The fact that Texas had no similar option means its injury is not self-inflicted.

The decision in *Amnesty International* supports this conclusion: The Court held that the plaintiffs lacked standing to challenge a provision of the Foreign Intelligence Surveillance Act authorizing the interception of certain electronic communications. *Amnesty Int'l,* 133 S.Ct. at 1155. The plaintiffs alleged that they had been forced to take costly steps to avoid surveillance, such as traveling to meet in person and not discussing certain topics by email or phone. *Id.* at 1150–51. The Court held that any such injuries were self-inflicted, *id.* at 1152–53, reasoning that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 1151 (citing *Pennsylvania v. New Jersey,* 426 U.S. at 664, 96 S.Ct. 2333). "If the law were otherwise, an enterprising plaintiff would

be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.*

By way of contrast, there is no allegation that Texas passed its driver's license law to manufacture standing. The legislature enacted the law one year before DACA and three years before DAPA was announced,[66] and there is no hint that the state anticipated a change in immigration policy—much less a change as sweeping and dramatic as DAPA. Despite the dissent's bold suggestion that Texas's license-plate-cost injury "is entirely manufactured by Plaintiffs for this case," Dissent at 195, the injury is not self-inflicted.

In addition to its notion that Texas could avoid injury, the government theorizes that Texas's injury is not fairly traceable to DAPA because it is merely an incidental and attenuated consequence of the program. But *Massachusetts v. EPA* establishes that the causal connection is adequate. Texas is entitled to the same "special solicitude" as was Massachusetts, and the causal link is even closer here.

For Texas to incur injury, DAPA beneficiaries would have to apply for driver's licenses as a consequence of DHS's action, and it is apparent that many would do so. For Massachusetts's injury to have occurred, individuals would have had to drive

---

would be that by taking those actions Texas would have abandoned its fully permissible policy goal of providing subsidized licenses only to those who are lawfully present in the United States a—policy that, as we have repeatedly pointed out, Texas instituted well before the Secretary designed DACA or DAPA.

In essence, the dissent would have us issue the following edict to Texas: "You may avoid injury to the pursuit of your policy goals— injury resulting from a change in federal immigration law—by changing your laws to pursue different goals or eliminating them al-

together. Therefore, your injuries are self-inflicted." Presumably the dissent would have liked for the Supreme Court to have issued a similar edict to Wyoming, which sought to tax the extraction of coal and had no way both to continue taxing extraction and to avoid being affected by Oklahoma's laws that reduced demand for that coal. *See* Dissent at 195–96.

**66.** *See* Certain State Fiscal Matters; Providing Penalties, ch. 4, sec. 72.03, § 521.101(f–2), 2011 Tex. Gen. Laws 5254, 5344 (codified at Tex. Transp. Code § 521.142(a)).

AR 00000155

less fuel-efficient cars as a result of the EPA's decision, and that would have had to contribute meaningfully to a rise in sea levels, causing the erosion of the state's shoreline. *See Massachusetts v. EPA*, 549 U.S. at 523, 127 S.Ct. 1438. There was some uncertainty about whether the EPA's inaction was a substantial cause of the state's harm, considering the many other emissions sources involved.[67] But the Court held that Massachusetts had satisfied the causation requirement because the possibility that the effect of the EPA's decision was minor did not negate standing, and the evidence showed that the effect was significant in any event. *Id.* at 524–25, 127 S.Ct. 1438.

This case raises even less doubt about causation, so the result is the same. The matters in which the Supreme Court held that an injury was not fairly traceable to the challenged law reinforce this conclusion. In some of them, the independent act of a third party was a necessary condition of the harm's occurrence, and it was uncertain whether the third party would take the required step.[68] Not so here.

DAPA beneficiaries have strong incentives to obtain driver's licenses, and it is hardly speculative that many would do so if they became eligible. In other cases, in which there was insufficient proof of causation, several factors potentially contributed to the injury, and the challenged policy likely played a minor role.[69]

Far from playing an insignificant role, DAPA would be the primary cause and likely the only one. Without the program, there would be little risk of a dramatic increase in the costs of the driver's-license program. This case is far removed from those in which the Supreme Court has held an injury to be too incidental or attenuated. Texas's injury is fairly traceable to DAPA.

---

**67.** *See Massachusetts v. EPA*, 549 U.S. at 523–24, 127 S.Ct. 1438; *id.* at 540–45, 127 S.Ct. 1438 (Roberts, C.J., dissenting) (questioning whether Massachusetts had lost land at all as a result of climate change and whether the EPA's decision had contributed meaningfully to any erosion).

**68.** *See, e.g., Amnesty Int'l*, 133 S.Ct. at 1147–50 (explaining that, for a provision of the Foreign Intelligence Surveillance Act to have resulted in the monitoring of the plaintiffs' communications, the Attorney General and the Director of National Intelligence would have had to authorize the collection of the communications, the Foreign Intelligence Surveillance Court would have had to approve the government's request, and the government would have had to intercept the communications successfully); *Whitmore v. Arkansas*, 495 U.S. 149, 156–60, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (reasoning that, for a death-row inmate's decision not to appeal to have harmed the plaintiff, who was another death row inmate, the court hearing any appeal would have had to rule in a way favorable to the plaintiff).

**69.** *See, e.g., Already, LLC v. Nike, Inc.*, —— U.S. ——, 133 S.Ct. 721, 731, 184 L.Ed.2d 553 (2013) (rejecting the theory "that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful—whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on."); *McConnell v. FEC*, 540 U.S. 93, 228, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (commenting that the plaintiffs, candidates for public office, were unable to compete not because of increased hard-money limits but instead because of their personal decisions not to accept large contributions), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010); *Allen v. Wright*, 468 U.S. 737, 756–59, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (observing that any lack of opportunity for the plaintiffs' children to attend racially integrated public schools was attributable not only to tax exemptions for discriminatory private schools but also to the decisions of private-school administrators and other parents), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, —— U.S. ——, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).

D.

[15] Texas has satisfied the third standing requirement, redressability. Enjoining DAPA based on the procedural APA claim could prompt DHS to reconsider the program, which is all a plaintiff must show when asserting a procedural right. *See id.* at 518, 127 S.Ct. 1438. And enjoining DAPA based on the substantive APA claim would prevent Texas's injury altogether.

E.

The United States submits that Texas's theory of standing is flawed because it has no principled limit. In the government's view, if Texas can challenge DAPA, it could also sue to block a grant of asylum to a single alien or any federal policy that adversely affects the state, such as an IRS revenue ruling that decreases a corporation's federal taxable income and corresponding state franchise-tax liability.

The flaw in the government's reasoning is that *Massachusetts v. EPA* entailed similar risks, but the Court still held that Massachusetts had standing. Under that decision, Massachusetts conceivably could challenge the government's decision to buy a car with poor fuel efficiency because the vehicle could contribute to global warming. The state might be able to contest any federal action that prompts more travel. Or it potentially could challenge any change in federal policy that indirectly results in greenhouse-gas emissions, such as a trade-promotion program that leads to more shipping. One of the dissenting Justices in *Massachusetts v. EPA* criticized the decision on that ground,[70] but the majority found those concerns unpersuasive, just as they are here.

After *Massachusetts v. EPA*, the answer to those criticisms is that there are other ways to cabin policy disagreements masquerading as legal claims.[71] First, a state that has standing still must have a cause of action. Even the APA—potentially the most versatile tool available to an enterprising state—imposes a number of limitations. A state must be defending concerns that are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[72] It is unclear whether a state dissatisfied with an IRS revenue ruling would be defending such an interest. Moreover, judicial review is unavailable where the statute precludes it or the matter is committed to agency discretion. 5 U.S.C. § 701(a). Because of those restrictions, a state would have limited ability to challenge many asylum determinations. *See* 8 U.S.C. § 1252(b)(4)(D). Further, numerous policies that adversely affect states either are not rules at all or are exempt from the notice-and-comment requirements. *See generally* 5 U.S.C. § 553.

Second, the standing requirements would preclude much of the litigation the government describes. For example, it would be difficult to establish standing to challenge a grant of asylum to a single alien based on the driver's-license theory. The state must allege an injury that has

---

**70.** *See Massachusetts v. EPA*, 549 U.S. at 546, 127 S.Ct. 1438 (Roberts, C.J., dissenting) ("Every little bit helps, so Massachusetts can sue over any little bit.").

**71.** The dissent responds to this by asserting that "[t]he majority's observation that this suit involves 'policy disagreements masquerading as legal claims' is also telling." Dissent at

202. That of course is not what our sentence (which is not a description of the suit at hand) says at all.

**72.** *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

AR 00000157

already occurred or is "certainly impending";[73] it is easier to demonstrate that some DAPA beneficiaries would apply for licenses than it is to establish that a particular alien would. And causation could be a substantial obstacle. Although the district court's calculation of Texas's loss from DAPA was based largely on the need to hire employees, purchase equipment, and obtain office space,[74] those steps would be unnecessary to license one additional person.

Third, our determination that Texas has standing is based in part on the "special solicitude" we afford it under *Massachusetts v. EPA* as reinforced by *Arizona State Legislature.* To be entitled to that presumption, a state likely must be exercising a procedural right created by Congress and protecting a "quasi-sovereign" interest. *See Massachusetts v. EPA,* 549 U.S. at 520, 127 S.Ct. 1438. Those factors will seldom exist. For instance, a grant of asylum to a single alien would impose little pressure to change state law. Without "special solicitude," it would be difficult for a state to establish standing, a heavy burden in many of the government's hypotheticals.

Fourth, as a practical matter, it is pure speculation that a state would sue about matters such as an IRS revenue ruling.

Though not dispositive of the issue, the absence of any indication that such lawsuits will occur suggests the government's parade of horribles is unfounded,[75] and its concerns about the possible future effects of Texas's theory of standing do not alter our conclusion. The states have standing.

## IV.

[16]   Because the states are suing under the APA, they "must satisfy not only Article III's standing requirements, but an additional test: The interest [they] assert[ ] must be 'arguably within the zone of interests to be protected or regulated by the statute' that [they] say[ ] was violated."[76] That "test ... 'is not meant to be especially demanding' " and is applied "in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.' "[77]

The Supreme Court "ha[s] always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff," and "[w]e do not require any 'indication of congressional purpose to benefit the would-be plaintiff.' "[78] "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' "[79]

**73.** *Amnesty Int'l,* 133 S.Ct. at 1147 (emphasis omitted) (quoting *Defs. of Wildlife,* 504 U.S. at 565 n. 2, 112 S.Ct. 2130).

**74.** *See* Dist. Ct. Op., 86 F.Supp.3d at 616–17 (discussing the potential loss and citing a portion of a declaration addressing those expenses).

**75.** *See Hosanna–Tabor Evangelical Lutheran Church & Sch. v. EEOC,* —— U.S. ——, 132 S.Ct. 694, 710, 181 L.Ed.2d 650 (2012) (stating, in response to an alleged "parade of horribles," that "[t]here will be time enough to address ... other circumstances" in future cases without altering the Court's present conclusion).

**76.** *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,* —— U.S. ——, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (quoting *Data Processing,* 397 U.S. at 153, 90 S.Ct. 827).

**77.** *Id.* (quoting *Sec. Indus. Ass'n,* 479 U.S. at 399, 107 S.Ct. 750).

**78.** *Id.* (quoting *Sec. Indus. Ass'n,* 479 U.S. at 399–400, 107 S.Ct. 750).

**79.** *Id.* (quoting *Sec. Indus. Ass'n,* 479 U.S. at 399, 107 S.Ct. 750).

**[17]** The interests the states seek to protect fall within the zone of interests of the INA.[80] "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[ ] many of the consequences of unlawful immigration." *Arizona v. United States*, 132 S.Ct. at 2500. Reflecting a concern that "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates," 8 U.S.C. § 1601, "Congress deemed some *unlawfully present* aliens ineligible for certain state and local public benefits unless the state explicitly provides otherwise."[81] With limited exceptions, unlawfully present aliens are "not eligible for any State or local public benefit." 8 U.S.C. § 1621(a).

Contrary to the government's assertion, Texas satisfies the zone-of-interests test not on account of a generalized grievance but instead as a result of the same injury that gives it Article III standing—Congress has explicitly allowed states to deny public benefits to illegal aliens. Relying on that guarantee, Texas seeks to participate in notice and comment before the Secretary changes the immigration classification of millions of illegal aliens in a way that forces the state to the Hobson's choice of spending millions of dollars to subsidize driver's licenses or changing its statutes.

### V.

The government maintains that judicial review is precluded even if the states are proper plaintiffs. "Any person 'adversely affected or aggrieved' by agency action . . . is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which there is no other adequate remedy in a court.' "[82] "But before any review at all may be had, a party must first clear the hurdle of 5 U.S.C. § 701(a). That section provides that the chapter on judicial review 'applies, according to the provisions thereof, except to the extent that— (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.' " *Chaney*, 470 U.S. at 828, 105 S.Ct. 1649.

**[18, 19]** "[T]here is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and we will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence.' "[83] The " 'strong presumption' favoring judicial review of administrative action . . . is rebuttable: It fails when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct." *Mach Mining, LLC v. EEOC*, —— U.S. ——, 135 S.Ct. 1645, 1651, 191 L.Ed.2d 607 (2015).

---

**80.** The INA "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.' " *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 131 S.Ct. 1968, 1973, 179 L.Ed.2d 1031 (2011) (quoting *DeCanas v. Bica*, 424 U.S. 351, 353, 359, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)).

**81.** *United States v. Alabama*, 691 F.3d 1269, 1298 (11th Cir.2012) (emphasis added) (citing 8 U.S.C. § 1621).

**82.** *Chaney*, 470 U.S. at 828, 105 S.Ct. 1649 (quoting 5 U.S.C. §§ 702, 704). The government does not dispute that DAPA is a "final agency action." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

**83.** *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63–64, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (quoting *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); *Abbott Labs. v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

[20, 21] Establishing unreviewability is a "heavy burden," [84] and "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* at 345, 104 S.Ct. 2450.

[22] The United States relies on 8 U.S.C. § 1252(g) [85] for the proposition that the INA expressly prohibits judicial review. But the government's broad reading is contrary to *Reno v. American–Arab Anti–Discrimination Committee* ("*AAADC*"), 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), in which the Court rejected "the unexamined assumption that § 1252(g) covers the universe of deportation claims—that it is a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.'" [86] The Court

emphasized that § 1252(g) is not "a general jurisdictional limitation," but rather "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" [87]

None of those actions is at issue here—the states' claims do not arise from the Secretary's "decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders against any alien," § 1252(g); instead, they stem from his decision to grant lawful presence to millions of illegal aliens on a class-wide basis. Further, the states are not bringing a "cause or claim by or on behalf of any alien"—they assert their own right to the APA's procedural protections. *Id.* Congress has expressly limited or precluded judicial review of many immigration decisions, [88] including some that are made in the Secretary's "sole and unreviewable discretion," [89] but DAPA is not one of them.

Judicial review of DAPA is consistent with the protections Congress affords to states that decline to provide public benefits to illegal aliens. "The Government of the United States has broad, undoubted

**84.** *Mach Mining*, 135 S.Ct. at 1651 (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975)).

**85.** With limited exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g).

**86.** *AAADC*, 525 U.S. at 482, 119 S.Ct. 936. "We are aware of no other instance in the United States Code in which language such as this has been used to impose a general jurisdictional limitation . . . ." *Id.*

**87.** *Id.* (quoting § 1252(g)).

**88.** *See AAADC*, 525 U.S. at 486–87, 119 S.Ct. 936 (listing "8 U.S.C. § 1252(a)(2)(A) (limit-

ing review of any claim arising from the inspection of aliens arriving in the United States), [(B)] (barring review of denials of discretionary relief authorized by various statutory provisions), [(C)] (barring review of final removal orders against criminal aliens), [(b)(4)(D)] (limiting review of asylum determinations)"); *see also, e.g.,* 8 U.S.C. §§ 1182(a)(9)(B)(v) (barring review of waiver of reentry restrictions); 1226a(b)(1) (limiting review of detention of terrorist aliens); 1229c(e) (barring review of regulations limiting eligibility for voluntary departure), (f) (limiting review of denial of voluntary departure).

**89.** *E.g.,* 8 U.S.C. §§ 1613(c)(2)(G), 1621(b)(4), 1641.

power over the subject of immigration and the status of aliens,"[90] but, through § 1621, Congress has sought to protect states from "bear[ing] many of the consequences of unlawful immigration."[91] Texas avails itself of some of those protections through Section 521.142(a) of the Texas Transportation Code, which allows the state to avoid the costs of issuing driver's licenses to illegal aliens.

If 500,000 unlawfully present aliens residing in Texas were reclassified as lawfully present pursuant to DAPA, they would become eligible for driver's licenses at a subsidized fee. Congress did not intend to make immune from judicial review an agency action that reclassifies millions of illegal aliens in a way that imposes substantial costs on states that have relied on the protections conferred by § 1621.

The states contend that DAPA is being implemented without discretion to deny applications that meet the objective criteria set forth in the DAPA Memo, and under *AAADC*, judicial review could be available if there is an indication that deferred-action decisions are not made on a case-by-case basis. In *AAADC*, a group of aliens "challenge[d] ... the Attorney General's decision to 'commence [deportation] proceedings' against them," and the Court held that § 1252(g) squarely deprived it of jurisdiction. *AAADC*, 525 U.S. at 487, 119 S.Ct. 936. The Court noted that § 1252(g) codified the Secretary's discretion to decline "the initiation or prosecution of various stages in the deportation process," *id.* at 483, 119 S.Ct. 936 and the Court observed that "[p]rior to 1997, deferred-ac-

tion decisions were governed by internal [INS] guidelines which considered [a variety of factors]," *id.* at 484 n. 8, 119 S.Ct. 936. Although those guidelines "were apparently rescinded," the Court observed that "there [was] no indication that the INS has ceased making this sort of determination on a case-by-case basis." *Id.* But the government has not rebutted the strong presumption of reviewability with clear and convincing evidence that, *inter alia*, it is making case-by-case decisions here.[92]

**A.**

Title 5 § 701(a)(2) "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (citation omitted). For example, "an agency's decision not to institute enforcement proceedings [is] presumptively unreviewable under § 701(a)(2)." *Id.* (citation omitted). Likewise, "[t]here is no judicial review of agency action 'where statutes [granting agency discretion] are drawn in such broad terms that in a given case there is no law to apply,'"[93] such as "[t]he allocation of funds from a lump-sum appropriation." *Vigil*, 508 U.S. at 192, 113 S.Ct. 2024.

**1.**

[23–26] The Secretary has broad discretion to "decide whether it makes sense

---

90.  *Arizona v. United States*, 132 S.Ct. at 2498.

91.  *Id.* at 2500.

92.  *See, e.g., Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 235 (5th Cir.2015) (Higginbotham, J.) ("[T]here is a 'strong presumption,' subject to Congressional language, that 'action taken by a federal agency is re-

viewable in federal court.'" (quoting *RSR Corp. v. Donovan*, 747 F.2d 294, 299 n. 23 (5th Cir.1984))).

93.  *Perales v. Casillas*, 903 F.2d 1043, 1047 (5th Cir.1990) (alteration in original) (citation omitted).

to pursue removal at all" [94] and urges that deferred action—a grant of "lawful presence" and subsequent eligibility for otherwise unavailable benefits—is a presumptively unreviewable exercise of prosecutorial discretion.[95] "The general exception to reviewability provided by § 701(a)(2) for action 'committed to agency discretion' remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." [96] Where, however, "an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers." [97]

Part of DAPA involves the Secretary's decision—at least temporarily—not to enforce the immigration laws as to a class of what he deems to be low-priority illegal aliens. But importantly, the states have not challenged the priority levels he has established,[98] and neither the preliminary injunction nor compliance with the APA requires the Secretary to remove any alien or to alter his enforcement priorities.

Deferred action, however, is much more than nonenforcement: It would affirmatively confer "lawful presence" and associated benefits on a class of unlawfully present aliens. Though revocable, that change in designation would trigger (as we have already explained) eligibility for federal benefits—for example, under title II and XVIII of the Social Security Act [99]—and state benefits—for example, driver's licenses and unemployment insurance[100]—that would not otherwise be available to illegal aliens.[101]

**94.** *Arizona v. United States*, 132 S.Ct. at 2499 ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." (citation omitted)).

**95.** The dissent misleadingly declares, "In other words, deferred action itself is merely a brand of 'presumptively unreviewable' prosecutorial discretion." Dissent at 196. The dissent attributes that statement to this panel majority when in fact, as shown above, we accurately cite the statement as coming from the Secretary.

**96.** *Chaney*, 470 U.S. at 838, 105 S.Ct. 1649 (citation omitted); *see Vigil*, 508 U.S. at 190–91, 113 S.Ct. 2024.

**97.** *Chaney*, 470 U.S. at 832, 105 S.Ct. 1649.

**98.** *See* Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Thomas Winkowski, Acting Dir., U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014) (the "Prioritization Memo"), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

**99.** *See supra* part I.A. DAPA would also toll the duration of the recipients' unlawful presence under the INA's reentry bars, which would benefit aliens who receive lawful presence as minors because the unlawful-presence clock begins to run only at age eighteen. *See* 8 U.S.C. § 1182(a)(9)(B)(iii)(I). Most adult beneficiaries would be unlikely to benefit from tolling because, to be eligible for DAPA, one must have continuously resided in the United States since before January 1, 2010, and therefore would likely already be subject to the reentry bar for aliens who have "been unlawfully present in the United States for one year or more." § 1182(a)(9)(B)(i)(II); *see* § 1182(a)(9)(C)(i)(I).

**100.** *See supra* part I.A.

**101.** *Cf.* Memorandum from James Cole, Deputy Att'y Gen., to All U.S. Attorneys (Aug. 29, 2013) (the "Cole Memo"), http://www.justice.gov/iso/opa/resources/305201382913 2756857467.pdf. The Cole Memo establishes how prosecutorial discretion will be used in relation to marihuana enforcement under the Controlled Substances Act. Unlike the DAPA Memo, it does not direct an agency to grant eligibility for affirmative benefits to anyone

The United States maintains that DAPA is presumptively unreviewable prosecutorial discretion because " 'lawful presence' is not a status and is not something that the alien can legally enforce; the agency can alter or revoke it at any time." [102] The government further contends that "[e]very decision under [DAPA] to defer enforcement action against an alien necessarily entails allowing the individual to be lawfully present.... Deferred action under DAPA and 'lawful presence' during that limited period are thus two sides of the same coin." [103]

Revocability, however, is not the touchstone for whether agency is action is reviewable. Likewise, to be reviewable agency action, DAPA need not directly confer public benefits—removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them "provides a focus for judicial review." *Chaney,* 470 U.S. at 832, 105 S.Ct. 1649.

Moreover, if deferred action meant only nonprosecution, it would not necessarily result in lawful presence. "[A]lthough prosecutorial discretion is broad, it is not 'unfettered.' " [104] Declining to prosecute

does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change. Regardless of whether the Secretary has the authority to offer lawful presence and employment authorization in exchange for participation in DAPA, his doing so is not shielded from judicial review as an act of prosecutorial discretion.

This evident conclusion is reinforced by the Supreme Court's description, in *AAADC,* of deferred action as a nonprosecution decision:

> To ameliorate a harsh and unjust outcome, the INS may *decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation.* This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action.... *Approval of deferred action status means that ... no action will thereafter be taken to proceed against an apparently deportable alien,* even on grounds normally regarded as aggravated.[105]

engaged in unlawful conduct. As we have explained, to receive public benefits, aliens accorded lawful presence must satisfy additional criteria set forth in the various benefit schemes, but they nevertheless become *eligible* to satisfy those criteria. That eligibility is itself a cognizable benefit.

**102.** Supplemental Brief for Appellants at 16. *But see* 8 U.S.C. § 1201(i) ("After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation."); § 1227(a)(1)(B) (providing that any alien "whose nonimmigrant visa ... has been revoked under section 1201(i) of this title, is deportable").

**103.** Supplemental Brief for Appellants at 16 (emphasis omitted).

**104.** *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quoting *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)).

**105.** *AAADC,* 525 U.S. at 484, 119 S.Ct. 936 (emphasis added) (quoting 6 CHARLES GORDON, STANLEY MAILMAN & STEPHEN YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03[2][h] (1998)); *accord Johns v. Dep't of Justice,* 653 F.2d 884, 890 (5th Cir.1981) ("The Attorney General also determines whether (1) to refrain from (or, in administrative parlance, to defer in) executing an outstanding order of deportation, or (2) to stay the order of deportation." (footnote omitted)); *see also Yoon v. INS,* 538 F.2d 1211, 1213 (5th Cir.1976) (per curiam).

In their procedural claim, the states do not challenge the Secretary's decision to "decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation," nor does deferred action mean merely that "no action will thereafter be taken to proceed against an apparently deportable alien." [106]

Under DAPA, "[d]eferred action ... means that, for a specified period of time, an individual is permitted to be *lawfully present* in the United States," [107] a change in designation that confers eligibility for substantial federal and state benefits on a class of otherwise ineligible aliens. Thus, DAPA "provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers." [108]

### 2.

[27] "The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." [109] In *Perales,* 903 F.2d at 1051, we held that the INS's decision *not* to grant pre-hearing voluntary

departures and work authorizations to a group of aliens was committed to agency discretion because "[t]here are no statutory standards for the court to apply.... There is nothing in the [INA] expressly providing for the grant of employment authorization or pre-hearing voluntary departure to [the plaintiff class of aliens]." Although we stated that "the agency's decision to grant voluntary departure and work authorization has been committed to agency discretion by law," *id.* at 1045, that case involved a challenge to the *denial* of voluntary departure and work authorization.

Under those facts, *Perales* faithfully applied *Chaney*'s presumption against judicial review of agency inaction "because there are no meaningful standards against which to judge the agency's exercise of discretion." *Id.* at 1047. But where there is affirmative agency action—as with DAPA's issuance of lawful presence and employment authorization—and in light of the INA's intricate regulatory scheme for changing immigration classifications and issuing employment authorization, [110] "[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers." *Chaney,* 470 U.S. at 832, 105 S.Ct. 1649.

The United States asserts that 8 C.F.R. § 274a.12(c)(14), [111] rather than DAPA,

---

106.   *AAADC,* 525 U.S. at 484, 119 S.Ct. 936 (quoting GORDON, MAILMAN & YALE-LOEHR, *supra* note 105).

107.   DAPA Memo at 2 (emphasis added).

108.   *Chaney,* 470 U.S. at 832, 105 S.Ct. 1649. Because the challenged portion of DAPA's deferred-action program is not an exercise of enforcement discretion, we do not reach the issue of whether the presumption against review of such discretion is rebutted. *See id.* at 832–34–, 105 S.Ct. 1649; *Adams v. Richardson,* 480 F.2d 1159, 1161–62 (D.C.Cir.1973) (en banc) (per curiam).

109.   *Perales,* 903 F.2d at 1051 (quoting *Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir.1985) (per curiam)).

110.   *See* infra part VII.

111.   "An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, [may be able to obtain work authorization upon application] if the alien establishes an economic necessity for employment." 8 C.F.R. § 274a.12(c)(14).

makes aliens granted deferred action eligible for work authorizations. But if DAPA's deferred-action program must be subjected to notice-and-comment, then work authorizations may not be validly issued pursuant to that subsection until that process has been completed and aliens have been "granted deferred action." § 274a.12(c)(14).

Moreover, the government's limitless reading of that subsection—allowing for the issuance of employment authorizations to any class of illegal aliens whom DHS declines to remove—is beyond the scope of what the INA can reasonably be interpreted to authorize, as we will explain.[112] And even assuming, *arguendo*, that the government does have that power, Texas is also injured by the grant of lawful presence itself, which makes DAPA recipients newly eligible for state-subsidized driver's licenses.[113] As an affirmative agency action with meaningful standards against which to judge it, DAPA is not an unreviewable "agency action . . . committed to agency discretion by law." § 701(a)(2).

**112.** The class of aliens eligible for DAPA is not among those classes of aliens identified by Congress as eligible for deferred action and work authorization. *See infra* part VII.

**113.** *See* TEX. DEP'T OF PUB. SAFETY, VERIFYING LAWFUL PRESENCE, *supra* note 56.

**114.** *Lexmark*, 134 S.Ct. at 1386 (quoting *Sprint Commc'ns, Inc. v. Jacobs*, — U.S. ——, 134 S.Ct. 584, 591, 187 L.Ed.2d 505 (2013)).

**115.** *See Sprint Commc'ns*, 134 S.Ct. at 590 ("Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821))).

**116.** *Texas v. United States*, 106 F.3d at 664; *see also Sure–Tan*, 467 U.S. at 897, 104 S.Ct. 2803 ("[P]rivate persons . . . have no judicially cognizable interest in procuring enforcement of the immigration laws . . . ."); *Fiallo*,

**B.**

**[28, 29]** The government urges that this case is not justiciable even though "'a federal court's 'obligation'' to hear and decide cases within its jurisdiction is 'virtually unflagging.'"[114] We decline to depart from that well-established principle.[115] And in invoking our jurisdiction, the states do not demand that the federal government "control immigration and . . . pay for the consequences of federal immigration policy" or "prevent illegal immigration."[116]

**[30]** Neither the preliminary injunction nor compliance with the APA requires the Secretary to enforce the immigration laws or change his priorities for removal, which have expressly not been challenged.[117] Nor have the states "merely invited us to substitute our judgment for that of Congress in deciding which aliens shall be eligible to participate in [a benefits program]." *Diaz*, 426 U.S. at 84, 96 S.Ct. 1883.[118] DAPA was enjoined because the

430 U.S. at 792, 97 S.Ct. 1473 ("[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953))).

**117.** *See* Brief for Appellees at 2 ("[T]he district court's injunction does not touch-and this lawsuit has never challenged-the Executive's separate memorandum establishing three categories for removal prioritization, or any decision by the Executive to forego a removal proceeding.").

**118.** The main thrust of the dissent could be summarized as claiming that "[i]t's Congress's fault." The President apparently agrees: As explained by the district court, "it was the failure of Congress to enact such a program that prompted [the President] . . . to 'change the law.'" *See infra* note 200. The dissent opens by blaming Congress for insufficient funding-*to-wit*, "decades of congression-

states seek an opportunity to be heard through notice and comment, not to have the judiciary formulate or rewrite immigration policy. "Consultation between federal and state officials is an important feature of the immigration system," [119] and the notice-and-comment process, which "is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making," [120] facilitates that communication.

At its core, this case is about the Secretary's decision to change the immigration classification of millions of illegal aliens on a class-wide basis. The states properly maintain that DAPA's grant of lawful presence and accompanying eligibility for benefits is a substantive rule that must go through notice and comment, before it imposes substantial costs on them, and that DAPA is substantively contrary to law. The federal courts are fully capable of adjudicating those disputes.

## VI.

[31] Because the interests that Texas seeks to protect are within the INA's zone of interests, and judicial review is available, we address whether Texas has established a substantial likelihood of success on its claim that DAPA must be submitted for notice and comment. The United States urges that DAPA is exempt as an "in-

---

al appropriations decisions, which require DHS ... to de-prioritize millions of removable each year due to these resource constraints." Dissent at 191 (footnote omitted).

The dissent's insistent invocation of what it perceives as Congress's inadequate funding is regrettable and exposes the weakness of the government's legal position. *See, e.g.,* Dissent at 188–89 ("unless and until more resources are made available by Congress"); *id.* ("if Congress is able to make more resources for removal available"); *id.* at 190 ("given the resource constraints faced by DHS"); *id.* ("to maximize the resources that can be devoted to such ends"); *id.* at 191 ("decades of congressional appropriations decisions"); *id.* at 191 ("due to these resource constraints"); *id.* at 192 n. 9 ("if Congress were to substantially increase the amount of funding"); *id.* at 196 ("DHS's limited resources"); *id.* at 214 n. 55 ("the decades-long failure of Congress to fund"); *id.* at [218] ("Congress's choices as to the level of funding for immigration enforcement").

The facts, not commentary on political decisions, are what should matter. Thus the dissent's notion that "this case essentially boils down to a policy dispute," Dissent at 201, far misses the mark and avoids having to tackle the hard reality—for the government—of existing law. Similarly unimpressive is the dissent's resort to hyperbole. *E.g.,* Dissent at 194 ("[t]he majority's breathtaking expansion of state standing"); *id.* at 195 ("the majority's sweeping 'special solicitude' analysis"); *id.* at

194–95 n. 15 ("the sweeping language the majority uses today"); *id.* at 213 n. 54 ("this radical theory of standing"); *id.* at 216 n. 61 ("The majority's ruling ... is potentially devastating.").

The dissent also claims that despite limited funding, "DHS ... has been removing individuals from the United States in record numbers." Dissent at 200. At the very least, the statistics on which the dissent relies are highly misleading. Although DHS claims that a record-high of 0.44 million aliens were deported in 2013, it arrives at that number by using only "removals" (which are deportations by court order) per year and ignoring "returns" (which are deportations achieved without court order). If, more accurately, one counts total removals and returns by both ICE and the Border Patrol, deportations peaked at over 1.8 million in 2000 and plunged to less than half—about 0.6 million—in 2013. In that thirteen-year interim, the number of aliens deported per court directive (that is, removed) roughly doubled from about 0.2 million to 0.44 million. The total number of deportations is at its lowest level since the mid–1970's. U.S. DEP'T OF HOMELAND SEC., 2013 YEARBOOK OF IMMIGRATION STATISTICS 103tbl.39 (2014), http://www.dhs.gov/sites/default/files/publications/ois_yb_2013_0.pdf.

**119.** *Arizona v. United States,* 132 S.Ct. at 2508.

**120.** *U.S. Steel Corp. v. EPA,* 595 F.2d 207, 214 (5th Cir.1979).

terpretative rule[ ], general statement[ ] of policy, or rule[ ] of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). "In contrast, if a rule is 'substantive,' the exemption is inapplicable, and the full panoply of notice-and-comment requirements must be adhered to scrupulously. The 'APA's notice and comment exemptions must be narrowly construed.' " [121]

## A.

[32, 33] The government advances the notion that DAPA is exempt from notice and comment as a policy statement.[122] We evaluate two criteria to distinguish policy statements from substantive rules: whether the rule (1) "impose[s] any rights and obligations" and (2) "genuinely leaves the agency and its decision-makers free

to exercise discretion." [123] There is some overlap in the analysis of those prongs "because '[i]f a statement denies the decisionmaker discretion in the area of its coverage ... then the statement is binding, and creates rights or obligations.' " [124] "While mindful but suspicious of the agency's own characterization, we ... focus[ ] primarily on whether the rule has binding effect on agency discretion or severely restricts it." [125] "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec.*, 290 F.3d at 383 (citation omitted).

[34] Although the DAPA Memo facially purports to confer discretion,[126] the dis-

**121.** *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir.1995) (footnote omitted) (quoting *United States v. Picciotto*, 875 F.2d 345, 347 (D.C.Cir.1989)).

**122.** The government does not dispute that DAPA is a "rule," which is defined by the APA as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes [various substantive agency functions] or practices bearing on any of the foregoing." 5 U.S.C. § 551(4).

**123.** *Prof'ls & Patients*, 56 F.3d at 595 (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C.Cir.1987) (per curiam)); *see also Vigil*, 508 U.S. at 197, 113 S.Ct. 2024 (describing general statements of policy "as 'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.' " (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979))); *Brown Express, Inc. v. United States*, 607 F.2d 695, 701 (5th Cir.1979) ("A general statement of policy is a statement by an administrative agency announcing motivating factors the agency will consider, or tentative goals toward which it

will aim, in determining the resolution of a [s]ubstantive question of regulation.").

**124.** *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C.Cir.2002) (quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C.Cir.1988)).

**125.** *Prof'ls & Patients*, 56 F.3d at 595 (footnote omitted); *accord id.* ("[W]e are to give some deference, 'albeit "not overwhelming," ' " to the agency's characterization of its own rule." (quoting *Cmty. Nutrition Inst.*, 818 F.2d at 946)); *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 619 (5th Cir.1994) ("This court, however, must determine the category into which the rule falls: '[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact.' " (alteration in original) (quoting *Brown Express*, 607 F.2d at 700)).

**126.** *See Crane*, 783 F.3d at 254–55. In *Crane*, we held that the plaintiff ICE agents and deportation officers had not "demonstrated the concrete and particularized injury required to give them standing" to challenge DACA, *id.* at 247, because, *inter alia*, they had not alleged a sufficient factual basis for their claim that an employment action against them was "certainly impending" if they "ex-

trict court determined that "[n]othing about DAPA '*genuinely* leaves the agency and its [employees] free to exercise discretion,'"[127] a factual finding that we review for clear error. That finding was partly informed by analysis of the implementation of DACA, the precursor to DAPA.[128]

Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, but the district court found that those statements were "merely pretext"[129] because only about 5% of the 723,-000 applications accepted for evaluation had been denied,[130] and "[d]espite a request by the [district] [c]ourt, the [g]overnment's counsel did not provide the number, if any, of requests that were denied [for discretionary reasons] even though the applicant met the DACA criteria...."[131] The finding of pretext was also based on a declaration by Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that "DHS management has taken multiple steps to ensure that DACA applications are simply rubberstamped if the

ercise[d] [their] discretion to detain an illegal alien," *id.* at 255. That conclusion was informed by the express delegation of discretion on the face of the DACA Memo and by the fact that no sanctions or warnings had yet been issued. *Id.* at 254–55. We did not hold that DACA was an unreviewable exercise of prosecutorial discretion or that the DACA criteria did not have binding or severely restrictive effect on agency discretion. *See id.* at 254–55.

127. Dist. Ct. Op., 86 F.Supp.3d at 670 (second alteration in original) (quoting *Prof'ls & Patients*, 56 F.3d at 595).

128. *Id.* at 669–70. *See* 3 JACOB A. STEIN ET AL., ADMINISTRATIVE LAW § 15.05[3] (2014) ("In general, the agency's past treatment of a rule will often indicate its nature.").

129. Dist. Ct. Op., 86 F.Supp.3d at 669 n. 101.

130. *Id.* at 609; *see id.* (noting that "[i]n response to a Senate inquiry, the USCIS told the Senate that the top four reasons for denials were: (1) the applicant used the wrong form; (2) the applicant failed to provide a valid signature; (3) the applicant failed to file or complete Form I–765 or failed to enclose the fee; and (4) the applicant was below the age of fifteen and thus ineligible to participate in the program"); *id.* at 669 n. 101 ("[A]ll were denied for failure to meet the criteria (or 'rejected' for technical filing errors, errors in filling out the form or lying on the form, and failures to pay fees), or for fraud.").

Relying on the Neufeld declaration, the dissent tries to make much of the distinction between denials and rejections. Dissent at 209. The district court did in fact mistakenly write "denials" (used to describe applications refused for failure to meet the criteria) in the above quoted passage where the USCIS response actually said "rejections" (applications refused for procedural defects). USCIS reported that approximately 6% of DACA applicants were rejected and that an additional 4% were denied. USCIS does not draw a distinction between denials of applicants who did not meet the criteria and denials of those who met the criteria but were refused deferred action as a result of a discretionary choice.

USCIS could not produce any applications that satisfied all of the criteria but were refused deferred action as an exercise of discretion. *Id.* at 669 n. 101 ("[A]ll were denied for failure to meet the criteria or 'rejected' for technical filing errors, errors in filling out the form or lying on the form, and failures to pay fees, or for fraud."). Given that the government offered no evidence as to the bases for other denials, it was not error—clear or otherwise—for the district court to conclude that DHS issued DACA denials under mechanical formulae.

131. Dist. Ct. Op., 86 F.Supp.3d at 609. The parties had ample opportunity to inform the district court, submitting over 200 pages of briefing over a two-month period with more than 80 exhibits. The court held a hearing on the motion for a preliminary injunction, heard extensive argument from both sides, and "specifically asked for evidence of individuals who had been denied for reasons other than not meeting the criteria or technical errors with the form and/or filing." *Id.* at 669 n. 101.

applicants meet the necessary criteria";[132] DACA's Operating Procedures, which "contain[ ] nearly 150 pages of specific instructions for granting or denying deferred action";[133] and some mandatory language in the DAPA Memo itself.[134] In denying the government's motion for a stay of the injunction, the district court further noted that the President had made public statements suggesting that in reviewing applications pursuant to DAPA, DHS officials who "don't follow the policy" will face "consequences," and "they've got a problem." [135]

[35] The DACA and DAPA Memos purport to grant discretion, but a rule can be binding if it is "applied by the agency in a way that indicates it is binding," [136] and there was evidence from DACA's implementation that DAPA's discretionary language was pretextual. For a number of reasons, any extrapolation from DACA must be done carefully.[137]

> I [the Secretary] hereby direct USCIS to establish a process, similar to DACA.... Applicants must file.... Applicants must also submit.... [Applicants] shall also be eligible.... Deferred action granted pursuant to the program shall be for a period of three years.... As with DACA, the above criteria are to be considered for all individuals.... ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria.... ICE is further instructed to review pending removal cases.... The USCIS process shall also be available to individuals subject to final orders of removal.
>
> *Id.* at 611–12 (paragraph breaks omitted.) This detailed explication of the DAPA Memo flies in the face of the dissent's unjustified critique that the district court "eschew[ed] the plain language of the [DAPA] Memorandum." Dissent at 207.

**132.** Dist. Ct. Op., 86 F.Supp.3d at 609–10.

**133.** *Id.* at 669 (footnote omitted). For example, the DACA National Standard Operating Procedures ("SOP") specifically directs officers on which evidence an applicant is required to submit, what evidence is to be considered, "the weight to be given" to evidence, and the standards of proof required to grant or deny an application. U.S. DEP'T OF HOMELAND SEC., NATIONAL STANDARD OPERATING PROCEDURES: DACA 42 (2012). To elaborate: An affidavit alone may not support an application, and DACA applicants must prove education and age criteria by documentary evidence. *Id.* at 8–10. The SOP also mandates, however, that "[o]fficers will NOT deny a DACA request solely because the DACA requestor failed to submit sufficient evidence with the request … officers will issue a [Request for Evidence (RFE) ] … whenever possible." *Id.* at 42.

DHS internal documents further provide that "a series of RFE [] templates have been developed and *must* be used," and those documents remind repeatedly that "[u]se of these RFE templates is mandatory." (Emphasis added.) And "[w]hen an RFE is issued, the response time given shall be 87 days." SOP at 42.

These specific evidentiary standards and RFE steps imposed by the SOP are just examples the district court had before it when it concluded that DACA and DAPA "severely restrict[ ]" agency discretion. *Prof'ls & Patients,* 56 F.3d at 595. Far from being clear error, such a finding was no error whatsoever.

**134.** Dist. Ct. Op., 86 F.Supp.3d at 648–49, 671 n. 103. There the district court exhibited its keen awareness of the DAPA Memo by quoting the following from it:

**135.** *Texas v. United States,* No. B–14–254, 2015 WL 1540022, at *3 (S.D.Tex. Apr. 7, 2015).

**136.** *Gen. Elec.,* 290 F.3d at 383; *accord McLouth Steel,* 838 F.2d at 1321–22 (reviewing historical conformity as part of determination of whether rule was substantive or non-binding policy, despite language indicating that it was policy statement); *id.* at 1321 ("More critically than EPA's language [,] … its later conduct applying it confirms its binding character.").

**137.** The dissent, citing *National Mining Ass'n v. McCarthy,* 758 F.3d 243, 253 (D.C.Cir. 2014), criticizes the states and the district court for enjoining DAPA without "an early snapshot" of its implementation. Dissent at

AR 00000169

First, DACA involved issuing benefits to self-selecting applicants, and persons who expected to be denied relief would seem unlikely to apply. But the issue of self-selection is partially mitigated by the finding that "the [g]overnment has publicly declared that it will make no attempt to enforce the law against even those who are denied deferred action (absent extraordinary circumstances)." Dist. Ct. Op., 86 F.Supp.3d at 663 (footnote omitted).

Second, DACA and DAPA are not identical: Eligibility for DACA was restricted to a younger and less numerous population,[138] which suggests that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial. Further, the DAPA Memo contains additional discretionary criteria: Applicants must not be "an enforcement priority as reflected in the [Prioritization Memo]; and [must] present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate." DAPA Memo at 4. But despite those differences, there are important similarities: The Secretary "direct[ed] USCIS to *establish a process, similar to DACA,* for exercising prosecutorial discretion," *id.* (emphasis added), and there was evidence that the DACA application process *itself* did not allow for discretion, regardless of the rates of approval and denial.[139]

Instead of relying solely on the lack of evidence that any DACA application had been denied for discretionary reasons, the district court found pretext for additional reasons. It observed that "the 'Operating Procedures' for implementation of DACA

207. First, the dissent overlooks a fundamental principle of preliminary injunctions: An injunction is of no help if one must wait to suffer injury before the court grants it. *United States v. Emerson,* 270 F.3d 203, 262 (5th Cir.2001) ("[T]he injury need not have been inflicted when application [for the injunction] is made or be certain to occur[.]").

Second, the dissent assumes the conclusion of *National Mining*—that the agency action in question is not subject to pre-enforcement review—is applicable here and asserts that we need an "early snapshot" of DAPA enforcement. The two cases are easily distinguished. The court found EPA's "Final Guidance" exempt from pre-enforcement review because it had "no legal impact." *National Mining,* 758 F.3d at 253; *see id.,* at 252 ("The most important factor concerns the actual legal effect (or lack thereof) of the agency action on regulated entities.... As a legal matter, the Final Guidance is meaningless ... [and] has no legal impact.")

DAPA, by contrast, has an effect on regulated entities (i.e. illegal aliens). DAPA removes a categorical bar to illegal aliens who are receiving state and federal benefits, so it places a cost on the states. The states are not required to suffer the injury of that legal impact before seeking an injunction. *See id.* 252.

138. Approximately 1.2 million illegal aliens are eligible for DACA and 4.3 million for DAPA. Dist. Ct. Op., 86 F.Supp.3d at 609, 670.

139. Despite these differences and the dissent's protestations to the contrary (*see,* e.g., Dissent at 208–10), DACA is an apt comparator to DAPA. The district court considered the DAPA Memo's plain language, in which the Secretary equates the DACA and DAPA procedure, background checks, fee exemptions, eligibility for work authorizations, durations of lawful presence and work authorization, and orders DHS to establish, for DAPA, processes similar to those for DACA:

> In order to align the DACA program more closely with the other deferred action authorization outlined below, ... I hereby direct USCIS to establish a process, similar to DACA.... There will be no fee waivers, and like DACA.... As with DACA, the above criteria are to be considered for all individuals....

DAPA Memo at 4–5. *See* Dist. Ct. Op., 86 F.Supp.3d at 610–11. The district court's conclusion that DACA and DAPA would be applied similarly, based as it was in part on the memorandum's plain language, was not clearly erroneous and indeed was not error under any standard of review.

contains nearly 150 pages of specific instructions for granting or denying deferred action to applicants" and that "[d]enials are recorded in a 'check the box' standardized form, for which USCIS personnel are provided templates. Certain denials of DAPA must be sent to a supervisor for approval[, and] there is no option for granting DAPA to an individual who does not meet each criterion." Dist. Ct. Op., 86 F.Supp.3d at 669 (footnotes omitted). The finding was also based on the declaration from Palinkas that, as with DACA, the DAPA application process itself would preclude discretion: "[R]outing DAPA applications through service centers instead of field offices ... created an application process that bypasses traditional in-person investigatory interviews with trained USCIS adjudications officers" and "prevents officers from conducting case-by-case investigations, undermines officers' abilities to detect fraud and national-security risks, and ensures that applications will be rubber-stamped." *See id.* at 609–10 (citing that declaration).

As the government points out, there was conflicting evidence on the degree to which DACA allowed for discretion. Donald Neufeld, the Associate Director for Service Center Operations for USCIS, declared that "deferred action under DACA is a ... case-specific process" that "necessarily involves the exercise of the agency's discretion," and he purported to identify several instances of discretionary denials.[140] Although Neufeld stated that approximately 200,000 requests for additional evidence had been made upon receipt of DACA applications, the government does not know the number, if any, that related to discretionary factors rather than the objective criteria. Similarly, the government did not provide the number of cases that service-center officials referred to field offices for interviews.[141]

Although the district court did not make a formal credibility determination or hold an evidentiary hearing on the conflicting statements by Neufeld and Palinkas, the record indicates that it did not view the Neufeld declaration as creating a material factual dispute.[142] Further, the govern-

---

**140.** The states properly maintain that those denials were not discretionary but instead were required because of failures to meet DACA's objective criteria. For example, Neufeld averred that some discretionary denials occurred because applicants "pose[d] a public safety risk," "[were] suspected of gang membership or gang-related activity, had a series of arrests without convictions" or "ongoing criminal investigations." As the district court aptly noted, however, those allegedly discretionary grounds fell squarely within DACA's objective criteria because DACA explicitly incorporated the enforcement priorities articulated in the DACA Operation Instructions and the memorandum styled Policies for Apprehension, Detention, and Removal of Undocumented Immigrants. Dist. Ct. Op., 86 F.Supp.3d at 669 n. 101.

**141.** The United States was also given the chance to show that it planned to put DAPA into effect in a manner different from how it implemented DACA; it failed to take advantage of that opportunity. Further, after assur-

ing the district court that "[USCIS] does not intend to entertain requests for deferred action under the challenged policy until February 18, 2015," the government later admitted to having approved dozens of DAPA applications and three-year employment authorization to more than 100,000 aliens satisfying the original DACA criteria; the government could not demonstrate which applicants, if any, were rejected on purely discretionary grounds, as distinguished from failure to meet the requirements set forth in the memoranda.

**142.** After a hearing on the preliminary injunction, the government filed a sur-reply that included the Neufeld declaration. The government did not seek an evidentiary hearing, but the states requested one if the "new declarations create a fact dispute of material consequence to the motion." No such hearing was held, and the court cited the Palinkas declaration favorably, *e.g.,* Dist. Ct. Op., 86 F.Supp.3d at 609–10, 613 n. 13, 669 n. 101, yet described other sources as providing insufficient detail, *e.g., id.* at 669 n. 101.

ment did not seek an evidentiary hearing, nor does it argue on appeal that it was error not to conduct such a hearing. Reviewing for clear error, we conclude that the states have established a substantial likelihood that DAPA would not genuinely leave the agency and its employees free to exercise discretion.

### B.

[36, 37]   A binding rule is not required to undergo notice and comment if it is one "of agency organization, procedure, or practice." § 553(b)(A).   "[T]he substantial impact test is the primary means by which [we] look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." [143]   "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply." [144]   DAPA undoubtedly meets that test—conferring lawful presence on 500,000 illegal aliens residing in Texas forces the state to choose between spending millions of dollars to subsidize driver's licenses and amending its statutes. [145]

The District of Columbia Circuit applies a more intricate test for distinguishing between procedural and substantive rules. [146] The court first looks at the " 'effect on those interests ultimately at stake in the agency proceeding.'   Hence, agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals are considered procedural, rather than substantive." [147]

Further, "a procedural rule generally may not 'encode [ ] a substantive value judgment or put[ ] a stamp of approval or disapproval on a given type of behavior,' " [148] but "the fact that the agency's decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one." [149]   "A corollary to this principle is that rules are generally considered procedural so long as they do not 'change the

---

**143.** *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir.1984); *accord* STEIN, *supra*, § 15.05[5] ("Procedural and practice rules have been distinguished from substantive rules by applying the substantial impact test.").

**144.** *Kast Metals*, 744 F.2d at 1153; *accord Brown Express*, 607 F.2d at 701–03.

**145.** *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir.1983) ("[Substantive] rules ... grant rights, impose obligations, or produce other significant effects on private interests.  They also narrowly constrict the discretion of agency officials by largely determining the issue addressed." (omission in original) (quoting *Batterton v. Marshall*, 648 F.2d 694 (D.C.Cir.1980))).

**146.** *Compare Kaspar Wire Works, Inc. v. Sec'y of Labor*, 268 F.3d 1123, 1132 (D.C.Cir.2001) (recognizing that the D.C. Circuit "has expressly rejected" "the Fifth Circuit's 'substantial impact' standard for notice and comment

requirements"), *with City of Arlington v. FCC*, 668 F.3d 229, 245 (5th Cir.2012) ("The purpose of notice-and-comment rulemaking is to assure fairness and mature consideration of rules having a substantial impact on those regulated." (quoting *United States v. Johnson*, 632 F.3d 912, 931 (5th Cir.2011))), *aff'd on other grounds*, —— U.S. ——, 133 S.Ct. 1863, —— L.Ed.2d —— (2013), *and Phillips Petroleum*, 22 F.3d at 620 (reaffirming substantial-impact test announced in *Brown Express* ).

**147.** *Nat'l Sec. Counselors v. CIA*, 931 F.Supp.2d 77, 107 (D.D.C.2013) (citation omitted) (quoting *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 637 (D.C.Cir.1984); *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1051 (D.C.Cir.1987)).

**148.** *Nat'l Sec. Counselors*, 931 F.Supp.2d at 107 (alterations in original) (quoting *Am. Hosp.*, 834 F.2d at 1047).

**149.** *Id.* (quoting *James V. Hurson Assocs. v. Glickman*, 229 F.3d 277, 282 (D.C.Cir.2000)).

*substantive standards* by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide." [150]

Applying those considerations to DAPA yields the same result as does our substantial-impact test. Although the burden imposed on Texas is derivative of conferring lawful presence on beneficiaries, DAPA establishes " 'the *substantive standards* by which the [agency] evaluates applications' which seek a benefit that the agency [purportedly] has the power to provide"—a critical fact requiring notice and comment. [151]

Thus, DAPA is analogous to "the rules [that] changed the substantive criteria for [evaluating station allotment counter-proposals]" in *Reeder v. FCC*, 865 F.2d 1298, 1305 (D.C.Cir.1989) (per curiam), holding that notice and comment was required. In contrast, the court in *JEM Broadcasting*, 22 F.3d at 327, observed that "[t]he critical fact here, however, is that the 'hard look' rules did not change the *substantive standards* by which the FCC evaluates license applications," such that the rules were procedural. Further, receipt of DAPA benefits implies a "stamp of approval" from the government and "encodes a substantive

value judgment," such that the program cannot be considered procedural. *Am. Hosp.*, 834 F.2d at 1047.

### C.

[38] Section 553(a)(2) exempts rules from notice and comment "to the extent that there is involved . . . a matter relating to . . . public property, loans, grants, benefits, or contracts." To avoid "carv[ing] the heart out of the notice provisions of Section 553", [152] the courts construe the public-benefits exception very narrowly as applying only to agency action that "clearly and directly relate[s] to 'benefits' as that word is used in section 553(a)(2)." [153]

[39] DAPA does not "clearly and directly" relate to public benefits as that term is used in § 553(a)(2). That subsection suggests that "rulemaking requirements for agencies managing benefit programs are . . . voluntarily imposed," [154] but USCIS—the agency tasked with evaluating DAPA applications—is not an agency managing benefit programs. Persons who meet the DAPA criteria do not directly receive the kind of public benefit that has been recognized, or was likely to have been included, under this exception. [155]

---

**150.** *Id.* (alteration in original) (quoting *JEM Broad. Co. v. FCC*, 22 F.3d 320, 327 (D.C.Cir.1994)).

**151.** *Id.* (first alteration in original) (quoting *JEM Broad.*, 22 F.3d at 327).

**152.** *Hous. Auth. of Omaha v. U.S. Hous. Auth.*, 468 F.2d 1, 9 (8th Cir.1972) ("The exemptions of matters under Section 553(a)(2) relating to 'public benefits,' could conceivably include virtually every activity of government. However, since an expansive reading of the exemption clause could easily carve the heart out of the notice provisions of Section 553, it is fairly obvious that Congress did not intend for the exemptions to be interpreted that broadly.").

**153.** *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1061 (5th Cir.1985).

**154.** *Alcaraz v. Block*, 746 F.2d 593, 611 (9th Cir.1984).

**155.** *See e.g., Vigil*, 508 U.S. at 184, 196, 113 S.Ct. 2024 (clinical services provided by Indian Health Service for handicapped children); *Hoerner v. Veterans Admin.*, No. 88-3052, 1988 WL 97342, at *1-2 & n. 10 (4th Cir. July 8, 1988) (per curiam) (unpublished) (benefits for veterans); *Baylor Univ. Med. Ctr.*, 758 F.2d at 1058-59 (Medicare reimbursement regulations issued by Secretary of Health and Human Services); *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 813 (D.C.Cir.1975) (food stamp allotment regulations). The Departments of Agriculture, Health and Human Ser-

In summary, the states have established a substantial likelihood of success on the merits of their procedural claim. We proceed to address whether, in addition to that likelihood on the merits, the states make the same showing on their substantive APA claim.[156]

## VII.

[40, 41]  A "reviewing court shall ... hold unlawful and set aside agency action ... found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C.  § 706(2).   Although the district court enjoined DAPA solely on the basis of the procedural APA claim, "it is an elementary proposition, and the supporting cases too numerous to cite, that this court may affirm the district court's judgment on any grounds supported by the record."[157]   Therefore, as an alternate and additional ground for affirming the injunction, we address this substantive issue, which was fully briefed in the district court.[158]

[42–44]  Assuming *arguendo* that *Chevron*[159] applies,[160] we first "ask whether

vices, and Labor have waived the exemption for matters relating to public property, loans, grants, benefits, or contracts.  *See* 29 C.F.R. § 2.7 (Department of Labor);  Public Participation in Rule Making, 36 Fed.Reg. 13,804, 13,804 (July 24, 1971) (Department of Agriculture);  Public Participation in Rule Making, 36 Fed.Reg. 2532, 2532 (Jan. 28, 1971) (Department of Health and Human Services, then known as Health, Education, and Welfare).

**156.**  We reiterate that DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion.  Therefore, even where a party has standing and is within the requisite zone of interests, a traditional nonenforcement policy would not necessarily be subject to notice and comment just because DAPA must undergo notice-and-comment review.

**157.**  *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (citation and internal quotation marks omitted).

**158.**  "This circuit follows the rule that alternative holdings are binding precedent and not obiter dictum."  *United States v. Potts*, 644 F.3d 233, 237 n. 3 (5th Cir.2011) (citation and internal quotation marks omitted).  At oral argument, the parties agreed that no further factual development is needed to resolve the substantive APA challenge.

**159.**  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**160.**  "[T]he fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due."  *Barnhart v. Walton*, 535 U.S. 212, 221, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (citation omitted).  Instead, we consider factors such as "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time...."  *Id.*  We need not decide whether DHS's interpretation satisfies that test, however, because, as we explain, the agency cannot prevail even under *Chevron*.

*Chevron* deference requires the courts to accept an agency's reasonable construction of a statute as long as it is "not patently inconsistent with the statutory scheme."  *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 813 (5th Cir.2000).  As explained below, we decide that, assuming *Chevron* deference does apply, DAPA is not a reasonable construction of the INA, because it is "manifestly contrary" to the INA statutory scheme.  *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53, 131 S.Ct. 704, 178 L.Ed.2d 588 (2011).

An agency construction that is manifestly contrary to a statutory scheme could not be persuasive under the test in *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), a test that affords agency constructions less deference than does *Chevron*.

Congress has 'directly addressed the precise question at issue.' "[161] It has. "Federal governance of immigration and alien status is extensive and complex." *Arizona v. United States*, 132 S.Ct. at 2499. The limited ways in which illegal aliens can lawfully reside in the United States reflect Congress's concern that "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates," 8 U.S.C. § 1601(3), and that "[i]t is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy," § 1601(5).

[45, 46] In specific and detailed provisions, the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present [162] and confers eligibility for "discretionary relief allowing [aliens in deportation proceedings] to remain in the country." [163] Congress has also identified narrow classes of aliens eligible for deferred action, including certain petitioners for immigration status under the Violence Against Women Act of 1994,[164] immediate family members of lawful permanent residents ("LPRs") killed by terrorism,[165] and immediate family members of LPRs killed in combat and granted posthumous citizenship.[166] Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA were it not enjoined. *See* DAPA Memo at 4.

Congress has enacted an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status: In general, an applicant must (i) have a U.S. citizen child who is at least twenty-one years old, (ii) leave the United States, (iii) wait ten years, and then (iv) obtain one of the limit-

---

*See Gonzales v. Oregon*, 546 U.S. 243, 256, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (providing that under *Skidmore*, an "interpretation is entitled to respect only to the extent it has the power to persuade"). Therefore, our decision to forego discussion of the Walton factors is sensible. *See Griffon v. U.S. Dep't of Health & Human Servs.*, 802 F.2d 146, 148 n. 3 (5th Cir.1986) (noting that where an interpretive rule is unreasonable, "there is no need to decide whether *Chevron* or a less exacting standard applies").

**161.** *Mayo Found.*, 562 U.S. at 52, 131 S.Ct. 704 (quoting *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778).

**162.** *E.g.*, lawful-permanent-resident ("LPR") status, *see* 8 U.S.C. §§ 1101(a)(20), 1255; nonimmigrant status, *see* §§ 1101(a)(15), 1201(a)(1); refugee and asylum status, *see* §§ 1101(a)(42), 1157–59, 1231(b)(3); humanitarian parole, *see* § 1182(d)(5); temporary protected status, *see* § 1254a. *Cf.* §§ 1182(a) (inadmissible aliens), 1227(a)–(b) (deportable aliens).

**163.** *Arizona v. United States*, 132 S.Ct. at 2499 (citing 8 U.S.C. §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)); *see also* § 1227(d) (administrative stays of removal for T- and U-visa applicants (victims of human trafficking, or of various serious crimes, who assist law enforcement)).

**164.** Pub.L. No. 103–322, tit. IV, 108 Stat. 1902 (codified as amended in scattered sections of the U.S. Code). *See* 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV).

**165.** USA PATRIOT Act of 2001, Pub.L. No. 107–56, § 423(b), 115 Stat. 272, 361.

**166.** National Defense Authorization Act for Fiscal Year 2004, Pub.L. No. 108–136, § 1703(c)–(d), 117 Stat. 1392, 1694–95; *see also* 8 U.S.C. § 1227(d)(2) (specifying that "[t]he denial of a request for an administrative stay of removal [for T- and U-visa applicants] shall not preclude the alien from applying for ... deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws....").

ed number of family-preference visas from a United States consulate.[167]   Although DAPA does not confer the full panoply of benefits that a visa gives, DAPA would allow illegal aliens to receive the benefits of lawful presence solely on account of their children's immigration status without complying with any of the requirements, enumerated above, that Congress has deliberately imposed.   DAPA requires only that prospective beneficiaries "have ... a son or daughter who is a U.S. citizen or lawful permanent resident"—without regard to the age of the child—and there is no need to leave the United States or wait ten years[168] or obtain a visa.[169]   Further, the INA does not contain a family-sponsorship process for parents of an LPR child,[170] but DAPA allows a parent to derive lawful presence from his child's LPR status.

The INA authorizes cancellation of removal and adjustment of status if, *inter alia*, "the alien has been physically present in the United States for a continuous period of *not less than 10 years* immediately preceding the date of such application" and if "removal would result in *exceptional and extremely unusual hardship* to the alien's spouse, parent, or child, who is a citizen of

the United States or an alien lawfully admitted for permanent residence."   8 U.S.C. § 1229b(b)(1)(A) (emphasis added). Although LPR status is more substantial than is lawful presence, § 1229b(b)(1) is the most specific delegation of authority to the Secretary to change the immigration classification of removable aliens that meet only the DAPA criteria and do not fit within the specific categories set forth in § 1229b(b)(2)–(6).

Instead of a ten-year physical-presence period, DAPA grants lawful presence to persons who "have continuously resided in the United States since before January 1, 2010," and there is no requirement that removal would result in exceptional and extremely unusual hardship.   DAPA Memo at 4. Although the Secretary has discretion to make immigration decisions based on humanitarian grounds, that discretion is conferred only for particular family relationships and specific forms of relief—none of which includes granting lawful presence, on the basis of a child's immigration status, to the class of aliens that would be eligible for DAPA.[171]

The INA also specifies classes of aliens

---

**167.**   *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255; *see Scialabba v. Cuellar de Osorio*, —— U.S. ——, 134 S.Ct. 2191, 2199, 189 L.Ed.2d 98 (2014) (recognizing that legal immigration "takes time—and often a lot of it.... After a sponsoring petition is approved but before a visa application can be filed, a family-sponsored immigrant may stand in line for years—or even decades—just waiting for an immigrant visa to become available.").

**168.**   Although "[t]he Attorney General has sole discretion to waive [the ten-year reentry bar] in the case of an immigrant who is the *spouse or son or daughter* of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refus-

al of admission to such immigrant alien would result in *extreme hardship* to the citizen or lawfully resident spouse or parent of such alien," § 1182(a)(9)(B)(v) (emphasis added), there is no such provision for waiving the reentry bar for *parents* of U.S. citizen or LPR children.

**169.**   DAPA Memo at 4.

**170.**   *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1152(a)(4), 1153(a).

**171.**   *See, e.g.,* 8 U.S.C. §§ 1182(a)(9)(B)(v), (C)(iii) (authorizing waiver of reentry bars for particular classes of inadmissible aliens), 1227(a)(1)(E)(iii) (authorizing waiver of inadmissibility for smuggling by particular classes of aliens).

eligible[172] and ineligible[173] for work authorization, including those "eligible for work authorization and deferred action"—with no mention of the class of persons whom DAPA would make eligible for work authorization. Congress " 'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law,' " [174] in part by "establishing an extensive 'employment verification system,' designed to deny employment to aliens who . . . are not *lawfully present* in the United States." [175]

The INA's careful employment-authorization scheme "protect[s] against the displacement of workers in the United States," [176] and a "primary purpose in restricting immigration is to preserve jobs for American workers." [177]   DAPA would

dramatically increase the number of aliens eligible for work authorization, thereby undermining Congress's stated goal of closely guarding access to work authorization and preserving jobs for those lawfully in the country.

DAPA would make 4.3 million otherwise removable aliens eligible for lawful presence, employment authorization, and associated benefits, and "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." [178]  DAPA undoubtedly implicates "question[s] of deep 'economic and political significance' that [are] central to this statutory scheme; had Congress wished to assign that decision to an agency, it surely would have done so expressly." [179]   But

172.  *E.g.*, 8 U.S.C. §§ 1101(i)(2) (human-trafficking victims in lawful-temporary-resident status pursuant to a T-visa), 1105a(a) (nonimmigrant battered spouses), 1154(a)(1)(K) (grantees of self-petitions under the Violence Against Women Act), 1158(c)(1)(B), (d)(2) (asylum applicants and grantees), 1160(a)(4) (certain agricultural workers in lawful-temporary-resident status), 1184(c)(2)(E), (e)(6) (spouses of L- and E-visa holders), (p)(3)(B) (certain victims of criminal activity in lawful-temporary-resident status pursuant to a U visa), 1254a(a)(1)(B) (temporary-protected status holders), 1255a(b)(3)(B) (temporary-resident status holders).

173.  *E.g.*, 8 U.S.C. §§ 1226(a)(3) (limits on work authorizations for aliens with pending removal proceedings), 1231(a)(7) (limits on work authorizations for aliens ordered removed).

174.  *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (alteration in original) (quoting *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 n. 8, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991)).

175.  *Id.* (emphasis added) (citation omitted) (quoting 8 U.S.C. § 1324a(a)(1)).

176.  *Nat'l Ctr. for Immigrants' Rights*, 502 U.S. at 194, 112 S.Ct. 551 (quoting Powers and

Duties of Service Officers; Availability of Service Records; Employment Authorization; Excludable or Deportable Aliens, 48 Fed.Reg. 51,142, 51,142 (Nov. 7, 1983)).

177.  *Id.* (quoting *Sure–Tan*, 467 U.S. at 893, 104 S.Ct. 2803); *see* 8 U.S.C § 1182(a)(5)(A)(i) (listing among the classes of excludable aliens those who "seek[ ] to enter the United States for the purpose of performing skilled or unskilled labor . . . , unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that—(I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (II) the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed").

178.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

179.  *King v. Burwell*, —— U.S. ——, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) (quoting *Util. Air Regulatory Grp. v. EPA*, —— U.S. ——,

**182**          **809 FEDERAL REPORTER, 3d SERIES**

assuming *arguendo* that *Chevron* applies and that Congress has not directly addressed the precise question at hand, we would still strike down DAPA as an unreasonable interpretation that is "manifestly contrary" to the INA. *See Mayo Found.*, 562 U.S. at 53, 131 S.Ct. 704.

[47]  The dissent, relying on *Texas Rural Legal Aid v. Legal Services Corp.*, 940 F.2d 685, 694 (D.C.Cir.1991), theorizes that our analysis is nothing but an application of the *expressio unius est exclusio alterius*[180] canon of construction, which the dissent claims is of limited utility in administrative law.  Dissent at 215–16.  The dissent's observation is astray, however, because our statutory analysis does not hinge on the *expressio unius* maxim.

Moreover, the Supreme Court and this court have relied on *expressio unius* in deciding issues of administrative law. While noting "the limited usefulness of

134  S.Ct.  2427,  2444,  189  L.Ed.2d  372 (2014)).

**180.**  "A canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." BLACK'S LAW DICTIONARY 701 (10th ed.2014).

**181.**  *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 443–44 (5th Cir.1999).

**182.**  *Id.* at 444 (concluding, on the basis of other statutory provisions, that "Congress intended to allow the FCC broad authority to implement this section").

**183.**  *See, e.g., Christensen v. Harris Cnty.*, 529 U.S.  576,  582–83,  120  S.Ct.  1655,  146 L.Ed.2d 621 (2000) (discussing *expressio unius*, and concluding that it does not inform the result, without suggesting that it has no applicability in administrative law); *Rodriguez–Avalos v. Holder*, 788 F.3d 444, 451 (5th Cir. 2015) (per curiam) (relying on the expression of a term in one section of the statute to infer that its absence in another section suggests intent to foreclose its implication in the latter, even though the statute was subject to inter-

the *expressio unius* doctrine in the administrative context," [181] some courts have declined to apply it mostly because they find it unhelpful for the specific statute at issue.[182]  On other occasions, both our circuit and the Supreme Court have employed the canon in addressing administrative law.[183]  Nor has the District of Columbia Circuit expressly foreclosed use of the canon on questions of statutory interpretation by agencies.[184] Our distinguished dissenting colleague, in fact, relied on *expressio unius* to uphold a decision of the Board of Immigration Appeals, concluding that the Equal Access to Justice Act did not provide for fee-shifting in proceedings before the Board.  *See Hodge v. Dep't of Justice*, 929 F.2d 153, 157 n. 11 (5th Cir.1991) (King, J.).

[48]  For the authority to implement DAPA, the government relies in part on 8

pretation by the Board of Immigration Appeals).

**184.**  *See Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C.Cir.2000) ("The Comptroller argues that the *expressio unius* maxim cannot preclude an otherwise reasonable agency interpretation.  This is not entirely correct.  True, we have rejected the canon in some administrative law cases, but only where the logic of the maxim ... simply did not hold up in the statutory context. ... In this case, the two canons upon which we rely [*expressio unius* and avoidance of surplusage] inarguably compel our holding that § 24 (Seventh) unambiguously does not authorize national banks to engage in the general sale of insurance as 'incidental' to 'the business of banking.' "); *see also* Ronald M. Levin, *The Anatomy of* Chevron: *Step Two Reconsidered*, 72  CHI.-KENT  L.REV.  1253,  1280  (1997) ("[P]ost-*Chevron* cases have often set aside agency interpretations by drawing upon the full range of conventional statutory construction techniques at step one.  Arguments from statutory structure and purpose ... are regularly examined at that step.  So are canons of construction.") (footnotes omitted).

U.S.C. § 1324a(h)(3),[185] a provision that does not mention lawful presence or deferred action, and that is listed as a "[m]iscellaneous" definitional provision expressly limited to § 1324a, a section concerning the "Unlawful employment of aliens"—an exceedingly unlikely place to find authori-

185.  "As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General."

186.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

187.  "The Secretary ... shall be responsible for ... [e]stablishing national immigration enforcement policies and priorities."

188.  "[The Secretary] ... shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."

189.  "The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section."

190.  *Util. Air*, 134 S.Ct. at 2444 (quoting *Brown & Williamson*, 529 U.S. at 159, 120 S.Ct. 1291); *accord id.* ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.' " (citation omitted) (quoting *Brown & Williamson*, 529 U.S. at 159, 120 S.Ct. 1291)).

zation for DAPA.[186]  Likewise, the broad grants of authority in 6 U.S.C. § 202(5),[187] 8 U.S.C. § 1103(a)(3),[188] and 8 U.S.C. § 1103(g)(2) [189] cannot reasonably be construed as assigning "decisions of vast 'economic and political significance,' " [190] such as DAPA, to an agency.[191]

191.  The dissent urges the courts to give DHS leeway to craft rules regarding deferred action because of the scope of the problem of illegal immigration and the insufficiency of congressional funding. Dissent at 217.  That is unpersuasive.  "Regardless of how serious the problem an administrative agency seeks to address, ... it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.' " *Brown & Williamson*, 529 U.S. at 125, 120 S.Ct. 1291 (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988)).

Because we conclude, at *Chevron* Step One, that Congress has directly addressed lawful presence and work authorizations through the INA's unambiguously specific and intricate provisions, we find no reason to allow DHS such leeway. There is no room among those specific and intricate provisions for the Secretary to "exercise discretion in selecting a different threshold" for class-wide grants of lawful presence and work authorization under DAPA. *Util. Air*, 134 S.Ct. at 2446 n. 8.

We merely apply the ordinary tools of statutory construction to conclude that Congress directly addressed, yet did not authorize, DAPA. *See King*, 135 S.Ct. at 2483 (noting that to determine whether Congress has expressed its intent, we "must read the words in their context and with a view to their place in the overall statutory scheme"); *City of Arlington v. F.C.C.*, — U.S. —, 133 S.Ct. 1863, 1868, — L.Ed.2d — (2013) ("First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue."); *Util. Air*, 134 S.Ct. at 2441 (recognizing the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). Now, even assuming the government had survived *Chevron* Step One, we would strike down DAPA as manifestly contrary to the INA under Step Two. *See Chev-*

The interpretation of those provisions that the Secretary advances would allow him to grant lawful presence and work authorization to any illegal alien in the United States—an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility. Even with "special deference" to the Secretary,[192] the INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization.

Presumably because DAPA is not authorized by statute, the United States posits that its authority is grounded in historical practice, but that "does not, by itself, create power,"[193] and in any event, previous deferred-action programs are not analogous to DAPA. "[M]ost ... discretionary deferrals have been done on a country-specific basis, usually in response to war, civil unrest, or natural disasters,"[194] but DAPA is not such a program. Likewise, many of the previous programs were bridges from one legal status to another,[195] whereas DAPA awards lawful presence to persons who have never had a legal status[196] and may never receive one.[197]

---

*ron*, 467 U.S. at 844, 104 S.Ct. 2778; *Mayo Found.*, 562 U.S. at 53, 131 S.Ct. 704.

**192.** *Texas v. United States*, 106 F.3d at 665 ("Courts must give special deference to congressional and executive branch policy choices pertaining to immigration.").

**193.** *Medellin v. Texas*, 552 U.S. 491, 532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)). *But see NLRB v. Noel Canning*, ── U.S. ──, 134 S.Ct. 2550, 2560, 189 L.Ed.2d 538 (2014) ("[T]he longstanding 'practice of the government' can inform our determination of 'what the law is.'" (citation omitted) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401, 4 L.Ed. 579 (1819); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803))).

**194.** ANDORRA BRUNO ET AL., CONG. RESEARCH SERV., ANALYSIS OF JUNE 15, 2012 DHS MEMORANDUM, EXERCISING PROSECUTORIAL DISCRETION WITH RESPECT TO INDIVIDUALS WHO CAME TO THE UNITED STATES AS CHILDREN 9 (July 13, 2012); *see* CHARLOTTE J. MOORE, CONG. RESEARCH SERV., ED206779, REVIEW OF U.S. REFUGEE RESETTLEMENT PROGRAMS AND POLICIES 9, 12–14 (1980).

**195.** *See* Voluntary Departure for Out–of–Status Nonimmigrant H–1 Nurses, 43 Fed.Reg. 2776, 2776 (Jan. 19, 1978) (deferring action on the removal of nonimmigrant nurses whose temporary licenses expired so that they could pass permanent licensure examinations); Memorandum from Michael Cronin, Acting Exec. Assoc. Comm'r, Office of Pro-

grams, INS, to Michael Pearson, Exec. Assoc. Comm'r, Office of Field Operations, INS 2 (Aug. 30, 2001) (directing that possible victims of the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub.L. No. 106–386, 114 Stat. 1464, "should not be removed from the United States until they have had the opportunity to avail themselves of the ... VTVPA," including receipt of a T- or U-visa); Memorandum from Paul Virtue, Acting Exec. Assoc. Comm'r, INS, to Reg'l Dirs., INS, et al. 3 (May 6, 1997) (utilizing deferred action for VAWA self-petitioners "pending the availability of a visa number"); Press Release, USCIS, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina 1 (Nov. 25, 2005) (deferring action on students "based upon the fact that the failure to maintain status is directly due to Hurricane Katrina"); *see also United States ex rel. Parco v. Morris*, 426 F.Supp. 976, 980 (E.D.Pa.1977) (discussing an INS policy that allowed aliens to "await the availability of a [Third Preference] visa while remaining in this country" under "extended voluntary departure").

**196.** DAPA Memo at 4 (limiting DAPA to persons who "have no lawful status").

**197.** *Id.* at 5 (specifying that DAPA "confers no ... immigration status or pathway to citizenship"). Throughout the dissent is the notion that DHS must pursue DAPA because Congress's funding decisions have left the agency unable to deport as many illegal aliens as it would if funding were available. But the

Although the "Family Fairness" program did grant voluntary departure to family members of legalized aliens while they "wait[ed] for a visa preference number to become available for family members," that program was interstitial to a statutory legalization scheme.[198] DAPA is far from interstitial: Congress has repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ("DREAM Act"),[199] features of which closely resemble DACA and DAPA.

Historical practice that is so far afield from the challenged program sheds no light on the Secretary's authority to implement DAPA. Indeed, as the district court recognized, the President explicitly stated that "it was the failure of Congress to enact such a program that prompted him ... to 'change the law.' "[200] At oral argument, and despite being given several opportunities, the attorney for the United States was unable to reconcile that remark with the position that the government now takes. And the dissent attempts to avoid the impact of the President's statement by accusing the district court and this panel majority of "relying ... on selected excerpts of the President's public statements." Dissent at 203, 208 n. 41.

adequacy or insufficiency of legislative appropriations is not relevant to whether DHS has statutory authority to implement DAPA. Neither our nor the dissent's reasoning hinges on the budgetary feasibility of a more thorough enforcement of the immigration laws; instead, our conclusion turns on whether the INA gives DHS the power to create and implement a sweeping class-wide rule changing the immigration status of the affected aliens without full notice-and-comment rulemaking, especially where—as here—the directive is flatly contrary to the statutory text.

The dissent's repeated references to DAPA as the appropriate continuation of a long-standing practice, *see, e.g.,* Dissent at 189, badly mischaracterizes the nature of DAPA. Previous iterations of deferred action were limited in time and extent, affecting only a few thousand aliens for months or, at most, a few years. MEMORANDUM ON THE DEP'T OF HOMELAND SEC.'S AUTH. TO PRIORITIZE REMOVAL OF CERTAIN ALIENS UNLAWFULLY PRESENT IN THE UNITED STATES AND TO DEFER REMOVAL OF OTHERS, Dep't of Justice, Office of Legal Counsel, at *15–*17 (Nov. 19, 2014).

Nothing like DAPA, which alters the status of more than four million aliens, has ever been contemplated absent direct statutory authorization. In its OLC memorandum, the Department of Justice noted that "extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action." *Id.* at *18 n. 8. Deferred action may be a decades-old tool, but it has never been used to affect so many aliens and to do so for so expansive a period of time.

**198.** *See* Memorandum from Gene McNary, Comm'r, INS, to Reg'l Comm'rs, INS 1 (Feb. 2, 1990) (authorizing extended voluntary departure and work authorization for the spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359); *see also* Memorandum from Donald Neufeld, Acting Assoc. Dir., USCIS, to Field Leadership, USCIS 1 (Sept. 4, 2009) (authorizing deferred action for "the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" because "no avenue of immigration relief exist[ed]" and "[t]his issue has caused a split among the circuit courts of appeal and is also the subject of proposed legislation in ... Congress").

**199.** "[A] bill that would have become the 'DREAM' Act never became law[; it] passed the House of Representatives during the 111th Congress and then stalled in the Senate." *Common Cause v. Biden,* 748 F.3d 1280, 1281 (D.C.Cir.) (citing H.R. 5281, 111th Cong. (2010)), *cert. denied,* —— U.S. ——, 135 S.Ct. 451, 190 L.Ed.2d 330 (2014).

**200.** Dist. Ct. Op., 86 F.Supp.3d at 657 & n. 71 (quoting Press Release, Remarks by the President on Immigration—Chicago, Ill., The White House Office of the Press Sec'y (Nov. 25, 2014)).

[49]   The dissent repeatedly claims that congressional silence has conferred on DHS the power to act. *E.g.*, Dissent at 214–15. To the contrary, any such inaction cannot create such power:

> "[D]eference is warranted only when Congress has left a gap for the agency to fill pursuant to an express or implied 'delegation of authority to the agency.'" *Chevron*[,] 467 U.S. at 843–44[, 104 S.Ct. 2778]. To suggest, as the [agency] effectively does, that *Chevron* step two is implicated at any time a statute does not expressly *negate* the existence of a claimed administrative power ... is both flatly unfaithful to the principles of administrative law ... and refuted by precedent.... Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.

*Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C.Cir.1995).

Through the INA's specific and intricate provisions, "Congress has 'directly addressed the precise question at issue.'" *Mayo Found.*, 562 U.S. at 52, 131 S.Ct. 704. As we have indicated, the INA prescribes how parents may derive an immigration classification on the basis of their child's status and which classes of aliens can achieve deferred action and eligibility for work authorization. DAPA is foreclosed by Congress's careful plan; the program is "manifestly contrary to the statute"[201] and therefore was properly enjoined.[202]

## VIII.

[50]   The states have satisfied the other requirements for a preliminary injunction. They have demonstrated "a substantial threat of irreparable injury if the injunction is not issued." *Sepulvado*, 729 F.3d at 417 (quoting *Byrum*, 566 F.3d at 445). DAPA beneficiaries would be eligible for driver's licenses and other benefits, and a substantial number of the more than four million potential beneficiaries—many of whom live in the plaintiff states—would take advantage of that opportunity. The district court found that retracting those benefits would be "substantially difficult—if not impossible," Dist. Ct. Op., 86 F.Supp.3d at 673, and the government has given us no reason to doubt that finding.

[51]   The states have shown "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted." *Sepulvado*, 729 F.3d at 417 (quoting *Byrum*, 566 F.3d at 445). The states have alleged a concrete threatened injury in the form of millions of dollars of losses.

The harms the United States has identified are less substantial. It claims that the injunction "obstructs a core Executive prerogative" and offends separation-of-powers and federalism principles. Those alleged harms are vague, and the principles the government cites are more likely to be affected by the resolution of the case on the merits than by the injunction.

Separately, the United States postulates that the injunction prevents DHS from

---

201.   *Mayo Found.*, 562 U.S. at 53, 131 S.Ct. 704 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004)).

202.   We do not address whether single, ad hoc grants of deferred action made on a genuinely case-by-case basis are consistent with the INA; we conclude only that the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a classwide basis to 4.3 million otherwise removable aliens.

effectively prioritizing illegal aliens for removal. But the injunction "does not enjoin or impair the Secretary's ability to marshal his assets or deploy the resources of the DHS [or] to set priorities," including selecting whom to remove first, *see* Dist. Ct. Op., 86 F.Supp.3d at 678, and any inefficiency is outweighed by the major financial losses the states face.

The government also complains that the injunction imposes administrative burdens because DHS has already leased office space and begun hiring employees to implement DAPA. Such inconveniences are common incidental effects of injunctions, and the government could have avoided them by delaying preparatory work until the litigation was resolved.[203] Finally, the government reasonably speculates that the injunction burdens DAPA beneficiaries and their families and discourages them from cooperating with law-enforcement officers and paying taxes. But those are burdens that Congress knowingly created, and it is not our place to second-guess those decisions.

[52] The states have also sufficiently established that "an injunction will not disserve the public interest." *Sepulvado*, 729 F.3d at 417 (quoting *Byrum*, 566 F.3d at 445). This factor overlaps considerably with the previous one, and most of the same analysis applies.[204] The main difference is that, instead of relying on their financial interests, the states refer to the public interest in protecting separation of powers by curtailing unlawful executive action.

Although the United States cites the public interest in maintaining separation of powers and federalism by avoiding judicial and state interference with a legitimate executive function, there is an obvious difference: The interest the government has identified can be effectively vindicated after a trial on the merits. The interest the states have identified cannot be, given the difficulty of restoring the *status quo ante* if DAPA were to be implemented.[205] The public interest easily favors an injunction.

## IX.

[53] The government claims that the nationwide scope of the injunction is an abuse of discretion and requests that it be confined to Texas or the plaintiff states. But the Constitution requires "an *uniform* Rule of Naturalization";[206] Congress has instructed that "the immigration laws of

---

203. *Cf. Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir.2004) ("[W]hen the potential harm to each party is weighed, a party 'can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself.'" (second alteration in original) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir.1990))).

204. *Cf. Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) ("Once an applicant satisfies the first two factors [for a stay of an alien's removal pending judicial review], the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party.").

205. *See Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir.1997) ("It is well settled that the issuance of a prohibitory injunction freezes the status quo, and is intended 'to preserve the relative positions of the parties until a trial on the merits can be held.' Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned." (citation omitted) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981))).

206. U.S. CONST. art. I, § 8, cl. 4 (emphasis added).

188        809 FEDERAL REPORTER, 3d SERIES

the United States should be enforced vigorously and *uniformly*";[207] and the Supreme Court has described immigration policy as "a comprehensive and *unified* system."[208]   Partial implementation of DAPA would "detract[ ] from the 'integrated scheme of regulation' created by Congress,"[209] and there is a substantial likelihood that a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states.

[54] Furthermore, the Constitution vests the District Court with "the judicial Power of the United States."[210]   That power is not limited to the district wherein the court sits but extends across the country.   It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction.[211]

[55] "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"  *Util. Air*, 134 S.Ct. at 2444 (citation omitted).  Agency announcements

207.  Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, § 115(1), 100 Stat. 3359, 3384 (emphasis added).

208.  *Arizona v. United States*, 132 S.Ct. at 2502.

209.  *Id.* (quoting *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 288–89, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986)).

210.  U.S. Const. art. III, § 1

211.  *See, e.g., Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir.2006) (upholding a nationwide injunction after concluding it was "compelled by the text of [§ 706 of the] Administrative Procedure Act"), *aff'd in part & rev'd in part on other grounds by Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (concluding that the plaintiff organizations lacked standing to challenge the forest service action in ques-

to the contrary are "greet[ed] … with a measure of skepticism."  *Id.*

The district court did not err and most assuredly did not abuse its discretion.  The order granting the preliminary injunction is AFFIRMED.

KING, Circuit Judge, dissenting:

Although there are approximately 11.3 million removable aliens in this country today, for the last several years Congress has provided the Department of Homeland Security (DHS) with only enough resources to remove approximately 400,000 of those aliens per year.[1]   Recognizing DHS's congressionally granted prosecutorial discretion to set removal enforcement priorities, Congress has exhorted DHS to use those resources to "mak[e] our country safer."   In response, DHS has focused on removing "those who represent threats to national security, public safety, and border security."   The DAPA Memorandum at issue here focuses on a subset of removable aliens who are unlikely to be removed unless and until more resources are made

tion); *Chevron Chem. Co. v. Voluntary Purchasing Grps.*, 659 F.2d 695, 705–06 (5th Cir. 1981) (instructing district court to issue broad, nationwide injunction); *Brennan v. J.M. Fields, Inc.*, 488 F.2d 443, 449–50 (5th Cir.1973) (upholding nationwide injunction against a national chain); *Hodgson v. First Fed. Sav. & Loan Ass'n*, 455 F.2d 818, 826 (5th Cir.1972) ("[C]ourts should not be loath[ ] to issue injunctions of general applicability. . . .   The injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a public policy judges too must carry out— actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium.'") (quoting *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir.1962)).

1.  During the period from 2009 through 2014, approximately 2.4 million aliens were removed from the United States.  DHS claims that this is a record number, and Plaintiffs do not dispute that point.

available by Congress: those who are the parents of United States citizens or legal permanent residents, who have resided in the United States for at least the last five years, who lack a criminal record, and who are not otherwise removal priorities as determined by DHS. The DAPA Memorandum has three primary objectives for these aliens: (1) to permit them to be lawfully employed and thereby enhance their ability to be self-sufficient, a goal of United States immigration law since this country's earliest immigration statutes; (2) to encourage them to come out of the shadows and to identify themselves and where they live, DHS's prime law enforcement objective; and (3) to maintain flexibility so that if Congress is able to make more resources for removal available, DHS will be able to respond.

Plaintiffs do not challenge DHS's ability to allow the aliens subject to the DAPA Memorandum—up to 4.3 million, some estimate—to remain in this country indefinitely. Indeed, Plaintiffs admit that such removal decisions are well within DHS's prosecutorial discretion.[2] Rather, Plaintiffs complain of the consequences of DHS's decision to use its decades-long practice of granting "deferred action" to these individuals, specifically that these "illegal aliens" may temporarily work lawfully for a living and may also eventually become eligible for some public benefits. Plaintiffs contend that these consequences and benefits must be struck down even while the decision to allow the "illegal aliens" to remain stands. But Plaintiffs' challenge cannot be so easily bifurcated. For the benefits of which Plaintiffs complain are not conferred by the DAPA Memorandum—the only policy being challenged in this case—but are inexorably tied to DHS's deferred action decisions by a host of unchallenged, preexisting statutes and notice-and-comment regulations enacted by Congresses and administrations long past. Deferred action decisions, such as those contemplated by the DAPA Memorandum, are quintessential exercises of prosecutorial discretion. As the Supreme Court put it sixteen years ago, "[a]t each stage [of the removal process] the Executive has discretion to abandon the endeavor, [including by] engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."[3] Because all parties agree that an exercise of prosecutorial discretion itself is unreviewable, this case should be dismissed on justiciability grounds.

Even if this case were justiciable, the preliminary injunction, issued by the district court, is a mistake. If the Memorandum is implemented in the truly discretionary, case-by-case manner it contemplates, it is not subject to the APA's notice-and-comment requirements, and the injunction cannot stand. Although the very face of the Memorandum makes clear that it must be applied with such discretion, the district court concluded on its own—prior to DAPA's implementation, based on improper burden-shifting, and without seeing the need even to hold an evidentiary hearing—that the Memorandum is a sham, a mere "pretext" for the Executive's plan "not [to] enforce the immi-

---

**2.** In their briefing on appeal, Plaintiffs refute the "mistaken premise that this lawsuit challenges [DHS]'s decision not to remove certain unauthorized aliens," making clear that "[t]his lawsuit has never challenged any decision by the Executive to initiate or forego

removal proceedings." Appellees' Suppl. Br. 18–19.

**3.** *Reno v. Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 483–84, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

AR 00000185

gration laws as to over four million illegal aliens." *Texas v. United States,* 86 F.Supp.3d 591, 638 (S.D.Tex.2015) [hereinafter Dist. Ct. Op.]. That conclusion is clearly erroneous. The majority affirms and goes one step further today. It holds, in the alternative, that the Memorandum is contrary to the INA and substantively violates the APA. These conclusions are wrong. The district court expressly declined to reach this issue without further development, *id.* at 677, and the limited briefing we have before us is unhelpful and unpersuasive. For these reasons, as set out below, I dissent.

## I. The DAPA Memorandum

For all of the pounds of paper written about it, the DAPA Memorandum spans only five pages, and I attach it to this dissent for all to read.[4] The D.C. Circuit (which hears more of these administrative law cases than any other) has wisely observed that "[s]ometimes a simple reading of the document and study of its role in the regulatory scheme will yield the answer." *Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n,* 940 F.2d 679, 682 (D.C.Cir. 1991).

The DAPA Memorandum is one of a series of memoranda issued by Secretary of Homeland Security Jeh Johnson on November 20, 2014. Broadly speaking, the Memorandum does two things: (1) it expands certain parameters of the prior DACA Memorandum, which provided guidelines for the use of deferred action with respect to certain individuals who came to the United States as children; and (2) it includes "guidance for case-by-case use of deferred action for those adults who have been in this country since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities." Appx. A, at 3.

It is important to recognize at the outset the backdrop upon which the Memorandum was written. As noted above, given the resource constraints faced by DHS, the agency is faced with important prioritization decisions as to which aliens should be the subject of removal proceedings. Congress has made clear that those decisions are to be made by DHS, not by Congress itself—and certainly not by the courts. Indeed, Congress has delegated to the Secretary of Homeland Security the authority to "[e]stablish[ ] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5),[5] and to "establish such regulations; ... issue such instructions; and perform such other acts as he deems necessary for carrying out" his responsibilities, 8 U.S.C. § 1103(a)(3).[6] Congress has given the Secretary some direction, in appropriations bills, as to how removal resources should be spent—by specifically devoting funding toward "identify[ing] aliens convicted of a crime who may be deportable, and ... remov[ing] them from the United States once they are judged deportable," and by making clear that the Secretary "shall prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Securi-

---

**4.** The DAPA Memorandum is attached as Appendix A. As Appendix B, I also attach the Secretary's November 20, 2014, memorandum entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (Enforcement Priorities Memorandum), which itself is unchallenged by Plaintiffs, but which the DAPA Memorandum incorporates by reference.

**5.** This statute was passed in 2002.

**6.** A version of this statute was first passed in 1990.

ty Appropriations Act, Pub.L. No. 114–4, 129 Stat. 39, 43 (2015).

In an apparent effort to maximize the resources that can be devoted to such ends and consistent with his congressionally granted authority to set enforcement priorities, the Secretary contends that he has chosen—through the DACA and DAPA Memoranda—to divert some of DHS's resources away from the lowest priority aliens to better enforce the immigration laws against the highest priority aliens. *See Arpaio v. Obama,* 797 F.3d 11, 17–18 (D.C.Cir.2015) ("DACA and DAPA . . . apply to the portion of the population that [DHS] considers not threatening to public safety and that has not had any involvement, or only minimal and minor involvement, with the criminal justice system."). By granting deferred action to children who were brought to this country unlawfully, and to the parents of U.S. citizens and lawful permanent residents (who otherwise have clean records), DHS has sought to "encourage [those individuals] to come out of the shadows, submit to background checks, pay fees, apply for work authorization . . . and be counted." Appx. A, at 3. Qualifying individuals can therefore work "on the books"—meaning, of course, that they will pay taxes on the income they earn. Furthermore, the Secretary points to the humanitarian aim of the DAPA Memorandum which, in conjunction with the DACA Memorandum, keeps families together—at least temporarily. *Cf. Reno,* 525 U.S. at 484, 119 S.Ct. 936 (describing "deferred action" as an "exercis[e] [of] discretion for humanitarian reasons or simply for [the Executive's] own convenience"). And by encouraging removable aliens to self-identify and register, both DACA and DAPA allow DHS to collect information (names, addresses, etc.) that will make it easier to locate these aliens in the future—if and when DHS ultimately decides to remove them. DHS is, of course, a law enforcement agency, and this is what we would call "good policing." Although these programs will likely apply to a large number of individuals, that result is the inevitable upshot of decades of congressional appropriations decisions,[7] which require DHS (whether by policy or by practice) to de-prioritize millions of removable aliens each year due to these resource constraints.

The DAPA Memorandum operates in two ways. First, with respect to the expansion of DACA, the DAPA Memorandum: removes the age cap (the DACA Memorandum excluded applicants over 31 years of age); extends the period of deferred action from two to three years; and adjusts the date-of-entry requirement from June 15, 2007, to January 1, 2010. Second, the Memorandum establishes new deferred action guidance, "direct[ing] USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals" who meet six threshold criteria:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

---

**7.** The limited resources that Congress has made available to DHS for removals are most probably a product of the nation's limited resources, not of penuriousness on the part of Congress.

- have no lawful status on the date of this memorandum;
- are not an enforcement priority as reflected in the [Enforcement Priorities Memorandum[8]]; and
- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Appx. A, at 4.

The Memorandum describes deferred action as a "form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission."[9] Appx. A, at 2. The Memorandum makes clear that deferred action: must be "granted on a case-by-case basis"; "may be terminated at any time at the agency's discretion";[10] and "does not confer any form of legal status in this country, much less citizenship." Appx. A, at 2. The Memorandum also states that although "immigration officers will be provided with specific eligibility criteria for deferred action, . . . the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis." Appx. A, at 5. In addition, the Memorandum makes clear that applicants must submit to a background check and pay a $465 fee.[11] Appx. A, at 4–5. It notes that deferred action recipients are eligible to apply for employment authorization.[12] Appx. A, at 4. Finally, the Memorandum states that it "confers no substantive right, immigration status or pathway to citizenship." Appx. A, at 5.

Holding that Plaintiffs' challenge to this Memorandum is likely to succeed on the merits, the majority reaches four conclusions, the first three of which were reached by the district court, to sustain the preliminary injunction: (1) Plaintiffs have standing; (2) this case is justiciable and reviewable under the APA; (3) the DAPA Memorandum constitutes a substantive rule that must go through the notice-and-comment process; and (4) the DAPA Memorandum is not authorized by statute and is a substantive violation of the APA. As to the first conclusion, the majority finds that Texas is entitled to "special solicitude" in the standing analysis as DAPA implicates state "sovereignty concerns." Majority Op. at 151, 153. Within this framework of standing, Texas has demonstrated an injury-in-fact because "it would incur significant costs in issuing driver's licenses to DAPA beneficiaries." *Id.* at 154. The majority contends that even though "Texas could avoid financial loss by requiring applicants to pay the full costs of licenses, it could not avoid injury

---

**8.** The Enforcement Priorities Memorandum classifies aliens into three priority categories: (1) "Priority 1 (threats to national security, border security, and public safety)"; (2) "Priority 2 (misdemeanants and new immigration violators)"; and (3) "Priority 3 (other immigration violations)." Appx. B, at 3–4. It further states that "resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified." Appx. B, at 5.

**9.** The Memorandum also summarizes the substantial past use of deferred action. Appx. A, at 2.

**10.** Therefore, if Congress were to substantially increase the amount of funding available to DHS for removals, deferred action would pose no impediment to the removal even of these low-priority aliens.

**11.** DHS contends that the fees collected will be sufficient to offset any administrative costs required to implement the DAPA Memorandum.

**12.** As discussed below, this is merely a statement of preexisting law. *See* 8 C.F.R. § 274a.12(c)(14).

altogether" because "avoid[ing] injury by incurring other costs does not negate standing." *Id.* at 156. Second, the majority determines that this action is reviewable under the APA even though DAPA helps set "priority levels" for immigration enforcement, suggesting that it "is a presumptively unreviewable exercise of 'prosecutorial discretion.'" *Id.* at 166. Despite this, the majority claims that DAPA is reviewable because it "affirmatively confer[s] 'lawful presence' and associated benefits." *Id.* While reaching this conclusion the majority also casts doubt on the validity of one of these benefits—a decades-old regulation on employment authorization, previously unchallenged in this suit. *See id.* at 168–69. Third, recognizing that the "DAPA Memo facially purports to confer discretion," *id.* at 171, the majority nonetheless deems the DAPA Memorandum a substantive rule subject to the requirements of notice-and-comment rulemaking, *id.* at 171–78. According to the majority, the district court's conclusion—that "[n]othing about *DAPA* 'genuinely leaves the agency and its [employees] free to exercise discretion,'" Dist. Ct. Op., 86 F.Supp.3d at 670—is not clearly erroneous, as there was at least "conflicting evidence on the degree to which *DACA* allowed for discretion." Majority Op. at 175 (emphasis added). Finally, the majority reaches beyond the district court's judgment to conclude that DAPA constitutes a substantive violation of the APA because it "is not authorized by statute." *Id.* at 184. I address each of these conclusions in turn.

## II. Standing

While I would conclude that this case is non-justiciable, I write first to note my concerns with the majority's primary theory of standing, premised on an expansive notion of state standing and Texas's increased costs due to the issuance of driver's licenses to DAPA recipients.

Building off a single, isolated phrase in *Massachusetts v. EPA*, 549 U.S. 497, 520, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), the majority finds that Texas has "special solicitude" in the standing inquiry because "DAPA affects the states' 'quasi-sovereign' interests." Majority Op. at 153. It is altogether unclear whether the majority means that states are afforded a relaxed standing inquiry by virtue of their statehood or whether their statehood, in of itself, helps confer standing. In any event, both propositions are deeply troublesome for three reasons.

First, this reasoning misconstrues the holding of *Massachusetts*. In that case, the Supreme Court held that Massachusetts had standing to challenge the EPA's decision not to regulate greenhouse gas emissions. *Massachusetts*, 549 U.S. at 526, 127 S.Ct. 1438. But it did so based on Massachusetts' quasi-sovereign interests *and* a provision of the Clean Air Act that specifically "recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious." *Id.* at 520, 127 S.Ct. 1438 (citing 42 U.S.C. § 7607(b)(1)). The Court there recognized that this statutory "authorization [was] of critical importance to the standing inquiry." *Id.* at 516, 127 S.Ct. 1438. By contrast, neither the INA nor the APA specifically authorizes this suit.[13] *Massachusetts* also provides little

---

13. The majority suggests that the APA does provide specific authorization for suit here because it "authorizes challenges to 'final agency action for which there is no other adequate remedy in a court.'" Majority Op. at

151 (citing 5 U.S.C. § 704). If this were the case, then presumably *Massachusetts* would have also referenced the APA as conferring a procedural right since the plaintiffs there challenged "final agency action" within the

instruction as to how far this "special solicitude" reaches. The phrase appears only once in the *Massachusetts* majority opinion. And the Court has had no occasion to revisit it since.[14]

Second, the majority's ruling raises serious separation of powers concerns. Long recognized is "the foundational role that Article III standing plays in our separation of powers." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 131 S.Ct. 1436, 1443, 179 L.Ed.2d 523 (2011); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 125 n. 20, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("[O]ur standing doctrine is rooted in separation-of-powers concerns."). By preserving the proper bounds of Article III standing, the judiciary prevents itself from "aggrandiz[ing] itself . . . at the expense of one of the other branches." John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1230 (1993).

The majority's breathtaking expansion of state standing would inject the courts into far more federal-state disputes and review of the political branches than is now the case. While the majority claims that the factors giving a state "special solicitude" to sue the federal government will "seldom exist," its holding suggests otherwise. Majority Op. at 162. If the APA provides the requisite procedural right to file suit—as the majority indicates, *see id.* at 151—and a state need only assert a "quasi-sovereign interest" to get "special solicitude," then states can presumably challenge a wide array of federal regulatory actions. The majority dismisses such a possibility as a "parade of horribles" and "unfounded" based on the lack of such lawsuits at the moment. *Id.* at 162. It is certainly possible to describe a parade of horribles that could result from the majority's decision, but those horribles are only "unfounded" because the majority's broad ruling is untested and unparalleled in any other court.[15] By relaxing standing for

---

ambit of the APA. *Massachusetts* did not, however, even refer to the APA. And, as discussed below, it would be odd if the APA provided such an expansive procedural right to states.

**14.** The notion of "special solicitude" was cited in *Arizona State Legislature v. Arizona Independent Redistricting Commission (AIRC)*, — U.S. —, 135 S.Ct. 2652, 2664–65 n. 10, 192 L.Ed.2d 704 (2015)—but as recognized by a treatise, in a footnote, in an opinion that did not concern federal–state suits. That footnote correctly observed that "[t]he cases on the standing of states to sue the federal government" are "hard to reconcile." *Id.* (quoting R. Fallon et al., *Hart and Wechsler's The Federal Courts and the Federal System* 263–66 (6th ed.2009)).

**15.** The majority cites a number of cases to show that courts have held that states have standing to sue the federal government. Majority Op. at 152–53. Many of these cases are inapposite. *Alaska v. U.S. Department of Transportation*, 868 F.2d 441, 443–45 (D.C.Cir.1989), found standing because the FAA, much like the CAA in *Massachusetts*,

created a procedural right to sue available to states. The court in *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 272 (4th Cir.2011), actually denied standing. And *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982), *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), and *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), did not involve federal–state suits. It is true that courts found state standing against the federal government in *Ohio ex rel. Celebrezze v. U.S. Department of Transportation*, 766 F.2d 228, 232–33 (6th Cir.1985), *Texas Office of Public Utility v. Federal Communications Commission*, 183 F.3d 393, 449 (5th Cir.1999), *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241–44 (10th Cir.2008), and *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 696 n.13 (10th Cir.2009), respectively. However, *Celebrezze* preceded the Supreme Court's more rigorous standing cases (i.e., post-*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). And *Texas Office of Public Utility, Crank*, and *Richardson* offered very curso-

state suits against the federal government, we risk transforming ourselves into "ombudsmen of the administrative bureaucracy, a role for which [we] are ill-suited both institutionally and as a matter of democratic theory." Roberts, *supra*, at 1232.

Third, and relatedly, the majority's sweeping "special solicitude" analysis "has no principled limit." Majority Op. at 160. Recognizing that fact, it "stress[es] that [its] decision is limited to these facts." *Id.* at 154. Really? If that were true, there would be no need to assuage concerns regarding the opinion's breadth by arguing "that there are other ways to cabin policy disagreements masquerading as legal claims." *Id.* at 161. It is hard for me to see the bounds of the majority's broad ruling. Circuit Judge Alvin B. Rubin of this court once wrote that "[a]ny appellate opinion worth publishing should not merely give a reasoned disposition of the particular matter; it should, in addition, articulate a standard or a rule that can be applied by lawyers and judges in future cases." Alvin B. Rubin, *Views From the Lower Court*, 23 UCLA L. Rev. 448, 451 (1976). Anything else is a " 'railway ticket' decision—good only for this day and station." *Id.* Today's decision is either just such a "railway ticket" (which, we are told, it actually aspires to be) or a broad, newfangled concept of state standing with little instruction going forward.

Apart from its "special solicitude" analysis, the majority also holds that Texas has standing because it suffered an injury-in-fact traceable to DAPA. This injury results from two independent decisions made by Texas: (1) an alleged decision to underwrite the costs of issuing driver's licenses to all applicants; and (2) a decision to allow deferred action recipients to apply for driver's licenses. The majority claims, at length, that there is a "pressure to change state law," Majority Op. at 153, because the DAPA Memorandum has the downstream effect of expanding the pool of potential Texas driver's license applicants, thus increasing the costs Texas has made the choice to bear. This "pressure" is entirely manufactured by Plaintiffs for this case, and the majority and the district court have signed on. Nothing in the DAPA Memorandum suggests changes in state law. And I am skeptical that an incidental increase in state costs is sufficient to confer standing for the purposes of Article III. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) ("No State can be heard to complain about damage inflicted by its own hand."). *But see Wyoming v. Oklahoma*, 502 U.S. 437, 448, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (holding a state had standing to sue another state when it suffered "a direct injury in the form of a loss of specific tax revenues").[16] Such a

ry examinations of state standing bereft of the sweeping language the majority uses today.

**16.** Recognizing the tension between these two cases, the majority claims that Texas's injury is like that of Wyoming in *Wyoming v. Oklahoma*, and not like that of Pennsylvania in *Pennsylvania v. New Jersey*. But a principal difference in these cases was that Pennsylvania, like Texas, tied its law to that of another sovereign, whereas Wyoming did not. *See Pennsylvania*, 426 U.S. at 663, 96 S.Ct. 2333 ("Pennsylvania permits a tax credit to any of its residents for income taxes paid to other

States, including, of course, New Jersey."). The majority asserts that forcing Texas to change its laws would be an injury because states have "a sovereign interest in 'the power to create and enforce a legal code.' " Majority Op. at 156 (footnote omitted). Yet if that is enough of an injury, then presumably Pennsylvania should have had standing in *Pennsylvania v. New Jersey*, as Pennsylvania was faced with an instance where it could avoid injury but would have had to change its laws by "withdrawing th[e] credit for taxes paid to New Jersey." *Pennsylvania*, 426 U.S. at 664, 96 S.Ct. 2333. The Court found that this was

theory of standing—based on the indirect economic effects of agency action—could theoretically bestow upon states standing to challenge any number of federal programs as well (assuming states have the motivation to create the factual record to support those economic effects). I have serious misgivings about any theory of standing that appears to allow limitless state intrusion into exclusively federal matters—effectively enabling the states, through the courts, to second-guess federal policy decisions—especially when, as here, those decisions involve prosecutorial discretion. *See AIRC,* 135 S.Ct. at 2665 n.12 ("The Court's standing analysis ... has been 'especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.' ") (quoting *Raines v. Byrd,* 521 U.S. 811, 819–20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)).

### III. Justiciability

I would conclude, as did Judge Higginson in dissenting from the denial of a stay in this action, that this case is non-justiciable. I write only to supplement Judge Higginson's thorough and forceful analysis as to this issue, with which I agree in full. *See generally Texas v. United States,* 787 F.3d 733, 769–84 (5th Cir.2015) (Higginson, J., dissenting).

Plaintiffs concede that if the DAPA Memorandum is only an exercise in enforcement discretion—without granting any "additional benefits"—it is unreviewable under 5 U.S.C. § 701(a).[17] *See* Majority Op. at 178 n. 156 (recognizing that

"a nonenforcement policy ... presumptively would be committed to agency discretion"); *see also Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."); *Texas v. United States,* 106 F.3d 661, 667 (5th Cir.1997) ("An agency's decision not to take enforcement actions is unreviewable...."). Even the district court concluded that "decisions as to how to marshal DHS resources, how to best utilize DHS manpower, and where to concentrate its activities are discretionary decisions solely within the purview of the Executive Branch." Dist. Ct. Op., 86 F.Supp.3d at 645. But those are exactly the type of decisions the DAPA Memorandum contemplates. The Memorandum is a statement embodying the Secretary's tentative decision, based on an assessment of the best uses of DHS's limited resources and under his congressionally delegated authority to "[e]stablish[ ] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), not to remove qualifying applicants for a certain period of time.

In other words, deferred action itself is merely a brand of "presumptively unreviewable" prosecutorial discretion. Majority Op. at 166; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"); *see also Reno,* 525 U.S. at 483–84, 119 S.Ct. 936 ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor, [including by] engaging in a regular

---

not a traceable injury, suggesting Texas's injury today is similarly "self-inflicted." *Id.*

**17.** For this very reason, Plaintiffs do not challenge the Enforcement Priorities Memoran-

dum. *See* Majority Op. at 166 ("[T]he states have not challenged the priority levels [the Secretary] has established." (footnote omitted)).

practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."); *Villas at Parkside Partners v. City of Farmers Branch,* 726 F.3d 524, 545 n.3 (5th Cir.2013) (en banc) (Dennis, J., concurring) (describing DACA as an "exercise of . . . prosecutorial discretion"); *Arpaio,* 797 F.3d at 17 ("One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States."); 6 Charles Gordon et al., *Immigration Law & Procedure* § 72.03[2][h] (2014) ("To ameliorate a harsh and unjust outcome, the immigration agency may decline to institute proceedings, may terminate proceedings, or may decline to execute a final order of deportation. This commendable exercise in administrative discretion . . . is now designated as deferred action."); *Steel on Immigration Law* § 14:42 (2014) (defining "deferred action" as the exercise of "discretionary authority by Immigration and Customs Enforcement, before or after a removal proceeding, not to remove the alien"). Much like pretrial diversion in the criminal context—which also developed over a period of decades without express statutory authorization—deferred action channels limited resources by allowing certain low-priority offenders to work openly and contribute taxes, thus reducing their burden on the system. Notably, such prosecutorial discretion is heightened in the immigration context. *See Arizona*

*v. United States,* —— U.S. ——, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials.");[18] *Reno,* 525 U.S. at 490, 119 S.Ct. 936 (stating that concerns of judicial intrusion into enforcement decisions "are greatly magnified in the deportation context"); *see also* 8 U.S.C. § 1252(g) (stripping courts of jurisdiction "to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien").

To the extent the exercise of deferred action "trigger[s]" other benefits, those are not new or "associated" benefits contained within the DAPA Memorandum itself. Majority Op. at 166–67.[19] Rather, those benefits are a function of statutes and regulations that were enacted by Congresses and administrations long past— statutes and regulations which, vitally, *Plaintiffs do not challenge in this action.* The ability to apply for work authorization, the benefit on which the district court most heavily relied, has been tied to deferred action by a federal regulation since the early 1980s. The most current such regulation, promulgated in 1987, states that "[a]n alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority," may apply for work authorization "if the alien establishes an economic necessity for employment." [20]

---

18. The majority repeatedly cites *Arizona* to support its position, including an assertion that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." Majority Op. at 162–63 (citing *Arizona,* 132 S.Ct. at 2500). To say the least, the majority's reliance on *Arizona* is misplaced. *Arizona* repeatedly approved of broad discretion in federal immigration enforcement and actually held that a

state law concerning immigration was preempted.

19. Nor does the DAPA Memorandum do anything to change the eligibility criteria for these benefits.

20. A predecessor regulation enacted in 1981 similarly stated that "[a]ny alien in whose case the district director recommends consid-

8 C.F.R. § 274a.12(c)(14). It is this regulation, not the DAPA Memorandum, which affords those granted deferred action the ability to apply for work authorization. Plaintiffs did not challenge the validity of this regulation,[21] and for good reason—it was promulgated via the notice-and-comment process.[22] The majority nevertheless states that § 274a.12(c)(14) as applied "to any class of illegal aliens whom DHS declines to remove—is beyond the scope of what the INA can reasonably be interpreted to authorize." Majority Op. at 169. This broad holding is very damaging to DHS's immigration enforcement policy,

which has operated, from time to time, on a class-wide basis. It stems from a deeply flawed reading of the INA that I discuss below.

Each of the other benefits relied on by the district court and the majority—not one of which is even mentioned on the face of the DAPA Memorandum—results, if at all, from prior statutes and notice-and-comment regulations: (1) the suspension of the accrual of certain time periods for purposes of the INA's illegal reentry bars;[23] (2) eligibility for certain Social Security and Medicare benefits;[24] and (3) the ability to obtain a Social Security num-

---

eration of deferred action, an act of administrative convenience to the government which gives some cases lower priority" may apply for work authorization "[p]rovided, [t]he alien establishes to the satisfaction of the district director that he/she is financially unable to maintain himself/herself and family without employment." 46 Fed. Reg. 25,079, 25,081 (May 5, 1981) (formerly codified at 8 C.F.R. § 109.1(b)(6)).

21. Plaintiffs suggested at oral argument that they were challenging the statutory underpinnings of 8 C.F.R. § 274a.12(c)(14), but that position is inconsistent with their briefing on appeal, in which they contend that the work authorization regulation "is not facially invalid," and in which they "assum[e] *arguendo* that the regulation is valid in all applications." Appellees' Br. 21 n.9. Moreover, throughout this litigation, Plaintiffs stated that they were challenging *only* the validity of the DAPA Memorandum; this is underscored by the complaint, which does not mention any challenge to the validity of 8 C.F.R. § 274a.12(c)(14). In any event, Plaintiffs' minimal and inconsistent briefing as to this issue cannot be considered sufficient to mount a challenge to a notice-and-comment regulation that has been on the books for decades, and we should not decide this issue. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir.2010) ("A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it. It is not enough to merely mention or allude to a legal theory." (internal citations omitted)).

22. Congress, of course, can limit those to whom work authorization is granted, *see* 8 U.S.C. § 1226(a)(3) (barring the Attorney General from granting work authorization to aliens who are "arrested and detained pending a decision on whether the alien is to be removed from the United States"), but it has not done so with respect to those eligible for deferred action under DAPA.

23. *See* 8 U.S.C. § 1182(a)(9)(B)(ii) (passed in 1997) (stating that "[f]or purposes of [the illegal entry bars], an alien is deemed to be unlawfully present in the United States if the alien is present in the United States *after the expiration of the period of stay authorized by the Attorney General* or is present in the United States without being admitted or paroled" (emphasis added)); *Dhuka v. Holder*, 716 F.3d 149, 156 (5th Cir.2013) (" '[A]uthorized by the Attorney General' describes an exercise of discretion by a public official." (quoting 8 U.S.C. § 1182(a)(9)(B)(ii))). DHS contends that this "benefit" is largely irrelevant here, as the vast majority of potential DAPA recipients have already accrued sufficient unlawful presence to trigger these statutory bars to admissibility.

24. *See* 8 U.S.C. § 1611(b)(2)–(3) (passed in 1997) (stating that aliens "lawfully present in the United States as determined by the Attorney General" are not barred from receiving certain Social Security and Medicare benefits); 8 C.F.R. § 1.3(a)(4)(vi) (promulgated in 2011) (defining an "alien who is lawfully present in the United States" to include "[a]liens currently in deferred action status").

ber.[25] Like work authorization, these benefits are conferred not by the DAPA Memorandum, but by federal statutes or notice-and-comment regulations that are not being directly challenged in this case. And to the extent there are "state benefits," Majority Op. at 166, to individuals granted deferred action, those benefits stem from *state* statutes or regulations, none of which is being challenged here. Accordingly, DAPA itself grants no new rights or benefits. It merely announces guidelines for the granting of deferred action (which may trigger benefits under this framework of preexisting law) in an effort to "encourage [qualifying individuals] to come out of the shadows, submit to background checks, pay fees, apply for work authorization ... and be counted." [26] Appx. A, at 3. Even absent this announcement, the above benefits would attach to any grant of deferred action.

These tangible benefits aside, the majority concludes that the term "lawful presence" itself constitutes a benefit bestowed by the DAPA Memorandum because it is "a change in designation that confers eligibility for substantial federal and state benefits on a class of otherwise ineligible aliens." Majority Op. at 168. The majority ascribes some added importance to "lawful presence." The Memorandum uses the phrase "lawful presence" to describe what deferred action is: "Deferred

action ... simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States." Appx. A, at 2. As the Memorandum makes clear, "[d]eferred action does not confer any form of legal status in this country, much less citizenship," and it "may be terminated at any time at the agency's discretion." *Id.* at 2; *see also Dhuka*, 716 F.3d at 156 ("We conclude that 'lawful status' implies a right protected by law, while '[lawful presence]' describes an exercise of discretion by a public official."); *Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir.2013) ("It is entirely possible for aliens to be lawfully present (*i.e.*, in a 'period of stay authorized by the Attorney General') even though their lawful status has expired."). Thus, "lawful *presence*" does not "confer[ ] legal *status* upon its recipients," Dist. Ct. Op., 86 F.Supp.3d at 637 n. 45 (emphasis added), nor does it constitute "a change in designation," Majority Op. at 168. Rather, both "lawful presence" and "deferred action" refer to nothing more than DHS's tentative decision, revocable at any time, not to remove an individual for the time being—i.e., the decision to exercise prosecutorial discretion. Even the majority acknowledges that, at its core, "deferred action [is] a nonprosecution decision." *Id.* at 167 (citing *Reno*, 525 U.S. at 484, 119 S.Ct. 936).[27]

---

**25.** *See* 20 C.F.R. § 422.104(a)(2) (promulgated in 2003) (stating that "[a]n alien ... under other authority of law permitting [the alien] to work in the United States" is "eligible for SSN assignment"); 20 C.F.R. § 422.105(a) (promulgated in 2004) (stating that "a current document authorized by [DHS] that verifies authorization to work has been granted" is sufficient documentation "to enable SSA to issue an SSN card that is valid for work"). Under preexisting statutes and regulations, obtaining a Social Security number may also trigger other benefits, such as earned income tax benefits. *See* 26 U.S.C. § 32(c)(1)(E), (m) (passed in 1997).

**26.** Of course, the DAPA Memorandum itself does not grant anyone deferred action. Those decisions will be made in the future by DHS agents guided by the DAPA Memorandum.

**27.** Strangely, the majority cites to *Reno* to support its conclusion that Plaintiffs' claims are justiciable. *Reno* stressed the broad discretion afforded to federal immigration officials and found the case at hand to be non-justiciable based on certain jurisdiction-stripping provisions of the INA. *Reno*, 525 U.S. at 484–92, 119 S.Ct. 936.

The Memorandum provides guidelines for this exercise of prosecutorial discretion, and thus falls squarely within DHS's "broad discretion to 'decide whether it makes sense to pursue removal at all.'" *Id.* at 165; *see also* Dist. Ct. Op., 86 F.Supp.3d at 645 (noting the Secretary's "virtually unlimited discretion when prioritizing enforcement objectives and allocating its limited resources"). Accordingly, precedent compels the conclusion that this case is non-justiciable.[28] *See Texas,* 106 F.3d at 667 (concluding that an "allegation that defendants have failed to enforce the immigration laws ... is not subject to judicial review ... because a court has no workable standard against which to judge the agency's exercise of discretion"); *see also Heckler,* 470 U.S. at 831, 105 S.Ct. 1649 (noting "the general unsuitability for judicial review of agency decisions to refuse enforcement"); *Johns v. Dep't of Justice,* 653 F.2d 884, 893 (5th Cir.1981) ("Th[e] discretion [to commence deportation proceedings] is, like prosecutorial discretion, immune from review in the courts."). That a prior statute or regulation ties a benefit to the exercise of prosecutorial discretion does not make that ordinarily unreviewable exercise of prosecutorial discretion reviewable or turn it into "affirmative agency action." Majority Op. at 168. Rather, the challenge is properly leveled at the prior legislation that does the tying. *See U.S. Dep't of*

*Labor v. Kast Metals Corp.,* 744 F.2d 1145, 1156 (5th Cir.1984) (deeming a rule non-substantive where the rule's "substantive effect ... is purely derivative" of preexisting statutes and regulations). Plaintiffs' failure to formally challenge the statutes and regulations discussed above—either through the political process at the time of their enactment or in this litigation—does not change the equation. It is always a risk that a different administration will be more generous with its discretion than the one in place at the time the statutes or regulations are passed. Moreover, that these decisions will likely be made with respect to a large number of individuals, and that DHS seeks to organize the process by memorializing these decisions and notifying applicants of the results, does not transform deferred action into anything other than an exercise of prosecutorial discretion. Rather, as noted above, the scale of this policy is a direct function of Congress's past appropriations decisions.

Nor can it possibly be maintained that this exercise of prosecutorial discretion may be reviewed because DHS, which has been removing individuals from the United States in record numbers, "'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities."[29] *Heckler,* 470 U.S. at 833 n.4, 105

---

**28.** This approach would not, as Plaintiffs suggest, constitute a "novel extension of *Heckler,*" allowing DHS to insulate grants of benefits from judicial review by attaching them to any enforcement policy. Appellees' Br. 18. Rather, the crucial fact rendering this action non-justiciable is that the benefits at issue are not being granted by the Memorandum itself. Thus, Plaintiffs' doomsday scenario of DHS "grant[ing] ... voting rights ... in conjunction with a non-removal policy," Appellees' Br. 18–19, would certainly be reviewable, as no preexisting statute or regulation grants voting rights to deferred action recipients.

**29.** In determining that DHS has adopted such a policy, the district court reasoned that "the Government here is 'doing nothing to enforce' the removal laws against a class of millions of individuals." Dist. Ct. Op., 86 F.Supp.3d at 663 (quoting *Texas,* 106 F.3d at 667). But by cabining its sample size only to DAPA-eligible individuals, and ignoring DHS's record number of enforcement efforts against others, the district court's conclusion was preordained. Under the district court's logic, if DHS grants deferred action to ten individuals, it would have "abdicated its duty" to enforce the immigration laws as to those ten individuals—

S.Ct. 1649. Although Plaintiffs may prefer a different approach to immigration enforcement, they "do[ ] not contend that federal defendants are *doing nothing* to enforce the immigration laws." *Texas*, 106 F.3d at 667 (emphasis added). As we have stated, "[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *Id.*; *see also Heckler*, 470 U.S. at 834, 105 S.Ct. 1649 ("The danger that agencies may not carry out their delegated powers with sufficient vigor does not necessarily lead to the conclusion that courts are the most appropriate body to police this aspect of their performance.").

Finally, I would note that characterizing any "associated" benefits as flowing exclusively from the DAPA Memorandum—despite the fact that they stem from separate legal authorities—sets a dangerous precedent. The majority concludes that, in order to be reviewable, "DAPA need not directly confer public benefits"; merely "removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them 'provides a focus for judicial review.'" Majority Op. at 167. Under this logic, any non-enforcement decision that triggers a collateral benefit somewhere within the background regulatory and statutory scheme is subject to review by the judiciary. As DHS notes, many exercises of prosecutorial discretion trigger such benefits. For example, a prosecutor's decision to place an individual in a federal pretrial diversion program in lieu of prosecution may result in that individual receiving drug treatment. *See* Thomas E. Ulrich, *Pretrial Diversion in the Federal Court System*, Fed. Prob., Dec. 2002 at 30, 32.[30] At the very least, the majority's reasoning would render reviewable every single exercise of deferred action—programmatic or *ad hoc*—as any grant of deferred action triggers benefits under the statutes and regulations discussed above. While the district court distinguished away many past exercises of deferred action as "different in kind and scope" from DAPA for the purposes of reviewability,[31] Dist. Ct. Op., 86 F.Supp.3d at 664, the majority does not cabin its conclusion. In fact, it suggests that all exercises of deferred action would be subject to judicial scrutiny. Majority Op. at 166 ("Deferred action . . . is much more than nonenforcement.").

This is logic to which I cannot subscribe. Because the DAPA Memorandum contains only guidelines for the exercise of prosecutorial discretion and does not itself confer any benefits to DAPA recipients, I would deem this case non-justiciable. The policy decisions at issue in this case are best resolved not by judicial fiat, but via the political process. That this case essentially boils down to a policy dispute is underscored not only by the dozens of amicus briefs filed in this case by interested par-

---

rendering that action reviewable. Reading *Heckler*'s narrow exception so broadly would swallow the general rule that "an agency's decision not to take enforcement action should be presumed immune from judicial review." *Heckler*, 470 U.S. at 832, 105 S.Ct. 1649. The majority does not appear to endorse this misrepresentation today.

**30.** While the majority suggests DAPA is more than "nonprosecution" because it "remov[es] a categorical bar on [the] receipt of . . . benefits," Majority Op. at 167, diversion also re-

moves a categorical bar on the receipt of benefits as convicted drug offenders are otherwise ineligible for certain public benefits. *See, e.g.*, 21 U.S.C. § 862a(a) (preventing these offenders from receiving TANF and food stamps).

**31.** As noted by DHS and various amici, the granting of deferred action—even to whole classes of individuals—has occurred for decades, under both Republican and Democratic administrations.

ties across the ideological spectrum—Mayors, Senators, Representatives, and law enforcement officials, among others—but also by the district court's opinion, which repeatedly expresses frustration that the Secretary is "actively act[ing] to thwart" the immigration laws and "is not just rewriting the laws [but is] creating them from scratch."  Dist. Ct. Op., 86 F.Supp.3d at 663.  The majority's observation that this suit involves "policy disagreements masquerading as legal claims" is also telling.  Majority Op. at 161.  Whether or not the district court's characterization of this case is accurate—though the record number of removals in recent years demonstrates that it is not—to the extent some are unhappy with the vigor of DHS's enforcement efforts, their remedies lie in the political process, not in litigation.  *See Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.").  Congress is free to constrain DHS's discretion, and, ultimately, the voters are free to express their approval or disapproval of DAPA through their choice of elected officials.  *See Lincoln v. Vigil,* 508 U.S. 182, 193, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) ("[W]e hardly need to note that an agency's decision to ignore congressional expectations

may expose it to grave political consequences.").

Accordingly, this case should be dismissed on justiciability grounds.  However, for the sake of thoroughness and to correct serious errors committed by the district court in granting the preliminary injunction and the majority in affirming that grant, I discuss below the merits of both APA claims.

## IV.  APA Procedural Claim

Our precedent is clear:  "As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm," and thus need not go through the procedures of notice-and-comment.  *Prof'ls & Patients for Customized Care v. Shalala,* 56 F.3d 592, 596–97 (5th Cir.1995) (citation omitted).[32]  Therefore, in order for Plaintiffs to establish a substantial likelihood of success on the merits—the required showing for a preliminary injunction, *Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 452 (5th Cir.2014)—Plaintiffs bore the burden of demonstrating that the Memorandum was non-discretionary.  As the majority admits, the Memorandum "facially purports to confer discretion."  Majority Op. at 171.  But the district court ignored this clear language, concluding that agency officials implementing DAPA will defy the

**32.**  As the Fifth Circuit has noted, in determining whether a rule is substantive, and thus subject to notice-and-comment procedures, we must "focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it."  *Prof'ls & Patients,* 56 F.3d at 595 (footnote omitted).  Plaintiffs now appear to argue (for the first time) on appeal that regardless of the discretion it confers, the DAPA Memorandum is a substantive rule because it "changed the law" by granting benefits to 4.3 million individuals.  But as discussed above, the DAPA Memorandum itself confers no additional benefits.  Moreover, the

scale of the program has no bearing on the substantive rule inquiry—i.e., whether the policy will be administered with case-by-case discretion.  *See id.; McLouth Steel Prods. Corp. v. Thomas,* 838 F.2d 1317, 1320 (D.C.Cir.1988) ("The question for purposes of [5 U.S.C.] § 553 is whether a statement is a rule of present binding effect; the answer depends on whether the statement constrains the agency's discretion.").  Indeed, Plaintiffs put it best in a letter brief filed with the district court:  "To be sure, 'case-by-case discretion' determines whether the [Memorandum] is a 'substantive rule' under the APA."

Memorandum and simply rubberstamp applications. In so doing, the district court disregarded a mountain of highly probative evidence from DHS officials charged with implementing DAPA, relying instead on selected excerpts of the President's public statements, facts relating to a program materially distinguishable from the one at issue here, and improper burden-shifting. The majority now adopts the district court's conclusions wholesale and without question. *Id.* at 175. For the reasons set out below, I would hold that the Memorandum is nothing more than a general statement of policy and that the district court's findings cannot stand, even under clear error review.

### A. The Language and Substance of the DAPA Memorandum

In determining whether the DAPA Memorandum constitutes a substantive rule, we must begin with the words of the Memorandum itself. *See Prof'ls & Patients*, 56 F.3d at 596. The Memorandum states that it reflects "new policies," Appx. A, at 1, and "guidance for case-by-case use of deferred action," Appx. A, at 3. Accordingly, the Secretary characterizes the Memorandum as a "general statement[ ] of policy"—which is not subject to the notice-and-comment process. 5 U.S.C. § 553(b)(3)(A); *see also Prof'ls & Patients*, 56 F.3d at 596 ("[T]he description as 'policy' in the [statement] itself ... militate[s] in favor of a holding that [the statement] is not a substantive rule."). The Memorandum also repeatedly references (more than ten times) the discretionary, "case-by-case" determinations to be made by agents in deciding whether to grant deferred action. It emphasizes that, despite the criteria contained therein, "the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis."[33] Appx. A, at 5; *see also Ass'n of Flight Attendants–CWA v. Huerta*, 785 F.3d 710, 717 (D.C.Cir.2015) (stating that a document "riddled with caveats is not" likely to constitute a substantive rule); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538 (D.C.Cir.1986) (Scalia, J.) (concluding that agency guidelines for determining when to take enforcement action against mine operators did not constitute a substantive rule where "[t]he language of the guidelines is replete with indications that the Secretary retained his discretion to cite production-operators as he saw fit"). Indeed, this court has already recognized the "discretion expressly granted under" DAPA—discretion that allows

---

**33.** The Memorandum also states that (1) "DHS must exercise prosecutorial discretion in the enforcement of the law"; (2) our immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case"; (3) "[d]eferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission"; (4) "deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion"; (5) "[h]istorically, deferred action has been used ... on a case-by-case basis"; (6) "I am now expanding certain parameters of DACA and issuing guid-

ance for case-by-case use of deferred action"; (7) "[c]ase-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests"; (8) "I hereby direct US-CIS to establish a process ... for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis"; (9) "ICE is ... instructed to review pending removal cases ... of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations"; and (10) "[i]t remains within the authority of the Executive Branch ... to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law." Appx. A, at 1–5.

"agent[s] to deal with each alien on a case by case basis." *Crane v. Johnson*, 783 F.3d 244, 255 (5th Cir.2015) (concluding that, on the record in *Crane*, the plaintiffs lacked standing to challenge DACA).

The discretionary nature of the DAPA Memorandum is further supported by the policy's substance. Although some of the Memorandum's criteria can be routinely applied,[34] many will require agents to make discretionary judgments as to the application of the respective criteria to the facts of a particular case. For example, agents must determine whether an applicant "pose[s] a danger to national security," Appx. B, at 3, whether the applicant is "a threat to ... border security" or "public safety," Appx. B, at 4, and whether the applicant has "significantly abused the visa or visa waiver programs,"[35] Appx. B, at 4. Such criteria cannot be mechanically applied, but rather entail a degree of judgment; in other words, they are "imprecise and discretionary—not exact and certain."[36] *Prof'ls & Patients*, 56 F.3d at 600 (concluding that an FDA policy delineating nine factors the agency should consider in determining whether to bring an enforcement action did not constitute a substantive rule). This aspect of the DAPA Memorandum appears to have been overlooked by the district court, which—in analyzing

whether the Memorandum allows for case-by-case discretion—was fixated on the extent to which applicants meeting DAPA's criteria would nonetheless be denied deferred action.[37] Such an approach ignores the fact that applying these threshold criteria itself involves an exercise of discretion.

Most strikingly, the last criterion contained in the DAPA Memorandum is entirely open-ended, stating that deferred action should be granted only if the applicant "present[s] no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate." Appx. A, at 4. The Memorandum does not elaborate on what such "other factors" should be considered—leaving this analysis entirely to the judgment of the agents processing the applications. This court has held that such a caveat "express[ing] that [a] list of ... factors is neither dispositive nor exhaustive," "clearly leaves to the sound discretion of the agency in each case the ultimate decision whether to bring an enforcement action." *Prof'ls & Patients*, 56 F.3d at 600–01. Indeed, construing the DAPA memorandum as a categorical grant of deferred action for all applicants meeting the other DAPA criteria would render this last criterion meaningless. *Cf. Brock*, 796 F.2d at 538. Thus, due to the pres-

---

**34.** For example: whether the applicant has "a son or daughter who is a U.S. citizen or lawful permanent resident." Appx. A, at 4.

**35.** Although these criteria come from the Enforcement Priorities Memorandum, the DAPA Memorandum incorporates these criteria into its own, stating that deferred action may be granted to individuals who "are not an enforcement priority as reflected in the" Enforcement Priorities Memorandum. Appx. A, at 4.

**36.** Similarly, an agent implementing the DACA Memorandum must make the threshold discretionary determinations of whether the applicant has been convicted of "a *significant*

misdemeanor," and whether the applicant "poses a threat to national security or public safety." And as we concluded in *Crane*, the DACA Memorandum too "makes it clear that the Agents shall exercise their discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case basis." *Crane*, 783 F.3d at 254–55.

**37.** The majority perpetuates this error today by accepting the district court's characterizations of DAPA without question—despite recognizing that there was "conflicting evidence" below and that extrapolating DAPA from DACA needed to "be done carefully." Majority Op. at 173, 175.

ence of these various flexible and indefinite criteria, the DAPA Memorandum is not a substantive rule that "so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion." *Huerta*, 785 F.3d at 718 (citation omitted); *cf. Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1113 (D.C.Cir.1974) (concluding that the "formula like" guidance for determining the length of parole constituted a substantive rule, as it involved the "purely mechanical operation" of computing a score using exclusive criteria).

As Judge Kavanaugh, writing for the D.C. Circuit, has stated, "[t]he most important factor" in distinguishing between a substantive rule and a general statement of policy "concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C.Cir.2014). Here, the Memorandum makes clear that it "confers no substantive right, immigration status or pathway to citizenship." Appx. A, at 5. The majority suggests that DAPA "modifies substantive rights and interests," by "conferring lawful presence on 500,000 illegal aliens" and forcing Texas to change its laws. Majority Op. at 175–76. None of this appears on the face of the Memorandum though.[38] In fact, nothing in the Memorandum indicates that it is legally binding—i.e., that an applicant who is not granted deferred action can challenge that decision in court, or that DHS would be barred from removing an applicant who appears to satisfy the Memorandum's cri-

teria. *See Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir.2000) ("Substantive or legislative rules affect individual rights and obligations and are binding on the courts."); *cf. Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C.Cir.1987) (per curiam) (deeming enforcement criteria a substantive rule where, "[a]s FDA conceded at oral argument, it would be daunting indeed to try to convince a court that the agency could appropriately prosecute a producer [who did not meet the agency's criteria for enforcement]"). Nor does anyone assert that the Memorandum "impose[s] any obligation or prohibition on regulated entities," i.e., the potential DAPA applicants.[39] *Huerta*, 785 F.3d at 717; *cf. Heckler*, 470 U.S. at 832, 105 S.Ct. 1649 ("[W]hen an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect."). Moreover, even absent the DAPA Memorandum, DHS would have the authority to take the action of which Plaintiffs complain—i.e., by granting deferred action on an *ad hoc* basis. *See McCarthy*, 758 F.3d at 253 ("When the agency applies a general statement of policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." (internal brackets omitted)). Accordingly, based on its language and substance, the Memorandum does not constitute a binding substantive rule subject to the requirements of notice-and-comment.

---

**38.** "Lawful presence," as previously indicated, is also not a substantive right, but rather a form of nonprosecution that can be revoked at any time. Any purported harm to Texas is incidental and not contemplated by DAPA.

**39.** The majority suggests that there is a "burden imposed on Texas" by DAPA and even

then concedes that this "is derivative of issuing lawful presence to beneficiaries." Majority Op. at 177. But the analysis centers on the effect of the policy statement on *regulated entities*, and Texas is plainly not regulated by or even mentioned in the DAPA Memorandum.

The majority recognizes that the plain language of Memorandum "facially purports to confer discretion" and does not argue that DAPA creates a substantive rule from its four corners alone. Majority Op. at 171. Nonetheless, the district court reached the opposite conclusion. And it bears identifying the errors committed by the district court in holding that DAPA was a substantive rule on its face.

The district court focused on the Memorandum's "mandatory term[s], instruction[s], [and] command[s]"—in particular, the Secretary's "direct[ion]" to USCIS to begin implementing DAPA. Dist. Ct. Op., 86 F.Supp.3d at 671 n. 103. But it should be no surprise that the Memorandum "direct[s]" the USCIS to establish a process for implementing this guidance, Appx. A, at 4; certainly the Secretary did not intend for it to be ignored, *see Prof'ls & Patients*, 56 F.3d at 599 ("[W]hat purpose would an agency's statement of policy serve if agency employees could not refer to it for guidance?"). Although "the mandatory tone of the factors is undoubtedly calculated to encourage compliance," such language does not transform a statement of policy into a substantive rule so long as there is "an opportunity for individualized determinations." *Id.* at 597. Our discussion in *Professionals and Patients* is particularly instructive on this point:

True, the FDA had even greater discretion in bringing enforcement actions before [the policy for determining whether to bring enforcement actions against pharmacies] issued; prior to that time inspectors were apparently provided with no official guidance whatsoever. In that sense, therefore, [the policy] has "channeled" the FDA's enforcement discretion, providing direction—where once there was none—by helping to determine whether a pharmacy is engaged in traditional compounding or drug manufacturing. But

all statements of policy channel discretion to some degree—indeed, that is their purpose. The more cogent question therefore is whether [the policy] is so restrictive in defining which pharmacies are engaged in drug manufacturing that it effectively removes most, if not all, of the FDA's discretion in deciding against which pharmacies it will bring an enforcement action. We cannot read [the policy] that restrictively.

*Id.* at 600. Nor should the DAPA Memorandum be read so restrictively. Its channeling of agency enforcement discretion—through the use of non-exhaustive, flexible criteria—is entirely consistent with a non-substantive rule. *See, e.g., Nat'l Roofing Contractors Ass'n v. U.S. Dep't of Labor*, 639 F.3d 339, 341–42 (7th Cir.2011) ("The Secretary committed to paper the criteria for allowing regulatory violations to exist without redress, a step essential to control her many subordinates. This does not make the exercise less discretionary."); *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 667 (D.C.Cir.1978) ("The mandatory tone of the specifications for audits and auditors doubtless encourages compliance. However, an opportunity for an individualized determination is afforded."); *see also Kast Metals Corp.*, 744 F.2d at 1152 n.13 ("[A]gency instructions to agency officers are not legislative rules."). This is the law for good reason. Requiring each and every policy channeling prosecutorial discretion to go through the notice-and-comment process would perversely encourage unwritten, arbitrary enforcement policies.

The plain language of the Memorandum cannot be characterized as "draw[ing] a 'line in the sand' that, once crossed, removes all discretion from the agency." *Prof'ls & Patients*, 56 F.3d at 601. Furthermore, the fact that the DAPA Memo-

randum relates to two areas in which courts should be reluctant to interfere—immigration and prosecutorial discretion—counsels in favor of concluding that it does not constitute a substantive rule. *See Brock,* 796 F.2d at 538 ("Our decision [that the rule is non-substantive] is reinforced by the fact that the statement here in question pertains to an agency's exercise of its enforcement discretion—an area in which the courts have traditionally been most reluctant to interfere.").

Rather than relying on the language of the Memorandum, the majority concludes that DAPA is a substantive rule because it "would not genuinely leave [DHS] and its employees free to exercise discretion" in practice. Majority Op. at 175; *see also Prof'ls & Patients,* 56 F.3d at 595 (quoting *Young,* 818 F.2d at 946). But in doing so, the majority relies unquestioningly on the district court's finding that the discretionary language in DAPA was "merely pretext" and that DHS officials would not exercise case-by-case discretion of removals under DAPA. Majority Op. at 171; *see also id.* at 177 ("DAPA establishes 'the *substantive standards* by which the [agency] evaluates applications.'" (alterations in original)). The district court's finding was clearly erroneous, however, and I turn to it next.

**B. Evidence of Pretext**

The district court erred not only in its analysis of the legal effect of the DAPA Memorandum, but also in its resolution of the facts. By eschewing the plain language of the Memorandum, and concluding that its discretionary aspects are "merely pretext," Dist. Ct. Op., 86 F.Supp.3d at 669

n. 101, the district court committed reversible error. To the extent the district court's pretext conclusion constitutes a factual finding entitled to "clear error" review, that does not mean that we "rubber stamp the district court's findings simply because they were entered." *McLennan v. Am. Eurocopter Corp.,* 245 F.3d 403, 409 (5th Cir.2001). Rather, "[c]lear error exists when this court is left with the definite and firm conviction that a mistake has been made." *Ogden v. Comm'r,* 244 F.3d 970, 971 (5th Cir.2001) (per curiam). I am left with such a conviction for three independent reasons: (1) the record lacks any probative evidence of DAPA's implementation; (2) the district court erroneously equated DAPA with DACA; and (3) even assuming DAPA and DACA can be equated, the evidence of DACA's implementation fails to establish pretext.

It is true that the plain language of the Memorandum—which, in the majority's words, "facially purports to confer discretion"—may not be conclusive if rebutted by "what the agency does in fact." *Prof'ls & Patients,* 56 F.3d at 596. Here, however, there is no such evidence of what the agency has done "in fact," as DAPA has yet to be implemented. The district court ruled even before it had "an early snapshot" of the policy's implementation. *McCarthy,* 758 F.3d at 253 (stating that, "because ... recently issued guidance will have been implemented in only a few instances," courts "look[ing] to post-guidance events to determine whether the agency has applied the guidance as if it were binding" must rely on "an early snapshot").[40] Plaintiffs have cited no authority,

---

40. As several amici argue, a challenge to a statement of policy as pretextual may be unripe prior to the policy's implementation. For example, where:

[T]he facts are so wholly ambiguous and unsharpened as not to present a purely

legal question 'fit ... for judicial decision,' and where the agency's characterization of its action would fit them cleanly into a § 553 exemption, ... the most prudent course [is] to await the sharpened facts that come from the actual workings of the regu-

and I am not aware of any, deeming a statement of policy pretextual without direct evidence of the policy's implementation. *Cf. Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 60 (D.C.Cir.2002) ("[I]f there have so far been *any* applications of the [agency]'s policy, neither side has seen fit to bring it to our attention. So there is no basis here for any claim that the [agency] has actually treated the policy with the de facto inflexibility of a binding norm."). Nor should pretext be found here absent such evidence. As noted at the outset, courts should not be quick to conclude that when a coordinate branch of government describes a policy as discretionary, it does not mean what it says.

How, then, did the district court reach the conclusion that the DAPA Memorandum's express inclusion of case-by-case discretion is "merely pretext"? First, the district court selectively relied on public statements the President made in describing the DAPA Memorandum to the public. Majority Op. at 173. But there is no precedent for a court relying on such general pronouncements in determining a program's effect on the agency and on those being regulated. As Judge Higginson aptly noted in his dissent from the denial of the motion for a stay, "Presidents, like governors and legislators, often describe [a] law enthusiastically yet defend the same law narrowly." *Texas*, 787 F.3d at 780 (Higginson, J., dissenting); *see also Prof'ls & Patients*, 56 F.3d at 599 (reasoning that "informal communications often exhibit a lack of 'precision of draftsmanship' and ... internal inconsistencies" and thus are "entitled to limited weight").[41]

More importantly, the statements relied upon by the district court are not inconsistent with the DAPA Memorandum's grant of discretion to agency decision makers. For example, the President's statement that those who "meet the [DAPA] criteria ... can come out of the shadows," Dist. Ct. Op., 86 F.Supp.3d at 668, does not suggest that applications will be rubber-stamped, given that (as discussed above) those very criteria involve the exercise of discretion. Similarly, the President's suggestion that agents who do not follow DAPA's guidelines may suffer consequences does not support the conclusion that the Memorandum is pretextual. Rather, it supports the opposite conclusion—that the terms of the DAPA Memorandum, which incorporate case-by-case discretion, will be followed. An order to "use your discretion" is not a substantive rule.

The district court's reliance on language contained in DHS's DAPA website—a source apparently not even cited by the parties and not mentioned by the majority—rests on even shakier ground. According to the district court, the DHS website's characterization of DAPA as a "program" and an "initiative" somehow contradicts DHS's position that the Memorandum constitutes "guidance." Of course, DAPA may very well be all three, but this has no bearing on whether the Memorandum constitutes a substantive rule—i.e., whether the "program" or "initiative" or "guidance" genuinely allows the agency to exercise its discretion on a case-by-case basis. Even more dubious is the

---

lation in question before striking the objective down as violative of the APA.

*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1056 (D.C.Cir.1987) (first alteration in original) (internal citation omitted); *see Hudson v. FAA*, 192 F.3d 1031, 1034–35 (D.C.Cir.1999); *Pub. Citizen, Inc.*, 940 F.2d at 683.

**41.** The majority appears to endorse the district court's reliance on presidential statements as it too cites the President's remark that he " 'change[d] the law' " as support for concluding that DAPA is beyond the scope of the INA. Majority Op. at 185.

district court's argument that, by using the word "initiative" on its website, DHS was intending to use the word in its technical legal sense to reference *voter* initiatives, thus implying a "legislative process."[42] *Id.* at 667–68.

Lacking any probative evidence as to *DAPA*'s implementation, the district court relied most heavily on evidence of *DACA*'s implementation—concluding unequivocally that DAPA will be "implemented exactly like DACA." *Id.* at 663.  It is this analysis that the majority finds convincing, all the while noting that "any extrapolation from DACA must be done carefully." Majority Op. at 173.  The district court reached this conclusion on two flawed bases: (1) the DAPA Memorandum's statement directing the USCIS to "establish a process, similar to DACA" for implementing DAPA, Appx. A, at 4;  and (2) the "lack of any suggestion that DAPA will be implemented in a fashion different from DACA," Dist. Ct. Op., 86 F.Supp.3d at 649.  With respect to the former, this single, nebulous statement does not specify *how* the DAPA and DACA processes would be similar; the phrase cannot be construed to mean that DAPA and DACA will be implemented *identically.*  The latter is pure burden-shifting—the district court implies that the burden is on DHS to show that the two programs will be implemented differently. Of course, in the preliminary injunction context, Plaintiffs, "by a clear showing, carr[y] the burden of persuasion." *Harris Cnty. v. CarMax Auto Superstores Inc.,* 177 F.3d 306, 312 (5th Cir.1999).  The district court also completely ignored the statement contained in the Declaration of

Donald W. Neufeld—the Associate Director for Service Center Operations for USCIS—that "USCIS is in the process of determining the procedures for reviewing requests under DAPA, and thus USCIS has not yet determined whether the process to adjudicate DAPA requests will be similar to the DACA process."

More importantly, the fact that the *administration* of the two programs may be similar is not evidence that the *substantive review* under both programs will be the same.  As discussed in more detail below, the district court relied heavily on the denial rates of applications submitted under DACA. But those rates are irrelevant for one simple reason, a reason the district court failed to confront: the substantive criteria under DACA and DAPA are different. And even the majority concedes that "DACA and DAPA are not identical." Majority Op. at 173.  Review under the DACA Memorandum does not, for example, require reference to the various discretionary factors contained in the Enforcement Priorities Memorandum, nor does DACA contain DAPA's criterion that the applicant "present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate." Appx. A, at 4;  *see also* Majority Op. at 174 ("Further, the DAPA Memo contains additional discretionary criteria."). Thus, even assuming DACA and DAPA applications are reviewed using the exact same administrative process, the district court had no basis for concluding that the results of that process—a process that would involve the application of markedly different, discretionary criteria—would be

---

**42.** The district court noted that this voter initiative definition is the "sole definition offered for 'initiative'" in *Black's Law Dictionary.*  Dist. Ct. Op., 86 F.Supp.3d at 668. There are, of course, other dictionaries—dictionaries far more likely to capture DHS's intended use of the word in a website created

to describe DAPA to the public (rather than to attorneys or judges).  For example, the first definition of "initiative" in the Oxford English Dictionary is "[t]hat which initiates, begins, or originates," *Initiative, The Oxford English Dictionary* (2d ed.1989)—a definition that certainly does not imply a binding norm.

the same. For this reason alone—that is, the district court's heavy reliance upon this minimally probative evidence—I would conclude that the district court clearly erred.[43]

There are additional reasons, however, to discount the DACA-related evidence on which the district court based its decision and which the majority now accepts. First, even assuming DACA's 5% denial rate has some probative value, and assuming that rate can be properly characterized as low,[44] a low rate would be unsurprising given the self-selecting nature of the program, as the majority concedes. Majority Op. at 173. It should be expected that only those highly likely to receive deferred action will apply; otherwise, applicants would risk revealing their immigration status and other identifying information to authorities, thereby risking removal (and the loss of a sizeable fee). The majority recognizes this issue but finds that it "is partially mitigated by the finding that 'the [g]overnment has publicly declared that it will make no attempt to enforce the law against even those who are denied deferred action.'" *Id.* (citing Dist. Ct. Op., 86 F.Supp.3d at 663). But this public declaration, cited by the district court, comes from an informational DHS website that never states that DHS will make no attempt to enforce the law.[45]

The district court also erred in its mischaracterization of a letter written by León Rodríguez, Director of USCIS, to Senator Charles Grassley, suggesting that the top four reasons for DACA denials are:

> (1) the applicant used the wrong form; (2) the applicant failed to provide a valid signature; (3) the applicant failed to file or complete Form I–765 or failed to enclose the fee; and (4) the applicant was below the age of fifteen and thus ineligible to participate in the program.

Dist. Ct. Op., 86 F.Supp.3d at 609. This, however, is *not* what the letter says. The letter actually states that these were the top four reasons for DACA application *rejections*, not denials. As made clear in DHS's Neufeld Declaration, "a DACA request is *'rejected'* when [it is] determine[d] upon intake that the [application] has a fatal flaw," while "[a] DACA request is *'denied'* when a USCIS adjudicator, on a case-by-case basis, determines that the requestor has not demonstrated that they satisfy the guidelines for DACA or when an adjudicator determines that deferred action should be denied even though the threshold guidelines are met." By conflating rejections with denials, the district court suggested that most denials are made for mechanical administrative reasons and thus could not have been discre-

---

**43.** In addition, as Judge Higginson noted in his dissent, DACA is materially distinguishable from DAPA because the former applies only to "a subset of undocumented immigrants who are particularly inculpable as they 'were brought to this country as children' and, thus, 'lacked the intent to violate the law.'" *Texas,* 787 F.3d at 781 (Higginson, J., dissenting) (quoting the DACA Memorandum). Accordingly, it would be reasonable to expect that denial rates under DAPA would be higher than those under DACA, as DACA applicants are far less likely to exhibit other factors (e.g., a threat to national security) that would prompt an exercise of discretion not to grant deferred action.

**44.** This rate represents 38,080 denials out of the 723,358 applications accepted for processing at USCIS service centers through December 2014. There were an additional 42,919 applications rejected for purely administrative reasons during this time period. Neither of these numbers suggests an agency on autopilot.

**45.** The majority's acceptance of this passage is but one illustration of the problem with relying on the district court's factual conclusions.

tionary.  But the five percent *denial* rate does not even take into account these administrative *rejections*.

The district court also appeared singularly focused on one metric for measuring whether DACA (and by implication, DAPA) is implemented in a discretionary manner.  The court insisted that DHS provide: "the number, if any, of requests that were denied even though the applicant met the DACA criteria as set out in Secretary Napolitano's DACA memorandum."[46]  *Id.* at 609.  In yet another instance of improper burden-shifting, the court reasoned that "[b]ecause the Government could not produce evidence concerning applicants who met the program's criteria but were denied DACA status, this Court accepts the States' evidence as correct."  *Id.* at 609 n.8.  But the burden of showing DAPA is non-discretionary was on Plaintiffs—the States—and Plaintiffs provided *no* evidence as to the number of these denials.  Rather, the district court accepted as true Plaintiffs' *bare assertion* that there were no such denials, concluding unequivocally that "[n]o DACA application that has met the criteria has been denied based on an exercise of individualized discretion."  *Id.* at 669 n.101.  The district court reached this conclusion in the face of *uncontested evidence* contained in the Neufeld Declaration that DACA applications "have also been denied on the basis that deferred action was not appropriate for other reasons not expressly set forth in [the] 2012 DACA Memorandum."  The district court also failed to acknowledge the reason DHS did not introduce statistics as to these denials: it had no ability to

do so.  As stated in the Neufeld Declaration, "[u]ntil very recently, USCIS lacked any ability to automatically track and sort the reasons for DACA denials," presumably because it had no reason to track such data prior to this litigation.  Although this point is undisputed, the district court and now the majority nonetheless fault DHS for failing to provide the information the district court requested.  *See* Majority Op. at 175 ("[T]he government did not provide the number of cases that service-center officials referred to field offices for interviews.").  Yet it was not DHS's burden to disprove Plaintiffs' assertions of pretext, nor must DHS (anticipatorily) track data in a way that may be convenient to an adversary in future litigation.

The district court also relied on a four-page declaration by Kenneth Palinkas, President of the National Citizenship and Immigration Services Council (the union representing USCIS employees processing DACA applications), for the proposition that "DACA applications are simply rubberstamped if the applicants meet the necessary criteria."[47]  Dist. Ct. Op., 86 F.Supp.3d at 610.  Yet lay witness conclusions are only competent evidence if rationally drawn from facts personally observed.  *See* Fed.R.Evid. 701.  Here, Palinkas's conclusion was supported only by the fact that DACA applications are routed to "service centers instead of field offices," and that "USCIS officers in service centers . . . do not interview applicants"—a weak basis on which to conclude that DHS's representations (both to the public and to the courts) are "merely pretext."[48]

---

**46.** As discussed above, this focus was misplaced, as application of both the DACA and DAPA criteria themselves involves the exercise of discretion.

**47.** Yet again, this focus ignores the discretion inherent in those criteria.

**48.** Palinkas also focuses on the USCIS's announcement that it will create a new service center for the processing of DAPA applications, to be staffed by approximately 700 USCIS employees and 300 federal contractors.  But the fact that so many agents are necessary to assess DAPA applications is inconsis-

*See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2949 (3d ed. 2015) ("Preliminary injunctions frequently are denied if the affidavits are too vague or conclusory to demonstrate a clear right to relief under Rule 65."). Indeed, Palinkas's assertions are rebutted—and the step-by-step process for reviewing DACA applications is explained—in the detailed affidavit filed by Donald Neufeld, the head of those very USCIS service centers. Neufeld declares that the service centers "are designed to adjudicate applications, petitions and requests" for various programs "that have higher-volume caseloads." Neufeld goes on to describe the "multi-step, case-specific process" for reviewing DACA applications: "Once a case arrives at a Service Center, a specially trained USCIS adjudicator is assigned to determine whether the requestor satisfies the DACA guidelines and ultimately determine whether a request should be approved or denied." [49] Adjudicators "evaluate the evidence each requestor submits in conjunction with the relevant DACA guidelines" and "assess the appropriate weight to accord such evidence." [50] Citing various examples, Neufeld explains that "[e]ven if it is determined that a requestor has satisfied the threshold DACA guidelines, USCIS may exercise discretion to deny a request where other factors make the grant of deferred action inappropriate." [51] As a part of their review, adjudicators can investigate the facts and evidence support-

ing the application "by contacting educational institutions, other government agencies, employers, or other entities." Moreover, although the Palinkas Declaration accurately states that adjudicators at USCIS service centers do not have the capability to interview applicants, the Neufeld Declaration clarifies that service center adjudicators "may refer a case for interview at a Field Office"—for example, "when the adjudicator determines, after careful review of the request and supporting documents, that a request is deniable, but potentially curable, with information that can best be received through an interview." Adjudicators may also request that applicants submit additional evidence in support of their applications for deferred action; this was no rare occurrence, as nearly 200,000 such requests for additional evidence were issued by adjudicators. "In addition, all DACA requestors must submit to background checks, and requests are denied if these background checks show that deferred action would be inappropriate."

Placing these declarations side-by-side, the detailed Neufeld Declaration does not simply rebut the conclusory assertions contained in the Palinkas Declaration—it provides *undisputed* context for how USCIS service centers actually work and how DACA application decisions are made. Or at the very least, as the majority concedes, the two in tandem create "conflicting evidence on the degree to which DACA allowed for discretion." Majority Op. at 175.

---

tent with the notion that the review will be conducted in a mechanical, pro forma manner.

**49.** Applications are first mailed to USCIS "lockboxes," where they are reviewed to determine whether they should be rejected for administrative reasons.

**50.** Neufeld notes, consistent with the discussion above, that "USCIS must … exercise

significant discretion in determining whether" some of the DACA guidelines apply; for example, "determining whether a requestor 'poses a threat to national security or public safety' necessarily involves the exercise of the agency's discretion."

**51.** Such discretionary denials are generally reviewed at USCIS headquarters.

AR 00000208

Yet the district court concluded that the Neufeld Declaration did not provide "the level of detail that the Court requested." [52] Dist. Ct. Op., 86 F.Supp.3d at 609. It is difficult to imagine what level of detail would have satisfied the district court. At a minimum, as recognized by Judge Higginson in his dissent to the denial of the stay pending appeal, the Neufeld Declaration created a factual dispute warranting an evidentiary hearing.[53] *See Texas,* 787 F.3d at 781–82 (Higginson, J., dissenting) (citing authorities); *see also Landmark Land Co. v. Office of Thrift Supervision,* 990 F.2d 807, 812 (5th Cir.1993) ("The record reveals several disputes of material fact that the district court must necessarily resolve in deciding whether to issue the injunction. An evidentiary hearing thus is in order upon remand."); *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.,* 446 F.2d 353, 356 n. 4 (5th Cir.1971) ("[W]here so very much turns upon an accurate presentation of numerous facts . . . the propriety of proceeding upon affidavits becomes the most questionable."); *Cobell v. Norton,* 391 F.3d 251, 261 (D.C.Cir.2004) ("Particularly when a court must make credibility determinations to resolve key factual disputes in favor of the moving party, it is an *abuse of discretion* for the court to settle the question on the basis of documents alone, without an evidentiary hearing." (emphasis added)). The district court's failure to hold an evidentiary hearing further undermines faith in its factual conclusions.

The district court also looked to the operating procedures governing the implementation of *DACA,* noting that they

"contain[ ] nearly 150 pages of specific instructions for granting or denying deferred action" and involve the use of standardized forms for recording denials—a fact the majority mentions. Dist. Ct. Op., 86 F.Supp.3d at 669 (footnote omitted). But no such operating procedures for the implementation of *DAPA* appear in the record—a fact the majority does not mention. As noted above, the USCIS is currently "in the process of determining the procedures for reviewing requests under DAPA." In any event, even "specific and detailed requirements" may qualify as a "'general' statement of policy." *Guardian Fed. Sav. & Loan Ass'n,* 589 F.2d at 667. And the "purpose" of a statement of policy is to "channel discretion" of agency decision makers; such channeling does not trigger the requirements of notice-and-comment unless it is "so restrictive . . . that it effectively removes most, if not all, of the [agency]'s discretion." *Prof'ls & Patients,* 56 F.3d at 600. As for the use of standardized forms to record denials, what matters is not whether DAPA decisions are *memorialized* in a mechanical fashion, but whether they are *made* in such a fashion. For the many reasons discussed above, the district court had no legitimate basis for concluding that they will be.

Finally, the district court's lengthy discussion of an "abdication theory" of standing—a theory for which Plaintiffs have not even expressly advocated—provides context for the district court's conclusions as to pretext.[54] In determining that the

---

**52.** The district court did not, however, make an express finding that it deemed the Palinkas Declaration more credible than the Neufeld Declaration.

**53.** Even Plaintiffs noted, after DHS submitted the Neufeld Declaration, that "if the Court decides that the Defendants' new declarations create a *material* fact dispute of material con-

sequence to the motion . . . , the *correct step* would be to hold a second hearing."

**54.** It appears that no court in the country has accepted this radical theory of standing. Indeed, the district court admitted that it had "not found a case where the plaintiff's standing was supported solely on this basis." Dist. Ct. Op., 86 F.Supp.3d at 643 n. 48. The ma-

DAPA Memorandum constituted an "abdication" of DHS's duties, the district court asserted (repeatedly) that it "cannot be disputed" that "the Government has abandoned its duty to enforce the law." Dist. Ct. Op., 86 F.Supp.3d at 638. The district court deemed it "*evident* that the Government has determined that it will not enforce the law as it applies to over 40% of the illegal alien population that qualify for DAPA." [55] *Id.* at 639 (emphasis added). Such blanket assertions—made without discussing any of the evidence set out above—*assume* a lack of discretion in the review of DAPA applications. This assumption—which the district court apparently required DHS to rebut—infects the opinion below, yet has no evidentiary basis.

The majority accepts the district court's factual conclusions almost *carte blanche.* But clear error review is not a rubber stamp, and the litany of errors committed by the district court become readily apparent from a review of the record. The record before us, when read properly, shows that DAPA is merely a general statement of policy. As such, it is exempt from the notice-and-comment requirements of 5 U.S.C. § 553.

## V.  APA Substantive Claim

The majority's conclusion that the states are substantially likely to succeed on their APA procedural claim should presumably be enough to affirm the decision below. Yet, for reasons altogether unclear, the majority stretches beyond the judgment of the district court and concludes that DAPA and a long, preexisting regulation (8 C.F.R. § 274a.12(c)(14)), as applied to DAPA, are substantive APA violations. *See* Majority Op. at 178–86. Prudence and judicial economy warrant against going this far, and I would not reach this issue on the record before us. For one, "the district court enjoined DAPA solely on the basis of the procedural APA claim." *Id.* at 178. It did not evaluate the substantive APA claim at issue. *See* Dist. Ct. Op., 86 F.Supp.3d at 677 ("[T]he Court is specifically not addressing Plaintiffs' likelihood of success on their *substantive* APA claim."). In fact, the district court eschewed determination of this issue and Plaintiffs' constitutional claim "until there [could be] further development of the record." *Id.*[56]

jority's broad concept of state standing based on harm to "quasi-sovereign interests" is strikingly similar to this theory of standing. *See* Majority Op. at 153 ("When the states joined the union, they surrendered some of their sovereign prerogatives over immigration.").

**55.** In addition, the district court stated: (1) "DHS has *clearly* announced that it has decided not to enforce the immigration laws as they apply to approximately 4.3 million individuals"; (2) "Secretary Johnson announced that the DHS will not enforce the immigration laws as to over four million illegal aliens eligible for DAPA, despite the fact that they are otherwise deportable"; (3) "As demonstrated by DACA and DAPA ..., the Government has decided that it will not enforce these immigration laws as they apply to well over five million people"; (4) "The DHS unilaterally established the parameters for DAPA and

determined that it would not enforce the immigration laws as they apply to millions of individuals"; and (5) "the DHS does not seek compliance with the federal law in any form, but instead establishes a pathway for non-compliance and completely abandons entire sections of this country's immigration law." *Id.* at 637 n.45, 638–43. The district court also characterized DAPA as an "announced policy of non-enforcement." *Id.* at 637 n.45. Although these quotations from the district court's opinion focus on what it perceives to be the failures of DHS to enforce the immigration laws, at other places in that opinion, the district court identifies the decades-long failure of Congress to fund what the district court would consider adequate enforcement.

**56.** There might not be much left in the way of factual development of the record, *see* Majority Op. at 178 n. 158, but there is much left wanting in the way of legal development.

On appeal, the parties offered only sparse arguments on the substantive APA claim. The parties filed briefs totaling 203 pages, of which ten pages addressed the substantive APA claim.[57] This hardly seems to be enough to help us answer a complicated question of statutory interpretation and administrative law. I would not address the substantive APA claim in light of this limited record while cognizant of the principle that "[c]ases are to be decided on the narrowest legal grounds available." *Korioth v. Briscoe*, 523 F.2d 1271, 1275 (5th Cir.1975).

That said, were I to reach the substantive APA claim I would find the majority's conclusion unpersuasive on the limited record before us. The argument that DAPA is a substantive APA violation, as I read it, appears to be the following: (1) DAPA is "manifestly contrary," Majority Op. at 186, to the text of the INA and deserves no deference partly because Congress would not assign it such a "decision[ ] of vast 'economic and political significance,' " *id.* at 184 (citation omitted); and (2) even if DHS deserved deference, DAPA is not a reasonable interpretation of the INA.

Questions of how agencies construe their governing statutes fall under the two-step inquiry announced in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It bears reiterating this framework as I believe the majority misapplies it and its associated precedents. At step one of *Chevron*, courts are to look at "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If Congress has directly spoken, then the court "must give effect to [its] unambiguously expressed intent." *Id.* at 843, 104 S.Ct. 2778. But "if

the statute is silent or ambiguous," then at step two, a court is to defer to an agency's interpretation of a statute so long as it is "reasonable." *Id.* at 843–44, 104 S.Ct. 2778.

The majority first states that DAPA fails *Chevron* step one because Congress has directly addressed the issue of deferred action. Majority Op. at 179–80. To bolster its conclusion, the majority points to provisions of the INA that delineate which aliens can receive lawful permanent resident (LPR) status, can be eligible for deferred action, and can receive LPR status by having a citizen family member. *Id.* at 179–80. These provisions are, indeed, "specific and detailed," *id.* at 179, but none of them precisely prohibits or addresses the kind of deferred action provided for under DAPA. The question under step one is whether the language of a statute is "precisely directed to the question," not whether "parsing of general terms in the text of the statute will reveal an actual intent of Congress." *Chevron*, 467 U.S. at 861–62, 104 S.Ct. 2778. Most of the provisions identified by the majority are directed at the requirements for *legal status*, not the *lawful presence* permitted by DAPA. And even the majority acknowledges the two are not the same. *See* Majority Op. at 180 ("LPR status is more substantial than is lawful presence."). DAPA does not purport to create "a lawful immigration classification." *Id.* at 179.

It is true that Congress has specified certain categories of aliens that are eligible for deferred action. *See id.* at 179. This line of argument follows from the legal maxim *expressio unius est exclusio alterius* ("the expression of one is the exclusion

---

**57.** Appellees' Br. 47–50; Appellants' Reply Br. 21–23; Appellants' Suppl. Br. 27–29; Ap-    pellees' Suppl. Br. 15–17.

of others") suggesting that because DAPA was not specified by Congress, it is contrary to the INA. But this argument is nonetheless incorrect. The *expressio unius* "canon has little force in the administrative setting." *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 694 (D.C.Cir.1991). And the inquiry at step one is "whether Congress has *directly spoken* to the *precise question* at issue," not whether it legislated in the general area or around the periphery. *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778 (emphasis added). Congress has never prohibited or limited *ad hoc* deferred action, which is no different than DAPA other than scale.[58] In fact, each time Congress spoke to this general issue, it did so incidentally and as part of larger statutes not concerned with deferred action. *See, e.g.,* USA PATRIOT ACT of 2001, Pub L. No. 107–56, § 423(b), 115 Stat. 272, 361 (discussing deferred action for family members of LPRs killed by terrorism within a far larger statute aimed primarily at combatting terrorism). And

the language regarding deferred action was worded in permissive terms, not prohibitive terms. *See, e.g.,* 8 U.S.C. § 1154(a)(1)(D)(i)(II) (stating that a qualifying individual "is eligible for deferred action and work authorization"). More importantly, in enacting these provisos, Congress was legislating against a backdrop of longstanding practice of federal immigration officials exercising *ad hoc* deferred action. By the time Congress specified categories of aliens eligible for deferred action, immigration officials were already "engaging in a regular practice ... of exercising [deferred action] for humanitarian reasons or simply for its own convenience." *Reno,* 525 U.S. at 484, 119 S.Ct. 936.[59] Yet Congress did nothing to upset this practice. The provisions cited by the majority, if anything, highlight Congress's continued acceptance of flexible and discretionary deferred action.[60] Denying DHS's ability to grant deferred action on a "class-wide basis," Majority Op. at 164, as the majority does, severely constrains the agency.[61]

**58.** The majority makes much of the scope of DAPA in concluding that it violates the APA. *See* Majority Op. at 179, 181. Yet the conclusions regarding DAPA's legality are similarly applicable to *ad hoc* deferred action. *Ad hoc* deferred action triggers the same eligibility for benefits and Congress has not directly mentioned it by statute. It should follow then that *ad hoc* deferred action is also not authorized by the INA and is a substantive APA violation. But this cannot be the case for the reasons mentioned below. Despite the majority's emphasis on the scale of DAPA, its size plays no role in whether or not it is authorized by statute. I am aware of no principle that makes scale relevant in this analysis, and the majority does not cite any authority otherwise. The question of whether an agency has violated its governing statute does not change if its actions affect one person or "4.3 million" persons. *Id.* at 179.

**59.** The Court in *Reno* noted that "[p]rior to 1997, deferred-action decisions were governed by internal INS guidelines which considered [a variety of factors]." *Reno,* 525

U.S. at 484 n.8, 119 S.Ct. 936. Although the guidelines were rescinded, the Court also observed that "there [was] no indication that the INS has ceased making this sort of determination on a case-by-case basis." *Id.*

**60.** The Office of Legal Counsel, in its evaluation of DAPA, noted that Congress had given its "implicit approval" to deferred action over the years. Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* 30–31 (2014), *available at* http://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/20/2014–11–19–auth–prioritize–removal.pdf.

**61.** The majority's ruling that class-wide deferred action violates the INA is potentially devastating. The definition of a class is expansive: "A group of people, things, qualities, or activities that have common characteristics or attributes." *Class,* Black's Law Dictionary (10th ed.2014). I suspect that DHS frequently grants deferred action to two or more aliens with common characteristics.

The majority makes a similar mistake with respect to the work authorization regulation, 8 C.F.R. § 274a.12(c)(14). The majority holds that this regulation as "to any class of illegal aliens whom DHS declines to remove—is beyond the scope of what the INA can reasonably be interpreted to authorize." Majority Op. at 169. It bases its conclusion on provisions of the INA that specify classes of aliens eligible and ineligible for work authorization and scattered statements from past cases supposedly stating that Congress restricted immigration to preserve jobs for American workers. Yet, much like with deferred action, Congress has never directly spoken to the question at issue and, if anything, has indirectly approved of it. In one form or another, 8 C.F.R. § 274a.12(c)(14) has been on the books since 1981. It follows from a grant of discretion to the Secretary to establish work authorizations for aliens, *see* 8 U.S.C. § 1324a(h)(3), and it predates the INA provisions the majority cites. *See Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir.1990) (noting that up to that point there was "nothing in the [INA] [that] expressly provid[ed] for the grant of employment authorization"). Had Congress wanted to negate this regulation, it presumably would have done so expressly, but by specifying the categories of aliens eligible for work authorization, Congress signaled its implicit approval of this longstanding regulation. Furthermore, no court, until today, has ever cast doubt on this regulation. Our own circuit in *Perales* found no problems with 8 C.F.R. § 274a.12(c)(14) in concluding that a challenge to employment authorization denials was non-justiciable. *Id.*[62] The majority's snapshot of Supreme Court opinions discussing the aims of the immigration laws

does not speak to this issue and is misleading. Those opinions noted that the immigration laws regarding employment authorization were also concerned with creating an "extensive 'employment verification system' ... designed to deny employment to aliens who (a) are not *lawfully present* in the United States, or (b) are not *lawfully authorized* to work in the United States." *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (citing 8 U.S.C. § 1324a) (emphasis added). DAPA and 8 C.F.R. § 274a.12(c)(14) further both these aims and also promote the "[s]elf-sufficiency" of aliens by giving them work authorization and making them less reliant on public benefits. *See* 8 U.S.C. § 1601(1) ("Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.").

The majority next holds that DAPA, fails *Chevron* step one because the INA's broad grants of authority "cannot reasonably be construed as assigning [DHS] 'decisions of vast economic and political significance,' such as DAPA." Majority Op. at 182–84 (footnote omitted). To the contrary, immigration decisions often have substantial economic and political significance. In *Arizona*, the Court noted that "discretionary decisions" made in the enforcement of immigration law "involve policy choices that bear on this Nation's international relations." 132 S.Ct. at 2499. "Removal decisions," it has been observed, " 'may implicate our relations with foreign powers' and require consideration of 'changing political and economic circumstances.' " *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 348, 125 S.Ct.

---

**62.** If 8 C.F.R. § 274a.12(c)(14) were contrary to the INA, then presumably the challenge in *Perales* would have been justiciable since an agency's "abdication of its statutory responsi-

bilities" is sufficient to overcome the presumption that agency inaction is unreviewable. *Heckler*, 470 U.S. at 833 n.4, 105 S.Ct. 1649.

694, 160 L.Ed.2d 708 (2005) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)). And deferred action—whether *ad hoc* or through DAPA—is not an effort by DHS to "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), but rather "[a] principal feature of the removal system," *Arizona*, 132 S.Ct. at 2499.

The majority's reliance on *King v. Burwell*, —— U.S. ——, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015), for its conclusion is misplaced. The Court in *King* held that it was unlikely Congress delegated a key reform of the ACA to the IRS—an agency not charged with implementing the ACA and with "no expertise in crafting health insurance policy." *Id.* at 2489. By contrast, DHS is tasked with enforcement of the immigration laws, *see, e.g.,* 6 U.S.C. § 202, and its substantial expertise in this area has been noted time and time again. *See, e.g., Arizona*, 132 S.Ct. at 2506 ("[T]he removal process is entrusted to the discretion of the Federal Government.").

Lastly, the majority concludes that "[e]ven with 'special deference' to the Secretary," DAPA is an unreasonable interpretation of the INA. Majority Op. at 184 (footnote omitted). Reasonableness at step two of *Chevron* requires only a "minimum level of reasonableness," *Tex. Office of Pub. Util. Counsel*, 183 F.3d at 420, and will be found so long as an agency's interpretation is "not patently inconsistent with the statutory scheme," *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 813 (5th Cir.2000) (citation omitted). It is hard to see how DAPA is unreasonable on the record before us. DAPA does not negate or conflict with any provision of the INA. *See Whitman*, 531 U.S. at 484, 121 S.Ct. 903. DHS has repeatedly asserted its right to engage in deferred action. *Cf. FDA v. Brown & Williamson Tobacco*

*Corp.*, 529 U.S. 120, 146, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (concluding an agency was not entitled to deference where it previously disavowed its enforcement authority). And DAPA appears to further DHS's mission of "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

Indeed, if DAPA were unreasonable under the INA, then it follows that *ad hoc* grants of deferred action are unreasonable as well—something the majority declines to reach. *See* Majority Op. at 186 n. 202. But, as previously mentioned, there is no difference between the two other than scale, and *ad hoc* deferred action has been repeatedly acknowledged by Congress and the courts as a key feature of immigration enforcement. *See Reno*, 525 U.S. at 483–84, 119 S.Ct. 936. After all, agencies are "far better equipped than the courts to deal with the many variables involved in the proper ordering of [their] priorities," *Heckler*, 470 U.S. at 831–32, 105 S.Ct. 1649 and "[t]he responsibilities for assessing the wisdom of such policy choices ... are not judicial ones," *Chevron*, 467 U.S. at 866, 104 S.Ct. 2778. From the limited record before us, I would conclude that the DAPA Memorandum is not a substantive APA violation.

## VI. Conclusion

There can be little doubt that Congress's choices as to the level of funding for immigration enforcement have left DHS with difficult prioritization decisions. But those decisions, which are embodied in the DAPA Memorandum, have been delegated to the Secretary by Congress. Because federal courts should not inject themselves into such matters of prosecutorial discretion, I would dismiss this case as nonjusticiable.

Furthermore, the evidence in the record (the importance of which should not be

overlooked) makes clear that the injunction cannot stand. A determination of "pretext" on the part of DHS *must* have a basis in concrete evidence. Of course, as appellate judges, we may not substitute our own view of the facts for that of the district court. But we must also embrace our duty to correct clear errors of fact— that is, to ensure that factual determinations are based not on conjecture, intuition, or preconception, but on evidence. Based on the record as it currently stands, the district court's conclusion that DAPA applications will not be reviewed on a discretionary, case-by-case basis cannot withstand even the most deferential scrutiny. Today's opinion preserves this error and, by reaching the substantive APA claim, propounds its own. I have a firm and definite conviction that a mistake has been made. That mistake has been exacerbated by the extended delay that has occurred in deciding this "expedited" appeal. There is no justification for that delay.

I dissent.

**APPENDIX A**

Secretary
U.S. Department of Homeland Security
Washington, DC 20528


Homeland
Security

November 20, 2014

MEMORANDUM FOR:   León Rodríguez
                  Director
                  U.S. Citizenship and Immigration Services

                  Thomas S. Winkowski
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  R. Gil Kerlikowske
                  Commissioner
                  U.S. Customs and Border Protection

FROM:             Jeh Charles Johnson
                  Secretary

SUBJECT:          **Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1] A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986. Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission. As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States. Nor can deferred action itself lead to a green card. Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3] Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1] Deferred action, in one form or another, dates back to at least the 1960s. "Deferred action" per se dates back at least as far as 1975. *See*, Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2] INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization")*; INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action")*; REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status")*; National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization")*.

[3] In August 2001, the former Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas. Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal. More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

2

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security. Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

### A.    Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis. The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years. On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.** DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today. The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981). That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years.** The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments. This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014. Beginning on that date, USCIS should issue all work

3

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.** In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

### B.    Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

4

the Immigration and Nationality Act.[4] Deferred action granted pursuant to the program shall be for a period of three years. Applicants will pay the work authorization and biometrics fees, which currently amount to $465. There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement. As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal. Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only an Act of Congress can confer these rights. It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law. This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

AR 00000220

**TEXAS v. U.S.**
Cite as 809 F.3d 134 (5th Cir. 2015)

225

**APPENDIX B**

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528



## Homeland Security

November 20, 2014

MEMORANDUM FOR:    Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

Leon Rodriguez
Director
U.S. Citizenship and Immigration Services

Alan D. Bersin
Acting Assistant Secretary for Policy

FROM:    Jeh Charles Johnson
Secretary

SUBJECT:    **Policies for the Apprehension, Detention and Removal of Undocumented Immigrants**

This memorandum reflects new policies for the apprehension, detention, and removal of aliens in this country. This memorandum should be considered Department-wide guidance, applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). This memorandum should inform enforcement and removal activity, detention decisions, budget requests and execution, and strategic planning.

In general, our enforcement and removal policies should continue to prioritize threats to national security, public safety, and border security. The intent of this new policy is to provide clearer and more effective guidance in the pursuit of those priorities. To promote public confidence in our enforcement activities, I am also directing herein greater transparency in the annual reporting of our removal statistics, to include data that tracks the priorities outlined below.

The Department of Homeland Security (DHS) and its immigration components-CBP, ICE, and USCIS-are responsible for enforcing the nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. And, in the exercise of that discretion, DHS can and should develop smart enforcement priorities, and ensure that use of its limited resources is devoted to the pursuit of those priorities. DHS's enforcement priorities are, have been, and will continue to be national security, border security, and public safety. DHS personnel are directed to prioritize the use of enforcement personnel, detention space, and removal assets accordingly.

In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case. While DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing enforcement and removal of higher priority cases. Thus, DHS personnel are expected to exercise discretion and pursue these priorities at all stages of the enforcement process-from the earliest investigative stage to enforcing final orders of removal-subject to their chains of command and to the particular responsibilities and authorities applicable to their specific position.

Except as noted below, the following memoranda are hereby rescinded and superseded: John Morton, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens*, March 2, 2011; John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens*, June 17, 2011; Peter Vincent, *Case-by-Case Review of Incoming and Certain Pending Cases*, November 17, 2011; *Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems*, December 21, 2012; *National Fugitive Operations Program: Priorities, Goals, and Expectations*, December 8, 2009.

2

**A.  Civil Immigration Enforcement Priorities**

The following shall constitute the Department's civil immigration enforcement priorities:

**Priority 1 (threats to national security, border security, and public safety)**

Aliens described in this priority represent the highest priority to which enforcement resources should be directed:

    (a)  aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;

    (b)  aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States;

    (c)  aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or aliens not younger than 16 years of age who intentionally participated in an organized criminal gang to further the illegal activity of the gang;

    (d)  aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status; and

    (e)  aliens convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the *Immigration and Nationality Act* at the time of the conviction.

The removal of these aliens must be prioritized unless they qualify for asylum or another form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.

**Priority 2 (misdemeanants and new immigration violators)**

Aliens described in this priority, who are also not described in Priority 1, represent the second-highest priority for apprehension and removal. Resources should be dedicated accordingly to the removal of the following:

    (a)  aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element

3

was the alien's immigration status, provided the offenses arise out of three separate incidents;

(b)   aliens convicted of a "significant misdemeanor," which for these purposes is an offense of domestic violence;[1] sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above, one for which the individual was sentenced to time in custody of 90 days or more (the sentence must involve time to be served in custody, and does not include a suspended sentence);

(c)   aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014; and

(d)   aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.

These aliens should be removed unless they qualify for asylum or another form of relief under our laws or unless, in the judgment of an ICE Field Office Director CBP Sector Chief, CBP Director of Field Operations, USCIS District Director or users Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.

**Priority 3 (other immigration violations)**

Priority 3 aliens are those who have been issued a final order of removal[2] on or after January 1, 2014. Aliens described in this priority, who are not also described in Priority 1 or 2, represent the third and lowest priority for apprehension and removal. Resources should be dedicated accordingly to aliens in this priority. Priority 3 aliens should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

---

[1] In evaluating whether the offense is a significant misdemeanor involving ..domestic violence   careful consideration should be given to whether the convicted alien was also the victim of domestic violence; if so this should be a mitigating factor. *See generally* John Morton *Prosecutorial Discretion Certain Victims, Witnesses, and Plaintiffs,* June 17 2011.

For present purposes  final order  is defined as it is in 8 C.F.R. § 1241.1.

**B.  Apprehension, Detention, and Removal of Other Aliens Unlawfully in the   United States**

Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities herein.  However, resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified.  Immigration officers and attorneys may pursue removal of an alien not identified as a priority herein, provided, in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest.

**C.  Detention**

As a general rule, DHS detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law.  Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest.  To detain aliens in those categories who are not subject to mandatory detention, DHS officers or special agents must obtain approval from the ICE Field Office Director.  If an alien falls within the above categories and is subject to mandatory detention, field office directors are encouraged to contact their local Office of Chief Counsel for guidance.

**D.  Exercising Prosecutorial Discretion**

Section A, above, requires DHS personnel to exercise discretion based on individual circumstances.  As noted above, aliens in Priority 1 must be prioritized for removal unless they qualify for asylum or other form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.  Likewise, aliens in Priority 2 should be removed unless they qualify for asylum or other forms of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.  Similarly, aliens in Priority 3 should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer, the alien is not a threat to the

5

integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

In making such judgments, DHS personnel should consider factors such as: extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child, or a seriously ill relative. These factors are not intended to be dispositive nor is this list intended to be exhaustive. Decisions should be based on the totality of the circumstances.

### E.    Implementation

The revised guidance shall be effective on January 5, 2015. Implementing training and guidance will be provided to the workforce prior to the effective date. The revised guidance in this memorandum applies only to aliens encountered or apprehended on or after the effective date, and aliens detained, in removal proceedings, or subject to removal orders who have not been removed from the United States as of the effective date. Nothing in this guidance is intended to modify USCIS Notice to Appear policies, which remain in force and effect to the extent they are not inconsistent with this memorandum.

### F.    Data

By this memorandum I am directing the Office of Immigration Statistics to create the capability to collect, maintain, and report to the Secretary data reflecting the numbers of those apprehended removed, returned, or otherwise repatriated by any component of DHS and to report that data in accordance with the priorities set forth above. I direct CBP, ICE, and USCIS to cooperate in this effort. I intend for this data to be part of the package of data released by DHS to the public annually.

### G.    No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

6

As the Court sees things, none of this would be enough. Real-world facts are irrelevant. For aficionados of pointless formalism, today's decision is a wonder, the veritable *ne plus ultra* of the genre.[4]

Along the way from *Taylor* to the present case, there have been signs that the Court was off course and opportunities to alter its course. Now the Court has reached the legal equivalent of Ms. Moreau's Zagreb. But the Court, unlike Ms. Moreau, is determined to stay the course and continue on, traveling even further away from the intended destination. Who knows when, if ever, the Court will call home.



**UNITED STATES, et al., Petitioners**

**v.**

**TEXAS, et al.**

No. 15–674

June 23, 2016.

Adam P. KohSweeney, Gabriel Markoff, Ward A. Penfold, Samuel Wilson, Mallory Jensen, Juan Camilo Méndez, Remi Moncel, O'Melveny & Myers LLP, San Francisco, CA, Darcy M. Meals, Jeremy R. Girton, O'Melveny & Myers LLP, Washington, DC, Thomas A. Saenz, Nina Perales, Mexican American Legal, Defense and Educational Fund, San Antonio, TX, Linda J. Smith, DLA Piper LLP, Los An-

geles, CA, for Intervenors–Respondents Jane Does.

Ken Paxton, Attorney General of Texas, Charles E. Roy, First Assistant Attorney General, Scott A. Keller, Solicitor General, J. Campbell Barker, Deputy Solicitor General, Ari Cuenin, Alex Potapov, Assistant Solicitors General, Office of the Attorney General, Austin, TX, Luther Strange, Attorney General, of Alabama, Mark Brnovich, Attorney General of Arizona, Leslie Rutledge, Attorney General of Arkansas, Pamela Jo Bondi, Attorney General of Florida, Samuel S. Olens, Attorney General of Georgia, Lawrence G. Wasden, Attorney General of Idaho, Cally Younger, Joseph C. Chapelle, Peter J. Rusthoven, Derek Schmidt, Attorney General of Kansas, James D. "Buddy" Caldwell, Attorney General of Louisiana, Paul R. LePage, Governor of Maine, Bill Schuette, Attorney General, Drew Snyder, Timothy C. Fox, Attorney General of Montana, Douglas J. Peterson, Attorney General of Nebraska, Adam Paul Laxalt, Attorney General of Nevada, Robert C. Stephens, Wayne Stenehjem, Attorney General of North Dakota, Michael DeWine, Attorney General of Ohio, Eric E. Murphy, Co-counsel for the State of Ohio, E. Scott Pruitt, Attorney General of Oklahoma, Alan Wilson, Attorney General of South Carolina, Marty J. Jackley, Attorney General of South Dakota, Herbert Slatery III, Attorney General and Reporter of Tennessee, Sean D. Reyes, Attorney General of Utah, Patrick Morrisey, Attorney General of West Virginia, Brad D. Schimel, Attorney General of Wisconsin.

Stevan E. Bunnell, General Counsel, U.S. Department of Homeland Security,

---

**4.** The Court claims that there are three good reasons for its holding, but as I explained in *Descamps*, none is substantial. The Court's holding is not required by ACCA's text or by the Sixth Amendment, and the alternative real-world approach would be fair to defendants. See 570 U.S., at ——, —— – ——, 133 S.Ct., at 2296–2297, 2299–2301 (ALITO, J., dissenting).

**2272**                    **136 SUPREME COURT REPORTER**

Washington, DC, Donald B. Verrilli, Jr., Solicitor General, Benjamin C. Mizer, Principal Deputy Assistant, Attorney General, Ian Heath Gershengorn, Edwin S. Kneedler, Deputy Solicitors General, Beth S. Brinkmann, Deputy Assistant Attorney General, Zachary D. Tripp, Assistant to the Solicitor General, Douglas N. Letter, Scott R. McIntosh, Jeffrey Clair, William E. Havemann, Attorneys, Department of Justice, Washington, DC, for petitioners.

Luther Strange, Attorney General of Alabama, Mark Brnovich, Attorney General of Arizona, Leslie Rutledge, Attorney General of Arkansas, Pamela Jo Bondi, Attorney General of Florida, Samuel S. Olens, Attorney General of Georgia, Lawrence G. Wasden, Attorney General of Idaho, Ken Paxton, Attorney General of Texas, Jeffrey C. Mateer, First Assistant Attorney General, Scott A. Keller, Solicitor General, J. Campbell Barker, Deputy Solicitor General, Ari Cuenin, Alex Potapov, Assistant Solicitors General, Office of the Attorney General, Austin, TX, Cally Younger, Joseph C. Chapelle, Peter J. Rusthoven, Derek Schmidt, Attorney General of Kansas, Jeff Landry, Attorney General of Louisiana, Paul R. LePage, Governor of Maine, Bill Schuette, Attorney General, Drew Snyder, Timothy C. Fox, Attorney General of Montana, Doug Peterson, Attorney General of Nebraska, Adam Paul Laxalt, Attorney General of Nevada, Robert C. Stephens, Wayne Stenehjem, Attorney General of North Dakota, Michael DeWine, Attorney General of Ohio, Eric E. Murphy, E. Scott Pruitt, Attorney General of Oklahoma, Alan Wilson, Attorney General of South Carolina, Marty J. Jackley, Attorney General of South Dakota, Herbert Slatery III, Attorney General and Reporter of Tennessee, Sean D. Reyes, Attorney General of Utah, Patrick Morrisey, Attorney General of West Virginia, Brad D. Schimel, Attorney General of Wisconsin, for State Respondents.

For U.S. Supreme Court briefs, see:
   2016 WL 1426629 (Reply.Brief)
   2016 WL 825550 (Resp.Brief)
   2015 WL 9592291 (Oppn.Brief)
   2016 WL 836758 (Pet.Brief)
   2016 WL 1213267 (Resp.Brief)

PER CURIAM.

The judgment is affirmed by an equally divided Court.



Stephen L. VOISINE and William E. Armstrong, III, Petitioners

v.

UNITED STATES.
No. 14–10154.

Argued Feb. 29, 2016.

Decided June 27, 2016.

**Background:** Following denial of his motion to dismiss, 2011 WL 1458666, defendant entered a conditional guilty plea in the United States District Court for the District of Maine, John A. Woodcock, J., to possession of firearm after having been convicted of misdemeanor crime of domestic violence. Defendant appealed. The Court of Appeals, 495 Fed.Appx. 101, affirmed. In separate case, another defendant entered a conditional guilty plea in the United States District Court for the District of Maine, John A. Woodcock, J., to possessing firearms and ammunition after having been convicted of misdemeanor crime of domestic violence. Defendant appealed. The Court of Appeals, 706 F.3d 1,

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



February 20, 2017

MEMORANDUM FOR:     Kevin McAleenan
                    Acting Commissioner
                    U.S. Customs and Border Protection

                    Thomas D. Homan
                    Acting Director
                    U.S. Immigration and Customs Enforcement

                    Lori Scialabba
                    Acting Director
                    U.S. Citizenship and Immigration Services

                    Joseph B. Maher
                    Acting General Counsel

                    Dimple Shah
                    Acting Assistant Secretary for International Affairs

                    Chip Fulghum
                    Acting Undersecretary for Management

FROM:               John Kelly
                    Secretary

SUBJECT:            **Enforcement of the Immigration Laws to Serve the National Interest**

        This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017. It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

AR 00000229

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

## A. The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

2

**B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States**

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

3

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

## C. Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

## D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

4

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

### E. Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F. Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G. Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

AR 00000233

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

## H. Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

## I. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

AR 00000234

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

June 15, 2017

MEMORANDUM FOR:    Kevin K. McAleenan
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   James W. McCament
                   Acting Director
                   U.S. Citizenship and Immigration Services

                   Thomas D. Homan
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Joseph B. Maher
                   Acting General Counsel

                   Michael T. Dougherty
                   Assistant Secretary for Border, Immigration, and Trade Policy

FROM:              John F. Kelly

SUBJECT:           Rescission of November 20, 2014 Memorandum Providing for
                   Deferred Action for Parents of Americans and Lawful Permanent
                   Residents ("DAPA")


On January 25, 2017, President Trump issued Executive Order No. 13768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, I issued an implementing memorandum, stating that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing the Deferred Action for Childhood Arrivals ("DACA") policy[1] and November 20, 2014 memorandum providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and for the

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

**Rescission of November 20, 2014 DAPA Memorandum**
Page 2

expansion of DACA[2]. After consulting with the Attorney General, I have decided to rescind the November 20, 2014 DAPA memorandum and the policies announced therein.[3] The June 15, 2012 DACA memorandum, however, will remain in effect.

**Background**

The November 20, 2014 memorandum directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident." This process was to be known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA."

To request consideration for deferred action under DAPA, the alien must have satisfied the following criteria: (1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[ ] the grant of deferred action inappropriate." The Memorandum also directed USCIS to expand the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and to lengthen the period of deferred action and work authorization from two years to three ("Expanded DACA").

Prior to implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide on the ground that the plaintiff states were likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") by failing to comply with notice-and-comment rulemaking requirements. *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). The Fifth Circuit Court of Appeals affirmed, holding that Texas had standing, demonstrated a substantial likelihood of success on the merits of its APA claims, and satisfied the other requirements for a preliminary injunction. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4) and did not issue a substantive opinion. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

The litigation remains pending before the district court.

---

[2] Memorandum from Jeh Johnson, Sec'y, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

[3] This Memorandum does not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time. I remind our officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis, and (2) such a grant may be terminated at any time at the agency's discretion.

**Rescission of November 20, 2014 DAPA Memorandum**
Page 3

**Rescission of November 20, 2014 DAPA Memorandum**

  I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities.  After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum.



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

June 29, 2017

The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

      Re:    *Texas, et al. v. United States, et al.*, No. 1:14-cv-00254 (S.D. Tex.)

Dear Attorney General Sessions:

The State plaintiffs that successfully challenged the Obama Administration's DAPA and Expanded DACA programs commend the Secretary of Homeland Security for issuing his June 15, 2017 memorandum rescinding, in large part, his predecessor's November 20, 2014 memorandum creating those DAPA and Expanded DACA programs.

As you know, this November 20, 2014 memorandum creating DAPA and Expanded DACA would have granted eligibility for lawful presence and work authorization to over four million unlawfully present aliens. Courts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. Rather, "[i]n specific and detailed provisions, the [Immigration and Nationality Act] expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." *Id.* Likewise, "[t]he INA also specifies classes of aliens eligible and ineligible for work authorization . . . with no mention of the class of persons whom DAPA would make eligible for work authorization." *Id.* at 180-81. Thus, "DAPA is not authorized by statute," *id.* at 184, and "DAPA is foreclosed by Congress's careful plan," *id.* at 186.

AR 00000238



**KEN PAXTON**

ATTORNEY GENERAL OF TEXAS

For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful. The original 2012 DACA program covers over one million otherwise unlawfully present aliens. *Id.* at 147. And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authorization from Congress.[1]

Nevertheless, the Secretary of Homeland Security's June 15, 2017 memorandum provided that "[t]he June 15, 2012 DACA memorandum, however, will remain in effect," and some "Expanded DACA" permits will also remain in effect.

We respectfully request that the Secretary of Homeland Security phase out the DACA program. Specifically, we request that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future. This request does not require the Executive Branch to immediately rescind DACA or Expanded DACA permits that have already been issued. This request does not require the Secretary to alter the immigration enforcement priorities contained in his separate February 20, 2017 memorandum.[2] And this request does not require the federal government to remove any alien.

If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise, the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits.

---

[1] *See, e.g.*, USCIS, DACA Frequently Asked Questions, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited June 29, 2017) (DACA recipients "are considered to be lawfully present").

[2] *See* DHS, Enforcement of Immigration Laws to Serve the National Interest, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

AR 00000239



## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

We appreciate the opportunity to continue working with you, and the entire Presidential Administration, to cooperatively enforce federal immigration laws.

Sincerely,

Ken Paxton
Attorney General of Texas

Steve Marshall
Attorney General of Alabama

Leslie Rutledge
Attorney General of Arkansas

Lawrence G. Wasden
Attorney General of Idaho

C.L. "Butch" Otter
Governor of Idaho

Derek Schmidt
Attorney General of Kansas

Jeff Landry
Attorney General of Louisiana

Doug Peterson
Attorney General of Nebraska

Alan Wilson
Attorney General of South Carolina

Herbert Slatery III
Attorney General and Reporter of Tennessee

Patrick Morrisey
Attorney General of West Virginia

AR 00000240

**JOHN LEWIS**
5th District, Georgia

SENIOR CHIEF DEPUTY
DEMOCRATIC WHIP

COMMITTEE ON
WAYS AND MEANS

RANKING MEMBER
OVERSIGHT SUBCOMMITTEE

HUMAN RESOURCES

SCANNED/RECEIVED
BY ESEC SEC

2017 AUG -2



**Congress of the United States**
**House of Representatives**
**Washington, DC 20515–1005**

WASHINGTON OFFICE:
343 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–1005
(202) 225–3801
FAX: (202) 225–0351

DISTRICT OFFICE:
THE EQUITABLE BUILDING
100 PEACHTREE STREET, N.W.
SUITE # 1920
ATLANTA, GA 30303
(404) 659–0116
FAX: (404) 331–0947

August 1, 2017

The Honorable Elaine Duke
Acting Secretary
Department of Homeland Security
500 12th Street, SW
Washington, DC 20528

Dear Acting Secretary Duke:

I write to express my strong support for the Deferred Action for Childhood Arrivals (DACA) program and respectfully request that the Department continue to support and defend this key humanitarian initiative.

As you know, the DACA program protects certain immigrant youth who came to our country as children from deportation. Since President Obama established this program in 2012, nearly 800,000 young people who call the United States home have benefited from the initiative. After passing a significant background check and paying fees, participants receive authorization to work and study in the U.S. DACA allows these *DREAMers* to bring their talents out of the shadows and apply them in service of our country.

Unfortunately, ongoing legal cases are constant threats to DACA. The Federal government has a responsibility to honor its commitments to thousands of young people who aspire towards life, liberty, and the pursuit of happiness in every corner of our country. The administration – especially the Department of Homeland Security and the Department of Justice – must be proactive in standing for those who contribute to our nation and strive towards realizing the American Dream.

For these reasons, I join my congressional colleagues in reiterating our appreciation of former Secretary Kelly's leadership in retaining the DACA program. Ending the DACA program through proactive decisions or passive inaction would negatively affect our economy. Employers would face huge costs, businesses owned by *DREAMers* would close, and the Social Security trust funds would lose millions of tax dollars. As you know, it is impossible, however, to calculate what the societal and humanitarian impact of ending DACA would be on the hundreds of thousands of young people who call America home.

As always, I thank you for your service and for your consideration of my concerns on this grave matter.

Sincerely,

John Lewis
Member of Congress

cc: The Honorable John F. Kelly, Chief of Staff, the White House

AR 00000241

# Congress of the United States
## Washington, DC 20515

August 1, 2017



President Donald J. Trump
The White House
1600 Pennsylvania Ave., NW
Washington, D.C. 20500

Dear Mr. President:

We respectfully request that you continue Deferred Action for Childhood Arrivals (DACA) and engage in a vigorous legal defense of DACA in light of the renewed threat of litigation. Along with continuing to accept requests for DACA, we ask that you direct your administration to: (a) oppose any efforts to challenge DACA in the ongoing *Texas v. United States* litigation;[1] (b) ask the court to dismiss the complaint in *United States v. Texas;* and (c) refuse any settlement that would end DACA.

On June 29, the Texas Attorney General, along with nine other attorney generals, in an attempt to usurp your authority, delivered to you an ultimatum threatening a legal challenge to DACA unless you ended the program by September 5, 2017. DOJ has already made problematic decisions in choosing not to oppose Texas' request to stay the proceedings.[2] We are further disturbed by Secretary Kelly's comments that he does not believe DACA is legally or constitutionally defensible.[3] Finally, we are concerned that Attorney General Jeff Sessions, who has historically opposed DACA, is now trying to abrogate your authority and set the Administration's immigration policies, when, ultimately, you hold that authority. You have stated, you "understand the situation very well" and that the future of DACA is "a decision that [you] make," not your subordinates.[4] Furthermore, as you are aware, there is substantial legal support for the constitutionality of DACA.[5] We commend your Administration's continuation of DACA and encourage you to keep DACA in place until Congress enacts a permanent legislative solution for this population.

As you know, over 787,000 individuals currently possess a grant of DACA, all of whom were thoroughly vetted for national security and criminal backgrounds.[6] Ending DACA would increase the nation's undocumented population, profoundly and negatively impact our nation's economy, contracting the nation's GDP by $460.3 billion. [7]Additionally, this reduces federal tax contributions to Social Security and Medicare by $24.6 billion over a decade, and costs businesses $3.4 billion in unnecessary turnover costs.[8]

---

[1] *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[2] Motion to Stay Merits Proceedings, Texas v. United States, No. 14-CV-00254 (S.D. Tex. July 7, 2017).

[3] Ted Hesson, *Kelly won't commit to defending DACA in court*, Politico. July 12, 2017. *available at* http://www.politico.com/story/2017/07/12/john-kelly-daca-legal-challenge-240470.

[4] David Lauter. *Trump says he'll make the final call on DACA, not subordinates*, L.A. Times, July 13, 2017. *available at* http://www.latimes.com/politics/washington/la-na-essential-washington-updates-president-trump-says-he-not-1499977334-htmlstory.html.

[5] Letter from Hiroshi Motomura, Professor of Law, University of California, Los Angeles School of Law, et. al, to Barack H. Obama, President, United States. Nov. 25, 2014, *available at* https://pennstatelaw.psu.edu/sites/default/files/documents/pdfs/Immigrants/executive-action-law-prof-letter.pdf.

[6] U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2017, 1 (March 31, 2017), *available at* https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals.

[7] Nicole Prchal Svajlenka, Tom Jawetz, and Angie Bautista-Chavez, *A New Threat to DACA Could Cost States Billions of Dollars*, Center for American Progress, July 21, 2017, https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/

[8] Jose Magaña-Salgado, *Money on the Table: The Economic Cost of Ending DACA*, Immigrant Legal Resource Center, Dec. 2016, *available at* https://www.ilrc.org/report-daca-economic-cost.

AR 00000242

Letter to President Trump
Page 2

Ultimately, you set the government's immigration policy, including your Administration's position in regards to DACA. We urge you to respond to Texas's threat to your executive authority by directing the Attorney General to use all legal options to defend DACA and ensure that nearly one million DREAMers continue to contribute to our nation.

Thank you for your time and consideration. We look forward to your response.

Sincerely,

Raúl M. Grijalva
Member of Congress

Nancy Pelosi
Democratic Leader

Steny H. Hoyer
Minority Whip

Judy Chu
Member of Congress

Yvette D. Clarke
Member of Congress

Michelle Lujan Grisham
Member of Congress

Jim McGovern
Member of Congress

Pete Aguilar
Member of Congress

Nanette Diaz Barragán
Member of Congress

Karen Bass
Member of Congress

Ami Bera
Member of Congress

Donald S. Beyer Jr.
Member of Congress

Sanford D. Bishop, Jr.
Member of Congress

Earl Blumenauer
Member of Congress

Suzanne Bonamici
Member of Congress

Brendan F. Boyle
Member of Congress

Anthony G. Brown
Member of Congress

Julia Brownley
Member of Congress

Michael E. Capuano
Member of Congress

Salud O. Carbajal
Member of Congress

Tony Cárdenas
Member of Congress

André Carson
Member of Congress

Matt Cartwright
Member of Congress

Kathy Castor
Member of Congress

Letter to President Trump
Page 3

Joaquin Castro
Member of Congress

David N. Cicilline
Member of Congress

Alma Adams
Member of Congress

Katherine Clark
Member of Congress

Wm. Lacy Clay
Member of Congress

Steve Cohen
Member of Congress

John Conyers, Jr.
Member of Congress

Jim Cooper
Member of Congress

Lou Correa
Member of Congress

Jim Costa
Member of Congress

Joe Courtney
Member of Congress

Charlie Crist
Member of Congress

Joe Crowley
Member of Congress

Elijah E. Cummings
Member of Congress

Josh Gottheimer
Member of Congress

Danny K. Davis
Member of Congress

Susan A. Davis
Member of Congress

Peter A. DeFazio
Member of Congress

Diana DeGette
Member of Congress

Rosa L. DeLauro
Member of Congress

Suzan K. DelBene
Member of Congress

Val Butler Demings
Member of Congress

Mark DeSaulnier
Member of Congress

Ted Deutch
Member of Congress

Debbie Dingell
Member of Congress

Lloyd Doggett
Member of Congress

Keith Ellison
Member of Congress

AR 00000244

Letter to President Trump
Page 4

Eliot L. Engel
Member of Congress

Anna G. Eshoo
Member of Congress

Adriano Espaillat
Member of Congress

Dwight Evans
Member of Congress

Bill Foster
Member of Congress

Lois Frankel
Member of Congress

Marcia L. Fudge
Member of Congress

Tulsi Gabbard
Member of Congress

Ruben Gallego
Member of Congress

Jimmy Gomez
Member of Congress

Vicente Gonzalez
Member of Congress

Al Green
Member of Congress

Gene Green
Member of Congress

Luis V. Gutiérrez
Member of Congress

Colleen Hanabusa
Member of Congress

Denny Heck
Member of Congress

Jared Huffman
Member of Congress

Pramila Jayapal
Member of Congress

Hakeem Jeffries
Member of Congress

Eddie Bernice Johnson
Member of Congress

Marcy Kaptur
Member of Congress

William R. Keating
Member of Congress

Joseph P. Kennedy, III
Member of Congress

Ro Khanna
Member of Congress

Ruben J. Kihuen
Member of Congress

James R. Langevin
Member of Congress

Rick Larsen
Member of Congress

John B. Larson
Member of Congress

Barbara Lee
Member of Congress

Sander Levin
Member of Congress

Letter to President Trump
Page 5

Ted W. Lieu
Member of Congress

Daniel W. Lipinski
Member of Congress

Zoe Lofgren
Member of Congress

Alan Lowenthal
Member of Congress

Nita M. Lowey
Member of Congress

Ben Ray Luján
Member of Congress

Alcee L. Hastings
Member of Congress

Carolyn Maloney
Member of Congress

Sean Patrick Maloney
Member of Congress

Doris Matsui
Member of Congress

Betty McCollum
Member of Congress

A. Donald McEachin
Member of Congress

Jerry McNerney
Member of Congress

Grace Meng
Member of Congress

Gwen Moore
Member of Congress

Seth Moulton
Member of Congress

Stephanie Murphy
Member of Congress

Ann McLane Kuster
Member of Congress

Jerrold Nadler
Member of Congress

Grace F. Napolitano
Member of Congress

Donald Norcross
Member of Congress

Eleanor Holmes Norton
Member of Congress

Tom O'Halleran
Member of Congress

Beto O'Rourke
Member of Congress

Frank Pallone, Jr.
Member of Congress

Jimmy Panetta
Member of Congress

William Pascrell
Member of Congress

Letter to President Trump
Page 6

Donald M. Payne, Jr.
Member of Congress

Ed Perlmutter
Member of Congress

Chellie Pingree
Member of Congress

Mark Pocan
Member of Congress

Jared Polis
Member of Congress

David E. Price
Member of Congress

Mike Quigley
Member of Congress

Jamie Raskin
Member of Congress

Jacky Rosen
Member of Congress

Lucille Roybal-Allard
Member of Congress

Dutch Ruppersberger
Member of Congress

Tim Ryan
Member of Congress

Cedric Richmond
Member of Congress

Linda T. Sánchez
Member of Congress

John Sarbanes
Member of Congress

Jan Schakowsky
Member of Congress

Adam Schiff
Member of Congress

Bradley Scott Schneider
Member of Congress

Kurt Schrader
Member of Congress

Bobby Scott
Member of Congress

José E. Serrano
Member of Congress

Brad Sherman
Member of Congress

Albio Sires
Member of Congress

Louise Slaughter
Member of Congress

Adam Smith
Member of Congress

Darren Soto
Member of Congress

Jackie Speier
Member of Congress

Eric Swalwell
Member of Congress

Mark Takano
Member of Congress

Mike Thompson
Member of Congress

Letter to President Trump
Page 7

Dina Titus
Member of Congress

Paul D. Tonko
Member of Congress

Norma J. Torres
Member of Congress

Niki Tsongas
Member of Congress

Juan Vargas
Member of Congress

Marc Veasey
Member of Congress

Filemon Vela
Member of Congress

Nydia M. Velázquez
Member of Congress

Tim Walz
Member of Congress

Gregorio Kilili Camacho Sablan
Member of Congress

Debbie Wasserman Schultz
Member of Congress

Bonnie Watson Coleman
Member of Congress

Peter Welch
Member of Congress

John Yarmuth
Member of Congress

Gregory Meeks
Member of Congress

Sheila Jackson Lee
Member of Congress

James E. Clyburn
Member of Congress

Scott Peters
Member of Congress

Derek Kilmer
Member of Congress

Cc: The Honorable Jeff Sessions, Attorney General, U.S. Department of Justice

SCANNED/RECEIVED **Congress of the United States**
BY ESEC SEC **Washington, DC 20515**

2017 SEP -1 PM 12: 13

August 22, 2017

The Honorable Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20502

Dear President Trump:

We write to express our support for maintaining the protections of Deferred Action for
Childhood Arrivals (DACA) for current recipients of the policy. We understand and deeply
respect the rule of law, and firmly believe that those who have violated the law must face fair
consequences. We also have a responsibility to apply the law in the manner required by the
circumstances.

Children brought to the United States at a young age did not have a choice in the matter. They
did not willingly seek to violate American statutes when they traveled with their families across
our borders, as the alternative was often life without primary caregivers. Such cases require
careful and thoughtful analysis about what is in the best interests of our country. For many, the
United States is the only country they know or remember. They speak English, educate
themselves at American schools, and may be starting careers. They have already passed a
background check to qualify for DACA status. Because they now have work permits, they are
making immediate contributions to our society and our economy. They are paying taxes,
receiving driver's licenses, and buying cars and first homes, all of which generates revenue for
federal, state, and local governments.

Targeting those with deferred status would also divert massive resources away from enforcement
actions against criminals who pose the greatest threat to law and order. We strongly support your
commitment to deporting those who have broken our laws, and we believe the resources that
might be directed towards targeting those with DACA status would be better spent on targeting
criminals.

According to a recent study by the CATO Institute, deporting the approximately 750,000 people
registered in the program would cost over $60 billion in lost tax revenue and result in a $280
billion reduction in economic growth over the next decade.

It is in the best interest of our nation to continue DACA until we can pass a permanent legislative
solution, such as the Republican-backed *Recognizing America's Children Act*.

Thank you for your continued work to improve and defend our great country.

PRINTED ON RECYCLED PAPER

AR 00000249

Respectfully,

Daniel M. Donovan, Jr.
Member of Congress

Carlos Curbelo
Member of Congress

David G. Valadao
Member of Congress

Jeff Denham
Member of Congress

Don Bacon
Member of Congress

Ileana Ros-Lehtinen
Member of Congress



**Office of the Attorney General**
**Washington, D. C. 20530**

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

September 5, 2017

MEMORANDUM FOR:   James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

FROM:   Elaine C. Duke
Acting Secretary

SUBJECT:   **Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

Re:  Rescission of June 15, 2012 DACA Memorandum
Page 2

**Background**

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply

---

[1] Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] *Id.*

Re:  Rescission of June 15, 2012 DACA Memorandum
Page 3

with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7]

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

---

[5] *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Re: Rescission of June 15, 2012 DACA Memorandum
Page 4

**Rescission of the June 15, 2012 DACA Memorandum**

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

Re: Rescission of June 15, 2012 DACA Memorandum
Page 5

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.