**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, <br><br> Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

**PLAINTIFF STATES' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………….............1

STATEMENT OF FACTS………...…………………………………………………….........3

LEGAL STANDARD…..……………………………………………………………….…  ....7

ARGUMENT………………………………………………………………………….....7

    I. PLAINTIFF'S CLAIMS ARE JUDICALLY REVIEWABLE…………...…….............. 8

        A. THE COURT HAS AUTHORITY TO REVIEW PLAINTIFFS'
            CONSTITUTIONAL CHALLENGES……...………...............................…....…8

        B. PLAINTIFFS' APA CLAIMS ARE PROPERLY ADDRESSED TO THIS
            COURT…………...........……………………………………………….....9

        C. JUDICIAL REVIEW OF PLAINTIFF STATES' CLAIMS IS ENTIRELY
            CONSISTENT WITH THE
            INA……...........…………………………………...……………………….....15

    II.PLAINTIFF STATES HAVE STANDING……...……………………………..............18

        A. PLANTIFF STATES HAVE ARTICLE III STANDING……...…..........……18

            1. DEFENDANTS' ACTIONS HAVE HARMED PLAINTIFF STATES'
               PRORIETARY
               INTERESTS………………...................…………………………........19

            2. DEFENDANTS' TERMINATION OF DACA HARMS PLAINTIFF
               STATES' SOVEREIGN AN QUASI-SOVEREIGN
               INTERESTS…........................................................................................21

            3. DEFENDANTS' TERMINATION OF DACA HAS CAUSED THE
               HARMS ALLEGED BY PLAINTIFF STATES AND ENJOINING THE
               TERMINATION WILL REDRESS SUCH
               INJURIES……………….........................................................................22

        B. PLAINTIFF STATES HAVE STANDING UNDER THE
            APA.......................................................................................................23

CONCLUSION………………........……………………………………………….............24

i

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982)....................................................................................19, 21-22

*Arar v. Ashcroft*,
414 F. Supp. 2d 250 (E.D.N.Y. 2006) ...............................................................16-17

*Assn. of Data Processing Serv. Organizations, Inc. v. Camp*,
397 US 150 (1970)................................................................................................ 24

*Botezatu v. INS*,
195 F.3d 311-312 (7th Cir. 1999) ......................................................................... 18

*Bowen v. Michigan Academy of Family Physicians*,
476 U.S. 667 (1986)............................................................................................... 10

*Calcano-Martinez v. I.N.S.*,
232 F.3d 328 (2d Cir. 2000), aff'd, 533 U.S. 348 (2001) ....................................... 16

*Chamber of Commerce of U.S. v. Whiting*,
563 U.S. 582 (2011)............................................................................................... 24

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004) ............................................................................... 19

*Commonwealth of Mass. v. Bull HN Info. Sys., Inc.*,
16 F. Supp. 2d 90 (D. Mass. 1998) ....................................................................... 22

*Crowley Caribbean Transport Inc. v. Pena*,
37 F.3d 671 (D.C. Cir. 1994) ................................................................................ 12

*Davis v. EPA*,
348 F.3d 772 (9th Cir. 2003) ................................................................................ 19

*Friends of the Earth, Inc. v. Laidlaw Environmental Svcs. (TOC), Inc.*,
528 U.S. 167 (2000)............................................................................................... 18

*Haitian Ctrs. Council, Inc. v. Sale*,
823 F. Supp. 1028 (E.D.N.Y. 1993) ...................................................................... 15

*Heckler v. Chaney*,
470 U.S. 821 (1985)............................................................................................... 13

*Heterochemical Corp. v. Food and Drug Admin.*,
644 F. Supp. 271 (E.D.N.Y. 1986) ........................................................................ 11

*Jean v. Nelson*,
472 U.S. 846 (1985)................................................................................ 15

*Kenney v. Glickman*,
96 F.3d 1118 (8th Cir. 1996) ........................................................... 11, 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
 134 S. Ct. 1377 (2014)........................................................................... 23

*Mada-Luna v. Fitzpatrick*,
 813 F.2d 1006 (9th Cir. 1987) .............................................................. 12

*Massachusetts v. EPA*,
549 U.S. 497 (2007).......................................................................... 18, 21

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)......................................................................... 23, 24

*McNary v. Haitian Refugee Ctr.*,
498 U.S. 479 (1991).......................................................................... 10, 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................. 15

*New York City Employees Retirement Sys. v. S.E.C.*,
45 F.3d 7 (2d Cir. 1995).................................................................... 11, 13

*New York v. Sebelius*,
2009 WL 1834599 (N.D.N.Y. 2009) ...................................................... 22

*People v. Peter & John's Pump House*,
914 F. Supp. 809 (N.D.N.Y. 1996) ........................................................ 22

*Plyler* v. Doe, 457 U.S. 202, 221-22
(1982)..................................................................................................... 22

*Polanco v. United States*,
No. 10 CV 1705, 2014 WL 795659 (E.D.N.Y. Feb. 27, 2014) .............. 16

*Puerto Rico Pub. Hous. Admin. v. U.S. HUD*,
59 F. Supp. 2d 310 (D.P.R. 1999)......................................................... 22

*Raila v. United States*,
355 F.3d 118 (2d Cir. 2004)..................................................................... 7

*Reno v. American-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999)........................................................................passim

iii

*Riverkeeper Inc. v. Collins*,
359 F.3d 156 (2nd Cir. 2004)............................................................ 14

*Salazar v. King*,
822 F.3d 61 (2d Cir. 2016)..................................................10, 13, 23

*Sharkey v. Quarantillo*,
541 F.3d 75 (2d Cir. 2008)............................................................... 10

*Texas v. United States*, 809 F.3d 134 ..................................passim

*United States v. Armstrong*,
517 U.S. 456 (1996)........................................................................ 9

*Vasquez v. Aviles,* 639 F. App'x 898, 901 (3d Cir. 2016).........................17

*Wade v. United States*,
504 U.S. 181 (1992)......................................................................8-9

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) ...................................................14, 20

*Webster v. Doe*,
486 U.S. 592 (1988)........................................................................ 8

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992)....................................................................... 19

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009)....................................................................... 23

**FEDERAL STATUTES**

5 U.S.C.
    § 553.............................................................................. 10
    § 701(a)(1) ...................................................................... 10
    § 701(a)(2) ...............................................................9-10, 18
    § 702 .............................................................................. 23
    § 706(2)........................................................................... 15

8 U.S.C.§ 1252(g) ...............................................................passim

   42 U.S.C.§ 405(g) .............................................................. 21

**RULES**

FRCP 12(b)(1) ....................................................................2, 7

iv

## PRELIMINARY STATEMENT

On September 5, 2017, the Departments of Homeland Security ("DHS") and Justice ("DOJ") announced the termination of Deferred Action for Childhood Arrivals ("DACA"), a nationwide program designed to protect persons who were brought to the United States as young children, grew up here, and graduated from high school here. Nearly one million individuals—the majority of whom are of Mexican descent—have received deferred action through DACA, which permitted them to work, attend school, and be productive members of society without a constant fear of deportation. The termination of DACA had the effect of revoking these benefits on short notice, greatly injuring DACA grantees, their families and communities, and their employers— including state institutions and agencies throughout the nation. Moreover, the reasons for that termination were never adequately explained by DHS and DOJ, and the termination itself was undertaken against a backdrop of anti-Mexican statements by President Trump.

The States of New York, Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and the District of Columbia (the "States" or "Plaintiff States") accordingly brought this suit to challenge Defendants' actions and to obtain redress for the harms that those actions are causing to Plaintiff States and their residents. The States' complaint alleges that the decision to rescind DACA was animus-driven in violation of the Equal Protection Clause of the U.S. Constitution and the substantive requirements of the Administrative Procedure Act ("APA"). The complaint also alleges that Defendants failed to comply with the procedural requirements of the Due Process Clause, APA, and Regulatory Flexibility Act ("RFA"). And the complaint further alleges that Defendants have violated the Due Process Clause and common law by declining to prohibit federal officials from using the personal information collected from DACA grantees to

1

undertake immigration enforcement actions against the grantees or their families.

The States now respectfully submit this Memorandum of Law in Opposition to the Defendants' Motion to Dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(1).[1] Defendants incorrectly contend that their termination of a program affecting hundreds of thousands of persons living in the United States is immune from judicial review. They assert that the rescission of DACA is unreviewable under the APA because deferred action is wholly discretionary, and unreviewable under the Immigration and Nationality Act ("INA") because it is covered by a jurisdiction-stripping provision of that statute, *see* 8 U.S.C. § 1252(g). But as numerous appellate courts have recognized, neither of those jurisdictional arguments applies to the types of constitutional and statutory claims that the State Plaintiffs bring here.

First, the decision to rescind DACA—a binding change in policy affecting the immigration classifications and privileges available to hundreds of thousands of persons—bears no resemblance to the individualized enforcement decisions on which Defendants rest their claims of APA unreviewability. Second, the INA only precludes review of agency decisions to "commence proceedings, adjudicate cases, or execute removal orders," 8 U.S.C. § 1252(g), and the decision to rescind DACA amounts to none of those types of actions.

Defendants are similarly misguided in challenging Plaintiff States' standing to sue. Plaintiff States satisfy Article III's standing requirements because they have alleged concrete and specific harms to their proprietary, sovereign, and quasi-sovereign interests. For example, the States' complaint describes how the rescission of DACA damages the States' revenue base, injures them

---

[1] Defendants' Memorandum of Law in Support of Their Motion To Dismiss also includes arguments to dismiss Plaintiff States' claims based on FRCP 12(b)(6), as well as against Plaintiffs' request for nationwide injunctive relief. ECF. 71-1 at Parts II and III. Pursuant to this Court's October 27, 2017 Order, ECF. 75, Plaintiff States limit this Memorandum of Law to addressing Defendants' challenge under FRCP 12(b)(1) to the Court's subject matter jurisdiction over Plaintiffs' claims. Plaintiff States reserve their right to address Defendants' FRCP 12(b)(6) claims on the schedule as directed by the Court.

as employers, impedes their mission as educators, and increases the burdens on their health care systems. And Plaintiff States have standing to assert claims under the APA because their employment of DACA grantees puts them within the zone of interests protected by the INA and APA.

## STATEMENT OF FACTS

On June 15, 2012, DHS established the DACA program, which allowed certain undocumented individuals who were brought to the U.S. as children to request deferred action—a form of prosecutorial discretion under which the federal government forbears from taking removal action against an individual—and work authorization for a two-year period, subject to renewal. ECF. 54, ¶¶ 22-24, Ex. 13. From June 2012 until September 2017, more than 800,000 individuals relied on DACA to obtain deferred action and employment authorization, including more than 100,000 individuals residing in Plaintiff States. ECF. 54, ¶¶ 36, 102, 107, 112, 117, 122, 127, 132, 137, 142, 147, 152, 155, 160, 168, 173, 178, 183, Ex. 1. DACA allowed these individuals to pursue higher education, secure employment, and create and run businesses. ECF. 55, ¶ 36. Plaintiff States significantly benefited from the DACA program, as grantees gained meaningful employment in both the public and private sectors, paid state and local taxes, contributed to state institutions such as public colleges and universities, and improved their local communities in myriad other ways. ECF. 54, ¶¶ 189-232.

While running for president, candidate Trump made a number of public statements expressing animus against Mexicans, who comprise nearly 78% of all DACA grantees. ECF. 54, ¶ 6, Ex. 1. For example, in announcing his candidacy for the presidency, then-candidate Trump stated: "When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us.

They're bringing drugs. They're bringing crime. They're rapists." ECF. 54, ¶ 58, Ex. 35. During the first Republican presidential debate, candidate Trump stated: "The Mexican government is much smarter, much sharper, much more cunning. And they send the bad ones over because they don't want to pay for them. They don't want to take care of them." ECF. 54, ¶ 59, Ex. 36. On separate occasions, candidate Trump called protestors displaying the Mexican flag "criminals" and "thugs," suggested that a judge could not be impartial in a case relating to his business because of the judge's Hispanic heritage, referred to immigrants from Mexico as "bad hombres," and publically excused the actions of two of his supporters who brutally assaulted a Latino man as "passionate." ECF. 54, ¶¶ 60-65, Ex. 39-43.

On January 27, 2017, shortly after taking the oath of office, President Trump again disparaged Mexicans when he told Mexico's President Peña Nieto that his country had "some pretty tough hombres," and that "they have to be knocked out and you have not done a good job of knocking them out." ECF. 54, ¶ 66, Ex. 45. More recently, on August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who had been convicted of contempt for his failure to obey a judicial order to stop racially profiling Latinos. ECF. 54, ¶ 67, Ex. 46. Prior to issuing this pardon, President Trump stated that Mr. Arpaio had been convicted "for doing his job." ECF. 54, ¶ 69, Ex. 46.

One week later on September 5, 2017, Attorney General Sessions announced the termination of DACA at a press conference, and cited to "strengthening the constitutional order and the rule of law in America," as the reason for the termination. ECF. 54, ¶ 81, Ex. 75. Attorney General Sessions made several additional claims about the program for which he offered no evidence, including that it led to an increase in unaccompanied minors entering the United States without inspection, and that it resulted in American citizens losing job opportunities. ECF. 54, ¶ 81, Ex. 75. Attorney General Sessions also referenced a letter sent by a group of ten states—led by

4

the State of Texas—threatening to amend a pending lawsuit to include a challenge to DACA unless the government revoked that program. ECF. 54, ¶ 73, Ex. 177.

That same day, DHS issued a Memorandum announcing the termination of DACA (the "DACA Termination Memorandum" or "Memorandum"). ECF. 54, ¶ 83, Ex. 74. The DACA Termination Memorandum cites to an opinion by Attorney General Sessions that the DACA program was "unconstitutional" and provides no further explanation or case law citations. *Id*. It also points to the Fifth Circuit and Supreme Court decisions in *Texas v. United States*, 809 F.3d 134, 178-186 (5th Cir. 2015), *aff'd by an equally divided court sub nom, U.S. v. Texas,* 136 S. Ct. 2271 (2016), as further support for termination. *Id.*

The federal government has failed to provide a rational or consistent explanation of its reasoning for terminating DACA. ECF. 54, ¶ 84. The DACA Termination Memorandum states that DACA was terminated based on perceived litigation risk. However, it glaringly fails to note that no court has ruled on the constitutionality of DACA, or that several federal agencies, including DHS and DOJ, had on several previous occasions, including as late as July 2017, determined that DACA was lawful and should be maintained. 54, ¶ 83, Exs. 23, 74.

In jointly deciding to terminate DACA, DHS and DOJ failed to consider many relevant factors, including the consequences its policy reversal would have on hundreds of thousands of DACA beneficiaries and on State and local communities. Neither the DACA Termination Memorandum nor Attorney General Sessions's statements mentioned the impact of termination on the lives of DACA grantees and their families. ECF. 54, ¶¶ 81-82, Ex. 74-75. Indeed, termination of the program will ultimately lead to a loss in employment for hundreds of thousands of grantees. ECF. 54, ¶¶ 3, 190, 195, 209, 219, 226, 231. DACA grantees currently working in fields such as education, healthcare, law, and others will lose authorization to continue working in those sectors. Grantees will lose steady incomes and health benefits. Others enrolled in higher education will

withdraw from school because there will be no work opportunities upon graduation. DACA termination will threaten the stability of mixed-status families in which a child, sibling, spouse or parent of a U.S. citizen is a DACA grantee.

Nor did DHS and DOJ account for the significant negative impact their termination of DACA will have on Plaintiff States. ECF. 54, ¶¶ 100-232. The States will lose the benefits of and investment in DACA grantees currently working in government or state-run institutions. With the loss of diverse and high achieving students, public universities will find it more difficult to satisfy their educational missions and prepare the States' residents for the workforce. Businesses and non-profits across the state will lose qualified and trained employees. These losses will damage State and municipal economies, and reduce State and local tax revenues. In addition, terminating the DACA program will disrupt States' statutory and regulatory regimes, as states made adjustments to qualifications for occupational licensing, and access to state health care and in-state tuition in reliance on the continuation of the DACA program.

As a result of DACA's termination, DHS officials may no longer exercise discretion to issue deferred action and employment authorization to individuals who previously qualified for DACA. ECF. 54, ¶¶ 80, 82, Ex. 74. DHS immediately stopped accepting new DACA applications, and limited renewal applications only to DACA grantees whose benefits expire before March 5, 2018, provided they apply for renewal by October 5, 2017. ECF. 54, ¶ 5, Ex. 74. DHS did not affirmatively state in its Memorandum announcing the termination or other documents that it would prohibit its officials from using the information collected in DACA initial applications and renewals for immigration enforcement actions against DACA grantees or their families. ECF. 54, ¶ 5, 8, 89, Exs. 74, 89. Nor did DHS provide DACA grantees with individualized notices that provided correct information about the limited window for renewing DACA before the March 5, 2018 termination date.  ECF. 54, ¶¶ 93-95, 274-280.

## **LEGAL STANDARD**

Defendants bring a FRCP 12(b)(1) challenge to the subject matter jurisdiction of this Court to review Plaintiff States' claims. Reviewing a motion to dismiss for lack of subject matter jurisdiction, the court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff." *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004). Further, "dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Id.* Plaintiff States undeniably meet this standard.

## **ARGUMENT**

This Court has the power to adjudicate all seven causes of action that Plaintiff States have asserted in their Amended Complaint. In arguing for a blanket ruling that all seven claims are non-justiciable, Defendants' singular focus on the APA fails to recognize that the APA standard of review has no bearing on judicial review for constitutional defects. Thus, none of Defendants' arguments have any bearing on Plaintiffs' Equal Protection and Due Process claims. More fundamentally, however, Defendants misunderstand the scope of the provisions of the APA and INA that limit judicial review. First, the decision to terminate DACA is a far-reaching and binding policy determination that will affect the immigration classification of hundreds of thousands of persons; it is nothing like a decision not to take enforcement action against a particular individual, which courts have found to be unreviewable. Second, although the INA precludes judicial review of certain immigration enforcement decisions, it does so only for narrow categories of action that courts have strictly construed. Because the termination of DACA is not an action "to commence proceedings, adjudicate cases, or execute removal orders," it is justiciable in the same manner as any other agency action. Finally, Defendants' challenges to Plaintiff States' standing are similarly meritless. The termination of DACA causes concrete harms to the States' proprietary, sovereign,

and quasi-sovereign interests that are well within the zone of interests protected by the INA and APA.

## I.   PLAINTIFFS' CLAIMS ARE JUDICIALLY REVIEWABLE

### A.  The Court Has Authority to Review Plaintiffs' Constitutional Challenges.

In arguing that their termination of DACA is an exercise of non-justiciable enforcement discretion, Defendants fail to acknowledge the existence of Plaintiff States' constitutional claims. Even if Plaintiffs' APA claims were barred by limits on judicial review set forth in the INA and APA—and they are not, *see infra* Part I.B and I.C—it is well settled that Defendants' actions are still "subject to constitutional limitations that district courts can enforce." *Wade v. United States*, 504 U.S. 181, 185 (1992).

The Supreme Court has expressly and repeatedly held that constitutional challenges remain reviewable even if other challenges arising from the same facts would not be justiciable. For example, in *Webster v. Doe*, 486 U.S. 592, 601-03 (1988), the Court rejected the government's argument that the National Security Act—which "precludes review of" the CIA Director's employee termination decisions under the APA—also barred judicial review of the plaintiff's Equal Protection and Due Process constitutional challenges. The Court explained that even when a court lacks power to conduct APA review of a matter that is "committed to agency discretion by law," it is not deprived of the ability to hear claims that the agency has acted in a manner "repugnant to the constitution." *Id.* at 603.

Similarly, in *Wade*, the Supreme Court held that quintessential exercises of enforcement discretion, such as a prosecutor's decision not to file a motion seeking a sentence below the statutory minimum, are subject to constitutional constraints and reviewable on that basis. 504 U.S. at 185-86. In other words, a purely discretionary enforcement decision made by a prosecutor, which is otherwise unreviewable, can still be challenged in court if the act is based on "an unconstitutional

8

motive," such as "the defendant's race or religion." *Id.* The Supreme Court again affirmed that principle in *United States v. Armstrong*, 517 U.S. 456, 455 (1996), declaring that "[o]f course, a prosecutor's discretion is subject to constitutional constraints," such as that imposed "by the equal protection component of the Due Process Clause."

Here, of the Plaintiffs' seven claims, three allege constitutional violations that fall squarely within the doctrines of *Webster*, *Wade*, and *Armstrong*. The Amended Complaint's first count asserts a violation of Equal Protection under the Fifth Amendment, alleging that Defendants' termination of DACA was driven, at least in part, by a discriminatory motive. ECF. 54, ¶¶ 233-239. The second count asserts a Substantive Due Process claim based on Defendants' failure to prohibit the government from using the information obtained through DACA applications and renewals for immigration enforcement purposes. ECF. 54, ¶¶ 240-245. And the seventh count asserts a violation of Procedural Due Process based on Defendants' failure to provide individualized, correct notices to DACA grantees about the program's termination and the limited window for renewal. ECF 54 at ¶¶ 246-252.

In sum, even if Defendants were correct about the scope of agency decision-making encompassed by APA § 701(a)(2) and INA § 1252(g), Plaintiff States' constitutional claims would still be justiciable. Defendants thus fail to present a colorable rationale for why this court lacks jurisdiction over counts one, two, and seven of the Plaintiff States' Amended Complaint.

### B. Plaintiffs' APA Claims Are Properly Addressed to this Court

Defendants fare no better in their efforts to challenge this Court's jurisdiction over Plaintiff States' APA claims, which address a dramatic and abrupt change in national policy affecting hundreds of thousands of DACA grantees. Specifically, Plaintiff States have alleged procedural and substantive defects in DHS's rulemaking with respect to the nationwide termination of DACA. In terminating DACA, Defendants engaged in an action that affects the substantive rights of DACA

grantees, including how grantees work, live, attend school, obtain credit, and travel in the United States. ECF. 54, ¶ 261. Yet, Defendants failed to go through notice-and-comment rulemaking procedures as required by the APA before taking this action. ECF. 54, ¶ 261; 5 U.S.C. § 553. The termination of DACA also violated APA's substantive requirements as it was arbitrary, capricious, and unconstitutional. 5 U.S.C. § 553. Defendants failed to consider relevant issues—for example, the benefits of the DACA program and the reliance interests of DACA grantees and their employers—and instead provided wholly inadequate and some pretextual reasons for their drastic change in policy. Further, the decision to terminate DACA was motivated, at least in part, by national origin animus, in violation of the Constitution and the APA.

These challenges to Defendants' decision to implement broad immigration policy in an arbitrary and unlawful manner, while bypassing the necessary procedural steps, are directly within the scope of the APA and are reviewable by this Court. Consistent with the "strong presumption that Congress intends judicial review of administrative action,"[2] the APA authorizes judicial review of *all* agency action except where a statute expressly precludes judicial review of a particular action, 5 U.S.C. § 701(a)(1), or where "agency action is committed to agency discretion at law," 5 U.S.C. §701(a)(2). Only "clear and convincing evidence" that Congress intended agency action to be unreviewable will overcome the strong presumption of judicial reviewability. *Sharkey v. Quarantillo*, 541 F.3d 75, 84 (2d Cir. 2008). Accordingly, "[i]n the absence of an express statutory prohibition," the agency bears a "heavy burden" to demonstrate that its decision is unreviewable. *Salazar*, 822 F.3d at 75 (citing *Dunlop v. Bachowski,* 421 U.S. 560, 567 (1975)). This is true even in the immigration context. *See, e.g., McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 483-84 (1991)

---

[2] *See, e.g., Salazar v. King*, 822 F.3d 61, 75 (2d Cir. 2016); *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670 (1986)); *see also Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015) (internal citations omitted) (stating that the exception to reviewability of agency action is "narrow").

("[G]iven the absence of clear congressional language mandating preclusion of federal jurisdiction . . . the District Court had jurisdiction to hear respondents' constitutional and statutory challenges to INS procedures").

Courts in this Circuit and elsewhere have repeatedly found that challenges to broad enforcement policies, such as the one at issue here, are reviewable. For example, in *New York City Employees Retirement Sys. v. S.E.C.*, a group of shareholders claimed that a Securities and Exchange Commission ("SEC") no-action letter violated the APA. 45 F.3d 7, 11 (2d Cir. 1995). The agency issued the letter in response to the shareholders' request for an investigation of a corporation's violation of SEC regulations. Although previous SEC policy suggested that the corporation's conduct violated the regulations, the SEC's letter stated that it had "reconsidered the application" of the regulation at issue and found it no longer applied to the corporation's alleged conduct. *Id.* at 10. Finding the SEC's action subject to judicial review, the Second Circuit explained that "the marrow of [Plaintiff's] claim is that the SEC announced a new rule without following the statutory notice and comment procedures," *id.* at 11, and rejected the agency's argument that the letter was merely a non-enforcement decision that was unreviewable.

As this Court has observed, an agency "'can often provide a basis for judicial review through the . . . announcement of policies." *Heterochemical Corp. v. Food and Drug Admin.*, 644 F. Supp. 271, 274 (E.D.N.Y. 1986) (quoting *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C.Cir.1985). In particular, "'[o]nce an agency has declared that a given course is the most effective way of implementing the statutory scheme, the courts are entitled to closely examine agency action that departs from this stated policy.'" *Id.* (quoting *Robbins*, 780 F.2d at 45).[3] Plaintiffs' challenge to the

---

[3] *See also Kenney v. Glickman*, 96 F.3d 1118, 1123-24 (8th Cir. 1996) (finding agency's adoption of policy setting forth change in enforcement criteria reviewable); *Crowley Caribbean Transport Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994) (recognizing that agency "expressions of broad enforcement policies" are judicially reviewable).

broad policy set forth in the DACA Termination Memo falls squarely within these holdings.

The fact that the agency action challenged here involves immigration does not alter this analysis. Agency discretion has not been construed to immunize *all* immigration-related rules and policies from judicial review. Thus, in analyzing justiciability issues strikingly similar to the one at bar, the Fifth Circuit found that the APA authorized review of DHS's implementation of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which authorized discretionary grants of deferred immigration enforcement action to eligible individuals. *Texas*, 809 F.3d at 166. As the court explained, the program encompassed "much more than nonenforcement" because the deferred action involved would "affirmatively confer 'lawful presence'" as well as benefit eligibility "on a class of unlawfully present aliens." *Id.* at 166.

Likewise, Defendants' termination of DACA is "much more," *id.*, than a decision to deny or discontinue deferred action to an individual DACA recipient. It is a substantial departure from existing policy that alters the lawful presence and benefit eligibility of an *entire class* of DACA grantees, consisting of approximately 800,000 people. The agency action challenged here is also far more significant than the agency acts found reviewable in the *Texas* case. In *Texas*, the action at issue was the creation of a program that allowed certain individuals who satisfied a strict set of criteria to *apply* for deferred action. *Texas,* 809 F.3d at 191-2 (5th Cir. 2015) (King, J., dissenting). Here, by contrast, the challenged action is an agency's *termination* of a program that has been in effect for five years and the consequent *revocation* of work, school, and benefit eligibility for several hundred thousand people on a non-discretionary, categorical basis. At a minimum, Plaintiff States should have the same "opportunity to be heard" as the states in the *Texas* case before such a harsh result is implemented. *See id.* at 170.[4]

---

[4] *See also Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013, 1017 (9th Cir. 1987) (new agency rules that create binding

Defendants cite to no authority to support their arguments that broad agency rules and policies, such as those at issue here, are unreviewable. Instead they rely on cases such as *Heckler v. Chaney*, 470 U.S. 821 (1985), that involve challenges to the federal government's decision to refrain from taking a specific enforcement action. But it defies logic to characterize Defendants' termination of DACA—which has the purpose and effect of changing the immigration classifications available to approximately 800,000 individuals who will lose benefits and become subject to enforcement measures—as a decision to forbear from enforcement in a specific matter. And courts have consistently found the narrow *Chaney* exception inapplicable where a plaintiff challenges broad agency rules and policies. *See New York City Employees Retirement Sys. v. S.E.C.*, 45 F.3d 7, 11 (2d Cir. 1995); *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Texas*, 809 F.3d at 166. Defendants' attempts to portray their termination of a program directly affecting 800,000 grantees as an *individual* non-enforcement action is nonsensical and would stretch *Chaney* beyond all logical reach. Under Defendants' approach every time an agency terminates a benefit— whether for one individual or one million—the process underlying that decision would be *per se* unreviewable so long as the agency styled it as a decision *not to* grant the benefit further. This would contort the *Chaney* holding into a presumption of non-reviewability of agency decision making, which is the exact opposite of what the law provides. *See Salazar*, 822 F.3 at 75 ("There is a strong presumption favoring judicial review of administrative action.").[5]

More importantly, the Court in *Chaney* premised its finding on the fact that agency *inaction* generally does not involve an agency's "exercise [of] its coercive power over an individual's liberty

---

norm that limits future discretion of agency and its officials are generally subject to APA notice and comment requirements).

[5] Defendants apparently understand the fallacy of their argument as they admit, "[t]o be sure, a decision 'not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action.'" ECF. 71-1, 15.

or property rights, and thus does not infringe upon areas that courts often are called upon to protect." 470 U.S. at 832. Conversely, when an agency does *act* and places an individual under its "coercive power" that falls well within the scope of judicial review. *See id.* This is especially so in the case at bar where the agency's action has impaired the ability of hundreds of thousands of people to obtain lawful employment and continue their schooling. *See generally McNary v. Haitian Refugee Ctr*, 498 U.S. 479, 491 (1991) (recognizing that a successful applicant to a government program providing amnesty to undocumented individuals "acquires a measure of freedom to live and work openly without fear of deportation and arrest that is markedly different from an unsuccessful applicant" and "the impact of a denial on the opportunity to gain lawful employment is plainly sufficient to mandate" fairness in the application process.).

Defendants' reliance on the Court's decision in *Reno v. American-Arab Anti-Discrimination Comm.*, ("*AAADC*") 525 U.S. 471 (1999) is also inapposite given that the decision does not address APA reviewability and involved an agency's enforcement actions with respect to eight specific individuals—not a decision that affects a class of nearly one million people. As multiple courts have recently held, challenges to broad immigration policies affecting a wide multitude of people, institutions, and states simply cannot be analogized to an individual decision to deny deferred action or other immigration relief to a particular person on persons. *See, e.g., Washington v. Trump,* 847 F.3d 1151, 1162 (9th Cir, 2017) ("The present case, by contrast, is not about the application of a . . . policy to the particular facts presented in an individual visa application. Rather, the States are challenging the President's *promulgation* of sweeping immigration policy."); *see also Riverkeeper Inc. v. Collins*, 359 F.3d 156, 167 (2nd Cir. 2004) (suggesting stricter review is appropriate when there is "an expression[ ] of broad enforcement polic[y].")

Finally, review is proper here because Plaintiffs have alleged that termination of DACA is

an irrational departure from the government's previously stated policy that does not reflect substantively or procedurally reasonable decision-making, as required by the APA. *See* 5 U.S.C. § 706(2); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 40-44 (1983) (articulating standard for evaluating agency's decision to rescind a rule). To the contrary, Plaintiffs' allege that Defendants' decision was motivated by unlawful discriminatory animus. This is the precise type of "affirmative agency action" that courts have long found subject to judicial review.[6]

### C. Judicial Review of Plaintiff States' Claims is entirely consistent with the INA.

Defendants proffer an erroneous interpretation of 8 U.S.C. § 1252(g) of the Immigration and Nationality Act ("INA") to argue that this provision deprives this Court of jurisdiction to review Plaintiff States' claims. Their argument is inconsistent with Supreme Court and Second Circuit precedent, the plain text of Section 1252(g)[7] and Congress' intent in enacting the statute.

The Supreme Court has recognized that the jurisdiction stripping provision of Section 1252(g) is limited *only* to the "specific activities listed in the statute," that is, decisions to "commence proceedings, adjudicate cases, or execute removal orders." *AAADC*, 525 U.S. at 482, (1999) (Section 1252(g)'s denial of jurisdiction applies exclusively to the "three discrete actions" it names). As the Supreme Court explained, "[i]t is implausible that" Congress intended to use "the mention of three discrete events along the road to deportation [as] a shorthand way of referring to

---

[6] *See, e.g., Jean v. Nelson*, 472 U.S. 846, 857 (1985) (affirming the court of appeals' *en banc* judgment to remand the matter to district court for determination of whether immigration officials exercised their broad statutory discretion to deny parole to class members in detention without regard to race or national origin.); *Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028, 1048 (E.D.N.Y. 1993) (holding that Attorney General has broad discretionary power to parole detained individuals but not "'to discriminate invidiously against a particular race or group or to depart without rational explanation from established policies.'") (quoting *Bertrand v. Sava*, 684 F.2d 204, 212 (2nd Cir. 1982)).

[7] Section 1252(g) provides:
Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

all claims arising from deportation proceedings." *See id*. Instead, Congress focused on these three discrete acts because at each of those stages, "the Executive has discretion to abandon the endeavor." *Id.* At 483. At the time Section 1252(g) was enacted, the "INS had been engaging in a regular practice of exercising discretion for humanitarian purposes or for convenience" for specific individuals. *Id*. at 484-485. Section 1252(g) was therefore enacted to insulate those choices from judicial review. *Id. See also Calcano-Martinez v. I.N.S.*, 232 F.3d 328, 339 n. 5 (2d Cir. 2000), *aff'd*, 533 U.S. 348 (2001) ("[Section 1252(g)] applies in a very narrow class of cases.").

The termination of DACA does not fit within any of the three enumerated actions in Section 1252(g) and Plaintiff States are not challenging a "decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders." *See* 8 U.S.C. § 1252(g). Rather, the States bring an APA challenge to the nationwide policy to terminate the DACA program as whole, which established a set of classifications and privileges available to a class of nearly one million individuals. ECF. 54, ¶¶ 1-2, 9, 19-22.

As the Fifth Circuit found in *Texas v. United States*, 1252(g) does not preclude judicial review of a decision to "reclassif[y] millions of illegal aliens," *Texas*, 809 F.3d at 155–63. An APA claim challenging such an administrative action is thus justiciable. *Id*. at 164. Indeed, as a number of courts in this Circuit have recognized, Section 1252(g) was not intended "to foreclose *bona fide* legal and constitutional questions unrelated to a removal order by barring all federal court review." *Arar v. Ashcroft*, 414 F. Supp. 2d 250, 267, 271 (E.D.N.Y. 2006).[8]

In light of Section 1252(g)'s text, legislative history, and interpretation by the courts,

---

[8] *See also Calcano-Martinez*, 232 F.3d at 339 (Section 1252(g) did not divest district courts of jurisdiction to review habeas appeals raising legal challenges to removal orders); *Polanco v. United States*, No. 10 CV 1705, 2014 WL 795659, at *3 (E.D.N.Y. Feb. 27, 2014) (DHS's decision to arrest petitioner was a decision that was separate and discrete from decision to commence proceedings, adjudicate cases, or execute removal orders, and therefore reviewable).

Defendants are simply incorrect in arguing that Section 1252(g) precludes review of DACA's termination because it is a "necessary step in commencing enforcement proceedings at some future date." ECF. 71-1 at 18. As the Supreme Court made clear in *AAADC*, a mere connection to an action named in Section 1252(g) does not destroy jurisdiction. *AAADC*, 525 U.S. at 482. Defendants' attempt to insulate any action "relating in any way to deportation proceedings," thus contradicts the holding in that case. *Arar*, 414 F. Supp. 2d at 271 (quoting *Wong v. INS*, 373 F.3d 952, 964 (9th Cir. 2004)). Moreover, Defendants' decision to terminate DACA is several steps removed from a decision to commence deportation proceedings against an individual DACA grantee.[9]

The two cases that Defendants rely on to support their Section 1252(g) argument, ECF. 71-1 at 18-19, are inapposite. Both cases involve individuals challenging decisions related to a removal order—precisely the actions governed by Section 1252(g)—and are unrelated to the government's decision to terminate categorical deferral programs such as DACA. In *Vasquez v. Aviles,* the Third Circuit held that Section 1252(g) barred review of the federal government's failure to grant deferred action status under DACA for one particular individual, who had already been removed from this country. 639 F. App'x 898, 901 (3d Cir. 2016). Vasquez had raised the argument that he was eligible for DACA in his removal proceedings; an ICE official rejected his application upon finding "no compelling reason to warrant a favorable exercise of [his] discretion. *Id.* at 900. Here, Plaintiff States do not challenge DHS's authority to exercise its discretion to deny DACA to individual applicants, but instead the joint decision of DHS and DOJ to terminate the entire program. For similar reasons, Defendants' reliance on *Botezatu v. INS*, 195 F.3d 311-312, 314 (7th Cir. 1999), is

---

[9] It would also require interpretative aerobatics for the Defendants to argue that Section 1252(g) applies to Plaintiff States' Procedural Due Process claim arising from Defendants' failure to provide adequate notice about DACA grantees' ability to renew. This claim is completely unrelated to the commencement of enforcement proceedings.

misplaced as the petitioner in that case sought review of the government's decision not to grant him individual relief—by reinstating voluntary parole or granting deferred action—*after* a removal order was issued; petitioner did not seek judicial review of an agency action that eliminated a class-wide program such as DACA.[10]

***

In summary, the narrow exceptions set forth in 5 U.S.C. §701(a)(2) or in § 1252(g) are inapplicable to Plaintiffs' claims. Defendants have therefore failed to overcome the strong presumption of judicial reviewability of the constitutional, statutory, and common law claims at issue in this suit.  Accordingly, Defendants' motion to dismiss on this ground must be denied.

## II.   PLAINTIFF STATES HAVE STANDING

### A.   Plaintiff States Have Article III Standing.

"To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Svcs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). Plaintiff States meet all three requirements, and have standing to redress injuries inflicted by

---

[10] As Defendants acknowledge in their Memorandum of Law, even if the Termination Order were to be deemed unreviewable under Section 1252(g), Plaintiff States' allegations regarding the discriminatory intent behind the decision to terminate DACA may permit judicial review under an exceptional category that the Supreme Court has contemplated. ECF. 71-1 at 16.  In *AAADC*, the Supreme Court reserved the question of "the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations [that protect discretion] can be overcome." 525 U.S. at 491 (1999).

Defendants.

1.   <u>Defendants' Actions Have Harmed Plaintiff States' Proprietary Interests</u>**.**

Plaintiff States have standing because Defendants' unlawful action in terminating DACA has harmed their proprietary interests. It is well established that States can invoke federal jurisdiction to protect their proprietary interests. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-02 (1982) (explaining proprietary interests); *Davis v. EPA*, 348 F.3d 772, 778 (9th Cir. 2003). Moreover, the threshold level of economic injury necessary to establish States' proprietary standing is low. Courts have consistently found that direct, non-trivial economic impacts constitute a concrete, particularized injury sufficient to show Article III standing. *See, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004) (sufficient economic interest for proprietary standing in lost tourist revenues caused by "aesthetic damage" from increased traffic).

Contrary to Defendants' suggestion, (ECF. 71-1 at 20), those non-trivial impacts can include alleged harms to state tax revenues or allegations of increased fiscal burdens. In *Wyoming v. Oklahoma*, 502 U.S. 437, 447-48 (1992), the Supreme Court held that Wyoming had standing to sue due to the effect that the challenged legislation had on Wyoming's severance tax revenues. And in *Texas*, the Fifth Circuit held that Texas had standing to challenge DAPA based solely on the costs of issuing driver's licenses to DAPA grantees, which amounted to approximately $130 per license. *See* 787 F.3d  at 733.

As relevant here, Plaintiff States are home to more than 100,000 DACA grantees who contribute to the States' economies, educational systems, businesses, non-profits, health systems, and broader communities. Defendants' unlawful actions will impose increased losses, costs, and burdens on each of these sectors, thus causing concrete injury to Plaintiff States' propriety interests.

Many DACA grantees are employed by State-run institutions, and the revocation of work authorization that accompanies the loss of their DACA status will create new administrative

19

burdens and costs for the Plaintiff States as employers. ECF. 54, ¶¶ 189-190. Similarly, the private companies that employ DACA grantees—including because of special skills and training that they may have—will find it more difficult to recruit and retain the employees they need, and may therefore need to spend more money on staffing and training. ECF. 54, ¶¶ 226-228.

Plaintiff States will suffer direct and substantial harms to their economies as a result of DACA's termination. According to expert estimates, Plaintiff States will lose billions of dollars of tax revenue as a result of DACA's termination, ECF. 54, ¶¶ 105, 110, 115, 120, 125, 130, 135, 140, 145, 150, 153, 158, 164-166, 171, 176, 181, 186; Ex 3. In addition, due to disruptions stemming from DACA's termination—including the disruptions further described below—the States will incur billions in other economic losses over a ten-year period. ECF. 54, ¶¶ 105, 110, 115, 120, 125, 130, 135, 140, 145, 150, 153, 158, 164-166, 171, 176, 181, 186, Ex. 4.

The States will also suffer proprietary losses in their capacity as university operators because the DACA grantees currently studying and teaching at their universities may be forced to discontinue those activities, creating increased administrative costs, losses of tuition revenue, and losses of a diverse student body.  ECF. 54, ¶¶ 191-205; *see also Washington*, 847 F.3d 1152, 1161 (9th Cir. 2017)(recognizing that States, as operators of universities, had Article III standing to challenge a federal policy barring the entry of foreign nationals from certain majority Muslim countries).

Terminating DACA will also impose additional health care costs on Plaintiff States. Work authorization allows DACA grantees access to employer-sponsored health benefits. Without these benefits, many of the States' residents are likely to forgo needed health care, including preventive care, which will create more costly health problems in the long run. It also will result in more residents relying on state-funded and/or state-administered public health care and other benefits and thus impose additional costs on the States. ECF. 54, ¶¶ 208-210.

Finally, Plaintiff States will directly experience the impact of the loss of work authorizations, as many DACA grantees are employed by State-run institutions that will now not be permitted to employ them. ECF. 54, ¶¶ 189-190. Further, terminating DACA grantees' work authorizations will inhibit the ability of private companies to adequately staff their organizations, develop their workforces, recruit talent, and maintain trained employees. ECF. 54, ¶¶ 226-228.

### 2. Defendants' Termination of DACA Harms Plaintiff States' Sovereign and Quasi-Sovereign interests.

Plaintiff States also have standing because Defendants' actions have caused injury to their sovereign and "quasi-sovereign" interests. As the Supreme Court explained in *Massachusetts v. E.P.A.*, "well before the creation of the modern administrative state, we recognized that States are not normal litigants for the purposes of invoking federal jurisdiction." 549 U.S. 497, 518 (2007). States are thus "entitled to special solicitude" in matters of standing, and a long line of cases "permit[] States to litigate as *parens patriae* to protect quasi sovereign interests . . . ." *Id.* at 520 & n.17 (internal quotations omitted). To assert a claim in a *parens patriae* capacity, a state must identify harm to a "quasi-sovereign interest" that injures a sufficiently substantial segment of its population, the redress of which no private party can obtain. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 593, 607 (1982).[11] Quasi-sovereign interests include "the health and well-being" of state residents, whether "physical [or] economic." *Snapp*, 485 U.S. at 593.

In the instant case, Plaintiff States have sufficiently alleged harm to their quasi-sovereign

---

[11]Defendants argue that the Plaintiff States do not have *parens patriae* standing to bring an action against the federal government. ECF. 71-1 at 20, n.4. But courts have found that States may invoke *parens patriae* standing to enforce— as opposed to overturn or avoid—application of a federal statute. *See, e.g., New York v. Sebelius*, 2009 WL 1834599 at *13 (N.D.N.Y. 2009) (finding that New York State "permissibly seeks only to vindicate its citizens' due process rights to procedurally adequate retroactive Title II determinations through 42 U.S.C. § 405(g); *Puerto Rico Pub. Hous. Admin. v. U.S. HUD*, 59 F. Supp. 2d 310, 326 (D.P.R. 1999) ("if by means of its suit the state seeks to enforce, rather than overturn or avoid, a federal statute, the parens patriae doctrine is triggered to drive the action forward."). Here, Plaintiff States are not seeking to overturn any federal statutes but instead seek proper enforcement of federal statutes.

interests. Plaintiff States allege—among other things—that termination of the DACA program will have an adverse impact on public health by causing many current DACA grantees to lose their employer provided health insurance, as well as threatening access to public health care in certain Plaintiff States. ECF. 54, ¶¶ 230-232; *see also Snapp*, 458 U.S. at 607 (recognizing State's quasi-sovereign interest in the health of their populations).

In addition, Plaintiff States allege impacts that are distinctly sovereign or quasi-sovereign in nature, beyond the interests of any particular individual or party. These include the States' interest in promoting family integrity, ensuring education equity, and protecting its residents from discrimination. *See supra* Statement of Facts at 5-6. Discrimination particularly harms Plaintiff States as they bear "significant social costs" when "groups are denied the means to absorb the values and skills upon which our social order rests." *Plyler* v. Doe, 457 U.S. 202, 221-22 (1982). *See also Commonwealth of Mass. v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90, 98 (D. Mass. 1998) ("Discrimination of any kind . . . corrodes the social fabric and fosters intolerance and inequality"); *People v. Peter & John's Pump House*, 914 F. Supp. 809, 813 (N.D.N.Y. 1996) (finding jurisdiction where "[t]he State alleges discrimination that has a destructive societal effect"). This interest is uniquely represented by the States, each of which have a strong "state interest in securing residents from the harmful effects of discrimination." *Snapp*, 458 U.S. at 609. Moreover, no other party can obtain complete relief sought by Plaintiff States as they have a profound interest in preventing the very real harms—both physical and economic—caused by discriminatory treatment in their States.

    3.   <u>Defendants' Termination of DACA Has Caused the Harms Alleged by Plaintiff States and Enjoining the Termination Will Redress Such Injuries.</u>

There is no question that the harms described *supra* are caused by DACA's termination; they cannot be traced to any other source. Further, there can be no meaningful dispute that this Court has the power to redress these harms by invalidating the termination of DACA (see *supra*

Point I), which would prevent these ongoing proprietary and quasi-sovereign harms to the States and their residents.

### B. Plaintiff States' Have Standing Under the APA.[12]

The APA confers standing on any party that is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "[T]o bring a claim under the APA a plaintiff must satisfy Article III''s standing requirements" …and must "assert interests that are arguably within the zone of interests to be protected or regulated by the statute she claims was violated , at all times during the litigation…" *Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016), (*quoting Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S. Ct. 1377, 1388 (2014). The zone-of-interests test "is not meant to be especially demanding" and is applied "in keeping with Congress's evident intent to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 225 (internal citation omitted); *see also Assn. of Data Processing Serv. Organizations, Inc. v. Camp*, 397 US 150, 154, (1970) ("that interest, at times, may reflect 'aesthetic, conservational, and recreational' as well as economic values")(internal citations omitted).

The INA established interests related to the "regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens

---

[12]Defendants did not challenge Plaintiff States' standing under the RFA. ECF. 71-1 at 19-21. However, it is clear Plaintiff States have standing under the RFA to represent the interests of their political subdivisions. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009) (""Political subdivisions of States—counties, cities, or whatever— never were and never have been considered as sovereign entities" . . . but are instead "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions.'" (internal citations omitted). Terminating DACA will adversely affect the economy, public safety, health, and wellbeing of small governmental jurisdictions in the States. ECF. 54, ¶¶ 211-216. The impact on small businesses and nonprofit organizations will also be especially stark, as for many of these organizations, losing even one skilled and trained DACA grantee employee will place an economic strain on operations, hiring, and training. ECF. 54, ¶¶ 38, 228-229.

lawfully in the country." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (*quoting DeCanas v. Bica*, 424 U.S. 351, 353, 359, (1976)) (internal quotations omitted). In *Texas v. United States*, the state of Texas was found to be in the zone of interests of the INA and to have standing under the APA due to the anticipated cost of "spending millions of dollars to subsidize driver's licenses" to DAPA and DACA-plus grantees. 809 F.3d at 155–63. That alleged injury is far less significant than what the Plaintiff States have alleged in the case at bar. *See* Part II.A *supra*. Accordingly, the interests that Plaintiff States seek to protect here fall squarely within the "zone of interests" regulated by the INA.

## CONCLUSION

For the reasons set forth above, Plaintiff States respectfully request that the Court deny Defendants' Motion to Dismiss.

DATED: Nov. 1, 2017

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

*Of Counsel:*

Anisha Dasgupta
Deputy Solicitor General

David Frankel
Assistant Solicitor General

By:  */s Lourdes M. Rosado*
Lourdes M. Rosado, Bureau Chief
Brooke Tucker, Assistant Attorney General\*
Diane Lucas, Assistant Attorney General
Sania Khan, Assistant Attorney General
Ajay Saini, Assistant Attorney General
Alex Finkelstein, Volunteer Assistant Attorney General\*
Civil Rights Bureau
Office of the New York State Attorney General
120 Broadway, 23rd Floor
New York, NY 10271
Lourdes.Rosado@ag.ny.gov
Brooke.Tucker@ag.ny.gov
Sania.Khan@ag.ny.gov
Diane.Lucas@ag.ny.gov
Ajay.Saini@ag.ny.gov
Tel. (212) 416-6348

Fax (212) 416-8074<br>
(*admission pending)

**MAURA HEALEY**
Attorney General for the Commonwealth of
Massachusetts

By:    */s Abigail B. Taylor*
        Jonathan B. Miller
        Genevieve C. Nadeau (*pro hac vice*)
        Abigail B. Taylor (*pro hac vice*)
        Assistant Attorneys General
        Office of the Attorney General
        One Ashburton Place
        Boston, MA 02108
        Jonathan.Miller@state.ma.us
        Genevieve.Nadeau@state.ma.us
        Abigail.Taylor@state.ma.us
        Tel. (617) 727-2200

**BOB FERGUSON**
Attorney General of the State Washington

By:    */s/ Robert W Ferguson*
        Robert W. Ferguson (*pro hac vice*)
        Attorney General
        Colleen M. Melody (*pro hac vice*)
        Civil Rights Unit Chief
        Marsha Chien (*pro hac vice*)
        Assistant Attorney General
        Office of the Attorney General
        800 Fifth Avenue, Suite 2000
        Seattle, WA 98104
        ColleenM1@atg.wa.gov
        MarshaC@atg.wa.gov
        Tel. (206) 464-7744

**GEORGE JEPSEN**
Attorney General of the State of Connecticut

By:    */s Mark K. Kohler*
        Mark F. Kohler (*pro hac vice*)
        Assistant Attorney General
        Connecticut Office of the Attorney
        General
        55 Elm Street, P.O. Box 120
        Hartford, CT 06106
        Mark.Kohler@ct.gov
        Tel. (860) 808-5020

**KARL A. RACINE**
Attorney General for the District of Columbia

By:    */s Robyn R. Bender*
        Robyn R. Bender*
        Deputy Attorney General
        Public Advocacy Division
        441 4th Street, NW
        Suite 650 North
        Washington, DC 20001
        Robyn.Bender@dc.gov
        Tel. (202) 724-6610
        Fax (202) 730-0650

**DOUGLAS S. CHIN**
Attorney General of the State of Hawaii

By:   */s Donna H. Kalama*
      Donna H. Kalama (*pro hac vice*)
      Deputy Attorney General
      State of Hawaii, Department of the
      Attorney General
      425 Queen Street
      Honolulu, HI 96813
      Donna.H.Kalama@hawaii.gov
      Tel. (808) 586-1224

**LISA MADIGAN**
Attorney General of the State of Illinois

By:   */s Anna P. Crane*
      Anna P. Crane, Assistant Attorney
      General (*pro hac vice*)
      Karyn L. Bass Ehler,
      Chief, Civil Rights Bureau
      Harpreet Khera, Deputy Bureau Chief,
      Special Litigation Bureau
      Caitlyn McEllis, Assistant Attorney
      General
      Jeff VanDam, Assistant Attorney Genera
      Civil Rights Bureau
      Office of the Illinois Attorney General
      100 W. Randolph Street
      Chicago, IL 60601
      Anna.Crane@atg.state.il.us
      Tel. (312) 814-3400
      Fax (312) 814-3212

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By:   */s Nathan Blake*
      Nathan Blake (*pro hac vice*)
      Deputy Attorney General
      Office of the Attorney General of Iowa
      1305 E. Walnut Street
      Des Moines, IA 50319
      Nathan.Blake@iowa.gov
      Tel. (515) 281-4325
      Fax (515) 281-4209

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By:   */s Tania Maestas*
      Tania Maestas, (*pro hac vice*)
      Deputy Attorney General
      Ari Biernoff, Assistant Attorney General
      Jennie Lusk, Assistant Attorney General
      New Mexico Office of the Attorney
      General
      408 Galisteo St.
      Santa Fe, NM 87501
      ABiernoff@nmag.gov
      Tel. (505) 490-4060

Fax (505) 490-4883

**MATTHEW DENN**
Attorney General of the State of Delaware

By:  *s/ Aaron Goldstein*
    Aaron Goldstein (*pro hac vice*)
    State Solicitor
    Aleine Cohen (*pro hac vice*)
    Michelle Whalen
    Deputies Attorney General
    Delaware Department of Justice
    820 N. French St.
    Wilmington, DE 19801
    Aaron.Goldstein@state.de.us
    Aleine.Cohen@state.de.us
    Michelle.Whalen@state.de.us
    Tel. (302) 577-8400

**PETER KILMARTIN**
Attorney General of the State of Rhode Island

By: */s Rebecca T. Partington*
    Rebecca T. Partington (*pro hac vice*)
    Chief, Civil Division
    Michael W. Field (*pro hac vice*)
    Assistant Attorney General
    Adam D. Roach (*pro hac vice*)
    Special Assistant Attorney General
    RI Office of the Attorney General
    150 South Main Street
    Providence, RI 02903
    RPartington@riag.ri.gov
    MField@riag.ri.gov
    ARoach@riag.ri.gov
    Tel. (401) 274-4400

**JOSH STEIN**
Attorney General of the State of North
Carolina

By:  */s Sripriya Narasimhan*
Sripriya Narasimhan\*
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
SNarasimhan@ncdoj.gov
Tel. (919) 716-6400

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By:  */s Brian De Haan*
Brian De Haan\*
Assistant Attorney General
Trial Attorney
Brian.A.DeHaan@doj.state.or.us
Tel. (971) 673-1880
Fax (971) 673-5000

**JOSH SHAPIRO**
Attorney General of the Commonwealth of
Pennsylvania

By:  */s Jonathan Scott Goldman*
Jonathan Scott Goldman\*
Executive Deputy Attorney General,
Civil Law Division
Michael J. Fischer, (*pro hac vice*)
Chief Deputy Attorney General, Impact
Litigation Section
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
MFischer@attorneygeneral.gov
Tel. (717) 787-3391

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

By:  */s Benjamin D. Battles*
Benjamin D. Battles, (*pro hac vice*)
Solicitor General
Julio A. Thompson\*, Assistant Attorney
General, Civil Rights Unit
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
Benjamin.Battles@vermont.gov
Tel. (802) 828-5500
Fax (802) 828-3187

**MARK R. HERRING**
Attorney General of the Commonwealth of
Virginia

By:  */s Matthew R. McGuire*
Matthew R. McGuire (*pro hac vice*)
Acting Deputy Solicitor General
202 North Ninth Street
Richmond, VA 23219
MMcguire@oag.state.va.us
Tel. (804) 786-7773

**JOHN W. HICKENLOOPER**
Governor of the State of Colorado

By:  */s Jacki Cooper Melmed*
Jacki Cooper Melmed
Special Assistant Attorney General\*
Chief Legal Counsel
136 State Capitol Building
Denver, Colorado 80203
Jackic.Melmed@state.co.us
Tel. (303) 866-3788
(\* Limited Appointment)