UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

MARTIN JONATHAN BATALLA VIDAL et al.,

                Plaintiffs,

     -against-

ELAINE C. DUKE, Acting Secretary, Department of
Homeland Security, et al.,

                Defendants.

---------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-4756 (NGG) (JO)**

STATE OF NEW YORK et al.,

                Plaintiffs,

     -against-

DONALD TRUMP, President of the United States, et al.,

                Defendants.

---------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

     Plaintiffs in the above-captioned cases challenge the rescission of the Deferred Action for

Childhood Arrivals ("DACA") program, as well as other actions that Defendants are alleged to

have taken in connection with the rescission of that program.  Defendants have moved to dismiss

these cases for lack of subject-matter jurisdiction and for failure to state a claim.  (See Defs. Mot.

to Dismiss (Dkt. 95)[1]; Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mem.") (Dkt. 95-1).)  For the reasons that follow, the court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss for lack of subject-matter jurisdiction and RESERVES RULING on Defendants' motion to dismiss for failure to state a claim.

## I.    BACKGROUND

The court begins by providing some background on the DACA program, the steps Defendants have taken to end it, and the increasingly complicated procedural history of these cases.

### A. Factual Background

#### 1.   Deferred Action

The DACA program originates in a mismatch between the number of individuals unlawfully present in the United States and DHS's ability to remove these individuals from the country.  As of 2014, for example, approximately 11.3 million removable individuals were present in the United States.[2]  (The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. at 1 (2014) ("OLC Op.") (Admin. R. ("AR") (Dkt. 77-1) at 4).)  DHS has the resources to remove only a small percentage of these individuals—specifically, about 400,000 per year, or less than four percent of the total, as of 2014.  (Id. at 1; DHS, 2015

---

[1] Except as noted, all docket citations refer to the docket in Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.). For convenience, the court refers to the Plaintiffs in Batalla Vidal v. Duke as the "Batalla Vidal Plaintiffs"; Plaintiff Make the Road New York as "MRNY"; the Plaintiffs in New York v. Trump, No. 17-CV-5228 (E.D.N.Y.), as the "State Plaintiffs"; the U.S. Department of Homeland Security as "DHS"; U.S. Customs and Border Protection as "CBP"; U.S. Citizenship and Immigration Services as "USCIS"; U.S. Immigration and Customs Enforcement as "ICE"; and the U.S. Department of Justice as "DOJ."

[2] "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." Arizona v. United States, 567 U.S. 387, 396 (2012) (citing 8 U.S.C. § 1227).

Yearbook of Immigration Statistics tbl. 39 (2016) (listing 333,341 removals and 129,122 "returns" for the year 2015).) Because of the "practical fact" that it cannot deport all these individuals, the Executive Branch has significant discretion to prioritize the removal of some and to deprioritize the removal of others. See Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." Id. "Deferred action," sometimes referred to as "nonpriority status," is "in effect, an informal administrative stay of deportation," Lennon v. INS, 527 F.2d 187, 191 n.7 (2d Cir. 1975), by which immigration authorities decide not to initiate, or decide to halt, removal proceedings "for humanitarian reasons or simply for . . . convenience," Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) ("AAADC"). Immigration authorities have used deferred action and similar policies on numerous occasions since at least the early 1960s. Arpaio, 797 F.3d at 16 (citing OLC Op. at 7-8, 12-13). Although deferred action was initially "developed without express statutory authorization," AAADC, 525 U.S. at 484 (quoting 6 C. Gordon et al., Immigration Law and Procedure § 72.03(2)(h) (1998)), it has since been referenced in the Immigration and Nationality Act ("INA") and in DHS regulations, see 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (making certain individuals "eligible for deferred action and work authorization"); 8 C.F.R. § 274a.12(c)(14) (authorizing certain recipients of deferred action to apply for work authorization).

## 2. DACA and DAPA

In 2012, the Obama Administration created the DACA program by issuing a memorandum stating that DHS would consider according deferred action to certain undocumented immigrants who entered the United States as children. (Mem. from Janet Napolitano, Sec'y of DHS, to David V. Aguilar, Acting Comm'r, CBP, et al., Exercising

Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) (the "2012 DACA Memo") (AR 1).)  The 2012 DACA Memo directed CBP, USCIS, and ICE to consider exercising prosecutorial discretion with respect to individuals without lawful immigration status who (1) were under the age of sixteen when they entered the United States; (2) had been continuously present in the United States for at least the five years leading up to June 15, 2012; (3) were currently in school, had graduated from high school or obtained GEDs, or were honorably discharged veterans; (4) had not been convicted of felonies, significant misdemeanors, or multiple misdemeanors, and did not "otherwise pose[] a threat to national security or public safety"; and (5) were not above the age of thirty.  (Id.)  Individuals who met these criteria, passed a background check, and were granted relief "on a case by case basis" were shielded from removal and eligible to apply for work authorization, subject to renewal every two years.  (Id. at 2-3.)  The 2012 DACA Memo made clear, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship," but only "set forth policy for the exercise of discretion within the framework of the existing law."  (Id. at 3.)  Following the issuance of the 2012 DACA Memo, approximately 800,000 individuals have been granted deferred action and work authorization under the program.  (Second Am. Compl. ("SAC") (Dkt. 60) ¶ 73; USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status, Fiscal Year 2012-2017 (June 30, 2017) (Am. Compl. ("State Pls. Am. Compl."), Ex. 1 (No. 17-CV-5228, Dkt. 55-1)).)

In 2014, the Obama Administration announced a new deferred action program for the parents of U.S. citizens and lawful permanent residents, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA").  (Mem. from Jeh Charles Johnson,

Sec'y of DHS, to León Rodríguez, Dir., USCIS., et al, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (the "2014 DAPA Memo") (AR 37).)  The 2014 DAPA Memo also expanded the DACA program by (1) permitting individuals born before June 15, 1981, to apply for deferred action; (2) extending the term of the benefits obtained under the DACA program from two to three years; and (3) adjusting the date-of-entry requirement so that individuals who entered the United States before January 1, 2010, could obtain deferred action and work authorization.  (Id. at 3-4.)  The court refers to these changes to the DACA program as the "DACA Expansion."

Following the issuance of the 2014 DAPA Memo, twenty-six states, led by Texas, filed suit in the U.S. District Court for the Southern District of Texas, claiming that the DAPA program violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 550 et seq., and the Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 3.  See Texas v. United States, 86 F. Supp. 3d 591, 598 (S.D. Tex. 2015).  On February 16, 2015, the district court concluded that those states had standing to sue and were likely to succeed on the merits of their procedural APA claim that the 2014 DAPA Memo was invalid because it constituted a "substantive rule," not a "general statement of policy," and thus should have been promulgated through notice-and-comment rulemaking.  Id. at 671-72.  The court issued a nationwide injunction against the implementation of the DAPA program, id. at 677-78, and the DACA Expansion, id. at 678 n.111.  The Fifth Circuit affirmed that decision, finding that the plaintiff states were likely to succeed both on their claim that the 2014 DAPA Memo should have been made through notice-and-comment procedures and on their claim that the memo was substantively contrary to the INA.  Texas v. United States, 809 F.3d 134, 178, 186 (5th Cir. 2015) (as revised).  The Fifth Circuit

declined to reach the plaintiff states' Take Care Clause claim.  Id. at 146 n.3.  The decision was affirmed by an equally divided Supreme Court.  See 136 S. Ct. 2271 (Mem.).

### 3.  DAPA Rescission

The Executive Branch's immigration-enforcement priorities shifted with the election of President Donald Trump.  Shortly after his Inauguration, President Trump issued an executive order that cast doubt on the exemption of "classes or categories of removable aliens from potential enforcement."  Exec. Order 13,768, Enhancing Public Safety in the Interior of the United States, 82 Fed. Reg. 8799 (Jan. 25, 2017).  The following month, then-Secretary of DHS John Kelly implemented that order by issuing a memorandum rescinding "all existing conflicting directives, memoranda, or field guidance regarding enforcement of our immigration laws and priorities for removal," except for the DACA and DAPA programs, which he left in place. (Mem. from John Kelly, Sec'y, DHS, to Kevin McAleenan, Acting Comm'r, CBP, et al., Enforcement of the Immigration Laws to Serve the National Interest at 2 (Feb. 20, 2017) (AR 230).)  Four months later, Secretary Kelly issued another memorandum, which rescinded the DAPA program and the DACA Expansion based on "the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities."  (Mem. from John F. Kelly, Sec'y, DHS, to Kevin K. McAleenan, Acting Comm'r, CBP, et al., Rescission of November 20, 2014, Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") at 3 (June 15, 2017) (AR 235).)  That memorandum did not, however, rescind the original DACA program or revoke the three-year-long deferred action and work authorization issued between the announcement of the DACA Expansion and the Southern District of Texas's issuance of a preliminary injunction against that program.  (Id. at 2 & n.3.)

4.  DACA Rescission

Following the rescission of the 2014 DAPA Memo, Texas Attorney General Ken Paxton

wrote on behalf of eleven states to Attorney General Jeff Sessions to demand that the "Executive

Branch" rescind the 2012 DACA Memo.  (Ltr. from Ken Paxton, Att'y Gen. of Texas, to Hon.

Jeff Sessions, Att'y Gen. of the U.S. (June 29, 2017) at 2 (AR 239).)  Paxton warned that, if DHS

did not act to end the DACA program, the plaintiff states would amend their complaint in Texas

v. United States to challenge the DACA program and the remaining work permits issued under

the DACA Expansion.  (Id. at 2.)

Thereafter, Attorney General Sessions wrote to Acting DHS Secretary Elaine Duke to

"advise that [DHS] should rescind" the 2012 DACA Memo.[3]  (Letter from Jefferson B. Sessions,

III, Att'y Gen. of the U.S., to Elaine C. Duke, Acting Sec'y, DHS (the "Sessions Letter") (AR

251).)  The Attorney General opined that DACA was unconstitutional and that the Texas

plaintiffs would likely prevail in their anticipated challenge to the program:

> DACA was effectuated by the previous administration through
> executive action, without proper statutory authority and with no
> established end-date, after Congress' repeated rejection of proposed
> legislation that would have accomplished a similar result.  Such an
> open-ended  circumvention  of  immigration  laws  was  an
> unconstitutional exercise of authority by the Executive Branch.  The
> related Deferred Action for Parents of Americans and Lawful
> Permanent Residents (DAPA) policy was enjoined on a nationwide
> basis in a decision affirmed by the Fifth Circuit on the basis of
> multiple legal grounds and then by the Supreme Court by an equally
> divided vote.  Then-Secretary of Homeland Security John Kelly
> rescinded the DAPA policy in June.  Because the DACA policy has
> the same legal and constitutional defects that the courts recognized
> as to DAPA, it is likely that potentially imminent litigation would
> yield similar results with respect to DACA.

(Id. (citation omitted).)

---

[3] While the letter is not dated, the PDF of the AR dates the letter September 4, 2017.  (See also Defs. Mem. at 9.)

7

On September 5, 2017, Defendants rescinded the DACA program.[4]  The Attorney General announced the decision at a press conference, and Acting Secretary Duke implemented the decision by issuing a memorandum (the "DACA Rescission Memo") to her subordinates. (DOJ, Press Release, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca; Mem. from Elaine C. Duke, Acting Sec'y, DHS, to James W. McCament, Acting Dir., USCIS, et al., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (AR 252).) Duke pointed to the rulings of the Fifth Circuit and the Supreme Court in the Texas litigation, as well as to the Attorney General's "legal determination" that DACA was "'an open-ended circumvention of immigration laws'" and "'an unconstitutional exercise of authority'":

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012[,] DACA program should be terminated.  In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

(Id. at 3-4 (quoting Sessions Letter).)

Rather than terminating the DACA program outright, the DACA Rescission Memo provided for a phased "wind down" of the program. First, DHS would consider initial

---

[4] Defendants maintain that, as a legal matter, Acting Secretary Duke is solely responsible for the decision to rescind the DACA program. (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate (Dkt. 80) at 3-4.)  As the court has noted, however, Defendants previously represented to the court that the Attorney General and Acting Secretary Duke jointly decided to end the DACA program. (Tr. of Sept. 14, 2017, Hr'g (Docket Number Pending) 13:17-14:06, 24:21-24, 26:1-6; Oct. 17, 2017, Mem. & Order (Dkt. 86) at 9-10.)  Defendants had not then, and still have not, presented this court with any reason why it should disregard their earlier representations as to who decided to end the DACA program. (See Oct. 17, 2017, Mem. & Order at 10; Oct. 19, 2017, Mem. & Order at 10-11.)  For purposes of this motion, however, nothing turns on the question of whether Acting Secretary Duke acted alone or with the Attorney General and the President when terminating the DACA program, so the court simply refers to the actions of "Defendants" in this regard.

applications for deferred action and work authorization that it had received as of September 5, 2017. (DACA Rescission Memo at 4.) Second, DHS would "adjudicate—on an individual, case by case basis" requests for renewal of deferred action and work authorization "from current beneficiaries whose benefits will expire between [September 5, 2017,] and March 5, 2018 that have been accepted by [DHS] as of October 5, 2017." (Id.) DHS would not consider other applications for deferred action or work authorization under the DACA program. (Id.) Existing grants of deferred action and work authorization would remain in effect "for the remaining duration of their validity periods," though DHS would retain the authority to terminate or deny deferred action when it deemed appropriate. (Id.) Under the DACA Rescission Memo, the benefits granted as part of the DACA program will therefore expire gradually over the next two years.

### B. Procedural Background

#### 1. Prior to the DACA Rescission

The first of the above-captioned cases, Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.), predates the Trump Administration's decision to rescind the DACA program. In that case, Plaintiff Martín Batalla Vidal initially challenged DHS's compliance with the nationwide injunction issued by the Southern District of Texas in Texas v. United States. Batalla Vidal applied for deferred action and work authorization in November 2014 and, in February 2015, was notified that he had received deferred action and work authorization for the next three years under the terms of the DACA Expansion. (Compl. (Dkt. 1) ¶ 32.) On May 14, 2015, however, DHS revoked his three-year work authorization, citing the Texas injunction, and replaced it with a two-year permit. (Id. ¶¶ 34-36.) Batalla Vidal challenged that decision, contending that the Texas plaintiffs lacked standing to seek, and the Southern District of Texas lacked jurisdiction to issue, a nationwide injunction. (Id. ¶¶ 43-47.) Batalla Vidal subsequently

amended his complaint to add the nonprofit organization MRNY as a plaintiff and name then-Director of USCIS León Rodríguez as a defendant.  (Am. Compl. (Dkt. 29).)  In November 2016, the Batalla Vidal Plaintiffs moved with Defendants' consent to stay briefing in the case "[d]ue to uncertainty regarding the future of the [DACA] program."  (Pls. Nov. 21, 2016, Mot. to Stay (Dkt. 35); Apr. 4, 2017, Joint Mot. to Stay (Dkt. 40).)

### 2. Following the DACA Rescission

Following Defendants' announcement of the decision to rescind the DACA program, Plaintiffs brought these actions challenging that decision and certain other actions that Defendants have taken relating to that decision.  On September 6, 2017, fifteen states and the District of Columbia[5] filed suit challenging both the rescission of the DACA program and DHS's alleged changes in its policy regarding the use of DACA applicants' information for immigration-enforcement purposes.  (State Pls. Compl. (No. 17-CV-5228, Dkt. 1) ¶¶ 269-301.) The State Plaintiffs asserted claims under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the APA, and the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12 (the "RFA"). (Id.)  Two weeks later, the Batalla Vidal Plaintiffs again amended their complaint to assert certain claims similar to those brought by the State Plaintiffs, as well as a claim that Defendants violated the Due Process Clause by failing to notify DACA recipients that they needed to renew their deferred action and work authorization by October 5, 2017.  (SAC ¶¶ 160-66.)  Finally, the State Plaintiffs amended their complaint to add claims (1) challenging the notice provided to DACA recipients of the rescission of the DACA program; and (2) further challenging the change

---

[5] The State Plaintiffs were initially comprised of the States of North Carolina, Hawaii, New York, Washington, Iowa, Oregon, Rhode Island, Vermont, Illinois, Connecticut, New Mexico, and Delaware; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the District of Columbia.  (State Pls. Compl. (No. 17-CV-5228, Dkt. 1).)  Colorado has since joined the case.  (State Pls. Am. Compl. (No. 17-CV-5228, Dkt. 54).)

in DHS's information-use policy. (State Pls. Am. Compl. (No. 17-CV-5228, Dkt. 54) ¶¶ 246-52, 274-80.) Together, Plaintiffs now assert the following claims:

**Equal Protection.** Both sets of Plaintiffs allege that the decision to rescind the DACA program violated the equal-protection principles incorporated in the Due Process Clause of the Fifth Amendment to the U.S. Constitution, see Bolling v. Sharpe, 347 U.S. 497, 498-500 (1954), because that decision was motivated by improper considerations. (SAC ¶¶ 167-70; State Pls. Am. Compl. ¶¶ 233-39.) The State Plaintiffs allege that the DACA Rescission Memo "target[s] individuals for discriminatory treatment, without lawful justification" and that it was "motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group." (State Pls. Am. Compl. ¶¶ 235-36.) The Batalla Vidal Plaintiffs allege that President Trump, Attorney General Sessions, and Acting Secretary Duke violated the Due Process Clause in deciding to rescind the DACA program because that decision "targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups," and "was substantially motivated by animus toward Latinos and, in particular, Mexicans." (SAC ¶¶ 169-70.)

**Due Process—Individualized Notice.** Both sets of Plaintiffs also contend that Defendants violated the Fifth Amendment's Due Process Clause by failing to provide DACA recipients with adequate notice of the decision to rescind the DACA program. (SAC ¶¶ 160-66; State Pls. Am. Compl. ¶¶ 274-80.) In particular, the Batalla Vidal Plaintiffs allege that, prior to the DACA Rescission Memo, DHS advised DACA recipients to submit applications to renew their deferred action and work authorization "as soon as possible" and, in particular, 120-150 days before expiration, to ensure that those benefits did not expire before DHS could process the renewal applications. (SAC ¶ 164.) Following the issuance of the DACA Rescission Memo, Defendants did not send individual revised notices to alert DACA recipients who were eligible to

11

renew their deferred action and work authorization (i.e., individuals whose benefits expired before March 5, 2018) that they only had until October 5, 2017, to do so.  (Id. ¶ 165.)  The State Plaintiffs allege that Defendants violated the Due Process Clause of the Fifth Amendment by failing to provide DACA recipients with "adequate notice" about "the procedures and timeline for renewing their DACA status," "the general termination of the DACA program after March 5, 2018," or "their inability to apply for renewal of their DACA status after March 5, 2018."  (State Pls. Am. Compl. ¶¶ 276-77.)

   **Due Process—Information-Use Policy.**  Both sets of Plaintiffs assert that DHS impermissibly backtracked on its representations that it would use information gleaned from DACA applications for immigration-enforcement purposes only in limited circumstances.  (SAC ¶¶ 151, 153; State Pls. Am. Compl. ¶¶ 240-45.)  While, as discussed below, the Batalla Vidal Plaintiffs fold this challenge into their substantive APA claim, the State Plaintiffs challenge this decision as "fundamentally unfair," in violation of the Due Process Clause of the Fifth Amendment.  (State Pls. Am. Compl. ¶ 243.)

   **Equitable Estoppel—Information-Use Policy.**  The State Plaintiffs argue that the doctrine of equitable estoppel bars DHS from changing its policy regarding the use of DACA applicants' information.  (Id. ¶¶ 246-52.)  The State Plaintiffs allege that Defendants, having "made repeated affirmative statements about the protections that would be given to the personal information provided by DACA applicants" and "placed affirmative restrictions on the use of such information for purposes of immigration enforcement" (id. ¶ 248), are now estopped from using that information for immigration-enforcement purposes (id. ¶¶ 250-51).  The court refers to this claim, together with Plaintiffs' constitutional information-use policy claims, as Plaintiffs' "information-use policy claims."

**APA—Arbitrary and Capricious.** Both sets of Plaintiffs challenge the decision to end the DACA program under the APA as substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). (SAC ¶¶ 149-54; State Pls. Am. Compl. ¶¶ 253-56.) The Batalla Vidal Plaintiffs contend that Attorney General Sessions and Acting Secretary Duke acted arbitrarily and capriciously by deciding to end the DACA program and by changing DHS's policy regarding the confidentiality of DACA applicants' information because those decisions "(a) lack a rational explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors." (SAC ¶ 151.) The State Plaintiffs argue that the implementation of the DACA Rescission Memo and termination of the DACA program "with minimal formal guidance" constituted arbitrary, capricious, and unlawful action in violation of Section 706 of the APA. (State Pls. Am. Compl. ¶ 254-55.) The court refers to these claims together as Plaintiffs' "substantive APA claims."

**APA—Notice and Comment.** Both sets of Plaintiffs also contend that DHS's implementation of the DACA Rescission Memo constitutes a substantive or legislative "rule" for purposes of the APA, and thus needed to be made through notice-and-comment rulemaking procedures. See 5 U.S.C. § 553. (SAC ¶¶ 144-48; State Pls. Am. Compl. ¶¶ 257-65.) In particular, the Batalla Vidal Plaintiffs argue that the DACA Rescission Memo is a substantive rule, "as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria." (SAC ¶ 146.) The State Plaintiffs, on the other hand, argue that the promulgation and implementation of the DACA Rescission Memo "categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States," impacting those beneficiaries'

13

"substantive rights." (State Pls. Am. Compl. ¶ 261.)  The court refers to these claims together as Plaintiffs' "procedural APA claims."

**RFA.**  Finally, both sets of Plaintiffs assert claims under the RFA.  Plaintiffs claim that Defendants violated the RFA by issuing the DACA Rescission Memo without conducting an analysis of the rescission's impact on "small entities."  (SAC ¶¶ 155-59; State Pls. Am. Compl. ¶¶ 266-73.)  MRNY alleges that it is a "small organization" that is directly affected by the DACA Rescission Memo and thus has a cause of action under the RFA.  (SAC ¶ 156.)  The State Plaintiffs assert that they and their "small governmental jurisdictions, nonprofits, and businesses, and their residents" are harmed by Defendants' failure to conduct such a regulatory impact analysis.  (State Pls. Am. Compl. ¶ 273.)  The court refers to these claims as Plaintiffs "RFA claims."

The following chart summarizes these claims:

*a. Table: Claims Presented*

| Challenged Action | Cause of Action | Batalla Vidal v. Duke[6] | New York v. Trump[7] |
|---|---|---|---|
| Termination of the DACA program | Due Process Clause | Fifth claim, ¶¶ 167-70 | First claim, ¶¶ 233-39 |
| | APA (substantive) | Second claim, ¶¶ 149-54 | Fourth claim, ¶¶ 253-56 |
| | APA (procedural) | First claim, ¶¶ 144-48 | Fifth claim, ¶¶ 257-65 |
| | RFA | Third claim, ¶¶ 155-59 (MRNY only) | Sixth claim, ¶¶ 266-73 |
| Notification of DACA recipients of (1) the termination of the DACA program and (2) revised renewal deadlines | Due Process Clause | Fourth claim, ¶¶ 160-66 (notice of revised renewal deadlines only) | Seventh claim, ¶¶ 274-80 |
| Changes to DHS policy regarding the use of DACA applicants' information for immigration-enforcement purposes | Due Process Clause | | Second claim, ¶¶ 240-45 |
| | APA (substantive) | Second claim, ¶¶ 149-51, 153-54 | |
| | Equitable estoppel | | Third claim, ¶¶ 246-52 |

---

[6] All citations refer to the SAC.

[7] All citations refer to the State Plaintiffs' Amended Complaint.

### 3.  District Court Proceedings

The parties have vigorously litigated these actions before this court.  Although the full procedural history can be discerned from the relevant dockets, the court provides the following limited summary of the proceedings to date.

Consistent with the regular practice of courts in this district in civil cases, discovery matters were referred to the magistrate judge assigned to the case, Magistrate Judge James Orenstein, to decide in the first instance.  See 28 U.S.C. § 636(b)(1)(A); Local Civ. R. 72.2.  After soliciting the views of the parties as to whether discovery should proceed (Sept. 15, 2017, Order (Dkt. 58)), Judge Orenstein authorized discovery to proceed over Defendants' objections (Tr. of Sept. 26, 2017, Hr'g (Docket Number Pending) 26:21-27:22).  Judge Orenstein then issued a case management and scheduling order (the "Case Management Order"), which confirmed the previously announced discovery schedule.  (Sept. 27, 2017, Order (Dkt. 67).)  Of particular relevance to these proceedings, the Case Management and Scheduling Order required Defendants to produce, by October 6, 2017, an administrative record as well as a privilege log describing "every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such . . . record to be part of the official administrative record."  (Id. ¶¶ II(c) (the "Privilege Log Requirement").)

Defendants promptly challenged the Case Management Order.  On September 29, 2017, Defendants filed a motion before this court "seek[ing] relief from" the Privilege Log Requirement, which, they argued, "raise[d] substantial separation-of-powers concerns," to the extent it could be read as applying to White House communications, and required Defendants to assert privilege with respect to documents that were not properly included in the administrative

15

record.  (Sept. 29, 2017, Defs. Mot. to Vacate (Dkt. 69) ("Defs. Sept. 29 Mot.") at 2-5.)

Defendants also argued that it would be impossible to comply with the Privilege Log

Requirement within the deadline set by the Case Management Order (id. at 5), and that the court

should consider threshold arguments for dismissal of these cases before allowing discovery to

proceed (id. at 5-6).  Defendants did not specifically argue that discovery was inappropriate,

although they reincorporated arguments against discovery by reference to a letter they had filed

with Judge Orenstein a week earlier and briefly outlined three "threshold dismissal arguments."

(Id. at 1, 5-6; see also Defs. Sept. 22, 2017, Ltr. Regarding Discovery (Dkt. 65).)

    The court issued two orders in response to Defendants' objections.  The first order

extended the deadline for complying with the Privilege Log Requirement by two weeks, so that

the court could consider whether the as-yet-unproduced administrative record was adequate and

whether Defendants retained the presumption that they had correctly compiled the record.

(Oct. 3, 2017, Order (Dkt. 72).)  Defendants subsequently asked the court to narrow the Privilege

Log Requirement or vacate it entirely.  (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate

(Dkt. 80) at 2.)  At the same time, Defendants also asked the court to stay discovery pending

resolution of Defendants' anticipated dispositive motions, which Defendants averred would

"raise arguments that are strong, purely legal, and completely dispositive of Plaintiffs' claims."

(Id. at 4.)  Defendants did not, however, specifically identify what those arguments were (instead

cross-referencing their September 29 Motion and string-citing to authority discussed below) or

address any of the factors that courts in this district consider in analyzing whether a party has

demonstrated "good cause" to stay discovery.  See Fed. R. Civ. P. 26(c); Richards v. N. Shore

Long Island Jewish Health Sys., No. 10-CV-4544 (LDW) (ETB), 2011 WL 4407518, at *1

(E.D.N.Y. Sept. 21, 2011).

The court then issued its second order, which narrowed the scope of the Privilege Log Requirement but denied Defendants' request to stay discovery. (Oct. 17, 2017 Mem. & Order (the "Oct. 17 M&O") (Dkt. 86).) With respect to Defendants' arguments that discovery outside the administrative record was inappropriate, the court noted that Defendants had not identified any reason why its review of Plaintiffs' information-use policy and notice claims should be limited to an administrative record that only purported to document the decision to rescind the DACA program. (Id. at 3-5.) The court declined to vacate the Privilege Log Requirement before Judge Orenstein decided whether the administrative record was complete. (Oct. 17 M&O at 5-6.) The court agreed, however, that the Privilege Log Requirement should be narrowed to exclude materials other than DHS and DOJ communications. (Id. at 7-9.) Finally, the court declined to exempt DOJ from the Privilege Log Requirement, as Defendants had failed to explain their apparent reversal in position regarding whether Attorney General Sessions was responsible for the decision to rescind the DACA program. (Id. at 9-10.)

The following evening, Defendants renewed their motion to stay discovery, this time threatening to seek mandamus review if the court did not address their objections by 2 p.m. the following day. (Defs. Oct. 18, 2017, Mot. to Stay (Dkt. 87).) The court ruled expeditiously on these requests. On October 19, 2017, Judge Orenstein issued an order granting Plaintiffs' motion to compel Defendants to produce a complete administrative record. (Oct. 19, 2017, Order Granting Motion to Produce (Dkt. 89).) The same day, this court issued another memorandum and order, granting in part and denying in part Defendants' motion for a stay. (Oct. 19, 2017, Mem. & Order (the "Oct. 19 M&O") at 9-11.) In light of Defendants' ongoing (and, this time, factually substantiated) concerns about the burdens of complying with the Privilege Log Requirement, the court agreed to stay the Privilege Log Requirement except with respect to

documents directly considered by the Attorney General, Acting Secretary Duke, and their subordinates who directly advised them on the decision to end the DACA program. (Id.) The court concluded, however, that Defendants had not demonstrated "good cause" warranting a stay of discovery (id. at 4-9), nor that they were entitled to a stay pending mandamus review (id. at 11-12).

On October 20, 2017, the U.S. Court of Appeals for the Second Circuit issued an emergency stay of discovery and record supplementation in proceedings before this court, contingent on Defendants' filing a full petition for a writ of mandamus by 3 p.m. on October 23, 2017. (Oct. 20, 2017, USCA Order (Dkt. 91).) Four days later, the Second Circuit issued a second order, which extended the stay pending determination of the mandamus petition but deferred ruling on that petition "until such time as the district court has considered and decided expeditiously issues of jurisdiction and justiciability." (Oct. 24, 2017, USCA Order (Dkt. 99).) In light of that order, the court directed the parties to file supplemental briefs as to whether the court "lacks jurisdiction to consider the claims raised in [these cases] or why such claims are otherwise non-justiciable." (Oct. 24, 2017, Order.) In response to that order, Defendants filed the motion to dismiss currently before the court. That motion not only argues that the court lacks jurisdiction to hear these cases, but also contends that Plaintiffs fail to state a claim upon which relief should be granted and that the court should not grant a nationwide injunction, should it decide that Plaintiffs are entitled to relief.[8]

---

[8] Prior to filing their Motion to Dismiss, Defendants requested and received leave to file an overlong brief "in order . . . to fully present their dismissal arguments in these cases." (Defs. Oct. 25, 2017, Appl. for Leave to File Excess Pages (Dkt. 94); Oct. 26, 2017, Order Granting Defendants' Application for Leave to File Excess Pages.) That application did not expressly indicate that Defendants intended to present arguments for dismissal for failure to state a claim under Rule 12(b)(6), as opposed to just the "jurisdiction and justiciability" arguments specifically referenced by the Second Circuit's and this court's October 24, 2017, orders. Defendants would not have required these excess pages had they confined their briefing to those issues. (See Oct. 27, 2017, Order (Dkt. 98).)

## II.   LEGAL STANDARDS

Pursuant to the Second Circuit's direction, the court addresses only "issues of jurisdiction and justiciability" at this point in the proceedings.  (Oct. 24, 2017, USCA Order; Oct. 27, 2017, Order (Dkt. 98).)  Accordingly, the court will consider only those portions of Defendants' motion to dismiss that challenge the court's subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Under Rule 12(b)(1), the court must dismiss a claim "for lack of subject matter jurisdiction . . . when the . . . court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  When considering a Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).  Nevertheless, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" Id. (quoting Makarova, 201 F.3d at 113).  "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." Id. (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)).

## III.   DISCUSSION

Defendants raise four challenges to the court's authority to hear the above-captioned cases.  First, Defendants argue, these cases are not justiciable under the APA because the decision to rescind the DACA program was "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2).  (Defs. Mem. at 12-17.)  Second, Defendants contend that the decision to terminate the DACA program constitutes a denial of deferred action, judicial review of which is barred by Section 1252(g) of the INA. See 8 U.S.C. § 1252(g).  (Id. at 17-19.)  Third, they

maintain, the <u>Batalla Vidal</u> Plaintiffs lack standing to bring certain claims (<u>id.</u> at 28-29, 34-35, 37), and the State Plaintiffs lack Article III standing to bring any claims (<u>id.</u> at 19-21). Fourth, Defendants assert, the State Plaintiffs and MRNY cannot bring claims under the APA because they assert interests that fall outside the "zone of interests" protected by the INA. (<u>Id.</u> at 19-20.) The court addresses each argument in turn.

**A. Committed to Agency Discretion by Law**

Defendants first argue that these cases are non-justiciable because the decision to end the DACA program was committed to DHS's exclusive discretion by law. The court disagrees. Certain agency decisions, including decisions not to institute enforcement action, are presumptively immune from judicial review under the APA because they are "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2); <u>Heckler v. Chaney</u>, 470 U.S. 821 (1985). But the rescission of the DACA program was not such a decision, nor have Defendants explained why Section 701(a)(2) precludes review of Plaintiffs' constitutional claims or other claims challenging actions other than the decision to rescind the DACA program.[9]

1. <u>Statutory and Equitable Claims</u>

Section 701(a)(2) of the APA does not preclude judicial review of Plaintiffs' statutory and equitable claims. "Under the APA, a party aggrieved by agency action is generally 'entitled to judicial review thereof.'" <u>Westchester v. U.S. Dep't of Hous. and Urban Dev.</u>, 778 F.3d 412, 418 (2d Cir. 2015) (quoting 5 U.S.C. § 702). "There is a strong presumption favoring judicial review of administrative action." <u>Salazar v. King</u>, 822 F.3d 61, 75 (2d Cir. 2016). Judicial review is not available, however, "to the extent that . . . statutes preclude judicial review,"

---

[9] It is not clear whether Section 701(a)(2) limits the court's jurisdiction or instead forms an "essential element" of a claim for relief under the APA. <u>Sharkey v. Quarantillo</u>, 541 F.3d 75, 87-88 (2d Cir. 2008); accord <u>Conyers v. Rossides</u>, 558 F.3d 137, 143 n.8 (2d Cir. 2009). Nothing turns on this distinction here, however, because Section 701(a)(2) does not shield Defendants' actions from judicial review.

5 U.S.C. § 701(a)(1), or "agency action is committed to agency discretion by law," § 701(a)(2). The latter is "a very narrow exception" to the presumption of reviewability of agency action under the APA, and it applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also Chaney, 470 U.S. at 830 (agency action is unreviewable "if a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"). "To determine whether there is 'law to apply' that provides 'judicially manageable standards' for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." Salazar, 822 F.3d at 76 (quoting Chaney, 470 U.S. at 830). These enactments supply "law to apply" because they may govern the agency's exercise of its own discretion. See id. at 76-77 (citing INS v. Yueh-Shaoi Yang, 519 U.S. 26, 32 (1996)); Sec'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 158-59 (D.C. Cir. 2006).

   a.  *"Law to Apply"*

      Here, there is "law to apply," permitting meaningful judicial review of Plaintiffs' statutory claims. Plaintiffs assert statutory claims under the APA and RFA. With respect to Plaintiffs' procedural APA and RFA claims, the relevant "law to apply" is found in the APA and RFA themselves, both of which specify procedures that agencies must follow when engaging in "substantive" or "legislative" rulemaking. See 5 U.S.C. §§ 553, 604. The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable. See Lincoln v. Vigil, 508

U.S. 182, 195-98 (1993); Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1134 (D.C. Cir. 1995); N.Y.C. Employees' Ret. Sys. v. SEC, 45 F.3d 7, 11 (2d Cir. 1995).

There is also "law to apply" permitting meaningful judicial review of Plaintiffs' substantive APA claims. In order to satisfy Section 706(2)(a), Plaintiffs must identify some source of law, other than the APA's "arbitrary and capricious" standard, against which the court can review their claims: "If agency actions could be challenged as 'arbitrary and capricious,' without reference to any other standard, then § 701(a)(2)'s limitation on APA review would amount to no limitation at all, and nothing would ever be 'committed to agency discretion by law.'" Lunney v. United States, 319 F.3d 550, 559 n.5 (2d Cir. 2003). The court agrees that Plaintiffs have identified "law to apply" to these claims. In deciding to rescind the DACA program, Defendants expressly and exclusively relied on a legal determination that the program was unlawful and could not be sustained in court. (Sessions Letter, AR 251; DACA Rescission Memo, AR 253-55.) The court may review that rationale in light of, among other sources, the text of the INA and other statutes, the history of the use of deferred action by immigration authorities, and the OLC Opinion.[10] While Defendants attempt to recast the decision to rescind the DACA program as the product of a discretionary "balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of 'potentially imminent litigation' that could throw DACA into immediate turmoil" (Defs. Mem. at 15), that argument is unsupported by the text of the Sessions Letter and the DACA Rescission Memo.

---

[10] The State Plaintiffs also assert a claim for equitable estoppel. (State Pls. Am. Compl. ¶¶ 246-52.) With respect to the State Plaintiffs' equitable estoppel claim, the court assumes for the sake of argument that the relevant "law to apply" may be found in DHS's past statements and practices regarding the use of DACA applicants' information. See Salazar, 822 F.3d at 76-77. (See State Pls. Am. Compl. ¶¶ 39-44.) The court need not decide this question, however, because, as discussed below, the State Plaintiffs lack standing to assert this claim. (See infra Section III.C.2.b.)

Defendants' argument that the <u>decision</u> to rescind the DACA program is unreviewable, notwithstanding the "substantive legal" <u>rationale</u> given for that decision (Defs. Mem. at 15), is unpersuasive.  Defendants correctly note that unreviewable agency action does not become reviewable simply because "the agency gives a reviewable reason for otherwise unreviewable action."  (Defs. Mem. at 13 (quoting <u>ICC v. Bhd. of Locomotive Eng'rs</u>, 482 U.S. 270, 283 (1987) ("<u>BLE</u>")).)  <u>See</u> <u>BLE</u>, 482 U.S. at 283 ("[A] common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief . . . that the law will not sustain a conviction. That is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review.").  That argument simply begs the question, however, of whether the decision to rescind DACA is actually unreviewable.  While it may be true that a presumptively unreviewable decision does not become subject to judicial review simply because the decisionmaker expresses a "reviewable" rationale," <u>see id.</u>, the decision to rescind the DACA program was not inherently such a decision, as the following section discusses in detail.

b.  *Prosecutorial Discretion*

Nor does the decision to end the DACA program fall within a class of decisions traditionally regarded as presumptively immune from judicial review under Section 701(a)(2) of the APA.  (Defs. Mem. at 12-14.)  Defendants assert that the decision to rescind the DACA program constitutes "an exercise of enforcement discretion" that is "entrusted to the agency alone" and immune from judicial review.  (<u>Id.</u> at 15.)  The court concludes, however, that the decision to eliminate the DACA program—a program by which certain undocumented immigrants could request immigration authorities to exercise prosecutorial discretion with respect to them—was not itself a presumptively unreviewable exercise of enforcement discretion.

Defendants rely in particular on Chaney, which held that decisions not to take enforcement action were presumptively not subject to judicial review under the APA. In Chaney, the Court rejected an attempt by a group of prisoners awaiting execution by lethal injunction to force the Food and Drug Administration to take enforcement action to prevent the use of certain drugs for capital punishment. See Chaney, 470 U.S. at 823-25, 830-33. The Court held that a regulator's refusal to take enforcement action was presumptively unreviewable, because decisions not to take enforcement action typically "involve[]a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," id. at 831, and do not implicate the agency's exercise of "coercive power over an individual's liberty or property rights, and thus do[] not infringe upon areas that courts often are called to protect," id. at 832.

The decision to rescind DACA is unlike the non-enforcement decision at issue in Chaney. First, Plaintiffs do not challenge an agency's failure or refusal to prosecute or take enforcement actions with respect to certain violations of law. Instead, they challenge Defendants' affirmative decision to eliminate a program by which DHS exercised prosecutorial discretion with respect to a large number of undocumented immigrants. The DACA Rescission Memo curtails (if it does not eliminate outright) DHS's ability to exercise prosecutorial discretion with respect to individuals previously eligible to request deferred action. Although the DACA Rescission Memo notes that it does not limit DHS's "otherwise lawful enforcement or litigation prerogatives," it makes clear that DHS "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after [September 5, 2017]" and "[w]ill reject all DACA renewal requests and associated applications for Employment Authorization Documents" inconsistent with the terms of the Memo. This affirmative decision to constrain DHS's prosecutorial discretion cannot be analogized to an exercise of prosecutorial

24

discretion, which would be presumptively immune from judicial review.  Cf. Texas, 809 F.3d at

165-69 (creation of the DAPA program was reviewable because it was a "affirmative agency

action," not an exercise of enforcement discretion).  Second, Plaintiffs do not challenge non-

enforcement decisions, which do not subject individuals to the "coercive power" of the state.

Chaney, 470 U.S. at 831.  To the contrary, the rescission of the DACA program subjects

individuals who previously enjoyed some protection from removal to coercive state authority.

Third, Defendants' decision to rescind the DACA program does not appear to have been

motivated by a "complicated balancing of a number of factors which are peculiarly within [the

agency's] expertise."  See id.  Instead, Defendants stated that they were required to rescind the

DACA program because it was unlawful, which suggests both that Defendants did not believe

that they were exercising discretion when rescinding the program and that their reasons for doing

so are within the competence of this court to review.  (Sessions Letter; DACA Rescission Memo

at 4.)  The decision to rescind the DACA program is thus manifestly unlike the non-enforcement

decision at issue in Chaney.  While courts have also held that agency decisions to take (as

opposed to refrain from taking) enforcement action are also unreviewable under the APA when

there are no judicially manageable standards for reviewing the agency's discretion in choosing to

bring an enforcement action, see Speed Mining, Inc. v. Fed. Mine Safety & Health Rev.

Comm'n, 528 F.3d 310, 316-19 (4th Cir. 2008); Twentymile Coal, 456 F.3d at 155-59, those

cases are inapposite because there is "law to apply" to review the decision to rescind DACA.

Finally, Defendants' arguments that Section 701(a)(2) precludes judicial review of

Plaintiffs' suits focus on the decision to rescind the DACA program.  Defendants do not explain

why the alleged decision to change DHS's policy regarding the use of DACA applicants'

information should be immune from judicial review.  To the contrary, there is "law to apply" in

reviewing that decision (namely, DHS's prior statements about the uses of DACA applicants' information), and the court does not understand how the change in that policy can be analogized to the sorts of decisions, such as enforcement and non-enforcement decisions, that courts have recognized as presumptively exempt from judicial review.  Accordingly, to the extent the Batalla Vidal Plaintiffs also challenge DHS's alleged change in information-use policy as part of their substantive APA claim, that claim is reviewable.  (SAC ¶¶ 151, 153-54.)

### 2.  Constitutional Claims

Nor does Section 701(a)(2) preclude judicial review of Plaintiffs' constitutional claims. It is well-established that "even where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated." Padula v. Webster, 822 F.2d 97, 101 (D.C. Cir. 1987); accord Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 347 (4th Cir. 2001); Woodward v. United States, 871 F.2d 1068, 1072-73 (Fed. Cir. 1989).

In Webster v. Doe, 486 U.S. 592 (1988), the Court rejected the Government's argument that Section 701(a)(2) barred a former CIA employee from bringing constitutional claims challenging his termination from the agency.  Because the National Security Act of 1947 vested the CIA Director with authority over firing decisions, the decision to fire the plaintiff because of his sexual orientation had been "committed to agency discretion by law," and he could not challenge that decision under the APA. Id. at 594-95, 599-601.  The National Security Act did not expressly preclude review of constitutional claims, however, so the Court would not presume that such claims were unreviewable. Id. at 603-04 (noting that the Court has held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," in order to "avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (quoting Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n.12 (1986))).  Similarly, Defendants

26

identify no express indication that Congress intended to preclude judicial review of the actions at issue in these cases. While DHS undoubtedly exercises "wide discretion . . . in the enforcement of the immigration laws" (Defs. Mem. at 16), that is insufficient to preclude review of Plaintiffs' constitutional claims.

### 3.   Deference to the Executive Branch on Immigration Matters Does Not Counsel a Different Result

Lastly, Defendants contend that the court should read Section 701(a)(2) broadly in light of the Executive Branch's wide discretion to enforce the immigration laws. (Id. at 16-17.) The Supreme Court, however, has applied the "strong presumption in favor of judicial review of administrative action" in the immigration context. See INS v. St. Cyr, 533 U.S. 289, 299 (2001). Defendants' specific arguments for a broad reading of Section 701(a)(2) likewise unavailing. While Defendants argue that judicial review of these cases is inappropriate because review could slow down the Executive Branch's removal of undocumented immigrants from this country, 8 U.S.C. § 1252(g) already precludes individuals in removal proceedings from delaying those proceedings by claiming that they were improperly denied deferred action. See AAADC, 525 U.S. at 485. In any event, those concerns do not apply to these cases, as the court discusses in Section III.B below. Defendants also argue that judicial review of immigration decisions is inappropriate because judicial review "may involve 'not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives' or other sensitive matters." (Defs. Mem. at 16 (quoting AAADC, 525 U.S. at 490).) Defendants' stated rationale for rescinding the DACA program, however, turns wholly on questions of U.S. constitutional and administrative law, not sensitive law-enforcement, intelligence, or foreign-policy issues. In any event, vague speculation that judicial review might somehow implicate foreign-policy concerns is insufficient to justify a presumption that

immigration cases are not subject to judicial review.  See Washington v. Trump, 847 F.3d 1151, 1161 (9th Cir. 2017) ("[T]he Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration . . . ."), reconsid. en banc denied, 853 F.3d 933 (9th Cir. 2017), superseded by 858 F.3d 1168 (9th Cir. 2017).  While the court is sensitive to the deference warranted to the Executive Branch in this sphere, Defendants' claims for deference cannot substitute for the "clear and convincing evidence" that Congress intended to restrict judicial review of administrative action.  Sharkey v. Quarantillo, 541 F.3d 75, 84 (2d Cir. 2008) (internal quotation marks and citation omitted).

**B. INA Jurisdictional Bar**

Nor does the INA divest the court of jurisdiction to hear this case.  That Act contains a provision, 8 U.S.C. § 1252(g), that limits judicial review of certain actions "by or behalf of any alien arising from" certain deportation proceedings.  8 U.S.C. § 1252(g); see AAADC, 525 U.S. at 472.  As explained below, that provision has no bearing on these cases, which do not arise from one of the three specifically enumerated actions by immigration authorities that trigger application of the statute.  Moreover, by its terms, Section 1252(g) does not apply to claims brought by MRNY or the State Plaintiffs.

1. Programmatic Challenges to DACA-Related Decisions

First, the court considers whether Section 1252(g) strips the court of jurisdiction to hear Plaintiffs' challenges to the decision to rescind the DACA program.  The court begins, as usual, with the text of the statute.  In relevant part, Section 1252(g) provides as follows:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

28

(emphasis added). As the Court has stated, this "provision applies only to three discrete actions that the Attorney General make take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" AAADC, 525 U.S. at 482. Accordingly, the court must consider whether Plaintiffs' suits "arise from [a] decision or action by [DHS[11]] to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g).

They do not. Defendants' termination of the DACA program does not, by itself, "commence proceedings, adjudicate cases, or execute removal orders against any alien." Id. By rescinding the DACA program, Defendants eliminated a set of guidelines identifying a discrete class of undocumented immigrants who were eligible to apply for deferred action. (See 2012 DACA Memo.) That decision, by itself, did not trigger any specific enforcement proceedings.[12] Nor do the individual Batalla Vidal Plaintiffs attack decisions by DHS to "commence proceedings, adjudicate cases, or execute removal orders" against them or any other specific individuals. Each of those Plaintiffs has received deferred action (see SAC ¶¶ 3-42), and the record does not suggest that any are currently in removal proceedings and seek to challenge the end of the DACA program as a means of obstructing those proceedings. Instead, Plaintiffs bring broad, programmatic challenges to Defendants' decisions (1) to end the DACA program; (2) to provide limited notice of that decision to DACA recipients; and (3) to change DHS's

---

[11] As part of transferring many immigration-related responsibilities from the Attorney General to the Secretary of DHS, the Homeland Security Act of 2002 provides that statutory references "to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary [of DHS], other official, or component of [DHS] to which such function is so transferred." 6 U.S.C. § 557; Shabaj v. Holder, 718 F.3d 48, 51 n.3 (2d Cir. 2013).

[12] Defendants have represented publicly that no action will be taken against DACA recipients prior to March 5, 2018. (See, e.g., Donald J. Trump (@realDonaldTrump), Twitter.com (Sept. 7, 2017, 6:42 a.m.), https://twitter.com/realdonaldtrump/status/905788459301908480 ("For all of those (DACA) that are concerned about your status during the 6 month period, you have nothing to worry about - No action!").)

information-use policy.  None of those constitutes a "decision or action . . . to commence

proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g);

cf. Texas, 809 F.3d at 164 (creation of DAPA reviewable because "decision to grant lawful

presence to millions of [undocumented immigrants] on a class-wide basis" was not enumerated

in the text of Section 1252(g)).  Accordingly, Section 1252(g) does not bar judicial review of

challenges to those decisions.

     This conclusion comports with both the plain meaning of the statute and with the

Supreme Court's decision in AAADC.  First, AAADC makes clear that Section 1252(g) only

limits judicial review with respect to suits arising from certain enumerated decisions by

immigration authorities.  Writing for the Court, Justice Scalia specifically rejected the notion that

Section 1252(g) was "a sort of 'zipper' clause that says 'no judicial review in deportation cases

unless this section provides judicial review." 525 U.S. at 482.  Instead, "[t]he provision applies

only to [the] three discrete actions" referenced above. Id.  While "[t]here are of course many

other decisions or actions that may be part of the deportation process," the Court stated, "[i]t is

implausible that the mention of three discrete events along the road to deportation was a

shorthand way of referring to all claims arising from deportation proceedings." Id.  Defendants'

argument that Section 1252(g) encompasses challenges to the decision to end the DACA

program because "[t]he denial of continued deferred action is a necessary step in commencing

enforcement proceedings at some later date" (Defs. Mem. at 18), is thus at odds with AAADC.

     Second, the reasoning of AAADC does not support extending Section 1252(g) to

encompass challenges to the decision to rescind DACA.  In AAADC, the Court reasoned that

Section 1252(g) must have been intended to limit judicial review of denials of deferred action:

> Section 1252(g) seems clearly designed to give some measure of
> protection to "no deferred action" decisions and similar

30

> discretionary determinations, providing that if they are reviewable
> at all, they at least will not be made the bases of separate rounds of
> judicial intervention outside the streamlined process that Congress
> has designed [(i.e., for judicial review of final orders of removal)].

525 U.S. at 485. These limits were "entirely understandable" in order to prevent "the

deconstruction, fragmentation, and hence prolongation of removal proceedings" that could result

if immigrants were allowed to attack in-process removal proceedings by claiming that they were

singled out by immigration authorities for adverse treatment. Id. at 487; see id. at 487-92.

Because the Batalla Vidal Plaintiffs challenge the programmatic decision to rescind DACA,

rather than attempting to obstruct their specific removal proceedings by claiming that they were

improperly denied deferred action, these cases do not implicate the concern raised in AAADC.

Accordingly, Section 1252(g) does not preclude review of these actions.

### 2.  Claims by MRNY and the State Plaintiffs

Moreover, Section 1252(g) does not preclude judicial review of the claims brought by

MRNY or the State Plaintiffs in particular.  Again, the court begins with the text of the statute.

Section 1252(g) only bars suits "by or on behalf of any alien arising from the decision or action .

. . to commence proceedings, adjudicate cases, or execute removal orders against any alien."

(emphasis added).  But neither MRNY nor the State Plaintiffs are suing "on behalf of any alien"

in removal proceedings or subject to an order of removal.  Instead, MRNY sues in its own right,

because it claims that the rescission of DACA has interfered with its operations.  (SAC ¶¶ 54-

57.)  Likewise, the State Plaintiffs sue not "on behalf of any alien," but instead to vindicate their

31

own proprietary and quasi-sovereign interests.[13]   (State Pls. Opp'n to Mot. to Dismiss ("State Pls. Opp'n") (No. 17-CV-5228, Dkt. 82) at 19-22.)   MRNY and the State Plaintiffs seek to assert their own rights and the rights of the general public, not those of individual immigrants in removal proceedings or subject to orders of removal.   There is no reason why Section 1252(g) would deprive the court of jurisdiction over their claims, brought on their own behalf.

## C. Standing

The court next considers whether Plaintiffs have established that they have standing to sue.   Defendants only cursorily raise Article III standing defenses.   (Defs. Mem. at 19-20, 34, 37.)   "Because the standing issue goes to this [c]ourt's subject matter jurisdiction," however, "it can be raised sua sponte."   Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005).

Under the U.S. Constitution, federal courts may hear only certain "cases" or "controversies."   U.S. Const. art. III, § 2.   This "case-or-controversy requirement" means that a plaintiff must have "standing," or a sufficient interest in a live dispute, to sue in federal court. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1546-47 (2016).   At its "irreducible constitutional minimum," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), standing consists of three elements:

> To establish Article III standing, [Plaintiffs] must demonstrate: "(1) injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly

---

[13] While a parens patriae suit is in some sense brought by a state "on behalf of" its citizens, "[t]he asserted quasi-sovereign interests will be deemed sufficiently implicated to support parens patriae standing only if 'the injury alleged affects the general population of a State in a substantial way.'"   Puerto Rico ex rel. Quiros v. Bramkamp, 654 F.2d 212, 215 (2d Cir. 1981) (emphasis added) (quoting Maryland v. Louisiana, 451 U.S. 725, 738 (1981)).   A state cannot sue parens patriae simply to assert its citizens' personal claims.   See Pennsylvania v. New Jersey, 426 U.S. 660, 665-66 (1976) (per curiam) (collecting cases).   To the extent the State Plaintiffs attempt to bring parens patriae claims based on harm to their quasi-sovereign interests, those claims are not "on behalf of" specific immigrants, but instead seek to protect the general welfare of their residents.   In any event, as the court discusses below, the State Plaintiffs lack parens patriae standing to bring these claims.

> traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."

Allco Fin. Ltd. v. Klee, 861 F.3d 82, 95 (2d Cir. 2017) (quoting W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008)); accord Lujan, 504 U.S. at 560-61. The "first and foremost" of these three requirements, "injury-in-fact" requires a plaintiff to "show that he or she suffered an invasion of a legally protected interest that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks and citation omitted) (quoting Lujan, 504 U.S. at 560). To be "imminent," the injury must be "certainly impending"; "allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal quotation marks, alteration, and citation omitted). The second and third requirements, "causation" and "redressability," require a plaintiff to demonstrate that the "injury-in-fact" he or she suffers is "fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386 (2014) (citing Lujan, 504 U.S. at 560). A plaintiff need not, however, demonstrate that the defendant was the proximate or "but-for" cause of the injury-in-fact. Id. at 1391 n.6; Rothstein v. UBS AG, 708 F.3d 82, 91-92 (2d Cir. 2013).

The court considers standing separately with respect to each claim raised in each case. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" with respect to each claim and form of relief sought. Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 53 n.3 (2006) ("FAIR"). The court therefore considers whether, for each claim raised in each of these two actions, at least one plaintiff has standing to sue.

33

1.  Batalla Vidal Plaintiffs

a.  *DACA Rescission Claims*

Defendants unsurprisingly do not contest that the Batalla Vidal Plaintiffs have standing to challenge the decision to rescind the DACA program.  If the DACA program ends, the individual Batalla Vidal Plaintiffs almost certainly will lose their work authorization, the availability of which turns on their status as recipients of deferred action.  See 8 C.F.R. § 274a.12(c)(14).  Loss of their ability to work in the United States is clearly an "injury-in-fact" fairly traceable to the rescission of the DACA program.  Additionally, if they were to lose their deferred action, the individual Batalla Vidal Plaintiffs would be subject to removal from the United States.  There is nothing "speculative" about the possibility that they would actually be removed.  See Hedges v. Obama, 724 F.3d 170, 195-97 (2d Cir. 2013) (to establish standing, a plaintiff who is clearly in violation of a "recent and not moribund" statute need not affirmatively demonstrate the government's intent to enforce the statute, absent "a disavowal by the government or another reason to conclude that no such intent exist[s]" (quoting Doe v. Bolton, 410 U.S. 179, 188 (1973))); cf. Amnesty Int'l, 568 U.S. at 410-16 (no standing where alleged injury-in-fact rested on a "speculative" "chain of contingencies").  Those harms are "fairly traceable" to the termination of the DACA program and would be redressed by the vacatur of that decision.  The Batalla Vidal Plaintiffs thus have Article III standing to challenge the decision to rescind the DACA program.

The Batalla Vidal Plaintiffs also have standing to challenge the process by which Defendants decided to end the DACA program.  Plaintiffs have standing to assert procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest . . . that is the ultimate basis of [their] standing."  Lujan, 504 U.S. at 573 n.8.  "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that

34

the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. EPA, 549 U.S. 497, 518 (2007). Here, there is "some possibility" that if Defendants had subjected the decision to rescind the DACA program to notice and comment and analyzed the impact of that decision on small entities, they would have reached a different outcome. Accordingly, the Batalla Vidal Plaintiffs also have Article III standing to assert their procedural APA claim, and MRNY has Article III standing to assert its RFA claim.

Defendants contend that Plaintiffs cannot assert procedural APA claims because, if the decision to rescind the DACA program was a "substantive" or "legislative" rule requiring notice-and-comment rulemaking, then, "a fortiori so was enacting the policy in the first place," and the DACA program itself was thus "void ab initio—leaving Plaintiffs without a remedy." (Defs. Mem. at 28-29.) It does not follow, however, that if the rescission of the DACA program required notice and comment, the program's creation necessarily required notice and comment as well. (See Defs. Mem. at 29 n.7.) While Defendants might be correct on the merits (an issue that the court does not consider or resolve at this time), all that Article III requires is that Plaintiffs show that their alleged injury would be redressed by the ruling they seek—i.e., that the decision to rescind DACA should be vacated because it was procedurally defective.

b. *Information-Use Policy Claim*

The Batalla Vidal Plaintiffs also have standing to challenge the alleged changes to DHS's information-use policy. To obtain deferred action and work authorization under DACA, an applicant was required to provide USCIS with extensive personal information, including his or her home address, height, weight, hair and eye color, fingerprints, photograph, and signature, and submit to a background check. (See USCIS, Form I-821D: Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60-1)) at ECF pp.6-8; USCIS, Instructions for

35

Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60-1)) at ECF p.3.)

The Batalla Vidal Plaintiffs also allege that DACA applicants "routinely provided" other

personal information, "including copies of school records, pay stubs, bank statements, passports,

birth certificates, and similar records," in support of their applications. (SAC ¶ 70.) They

contend that this information will enable DHS to deport them more easily once their deferred

action expires. (Id. ¶ 127.) The court agrees. It is not difficult to infer that this information

would facilitate DHS's ability to remove these individuals from the country. This increased

likelihood of removal is sufficiently concrete, imminent, and traceable to Defendants' alleged

conduct to establish standing.

Defendants argue that Plaintiffs lack standing to pursue their information-use policy

claims because "[n]o Plaintiff plausibly alleges that the agency has in fact used his DACA

information for any enforcement purpose, much less initiated enforcement proceedings against

him as a result, or that there is any imminent threat of this occurring." (Defs. Mem. at 37.) The

individual Batalla Vidal Plaintiffs need not wait, however, until they are deported to have

standing to press this claim. Once their deferred action expires, they will be subject to removal

from the United States, and the court will presume that Defendants will enforce the immigration

laws against them. See Hedges, 724 F.3d at 197. Nor will the court ignore the obvious reality

that many DACA recipients will be removed from the country when their deferred action

expires. (See, e.g., State Pls. Am. Compl. ¶ 71 (quoting a statement by Acting Director of ICE

Thomas Homan that undocumented immigrants "should be uncomfortable" and "should look

over [their] shoulder[s]" and "be worried").) The threat of removal based on information

provided to DHS is sufficiently imminent as to constitute injury-in-fact.

c. *Notice Claim*

The Batalla Vidal Plaintiffs lack standing, however, to assert their notice claim.  In their

Second Amended Complaint, the Batalla Vidal Plaintiffs allege that, following the enactment of

the DACA Rescission Memo, Defendants failed to send DACA recipients whose status expired

by March 5, 2018, individualized notices "advising them that they must apply to renew DACA

by October 5, 2017 or be forever ineligible to renew their status."  (SAC ¶ 165; see id. at 3,

¶¶ 48, 103-05, 160-66.)  As Defendants correctly note, however, the Batalla Vidal Plaintiffs have

not alleged that any of them missed the October 5, 2017, deadline or suffered other adverse

effects from not receiving such individualized notice.  (Defs. Mem. at 34-35.)  Nor, even

drawing all reasonable inferences in Plaintiffs' favor, does the Second Amended Complaint

show that MRNY was injured by Defendants' failure to provide DACA recipients with

individualized notice of the renewal deadline.[14]  While the Second Amended Complaint alleges

that "MRNY has not been able to reach four DACA recipients to inform them that they need to

renew now" (SAC ¶ 48), that does not support the reasonable inferences either that those

individuals failed to apply for renewal or that such failure was "fairly traceable" to Defendants'

actions.[15]  In the absence of a showing that anyone has been harmed by a failure to receive notice

---

[14] The court also notes that the renewal deadline provided by the DACA Rescission Memo was not significantly different than that provided by existing DHS policy.  The State Plaintiffs allege that "[p]rior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120-150 days prior to expiration . . . in order to avoid a lapse in deferred action and employment authorization."  (State Pls. Am. Compl. ¶ 93.)  Under the DACA Rescission Memo, a DACA recipient whose deferred action and work authorization was set to expire on March 4, 2018, was required to file an application for renewal by October 5, 2018—i.e., 150 days before those benefits were set to expire.

[15] Even if those conditions were met, it is not clear that MRNY would have organizational standing to bring this claim.  See Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) ("[O]ur prior cases . . . have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm.")

of the change to the application deadline, the Batalla Vidal Plaintiffs have not demonstrated that they have Article III standing to bring this claim.

## 2. State Plaintiffs

The court next considers whether the State Plaintiffs have Article III standing. As the Court has noted, the ordinary rules of standing are somewhat different when a state is a plaintiff. States are "not normal litigants for the purposes of invoking federal jurisdiction," and they are entitled to "special solicitude" when they seek to vindicate their "proprietary" or "quasi-sovereign" interests.[16] Massachusetts v. EPA, 549 U.S. at 518. This does not mean, however, that states have unbridled license to sue.

### a. The State Plaintiffs Have Standing to Challenge the DACA Rescission

The State Plaintiffs have Article III standing to challenge Defendants' decision to rescind the DACA program, as well as the procedures by which that decision was made and implemented, based on that decision's impacts to the State Plaintiffs' proprietary interests. States, "like other associations and private parties," may have a "variety of proprietary interests" that they may vindicate in court. Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601-02 (1982) ("Snapp"). A state has proprietary interests, for example, in its ownership of land, id. at 601, and in its relationships with its employees, see Indiana v. IRS, 38 F. Supp. 3d 1003, 1009 (S.D. Ind. 2014) ("The Defendants recognize, as they must, that a State

---

[16] The Court has categorized a state's litigation interests using the trichotomy of "sovereign," "quasi-sovereign," and "proprietary" interests. See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601 (1982) ("Snapp"). Proprietary interests are those that a state may have akin to a private party, such as ownership of land or participation in a business venture. Id. at 601. Sovereign interests are interests the state has in its capacity as a state, such as "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" and "the demand for recognition from other sovereigns." Id. "Quasi-sovereign" interests are harder to define but "consist of a set of interests that the State has in the well-being of its populace." Id. at 602; see also id. at 607 ("[T]he articulation of [quasi-sovereign] interests is a matter for case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract . . . .").

and its political subdivisions may sue in their capacity as employers."). A state also has proprietary interests in its "participat[ion] in a business venture," Snapp, 458 U.S. at 601, and in the operation of state-run institutions, such as state colleges and universities, Washington, 847 F.3d at 1159-61; Aziz v. Trump, 231 F. Supp. 3d 23, 32-33 (E.D. Va. 2017).

Here, the State Plaintiffs have amply alleged and documented that the rescission of DACA would harm the states' proprietary interests as employers and in the operation of state-run colleges and universities. (State Pls. Am. Compl. ¶ 190 (states employ "[m]any DACA recipients").). For example, the State of Washington represents that it employs DACA recipients within state government (e.g., Decl. of Paul Quinonez ¶¶ 1-6 (State Pls. Am. Compl., Ex. 56 (Dkt. 55-56)); Decl. of E. Alexandra Monroe ¶ 3-4 (State Pls. Am. Compl., Ex. 62 (Dkt. 55-62))) and at state-run colleges and universities (e.g., Decl. of Lucila Loera ¶ 4 (State Pls. Am. Compl., Ex. 58 (Dkt. 55-58))). If DACA were rescinded, these employees would lose their work authorization, and the State of Washington would incur expenses in identifying, hiring, and training their replacements. (State Pls. Am. Compl. ¶ 190.) Accordingly, the State of Washington has standing to assert equal protection and substantive APA claims challenging the decision to end the DACA program. Moreover, Washington has standing to challenge the procedures by which Defendants decided to end the DACA program, because "there is some possibility" that, if DHS complied with notice-and-comment and RFA rulemaking procedures, it might "reconsider the decision." See Massachusetts v. EPA, 549 U.S. at 518. Because Washington has established its standing to assert substantive and procedural APA and RFA claims, the State Plaintiffs therefore have Article III standing to bring these claims. See FAIR, 547 U.S. at 53 n.3.

Defendants' arguments that State Plaintiffs lack Article III standing because they would be only "incidentally" harmed by the rescission of the DACA program are without merit. (See Defs. Mem. at 19.) Defendants protest that "[i]t would be extraordinary to find Article III standing" based on a state's assertions of "alleged harms to their residents, employees, tax bases, health expenditures, and educational experiences at their universities," as "virtually any administration of federal law by a federal agency could have such effects." (Id.) That a federal policy may have sweeping, adverse effects on states and state-run institutions is not, however, a convincing argument that states should not have standing to challenge that policy. Moreover, Defendants' position is irreconcilable with their own stated rationale for rescinding the DACA program. Defendants have stated that they rescinded the DACA program because it suffered from the same legal flaws as the DAPA program and could not be defended in court against the threatened challenge by Texas and other state plaintiffs. That necessarily assumes that at least one of the plaintiff states in the Texas litigation has standing to challenge the existence of the DACA program. Cf. Texas, 809 F.3d at 150-62 (finding standing based on the likely costs of having to issue drivers licenses to DAPA beneficiaries). Defendants offer no convincing reason why states should have standing to challenge the DACA program but not to challenge the decision to end that program.[17]

---

[17] Defendants' arguments to the contrary are unpersuasive. (Defs. Mem. at 21.) First, Defendants argue that neither the Acting Secretary nor the Attorney General "expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings." (Id.) Jurisdiction is, however, a prerequisite to a ruling on the merits, so the plaintiff states could prevail in their threatened challenge to the DACA program only if they had standing. Second, Defendants argue that "it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place," and that the Executive Branch has "an independent duty to consider the legality of . . . policies regardless of whether they are judicially reviewable." (Id.) The DACA Rescission Memo does not indicate, however, that Defendants actually considered these issues when deciding to rescind the DACA program. Finally, Defendants argue that the adoption of the DACA program could have been reviewed as an abdication of DHS's statutory responsibilities—a grounds for justiciability that would not apply to the decision to rescind the program. (Id. at 21-22.) The Fifth Circuit expressly did not rely on that theory of standing, 809 F.3d at 150, nor is there any indication that the Attorney General or Acting Secretary considered it in rescinding the DACA program.

b.  *The State Plaintiffs Lack Standing to Bring Notice and Information-Use Policy Claims*

Whether the State Plaintiffs can assert their notice or information-use policy claims,

however, is a close question.  In order to assert these claims, the State Plaintiffs must identify

some cognizable proprietary or quasi-sovereign interest that was harmed by Defendants'

challenged conduct—i.e., (1) with respect to the notice claim, Defendants' communication of its

decision to rescind the DACA program and impose an October 5, 2017, renewal deadline; and

(2) with respect to the information-use policy claims, the alleged change in DHS policy

regarding the use of DACA applicants' information.  In the court's view, the State Plaintiffs have

not identified any interests harmed by these actions that they can sue the federal government to

redress, and so they lack standing to bring these claims.

i.  *Proprietary Interests*

While the State Plaintiffs allege that their proprietary interests will be harmed by the

termination of DACA (State Pls. Am. Compl. ¶¶ 15, 100), they do not identify any proprietary

interests that have been or will be harmed by Defendants' alleged failure to provide DACA

recipients with "adequate notice" of the "procedures and timeline for renewing their DACA

status," "about the general termination of the DACA program after March 5, 2018," or "of

[DACA recipients'] inability to apply for renewal of their DACA status after March 5, 2018"

(id. ¶¶ 276-78; cf. State Pls. Mem. at 19-21).  It is certainly conceivable that many DACA

recipients who were eligible to renew their deferred action and work authorization under the

DACA Rescission Memo failed to do so before the October 5, 2017 deadline.  (State Pls. Am.

Compl. ¶ 96 (noting that "up to one third of DACA grantees who are eligible for renewal had not

applied as of two days before the . . . deadline").)  The State Plaintiffs' Amended Complaint does

not provide a sufficient basis for the court to conclude, however, that (1) such failures to renew

were "fairly traceable" to Defendants' decision not to provide each DACA recipient with

individualized notice of the change in application procedures and timelines; or (2) that these failures to renew harmed any State Plaintiff's proprietary interests (for example, by depriving a state employee of work authorization). See Amnesty Int'l, 568 U.S. at 410-16. Accordingly, the State Plaintiffs fail to assert a proprietary interest that would give them standing to bring their notice claim.[18]

Nor do the State Plaintiffs identify a cognizable proprietary interest harmed by the alleged change to DHS's information-use policy. The State Plaintiffs' information-use policy claims challenge not the decision to rescind DACA itself, but the alleged changes in DHS's information-use policy, which, Plaintiffs allege, will facilitate the deportation of DACA applicants. As discussed above, the court accepts that these changes (if true) will likely result in more undocumented immigrants' removal from the United States. (See State Pls. Am. Compl. ¶ 86.) The State Plaintiffs have not, however, identified any cognizable harm to their proprietary interests that would result from the removal of their undocumented residents. The State Plaintiffs have proffered evidence that the removal of DACA beneficiaries would grievously affect state economies. (See Decl. of Dr. Ike Brannon ¶¶ 12, 14 (State Pls. Am. Compl., Ex. 4 (Dkt. 55-4)) (estimating that the removal of DACA recipients from the United States "would cost . . . the economy as a whole $215 billion in lost GDP," with impacts falling hardest on states with the largest number of DACA recipients).) Despite the scale of these impacts, the State Plaintiffs' own authority makes clear that states lack standing to bring a "claim . . . that actions taken by United States Government agencies had injured a State's economy and thereby caused a

---

[18] In this circuit, the State Plaintiffs need not demonstrate, however, that the individuals they seek to protect must themselves meet the injury-in-fact, causation, and redressability requirements of Article III. See Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 338-39 (2d Cir. 2009), aff'd in relevant part by an equally divided court, 564 U.S. 410, 420 (2011).

decline in general tax revenues." Wyoming v. Oklahoma, 502 U.S. 437, 448 (1992).  Absent

some showing of injury to their own proprietary interests (for example, "direct injury in the form

of a loss of specific tax revenues," id.), the State Plaintiffs cannot maintain their information-use

policy claims based on alleged harms to their proprietary interests.

ii.      *Quasi-Sovereign Interests*

Accordingly, the court will consider whether the State Plaintiffs can assert these claims

parens patriae to vindicate their quasi-sovereign interests.  States may bring parens patriae

(literally, "parent of the country") suits to vindicate what the Court has characterized as "quasi-

sovereign" interests.  See Snapp, 458 U.S. at 600-02.  There are no bright-line rules for which

interests qualify as "quasi-sovereign."  See id. at 600, 607; 13B Charles A. Wright et al., Federal

Practice and Procedure § 3531.11.1, at 117 (3d ed. 2008) ("Wright & Miller").  In general,

however, the Court has recognized that a state has quasi-sovereign interests in the "health and

well-being—both physical and economic—of its residents in general," in protecting state

"residents from the harmful effects of discrimination," and in challenging the discriminatory

denial of a state's "rightful status within the federal system."  Id. at 607, 609.  There are,

however, at least two notable limitations on states' parens patriae standing.

First, to be "quasi-sovereign," the state's interests must be sufficiently generalized that

the state is seeking to vindicate its citizens' welfare, rather than simply pressing suit on behalf of

its individual residents.  See id. at 607 ("[M]ore must be alleged than injury to an identifiable

group of individual residents . . . .").  A state cannot sue parens patriae when it is "merely

litigating as a volunteer the personal claims of its citizens."  Pennsylvania v. New Jersey, 426

U.S. 660, 665 (1976).

Second, special considerations are present when a state brings a parens patriae suit

against the federal government.  See 13B Wright & Miller § 3531.11.1, at 96.  In Massachusetts

43

v. Mellon, 262 U.S. 447 (1923), the Court rejected Massachusetts's attempt to bring a parens
patriae suit challenging a federal statute as unconstitutional. See id. at 485-86. "While the state,
under some circumstances, may sue in [a parens patriae] capacity for the protection of its
citizens, it is no part of its duty or power to enforce their rights in respect of their relations with
the federal government. In that field it is the United States, and not the state, which represents
them as parens patriae . . . ." Id. (emphasis added); see also Snapp, 458 U.S. at 609 n.16 ("A
State does not have standing as parens patriae to bring an action against the Federal
Government."). The Court has rejected the argument, however, that Massachusetts v. Mellon
bars all state parens patriae claims against the federal government. See Ariz. State Legislature v.
Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2664 n.10 (2015) (observing that "[t]he
cases on the standing of states to sue the federal government seem to depend on the kind of claim
that the state advances" (quoting Richard Fallon et al., Hart and Wechsler's The Federal Courts
and the Federal System 263-66 (6th ed. 2009))). Compare Massachusetts v. EPA, 549 U.S. at
520 n.17, with id. at 538-39 (Roberts, C.J., dissenting). Instead, states may sue the federal
government parens patriae to enforce rights guaranteed by a federal statute. See Massachusetts
v. EPA, 549 U.S. at 520 n.17; see also New York v. Sebelius, No. 1:07-CV-1003 (GLS) (DRH),
2009 WL 1834599, at *12 (N.D.N.Y. June 22, 2009) (collecting cases). Massachusetts v. EPA
expressly did not disturb the settled rule, however, that a state may not sue parens patriae to
"protect her citizens from the operation of federal statutes." Massachusetts v. EPA, 549 U.S. at
520 n.17 (quoting Georgia v. Penn. R. Co., 324 U.S. 439, 447 (1945)).

The court concludes that the State Plaintiffs lack standing to bring either their notice and
information-use policy claims. With respect to their notice claim, the State Plaintiffs have not
argued or demonstrated that Defendants' alleged failure to provide DACA applicants with

44

adequate notice of changes in the DACA program and renewal deadline has actually harmed "the health and well-being" of state residents or any other cognizable quasi-sovereign interest. See Snapp, 458 U.S. at 607. (Cf. State Pls. Am. Compl. ¶¶ 15, 100; State Pls. Opp'n at 21-22.) Even if they had done so, they would be challenging federal enforcement of federal immigration laws as unconstitutional, which Massachusetts v. Mellon prohibits. See Massachusetts v. EPA, 549 U.S. at 520 n.17 ("[T]here is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what Mellon prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)."). For the same reason, the State Plaintiffs also lack standing to assert their information-use policy claims. Even assuming, as discussed above, that the change in information-use policy will facilitate the removal of undocumented immigrants from these states, and that this removal will harm the "health and well-being—both physical and economic" of state residents, see Snapp, 458 U.S. at 607, the thrust of the State Plaintiffs' information-use policy claims is to challenge as fundamentally unfair a change in federal policy that will facilitate the federal government's enforcement of the immigration laws.

The State Plaintiffs' argument that they merely seek to "enforce—as opposed to overturn or avoid—application of a federal statute" is unpersuasive. (State Pls. Opp'n at 21 n.11) Plaintiffs plainly seek to invalidate federal action as unconstitutional. Such claims more closely resemble constitutional challenges to application of federal statutes, which Massachusetts v. Mellon prohibits states from asserting parens patriae, than suits to enforce compliance with federal statutory law, which Massachusetts v. EPA permits states to bring parens patriae. When challenging federal action on constitutional grounds, "it is no part of [the state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government."

45

Massachusetts v. Mellon, 262 U.S. at 485-86. But see Aziz, 231 F. Supp. 3d at 31-32

(concluding that "a state is not barred by the Mellon doctrine from a parens patriae challenge

to executive action when the state has grounds to argue that the executive action is contrary to

federal statutory or constitutional law" (emphasis added)).

 The court concludes, therefore, that the State Plaintiffs lack standing to assert their notice

and information-use policy claims.

### D.  Whether State Plaintiffs Have Cause of Action under the APA

 Lastly, Defendants assert that neither MRNY's nor the State Plaintiffs' claims are

justiciable because those Plaintiffs do not assert interests that are "arguably within the zone of

interests . . . protected or regulated by the statute . . . in question."  (Defs. Mem. at 21 (quoting

Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 395 (1987) (first alteration added)).)  To bring suit

under the APA, a plaintiff "must satisfy not only Article III's standing requirements, but an

additional test: [t]he interest he asserts must be 'arguably within the zone of interests to be

protected or regulated by the statute' that he says was violated."  Match-E-Be-Nash-She-Wish

Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 224 (2012) ("Match-E-Be-Nash")

(quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).  This

test "is not meant to be especially demanding'" and "forecloses suit only when a plaintiff's

'interests are so marginally related to or inconsistent with the purposes implicit in the statute that

it cannot reasonably be assumed that Congress intended to permit the suit.'"  Id. (quoting Secs.

Indus. Ass'n, 479 U.S. at 399).

 Critically, for the court's current purposes, whether MRNY and the State Plaintiffs assert

interests falling within the "zone of interests" protected by the APA is not a question of

"jurisdiction" or "justiciability."  As the Supreme Court has explained, the question of whether a

plaintiff falls within the zone of interests protected by a statute is not properly classed as an issue

46

Case 1:17-cv-05228-NGG-JO   Document 85   Filed 11/09/17   Page 47 of 48 PageID #: 3841

of "prudential standing," but is instead an issue of "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l, 134 S. Ct. at 1387. That issue "goes not to the court's jurisdiction—that is, 'power'—to adjudicate a case, but instead to whether the plaintiff has adequately pled a claim." Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 201 (2d Cir. 2014) (citing Lexmark Int'l, 134 S. Ct. at 1387 n.4, 1389 n.5); see also Casper Sleep, Inc. v. Mitcham, 204 F. Supp. 3d 632, 637-38 (S.D.N.Y. 2016) (arguments for dismissal for lack of "prudential standing" were appropriately addressed under Rule 12(b)(6), not Rule 12(b)(1), of the Federal Rules of Civil Procedure). Because this argument does not raise an issue of "jurisdiction or justiciability," the court does not address it here.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for lack of subject-matter jurisdiction (Dkt. 95) is GRANTED IN PART and DENIED IN PART. The following claims are dismissed:

- Batalla Vidal v. Duke, No. 16-CV-4756:
  - Fourth claim for relief (Due Process Clause—Notice)
- New York v. Trump, No. 17-CV-5228:
  - Second claim for relief (Due Process Clause—Information-Use Policy)
  - Third claim for relief (Equitable Estoppel—Information-Use Policy)
  - Seventh claim for relief (Due Process Clause—Notice)

Defendants' motion to dismiss for lack of subject-matter jurisdiction is denied with respect to all other claims.  The court RESERVES RULING on Defendants' motion to dismiss for failure to state a claim.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       November 9, 2017

NICHOLAS G. GARAUFIS
United States District Judge

48