**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>              Plaintiffs,<br><br>     v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>              Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATES'**
**MOTION FOR PRELIMINARY INJUNCTION**

1

## TABLE OF CONTENTS

ARGUMENT ...................................................................................................................4

PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS .......................... 4

   I.   Defendants' Termination of DACA was Arbitrary and Capricious in Violation of the
      APA............................................................................................................................ 4

       A.   Defendants' Termination of DACA Was Arbitrary and Capricious as Defendants
            Failed to Offer a Reasoned Explanation for Reversal of Policy. ........................... 5

            1.   *Defendants did not offer reasoned, evidence-based rationales for reversing
                 their prior position.* .........................................................................................5

            2.   *Defendants' termination failed to acknowledge inconsistencies with their
                 prior position.* ..................................................................................................7

       B.   Defendants' Termination Did Not Account for the Significant Reliance Interests
            Created by DACA, or Consider Any Steps to Mitigate the Harm of Termination. 9

       C.   Defendants' Explanations for Termination Are Pretextual and Their True Basis
            for Termination Is Impermissible. ...................................................................... 12

   II.  Defendants' Termination of DACA Violated Equal Protection. ...................................... 15

   III. Defendants' Termination of DACA Violates the Procedural Requirements of the APA
      and RFA. .................................................................................................................. 20

       A.   The Termination Changed Existing Rights and Interests. .................................... 22

       B.   The Termination Binds the Discretion of DHS and Its Officials.......................... 23

       C.   A Strong Public Interest in the Treatment of DACA Grantees Weighs in Favor
            of Notice and Comment. ..................................................................................... 26

PLAINTIFF STATES SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ............... 27

   I.   Absent an Injunction, the States Will Suffer Irreparable Harm....................................... 27

       A.   Harm to the States' Regulatory and Licensing Schemes. .................................... 29

       B.   Harm to State Employers. ................................................................................... 29

       C.   Harm to State Educational Institutions. .............................................................. 30

       D.   Harm to State Healthcare Systems....................................................................... 31

       E.   Harm to State and Local Economies.................................................................... 33

   II.  The Public Interest and the Balance of the Equities Weigh in Favor of a Preliminary
      Injunction. ................................................................................................................ 34

CONCLUSION..............................................................................................................36

i

# TABLE OF AUTHORITIES

CASES                                                                                              Page(s)

*Aeronautical Repair Station Ass'n v. F.A.A.*,
    494 F.3d 161 (D.C. Cir. 2007) ................................................................21

*Amerijet Int'l v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014) ..............................................................7

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d (9th Cir. 2014) ..........................................................................33

*Ariz. Dream Act Coal. v. Brewer*,
    No. 15-15307 (9th Cir. Aug. 28, 2015).................................................18

*Ariz. Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) .................................................................34

*Bechtel v. FCC*,
    10 F.3d 875 (D.C. Cir. 1993) ..................................................................4

*Bellarno Intern. Ltd. v. Food & Drug Admin.*,
    678 F.Supp. 410 (E.D.N.Y. 1988) ........................................................24

*Bertrand v. Sava*,
    684 F2d 204 (2d. Cir. 1982)...................................................................13

*Bolling v. Sharpe*,
    347 U.S. 497 (1954)................................................................................15

*Bowman Transp. Inc. v. Arkansas-Best Freight System*,
    419 U.S. 281 (1974)..................................................................................9

*Camp v. Pitts*,
    411 U.S. 138 (1973).................................................................................4

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)...............................................................................20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971).................................................................................4

*Cmty. Nutrition Inst. v. Young*,
    818 F.2d 943 (D.C. Cir. 1987) ...............................................................24

*Dimaren v. Immigration and Naturalization Serv.*,
   398 F.Supp. 556 (S.D.N.Y. 1974) ...........................................................24

*Donovan v. Red Star Marine Servs., Inc.*,
   739 F.2d 774 (2d Cir. 1984).....................................................................22

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
   653 F.3d 1 (D.C. Cir. 2011) ................................................................22, 26

*Encino Motorcars LLC v. Navarro*,
   136 S.Ct. 2117 (2016)..........................................................................5, 12

*FCC v. Fox Television Stations*,
   556 U.S. 502 (2009).........................................................................5, 9, 10

*Fishman v. Paolucci*,
   628 F. App'x 797 (2d Cir. 2015) ..............................................................32

*Forest City Daly Hous., Inc. v. Town of N. Hempstead*,
   175 F.3d 144 (2d Cir.1999).......................................................................27

*Gen. Elec. Co. v. E.P.A.*,
   290 F.3d 377 (D.C. Cir. 2002) ..................................................................23

*Haitian Ctrs. Council, Inc. v. Sale*,
   823 F.Supp. 1028 (E.D.N.Y. 1993) ..........................................................13

*Heller v. Doe*,
   509 U.S. 312 (1993)...................................................................................17

*Hoctor v. U.S. Dept. of Agric.*,
   82 F.3d 165 (7th Cir. 1996) ......................................................................26

*Hoffman ex rel. Nat'l Labor Relations Bd. v. Inn Credible Caterers, Ltd.*,
   247 F.3d 360 (2d Cir. 2001)......................................................................35

*Int'l Refugee Assistance Project v. Trump*,
   2017 WL 4674314 (D. Md. Oct. 17, 2017), appeal docketed, 17-2231 (4th Cir.
   Oct 20, 2017), 17-2240 (4th Cir. Oct 23, 2017), stay pending appeal.....................28

*Int'l Union of Mine Workers v. U.S. Dep't of Labor*,
   358 F.3d 40 (D.C. Cir. 2004) ......................................................................6

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir.1996)..........................................................................27

*Kandamar v. Gonzalez*,
   464 F.3d 65 (1st Cir. 2006) .......................................................................17

*Kadrmas v. Dickinson Pub. Schools*,
   108 S.Ct. 2481 (1988) ................................................................................... 19

*Lewis v. Grinker*,
   1987 WL 8412 (E.D.N.Y. Mar. 6, 1987) ..................................................... 32

*Lewis v. Thompson*,
   252 F.3d 567 (2d Circ. 2001) ....................................................................... 19

*Lewis-Mota v. Sec'y of Labor*,
   469 F.2d 478 (2d Cir.1972) ........................................................................... 22

*Long Island Head Start Child Dev. Servs. v. N.L.R.B.*,
   460 F.3d 254 (2d Cir. 2006) ................................................................... 4, 12

*Mada–Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir.1987) ....................................................................... 23

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir.2012) ......................................................................... 34

*Mhany Mgmt v. Cty. of Nassau*,
   819 F.3d 581 (2d Cir. 2016) ......................................................................... 16

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ............................................................................... passim

*Municipality of Anchorage v. United States*,
   980 F.2d 1320 (9th Cir. 1992) ..................................................................... 23

*N. Mariana Islands v. United States*,
   686 F.Supp.2d 7 (D.D.C. 2009) ............................................................ 27, 34

*N. Y. Council v. Fed. Labor Relations Auth.*,
   757 F.2d 502 (2d Cir. 1985) ......................................................................... 11

*N. Y. ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015), cert. dismissed sub nom, *Allergan PLC v. N. Y.*
   *ex. rel. Schneiderman*, 136 S. Ct. 581 (2015) .................................... 27, 34

*N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*,
   267 F.3d 128 (2d Cir. 2001) ......................................................................... 22

*Nat'l Nutritional. Foods Ass'n v. Mathews*,
   557 F.2d 325 (2d. Cir. 1977) .......................................................................... 4

*Nat'l Law Center on Homelessness and Poverty v. N.Y.*,
   224 FRD 314 (EDNY 2004) ......................................................................... 19

*Natural Resources Defense Council v. EPA*,
   808 F.3d 556 (2d Cir. 2015).................................................................9

*New England Coal. on Nuclear Pollution v. NRC*,
   727 F.2d 1127 (D.C. Cir. 1984)..........................................................12

*Nguyen v. INS*,
   533 U.S. 53 (2001)..............................................................................17

*Noel v. Chapman*,
   508 F.2d 1023 (2d Cir. 1975)..............................................................25

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) (en banc) ...............................................6

*Parco v. Morris*,
   426 F. Supp. 976 (E.D. Pa. 1977) ......................................................25

*Perales v. Sullivan*,
   948 F.2d 1348 (2d Cir. 1991)..............................................................21

*Perez v. Mortgage Bankers Ass'n*,
   135 S.Ct. 1199 (2015)...........................................................................4

*Plyler v. Doe*,
   457 U.S. 202 (1982)............................................................................18

*Public Citizen v. Heckler*,
   653 F. Supp. 1229 (D.D.C. 1986) ...................................................4, 12

*Romer v. Evans*,
   517 U.S. 620 (1996)....................................................................2, 16-17

*State v. Trump*,
   2017 WL 4639560 (D. Haw. Oct. 17, 2017), aff'd in part, State of Hawaii ..........................28

*Statharos v. N.Y. City Taxi & Limousine Comm'n*,
   198 F.3d 317 (2d Cir.1999).................................................................27

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ..............................................................27

*Sweet v. Sheahan*,
   235 F.3d 80 (2d Cir. 2000)..................................................................22

*Texas v. United States*,
   2015 WL 1611821 (5th Cir. 2015) ........................................................7

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ..................................................................6

*Time Warner Cable Inc. v. F.C.C.*,
  729 F.3d 137 (2d Cir. 2013)...................................................................22

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973)......................................................................... 16-17

*U.S. Telecom Ass'n v. FCC*,
  400 F.3d 29 (D.C. Cir. 2005)................................................................21

*United States v. Lott*,
  750 F.3d 214 (2d Cir. 2014)..................................................................20

*United States v. Picciotto*,
  875 F.2d 345 (D.C. Cir. 1989)..............................................................21

*United States v. Texas*,
  2016 WL 836758 (U.S. 2016)........................................................ 6-7, 18

*Weinberger v. Wiesenfeld*,
  420 U.S. 636 (1975)...............................................................................15

*White v. Shalala*,
  7 F.3d 296 (2d Cir. 1993)...........................................................20-21, 22

*Winter v. Nat'l Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...............................................................................3, 27

*Wong Wing Hang v. I.N.S.*,
  360 F.2d 715 (2d. Cir. 1966).................................................................13

*Yale-New Haven Hosp. v. Leavitt*,
  470 F.3d 71 (2d. Cir. 2006)............................................................4-5, 11

## CONSTITUTION

U.S. Const. Fifth Amendment.................................................................15

U.S. Const. Fourteenth Amendment ......................................................15

**FEDERAL STATUTES**

5 U.S.C.
    § 553 ................................................................................................................ 20-21
    §§ 601(2), 603(a) 604(a), 605(b) ........................................................................21
    § 605(b) ...............................................................................................................21
    § 706(2) ..............................................................................................................2,4


8 U.S.C.
    § 1182(d)(5) ........................................................................................................21

Immigration Reform and Control Act of 1986 ....................................................23

Regulatory Flexibility Act (RFA) ..................................................... 3, 20-22, 26, 33

**STATE STATUTES**

Ill. Comp. Stat. 205/2 ........................................................................................10, 29

Oregon Revised Statutes (ORS) 807.021 ............................................................10, 29

N.Y. Fin. Law § 3 ....................................................................................................29

## PRELIMINARY STATEMENT

On September 5, 2017, the Departments of Homeland Security ("DHS") and Justice ("DOJ") announced the termination of Deferred Action for Childhood Arrivals ("DACA"). DACA is a nationwide program that permits undocumented individuals who were brought to the United States as young children to live and work in the only country they know as home. Through this highly successful program, nearly 800,000 DACA grantees—the majority of whom are of Latino descent—contribute to our communities and economies daily. DACA grantees work in state and local government agencies, universities and hospitals, and in a diverse array of businesses and non-profit institutions. DACA grantees are integrated into our communities and both the public and private sectors rely on their significant contributions.

Yet when DHS and DOJ decided to end DACA, they disregarded the harm the termination will inflict on DACA grantees as well as on the state and local institutions and private companies that count on them. Instead, DHS and DOJ cited two unsubstantiated reasons for the termination—the likelihood of successful litigation against the United States if Defendants continued the program, and that DACA itself was unconstitutional and unlawful. Evidence in the record reveals the stated bases to be pretextual. Specifically, statements and actions demonstrate that Defendants' termination of DACA was motivated, at least in part, by animus against Latinos.

Defendants have repeatedly asserted to this Court and others that they have unfettered authority to terminate DACA—whenever they want, however they want, and for whatever reason they want.[1] This assertion is simply not true. While Congress has delegated wide discretion to the Executive Branch in the area of immigration enforcement, the U.S. Constitution

---

[1] *See* Mem. of Law in Supp. of Defs.' Mtn. to Dismiss at 12-19, ECF. 71-1; Defs' Mtn. to Vacate at 5-6, ECF. 48.

1

places important limits on the exercise of such discretion. Similarly, Congress has enacted laws to ensure that the Executive does not exercise its discretion in an arbitrary and capricious manner, and that the Executive hears from diverse interests and considers potential consequences before it takes action. Plaintiff States (herein, "Plaintiff States" or "States") accordingly filed this suit to prevent Defendants from sidestepping these key restraints on their authority and from causing great harm to the States and their residents.

Now Plaintiff States bring this motion requesting that the Court preliminarily enjoin the termination of DACA. Plaintiff States are likely to succeed on the merits of their claim that the termination was arbitrary and capricious and an abuse of discretion, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). Defendants did not offer reasoned, evidence-based rationales for the termination; failed to analyze all relevant issues and factors, including the significant reliance interests created by DACA; and Defendants' stated reasons for the termination were pretextual as the decision to terminate DACA was animus-driven.

That animus towards Latinos motivated the decision to terminate DACA, and the stated irrational reasons for the action, demonstrate that Defendants also violated the equal protection guarantee of the U.S. Constitution. Animus-driven decisionmaking cannot withstand even the most deferential form of Equal Protection. Indeed, given the breadth and abruptness of the termination, its lack of evidentiary support, and its unprecedented departure from deferred action norms, the termination decision "seems inexplicable by anything but animus toward the class it affects." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Thus, Plaintiff States are likely to succeed on their equal protection claim.

 Plaintiff States are also likely to succeed on their claim that Defendants violated the procedural requirements of the APA and Regulatory Flexibility Act ("RFA"), because

Defendants failed to provide for notice and comment on the termination and failed to consider the impact on numerous local governments and small businesses throughout the country. The termination is a legislative rule that affects substantial rights and interests and binds discretion of DHS officials. Moreover, the strong public interest in the termination makes it just the type of rule for which notice and comment is meant to apply.

In terminating DACA—when they did, in the manner they did, and for the reasons they did—Defendants have attempted to evade critical safeguards against the unconstitutional and unlawful exercise of their power. Left unchecked, Defendants actions will cause irreparable and grave harm to Plaintiff States and their residents. By contrast, Defendants will not be harmed by a preliminary injunction. The balance of the equities therefore supports such preliminary relief. Preliminary relief will ensure that Defendants are not allowed to elude legal provisions designed to prevent abuses of power and to protect the well-being of the American public.

## STANDARD OF REVIEW

A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**ARGUMENT**

**PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS**

**I.    Defendants' Termination of DACA was Arbitrary and Capricious in Violation of the APA.**

Under the APA, agency action is unlawful if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2).[2] To determine whether an agency action is arbitrary and capricious, a reviewing court must conduct a "thorough, probing, in-depth review" of the agencies' actions and a "searching and careful" inquiry into the underlying facts.[3] *Citizens to Preserve Overton Park, Inc.  v. Volpe,* 401 U.S. 402, 415-16 (1971). Actions are arbitrary and capricious where, among other things, an agency fails to offer a reasoned explanation for reversing a prior policy, *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 41-42 (1983), fails to consider and analyze "all relevant issues and factors," including the serious reliance interests engendered by the prior policy, *Long Island Head Start Child Dev. Servs. v. N.L.R.B.*, 460 F.3d 254, 258-260 (2d Cir. 2006); *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1209 (2015), or adopts a pretextual rationale for its action, *Public Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986). Although Defendants violated all of these prohibitions, a finding by this Court that they simply violated one of them is sufficient to sustain a ruling that Defendants acted in an arbitrary and capricious manner.

---

[2] The arbitrary and capricious standard applies to agency actions other than rulemaking, including policy statements. *See, e.g.*, *Bechtel v. FCC*, 10 F.3d 875, 878, 887 (D.C. Cir. 1993) (holding that a policy statement exempt from notice and comment was arbitrary and capricious).

[3] In addition, review of agency action may include information outside the Administrative Record where an agency's failure to explain an action frustrates effective judicial review, *Camp v. Pitts*, 411 U.S. 138, 143 (1973), *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 82 (2d. Cir. 2006), or where an agency has engaged in bad faith or improper behavior, such as discrimination. *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325 (2d. Cir. 1977). Here, Defendants have both failed to adequately explain their actions, *see infra* Part I.A., and acted on an improper basis, *see infra* Part I.B. Therefore, the Court may consider information outside the Administrative Record.

**A.** **Defendants' Termination of DACA Was Arbitrary and Capricious as Defendants**
**Failed to Offer a Reasoned Explanation for Reversal of Policy**.

When an agency reverses course on a policy it must provide "a reasoned analysis" for its

reversal. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 41-42 (1983); *Yale-New Haven*

*Hosp. v. Leavitt*, 470 F.3d 71, 79 (2d Cir. 2006) ("[R]eview is particularly searching" when the

agency changes "[a] settled course of behavior."). Under certain circumstances, the agency must

provide "a more detailed justification than what would suffice for a new policy created on a

blank slate." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). This includes

circumstances in which an agency's action is inconsistent with facts and circumstances that

underlay the prior policy. *Encino Motorcars LLC v. Navarro*, 136 S.Ct. 2117, 2126 (2016). An

agency's failure to explain these inconsistencies is reason for holding its policy reversal arbitrary

and capricious. *Id*.

**1.** *Defendants did not offer reasoned, evidence-based rationales for reversing their*
*prior position.*

In the memo terminating DACA (the "Termination Memo"), Defendants' cite only two

reasons for terminating DACA: the risk that continuing the program would result in litigation,

and the program's purported unlawfulness.[4] In drawing these conclusions, Defendants provide

no assessment of the litigation risk or explanation of their legal reasoning. This lack of reasoned

analysis is particularly striking since Defendants' newfound position is squarely inconsistent

with their prior position, namely that DACA is a deeply rooted, lawful exercise of prosecutorial

discretion.

---

[4] *See* Memorandum from Acting Secretary Elaine Kelly to James McCament, Acting Director of U.S. Citizenship
and Immigration Services, *Rescission of Deferred Action for Childhood Arrivals*, September 5, 2017 ("Termination
Memo"), AR 252-55.

Defendants failed to provide a reasoned assessment of the litigation risk resulting from continuing the DACA program. When seeking to reverse policy based on a purported risk of litigation, an agency must explain why it determined that case law was "fatal" to the prior policy. *Int'l Union of Mine Workers v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (finding arbitrary an agency's reversal of a rule based on a court decision to reverse a separate rule). While Defendants reference decisions by the Fifth Circuit and Supreme Court in their Termination Memo, the Memo and Administrative Record includes no assessment explaining why these cases were "fatal" to DACA.[5] Moreover, a valid consideration of litigation risk would entail weighing the comparative costs and burdens of taking different actions, an analysis also absent from the Termination Memo and Administrative Record. Defendants' failure to assess or analyze the potential risk of litigation undermines their subsequent reliance on that risk to terminate DACA.

Further, Defendants were aware that their desire to avoid litigation could not be achieved by their decision to terminate DACA, as that decision was also subject to the virtual certainty of litigation. Defendants' attempt to avoid a lawsuit initiated by the State of Texas merely "traded" that lawsuit for this suit by Plaintiff States. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (en banc) (rejecting litigation risk rationale as "implausible" where agency "deliberately traded one lawsuit for another").

---

[5] DACA Termination Memo, AR 252-55. In fact, the decisions arising out of *Texas v. United States* do not support the conclusion that DACA is unlawful as: (1) the *Texas* court did not find constitutional defects in DAPA. 809 F.3d 134, 154 (5th Cir. 2015) ("We decide this appeal, however, without resolving the Constitutional claim."); (2) the legality of the original DACA policy was never at issue in *Texas* and no court has held DACA itself unlawful. *Id.* at 173; (3) the Fifth Circuit found legally significant differences between DAPA and DACA. *Id.* at 173-74 (finding that "for a number of reasons, any extrapolation [of DAPA] from DACA must be done carefully"); and (4) the Fifth Circuit decision regarding DAPA's legal defects is not persuasive in light of the flaws in that reasoning discussed in Br. Of U.S., *United States v. Texas*, 2016 WL 836758 (U.S. 2016).

6

Defendants also failed to provide any legal analysis in support of their conclusions regarding the lawfulness of the DACA program. The Termination Memo relies entirely on a one-line assertion in a letter from the Attorney General that DACA "has the same legal and constitutional defects" that the Fifth Circuit and a divided Supreme Court recognized as to the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program.[6]

Agencies are obligated to provide reasons, not bare conclusions, to support an action. *Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do; an agency's statement must be one of reasoning")(internal quotations omitted). Defendants' reliance on cursory and erroneous conclusions renders its decision arbitrary and capricious.

### 2. *Defendants' termination failed to acknowledge inconsistencies with their prior position.*

Defendants failed to explain the inconsistencies between their stated reasons for terminating DACA, and their prior well-reasoned and in-depth analysis supporting the program. In substantial analyses provided in an Office of Legal Counsel opinion in 2014, and in briefs in support of the DAPA program filed with the Fifth Circuit and the U.S. Supreme Court,[7] Defendants explained that the DACA program was lawful. Although Defendants now claim that

---

[6] Ltr from Att'y Gen. Jefferson Sessions to Sec'y of the Dep't of Homeland Security Elaine Duke, AR 251; DACA Termination Memo ("Sessions Letter"), AR 252-55. DAPA offered deferred action to the parents of U.S. Citizens and Lawful Permanent Residents.

[7] *See* United States Office of Legal Counsel, "The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Other," (Nov. 19, 2014), AR 4-36; Appellant's Br., *Texas v. United States*, 2015 WL 1611821 (5th Cir. 2015); Br. Of U.S., *United States v. Texas*, 2016 WL 836758 (U.S. 2016).

the program is unlawful, they failed to consider any reasoned analysis or evidence to rebut their prior analysis, as evidenced by the lack of any such materials in the Administrative Record.[8]

Likewise, Defendants' argument that DACA was an extra-statutory and "unconstitutional"[9] exercise of Executive power fails to acknowledge that DACA is rooted in an established tradition of Executive action dating back to the New Deal.[10] DHS and its predecessor agencies have regularly developed prosecutorial discretion programs, like DACA, which have offered temporary relief from deportation to millions of immigrants across a variety of circumstances.[11] Deferred action has been offered to many different classes of people to respond to an array of global events and domestic policy objectives, and often, as with DACA, out of concern for immigrants' age, and their long-term presence and ties to the United States.[12] The Termination Memo and Administrative Record lack any explanation of why Defendants now, in a reversal of Defendants' prior policy, believe the DACA program is an illegal exercise of Executive power. Based on the complete failure to explain these inconsistencies, Defendants' termination decision is arbitrary and capricious.

---

[8] Prior to termination, Defendants received a letter from prominent law professors who presented substantial, reasoned analysis supporting the lawfulness of the DACA program. *See* Ex. 87 (Ltr from Shobha Wadhia *et al.* to President Donald Trump, Aug. 14, 2017). Defendants ignored this letter.

[9] Sessions Letter, AR 251.

[10] *See* Ex. 1, ¶ 24 (Wadhia Decl.).

[11] *See Id.* at, ¶¶ 31-44, 60-65.

[12] *See Id.* at, ¶¶ 40-41, 61, 71; For example, President Reagan's "Family Fairness" program shares several similarities to DACA. It provided deferred action for children under 18 whose parents were eligible for permanent residency legalizing under the Immigration Reform and Control Act of 1986. Three years later, the Family Fairness program was expanded under President George H.W. Bush. That Executive program made 1.5 million people eligible for relief out of a total undocumented population of 3.5 million. Just like DACA grantees, Family Fairness grantees were also allowed to apply for employment authorization. Eventually, Congress acted to provide a permanent solution for many of these individuals.

**B.  Defendants' Termination Did Not Account for the Significant Reliance Interests Created by DACA, or Consider Any Steps to Mitigate the Harm of Termination.**

When reversing a prior policy that "engendered serious reliance interests," agencies must provide a reasoned explanation for disregarding facts and circumstances that underlay that policy. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). In addition, agencies must consider all "relevant factors" during the decision-making process. *State Farm*, 463 U.S. at 43(1983) (citing to *Bowman Transp. Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 285-86 (1974)). Those factors include "the costs as well as the benefits" of the action. *State Farm*, 463 U.S. at 54. Failing to consider an "important aspect of the problem" is grounds for finding an action arbitrary and capricious. *Natural Resources Defense Council v. EPA*, 808 F.3d 556, 569, 576–77 (2d Cir. 2015). Defendants violated the APA by disregarding the serious reliance interests engendered by DACA, and utterly failing to consider any of the costs triggered by terminating DACA.

While Defendants single-mindedly focused on their unfounded legal conclusions, they ignored the serious reliance interests engendered by DACA. Since 2012, nearly 800,000 grantees have relied on DACA to "come out of the shadows" and integrate into their communities.[13] Grantees have relied on the promises of the DACA program to make long-term decisions inconsistent with a sudden end to the program. For instance, many grantees have enrolled in multi-year degree programs that will now be disrupted.[14] One in twenty grantees has relied on

---

[13] Ex. 2 (Updated USCIS, Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017, Sept. 30, 2017); Ex. 3, McCament Dep. 158: 3 –159:1.

[14] *See* Ex. 4, ¶ 13 (Andrade Decl.) (rely on DACA to pursue a medical degree); Ex. 5, ¶ 10, 13 (Naveed Decl.) (rely on DACA to pursue degrees in nursing and law); Ex. 6, ¶ 7-9, 12-13 (Cuevas Decl.) (rely on DACA to pursue a Dental degree); Ex. 7, ¶ 6 (Mendes Decl.); Ex. 8, ¶ 4 (Teodoro Decl.); Ex. 9, ¶ 7, 9-10 (Juarez Decl.).

9

the program to start a business, a rate higher than native-born Americans.[15] Public and private employers have also counted on DACA to invest time and resources in hiring and training grantees; losing these employees will disrupt their businesses and agencies.[16] In addition, public and private colleges and universities have relied on the program to enroll and integrate DACA grantees into their educational programs.[17] Finally, the States have relied on DACA to integrate grantees into their licensing schemes and economies generally, including into sectors in which professional licenses are necessary.[18]

As described in detail in Part IV, the termination of DACA will impose substantial costs on grantees and their communities. Yet Defendants considered none of this before terminating DACA. The Termination Memo and Administrative Record contain no references to reliance interests and no cost evaluation. Defendants ignored any readily obtainable data regarding the potential impact of termination. *See State Farm*, 463 U.S. at 43; *Fox Television*, 556 U.S. at 519 (2009) (holding that agencies must "adduce empirical data that can readily be obtained").[19] The

---

[15] *See* Ex. 10, ¶ 10(g) (Wong Decl.); Ex. 11 (Ike Brannon, *The Economic and Fiscal Impact of Repealing DACA*, The Cato Institute, Jan. 18, 2017).

[16] *See* Ex. 12, ¶ 4 (Blackwell-Hawkins Decl., Amazon); Ex. 13, ¶¶ 7-11 (Kalvert Decl., TripAdvisor); Ex. 14, ¶ 8-11 (Igneri Decl., Local Burger); Ex. 15, ¶¶ 4-7 (Tingen Decl., Tingen & Williams); Ex. 16, ¶¶ 7-11 (Schwartz Decl., Univision); Ex. 17, ¶ 7 (Loera Decl., Wash. St. Univ.); Ex. 18, ¶¶ 5-10 (Heatwole Decl., Univ. of Mass.); Ex. 19, ¶¶ 3-6 (Monroe Decl., Wash. Dept. of Ecology); Ex. 20, ¶¶ 3-6 (Kaplan Decl., Wash. Dept. of Social and Health Serv.); Ex. 21, ¶¶ 3-6 (Jones Decl., Wash. Office of Treasurer); Ex. 22, ¶¶ 3-6 (Conly Decl., Wash. Dep't of Veterans Affairs).

[17] *See*, Ex. 18, ¶¶ 5-7 (Heatwole Decl., U. Mass); Ex. 24, ¶¶ 12-13 (Clark *et al*. Decl., Mass. State Univ.); Ex. 25, ¶¶ 15-38 (Herbst Decl., Univ. of Conn.); Ex. 26 ¶¶ 6-13 (Pachis Decl., Eastern Conn. St. Univ.); Ex. 27, ¶¶ 4-7 (Hardwick Decl., Univ. of the District of Columbia).

[18] *See* Ex. 59, ¶ 12 (Rosado Decl., New York Secretary of State); s*ee also* 705 Ill. Comp. Stat. 205/2 (Illinois statute allowing DACA grantees to apply for a license to practice law); Ex. 55, ¶¶ 6-7 (Bzdyra Decl., CT DMV); Ex. 56, ¶¶ 6-10 (White Decl., IL SOS); Ex. 57, (Mass. Registry of Motor Vehicles, *Social Security Number (SSN) Requirements*); Ex. 58, (Attorney General Advisory Letter to Acting Commissioner K. Eric Boyette, Jan. 17, 2013); ORS 807.021 (Oregon Revised Statutes requiring proof of legal presence to issue, renew, or replace driver license).

[19] Several studies were available at the time of Termination discussing in detail the potential impact including: Ex. 28 (Tom Wong, *et al*., *DACA Grantees' Economic and Educational Gains Continue to Grow*, Center for American Progress, Aug. 28, 2017); Ex. 29 (Tom Wong *et al*., *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Center for American Progress, Oct. 18, 2016); Ex. 11 (Ike Brannon, *The Economic and*

testimony of senior DHS officials confirms that Defendants did not analyze the potential costs of termination. According to DHS officials, the decision to terminate DACA resulted from two and a half hours of meetings and a few follow-up conversations.[20] Defendants did not consult key senior officials at U.S. Citizenship and Immigration Services ("USCIS") or Immigration and Customs Enforcement ("ICE") on important aspects of the termination during the decision-making process.[21] Moreover, Defendants failed to consult many key stakeholders, including states and localities (other than Texas), DACA grantees and their employers, colleges and universities, students, patients, military unit commanders, and family members.[22] Defendants did not confer with any economists about the potential impact on the economy and even failed to consider readily-available data from other agencies.[23] With regard to the most obvious outcomes, such as loss of employment by grantees, at least one DHS official agreed that the policy was "not wise."[24]

Finally, Defendants failed to consider any alternatives to mitigate damage to the hundreds of thousands of people relying on the program. When reversing a prior policy, agencies have an obligation to consider "reasonably obvious alternatives," and when rejecting those alternatives, they "must give reasons for rejection." *Yale-New Haven Hosp.*, 470 F.3d at 80 (quoting *N. Y. Council v. Fed. Labor Relations Auth.*, 757 F.2d 502, 508 (2d Cir. 1985)). The Termination

---

*Fiscal Impact of Repealing DACA*, the Cato Institute, Jan. 18, 2017); Ex. 30 (Nicole Prchal Svajlenka, et. al., *A New Threat to DACA Could Cost States Billions of Dollar*, Center for American Progress, July 21, 2017); and Ex. 31 (Misha Hill and Meg Wiehe, *State & Local Contributions of Young Undocumented Immigrants*, Institute on Taxation & Economic Policy, April 25, 2017).

[20] *See* Ex. 3, McCament Dep. 72:22-75:17, 124:22-128:16, 130:2-132:7; Ex. 32, Hamilton Dep. 98:6-113:15.

[21] *See, e.g.,* Ex. 34, Miller Dep. 99:12-19, 100:3-7, 204:1-21, 207:13-20; Ex. 35, Neufeld Dep. 138:13-139:6.

[22] *See* Ex. 33, Nealon Dep. 165:3-168:18; Ex. 3, McCament Dep. 240:20-242:5; Ex. 35, Neufeld Dep. 187:6-188:8; Oct 3 Sen. Jud. Oversight Hearing Transcript at 39.

[23] *See* Ex. 33, Nealon Dep. 168:3-168:18; Ex. 32, Hamilton Dep. 213:14-215:15; Ex. 34, Miller Dep. 102:24-108:8.

[24] Ex. 3, McCament Dep. 15:18-24.

Memo and Administrative Record contain no evidence that Defendants considered different alternatives for winding down the DACA program, or for changing the operation of the program to address its alleged legal flaws. Defendants even ignored the obvious alternative of allowing current grantees to continue receiving deferred action. Defendants' actions are arbitrary and capricious because they did not consider any reasonably available alternatives to mitigate the harm to hundreds of thousands of grantees—as well state and local governments, employers, and universities—who rely on the program.

An Executive action that has the potential to disrupt millions of lives calls for "extensive study and analysis." *United States. v. U.S. Dist. Court for the N. Dist. of Cal.*, No. 17-72917, N.4 (9th Cir. 2017) (Watford, J. dissenting). However, Defendants failed to conduct "even [a] minimal level of analysis," and altogether failed to acknowledge the vast and profound impacts of their action. *Encino Motorcars,* 136 S. Ct. at 2120. Defendants' failure to "examine the relevant data" during the decision-making process renders their decision to terminate DACA arbitrary and capricious. *Long Island Head Start*, 460 F.3d at 257-258 (citing *State Farm*, 463 U.S. at 43).

**C.** **Defendants' Explanations for Termination Are Pretextual and Their True Basis for Termination Is Impermissible.**

As stated above, an agency must "cogently explain" the "true basis" for its actions. *State Farm*, 463 U.S. at 48-49; *Public Citizen,* 653 F.Supp. at 1237 (citing *New England Coal. on Nuclear Pollution v. NRC*, 727 F.2d 1127 (D.C. Cir. 1984). An agency's reasoning is pretextual where the agency makes statements contradicting its purported rationale.

Here, administration officials made statements that conflict with and undermine Defendants' proposed justifications for terminating DACA. While the Termination Memo cites the risk of litigation as a reason for terminating the DACA program, an administration official

involved in the decision-making process noted that an agency acting on the basis of litigation risk was the "craziest policy you could ever have in a Department."[25] In addition, on September 5, 2017, the same day DHS issued the Termination Memo, President Trump tweeted, "Congress now has 6 months to legalize DACA . . . If they can't, I will revisit the issue."[26] The President's promise to "revisit the issue" implies that the Executive has the authority to extend DACA, an implication inconsistent with Defendants' statement that DACA was "effectuated…without proper statutory authority" and that the program was "an unconstitutional exercise of authority."[27]

In fact, Defendants' contradictory rationales for terminating DACA masked the "true basis" for their decision—animus toward Latinos, who make up 93% of DACA grantees. Where an agency rests its action on an "impermissible basis," including invidious discrimination against a particular race or group, it abuses its discretion. *Wong Wing Hang v. I.N.S.*, 360 F.2d 715, 718-19 (2d. Cir. 1966); *Bertrand v. Sava*, 684 F. 2d 204, 212-213 (2d. Cir. 1982); *Haitian Ctrs. Council, Inc. v. Sale*, 823 F.Supp. 1028, 1048-1049 (E.D.N.Y. 1993) (holding that Attorney General abused her discretion by detaining Haitians "solely because they are Haitian and have tested HIV-positive.").

Statements by senior officials leading up to the termination of DACA demonstrate that their action rested on invidious discrimination towards Latinos. First, in announcing his presidential campaign, candidate Trump promised to eliminate DACA and compared Mexican

---

[25] Ex. 32, Hamilton Dep. 207:20-208:11. Indeed, a senior cabinet official has made similar statements when discussing the risk of litigation in response to a recommendation to reduce the size of certain public lands, stating, "I don't yield to public pressure. Sound policy is not based on threats of a lawsuit. It's doing what's right." Ex. 36 (Juliet Elperin, *Zinke backs shrinking more national monuments and shifting management of 10*, THE WASHINGTON POST, Dec. 5, 2017).

[26] Ex. 37 (Donald J. Trump (@realDonaldTrump), Twitter, Sept. 5, 2017, 5:38 PM).

[27] Sessions Letter, AR 251; DACA Termination Memo, AR 252-55.

immigrants to criminals and rapists, stating: "When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."[28] Subsequently, in announcing the termination of DACA, President Trump's appointed Attorney General used the same rhetoric and falsely associated DACA and its grantees with "crime, violence, and even terrorism."[29]

Defendants' use of racial code words to discuss issues related to immigration and the continuation of DACA provide additional evidence of their discriminatory animus towards Latinos. The campaign of then-candidate Trump and President Trump's Administration once installed have repeatedly invoked this strategy and used code words such as "criminals," "drug dealer," "thugs," and "cartel," in reference to Latino immigrants.[30] For example, less than four weeks before the termination of DACA, President Trump made a speech featuring racially coded language about undocumented individuals who cross the Mexican border. President Trump lumped together all such individuals, including DACA grantees, and characterized the entire collective as involved in "gangs," "cartels" and "trafficking."[31] He further referred to these individuals as "animals" and stated that America needed to be "liberat[ed]" from them.[32] On a

---

[28] Ex. 38, ¶ 68 (Pitti Decl.); *See also Id*. at ¶ 66 (Candidate Trump's description of men who used anti-immigrant language, and beat a sleeping Latino man, as "passionate" people who "love their country"), and ¶¶ 110, 128, 134 (Candidate Trump referred to Latinos as "bad hombres," swore he would construct a border wall to keep Mexicans out of the United States, and falsely attributed American public health crises to Mexican immigration). These promises and false accusations were consistent staples in the rhetoric that Latinos engage in fraud and pose a threat to national security and public safety. *See Id*. at ¶¶ 13, 97, 145.

[29] Ex. 39 (DOJ, *Attorney General Sessions Delivers Remarks on DACA, Prepared Remarks*, Sept. 5, 2017); *see also* Ex. 38, ¶¶ 22, 134 (Pitti Decl.) (noting Sessions previously associated Mexicans immigrants with "filth").

[30] Ex. 38, ¶¶ 14, 63 (Pitti Decl.).

[31] *Id*. at ¶ 120 (Pitti Decl.).

[32] *Id*. at ¶¶ 63, 120. Further, President Trump, during both his candidacy and presidency, has repeatedly equated Latino immigrants as terrorists, enemies of the United States, and un-American. This negative language describing

separate occasion, President Trump grouped Mexican individuals with inanimate objects such as cars coming across the borders, and referred to both collectively as "vomit."[33] Attorney General Sessions has similarly described Mexicans as "filth."[34]

In short, Defendants' claim that they terminated DACA based on litigation risk or the program's unlawfulness is implausible given that Defendants previously concluded that DACA is legal and knew that litigation was certain to result from the abrupt cancellation of the program. Ample evidence of Defendants' animus towards Latinos demonstrates that their stated reasons for terminating DACA are not only implausible, but also pretextual. Because rendering decisions based on invidious discrimination is *ipso facto* an abuse of discretion, Defendants acts' violated the APA.

## II.   Defendants' Termination of DACA Violated Equal Protection.

The Fifth Amendment to the United States Constitution requires the United States to provide equal protection of the laws to all persons. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n. 2 (1975) ("[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." (citations and internal quotation marks omitted; alteration in original)); *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954) (holding that the Fifth Amendment's Due Process Clause contains an equal protection safeguard). Pursuant to

---

Latinos is contrasted with positive language Defendant Trump has used for Whites, such as "'good Americans,' 'tax payers,' 'hard-working citizens, 'members of our communities,' and the like."

[33] *Id*. at ¶ 133 (Pitti Decl.).

[34] *Id*. at ¶¶ 22, 134 (Pitti Decl.). In addition, President Trump terminated DACA less than two weeks after pardoning former Maricopa County Sheriff Joe Arpaio, a man convicted for racially profiling Latinos in defiance of court orders.

that guarantee, government action that is motivated by animus toward individuals—whether such animus is based on race, ethnicity, national origin or any other ground—is unconstitutional. *See Romer v. Evans*, 517 U.S. 620, 632 (1996); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Defendants' termination of DACA violates Equal Protection because it was motivated by animus toward Latinos and Defendants' stated reasons for their action are baseless and illogical.

It is axiomatic that governmental action borne out of "a bare . . . desire to harm a politically unpopular group" cannot constitute equal protection of the laws. *Moreno*, 413 U.S. at 534. Although "discriminatory intent is rarely susceptible to direct proof," *Mhany Mgmt v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016), occasionally the record contains unambiguous evidence of the decisionmaker's animus. For example, in *Moreno*, the federal government amended the Food Stamp Act in order to render unrelated individuals who live together ineligible for food stamps. *Id.* at 530. The Supreme Court determined the law unconstitutional because the scant legislative record demonstrated that the amendment was intended to target "hippies" and "hippie communes" to ensure they could not obtain food stamps. *Id.* at 534. Similarly, in *Romer*, the Court analyzed a state constitutional amendment that stripped homosexual individuals, but no other group, of the ability to obtain legal protections against discrimination. When invalidating the amendment, the Court found its "sheer breadth is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class it affects." *Romer*, 517 U.S at 632.

As in *Moreno*, this case is one of those rare instances in which the record reflects unambiguous evidence of Defendants' animus towards Latinos. *See supra* Part I.C. (describing evidence of Defendants' animus toward Latino individuals). Further, similar to *Romer*, the "sheer breadth" of Defendants' termination of DACA—a wholesale stripping of eligibility for

employment and imposition of substantial obstacles to obtaining higher education for nearly 800,000 individuals, without exception—despite the significant reliance interests for those individuals, their U.S. citizen children, and Plaintiff States and their residents, "seems inexplicable by anything but animus towards the class it affects." *See Romer*, 517 U.S. at 632. Because animus can never constitute a legitimate state interest, *see id.* at 634-35, Defendants' termination of DACA is unconstitutional.

Even if the record did not contain ample evidence of Defendants' animus, the termination of DACA would still violate equal protection principles. "In the ordinary case, a [challenged policy] will be sustained if it can be said to advance a legitimate government interest," meaning the policy is "narrow enough in scope and grounded in a sufficient factual context for [a court] to ascertain some relation between the classification and the purpose it served." *Romer*, 517 U.S. at 632-33; *see also Heller v. Doe*, 509 U.S. 312, 324 (1993) (a policy "fails rational-basis review" when it "rests on grounds wholly irrelevant to achievement of the [stated] objective") (citation and internal quotations omitted). Thus, even under the most deferential form of scrutiny,[35] courts must analyze government action to ensure it is rationally related to a legitimate governmental interest. *Romer*, 517 U.S. at 632-33; *Moreno*, 413 U.S. at 533. Defendants' stated bases for

---

[35] The Supreme Court has not directly addressed the level of scrutiny that applies to an equal protection claim based on discrimination against a suspect class in the immigration context. *See, e.g., Kandamar v. Gonzalez*, 464 F.3d 65, 72 (1st Cir. 2006) (citing *Nguyen v. INS*, 533 U.S. 53, 60-61 (2001)). In *Nguyen*, the Court upheld a statute that made it more difficult for a child to claim U.S. citizenship if the child was born abroad and out of wedlock to a U.S. citizen father as compared to a U.S. citizen mother. 533 U.S. at 60-61. The Court concluded that the gender-based classification served an important government objective and the discriminatory classification was substantially related to the achievement of that objective. *Id.* at 60. Although the *Nguyen* Court applied heightened scrutiny to assess the law, it stated that "[g]iven [the Court's] determination [about the statute at issue], we need not decide whether some lesser degree of scrutiny pertains because the statute implicates Congress' immigration and naturalization power." *Id.* at 61 (citations omitted). Here, Plaintiff States do not concede that Congress' immigration and naturalization power is only subject to the most deferential form of scrutiny in *all* circumstances. This is especially so given that courts have acknowledged that Latinos are a suspect class for equal protection analysis, and thus entitled to heightened scrutiny. *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983). Rather, Plaintiff States only argue that Defendants' animus toward Latinos—as evidenced in the record—fails even the most deferential Equal Protection test.

terminating DACA fail even this highly deferential standard because there exists no rational relationship between means and ends. Specifically, Defendants have asserted that they terminated DACA to avoid "the prospect of continued litigation"[36] because DACA is unlawful and unconstitutional.[37] But no court has held that DACA is illegal, and prior to its recent about-face, the government consistently affirmed DACA's legality.[38] Further, Defendants were on notice that abruptly terminating DACA would trigger this very lawsuit, thus destroying any argument that ending DACA would somehow avert litigation.[39] In addition, government officials involved in the termination of DACA acknowledge that litigation risk is not a reasonable basis for directing a sea change in government policy.[40] The irrationality of the decision to terminate is particularly stark given the stakes for the Plaintiff States and their residents. *See infra* Part IV (describing irreparable harm).

Moreover, the Supreme Court's reasoning in *Plyler v. Doe*, 457 U.S. 202 (1982) cautions that this Court should be especially skeptical of Defendants' actions because they are harming a group of individuals who "are present in this country through no fault of their own," *Id.* at 226.[41] Indeed, a "special constitutional sensitivity" attaches where, as here, a government action

---

[36] Mem. Of Law in Supp. Of Defs.' Mtn. to Dismiss at 18, ECF 71-1. *See also* Termination Memo, AR 252-55 (citing litigation risk to support decision).

[37] Termination Memo, AR 252-55.

[38] *See, e.g.*, U.S. DOJ, Office of Legal Counsel, "Department of Homeland Security's Authorization to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others" (Nov. 19, 2014), 2014 WL 10788677; Br. Of U.S. at 31-37, *Ariz. Dream Act Coal. V. Brewer*, No. 15-15307 (9th Cir. Aug. 28, 2015), ECF. 62; Br. Of U.S., *United States v. Texas*, No. 15-674 (U.S. Mar. 1, 2016), 2016 WL 836758 at *2-9, 42-64.

[39] *See* Ex. 40 (Ltr. from Att'y Gen. Xavier Becerra *et al.* to President Donald Trump, at 3, July 21, 2017).

[40] *See* Ex. 32, Hamilton Dep. At 207:20-208:11 (Oct. 20, 2017) (responding to whether "DHS ha[s] a policy to deal with litigation risk" including "threats to sue by state or local officials" by stating, "No. And that sounds like the craziest policy you could ever have in a department. You could never do anything if you were always worried about being sued."); *accord* Ex. 33, Nealon Dep. At 28:5-7, 154:23-155:11 (Oct. 13, 2017) (unaware, in 33 years of federal government service, of any policy besides DACA that was rescinded due to litigation risk).

[41] *See also* Ex. 10, ¶ 5 & n.6 (Wong Decl.) ("The average age that [a DACA recipient] first arrived in the U.S. is 6.5," during "kindergarten or first grade.").

punishes individuals for the illegal actions of their parents and will have life-altering consequences. *Id.* at 226; *see also Kadrmas v. Dickinson Pub. Schools*, 487 U.S. 450, 459 (1988) (affirming that denying a public education to the children of illegal aliens penalized them because of their parents' illegal conduct and they would suffer adverse, life-long consequences). Thus, in *Lewis v. Thompson*, 252 F.3d 567, 591 (2d Cir. 2001), the Second Circuit held that a federal statute that denied automatic Medicaid coverage to children born in the U.S. to undocumented aliens violated Equal Protection. Key to the holding was the Second Circuit's finding that the Medicaid provision penalized children for their mother's conduct and triggered significant and enduring consequences to the children themselves. *Id.; see also Nat'l Law Ctr. on Homelessness and Poverty v. N.Y.*, 224 F.R.D. 314, 321-22 (E.D.N.Y. 2004) (denying state's motion to dismiss equal protection claim asserted by homeless children that they were not receiving the same educational benefits as children with homes; "[d]efendants appear to be penalizing these homeless children because of the misfortunes or misdeeds of their parents" and "the penalty [risks] significant and ensuring consequences" to the homeless children.)

All DACA grantees were brought to this country as children, through no choice or fault of their own, and thus have the same blameless quality identified by the Supreme Court and Second Circuit.[42] As in *Lewis*, depriving these young adults of the ability to obtain any employment or imposing substantial burdens on their ability to attend school both penalizes them for the actions of their parents and exposes them to "significant and enduring adverse consequences." *Lewis,* 252 F.3d at 591.

---

[42] *See* Memorandum from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012, AR 1-3.

In sum, Defendants' decision to terminate DACA was motivated by animus towards Latinos and is therefore unconstitutional. Defendants' termination of DACA is also unconstitutional because there exists no rational relationship between that policy and their stated objectives. This irrationality is especially problematic given the blameless nature of the class affected. Thus, Plaintiff States have shown a likelihood of success on their claim that Defendants' termination of DACA violates Equal Protection.

**III.   Defendants' Termination of DACA Violates the Procedural Requirements of the APA and RFA.**

In addition to its substantive defects, the termination of DACA is procedurally invalid. By terminating DACA without allowing for notice and comment or conducting a regulatory flexibility analysis, Defendants violated the APA and RFA.

Rules created by federal agencies are generally subject to notice and comment. APA requirements "are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *United States v. Lott*, 750 F.3d 214, 219 (2d Cir. 2014) (internal quotation and citation omitted). The APA requires notice of proposed agency rules and an opportunity to comment for all "legislative" or "substantive" rules,[43] exempting only "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–303 (1979); *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993). In other words, notice and comment rulemaking applies to all rules other than those that describe "an agency's intended course of

---

[43] While the terms "legislative" and "substantive" are used interchangeably in this context, Plaintiff States use the term "legislative" consistent with the preference identified by the Second Circuit. *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993).

action" (general statements of policy), "its tentative view of the meaning of a particular statutory term" (interpretative rules), or "internal house-keeping measures organizing agency activities" (procedural rules). *Perales v. Sullivan*, 948 F.2d 1348, 1354 (2d Cir. 1991) (internal citation and quotations omitted). Notice and comment is required whenever agency action does not fall within these specific exemptions, which "must be narrowly construed." *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989).

When the APA's notice and comment requirements apply, the RFA further requires a regulatory flexibility analysis to assess a prospective rule's impact on small businesses, nonprofits, and small governmental jurisdictions, unless the head of the agency certifies that the rule will not affect small entities.[44] 5 U.S.C. §§ 601(2), 603(a) 604(a), 605(b); *see also U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (FCC should have provided notice of a rule under 5 U.S.C. § 553 (Rulemaking), so the RFA's requirements were applicable).

In this case, the termination does not fall under the APA's exemptions for interpretive or procedural rules, because it affects existing rights and interests in profound ways. The termination is not exempt as a general statement of policy because it binds the discretion of DHS and its officials. Moreover, the substantial impact of the rule has engendered significant public interest, which weighs in favor of public input through notice and comment. Yet Defendants terminated DACA after a few brief meetings and without the benefit of input and analysis from

---

[44] The termination directly affects small entities, in that it prohibits them from continuing to employ DACA grantees. *See Aeronautical Repair Station Ass'n v. F.A.A.*, 494 F.3d 161, 177–78 (D.C. Cir. 2007) (a rule that required employees to undergo drug and alcohol testing "directly affected" contractors and subcontractors, not just primary employers). But absent this direct effect, the DHS Secretary would have been required to certify, by publication in the Federal Register, that the rule would not have a significant economic impact on a substantial number of small entities, along with a factual basis for such certification. *See* 5 U.S.C. § 605(b). The DHS Secretary issued no such certification here.

numerous stakeholders. Under the APA and the RFA, a more deliberative and public process was required.

**A.  <u>The Termination Changed Existing Rights and Interests.</u>**

Whether a rule is "legislative" rather than "interpretive" or "procedural" turns on whether the rule "creates new law, rights, or duties in what amounts to a legislative act." *Sweet v. Sheahan,* 235 F.3d 80, 91 (2d Cir. 2000) (quoting *White,* 7 F.3d at 303). Thus, where a rule "change[s] existing rights and obligations," it is a legislative rule. *Donovan v. Red Star Marine Servs., Inc.*, 739 F.2d 774, 783 (2d Cir. 1984) (citing *Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 482 (2d Cir.1972) (internal citations omitted). "A procedural rule, by contrast, 'does not alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.'" *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 168 (2d Cir. 2013) (quoting *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5-6 (D.C. Cir. 2011)). And an "interpretive" rule "merely 'clarif[ies] an existing statute or regulation.'" *N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 131 (2d Cir. 2001) (internal citations omitted).

Here, the rule terminating DACA significantly altered the rights and interests of hundreds of thousands of DACA grantees and DACA-eligible individuals. Current grantees will lose deferred status and work authorization benefits when their terms expire and they are precluded from the opportunity to renew. DACA grantees were repeatedly assured that their requests for renewal of their lawful presence would be considered if they followed the rules of the DACA program.[45] As Former Secretary of Homeland Security John Kelly affirmed, once an individual

---

[45] *See* Napolitano Memo, June 15, 2012, AR 1; Ex. 41 (USCIS Help Center, DACA FAQs); Ex. 42 (USCIS Help Center, *How will USCIS evaluate my request for renewal of DACA*); Ex. 43 (USCIS DACA Approval Notice).

was granted deferred prosecution under DACA, he or she was granted a "commitment … by the government."[46] Walking away from that "commitment" curtails DACA grantees' existing rights and deeply affects their interests. The termination also categorically disallows all applications for deferred action for all those who satisfy DACA's established criteria. Prospective grantees have lost not only the ability to apply for deferred action based on that criteria, but also access to work authorization, social security cards, advance parole (under 8 U.S.C. § 1182(d)(5)), and numerous collateral benefits. Thus, the rule does not fall under the interpretive or procedural exemptions of the APA.

**B.** **The Termination Binds the Discretion of DHS and Its Officials.**

The termination is more than a "general statement of policy" because it binds DHS discretion. To determine whether the exemption to notice and comment applies, courts look to whether a rule binds the discretion of the agency and its officials. *See Gen. Elec. Co. v. E.P.A.,* 290 F.3d 377, 382–83 (D.C. Cir. 2002) (notice and comment is required when a rule "expresses a change in substantive law or policy (that is not an interpretation) which the agency intends to make binding, or administers with binding effect.") (internal quotation and citation omitted). The "critical factor" in distinguishing a legislative rule from a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1324 (9th Cir. 1992) (quoting *Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1013-14 (9th Cir.1987)). Thus, "cabining of an agency's prosecutorial discretion" rises to the level of a legislative rule where it requires agency

---

[46] Ex. 44 (Ted Hesson & Seung Min Kim, Wary Democrats Look to Kelly for Answers on Immigration, Politico, Mar. 29, 2017).

officials to take a particular approach. *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987); *see also Bellarno Intern. Ltd. v. Food & Drug Admin.*, 678 F.Supp. 410, 414 (E.D.N.Y. 1988) (an alert that automatically required detention of certain pharmaceuticals imported into the U.S. was binding on both the government and importers and thus subject to notice and comment).

The Termination Memo eliminates DHS's discretion to grant new DACA applications, to renew existing benefits, or to authorize advance parole. From now on, DHS "*[w]ill* reject *all* DACA initial requests … filed after the date of this memorandum,*" "[w]ill* reject *all* DACA renewal requests" outside of a strict wind-down period which has already ended, "*[w]ill* not approve *any* new Form I-131 applications for advance parole," and "*[w]ill* administratively close *all* pending Form I-131 applications for advance parole" by DACA grantees (emphasis added).[47] This type of "mandatory, definitive language is a powerful, even potentially dispositive, factor" in determining whether a rule is substantive. *Young*, 818 F.2d at 947. In fact, DHS officials currently retain *no* discretion to fulfill any DACA-related requests, whether for initial or renewal applications or for advance parole. *Cf. Dimaren v. Immigr. and Naturalization Serv.*, 398 F.Supp. 556, 559 (S.D.N.Y. 1974) (rule was exempt from notice and comment because agency officials were free to give an immigration policy memorandum "whatever weight [they] deemed appropriate," so it did not bind their discretion). Moreover, DACA grantees and DACA-eligible individuals are bound in that they cannot meaningfully request deferred action or advance parole under the framework that they could under DACA.

---

[47] DACA Termination Memo, AR 252-255.

Unlike the DACA termination, deferred action programs usually end when circumstances render them no longer necessary (such as new statutory protections coming from Congress).[48] In one circumstance in which the government attempted to eliminate a prosecutorial discretion program for a class of non-citizens, however, a federal court determined that notice and comment rulemaking was required under the APA. *See Parco v. Morris*, 426 F. Supp. 976, 984-985 (E.D. Pa. 1977). In *Parco,* the federal government attempted to terminate a policy that granted extended stay in the U.S. for individuals awaiting a certain type of visa. Because this decision stripped agency officials of discretion to offer relief, the court found that it was a "flat rule of eligibility" rather than a "general statement of policy." *Id.* The DACA termination allows for even less discretion than that in *Parco*, as the *Parco* termination explicitly left in place discretion to grant relief in "compelling" cases, *id.* at 981, while the DACA termination flatly states that DACA requests will be rejected. *Parco* distinguished the Second Circuit's decision in *Noel v. Chapman*, 508 F.2d 1023, 1029 (2d Cir. 1975), which upheld a different aspect of the same termination decision against an APA challenge. In *Noel*, the challenged aspect of the policy served as only a "guideline" for agency discretion, left relevant determinations in the "sole discretion" of agency officials, and contained an explicit "hardship" exception." *Id.* at 1030. The difference between *Noel* and *Parco* is analogous to the difference between the creation of deferred action policies (such as DACA) and the DACA termination. Deferred action policies for groups of people provide guidance to agency officials in the field to inform their exercise of discretion in individual cases.[49] The DACA termination, on the other hand, mandates that agency

---

[48] *See* Ex. 1, ¶ 76 (Wadhia Decl.).

[49] *See* Ex. 1, ¶ 51, 53 (Wadhia Decl.).

officials reject all requests of a certain type. Thus, the termination cannot be characterized as a statement of policy exempt from notice and comment.

**C.  A Strong Public Interest in the Treatment of DACA Grantees Weighs in Favor of Notice and Comment.**

Courts also recognize that the question of whether the impact of a rule is substantial enough to trigger notice and comment is "'one of degree' depending upon 'whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.'" *Elec. Privacy Info. Ctr.*, 653 F.3d at 5-6 (internal citations omitted). A strong public interest in a rule thus weighs in favor of a finding that the rule is legislative in nature, and therefore subject to notice-and-comment rulemaking. *Hoctor v. U.S. Dept. of Agric.*, 82 F.3d 165, 171 (7th Cir. 1996) ("The greater the public interest in a rule, the greater reason to allow the public to participate in its formation.").

There is a strong public interest in the protection of the DACA program, not only from hundreds of thousands of DACA grantees themselves, but also from states, colleges, universities, businesses, non-profits, cities and towns, school districts, family members, and taxpayers who have invested significant resources and benefitted from the DACA program. All of these individuals and entities will be significantly harmed when hundreds of thousands of young people lose the opportunities and security that DACA has provided. *Accord infra* Part IV (cataloguing the irreparable harm that Plaintiff States and their residents will suffer if the termination is not enjoined). This substantial impact merits the opportunity for notice and comment by those affected. Thus, Plaintiff States are likely to succeed on their claim that Defendants violated the APA and RFA by foregoing notice and comment procedures and a regulatory flexibility analysis.

## PLAINTIFF STATES SATISFY THE REMAINING REQUIREMENTS FOR
## INJUNCTIVE RELIEF

Plaintiff States also satisfy the remaining requirements of the preliminary injunction standard, as the States will suffer irreparable harm without preliminary relief, preliminary relief is in the public interest, and the balance of equities weigh in favor of the States.

### I.   Absent an Injunction, the States Will Suffer Irreparable Harm.

Plaintiff States and their residents will suffer irreparable harm absent injunctive relief. *Winter*, 555 U.S. at 22.[50] Plaintiff States' demonstration that they are likely to succeed on the merits of their equal protection claim establishes that they will incur irreparable harm. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("the *alleged* violation of a constitutional right [] triggers a finding of irreparable harm"); *see also Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.") (citation omitted). Further, whether a party has been "depriv[e]d of a procedural protection to which they are entitled" under the APA, as Plaintiff States were here, can be significant when finding irreparable harm; if this were not the case, "section 553 [rulemaking] would be a dead letter." *N. Mariana Islands v. United States*, 686 F.Supp.2d 7, 17-18 (D.D.C. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002)).

The threat of harm to Plaintiff States is imminent. *See N. Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015), *cert. dismissed sub nom, Allergan PLC v. N. Y. ex. rel. Schneiderman*, 136 S. Ct. 581 (2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir.1999)) (internal quotation marks omitted) (irreparable

---

[50] As detailed for this Court in *Batalla Vidal* Plaintiffs' Memorandum of Law in support of their Motion for Preliminary Injunction, the termination of DACA will also cause irreparable harm to DACA grantees and organizations that serve them.

harm is "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages"). Between September 5, 2017 and March 4, 2018, 122 people per day have lost, or will lose, their DACA benefits; and "beginning on March 5th, 2018, every work day for the following two years…approximately 1,400 dreamers will lose their work permits and be subject to deportation."[51] This imminent loss of work and potential deportation of DACA grantees will cause irreparable injury to the States. The termination will negatively impact the States' child welfare systems as the U.S. citizen children of DACA grantees may be placed in the States' care as a result of their parents inability to remain legally in the United States.[52] Increased fear of deportation will also harm public safety, since without DACA status, DACA grantees will be less likely to report violence, abuse, crimes or other harms to the community.[53] The States will also suffer concrete and irreparable injury, as regulators and licensors, employers, and providers of education and health care systems.[54] State and local economies will also be harmed. These harms will be irreversible absent the granting of preliminary relief during the pendency of this litigation.

---

[51] *See* Ex. 45 (Tom Jawetz and Nichole Prchal Svajlenka, Thousands of DACA Recipients Are Already Losing Their Protection From Deportation, Nov. 9 2017); Oct. 3 S. Jud. Transcript 2017 WL 4410019 at 12.

[52] *See* Ex. 10, ¶¶ 26-27 (Wong Decl.); Ex. 46, ¶ 20 (Zayas Decl.); Ex. 47, ¶¶ 9-11 (Rubin Decl.); Ex. 48, ¶¶ 3, 8 (Morales Decl.); Ex. 6, ¶ 20 (Cuevas Decl.); Ex. 111, ¶ 9 (Mendez Decl.); Ex. 49, ¶ 7 (Nicolas Decl.); Ex. 50, ¶ 4 (G.L. Decl.); *See State v. Trump*, 2017 WL 4639560, at *36 (D. Haw. Oct. 17, 2017), *stayed pending appeal*---S.Ct.---, 2017 WL 5987435 (Mem)("Plaintiffs identify a multitude of harms that are not compensable with monetary damages and that are irreparable—among them, prolonged separation from family members."); *Int'l Refugee Assistance Project v. Trump*, 2017 WL 4674314, at *37 (D. Md. Oct. 17, 2017), *stayed pending appeal*—S.Ct.—, 2017 WL 5987435 (Mem)("Without an injunction, Plaintiffs will be subjected to imminent and irreparable harm as a result of the prolonged separation from their family members caused by the Proclamation").

[53] *See* Ex. 10, ¶ 30 (Wong Decl.); Ex. 51, ¶ 10 (Graham Decl., DE Comm. Legal Aid Soc.); Ex. 52, ¶ 15 (Ambrosino Decl., City of Chelsea, MA); Ex. 53, ¶ 16 (Suarez-Orozco Decl.).

[54] *See* Ex. 10, ¶¶ 37-100 (Wong Decl.); Ex. 54, ¶¶ 22-41, 43-44, 46 (Ku Decl.).

### A. **Harm to the States' Regulatory and Licensing Schemes.**

The termination will require a shift in the States' regulatory and licensing schemes, as many States will have to devise alternate regulations to address the thousands of DACA grantees who have obtained licenses, social security cards, and insurance because of their status under DACA.[55] For example, the Board of Regents in New York, which permanently adopted regulations to allow DACA grantees to apply for teacher certification and professional licenses, including nursing licenses, will likely have to adjust or revoke these regulations due to the termination.[56] These shifts will create budgetary uncertainty,[57] and impair the States, along with their towns and counties, from making informed decisions going forward.[58]

### B. **Harm to State Employers.**

As DACA benefits expire, the States will lose the services of highly qualified employees in government who provide a diverse range of services to the States' residents, including faculty at State universities, nurses, information technology specialists, and public safety officers.[59] The States will lose the substantial investment that they have made in training these individuals, an investment they will never recoup if DACA is terminated. For example, there is substantial fear

---

[55] *See* Ex. 55, ¶¶ 6-7 (Bzdyra Decl., CT DMV.); Ex. 56, ¶¶ 6-7 (White Decl., IL SOS); Ex. 57 (Mass. Registry of Motor Vehicles, *Social Security Number (SSN) Requirements*); Ex. 58 (Attorney General Advisory Letter to Acting Commissioner K. Eric Boyette, Jan. 17, 2013); ORS 807.021 (Oregon Revised Statutes requiring proof of legal presence to issue, renew, or replace driver license).

[56] *See* Ex. 59, ¶5 (Rosado Decl., New York Secretary of State); Ex. 5, ¶ 10 (Naveed Decl.); *See also* 705 Ill. Comp. Stat. 205/2 (Illinois statute allowing DACA grantees to apply for a license to practice law).

[57] For example, in New York State, the March 5, 2018 deadline is just a few weeks before the fiscal year, which runs from April 1 to March 31. *See* N.Y. Fin. Law § 3.

[58] *See* Ex. 56, ¶ 7 (Decl. White, IL SOS); Ex. 57 (Mass. Registry of Motor Vehicles, Social Security Number (SSN) Requirements); Ex. 60, ¶¶ 5-7 (Decl. Perez); Ex. 7, ¶¶ 7,9 (Decl. Mendes); Ex. 9, ¶ 8 (Decl. Juarez); Ex. 61, ¶ 4 (Decl. Oduyoye); Ex. 62, ¶ 8 (Decl. I.V.); Ex. 63, ¶ 9 (Decl. I.T.).

[59] *See* Ex. 64, ¶¶ 8. 10-14 (Johnson Decl., SUNY); Ex. 59, ¶¶ 8-9 (Rosado Decl., New York Secretary of State); Ex. 19, ¶¶ 4-6 (Monroe Decl., WA DOE); Ex. 18, ¶ 10 (Heatwole Decl., UMass); Ex. 65, ¶¶ 3-6 (Glatt Decl., Columbia Basin College); Ex. 20, ¶¶ 3-6 (Kaplan Decl., WA DSHS); Ex. 21, ¶¶ 3-6 (Jones Decl., WA Office of Treasurer); Ex. 66, ¶¶ 3-6 (Schuh Decl., Anacortes); Ex. 22, ¶¶ 3-6 (Conly Decl., WA DVA); Ex. 67, ¶¶ 3-6 (Garza Decl., Big Ben Community College).

that the termination will result in Washington State University losing many valuable employees, including research and teaching assistants.[60] School districts employ DACA grantees as teachers, and public and community-based healthcare institutions hire DACA grantees who are doctors to work in underserved or high-demand communities.[61] In addition to losing the critical skills of these employees, States will incur additional costs to recruit, hire, and train replacements for the DACA grantees, resulting in concrete and irreparable injury. State and local government agencies also will be hampered in their efforts to recruit strong candidates for open positions.[62]

## C. <u>Harm to State Educational Institutions.</u>

In addition to the loss of employees, the States' educational institutions will lose students and experience a loss of revenue, thus hindering their ability to promote critical programming necessary to fulfill their educational missions.[63] DACA grantees who are students—one half of all DACA grantees—may stop attending school in the upcoming semesters due to a loss of funding, fear of deportation, and the inability to work following graduation.[64] Without relief from the Court, students will lose scholarships and default on educational loans, impacting both

---

[60] *See* Ex. 17, ¶ 7 (Loera Decl., WSU).

[61] *See* Ex. 68, ¶ 11 (Carrizales Decl., Teach For America), Ex. 6, ¶¶ 8-11 (Cuevas, Decl., Oregon dentist); Ex. 69, ¶¶ 8,15 (Mostafi Decl., MOIA); *see also* Ex. 54, ¶¶ 44, 46 (Ku Decl.); Ex. 70, ¶ 10 (Kennedy Decl., City of Newburgh).

[62] *See* Ex. 70, ¶¶ 7-14,17 (Kennedy Decl., Newburgh, NY); Ex. 52, ¶¶ 4-16 (Ambrosino & Bourke Decl., City of Chelsea); Ex. 66, ¶¶ 3-6 (Schuh Decl., Anacortes); Ex. 68, ¶¶ 7-12 (Carrizales Decl., Teach for America).

[63] *See* Ex. 18, ¶¶ 5-7 (Heatwole Decl., UMass); Ex. 24, ¶¶ 12-13 (Clark *et al.* Decl., MA St. U.); Ex. 25, ¶¶ 15-38 (Herbst Decl., UConn); Ex. 26, ¶¶ 15-24 (Pachis Decl., E. CT St. U.); Ex. 27, ¶¶ 1, 4 (Hardwick Decl., U. DC).

[64] For DACA grantees with a spring expiration date an injunction could be the difference between completing their education or dropping out mid-semester. *See* Oct. 3 S. Jud. Transcript 2017 WL 4410019 at 39. *See also* Ex. 17, ¶¶ 4-6, 9-11 (Loera Decl., WSU); Ex. 71, ¶ 7 (Milliken Decl. CUNY); Ex. 72, ¶¶ 4-5 (Ballinger Decl., UW); Ex. 18, ¶ 5 (Heatwole Decl., UMass);   Ex. 73, ¶ 8 (Jeka Decl., Tufts University); Ex. 25, ¶ 17 (Herbst Decl., UConn); Ex. 74, ¶ 10 (Salgado Decl., CCC); Ex. 75, ¶¶ 8-9 (Wilson Decl., U of I).

the educational institutions and financial providers in the States.[65] For example, Eastern Connecticut State University stands to lose almost $2 million in payments for the 2017-2018 academic year if DACA students are forced to withdraw as a result of the termination.[66] Those DACA grantees who continue to attend school post-termination will not be able to fully participate in a variety of activities—including travel sports teams, study-abroad programs, research projects, scholarly work, and travel opportunities—because they will lack the necessary work and travel authorizations.[67] These factors may shrink the capacity of state and private educational institutions to offer such programming to their entire student body. Public and private universities will be forced to alter recruitment of both students and faculty.[68] Finally, termination will hinder the ability of colleges and universities to advance their commitment to inclusion and diversity.[69]

### D.  Harm to State Healthcare Systems.

Absent an injunction, the termination will also cause immediate and far-reaching consequences to the States' health care systems.[70] The termination will force DACA grantees, 57% of whom obtain their health insurance through their employers, off employer-based

---

[65] *See* Ex. 4, ¶ 13 (Andrade Decl.); Ex. 76, ¶ 6 (Guevara Decl.); Ex. 7, ¶ 8 (Mendes, Decl.); Ex. 71 ¶ 7 (I.T. Decl.); Ex. 8, ¶¶ 4-5 (Teodoro Decl.); Ex. 6, ¶¶ 7-9, 12-13 (Cuevas Decl.); Ex. 5, ¶¶ 10, 13 (Naveed Decl.); Ex. 77, ¶ 4 (Preciado Decl.); Ex. 61, ¶ 4 (Oduyoye Decl.); Ex. 78, ¶ 6 (Suria Decl.); Ex. 79, ¶ 5 (Torrez Decl.).

[66]  *See* Ex. 26, ¶ 18 (Pachis Decl., E. CT St. U.); *see also* Ex. 80, ¶ 8 (Miranda Decl., CSU); Ex. 81, ¶ 6 (Hagemann Decl.,WOU); Ex. 82, ¶ 6 (Trueblood-Gamble Decl., SOU); Ex. 27, ¶ 6 (Hardwick Decl., U. DC); Ex. 83, ¶ 5 (Alexander Decl., OSU); Ex. 84, ¶ 6 (Ridder Decl., PSU); Ex. 85, ¶ 5 (Galvan Decl., U of O).

[67] *See* Ex. 86, ¶ 6 (Dietz Decl., ISU); Ex. 88, ¶ 7 (Martin Decl., Amherst); Ex. 89, ¶ 8 (Stephens Decl., Mount Holyoke).

[68]  *See* Ex. 90, (Locke Decl., Brown); Ex. 64, ¶ 6 (Johnson Decl., SUNY); Ex. 17, ¶¶ 4-6, 9-11 (Loera Decl., WSU).

[69]  *See* Ex. 71, ¶ 10 (Milliken Decl., CUNY); Ex. 72 ¶6 (Ballinger Decl, U. of Washington); Ex. 18, ¶ 7 (Heatwole Decl., UMass); Ex. 80, ¶ 9 (Miranda Decl., Colorado State U.); Ex. 25, ¶¶ 19-26, 36-38 (Herbst Decl., UConn.); Ex. 27, ¶ 8 (Hardwick Decl., U. DC); Ex. 91, ¶¶ 7-8, 10 (Straney Decl., U. of Hawaii); Ex. 86, ¶¶ 3, 4, 7, Dietz Decl., Illinois State U.); Ex. 23, ¶¶ 10, 18, 21 (Mathewson & Pareja Decl., Univ. of NM School of Law ); Ex. 83, ¶¶ 6, 8 (Alexander Decl., Oregon State. U.); Ex. 92, ¶¶ 4-5 (Reveley Decl., College of William and Mary).

[70] *See* Ex. 54, ¶¶ 22-42 (Ku Decl.).

coverage and on to emergency Medicaid or other uncompensated care that is administered or funded by the States.[71] Termination will thus place a heavier burden on state public health systems to serve the uninsured.[72] For example, Illinois and New York—the two Plaintiff States that will be most impacted—will incur an estimated $20 million and $18 million, respectively, in additional public health costs due to the termination; nationwide the estimate climbs to an increase of more than $343 million in public health costs.[73]

Moreover, States will have to adjust their healthcare systems to increase access for former DACA grantees.[74] For example, both New York and the District of Columbia have State-funded health care coverage for low-income undocumented immigrants who have received deferred action. However, due to the termination, both States may have to amend their rules to include *former* DACA grantees in that coverage, which will drain State resources.[75] Access to care will also be limited for dependents of DACA grantees, including U.S. citizen children, once DACA grantees lose their work authorizations and private insurance coverage.[76] An increased strain on State-funded healthcare programs and a subsequent lack of access to care for the States' residents is irreparable and imminent harm.

---

[71] *See* Ex. 10, ¶ 10(e) (Wong. Decl.); Ex. 54, ¶ 12 (Ku Decl.).

[72] *See* Ex. 54, ¶ 22 (Ku Decl.) (finding that DACA grantees' loss of private health insurance will result in higher demand on state-funded emergency Medicaid).

[73] *See* Ex. 54 ¶¶ 29, 33, 42 (Ku Decl.).

**[74]** Ex. 93, ¶¶ 5-6 (Peterson Decl.); Ex. 94, ¶¶ 4-7 (Groff Decl.).  See also Fishman v. Paolucci, 628 F. App'x 797, 800 (2d Cir. 2015) (District Court did not abuse its discretion in finding that "the wrongful denial of Medicaid benefits . . . is the type of non-monetary, imminent harm that is properly characterized as irreparable." (internal citation omitted)); Lewis v. Grinker, 1987 WL 8412, at *5 (E.D.N.Y. Mar. 6, 1987) (finding denial of non-emergency Medicaid coverage to aliens residing in New York State to be irreparable harm)**.**

[75] *See* Ex. 54 ¶¶ 27, 33 (Ku Decl.); Ex. 95, ¶¶ 9-12 (Schlosberg Decl.).

[76] *See* Ex. 54. ¶¶ 11-12,15, 22 (Ku Decl.); Ex. 10, ¶ 26 (Wong. Decl.); Ex. 46, ¶ 27 (Zayas Decl.); Ex. 47, ¶¶ 9-11 (Rubin Decl.); Ex. 48, ¶¶ 3, 8 (Morales Decl.); Ex. 6, ¶ 20 (Cuevas Decl.).

E. **Harm to State and Local Economies.**

The negative economic impact of the termination will be staggering. The country as a whole will lose approximately $215 billion over the next ten years in economic contributions by DACA grantees,[77] and states and localities will lose an estimated $797 million in tax revenues.[78] States also will be deprived of DACA grantees' critical contribution to vulnerable communities and key sectors in their states. For example, many DACA grantee students have expressed interest in—and have in fact obtained—scholarships that require them to work in rural or under-served communities as physicians, lawyers, and healthcare professionals once they finish their studies.[79] They will no longer be able to do so.

More than 90% of DACA grantees are employed, and the program has allowed many grantees to obtain better paying employment that more closely matches their education and training.[80] Moreover, one in twenty grantees has relied on the program to start a business, a rate higher than that of native-born Americans.[81] Termination will translate into smaller consumer and legal workforce bases within the States,[82] harming the private sector and especially small

---

[77] *See* Ex. 96, ¶ 14 (Brannon Decl.).

[78] *See* Ex. 97, ¶ 6 (Decl. Essig *et al.*).

[79] *See* Ex. 98, ¶ 8 (Callahan Decl., Loyola); Ex. 4 ¶ 15 (Andrade Decl.); Ex. 99, ¶ 14 (Roth Decl., UNMHSC); Ex. 100, ¶ 6 (Cuprill-Comas Decl., OHSU); Ex. 101, ¶ 7 (Sullivan Decl., U of V); Ex. 5, ¶ 14 (Decl. Naveed); Ex. 102, ¶ 8 (Perla Decl.); Ex. 9, ¶¶ 12-13 (Juarez Decl.); Ex. 54, ¶ 45 (Ku Decl.).

[80] *See* Ex. 10, ¶ 10-12 (Wong Decl.).

[81] *See* Ex. 10, ¶ 10(g) (Wong Decl.).

[82] *See* Ex. 103, ¶ 7 (Mutty Decl., Starbucks); Ex. 12, ¶ 4 (Blackwell-Hawkins Decl., Amazon); Ex. 13, ¶ 7-11 (Kalvert Decl., TripAdvisor); Ex. 104, ¶ 7-12 (Shively Decl., Microsoft); Ex. 105, ¶ 6-14 (Tracy Decl., Brazilian Workers Center); Ex. 14, ¶ 7-11 (Igneri Decl., Local Burger); Ex. 15, ¶ 4-7 (Tingen Decl., Tingen and Williams); Ex. 106, ¶ 4-6 (Romero Decl., Barrera Legal Group); Ex. 107, ¶ 7 (Greenberg Decl., WP); Ex. 16, ¶ 7 (Schwartz Decl., Univision); Ex. 108, ¶ 5 (Pinsky Decl., ABNY); Ex. 109, ¶ 3-7 (Gooden Decl., VA DAF). The entrepreneurial sector in the States will also suffer, as the data shows that immigrants start their own businesses and file patents at greater rates than native-born Americans. Ex. 11, ¶ 18 (Brannon Decl.)); Ex. 10, ¶¶ 37-100 (Wong Decl.).

businesses and nonprofits for which the loss of even one qualified and trained employee can cause significant disruption.[83]

***

Each day during the pendency of this litigation, hundreds of thousands of DACA grantees experience fear and uncertainty in their lives, with significant adverse effects to them and their families, and also to the State employers, universities, hospitals, and communities in which they work and reside. The only way to head off the imminent and irreparable harms that termination on March 5, 2018 will cause is for the Court to grant preliminary relief until this lawsuit is fully resolved.

## II.   The Public Interest and the Balance of the Equities Weigh in Favor of a Preliminary Injunction.

The public interest and the balance of the equities weigh in favor of granting a preliminary injunction.[84] Both favor "preventing the violation of a party's constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d at 1069 (9th Cir. 2014) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.2012)) (brackets omitted). The public interest also favors compliance by agencies with their obligations under the APA and RFA. *See N. Mariana Islands*, 686 F.Supp.2d at 21 ("the public interest is served when administrative agencies comply with their obligations under the APA"). Here, Plaintiff States have shown that Defendants have violated the constitutional guarantee of Equal Protection, as well as the APA and RFA. In fact,

---

[83] *See* Ex. 10, ¶¶ 6, 11-12, 18, 23 (Wong Decl.); *See also Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) ("Plaintiffs' inability to obtain drivers' licenses hinders them in pursuing new jobs, attending work, advancing their careers, and developing business opportunities. They thus suffer financial harm and significant opportunity costs. And as we have previously found, the irreparable nature of this injury is exacerbated by Plaintiffs' young age and fragile socioeconomic status").

[84] Plaintiffs choose to address these prongs although this showing may not be necessary. *See Actavis* at 662, n 38. ("We need not consider the balance of the hardships given that New York has demonstrated a substantial likelihood of success on the merits.").

all parties agree that DACA has brought great benefit to DACA grantees, their families, their schools, their employers, their states, and the nation at large.[85] Absent an injunction, DACA grantees, the States and their residents will face grave costs. Provisional relief benefits the public interest.

In contrast to the harm faced by the public if DACA is terminated, Defendants will suffer minimal to no harm if the court grants an injunction. A grant of preliminary relief here would require DHS to review additional DACA applications—a mere continuation of current practice as DHS already anticipates that it will be processing applications up to and after March 5, 2018.[86] The small cost of processing additional applications pales in comparison to the irreparable harm that will befall Plaintiff States absent an injunction.[87] Any delay caused by a preliminary injunction pending adjudication on the merits will not significantly change this calculation nor impede the orderly functioning of the immigration system as a whole. Accordingly, both the balance of the equities and the public interest favor relief.

Indeed, provisional relief preserves the status quo. "In this Circuit, the appropriate status quo in need of preservation is that which was in existence before the [challenged conduct] occurred." *Hoffman ex rel. Nat'l Labor Relations Bd. v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 369 (2d Cir. 2001). Plaintiff States allege that the termination is unlawful, and an injunction would preserve the status quo during the pendency of this suit by allowing DACA grantees to

---

[85] *See* ECF. 54 at ¶¶ 198, 205; Ex. 10, ¶¶ 6, 11-12, 13-14, 18, 22-23 (Wong Decl.); Ex. 110 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu, Dec. 30, 2016); Ex. 53, ¶¶ 4,7-11 (Suarez-Orozco Decl.); Ex. 46, ¶¶ 32, 34-35 (Zayas Decl.); *See* Oct.3 S. Jud. Transcript, 2017 WL 4410019 at 12, 25. (Dreamers are "a benefit to the country" and are "a valuable contribution"); Ex. 112, Donald J. Trump (@realDonaldTrump), Twitter, Sept. 14, 2017, 3:28 AM) (Dreamers serve in the military); Ex. 3, McCament Dep. 12:13-14:7 (DACA holders contribute to educational, business, and economic sectors), and 13:3-14:7 (regularization of status helps "administer the system more effectively"); Ex. 33, Nealon Dep. 152:12-23 (DACA provides "human" and economic benefits).

[86] *See* Ex. 35, Neufeld Dep. 208:3-9.

[87] DHS has testified that the administrative burdens and costs in terminating DACA are minimal. Ex. 35, Neufeld Dep. 203:18-204:4.

keep their jobs and continue attending schools, while allowing the States to continue to employ them to serve the States' residents.

## **CONCLUSION**

For the reasons set forth above, Plaintiff States respectfully request that the Court grant the instant Motion for a Preliminary Injunction.


DATED: December 15, 2017

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York

By:   */s Lourdes M. Rosado*
       Lourdes M. Rosado, Bureau Chief
       Brooke Tucker, Assistant Attorney
       General*
       Sania Khan, Assistant Attorney General
       Diane Lucas, Assistant Attorney General
       Ajay Saini, Assistant Attorney General
       Alex Finkelstein, Volunteer Assistant
       Attorney General
       Civil Rights Bureau
       Office of the New York State Attorney
       General
       120 Broadway, 23rd Floor
       New York, NY 10271
       Lourdes.Rosado@ag.ny.gov
       Sania.Khan@ag.ny.gov
       Diane.Lucas@ag.ny.gov
       Ajay.Saini@ag.ny.gov
       Tel. (212) 416-6348
       Fax (212) 416-8074

**MAURA HEALEY**
Attorney General for the Commonwealth of
Massachusetts

By:    */s Abigail B. Taylor*
       Jonathan B. Miller
       Genevieve C. Nadeau (*pro hac vice*)
       Abigail B. Taylor (*pro hac vice*)
       Assistant Attorneys General
       Office of the Attorney General
       One Ashburton Place
       Boston, MA 02108
       Jonathan.Miller@state.ma.us
       Genevieve.Nadeau@state.ma.us
       Abigail.Taylor@state.ma.us
       Tel. (617) 727-2200

**BOB FERGUSON**
Attorney General of the State Washington

By:    */s/ Robert W Ferguson*
       Robert W. Ferguson (*pro hac vice*)
       Attorney General
       Colleen M. Melody (*pro hac vice*)
       Civil Rights Unit Chief
       Marsha Chien (*pro hac vice*)
       Assistant Attorney General
       Office of the Attorney General
       800 Fifth Avenue, Suite 2000
       Seattle, WA 98104
       ColleenM1@atg.wa.gov
       MarshaC@atg.wa.gov
       Tel. (206) 464-7744

**GEORGE JEPSEN**
Attorney General of the State of Connecticut

By:    */s Mark K. Kohler*
       Mark F. Kohler (*pro hac vice*)
       Assistant Attorney General
       Connecticut Office of the Attorney
       General
       55 Elm Street, P.O. Box 120
       Hartford, CT 06106
       Mark.Kohler@ct.gov
       Tel. (860) 808-5020

**KARL A. RACINE**
Attorney General for the District of Columbia

By:    */s Robyn R. Bender*
       Robyn R. Bender*
       Deputy Attorney General
       Public Advocacy Division
       441 4th Street, NW
       Suite 650 North
       Washington, DC 20001
       Robyn.Bender@dc.gov
       Tel. (202) 724-6610
       Fax (202) 730-0650

**DOUGLAS S. CHIN**
Attorney General of the State of Hawaii

By:   */s Donna H. Kalama*
      Donna H. Kalama (*pro hac vice*)
      Deputy Attorney General
      State of Hawaii, Department of the
      Attorney General
      425 Queen Street
      Honolulu, HI 96813
      Donna.H.Kalama@hawaii.gov
      Tel. (808) 586-1224

**LISA MADIGAN**
Attorney General of the State of Illinois

By:   */s Anna P. Crane*
      Anna P. Crane, Assistant Attorney
      General (*pro hac vice*)
      Karyn L. Bass Ehler,
      Chief, Civil Rights Bureau
      Harpreet Khera, Deputy Bureau Chief,
      Special Litigation Bureau
      Caitlyn McEllis, Assistant Attorney
      General
      Jeff VanDam, Assistant Attorney Genera
      Civil Rights Bureau
      Office of the Illinois Attorney General
      100 W. Randolph Street
      Chicago, IL 60601
      Anna.Crane@atg.state.il.us
      Tel. (312) 814-3400
      Fax (312) 814-3212

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By:   */s Nathan Blake*
      Nathan Blake (*pro hac vice*)
      Deputy Attorney General
      Office of the Attorney General of Iowa
      1305 E. Walnut Street
      Des Moines, IA 50319
      Nathan.Blake@iowa.gov
      Tel. (515) 281-4325
      Fax (515) 281-4209

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By:   */s Tania Maestas*
      Tania Maestas, (*pro hac vice*)
      Deputy Attorney General
      Ari Biernoff, Assistant Attorney General
      Jennie Lusk, Assistant Attorney General
      New Mexico Office of the Attorney
      General
      408 Galisteo St.
      Santa Fe, NM 87501
      ABiernoff@nmag.gov
      Tel. (505) 490-4060
      Fax (505) 490-4883

**MATTHEW DENN**
Attorney General of the State of Delaware

By:     *s/ Aleine Cohen*
         Aaron Goldstein*
         State Solicitor
         Aleine Cohen*
         Deputy Attorney General
         Delaware Department of Justice
         820 N. French St.
         Wilmington, DE 19801
         Aaron.Goldstein@state.de.us
         Aleine.Cohen@state.de.us
         Tel. (302) 577-8400

**PETER KILMARTIN**
Attorney General of the State of Rhode Island

By:     */s Rebecca T. Partington*
         Rebecca T. Partington (*pro hac vice*)
         Chief, Civil Division
         Michael W. Field (*pro hac vice*)
         Assistant Attorney General
         Adam D. Roach (*pro hac vice*)
         Special Assistant Attorney General
         RI Office of the Attorney General
         150 South Main Street
         Providence, RI 02903
         RPartington@riag.ri.gov
         MField@riag.ri.gov
         ARoach@riag.ri.gov
         Tel. (401) 274-4400

**JOSH STEIN**
Attorney General of the State of North Carolina

By:     */s Sripriya Narasimhan*
         Sripriya Narasimhan*
         North Carolina Department of Justice
         114 W. Edenton Street
         Raleigh, NC 27603
         SNarasimhan@ncdoj.gov
         Tel. (919) 716-6400

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By:     */s Brian De Haan*
         Brian De Haan*
         Assistant Attorney General
         Trial Attorney
         Brian.A.DeHaan@doj.state.or.us
         Tel. (971) 673-1880
         Fax (971) 673-5000

39

**JOSH SHAPIRO**
Attorney General of the Commonwealth of
Pennsylvania

By:  */s Jonathan Scott Goldman*
Jonathan Scott Goldman*
Executive Deputy Attorney General,
Civil Law Division
Michael J. Fischer, (*pro hac vice*)
Chief Deputy Attorney General, Impact
Litigation Section
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
MFischer@attorneygeneral.gov
Tel. (717) 787-3391


**MARK R. HERRING**
Attorney General of the Commonwealth of
Virginia

By:  */s Matthew R. McGuire*
Matthew R. McGuire (*pro hac vice*)
Acting Deputy Solicitor General
202 North Ninth Street
Richmond, VA 23219
MMcguire@oag.state.va.us
Tel. (804) 786-7773


**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

By:  */s Benjamin D. Battles*
Benjamin D. Battles, (*pro hac vice*)
Solicitor General
Julio A. Thompson*, Assistant Attorney
General, Civil Rights Unit
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
Benjamin.Battles@vermont.gov
Tel. (802) 828-5500
Fax (802) 828-3187


**JOHN W. HICKENLOOPER**
Governor of the State of Colorado

By:  */s Jacki Cooper Melmed*
Jacki Cooper Melmed
Special Assistant Attorney General*
Chief Legal Counsel
136 State Capitol Building
Denver, Colorado 80203
Jackic.Melmed@state.co.us
Tel. (303) 866-3788
(* Limited Appointment)