# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

          Plaintiffs,

      v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

          Defendants.

CIVIL ACTION NO. 17-cv-5228

**DECLARATION OF SHOBA
SIVAPRASAD WADHIA**

I, Shoba Sivaprasad Wadhia, declare as follows:

1.      I am presently the Samuel Weiss Faculty Scholar, Clinical Professor of Law and founding director of the Center for Immigrants' Rights Clinic at Penn State Law in University Park. I have been employed by the Pennsylvania State University ("University") since 2008. This declaration was prepared in my individual capacity and does not reflect the views of the University.

2.      In 1999, I received my Juris Doctorate degree from the Georgetown University Law Center. Since that time, I have worked in the immigration field for nearly 20 years in the following settings: private practice, non-profit organizations, and institutions of higher education.

3.      As a practitioner, I have practiced immigration law on behalf of individuals seeking a benefit before the immigration agency as well as those challenging removal or seeking relief from removal before an immigration judge or the appellate agency. In the non-profit sector, I have drafted, reviewed, and analyzed legislative proposals on immigration and convened or participated in meetings with government officials, organizational leaders, and the public on immigration topics.

4.      As an academic researcher, my work focuses on the role of prosecutorial discretion in immigration law and the intersections of race, national security and immigration. In the area of prosecutorial discretion in immigration law, my scholarship has served as a foundation for scholars, advocates, and government officials seeking to understand or design a strong prosecutorial discretion policy. My book, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases*, was published by New York University Press and is the first book on the topic.

5.      I have published more than 30 articles, book chapters, and essays on immigration law, including a number discussing the use of prosecutorial discretion in immigration cases. My work has been published in seventeen law journals, including but not limited to *Emory Law Journal*; *Texas Law Review*; *Columbia Journal of Race and Law*; *Notice & Comment, Yale Journal on Regulation*; *Harvard Latino Law Review*; *Connecticut Public Interest Law Journal*; *Georgetown Immigration Law Journal*; and *Howard Law Journal*. Some of my scholarly works have been cited by federal judges in their opinions and decisions.

6.      I have delivered several academic lectures and papers over the past 15 years on a variety of topics, including the history of prosecutorial discretion in immigration cases.

7.      As an educator, I teach law students in the doctrinal survey course in immigration law and a specialized course in asylum and refugee law. I also supervise students in an in-house law school clinic known as the Center for Immigrants' Rights, which I founded.

8.      Since the Fall 2008 semester, I have supervised more than 75 students on the following types of cases and projects: policy products on behalf of institutional clients, outreach and education with the community and local municipality, and legal support in individual cases.

9.      I currently sit on the Board of Trustees of the American Immigration Council and previously served as a Commissioner on the American Bar Association's Commission on Immigration.

10.     I have received multiple awards and honors, including: Pro Bono Attorney of the Year by the American-Arab Anti-Discrimination Committee in 2003, leadership awards by the Department of Homeland Security's Office of Civil Rights and Civil Liberties and Office of the Inspector General in 2008, recognition as the 2017 Honoree by the National Immigration Project

and the award for Excellence in Legal Advocacy by the American-Arab Anti-Discrimination Committee in 2017.

11.     I spent nearly a decade researching the history of prosecutorial discretion in immigration cases, especially its historical use, legal foundation, and litigation challenging the use of such authority, before and while writing my book. The opinions expressed in this declaration are based largely on the research for my book as well as related articles which have been published in law journals.

12.     More information about my experience and qualifications as an expert, a complete list of my publications, and other relevant information is contained in my *curriculum vitae*, which is attached as Exhibit A to this declaration.

### Summary of Expert Opinions

13.     I have been asked for my expert opinion concerning the history and use of prosecutorial discretion, including specifically deferred action, by federal immigration authorities in the United States. I have also been asked for my expert opinion as to how the formation and termination of the Deferred Action for Childhood Arrivals (DACA) compares to prior uses of deferred action. A summary of my conclusions are as follows:

- Prosecutorial discretion is a tool that has been part of the immigration system for as long as the system has operated.

- Deferred action is one form of prosecutorial discretion in immigration law and enjoys a long history.

- The Department of Homeland Security ("DHS") and its predecessor, Immigration and Naturalization Services ("INS"), have applied deferred action and other forms of prosecutorial discretion to groups (while still

4

requiring a case-by-case determination of each individual) based on
factors that are largely consistent with the eligibility criteria utilized for
DACA.

• The method by which DACA has been terminated is inconsistent with
how deferred action has been used and applied historically.

**Prosecutorial Discretion in Immigration Law**

14.    Prosecutorial discretion refers to the choice by the DHS and its predecessor
agencies, including INS, of whether and how to enforce the full scope of immigration law
against a person or group persons if at all.

15.    When an individual enters the country without inspection, overstays a visa, or
engages in conduct that makes her removable, she is subject to removal by DHS. This requires
enforcement action (*i.e.*, prosecution) by DHS to effectuate.

16.    To illustrate, when DHS chooses not to file legally valid immigration charges
against a person who is present in the United States without authorization discretion is being
exercised favorably. In other words, the question of whether to use discretion is raised only
where there is legally sufficient basis to bring immigration enforcement actions in the first place.

17.    There are more than one dozen forms of prosecutorial discretion in federal
immigration law. These forms have been outlined in several guidance documents issued by DHS
and INS, including a memorandum published in 1976 by then-INS General Counsel Sam
Bernsen (the "Bernsen Memo"),[1] a 2000 memorandum published by then-INS Commissioner

---

[1] Memorandum from Sam Bernsen, General Counsel, Immigration and Naturalization Service, Legal
Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976),
https://www.ice.gov/doclib/foia/prosecutorial-discretion/service-exercise-pd.pdf.

Doris Meissner (the "Meissner Memo"),[2] a 2011 memorandum by then-Immigrations and

Customs Enforcement ("ICE") Commissioner John Morton (the "Morton Memo"),[3] and more

recently by then-DHS Secretary Jeh Johnson (the "Johnson Memo").[4]

18.     The memoranda list at least 15 types of prosecutorial discretion. The most

commonly utilized forms are:

- Deciding whether to issue, serve, file, or cancel a Notice to Appear;

- Deciding whom to stop, question, and arrest;

- Deciding whom to detain or release;

- Deciding whether to settle, dismiss, appeal, or join in a motion on a case; and

- Deciding whether to grant deferred action, parole, or a stay of removal.

19.     Other forms of prosecutorial discretion include the use of "extended voluntary

departure"[5] and "deferred enforcement departure."[6] Formerly called extended voluntary

departure, deferred enforcement departure can be utilized by the President to temporarily

safeguard classes of individuals from removal.[7]

---

[2] Memorandum from Doris Meissner, Commissioner of Immigration and Naturalization Service, on Exercising Prosecutorial Discretion, (Nov. 17, 2000), http://library.niwap.org/wp-content/uploads/2015/IMM-Memo-ProsDiscretion.pdf.

[3] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, on Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens, (June 17, 2011), http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.

[4] Memorandum from Jeh Charles Johnson, Secretary of U.S. Department of Homeland Security, on Policies for the Apprehension, Detention and Removal of Undocumented Immigrants, (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

[5] Ira Kurzban, *Kurzban's Immigration Law Sourcebook* 493 (11th ed. 2009).

[6] Shoba S. Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Connecticut Pub. Int. L. J. 243, n.124 (2009), citing U.S. Citizenship and Immigration Services, Affirmative Asylum Procedures Manual 57 (Nov. 2007).

[7] U.S. Citizenship and Immigration Services, Adjudicator's Field Manual 38.2(a) (2007),

20.     Prosecutorial discretion may be exercised at any stage of the immigration enforcement process including right before an arrest, prior to the filing of charges, and even after a removal order has been entered. As ICE's Principal Legal Advisor, William J. Howard, explained in a 2005 memo, there is a "universe of opportunities" to exercise prosecutorial discretion in federal immigration enforcement.[8]

21.     While there are multiple forms of prosecutorial discretion and stages at which it may be enforced, the outcome in any case is the same: a temporary reprieve from removal proceedings and/or deportation.

22.     The concept behind prosecutorial discretion is entrenched in the prioritization of limited government resources and compassion for individuals without a lawful immigration status who present strong qualities or equities in their cases. When DHS makes the choice to not take enforcement actions against a mother caring for an ill child, for a student affected by a natural disaster back home, or for a Dreamer working and/or finishing school, prosecutorial discretion is being exercised favorably with respect to that individual.

### Legal Basis for Use of Prosecutorial Discretion

23.     Prosecutorial discretion in immigration law has been recognized repeatedly by federal courts and former agency heads.[9] The basis for this discretion is inherent to agency enforcement action as well as statutory authority.

---

https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-16606/0-0-0-16764.html.

[8] Memorandum from William J. Howard, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion (Oct. 24, 2005), http://www.asistahelp.org/documents/resources/DHS_NTA_discretion_7076BC4F57842.pdf; *see also* Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 27 (2015).

[9] *See, e.g.*, Bernsen Memo, *supra* note 1, at 1-2.

24.     Discretion in agency action dates back to the New Deal, with the birth of the modern administrative state.

25.     The Bernsen Memo published in 1976 is one of the first legal opinions issued on the use of prosecutorial discretion in immigration. The Bernsen Memo traces prosecutorial discretion back to common law and cites to the 1868 Confiscation Cases to describe the general authority of the Executive Branch to terminate a case. This same memo cites to a 1934 memo by the Attorney General to highlight the various sources for prosecutorial discretion and its extension to both civil and criminal contexts.

26.     The Bernsen Memo also identifies the Take Care Clause, Article II, Section 3 to the U.S. Constitution, as a source of authority for prosecutorial discretion in immigration matters.

27.     The Meissner Memo builds upon the Bernsen Memo and provides a broad overview regarding the use of prosecutorial discretion, including connections to criminal law. Standards guiding prosecutorial discretion in the criminal context historically have informed the use of such discretion in immigration.

28.     A review of the immigration statute, the Immigration and Nationality Act, also makes clear that Congress authorizes DHS to utilize its discretion. Section 103 delegates the administration and enforcement of immigration law to DHS, 8 U.S.C. § 1103(a)(1), and section 242 prohibits judicial review of three specific acts of prosecutorial discretion (commencement of proceedings, adjudication of cases, and execution of removal orders), *id.* § 1252(g).

29.     The Homeland Security Act delegates the establishment of national immigration enforcement policies and priorities to the DHS Secretary. 6 U.S.C. § 202(5).

30.     The Supreme Court also explicitly recognized the use of discretion in immigration law. In *Arizona v. United States* 567 U.S. 387 (2012), the Court concluded that several anti-immigration provisions in an Arizona statute overreached into federal domain over immigration matters and explained that "a principal feature of the removal system is the broad discretion exercised by immigration officials" in relation to how "federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Id.* at 396.

## History of Use of Prosecutorial Discretion

31.     Formal uses of prosecutorial discretion immigration law can be traced back to as early as September 20, 1909. On that date, the Department of Justice issued a letter concerning the initiation of proceedings to cancel naturalization.[10]

32.     In individual matters, prosecutorial discretion is exercised routinely, including whether to arrest, interrogate, file charging documents, or appeal a case. It is exercised at every stage, including after an order of removal has been obtained. Over time, INS and, then, DHS have taken greater care to ensure more uniformity in how prosecutorial discretion is exercised.

33.     The Meissner Memo provides a broad overview regarding the use of prosecutorial discretion, including a list of 13 factors to consider when evaluating the "totality of the circumstances" of a particular case. These factors include, but are not limited to: (i) immigration status; (ii) length of residence in the United States, (iii) criminal history, (iv) humanitarian concerns, and (v) immigration history, (vi) likelihood of ultimately removing the alien, (vii) likelihood of achieving enforcement goal by other means, (viii) whether the alien is eligible or is

---

[10] Bernsen Memo, *supra* note 1, at 4 (quoting Department of Justice Circular Letter Number 107 (Sep. 20, 1909). ("In the opinion of the department, as a general rule, good cause is not shown for the institution of proceedings to cancel certificates of naturalization alleged to have been fraudulently or illegally procured unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country.").

likely to become eligible for other relief, (ix) effect of action on future admissibility, (x) current or past cooperation with law enforcement authorities, (xi) honorable U.S. military service, (xii) community attention, and (xiii) resources available to the INS.

34.     In addition to these factors for consideration, the Meissner Memo calls for even-handed application of discretion: "Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process."

35.     The Meissner Memo has been repeatedly reaffirmed in subsequent years, through both a 2003 memo from INS Associate Commissioner Johnny N. Williams,[11] shortly after DHS was formed, a 2007 memo from ICE Assistant Secretary Julie Myers,[12] and the 2011 Morton Memo, which details at least 16 factors for consideration and listing particular care for veterans, minors, and elderly individuals, among others.[13]

36.     Beyond the application of prosecutorial discretion in individual cases, there are many examples of the use of prosecutorial discretion on behalf of groups of people.

37.     **1956 (Eisenhower):** Thousands of Hungarian "Freedom Fighters" were permitted to enter the United States by way of "parole." Faced with the inaction of Congress to solidify an immigration statute for refugees, the administration moved to exercise prosecutorial discretion to admit refugees from Hungary.[14]

---

[11] Memorandum from Johnny N. Williams, Executive Associate Commissioner of the Office of Field Operations, U.S. Immigration and Naturalization Service, on Family Unity Benefits and Unlawful Presence (Jan. 27, 2003).

[12] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, on Prosecutorial and Custody Discretion (Nov. 7, 2007), https://www.ice.gov/doclib/foia/prosecutorial-discretion/custody-pd.pdf.

[13] Morton Memo at 5, *supra* note 3.

[14] Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 29-30, (2015). ("Similar parole programs were applied in subsequent administrations to protect classes of individuals."). Kate M. Manuel & Michael J. Garcia, *Executive Discretion as to Immigration: Legal*

38.    **1956 (Eisenhower):** An extended voluntary departure program was implemented for certain beneficiaries of an approved third-preference petition for skilled or other workers.[15]

39.    **1981 (Reagan):** Extended voluntary departure was issued to thousands of Polish nationals as refugees residing in the United States when Poland declared martial law.[16]

40.    **1987 (Reagan):** After Congress passed the Immigration Reform and Control Act of 1986 (IRCA), the "Family Fairness" executive action was announced to defer deportations for children of a parent eligible for permanent residency.[17]

41.    **1990 (George H.W. Bush):** The "Family Fairness" policy was expanded to defer deportations to spouses and children of immigrants who qualified for permanent residency under IRCA.[18]

---

*Overview*, U.S. Congressional Research Service (Nov. 10, 2014), https://fas.org/sgp/crs/homesec/R43782.pdf.

[15] Immigration and Naturalization Service, Operations Instructions, O.I. § 242.10(a)(6)(i) (1956).

[16] Stephen H. Legomsky & Cristina M. Rodriguez, *Immigration and Refugee Law and Policy* 1115-17 (5th ed. 2009); David Reimers, *Still the Golden Door: The Third World Comes to America* 202 (1986).

[17] 64 Interpreter Releases 1191 (Oct. 26, 1987); *see also* American Immigration Council, *Reagan-Bush Family Fairness: A Chronological History* 1-2, (Dec. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/reagan_bush_family_fairness_final_0.pdf.

[18] Marvine Howe, *New Policy Aids Families of Aliens*, N.Y. Times (Mar. 5, 1990), http://www.nytimes.com/1990/03/05/nyregion/new-policy-aids-families-of-aliens.html; 67 Interpreter Releases 204 (Feb. 26, 1990); 67 Interpreter Releases 153 (Feb. 5, 1990). ("President Bush's policy followed a narrower 1987 executive order by President Reagan's immigration commissioner that applied only to children."). Immigration and Nationality Act of 1990, Pub. L. 101-649, Sec. 301, 104 Stat. 4978, http://www.justice.gov/eoir/IMMACT1990.pdf.

42.     **2007 (George W. Bush):** Deferred enforcement departure was announced for certain Liberians in light of armed conflict in in Liberia.[19] The policy has since been extended for 18 months at a time, most recently by President Obama in September 2016.[20]

43.     **2011 (Obama):** ICE Commissioner John Morton published several memoranda concerning prosecutorial discretion. One memo discussed the specific enforcement priorities of the federal government with regard to deportable immigrants with criminal records, noting that "particular care should be given when dealing with lawful permanent residents, juveniles, and the immediate family members of U.S. citizens."[21] Another guidance memorandum dealt with the use of prosecutorial discretion for plaintiffs, victims, and witnesses in order to "avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights."[22]

44.     Several administrations have used prosecutorial discretion as an instrument for protecting victims of crime, domestic abuse, and sexual assault.

### Deferred Action

45.     Deferred action is one of the most common forms of prosecutorial discretion in immigration law and enjoys a long history. It is one of the few forms of prosecutorial discretion

---

[19] Deferred Enforcement Departure- Liberia, U.S. Citizenship and Immigration Services, http://www.uscis.gov/humanitarian/temporaryprotected-status-deferred-enforced-departure/ded-granted-country-liberia/ded-granted-country-liberia (last updated Sep. 28, 2016).

[20] Memorandum from Barack Obama, President of the United States of America, on Deferred Enforced Departure for Liberians (Sep. 28, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/09/28/presidential-memorandum-deferred-enforced-departure-liberians.

[21] Morton Memo, *supra* note 3, at 2.

[22] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), https://www.ice.gov/doclib/foia/prosecutorial-discretion/certain-victims-witnesses-plaintiffs.pdf.

to provide with it work authorization, the others being parole[23] and orders of supervision.[24] Historically, decisions to grant deferred action have also rested on identifiable humanitarian factors for consideration.

46.     For many years, deferred action was in operation through case-by-case determinations but not publicly understood. Previously described as "nonpriority," it operated essentially in secret for much of the 20th Century.

47.     In the early 1970s, as part of his effort to support his clients John Lennon and Yoko Ono, attorney Leon Wildes pursued Freedom of Information Act (FOIA) litigation to obtain deferred action records from INS.

48.     Through these records, Wildes conducted groundbreaking research and revealed multiple facets of deferred action. Among these revelations was the fact that deferred action cases labeled as "tender age" involved individuals who were teenagers or young adults when INS granted deferred action.[25]

49.     Following Wildes' litigation on behalf of Lennon and Ono, INS issued guidance on deferred action through "Operations Instructions." These instructions contained factors for INS agents and officers to determine whether a case should be referred for deferred action. They included: (i) young or old age; (ii) years present in the United States; (iii) health condition

---

[23] 8 U.S.C. § 1182(d)(5)(A) (2013) ("The Attorney General may…in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission.…").

[24] Shoba S. Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6 Colum. J. of Race and L. 1, 7-8 (2016). ("Unlike deferred action, which can be granted or processed at any stage of immigration enforcement, an order of supervision may be processed after the government orders removal."); 8 U.S.C. § 1231(a)(3) (2006).

[25] Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 64, (2015).

requiring care in the United States; (iv) impact of removal on family in United States; and (v) criminal or other problematic conduct.[26]

50.     The Operations Instructions required consideration for deferred action "[i]n every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for deferred action category…."[27]

51.     Since that time, INS and DHS have repeatedly issued guidance over the course of several administrations on the use of deferred action for both individuals and groups.  In the last 15 years, DHS has granted deferred action in thousands of cases for largely humanitarian reasons.

52.     Deferred action can have a significant impact on the individual and his or her family, as individuals granted deferred action are able to apply for employment authorization upon the showing of "economic necessity."[28]

53.     The United States Citizenship and Immigration Services ("USCIS") Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices details that a request for deferred action can be formally filed by the individual, a legal representative, or USCIS officers.[29] A request must have at least four components: an explanation supporting the

---

[26] *Id.* at 197, n.8(ii), citing (Legacy) Immigration and Naturalization Service, Operations Instructions, O.I. § 103.1(a)(1)(ii) (1975).

[27] *Id.*

[28] 8 C.F.R. § 274.12(c)(14) (2008); Shoba S. Wadhia, *The Aftermath of United States v. Texas: Rediscovering Deferred Action*, Notice & Comment: A Blog from the Yale Journal on Regulation and the ABA Section of Administrative Law & Regulatory Practice (Aug. 10, 2016), http://yalejreg.com/nc/the-aftermath-of-united-states-v-texas-rediscovering-deferred-action-by-shoba-sivaprasad-wadhia/.

[29] Shoba S. Wadhia, Standard Operating Procedure for Deferred Action (non-DACA), (Mar. 7, 2012), (Obtained under the Freedom of Information Act from U.S. Citizenship and Immigration Services; received Aug. 2015), http://works.bepress.com/shoba_wadhia/36/.

request with supplemental documentation, proof of identity and nationality, any documents utilized to enter the U.S., and biographical information. My understanding is that this policy still guides USCIS treatment of deferred action requests outside DACA. In addition, ICE has the authority to grant deferred action to individuals.

## Legal Basis for Deferred Action

54.    The legal foundation for the use of deferred action is clear from opinions of federal courts, federal statutes, regulations, and memoranda published by DHS and INS.

55.    Agency regulations that have been in place for nearly 30 years explicitly identify "deferred action" as one basis for the provision of work authorization. 8 C.F.R. § 274a.12(c)(14).

56.    Federal immigration law provides that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action[.]" 8 U.S.C. § 237(d)(2).

57.    Shortly after the Operations Instructions were published in 1975, several Courts of Appeals recognized the ability of INS to offer deferred action to individuals who were facing removal or who were removable.[30]

58.    The Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), specifically mentioned "deferred action" when analyzing 8 U.S.C. § 1252(g), which precludes judicial review over certain acts of prosecutorial discretion decisions.

---

[30] *Soon Bok Yoon v. INS*, 538 F.2d 1211, 1211 (5th Cir. 1976); *Vergel v. INS*, 536 F.2d 755, 755 (8th Cir. 1976); *David v. INS*, 548 F.2d 219, 223 (8th Cir. 1977).

59.     Memoranda published by DHS provide guidance on the use of prosecutorial discretion in immigration law and in doing so identify the grant of deferred action as one such use of discretion.[31]

### Historical Use of Deferred Action

60.     Long before DACA, thousands of individuals have been processed for and granted work authorization pursuant to deferred action.[32]

61.     Historically, many deferred action cases have been driven by factors that are relevant to the DACA population. Two factors in particular have long driven outcomes in deferred action cases: age and long term presence in the United States.

62.     DHS and its predecessor agencies have often set criteria, similar to those put forth in DACA, for how deferred action should be applied to particular groups, while still requiring a case-by-case determination for each individual.

63.     **2003 (George W. Bush):**  INS Associate Director of Operations Williams Yates published memoranda directing officers to use prosecutorial discretion forms like deferred action to protect victims who were eligible for eligible for certain statutory protections such as a U visa.[33]

---

[31] Letter from 130+ Law Professors (Sep. 3, 2014), https://pennstatelaw.psu.edu/_file/Law-Professor-Letter.pdf.

[32] Wadhia, *supra* note 25, at 2.

[33] Memorandum from William Yates, Associate Director of Operations, U.S. Citizenship and Immigration Services, on Centralization of Interim Relief for U Nonimmigrant Status Applicants (Oct. 8, 2003), http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2003/ucntrl100803.pdf; Memorandum from William Yates, Associate Director of Operations, U.S. Citizenship and Immigration Services, on Assessment of Deferred Action Requests for Interim Relief from U Nonimmigrant Status Aliens in Removal Proceedings (May 6, 2004), http://www.uscis.gov/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2004/uprcd050604.pdf; *see also* Wadhia, *supra* note 25, at 61.

64.     **2005 (George W. Bush):** The President announced a "deferred action" program for foreign academic students affected by Hurricane Katrina.[34]

65.     **2009 (Obama):** USCIS announced deferred action for the widows of U.S. citizens. In announcing the decision, DHS Secretary Janet Napolitano said: "Granting deferred action to the widows and widowers of U.S. citizens who otherwise would have been denied the right to remain in the United States allows these individuals and their children an opportunity to stay in the country that has become their home while their legal status is resolved."[35]

66.     Deferred action has been used to protect individuals applying for relief under the Violence Against Women Act (VAWA). VAWA was enacted by Congress in 1994 and twice amended to include statutory remedies for abused spouses, parents, and children; victims of crimes and domestic abuse; and victims of human trafficking.

67.     One protection under VAWA allows abused spouses and children of U.S. citizens and green card holders (lawful permanent residents) or the abused parents of U.S. citizens to file petitions for themselves with USCIS.

68.     The self-petition process is critical to victims of domestic violence and abuse because it allows them to achieve a positive immigration status without having to rely on their abuser. If the self-petition is ultimately approved, the petitioner may receive deferred action.[36]

---

[34] Shoba S. Wadhia, *Response, In Defense of DACA, Deferred Action, and the DREAM Act*, 91 Tex. L. Rev. 59, n. 46 (2013), citing Press Release, U.S. Citizenship and Immigration Services, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005), http://www.uscis.gov/files/pressrelese/F1Student_11_25_05_PR.pdf.

[35] DHS Establishes Interim Relief for Widows of U.S. Citizens, https://www.dhs.gov/news/2009/06/09/dhs-establishes-interim-relief-widows-us-citizens.

[36] William A. Kandel, *Immigration Provisions of the Violence Against Women Act (VAWA)*, U.S. Congressional Research Service (May 15, 2012), https://fas.org/sgp/crs/misc/R42477.pdf

69.    Deferred action also has been used as a mechanism to keep immigrants who are the spouses, parents, and children of military members together.

70.    The examples identified above are not exhaustive but demonstrate how DHS (and INS before it) has long used the instrument of deferred action and its authority under the INA to protect certain classes of people.[37]

## DACA

71.    DACA falls in line with the long history described above. By its terms, DACA requires the individual to document entry into the United States before the age of sixteen and presence in the United States since June 15, 2007.[38] Long-term residence and tender age are two central facets of deferred action.

72.    Beyond those characteristics, the totality of circumstances weighs in favor of DACA grantees receiving deferred action based on past guidance documents. Among other things, DACA grantees are either in school, have graduated from high school (or obtained an equivalent degree), or have served honorably in the military.

73.    The idea of protecting those who came to the United States at a young age, residing in the United States for a long period of time, and with other equities from removal through deferred action longstanding and in fact customary.

74.    The implementation of DACA, even on a wide scale, is entirely consistent with previous acts of prosecutorial discretion by Democratic and Republic administrations.

---

[37] Wadhia, *supra* note 25, at 68.

[38] Memorandum from Janet Napolitano, Secretary of Homeland Security, on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

75.     The decision to and method by which DACA has been terminated raises serious legal questions and is wholly inconsistent with how deferred action has been used and applied historically.

76.     Previous decisions to end deferred action programs or to change course on broad exercises of prosecutorial discretion have been triggered by new statutory protections through an Act of Congress that rendered the exercise of further prosecutorial discretion unnecessary, changes in country conditions, or other significant changes in circumstances. DACA's termination does not meet any of these criteria.

77.     Despite the great success of the DACA program and the contributions of its grantees to our schools, businesses, communities, and economy, this Administration has turned DACA grantees into among the most vulnerable immigrants. This switch from protecting those with the most compelling cases for deferred action to the most vulnerable for such a large group of immigrants is remarkable and also destabilizes the structure of prosecutorial discretion in the immigration system.

**Conclusion**

78.      Deferred action is a long-recognized form of prosecutorial discretion in immigration law and with a strong legal foundation. The operation of DACA is a lawful exercise of prosecutorial discretion. Categorically revoking deferred action from hundreds of thousands of beneficiaries without reason is not only unprecedented but is in tension with the history of both INS and DHS.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

SHOBA SIVAPRASAD WADHIA

Dated this 15th day of December 2017.

# EXHIBIT A

# CURRICULUM VITAE
## Shoba Sivaprasad Wadhia
## Samuel Weiss Faculty Scholar
## Penn State Law-University Park
## Phone: 814-865-3823 | Email: ssw11@psu.edu

## EMPLOYMENT

**Pennsylvania State University School of Law, University Park, PA**
**Samuel Weiss Faculty Scholar, Clinical Professor of Law**
**Director/Founder, Center for Immigrants' Rights, June 2008-present**

Direct an immigration clinic whose mission is to advance immigrants' rights through legal excellence, advocacy, education, and collaboration with key stakeholders on immigration law and policy. Supervise law students representing clients on policy projects, community education and individual cases pertaining to U.S. immigration law and policy.

Publications by the Center

Press releases and stories about the Center's work

**Teaching at Penn State Law:**

Center for Immigrants' Rights Clinic (5 credits)

Advanced Immigration Clinic (2 credits)

Asylum and Refugee Law (3 credits)

Immigration Law (3 credits)

**Scholarship at Penn State Law (see publication list below)**

**Service at Penn State Law:**

**Post-Election:** Penn State Law's Center for Immigrants' Rights has been at the forefront of responding to immigration issues Post-Election at local and national levels. See: https://pennstatelaw.psu.edu/immigration-after-election for more details.

**Minority Mentor Program:** Helped to develop and institutionalize the law school's first minority mentor program, aimed at improving the climate of law school and academic performance. Received initial and renewal matching grant from Penn State's Equal Opportunity Commission.

**Interdisciplinary Roundtable on Immigration:** Co-founder/chair of Interdisciplinary Working Group on Immigration, whose objective is to build connections among research

and service organizations who work with or conduct research about immigrants and immigration, and to raise awareness of resources available among the local community of scholars and service providers.

**Academic Symposia Featuring Nationally Renowned Scholars and Legal Experts:** Organized and moderated academic symposia annually from 2009-12 on national immigration topics, with featuring speakers from around the nation.

- Symposium: Immigration in a New Administration (2009)
- Symposium: Immigration Adjudications: Court Reform and Beyond (2010)
- Colloquium: 30th Anniversary of the Refugee Act (2010)
- Symposium: 10th Anniversary of 9/11 (2011)
- Symposium: Immigration Remedies for Victims of Domestic Abuse (2012)

**Faculty Committees:** Serve(d) on the following academic committees:

- Diversity Committee (Chair) (2013-present)
- Strategic Planning Committee (2013-14)
- Academic Rules Committee (2012-13)
- Curriculum Committee (2009-12)
- Clinics Committee (2008-9)

**National Immigration Forum, Washington DC**
**Deputy Director for Legal Affairs, January 2007- June 2008**
**Senior Policy Associate/Counsel, July 2002-December 31, 2006**

- Worked for national immigration advocacy organization on the multiple legislative efforts, including the creation of the Department of Homeland Security, comprehensive immigration reform, immigration enforcement, and post 9-11 proposals affecting immigrants
- Provided legal and policy expertise on immigration issues to government officials, interested advocates, and the public
- Played a leadership role in working groups engaged in strategy and policy development on immigration law and policy reform with government officials
- Analyzed, prepared and/or drafted legislative and regulatory proposals on immigration law and policy for government officials and interested advocates

**Maggio Kattar, P.C., Washington DC**
**Attorney, 2000-2002/Law Clerk, 1998-2000**

- Represented clients in deportation (removal) proceedings before the VA and MD immigration courts
- Represented clients before Immigration and Naturalization Service (now Department of Homeland Security) during interviews for immigration benefits
- Interviewed clients and witnesses; prepared affidavits, evidentiary materials and legal briefs; conducted related legal research

## EDUCATION

**Georgetown University Law Center, Washington, DC, J.D., May 1999**

*Related Coursework/Activities*
Georgetown Immigration Law Journal- Senior Notes & Comments Editor
Immigration and Refugee Law
Advanced Seminar on Immigration Research

**Indiana University, A.B. with Honors, Political Science, May 1996**

## PUBLICATIONS

**Books**

Beyond Deportation: *The Role of Prosecutorial Discretion in Immigration Cases* (New York University Press 2015), new on paperback May 1, 2017
- Website: www.beyonddeportation.com
- Reviews published by NYU Press: https://nyupress.org/books/9781479870059/
- Review in Oxford University's Border Criminologies, April 22, 2016.
- Review in International Migration Review, Fall 2016.
- Featured in Guernica Magazine, July 1, 2016
- Review in Harvard Law Review, Recent Publications, June 2016
- Review in The Federal Lawyer, October/November 2016
- Review by Reader's Favorite, Book Review, August 2016
- Review by International Migration Review, Book Review, Fall 2016

**Law Journals**

Emory Law Journal, Is Immigration Law National Security Law? 66 Emory Law Journal 669 (2017).

"Beyond Deportation: Understanding Immigration Prosecutorial Discretion and U.S. v. Texas," 36 IMMGR. & NAT'LITY L. REV. 94 (2015).

"Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases" Colum. J. Race & L. 1 (2016).

"The Aftermath of United States v. Texas: Rediscovering Deferred Action," Notice and Comment, Yale Journal on Regulation (2016).

The President and Deportation: DACA, DAPA, and the Sources and Limits of Executive Authority - Response to Hiroshi Motomura Washburn Law Journal (2016).

"Executive Action and Immigration" Case W. Res. Journal of International Law 48 (2016).

"The History of Prosecutorial Discretion in Immigration Law" American University Law Review Vol 64.5 (2015).

"The Rise of Speed Deportation and the Role of Discretion," Vol. 5 No. 1 Colum. J of Race & L. (2014).

"Immigration Remarks for the 10th Annual Wiley A. Branton Symposium," Vol. 57 No. 3 HOW. L.J. (2014).

"My Great FOIA Adventure and Discoveries of Deferred Action Cases at ICE," 27 Geo. Immig. L.J. (2013).

"In Defense of DACA, Deferred Action, and the DREAM Act," 91 Texas L. Rev. SEE ALSO 59 (2013).

"The Immigration Prosecutor and the Judge: Examining the Role of the Judiciary in Prosecutorial Discretion Decisions," 16 Harv. Latino L. Rev.  39 (2013).

"Sharing Secrets: Examining Deferred Action and Transparency in Immigration Law," 10 U. N. H. L. Rev. 1 (2012).

"Business As Usual: Immigration and the National Security Exception," 114 Penn State L. Rev. 1485 (2010).

"The Role of Prosecutorial Discretion in Immigration Law," 9 Connecticut Pub. Int. L. J. 243 (2010).

 "Under Arrest: Immigrants' Rights and the Rule of Law," 38 U. Memphis L. Rev. 853 (2008).

"The Policy and Politics of Immigrant Rights," 16 Temple Pol. & Civil Rts. L. Rev. 387 (2007).

"Immigration: Mind Over Matter," 5 U. Md. L. J. on Race, Religion, Gender & Class 201 (2006).

**Book Chapters and Essays**

American Immigration Lawyers Association, *Prosecutorial Discretion, Practice Advisory* (w. A. Gallagher and A. Nunez) (2017)

Carolina Academic Press, Book Chapter, Dreams Deferred: Deferred Action, Prosecutorial Discretion, and the Vexing Case(s) of DREAM Act Students in Law Professor and Accidental Historian (2017)

American Immigration Lawyers Association, *The Long and Winding Road of Prosecutorial Discretion, Practice Advisory* (w. L. Wildes and P. Taurel) (2015)

Who are the Players in Immigration Law? in What Every Lawyer Should Know About Immigration Law (American Bar Association 2014)

Reflections on Prosecutorial Discretion One Year After the Morton Memo, in *Emerging Issues Analysis* (LexisNexis, June 2012)

Prosecutorial Discretion in Immigration Agencies: A Year in Review, in *Emerging Issues Analysis* (LexisNexis, January 2012)

The Term Illegal Alien, *in Debates on U.S. Immigration*, (Sage Publications, 2012)

The Morton Memo and Prosecutorial Discretion: An Overview, American Immigration Council (July 2011)

Reading the Morton Memo: Federal Priorities and Prosecutorial Discretion, American Immigration Council (December 2010)

"Letter to Lahore," The Subcontinental Vol. 1, Issue 3 (with Sin Yen Ling), (2004)

Obama-Biden Presidential Transition Team, Immigration Policy: Transition Blueprint for the Obama Administration, 2008 (contributor)

Immigration Law Weekly, *Concerns With The DOJ's Proposed Rule To Implement The St. Cyr. Ruling* (w. Rob Randhava and Nancy Morawetz), September 13, 2003

Florida Bar Association, *21st Annual Immigration Law Update, Extreme Hardship For Waivers of Inadmissibility*, (w. Michael Maggio), 2000

## APPOINTMENTS/HONORS

American-Arab Anti-Discrimination Committee, Excellence in Legal Advocacy Award, September 2017

National Immigration Project of the National Lawyers Guild, 2017 Honoree, June 2017

Penn State Law, Faculty Diversity Award, February 2017

Global Connections, Spirit of Internationalization Award, March 15, 2016

Named Samuel Weiss Faculty Scholar at Penn State Law, July 2013

Appointed to American Bar Association Commission on Immigration: 2010-2014

Department of Homeland Security, Office of Inspector General, Leadership Plaque, June 2008

Department of Homeland Security, Office of Civil Rights and Civil Liberties, award for leadership as co-chair of NGO working group, June 2008

Department of Homeland Security, Office of Civil Rights and Civil Liberties, Leadership Plaque, April 2006

American-Arab Anti-Discrimination Committee, Pro Bono Attorney of the Year, June 2003

Indiana University, Political Science Department, William Jennings Bryan Prize, 1996

Indiana University, Honors Division: Summer Research Grant, 1996

American University, Washington Semester Program, Dean's Scholarship, 1994

Congressional Award: Silver, 1991; Bronze, 1989

State/National Forensics League: over 25 trophies in related competitions, 1990-1993

## BAR ADMISSIONS

State of Maryland

State of New Jersey

Court of Appeals for the Third Circuit

Supreme Court of the United States

## MEMBERSHIPS

American Bar Association (since 2008) (Commissioner, 2010-2014)

American Civil Liberties Union, Pennsylvania Chapter, Board Member (2010-2011)

American Constitution Society (since 2015)

American Immigration Council, Board of Trustees (since 2016)

American Immigration Lawyers Association (since 2001)

National Immigration Project, National Lawyers Guild (since 2000)

Pennsylvania Immigration Resource Center, Board Member (2008-2011)

## **PRESENTATIONS (HIGHLIGHTS)**

**2017**

Lecturer (Invited), Arlin Adams Center for Law and Society at Susquehanna University, Immigration in a New Administration, Selinsgrove, Pennsylvania, October 10, 2017

2017-2018 Cannon Lecturer (Invited), Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases in the Wake of the Trump Administration, University of Toledo School of Law, Toledo, Ohio, September 11, 2017

Faculty Speaker, Student Orientation, Diversity and Inclusion in the Legal Profession, Penn State Law at University Park, August 15, 2017

Panelist, International Student Orientation, Understanding International Student Visas and the U.S. Travel Ban, Office of Global Programs, Pennsylvania State University, August 12, 2017

Panelist, National Council for State Legislatures (Invited), National Summit, Immigration in 2017, Boston, MA, August 6, 2017

Discussant, Southeastern Association of Law Schools (SEALS), Workshop on National Security, Discussion Group: Trump's Executive Actions on Immigration: Travel Ban, Extreme Vetting, Border Surveillance, and Mass Deportation**,** Boca Raton, FL, August 4, 2017

Moderator (Invited), Annual Conference, American Immigration Lawyers Association, Prosecutorial Discretion, New Orleans, LA, June 21, 2017

Guest Speaker (Invited), Interfaith Initiative Centre County, Immigration in a New Administration, June 11, 2017

Speaker (Invited), Annual Conference, Community Diversity Group Conference, Immigration, June 6, 2017

Panelist (Invited), Career Professionals Conference, Pennsylvania State University, Immigration in a New Administration, May 9, 2017

Keynote (Invited), Immigrant Justice Week Keynote Speaker, University of Wisconsin School of Law, Beyond Deportation: The Role of Prosecutorial Discretion in the Wake of Trump's Executive Orders, April 2017

Moderator, "All In at Penn State Law: Addressing Diversity and Implicit Bias in the Legal Academy, Penn State Law, March 16, 2017

Keynote (Invited), Sprit of Internationalization Awards Ceremony, Hosted by Global Connections, March 16, 2017

Speaker (Invited), National Press Conference on Executive Order on Immigration, Hosted by Americas Voice, March 6, 2017

Speaker (Invited), National Community Call on Executive Order on Immigration (Muslim Ban 2.0), Hosted by Muslim Advocates, March 6, 2017

Organizer, Executive Orders on Immigration: Where Have We Been and What Lies Ahead? at Penn State Law, February 24, 2017

Guest Speaker on Immigration for International Ministries at Penn State University, February 24, 2017

Speaker (Invited), Post-Executive Order Briefing for Academics, American Immigration Council February 15, 2017

Speaker, Information Session on Executive Orders on Immigration for Postdoctoral students, staff and faculty at Penn State, February 10, 2017

Speaker, Information Session on Executive Orders on Immigration for Engineering faculty, staff and students at Penn State, February 7, 2017

Organizer, Information Session, President Trump's Executive Orders on Immigration, February 3, 2017

**2016**

Speaker (Invited), Post-Election Research Briefing for Academics, Muslim Registry, American Immigration Council, December 20, 2016

Facilitator, Community Dialogue on Diversity, Immigration and Race Post-Election, State College, PA, November 18, 2016

Panelist (Invited), Fall Conference, DC Chapter of the American Immigration Lawyers Association, Notices to Appear/Prosecutorial Discretion, November 16, 2016

Panelist (Invited), Equal Justice Leadership and Training Conference, United States v. Texas and Prosecutorial Discretion, Washington D.C., October 26, 2016

Keynote and Book Discussion (Invited), Spartan Scholars Awards Ceremony, Ocean Township High School, Ocean, NJ, October 24, 2016

Lecture and Book Discussion (Invited), Washington University School of Law (sponsored by the Immigration Law Society and American Constitution Society), St. Louis, MO, October 14, 2016

Book Talk, University Women's Club (Invited), Book and Play Review Group, Schlow Centre Regional Library, State College, PA, September 26, 2016

Immigration Issues after U.S. v. Texas, Center for Immigrants' Rights Clinic, September 1, 2016

Immigration Issues after U.S. v. Texas, State College Municipal Building, A Panel Discussion, August 31, 2016

Book Talk and Discussion of DAPA/DACA Case at Supreme Court, State College Sunrise Rotary, State College, PA, August 17, 2016

Book Talk and Discussion of DAPA/DACA Case at the Supreme Court and Beyond; Brown University Bookstore, Providence, RI, August 4, 2016

Panelist (Invited), American Immigration Lawyers Association's Annual Conference, Humanitarian Remedies in Immigration Law, June 2016

Guest Lecturer (Invited) United Nations Association of Centre County, May 2016

Cornell University School of Law, invited to present my research and FOIA strategies to social scientists working on empirical research related to deferred action, April 2016

Cornell University School of Law, present remarks on Beyond Deportation at a school sponsored public forum, April 2016

Pennsylvania Bar Association, Law Form on Mass Incarceration, Pittsburgh, PA (representing Penn State Law), March 31, 2016

Emory University School of Law, Discussion of Beyond Deportation (w. C. Kuck, sponsored by Immigration Law Society), February 2016

Emory University School of Law, annual Thrower Symposium on National Security, Invited panelist on domestic terrorism, immigration and national security, February 2016 Washington College of Law at American University, spoke about Beyond Deportation and Texas case (w. A. Frost, B. Johnson, P. Spiro) February 2016

New York School of Law/City Bar Association of New York City/NYU Press: panel on Beyond Deportation and United States v. Texas (w. L. Benson, A. Kalhan, F. Anello), January 2016

American Association for Law Schools, Annual Conference, (Invited) "Is Immigration Law Administrative Law," January 2016

**2015**

University of Cincinnati School of Law, Invited Speaker from Immigration and Nationality Law Review, Spoke about Beyond Deportation and United States v. Texas, November 2015

Case Western Reserve University School of Law, annual symposium, Invited panelist on executive action and immigration, October 2015

Chicago Bar Foundation/Mayor Brown/National Immigrant Justice Center: Panel Discussion on Beyond Deportation and United States v. Texas (w. G. Hereen, T. Magner, C. Valenzuela), October 2015

American Civil Liberties Union, Washington D.C., Book Talk on Beyond Deportation, September 2015

Department of Justice Office of Immigration Litigation, Washington D.C., Invited talk on Beyond Deportation to DOJ attorneys, September 2015

Temple University, Beasley School of Law, Philadelphia, PA, Panel Discussion on Beyond Deportation (w. Jaya Ramji-Nogales, J. Family), September 2015

Drexel School of Law, Philadelphia, PA, Panel Discussion on Beyond Deportation (w. B. Stock and A. Kalhan), September 2015

National Press Club, Book Launch of Beyond Deportation (with S. Legomsky, F. Sharry and E. Quinn), June 2015

Panelist, American Constitution Society, [Going it Alone? Presidential Power and the DAPA Debate](), June 2015

Moderator, American Immigration Lawyers Association's Annual Conference, The Long and Winding Road of Prosecutorial Discretion, June 2015

Keynote Speaker, Pennsylvania Immigration Resource Center, Light of Liberty Awards, March 2015

Keynote Speaker, Conference on Race, Class, Gender and Ethnicity: University of North Carolina School of Law-Chapel Hill, February 2015

Presenter, CLE on Immigration and Executive Action, Centre County Bar Association, February 2015

Opening Remarks and Panelist, American University Law Review, Symposium on Prosecutorial Discretion, January 2015

Panelist, American Association for Law School's Academic Symposium on Congressional Dysfunction and Executive Lawmaking, January 2015

**2014**

Moderator, Penn State Law, Symposium "Shining the Light on Gender-Based Violence at Home and Abroad", October 2014

Facilitator, National Immigration Project, Continuing Legal Education Program on Challenges to Immigration Detention, September 2014

Panelist, American Bar Association, Homeland Security Institute August 2014

Presenter of and Commentator on Works-in-Progress, Immigration Law Professors Workshop, University of California Irvine- School of Law May 2014

Presenter of and Commentator on Works-in-Progress, The Association of American Law Schools Annual Conference on Clinical Legal Education, April 2014

**2013**

Panelist, Tenth Annual Wiley A. Branton / Howard Law Journal Symposium, Howard University School of Law, October 2013

Workshop and Presenter, Clinical Law Review Writers' Workshop 2013, New York University School of Law, September 2013

Panelist, National Immigration Project, CLE Program on "Developments in Immigration Law & Removal Defense" (May 2013)

**2012**

Moderator, American Bar Association Section on Administrative Law and Regulatory Practice, Fall Conference, Understanding Prosecutorial Discretion in Immigration Law, (October 2012)

Luncheon Speaker, Pennsylvania State University, Migration Studies Project, Immigration Law and the Administration's Deferred Action for Childhood Arrivals Program, (September 2012)

Organizer and Moderator, Penn State Law's Symposium on Immigration Remedies for Victims of Domestic Abuse, (September 2012) (w. Centre County Women Resource Center's Civil Legal Representation Project)

Panelist, Immigration Law Teachers Workshop, Plenary on Prosecutorial Discretion

(June 2, 2012)

Panelist, Press Conference, "The NSEERS Effect: A Decade of Racial Profiling, Fear, and Secrecy" (June 4, 2012)

Speaker, Press Conference: "Law Professors Alongside DREAMers Discuss Details of Memo Outlining President's Legal Authority to Grant Much Needed Relief for the Latino Community," (June 1, 2012), http://act.americasvoiceonline.org/page/-/americasvoice/audio/DREAM%20060112.mp3

Panelist, Foreign Policy Association, *Immigration Policy: What Is It and What Should It Be?* (May 24, 2012)

Panelist, American Immigration Lawyers Association, CLE Audio Seminar on Cancellation of Removal Relief (April 26, 2012)

**2011**

Panelist, American Immigration Lawyers Association, CLE Webinar on Deferred Action (October 25, 2011)

Penn State Law, Center for Immigrants' Rights, The 9/11 Effect and its Legacy on U.S. Immigration Laws, Organizer and Moderator (September 2011)

Panelist, 23nd Annual Minority Attorney Conference, Immigration Panel, Philadelphia, PA (March 17 & 18, 2011)

Panelist, Maggio + Kattar Community Forum on Prosecutorial Discretion and Private Bills, Washington D.C. (January 26, 2011)

**2010**

Penn State Law, Center for Immigrants' Rights, Fall Colloquium on the 30th Anniversary of the Refugee Act, Organizer and Moderator (November 2010)

Presenter, Penn State University, Research Unplugged, Presentation on "Immigration Rights and Wrongs" (October 2010)

Penn State Law, World on Trial, Jury Member and Foreperson (September 2010)

Robert C. Byrd Center for Legislative Studies, Tom E. Moses Memorial Lecture on the U.S. Constitution (September 2010)

Seton Hall Law School, National People of Color Legal Scholarship Conference, Moderator and Panelist (September 2010)

Panelist, Penn State University Dickinson School of Law, Symposium on Iqbal v. Ashcroft (2010)

M.C. and Moderator, Penn State University Dickinson School of Law, Symposium on Immigration Adjudications and Court Reform (2010)

**2009**

Lecturer, Penn State University, Presidential Leadership Academy, Immigration (2009)

Lecturer, Penn State University, School for International Affairs, Asylum Law (2009)

University of Illinois School of Law, Big 10 Aspiring Scholars Conference, Abstract Presentation (2009)

M.C. and Moderator, Penn State Dickinson School of Law, Symposium on Immigration Reform (2009)

Panelist, Georgetown University Law Center, Panel on Counterterrorism and Immigration (2009)

**2008**

Panelist, University of Connecticut School of Law, Symposium on Immigration (2008)

Panelist, University of Memphis School of Law, Symposium on Immigration Issues (2008)

**Older**

New England People of Color Conference, Moving Forward or Moving Backward? Criminal Justice and Immigration in the 21st Century, Commentator (2007)

Panelist, Stanford Law School, Symposium on Immigration Reform and Policy (2007)

Panelist, Temple University School of Law, Symposium on Immigration Reform (2006)

Panelist, University of Texas School of Law, Symposium on Immigration and Civil Rights (2006)

Panelist, University of Maryland School of Law, Symposium on Immigration Reform (2004)

Instructor, District of Columbia Bar: Continuing Legal Education Series, Removal and Deportation (2002-03)

Panelist, Columbia University Law School, Panel on Immigration Policy and Due Process (2005)

Panelist, Catholic University Law School, Panel on Immigration Policy and Due Process (2005)

Panelist, Georgetown University Law Center, Alumni Panel on Public Interest Law (2004)

Arab Community Center for Economic and Social Services, Panel on Immigration Policy (2004)

University of Michigan-Dearborn, Teach-In on Immigration Policy (2005)

Illinois Coalition for Immigrant and Refugee Rights, Policy Summit, Panel on Immigration Policy and Due Process (2004)

Speaker, New York University School of Law/Breakthrough: Forum on Immigration Policy (2004)

Panelist, Japanese American Citizens League/Office of Chinese Americans Annual Leadership Conference: Panel on Immigration Policy and Due Process (2003-2005)

National Lawyers Guild Annual Convention, Panels on Immigration Policy (2001-05)

Panelist, Ethiopian Community Development Council: Panel on Department of Homeland Security and its Impact on the Asylum and Refugee Community (2003)

## **MEDIA**

MSNBC The Last Word with Lawrence O'Donnell, November 20, 2014.

USA Today, What's Next for Trump's travel ban? June, 2017

New York Times Magazine, Is It Possible to Resist Deportation in Trump's America? May 2017

Wisconsin Public Radio, Travel Ban Litigation, July 2017

WPSU, Travel Ban Blocked, But Its Aftermath Reverberates At Penn State, May 2017

The Hill, Immigrant detention centers marred by 'needless deaths' amid poor care – report, May 2017

ABC23 News, Immigration Concerns, May 2017

WPSU, Featured Guest on Immigration Panel, Conversations Live, March 2017

WPSU, Featured Guest, Digging Deeper on Immigration (w. Pennsylvania State University President Eric Barron), March 2017 (aired April 2017)

Town & Gown, Lunch with Mimi, March 2017

ABC23 New, Immigration Concerns, March 2017

WJAC, Trump's executive order could be stopped before going into effect, March 2017

Bloomberg BNA, Are Immigrants Protected Under Obama No Longer Safe?, February 2017

Law360, 3 Key Takeaways From The 9th Circ.'s Travel Ban Ruling, February 2017

The Washington Post, Draft executive order would begin 'extreme vetting' of immigrants and visitors to the U.S., January 2017

The Atlantic, Two Cases Could Limit or Enhance Trump's Ability to Engage in Mass Deportations, January 2017

NBC News, Obama Leaves Behind a Mixed Legacy on Immigration, January 2017

Centre Daily Times (Front Page), Teach-In Offers Overview of Immigrants' Rights, January 2017

WTAJ-TV, Statewide 'teach-in' held on immigrants' rights, January 2017

WJAC-TV, Penn State Law hosts 'Teach-In' on immigrants' rights, January 2017

Centre Daily Times (Front Page), Borough Council Expresses Support for Immigrant Community, January 2017

WTAJ-TV, Resolution approved to help immigrants, January 2017

Statecollege.com, Borough Council Passes Immigration Enforcement Resolution, January 2017

The Guardian, Registry used to track Arabs and Muslims dismantled by Obama administration, December 2016

Long Island Press, Obama Administration Dismantles Framework of Muslim-Focused Registry, December 2016

Huffington Post, Obama Administration Makes Last-Minute Bid To Stall Trump's Ability To Create Muslim Registry, December 2016

The Atlantic, America Already Had a Muslim Registry, December 2016

The Guardian, Muslims to march on White House in bid to dismantle discriminatory registry, December 2016

PBS Newshour, Could President Trump really create a tracking system for U.S. Muslims? , December 2016

Politifact, In context: "Dreamers" and background checks, December 2016

VICE, This Small Town Is Helping Undocumented Immigrants, but Don't Call It a 'Sanctuary City', December 2016

Centre Daily Times (Front Page): Penn State supports DACA students, hopes to ease fears, December 2016

Philadelphia Inquirer, Ebola scare over, Liberian immigrants lose right to stay in U.S., November 2016

Long Island Press, Trump Team Considering Resurrecting Ineffective & Discredited Bush-Era Muslim Registry, November 2016

ATTN, Why Muslim Registries Haven't Worked in America, November 2016

Medium, Musings on Dreamers, Mass Deportations and a "Muslim Registry"  November 2016

New York Times, Trump Camp's Talk of Registry and Japanese Internment Raises Muslims' Fears, November 2016

Vox, Donald Trump's proposed "Muslim registry," explained, November 2016

The Christian Science Monitor, Will Trump's plan to register Muslims make it to The White House? , November 2016

Penn State Research Magazine Profile on Clinic and Research, Spring 2016

Penn State Probing Questions Video Project, February 2016

National Public Radio, Take Note: Unauthorized Immigrants and the Use of Prosecutorial Discretion, September 18, 2015 (full length book interview)

Minnesota Public Radio, Untangling Obama's Immigration Policy, March 2, 2016

San Francisco Chronicle, Paris attacks stoke fears at home about Syrian refugees, November 17, 2015

CNN National, States cannot refuse refugees, but they can make it difficult, November 16, 2015

Wall Street Journal Appeals Court to Again Consider Obama Immigrant Deportation Policy July 9, 2015

Buzzfeed No Clear Indications About Ruling On Immigration Actions Case At Arguments, April 17, 2015

Vox.com The government can't enforce every law. Who gets to decide which ones it does?, March 31, 2015

C-SPAN coverage, Association for American Law Schools, Academic Symposium on Executive Action, Jan. 5, 2015.

Rachel Maddow Blog Judge takes aim at Obama's immigration policy, Dec. 17, 2014.

MSNBC Bush appointee rules Obama's immigration action unconstitutional, Dec. 16, 2014.

Roll Call Obama's Immigration Actions Test Presidential Power, November 20, 2014.

The Roanoke Times Goodlatte signs legal brief fighting Obama immigration action Dec. 17, 2014.

C-SPAN coverage, American Bar Association, Homeland Security Institute, August 2014.

The Economist Blog Mini-DREAM and the rule of law, June 18, 2012.

Dallas Morning News U.S. Immigration Enforcements 'Prosecutorial Discretion' History Dates to John Lennon, October 6, 2013.

The Epoch Times Immigration's Legal Labyrinth: The Agony of Discretion, November 16, 2014.

United We Dream, Speaker, Press Conference UWD & Legal Experts Define Success: Presidential Executive Action Must Be Broad, Bold and Inclusive, Oct. 29, 2014.

National Immigration Law Center, Invited Speaker, Press Conference Law and Precedent Allow Broad Presidential Action on Immigration, August 14, 2014.

America's Voice, Invited Speaker, Press Conference: "Law Professors Alongside

DREAMers Discuss Details of Memo Outlining President's Legal Authority to Grant Much Needed Relief for the Latino Community," June 1, 2012.

**Original Op-Eds/Opinion Pieces**

American Constitution Society, Muslim Ban Litigation: An Unfinished Symphony, July 20, 2017

American Constitution Society, Reflections on Bona Fide Relationships, July 14, 2017

American Immigration Council, ImmigrationImpact, Ending Deportation Priorities Breaks Away from Decades of History and Sound Policy, July 10, 2017.

SCOTUS Blog, Immigration symposium: Delays, detentions and due process – Why Jennings matters, June 27, 2017.

American Constitution Society, Musings on Today's Travel Ban Decision by the Supreme Court, June 26, 2017.

Medium, The Birth and Death of Deferred Action (and what the Future Holds), June 16, 2017.

American Immigration Council, ImmigrationImpact, The Dire State of Immigration Detention in Georgia, June 6, 2017.

Yale Law Journal on Regulation, Notice and Comment, Prosecutorial Discretion at ICE: My Latest FOIA Adventure, May 26, 2017.

Yale Law Journal on Regulation, Notice and Comment, Donald Trump's Enforcement Plan and the Future of Discretion, April 25, 2017.

Medium, Immigration Law and Policy After the Executive Orders: Five Key Points, March 25, 2017.

American Constitution Society, Musings on Muslim Ban 2.0, March 13, 2017.

The Conversation, Trump's immigration executive orders: The demise of due process and discretion, March 6, 2017. (reprinted in Associated Press, Newsweek, Salon, Houston Chronicle, and additional outlets)

Medium, Leaked DHS Memo Implementing the Executive Order on Border Enforcement, February 18, 2017.

Medium, Leaked DHS Memo Implementing the Executive Order on Interior Enforcement (or Is Prosecutorial Discretion Dead?), February 18, 2017.

Medium, On This Day: The End of NSEERS, December 2016.

Notice & Comment, Yale Journal on Regulation; Medium, Understanding the Final Rule Ending NSEERS, December 2016.

Medium, Shutting Down Special Registration, December 2016.

Medium, NSEERS or "Muslim" Registration Was a Failed Post 9–11 Program and Must Come to an End, November 2016.

American Constitution Society, Medium, Musings on Dreamers, Mass Deportations and a "Muslim Registry", November 2016.

Medium, Immigration Law and Policy After the Election: Six Key Points, November 2016

Supreme Court of the United States Blog (SCOTUS Blog), Symposium: A meditation on history, law and loss, June 23, 2016.

American Constitution Society. Beyond Deportation: Prosecutorial Discretion Requests After U.S. v. Texas, June 28, 2016.

American Constitution Society. Reflections on Judge Hanen's Reprimand. May 23, 2016.

American Immigration Council, ImmigrationImpact. Understanding Justice Kennedy's Upside Down Argument, April 20, 2016.

ImmigrationProf Blog. U.S. v. Texas – TRUE OR FALSE?, April 19, 2016.

American Constitution Society. Notice and Comment Rulemaking in U.S. v. Texas, April 15, 2016.

Yale Law Journal on Regulation, Notice and Comment, Employment Authorization and Prosecutorial Discretion: The Case for Immigration Unexceptionalism, February 10, 2016.

The Patriot-News, Trump's Muslim ban reeks of failed post-9/11 anti-Muslim policies, December 10, 2015.

The Hill, 9-11 Flashback and Future Immigration Policy, December 9, 2015.

The Hill, On the Anniversary of Obama's Immigration Announcement, November 21, 2015.

Centre Daily Times, Syrian Refugees and Moral Courage, November 21, 2015.

The Hill, Immigration Argument at the Fifth Circuit, July 14, 2015.

<u>Centre Daily Times</u>, State College Raid: Reflections One Year Later, June 9, 2015.

American Constitution Society. A President's Constitutional and Faithful Execution of Immigration Law, January 19, 2016.

American Constitution Society. Book Talk. Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases, January 27, 2016.

From the Square. NYU Press Blog. The Refugee Dilemma and the Broader Immigration Debate, December 11, 2015.

American Constitution Society. Seeking to Understand the Fifth Circuit Ruling on Deferred Action, November 11, 2015.

Crimmigration. Beyond Deportation: The Relationship Between Immigration Prosecutorial Discretion and Criminal Activity, August 4, 2015.

From the Square. NYU Press Blog, Book Notes: Beyond Deportation, July 28, 2015.

ImmigrationProf Blog. Law Professor Blogs, Work authorization for dreamers, a week of wonders and woes, July 17, 2015.

ImmigrationProf Blog. Law Professor Blogs, Beyond Deportation, July 10, 2015.

<u>Centre Daily Times</u> <u>Raids, rights and the rule of law</u>, June 24, 2014.

The Hill <u>Relics of 'deferred action'</u>, November 20, 2014.

The Hill- Op-Ed <u>To file or not to file Vargas's Notice to Appear</u>, July 17, 2014.

<u>Centre Daily Times</u> <u>State College Raid: Reflections One Year Later</u>, June 9, 2015.

ImmigrationProf Blog. Law Professor Blogs, *Immigration Prosecutorial Discretion and Deportation,* April 30, 2014.

AILA Slip Opinion Blog. American Immigration Lawyers Association, *Ninth Circuit Upholds the Rule of Law and Limits Chevron Deference for Children who "Age-Out" During the Green Card Process*, October 2012.

ImmigrationProf Blog. Law Professor Blogs, *Deferred Action in Immigration Law: The Next Generation,* June 28, 2012.

AILA Leadership Blog. American Immigration Lawyers Association, *DHS Releases Long-Awaited Memo on Controversial 9/11 Program* (w. Denyse Sabagh), May 2012.

AILA Slip Opinion Blog. American Immigration Lawyers Association, *Musings on the Visa Waiver Program, No-Right Waivers and the Age of Youth*, March 2012.

AILA Slip Opinion Blog. American Immigration Lawyers Association, Board Offers New Standard for Administrative Closure, and Highlights the Importance of Decisional Independence, February 2012.

ImmigrationProf Blog. Law Professor Blogs, *Prosecutorial Discretion and Post 9-11*, December 2011.

AILA Slip Opinion Blog. American Immigration Lawyers Association, Third Circuit Reflects on Unlawful Presence, Chevron, and the Importance of Prosecutorial Discretion, September 2011.

ImmigrationProf Blog. Law Professor Blogs, *White House's Review of Removal Cases*, September 2011.

ImmigrationProf Blog. Law Professor Blogs, *9/11 Registration and the Morton Memo*, July 2011.

ImmigrationProf Blog. Law Professor Blogs, (w. Leon Wildes) *Prosecutorial Discretion and the Legacy of John Lennon,* July 2011.

Co-founder and contributor to "Race Matters" blog: http://endnseers.blogspot.com/

**Advocacy - Law Professor Letters**

Co-author of letter to the White House supporting the legal authority of executive action in immigration law, signed by 136 law professors and featured in national press, Sept. 3, 2014
- Washington Post Lawyer's agree:  Obama has broad authority to act on deportations, Sept. 3, 2014

Co-author of letter supporting President Obama's deferred action programs announced signed by 135 law professors and featured in national press and at congressional hearings, Nov. 25, 2014:
- Associated Press Bigstory Legal Scholars: Obama's immigration actions lawful, Nov. 25, 2014

Co-author of letter to the White House defending the legality of extending deferred action to the parents of DACA (Deferred action for Childhood Arrivals) recipients, Nov. 3, 2014
- NBC News Law Profs: Legal To Include More Immigrant Parents In Exec Action, Dec. 3, 2014

Co-author of law professor letter challenging *Texas v. U.S.* (March 2015), signed by 104 immigration law scholars and featured in national press

- NBC News Legal Experts: <u>Ruling Blocking Immigration Action 'Deeply Flawed'</u>, March 13, 2015
- Law 360: Law Profs. Call Executive Action Injunction 'Deeply Flawed', March 13, 2015

## OTHER EXPERIENCE

**Howard University School of Law, Washington DC**
*Adjunct Faculty, January 2008-May 2008*
Taught 3 unit course on immigration law and policy

**American University, Washington College of Law, Washington DC**
*Adjunct Faculty, Spring 2005-August 2008*
Taught 3 unit course on asylum and refugee law

**Indiana University, Bloomington, Indiana**
*Teaching Assistant, Fall 1995*
Taught undergraduate course on American Political Science

**Georgetown University Law Center, Washington DC**
*Research Assistant for T. Alexander Aleinikoff, 1997-1998*

**District of Columbia Superior Court, Washington DC**
*Legal Intern, Fall 1997*

**Advice Desk for Abused Women, Durban, South Africa**
*Legal Intern/Trainer, Summer 1997*
Monitored women's collectives in rural regions of Zululand; Lived in a shelter for and counseled abused women and children; Wrote legal analysis of the Advice Desk for Abused Women's activities

**Indian Social Institute, New Delhi, India**
*Legal Researcher, Summer 1996*
Published legal analysis of girl-child prostitution in India; Conducted field work in village and slum areas of Delhi; wrote white paper on human rights education methods for women

**Department of Justice, Civil Rights Division, Washington DC**
*Washington Semester Intern, Fall 1994*
Read and absorbed Title II of the American with Disabilities Act (ADA); Reviewed and assessed complaints falling under Title II of ADA

## VOLUNTEER WORK AND COMMUNITY SERVICE

- Georgetown University Law Center Mentor, Public Interest Law Scholars Program, 2006-2009
- National Lawyers Guild, Washington DC Chapter, Immigration Comm. Chair, 2001-2004
- Florida Immigrant Advocacy Center, Legal Volunteer, Spring 1996 (one week intensive)
- Council for Community Accessibility, Bloomington, IN, Volunteer, 1995
- Monmouth Medical Center, Long Branch, NJ, Hospital Volunteer, 1988-1993- 500+ hours

# EXHIBIT 2

**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals,
by Fiscal Year, Quarter, Intake, Biometrics and Case Status
Fiscal Year 2012-2017 (September 30)**

Requests by Intake, Biometrics and Case Status

| Period | Intake[1] | | | | Biometrics[6] | Case Review[8] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Biometrics Scheduled[7] | Requests Under Review[9] | Approved[10] | Denied[11] | Pending[12] |
| **Fiscal Year - Total[13]** | | | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 124,055 | 38,024 | 1,680 | | 150,751 |
| 2013 | 427,616 | 16,351 | 443,967 | 1,697 | 445,013 | 77,747 | 470,352 | 10,975 | 97,040 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 209,670 | 101,568 | 158,336 | 20,992 | 156,612 |
| 2014 Initial | 122,424 | 19,127 | 141,551 | 488 | | | 136,101 | 20,989 | 62,374 |
| 2014 Renewal | 116,476 | 5,760 | 122,236 | 1,370 | | - | 22,235 | D | 94,238 |
| 2015 | 448,856 | 35,474 | 484,330 | 1,781 | 525,499 | 48,355 | 510,007 | 21,355 | 74,106 |
| 2015 Initial | 85,303 | 7,477 | 92,780 | 338 | | | 90,613 | 19,070 | 37,994 |
| 2015 Renewal | 363,553 | 27,997 | 391,550 | 1,443 | | - | 419,394 | 2,285 | 36,112 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 68,140 | | 198,702 | 14,427 | 121,678 |
| 2016 Initial | 73,362 | 1,204 | 74,566 | 291 | | - | 52,789 | 11,398 | 47,169 |
| 2016 Renewal | 187,339 | 11,113 | 198,452 | 744 | | - | 145,913 | 3,029 | 74,509 |
| 2017 | 472,873 | 43,429 | 516,302 | 1,884 | | - | 462,713 | 13,193 | 118,645 |
| 2017 Initial | 45,557 | 42 | 45,599 | 194 | | - | 47,445 | 9,248 | 36,033 |
| 2017 Renewal | 427,316 | 43,387 | 470,703 | 1,602 | | - | 415,268 | 3,945 | 82,612 |
| Total Cumulative | 2,001,377 | 137,853 | 2,139,230 | 1,541 | 1,372,377 | | 1,801,790 | 80,942 | 118,645 |
| Total Cumulative Initial | 906,693 | 49,596 | 956,289 | 698 | | - | 798,980 | 71,680 | 36,033 |
| Total Cumulative Renewal | 1,094,684 | 88,257 | 1,182,941 | 1,305 | | - | 1,002,810 | 9,262 | 82,612 |
| **Fiscal Year 2017 by Quarter[13]** | | | | | | | | | |
| Q1. October - December | 110,186 | 4,141 | 114,327 | 1,777 | | - | 121,919 | 2,720 | 107,225 |
| Q1. October - December Initial | 15,326 | 15 | 15,341 | 247 | | - | 18,239 | 2,091 | 42,165 |
| Q1. October - December Renewal | 94,860 | 4,126 | 98,986 | 1,530 | | - | 103,680 | 629 | 65,060 |
| Q2. January - March | 132,784 | 19,266 | 152,050 | 2,142 | | - | 124,700 | 4,137 | 111,172 |
| Q2. January - March Initial | 10,419 | 8 | 10,427 | 168 | | - | 17,220 | 3,024 | 32,340 |
| Q2. January - March Renewal | 122,365 | 19,258 | 141,623 | 1,974 | | - | 107,480 | 1,113 | 78,832 |
| Q3. April - June | 94,562 | 8,590 | 103,152 | 1,525 | | - | 102,509 | 3,705 | 99,520 |
| Q3. April - June Initial | 10,977 | 8 | 10,985 | 177 | | - | 5,827 | 2,719 | 34,771 |
| Q3. April - June Renewal | 83,585 | 8,582 | 92,167 | 1,348 | | - | 96,682 | 986 | 64,749 |
| Q4. July - September | 135,341 | 11,432 | 146,773 | 2,115 | | - | 113,585 | 2,631 | 118,645 |
| Q4. July - September Initial | 8,835 | 11 | 8,846 | 138 | | - | 6,159 | 1,414 | 36,033 |
| Q4. July - September Renewal | 126,506 | 11,421 | 137,927 | 1,977 | | - | 107,426 | 1,217 | 82,612 |

D - Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.
Each request is considered on a case-by-case basis.
See http://www.uscis.gov/childhoodarrivals.

[2] The number of new requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] Refers to capture of requestors' biometrics.

[7] The number of appointments scheduled to capture requestors' biometrics during the reporting period.

[8] Refers to consideration of deferring action on a case-by-case basis during the reporting period.

[9] The number of new requests received and entered into a case-tracking system during the reporting period.

[10] The number of requests approved during the reporting period.

[11] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[12] The number of requests awaiting a decision as of the end of the reporting period.

[13] Data on biometrics scheduled is not available past January 31, 2016. Totals reflect up to January 31, 2016.

NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.
2. The report reflects the most up-to-date estimate available at the time the report is generated.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), September 30th, 2017

U.S. Citizenship and Immigration Services

**Number of Form I-821D,Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (September 30)**

| Period | Requests by Intake, Biometrics and Case Status | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Biometrics[6] | Case Review[8] | | | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Biometrics Scheduled[7] | Requests Under Review[9] | Approved[10] | Denied[11] | Pending[12] | |

| Top Countries of Origin | Accepted to Date[1] Initials | Accepted to Date[1] Renewals | Accepted to Date[1] Total | Approved to Date[2] Initials | Approved to Date[2] Renewals | Approved to Date[2] Total |
|---|---|---|---|---|---|---|
| Mexico | 705,125 | 857,475 | 1,562,600 | 627,666 | 785,675 | 1,413,341 |
| El Salvador | 34,430 | 41,531 | 75,961 | 28,754 | 37,843 | 66,597 |
| Guatemala | 24,852 | 27,219 | 52,071 | 20,187 | 24,706 | 44,893 |
| Honduras | 22,634 | 26,167 | 48,801 | 18,486 | 23,590 | 42,076 |
| Peru | 9,816 | 13,169 | 22,985 | 9,147 | 12,189 | 21,336 |
| South Korea | 7,893 | 12,832 | 20,725 | 7,309 | 11,964 | 19,273 |
| Brazil | 8,591 | 9,963 | 18,554 | 7,429 | 9,136 | 16,565 |
| Ecuador | 7,774 | 9,442 | 17,216 | 6,750 | 8,558 | 15,308 |
| Colombia | 7,285 | 9,221 | 16,506 | 6,631 | 8,537 | 15,168 |
| Philippines | 5,112 | 6,804 | 11,916 | 4,692 | 6,390 | 11,082 |
| Argentina | 5,249 | 6,357 | 11,606 | 4,833 | 5,876 | 10,709 |
| India | 3,782 | 4,869 | 8,651 | 3,205 | 4,496 | 7,701 |
| Jamaica | 4,430 | 4,387 | 8,817 | 3,464 | 4,025 | 7,489 |
| Venezuela | 3,481 | 4,283 | 7,764 | 3,119 | 3,954 | 7,073 |
| Dominican Republic | 3,812 | 3,752 | 7,564 | 3,169 | 3,428 | 6,597 |
| Uruguay | 2,636 | 2,980 | 5,616 | 2,395 | 2,709 | 5,104 |
| Bolivia | 2,232 | 3,005 | 5,237 | 2,080 | 2,768 | 4,848 |
| Unknown | 2,724 | 2,744 | 5,468 | 2,067 | 2,305 | 4,372 |
| Costa Rica | 2,287 | 2,834 | 5,121 | 2,065 | 2,623 | 4,688 |
| Poland | 1,998 | 2,407 | 4,405 | 1,808 | 2,226 | 4,034 |
| Chile | 1,907 | 2,446 | 4,353 | 1,763 | 2,251 | 4,014 |
| Pakistan | 1,947 | 2,415 | 4,362 | 1,697 | 2,222 | 3,919 |
| Tobago | 2,441 | 1,715 | 4,156 | 2,094 | 1,702 | 3,796 |
| Nicaragua | 1,900 | 2,114 | 4,014 | 1,601 | 1,948 | 3,549 |
| Guyana | 1,483 | 1,748 | 3,231 | 1,277 | 1,621 | 2,898 |

| Residence | Accepted to Date[1] Initials | Accepted to Date[1] Renewals | Accepted to Date[1] Total | Approved to Date[2] Initials | Approved to Date[2] Renewals | Approved to Date[2] Total |
|---|---|---|---|---|---|---|
| California | 246,140 | 256,248 | 502,388 | 224,737 | 238,464 | 463,201 |
| Texas | 142,635 | 138,005 | 280,640 | 125,239 | 128,812 | 254,051 |
| New York | 51,462 | 80,850 | 132,312 | 43,138 | 72,637 | 115,775 |
| Missing | 16,517 | 100,782 | 117,299 | 9,768 | 89,320 | 99,088 |
| Florida | 41,582 | 67,495 | 109,077 | 33,631 | 59,249 | 92,880 |
| Illinois | 46,279 | 45,797 | 92,076 | 42,701 | 42,833 | 85,534 |
| New Jersey | 26,479 | 37,351 | 63,830 | 22,471 | 33,654 | 56,125 |
| Arizona | 31,040 | 29,458 | 60,498 | 28,028 | 27,350 | 55,378 |
| North Carolina | 29,881 | 26,798 | 56,679 | 27,515 | 25,169 | 52,684 |
| Georgia | 29,058 | 28,162 | 57,220 | 24,322 | 26,047 | 50,369 |
| Washington | 19,978 | 21,345 | 41,323 | 18,037 | 19,713 | 37,750 |
| Colorado | 19,351 | 17,677 | 37,028 | 17,369 | 16,497 | 33,866 |
| Virginia | 14,350 | 19,207 | 33,557 | 12,357 | 17,382 | 29,739 |
| Nevada | 14,326 | 14,690 | 29,016 | 13,160 | 13,741 | 26,901 |
| Maryland | 11,845 | 15,976 | 27,821 | 9,957 | 14,350 | 24,307 |
| Massachusetts | 9,955 | 17,248 | 27,203 | 8,172 | 15,174 | 23,346 |
| Oregon | 12,219 | 11,758 | 23,977 | 11,356 | 11,020 | 22,376 |
| Indiana | 10,841 | 9,946 | 20,787 | 9,894 | 9,293 | 19,187 |
| Pennsylvania | 7,476 | 13,151 | 20,627 | 6,084 | 11,711 | 17,795 |
| Utah | 10,617 | 9,124 | 19,741 | 9,749 | 8,533 | 18,282 |
| Michigan | 7,569 | 10,936 | 18,505 | 6,563 | 9,801 | 16,364 |
| Tennessee | 9,430 | 8,822 | 18,252 | 8,407 | 8,165 | 16,572 |
| Wisconsin | 8,252 | 7,786 | 16,038 | 7,610 | 7,278 | 14,888 |
| Minnesota | 7,116 | 8,914 | 16,030 | 6,324 | 8,004 | 14,328 |
| Oklahoma | 7,567 | 7,152 | 14,719 | 6,915 | 6,742 | 13,657 |
| Kansas | 7,397 | 6,926 | 14,323 | 6,849 | 6,497 | 13,346 |
| Connecticut | 5,854 | 8,558 | 14,412 | 5,038 | 7,752 | 12,790 |
| New Mexico | 7,498 | 6,422 | 13,920 | 6,858 | 6,063 | 12,921 |
| South Carolina | 7,257 | 6,650 | 13,907 | 6,454 | 6,171 | 12,625 |
| Ohio | 5,474 | 7,908 | 13,382 | 4,524 | 6,992 | 11,516 |

| . | Accepted to Date[1] Initials | Accepted to Date[1] Renewals | Accepted to Date[1] Total | Approved to Date[2] Initials | Approved to Date[2] Renewals | Approved to Date[2] Total |
|---|---|---|---|---|---|---|
| Arkansas | 5,668 | 5,149 | 10,817 | 5,124 | 4,815 | 9,939 |
| Alabama | 4,861 | 4,600 | 9,461 | 4,304 | 4,270 | 8,574 |
| Missouri | 3,983 | 4,801 | 8,784 | 3,569 | 4,374 | 7,943 |
| Nebraska | 3,848 | 3,932 | 7,780 | 3,399 | 3,603 | 7,002 |
| Kentucky | 3,517 | 3,777 | 7,294 | 3,084 | 3,423 | 6,507 |
| Iowa | 3,211 | 3,841 | 7,052 | 2,826 | 3,483 | 6,309 |
| Idaho | 3,427 | 3,335 | 6,762 | 3,158 | 3,113 | 6,271 |
| Louisiana | 2,492 | 3,285 | 5,777 | 2,089 | 2,946 | 5,035 |
| Rhode Island | 1,508 | 2,616 | 4,124 | 1,264 | 2,338 | 3,602 |
| Hawaii | 856 | 2,974 | 3,830 | 617 | 2,623 | 3,240 |
| Delaware | 1,645 | 1,902 | 3,547 | 1,461 | 1,755 | 3,216 |
| Mississippi | 1,723 | 1,704 | 3,427 | 1,476 | 1,578 | 3,054 |
| District of Columbia | 987 | 1,783 | 2,770 | 787 | 1,558 | 2,345 |
| Puerto Rico | 571 | 1,966 | 2,537 | 357 | 1,610 | 1,967 |
| Unknown | 233 | 1,738 | 1,971 | 139 | 1,494 | 1,633 |
| New Hampshire | 476 | 1,038 | 1,514 | 381 | 904 | 1,285 |
| Wyoming | 699 | 653 | 1,352 | 624 | 608 | 1,232 |
| Alaska | 216 | 757 | 973 | 151 | 644 | 795 |
| South Dakota | 316 | 487 | 803 | 259 | 435 | 694 |
| Maine | 146 | 555 | 701 | 105 | 501 | 606 |
| Guam | 115 | 556 | 671 | 68 | 492 | 560 |
| North Dakota | 151 | 511 | 662 | 106 | 431 | 537 |
| Virgin Islands | 168 | 353 | 521 | 104 | 314 | 418 |
| West Virginia | 157 | 333 | 490 | 118 | 286 | 404 |
| Montana | 92 | 250 | 342 | 77 | 222 | 299 |
| Vermont | 66 | 278 | 344 | 45 | 245 | 290 |
| Armed Forces-Pacific | 33 | 118 | 151 | 19 | 109 | 128 |
| Armed Forces-Europe, Middle East, Africa, Canada | 28 | 105 | 133 | 17 | 91 | 108 |
| Armed Forces-Americas (except Canada) | 19 | 76 | 95 | 12 | 73 | 85 |
| Northern Mariana Islands | 32 | 32 | 64 | 11 | 25 | 36 |
| Not Reported | 4 | 37 | 41 | 2 | 33 | 35 |

D Data withheld to protect requestors' privacy.
- Represents zero.
[1] The number of requests that were accepted to date of the reporting period.
[2] The number of requests that were accepted to date of the reporting period.
[3] All fields with less than 10 or a blank in the state field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.
2) The report reflects the most up-to-date estimate data available at the time the report is generated.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), September 2017

# EXHIBIT 3

                                                      Page 1

1                  UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

    THE REGENTS OF THE UNIVERSITY OF    ) Case No.

5   CALIFORNIA and JANET NAPOLITANO,    ) 17-CV-05211-WHA

    in her official capacity as         )

6   President of the University of      )

    California,                         )

7                                       )

                 Plaintiffs,            )

8                                       )

         v.                             )

9                                       )

    U.S. DEPARTMENT OF HOMELAND         )

10  SECURITY and ELAINE DUKE, in her    )

    official capacity as Acting         )

11  Secretary of the Department of      )

    Homeland Security,                  )

12                                      )

                 Defendants.            )

13  ----------------------------------)

    AND RELATED CASES.                  )

14  ----------------------------------)

15                       - - -

16               Tuesday, October 17, 2017

17                       - - -

18

19       Videotaped deposition of JAMES McCAMENT,

20  taken at the offices of Gibson, Dunn & Crutcher,

21  1050 Connecticut Avenue NW, Washington, D.C.,

22  beginning at 9:14 a.m., before Nancy J. Martin, a

23  Registered Merit Reporter, Certified Shorthand

24  Reporter.

25

```
 1   A P P E A R A N C E S :
 2
 3              STATE OF CALIFORNIA
                DEPARTMENT OF JUSTICE
 4              OFFICE OF THE ATTORNEY GENERAL
                BUREAU OF CHILDREN'S JUSTICE
 5              BY:  RONALD H. LEE, ESQ.
                1515 Clay Street
 6              Suite 2100
                Oakland, California    94612
 7              (510) 879-0094
                ronald.lee@doj.ca.gov
 8              Representing State of California
 9
10              COVINGTON & BURLING LLP
                BY:  MEGAN CROWLEY, ATTORNEY AT LAW
11              One City Center
                850 Tenth Street NW
12              Washington, D.C.    20001
                (202) 662-5367
13              aberengaut@cov.com
                kstietz@cov.com
14              mcrowley@cov.com
                Representing Regents of the University of
15              California and Janet Napolitano
16
17              GIBSON, DUNN & CRUTCHER LLP
                BY:  ETHAN DETTMER, ESQ.
18                   HALEY MORRISSON, ATTORNEY AT LAW
                1050 Connecticut Avenue, N.W.
19              Washington, D.C.    20036
                (202) 955-8500
20              edettmer@gibsondunn.com
                hmorrisson@gibsondunn.com
21              Representing the Garcia Plaintiffs
22
23
24
25
```

```
 1    A P P E A R A N C E S :   (CONTINUED)
 2
 3
              NATIONAL IMMIGRATION LAW CENTER
 4            BY:   JOSHUA ROSENTHAL, ESQ.
                    KAREN TUMLIN, ATTORNEY AT LAW
 5            1121 14th Street, N.W.
              Suite 200
 6            Washington, D.C.   20005
              (202) 470-6412
 7            rosenthal@nilc.org
              ktumlin@nilc.org
 8            Representing Batalla Vidal Plaintiffs
 9
10            STATE OF NEW YORK
              OFFICE OF THE ATTORNEY GENERAL
11            BY:   SANIA W. KHAN, ASSIST. ATTORNEY GENERAL
              CIVIL RIGHTS BUREAU
12            120 Broadway
              New York, New York   10271
13            (212) 416-8534
              sania.khan@ag.ny.gov
14            Representing plaintiff states and New York,
              et al. v. Trump, et al.
15
16
              U.S. DEPARTMENT OF HOMELAND SECURITY
17            OFFICE OF THE GENERAL COUNSEL
              BY:   REID COX, ASST. GEN. COUNSEL
18            Washington, D.C.   20528
              (202) 447-3891
19            rene.browne@hq.dhs.gov
              reid.cox@hq.dhs.gov
20
21            U.S. DEPARTMENT OF JUSTICE
              CIVIL DIVISION
22            BY:   JOSHUA E. GARDNER, ASST. DIRECTOR
              20 Massachusetts Avenue N.W.
23            Washington, D.C.   20530
              (202) 305-7583
24            joshua.e.gardner@usdoj.gov
              Representing the U.S. Department of Justice
25            and the Deponent
```

```
                                              Page 4

1    A P P E A R A N C E S :   (CONTINUED)

2

                 U.S. DEPARTMENT OF JUSTICE

3                CIVIL DIVISION

                 FEDERAL PROGRAMS BRANCH

4                BY:   RACHEL WESTMORELAND, ATTORNEY AT LAW

                 20 Massachusetts Avenue NW

5                Washington, D.C.   20530

                 (202) 514-1280

6                rachel.westmoreland@usdoj.gov

                 kate.bailey@usdoj.gov

7

8

          ALSO PRESENT:

9

                 DAVID CAMPBELL, Legal Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                     I N D E X
                                              PAGE
2
    TESTIMONY OF JAMES McCAMENT
3
    BY MR. DETTMER                            9
4
    BY MS. CROWLEY                            232
5
    BY MR. LEE                               244
6
    BY MR. ROSENTHAL                          284
7
    BY MS. KHAN                               296
8
9                     E X H I B I T S
10  NUMBER        DESCRIPTION                  PAGE
11  Exhibit 6     Statement of Michael Dougherty    16
                  before the United States Senate,
12                Committee on the Judiciary, October
                  3, 2017, 4 pages
13
    Exhibit 7     CQ Congressional Transcripts, 118    16
14                pages
15  Exhibit 8     James McCament, Acting Director,     26
                  U.S. Citizenship and Immigration
16                Services, Experience and
                  Achievements, 1 page
17
    Exhibit 9     U.S. Department of Homeland          53
18                Security Organizational Chart, 25
                  pages
19
    Exhibit 10    Declaration of James W. McCament,    56
20                3 pages
21  Exhibit 11    "How Do I Request Consideration of   137
                  Deferred Action for Childhood
22                Arrivals?" 3 pages
23  Exhibit 12    DACA Overview, 32 pages              151
24  Exhibit 13    "Don't Let Your Work Permit          171
                  Expire," 2 pages
25

Page 6

 1                   E X H I B I T S
 2                     (CONTINUED)
 3    NUMBER        DESCRIPTION                        PAGE
 4    Exhibit 14   DACA Frequently Asked Questions,    174
                   20 pages
 5
      Exhibit 15   USCIS Number of Form I-821D,        182
 6                 Request by Intake Biometrics and
                   Case Status, 2 pages
 7
      Exhibit      Enlarged version of USCIS Number    182
 8    15-A         of Form I-821D, Request by Intake
                   Biometrics and Case Status, 2
 9                 pages
10    Exhibit 16   I-821D, Consideration of Deferred   189
                   Action for Childhood Arrivals, 4
11                 pages
12    Exhibit 17   National Standard Operating         215
                   Procedures, SOP, Deferred Action
13                 for Childhood Arrivals, DACA.
14    Exhibit 18   Department of Homeland Security,    217
                   statement from Acting Secretary
15                 Duke on rescission of deferred
                   action for childhood arrivals,
16                 release date is September 5, 2017
17    Exhibit 19   Letter dated July 21, 2017 from     257
                   the Office of the Attorney General
18                 of the State of California to the
                   President of the United States
19
      Exhibit 20   Email string, DHS 7 - 9, 3 pages    287
20
      Exhibit 21   Question #20, DACA Adjurations      292
21                 3, 2 pages
22
                     EXHIBITS PREVIOUSLY MARKED
23
                   NUMBER                              PAGE
24
                   Exhibit 3                            193
25

                                              Page 7

1    WASHINGTON, D.C., TUESDAY, OCTOBER 17, 2017; 9:14 A.M.

2                         -OoO-

3              THE VIDEOGRAPHER:  Good morning.  We are

4    going on the record at 9:14 on October 17, 2017.

5    Please note that the microphones are sensitive and may

6    pick up whispering and private conversations.  Please

7    turn off all cell phones or place them away from the

8    microphones as they may interfere with the deposition

9    audio.  Audio and video recording will continue to

10   take place unless all parties agree to go off the

11   record.

12             This is Media Unit 1 of the video recorded

13   deposition of James McCament in the matter of the

14   Regents of the University of California and Janet

15   Napolitano, in her official capacity as president of

16   the University of California, V. United States

17   Department of Homeland Security and Elaine Duke in her

18   official capacity as acting secretary of the

19   Department of Homeland Security and other related

20   cases.

21             This is in the U.S. District Court, Northern

22   District of California, San Francisco Division.  This

23   deposition is being held at Gibson, Dunn located at

24   1050 Connecticut Avenue, Northwest, Washington, D.C.,

25   20036.  My name is David Campbell from the firm

                                              Page 8

1    Veritext.  And I'm the videographer.

2            The court reporter is Nancy Martin from the

3    firm Veritext.  I am not authorized to administer an

4    oath.  I'm not related to any party in this action,

5    nor am I financially interested in the outcome.

6            Counsel, will you please identify yourselves

7    for the record.  Then the witness will be sworn in,

8    and we can proceed.

9            MR. DETTMER:  Ethan Dettmer from Gibson, Dunn

10   on behalf of the plaintiffs in the Garcia action.

11           MS. MORRISON:  Haley Morrisson from Gibson,

12   Dunn on behalf of the Garcia plaintiffs.

13           MS. CROWLEY:  Megan Crowley from Covington &

14   Burling on behalf of the Regents of the University of

15   California and President Napolitano.

16           MR. LEE:  Ronald Lee with the California

17   Attorney General's office on behalf of the State of

18   California.

19           MR. NEWMAN:  Michael Newman of the California

20   Attorney General's office on behalf of the State of

21   California.

22           MS. KHAN:  Sania Khan from the New York

23   Attorney General's office on behalf of plaintiff

24   states and New York, et al.

25           MR. ROSENTHAL:  Joshua Rosenthal of the

Page 9

1    National Immigration Law Center on behalf of the

2    plaintiffs, Batalla Vidal.

3            MS. TUMLIN:  Karen Tumlin of the National

4    Immigration Law Center on behalf of the Batalla Vidal

5    plaintiffs.

6            MS. ZENGOTITABENGOA:  Colleen Zengotitabengoa

7    of USCIS.

8            MS. WESTMORELAND:  Rachel Westmoreland of the

9    United States Department of Justice.

10           MR. COX:  Reid Cox, the General Counsel's

11   Office of the Department of Homeland Security.

12           MR. GARDNER:  Josh Gardner of the Department

13   of Justice, and the witness will reserve the right to

14   read and sign.

15

16                   JAMES McCAMENT,

17       having been first duly sworn/affirmed,

18       was examined and testified as follows:

19

20                   EXAMINATION

21   BY MR. DETTMER:

22       Q.  Thanks for being here today, Mr. McCament.

23   We met briefly off the record.  My name is Ethan

24   Dettmer, and I represent the plaintiffs in one of

25   these cases, the Garcia case, which was filed in

1    San Francisco.  So let's start.  Can you give me --

2    give us your full name.

3         A.  Certainly.  James Wesley McCament.

4         Q.  Are you a lawyer?

5         A.  I am.

6         Q.  All right.  Have you ever been deposed

7    before?

8         A.  I have not.

9         Q.  Ever given testimony in a trial or an

10    arbitration?

11        A.  No, I've not.

12        Q.  All right.  Given testimony before Congress;

13    is that right?

14        A.  I have.

15        Q.  On how many occasions?

16        A.  Once.

17        Q.  And that was two weeks ago today, if I'm not

18    mistaken?

19        A.  That's correct.

20        Q.  That was testimony for a hearing on the

21    oversight of the administration's decision to end

22    deferred action for childhood arrivals, and that was

23    before the Senate committee on the judiciary; is that

24    right?

25        A.  Yes to both.

```
                                                    Page 11

 1        Q.   Okay.  Let me ask you what did you do to

 2   prepare for that testimony, the Senate testimony we

 3   just mentioned?

 4        A.   For the Senate testimony?

 5        Q.   Yes.

 6        A.   I met with members of the USCIS team.  I

 7   reviewed the -- there's a hearing book, which has

 8   standard materials regarding the DACA program, as well

 9   as possible questions to be asked by members of

10   Congress on other topics.

11        Q.   Okay.  The hearing -- I'm sorry.  I didn't

12   mean to cut you off.

13        A.   So the hearing book, and I'm sure just other

14   materials with respect to statistics on the DACA

15   program, the wind-down.

16        Q.   Okay.  The hearing book that you just

17   mentioned, was that assembled by members of your team?

18        A.   It was.

19        Q.   Okay.  Do you have an estimate of how much

20   time you spent preparing for that testimony?

21        A.   I was -- I would estimate it was several

22   hours.  Actually, quite a few hours, I suppose.

23   Probably about 8 to 12 hours, perhaps, over the

24   two-week period from the time I was invited to testify

25   to the hearing perhaps, approximately.
```

Page 12

1          Q.   And the topic of that hearing was the

2     rescission of the DACA program; right?

3          A.   Right.

4          Q.   And just so we're all on the same page, you

5     know what I'm talking about when I talk about "DACA";

6     right?

7          A.   Yes.

8          Q.   Deferred Action for Childhood Arrivals

9     Program?

10         A.   Yes.

11         Q.   Let me ask you just a couple of questions

12    around that testimony.

13         A.   Uh-huh.

14         Q.   First, do you agree that DACA holders are a

15    benefit to our country?

16         A.   Yes.  I believe that the DACA holders, as I

17    stated in my testimony, as well, are folks who have

18    requested DACA over these last five years, are in

19    various sectors, educational, business, and so they

20    contribute to the economy and contribute to the

21    sectors in which they work.

22         Q.   Okay.  And you agree that they make a

23    valuable contribution to our society?

24         A.   I agree, and I think, you know, all those --

25    many in the immigrant system, those in the immigrant

```
                                               Page 13
 1   system make contributions across all sectors of

 2   society.

 3       Q.   Do you also agree that it makes sense to

 4   regularize their status through some legal means?

 5       A.   I think that the regularization of status as

 6   being discussed in Congress now, in the immigration

 7   system any time there's a capacity within the right

 8   bounds of laws and protections for regularization of

 9   status, that's to the benefit of our immigration

10   system.

11       Q.   And, in your view, why is that?

12       A.   So our immigration history, our system back

13   to the founding of the nations, and our immigrants

14   have made many great contributions.  And therefore, I

15   think when immigrants are in a regularized status, it

16   certainly contributes to society.

17           Secondly, for law enforcement purposes as

18   well, it assists in the fact that the status is

19   regularized, and therefore, we know, as we do with

20   everyone in the immigrant system, we know who people

21   are, they're identified, they're contributing to

22   society.

23       Q.   Okay.  Any other reasons you can think of as

24   you sit here today?

25       A.   For the regularization of status?
```

Page 14

1      Q.   Right.

2      A.   As I mentioned, the contribution to society,

3  the legalization benefits overall, and I think

4  generally, any time that we, as I said previously,

5  that we have folks in the legal system, it helps us in

6  USCIS, DHS, DOJ administer the immigration system more

7  effectively.

8      Q.   Let me switch gears a little bit.

9      A.   Sure.

10      Q.   Do you agree that rescinding DACA will create

11  disruptions for the DACA holders?

12      A.   To rescind DACA as we have, DHS, and USCIS

13  have, absent another solution, leaves those DACA

14  requesters and recipients without a future status as

15  their employment authorization documents begin to

16  expire.  But for that reason, the hope is that

17  Congress will provide a permanent solution for that

18  population.

19      Q.   Can you identify the disruptions that you see

20  for the DACA holders.  What are they, in your view?

21      A.   So DACA is an act of prosecutorial

22  discretion, deferring action on someone's case.  So

23  absent legislative action or permanent action to your

24  previous question regarding regularization of status,

25  as DACA holders begin to expire, or their EAD begins

1   to expire, they would not be able to work, or lawfully

2   work.

3           In addition, they are -- the status that they

4   held, if they held a status prior to the grant of

5   DACA, they revert to that.  And therefore, if that

6   status begins to expire, then that's subject to law

7   enforcement within appropriate bounds for ICE and

8   other law enforcement agencies which are A, outside of

9   my purview, USCIS, and B, subject to guidelines.

10      Q.  And -- I'm sorry.

11      A.  No.  Sorry.  So then I would say the other

12  harm, to your question for DACA requesters and

13  recipients as the benefits begin to expire, is that

14  they are no longer -- they don't have that legal

15  status, but they never really did.  They had a

16  deferred action that allowed them to have employment

17  authorization.

18          If they don't, then that limits their options

19  here in the United States, ultimately, for work, for

20  employment and to really be in the legal immigration

21  system, which I think is not wise and why we hope that

22  there's a legislative solution, because that,

23  statutorily, provides the only permanent protection or

24  permanent status for them.

25      Q.  Have you finished your answer?

1      A.   I have.

2      Q.   One of the things I'll get to in a second,

3   having not been in a deposition, it's important for us

4   not to talk over each other.  I think I've violated

5   that rule a couple times already.  So I apologize.

6   But if we can both try to make the court reporter's

7   life easier --

8      A.   Yes.

9      Q.   -- then that would be good for us all.

10          So one of the harms, I mean to make it real

11   simple, is that the DACA holders, once DACA has

12   rescinded, are much more subject to removal from the

13   country; right?

14      A.   Because they no longer hold the status of or

15   have received deferred action.  Once that deferred

16   action has expired, they're subject to law enforcement

17   within the actions and prioritization of ICE and

18   others.

19          MR. DETTMER:  So I'm going to ask the court

20   reporter to mark two exhibits.  It should be 6 and 7,

21   I believe.

22          (Deposition Exhibits 6 and 7 were marked

23          for identification.)

24          MR. DETTMER:  Unfortunately, I don't have

25   enough copies for everybody.  Maybe we can share.

```
                                                     Page 17
 1        Q.  So for the record, Exhibit 6 is a four-page
 2   document.  The title is "Statement of Michael
 3   Dougherty and James McCament" -- I'm leaving out the
 4   titles -- "for a hearing on oversight of the
 5   administration's decision to end deferred action for
 6   childhood arrivals," dated October 3, 2017.
 7            And Exhibit 7 is a 118-page printout from the
 8   Internet.  The top line says, "CQ congressional
 9   Transcripts."  So let's start with Exhibit 6.
10        A.  Sure.
11        Q.  Do you recognize that document?
12        A.  I do.
13        Q.  And what is it?
14        A.  It is the joint testimony by myself and
15   Michael Dougherty, written testimony.
16        Q.  Okay.  So you and Mr. Dougherty wrote this
17   document, submitted it to Congress in advance of your
18   testimony?
19        A.  Yes.
20        Q.  And how did this get written?  Did you two
21   actually write it, or did someone write it for you and
22   you edited?  How did this come to be?
23        A.  So we edited it.  It was a joint product of
24   the department.  In other words, Michael Dougherty's
25   team.  And I was also provided with a draft to provide
```

```
                                          Page 18
```

1    edits.

2              And if I may go back to an earlier question.

3         Q.   Sure.

4         A.   You had asked with respect to preparation for

5    the testimony, and I had referenced working with my

6    own team, as I understood the question.  But to also

7    note, Michael Dougherty and I met and did a joint prep

8    with the department as well.  So just to clarify the

9    answer.

10        Q.   No, I appreciate that.  And that actually

11   brings up another sort of rules of the road point that

12   I think is important.  If during the course of the day

13   something comes to you, "I left this out" or "I want

14   to clarify something," please feel free to do that.

15        A.   Good.  Thank you.

16        Q.   Do you recognize Exhibit 7?  This is

17   something printed from the Internet, and I don't want

18   you to look at the whole thing and I'm not asking you

19   to verify that the whole thing is true, but I will

20   point you to a few sections that I want to talk about.

21             But you recognize that congressional

22   testimony is typically reported; right?

23        A.   I do.

24        Q.   Okay.

25        A.   Yes.

1     Q.  Any reason to doubt that this is an accurate

2     transcription of what was said that day?

3     A.  No reason to doubt, although as you noted,

4     this is the CQ print, and the usual protocol is that

5     edits are made to a transcript if there are any --

6     Q.  Okay.  Is that something you either have done

7     or plan on doing, go through the transcript and make

8     corrections?

9     A.  We have received the transcript recently.  I

10    don't believe that there are any -- I don't recall

11    that there are any corrections that I would be making,

12    but I don't believe that has formally gone back to the

13    committee.  In fact, if I may, to your earlier point,

14    amend.

15    Q.  Sure.

16    A.  I believe what we received is the CQ

17    transcript.  Protocolwise, we would receive a formal

18    transcript with a line by line annotation for review

19    and editing, as with all congressional testimony.  I

20    do not know if we've received that as yet, but it is

21    only two weeks since the testimony.  So it may be that

22    we have not, and that would be the space to really go

23    line by line for review.

24    Q.  Got it.

25    A.  So to that, I don't believe we've received

Page 20

1    that piece to look at.

2        Q.  Got it.  So let me ask you to turn to Page 37

3    of that Exhibit 7.  I'm actually going to turn over to

4    the next page.  But just to identify the first speaker

5    on Page 38 of this version, it's Senator Graham?

6        A.  Uh-huh.

7        Q.  And then you see the question he asks there

8    for -- to Mr. Dougherty, and I'm reading the second

9    sentence.  "Do you believe the dream act kids on a

10   whole -- I mean there's always outliers in any large

11   group -- add value to the country or they're a

12   liability?"

13           And you see Mr. Dougherty's answer there.

14   I'll read it for the record.  "They're a benefit to

15   the country as are many immigrants coming in.  I

16   served as the ombudsman.  I naturalized people to

17   become U.S. citizens.  It means a great deal.  They're

18   a valuable contribution to our society.  We need to

19   regularize status through some legal means."

20           Senator Graham then asks, "Do you agree with

21   that, Mr. McCament?"

22           And you answer, "I do, Senator."

23       A.  Uh-huh.

24       Q.  What I've just read, is that an accurate

25   transcription of the testimony that you were at two

1   week ago?

2          A.  It is what I recall, as written, yes.

3          Q.  Thank you.  All right.  It probably makes

4   sense --

5              And you can just leave those.

6          A.  Okay.

7          Q.  -- to go over a little bit more of the ground

8   rules of a deposition given that you have not given

9   one before.

10         A.  Thank you.

11         Q.  And I assume you've had some chance -- and

12  we'll talk about this -- to talk with the lawyers

13  representing you just to talk about how this happens,

14  but I'll give you some rules of the road.

15         A.  Thanks.

16         Q.  So as you know, the court reporter is taking

17  down everything we say, at least when we're on the

18  record, and the videographer is also videotaping what

19  we're doing here and recording our voices.  You've

20  taken an oath.  It's the same oath that you'd take if

21  you were testifying in a courtroom, and your testimony

22  has the same effect as if you were in a courtroom.

23  Does that make sense to you?

24         A.  It does.

25         Q.  Okay.  Can you think of any reason,

```
                                              Page 22
```

1   medication, anything like that, why you can't give

2   your best testimony today?

3       A.  No.

4       Q.  So we've already talked about not talking

5   over each other.  I'm sure we will do that, but we'll

6   do our best not to, if that's fair.

7       A.  Fair.

8       Q.  If I ask you a question that isn't clear to

9   you, which I'm sure I will do, please ask me to

10  rephrase it.  I'll do my best to ask a very clear

11  question so you understand what I'm asking, but please

12  do feel free to ask me if you don't understand my

13  question.  Will you do that?

14      A.  I will.

15      Q.  Now, one or more of the many lawyers in this

16  room may make an objection to my questions.  Though I

17  try very hard to ask unobjectionable questions, I

18  won't always succeed.  Unless you're directed not to

19  answer the question on the basis of privilege, you

20  still answer the question.  The objections, for the

21  most part, are just made for the record for a judge to

22  consider later.

23      A.  I see.

24      Q.  So you can, you know, obviously wait until

25  the objection is over, and then go ahead and answer

                                                      Page 23

 1    the question unless you've been directed not to.
 2         A.   Okay.
 3         Q.   If you need a break, let me know.  This is
 4    not an endurance test.  So feel free to ask.  I'll try
 5    to shoot to take a break every hour or so.
 6         A.   That would be good.  Thank you.
 7         Q.   All right.  So switching fields again, what
 8    did you do to prepare for the deposition today?
 9         A.   I met with my Department of Justice counsel
10    and Department of Homeland Security counsel and our
11    USCIS counsel yesterday.
12         Q.   Okay.  Who was there?
13         A.   Actually, the four -- for the purposes of the
14    video and the transcript.  So Josh, Reid, Rachel, and
15    Colleen, and in addition, two other folks, Amora Uiy,
16    who also works with Colleen in the USCIS office of
17    chief counsel.
18         Q.   Okay.  Anybody else there?
19         A.   And an advisor on my team, Jessica Shaw
20    Nelson.
21         Q.   She's a non-lawyer advisor?
22         A.   She is a lawyer but on detail to my office as
23    a non-lawyer.  Well, as an advisor.
24         Q.   Got you.  And I'm not going to ask what
25    exactly you talked about.  That's privileged.  How

```
                                          Page 24
 1    long did you spend meeting to prepare for this?
 2         A.   I believe it was from 11:30 to about 4:30 or
 3    5:00, as I recall.
 4         Q.   And did you review documents?
 5         A.   Prior to or during?
 6         Q.   Good question.  Let's start with prior to.
 7    Did you review documents prior to the meeting?
 8         A.   I did not.
 9         Q.   Did you review documents during the meeting?
10         A.   I did not review any documents that were sort
11    of provided to refresh.  I did look at a couple of
12    documents in the prep.
13         Q.   Okay.  Can you explain that distinction that
14    you just made?  I'm not sure I follow.
15         A.   Sure.  I had looked at one document, which
16    was the letter from the state attorney general in
17    Texas, Ken Paxton.
18         Q.   Okay.
19         A.   Just happened -- I mean as part of the
20    discussion.
21         Q.   Okay.  Any other documents that you looked
22    at?  Can you remember?
23         A.   I don't recall any others as far as that.  I
24    may exercise the point as we go along --
25         Q.   Sure.
```

                                                      Page 25

1        A.   -- if more comes to mind, but the Paxton

2    letter I remember.

3        Q.   Do you think there were other documents and

4    you can't remember what they were, or you don't think

5    there were and something may come to you?

6        A.   I think the only thing to that question, the

7    only other one that I recall is the Secretary's memo,

8    which was to myself and Tom Homan and Kevin McAleenan

9    and the others listed.

10       Q.   The rescission memo?

11       A.   The rescission memo.  And I believe those

12   were the only two.

13       Q.   Okay.  Did you bring any documents with you

14   today?

15       A.   I did not.

16       Q.   Do you believe that your memory as to the

17   issues surrounding the rescission of DACA are

18   sufficiently refreshed to give a deposition today?

19       A.   I believe my memory is pretty good, yes.

20       Q.   Okay.  And how about as to the DACA program

21   generally?

22       A.   Generally good.  I don't ascribe to every

23   detail, but yes.

24            MR. DETTMER:  Okay.  I'll ask the court

25   reporter to mark this as Exhibit 8.

```
                                        Page 26

 1              (Deposition Exhibit 8 was marked for

 2              identification.)

 3   BY MR. DETTMER:

 4        Q.   And while you're looking at that, for the

 5   record, Exhibit 8 is a one-page printout from the

 6   website USCIS.GOV.  The title is "James McCament

 7   Acting Director U.S. Citizenship and Immigration

 8   Services."

 9              Do you recognize this document, Mr. McCament?

10        A.   I do.

11        Q.   Describe what it is, please.

12        A.   It is an overview of my experience and

13   achievements posted on the USCIS.GOV website.

14        Q.   And is this accurate as you're sitting here

15   today?

16        A.   Yes.

17        Q.   Actually, I am curious on one background,

18   just an aside.  What do you teach at the Antonin

19   Scalia Law School?

20        A.   I teach homeland security law and policy.

21        Q.   How long have you been doing that?

22        A.   Since January of 2010, with the exception of

23   a couple of semesters, including this one.

24        Q.   And does that cover matters related to

25   immigration?
```

1          A.   It does, and a seminar summary course on

2     multiple DHS topics, but it includes immigration as

3     one or two modules.

4          Q.   Okay.  And have you taught anything related

5     to DACA in that class?

6          A.   No, I have not.

7          Q.   Okay.  So let me focus on a period beginning

8     in 2012.  That's when DACA was first initiated; right?

9          A.   Yes.

10         Q.   In 2012, if I'm reading this right, you were

11    working as the chief of the USCIS Office of

12    Legislative Affairs; is that correct?

13         A.   Yes.

14         Q.   Can you describe what that job was at the

15    time?

16         A.   Certainly.  The Office of Legislative Affairs

17    in USCIS has, from my perspective, two main purposes,

18    and that is this.  First, as with all legislative

19    affairs, functions, and offices in various agencies

20    and departments, liaising with Congress, managing

21    hearings, managing provision of information to

22    committees, general communications.  Establishing

23    meetings with members of Congress for leadership.  And

24    so that is what I would say is the traditional part of

25    legislative affair operations representing the agency.

Page 28

1           Part 2, which is more unique, is responding

2     to case work, and there is a significant amount of

3     case work handled by USCIS, and therefore, of strong

4     interest to members of Congress and their staff for

5     their constituents.

6           Q.  Can you explain what that means, "responding

7     to case work"?

8           A.  Certainly.  USCIS receives each year millions

9     of cases which are filed with our agency.  Those

10    trigger congressional inquiries when members of

11    Congress and their staff receive questions about how a

12    case is handled, where it is in the process, or other

13    questions related to that case.  As a consequence --

14    or consequence as an effect, I should say, better

15    said, the immigration case work is handled usually by

16    at least one person in a member of Congress' office,

17    be it a senator or a congressman or more than one

18    person.

19           Our role in USCIS, the second tranche I said

20    that was a bit unique was to work across the country

21    with the staffs, largely and members, as they have

22    questions, utilizing approximately 140 to 150 or more

23    congressional liaisons that work for USCIS but across

24    the country work on those case inquiries.

25           So status of that case, where it is, and

1  generally, questions about why it has not been

2  approved or other questions.  Not surprisingly, that

3  requires a good amount of finesse and providing of

4  information.  So those were the two branches or

5  opportunities that we had in legislative affairs, the

6  second a bit more unique.

7      Q.  So you were in that job, if I'm reading this

8  right, in 2012 when DACA was first put into effect

9  through May of 2014; is that right?

10     A.  Through May of 2014, at which time while

11  still titled as the head of legislative affairs, I

12  then began serving as, for a couple of months, the

13  acting chief of staff, and then for a longer duration

14  until 2015 as deputy chief of staff.

15     Q.  In your role as chief of the office of

16  legislative affairs, what do you remember your

17  responsibilities being with respect to DACA

18  specifically?

19     A.  So DACA, the 2012 launch.  I can lay out a

20  couple of different points, especially at the

21  beginning, which, so in the -- first was the initial

22  announcement of DACA in June of 2012, and then the

23  2nd, August of 2012, at which point the program became

24  operational.  In June 15 of 2012 I received

25  notification the morning that Secretary Napolitano's

Page 30

1  memo was to be released, advised that the memo was to

2  be released, and this was to be announced.

3          In keeping with my role as the head of

4  legislative affairs, normally there would be keen

5  congressional interest.

6          And then from June until August as the

7  program was being stood up, as I recall -- and this

8  may bleed over past August 2012 with the actual

9  operational launch of DACA, I did participate and lead

10  at least one, but I believe there were more,

11  congressional calls, conference calls to walk through

12  the details of the DACA program.

13          And that is a fairly standard practice, not

14  always, in legislative affairs work, certainly USCIS,

15  to provide detailed information if it is of interest

16  to Capitol Hill in a broader setting than one to one

17  to each of the 535 members of Congress in order to

18  avoid confusion and discuss the parameters.

19          So we had a couple of calls, I think it was

20  in that interim walking through, and then after August

21  and the launch there would have been, I believe, at

22  least one other call with the launch.  But again,

23  that's five years ago, and I did not go back to sort

24  of try to reflect on that.

25          And then subsequent, as with all the many

1    benefits that USCIS administers, we would provide

2    answers to questions, and whether DACA or other

3    benefit types, and that's more in the standard

4    process.

5        Q.  The case work process that you mentioned,

6    you'd get --

7        A.  Correct.

8        Q.  -- inquiries about specific cases, what's

9    going on with the DACA presentation?

10       A.  Correct.  Parameters, as with all the other

11   benefit types.

12       Q.  Did you have any other responsibilities or

13   interactions with the DACA program in your role as

14   chief of office of legislative affairs?

15       A.  Not that I recall beyond those broad

16   parameters.  Again, to emphasize, given the number of

17   benefits, and in this case, requests with respect to

18   DACA, over those years we would answer questions

19   responsive to Congress and/or provide information if

20   testimony was being drafted.  So I just want to sort

21   of make that point as far as the broad scope after

22   that, in my view, began to fall into the other

23   categories at work to which we respond.

24       Q.  Do you remember how you got the information

25   to -- about DACA to give to Congress?

1      A.  As I recall -- again, five years ago, but I
2  do, yes.  I do remember the process.
3      Q.  Describe that, please.
4      A.  Certainly.  Again, it was after the June
5  announcement.  A script was prepared to lay out the
6  parameters of DACA and explain the application
7  process.  At that point, I would have to say that
8  maybe -- I may be bleeding over into post August --
9  right? -- because June to August USCIS was building
10  the program, but I do recall that we had a PowerPoint
11  slide deck to walk through each of the points of what
12  was announced in the Secretary's memo.
13      Q.  Do you remember in that time period, that
14  June to August time period of 2012, who was
15  responsible for the rollout of DACA?
16      A.  Can you explain that a bit more as far as --
17      Q.  Sure.  You just mentioned --
18      A.  Please, sorry.
19      Q.  That time period was when DACA was being
20  rolled out; right?
21      A.  If I may.
22      Q.  Of course.
23      A.  June to August was from the announcement to
24  the forthcoming, it will be become operational in
25  August.  The reason for that distinction is that all

                                                      Page 33

1    the operational details would not have been announced

2    until early August, as I recall.

3         Q.  So my question is presumably, somebody was

4    putting together those operational details so that the

5    program would function in August; right?

6         A.  Correct.

7         Q.  Do you know who that was?

8         A.  So I cannot name all specific names for this

9    reason.  There were many people working on that in

10   those two months.

11        Q.  Was there somebody leading that effort?

12        A.  So I pause because that's a broad question in

13   the USCIS DHS operations perspective, and if I may.

14        Q.  Please.

15        A.  Because there was a working group working on

16   the structure, how would this be received.  You know,

17   how would you request DACA launching from the

18   Secretary's memo.  And those various operational

19   pieces, I don't recall specifically who led it, but

20   that was being overseen by the front office of USCIS,

21   and if I may explain that phrase.

22        Q.  Sure.

23        A.  And as I sit now in the deputy director

24   position is in overseeing, you receive reports.  You

25   are monitoring how something is being built.  So from

1    that perspective there's a working group level

2    leadership.  There was a service center leadership,

3    USCIS front office monitoring, and then I'm sure there

4    was also department -- I mean, you know, there was

5    departmental interest in hearing the details.  I don't

6    know that part.  And then as we would drew closer,

7    there's also the communication side as well.

8              If that answers the parameter side.

9         Q.  That's fair.  Were you part of any of those

10   working groups?  Did you consider yourself part --

11        A.  With respect to the legislative piece, to ask

12   questions how things were being unpacked, not with

13   respect to the substantive.  In other words, if I may,

14   the operational footprint, how a request would be

15   received was not something that I necessarily would

16   opine on because in the front office, as I recall at

17   the time, political chief of staff was heavily

18   involved, sort of, in monitoring, and then the

19   operational folks in the service centers were working

20   to build it.

21        Q.  So what I'd love, if you remember, are names

22   of some of the people who were heavily involved in

23   that rollout process.  Do you remember any names?

24        A.  So beginning with the -- and again, this is

25   not going to be a probably fulsome, complete list.  I

1   do remember some names.

2        Q.  And who were they?

3        A.  So the former director, Alejandro Mayorkas.

4   The former political chief of staff, Rebecca Carson.

5   I think the former deputy director, my predecessor,

6   Lori Scialabba would have been involved.  Again, going

7   back, I may not be remembering sort of all the levels

8   of involvement.

9            And then, as well, in the service centers --

10  and I'm only, I think, best suited to speak to the

11  leadership part that I recall because -- and if I may

12  explain that.  USCIS, as I think all federal agencies,

13  will provide -- when asked to do a task, will work

14  through working groups to build, get the information

15  needed, build a structure, have the various people.

16  So I don't really recall offhand names of all of those

17  folks per se.  From the leadership side Don Neufeld

18  was the head of the service center operations at the

19  time.  And Barbara Velarde, who was his deputy at the

20  time.  I'm just recollecting back.  Those are the

21  folks I remember in leadership at the time.

22       Q.  Okay.

23       A.  If another name pops in, I can tell you.  But

24  as I said, there were many people on the working group

25  level, many discussions, but from the leadership side

Page 36

1    I'm comfortable I'm pretty correct.

2         Q.  I appreciate that, and I do know, obviously,

3    this was a while ago.  So based on the conversations

4    about DACA that you were part of at that time, do you

5    remember hearing a concern that undocumented people

6    would be hesitant to sign up for DACA because they

7    were giving sensitive information to the government?

8    Do you remember that concern generally from that time

9    period?

10        A.  Generally, I do.  And that it was also coming

11   from outside, meaning, if I may --

12        Q.  Please.

13        A.  That as I recall -- and again, over five

14   years, public statements, internal working group

15   statements, questions tend to blur a bit, but I

16   believe there were even questions from the Hill,

17   Capitol Hill and the public, what would happen to that

18   information once provided.

19        Q.  So you remember that issue being something

20   that was discussed in these working groups, sort of

21   how to address that concern?

22             MR. GARDNER:  Objection.  Mischaracterizes

23   the witness' testimony.

24             THE WITNESS:  Could you restate the question?

25   BY MR. DETTMER:

Page 37

1      Q.  Sure.  So we just talked about this concern

2   that was in the air at the time; right?

3      A.  Uh-huh.

4      Q.  I gather that you don't have specific

5   recollection of specific comments that were made.

6          My question is -- maybe I'm rephrasing it all

7   together -- what do you remember about the internal

8   discussions at USCIS about that topic?

9          MR. GARDNER:  Objection to the extent it

10  calls for disclosure of information subject to

11  deliberative process privilege.

12         If you can answer that question without

13  revealing deliberative information, you can answer.

14  Otherwise, I'd instruct you not to answer.

15         THE WITNESS:  I don't believe I can.

16  BY MR. DETTMER:

17     Q.  Do you remember being concerned about that

18  issue?

19     A.  My personal --

20     Q.  Yes.

21     A.  -- concern?

22         No, I do not.

23     Q.  And why not?

24     A.  So from my perspective as head of legislative

25  affairs, but also working in the immigration sphere,

Page 38

1   at least from 2006 on, I saw that if -- my belief was

2   that if we were asking for information and setting

3   parameters on how it would be used, as in all the many

4   benefit types and requests in this case, that we would

5   keep our word, that DHS would keep our word, USCIS

6   would keep our word.

7          I understand the concern and -- but my belief

8   was if the program was being built and the assurance

9   that was being provided, within parameters which was

10  set out in our FAQs, that we would intend to keep

11  that.

12     Q.  So -- and we'll look at the FAQs.

13     A.  Sure.

14     Q.  Without pretending to quote from them, the

15  basic word that was given was that that information

16  would not be used for enforcement purposes, with some

17  caveats?

18     A.  With some caveats, and actually, yes, the

19  immigration specifically, if I recall -- I don't have

20  them in front of me.  But that FAQ by which we

21  governed the program, rather uniquely among other

22  elements that we administer, did say that the

23  information provided for DACA request purposes would

24  not be provided for immigration enforcement purposes

25  but could be provided for other reasons.  National

                                                            Page 39

1    security, identification of crimes.  I'm trying to

2    remember off the top.

3              So that was set forth in the FAQ.

4        Q.  And just so I make sure I understand your

5    testimony, it was your belief that the government

6    would keep its word with respect to those

7    representations.

8        A.  Yes.  Because we made the representations, or

9    we in the USCIS, DHS as well, the caveats you noted.

10   So outside of immigration enforcement proceeding

11   purposes and also, of course, there was a caveat that

12   this could be changed, but...

13       Q.  And your belief was that because of that,

14   what you just described, the concern that potential

15   DACA applicants had about providing that information

16   to the government was addressed?

17       A.  Addressed, yes.  And understood.  So for that

18   reason the FAQ was constructed to note that.

19       Q.  Are you aware of steps that USCIS or DHS more

20   generally took to, I guess, encourage people to apply

21   for DACA?

22       A.  Yes.

23       Q.  And can you describe those to the extent

24   you're aware of them.

25       A.  So recollecting then and over the years,

1    simply put, promoting this as an available option.

2         Q.  Why did DHS, USCIS do that?

3              MR. GARDNER:  Objection.  Calls for

4    speculation.

5              THE WITNESS:  If I may ask, Counsel, so with

6    your objection I may proceed but --

7              MR. GARDNER:  Right.

8              MR. DETTMER:  That's okay.

9              THE WITNESS:  So why did DHS and USCIS

10   promote it?

11   BY MR. DETTMER:

12        Q.  Yes.

13        A.  Well, it was a direction from our secretary

14   that we would begin implementing this ability, this

15   capacity for folks within those guidelines to request

16   DACA.  And to be clear, to respond to your question,

17   again looking across all the many benefit types, when

18   there is direction given, it's incumbent, appropriate

19   for us, USCIS or other agencies, to explain clearly to

20   the public what those guidelines in this case would be

21   and note to recipient requesters that this was now an

22   available option.  I hope I'm explaining it clearly.

23             Because of the many benefit types and

24   requests in this case that we administer, for that

25   reason our website at USCIS has a very high level of

1   traffic.  For the purposes of the deposition I'll just

2   say approximately, but certainly approximates the

3   level of traffic with the IRS, and oftentimes goes

4   above that as one of the busiest access points for

5   information of federal agencies.

6          So I think that reflects, you know, our

7   belief to try to put information out there so there is

8   clarity about something that's been announced.

9     Q.  Okay.  Maybe we can finish just a few

10  questions about this exhibit and then we can take a

11  break, if that works.

12    A.  Thank you.

13    Q.  So your next job, I think you mentioned after

14  you were at the office of legislative affairs was sort

15  of shading over to acting deputy chief of staff and

16  then chief of staff for USCIS; is that right?

17    A.  The reverse.

18    Q.  Okay.

19    A.  Acting chief of staff, then acting deputy.

20    Q.  Okay.  And can you briefly describe what your

21  job responsibilities were in those roles?

22    A.  Certainly.  And I'll explain both.

23    Q.  Thanks.

24    A.  So with respect to acting chief of staff,

25  from May 2014 to July 2014 I served in that role with

Page 42

1   the departure of the former, then actually acting

2   chief of staff until the new director of USCIS arrived

3   following confirmation, along with his political chief

4   of staff.  So from May until July I served in that

5   acting chief of staff role.

6       Q.  I'm sorry to interrupt.  Who is the

7   director -- or the acting director at that time who

8   you were reporting to?

9       A.  The acting director at the time from May

10  until July was Laurie Scialabba --

11      Q.  Okay.

12      A.  -- the permanent deputy director and acting.

13          So the responsibilities --

14      Q.  Yes.  Sorry to interrupt you.

15      A.  No, not at all.  So as acting chief of staff,

16  it is a liaison role.  I believe more complexities to

17  that as, I think, the way I envision it.  So as the

18  liaison within the agency on behalf of the then acting

19  director, information flow, items for her signature,

20  tracking and liaising to make sure that requests from

21  her, requests that needed to be carried out, gathering

22  information, coordinating meetings.

23          So that is -- oftentimes chiefs of staffs are

24  referred to as sort of keeping the trains running, and

25  that is largely what that role entailed.  And also

1    liaising with the department and the Secretary's

2    office.  Attending chief of staff meetings to keep the

3    information flowing.

4            And then, finally, in addition, working

5    within the inner agency, other departments, chiefs of

6    staff who would have questions for USCIS or DHS.  So

7    there was that liaison role.  So that was for those

8    two months.  And then near the end of that, preparing

9    for the transition to the incoming chief of staff.

10       Q.  Okay.  And let me just interrupt again.  In

11   that job that you've just described, do you remember

12   any particular interactions with the DACA program?

13       A.  I recall because that -- so that may -- well,

14   that 2014 time period was coming up on the two-year

15   anniversary of DACA.  And so I'm pausing because I'm

16   trying to recollect.  So that was the first renewal

17   period --

18       Q.  Right.

19       A.  -- for initial DACA requesters.  So I recall

20   there being discussions, and I'm not recalling all the

21   details.  But discussions or questions on how will the

22   renewal process work and, you know, just questions

23   about how the information would be taken in and

24   adjustments to the process.

25            As far as those adjustments, I'm reflecting a

Page 44

1    bit that when -- I recall when initial DACA, as we

2    refer to it, initial versus renewal, of course, was

3    built, I believe there were discussions about renewals

4    as far as knowing that process would be coming, and

5    the form was set to include both initial and renewals.

6    So you could select one or the other.

7            I don't recall, because the program was so

8    compressed in its stand up from June to August, many

9    questions -- there may well have been -- on how the

10   renewal process would work.  But it may be there were

11   some points.  But then in coming into August of 2014,

12   there were more discussions about how the renewal

13   process would work, the level of information required,

14   reverification, you know, of information.  So I recall

15   that, and there being discussions, department meetings

16   with USCIS.

17           I'm just, three years later, trying to recall

18   the specifics.  I don't.  But there certainly were

19   discussions.

20       Q.  Okay.  I mean it's certainly the case that

21   renewal of the program -- renewal of DACA status was

22   an important aspect of the program; right?

23       A.  It was a next step --

24       Q.  Yeah.

25       A.  -- as opposed to initial.

```
                                              Page 45
 1         Q.  I mean it would seem, and I don't know if you
 2    would agree me on this, that, you know, without the
 3    ability to renew after two years, it would seem like
 4    not a particularly worthwhile effort.  Is that fair?
 5         A.  I believe that's fair, and if I may.
 6         Q.  Please.
 7         A.  You raised the earlier question about the
 8    assurances of the use of information.
 9         Q.  Yeah.
10         A.  And with respect to your question I recall --
11    I do not recall the names or anything, but that being
12    a discussion point.  If the information has been
13    provided, we have the reassurances.  Those are in the
14    FAQs.  But also as folks expire what -- I don't want
15    to put words in anyone's mouth.  So at the time, but
16    in essence to your point, initials have been launched,
17    a two-year period was selected.
18              Other periods could have been selected, but
19    two years was selected and -- as a policy choice.  And
20    if you don't have any renewals, you have shut off the
21    pipeline.  So it doesn't seem to represent what has
22    been represented.  I'm hoping I said that clearly.
23         Q.  No.  I think that makes sense.  What you're
24    saying is if there are -- if the program is set up and
25    people sign up for it but then it's shut off after two
```

1    years, the applicants wouldn't be getting what they

2    had bargained for?

3        A.   And knowing too that, as I recall President

4    Obama's public statements, when the program was

5    launched by Secretary Napolitano, that it is only

6    temporary; right?  It is a deferral of action, and I

7    think you used the footnote that it's been since, that

8    Congress should provide a legal status.  But

9    nonetheless, it has been operational as initial

10   renewal would demonstrate that, you know, it would

11   fulfill the next step, still with the thought, as I

12   recall in the either, so to speak, hoping to press for

13   Congress to do something more permanent with the

14   population.

15       Q.   All right.  So I've interrupted you twice in

16   your description of your chief of staff and deputy

17   chief of staff roles.  So then you transitioned into

18   deputy chief of staff?

19       A.   So I returned to being the full head of leg

20   affairs for three weeks.  The chief of staff arrived

21   at the beginning of July, as did the director,

22   Director Rodriguez and the political chief of staff.

23   And at the end of July, early August, the director,

24   chief of staff, and I think, actually, the deputy

25   director as well, had asked if I would come back for

1   two months or three months -- I had said I would do it

2   for two or three months, to just bridge the gap, help

3   in the transition as she served as chief of staff and

4   get acclimated.

5              I guess open opinions on my performance, but

6   I was asked to stay until the following August in one-

7   to two-month increments at a time.

8              So to your question as to why the leg

9   affairs, legislative affairs chief position remained

10  the official title, but I was in this acting role.

11       Q.   You were wearing two hats?

12       A.   I was.  And as acting deputy chief of staff,

13  it largely reflects what I shared of the role of

14  acting chief of staff but more of an administrative,

15  administrator function, much less on the policy side.

16  I'm no longer in an acting role that has a political

17  title.  But still, with respect to internal processes,

18  keeping the trains running, documents to be signed by

19  the director, reviewed in the government what we refer

20  to as sort of the executive secretary process to make

21  sure things continue to run as well, as oversight on

22  certain matters, like leadership conferences to be

23  built and some other things.  Other duties assigned, I

24  believe is more precise.

25       Q.   Related duties as required.

Page 48

1          A.   Yes.

2          Q.   In that role, what interactions did you have

3    with the DACA program?

4          A.   So from August on to -- basically from August

5    to August for DACA, what I recall, again, it would

6    have been some of the after discussions as the renewal

7    process was taking effect.  I think there would

8    have -- I'm trying to -- I'm seeking to recall if

9    there were any changes.  I think there were

10   adjustments to the FAQs.  I just don't remember what

11   those were, but they were sort of part of what was

12   happening.

13          And then reviewing and assessing the intake

14   of the DACA renewal requests and sort of the

15   operational mechanics, not that I necessarily was, but

16   sort of that was in the process along with other

17   duties.

18          As well, from my head of legislative affairs,

19   while I had a good deputy who was lucky or unlucky for

20   him, having to serve as the acting head while I was in

21   the front office.  If there were questions on DACA

22   or -- I don't recall if there was testimony.  There

23   might have been.  But, you know, just sort of if there

24   were inquiries on DACA or any other benefits, I will

25   say that kind of bleeds somewhat because of all the

1   different -- it was one of many types of, I won't say

2   benefits but the requests that we received for DACA

3   and the mechanics and questions from the Hill, from my

4   view, would be across the same environment of any

5   other type of element or benefit that we administered.

6        Q.  Okay.  So am I fairly characterizing your

7   role in that time period as being a liaison with the

8   people who were actually working on the program with

9   the director at the time?

10       A.  Only in part --

11       Q.  Okay.

12       A.  -- because those in the structure, we'll say

13  at the service centers and others would also liaise

14  directly with the director.

15       Q.  I see.

16       A.  So I don't want to overstate the role in that

17  sense because while being aware, and I'm sure

18  participating in some meetings of course, but the role

19  is also in the org chart, and I see at least the org

20  chart of DHS that you have there, is such that the

21  associate directors report directly through the deputy

22  to the director.

23       Q.  Okay.  Okay.  We may come back to that.  Just

24  in the interest of time, your next role at USCIS was,

25  if I'm reading this right, deputy associate director,

1    service center operations?

2        A.  Yes.

3        Q.  And what was that job?  What was your

4    responsibility there?

5        A.  As the deputy -- first acting and then early

6    in the new year became a permanent senior executive

7    service selection.  But never changed from that role.

8    So as deputy associate director the No. 2, the deputy

9    to the associate director or head of the service

10   center operations, as noted in the biography that you

11   have here in the Exhibit 8 that is facilitating

12   overseeing the work of our five USCIS service centers

13   in administrating the processing of applications and

14   requests each year.

15       Q.  Of all sorts of different applications and

16   requests?

17       A.  Yes.  We have for the service centers, I'd

18   say, approximately tens of -- I think it's probably

19   around 40 or so different benefit types, and I would

20   say particularly coming from this role now, our field

21   operations handle certain types of benefit types and

22   requests.  Our service centers handle a bulk of

23   intake, and, of course, the Asylum International by

24   its name handles others.

25           But the service centers do, and they receive,

Page 51

1   at this time, and I think the number is probably still

2   accurate, more than 4 million applications of our

3   approximately 7-1/2 to 8 million that we receive.

4        Q.  Are the service centers responsible for

5   receiving and processing DACA applications both

6   initial and renewal?

7        A.  They are, and there is a first piece to that

8   where the documents are brought in to our first file

9   with our lockbox, lockboxes, the lockbox for DACA.

10       Q.  Can you explain what that means.

11       A.  Yes.  The best way to walk into that is that

12   the lockboxes are the parallel structure as when you

13   file your taxes.  So when we file with the IRS, we

14   send to the P.O. Box X, wherever that may be, and the

15   lockboxes which are administered by a bank, receive

16   the application and receive the payment and separate

17   the two.  And so the cash or the payment is received

18   in a secure environment.

19            USCIS now uses lockboxes and has for probably

20   around 10 years, maybe a little less.  And so they

21   then receive filings directly into the lockbox.

22       Q.  Okay.

23       A.  Who then, in that same structure, separate

24   application fees from what's filed.  That then is sent

25   on.  In that instance, it is sent on to the service

Page 52

1    centers.

2             So with respect to DACA, the service center

3    that processes initial and the service center that

4    processes renewal then receives from the lockbox that

5    filing.

6        Q.   Okay.  Okay.  And you -- we'll talk more

7    about that.  You served in that role until March of

8    this year when you got your current position.  Is that

9    fair?

10       A.   Yes.

11            MR. DETTMER:  All right.  Why don't we, if

12   it's all right with everybody, take a break for

13   10 minutes.

14            MR. GARDNER:  Sure.

15            MR. DETTMER:  Then we'll go back on the

16   record.

17            THE VIDEOGRAPHER:  We are going off the

18   record at 10:21 a.m.

19            (A recess was taken from 10:21 a.m.

20            to 10:35 a.m.)

21            THE VIDEOGRAPHER:  We are back on the record

22   at 10:35 a.m.

23   BY MR. DETTMER:

24       Q.   Welcome back, Mr. McCament.  You realize

25   you're still under oath; right?

Page 53

1        A.   Yes.

2             MR. DETTMER:  Okay.  Great.

3             I am going to ask the court reporter to mark

4    this as Exhibit 9.

5             (Deposition Exhibit 9 was marked for

6             identification.)

7             MR. DETTMER:  For the record, Exhibit 9 is a

8    printout from DHS's website, and it is a whole series

9    of organizational charts, the first one on the first

10   page is U.S. Department of Homeland Security.

11       Q.   And just to direct you, I'm not going to ask

12   you about all of these, obviously.  But the third page

13   from the end is USCIS.  So I guess focusing on the

14   first page and the third from the last page, do you

15   understand those two pages to accurately represent the

16   organizational structure of DHS, Page 1, and USCIS,

17   page third from the end?

18       A.   May I just review for --

19       Q.   Yes, of course.

20            (The witness reviewed Exhibit 9.)

21            THE WITNESS:  Yes, with respect to the DHS

22   chart.  I'll now review USCIS.

23   BY MR. DETTMER:

24       Q.   Thank you.

25            (The witness further reviewed Exhibit 9.)

```
                                              Page 54
 1          THE WITNESS:  And yes with respect to USCIS,
 2    as well.
 3    BY MR. DETTMER:
 4       Q.  Now, let me ask you, obviously, like any
 5    organizational chart, these have little boxes with
 6    titles in them to sort of indicate the general area of
 7    responsibility of each branch, to use a general term.
 8          What I'd like to ask you to do is which of
 9    the boxes, for lack of a better term, on those two
10    pages that you just looked at, have responsibility for
11    the DACA program?
12       A.  Which would you like me to begin with?
13       Q.  Do you want to start with DHS?
14       A.  Certainly.  And I'm sorry.  With respect to
15    the administration or the oversight, you said?
16       Q.  Either or both.  Maybe you can specify which
17    is which.
18       A.  The Secretary for sure.  Perhaps the Deputy
19    Secretary.  It depends upon -- I'm sorry to ask.  So
20    with respect to over the five years or just --
21       Q.  Good question.  Why don't we talk about right
22    now?
23       A.  Okay.  So the rescission or that area?
24       Q.  Yes.  In the past, you know, 2017.  If it's
25    changed in 2017, let us know.
```

Page 55

1        A.   Okay.   So for 2017, or for that period, the

2    Secretary, probably just going through looking at the

3    chart.   Less so the Deputy Secretary, probably from

4    what I see.

5             With respect to administration or oversight,

6    to your question, there's some role, office of the

7    general counsel, the office of legislative affairs,

8    office of public affairs, and I can explain that role.

9    It's just not administrative.   But again, the point of

10   communications on those topics.   Office of policy.

11   U.S. citizenship and immigration services.   Customs

12   and border protection.   Immigration and customs

13   enforcement.   Citizenship and immigration services

14   ombudsman, and office of partnership and engagement,

15   and perhaps there's sort of, as well, the management

16   director.

17       Q.   Any others there that you can think of that

18   would have responsibility for the DACA program in some

19   form?

20       A.   Not that I see.   I believe that's the list.

21       Q.   Now, let me ask you the same question for

22   USCIS.   It's on the third page from the end there.

23       A.   So the same time line applies?

24       Q.   Yes.

25       A.   January 2017.   Director, Deputy Director,

Page 56

1   Chief Counsel, Chief of Staff.  Service center

2   operations, management, policy and strategy.  Let's

3   see.  Legislative affairs, communications.

4       Q.  Any others you can think of there?

5       A.  Not that I see and that I can think of.

6       Q.  Okay.  So we'll probably refer back to this

7   document.  So keep it nearby.  Now, you signed a

8   declaration, in California, lawsuit, I believe last

9   week.  Do you remember doing that?

10      A.  I did sign a declaration, and I believe it

11  was in California.

12          MR. DETTMER:  I'll ask the court reporter to

13  mark it as Exhibit 10.

14          (Deposition Exhibit 10 was marked for

15          identification.)

16  BY MR. DETTMER:

17      Q.  While you're looking over that, just for the

18  record, it is a three-page document entitled

19  "Declaration of James McCament."  It's got an E-filing

20  line at the top.  Document No. 71-5.

21          Is this the declaration you signed,

22  Mr. McCament?

23      A.  I believe so.  Let me just --

24      Q.  Take your time to look at it.

25      A.  Thank you.  Yes, I did sign it, but I'd just

Page 57

1    like to review.

2         Q.   Understood.   Let me know when you're

3    finished.

4              (The witness reviewed Exhibit 10.)

5    BY MR. DETTMER:

6         Q.   So I want to ask you about Paragraph 5 of

7    this declaration.   In Paragraph 5 you say, "In

8    response to the discovery requests served in the

9    various DACA cases pending here," meaning California,

10   "and in the eastern district of New York, USCIS is in

11   the process of searching, collecting, reviewing, and

12   analyzing documents from more than approximately 70

13   custodians, including more than 260,000 E-mails in

14   addition to documents from approximately 30 shared

15   drives or hard drives."

16             Were you involved in the process of

17   determining which custodians had documents that were

18   potentially responsive to the various discovery

19   requests?

20        A.   Yes.

21        Q.   Did you determine who those custodians should

22   be?

23        A.   I did not determine the full list, but

24   contributed.

25        Q.   Okay.   Can you identify who those custodians

1    are or some subset of them?

2        A.   I believe noting the number of 70, I could

3    identify perhaps some subpart by recollection.

4        Q.   Okay.  And I don't know if Exhibit 9, the org

5    chart may be helpful to you in doing that.  But maybe

6    you can give me the list of the people who come to

7    mind as we sit here.

8        A.   Because I don't have the list in front of me,

9    I'll say again, a subpart.

10       Q.   Understood.

11       A.   For myself, certainly I believe our chief of

12   staff, Laura Reece, acting chief of staff.

13       Q.   What's the name?

14       A.   Laura Reece.  The chief counsel.

15       Q.   If you can give me names, that would be

16   great.

17       A.   Certainly.  Chief counsel, Craig Symons.

18           REPORTER MARTIN:  Greg or Craig?

19           THE WITNESS:  I'm sorry.  Craig.  Sorry.

20           Craig Symons.  Our head of policy and

21   strategy, I believe, Kathy Neubel.  Don Neufeld, who

22   is Donald Neufeld, who's head of the service center

23   operations.

24           Jennifer Higgins, who was serving for a

25   period, a short period of time as acting deputy

```
 1    director while my acting deputy director was on
 2    vacation.
 3             Tracy Renaud, who was the acting deputy
 4    director until our director arrived, and then I
 5    returned to that role.
 6             I know there are -- I believe there were also
 7    several -- certainly to add up to the 70, several
 8    folks in the service operations.  Again, by
 9    recollection, Joe Moore, who was our chief financial
10    officer.
11             And as well the -- I mentioned the service
12    center operations team.
13             And Joe Moore and his team, the head of our
14    office of intake and document production, Ernie
15    DeStefano, and I believe several on his staff.
16    BY MR. DETTMER:
17       Q.  Ernie DeStefano?
18       A.  Ernest DeStefano.  I believe also our office
19    of performance and quality.  Michael Hoefer, and I
20    believe, if I recall correctly, some of his staff.
21             As far as other names, my recollection is the
22    parameters of the discovery request as it relates to
23    DACA are quite broad, and for that reason with USCIS
24    administration of DACA is, therefore, a broad
25    response.  So those are the names.  Obviously, it's a
```

1  very small subset to the 70, but I don't want to

2  misspeak as far as on the precise list.

3      Q.  Understood.  Those 70 custodians that you

4  referred to in your declaration to the 10, are they

5  all within USCIS or are there people outside of the

6  USCIS organization?

7      A.  I believe that our search is focused upon the

8  USCIS team, and as I sit, I think that may also

9  include some -- I can't recall for sure the reason.

10  We have our own OIT team, and the department has its

11  own OIT team.

12      Q.  OIT means?

13      A.  Office of information technology to do the

14  searches.  So I believe those are the custodians for

15  USCIS.  It may include, and I apologize, I don't

16  recollect precisely if it also scopes to the DHS or

17  DHS as is separately and included.

18      Q.  Who else is involved in the process of -- or

19  was involved, I should say, in the process of

20  identifying who those custodians should be?

21      A.  So myself, our office of chief counsel, as

22  responding to the request, was predominantly involved

23  in asking for information for those that maybe have

24  information that might be responsive.

25      Q.  Now, the 30 shared drives or hard drives that

Page 61

1    you mentioned, who was responsible for identifying

2    which shared drives or hard drives were -- potentially

3    contained responsive information?

4          A.   So I believe the office of the chief counsel

5    worked with those that were identified as custodians

6    to determine what shared drive or hard drives would

7    relate to their position or office.

8          Q.   Okay.  And as far as you know, that work that

9    is being described in that paragraph is ongoing?

10         A.   Yes.

11         Q.   Do you know whether there's a target end date

12   for that work?

13         A.   I understand from conversations that there

14   is.

15         Q.   And do you know what it is?

16         A.   But it is, in essence, as soon as possible.

17   And that is to say that that is fairly precise, in

18   other words, trying to respond to the request as

19   quickly as possible.

20         Q.   Okay.  So the people whose names you just

21   gave me, and I understand it's a subset of a total

22   list, are those people who you think, based on your

23   knowledge of how your department works, are people who

24   are likely to have information that is responsive to,

25   you know, the issues in this lawsuit?

Page 62

1        A.   Likely to, yes.

2        Q.   I mean I'm not asking if you've interviewed

3   them or anything like that, but based on your

4   understanding of how your department works --

5        A.   Yes.

6        Q.   -- they're likely to have information?

7        A.   Yes.

8        Q.   Okay.  All right.  Is there a written list

9   somewhere of those 70 names that you're aware of?

10       A.   I believe there is.  I can't speak to where,

11   but there would be a list.

12       Q.   Do you have one?

13       A.   I do not have one with me for reference.

14       Q.   Do you have one, you know, at your desk?

15       A.   I don't believe so.  But again, working with

16   the office of the chief counsel has been the lead on

17   identifying and collaboration with anyone.

18       Q.   When you searched for your own documents in

19   connection with these various lawsuits that we're here

20   for, where did you look?

21       A.   I looked in two places.

22       Q.   What were they?

23       A.   Certainly.  So the first was hard copy

24   documents --

25       Q.   Okay.

Page 63

1          A.   -- and located those.
2          Q.   Do you have, like, an -- I don't know -- file
3     where you keep things by topic?
4          A.   I do.
5          Q.   Okay.
6          A.   And so that's where I looked for that list of
7     documents or those documents.
8          Q.   And how many hard copy documents did you have
9     responsive -- or that you located as a result of that
10    search?
11         A.   I don't recall the approximate number but can
12    speculate to there were not a lot of hard copy
13    documents.
14         Q.   So sort of a manila folder, something like
15    that?
16         A.   A stack on my desk --
17         Q.   Okay.
18         A.   -- of documents which were DACA related, as
19    well as the hearing binder.
20         Q.   Okay.  And then you said there were two
21    places you looked?
22         A.   The other is electronic.  And so I authorized
23    the team to authorize OIT, the office of information
24    technology, to search that.
25         Q.   Your computer?

Page 64

1          A.   My computer, right.

2          Q.   And are you aware how they did that?  Did

3     they, you know, take an image of your hard drive and

4     do search terms, or do you know how that worked?

5          A.   I'm not aware of the specifics.  Certainly

6     OIT are the experts.

7          Q.   Okay.

8          A.   I do understand they have search terms.

9          Q.   Okay.  So it wasn't a situation where you

10    had, you know, a folder on your hard drive or the DACA

11    folder and you just sent that information along.  It

12    was a download and search terms?

13         A.   I authorized a search of my files,

14    electronic --

15         Q.   Okay.

16         A.   -- to be sure every responsive document could

17    be pulled.

18         Q.   Anywhere else that you kept documents, at

19    home or, I don't know, on your phone?  Did you have

20    text messages or anything like that?

21         A.   No.

22         Q.   Okay.  And do you know, is that process that

23    you've just described, is that a standardized process

24    that was used here, or was that just something that

25    you did?  Do you know?

```
                                          Page 65
 1        A.   It's my understanding it's the standardized
 2   process.
 3        Q.   Okay.   Okay.
 4        A.   As far as -- let me ask a question back.   So
 5   as far as the process OIT used to search files
 6   electronically?
 7        Q.   Yeah.
 8        A.   That's my understanding they used their
 9   standard process.
10        Q.   Okay.   Were you ever instructed -- I don't
11   know if you're familiar with the term -- a "document
12   hold memo" or a "document hold letter"?   Did you ever
13   receive something like that when these lawsuits were
14   filed?
15        A.   I believe we did receive a document hold.   As
16   deputy director or acting director we received those
17   periodically.   I received them periodically.
18        Q.   And do you know who else received them?   Do
19   you know how broadly that was disseminated?
20        A.   Not precisely.
21        Q.   Generally?
22        A.   It was -- sure.   It was an E-mail from the
23   chief counsel's office triggered by folks, if I recall
24   correctly, for this purpose, again, multiple
25   litigation holds, but...
```

```
                                                    Page 66
```

1          Q.  Okay.  Okay.  All right.  Let me switch

2    gears.  I want to ask about -- I don't know if you

3    need to refer to Exhibit 9.  Feel free to do it if

4    it's helpful.  I want to ask about sort of the -- you

5    know, your contacts and the way you operate in your

6    current job.  Sort of the structure of hierarchy, I

7    guess, of how you operate.

8               Am I right that you report directly to the

9    Secretary of DHS?

10         A.  I do not now.

11         Q.  Okay.  Who do you report to now?

12         A.  The director of USCIS.

13         Q.  Got you.  Okay.  When did that change happen?

14         A.  Monday, October 9 or Sunday, evening

15   October 8 when I got sworn in.

16         Q.  To be precise?

17         A.  To be precise.

18         Q.  And who is the current director?

19         A.  Lee Francis Cissna.

20         Q.  What was Lee Francis Cissna's job before the

21   current one?

22         A.  Director of immigration policy.

23         Q.  Okay.  Okay.  So I want to talk about before

24   that change occurred --

25         A.  Sure.

```
                                            Page 67
 1        Q.   -- when you were acting director.
 2             You were reporting to the Secretary of DHS?
 3        A.   Yes.
 4        Q.   Okay.  And who were -- and again, in that
 5   time period, who were your direct reports?  Who was
 6   reporting directly to you?
 7        A.   Within USCIS?  Well, not --
 8        Q.   Yes.
 9        A.   The career leadership of USCIS.
10        Q.   Is it just as reflected in this --
11        A.   Yes.
12        Q.   So the way this third page from the end of
13   Exhibit 9 is set out, it looks like -- I mean just on
14   my looking at this, the chief of staff, deputy
15   director, and chief counsel would have reported
16   directly to you.  But is it in fact the case that all
17   those people whose lines go into the deputy director's
18   would all report to you?
19        A.   So ultimately report, yes.
20        Q.   Okay.  Was the structure set up such that
21   they reported through the deputy?
22        A.   Yes.
23        Q.   Okay.  Okay.  And has that structure been
24   consistent in your experience at USCIS?
25        A.   To report through the deputy director?
```

1          Q.  Yes.

2          A.  Yes.  Over the years, I think that's correct.

3          Q.  Okay.

4          A.  I believe so.

5          Q.  In that role when you were acting director,

6     did you have contact with people in the White House?

7          A.  At times.

8          Q.  How often in that job, would you say?

9          A.  It depended upon the topic.

10          Q.  Let's talk about DACA --

11          A.  Yes.

12          Q.  -- since that's what we're here for.

13          A.  Those communications -- so contact from the

14     White House.  As I recall, for DACA came through the

15     Secretary's office down to me, or to us.

16          Q.  So do I understand your answer to mean that

17     you didn't have direct contact from people at the

18     White House?  There was a contact that you understood

19     came from the White House to the Secretary's office

20     and then was relayed to you?

21          A.  Correct.  I don't recall separate from that

22     coming through.

23          Q.  Okay.

24          A.  Other topics, there could be.

25          Q.  So you don't remember any direct

```
 1    communications you had with people in the White House
 2    as acting director on the topic of DACA?
 3         A.  As far as E-mail communication and
 4    conversation -- I mean E-mail contact.
 5         Q.  Well, I'm talking about communications
 6    generally.
 7         A.  Generally, that's true, yes.
 8         Q.  So you didn't have any phone conversations or
 9    face-to-face meetings with White House people about
10    DACA while you were acting director?
11         A.  There was a White House meeting, yes.
12         Q.  Okay.
13         A.  You mentioned phone conversations.  I don't
14    recall any phone conversations.
15         Q.  Okay.  And then E-mails that were forwarded
16    from the White House through DHS through the
17    Secretary's office to you?
18         A.  So I don't recall any E-mails being forwarded
19    through them over to me.
20         Q.  Okay.
21         A.  And I can explain further.
22         Q.  Sure.
23         A.  Outside of DACA.
24         Q.  Okay.
25         A.  Which is to say in other topics as deputy --
```

1    or acting director, sorry.  As acting director, there

2    would be at times approaches from White House staff on

3    questions on other non DACA topics.

4         Q.  Okay.

5         A.  So that's why I draw the distinction because

6    I can see other topics where they were direct.  I just

7    don't recall direct E-mail conversations from the

8    White House on.  There may have been, maybe in the

9    E-mail.

10        Q.  On DACA?

11        A.  Right.

12        Q.  How about indirect?  By "indirect," it sounds

13   like stuff was forwarded to you.  Is that fair?

14        A.  I think that's fair.  Again, this is a

15   compressed time line.

16        Q.  Yeah.

17        A.  What I recall more is questions coming from

18   the Secretary's office, perhaps phrased as "The White

19   House is asking" or direct.  So I don't want to say

20   there wasn't an E-mail that said, "We have this

21   question."  From my recollection is it largely was

22   from -- through the Secretary's office and questions

23   on DACA.

24        Q.  Got you.  Do you remember the identities of

25   any of the people in the White House from whom those

Page 71

1    communications originated?

2         A.   As far as the E-mail type of conversation, we

3    can speak to the -- later.

4         Q.   Yes.

5         A.   Again, I don't recall a direct E-mail sort of

6    being forwarded on, but I don't want to misspeak that

7    there isn't one.   Just, there was a lot of discussion

8    with the Secretary, you know, through the Secretary's

9    office, et cetera.   So I just don't recall one coming,

10   like, forwarded on.   Might be.

11        Q.   I'm sorry.

12        A.   Sure.

13        Q.   What I was going to ask was whether or not

14   you actually got an E-mail forwarded, you know,

15   regardless of how the communication came.   Was that

16   ever tied to the identity of a White House staffer, so

17   and so "wants to know about 'X'"?

18        A.   Not that I recall.   Not worded that way.

19        Q.   Okay.   Worded any way that gave you a name?

20        A.   Not worded in a way that would give a name

21   either.

22        Q.   Okay.

23        A.   Then again, that compares to other requests

24   on other areas and issues.

25        Q.   Okay.   Just based on conversations that you

Page 72

1    had or however you might have -- are you aware of

2    people in the White House who were engaged on this

3    issue on DACA?

4          A.   From those E-mail conversations or --

5          Q.   From any source.

6          A.   Largely, those two sitting in one of the

7    meetings or a meeting, and I remember those names.

8    But I don't recall sort of a reference to an "X"

9    person "wants this."  And generally what I recall is

10   if there was an ask, it was -- it may be "the White

11   House is asking" type of question.  Does that make

12   sense?

13         Q.   Yeah.  So it sounds like, with respect to

14   anything other than in-person -- it sounds like you

15   had one in-person meeting on this issue while you were

16   acting Secretary?

17         A.   That's what I recall.  Acting director.

18         Q.   Sorry.  Acting director.  Thank you.

19         A.   Please clarify.

20         Q.   I gave you a promotion.

21         A.   That's right.

22         Q.   So you remember one meeting while you were

23   acting director with White House people on the topic

24   of DACA?

25         A.   Yes.  I remember one meeting being held in

Case 1:17-cv-05228-NGG-JO  Document 97-1  Filed 12/15/17  Page 122 of 1603 PageID #:
4067

Page 73

1   completion on discussion of DACA.

2        Q.   Okay.  That you attended?

3        A.   That I attended.

4        Q.   Okay.  Are you aware of other meetings that

5   you did not attend?

6        A.   I'm not aware of other meetings that I did

7   not attend, but there may well have been.

8        Q.   Okay.

9        A.   I mean that's not unusual.

10       Q.   Understood.  And obviously, I'm, you know,

11  just trying to get what you know.

12       A.   Sure.

13       Q.   Okay.  So let's talk, then, about that

14  meeting.  Do you remember when it happened?

15       A.   I believe it was August 24.

16       Q.   August 24.  Where did it happen?

17       A.   The Roosevelt Room.

18       Q.   Okay.  Which is where?

19       A.   In the White House, west wing.

20       Q.   Okay.  Who was there that you remember?

21       A.   That I recall, Acting Secretary Duke, General

22  Kelly, the chief of staff, the attorney general, Jeff

23  Sessions.  I'm reflecting around the table.  Rachel

24  Brand with Department of Justice.  OMB Director

25  Mulvaney.  Deputy Secretary of State Sullivan.

Footer
Veritext Legal Solutions
212-279-9424        www.veritext.com        212-490-3430

                                                    Page 74

1    Stephen Miller.  I think Rob Porter.  I believe I have

2    that name right.

3         Q.   What's Mr. Porter's role?

4         A.   He is the staff -- I was going to say

5    executive secretary, but it's that staff secretary

6    or -- I probably have misapplied the title, but, in

7    essence, who handles correspondence, I believe, for

8    the White House, but I may have the title wrong.

9              Don McGhan.  Kierstjen Nielsen, the deputy

10   chief of staff to -- or currently the deputy chief of

11   staff.  I believe John Bash.

12        Q.   Who's John Bash?

13        A.   He's, I think, special counsel, and I believe

14   also -- I have to double-check the title.  I believe

15   special assistant to the President as well.  Marc

16   Short, who is -- I'm sorry.

17        Q.   Who is Mr. Short?

18        A.   The head of the legislative, White House

19   legislative affairs operation.  It may be a more

20   expanded title, but I think that he is the head of

21   legislative affairs.

22        Q.   Anybody else you can remember?

23        A.   Gene Hamilton, the senior counsel to the

24   Secretary.  I believe Chad Wolf.  There may have been

25   a couple of others as well.  I'm just trying to kind

Page 75

1    of think through.  Danielle Cutrona.

2         Q.  How do you spell Cutrona?

3         A.  I believe C-u-t-r-o-n-a.

4         Q.  And who is she?

5         A.  She works for the attorney general directly.

6         Q.  Anyone else you remember?

7         A.  I believe Andrew Bremberg as well.

8         Q.  Who is that?

9         A.  He also, I believe, is a special assistant to

10   the President, but I might have the title adjusted

11   incorrectly.  I think there may have been one or two

12   others, but I'm just not recalling at the moment.

13        Q.  Okay.  Do you remember how long the meeting

14   lasted?

15        A.  Approximately.

16        Q.  How long, about, did it last?

17        A.  Approximately an hour to an hour and a half.

18        Q.  How did you come to be there?  Did you get an

19   E-mail invitation?  Did you get a phone call?

20        A.  I did receive --

21        Q.  Okay.  From whom?

22        A.  As I recall, from the chief of staff.  DHS

23   chief of staff.

24        Q.  Okay.  And do you remember what that said?

25   What did the E-mail say?

Page 76

1        A.   I recall generally what it said.

2        Q.   What did it say?

3        A.   As I recall, that there would be a meeting in

4   the EEOB, or White House.  I'm not sure which was said

5   since they're adjacent.  And that I would be

6   attending.  That was how I knew that was the case.

7        Q.   Okay.  Anything else in that E-mail?  Did

8   you -- well, anything else on that E-mail?

9        A.   What I recall is that it was to discuss DACA.

10       Q.   Was there an agenda attached?

11       A.   No, not to that E-mail.

12       Q.   Did you ever receive an agenda for that

13   meeting?

14       A.   I don't recall receiving an agenda.  I

15   received an invite.

16       Q.   Okay.  Did you receive any E-mail, whatever

17   you were going to call it, anything like an agenda,

18   anything that set forth what was to be discussed?

19       A.   I don't recall receiving the agenda or a

20   read-ahead before the meeting.

21       Q.   You got a package of information at the

22   meeting of some kind?

23       A.   I recall receiving at the meeting what we

24   would say is the read-ahead, but the agenda.  I don't

25   recall receiving anything prior.  Could have been.  I

1   don't remember that.

2        Q.  So you got a hard copy of it when you got

3   there?

4        A.  Yes, as I recall.

5        Q.  What was that package?  What did it look

6   like?

7            MR. GARDNER:  Objection.  Vague.

8            Are you asking for the content?  Just so I'm

9   clear.

10  BY MR. DETTMER:

11       Q.  I mean was it a sheet of paper?  Was it a,

12  you know, binder?  What was it?

13       A.  A sheet of paper.

14       Q.  Okay.  And did it -- I guess what I'm trying

15  to get is the content in the sense of, you know, was

16  it an agenda?  Was it a bunch of data?  What kind of

17  information was it giving you?

18           MR. GARDNER:  Objection.  I'm not trying to

19  be obstreperous.  I will allow him to answer the

20  question, but I don't want him to get into privileged

21  testimony.

22           So to the extent you can answer his question

23  without divulging privileged information, please go

24  ahead and answer.  Let's take it step by step.

25           MR. DETTMER:  Sure.

1          THE WITNESS:  Sure.

2          It was an agenda.

3    BY MR. DETTMER:

4        Q.  Okay.  And it was one sheet of paper?

5        A.  As I recall, yes.

6        Q.  And do you know who put that agenda together?

7        A.  My understanding was that the White House

8    did.

9        Q.  Who led the meeting?

10       A.  General Kelly.  Yeah.  Right.

11       Q.  Okay.  And who -- were there sort of

12   presentations given during the meeting?

13       A.  As I recall there were --

14          MR. GARDNER:  I'm sorry.  I'm going to lodge

15   an objection at this point.

16          You can answer that question with a "yes" or

17   "no," but the content of that information would be

18   subject to privilege.

19          So again, we'll just take it step by step.

20          THE WITNESS:  Would you ask your question

21   again.

22   BY MR. DETTMER:

23       Q.  Were there presentations given at the

24   meeting?

25       A.  I viewed that as more as discussions.

1          Q.   Okay.   So you said General Kelly led the

2     meeting, which I take to mean he was sort of the

3     moderator or the director of who was talking.   Who

4     sort of -- can you -- let me start over.

5               Who did the most talking at the meeting?

6               MR. GARDNER:   Objection.   At this point I do

7     think we are getting into privileged information

8     subject both to deliberative process privilege,

9     potentially Presidential communications privilege.

10              MR. DETTMER:   I'm not asking for any

11    substance.   I'm just asking for --

12              MR. GARDNER:   The identity of an individual?

13    Is that what you're asking for?

14              MR. DETTMER:   Yeah.   Who did the

15    most talking.

16              MR. GARDNER:   So you can answer as to the

17    individuals.

18              THE WITNESS:   Multiple people spoke.

19    BY MR. DETTMER

20         Q.   Okay.   Who spoke at the meeting?

21         A.   General Kelly, Acting Secretary Duke,

22    Attorney General Sessions.   As I recall, Rachel Brand.

23    I believe Deputy Secretary Sullivan, but I may be

24    misremembering, I believe.   Don McGhan, Stephen

25    Miller.   I think Marc Short as well.   Multiple folks

```
                                                   Page 80
 1    spoke.  So I may not be remembering someone.
 2          Q.  Did you speak at the meeting?
 3          A.  At the very end.
 4          Q.  Okay.  For how long?
 5          A.  Less than a minute.
 6          Q.  Okay.  Do you remember about how long the
 7    Attorney General spoke at that meeting?  Can you
 8    approximate?
 9          A.  It's difficult to approximate, but I can
10    explain that.
11          Q.  Sure.
12          A.  Multiple conversations, multiple times people
13    spoke.  It's just a bit harder for me to approximate
14    time lines over that hour and a half --
15          Q.  And I understand.
16          A.  -- people spoke.
17          Q.  You know, we've all been at meetings with a
18    lot of people.  Obviously, you and I are dominating
19    this conversation for obvious reasons.
20          A.  Right.
21          Q.  You know, and we've all sort of seen meetings
22    dominated by one person or another.  Were there people
23    who spoke for the bulk of the meeting at this meeting
24    you were at, or was it sort of more evenly spread out
25    among the participants?
```

1          A.  I would say somewhere in between.

2          Q.  Okay.  And who were the people who spoke the

3     most?  The ones that you just identified?

4          A.  I would say almost all of those spoke, not

5     necessarily equally but quite a bit.

6          Q.  And who talked the most?  Obviously, General

7     Kelly was leading the meeting.  Who else?

8          A.  General Kelly.  Acting Secretary Duke, the

9     attorney general.  As I recall, Don McGhan, Stephen

10    Miller.  Marc Short, to your point, less so --

11         Q.  Okay.

12         A.  -- strategy.  And Director Mulvaney.

13         Q.  Less so?

14         A.  As I recall, probably less so than those

15    others.

16              MR. DETTMER:  Okay.  In the interest of time,

17    I mean I gather from our exchange that you're going to

18    assert the privilege objections to all my questions

19    about what did each one of these people say.

20              MR. GARDNER:  And just to be absolutely clear

21    with you, that's right.  I'm really trying to give you

22    as much latitude as reasonably possible.  We would

23    assert both the attorney-client privilege,

24    deliberative process privilege, and potentially the

25    Presidential communications privilege over the subject

Page 82

1    matter, the substance of the deliberative nature of

2    that meeting.  So that's correct.

3              MR. DETTMER:  Okay.  I appreciate that.

4    Well, I don't appreciate that.

5              MR. GARDNER:  We're not going to resolve this

6    right here, I imagine, but I appreciate you

7    understanding our position.

8              MR. DETTMER:  Yeah.  And I just want to make

9    sure there's not going to be -- because obviously,

10   this is, you know, going to have to go to the judge.

11             MR. GARDNER:  Of course.  Of course.

12             MR. DETTMER:  You know I just -- in the

13   interest of everybody's time --

14             MR. GARDNER:  I appreciate that.

15             MR. DETTMER:  -- there's not going to be any

16   kind of waiver or argument that you guys are making

17   for me not going through the motions of asking all

18   these questions.

19             MR. GARDNER:  No.  In fact, if you want to

20   ask the ultimate question of what substantively was

21   decided, I can lodge the objections, instruct him not

22   to answer, and you can him if he's going to follow my

23   instruction, and I feel like that will really preserve

24   your ability to bring this up should you choose to do

25   so.

```
                                        Page 83
 1            MR. DETTMER:  Let us go through that process.
 2       Q.  So what was the -- actually, let me ask you a
 3   question I think you can answer within the scope of
 4   what your lawyer is telling you.
 5            Was a decision actually reached at this
 6   meeting?
 7            MR. GARDNER:  You can answer that with a
 8   "yes" or a "no" without going into detail.
 9            THE WITNESS:  Not an ultimate decision.  So I
10   guess no to that.
11   BY MR. DETTMER:
12       Q.  Okay.  A tentative decision?
13       A.  In part, yes.
14       Q.  Okay.
15            MR. GARDNER:  It's bigger than a bread box.
16   It's two words.
17            THE WITNESS:  Right.  It's hard.
18            MR. GARDNER:  We're in this together, my
19   friend.
20            THE WITNESS:  All three of us, actually.
21   BY MR. DETTMER:
22       Q.  Okay.  Well, then in order to preserve the
23   fight for judicial resolution, what was the decision
24   that was -- or the partial decision that was
25   eventually reached at this meeting?
```

```
                                                    Page 84

 1            MR. GARDNER:  Objection.  The disclosure of

 2    that information would be subject to the

 3    attorney-client privilege, the deliberative process

 4    privilege, and potentially the Presidential

 5    communications privilege.

 6            I instruct the witness not to answer.

 7    BY MR. DETTMER:

 8        Q.  And sir, are you going to follow your

 9    attorney's instruction?

10        A.  Yes.

11        Q.  And just so we're clear, we're going to sort

12    of wrap all of the sub questions into that.

13            MR. GARDNER:  That's perfectly acceptable.  I

14    appreciate your professionalism.

15            MR. DETTMER:  No.  No.  Likewise.  And we'll

16    get this worked out.  See what Judge Alsup wants to

17    do.

18        Q.  So apart from -- I guess the way we got to

19    that whole series of questions and answers and

20    objections was asking you about communications at the

21    White House.  Apart from that meeting that I think

22    we've explored as much as we can today, have you had

23    any communications with -- actually, I'm going to have

24    to clarify that.

25            I understand you've had communications with
```

Page 85

1  the Department of Justice with respect to the various

2  litigations that are going on about DACA.

3      A.  Yes.

4      Q.  So I want to put those to the side because

5  those are likely privileged conversations.

6      A.  Okay.

7      Q.  Have you had conversations with the

8  Department of Justice about DACA in your role as

9  acting director outside of the context of those

10 litigations?

11     A.  And outside the context of the meeting.  I

12 know you said, but just to try to parse.

13     Q.  Yeah.

14     A.  I don't recall any with DOJ apart from that

15 meeting.

16     Q.  Okay.  And when I say, "communications," I'm

17 doing that broadly.  E-mail, phone call, face to face.

18     A.  Not that I recall.

19     Q.  Okay.  Let me ask the same question about

20 members of Congress or Congressional staff.  Have you,

21 in your role as acting director of USCIS, had

22 communications with Congress, either members or their

23 staff, about DACA?

24     A.  Yes.

25     Q.  I take it from your answer that --

Page 86

1    frequently?

2          A.  No.  The hearing.

3          Q.  Okay.

4          A.  I mean that was a conversation of DACA.

5          Q.  Fair enough.  Actually, I don't know if I

6    asked this.  Was that under oath?  Did you have to

7    take an oath before that hearing?

8          A.  It was not.

9          Q.  Okay.  So let's put that to the side as well.

10   Any other communications with Congress on the topic of

11   DACA while you were acting director?

12         A.  As acting director, I think yes.  I recall,

13   yes, with respect to letters.

14         Q.  What does that mean?

15         A.  So congressional letters of members

16   requesting consideration on DACA or acting on DACA or

17   not acting on DACA.

18         Q.  Okay.

19         A.  As I recall.  But I also receive a lot of

20   letters in that role.  So I may only be recalling

21   after the fact of the rescission, as far as that

22   communication.

23         Q.  I'm sorry to interrupt.

24         A.  No worries.

25         Q.  Are those letters you're talking about, are

Page 87

1    those sort of about individual applicants?

2         A.  As I recall, that would be about a DACA,

3    generally.  Perhaps on a subgroup of applicants.

4         Q.  So I'm just trying to get clear on what the

5    communication -- it may be just I'm not following.  It

6    sounds like maybe you've gotten some letters from

7    members of Congress about the rescission of DACA.  Is

8    that --

9         A.  As I recall, yes.  But I think perhaps to the

10   Secretary and then down to me.  Sorry.  I'm just

11   trying to -- there are a lot of letters.

12        Q.  Understood.  All right.  So the letters, I

13   think, would all be matters of public record; right?

14        A.  Right.  If my recollection is correct.

15        Q.  So let's put those to the side for current

16   purposes.  Any sort of phone calls, meetings, or other

17   types of discussions with either members of Congress

18   or their staff on the topic of DACA while you were

19   acting director?

20        A.  So from --

21        Q.  Putting aside the testimony.

22        A.  I think we understand each other.  The -- as

23   acting director from April to a week ago, I don't

24   recall any phone conversations with members on DACA.

25   I don't recall any on DACA.

1      Q.   Okay.

2      A.   No.

3      Q.   Okay.  I'm sure I'm going to come up with

4  follow-up questions that I want to ask about the

5  August 24 meeting.  Even in advance of a ruling, I

6  don't know whether I can ask substantive questions.

7           Were there any follow-up conversations,

8  communications that you had as a result of that

9  meeting?

10          MR. GARDNER:  And you can answer that

11  question with a "yes" or a "no."  The substance of

12  that could be potentially privileged.

13          THE WITNESS:  Sure.

14          So yes.

15  BY MR. DETTMER

16     Q.   How many follow-up communications did you

17  have as a result of that August 24 meeting?

18     A.   Can you clarify as far as from the White

19  House?  Is that what you mean?

20     Q.   Well, it's a fair question.  So let me start

21  with that.  From the White House.

22     A.   So one.

23     Q.   Okay.  And what was the form of that

24  communication?

25     A.   So it was a proposed follow-up meeting.

1      Q.  Okay.  And was it a phone call or an E-mail

2  invitation?  How did that come to you?

3      A.  As I recall, it was an E-mail invitation.

4      Q.  And you say, "proposed follow-up meeting."  I

5  take it from that answer that that meeting didn't

6  happen?

7      A.  It did and did not.  I'll explain.

8          MR. GARDNER:  Can you explain without

9  divulging privileged information?  Because I do want

10  you to be able to provide responsive testimony.

11          THE WITNESS:  Absolutely.

12          MR. GARDNER:  Okay.

13          THE WITNESS:  I can explain the parameters

14  without the discussion.

15          MR. GARDNER:  Okay.  Terrific.

16          THE WITNESS:  The parameter is invitation to

17  a meeting at the Roosevelt Room.  We showed up, and

18  the meeting was canceled.

19  BY MR. DETTMER:

20      Q.  I see.  What day did that happen?

21      A.  Subsequent to August 24, prior to, I guess, I

22  think prior to August 31.  Sorry.  Given the

23  circumstances, we left.

24      Q.  So you think within a week after that

25  August 24 meeting?

                                                            Page 90

1          A.   Yes.

2          Q.   Okay.   The E-mail invitation that you

3    received, what did it say?  Did it have an agenda on

4    it?

5          A.   I don't recall that.  I recall there was not

6    an agenda.   It was an invitation to come to that

7    meeting.

8          Q.   Okay.  So it may have been --

9          A.   So I think it was an e-vite or a calendar

10   invite.   It may have been by E-mail.

11         Q.   And did you have an understanding of who was

12   supposed to be at that meeting?  Was it the same group

13   or a different group?

14         A.   So my understanding was a similar group, but

15   not necessarily the same group, or the full group.

16         Q.   Do you know any particular people who were

17   either supposed to be at that meeting and not at the

18   earlier one or vice versa?

19         A.   No.   I know sort of the subset from what I

20   understood the invite to be.

21         Q.   And what was that?

22         A.   So for those of us that arrived from the

23   department, myself, Gene Hamilton and Elizabeth

24   Newmann, the deputy chief of staff for the department.

25   So for DHS, that's what I recall.

Page 91

1      Q.  Okay.  And did other people show up at this

2   meeting and then it was canceled or --

3      A.  Yes.

4      Q.  Who else was there?

5      A.  So I recall for Director Mulvaney, Kathy

6   Kraninger, who works as his -- one of his principal

7   directors was there that I know.  It was a smaller

8   group, and I believe General Kelly did not attend the

9   meeting.  He was intended to, but the reason, once we

10  arrived, that the meeting was then paused and then

11  postponed, never began, I'm not sure why.

12      Q.  Was an explanation given to you?

13      A.  As I recall --

14          MR. GARDNER:  You can answer that with a

15  "yes" or a "no."

16          THE WITNESS:  Yes.

17  BY MR. DETTMER:

18      Q.  Okay.  So when you were describing the

19  August 24 meeting you said that there was sort of

20  an -- and I'm going to put words in your mouth a

21  little bit.  I think I'm getting this right.  You can

22  correct me if I'm getting it wrong.  There was a

23  tentative sort of decision arrived at.  Was there a

24  final decision made, as far as you know, at the time

25  of this canceled meeting?

Page 92

1        A.   As far as I know, no.

2        Q.   Okay.   Was the -- I'm just trying to ask

3    these questions, you know, to get as much information

4    as I can in advance of a judicial ruling.

5             MR. GARDNER:   Sure.

6    BY MR. DETTMER:

7        Q.   Was the reason for the cancellation that you

8    were given, was it substantive having to do with, you

9    know, what was going to happen with DACA, or was it

10   just a scheduling issue?

11            MR. GARDNER:   You can answer that with a

12   "yes" or "no" as well.   Objection.   Compound.

13            THE WITNESS:   So can you ask the first part.

14   BY MR. DETTMER:

15       Q.   Was the reason for the cancellation of the

16   meeting given to you a substantive reason having to do

17   with what was happening with DACA?

18       A.   No.

19       Q.   Okay.   Was it just a scheduling issue?

20       A.   Yes.

21       Q.   Okay.   Was that meeting, the follow-up

22   meeting, rescheduled?

23       A.   Not to my knowledge.

24       Q.   Okay.   Did you have any other follow-up

25   communications from the White House about either the

Page 93

1  August 24 meeting or this canceled meeting?

2       A.  No.

3       Q.  Okay.  Did you have any follow-up

4  communications from the August 24 meeting with anybody

5  from the Department of Justice from Attorney General

6  Session's office?

7       A.  No.

8       Q.  When did you find out that -- well, actually,

9  let me step back and make sure the record is clean.

10      A.  Sure.

11          MR. DETTMER:  So is our agreement about the

12 exhaustion of -- in all the questioning that we had

13 about the August 24th meeting, do I need to ask him

14 all the questions about the follow-up meeting?

15          MR. GARDNER:  The meeting that did not

16 happen, you mean?

17          MR. DETTMER:  Correct.

18          MR. GARDNER:  It didn't happen.  So there

19 wouldn't be anything to ask.  Are you asking about the

20 substance of a meeting that didn't happen?  I'm not

21 trying to be cute with you.

22          MR. DETTMER:  No.  No, I understand.

23          MR. GARDNER:  I'm just trying to make sure I

24 understand what you want to know, and then I'll try --

25 I'm trying to be accommodating.

Page 94

1           MR. DETTMER:  Sure.

2       Q.  Were there any substantive conversations

3   about DACA at that -- before you all split up having

4   gathered there at the White House?

5           MR. GARDNER:  You can answer that with a

6   "yes" or "no."

7           THE WITNESS:  No.

8   BY MR. DETTMER:

9       Q.  So you all showed up.  Someone said, "The

10  meeting is not happening" and you left?

11      A.  Yes.

12      Q.  Okay.  Well, I guess there's nothing

13  substantive there, then.

14          MR. GARDNER:  That was why I was sort of

15  inquiring.

16  BY MR. DETTMER:

17      Q.  Did you -- let me ask this, actually.  Was

18  there sort of a read ahead document or some kind of

19  package of information at that follow-up meeting that

20  was canceled?

21      A.  No.

22      Q.  Did you ever get any sort of agenda or any

23  kind of, you know, substantive information in

24  connection with that meeting that was canceled?

25      A.  Not that I recall.

Page 95

```
 1        Q.  Did you ever see minutes of the August 24
 2   meeting?
 3        A.  No.  I don't recall.
 4        Q.  Or any kind of, you know, written description
 5   of what was said at that meeting.
 6        A.  I don't recall receiving one.
 7        Q.  Okay.  Did you see people taking notes at
 8   that meeting?
 9        A.  Probably.
10        Q.  Do you remember who?
11        A.  I don't recall specifically.
12        Q.  Was there somebody tasked with taking notes
13   of that meeting, to your knowledge?
14        A.  So I believe by position, yes.
15        Q.  Who would that be?
16        A.  Probably Mr. Porter.
17        Q.  Okay.  And did you see Mr. --
18        A.  Probably.
19        Q.  Understood.  Did you see Mr. Porter taking
20   notes at that meeting?
21        A.  I did not focus on -- I did not see him
22   taking notes.
23        Q.  Okay.  You're just not sure whether he did or
24   not?
25        A.  I didn't focus on if people were taking
```

Page 96

1    notes, frankly.

2        Q.  Fair enough.  Just it's your understanding

3    that given his role, that would be something he would

4    do?

5        A.  Possibly, yes.

6        Q.  Okay.  Okay.  Did you ever have follow-up

7    conversations with people within DHS about that

8    August 24 meeting?

9            MR. GARDNER:  You can answer that again with

10   a "yes" or "no" without getting into the substantive

11   conversations.

12           THE WITNESS:  Yes.

13   BY MR. DETTMER:

14       Q.  Okay.  Who?

15       A.  Gene Hamilton.  As I recall, the Secretary,

16   Acting Secretary.  And I believe as well, as I recall

17   correctly, members of my own team with the few folks

18   that we were working on this.

19       Q.  Okay.

20       A.  As I recall.  It was a compressed time line.

21       Q.  Understood.  Did you ever send any E-mails to

22   anybody about that meeting?

23       A.  About what occurred in the meeting?

24       Q.  Yes.

25       A.  I don't recall sending sort of a summary of

1    the meeting per se.

2        Q.   Okay.

3        A.   I don't recall.

4        Q.   Did you take notes at the meeting?

5        A.   I may have jotted one or two items.  Again, I

6    was not focused on taking notes, watching the notes,

7    more a conversation, discussion.

8        Q.   Did you take the notes on your read-ahead

9    document that you described?

10       A.   If I did take notes, I think it would have

11   been on that document.

12       Q.   And was that document given to the lawyers in

13   connection with this litigation, or a copy of it?

14       A.   I provided all the hard copy documents that I

15   had in response to our attorneys.  So if -- so yes, if

16   it was in that stack.  In other words, I looked, and

17   those were the documents that I had.

18       Q.   And you don't remember throwing that document

19   away or anything like that?

20       A.   No.

21       Q.   Okay.  So we've talked about follow-up

22   conversations with the White House, with the

23   Department of Justice, with people on your own staff

24   or within DHS.  Any other communications that we

25   haven't talked about yet that you remember having as

1    follow-ups to either the August 24 meeting or the

2    canceled meeting?

3         A.   No.

4         Q.   Okay.

5         A.   Not outside those parameters.

6         Q.   And obviously, this conversation we're having

7    today.

8         A.   Well, yes.  Correct.  Self-evident.

9              MR. DETTMER:  Okay.  So there, obviously, is

10   another area where I would like to ask him about the

11   conversations that he had with people within DHS about

12   the substance of the meeting.  Are we okay that, you

13   know, if we get a ruling that we can ask those

14   questions that I haven't waived anything?

15             MR. GARDNER:  Well, depending on what the

16   ruling is.

17             MR. DETTMER:  Of course.

18             MR. GARDNER:  Why don't we do this so we have

19   a very clear record.  Why don't you ask the questions

20   you want to ask, and I can, on a question-by-question

21   basis -- I'm not saying you need to go through your

22   entire list, but if you want to ask your ultimate

23   question that you think I think might be privileged so

24   we can get a real nice, clean record.

25             MR. DETTMER:  Sure.

Page 99

1      Q.   So Mr. McCament, what did you discuss with

2   people at DHS about the August 24 meeting?

3          MR. GARDNER:   Objection.   Calls for the

4   disclosure of information subject to the deliberative

5   process privilege.   I instruct the witness not to

6   answer.

7   BY MR. DETTMER:

8      Q.   And you're going to follow your lawyer's

9   instruction?

10     A.   I do.

11         MR. DETTMER:   And, you know, obviously, I've

12  got a whole bunch of follow-up questions.

13         MR. GARDNER:   I understand.   I think we will

14  definitely agree that your subsidiary questions would

15  be encompassed by the broader question.   It would be

16  unreasonable to think otherwise.

17         MR. DETTMER:   It sure wouldn't be a good use

18  of our time.   All right.   I think we've been going for

19  another hour.   Should we take a break and change?

20         THE VIDEOGRAPHER:   We are going off the

21  record at 11:45 a.m.

22         (A recess was taken from 11:45 a.m.

23         to 12:00 p.m.)

24         THE VIDEOGRAPHER:   We are back on the record

25  at 12:00 p.m.

Page 100

1    BY MR. DETTMER:

2        Q.  All right.  It won't surprise you to hear I

3    have a few follow-up questions from our earlier

4    discussion.  So one question, I think you mentioned

5    that you had some communications with your staff

6    following that August 24 meeting.  Obviously not

7    getting into the substance of them for now.  One of

8    the things that you, I think, mentioned was that they

9    were working on various tasks related to DACA at the

10   time; is that right?

11       A.  Yes.

12       Q.  What were they doing with respect to DACA at

13   that time?  So I guess we're talking about, you know,

14   the week following August 24?  What was your staff

15   doing with respect to DACA at that time?

16       A.  So with respect to the DACA program at large

17   or the rescission --

18       Q.  Let's start with that.  How about -- well,

19   actually, why don't we start with the rescission.

20   What tasks did they have?

21           MR. GARDNER:  So I had understood you to be

22   asking about the DACA program more generally, which I

23   have no objection to.  If the question is about issues

24   relating to DACA rescission, I would object on the

25   bases of deliberative process privilege.

```
                                              Page 101

 1              If you can answer that question without

 2      getting into deliberative process making, please

 3      answer the question.

 4              THE WITNESS:  With respect to the rescission?

 5              MR. GARDNER:  As I understood his question.

 6      BY MR. DETTMER:

 7          Q.  Yeah.

 8          A.  So outside the decision for rescission --

 9          Q.  Yeah.

10          A.  -- but continuing to gather review data on

11      DACA requesters, recipients, program parameters as

12      being currently operated.

13          Q.  So without giving me sort of -- and again,

14      I'm asking the questions in this way --

15          A.  Sure.

16          Q.  -- just to try to get what we can, you know,

17      in the absence of a ruling thus far.

18              Without giving sort of the substance, were

19      they gathering data to inform the decision-making

20      process on DACA rescission?

21          A.  Yes.

22              MR. DETTMER:  Okay.  Were they -- so

23      okay.  Let's put that to the side because I would like

24      to ask all sorts of substantive questions about that.

25      You're going to give an instruction, and you're going
```

Page 102

1  to follow it.  Is that fair, and we can say we're set?

2            MR. GARDNER:  That's correct.  That's

3  correct.

4  BY MR. DETTMER:

5       Q.  So let's put that to the side.

6            Were they drafting any sort of drafts of

7  documents for release to the public in connection with

8  that decision-making process?

9       A.  Yes.

10      Q.  Okay.  When did that work start?

11      A.  As I recall?

12      Q.  Yes.

13      A.  During that week before the September 5.

14      Q.  Okay.  So in September or in August?

15      A.  So at the end of August --

16      Q.  Okay.

17      A.  -- into --

18      Q.  Into September?

19      A.  -- coming up to September 5.

20      Q.  Okay.  So it was after the August 24 meeting.

21  Was it --

22      A.  As I recall, yes.

23      Q.  -- do you remember did that work start before

24  the canceled meeting or after?

25      A.  I believe after, but I don't recall the

                                                  Page 103

1    specific date of the canceled meeting post August 24.

2         Q.   Fair enough.  Who was involved in drafting

3    documents for release to the public?

4         A.   At which part?

5         Q.   What we were just talking about, that

6    started, I think you said either at the very end of

7    August or at the beginning of September.

8         A.   Right.  So the USCIS team, then?

9         Q.   Yeah.

10        A.   For USCIS, myself, Jennifer Higgins, Craig

11   Symons, Kathy Nuebel, Gillian Cristensen, I believe

12   Don Neufeld as well.  And perhaps, I think, Ernest

13   DeStefano and Joe Moore, as I recall sort of --

14        Q.   And --

15        A.   -- at USCIS.

16        Q.   Okay.  And then I guess my next question

17   is -- well, I have a couple of follow-ups to that.

18   The documents that that team was working on, were they

19   documents that were to be released by USCIS sort of

20   under USCIS auspices, or were they for another agency

21   or branch of government, or both?

22        A.   Both, I guess is the right way to say.

23        Q.   And were the documents that were being

24   drafted by that team eventually released to the public

25   in some form?

Page 104

1          A.   Final versions were released --

2          Q.   Okay.   When?

3          A.   -- as I recall.

4               On September 5 --

5          Q.   Okay.

6          A.   -- or after.

7          Q.   Okay.   Now, you sort of drew up a team of

8    USCIS people.   Were there other government employees

9    or officials who were also working on a similar

10   project, drafting materials to be released to the

11   public in connection with the DACA rescission that

12   you're aware of?

13         A.   Yes.

14         Q.   Okay.   And who were those people?

15         A.   So at the Department, DHS working with us on

16   those materials.

17         Q.   And who?

18         A.   As I recall Jonathan Hoffman is definitely

19   one.   And I'm pretty sure Gene Hamilton as well from

20   the Department, working with us.

21         Q.   Anybody else you can remember at DHS?

22         A.   Not off the top.   I mean there's -- I don't

23   recall their names.   There may well have been.

24         Q.   Did that team that you've just described,

25   USCIS and DHS, working on those documents, did they,

Page 105

1   to your knowledge, communicate with other government

2   officials about that project?

3        A.  Not to my direct knowledge.

4        Q.  Okay.

5        A.  To my knowledge --

6        Q.  Did you ever hear that, "Oh, we heard from"

7   so and so "about, you know, what we're writing, and

8   they gave us this feedback."  Anything like that?

9        A.  I don't recall that, but I most likely did.

10  But I just don't recall seeing that or hearing that.

11  But most likely, I did.

12       Q.  Did you have any communications with anybody

13  at the White House or DOJ about that project?

14       A.  No.

15       Q.  Okay.  But you think there was some feedback

16  that people got on the team that you heard about?

17            MR. GARDNER:  Objection because that

18  mischaracterizes the witness' testimony.

19            THE WITNESS:  So if you can ask your question

20  again.

21  BY MR. DETTMER:

22       Q.  Sure.  Maybe I'm just clarifying what I think

23  you said, but I want to make sure I've got it right.

24            Did you get any feedback from anybody on that

25  DHS, USCIS team drafting these documents --

Page 106

1        A.   Uh-huh.

2        Q.   -- that they got feedback from either people

3    at DOJ or at the White House about that project?

4        A.   I don't recall that being said for DOJ or the

5    White House.  It would be a standard practice --

6        Q.   Okay.

7        A.   -- and some feedback.

8        Q.   Okay.  Do you know whether the documents

9    being worked on were shared with DOJ or the White

10   House in that process?

11       A.   I don't recall specifically that they were,

12   but, again, there's a vetting process usually.

13       Q.   Okay.  So that would be a standard operating

14   procedure, to share those documents.  You just don't

15   know whether specifically it happened in this case.

16       A.   Generally, it would be.  I don't recall

17   specifically in this case.

18            MR. DETTMER:  Okay.  Okay.  And I hate to be

19   a broken record, but obviously, I want to ask all

20   sorts of substantive questions about that.  We're just

21   going to agree that I don't have to and --

22            MR. GARDNER:  Yeah.  Why don't you just,

23   again, for the record, ask your sort of ultimate

24   question so we can get a clear transcript.

25            MR. DETTMER:  Okay.

Page 107

1          Q.   Why don't we start with this.  What were the

2    documents that this team was working on that we've

3    just been discussing?

4              MR. GARDNER:  And to be clear, are you asking

5    for the final documents that were issued?  Because

6    I'll let him answer that question.

7              MR. DETTMER:  Okay.

8              MR. GARDNER:  To the extent there's a final

9    document that became publicly issued, you can identify

10   those documents.

11             THE WITNESS:  Yeah.  With respect to the

12   final documents, there was, as I recall, a news

13   release.

14   BY MR. DETTMER:

15         Q.   Okay.

16         A.   For our purposes, also there was a script for

17   calls that were held on the day of the announcement.

18   I believe there were DACA rescission FAQs, as well, to

19   supplement the FAQs that existed.  And I believe there

20   may have been a couple of other media -- related

21   materials, but I'm just not recalling.  Those were the

22   core ones that I recall, as far as what we were

23   working on for the communications.

24         Q.   Did this team that you've just described, did

25   it have any role in Secretary Duke's memo, rescission

Page 108

1   memo?

2          MR. GARDNER:  Objection.  That calls for

3   disclosure of information and subject to deliberative

4   process privilege.

5          I would instruct the witness not to answer.

6   BY MR. DETTMER:

7      Q.  And you're going to --

8      A.  And I will take Counsel's advice.

9      Q.  Same question for her statement that she

10  released in connection with the memo.

11         MR. GARDNER:  Same objection.  Same

12  instruction.

13         THE WITNESS:  And same following of Counsel.

14  BY MR. DETTMER:

15     Q.  And were you consulted in any way in

16  connection with those two documents that I just

17  mentioned in advance of them being released?

18     A.  Yes, with respect to her memo of direction to

19  us.

20     Q.  Okay.

21     A.  And you asked the second -- sorry.  First was

22  her memo, and the second --

23     Q.  There was the statement that she released

24  along with her memo?

25     A.  Right.  I don't recall being consulted on

Page 109

1    that one.  I might have been.

2        Q.  You saw the document after it was released

3    but --

4        A.  I definitely saw it after it was released.  I

5    don't recall seeing it before.  But certainly, the

6    draft memo, yes.

7        Q.  Do you remember when you were first consulted

8    on the rescission memo?

9        A.  Approximately, as I recall, so yes.  In that

10   week after the August 24, as I recall.

11       Q.  Okay.  So before the canceled meeting?

12       A.  Again, apologies, but I'm not sure of the

13   precise date during that week as far as that canceled

14   meeting.  I think it was mid-week.

15       Q.  Okay.  Do you remember, just as you sit here,

16   regardless of the date, whether you were first

17   consulted on the rescission memo before or after that

18   canceled meeting?

19       A.  I'm pretty sure before.

20       Q.  Okay.

21       A.  And I'm pretty certain it was after the 24th.

22   It could have been before, but I don't think so.

23       Q.  What was sort of the form of how you were

24   consulted?  Did Secretary Duke come talk to you or was

25   it one of her staff members?  How did that happen?

```
                                              Page 110

 1            MR. GARDNER:  And just to caution you, the
 2   substance of --
 3            THE WITNESS:  Right.
 4            MR. GARDNER:  -- what you contributed would
 5   be privileged, but he's asking you a process question
 6   which you can answer.  So just be cognizant of that.
 7            THE WITNESS:  Okay.
 8            So could you ask your question again?
 9   BY MR. DETTMER:
10       Q.  How did it come about that you were consulted
11   initially in connection with the rescission memo?
12       A.  As I recall being provided a copy of the memo
13   electronically.
14       Q.  (Inaudible.)
15       A.  Yes.
16       Q.  And asked for your input?
17       A.  Yes.
18       Q.  And did you provide input?
19       A.  As I recall, I did, yes.
20       Q.  Via E-mail or a phone call or a meeting, or
21   some combination?
22       A.  As I recall, definitely E-mail.  I don't
23   recall, by phone, a conversation.  It could have been
24   as well.
25       Q.  And who was that E-mail exchange with?
```

Page 111

1      A.   So I think with Gene Hamilton.

2      Q.   Okay.

3      A.   Possibly -- again, I'm trying to reflect --

4   Chad Wolf as well, but it may have been just through

5   Gene.

6      Q.   Okay.  And what was the advice that you gave

7   on that memo?

8           MR. GARDNER:  Objection.  Calls for

9   disclosure of information subject to deliberative

10  process privilege.

11          I instruct you not to answer.

12          THE WITNESS:  Yes, I will take advice of

13  Counsel.

14  BY MR. DETTMER:

15     Q.   And obviously, I have a bunch of follow-up

16  stuff.

17     A.   Okay.

18     Q.   The canceled follow-up meeting, a couple

19  other questions about that.  So I think you described

20  DHS/USCIS people who showed up to that meeting --

21     A.   Right.

22     Q.   -- and were told that it was canceled?

23          Did anybody from the Department of Justice

24  show up at that meeting also?

25     A.   I believe the attorney general was scheduled

```
                                              Page 112
 1   to attend.
 2        Q.  Right.
 3        A.  I don't recall seeing him in the room because
 4   the meeting hadn't started.  So some folks were there
 5   and not in the room.
 6        Q.  Okay.
 7        A.  Others of us were there waiting.
 8        Q.  So who was in the room waiting?
 9        A.  The group from DHS.
10        Q.  Right.
11        A.  And as far as the others, we waited for a
12   while until we were told that it was canceled.  I
13   believe, as I recall, I think the attorney general was
14   there and then stepped out.  And then -- I'm trying to
15   remember because it didn't occur.  So our group, DHS,
16   USCIS.  I think the attorney general.  I think Kathy
17   Kraninger, and I'm not -- I don't recall Director
18   Mulvaney, whether he was sitting there, had come in,
19   had not come in.  Because we waited for a while before
20   it ended -- or we were told it was over due to
21   scheduling.
22        Q.  Okay.  Can you remember anybody else who came
23   in or --
24        A.  I don't, because largely, it was our
25   DHS/USCIS that sat for a while --
```

Page 113

1        Q.  Got you.

2        A.  -- waiting to hear.

3        Q.  I may have asked this -- I don't think I

4   did -- who told you that the meeting was canceled?

5        A.  Someone came in from -- I think from either

6   General Kelly's office or the Vice President's office.

7   One of the staff came in and said, "I'm sorry.  We're

8   not going to be able to hold the meeting.  Another

9   matter."

10       Q.  So it was just somebody relaying the message?

11       A.  Yes.

12       Q.  It wasn't a player, so to speak, in the --

13       A.  Not that I recall, no.

14       Q.  Not to use that term.

15       A.  No, understood.

16       Q.  Did you ever have any -- other than what you

17   just mentioned, did you ever have any communications

18   with the Vice President's office about DACA

19   rescission?

20       A.  No.

21       Q.  Or the Vice President himself?

22       A.  No.

23       Q.  Are you aware of anybody -- did anybody tell

24   you about, you know, "Vice President's office wants,"

25   X, Y, or Z?  Did you ever get communications like

Page 114

1    that?

2        A.  I don't recall anyone sayings that.  Could

3    have, but I don't recall.

4        Q.  So when do you first remember learning that a

5    final decision had been made on DACA rescission, that

6    that was what was going to happen?

7        A.  I think the final decision, during the week

8    before September 5 for certain that it was going to be

9    rescinded.

10       Q.  Was it before or after the canceled meeting?

11       A.  It was at that time.  I mean it was --

12   September 5 was coming, and we were -- so it was

13   around that time.  Sorry.

14       Q.  No, I understand.  Sometimes our memory works

15   in ways and you can connect something to an event,

16   even if you don't remember when the event is.

17       A.  Right.

18       Q.  Do you remember was it sort of the same day

19   as that canceled meeting, or your memory is not

20   working that way?

21       A.  I don't remember it that way because the

22   meeting was canceled.

23       Q.  Okay.  Did you ever -- were you ever

24   consulted in connection with Attorney General

25   Sessions, letter about DACA rescission?

1          MR. GARDNER:  Object.  You can answer that

2     with a "yes" or "no."  The contents of that we would

3     assert privilege over.  So let's take it a step at a

4     time.

5          THE WITNESS:  Okay.  So with respect to his

6     actual letter?

7     BY MR. DETTMER:

8          Q.  Yes.

9          A.  No.

10         Q.  Did you ever see a draft of that letter

11    before it was issued?

12         A.  I don't recall seeing a draft of his letter.

13    It could have been prior to the memo going.

14         Q.  Okay.  How did you first get -- how did the

15    final decision come to you?  How was it communicated

16    to you that DACA was being rescinded?

17         A.  That it was being finally decided and moving?

18    From a couple different access points.  First was

19    obviously her memo to us.

20         Q.  You mean in draft form?

21         A.  In draft form.  But there were multiple

22    conversations about the possibilities operationally

23    before the rescission.

24         Q.  Okay.  So you think that when you -- when you

25    got a draft of Secretary Duke's memo and were asked

Page 116

1    to, you know, weigh in on it, at that point you said
2    to yourself, "Well, it's final now, essentially?  The
3    decision has been made"?
4         A.   Right.  Conversations prior to, but yes, and
5    it's set.
6         Q.   Okay.  And that was before you saw Attorney
7    General Sessions' letter, whether in draft or final;
8    right?
9         A.   Yes.
10        Q.   By a week or so?
11        A.   Probably, yeah.
12        Q.   Okay.  So I'm going to obviously have to talk
13   about this after lunch, but let me just ask generally,
14   as you sit here today, what is your understanding of
15   the reason for the rescission of the DACA program?
16        A.   There's several.  First, the Secretary made a
17   decision to rescind.
18             Second, the Supreme Court ruling, or divided
19   ruling with respect to DAPA.  The Fifth Circuit
20   ruling.  The district court before whom the DACA
21   litigation would be -- or amendment would be filed,
22   which leads to what I would say is a strong one,
23   particularly is the Texas attorney general's letter or
24   attorneys general letter with respect to amendment of
25   their filing by September 5.

```
                                          Page 117

 1            Again, of course, as well, Attorney General
 2    Sessions' letter with respect to unconstitutionality
 3    and rescission, or lack of legality and decision and
 4    defense.
 5        Q.   Okay.  So just to recap, first, because
 6    Secretary Duke made the decision.
 7        A.   Right.
 8        Q.   Second, and I'll just sort of lump all these
 9    together, is the various decisions -- or the Supreme
10    Court's 4-4 determination, Fifth Circuit's ruling, and
11    the District Court's ruling in U.S. V. Texas?
12        A.   Yes.
13        Q.   The letter, I think that was signed by Texas
14    Attorney General Paxton that was basically about that
15    case; right?
16        A.   Yes.
17        Q.   And then Attorney General Sessions' letter.
18        A.   Yes.
19        Q.   Apart from those, any other reason that
20    you're aware of for the rescission of DACA?
21        A.   Not that I'm aware of.
22        Q.   And so I guess the first one of those is
23    really sort of a conclusion; right?  I mean because
24    the Secretary said so isn't a reason.  It's an act.
25        A.   Correct.  Yes.
```

1      Q.   Okay.  And then the second one is -- and a

2  lump them together, the Supreme Court, Fifth Circuit,

3  and District Court opinions in the U.S. V. Texas case.

4      A.   These are not sequential in the list, but

5  yes.  I mean the Secretary's is, but the others...

6      Q.   Okay.  Fair enough.  So can you just sort of

7  talk a little bit more about why those judicial

8  decisions, in your view, are a reason for the

9  rescission?

10      A.   Yes.

11      Q.   Please do.  And obviously, if you need a sip

12  of water.

13      A.   Thanks.  I think it needs to begin, though,

14  with the State Attorneys General letter.

15      Q.   So whatever order you think makes the most

16  sense.

17      A.   Right.  So if you're asking my opinion, sort

18  of --

19      Q.   Yeah.

20      A.   What the State Attorneys General letter laid

21  out with respect to the litigation and likelihood of

22  success was a strong concern, from my view.

23      Q.   Why?

24      A.   Because the time line that was set for

25  September 5 noted that the amendment would be before

Page 119

1    the same district court judge who ended DAPA.  At the

2    district court level ruled against DAPA and expanded

3    DACA in that sense, if I said it correctly.

4         Q.  I'm just going to repeat back to you what I

5    think I'm understanding you saying, and if I get this

6    wrong, please correct me.

7         A.  Yes.

8         Q.  But I just want to make sure I'm clear on

9    what you're saying.

10        A.  Sure.

11        Q.  Your take is that the State Attorneys General

12   letter made -- said that they would amend the

13   complaint in front of this district court judge in

14   Texas who had already ruled against DAPA and expanded

15   DACA.  And that because that was their intent and they

16   were going to do it on September 5, your belief is

17   that it was likely that there would be a similar

18   ruling against DACA.  Is that fair?

19        A.  Yes.  That's fair.

20        Q.  Okay.  And therefore, if all that happened,

21   DACA would be found unconstitutional, improper.

22   Whatever the result would be, it would be held to be

23   enjoined?

24        A.  That would appear to be likely, yes.

25        Q.  And so if you could just sort of lay out why,

Page 120

1   in your view, does that risk lead to a conclusion that
2   it should be done away with proactively?
3       A.   From my opinion?
4       Q.   Yes.
5       A.   Several points to that.  First, the Attorneys
6   General letter, in addition to laying out those
7   points, did indicate, as I recall -- I don't have it
8   in front of me -- that DHS, although the letter, as I
9   recall, was addressed to the Attorney General, but DHS
10  should take action to wind down or rescind -- what
11  terminology, I don't recall.  And nonetheless, that
12  DACA, as currently being operated, and those with DACA
13  would not have to be invalidated as I recall.
14          It was words to the effect of "Here are the
15  concerns" and, you know, want DHS to end DACA, but
16  those who currently have valid employment
17  authorization documents or an allusion to that would
18  not necessarily have to be rescinded.  And so DHS
19  would have some control over winding down the program
20  if they so chose was the way I read that letter.
21          So that's one point.  I may not be exactly
22  remembering all the language in the letter.
23      Q.   Sure.
24      A.   But there's a much stronger point to that, or
25  in my view, that's strong, but there's an additional

1    point, which is because the likelihood is very high,

2    in my view, because I've been at USCIS since before

3    DACA was stood up.  I was part of USCIS when Judge

4    Hanen ruled, and understanding the operational impact,

5    and again, from my personal opinion viewing this,

6    there was a much stronger likelihood with that

7    district court judge than a to-be-assigned district

8    court judge or in another of the many district courts,

9    if that makes sense.

10          There's an operational impact as well.

11          Q.  What does that mean?

12          A.  Sure.  So as we understood in gathering

13   information, you know, checking our information in

14   those weeks, the -- there are approximately 690,000 or

15   so active DACA requesters, recipients.  Approximately

16   800,000 who have applied and requested for DACA

17   throughout the history of the program.  If you take

18   that 690,000, my perspective from within USCIS and

19   watching the district court actions before, that there

20   was a good possibility that a ruling by that district

21   court judge could act in the same way as happened with

22   DAPA, but there's an important distinction to that.

23          Q.  Which is?

24          A.  That DAPA was never actually launched, that

25   portion.  There were other pieces of Secretary

Page 122

1    Johnson's element, but that was never launched.  So

2    the injunction halted the next steps.  This is an

3    active program, or at that time, particularly, in

4    initials and renewals.

5            As an operational view, my view, that the

6    judge could have ruled -- this is not speculating on

7    whether he would have but what was presented, and that

8    particular judge could have ruled to immediately

9    invalidate all the employment authorization documents.

10           There were also approximately 100,000 --

11   approximately, initials and renewals in our system

12   being processed before September 5.  Those too in

13   theory, possibly, the judge could have ruled to

14   immediately not only cease processing but require

15   USCIS to perhaps rescind -- not rescind because they

16   were being adjudicated for the initials.  The renewals

17   were being renewed.  We could have been required,

18   could have, to pull those out of the system and refund

19   100,000 application fees, and that it's not just the

20   fees.  If you go from that group to 690,000, they

21   could immediately have had everything invalidated.

22   And that's over half a million people.  So I'm saying

23   that's, again, my personal perspective observing those

24   factors.

25           Q.  Okay.  Just to get this all on the table -- I

                                                         Page 123

1    know I'd say we'd finish, but --

2         A.   Sure.

3         Q.   -- and we'll obviously talk about this after

4    lunch, you also mentioned the AG's letter.  I think

5    you've covered the other points that you mentioned.

6         A.   Uh-huh.

7         Q.   So what about the AG's letter, the U.S. AG's

8    letter as a reason --

9         A.   Certainly.

10        Q.   -- in your mind for the rescission?

11        A.   Certainly.  It definitely was.

12        Q.   And why?  What about it?

13        A.   Because the AG was providing guidance to the

14   Department, that the Department of Justice did not

15   feel that they could defend DACA, as I read the

16   letter, against the Amended Complaint because it had

17   some of the same -- or had the same failings -- that's

18   not the word that was used in the AG's letter, and I

19   apologize, but the same structural lack or lack of

20   constitutionality that was applied to DAPA, the same

21   underpinnings applied to DACA.

22             So therefore, you know, stating to the

23   Secretary and recommending that she rescind the DACA

24   memo of 2012 and implement an orderly and efficient

25   wind-down.  It was also, I think -- I can't speak for

                                                    Page 124

1    the Secretary but with respect to her memo, indicates

2    that also was a factor, which certainly seems to tie

3    with those other points.

4              MR. DETTMER:  Okay.  All right.  I'm only two

5    minutes over.  Should we break now, have some food and

6    then we'll come back in an hour?

7              MR. GARDNER:  That's fine.

8              MR. DETTMER:  Want to say 1:30 or 45 minutes.

9              THE VIDEOGRAPHER:  We're going off the record

10   at 12:35 p.m.

11             (A recess was taken from 12:35 p.m.

12             to 1:38 p.m.)

13             THE VIDEOGRAPHER:  We are back on the record

14   at 1:38 p.m.

15   BY MR. DETTMER:

16        Q.  All right.  Good afternoon.

17        A.  Good afternoon.

18        Q.  You know you're still under oath; right?

19        A.  Yes.

20        Q.  And on the record?

21        A.  Yes.

22        Q.  Are you aware of a meeting on the topic of

23   DACA rescission that happened on August 21?

24        A.  Yes.  If I have the date correct.

25        Q.  Were you at that meeting?

Page 125

1      A.  Can you specify as far as -- you mean as far

2   as a White House meeting or at DHS?

3      Q.  I'm not sure.  As far as I know, it was a DHS

4   only meeting.  Are you aware --

5      A.  Yes.

6      Q.  -- of that?

7      A.  Yes.

8      Q.  Okay.  And were you at that meeting?

9      A.  Yes.

10     Q.  Who else was at that meeting?

11     A.  As I recall, the acting secretary, the Chief

12  of Staff.  I believe the Deputy Chief of Staff as

13  well.  Gene Hamilton.  Joe Maher.  Nader Baroukh,

14  Dimple Shah, myself, of course.  I believe Kathy

15  Nuebel, Craig Symons, I believe our chief of counsel.

16  I think as well Tom Homan.  I'm trying to look around

17  the room.  I think one of his advisors was there, if I

18  recall correctly, John Feere.  I might be

19  mispronouncing the last name.  I think Kevin McAleenan

20  was there from customs and border protection.  But

21  certainly, it was someone from his team, or two

22  people, I think, from his team.  And, I believe, Kevin

23  was there.  If not, it would have been Ron Vitiello.

24  I'm not remembering exactly.

25           REPORTER MARTIN:  Ron Vitiello?

                                              Page 126

1              THE WITNESS:  Sorry.  I apologize, Nancy.
2      Ron Vitiello, who was the deputy -- acting Deputy
3      Commissioner.  So if it weren't Kevin, it would be
4      Ron.
5              And also -- those are the names I recall.  I
6      mean I don't recall the two names from CVP, but it
7      might have been Julie Core, who's one of the executive
8      commissioners.  Then probably a couple other people.
9      It was a full room.
10     BY MR. DETTMER:
11         Q.  Okay.  How long did that meeting last?
12         A.  What I recall, it was probably an hour.
13     Somewhere between an hour and two hours.
14         Q.  And where was it?
15         A.  At the DHS headquarters.
16         Q.  Who called that meeting?  Who was the
17     motivator in making that meeting happen?
18         A.  I don't know the motivator, but I think the
19     scheduling invite would have come from the Secretary's
20     office.
21         Q.  Okay.  And did she lead the meeting?
22         A.  Yes.
23         Q.  And, you know, without getting into the
24     substance, the topic was DACA rescission?
25         A.  Yes.

                                                            Page 127

1       Q.   Okay.   Were any decisions made at that
2   meeting?
3       A.   No, not that I recall.
4       Q.   Was it sort of a preparatory-type meeting for
5   the August 24 meeting?
6       A.   So I don't -- no.   As I recall, it was not
7   preparatory for that meeting.   It was to discuss the
8   topic, potential DACA rescission.
9       Q.   Who -- sorry.
10      A.   Sorry.   So as I recollect, it may have been
11  in preparation for a forthcoming meeting.   I don't
12  remember it being set as that date for a meeting on
13  the 24th, but it could have been.
14      Q.   Who were the people who sort of spoke the
15  most at that meeting?   Who were the primary
16  contributors?
17      A.   The Secretary.   I recall Joe Maher, Dimple.
18  I think Nader was there.   If he was, I think he spoke.
19  I'm pretty sure he was.   Myself.   I think Tom Homan
20  spoke.   Again, if I'm not misremembering.   We've had
21  several meetings with the three immigration agencies,
22  non DACA issues over the years, over the months, but I
23  think Kevin McAleenan or his team were there speaking,
24  and I believe Kathy and Craig spoke as well.
25      Q.   Was there anyone there who was not there sort

1    of under the DHS umbrella, from other agencies or --

2         A.  No.  And I think I also -- if I didn't

3    mention, Gene Hamilton was at the meeting, but I think

4    he spoke as well.

5         Q.  What was Gene's role again?

6         A.  He was the senior counsel to the Secretary.

7         Q.  Got you.  Okay.  Do you know Julie Kirchner?

8         A.  Yes.

9         Q.  To your knowledge, did Julie Kirchner have

10   any role in all these discussions that we've been

11   talking about today with respect to the rescission of

12   DACA?

13        A.  I don't recall her being at the meeting.  And

14   if I may ask and answer in a couple points.  So with

15   respect to the decisions we've discussed, she wasn't

16   present.

17        Q.  Okay.  Are you aware of her having any role

18   in the decision-making process on DACA rescission?

19        A.  Excepting her official title and role, I'm

20   not aware of that.

21        Q.  And what do you mean "excepting her official

22   title and role"?

23        A.  So she is a citizenship and immigration

24   services ombudsman.

25        Q.  And so you would expect somebody in that

Page 129

1    position to have some role in the decision making?

2          A.   Not necessarily, but I can explain.

3          Q.   Please do.

4          A.   So the ombudsman has by the definition the

5    title of ombudsman, oversees partners with our agency,

6    and so therefore, has opinions on our operations and

7    involves themselves appropriately with the work or

8    operations on decisions sometimes may, usually does

9    not from a guidance perspective.

10         Q.   Okay.  Well, just to go through the

11   formalities, what was discussed at that August 21

12   meeting?

13              MR. GARDNER:  Objection.  Calls for

14   disclosure of information subject to deliberative

15   process privilege as well as the attorney-client

16   privilege.

17              I instruct the witness not to answer.

18              THE WITNESS:  And I follow my counsel's lead.

19              MR. DETTMER:  If I didn't say that I'm going

20   to observe the formalities, you think I could have

21   slipped that through?

22              MR. GARDNER:  I think so.  I'm still in a

23   lunch coma right now.

24              THE WITNESS:  Looking at these different

25   options to keep it going.

```
                                             Page 130
 1   BY MR. DETTMER:
 2       Q.   Was there any follow-up to that August 21
 3   meeting that you were part of?
 4       A.   Yes.
 5       Q.   Can you describe that.
 6            MR. GARDNER:  Objection.  Calls for
 7   disclosure of information and subject to the
 8   deliberative process privilege and potentially the
 9   attorney-client privilege.
10            I instruct the witness not to answer.
11   BY MR. DETTMER:
12       Q.   So --
13       A.   I agree.  I concur, yes.
14       Q.   So let me just back off of that just a little
15   bit --
16       A.   Sure.
17       Q.   -- and ask you without divulging the
18   substance of the follow-up conversations, how many
19   were there, who were they with, when did they happen?
20            MR. GARDNER:  Objection.  Compound.  Can we
21   do it question by question?  I'm not trying to --
22            MR. DETTMER:  No.  Sure.
23       Q.   I'm trying to do it in a way that --
24       A.   Understood.
25       Q.   How many follow-up conversations do you
```

Page 131

1    remember having?  Excuse me, follow-up communications

2    do you remember having to that August 21 meeting?

3         A.  A handful.  A few.

4         Q.  Okay.  Less than five?

5         A.  What is the time parameter when you say,

6    "follow-up"?

7         Q.  Well, you know, it's hard to say.  I mean it

8    depends on what you mean by "follow-up."  I mean --

9         A.  That's why I was asking.

10        Q.  -- if it's a communication that you

11   understood was sort of a follow-up on that meeting,

12   that's what I'm curious about.  And I don't --

13        A.  Right.

14        Q.  I can't see it in your mind.

15        A.  I can explain a bit of the parameters of why

16   I asked the question.

17        Q.  Sure.

18        A.  So following any conversation with the

19   Secretary or principal from that then role, or even

20   this one, usually, on whatever the topic is there may

21   be a variety of different types of communication or

22   follow-up.  So it could be E-mail or calls asking for

23   data.  Sometimes decisions are ultimately made.

24   Sometimes they aren't.  So sorry.  I was trying to set

25   the --

1    Q.  No.  No.  Understood.  And I'm sorry.  It is
2    a little vague just by nature.
3         A.  So I would say between the 21st and the 24th,
4    meaning that that meeting then occurred at the White
5    House.  There was, I think, a handful, maybe a
6    couple -- I don't recall exactly -- follow-up on what
7    was discussed.
8         Q.  And do you remember who those communications,
9    those follow-up communications were with?
10        A.  Some.
11        Q.  Tell me what you remember.
12        A.  So follow-up on the discussions at the
13   meeting for further information.
14        Q.  Do you remember with whom?
15        A.  So I recall Gene Hamilton would be one.  I
16   don't recall if it came through other channels or not.
17   It might have.
18        Q.  Were those requests for additional data?  Was
19   that sort of the nature of the --
20        A.  Additional data.  I think data would be
21   correct overall.
22        Q.  Okay.
23        A.  If I may amend an earlier answer.  At the
24   meeting as well, I believe on the 21st was Ambassador
25   Nealon.  James Nealon as well.  Assistant secretary in

                                                    Page 133

1    the policy office.

2         Q.   Okay.  Do you remember whether Mr. Nealon

3    made -- was a participant in the conversation?

4         A.   I remember him speaking, but I don't remember

5    the specifics given a lot of folks were discussing.

6    So...

7         Q.   Okay.  I think I'm going to sort of switch

8    gears and take you back to earlier in your time at

9    USCIS and ask you a few questions about earlier in the

10   DACA program.  Sort of starting back in 2012-2013 time

11   period --

12        A.   Okay.

13        Q.   -- and moving forward from there.

14             We had talked a little bit this morning about

15   the roll-out of DACA --

16        A.   Uh-huh.

17        Q.   -- which you had some role in, it sounds,

18   like, based on your position.  I'm going to show you a

19   few of the documents that were put out by USCIS around

20   the DACA program and just ask you a few questions

21   about those if that makes sense.

22        A.   Sure.

23        Q.   Let me ask you one thing, though.  So for

24   sort of a general question.  For the sort of official,

25   you know, guidance documents that USCIS puts out, is

Page 134

1   there a protocol that is generally followed in order

2   to get those drafted and approved and released to

3   people who have to sign off on them, that kind of

4   thing?

5        A.  Yes.

6        Q.  And does that vary by the type of document,

7   or is there sort of a general protocol that's

8   followed?

9        A.  A general protocol.

10        Q.  Can you describe that?

11        A.  With the caveat it's general.  It sometimes

12   can change.

13        Q.  Fair enough.

14        A.  Yes.  It's probably better to explain it

15   going backward, sort of from the point of publication,

16   sort of working back.

17            So certainly, at the department level,

18   usually if it's --

19        Q.  DHS?

20        A.  DHS.  If there is a -- I don't know if it's

21   department initiative or department overseeing that

22   initiative in particular, there would be clearance,

23   what we'd call "clearance" by the public affairs, by

24   the legislative affairs by the general counsel, but

25   not always, but sort of a general review process that

1   happens at the department level before materials would

2   be posted, cleared.

3        Q.   So just to stop you a second there, because I

4   want to hear the rest.  When you say, "clearance,"

5   that means basically you have the final draft and it

6   is circulated to those groups that you just mentioned,

7   and they say, "Okay" or they say, "Change this"?

8        A.   Right.  Generally.

9        Q.   Right.

10       A.   That's at the department level.

11       Q.   Okay.

12       A.   That may occur -- you're asking generally.

13       Q.   Understood.

14       A.   That may occur with the office of the

15  executive secretariat to circulate those, or they may

16  come directly from what we call "the components."

17       Q.   Okay.

18       A.   And that clearance process is also then made,

19  in some fashion incorporate the office of the

20  Secretary and the Deputy, not necessarily always,

21  depending on the level, at the department level.

22  Again, we're speaking to sort of these types of posted

23  materials.

24       Q.   Uh-huh.

25       A.   Broadly, generally, then those are provided

Page 136

1   up from the leadership at, in our case, USCIS, and

2   therefore, those documents, that material, that piece

3   of information would generally be reviewed by the

4   office of the director and deputy director staff, at

5   least, for clearance, and that would happen after,

6   generally, construction at the -- if it's those types

7   of materials -- office of communication, office of

8   legislative affairs or public engagement.

9        Q.   I will ask these questions -- some of these

10  questions with more specific documents, but does it

11  sometimes -- is it sometimes the case that posted

12  documents are shared outside the Department before

13  they're posted for clearance?

14       A.   Yes.  Sometimes.

15       Q.   How does that happen?  I mean is there

16  somebody who's generally a decision maker?  How does

17  that --

18       A.   It really does vary.

19       Q.   Okay.

20       A.   But it definitely can be shared outside the

21  department.

22       Q.   Okay.  Is there -- and maybe there is no

23  general answer to this, but who, typically, would make

24  the decisions about the level of clearance that's

25  necessary?  Would it be, like, a chief of staff or

Page 137

1    what -- it just depends on the document or --

2         A.   Generally, it's following the protocol I laid

3    out.

4         Q.   Okay.

5         A.   Multiple levels of folks will review, and

6    there's a general scribe those levels go up through

7    the department, including, I mentioned the group that

8    would include our own chief counsel and policy and

9    other folks at the agency that it would go up through

10   for review before posting to avoid surprises.

11             MR. DETTMER:   Okay.   All right.   Well, let's

12   look at a few of these.

13             This is Exhibit 11.

14             (Deposition Exhibit 11 was marked for

15             identification.)

16             MR. DETTMER:   While you're looking at that,

17   just for the record, Exhibit 11 is a three-page

18   document.   Title up at the top, just for

19   identification says, "General information.   How do I

20   request considering of deferred action for childhood

21   arrivals," and it says -- it's got the U.S.

22   Citizenship and Immigration Services seal and name

23   there.

24             I'll just note at the bottom of the page it

25   says -- or the footer of each page it says, "October

Page 138

1    2013."

2         Q.  Do you think that's the publication date of

3    this document?

4         A.  Certainly of this document because it's on

5    the footer.

6         Q.  Okay.  So just, do you know what this

7    document is?

8         A.  Yes.

9         Q.  What is it?

10        A.  It's what we referred to as a "how do I."  It

11   says it as well (indicating).

12        Q.  And what's the purpose of this document, as

13   far as you know?

14        A.  For this document and for others is to

15   explain general information with respect to one of our

16   programs.

17        Q.  Do you know whether there were similar

18   documents for the DACA program before this, or do you

19   think this is the first one?  Do you know?

20        A.  I don't recollect.  I don't know for sure.

21        Q.  Okay.

22        A.  But, yeah, I don't know for sure.

23        Q.  Let's see.  At this time you were -- remind

24   me.  In October 2013 what was your job?

25        A.  Chief of the office of legislative affairs.

Page 139

1          Q.   Okay.   So this would not have been something

2     that would be in your bailiwick at that point in time;

3     right?

4          A.   Not to create or --

5          Q.   Okay.   Would it have been something -- or do

6     you remember if this was something you received, were

7     aware of?

8          A.   I don't recall specifically, but quite

9     probably as information regarding DACA.

10          Q.   Turn to the second page of this Exhibit 11.

11     If you look at sort of the first full question in the

12     left-hand column, sort of halfway down the left-hand

13     column.   One of the questions here is "Does this

14     process," referring to DACA, "apply to me if I am

15     currently in removal proceedings, have a final removal

16     order or have a voluntary departure order."

17               And the response underneath that is, "This

18     process is open to any individual who can demonstrate

19     he or she meets the guidelines for consideration,

20     including those who have never been in removal

21     proceedings as well as those in removal proceedings

22     with a final order or with a voluntary departure order

23     as long as they are not in immigration detention."

24               Do you see where I read that there?

25          A.   I do.

Page 140

1      Q.   And I read that accurately?

2      A.   Yes.

3      Q.   So that's consistent with your understanding

4  of how DACA worked before the rescission; right?

5      A.   That is my understanding.

6      Q.   So if an undocumented person was in removal

7  proceedings but had met the eligibility criteria for

8  DACA, they could be taken out of removal proceedings

9  based on that?

10      A.   According to as long as they are not in

11  immigration detention.

12      Q.   Okay.  If you look at the next column at the

13  top, "Will USCIS conduct a background check when

14  reviewing my request for consideration of deferred

15  action for childhood arrivals."

16           Do you see there it says, "Yes.  You must

17  undergo biographic and biometric background checks

18  before USCIS will exercise prosecutorial discretion,"

19  and it goes on.

20           Are you familiar with that process the

21  background check process under DACA, how it works?

22      A.   Yes.  Generally.

23      Q.   And is that a -- in your understanding, a

24  rigorous background check process?

25           MR. GARDNER:  Objection.  Vague.

Page 141

1              THE WITNESS:  So --
2    BY MR. DETTMER:
3         Q.  You can answer if you can.
4         A.  So could you ask the question again, please.
5         Q.  Sure.  I can ask it a different way.
6         A.  Please.
7         Q.  Can you describe the background check
8    process, what happens?
9         A.  So as described here the biographic and
10   biometric information is pulled, and we run that
11   against the, in this instance as I recall, the TECS,
12   Treasury Enforcement -- it's TECS now, it's the
13   acronym, system to determine if there are any flags
14   for information with respect to convictions, criminal
15   records, other information.
16        Q.  And just so we can understand that database
17   that you just referred to, TECS, you said?
18        A.  TECS, T-E-C-S.
19        Q.  And do you know what that stands for?
20        A.  Yes, I do.
21        Q.  What does it stands for?
22        A.  At one time it stood for the Treasury
23   Enforcement, and I think it was Treasury Enforcement
24   Customs System.  Subsequently, same system, it is now
25   referred to as TECS by its acronym.

Page 142

1      Q.   Got you.  I don't know how that works.  Is it
2  a conglomeration of a whole bunch of different
3  databases of convictions and --
4      A.   It draws -- it's my understanding it draws
5  from different databases of information but houses
6  information in the system.
7      Q.   Okay.  So is the idea if somebody has a
8  conviction of some kind somewhere it will show up?
9      A.   Yes, with a caveat.
10     Q.   What's the caveat?
11     A.   If it has been entered into the system.
12     Q.   Okay.  Is there also a background check for
13  gang affiliation?
14     A.   So it's my understanding that with respect to
15  gang affiliation, if there is information in the
16  system that would come up, or a conviction for
17  gang-related crimes, if it's in the system, it could
18  come up.
19     Q.   Looking a little further down that same
20  column, there's a question, "Can I extend the period
21  for which removal action will be deferred in my case."
22  And this is looking at the date before the first set
23  of renewals has come up; right?
24     A.   Correct, based on the date.
25     Q.   Yeah.  I don't know, nine months before the

Page 143

1    first set of renewals more or less.

2         A.  Uh-huh.

3         Q.  So the answer is "Yes.  Unless terminated,

4    individuals whose case is deferred pursuant to the

5    consideration of deferred action for childhood

6    arrivals, process will not be placed in removal

7    proceedings or removed from the United States for a

8    period of two years.  You may request consideration

9    for an extension of that period of deferred action.

10   You must also request an extension of your employment

11   authorization at that time."

12            Do you know what the purpose was for putting

13   the two-year renewal period in place?

14        A.  I don't recall other than it was set as two

15   years --

16        Q.  Okay.

17        A.  You mean the original; right?

18        Q.  Yeah.  So you don't know what the reasoning

19   was behind that period?

20        A.  I don't recall, but it was a two-year period

21   consistent for everyone.

22        Q.  And was the idea that every two years DACA

23   holders would have to go through these background

24   checks again, and if they passed that background

25   check, they were very likely to get a renewal of their

Page 144

1    DACA status?

2        A.  So with respect to your first question, would

3    they go through that background check process each two

4    years, yes, is the expectation or conduct.  And if

5    they met the qualifying criteria still, then it was

6    very likely that they would.  The qualifying

7    guidelines if I may point that out, yes.

8        Q.  If they met the qualifying guidelines of

9    DACA?

10       A.  Right.  For renewal.

11       Q.  And I think we talked about this perhaps a

12   little bit this morning.  Was it your understanding

13   that renewal was -- or the likelihood of renewal, if

14   you meet the criteria, was a critical aspect of this

15   program?

16       A.  Sorry.  Explain that again.  Sorry.

17       Q.  People would not sign up for this program and

18   volunteer their personal information but for the

19   prospect of likely renewal?

20           MR. GARDNER:  Objection.  Calls for

21   speculation.

22           THE WITNESS:  I can speak to the way that

23   initial was constructed, and that they had an

24   expectation that if they qualified, they would receive

25   it for two years.

Page 145

1   BY MR. DETTMER:

2        Q.  Right.

3        A.  I'm sorry.  Maybe I'm not understanding the

4   question.

5        Q.  Maybe I'm not asking a clear question.

6        A.  So that's the first time.

7        Q.  Right.

8        A.  Right.

9        Q.  So did you have a concern -- let me just ask

10  it about you -- when DACA was getting stood up that

11  unless there was a renewal process that people would

12  not sign up for the program?

13       A.  So I don't recall -- again, I wasn't helping

14  necessarily construct it; right?  I didn't recall

15  thinking that there was -- post the first two years, I

16  think we were all focused on how it would go the first

17  two years.  It's an understandable concern once, a

18  request.

19       Q.  Did you ever hear concerns about that voiced

20  by people in the legislature or their constituents,

21  that people who were, you know, coming through their

22  offices about that issue, about the likelihood of

23  renewal?

24       A.  So I cannot provide specifics, but yes,

25  generally.

1      Q.  So just so I'm understanding, you're saying

2  generally, you do recall that there were concerns

3  raised by legislatures by the public that they wanted

4  to know that renewal was something that was going to

5  happen?

6      A.  Was going to happen.  Within the time period

7  coming up to the first renewal, I recall there was

8  general concern.

9      Q.  Do you remember being concerned about how to

10  reassure legislators, people they're speaking for,

11  that that in fact was going to happen?

12      A.  So not -- well, so with respect to

13  reassurance to them, my understanding is that would be

14  on the basis of once we conducted the first renewal

15  period that that would provide the reassurance that

16  the renewal process would happen, if I understand the

17  question correctly.

18      Q.  Well, just --

19      A.  Sorry.

20      Q.  No.  No.  Maybe I'm not asking clear

21  questions.  But just so I understand you, what you're

22  saying is you thought that if the first renewal

23  process in 2014 went smoothly and people were renewed

24  in sufficient numbers, that that would give the

25  reassurance that people were looking for?

1          A.   Slightly different --

2          Q.   Okay.

3          A.   -- but a part, which is leading up to the

4    first renewal period, there was the question was it

5    initial only or would there actually be a renewal

6    process -- right? -- that was promised to be.   In

7    order to address concerns as to whether that

8    actually -- there would be a renewal process --

9          Q.   No.  No, I appreciate it.

10         A.   That there is to be a renewal process, the

11   reassurance is when renewals start to occur.  That's a

12   response that provides more reassurance.

13         Q.   Okay.  Fair enough.  I guess, would you agree

14   with me that this language that I just read in

15   Exhibit 11 about "Can I extend the period for which

16   removal action will be deferred," I mean that's an

17   instance of the USCIS, you know, giving assurances --

18         A.   Yes.

19         Q.   -- that it will happen?

20         A.   Yes.

21         Q.   All right.  Are you aware --

22         A.   Or could.

23         Q.   Are you aware of other ones as well?  Do you

24   remember?

25         A.   Likely, because these are not the only

Page 148

1    materials.  So...

2         Q.  And did you address that question about

3    renewals with people in the legislature in your job at

4    the time?

5         A.  Most likely.

6         Q.  Okay.  So there are a couple other items on

7    this Exhibit 11 I just wanted to ask you about.  The

8    next item down -- again, this is pre the first

9    renewal; right?

10        A.  Uh-huh.

11        Q.  "If USCIS does not exercise deferred action

12   in my case, will I be placed in removal proceedings."

13   Do you understand that question to be addressing the

14   concern that, you know, here I'm giving my personal

15   information to the people who are responsible for

16   removals, at least DHS generally; right?

17        A.  (Nods head.)

18        Q.  And so do you understand this to be

19   addressing the concern that DACA applicants may have

20   about "Am I just signing myself up to get removed here

21   if I sign up for this program"?

22        A.  That would be my understanding of one way to

23   advise on that process.

24        Q.  And the answer, as you see, is "If your case

25   does not involve a criminal offense, fraud, or a

1  threat to national security or public safety, your

2  case will not be referred to ICE for removal

3  proceedings except in exceptional circumstances."  Do

4  you understand that to be -- or to have been at the

5  time the policy of DHS for DACA?

6       A.  Yes.  Linked to what was said in our FAQs as

7  well.

8       Q.  Right.  Okay.  And just one more piece to

9  follow up on that.

10       A.  Sure.

11       Q.  On the last page, the last question there,

12  "What protections from disclosure are in place to

13  protect information I share in my request for

14  consideration of deferred action for childhood

15  arrivals from being used for immigration enforcement

16  purposes."  Sort of addressing a similar concern,

17  obviously?

18       A.  Right.  Right.

19       Q.  This concern, is this something that you

20  heard about from legislators in your role in the

21  office of legislative affairs?

22       A.  Yes.

23       Q.  Okay.  And what were the types of concerns

24  that you were hearing on this theme?  Was it common?

25       A.  I would say, "common," but again, it's across

Page 150

1    multiple, different questions across multiple topics

2    we received from the Hill.  So depending on the

3    parameters of common, yes, they would ask it.

4         Q.  What did you do in your job at the office of

5    legislative affairs to address that concern?

6         A.  I can speak to that generally and not

7    specifically.

8         Q.  Sure.

9         A.  So generally, with respect to process, the

10   role of the office of legislative affairs is to

11   provide information about our policies and procedures

12   as I explained.

13            So then for the second would be, again, to

14   provide the specific references and information, point

15   people to that, members of Congress and their staff.

16        Q.  Such as this question and answer here as an

17   example?

18        A.  As an example, and our FAQs.

19        Q.  Okay.  And in your experience in that job,

20   did that information that you provided reassure the

21   legislators and their staffs?

22        A.  To the extent that they read, reviewed, and

23   agreed, understood.  You know, we can only provide the

24   information.  We can't speak to their confidence level

25   or belief, but we would provide it to demonstrate that

Page 151

1   we have answered that question.

2        Q.  And I understand you had a number of

3   conversations on that topic.

4        A.  And DACA generally.

5        Q.  And DACA generally.  Did you get feedback

6   from the people that you're talking to that this was

7   helpful, satisfactory, or not?

8        A.  I would say helpful within limits.  You know,

9   it depends which member of Congress was either

10  concerned about the information being protected or a

11  member of Congress that was concerned that information

12  would be precluded from review as well.  That

13  clarifies.

14       Q.  So you had -- what you're saying is you had

15  some members of Congress that were saying, "We need

16  assurance that this information is not going to be

17  used for enforcement purposes."  You had other members

18  of Congress saying, "Why aren't we using this for

19  enforcement purposes"?

20       A.  Correct.  535 opinions.  Maybe not quite that

21  many, sorry.  But yeah, many.

22            MR. DETTMER:  All right.  I'll ask the court

23  reporter to mark this as Exhibit 12.

24            (Deposition Exhibit 12 was marked for

25            identification.)

Page 152

1    BY MR. DETTMER:

2        Q.   Exhibit 12, for the record, is a fairly

3    lengthy document.  It has a table of contents on the

4    front page.  It says, "Program Overview, DACA, How Do

5    I Guide Initial Versus Renewal, DACA Tip Sheet," and

6    then it goes on.

7            Do you know what this document

8    is, Mr. McCament?

9        A.   Yes.

10       Q.   What is it?

11       A.   It appears to be the package of information

12   providing the overview on the program and the various

13   materials that we utilized to discuss and present the

14   program.

15       Q.   Okay.  I see a couple places in here.  Dates.

16   June 2014, if that helps you to place this in time.

17       A.   Uh-huh.

18       Q.   Would you have had any part in putting this

19   document together?

20       A.   I believe so.

21       Q.   What would your role have been?  Let me ask

22   it differently.

23            Do you remember helping to put this together?

24       A.   So I remember seeing perhaps not all of this,

25   but most of this information as part of promotional

Page 153

1    materials in which the office of legislative affairs

2    would have a review role.

3         Q.   Okay.  And when you say, "promotional

4    materials," can you explain that?  What does that mean

5    exactly?

6         A.   I think that's a misstatement on my part.

7    "Promotional" may sound a bit different.  The

8    presentation of the information regarding the DACA

9    program.

10        Q.   Okay.

11        A.   And so you have listed all of the

12   information, the frequently asked questions by topic,

13   how do I, et cetera, all that's listed out.  So,

14   again, answering the questions, putting them on our

15   website, making sure people are -- have access to that

16   information.

17        Q.   So these documents -- I see on Page 3 there's

18   a notation of the "DACA toolkit."  Have you heard that

19   phrase?

20        A.   Yes.

21        Q.   Do you know how this package was

22   disseminated?

23        A.   I believe so.

24        Q.   You mentioned the website.  Were there other

25   ways as well?

Page 154

1      A.  If I recall correctly, back in 2014 at the

2  time of renewal, this also would have been packaged

3  and provided by our customer service and public

4  engagement team, or our public engagement to provide

5  out to the public.

6      Q.  Okay.  And do you know whether the public

7  engagement team had sort of a plan for how it was

8  going to be disseminated?  Did they have groups they

9  sent it to, places where it would be most -- did they

10  try to get as much exposure as they could to this?

11          MR. GARDNER:  Can we get sort of one

12  question --

13          THE WITNESS:  Happy to answer.  Can you just

14  sort of --

15  BY MR. DETTMER:

16      Q.  Sure.  Do you know, did the office of public

17  engagement have a plan for maximizing the exposure of

18  the public to this document?

19      A.  Yes, to providing that information, as with

20  all of our programs or benefits where we need to

21  provide to try to provide it broadly.

22      Q.  And do you know -- well, how much do you know

23  about that plan?

24      A.  That it is, as I recall, fairly reflective of

25  how we work with other -- speak to our other programs

                                                    Page 155

1    publicly.

2        Q.  Did USCIS partner with, for example, advocacy

3    groups to ensure that these were more broadly

4    disseminated?

5        A.  Yes, as I recall, as it was a toolkit for

6    information dissemination.

7        Q.  Okay.  So the "How Do I" guide in this

8    Exhibit 12 is, I guess, an updated version of what we

9    just looked at in Exhibit 11; right?

10       A.  I believe so.

11       Q.  And you'll see some of the same questions and

12   answers that we looked at in Exhibit 11 are also in

13   this version of the, "How Do I"; right?

14       A.  It appears.

15       Q.  At the end of it there's, again, the

16   statement that the information -- I'm looking at --

17   gosh, there's not a page number.  The last page of the

18   "How Do I"?

19       A.  Uh-huh.

20       Q.  There's a statement that, "The information

21   you provide in your request is protected from

22   disclosure to U.S. Immigrations and Customs

23   Enforcement, or ICE, and U.S. Customs and Border

24   Protection, CBP, for the purpose of immigration and

25   enforcement proceedings unless you meet the criteria

Page 156

1    for an issuance of a notice to appear or referral to
2    ICE under criteria explained in UC ICE's notice to
3    appear guidance."  You understand that to be the
4    policy at the time; right?
5         A.  Yes.
6         Q.  And still the policy today?
7         A.  That's my understanding, yes.
8         Q.  So I want to direct you to Page 8 of this
9    document.  At the top it says, "Frequently Asked
10   Questions."
11        A.  Uh-huh.
12        Q.  Are these the FAQs you're referring to?
13        A.  I believe so.
14        Q.  Okay.
15        A.  I mean it appears.
16        Q.  At least as of that time?
17        A.  As of that time, yes.
18        Q.  At the beginning of that part of this
19   document it says, "What is deferred action for
20   childhood arrivals," and I'll just read it.  "Over the
21   past several years this administration has undertaken
22   an unprecedented effort to transform the immigration
23   enforcement system into one that focuses on national
24   security, public safety, border security and the
25   integrity of the immigration system."

Page 157

1           Based on your experience at the time at

2    USCIS, is that consistent with your understanding at

3    the time?

4         A.   Of the perspective of the administration?

5         Q.   Yeah.

6         A.   That's my understanding of the perspective of

7    the administration, yes.

8         Q.   How about USCIS?

9           MR. GARDNER:   Objection.   Calls for

10   speculation.

11   BY MR. DETTMER:

12        Q.   How about you, yourself?   Was that consistent

13   with your understanding of what was happening at the

14   time?

15        A.   So my understanding, my view, observation,

16   was the administration was undertaking an effort to

17   transform the immigration system, really the way each

18   administration does, and they will then delineate what

19   they wish to focus on.   And so I think that's -- when

20   they were focusing on those points, I wouldn't

21   disagree with the administration's perspective on

22   that, but every administration reviews the immigration

23   system.

24        Q.   In your view, was DACA -- did DACA further

25   those goals in that sentence that I just read?

Page 158

1          A.   So in my view, in part.

2          Q.   Can you elaborate?

3          A.   Sure.  So 1, DACA, as the request for

4    deferred action, as you have asked, allowed people who

5    did not have either a status or a benefit or an action

6    of deferred action to receive that, No. 1.

7               No. 2, that then allowed them, if they

8    qualified, to receive an employment authorization

9    document, which meant that they were then able to be

10   part, for that parameter of time under that grant for

11   two years, to be within the immigration system.

12              So for those purposes I would say it brought

13   them into the immigration system instead of being

14   outside of the immigration system, however people may

15   view that.  But they were now able to participate

16   rather than being what would have been referred to as

17   being in the shadows or other phrases that are used.

18         Q.   And you yourself, based on your experience,

19   you see that as a benefit?

20         A.   A benefit from the step of, as was reflected

21   in our own testimony, from the step of not having any

22   ability to work or be in the system.  Again, for two

23   years, that's a step.  It's not a permanent one, and

24   statutorily is the only way to change that to become a

25   real -- to become a long term immigration status

Page 159

1    versus an action, a deferred action.

2        Q.  And just to be clear, two years renewable,

3    obviously?

4        A.  Yes.  No guarantees, but certainly within

5    those two years.

6        Q.  Right.  And did you also see DACA as a

7    benefit for USCIS, for DHS as far as bringing order to

8    the immigration system?

9        A.  A good question.  It had several facets to

10   that, I think.  So first it added operational workload

11   to the agency.

12       Q.  Processing the application?

13       A.  Processing among millions of requests or

14   benefits already.  That requires more complexity of

15   management, neither pro nor con, but it just adds to

16   the workload.  It did address a segment of a

17   population that, as was laid out, did not seem to have

18   any other step.  Let me rephrase that.

19           Those requesters for DACA based upon

20   Secretary Napolitano's memo, there were parameters,

21   but it did mean those requesters who met those

22   parameters could now come into the system, as I said

23   earlier.  To me, I think that then allowed -- I'm not

24   so sure if it's a benefit to DHS per se, but it

25   brought another group of people into the legal

Page 160

1    immigration system.  I think that's a benefit, though

2    it was a limited one, and I shouldn't say -- let me

3    qualify, not the benefit but the request and receiving

4    DACA brought them into the system.

5         So I think that was a benefit, to have a

6    portion of the population that previously was not, was

7    able to now participate.  So that was sort of a broad

8    goal in the immigration system.

9         Q.  Okay.  Let me ask you to flip forward in the

10   same document, Exhibit 12, Page 20.

11        A.  Sure.

12        Q.  This is still, I believe, the FAQs.

13             (The witness reviewed Exhibit 12.)

14   BY MR. DETTMER:

15        Q.  If you look at the right-hand column under

16   "Renewal of DACA," it says, "USCIS encourages you to

17   submit your request for renewal approximately 120 days

18   or four months before your current period of deferred

19   action under the DACA process expires."

20             Do you remember USCIS sending reminder

21   notices to DACA holders to renew, send in their

22   renewal application?

23        A.  Yes, I do.

24        Q.  What do you remember about that?

25        A.  So I remember notices being sent out.  I

Page 161

1  think this would have been 2014.  So we sent them out.

2  I don't remember all the parameters, but I think it

3  was around the 150 days or so prior.

4       Q.  And do you remember that being a consistent

5  practice of USCIS all the way through the rescission?

6       A.  I think it was with a couple of parameters.

7  1, I don't know when it actually began.  I mean, in

8  other words, the reminder for renewal probably was

9  around this time that it started since there had been

10  initials before.

11       Q.  Right.

12       A.  No. 2, we did adjust, if I recall correctly,

13  and it was fairly recently.  So we sent renewal

14  notices from our system, the CLAIMS 3 system, when

15  CLAIMS was still managing the DACA processing.  When

16  it went into a different system, I think it was

17  sometime in the -- probably -- I think it was this

18  summer, we stopped sending those notices out, but we

19  had not been sending them out.  So sorry it got so

20  complicated.

21            So they were processed in CLAIMS 3, but DACA

22  since 2016-ish, early, has been processed in our Ellis

23  system, another electronic system.  And I don't

24  believe we sent notices out from Ellis.  We did send

25  them out from CLAIMS.  And so I think it was in late

1    spring, early summer -- it was early summer, I think,

2    where we stopped sending them from CLAIMS now that all

3    of the DACA notices are processing as occurring in

4    Ellis.  A lot of acronyms, sorry.

5         Q.  But the upshot being --

6         A.  But the upshot -- sorry.

7         Q.  Go ahead.

8         A.  So the notices were sent around the time in

9    the 2014, I think, when the first would have been sent

10   until recently were sent out in early summer, I think.

11        Q.  So you think the last ones were sent early

12   this summer?

13        A.  I believe the last ones were sent in July.

14        Q.  And do you know why they stopped in -- July

15   of '16?

16        A.  July of '17.

17        Q.  Do you know why they stopped then?

18            MR. GARDNER:  Objection.  You can answer that

19   question with a "yes" or "no," but I think the inquiry

20   into that, again, is implicating deliberative process

21   privilege.  So you can answer that "yes" or "no."

22            THE WITNESS:  Yes.

23   BY MR. DETTMER:

24        Q.  Was there discussion -- you don't need to

25   give me the substance of it, but was there discussion

Page 163

1    of DACA rescission in July of this year?

2        A.  Within USCIS or DHS?

3        Q.  Yeah.

4        A.  Not that I recall.

5        Q.  Do you remember who made the decision to stop

6    sending renewal notices out?

7        A.  So it was an operational decision based upon

8    the transition from the CLAIMS 3 printing mechanism to

9    a different printing mechanism, and that construction,

10   as I recall, wasn't programmed in because it was going

11   to be very complex and costly to do so.

12           MR. GARDNER:  In light of that testimony,

13   feel free to proceed.  I thought this was going

14   somewhere slightly differently.

15   BY MR. DETTMER:

16       Q.  So what you're saying is there was some

17   technical reason, based on the changeover of the

18   systems, that it became complicated to send renewal

19   notices from the new system?

20       A.  To program it into the new system.

21       Q.  And so the decision was made that they just

22   wouldn't be sent anymore?

23       A.  They would not be issued out, printed and

24   mailed out.

25       Q.  Do you know who made that decision?

Page 164

1        A.   I think it was at least in part, as I recall,

2    it would have been within the service centers.

3        Q.   Okay.  Was there an effort made to figure out

4    how to send them out with this new system and it just

5    was too complicated?  How did that work?

6        A.   So what I recall -- and I don't recall all

7    the specifics.  I know it was fairly recent, but it

8    was a mechanical.  So we switched from how we were

9    previously printing the CLAIMS 3 system over to a new

10   electronic print management system.  It was going to

11   be very complicated, and I can't go into all the

12   technical.  I don't understand it all either.

13          But to be able to transition over was going

14   to be very complicated to sort of build that new

15   module and put it in.  So it was not built into the

16   claims, also knowing that most -- since February of

17   '16, the DACA renewal, the cases request were put in

18   the Ellis systems.  So those were just being ingested

19   there.  There really wasn't as much of a need before.

20          Beyond that, I can't recall the technical

21   specifics or if I knew that.

22       Q.   Why was there no need anymore?  Maybe I'm

23   just not understanding what that --

24       A.   So as I understood, the claims system -- I

25   hope I'm explaining it well, but the claims system

Page 165

1    that processed prior, when they were switching over to

2    how to print the centralized electronic printing

3    module, as I recall, the comment was, and discussion

4    was that it was going to be too costly to put in a new

5    module.  So the last notification went out in July, I

6    think, for the 180 days out, or I think it was for

7    180 days out, and then I don't recall conversations

8    about the next steps.  I think that's to your

9    question.

10        Q.  Yeah.

11        A.  So that was sometime in July those reminder

12   notices were sent out, and then the rescission

13   occurred in September.  So -- but as far as -- I'm

14   sorry.  I was trying to recall if there were any other

15   technical discussions on that.

16        Q.  So do you know, were there any renewal

17   reminder notices sent out between July and September?

18        A.  I don't believe so.  So the switchover -- so

19   the last transmit of reminder notices went out in

20   July, and I don't believe any went out in August --

21        Q.  And to your understanding --

22        A.  -- to my understanding.

23        Q.  Well, sure.  But as far as you know, that set

24   of facts doesn't have anything to do with the

25   rescission itself, the decision to stop sending

Page 166

1    renewal notices in July?

2         A.   Not for the specific recession notice.   And I

3    don't recall it.   I mean there could have been

4    discussion or perception of -- with the attorney

5    general at the end of June, but it was a mechanical

6    decision as to why the switchover was happening with

7    the notices.   So they went out in July, and then it

8    would be maybe rescinded in September.

9              So I'm not trying to delink or link.   I'm

10   just saying the next notices would have gone out

11   probably at the end of August or the beginning of

12   September.   Then rescission happened.

13        Q.   So there was tranche sent out once a month.

14   It wasn't like a continuous thing?

15        A.   They were sent out regularly.   I believe they

16   were sent out almost daily.   I think the last ones

17   were sent out near the end of July, middle or end of

18   July.

19        Q.   Okay.   Okay.   I'm going to ask you to flip to

20   the next page of this document.   So it's Page 21 of

21   Exhibit 12.

22        A.   Sure.

23        Q.   In the bottom of the right-hand column it

24   says, "If my case is deferred under DACA, will I be

25   able to travel outside the United States."

Page 167

1           It says, "Not automatically.  If USCIS has
2    decided to defer action in your case and you want to
3    travel outside the United States, you must apply for
4    advance parole by filing a certain form and paying a
5    fee."
6           That's something that somebody without DACA
7    can't do; right?  An undocumented person without DACA
8    can't apply for advance parole.
9       A.  It's my understanding an undocumented
10   person -- there are other options for advanced -- I
11   mean people can request parole, not undocumented.
12      Q.  So one of the benefits to an undocumented
13   person receiving DACA status is that they're eligible
14   for advanced parole?
15      A.  If eligible under the parameters guideline.
16          MR. GARDNER:  I don't want to break your flow
17   at all.  We've been going for about an hour.  Would
18   now be a good time to take a break?
19          MR. DETTMER:  Sure.  We can take a break.
20          THE VIDEOGRAPHER:  We are going off the
21   record at 2:38 p.m.
22          (A recess was taken from 2:38 p.m.
23          to 2:49 p.m.)
24          THE VIDEOGRAPHER:  We are back on the record
25   at 2:49 p.m.

1    BY MR. DETTMER:

2        Q.  Before the break we were talking about the

3    cessation of the renewal notices going out in July.

4        A.  Yes.

5        Q.  And you mentioned that there may have been a

6    discussion or perception with the attorney general's

7    letter at the end of June in connection with that.  I

8    just wasn't 100 percent clear on your testimony.

9            You remember Paxton's letter came out --

10       A.  Right.  At the end of June.

11       Q.  I don't remember exactly, end of June 2017.

12       A.  Uh-huh.

13       Q.  And do you remember discussions on the topic

14   of that letter in connection with the cessation of

15   renewal notices going out?

16           MR. GARDNER:  You can answer that question

17   with a yes or no.  I think the content of that would

18   be deliberative.  The content of those conversations.

19           THE WITNESS:  I don't remember, no.

20   BY MR. DETTMER:

21       Q.  You don't remember one way or the other?

22       A.  No.

23       Q.  So as I understand your testimony, there was

24   this technical issue that would make it very expensive

25   to switch over how the notices are going out?

1      A.   Right.

2      Q.   And that happens in July?

3      A.   To not switch them over to not -- the end of

4 the last notices was in July, of those notices in

5 July.

6      Q.   So is it right that you -- "you" meaning you

7 and USCIS -- were aware of this technical problem

8 coming up before July?

9      A.   Though not what I would view as a technical

10 problem.  It was switching over to a different

11 system -- or a different printing queue in the system.

12     Q.   Fair enough.  So you were aware of the fact

13 that -- before July, you were aware of the fact that

14 it was going to be very expensive to keep sending out

15 notices?

16     A.   To make the switchover is what I recall, as

17 part of many operational issues on many things.

18     Q.   So there was sort of a cost benefit analysis

19 of it's going to cost "X" amount to keep sending these

20 out, and a decision is made not to do it?

21     A.   That's what I recall.

22     Q.   Okay.  And do you recall the Texas attorney

23 general's letter being part of the mix of that

24 conversation?

25          MR. GARDNER:  Objection.  Vague.

1        THE WITNESS:  So if I may, you had earlier

2    asked about if a decision on rescission or generally

3    knowledge about rescission, and as I recall -- it may

4    not be what came out in the testimony, but what I

5    recall is stating that we were aware that the Texas

6    attorney general's letter, which called for a

7    wind-down or rescission.  I just don't recall in

8    connection with deciding to end the notices that that

9    was a factor discussed.  It might have been

10    referenced.  I genuinely don't recall.

11    BY MR. DETTMER:

12        Q.  So it may have been.  May not have been.  You

13    don't remember?

14        A.  Right.  But it wasn't with respect to the

15    rescission, it's going to end by -- it was the

16    technical issue, the point of the cost of switching

17    over and moving that was the reasoning.

18        Q.  I'm not sure I ever got a clear answer to

19    this question.  It may just be that I don't remember.

20        A.  Sure.

21        Q.  Who was the final decision maker on the

22    question of "Are we going to switch over to this new

23    system and keep sending out notices or not"?

24        A.  So what I recall -- it was not a large issue

25    at the time in that spring, summer, you know, to July

Page 171

1    as it would have ultimately been an operational

2    decision within the service centers -- service center

3    operations.

4        Q.  So would that be, like, the head of service

5    center?

6        A.  I believe it was Don -- it may have been --

7    it may have been discussed with us, with myself.  I

8    didn't remember it at the time.  I don't remember

9    that, but administering for the service centers,

10   around 4 million applications and making changes in

11   the system, I didn't recall that.

12       Q.  Okay.

13       A.  Hopefully, that's clear with respect to the

14   operational side.

15       Q.  I think so.  You don't remember being the

16   decision maker on that issue of whether or not to keep

17   sending notices out?

18       A.  I don't remember that.

19       Q.  Okay.

20       A.  I don't recall that.  But yeah.

21           MR. DETTMER:  All right.  Let me show you,

22   this has been marked as Exhibit 13.

23           (Deposition Exhibit 13 was marked for

24           identification.)

25           MR. DETTMER:  This is going back in time a

Page 172

1    little bit again.

2            So this is a two-page document from USCIS's

3    website, and it's got USCIS's crest and title at the

4    top.

5            THE WITNESS:  Right.

6            MR. DETTMER:  And the title of document is

7    "Don't Let Your Work Permit Expire.  Follow These DACA

8    Renewal Tips."  And it says at the bottom, "Last

9    reviewed" -- the "bottom" meaning the end of the

10   document on the second page.  "Last review, updated

11   6-5-2015."

12       Q.  I want to direct your attention to the bottom

13   of the first page.  It says, "Since March 27, 2015

14   USCIS has been mailing renewal reminder notices to

15   DACA recipients 180 days before the expiration date of

16   their current period of deferred action.  Previously

17   these reminder notices were mailed 100 days in

18   advance.  The earlier notices are intended to ensure

19   that DACA recipients are reminded before the start of

20   the recommended renewal period and have sufficient

21   time to prepare their renewal requests."

22           Do you see where I read that?

23       A.  I do.

24       Q.  Do you remember that switchover happening?

25       A.  From 2015 on?

Page 173

1        Q.   Yeah.   The change in time period of the

2   renewal notices.

3        A.   I do.   I think I generally recall when that

4   was expanded.

5        Q.   And is the description here of the reason for

6   that change consistent with your recollection of why

7   that change was made?

8        A.   With respect to reminded before the start of

9   recommended renewal period, and then sufficient time

10   to prepare the renewal requests?

11        Q.   Yeah.   To ensure -- as the document says, "To

12   ensure that DACA recipients are reminded before the

13   start of the recommended renewal period and have

14   sufficient time."

15        A.   That's my recollection in the discussions.

16        Q.   And it was important in those conversations

17   to the folks at USCIS making the decision that DACA

18   applicants have sufficient time to do their renewals.

19        A.   Yes, and I'd add, if I may --

20        Q.   Please.

21        A.   -- that as I recall, that also came from

22   engagement with the public and the advocacy community

23   requesting, I think, or at least coming from

24   conversations leading to a decision by the leadership

25   at the time to expand the notification.

Page 174

1          Q.   So just so I'm clear on what you're saying,

2     it was a reaction to sort of a request by the advocacy

3     community?

4          A.   And the general public.  So that's what I

5     recall is as part of the monitoring working with

6     respect to DACA or other requests for benefits, the

7     decision was made to expand that.

8               MR. DETTMER:  Got it.  Okay.

9               (Deposition Exhibit 14 was marked for

10              identification.)

11              MR. DETTMER:  This has been marked as

12    Exhibit 14.

13         Q.   Exhibit 14 is, again, something printed from

14    USCIS's website, and it is a 20-page document.  Title

15    is "Frequently Asked Questions."  So this is another

16    version of the FAQs that we were talking about

17    earlier; right?

18         A.   Yes, with the actual numbers --

19         Q.   Okay.

20         A.   -- I believe, yes.

21         Q.   Yep.

22              And you're familiar with this document?

23         A.   I'm familiar with as we've had the FAQs over

24    the years, yes.

25         Q.   Okay.  Do you -- did you have a role in

                                        Page 175

1    writing, revising these FAQs?

2         A.   So yes, in part.

3         Q.   Okay.   Can you explain what your role was?

4         A.   Sure.   As far as I recall, there's a

5    background piece to the FAQs, and then there's with

6    respect to your drafting question.   I'd like to

7    provide both first with background.

8         Q.   Okay.

9         A.   The guidelines for DACA were set out as

10   frequently asked questions, instead of regulation or

11   some -- instead of regulation per se.   So the

12   frequently asked questions were drafted at the start

13   of the launch of DACA.   I'm sure they were ready by

14   August of 2015.   I believe there may have been some

15   adjustments over time and with respect to being aware

16   that those were being drafted and as part of the head

17   of legislative affairs, I certainly recall seeing

18   them.

19             So the second part is just I recall being in

20   some of the discussions.   I don't really recall what I

21   contributed because as the head of legislative

22   affairs, that wasn't an operational role.

23        Q.   Okay.   So is what you're saying that as the

24   people responsible for drafting or revising these

25   frequently asked questions would go through that

Page 176

1    process, they may come and ask you, "What do you think

2    about this" or get some input on that?

3         A.  Or within the DACA working group, be

4    elevating those up for the front office leadership or

5    others to review.  That's why I don't want to over or

6    understate the role.

7         Q.  I appreciate that.  You don't have any

8    specific recollection of commenting on any particular

9    aspects of this document?

10        A.  I don't recall commenting on specific

11   iterations.  It's over five years.

12        Q.  Sure.

13        A.  So --

14        Q.  Do you remember any specific subject matter

15   that you weighed in on regardless of when it might

16   have happened?

17        A.  I don't recall weighing in specifically, and

18   as I understand that, meaning sort of writing the

19   question or influencing, I don't recall that.  USCIS

20   does a lot of work on different topics, including

21   guidelines at times or guidance documents.

22        Q.  So let me ask you about a specific -- if

23   you'll look at Page 4 of this document, the numbers

24   are at the bottom right-hand corner.  It says, "4/20."

25        A.  Uh-huh.

Page 177

1          Q.  Question 9 says, at the bottom of the page,

2     "If individuals meet the guidelines for consideration

3     of DACA and are encountered by U.S. Customs and Border

4     Protections, CBP or U.S. Immigration and Customs

5     Enforcement, ICE, will they be placed into removal

6     proceedings?"

7               Answer 9, "DACA is intended in part to allow

8     CBP and ICE to focus on priority cases.  Under the

9     direction of the Secretary of Homeland Security, if an

10    individual meets the guidelines for DACA, CBP or ICE

11    should exercise their discretion on a case-by-case

12    basis to prevent qualifying individuals from being

13    apprehended, placed into removal proceedings or

14    removed.  If individuals believe that in light of this

15    policy they should not have been apprehended or placed

16    into removal proceedings, contact the Law Enforcement

17    Support Center's hotline," and then it gives the phone

18    number, 855- -- I won't read it -- "staffed 24 hours a

19    day, seven days a week."

20               Do you see where I read that?

21         A.  I do.

22         Q.  Now, are you familiar with Law Enforcement

23    Support Center's hotline?

24         A.  I'm not.  I haven't dialed it or -- no.

25         Q.  Is that something that's run by DHS?

Page 178

1        A.  I actually don't know.

2        Q.  Okay.

3        A.  I know that there is a Law Enforcement

4   Support Center hotline.  I'm not sure who the -- who

5   runs it per se or how it feeds into other --

6        Q.  Do you know whether it's still up and

7   running?

8        A.  As I don't know, candidly, who operates it, I

9   don't know whether it's still up and running or not.

10       Q.  Are you aware that at least, you know, before

11  recently, that DACA holders who had been apprehended

12  could call that number and be released?

13           MR. GARDNER:  Objection.  Vague.

14           THE WITNESS:  So I'm aware that because it's

15  in the FAQ that they could call.  I'm not aware of the

16  proceedings after that.  So what comes from that.

17  BY MR. DETTMER:

18       Q.  Okay.  So you don't know one way or the other

19  what happened as a result of --

20       A.  I don't.  I do not.

21       Q.  Okay.  Do you know whether it was intended,

22  as a matter of policy, that DACA recipients or people

23  who meet the guidelines for consideration were

24  supposed to be able to get out of removal proceedings

25  by calling that phone number?

1          A.   I'm sorry.  Can you ask the question again?

2     I was looking down at the answer, the FAQ as you were

3     asking the question.  I think I may have processed it.

4          Q.   And I guess what I'm getting at is obviously,

5     the FAQs say that individuals who, in light of the

6     DACA policy articulated in this Answer 9 who are --

7     believe they should not have been apprehended or

8     placed into removal proceedings on account of the fact

9     that they meet the standards for DACA --

10         A.   Right.

11         Q.   -- it was the intent of USCIS that they be

12    able to call this phone number and be able to get

13    relief from that; is that correct?

14         A.   It was the intention that -- my

15    understanding, not having focused on this part over

16    the years, but that they would be able to, as noted,

17    look at the qualifications and meet the guidelines,

18    and if they have been -- based on the last sentence,

19    they've been apprehended or placed in removal

20    proceedings, they could contact the Law Enforcement

21    Support Center for potential relief.

22              I just can't speak to sort of how that -- the

23    next steps from there or how relief was redressed or

24    possibly --

25         Q.   You don't know one way or the other?

```
                                              Page 180
 1         A.  I do not.
 2         Q.  Do you know whether the Law Enforcement
 3   Support Center sits in the DHS org chart?  We can go
 4   back to the exhibit if that helps.
 5         A.  I do not know where it's located.  And given
 6   the role of USCIS, it's not on the law enforcement
 7   side per se.  So I do not want to misspeak.
 8         Q.  Sure.  So I just point out, and I think I
 9   know the answers.  If you look at the next page of
10   this same exhibit, Page 5, Questions 13 and 14 are
11   very similar.  13 says, "If I am about to be removed
12   by ICE and believe I meet the guidelines for
13   consideration of DACA, what steps should I take?"
14              And the answer is, "You should immediately
15   contact the Law Enforcement Support Center's hotline."
16              And similarly, Question 14 asks the same
17   question, "If I've been issued an ICE detainer
18   followed by an arrest by a state or local law
19   enforcement officer," and the same guidance is given.
20         A.  Yes.
21         Q.  And I take it your answer is the same.  You
22   see that in here and you see that that's a
23   recommendation that's given to people who are eligible
24   for DACA or who are on DACA?
25         A.  Yes.
```

Page 181

1       Q.  But you're not sure exactly how that actually

2   worked in practice?

3       A.  I do not know, and I don't want to misspeak.

4       Q.  Okay.  So let me ask you to turn to Page 16

5   of this same exhibit, 14.  Question 51 at the top of

6   that page asks how -- I'm sorry.  I'll wait for you to

7   get there.  Don't mean to rush you.

8       A.  Question?

9       Q.  51.

10      A.  Yes.

11      Q.  "How will USCIS evaluate my request for

12  renewal of DACA?"

13          The answer is "You may be considered for

14  renewal of DACA if you meet the guidelines for

15  consideration of initial DACA and you did not depart

16  the United States on or after August 15, 2012 without

17  advance parole, have continuously resided in the

18  United States since you submitted your most recent

19  request for DACA that was approved up to the present

20  time, and have not been convicted of a felony,

21  significant misdemeanor, or three or more misdemeanors

22  and do not otherwise pose a threat to national

23  security or public safety."

24          Now, do you know what the percentages are of

25  people who applied for renewal who actually received

Page 182

1    it?

2            MR. GARDNER:  Object- --

3    BY MR. DETTMER:

4        Q.  Do you know how common that is?

5            MR. GARDNER:  Sorry.  Objection.  Vague as to

6    time frame.

7            THE WITNESS:  As far as overall approval rate

8    for renewal?

9    BY MR. DETTMER:

10       Q.  Yeah.

11       A.  I probably do know.  I just don't recollect.

12       Q.  Can you ballpark it?

13       A.  I'm sorry.  I'm just blanking.

14       Q.  I was going to say, I don't mean it to be a

15   memory test.  I actually brought some data that you

16   can look at.

17       A.  Sure.  Yep.  Happy to.

18       Q.  All right.  Great.

19       A.  We're dealing with a lot of numbers.  So I

20   really don't want to speculate.

21           (Deposition Exhibit 15 was marked for

22           identification.)

23           MR. DETTMER:  I'm showing you Exhibit 15.

24   And I apologize.  We actually have blown-up versions

25   of this, if that's helpful.  It's hard for me to read

```
                                           Page 183
 1    too.
 2             Do you want the blown up version?  It's kind
 3    of huge.
 4             MR. GARDNER:  No.  Thank you for asking.
 5             THE WITNESS:  I think I'm all right, but I
 6    may reserve that.
 7             (The witness reviewed the documents.)
 8    BY MR. DETTMER:
 9         Q.  While you're looking at that --
10         A.  Yes.
11         Q.  -- Exhibit 15 is a two-page document.  It's
12    printed off of the website for USCIS.  And it says, at
13    the top, "Request by" -- I'm sorry.  "Number of
14    Form I-821D Consideration of Deferred Action for
15    Childhood Arrival by Fiscal Year, Quarter, Intake,
16    Biometrics and Case Status Fiscal Year 2012 through
17    2017, June 30."
18         A.  Uh-huh.
19         Q.  So am I correct that this basically is the
20    data for, you know, the measured categories here for
21    the DACA program up through June 30 of this year?
22         A.  Yes.  That's what it appears to reflect.
23         Q.  And this is data that USCIS keeps track of?
24         A.  Yes.
25         Q.  Okay.  I should say these are data, to be
```

                                                    Page 184

1    precise.

2             So if you look at sort of in the middle of

3    the chart on the first page, there's a line that says,

4    "Total Cumulative Renewal."  Do you see that?  It's

5    just above the shaded line --

6        A.  Sorry.  I was looking on the wrong side.

7    Yes.

8        Q.  Okay.  And am I reading this right that those

9    numbers there are, you know, all of the renewal

10   numbers reported for the whole period of the DACA

11   program through June 30 of this year?

12       A.  I believe that's correct based on how the

13   table is structured.

14       Q.  Okay.  And so the first numbered column there

15   says, "Requests Accepted."  That's renewal requests;

16   right?

17       A.  So it actually has "Requests Accepted."  I

18   believe it's both cumulative, initial cumulative,

19   renewal.  I mean at the bottom tabulates that; right?

20       Q.  Yes.

21       A.  So I believe that's requests since it begins

22   with 2012.  It would be initial on renewal.

23       Q.  Well, there are two lines; right?  There's a

24   "Total Cumulative Initial" line and there's a "Total

25   Cumulative Renewal" line?

```
                                          Page 185
 1        A.   Yes.
 2        Q.   And so those would be, I assume, separate;
 3   right?
 4        A.   Yes.  That's broken out by initial and
 5   renewal.  Sorry.  Now I understand your question, yes.
 6   I was looking at 2012 and 2013, which, of course,
 7   would have been the initials at the time.  That's why
 8   there wouldn't be an initial renewal.
 9        Q.   So if you look at the line item in the middle
10   that says, "Total Cumulative Renewal," that would, I
11   think, give you the figures for how many renewal
12   applications were accepted, how many were approved,
13   how many were denied; right?
14        A.   Yes.  That appears, yes.
15        Q.   So if you look at the columns there's a
16   "Requests Accepted," "Requests Rejected," "Total
17   Requests Received."  And the total requests received
18   is, roughly, 1,045,000?
19        A.   Yes, it appears.
20        Q.   Okay.  And then accepted is almost -- let's
21   see, 963,443, and rejected is 76,824.  Do you know
22   what that means in that context, you know, accepted
23   and rejected.  Would "rejected" mean there was some
24   kind of clerical error in the application?  Do you
25   know what that refers to?
```

1      A.  So I believe that refers to -- and I think

2   there are also the footnotes here as well.  So if you

3   look -- so as far as the requests rejected -- I may

4   have to borrow your chart.  I think it says 3.  Right.

5   So we can cross reference.

6      Q.  Sure.

7      A.  So requests rejected, Footnote 3 notes the

8   number of requests rejected at a lockbox during a

9   period.

10      Q.  And so I guess my question is does that mean

11   to you that it was rejected for sort of a clerical

12   reason.  It wasn't signed or it didn't come with a

13   fee, as opposed to on the merits, so to speak?

14          MR. GARDNER:  Objection.  Compound.

15          THE WITNESS:  Could you break it apart?

16   BY MR. DETTMER:

17      Q.  Well, let me just ask it a different way.

18   What does "rejected" mean in that context of that

19   column?

20      A.  So rejected at the lockbox.  There could be

21   several reasons that it would be rejected at the

22   lockbox.

23      Q.  Can you identify them?

24      A.  Certainly one would be the fee not being

25   attached.

Page 187

1          Secondly, and I believe there's several

2     identifying criteria, that if they were not included

3     in the -- in the what's received at the lockbox, that

4     it would be rejected and sent back.  I can't at this

5     point recall the whole list, but there are several

6     factors.  So in addition, I think if they didn't

7     include their name, if they didn't include, I think

8     their address, so on the actual form right, for

9     whatever reason, I believe -- and again, I'll go off

10     the ones I recall off the top -- in addition

11     identifying specific information like date of birth.

12          I think there are several, and I believe

13     there's more than that, but that's what I recall.  So

14     those could be some of the reasons that it would be

15     stopped at the lockbox.

16     Q.   Sort of required items that they left off?

17     A.   Right.  Without which -- again, it's not an

18     exhaustive, but as I recall, there are several factors

19     without which the adjudication couldn't occur, the

20     review of the request.

21          MR. DETTMER:  Okay.  One quick housekeeping

22     thing.  Maybe we ought to put Exhibit 15-A on the big

23     one just for the clarity of the record.

24          (A discussion was held off the record.)

25     BY MR. DETTMER:

Page 188

1      Q.  All right.  So if we move down in the chart,

2   then, to "Case Review," and there are columns there

3   that say, "Approved," "Denied," and "Pending."

4      A.  Yes.

5      Q.  Now, I take it that those refer to sort of a

6   substantive judgment on the application; right?

7   They've looked at the factors.  They've done the

8   background check, and they made a decision as to

9   whether to accept or deny the application?

10      A.  What we would refer to as "the adjudication."

11      Q.  Okay.  So if you again look at the line of

12   "Total Cumulative Renewal," under that -- on that line

13   the approved number is 895,574.

14      A.  Yes, in that column.

15      Q.  The denied number is 7,130; right?

16      A.  Yes.

17      Q.  And then there are -- I guess as of June 30,

18   2017, 64,779 pending?

19      A.  Yes.

20      Q.  I did the math.  You don't have to take my

21   word for it.  So that is .79 percent.  So less than

22   1 percent were denied.  Does that sound right to you?

23      A.  For the reason I said earlier, not wanting to

24   speculate on the number off the top, yes.

25      Q.  And you probably should not trust my math

Page 189

1    skills?

2         A.  I went to law school.  So...

3         Q.  Do you have enough familiarity with the

4    adjudication process to just know whether that rings

5    true to you?  Does that ratio seem appropriate, in

6    your experience?

7         A.  Specifically with respect to DACA?

8         Q.  Yes.

9         A.  I believe so.  That's around the number I was

10   going to say.

11             MR. DETTMER:  Okay.

12             (Deposition Exhibit 16 was marked for

13             identification.)

14   BY MR. DETTMER:

15        Q.  All right.  Let me show you Exhibit 16.

16   While you're looking at that, Exhibit 16 is another

17   printout from the USCIS website.  It's a four-page

18   document.  Title is I-821D, "Consideration of Deferred

19   Action for Childhood Arrivals."  Actually, what I --

20   well, actually, one other thing.  On the last page it

21   indicates that this document was last reviewed or

22   updated on October 6, 2017, which is two weeks ago

23   more or less.  Not quite.

24             I want to ask you about the first page.  In

25   the box sort of right in the middle of that first page

Page 190

1   in red letters it says, "DACA is ending."

2           The first bullet point says, "We are no

3   longer accepting initial or renewal requests for

4   deferred action for childhood arrivals.  We will

5   consider DACA requests received from residents of the

6   U.S. Virgin Islands and Puerto Rico on a case-by-case

7   basis."  Do you see where I read that there?

8       A.  Yes.

9       Q.  When was the decision made to consider DACA

10  requests from residents of the U.S. Virgin Islands and

11  Puerto Rico on a case-by-case basis?

12      A.  As I recall, a few days prior to the

13  October 5 expiration.

14      Q.  And why was that decision made?

15          MR. GARDNER:  Objection.  Calls for

16  disclosure of privileged information.  Subject to the

17  deliberative process privilege.

18          Instruct the witness to not answer.

19          THE WITNESS:  And I will follow the advice of

20  my counsel.

21  BY MR. DETTMER

22      Q.  You know, unfortunately, the fact of the

23  matter is, as we all know in this room, that there

24  have been an awful lot of horrible, natural, and

25  manmade disasters recently.  Maybe you have the same

1   instruction, but what's the reason for these being

2   given additional consideration, and not Houston,

3   Napa Sonoma, Las Vegas?

4           MR. GARDNER:  You are correct.  Same

5   objection.  Same instruction.

6   BY MR. DETTMER:

7       Q.  Okay.  Let me ask you maybe a slightly

8   different question.  You can answer "yes" or "no."  Is

9   consideration being given to similar treatment for

10  residents of some of these other affected areas?

11          MR. GARDNER:  Same objection.  Same

12  instruction.

13          THE WITNESS:  I'll follow the advice of

14  counsel.

15          MR. DETTMER:  Really what I'm trying to get

16  in that last one is just whether there is

17  consideration going on or not.

18          MR. GARDNER:  I understand, and if we can try

19  to parse it a different way.  What I'm trying to do is

20  avoid disclosing the deliberative process while giving

21  you the ability to obtain factual information.  So I

22  think that last question, unfortunately, in my

23  judgement crosses the line.  I'm not trying to

24  speechify.  I'm trying to figure out a way we could

25  get you the information you need without intruding on

Page 192

1    the privilege.

2            MR. DETTMER:  I guess I just -- I mean the

3    question goes to whether there is a deliberative

4    process on that issue.  If the answer is "no," then

5    there's no privilege to give.

6            MR. GARDNER:  That's correct.

7            MR. DETTMER:  If the answer is "yes," then,

8    you know, obviously, I can't get into the substance of

9    it.

10           MR. GARDNER:  I think as a high level topical

11   matter he can answer the question is there being

12   consideration.  I think when we get to the substance,

13   obviously then we're getting closer.  I think we can

14   proceed maybe that way if you understand.

15           So why don't you re-ask the question.  I

16   apologize.

17   BY MR. DETTMER:

18       Q.  Is USCIS considering whether or not to give

19   similar consideration to other geographic areas that

20   are also subject to natural disasters?

21       A.  Other than what is represented as U.S. VI and

22   Puerto Rico, no.

23       Q.  I'll just ask the question just to preserve

24   the record.  Why did USCIS decide to extend the

25   deadline, at least on a case-by-case basis, for people

Page 193

1    from the U.S. Virgin Islands and Puerto Rico and not

2    other geographic areas also affected by natural

3    disasters?

4              MR. GARDNER:  Objection.  Calls for

5    disclosure of information subject to deliberative

6    process privilege.

7              I instruct the witness not to answer.

8              THE WITNESS:  I'll follow that advice, or

9    instruction.

10             MR. DETTMER:  All right.  Let's dive into

11   this.  This was marked as Exhibit 3 at a deposition

12   last week.

13             THE WITNESS:  Okay.

14             MR. DETTMER:  And it is the administrative

15   record that was produced in our case, and I think in

16   your cases as well.  And it is a 256-page document or,

17   I guess, compilation of documents.

18             (Previously marked Exhibit 3 was handed to

19             the witness.)

20             MR. DETTMER:  And it has Bates numbers on it

21   AR1 through AR256.

22             MR. GARDNER:  You might want to take the

23   binder clip off.  Just don't --

24             THE WITNESS:  Yep.

25   BY MR. DETTMER:

1      Q.  I know, based on our conversation so far

2   today, that you have seen at least some of these

3   documents that are in here.  And just -- so I'll

4   explain to you what this purports to be, and just so

5   you have this framework, unless you already know.

6      A.  No, I'd appreciate the explanation.

7      Q.  So this has been represented to us by the

8   lawyers representing the government in this case, the

9   defendants in these cases as the administrative

10  record.  So when there's a challenge to an

11  administrative decision, the government has to produce

12  an administrative record that is supposedly the record

13  of that decision-making process.  And this is what has

14  been produced to us as that record.

15     A.  I see.

16     Q.  And I mean, you know, I will ask you certain

17  questions about it.  It's just sort of convenient to

18  have this package here because it's some of the

19  documents we've been talking about.

20         MR. DETTMER:  If I've misstated anything, you

21  guys can feel free to correct me.

22         MR. GARDNER:  We'll do.

23  BY MR. DETTMER:

24     Q.  So it contains, just so you know, the

25  Napolitano memo, you can see at the front there --

                                                    Page 195

1          A.   Right.

2          Q.   -- June 15, 2012 that started the DACA

3     program.  You've seen that document; right?

4          A.   Yes.

5          Q.   Okay.  It has, starting on Page AR4, the

6     office of legal counsel memo about DAPA and DACA.

7     Have you seen this document?

8          A.   I don't recall seeing this.  This is the

9     office of legal counsel, DOJ?

10         Q.   Yes.

11         A.   I don't recall it.  I might have back then.

12         Q.   Okay.  And just for the record, that document

13    goes from AR4 through AR41, I believe.  No.  I'm

14    sorry.  Through AR36.  Then the next document is a

15    memo from Secretary Johnson to Leon Rodriguez and

16    others dated November 20, 2014.  You're familiar with

17    this memo?

18         A.   Yes, I've seen it.

19         Q.   Okay.  And then the bulk of this stack of

20    paper is some of the judicial opinions that you

21    referenced earlier today.  AR42 through AR228 are

22    decisions from the District Court in Brownsville in

23    the Fifth Circuit and from the U.S. Supreme Court in

24    the U.S. V. Texas case, or Texas V. U.S. case.

25         A.   Okay.

Page 196

1       Q.   Then Page -229 through -234 is Secretary

2    Kelly's February 20, 2017 memo, entitled "Enforcement

3    of the Immigration Laws That Serve National Interest."

4    You're familiar with that document?

5       A.   Yes, I've seen it.

6       Q.   The next document, AR235 through -237 is

7    Mr. Kelly's June 15, 2017 memo, rescission of the DAPA

8    memo.  Are you familiar with this?

9       A.   I have seen it, yes.

10      Q.   Okay.  -238 through -- there's a lot of

11   signatures on the next one -- through -250 is Ken

12   Paxton's letter that you referenced earlier?

13      A.   Yes.

14      Q.   You've read that letter?

15      A.   I have.

16      Q.   Okay.  The next page is a one-page document.

17   -251 is the Attorney General Jeff Sessions letter.

18           MR. GARDNER:  You skipped one thing.  There's

19   -241.

20           THE WITNESS:  The letter from John Lewis, one

21   pager.  I'm sorry.  Two.

22           MR. DETTMER:  Oh, you're absolutely right.

23   I'm sorry.  My mistake.

24           MR. GARDNER:  There are more than three

25   pages.

Page 197

1          MR. DETTMER:  Yeah.  There are -- you're

2    absolutely right.  Paxton's letter ends at -240.

3          THE WITNESS:  Right.

4          MR. DETTMER:  And then there are a series of

5    letters from Congress --

6          The WITNESS:  Yes.

7          MR. DETTMER:  -- starting at Page -241 and

8    going through -250.

9          THE WITNESS:  Yes.

10          MR. DETTMER:  Thank you for the

11    clarification.  And then Jeff Sessions' letter is

12    -251.

13          MR. GARDNER:  I think we're missing some

14    pages between -250 and -256.

15          MR. DETTMER:  I think it got out of order a

16    little bit.

17          MR. GARDNER:  You are totally right.

18          MR. DETTMER:  My apologies.  I fixed mine,

19    and I didn't fix the other ones.

20          THE WITNESS:  There it is.  Okay.  All right.

21          MR. DETTMER:  I should have gone back.  I

22    fixed mine in the middle of the night, and I didn't

23    get to the others.  My apologies.

24          All right.  And finally, getting to the end,

25    Elaine Duke's recession memo is the last document,

1    -252 through -256.  I'm glad we did that exercise.  We

2    got the record squared away.

3              THE WITNESS:  Yes.

4    BY MR. DETTMER:

5         Q.  So you've seen all these documents with the

6    possible exception of that OLC memo?

7         A.  With the exception of the OLC memo, and the

8    compendium of the court opinions, I have not seen in

9    that fashion or reviewed.

10        Q.  You have not reviewed those court decisions?

11        A.  I don't recall reviewing them, no.

12        Q.  Okay.  When did you first see Ken Paxton's

13   letter that starts at AR238?

14        A.  I believe right at the end of June or

15   beginning of July.

16        Q.  So right around the time it actually came

17   out?

18        A.  Yes.  Sorry.  I should have pulled these out.

19             (Pause in proceedings.)

20   BY MR. DETTMER:

21        Q.  Do you remember when you first saw that

22   letter?

23        A.  Shortly after it came out.

24        Q.  Okay.  And what did you think when you saw

25   it?  What was your reaction to that letter?

1        A.   As I recall, it was the -- as we discussed

2    this morning, there was a deadline set, September 5,

3    and it was appearing before Judge Hanen.  So the case

4    would be filed in front of Judge Hanen with whom USCIS

5    had a history on DAPA.

6        Q.   So maybe just adding up what you're saying

7    right now, your expectation was that if they went

8    through with this threat or this promise, I don't know

9    what you want to call it, this stated intention, that

10   there would be an injunction against DACA.  That was

11   what you thought when you read this?

12       A.   I thought there was a possibility of that

13   based on the past history.

14       Q.   Okay.  And did you think, as you read this

15   letter, that that meant that DACA should be rescinded?

16       A.   As I recall and noting, I guess on the second

17   page, -239, the respectful request that the Secretary

18   of DHS phase out the DACA program, with respect to,

19   like I said, asking if something was going to happen

20   to DACA, a case was be being made, and I thought there

21   was a possibility.  I'm sorry.  I may not have

22   answered your question.

23       Q.   Well, you have a slightly different answer.

24       A.   Please ask again.

25       Q.   You thought that there was a possibility that

Page 200

1    based on this DACA would be rescinded?

2         A.   Based on this letter, DACA could be

3    rescinded.  And I think your second -- your other

4    question was on the injunction.

5         Q.   Yeah.  Well, I think you answered that

6    already.

7         A.   Yeah.  Sorry.

8         Q.   No.  That's all right.

9              Let me ask you this question:  You obviously

10   have spent a lot of time interacting with legislators

11   in connection with immigration issues.

12        A.   Yes.

13        Q.   Have you ever seen, in your experience, other

14   than this letter that we're looking at right now from

15   Ken Paxton, other instances where state officials have

16   made requests of DHS like this one, that it end a

17   program?

18        A.   Not that I recall.  However, we have a great

19   deal of -- again, we have a great deal -- many

20   programs, benefit types that we administer.

21        Q.   Do you ever remember, in your experience, a

22   program ending because of a request from state

23   officials?

24        A.   Not -- no.  But I view this a bit

25   differently.

1      Q.   Can you explain it?

2      A.   Sure.  And it requires explaining a bit more

3  on the requests we receive from members of Congress

4  and at times, perhaps, state governments for action,

5  as I understood your question.  You said a request

6  from state officials.

7           We may, USCIS, receive requests from members

8  of Congress, as we've discussed, and state officials

9  with respect to taking certain action, if I'm

10  explaining it clearly.  That's one part.  "Please do

11  X.  Please consider X."  This, in my view, is a step

12  beyond that.

13      Q.   Why?

14      A.   Because it indicated there would be an

15  amendment to ongoing litigation that could, so it

16  would but could, result in action against one of the

17  programs which we administered, and the request was

18  being made to take an action to perhaps avoid that

19  litigation risk.  I don't know if I'm explaining this

20  correctly.  It's a request from state officials to act

21  in a certain way, for USCIS or DHS to take certain

22  action.  Is that in part is correct on this, you're

23  right.  But it goes beyond that in threatening also a

24  litigation impact that could -- unilaterally could end

25  one of the programs that we administer.  So that's why

1    I said I view it as a step beyond solely a request

2    from state officials.

3         Q.  So -- sorry.  Were you finished?

4         A.  No.  To clarify that point.

5         Q.  Okay.  So and I guess maybe we're going back

6    to our earlier conversation about the reasons, as you

7    understood them, for the rescission of DACA; right?

8         A.  Right.

9         Q.  Which is, as I understand your testimony both

10   before lunch and now, to be essentially there was

11   litigation risk, and therefore, the program -- there

12   was litigation risk of the program being shut down,

13   and therefore, the program should be shut down.

14            MR. GARDNER:  Mischaracterizes the witness'

15   previous testimony.

16            THE WITNESS:  So I think we need to break

17   that apart.

18   BY MR. DETTMER:

19        Q.  Okay.

20        A.  So if you could ask the first part again, and

21   I'll explain the second, or reiterate the second.

22        Q.  Sure.  Well, I mean --

23        A.  They're --

24        Q.  Go ahead.

25        A.  I'm sorry.  We're both talking.  My

Page 203

1    apologies.

2         Q.  I was just going to try to break the question

3    down.

4         A.  Please.

5         Q.  The first one, as I understand it, is that

6    your concern is for groupings -- right? -- and we

7    talked about litigation risk, the risk that due to

8    this letter and actions indicated in it, there be an

9    amendment to the Complaint and there would be a

10   possibility that the judge would enter an injunction

11   that would end the DACA program?

12        A.  Yes.

13        Q.  And based on that risk, your understanding

14   was that that was the reason or a reason why the

15   program was being shut down?

16        A.  So with those factors laid out by

17   Secretary -- Acting Secretary Duke in her memo, that

18   was certainly one of the elements listed as she was

19   taking into consideration.  And also, noting from my

20   perspective -- I'm not saying whether that was fully

21   in her perspective as she references the letter, but

22   there is also indication that the secretary of DHS

23   phase out the DACA program, which to my interpretation

24   is a phase out, not a termination immediate to an

25   injunctive effort or just an immediate end.

Page 204

1        Q.   And that gets to a timing issue; right?   I

2   mean I take it from what you're saying that you and

3   others thought that it made more sense to not end it

4   right away but end it over a period of time?

5        A.   My perspective that the phase out idea was

6   better suited operationally than an immediate cutoff.

7        Q.   So to that question, who made the decision

8   about the time periods that would be put in place,

9   that would be used to end the program?

10            MR. GARDNER:   Objection.   Calls for the

11   disclosure of information subject to deliberative

12   process privilege.

13            I instruct the witness not to answer.

14            MR. DETTMER:   And just to be clear, I'm just

15   asking for the identity of the person.

16            MR. GARDNER:   Yeah.   I think with that

17   question, unlike the previous questions, I think the

18   identity does reveal deliberations.   I think some of

19   the previous questions did not.   So that's the line.

20            MR. DETTMER:   I'm not sure I follow.   How

21   does the identity of the decision maker reveal the

22   deliberative process?

23            MR. GARDNER:   Well, I think it's also

24   evident -- right? -- because you're -- I don't want to

25   make arguments in front of the witness, and we can

Page 205

1   excuse him if we think we need to, but my

2   understanding is you're asking for who made a

3   particular decision that led up to the ultimate

4   decision, which is the rescission of DACA, meaning the

5   time frames within there, and I think that does reveal

6   the deliberative process.

7           MR. DETTMER:  I actually don't know the

8   answer to that.

9           MR. GARDNER:  That's what I understood you to

10  be asking.  Maybe I misunderstood your question.

11  BY MR. DETTMER:

12      Q.  Let me ask this sort of build-up question.

13  Was the decision to rescind DACA made before or after

14  the decision about the time periods about, you know,

15  when the last application would be accepted or at the

16  same time?

17      A.  I would say they were contemporaneous.  I

18  mean if I -- I need to qualify if I understand your

19  question.

20      Q.  Yeah.

21      A.  Asking the specific time lines, the dates,

22  that, to my recollection, couples contemporaneous with

23  a decision ultimately that the program would end.

24  There would be a rescission of DACA, and there would

25  be a wind-down, then all of the parameters for that

1    wind-down also were built and -- you know, built out

2    so that when the announcement came, all those factors

3    were established; right?

4         So that's why I say, "contemporaneous" in the

5    sense of the decision making on what the parameters of

6    a wind-down would look like.

7         Q.  Okay.

8         MR. GARDNER:  In light of that answer, I

9    think he can answer the question who made the ultimate

10   decision about the deadlines.  I think obviously

11   getting into the substance of that decision-making

12   process we still maintain it's off limits based on

13   privilege.  If so if you want to re-ask that question

14   in light of that testimony, I think we'll be okay.

15        MR. DETTMER:  Sure.  Thank you.

16        Q.  So who made the decisions about the

17   deadlines, you know, that October 5th was going to be

18   the date, for instance?

19        A.  So for the October 5 or the other dates, it's

20   my recollection ultimately, it was the Secretary,

21   Acting Secretary.

22        Q.  Okay.  And is it your understanding that the

23   acting secretary was also the decision maker on

24   rescission itself?

25        A.  Yes, the ultimately decision maker.

Page 207

1      Q.  Okay.  Let me go back to Attorney General

2    Paxton's letter, and I'm looking at Page 239.

3      A.  Yes.

4      Q.  Specifically, the last sentence in the sort

5    of middle paragraph there.  It reads, "And this

6    request," referring to the request to phase out the

7    DACA program, does not require the Federal Government

8    to remove any alien."  Is it your understanding, in

9    fact, that if the DACA program, once the DACA program

10   has ended, fully ended, that people who now have DACA

11   status will, in fact, be subject to removal in a way

12   that they're not subject to it now?

13     A.  So if we can define by "ending" meaning the

14   expiration of the employment authorization document --

15     Q.  Yes.

16     A.  -- then they would be subject to removal.

17   Could be subject to removal.

18     Q.  In a way --

19     A.  Because they currently have an employment

20   action and a deferred action that's been granted to

21   them.  Deferred action from immigration enforcement

22   action.

23           MR. DETTMER:  Should we take a brief break

24   now?

25           MR. GARDNER:  Sure.

Page 208

1           THE VIDEOGRAPHER:  We're going off the record

2    at 3:46 p.m.

3           (A recess was taken from 3:46 p.m.

4           to 4:00 p.m.)

5           THE VIDEOGRAPHER:  We are back on the record

6    at 4:00 p.m.

7    BY MR. DETTMER:

8        Q.  Quick follow-up question.  Before the break

9    you testified that Acting Secretary Duke was the

10   ultimate decision maker on the rescission.  Do you

11   remember that?

12       A.  Yes.

13       Q.  You used the words "ultimate decision maker."

14   Were there other decision makers in your view?

15       A.  Contributors to the decision making is how I

16   would view that.

17       Q.  Okay.  And who were those people?

18       A.  So from my perspective, in addition -- so

19   there were a few.  So first, as I referenced earlier,

20   her own determinations, Attorney General Paxton's

21   letter, Attorney General Sessions' letter.  So when

22   you speak to individuals, I'll include them in those

23   names.  And then as contributors as well I would say

24   several of those at the department.  So probably the

25   best way to look at it, from my perspective, is the

1  August 21 meeting with a group of people, all of us

2  that were listed, in my view, contributed to providing

3  information for her ultimate decision in the process,

4  whether at that meeting or not.

5      Q.  So just so I'm understanding your testimony,

6  you're saying the contributors to the decision

7  included Attorney General Paxton, Attorney General

8  Sessions, the people at the August 21 meeting?

9      A.  Through their communications for the first

10 two, and for those -- us in the meeting, we provided

11 opinions and information.  I use that as a collective

12 with respect to the individuals, not necessarily in

13 that meeting.

14     Q.  And would you include the participants at the

15 August 24 meeting as well?

16     A.  Yes.

17     Q.  Okay.  And maybe just so we can all be clear,

18 you say, "ultimate decision maker."  I just want to

19 make sure I understand what you mean with that, I

20 guess, qualification, "ultimate."

21     A.  Sure.

22     Q.  Can you explain what that means in your

23 answer?

24     A.  Yes.  To me what she noted in her memorandum

25 explains it in the sense that there's a reference

1    because I don't have it in front of me now, and I

2    won't perhaps recall the language precisely, but she

3    notes that in her role as overseeing the

4    administration of the nation's immigration laws,

5    again, words to that effect, and setting the --

6    overseeing the administration of that law and the

7    immigration principles that she is taking this

8    decision based upon those above factors.

9            I know that was sort of her conclusion.  So

10   that's how I view her, as the ultimate decision maker

11   for DHS overseeing our collective administration of

12   the immigration laws and system.

13       Q.  Would it be helpful for you to just look at

14   her memo?

15       A.  Sure.

16           MR. DETTMER:  Can we pull out Exhibit 3.

17           (Pause in proceedings.)

18           MR. DETTMER:  There's Exhibit 3.  And I think

19   it's right at the end.

20           (The witness reviewed Exhibit 3.)

21   BY MR. DETTMER:

22       Q.  Which language were you referring to?

23       A.  So I appreciate the opportunity to refresh

24   because I didn't quite state it as she stated.  At the

25   top -- it's AR255 --

Page 211

1      Q.   Okay.

2      A.   -- the first paragraph, "Taking into

3   consideration the Supreme Court's and the Fifth

4   Circuit's rulings in the ongoing litigation, in the

5   September 4, 2017 letter from the Attorney General it

6   is clear that the June 15, 2012 DACA program should be

7   terminated.  In the exercise of my authority," the

8   Secretary's, "in establishing national immigration

9   policies and priorities, except for the purposes

10  explicitly identified below, I hereby..."

11         So that, with respect to ultimate meaning she

12  then made the decision based upon that.  There's

13  authority in that role.

14     Q.   Another little follow-up question, I guess.

15     A.   Sure.

16     Q.   Earlier, you talked about Attorney General

17  Paxton's letter, and I think we were talking about the

18  sort of threat of amending their Complaint and seeking

19  an injunction against DACA.

20     A.   Yes.

21     Q.   Are you familiar -- in your experience at

22  USCIS, are you familiar with any other instances where

23  a program has been rescinded based on a litigation

24  threat from a state?

25     A.   No, I am not.

1    Q.   Are you aware of other litigation threats

2    from states?

3    A.   If I understand the question correctly, USCIS

4    and our immigration agencies are regularly sued for a

5    variety of reasons.

6    Q.   Right.

7    A.   So threat or no, sometimes actual.

8    Q.   I guess what I'm trying to get at is as you

9    say, and I think it's -- we all know it's true that as

10   you say, USCIS is sued all the time over programs that

11   it's running; right?

12   A.   Programs it is running or perhaps more

13   specifically, administration of programs or benefits

14   as established by statute.

15   Q.   And at a programmatic level as opposed to for

16   specific benefits for specific people?

17   A.   I think yes, in part.  So if I understand the

18   question correctly.

19   Q.   Well, I guess all I'm saying is, you know, we

20   all know there are lawsuits where, you know, a person

21   didn't get the benefits that he or she thinks he or

22   she is entitled to and files a lawsuit for those

23   benefits.  There are other lawsuits, like this one,

24   that's about the program as a whole?

25   A.   Program as a whole, and I would say, as well,

Page 213

1    though, a class of those individuals to your first

2    point added onto that.

3        Q.   Right.  So I think we all know that that

4    second category of litigation is not uncommon for your

5    agency; right?

6        A.   Correct.

7        Q.   And yet, as you recall, this is the only

8    instance, Paxton's letter, where a program has been

9    canceled just because of that litigation threat.

10           MR. GARDNER:  Objection.  Mischaracterizes

11   the witness' previous testimony.

12           THE WITNESS:  So I would say that

13   differently.  I mean my response.

14   BY MR. DETTMER:

15       Q.   Please.  It is your right.

16       A.   Thank you.  It is this.  It is my

17   understanding that those other lawsuits, litigation

18   brought, threats of litigation and attached to

19   programs that arise from statutory acumen.  So I will

20   say if we are speaking, and I will now put in a

21   hypothetical because I don't want to misstate if

22   there's ongoing litigation on a certain case.  But if

23   there is a concern about how we are administering some

24   part of, for example, the temporary protected status

25   program, that's regularly recurrently in the news and

Page 214

1    discussions, that is ultimately established by
2    statute.
3           So a state saying, 'We will bring litigation
4    that will end the temporary protected status" is
5    pretty unlikely simply because it's set in statute.
6    It could go to the Supreme Court, it could be evolved
7    and be attacked.  This was a program established out
8    of the prosecutorial discretion.  So I view, then,
9    that the litigation threat, particularly coupled with
10   the actions against the DAPA program -- well, against
11   the actions with respect to the DAPA program in that
12   same district court present a different picture,
13   perspective, than a state that would provide a letter
14   saying, "We're going to bring in a litigation
15   challenge against a temporary protected status program
16   if."  A whole hypothetical there.
17        Q.   Sure.   Yeah.   I get the figure.   You're
18   raising a hypothetical.
19           Slightly different question.   Are you aware
20   of any communications other than in that letter that
21   we looked at between Attorney General Paxton's office
22   and anyone responsible for the DACA program
23   rescission?
24        A.   So I'm aware only through an interrogatory
25   response that, if I recall correctly, that there was a

Page 215

1  communication or communications from that -- and you

2  speak with respect to Attorney General Paxton's office

3  or Texas.  I think that there may have been, if I

4  recall, in that interrogatory response, a

5  communication or communications between the Department

6  and the attorney general's office.  I just recall the

7  specifics.  I recall seeing that.

8       Q.  So your only awareness of those kind of

9  communications is through this litigation?

10       A.  That's correct.

11       Q.  You, back pre-rescission, were not aware of

12  any such communications?

13       A.  I was not.

14          (Deposition Exhibit 17 was marked for

15          identification.)

16  BY MR. DETTMER:

17       Q.  Okay.  All right.  Let me change gears a

18  little bit here.  Exhibit 17 in front of you is a very

19  lengthy document.  It is -- has the U.S. Department of

20  Homeland Security seal on it, and it says, "National

21  Standard Operating Procedures, SOP, Deferred Action

22  for Childhood Arrivals, DACA."  Are you familiar with

23  this document?

24       A.  Yes.  I'm aware that it exists.

25       Q.  Okay.  And what is it?

1      A.   It is a -- to restate, but it's a national

2   standard operating procedure to -- with respect to the

3   adjudication of DACA requests.

4      Q.   Okay.  So the purpose of this document is to

5   guide, inform, USCIS people in adjudicating DACA

6   applications?

7      A.   Yes.  Officers to adjudicate, yes.

8      Q.   Okay.  Does it have any other purposes?

9      A.   I'm sorry.  I'm not quite sure what you mean.

10  It's the standard operating procedure to guide our

11  adjudicators to make judgments on the DACA cases or

12  DACA requests.

13     Q.   I'm sorry.  I didn't mean to be too --

14     A.   I misunderstood.

15     Q.   Is there any other purpose to it besides what

16  you just said, or does that cover everything?

17     A.   Not to my knowledge.  It's an SOP.

18     Q.   How did this document come into being?

19          MR. GARDNER:  Objection.  Lack of foundation.

20          THE WITNESS:  I -- it was created after the

21  launch of the DACA program to guide the adjudicators.

22  I know I've restated that.

23  BY MR. DETTMER:

24     Q.   Do you know who created it?

25     A.   I do not know specific names, but it's

Page 217

1    clearly created by the service operations director.

2          Q.   Did you ever use this document or refer to

3    this document in your work at USCIS?

4          A.   Not that I recall.

5          Q.   Did you ever provide copies of it to

6    legislators or their staff members?

7          A.   No, not that I recall.  I'm pretty sure I did

8    not.  And I could explain that if you'll note.

9          Q.   Sure.

10         A.   If you'll note, I believe it's on each page.

11   I won't go through all the pages.  If you'll notice at

12   the beginning of Page 2 at the bottom, "For Official

13   Use Only, Law Enforcement Sensitive."  It would not be

14   the type of information we would unilaterally turn

15   over.  There may have been a reason that we do.  I

16   just don't recall turning over the SOP.  It's

17   possible, but I don't recall that.

18         Q.   Okay.  I think I just have a few more

19   questions for you about a different document, and then

20   I know some of my colleagues are going to want to ask

21   you some questions as well.

22         A.   Okay.

23              (Deposition Exhibit 18 was marked for

24              identification.)

25              MR. DETTMER:  While you're looking at that,

```
                                        Page 218
 1   Exhibit 18 is a printout from the website of
 2   Department of Homeland Security, and it is a statement
 3   from Acting Secretary Duke on the rescission of
 4   deferred action for childhood arrivals.  It's dated --
 5   or at least release date is September 5, 2017.
 6        Q.  Have you read this document before?
 7        A.  I've -- yes.
 8        Q.  Okay.  And I think you testified earlier that
 9   you did not see any drafts of this before it was
10   released?
11        A.  I don't recall seeing any drafts.
12        Q.  Okay.  Do you know, just from your work in
13   USCIS, who might have been involved in writing this?
14        A.  I believe the Secretary for one, Acting
15   Secretary.  I don't know specifically anyone else that
16   I was told who had or had an understanding, but -- so
17   there could be others as well.
18        Q.  In the second paragraph of this statement,
19   Secretary Duke writes -- Acting Secretary Duke writes,
20   "As a result of recent litigation, we were faced with
21   two options, wind the program down in an orderly
22   fashion that protects beneficiaries in the near term,
23   while working with Congress to pass legislation, or
24   allow the judiciary to potentially shut the program
25   down completely and immediately."
```

1           Are you aware of other options that were

2      considered in connection with the shutdown of this

3      program.

4           MR. GARDNER:  I'm going to object.

5           You can answer that question with a "yes" or

6      "no."  The contents of what those other options may or

7      may not be would be subject to deliberative process

8      privilege.  So I just want to make sure we take it one

9      step at a time.

10          If you understand his question.

11          Or if you would rephrase it one more time.

12     BY MR. DETTMER:

13          Q.  Well, go ahead and --

14          A.  So were there other options beyond the two

15     that she expressed with respect to wind it down or

16     allow the judiciary to potentially shut the program

17     down completely?

18          Q.  Yes.

19          A.  I'm not aware of other options.  They're both

20     pretty broad, especially wind it down in an orderly

21     fashion.

22          Q.  Well, not to be too obvious, but there's the

23     option of --

24          A.  Sustaining?

25          Q.  -- keeping the program going and litigating

                                                      Page 220

1    the case.

2         A.  Yeah.  Fair.  Yeah.

3         Q.  I mean I'm sure there are other options as

4    well.  And, you know, My question is whether others

5    were considered or whether really only those two were

6    discussed.

7              MR. GARDNER:  Objection.  Compound.  If you

8    can rephrase it, we can take it that way because I do

9    think your question as phrased does implicate the

10   deliberative process privilege.  The way you phrased

11   it originally did not.  I'm sorry.  I'm not trying to

12   be difficult.

13             MR. DETTMER:  No, I understand.  I guess part

14   of my issue is that in a sense, the deliberative

15   process is being described here in this public

16   document, and, you know, I'm being limited to just

17   what's on the face of this, and there seems to be at a

18   minimum, some kind of waiver.

19             MR. GARDNER:  I understand that's your

20   position.  We disagree.  I'm not going to convince

21   you, and you're not going to convince me here.  But I

22   believe the way you phrased the question initially, he

23   could answer.  The way you rephrased it, I do think is

24   objectionable.  So if you want to re-ask it the

25   original way and he can answer with a "yes" or "no," I

                                                    Page 221

1    won't lodge an objection to that.  I'm not trying to

2    be obstreperous.

3              MR. DETTMER:  I understand.

4         Q.  So other than the two options that are listed

5    here in that paragraph I read, were there other

6    options that were discussed or considered in this

7    process?

8         A.  I see.  Beyond those two?

9         Q.  Yes.

10        A.  As I recall, yes.  One other one.

11        Q.  Okay.  And what was that?

12             MR. GARDNER:  I'll object.

13             Instruct the witness not to answer as

14   revealing deliberative process, or subject to

15   deliberative process privilege.

16             THE WITNESS:  I'll follow the advice of

17   counsel.

18   BY MR. DETTMER:

19        Q.  You're following his instruction; right?

20        A.  Right.

21             MR. GARDNER:  Just so we're on the same page,

22   I understood you were asking him about what that other

23   option was that is not identified in this document?

24             MR. DETTMER:  Right.

25             MR. GARDNER:  Okay.

Page 222

1    BY MR. DETTMER:

2        Q.  So, well, due to the assertion of privilege,

3    I can't ask about the third option.  Your recollection

4    is that there were in fact three options that were

5    discussed?

6        A.  Three options.  These are the two that were

7    the predominant.

8        Q.  Okay.  Predominant that were discussed?

9        A.  Yes.

10       Q.  Okay.  Now, the last sentence in that

11   paragraph is, "The administration chose the least

12   disruptive option."  So in your view -- actually, I'm

13   sorry.  Let me back up because I have another

14   question.  So I want to put to the side the

15   deliberations that you all had about recession and

16   just ask you, sitting here today, do you see other

17   options for how the situation that was presented that

18   led to the rescission, you know, what other options do

19   you see that were possibilities for getting out of

20   that situation or for dealing with that situation?

21       A.  As a result of the recent litigation?

22       Q.  Yeah.

23       A.  The way she begins that?

24           Again, going back to what we discussed

25   earlier, looking at not only litigation and the threat

Page 223

1    by the state attorney general but the specific court

2    in previous actions, those seem to me to be the

3    options.  I will incorporate your earlier statement of

4    doing nothing or --

5            Q.  Staying the course?

6            A.  Staying the course.  Different ways of saying

7    that.  As I sit here and look back -- right? -- we

8    discussed earlier, like I referenced other district

9    courts across the country.  Perhaps that's a little

10   bit -- this is my perspective.  Perhaps a little

11   different.  We don't know the outcome.  This is the

12   judge who took action on DAPA.

13           And so for that reason, the do nothing or

14   stay the course, to use your language that you

15   reference, I think that then links to the second point

16   the Secretary made, that that could allow the

17   judiciary to potentially shut down the program

18   completely and immediately, or that particular

19   district court judge through an injunctive action.

20           Q.  All right.  So let me go on and talk about

21   that sentence that I read, "The administration chose

22   the least disruptive option" is what Secretary Duke

23   writes there.  I think we may have touched on this,

24   but you recognize, obviously, that rescission as it

25   was done is disruptive even if, in Secretary Duke's

Page 224

1    view, it's the least disruptive option; is that right?

2         A.  So I would agree it's the least disruptive,

3    but the point is there is a disruptive -- I can define

4    that in my view if you'd like.

5         Q.  Sure.

6         A.  So "disruptive" meaning it's referencing back

7    to the two options, winding the program down or

8    allowing the possibility of the judiciary to act.

9    That would be the least disruptive.  You referenced

10   earlier the program sustaining.  So staying the

11   course, to use your language, would not disrupt

12   because that would continue.  But of these two

13   options, between those two DHS, USCIS retained some

14   level of ability to wind-down the program.

15        Q.  Let me ask another question just about that

16   same paragraph.  Secretary Duke writes, "wind down the

17   program in an orderly fashion that protects

18   beneficiaries in the near term while working with

19   Congress to pass legislation."  Do you know, is that

20   happening?  Is DHS working with Congress to pass

21   legislation?

22             MR. GARDNER:  Objection.  Calls for

23   disclosure of information subject to deliberative

24   process privilege.

25             MR. DETTMER:  I'm just asking if it's

Page 225

 1    happening or not.

 2          MR. GARDNER:  Not the substance?  Okay.

 3    BY MR. DETTMER:

 4      Q.  Yeah, is that happening?  Is DHS working with

 5    Congress to pass legislation?

 6      A.  Yes.  I can give you an example.  We held a

 7    hearing two weeks ago and that is, if you read -- you

 8    referenced our testimony, there's reference repeatedly

 9    to "Will you work with Congress."  In different ways

10    that question was asked.

11      Q.  And that's an example.  There are other

12    things going on?

13      A.  To me, that is the biggest example in the way

14    that we do generally work with Congress.

15      Q.  Okay.  In the next paragraph Secretary Duke

16    writes, "I am very aware of the consequences of this

17    action, and I sympathize with the DACA recipients

18    whose future may now be less certain."  We've talked a

19    little bit about this.  Have you spoken with Secretary

20    Duke about the consequences of this action?

21      A.  The consequences of the action of winding it

22    down?  Prior to the announcement we laid out how that

23    would occur and the operational impact or how we

24    would -- sorry.  How we would unpack that.  How we

25    would wind it down --

                                              Page 226

1          Q.  Well, it seems here --

2          A.  -- understanding it.

3          Q.  I'm sorry.

4          A.  Yeah.

5          Q.  She's talking about the consequences of the

6    action to the DACA recipients.  Is that how you read

7    that also?

8          A.  Yes.

9          Q.  And we've talked about some of those.  Is

10   that what you were referencing when you gave that

11   answer?

12         A.  I was referencing more the broader -- how the

13   program would be wound down.  So you're asking with

14   respect to the consequences to the DACA recipients?

15         Q.  Yes.

16         A.  So we provided information understanding

17   expiration of DACA -- of employment authorization

18   documents and the DACA status or requests and period

19   of deferred action.  So if I understand correctly, and

20   sort of to make sure I'm answering, part of those

21   consequences would be as employment authorization

22   documents begin to expire, they no longer have DACA.

23   They no longer have EADs.

24         Q.  Right.  And they're subject to removal;

25   right?

Page 227

1          A.   Absent that deferred action to what we
2     discussed before, they could be subject to that.
3          Q.   They're no longer eligible for advanced
4     parole?
5          A.   Right.  As part of this wind-down.
6          Q.   Right.
7          A.   Unless they -- sorry just to add.  Unless
8     they already had advance parole at the time we ended
9     it would go for that period, whatever it might be.
10         Q.   Okay.  Do you see at the end of that same
11    paragraph it goes over to the next page.  Secretary
12    Duke ends that paragraph by saying, "For that reason,
13    DACA was fundamentally a lie."  Do you see that?
14         A.   I do.
15         Q.   Do you agree with that statement?
16         A.   I agree that DACA was never more than the
17    deferred action bureaucratic delay.  I mean it's
18    therefore, not as the Secretary -- so the answer is
19    she characterized that as fundamentally a lie because
20    it never promised the rights of citizenship or legal
21    status, and I agree that's correct.  It did not.
22         Q.   So do you have any understanding of how that
23    is a lie?
24         A.   I mean it's the Secretary's statement.  So I
25    don't know.  As far as the link to that, I'd just go

1    back to the previous two or three sentences.  There

2    was a temporary delay, and there wasn't a permanent

3    status, legal status.

4         Q.  So I -- I'm sorry.

5         A.  No.  Go ahead.

6         Q.  I'm trying to understand how that makes it a

7    lie.  You and I have both read all the documents, and

8    I think you wrote some of them that said, "This is

9    temporary" and it had renewal.

10        A.  Participated in them.

11        Q.  Right.  So how is DACA a lie in light of

12   that?

13        A.  I mean as I said, I didn't write the

14   statement.  So I'm providing back my reflections based

15   on the Secretary's conclusion and the previous

16   statements where she believes that leads to being

17   fundamentally a lie, as she stated.

18        Q.  Okay.  So do you agree with -- if I just look

19   at that statement, "DACA was fundamentally a lie," do

20   you agree with that statement?

21        A.  So I believe that it didn't -- the Secretary

22   called it a lie, did not fully represent.  It did not

23   provide what -- it never promised the rights of

24   citizenship or legal status.  So I agree with that.

25   It did not.  I'm trying to be responsive, but I mean

1 that's her personal opinion.  You know, my opinion is

2 it did not -- it cannot, would not provide a legal

3 status or pathway to citizenship as constructed.

4      Q.  In your view, at least pre-rescission, did

5 DACA deliver what it promised to deliver?

6      A.  It delivered what we constructed and what we

7 stated, which was it was a period of deferred action.

8 But it also could be viewed that, to your question

9 earlier about initials and then renewals and on, it

10 could be viewed that that would continue in perpetuity

11 and could be viewed particularly with providing

12 employment authorization documents a level of

13 certainty that deferred action and prosecutorial

14 action doesn't provide.

15      Q.  I'm not sure I follow your last answer.

16      A.  Okay.  So could you ask the -- and I'm sorry.

17 I may be --

18      Q.  No.  It's okay.

19      A.  -- drawing down on the --

20      Q.  I'm going to wrap up my piece so these guys

21 can take over.

22      A.  But please ask again.

23      Q.  Sure.  In your view, before the rescission, I

24 mean obviously once the rescission happens, it's a

25 different situation.  Before the rescission, did DACA

Page 230

1   provide to its recipients what was promised with the

2   DACA program?

3        A.  So it provides -- sorry.  So DACA provided

4   from USCIS, and for our agency, it provided two years

5   of deferred action, and if they qualified, an

6   employment authorization document.  So those

7   parameters were provided, and that's what they

8   received.  I think as I understood, and my apologies

9   if it wasn't clear and I was being unclear, it

10  probably was, that as the Secretary was stating, it

11  also never promised a level of complete certainty down

12  for a period of years even if it were a two year by

13  two year process.

14       So we -- I'll say again, USCIS provided what

15  was set out as the parameters and structure of DACA,

16  which was the deferred action and employment

17  authorization document.

18       Q.  Okay.  I understand your answer.  I

19  appreciate that.  I think what is confusing me, and

20  perhaps we just are going to ask, hopefully, Secretary

21  Duke is it's not clear to me how -- I mean a lie is

22  something that's dishonest, and it sounds like from

23  your answer, like there was not, at least in your

24  view, dishonesty involved here.  "X" was promised and

25  "X" was provided.

Page 231

1        A.  "X" was promised in the parameters of the

2    program, as I understand.  Again, I'll have to speak

3    to -- the Secretary ultimately makes that conclusion;

4    right?  But my view is it also could not promise a

5    full legal status.  So I understand her perspective in

6    saying that.  What we were instructed to create and

7    administer, we did.

8        Q.  Okay.  One other aspect, just so we're on the

9    same page.  I think you talked about the two years,

10   the work authorization as part of the promise.

11   Renewal was also --

12       A.  Yes.

13       Q.  The availability of renewal was also part of

14   the promise; right?

15       A.  Right.  If they qualified.

16       Q.  Of course.

17       A.  Right.

18            MR. DETTMER:  Okay.  Well how about this.  I

19   think I'm going to stop now.  I know my colleagues

20   have a few more questions.

21            How far are we here?

22            THE VIDEOGRAPHER:  5 hours, 44 minutes.

23            MR. DETTMER:  Do you want to take a brief

24   break or should we just switch around.

25            THE WITNESS:  Let's take a quick break.

Page 232

1          THE VIDEOGRAPHER:  We are going off the

2     record at 4:35 p.m.

3               (A recess was taken from 4:35 p.m.

4               to 4:41 p.m.)

5          THE VIDEOGRAPHER:  We are back on the record

6     at 4:41 p.m.

7

8                         EXAMINATION

9     BY MS. CROWLEY:

10        Q.  Good afternoon.  My name is Megan Crowley,

11    and I'm with Covington & Burling, and we represent the

12    University of California and President Napolitano.

13    And I'm going to ask you a few questions following up

14    on what you and Ethan discussed.

15              The first set of questions I want to ask you

16    are about what you had described as the litigation

17    risk related to the rescission of DACA.  And so do you

18    understand that DHS has said that litigation risk

19    associated with the continuation of DACA was a reason

20    that DACA was rescinded?

21        A.  That's my understanding.

22        Q.  Is there a component of DHS that is

23    principally responsible for assessing litigation risk?

24        A.  Yes.

25        Q.  And what component is that?

1      A.   For DHS, the office of the general counsel.

2      Q.   Did you have any communications with the

3  office of general counsel about the litigation risk

4  related to continuation of DACA?

5      A.   I did once.

6      Q.   Okay.  And is it correct to say that you also

7  personally assessed litigation risk associated with

8  continuation of DACA?

9      A.   So from my personal opinion, not as a lawyer.

10     Q.   Did any of your staff assess litigation risk

11  associated with continuing the program?

12     A.   Within my office of the chief counsel, they

13  may have to support the office of the general counsel.

14  I don't know.

15     Q.   Did they look into this issue at your

16  direction?

17     A.   No.

18     Q.   Were there any internal memoranda prepared

19  regarding the litigation risk of continuing the

20  program?

21     A.   I don't know if there were.  There may have

22  been.

23     Q.   And not to make you repeat something you've

24  already covered, but as of September 5 what was your

25  view on the litigation risk associated with continuing

Page 234

1    the program?

2        A.  My personal view was that it was quite high

3    with respect -- my apologies.  With respect to

4    continuing the program.  That for the reasons earlier

5    described, there was a significant or high litigation

6    risk.

7        Q.  And to unpack that a little bit more, what

8    factors went into your personal assessment of that

9    litigation risk?  You mentioned the Texas litigation,

10   the letter from the attorney general.  Was there

11   anything else that went into that evaluation?

12       A.  My personal evaluation, my personal view?  I

13   mean in addition, the attorney general's letter

14   indicated DACA as we administered had some of the same

15   risks that DAPA had and the underlying foundation.

16       Q.  And was use of government resources a

17   consideration?  DHS resources?

18           MR. GARDNER:  Objection.  Vague.

19   Consideration by him?

20   BY MS. CROWLEY:

21       Q.  Yes, by you.  Was that part of the

22   consideration, the litigation risk?

23       A.  I'm sorry.  Just to be clear, so the use of

24   our USCIS resources as part of the litigation risk.

25       Q.  In assessing the litigation risk --

1      A.   Yeah.

2      Q.   -- was there consideration -- did you

3  consider the amount of -- the number of government

4  resources, DHS resources that would be used to either

5  continue the program or rescind the program?

6      A.   I mean to answer clearly, I saw if the

7  program -- so consideration of resources in the sense

8  if the program continued we would presumptively,

9  absent other challenges, use the same resources we've

10 been using to administer it.

11         So then I can answer the second part to your

12 question, if the program were rescinded, you know,

13 particularly actively by a court injunction, then

14 there would be, from my view at the time, thinking

15 through additional resources, depending upon how a

16 court action would play out, again, linking back to

17 DAPA or the injunction of DAPA.

18     Q.   In assessing the litigation risk of

19 continuing or rescinding -- continuing the program,

20 did you consider the likelihood of being sued for a

21 rescission of the program?  Was this lawsuit

22 contemplated?

23     A.   So again, just to reiterate, this was my

24 personal review -- personal view, looking at the

25 factors.  I wouldn't necessarily call it a formal

Page 236

1    analysis nor documented as such.  But we've been sued

2    both directions.  If you're asking my opinion now, it

3    is if we were being sued requires an expenditure of

4    resources as well, but yet, the expenditure of

5    resources to perhaps unilaterally return approximately

6    100,000 requests or employment authorization documents

7    and rescind them to the tune of several hundred

8    thousand is also significant.

9         Q.  Were you involved in the decision to rescind

10   the deferred action for parents of Americans and

11   lawful permanent residents or DAPA in June 2017?

12        A.  You mean Secretary Kelly's memo?

13        Q.  Yes.

14        A.  I don't recall being involved on that.  If I

15   may add, there's a memo from the Secretary to several

16   of us; right?  But DAPA was never operational.  So

17   it's a different analysis or involvement point, from

18   my view.

19        Q.  Do you know whether litigation risk was a

20   factor that was considered in ending DAPA?

21             MR. GARDNER:  Objection.  Calls for the

22   disclosure of information subject to the deliberative

23   process privilege.  Instruct the witness not to

24   answer.

25             THE WITNESS:  I will follow counsel's advice.

```
                                           Page 237
 1   BY MS. CROWLEY:
 2       Q.  Were you in any meetings in which litigation
 3   risk associated with the rescission of DAPA was
 4   discussed?
 5           MR. GARDNER:  Same objection.  Same
 6   instruction.
 7           THE WITNESS:  And the same response.
 8   BY MS. CROWLEY:
 9       Q.  When did you first learn that litigation risk
10   was a relevant factor in rescinding DACA?
11       A.  Attorney General Paxton's letter laid out
12   litigation risk.
13       Q.  I understand that, in your opinion,
14   litigation risk is a proper consideration in
15   evaluating the rescission of a government program such
16   as DACA; is that correct?
17       A.  Based upon the unique parameters of DACA.
18       Q.  So do you think that litigation risk is a
19   factor that should be considered when evaluating the
20   continuation of all government programs?
21           MR. GARDNER:  Objection.  Calls for
22   speculation.  Hypothetical.  Vague.
23           THE WITNESS:  So could you repeat the
24   question, sorry, to make sure I have it clearly.
25   BY MS. CROWLEY:
```

1          Q.  Do you think that litigation risk is a factor

2    that should be considered when evaluating the

3    continuation of all government programs?

4               MR. GARDNER:  Objection.  Hypothetical.

5    Speculation.  Vague.

6               THE WITNESS:  With respect to that, my

7    personal view is, again, that within USCIS and benefit

8    types, litigation risk should be considered, but

9    there's a distinction here with the fact of the

10   parameters of how DACA was stood up and guided through

11   the FAQ process, et cetera.  And so litigation risk

12   should be a factor I think folks should consider.  In

13   this case, it's from other programs we administer.

14   BY MS. CROWLEY:

15        Q.  In evaluating the programs you administer in

16   determining whether they should be continued, would it

17   be fair to say that you weigh the costs and benefits

18   of a program?

19        A.  So of the other types of programs?

20        Q.  As a general matter.

21        A.  Virtually all those are mandated by statute.

22   I mean we operate the program.  So I'm not sure -- I

23   mean if I understand your question is there's not

24   really, in my view, a choice, you know, because it is

25   in the statute or in other enactment that we seek to

Page 239

1    implement or run.

2         Q.   Let me rephrase.

3         A.   Sure.

4         Q.   In determining -- are you part of helping

5    determine the department's policy goals?

6         A.   As part -- as deputy director, among many

7    others, I would say yes with respect to those that

8    touch USCIS.

9         Q.   And in determining the department's policy

10   goals, would it be fair to say that you weigh the

11   costs and benefits of various policy options as a

12   general matter?

13        A.   Whether implemented or not, or not yet

14   implemented, those are some -- I would say that's a

15   consideration.

16        Q.   You talked with Ethan about some of the

17   benefits that DACA recipients received from DACA.  You

18   remember that?

19        A.   Uh-huh.

20        Q.   You also talked about some of the benefits

21   that DACA may have had for USCIS.  Do you remember

22   that?

23        A.   With respect to some of the general goals and

24   policy principles --

25        Q.   Yes.

Page 240

1          A.  -- that's to what you refer?

2          Q.  Yes.  Were those benefits considered in

3     evaluating whether DACA should be continued?

4               MR. GARDNER:  Objection.  Calls for the

5     disclosure of information such as deliberative process

6     privilege.

7               I instruct the witness not to answer.

8               THE WITNESS:  I'll follow counsel's advice.

9     BY MS. CROWLEY:

10         Q.  Let me break that down a little bit more,

11    then.  To your knowledge, were any of those benefits

12    considered in connection with the decision to rescind

13    DACA?

14              MR. GARDNER:  Objection.  Calls for the

15    disclosure of information subject to deliberative

16    process privilege.

17              I instruct the witness not to answer.

18              THE WITNESS:  I follow my counsel.

19    BY MS. CROWLEY:

20         Q.  Are you aware that DACA recipients are

21    employees of companies in this country?

22         A.  Yes.

23         Q.  To your knowledge, were any of their

24    employers consulted in connection with the decision to

25    rescind DACA?

1          A.  Not to my knowledge.

2          Q.  Are you aware that DACA recipients are

3     employers of other individualss in this country, that

4     they employ people?

5          A.  It's possible.  I mean probably.  I mean I

6     just don't know for sure.

7          Q.  But it stands to reason?

8          A.  Yes.  It's a possibility.

9          Q.  Are you aware of whether any of their

10    employees were consulted in connection with the

11    decision to rescind DACA?

12         A.  I'm not aware that they were.  They may have

13    been.

14         Q.  Are you aware that DACA recipients are

15    students in this country?

16         A.  Yes.

17         Q.  To your knowledge, were any of their schools

18    consulted in connection with the decision to rescind

19    DACA?

20         A.  I'm not aware that they were.  They may have

21    been.  I'm not aware.

22         Q.  Are you aware that DACA recipients are

23    teachers in this country?

24         A.  Yes.

25         Q.  And are you aware -- to your knowledge, were

1    any of the employees of those teachers consulted in

2    the connection with the decision to rescind DACA?

3         A.   The employees?

4         Q.   The employers.

5         A.   I'm not aware if they were.

6         Q.   Okay.  I want to shift a little bit and just

7    ask you one last set of questions.  Am I correct in

8    understanding that after March 5, 2018 DHS will no

9    longer adjudicate renewal applications from current

10   DACA recipients?

11        A.   No.  We'll still have it.  We will still have

12   renewals under adjudication.

13        Q.   But you will not be accepting new renewal

14   applications?

15        A.   Not accepting, that's correct, as of

16   October -- after October 5.

17        Q.   Are you aware of any discussions within DHS

18   regarding whether to extend that deadline, the March 5

19   deadline?

20        A.   I'm not aware of any.

21        Q.   To your knowledge, has anyone from the

22   Department of Justice provided input into whether the

23   March 5 deadline should be extended?

24        A.   Not to my knowledge.

25        Q.   To your knowledge, has anyone from the White

Page 243

1    House provided input into whether the March 5 deadline
2    should be extended?
3         A.   Not to my knowledge.
4         Q.   And to your knowledge, has anyone from other
5    organizations within the executive branch weighed in
6    or provided input into whether the March 5 deadline
7    should be extended?
8         A.   Within the executive branch, not to my
9    knowledge.
10        Q.   In your opinion, does DHS have the authority
11   to extend the March 5 deadline?
12             MR. GARDNER:  Objection.  Calls for a legal
13   conclusion.
14             THE WITNESS:  Right.  I can't advise on that.
15   I'm not in a practicing attorney role.
16   BY MS. CROWLEY:
17        Q.   Do you personally see any benefits of
18   extending the March 5 deadline?
19        A.   My personal opinion, no, I don't.  We have --
20   I would like to explain, if I may.
21        Q.   Uh-huh.
22        A.   As in my testimony a couple of weeks ago and
23   the questions asked by members, I think congressional
24   action and statutory enactment is what will provide a
25   permanent status, or could, for this population.

Page 244

1          MS. CROWLEY:  Okay.  I think I've used up my

2     allotment of time.  Maybe we can go off the record for

3     one moment while we switch.

4          THE WITNESS:  Okay.  Thank you.

5          THE VIDEOGRAPHER:  We're going off the record

6     at 4:56 p.m.

7          (A recess was taken from 4:56 p.m.

8          to 4:58 p.m.)

9          THE VIDEOGRAPHER:  We are back on the record

10    at 4:58 p.m.

11

12                    EXAMINATION

13    BY MR. LEE:

14     Q.  Good afternoon, Mr. McCament.  Thank you for

15    your patience with our series of questions today.  My

16    name is Ronald Lee again, and I am counsel to the

17    State of California.  I'm from the California Attorney

18    General's office.  I also have some questions for you

19    today.  I'll try to avoid being duplicative, but for

20    the purposes of getting some clarity of the record,

21    I'm going to go over some of the ground that we've

22    covered today.

23     A.  Sure.

24     Q.  How soon after you reviewed Attorney General

25    Paxton's letter did you come to understand that any

1   component of the executive branch was considering the

2   possibility of rescinding DACA?

3         A.   What I recall is in early August being aware

4   that, early this week or two, that that was being

5   fully contemplated.  But again, your question, after

6   the end of June the letter was out there.  So if I

7   understand your question correctly, that was already

8   known.  What I recall is learning in early August, or

9   maybe mid-August, but I think it was early August that

10  it was being contemplated.

11        Q.   And how did you come to that understanding?

12        A.   As I recall, it was prior to the August 21

13  meeting as we were brought --

14             MR. GARDNER:  At this point, I'm sorry, I am

15  going to object.  I think that that question as stated

16  does call for the disclosure of information subject to

17  deliberative process privilege.  I instruct the

18  witness not to answer.  I think there might be a way

19  you can rephrase it, but I think as stated, you're

20  asking about the deliberations leading up to the

21  rescission.

22             THE WITNESS:  I'll follow my counsel.

23  BY MR. LEE:

24        Q.   Did you develop any understanding of which

25  government official or entity was exploring this

Page 246

1    possibility at the beginning of August?

2         A.  Yes.

3         Q.  Which entity or official?

4         A.  The Department of Homeland Security.

5         Q.  Any others?

6         A.  Not that I recall initially.  DHS was

7    exploring.

8         Q.  Did you come to this understanding via

9    written communication?

10        A.  I believe it was, again, prior to the

11   August 21 meeting being aware that -- I'm just trying

12   to recall.  But being aware that consideration was

13   being given to respond to the letter by doing so.  I

14   just honestly don't recall whether by phone call or by

15   E-mail.

16        Q.  So you came to this understanding in early

17   August, either via phone call or E-mail; is that

18   correct?

19        A.  That's my recollection that, to your point,

20   the Department was considering the decision.

21        Q.  And is this E-mail or phone call something

22   that came from within the Department?

23        A.  Yes.

24        Q.  Was it from a level senior to you?

25        A.  As I recall, it was from the Secretary's

Page 247

1    office.  I think it might have been Gene Hamilton

2    giving me a heads up, but I don't recall.  I think it

3    was, that that consideration was being given.

4         Q.  Between the time you first became aware of

5    the possibility of rescission of DACA on August 21,

6    when there was an internal meeting among DHS personnel

7    to discuss rescission of DACA, did you have any

8    further communication with anyone within the

9    Department about the possibility of rescinding DACA?

10        A.  Well, again, I think if you go back from

11   June 29 on, that possibility was open.  Learning

12   sometime early August that we were probably preceding

13   to look at that.  And then I don't recall specifics

14   between that time of learning and after, but I recall

15   just there being some level of conversation, talking

16   about impact, what would be -- what could be the

17   parameters.

18        Q.  So to be clear, you do recall communications

19   about the impact of rescission of DACA between early

20   August and August 21?

21        A.  To be clear, so being requested to provide

22   information about the DACA program, numbers, you know,

23   some of what we discussed earlier.

24        Q.  And do you recall who made that request of

25   you?

Page 248

1      A.  So I recall, I think Gene and I discussed and

2  we prepared information, you know, pulling data and

3  information.  So it was prior to the August 21

4  meeting.  I just don't really recall kind of the

5  cadence of that.

6      Q.  And by "Gene," are you referring to

7  Mr. Hamilton?

8      A.  Uh-huh.

9      Q.  And were these communications via E-mail?

10     A.  So yes with respect to the data questions.

11  That's what I recall.

12     Q.  Do you recall if these E-mails were of the

13  type that you turned over to counsel, your counsel?

14     A.  As referenced to Ethan, I asked of EIT and my

15  counsel team to review all my E-mails and pull up what

16  was responsive.

17     Q.  Sure.  How did you understand that the basis

18  for rescinding DACA would be the illegality of the

19  program as articulated by Secretary Duke's rescission

20  memo?

21          MR. GARDNER:  Objecting to the extent --

22  well, a couple of objections.  1, mischaracterizes the

23  witness' prior testimony.

24          But 2, objection to the extent that that

25  question is implicating the deliberative process

                                          Page 249

1    privilege, and to the extent you're asking him for

2    deliberations, I'll instruct the witness not to

3    answer.

4              THE WITNESS:  I'll follow counsel's advice.

5    BY MR. LEE:

6        Q.  You agree with me that as articulated by

7    Secretary Duke in the rescission memo, that the basis

8    for rescinding the DACA program is because it is an

9    unlawful program?

10             MR. GARDNER:  Objection.  Mischaracterizes

11   the document.

12             THE WITNESS:  As described -- the Secretary

13   described her reasons in the memo.

14   BY MR. LEE:

15       Q.  And when did you first come to understand

16   that those reasons, as she articulated in her memo

17   would be the reasons for rescinding DACA?

18       A.  I mean I'm pausing because I'm not quite

19   sure.  The -- there are several factors sort of

20   leading to what I think I understand your question to

21   be.

22       Q.  I can clarify, and I apologize.

23       A.  My apologies, probably with the time.

24       Q.  Not at all.  For present purposes I'm

25   referring only to the reasons that were articulated by

Page 250

1    Secretary Duke in her rescission memo.

2         A.  I see.  So what was in the memo when it was

3    put into the memo.

4         Q.  And I'm trying to understand from you when

5    you first came to the understanding that those reasons

6    that are publicly in that rescission memo --

7         A.  Right.

8         Q.  -- were going to be the reasons upon which

9    the rescission of DACA was going to be based.

10        A.  So then, thank you.  So when I saw the draft

11   of the memo that listed in whatever draft would have

12   said that, those would have been listed out as her

13   reasons.

14        Q.  And you're referring to the draft of the

15   rescission memo that was transmitted to you for

16   comment and input; is that correct?

17        A.  Yes.  Yeah.  The wind-down.

18        Q.  The wind-down memo.  When you received the

19   memo, was it already in substantially final form to

20   the version that the public has seen?

21        A.  The draft memo?

22        Q.  Yes.

23        A.  To my recollection, there were, I think as I

24   said earlier, a couple of drafts that I saw, or at

25   least I think.  So I think substantially, I just want

Page 251

1    to be clear to a process point.  I'm happy to expand

2    on that.

3         Q.  To the best of your recollection, the first

4    time you saw the draft memo it was in a

5    substantially -- in the form that was substantially

6    similar to the final version, public version?

7         A.  I just don't recall.  So I don't recall --

8    sorry.

9              What I want to be clear on is when we say

10   "substantially the same," in the government review of

11   documents different drafts -- drafts can have several

12   iterations saying substantially, in my view, just to

13   be clear, is one part if it's substantially meaning

14   everything remains the same, I think there were

15   definitely some changes and adjustments.

16             So that's why I want to be clear to say some

17   parts may have remained the same.  Others might have

18   been changed, and you would see that in subsequent

19   drafts, including as we were finalizing operational

20   steps.  So that's why I wanted to lay that out as far

21   as what "substantially" means.

22        Q.  Prior to seeing the draft of the memo, you

23   had no basis to understand that the reasons

24   articulated by Secretary Duke in her rescission memo

25   were going to be the reasons for the rescission of

```
                                          Page 252
 1   DACA?
 2              MR. GARDNER:  Objection.  Mischaracterizes
 3   the witness' prior testimony.
 4              THE WITNESS:  No.  I mean as I understood the
 5   question was when did I understand that those factors
 6   listed were the final factors.  That's when I saw them
 7   in the memo saying those were the final factors.
 8              As you referenced earlier, I was aware of the
 9   Paxton letter.  You know, aware of an attorney general
10   decision or, you know, rendering and all that
11   litigation.  So that's why I wanted to make sure to
12   clarify that point.
13   BY MR. LEE:
14      Q.  Okay.  I appreciate that.  Thank you for
15   that.
16              I'd like to draw your attention very briefly
17   to the Paxton letter, and I believe that is in
18   Exhibit 3, the administrative record with the Bates
19   No. AR238.
20              MR. GARDNER:  What's the Bates?
21              MR. LEE:  -238.
22              MR. NEWMAN:  We're going to take a break
23   right now.  Let's go off the record, please.
24              THE VIDEOGRAPHER:  We're going off the record
25   at 5:09 p.m.
```

Page 253

1              (A recess was taken from 5:09 p.m.

2         to 5:25 p.m.)

3              THE VIDEOGRAPHER:  We are back on the record

4    at 5:25 p.m.

5              MR. LEE:  Okay.  We just came back from a

6    brief break to assess an order that was issued by

7    Judge Alsup in the related California actions that was

8    just issued on the scope of discovery and

9    applicability of various deliberative process and

10   executive privileges asserted today.

11             Per this order, it is Plaintiffs' position

12   that most, if not all of the assertions of those two

13   privileges today and asserted on Friday's deposition

14   of James Nealon are inappropriate and need to be

15   withdrawn.  We understand that government counsel is

16   taking prompt steps to assess this order, and we

17   reserve the right, as necessary, to redepose

18   Mr. Nealon, Mr. McCament, and going forward any other

19   witnesses until this issue is fully resolved

20             MR. GARDNER:  And we understand your

21   position.  First of all, let me say on the record I

22   really appreciate everyone in the room's

23   professionalism.  This is happening in real time.  As

24   you noted, we just got the order.  We are assessing

25   it, and obviously, assessing what, if any, next steps

                                                        Page 254

1    are appropriate.

2            Accordingly, we'll continue the remainder of

3    this deposition with the assumption that the

4    privileges may be applicable.  We'll conclude this

5    deposition, and then however this gets sorted out it,

6    gets sorted out, and we can work mutually agreeably to

7    resolve next steps once we can figure out what those

8    next steps are.

9            MR. LEE:  Thank you for that, Counsel.

10       Q.  Mr. McCament, you understand you're still

11   under oath?

12       A.  Yes.

13       Q.  So pursuant to that exchange, we're going to

14   continue the questioning as we were just doing

15   previously.

16       A.  Understood.

17       Q.  Wonderful.

18           I believe I was in the process of asking you

19   to return to the administrative record, which I

20   believe is Exhibit 3, and to refer you to Attorney

21   General Paxton's letter as Bates No. AR238.

22           (The witness reviewed Exhibit 3.)

23   BY MR. LEE:

24       Q.  Mr. McCament, do you have that letter in

25   front of you?

Page 255

1      A.  I do.

2      Q.  And we've discussed this letter in some

3  detail today already; is that correct?

4      A.  Yes.

5      Q.  As you can see from this letter, this --

6  would you agree with me that this letter was addressed

7  to Attorney General Jeff Sessions?

8      A.  Yes.

9      Q.  And this is signed by the attorneys general

10  of 11 states?

11      A.  I believe that's correct, based on the names.

12      Q.  And do you see any CC lines directing this

13  correspondence to the Department of Homeland Security?

14      A.  No.

15      Q.  Okay.  How did you come to receive this

16  letter from Attorney General Paxton?

17      A.  It was forwarded to me.

18      Q.  From whom?

19      A.  As I recall, at least from our chief counsel.

20  It may have been from other source, but I mean

21  that's -- I know for sure it came from him.

22      Q.  And when you say, "chief counsel," was that

23  office of chief counsel within USCIS?

24      A.  Craig Symons, our chief counsel for USCIS.

25      Q.  Do you have any understanding how this letter

Page 256

1    got to the Department of Homeland Security in the

2    first place?

3         A.  Not specifically, though it references us.

4    If I may, "us" meaning Homeland Security, secretary of

5    Homeland Security.

6         Q.  And it is your understanding that the states

7    represented in this letter were plaintiffs in the

8    district court case you referenced earlier in your

9    testimony in the Southern District of Texas?

10        A.  It's my -- it's my understanding without

11   having cross referenced all of them -- or having cross

12   referenced, I should say, to be precise.

13        Q.  And are you aware that these 11 states are a

14   subset of the states that filed the District Court

15   action in the Southern District of Texas?

16        A.  I believe I knew that generally.  I can't say

17   for sure, but there were more that filed.  Is that

18   your question?  That more filed the lawsuit than were

19   signing here.  That was my understanding just

20   generally.  But again, I didn't compare.

21        Q.  Was any significance to that -- was any

22   significance accorded to this fact in your discussions

23   surrounding this letter?

24        A.  Not that I recall.  Could have been, but not

25   that I recall.

Page 257

1          MR. LEE:  I'd like to introduce Exhibit 18 --

2     19.

3          (Deposition Exhibit 19 was marked for

4          identification.)

5     BY MR. LEE:

6          Q.  Mr. McCament, I just handed you Exhibit 19,

7     which is a letter dated July 21, 2017 from the office

8     of the attorney general of the State of California to

9     the President of the United States.

10         A.  Yes.

11         Q.  Have you seen this letter before?

12         A.  I don't recall seeing this -- well, so I

13    don't recall seeing the letter, but I'm aware that

14    there was a letter.  So I'm not sure if that means I

15    saw it or not.  Sorry.

16         Q.  What specifically were you aware of with

17    respect to this letter?

18         A.  As I recall, that the attorney general had

19    written a letter asking to maintain DACA.

20         Q.  How were you informed -- how were you made

21    aware that this letter had been transmitted to the

22    federal government?

23         A.  I don't recall whether it was just publicly

24    or whether there was one forwarded.  I just don't

25    recall.  I recall being aware there was a letter.

Page 258

1      Q.  But you do not recall that the specific

2  letter was forwarded to you in any way in the form

3  that you see here by someone at the Department of

4  Homeland Security?

5      A.  I don't recall that it was.  It may have

6  been.

7      Q.  If I take you to the very last page of this

8  exhibit, do you see that this letter was also copied

9  to then Secretary John Kelly?  Secretary of Homeland

10  Security John Kelly?

11      A.  At the end of the page, yes.

12      Q.  Do you have any understanding as to why this

13  letter may not have reached your attention?

14          MR. GARDNER:  Objection.  Calls for

15  speculation.

16          THE WITNESS:  And again, I might well have

17  received it.  I just -- I was aware of the letter, and

18  I just don't recall how in this instance.

19  BY MR. LEE:

20      Q.  As you sit here today, are you familiar with

21  the content of this letter?

22      A.  As I read it as it's presented to me,

23  generally knowing that there were attorneys general

24  who had written to the President to ask to not rescind

25  DACA, yes.

1          Q.   Do you have any understanding whether in this

2     letter the 20 attorneys general that wrote this letter

3     expressed their commitment to support the effort to

4     defend DACA by all appropriate means?

5          A.   As laid out?  Sorry.  You mean in the last

6     paragraph that you're referencing as I look at it now?

7          Q.   Yes.

8          A.   Yes.  I'm aware it's there to maintain and

9     defend DACA.

10         Q.   Were you aware of this commitment at the time

11    that this letter was first put to your attention, or

12    are you developing that -- are you developing that

13    understanding only now as you read the letter today?

14         A.   Again, while I might well have received it, I

15    just don't remember that, but I might well have.  But

16    to your point on this reference, I'm reading it now

17    and then responding to you.

18         Q.   Okay.  You would agree with me that at the --

19    as of the end of July, the Department of Homeland

20    Security had both the Paxton letter we just discussed

21    and this letter from Attorney General Becerra.

22         A.   Yes, based on the CC line and to the

23    Secretary.

24         Q.   And that one letter, the Paxton letter

25    threatened litigation to end DACA; correct?

Page 260

1          A.  Yes.

2          Q.  And another letter promised to defend it?

3              MR. GARDNER:  Objection.  Mischaracterizes

4     the document.

5              THE WITNESS:  It says -- if I may, based upon

6     as you were saying that, what I see is the last

7     sentence subpart.  Well, so for the last sentence

8     before the signatories, "For these reasons we urge you

9     to maintain and defend DACA, and we stand in support

10    of the effort to defend DACA."

11    BY MR. LEE:

12         Q.  Are you aware of any consideration of this

13    letter as part of the litigation risk analysis

14    conducted by the Department?

15             MR. GARDNER:  Objection.  Calls for the

16    disclosure of information subject to deliberative

17    process privilege.

18             I instruct the witness not to answer.

19             THE WITNESS:  So at this point, based upon

20    the parameters outlined, I will follow counsel's

21    advice.

22    BY MR. LEE:

23         Q.  I want to take you now to the August 21

24    internal DHS meeting --

25         A.  Yes.

                                                    Page 261

1        Q.  -- we discussed earlier today about the

2   rescission of DACA?

3        A.  Yes.

4        Q.  Okay.  And I apologize if I missed this in

5   your earlier testimony, but was Assistant Secretary

6   Dougherty present at this meeting?

7        A.  I believe he was.  Thanks for the addition,

8   as I said -- or not addition sorry.  Thanks for that

9   question.  As I said, there were probably a couple

10  other people.  I think he was.  I knew Ambassador

11  Nealon, I believe he was.  I think he was.  As I said,

12  it was a room full of a lot of us, but I believe so.

13       Q.  And am I correct to say that his title is the

14  assistant secretary for border immigration and trade

15  policy?

16       A.  Yes, that's my understanding.  Yes.

17       Q.  Are you familiar with what that portfolio

18  entails?

19       A.  As is laid out, border issues and immigration

20  matters.  Right.  Right.  Working with, therefore, the

21  operational agencies that fall under that purview.

22       Q.  Okay.  And with that understanding of sort of

23  his portfolio, why was he a participant at this

24  meeting?

25            MR. GARDNER:  Objection.  Calls for

Page 262

1    speculation.

2            THE WITNESS:  Right.  I mean we all received

3    invitations to attend the meeting.

4    BY MR. LEE:

5        Q.  You understand -- you just testified that

6    you're familiar with his general portfolio --

7        A.  Yes.

8        Q.  Correct?

9            So from your experience as a longtime

10   employee of USCIS and of DHS, what about his portfolio

11   made the discussion of DACA relevant to him?

12           MR. GARDNER:  Objection.  Calls for

13   speculation.

14   BY MR. LEE:

15       Q.  You can still answer.

16       A.  Yes.  Understood.  Again, as the assistant

17   secretary for border immigration and trade, he works

18   with our agencies, meaning our, "USCIS" customs,

19   border protection, and ICE.

20       Q.  You mentioned that Director Homan was present

21   as well; is that correct?

22       A.  Yes.

23       Q.  Did he speak at this meeting?

24       A.  As I recall, he did.  If I may.

25       Q.  Please.

1      A.  Our immigration agencies, the three of us, or

2   the three agencies, when there are meetings, there are

3   quite a few on different topics.  So but that said, I

4   think he did speak in that meeting.  I'm just saying

5   it's a familiar location, familiar conference room and

6   familiar -- at least in that respect, group of people,

7   but I believe so.

8      Q.  When you say, three immigration agencies, are

9   you -- what agencies are you referring to?

10      A.  So customs and border protection, immigration

11   and customs enforcement, and, of course, USCIS.

12      Q.  I believe you mentioned that he had a deputy

13   or assistant with him; is that correct?

14      A.  He had -- at least as I recall, I think John

15   Feere.  I may be mispronouncing and misstating -- I

16   mean mispronouncing, but I think he's the senior

17   advisor.

18      Q.  And do you recall whether he spoke at this

19   meeting?

20      A.  I don't recall, but it doesn't mean that he

21   did or did not.  Again, a lot of people in the room.

22   If I may, because of your earlier question with

23   Michael and with Tom Homan, I believe Tracy Short, who

24   is the general principal legal advisor for ICE, I

25   think may have been there.  Now I'm trying to think

Page 264

1    through on that.  It was a full room.  May have been.

2    I'm just thinking through.

3         Q.  Are you familiar with Philip Miller?

4         A.  I believe he works for CBP.  I think, if

5    that's the same person.

6         Q.  A Philip Miller who works in ICE.

7         A.  Oh, sorry.  Then I'm confusing.  I don't

8    recall the name, but he may well have even been at the

9    meeting if he works for ICE.

10        Q.  He may well have been at the meeting?

11        A.  He may or may not.  The name isn't resonating

12   to me.

13        Q.  Fair enough.  Thank you.

14             Now, between August 24 and September 5, and

15   just to orient our time line, we're talking about the

16   period between the White House meeting you've

17   discussed extensively today and the date of the

18   rescission.

19        A.  Right.

20        Q.  Which I'll represent to you is a 12-day

21   period of time.

22        A.  Sure.

23        Q.  You explained that your team was executing a

24   number of tasks with respect to the impending

25   rescission of DACA; is that correct?

1        A.  Yes.  As we specifically discussed with

2   Ethan, like the materials, promotional materials and

3   other topics and operational topics.

4        Q.  You discussed news releases; is that correct?

5        A.  News releases.  Again, that question was on

6   the public information, and we were also looking at

7   the operational steps.

8        Q.  And I think you mentioned scripts as well.

9        A.  And those, again, were with respect to the

10  public rollout, and then there were operational steps

11  as well.

12       Q.  Would those scripts be a version of talking

13  points?

14       A.  Yes.

15       Q.  Okay.  And in this period, your team was also

16  working on the FAQs; is that correct?

17       A.  Are you referring to the DACA rescission

18  FAQs?

19       Q.  Yes.

20       A.  Yes, with the Department.

21       Q.  And nothing else beyond news releases,

22  scripts, and the rescission FAQs?

23       A.  So as I said with respect to operational

24  steps, so there was work being looked at for

25  September 5 and beyond for implementing operationally

                                                    Page 266

1    the rescission.

2         Q.  Did this work start immediately after the

3    August 24 White House meeting?

4         A.  As far as the operation -- well, so with

5    respect to the operational discussions and evaluation,

6    I think so.  I mean it wasn't -- there was a

7    discussion, and then as I mentioned earlier, it was

8    the ongoing discussion on the different iterations of

9    the Secretary's memo in -- subsequent as we led up to

10   September 5, and we had to be operationally prepared.

11   So if -- so there were operational steps being looked

12   at to be ready.

13        Q.  So the operational steps, the work being done

14   around the operational steps, as best you can recall,

15   began immediately or very soon after the August 24

16   meeting?

17             MR. GARDNER:  Objection.  Mischaracterizes

18   the witness' testimony.

19             THE WITNESS:  And again, with respect to

20   timing, you know, after the August 24 meeting and

21   beyond, you referenced 12 days from that time to be

22   looking at the options for a rescission to implement

23   September 5.  I can think of at least one example of

24   that.

25   BY MR. LEE:

Page 267

1      Q.   What example would that be?

2      A.   It would be that on that date we would no --

3  or after that date, September 5, we would no longer

4  accept new initials.  So that requires operational

5  steps.

6      Q.   And how about the work on news releases,

7  scripts, or the FAQ?  Did any of that start

8  immediately after the August 24 meeting?

9      A.   So again, it occurred, as I recall, preparing

10 those scripts was fought -- you said 12 days.  So I'll

11 take that.  In the days leading up to September 5 and

12 after the August 24, particularly in the last few days

13 before the 5th, working on the materials when they

14 were pretty finalized in that weekend, how the

15 rescission would operate.

16     Q.   Who on your team did you direct to work on

17 the FAQs?

18     A.   Well, again, as I believe I said earlier,

19 there was a group of folks that were working on the

20 materials, as well as -- I think I said this earlier,

21 but if not, pretty much that same team or some portion

22 were also working on the operational steps.

23     Q.   Can you identify those team members by name?

24     A.   Sure.  So as I said, I think earlier,

25 Jennifer Higgins was the acting deputy director during

1    the time of my acting director, deputy director was on

2    vacation.  As I recall, I think Don Neufeld and Ernest

3    DeStefano with respect to the lockbox elements, as

4    well as the operational pieces.  And again, sorry.

5    You were asking, I think on the DACA rescission FAQs

6    alone?

7         Q.   Yes.

8         A.   Okay.  Sorry.  So on the DACA rescission

9    FAQs, I think Craig Symons our chief counsel.  I

10   believe Kathy Nuebel, our head of policy and strategy.

11   Because they were public materials or would become

12   public materials, I think Gillian.  I think Don and

13   Jennifer as well, but again, there were several steps

14   being taken at the operations and the public

15   materials.  So I might be missing someone.

16        Q.   That's helpful.  Thank you, Mr. McCament.

17   When you refer to "Gillian," Gillian --

18        A.   Cristensen.

19        Q.   Cristensen?

20        A.   Uh-huh.

21        Q.   When you refer to "Don," you're talking about

22   Mr. Neufeld?

23        A.   Correct.

24        Q.   And Jennifer Higgins; correct?

25        A.   Yes.

1      Q.   Okay.   Were you part of the review chain for

2    the FAQs?

3      A.   I believe so.   I saw the other materials

4    throughout the weekend.   I mean as we were leading up

5    to the finalization.   So I think so.

6      Q.   Do you recall any significant debates

7    regarding the content of the FAQs?

8           MR. GARDNER:   Objection.

9           You can answer that question with a "yes" or

10   "no."   The substance of that would be subject to

11   deliberative process privilege.

12          THE WITNESS:   So yes, discussion.

13   BY MR. LEE:

14     Q.   Yes, significant debate?

15     A.   Amongst USCIS?   I don't recall.   I wouldn't

16   characterize it that way.   But discussions.

17     Q.   Okay.   Were there E-mail -- were there any

18   E-mail exchanges among the USCIS team members with

19   respect to the preparation of the FAQs?

20     A.   Probably.   As we were E-mailing on various

21   matters.

22     Q.   With respect to the content of the FAQs, did

23   those require clearance or vetting from components

24   outside of USCIS?

25     A.   So with respect to -- I believe so.   Again,

Page 270

1    I'm trying to sort of recall all the different

2    materials and items, but I believe so.  Outside of

3    USCIS.

4         Q.  And which agencies would those be, or

5    components within DHS?

6         A.  I would say, I believe the office of the

7    general counsel would have reviewed.  I believe public

8    affairs would have reviewed because they were being

9    posted.  I believe policy and strat- -- policy, sorry

10   of the Department.  And I'm trying to recall because

11   these were DHS FAQs that would be posted by DHS.

12           So I don't recall involvement of CBP and ICE

13   per se, although they're, you know, I think in the

14   rescission FAQs would be references.  So I think they

15   may.  I just, again, during a very compressed period

16   of time don't recall all those who would be included.

17   Those, I think -- it's certainly those that I listed,

18   possibly CBP and ICE.

19        Q.  And how about outside of the Department?

20        A.  I'm not aware that those were shared outside

21   of the Department.  They might well have been.

22        Q.  I'd like to switch gears, just in the

23   interest of time, and go back to the issue around the

24   renewal notices.

25        A.  Sure.

Page 271

1    Q.  With respect to when renewal notices are sent

2    out to a particular beneficiary, is that a matter of

3    discretion, agency discretion?

4    A.  As with the guidelines overall, that's my

5    understanding.

6    Q.  Okay.  Are you the ultimate decision maker

7    within DHS regarding the issuance of renewal notices

8    or the -- maybe let me rephrase.

9    A.  Sure.

10   Q.  Is the director of USCIS the ultimate

11   decision maker within DHS regarding the issuance of

12   renewal notices?

13   A.  I mean so while we delegate, I mean our

14   associate directors have responsibility for their

15   programs.  So, you know, ultimately items may reside

16   in those programs to make decisions.  They certainly

17   can be raised to the director and deputy.  I mean I

18   want to be clear.  It's director and deputy have

19   oversight over the entire agency.

20        So from that perspective, I would say

21   ultimately would own those decisions.  But at the same

22   time they may be made at operational levels.

23   Q.  Sure.  The specifics of when and how the

24   renewal notices are issued --

25   A.  The direction itself, right.

Page 272

1      Q.   -- could be delegated to members within

2   USCIS?

3      A.   Because of their operational purview.

4      Q.   Fair enough.  And just as a reminder, let's

5   try to avoid talking over each other just for Nancy's

6   benefit, and I apologize --

7      A.   Sure.

8      Q.   -- for doing that.

9           You explained to Mr. Dettmer earlier that

10  there was a switch at some point for the renewal

11  notice to go out for DACA beneficiaries at the 180-day

12  mark instead of the 100-day mark?

13     A.   Yes.

14     Q.   And I think I believe you explained the

15  reasoning behind why that change was made.

16     A.   My understanding of several years ago.

17     Q.   Right.  Were you, at that point, the decision

18  maker in terms of extending the window from

19  100 days -- maybe not the window.  Let me rephrase.

20          Were you the decision maker with respect to

21  the switch or the change from the 100-day issuance to

22  the 180-day issuance?

23     A.   If I recall, based upon the document that

24  Mr. Dettmer provided me, I believe that was in 2014 or

25  2015.  So I would not have been.  I wasn't in service

Page 273

1    centers.

2         Q.   Thank you for that clarification.

3              With respect to the renewals that we

4    discussed in 2017, you've referenced a number of

5    systems that are required for the actual sort of

6    printing and issuance of these renewal notices; is

7    that right?

8         A.   Yes.

9         Q.   And I believe one of the systems is called

10   the CLAIMS 3 system?

11        A.   CLAIMS 3 is the processing system, yes, and

12   holds information about our programs, about that

13   program.

14        Q.   And in July of 2017 it's your testimony that

15   the Department was transitioning to a centralized

16   electronic printing module?

17        A.   Not the Department.

18        Q.   USCIS?

19        A.   USCIS for that claims system was transmitting

20   over to a centralized EPMS, Electronic Print

21   Management System, I think.  I'm sorry.  I shouldn't

22   spout the acronym if I'm not sure.

23        Q.   But the acronym was EPMS?

24        A.   EPMS.

25        Q.   Was it the phase-out of the CLAIMS 3 system

1  that stopped the notices to stop being -- to no longer

2  being sent?

3       A.  Thanks for the opportunity to clarify.  So

4  CLAIMS 3 continues as one of our systems for

5  adjudication and housing information.  It was a change

6  in how the print notices were generated, that it was

7  moving over to the EPMS centralized system.

8       Q.  How the print notices were being generated?

9       A.  So how the notices were being printed.

10  Thanks, sorry.

11       Q.  And the switch was that the notices were to

12  be printed not through the CLAIMS 3 system but through

13  EPMS?

14       A.  So if I can clarify, and as I recall, the

15  EPMS module was being -- was transitioned.  So the --

16  my understanding is that the module that was printing

17  the DACA notices was not transitioned over into the

18  EPMS system for reasons that our systems, when changes

19  are moded and modified, there are always operational

20  costs and building costs, if you will.  And what I'm

21  recalling is that the cost to sort of mode that, the

22  system, with EPMS to print the DACA notices was going

23  to be pretty costly and cumbersome.

24       Q.  So I want to be clear that the issue with not

25  doing the transition to EPMS was a financial

Page 275

1  consideration?

2       A.  Operational and financial, as I recall.

3       Q.  What do you mean by "operational"?

4       A.  So to build it -- and I'm not the techie

5  person, and that's, I think, evident in trying to

6  explain it, and I believe that's actually indicated in

7  the interrogatory, not the techie part but the

8  reasons.

9            But to change it -- sorry.  To change the

10  technical build, any changes in our, approximately,

11  70 systems or so that we have that operate throughout

12  USCIS, when changes are made to that infrastructure,

13  there are always operational costs to doing so.

14       Q.  Sure.  And I want to understand that the

15  switch was not because it was technologically not

16  possible.  It was the cost behind making that switch.

17       A.  That's my understanding.  I mean that's --

18  yeah.

19       Q.  Who made that determination with respect to

20  the financial consideration being problematic?

21       A.  That it was costly, so to speak?

22       Q.  (Nods head.)

23       A.  As I recall, and again, this is more in the

24  interrogatory, but I mean in recent -- but I think it

25  was an operational decision.  So I think it was within

1  the service centers.  I don't recall specifically,
2  honestly.
3      Q.  Would that be something that Mr. Neufeld
4  would have been part of?
5      A.  I believe so.
6      Q.  Let me rephrase that question.
7          Was that decision one that Mr. Neufeld would
8  have participated in?
9      A.  Yes, I believe so.
10     Q.  Did you have any involvement with
11 communicating to anyone within USCIS that because of
12 this financial consideration, notices were not to be
13 printed anymore?
14     A.  I don't recall doing so, no.
15     Q.  Who in the Department would operate -- from
16 an operational perspective be the ones responsible for
17 instructions on whether to print notices?  Renewal
18 notices.
19     A.  So just generally, how the system generates?
20 I mean that would still be within USCIS, and more at
21 the service center.  More at the service center level.
22 Again, I just generally don't recall exactly how that
23 all ultimately unfolded other than I recall it being a
24 decision that was due to the changeover costs.  So I
25 just -- that's what I recall.

Page 277

1    Q.  Do you recall that this financial

2  consideration was brought to your attention by

3  somebody within USCIS?

4    A.  So I don't recall if it was.  I think it

5  probably was.

6    Q.  Presumably, you didn't do the budget and

7  number crunching around the cost of that transition;

8  correct?

9    A.  Right.

10    Q.  Okay.

11    A.  Right.

12    Q.  So you would agree with me, at least, that

13  this issue of the financial costs was communicated to

14  you from somebody within USCIS?

15         MR. GARDNER:  Objection.  Mischaracterizes

16  the witness' testimony.

17         THE WITNESS:  So I don't recall it being

18  communicated, or if it was, how it was.  I just don't.

19  BY MR. LEE:

20    Q.  So I guess how do you know that the financial

21  consideration was the reason for not continuing to

22  print out DACA renewal notices?

23    A.  So it was my understanding, as well with

24  respect to a recent interrogatory that refreshed that

25  that was the basis for that decision.  And again, I

1    don't want to misspeak.  So that's why I'm providing

2    that point.

3         Q.  Fair enough.  Thank you.

4              So at that point in, I believe you testified

5    it was sort of mid to late July where this issue came

6    up, was there not a concern that beneficiaries needed

7    to get notices about the renewal options in some form

8    or the other?

9         A.  So when the last notices went out, I don't

10   recall that being discussed.

11        Q.  Perhaps let me back up.

12             Is the -- is this change or switch from

13   CLAIMS 3 to EPMS something that affected only DACA

14   renewal notices or renewal notices in general?

15        A.  So it's my understanding that the EPMS print

16   module, the new module would affect the printing of

17   other notices.  I just don't know which ones.

18        Q.  Do you know if notices for other renewals

19   were being issued as of mid to late July through EPMS?

20        A.  I don't know offhand.  So I don't know.  As

21   far as what other types might have been issued out, I

22   just generally don't know.

23        Q.  Is it possible that all renewal notices had

24   been stopped beginning mid to late July with respect

25   to anyone that had to renew their employment

                                        Page 279

1    authorization document?

2            MR. GARDNER:  Objection.  Calls for

3    speculation.

4            THE WITNESS:  So I apologize.  So this is one

5    where I just don't know that answer.  So I could -- I

6    don't know that answer.  As far as what you're asking

7    is other notices for EADs outside of DACA,

8    understanding that, again, as I referenced earlier in

9    the testimony, that the DACA was also being processed

10   through Ellis.  So a separate system.  So that's why,

11   as we've been discussing, I haven't gone back to that

12   point that predominantly Ellis was now processing

13   those DACA renewals rather than the CLAIMS system.

14   BY MR. LEE:

15       Q.  But it is your testimony, is it not, that the

16   actual system that was required to issue DACA renewal

17   notices was EPMS?

18       A.  To put out the -- for those that remain in

19   the CLAIMS and were not otherwise being processed in

20   the Ellis system, electronic system, which would

21   provide documents, then EPMS would handle the

22   notices -- sorry.  I'm just trying to sort of explain.

23   So I understand would process those notices for those

24   prior to July 15, as the notices were going out, would

25   process those that remained in the CLAIMS system.

Page 280

1   Ellis is the on-line electronic system that handles
2   our renewals.
3       Q.  Did the Ellis system continue to issue -- or
4   did the Ellis system continue to produce DACA renewal
5   notices past July?
6       A.  July.  I don't believe so, but I don't know.
7   I don't.  That's why I'll say that.
8       Q.  So to the best of your recollection, as of
9   the end of July, none of the systems were continuing
10  to process and print DACA renewal notices?
11      A.  So as we are discussing, and as I've
12  mentioned with respect to the claims processing and
13  then with respect to Ellis handling, I generally don't
14  know, as we sit here, with respect to the Ellis
15  notification process.  We should, but I'm just not
16  recalling.  I don't know.
17      Q.  Did you ever ask anyone within USCIS or, in
18  fact, ask anyone within the Department how to handle
19  this problem of renewal notices sort of being stopped?
20      A.  As far as the transition, at the end of
21  July -- and again, this is more from a refresher from
22  the interrogatory, but no, I didn't recall raising
23  that to the Department or referencing.  I mean I just
24  don't remember that.  I don't think I did, I should
25  say.  So...  And if I may, as I say, I don't think I

1    did.  I don't recall doing so.  So I want to make it

2    clear that I don't think, but I don't recall doing so.

3         Q.  Did anyone express to you their concern that

4    as a result of this problem with the cost of using

5    EPMS that USCIS beneficiaries out there in the country

6    are not getting the renewal notices they need?

7         A.  With that cessation or with that transition,

8    no.  Sorry.  Can you ask the question one more time.

9         Q.  Did anyone within the department express to

10   you the concern that as a result of the problem with

11   the cost of using EPMS that USCIS beneficiaries are

12   not getting the renewal notices?

13        A.  For DACA, the renewal notices, no.  But

14   again, as I referenced, trying to recall now as we sit

15   with respect to raising that, I don't believe I did

16   so.  So therefore, I don't recall anyone in the

17   department raising that.

18        Q.  And just to be clear, I, for one, have been

19   on various EADs in my pathway --

20        A.  Sure.

21        Q.  -- based on various different immigration

22   statuses, not DACA.  Do you know whether within this

23   period of time people with an F1 Visa, H-1B, TPS, any

24   other types of statuses or thousands, if you will,

25   were they also not getting their renewal notices?

1          MR. GARDNER:  Objection.  Compound.

2          THE WITNESS:  So with respect to what -- as I

3    understand your question, this goes to the point again

4    of what other notices were going out, whether from

5    CLAIMS, EPMS, or others.  And we do send notices.  I

6    just don't know, and you asked several questions.  I

7    don't know with respect to those.

8          MR. LEE:  Okay.

9          MR. GARDNER:  How much longer do you have?  I

10   think the witness is a little tired.

11         MR. LEE:  No problem.  I actually have about

12   three to five more.

13         THE WITNESS:  Okay.

14   BY MR. LEE:

15     Q.  So I am switching gears to the final topic,

16   and I want to understand whether the various

17   components, USCIS, ICE, CBP, do you maintain, as a

18   general matter, your own databases and own systems?

19     A.  Yes.  You said with respect to the

20   individuals, yes, individual agencies.

21     Q.  And are there systems or databases that all

22   three components can collectively use, collectively

23   access?

24     A.  So we do have -- so yes, with respect to

25   being able to access, but there are qualifications to

Page 283

1    that?

2        Q.  And is that a departmentwide database you're

3    referring to, or do you mean accessing the databases

4    or systems of the other agency?

5        A.  So with our agencies, if I may go to the

6    three immigration agencies.

7        Q.  Please.

8        A.  I can use USCIS as a specific example.  So we

9    have the central index system, USCIS not for that

10   reason, but it is a system.  And, for example, ICE and

11   CBP have a, basically, read only access to that

12   system.

13       Q.  And would information about DACA

14   beneficiaries be contained within the USCIS?

15       A.  It would.

16       Q.  And who at ICE or CBP would have read only

17   access to the system?

18       A.  So I can't speak specifically, but there

19   would be officers that would be granted read only

20   access to do individual queries or requests of the

21   system for that information.

22       Q.  Is that permission at sort of a depending on,

23   like, your title and rank within the department, or is

24   that on an as-needed basis regardless of where --

25           MR. GARDNER:  Objection.  Compound.

Page 284

1           THE WITNESS:  Sure.  If we can break it down.

2    It may help if I explained the -- as I understand that

3    structure --

4    BY MR. LEE:

5        Q.  Please.

6        A.  -- for the system.

7           And again, systems are not my world per se.

8    But it is my understanding that, you know, we have

9    administrators for that, CIS, that can grant that read

10   only access.  Again, I've always understood it's on an

11   individual case by -- taking it out of the DACA part,

12   but a case query, if you will.  Or person centric case

13   query.

14          MR. LEE:  Great.  Thank you very much for

15   your time.

16          THE VIDEOGRAPHER:  Going off the record

17   around at 6:10 p.m.

18          (A recess was taken from 6:10 p.m.

19          to 6:21 p.m.)

20          THE VIDEOGRAPHER:  We are back on the record

21   at 6:21 p.m.

22

23                    EXAMINATION

24   BY MR. ROSENTHAL:

25       Q.  Thank you, Mr. McCament, for your patience.

Page 285

1    Do you understand you're still on the record?

2        A.  Yes.

3        Q.  I'm Josh Rose- -- Joshua Rosenthal from the

4    National Immigration Law Center representing the

5    Batalla Vidal plaintiffs in the case in the Eastern

6    District of New York.

7            And I have a scattered set of questions.  So

8    I hope you'll excuse me for jumping around a bit.

9        A.  Of course.

10       Q.  First, at the August 24 meeting at the White

11   House, I don't recall if you said, do you remember if

12   Zina Gelman Bash was present at that meeting?

13       A.  Yes, I believe she was.

14       Q.  Okay.

15       A.  I believe so.

16       Q.  Great.

17       A.  There was a lot of people.

18       Q.  Second, are you aware of -- are you aware

19   that DACA renewal applicants would sometimes submit

20   their renewal applications or renewal requests after

21   the expiration of their deferred action?  Is that a

22   fact that --

23       A.  Yes.

24       Q.  And are you aware of approximately how common

25   that is?  That has been in the past?

Page 286

1          A.   It's permitted --

2          Q.   Uh-huh.

3          A.   -- under -- in making DACA requests.  Sorry.

4     Let me rephrase.

5               Under operation of the program prior to

6     rescission, yes, that was an option.

7          Q.   And do you have a sense of how many DACA

8     holders took advantage of that option?

9          A.   I know that some did.  Similar to earlier

10    references on numbers, I just, sitting here, don't

11    recall the number --

12         Q.   Sure.

13         A.   -- a number knowing that.

14         Q.   And are you aware that some proportion of

15    DACA renewal applicants submitted their request for

16    renewal less than 120 days before their deferred

17    action would expire?

18         A.   That they might, and that they did, yes.

19         Q.   Okay.   --

20         A.   Perhaps if I can ask -- sorry.  You were

21    asking less than 120 days before expiration of their

22    DACA --

23         Q.   Of their deferred action status.

24         A.   Of their deferred action status, and

25    presumptively the employment authorization?

Page 287

1        Q.  Yes.

2        A.  Yes, folks would do that in a more narrow

3    window than 120 days out.

4            MR. ROSENTHAL:  Okay.  Thank you.  One just

5    piece of housekeeping, if I could mark this as the

6    next exhibit.

7            (Deposition Exhibit 20 was marked for

8            identification.)

9    BY MR. ROSENTHAL:

10       Q.  So Exhibit 20.

11           So this is an E-mail that was produced on

12   Friday.  It's Bates stamped at the bottom DHS7 through

13   -9.

14       A.  Uh-huh.

15       Q.  And on the -- on Pages 8 and 9 there's an

16   E-mail.  There's a source E-mail from Tracy Batla that

17   is labeled "A Tasker."  What is a tasker?

18       A.  A tasker is a task from the department.

19       Q.  And --

20       A.  Sorry.  It's -- thanks for the opportunity to

21   sort of think this through.  As noted, as I see on the

22   subject line, a tasker meaning a request for action,

23   information, a task to be completed by one of the

24   components or the recipient of that task.

25       Q.  And do all taskers go through the executive

Page 288

1   secretary?

2       A.   They are supposed to.

3       Q.   Should I interpret that to means that

4   sometimes they don't?

5       A.   If I can explain that.

6       Q.   Uh-huh.

7       A.   Because what's entitled "component tasker"

8   and coming through ExecSec, then all of those would go

9   through ExecSec.  But when you were saying a tasker,

10  it's also you could be asked to do something.  It

11  would be viewed as a task and wouldn't necessarily go

12  through ExecSec.  They should.  They usually do.

13      Q.   And you mentioned certain pieces of

14  information that you were asked by Gene Hamilton to

15  provide.  Do you recall whether all of those were sent

16  through the executive secretary?

17      A.   So I don't recall those coming through the

18  executive secretary, and that would go to the point I

19  just referenced with those that go through and others

20  that are "asks" that are tasks.

21      Q.   Sure.  All right.  So to move on to my next

22  question, I'd like to go back to the administrative

23  record, which is Exhibit 3 from the prior deposition.

24  Specifically to the memorandum, the Duke memorandum

25  ending DACA Page AR253.

1          MR. GARDNER:  -252?

2          MR. ROSENTHAL:  -253.

3      Q.  Specifically, I'd like to call your attention

4  to Footnote 1, which says -- could you read

5  Footnote 1, please.

6      A.  Certainly.  "Significantly, while the DACA

7  denial notice indicates the decision to deny is made

8  in the unreviewable discretion of USCIS, USCIS has not

9  been able to identify specific denial cases where an

10  applicant appeared to satisfy the programmatic

11  categorical criteria as outlined in the June 15, 2012

12  memorandum but still had his or her application denied

13  based solely upon discretion.

14      Q.  Do you know if you were the source of the

15  factual representation in that footnote?

16      A.  So I recall reviewing it and seeing a

17  footnote, and it is factual that our system does not

18  call out a denial by discretion, that the reason for

19  the denial is for discretion.

20      Q.  Does your system -- I'm sorry to go back to

21  information systems.

22          MR. GARDNER:  You promised, Josh.  You

23  promised.

24  BY MR. ROSENTHAL:

25      Q.  Does your system have a way to record the

Page 290

1    reason for denial of a DACA request?

2        A.  So it -- the way that our system, as I

3    understand the system, is it will record a denial --

4    if there is a denial, it will record that the denial

5    was made.  It does not -- as I've always understood,

6    it doesn't break out the subparts or the reasons or

7    the rationales per se.

8        Q.  So the fact that USCIS has not been able to

9    identify specific cases is potentially a reflection of

10   the limitations of the information system as opposed

11   to whether those cases exist?

12       A.  Yes, that's correct.  Or could be, yes.

13       Q.  And do you have a way of knowing whether

14   that's correct?

15       A.  That the system doesn't track in that way?

16   Yes.

17       Q.  Let me rephrase.

18           Do you know whether there are any cases that

19   exist where an applicant appeared to satisfy the

20   categorical criteria but had his or her application

21   denied based solely upon discretion?

22       A.  So I'm not aware -- so I'm not aware of

23   cases.  I've not been provided those.  I do understand

24   that I think there's been previous testimony in the

25   DACA -- sorry, in the Texas litigation originally

1  that, if I recall, I think that there may have been a
2  couple of cases identified where it appeared
3  discretion was a factor.
4        But if I can add to that, you know, we
5  mentioned the system limitation.  So there's that
6  aspect for the tracking.  But just as an example, a
7  determination that, you know, for reasons of public
8  safety a person should be denied DACA is itself a
9  discretionary action because you're looking at a
10  totality or an adjudicator would be reviewing to say,
11  "I believe this person may be a concern to public
12  safety."  So that would be an exercise of discretion.
13        Q.  I'm going to --
14        A.  I -- yeah.
15        Q.  -- to ask the question before I move on to
16  this exhibit a little bit differently.
17        A.  Sure.
18        Q.  Are you -- do you know that there have been
19  no individual cases that were denied on an exercise of
20  discretion?
21        A.  If I say it correctly with the double
22  negative in a way I do not know that there have been
23  no cases for this reason.  The way to ultimately
24  determine that would be to go through each case of the
25  approximately 800- -- or more than that, 800,000 cases

                                                    Page 292

1    to review the file.

2         Q.   And --

3         A.   So that's why I would say no, not say there

4    were no cases, yes.

5         Q.   Sure.  And USCIS didn't do that kind of an

6    analysis in response to the June 29 letter or these

7    August meetings we've discussed?

8         A.   No.

9              MR. ROSENTHAL:  I'd like to mark Exhibit 21,

10   please.

11             (Deposition Exhibit 21 was marked for

12             identification.)

13   BY MR. ROSENTHAL:

14        Q.   So I'm going to represent that this is a

15   written question submitted to USCIS by Senator

16   Sessions following a hearing on DACA, and do you have

17   any reason to disagree with that representation?

18        A.   Having -- reading it now?

19        Q.   Yeah.

20        A.   No, I do not.

21        Q.   All right.  And just to clarify, this is

22   Jefferson Sessions when he was in the senate on the

23   senate judiciary committee.  Can I direct your

24   attention to the first paragraph of the response, one,

25   two, three, four, five, six, seven, eight, nine lines

Page 293

1    down at the sentence starting "For example."

2          A.   For example.

3          Q.   And do you acknowledge that this provides two

4    examples of individual DACA requesters who were denied

5    in an exercise of discretion?

6          A.   Yes.

7          Q.   Do you have any reason to believe that these

8    examples were false or inaccurate?

9                MR. GARDNER:  Objection.  Lack of foundation.

10   BY MR. ROSENTHAL:

11         Q.   Are -- you can answer.

12         A.   Sure.  So on the basis this was submitted to

13   Congress, in response it appears to a question for the

14   record and what's stated, no, I have no reason to

15   doubt that.

16         Q.   Okay.  The last subject that I'd like to talk

17   to you about briefly are a couple of other programs

18   administered by USCIS.  The first is deferred enforced

19   departure?

20         A.   Yes.

21         Q.   Are you familiar with deferred enforced

22   departure?

23         A.   I am generally.

24         Q.   Is there an established procedure by which

25   the Secretary determines whether to extend deferred

Page 294

1   enforced departure for a given category of

2   noncitizens?

3        A.  So I believe that deferred enforced departure

4   is actually a power that's executed, exercised, I

5   think -- I believe by the president of foreign affairs

6   policy, powers.

7        Q.  So is it your understanding that that's a

8   directive that would come from the President?

9        A.  It's my understanding because of one example

10  of which I'm aware.

11       Q.  Is that example the example of Liberia?

12       A.  It is.

13       Q.  Okay.  To move on from deferred enforced

14  departure, are you familiar with the automatic

15  extension of work authorization from January 17, 2017?

16       A.  So familiar with the mechanics of the auto

17  extensions?

18       Q.  Are you aware that USCIS automatically

19  extended work authorization for a number of EAD

20  holders in January of 2017?

21       A.  Yes, I recall that.

22       Q.  And could you recall what that entailed.

23       A.  So what I recall, and I was in the service

24  centers at the time, that we auto extended for a

25  period of time on the basis as we were processing

1    applications, and I believe in that instance, if I'm

2    not misremembering, I think that was for TPS

3    recipients.

4         Q.  I believe it included TPS recipients as well

5    as certain other categories --

6         A.  I believe that's right.

7              And again, as I recall, at that time what we

8    would do is auto extend, meaning that we would put

9    into the system the extension by a certain time

10   period, and I just don't recall, honestly, in January

11   what that time period was.  It's a small period of

12   time, I believe.  So that the system registered that

13   the employment authorization document that the person

14   held was -- in fact, had an extended validity period.

15        Q.  So the EAD itself would have a certain

16   expiration date but it would, in fact, be valid past

17   that expiration date?

18        A.  It would be valid past that expiration date,

19   and therefore, if somebody checked it, they would see

20   it was extended beyond.

21        Q.  So if DHS decided to extend the validity of

22   EADs granted to DACA recipients past their current

23   expiration dates, it would be operationally possible

24   to do so through an automatic extension of work

25   authorization?

Page 296

1          A.   It would be possible, as far as I know, yes.

2               MR. ROSENTHAL:  All right.  Could we go off

3     the record, please.

4               THE VIDEOGRAPHER:  We're going off the record

5     at 6:37 p.m.

6               (A recess was taken from 6:37 p.m.

7               to 6:38 p.m.)

8               THE VIDEOGRAPHER:  We are back on the record

9     at 6:38 p.m.

10

11                         EXAMINATION

12    BY MS. KHAN:

13         Q.   So I'm Sania Khan from the New York Attorney

14    General's office on behalf of the plaintiff states and

15    a related matter New York V. Trump.  I just have a few

16    quick questions for you.

17         A.   Yes.

18         Q.   First, with regard to the August 24 meeting

19    at the White House, you mentioned earlier that there

20    was a tentative decision reached at the end of that

21    meeting.  My question is was that based on consensus?

22         A.   Yes, and I believe I said a tentative

23    decision in part or words to that effect.

24         Q.   Right.  Right.

25         A.   Right.

Page 297

1    Q.  So just to understand the structure of the

2    meeting, was everyone sitting around a big table like

3    this?

4    A.  They were, with some folks at the back, sort

5    of ringing around.

6    Q.  And you mentioned there were multiple

7    conversations.  Were there multiple conversations

8    within groups, or was it a conversation around the

9    table?

10         MR. GARDNER:  Objection.  Compound.

11   BY MS. KHAN:

12   Q.  Was it a conversation around the table?

13   A.  It was.

14   Q.  And were there also conversations within

15   groups?

16   A.  Not that I recall.  It was as with us.

17   Q.  So what did you mean when you said there were

18   multiple conversations?

19   A.  So if I use -- I'm discounting I used the

20   word "multiple conversations," but my intention in

21   saying that was that there were multiple people

22   speaking.

23         And secondly, that they were discussing

24   topics but not that they were, as unfortunately, I

25   think, a couple time I've done during this deposition,

Page 298

1    spoken over someone.  It was a conversation with

2    multiple people.  But thanks for the opportunity to

3    clarify.

4         Q.  Were there disagreements?

5         A.  Yes.

6         Q.  Who was in disagreement?

7              MR. GARDNER:  Objection.  Calls for

8    disclosure of information subject to deliberative

9    process privilege.

10             I'll instruct the witness not to answer.

11             MS. KHAN:  That doesn't count as identifying

12   a person?

13             MR. GARDNER:  No, because I think now you're

14   getting really into the substance of the deliberations

15   there.

16             MS. KHAN:  So we'll reserve our right to ask

17   that pending the decision.

18             THE WITNESS:  Understood.

19   BY MS. KHAN:

20        Q.  Okay.  So then moving on to data.

21        A.  Yes.

22        Q.  You mentioned that your team had compiled

23   certain data points with regard to DACA.

24        A.  Yes.

25        Q.  What were those data points?

1          MR. GARDNER:  I'm going to also object.

2    You're asking about the data collected with respect to

3    the decision to rescind DACA?

4          MS. KHAN:  Right now I'm asking generally

5    about DACA as a program.

6          MR. GARDNER:  Sorry.  I just want to make

7    sure I understand your question.  Are you asking what

8    his job responsibilities are for the collection of

9    data, generally because I have no objection to that

10   question.  I thought you were asking a different

11   question about what data he was collecting with

12   respect to the decision.  I'm sorry.  I'm not trying

13   to give you a speaking objection.  I want to be sure I

14   understood the question.

15         MS. KHAN:  Those are all great questions I

16   wish I would have asked.

17         MR. GARDNER:  You can totally take them.

18   BY MS. KHAN:

19      Q.  What I wanted to ask was what data points

20   were compiled during the duration of DACA?

21      A.  I see.

22         MR. GARDNER:  No objection to that.

23         THE WITNESS:  Understood.  So I can provide

24   several.  I will say particularly at this point in

25   time it probably is not exhaustive, but I can provide

Page 300

1    a list as I recall for sure.

2    BY MS. KHAN:

3        Q.   That would be great.

4        A.   So data with respect to those who had

5    requested DACA, data with respect to those who were

6    rejected -- so those who had requested -- I'm trying

7    to go through sort of through the process -- those who

8    had been -- when they filed their request with a

9    lockbox, the data as to who was rejected as we

10   discussed earlier with Ethan.  Then those that were

11   approved.  Those that were denied.  Then as far as

12   data -- I mean so those, I'm sort of using the numbers

13   of those coming in for initial, subsequent to 2014,

14   renewals.

15          And then the data -- so not to delineate

16   exhaustively, but then the data that was used to make

17   adjudication decision, specifically, if I may recast

18   that, it would be what's requested on the application

19   form, a request form, the I-821D.  For the initials,

20   and then obviously, there's a subset of that.  They're

21   relatively small for renewal.  So all of that data

22   used to make that adjudication.  And then the

23   biometric information.  I think when we're saying,

24   "data," I'm using data in the broad sense.  So it's

25   not necessarily numeric data when I speak about

1   biometrics, for example, or what's provided in the

2   request form.

3        Q.  So let me ask you this:  For example, was

4   data with regard to certain professions of DACA

5   recipients, is that compiled?

6        A.  So I'm trying to recollect on the form what

7   was asked with respect to what someone's current

8   action was knowing that an initial request for DACA,

9   you know, required an educational component.  And I

10  apologize, I just don't remember on the form, on the

11  request form what, if that was requested as far as

12  profession.

13       Q.  Okay.  So I'm going to move on.  Are you

14  aware of any plans to deport DACA grantees after the

15  March 5, 2018 deadline?

16       A.  I'm not -- so I'm not aware of any plans to

17  deport DACA recipients after March 5 with the note, as

18  Evan and I have discussed, I think probably a couple

19  of times, that with the expiration of validity periods

20  and DACA beginning post March 5, those persons would

21  be subject to the possibility of removal depending

22  upon ICE's assessment of that prioritization.

23       Q.  Are you aware of any plan to use -- beyond

24  the caveat that's explained in the frequently asked

25  questions, are you aware of any plan to use DACA

Page 302

1   information for enforcement purposes after the March 5

2   deadline?

3       A.  I am not aware of any plans to do so.  I

4   would point again, though, as we've said, since 2012

5   in that respective FAQ, that that policy to not

6   provide for immigration proceedings is subject to

7   revocation or change.  But we've said that since the

8   beginning.

9       Q.  Okay.  And with regard to notices, to your

10  knowledge, were there any notices, individualized

11  notices sent with regard to informing DACA grantees of

12  the rescission of DACA?

13      A.  No notices sent out but, if I may, we

14  provided broad notification publicly on September 5 on

15  our website, and as well as noted with some of the

16  reference documents to me, noting that DACA has

17  changed and the parameters.

18      Q.  And with regard to the databases --

19      A.  Yes.

20      Q.  -- do the databases that you named, I think

21  you named CIS and within that Ellis and then

22  separately TECS database; is that right?

23      A.  CIS for sure.  Ellis is an electronic system

24  in which over the last several years USCIS has brought

25  a few of our work product lines for electronic

Page 303

1    adjudication, brought them into that system.  So that

2    is a -- it's not a subset of CIS.  I'm not real good

3    and clear in explaining systems, but we have multiple

4    systems and how they integrate and work, both for

5    intake and adjudication.

6            Ellis processes the adjudication of the DACA

7    renewals, and then TECS is, I think I explained

8    earlier, at one time treasury enforcement system.  Now

9    it's just known by its acronym.

10       Q.   Uh-huh.

11       A.   That's really a database with respect to

12   criminal history or information from the law

13   enforcement committee.

14       Q.   Sorry.  I'm not trying to cut you off.  Just

15   because of time.

16       A.   Sure.

17       Q.   The specific question I want to know is

18   whether family or guardian info of DACA grantees is

19   kept with their information in those databases?  Kept

20   alongside DACA grantee information.

21       A.   So to the extent that there's a -- I

22   understand your question.  I'm trying to explain it as

23   I understand it.  That that family or guardian

24   information, to the extent it would be included in

25   their application, would be in the database.  I mean

Page 304

1    that's -- to the extent it's part of what they provide

2    in their application itself, the DACA requester.

3              MS. KHAN:  I think that's it for me.

4              THE WITNESS:  Okay.  Thank you.

5              MR. DETTMER:  I guess we should just say that

6    obviously, given the disputes that we talked about

7    before, we're going to reserve rights to reopen.

8              MR. GARDNER:  And we understand.  We'll cross

9    that bridge when we get there.

10             MR. DETTMER:  Absolutely.

11             THE VIDEOGRAPHER:  All right.  If that is

12   everything, this concludes today's questioning.  We

13   are going off the record on October 17, 2017 at

14   6:49 p.m.

15             (Witness excused.)

16             (Deposition concluded at 6:49 P.M.)

17

18

19

20

21

22

23

24

25

Page 305

1            C E R T I F I C A T E

2        I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15                    Nancy J. Martin, RMR, CSR

16

17   Dated:  October 18, 2017

18

19

20

21   (The foregoing certification of this transcript does

22   not apply to any reproduction of the same by any

23   means, unless under the direct control and/or

24   supervision of the certifying shorthand reporter.)

25

Page 306

1                    INSTRUCTIONS TO WITNESS

2

3            Please read your deposition over carefully

4    and make any necessary corrections. You should state

5    the reason in the appropriate space on the errata

6    sheet for any corrections that are made.

7               After doing so, please sign the errata sheet

8    and date it.  You are signing same subject to the

9    changes you have noted on the errata sheet, which will

10   be attached to your deposition.  It is imperative that

11   you return the original errata sheet to the deposing

12   attorney within thirty (30) days of receipt of the

13   deposition transcript by you.  If you fail to do so,

14   the deposition transcript may be deemed to be accurate

15   and may be used in court.

16

17

18

19

20

21

22

23

24

25

Page 307

1           ACKNOWLEDGMENT OF DEPONENT

2           I, JAMES McCAMENT, do hereby certify

3    that I have read the foregoing transcript of my

4    testimony taken on 10/17/17, and further certify

5    that it is a true and accurate record of my

6    testimony (with the exception of the corrections

7    listed below):

8    Page   Line                Correction

9    _____|_____|_____|_____

10   _____|_____|_____|_____

11   _____|_____|_____|_____

12   _____|_____|_____|_____

13   _____|_____|_____|_____

14   _____|_____|_____|_____

15   _____|_____|_____|_____

16   _____|_____|_____|_____

17   _____|_____|_____|_____

18   _____|_____|_____|_____

19   _____|_____|_____|_____

20   _____|_____|_____|_____

21

22   Signed under the pains and penalties of perjury

23   this _____ day of _____, 20____.

24

                 _____

25                    JAMES McCAMENT

[& - 240]

**&**

**&**   1:20 2:10,17
8:13 232:11

**0**

**05211**   1:5

**1**

**1**   5:16 7:12 53:16
158:3,6 161:7
188:22 248:22
289:4,5
**1,045,000**   185:18
**10**   5:19 51:20
52:13 56:13,14
57:4 60:4
**10/17/17**   307:4
**100**   168:8 172:17
272:12,19,21
**100,000**   122:10,19
236:6
**10271**   3:12
**1050**   1:21 2:18
7:24
**10:21**   52:18,19
**10:35**   52:20,22
**11**   5:21 137:13,14
137:17 139:10
147:15 148:7
155:9,12 255:10
256:13
**1121**   3:5
**118**   5:13 17:7
**11:30**   24:2
**11:45**   99:21,22
**12**   5:23 11:23
151:23,24 152:2
155:8 160:10,13
166:21 264:20
266:21 267:10
**120**   3:12 160:17
286:16,21 287:3

**12:00**   99:23,25
**12:35**   124:10,11
**13**   5:24 171:22,23
180:10,11
**137**   5:21
**14**   6:4 174:9,12,13
180:10,16 181:5
**140**   28:22
**14th**   3:5
**15**   6:5,8 29:24
181:16 182:21,23
183:11 187:22
195:2 196:7 211:6
279:24 289:11
**150**   28:22 161:3
**151**   5:23
**1515**   2:5
**16**   5:11,13 6:10
162:15 164:17
181:4 189:12,15
189:16
**17**   1:5,16 6:12 7:1
7:4 162:16 215:14
215:18 294:15
304:13
**171**   5:24
**174**   6:4
**18**   6:14 217:23
218:1 257:1
305:17
**180**   165:6,7 172:15
272:11,22
**182**   6:5,7
**189**   6:10
**19**   6:17 257:2,3,6
**193**   6:24
**1:30**   124:8
**1:38**   124:12,14
**1b**   281:23

**2**

**2**   5:24 6:6,8,21
28:1 50:8 158:7
161:12 217:12
248:24
**20**   3:22 4:4 6:4,19
6:20 160:10
174:14 195:16
196:2 259:2 287:7
287:10 307:23
**200**   3:5
**20001**   2:12
**20005**   3:6
**20036**   2:19 7:25
**2006**   38:1
**2010**   26:22
**2012**   27:8,10 29:8
29:19,22,23,24
30:8 32:14 123:24
181:16 183:16
184:22 185:6
195:2 211:6
289:11 302:4
**2012-2013**   133:10
**2013**   138:1,24
185:6
**2014**   29:9,10 41:25
41:25 43:14 44:11
146:23 152:16
154:1 161:1 162:9
195:16 272:24
300:13
**2015**   29:14 172:13
172:25 175:14
272:25
**2016**   161:22
**2017**   1:16 5:12
6:16,17 7:1,4 17:6
54:24,25 55:1,25
168:11 183:17
188:18 189:22

**196**:2,7 211:5
218:5 236:11
257:7 273:4,14
294:15,20 304:13
305:17
**2018**   242:8 301:15
**202**   2:12,19 3:6,18
3:23 4:5
**20528**   3:18
**20530**   3:23 4:5
**21**   6:17,20 124:23
129:11 130:2
131:2 166:20
209:1,8 245:12
246:11 247:5,20
248:3 257:7
260:23 292:9,11
**2100**   2:6
**212**   3:13
**215**   6:12
**217**   6:14
**21st**   132:3,24
**229**   196:1
**232**   5:4
**234**   196:1
**237**   196:6
**238**   196:10 252:21
**239**   199:17 207:2
**24**   73:15,16 88:5
88:17 89:21,25
91:19 93:1,4 95:1
96:8 98:1 99:2
100:6,14 102:20
103:1 109:10
127:5 177:18
209:15 264:14
266:3,15,20 267:8
267:12 285:10
296:18
**240**   197:2

**241** 196:19 197:7
**244** 5:5
**24th** 93:13 109:21 127:13 132:3
**25** 5:18
**250** 196:11 197:8 197:14
**251** 196:17 197:12
**252** 198:1 289:1
**253** 289:2
**256** 193:16 197:14 198:1
**257** 6:17
**26** 5:15
**260,000** 57:13
**27** 172:13
**284** 5:6
**287** 6:19
**29** 247:11 292:6
**292** 6:20
**296** 5:7
**2:38** 167:21,22
**2:49** 167:23,25
**2nd** 29:23

**3**

**3** 5:12,20,22 6:19 6:21,24 17:6 153:17 161:14,21 163:8 164:9 186:4 186:7 193:11,18 210:16,18,20 252:18 254:20,22 273:10,11,25 274:4,12 278:13 288:23
**30** 57:14 60:25 183:17,21 184:11 188:17 306:12
**305-7583** 3:23
**31** 89:22

**32** 5:23
**37** 20:2
**38** 20:5
**3:46** 208:2,3

**4**

**4** 5:12 6:10 51:2 171:10 176:23 211:5
**4-4** 117:10
**4/20** 176:24
**40** 50:19
**416-8534** 3:13
**44** 231:22
**447-3891** 3:18
**45** 124:8
**470-6412** 3:6
**4:00** 208:4,6
**4:30** 24:2
**4:35** 232:2,3
**4:41** 232:4,6
**4:56** 244:6,7
**4:58** 244:8,10

**5**

**5** 6:16 57:6,7 102:13,19 104:4 114:8,12 116:25 118:25 119:16 122:12 180:10 190:13 199:2 206:19 218:5 231:22 233:24 242:8,16,18,23 243:1,6,11,18 264:14 265:25 266:10,23 267:3 267:11 301:15,17 301:20 302:1,14
**51** 181:5,9
**510** 2:7

**514-1280** 4:5
**53** 5:17
**535** 30:17 151:20
**56** 5:19
**5:00** 24:3
**5:09** 252:25 253:1
**5:25** 253:2,4
**5th** 206:17 267:13

**6**

**6** 5:11 16:20,22 17:1,9 189:22
**6-5-2015** 172:11
**64,779** 188:18
**662-5367** 2:12
**690,000** 121:14,18 122:20
**6:10** 284:17,18
**6:21** 284:19,21
**6:37** 296:5,6
**6:38** 296:7,9
**6:49** 304:14,16

**7**

**7** 5:13 6:19 16:20 16:22 17:7 18:16 20:3
**7,130** 188:15
**7-1/2** 51:3
**70** 57:12 58:2 59:7 60:1,3 62:9 275:11
**71-5** 56:20
**76,824** 185:21
**79** 188:21

**8**

**8** 5:15 11:23 25:25 26:1,5 50:11 51:3 66:15 156:8 287:15
**800** 291:25

**800,000** 121:16 291:25
**821d** 6:5,8,10 183:14 189:18 300:19
**850** 2:11
**855** 177:18
**879-0094** 2:7
**895,574** 188:13

**9**

**9** 5:3,17 6:19 53:4 53:5,7,20,25 58:4 66:3,14 67:13 177:1,7 179:6 287:13,15
**94612** 2:6
**955-8500** 2:19
**963,443** 185:21
**9:14** 1:22 7:1,4

**a**

**a.m.** 1:22 7:1 52:18,19,20,22 99:21,22
**aberengaut** 2:13
**ability** 40:14 45:3 82:24 158:22 191:21 224:14
**able** 15:1 89:10 113:8 158:9,15 160:7 164:13 166:25 178:24 179:12,12,16 282:25 289:9 290:8
**absence** 101:17
**absent** 14:13,23 227:1 235:9
**absolutely** 81:20 89:11 196:22 197:2 304:10

accept   188:9 267:4
acceptable   84:13
accepted   184:15
 184:17 185:12,16
 185:20,22 205:15
accepting   190:3
 242:13,15
access   41:4 115:18
 153:15 282:23,25
 283:11,17,20
 284:10
accessing   283:3
acclimated   47:4
accommodating
 93:25
accorded   256:22
account   179:8
accurate   19:1
 20:24 26:14 51:2
 306:14 307:5
accurately   53:15
 140:1
achievements   5:16
 26:13
acknowledge
 293:3
acknowledgment
 307:1
acronym   141:13
 141:25 273:22,23
 303:9
acronyms   162:4
act   14:21 20:9
 117:24 121:21
 201:20 224:8
acting   1:10 5:15
 6:14 7:18 26:7
 29:13 41:15,19,19
 41:24 42:1,5,7,9
 42:12,15,18 47:10
 47:12,14,16 48:20

50:5 58:12,25
59:1,3 65:16 67:1
68:5 69:2,10 70:1
70:1 72:16,17,18
72:23 73:21 79:21
81:8 85:9,21
86:11,12,16,17
87:19,23 96:16
125:11 126:2
203:17 206:21,23
208:9 218:3,14,19
267:25 268:1
action   5:21 6:10
 6:12,15 8:4,10
 10:22 12:8 14:22
 14:23,23 15:16
 16:15,16 17:5
 46:6 120:10
 137:20 140:15
 142:21 143:5,9
 147:16 148:11
 149:14 156:19
 158:4,5,6 159:1,1
 160:19 167:2
 172:16 183:14
 189:19 190:4
 201:4,9,16,18,22
 207:20,20,21,22
 215:21 218:4
 223:12,19 225:17
 225:20,21 226:6
 226:19 227:1,17
 229:7,13,14 230:5
 230:16 235:16
 236:10 243:24
 256:15 285:21
 286:17,23,24
 287:22 291:9
 301:8 305:12
actions   16:17
 121:19 203:8

214:10,11 223:2
253:7
active   121:15
 122:3
actively   235:13
actual   30:8 115:6
 174:18 187:8
 212:7 273:5
 279:16
acumen   213:19
add   20:11 59:7
 173:19 227:7
 236:15 291:4
added   159:10
 213:2
adding   199:6
addition   15:3
 23:15 43:4 57:14
 120:6 187:6,10
 208:18 234:13
 261:7,8
additional   120:25
 132:18,20 191:2
 235:15
address   36:21
 147:7 148:2 150:5
 159:16 187:8
addressed   39:16
 39:17 120:9 255:6
addressing   148:13
 148:19 149:16
adds   159:15
adjacent   76:5
adjudicate   216:7
 242:9
adjudicated
 122:16
adjudicating
 216:5
adjudication
 187:19 188:10

189:4 216:3
242:12 274:5
300:17,22 303:1,5
303:6
adjudicator
 291:10
adjudicators
 216:11,21
adjurations   6:20
adjust   161:12
adjusted   75:10
adjustments   43:24
 43:25 48:10
 175:15 251:15
administer   8:3
 14:6 38:22 40:24
 200:20 201:25
 231:7 235:10
 238:13,15
administered   49:5
 51:15 201:17
 234:14 293:18
administering
 171:9 213:23
administers   31:1
administrating
 50:13
administration
 54:15 55:5 59:24
 156:21 157:4,7,16
 157:18,22 210:4,6
 210:11 212:13
 222:11 223:21
administration's
 10:21 17:5 157:21
administrative
 47:14 55:9 193:14
 194:9,11,12
 252:18 254:19
 288:22

**administrator** 47:15

**administrators** 284:9

**advance** 17:17 88:5 92:4 108:17 167:4,8 172:18 181:17 227:8

**advanced** 167:10 167:14 227:3

**advantage** 286:8

**advice** 108:8 111:6 111:12 190:19 191:13 193:8 221:16 236:25 240:8 249:4 260:21

**advise** 148:23 243:14

**advised** 30:1

**advisor** 23:19,21 23:23 263:17,24

**advisors** 125:17

**advocacy** 155:2 173:22 174:2

**affair** 27:25

**affairs** 27:12,16,19 29:5,11,16 30:4,14 31:14 37:25 41:14 46:20 47:9,9 48:18 55:7,8 56:3 74:19,21 134:23 134:24 136:8 138:25 149:21 150:5,10 153:1 175:17,22 270:8 294:5

**affect** 278:16

**affiliation** 142:13 142:15

**affirmed** 9:17

**aforesaid** 305:2

**afternoon** 124:16 124:17 232:10 244:14

**ag** 123:13

**ag's** 123:4,7,7,18

**ag.ny.gov** 3:13

**agencies** 15:8 27:19 35:12 40:19 41:5 127:21 128:1 212:4 261:21 262:18 263:1,2,8,9 270:4 282:20 283:5,6

**agency** 27:25 28:9 42:18 43:5 103:20 129:5 137:9 159:11 213:5 230:4 271:3,19 283:4

**agenda** 76:10,12 76:14,17,19,24 77:16 78:2,6 90:3 90:6 94:22

**ago** 10:17 21:1 30:23 32:1 36:3 87:23 189:22 225:7 243:22 272:16

**agree** 7:10 12:14 12:22,24 13:3 14:10 20:20 45:2 99:14 106:21 130:13 147:13 224:2 227:15,16 227:21 228:18,20 228:24 249:6 255:6 259:18 277:12

**agreeably** 254:6

**agreed** 150:23

**agreement** 93:11

**ahead** 22:25 76:20 76:24 77:24 94:18 97:8 162:7 202:24 219:13 228:5

**aided** 305:9

**air** 37:2

**al** 3:14,14 8:24

**alejandro** 35:3

**alien** 207:8

**allotment** 244:2

**allow** 77:19 177:7 218:24 219:16 223:16

**allowed** 15:16 158:4,7 159:23

**allowing** 224:8

**allusion** 120:17

**alongside** 303:20

**alsup** 84:16 253:7

**ambassador** 132:24 261:10

**amend** 19:14 119:12 132:23

**amended** 123:16

**amending** 211:18

**amendment** 116:21,24 118:25 201:15 203:9

**americans** 236:10

**amora** 23:15

**amount** 28:2 29:3 169:19 235:3

**analysis** 169:18 236:1,17 260:13 292:6

**analyzing** 57:12

**andrew** 75:7

**anniversary** 43:15

**annotation** 19:18

**announced** 30:2 32:12 33:1 41:8

**announcement** 29:22 32:5,23 107:17 206:2 225:22

**answer** 15:25 18:9 20:13,22 22:19,20 22:25 31:18 37:12 37:13,14 68:16 77:19,22,24 78:16 79:16 82:22 83:3 83:7 84:6 85:25 88:10 89:5 91:14 92:11 94:5 96:9 99:6 101:1,3 107:6 108:5 110:6 111:11 115:1 128:14 129:17 130:10 132:23 136:23 141:3 143:3 148:24 150:16 154:13 162:18,21 168:16 170:18 177:7 179:2,6 180:14,21 181:13 190:18 191:8 192:4,7,11 193:7 199:23 204:13 205:8 206:8,9 209:23 219:5 220:23,25 221:13 226:11 227:18 229:15 230:18,23 235:6 235:11 236:24 240:7,17 245:18 249:3 260:18 262:15 269:9

[answer - asking]                                                                Page 5

279:5,6 293:11
298:10
**answered**   151:1
199:22 200:5
**answering**   153:14
226:20
**answers**   31:2 34:8
84:19 155:12
180:9
**antonin**   26:18
**anybody**   23:18
74:22 93:4 96:22
104:21 105:12,24
111:23 112:22
113:23,23
**anymore**   163:22
164:22 276:13
**anyone's**   45:15
**apart**   84:18,21
85:14 117:19
186:15 202:17
**apologies**   109:12
197:18,23 203:1
230:8 234:3
249:23
**apologize**   16:5
60:15 123:19
126:1 182:24
192:16 249:22
261:4 272:6 279:4
301:10
**appear**   119:24
156:1,3
**appeared**   289:10
290:19 291:2
**appearing**   199:3
**appears**   152:11
155:14 156:15
183:22 185:14,19
293:13

**applicability**
253:9
**applicable**   254:4
**applicant**   289:10
290:19
**applicants**   39:15
46:1 87:1,3
148:19 173:18
285:19 286:15
**application**   32:6
51:16,24 122:19
159:12 160:22
185:24 188:6,9
205:15 289:12
290:20 300:18
303:25 304:2
**applications**   50:13
50:15 51:2,5
171:10 185:12
216:6 242:9,14
285:20 295:1
**applied**   121:16
123:20,21 181:25
**applies**   55:23
**apply**   39:20
139:14 167:3,8
305:22
**appreciate**   18:10
36:2 82:3,4,6,14
84:14 147:9 176:7
194:6 210:23
230:19 252:14
253:22
**apprehended**
177:13,15 178:11
179:7,19
**approaches**   70:2
**appropriate**   15:7
40:18 189:5 254:1
259:4 306:5

**appropriately**
129:7
**approval**   182:7
**approved**   29:2
134:2 181:19
185:12 188:3,13
300:11
**approximate**
63:11 80:8,9,13
**approximately**
11:25 28:22 41:2
50:18 51:3 57:12
57:14 75:15,17
109:9 121:14,15
122:10,11 160:17
236:5 275:10
285:24 291:25
**approximates**
41:2
**april**   87:23
**ar1**   193:21
**ar228**   195:21
**ar235**   196:6
**ar238**   198:13
252:19 254:21
**ar253**   288:25
**ar255**   210:25
**ar256**   193:21
**ar36**   195:14
**ar4**   195:5,13
**ar41**   195:13
**ar42**   195:21
**arbitration**   10:10
**area**   54:6,23 98:10
**areas**   71:24
191:10 192:19
193:2
**argument**   82:16
**arguments**   204:25
**arrest**   180:18

**arrival**   183:15
**arrivals**   5:22 6:10
6:13,15 10:22
12:8 17:6 137:21
140:15 143:6
149:15 156:20
189:19 190:4
215:22 218:4
**arrived**   42:2 46:20
59:4 90:22 91:10
91:23
**articulated**   179:6
248:19 249:6,16
249:25 251:24
**ascribe**   25:22
**aside**   26:18 87:21
**asked**   6:4 11:9
18:4 35:13 46:25
47:6 86:6 108:21
110:16 113:3
115:25 131:16
153:12 156:9
158:4 170:2
174:15 175:10,12
175:25 225:10
243:23 248:14
282:6 288:10,14
299:16 301:7,24
**asking**   18:18
22:11 38:2 60:23
62:2 70:19 72:11
77:8 79:10,11,13
82:17 84:20 93:19
100:22 101:14
107:4 110:5
118:17 131:9,22
135:12 145:5
146:20 179:3
183:4 199:19
204:15 205:2,10
205:21 221:22

224:25 226:13
236:2 245:20
249:1 254:18
257:19 268:5
279:6 286:21
299:2,4,7,10
**asks**  20:7,20
180:16 181:6
288:20
**aspect**  44:22
144:14 231:8
291:6
**aspects**  176:9
**assembled**  11:17
**assert**  81:18,23
115:3
**asserted**  253:10,13
**assertion**  222:2
**assertions**  253:12
**assess**  233:10
253:6,16
**assessed**  233:7
**assessing**  48:13
232:23 234:25
235:18 253:24,25
**assessment**  234:8
301:22
**assigned**  47:23
121:7
**assist**  3:11
**assistant**  74:15
75:9 132:25 261:5
261:14 262:16
263:13
**assists**  13:18
**associate**  49:21,25
50:8,9 271:14
**associated**  232:19
233:7,11,25 237:3
**asst**  3:17,22

**assume**  21:11
185:2
**assumption**  254:3
**assurance**  38:8
151:16
**assurances**  45:8
147:17
**asylum**  50:23
**attached**  76:10
186:25 213:18
306:10
**attacked**  214:7
**attend**  73:5,7 91:8
112:1 262:3
**attended**  73:2,3
**attending**  43:2
76:6
**attention**  172:12
252:16 258:13
259:11 277:2
289:3 292:24
**attorney**  2:4,10,18
3:4,10,11 4:4 6:17
8:17,20,23 24:16
73:22 75:5 79:22
80:7 81:9,23 84:3
93:5 111:25
112:13,16 114:24
116:6,23 117:1,14
117:17 120:9
129:15 130:9
166:4 168:6
169:22 170:6
196:17 207:1
208:20,21 209:7,7
211:5,16 214:21
215:2,6 223:1
234:10,13 237:11
243:15 244:17,24
252:9 254:20
255:7,16 257:8,18

259:21 296:13
306:12
**attorney's**  84:9
**attorneys**  97:15
116:24 118:14,20
119:11 120:5
255:9 258:23
259:2
**audio**  7:9,9
**august**  29:23 30:6
30:8,20 32:8,9,14
32:23,25 33:2,5
44:8,11 46:23
47:6 48:4,4,5
73:15,16 88:5,17
89:21,22,25 91:19
93:1,4,13 95:1
96:8 98:1 99:2
100:6,14 102:14
102:15,20 103:1,7
109:10 124:23
127:5 129:11
130:2 131:2
165:20 166:11
175:14 181:16
209:1,8,15 245:3,8
245:9,9,12 246:1
246:11,17 247:5
247:12,20,20
248:3 260:23
264:14 266:3,15
266:20 267:8,12
285:10 292:7
296:18
**auspices**  103:20
**authority**  211:7,13
243:10
**authorization**
14:15 15:17
120:17 122:9
143:11 158:8

207:14 226:17,21
229:12 230:6,17
231:10 236:6
279:1 286:25
294:15,19 295:13
295:25
**authorize**  63:23
**authorized**  8:3
63:22 64:13
**auto**  294:16,24
295:8
**automatic**  294:14
295:24
**automatically**
167:1 294:18
**availability**
231:13
**available**  40:1,22
**avenue**  1:21 2:18
3:22 4:4 7:24
**avoid**  30:18
137:10 191:20
201:18 244:19
272:5
**aware**  39:19,24
49:17 62:9 64:2,5
72:1 73:4,6
104:12 113:23
117:20,21 124:22
125:4 128:17,20
139:7 147:21,23
169:7,12,13 170:5
175:15 178:10,14
178:15 212:1
214:19,24 215:11
215:24 219:1,19
225:16 240:20
241:2,9,12,14,20
241:21,22,25
242:5,17,20 245:3
246:11,12 247:4

252:8,9 256:13
257:13,16,21,25
258:17 259:8,10
260:12 270:20
285:18,18,24
286:14 290:22,22
294:10,18 301:14
301:16,23,25
302:3
**awareness**   215:8
**awful**   190:24

**b**

**b**   5:9 6:1 15:9
**back**   13:12 18:2
19:12 30:23 35:7
35:20 46:25 49:23
52:15,21,24 56:6
65:4 93:9 99:24
119:4 124:6,13
130:14 133:8,10
134:16 154:1
167:24 171:25
180:4 187:4
195:11 197:21
202:5 207:1 208:5
215:11 222:13,24
223:7 224:6 228:1
228:14 232:5
235:16 244:9
247:10 253:3,5
270:23 278:11
279:11 284:20
288:22 289:20
296:8 297:4
**background**   26:17
140:13,17,21,24
141:7 142:12
143:23,24 144:3
175:5,7 188:8
**backward**   134:15

**bailiwick**   139:2
**ballpark**   182:12
**bank**   51:15
**barbara**   35:19
**bargained**   46:2
**baroukh**   125:13
**based**   36:3 61:22
62:3 71:25 133:18
140:9 142:24
157:1 158:18
159:19 163:7,17
179:18 184:12
194:1 199:13
200:1,2 203:13
206:12 210:8
211:12,23 228:14
237:17 250:9
255:11 259:22
260:5,19 272:23
281:21 289:13
290:21 296:21
**bases**   100:25
**bash**   74:11,12
285:12
**basic**   38:15
**basically**   48:4
117:14 135:5
183:19 283:11
**basis**   22:19 98:21
146:14 177:12
190:7,11 192:25
248:17 249:7
251:23 277:25
283:24 293:12
294:25
**batalla**   3:8 9:2,4
285:5
**bates**   193:20
252:18,20 254:21
287:12

**batla**   287:16
**becerra**   259:21
**began**   29:12 31:22
91:11 161:7
266:15
**beginning**   1:22
27:7 29:21 34:24
46:21 103:7
156:18 166:11
198:15 217:12
246:1 278:24
301:20 302:8
**begins**   14:25 15:6
184:21 222:23
**behalf**   8:10,12,14
8:17,20,23 9:1,4
42:18 296:14
**belief**   38:1,7 39:5
39:13 41:7 119:16
150:25
**believe**   12:16
16:21 19:10,12,16
19:25 20:9 24:2
25:11,16,19 30:10
30:21 36:16 37:15
42:16 44:3 45:5
47:24 55:20 56:8
56:10,23 58:2,11
58:21 59:6,15,18
59:20 60:7,14
61:4 62:10,15
65:15 68:4 73:15
74:1,7,11,13,14,24
75:3,7,9 79:23,24
91:8 95:14 96:16
102:25 103:11
107:18,19 111:25
112:13 125:12,14
125:15,22 127:24
132:24 152:20
153:23 155:10

156:13 160:12
161:24 162:13
165:18,20 166:15
171:6 174:20
175:14 177:14
179:7 180:12
184:12,18,21
186:1 187:1,9,12
189:9 195:13
198:14 217:10
218:14 220:22
228:21 246:10
252:17 254:18,20
255:11 256:16
261:7,11,12 263:7
263:12,23 264:4
267:18 268:10
269:3,25 270:2,6,7
270:9 272:14,24
273:9 275:6 276:5
276:9 278:4 280:6
281:15 285:13,15
291:11 293:7
294:3,5 295:1,4,6
295:12 296:22
**believes**   228:16
**beneficiaries**
218:22 224:18
272:11 278:6
281:5,11 283:14
**beneficiary**   271:2
**benefit**   12:15 13:9
20:14 31:3,11
38:4 40:17,23
49:5 50:19,21
158:5,19,20 159:7
159:24 160:1,3,5
169:18 200:20
238:7 272:6
**benefits**   14:3
15:13 31:1,17

48:24 49:2 154:20
159:14 167:12
174:6 212:13,16
212:21,23 238:17
239:11,17,20
240:2,11 243:17
**best**  22:2,6,10
35:10 51:11
208:25 251:3
266:14 280:8
**better**  28:14 54:9
134:14 204:6
**beyond**  31:15
164:20 201:12,23
202:1 219:14
221:8 265:21,25
266:21 295:20
301:23
**big**  187:22 297:2
**bigger**  83:15
**biggest**  225:13
**binder**  63:19
77:12 193:23
**biographic**  140:17
141:9
**biography**  50:10
**biometric**  140:17
141:10 300:23
**biometrics**  6:6,8
183:16 301:1
**birth**  187:11
**bit**  14:8 21:7 28:20
29:6 32:16 36:15
44:1 80:13 81:5
91:21 118:7
130:15 131:15
133:14 144:12
153:7 172:1
197:16 200:24
201:2 215:18
223:10 225:19

234:7 240:10
242:6 285:8
291:16
**blanking**  182:13
**bleed**  30:8
**bleeding**  32:8
**bleeds**  48:25
**blown**  182:24
183:2
**blur**  36:15
**book**  11:7,13,16
**border**  55:12
125:20 155:23
156:24 177:3
261:14,19 262:17
262:19 263:10
**borrow**  186:4
**bottom**  137:24
166:23 172:8,9,12
176:24 177:1
184:19 217:12
287:12
**bounds**  13:8 15:7
**box**  51:14 83:15
189:25
**boxes**  54:5,9
**branch**  4:3 54:7
103:21 243:5,8
245:1
**branches**  29:4
**brand**  73:24 79:22
**bread**  83:15
**break**  23:3,5 41:11
52:12 99:19 124:5
167:16,18,19
168:2 186:15
202:16 203:2
207:23 208:8
231:24,25 240:10
252:22 253:6
284:1 290:6

**bremberg**  75:7
**bridge**  47:2 304:9
**brief**  207:23
231:23 253:6
**briefly**  9:23 41:20
252:16 293:17
**bring**  25:13 82:24
214:3,14
**bringing**  159:7
**brings**  18:11
**broad**  31:15,21
33:12 59:23,24
160:7 219:20
300:24 302:14
**broader**  30:16
99:15 226:12
**broadly**  65:19
85:17 135:25
154:21 155:3
**broadway**  3:12
**broken**  106:19
185:4
**brought**  51:8
158:12 159:25
160:4 182:15
213:18 245:13
277:2 302:24
303:1
**brownsville**
195:22
**budget**  277:6
**build**  34:20 35:14
35:15 164:14
205:12 275:4,10
**building**  32:9
274:20
**built**  33:25 38:8
44:3 47:23 164:15
206:1,1
**bulk**  50:22 80:23
195:19

**bullet**  190:2
**bunch**  77:16 99:12
111:15 142:2
**bureau**  2:4 3:11
**bureaucratic**
227:17
**burling**  2:10 8:14
232:11
**busiest**  41:4
**business**  12:19

**c**

**c**  2:1 3:1 4:1 75:3
141:18 305:1,1
**cadence**  248:5
**calendar**  90:9
**california**  1:2,5,6
2:3,6,8,15 6:18
7:14,16,22 8:15,16
8:18,19,21 56:8,11
57:9 232:12
244:17,17 253:7
257:8
**call**  30:22 75:19
76:17 85:17 89:1
110:20 134:23
135:16 178:12,15
179:12 199:9
235:25 245:16
246:14,17,21
289:3,18
**called**  126:16
170:6 228:22
273:9
**calling**  178:25
**calls**  30:11,11,19
37:10 40:3 87:16
99:3 107:17 108:2
111:8 129:13
130:6 131:22
144:20 157:9
190:15 193:4

204:10 224:22
236:21 237:21
240:4,14 243:12
258:14 260:15
261:25 262:12
279:2 298:7
**campbell** 4:9 7:25
**canceled** 89:18
91:2,25 93:1
94:20,24 98:2
102:24 103:1
109:11,13,18
111:18,22 112:12
113:4 114:10,19
114:22 213:9
**cancellation** 92:7
92:15
**candidly** 178:8
**capacity** 1:5,10
7:15,18 13:7
40:15
**capitol** 30:16
36:17
**career** 67:9
**carefully** 306:3
**carried** 42:21
**carson** 35:4
**case** 1:4 6:6,8 9:25
14:22 28:2,3,7,12
28:13,15,24,25
31:5,17 38:4
40:20,24 44:20
67:16 76:6 106:15
106:17 117:15
118:3 136:1,11
142:21 143:4
148:12,24 149:2
166:24 167:2
177:11,11 183:16
188:2 190:6,6,11
190:11 192:25,25

193:15 194:8
195:24,24 199:3
199:20 213:22
220:1 238:13
256:8 284:11,12
284:12 285:5
291:24
**cases** 1:13 7:20
9:25 28:9 31:8
57:9 164:17 177:8
193:16 194:9
216:11 289:9
290:9,11,18,23
291:2,19,23,25
292:4
**cash** 51:17
**categorical** 289:11
290:20
**categories** 31:23
183:20 295:5
**category** 213:4
294:1
**caution** 110:1
**caveat** 39:11
134:11 142:9,10
301:24
**caveats** 38:17,18
39:9
**cbp** 155:24 177:4
177:8,10 264:4
270:12,18 282:17
283:11,16
**cc** 255:12 259:22
**cease** 122:14
**cell** 7:7
**center** 2:11 3:3 9:1
9:4 34:2 35:18
50:1,10 52:2,3
56:1 58:22 59:12
171:2,5 178:4
179:21 180:3

276:21,21 285:4
**center's** 177:17,23
180:15
**centers** 34:19 35:9
49:13 50:12,17,22
50:25 51:4 52:1
164:2 171:2,9
273:1 276:1
294:24
**central** 283:9
**centralized** 165:2
273:15,20 274:7
**centric** 284:12
**certain** 47:22
50:21 109:21
114:8 167:4
194:16 201:9,21
201:21 213:22
225:18 288:13
295:5,9,15 298:23
301:4
**certainly** 10:3
13:16 27:16 28:8
30:14 32:4 41:2
41:22 44:18,20
54:14 58:11,17
59:7 62:23 64:5
109:5 123:9,11
124:2 125:21
134:17 138:4
159:4 175:17
186:24 203:18
270:17 271:16
289:6
**certainty** 229:13
230:11
**certification**
305:21
**certified** 1:23
**certify** 305:2
307:2,4

**certifying** 305:24
**cessation** 168:3,14
281:7
**cetera** 71:9 153:13
238:11
**chad** 74:24 111:4
**chain** 269:1
**challenge** 194:10
214:15
**challenges** 235:9
**chance** 21:11
**change** 66:13,24
99:19 134:12
135:7 158:24
173:1,6,7 215:17
272:15,21 274:5
275:9,9 278:12
302:7
**changed** 39:12
50:7 54:25 251:18
302:17
**changeover**
163:17 276:24
**changes** 48:9
171:10 251:15
274:18 275:10,12
306:9
**channels** 132:16
**characterize**
269:16
**characterized**
227:19
**characterizing**
49:6
**chart** 5:18 49:19
49:20 53:22 54:5
55:3 58:5 180:3
184:3 186:4 188:1
**charts** 53:9
**check** 74:14
140:13,21,24

**[check - comment]**

141:7 142:12
143:25 144:3
188:8
**checked**  295:19
**checking**  121:13
**checks**  140:17
143:24
**chief**  23:17 27:11
29:13,14,15 31:14
34:17 35:4 41:15
41:16,19,24 42:2,3
42:5,15 43:2,9
46:16,17,18,20,22
46:24 47:3,9,12,14
56:1,1 58:11,12,14
58:17 59:9 60:21
61:4 62:16 65:23
67:14,15 73:22
74:10,10 75:22,23
90:24 125:11,12
125:15 136:25
137:8 138:25
233:12 255:19,22
255:23,24 268:9
**chiefs**  42:23 43:5
**childhood**  5:21
6:10,13,15 10:22
12:8 17:6 137:20
140:15 143:5
149:14 156:20
183:15 189:19
190:4 215:22
218:4
**children's**  2:4
**choice**  45:19
238:24
**choose**  82:24
**chose**  120:20
222:11 223:21
**circuit**  116:19
118:2 195:23

**circuit's**  117:10
211:4
**circulate**  135:15
**circulated**  135:6
**circumstances**
89:23 149:3
**cis**  284:9 302:21
302:23 303:2
**cissna**  66:19
**cissna's**  66:20
**citizens**  20:17
**citizenship**  5:15
26:7 55:11,13
128:23 137:22
227:20 228:24
229:3
**city**  2:11
**civil**  3:11,21 4:3
**claims**  161:14,15
161:21,25 162:2
163:8 164:9,16,24
164:25 273:10,11
273:19,25 274:4
274:12 278:13
279:13,19,25
280:12 282:5
**clarification**
197:11 273:2
**clarifies**  151:13
**clarify**  18:8,14
72:19 84:24 88:18
202:4 249:22
252:12 274:3,14
292:21 298:3
**clarifying**  105:22
**clarity**  41:8
187:23 244:20
**class**  27:5 213:1
**clay**  2:5
**clean**  93:9 98:24

**clear**  22:8,10
40:16 77:9 81:20
84:11 87:4 98:19
106:24 107:4
119:8 145:5
146:20 159:2
168:8 170:18
171:13 174:1
204:14 209:17
211:6 230:9,21
234:23 247:18,21
251:1,9,13,16
271:18 274:24
281:2,18 303:3
**clearance**  134:22
134:23 135:4,18
136:5,13,24
269:23
**cleared**  135:2
**clearly**  40:19,22
45:22 201:10
217:1 235:6
237:24
**clerical**  185:24
186:11
**client**  81:23 84:3
129:15 130:9
**clip**  193:23
**closer**  34:6 192:13
**cognizant**  110:6
**collaboration**
62:17
**colleagues**  217:20
231:19
**collected**  299:2
**collecting**  57:11
299:11
**collection**  299:8
**collective**  209:11
210:11

**collectively**  282:22
282:22
**colleen**  9:6 23:15
23:16
**column**  139:12,13
140:12 142:20
160:15 166:23
184:14 186:19
188:14
**columns**  185:15
188:2
**coma**  129:23
**combination**
110:21
**come**  17:22 25:5
46:25 49:23 58:6
75:18 88:3 89:2
90:6 109:24
110:10 112:18,19
115:15 124:6
126:19 135:16
142:16,18,23
159:22 176:1
186:12 216:18
244:25 245:11
246:8 249:15
255:15 294:8
**comes**  18:13 25:1
178:16
**comfortable**  36:1
**coming**  20:15
36:10 43:14 44:4
44:11 50:20 68:22
70:17 71:9 102:19
114:12 145:21
146:7 169:8
173:23 288:8,17
300:13
**comment**  165:3
250:16

**commenting** 176:8
176:10
**comments** 37:5
**commissioner**
126:3
**commissioners**
126:8
**commitment**
259:3,10
**committee** 5:12
10:23 19:13
292:23 303:13
**committees** 27:22
**common** 149:24
149:25 150:3
182:4 285:24
**communicate**
105:1
**communicated**
115:15 277:13,18
**communicating**
276:11
**communication**
34:7 69:3 71:15
86:22 87:5 88:24
131:10,21 136:7
215:1,5 246:9
247:8
**communications**
27:22 55:10 56:3
68:13 69:1,5 71:1
79:9 81:25 84:5
84:20,23,25 85:16
85:22 86:10 88:8
88:16 92:25 93:4
97:24 100:5
105:12 107:23
113:17,25 131:1
132:8,9 209:9
214:20 215:1,5,9
215:12 233:2

247:18 248:9
**community**
173:22 174:3
**companies** 240:21
**compare** 256:20
**compares** 71:23
**compendium**
198:8
**compilation**
193:17
**compiled** 298:22
299:20 301:5
**complaint** 119:13
123:16 203:9
211:18
**complete** 34:25
230:11
**completed** 287:23
**completely** 218:25
219:17 223:18
**completion** 73:1
**complex** 163:11
**complexities** 42:16
**complexity** 159:14
**complicated**
161:20 163:18
164:5,11,14
**component** 232:22
232:25 245:1
288:7 301:9
**components**
135:16 269:23
270:5 282:17,22
287:24
**compound** 92:12
130:20 186:14
220:7 282:1
283:25 297:10
**compressed** 44:8
70:15 96:20
270:15

**computer** 63:25
64:1 305:9
**con** 159:15
**concern** 36:5,8,21
37:1,21 38:7
39:14 118:22
145:9,17 146:8
148:14,19 149:16
149:19 150:5
203:6 213:23
278:6 281:3,10
291:11
**concerned** 37:17
146:9 151:10,11
**concerns** 120:15
145:19 146:2
147:7 149:23
**conclude** 254:4
**concluded** 304:16
**concludes** 304:12
**conclusion** 117:23
120:1 210:9
228:15 231:3
243:13
**concur** 130:13
**conduct** 140:13
144:4
**conducted** 146:14
260:14
**conference** 30:11
263:5
**conferences** 47:22
**confidence** 150:24
**confirmation** 42:3
**confusing** 230:19
264:7
**confusion** 30:18
**conglomeration**
142:2
**congress** 10:12
11:10 13:6 14:17

17:17 27:20,23
28:4,11,16 30:17
31:19,25 46:8,13
85:20,22 86:10
87:7,17 150:15
151:9,11,15,18
197:5 201:3,8
218:23 224:19,20
225:5,9,14 293:13
**congressional** 5:13
17:8 18:21 19:19
28:10,23 30:5,11
85:20 86:15
243:23
**congressman**
28:17
**connect** 114:15
**connecticut** 1:21
2:18 7:24
**connection** 62:19
94:24 97:13 102:7
104:11 108:10,16
110:11 114:24
168:7,14 170:8
200:11 219:2
240:12,24 241:10
241:18 242:2
**consensus** 296:21
**consequence**
28:13,14
**consequences**
225:16,20,21
226:5,14,21
**consider** 22:22
34:10 190:5,9
201:11 235:3,20
238:12
**consideration** 5:21
6:10 86:16 139:19
140:14 143:5,8
149:14 177:2

178:23 180:13
181:15 183:14
189:18 191:2,9,17
192:12,19 203:19
211:3 234:17,19
234:22 235:2,7
237:14 239:15
246:12 247:3
260:12 275:1,20
276:12 277:2,21
**considered** 181:13
219:2 220:5 221:6
236:20 237:19
238:2,8 240:2,12
**considering**
137:20 192:18
245:1 246:20
**consistent** 67:24
140:3 143:21
157:2,12 161:4
173:6
**constituents** 28:5
145:20
**constitutionality**
123:20
**construct** 145:14
**constructed** 39:18
144:23 229:3,6
**construction**
136:6 163:9
**consulted** 108:15
108:25 109:7,17
109:24 110:10
114:24 240:24
241:10,18 242:1
**contact** 68:6,13,17
68:18 69:4 177:16
179:20 180:15
**contacts** 66:5
**contained** 61:3
283:14

**contains** 194:24
**contemplated**
235:22 245:5,10
**contemporaneous**
205:17,22 206:4
**content** 77:8,15
78:17 168:17,18
258:21 269:7,22
**contents** 115:2
152:3 219:6
**context** 85:9,11
185:22 186:18
**continuation**
232:19 233:4,8
237:20 238:3
**continue** 7:9 47:21
224:12 229:10
235:5 254:2,14
280:3,4
**continued** 3:1 4:1
6:2 235:8 238:16
240:3
**continues** 274:4
**continuing** 101:10
233:11,19,25
234:4 235:19,19
277:21 280:9
**continuous** 166:14
**continuously**
181:17
**contribute** 12:20
12:20
**contributed** 57:24
110:4 175:21
209:2
**contributes** 13:16
**contributing**
13:21
**contribution**
12:23 14:2 20:18

**contributions** 13:1
13:14
**contributors**
127:16 208:15,23
209:6
**control** 120:19
305:23
**convenient** 194:17
**conversation** 69:4
71:2 80:19 86:4
97:7 98:6 110:23
131:18 133:3
169:24 194:1
202:6 247:15
297:8,12 298:1
**conversations** 7:6
36:3 61:13 69:8
69:13,14 70:7
71:25 72:4 80:12
85:5,7 87:24 88:7
94:2 96:7,11
97:22 98:11
115:22 116:4
130:18,25 151:3
165:7 168:18
173:16,24 297:7,7
297:14,18,20
**convicted** 181:20
**conviction** 142:8
142:16
**convictions** 141:14
142:3
**convince** 220:20
220:21
**coordinating**
42:22
**copied** 258:8
**copies** 16:25 217:5
**copy** 62:23 63:8
63:12 77:2 97:13
97:14 110:12

**core** 107:22 126:7
**corner** 176:24
**correct** 10:19
27:12 31:7,10
33:6 36:1 68:2,21
82:2 87:14 91:22
93:17 98:8 102:2
102:3 117:25
119:6 124:24
132:21 142:24
151:20 179:13
183:19 184:12
191:4 192:6
194:21 201:22
213:6 215:10
227:21 233:6
237:16 242:7,15
246:18 250:16
255:3,11 259:25
261:13 262:8,21
263:13 264:25
265:4,16 268:23
268:24 277:8
290:12,14 305:10
**correction** 307:8
**corrections** 19:8
19:11 306:4,6
307:6
**correctly** 59:20
65:24 96:17 119:3
125:18 146:17
154:1 161:12
201:20 212:3,18
214:25 226:19
245:7 291:21
305:7
**correspondence**
74:7 255:13
**cost** 169:18,19
170:16 274:21
275:16 277:7

281:4,11
**costly** 163:11
165:4 274:23
275:21
**costs** 238:17
239:11 274:20,20
275:13 276:24
277:13
**counsel** 3:17,17
8:6 23:9,10,11,17
40:5 55:7 56:1
58:14,17 60:21
61:4 62:16 67:15
74:13,23 108:13
111:13 125:15
128:6 134:24
137:8 190:20
191:14 195:6,9
221:17 233:1,3,12
233:13 240:18
244:16 245:22
248:13,13,15
253:15 254:9
255:19,22,23,24
268:9 270:7
305:11
**counsel's** 9:10
65:23 108:8
129:18 236:25
240:8 249:4
260:20
**count** 298:11
**country** 12:15
16:13 20:11,15
28:20,24 223:9
240:21 241:3,15
241:23 281:5
**couple** 12:11 16:5
24:11 26:23 29:12
29:20 30:19 74:25
103:17 107:20

111:18 115:18
126:8 128:14
132:6 148:6
152:15 161:6
243:22 248:22
250:24 261:9
291:2 293:17
297:25 301:18
**coupled** 214:9
**couples** 205:22
**course** 18:12 27:1
32:22 39:11 44:2
49:18 50:23 53:19
82:11,11 98:17
117:1 125:14
185:6 223:5,6,14
224:11 231:16
263:11 285:9
**court** 1:1 7:21 8:2
16:6,19 21:16
25:24 53:3 56:12
116:18,20 118:2,3
119:1,2,13 121:7,8
121:19,21 151:22
195:22,23 198:8
198:10 214:6,12
223:1,19 235:13
235:16 256:8,14
306:15
**court's** 117:10,11
211:3
**courtroom** 21:21
21:22
**courts** 121:8 223:9
**cov.com** 2:13,13
2:14
**cover** 26:24
216:16
**covered** 123:5
233:24 244:22

**covington** 2:10
8:13 232:11
**cox** 3:17 9:10,10
**cq** 5:13 17:8 19:4
19:16
**craig** 58:17,18,19
58:20 103:10
125:15 127:24
255:24 268:9
**create** 14:10 139:4
231:6
**created** 216:20,24
217:1
**crest** 172:3
**crimes** 39:1
142:17
**criminal** 141:14
148:25 303:12
**cristensen** 103:11
268:18,19
**criteria** 140:7
144:5,14 155:25
156:2 187:2
289:11 290:20
**critical** 144:14
**cross** 186:5 256:11
256:11 304:8
**crosses** 191:23
**crowley** 2:10 5:4
8:13,13 232:9,10
234:20 237:1,8,25
238:14 240:9,19
243:16 244:1
**crunching** 277:7
**crutcher** 1:20 2:17
**csr** 305:15
**cumbersome**
274:23
**cumulative** 184:4
184:18,18,24,25
185:10 188:12

**curious** 26:17
131:12
**current** 52:8 66:6
66:18,21 87:15
160:18 172:16
242:9 295:22
301:7
**currently** 74:10
101:12 120:12,16
139:15 207:19
**custodians** 57:13
57:17,21,25 60:3
60:14,20 61:5
**customer** 154:3
**customs** 55:11,12
125:20 141:24
155:22,23 177:3,4
262:18 263:10,11
**cut** 11:12 303:14
**cute** 93:21
**cutoff** 204:6
**cutrona** 75:1,2
**cv** 1:5
**cvp** 126:6

**d**

**d** 5:1
**d.c.** 1:21 2:12,19
3:6,18,23 4:5 7:1
7:24
**daca** 5:23 6:4,13
6:20 11:8,14 12:2
12:5,14,16,18
14:10,11,12,13,20
14:21,25 15:5,12
16:11,11 25:17,20
27:5,8 29:8,17,19
29:22 30:9,12
31:2,9,13,18,25
32:6,15,19 33:17
36:4,6 38:23
39:15,21 40:16

| | | | |
|---|---|---|---|
| 43:12,15,19 44:1 | 177:3,7,10 178:11 | 290:1,25 291:8 | 295:16,17,18 |
| 44:21 48:3,5,14,21 | 178:22 179:6,9 | 292:16 293:4 | 306:8 |
| 48:24 49:2 51:5,9 | 180:13,24,24 | 295:22 298:23 | **dated** 6:17 17:6 |
| 52:2 54:11 55:18 | 181:12,14,15,19 | 299:3,5,20 300:5 | 195:16 218:4 |
| 57:9 59:23,24 | 183:21 184:10 | 301:4,8,14,17,20 | 257:7 305:17 |
| 63:18 64:10 68:10 | 189:7 190:1,5,9 | 301:25 302:11,12 | **dates** 152:15 |
| 68:14 69:2,10,23 | 195:2,6 199:10,15 | 302:16 303:6,18 | 205:21 206:19 |
| 70:3,10,23 72:3,24 | 199:18,20 200:1,2 | 303:20 304:2 | 295:23 |
| 73:1 76:9 85:2,8 | 202:7 203:11,23 | **daily** 166:16 | **david** 4:9 7:25 |
| 85:23 86:4,11,16 | 205:4,13,24 207:7 | **danielle** 75:1 | **day** 18:12 19:2 |
| 86:16,17 87:2,7,18 | 207:9,9,10 211:6 | **dapa** 116:19 119:1 | 89:20 107:17 |
| 87:24,25 92:9,17 | 211:19 214:22 | 119:2,14 121:22 | 114:18 177:19 |
| 94:3 100:9,12,15 | 215:22 216:3,5,11 | 121:24 123:20 | 264:20 272:11,12 |
| 100:16,22,24 | 216:12,21 225:17 | 195:6 196:7 199:5 | 272:21,22 307:23 |
| 101:11,20 104:11 | 226:6,14,17,18,22 | 214:10,11 223:12 | **days** 160:17 161:3 |
| 107:18 113:18 | 227:13,16 228:11 | 234:15 235:17,17 | 165:6,7 172:15,17 |
| 114:5,25 115:16 | 228:19 229:5,25 | 236:11,16,20 | 177:19 190:12 |
| 116:15,20 117:20 | 230:2,3,15 232:17 | 237:3 | 266:21 267:10,11 |
| 119:3,15,18,21 | 232:19,20 233:4,8 | **data** 77:16 101:10 | 267:12 272:19 |
| 120:12,12,15 | 234:14 237:10,16 | 101:19 131:23 | 286:16,21 287:3 |
| 121:3,15,16 | 237:17 238:10 | 132:18,20,20 | 306:12 |
| 123:15,21,23 | 239:17,17,21 | 182:15 183:20,23 | **deadline** 192:25 |
| 124:23 126:24 | 240:3,13,20,25 | 183:25 248:2,10 | 199:2 242:18,19 |
| 127:8,22 128:12 | 241:2,11,14,19,22 | 298:20,23,25 | 242:23 243:1,6,11 |
| 128:18 133:10,15 | 242:2,10 245:2 | 299:2,9,11,19 | 243:18 301:15 |
| 133:20 138:18 | 247:5,7,9,19,22 | 300:4,5,9,12,15,16 | 302:2 |
| 139:9,14 140:4,8 | 248:18 249:8,17 | 300:21,24,24,25 | **deadlines** 206:10 |
| 140:21 143:22 | 250:9 252:1 | 301:4 | 206:17 |
| 144:1,9 145:10 | 257:19 258:25 | **database** 141:16 | **deal** 20:17 200:19 |
| 148:19 149:5 | 259:4,9,25 260:9 | 283:2 302:22 | 200:19 |
| 151:4,5 152:4,5 | 260:10 261:2 | 303:11,25 | **dealing** 182:19 |
| 153:8,18 157:24 | 262:11 264:25 | **databases** 142:3,5 | 222:20 |
| 157:24 158:3 | 265:17 268:5,8 | 282:18,21 283:3 | **debate** 269:14 |
| 159:6,19 160:4,16 | 272:11 274:17,22 | 302:18,20 303:19 | **debates** 269:6 |
| 160:19,21 161:15 | 277:22 278:13 | **date** 6:16 61:11 | **decide** 192:24 |
| 161:21 162:3 | 279:7,9,13,16 | 103:1 109:13,16 | **decided** 82:21 |
| 163:1 164:17 | 280:4,10 281:11 | 124:24 127:12 | 115:17 167:2 |
| 166:24 167:6,7,13 | 281:22 283:13 | 138:2 142:22,24 | 295:21 |
| 172:7,15,19 | 284:11 285:19 | 172:15 187:11 | **deciding** 170:8 |
| 173:12,17 174:6 | 286:3,7,15,22 | 206:18 218:5 | **decision** 10:21 |
| 175:9,13 176:3 | 288:25 289:6 | 264:17 267:2,3 | 17:5 83:5,9,12,23 |

83:24 91:23,24
101:8,19 102:8
114:5,7 115:15
116:3,17 117:3,6
128:18 129:1
136:16 163:5,7,21
163:25 165:25
166:6 169:20
170:2,21 171:2,16
173:17,24 174:7
188:8 190:9,14
194:11,13 204:7
204:21 205:3,4,13
205:14,23 206:5
206:10,11,23,25
208:10,13,14,15
209:3,6,18 210:8
210:10 211:12
236:9 240:12,24
241:11,18 242:2
246:20 252:10
271:6,11 272:17
272:20 275:25
276:7,24 277:25
289:7 296:20,23
298:17 299:3,12
300:17
**decisions** 117:9
118:8 127:1
128:15 129:8
131:23 136:24
195:22 198:10
206:16 271:16,21
**deck** 32:11
**declaration** 5:19
56:8,10,19,21 57:7
60:4
**deemed** 306:14
**defend** 123:15
259:4,9 260:2,9,10

**defendants** 1:12
194:9
**defense** 117:4
**defer** 167:2
**deferral** 46:6
**deferred** 5:21 6:10
6:12,15 10:22
12:8 15:16 16:15
16:15 17:5 137:20
140:14 142:21
143:4,5,9 147:16
148:11 149:14
156:19 158:4,6
159:1 160:18
166:24 172:16
183:14 189:18
190:4 207:20,21
215:21 218:4
226:19 227:1,17
229:7,13 230:5,16
236:10 285:21
286:16,23,24
293:18,21,25
294:3,13
**deferring** 14:22
**define** 207:13
224:3
**definitely** 99:14
104:18 109:4
110:22 123:11
136:20 251:15
**definition** 129:4
**delay** 227:17
228:2
**delegate** 271:13
**delegated** 272:1
**deliberations**
204:18 222:15
245:20 249:2
298:14

**deliberative** 37:11
37:13 79:8 81:24
82:1 84:3 99:4
100:25 101:2
108:3 111:9
129:14 130:8
162:20 168:18
190:17 191:20
192:3 193:5
204:11,22 205:6
219:7 220:10,14
221:14,15 224:23
236:22 240:5,15
245:17 248:25
253:9 260:16
269:11 298:8
**delineate** 157:18
300:15
**delink** 166:9
**deliver** 229:5,5
**delivered** 229:6
**demonstrate**
46:10 139:18
150:25
**denial** 289:7,9,18
289:19 290:1,3,4,4
**denied** 185:13
188:3,15,22
289:12 290:21
291:8,19 293:4
300:11
**deny** 188:9 289:7
**depart** 181:15
**department** 1:9,11
2:3 3:16,21,24 4:2
5:17 6:14 7:17,19
9:9,11,12 17:24
18:8 23:9,10 34:4
43:1 44:15 53:10
60:10 61:23 62:4
73:24 85:1,8

90:23,24 93:5
97:23 104:15,20
111:23 123:14,14
134:17,21,21
135:1,10,21
136:12,21 137:7
208:24 215:5,19
218:2 242:22
246:4,20,22 247:9
255:13 256:1
258:3 259:19
260:14 265:20
270:10,19,21
273:15,17 276:15
280:18,23 281:9
281:17 283:23
287:18
**department's**
239:5,9
**departmental** 34:5
**departments**
27:20 43:5
**departmentwide**
283:2
**departure** 42:1
139:16,22 293:19
293:22 294:1,3,14
**depended** 68:9
**depending** 98:15
135:21 150:2
235:15 283:22
301:21
**depends** 54:19
131:8 137:1 151:9
**deponent** 3:25
305:4,6 307:1
**deport** 301:14,17
**deposed** 10:6
**deposing** 306:11
**deposition** 1:19
7:8,13,23 16:3,22

| | | | |
|---|---|---|---|
| 21:8 23:8 25:18 | describing 91:18 | 93:22 94:1,8,16 | developing 259:12 |
| 26:1 41:1 53:5 | description 5:10 | 96:13 98:9,17,25 | 259:12 |
| 56:14 137:14 | 6:3 46:16 95:4 | 99:7,11,17 100:1 | dhs 6:19 14:6,12 |
| 151:24 171:23 | 173:5 | 101:6,22 102:4 | 27:2 33:13 38:5 |
| 174:9 182:21 | desk 62:14 63:16 | 105:21 106:18,25 | 39:9,19 40:2,9 |
| 189:12 193:11 | destefano 59:15 | 107:7,14 108:6,14 | 43:6 49:20 53:16 |
| 215:14 217:23 | 59:17,18 103:13 | 110:9 111:14 | 53:21 54:13 60:16 |
| 253:13 254:3,5 | 268:3 | 115:7 124:4,8,15 | 60:17 66:9 67:2 |
| 257:3 287:7 | detail 23:22 25:23 | 126:10 129:19 | 69:16 75:22 90:25 |
| 288:23 292:11 | 83:8 255:3 | 130:1,11,22 | 96:7 97:24 98:11 |
| 297:25 304:16 | detailed 30:15 | 137:11,16 141:2 | 99:2 104:15,21,25 |
| 305:9 306:3,10,13 | details 30:12 33:1 | 145:1 151:22 | 105:25 111:20 |
| 306:14 | 33:4 34:5 43:21 | 152:1 154:15 | 112:9,15,25 120:8 |
| deputy 29:14 | detainer 180:17 | 157:11 160:14 | 120:9,15,18 125:2 |
| 33:23 35:5,19 | detention 139:23 | 162:23 163:15 | 125:3 126:15 |
| 41:15,19 42:12 | 140:11 | 167:19 168:1,20 | 128:1 134:19,20 |
| 46:16,18,24 47:12 | determination | 170:11 171:21,25 | 148:16 149:5 |
| 48:19 49:21,25 | 117:10 275:19 | 172:6 174:8,11 | 159:7,24 163:2 |
| 50:5,8,8 54:18 | 291:7 | 178:17 182:3,9,23 | 177:25 180:3 |
| 55:3,25 58:25 | determinations | 183:8 186:16 | 199:18 200:16 |
| 59:1,3 65:16 | 208:20 | 187:21,25 189:11 | 201:21 203:22 |
| 67:14,17,21,25 | determine 57:21 | 189:14 190:21 | 210:11 224:13,20 |
| 69:25 73:25 74:9 | 57:23 61:6 141:13 | 191:6,15 192:2,7 | 225:4 232:18,22 |
| 74:10 79:23 90:24 | 239:5 291:24 | 192:17 193:10,14 | 233:1 234:17 |
| 125:12 126:2,2 | determines 293:25 | 193:20,25 194:20 | 235:4 242:8,17 |
| 135:20 136:4 | determining 57:17 | 194:23 196:22 | 243:10 246:6 |
| 239:6 263:12 | 238:16 239:4,9 | 197:1,4,7,10,15,18 | 247:6 260:24 |
| 267:25 268:1 | dettmer 2:17 5:3 | 197:21 198:4,20 | 262:10 270:5,11 |
| 271:17,18 | 8:9,9 9:21,24 | 202:18 204:14,20 | 270:11 271:7,11 |
| describe 26:11 | 16:19,24 25:24 | 205:7,11 206:15 | 295:21 |
| 27:14 32:3 39:23 | 26:3 36:25 37:16 | 207:23 208:7 | dhs's 53:8 |
| 41:20 130:5 | 40:8,11 52:11,15 | 210:16,18,21 | dhs7 287:12 |
| 134:10 141:7 | 52:23 53:2,7,23 | 213:14 215:16 | dialed 177:24 |
| described 39:14 | 54:3 56:12,16 | 216:23 217:25 | different 29:20 |
| 43:11 61:9 64:23 | 57:5 59:16 77:10 | 219:12 220:13 | 49:1 50:15,19 |
| 97:9 104:24 | 77:25 78:3,22 | 221:3,18,24 222:1 | 90:13 115:18 |
| 107:24 111:19 | 79:10,14,19 81:16 | 224:25 225:3 | 129:24 131:21 |
| 141:9 220:15 | 82:3,8,12,15 83:1 | 231:18,23 272:9 | 141:5 142:2,5 |
| 232:16 234:5 | 83:11,21 84:7,15 | 272:24 304:5,10 | 147:1 150:1 153:7 |
| 249:12,13 | 88:15 89:19 91:17 | develop 245:24 | 161:16 163:9 |
| | 92:6,14 93:11,17 | | 169:10,11 176:20 |

186:17 191:8,19
199:23 214:12,19
217:19 223:6,11
225:9 229:25
236:17 251:11
263:3 266:8 270:1
281:21 299:10
**differently** 152:22
163:14 200:25
213:13 291:16
**difficult** 80:9
220:12
**dimple** 125:14
127:17
**direct** 53:11 67:5
68:17,25 70:6,7,19
71:5 105:3 156:8
172:12 267:16
292:23 305:23
**directed** 22:18
23:1
**directing** 255:12
**direction** 40:13,18
108:18 177:9
233:16 271:25
**directions** 236:2
**directive** 294:8
**directly** 49:14,21
51:21 66:8 67:6
67:16 75:5 135:16
**director** 3:22 5:15
26:7 33:23 35:3,5
42:2,7,7,9,12,19
46:21,22,23,25
47:19 49:9,14,22
49:25 50:8,9
55:16,25,25 59:1,1
59:4,4 65:16,16
66:12,18,22 67:1
67:15,25 68:5
69:2,10 70:1,1

72:17,18,23 73:24
79:3 81:12 85:9
85:21 86:11,12
87:19,23 91:5
112:17 136:4,4
217:1 239:6
262:20 267:25
268:1,1 271:10,17
271:18
**director's** 67:17
**directors** 49:21
91:7 271:14
**disagree** 157:21
220:20 292:17
**disagreement**
298:6
**disagreements**
298:4
**disasters** 190:25
192:20 193:3
**disclosing** 191:20
**disclosure** 37:10
84:1 99:4 108:3
111:9 129:14
130:7 149:12
155:22 190:16
193:5 204:11
224:23 236:22
240:5,15 245:16
260:16 298:8
**discounting**
297:19
**discovery** 57:8,18
59:22 253:8
**discretion** 14:22
140:18 177:11
214:8 271:3,3
289:8,13,18,19
290:21 291:3,12
291:20 293:5

**discretionary**
291:9
**discuss** 30:18 76:9
99:1 127:7 152:13
247:7
**discussed** 13:6
36:20 76:18
128:15 129:11
132:7 170:9 171:7
199:1 201:8 220:6
221:6 222:5,8,24
223:8 227:2
232:14 237:4
247:23 248:1
255:2 259:20
261:1 264:17
265:1,4 273:4
278:10 292:7
300:10 301:18
**discussing** 107:3
133:5 279:11
280:11 297:23
**discussion** 24:20
45:12 71:7 73:1
89:14 97:7 100:4
162:24,25 165:3
166:4 168:6
187:24 262:11
266:7,8 269:12
**discussions** 35:25
37:8 43:20,21
44:3,12,15,19 48:6
78:25 87:17
128:10 132:12
165:15 168:13
173:15 175:20
214:1 242:17
256:22 266:5
269:16
**dishonest** 230:22

**dishonesty** 230:24
**disputes** 304:6
**disrupt** 224:11
**disruptions** 14:11
14:19
**disruptive** 222:12
223:22,25 224:1,2
224:3,6,9
**disseminated**
65:19 153:22
154:8 155:4
**dissemination**
155:6
**distinction** 24:13
32:25 70:5 121:22
238:9
**district** 1:1,2 7:21
7:22 57:10 116:20
117:11 118:3
119:1,2,13 121:7,7
121:8,19,20
195:22 214:12
223:8,19 256:8,9
256:14,15 285:6
**dive** 193:10
**divided** 116:18
**division** 1:3 3:21
4:3 7:22
**divulging** 77:23
89:9 130:17
**document** 17:2,11
17:17 24:15 26:9
56:7,18,20 59:14
64:16 65:11,12,15
94:18 97:9,11,12
97:18 107:9 109:2
134:6 137:1,18
138:3,4,7,12,14
152:3,7,19 154:18
156:9,19 158:9
160:10 166:20

[document - edits]                                                                                      Page 18

172:2,6,10 173:11
174:14,22 176:9
176:23 183:11
189:18,21 193:16
195:3,7,12,14
196:4,6,16 197:25
207:14 215:19,23
216:4,18 217:2,3
217:19 218:6
220:16 221:23
230:6,17 249:11
260:4 272:23
279:1 295:13
**documented** 236:1
**documents** 14:15
    24:4,7,9,10,12,21
    25:3,13 47:18
    51:8 57:12,14,17
    62:18,24 63:7,7,8
    63:13,18 64:18
    97:14,17 102:7
    103:3,18,19,23
    104:25 105:25
    106:8,14 107:2,5
    107:10,12 108:16
    120:17 122:9
    133:19,25 136:2
    136:10,12 138:18
    153:17 176:21
    183:7 193:17
    194:3,19 198:5
    226:18,22 228:7
    229:12 236:6
    251:11 279:21
    302:16
**doing** 19:7 21:19
    26:21 56:9 58:5
    85:17 100:12,15
    223:4 246:13
    254:14 272:8
    274:25 275:13

276:14 281:1,2
    306:7
**doj** 14:6 85:14
    105:13 106:3,4,9
    195:9
**doj.ca.gov** 2:7
**dominated** 80:22
**dominating** 80:18
**don** 35:17 58:21
    74:9 79:24 81:9
    103:12 171:6
    268:2,12,21
**donald** 58:22
**double** 74:14
    291:21
**doubt** 19:1,3
    293:15
**dougherty** 5:11
    17:3,15,16 18:7
    20:8 261:6
**dougherty's** 17:24
    20:13
**download** 64:12
**draft** 17:25 109:6
    115:10,12,20,21
    115:25 116:7
    135:5 250:10,11
    250:14,21 251:4
    251:22
**drafted** 31:20
    103:24 134:2
    175:12,16
**drafting** 102:6
    103:2 104:10
    105:25 175:6,24
**drafts** 102:6 218:9
    218:11 250:24
    251:11,11,19
**draw** 70:5 252:16
**drawing** 229:19

**draws** 142:4,4
**dream** 20:9
**drew** 34:6 104:7
**drive** 61:6 64:3,10
**drives** 57:15,15
    60:25,25 61:2,2,6
**due** 112:20 203:7
    222:2 276:24
**duke** 1:10 6:15
    7:17 73:21 79:21
    81:8 109:24 117:6
    203:17 208:9
    218:3,19,19
    223:22 224:16
    225:15,20 227:12
    230:21 249:7
    250:1 251:24
    288:24
**duke's** 107:25
    115:25 197:25
    223:25 248:19
**duly** 9:17 305:4
**dunn** 1:20 2:17
    7:23 8:9,12
**duplicative** 244:19
**duration** 29:13
    299:20
**duties** 47:23,25
    48:17

### e

**e** 2:1,1 3:1,1,22 4:1
    4:1 5:1,9 6:1
    56:19 57:13 65:22
    69:3,4,15,18 70:7
    70:9,20 71:2,5,14
    72:4 75:19,25
    76:7,8,11,16 85:17
    89:1,3 90:2,9,10
    96:21 110:20,22
    110:25 131:22
    141:18 246:15,17

246:21 248:9,12
248:15 269:17,18
269:20 287:11,16
287:16 305:1,1
**ead** 14:25 294:19
    295:15
**eads** 226:23 279:7
    281:19 295:22
**earlier** 18:2 19:13
    45:7 90:18 100:3
    132:23 133:8,9
    159:23 170:1
    172:18 174:17
    188:23 195:21
    196:12 202:6
    208:19 211:16
    218:8 222:25
    223:3,8 224:10
    229:9 234:4
    247:23 250:24
    252:8 256:8 261:1
    261:5 263:22
    266:7 267:18,20
    267:24 272:9
    279:8 286:9
    296:19 300:10
    303:8
**early** 33:2 46:23
    50:5 161:22 162:1
    162:1,10,11 245:3
    245:4,8,9 246:16
    247:12,19
**easier** 16:7
**eastern** 57:10
    285:5
**economy** 12:20
**edettmer** 2:20
**edited** 17:22,23
**editing** 19:19
**edits** 18:1 19:5

**educational** 12:19
  301:9
**eeob** 76:4
**effect** 21:22 28:14
  29:8 48:7 120:14
  210:5 296:23
**effectively** 14:7
**efficient** 123:24
**effort** 33:11 45:4
  156:22 157:16
  164:3 203:25
  259:3 260:10
**eight** 292:25
**eit** 248:14
**either** 19:6 46:12
  54:16 71:21 85:22
  87:17 90:17 92:25
  98:1 103:6 106:2
  113:5 151:9 158:5
  164:12 235:4
  246:17
**elaborate** 158:2
**elaine** 1:10 7:17
  197:25
**electronic** 63:22
  64:14 161:23
  164:10 165:2
  273:16,20 279:20
  280:1 302:23,25
**electronically** 65:6
  110:13
**element** 49:5
  122:1
**elements** 38:22
  203:18 268:3
**elevating** 176:4
**eligibility** 140:7
**eligible** 167:13,15
  180:23 227:3
**elizabeth** 90:23

**ellis** 161:22,24
  162:4 164:18
  279:10,12,20
  280:1,3,4,13,14
  302:21,23 303:6
**email** 6:19
**emphasize** 31:16
**employ** 241:4
**employee** 262:10
**employees** 104:8
  240:21 241:10
  242:1,3
**employers** 240:24
  241:3 242:4
**employment** 14:15
  15:16,20 120:16
  122:9 143:10
  158:8 207:14,19
  226:17,21 229:12
  230:6,16 236:6
  278:25 286:25
  295:13
**enactment** 238:25
  243:24
**encompassed**
  99:15
**encountered** 177:3
**encourage** 39:20
**encourages** 160:16
**ended** 112:20
  119:1 207:10,10
  227:8
**ends** 197:2 227:12
**endurance** 23:4
**enforced** 293:18
  293:21 294:1,3,13
**enforcement**
  13:17 15:7,8
  16:16 38:16,24
  39:10 55:13
  141:12,23,23

149:15 151:17,19
  155:23,25 156:23
  177:5,16,22 178:3
  179:20 180:2,6,15
  180:19 196:2
  207:21 217:13
  263:11 302:1
  303:8,13
**engaged** 72:2
**engagement** 55:14
  136:8 154:4,4,7,17
  173:22
**enjoined** 119:23
**enlarged** 6:7
**ensure** 155:3
  172:18 173:11,12
**entailed** 42:25
  294:22
**entails** 261:18
**enter** 203:10
**entered** 142:11
**entire** 98:22
  271:19
**entitled** 56:18
  196:2 212:22
  288:7
**entity** 245:25
  246:3
**environment** 49:4
  51:18
**envision** 42:17
**epms** 273:20,23,24
  274:7,13,15,18,22
  274:25 278:13,15
  278:19 279:17,21
  281:5,11 282:5
**equally** 81:5
**ernest** 59:18
  103:12 268:2
**ernie** 59:14,17

**errata** 306:5,7,9
  306:11
**error** 185:24
**especially** 29:20
  219:20
**esq** 2:5,17 3:4
**essence** 45:16
  61:16 74:7
**essentially** 116:2
  202:10
**established** 206:3
  212:14 214:1,7
  293:24
**establishing** 27:22
  211:8
**estimate** 11:19,21
**et** 3:14,14 8:24
  71:9 153:13
  238:11
**ethan** 2:17 8:9
  9:23 232:14
  239:16 248:14
  265:2 300:10
**evaluate** 181:11
**evaluating** 237:15
  237:19 238:2,15
  240:3
**evaluation** 234:11
  234:12 266:5
**evan** 301:18
**evening** 66:14
**evenly** 80:24
**event** 114:15,16
**eventually** 83:25
  103:24
**everybody** 16:25
  52:12
**everybody's** 82:13
**evident** 98:8
  204:24 275:5

evolved 214:6
exactly 23:25
  120:21 125:24
  132:6 153:5
  168:11 181:1
  276:22
examination 9:20
  232:8 244:12
  284:23 296:11
examined 9:18
example 150:17
  150:18 155:2
  213:24 225:6,11
  225:13 266:23
  267:1 283:8,10
  291:6 293:1,2
  294:9,11,11 301:1
  301:3
examples 293:4,8
excepting 128:19
  128:21
exception 26:22
  198:6,7 307:6
exceptional 149:3
exchange 81:17
  110:25 254:13
exchanges 269:18
excuse 131:1
  205:1 285:8
excused 304:15
execsec 288:8,9,12
executed 294:4
executing 264:23
executive 47:20
  50:6 74:5 126:7
  135:15 243:5,8
  245:1 253:10
  287:25 288:16,18
exercise 24:24
  140:18 148:11
  177:11 198:1

211:7 291:12,19
  293:5
exercised 294:4
exhaustion 93:12
exhaustive 187:18
  299:25
exhaustively
  300:16
exhibit 5:11,13,15
  5:17,19,21,23,24
  6:4,5,7,10,12,14
  6:17,19,20,24 17:1
  17:7,9 18:16 20:3
  25:25 26:1,5
  41:10 50:11 53:4
  53:5,7,20,25 56:13
  56:14 57:4 58:4
  66:3 67:13 137:13
  137:14,17 139:10
  147:15 148:7
  151:23,24 152:2
  155:8,9,12 160:10
  160:13 166:21
  171:22,23 174:9
  174:12,13 180:4
  180:10 181:5
  182:21,23 183:11
  187:22 189:12,15
  189:16 193:11,18
  210:16,18,20
  215:14,18 217:23
  218:1 252:18
  254:20,22 257:1,3
  257:6 258:8 287:6
  287:7,10 288:23
  291:16 292:9,11
exhibits 6:22
  16:20,22
exist 290:11,19
existed 107:19

exists 215:24
expand 173:25
  174:7 251:1
expanded 74:20
  119:2,14 173:4
expect 128:25
expectation 144:4
  144:24 199:7
expenditure 236:3
  236:4
expensive 168:24
  169:14
experience 5:16
  26:12 67:24
  150:19 157:1
  158:18 189:6
  200:13,21 211:21
  262:9
experts 64:6
expiration 172:15
  190:13 207:14
  226:17 285:21
  286:21 295:16,17
  295:18,23 301:19
expire 5:24 14:16
  14:25 15:1,6,13
  45:14 172:7
  226:22 286:17
expired 16:16
expires 160:19
explain 24:13 28:6
  32:6,16 33:21
  35:12 40:19 41:22
  51:10 55:8 69:21
  80:10 89:7,8,13
  129:2 131:15
  134:14 138:15
  144:16 153:4
  175:3 194:4 201:1
  202:21 209:22
  217:8 243:20

275:6 279:22
  288:5 303:22
explained 150:12
  156:2 264:23
  272:9,14 284:2
  301:24 303:7
explaining 40:22
  164:25 201:2,10
  201:19 303:3
explains 209:25
explanation 91:12
  194:6
explicitly 211:10
explored 84:22
exploring 245:25
  246:7
exposure 154:10
  154:17
express 281:3,9
expressed 219:15
  259:3
extend 142:20
  147:15 192:24
  242:18 243:11
  293:25 295:8,21
extended 242:23
  243:2,7 294:19,24
  295:14,20
extending 243:18
  272:18
extension 143:9,10
  294:15 295:9,24
extensions 294:17
extensively 264:17
extent 37:9 39:23
  77:22 107:8
  150:22 248:21,24
  249:1 303:21,24
  304:1

| **f** | **fairly** 30:13 49:6 | 227:25 231:21 | 116:21 199:4 |
|---|---|---|---|
| **f** 305:1 | 61:17 152:2 | 251:20 266:4 | 256:14,17,18 |
| **f1** 281:23 | 154:24 161:13 | 278:21 279:6 | 300:8 |
| **face** 69:9,9 85:17 | 164:7 | 280:20 296:1 | **files** 64:13 65:5 |
| 85:17 220:17 | **fall** 31:22 261:21 | 300:11 301:11 | 212:22 |
| **faced** 218:20 | **false** 293:8 | **fashion** 135:19 | **filing** 52:5 56:19 |
| **facets** 159:9 | **familiar** 65:11 | 198:9 218:22 | 116:25 167:4 |
| **facilitating** 50:11 | 140:20 174:22,23 | 219:21 224:17 | **filings** 51:21 |
| **fact** 13:18 19:13 | 177:22 195:16 | **february** 164:16 | **final** 91:24 104:1 |
| 67:16 82:19 86:21 | 196:4,8 211:21,22 | 196:2 | 107:5,8,12 114:5,7 |
| 146:11 169:12,13 | 215:22 258:20 | **federal** 4:3 35:12 | 115:15 116:2,7 |
| 179:8 190:22 | 261:17 262:6 | 41:5 207:7 257:22 | 135:5 139:15,22 |
| 207:9,11 222:4 | 263:5,5,6 264:3 | **fee** 167:5 186:13 | 170:21 250:19 |
| 238:9 256:22 | 293:21 294:14,16 | 186:24 | 251:6 252:6,7 |
| 280:18 285:22 | **familiarity** 189:3 | **feedback** 105:8,15 | 282:15 |
| 290:8 295:14,16 | **family** 303:18,23 | 105:24 106:2,7 | **finalization** 269:5 |
| **factor** 124:2 170:9 | **faq** 38:20 39:3,18 | 151:5 | **finalized** 267:14 |
| 236:20 237:10,19 | 178:15 179:2 | **feeds** 178:5 | **finalizing** 251:19 |
| 238:1,12 291:3 | 238:11 267:7 | **feel** 18:14 22:12 | **finally** 43:4 115:17 |
| **factors** 122:24 | 302:5 | 23:4 66:3 82:23 | 197:24 |
| 187:6,18 188:7 | **faqs** 38:10,12 | 123:15 163:13 | **financial** 59:9 |
| 203:16 206:2 | 45:14 48:10 | 194:21 | 274:25 275:2,20 |
| 210:8 234:8 | 107:18,19 149:6 | **feere** 125:18 | 276:12 277:1,13 |
| 235:25 249:19 | 150:18 156:12 | 263:15 | 277:20 |
| 252:5,6,7 | 160:12 174:16,23 | **fees** 51:24 122:19 | **financially** 8:5 |
| **facts** 165:24 | 175:1,5 179:5 | 122:20 | **find** 93:8 |
| **factual** 191:21 | 265:16,18,22 | **felony** 181:20 | **fine** 124:7 |
| 289:15,17 | 267:17 268:5,9 | **field** 50:20 | **finesse** 29:3 |
| **fail** 306:13 | 269:2,7,19,22 | **fields** 23:7 | **finish** 41:9 123:1 |
| **failings** 123:17 | 270:11,14 | **fifth** 116:19 | **finished** 15:25 |
| **fair** 22:6,7 34:9 | **far** 24:23 31:21 | 117:10 118:2 | 57:3 202:3 |
| 45:4,5 52:9 70:13 | 32:16 43:25 44:4 | 195:23 211:3 | **firm** 7:25 8:3 |
| 70:14 86:5 88:20 | 59:21 60:2 61:8 | **fight** 83:23 | **first** 9:17 12:14 |
| 96:2 102:1 103:2 | 65:4,5 69:3 71:2 | **figure** 164:3 | 20:4 27:8,18 29:8 |
| 118:6 119:18,19 | 86:21 88:18 91:24 | 191:24 214:17 | 29:21 43:16 50:5 |
| 134:13 147:13 | 92:1 101:17 | 254:7 | 51:7,8 53:9,9,14 |
| 169:12 220:2 | 107:22 109:13 | **figures** 185:11 | 62:23 92:13 |
| 238:17 239:10 | 112:11 125:1,1,3 | **file** 51:8,13,13 | 108:21 109:7,16 |
| 264:13 272:4 | 138:13 159:7 | 63:2 292:1 | 114:4 115:14,18 |
| 278:3 | 165:13,23 175:4 | **filed** 9:25 28:9 | 116:16 117:5,22 |
| | 182:7 186:3 194:1 | 51:24 65:14 | 120:5 138:19 |

139:11 142:22
143:1 144:2 145:6
145:15,16 146:7
146:14,22 147:4
148:8 159:10
162:9 172:13
175:7 184:3,14
189:24,25 190:2
198:12,21 202:20
203:5 208:19
209:9 211:2 213:1
232:15 237:9
247:4 249:15
250:5 251:3
253:21 256:2
259:11 285:10
292:24 293:18
296:18
**fiscal** 183:15,16
**five** 12:18 30:23
32:1 36:13 50:12
54:20 131:4
176:11 282:12
292:25
**fix** 197:19
**fixed** 197:18,22
**flags** 141:13
**flip** 160:9 166:19
**flow** 42:19 167:16
**flowing** 43:3
**focus** 27:7 95:21
95:25 157:19
177:8
**focused** 60:7 97:6
145:16 179:15
**focuses** 156:23
**focusing** 53:13
157:20
**folder** 63:14 64:10
64:11

**folks** 12:17 14:5
23:15 34:19 35:17
35:21 40:15 45:14
59:8 65:23 79:25
96:17 112:4 133:5
137:5,9 173:17
238:12 267:19
287:2 297:4
**follow** 24:14 82:22
84:8 88:4,7,16,25
89:4 92:21,24
93:3,14 94:19
96:6 97:21 98:1
99:8,12 100:3
102:1 103:17
111:15,18 129:18
130:2,18,25 131:1
131:6,8,11,22
132:6,9,12 149:9
172:7 190:19
191:13 193:8
204:20 208:8
211:14 221:16
229:15 236:25
240:8,18 245:22
249:4 260:20
**followed** 134:1,8
180:18
**following** 42:3
47:6 87:5 100:6
100:14 108:13
131:18 137:2
221:19 232:13
292:16
**follows** 9:18
**food** 124:5
**footer** 137:25
138:5
**footnote** 46:7
186:7 289:4,5,15
289:17

**footnotes** 186:2
**footprint** 34:14
**foregoing** 305:21
307:3
**foreign** 294:5
**form** 6:5,8 44:5
55:19 88:23
103:25 109:23
115:20,21 167:4
183:14 187:8
250:19 251:5
258:2 278:7
300:19,19 301:2,6
301:10,11
**formal** 19:17
235:25
**formalities** 129:11
129:20
**formally** 19:12
**former** 35:3,4,5
42:1
**forth** 39:3 76:18
**forthcoming** 32:24
127:11
**forward** 133:13
160:9 253:18
**forwarded** 69:15
69:18 70:13 71:6
71:10,14 255:17
257:24 258:2
**fought** 267:10
**found** 119:21
**foundation** 216:19
234:15 293:9
**founding** 13:13
**four** 17:1 23:13
160:18 189:17
292:25
**frame** 182:6
**frames** 205:5

**framework** 194:5
**francis** 66:19,20
**francisco** 1:3 7:22
10:1
**frankly** 96:1
**fraud** 148:25
**free** 18:14 22:12
23:4 66:3 163:13
194:21
**frequently** 6:4
86:1 153:12 156:9
174:15 175:10,12
175:25 301:24
**friday** 287:12
**friday's** 253:13
**friend** 83:19
**front** 33:20 34:3
34:16 38:20 48:21
58:8 119:13 120:8
152:4 176:4
194:25 199:4
204:25 210:1
215:18 254:25
**fulfill** 46:11
**full** 10:2 46:19
57:23 90:15 126:9
139:11 231:5
261:12 264:1
**fully** 203:20
207:10 228:22
245:5 253:19
**fulsome** 34:25
**function** 33:5
47:15
**functions** 27:19
**fundamentally**
227:13,19 228:17
228:19
**further** 53:25
69:21 132:13
142:19 157:24

247:8 307:4
**future**   14:14
  225:18

**g**

**gang**   142:13,15,17
**gap**   47:2
**garcia**   2:21 8:10
  8:12 9:25
**gardner**   3:22 9:12
  9:12 36:22 37:9
  40:3,7 52:14 77:7
  77:18 78:14 79:6
  79:12,16 81:20
  82:5,11,14,19 83:7
  83:15,18 84:1,13
  88:10 89:8,12,15
  91:14 92:5,11
  93:15,18,23 94:5
  94:14 96:9 98:15
  98:18 99:3,13
  100:21 101:5
  102:2 105:17
  106:22 107:4,8
  108:2,11 110:1,4
  111:8 115:1 124:7
  129:13,22 130:6
  130:20 140:25
  144:20 154:11
  157:9 162:18
  163:12 167:16
  168:16 169:25
  178:13 182:2,5
  183:4 186:14
  190:15 191:4,11
  191:18 192:6,10
  193:4,22 194:22
  196:18,24 197:13
  197:17 202:14
  204:10,16,23
  205:9 206:8
  207:25 213:10

216:19 219:4
220:7,19 221:12
221:21,25 224:22
225:2 234:18
236:21 237:5,21
238:4 240:4,14
243:12 245:14
248:21 249:10
252:2,20 253:20
258:14 260:3,15
261:25 262:12
266:17 269:8
277:15 279:2
282:1,9 283:25
289:1,22 293:9
297:10 298:7,13
299:1,6,17,22
304:8
**gather**   37:4 81:17
  101:10
**gathered**   94:4
**gathering**   42:21
  101:19 121:12
**gears**   14:8 66:2
  133:8 215:17
  270:22 282:15
**gelman**   285:12
**gen**   3:17
**gene**   74:23 90:23
  96:15 104:19
  111:1,5 125:13
  128:3 132:15
  247:1 248:1,6
  288:14
**gene's**   128:5
**general**   2:4 3:10
  3:11,17 6:17 9:10
  24:16 27:22 54:6
  54:7 55:7 73:21
  73:22 75:5 78:10
  79:1,21,22 80:7

81:6,8,9 91:8 93:5
111:25 112:13,16
113:6 114:24
116:7,24 117:1,14
117:17 118:14,20
119:11 120:6,9
133:24 134:7,9,11
134:24,25 136:23
137:6,19 138:15
146:8 166:5 174:4
196:17 207:1
208:20,21 209:7,7
211:5,16 214:21
215:2 223:1 233:1
233:3,13 234:10
237:11 238:20
239:12,23 244:24
252:9 254:21
255:7,9,16 257:8
257:18 258:23
259:2,21 262:6
263:24 270:7
278:14 282:18
**general's**   8:17,20
  8:23 116:23 168:6
  169:23 170:6
  215:6 234:13
  244:18 296:14
**generally**   14:4
  25:21,22 29:1
  36:8,10 39:20
  65:21 69:6,7 72:9
  76:1 87:3 100:22
  106:16 116:13
  134:1 135:8,12,25
  136:3,6,16 137:2
  140:22 145:25
  146:2 148:16
  150:6,9 151:4,5
  170:2 173:3
  225:14 256:16,20

258:23 276:19,22
278:22 280:13
293:23 299:4,9
**generated**   274:6,8
**generates**   276:19
**genuinely**   170:10
**geographic**   192:19
  193:2
**getting**   46:1 79:7
  91:21,22 96:10
  100:7 101:2
  126:23 145:10
  179:4 192:13
  197:24 206:11
  222:19 244:20
  281:6,12,25
  298:14
**gibson**   1:20 2:17
  7:23 8:9,11
**gibsondunn.com**
  2:20,20
**gillian**   103:11
  268:12,17,17
**give**   10:1,2 21:14
  22:1 25:18 31:25
  58:6,15 71:20
  81:21 101:25
  146:24 162:25
  185:11 192:5,18
  225:6 299:13
**given**   10:9,12 21:8
  21:8 31:16 38:15
  40:18 78:12,23
  89:22 91:12 92:8
  92:16 96:3 97:12
  133:5 180:5,19,23
  191:2,9 246:13
  247:3 294:1 304:6
  305:10
**gives**   177:17

[giving - half]                                                                 Page 24

**giving** 36:7 77:17
  101:13,18 147:17
  148:14 191:20
  247:2
**glad** 198:1
**go** 7:10 18:2 19:7
  19:22 21:7 22:25
  24:24 30:23 52:15
  67:17 77:23 82:10
  83:1 98:21 122:20
  129:10 137:6,9
  143:23 144:3
  145:16 162:7
  164:11 175:25
  180:3 187:9
  202:24 207:1
  214:6 217:11
  219:13 223:20
  227:9,25 228:5
  244:2,21 247:10
  252:23 270:23
  272:11 283:5
  287:25 288:8,11
  288:18,19,22
  289:20 291:24
  296:2 300:7
**goal** 160:8
**goals** 157:25 239:5
  239:10,23
**goes** 41:3 140:19
  152:6 192:3
  195:13 201:23
  227:11 282:3
**going** 7:4 16:19
  20:3 23:24 31:9
  34:25 35:6 52:17
  53:3,11 55:2
  71:13 74:4 76:17
  78:14 81:17 82:5
  82:9,10,15,17,22
  83:8 84:8,11,23

85:2 88:3 91:20
  92:9 99:8,18,20
  101:25,25 106:21
  108:7 113:8 114:6
  114:8 115:13
  116:12 119:4,16
  124:9 129:19,25
  133:7,18 134:15
  146:4,6,11 151:16
  154:8 163:10,13
  164:10,13 165:4
  166:19 167:17,20
  168:3,15,25
  169:14,19 170:15
  170:22 171:25
  182:14 189:10
  191:17 197:8
  199:19 202:5
  203:2 206:17
  208:1 214:14
  217:20 219:4,25
  220:20,21 222:24
  225:12 229:20
  230:20 231:19
  232:1,13 244:5,21
  245:15 250:8,9
  251:25 252:22,24
  253:18 254:13
  274:22 279:24
  282:4 284:16
  291:13 292:14
  296:4 299:1
  301:13 304:7,13
**good** 7:3 16:9
  18:15 23:6 24:6
  25:19,22 29:3
  48:19 54:21 99:17
  121:20 124:16,17
  159:9 167:18
  232:10 244:14
  303:2

**gosh** 155:17
**gotten** 87:6
**governed** 38:21
**government** 36:7
  39:5,16 47:19
  103:21 104:8
  105:1 194:8,11
  207:7 234:16
  235:3 237:15,20
  238:3 245:25
  251:10 253:15
  257:22
**governments**
  201:4
**graham** 20:5,20
**grant** 15:4 158:10
  284:9
**granted** 207:20
  283:19 295:22
**grantee** 303:20
**grantees** 301:14
  302:11 303:18
**great** 13:14 20:17
  53:2 58:16 182:18
  200:18,19 284:14
  285:16 299:15
  300:3
**greg** 58:18
**ground** 21:7
  244:21
**group** 20:11 33:15
  34:1 35:24 36:14
  90:12,13,14,15,15
  91:8 112:9,15
  122:20 137:7
  159:25 176:3
  209:1 263:6
  267:19
**groupings** 203:6
**groups** 34:10
  35:14 36:20 135:6

154:8 155:3 297:8
  297:15
**guarantees** 159:4
**guardian** 303:18
  303:23
**guess** 39:20 47:5
  53:13 66:7 77:14
  83:10 84:18 89:21
  94:12 100:13
  103:16,22 117:22
  147:13 155:8
  179:4 186:10
  188:17 192:2
  193:17 199:16
  202:5 209:20
  211:14 212:8,19
  220:13 277:20
  304:5
**guidance** 123:13
  129:9 133:25
  156:3 176:21
  180:19
**guide** 152:5 155:7
  216:5,10,21
**guided** 238:10
**guideline** 167:15
**guidelines** 15:9
  40:15,20 139:19
  144:7,8 175:9
  176:21 177:2,10
  178:23 179:17
  180:12 181:14
  271:4
**guys** 82:16 194:21
  229:20

**h**

**h** 2:5 5:9 6:1
  281:23
**haley** 2:18 8:11
**half** 75:17 80:14
  122:22

**halfway** 139:12
**halted** 122:2
**hamilton** 74:23
  90:23 96:15
  104:19 111:1
  125:13 128:3
  132:15 247:1
  248:7 288:14
**hand** 139:12,12
  160:15 166:23
  176:24
**handed** 193:18
  257:6
**handful** 131:3
  132:5
**handle** 50:21,22
  279:21 280:18
**handled** 28:3,12
  28:15
**handles** 50:24
  74:7 280:1
**handling** 280:13
**hanen** 121:4 199:3
  199:4
**happen** 36:17
  66:13 73:16 89:6
  89:20 92:9 93:16
  93:18,20 109:25
  114:6 126:17
  130:19 136:5,15
  146:5,6,11,16
  147:19 199:19
**happened** 24:19
  73:14 106:15
  119:20 121:21
  124:23 166:12
  176:16 178:19
**happening** 48:12
  92:17 94:10
  157:13 166:6
  172:24 224:20

  225:1,4 253:23
**happens** 21:13
  135:1 141:8 169:2
  229:24
**happy** 154:13
  182:17 251:1
**hard** 22:17 57:15
  60:25 61:2,6
  62:23 63:8,12
  64:3,10 77:2
  83:17 97:14 131:7
  182:25
**harder** 80:13
**harm** 15:12
**harms** 16:10
**hate** 106:18
**hats** 47:11
**head** 29:11 30:3
  35:18 37:24 46:19
  48:18,20 50:9
  58:20,22 59:13
  74:18,20 148:17
  171:4 175:16,21
  268:10 275:22
**headquarters**
  126:15
**heads** 247:2
**hear** 100:2 105:6
  113:2 135:4
  145:19
**heard** 105:6,16
  149:20 153:18
**hearing** 10:20
  11:7,11,13,16,25
  12:1 17:4 34:5
  36:5 63:19 86:2,7
  105:10 149:24
  225:7 292:16
**hearings** 27:21
**heavily** 34:17,22

**held** 7:23 15:4,4
  72:25 107:17
  119:22 187:24
  225:6 295:14
**help** 47:2 284:2
**helpful** 58:5 66:4
  151:7,8 182:25
  210:13 268:16
**helping** 145:13
  152:23 239:4
**helps** 14:5 152:16
  180:4
**hesitant** 36:6
**hierarchy** 66:6
**higgins** 58:24
  103:10 267:25
  268:24
**high** 40:25 121:1
  192:10 234:2,5
**hill** 30:16 36:16,17
  49:3 150:2
**history** 13:12
  121:17 199:5,13
  303:12
**hmorrisson** 2:20
**hoefer** 59:19
**hoffman** 104:18
**hold** 16:14 65:12
  65:12,15 113:8
**holders** 12:14,16
  14:11,20,25 16:11
  143:23 160:21
  178:11 286:8
  294:20
**holds** 65:25
  273:12
**homan** 25:8
  125:16 127:19
  262:20 263:23
**home** 64:19

**homeland** 1:9,11
  3:16 5:17 6:14
  7:17,19 9:11
  23:10 26:20 53:10
  177:9 215:20
  218:2 246:4
  255:13 256:1,4,5
  258:4,9 259:19
**honestly** 246:14
  276:2 295:10
**hope** 14:16 15:21
  40:22 164:25
  285:8
**hopefully** 171:13
  230:20
**hoping** 45:22
  46:12
**horrible** 190:24
**hotline** 177:17,23
  178:4 180:15
**hour** 23:5 75:17
  75:17 80:14 99:19
  124:6 126:12,13
  167:17
**hours** 11:22,22,23
  126:13 177:18
  231:22
**house** 68:6,14,18
  68:19 69:1,9,11,16
  70:2,8,19,25 71:16
  72:2,11,23 73:19
  74:8,18 76:4 78:7
  84:21 88:19,21
  92:25 94:4 97:22
  105:13 106:3,5,10
  125:2 132:5 243:1
  264:16 266:3
  285:11 296:3
**housekeeping**
  187:21 287:5

| | | | |
|---|---|---|---|
| houses 142:5 | identified 13:21 | 159:8 160:1,8 | includes 27:2 |
| housing 274:5 | 61:5 81:3 211:10 | 177:4 196:3 | including 26:23 |
| houston 191:2 | 221:23 291:2 | 200:11 207:21 | 57:13 137:7 |
| hq.dhs.gov 3:19 | identify 8:6 14:19 | 210:4,7,12 211:8 | 139:20 176:20 |
| 3:19 | 20:4 57:25 58:3 | 212:4 261:14,19 | 251:19 |
| huge 183:3 | 107:9 186:23 | 262:17 263:1,8,10 | incoming 43:9 |
| huh 12:13 20:6,23 | 267:23 289:9 | 281:21 283:6 | incorporate |
| 37:3 106:1 123:6 | 290:9 | 285:4 302:6 | 135:19 223:3 |
| 133:16 135:24 | identifying 60:20 | immigrations | incorrectly 75:11 |
| 143:2 148:10 | 61:1 62:17 187:2 | 155:22 | increments 47:7 |
| 152:17 155:19 | 187:11 298:11 | impact 121:4,10 | incumbent 40:18 |
| 156:11 168:12 | identities 70:24 | 201:24 225:23 | index 283:9 |
| 176:25 183:18 | identity 71:16 | 247:16,19 | indicate 54:6 |
| 239:19 243:21 | 79:12 204:15,18 | impending 264:24 | 120:7 |
| 248:8 268:20 | 204:21 | imperative 306:10 | indicated 201:14 |
| 286:2 287:14 | illegality 248:18 | implement 123:24 | 203:8 234:14 |
| 288:6 303:10 | image 64:3 | 239:1 266:22 | 275:6 305:4 |
| hundred 236:7 | imagine 82:6 | implemented | indicates 124:1 |
| hypothetical | immediate 203:24 | 239:13,14 | 189:21 289:7 |
| 213:21 214:16,18 | 203:25 204:6 | implementing | indicating 138:11 |
| 237:22 238:4 | immediately 122:8 | 40:14 265:25 | indication 203:22 |
| **i** | 122:14,21 180:14 | implicate 220:9 | indirect 70:12,12 |
| ice 15:7 16:17 | 218:25 223:18 | implicating | individual 79:12 |
| 149:2 155:23 | 266:2,15 267:8 | 162:20 248:25 | 87:1 139:18 |
| 156:2 177:5,8,10 | immigrant 12:25 | important 16:3 | 177:10 282:20 |
| 180:12,17 262:19 | 12:25 13:20 | 18:12 44:22 | 283:20 284:11 |
| 263:24 264:6,9 | immigrants 13:13 | 121:22 173:16 | 291:19 293:4 |
| 270:12,18 282:17 | 13:15 20:15 | improper 119:21 | individualized |
| 283:10,16 | immigration 3:3 | inaccurate 293:8 | 302:10 |
| ice's 156:2 301:22 | 5:15 9:1,4 13:6,9 | inappropriate | individuals 79:17 |
| idea 142:7 143:22 | 13:12 14:6 15:20 | 253:14 | 143:4 177:2,12,14 |
| 204:5 | 26:7,25 27:2 | inaudible 110:14 | 179:5 208:22 |
| identification | 28:15 37:25 38:19 | include 44:5 60:9 | 209:12 213:1 |
| 16:23 26:2 39:1 | 38:24 39:10 55:11 | 60:15 137:8 187:7 | 282:20 |
| 53:6 56:15 137:15 | 55:12,13 66:22 | 187:7 208:22 | individualss 241:3 |
| 137:19 151:25 | 127:21 128:23 | 209:14 | influencing 176:19 |
| 171:24 174:10 | 137:22 139:23 | included 60:17 | info 303:18 |
| 182:22 189:13 | 140:11 149:15 | 187:2 209:7 | inform 101:19 |
| 215:15 217:24 | 155:24 156:22,25 | 270:16 295:4 | 216:5 |
| 257:4 287:8 | 157:17,22 158:11 | 303:24 | information 27:21 |
| 292:12 | 158:13,14,25 | | 29:4 30:15 31:19 |

31:24 35:14 36:7
36:18 37:10,13
38:2,15,23 39:15
41:5,7 42:19,22
43:3,23 44:13,14
45:8,12 60:13,23
60:24 61:3,24
62:6 63:23 64:11
76:21 77:17,23
78:17 79:7 84:2
89:9 92:3 94:19
94:23 99:4 108:3
111:9 121:13,13
129:14 130:7
132:13 136:3
137:19 138:15
139:9 141:10,14
141:15 142:5,6,15
144:18 148:15
149:13 150:11,14
150:20,24 151:10
151:11,16 152:11
152:25 153:8,12
153:16 154:19
155:6,16,20
187:11 190:16
191:21,25 193:5
204:11 209:3,11
217:14 224:23
226:16 236:22
240:5,15 245:16
247:22 248:2,3
260:16 265:6
273:12 274:5
283:13,21 287:23
288:14 289:21
290:10 298:8
300:23 302:1
303:12,19,20,24
**informed** 257:20

**informing** 302:11
**infrastructure**
  275:12
**ingested** 164:18
**initial** 29:21 43:19
  44:1,2,5,25 46:9
  51:6 52:3 144:23
  147:5 152:5
  181:15 184:18,22
  184:24 185:4,8
  190:3 300:13
  301:8
**initially** 110:11
  220:22 246:6
**initials** 45:16
  122:4,11,16
  161:10 185:7
  229:9 267:4
  300:19
**initiated** 27:8
**initiative** 134:21
  134:22
**injunction** 122:2
  199:10 200:4
  203:10 211:19
  235:13,17
**injunctive** 203:25
  223:19
**inner** 43:5
**input** 110:16,18
  176:2 242:22
  243:1,6 250:16
**inquiries** 28:10,24
  31:8 48:24
**inquiring** 94:15
**inquiry** 162:19
**instance** 51:25
  141:11 147:17
  206:18 213:8
  258:18 295:1

**instances** 200:15
  211:22
**instruct** 37:14
  82:21 84:6 99:5
  108:5 111:11
  129:17 130:10
  190:18 193:7
  204:13 221:13
  236:23 240:7,17
  245:17 249:2
  260:18 298:10
**instructed** 65:10
  231:6
**instruction** 82:23
  84:9 99:9 101:25
  108:12 191:1,5,12
  193:9 221:19
  237:6
**instructions**
  276:17 306:1
**intake** 6:6,8 48:13
  50:23 59:14
  183:15 303:5
**integrate** 303:4
**integrity** 156:25
**intend** 38:10
**intended** 91:9
  172:18 177:7
  178:21
**intent** 119:15
  179:11
**intention** 179:14
  199:9 297:20
**interacting** 200:10
**interactions** 31:13
  43:12 48:2
**interest** 28:4 30:5
  30:15 34:5 49:24
  81:16 82:13 196:3
  270:23

**interested** 8:5
  305:12
**interfere** 7:8
**interim** 30:20
**internal** 36:14
  37:7 47:17 233:18
  247:6 260:24
**international**
  50:23
**internet** 17:8
  18:17
**interpret** 288:3
**interpretation**
  203:23
**interrogatory**
  214:24 215:4
  275:7,24 277:24
  280:22
**interrupt** 42:6,14
  43:10 86:23
**interrupted** 46:15
**interviewed** 62:2
**introduce** 257:1
**intruding** 191:25
**invalidate** 122:9
**invalidated** 120:13
  122:21
**invitation** 75:19
  89:2,3,16 90:2,6
**invitations** 262:3
**invite** 76:15 90:10
  90:20 126:19
**invited** 11:24
**involve** 148:25
**involved** 34:18,22
  35:6 57:16 60:18
  60:19,22 103:2
  218:13 230:24
  236:9,14
**involvement** 35:8
  236:17 270:12

276:10
**involves** 129:7
**irs** 41:3 51:13
**ish** 161:22
**islands** 190:6,10
193:1
**issuance** 156:1
271:7,11 272:21
272:22 273:6
**issue** 36:19 37:18
72:3,15 92:10,19
145:22 168:24
170:16,24 171:16
192:4 204:1
220:14 233:15
253:19 270:23
274:24 277:13
278:5 279:16
280:3
**issued** 107:5,9
115:11 163:23
180:17 253:6,8
271:24 278:19,21
**issues** 25:17 61:25
71:24 100:23
127:22 169:17
200:11 261:19
**item** 148:8 185:9
**items** 42:19 97:5
148:6 187:16
270:2 271:15
**iterations** 176:11
251:12 266:8

**j**

**j** 1:22 305:15
**james** 1:19 5:2,15
5:19 7:13 9:16
10:3 17:3 26:6
56:19 132:25
253:14 307:2,25

**janet** 1:5 2:15 7:14
**january** 26:22
55:25 294:15,20
295:10
**jeff** 73:22 196:17
197:11 255:7
**jefferson** 292:22
**jennifer** 58:24
103:10 267:25
268:13,24
**jessica** 23:19
**job** 27:14 29:7
41:13,21 43:11
50:3 66:6,20 68:8
138:24 148:3
150:4,19 299:8
**joe** 59:9,13 103:13
125:13 127:17
**john** 74:11,12
125:18 196:20
258:9,10 263:14
**johnson** 195:15
**johnson's** 122:1
**joint** 17:14,23 18:7
**jonathan** 104:18
**josh** 9:12 23:14
285:3 289:22
**joshua** 3:4,22 8:25
285:3
**joshua.e.gardner**
3:24
**jotted** 97:5
**judge** 22:21 82:10
84:16 119:1,13
121:3,7,8,21 122:6
122:8,13 199:3,4
203:10 223:12,19
253:7
**judgement** 191:23
**judgment** 188:6

**judgments** 216:11
**judicial** 83:23 92:4
118:7 195:20
**judiciary** 5:12
10:23 218:24
219:16 223:17
224:8 292:23
**julie** 126:7 128:7,9
**july** 6:17 41:25
42:4,10 46:21,23
162:13,14,16
163:1 165:5,11,17
165:20 166:1,7,17
166:18 168:3
169:2,4,5,8,13
170:25 198:15
257:7 259:19
273:14 278:5,19
278:24 279:24
280:5,6,9,21
**jumping** 285:8
**june** 29:22,24 30:6
32:4,9,14,23 44:8
152:16 166:5
168:7,10,11
183:17,21 184:11
188:17 195:2
196:7 198:14
211:6 236:11
245:6 247:11
289:11 292:6
**justice** 2:3,4 3:21
3:24 4:2 9:9,13
23:9 73:24 85:1,8
93:5 97:23 111:23
123:14 242:22

**k**

**karen** 3:4 9:3
**kate.bailey** 4:6
**kathy** 58:21 91:5
103:11 112:16

125:14 127:24
268:10
**keen** 30:4
**keep** 38:5,5,6,10
39:6 43:2 56:7
63:3 129:25
169:14,19 170:23
171:16
**keeping** 30:3
42:24 47:18
219:25
**keeps** 183:23
**kelly** 73:22 78:10
79:1,21 81:7,8
91:8 258:9,10
**kelly's** 113:6 196:2
196:7 236:12
**ken** 24:17 196:11
198:12 200:15
**kept** 64:18 303:19
303:19
**kevin** 25:8 125:19
125:22 126:3
127:23
**khan** 3:11 5:7 8:22
8:22 296:12,13
297:11 298:11,16
298:19 299:4,15
299:18 300:2
304:3
**kids** 20:9
**kierstjen** 74:9
**kin** 305:11
**kind** 48:25 74:25
76:22 77:16 82:16
94:18,23 95:4
134:3 142:8 183:2
185:24 215:8
220:18 248:4
292:5

**kirchner** 128:7,9
**knew** 76:6 164:21
256:16 261:10
**know** 12:5,24
13:19,20 19:20
21:16 22:24 23:3
33:7,16 34:4,6
36:2 41:6 43:22
44:14 45:1,2
46:10 48:23 54:24
54:25 57:2 58:4
59:6 61:8,11,15,25
62:14 63:2 64:3,4
64:10,19,22,25
65:11,18,19 66:2,5
71:8,14,17 73:10
73:11 77:12,15
78:6 80:17,21
82:10,12 85:12
86:5 88:6 90:16
90:19 91:7,24
92:1,3,9 93:24
94:23 95:4 98:13
99:11 100:13
101:16 105:7
106:8,15 113:24
116:1 120:15
121:13 123:1,22
124:18 125:3
126:18,23 128:7
131:7 133:25
134:20 138:6,13
138:17,19,20,22
141:19 142:1,25
143:12,18 145:21
146:4 147:17
148:14 150:23
151:8 152:7
153:21 154:6,16
154:22,22 161:7
162:14,17 163:25

164:7 165:16,23
170:25 178:1,3,6,8
178:9,10,18,21
179:25 180:2,5,9
181:3,24 182:4,11
183:20 184:9
185:21,22,25
189:4 190:22,23
192:8 194:1,5,16
194:24 199:8
201:19 205:7,14
206:1,17 210:9
212:9,19,20,20
213:3 216:22,24
216:25 217:20
218:12,15 220:4
220:16 222:18
223:11 224:19
227:25 229:1
231:19 233:14,21
235:12 236:19
238:24 241:6
247:22 248:2
252:9,10 255:21
266:20 270:13
271:15 277:20
278:17,18,20,20
278:22 279:5,6
280:6,14,16
281:22 282:6,7
284:8 286:9
289:14 290:18
291:4,7,18,22
296:1 301:9
303:17
**knowing** 44:4 46:3
164:16 258:23
286:13 290:13
301:8
**knowledge** 61:23
92:23 95:13 105:1

105:3,5 128:9
170:3 216:17
240:11,23 241:1
241:17,25 242:21
242:24,25 243:3,4
243:9 302:10
**known** 245:8
303:9
**kraninger** 91:6
112:17
**kstietz** 2:13
**ktumlin** 3:7

**l**

**labeled** 287:17
**lack** 54:9 117:3
123:19,19 216:19
293:9
**laid** 118:20 137:2
159:17 203:16
225:22 237:11
259:5 261:19
**language** 120:22
147:14 210:2,22
223:14 224:11
**large** 20:10 100:16
170:24
**largely** 28:21
42:25 47:13 70:21
72:6 112:24
**las** 191:3
**lasted** 75:14
**late** 161:25 278:5
278:19,24
**latitude** 81:22
**launch** 29:19 30:9
30:21,22 175:13
216:21
**launched** 45:16
46:5 121:24 122:1
**launching** 33:17

**laura** 58:12,14
**laurie** 42:10
**law** 2:10,18 3:3,4
4:4 9:1,4 13:17
15:6,8 16:16
26:19,20 177:16
177:22 178:3
179:20 180:2,6,15
180:18 189:2
210:6 217:13
285:4 303:12
**lawful** 236:11
**lawfully** 15:1
**laws** 13:8 196:3
210:4,12
**lawsuit** 56:8 61:25
212:22 235:21
256:18
**lawsuits** 62:19
65:13 212:20,23
213:17
**lawyer** 10:4 23:21
23:22,23 83:4
233:9
**lawyer's** 99:8
**lawyers** 21:12
22:15 97:12 194:8
**lay** 29:19 32:5
119:25 251:20
**laying** 120:6
**lead** 30:9 62:16
120:1 126:21
129:18
**leadership** 27:23
34:2,2 35:11,17,21
35:25 47:22 67:9
136:1 173:24
176:4
**leading** 33:11 81:7
147:3 173:24
245:20 249:20

267:11 269:4
**leads** 116:22
  228:16
**learn** 237:9
**learning** 114:4
  245:8 247:11,14
**leave** 21:5
**leaves** 14:13
**leaving** 17:3
**led** 33:19 78:9
  79:1 205:3 222:18
  266:9
**lee** 2:5 5:5 8:16,16
  66:19,20 244:13
  244:16 245:23
  249:5,14 252:13
  252:21 253:5
  254:9,23 257:1,5
  258:19 260:11,22
  262:4,14 266:25
  269:13 277:19
  279:14 282:8,11
  282:14 284:4,14
**left** 18:13 89:23
  94:10 139:12,12
  187:16
**leg** 46:19 47:8
**legal** 4:9 13:4 14:5
  15:14,20 20:19
  46:8 159:25 195:6
  195:9 227:20
  228:3,24 229:2
  231:5 243:12
  263:24
**legality** 117:3
**legalization** 14:3
**legislation** 218:23
  224:19,21 225:5
**legislative** 14:23
  15:22 27:12,16,18
  27:25 29:5,11,16

30:4,14 31:14
34:11 37:24 41:14
47:9 48:18 55:7
56:3 74:18,19,21
134:24 136:8
138:25 149:21
150:5,10 153:1
175:17,21
**legislators** 146:10
149:20 150:21
200:10 217:6
**legislature** 145:20
148:3
**legislatures** 146:3
**lengthy** 152:3
215:19
**leon** 195:15
**letter** 6:17 24:16
25:2 65:12 114:25
115:6,10,12 116:7
116:23,24 117:2
117:13,17 118:14
118:20 119:12
120:6,8,20,22
123:4,7,8,16,18
168:7,9,14 169:23
170:6 196:12,14
196:17,20 197:2
197:11 198:13,22
198:25 199:15
200:2,14 203:8,21
207:2 208:21,21
211:5,17 213:8
214:13,20 234:10
234:13 237:11
244:25 245:6
246:13 252:9,17
254:21,24 255:2,5
255:6,16,25 256:7
256:23 257:7,11
257:13,14,17,19

257:21,25 258:2,8
258:13,17,21
259:2,2,11,13,20
259:21,24,24
260:2,13 292:6
**letters** 86:13,15,20
86:25 87:6,11,12
190:1 197:5
**level** 34:1 35:25
40:25 41:3 44:13
119:2 134:17
135:1,10,21,21
136:24 150:24
192:10 212:15
224:14 229:12
230:11 246:24
247:15 276:21
**levels** 35:7 137:5,6
271:22
**lewis** 196:20
**liability** 20:12
**liaise** 49:13
**liaising** 27:20
42:20 43:1
**liaison** 42:16,18
43:7 49:7
**liaisons** 28:23
**liberia** 294:11
**lie** 227:13,19,23
228:7,11,17,19,22
230:21
**life** 16:7
**light** 163:12
177:14 179:5
206:8,14 228:11
**likelihood** 118:21
121:1,6 144:13
145:22 235:20
**likewise** 84:15
**limitation** 291:5

**limitations** 290:10
**limited** 160:2
  220:16
**limits** 15:18 151:8
  206:12
**line** 17:8 19:18,18
  19:23,23 55:23
  56:20 70:15 96:20
  118:24 184:3,5,24
  184:25 185:9
  188:11,12 191:23
  204:19 259:22
  264:15 280:1
  287:22 307:8
**lines** 67:17 80:14
  184:23 205:21
  255:12 292:25
  302:25
**link** 166:9 227:25
**linked** 149:6
**linking** 235:16
**links** 223:15
**list** 34:25 55:20
  57:23 58:6,8 60:2
  61:22 62:8,11
  63:6 98:22 118:4
  187:5 300:1
**listed** 25:9 153:11
  153:13 203:18
  209:2 221:4
  250:11,12 252:6
  270:17 307:7
**litigating** 219:25
**litigation** 65:25
  97:13 116:21
  118:21 201:15,19
  201:24 202:11,12
  203:7 211:4,23
  212:1 213:4,9,17
  213:18,22 214:3,9
  214:14 215:9

218:20 222:21,25
232:16,18,23
233:3,7,10,19,25
234:5,9,9,22,24,25
235:18 236:19
237:2,9,12,14,18
238:1,8,11 252:11
259:25 260:13
290:25
**litigations**   85:2,10
**little**   14:8 21:7
51:20 54:5 91:21
118:7 130:14
132:2 133:14
142:19 144:12
172:1 197:16
211:14 215:18
223:9,10 225:19
234:7 240:10
242:6 282:10
291:16
**llp**   2:10,17
**local**   180:18
**located**   7:23 63:1
63:9 180:5
**location**   263:5
**lockbox**   51:9,9,21
52:4 186:8,20,22
187:3,15 268:3
300:9
**lockboxes**   51:9,12
51:15,19
**lodge**   78:14 82:21
221:1
**long**   24:1 26:21
75:13,16 80:4,6
126:11 139:23
140:10 158:25
**longer**   15:14 16:14
29:13 47:16 190:3
226:22,23 227:3

242:9 267:3 274:1
282:9
**longtime**   262:9
**look**   18:18 20:1
24:11 38:12 56:24
62:20 77:5 125:16
137:12 139:11
140:12 160:15
176:23 179:17
180:9 182:16
184:2 185:9,15
186:3 188:11
206:6 208:25
210:13 223:7
228:18 233:15
247:13 259:6
**looked**   24:15,21
54:10 62:21 63:6
63:21 97:16 155:9
155:12 188:7
214:21 265:24
266:11
**looking**   26:4 40:17
55:2 56:17 67:14
129:24 137:16
142:19,22 146:25
155:16 179:2
183:9 184:6 185:6
189:16 200:14
207:2 217:25
222:25 235:24
265:6 266:22
291:9
**looks**   67:13
**lori**   35:6
**lot**   63:12 71:7
80:18 86:19 87:11
133:5 162:4
176:20 182:19
190:24 196:10
200:10 261:12

263:21 285:17
**love**   34:21
**lucky**   48:19
**lump**   117:8 118:2
**lunch**   116:13
123:4 129:23
202:10

## m

**machine**   305:7
**maher**   125:13
127:17
**mail**   65:22 69:3,4
70:7,9,20 71:2,5
71:14 72:4 75:19
75:25 76:7,8,11,16
85:17 89:1,3 90:2
90:10 110:20,22
110:25 131:22
246:15,17,21
248:9 269:17,18
287:11,16,16
**mailed**   163:24
172:17
**mailing**   172:14
269:20
**mails**   57:13 69:15
69:18 96:21
248:12,15
**main**   27:17
**maintain**   206:12
257:19 259:8
260:9 282:17
**maker**   136:16
170:21 171:16
204:21 206:23,25
208:10,13 209:18
210:10 271:6,11
272:18,20
**makers**   208:14
**making**   19:11
82:16 101:2,19

102:8 126:17
128:18 129:1
153:15 171:10
173:17 194:13
206:5,11 208:15
275:16 286:3
**management**
55:15 56:2 159:15
164:10 273:21
**managing**   27:20
27:21 161:15
**mandated**   238:21
**manila**   63:14
**manmade**   190:25
**marc**   74:15 79:25
81:10
**march**   52:7
172:13 242:8,18
242:23 243:1,6,11
243:18 301:15,17
301:20 302:1
**mark**   16:20 25:25
53:3 56:13 151:23
272:12,12 287:5
292:9
**marked**   6:22
16:22 26:1 53:5
56:14 137:14
151:24 171:22,23
174:9,11 182:21
189:12 193:11,18
215:14 217:23
257:3 287:7
292:11
**martin**   1:22 8:2
58:18 125:25
305:15
**massachusetts**
3:22 4:4
**material**   136:2

**materials**  11:8,14
  104:10,16 107:21
  135:1,23 136:7
  148:1 152:13
  153:1,4 265:2,2
  267:13,20 268:11
  268:12,15 269:3
  270:2
**math**  188:20,25
**matter**  7:13 82:1
  113:9 176:14
  178:22 190:23
  192:11 238:20
  239:12 271:2
  282:18 296:15
**matters**  26:24
  47:22 87:13
  261:20 269:21
**maximizing**
  154:17
**mayorkas**  35:3
**mcaleenan**  25:8
  125:19 127:23
**mccament**  1:19
  5:2,15,19 7:13
  9:16,22 10:3 17:3
  20:21 26:6,9
  52:24 56:19,22
  99:1 152:8 244:14
  253:18 254:10,24
  257:6 268:16
  284:25 307:2,25
**mcghan**  74:9
  79:24 81:9
**mcrowley**  2:14
**mean**  11:12 16:10
  20:10 24:19 34:4
  44:20 45:1 62:2
  67:13 68:16 69:4
  73:9 77:11 79:2
  81:17 86:4,14

88:19 93:16
  104:22 114:11
  115:20 117:23
  118:5 121:11
  125:1 126:6
  128:21 131:7,8,8
  136:15 143:17
  147:16 153:4
  156:15 159:21
  161:7 166:3
  167:11 181:7
  182:14 184:19
  185:23 186:10,18
  192:2 194:16
  202:22 204:2
  205:18 209:19
  213:13 216:9,13
  220:3 227:17,24
  228:13,25 229:24
  230:21 234:13
  235:6 236:12
  238:22,23 241:5,5
  249:18 252:4
  255:20 259:5
  262:2 263:16,20
  266:6 269:4
  271:13,13,17
  275:3,17,24
  276:20 280:23
  283:3 297:17
  300:12 303:25
**meaning**  36:11
  57:9 132:4 169:6
  172:9 176:18
  205:4 207:13
  211:11 224:6
  251:13 256:4
  262:18 287:22
  295:8
**means**  13:4 20:17
  20:19 28:6 51:10

60:12 135:5
  185:22 209:22
  251:21 257:14
  259:4 288:3
  305:23
**meant**  158:9
  199:15
**measured**  183:20
**mechanical**  164:8
  166:5
**mechanics**  48:15
  49:3 294:16
**mechanism**  163:8
  163:9
**media**  7:12 107:20
**medication**  22:1
**meet**  144:14
  155:25 177:2
  178:23 179:9,17
  180:12 181:14
**meeting**  24:1,7,9
  69:11 72:7,15,22
  72:25 73:14 75:13
  76:3,13,20,22,23
  78:9,12,24 79:2,5
  79:20 80:2,7,23,23
  81:7 82:2 83:6,25
  84:21 85:11,15
  88:5,9,17,25 89:4
  89:5,17,18,25 90:7
  90:12,17 91:2,9,10
  91:19,25 92:16,21
  92:22 93:1,1,4,13
  93:14,15,20 94:10
  94:19,24 95:2,5,8
  95:13,20 96:8,22
  96:23 97:1,4 98:1
  98:2,12 99:2
  100:6 102:20,24
  103:1 109:11,14
  109:18 110:20

111:18,20,24
  112:4 113:4,8
  114:10,19,22
  124:22,25 125:2,4
  125:8,10 126:11
  126:16,17,21
  127:2,4,5,7,11,12
  127:15 128:3,13
  129:12 130:3
  131:2,11 132:4,13
  132:24 209:1,4,8
  209:10,13,15
  245:13 246:11
  247:6 248:4
  260:24 261:6,24
  262:3,23 263:4,19
  264:9,10,16 266:3
  266:16,20 267:8
  285:10,12 296:18
  296:21 297:2
**meetings**  27:23
  42:22 43:2 44:15
  49:18 69:9 72:7
  73:4,6 80:17,21
  87:16 127:21
  237:2 263:2 292:7
**meets**  139:19
  177:10
**megan**  2:10 8:13
  232:10
**member**  28:16
  151:9,11
**members**  11:6,9
  11:17 27:23 28:4
  28:10,21 30:17
  85:20,22 86:15
  87:7,17,24 96:17
  109:25 150:15
  151:15,17 201:3,7
  217:6 243:23
  267:23 269:18

272:1
**memo**  25:7,10,11
  30:1,1 32:12
  33:18 65:12
  107:25 108:1,10
  108:18,22,24
  109:6,8,17 110:11
  110:12 111:7
  115:13,19,25
  123:24 124:1
  159:20 194:25
  195:6,15,17 196:2
  196:7,8 197:25
  198:6,7 203:17
  210:14 236:12,15
  248:20 249:7,13
  249:16 250:1,2,3,6
  250:11,15,18,19
  250:21 251:4,22
  251:24 252:7
  266:9
**memoranda**
  233:18
**memorandum**
  209:24 288:24,24
  289:12
**memory**  25:16,19
  114:14,19 182:15
**mention**  128:3
**mentioned**  11:3,17
  14:2 31:5 32:17
  41:13 59:11 61:1
  69:13 100:4,8
  108:17 113:17
  123:4,5 135:6
  137:7 153:24
  168:5 234:9
  262:20 263:12
  265:8 266:7
  280:12 288:13
  291:5 296:19

297:6 298:22
**merit**  1:23
**merits**  186:13
**message**  113:10
**messages**  64:20
**met**  9:23 11:6 18:7
  23:9 140:7 144:5
  144:8 159:21
**michael**  5:11 8:19
  17:2,15,24 18:7
  59:19 263:23
**microphones**  7:5,8
**mid**  109:14 245:9
  278:5,19,24
**middle**  166:17
  184:2 185:9
  189:25 197:22
  207:5
**miller**  74:1 79:25
  81:10 264:3,6
**million**  51:2,3
  122:22 171:10
**millions**  28:8
  159:13
**mind**  25:1 58:7
  123:10 131:14
**mine**  197:18,22
**minimum**  220:18
**minute**  80:5
**minutes**  52:13
  95:1 124:5,8
  231:22
**misapplied**  74:6
**mischaracterizes**
  36:22 105:18
  202:14 213:10
  248:22 249:10
  252:2 260:3
  266:17 277:15
**misdemeanor**
  181:21

**misdemeanors**
  181:21
**mispronouncing**
  125:19 263:15,16
**misremembering**
  79:24 127:20
  295:2
**missed**  261:4
**missing**  197:13
  268:15
**misspeak**  60:2
  71:6 180:7 181:3
  278:1
**misstate**  213:21
**misstated**  194:20
**misstatement**
  153:6
**misstating**  263:15
**mistake**  196:23
**mistaken**  10:18
**misunderstood**
  205:10 216:14
**mix**  169:23
**mode**  274:21
**moded**  274:19
**moderator**  79:3
**modified**  274:19
**module**  164:15
  165:3,5 273:16
  274:15,16 278:16
  278:16
**modules**  27:3
**moment**  75:12
  244:3
**monday**  66:14
**monitoring**  33:25
  34:3,18 174:5
**month**  47:7
  166:13
**months**  29:12
  33:10 43:8 47:1,1

47:2 127:22
  142:25 160:18
**moore**  59:9,13
  103:13
**morning**  7:3 29:25
  133:14 144:12
  199:2
**morrison**  8:11
**morrisson**  2:18
  8:11
**motions**  82:17
**motivator**  126:17
  126:18
**mouth**  45:15
  91:20
**move**  188:1
  288:21 291:15
  294:13 301:13
**moving**  115:17
  133:13 170:17
  274:7 298:20
**multiple**  27:2
  65:24 79:18,25
  80:12,12 115:21
  137:5 150:1,1
  297:6,7,18,20,21
  298:2 303:3
**mulvaney**  73:25
  81:12 91:5 112:18
**mutually**  254:6

**n**

**n**  2:1 3:1 4:1 5:1
  75:3
**n.w.**  2:18 3:5,22
**nader**  125:13
  127:18
**name**  7:25 9:23
  10:2 33:8 35:23
  50:24 58:13 71:19
  71:20 74:2 125:19
  137:22 187:7

232:10 244:16
264:8,11 267:23
**named** 302:20,21
**names** 33:8 34:21
34:23 35:1,16
45:11 58:15 59:21
59:25 61:20 62:9
72:7 104:23 126:5
126:6 208:23
216:25 255:11
**nancy** 1:22 8:2
126:1 305:15
**nancy's** 272:5
**napa** 191:3
**napolitano** 1:5
2:15 7:15 8:15
46:5 194:25
232:12
**napolitano's** 29:25
159:20
**narrow** 287:2
**nation's** 210:4
**national** 3:3 6:12
9:1,3 38:25 149:1
156:23 181:22
196:3 211:8
215:20 216:1
285:4
**nations** 13:13
**natural** 190:24
192:20 193:2
**naturalized** 20:16
**nature** 82:1 132:2
132:19
**nealon** 132:25,25
133:2 253:14,18
261:11
**near** 43:8 166:17
218:22 224:18
**nearby** 56:7

**necessarily** 34:15
48:15 81:5 90:15
120:18 129:2
135:20 145:14
209:12 235:25
288:11 300:25
**necessary** 136:25
253:17 306:4
**need** 20:18 23:3
66:3 93:13 98:21
118:11 151:15
154:20 162:24
164:19,22 191:25
202:16 205:1,18
253:14 281:6
**needed** 35:15
42:21 278:6
283:24
**needs** 118:13
**negative** 291:22
**neither** 159:15
305:11
**nelson** 23:20
**neubel** 58:21
**neufeld** 35:17
58:21,22 103:12
268:2,22 276:3,7
**never** 15:15 50:7
91:11 121:24
122:1 139:20
227:16,20 228:23
230:11 236:16
**new** 3:10,12,12,14
8:22,24 42:2 50:6
57:10 163:19,20
164:4,9,14 165:4
170:22 242:13
267:4 278:16
285:6 296:13,15
**newman** 8:19,19
252:22

**newmann** 90:24
**news** 107:12
213:25 265:4,5,21
267:6
**nice** 98:24
**nielsen** 74:9
**night** 197:22
**nilc.org** 3:7,7
**nine** 142:25
292:25
**nods** 148:17
275:22
**non** 23:21,23 70:3
127:22
**noncitizens** 294:2
**normally** 30:4
**northern** 1:2 7:21
**northwest** 7:24
**notation** 153:18
**note** 7:5 18:7
39:18 40:21
137:24 217:8,10
301:17
**noted** 19:3 39:9
50:10 118:25
179:16 209:24
253:24 287:21
302:15 306:9
**notes** 95:7,12,20
95:22 96:1 97:4,6
97:6,8,10 186:7
210:3
**notice** 156:1,2
166:2 217:11
272:11 289:7
305:3
**notices** 160:21,25
161:14,18,24
162:3,8 163:6,19
165:12,17,19
166:1,7,10 168:3

168:15,25 169:4,4
169:15 170:8,23
171:17 172:14,17
172:18 173:2
270:24 271:1,7,12
271:24 273:6
274:1,6,8,9,11,17
274:22 276:12,17
276:18 277:22
278:7,9,14,14,17
278:18,23 279:7
279:17,22,23,24
280:5,10,19 281:6
281:12,13,25
282:4,5 302:9,10
302:11,13
**notification** 29:25
165:5 173:25
280:15 302:14
**noting** 58:2 199:16
203:19 302:16
**november** 195:16
**nuebel** 103:11
125:15 268:10
**number** 5:10 6:3,5
6:7,23 31:16 51:1
58:2 63:11 151:2
155:17 177:18
178:12,25 179:12
183:13 186:8
188:13,15,24
189:9 235:3
264:24 273:4
277:7 286:11,13
294:19
**numbered** 184:14
**numbers** 146:24
174:18 176:23
182:19 184:9,10
193:20 247:22
286:10 300:12

| | | | |
|---|---|---|---|
| numeric 300:25 | 299:9,13,22 | 190:13 206:17,19 | 246:3 |
| nw 1:21 2:11 4:4 | objectionable | 242:16,16 304:13 | officials 104:9 |
| **o** | 220:24 | 305:17 | 105:2 200:15,23 |
| o 75:3 | objections 22:20 | offense 148:25 | 201:6,8,20 202:2 |
| oakland 2:6 | 81:18 82:21 84:20 | offhand 35:16 | oftentimes 41:3 |
| oath 8:4 21:20,20 | 248:22 | 278:20 | 42:23 |
| 52:25 86:6,7 | observation | office 2:4 3:10,17 | oh 105:6 196:22 |
| 124:18 254:11 | 157:15 | 6:17 8:17,20,23 | 264:7 |
| obama's 46:4 | observe 129:20 | 9:11 23:16,22 | oit 60:10,11,12 |
| object 100:24 | observing 122:23 | 27:11,16 28:16 | 63:23 64:6 65:5 |
| 115:1 182:2 219:4 | obstreperous | 29:15 31:14 33:20 | okay 11:1,11,16 |
| 221:12 245:15 | 77:19 221:2 | 34:3,16 41:14 | 11:19 12:22 13:23 |
| 299:1 | obtain 191:21 | 43:2 48:21 55:6,7 | 17:16 18:24 19:6 |
| objecting 248:21 | obvious 80:19 | 55:8,10,14 59:14 | 21:6,25 23:2,12,18 |
| objection 22:16,25 | 219:22 | 59:18 60:13,21 | 24:13,18,21 25:13 |
| 36:22 37:9 40:3,6 | obviously 22:24 | 61:4,7 62:16 | 25:20,24 27:4,7 |
| 77:7,18 78:15 | 36:2 53:12 54:4 | 63:23 65:23 68:15 | 35:22 40:8 41:9 |
| 79:6 84:1 92:12 | 59:25 73:10 80:18 | 68:19 69:17 70:18 | 41:18,20 42:11 |
| 99:3 100:23 | 81:6 82:9 98:6,9 | 70:22 71:9 93:6 | 43:10 44:20 49:6 |
| 105:17 108:2,11 | 99:11 100:6 | 113:6,6,18,24 | 49:11,23,23 51:22 |
| 111:8 129:13 | 106:19 111:15 | 126:20 133:1 | 52:6,6 53:2 54:23 |
| 130:6,20 140:25 | 115:19 116:12 | 135:14,19 136:4,7 | 55:1 56:6 57:25 |
| 144:20 157:9 | 118:11 123:3 | 136:7 138:25 | 58:4 61:8,20 62:8 |
| 162:18 169:25 | 149:17 159:3 | 149:21 150:4,10 | 62:25 63:5,17,20 |
| 178:13 182:5 | 179:4 192:8,13 | 153:1 154:16 | 64:7,9,15,22 65:3 |
| 186:14 190:15 | 200:9 206:10 | 176:4 195:6,9 | 65:3,10 66:1,1,11 |
| 191:5,11 193:4 | 223:24 229:24 | 214:21 215:2,6 | 66:13,23,23 67:4 |
| 204:10 213:10 | 253:25 300:20 | 233:1,3,12,13 | 67:20,23,23 68:3 |
| 216:19 220:7 | 304:6 | 244:18 247:1 | 68:23 69:12,15,20 |
| 221:1 224:22 | occasions 10:15 | 255:23 257:7 | 69:24 70:4 71:19 |
| 234:18 236:21 | occur 112:15 | 270:6 296:14 | 71:22,25 73:2,4,8 |
| 237:5,21 238:4 | 135:12,14 147:11 | officer 59:10 | 73:13,18,20 75:13 |
| 240:4,14 243:12 | 187:19 225:23 | 180:19 | 75:21,24 76:7,16 |
| 248:24 249:10 | occurred 66:24 | officers 216:7 | 77:14 78:4,11 |
| 252:2 258:14 | 96:23 132:4 | 283:19 | 79:1,20 80:4,6 |
| 260:3,15 261:25 | 165:13 267:9 | offices 1:20 27:19 | 81:2,11,16 82:3 |
| 262:12 266:17 | occurring 162:3 | 145:22 | 83:12,14,22 85:6 |
| 269:8 277:15 | october 1:16 5:12 | official 1:5,10 7:15 | 85:16,19 86:3,9,18 |
| 279:2 282:1 | 7:1,4 17:6 66:14 | 7:18 47:10 128:19 | 88:1,3,23 89:1,12 |
| 283:25 293:9 | 66:15 137:25 | 128:21 133:24 | 89:15 90:2,8 91:1 |
| 297:10 298:7 | 138:24 189:22 | 217:12 245:25 | 91:18 92:2,19,21 |

92:24 93:3 94:12
95:7,17,23 96:6,6
96:14,19 97:2,21
98:4,9,12 101:22
101:23 102:10,14
102:16,20 103:16
104:2,5,7,14 105:4
105:15 106:6,8,13
106:18,18,25
107:7,15 108:20
109:11,15,20
110:7 111:2,6,17
112:6,22 114:23
115:5,14,24 116:6
116:12 117:5
118:1,6 119:20
122:25 124:4
125:8 126:11,21
127:1 128:7,17
129:10 131:4
132:22 133:2,7,12
135:7,11,17
136:19,22 137:4
137:11 138:6,21
139:1,5 140:12
142:7,12 143:16
147:2,13 148:6
149:8,23 150:19
152:15 153:3,10
154:6 155:7
156:14 160:9
164:3 166:19,19
169:22 171:12,19
174:8,19,25 175:3
175:8,23 178:2,18
178:21 181:4
183:25 184:8,14
185:20 187:21
188:11 189:11
191:7 193:13
195:5,12,19,25

196:10,16 197:20
198:12,24 199:14
202:5,19 206:7,14
206:22 207:1
208:17 209:17
211:1 215:17,25
216:4,8 217:18,22
218:8,12 221:11
221:25 222:8,10
225:2,15 227:10
228:18 229:16,18
230:18 231:8,18
233:6 242:6 244:1
244:4 252:14
253:5 255:15
259:18 261:4,22
265:15 268:8
269:1,17 271:6
277:10 282:8,13
285:14 286:19
287:4 293:16
294:13 298:20
301:13 302:9
304:4
**olc** 198:6,7
**omb** 73:24
**ombudsman** 20:16
55:14 128:24
129:4,5
**once** 10:16 16:11
16:15 36:18 91:9
145:17 146:14
166:13 207:9
229:24 233:5
254:7
**ones** 81:3 107:22
147:23 162:11,13
166:16 187:10
197:19 276:16
278:17

**ongoing** 61:9
201:15 211:4
213:22 266:8
**ooo** 7:2
**open** 47:5 139:18
247:11
**operate** 66:5,7
238:22 267:15
275:11 276:15
**operated** 101:12
120:12
**operates** 178:8
**operating** 6:12
106:13 215:21
216:2,10
**operation** 74:19
266:4 286:5
**operational** 29:24
30:9 32:24 33:1,4
33:18 34:14,19
46:9 48:15 121:4
121:10 122:5
159:10 163:7
169:17 171:1,14
175:22 225:23
236:16 251:19
261:21 265:3,7,10
265:23 266:5,11
266:13,14 267:4
267:22 268:4
271:22 272:3
274:19 275:2,3,13
275:25 276:16
**operationally**
115:22 204:6
265:25 266:10
295:23
**operations** 27:25
33:13 35:18 50:1
50:10,21 56:2
58:23 59:8,12

129:6,8 171:3
217:1 268:14
**opine** 34:16
**opinion** 118:17
120:3 121:5 229:1
229:1 233:9 236:2
237:13 243:10,19
**opinions** 47:5
118:3 129:6
151:20 195:20
198:8 209:11
**opportunities** 29:5
**opportunity**
210:23 274:3
287:20 298:2
**opposed** 44:25
186:13 212:15
290:10
**option** 40:1,22
219:23 221:23
222:3,12 223:22
224:1 286:6,8
**options** 15:18
129:25 167:10
218:21 219:1,6,14
219:19 220:3
221:4,6 222:4,6,17
222:18 223:3
224:7,13 239:11
266:22 278:7
**order** 30:17 83:22
118:15 134:1
139:16,16,22,22
147:7 159:7
197:15 253:6,11
253:16,24
**orderly** 123:24
218:21 219:20
224:17
**org** 49:19,19 58:4
180:3

| | | | |
|---|---|---|---|
| organization 60:6 | **p** | pager 196:21 | 92:13 103:4 121:3 |
| organizational | | pages 5:12,14,18 | 130:3 147:3 |
| 5:18 53:9,16 54:5 | p 2:1,1 3:1,1 4:1,1 | 5:20,22,23,24 6:4 | 152:18,25 153:6 |
| organizations | p.m. 99:23,25 | 6:6,9,11,19,21 | 156:18 158:1,10 |
| 243:5 | 124:10,11,12,14 | 53:15 54:10 | 164:1 169:17,23 |
| orient 264:15 | 167:21,22,23,25 | 196:25 197:14 | 174:5 175:2,16,19 |
| original 143:17 | 208:2,3,4,6 232:2 | 217:11 287:15 | 177:7 179:15 |
| 220:25 306:11 | 232:3,4,6 244:6,7 | pains 307:22 | 201:10,22 202:20 |
| originally 220:11 | 244:8,10 252:25 | paper 77:11,13 | 212:17 213:24 |
| 290:25 | 253:1,2,4 284:17 | 78:4 195:20 | 220:13 226:20 |
| originated 71:1 | 284:18,19,21 | paragraph 57:6,7 | 227:5 231:10,13 |
| ought 187:22 | 296:5,6,7,9 304:14 | 61:9 207:5 211:2 | 234:21,24 235:11 |
| outcome 8:5 | 304:16 | 218:18 221:5 | 239:4,6 251:13 |
| 223:11 305:13 | p.o. 51:14 | 222:11 224:16 | 260:13 269:1 |
| outliers 20:10 | package 76:21 | 225:15 227:11,12 | 275:7 276:4 |
| outlined 260:20 | 77:5 94:19 152:11 | 259:6 292:24 | 284:11 296:23 |
| 289:11 | 153:21 194:18 | parallel 51:12 | 304:1 |
| outside 15:8 36:11 | packaged 154:2 | parameter 34:8 | partial 83:24 |
| 39:10 60:5 69:23 | page 5:1,10,16 6:3 | 89:16 131:5 | participant 133:3 |
| 85:9,11 98:5 | 6:23 12:4 17:1,7 | 158:10 | 261:23 |
| 101:8 136:12,20 | 20:2,4,5 26:5 | parameters 30:18 | participants 80:25 |
| 158:14 166:25 | 53:10,12,14,14,16 | 31:10,16 32:6 | 209:14 |
| 167:3 269:24 | 53:17 55:22 56:18 | 38:3,9 59:22 | participate 30:9 |
| 270:2,19,20 279:7 | 67:12 137:17,24 | 89:13 98:5 101:11 | 158:15 160:7 |
| overall 14:3 | 137:25 139:10 | 131:15 150:3 | participated |
| 132:21 182:7 | 149:11 152:4 | 159:20,22 161:2,6 | 228:10 276:8 |
| 271:4 | 153:17 155:17,17 | 167:15 205:25 | participating |
| overseeing 33:24 | 156:8 160:10 | 206:5 230:7,15 | 49:18 |
| 50:12 134:21 | 166:20,20 172:2 | 231:1 237:17 | particular 43:12 |
| 210:3,6,11 | 172:10,13 174:14 | 238:10 247:17 | 90:16 122:8 |
| overseen 33:20 | 176:23 177:1 | 260:20 302:17 | 134:22 176:8 |
| oversees 129:5 | 180:9,10 181:4,6 | parents 236:10 | 205:3 223:18 |
| oversight 10:21 | 183:11 184:3 | parole 167:4,8,11 | 271:2 |
| 17:4 47:21 54:15 | 189:17,20,24,25 | 167:14 181:17 | particularly 45:4 |
| 55:5 271:19 | 193:16 195:5 | 227:4,8 | 50:20 116:23 |
| overstate 49:16 | 196:1,16,16 197:7 | parse 85:12 | 122:3 214:9 |
| overview 5:23 | 199:17 207:2 | 191:19 | 229:11 235:13 |
| 26:12 152:4,12 | 217:10,12 221:21 | part 22:21 24:19 | 267:12 299:24 |
| | 227:11 231:9 | 27:24 28:1 34:6,9 | parties 7:10 |
| | 258:7,11 288:25 | 34:10 35:11 36:4 | partner 155:2 |
| | 307:8 | 48:11 49:10 83:13 | |

**partners**  129:5
**partnership**  55:14
**parts**  251:17
**party**  8:4 305:12
**pass**  218:23
  224:19,20 225:5
**passed**  143:24
**pathway**  229:3
  281:19
**patience**  244:15
  284:25
**pause**  33:12
  198:19 210:17
**paused**  91:10
**pausing**  43:15
  249:18
**paxton**  24:17 25:1
  117:14 200:15
  209:7 252:9,17
  255:16 259:20,24
**paxton's**  168:9
  196:12 197:2
  198:12 207:2
  208:20 211:17
  213:8 214:21
  215:2 237:11
  244:25 254:21
**paying**  167:4
**payment**  51:16,17
**penalties**  307:22
**pending**  57:9
  188:3,18 298:17
**people**  13:20
  20:16 33:9 34:22
  35:15,24 36:5
  39:20 45:25 49:8
  58:6 60:5 61:20
  61:22,23 67:17
  68:6,17 69:1,9
  70:25 72:2,23
  79:18 80:12,16,18

80:22 81:2,19
  90:16 91:1 95:7
  95:25 96:7 97:23
  98:11 99:2 104:8
  104:14 105:16
  106:2 111:20
  122:22 125:22
  126:8 127:14
  134:3 144:17
  145:11,20,21
  146:10,23,25
  148:3,15 150:15
  151:6 153:15
  158:4,14 159:25
  167:11 175:24
  178:22 180:23
  181:25 192:25
  207:10 208:17
  209:1,8 212:16
  216:5 241:4
  261:10 263:6,21
  281:23 285:17
  297:21 298:2
**percent**  168:8
  188:21,22
**percentages**
  181:24
**perception**  166:4
  168:6
**perfectly**  84:13
**performance**  47:5
  59:19
**period**  11:24 27:7
  32:13,14,19 36:9
  43:14,17 45:17
  49:7 55:1 58:25
  58:25 67:5 133:11
  142:20 143:8,9,13
  143:19,20 146:6
  146:15 147:4,15
  160:18 172:16,20

173:1,9,13 184:10
  186:9 204:4
  226:18 227:9
  229:7 230:12
  264:16,21 265:15
  270:15 281:23
  294:25 295:10,11
  295:11,14
**periodically**  65:17
  65:17
**periods**  45:18
  204:8 205:14
  301:19
**perjury**  307:22
**permanent**  14:17
  14:23 15:23,24
  42:12 46:13 50:6
  158:23 228:2
  236:11 243:25
**permission**  283:22
**permit**  5:24 172:7
**permitted**  286:1
**perpetuity**  229:10
**person**  28:16,18
  72:9,14,15 80:22
  140:6 167:7,10,13
  204:15 212:20
  264:5 275:5
  284:12 291:8,11
  295:13 298:12
**personal**  37:19
  121:5 122:23
  144:18 148:14
  229:1 233:9 234:2
  234:8,12,12
  235:24,24 238:7
  243:19
**personally**  233:7
  243:17
**personnel**  247:6

**persons**  301:20
**perspective**  27:17
  33:13 34:1 37:24
  121:18 122:23
  129:9 157:4,6,21
  203:20,21 204:5
  208:18,25 214:13
  223:10 231:5
  271:20 276:16
**phase**  199:18
  203:23,24 204:5
  207:6 273:25
**philip**  264:3,6
**phone**  64:19 69:8
  69:13,14 75:19
  85:17 87:16,24
  89:1 110:20,23
  177:17 178:25
  179:12 246:14,17
  246:21
**phones**  7:7
**phrase**  33:21
  153:19
**phrased**  70:18
  220:9,10,22
**phrases**  158:17
**pick**  7:6
**picture**  214:12
**piece**  20:1 34:11
  51:7 136:2 149:8
  175:5 229:20
  287:5
**pieces**  33:19
  121:25 268:4
  288:13
**pipeline**  45:21
**place**  7:7,10
  143:13 149:12
  152:16 204:8
  256:2 305:4

[placed - presented]                                                    Page 39

**placed** 143:6
  148:12 177:5,13
  177:15 179:8,19
**places** 62:21 63:21
  152:15 154:9
**plaintiff** 3:14 8:23
  296:14
**plaintiffs** 1:7 2:21
  3:8 8:10,12 9:2,5
  9:24 253:11 256:7
  285:5
**plan** 19:7 154:7,17
  154:23 301:23,25
**plans** 301:14,16
  302:3
**play** 235:16
**player** 113:12
**please** 7:5,6 8:6
  18:14 22:9,11
  26:11 32:3,18
  33:14 36:12 45:6
  72:19 77:23 101:2
  118:11 119:6
  129:3 141:4,6
  173:20 199:24
  201:10,11 203:4
  213:15 229:22
  252:23 262:25
  283:7 284:5 289:5
  292:10 296:3
  306:3,7
**point** 18:11,20
  19:13 24:24 29:23
  31:21 32:7 45:12
  45:16 55:9 78:15
  79:6 81:10 116:1
  120:21,24 121:1
  134:15 139:2
  144:7 150:14
  170:16 180:8
  187:5 190:2 202:4

213:2 223:15
224:3 236:17
245:14 246:19
251:1 252:12
259:16 260:19
272:10,17 278:2,4
279:12 282:3
288:18 299:24
302:4
**points** 29:20 32:11
  41:4 44:11 115:18
  120:5,7 123:5
  124:3 128:14
  157:20 265:13
  298:23,25 299:19
**policies** 150:11
  211:9
**policy** 26:20 45:19
  47:15 55:10 56:2
  58:20 66:22 133:1
  137:8 149:5 156:4
  156:6 177:15
  178:22 179:6
  239:5,9,11,24
  261:15 268:10
  270:9,9 294:6
  302:5
**political** 34:17
  35:4 42:3 46:22
  47:16
**pops** 35:23
**population** 14:18
  46:14 159:17
  160:6 243:25
**porter** 74:1 95:16
  95:19
**porter's** 74:3
**portfolio** 261:17
  261:23 262:6,10
**portion** 121:25
  160:6 267:21

**pose** 181:22
**position** 33:24
  47:9 52:8 61:7
  82:7 95:14 129:1
  133:18 220:20
  253:11,21
**possibilities**
  115:22 222:19
**possibility** 121:20
  199:12,21,25
  203:10 224:8
  241:8 245:2 246:1
  247:5,9,11 301:21
**possible** 11:9
  61:16,19 81:22
  198:6 217:17
  241:5 275:16
  278:23 295:23
  296:1
**possibly** 96:5
  111:3 122:13
  179:24 270:18
**post** 32:8 103:1
  145:15 301:20
**posted** 26:13
  135:2,22 136:11
  136:13 270:9,11
**posting** 137:10
**postponed** 91:11
**potential** 39:14
  127:8 179:21
**potentially** 57:18
  61:2 79:9 81:24
  84:4 88:12 130:8
  218:24 219:16
  223:17 290:9
**power** 294:4
**powerpoint** 32:10
**powers** 294:6
**practice** 30:13
  106:5 161:5 181:2

**practicing** 243:15
**pre** 148:8 215:11
  229:4
**preceding** 247:12
**precise** 47:24 60:2
  61:17 66:16,17
  109:13 184:1
  256:12
**precisely** 60:16
  65:20 210:2
**precluded** 151:12
**predecessor** 35:5
**predominant**
  222:7,8
**predominantly**
  60:22 279:12
**prep** 18:7 24:12
**preparation** 18:4
  127:11 269:19
**preparatory** 127:4
  127:7
**prepare** 11:2 23:8
  24:1 172:21
  173:10
**prepared** 32:5
  233:18 248:2
  266:10
**preparing** 11:20
  43:8 267:9
**present** 4:8 128:16
  152:13 181:19
  214:12 249:24
  261:6 262:20
  285:12
**presentation** 31:9
  153:8
**presentations**
  78:12,23
**presented** 122:7
  222:17 258:22

**preserve** 82:23
83:22 192:23
**president** 1:6 6:18
7:15 8:15 46:3
74:15 75:10
113:21 232:12
257:9 258:24
294:5,8
**president's** 113:6
113:18,24
**presidential** 79:9
81:25 84:4
**press** 46:12
**presumably** 33:3
277:6
**presumptively**
235:8 286:25
**pretending** 38:14
**pretty** 25:19 36:1
104:19 109:19,21
127:19 214:5
217:7 219:20
267:14,21 274:23
**prevent** 177:12
**previous** 14:24
202:15 204:17,19
213:11 223:2
228:1,15 290:24
**previously** 6:22
14:4 160:6 164:9
172:16 193:18
254:15
**primary** 127:15
**principal** 91:6
131:19 263:24
**principally** 232:23
**principles** 210:7
239:24
**print** 19:4 164:10
165:2 273:20
274:6,8,22 276:17

277:22 278:15
280:10
**printed** 18:17
163:23 174:13
183:12 274:9,12
276:13
**printing** 163:8,9
164:9 165:2
169:11 273:6,16
274:16 278:16
**printout** 17:7 26:5
53:8 189:17 218:1
**prior** 15:4 24:5,6,7
76:25 89:21,22
115:13 116:4
161:3 165:1
190:12 225:22
245:12 246:10
248:3,23 251:22
252:3 279:24
286:5 288:23
**priorities** 211:9
**prioritization**
16:17 301:22
**priority** 177:8
**private** 7:6
**privilege** 22:19
37:11 78:18 79:8
79:9 81:18,23,24
81:25 84:3,4,5
99:5 100:25 108:4
111:10 115:3
129:15,16 130:8,9
162:21 190:17
192:1,5 193:6
204:12 206:13
219:8 220:10
221:15 222:2
224:24 236:23
240:6,16 245:17
249:1 260:17

269:11 298:9
**privileged** 23:25
77:20,23 79:7
85:5 88:12 89:9
98:23 110:5
190:16
**privileges** 253:10
253:13 254:4
**pro** 159:15
**proactively** 120:2
**probably** 11:23
21:3 34:25 50:18
51:1,19 55:2,3
56:6 74:6 81:14
95:9,16,18 116:11
126:8,12 134:14
139:9 161:8,17
166:11 182:11
188:25 208:24
230:10 241:5
247:12 249:23
261:9 269:20
277:5 299:25
301:18
**problem** 169:7,10
280:19 281:4,10
282:11
**problematic**
275:20
**procedure** 106:14
216:2,10 293:24
**procedures** 6:12
150:11 215:21
**proceed** 8:8 40:6
163:13 192:14
**proceeding** 39:10
**proceedings**
139:15,21,21
140:7,8 143:7
148:12 149:3
155:25 177:6,13

177:16 178:16,24
179:8,20 198:19
210:17 302:6
**process** 28:12 31:4
31:5 32:2,7 34:23
37:11 43:22,24
44:4,10,13 47:20
48:7,16 57:11,16
60:18,19 64:22,23
65:2,5,9 79:8
81:24 83:1 84:3
99:5 100:25 101:2
101:20 102:8
106:10,12 108:4
110:5 111:10
128:18 129:15
130:8 134:25
135:18 139:14,18
140:20,21,24
141:8 143:6 144:3
145:11 146:16,23
147:6,8,10 148:23
150:9 160:19
162:20 176:1
189:4 190:17
191:20 192:4
193:6 194:13
204:12,22 205:6
206:12 209:3
219:7 220:10,15
221:7,14,15
224:24 230:13
236:23 238:11
240:5,16 245:17
248:25 251:1
253:9 254:18
260:17 269:11
279:23,25 280:10
280:15 298:9
300:7

**processed** 122:12
161:21,22 165:1
179:3 279:9,19
**processes** 47:17
52:3,4 303:6
**processing** 50:13
51:5 122:14
159:12,13 161:15
162:3 273:11
279:12 280:12
294:25
**produce** 194:11
280:4
**produced** 193:15
194:14 287:11
**product** 17:23
302:25
**production** 59:14
**profession** 301:12
**professionalism**
84:14 253:23
**professions** 301:4
**program** 11:8,15
12:2,9 25:20
29:23 30:7,12
31:13 32:10 33:5
38:8,21 43:12
44:7,21,22 45:24
46:4 48:3 49:8
54:11 55:18
100:16,22 101:11
116:15 120:19
121:17 122:3
133:10,20 138:18
144:15,17 145:12
148:21 152:4,12
152:14 153:9
163:20 183:21
184:11 195:3
199:18 200:17,22
202:11,12,13

203:11,15,23
204:9 205:23
207:7,9,9 211:6,23
212:24,25 213:8
213:25 214:7,10
214:11,15,22
216:21 218:21,24
219:3,16,25
223:17 224:7,10
224:14,17 226:13
230:2 231:2
233:11,20 234:1,4
235:5,5,7,8,12,19
235:21 237:15
238:18,22 247:22
248:19 249:8,9
273:13 286:5
299:5
**programmatic**
212:15 289:10
**programmed**
163:10
**programs** 4:3
138:16 154:20,25
200:20 201:17,25
212:10,12,13
213:19 237:20
238:3,13,15,19
271:15,16 273:12
293:17
**project** 104:10
105:2,13 106:3
**promise** 199:8
231:4,10,14
**promised** 147:6
227:20 228:23
229:5 230:1,11,24
231:1 260:2
289:22,23
**promote** 40:10

**promoting** 40:1
**promotion** 72:20
**promotional**
152:25 153:3,7
265:2
**prompt** 253:16
**proper** 237:14
**proportion** 286:14
**proposed** 88:25
89:4
**prosecutorial**
14:21 140:18
214:8 229:13
**prospect** 144:19
**protect** 149:13
**protected** 151:10
155:21 213:24
214:4,15
**protection** 15:23
55:12 125:20
155:24 262:19
263:10
**protections** 13:8
149:12 177:4
**protects** 218:22
224:17
**protocol** 19:4
134:1,7,9 137:2
**protocolwise**
19:17
**provide** 14:867
17:25 30:15 31:1
31:19 35:13 46:8
89:10 110:18
145:24 146:15
150:11,14,23,25
154:4,21,21
155:21 175:7
214:13 217:5
228:23 229:2,14
230:1 243:24

247:21 279:21
288:15 299:23,25
302:6 304:1
**provided** 17:25
24:11 36:18 38:9
38:23,24,25 45:13
97:14 110:12
135:25 150:20
154:3 209:10
226:16 230:3,4,7
230:14,25 242:22
243:1,6 272:24
290:23 301:1
302:14
**provides** 15:23
147:12 230:3
293:3
**providing** 29:3
39:15 123:13
152:12 154:19
209:2 228:14
229:11 278:1
**provision** 27:21
**public** 36:14,17
40:20 46:4 55:8
87:13 102:7 103:3
103:24 104:11
134:23 136:8
146:3 149:1 154:3
154:4,5,6,16,18
156:24 173:22
174:4 181:23
220:15 250:20
251:6 265:6,10
268:11,12,14
270:7 291:7,11
**publication**
134:15 138:2
**publicly** 107:9
155:1 250:6
257:23 302:14

**puerto** 190:6,11
  192:22 193:1
**pull** 122:18 210:16
  248:15
**pulled** 64:17
  141:10 198:18
**pulling** 248:2
**purports** 194:4
**purpose** 65:24
  138:12 143:12
  155:24 216:4,15
**purposes** 13:17
  23:13 27:17 38:16
  38:23,24 39:11
  41:1 87:16 107:16
  149:16 151:17,19
  158:12 211:9
  216:8 244:20
  249:24 302:1
**pursuant** 143:4
  254:13 305:3
**purview** 15:9
  261:21 272:3
**put** 29:8 40:1 41:7
  45:15 78:6 85:4
  86:9 87:15 91:20
  101:23 102:5
  133:19 152:23
  164:15,17 165:4
  187:22 204:8
  213:20 222:14
  250:3 259:11
  279:18 295:8
**puts** 133:25
**putting** 33:4 87:21
  143:12 152:18
  153:14

**q**

**qualification**
  209:20

**qualifications**
  179:17 282:25
**qualified** 144:24
  158:8 230:5
  231:15
**qualify** 160:3
  205:18
**qualifying** 144:5,6
  144:8 177:12
**quality** 59:19
**quarter** 183:15
**queries** 283:20
**query** 284:12,13
**question** 6:20
  14:24 15:12 18:2
  18:6 20:7 22:8,11
  22:13,19,20 23:1
  24:6 25:6 33:3,12
  36:24 37:6,12
  40:16 45:7,10
  47:8 54:21 55:6
  55:21 65:4 70:21
  72:11 77:20,22
  78:16,20 82:20
  83:3 85:19 88:11
  88:20 98:20,20,23
  99:15 100:4,23
  101:1,3,5 103:16
  105:19 106:24
  107:6 108:9 110:5
  110:8 130:21,21
  131:16 133:24
  139:11 141:4
  142:20 144:2
  145:4,5 146:17
  147:4 148:2,13
  149:11 150:16
  151:1 154:12
  159:9 162:19
  165:9 168:16
  170:19,22 175:6

176:19 177:1
  179:1,3 180:16,17
  181:5,8 185:5
  186:10 191:8,22
  192:3,11,15,23
  199:22 200:4,9
  201:5 203:2 204:7
  204:17 205:10,12
  205:19 206:9,13
  208:8 211:14
  212:3,18 214:19
  219:5,10 220:4,9
  220:22 222:14
  224:15 225:10
  229:8 235:12
  237:24 238:23
  245:5,7,15 248:25
  249:20 252:5
  256:18 261:9
  263:22 265:5
  269:9 276:6 281:8
  282:3 288:22
  291:15 292:15
  293:13 296:21
  299:7,10,11,14
  303:17,22
**questioning** 93:12
  254:14 304:12
**questions** 6:4 11:9
  12:11 22:16,17
  28:11,13,22 29:1,2
  31:2,18 34:12
  36:15,16 41:10
  43:6,21,22 44:9
  48:21 49:3 70:3
  70:17,22 81:18
  82:18 84:12,19
  88:4,6 92:3 93:14
  98:14,19 99:12,14
  100:3 101:14,24
  106:20 111:19

133:9,20 136:9,10
  139:13 146:21
  150:1 153:12,14
  155:11 156:10
  174:15 175:10,12
  175:25 180:10
  194:17 204:17,19
  217:19,21 231:20
  232:13,15 242:7
  243:23 244:15,18
  248:10 282:6
  285:7 296:16
  299:15 301:25
**queue** 169:11
**quick** 187:21
  208:8 231:25
  296:16
**quickly** 61:19
**quite** 11:22 59:23
  81:5 139:8 151:20
  189:23 210:24
  216:9 234:2
  249:18 263:3
**quote** 38:14

**r**

**r** 2:1 3:1 4:1 75:3
  305:1
**rachel** 4:4 9:8
  23:14 73:23 79:22
**rachel.westmore...**
  4:6
**raised** 45:7 146:3
  271:17
**raising** 214:18
  280:22 281:15,17
**rank** 283:23
**rate** 182:7
**ratio** 189:5
**rationales** 290:7
**reached** 83:5,25
  258:13 296:20

**reaction** 174:2 198:25
**read** 9:14 20:14,24 76:20,24 94:18 97:8 120:20 123:15 139:24 140:1 147:14 150:22 156:20 157:25 172:22 177:18,20 182:25 190:7 196:14 199:11,14 218:6 221:5 223:21 225:7 226:6 228:7 258:22 259:13 283:11,16,19 284:9 289:4 306:3 307:3
**reading** 20:8 27:10 29:7 49:25 184:8 259:16 292:18
**reads** 207:5
**ready** 175:13 266:12
**real** 16:10 98:24 158:25 253:23 303:2
**realize** 52:24
**really** 15:15,20 19:22 35:16 81:21 82:23 117:23 136:18 157:17 164:19 175:20 182:20 191:15 220:5 238:24 248:4 253:22 298:14 303:11
**reason** 14:16 19:1 19:3 21:25 32:25 33:9 39:18 40:25

59:23 60:9 91:9 92:7,15,16 116:15 117:19,24 118:8 123:8 163:17 173:5 186:12 187:9 188:23 191:1 203:14,14 217:15 223:13 227:12 232:19 241:7 277:21 283:10 289:18 290:1 291:23 292:17 293:7,14 306:5
**reasonably** 81:22
**reasoning** 143:18 170:17 272:15
**reasons** 13:23 38:25 80:19 186:21 187:14 202:6 212:5 234:4 249:13,16,17,25 250:5,8,13 251:23 251:25 260:8 274:18 275:8 290:6 291:7
**reassurance** 146:13,15,25 147:11,12
**reassurances** 45:13
**reassure** 146:10 150:20
**rebecca** 35:4
**recall** 19:10 21:2 24:3,23 25:7 30:7 31:15 32:1,10 33:2,19 34:16 35:11,16 36:13 38:19 43:13,19 44:1,7,14,17 45:10

45:11 46:3,12 48:5,8,22 59:20 60:9 63:11 65:23 68:14,21 69:14,18 70:7,17 71:5,9,18 72:8,9,17 73:21 75:22 76:1,3,9,14 76:19,23,25 77:4 78:5,13 79:22 81:9,14 85:14,18 86:12,19 87:2,9,24 87:25 89:3 90:5,5 90:25 91:5,13 94:25 95:3,6,11 96:15,16,20,25 97:3 102:11,22,25 103:13 104:3,18 104:23 105:9,10 106:4,11,16 107:12,22 108:25 109:5,9,10 110:12 110:19,22,23 112:3,13,17 113:13 114:2,3 115:12 120:7,9,11 120:13 125:11,18 126:5,6,12 127:3,6 127:17 128:13 132:6,15,16 139:8 141:11 143:14,20 145:13,14 146:2,7 154:1,24 155:5 161:12 163:4,10 164:1,6,6,20 165:3 165:7,14 166:3 169:16,21,22 170:3,5,7,10,24 171:11,20 173:3 173:21 174:5 175:4,17,19,20 176:10,17,19

187:5,10,13,18 190:12 195:8,11 198:11 199:1,16 200:18 210:2 213:7 214:25 215:4,6,7 217:4,7 217:16,17 218:11 221:10 236:14 245:3,8,12 246:6 246:12,14,25 247:2,13,14,18,24 248:1,4,11,12 251:7,7 255:19 256:24,25 257:12 257:13,18,23,25 257:25 258:1,5,18 262:24 263:14,18 263:20 264:8 266:14 267:9 268:2 269:6,15 270:1,10,12,16 272:23 274:14 275:2,23 276:1,14 276:22,23,25 277:1,4,17 278:10 280:22 281:1,2,14 281:16 285:11 286:11 288:15,17 289:16 291:1 294:21,22,23 295:7,10 297:16 300:1
**recalling** 43:20 75:12 86:20 107:21 274:21 280:16
**recap** 117:5
**recast** 300:17
**receipt** 306:12
**receive** 19:17 28:11 33:24 50:25

51:3,15,16,21
65:13,15 75:20
76:12,16 86:19
144:24 158:6,8
201:3,7 255:15
**received** 16:15
19:9,16,20,25
29:24 33:16 34:15
49:2 51:17 65:16
65:17,18 76:15
90:3 139:6 150:2
181:25 185:17,17
187:3 190:5 230:8
239:17 250:18
258:17 259:14
262:2
**receives** 28:8 52:4
**receiving** 51:5
76:14,19,23,25
95:6 160:3 167:13
**recess** 52:19 99:22
124:11 167:22
208:3 232:3 244:7
253:1 284:18
296:6
**recession** 166:2
197:25 222:15
**recipient** 40:21
287:24
**recipients** 14:14
15:13 101:11
121:15 172:15,19
173:12 178:22
225:17 226:6,14
230:1 239:17
240:20 241:2,14
241:22 242:10
295:3,4,22 301:5
301:17
**recognize** 17:11
18:16,21 26:9

223:24
**recollect** 43:16
60:16 127:10
138:20 182:11
301:6
**recollecting** 35:20
39:25
**recollection** 37:5
58:3 59:9,21
70:21 87:14 173:6
173:15 176:8
205:22 206:20
222:3 246:19
250:23 251:3
280:8
**recommendation**
180:23
**recommended**
172:20 173:9,13
**recommending**
123:23
**record** 7:4,11 8:7
9:23 17:1 20:14
21:18 22:21 26:5
52:16,18,21 53:7
56:18 87:13 93:9
98:19,24 99:21,24
106:19,23 124:9
124:13,20 137:17
152:2 167:21,24
187:23,24 192:24
193:15 194:10,12
194:12,14 195:12
198:2 208:1,5
232:2,5 244:2,5,9
244:20 252:18,23
252:24 253:3,21
254:19 284:16,20
285:1 288:23
289:25 290:3,4
293:14 296:3,4,8

304:13 305:10
307:5
**recorded** 7:12
305:7
**recording** 7:9
21:19
**records** 141:15
**recurrently**
213:25
**red** 190:1
**redepose** 253:17
**redressed** 179:23
**reece** 58:12,14
**refer** 44:2 47:19
56:6 66:3 188:5
188:10 217:2
240:1 254:20
268:17,21
**reference** 62:13
72:8 186:5 209:25
223:15 225:8
259:16 302:16
**referenced** 18:5
170:10 195:21
196:12 208:19
223:8 224:9 225:8
248:14 252:8
256:8,11,12
266:21 273:4
279:8 281:14
288:19
**references** 150:14
203:21 256:3
270:14 286:10
**referencing** 224:6
226:10,12 259:6
280:23
**referral** 156:1
**referred** 42:24
60:4 138:10
141:17,25 149:2

158:16
**referring** 139:14
156:12 207:6
210:22 248:6
249:25 250:14
263:9 265:17
283:3
**refers** 185:25
186:1
**reflect** 30:24 111:3
183:22
**reflected** 67:10
158:20
**reflecting** 43:25
73:23
**reflection** 290:9
**reflections** 228:14
**reflective** 154:24
**reflects** 41:6 47:13
**refresh** 24:11
210:23
**refreshed** 25:18
277:24
**refresher** 280:21
**refund** 122:18
**regard** 296:18
298:23 301:4
302:9,11,18
**regarding** 11:8
14:24 139:9 153:8
233:19 242:18
269:7 271:7,11
**regardless** 71:15
109:16 176:15
283:24
**regents** 1:4 2:14
7:14 8:14
**registered** 1:23
295:12
**regularization**
13:5,8,25 14:24

| | | | |
|---|---|---|---|
| **regularize** 13:4 20:19 | **relevant** 237:10 262:11 | **remind** 138:23 | 172:8,14,20,21 173:2,9,10,13 |
| **regularized** 13:15 13:19 | **relief** 179:13,21,23 | **reminded** 172:19 173:8,12 | 181:12,14,25 182:8 184:4,9,15 |
| **regularly** 166:15 212:4 213:25 | **remain** 279:18 | **reminder** 160:20 161:8 165:11,17 | 184:19,22,25 185:5,8,10,11 |
| **regulation** 175:10 175:11 | **remainder** 254:2 | 165:19 172:14,17 272:4 | 188:12 190:3 228:9 231:11,13 |
| **reid** 3:17 9:10 23:14 | **remained** 47:9 251:17 279:25 | **removal** 16:12 139:15,15,20,21 | 242:9,13 270:24 271:1,7,12,24 |
| **reid.cox** 3:19 | **remains** 251:14 | 140:6,8 142:21 143:6 147:16 | 272:10 273:6 276:17 277:22 |
| **reiterate** 202:21 235:23 | **remember** 24:22 25:2,4 29:16 | 148:12 149:2 177:5,13,16 | 278:7,14,14,23 279:16 280:4,10 |
| **rejected** 185:16,21 185:23,23 186:3,7 | 31:24 32:2,13 34:21,23 35:1,21 | 178:24 179:8,19 207:11,16,17 | 280:19 281:6,12 281:13,25 285:19 |
| 186:8,11,18,20,21 187:4 300:6,9 | 36:5,8,19 37:7,17 39:2 43:11 48:10 | 226:24 301:21 | 285:20,20 286:15 286:16 300:21 |
| **relate** 61:7 | 56:9 68:25 70:24 | **removals** 148:16 | |
| **related** 1:13 7:19 8:4 26:24 27:4 | 72:7,22,25 73:14 73:20 74:22 75:6 | **remove** 207:8 **removed** 143:7 | **renewals** 44:3,5 45:20 122:4,11,16 |
| 28:13 47:25 63:18 100:9 107:20 | 75:13,24 77:1 80:6 95:10 97:18 | 148:20 177:14 180:11 | 142:23 143:1 147:11 148:3 |
| 142:17 232:17 233:4 253:7 | 97:25 102:23 104:21 109:7,15 | **renaud** 59:3 | 173:18 229:9 242:12 273:3 |
| 296:15 | 112:15,22 114:4 114:16,18,21 | **rendering** 252:10 | 278:18 279:13 280:2 300:14 |
| **relates** 59:22 | 127:12 131:1,2 132:8,11,14 133:2 | **rene.browne** 3:19 **renew** 45:3 160:21 | 303:7 |
| **relating** 100:24 | 133:4,4 139:6 | 278:25 | **renewed** 122:17 |
| **relatively** 300:21 | 146:9 147:24 152:23,24 160:20 | **renewable** 159:2 | 146:23 |
| **relayed** 68:20 | 160:24,25 161:2,4 | **renewal** 43:16,22 | **reopen** 304:7 |
| **relaying** 113:10 | 163:5 168:9,11,13 | 44:2,10,12,21,21 | **repeat** 119:4 |
| **release** 6:16 102:7 103:3 107:13 | 168:19,21 170:13 170:19 171:8,8,15 | 46:10 48:6,14 51:6 52:4 143:13 | 233:23 237:23 **repeatedly** 225:8 |
| 218:5 | 171:18 172:24 176:14 198:21 | 143:25 144:10,13 144:13,19 145:11 | **rephrase** 22:10 159:18 219:11 |
| **released** 30:1,2 103:19,24 104:1 | 200:21 208:11 239:18,21 259:15 | 145:23 146:4,7,14 146:16,22 147:4,5 | 220:8 239:2 245:19 271:8 |
| 104:10 108:10,17 108:23 109:2,4 | 280:24 285:11 301:10 | 147:8,10 148:9 152:5 154:2 | 272:19 276:6 286:4 290:17 |
| 134:2 178:12 218:10 | **remembering** 35:7 80:1 120:22 | 160:16,17,22 161:8,13 163:6,18 | **rephrased** 220:23 |
| **releases** 265:4,5 265:21 267:6 | 125:24 | 164:17 165:16 166:1 168:3,15 | |

**rephrasing** 37:6
**report** 49:21 66:8
  66:11 67:18,19,25
**reported** 18:22
  67:15,21 184:10
**reporter** 1:23,24
  8:2 16:20 21:16
  25:25 53:3 56:12
  58:18 125:25
  151:23 305:24
**reporter's** 16:6
**reporting** 42:8
  67:2,6
**reports** 33:24 67:5
**represent** 9:24
  45:21 53:15
  228:22 232:11
  264:20 292:14
**representation**
  289:15 292:17
**representations**
  39:7,8
**represented** 45:22
  192:21 194:7
  256:7
**representing** 2:8
  2:14,21 3:8,14,24
  21:13 27:25 194:8
  285:4
**reproduction**
  305:22
**request** 5:21 6:6,8
  33:17 34:14 38:23
  40:15 59:22 60:22
  61:18 137:20
  140:14 143:8,10
  145:18 149:13
  155:21 158:3
  160:3,17 164:17
  167:11 174:2
  181:11,19 183:13

187:20 199:17
  200:22 201:5,17
  201:20 202:1
  207:6,6 247:24
  286:15 287:22
  290:1 300:8,19
  301:2,8,11
**requested** 12:18
  121:16 247:21
  300:5,6,18 301:11
**requester** 304:2
**requesters** 14:14
  15:12 40:21 43:19
  101:11 121:15
  159:19,21 293:4
**requesting** 86:16
  173:23
**requests** 31:17
  38:4 40:24 42:20
  42:21 48:14 49:2
  50:14,16,22 57:8
  57:19 71:23
  132:18 159:13
  172:21 173:10
  174:6 184:15,15
  184:17,21 185:16
  185:16,17,17
  186:3,7,8 190:3,5
  190:10 200:16
  201:3,7 216:3,12
  226:18 236:6
  283:20 285:20
  286:3
**require** 122:14
  207:7 269:23
**required** 44:13
  47:25 122:17
  187:16 273:5
  279:16 301:9
**requires** 29:3
  159:14 201:2

236:3 267:4
**rescheduled** 92:22
**rescind** 14:12
  116:17 120:10
  122:15,15 123:23
  205:13 235:5
  236:7,9 240:12,25
  241:11,18 242:2
  258:24 299:3
**rescinded** 16:12
  114:9 115:16
  120:18 166:8
  199:15 200:1,3
  211:23 232:20
  235:12
**rescinding** 14:10
  235:19 237:10
  245:2 247:9
  248:18 249:8,17
**rescission** 6:15
  12:2 25:10,11,17
  54:23 86:21 87:7
  100:17,19,24
  101:4,8,20 104:11
  107:18,25 109:8
  109:17 110:11
  113:19 114:5,25
  115:23 116:15
  117:3,20 118:9
  123:10 124:23
  126:24 127:8
  128:11,18 140:4
  161:5 163:1
  165:12,25 166:12
  170:2,3,7,15 196:7
  202:7 205:4,24
  206:24 208:10
  214:23 215:11
  218:3 222:18
  223:24 229:4,23
  229:24,25 232:17

235:21 237:3,15
  245:21 247:5,7,19
  248:19 249:7
  250:1,6,9,15
  251:24,25 261:2
  264:18,25 265:17
  265:22 266:1,22
  267:15 268:5,8
  270:14 286:6
  302:12
**reserve** 9:13 183:6
  253:17 298:16
  304:7
**reside** 271:15
**resided** 181:17
**residents** 190:5,10
  191:10 236:11
**resolution** 83:23
**resolve** 82:5 254:7
**resolved** 253:19
**resonating** 264:11
**resources** 234:16
  234:17,24 235:4,4
  235:7,9,15 236:4,5
**respect** 11:14 18:4
  29:17 31:17 34:11
  34:13 39:6 41:24
  45:10 47:17 52:2
  53:21 54:1,14,20
  55:5 72:13 85:1
  86:13 100:12,15
  100:16 101:4
  107:11 108:18
  115:5 116:19,24
  117:2 118:21
  124:1 128:11,15
  138:15 141:14
  142:14 144:2
  146:12 150:9
  170:14 171:13
  173:8 174:6 175:6

| | | | |
|---|---|---|---|
| 175:15 189:7 | 232:23 276:16 | 183:7 189:21 | 148:9,16 149:8,18 |
| 199:18 201:9 | **responsive** 31:19 | 198:9,10 210:20 | 149:18 151:22 |
| 209:12 211:11 | 57:18 60:24 61:3 | 244:24 254:22 | 155:9,13 156:4 |
| 214:11 215:2 | 61:24 63:9 64:16 | 270:7,8 | 159:6 160:15 |
| 216:2 219:15 | 89:10 228:25 | **reviewing** 48:13 | 161:11 166:23 |
| 226:14 234:3,3 | 248:16 | 57:11 140:14 | 167:7 168:10 |
| 238:6 239:7,23 | **rest** 135:4 | 198:11 289:16 | 169:1,6 170:14 |
| 248:10 257:17 | **restate** 36:24 | 291:10 | 171:21 172:5 |
| 263:6 264:24 | 216:1 | **reviews** 157:22 | 174:17 176:24 |
| 265:9,23 266:5,19 | **restated** 216:22 | **revising** 175:1,24 | 179:10 182:18 |
| 268:3 269:19,22 | **result** 63:9 88:8,17 | **revocation** 302:7 | 183:5 184:8,16,19 |
| 269:25 271:1 | 119:22 178:19 | **rico** 190:6,11 | 184:23 185:3,13 |
| 272:20 273:3 | 201:16 218:20 | 192:22 193:1 | 186:4 187:8,15 |
| 275:19 277:24 | 222:21 281:4,10 | **right** 9:13 10:6,12 | 188:1,6,15,22 |
| 278:24 280:12,13 | **retained** 224:13 | 10:13,24 12:2,3,6 | 189:15,25 193:10 |
| 280:14 281:15 | **return** 236:5 | 13:7 14:1 16:13 | 195:1,3 196:22 |
| 282:2,7,19,24 | 254:19 306:11 | 18:22 21:3 23:7 | 197:2,3,17,20,24 |
| 299:2,12 300:4,5 | **returned** 46:19 | 27:8,10 29:8,9 | 198:14,16 199:7 |
| 301:7 303:11 | 59:5 | 32:9,20 33:5 37:2 | 200:8,14 201:23 |
| **respectful** 199:17 | **reveal** 204:18,21 | 40:7 41:16 43:18 | 202:7,8 203:6 |
| **respective** 302:5 | 205:5 | 44:22 46:6,15 | 204:1,4,24 206:3 |
| **respond** 31:23 | **revealing** 37:13 | 49:25 52:11,12,25 | 210:19 212:6,11 |
| 40:16 61:18 | 221:14 | 54:21 62:8 64:1 | 213:3,5,15 215:17 |
| 246:13 | **reverification** | 66:1,8 70:11 | 221:19,20,24 |
| **responding** 28:1,6 | 44:14 | 72:21 74:2 78:10 | 223:7,20 224:1 |
| 60:22 259:17 | **reverse** 41:17 | 80:20 81:21 82:6 | 226:24,25 227:5,6 |
| **response** 57:8 | **revert** 15:5 | 83:17 87:12,13,14 | 228:11 231:4,14 |
| 59:25 97:15 | **review** 19:18,23 | 91:21 99:18 100:2 | 231:15,17 236:16 |
| 139:17 147:12 | 24:4,7,9,10 53:18 | 100:10 103:8,22 | 243:14 250:7 |
| 213:13 214:25 | 53:22 57:1 101:10 | 105:23 108:25 | 252:23 253:17 |
| 215:4 237:7 292:6 | 134:25 137:5,10 | 110:3 111:21 | 261:20,20 262:2 |
| 292:24 293:13 | 151:12 153:2 | 112:2,10 114:17 | 264:19 271:25 |
| **responsibilities** | 172:10 176:5 | 116:4,8 117:7,15 | 272:17 273:7 |
| 29:17 31:12 41:21 | 187:20 188:2 | 117:23 118:17 | 277:9,11 288:21 |
| 42:13 299:8 | 235:24 248:15 | 124:4,16,18 | 292:21 295:6 |
| **responsibility** | 251:10 269:1 | 129:23 131:13 | 296:2,24,24,25 |
| 50:4 54:7,10 | 292:1 | 135:8,9 137:11 | 298:16 299:4 |
| 55:18 271:14 | **reviewed** 11:7 | 139:3 140:4 | 302:22 304:11 |
| **responsible** 32:15 | 47:19 53:20,25 | 142:23 143:17 | **rights** 3:11 227:20 |
| 51:4 61:1 148:15 | 57:4 136:3 150:22 | 144:10 145:2,7,8 | 228:23 304:7 |
| 175:24 214:22 | 160:13 172:9 | 145:14 147:6,21 | |

**rigorous** 140:24
**ringing** 297:5
**rings** 189:4
**risk** 120:1 201:19
 202:11,12 203:7,7
 203:13 232:17,18
 232:23 233:3,7,10
 233:19,25 234:6,9
 234:22,24,25
 235:18 236:19
 237:3,9,12,14,18
 238:1,8,11 260:13
**risks** 234:15
**rmr** 305:15
**road** 18:11 21:14
**rob** 74:1
**rodriguez** 46:22
 195:15
**role** 28:19 29:15
 30:3 31:13 41:25
 42:5,16,25 43:7
 47:10,13,16 48:2
 49:7,16,18,24 50:7
 50:20 52:7 55:6,8
 59:5 68:5 74:3
 85:8,21 86:20
 96:3 107:25 128:5
 128:10,17,19,22
 129:1 131:19
 133:17 149:20
 150:10 152:21
 153:2 174:25
 175:3,22 176:6
 180:6 210:3
 211:13 243:15
**roles** 41:21 46:17
**roll** 133:15
**rolled** 32:20
**rollout** 32:15
 34:23 265:10

**ron** 125:23,25
 126:2,4
**ronald** 2:5 8:16
 244:16
**ronald.lee** 2:7
**room** 22:16 73:17
 89:17 112:3,5,8
 125:17 126:9
 190:23 261:12
 263:5,21 264:1
**room's** 253:22
**roosevelt** 73:17
 89:17
**rose** 285:3
**rosenthal** 3:4,7 5:6
 8:25,25 284:24
 285:3 287:4,9
 289:2,24 292:9,13
 293:10 296:2
**roughly** 185:18
**rule** 16:5
**ruled** 119:2,14
 121:4 122:6,8,13
**rules** 18:11 21:8
 21:14
**ruling** 88:5 92:4
 98:13,16 101:17
 116:18,19,20
 117:10,11 119:18
 121:20
**rulings** 211:4
**run** 47:21 141:10
 177:25 239:1
**running** 42:24
 47:18 178:7,9
 212:11,12
**runs** 178:5
**rush** 181:7

**s**

**s** 2:1 3:1 4:1 5:9
 6:1 141:18
**safety** 149:1
 156:24 181:23
 291:8,12
**san** 1:3 7:22 10:1
**sania** 3:11 8:22
 296:13
**sania.khan** 3:13
**sat** 112:25
**satisfactory** 151:7
**satisfy** 289:10
 290:19
**saw** 38:1 109:2,4
 116:6 198:21,24
 235:6 250:10,24
 251:4 252:6
 257:15 269:3
**saying** 45:24 98:21
 119:5,9 122:22
 146:1,22 151:14
 151:15,18 163:16
 166:10 174:1
 175:23 199:6
 203:20 204:2
 209:6 212:19
 214:3,14 223:6
 227:12 231:6
 251:12 252:7
 260:6 263:4 288:9
 297:21 300:23
**sayings** 114:2
**says** 17:8 137:19
 137:21,25,25
 138:11 140:16
 152:4 156:9,19
 160:16 166:24
 167:1 172:8,13
 173:11 176:24
 177:1 180:11

183:12 184:3,15
 185:10 186:4
 190:1,2 215:20
 260:5 289:4
**scalia** 26:19
**scattered** 285:7
**scheduled** 111:25
**scheduling** 92:10
 92:19 112:21
 126:19
**school** 26:19 189:2
**schools** 241:17
**scialabba** 35:6
 42:10
**scope** 31:21 83:3
 253:8
**scopes** 60:16
**scribe** 137:6
**script** 32:5 107:16
**scripts** 265:8,12
 265:22 267:7,10
**se** 35:17 97:1
 159:24 175:11
 178:5 180:7
 270:13 284:7
 290:7
**seal** 137:22 215:20
**search** 60:7 63:10
 63:24 64:4,8,12,13
 65:5
**searched** 62:18
**searches** 60:14
**searching** 57:11
**second** 16:2 20:8
 28:19 29:6 108:21
 108:22 116:18
 117:8 118:1 135:3
 139:10 150:13
 172:10 175:19
 199:16 200:3
 202:21,21 213:4

218:18 223:15
235:11 285:18
**secondly** 13:17
187:1 297:23
**secretariat** 135:15
**secretary** 1:11
6:14 7:18 29:25
40:13 46:5 47:20
54:18,19 55:2,3
66:9 67:2 71:8
72:16 73:21,25
74:5,5,24 79:21,23
81:8 87:10 96:15
96:16 107:25
109:24 115:25
116:16 117:6,24
121:25 123:23
124:1 125:11
127:17 128:6
131:19 132:25
135:20 159:20
177:9 195:15
196:1 199:17
203:17,17,22
206:20,21,23
208:9 218:3,14,15
218:19,19 223:16
223:22,25 224:16
225:15,19 227:11
227:18 228:21
230:10,20 231:3
236:12,15 248:19
249:7,12 250:1
251:24 256:4
258:9,9 259:23
261:5,14 262:17
288:1,16,18
293:25
**secretary's** 25:7
32:12 33:18 43:1
68:15,19 69:17

70:18,22 71:8
118:5 126:19
211:8 227:24
228:15 246:25
266:9
**sections** 18:20
**sectors** 12:19,21
13:1
**secure** 51:18
**security** 1:10,11
3:16 5:18 6:14
7:17,19 9:11
23:10 26:20 39:1
53:10 149:1
156:24,24 177:9
181:23 215:20
218:2 246:4
255:13 256:1,4,5
258:4,10 259:20
**see** 14:19 20:7,13
22:23 49:15,19
55:4,20 56:3,5
70:6 84:16 89:20
95:1,7,17,19,21
115:10 131:14
138:23 139:24
140:16 148:24
152:15 153:17
155:11 158:19
159:6 172:22
177:20 180:22,22
184:4 185:21
190:7 194:15,25
198:12 218:9
221:8 222:16,19
227:10,13 243:17
250:2 251:18
255:5,12 258:3,8
260:6 287:21
295:19 299:21

**seeing** 105:10
109:5 112:3
115:12 152:24
175:17 195:8
215:7 218:11
251:22 257:12,13
289:16
**seek** 238:25
**seeking** 48:8
211:18
**seen** 80:21 194:2
195:3,7,18 196:5,9
198:5,8 200:13
250:20 257:11
**segment** 159:16
**select** 44:6
**selected** 45:17,18
45:19
**selection** 50:7
**self** 98:8
**semesters** 26:23
**seminar** 27:1
**senate** 5:11 10:23
11:2,4 292:22,23
**senator** 20:5,20,22
28:17 292:15
**send** 51:14 96:21
160:21 161:24
163:18 164:4
282:5
**sending** 96:25
160:20 161:18,19
162:2 163:6
165:25 169:14,19
170:23 171:17
**senior** 50:6 74:23
128:6 246:24
263:16
**sense** 13:3 21:4,23
45:23 49:17 72:12
77:15 118:16

119:3 121:9
133:21 204:3
206:5 209:25
220:14 235:7
286:7 300:24
**sensitive** 7:5 36:7
217:13
**sent** 51:24,25
64:11 154:9
160:25 161:1,13
161:24 162:8,9,10
162:11,13 163:22
165:12,17 166:13
166:15,16,17
187:4 271:1 274:2
288:15 302:11,13
**sentence** 20:9
157:25 179:18
207:4 222:10
223:21 260:7,7
293:1
**sentences** 228:1
**separate** 51:16,23
68:21 185:2
279:10
**separately** 60:17
302:22
**september** 6:16
102:13,14,18,19
103:7 104:4 114:8
114:12 116:25
118:25 119:16
122:12 165:13,17
166:8,12 199:2
211:5 218:5
233:24 264:14
265:25 266:10,23
267:3,11 302:14
**sequential** 118:4
**series** 53:8 84:19
197:4 244:15

| | | | |
|---|---|---|---|
| **serve** 48:20 196:3 | **shading** 41:15 | 145:12 148:21 | **six** 292:25 |
| **served** 20:16 | **shadows** 158:17 | 306:7 | **skills** 189:1 |
| 41:25 42:4 47:3 | **shah** 125:14 | **signatories** 260:8 | **skipped** 196:18 |
| 52:7 57:8 | **share** 16:25 | **signature** 42:19 | **slide** 32:11 |
| **service** 34:2,19 | 106:14 149:13 | 305:15 | **slightly** 147:1 |
| 35:9,18 49:13 | **shared** 47:13 | **signatures** 196:11 | 163:14 191:7 |
| 50:1,7,9,12,17,22 | 57:14 60:25 61:2 | **signed** 47:18 56:7 | 199:23 214:19 |
| 50:25 51:4,25 | 61:6 106:9 136:12 | 56:21 117:13 | **slipped** 129:21 |
| 52:2,3 56:1 58:22 | 136:20 270:20 | 186:12 255:9 | **small** 60:1 295:11 |
| 59:8,11 154:3 | **shaw** 23:19 | 307:22 | 300:21 |
| 164:2 171:2,2,4,9 | **sheet** 77:11,13 | **significance** | **smaller** 91:7 |
| 217:1 272:25 | 78:4 152:5 306:6 | 256:21,22 | **smoothly** 146:23 |
| 276:1,21,21 | 306:7,9,11 | **significant** 28:2 | **society** 12:23 13:2 |
| 294:23 | **shift** 242:6 | 181:21 234:5 | 13:16,22 14:2 |
| **services** 5:16 26:8 | **shoot** 23:5 | 236:8 269:6,14 | 20:18 |
| 55:11,13 128:24 | **short** 58:25 74:16 | **significantly** 289:6 | **solely** 202:1 |
| 137:22 | 74:17 79:25 81:10 | **signing** 148:20 | 289:13 290:21 |
| **serving** 29:12 | 263:23 | 256:19 306:8 | **solution** 14:13,17 |
| 58:24 | **shorthand** 1:23 | **similar** 90:14 | 15:22 |
| **session's** 93:6 | 305:7,24 | 104:9 119:17 | **somebody** 33:3,11 |
| **sessions** 73:23 | **shortly** 198:23 | 138:17 149:16 | 95:12 113:10 |
| 79:22 114:25 | **show** 91:1 111:24 | 180:11 191:9 | 128:25 136:16 |
| 116:7 117:2,17 | 133:18 142:8 | 192:19 251:6 | 142:7 167:6 277:3 |
| 196:17 197:11 | 171:21 189:15 | 286:9 | 277:14 295:19 |
| 208:21 209:8 | **showed** 89:17 94:9 | **similarly** 180:16 | **someone's** 14:22 |
| 255:7 292:16,22 | 111:20 | **simple** 16:11 | 301:7 |
| **set** 38:10 39:3 44:5 | **showing** 182:23 | **simply** 40:1 214:5 | **somewhat** 48:25 |
| 45:24 67:13,20 | **shut** 45:20,25 | **sip** 118:11 | **sonoma** 191:3 |
| 76:18 102:1 116:5 | 202:12,13 203:15 | **sir** 84:8 | **soon** 61:16 244:24 |
| 118:24 127:12 | 218:24 219:16 | **sit** 13:24 33:23 | 266:15 |
| 131:24 142:22 | 223:17 | 58:7 60:8 109:15 | **sop** 6:12 215:21 |
| 143:1,14 165:23 | **shutdown** 219:2 | 116:14 223:7 | 216:17 217:16 |
| 175:9 199:2 214:5 | **side** 34:7,8 35:17 | 258:20 280:14 | **sorry** 11:11 15:10 |
| 230:15 232:15 | 35:25 47:15 85:4 | 281:14 | 15:11 32:18 42:6 |
| 242:7 285:7 | 86:9 87:15 101:23 | **sits** 180:3 | 42:14 54:14,19 |
| **setting** 30:16 38:2 | 102:5 171:14 | **sitting** 26:14 72:6 | 58:19,19 70:1 |
| 210:5 | 180:7 184:6 | 112:18 222:16 | 71:11 72:18 74:16 |
| **seven** 177:19 | 222:14 | 286:10 297:2 | 78:14 86:23 87:10 |
| 292:25 | **sign** 9:14 36:6 | **situation** 64:9 | 89:22 108:21 |
| **shaded** 184:5 | 45:25 56:10,25 | 222:17,20,20 | 113:7 114:13 |
| | 134:3 144:17 | 229:25 | 126:1 127:9,10 |

131:24 132:1
144:16,16 145:3
146:19 151:21
161:19 162:4,6
165:14 179:1
181:6 182:5,13
183:13 184:6
185:5 195:14
196:21,23 198:18
199:21 200:7
202:3,25 216:9,13
220:11 222:13
225:24 226:3
227:7 228:4
229:16 230:3
234:23 237:24
245:14 251:8
257:15 259:5
261:8 264:7 268:4
268:8 270:9
273:21 274:10
275:9 279:22
281:8 286:3,20
287:20 289:20
290:25 299:6,12
303:14
**sort**  18:11 24:10
30:23 31:20 34:18
35:7 36:20 41:14
42:24 47:20 48:11
48:14,16,23 54:6
55:15 63:14 66:4
66:6 71:5 72:8
78:11 79:2,4
80:21,24 84:11
87:1,16 90:19
91:19,23 94:14,18
94:22 96:25
101:13,18 102:6
103:13,19 104:7
106:23 109:23

114:18 117:8,23
118:6,17 119:25
127:4,14,25
131:11 132:19
133:7,10,24,24
134:7,15,16,25
135:22 139:11,12
149:16 154:7,11
154:14 160:7
164:14 169:18
174:2 176:18
179:22 184:2
186:11 187:16
188:5 189:25
194:17 205:12
207:4 210:9
211:18 226:20
249:19 261:22
270:1 273:5
274:21 278:5
279:22 280:19
283:22 287:21
297:4 300:7,12
**sorted**  254:5,6
**sorts**  50:15 101:24
106:20
**sound**  153:7
188:22
**sounds**  70:12
72:13,14 87:6
133:17 230:22
**source**  72:5
255:20 287:16
289:14
**southern**  256:9,15
**space**  19:22 306:5
**speak**  35:10 46:12
62:10 71:3 80:2
113:12 123:25
144:22 150:6,24
154:25 179:22

186:13 208:22
215:2 231:2
262:23 263:4
275:21 283:18
300:25
**speaker**  20:4
**speaking**  127:23
133:4 135:22
146:10 213:20
297:22 299:13
**special**  74:13,15
75:9
**specific**  31:8 33:8
37:4,5 103:1
136:10 150:14
166:2 176:8,10,14
176:22 187:11
205:21 212:16,16
216:25 223:1
258:1 283:8 289:9
290:9 303:17
**specifically**  29:18
33:19 38:19 95:11
106:11,15,17
139:8 150:7
176:17 189:7
207:4 212:13
218:15 256:3
257:16 265:1
276:1 283:18
288:24 289:3
300:17
**specifics**  44:18
64:5 133:5 145:24
164:7,21 215:7
247:13 271:23
**specify**  54:16
125:1
**speculate**  63:12
182:20 188:24

**speculating**  122:6
**speculation**  40:4
144:21 157:10
237:22 238:5
258:15 262:1,13
279:3
**speechify**  191:24
**spell**  75:2
**spend**  24:1
**spent**  11:20
200:10
**sphere**  37:25
**split**  94:3
**spoke**  79:18,20
80:1,7,13,16,23
81:2,4 127:14,18
127:20,24 128:4
263:18
**spoken**  225:19
298:1
**spout**  273:22
**spread**  80:24
**spring**  162:1
170:25
**squared**  198:2
**stack**  63:16 97:16
195:19
**staff**  28:4,11 29:13
29:14 34:17 35:4
41:15,16,19,24
42:2,4,5,15 43:2,6
43:9 46:16,17,18
46:20,22,24 47:3
47:12,14 56:1
58:12,12 59:15,20
67:14 70:2 73:22
74:4,5,10,11 75:22
75:23 85:20,23
87:18 90:24 97:23
100:5,14 109:25
113:7 125:12,12

[staff - subsequently]                                                  Page 52

136:4,25 150:15
217:6 233:10
**staffed** 177:18
**staffer** 71:16
**staffs** 28:21 42:23
150:21
**stamped** 287:12
**stand** 44:8 260:9
**standard** 6:12
11:8 30:13 31:3
65:9 106:5,13
215:21 216:2,10
**standardized**
64:23 65:1
**standards** 179:9
**stands** 141:19,21
241:7
**start** 10:1 17:9
24:6 54:13 79:4
88:20 100:18,19
102:10,23 107:1
147:11 172:19
173:8,13 175:12
266:2 267:7
**started** 103:6
112:4 161:9 195:2
**starting** 133:10
195:5 197:7 293:1
**starts** 198:13
**state** 2:3,8 3:10
6:18 8:17,20
24:16 73:25
118:14,20 119:11
180:18 200:15,22
201:4,6,8,20 202:2
210:24 211:24
214:3,13 223:1
244:17 257:8
306:4
**stated** 12:17 199:9
210:24 228:17

229:7 245:15,19
293:14
**statement** 5:11
6:14 17:2 108:9
108:23 155:16,20
218:2,18 223:3
227:15,24 228:14
228:19,20
**statements** 36:14
36:15 46:4 228:16
**states** 1:1 3:14
5:11 6:18 7:16
8:24 9:9 15:19
143:7 166:25
167:3 181:16,18
212:2 255:10
256:6,13,14 257:9
296:14
**stating** 123:22
170:5 230:10
**statistics** 11:14
**status** 6:6,8 13:4,5
13:9,15,18,25
14:14,24 15:3,4,6
15:15,24 16:14
20:19 28:25 44:21
46:8 144:1 158:5
158:25 167:13
183:16 207:11
213:24 214:4,15
226:18 227:21
228:3,3,24 229:3
231:5 243:25
286:23,24
**statuses** 281:22,24
**statute** 212:14
214:2,5 238:21,25
**statutorily** 15:23
158:24
**statutory** 213:19
243:24

**stay** 47:6 223:14
**staying** 223:5,6
224:10
**step** 44:23 46:11
77:24,24 78:19,19
93:9 115:3 158:20
158:21,23 159:18
201:11 202:1
219:9
**stephen** 74:1
79:24 81:9
**stepped** 112:14
**steps** 39:19 122:2
165:8 179:23
180:13 251:20
253:16,25 254:7,8
265:7,10,24
266:11,13,14
267:5,22 268:13
**stood** 30:7 121:3
141:22 145:10
238:10
**stop** 135:3 163:5
165:25 231:19
274:1
**stopped** 161:18
162:2,14,17
187:15 274:1
278:24 280:19
**strat** 270:9
**strategy** 56:2
58:21 81:12
268:10
**street** 2:5,11 3:5
**string** 6:19
**strong** 28:3 116:22
118:22 120:25
**stronger** 120:24
121:6
**structural** 123:19

**structure** 33:16
35:15 49:12 51:12
51:23 53:16 66:6
67:20,23 230:15
284:3 297:1
**structured** 184:13
**students** 241:15
**stuff** 70:13 111:16
**sub** 84:12
**subgroup** 87:3
**subject** 15:6,9
16:12,16 37:10
78:18 79:8 81:25
84:2 99:4 108:3
111:9 129:14
130:7 176:14
190:16 192:20
193:5 204:11
207:11,12,16,17
219:7 221:14
224:23 226:24
227:2 236:22
240:15 245:16
260:16 269:10
287:22 293:16
298:8 301:21
302:6 306:8
**submit** 160:17
285:19
**submitted** 17:17
181:18 286:15
292:15 293:12
**subpart** 58:3,9
260:7
**subparts** 290:6
**subsequent** 30:25
89:21 251:18
266:9 300:13
**subsequently**
141:24

**subset** 58:1 60:1
   61:21 90:19
   256:14 300:20
   303:2
**subsidiary** 99:14
**substance** 79:11
   82:1 88:11 93:20
   98:12 100:7
   101:18 110:2
   126:24 130:18
   162:25 192:8,12
   206:11 225:2
   269:10 298:14
**substantially**
   250:19,25 251:5,5
   251:10,12,13,21
**substantive** 34:13
   88:6 92:8,16 94:2
   94:13,23 96:10
   101:24 106:20
   188:6
**substantively**
   82:20
**succeed** 22:18
**success** 118:22
**sued** 212:4,10
   235:20 236:1,3
**sufficient** 146:24
   172:20 173:9,14
   173:18
**sufficiently** 25:18
**suite** 2:6 3:5
**suited** 35:10 204:6
**sullivan** 73:25
   79:23
**summary** 27:1
   96:25
**summer** 161:18
   162:1,1,10,12
   170:25

**sunday** 66:14
**supervision** 305:8
   305:24
**supplement**
   107:19
**support** 177:17,23
   178:4 179:21
   180:3,15 233:13
   259:3 260:9
**suppose** 11:22
**supposed** 90:12,17
   178:24 288:2
**supposedly** 194:12
**supreme** 116:18
   117:9 118:2
   195:23 211:3
   214:6
**sure** 11:13 14:9
   17:10 18:3 19:15
   22:5,9 24:14,15,25
   32:17 33:22 34:3
   37:1 38:13 39:4
   42:20 47:21 49:17
   52:14 54:18 60:9
   64:16 65:22 66:25
   69:22 71:12 73:12
   76:4 77:25 78:1
   80:11 82:9 88:3
   88:13 91:11 92:5
   93:9,10,23 94:1
   95:23 98:25 99:17
   101:15 104:19
   105:22,23 109:12
   109:19 119:8,10
   120:23 121:12
   123:2 125:3
   127:19 130:16,22
   131:17 133:22
   138:20,22 141:5
   149:10 150:8
   153:15 154:16

158:3 159:24
160:11 165:23
166:22 167:19
170:18,20 175:4
175:13 176:12
178:4 180:8 181:1
182:17 186:6
201:2 202:22
204:20 206:15
207:25 209:19,21
210:15 211:15
214:17 216:9
217:7,9 219:8
220:3 224:5
226:20 229:15,23
237:24 238:22
239:3 241:6
244:23 248:17
249:19 252:11
255:21 256:17
257:14 264:22
267:24 270:25
271:9,23 272:7
273:22 275:14
281:20 284:1
286:12 288:21
291:17 292:5
293:12 299:7,13
300:1 302:23
303:16
**surprise** 100:2
**surprises** 137:10
**surprisingly** 29:2
**surrounding**
   25:17 256:23
**sustaining** 219:24
   224:10
**switch** 14:8 66:1
   133:7 168:25
   169:3 170:22
   231:24 244:3

270:22 272:10,21
274:11 275:15,16
278:12
**switched** 164:8
**switching** 23:7
   165:1 169:10
   170:16 282:15
**switchover** 165:18
   166:6 169:16
   172:24
**sworn** 8:7 9:17
   66:15 305:5
**symons** 58:17,20
   103:11 125:15
   255:24 268:9
**sympathize**
   225:17
**system** 12:25 13:1
   13:7,10,12,20 14:5
   14:6 15:21 122:11
   122:18 141:13,24
   141:24 142:6,11
   142:16,17 156:23
   156:25 157:17,23
   158:11,13,14,22
   159:8,22 160:1,4,8
   161:14,14,16,23
   161:23 163:19,20
   164:4,9,10,24,25
   169:11,11 170:23
   171:11 210:12
   273:10,11,19,21
   273:25 274:7,12
   274:18,22 276:19
   279:10,13,16,20
   279:20,25 280:1,3
   280:4 283:9,10,12
   283:17,21 284:6
   289:17,20,25
   290:2,3,10,15
   291:5 295:9,12

[system - thank]                                                    Page 54

302:23 303:1,8
**systems**  163:18
  164:18 273:5,9
  274:4,18 275:11
  280:9 282:18,21
  283:4 284:7
  289:21 303:3,4

---

**t**

**t**  5:9 6:1 75:3
  141:18 305:1,1
**table**  73:23 122:25
  152:3 184:13
  297:2,9,12
**tabulates**  184:19
**take**  7:10 21:20
  23:5 41:10 52:12
  56:24 64:3 77:24
  78:19 79:2 85:25
  86:7 89:5 97:4,8
  97:10 99:19 108:8
  111:12 115:3
  119:11 120:10
  121:17 133:8
  167:18,19 180:13
  180:21 188:5,20
  193:22 201:18,21
  204:2 207:23
  219:8 220:8
  229:21 231:23,25
  252:22 258:7
  260:23 267:11
  299:17
**taken**  1:20 21:20
  43:23 52:19 99:22
  124:11 140:8
  167:22 208:3
  232:3 244:7 253:1
  268:14 284:18
  296:6 305:3 307:4
**talk**  12:5 16:4
  18:20 21:12,12,13

52:6 54:21 66:23
68:10 73:13
109:24 116:12
118:7 123:3
223:20 293:16
**talked**  22:4 23:25
  37:1 81:6 97:21
  97:25 133:14
  144:11 203:7
  211:16 225:18
  226:9 231:9
  239:16,20 304:6
**talking**  12:5 22:4
  69:5 79:3,5,15
  86:25 100:13
  103:5 128:11
  151:6 168:2
  174:16 194:19
  202:25 211:17
  226:5 247:15
  264:15 265:12
  268:21 272:5
**target**  61:11
**task**  35:13 287:18
  287:23,24 288:11
**tasked**  95:12
**tasker**  287:17,17
  287:18,22 288:7,9
**taskers**  287:25
**tasks**  100:9,20
  264:24 288:20
**taught**  27:4
**taxes**  51:13
**teach**  26:18,20
**teachers**  241:23
  242:1
**team**  11:6,17
  17:25 18:6 23:19
  59:12,13 60:8,10
  60:11 63:23 96:17
  103:8,18,24 104:7

104:24 105:16,25
107:2,24 125:21
125:22 127:23
154:4,7 248:15
264:23 265:15
267:16,21,23
269:18 298:22
**techie**  275:4,7
**technical**  163:17
  164:12,20 165:15
  168:24 169:7,9
  170:16 275:10
**technologically**
  275:15
**technology**  60:13
  63:24
**tecs**  141:11,12,17
  141:18,25 302:22
  303:7
**tell**  35:23 113:23
  132:11 305:5
**telling**  83:4
**temporary**  46:6
  213:24 214:4,15
  228:2,9
**tend**  36:15
**tens**  50:18
**tentative**  83:12
  91:23 296:20,22
**tenth**  2:11
**term**  54:7,9 65:11
  113:14 158:25
  218:22 224:18
**terminated**  143:3
  211:7
**termination**
  203:24
**terminology**
  120:11
**terms**  64:4,8,12
  272:18

**terrific**  89:15
**test**  23:4 182:15
**testified**  9:18
  208:9 218:8 262:5
  278:4
**testify**  11:24
**testifying**  21:21
**testimony**  5:2 10:9
  10:12,20 11:2,2,4
  11:20 12:12,17
  17:14,15,18 18:5
  18:22 19:19,21
  20:25 21:21 22:2
  31:20 36:23 39:5
  48:22 77:21 87:21
  89:10 105:18
  158:21 163:12
  168:8,23 170:4
  202:9,15 206:14
  209:5 213:11
  225:8 243:22
  248:23 252:3
  256:9 261:5
  266:18 273:14
  277:16 279:9,15
  290:24 305:2,6,10
  307:4,6
**texas**  24:17 116:23
  117:11,13 118:3
  119:14 169:22
  170:5 195:24,24
  215:3 234:9 256:9
  256:15 290:25
**text**  64:20
**thank**  18:15 21:3
  21:10 23:6 41:12
  53:24 56:25 72:18
  183:4 197:10
  206:15 213:16
  244:4,14 250:10
  252:14 254:9

264:13 268:16
273:2 278:3
284:14,25 287:4
304:4
**thanks**  9:22 21:15
41:23 118:13
261:7,8 274:3,10
287:20 298:2
**theme**  149:24
**theory**  122:13
**thereof**  305:13
**thing**  18:18,19
25:6 133:23 134:4
166:14 187:22
189:20 196:18
**things**  16:2 34:12
47:21,23 63:3
100:8 169:17
225:12
**think**  12:24 13:5
13:15,23 14:3
15:21 16:4 18:12
21:25 25:3,4,6
30:19 35:5,10,12
41:6,13 42:17
45:23 46:7,24
48:7,9 50:18 51:1
55:17 56:4,5 60:8
61:22 68:2 70:14
74:1,13,20 75:1,11
79:7,25 83:3
84:21 86:12 87:9
87:13,22 89:22,24
90:9 91:21 97:10
98:23,23 99:13,16
99:18 100:4,8
103:6,12 105:15
105:22 109:14,22
111:1,19 112:13
112:16,16 113:3,5
114:7 115:24

117:13 118:13,15
119:5 123:4,25
125:16,17,19,22
126:18 127:18,18
127:19,23 128:2,3
129:20,22 132:5
132:20 133:7
138:2,19 141:23
144:11 145:16
153:6 157:19
159:10,23 160:1,5
161:1,2,6,16,17,25
162:1,9,10,11,19
164:1 165:6,6,8
166:16 168:17
171:15 173:3,23
176:1 179:3 180:8
183:5 185:11
186:1,4 187:6,7,12
191:22 192:10,12
192:13 193:15
197:13,15 198:24
199:14 200:3,5
202:16 204:16,17
204:18,23 205:1,5
206:9,10,14
210:18 211:17
212:9,17 213:3
215:3 217:18
218:8 220:9,23
223:15,23 228:8
230:8,19 231:9,19
237:18 238:1,12
243:23 244:1
245:9,15,18,19
247:1,2,10 248:1
249:20 250:23,25
250:25 251:14
261:10,11 263:4
263:14,16,25,25
264:4 265:8 266:6

266:23 267:20,24
268:2,5,9,12,12
269:5 270:13,14
270:17 272:14
273:21 275:5,24
275:25 277:4
280:24,25 281:2
282:10 287:21
290:24 291:1
294:5 295:2
297:25 298:13
300:23 301:18
302:20 303:7
304:3
**thinking**  145:15
235:14 264:2
**thinks**  212:21
**third**  53:12,14,17
55:22 67:12 222:3
**thirty**  306:12
**thought**  46:11
146:22 163:13
199:11,12,20,25
204:3 299:10
**thousand**  236:8
**thousands**  281:24
**threat**  149:1
181:22 199:8
211:18,24 212:7
213:9 214:9
222:25
**threatened**  259:25
**threatening**
201:23
**threats**  212:1
213:18
**three**  44:17 46:20
47:1,2 56:18
83:20 127:21
137:17 181:21
196:24 222:4,6

228:1 263:1,2,8
282:12,22 283:6
292:25
**throwing**  97:18
**tie**  124:2
**tied**  71:16
**time**  11:20,24 13:7
14:4 27:15 29:10
32:13,14,19 34:17
35:19,20,21 36:4,8
37:2 42:7,9 43:14
45:15 47:7 49:7,9
49:24 51:1 55:23
56:24 58:25 67:5
70:15 80:14 81:16
82:13 91:24 96:20
99:18 100:10,13
100:15 114:11,13
115:4 118:24
122:3 131:5 133:8
133:10 138:23
139:2 141:22
143:11 145:6
146:6 148:4 149:5
152:16 154:2
156:4,16,17 157:1
157:3,14 158:10
161:9 162:8
167:18 170:25
171:8,25 172:21
173:1,9,14,18,25
175:15 181:20
182:6 185:7
198:16 200:10
204:4,8 205:5,14
205:16,21 212:10
219:9,11 227:8
235:14 244:2
247:4,14 249:23
251:4 253:23
259:10 264:15,21

266:21 268:1
270:16,23 271:22
281:8,23 284:15
294:24,25 295:7,9
295:11,12 297:25
299:25 303:8,15
305:3
**times** 16:5 68:7
70:2 80:12 176:21
201:4 301:19
**timing** 204:1
266:20
**tip** 152:5
**tips** 172:8
**tired** 282:10
**title** 17:2 26:6
47:10,17 74:6,8,14
74:20 75:10
128:19,22 129:5
137:18 172:3,6
174:14 189:18
261:13 283:23
**titled** 29:11
**titles** 17:4 54:6
**today** 9:22 10:17
13:24 22:2 23:8
25:14,18 26:15
84:22 98:7 116:14
128:11 156:6
194:2 195:21
222:16 244:15,19
244:22 253:10,13
255:3 258:20
259:13 261:1
264:17
**today's** 304:12
**told** 111:22 112:12
112:20 113:4
218:16
**tom** 25:8 125:16
127:19 263:23

**toolkit** 153:18
155:5
**top** 17:8 39:2
56:20 104:22
137:18 140:13
156:9 172:4 181:5
183:13 187:10
188:24 210:25
**topic** 12:1 37:8
63:3 68:9 69:2
72:23 86:10 87:18
124:22 126:24
127:8 131:20
151:3 153:12
168:13 282:15
**topical** 192:10
**topics** 11:10 27:2
55:10 68:24 69:25
70:3,6 150:1
176:20 263:3
265:3,3 297:24
**total** 61:21 184:4
184:24,24 185:10
185:16,17 188:12
**totality** 291:10
**totally** 197:17
299:17
**touch** 239:8
**touched** 223:23
**tps** 281:23 295:2,4
**track** 183:23
290:15
**tracking** 42:20
291:6
**tracy** 59:3 263:23
287:16
**trade** 261:14
262:17
**traditional** 27:24
**traffic** 41:1,3

**trains** 42:24 47:18
**tranche** 28:19
166:13
**transcribed** 305:8
**transcript** 19:5,7,9
19:17,18 23:14
106:24 305:21
306:13,14 307:3
**transcription** 19:2
20:25 305:9
**transcripts** 5:13
17:9
**transform** 156:22
157:17
**transition** 43:9
47:3 163:8 164:13
274:25 277:7
280:20 281:7
**transitioned** 46:17
274:15,17
**transitioning**
273:15
**transmit** 165:19
**transmitted**
250:15 257:21
**transmitting**
273:19
**travel** 166:25
167:3
**treasury** 141:12
141:22,23 303:8
**treatment** 191:9
**trial** 10:9
**trigger** 28:10
**triggered** 65:23
**true** 18:19 69:7
189:5 212:9
305:10 307:5
**trump** 3:14 296:15
**trust** 188:25

**truth** 305:5,5,6
**try** 16:6 22:17
23:4 30:24 41:7
85:12 93:24
101:16 154:10,21
191:18 203:2
244:19 272:5
**trying** 39:1 43:16
44:17 48:8 61:18
73:11 74:25 77:14
77:18 81:21 87:4
87:11 92:2 93:21
93:23,25 111:3
112:14 125:16
130:21,23 131:24
165:14 166:9
191:15,19,23,24
212:8 220:11
221:1 228:6,25
246:11 250:4
263:25 270:1,10
275:5 279:22
281:14 299:12
300:6 301:6
303:14,22
**tuesday** 1:16 7:1
**tumlin** 3:4 9:3,3
**tune** 236:7
**turn** 7:7 20:2,3
139:10 181:4
217:14
**turned** 248:13
**turning** 217:16
**twice** 46:15
**two** 10:17 11:24
16:20 17:20 19:21
20:25 23:15 25:12
27:3,17 29:4
33:10 43:8,14
45:3,17,19,25 47:1
47:2,7,11 51:17

53:15 54:9 62:21
63:20 72:6 75:11
83:16 97:5 108:16
124:4 125:21
126:6,13 143:8,13
143:14,20,22
144:3,25 145:15
145:17 158:11,22
159:2,5 172:2
183:11 184:23
189:22 196:21
209:10 218:21
219:14 220:5
221:4,8 222:6
224:7,12,13 225:7
228:1 230:4,12,13
231:9 245:4
253:12 292:25
293:3
**type**  49:5 71:2
72:11 127:4 134:6
217:14 248:13
**types**  31:3,11 38:4
40:17,23 49:1
50:19,21,21 87:17
131:21 135:22
136:6 149:23
200:20 238:8,19
278:21 281:24
**typically**  18:22
136:23

---

**u**

**u**  75:3
**u.s.**  1:9 3:16,21,24
4:2 5:15,17 7:21
20:17 26:7 53:10
55:11 117:11
118:3 123:7
137:21 155:22,23
177:3,4 190:6,10
192:21 193:1

195:23,24,24
215:19
**uc**  156:2
**uh**  12:13 20:6,23
37:3 106:1 123:6
133:16 135:24
143:2 148:10
152:17 155:19
156:11 168:12
176:25 183:18
239:19 243:21
248:8 268:20
286:2 287:1
288:6 303:10
**uiy**  23:15
**ultimate**  82:20
83:9 98:22 106:23
205:3 206:9
208:10,13 209:3
209:18,20 210:10
211:11 271:6,10
**ultimately**  15:19
67:19 131:23
171:1 205:23
206:20,25 214:1
231:3 271:15,21
276:23 291:23
**umbrella**  128:1
**unclear**  230:9
**uncommon**  213:4
**unconstitutional**
119:21
**unconstitutional...**
117:2
**undergo**  140:17
**underlying**  234:15
**underneath**
139:17
**underpinnings**
123:21

**understand**  22:11
22:12 38:7 39:4
53:15 61:13,21
64:8 68:16 80:15
84:25 87:22 93:22
93:24 99:13
114:14 141:16
146:16,21 148:13
148:18 149:4
151:2 156:3
164:12 168:23
176:18 185:5
191:18 192:14
202:9 203:5
205:18 209:19
212:3,17 219:10
220:13,19 221:3
226:19 228:6
230:18 231:2,5
232:18 237:13
238:23 244:25
245:7 248:17
249:15,20 250:4
251:23 252:5
253:15,20 254:10
262:5 275:14
279:23 282:3,16
284:2 285:1 290:3
290:23 297:1
299:7 303:22,23
304:8
**understandable**
145:17
**understanding**
62:4 65:1,8 78:7
82:7 90:11,14
96:2 116:14 119:5
121:4 140:3,5,23
142:4,14 144:12
145:3 146:1,13
148:22 156:7

157:2,6,13,15
164:23 165:21,22
167:9 179:15
203:13 205:2
206:22 207:8
209:5 213:17
218:16 226:2,16
227:22 232:21
242:8 245:11,24
246:8,16 250:5
255:25 256:6,10
256:19 258:12
259:1,13 261:16
261:22 271:5
272:16 274:16
275:17 277:23
278:15 279:8
284:8 294:7,9
**understate**  176:6
**understood**  18:6
39:17 57:2 58:10
60:3 68:18 73:10
87:12 90:20 95:19
96:21 100:21
101:5 113:15
121:12 130:24
131:11 132:1
135:13 150:23
164:24 201:5
202:7 205:9
221:22 230:8
252:4 254:16
262:16 284:10
290:5 298:18
299:14,23
**undertaken**
156:21
**undertaking**
157:16
**undocumented**
36:5 140:6 167:7

167:9,11,12
**unfolded**   276:23
**unfortunately**
  16:24 190:22
  191:22 297:24
**unilaterally**
  201:24 217:14
  236:5
**unique**   28:1,20
  29:6 237:17
**uniquely**   38:21
**unit**   7:12
**united**   1:1 5:11
  6:18 7:16 9:9
  15:19 143:7
  166:25 167:3
  181:16,18 257:9
**university**   1:4,6
  2:14 7:14,16 8:14
  232:12
**unlawful**   249:9
**unlucky**   48:19
**unobjectionable**
  22:17
**unpack**   225:24
  234:7
**unpacked**   34:12
**unprecedented**
  156:22
**unreasonable**
  99:16
**unreviewable**
  289:8
**unusual**   73:9
**updated**   155:8
  172:10 189:22
**ups**   98:1 103:17
**upshot**   162:5,6
**urge**   260:8
**uscis**   6:5,7 9:7
  11:6 14:6,12 15:9

23:11,16 27:11,17
28:3,8,19,23 30:14
31:1 32:9 33:13
33:20 34:3 35:12
37:8 38:5 39:9,19
40:2,9,19,25 41:16
42:2 43:6 44:16
49:24 50:12 51:19
53:13,16,22 54:1
55:22 57:10 59:23
60:5,6,8,15 66:12
67:7,9,24 85:21
103:8,10,15,19,20
104:8,25 105:25
111:20 112:16,25
121:2,3,18 122:15
133:9,19,25 136:1
140:13,18 147:17
148:11 155:2
157:2,8 159:7
160:16,20 161:5
163:2 167:1 169:7
172:14 173:17
176:19 179:11
180:6 181:11
183:12,23 189:17
192:18,24 199:4
201:7,21 211:22
212:3,10 216:5
217:3 218:13
224:13 230:4,14
234:24 238:7
239:8,21 255:23
255:24 262:10,18
263:11 269:15,18
269:24 270:3
271:10 272:2
273:18,19 275:12
276:11,20 277:3
277:14 280:17
281:5,11 282:17

283:8,9,14 289:8,8
290:8 292:5,15
293:18 294:18
302:24
**uscis's**   172:2,3
  174:14
**uscis.gov**   26:13
**uscis.gov.**   26:6
**usdoj.gov**   3:24 4:6
  4:6
**use**   45:8 54:7
  99:17 113:14
  209:11 217:2,13
  223:14 224:11
  234:16,23 235:9
  282:22 283:8
  297:19 301:23,25
**uses**   51:19
**usual**   19:4
**usually**   28:15
  106:12 129:8
  131:20 134:18
  288:12
**utilized**   152:13
**utilizing**   28:22

**v**

**v**   1:8 3:14 7:16
  117:11 118:3
  195:24,24 296:15
**vacation**   59:2
  268:2
**vague**   77:7 132:2
  140:25 169:25
  178:13 182:5
  234:18 237:22
  238:5
**valid**   120:16
  295:16,18
**validity**   295:14,21
  301:19

**valuable**   12:23
  20:18
**value**   20:11
**variety**   131:21
  212:5
**various**   12:19
  27:19 33:18 35:15
  57:9,18 62:19
  85:1 100:9 117:9
  152:12 239:11
  253:9 269:20
  281:19,21 282:16
**vary**   134:6 136:18
**vegas**   191:3
**velarde**   35:19
**verify**   18:19
**veritext**   8:1,3
**versa**   90:18
**version**   6:7 20:5
  155:8,13 174:16
  183:2 250:20
  251:6,6 265:12
**versions**   104:1
  182:24
**versus**   44:2 152:5
  159:1
**vetting**   106:12
  269:23
**vi**   192:21
**vice**   90:18 113:6
  113:18,21,24
**vidal**   3:8 9:2,4
  285:5
**video**   7:9,12 23:14
**videographer**   4:9
  7:3 8:1 21:18
  52:17,21 99:20,24
  124:9,13 167:20
  167:24 208:1,5
  231:22 232:1,5
  244:5,9 252:24

253:3 284:16,20
296:4,8 304:11
**videotaped** 1:19
**videotaping** 21:18
**view** 13:11 14:20
31:22 49:4 118:8
118:22 120:1,25
121:2 122:5,5
157:15,24 158:1
158:15 169:9
200:24 201:11
202:1 208:14,16
209:2 210:10
214:8 222:12
224:1,4 229:4,23
230:24 231:4
233:25 234:2,12
235:14,24 236:18
238:7,24 251:12
**viewed** 78:25
229:8,10,11
288:11
**viewing** 121:5
**violated** 16:4
**virgin** 190:6,10
193:1
**virtually** 238:21
**visa** 281:23
**vite** 90:9
**vitiello** 125:23,25
126:2
**voiced** 145:19
**voices** 21:19
**voluntary** 139:16
139:22
**volunteer** 144:18

**w**

**w** 3:11 5:19
**wait** 22:24 181:6
**waited** 112:11,19

**waiting** 112:7,8
113:2
**waived** 98:14
**waiver** 82:16
220:18
**walk** 30:11 32:11
51:11
**walking** 30:20
**want** 18:13,17,20
31:20 45:14 49:16
54:13 57:6 60:1
66:2,4,23 70:19
71:6 77:20 82:8
82:19 85:4 88:4
89:9 93:24 98:20
98:22 105:23
106:19 119:8
120:15 124:8
135:4 156:8 167:2
167:16 172:12
176:5 180:7 181:3
182:20 183:2
189:24 193:22
199:9 204:24
206:13 209:18
213:21 217:20
219:8 220:24
222:14 231:23
232:15 242:6
250:25 251:9,16
260:23 271:18
274:24 275:14
278:1 281:1
282:16 299:6,13
303:17
**wanted** 146:3
148:7 251:20
252:11 299:19
**wanting** 188:23
**wants** 71:17 72:9
84:16 113:24

**washington** 1:21
2:12,19 3:6,18,23
4:5 7:1,24
**watching** 97:6
121:19
**water** 118:12
**way** 42:17 51:11
66:5 67:12 71:18
71:19,20 84:18
101:14 103:22
108:15 114:20,21
120:20 121:21
130:23 141:5
144:22 148:22
157:17 158:24
161:5 168:21
178:18 179:25
186:17 191:19,24
192:14 201:21
207:11,18 208:25
220:8,10,22,23,25
222:23 225:13
245:18 258:2
269:16 289:25
290:2,13,15
291:22,23
**ways** 114:15
153:25 223:6
225:9
**we've** 19:20,25
22:4 80:17,21
84:22 97:21 99:18
107:2 127:20
128:10,15 167:17
174:23 194:19
201:8 225:18
226:9 235:9 236:1
244:21 255:2
279:11 292:7
302:4,7

**wearing** 47:11
**website** 26:6,13
40:25 53:8 153:15
153:24 172:3
174:14 183:12
189:17 218:1
302:15
**week** 11:24 21:1
56:9 87:23 89:24
100:14 102:13
109:10,13,14
114:7 116:10
177:19 193:12
245:4
**weekend** 267:14
269:4
**weeks** 10:17 19:21
46:20 121:14
189:22 225:7
243:22
**weigh** 116:1
238:17 239:10
**weighed** 176:15
243:5
**weighing** 176:17
**welcome** 52:24
**went** 146:23
161:16 165:5,19
165:20 166:7
189:2 199:7 234:8
234:11 278:9
**wesley** 10:3
**west** 73:19
**westmoreland** 4:4
9:8,8
**wha** 1:5
**whispering** 7:6
**white** 68:6,14,18
68:19 69:1,9,11,16
70:2,8,18,25 71:16
72:2,10,23 73:19

[white - yeah]                                                                  Page 60

74:8,18 76:4 78:7
84:21 88:18,21
92:25 94:4 97:22
105:13 106:3,5,9
125:2 132:4
242:25 264:16
266:3 285:10
296:19
**wind** 11:15 120:10
123:25 170:7
205:25 206:1,6
218:21 219:15,20
224:14,16 225:25
227:5 250:17,18
**winding** 120:19
224:7 225:21
**window** 272:18,19
287:3
**wing** 73:19
**wise** 15:21
**wish** 157:19
299:16
**withdrawn** 253:15
**witness** 8:7 9:13
36:23,24 37:15
40:5,9 53:20,21,25
54:1 57:4 58:19
78:1,20 79:18
83:9,17,20 84:6
88:13 89:11,13,16
91:16 92:13 94:7
96:12 99:5 101:4
105:18,19 107:11
108:5,13 110:3,7
111:12 115:5
126:1 129:17,18
129:24 130:10
141:1 144:22
154:13 160:13
162:22 168:19
170:1 172:5

178:14 182:7
183:5,7 186:15
190:18,19 191:13
193:7,8,13,19,24
196:20 197:3,6,9
197:20 198:3
202:14,16 204:13
204:25 210:20
213:11,12 216:20
221:13,16 231:25
236:23,25 237:7
237:23 238:6
240:7,8,17,18
243:14 244:4
245:18,22 248:23
249:2,4,12 252:3,4
254:22 258:16
260:5,18,19 262:2
266:18,19 269:12
277:16,17 279:4
282:2,10,13 284:1
298:10,18 299:23
304:4,15 305:11
306:1
**witnesses** 253:19
**wolf** 74:24 111:4
**wonderful** 254:17
**word** 38:5,5,6,15
39:6 123:18
188:21 297:20
**worded** 71:18,19
71:20
**words** 17:24 34:13
45:15 61:18 83:16
91:20 97:16
120:14 161:8
208:13 210:5
296:23
**work** 5:24 12:21
15:1,2,19 28:2,3,7
28:15,20,23,24

30:14 31:5,23
35:13 43:22 44:10
44:13 50:12 61:8
61:12 102:10,23
129:7 154:25
158:22 164:5
172:7 176:20
217:3 218:12
225:9,14 231:10
254:6 265:24
266:2,13 267:6,16
294:15,19 295:24
302:25 303:4
**worked** 61:5 64:4
84:16 106:9 140:4
181:2
**working** 18:5
27:11 33:9,15,15
34:1,10,19 35:14
35:24 36:14,20
37:25 43:4 49:8
62:15 96:18 100:9
103:18 104:9,15
104:20,25 107:2
107:23 114:20
134:16 174:5
176:3 218:23
224:18,20 225:4
261:20 265:16
267:13,19,22
**workload** 159:10
159:16
**works** 23:16 41:11
61:23 62:4 75:5
91:6 114:14
140:21 142:1
262:17 264:4,6,9
**world** 284:7
**worries** 86:24
**worthwhile** 45:4

**wound** 226:13
**wrap** 84:12 229:20
**write** 17:21,21
228:13
**writes** 218:19,19
223:23 224:16
225:16
**writing** 105:7
175:1 176:18
218:13
**written** 17:15,20
21:2 62:8 95:4
246:9 257:19
258:24 292:15
**wrong** 74:8 91:22
119:6 184:6
**wrote** 17:16 228:8
259:2

| x |
|---|

**x** 5:1,9 6:1 51:14
71:17 72:8 113:25
169:19 201:11,11
230:24,25 231:1

| y |
|---|

**y** 113:25
**yeah** 44:24 45:9
65:7 70:16 72:13
78:10 79:14 82:8
85:13 101:7,9
103:9 106:22
107:11 116:11
118:19 138:22
142:25 143:18
151:21 157:5
163:3 165:10
171:20 173:1,11
182:10 197:1
200:5,7 204:16
205:20 214:17
220:2,2 222:22

225:4 226:4 235:1
250:17 275:18
291:14 292:19
**year**   28:8 43:14
  45:17 50:6,14
  52:8 143:13,20
  163:1 183:15,16
  183:21 184:11
  230:12,13
**years**   12:18 30:23
  31:18 32:1 36:14
  39:25 44:17 45:3
  45:19 46:1 51:20
  54:20 68:2 127:22
  143:8,15,22 144:4
  144:25 145:15,17
  156:21 158:11,23
  159:2,5 174:24
  176:11 179:16
  230:4,12 231:9
  272:16 302:24
**yep**   174:21 182:17
  193:24
**yesterday**   23:11
**york**   3:10,12,12,14
  8:22,24 57:10
  285:6 296:13,15

**z**

**z**   113:25
**zengotitabengoa**
  9:6,6
**zina**   285:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 4

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | |
| | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

**Declaration of Cesar Andrade**

Pursuant to 28 U.S.C. § 1746(2), I, Cesar Alberto Andrade Chiriboga, hereby declare as follows:

1. I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. I am a twenty-five year old New York City resident.

3. In 2001, when I was eight years old, I came to New York City from Ecuador.

4. I arrived in Washington Heights, a neighborhood in New York City.  I immediately entered the public school system in New York.

5. My interest in practicing medicine was sparked at sixteen when I had the opportunity to volunteer at a hospital, which treated cancer patients.

6. In 2010, I was accepted into the Macaulay Honors College at the City University of New York ("CUNY") Lehman College. Due to my undocumented immigration status, I was ineligible to receive any financial assistance or grants to fund my education. However, through my outstanding academic performance and achievements, I was awarded a scholarship covering the full cost of tuition. I majored in molecular biology and was a pre-med student. In addition, I was a member of my college's tennis and soccer teams. In 2011, I was part of a soccer team that won the first CUNY championship for my college. Being a student athlete gave me the opportunity to learn how to successfully balance multiple obligations.

7. DACA did not exist during the first two years of my education at CUNY. Therefore, for those first two years of my education at CUNY, I was unable to intern anywhere. Without a social security number I was prevented from applying to internships and volunteering at hospitals, both of which are a requirement for applying to medical school.

8. In 2012, DACA was enacted and I applied that same year and received DACA status in March 2013. When I attained DACA status, I received a social security number and work authorization,

both of which allowed me to have access to previously unattainable healthcare and employment options.

9.  During my college years, I also became a DACA advocate and worked in clinics to spread awareness of the program and promote enrollment into the program among the undocumented community.

10. In 2014, I graduated from CUNY with a bachelor's degree in molecular biology. After graduation, my DACA status allowed me the opportunity to intern for one year at the New York State Health Foundation. While there, I helped lead a public education campaign that spread awareness that DACA grantees are eligible for Medicaid health insurance. As part of this campaign, I worked with the Community Service Society, an advocacy group that addresses the roots of economic disparity, to pair DACA grantees with enrollment navigators who assisted their enrollment in Medicaid. I was involved in every aspect of this campaign, including – handing out flyers, placing flyers online and appearing at events where I would speak directly to community members. This campaign was organized in partnership with the Mayor's Office of Immigrant Affairs.

11. I also participated in Pre-Health Dreamers, a community of undocumented students in America who wish to pursue careers in healthcare. I actively worked on the Pre-Health Dreamer campaign to amend New York City laws to allow non-citizens to receive licenses in professional careers as long as they complete all other required licensure or certification requirements.

12. After my internship at the New York State Health Foundation, I worked at Mt. Sinai hospital in New York City for a year conducting research on diabetes prevention. Specifically, I researched the social determinants of diabetes and how to address them.

2

13. In 2016, I applied for and was accepted into medical school. I am currently a second year medical student at the Icahn School of Medicine at Mt. Sinai. I was fortunate enough to receive a significant scholarship from my medical school.  Without the scholarship, I could not have afforded the cost of medical school.  As an undocumented immigrant, I am ineligible to receive federal government assistance and I cannot finance my medical education on my own.

14. I renewed my DACA status in January 2017 for the duration of at least the next two years.

15. Any revocation of DACA would have a huge impact on my life. First, if I lose my DACA status, I will lose my health insurance and my ability to work or intern in the United States. This will impact my ability to complete my medical training. For example, in two years I will have to apply for residency. Without DACA status, I will be unable to get work authorization in order to participate in any residency program. I know I have the support of those at my current academic institution, and other DACA advocates; however, there is no certainty of any favorable outcome.  In addition, on a personal level – revocation of DACA would impact my sister and her ability to work as well, which would potentially add more hardship and stress to my family. I am truly unclear about our future without DACA.

16. If I have to, I will consider completing my medical training in another country. However, my first preference is to have the opportunity to give back to this country, and to the communities and academic institutions, which have supported me throughout my life. Allowing DACA to continue would allow my sister and I to continue to live, work, and contribute to the economy and communities of America; where we have spent most of our lives.

17. I was attracted to the medical profession, because I grew up seeing the lack of access to

healthcare in underserved communities, particularly among undocumented immigrants. I saw

firsthand how a lack of primary care can harm a community. I want to become a primary care

doctor so I can help fill that gap in healthcare access, and make a difference in underserved

communities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of September, 2017

_____/s_____

Cesar Andrade

4

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>       Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>       Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

Pursuant to 28 U.S.C. § 1746(2), I, Hina Naveed, hereby declare as follows:

1. I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. I am a twenty-seven year old nurse and New York City resident.  I currently work to help foster children in Brooklyn and Staten Island obtain access to health care services.

3. In 2001, at the age of ten, I came to New York from Dubai to seek medical care for my younger sister's life-threatening brain condition.  We came to the United States after we had exhausted treatment options in both Dubai and India.

4. I worked very hard throughout school.  In high school, I was salutatorian of my class and President of the National Honor Society.

5. DACA did not exist at the time I graduated from high school.  Due to my undocumented status, I was ineligible for college scholarships and financial aid.  As a result, I could only afford to attend college part-time.

6. In 2008, I enrolled in the College of Staten Island with the goal of pursuing a degree in nursing.  My interest in health care was sparked by the compassion and empathy that I saw doctors and nurses give to my sister.  I wanted the opportunity to provide similar care to other children.

7. Before DACA, I took the entrance exam to enroll in the nursing program.  Students in this program immediately begin clinical rotations at hospitals as part of their studies.  Although I scored very highly on the entrance exam, I was unable to enroll in the program because undocumented students are prohibited from working in hospitals.

8. In 2012, DACA was enacted.  I applied and received DACA status in February 2013.  When I attained DACA status, I received a social security number and work authorization.  This

2

allowed me to enroll in the nursing program and move closer towards fulfilling my dreams of working in healthcare.

9.  My DACA status also allowed me to obtain a drivers license for the first time.  With this license, I was able to provide much needed assistance to my parents and help transport my sister with special needs to numerous medical appointments.

10.  Although I had DACA status, I remained frightened that I would not have the opportunity to put my nursing education into practice.  At the time, New York did not allow undocumented individuals like myself to obtain nursing licenses. Fortunately, the Board of Regents of New York passed a rule last year that allows undocumented individuals to apply for nursing licenses if they have DACA status.   After I obtained my associates degree in nursing in 2016, I applied for and received my nursing license.  I immediately put my nursing education into practice by working part-time as a home healthcare worker while finishing my college studies.

11.  I received my bachelors of science degree in nursing in January 2017.   As a result, I was able to obtain a position supervising the health department at a foster care agency in New York City.  In this role, I am able to carry out my goal of caring for children by connecting children in foster care with the health services they need.

12.  Beyond my education, I also became an immigrant's rights advocate and worked at the DREAM Action Coalition to engage youth in voter and civic engagement.  I also held DACA clinics that assisted several hundred youth with DACA's application process.  In addition, I worked in the Mayor's Office of Immigrant Affairs on policy initiatives, such as municipal IDs, to increase the quality of life for undocumented individuals.

13.  To strengthen my advocacy efforts on behalf of both undocumented youth and youth in foster care, I recently enrolled in the evening program at CUNY Law School.  I applied only to

3

CUNY because their mission resonates so strongly with me - - "Law In the Service of Human Needs." My anticipated graduation date is May 2021.

14. My current DACA status expires in March 2019. If DACA is rescinded, my life will be drastically altered. I will lose my work authorization and therefore be unable to keep the job that I love providing much needed services to foster youth. Additionally, without the income from this job, I will be unable to afford my law school tuition and will likely have to withdraw. Even if I am somehow able to continue my legal education, without DACA status I will be unable to gain admission to the New York Bar and practice law.

15. Revocation of my DACA status will also result in the loss of my drivers license and an inability to renew my nursing license when it expires in April 2019.

16. Besides its impact on me, the revocation of DACA will also have serious consequences for my sister, who will no longer be able to obtain the life-saving medical care that she needs.

17. I have lived, worked and studied in the United States for the majority of my life. It is my home. I have long dreamt about giving back to the country that gave so much to my sister and I. I have taken the necessary steps to make those dreams a reality. Now that I finally have the chance to use my education to help other New Yorkers, I hope I am not forced to give it up.

Dated:  September 6, 2017                          _____/s Hina Naveed_____

                                                                    Hina Naveed

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>               Plaintiffs,<br><br>      v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>               Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

Pursuant to 28 U.S.C. § 1746(2), I, Milton Eduardo Ramirez Cuevas, hereby declare as follows:

1.      I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.      I came to the U.S. when I was under two years old from Guadalajara, Mexico with my mother and father.

3.      I grew up in Gresham, Oregon and graduated from Reynolds High School in 2010.  Everyone calls me "Eddie."

4.      I applied for the Deferred Action for Childhood Arrivals ("DACA") program in August 2012.  My application was approved in September 2012, and I have remained in the program ever since.

5.      I graduated from Portland State University ("PSU") in 2014. I was charged in-state tuition rates at PSU.

6.      After my DACA status was approved in September 2012, I was able to get a paid job in the PSU Admissions Office.  I pay taxes in Oregon.

7.      In the fall of 2014, I enrolled at the Oregon Health and Sciences University ("OHSU") in the School of Dentistry. I was charged in-state tuition rates at OHSU.

8.      I am currently a fourth year dental student at OHSU.  I anticipate graduating from OHSU with a Doctor of Dental Medicine ("DMD") degree in June of 2018.

9.      As an OHSU student, I received a scholarship through the Scholars for a Healthy Oregon Initiative ("SHOI") for all four years of my education at OHSU.

10.     The SHOI program was created by the Oregon legislature to promote better access to healthcare in rural and underserved communities in Oregon. ORS 348.303.

11.     The SHOI scholarship provides full tuition and applicable fees for my dental degree program at OHSU. In return, as a recipient I agreed to practice full time as a dentist in a rural or underserved community in Oregon for a minimum of one year longer than the total years of funding received; in my case, that is five years of service.  ORS 348.303(3)(c).

Page 2 -   DECLARATION OF EDUARDO RAMIREZ

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

12.     The eligible locations in Oregon for providing my five years of SHOI service include (i) federally designated Health Professional Shortage Areas, (ii) federally designated Medically Underserved Area or Population, and (iii) Areas of Unmet Need as designated by the Oregon Office of Rural Health.  ORS 348.303(1)(a).

13.     The terms of the SHOI agreement provide that if I do not begin my service commitment work within 90 days of completing the dental program, and then complete my five years of service, I may have to repay the value of the SHOI scholarship plus an additional twenty-five percent penalty. ORS 348.303(6)-(8).

14.     In June 2018, I was offered an externship at the Klamath Falls Open Door Medical Center in Klamath Falls, Oregon, through the School of Dentistry rotation office.  This is my second externship rotation in Klamath Falls. This on-the-job externship is required practical experience to meet OHSU's graduation requirements to receive my DMD, and then Oregon license to practice dentistry.

15.     The Klamath Falls Open Door Medical Center in Klamath Falls, Oregon provides dental care to in a rural or underserved community in Oregon.

16.     My DACA deferred action status expires in September 2018, if it is not renewed.

17.     If my DACA status is taken away, I will not be able to work in Oregon as a dentist despite having most likely graduated from OHSU's dental school with my DMD degree and having received an Oregon license to practice dentistry.

18.     If my DACA status is taken away, it will impair my ability to fulfill my SHOI obligations to provide five years of service by working full time as a dentist in a rural or underserved community in Oregon.

19.     If my DACA status is taken away, I could be deported to Mexico – a country I have not lived in since infancy. The United States is the only country that I have ever known, and Oregon is the only state that I have ever lived in here. It is my home.

Page 3 -     DECLARATION OF EDUARDO RAMIREZ

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

20.     My younger brother is a U.S. citizen.  I am concerned that if the program ends, my family might be split apart, may not be able to sustain themselves, and may not be able to obtain an education.

**I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.**

Executed this __14__ day of September, 2017, at Portland, Oregon.

_____
MILTON EDUARDO RAMIREZ CUEVAS

Page 4 -    DECLARATION OF EDUARDO RAMIREZ
JND/a2c/8490650-v2

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
|          Plaintiffs, | |
|     v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
|          Defendants. | |

## DECLARATION OF CAIRO MENDES

I, Cairo Mendes, declare as follows:

1.  My name is Cairo Mendes.  I am 24 years old.  I live in Marlborough, Massachusetts.

2.  I have personal knowledge of the matters set forth below.

3.  I was born in Goiania, Brazil.  When I was 9 years old, my mother brought my sister and me to Massachusetts to join my father who had been working here for two years.  My parents always told me that they brought our family to Massachusetts because of the opportunity for a better life – because of the American Dream.

4.  I have lived in Marlborough for 15 years.  I went to public school in here.  I'm now a senior at UMass Boston.  I'm studying economics and political science.

5.  Receiving DACA has had an enormous impact on my life.

6.  I work to help my family and pay for school.  Because of DACA, I was able to get a social security card and a work permit.  That allowed me find a job that paid more and, for the first time, provided health insurance.  I pay state and federal taxes.

7.  I commute to work and school every day.  Because of DACA, I was able to get a driver's license and a loan to buy a car.

8.  I wouldn't be able to attend UMass Boston without DACA.  I started college at Mass Bay Community College in 2012 before DACA.  It was a huge struggle to pay the tuition.  After I received DACA status, I qualified for in-state tuition and was able to afford to enroll in more classes.  I graduated from Mass Bay in 2015 and then started at UMass Boston.  I still struggle to pay for school, but I couldn't make it work without DACA.  If I lost in-state tuition – or my driver's license and work permit – I would have to drop out.

1

9. Getting DACA status removed the fear and anxiety from my life. It gave me the space to breathe. The only reason I've been able to get this far is because of DACA.

10. Losing DACA would turn my life upside down and hurt my entire family. I could lose my job, my health insurance, and I would have to put my education on hold. I'm my mother's right hand; without DACA I wouldn't be able to help my family in the same way. I could be deported to a country I don't know and haven't lived in since I was a little boy.

11. Eliminating DACA wouldn't' just hurt recipients like me, it would destabilize entire families and communities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of September, 2017.

Cairo Mendes

2

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF RENATA BORGES TEODORO

I, Renata Borges Teodoro, declare as follows:

1. My name is Renata Borges Teodoro.  I am 29 years old and currently live in Dorchester, Massachusetts.

2. I have personal knowledge of the matters set forth below.

3. My parents are from Brazil.  I was brought to the United States when I was six years old. Soon after we arrived, my family moved to Massachusetts to be near to the large Brazilian community here.  I have lived in Massachusetts for more than 20 years.

4. The DACA program has changed my life.  I applied for DACA the day it became available in 2012.  My application was approved in March 2013, and since then I have been able to get a work permit, a social security number, a credit card, and in-state tuition at the University of Massachusetts-Boston.  I was also able to receive health insurance through my work for the first time, which allowed me to obtain critical health services that I had been putting off because I didn't have insurance.

5. I graduated in May 2017 from UMass-Boston with a Bachelor's Degree in Philosophy and Public Policy.  I likely would not have finished my degree without DACA, since it allowed me to pay a reduced tuition rate and also to get a job on campus, which allowed me to attend school full-time rather than working elsewhere.

6. I recently received a renewal of my DACA status until July 2019, and am currently looking for a job to put my degree to good use.  I am passionate about immigrants' rights, community development, and higher education, and I hope someday to work for a foundation that funds community-based nonprofit work.

1

7. Obtaining DACA status also allowed me to travel outside the country for the first time since I was brought here as a child.  My family now lives in Brazil, and for years I was unable to visit them.  With DACA, however, I was able to apply for advanced parole and I have visited them four times since 2013.  Those reunions have been unbelievably special to me.

8. If DACA status were taken away, life would become extraordinarily hard for me.  I would lose my work permit, my social security number, and my ability to travel.  I would probably not be able to find a decent job, since almost all jobs that require a college degree also require a work permit.

9. I would also face the prospect of imminent deportation.  How can I build a life for myself if I am afraid of being deported?

10. I was brought to this country at age 6.  The United States is really all I know.  I have paid taxes for years.  I have gone to school and earned my degree.  I have strived to do everything right.  DACA has provided me with an opportunity to build a life here.  Rescinding it now would take all that away.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _1_ day of September, 2017.

_____

Renata Borges Teodoro

2

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
|           Plaintiffs, | |
|     v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
|           Defendants. | |

Declaration of Javier A. Juarez

1. My name is Javier A Juarez, I am 28 years old, and I reside in Cranston, RI.
2. I have personal knowledge of the matters set forth below.
3. I was born in Peru where I lived until the age of ten prior to moving to Cranston, Rhode Island.
4. I grew up in Cranston, I graduated from Cranston elementary, middle and high School.
5. I went to the Community College of Rhode Island and graduated with an Associate's degree in General Studies. I also was granted a path to Rhode Island College to finish a bachelor's degree.
6. I applied for DACA soon after it was announced in 2012. I received DACA and a work permit. I immediately began to work to save money and help my parents with their home bills. DACA allowed me to work, pay taxes, and drive a vehicle.
7. Because of DACA, I was able to obtain a job with benefits such as insurance and a 401k. I was able to save enough money to return to school and finish my bachelor's degree at Rhode Island College.
8. DACA allowed me to pay taxes, rent an apartment, pay for tuition and purchase an automobile.
9. I was able to graduate Rhode Island College with a Bachelor's degree in American History in May of 2017.
10. On June of 2017, I was accepted to Brown University to pursue a Master's degree in American studies where I will be exposed to an ivy league curriculum which will help me become a better candidate to law school.
11. I am planning on applying to Harvard, Yale, Roger Williams University, and Stanford.
12. As the current situation stands, I will not be able to take out loans for law school because my work authorization will expire on December 18th of 2018.
13. Due to this, my dreams of becoming a lawyer and going to law school have been destroyed.
14. Fear of deportation has caused me and my family great physical and mental stress and has deprived me to focus on the education that I seek.

I declare under penalty of perjury that the foregoing is true and correct.
September 27, 2017

Javier A. Juarez

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et. al.*,

        Plaintiffs,

   v.

DONALD TRUMP, *et. al.*,

        Defendants,

No. 1:17-CV-5228

**Declaration of Tom K. Wong**

I, Tom K. Wong, declare as follows:

1. My name is Tom K. Wong and I am over eighteen years of age. I have personal knowledge of and could testify in Court concerning the following statements of fact.

2. I am an Associate Professor with tenure at the University of California, San Diego (UCSD). I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally. I am also the Director of the International Migration Studies Program Minor at UCSD.

3. I am an expert on immigration politics and policy, which includes the Deferred Action for Childhood Arrivals (DACA) policy. I have written two peer-reviewed books and several peer-reviewed journal articles, book chapters, and reports on these subjects. My most recent research on DACA is a national survey of 3,063 DACA recipients conducted in August 2017 (henceforth referred to as the "2017 DACA survey"). The 2017 DACA survey is in addition to two peer-reviewed journal articles on DACA (*International Migration Review* and *Journal on Migration and Human Security*), another forthcoming peer-reviewed journal article on DACA (*Social Problems*), one book-length monograph (supported by a grant from the U.S. Department of Homeland Security [DHS]), and three other reports based on national surveys that I have conducted of DACA recipients.

4. I received a Ph.D. in political science at the end of the 2010-2011 academic year. I was a post-doctoral research fellow during the 2011-2012 academic year. I joined the

political science department at UCSD during the 2012-2013 academic year. I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.

5.  I previously testified as an expert witness in the case, City of El Cenizo, et. al. v. State of Texas, et. al.

6.  I am being compensated by the State of Washington in the amount of $5,000.

7.  I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration. I have also attached a true and complete copy of the 2017 DACA survey as Exhibit B to this Declaration.

## DACA

1.  Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals policy has provided temporary relief from deportation and work authorization to 793,026 people.[1] As of September 4, 2017, there are 689,900 active DACA recipients.[2]

---

[1] Based on the most recent publicly available data from U.S. Citizenship and Immigration Services (USCIS) at the time of this writing, which is up to June 30, 2017. USCIS provides quarterly reports on DACA. See: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

[2] The lesser 689,900 figure represents the total number of individuals who, as of September 4, 2017, were "active DACA recipients." For example, those who received DACA may have adjusted to lawful permanent resident (LPR) status. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

**2017 National Survey of DACA Recipients**

2.  From August 1, 2017 to August 20, 2017, I conducted a national online survey of DACA recipients. The resulting survey is the largest study to date of DACA recipients with a sample size of 3,063 respondents in forty-six states plus the District of Colombia.

3.  Methodologically, several steps were taken to account for the known sources of bias that can result from online panels. To prevent ballot stuffing, meaning one person submitting multiple responses, incentives were not given for each completed survey that was submitted. Moreover, the online survey platform used (Qualtrics) was programmed to prevent one IP address from submitting multiple responses. To prevent spoiled ballots, meaning people who responded to the survey who were not undocumented, I used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked during different parts of the survey. When a question was repeated, it was posed using different wording. For example, "How old were you when you first came to the U.S.?" and, "In what year did you first come to the U.S.?" (current age was used to tether these answers). If there was agreement in the answers, meaning there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting sample. If there were inconsistencies, the respondent was excluded. Also, Facebook ads were used to improve the geographic representativeness of the resulting sample, as well as to recruit respondents who were outside of the networks of the organizations that conducted outreach for the survey. Because there is no directory of

undocumented immigrants from which to randomly sample from, researchers need to

partner with organizations that interact with undocumented immigrants to conduct such

surveys. The outreach partners were United We Dream (UWD), the National

Immigration Law Center (NILC), and the Center for American Progress (CAP). These

partners distributed the survey link to their respective email lists. Given the nature of

online opt-in surveys, it is not possible to construct a valid margin of error.

Nevertheless, the survey is methodologically rigorous and sound. Indeed, a peer-

reviewed academic journal on DACA based on survey results obtained using the

methods described above is forthcoming in a top sociology journal.

4.   Evaluating the representativeness of the survey sample requires current and complete

data on the characteristics of DACA recipients. The only publicly available data

provided by U.S. Citizenship and Immigration Services (USCIS) in its quarterly DACA

statistics that are both current and complete is the geographic breakdown of DACA

recipients at the state level.[3] Using these data, a two-sample Kolmogorov-Smirnov (K-

S) test of equality of distributions can be run to evaluate how well the survey sample

---

[3] USCIS also provides publicly available data on the country of birth of DACA recipients, but these data are incomplete, as only the top twenty-five countries of birth are listed (and one of these is labeled "Unknown"). USCIS has analyzed the demographic characteristics of DACA recipients, but this initial analysis was based on data from August 2012 to September 2013. See: https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/USCIS-DACA-Characteristics-Data-2014-7-10.pdf. More recently, USCIS published an updated analysis (September 2017). A Kolmogorov-Smirnov (K-S) test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all "active DACA recipients" ($p = .557$) that USCIS analyzed. The null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .557 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 44% confident (1 minus .557) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result. Moreover, the September 2017 USCIS report indicates that the average age of active DACA recipients is 23.8. The average age of the survey sample is similar at 25.2. The most recent USCIS data do not provide detailed cross-tabulations sufficient for weighting purposes.

matches the actual distribution of DACA recipients by state. The results of the K-S test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all DACA recipients ($p$ = .570).[4]

### Characteristics of DACA Recipients

5.  The average age of respondents is 25.2.[5] The average age that respondents first arrived in the U.S. is 6.5.[6] The average number of years that respondents have lived in the U.S. is 18.8.[7] Regarding race and ethnicity, 93% of respondents identify as Hispanic/Latino, 4% identify as Asian or Pacific Islander, 2% identify as White, and 1% identify as Black.[8] Also, 10% of respondents personally identify as lesbian, gay, bisexual, or transgender (LGBT).

### DACA and Economic Integration

6.  DACA has been critical in improving the economic integration of DACA recipients,

---

[4] That is, there is no evidence to suggest that the distribution of survey respondents by state and the actual number of DACA recipients by state is statistically significantly different. Moreover, analyzing and comparing the unweighted and weighted results show that the findings are substantively similar throughout. As previously noted, the null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .570 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 43% confident (1 minus .570) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

[5] As previously noted, a September 2017 USCIS report shows that the average age of "active DACA recipients" is 23.8. The average age of the survey sample is thus similar to the average age of active DACA recipients as reported by USCIS.

[6] In other words, on average, DACA recipients first entered the U.S. during kindergarten or first grade.

[7] Moreover, 38.5% of respondents have lived in the U.S. for 20 years or more.

[8] USCIS does not report race and ethnicity in its quarterly DACA statistics. However, the large majority of the "Top Countries of Origin" listed in the USCIS quarterly reports are Latin American countries.

DECLARATION OF TOM K. WONG                      5                      ATTORNEY GENERAL OF WASHINGTON
                                                                       800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA 98104-3188
                                                                       (206) 464-7744

which is evidenced by their employment rates, their employment in "white collar," higher-skilled jobs, greater job mobility, higher wages, more financial independence, and increased consumer purchasing power, among other indicators.

7.  Regarding employment, the data show that 91% of DACA recipients are currently employed. Among those 25 years and older, this percentage climbs to 93%. Moreover, the data show that at least 72% of the top twenty-five Fortune 500 companies employ DACA recipients.

8.  DACA recipients are most likely to work in *Office and Administrative Support Occupations* followed by *Sales and Related Occupations* and then *Management, Business, Science, and Arts Occupations*. U.S. Census occupation categories are used to distinguish between types of occupations.[9] Table 1 lists the top ten occupation categories for DACA recipients.

Table 1

|  |  | DACA |
|---|---|---|
| Office and Administrative Support Occupations | ....................................... | 16.5% |
| Sales and Related Occupations | ....................................... | 11.6% |
| Management, Business, Science, and Arts Occupations | ....................................... | 10.8% |
| Education, Training, and Library Occupations | ....................................... | 9.6% |
| Food Preparation and Serving Occupations | ....................................... | 6.8% |
| Healthcare Support Occupations | ....................................... | 6.4% |
| Healthcare Practitioners and Technical Occupations | ....................................... | 4.6% |
| Community and Social Services Occupations | ....................................... | 4.3% |
| Financial Specialists | ....................................... | 3.4% |
| Legal Occupations | ....................................... | 3.0% |
| Computer and Mathematical Occupations | ....................................... | 3.0% |
| Other | ....................................... | 19.9% |

9.  Table 2 below compares the occupations of DACA recipients to native-born workers

---

[9] For detailed occupation listing, see here: https://usa.ipums.org/usa/volii/c2ssoccup.shtml

between the ages of sixteen and thirty-five. As the table shows, DACA recipients are more likely to work in "white-collar" higher-skilled occupations such as *Management, Business, Science, and Arts Occupations*, H*ealthcare Support Occupations*, and *Legal Occupations*, and they are less likely to work in "blue-collar" lesser-skilled occupations such as *Building and Grounds Cleaning and Maintenance Occupations*, *Construction and Extraction Occupations*, and *Food Preparation and Serving Occupations*.

Table 2

| | | DACA | Native Born | Diff |
|---|---|---|---|---|
| Management, Business, Science, and Arts Occupations | ........................................ | 10.8% | 6.4% | +4.4% |
| Education, Training, and Library Occupations | ........................................ | 9.6% | 5.9% | +3.7% |
| Healthcare Support Occupations | ........................................ | 6.4% | 3.1% | +3.3% |
| Community and Social Services Occupations | ........................................ | 4.3% | 1.5% | +2.7% |
| Office and Administrative Support Occupations | ........................................ | 16.5% | 13.9% | +2.6% |
| Legal Occupations | ........................................ | 3.0% | 0.9% | +2.2% |
| Financial Specialists | ........................................ | 3.4% | 1.9% | +1.5% |
| Computer and Mathematical Occupations | ........................................ | 3.0% | 2.3% | +0.8% |
| Architecture and Engineering Occupations | ........................................ | 2.1% | 1.5% | +0.6% |
| Business Operations Specialists | ........................................ | 2.8% | 2.3% | +0.4% |
| Life, Physical, and Social Science Occupations | ........................................ | 1.2% | 0.8% | +0.4% |
| Extraction Workers | ........................................ | 0.1% | 0.2% | -0.1% |
| Farming, Fishing, and Forestry Occupations | ........................................ | 0.1% | 0.6% | -0.5% |
| Healthcare Practitioners and Technical Occupations | ........................................ | 4.6% | 5.2% | -0.5% |
| Arts, Design, Entertainment, Sports, and Media | ........................................ | 1.5% | 2.2% | -0.7% |
| Military Specific Occupations | ........................................ | 0.0% | 0.8% | -0.8% |
| Building and Grounds Cleaning and Maintenance | ........................................ | 1.4% | 2.8% | -1.4% |
| Sales and Related Occupations | ........................................ | 11.6% | 13.0% | -1.4% |
| Protective Service Occupations | ........................................ | 0.8% | 2.6% | -1.7% |
| Construction and Extraction Occupations | ........................................ | 1.8% | 3.9% | -2.1% |
| Installation, Maintenance, and Repair Workers | ........................................ | 0.8% | 3.2% | -2.3% |
| Personal Care and Service Occupations | ........................................ | 2.0% | 4.4% | -2.4% |
| Production Occupations | ........................................ | 2.6% | 5.1% | -2.5% |
| Transportation and Material Moving Occupations | ........................................ | 2.7% | 5.7% | -3.0% |
| Food Preparation and Serving Occupations | ........................................ | 6.8% | 9.9% | -3.0% |

Note: percentages may not sum to 100 due to rounding. The column "DACA" refers to DACA recipients. "Native Born" refers to native-born workers who are (a) employed and are (b) between the ages of sixteen and thirty-five. These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file. "Diff" is the difference in the percentage between DACA recipients and comparable native-born workers.

10. Moreover, after receiving DACA:

    a.  54% got their first job;

    b.  69% got a job with better pay;

    c.  54% got a job that better fits their education and training;

    d.  54% got a job that better fits their long-term career goals;

    e.  57% got a job with health insurance or other benefits;[10]

    f.  56% got a job with improved work conditions; and

    g.  5% started their own businesses.[11]

Table 3 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 3

|  | | | ≥ 25 |
|---|---|---|---|
| Got my first job | ........................................ | 54.2% | 35.3% |
| Got a job with better pay | ........................................ | 68.5% | 77.7% |
| Got a job that better fits my education and training | ........................................ | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ........................................ | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ........................................ | 57.3% | 66.9% |
| Got a job with improved work conditions | ........................................ | 56.2% | 64.4% |
| Started my own business | ........................................ | 5.4% | 7.9% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n$ = 1,662 for all respondents 25 years and older.

11. Regarding earnings, the data make clear that DACA is having a positive and significant

---

[10] 49.2% of respondents in my 2016 DACA survey reported that they obtained health insurance through their employer and 46.8% of respondents reported that they had "Received health care using [their] newly obtained health insurance."

[11] This rate of business starts is higher than the rate of business starts for the American public as a whole (3.1%).

DECLARATION OF TOM K. WONG         8          ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

effect on the wages of DACA recipients.

12. The average hourly wage of DACA recipients has increased by 69% since receiving DACA. Among those 25 years and older, the average hourly wage has increased by 81% since receiving DACA. I have noted in previous research that more work (and time) may be needed to parse out the short- and long-run wage effects of DACA, as well as to answer the question of whether short-run gains in wages represent a plateau in earnings or if more robust long-run wage effects exist. This continues to be true. However, because of the continued upward trajectory in the observed wages of DACA recipients, it is likely that there is even more room for wage growth as DACA recipients move further along in their careers. These gains will disappear if these individuals lose their DACA status and the accompanying work authorization.

13. The data also show that average annual earnings among DACA recipients is $36,232. Among those 25 years and older, it is $41,621. A multivariate Ordinary Least Squares (OLS) regression regressing annual earnings on age shows that annual earnings increase by $1,583 for each year that a DACA recipient grows older ($p < .001$).[12] These gains will also disappear if these individuals lose their DACA status and the accompanying work authorization.

14. Higher wages have meant greater financial independence and consumer purchasing

---

[12] The model controls for number of years in the U.S., whether the DACA recipient is in school, whether the DACA recipient has a bachelor's degree or higher, and state-level fixed effects. The null hypothesis for age is that age has no effect on annual earnings. A $p$ value of less than .001 means that we are over 99.9% confident (1 minus < .001) that we can reject the null hypothesis that age has no effect on annual earnings and thus say that age is positively and statistically significantly related to annual earnings. To recall, by convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

power for DACA recipients:

a.  69% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [them] become financially independent";

b.  71% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [their] family financially";

c.  Among those who have a bachelor's degree or higher and are no longer in school, 27% reported paying off some or all of their student loans after their DACA application was approved;

d.  65% purchased their first car after their DACA application was approved; and

e.  16% purchased their first home after their DACA application was approved.

Table 4 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 4

|  |  |  | ≥ 25 |
|---|---|---|---|
| I have been able to earn more money, which has helped me become financially independent | ...................................... | 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | ...................................... | 70.8% | 73.7% |
| Paid off some/all of my student loans | ...................................... | 27.1% | 27.4% |
| Bought my first car | ...................................... | 64.5% | 67.2% |
| Bought a home | ...................................... | 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

15. Higher wages are indicative of the broader positive economic impact of DACA. For example, higher wages translate into more in Federal Insurance Contributions Act (FICA) contributions, which are mandatory payroll deductions for Social Security and Medicare. Using data on wages and earnings from the 2017 DACA survey, I estimate that DACA recipients will add $39.3 billion in Social Security and Medicare contributions (half in employee contributions and half in employer contributions) over a ten-year period.[13] These contributions will disappear if these individuals lose their DACA status and the accompanying work authorization.[14]

16. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "If I were to lose DACA the first thing to go with it would be my job as a nurse. This would […] make it impossible for my family to afford to pay our mortgage. I would lose my home." Another DACA recipient writes, "I will lose my job and the associated health/retirement benefits I have been paying into. Right now my family depends on the income that I make working […] I'm also paying off a new car that I bought last year. It would be difficult for me to continue paying for it if I'm not able to work where I do now." Another DACA recipient writes, "I will lose my job, which then would have a trickle effect […] losing my vehicle for

---

[13] This breaks down into $31.8 billion in Social Security contributions and $7.4 billion in Medicare contributions. For a detailed explanation of the methodology used to estimate Social Security and Medicare contributions, see here: https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf

[14] Higher wages also translate into more in federal income taxes paid, more in state income taxes paid. Large purchases such as cars add to state tax revenues, as most states collect a percentage of the car purchase in sales tax, along with additional registration and title fees. Similarly, home buying further adds to state and local tax revenues in the form of property taxes. There is a large literature on how home buying creates new jobs and adds new spending in local economies. For job creation, see here: https://www.nar.realtor/topics/home-ownership-matters/jobs-impact-of-an-existing-home-purchase. For spending in local economies, see here: https://www.cnbc.com/2017/04/12/immigrant-households-impact-success-of-real-estate-market-says-report.html

non-payment, losing my home and being evicted, going into higher debt for not being able to pay credit cards." Another DACA recipient writes, "I have spoken to my supervisors about what would happen if DACA were to end and they informed me that since they know I have DACA they would not be able to keep me on if I did not have work authorization." A DACA recipient who owns a business writes, "our restaurant would disappear." Another DACA recipient writes, "I would no longer be able to work as an EMT." Another DACA recipient writes, "If DACA ends […] My students would be left without a teacher for the rest of the year." Another DACA recipient writes, "I won't be able to accept [a] fulltime offer from [an employer], which is contingent on my completing my MBA in 2018." Another DACA recipient writes, "I will not be able to practice medicine when I graduate from medical school." Another DACA recipient writes, "I have a degree in engineering, and I want to obtain my professional engineering license. If I do not have DACA, I would not be able to work, thus I would not be able to accumulate the necessary work experience to obtain my PE license." Another DACA recipient writes, "I will lose my career, the opportunity to get my CDL [Commercial Driver License], the opportunity to eventually become a citizen and join the army like I've always wanted since a child."

**DACA and Education**

17. DACA improves educational outcomes for DACA recipients.

18. Regarding education, 45% of DACA recipients are currently in school.[15]

---

[15] The percentage of respondents who are currently in school has slowly declined over the four years that I have been surveying DACA recipients. This makes intuitive sense: as DACA recipients grow older, they are

19. Among those who are currently in school, 94% reported, "[they] pursued educational opportunities that [they] previously could not" because of DACA.

20. Moreover, among those in school, 72% are pursuing a bachelor's degree or higher (an additional 19% are pursuing an associate's degree). The majors and specializations that DACA recipients are pursuing include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few. These majors and specializations concretize how the education that DACA recipients are receiving is contributing to the development of a better prepared and more competitive college-educated workforce.

21. Regarding educational attainment, 36% of respondents 25 years and older have a bachelor's degree or higher. This percentage is higher than the 30% of native-born persons 25 years and older who have a bachelor's degree or higher, but is similar to the 34% of foreign-born naturalized persons 25 years and older who have a bachelor's degree or higher.[16]

22. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "DACA has given me the opportunity to be someone in life. Ever since I was in elementary school, I was a good student. I liked

---

more likely to transition out of school and into their careers. Moreover, as the USCIS quarterly DACA statistics show, older DACA recipients are not being replaced at anywhere close to the rate in which younger DACA recipients have aged into eligibility.

[16] These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file.

DECLARATION OF TOM K. WONG                    13                    ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

school and I liked to learn […] Depression was really getting to me because I saw my

friends pursuing their dreams, and I was not allowed to do the same. It did not matter

how smart I was, how much of a hard worker I was, or how much passion I had; I was

never going to be able to become who I wanted to be. DACA opened the door, it gave a

lot of us hope. Thanks to DACA, I am now a woman who is pursuing an engineering

degree." Another DACA recipient writes, "With DACA, I have worked as a researcher

and am now starting the grad school application process for PhD programs. I have

wanted to be a scientist since I was nine years old, staring out of my first telescope.

DACA allows that dream to not be hindered. I still cannot apply for anything funded by

the National Science Foundation or work for NASA, but hopefully my status will one

day become permanent and those doors will become open to me as well." Another

DACA recipient writes, "Without DACA, I would lose the ability to continue working

legally and will have to stop attending school since I will not be able to afford it. I will

lose the opportunity to become a certified teacher […] and will not be able to fulfill my

dreams of being an educator." Another DACA recipient writes, "I will be unable to

continue my education in computer science." Another DACA recipient writes, "If

DACA ends, I will lose the opportunity of pursuing the career I've been studying for

my whole life. I will not be able to work anywhere, so my degree won't matter."

**DACA and Normality in Day-to-Day Life**

23. The data further show that DACA has given DACA recipients a sense of normality in

their day-to-day lives, which has led to a greater sense of belonging and inclusion and,

1   in some cases, improved mental health.

2   24. In the 2017 DACA survey, respondents were asked to describe "what you will lose if

3   DACA ends." One DACA recipient writes, "I will lose my feeling of belonging in the

4   only country I have truly ever known." Another DACA recipient writes, "I would lose

5   my sense of belonging. For the first time I feel safe without fear." Another DACA

6   recipient writes, "Having DACA has changed my life completely, I feel like I have

7   purpose again. I can go to school and work. I can strive now for a better life. Things are

8   more manageable. Before DACA, I lost all hope of ever becoming anything or

9   accomplishing anything. I've regained a lot of that hope and now I have a strong drive

10  to succeed." Another DACA recipient writes, "DACA was a glimpse of what I could

11  have if I had papers and it made me love this country more." Another DACA recipient

12  writes, "DACA has allowed me to feel a sense of hope and security within the nation I

13  grew up in […] its existence provides me with the reassurance that someone cares, that

14  someone is listening, and that we are not alone." Another DACA recipient writes, "I

15  will lose feeling safe and protected." Another DACA recipient writes, "I will lose the

16  independence and freedom I had to wait so many years to have." Another DACA

17  recipient writes, "I will no longer be able to drive to school or work." Another DACA

18  recipient writes, "I will lose a sense of safety. I remember feeling a lot of fear, anxiety,

19  and uncertainty about my future before DACA was passed. I'm worried all of that will

20  come flooding back. Aside from the practical things, like losing my license, my job, my

21  independence, I really don't want to feel that way again. I have become more open with

22  people since DACA, and I don't want to go back to having to worry about what I say

and to who."

25. Moreover, despite being brought to the U.S., on average, at the age of 6.5, and despite having lived in the U.S., on average, 18.8 years, it was only after receiving DACA that:

    a.   61% opened a bank account;

    b.   66% got their first credit card;

    c.   90% got a driver's license or state identification card for the first time; and

    d.   49% became organ donors.

Table 5 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 5

| | | ≥ 25 |
|---|---|---|
| Opened a bank account | ........................................ 61.0% | 47.3% |
| Got my first credit card | ........................................ 65.7% | 67.9% |
| Got my driver's license or state identification card for the first time | ........................................ 90.3% | 88.3% |
| Became an organ donor | ........................................ 48.7% | 49.8% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

**DACA Recipients and American Citizen Family Members**

26. The data also show that DACA recipients are deeply interwoven in families that include American citizen siblings, spouses, and children. Indeed, 73% of DACA recipients have either an American citizen sibling, spouse, or child:

    a.   59% reported having an American citizen sibling;

    b.   17% reported having an American citizen spouse; and

c.   26% reported having an American citizen child.

Table 6 summarizes these results.

Table 6

| | | |
|---|---|---|
| American citizen spouse | ........................................ | 16.6% |
| American citizen child | ........................................ | 25.7% |
| American citizen sibling | ........................................ | 58.9% |
| American citizen spouse, child, or sibling | ........................................ | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

27. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "My daughter is a 4 year old U.S. citizen and everything I do is to give her a better life. I would lose the ability to safely go to school and work. I would constantly worry that my daughter would end up in foster care." Another DACA recipient writes, "I will lose my job and face possible deportation and being separated from my son who is only 3 and needs his mom." Another DACA recipient writes, "Sometimes I can't even sleep just thinking of what's going to happen with DACA […] I'm not only thinking about my future, but my son's." Another DACA recipient writes, "I just had my second child 2 weeks ago […] my plans are to go back to work by next year and I'm truly scared that by that time I won't be able to […] Now more than ever I need DACA to support my kids." Another DACA recipient writes, "a year into my new DACAmented life, my daughter was born and she has been such a blessing, but I am more afraid than ever about the consequences my status might have. If DACA ends, I lose the peace of mind that I will be here to raise her. I work 60+ hours a week at 2 jobs so I can provide for her and if

DACA ends I will not be able to do so." Another DACA recipient writes, "we risk being homeless with a new-born child if DACA ends." Another DACA recipient writes, "My kids are U.S. citizens […] I will lose my job, I will lose the opportunity to give my kids a better life […] Please, I beg to continue to have DACA. It is not just about being legal, but is also about having a better life for my kids." Another DACA recipient writes, "we would struggle providing for our kids who are all citizens […] I hope this never happens because our family has so much riding on whether my next permit is approved or not." Another DACA recipient writes, "I have a 3 year old daughter who is heading to Head Start this year and I am currently pregnant. I would miss out on my kid's lives, as they would most likely stay in the U.S. with their dad." Another DACA recipient writes, "I would lose healthcare coverage for me and my son." Another DACA recipient writes, "having my driver's license taken away would be a devastating blow […] I take my sons to school and childcare almost every day." Another DACA recipient writes, "without my driver's license I won't be able to drive to school or any of my son's doctor's appointments." Another DACA recipient writes, "How do you tell your 5 year old mommy can't bring food to the table because of a simple paper? How do you explain to your child that there will be no more sports because we can no longer drive?" Another DACA recipient writes, "I would lose my job first of all and if I lose my job I will lose my apartment. I will have to stay with family or other people and hopefully find a way to make some money in order to take care of my 3 year old. I will definitely end up in debt without a way to pay my bills and I will have to ask for public assistance to feed my son. It sounds extreme but that's

what will happen if I cannot work because I have no parents left and no one is going to take care of me or my son." Another DACA recipient writes, "I am married now with a 10 month old daughter […] if DACA ended I would be really scared to be split up from my daughter and husband and family. I have been here since I was 8 months old, this is my home, I don't know my place of birth." Another DACA recipient writes, "My U.S. citizen husband and U.S. citizen children would constantly be worrying about me because the likelihood of deportation would increase greatly." Another DACA recipient writes, "My wife and I have barely just begun our adult lives together. We have medical and student debt, monthly utility expenses, a mortgage, car payments, insurance payments and groceries to buy. We are just like any other young responsible adults trying to kick start their careers to gain financial stability and potentially start a family. Without my job I lose my ability to contribute to our monthly expenses. We would lose our financial stability and could lose everything which could ruin our lives before they even begin." Another DACA recipient writes, "If DACA ended […] it would put a stress on my marriage." Another DACA recipient writes, "I would lose my family […] my husband is a U.S. citizen […] my brother is also a citizen, and a U.S. Marine."

**Many May Go "Into the Shadows" Without DACA**

28. Many DACA recipients may go back into the shadows if these individuals lose their DACA status and the accompanying work authorization.

29. In the 2017 DACA survey, respondents were asked to describe "what you will lose if

DACA ends." One DACA recipient writes, "I really can't imagine living in the darkness again […] I have been a good member of society, I pay my taxes, and I have never gotten in trouble with the law." Another DACA recipient writes, "With DACA I was able to begin planning for a better future, if it's taken away I'll go back to trying to get by day to day." Another DACA recipient writes, "Losing DACA will be devastating because everything that I have built up to this point will be lost. I will lose my current employment, the health insurance provided by my employer, and driver's license for starters. Most importantly, I will return back to the shadows facing certain deportation considering the government already has all of my information." Another DACA recipient writes, "If DACA ends […] I lose everything. I can no longer work and my mental health will suffer. Currently my mental health is already suffering because of the constant fear about whether DACA will be taken away. This is the only place that I call home and people want to take that away from me. It is a terrible feeling and I hate that I have to be in this position, but none of us chose it and we are trying to do our best to make a living and do things the right way." Another DACA recipient writes, "I would go back to the shadows that I once thought I would never go back too. I would live in fear." Another DACA recipient writes, "I will live in fear and hiding, again." Another DACA recipient writes, "what hurts most is losing my ability to live without fear. To be back in the shadows, to feel less than and incapable of doing anything about the circumstances, [to] feel betrayed by the government who promised to protect us if we came out of the shadows and followed the rules." Another DACA recipient writes, "losing DACA would make me lose faith in a government [that] asked

us to come fourth and identify ourselves in exchange for a taste of regular American life." Another DACA recipient writes, "Everything that I've been working so hard for will suddenly mean nothing. All the contributions I've given to this country will be ignored and unrecognized by the government."

30. Moreover, when given a scenario in which they no longer had DACA[17]:

    a.  53% reported that they would be less likely to report a crime they witnessed;

    b.  47% reported that they would be less likely to report a crime even if they were the victim;

    c.  48% reported that they would be less likely to go to the hospital if they suffered an injury; and

    d.  60% reported that they would be less likely to report wage theft by their employer.

31. Moreover, many DACA recipients fear what the government will do with their personal information.

32. Among respondents who were eligible to renew, but had not yet submitted a renewal application[18]:

    a.  18% reported that fear of providing updated information to the government was a prohibitive factor[19]; and

    b.  26% reported that fear that the government will use the information provided in

---

[17] The question was worded, "If you no longer had DACA, would you be more or less likely to do the following…"

[18] This represents 11.2% of respondents.

[19] In my 2016 DACA survey, just 2% of respondents who were eligible to renew, but had not yet submitted a renewal application reported that that fear of providing updated information to the government was a prohibitive factor.

the renewal application for immigration enforcement purposes was a prohibitive factor.

33. Among respondents who were not yet eligible to renew,[20] 28% agreed or strongly agreed with the statement, "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."

34. The prospect of going back into the shadows and fear about what the government will do with their personal information likely exacerbates the concerns that DACA recipients had when they first applied for DACA.

35. In my 2014 DACA survey, the concerns that DACA recipients had when they first applied included:

　　a.　79% reported being concerned about what would happen if DACA ended;

　　b.　59% reported being concerned about letting the government know they were undocumented;

　　c.　49% reported being concerned about revealing their personal information;

　　d.　59% reported being concerned about revealing information about their family;

　　e.　59% reported being concerned "that the information [they] revealed in [their] application would be used to put [them] or [their] family in detention and/or deportation proceedings"; and

　　f.　 32% reported hearing that "the government was not going to use the information in the DACA application for enforcement purposes (e.g., detention

---

[20] This represents 46.9% of respondents.

or deportation)."

## DACA Recipients by State

36. Below are examples of state-specific profiles of DACA recipients. Data from the

survey are used to construct these profiles.[21]

## DACA Recipients in the State of Colorado

37. As of September 4, 2017, there were 15,500 active DACA recipients in the State of

Colorado.[22]

38. Regarding employment and earnings:

    a.   An estimated 14,167 DACA recipients in the State of Colorado are currently

        employed[23];

    b.   An estimated 837 DACA recipients in the State of Colorado are business

        owners[24]; and

    c.   The State of Colorado's DACA recipients earn an estimated $513.3 million

---

[21] To construct state-specific profiles, a previous version of this declaration used USCIS quarterly statistics (published on September 20, 2017 for the 3rd quarter of 2017) on the total number of individuals who received DACA as of June 30, 2017. Recently, USCIS published statistics on the total number of individuals with DACA as of September 4, 2017 (https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf). The state-specific profiles herein use the most up-to-date information at the time of this writing, which is information on the total number of individuals with DACA as of September 4, 2017.

[22] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

[23] 91.4% of 15,500.

[24] 5.4% of 15,500.

annually.[25]

39. Regarding education:

    a.  An estimated 6,960 DACA recipients in the State of Colorado are currently in school[26];

    b.  Among those currently in school, an estimated 6,514 have "pursued educational opportunities that I previously could not" because of DACA[27]; and

    c.  An estimated 4,976 DACA recipients in the State of Colorado are currently pursuing a bachelor's degree or higher.[28]

40. Regarding American citizen family members:

    a.  An estimated 11,269 DACA recipients in the State of Colorado have an American citizen sibling, spouse, or child.[29]

**DACA Recipients in the State of Connecticut**

41. As of September 4, 2017, there were 3,800 active DACA recipients in the State of Connecticut.[30]

42. Regarding employment and earnings:

    a.  An estimated 3,473 DACA recipients in the State of Connecticut are currently

---

[25] 14,167 multiplied by $36,231.91. This translates into $31.8 million annually in Social Security contributions (6.2% per FICA) and $7.4 million annually in Medicare contributions (1.45% per FICA).
[26] 44.9% of 15,500.
[27] 93.6 % of 6,960.
[28] 71.5% of 6,960.
[29] 72.7% of 15,500.
[30] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

employed[31];

    b.  An estimated 205 DACA recipients in the State of Connecticut are business

        owners[32]; and

    c.  The State of Connecticut's DACA recipients earn an estimated $125.8 million

        annually.[33]

43. Regarding education:

    a.  An estimated 1,706 DACA recipients in the State of Connecticut are currently

        in school[34];

    b.  Among those currently in school, an estimated 1,597 have "pursued educational

        opportunities that I previously could not" because of DACA[35]; and

    c.  An estimated 1,220 DACA recipients in the State of Connecticut are currently

        pursuing a bachelor's degree or higher.[36]

44. Regarding American citizen family members:

    a.  An estimated 2,763 DACA recipients in the State of Connecticut have an

        American citizen sibling, spouse, or child.[37]

**DACA Recipients in the State of Delaware**

45. As of September 4, 2017, there were 1,100 active DACA recipients in the State of

---

[31] 91.4% of 3,800.
[32] 5.4% of 3,800.
[33] 3,473 multiplied by $36,231.91. This translates into $7.8 million annually in Social Security contributions (6.2% per FICA) and $1.8 million annually in Medicare contributions (1.45% per FICA).
[34] 44.9% of 3,800.
[35] 93.6 % of 1,706.
[36] 71.5% of 1,706.
[37] 72.7% of 3,800.

Delaware.[38]

46. Regarding employment and earnings:

    a.   An estimated 1,005 DACA recipients in the State of Delaware are currently employed[39]; and

    b.   The State of Delaware's DACA recipients earn an estimated $36.4 million annually.[40]

47. Regarding education:

    a.   An estimated 494 DACA recipients in the State of Delaware are currently in school[41];

    b.   Among those currently in school, an estimated 462 have "pursued educational opportunities that I previously could not" because of DACA[42]; and

    c.   An estimated 353 DACA recipients in the State of Delaware are currently pursuing a bachelor's degree or higher.[43]

48. Regarding American citizen family members:

    a.   An estimated 800 DACA recipients in the State of Delaware have an American citizen sibling, spouse, or child.[44]

---

[38] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[39] 91.4% of 1,100.

[40] 1,005 multiplied by $36,231.91. This translates into $2.3 million annually in Social Security contributions (6.2% per FICA) and $0.5 million annually in Medicare contributions (1.45% per FICA).

[41] 44.9% of 1,100.

[42] 93.6 % of 494.

[43] 71.5% of 494.

[44] 72.7% of 1,100.

**DACA Recipients in the District of Columbia**

49. As of September 4, 2017, there were 920 active DACA recipients in the District of Columbia.[45]

50. Regarding employment and earnings:

    a. An estimated 841 DACA recipients in the District of Columbia are currently employed[46]; and

    b. The District of Columbia's DACA recipients earn an estimated $30.5 million annually.[47]

51. Regarding education:

    a. An estimated 413 DACA recipients in the District of Columbia are currently in school[48];

    b. Among those currently in school, an estimated 387 have "pursued educational opportunities that I previously could not" because of DACA[49]; and

    c. An estimated 295 DACA recipients in the District of Columbia are currently pursuing a bachelor's degree or higher.[50]

52. Regarding American citizen family members:

    a. An estimated 669 DACA recipients in the District of Columbia have an

---

[45] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[46] 91.4% of 920.

[47] 841 multiplied by $36,231.91. This translates into $1.9 million annually in Social Security contributions (6.2% per FICA) and $0.4 million annually in Medicare contributions (1.45% per FICA).

[48] 44.9% of 920.

[49] 93.6 % of 413.

[50] 71.5% of 413.

American citizen sibling, spouse, or child.[51]

### DACA Recipients in the State of Hawaii

53. As of September 4, 2017, there were 320 active DACA recipients in the State of Hawaii.[52]

54. Regarding employment and earnings:

    a.  An estimated 292 DACA recipients in the State of Hawaii are currently employed[53]; and

    b.  The State of Hawaii's DACA recipients earn an estimated $10.6 million annually.[54]

55. Regarding education:

    a.  An estimated 144 DACA recipients in the State of Hawaii are currently in school[55];

    b.  Among those currently in school, an estimated 134 have "pursued educational opportunities that I previously could not" because of DACA[56]; and

    c.  An estimated 103 DACA recipients in the State of Hawaii are currently pursuing a bachelor's degree or higher.[57]

---

[51] 72.7% of 920.

[52] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[53] 91.4% of 320.

[54] 292 multiplied by $36,231.91. This translates into approximately $0.7 million annually in Social Security contributions (6.2% per FICA) and $0.2 million annually in Medicare contributions (1.45% per FICA).

[55] 44.9% of 320.

[56] 93.6 % of 144.

[57] 71.5% of 144.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

56. Regarding American citizen family members:

    a.   An estimated 233 DACA recipients in the State of Hawaii have an American citizen sibling, spouse, or child.[58]

**DACA Recipients in the State of Illinois**

57. As of September 4, 2017, there were 35,600 active DACA recipients in the State of Illinois.[59]

58. Regarding employment and earnings:

    a.   An estimated 32,538 DACA recipients in the State of Illinois are currently employed[60];

    b.   An estimated 1,922 DACA recipients in the State of Illinois are business owners[61]; and

    c.   The State of Illinois's DACA recipients earn an estimated $1.2 billion annually.[62]

59. Regarding education:

    a.   An estimated 15,984 DACA recipients in the State of Illinois are currently in school[63];

    b.   Among those currently in school, an estimated 14,961 have "pursued

---

[58] 72.7% of 320.

[59] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[60] 91.4% of 35,600.

[61] 5.4% of 35,600.

[62] 32,538 multiplied by $36,231.91. This translates into $73.1 million annually in Social Security contributions (6.2% per FICA) and $17.1 million annually in Medicare contributions (1.45% per FICA).

[63] 44.9% of 35,600.

educational opportunities that I previously could not" because of DACA[64]; and

    c. An estimated 11,429 DACA recipients in the State of Illinois are currently pursuing a bachelor's degree or higher.[65]

60. Regarding American citizen family members:

    a. An estimated 25,881 DACA recipients in the State of Illinois have an American citizen sibling, spouse, or child.[66]

## DACA Recipients in the State of Iowa

61. As of September 4, 2017, there were 2,500 active DACA recipients in the State of Iowa.[67]

62. Regarding employment and earnings:

    a. An estimated 2,285 DACA recipients in the State of Iowa are currently employed[68];

    b. An estimated 135 DACA recipients in the State of Iowa are business owners[69]; and

    c. The State of Iowa's DACA recipients earn an estimated $82.8 million annually.[70]

---

[64] 93.6 % of 15,984.
[65] 71.5% of 15,984.
[66] 72.7% of 35,600.
[67] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[68] 91.4% of 2,500.
[69] 5.4% of 2,500.
[70] 2,285 multiplied by $36,231.91. This translates into $5.1 million annually in Social Security contributions (6.2% per FICA) and $1.2 million annually in Medicare contributions (1.45% per FICA).

63. Regarding education:

    a.   An estimated 1,123 DACA recipients in the State of Iowa are currently in school[71];

    b.   Among those currently in school, an estimated 1,051 have "pursued educational opportunities that I previously could not" because of DACA[72]; and

    c.   An estimated 803 DACA recipients in the State of Iowa are currently pursuing a bachelor's degree or higher.[73]

64. Regarding American citizen family members:

    a.   An estimated 1,818 DACA recipients in the State of Iowa have an American citizen sibling, spouse, or child.[74]

### DACA Recipients in the State of Massachusetts

65. As of September 4, 2017, there were 5,900 active DACA recipients in the State of Massachusetts.[75]

66. Regarding employment and earnings:

    a.   An estimated 5,393 DACA recipients in the State of Massachusetts are currently employed[76];

    b.   An estimated 319 DACA recipients in the State of Massachusetts are business

---

[71] 44.9% of 2,500.
[72] 93.6 % of 1,123.
[73] 71.5% of 1,123.
[74] 72.7% of 2,500.
[75]
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[76] 91.4% of 5,900.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

owners[77]; and

   c.  The State of Massachusetts's DACA recipients earn an estimated $195.4 million annually.[78]

67. Regarding education:

   a.  An estimated 2,649 DACA recipients in the State of Massachusetts are currently in school[79];

   b.  Among those currently in school, an estimated 2,480 have "pursued educational opportunities that I previously could not" because of DACA[80]; and

   c.  An estimated 1,894 DACA recipients in the State of Massachusetts are currently pursuing a bachelor's degree or higher.[81]

68. Regarding American citizen family members:

   a.  An estimated 4,289 DACA recipients in the State of Massachusetts have an American citizen sibling, spouse, or child.[82]

**DACA Recipients in the State of New Mexico**

69. As of September 4, 2017, there were 6,000 active DACA recipients in the State of New Mexico.[83]

---

[77] 5.4% of 5,900.
[78] 5,393 multiplied by $36,231.91. This translates into $12.1 million annually in Social Security contributions (6.2% per FICA) and $2.8 million annually in Medicare contributions (1.45% per FICA).
[79] 44.9% of 5,900.
[80] 93.6 % of 2,649.
[81] 71.5% of 2,649.
[82] 72.7% of 5,900.
[83]
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

70. Regarding employment and earnings:

    a. An estimated 5,484 DACA recipients in the State of New Mexico are currently employed[84];

    b. An estimated 324 DACA recipients in the State of New Mexico are business owners[85]; and

    c. The State of New Mexico's DACA recipients earn an estimated $198.7 million annually.[86]

71. Regarding education:

    a. An estimated 2,694 DACA recipients in the State of New Mexico are currently in school[87];

    b. Among those currently in school, an estimated 2,522 have "pursued educational opportunities that I previously could not" because of DACA[88]; and

    c. An estimated 1,926 DACA recipients in the State of New Mexico are currently pursuing a bachelor's degree or higher.[89]

72. Regarding American citizen family members:

    a. An estimated 4,362 DACA recipients in the State of New Mexico have an American citizen sibling, spouse, or child.[90]

---

[84] 91.4% of 6,000.
[85] 5.4% of 6,000.
[86] 5,484 multiplied by $36,231.91. This translates into $12.3 million annually in Social Security contributions (6.2% per FICA) and $2.9 million annually in Medicare contributions (1.45% per FICA).
[87] 44.9% of 6,000.
[88] 93.6 % of 2,694.
[89] 71.5% of 2,694.
[90] 72.7% of 6,000.

DECLARATION OF TOM K. WONG      33

**DACA Recipients in the State of New York**

73. As of September 4, 2017, there were 32,900 active DACA recipients in the State of New York.[91]

74. Regarding employment and earnings:

    a.  An estimated 30,071 DACA recipients in the State of New York are currently employed[92];

    b.  An estimated 1,777 DACA recipients in the State of New York are business owners[93]; and

    c.  The State of New York's DACA recipients earn an estimated $1.1 billion annually.[94]

75. Regarding education:

    a.  An estimated 14,772 DACA recipients in the State of New York are currently in school[95];

    b.  Among those currently in school, an estimated 13,827 have "pursued educational opportunities that I previously could not" because of DACA[96]; and

    c.  An estimated 10,562 are currently pursuing a bachelor's degree or higher.[97]

76. Regarding American citizen family members:

---

[91] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[92] 91.4% of 32,900.
[93] 5.4% of 32,900.
[94] 30,071 multiplied by $36,231.91. This translates into $67.5 million annually in Social Security contributions (6.2% per FICA) and $15.8 million annually in Medicare contributions (1.45% per FICA).
[95] 44.9% of 32,900.
[96] 93.6 % of 14,772.
[97] 71.5% of 14,772.

      a.   An estimated 23,918 DACA recipients in the State of New York have an

American citizen sibling, spouse, or child.[98]

### DACA Recipients in the State of North Carolina

77. As of September 4, 2017, there were 25,100 active DACA recipients in the State of

North Carolina.[99]

78. Regarding employment and earnings:

      a.   An estimated 22,941 DACA recipients in the State of North Carolina are

currently employed[100];

      b.   An estimated 1,355 DACA recipients in the State of North Carolina are

business owners[101]; and

      c.   The State of North Carolina's DACA recipients earn an estimated $831.2

million annually.[102]

79. Regarding education:

      a.   An estimated 11,270 DACA recipients in the State of North Carolina are

currently in school[103];

      b.   Among those currently in school, an estimated 10,549 have "pursued

---

[98] 72.7% of 32,900.

[99] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[100] 91.4% of 25,100.

[101] 5.4% of 25,100.

[102] 22,941 multiplied by $36,231.91. This translates into $51.5 million annually in Social Security contributions (6.2% per FICA) and $12.1 million annually in Medicare contributions (1.45% per FICA).

[103] 44.9% of 25,100.

educational opportunities that I previously could not" because of DACA[104]; and

    c.   An estimated 8,058 DACA recipients in the State of North Carolina are currently pursuing a bachelor's degree or higher.[105]

80. Regarding American citizen family members:

    a.   An estimated 18,248 DACA recipients in the State of North Carolina have an American citizen sibling, spouse, or child.[106]

## DACA Recipients in the State of Oregon

81. As of September 4, 2017, there were 10,200 active DACA recipients in the State of Oregon.[107]

82. Regarding employment and earnings:

    a.   An estimated 9,323 DACA recipients in the State of Oregon are currently employed[108];

    b.   An estimated 551 DACA recipients in the State of Oregon are business owners[109]; and

    c.   The State of Oregon's DACA recipients earn an estimated $337.8 million annually.[110]

---

[104] 93.6 % of 11,270.
[105] 71.5% of 11,270.
[106] 72.7% of 25,100.
[107] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[108] 91.4% of 10,200.
[109] 5.4% of 10,200.
[110] 9,323 multiplied by $36,231.91. This translates into $20.9 million annually in Social Security contributions (6.2% per FICA) and $4.9 million annually in Medicare contributions (1.45% per FICA).

83. Regarding education:

    a.  An estimated 4,580 DACA recipients in the State of Oregon are currently in school[111];

    b.  Among those currently in school, an estimated 4,287 have "pursued educational opportunities that I previously could not" because of DACA[112]; and

    c.  An estimated 3,275 DACA recipients in the State of Oregon are currently pursuing a bachelor's degree or higher.[113]

84. Regarding American citizen family members:

    a.  An estimated 7,415 DACA recipients in the State of Oregon have an American citizen sibling, spouse, or child.[114]

**DACA Recipients in the State of Pennsylvania**

85. As of September 4, 2017, there were 4,900 active DACA recipients in the State of Pennsylvania.[115]

86. Regarding employment and earnings:

    a.  An estimated 4,479 DACA recipients in the State of Pennsylvania are currently employed[116];

    b.  An estimated 265 DACA recipients in the State of Pennsylvania are business

---

[111] 44.9% of 10,200.
[112] 93.6 % of 4,580.
[113] 71.5% of 4,580.
[114] 72.7% of 10,200.
[115] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[116] 91.4% of 4,900.

DECLARATION OF TOM K. WONG      37      ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

owners[117]; and

    c.  The State of Pennsylvania's DACA recipients earn an estimated $162.3 million annually.[118]

87. Regarding education:

    a.  An estimated 2,200 DACA recipients in the State of Pennsylvania are currently in school[119];

    b.  Among those currently in school, an estimated 2,059 have "pursued educational opportunities that I previously could not" because of DACA[120]; and

    c.  An estimated 1,573 DACA recipients in the State of Pennsylvania are currently pursuing a bachelor's degree or higher.[121]

88. Regarding American citizen family members:

    a.  An estimated 3,562 DACA recipients in the State of Pennsylvania have an American citizen sibling, spouse, or child.[122]

**DACA Recipients in the State of Rhode Island**

89. As of September 4, 2017, there were 970 active DACA recipients in the State of Rhode Island.[123]

---

[117] 5.4% of 4,900.
[118] 4,479 multiplied by $36,231.91. This translates into $10.1 million annually in Social Security contributions (6.2% per FICA) and $2.4 million annually in Medicare contributions (1.45% per FICA).
[119] 44.9% of 4,900.
[120] 93.6 % of 2,200.
[121] 71.5% of 2,200.
[122] 72.7% of 4,900.
[123] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

90. Regarding employment and earnings:

    a. An estimated 887 DACA recipients in the State of Rhode Island are currently employed[124]; and

    b. The State of Rhode Island's DACA recipients earn an estimated $32.1 million annually.[125]

91. Regarding education:

    a. An estimated 436 DACA recipients in the State of Rhode Island are currently in school[126];

    b. Among those currently in school, an estimated 408 have "pursued educational opportunities that I previously could not" because of DACA[127]; and

    c. An estimated 311 DACA recipients in the State of Rhode Island are currently pursuing a bachelor's degree or higher.[128]

92. Regarding American citizen family members:

    a. An estimated 705 DACA recipients in the State of Rhode Island have an American citizen sibling, spouse, or child.[129]

**DACA Recipients in the State of Virginia**

93. As of September 4, 2017, there were 10,100 active DACA recipients in the State of

---

[124] 91.4% of 970.
[125] 887 multiplied by $36,231.91. This translates into $1.9 million annually in Social Security contributions (6.2% per FICA) and $0.5 million annually in Medicare contributions (1.45% per FICA).
[126] 44.9% of 970.
[127] 93.6 % of 436.
[128] 71.5% of 436.
[129] 72.7% of 970.

Virginia.[130]

94. Regarding employment and earnings:

    a. An estimated 9,231 DACA recipients in the State of Virginia are currently employed[131];

    b. An estimated 545 DACA recipients in the State of Virginia are business owners[132]; and

    c. The State of Virginia's DACA recipients earn an estimated $334.5 million annually.[133]

95. Regarding education:

    a. An estimated 4,535 DACA recipients in the State of Virginia are currently in school[134];

    b. Among those currently in school, an estimated 4,245 have "pursued educational opportunities that I previously could not" because of DACA[135]; and

    c. An estimated 3,242 DACA recipients in the State of Virginia are currently pursuing a bachelor's degree or higher.[136]

96. Regarding American citizen family members:

    a. An estimated 7,343 DACA recipients in the State of Virginia have an American

---

[130] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[131] 91.4% of 10,100.

[132] 5.4% of 10,100.

[133] 9,231 multiplied by $36,231.91. This translates into $20.7 million annually in Social Security contributions (6.2% per FICA) and $4.8 million annually in Medicare contributions (1.45% per FICA).

[134] 44.9% of 10,100.

[135] 93.6 % of 4,535.

[136] 71.5% of 4,535.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

citizen sibling, spouse, or child.[137]

### DACA Recipients in the State of Washington

97. As of September 4, 2017, there were 16,300 active DACA recipients in the State of Washington.[138]

98. Regarding employment and earnings:

    a.  An estimated 14,898 DACA recipients in the State of Washington are currently employed[139];

    b.  An estimated 880 DACA recipients in the State of Washington are business owners[140]; and

    c.  The State of Washington's DACA recipients earn an estimated $539.8 million annually.[141]

99. Regarding education:

    a.  An estimated 7,319 DACA recipients in the State of Washington are currently in school[142];

    b.  Among those currently in school, an estimated 6,850 have "pursued educational opportunities that I previously could not" because of DACA[143]; and

---

[137] 72.7% of 10,100.

[138] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[139] 91.4% of 16,300.

[140] 5.4% of 16,300.

[141] 14,898 multiplied by $36,231.91. This translates into $33.5 million annually in Social Security contributions (6.2% per FICA) and $7.8 million annually in Medicare contributions (1.45% per FICA).

[142] 44.9% of 16,300.

[143] 93.6 % of 7,319.

c.   An estimated 5,233 DACA recipients in the State of Washington are currently pursuing a bachelor's degree or higher.[144]

100.   Regarding American citizen family members:

a.   An estimated 11,850 DACA recipients in the State of Washington have an American citizen sibling, spouse, or child.[145]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

_____

Dr. Tom K. Wong

10/23/2017

_____

Date

---

[144] 71.5% of 7,319.
[145] 72.7% of 16,300.

DECLARATION OF TOM K. WONG                42                ATTORNEY GENERAL OF WASHINGTON
                                                            800 Fifth Avenue, Suite 2000
                                                            Seattle, WA 98104-3188
                                                            (206) 464-7744

# EXHIBIT 11



## AT LIBERTY

**JANUARY 18, 2017 3:00PM**

# The Economic and Fiscal Impact of Repealing DACA

*By* IKE BRANNON *and Logan Albright*

**Executive Summary**

Donald Trump has proposed eliminating or severely modifying the Deferred Action for Childhood Arrivals (DACA) program. Many Americans believe that the presence of unauthorized immigrants is harmful to the economy and would like to see steps taken to reduce their presence. However, a repeal or roll-back of DACA would harm the economy and cost the U.S. government a significant amount of lost tax revenue. We estimate that the fiscal cost of immediately deporting the approximately 750,000 people currently in the DACA program would be over $60 billion to the federal government along with a $280 billion reduction in economic growth over the next decade.

We arrived at our estimates by comparing and adjusting the characteristics of DACA recipients to similarly well-educated immigrants admitted through the H-1B visa program, a cohort that not only resembles the population of DACA recipients but whose own economic impact has been well-studied. We use the esti-

mated budgetary and economic impact of H-1B visa workers and adjust it to re-
flect the age and earnings differences between the two groups to calculate our
figures.

## Background

President Obama created the DACA program in 2012 via executive action.
DACA's objective was to allow American residents who entered the country ille-
gally as children to receive temporary protection from deportation, work per-
mits, and an incentive to invest in their own human capital. The program only
applies to those who have lived in the United States for five years or longer and
do not have a criminal record. Essentially, these are people who never knowing-
ly broke any law and have been productive and peaceful members of society
since their arrival. The logic of the Obama Administration in creating DACA is
that it makes little sense to expend time and resources trying to track down, ar-
rest, and deport these people when they have not committed any crime save for
being unwittingly brought across the border by others.

There is much legitimate debate in the United States over the role that immigra-
tion—both legal and illegal—plays in the economy, and what should be done
about border security. Inseparable from this problem is the question of what to
do with the undocumented immigrants already in the country, a sizeable popu-
lation that is estimated to number 11 to 12 million.[1]

President-Elect Donald Trump has taken an absolutist position on the issue,
vowing not only to build a wall with the intent of greatly reducing illegal entry
from the Mexican border, but also to unilaterally nullify President Obama's ex-
ecutive actions dealing with immigration, including the action which spawned
DACA.

As with any sudden and dramatic shift in any policy, there are bound to be costs
associated with implementation, as well as after-effects of the policy, not all of
which are immediately intuitive. It is the goal of this paper to examine the costs

that the wholesale repeal of DACA would impose on the American economy, both in terms of enforcement as well as the sudden loss of a large number of residents and their contributions to the domestic economy.

## Who Are the DACA Recipients?

Although there have been many previous studies on the costs and benefits of immigration as a whole (we recently authored a <u>review</u> of such studies), it is important to note that we cannot simply assume that DACA recipients constitute a representative sample of the immigrant population. In addition to the aforementioned screening for criminal activity, workers in the DACA program tend to be younger, better educated, and more highly paid than the typical immigrant. To extrapolate from the studies on immigration in general, therefore, would significantly underestimate the opportunity cost to the economy of deporting the approximately 750,000 program participants, due to their higher level of productivity.

We instead looked for another group that might more closely resemble the demographic characteristics of those in the DACA program whose economic and budgetary impacts on the economy is well established: the recipients of H-1B visas, which are issued to skilled workers who are invited into the country to fulfill specific economic needs. This coincidence is useful.

The average DACA recipient is 22 years old, employed, and earns about $17 an hour. The majority are still students and 17 percent are pursuing an advanced degree.[2] By contrast, most recipients of H-1B visas are between 25 and 34 and hold either a Bachelor's Degree or a Master's Degree. In short, they appear to be a close reflection of what DACA recipients will look like a few years from now as they complete their educations.[3]

While the comparison is not perfect, as no such comparison can be, calculating costs under the assumption that DACA recipients are more like H-1B Visa holders than the general population of unauthorized immigrants will, we believe,

yield a more accurate result. And given that we know the demographic and edu-

cational differences between the two groups we take those differences into ac-
count when estimating the fiscal and economic costs of repealing DACA.

## Economic Costs

As of June 2016, U.S. Citizenship and Immigration Services has received 844,931
applications for the DACA program. Of these, 741,546 were accepted, with the
rest either denied or pending approval.[4] It should be noted that the applicants
to DACA are asked to pay the administrative fees for background checks and
processing, so the administrative costs of implementing the program itself are
minimal. While the Obama Administration had announced its intention to ex-
pand the program last year, this is unlikely to occur under the Trump Adminis-
tration, so we will accept these numbers as representative of the affected
population.

Little research has been done on the effects of DACA itself, which is why we
have chosen to extrapolate the program's economic impact from the research
done on holders of H-1B visas, who are demographically similar to workers in
the DACA program, as well as from the numerous studies on the economic ef-
fects of undocumented immigration generally.

One study on DACA itself was conducted by Nolan G. Pope and published in the
*Journal of Public Economics* in 2016. Nolan found that DACA moved between
50,000 and 75,000 immigrants into employment from either outside the formal
labor force or unemployment, and increased the average income of immigrants
in the bottom of the income distribution.[5] This is a positive labor market out-
come for a number of reasons: working and earning a higher level of income in
the formal sector means that the DACA workers pay more taxes, both through
payroll, income, and sales as a result of greater consumption associated with
higher incomes. The Organization of Economic Co-operation and Development

(OECD) cited employment as "the most important factor that weighs on migrants' net fiscal contributions," so it is clear that any increase in immigrant employment will tend to result in a positive fiscal impact.[6]

A 2014 survey found that 59 percent of DACA recipients reported getting their first job, 45 percent received a pay increase, 49 percent opened their first bank account, and 33 percent got their first credit card due to their participating in DACA.[7] All of these factors contribute positively to the economy. But while the survey also noted that recipients would be eligible for higher levels of education, Pope's research completed two years later found no correlation between DACA participation and education, although it is possible that simply not enough time has passed to observe an effect.

Turning more generally to the cost-benefit analysis of unauthorized immigration as a whole, the evidence suggests that the mere presence of undocumented workers, especially non-criminals like those covered under DACA, is not nearly as detrimental to the economy as most people suppose, and may actually be a net benefit. Legalizing unauthorized immigrants and allowing them to participate in society as legal workers dramatically reduces government enforcement costs and generates broader economic benefits.[8]

**Quantifying the Net Costs**

Quantifying the costs of any action on immigration presents enormous difficulties, due to the complexity and number of variables involved.

Alex Nowrasteh, a scholar at the Cato Institute, points out that while the economic impact of immigration is large and positive, the fiscal impact tends to be minimal. Nowrasteh also stresses the need to take into account the long-term effects of immigration, meaning the contributions of immigrants' children and grandchildren, which tend to be more positive than those of first generation immigrants.[9]

There are unquantifiable benefits from DACA as well, such as providing increased access to private health insurance, driver's licenses, and auto insurance, all of which generate spillover benefits to the rest of society. This analysis also leaves out the effects of simply having more productive minds in the country capable of producing innovations and increasing labor productivity. The data show that immigrants start their own businesses and file patents at greater rates than native-born Americans.[10]

The fiscal costs of DACA recipients are also minimal and comparable to the fiscal costs of H-1B workers.[11] Under current law, DACA recipients are ineligible for means-tested welfare benefits provided by the federal government or funded through federal matching grants to the states.[12] Although states can extend welfare benefits to DACA recipients if they choose to, few have done so. DACA recipients, like everybody else in the United States, are eligible for emergency Medicaid. Thus, DACA does not boost government welfare expenditures above the level consumed by unauthorized immigrants.

To reiterate, we need to isolate DACA recipients—who tend to be more educated, younger, and less prone to criminal activity—from the general population of unauthorized immigrants to derive an accurate estimate of DACA's impact. To do this, we begin by comparing them to the holders of H-1B visas, the work permits issued for high-skilled labor. The main difference between the two groups is age, with H-1B visa holders being on average 3 to 12 years older. With this age gap also comes the concomitant difference in education and earnings, which we can adjust for in our calculations.

Thomas Church, a senior fellow at the Hoover Institution, estimates that expanding the H-1B visa program over a ten year period would increase GDP by $456 billion and tax revenues by $113 billion, assuming that 660,000 new H-1B immigrants would arrive over the decade.[13] Church obtains his results by taking the mean wages for H-1B immigrants, assuming an average wage growth of 3 percent per year, and applying the appropriate tax rates.

Church also incorporates income accrued to capital from these workers, using the relatively stable historical averages calculated by the Congressional Budget Office. Multiple studies have been conducted on the impact of immigration on native wages, and the results have been both positive and negative, albeit small in either direction. There is also some evidence that the presence of immigrant workers can increase purchasing power by reducing consumer prices. Given these conflicting and minor findings, Church has not included wage or purchasing power effects in his calculations, and we have done the same.

We take Church's estimate as our baseline and begin by adjusting it to reflect the 741,546 participants in the DACA program—which is a bit more than his H-1B expansion called for—producing an estimated GDP gain of $512 billion and a budgetary impact of $127 billion.

However, since the average wages of DACA participants are lower than H-1B immigrants, we corrected these values to reflect the relative youth and inexperience of DACA immigrants. DACA participants earn an average of $34,000 annually and H-1B participants an average of $72,000 annually, a ratio of 47 percent. Applying this ratio to the economic and fiscal costs above yields an economic impact of $215 billion and a fiscal impact of $60 billion.

We feel this is a conservative estimate due to the fact that many DACA immigrants are young and still acquiring education credentials that will boost wages later. DACA immigrants are less like H-1B immigrants at half the salary, and more like younger H-1B workers. Additionally, the higher tax brackets associated with higher incomes would increase DACA immigrants' fiscal contributions at a greater rate than the increase in salary. In other words, doubling the wages of DACA participants would more than double their contributions to state and federal budgets. Thus, a life-cycle comparison of the wages of the two groups would produce a narrower difference.

For comparison, an influential study by the National Research Council,[14] examined the present value fiscal impact of immigration in the United States, with an emphasis on long-term impact. The study points out that immigrants become more productive over time as they learn new skills and become more fluent in English. The authors concluded that the average immigrant will have a net long-term impact on state, local and federal budgets of $80,000, which includes tax payments as well as the impact of the children of immigrants, who tend to be less costly—and higher-earning—than their parents. Multiplying this estimate by the number of DACA recipients produces an estimated fiscal impact of $59.3 billion, nearly identical to the $60 billion fiscal impact we derived from the Hoover study.

We also need to add the actual cost of deportation for current DACA recipients to the fiscal and economic estimates. For this we borrow from a study from the Center for American Progress that estimates the marginal deportation costs at just over $10,000 per removal.[15] The total deportation cost would then be $7.5 billion.

Summing these numbers produces a total cost estimate of immediately eliminating the DACA program and deporting its participants of $283 billion over 10 years. In other words, the United States economy would be poorer by more than a quarter of a trillion dollars if President Trump were to make good on his threat to repeal it.

There are other variables that potentially impact both the costs and benefits of immigrant workers, and the further into the future we attempt to project such costs and benefits the more difficult accurate estimates become. For example, our calculation used only the current number of DACA recipients, but it is estimated that there could be another one million eligible residents who have not yet applied for, or received, membership in the program.[16] We do not make any forecast regarding whether this cohort would eventually take advantage of the program and instead assume none of them would do so.

Likewise, assuming immediate deportation instead of a temporary reversion to undocumented status changes the calculus as well, considering the costs that result from people trying to live outside the law. This would need to be taken into account.

Alex Nowrasteh of Cato suggested that it is probably more realistic to assume that upon a repeal of DACA the newly unauthorized immigrants would predominantly remain in the United States and pursue employment illegally, at wages 10 percent to 20 percent less than they earned legally. If we combined that with a similar reduction in employment levels then the resulting economic impact would be a bit less—in the range of $60-$100 billion—but still significant. [17]

Regardless of the response, it is clear that there is a significant fiscal and economic cost to the immediate repeal of DACA, one borne by all of the nation's residents and not just by those whose lives would be upended by such a move. This suggests that it would make more sense to focus immigration enforcement efforts elsewhere—if indeed the aim is to protect American national sovereignty, as well as the life, liberty, and private property of Americans.

**Small Gains, Big Costs**

There are valid reasons to be concerned about unauthorized immigration in the United States. The DACA program, however, screens out anyone with a criminal past as part of its core eligibility requirements. DACA participants are not eligible for means-tested welfare benefits or Obamacare subsidies.

Since DACA applicants pay their own processing fees, the program itself does not have an administrative cost, and so the only costs we need to evaluate are those that stem from having these people in the country in the first place. We submit that any such costs are far outweighed by the benefits that come from immigrants who are able to work openly and legally, pay taxes, support entitlement programs, create jobs, innovate, and sire children who will one day do the same.

The deportation of DACA participants would cost the American economy billions of dollars, as well as billions of tax dollars foregone, while doing little to address the true concerns that Americans may have about unauthorized immigrants.

---

[1] Jeffrey S. Passel and D'Vera Cohn, "Unauthorized Immigrant Population Stable for Half a Decade," (Washington: Pew Research Center, September 21, 2016), http://www.pewresearch.org/fact-tank/2016/09/21/unauthorized-immigrant-population-stable-for-half-a-decade/.

[2] Tom K. Wong, "Results of Tom K. Wong, National Immigration Law Center, and Center for American Progress National Survey," (Washington: National Immigration Law Center and Center for American Progress, June 2015), https://cdn.americanprogress.org/wp-content/uploads/2015/07/DACA-Wong_NILC_CAP-Codebook-PDF.pdf.

[3] "Characteristics of H-1B Specialty Occupation Workers," Fiscal Year 2014 Annual Report to Congress (Washington: U.S. Citizenship and Immigration Services, February 26, 2015), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/H-1B/h-1B-characteristics-report-14.pdf.

[4] "Number of I-821D, Consideration of Arrivals by Fiscal Year, Quarter, Intake, Biometrics, and Case Status: 2012-2016," (Washington: U.S. Citizenship and Immigration Services, June 30, 2016), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%....

[5] Nolan G. Pope, "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants," *Journal of Public Economics* 143 (2016): 98-114.

[6] Organization for Economic Cooperation and Development, "International Migration Outlook," (Paris: OECD, 2013), p. 161.

[7] Robert G. Gonzales and Angie M. Bautista-Chavez, "Two Years and Counting: Assessing the Growing Power of DACA," American Immigration Council Special Report (Washington: American Immigration Council, June 14, 2014), https://www.americanimmigrationcouncil.org/research/two-years-and-counting-assessing-growing-power-daca.

[8] Ike Brannon and Logan Albright, "Immigration's Impact on the Texas Economy," Texas Public Policy Foundation (Austin: TPPF, March 2016), http://www.texaspolicy.com/library/doclib/Immigration-s-Impact-on-the-Texas-Economy.pdf.

[9] Alex Nowrasteh, "The Fiscal Impact of Immigration," Cato Institute Working Paper (Washington: Cato Institute, July 23, 2014), https://object.-cato.org/sites/cato.org/files/pubs/pdf/working-paper-21-fix.pdf.

[10] American Immigration Council, "Value Added: Immigrants Create Jobs and Businesses, Boost Wages of Native-Born Workers," American Immigration Council Factsheet (Washington: AIC, January 2, 2012), https://www.americanimmigrationcouncil.org/research/value-added-immigrants-create-jobs-and-businesses-boost-wages-native-born-workers.

[11] Ruth Ellen Wasem, "Noncitizen Eligibility for Federal Public Assistance: Policy Overview and Trends," Congressional Research Service (Washington: CRS, September 27, 2012).

[12] "Frequently Asked Questions: The Obama Administration's DAPA and Expanded DACA Programs," National Immigration Law Center (Washington: NILC, March 2, 2015), https://www.nilc.org/issues/immigration-reform-and-executive-actions/dapa-and-expanded-daca-programs/.

[13] Thomas V. Church, "Estimating the Economic and Budgetary Effects of New H-1B Visas in the Senate Gang of Eight's Proposed Immigration Bill," Hoover Institution (Stanford: Hoover, May 7, 2013), http://www.hoover.org/sites/default/files/uploads/aafs/2013/05/Estimating-the-Economic-and-Budgetary-Effects-of-H-1B-Reform-In-S.744.pdf.

[14] James P. Smith and Barry Edmonston, editors, "The New Americans: Economics, Demographic, and Fiscal Effects of Immigration," National Academies Press (Washington: NAP, 1997), p. 346.

[15] https://www.americanprogress.org/issues/immigration/news/2015/02/23/1069.

[16] Philip E. Wolgin, "What Would it Cost to Deport All 5 Million Beneficiaries of Executive Action on Immigration?" Center for American Progress (Washington: CAP, February 23, 2015), https://www.americanprogress.org/issues/immigration/news/2015/02/23/106983/what-would-it-cost-to-deport-all-5-million-beneficiaries-of-executive-action-on-immigration/.

[17] Alex Nowrasteh, "Heritage Immigration Study Fatally Flawed," Cato at Liberty, April 4, 2013, https://www.cato.org/blog/heritage-immigration-study-fatally-flawed.

**Topics:** International Economics, Development & Immigration

**Tags:** immigration, DACA, Trump



This work by Cato Institute is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 3.0 Unported License.

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>          Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>          Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

Pursuant to 28 U.S.C. § 1746(2), I, Ayesha Blackwell-Hawkins, hereby declare as follows:

1.      I am over the age of eighteen and competent to testify.

2.      I am Senior Manager of Mobile Talent and Immigration Strategy at Amazon.com, Inc. and its subsidiaries ("Amazon"). I am responsible for managing the company's global immigration strategy in various countries where Amazon operates. Prior to this role, I led the team that is responsible for providing immigration support for employees and their dependent families and ensuring lawful immigration to and from the various countries in which Amazon operates. I have been employed at Amazon since 2009.

3.      Amazon employs more than 40,000 employees in the State of Washington and more than 200,000 employees in the United States.

4.      At least nine Amazon employees are grantees under the Deferred Action for Childhood Arrivals program ("DACA"), and we believe, like most large US companies, there are many more. These employees are located in several different states, including Washington and California, and work in a wide range of technical and non-technical job families, from software development to procurement. If these employees lose their status and are deported, Amazon will suffer injury.

5.      Amazon has always been committed to equal rights, tolerance, and diversity - and we always will be. As we've grown the company, we've worked hard to attract talented people from all over the world, and we believe this is one of the things that makes Amazon great - a diverse workforce with diverse backgrounds, ideas, and points of view helps us build better products and services for customers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of September, 2017

_Ayesha Blackwell-Hawkins_
Ayesha Blackwell-Hawkins

DECLARATION OF AYESHA BLACKWELL-HAWKINS      1

# EXHIBIT 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et. al.*,<br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, *et. al.*,<br>Defendants. | No. 1:17-CV-5228<br><br>**DECLARATION OF<br>SETH KALVERT** |

Pursuant to 28 U.S.C. § 1746(2), I, Seth Kalvert, hereby declare as follows:

I am over the age of eighteen and competent to testify.

1.    I am the Senior Vice President, General Counsel, and Secretary of non-party TripAdvisor LLC ("TripAdvisor" or the "Company"). TripAdvisor is a Delaware limited liability company, with headquarters located at 400 First Avenue, Needham, MA 02494, where I work. The information contained herein is based on my personal knowledge or the knowledge of my coworkers who provided this information at my direction, and, if called as a witness, I could testify competently thereto.

2.    TripAdvisor, by and through its subsidiaries, operates the world's largest travel website, located at www.tripadvisor.com and other country-specific domains featuring localized versions of the site, enabling travelers to plan and book their travel. The TripAdvisor branded websites, which reach an average of 390 million monthly unique visitors, host reviews of hotels, restaurants and attractions in all 50 states, as well as throughout the world. TripAdvisor offers advice from millions of travelers, including more than 435 million reviews and opinions covering 6.8 million accommodations, restaurants and attractions. TripAdvisor is a global company headquartered here in Massachusetts.

3.    On September 5, 2017, TripAdvisor was made aware that the Department of Homeland Security had issued a memorandum (the "Memorandum") ending portions of the Deferred Action for Childhood Arrivals Program ("DACA").

1

4. It is TripAdvisor's view that the Memorandum could have a negative impact on our Company's business and work force.

5. TripAdvisor runs a worldwide business that seeks to enable travelers from all over the world to plan, book and review their travel to other places all over the world. In doing so, TripAdvisor places a very high value on attracting the best talent from all over the world. Our products, our services and our customers all benefit from our accessing the highest talent pool available and the diversity of backgrounds and heritages of TripAdvisor's workforce.

6. TripAdvisor employs nearly 1,800 individuals in the United States and more than 1,000 individuals in the Commonwealth of Massachusetts.

7. Based on an initial review, TripAdvisor has at least four employees who are beneficiaries under the DACA program. Three of those employees are based in Massachusetts and one is based in Nevada. If these employees lose their status and are deported, TripAdvisor will suffer a number of harms.

8. These employees work in the Company's Engineering, Ad Operations, Sales and Customer Care departments. One employee in the position of a Software Engineer has multiple years of experience and is responsible for developing and understanding production quality software. Additionally, said Software Engineer regularly manages and mentors junior engineers, and is required to understand, and be able to communicate, complex technical problems. The U.S. market for a software engineer at this level is highly-competitive because there are not enough qualified individuals to fill the available roles. As a result, the time to replace just one individual is upwards of four months and talent search costs can exceed $35,000.

9. Employees in TripAdvisor's Ad Operations and Sales departments are highly-skilled in communication and have superior analytical and technical expertise. Both positions require higher education and multiple years of experience in the applicable areas. The withdrawal of the DACA program will not only affect TripAdvisor's current operations, but will also negatively impact future operations, because of the already limited market of eligible candidates.

2

10.    TripAdvisor's Talent Acquisition and Human Resources Departments spend considerable resources in recruiting and hiring the best and most highly-qualified individuals. Furthermore, once hired, TripAdvisor invests in retaining these valuable employees whose skills, diverse backgrounds and knowledge contribute to TripAdvisor's ability to provide a world-class product and customer service experience. In addition to serving TripAdvisor with the technical know-how and expertise required to perform their roles, these employees are also an integral part of the TripAdvisor community, regularly engaging in philanthropic endeavors and community-based events alongside their co-workers.

11.    The loss of DACA work authorization for TripAdvisor employees would harm our business in a number of ways, including through the disruption of ongoing projects, costs associated with recruiting new employees to attempt to fill the employees' previous positions, and business disruptions and delays associated with the loss of valuable, knowledgeable and dedicated employees.


I declare under penalty of perjury that the foregoing is true and correct. Executed on October 2, 2017.


Seth Kalvert

3

# EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

              Plaintiffs,

     v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

              Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

Declaration of Jeffrey Igneri

I, Jeffrey Igneri, declare as follows:

1. I am the owner of Local Burger, a family owned and operated restaurant based in Massachusetts.

2. I have personal knowledge of the facts set forth in this Declaration.

3. Local Burger's goal is to provide fresh, delicious, and well-priced food, while supporting the community through the use of local meats, produce, products and services whenever possible.

4. Local Burger operates three restaurants: one in Northampton, Massachusetts; one in Keene, New Hampshire; and a seasonal, outdoor location in Williamsburg, Massachusetts.

5. Local Burger employs approximately thirty employees, most of whom work part-time.

6. Local Burger's annual sales total approximately $1.6 million.

7. Two of Local Burger's current Massachusetts-based employees are DACA grantees, and they are both great employees.

8. One of Local Burger's DACA employees in particular has been a huge part of our success. This employee runs our Northampton restaurant, putting in sixty to seventy hours of work a week there. He is such an important part of Local Burger that I entered into a private agreement with him which gives him ten percent of Local Burger's profits per

year and ten percent of the business if it is ever sold. Our other employees consider him a managing partner. Since becoming a DACA grantee and starting work at Local Burger, this employee has gotten married and bought a house, contributing to the local community and economy.

9. Without this DACA grantee managing Local Burger's Northampton restaurant, I do not know what I would do. If he loses his work authorization, Local Burger will be significantly harmed. Without him, I probably would not have been able to open a second location in Massachusetts because I would have had to be in the Northampton restaurant so much. Our second location, in Williamsburg, is profitable and benefits the local economy. Annual sales in our Williamsburg location total approximately $500,000 – $600,000 and we seasonally employ eight to ten people there.

10. In addition to the manager of our Northampton restaurant, we currently have a second employee who is also a DACA grantee. This second DACA employee has been with Local Burger for years and is really dedicated to us. To lose him would hurt Local Burger a lot.

11. Local Burger's two employees who are DACA grantees have helped us so much. If they lose their work authorization through the DACA program, Local Burger will suffer substantial harm.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2ND day of October 2017.

Jeff Igneri

# EXHIBIT 15

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF JACOB TINGENS

Pursuant to 28 U.S.C. § 1746(2), I, Jacob Tingen, declare as follows:

1. I am over the age of eighteen. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. I am a managing partner of Tingen & Williams, PLLC, a law firm located in Richmond, Virginia. Our practice areas include immigration, criminal defense, family law, personal injury, and business law. Our employees and clients are extraordinarily diverse by any measure, including in country of origin, language, culture, race, ethnicity, religion, geography, family income, age, and educational background.

3. Tingen & Williams currently employees eleven employees.

4. Tingen & Williams employs one employee, G.L., who is a recipient of the Deferred Action of Childhood Arrivals ("DACA") program. G.L. is employed as the Receptionist of the law firm. As a receptionist, her duties include:

   a. Answering the phone,

   b. Customer Service,

   c. Handling incoming and outgoing mail,

   d. Preparing immigration forms,

   e. Contacting and coordinating with courts,

   f. Contacting clients,

   g. Collecting payment,

   h. Managing calendars and attorney appointments,

   i. And more.

5. Because of our diverse clientele, our law firm requires staff like G.L. who has the capability to speak both English and Spanish. It is always difficult for us to find high-quality employees like G.L. who are bilingual and who are capable of learning what we need in our law office in terms of professionalism, use of technology, and the day-to-day tasks of our office. For that reason, we are grateful to employ G.L. as our Receptionist.

6. Tingen & Williams spends significant time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our law firm and costs us time and resources to replace and train a new employee. Failure to retain a qualified Receptionist to manage this law firm puts the timeliness of court deadlines and the firm's ability to successfully perform its critical day-to-day work at risk.

7. The termination of DACA will be disruptive to our firm's operations and cause us to expend additional resources.

Executed on:  September 27, 2017

Jacob Tingens

# EXHIBIT 16

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

               Plaintiffs,

     v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

               Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

## Declaration of Jonathan Schwartz

Pursuant to 28 U.S.C. § 1746(2), I, Jonathan Schwartz, hereby declare as follows:

1. I am over the age of eighteen and competent to testify.

2. I am the Chief Legal & Corporate Affairs Officer at Univision Communications Inc. (Univision). I have been employed by Univision since 2012. In my role, I oversee the Legal & Corporate Affairs Department, which includes the following areas: Legal and Business Affairs, Corporate Compliance, Government Relations, Corporate Social Responsibility, Community Empowerment, Global Security, Media Rights Management & Content Protection, Standards & Practices, and Advertising Review.

3. Univision is the leading media company serving Hispanic America and the rising multicultural mainstream of the United States. Univision's workforce reflects the audience it serves, including DACA beneficiaries, their families, and their communities. The government's decision to terminate DACA means that a segment of Univision's employees will eventually lose their work authorization. As a direct consequence of the government's decision, therefore, Univision will lose the benefit of these employees' immeasurable contributions to the Company. And because these employees uniquely contribute to Univision's operations, the Company cannot adequately replace them. Moreover, in hiring and training replacements, Univision will incur both business disruptions and financial losses. Additionally, the loss of DACA beneficiaries in our workforce will result in significant harm in the form of diminished connection with the communities we serve and reduced diversity of thought and point of view in the content we produce.

4. Univision employs approximately 800 employees in the state of New York, and a total of approximately 4,630 employees across the country in our corporate, network, local TV, radio, and digital operations. Univision's mission is to inform, empower, and entertain the Hispanic American population and rising multicultural mainstream.

5. Univision began as a small Spanish-language TV station in San Antonio, Texas. Over its more than 50-year history, Univision's broadcast and cable TV, digital, and radio offerings have grown to become the foremost destination for Hispanic America and the rising multicultural mainstream, reaching an estimated 108 million average monthly-unduplicated media consumers. We engage audiences via our portfolio of 123 local TV and radio stations (in Arizona, California, Florida, Illinois, New York, North Carolina and Texas, among other states), and 17 broadcast, cable and digital networks and partnerships. In recent years, we have expanded our efforts to reach English speaking Hispanics and young multicultural audiences through our investment in the El Rey network and the launch of the Fusion Media Group, which includes such properties as FusionTV, the Gizmodo Media Group (and its digital-first platforms Gizmodo, Jalopnik, Jezebel, Deadspin, Lifehacker, Kotaku, Splinter, and the Root), and a stake in The Onion.

1

6. Univision has a unique relationship with its audience, whose members rely on us for news and information on critical matters such as immigration and DACA. Univision's news content has often been described as a "lifeline" for the Hispanic community. In addition, Univision provides a platform for—and gives a voice to—traditionally underrepresented communities in America. We do this through not only our media properties, but also through our Corporate Social Responsibility (CSR) and Social Impact initiatives. Among Univision's CSR priorities are several projects focused on education and youth development, informing and empowering Hispanic America through a multitude of health and wellness initiatives, increasing diversity in media, and providing training opportunities for young people to learn coding and other necessary skills to enter STEAM (science, technology, engineering, art, and math) careers.

7. Univision may have up to 60 employees, ranging across our entire company, who are beneficiaries of the DACA program and affected by the government's decision. (Like many other companies, Univision has not yet been able to confirm the exact number of its employees who have DACA status.) From the talent in front of and behind the camera, to the sharp creative minds that make our business run, to energized interns who are the Company's future – hard-working DACA beneficiaries are essential to creating and disseminating the news, entertainment, and services that Univision provides to millions of Americans every day.

8. Univision engages in expressive activity and depends on the unique perspectives and creative contributions of its content producers and the employees who support them. Some of Univision's DACA beneficiary employees are directly involved in producing content that helps shape Univision's expressive activity. These employees provide a distinct perspective both as individual voices and because their experiences as individuals who first came to the United States as children give them valuable insights into the culture and issues of interest to many of Univision's viewers. Their experiences as young immigrants help Univision better serve both the immigrant and non-immigrant communities that make up Univision's core audiences. The value of these employees to Univision thus goes well beyond their economic contributions.

9. As a news operation, Univision will be harmed by the elimination of DACA. The ending of the program will make DACA beneficiaries, including DACA beneficiaries with family members who may be in the United States without status, less likely to come forward to appear on news programs, provide commentary on public affairs, and otherwise speak up on such issues as social justice and community affairs for fear that they or their families may be deported. This would not only hamper news coverage but, as seen in other countries, create a dearth of reliable information, lead to the dissemination of misinformation, and stifle the award-winning efforts of Univision's investigative journalism teams.

2

10. Congress has recognized the unique importance of having the world's most talented journalists working in the United States, regardless of their country of birth, in providing for media and employment-based visas. Univision can avail itself of these visa processes if it seeks to hire a journalist from any other country in the world. But with the rescission of DACA, Univision will not be able to avail itself of these processes with respect to the skilled young persons who are already living in the United States with DACA status, even though they have unique talents and abilities and have been trained at our colleges and universities and have received U.S. journalism degrees. Without DACA, Univision would be unable to hire journalists from this talented set of individuals.

11. For all these reasons, Univision stands by the hundreds of thousands of young people— including our own DACA beneficiary employees—who are impacted by the government's decision to terminate DACA. They have done everything asked of them by the government under DACA; they are active and contributing members of society who go to school, serve in the military, and work in thousands of civilian jobs—including at Univision—across our nation. Simply put, they should be able to stay in the United States—the only country most of them have ever known.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of October 2017.

Jonathan Schwartz, Esq.

3

# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

# DECLARATION OF LUCILA LOERA

I, Lucila Loera, hereby declare and affirm:

1.      I am the Assistant Vice President for Access, Equity, and Achievement at Washington State University (WSU), Washington State's land grant institution and the second largest public research university in the Pacific Northwest. I have been in this position for seven years. However, I have worked in the area of higher education, access and success, for over 20 years in numerous leadership roles, such as Director of Student Support Services and Dean of Students at WSU. I have achieved national recognition for my work in promoting access and opportunity for first-generation, low-income, and underrepresented populations.

2.      I have personal knowledge of the facts set forth in this declaration, and I am competent to testify about them.

3.      As Assistant Vice President for Access, Equity, and Achievement, I lead WSU's institutional efforts to ensure the access and success of first-generation, low-income, and otherwise underrepresented students in higher education. Among our many activities, programs, and services, the Office of Access, Equity, and Achievement is home to the Office of Multicultural Student Services (MSS), which facilitates the undergraduate experience for multicultural students through culturally relevant programs and services. Our office also houses federally funded programs such as the College Assistance Migrant Program (CAMP), TRIO Student Support Services, and TRIO Upward Bound.

4.      The Office of Access, Equity, and Achievement, in particular MSS, assists thousands of students each year, including many students who are registered under the Deferred Action for Childhood Arrivals program (DACA), as well as the Washington Dream Act, also called the REAL Hope Act. Although we do not require students to self-identify as DACA enrollees, I can confirm there are a minimum of 157 undergraduate DACA students currently enrolled at WSU, as well as 44 employees. However, based on my and my staff's observations and interactions with students, I estimate there actually are several hundred DACA students

DECLARATION OF LUCILA LOERA                    1                    ATTORNEY GENERAL OF WASHINGTON
332 French Administration Building
PO Box 641031
Pullman, WA  99164-1031
(509) 335-2636

1  enrolled at WSU each year, many of whom are served by our office.  These students participate

2  in various academic programs across WSU and also play a significant role in WSU's student life

3  and culture.

4        5.     If DACA is rescinded, many of these students will be unable to continue attending

5  WSU.  This is in large part due to financial considerations.  If students become ineligible to

6  work, many of them, as well as their family members, will lose the summer and academic year

7  employment they need to help pay living and educational expenses.  In most cases, these students

8  will not have funds for tuition, food, or housing since they depend on work to pay as they go.  If

9  DACA is rescinded, many of these students feel they cannot risk continuing their education

10  because of fear of deportation, and they plan to withdraw from WSU.

11        6.     Many DACA students are the first in their family to attend college and are often

12  seen as the leaders and change agents in their family and communities.  Like many Americans,

13  these students have the dreams and aspirations of Americans seeking a better life through higher

14  education.   Many of these students participate and serve in leadership roles in student

15  organizations across the WSU campuses.  If they are forced to withdraw from WSU, student life

16  and the overall student experience on campus will be negatively impacted.

17        7.     WSU also stands to lose hundreds of thousands of dollars in revenue, including

18  direct tuition revenue, as well as scholarships and financial aid.  Each of these students pays

19  approximately $12,000 in tuition per year based on full-time attendance and in-state tuition.

20  They also may be eligible for state need grants and other scholarships.  If DACA is rescinded,

21  WSU will lose this revenue, and the impact will be significant.  Moreover, WSU will lose many

22  valuable employees and risks significant disruption to its academic enterprise due to the loss of

23  DACA students who currently are working as research or teaching assistants.

24        8.     The threat of rescission of DACA has already been having a negative impact on

25  the WSU community.  DACA students, as well as their many friends, family, and supporters in

26  the WSU community, are under extreme stress.  They are angry and frightened.  Many of these

1  students have no memory of the country their parents came from and no connections in that

2  country.  They fear being taken from their families and the only home many of them have ever

3  known.

4        9.      DACA students have had to work extremely hard to get to WSU, and many are

5  first in their families to attend college.  They are high achievers, having done everything that has

6  been asked of them, and are in college realizing their potential.  If DACA is rescinded, many

7  will have to leave college with debt and no degree.  This is a violation of their trust.

8        10.     Nearly all of these students have ceased academic and personal international

9  travel for fear they will not be permitted re-entry into the United States.  This negatively impacts

10  them personally and professionally, and also negatively impacts WSU by limiting the scope of

11  academic activities in which these members of the WSU community are able to engage.

12        11.     I believe that the presence of DACA students and staff on our campus serves to

13  build diversity and intercultural understanding among all members of our community.  Their

14  presence greatly enriches the educational experience of all WSU students.  By impeding WSU's

15  ability to reach these students and benefit from their presence on campus, the rescission of

16  DACA directly and immediately negatively impacts WSU's mission as a land-grant institution.

17  The rescission of DACA will also harm the state of Washington and the country as a whole, as

18  these students will lose the opportunity to obtain the education and skills needed to contribute to

19  society up to their potential.  In Washington, a fast-growing state with a large population of

20  DACA residents, there is a high demand for an educated and skilled workforce.  DACA students

21  are crucial to meeting that demand.

22        12.     I declare under penalty of perjury under the laws of the State of Washington that

23  the foregoing is true and complete to the best of my knowledge.

24        Dated this 5th day of September, 2017.

25

26        Lucila Loera

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
|                Plaintiffs, | |
|    v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
|                Defendants. | |

**DECLARATION OF DEIRDRE HEATWOLE**

I, Deirdre Heatwole, declare as follows:

1.      I am General Counsel for the University of Massachusetts ("UMass" or "University").  UMass is a public land grant university with five campuses located in Amherst, Boston, Dartmouth, Lowell, and Worcester, Massachusetts.  I have been employed at the University in this capacity since 2008.  Previously I was employed as Associate Counsel for the University since 1988.  My current duties generally include managing legal services for the University; providing advice and representation for University administration; informing University employees and officers regarding compliance, risk management, and state and federal laws.

2.      I have either personal knowledge of the matters set forth below or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered from University records by others within the organization.

3.      The University's campuses offer vibrant learning environments that welcome diverse people, ideas, and perspectives.  We encourage the application and enrollment of undocumented students and students granted Deferred Action for Childhood Arrivals (DACA).

4.      Since the DACA program went into effect in 2012, many colleges and universities, including UMass campuses, have seen the critical benefits of this program for our students and the positive impacts on our institutions.

5.      Terminating the DACA program will have a negative impact on the University, its students, and faculty.  DACA recipients enrolled at UMass campuses are eligible for in-state tuition and various scholarships.  Without access to this financial assistance, and with the likelihood that they will not be able to work legally upon graduation, some DACA beneficiaries

1

may not apply or enroll at the University in the first place.  Many of those DACA students who already have enrolled will not be able to afford to continue their education.  Graduate students, in particular, will be significantly affected as the loss of employment authorization needed for Graduate Assistantship (Research or Teaching) will likely mean the loss of tuition waivers and fringe benefits such as subsidized health/dental/eye care insurance for the DACA Graduate student and their families.

6.      Additionally, any undergraduate or graduate program that requires employment authorization to complete elements of the program such as paid internships, residency training and Graduate Assistantships, such as Research (RA) and Teaching (TA) positions, will be severely impacted by the loss of work authorization.  Inability to work may, in certain circumstances, prevent a DACA student from meeting the academic requirements of their degree programs, especially in the "bench sciences" that require significant lab work to complete research needed for Masters and Ph.D. degrees.  Graduate RAs and TAs perform significant functions for the University, the loss of which will negatively impact both faculty who rely on their research to advance scholarship, and students who rely on their teaching duties to complete lower level course curriculum requirements.

7.      If new DACA students do not enroll, or current DACA students are forced to drop out, the University will lose the benefit of the special contributions and perspectives that these special young people bring to our campus communities as both students and alumni.  If current DACA students are forced to drop out, UMass will also lose the value of the financial assistance and the other resources UMass has invested in educating students who ultimately are not able to graduate.

2

8.     The University will also suffer additional tangible harms if the DACA program is terminated. We have already begun to experience disruption as a result of uncertainty over the future of the program and are preparing for the likelihood of increased institutional funds needed to help DACA students meet loss of employment.

9.     All UMass campuses have designated a dedicated staff member who manages communications and services for our "dreamers" population, including DACA students. In addition, among other things, UMass has had to create an internal crisis communication structure for alerting senior leadership and management of various immigration changes with campus-level task forces closely monitoring executive actions, initiating outreach to the campus community that protects confidentiality and privacy concerns, and identifying institutional needs and resources.

10.     Finally, the University also employs a number of non-student DACA recipients. If the program is terminated, we can no longer employ these individuals, and we will lose their services and the value of our investment in them and will incur additional costs to hire and train replacements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of September, 2017.

Deirdre Heatwole

3

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

**DECLARATION OF DEIRDRE HEATWOLE**

I, Deirdre Heatwole, declare as follows:

1.      I am General Counsel for the University of Massachusetts ("UMass" or "University").  UMass is a public land grant university with five campuses located in Amherst, Boston, Dartmouth, Lowell, and Worcester, Massachusetts.  I have been employed at the University in this capacity since 2008.  Previously I was employed as Associate Counsel for the University since 1988.  My current duties generally include managing legal services for the University; providing advice and representation for University administration; informing University employees and officers regarding compliance, risk management, and state and federal laws.

2.      I have either personal knowledge of the matters set forth below or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered from University records by others within the organization.

3.      The University's campuses offer vibrant learning environments that welcome diverse people, ideas, and perspectives.  We encourage the application and enrollment of undocumented students and students granted Deferred Action for Childhood Arrivals (DACA).

4.      Since the DACA program went into effect in 2012, many colleges and universities, including UMass campuses, have seen the critical benefits of this program for our students and the positive impacts on our institutions.

5.      Terminating the DACA program will have a negative impact on the University, its students, and faculty.  DACA recipients enrolled at UMass campuses are eligible for in-state tuition and various scholarships.  Without access to this financial assistance, and with the likelihood that they will not be able to work legally upon graduation, some DACA beneficiaries

1

may not apply or enroll at the University in the first place.  Many of those DACA students who already have enrolled will not be able to afford to continue their education.  Graduate students, in particular, will be significantly affected as the loss of employment authorization needed for Graduate Assistantship (Research or Teaching) will likely mean the loss of tuition waivers and fringe benefits such as subsidized health/dental/eye care insurance for the DACA Graduate student and their families.

6.      Additionally, any undergraduate or graduate program that requires employment authorization to complete elements of the program such as paid internships, residency training and Graduate Assistantships, such as Research (RA) and Teaching (TA) positions, will be severely impacted by the loss of work authorization.  Inability to work may, in certain circumstances, prevent a DACA student from meeting the academic requirements of their degree programs, especially in the "bench sciences" that require significant lab work to complete research needed for Masters and Ph.D. degrees.  Graduate RAs and TAs perform significant functions for the University, the loss of which will negatively impact both faculty who rely on their research to advance scholarship, and students who rely on their teaching duties to complete lower level course curriculum requirements.

7.      If new DACA students do not enroll, or current DACA students are forced to drop out, the University will lose the benefit of the special contributions and perspectives that these special young people bring to our campus communities as both students and alumni.  If current DACA students are forced to drop out, UMass will also lose the value of the financial assistance and the other resources UMass has invested in educating students who ultimately are not able to graduate.

2

8.      The University will also suffer additional tangible harms if the DACA program is terminated. We have already begun to experience disruption as a result of uncertainty over the future of the program and are preparing for the likelihood of increased institutional funds needed to help DACA students meet loss of employment.

9.      All UMass campuses have designated a dedicated staff member who manages communications and services for our "dreamers" population, including DACA students. In addition, among other things, UMass has had to create an internal crisis communication structure for alerting senior leadership and management of various immigration changes with campus-level task forces closely monitoring executive actions, initiating outreach to the campus community that protects confidentiality and privacy concerns, and identifying institutional needs and resources.

10.     Finally, the University also employs a number of non-student DACA recipients. If the program is terminated, we can no longer employ these individuals, and we will lose their services and the value of our investment in them and will incur additional costs to hire and train replacements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of September 2017.

Deirdre Heatwole

3

# EXHIBIT 19

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746(2), I, E. Alexandra Monroe hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at the Washington State Department of Ecology (Ecology) as the Labor Relations and Personnel Operations Manager. I am responsible for providing human resources and labor relations consultation, advice, and services to agency staff and managers, both directly and through a team of human resource consultants, and for providing overall management of the day-to-day personnel operations of the agency.

3. There is at least 1 employee at Ecology who is a recipient of Deferred Action for Childhood Arrivals (DACA).

4. The DACA recipient is employed as an Information Technology Specialist 3, Application Developer, in the Environmental Systems Support unit of the Agency's Information Technology (IT) Services Office. The employee supports the development of complex environmental information systems, using development tools to develop, test, implement, and maintain highly efficient code that delivers the IT systems required by the business of the agency. These systems are relied upon by Agency staff, management, legislators, partner-agencies, and the public to identify, analyze, and reflect the state of the environment in Washington State.

5. Ecology's mission is to protect, preserve, and enhance Washington's environment for current and future generations, with the goals to protect and restore land, air and water; prevent pollution; promote healthy communities and natural resources; and deliver efficient and effective services. A strong technology infrastructure is essential in order for Ecology to meet its mission and goals and information technology specialists are vital to developing, managing, and maintaining that infrastructure. Ecology spends significant time and resources to recruit, hire, train, and supervise its employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person. Failure to retain qualified IT specialists to manage agency technology puts the timeliness of IT projects and the Agency's ability to successfully perform its critical day to day work at risk.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of September, 2017

E. Alexandra Monroe

E. Alexandra Monroe

DECLARATION OF E. ALEXANDRA MONROE          1          ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# EXHIBIT 20

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
|                  Plaintiffs, | |
|      v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
|                  Defendants. | |

Pursuant to 28 U.S.C. § 1746(2), I, Enola Kaplan hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at Department of Social and Health Services (DSHS)/ Human Resources Division (HRD). My job title is Human Resource Manager. My job description is to manage the delivery of full scope of human resource services to Lakeland Village/Region 1 DDA Field Services/Region 1 State Operated Living Alternative (SOLA) and Consolidated Support Services (CSS).  I am responsible for managing a team of human resource professionals in the delivery of exceptional and valued human resource services to a major area of DSHS.

3. There are at least one (1) employees at DSHS/DDA/Lakeland Village who are recipients of Deferred Action for Childhood Arrivals (DACA).

4. One DACA recipient is employed as an Attendant Counselor 1. That employee's job description is to assist, train, monitor and keep intellectually challenged residents free of abuse/neglect in a homelike setting.

5. DSHS/DDA/Lakeland Village spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _01_ day of September, 2017

Enola Kaplan

DECLARATION OF ENOLA KAPLAN                    1                    ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# EXHIBIT 21

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746(2), I, <u>Rich Jones</u>, hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at Washington State Office of the State Treasurer (OST). My job title is Human Resources Manager and my job description is the responsibility for the management, support, development and implementation of human resources activities and programs and oversight of the organizations most sensitive and complex human resource issues.  I manage, supervisor, mentor and guide Human Resource staff in their performance and application of human resources and serve as a member of the Executive Leadership Team.

3. There is one employee at Washington State Office of the State Treasurer who is a recipient of Deferred Action for Childhood Arrivals (DACA).

4. The one DACA recipient is employed as a Senior Secretary in our Administration Division. That employee's job description is to support the organization's mission by performing varied and complex administrative and secretarial functions for the agency's Administration, Debt Management and Investments Divisions within the OST Legislative Building offices.  Importantly, this position serves as the first point of contact ensuring communications with the public and other agency visitors/guests to include government officials and legislative leaders shows our commitment to being a transparent and professional organization.

5. The Washington State Office of the State Treasurer spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.  Moreover, as a small and principal state agency, the loss of a front office staff can create strain and stress on an area of the office that has been developed to operate effectively and efficiently with a minimal staffing level.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>1</u> day of September, 2017

*Rich Jones*

Rich Jones, Human Resource Manager

DECLARATION OF [NAME]　　　　　1　　　　　ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

     Plaintiffs,

   v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

     Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

1     Pursuant to 28 U.S.C. § 1746(2), I, Sarah Conly, hereby declare as follows:

2     1. I am over the age of eighteen and competent to testify herein.

3

4     2. I am employed at the Washington Department of Veterans Affairs (WDVA). My job title is Human Resources Director.  My position is responsible to manage and integrate the human resources and payroll offices statewide.  I have administrative responsibility for developing, implementing and maintaining a full range of human resource and payroll programs and services including planning, recruitment, benefits, leave, compensation, contracts, classification, training, disciplinary actions, affirmative action/equal employment opportunities, employee and labor relations, complaint investigations, and adherence to applicable laws and regulations.

5

6

7

8

9     3. There are at least one employee at the WDVA located at the Washington Soldiers Home (WSH) who is a recipient of Deferred Action for Childhood Arrivals (DACA).

10     4. One DACA recipient is employed as a Nursing Assistant – Certified (NAC). That employee's job description is to assist in delivery of nursing and nursing related care to residents of the WSH.  In accordance with current standards of practice, the NAC assists or supervises assigned residents with activities of daily living, i.e., bathing, dressing, grooming, hygiene, toileting and eating at a long term care facility.  The NAC promotes resident-centered care and ensures that the veterans are treated with dignity and respect.

11

12

13

14     5. WDVA spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

15

16

17     6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

18

19 I declare under penalty of perjury that the foregoing is true and correct.

20                                Executed on this 21 day of September, 2017

21

22

23                                  Sarah Conly

24

25

26

DECLARATION OF SARAH CONLY          1         

# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

                Plaintiffs,

     v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

                Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

DECLARATION OF ALFRED MATHEWSON AND SERGIO PAREJA, CO-DEANS OF THE
UNIVERSITY OF NEW MEXICO SCHOOL OF LAW

Pursuant to 28 U.S.C. Sec. 1746, I, Alfred Mathewson, hereby declare:

    1.   I am over the age of 18 and competent to testify.

    2.   I was named one of two co-deans of the University of New Mexico (UNM) School of Law in August 2015.

    3.   I joined the UNM law faculty in 1983 after working as a corporate, securities and banking lawyer in Denver.

4.   From 1997 through 2002, I was Associate Dean of Academic Affairs, overseeing the Law School curriculum, clinical law program, faculty appointments, the faculty promotion and tenure process, library, faculty development and related issues. I directed the UNM Africana Studies program from 2009 through 2014.

Pursuant to 28 U.S.C. Sec. 1746 I, Sergio Pareja, hereby declare:

5.   I am over the age of 18 and competent to testify.

6.   I was named one of two co-deans of the UNM School of Law in August 2015.

7.   My career includes nearly nine years in private practice in Colorado and Indiana, including work as a partner in the tax department of a large Denver law firm prior to my tenure at the UNM School of Law.

8.   In practice I specialized in federal individual and corporate income tax planning, state and local tax matters, and estate and gift tax planning.  These subjects remain the focus of my teaching and scholarly activities.

## JOINT CONCERNS OF THE CO-DEANS

9.   As the two co-deans of UNM Law School, the only law school in the State of New Mexico, we and our faculty colleagues have consistently and proudly strengthened the diversity of our student body, including diversity of national origin.

10.   We regularly admit a cohort of 110 - 120 first-year law students to join a student body totaling approximately 350 students. Our longstanding policy has been to do so without regard to immigration status.  This is consonant with our core values of diversity and inclusion on the basis of gender, race, religion, nationality, sexual orientation, physical ability, class background, and political opinion.  Such diversity enriches the teaching and learning experience for all our

faculty and students.  It also helps ensure that UNM School of Law graduates will have the cultural and legal skills to serve the needs of our diverse state, nation, and world.

11. Our non-discriminatory admissions policy is also required by New Mexico State law, NMSA 1978, Sec. 21-1-4.6.  New Mexico post-secondary institutions are prohibited from discriminating on the basis of immigration status.  Thus it is our legal duty and our educational mission to ensure that we help all our students succeed academically, professionally, and personally, regardless of citizenship or immigration status.

12. The Law School plays a significant role in the New Mexico legal system.  The dean is designated by the constitution of the State of New Mexico to chair the judicial selection process, and by statute to chair the Judicial Compensation Commission.  The Law School also has primary responsibility for all judicial education in New Mexico.

13. The School of Law's academic program includes the opportunity to pursue a Joint Degree in Law and Latin American Studies, as well as opportunities to study abroad.

14. We offer exchange programs in Mexico, Canada, and Australia (Tasmania).

15. In addition, the Law School conducts a summer law program in Spain, where we administer the UNM School of Law Program in Madrid, and has been a member of consortium of law schools for a summer program in Guanajuato, Mexico.

16. Because New Mexico shares a border with Mexico, we have established a close relationship with Mexican attorneys, working together to resolve disputes in the areas of international, immigration, and refugee law.

17. Our tuition for the 2017-18 academic year is just over $16,500 for in-state and $36,000 for non-residents, making the UNM School of Law an economically accessible opportunity for students.

18. The educational programs and careers of some UNM Law School students may be interrupted if the Deferred Action on Childhood Arrivals (DACA) program is rescinded or limited.

19. If DACA is rescinded or limited, some of our students and other members of their families may face a heightened risk of removal from the United States, or potentially lose employment and/or career opportunities.

20. In September 2017, our Law School organized a Teach-In on the proposed DACA rescission for students, faculty, staff and families. A panel of faculty, staff and local attorneys discussed the impact of the DACA rescission.  Panelists and guests expressed and acknowledged the insecurity that certain members of our community face with regard to their legal status, economic livelihood, and emotional health.

21. Our law school community is founded on principles of fairness, due process, equity, and free expression.  We also pride ourselves in the mutual respect and compassion we show to one another.  We value diversity in multiple dimensions, including political opinion, race and ethnic background, and national origin.  The celebration of such diversity is our heritage as a state that shares a national border with Mexico and includes 23 recognized indigenous tribes and nations. The preservation of such diversity is essential to the continuing mission of the UNM School of Law to educate future lawyers who will increase access to justice locally, nationally, and internationally.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 26th day of September 2017.


Alfred Mathewson
Dean and Professor of Law
UNM School of Law
1117 Stanford NE
Albuquerque, NM 87131

Sergio Pareja
Dean and Professor of Law
UNM School of Law
1117 Stanford NE
Albuquerque NM 87131

# EXHIBIT 24

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF THE MASSACHUSETTS STATE UNIVERSITY PRESIDENTS

We, the undersigned Presidents of the nine Massachusetts state universities, declare as follows:

1.    We have personal knowledge of the information set forth below.  With respect to matters for which we do not have personal knowledge, we have worked with state university personnel to gather and review the information.

2.    The nine state universities, along with the five campuses of the University of Massachusetts and fifteen community colleges, comprise the 29 institutions of the Massachusetts Public Higher Education system. Mass. Gen. Laws Chapter 15A, § 5.

3.    While the universities were founded nearly 200 years ago as normal schools, we now educate over 70,000 students annually in undergraduate and graduate programs in hundreds of disciplines, ranging from teaching and health care to the physical and life sciences, and from marine engineering and industrial design to information technology and game design.  We also have three specialized colleges: Massachusetts College of Liberal Arts, Massachusetts Maritime Academy and Massachusetts College of Art and Design, the only freestanding public art school in the country.

4.    With an average annual tuition and fees of just over $9,000, the state universities offer their students the most affordable four year undergraduate education in the Commonwealth and provide high quality, affordable pathways to scores of graduate programs.

5.    We believe that all persons, particularly those who face socioeconomic barriers to opportunity and advancement, have the ability to contribute to the economic, social and civic life of their communities.  Accordingly, the state universities have long welcomed students regardless of their race, national origin, citizenship or immigration status.

6.    To that end, the universities have embraced students enrolled pursuant to the Deferred Action for Childhood Arrivals ("DACA") program.  We do not believe that one's country of

1950767_1

origin, citizenship or immigration status need be a barrier to success.  To the contrary, we strive to provide affordable pathways to undergraduate and advanced degrees to anyone who wishes to obtain them.

7.      In Massachusetts, DACA-enrolled students are eligible for in-state tuition and fees. DACA-enrolled and undocumented students are not eligible, however, for other state, federal, or institutional financial aid that is need-based.  Accordingly, the DACA program has afforded a financial opportunity, in the form of in-state tuition and fees, to these students without which they may not be able to enjoy the full advantages of a state university education.

8.      In our experience, DACA-enrolled and undocumented students have to work to be able to afford their education, despite their academic strengths.  In addition to obtaining work, they often must support family members.  The DACA program has helped to ease this financial burden not only in terms of the in-state tuition rate, but also by providing work authorization which is necessary for these students to work, including higher-paying academic internships and placements.  By providing this financial relief, and by protecting the students from deportation for a defined period of time, our DACA-enrollees experience less stress and anxiety, and are able to focus their attention on their academic work and bettering their chances at obtaining their future goals.

9.      While the universities do not collect or maintain information on students with DACA status, we know that numerous DACA students are enrolled within our nine-campus system.

10.      The Attorney General's September 5th announcement of the President's intention to end the DACA program has caused visible stress, anxiety, anger and fear among our students, parents, siblings and the administrators who support them.  Since those actions, students have not only raised concerns about themselves, but also their parents and family members.  Some students

2

1950767_1

have expressed significant concern that just by identifying themselves as DACA-enrollees to the universities, the students have exposed their parents to the risk of arrest or deportation.

11.     In fact, in preparation of this Declaration, our own university administrators have been unwilling to discuss - even when in compliance with state and federal privacy laws - the issues faced by DACA-enrolled students for fear that anything they say may expose the students to the possibility of deportation.

12.     The students, faculty and staff of the state university community will suffer if the DACA program is eliminated.  Some members of this community will be deported, causing them to leave the only home that some of them have known and to suspend – if not conclude - their academic pursuits.  Members of this community will lose their ability to work, and, consequently, their ability not only to pay for their education, but to feed and house their families.

13.     Moreover, the loss of our DACA-enrollees will undermine the universities' commitment to providing an affordable higher education to all who seek it, regardless of race, national origin, citizenship or immigration status.  Diversity is one of our core values; we strive to provide learning and working environments in which the ideas, values, perspectives, and contributions of all students and employees are respected.  When we lose the perspectives of any distinct group, our community deteriorates.

14.      On September 5, 2017, only moments after the Attorney General's announcement, our Executive Officer, on our behalf, wrote to the leadership of the Massachusetts legislature to implore them to act immediately to pass legislation that would permit the 29 public institutions of higher education to continue to offer in-state tuition to those undocumented students who have qualified under DACA, regardless of any change to or elimination of the program by the federal government.  We are committed to our DACA students, and we are fighting to keep them enrolled.

3

SIGNED UNDER THE PAINS AND PENALITES OF PERJURY THIS 22nd DAY OF

SEPTEMBER, 2017,

By: _____
    Frederick W. Clark
    President
    Bridgewater State University

By: _____
    Richard Lapidus
    President
    Fitchburg State University

By: _____
    F. Javier Cevallos
    President
    Framingham State University

By: _____
    David P. Nelson
    President
    Massachusetts College of Art and
    Design

By: _____
    Francis McDonald
    President
    Massachusetts Maritime
    Academy

By: _____
    James Birge
    President
    Massachusetts College of
    Liberal Arts

By: _____
    John Keenan
    President
    Salem State University

By: _____
    Ramon S. Torrecilha
    President
    Westfield State University

By: _____
    Barry Maloney
    President
    Worcester State University

4

1950767_1

# EXHIBIT 25

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF SUSAN HERBST

Pursuant to 28 U.S.C. 1746, I, Susan Herbst, having been duly sworn, depose and say, based on my personal knowledge and belief:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I am the President of the University of Connecticut ("UConn" or "the University").

## BACKGROUND

3. UConn is a public land grant and sea grant university. It is the State of Connecticut's flagship institution of higher learning. We are currently ranked as No. 18 among the

1

nation's top public universities, which marks our seventh consecutive year in the Top 25, according to the annual ranking produced by *U.S. News & World Report*. UConn has ten schools and colleges at its main campus in Storrs, separate schools of Law and Social Work, four regional campuses throughout the state located in Hartford, Stamford, Waterbury and Avery Point, and Schools of Medicine and Dental Medicine at the UConn Health Center in Farmington. UConn is fully accredited by the New England Association of Schools and Colleges and is a Carnegie "Research Very High" university, a prestigious designation shared by only the nation's top higher education institutions. UConn has more than 70 focused research centers where faculty, graduate students and undergraduates explore everything from improving human health to enhancing public education and protecting the country's natural resources.

4. I have been employed at the University in my present capacity since 2011. Previously I served as executive vice chancellor and chief academic officer of the University System of Georgia, where I led 15 university presidents and oversaw the academic missions for all 35 public universities in Georgia. Before arriving in Georgia, I was provost and executive vice president at the University at Albany (SUNY), and also served as officer in charge of the university, effectively the acting president, from 2006 to 2007. I also previously served as the dean of the College of Liberal Arts at Temple University. I initially spent 14 years at Northwestern University, joining the faculty in 1989 and serving until my departure to Temple University. At Northwestern I held a variety of positions including professor of political science and chair of the department. I earned my doctorate in communication theory and research from the University of Southern California's Annenberg School for

Communication in Los Angeles in 1989 and a Bachelor of Arts from Duke University in 1984.

5.  As President, I am the chief executive officer of UConn, its schools and colleges, and its other divisions and units. I have led multiple initiatives to strengthen teaching, research and service at the University.

6.  I have either personal knowledge of the matters set forth below or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered by the University administrative staff, all of whom report to me.

## DACA RECIPIENTS AT UCONN

7.  UConn admits academically qualified students regardless of their immigration status. We encourage the application and enrollment of qualified undocumented students including students granted Deferred Action for Childhood Arrivals ("DACA").

8.  DACA recipients who are Connecticut residents are eligible for in-state tuition, making our flagship institution an affordable option for higher education.

9.  UConn does not track undocumented or DACA status among its student population because it does not have a business need to do so. Our administration, however, has personal knowledge that some UConn students are DACA recipients as a result of the voluntary self-declaration of the students. This declaration describes the accomplishments and impacts of the self-declared DACA students.  Because many DACA students elect not to self-declare, the benefits to UConn of DACA students are undoubtedly greater than what is described here.

3

10. Since the DACA program went into effect in 2012, like many colleges and universities, UConn campuses have seen the critical benefits of this program not only for the DACA students themselves, but for all of our UConn students and the larger UConn community.

11. DACA students are enrolled in a wide variety of academic disciplines that represent a cross section of UConn's instructional programs, including Education, Political Science, Allied Health, Sociology, and Mechanical Engineering.

12. Self-declared DACA students have made significant individualized contributions to UConn's academic community. They have conducted research on First Generation College Students; have maintained outstanding academic status; and have served as Ambassadors for UConn's Cultural Centers.

13. DACA students have contributed to the UConn community through participation in a wide variety of co-curricular and service activities.  These include: leadership in the Mentoring, Educating, and Training for Academic Success program; cultural-based organizations; advocacy and social justice organizations such as Students Without Borders and Connecticut Students for a Dream; fraternities and sororities; Homecoming celebrations; and the Society of Hispanic Professional Engineers, just to name a few examples.

14. In addition to the specific contributions DACA students have made to academic programs and co-curricular activities, their very presence as a part of our living and learning community is of great value. All UConn students, as well as our faculty and staff, benefit from having DACA students bring their particular experience and perspective to our community. A diverse study body and learning environment are necessary for UConn's academic excellence as an institution in creating effective scholars and educators.

4

## THE HARM TO UCONN OF ENDING DACA

15. Cancelling the DACA program will hurt the University of Connecticut academically and economically.

16. Ending DACA will effectively end DACA recipients' relief from deportation.  It will end their employment authorization. Employment authorization is critical to DACA students' ability to fund their current tuition and living expenses. Without such authorization they will not be able to work legally upon graduation. Without current income or the possibility of future employment, some DACA beneficiaries may not apply or enroll at the University in the first place. Many currently enrolled DACA students will not be able to afford to continue their education.

17. The University anticipates that the cancelation of the DACA program will cause an exodus of DACA students from our institution and will deter other DACA recipients from applying and enrolling.

18. Terminating the DACA program will have a negative impact on the University, its students, its faculty, and its learning environment.

**The Academic Harm to UConn**

19. The University's academic community would be injured by the cancelation of the DACA program.

20. The University of Connecticut is committed to being an inclusive environment in which all members of our diverse community can freely and securely engage in UConn's research, teaching, and public service missions. UConn's campuses offer vibrant learning environments that welcome diverse people, ideas, and perspectives.

5

21. As a lifelong educator in higher education, from my graduate studies, as a faculty member, as an administrator, and now as chief executive, I can attest to the critical importance of exposing students to a wide range of individuals of different backgrounds. That is a fundamental component of the education process. Diverse individuals from divergent backgrounds contribute new ideas and viewpoints that enhance the dialogue within the classroom and force their peers to question what they think they know.

22. DACA students contribute a unique perspective to the educational environment that cannot be met by any other student population. DACA students are neither traditional domestic nor international students. They have a different personal experience and a unique viewpoint which they bring to our student body as a whole.

23. The contributions of DACA students extend beyond the classroom and into the campus community. As stated above, DACA students contribute greatly to the extracurricular and social life at UConn. Their presence on campus enriches UConn's student life environment.

24. The mere presence of diverse student populations enhances the living, social, and curricular aspects of higher education that are a fundamental part of the overall education process.

25. Today, students in the DACA program who are enrolled at UConn have proven themselves to be talented, hard-working and ambitious. That is how they gained admission. That is why they are succeeding academically. Like all of our graduates, after earning their degrees they can continue to lead positive, productive lives, contributing to Connecticut's economy and communities. Above all, these bright young people are striving to succeed. That sense of hope and opportunity represents the great promise of the United States and our higher education system.

26. If new DACA students do not enroll, or current DACA students are forced to drop out, UConn will lose the benefit of the extraordinary contributions and perspectives that these special young people bring to our campus communities as both students and alumni.

**The Financial Harm to UConn**

27. UConn as an institution would be injured economically by the cancelation of the DACA program.

28. UConn would be hurt financially because a loss of students due to the termination of DACA will cause UConn to lose tuition revenue. If DACA students are deported, forced to withdraw or leave the University, UConn will lose the tuition revenue that these students contribute. This is a significant impact on the University.

29. UConn will be hurt financially because UConn will have allocated valuable enrollment spaces and devoted considerable resources to students who are unable to complete their education at UConn. This past year, UConn received 34,194 applications for freshmen enrollment to our Storrs campus. UConn ultimately granted 16,360 admissions selections resulting in 3,683 newly-enrolled freshmen, evidencing the extreme competitiveness of each UConn admissions spot. If current DACA students are forced to drop out, UConn will lose the value of the resources UConn has invested in educating students who ultimately are not able to graduate.

30. UConn will be hurt financially because the loss of our DACA students would cause UConn to lose the investment of the resources already provided to this student population. Some examples of the resources that would be lost include: the loss of research dollars invested in, or granted to, DACA students and programs they work on; the loss of the assignment of student housing benefits provided to DACA students; and the overall loss of

7

instructional time and other institutional resources deployed in educating students who ultimately do not graduate and go on to become proud UConn alumni.

31. UConn will be hurt financially by the loss of graduate DACA students' employment authorization, resulting in these students no longer being eligible to hold Graduate Assistantships. A Graduate Assistantship is a part-time employment position awarded to a graduate student to provide teaching support ("Graduate Teaching Assistant") or research support ("Graduate Research Assistant") to the University that is a part of the graduate student's academic program. To support Graduate Assistantship positions, UConn provides a salary, a tuition waiver covering the costs of attendance at UConn, and fringe benefits such as subsidized health/dental/eye care insurance. If DACA is rescinded, Graduate Assistants who are DACA recipients will lose their employment positions and will lose all the attendant benefits for themselves and their families.

32. UConn will be hurt by the loss of these Graduate Assistants because they provide significant service to the University. The loss of Graduate Teaching Assistants hurts the faculty who depend on them, particularly in larger classes, to conduct discussion sections, grade papers and meet with students.  It will hurt the students in those classes who will lose this resource. Graduate Teaching Assistants may also serve as the sole instructor in courses, particularly later in their graduate career. Students will be harmed by the loss of Graduate Teaching Assistants because departments may not be able to offer some courses as regularly as they now do. Qualified Graduate Research Assistants are essential members of research teams headed by faculty members. Losing them would have a negative impact both on the faculty who depend on them for labor and intellectual support of research, and on the research initiatives themselves. In addition, other Graduate Assistants provide vital

8

support to offices that provide services to students, and the functions of these offices could be greatly hampered by the cancelation of the DACA program.

33. UConn will be hurt by the exclusion of DACA students from a number of our degree programs. Certain degree programs require employment elements for the completion of the degree such as paid internships, clinical training, and graduate assistantships. The loss of work authorization in some circumstances may prevent DACA students from meeting the academic requirements of their degree programs, especially in programs that require employment to complete research or experiential components of the program. The fields affected include, by way of example, nursing, pharmacy, and UConn's Higher Education and Student Affairs Master of Arts program. Any undergraduate or graduate program that requires employment authorization, state licensure or a social security number to complete elements of the program will be effectively closed to this student population. If DACA is terminated, these students will be stripped of their legal work status, and will be unable to complete their degree program. If they cannot complete their program they may never enroll, and many already enrolled will likely drop out.

34. UConn will be hurt financially by the loss of resources spent on training our faculty and staff. As with many student populations with unique attributes on campus, UConn has invested financial resources and time to provide specialized trainings offered by not-for-profit organizations designed to educate our faculty and staff on how best to address the needs of the DACA and undocumented student population. UConn has provided external trainings on interacting with the DACA and undocumented student population to University offices spanning Enrollment Planning and Management, including Undergraduate Admissions and Student Financial Aid Services, Student Affairs, the Center

9

for Career Development, the Graduate School, and University Advising, among others. Some staff have taken additional individualized trainings. By way of example, UConn's Undergraduate Admissions has a staff member who specializes in advising DACA and undocumented prospective students in the admissions process, and all public-facing staff across the Division of Enrollment Planning and Management receive DACA peer trainings. The University considers this a valuable investment to our staff training, but this investment would be lost if DACA students could no longer enroll at UConn.

35. UConn will be hurt financially by the increased need of student support services that will result from a cancelation of DACA. DACA students have access to UConn's Student Health Services, including Counseling and Mental Health Services, and other student support services on the same basis as all UConn students. The uncertainty and even fear that the DACA rescission has introduced into DACA students' lives has caused additional physical and emotional impacts on our individual students. Those effects will need to be addressed by UConn's Student Health Services and other student support services offices, with additional cost to the University.

36. UConn will be hurt by the exclusion of the DACA student population from our education abroad opportunities. The termination of DACA status would mean that this student population cannot travel internationally because these students will lose the ability to receive advance parole. Loss of these students will impact UConn's education abroad programs. DACA students have engaged our Office of Global Affair's Education Abroad in conversations about education abroad opportunities. With the cancelation of DACA these opportunities will be closed to them. The inability to participate in education abroad

represents another aspect in which this student population cannot engage fully and equally alongside other UConn students in our programs, services and opportunities.

37. UConn will be hurt financially by the loss of any DACA faculty and staff employed by the University. UConn would lose the services of qualified and trained employees and suffer the resulting costs.

38. The loss of DACA students, faculty and staff will also cause a moral loss to our UConn community. The idea of unwillingly losing classmates, peers and friends through action that is contrary to UConn's mission and values represents a shock to our collective identity. UConn has already experienced student protests in support of the DACA program and our DACA population since the announcement that DACA is to be terminated. These sentiments are only expected to increase. UConn will need to expend additional resources, both financial and intellectual, to address the detrimental effects of the DACA rescission on University family and friends of DACA recipients.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SUSAN HERBST

DATED: SEPTEMBER 20, 2017

11

# EXHIBIT 26

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, |  |
| v. |  |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, |  |
| Defendants. |  |

**DECLARATION OF DR. DIMITRIOS PACHIS**

Pursuant to 28 U.S.C. 1746, I, Dr. Dimitrios Pachis, having been duly sworn, depose and say, based on my personal knowledge and belief:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I am Interim Provost and Vice President for Academic Affairs at Eastern Connecticut State University ("ECSU" or "the University"). I have held this position since June 2015. Before becoming its Provost, I was a Professor of Economics at ECSU since 1988.

1

3. As Provost, I oversee the academic programs and faculty of the University, direct the work of the entire teaching faculty of the University, oversee administrative programs, guide future direction of academic programs, assure a faculty and professional workforce capable of high-level performance, assure the fiscal soundness of the University's academic operations, contribute to the long-term vitality of the University, and provide continuity in University direction by serving as an integral member of the Office of the President and, when delegated, functioning on behalf of the President in the President's absence.

4. I have personal knowledge of the matters set forth below or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered from ECSU records by others within the organization.

5. Since 2016, ECSU has worked closely with a private foundation, TheDream.US Opportunity Scholarship Program, which assists students who are beneficiaries of the Deferred Action for Childhood Arrivals (DACA) program. TheDream.US foundation provides funding of up to $80,000 over four years to DACA grantees to help them obtain Bachelor's Degrees at ECSU. *See generally* http://www.courant.com/politics/hc-undocumented-students-scholarship-20160510-story.html.

6. ECSU is one of two colleges in the nation that have agreed to provide an affordable college education to DREAMers, who live in locked-out states in conjunction with TheDream.US foundation. http://www.thedream.us/opportunityscholarship/. Locked-out states are those states where DACA grantees reside but which have refused to offer higher educational opportunities to undocumented young people, even ones that have lived in their states for years.

2

7. ECSU welcomes these out-of-state "locked-out" DACA students as well as our own Connecticut resident DACA students.

8. Since 2016, ECSU has enrolled 109 undergraduate students who are beneficiaries of the DACA program.  This group of ECSU DACA students is comprised of out-of-state students who come to ECSU because of ECSU's unique and intentional investment in DACA students and in-state students.

9. In the most recent complete academic year, 2016-2017, ECSU enrolled 42 out-of-state DACA students and 5 in-state students.   In the current academic year, 2017-2018, ECSU has enrolled 51 out-of-state DACA students and 11 in-state students.

10. These DACA students contribute significantly to the financial health of ECSU.  ECSU has a two-tiered tuition and fees structure: one for in-state students and another for out-of-state students.  Some students from other New England states may also qualify for an out-of-state tuition rate that is markedly reduced.  In academic year 2017-2018, ECSU's tuition and fees for in-state students is approximately $11,000, whereas for out-of-state students the charge is closer to $24,000.  When you add in housing and board, the amounts rise to nearly $24,000 for in-state and $37,000 for out-of-state.

11. TheDream.US Opportunity Scholarship Fund contributes significant funds to ECSU in the form of direct payments for DACA grantees.  For out-of-state DACA students from the locked-out states TheDream.US foundation provides a $20,000 per year scholarship to cover tuition, fees, and on-campus housing and meals for four years provided the grantee agrees to live on ECSU campus.

12. For in-state DACA students from Connecticut, TheDream.US foundation provides a $7,500 per year scholarship to partially cover tuition, fees, books and supplies for four

years.  The in-state grantees are not required to live on ECSU campus to qualify for the scholarship.

13. TheDream.US foundation flat payments to ECSU for the out-of-state DACA students cover the University required tuition and fees, but do not cover expenses related to books, supplies, healthcare, transportation and other personal expenses.  As a result, many DACA students must work at jobs both on and off campus in order to afford to attend ECSU.  If the DACA program is terminated and DACA students lose their ability to work legally in the United States, this will have immediate negative effects on their ability to continue their ECSU education.

14. I know from my personal interactions with ECSU students that DACA students have an acute need to be able to work while in school because they lack other financial resources. In-state DACA students are not eligible for the $20,000 TheDream.US foundation grant, and they cannot obtain financial aid such as Pell grants.  They need to work and earn money legally in order to remain enrolled in ECSU.

15. ECSU students, including our DACA students, make a significant positive contribution to the State of Connecticut both while attending ECSU and upon graduation.  In-state and out-of-state DACA students, like all of ECSU students live on campus and in the local community and pay state and local sales taxes, rents, purchase meals, groceries and household items.

16. The most recent figures that I have reviewed indicate that between 85% - 87% of ECSU's approximate 1200 graduates each year remain in Connecticut upon graduation.  Each ECSU student contributes to the growth and vitality of Connecticut's economy because ECSU students go on to professions of critical importance to growth industries in

4

Connecticut's economy such as business, biomedical sciences, health care, social work, criminology, early childhood education, elementary and secondary education and other important fields of employment.

17. ECSU and the State of Connecticut would experience a quantifiable economic loss if DACA students are forced to withdraw from ECSU before completing their degrees or if new DACA students are no longer permitted to enroll at ECSU.

18. Under the current scholarship program with the TheDream.US foundation, ECSU stands to lose $1,964,000 in payments for the 2017-18 academic year and for each of the following two academic years if DACA students are forced to withdraw. That amount would be even greater if no new DACA students are not permitted to enroll in fall of 2018.

19. The State of Connecticut will also suffer a diminished return on its investment if enrolled DACA students are forced to leave before completing their degrees.

20. The State of Connecticut covers nearly a third of the on-going cost of educating each ECSU student, as well as costs related to construction and renovation of most campus facilities.  Thus, students' tuition and fees payments do not cover the full actual costs when one factors, faculty and staff compensation packages as well as cost of facilities.  A student who fails to complete their degree at ECSU does not provide the same benefit and return to the State as one who graduates with a degree.

21. Students who are unable to complete their education have less positive economic futures both short term and long term.  They have a diminished ability to repay loans, obtain higher wages and fully contribute to Connecticut's economy,

22. Connecticut is working hard to build a knowledge economy. In today's economy educating, attracting and retaining highly educated skilled people is the only path to sustainable economic strength and resilience. Today and in the foreseeable future, the states that are going to thrive are the ones with the most educated workforce. Our DACA students are exactly the type of exceptional students and people that Connecticut needs of to grow.

23. Our DACA students have GPA's that are well above that of the average ECSU student. Moreover, they have demonstrated a profound commitment to their education and future. For example, this September 2017, 100% of our DACA students from last year returned to ECSU. In my experience, this is a highly unusual retention rate for any subgroup of students. The DACA students that come to ECSU are the top students in their high school classes. I expect many of these students will go on to obtain higher professional degrees.

24. Beyond the clear and quantifiable economic harm that the State of Connecticut taxpayers and ECSU will experience if DACA is terminated, there are some intangible but nonetheless significant losses that will be felt throughout the ECSU community and the State. In my personal experience observing and working with ECSU's DACA population I have been struck by their work ethic and desire to contribute to their community. Many of these students are incredibly dedicated, active and intelligent and have grown into leaders in the ECSU community. In my professional opinion, the true measure of the loss of these students would be incalculable for ECSU. Not only would the students be deprived the opportunity to realize their full potential but we will all lose from not having them as leaders, teachers, and researchers of tomorrow in Connecticut. While their

6

numbers at ECSU are relatively small, they have an outsized impact and I expect that, as they grow and learn, they will do the same for the State of Connecticut - if they are permitted to complete their education and remain here.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Dimitrios Pachis*

DR. DIMITRIOS PACHIS

DATED: SEPTEMBER 22, 2017

*Darren Nosal Notary*
*9-22-17*

**DARREN NOSAL**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES DEC. 31, 2021

# EXHIBIT 27

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## DECLARATION OF KAREN M. HARDWICK

I, Karen M. Hardwick, declare as follows:

1.       I am the General Counsel for the University of the District of Columbia ("UDC" or the "University").  The University is a public, historically Black, land-grant institution.  A pacesetter in urban education, UDC provides affordable and effective undergraduate, graduate, professional, and workplace learning opportunities accessible to all residents of the District of Columbia (the "District").

2.       I have been employed at the University as General Counsel since March 2016.  My current duties generally include managing legal services for the University; providing advice and representation for the University administration; and counseling University faculty and staff regarding compliance, risk management, and District of Columbia, state and federal laws.

3.       I have either personal knowledge of the matters set forth below or, with respect to those matters as to which I do not have personal knowledge, I have reviewed information gathered from University records by others within the organization.

4.       With campuses across the District, the University offers vibrant learning environments that welcome diverse people, ideas, and perspectives.  The mission of the University is to build a diverse generation of competitive, civically engaged scholars and leaders.  UDC therefore encourages the application and enrollment of undocumented students and students granted Deferred Action for Childhood Arrivals (DACA).

5.       Since the DACA program took effect in 2012, many colleges and universities, including UDC, have seen the critical benefits of this program for our students and the positive impacts on our campuses.

1

6.      Terminating the DACA program will have a negative impact on the University, its students, faculty and staff.  DACA recipients enrolled at UDC campuses are eligible for in-state tuition and local financial aid.  With the likelihood that they will not be able to remain in the country or work legally upon graduation, some DACA beneficiaries may not apply or enroll at UDC in the first place.  Many of those DACA students who already have enrolled may not continue their education.  As a result, the University will lose revenue from the tuition current and future DACA students would have paid but for termination of the DACA program.

7.      Additionally, any undergraduate or graduate programs that require employment authorization to complete elements of the program, such as paid internships or clinical placement, will be severely and adversely impacted by the loss of work authorization.  Inability to work may, in certain circumstances, prevent a DACA student from meeting the academic requirements of their degree programs or related licensing requirements, especially in programs that require significant lab or field work.

8.      If new DACA students do not enroll at UDC, or if current DACA students are forced to drop out of UDC, the University will lose the benefit of the invaluable contributions and perspectives that these special young people bring to our campus communities as both students and alumni.  If current DACA students are forced to drop out, UDC will also lose the value of the financial assistance and the other resources that UDC has invested in educating students who ultimately are not able to graduate.

9.      The University will suffer additional tangible harm if the DACA program is terminated. UDC has already begun to experience disruption because of student uncertainty and anxiety over the future of the program.

10.     On April 15, 2017, the District of Columbia enacted the UDC DREAM Amendment Act of 2016, D.C. Law 21-275. This law allows District residents, regardless of their federal immigration status, to pay in-state tuition rates and receive local financial aid for attendance at any UDC school or campus. This law is similar to those passed by sixteen (16) other states that have sought to grant undocumented students some level of tuition relief. Terminating the DACA program would undermine the effectiveness of this duly-enacted law of the District of Columbia.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 28, 2017

Karen M. Hardwick

3

# EXHIBIT 28

Center for American Progress

IMMIGRATION

# DACA Recipients' Economic and Educational Gains Continue to Grow

By Tom K. Wong, Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin  |  Posted on August 28, 2017, 9:01 am



AP/Craig Ruttle

Activists supporting Deferred Action for Childhood Arrivals (DACA) and other immigration issues gather near Trump Tower in New York, August 2017.

*Note: The survey results can be found here. For more information on the survey, please contact Tom K. Wong.*

Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals (DACA) policy has provided temporary relief from deportation as well as work authorization to approximately 800,000 undocumented young people across the country. As research has consistently shown, DACA has not only improved the lives of undocumented young people and their families but has also positively affected the economy more generally, which benefits all Americans.

From August 1, 2017 to August 20, 2017, Tom K. Wong of the University of California, San Diego; United We Dream (UWD); the National Immigration Law Center (NILC); and the Center for American Progress fielded a national survey to further analyze the economic, employment, educational, and societal experiences of DACA recipients. This is the largest study to date of DACA recipients with a sample size of 3,063 respondents in 46 states as well as the District of Columbia.

The data illustrate that DACA recipients continue to make positive and significant contributions to the economy, including earning higher wages, which translates into higher tax revenue and economic growth that benefits all Americans. In addition, DACA recipients are buying cars, purchasing their first homes, and even creating new businesses. The survey's results also show that at least 72 percent of the top 25 Fortune 500 companies employ DACA recipients. Moreover, 97 percent of respondents are currently employed or enrolled in school.

# DACA's impact on employment

Work authorization is critical in helping DACA recipients participate more fully in the labor force. The data show that 91 percent of respondents are currently employed. Among respondents age 25 and older, employment jumps to 93 percent.

After receiving DACA, 69 percent of respondents reported moving to a job with better pay; 54 percent moved to a job that "better fits my education and training"; 54 percent moved to a job that "better fits my long-term career goals"; and 56 percent moved to a job with better working conditions.

We also see that 5 percent of respondents started their own business after receiving DACA. Among respondents 25 years and older, this climbs to 8 percent. As the 2016 survey noted, among the

American public as a whole, the rate of starting a business is 3.1 percent, meaning that DACA recipients are outpacing the general population in terms of business creation.

As one respondent stated, "I started a bookkeeping business which gives me the opportunity to help our Hispanic community be in compliance with tax law […] If DACA ended, I will not be able to keep my small business and help my community."

Another respondent stated, "Because of DACA, I opened a restaurant. We are contributing to the economic growth of our local community. We pay our fair share of taxes and hire employees […] It will be hard to maintain my business if DACA ended. I depend on my [social security number] for a lot of my business, such as when getting licenses, permits, leases, and credit."

# DACA's impact on earnings

The data make clear that DACA is having a positive and significant effect on wages. The average hourly wage of respondents increased by 69 percent since receiving DACA, rising from $10.29 per hour to $17.46 per hour. Among respondents 25 years and older, the average hourly wage increased by 84 percent since receiving DACA.

The data also show that respondents' average annual earnings come out to $36,232, and their median annual earnings total $32,000. Among respondents 25 years and older, the figures are $41,621 and $37,595, respectively. These higher wages are not just important for recipients and their families but also for tax revenues and economic growth at the local, state, and federal levels.

Last year, we noted that further research is needed to parse out the short- and long-run wage effects of DACA as well as whether short-run gains represent a plateau in earnings or if more robust long-run wage effects may exist. This remains true. However, as DACA recipients are now further along in their careers, and as we continue to see growth in their earnings, it is likely there is even more room for recipients' wages to grow.

The immediate impact of wage increases is evident in 69 percent of survey respondents reporting that their increased earnings have "helped me become financially independent" and 71 percent reporting that their increased earnings have "helped my family financially." Among respondents 25 years and older, these percentages rise to 73 percent and 74 percent, respectively.

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 594 of 1603 PageID #: 4539

# DACA's impact on the economy

The purchasing power of DACA recipients continues to increase. In the 2017 study, nearly two-thirds of respondents, or 65 percent, reported purchasing their first car. The average cost paid was $16,469. As we have noted previously, these large purchases matter in terms of state revenue, as most states collect a percentage of the purchase price in sales tax, along with additional registration and title fees. The added revenue for states comes in addition to the safety benefits of having more licensed and insured drivers on the roads.

The data also show that 16 percent of respondents purchased their first home after receiving DACA. Among respondents 25 years and older, this percentage rises to 24 percent. The broader positive economic effects of home purchases include the creation of jobs and the infusion of new spending in local economies.

Additionally—and importantly—the data show that at least 72 percent of the top 25 Fortune 500 companies—including Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo, among others—employ DACA recipients. All told, these companies account for $2.8 trillion in annual revenue.

# DACA's impact on education

Overall, 45 percent of respondents are currently in school. Among those currently in school, 72 percent are pursuing a bachelor's degree or higher. The majors and specializations that respondents report include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few.

When it comes to educational attainment, 36 percent of respondents 25 years and older have a bachelor's degree or higher. Importantly, among those who are currently in school, a robust 94 percent said that, because of DACA, "I pursued educational opportunities that I previously could not."

# Conclusion

Our findings could not paint a clearer picture: DACA has been unreservedly good for the U.S. economy and for U.S. society more generally. Previous research has shown that DACA beneficiaries will contribute $460.3 billion to the U.S. gross domestic product over the next decade—economic growth that would be lost were DACA to be eliminated.

As our results show, the inclusion of these young people has contributed to more prosperous local, state and national economies; to safer and stronger communities through increased access to cars and home ownership; and to a more prepared and educated workforce for the future. Ending DACA now would be counterproductive at best and, at worst, cruel. At present, 800,000 lives—as well as the lives of their families and friends—hang in the balance. At a time when the continuing existence of DACA is facing its most serious threat ever, understanding the benefits of the program for recipients; their families and communities; and to the nation as a whole is all the more important.

*Tom K. Wong is associate professor of political science at the University of California, San Diego. Greisa Martinez Rosas is advocacy and policy director, Adam Luna is senior advisor for communications, Henry Manning is research fellow, and Adrian Reyna is director of membership and technology strategies at United We Dream. Patrick O'Shea is Mellon/ACLS public fellow at the National Immigration Law Center. Tom Jawetz is vice president for Immigration Policy and Philip E. Wolgin is managing director for Immigration Policy at the Center for American Progress.*

*The authors thank all those who took the survey for their time and effort in helping to bring these stories to light.*

# Methodology

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—meaning, people responding who are not undocumented—the authors used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire. When repeated,

the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used. Because there is no phone book of undocumented immigrants, and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.

Center for American Progress

© 2017 - Center for American Progress

# EXHIBIT 29

*Center for American Progress*

IMMIGRATION

# New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes

By Tom K. Wong, Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin  | Posted on October 18, 2016, 12:00 pm



Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 599 of 1603 PageID #: 4544

AP/Pablo Martinez Monsivais

Hareth Andrade, who was born in Bolivia, works at the Mexican American Legal Defense and Education Fund office in Washington, D.C., on February 7, 2014.

*Note: The survey results can be found here. For more information on the survey, please contact Tom K. Wong. The 2017 version of this survey can be found here.*

This year marks the fourth anniversary of the Deferred Action for Childhood Arrivals, or DACA, initiative. Through executive action, DACA provides temporary relief from deportation and work authorization to eligible unauthorized immigrants who entered the country at a young age. According to the latest publicly available data from the *U.S. Citizenship and Immigration Services*, 741,546 unauthorized young people have received DACA. Early studies—including one that Tom K. Wong of the University of California, San Diego; the National Immigration Law Center, or NILC; and the Center for American Progress, or CAP, conducted last year and another published by United We Dream—illustrate that DACA has improved the lives of its recipients and their families.

Following up on these studies, these organizations teamed up on a new national survey to further analyze the economic, educational, and employment experiences and outcomes of DACA recipients. The survey was fielded from September 8, 2016, to September 26, 2016, with a sample size of 1,308 individuals. The results make clear that DACA has had a positive impact, not just for recipients but also for the American economy more generally.

The data illustrate that DACA recipients are making significant contributions to the economy by buying cars and first homes, which translate into more revenue for states and localities in the form of sales and property taxes. Some are even using their entrepreneurial talents to help create new jobs and further spur economic growth by starting their own businesses.

The positive wage effect of DACA is also significant. The data show that DACA increased recipients' average hourly wages by 42 percent. Given that higher wages translate into higher tax revenue and economic growth, these findings reinforce the fact that DACA benefits all Americans. Moreover, a full 95 percent of survey respondents are currently employed or enrolled in school. Consistent with the 2015 survey, the data indicate that many DACA recipients are getting better and higher-paying jobs because of DACA. Many are pursuing educational opportunities that were previously unavailable to them. The majors, specializations, and training that DACA recipients are pursuing include early

childhood education, biochemistry, computer science, creative writing, graphic design, neuroscience, nursing, social work, and urban planning, among many others.

# DACA's impact on employment

The latest data indicate that having work authorization remains vital when it comes to helping DACA recipients participate more fully in the labor force. Eighty-seven percent of respondents to the 2016 survey are currently employed, with an additional 8 percent not working but in school.

The current survey is one of the first to systematically identify the industries in which DACA recipients are working, and the results show wide-ranging labor market contributions. The data indicate that 21 percent of respondents work in educational and health services, 11 percent work in the nonprofit sector, 9 percent work in wholesale and retail trades, and 8 percent work in professional and business services. The results illustrate that DACA recipients are contributing across all sectors of the economy.

Furthermore, after receiving DACA, 63 percent of respondents reported moving to a job with better pay; 49 percent moved to a job that "better fits my education and training"; and 48 percent moved to a job with better working conditions. These figures are largely consistent with previous findings from the 2015 survey and show that the temporary work authorization that comes with DACA has helped to unlock recipients' economic potential.

The 2016 survey also found that 6 percent of respondents started their own business after receiving DACA. This rate of business starts is higher than that of both the American public as a whole—at 3.1 percent—and the entire immigrant population—at 3.6 percent. These businesses include tech startups, online craft stores, and tax preparation services, among others. One business owner who employs nine people hopes to continue to grow and "hire [even] more people from the community."

# DACA's impact on earnings

Last year's survey found that having DACA increased individuals' average hourly wages by more than 40 percent. The current survey data confirm that DACA is having a positive and significant effect on wages: The average hourly wages of respondents increased by 42 percent since receiving DACA, rising from $9.83 per hour to $13.96 per hour. Further research is needed to parse out the short- and long-run wage effects of DACA, as well as whether short-run gains represent a plateau in earnings or if an

even more robust long-run wage effect exists as recipients gain more work experience and progress in their careers. But for now, this much is clear: Four years into the initiative, DACA means earning higher wages.

Accordingly, 60 percent of survey respondents reported that their increased earnings have "helped me become financially independent," and 61 percent reported that their increased earnings have "helped my family financially." These figures are also consistent with the previous 2015 findings, but importantly, the percentage of respondents who are now able to help their families financially has increased from last year, which is another sign of the broader benefits of DACA.

## DACA's impact on the economy

The current survey results suggest that the purchasing power of those with DACA is increasing.

Last year, the survey found that 21 percent of respondents purchased their first car after receiving DACA. This year, this figure climbed to an astonishing 54 percent. The data indicate that most people—71 percent—purchased used cars, while a smaller group—29 percent—purchased new cars. The average cost of used car purchases was $10,637, and the average cost of new car purchases was $24,307. These large purchases matter for state revenue, as most states collect between 3 percent and 6 percent of the purchase price in sales tax, along with additional registration and title fees. The added revenue for states comes in addition to the safety benefits of having more licensed and insured drivers on the roads.

The survey also found that 12 percent of respondents purchased their first home after receiving DACA, at an average cost of $167,596. The broader positive economic impact of home purchases are well-documented and include the creation of jobs and the infusion of new spending in local economies.

## DACA's impact on education

Overall, 46 percent of respondents are currently in school. Of these individuals, a full 83 percent are also working, which is perhaps reflective of the limited options for in-state tuition and financial aid that are available to DACA recipients. Among those who are currently in school:

- 4 percent are pursuing a high school or GED diploma.

New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes - Center for American Progress 10/3/17, 10:27 AM

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 602 of 1603 PageID #: 4547

- 20 percent are pursuing an associate degree.

- 4 percent are pursuing a trade, technical, or vocational certificate.

- 70 percent are pursuing a bachelor's degree or higher.

Importantly, among those who are currently in school, a robust 92 percent said that because of DACA, "I pursued educational opportunities that I previously could not."

## DACA's impact on social inclusion

A little more than 90 percent of survey respondents reported obtaining a driver's license or state identification card for the first time after receiving DACA. The average cost of obtaining a driver's license was $35, and the average cost of obtaining a state identification card was $28. As one respondent wrote, "I can now drive to work." Another respondent said that after obtaining a state identification card, "I was able to apply for credit cards and have a bank account."

## DACA's impact on civic participation

The results also show that DACA may be a strong motivator of civic participation: The 2016 survey found that 41 percent of respondents have immediate family members who are U.S. citizens over age 18 and that 80 percent of these family members are registered to vote. A recent national poll found that protecting DACA and its recipients will be a key motivator for Latino voters during the 2016 elections, and these survey results suggest that this will be especially true of eligible voters with DACA-recipient family members.

## Conclusion

The survey results reported here illustrate that DACA has promoted educational and employment outcomes and has been a major driver of economic growth—for individuals and families, as well as cities and states that reap the benefits of new tax dollars from large purchases and new jobs. Four years later, the effects of DACA on the lives of unauthorized young people have been enormous.

Still, hundreds of thousands more people could benefit from the initiative and have not applied for various reasons. These findings suggest that beyond DACA, greater opportunities and benefits could

New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes - Center for American Progress 10/3/17, 10:27 AM

Case 1:17-cv-05228-NGG-JO Document 97-1 Filed 12/15/17 Page 603 of 1603 PageID #: 4548

accrue from the creation of an even more inclusive executive action reaching a greater swath of the unauthorized population. As of this publication, two parts of the November 2014 executive actions on immigration—Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA, and an expansion of the DACA initiative—are still on hold in the courts. Similar to DACA, these initiatives could have a deep impact on the lives of unauthorized immigrants who have lived in this country for years, their families, and the nation as a whole.

# Methodology

The survey questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to adjust for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—meaning people responding who are not unauthorized—the authors used a unique validation test for unauthorized status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire, and some questions were repeated but posed using different wording. If there was agreement in the answers such that there was consistency with respect to the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used to recruit respondents. Because there is no phone book of unauthorized immigrants and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.

*Tom K. Wong is an Assistant Professor of Political Science at University of California, San Diego. Greisa Martinez Rosas is Advocacy Director and Adrian Reyna is Director of Membership and Technology at United We Dream. Ignacia Rodriguez is Immigration Policy Advocate and Patrick O'Shea is Research Manager at the National Immigration Law Center. Tom Jawetz is Vice President for Immigration Policy and Philip E. Wolgin is Managing Director for Immigration Policy at the Center for American Progress.*

*The authors thank all those who took the survey for their time and effort in helping to bring these stories to light.*

Case 1:17-cv-05228-NGG-JO Document 97-1 Filed 12/15/17 Page 604 of 1603 PageID #: 4549

## Center for American Progress

© 2017 - Center for American Progress

# EXHIBIT 30



# Center for American Progress

☰

IMMIGRATION

# A New Threat to DACA Could Cost States Billions of Dollars

By Nicole Prchal Svajlenka, Tom Jawetz, and Angie Bautista-Chavez   |   Posted on July 21, 2017, 10:05 am



AP/Jacquelyn Martin

In this June 15, 2012 photo, undocumented immigrants who live in Maryland, hold signs saying "Thank You President Obama" in Washington, D.C.

Over the course of its five-year history, Deferred Action for Childhood Arrivals (DACA), has changed the lives of nearly 800,000 young people who have lived in the United States since their childhood. By providing the opportunity for individuals to come forward, pass rigorous background checks, and obtain permission to live and work in the United States lawfully, DACA has helped its recipients achieve milestones typically associated with the American dream, such as pursuing higher education, earning better wages to support their families, and buying homes.

9/2/2017
A New Threat to DACA Could Cost States Billions of Dollars - Center For American Progress
Case 1:17-cv-05228-NGG-VMS   Document 91-1   Filed 12/15/17   Page 607 of 1603 PageID #:
4552

Nearly 8 in 10 voters support allowing DREAMers to remain permanently in the country, including almost three-quarters of Trump voters, and only 14 percent believe they should be forced to leave.

But despite the benefits of the popular program, DACA is now facing a dangerous new attack. In late June, officials from 10 states led by Texas Attorney General Ken Paxton issued an ultimatum to the Trump administration and Attorney General Jeff Sessions: End the DACA program by September 5 or face a lawsuit in front of the same federal judge who halted a separate initiative that would have provided similar temporary protections to the parents of U.S. citizens and lawful permanent residents. If DACA ends—whether because the administration accedes to the demands of DACA opponents or the initiative is enjoined by a federal court—hundreds of thousands of young people will be forced out of the workforce, upending their lives and the lives of their families, creating tremendous disruption for businesses, and sending shockwaves through the economies of most states.

According to the U.S. Citizenship and Immigration Services (USCIS), 787,580 people received DACA through March 2017. The data presented in this column update previous columns from November 2016 and January 2017, accounting for the additional DACA applicants that were approved since their publications.

Using data from two Center for American Progress publications—a report that estimates the gross domestic product (GDP) declines that would accompany removing all unauthorized workers from the country and a survey that estimates the share of DACA recipients who are employed—CAP estimates that ending DACA would result in a loss of $460.3 billion from the national GDP over the next decade. Ending DACA would remove an estimated 685,000 workers from the nation's economy.

Altogether, the 10 states demanding that the Trump administration end DACA—Alabama, Arkansas, Idaho, Kansas, Louisiana, Nebraska, Tennessee, Texas, South Carolina, and West Virginia—stand to lose more than $8 billion annually in state GDP if they get their wish.

**TABLE 1**
**State-by-state annual GDP loss from removing workers with DACA**

| State | Number of DACA recipients | Estimated number of DACA workers | Estimated annual GDP loss from removing DACA workers |
|---|---|---|---|
| Alabama | 4,270 | 3,715 | $182,030,100 |
| Alaska | 138 | 120 | $8,572,284 |
| Arizona | 27,865 | 24,243 | $1,322,494,899 |
| Arkansas | 5,099 | 4,436 | $236,028,211 |
| California | 222,795 | 193,832 | $11,620,786,775 |
| Colorado | 17,258 | 15,014 | $856,946,796 |
| Connecticut | 4,929 | 4,288 | $315,289,496 |
| Delaware | 1,444 | 1,256 | $88,119,069 |
| District of Columbia | 764 | 665 | $48,219,513 |
| Florida | 32,795 | 28,532 | $1,524,721,538 |
| Georgia | 24,135 | 20,997 | $1,025,191,287 |
| Hawaii | 558 | 485 | $28,844,415 |

| | | | |
|---|---|---|---|
| Idaho | 3,132 | | $159,526,996 |
| Illinois | 42,376 | 36,867 | $2,296,685,031 |
| Indiana | 9,840 | 8,561 | $516,409,548 |
| Iowa | 2,798 | 2,434 | $188,481,274 |
| Kansas | 6,803 | 5,919 | $335,913,999 |
| Kentucky | 3,062 | 2,664 | $155,574,096 |
| Louisiana | 2,049 | 1,783 | $91,007,953 |
| Maine | 95 | 83 | $3,967,200 |
| Maryland | 9,785 | 8,513 | $509,446,852 |
| Massachusetts | 7,934 | 6,903 | $606,598,730 |
| Michigan | 6,430 | 5,594 | $418,625,150 |
| Minnesota | 6,255 | 5,442 | $376,707,375 |
| Mississippi | 1,460 | 1,270 | $62,337,508 |
| Missouri | 3,524 | 3,066 | $209,005,419 |
| Montana | 72 | 63 | $3,507,840 |
| Nebraska | 3,371 | 2,933 | $150,222,997 |
| Nevada | 13,070 | 11,371 | $603,921,133 |
| New Hampshire | 367 | 319 | $26,873,575 |
| New Jersey | 22,024 | 19,161 | $1,587,108,546 |
| New Mexico | 6,815 | 5,929 | $384,647,119 |
| New York | 41,970 | 36,514 | $2,598,303,273 |
| North Carolina | 27,385 | 23,825 | $1,198,925,683 |
| North Dakota | 98 | 85 | $8,611,260 |
| Ohio | 4,442 | 3,865 | $251,609,158 |
| Oklahoma | 6,865 | 5,973 | $343,573,469 |
| Oregon | 11,281 | 9,814 | $605,603,130 |
| Pennsylvania | 5,889 | 5,123 | $357,080,795 |
| Rhode Island | 1,229 | 1,069 | $61,058,661 |
| South Carolina | 6,406 | 5,573 | $252,065,985 |
| South Dakota | 252 | 219 | $12,204,360 |
| Tennessee | 8,340 | 7,256 | $347,345,511 |
| Texas | 124,300 | 108,141 | $6,294,162,134 |
| Utah | 9,711 | 8,449 | $476,470,215 |
| Vermont | 42 | 37 | $2,429,910 |
| Virginia | 12,134 | 10,557 | $711,429,519 |
| Washington | 17,843 | 15,523 | $1,098,330,382 |
| West Virginia | 117 | 102 | $5,445,765 |
| Wisconsin | 7,565 | 6,582 | $427,041,340 |
| Wyoming | 621 | 540 | $39,079,530 |

Source: See Methodology.



Case 1:17-cv-05228-NGG-JO   Document 57-1   Filed 12/15/17   Page 609 of 1603 PageID #: 4554

The present threat to those with DACA is real. Moreover, because DACA recipients are so well integrated into families, communities, schools, and workplaces throughout the country, the economic and social effects of ending DACA would be widespread and significant. In the short term, the fate of DACA rests entirely in the hands of President Donald Trump, who has at times expressed great support for DREAMers and has encouraged them to "rest easy." But ultimately, it is Congress that must act to provide a permanent solution so that these young people can contribute even more fully to the country they call home. Yesterday's introduction of the DREAM Act of 2017, which has bipartisan sponsorship from Sens. Dick Durbin (D-IL), Jeff Flake (R-AZ), Lindsey Graham (R-SC), and Chuck Schumer (D-NY), is an encouraging step.

## Methodology

This column uses the same methodology employed in CAP's November 2016 and January 2017 estimates of the cost of ending DACA.

The USCIS publishes quarterly data on DACA applicants and recipients since the program's beginning in 2012. In addition to national numbers, the USCIS also provides state-level data.

An October 2016 survey of DACA recipients—conducted by political scientist Tom K. Wong, United We Dream, the National Immigration Law Center, and CAP—estimated that nationally, 87 percent of DACA recipients were employed. The survey does not provide employment rates for individual states. Thus, this column uses the 87 percent benchmark for employment levels in each state.

The number of DACA recipients working in each state is a combination of the latest USCIS data and the survey findings.

A 2016 CAP report authored by Ryan Edwards and Francesc Ortega estimated the national and state-by-state GDP loss that would result from removing unauthorized workers from the workforce, both annually and over the next decade. This column uses the GDP loss and number of unauthorized workers by each state to identify the contributions of each unauthorized worker to the state GDP. By both assuming that the skill distribution of the workforce with DACA reflects that of the broader unauthorized workforce and expressing data in 2013 dollars, this analysis reflects a conservative estimate.

The GDP losses associated with ending DACA for each state are derived by multiplying the number of employed DACA recipients with the losses associated with each unauthorized worker.

*Nicole Prchal Svajlenka is a senior policy analyst for the Immigration Policy team at the Center for American Progress. Tom Jawetz is vice president for Immigration Policy at the Center. Angie Bautista-Chavez is an intern for the Immigration Policy team at the Center.*

# Center for American Progress

© 2017 - Center for American Progress

# EXHIBIT 31

# State & Local Tax Contributions of Young Undocumented Immigrants

## Institute on Taxation & Economic Policy

*April 2017*

Misha E. Hill
Meg Wiehe

### About The Institute on Taxation & Economic Policy

The Institute on Taxation and Economic Policy (ITEP) is a non-profit, non-partisan 501 (c) 3 organization that produces timely, accessible, and sound analyses on federal, state, and local tax policy issues. ITEP's research helps inform policy makers, advocates, the media and general public about the fairness, adequacy, and sustainability of existing tax structures and how proposed tax changes would impact revenues and taxpayers across the income spectrum.

### Acknowledgments

ITEP extends special thanks to David Dyssegaard Kallick at the Fiscal Policy Institute, Erica Williams at the Center on Budget and Policy Priorities, Jeanne Batalova at the Migration Policy Institute, and Wesley Tharpe at the Georgia Budget and Policy Institute for their guidance on this report.

# Introduction

The Trump administration's immigration policies have broken apart families and removed established members of communities. The administration's disregard for the contributions of immigrants, regardless of their legal status, is of real concern for young immigrants whose parents brought them to the United States as children. Many of those young immigrants qualify for deferred deportation action and legal work authorization under Deferred Action for Childhood Arrivals (DACA), a 2012 executive order under President Barack Obama.

While it remains unclear what actions, if any, President Trump will take to amend DACA, the policy guidance the president has given to federal agencies has resulted in detentions and deportations of individuals reportedly eligible for deferred action. The ambiguity of the Trump Administration's statements and actions relating to the DACA program makes it essential that clear and accurate data about the DACA population is available.

More than 1.3 million out of the 11 million undocumented immigrants living in the United States are eligible for DACA. As of September 2016, more than 852,000 individuals were enrolled in the program.[1] DACA offers eligible teenagers and young adults who were brought to the United States as children outside of their control temporary deferral from deportation and legal work authorization.[2]

DACA enrollment has helped young immigrants become more engaged in their communities. A national survey of DACA enrollees in 2016 found that more than 40 percent of respondents secured their first job after enrollment in DACA, and more than 60 percent landed a job with better pay. DACA enrollment also allowed 60 percent of respondents to pursue educational opportunities that were previously unavailable to them. The young immigrants enrolled in DACA work in diverse industries, including educational and health services, wholesale and retail trade, and professional and business services.

The 1.3 million young immigrants eligible for deferred action contribute tax dollars to communities that help pay for schools, public infrastructure, and other services. Their contributions could be increased by taking steps to ensure that all individuals eligible for deferred action are enrolled, or even by offering a path to citizenship. Conversely, stripping their temporary lawful status or deporting them would decrease their tax contributions and deprive our country of a dedicated and diverse generation.

## What is DACA?

Deferred Action for Childhood Arrivals provides temporary deferral from deportation and work authorization. Individuals must apply for DACA status through U.S. Citizenship and Immigration Services. Approved individuals maintain their status for two years and must apply to renew their eligibility.

To qualify for DACA an individual must:

✓ Be between the ages of 15 and 30

✓ Have arrived in the U.S. prior to the age of 16

✓ Have continuously resided in the U.S. for at least five years prior to their application for deferred action

✓ Be enrolled in an approved education course, have completed high school or its equivalency, or have been honorably discharged from military service

✓ Not have been convicted of a felony, significant misdemeanor, three or more misdemeanors, or "otherwise pose a threat to public safety or national security"

*Note: See "DACA at Four" and "DACA at the Two-Year Mark" from the Migration Policy Institute for more detailed information.*

An ITEP report from March 2017 found the 11 million undocumented immigrants living and working in the United States contribute more than $11.74 billion in state and local taxes.[3] This report specifically examines the state and local tax contributions of undocumented immigrants who are currently enrolled or immediately eligible for DACA and the fiscal implications of various policy changes. The report includes information on the national impact (Table 1) and provides a state-by-state breakdown (Appendix 1).

## Key Findings

- The 1.3 million young undocumented immigrants enrolled or immediately eligible for DACA **contribute an estimated $2 billion a year** in state and local taxes.[4] This includes personal income, property, and sales and excise taxes.

- DACA-eligible individuals pay on average **8.9 percent of their income** in state and local taxes. Their effective tax rate is higher than the average rate paid by the top 1% of taxpayers in state and local taxes of just 5.4 percent and is on par with the average rate paid of 9.4 percent paid by the middle 20 percent of taxpayers.[5]

- Continuing DACA and ensuring all who are eligible for the program are enrolled would **increase estimated state and local revenue by $425 million**, bringing the total contribution to $2.45 billion, and increasing the effective tax rate for those enrolled to 9 percent.

- Replacing DACA with a path to citizenship could provide **nearly $505 million in additional state and local taxes**, increasing total contributions to at least $2.53 billion a year.

- Repealing the temporary legal status and work authorizations permitted by DACA would **reduce estimated state and local revenues by nearly $800 million**, and drop the total contributions to just over $1.2 billion annually.

- Every state benefits from the economic contributions of the young immigrants eligible for DACA (see Appendices 1 and 2). For example, the 379,000 young immigrants living in California are contributing more than $534 million to the golden state while the 2,000 immigrants in our nation's capital contribute $2.7 million to the District. Likewise, every state stands to lose considerable revenue if we do not maintain the protections and opportunities DACA has allowed.

# How federal policy changes in the treatment of young immigrants affect state and local revenues

Questions have frequently been raised about the taxes paid by undocumented immigrants. Everyone living and working in the U.S. contributes to state and local taxes, regardless of their immigration status. We all pay sales and excise taxes when we purchase goods and services such as clothing or gasoline. We all pay property taxes either directly for our homes or indirectly as renters.

As ITEP's March report demonstrated, about half of undocumented immigrants file income tax returns. They do this using Individual Taxpayer Identification Numbers (ITINs) in the absence of having valid Social Security numbers. Because DACA provides young immigrants with work authorization, recipients are subject to the same state and local personal income tax laws as all lawfully present workers. DACA recipients do have (temporary) Social Security numbers.

The tax revenues generated by DACA recipients are further boosted by the fact that DACA status boosts employment rates and wages. A national survey of DACA recipients found that employment rates increased by 36 percentage points after enrollment, from 51 percent of respondents employed to 87 percent.[6] Evidence also shows that relief from deportation and temporary work permits through programs like DACA also boosts undocumented immigrants' wages by at least 8.5 percent. When given the opportunity to work legally and a reprieve from deportation DACA recipients are able to work more, earn more wages, and are less likely to be victims of wage theft from unscrupulous employers.

## Table 1: U.S. Total of State and Local Tax Contributions of DACA-eligible individuals

*Current and potential contributions of individuals currently receiving or eligible for DACA status*

|  | Currently receiving DACA (852,000) | Currently eligible but not receiving (452,900) | Total DACA-eligible population (1.3 million) | Change from Current Contribution |
|---|---|---|---|---|
| **Current Taxes** | $1,603,068,000 | $423,765,000 | **$2,026,833,000** | -- |
| **Taxes if All Eligible Receiving** | $1,603,068,000 | $849,546,000 | **$2,452,614,000** | +$425,781,000 |
| **If granted citizenship** | $1,654,779,000 | $876,951,000 | **$2,531,730,000** | +$504,897,000 |
| **If DACA protections lost** | $805,751,000 | $423,765,000 | **$1,229,516,000** | ($797,317,000) |

Based on this evidence, we assume that 87 percent of the 852,000 young immigrants currently enrolled in DACA are employed, and that they are earning, on average, 8.5 percent more than the estimated 452,900 young people eligible for but not receiving DACA. The higher earnings, higher employment rate, and higher tax compliance rate

of individuals enrolled in DACA leads to their increased tax contributions and higher effective tax rate compared to those eligible for but not receiving DACA. The total contributions of individuals currently receiving or eligible for DACA status is just over $2 billion in state and local taxes annually. If all eligible individuals were enrolled in DACA, those state and local tax contributions would increase by more the $425 million due to higher earnings, higher employment rate, and 100 percent tax compliance for all DACA eligible immigrants (see Table 1).

Granting DACA eligible immigrants a path to citizenship would provide an even larger wage boost. A 2013 analysis by the Congressional Budget Office estimated a 12 percent wage boost for undocumented citizens who were granted a path to citizenship.[7] State and local revenues would net an additional $505 million if the 1.3 million young people currently eligible for or receiving DACA were granted a path to citizenship (see Table 1).

In contrast, failing to maintain work authorizations and deportation relief of DACA would hurt state and local coffers. If the 852,000 young immigrants currently enrolled lost the protections of DACA, it would reduce their state and local tax contributions by nearly $800 million (see Table 1).

Just as every state benefits from the tax contributions of young undocumented immigrants every state has much more to lose if we remove the protections and work authorization granted to these young immigrants who were brought to the United States as children and have always considered it home. If the Trump administration fails to protect this population from deportation, the nation risks forcing them back into the shadows and losing the economic and societal contributions these engaged young people are making in their communities.

## Methodology

ITEP estimates the state and local tax contributions of DACA-eligible immigrants under different policy options through the methodology detailed below.

### 1. Estimated DACA- eligible and enrolled population in each state

- The number of young immigrants in each state immediately eligible for DACA comes from the Migration Policy Institute.[8]  MPI estimated just under 1.3 million young immigrants nationwide are immediately eligible for DACA. MPI's estimates are limited to 41 states and the District of Columbia. To calculate the eligible population in the nine missing states, ITEP used the enrollee data (see below) for each state to estimate a total eligible population (see Appendix 2).

- The number of people currently enrolled in DACA nationally (852,000) and in each state comes from the United States Citizenship and Immigration Services[9]. (see Appendix 2).

### 2. Taxpaying units and employment status

- This analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

- The employment rate of immigrants depends on legal status. A 2016 national survey of 1,308 DACA recipients found that 87 percent of respondents were employed, compared to only 51 percent before gaining lawful status. The assumed employment rate of DACA-eligible immigrants with legal status, either those participating in the program or granted a pathway to citizenship, is 87 percent. The assumed employment rate of DACA-eligible immigrants who are not enrolled in the program is 51 percent.[10] Additionally, to calculate the impact on tax contributions if DACA protections are removed, 51 percent was applied to the total DACA-eligible population.

- Here's how the national numbers break down (see Appendix 2 for state numbers):

| | Population | Workforce Participation % | Estimated Workers |
|---|---|---|---|
| Eligible DACA Population | 1,304,900 | | |
| Enrolled DACA Population | 852,000 | 87% | 740,400 |
| Eligible, but unenrolled DACA Population | 452,900 | 51% | 232,300 |
| Eligible, but no DACA protections | | 51% | 669,400 |

## 3. Income

- Immigrant wages change depending on legal status. Undocumented workers earn $22,029 a year on average and granting DACA status increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress[11]. Putting immigrants on a path to citizenship would carry a larger effect, since it grants rights and protections associated with permanent residence. The Congressional Budget Office estimates a path to citizenship would boost wages by 12 percent[12]. The average wages applied to the estimated DACA working population in this analysis are:

  o $23,901 for the DACA-eligible population working and enrolled in the program.

  o $22,029 for the DACA-eligible population working, but not enrolled in the program.

  o $24,673 for the DACA-eligible population working and granted a pathway to citizenship.

## 4. Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state[13]

ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law in place as of December 31, 2014. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of

the state and local tax laws as of January 2015 on taxpayers at 2012 income levels. This report applies effective tax rates calculated in the 2015 *Who Pays?* report to the DACA eligible population.

### *The following assumptions were made to calculate the sales and excise, income, and property taxes of the undocumented immigration population:*

- **Sales and excise taxes:** Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service. It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

- **Income tax:** Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 740,400 DACA-enrolled workers are fully complying with state personal income taxes. 100 percent compliance is also assumed under the path to citizenship policy option.  Personal income tax effective rates in each state were applied accordingly. Various studies have estimated between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers.[14] This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost. Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

  Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers. The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

- **Property tax:** The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state. This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state. The model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

[1] "Deferred Action for Childhood Arrivals Process (Through Fiscal Year 2016, 4th Qtr.)." United States Citizenship and Immigration Services (USCIS). Available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2016_qtr4.pdf

[2] Batalova, Jeanne, et al. "DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action." Migration Policy Institute, Aug. 2014, http://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action

[3] Christensen Gee, et al. "Undocumented Immigrants' State and Local Tax Contributions." Institute on Taxation and Economic Policy, Mar. 2017, http://www.itep.org/pdf/immigration2017.pdf

[4] See the methodology section for more information on the calculation of estimated undocumented immigrant state and local tax payments.

[5] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

[6] "Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey." Center for American Progress, https://cdn.americanprogressaction.org/content/uploads/2016/10/21111136/2016-daca_survey_draft_updated-FINAL2.pdf

[7] "Economic Impact of S. 744, Border Security, Economic Opportunity, and Immigration Modernization Act." *Congressional Budget Office*, Congressional Budget Office, Jun. 2013, www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/44346-Immigration.pdf.

[8] See endnote 2 and Migration Policy Institute, "Deferred Action for Childhood Arrivals (DACA) Data Tools." http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events

[9] USCIS (see endnote 1)

[10] Center for American Progress (see endnote 6)

[11] Oakford, Patrick. "Administrative Action on Immigration Reform." Center for American Program, September 2014. https://www.americanprogress.org/issues/immigration/reports/2014/09/04/96177/administrative-action-on-immigration-reform/

[12] Congressional Budget Office (see endnote 7)

[13] Institute on Taxation and Economic Policy (see endnote 3)

[14] See among others: Feinleib, Joel, and David Warner. "Issue Brief #1: The Impact of Immigration on Social Security and the National Economy." *Social Security Advisory Board*, Social Security Advisory Board, Dec. 2005, www.ssab.gov/Portals/0/OUR_WORK/REPORTS/Impact%20of%20Immigration%20on%20Social%20Security%20Brief_2005.pdf; Singer, Paula, and Linda Dodd-Major. "Identification Numbers and U.S. Government Compliance Initiatives." *Tax Analysts*, 20 Sept, 2004; and Cornelius, Wayne, and Jessica Lewis. *Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities*, La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007.

# Appendix 1: State and Local Tax Contributions of DACA-eligible individuals

*Current and potential contributions of those currently receiving or eligible for DACA status*

| State | Current State and Local Taxes | Current Effective Tax Rate | Taxes if All Eligible Receiving | Change if All Eligible are Receiving | New Effective Tax Rate | Taxes if All Eligible Granted Citizenship | Change if All Granted Citizenship | New Effective Tax Rate2 | Taxes if DACA Protections Lost | Change if DACA Protections are Lost | New Effective Tax Rate3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | $13,220,000 | 9.0% | $17,605,000 | +$4,385,000 | 9.4% | $18,172,000 | +$4,952,000 | 9.4% | $8,376,000 | -$4,844,000 | 8.2% |
| Alaska* | $966,000 | 4.0% | $1,659,000 | +$693,000 | 4.0% | $1,712,000 | +$746,000 | 4.0% | $903,000 | -$63,000 | 4.0% |
| Arizona | $61,357,000 | 9.0% | $65,837,000 | +$4,480,000 | 9.1% | $67,961,000 | +$6,604,000 | 9.1% | $33,274,000 | -$28,083,000 | 8.4% |
| Arkansas | $15,894,000 | 11.1% | $18,821,000 | +$2,927,000 | 11.3% | $19,428,000 | +$3,534,000 | 11.3% | $9,336,000 | -$6,558,000 | 10.3% |
| California | $534,124,000 | 8.2% | $652,389,000 | +$118,265,000 | 8.3% | $673,433,000 | +$139,309,000 | 8.3% | $334,630,000 | -$199,494,000 | 7.8% |
| Colorado | $33,977,000 | 7.8% | $37,631,000 | +$3,654,000 | 7.9% | $38,845,000 | +$4,868,000 | 7.9% | $17,479,000 | -$16,498,000 | 6.7% |
| Connecticut | $17,639,000 | 10.0% | $23,269,000 | +$5,630,000 | 10.2% | $24,019,000 | +$6,380,000 | 10.2% | $12,144,000 | -$5,495,000 | 9.8% |
| Delaware | $2,434,000 | 5.0% | $3,377,000 | +$943,000 | 5.4% | $3,486,000 | +$1,052,000 | 5.4% | $1,410,000 | -$1,024,000 | 4.2% |
| District of Columbia* | $2,702,000 | 8.7% | $3,910,000 | +$1,208,000 | 9.4% | $4,036,000 | +$1,334,000 | 9.4% | $1,756,000 | -$946,000 | 7.8% |
| Florida | $100,239,000 | 8.5% | $127,799,000 | +$27,560,000 | 8.5% | $131,922,000 | +$31,683,000 | 8.5% | $69,534,000 | -$30,705,000 | 8.5% |
| Georgia | $71,705,000 | 9.0% | $90,911,000 | +$19,206,000 | 9.3% | $93,844,000 | +$22,139,000 | 9.3% | $43,172,000 | -$28,533,000 | 8.1% |
| Hawaii | $3,223,000 | 11.2% | $4,978,000 | +$1,755,000 | 12.0% | $5,138,000 | +$1,915,000 | 12.0% | $2,353,000 | -$870,000 | 10.4% |
| Idaho | $6,026,000 | 7.9% | $6,578,000 | +$552,000 | 7.9% | $6,791,000 | +$765,000 | 7.9% | $3,288,000 | -$2,738,000 | 7.3% |
| Illinois | $131,028,000 | 11.0% | $159,279,000 | +$28,251,000 | 11.3% | $164,417,000 | +$33,389,000 | 11.3% | $76,260,000 | -$54,768,000 | 9.9% |
| Indiana | $23,288,000 | 10.4% | $23,784,000 | +$496,000 | 10.4% | $24,552,000 | +$1,264,000 | 10.4% | $10,755,000 | -$12,533,000 | 8.7% |
| Iowa | $6,807,000 | 9.2% | $7,806,000 | +$999,000 | 9.4% | $8,058,000 | +$1,251,000 | 9.4% | $3,594,000 | -$3,213,000 | 8.0% |
| Kansas | $14,592,000 | 9.2% | $15,361,000 | +$769,000 | 9.2% | $15,856,000 | +$1,264,000 | 9.2% | $7,699,000 | -$6,893,000 | 8.5% |
| Kentucky | $9,093,000 | 9.1% | $12,116,000 | +$3,023,000 | 9.7% | $12,507,000 | +$3,414,000 | 9.7% | $5,182,000 | -$3,911,000 | 7.6% |
| Louisiana | $7,459,000 | 9.5% | $10,221,000 | +$2,762,000 | 9.8% | $10,551,000 | +$3,092,000 | 9.8% | $5,061,000 | -$2,398,000 | 9.0% |
| Maine* | $256,000 | 7.7% | $330,000 | +$74,000 | 8.0% | $341,000 | +$85,000 | 8.0% | $160,000 | -$96,000 | 7.1% |
| Maryland | $40,801,000 | 10.8% | $56,926,000 | +$16,125,000 | 11.4% | $58,762,000 | +$17,961,000 | 11.4% | $26,907,000 | -$13,894,000 | 9.9% |
| Massachusetts | $24,261,000 | 8.1% | $34,426,000 | +$10,165,000 | 8.7% | $35,537,000 | +$11,276,000 | 8.7% | $15,052,000 | -$9,209,000 | 7.0% |
| Michigan | $15,938,000 | 8.9% | $18,952,000 | +$3,014,000 | 9.1% | $19,563,000 | +$3,625,000 | 9.1% | $8,666,000 | -$7,272,000 | 7.7% |

# Appendix 1: State and Local Tax Contributions of DACA-eligible individuals

*Current and potential contributions of those currently receiving or eligible for DACA status*

| State | Current State and Local Taxes | Current Effective Tax Rate | Taxes if All Eligible Receiving | Change if All Eligible are Receiving | New Effective Tax Rate | Taxes if All Eligible Granted Citizenship | Change if All Granted Citizenship | New Effective Tax Rate2 | Taxes if DACA Protections Lost | Change if DACA Protections are Lost | New Effective Tax Rate3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minnesota | $15,439,000 | 8.7% | $18,766,000 | +$3,327,000 | 9.0% | $19,372,000 | +$3,933,000 | 9.0% | $8,550,000 | –$6,889,000 | 7.6% |
| Mississippi | $4,169,000 | 8.4% | $5,442,000 | +$1,273,000 | 8.7% | $5,618,000 | +$1,449,000 | 8.7% | $2,593,000 | –$1,576,000 | 7.6% |
| Missouri | $8,430,000 | 8.1% | $10,513,000 | +$2,083,000 | 8.4% | $10,852,000 | +$2,422,000 | 8.4% | $4,916,000 | –$3,514,000 | 7.2% |
| Montana* | $101,000 | 5.3% | $112,000 | +$11,000 | 5.4% | $116,000 | +$15,000 | 5.4% | $50,000 | –$51,000 | 4.4% |
| Nebraska | $7,693,000 | 9.6% | $8,013,000 | +$320,000 | 9.6% | $8,272,000 | +$579,000 | 9.6% | $3,905,000 | –$3,788,000 | 8.6% |
| Nevada | $17,488,000 | 5.6% | $18,595,000 | +$1,107,000 | 5.6% | $19,195,000 | +$1,707,000 | 5.6% | $10,117,000 | –$7,371,000 | 5.6% |
| New Hampshire* | $812,000 | 7.6% | $946,000 | +$134,000 | 7.6% | $976,000 | +$164,000 | 7.6% | $512,000 | –$300,000 | 7.5% |
| New Jersey | $65,968,000 | 7.9% | $90,221,000 | +$24,253,000 | 8.2% | $93,131,000 | +$27,163,000 | 8.2% | $44,911,000 | –$21,057,000 | 7.5% |
| New Mexico | $18,848,000 | 10.3% | $21,646,000 | +$2,798,000 | 10.4% | $22,345,000 | +$3,497,000 | 10.4% | $11,288,000 | –$7,560,000 | 10.0% |
| New York | $140,035,000 | 10.7% | $174,199,000 | +$34,164,000 | 11.0% | $179,818,000 | +$39,783,000 | 11.0% | $84,137,000 | –$55,898,000 | 9.8% |
| North Carolina | $63,618,000 | 8.6% | $75,296,000 | +$11,678,000 | 8.8% | $77,725,000 | +$14,107,000 | 8.8% | $34,532,000 | –$29,086,000 | 7.5% |
| North Dakota | $286,000 | 8.6% | $360,000 | +$74,000 | 8.7% | $371,000 | +$85,000 | 8.7% | $190,000 | –$96,000 | 8.4% |
| Ohio | $14,103,000 | 9.4% | $18,397,000 | +$4,294,000 | 9.8% | $18,991,000 | +$4,888,000 | 9.8% | $8,586,000 | –$5,517,000 | 8.4% |
| Oklahoma | $17,411,000 | 9.5% | $20,064,000 | +$2,653,000 | 9.7% | $20,711,000 | +$3,300,000 | 9.7% | $9,950,000 | –$7,461,000 | 8.8% |
| Oregon | $20,021,000 | 7.1% | $22,898,000 | +$2,877,000 | 7.3% | $23,637,000 | +$3,616,000 | 7.3% | $8,995,000 | –$11,026,000 | 5.3% |
| Pennsylvania | $20,765,000 | 8.9% | $30,086,000 | +$9,321,000 | 9.7% | $31,056,000 | +$10,291,000 | 9.7% | $13,239,000 | –$7,526,000 | 7.8% |
| Rhode Island | $3,842,000 | 8.2% | $5,300,000 | +$1,458,000 | 8.5% | $5,471,000 | +$1,629,000 | 8.5% | $2,602,000 | –$1,240,000 | 7.7% |
| South Carolina | $11,768,000 | 6.5% | $13,835,000 | +$2,067,000 | 6.7% | $14,281,000 | +$2,513,000 | 6.7% | $6,802,000 | –$4,966,000 | 6.0% |
| South Dakota* | $585,000 | 8.1% | $672,000 | +$87,000 | 8.1% | $693,000 | +$108,000 | 8.1% | $365,000 | –$220,000 | 8.1% |
| Tennessee | $21,266,000 | 8.7% | $25,228,000 | +$3,962,000 | 8.7% | $26,042,000 | +$4,776,000 | 8.7% | $13,723,000 | –$7,543,000 | 8.7% |
| Texas | $313,095,000 | 9.5% | $347,623,000 | +$34,528,000 | 9.5% | $358,837,000 | +$45,742,000 | 9.5% | $189,137,000 | –$123,958,000 | 9.5% |
| Utah | $18,807,000 | 8.4% | $19,372,000 | +$565,000 | 8.5% | $19,997,000 | +$1,190,000 | 8.5% | $8,981,000 | –$9,826,000 | 7.2% |
| Vermont* | $140,000 | 8.6% | $185,000 | +$45,000 | 8.9% | $191,000 | +$51,000 | 8.9% | $92,000 | –$48,000 | 8.2% |

## Appendix 1: State and Local Tax Contributions of DACA-eligible individuals

*Current and potential contributions of those currently receiving or eligible for DACA status*

| State | Current State and Local Taxes | Current Effective Tax Rate | Taxes if All Eligible Receiving | Change if All Eligible are Receiving | New Effective Tax Rate | Taxes if All Eligible Granted Citizenship | Change if All Granted Citizenship | New Effective Tax Rate2 | Taxes if DACA Protections Lost | Change if DACA Protections are Lost | New Effective Tax Rate3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Virginia | $34,726,000 | 7.4% | $50,323,000 | +$15,597,000 | 8.1% | $51,946,000 | +$17,220,000 | 8.1% | $22,019,000 | -$12,707,000 | 6.5% |
| Washington | $51,272,000 | 10.5% | $59,072,000 | +$7,800,000 | 10.5% | $60,978,000 | +$9,706,000 | 10.5% | $32,140,000 | -$19,132,000 | 10.5% |
| West Virginia* | $283,000 | 8.0% | $342,000 | +$59,000 | 8.2% | $353,000 | +$70,000 | 8.2% | $161,000 | -$122,000 | 7.1% |
| Wisconsin | $17,825,000 | 9.4% | $19,926,000 | +$2,101,000 | 9.6% | $20,569,000 | +$2,744,000 | 9.6% | $9,365,000 | -$8,460,000 | 8.3% |
| Wyoming* | $949,000 | 5.3% | $1,217,000 | +$268,000 | 5.3% | $1,256,000 | +$307,000 | 5.3% | $662,000 | -$287,000 | 5.3% |
| All States | $2,026,772,000 | 8.9% | $2,452,614,000 | +$425,842,000 | 9.0% | $2,531,730,000 | +$504,958,000 | 9.0% | $1,229,516,000 | -$797,256,000 | 8.3% |

# Appendix 2: DACA Eligible Population Estimates

| STATE | Estimated Population Immediately Eligible for DACA[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled | Share of Est. Undocumented Immigrant Population[3] |
|---|---|---|---|---|
| **Alabama** | 9,000 | 4,720 | 4,280 | 13% |
| **Alaska*** | 2,000 | 170 | 1,830 | 29% |
| **Arizona** | 35,000 | 30,180 | 4,820 | 14% |
| **Arkansas** | 8,000 | 5,530 | 2,470 | 14% |
| **California** | 379,000 | 237,940 | 141,060 | 13% |
| **Colorado** | 23,000 | 18,830 | 4,170 | 14% |
| **Connecticut** | 11,000 | 5,430 | 5,570 | 10% |
| **Delaware** | 3,000 | 1,560 | 1,440 | 13% |
| **Dist. of Col.*** | 2,000 | 880 | 1,120 | 7% |
| **Florida** | 72,000 | 37,940 | 34,060 | 12% |
| **Georgia** | 47,000 | 28,090 | 18,910 | 12% |
| **Hawaii** | 2,000 | 660 | 1,340 | 10% |

# Appendix 2: DACA Eligible Population Estimates

| STATE | Estimated Population Immediately Eligible for DACA[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled | Share of Est. Undocumented Immigrant Population[3] |
|---|---|---|---|---|
| **Idaho** | 4,000 | 3,330 | 670 | 12% |
| **Illinois** | 68,000 | 44,860 | 23,140 | 13% |
| **Indiana** | 11,000 | 10,580 | 420 | 12% |
| **Iowa** | 4,000 | 3,050 | 950 | 11% |
| **Kansas** | 8,000 | 7,200 | 800 | 13% |
| **Kentucky** | 6,000 | 3,380 | 2,620 | 13% |
| **Louisiana** | 5,000 | 2,320 | 2,680 | 8% |
| **Maine*** | 200 | 110 | 90 | 4% |
| **Maryland** | 24,000 | 11,110 | 12,890 | 9% |
| **Massachusetts** | 19,000 | 9,030 | 9,970 | 11% |
| **Michigan** | 10,000 | 7,070 | 2,930 | 10% |
| **Minnesota** | 10,000 | 6,740 | 3,260 | 12% |

# Appendix 2: DACA Eligible Population Estimates

| STATE | Estimated Population Immediately Eligible for DACA[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled | Share of Est. Undocumented Immigrant Population[3] |
|---|---|---|---|---|
| **Mississippi** | 3,000 | 1,660 | 1,340 | 12% |
| **Missouri** | 6,000 | 3,770 | 2,230 | 11% |
| **Montana*** | 100 | 80 | 20 | 10% |
| **Nebraska** | 4,000 | 3,690 | 310 | 11% |
| **Nevada** | 16,000 | 13,910 | 2,090 | 12% |
| **New Hampshire** | 600 | 420 | 190 | 7% |
| **New Jersey** | 53,000 | 24,630 | 28,370 | 11% |
| **New Mexico** | 10,000 | 7,300 | 2,700 | 15% |
| **New York** | 76,000 | 47,170 | 28,830 | 9% |
| **North Carolina** | 41,000 | 29,260 | 11,750 | 12% |
| **North Dakota** | 200 | 110 | 90 | 7% |
| **Ohio** | 9,000 | 5,060 | 3,940 | 11% |

# Appendix 2: DACA Eligible Population Estimates

| STATE | Estimated Population Immediately Eligible for DACA[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled | Share of Est. Undocumented Immigrant Population[3] |
|---|---|---|---|---|
| Oklahoma | 10,000 | 7,380 | 2,620 | 12% |
| Oregon | 15,000 | 11,900 | 3,100 | 13% |
| Pennsylvania | 15,000 | 6,700 | 8,300 | 11% |
| Rhode Island | 3,000 | 1,380 | 1,620 | 10% |
| South Carolina | 10,000 | 7,060 | 2,940 | 10% |
| South Dakota* | 400 | 290 | 110 | 8% |
| Tennessee | 14,000 | 9,180 | 4,820 | 12% |
| Texas | 177,000 | 138,440 | 38,560 | 12% |
| Utah | 11,000 | 10,400 | 600 | 14% |
| Vermont* | 100 | 50 | 50 | 3% |
| Virginia | 30,000 | 13,470 | 16,530 | 11% |
| Washington | 27,000 | 19,180 | 7,820 | 12% |

# Appendix 2: DACA Eligible Population Estimates

| STATE | Estimated Population Immediately Eligible for DACA[1] | Estimated Population Enrolled in DACA[2] | Estimated Population Eligible for DACA but not Enrolled | Share of Est. Undocumented Immigrant Population[3] |
|---|---|---|---|---|
| **West Virginia*** | 200 | 140 | 70 | 3% |
| **Wisconsin** | 10,000 | 8,010 | 1,990 | 14% |
| **Wyoming*** | 1,000 | 690 | 310 | 17% |
| **All States** | 1,304,800 | 852,000 | 452,900 | 12% |

* DACA eligible population in these states was estimated using data on enrolled DACA participants as of September 2016. Nationwide roughly 66 percent of immigrants immediately eligible DACA are enrolled thus the assumption was made that the actual participants in those states represent 66 percent of the eligible population (rounding was used).

[1] Batalova, Jeanne, et al. "DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action." Migration Policy Institute, Aug. 2014, http://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action

[2] "Deferred Action for Childhood Arrivals Process (Through Fiscal Year 2016, 4th Qtr)." United States Citizenship and Immigration Services(USCIS). Available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2016_qtr4.pdf

[3] Migration Policy Institute (MPI) DACA estimates divided by MPI undocumented immigrant population estimates (Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the 2010-2014 ACS pooled, and the 2008 Survey of Income and Program Participation (SIPP) by Colin Hammar and James Bachmeier of Temple University and Jennifer Van Hook of Pennsylvania State University, Population Research Institute.)

# EXHIBIT 32

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

```
                                                              1

 1            IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
 2
 3     ------------------------x
                               )
 4     MARTIN JONATHAN BATALLA  )
       VIDAL, et al.,           )
 5                              )
                Plaintiffs,     )
 6                              ) Case Nos.
              v                 ) 1:16-CV-04756(NGG)(JO)
 7                              ) 3:17-CV-05211
       ELAINE C. DUKE, Acting   )
 8     Secretary Department of  )
       Homeland Security        )
 9     JEFFERSON BEAUREGARD     )
       SESSION III, Attorney    )
10     General of the United    )
       States,and DONALD J TRUMP,)
11     President of the UNITED  )
       STATES,                  )
12                              )
                Defendants.     )
13     ------------------------x
14
15            Deposition of GENE HAMILTON
16                 Washington, DC
17            Friday, October 20, 2017
18                   9:17 a.m.
19
20     Job No.: 37567
21     Pages: 1 - 233
22     Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

2

```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
 2
 3       ------------------------x
                                 )
 4       MARTIN JONATHAN BATALLA  )
         VIDAL, et al.,           )
 5                                )
                   Plaintiffs,    )
 6                                ) Case No.
                        v         ) 1:16-CV-04756(NGG)(JO)
 7                                )
         ELAINE C. DUKE, Acting   )
 8       Secretary Department of  )
         Homeland Security        )
 9       JEFFERSON BEAUREGARD     )
         SESSION III, Attorney    )
10       General of the United    )
         States,and DONALD J TRUMP,)
11       President of the UNITED  )
         STATES,                  )
12                                )
                   Defendants.    )
13       ------------------------x
14
15              Deposition of GENE HAMILTON, held at US
16       Conference of Mayors, 1620 I Street, NW,
17       Washington 20006 pursuant to Notice, before Donna
18       Marie Lewis, Registered Professional Reporter and
19       Notary Public of and for the District of Columbia.
20
21
22
```

Gene Hamilton

Martin Vidal, et al v. Elaine Duke, et al                          10/20/2017

3

1                     A P P E A R A N C E S
2       ON BEHALF OF PLAINTIFFS:
3
            NATIONAL IMMIGRATION LAW CENTER
4           BY: JOSHUA A. ROSENTHAL, ESQUIRE
                KAREN C. TUMLIN, ESQUIRE
5               TRUDY REBERT, ESQUIRE
            1121 14th Street, NW
6           Suite 200
            Telephone: (202)216-0261
7           Email: rosenthal@nilc.org
                    tumlin@nilc.org
8                   rebert@nilc.org
9
10          MAKE THE ROAD NEW YORK
            BY: ANTONIO ALARCON, ESQUIRE
11              ALEXIA SCHAPICA, ESQUIRE
            92-10 Roosevelt Avenue
12          Jackson Heights, NY 11372
            Emails antonio.alarcon@maketheroadny.org
13
14
            STATE OF CALIFORNIA, DEPT OF JUSTICE
15          OFFICE OF THE ATTORNEY GENERAL
            BUREAU OF CHILDREN'S JUSTICE
16          BY: MICHAEL L. NEWMAN, DIRECTOR
            300 S. Spring Street
17          Suite 1702
            Los Angeles, CA 90013
18          Telephone: 213 897-2642
            Email: michael.newman@doj.ca.gov
19
20
21
22

```
                                                                          4
   1    APPEARANCES:   (Continued)

   2

   3    ON BEHALF OF PLAINTIFFS: (Continued)

   4          STATE OF CALIFORNIA, DEPT OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
   5          CIVIL RIGHTS ENFORCEMENT SECTION
              BY: RONALD H. LEE, DEPUTY ATTORNEY GENERAL
   6          1515 Clay Street,
              Suite 2100
   7          Oakland, CA 94612-1492
              Telephone: (510) 879-1983
   8          Email: ronald.lee@doj.ca.gov

   9

  10          COVINGTON & BURLING, LLP
              BY:  JONATHAN MINCER,, ESQUIRE
  11          One CityCenter
              850 Tenth Street, NW
  12          Washington, DC 20001-4956
              Telephone: (202) 662-5781
  13          Email: jmincer@cov.com

  14

  15

  16          GIBSON DUNN & CRUTCHER, LLP
              BY:  HALEY MORRISSON, ESQUIRE
  17          1050 Connecticut Avenue, NW
              Washington, D C 20036-5306
  18          Telephone: (202) 955-8500
              Email: hmorrisson@gibsondunn.com

  19

  20

  21

  22
```

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                                   **10/20/2017**

5

```
1    APPEARANCES:  (Continued)
2    ON BEHALF OF PLAINTIFFS: (Continued)
3
               STATE OF NEW YORK
4              OFFICE OF ATTORNEY GENERAL
               CIVIL RIGHTS BUREAU
5              BY:  ALEX W. FINKELSTEIN, ESQUIRE
               120 Broadway
6              New York, NY 10271-0332
               Telephone: (212) 416-6129
7              Email: Alex.Finkelstein@ag.ny.gov
8
9              STATE OF NEW YORK
               OFFICE OF ATTORNEY GENERAL
10             CIVIL RIGHTS BUREAU
               BY: DIANE O. LUCAS, ESQUIRE
11             120 Broadway
               New York, NY 10271-0332
12             Telephone: (212) 416-8149
               Email: Diane.Lucas@ag.ny.gov
13
14
15   ON BEHALF OF DEFENDANTS:
16
               U S DEPARTMENT OF HOMELAND SECURITY
17             OFFICE OF THE GENERAL COUNSEL
               BY: RENE E. BROWNE, ESQUIRE
18             Washington, DC 20528
               Telephone: (202) 447-3891
19             Facsimile: (202) 282-9186
               Email: Rene.Browne@dhs.gov
20
21
22
```

```
                                                              6

  1    APPEARANCES:  (Continued)

  2    ON BEHALF OF DEFENDANTS:

  3

              U S DEPARTMENT OF JUSTICE
  4           BY: JOHN TYLER, ESQUIRE
                  JOSHUA E. GARDNER, ESQUIRE
  5           20 Massachusetts Avenue, NW
              Washington, D C 20530
  6           Telephone: (202) 305-7583
              Email: joshua.e.gardner@usdoj.gov

  7

  8    ALSO PRESENT:

  9           DAN REIDY, LEGAL VIDEOGRAPHER

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22
```

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

7

```
 1                    I N D E X

 2    WITNESS:

 3        GENE HAMILTON

 4    EXAMINATION BY:                        PAGE

 5        Ms. Tumlin                           12

 6

 7                  E X H I B I T S

 8    HAMILTON

      EXHIBITS:            DESCRIPTION       PAGE

 9

10    No. 28    Notice of Deposition          21

11    No. 29    Email Exchange               197

12    No. 30    Frequently Asked Questions, 9/15/17  221

13

14    PREVIOUSLY MARKED

      EXHIBITS:

15

16    No.  3    Document                     126

17    No. 19    Letter                       154

18    No. 20    Email Chain                  165

19

20

21

22
```

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

8

```
1                    P-R-O-C-E-E-D-I-N-G-S

2            THE VIDEOGRAPHER:  Good morning.  We are

3    going on the record at 9:00 a.m. on Friday --

4    excuse me, 9:13 a.m. on Friday, October 20, 2017.

5    This is media unit one of the video recorded

6    deposition of Gene Hamilton taken by counsel for

7    the plaintiff in the matter of Martin Jonathan

8    Batalla Vidal, et al., v.  Elaine C. Duke, Acting

9    Secretary of the Department of Homeland Security;

10   Jefferson Beauregard Sessions III, Attorney

11   General of the United States; and Donald J. Trump,

12   President of the United States.

13            This is filed in the United States

14   District Court for the Eastern District of

15   New York.  This deposition is being held at the

16   offices of the Conference of Mayors located at

17   1620 I Street, Northwest, Washington, D C 20006.

18            My name is Dan Reidy from the firm of

19   Veritext Legal Solutions and I'm the videographer.

20   The court reporter this morning is Donna Lewis

21   from the firm Olender Court Reporting.

22            I am not authorized to administer an
```

9

1    oath.  I'm not related to any party in this

2    action, nor am I financially interested in the

3    outcome.

4           Counsel and all present will now state

5    their appearances and affiliations for the record.

6    If there are any objections to proceedings please

7    state them at the time of your appearance

8    beginning with the noticing attorney.

9           MS. TUMLIN:  Karen Tumlin, National

10   Immigration Law Center on behalf of the Batalla

11   Vidal plaintiffs.

12          MS. REBERT:  Trudy Rebert with the

13   National Immigration Law Center.

14          MR. ROSENTHAL:  Joshua Rosenthal with

15   the National Immigration Law Center on behalf of

16   the Batalla Vidal plaintiffs.

17          MR. VIDAL:  My name is Martin Jonathan

18   Batalla Vidal and I'm the plaintiff.

19          MS. SCHAPIRA:  Alexia Schapira with Make

20   the Road New York on behalf of the Batalla Vidal

21   plaintiff.

22          MR. ALARCON:  Antonio Alarcon, one of

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                     **10/20/2017**

10

1    the plaintiffs on the Martin Batalla case and also

2    with Make the Road New York.

3          MR. LEE:   Ronald Lee with the California

4    Attorney General's Office on behalf of State of

5    California in the case States of California,

6    Maine, Maryland, and Minnesota v. U S Department

7    of Homeland Security, Elaine C. Duke in her

8    official capacity as acting secretary of Homeland

9    Security in the United States of America in the

10   case filed in the Northern District of California.

11         MR. NEWMAN:   Michael Newman from the

12   California Attorney General's Office, in the same

13   case.

14         MR. MINCER:   Jonathan Mincer at

15   Covington and Burling on behalf of The Regents in

16   University of California and Janet Napolitano.

17         MS. MORRISSON:   Haley Morrisson with

18   Gibson, Dunn and Crutcher on behalf of the Garcia

19   plaintiffs in the matter of Dulce Garcia, et al.,

20   v. United States of America, et al., the

21   United States District Court for the Northern

22   District of California, San Francisco Division.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

1          MR. FINKELSTEIN:  Alex Finkelstein,

2    Volunteer Assistant Attorney General with the

3    State of New York representing the plaintiff

4    states in the State of New York, et al., v. Trump,

5    et al.

6          MS. LUCAS:  Diane Lucas with the New

7    York State Attorney General's Office representing

8    the plaintiff states in New York, et al., v.

9    Trump, et al., in the Eastern District of New

10   York.

11         MS. BROWNE:  René Browne, United States

12   Department of Homeland Security Office of the

13   General Counsel on behalf of defendant Elaine C.

14   Duke in her official capacity as acting secretary

15   of the Department of Homeland Security.

16         MR. TYLER:  John Tyler, United States

17   Department of Justice on behalf of defendants.

18         MR. GARDNER:  Josh Gardner, United

19   States Department of Justice on behalf of the

20   defendants.

21         And the witness reserves the right to

22   read and sign.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

---

                                                                                    12

1              THE VIDEOGRAPHER:  Would the court

2    reporter please swear in the witness.

3    Whereupon,

4                    G E N E   H A M I L T O N

5    after having been first duly sworn by the Notary

6    Public was examined and testified as follows:

7              EXAMINATION ON BEHALF OF PLAINTIFFS

8              MS. TUMLIN:  Good morning.  My name is

9    Karen Tumlin.  I'm one of the plaintiff's counsel

10   and I'm with the Nation Immigration Law Center.

11   Can you please state your full name for the

12   record?

13             THE WITNESS:  Gene Patrick Hamilton.

14   BY MS. TUMLIN:

15        Q    **Great.  And is that G-E-N-E?**

16        A    Correct.

17        Q    **Perfect.  And with whom are you**

18   **currently employed?**

19        A    I work for the United States Department

20   of Homeland Security.

21        Q    **And what is your title with the**

22   **Department of Homeland Security?**

---

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

13

1      A      Senior counselor to the secretary.

2      **Q      And would that be Acting Secretary**

3  **Elaine Duke?**

4      A      She is the acting secretary of Homeland

5  Security.

6      **Q      And are you an attorney, Mr. Hamilton?**

7      A      Indeed.

8      **Q      And have you ever had your deposition**

9  **taken before?**

10      A      No.

11      **Q      And have you ever taken the deposition**

12  **of a witness before?**

13      A      Not since graduating law school.

14      **Q      Great.  And so for that reason I'll just**

15  **go over a few ground rules, although as an**

16  **attorney who has been in a deposition or a law**

17  **student I think you know a lot of these ground**

18  **rules.  Do you understand that you have taken an**

19  **oath to tell the truth and that oath has the same**

20  **effect as if you are testifying in court?**

21      A      Yes.

22      **Q      And you understand even though we are in**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

14

1    a lovely, informal conference room that your

2    testimony will have the same force and effect as

3    if we were in a court of law?

4          A    Yes.

5          Q    Is there any reason why you would not be

6    able to answer truthfully today?

7          A    No.

8          Q    Have you taken any medications that

9    would interfere with your ability to give truthful

10   testimony?

11         A    No.

12         Q    And have you discussed the nature of

13   today's deposition with an attorney?

14         A    The nature of it?

15         Q    Uh huh?

16         A    Yes.

17         Q    And which attorneys did you discuss the

18   nature of today's deposition with?

19         A    The attorneys who are present at the

20   table.

21         Q    Okay.

22         A    As well as a number of other attorneys

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

15

1    from the Department of Justice and Homeland

2    Security.

3         Q     Okay.  And so just to keep the record

4    clear, that would be with Ms. Browne, Mr. Tyler,

5    and Mr. Gardner?

6         A     That's correct.

7         Q     Do you remember any of the other

8    attorneys that you discussed the nature of today's

9    deposition with?

10        A     Now, when you say the nature of the

11   deposition what do you mean?

12        Q     That you had conversations -- and I'm

13   not asking you to reveal the content of those

14   conversations, about the fact that you would be

15   coming here this morning for a deposition?

16        A     So the fact that I would be coming here

17   to discuss, to have a deposition, did I have any

18   conversations with any attorneys about the fact

19   that I was being deposed today, this morning?

20        Q     Yes.

21        A     Yes.  In addition to the three who are

22   at the table there was a number of folks who I

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

16

1    talked to yesterday at a meeting, a prep session.

2    I do not recall all of their names off of the top

3    of my head.  But in addition I -- clearly the

4    principal deputy general counsel knows that I'm

5    here today.  They're well aware of that.  Joe

6    Maher as well as one of the other deputy counsels,

7    Dimple Shah.

8         Q    And if you had to approximate how many

9    attorneys you spoke to in that prep session what

10   would you approximate that number as?

11        A    I don't know, five to seven.

12        Q    Great.

13        A    Maybe.

14        Q    Okay.  And did any of those attorneys

15   explain to you the nature of these proceedings and

16   the importance of giving honest and accurate

17   answers?

18        A    Yes.

19        Q    And were you satisfied with that

20   explanation?

21        A    Sure.

22        Q    Okay.  So today I'm going to be the

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

17

1  primary person asking you questions in this

2  deposition, but because we have the two cases, the

3  cases proceeding in the Eastern District of

4  New York challenging the termination of DACA as

5  well as the cases that are consolidated in the

6  Northern District of California, we will have

7  other attorneys who are asking you questions later

8  on.

9      A    Great.

10     Q    And what I would ask is if you don't

11 understand a question that has been asked just

12 please tell the person who is presenting the

13 question that you don't understand it.  Does that

14 work for you?

15     A    Yes, it does.

16     Q    Great.  And if you don't understand a

17 question the person asking the question will

18 rephrase the question.  Does that work for you?

19     A    It does.

20     Q    Okay.  And do you understand that if you

21 answer a question it will be assumed that you have

22 understood the question?

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

18

1        A    Unless I say otherwise.

2        Q    Perfect.  And do you understand that the

3    questions and your answers will be recorded by our

4    court reporter, Donna, and will be written into

5    the transcript and that this transcript may be

6    read to the judge as your testimony at a trial or

7    a hearing?

8        A    I do.

9        Q    And do you understand that if you make

10    changes to your testimony that the attorneys may

11    comment on these changes at a trial or a hearing?

12        A    I do.

13        Q    Okay.  And I will try to abide by this

14    rule as well, but for the benefit of creating a

15    nice, clear, and understandable transcript I'm

16    going to ask that you try to wait until I finish

17    my question before answering and I will also try

18    not to interrupt you.

19        A    Sounds fair.

20        Q    And it would be great if both you and I

21    can try to provide verbal answers instead of

22    gestures or nods.  Do you understand?

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

19

```
1        A    I do.

2        Q    And your attorney may make objections

3   during the deposition today.  After the objection

4   has been stated you are still going to be required

5   to answer the question unless your attorney

6   instructs you not to answer.  Do you understand?

7        A    I do.

8        Q    Okay.  Do you understand that you may

9   not have an exact recollection of the

10  conversations or events but that we're entitled to

11  your best recollection?

12       A    Generally, yes.  That would make sense

13  to me.

14       Q    Perfect.  Is there any reason in your

15  mind why this deposition cannot proceed at this

16  time?

17       A    No.

18       Q    Okay.  And if you need a break at any

19  time please let me know.  We want to make this as

20  easy for everyone as possible.  I will just ask

21  that if there is a question on the table that you

22  complete that question before we take a break?
```

20

1      A     Okay.

2      Q     And because we're having the deposition

3   video taped we will for sure take a break about

4   every two hours because we'll need to change the

5   disk for the videographer.

6            Okay.  In today's deposition I'm going

7   to use a bunch of acronyms and I just want to make

8   sure that you and I are on the same page about

9   what those mean.

10     A     Okay.

11     Q     USCIS is short for the United States

12  Citizenship and Immigration Services.  Do you

13  agree with that?

14     A     I do.

15     Q     DACA, D-A-C-A, is short for Deferred

16  Action for Childhood Arrivals.  Do you agree with

17  that?

18     A     I do.

19     Q     ICE, I-C-E, is short for Immigration and

20  Customs Enforcement.  Do you agree with that?

21     A     Technically, U S Immigration and Customs

22  Enforcement, yes.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

21

1      Q    Perfect.  DHS is the Department of

2   Homeland Security.  Do you agree with that?

3      A    I do?

4      Q    DPC is short for Domestic Policy

5   Council.  Do you agree with that?

6      A    Sure.

7      Q    Okay.  Fantastic.  So I am going to hand

8   the court reporter a new exhibit.  This is -- I

9   would like to ask to mark this as Exhibit 28.  We

10  are still doing sequential numbering from the

11  other cases.  I have copies for you all.

12          MR. GARDNER:  We appreciate it.

13          (Whereupon, Exhibit No. 28 was marked

14  for identification.)

15          MS. TUMLIN:  This is a nice short

16  document.

17          (Court reporter requested

18  clarification.)

19          MS. TUMLIN:  Okay.  Sorry, Donna.  Short

20  document.

21  BY MS. TUMLIN:

22      Q    I will give you a minute to take a look

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

22

1    at it, please.  I'm going to represent that this

2    is the Notice of Deposition for your deposition

3    this morning by the Batalla Vidal plaintiffs.

4    Have you seen this document before?

5        A    No.

6        Q    Can you tell me what you did to prepare

7    for your deposition?

8            MR. GARDNER:  Objection to the extent it

9    calls for divulsion of materials that are

10   protected by the attorney/client product --

11   attorney/client privilege and/or work product.

12   BY MS. TUMLIN:

13       Q    You may answer.

14           MR. GARDNER:  So in other words, you

15   can't convey the substance of conversations you've

16   had with attorneys.  You can explain who you met

17   with, if you reviewed documents, things like that.

18           THE WITNESS:  As I indicated earlier we

19   had a meeting yesterday where we discussed the

20   nature of this deposition.

21   BY MS. TUMLIN:

22       Q    About how long did that meeting last?

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                                    10/20/2017

23

1      A    I don't recall specifics.  It was off

2    and on for a number of hours.

3      **Q    More than three hours?**

4      A    Likely, yes.

5      **Q    More than five hours?**

6      A    I don't know.  With breaks, probably

7    not.

8      **Q    Okay.  And was that the only preparation**

9    **meeting you had with your attorneys in advance of**

10   **today's deposition?**

11     A    I discussed the fact that I was being

12   deposed with Ms. Browne a week or two ago.

13     **Q    Okay.  And approximately how long was**

14   **that conversation?**

15     A    20 minutes.

16     **Q    Any other meetings or phone calls with**

17   **any of your attorneys to discuss preparation for**

18   **today's deposition?**

19     A    No, ma'am.

20     **Q    Great.  And did you review any documents**

21   **to prepare for this deposition?**

22     A    I did not.

24

1      Q      Have you reviewed any court documents

2    from this case in the Eastern District of

3    New York?

4      A      Not that I can recall.  It may have been

5    sent to me at some point, various points.  I'm

6    generally aware of these cases based on news

7    reporting, but I can't recall reading specifics.

8      Q      So have you ever read the complaint

9    filed in this case or any of the cases challenging

10   the termination of the DACA program?

11     A      Not to the best of my recollection.

12     Q      Okay.  Did you review any transcripts of

13   any of the depositions conducted in this case or

14   in the related California cases?

15     A      No.

16     Q      Did you review any emails discussing the

17   termination of the DACA program?

18     A      No.

19     Q      Did you bring any documents with you

20   today?

21     A      Nope.

22     Q      Other than your attorneys, both

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

25

1    **Ms. Browne and all of the attorneys that you met**

2    **with yesterday to prepare for this deposition, did**

3    **you discuss your deposition with anyone else other**

4    **than your lawyers?**

5         A     What do you mean by discuss my

6    deposition?

7         **Q     Did you discuss the fact that you were**

8    **going to be deposed today with anyone aside from**

9    **your lawyers?**

10        A     The fact that I was going to come to

11   this building today to be deposed, yes.

12        **Q     And who did you discuss that with?**

13        A     My wife knows that I'm here, as well as

14   my parents.  And I believe it's a generally known

15   fact within the department that there are a number

16   of people who are being deposed, the Department of

17   Homeland Security and Department of Justice.  But

18   I can't recall specific discussions.

19        **Q     Great.  And did you -- aside from**

20   **attorneys in the general counsel's office at the**

21   **Department of Homeland Security did you discuss**

22   **today's deposition with anyone else within the**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

26

1    Department of Homeland Security?

2         A    Did I discuss what about today's

3    deposition?  The fact that I was being deposed?

4         Q    The nature of the deposition?

5         A    What do you mean by the nature of the

6    deposition?

7         Q    The content?

8         A    The content of the deposition, no.

9         Q    Did you discuss the fact that you were

10   being deposed in the case challenging the DACA

11   program with any employees of the Department of

12   Homeland Security who are not attorneys in the

13   Office of the General Counsel?

14        A    Yes, I mean in terms of scheduling.

15        Q    And --

16        A    I mean --

17        Q    -- Who would that be?  Pardon me.

18        A    I have a confidential assistant who

19   knows my schedule and where I am.  And I have a

20   couple of individuals who support me as well who

21   know that I am here today.

22        Q    Aside from your confidential assistant

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

27

1    and what sounds like support staff, did you

2    discuss the fact that you were being deposed in a

3    case challenging the termination of DACA with any

4    non-attorney DHS employees?

5        A    I got a text message from the deputy

6    chief of staff yesterday asking where -- where my

7    whereabouts were yesterday.  And I told her that I

8    was in DACA prep and that I would be here --

9    deposition prep for DACA, and I would be here

10   today.

11       Q    Okay.  Do you know that other employees

12   of DHS have been deposed either in this case or in

13   the California DACA termination case in the last

14   week?

15       A    I am aware.

16       Q    Do you know James Nealon who works for

17   DHS?

18       A    I do.

19       Q    Did you speak to James Nealon about your

20   deposition testimony?

21       A    I did not.

22       Q    Do you know James McCament who works for

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                         **10/20/2017**

28

1    USCIS?

2          A    I do.

3          Q    Did you speak to James McCament about

4    your deposition testimony?

5          A    I did not.

6          Q    Do you know Phillip Miller who works for

7    ICE?

8          A    I do.

9          Q    Did you speak to Phillip Miller about

10   your deposition testimony?

11         A    I did not.

12         Q    Do you know Donald Neufeld who works at

13   USCIS?

14         A    I do.

15         Q    Did you speak to Donald Neufeld about

16   your deposition testimony?

17         A    I do not.

18         Q    Have you ever provided testimony at all

19   in a lawsuit?

20         A    Testimony, no.

21         Q    Have you ever provided a written

22   declaration for any lawsuit?

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

                                                                   29

1          A     I don't believe so.

2          Q     Have you ever provided testimony before

3    Congress, the United States Congress?

4          A     I have not.

5          Q     Have you ever help prepare congressional

6    testimony for other witnesses before the

7    United States Congress?

8          A     Certainly.

9          Q     Did that include written testimony?

10         A     Yes.

11         Q     Have you ever helped prepare a witness

12   to provide oral testimony for a congressional

13   hearing at the United States Congress?

14         A     Yes.

15         Q     Where did you grow up?

16         A     Where did I grow up?  I was born in

17   Arizona.  I lived there for 16 years.  I moved to

18   Georgia.  I lived in Georgia for a while.  I moved

19   to Florida.  I moved to Virginia.  Back to

20   Georgia.  Back to Virginia.  And so a little bit

21   all over the place.

22         Q     Great.  When did you graduate college?

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

30

1      A     2005.

2         Q     **And what did you study in college?**

3      A     International affairs.

4         Q     **Where did you work after college?**

5      A     A commercial landscape company called --

6    it is now known as Ruppert Landscaping.  At the

7    time it was known as Ruppert Nurseries.

8         Q     **And what state was that in?**

9      A     I worked for them in Georgia.  They are

10   headquartered here in metro D C.

11        Q     **Great.  You attended law school at**

12   **Washington and Lee School of Law.  Is that**

13   **correct?**

14     A     That is where I graduated from.

15        Q     **Did you attend a different law school**

16   **previous to Washington and Lee School of Law?**

17     A     I did.

18        Q     **What was that law school?**

19     A     My first year of law school was at the

20   Florida International University School of Law.

21        Q     **Great.  And when did you graduate from**

22   **Washington and Lee School of Law?**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

31

1      A    2010.

2      **Q    Why did you decide to attend law school?**

3      A    I'd always found the law interesting and

4  thought that it was something that I would like to

5  do.  And after working in commercial landscaping

6  for a couple of years I decided that it would

7  probably be worth a shot for a change.

8      **Q    Okay.  Were you interested in focusing**

9  **in any particular areas while you were in law**

10  **school?**

11      A    I was generally open to a lot.

12      **Q    Did you have an interest in immigration**

13  **when you entered law school?**

14      A    When I entered law school?

15      **Q    Uh huh?**

16      A    Not specifically.

17      **Q    When would you say your interest in**

18  **immigration law arose?**

19      A    I did an internship or externship with U

20  S Immigration and Customs Enforcement at the Krome

21  detention center in Miami the summer after my

22  first year of law school.  And it was interesting,

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                          10/20/2017

32

1    but I don't know that it was necessarily anything

2    that I thought I would do forever.

3         Q     Great.  Did you work over your law

4    school summers?

5         A     I did.

6         Q     And where did you work over your law

7    school summers?

8         A     I worked as indicated at the Krome

9    detention center with U S Immigration and Customs

10   Enforcement.  After my one L year -- my second

11   year, my second summer I worked at the Air Force

12   General Counsel's office as well as served as a

13   research assistant to a law professor and served

14   as a guest editor on the Harvard Journal of Law

15   and Public Policy.

16        Q     What was the name of the law professor

17   who you served as a research assistant for?

18        A     Susan Franck.

19        Q     And was she at Washington and Lee School

20   of Law?

21        A     She was.

22

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

33

1      Q      And did you have any term time

2   internships while in law school?

3      A      Term time?  What do you mean by that?

4      Q      Not during the summers, but during the

5   academic school year?

6      A      And what do you mean by internship?

7      Q      Where you worked for an organization?

8      A      I provided part time assistance over I

9   think beginning in my one L year and over the

10  course of my law school career to a professor of

11  law at the United States Coast Guard Academy.  At

12  the time he was Commander Sulmasy.  He later

13  became Captain Sulmasy.  I believe he's now

14  retired and now teaches somewhere.

15            I worked for Susan Franck off and on

16  doing research assistance.

17            And then during my third year of law

18  school I don't know that I -- I don't recall

19  specific externships or internships, but the

20  entire third year curriculum at Washington and Lee

21  was modeled on a practice oriented type of

22  program.  So I was engaged in some practice

34

1   oriented type of classes, but not internships

2   specifically.

3        Q    Thank you.  And did you take part in any

4   legal clinics during law school?

5        A    Legal clinics?  Define a legal clinic?

6        Q    A legal clinic is generally hosted at

7   the law school to provide practical education or

8   clinical education serving specific clients?

9        A    Specific clients in the community?

10  Where I -- one of the programs that I took in my

11  third year was focused on international tribunals.

12  And we provided some legal research to I believe

13  the international -- I don't even remember.  It

14  was a specific name.  It was for somebody who was

15  being tried for war crimes in Yugoslavia,

16  something along those lines.  I don't remember

17  specifics.

18       Q    Okay.

19       A    It wasn't that interesting.

20       Q    Thank you.  What was your first job

21  after law school?

22       A    I was accepted into the Secretary's

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

35

1    Honors Program for attorney's at the United States

2    Department of Homeland Security in the general

3    counsel's office.  That program involved a number

4    of opportunities to rotate around the department.

5    So my first billet in that program was with the

6    United States Customs and Border Protection.  I

7    spent a number of months working with the ethics

8    labor and employment division.  Subsequently

9    worked for the enforcement division and the trade

10   divisions.  After that my next rotation was with

11   the Office of General Counsel's office of

12   operations and -- the operations and enforcement

13   law division.  After that I did a rotation with

14   the intelligence law division at the Office of

15   General Counsel.  After that I worked at the TSA's

16   Office of Chief Counsel.  And left the program to

17   take a position with U S Immigration and Customs

18   Enforcement in Atlanta, Georgia.

19        **Q    Great.  Did you do any other rotations**

20   **other than the ones you enumerated while in the**

21   **DHS honors program?**

22        A    No.

**Martin Vidal, et al v. Elaine Duke, et al**                                    10/20/2017

36

1      Q      When did you leave the DHS honors

2   program?

3      A      I left early.  It was May of 2012 I

4   believe.

5      Q      Okay.  And when did you began at the --

6   was it the Office of Chief Counsel in Atlanta?

7      A      That's correct.

8      Q      The DHS?  When did you begin there?

9      A      Immediately after leaving.

10      Q      In May?

11      A      May 2012.

12      Q      So you were at the Office of Chief

13   Counsel in Atlanta, Georgia when the DACA program

14   was created?

15      A      That is correct.

16      Q      Is it okay for me to refer to the Office

17   of Chief Counsel as OCC?

18      A      Sure.  If you want to.

19      Q      What attracted you to taking that job at

20   OCC in Atlanta?

21      A      I was interested in staying within the

22   department, getting practical field experience.

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                **10/20/2017**

37

1   And my wife was pregnant at the time and getting

2   back to Georgia was a good idea.

3         **Q**     **And what was your title at the OCC in**

4   **Atlanta?**

5         A     Assistant chief counsel.

6         **Q**     **And what were your responsibilities as**

7   **assistant chief counsel?**

8         A     Primarily litigating cases before the

9   Executive Office of Immigration Review.  So that

10  was being at immigration court two to three days a

11  week, all day, handling master care -- master

12  cases, merits cases as well as providing

13  enforcement and advice to the law enforcement

14  officers and agents of U S Immigration and Customs

15  Enforcement.  Also had responsibilities for the

16  national security docket at certain portions of my

17  time there, as well as work site enforcement

18  litigation with respect to the civil fines and

19  penalties we are authorized to collect under the

20  Title 8.

21        **Q**     **And while at the OCC in Atlanta did you**

22  **have cases involving DACA recipients?**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

38

1        A     I believe so.

2        Q     **What do you recall about the cases that**

3    **you had involving DACA recipients?**

4        A     Let's take a step back.   When you say

5    DACA recipients?

6        Q     **People who had been granted DACA?**

7        A     If someone was granted DACA, we were

8    generally instructed to close cases for someone

9    who had been granted DACA.   So generally speaking

10   a DACA recipient, we would not have a case

11   involving a DACA recipient.

12       Q     **Did you ever have a case in which an**

13   **individual had DACA but you did not terminate**

14   **immigration proceedings?**

15       A     Not that I can recall.

16       Q     **Did you have cases involving individuals**

17   **who appeared facially eligible for DACA but had**

18   **not yet applied?**

19       A     Yes.

20       Q     **What did you do in those cases?**

21       A     We followed protocol.   And generally

22   everyone was aware of DACA and they would come to

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

39

1    court and indicate an intent to apply and we

2    would -- they would seek a continuance and we

3    would not object to a continence of the court.

4         Q    Do you ever recall a case where the

5    individual was not aware that they were facially

6    eligible for DACA where you may have recommended

7    or identified that they might want to look into

8    the application process for DACA?

9         A    I don't recall any specific times.

10        Q    And what month and year did you leave

11   OCC in Atlanta?

12        A    February of 2015.

13        Q    While at the OCC in Atlanta did you work

14   on the issue of unaccompanied minors at all?

15        A    Define the issue of unaccompanied

16   minors?  What do you mean by that?

17        Q    Are you aware that beginning in May --

18   May or June of 2014 there was increase of the

19   arrival of unaccompanied minors to the

20   United States from Central American countries?

21        A    Generally speaking, yes, that is

22   accurate and I was aware of that.

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

40

1      Q     Did you see that in your own work at the

2  OCC in Atlanta?

3      A     Certainly.

4      Q     What kind of interactions did you have

5  with unaccompanied minors arriving from Central

6  America in your work at OCC in Atlanta?

7      A     Any unaccompanied alien child who is

8  apprehended by the United States Department of

9  Homeland Security is issued a notice to appear and

10  placed into immigration court removal proceedings.

11  So we would have dockets of UACs.  Occasionally,

12  the court would erroneously schedule a UAC on a

13  non-UAC docket and so we would handle the cases.

14  But we were generally aware of that, reviewed

15  files as they came in, served them at the court, a

16  whole host of general duties.

17      Q     Did you see an increase in the number of

18  unaccompanied minors on the docket at OCC in

19  Atlanta during your time there?

20      A     Yes, I did.

21      Q     And what countries were those

22  unaccompanied minors primarily from?

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

41

1        A    The Northern Triangle, Central -- in

2    Central America.  So, El Salvador, Honduras,

3    Guatemala.

4        **Q    Do you have a general sense of the**

5    **country conditions in El Salvador, Honduras, and**

6    **Guatemala?**

7        A    Generally.

8        **Q    What -- what is your general sense of**

9    **the country conditions in those three countries?**

10       A    Define country conditions?

11       **Q    I would define country conditions in**

12   **this occasion akin to how the United States**

13   **Department of State does, where there is civil**

14   **unrest and high levels of violence or targeting of**

15   **individuals.**

16       A    Targeting of individuals by whom?

17       **Q    Well, what's your understanding of the**

18   **type of violence that exists in these countries,**

19   **for example?**

20       A    My general understanding is that each

21   specific country has different conditions between

22   El Salvador, Guatemala, Honduras, as well as some

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

42

1    of the neighboring countries and Mexico as well.

2    They -- conditions have generally -- I wouldn't

3    even say generally.  In some cases depending on

4    the metric, they have improved.  Some cases you

5    could look at certain statistics and say that they

6    have not improved.  You are talking about

7    countries that generally speaking have been marked

8    by civil strife and discord for decades in various

9    fashions.  They are countries that are on the cusp

10   of a lot of change and positive development and it

11   is something that this government has shown its

12   commitment and dedication to.  And we hosted a

13   Conference on Security and Prosperity in Central

14   America in Miami in June where we brought together

15   the leaders of those countries as well as the

16   private sector.  And we heard a lot of positive

17   developments and I'm generally encouraged about

18   the future prospects of those countries and about

19   their current conditions.  It's not to say that

20   there's not problems there, but generally speaking

21   it's things are improving.

22       Q    Great.  And did you get a sense when you

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

43

1  **were at OCC in Atlanta of the primary reasons why**

2  **unaccompanied minors were leaving from El**

3  **Salvador, Guatemala, and Honduras?**

4        A     Let's parse that out.

5        **Q     Sure.**

6        A     Did I get a sense of the general reasons

7  that they were leaving?

8        **Q     Uh huh?**

9        A     In that so much as what was said by

10  them, the stated reasons?  Or --

11        **Q     -- Sure.  Let's start with --**

12        A     -- the actual potential reasons?

13        **Q     Perfect.  Let's start with the stated**

14  **reasons by the unaccompanied minors themselves?**

15        A     Generally speaking any time an alien is

16  apprehended by the United States Department of

17  Homeland Security they are interviewed by

18  typically a border patrol agent.  They are asked a

19  series of questions including why did you come,

20  where are you going, do you have a fear of return.

21  And in a large number of the cases that I

22  remember recall -- reviewing the stated reason was

44

1    to come join a family member residing in the

2    United States.  There was not generally any

3    expressed fear, although there were certain cases

4    where that was done, generally speaking if we are

5    talking about UACs.

6          **Q     Do you remember any example of UAC or**

7    **unaccompanied minor stating that they came to the**

8    **United States in order to apply for the DACA**

9    **program?**

10         A     That they came to the United States to

11   apply for the DACA program?

12         **Q     Correct.**

13         A     I don't recall anyone ever saying

14   specifically that they were coming to apply for

15   the DACA program.  I seem to recall -- and we are

16   talking about reviewing hundreds if not thousands

17   of case files over the course of the years and it

18   has about sometime.  I do recall on several

19   occasions reading statements about individuals

20   saying that they were coming to seek permisos.

21   That they were seeking -- coming here because they

22   had heard that the law had changed with respect to

45

1    the treatment of minors in the United States.

2         Q     And what did you understand the term

3    permisos to mean in this context?

4         A     Permisos generally refer to work

5    permits.

6         Q     And of those hundreds to thousands of

7    case files approximately how many or what percent,

8    whatever is easier for you to approximate, would

9    you say that the unaccompanied minors stated that

10   they were coming to the United States in order to

11   apply for permisos?

12        A     I couldn't guess.

13        Q     Less than 2 percent?

14        A     I couldn't guess.

15        Q     Okay.  What was your next job after you

16   were at the OCC in Atlanta?

17        A     My next job was serving as general

18   counsel to Senator Sessions on the United States

19   Judiciary Committee.

20        Q     When did you begin that position?

21        A     February of 2015.

22        Q     If I refer to the Senate Judiciary

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

46

1   Committee as the SJC is that okay?

2        A    If it makes it easier for you.

3        Q    What attracted you to working for the

4   SJC?

5        A    The work of the Senate Judiciary

6   Committee is diverse and generally covers a lot of

7   interesting legal topics including immigration.

8   And Senator Sessions assumed the chairmanship of

9   the subcommittee on Immigration and The National

10  Interest and so I took a position serving him in

11  that capacity.

12       Q    Great.  And when did you leave the

13  Senate Judiciary Committee?

14       A    January 20, 2017.

15       Q    In the entire time you were at SJC did

16  you hold the title of general counsel to Senator

17  Sessions?

18       A    Indeed.

19       Q    And in your role as general counsel to

20  Senator Sessions at the SJC can you describe your

21  working relationship to then Senator Jefferson

22  Sessions?

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                          **10/20/2017**

47

1                    MR. GARDNER:  Counsel, just to be clear.

2                    MS. TUMLIN:  Sure.

3                    MR. GARDNER:  So if you are asking about

4        the substance of the work he did that would be

5        subject to the speech and debate clause and we

6        instruct the witness not to answer.  If you are

7        asking at a high level of generality what his

8        general job responsibilities are we can permit the

9        witness to answer that question.  I just want to

10       be clear.  I'm not entirely clear what you are

11       asking.

12       BY MS. TUMLIN:

13            **Q    Sure.  Well, right now I'm asking about**

14       **your working relationship to then**

15       **Senator Sessions, meaning how frequently did you**

16       **have contact with the senator when you were**

17       **serving in this role?**

18                   MR. GARDNER:  That is a permissible

19       question if you're asking about just the frequency

20       of contact.  You can answer that question.

21                   THE WITNESS:  I had a tremendous working

22       relationship with then Senator Sessions and we

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

48

1    spoke on a near daily basis, if not multiple times

2    a day.

3    BY MS. TUMLIN:

4         **Q     Great.  Do you recall how you first came**

5    **to work for then Senator Sessions?**

6         A     Clarify your question?

7         **Q     How did you first apply for the job at**

8    **the SJC?**

9         A     I became aware of an opening through a

10   friend and was asked if I was interested.  And I

11   sent my resume and was interviewed and --

12        **Q     What was the name of that friend who**

13   **made you aware of the opening?**

14        A     Danielle Cutrona.

15        **Q     And at a high level of generality what**

16   **were your responsibilities when you were the**

17   **general counsel to Senator Sessions at the SJC?**

18        A     Generally speaking the subcommittee on

19   Immigration and The National Interest has a work

20   portfolio that they do.  So it's everything from

21   managing legislation that comes through the

22   subcommittee to the disposition of private relief

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

49

1    bills that are filed, as well as providing subject

2    matter expertise on pending legislation to the

3    chairman as holding hearings, interacting with the

4    executive branch, other members of Congress,

5    assisting the chairman with speech writing and

6    other duties as necessary.

7        **Q    Great.  How many other staff worked for**

8    **Senator Sessions at that time serving him in his**

9    **role as a member of the SJC?**

10       A    The judiciary committee staff was --

11   fluctuated a little bit, generally speaking it was

12   about five to six people.

13       **Q    Okay.  Were there any other attorneys on**

14   **the Senate judiciary staff at the time that you**

15   **were there?**

16       A    It was largely all attorneys.

17       **Q    Were there any other attorneys who had**

18   **experience in immigration law aside from yourself?**

19       A    What do you mean experience in

20   immigration law?

21       **Q    Previous work experience in the subject**

22   **of immigration as an attorney?**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

50

```
 1        A     As an attorney working in immigration

 2   outside of the United States Congress?

 3        Q     Either inside of the United States

 4   Congress or outside experience with the federal

 5   immigration laws as an attorney?

 6        A     Danielle Cutrona who worked there,

 7   although she did not work outside of the

 8   United States Congress on the matter, is generally

 9   knowledgeable about the immigration laws of the

10   United States.

11        Q     Anyone else from the SJC staff at that

12   time?

13        A     You are asking about prior work

14   experience, not work experience gained during

15   their time?

16        Q     Correct.

17        A     Generally, not.

18        Q     Of the five to six other attorneys

19   working on the SJC staff at the time you were

20   there, in addition to yourself and Danielle

21   Cutrona would you consider anyone else as having

22   expertise in the federal immigration laws?
```

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

51

1    A    Expertise, generally not.  Although,

2    individuals are -- who worked with us became

3    immediately familiar with a lot of the immigration

4    laws and developed some level of knowledge,

5    perhaps not expertise.  But they -- they were

6    required to become knowledgeable about the

7    business of the committee.

8        **Q    Is it fair to say that you had primary**

9    **responsibility for immigration issues while at the**

10   **SJC?**

11       A    Yes.

12       **Q    While at the SJC did you work on press**

13   **materials for then Senator Sessions?**

14           MR. GARDNER:  Karen, I think at this

15   point we are getting into speech and debate clause

16   issues.  Again, at a high level of generality --

17           MS. TUMLIN:  -- It's a yes, no question.

18           MR. GARDNER:  I understand it's a yes,

19   no question.  I think we are getting into the core

20   of the speech and debate clause.  So we instruct

21   the witness not to answer.

22           MS. TUMLIN:  Okay.  You're -- just to be

52

1    clear for the record you're instructing him not to

2    answer the question of whether he worked on press

3    materials for then Senator Sessions while at the

4    SJC.

5            MR. GARDNER:  You were asking him about

6    the work that he did for a particular senator.

7    The speech and debate clause may apply to protect

8    that information.

9            MS. TUMLIN:  Okay.

10            MR. GARDNER:  It's a broad privilege,

11    yes.

12    BY MS. TUMLIN:

13        Q    So you may have a similar objection and

14    instruction, but I will ask the question anyway so

15    we have a clean record.

16            While at the SJC did you work on

17    advocacy to the Department of Homeland Security or

18    to other federal agencies?

19            MR. GARDNER:  I do have the same

20    objection and the same instruction.

21            MS. TUMLIN:  Okay.  Right.  Again, for

22    clarity on the record we object to that

53

1    instruction.  We reserve our right to take that up

2    later with the court.

3    BY MS. TUMLIN:

4        Q    Okay.  What immigration related hearings

5    did then Senator Sessions hold while you were

6    working for him at the SJC?

7        A    What hearings did he hold immigration --

8        Q    -- Immigration related?

9        A    -- related?  I couldn't recall all of

10   them.  A number.

11       Q    Could you approximate roughly how many?

12       A    At least ten.

13       Q    Great.

14       A    Likely.  It could have been more, it

15   could have been less.

16       Q    Okay.  Did then Senator Sessions hold

17   any hearings related to DACA while you were

18   working for him?

19       A    Specifically related on the topic of

20   DACA?

21       Q    Where DACA featured prominently even if

22   the hearing for example was generally related to

54

1    immigration?

2         A    I recall it came up in a few hearings,

3    but I'm not sure.

4         Q    **And approximately how many hearings do**

5    **you think DACA came up while you were at the SJC?**

6         A    I couldn't guess.

7         Q    **Less than five?**

8         A    I couldn't tell you.

9         Q    **Okay.  Do you remember what role you had**

10   **in those hearings where DACA did come up?**

11            MR. GARDNER:  And that is a yes or no

12   question and you can answer that with a yes or no.

13            THE WITNESS:  Yes.

14   BY MS. TUMLIN:

15        Q    **Your attorney may instruct you not to**

16   **answer, but can you describe what your role was in**

17   **those hearings where DACA came up?**

18            MR. GARDNER:  Objection.  That calls for

19   disclosure of information subject to the speech

20   and debate clause.  I instruct the witness not to

21   answer.

22

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

55

1          MS. TUMLIN:  Okay.  And we preserve our

2    objection to that instruction.

3    BY MS. TUMLIN:

4          **Q    Did you interview with then Senator**

5    **Sessions for your job at the SJC before you were**

6    **offered that position?**

7          A    Did I interview with him specifically?

8          **Q    Yes.**

9          A    No.

10         **Q    Did you meet him during any interview**

11   **you had for that job before you were offered the**

12   **job?**

13         A    I did not meet him prior to being hired

14   by him.  And in fact he represented to me later

15   that I was the first person he had ever hired as

16   an attorney to work for him based solely on the

17   strong recommendations of those who did interview

18   me.

19         **Q    So, had you ever spoken with Senator**

20   **Sessions before you started your position at the**

21   **SJC?**

22         A    No.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

56

1      Q     Do you know Stephen Miller who works at

2   the White House now?

3      A     Yes, I do.

4      Q     How did you first meet Mr. Miller?

5      A     Through our work at the United States

6   Senate.

7      Q     Did you work with Stephen Miller while

8   working for then Senator Sessions at the SJC?

9      A     Yes.

10     Q     Did you work on hearings together with

11  Mr. Miller while at the SJC?

12     A     Did we work on hearings together?  Did

13  he have a role to play with some of the hearings

14  that we held?  Sure.  As the communications

15  director for the senator he had a role to play

16  with respect to the hearings that the senator

17  participated in.

18     Q     Did you work on any legislation together

19  with Mr. Miller while at the SJC?

20           MR. GARDNER:  Again, I think we are

21  getting close to the line of again, implicating

22  the speech and debate clause.  I instruct the

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

57

1    witness not to answer.

2              MS. TUMLIN:  Okay.  You're instructing

3    him not to answer the yes, no question?

4              MR. GARDNER:  That's what I said.

5    BY MS. TUMLIN:

6         Q    Okay.  While at the SJC did you work on

7    any legislation related to DACA?

8              MR. GARDNER:  Same objection.  Same

9    instruction.

10             MS. TUMLIN:  Okay.  We preserve our

11   right to bring those objections before the court.

12   BY MS. TUMLIN:

13        Q    How were the roles that you and Stephen

14   Miller held during the time you were at the SJC

15   related to one another?

16             MR. GARDNER:  Same objection.  Calls for

17   information covered by the speech and debate

18   clause.  I instruct the witness not to answer.

19   BY MS. TUMLIN:

20        Q    Okay.  Going back to your interview for

21   your job at the SJC, who interviewed you?

22        A    My real, formal interview was conducted

58

1    by Rick Dearborn, the chief of staff for Senator

2    Sessions.

3        Q    Was anyone else in the interview that

4    you remember?

5        A    Was anyone else in the interview in the

6    room?

7        Q    Asking questions or --

8        A    I -- I honestly don't know.  Well, the

9    only person who asked me questions was Rick

10   Dearborn.  At the time my wife had just suffered a

11   miscarriage and so instead of traveling to D C

12   they arranged a video teleconference for me down

13   in Georgia and I participated that way.  And so I

14   only saw on the screen.  And I was thankful for

15   the opportunity to do so.

16       Q    Okay.  We're going to switch subjects.

17   You served on President Trump's transition team.

18   Is that correct?

19       A    That's correct.

20       Q    What dates approximately did you serve

21   on President Trump's transition team?

22       A    I believe I started in August of 2016.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

59

1      Q      Okay.  How did you get appointed to the

2    transition team for now President Trump?

3      A      I don't recall specifically.  It was

4    just kind of a situational became aware of it and

5    engaged.

6      Q      Did someone recommend you to be placed

7    on the transition team?

8      A      I think to the best of my recollection

9    Danielle and I both generally agreed to

10   participate and to help them out.

11     Q      Who did you make your agreement to

12   participate in the transition team known to?

13     A      Who did I make it known to?

14     Q      Uh huh?

15     A      At what point in time?

16     Q      In -- previous to August 2016?

17     A      I'm not sure I follow the question.

18     Q      Did you have to interview with anyone to

19   become a member of the transition team?

20     A      I don't recall a specific interview.

21     Q      What was your role in the transition

22   team?

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

60

1        A     I served as an adviser on immigration

2    related issues.

3        **Q     Did you have a title?**

4        A     Not to the best of my recollection.

5        **Q     Aside from Danielle, who I assume is**

6    **Danielle Cutrona, did anyone else serve with you**

7    **on the transition team as an adviser on**

8    **immigration related issues?**

9        A     Yes, there were others.

10       **Q     Who were they?**

11       A     I signed a confidentiality agreement

12   with the transition entity and I have a legal

13   contract that I believe precludes me from

14   disclosing any of the substantive information

15   about the fact that other individuals participated

16   on the transition team.

17       **Q     Presumably that should include Danielle?**

18       A     Danielle is one I can -- I -- who

19   introduced me to the position generally speaking.

20   The two of us at the same time, revealing that

21   information was necessary in that context to

22   explain how I became aware of the program or of

61

1    the position.

2          Q     So it is through Danielle that you

3    became aware of the position in the transition

4    team?

5          A     Generally I would say that's probably

6    right, although we both became aware of it at

7    about the same time.

8          Q     Okay.  Who did you report to while you

9    were part of the transition team?

10         A     I don't recall specifically prior to the

11   election who I reported to.  Although -- I don't

12   recall.

13         Q     Was there someone who you were sending

14   ideas or recommendations on immigration related

15   issues to prior to the election?

16         A     Not generally.  I don't know that there

17   was -- we were sending anything to anyone

18   specifically so much as just working on them.

19         Q     Did anyone report to you while you were

20   serving as an adviser on immigration related

21   issues on the transition team?

22         A     Yes.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                          **10/20/2017**

62

1       Q     And who was that?

2       A     I would prefer to not disclose their

3   identities, although after the election I was

4   generally the lead on development of all

5   immigration policy issues for the transition

6   entity and so everyone who worked on that reported

7   to me.

8       Q     I'm sorry.  Did you say after the

9   election you were the lead on all immigration

10  related issues or before?  I just heard that --

11      A     It was -- I know for certain it was

12  definitive that I was after.  And before largely,

13  yes, also.

14      Q     Okay.  So leaving aside the identities

15  of those individuals for a moment can you give me

16  a rough number of how many other individuals

17  worked on immigration related issues as a part of

18  the transition team?

19      A     Ten, 12.

20      Q     Great.  Okay.  Did you have a role in

21  vetting or assessing candidates for presidential

22  appointments as part of the transition team?

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

63

1      A     In vetting or assessing?

2      **Q     Uh huh.**

3      A     No.

4      **Q     What about in recommending names for**
5      **specific appointments?**

6      A     Yes.

7      **Q     Did you recommend names for the**
8      **Department of Homeland Security appointments?**

9      A     Yes.

10     **Q     How about USCIS?**

11     A     Yes.

12     **Q     How about ICE?**

13     A     Yes.

14     **Q     How about U S Department of Justice?**

15     A     I think so.

16     **Q     Okay.  Did you work with Stephen Miller**
17     **while on the transition team?**

18     A     Yes.

19     **Q     Can you describe in what ways you worked**
20     **with Stephen Miller as a member of the transition**
21     **team?**

22

64

1           MR. GARDNER:  Are you asking about prior

2    to the election or after the election?  Just so

3    I'm clear.

4           MS. TUMLIN:  I'm asking about prior to

5    inauguration day.

6           MR. GARDNER:  Okay.

7           MS. TUMLIN:  Do you need a moment?

8           MR. GARDNER:  Do you need to take a

9    break?

10           MR. ROSENTHAL:  There is the room back

11    there where I showed you last time.

12           THE VIDEOGRAPHER:  We are going off the

13    record.  The time on the video is 10:09 a.m.

14           (The proceeding recessed from 10:09 a.m

15    to 10:22 a.m.)

16           THE VIDEOGRAPHER:  We're back on the

17    record.  The time on the video is 10:22 a.m.

18    BY MS. TUMLIN:

19       Q    Okay.  And I believe I was asking you

20    some questions about your role in President-elect

21    Trump's transition team.  When we broke I was

22    asking you a question about your work with Stephen

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

65

1    Miller on the transition team.  To try to help us

2    get over some of the disagreements on objections

3    I'm going to restate that question and limit the

4    temporal scope.

5            So can you describe your work with

6    Stephen Miller on the transition team prior to the

7    election of President Trump?

8        A    I don't know that we had a whole lot of

9    direct interaction on the transition team itself.

10   He was busy with the campaign.  We were focusing

11   on transition team related matters.  We had some

12   interactions, but I don't recall anything

13   specifically.

14       Q    Okay.  And looking now only at the

15   period after the election day and prior to the

16   inauguration of President Trump can you describe

17   your interaction with Stephen Miller while on the

18   president's transition team?

19           MR. GARDNER:  You can you answer that

20   question to the extent you can do so without

21   identifying pre-decisional deliberative

22   information.  To the extent that your answer would

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

66

1   include that we would instruct you not to answer

2   on the basis deliberative process privilege and

3   potential presidential communication privilege.

4              THE WITNESS:  We generally discussed the

5   formulation of policy.

6   BY MS. TUMLIN:

7       **Q    Did you discuss the formulation of**

8   **immigration policy?**

9              MR. GARDNER:  That is a question you can

10  answer.

11             THE WITNESS:  Yes.

12  BY MS. TUMLIN:

13      **Q    Did you discuss the formulation of**

14  **policy with respect to the DACA program?**

15      A    Yes.

16      **Q    Did you discuss whether or not you felt**

17  **the DACA program should be terminated?**

18             MR. GARDNER:  I will object on -- and

19  now we are talking post November 7?  Correct?

20  BY MS. TUMLIN:

21      **Q    We're talking after November 7 and prior**

22  **to January 20 did you discuss whether you felt the**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

67

1    DACA program should be terminated with Stephen

2    Miller?

3              MR. GARDNER:  At this point we would

4    object on the basis of deliberative process

5    privilege and presidential communication

6    privilege.  I instruct the witness not to answer.

7              MS. TUMLIN:  Okay.  And plaintiffs take

8    a position that because the president had not yet

9    taken the oath of office that the presidential

10   privilege does not apply.  We preserve our right

11   to take up that objection, and the deliberative

12   process privilege as well.

13   BY MS. TUMLIN:

14        Q    So again, I will try to be clear about

15   the time period I'm talking about.  So, prior to

16   election day did you discuss DACA in any way with

17   any other transition team members aside from

18   Stephen Miller?

19        A    Likely, yes.

20        Q    And who would that include?

21        A    Preelection day?

22        Q    Uh huh.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

68

1        A     I signed a nondisclosure agreement.

2        **Q     Okay.  So that nondisclosure agreement**

3   **is not with anyone in this room.  Correct?**

4        A     That's correct.

5              MS. TUMLIN:  And there is no basis that

6   I hear your attorney objecting to.

7              Do you have any objections to the

8   witness under oath providing the names of the

9   other individuals prior to the election of

10  President Trump on the transition team that he

11  discussed DACA with?

12             MR. GARDNER:  The agreement that

13  Mr. Hamilton may have with the transition team is

14  not an agreement I've ever seen.  It is between he

15  and the campaign.  We are not asserting any basis

16  for him to respond or not respond on the basis of

17  the nondisclosure agreement.  It's a private

18  agreement.

19  BY MS. TUMLIN:

20       **Q     Mr. Hamilton, are you refusing to answer**

21  **that question on the basis of an agreement that's**

22  **not --**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

69

1      A    I am.

2      Q    -- before any of these parties?

3      A    Yes.

4      Q    Okay.  We are likely going to have to

5  come back to that later on today.

6            So again, I'm focusing on the period

7  prior to the election of President Trump.  Did you

8  discuss whether you felt the DACA program should

9  be terminated with any other members of the

10  transition team other than Stephen Miller?

11     A    Didn't you just ask me that question?

12     Q    I asked if you discussed DACA.  This one

13  is about whether you felt DACA would be

14  terminated?

15     A    Yes.

16     Q    And are you taking the same position

17  that you refuse to disclose who else you discussed

18  whether you felt DACA should be terminated?

19     A    Indeed.

20     Q    Okay.  I'm going to switch time periods

21  on you.  After the election of President Trump,

22  but before his inauguration did you discuss

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                          **10/20/2017**

70

1    whether you felt DACA should be terminated with

2    any other members of the transition team other

3    than Stephen Miller?

4              MR. GARDNER:  That's a yes or no.  So

5    that you would be permitted answer.

6              THE WITNESS:  Yes.

7    BY MS. TUMLIN:

8         Q    Okay.  And are you continuing to take

9    the position that you will not disclose who aside

10   from Stephen Miller you discussed whether the DACA

11   program would be terminated with?

12        A    Yes.

13        Q    Okay.  Prior to the election of

14   President Trump did you discuss DACA in any way

15   with individuals who you were considering to

16   recommend for positions within the Trump

17   administration?

18        A    Let's boil that down.  Did I discuss it

19   with anyone who I referred for potential at -- in

20   over what period of time?

21        Q    Let's start with from when you began

22   your role in August of 2016 on the transition team

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

71

1   and before the election of President Trump.  For

2   any of the individuals who you recommended they be

3   appointed to a position in a President Trump

4   administration did you discuss DACA with them?

5         A    I don't recall specifically, but maybe.

6         Q    You previously testified that you

7   recommended individuals to be appointed to the

8   Department of Homeland Security.  Is that correct?

9         A    Yes.

10        Q    For those individuals who you

11  recommended to be appointed to the Department of

12  Homeland Security did you discuss DACA with them?

13        A    Over what period of time?

14        Q    From August 2016 until November 2017 --

15  pardon me, 2016?

16             MR. GARDNER:  Do you want to reask that?

17  Kind of confused --

18             MS. TUMLIN:  -- Sure.

19  BY MS. TUMLIN:

20        Q    From August 2016 until November 2016 for

21  the individuals who you recommended to be

22  appointed to the Department of Homeland Security

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

72

1    did you discuss DACA with any of them?

2         A    What do you mean by discuss DACA?  Did

3    we utter the word DACA?  Did it ever come up in a

4    sentence or --

5         Q    -- Yes.

6         A    I am certain that I -- the words, the

7    word DACA was uttered at some point in time.

8         Q    For any of the individuals who you

9    recommended to be appointed to the Department of

10   Homeland Security did you ask them whether they

11   felt the DACA program should be terminated?

12        A    No.

13        Q    For any of the individuals that you

14   recommended to be appointed to the Department of

15   Homeland Security did you convey to them your own

16   view that DACA should be terminated?

17        A    I think they were likely generally

18   aware, but I don't recall specifically.

19        Q    How would they have been aware that you

20   felt the DACA program should be terminated?

21        A    A number of the individuals are people

22   with whom I have had associations and friendships

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

73

1    for some period of time.  It's likely that it came

2    up in conversation.

3         **Q     So is it fair to say that individuals**

4    **who you've had associations or friendships with**

5    **for some time would be generally aware that you**

6    **believe the DACA program should be terminated?**

7         A     They would generally be aware of my

8    position that the program was illegal and that

9    there should be some kind of disposition

10   associated with it.

11        **Q     Why do you believe the DACA program is**

12   **illegal, Mr. Hamilton?**

13        A     There is no statutory basis for the DACA

14   program.  Congress expressly considered the

15   creation of a legislative form of relief for that

16   class of individuals and it chose not to pass it.

17   It's pretty strong evidence.

18        **Q     Are you aware of a lawsuit that was**

19   **filed by the USCIS union challenging the legality**

20   **of the DACA program?**

21        A     The USCIS union?

22        **Q     I believe it was on behalf of Chris**

74

1    **Crane?**

2        A    Chris Crane is not a member of the USCIS

3    union.  He is an employee of U S Immigration and

4    Customs Enforcement.

5        **Q    Are you aware of any lawsuits that have**

6    **been filed challenging the legality of the DACA**

7    **program?**

8        A    Yes.

9        **Q    And which lawsuit would that be?**

10       A    The -- there was -- I'm generally aware

11   of a lawsuit that was filed by the ICE union

12   challenging some aspects of the DACA program.

13       **Q    Is that the lawsuit in which Kris Kobak**

14   **was counsel?**

15       A    I believe so.

16       **Q    And are you aware of the result of that**

17   **lawsuit?**

18       A    I don't recall the specifics.  I know it

19   was disposed of by a judge in the Northern

20   District of Texas on -- I believe on standing

21   potentially, but that the end resolution was

22   somewhat mixed about the program itself.

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

75

1      Q    Are you aware of any court ruling

2  finding that the DACA program is illegal?

3      A    A specific court ruling that found that

4  DACA was illegal?

5      Q    Uh huh?

6      A    No.

7      Q    Are you aware of any legislative efforts

8  to defund the DACA program?

9      A    Let me take a step back --

10     Q    -- You want to go back?

11     A    Am I aware of a court ruling that found

12  that the DACA program, the original DACA program

13  was illegal?

14     Q    Uh huh?

15     A    No.  Am I aware of a court decision that

16  found the expansion of the DACA program to be

17  illegal and contrary to law, yes.

18     Q    And by the court ruling on the expansion

19  of the DACA program are you referring to the

20  United States v. Texas injunction that came from

21  the Southern District of Texas?

22     A    Indeed.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

76

1      Q      From Judge Hanen's courtroom?

2      A      Correct.

3      Q      And what's your understanding of what

4   that injunction limited with respect to DACA?

5      A      The expansion of DACA as announced in

6   former Secretary Johnson's November 20, 2014

7   memorandum because that was all that the

8   plaintiff's challenged.

9      Q      After that injunction from Judge Hanen

10  were individuals still allowed to make new

11  applications, initial applications for the DACA

12  program?

13     A      Under the terms of the memorandum that

14  was issued on June 15, 2012, yes.

15     Q      Under the United States v. Texas

16  injunction were individuals still allowed to renew

17  their DACA for two-year periods of deferred action

18  and work authorization?

19     A      Pursuant to the original parameters of

20  the program, yes.

21     Q      As a member of the Trump transition team

22  would you have ever recommended an individual to

77

1    work for the Department of Homeland Security if

2    they felt the DACA program should continue after

3    the president took office?

4              MR. GARDNER:  Object.  Calls for

5    speculation, hypothetical.

6              THE WITNESS:  It's a very speculative

7    question.  And I can't answer a hypothetical.

8    BY MS. TUMLIN:

9        Q    Did any of the individuals who you

10   recommended for positions within the Department of

11   Homeland Security express a view to you that they

12   believed the DACA program should continue?

13       A    I don't know.

14       Q    If they had would you have recommended

15   them for a position within the Department of

16   Homeland Security?

17             MR. GARDNER:  Objection.  Calls for

18   speculation, hypothetical.

19             MS. TUMLIN:  Are you instructing the

20   witness not to answer?

21             MR. GARDNER:  Not at all.  I just made a

22   form objection.

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

78

1          THE WITNESS:  I will generally say that

2    I would consider the whole person.  I didn't use a

3    categorical questionnaire.  I didn't ask people

4    specific questions about specific issues.

5    BY MS. TUMLIN:

6          Q    **To your knowledge did any of the**

7    **individuals who you recommended for positions in**

8    **the Department of Homeland Security believe the**

9    **DACA program should continue?**

10         A    I don't know.

11         Q    **About how many individuals did you**

12   **recommend for positions within the Department of**

13   **Homeland Security?**

14         A    Many.

15         Q    **More than ten?**

16         A    Likely.

17         Q    **More than 20?**

18         A    I don't know.

19         Q    **Did you meet then President-elect Trump**

20   **while working with the transition team?**

21         A    I don't know that I met Trump during the

22   transition period specifically.  I don't recall.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                          **10/20/2017**

79

1      I don't think so.

2            Q     Have you met President Trump?

3            A     Yes.

4            Q     Do you remember the first time you met

5      him, approximately?

6            A     Probably January or February of this

7      year.

8            Q     Okay.  Did you meet President Trump

9      before he took the oath of office?

10           A     Not to my recollection.

11           Q     Okay.  Have you ever discussed DACA with

12     President Trump?

13           A     No.

14           Q     Have you ever discussed any immigration

15     topics with President Trump?

16           A     Yes.

17           Q     What topics are those?

18                 MR. GARDNER:  You can answer the

19     question as to topics at a high level.  To the

20     extent that question implicates deliberative

21     information that predates a decision that would be

22     subject to the deliberative process privilege and

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

80

1    presidential communications privilege I instruct

2    you not to answer.

3              THE WITNESS:  All of our -- every

4    occasion I have had generally speaking has been

5    about a pending decision and has been deliberative

6    and I won't say anything further.

7    BY MS. TUMLIN:

8         Q    Okay.  I may get it incorrect, so please

9    just correct me.  You currently work as the

10   special adviser to the acting secretary of DHS.

11   Is that correct?

12        A    No.

13        Q    Can you please provide me with your

14   correct title again?

15        A    Senior counselor to the secretary of

16   Homeland Security.

17        Q    Okay.

18        A    I don't -- I'm generally aware.  I saw a

19   New York Times article that provided about this

20   litigation that gave me a different title and I

21   have no idea where in the heck y'all got that

22   from.

81

1     Q    Okay.  So since you rejoined DHS in 2017
2  have you always had the same position?
3     A    Yes.
4     Q    And that position would be senior
5  counselor to the secretary of Homeland Security.
6  Is that correct?
7     A    That is my understanding.
8     Q    Okay.
9     A    I think, for full clarity I think there
10 may have been -- that was my title.  On paper it
11 may have been that I was a special adviser for a
12 few weeks while they were processing paperwork.
13 But my title has always been this.
14    Q    Great.
15    A    To the best of my recollection.
16    Q    Perfect.  Thank you.  And you are a
17 political appointee within the agency.  Is that
18 correct?
19    A    Yes.
20    Q    Who do you report to?
21    A    The secretary.
22    Q    Presently that's Acting Secretary Elaine

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                    10/20/2017

82

1     **Duke.  Is that correct?**

2            A     That's correct.

3            **Q     And prior to that did you report to**

4     **Secretary Kelly?**

5            A     I did.

6            **Q     Okay.  Who reports to you?**

7            A     In terms of direct supervision of

8     people, generally just I have a -- I have a

9     confidential assistant.  But she is kind of a

10    shared resource with a number of people.  So, I

11    don't know that I would say I have full, direct

12    control.  I have two detailees who report to me

13    and provide assistance to me, but that's about it.

14           **Q     What are the names of your two**

15    **detailees?**

16           A     Theresa Hunter and Nicole Lillibridge.

17           **Q     Can you say Nicole's last name again,**

18    **please?**

19           A     It's spelled L-I-L-L-I-B-R-I-D-G-E.

20           **Q     Okay.  Lillibridge.  Thank you.  And**

21    **where is Theresa Hunter detailed from?**

22           A     USCIS.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

83

1      Q     And where is Nicole Lillibridge detailed

2    from?

3      A     ICE.

4      Q     Does anyone else report to you aside

5    from these three individuals, your confidential

6    assistant, Theresa Hunter, and Nicole Lillibridge?

7      A     No.

8      Q     When were you appointed to your position

9    as senior counselor to the secretary of Homeland

10   Security?

11     A     January 20, 2017 --

12     Q     That was -- sorry.

13           (Court reporter requested

14   clarification.)

15           THE WITNESS:  January 20, 2017.

16   Inauguration date.

17   BY MS. TUMLIN:

18     Q     And who appointed you?

19     A     The secretary.

20     Q     Do you know who suggested that you be

21   appointed to your current position?

22     A     Not really, other than myself.

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

84

1        Q     And when you first began your role as
2   senior counselor to the secretary of Homeland
3   Security.  You've previously testified that was
4   for former DHS Secretary Kelly, correct?
5        A     That's correct.
6        Q     What were your responsibilities when
7   working for him?
8        A     Same as they are now.
9        Q     Okay.  Can you please describe those in
10  brief?
11       A     I provide counsel, guidance to the
12  secretary and to also to the deputy secretary on a
13  variety of issues that involve the department's
14  operations primarily related to immigration.  I
15  coordinate operations and activities, memo --
16  policy decisions between the components.  Assist
17  with document production, policy formulation,
18  editing of documents, drafting speeches, you name
19  it.  There is a whole host of activities.
20       Q     Great.  So is it fair to say that you
21  provide policy advice to the former secretary and
22  now the acting secretary on immigration related

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                          10/20/2017

85

1    issues?

2         A    I do.

3         Q    Do you also provide legal advice to the

4    former secretary and now the acting secretary on

5    immigration issues?

6         A    I am not an attorney in my current

7    capacity, so any legal advice must come from the

8    Office of the General Counsel.

9         Q    Okay.  Understood.  Have you worked on

10   DACA while -- or pardon me.  I will rephrase that.

11   Did you work on DACA while working for former

12   Secretary Kelly?

13        A    Define work on DACA?

14        Q    Did you provide policy advice on the

15   DACA program to former Secretary Kelly?

16        A    Yes.

17        Q    Did you provide a recommendation as to

18   whether or not the DACA program should be

19   terminated to former Secretary Kelly?

20             MR. GARDNER:  You can answer that

21   question with yes or no.  The substance of those

22   conversations would be privileged.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

86

1              THE WITNESS:  Yes.

2    BY MS. TUMLIN:

3         **Q    When did you provide that recommendation**

4    **about whether the DACA program should be**

5    **terminated to former Secretary Kelly?**

6         A    We had many discussions.

7         **Q    When was the first time you provided a**

8    **recommendation on whether or not the DACA program**

9    **should be terminated to former Secretary Kelly?**

10        A    I don't recall.  It was probably early

11   February.

12        **Q    Early February 2017?  Is that correct?**

13        A    Correct.

14        **Q    Was it your recommendation in early**

15   **February 2017 to former Secretary Kelly that the**

16   **DACA program should be terminated?**

17             MR. GARDNER:  Objection.  Calls for

18   disclosure of information subject to deliberative

19   process privilege.  Instruct the witness not to

20   answer.

21             MS. TUMLIN:  Even though the witness has

22   said he provides policy advice and not legal

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

87

1    advice?

2              MR. GARDNER:  That's exactly why we did

3    deliberative process privilege.  I didn't say

4    attorney/client.  To be clear, you're asking about

5    the policy recommendations he made to a decision

6    maker.  Correct?

7              MS. TUMLIN:  I am.

8              MR. GARDNER:  Yeah.  So that is subject

9    to deliberative process privilege.

10   BY MS. TUMLIN:

11       Q    Okay.  During the time you worked for

12   former Secretary Kelly how often would you speak

13   to former Secretary Kelly about work matters?

14       A    How often would I speak to him about

15   work matters?

16       Q    Yes.

17       A    Every day, multiple times a day.

18       Q    Okay.  Do your responsibilities for

19   Acting Secretary Duke differ from those for

20   Secretary Kelly?

21       A    No.

22       Q    Okay.  And how often do you speak to

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

88

1    Acting Secretary Duke about work matters?

2         A     About every day, multiple times a day.

3         Q     Did the individuals who report to you at

4    all change when former Secretary Kelly left DHS?

5         A     Nope.

6         Q     Okay.  What other political appointees

7    are in the Office of the Secretary of DHS at this

8    time?

9         A     You want an org chart?

10        Q     Approximately how many people in the

11   Office of the Secretary?

12        A     There is the secretary.  There is the

13   deputy secretary.  There's a chief of staff.

14   There are two deputy chiefs of staff.  Myself.

15   There is a counselor.  There is another senior

16   counselor.  And there is a White House liaison.

17   There might be one or two others.  I'm not really

18   sure.  It depends on how broadly you define the

19   Office of the Secretary.  If you are talking the

20   immediate Office of the Secretary that's probably

21   everybody.  But within the department's

22   organization the Office of the Secretary also

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

1    includes a large number of other offices in our

2    headquarters including the Office of General

3    Counsel, Office of Management.  The list goes on,

4    so I couldn't give you specifics.

5         Q    Great.  While working for Acting

6    Secretary Duke did you provide policy advice to

7    her on the DACA program?

8         A    I did.

9         Q    While working for Acting Secretary Duke

10   did you provide a recommendation to her on whether

11   or not the DACA program should be terminated?

12        A    Yes.

13        Q    When is the first time you provided a

14   recommendation to Acting Secretary Duke regarding

15   whether the DACA program should be terminated?

16        A    I don't remember specifics.  When is the

17   first time we discussed the issue, was likely in

18   early August.  She assumed office in July 30 --

19   July 31, something like that.  So might have been

20   the next week when we started to talk about it.

21        Q    And is it fair to assume that your

22   consistent recommendation both to former

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

90

1   Secretary Kelly and to Acting Secretary Duke is

2   that the DACA program should be terminated?

3            MR. GARDNER:  Objection.  Calls for

4   disclosure of information subject to deliberative

5   process privilege.  I instruct the witness not to

6   answer.

7   BY MS. TUMLIN:

8        Q    Okay.  What was your involvement in the

9   decision to terminate the DACA program?

10           MR. GARDNER:  If you can describe that

11  at a high level without disclosing pre-decision

12  deliberative information, otherwise I instruct you

13  not to answer.

14           THE WITNESS:  I generally provided

15  information and coordinated within the department

16  as to a recommendation as to the DACA program and

17  its existence.

18  BY MS. TUMLIN:

19       Q    When was the final decision made that

20  DACA would be terminated?

21       A    September 5, 2017.

22       Q    Is September 5, 2017 the day

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

91

1   Attorney General Sessions held a press conference

2   announcing the termination of the DACA program?

3       A    To the best of my recollection, yes.

4       Q    Is that the same day that a memorandum

5   issued from Acting Secretary Duke on the

6   termination of the DACA program?

7       A    Yes.

8       Q    Is that the same day that questions and

9   answers went online on the USCIS website with

10  respect to termination of the DACA program?

11      A    Yes.

12      Q    Is it your position that no final

13  decision had been made until the same day that

14  that press conference memo and question and

15  answers went online?

16      A    There is no final decision until there

17  is ink on paper.

18      Q    So the morning of September 5 were you

19  waiting for a yes, no on whether or not DACA was

20  going to be terminated?

21      A    There is -- it is always up to the

22  secretary to decide what she wants to do with

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

92

1    anything that the department does until the moment

2    that she signs off on any policy or practice of

3    the department.  I think there was a general

4    understanding of what may happen, but the final

5    decision was made the moment that she put ink to

6    paper.

7         **Q    Are you aware that a press advisory went**

8    **out on September the 4th to media calling them to**

9    **the attorney general's press conference?**

10        A    I am.

11        **Q    Are you -- is it your belief that at the**

12   **time the press advisory went out a final decision**

13   **on whether or not DACA was going to be terminated**

14   **had not been made?**

15        A    It is my position that until the

16   secretary signs a document it's not final.

17        **Q    Had the secretary indicated prior to her**

18   **signature on 9/5 that she intended to sign the**

19   **document terminating the DACA program?**

20        A    Can you rephrase that?

21             MR. GARDNER:  Objection.

22

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                           **10/20/2017**

93

1    BY MS. TUMLIN:

2        **Q      Sure.  I'll actually backup with an**

3    **earlier question.  Is it your understanding that**

4    **Acting Secretary Duke did not sign the memorandum**

5    **terminating the DACA program until September the**

6    **5th?**

7        A      To the best of my recollection she

8    signed it on September 5.

9        **Q      Okay.  Prior to Acting Secretary Duke's**

10   **signature of the memorandum terminating the DACA**

11   **program had she indicated that she intended to**

12   **sign that memorandum?**

13           MR. GARDNER:  Objection.  That does

14   calls for disclosure of information subject to

15   deliberative process privilege.  I instruct the

16   witness not to answer.

17   BY MS. TUMLIN:

18       **Q      Was a tentative decision to terminate**

19   **the DACA program made at some time prior to**

20   **September the 5th?**

21           MR. GARDNER:  You can answer that

22   question with a yes or no.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

94

1                    THE WITNESS:  Yes.

2    BY MS. TUMLIN:

3        **Q     When was that tentative decision to**

4    **terminate the DACA program made?**

5                    MR. GARDNER:  Objection.  Calls for

6    disclosure of information subject to deliberative

7    process privilege.  Instruct the witness not to

8    answer.

9    BY MS. TUMLIN:

10       **Q     Did President Trump direct the decision**

11   **to terminate the DACA program?**

12                   MR. GARDNER:  Objection.  Calls for

13   disclosure of information subject to deliberative

14   process privilege.  I instruct the witness not to

15   answer.

16   BY MS. TUMLIN:

17       **Q     Was President Trump a key decision maker**

18   **in the decision to terminate the DACA program?**

19                   MR. GARDNER:  Objection.  Vague.

20   BY MS. TUMLIN:

21       **Q     That means you can answer.**

22       A     It's vague.  I don't know what you mean.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                        **10/20/2017**

95

1      Q    In your mind who were the key decision

2   makers in determining whether the DACA program

3   should be terminated?

4           MR. GARDNER:  I think that is not

5   objectionable.  You can identify individuals or

6   individual, as the case may be.

7           THE WITNESS:  The acting secretary.  And

8   the acting secretary was the individual who made

9   the decision.  Certainly as evidenced by the

10  September 4 letter from the attorney general there

11  is expressed a legal opinion about the legality of

12  DACA.  And she did with it what she saw fit.

13  BY MS. TUMLIN:

14     Q    Is it your opinion that the decision to

15  terminate DACA was made exclusively by

16  Acting Secretary Duke?

17     A    Ultimately it was exclusively her

18  decision.

19     Q    Did anybody else get a vote?

20          MR. GARDNER:  Objection.  Vague.

21          THE WITNESS:  Are you surmising that

22  there was some kind of a congress in which

**Martin Vidal, et al v. Elaine Duke, et al**                                    10/20/2017

1   everyone took a vote to --

2   BY MS. TUMLIN:

3        **Q     I'm asking whether or not**

4   **Acting Secretary Duke to your knowledge took**

5   **account of anyone else's opinion or their final**

6   **decision on whether the DACA program should be**

7   **terminated?**

8            MR. GARDNER:  You can answer that

9   question with a yes or no.  The contents of what

10  she considered would be subject to privilege.

11           THE WITNESS:  Yes, she listened to

12  the -- yes.

13  BY MS. TUMLIN:

14       **Q     I'm sorry.  She listened to the -- I**

15  **didn't hear that.**

16       A     She listened to multiple inputs from

17  other individuals.

18       **Q     Whose inputs did Acting Secretary Duke**

19  **listen to in reaching her ultimate decision to**

20  **terminate the DACA program?**

21           MR. GARDNER:  Objection.  That also

22  calls for disclosure of information subject to

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                          **10/20/2017**

97

1    deliberative process privilege.  I instruct the

2    witness not to answer.

3    BY MS. TUMLIN:

4          **Q     Okay.  Did Attorney General Sessions**

5    **direct the decision to terminate DACA?**

6                MR. GARDNER:  Objection.  Vague.

7                THE WITNESS:  What do you mean by

8    direct?

9    BY MS. TUMLIN:

10         **Q     Did Attorney General Sessions provide a**

11   **strong recommendation to Acting Secretary Duke**

12   **that he felt the DACA program should be**

13   **terminated?**

14               MR. GARDNER:  Objection.  Vague.

15               THE WITNESS:  What do you mean by

16   recommendation?  Let me tell you, the attorney

17   general sent a letter that said that the program

18   was, generally speaking, illegal and

19   unconstitutional.  I don't know what other course

20   of action you would expect for him to advocate if

21   that's his legal conclusion about the program.

22

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

98

1    BY MS. TUMLIN:

2        **Q    Was the -- did you participate in any**

3    **meetings to determine whether or not the DACA**

4    **program should be terminated?**

5        A    Yes.

6        **Q    When is the first meeting that you**

7    **remember participating in to discuss whether the**

8    **DACA program should be terminated?**

9        A    When is the first meeting with whom?

10   Internal to DHS?

11       **Q    Let's start with that.  Let's start with**

12   **the first internal to DHS only meeting that you**

13   **participated in in which the question of whether**

14   **DACA should be terminated was discussed?**

15       A    Sometime in August.

16       **Q    August, mid August?**

17       A    Mid to late August.

18       **Q    And who was at that meeting?**

19           MR. GARDNER:  You can answer.  All she

20   is asking is identity, not substance.

21           THE WITNESS:  To the best of my

22   recollection the attendees at that meeting were

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

99

1    the acting secretary; chief of staff, Chad Wolf;

2    deputy chief of staff, Elizabeth Neumann; myself;

3    our acting under secretary for policy strategy and

4    plans, Jim Nealon; potentially his acting chief of

5    staff, Brianna Petgill (phonetic).  I believe

6    Dimple Shah, deputy general counsel OJC.  Acting

7    Director Homan from ICE; his principal legal

8    adviser, Tracy Short.  I believe his special

9    adviser, John Theory.  Acting Commissioner Kevin

10   MacAleenan.  I don't remember her title, one of

11   his attorneys, Julie Cooler (phonetic).

12   Potentially, I don't recall if his chief of staff

13   was there.  James McCament, the acting now deputy

14   director of USCIS, but was the acting director.

15   Francis Cissna in his former capacity as director

16   of immigration policy at DHS.  There may have been

17   assistant secretary of legislative affairs, Ben

18   Cassidy.  And potentially our assistant secretary

19   for public affairs, Jonathan Hoffman.  I don't

20   recall specifically.

21   BY MS. TUMLIN:

22        **Q     Was that an in-person or a telephone**

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                          10/20/2017

100

1    meeting?

2         A    In person.

3         Q    Was that at DHS headquarters?

4         A    It was.

5         Q    Approximately how long did that meeting

6    last?

7         A    I don't know.  Maybe an hour or so.

8         Q    Who convened the meeting?

9         A    I don't recall.

10         Q    Did anybody organize or suggest that the

11    meeting be held?

12         A    Yes.

13         Q    Who was that?

14         A    I don't recall.  It may have been the

15    chief of staff.

16         Q    Chad Wolf --

17         A    -- Or may have been the secretary or it

18    may have been me.  I just don't recall who did it.

19         Q    How would that meeting have been

20    organized?  Would an email have gone out telling

21    folks to show up at a certain place at a certain

22    time?

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    10/20/2017

101

1          A     There likely would have been an email

2     invitation to a meeting that would have went out.

3     And I just don't remember who organized it

4     principally from the get-go in terms of calling

5     the meeting, that specific meeting.

6          **Q     Got it.  And would that have been**

7     **something like an Outlook -- Outlook calendar**

8     **invite that went out?**

9          A     Yes.

10          **Q     Okay.  Would an agenda have gone out for**

11     **that meeting?**

12          A     I believe so.

13          **Q     Who would have composed that agenda?**

14          A     Typically several individuals, but I

15     know that I did certainly on that one.

16          **Q     You helped compose that agenda?**

17          A     I did.

18          **Q     What do you remember about what you put**

19     **on the agenda?**

20               MR. GARDNER:  Objection.  You can

21     describe that at a high level of generality

22     without revealing deliberative pre-decision

102

1    material.

2          THE WITNESS:  Generally outlined the

3    situation as it stood with respect to DACA at the

4    time and weighed out various potential options.

5    BY MS. TUMLIN:

6      Q    So your agenda would have presented

7    potential options for terminating or keeping the

8    DACA program?

9      A    Yes.

10     Q    Okay.  Do you remember how many options

11   you presented for terminating, keeping or

12   something else with respect to the DACA program?

13     A    No.

14     Q    More than two?

15     A    I don't know.

16     Q    Would that agenda have included an

17   option of keeping the DACA program in place as it

18   stood prior to September 5, 2017?

19         MR. GARDNER:  Objection.  Calls for

20   disclosure of information subject to deliberative

21   process privilege.  Instruct the witness not to

22   answer.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

103

1   BY MS. TUMLIN:

2       Q    Would that agenda have included an

3   option for the full scale termination of the DACA

4   program with no wind down period?

5           MR. GARDNER:  Objection.  Calls for

6   disclosure of information subject to deliberative

7   process privilege.  Instruct the witness not to

8   answer.

9   BY MS. TUMLIN:

10      Q    Okay.  Would that agenda have been sent

11  around as an attachment to the Outlook calendar

12  invite?

13      A    I don't know.  Maybe.

14      Q    Could it have gone around on an email?

15      A    Probably.

16      Q    Would you have printed -- would someone

17  at the Department of Homeland Security have

18  printed hard copies for meeting attendees?

19          MR. GARDNER:  Objection.  Calls for

20  speculation.

21          THE WITNESS:  Probably.  I don't know.

22  I'm really not sure.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                     **10/20/2017**

104

1              MS. TUMLIN:  Okay.

2              THE WITNESS:  You are asking me to

3     guess.

4     BY MS. TUMLIN:

5         **Q**    **Were notes taken of that meeting?**

6         A    I don't know.

7         **Q**    **Either by hand or on computer?**

8         A    I don't know.

9         **Q**    **Did you take any notes at the meeting?**

10        A    I might have.

11        **Q**    **By hand?**

12        A    I generally take notes by hand.

13        **Q**    **Okay.  Okay.  That was sometime in mid**

14    **to late August and it was an internal DHS meeting**

15    **on whether to terminate the DACA program.  Was**

16    **there a meeting subsequent to that meeting that**

17    **was still internal only to DHS to consider the**

18    **question of whether to terminate the DACA program?**

19    **So after this meeting we just discussed and before**

20    **November the 5th?**

21        A    I don't recall if there was or if there

22    wasn't.

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

                                                                                    105

1      **Q    Was there a meeting after the meeting we**

2      **just discussed but prior to November the 5th on**

3      **whether or not to terminate the DACA program that**

4      **included individuals in the federal government**

5      **outside of the Department of Homeland Security?**

6              MR. GARDNER:  For clarification you said

7      November 5?  Is that right?

8              MS. TUMLIN:  I did say that according to

9      the transcript and I meant September 5.  I

10     apologize.

11             MR. GARDNER:  That's what I thought.

12     Just wanted to be clear about that.

13             THE WITNESS:  So if you could --

14             MS. TUMLIN:  -- Absolutely.

15             THE WITNESS:  -- just say that one more

16     time?

17     BY MS. TUMLIN:

18     **Q    So the meeting that we have been talking**

19     **about internal only at DHS I think you put at**

20     **about mid to late August?**

21     A    I did.

22     **Q    Of 2017?**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

106

1      A     Uh huh.

2      **Q      So after that meeting but before the**

3  **announcement of the termination of the DACA**

4  **program on September 5, 2017 was there another**

5  **meeting considering the question of whether to**

6  **terminate the DACA program that you were a part**

7  **of?**

8      A     Yes.

9      **Q      When approximately was that meeting?**

10     A     Around the same time, a few days later.

11     **Q      A few days later?  Late August?**

12     A     Yes.

13     **Q      Who was at that meeting?**

14            MR. GARDNER:  You can answer the

15  identity of individuals that attended.

16            THE WITNESS:  There was a meeting in the

17  Roosevelt Room of the White House at which chief

18  of staff, John Kelly was present.  Principal

19  deputy chief of staff, Kirstjen Nielsen, was

20  present.  Deputy chief of staff, Rick Dearborn,

21  was present.  Senior policy adviser to the

22  president, Stephen Miller, was present.  I believe

107

1    the staff secretary, Rob Porter, was present.

2    White House counsel, Don McGahn, was present.  I

3    believe the assistant or the director of White

4    House legislative affairs, Mark Short, was present

5    at least for a time.  The director of the Office

6    of Management and Budget, Mick Mulvaney, was

7    present.  I was present.  Acting Secretary Duke

8    was present.  Acting Director McCament was

9    present.  Acting chief of staff, Chad Wolf, was

10   present.  The attorney general was present.  His

11   chief of staff, Jody Hunt, was present.  The

12   associate attorney general, Rachel Brand, was

13   present.  Counsel to the attorney general,

14   Danielle Cutrona was present.  And I don't recall

15   anyone else.  Oh, I'm sorry.  Deputy secretary of

16   state, John Sullivan, was present, I believe.

17   Fairly certain.  Could be wrong.

18   BY MS. TUMLIN:

19        Q    That's a lot of people.  You may have

20   already said this, but was John Bash present?

21             (Court reporter requested

22   clarification.)

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

108

1          MS. TUMLIN:  Bash.

2          THE WITNESS:  I think he -- I don't

3    recall specifically, but he may have been there.

4    I believe that there were one or two staffers from

5    the White House counsel as well as -- I apologize,

6    the director of the Domestic Policy Council,

7    Andrew Bremberg, was present.  Potentially one or

8    two of his staff was, but I don't remember.  I may

9    be -- at that point I may be conflating meetings.

10   There's many on other issues.

11   BY MS. TUMLIN:

12       Q    **Approximately how long did that meeting**

13   **last?**

14       A    Might have been an hour and a half.

15       Q    **Okay.  Do you know who convened that**

16   **meeting?**

17       A    What do you mean convened?

18       Q    **Who invited people to come to the**

19   **meeting?**

20       A    Who sent out the physical invitations or

21   who called the meeting in a pulled it together?

22       Q    **Who -- both?  Who sent out the physical**

109

1    invitation first?

2        A    I don't know.

3        Q    Who brought the meeting together, made

4    it happen?

5        A    I don't know.

6        Q    Did anybody facilitate the meeting?

7        A    Define facilitate?

8        Q    Lead or preside over the meeting?

9        A    To the best of my recollection the White

10   House chief of staff and Stephen Miller both had

11   lead at various points in the meeting.

12       Q    Was there an agenda for the meeting?

13       A    Yes, I believe so.

14       Q    Was that sent out to meeting attendees

15   electronically in any form?

16       A    I believe so.

17       Q    Via email?

18       A    Fairly certain.

19       Q    Was it also provided in hard copy to

20   meeting attendees?

21       A    I don't remember.

22       Q    What do you remember as being on that

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

110

1   agenda?

2          MR. GARDNER:  You can describe that in a

3   high level of generality unless disclosing

4   contents will reveal deliberative pre-decisional

5   information.

6          THE WITNESS:  I don't recall

7   specifically other than just general things about

8   DACA and potential decisions.

9   BY MS. TUMLIN:

10     Q    Were there various options for what to

11  do with the DACA program on that agenda?

12     A    I don't specifically recall.  There

13  might have been.

14     Q    Was the goal of the meeting to reach a

15  tentative decision on whether or not to terminate

16  the DACA program?

17     A    My understanding of the meeting was to

18  develop at least a tentative path forward with

19  respect to what to do with the program known as

20  Deferred Action for Childhood Arrivals.

21     Q    Was a tentative decision to terminate

22  the DACA program reached at that meeting?

111

1        A    A tentative decision by whom?

2        **Q    Acting Secretary Duke?**

3        A    I don't know if you call it a tentative

4    decision, but maybe.

5        **Q    Did Acting Secretary Duke express in**

6    **that meeting that her present inclination was to**

7    **terminate the DACA program?**

8             MR. GARDNER:  Objection.  Calls for

9    disclosure of information subject to deliberative

10   process privilege.  I instruct the witness not to

11   answer.

12   BY MS. TUMLIN:

13       **Q    After this meeting in the Roosevelt Room**

14   **of the White House were there any other meetings**

15   **that you were part of before September 5**

16   **considering the question of whether or not to**

17   **terminate the DACA program?**

18       A    Yes.

19       **Q    Approximately when was the next meeting?**

20       A    I don't remember.

21       **Q    Do you remember where that meeting was?**

22       A    The White House.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

112

1       Q       Where at the White house?

2       A       The Roosevelt Room.

3       Q       Approximately how long did meeting

4    number two at the Roosevelt Room last?

5       A       It never really happened.  I think it

6    was -- we were waiting to get it started and it

7    kind of got canceled.

8       Q       Understood.  Okay.  So was that just a

9    couple of days after this meeting that did happen?

10      A       I mean, when you say a couple, I presume

11   two.  And I'm not really sure.  It was several, at

12   least several days after.

13      Q       Okay.  Who organized that meeting?

14      A       I don't know.

15      Q       Do you recall getting an invitation of

16   some kind to show up at that meeting?

17      A       Certainly.

18      Q       Do you recall who that was from?

19      A       Nope.

20      Q       And how did you learn that the meeting

21   was being canceled?

22      A       We were sitting around the table and one

113

1  of the chief of staff's aides came in the room and

2  said that the meeting was being canceled.

3      Q     Did they -- pardon me.  Did that aide

4  provide any reason for why the meeting was being

5  canceled?

6      A     No.

7      Q     Was that meeting ever rescheduled?

8      A     If it was I wasn't there.  I don't know.

9      Q     After that meeting which was canceled in

10  the Roosevelt Room did you attend any other

11  meetings regarding the termination of the DACA

12  program before September the 5th?

13      A     I don't recall any formal meetings.

14  Certainly it was discussed, but I don't recall

15  formal meetings.

16      Q     When do you remember finding out a final

17  decision had been made to terminate the DACA

18  program?

19      A     As I indicated earlier my perspective on

20  things is that there is no final decision until

21  there is ink on paper, so it was sometime on

22  September 5.

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

114

1      Q     So is it your opinion that you found out

2   about the final decision to terminate the DACA

3   program -- or let me correct that.

4            Did you watch the press conference with

5   Attorney General Sessions announcing the

6   termination of the DACA program?

7      A     I seem to recall watching some of it,

8   yes.

9      Q     Is that when you found out about the

10   decision to termination the DACA program in your

11   opinion?

12      A     Well, the attorney general did not

13   terminate the DACA program, so no.  And he did not

14   sign the memo that canceled, that rescinded the

15   2012 memo, so no.

16      Q     But he was the spokesperson for the

17   administration announcing that?

18      A     The attorney general held a press

19   conference in which he stated his legal position

20   about the program and his general suppositions

21   about the way that the program, what might happen

22   to it.

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

115

1      Q    How did you find out that the September

2   5 memo on the termination of DACA had been signed?

3      A    I don't specifically recall.

4      Q    Okay.

5      A    I don't know.

6      Q    Was the decision to allow DACA

7   recipients whose DACA was expiring between

8   September 6, 2017 and March 5, 2018 to apply for

9   renewal made at the same time as the decision to

10  end DACA in your opinion?

11          MR. GARDNER:  That's asking yes or no.

12  You can answer that.

13          THE WITNESS:  Yes.

14  BY MS. TUMLIN:

15      Q    In your opinion that decision was made

16  on September 5 whenever Acting Secretary Duke

17  signed her memorandum?

18      A    Yes.

19      Q    Okay.

20      A    It was tentatively discussed before

21  then, but of course nothing is final until there

22  is ink on paper.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                      **10/20/2017**

116

1      Q    Okay.  So was -- for ease of all of us

2   I'm going to call this a renewal window decision.

3   Does that work for you?

4      A    Sure.

5      Q    Would you understand when I use the term

6   renewal decision window the portion of

7   Acting Secretary Duke's memorandum allowing

8   individuals with DACA expiring between September

9   6, 2017 and March 5, 2018 to apply for a one time

10  renewal of DACA?

11     A    Yes.

12     Q    Okay.  Was that renewal window decision

13  something that was discussed in the two meetings

14  you've described to me, one in mid to late August

15  that was internal to DHS and a second meeting

16  subsequent at the Roosevelt Room in the White

17  House?

18          MR. GARDNER:  Without divulging the

19  substance of the communications you can answer

20  that yes or no.

21          THE WITNESS:  I don't recall if it was

22  specifically discussed -- that specific renewal

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

117

1    window was specifically discussed at any of those.

2    BY MS. TUMLIN:

3         **Q    You previous --**

4         A    -- It may have been.

5         **Q    Sorry.  You previously testified that**

6    **you put together the agenda for the internal DHS**

7    **meeting.  Correct?**

8         A    I had a large contributing role if I

9    didn't put it together myself.  I just don't

10   recall.

11        **Q    Was having this type of renewal window**

12   **decision one of the options on that agenda that**

13   **you helped put together?**

14             MR. GARDNER:  Objection.  That calls for

15   disclosure of information subject to deliberative

16   process privilege.  I instruct the witness not to

17   answer.

18   BY MS. TUMLIN:

19        **Q    Looking only at the meeting in the**

20   **Roosevelt Room that occurred did any of the**

21   **individuals present express strong views that**

22   **there be a renewal window before DACA is**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

118

1   terminated?

2           MR. GARDNER:  Objection.  Calls for

3   disclosure of information subject to deliberative

4   process privilege, potentially presidential

5   communications privilege, and potentially the

6   attorney/client privilege.  Instruct the witness

7   not to answer.

8   BY MS. TUMLIN:

9       Q    Okay.  Aside from the two meetings we

10  have talked about, one internal to DHS and one at

11  the Roosevelt Room of the White House, were you

12  part of any other meetings discussing specifically

13  this question of whether to have a renewal window

14  before terminating the DACA program?

15      A    I'm certain that there were further

16  discussions.  I'm just -- I don't -- I recall

17  being -- discussing it with -- I don't know that

18  it was a formal meeting.  But I recall discussing

19  this with the acting secretary, the chief of

20  staff, our acting general counsel in a meeting

21  subsequent.  But I don't remember others.

22      Q    So the acting secretary would be

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

119

1    Secretary Duke, the chief of staff is Chad Wolf?

2    Is that correct?

3          A    That's correct.

4          Q    And who is the acting general counsel?

5          A    He is our principal deputy general

6    counsel, Joe Maher.

7          Q    Thank you.  So you remember discussing

8    the renewal window issue with those three

9    individuals?

10         A    I do.

11         Q    And was that in a in-person meeting or

12   via phone?

13         A    In person.

14         Q    Do you remember roughly when that was?

15         A    End of August, first of September,

16   somewhere -- somewhere in that range.

17         Q    Was that subsequent to the Roosevelt

18   Room meeting, the one that occurred?

19         A    The one that occurred, yes.  Absolutely.

20         Q    Okay.  About how long did that meeting

21   last?

22         A    I don't know.  It wasn't long.  It might

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

120

1  have been 30 minutes, maybe an hour.  I don't --

2       **Q    Was a tentative decision reached in that**

3  **meeting to have a renewal window within the -- in**

4  **the termination of the DACA program?**

5            MR. GARDNER:  You can answer that

6  question with a yes or no.

7            THE WITNESS:  Yes.

8  BY MS. TUMLIN:

9       **Q    And was that tentative decision to have**

10 **a six month renewal window?**

11           MR. GARDNER:  Objection.  Calls for

12 disclosure of information subject to the

13 deliberative process privilege.  In the extent

14 that it's asking for disclosure of information

15 subject to the attorney/client privilege we'd also

16 object and instruct the witness not to answer.

17 BY MS. TUMLIN:

18      **Q    Okay.  In that in-person meeting with**

19 **Acting Secretary Duke and the chief of staff and**

20 **the principal general counsel did you discuss**

21 **having a deadline for when renewal applications**

22 **would have to come in for any renewal window**

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

121

1    period?

2            MR. GARDNER:  Objection.  Calls for

3    disclosure of information subject to the

4    deliberative process privilege and potentially the

5    attorney/client privilege and instruct the witness

6    not to answer.

7    BY MS. TUMLIN:

8        Q    Okay.  What was the Department of

9    Justice's involvement in designing the process to

10   end the DACA program?

11           MR. GARDNER:  I'm sorry.  Can you repeat

12   the question?

13   BY MS. TUMLIN:

14       Q    Absolutely.  What is the Department of

15   Justice's involvement in designing the process for

16   the end of the DACA program?

17           MR. GARDNER:  If you can answer that

18   question without divulging pre-decisional

19   deliberative information you may so answer,

20   otherwise I instruct you not to answer on the

21   basis of deliberative process privilege.

22           THE WITNESS:  I don't really know what

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                           10/20/2017

122

1    you mean.

2          MR. GARDNER:  Can we break it up maybe

3    in a couple of questions?

4    BY MS. TUMLIN:

5        **Q    Absolutely.  So you've previously**

6    **testified about Attorney General Sessions's**

7    **September 4 letter on providing his view on the**

8    **legality of the DACA program.  In addition to that**

9    **did the Department of Justice play any role in the**

10   **decision reached to terminate the DACA program?**

11         MR. GARDNER:  You can answer that

12   question with a yes or no.

13         THE WITNESS:  Did the Department of

14   Justice play any role in the decision to

15   termination the DACA program?

16   BY MS. TUMLIN:

17       **Q    In addition to the letter that we've**

18   **already talked about from Attorney General**

19   **Sessions?**

20       A    The decision to terminate DACA was the

21   acting secretary's decision.

22       **Q    To your knowledge are there any legal**

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

123

1    **memorandum that support Attorney General Session's**

2    **September 4,2017 letter advising of his position**

3    **on the legality of the DACA program?**

4              MR. GARDNER:  You can answer that

5    question with a yes or no.

6              THE WITNESS:  I don't know if there is a

7    legal memorandum in the Department of Justice or

8    DHS, I'm not sure.

9    BY MS. TUMLIN:

10         **Q    You've never seen one?**

11         A    I have seen the November 2014 legal

12   memorandum from the Office of Legal Counsel that

13   justified the existence of DACA, the expanded DACA

14   program, contained a footnote justifying the

15   existence of the DACA program.  And I believe that

16   the DACA program is entirely inconsistent with the

17   legal analysis as described in that OLC opinion in

18   operation.

19         **Q    Are you aware of whether the OLC, which**

20   **I will represent means the Office of Legal**

21   **Counsel, has written its own memorandum to replace**

22   **the memorandum that you just expressed**

124

1   **disagreement with?**

2              MR. GARDNER:  You can answer that

3   question with yes or no.

4              THE WITNESS:  I have no idea.  I

5   couldn't tell you.

6   BY MS. TUMLIN:

7        **Q    Do you know whether**

8   **Attorney General Sessions advised on whether the**

9   **termination of the DACA program should be done**

10  **with a wind down period or whether there should be**

11  **a clear end date for all DACA recipients?**

12             MR. GARDNER:  You can answer that

13  question with a yes or no without disclosing the

14  content of any advice provided to the extent there

15  was any.

16             THE WITNESS:  Can you say that one more

17  time?

18  BY MS. TUMLIN:

19       **Q    Absolutely.  Do you know whether**

20  **Attorney General Sessions advised on whether the**

21  **DACA program should be terminated with a wind down**

22  **period versus whether there should just be a clear**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                          **10/20/2017**

125

1    **end date for all DACA recipients?**

2         A    He was certainly aware of the

3    department's proposed path for winding down the

4    program.  And so to that extent he might have been

5    aware, I don't know if you call that giving

6    advice.

7         **Q    Do you know if Attorney General Sessions**

8    **expressed a view on whether it would be more**

9    **appropriate to have a clear end date for all DACA**

10   **recipients?**

11             MR. GARDNER:  You can answer that

12   question with a yes or no without divulging

13   attorney/client confidences or deliberative

14   information.

15             THE WITNESS:  I don't know.

16             MS. TUMLIN:  Okay.  This would be a good

17   time to take a break before the video ends.  Is

18   that okay?

19             MR. GARDNER:  You want --

20             MS. TUMLIN:  Should we go off the

21   record?

22             THE VIDEOGRAPHER:  We're going off on

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

126

1    record.  This is the end of media unit number one.

2    The time is 11:23 a.m.

3            (Whereupon, a recess occurred from

4    11:23 a.m. until 12:24 p.m.)

5            THE VIDEOGRAPHER:  This begins media

6    unit two.  The time on the video is 12:24 p.m.  We

7    are on the record.

8            MS. TUMLIN:  I am going to pass to Donna

9    what has been previously marked as Exhibit 3.

10           (Whereupon, Exhibit No. 3 previously

11   marked was identified.)

12   BY MS. TUMLIN:

13       **Q    For handiness I put a little tab at what**

14   **is marked as page 238.  If you don't mind flipping**

15   **to that?**

16           MR. GARDNER:  It might be easier for you

17   if you take the binder clip off.

18           THE WITNESS:  Yeah.  Of course.

19   BY MS. TUMLIN:

20       **Q    Yeah.  I will give you a second to take**

21   **a look at that.**

22       A    Bates stamp page 238?

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

127

1      **Q      238 through 240, please?**

2      A      Okay.

3      **Q      Have you seen this letter before?**

4      A      I have.

5      **Q      Can you briefly describe to me what it**

6      **is?**

7      A      It is a letter from the Attorney General

8      of Texas with respect to the DACA program.

9      **Q      Okay.  When did you first see this**

10     **letter?**

11     A      I don't recall specifically, but perhaps

12     the same day or the next day.

13     **Q      Okay.  So close to, in time, June 29,**

14     **2017?**

15     A      Approximately.

16     **Q      What was your immediate reaction the**

17     **first time you saw this letter?**

18     A      What do you mean by my immediate

19     reaction?

20     **Q      What were the first thoughts you**

21     **remember having after seeing this letter for the**

22     **first time?**

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

128

1          A      They sent a letter, was my first

2     thought.   My second thought might have been; okay,

3     now what.

4          **Q      Great.  Who is the first person within**

5     **the federal government that you spoke to about**

6     **this letter?**

7          A      I don't recall.

8          **Q      Okay.  Do you recall speaking to former**

9     **Secretary Kelly about this letter?**

10         A      Yes.

11         **Q      What did you discuss?**

12                MR. GARDNER:  Objection.  Calls for

13    disclosure of information subject to deliberative

14    process privilege.  Instruct the witness not to

15    answer.

16    BY MS. TUMLIN:

17         **Q      Did you recall speaking to anyone else**

18    **within the Department of Homeland Security aside**

19    **from former Secretary Kelly about this letter?**

20         A      Yes.

21         **Q      Who?**

22         A      That's rather vague and broad in terms

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

129

1   of who I discussed the letter with.  I think it

2   was a well known fact to everyone within the

3   Department of Homeland Security that this letter

4   had been sent and that the Attorney General of

5   Texas had requested something be done with DACA.

6   So I couldn't give you a precise answer other than

7   to say that I think -- you know, I wouldn't

8   venture to say every single discussion I ever had

9   after that we talked about this, but it certainly

10  was well known.

11          **Q    Is it fair to say that subsequent to the**

12  **receipt of this letter from Attorney General**

13  **Paxton and other state attorney generals that this**

14  **letter featured prominently in subsequent**

15  **discussions you had regarding the DACA program**

16  **within the Department of Homeland Security?**

17                MR. GARDNER:  Objection, vague.

18                THE WITNESS:  I don't know what you mean

19  featured prominently.

20  BY MS. TUMLIN:

21          **Q    Was a large part of those discussions?**

22          A    About the letter?

130

1      Q      About that the letter was a large part

2    of the discussions about DACA?

3      A      What about the letter?  The fact that

4    the letter was sent, the contents of the letter?

5      Q      The threat made by the State of Texas

6    and other states to sue the federal government as

7    to the legality of the DACA program if it was not

8    terminated by a date certain?

9      A      That was a topic of discussion.

10      Q      Okay.  Did you speak to anyone else

11    within DHS leadership about this threat to sue

12    letter?

13      A      Well, as I indicated I don't recall

14    specifically.  But I know that we talked about it

15    numerous times with numerous people.  So it could

16    be that I talked about it with a whole host of

17    people that would probably take an hour or two to

18    list.  But I'm not really sure.

19      Q      Okay.

20      A      I don't recall specific occasions other

21    than to say that we talked about it generally.

22      Q      Great.  Did you speak to anyone at the

131

1    White House about this letter?

2         A    Probably, but I don't recall any

3    specific conversations.

4         Q    Did you speak to President Trump about

5    this letter?

6         A    No.

7         Q    Did you speak to

8    Attorney General Sessions about this letter?

9         A    About the fact that it had been sent,

10   yes.

11        Q    Did you speak to anybody else within the

12   Department of Justice about this Texas threat to

13   sue letter?

14        A    Yes, I think so.

15        Q    Do you remember who that would be?

16        A    And again, similar to DHS, I mean the

17   fact of this letter being out there was widely

18   known and well known so I can't recall every

19   specific conversation I had with someone at the

20   Department of Justice about this letter.  But I do

21   know that I spoke with a number of individuals at

22   the Department of Justice about the existence and

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    10/20/2017

132

1    the request of this letter.

2        **Q    Did you speak to any -- did you speak to**

3    **Attorney General Sessions about whether or not the**

4    **Department of Justice would defend the federal**

5    **government in any lawsuit filed by the State of**

6    **Texas challenging the legality of the DACA**

7    **program?**

8            MR. GARDNER:  Objection.  It does call

9    for the disclosure of information subject to the

10   deliberative process privilege and the

11   attorney/client privilege.  I instruct the witness

12   not to answer.

13           MS. TUMLIN:  Even though it is a yes or

14   no question?

15           MR. GARDNER:  You are asking did they

16   have that substantive conversation.

17           MS. TUMLIN:  Did you -- yes.

18           MR. GARDNER:  Why don't you reask the

19   question?

20           MS. TUMLIN:  Sure.

21           MR. GARDNER:  I apologize.

22

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

133

1          MS. TUMLIN:  No problem.

2     BY MS. TUMLIN:

3          **Q     Did you speak to**

4     **Attorney General Sessions about whether or not the**

5     **Department of Justice would defend the federal**

6     **government in any lawsuit filed by the State of**

7     **Texas challenging the legality of the DACA**

8     **program?**

9          MR. GARDNER:  Phrased that way you can

10    answer that with a yes or no.

11         THE WITNESS:  Perhaps, I might have.  I

12    don't know if you can characterize the discussions

13    in that manner.  But generally the topic came up

14    in -- I think in a couple of discussions, but I'm

15    not really specifically sure.

16    BY MS. TUMLIN:

17         **Q     Did you speak to Acting Secretary Duke**

18    **at any time about this Texas threat to sue letter?**

19         A     Yes.

20         **Q     Did the receipt of this Texas threat to**

21    **sue letter change your view in any fashion with**

22    **respect to the legality of the DACA program?**

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                               **10/20/2017**

134

 1          MR. GARDNER:  You're asking for his

 2   views?

 3   BY MS. TUMLIN:

 4       Q    Yes.  Your views, Mr. Hamilton?

 5          MR. GARDNER:  You can answer the

 6   question.

 7          THE WITNESS:  Did it change my view --

 8   BY MS. TUMLIN:

 9       Q    -- In any way?

10       A    -- about the legality of DACA?  No.

11       Q    Okay.  Before June 29, 2017 did you --

12   pardon me, did you know that Texas or any other

13   states were going to ask DHS to end the DACA

14   program?

15       A    No.

16       Q    Are you aware of any communications

17   between Texas and the other states listed on this

18   letter with Attorney General Sessions about the

19   substantive content of this letter before its

20   issuance?

21       A    No.

22       Q    Are you aware of any communications

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                         **10/20/2017**

135

1    between Texas and the other states listed on this

2    letter with anyone in the White House about the

3    substantive content of this letter prior to its

4    issuance?

5          A    No.

6          Q    The Texas threat to sue letter is signed

7    by ten state attorney generals and the governor of

8    Idaho.  I'm going to list a series of individuals

9    and ask whether between the time President Trump

10   was elected in November 2017 and when the letter

11   was sent on June 29 you had any communication with

12   them or their staff.  So I will start --

13         A    What is the date range again?

14         Q    The date of the presidential election.

15         A    Yup.

16         Q    And the date of this letter June 29,

17   2017?

18         A    Okay.

19         Q    Any communications with Ken Paxton?

20         A    In my capacity as counselor, senior

21   counselor to the secretary we met with Ken Paxton

22   and his staff about other issues not related to

136

1    DACA once or twice before this letter came out.  I

2    don't recall specifically when or the precise

3    discussions they were about.  I think they were

4    just general introductory meetings.  Engages --

5    principal secretaries engage in such discussions

6    with a number of stakeholders and we did have a

7    meeting with him and his staff.

8         Q    Okay.  And at those meetings with

9    Attorney General Paxton and his staff is it true

10   that DACA was never discussed?

11        A    I don't recall it ever being mentioned.

12        Q    Okay.  How about did you have any

13   communications with Steve Marshall, the Attorney

14   General of Alabama?

15        A    No.

16        Q    Or Steve Marshall's staff?

17        A    No.

18        Q    How about Lawrence Wasden, the Attorney

19   General of Idaho?

20        A    No.

21        Q    Or Mr. Wasden's staff?

22        A    No.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

137

1      Q    How about Derek Schmidt, the Attorney
2  General of Kansas?

3      A    No.

4      Q    Or Mr. Schmidt's staff?

5      A    No.

6      Q    How about Jeff Landry, the Attorney
7  General of Louisiana?

8      A    No.

9      Q    Or Mr. Landry's staff?

10      A    No.

11      Q    How about Doug Peterson, the Attorney
12  General of Nebraska?

13      A    No.

14      Q    Or Mr. Peterson's staff?

15      A    No.

16      Q    How about Alan Wilson, the Attorney
17  General of South Carolina?

18      A    No.

19      Q    Or Mr. Wilson's staff?

20      A    No.

21      Q    How about Herbert Slatery III, the
22  Attorney General and Reporter of Tennessee?

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

138

1      A    No.

2      Q    Or Mr. Slatery's staff?

3      A    No.

4      Q    How about Patrick Morrisey, the Attorney

5    General of West Virginia?

6      A    No.

7      Q    Or Mr. Morrisey's staff?

8      A    No.

9      Q    How about -- his full name is C.L.

10   "Butch" Otter, the Governor of Idaho?

11     A    No.

12     Q    Or Mr. Otter's staff?

13     A    No.

14     Q    In the same time period, which is from

15   the presidential election to June 29, did you have

16   any communications with any other state attorney

17   generals aside from Ken Paxton?

18     A    I don't recall any.  I know that we met

19   with a number of representatives on a couple of

20   trips with Secretary Kelly from the State of

21   Arizona, the State of Texas, the State of

22   California.  But I don't know that there was any

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                          **10/20/2017**

139

1   representatives from the AG office or anyone else

2   who were present at any of those meetings.  But --

3   so to answer your question, no, generally not.

4              MS. TUMLIN:  Okay.  I'm sorry to do

5   this.  We need to go off of the record for a quick

6   second.  I have been told that the realtime

7   transcript isn't working.

8              THE VIDEOGRAPHER:  We're going off the

9   record.  The time on the video, 12:36 p.m.

10             (The proceeding recessed from 12:36 p.m.

11  to 12:39 p.m.)

12             THE VIDEOGRAPHER:  We are back on the

13  record.  The time on the video is 12:39 p.m.

14  BY MS. TUMLIN:

15       **Q    Okay.  I have a few more questions about**

16  **the Texas threat to sue letter in general.  You**

17  **previously testified that after the presidential**

18  **election and before June 29, 2017 you had a couple**

19  **of meetings with Ken Paxton and his staff.  Do you**

20  **remember who initiated that meeting?**

21       A    I don't particularly.  There was one

22  occasion where we were in Texas on a border tour

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

1    and I believe that there might have been a couple

2    of representatives from his office who were

3    present in a -- for some meeting or kind of a

4    briefing that took place.  The meeting, I do

5    recall one kind of formal meeting and I believe

6    that was at the request of the Texas Attorney

7    General.

8         Q    Okay.  In this same time period from the

9    presidential election to June 29, 2017 aside from

10   the State of Texas have any other state attorney

11   generals requested a meeting with you or your

12   office?

13        A    Not to the best of my recollection.

14        Q    Okay.  And after receipt of this June

15   29, 2017 threat to sue letter did you communicate

16   directly with any of the signatories of the

17   letter?

18        A    Not to the best of my -- none of the

19   signatories, no.

20        Q    How about with any members of their

21   staff?

22        A    Yes.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

141

1      Q    Who would that be?

2      A    I had I think one, maybe two discussions

3   with one member of Attorney General Paxton's

4   staff.  I think his name is Michael Toth.  I think

5   he is special counsel or something.  I'm not

6   precisely sure what he title was.

7      Q    Okay.  And were those phone

8   conversations?

9      A    Yes.

10     Q    With Michael Toth -- had you ever spoken

11  to Michael Toth before those conversations?

12     A    Yes.  Yes --

13     Q    -- Yes?  I'm sorry.  Thank you.  When

14  was that?

15     A    At the meeting where General Paxton was

16  there.

17     Q    The one we just discussed?

18     A    That's correct.

19     Q    Okay.

20     A    And I believe also in June at some

21  point.  Early June I think he was cognizant that

22  we were going to be in Miami for the Conference on

Gene Hamilton

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

142

1    Security and Prosperity in Central America.  He

2    was doing drill duty in Miami and was hopeful that

3    he might be able to see myself and General Kelly.

4    That did not happen, but there was some type of

5    communication to that effect.

6         Q    And with respect to the phone

7    conversations you had with Michael Toth after the

8    Texas threat to sue letter, approximately how many

9    times did you speak to him?

10        A    After the threat to sue letter?

11        Q    Uh huh.

12        A    Once or twice.

13        Q    And was that always on the phone?

14        A    Yes.

15        Q    Did anyone else participate in the phone

16   calls you've had with Michael Toth after the

17   threat to sue letter?

18        A    Not to the best of my knowledge.

19        Q    Approximately how long were each of the

20   phone calls you had with Michael Toth?

21        A    Ten to 15 minutes maybe.

22        Q    What did you discuss in those phone

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

143

1    **calls?**

2         A    One of those -- well, the only one that

3    I can actually recall in this time period -- I've

4    talked to him since September 5 about an unrelated

5    issue.  But the one phone call I can remember was

6    I believe I called him or he called me -- I'm not

7    sure which one, to ask about kind of the general

8    intent of the letter and what it meant and what

9    they were looking for, to his knowledge.  Reaching

10   out kind of staffer to staffer, so to speak.

11        **Q    Did that include a discussion of what**

12   **type of termination or wind down of the DACA**

13   **program would be necessary in order to ensure that**

14   **Texas and the other states would not sue?**

15        A    I mean, I guess you could say that

16   generally just in terms of obviously the letter

17   says what it says so what does it mean and what is

18   your understanding of what you all are hoping for,

19   understanding that there's all kinds of parameters

20   and ways that this could be done.  So that I could

21   advise my principal I reached out to find out what

22   might be the realm of the possible.

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                     10/20/2017

144

1      Q     Did you in those -- in that conversation
2  that you can recall inquire as to whether the
3  September 5 deadline set for suing by Texas and
4  the other states was a hard deadline?

5      A     I don't remember any specific
6  discussion, but generally that might have -- I
7  mean, that may have come up.  I just -- I'm sorry
8  I don't recall the specifics.

9      Q     Did you inquire as to whether the State
10 of Texas or other attorney generals were already
11 working on legal papers.

12     A     I did not, I know that.

13     Q     Did either you or Mike Toth define any
14 next steps following the call?

15     A     I did not.

16     Q     Did you make any agreements to speak
17 again?

18     A     No.

19     Q     Have you had any other conversations
20 with Michael Toth about the DACA program since
21 that phone call?

22     A     I don't think so.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

145

1    Q    Did you have any other conversations

2    with other staff of the Texas Attorney General

3    regarding DACA?

4    A    I don't -- I don't remember any.  I

5    don't think so.

6    Q    And did you have any conversations with

7    staff or any of the other state attorney generals

8    listed on this letter regarding DACA?

9    A    No, I don't think so.

10    Q    Did you discuss the content of this

11    Texas threat to sue letter with Stephen Miller?

12         MR. GARDNER:  You can answer that with a

13    yes or no.

14         THE WITNESS:  Yes.

15    BY MS. TUMLIN:

16    Q    When was that?

17    A    On many occasions.

18    Q    Do you remember the first time roughly

19    upon which you discussed the Texas threat to sue

20    letter with Stephen Miller?

21    A    Soon after it was issued.

22    Q    Was anyone else present?

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

146

1        A    I don't believe so.

2        **Q    And when was the next time you spoke to**

3   **Stephen Miller about the Texas threat to sue**

4   **letter?**

5        A    If you are trying to get me to do a

6   sequential -- you know, I talked to him on this

7   date, this date, this date, I would be speculating

8   and guessing entirely.  There is no way I could

9   nail that down.

10        **Q    Okay.  More than -- did you speak to**

11   **Stephen Miller about this letter more than five**

12   **times?**

13        A    Potentially.

14        **Q    Okay.  And in those conversations with**

15   **Stephen Miller about the Texas threat to sue**

16   **letter were any decisions made?**

17        A    No.

18        **Q    Did you discuss the content of the Texas**

19   **threat to sue letter with**

20   **Attorney General Sessions?**

21        A    Did I discuss the content of the letter

22   with the Attorney General?  I think so.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

147

1      Q      Did you discuss your phone conversation

2   with Michael Toth with the Attorney General?

3      A      I did not.

4      Q      Okay.  How many times would you say you

5   discussed the Texas threat to sue letter with

6   Attorney General Sessions?

7      A      Maybe -- maybe a couple of times.

8      Q      Was that on the phone?

9      A      In person.

10      Q      In person.  Was anyone else present?

11      A      Yeah.  The first time would have been at

12   the White House meeting, the Roosevelt Room.  And

13   the other time was immediately after the meeting

14   that didn't happen.

15      Q      Got it.  Okay.  Going back briefly for a

16   moment to your phone conversation with Michael

17   Toth.  When you talked to him about the various

18   possibilities for how the DACA program might be

19   terminated that would satisfy Texas and the other

20   attorney generals what do you recall Mr. Toth

21   saying?

22              MR. GARDNER:  Objection to the extent

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

148

1    that it mischaracterizes the witness's previous

2    testimony.

3              THE WITNESS:  Can you rephrase?

4    BY MS. TUMLIN:

5         **Q    Sure.  You previously testified or**

6    **described your phone call with Michael Toth as a**

7    **staffer to staffer level call.  Is that correct?**

8         A    Yes.

9         **Q    And it -- you also previously testified**

10   **that it included a recognition between you and**

11   **Toth that there would be various ways that one**

12   **could terminate the DACA program.  Is that**

13   **correct?**

14             MR. GARDNER:  Objection to the extent

15   that mischaracterizes the witness's testimony.

16             THE WITNESS:  I don't know that I said

17   various thing to terminate the DACA program.

18   Various -- the parameters of the realm of the

19   possible what might be acceptable to Texas I think

20   might have been my language, but I would have to

21   see the transcript.

22

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                              10/20/2017

149

1   BY MS. TUMLIN:

2        Q    Sure.  And what did Mr. Toth say about

3   the parameters or the various realm of the

4   possibility that might be acceptable to Texas?

5        A    Not a whole lot, quite frankly.

6        Q    Did he give you any indication?

7        A    Just that the letter said kind of what

8   it said and there was really -- I'm trying to

9   think back about everything that we discussed in

10  that call.  And I don't recall that there was --

11  that I really gained that much from that phone

12  call in terms of information what might be

13  acceptable to the State of Texas.

14       Q    Did you leave with the sense that the

15  letter basically spoke for itself or summarizes

16  much of the details of Texas' position as you

17  could ascertain at that time?

18       A    It might be a fair assessment.

19       Q    Was it -- did it seem clear to you that

20  if the DACA program was terminated in total on

21  September 5 that that would stave off a lawsuit

22  from the State of Texas?

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                    10/20/2017

150

1        A     Not entirely.

2        **Q     Why not?**

3        A     It really depended on the manner in

4    which the program was terminated.

5        **Q     And did you have a sense of particular**

6    **ways that if the program was terminated the**

7    **federal government would still be at risk of a**

8    **lawsuit from the State of Texas?**

9              MR. GARDNER:  Objection.  Just for a

10   point of clarification, you're asking based on his

11   conversation with the Texas AG's office?

12   BY MS. TUMLIN:

13       **Q     Based upon his conversation with Michael**

14   **Toth, the one conversation he can recall?**

15       A     I didn't gain anything really in terms

16   of my understanding based on that discussion.  I

17   am familiar with the contents generally of the

18   Texas Attorney General's letter and what it asked

19   for.  And to the best of my recollection -- I'll

20   look at it and read it if you want me to, it said

21   something about no new applications.  And so

22   conceivably there would be no new grants of DACA.

**Martin Vidal, et al v. Elaine Duke, et al**                          **10/20/2017**

1   So conceivably there could be a circumstance in

2   which the program is rescinded and Texas would

3   still sue, depending on the way that you do it.

4   They asked for specific things.

5        **Q     Okay.  Is there anything that Mr. Toth**

6   **shared with you in that conversation about bottom**

7   **lines for the State of Texas with respect to --**

8        A     -- No.

9        **Q     -- the termination of the DACA program?**

10  **Okay.**

11       A     Not that I can recall.

12       **Q     Great.  Did you discuss the content of**

13  **the Texas threat to sue letter with General Kelly?**

14       A     Yes, I did.

15       **Q     Do you remember when that was?**

16       A     It was probably the same day that the

17  letter was sent to the attorney general or the day

18  after, whenever we first became aware of it.

19       **Q     In that initial one to two day period**

20  **after the letter was sent where you discussed it**

21  **with General Kelly was anyone else present?**

22       A     I don't recall specifically.  Likely

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                     **10/20/2017**

152

1    there would have been other people present.

2        **Q    Did you at that time discuss the**

3    **termination of the DACA program?**

4            MR. GARDNER:  You can answer that with a

5    yes or no.

6            THE WITNESS:  Did we discuss the

7    termination of the DACA program?

8    BY MS. TUMLIN:

9        **Q    Uh huh?**

10       A    I don't know if I can say yes or no to

11   that.  We generally discussed it and we discussed

12   what they were requesting.  And in so far as they

13   requested the termination of the program I suppose

14   you could say yes we discussed it.  But I don't

15   know that there was any in-depth discussions on

16   that --

17       **Q    -- Okay.**

18       A    -- point in time.

19       **Q    Were any decisions made on whether or**

20   **not to terminate the DACA program at that -- at**

21   **that time?**

22       A    No.

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

153

1      Q    Okay.  And did you discuss the content

2   of the Texas threat to sue letter with General

3   Kelly since he became the White House chief of

4   staff?

5      A    Yes.

6      Q    I'm guessing one of those times might be

7   in the Roosevelt Room at the meeting we've

8   discussed.  Is that accurate?

9      A    That would be accurate.

10     Q    Are there any other occasions since

11  General Kelly became the White House chief of

12  staff that you've discussed the Texas threat to

13  sue letter with him?

14     A    I don't recall any specifics.  There may

15  have been, but I don't know.

16     Q    Okay.  Okay.  Did you discuss the

17  content of the Texas threat to sue letter with

18  President Trump?

19     A    No.

20          MS. TUMLIN:  Okay.  I am going to pass

21  you a separate exhibit that has been previously

22  marked in this litigation -- pardon me, as

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                                      **10/20/2017**

154

1    Exhibit 19.  Here you are.  And actual I will give

2    you all the multiple copies.  Here you go.

3              (Whereupon, Exhibit No. 19 previously

4    marked was identified.)

5    BY MS. TUMLIN:

6        **Q    And I will give you a moment to take a**

7    **look at that.  Have you ever seen this letter**

8    **before?**

9        A    I think so.

10       **Q    Can you briefly describe what you**

11   **understand this letter to be?**

12       A    This is a letter from the -- four state

13   attorney generals, actually more than that.  And a

14   number of other attorney generals asking the

15   president to maintain the DACA program.

16       **Q    Do you have a recollection of when you**

17   **first became aware of this letter?**

18       A    I don't know specifically, but it's

19   probably soon after it was sent to the White

20   House.

21       **Q    Did you have any discussions with former**

22   **Secretary Kelly about this letter?**

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                                      10/20/2017

155

1       A     I don't recall.

2       Q     Did you have any discussions with Acting

3   Secretary Duke about this letter?

4       A     I don't recall.  I know that we

5   discussed -- we received a number of letters about

6   this issue from a lot of different people and so I

7   can't recall specifically every letter because

8   they are all very similar in structure.

9       Q     After seeing this letter from Attorney

10  General Xavier Becerra and other state attorney

11  generals did you have any contact with Attorney

12  General Becerra or his staff?

13      A     No.

14      Q     Did you have any contact with other any

15  of the other state attorney generals or their

16  staff listed on this letter?

17      A     I don't -- I don't think so.

18      Q     Okay.  Are you aware whether Danielle

19  Cutrona spoke to anyone in the Texas Attorney

20  General's office about the Texas threat to sue

21  letter?

22      A     I'm not aware.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

156

1      Q    Okay.  Okay.  I would like to talk with

2   you a bit more about your role in the secretary's

3   office.  And I know you previously testified that

4   you served in the Office of the Secretary for DHS

5   for essentially the entire Trump administration.

6   Is that correct?

7      A    That's correct.

8      Q    Would you agree that during that time

9   the Office of the Secretary has changed existing

10  administration policies on immigration?

11     A    Yes.

12     Q    Can you give me just one or two examples

13  of those changes?

14     A    In addition to this?

15     Q    Yes, please?

16     A    Former Secretary Kelly very clearly and

17  publicly issued a few memoranda that implemented

18  the requirements of executive orders issued by the

19  president.  I believe the date on both of those

20  was February 20th.

21     Q    That is my birthday.  That is the date.

22          And are those memoranda that you are

157

1    referring to, just to make a clean record, with

2    respect to President Trump's executive order on

3    border security and a second one on interior

4    enforcement?

5        A    Correct.

6        Q    Okay.  Would you agree that during the

7    time you have served in the Office of the

8    Secretary that the office has created new policies

9    on immigration?

10       A    What do you mean by created new

11   policies?

12       Q    An example would be creating guidance or

13   a memo or protocol that did not previously exist?

14       A    Did not previously exist at what time?

15       Q    Prior to January 20, 2017?

16       A    Well, the answer to the question that

17   you asked is no.  The policies that have been

18   effectuated by this administration existed prior,

19   previously.  They may not have existed during the

20   latter years of the Obama administration, but they

21   existed at one point in time.

22       Q    Okay.

158

```
1        A     Because they are the laws that were

2   passed by Congress.

3        Q     Okay.  Is there a set of formal

4   procedures that is generally used for

5   Acting Secretary Duke to change existing

6   administration policies?

7              MR. GARDNER:  Objection.  Vague.

8              THE WITNESS:  I don't really know what

9   you mean.

10  BY MS. TUMLIN:

11       Q     So for example, going back to the

12  examples that you provided.  When former

13  Secretary Kelly signed the two sets of memorandum

14  on February 20, 2017 is there a usual protocol for

15  creation of those kind of secretary level

16  memorandum that has to be followed?

17       A     Not that I'm aware of.  And nothing that

18  has to be followed or a standard protocol, it just

19  varies depending on the circumstances.

20       Q     So when either former Secretary Kelly or

21  Acting Secretary Duke sign a memorandum in their

22  role as secretary is there any kind of
```

159

1    preclearance process for those memoranda before

2    they're finalized?

3        A    Yes --

4             MR. GARDNER:   -- Objection.   Compound.

5    BY MS. TUMLIN:

6        Q    Can you describe the preclearance

7    process for secretary level memorandum?

8        A    It depends.

9        Q    Can you describe the preclearance

10   process that was used for either February 20, 2017

11   secretary memorandum?

12       A    Can I describe the process that was

13   involved with the memos on February 20th?

14       Q    (nods)

15       A    There was a draft of the memo that

16   circulated among various members of the

17   department, our operational components.   And they

18   are provided the opportunity to comment and edit

19   and revise accordingly, make suggestions.   At

20   which point once there is a final position of the

21   department generally the secretary then makes a

22   decision whether or not to sign it.   And then

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

160

1   we'll sign it or issue it.  And if there is a

2   dispute the secretary resolves that dispute

3   according to how he or she sees fit.

4        **Q    Okay.  When a memorandum is being**

5   **proposed, a secretary level memorandum is being**

6   **proposed for signature are all operational**

7   **components provided with an opportunity to edit?**

8        A    You need to define what you mean by

9   operational components.  The department has

10  250,000 employees and a number of operational

11  components.  So do you mean in the context of

12  immigration, in the context of disaster relief?

13       **Q    Good point.  Let's limit it just to the**

14  **concepts of immigration.  So in the context of**

15  **immigration if a secretary level memorandum is**

16  **being proposed which operational components would**

17  **be provided an opportunity to revise and edit that**

18  **memorandum?**

19       A    Depending on the circumstances generally

20  it would be ICE, USCIS, CBP, Office of General

21  Counsel, Office of Policy are generally the ones

22  that would provide such comment, feedback, and

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

161

1    edits.

2        Q    And who if anyone makes the decision of

3    which of those operational components would be

4    provided the opportunity to revise and edit a

5    proposed secretary level memorandum?

6        A    It depends.

7        Q    Does it depend on the content of the

8    memorandum?

9        A    Well, the memorandum is not always in

10   existence yet.  So the content of the memorandum,

11   maybe not.  But the subject matter, maybe so.

12       Q    Okay.  Within the Department of Homeland

13   Security does anyone have primary responsibility

14   to identify potential decisions that need to be

15   made by the acting secretary?

16            MR. GARDNER:  Objection.  Vague.

17            THE WITNESS:  I don't really know what

18   you mean.

19   BY MS. TUMLIN:

20       Q    Presumably there's a host of decisions

21   that get made in DHS every day that don't require

22   the acting secretary to sign off on them.  Is that

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                        **10/20/2017**

162

1    a fair statement?

2         A     Likely so.

3         Q     On the other hand presumably there are

4    certain decisions of such high importance like the

5    termination of the DACA program that require

6    Acting Secretary Duke to approve or be the

7    ultimate decision maker.  Is that a fair

8    statement?

9         A     Yes.

10        Q     So for decisions only in that latter

11   category where Acting Secretary Duke's decision is

12   required is there anybody responsible for

13   highlighting for her those decisions that are

14   needing her attention?

15        A     Generally speaking the secretary's

16   senior staff.  So myself, chief of staff, the

17   deputy chief of staff, the deputy secretary.

18   There's are a whole host of folks who could

19   potentially.  Or if there is an issue that arises

20   after that is brought to her attention my

21   component, may be the component points out that

22   somebody needs to coordinate.  So it just -- it

163

1   really depends.

2       Q    Okay.  And with that level of senior

3   staff that you've just identified would that be

4   basically the same grouping who would be

5   responsible for identifying decisions requiring

6   former Secretary Kelly's decision making as well?

7       A    Generally, yes.

8       Q    Okay.  When a secretary level memorandum

9   has been proposed to Acting Secretary Duke is it

10  common that she would hold a meeting to discuss

11  the substance of the memorandum with various

12  operational components before deciding whether or

13  not to sign that memorandum?

14      A    Is it common that she would hold a

15  meeting to discuss the contents of a memorandum

16  with the components?

17      Q    Uh huh?

18      A    Sometimes, yes.  Sometimes, no.

19      Q    Okay.  And who generally makes the

20  decision whether or not a meeting would be

21  required before approval or disapproval of a

22  proposed memorandum to the acting secretary?

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

164

```
1        A    Typically either the secretary or the

2    chief of staff.

3        Q    Are you familiar with the use of the

4    term tasker, T-A-S-K-E-R, within DHS?

5        A    I am aware of the use of that term, yes.

6    It can have many connotations.

7        Q    Are you also familiar with the use of

8    the term component tasker within DHS?

9        A    Not really.

10       Q    Is it fair to say that a tasker is a

11   request for action or for a task to be completed

12   by one of the components?

13       A    I don't know.

14       Q    How would you define the term tasker?

15       A    It depends on the context, who is

16   issuing the task, who is originating it, what is

17   the task, is it -- is it something that needs to

18   be provided, is it something that needs be -- I

19   just -- I don't know.  That could have all kinds

20   of different meanings.  I want to give you the

21   right answer.

22       Q    Okay.  Can you -- can you describe for
```

165

1    me if you are aware of when tasking assignments

2    would go through the executive secretary?

3         A    When tasking assignments would go

4    through the executive secretary?  On what subject?

5         Q    On a immigration related subject?

6         A    It depends.

7              MS. TUMLIN:  Exhibit 20.  Okay.  I will

8    keep going while we get that so we don't waste

9    time.  Okay.  Great.  I'm going to hand to folks

10   what's previously been marked as Exhibit 20 in the

11   Northern District of California cases.  You're

12   first, you're second.

13             (Whereupon, Exhibit No. 20 previously

14   marked was identified.)

15   BY MS. TUMLIN:

16        Q    Mr. Hamilton, I will represent to you

17   that this is an email chain that I have no belief

18   that you are on.  So I'm only providing it to you

19   because it has been entered into the record and it

20   uses this term tasker.  So I will give you a

21   second to take a look over the -- the short email

22   chain.

166

1        A     Can I ask how this was obtained?

2        Q     Absolutely.  This is Bates stamped as

3   part of the administrative record that was

4   produced in this case.  So it could have been --

5   actually, that's not correct.  This is part of the

6   RFPs.  Correct?  These are -- these are responses

7   that were provided to the plaintiffs in response

8   to our request for document production in this

9   case.

10       A     Okay.

11       Q     And that's why they were Bates stamped

12  at the bottom but they were not part of the

13  administrative record.

14       A     Okay.

15       Q     Okay.  So this document has a subject

16  line called component tasker.  Is that correct?

17       A     It appears to, yes.

18       Q     Does that term have any type of common

19  meaning that you are familiar with from your time

20  in the Department of Homeland Security?

21       A     I don't know if it has a common

22  understanding.  I would look at this email and

Gene Hamilton

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

167

1    interpret it to mean that someone has asked a

2    component to provide some materials for review or

3    to produce something.  But I don't know if it has

4    a common understanding or not.  I couldn't tell

5    you.

6         **Q     Within your office is this a term that's**

7    **used when one component asks someone else to**

8    **provide information?  Is the term tasking or being**

9    **a component tasker used?**

10        A    I couldn't tell you.  I just ask for

11   information and get it.

12        **Q    Handy.**

13        A    They call it whatever they want to call

14   it.  I don't know.

15        **Q    Okay.  And does the use of this term in**

16   **your mind or in your experience at the Department**

17   **of Homeland Security indicate that certain steps**

18   **have to be followed for the provision of**

19   **information or anything like that?**

20        A    I really couldn't tell you.  I have no

21   idea.

22        **Q    Okay.  Terrific.  Do you consider the**

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

168

1    decision to terminate the DACA program a

2    significant decision by the Department of Homeland

3    Security?

4         A    What do you mean by a significant

5    decision?

6         Q    A decision with a large impact on the

7    country?

8         A    What do you mean by a large impact on

9    the country?

10        Q    I think it's open to interpretation.

11        A    I don't -- that's -- it's a really vague

12   question.  I don't know that I can give you an

13   answer to that.

14        Q    Did you consider that the decision to

15   terminate DACA had a large impact on a significant

16   number of human beings within the United States?

17        A    Just so I'm clear, what did you mean by

18   impact?  I think -- I think I know how you --

19        Q    -- Do you consider it that it was a life

20   altering decision for a large number of

21   individuals in the United States?

22        A    A life altering decision?  You mean life

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

169

1    and death decision?

2        Q    **Life changing?**

3        A    Life changing?

4        Q    **Yeah.  Life altering or life changing?**

5        A    I don't know if I could answer that.

6    Maybe.  It could.  The decision could have an

7    impact on certain benefits that individuals are

8    entitled to, certainly.

9        Q    **Do you think it might alter their**

10   **prospects for education or stability in there**

11   **life?**

12           MR. GARDNER:  Calls for speculation.

13   Sorry.  Objection.  Calls for speculation.

14           THE WITNESS:  I mean that is a very

15   speculative question and it would ask -- that

16   would require me to know the laws of every

17   educational universe -- every educational

18   institute of the United States, all of the

19   policies and procedures.  I don't know if

20   individuals are in private school, public school.

21   I have no idea.

22

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

170

1    BY MS. TUMLIN:

2        Q     Do you have an idea of roughly how many

3    individuals on September 5 had DACA in the

4    United States?

5        A     I do.

6        Q     What do you understand that number to

7    be?

8        A     Approximately 690,000 people.

9        Q     Approximately.  So substantially more

10   than half a million.  So are there many other

11   decisions that you have been part of during your

12   time at the Department of Homeland Security that

13   impacted over half a million people?

14       A     Largely, yes, I think so.

15       Q     Okay.  Okay.  If a component within DHS

16   disagrees with the course of action that is being

17   proposed or recommended to the acting secretary is

18   there any kind of formal way to register that

19   disagreement?

20       A     Depending on the context generally, yes.

21       Q     Are there any standardized templates or

22   policy recommendation memos that go to the acting

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

171

1    **secretary?**

2         A    I don't know that there are any

3    standardized templates or memos or anything that

4    go.  Sometimes it's a phone call, sometimes it's

5    an email, sometimes it might be a memo.  It just

6    would really depend.

7         **Q    So for example one of the memorandums**

8    **that was signed on February 20, 2017 if a**

9    **particular component disagreed with a draft of**

10   **that memorandum how would they register that**

11   **disagreement?**

12             MR. GARDNER:  Objection.  Calls for

13   hypothetical.

14             THE WITNESS:  Can you rephrase the

15   question?

16   BY MS. TUMLIN:

17        **Q    Oh, sorry.  Prior to the signature of**

18   **the -- pardon me, February 20, 2017 memorandum did**

19   **a draft circulate among any of the DHS components?**

20        A    They did.

21        **Q    If any of those components had disagreed**

22   **with portions of the memorandum what would be the**

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

172

1    best way for them to register that disagreement?

2              MR. GARDNER:  Objection.  Calls for

3    hypothetical.

4              THE WITNESS:  Can you rephrase your

5    question, please?

6    BY MS. TUMLIN:

7        Q    Sure.  When the memorandum from February

8    20, 2017 circulated did any of the components who

9    saw drafts disagree with any of the language?

10       A    Insofar as they provided suggested

11   edits, which is standard practice, sure.  I think

12   that could be interpreted as a preference for

13   alternate language or alternate outcomes.

14       Q    Does Acting Secretary Duke receive a

15   daily briefing book?

16       A    She does.

17       Q    Every day?

18       A    Yes, she does.

19       Q    Okay.  What kinds of materials are

20   placed in her daily briefing book?

21             MR. GARDNER:  You can answer that

22   question to the extent it wouldn't disclose

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                               **10/20/2017**

173

1   pre-decisional deliberative material, otherwise I

2   would instruct you not to answer based on

3   deliberative process privilege.

4            THE WITNESS:  Intelligence reports, news

5   clippings, other operational news out of the --

6   originating out of the federal government.  She

7   receives the president's daily briefing every day.

8   BY MS. TUMLIN:

9       **Q    Okay.  How about an agenda for the day?**

10      A    Generally speaking she has a calendar.

11      **Q    Okay.  Anything else that is regularly**

12  **placed in her briefing book, categories?**

13      A    Not to my knowledge.  I don't put it

14  together, so I couldn't tell you really.

15      **Q    That's my next question.  Who is**

16  **responsible for compiling the briefing book?**

17      A    It is my understanding that the

18  secretary's briefing staff at the Department of

19  Homeland Security puts it together.

20      **Q    Do you know the name of that person or**

21  **individuals?**

22      A    No.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

174

1     **Q     Okay.  Do you --**

2     A     There's a lot of people that work in the

3     office.  So that's a large -- I mean, that's a

4     broad question.

5     **Q     Okay.  Do you assist in any way in**

6     **compiling the daily briefing book?**

7     A     No.

8     **Q     Can you recommend that certain things be**

9     **placed in the book if you think it would be**

10    **advantageous for the acting secretary to have**

11    **them?**

12    A     Yes.

13    **Q     Do you do that on occasion?**

14    A     I have on occasion asked for materials

15    to be placed in the book.

16    **Q     Can you describe not the content but**

17    **what kinds of materials you might ask to be placed**

18    **in the briefing book?**

19    A     Sometimes draft memos, draft documents.

20    Just kind of depends.

21    **Q     Is there anyone who exercises editorial**

22    **control over what goes in that briefing book,**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                   **10/20/2017**

1  meaning if you make a request that something gets

2  put into the briefing book will it definitely go

3  in or could somebody edit it out?

4            MR. GARDNER:  Objection.  Compound.

5            THE WITNESS:  Split the question up?

6  BY MS. TUMLIN:

7      Q    Every time you've recommend that

8  something goes in the daily briefing book has it

9  gone in?

10     A    Probably.  I don't know definitively,

11 but likely so.

12     Q    Okay.  Do you know if Acting

13 Secretary Duke writes in her daily briefing book?

14     A    I have seen her write on her materials

15 so I think that's likely the case.

16     Q    Do you know if the notes that she makes

17 in the daily briefing book are ever distributed do

18 others within the department?

19     A    I don't know.  I don't think so.

20     Q    To your knowledge was the daily briefing

21 book that former Secretary Kelly received

22 different in any material ways than the one what

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    10/20/2017

176

1    Acting Secretary Duke receives?

2         A    I don't think so.  I think it was

3    largely the same.

4         Q    And to your knowledge was the process

5    for compiling the daily briefing book that former

6    Secretary Kelly received different in any material

7    ways than the one received by Acting

8    Secretary Duke now?

9         A    I don't think so.

10        Q    Okay.

11        A    Must have been a great note.

12        Q    It's kind of interesting.

13             What are the primary ways that DHS staff

14   communicate with Acting Secretary Duke?

15        A    It could be in person meetings, phone

16   calls, occasionally emails.

17        Q    Okay.

18        A    We don't use carrier pigeons.

19        Q    Does Acting Secretary Duke personally

20   read her DHS email?

21             MR. GARDNER:  Objection.  Calls for

22   speculation.

177

1          THE WITNESS:  I don't know the answer to

2     that question.

3     BY MS. TUMLIN:

4          Q    Do you email Acting Secretary Duke on

5     her DHS email?

6          A    Do I?  Meaning -- do you mean have I

7     emailed her?

8          Q    Yes.  Uh huh?

9          A    I have emailed her.

10          Q    Has she responded to you using her DHS

11     email address?

12          A    I believe she has.

13          Q    Okay.  Does Acting Secretary Duke have

14     more than one DHS email address?

15          MR. GARDNER:  Objection.  Calls for

16     speculation.  Lack of foundation.

17          THE WITNESS:  I have no idea.

18     BY MS. TUMLIN:

19          Q    How many email addresses do you have for

20     Acting Secretary Duke?

21          A    One.

22          Q    To your knowledge are there any

178

1   restrictions on who can send email to that one

2   email address that you have for Acting Secretary

3   Duke?

4        A    I do not know.

5        Q    Do you know if Acting Secretary Duke's

6   email address is publicly available?

7        A    What do you mean by publicly available?

8        Q    Posted online?

9        A    No.  It is not.

10       Q    Does Acting Secretary Duke conduct any

11  DHS business on her personal email account?

12            MR. GARDNER:  Objection.  Calls for

13  speculation.  Lack of foundation.

14            THE WITNESS:  I don't have the slightest

15  idea.

16  BY MS. TUMLIN:

17       Q    Okay.  Does Acting Secretary Duke

18  generally conduct DHS business via phone?

19            MR. GARDNER:  Objection.  Calls for

20  speculation.  Lack of foundation.

21            THE WITNESS:  I have no idea.  I am not

22  with her every hour of the day.  I could never

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

179

1    answer that question truthfully and fully,

2    completely.

3    BY MS. TUMLIN:

4        **Q     How many times a week does Acting**

5    **Secretary Duke call you on the phone to discuss**

6    **DHS business?**

7        A     I couldn't even give you an estimate.  A

8    few times, I don't know.  Depends.  We see each

9    other a lot.  Work with each other a lot.  It just

10   depends.

11       **Q     Great.  Do you have any standing**

12   **meetings with Acting Secretary Duke?**

13       A     We do.

14       **Q     How often are those?**

15       A     Daily, typically.

16       **Q     Okay.**

17       A     When she's in town and when I'm in town.

18       **Q     Okay.  And what were the primary ways**

19   **that DH staff -- DHS staff communicated with**

20   **former Secretary Kelly?**

21            MR. GARDNER:  Objection.  Calls for

22   speculation.  Lack of foundation.

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

---

                                                                        180

1             THE WITNESS:  I couldn't -- I couldn't

2     answer for you the way that 250,000 employees at

3     the department communicated with the former

4     secretary.

5     BY MS. TUMLIN:

6         Q     Okay.  We will take you as a grid

7     example.  Did you have standing meetings with

8     former Secretary Kelly when he was the secretary

9     of DHS?

10        A     If by standing do you mean regular, yes,

11    we had regular.  We were not standing always.

12    Sometimes we sat down.  It's possible.

13        Q     How often were those regular meetings

14    that you had with former Secretary Kelly?

15        A     Every day.

16        Q     Okay.  Did you also email former

17    Secretary Kelly at his DHS email address?

18        A     I did.

19        Q     And did he respond to you using that

20    address?

21        A     Yes.

22        Q     And was his DHS email address publicly

---

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    10/20/2017

181

1    available?

2         A    No.

3         Q    To your knowledge were there any

4    restrictions on who could send incoming email to

5    former Secretary Kelly's DHS email address?

6         A    I do not know.

7         Q    Did you have any other email addresses

8    for former Secretary Kelly at the time he was the

9    secretary?

10        A    Can I have any other email addresses?

11        Q    Like a personal email address for him as

12   well?

13        A    I'm aware of his personal email address.

14        Q    Did former Secretary Kelly ever send you

15   DHS business using his personal email address?

16        A    No.  I believe there may have been one

17   or two occasions where he had seen something on

18   his personal -- he had seen something and it was

19   on his personal device and he had forwarded it

20   from his personal device to his work account and

21   from his work account to me, is the general range

22   of what I understand.  He was always very careful

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                                      **10/20/2017**

182

1   about that and rightfully so.

2       **Q    Okay.  Did former Secretary Kelly**

3   **regularly call you on the phone to discuss DHS**

4   **business?**

5       A    Over which time period?

6       **Q    Between January 21, 2017 until he left**

7   **the White House?**

8       A    Did he regularly call me to discuss DHS

9   business, yes.  We talked many -- on many

10  occasions on the phone.

11      **Q    Okay.  Since you have been with the**

12  **Office of the Secretary at DHS has the White House**

13  **ever communicated a policy directive to the**

14  **Department of Homeland Security?**

15      A    What do you mean a policy directive?

16      **Q    By policy directive here I mean an**

17  **instruction that a certain policy should be**

18  **implemented?**

19      A    What do you mean by the White House?

20  White House is a big entity, a lot of people --

21      **Q    -- Anyone with authority to speak for**

22  **the White House?**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

183

1    A    Well, I think that it's a matter of

2  public record that the president issued a few

3  executive orders that implicated the department's

4  business and directed us to do certain things.

5    **Q    Is that the most common way for a**

6  **directive from the White House to come to the**

7  **department is via executive order?**

8    A    Not always.

9    **Q    Do you sometime received memorandum from**

10  **the White House?**

11    A    I am aware that the White House issues

12  executive orders, presidential proclamations,

13  presidential memorandum, presidential directives.

14  There are summary of conclusions that come out of

15  meetings at the White House.  They don't

16  necessarily do -- there are all kinds of manners

17  in which --

18    **Q    Okay.**

19    A    -- A decision could be -- or a decision

20  or a guidance could come out of the White House.

21    **Q    Got it.  Do you participate in the**

22  **Domestic Policy Council or DPC?**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**        **10/20/2017**

184

1       A     What do you mean by participate in?

2       **Q     Are you a formal member of the DPC?**

3       A     Am I a formal member of the Domestic

4   Policy Council, no.

5       **Q     Do you sit in on regular meetings at the**

6   **DPC?**

7       A     Do I -- do I sit in on regular meetings

8   of the Domestic Policy Council, no.  Do I sit in

9   on meetings that are hosted largely by the

10  Domestic Policy Council that involve other

11  agencies and individuals, yes.

12      **Q     Approximately how often do you attend a**

13  **meeting hosted by the Domestic Policy Council?**

14      A     Many times.

15      **Q     Since January 21, 2017 more than 20?**

16      A     Likely.

17      **Q     More than 50?**

18      A     Probably.

19      **Q     That's a lot.  More than 100?**

20      A     I couldn't tell you.  It's been a lot.

21      **Q     Okay.  Have you ever attended a meeting**

22  **hosted by the Domestic Policy Council in which**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                        **10/20/2017**

185

1    DACA was discussed?

2         A    I don't know.  Maybe.  I don't recall

3    any specific meetings where we discussed DACA

4    itself.

5         Q    Do you recall any specific meetings that

6    you attended hosted by the Domestic Policy Council

7    that discussed immigration issue?

8         A    Certainly.

9         Q    Okay.  More than 20 of those meetings?

10        A    Yes.  All of the -- it would be a fair

11   assumption -- just to help you out here, a fair

12   assumption that all of them involved largely

13   immigration issues.

14        Q    So potentially close to a hundred

15   meetings that you attended at the Domestic Policy

16   Council included immigration issues?

17        A    I don't know if I said close to a

18   hundred.  I said it's a lot.  I don't know.

19   Largely all of them are on immigration issues.

20        Q    Okay.  But you don't have any specific

21   memory of any of those meetings involving the

22   mention of DACA?

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                **10/20/2017**

186

1     A     Not to the best of my recollection.

2     **Q     Okay.**

3     A     I just -- I don't recall anything

4  specifically.  But could the word DACA have been

5  uttered by somebody at one of those meetings?

6  Lord knows.  I mean, I don't know.  I can't recall

7  every word.

8     **Q     Okay.  Do you -- it seems like a silly**

9  **question in light of these meetings, however, do**

10  **you speak to DPC staff regularly?**

11     A     Yes.

12     **Q     Which ones?**

13          MR. GARDNER:  You can identify

14  individuals you have spoken to.

15          THE WITNESS:  I regularly communicate

16  with a -- the director of Domestic Policy Council,

17  Andrew Bremberg.  Domestic Policy Council

18  technically reports to Stephen Miller.  I've

19  talked to Steve.  The deputy director is Paul

20  Winfree and I have regular discussions and

21  exchanges with him.  John Zadrozny works on the

22  Domestic Policy Council, I've talked with him

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

187

```
1    frequently.  Zina Bash, talked with her.  There's
2    are a number of detailees who work on the Domestic
3    Policy Council that I talk with.  I'd say it's a
4    fair assumption that I've probably talked to all
5    of them.
6    BY MS. TUMLIN:
7        Q    Okay.  How about Mary Salvi?
8        A    Mary is an administrative assistant or
9    special assistant, confidential assistant.  I
10   don't know her precise title.  But she works on
11   the Domestic Policy Council.
12       Q    How about Peter White?
13       A    Not as much with Peter.
14       Q    Okay.  How often do you speak with staff
15   at the White House?
16       A    Frequently.
17       Q    Who are the primary staff at the White
18   House that you speak to frequently?
19       A    There are many depending on the time and
20   the place and the subject matter.
21       Q    Before he left the White House did you
22   speak frequently with Steve Bannon?
```

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

188

1      A     Did I speak frequently?   Define

2   frequently?

3      **Q     I was using it because you did.**

4      A     Did I speak with Steve Bannon on

5   multiple occasions, yes.

6      **Q     Have you spoken with him since he left**

7   **the White House?**

8      A     Maybe once.

9      **Q     Before Steve Bannon left the White House**

10  **did you ever speak to him about DACA?**

11     A     I'm certain that we talked about DACA at

12  some point.   I just don't know when.   It may

13  have -- it may have predated the election.

14     **Q     Okay.   Okay.   Are you familiar with the**

15  **Center for Immigration Studies?**

16     A     I am.

17     **Q     Have you communicated with them since**

18  **you began working in DHS in 2017?**

19     A     We had a meeting with them a couple of

20  months ago.   It was hosted by our Office of

21  Partnership and Engagement and there were

22  representatives from that organization at the

189

1    department.

2        Q     Were there other organizations at that

3    meeting in addition to representatives from the

4    Center for Immigration Studies?

5        A     I believe that NumbersUSA was there and

6    FAIR.  I think that was it.

7        Q     Okay.  Do you remember the names of any

8    individuals from the Center of Immigration Studies

9    who were at that meeting?

10       A     Mark Krikorian was there.

11       Q     Do you remember anyone else from the

12   Center for Immigration Studies who was at that

13   meeting in addition to Mark Krikorian?

14       A     I don't think so.

15       Q     Do you remember the names of anyone from

16   NumbersUSA who was at that meeting?

17       A     Rosemary Jenks.

18       Q     Okay.  Do you remember anyone else from

19   NumbersUSA who was at the meeting in addition to

20   Rosemary?

21       A     Grant Newman.

22       Q     Anyone else?

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                                    10/20/2017

```
                                                                    190
1       A     No.

2       Q     Do you remember the names of anyone from

3   FAIR who was at that meeting?

4       A     Rob Law.

5       Q     Anyone else from FAIR?

6       A     I don't remember who he was.  I don't

7   remember his name.

8       Q     Okay.

9       A     Somebody else was there.

10      Q     Okay.  And were there any other

11  representatives from nongovernmental organizations

12  at that meeting?

13      A     Not at that particular meeting.

14      Q     Okay.  And who from -- at the Department

15  of Homeland Security in addition to yourself was

16  at that meeting?

17      A     The Office of Partnership and

18  Engagement, so our acting assistant secretary,

19  John Barsa.  Myself.  I think there were a couple

20  folks from our Office of Policy and a couple of

21  folks from USCIS and maybe from ICE.  But I don't

22  really remember.
```

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

191

1      Q      Do you remember who would have been

2   there from USCIS?

3      A      No.

4      Q      Or from ICE?

5      A      No.  Sorry.

6      Q      Or from the Office of Policy?

7      A      I would be speculating, but I think that

8   Michael Dougherty was there from Office of Policy.

9   But other than that I don't really recall.

10      Q      And I'm sorry.  I think you said, was it

11   the Office of Partnership who hosted that meeting?

12      A      That's correct.

13      Q      And do you know approximately how long

14   the meeting lasted?

15      A      Maybe an hour.

16      Q      Okay.  Do you remember the topic of the

17   meeting?

18      A      General get to know you or -- you know,

19   howdy to the department.  They had been completely

20   shut out by the last administration and never

21   invited to participate in any meetings whatsoever.

22   So the Office of Partnership and Engagement

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

192

1    thought it might be a good idea to bridge the gap.

2        Q    Did you discuss DACA in that meeting?

3        A    I don't recall.

4        Q    Were -- was there an agenda at all

5    prepared for that meeting?

6        A    No.

7        Q    Has the Office of Partnership hosted any

8    other meetings that you've attended involving

9    different nongovernmental immigration groups in

10    2017?

11        A    Yes.  There was -- I don't remember

12    what -- there are a number of -- there is a

13    business council of some kind and representatives

14    from various businesses and immigration

15    organizations that came and met with us and talked

16    about various issues.

17        Q    Okay.

18        A    With OP there's -- we have talked to --

19    OPE hosted another meeting I can remember

20    involving the agricultural industry

21    representatives.  But I don't --

22        Q    Is OPE --

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

193

1      A      -- there have been -- I mean, goodness.

2   They coordinate all of our engagements with the

3   private sector and nongovernmental entities.  And

4   so whether that's that or whether that's meetings

5   with the chamber of commerce, whether that's

6   whatever.  I mean, there's a whole host of

7   meetings that likely were where we could have

8   discussed immigration issues generally in some

9   fashion or another.

10      **Q      Okay.  A couple of things for**

11   **clarification.  Is OPE, Office of Partnership and**

12   **Engagement?**

13      A      It is.

14      **Q      Okay.**

15      A      Very good.

16      **Q      Winning.  And the meeting that we first**

17   **discussed that had Center for Immigration Studies,**

18   **NumbersUSA, and FAIR you approximated that is**

19   **about a couple of months ago.  Is that correct?**

20      A      I think it was.  I mean, it was at least

21   a couple of months ago.  I mean it's hard to

22   believe it's late October at this point in time.

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                           **10/20/2017**

194

1   The year has been a blur.  So it's been at least a

2   couple of months, if not more.

3        Q    Okay.  And then the separate meeting

4   with business counsel and other folks that OPE

5   hosted do you remember approximately when that

6   was?

7        A    It was before that, sometime in the

8   summer.

9        Q    Okay.  And at that meeting with business

10  council representatives do you remember if DACA

11  came up?

12       A    I don't remember if it came up.

13       Q    Have you in 2017 met with the American

14  Immigration Lawyers Association?

15       A    America Immigration Lawyers Association.

16       Q    AILA?

17       A    I don't know if AILA was present at any

18  of our meetings specifically, although I seem to

19  recall representatives from AILA being present at

20  various meetings.  I just -- I don't recall which

21  ones and where.

22       Q    Okay.  Separate from the meeting with

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

195

1    OPE that we discussed have you initiated any other

2    communications with anyone at the Center for

3    Immigration Studies in 2017?

4         A    Have I initiated any conversations with

5    them?  Not to the best of my recollection.

6         Q    And in 2017 have you initiated or had

7    any communications with FAIR aside from that

8    meeting with OPE?

9         A    Have I initiated or had any

10   conversations about anything under the sun, under

11   the universe?

12        Q    Uh huh.

13        A    I don't -- I don't know.  Maybe.  I'm

14   not really sure.

15        Q    Have you had any discussions in 2017

16   with representatives of FAIR regarding DACA?

17        A    No.

18        Q    Have you had any conversations in 2017

19   with representative of NumbersUSA regarding DACA?

20        A    I have not had any formal meetings with

21   members of NumbersUSA that I can recall where

22   any -- where DACA was a topic of an agenda.  Just

196

1    I have had discussions.  I have seen them in

2    social, a few folks in social encounters.  And I

3    can't guarantee that no one ever said the word

4    DACA, but I just don't recall anything.

5         Q    Okay.  And are you familiar with Kris

6    Kobach?

7         A    I am.

8         Q    Have you communicated with Kris Kobach

9    since you began working DHS in 2017?

10        A    Yes.

11        Q    Did you receive or have any

12   communications from Kris Kobach regarding DACA in

13   2017?

14        A    No.

15        Q    Did you speak to Kris Kobach regarding

16   any other immigration issue in 2017?

17        A    Any immigration issues, no.

18             MS. TUMLIN:  Okay.  Okay.  I apologize.

19   I'm not sure what exhibit we are at.  I think

20   we're at 29.  Does that sound right?  This is a

21   new exhibit.  I know we are trying to keep it

22   clean.

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

197

1          MR. GARDNER:  29.

2          MS. TUMLIN:  This is for you to mark,

3    please, as Exhibit 29.  That's for you.

4          (Whereupon, Exhibit No. 29 was marked

5    for identification.)

6    BY MS. TUMLIN:

7      Q    Okay.  I will give you a second to look

8    at that, of course.  For the record this is a

9    printout email exchange.  It appears to be between

10   you, Mr. Hamilton, and Kris Kobach?

11     A    Yes.  From 2016.

12     Q    I think 2016 and into just there is one

13   little header on 2017?

14     A    The header is the forward.

15     Q    I think that's correct.

16     A    There is no communication here between

17   us in 2017.

18     Q    That's right.

19     A    Okay.

20     Q    Can you just please let me know when you

21   familiarize yourself with the document?

22     A    I'm generally familiar with the

**Gene Hamilton**
Martin Vidal, et al v. Elaine Duke, et al                          10/20/2017

198

1    document.

2         Q    Okay.  So starting at the bottom I see

3    an email from what I believe is yourself to Kris

4    Kobach.  Is that correct?

5         A    Yes.

6         Q    And is this in fact your email?

7         A    Well, it's blacked out so I assume it's

8    my email.  It looks familiar to me and it looks

9    like my signature on the signature line.

10        Q    The email subject is "day one book."  Is

11   that correct?

12        A    That's correct.

13        Q    Can you describe to me what you meant

14   by, day one book, in this context?

15        A    This related to various -- this is the

16   day after the election.  This would have been

17   various potential policy proposals that would be

18   formulated related to immigration in the

19   transition context.

20        Q    Okay.  Who was responsible for compiling

21   the day one book?

22        A    Compiling it, a number -- I mean a

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

199

1    number of folks participated.  I might have

2    organized it.  I might have -- you know, I clearly

3    sent him the document, so.

4         Q    So you were familiar with the content of

5    the day one book?

6         A    Generally.

7         Q    Okay.  To your knowledge did the day one

8    book include any policy proposals that would

9    affect DACA recipients?

10             MR. GARDNER:  Answer that with a yes or

11   no.

12             THE WITNESS:  Maybe.

13   BY MS. TUMLIN:

14        Q    Okay.  To your knowledge did the day one

15   book include any -- pardon me, changes to DHS

16   policy?

17        A    Yes.

18        Q    To your knowledge did the day one book

19   include any legislative proposals?

20        A    I think so.

21        Q    To your knowledge did the day one book

22   include draft legislation that would affect DACA

200

1   recipients?

2        A    I don't recall anything that specific.

3   It's possible, but I really don't remember.

4        Q    What were the key immigration proposals

5   in the day one book that you remember?

6             MR. GARDNER:  Objection.  Calls for

7   disclosure of information subject to deliberative

8   process privilege as well as potentially

9   presidential communications privilege.  I instruct

10  the witness not to answer.

11  BY MS. TUMLIN:

12       Q    Okay.  Have you discussed DACA with any

13  organization or individual outside of the federal

14  government?

15       A    It's a pretty broad question.  If you

16  can give me a time frame?

17       Q    Sure.  Since inauguration day for

18  President Trump have you discussed DACA with any

19  organizations outside of the federal government?

20       A    I mean I can't say, no.  I probably --

21  it might have come up in converse -- I mean, we

22  have had countless meetings and engagements since

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

201

1    January 20.  I know DACA was a subject of

2    conversation of some things, but I can't give you

3    specifics.

4         Q    Okay.  In your opinion why did this

5    administration terminate the DACA program?

6         A    In my opinion why did the administration

7    terminate DACA.  I think that the reason why the

8    administration terminated DACA is largely

9    reflected in Acting Secretary Duke's memoranda

10   that was issued on September 5.

11        Q    Did the administration consider the

12   foreign policy effects of ending DACA prior to

13   issuing Acting Secretary Duke's memorandum on

14   September 5, 2017?

15             MR. GARDNER:  Objection.  Calls for

16   disclosure of information subject to deliberative

17   process privilege.  Instruct the witness not to

18   answer.

19   BY MS. TUMLIN:

20        Q    Did the administration consider the idea

21   of DACA as a pull factor for immigration when

22   deciding to end the program?

202

1        MR. GARDNER:  Objection.  Calls for the

2   disclosure of information subject to deliberative

3   process privilege.  Instruct the witness not to

4   answer.

5   BY MS. TUMLIN:

6        Q    Did the administration consider the

7   labor market affects of DACA recipients before

8   deciding to end the program?

9        MR. GARDNER:  Objection.  Calls for

10   disclosure of information subject to deliberative

11   process privilege.  Instruct the witness not to

12   answer.

13   BY MS. TUMLIN:

14       Q    Why did this administration chose

15   September 5, 2017 as the date to announce the end

16   of DACA?

17       MR. GARDNER:  Objection.  Calls for the

18   disclosure of information subject to deliberative

19   process privilege.  I instruct the witness not to

20   answer.  To the extent you can answer that

21   question without revealing deliberations, you may

22   answer.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                      **10/20/2017**

203

1           THE WITNESS:  I think we've all looked

2   at in this room a letter from the Attorney General

3   of Texas that gave a deadline of September 5.

4   BY MS. TUMLIN:

5        **Q    Why did this administration choose a six**

6   **month period for winding down DACA?**

7           MR. GARDNER:  Objection.  Calls for

8   disclosure of information subject to deliberative

9   process privilege.  I instruct the witness not to

10  answer.  To the extent that you can answer that

11  question without revealing deliberations, you may

12  so answer.

13          THE WITNESS:  I can't give you an answer

14  to that question.

15  BY MS. TUMLIN:

16       **Q    Okay.  Why did this administration**

17  **choose October 5 for a deadline for renewal**

18  **applications?**

19          MR. GARDNER:  Objection.  Calls for the

20  disclosure of information subject to deliberative

21  process privilege.  I instruct the witness not to

22  answer.  To the extent the witness can answer

204

1  without revealing deliberations he may so answer.

2  BY MS. TUMLIN:

3      **Q     Okay.  How is DHS participating in**

4  **legislative discussions around the Dream Act or**

5  **other means of providing status to DACA eligible**

6  **recipients?**

7              MR. GARDNER:  Objection, vague.  And

8  also objection to extent it calls for disclosure

9  of information subject to deliberative process

10 privilege.  To the extent you can answer that

11 question without revealing deliberations, you can

12 answer.  Otherwise I instruct you not to answer.

13             THE WITNESS:  I cannot answer that

14 question.

15 BY MS. TUMLIN:

16     **Q     Okay.  The memorandum terminating the**

17 **DACA program that was signed by Acting**

18 **Secretary Duke on September 5, 2017 did -- were**

19 **there prior drafts of that memorandum circulated?**

20     A     Were there prior drafts of the memo

21 circulated in what was the final product, yes.  It

22 was an iterative process under which there were

205

1    multiple edits made to the document.

2         Q    Did you draft that memorandum?

3              MR. GARDNER:  You can answer that yes or

4    no.

5              THE WITNESS:  Principally, yes.

6    BY MS. TUMLIN:

7         Q    On what date did you first draft that

8    memo?

9         A    I don't know.

10        Q    What month?

11        A    August or September.  I don't remember

12   it was late August, early September.

13        Q    Okay.  You previously testified that the

14   final decision to terminate DACA was not made

15   until Acting Secretary Duke signed the memorandum

16   which you principally drafted.  Is that correct?

17        A    That is correct.

18        Q    Did you also draft an alternative

19   memorandum that kept the DACA program in place?

20             MR. GARDNER:  Objection.  Calls for

21   information subject to the deliberative process

22   privilege.  I instruct the witness not to answer.

Gene Hamilton

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

206

1    BY MS. TUMLIN:

2         Q     **Prior to September the 5th was there any**

3    **other draft memorandum regarding DACA circulating**

4    **within components at DHS?**

5              MR. GARDNER:  You can answer that

6    question with a yes or no.

7              THE WITNESS:  Let's really boil down.

8    By what do you mean like other drafts?  I mean

9    clearly a document that goes through an editing

10   process takes various form and depending on who

11   edits it and saves it and emails it back around

12   there are then unique documents created at every

13   single step along the way.  So, yes, there were

14   alternate versions that existed and it eventually

15   became the final version.

16   BY MS. TUMLIN:

17        Q     **So I wasn't speaking about various**

18   **iterations of that draft that was eventually**

19   **signed by Acting Secretary Duke.  But previously**

20   **you had testified that up until the time Acting**

21   **Secretary Duke signed that document on September**

22   **the 5th no final decision on whether to terminate**

207

1    the DACA program had been made.  Correct?

2         A    That -- that is generally correct,

3    although I will say again, no final decision is

4    ever made until there is ink on paper.  That is

5    the fundamental difference.  There may have been

6    tentative decision, but until a secretary of a

7    cabinet department makes a decision in writing or

8    in whatever method is appropriate for the

9    circumstance the decision is technically not

10   final.

11        Q    Was there a substantively alternative

12   version of a DACA memorandum that was circulating

13   prior to September the 5th that could have been

14   signed by Acting Secretary Duke?

15             MR. GARDNER:  Objection.  Calls for

16   disclosure of information subject to deliberative

17   process privilege.  I instruct the witness not to

18   answer.

19   BY MS. TUMLIN:

20        Q    Okay.  Does DHS have a policy on how to

21   deal with litigation risk?

22

Gene Hamilton
Martin Vidal, et al v. Elaine Duke, et al                          10/20/2017

208

1        A     Do we have a policy on how to deal with

2   litigation risk?

3        Q     Uh huh.

4        A     Nothing in writing.

5        Q     Okay.  So there is -- is there any

6   policy on how to deal with threats to sue by state

7   or local officials?

8        A     No.  And that sounds like the craziest

9   policy you could ever have in a department.  You

10  could never do anything if you were always worried

11  about being sued.

12       Q     Are you familiar with the executive

13  order issued by President Trump with respect to

14  sanctuary jurisdictions?

15       A     That -- I believe that is in Executive

16  Order 13768.  I am familiar.

17       Q     And are you aware that several

18  municipalities have sued the federal government on

19  the basis of that executive order?

20       A     In general I am, yes.

21       Q     Are you aware that some of these

22  lawsuits have successfully blocked parts of the

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                          **10/20/2017**

209

1   executive order?

2         A    On a temporary basis.

3         **Q    And as a result has DHS considered**

4   **rescinding any of that executive order?**

5              MR. GARDNER:  Objection.  Calls for

6   disclosure of information subject to deliberative

7   process privilege, plus the attorney/client

8   privilege.  I instruct the witness not to answer.

9   BY MS. TUMLIN:

10        **Q    Okay.  Have you ever requested that**

11  **anyone within DHS provide metrics or statistics**

12  **about DACA recipients?**

13        A    I have.

14        **Q    And when you ask for information they**

15  **generally give it to you.  Is that correct?**

16        A    Correct.

17        **Q    Did you ever request metrics about how**

18  **many DACA recipients who subsequent to their**

19  **receipt of DACA were arrested, detained or**

20  **removed?**

21             MR. GARDNER:  Objection.  Calls for

22  disclosure of information subject to deliberative

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                                    10/20/2017

210

1    process privilege.  I instruct the witness not to

2    answer.

3    BY MS. TUMLIN:

4         **Q      What kind of metrics or statistics about**

5    **DACA recipients have you requested?**

6              MR. GARDNER:  Just for clarification,

7    over what time frame?

8    BY MS. TUMLIN:

9         **Q      Since January 20, 2017?**

10             MR. GARDNER:  To the extent you can

11   answer that question without divulging

12   deliberative pre-decisional information.

13   Otherwise, that calls for the disclosure of

14   information subject to the deliberative process

15   privilege and I would instruct you not to answer.

16             THE WITNESS:  I have asked for a variety

17   of information about DACA recipients and DACA

18   applicants.

19   BY MS. TUMLIN:

20        **Q      Such as what general categories?**

21        A      Generally speaking information

22   pertaining to the parameters established in the

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

211

1    June 15, 2012 memorandum.

2         Q    Can you give me one example?

3         A    How many DACA recipients -- how many

4    DACA recipients have ever been convicted of a

5    crime.

6         Q    Why did you request that specific

7    statistic?

8              MR. GARDNER:  Objection to the extent it

9    calls for disclosure of information subject to

10   deliberative process privilege.  To the extent you

11   can answer that without revealing deliberations,

12   you may so answer.

13             THE WITNESS:  It seemed like basic

14   information that the department would have on

15   hand.

16   BY MS. TUMLIN:

17        Q    Okay.  Do you remember when you

18   requested that?

19        A    Multiple occasions.

20        Q    Starting as early as what month?

21        A    I don't recall.

22        Q    February?

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

212

1          A      Possibly.

2          **Q      Do you remember when that information**

3    **was provided to you?**

4          A      To date it has never been provided to

5    me.

6          **Q      Was there a reason for failure to**

7    **provide the information given to you?**

8          A      The Department of Homeland Security made

9    a deliberate decision with the rollout of the DACA

10   program to not record certain information in

11   statistically reportable fields.  So the

12   Department of Homeland Security is not capable of

13   producing the number of individuals who have

14   applied for DACA or received DACA and have

15   criminal convictions of any kind, nor can the

16   Department of Homeland Security report on the

17   educational attainment of most DACA recipients.

18         **Q      Okay.  I'm going to take those**

19   **separately for a hot second.  With respect to**

20   **information on convictions of DACA recipients,**

21   **which I think is the first category you**

22   **identified.  Is that correct?**

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

213

1       A      (nods).

2       Q      **Is what the Department of Homeland**

3  **Security has represented that there is no easily**

4  **electrically searchable field for that**

5  **information?  Is that something close to the**

6  **understanding that has been given to you?**

7       A      Generally.

8       Q      **So searching for that information would**

9  **require some kind of physical search?**

10      A      That's my general understanding.

11      Q      **Okay.**

12      A      In terms of the question of how many

13  have ever been convicted of a criminal offense.

14      Q      **And you mentioned something with respect**

15  **to educational attainment of DACA recipients?**

16      A      That is correct.

17      Q      **What is the specific type of information**

18  **you have been told is unavailable?**

19      A      Well, I believe the June 15, 2012 memo

20  laid out as a criteria that DACA recipients -- or

21  to receive DACA an applicant had to be enrolled in

22  school or obtain certain levels of education, more

214

1   than a GED program, be in college, be a member of

2   the military.  And I figured that would be basic

3   information so that the department would have on

4   hand so that policymakers could make informed

5   decisions.

6        Q    And what is the closest approximation of

7   that information that the department has told you

8   they can provide you with?

9             MR. GARDNER:  Objection.  Vague.

10  BY MS. TUMLIN:

11       Q    Can the department provide you with some

12  type of statistical information on how many DACA

13  recipients met the June 15, 2012 criteria?

14       A    Which criteria?

15       Q    All of the criteria that's required to

16  establish eligibility?

17       A    Technically speaking to receive DACA

18  they would have met all of the criteria.

19       Q    But they can't provide you with a break

20  down of how the educational requirement was met,

21  is that --

22       A    That is correct.

215

1      Q      So if it was a GED versus in school?

2      A      Or college or a master's program or

3  Ph.D. program.

4      Q      Okay.  Understood.  Are there any other

5  categories of statistics on DACA recipients that

6  you requested aside from information on criminal

7  conviction or educational attainment?

8      A      I know I have asked for the total number

9  of beneficiaries.

10     Q      Just an aggregate or any specific break

11  downs you were looking for?

12     A      I have asked that we break down and

13  provide as much information as possible to be as

14  transparent as possible about the program so the

15  policymakers can make informed decisions.

16            MR. GARDNER:  Would this be a good time

17  for a break.  We have been going well over an

18  hour.

19            MS. TUMLIN:  Okay.

20            MR. GARDNER:  I don't want to break if

21  you're in the middle of a question.

22

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

216

1    BY MS. TUMLIN:

2         **Q      Let me ask two more questions and we**

3    **will wrap it up for a little break and that might**

4    **make everybody happy.**

5              **Who did you ask to provide you with this**

6    **statistical information on educational attainment,**

7    **criminality or characteristics of DACA recipients?**

8         A      Typically USCIS.

9         **Q      Anyone in USCIS specifically?**

10        A      I believe I've asked the acting director

11   at the time, McCament, possibly others.  I don't

12   recall.

13        **Q      Did you ask Phillip Miller to provide**

14   **any metrics on DACA recipients?**

15        A      Phil works in ICE.  I may have asked for

16   the total number of individuals who were ever --

17   who had DACA who were arrested or removed.

18             MS. TUMLIN:  Okay.  That's all I have.

19   We can take a break and go off of the record if

20   you'd like.

21             THE VIDEOGRAPHER:  We're going off to

22   the record.  This conclude media unit number two.

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                     **10/20/2017**

217

1    The time on the video 2:00 p.m.

2              (Whereupon, a recess occurred from

3    2:00 p.m. until 2:17 p.m.)

4              THE VIDEOGRAPHER:  This begins media

5    unit number three.  We are on the record.  The

6    time on the video is 2:17 p.m.

7    BY MS. TUMLIN:

8         Q    **Are you aware that USCIS had a practice**

9    **at one point to mail DACA recipients a renewal**

10   **reminder notice prior to the expiration of their**

11   **DACA?**

12        A    I've heard that.

13        Q    **Are you aware that USCIS mailed DACA**

14   **recipients this renewal reminder notice**

15   **approximately 180 days prior to the expiration of**

16   **their DACA?**

17        A    My understanding is that they were

18   strongly encouraged to apply somewhere between 180

19   and 150 days in advance to expiration, but I don't

20   know if it was conveyed in letter or not.

21        Q    **Okay.  Prior to end of DACA, so for**

22   **example on September 1, 2017 was USCIS sending**

218

1   renewal reminder notices to DACA recipients?

2         A    I couldn't tell you.

3         Q    Do you know the approximate date when

4   USCIS stopped sending renewal reminder notices to

5   DACA recipients?

6         A    I do not.

7              MS. TUMLIN:  Okay.  So I am going to

8   hand the court reporter an exhibit and ask Donna

9   to please mark this as Exhibit 30.  Okay.  So for

10  the record the document is titled; Defendant's

11  objections and responses to plaintiff's first set

12  of requests for admission to Elaine Duke, Acting

13  Secretary of Homeland Security.

14             MR. GARDNER:  I got a different

15  document.  I have your actual requests, not our

16  responses.

17             MS. TUMLIN:  Well, let's fix that.

18  Thank you.

19             THE WITNESS:  Same here.

20             MR. GARDNER:  Do you want to mark it as

21  31 or do you want to remark it as 30?

22             MS. TUMLIN:  Let's remark if that's not

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

219

1    to much of a hassle for you.  Thank you.  Thank

2    you both.  Yes, please.

3              We don't have it.  No?  Okay.  So we

4    won't mark it.  We should skip it until we have

5    it.  Sorry.  That's a real errata, my friends.

6              MR. GARDNER:  Do you want to show it to

7    him and not mark it and I will look over his

8    shoulder?

9              MS. TUMLIN:  No.  We don't have the copy

10   of objections.

11             MR. GARDNER:  You don't have a copy at

12   all?  Okay.

13             MS. TUMLIN:  I don't think so.

14             THE WITNESS:  Who's getting fired for

15   that, geez.

16   BY MS. TUMLIN:

17        Q    Me, I think.

18             Do you know Kathy Nuebel Kovarik who is

19   the chief of the Office of Policy and Strategy?

20        A    I do.

21        Q    Did you ever discuss with Kathy prior to

22   July 2017 whether USCIS would stop sending renewal

220

1    notices to DACA recipients?

2         A    I don't remember.  It's possible, but I

3    just don't recall.

4         Q    Did you ever discuss with anyone at the

5    White house whether USCIS would stop sending

6    renewal notices to DACA recipients?

7         A    I don't remember.

8         Q    Did you ever discuss with anyone at the

9    Department of Justice prior to July 2015 whether

10   USCIS would stop sending renewal notices?

11        A    I don't remember.

12        Q    Do you know whether the DACA renewal

13   notices that were previously sent were generated

14   electronically?

15        A    I don't know.

16        Q    Do you know what computer system

17   formally generated DACA renewal notices?

18        A    I do not.

19        Q    Are you familiar with the Claims 3

20   computer system?

21        A    I know of it.

22        Q    Do you know whether DHS changed computer

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

221

1  systems that housed the information of DACA

2  grantees in 2017?

3      A    That sounds familiar, but I don't want

4  to tell you wrong.

5      Q    Have you heard of the ELIS, E-L-I-S,

6  computer system?

7      A    Yes, I have.

8      Q    Do you know whether ELIS, E-L-I-S, has

9  the capability of generating renewal reminder

10 notices for DACA recipients?

11     A    I couldn't tell you.

12         MS. TUMLIN:  Okay.  Do we have the --

13 let's see.  I will see if we can come up with an

14 Exhibit 30.  Let's test.  All right.  Let's try

15 this again, please.  30.  I sure did, see.

16         (Court reporter requested

17 clarification.)

18         MR. GARDNER:  Can I have a copy?

19         MS. TUMLIN:  Oh, sorry.  Sorry.

20         (Whereupon, Exhibit No. 30 was marked

21 for identification.)

22

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                          **10/20/2017**

222

1   BY MS. TUMLIN:

2       Q    Okay.  For the record I'm handing the

3   court reporter an exhibit which I requested to be

4   marked as Exhibit 30.  The exhibit is titled;

5   Frequently asked questions, Recision of Deferred

6   Action for Childhood Arrivals or DACA.  It has a

7   release date of September 5, 2017.

8            Are you familiar with this document

9   Mr. Hamilton?

10      A    I think so, yes.

11      Q    Did you have any role in helping to

12  draft this document?

13      A    I think I edited it at some point.

14      Q    Okay.  Would you please turn to page 2

15  and Q7 in particular.  And I will give you a

16  moment to take a look at Q7 and the answer to

17  number 7 as well?

18      A    Okay.  All right.

19      Q    Did you have a role in writing or

20  editing this question and answer, Q7 and A7?

21           MR. GARDNER:  You can answer yes or no.

22           THE WITNESS:  I think I provided edits

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

223

1    to the entire document.

2    BY MS. TUMLIN:

3        Q    Okay.  Q7 of these FAQs reads "once an

4    individual's DACA expires will their case be

5    referred to ICE for enforcement purposes."

6              Let me represent that the answer in

7    summary states that information provided to USCIS

8    in DACA requests will not be proactively provided

9    to ICE and CBP for immigration enforcement unless

10   the requester meets the criteria for the issuance

11   of a notice to appear or a referral to ICE under

12   the criteria set forth in USCIS's notice to appear

13   guidance.

14             Do you agree that that is a correct

15   summary of A7 to Q7 on the FAQ, Mr. Hamilton?

16             MR. GARDNER:  Objection.  Misstates the

17   document.

18   BY MS. TUMLIN:

19       Q    There is not an objection not to answer.

20       A    I just -- are you asking is that a fair

21   summary that you read from the document?

22       Q    Uh huh?

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

224

1       A    So that's what the document says.

2       **Q    Okay.  Are you familiar with USCIS's**

3    **notice to appear guidance?**

4       A    Generally.

5       **Q    Have you discussed with anyone at DHS**

6    **possible changes to the notice to appear guidance?**

7            MR. GARDNER:  You can answer with a yes

8    or no.

9            THE WITNESS:  Yes.

10   BY MS. TUMLIN:

11      **Q    Who at DHS have you discussed possible**

12   **changes to the notice to appear guidance with?**

13           MR. GARDNER:  You can identify

14   individuals.

15           THE WITNESS:  Sometime ago, months back

16   it might have been in the spring, I don't know.

17   We had a meeting with myself, representatives from

18   USCIS, representatives from ICE, representatives

19   from the Office of General Counsel, and the

20   representatives from the Office of Policy about

21   our, USCIS's, NTA issuance policy in generally.

22

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

225

1    BY MS. TUMLIN:

2         **Q     Do you remember who was at that meeting**

3    **representing USCIS?**

4         A     It could have been Director McCament and

5    Kathy.  I don't recall.

6         **Q     And what's Kathy's last name, just for**

7    **the record?**

8         A     Nuebel Kovarik.

9         **Q     Thank you.  And do you remember who was**

10   **representing ICE at that meeting?**

11        A     I think Phil Miller.

12        **Q     Do you remember who was representing the**

13   **Office of General Counsel at that meeting?**

14        A     Nope.

15        **Q     And do you remember who was representing**

16   **the Office of Policy at that meeting?**

17        A     I do not.

18        **Q     Do you remember roughly how long that**

19   **meeting lasted?**

20        A     I don't.

21        **Q     Was that an in-person meeting?**

22        A     It was.

226

1          Q     Have you discussed with anyone at the

2     White House changes to the notice to appear

3     guidance?

4          A     Not that I can recall.

5          Q     In addition to the meeting in --

6     possibly the spring of 2017, with USCIS, ICE, and

7     the Office of General Counsel, and the Office of

8     Policy, have you participated in any other formal

9     or informal meetings regarding possible changes to

10    NTA guidance?

11         A     I don't know that there has been any

12    other formal or informal meetings.  I think we

13    talked about it a few times generally speaking,

14    but I just don't -- it's been a busy year.

15         Q     Have you drafted any possible changes to

16    the NTA guidance?

17              MR. GARDNER:  Objection.  Calls for

18    disclosure of information subject to deliberative

19    process privilege.  Instruct the witness not to

20    answer.

21              THE WITNESS:  I couldn't give you an

22    answer to that question.

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

227

1              MS. TUMLIN:  Okay.  We should take a

2    break.  We need to go off of the record.

3              THE VIDEOGRAPHER:  We're going off of

4    the record.  The time on the video is 2:28 p.m.

5              (The proceeding recessed from 2:30 p.m.

6    to 3:24 p.m.)

7              THE VIDEOGRAPHER:  We are back on the

8    record.  The time on the video is 3:24 p.m.

9    BY MS. TUMLIN:

10        Q    Okay.  So I just want to clarify for the

11   record why we are now going to suspend the rest of

12   the deposition in the Batalla Vidal case.  I

13   really appreciate everybody's professionalism with

14   what is an unusual deposition situation.  So as

15   soon as we understood that there was a stay in

16   place from the Second Circuit, which we believe

17   would cover this deposition, we're going to

18   suspend the deposition for today.  Of course if

19   that stay is lifted the Batalla Vidal plaintiffs

20   would resume the deposition.  We have 3 hours and

21   17 minutes remaining on the time and of course

22   there also would be the possibility of any

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                              **10/20/2017**

228

1    additional time added for the -- if there are

2    court orders regarding the instructions not to

3    answer to date.

4            I wanted to just -- a couple of things

5    for the record.  First is regarding work that

6    Mr. Hamilton did for the Trump transition team.

7    He's referenced a nondisclosure agreement that he

8    has and for that reason has refused to provides

9    names of certain individuals he worked with on

10   issues.  The position of the Batalla Vidal

11   plaintiffs is that that information is not

12   protected, counsel has not made any objections or

13   instructions not to answer.  We think the that

14   burden is on the witness, Mr. Hamilton, to show

15   why that information would need to be protected.

16   However, we are open to working with the witness

17   over the next week to enter a protective order if

18   that would be something that the witness is

19   interested in.  We're certainly happy to do that

20   if that could resolve the issue in a better way.

21           And the only last thing I would state

22   for the record is that there have been some

Gene Hamilton

**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

229

1    disagreements to date between the Batalla Vidal

2    plaintiffs and the federal government with respect

3    to whether or not pre-inauguration material is

4    covered by the presidential communications

5    privilege or the deliberative process privilege.

6    Our position is that pre-inauguration material is

7    not covered and obviously that's something we can

8    take up with our magistrate judge.  That's all

9    that I had, Josh.

10             MR. GARDNER:  Thank you.  I want to echo

11   I really appreciate, as I have in other

12   depositions, the professionalism.  These are not

13   easy issues.  We agree that with the stay in the

14   Second Circuit that all discovery from New York is

15   currently suspended.  We also agree there's 3

16   hours and 17 minutes left.  Our position is that

17   is 3 hours and 17 minutes for all plaintiffs

18   including California.  However, we can sort of

19   work that out as if and when things go forward.

20   And so, thank you.  That's all.

21             MS. TUMLIN:  I'm going to pass the

22   microphone to the counsel for the Northern

**Gene Hamilton**
**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

230

1    District of California case.

2           MR. NEWMAN:  Thank you, counsel.  This

3    is Michael Newman from the California Attorney

4    General's Office on behalf of the Northern

5    District of California plaintiffs.  So let me get

6    to your 3 hours and 17 minutes in a second.  But

7    first I want to concur on the record with what

8    previous counsel just said with regard to the

9    protective order.  I concur with that.  I will

10   come back to the 3 hours and 17 minutes timing in

11   a moment.  I just want to confirm a few things on

12   the record.

13          First, the witness has confirmed that he

14   is available Friday, October 27, 2017 to continue

15   this deposition.  Is that correct?

16          MR. GARDNER:  That is correct.  I'll let

17   the witness answer.

18          THE WITNESS:  Yes, generally.

19          MR. GARDNER:  I'm sorry?

20          THE WITNESS:  Yes, generally.  I'm happy

21   to come talk to y'all.

22

**Gene Hamilton**

Martin Vidal, et al v. Elaine Duke, et al                    10/20/2017

231

 1          MR. NEWMAN:  Okay.  Counsel for the

 2    federal government has agreed to produce the

 3    witness to complete this deposition on Friday,

 4    October 27, 2017.  Is that correct?

 5          MR. GARDNER:  With the caveat that there

 6    is not a ruling on the stay in the 9th Circuit, of

 7    course.  And we will have to discuss the amount of

 8    time because we do think it would be inappropriate

 9    for the witness to be available for seven hours

10    after spending three hours and 43 minutes

11    answering questions.  But, yes.  Subject to those

12    caveats that is correct.

13          MR. NEWMAN:  Okay.  So for the record,

14    the California plaintiffs irrespective of a stay

15    of these cases in the Eastern District of New York

16    and presuming there is no stay in the Northern

17    District of California or the 9th Circuit believe

18    that they are entitled to at least the balance of

19    the time, 3 hours and 17 minutes; subject to

20    additional time pending the court's rulings on

21    objections which may result in the provision of

22    additional time based on the time taken by

232

1    objections and additional delay.

2             MR. GARDNER:  And the government's

3    position, as I stated off of the record, is I

4    think we can try to work to a creative solution to

5    rather then bring back witnesses, to the extent

6    privilege assertions are overruled, come up with

7    perhaps an alternative vehicle to get you the

8    information you want without having to

9    inconvenience multiple witnesses.  And we can work

10   that out offline.

11            MR. NEWMAN:  We certainly agree to that.

12   And finally I want to note for the record that we

13   have separately noticed today's deposition so this

14   witness has been noticed by both the Batalla Vidal

15   plaintiffs and the eastern -- Northern District of

16   California plaintiffs collectively.  Therefore by

17   rule we believe we could be entitled to separate,

18   full separate depositions of seven hours each.

19   But I will note for the record that for the sake

20   of courtesy and commodity we have thus far agreed

21   to split time across all plaintiffs which is to

22   the benefit -- benefit and convenience solely of

**Gene Hamilton**

**Martin Vidal, et al v. Elaine Duke, et al**                                    **10/20/2017**

233

1    the government and its witnesses.  I make that

2    notation for the record just to indicate that we

3    do anticipate that we will continue going forward,

4    but based on these surprise circumstances and the

5    difference in timing between the California and

6    the New York cases we want to acknowledge that we

7    were all aware that there is a possibility as we

8    see it that we may need to proceed with a

9    California plaintiffs' deposition on Friday as the

10   witness and counsel have agreed the witness will

11   be available and would remain available subject to

12   everything we've talked about.

13            And that it is possible and will be

14   subject to additional discussions that there would

15   be at that point a split in deposition between --

16   or not necessarily a split, but an additional time

17   period that would be allocated to the California

18   plaintiffs in order to accommodate the California

19   briefing schedule and develop facts and evidence

20   in support of that briefing schedule, for which

21   none of us have control, and the Eastern District

22   of New York and stay which is presently in place.

Gene Hamilton
**Martin Vidal, et al v. Elaine Duke, et al**                    **10/20/2017**

234

1           MR. GARDNER:  Subject to further

2      discussion.

3           MR. NEWMAN:  Absolutely.  Off the

4      record.

5           THE VIDEOGRAPHER:  This concludes

6      today's deposition.  The time on the video is 3:31

7      p.m.  We are off of the record.

8           (Whereupon, at 3:31 p.m., the above

9      proceedings was adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 863 of 1603 PageID #: 4808

235

1                    REPORTER'S CERTIFICATE

2             I, DONNA M. LEWIS, RPR, Certified

3   Shorthand Reporter, certify;

4             That the foregoing proceedings were

5   taken before me at the time and place therein set

6   forth, at which time the witness, Gene Hamilton,

7   was put under oath by me;

8             That the testimony of the witness, the

9   questions propounded and all objections and

10  statements made at the time of the examination

11  were recorded stenographically by me and were

12  thereafter transcribed;

13            I declare that I am not of counsel to

14  any of the parties, nor in any way interested in

15  the outcome of this action.

16            As witness, my hand and notary seal this

17  22nd day of October, 2017.

18

19            _____

              Donna M. Lewis, RPR

20            Notary Public

21  My Commission expires:

    March 14, 2018

22

# EXHIBIT 33

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
    THE REGENTS OF THE UNIVERSITY OF   ) Case No.
 5  CALIFORNIA and JANET NAPOLITANO,   ) 17-CV-05211-WHA
    in her official capacity as        )
 6  President of the University of     )
    California,                        )
 7                                     )
             Plaintiffs,               )
 8                                     )
         v.                            )
 9                                     )
    U.S. DEPARTMENT OF HOMELAND        )
10  SECURITY and ELAINE DUKE, in her   )
    official capacity as Acting        )
11  Secretary of the Department of     )
    Homeland Security,                 )
12                                     )
             Defendants.               )
13  ----------------------------------)
14
15                    - - -
16              Friday, October 13, 2017
17                    - - -
18
19      Videotaped deposition of JAMES D. NEALON,
20  taken at the offices of Covington & Burling,
21  850 Tenth Street NW, One City Center,
22  Washington, D.C., beginning at 7:32 a.m., before
23  Nancy J. Martin, a Registered Merit Reporter,
24  Certified Shorthand Reporter.
25
```

```
                                                  Page 2
 1   A P P E A R A N C E S :
 2
 3           STATE OF CALIFORNIA
             DEPARTMENT OF JUSTICE
 4           OFFICE OF THE ATTORNEY GENERAL
             BUREAU OF CHILDREN'S JUSTICE
 5           BY:  CHRISTINE CHUANG, ATTORNEY AT LAW
                  MICHAEL L. NEWMAN, ESQ.
 6           1515 Clay Street
             Suite 2100
 7           Oakland, California    94612
             (510) 879-0094
 8           christine.chuang@doj.ca.gov
             Representing State of California
 9
10
             COVINGTON & BURLING LLP
11           BY:  ALEXANDER A. BERENGAUT, ESQ.
                  KIMBERLY STIETZ, ATTORNEY AT LAW
12           One City Center
             850 Tenth Street NW
13           Washington, D.C.    20001
             (202) 662-5367
14           aberengaut@cov.com
             Representing Regents of the University of
15           California and Janet Napolitano
16
17           GIBSON, DUNN & CRUTCHER LLP
             BY:  HALEY MORRISON, ATTORNEY AT LAW
18           1050 Connecticut Avenue, N.W.
             Washington, D.C.    20036
19           (202) 955-8500
             hmorrison@gibsondunn.com
20           Representing the Garcia Plaintiffs
21
22           NATIONAL IMMIGRATION LAW CENTER
             BY:  CECILIA CHANG, ATTORNEY AT LAW
23           1121 14th Street, N.W.
             Suite 200
24           Washington, D.C.    20005
             (202) 470-6412
25           chang@nilc.com
          Representing Batalla Vidal Plaintiffs
```

```
 1   A P P E A R A N C E S :   (CONTINUED)
 2
 3
             STATE OF NEW YORK
 4           OFFICE OF THE ATTORNEY GENERAL
             BY:  SANIA W. KHAN, ASSIST. ATTORNEY GENERAL
 5           CIVIL RIGHTS BUREAU
             120 Broadway
 6           New York, New York   10271
             (212) 416-8534
 7           sania.khan@ag.ny.gov
             Representing plaintiff states and New York,
 8           et al. v. Trump, et al.
 9
10           U.S. DEPARTMENT OF HOMELAND SECURITY
             OFFICE OF THE GENERAL COUNSEL
11           BY:  RENE E. BROWNE, ASST. GEN. COUNSEL
             Washington, D.C.   20528
12           (202) 447-3891
             rene.browne@hq.dhs.gov
13
14
             U.S. DEPARTMENT OF JUSTICE
15           CIVIL DIVISION
             BY:  JOSHUA E. GARDNER, ASST. DIRECTOR
16           20 Massachusetts Avenue N.W.
             Washington, D.C.   20530
17           (202) 305-7583
             joshua.e.gardner@usdoj.gov
18           Representing the U.S. Department of Justice
             and the Deponent
19
20
             DEPARTMENT OF JUSTICE
21           FEDERAL PROGRAMS BRANCH
             KATE BAILEY, ATTORNEY AT LAW
22           kate.bailey@usdoj.gov
23
24      ALSO PRESENT:
25           KRISHNA SARMA, Legal Videographer
```

Page 4

1                        I N D E X

                                                      PAGE
2
     TESTIMONY OF JAMES D. NEALON
3
     BY MS. CHUANG                                      7
4
     BY MR. BERENGAUT                                  149
5
     BY MS. MORRISSON                                  169
6
     BY MS. CHANG                                      182
7
     BY MS. KHAN                                       192
8
9                        E X H I B I T S
10   NUMBER        DESCRIPTION                       MARKED
11   Exhibit 1   Notice of Deposition, 6 pages        8
12   Exhibit 2   "How the  Most Dangerous Place on    33
                 Earth Got Safer," 9 pages
13
     Exhibit 3   Administrative Record, 256 pages     61
14
     Exhibit 4   "DHS Reviewing Status of Obama's     81
15               Deferred-Action Program for
                 Illegal Immigrants," 2 pages
16
     Exhibit 5   Complaint for Declaratory and       124
17               Injunctive Relief, 163 pages
18
19
20
21
22
23
24
25

1    WASHINGTON, D.C., FRIDAY, OCTOBER 13, 2017; 7:32 A.M.

2                        -   -   -

3                THE VIDEOGRAPHER:  Good morning again.  My

4    name is Krishna Sarma, and I'm the video specialist.

5    We're now on the record at 7:32, and the date today is

6    October 13, 2017.  This is Media Unit No. 1 of the

7    video recorded deposition of Mr. James D. Nealon,

8    taken in the matter of the Regents of the University

9    of California and Janet Napolitano V. the

10   United States Department of Homeland Security.  This

11   case is filed in the U.S. District Court for the

12   Northern District of California, San Francisco

13   Division, and this deposition is being held at

14   Covington & Burling located at 850 Tenth Street,

15   Northwest, Washington, D.C.

16               The court reporter today is Ms. Nancy Martin,

17   and we both represent Veritext Legal Solutions.  At

18   this time I'd like to request all the attorneys

19   present in the room to identify themselves and those

20   who are attending remotely to also identify

21   themselves.  After that, our court reporter will swear

22   the witness, and we can begin.

23               MS. CHUANG:  Christine Chuang, Deputy

24   Attorney General from the California Attorney

25   General's office.

Page 6

1          MR. BERENGAUT:  Alexander Berengaut with

2     Covington & Burling on behalf of the Regents of the

3     University of California and Janet Napolitano.

4          MS. MORRISSON:  Haley Morrisson with Gibson,

5     Dunn & Crutcher on behalf of the Garcia plaintiffs.

6          MS. CHANG:  I'm Cecilia Chang with the

7     National Immigration Law Center on behalf of the

8     Batalla Vidal plaintiffs in the eastern district of

9     New York.

10          MS. KHAN:  Sania Khan from the New York

11     attorney's office on behalf of plaintiff states and

12     New York, et al. v. Trump, et al.

13          MR. NEWMAN:  Michael Newman from the

14     California attorneys general office on behalf of the

15     state.

16          MS. STIETZ:  Kimberly Stietz, Covington &

17     Burling on behalf of the University of California.

18          MS. BAILEY:  Kate Bailey on behalf of the

19     Department of Justice.

20          MS. BROWNE:  Rene Browne, U.S. Department of

21     Homeland Security, office of the general counsel on

22     behalf of the Department of Homeland Security.

23          MR. GARDNER:  Josh Gardner with the

24     Department of Justice, and the witness will reserve

25     the right to read and sign.

```
                                                    Page 7

 1                          JAMES D. NEALON,

 2                having been first duly sworn/affirmed,

 3                was examined and testified as follows:

 4

 5                           EXAMINATION

 6    BY MS. CHUANG:

 7         Q.   Good morning.  My name is Christine Chuang.

 8    I'm from the California Attorney General's Office on

 9    behalf of the state of California.  Can you please

10    state your full name.

11         A.   James Deneen Nealon.

12         Q.   And have you ever been deposed before?

13         A.   I not have.

14         Q.   I'll go over some ground rules, and if you

15    have any questions, just let me know.  As you can see,

16    there's a court reporter and the deposition is being

17    videotaped.  I wanted to remind you that you were just

18    sworn under oath, and the effect of the oath is the

19    same as if you were testifying in court.  Do you

20    understand?

21         A.   I do.

22         Q.   Is there any reason why you would not be able

23    to answer truthfully today?

24         A.   There isn't.

25         Q.   Have you taken any medications that would
```

1    interfere with your ability to give truthful

2    testimony?

3           A.  I haven't.

4           Q.  I would appreciate it if you would wait until

5    I finish my question before answering so that the --

6    so we can get a clear transcript.  Do you understand?

7           A.  I do.

8           Q.  And if you could also provide a verbal answer

9    instead of gestures or head nods, that would be

10   greatly appreciated.

11              Your attorney may make objections during the

12   deposition today.  After the objection has been

13   stated, you're still required to answer the question

14   unless your attorney instructs you not to answer.  Do

15   you understand?

16          A.  I do.

17          Q.  And if you need a break just let me know.  I

18   just ask that you don't take a break while a question

19   is pending.

20              MS. CHUANG:  I'd like to mark this as Exhibit

21   1.  This is the deposition notice.

22              (Deposition Exhibit 1 was marked for

23              identification.)

24   BY MS. CHUANG:

25          Q.  Have you seen this document before,

```
                                          Page  9
 1    Mr. Nealon?
 2         A.  I haven't.
 3         Q.  Okay.  This is the notice of deposition that
 4    we provided to your attorney to schedule your
 5    deposition, which we agreed to take today.  You agree
 6    that you are here pursuant to the deposition notice?
 7         A.  I do.
 8         Q.  Thank you.  Did you meet with your attorney
 9    before the deposition?
10         A.  I did.
11         Q.  When did you meet with him?
12         A.  Last night.
13         Q.  How long did the meeting take?
14         A.  Approximately an hour, I think.
15         Q.  Who was present at the meeting?
16         A.  Josh Gardner, Rene Browne, and Kate.
17         Q.  Did you review any documents to prepare for
18    the deposition?
19         A.  I believe we looked at one or two documents.
20    I haven't reviewed any documents from my files.
21         Q.  What documents did you review?
22         A.  I don't recall what documents they were.
23             MR. GARDNER:  I can't answer questions.
24             THE WITNESS:  I don't recall what documents.
25    Actually, I do recall one.  One was a memorandum from
```

                                                    Page 10

1       Acting Secretary Duke to me and other members of the

2       Department of Homeland Security rendering her decision

3       on September 5 on DACA.

4       BY MS. CHUANG:

5            Q.  Is that the September 5, 2017 memo?

6            A.  It's a September 5, 2017 memo, yes.

7            Q.  Besides that memo, did you review any other

8       documents?

9            A.  I don't believe we did.

10           Q.  Did you use any documents to refresh your

11      recollection for the deposition today?

12           A.  I didn't.

13           Q.  Did you bring any documents with you today?

14           A.  I didn't.

15           Q.  You had stated that you have never been

16      deposed before; is that correct?

17           A.  Correct.

18           Q.  Have you ever provided testimony at all in a

19      lawsuit?

20           A.  I believe I testified at my parents' divorce

21      proceedings when I was a child.

22           Q.  Any other testimony?

23           A.  No.

24           Q.  Have you ever provided testimony before

25      Congress?

Page 11

1          A.   Yes, I had a confirmation hearing in 2014
2     when I was named Ambassador of Honduras.
3          Q.   And you were confirmed; correct?
4          A.   I was.
5          Q.   Besides that confirmation hearing, have you
6     ever testified before Congress?
7          A.   I haven't.
8          Q.   Have you ever been arrested?
9          A.   I haven't.
10          Q.   What's your current position at the
11     Department of Homeland Security?
12          A.   I'm the assistant secretary for international
13     affairs, and I'm the senior official performing the
14     duties of the undersecretary of policy.
15          Q.   Is that an acting role?
16          A.   It is.
17          Q.   When did you begin that acting role?
18          A.   So I began working at the Department of
19     Homeland Security in mid-July of this year.
20          Q.   What was the exact date that you began
21     working at the Department of Homeland Security?
22          A.   I don't recall.  It may have been July 11.
23     It was mid-July.
24          Q.   Okay.  What office do you work within at the
25     Department of Homeland Security?

Page 12

1          A.   The office of policy.

2          Q.   And what does the office of policy do?

3          A.   The office of policy performs a coordination

4    role across the Homeland Security enterprise.

5          Q.   Okay.  What sort of "coordination role"?

6          A.   Coordination of policy, affairs, things like

7    aviation security, for example, cyber security.

8          Q.   Do you set the policy goals for the

9    Department of Homeland Security?

10         A.   I wouldn't say that we set the policy goals,

11   but we try to coordinate the policy goals across the

12   enterprise of 250,000 employees.

13         Q.   And when a policy goal is set by the

14   Department of Homeland Security, do you assist in

15   implementing the policy?

16         A.   Yes.

17         Q.   Were you involved in compiling the

18   administrative record in this case?

19         A.   I'm not sure I understand the question.

20         Q.   Do you understand that an administrative

21   record was filed in this case?

22         A.   Can you explain what that is?

23         Q.   Sure.  As part of the related lawsuits in

24   this case, the Department of Homeland Security was

25   required to file an administrative record indicating

Page 13

1    what documents had been reviewed by the acting

2    secretary in connection with the decision to rescind

3    the deferred action for childhood arrivals.  For

4    short, I'm going to call it "DACA" today.  And I was

5    wondering if you were involved in compiling that

6    administrative record.

7         A.   So if I understand correctly, I was contacted

8    by the DHS office of general counsel and asked if I

9    had documents related to the DACA case, yes.

10        Q.   And did you have any documents --

11        A.   I did.

12        Q.   -- related to the DACA case?

13        A.   Yes.

14        Q.   What documents were those?

15        A.   So I had a paper file, which if I recall had

16   approximately 15 documents in it, and I also had an

17   E-mail file, which I called DACA, which if I recall

18   had approximately 19 documents in it.

19        Q.   In compiling those paper files and E-mail

20   file, what particular locations did you look for them,

21   on your computer, your hard-copy files?  Did you look

22   at any other locations?

23             MR. GARDNER:  Objection.  Compound.

24   BY MS. CHUANG:

25        Q.   Do you understand the question?

1          A.   Yes, but I agree with the objection.  I would

2    prefer if you break it down to single questions that I

3    can answer.

4          Q.   Sure.  In looking for the E-mail file, did

5    you look on your computer only?

6          A.   I did.  Correct.

7          Q.   In looking for the paper files relating to

8    DACA, did you look at your own files in your office?

9          A.   Correct.

10          Q.   Did you look in any other locations for DACA

11    files?

12          A.   I did.  I looked on my computer hard drive as

13    well.

14          Q.   And that is your personal computer hard

15    drive?

16          A.   It's my work computer.

17          Q.   So let's start with the paper files.  What

18    documents were those?

19          A.   So on the advice of counsel, I did not make a

20    review of those documents.  What I did was identify

21    that I had a file containing paper documents and I

22    turned that over to counsel.

23          Q.   You did not review the content of the

24    15 files?

25          A.   To be very precise, what I did was rifle

Page 15

1    through it and looked at documents, but I didn't

2    extract documents or read documents.

3        Q.   Do you have an understanding of what dates

4    those documents spanned?

5        A.   Some understanding.

6        Q.   What is the understanding?

7        A.   So if I recall, I believe there were

8    historical documents related to the creation of DACA

9    in 2012, and then there were other documents that --

10   such as news articles that I put in there since my

11   time at Homeland Security.

12       Q.   So from your understanding, besides the

13   historical documents created in 2012, the other

14   documents were news articles after the time that you

15   were appointed in the Department of Homeland Security?

16       A.   Again, to be very precise the file contains

17   the historical documents that I referenced.  It

18   contains news articles, as I said, and it contains

19   other paper documents, but I don't know -- I don't

20   recall exactly what those documents are.

21       Q.   What are the historical documents that were

22   created in 2012?

23       A.   I believe there's a memorandum from the then

24   secretary creating DACA.  Again, I didn't review the

25   document.  And so I can't give you a better answer

Page 16

1    than that at this time.

2        Q.   When you refer to "the then secretary," do

3    you mean Janet Napolitano?

4        A.   I believe so.

5        Q.   For the E-mail files, you mentioned that

6    there were 19 documents associated with DACA; is that

7    correct?

8        A.   That's what I recall.

9        Q.   And what were those documents?

10       A.   Those would have been E-mails either to me or

11   from me related to DACA.

12       Q.   Did you review each of those E-mails?

13       A.   I did not.

14       Q.   Do you know what each of those E-mails

15   contained?

16       A.   I do not.

17       Q.   You were appointed by John Kelly on July 10,

18   2017; is that correct?

19       A.   I was certainly appointed by John Kelly, and

20   the date sounds about right.

21       Q.   When you were first -- when you first started

22   at the Department of Homeland Security, can you please

23   describe the chain of command under John Kelly when he

24   was at the department?

25       A.   Sure.  So John Kelly was obviously the

1    secretary of Homeland Security.  Elaine Duke was the

2    deputy, and then there were -- so that's my chain of

3    command.  He also had a chief of staff, Kirstjen

4    Nielsen, and a deputy chief of staff, Elizabeth

5    Neumann.

6         Q.  Who did you directly report to?

7         A.  So the way it works is I reported up through

8    the chief of staff to the deputy, to the secretary.

9         Q.  Did you have any direct reports under you?

10         A.  Yes, I do.

11         Q.  Who were they?

12         A.  So I have a chief of staff -- actually, an

13    acting chief of staff, and then there are four other

14    assistant secretaries who would report to me in my

15    role as acting undersecretary, or the senior official

16    performing the duties of the undersecretary.  But when

17    I got there, three of those assistant secretary

18    positions were unfilled.  Since then -- only one was

19    filled.  Since that time one other has been filled.  I

20    also have an office manager who reports to me.

21         Q.  Who is the acting chief of staff under you?

22         A.  Her name is Briana Petyo, P-e-t-y-o.

23         Q.  Thank you.

24             And who is the person who filled the

25    assistant secretary role?

1      A.  So one of the assistant secretaries was in

2   place when I got there, and another position was

3   filled after my arrival.

4      Q.  Who are those two individuals?

5      A.  So the one who was there upon my arrival is

6   Michael Dougherty, and the one who was appointed while

7   I was there is Nate Jensen.

8      Q.  What is Michael Dougherty's role?

9      A.  Michael Dougherty is the assistant secretary

10   for borders, immigration, and trade.

11      Q.  What is Nate Jensen's role?

12      A.  He's the assistant secretary for planning,

13   analysis, and reports.

14      Q.  What does "planning, analysis, and reports"

15   entail?

16      A.  So many things, but generally speaking,

17   they're responsible for the creation of sort of

18   fundamental documents, such as quarterly --

19   quadrennial Homeland Security review, strategic plan,

20   that sort of thing.

21      Q.  So I understand that John Kelly left the

22   Department of Homeland Security and went to The White

23   House around July -- the end of July.  Is that your

24   understanding?

25      A.  Correct.

1        Q.   So after John Kelly left, what was your chain
2    of command?
3        A.   So Elaine Duke, who was the Deputy became the
4    Acting Secretary, and I believe shortly after Kelly's
5    departure in mid-August Claire Grady, who had been
6    confirmed as the undersecretary for management, became
7    the acting deputy secretary.
8        Q.   And the direct reports under you stayed the
9    same?
10       A.   Correct.
11       Q.   How many undersecretaries are there?
12       A.   I believe there are four.
13       Q.   So I understand that Ms. Nielsen was recently
14   nominated to be the secretary of the Department of
15   Homeland Security.  Is that your understanding?
16       A.   That's correct.
17       Q.   If she is indeed confirmed, do you know what
18   the chain of command will be?
19       A.   I don't.
20           MR. GARDNER:  Objection.  Calls for
21   speculation.
22   BY MS. CHUANG:
23       Q.   In your current day-to-day responsibilities,
24   do you have any contact with anyone in The White
25   House?

1        A.   Yes.

2        Q.   In what capacity?

3        A.   So the way policy gets made in the United

4    States government is that there are very frequent

5    policy coordination meetings that are convened by

6    various offices within The White House, and those

7    meetings bring together members of the inner agency to

8    discuss and coordinate policy.

9        Q.   In your day-to-day responsibilities, with

10   respect to contact with The White House, what

11   particular members of The White House are you usually

12   dealing with?

13       A.   So I usually deal with members of the

14   National Security Council and sometimes with members

15   of the Domestic Policy Council.

16       Q.   Do you ever deal with the chief of staff?

17       A.   With John Kelly?

18       Q.   Uh-huh.

19       A.   I've seen him three times since his

20   departure, but each time was to say hello and shake

21   hands.  I haven't had a substantive conversation with

22   him since my departure.

23       Q.   Where did these three times take place?

24       A.   I believe all three were either in The White

25   House or in the Eisenhower executive office building.

```
                                          Page 21

  1          Q.   Were these at planned meetings?

  2          A.   Yes.

  3          Q.   And what -- let's take the first instance.

  4   Around what date did that occur?

  5          A.   Probably six weeks ago.

  6          Q.   And what was the planned meeting that was

  7   taking place?

  8          A.   It was a meeting to discuss a new initiative

  9   on drug demand reduction.

 10          Q.   Did you and Mr. Kelly both attend this

 11   meeting?

 12          A.   Yes.

 13          Q.   Was this meeting only for government

 14   officials or were members of the public also in

 15   attendance?

 16          A.   Only government officials.

 17          Q.   And you stated that the only contact that you

 18   had with Mr. Kelly was to say hello and good-bye?

 19          A.   Correct.  I'll be very specific.  I believe

 20   he left the meeting early, and as he walked by, we

 21   shook hands and exchanged pleasantries.

 22          Q.   What was the date of the second instance in

 23   which you encountered Mr. Kelly?

 24          A.   You know, I'm almost certain I've seen him

 25   three times since his departure, and I can remember
```

```
                                      Page 22
 1   two specifically, and I can't at this moment recall
 2   the third, but I am certain that I haven't had any
 3   substantive conversations with him.  Each encounter
 4   with him has been as I just described.
 5        Q.   The second or the third instance that you can
 6   recall, that was after the meeting regarding the drug
 7   demand?
 8        A.   Correct.
 9        Q.   In your day-to-day responsibilities with
10   respect to your contacts with The White House, do you
11   have contact with the vice president?
12        A.   No.  But again, let me be very specific.  So
13   I don't have daily contact with The White House.  I
14   have occasional contact with The White House relating
15   to meetings that I described, policy coordination.
16        Q.   In your day-to-day responsibilities with
17   respect to The White House, do you have contact with
18   President Trump?
19        A.   I do not.
20        Q.   In your day-to-day responsibilities do you
21   have contact with any members of Congress?
22        A.   I have not had any contact with members of
23   Congress since taking this job.
24        Q.   In your day-to-day responsibilities, do you
25   have contact with any Department of Justice officials?
```

1      A.   Yes.

2      Q.   In what capacity?

3      A.   So Department of Justice officials are

4  sometimes present at the policy coordination meetings

5  that I described.

6      Q.   In those instances, what level of staff

7  member from Department of Justice are you typically in

8  contact with?

9      A.   So the short answer is I don't know.  I don't

10 often know who -- what level the other people

11 participating in these meetings are.  I generally

12 participate in meetings that are geared at my level,

13 the level of an assistant secretary.  So one -- that's

14 generally the level of people who are present at these

15 meetings.

16     Q.   In your day-to-day responsibilities with

17 respect to Department of Justice officials, do you

18 have contact with Attorney General Sessions?

19     A.   No, though I have met Attorney General

20 Sessions.

21     Q.   When did you meet Attorney General Sessions?

22     A.   I met Attorney General Sessions two weeks ago

23 when he was cohost, along with Acting Secretary Duke,

24 of a -- something called the U.S.-China Law

25 Enforcement and Cyber Security Dialogue.

1          Q.   Was this an in-person meeting?

2          A.   Yes.   So Attorney General Sessions was the

3     cohost of this dialogue, along with Acting Secretary

4     Duke, and I was present.

5          Q.   Was this meeting just for government

6     officials or were members of the public invited to

7     attend?

8          A.   Government officials.

9          Q.   Did you have any conversations with Attorney

10    General Sessions about DACA?

11         A.   I did not.

12         Q.   Did you have any conversations at that

13    meeting with Acting Secretary Duke about DACA?

14         A.   I did not.

15         Q.   Is that the only instance in which you have

16    met Attorney General Sessions since coming to the

17    Department of Homeland Security?

18         A.   Yes.   Although I've been present at meetings

19    where he was present, but I did not meet him or have

20    any exchange with him.

21         Q.   Do you recall any of those specific meetings

22    and dates?

23         A.   I do.   Attorney General Sessions was at the

24    same meeting that I described earlier that Chief of

25    Staff Kelly was present at, the launching of the

Page 25

1    initiative to reduce drug demand.

2         Q.  Did you speak with Attorney General Sessions

3    at that meeting?

4         A.  I did not.

5         Q.  What other meetings were you present where

6    Attorney General Sessions was also present?

7         A.  So those are the only two instances I recall

8    being present where he was present.  The China Law

9    Enforcement Cyber Security Dialog, and the drug demand

10   reduction meeting.

11        Q.  Have you had any other communications with

12   Attorney General Sessions other than the in-person

13   meetings that you just described?

14        A.  I have not.

15        Q.  In your day-to-day responsibilities, do you

16   have contact with members of the state department?

17        A.  I do.

18        Q.  In what capacity?

19        A.  Coordination, policy coordination.

20        Q.  What type of coordination of policy?

21        A.  So, for example, I recently attended a

22   meeting convened by the UN high commissioner on

23   refugees that the state department was also present

24   at.  I had conversations with colleagues regarding

25   those meetings.  That type of thing.

Page 26

1        Q.   In your day-to-day responsibilities, do you

2    have contact with any state or local government

3    officials?

4        A.   Not regular, but I have had such contact.

5        Q.   Can you please describe the contact.

6        A.   Yes.   For example, I was present a month ago

7    or so when the acting secretary met with the Governor

8    of Guam.

9        Q.   What was that meeting about?

10        A.   The Governor of Guam wanted to see her to

11    discuss the department's policy regarding a certain

12    category of temporary worker visa.

13        Q.   Can you recall any other contacts with state

14    or local government officials?

15        A.   I cannot.

16        Q.   In your current day-to-day responsibilities,

17    do you have contact with members of the public?

18        A.   No.

19        Q.   In your current day-to-day responsibilities,

20    do you have contact with any immigration

21    organizations?

22        A.   Could you be more specific?

23        Q.   Immigration organizations, such as the Center

24    for Immigration Studies.

25        A.   I haven't up to this time, no.

1          Q.  Or any other organizations that might work in

2      the area of immigration?

3               MR. GARDNER:  Objection.  Vague.

4      BY MS. CHUANG:

5          Q.  You can answer.

6          A.  I don't recall at this time.  Just a point of

7      clarification.  When my attorney makes an objection, I

8      would like to defer to my attorney.  Is that okay?

9          Q.  When your attorney makes an objection, you

10     are still required to answer the question unless you

11     don't understand it, and you can ask me to rephrase,

12     or if your attorney specifically instructs you not to

13     answer.  In all other instances you should answer the

14     question.

15         A.  Thank you.

16         Q.  Thank you.  Do you know what "DACA" is?

17         A.  I do.

18         Q.  What is it?

19         A.  Deferred action -- I know what it is.  Yeah.

20         Q.  What specifically does DACA entail?

21         A.  What DACA entails is it protects a certain

22     class of people from immigration enforcement actions.

23         Q.  When did you first learn about DACA?

24         A.  I don't recall precisely, but probably when

25     it was first enacted.

Page 28

1        Q.   Is that 2012?

2        A.   2012.

3        Q.   Do you recall whether you heard of it from

4   within the government?

5        A.   So I've worked for the government for over

6   33 years.  So I was working for the government at the

7   time that I learned about DACA.

8        Q.   And at the time you first learned about DACA

9   in 2012, what did you think about it?

10       A.   You're asking me for my personal opinion?

11       Q.   Yes.

12       A.   I don't recall what my personal opinion was

13   at the time.

14       Q.   Did you have occasion to hear about DACA any

15   time after 2012 before you were appointed to the

16   Department of Homeland Security?

17       A.   Yes.

18       Q.   In what capacity?

19       A.   Well, I follow the news very closely.  So I

20   was aware of DACA.

21       Q.   So you were aware of DACA from newspapers and

22   media reports regarding DACA; is that correct?

23       A.   Correct.

24       Q.   Are there any other forms of communication in

25   which you've learned about DACA in that time period?

                                                              Page 29

 1                  MR. GARDNER:  Objection.  Vague.

 2       BY MS. CHUANG:

 3            Q.  Do you understand the question?

 4            A.  I do.  Could you be more specific?

 5            Q.  Besides newspapers and media reports, did you

 6       hear about DACA between the time you learned of it and

 7       before the time you were appointed?

 8            A.  Yes.

 9            Q.  How did you hear about DACA?

10            A.  So, for example, I was ambassador to Honduras

11       between 2014 and 2017, and there are Hondurans who

12       have DACA.  And so one would read about DACA in the

13       Honduran news, for example.

14            Q.  Do you recall what the Honduran news would

15       say about DACA?

16            A.  No, not specifically.

17            Q.  What were your general duties when you were

18       ambassador to Honduras?

19            A.  So an ambassador is the President's personal

20       representative in the country to which the ambassador

21       is sent, and an ambassador is charged with managing

22       all U.S. government personnel programs in that

23       country.

24            Q.  Would you agree that you have significant

25       experience and knowledge regarding the country of

```
                                              Page 30

 1    Honduras?

 2         A.  I would.

 3         Q.  Can you please just generally describe the

 4    country conditions of Honduras.

 5              MR. GARDNER:  Objection.  Vague.

 6    BY MS. CHUANG:

 7         Q.  Do you understand the question?

 8         A.  I do.

 9         Q.  Can you please answer?

10         A.  Sure.  What would you like to know?

11         Q.  What is the economy of Honduras like?

12         A.  Honduras is a country of about 8 million

13    people in the heart of Central America.  It's about

14    the size of the state of Tennessee, I believe.  It's

15    got a per capita income of about $2,500 a month.  It

16    has a democratically elected government.  It has a

17    unicameral legislature.  The United States is its

18    largest trading partner.  Its economy is dependent on

19    agriculture to a large extent.  Coffee is the largest

20    export.

21         Q.  Does the United States have a good

22    relationship with Honduras?

23         A.  Yes.

24         Q.  Does Honduras have a stable government?

25         A.  Yes.
```

Page 31

1          Q.   Is there violence in Honduras?

2          A.   There is.

3          Q.   What type of violence?

4          A.   So there's a lot of gang-related violence in

5     Honduras.  There is gender-related violence in

6     Honduras.  Honduras is a violent country.

7          Q.   Was the violence that you described in place

8     during your tenure as ambassador?

9          A.   Yes.  Though during my time in Honduras, the

10     levels of violence decreased dramatically.

11          Q.   Do you have an understanding of why the

12     levels of violence decreased?

13          A.   I do.

14          Q.   And why is that?

15          A.   So this is a very long story, and I won't

16     tell the very long story, but by about 2011, 2012,

17     levels of violence in Honduras had reached very, very

18     high levels for a lot of reasons.

19               And beginning in about 2013, Honduras began

20     to take the steps necessary to bring those levels of

21     violence down, with considerable assistance from the

22     United States to do that.

23          Q.   The high levels of violence that you

24     described that started around 2011, 2012 --

25          A.   No.  Well, go ahead.  I'm sorry.

```
                                              Page 32

1          Q.  The high levels of violence that you

2     described that reached very, very high levels in 2011

3     and 2012, do you have an understanding of the type of

4     violence?

5          A.  Yes.

6          Q.  What was the type of violence?

7          A.  So the murder rate, for example, peaked at

8     about 86 per 100,000.

9          Q.  Was there gang-related violence at that time?

10         A.  Yes.

11         Q.  Did the gang-related violence lead to the

12    murder rate peaking?

13         A.  Yes, that was one of the factors.

14         Q.  Any other types of violence?

15         A.  Yes.  Honduras is a country that was besieged

16    by all sorts of criminality but -- including violence

17    and including murder.

18         Q.  You mentioned that in around 2013 Honduras

19    took the steps necessary to bring the levels of

20    violence down; is that correct?

21         A.  So Honduras began to take the steps necessary

22    to reverse that rise of violence and begin to bring

23    that curve down.

24         Q.  And what were those steps?

25         A.  Those steps were numerous, but things like
```

Page 33

1   putting police back into the most violent

2   neighborhoods, neighborhoods where the police had been

3   chased out.  Things like implementing innovative

4   programs of violence prevention.  Things like a

5   purging of the police force to get criminal actors out

6   of the police force and replace them with people who

7   would serve at the benefit of people and not at the

8   benefit of criminal organizations.

9          MR. GARDNER:  I'm sorry to interrupt.  Can

10  you adjust your microphone, please, because they're

11  having a hard time picking it up.

12          (Pause in proceedings.)

13          MS. CHUANG:  I'm going to mark this as

14  Exhibit 2.

15          (Deposition Exhibit 2 was marked for

16          identification.)

17  BY MS. CHUANG:

18      Q.  I'll give you a quick moment to review the

19  document.

20      A.  This is the article by Sonia Nazario?

21      Q.  Yes.

22      A.  Would you like me to read the document.

23      Q.  You can read it to yourself quickly if you

24  would like to review it.  You don't need to read it

25  out loud.

                                                                Page 34

1            A.  But I just meant you want me to read the

2    whole document?

3            Q.  If you would like.

4            A.  Are you going to ask me questions about the

5    document?

6            Q.  I am going to be asking you questions about

7    the document.

8            A.  Then I shall read the document.

9                (The witness reviewed Exhibit 2.)

10               THE WITNESS:  Okay.

11   BY MS. CHUANG:

12           Q.  Before today, have you seen this article

13   before?

14           A.  Yes.

15           Q.  And this is an article from the New York

16   Times dated August 11, 2016 entitled "How the Most

17   Dangerous Place on Earth Got Safer," by Sonia Nazario;

18   is that correct?

19           A.  That appears to be correct.

20           Q.  And you were interviewed for this article; is

21   that correct?

22           A.  Yes.

23           Q.  What is this article about?

24           A.  This article is about time that Sonia Nazario

25   spent in Honduras looking at very conflictive

1    neighborhoods and programs, some of them sponsored by

2    the United States government, to try to reduce

3    violence in those neighborhoods.

4        Q.  I'm going to read a couple statements from

5    the article, and I would like you to tell me whether,

6    based on your experience and knowledge, you believe

7    those to be accurate.  Okay?

8        A.  Sure.

9        Q.  The first paragraph of the article states

10   that "Three years ago Honduras had the highest

11   homicide rate in the world."  Is that accurate, based

12   on your knowledge and experience?

13       A.  So there's some discussion about whether or

14   not Honduras was the most violent country in the world

15   or not.  It has to do with how you measure and which

16   organization -- which organization's statistics you

17   refer to.  So I can't categorically say that it was

18   the most violent country in the world.  It was a

19   violent country.

20       Q.  In the first paragraph the article states,

21   "Tens of thousands of young Hondurans traveled to the

22   United States to plead for asylum from the drug gangs'

23   violence."  Based on your knowledge and experience, is

24   this an accurate statement?

25       A.  It's certainly accurate to say that many

Page 36

1    Hondurans went to the United States to seek asylum.

2        Q.  In the third paragraph of the article it

3    states, "Two years ago, some 18,000 unaccompanied

4    Honduran children showed up on the United States

5    border."  The last sentence of that paragraph states

6    Honduras "has dropped from first place to third among

7    Central American countries sending unaccompanied

8    children to the United States illegally."  Based on

9    your experience and knowledge, are those two

10   statements accurate?

11           MR. GARDNER:  Objection.  Compound.

12           THE WITNESS:  Could you break them up into

13   separate questions for me.

14   BY MS. CHUANG:

15       Q.  Yes.

16       A.  Thank you.

17       Q.  The first statement is "Two years ago, some

18   18,000 unaccompanied Honduran children showed up on

19   the United States border."  Is that accurate?

20       A.  Yes.

21       Q.  "Honduras has dropped from first place to

22   third among Central American countries sending

23   unaccompanied children to the United States

24   illegally."  Is that accurate?

25       A.  It was certainly accurate at the time that I

1    spoke to Sonia and that this article was written.   I

2    haven't followed the numbers precisely since I left

3    Honduras.

4         Q.  Do you have an understanding, since you left

5    Honduras, of whether that statement is still accurate?

6         A.  I don't.

7         Q.  Please turn to Page 3 of the article.   The

8    third full paragraph includes some statements from

9    you; is that correct?

10         A.  Yes.

11         Q.  The first statement is "America's support is

12    'getting results.'"   Is that your statement?

13         A.  That's certainly my statement reflected in

14    this article, yes.

15         Q.  Do you have an understanding of whether that

16    statement was accurate, at the time that you spoke to

17    the reporter, in this article?

18         A.  I certainly remember a long conversation with

19    Sonia Nazario.   I obviously don't remember precisely

20    what I told her, but that would seem to be an accurate

21    reflection of what I said.

22         Q.  What do you mean by "America's support"?

23         A.  So the United States is deeply involved in

24    Honduras in supporting Honduran efforts to reduce

25    violence.

Page 38

1          Q.   What type of efforts?

2          A.   So we have all manner of programs aimed at

3     doing that.  So as I stated previously, for example,

4     we're deeply involved in a Honduran process to purge

5     their police force, to purge their police force of bad

6     actors.  We also provide a lot of training to the

7     Honduran police so that they can be more effective in

8     these conflictive communities in helping reduce the

9     violence.  So we provide training, community police

10    type of training, that sort of thing.

11          We also provide -- we also run some very

12    interesting innovative training on secondary and

13    tertiary prevention so that you identify -- you try to

14    identify people at risk, both at risk of committing

15    crimes and at risk of being victims of crime, and we

16    try to do something about it.

17          Q.   Are these programs aimed, in part at least,

18    to reducing gang-related violence?

19          A.   So they're aimed at reducing violence of all

20    kinds.

21          Q.   In the second sentence of the third full

22    paragraph you state, "We are reducing migration."  Is

23    that accurate?

24          A.   So as I stated previously, that was certainly

25    accurate at the time.  When the unaccompanied minor

Page 39

1      crisis spiked in 2014, I believe that there were more

2      Honduran unaccompanied minors crossing the southwest

3      border than minors from the other two countries of the

4      northern triangle, Guatemala and El Salvador.  But

5      over time that number was greatly reduced to the point

6      that Hondurans were third, if you will.

7              So there were fewer Honduran unaccompanied

8      minors crossing than Salvadorans or Guatemalans, and

9      that was what I was referring to.

10      Q.  In your understanding, was that reduction of

11      Honduran unaccompanied minors a result of the program

12      that you previously described?

13      A.  So these things are very difficult to

14      measure, but we were fairly confident that our

15      programs and our support for Honduran efforts were

16      playing a role in that reduction.

17      Q.  Your first statement states that "America's

18      support is 'getting results.'"  Is reducing migration

19      one of those results?

20      A.  Yes.

21      Q.  What other results are you talking about in

22      this article?

23      A.  I believe that Ms. Nazario was asking me

24      specifically about violence.  So I believe -- though

25      this was two years ago, I believe that that's

Page 40

1    specifically what I was referring to.

2         Q.  You stated that the unaccompanied minor

3    crisis spiked in 2014; is that correct?

4         A.  I did say that.

5         Q.  Do you have an understanding of when the

6    crisis began?

7         A.  Not a precise time line, but I think over the

8    year previous to that we'd seen the numbers go up, and

9    then we saw a spike in 2014.

10        Q.  Did the unaccompanied minor crisis, in your

11   understanding, correlate to the high levels of

12   violence that you described that began around 2011 and

13   2012?

14             MR. GARDNER:  Objection.  Lack of foundation.

15             THE WITNESS:  Should I answer the question?

16   BY MS. CHUANG:

17        Q.  You can still answer.

18        A.  So I can't give you a direct answer to your

19   question.  I believe that every decision to migrate is

20   a personal decision, just as all of our ancestors made

21   a personal decision to move from wherever they were to

22   the United States.  That's the same process that goes

23   on in Central America.

24             That said, I believe there are both pull

25   factors related to immigration and push factors.  And

1    what we were trying to get at in Honduras were those

2    push factors of migration.  And in my judgment, the

3    main push factors of immigration are a lack of

4    economic opportunity, poor governance, lack of

5    institutionality and violence.

6            And so U.S. government programs in Honduras,

7    during the time I was there, were aimed at improving

8    all three of those factors.

9        Q.  The second line of the third or paragraph of

10   the article states, "But we are also repairing harm

11   the United States inflicted - first by deporting tens

12   of thousands of gangsters over the past two decades, a

13   decision that fueled much of the recent mayhem," and

14   then the sentence goes on.  In your opinion, is that

15   first part of that sentence accurate?

16       A.  I'm sorry.  Where are you?  What page?

17       Q.  On Page 3.

18            (The witness reviewed Exhibit 2.)

19            THE WITNESS:  So those are Nazario's words,

20   not mine.

21   BY MS. CHUANG:

22       Q.  Do you believe that that statement is

23   accurate?

24            MR. GARDNER:  Objection.  Lack of foundation.

25            THE WITNESS:  So I certainly believe that the

Page 42

1    American demand for drugs, for illegal drugs is one of

2    the factors that fueled violence -- that fuels

3    violence in Honduras.

4    BY MS. CHUANG:

5        Q.  Do you believe that deporting tens of

6    thousands of gangsters to Honduras contributed to the

7    conditions in Honduras.

8        A.  So I believe that the deportation of

9    criminals to Central America decades ago certainly

10   contributed to gang violence in Central America.

11       Q.  The last sentence of that paragraph, "If the

12   United States sustains its anti-violence work in

13   Honduras, in five years they will get their country

14   back."  Is this your statement?

15       A.  It appears to be, yes.

16       Q.  Is it accurate?

17       A.  You know, what I was saying was aspirational.

18       Q.  Do you understand if the anti-violence work

19   is still going on?

20       A.  I believe it is.

21       Q.  Can you briefly describe what the current

22   anti-violence work is?

23       A.  Since I'm not there anymore, I wouldn't be

24   comfortable doing that.

25       Q.  Have you ever discussed the issue of

1    unaccompanied minors with Attorney General Sessions?

2         A.   No.

3         Q.   Have you ever discussed the issue of

4    unaccompanied minors with Acting Secretary Duke?

5         A.   Could you repeat the question.

6         Q.   Have you ever discussed the issue of

7    unaccompanied minors with Acting Secretary Duke?

8         A.   I don't believe so.

9         Q.   Have you ever discussed the issue of

10   unaccompanied minors with anyone at the Department of

11   Homeland Security?

12        A.   I'm sure I have.

13        Q.   Do you recall any specific instances?

14        A.   I don't.

15        Q.   Have you ever discussed the issue of

16   unaccompanied minors with anyone at the Department of

17   Justice?

18        A.   During my tenure at Homeland Security or at

19   any time?

20        Q.   Let's start with your tenure at Homeland

21   Security.

22        A.   I don't recall having had such a discussion

23   with anyone from the Department of Justice during my

24   time in Homeland Security.

25        Q.   What about before your tenure started?

1        A.  So when I was ambassador to Honduras, I

2    probably had thousands of conversations about

3    unaccompanied children with all sorts of people.

4        Q.  Were any of those conversations involving

5    unaccompanied children in the context of DACA?

6        A.  I don't recall any such conversation.

7        Q.  Have you ever discussed the issue of

8    unaccompanied minors with anyone from The White House?

9        A.  So, again, I was ambassador to Honduras for

10   three years, and I had thousands of conversations

11   about unaccompanied minors with lots of different

12   people.  So it would be helpful to me if you would

13   refer to my questions with my time at Homeland

14   Security or ever, and that would help me answer your

15   questions better.

16       Q.  I will.  Let's start with your tenure at

17   Homeland Security?

18       A.  So please repeat the question.  I'm sorry.

19       Q.  Have you ever discussed the issue of

20   unaccompanied minors with anyone from The White House

21   during your tenure at Homeland Security?

22       A.  I don't believe so.

23       Q.  Have you ever discussed the issue of

24   unaccompanied minors with anyone at The White House

25   prior to your tenure at Homeland Security?

1      A.   Yes.

2      Q.   Can you recall specific instances?

3      A.   I don't recall specific instances, but again,

4  I would have had thousands of conversations about

5  unaccompanied minors during the three years that I was

6  ambassador of Honduras.  It was a subject of great

7  importance.

8      Q.   Were any of those thousands of conversations

9  that you had about unaccompanied minors in the context

10  of DACA?

11      A.   No, not that I recall.

12      Q.   Have you ever discussed the issue of

13  unaccompanied minors with members of Congress during

14  your tenure at Homeland Security?

15      A.   No.

16      Q.   What about before?

17      A.   Yes.

18      Q.   And can you recall any specific instances?

19      A.   So -- yes.  So during the time that I was

20  ambassador to Honduras, we probably had about 25

21  congressional delegations or staff delegations that

22  came to Honduras, and virtually all of those

23  delegations were interested in the issue of migration.

24      Q.   Were any of those 25 congressional

25  delegations discussing the issue of unaccompanied

Page 46

1    minors in the context of DACA?

2        A.  Not that I recall.

3        Q.  Have you ever discussed the issue of

4    unaccompanied minors with any state or local

5    government officials during your tenure at Homeland

6    Security?

7        A.  No.

8        Q.  What about before your tenure at Homeland

9    Security?

10       A.  I don't recall conversations with state and

11   local officials.

12       Q.  Have you ever discussed the issue of

13   unaccompanied minors with any immigration

14   organizations during your tenure at Homeland Security?

15           MR. GARDNER:  Objection.  Vague.

16           THE WITNESS:  Would you repeat the question.

17   BY MS. CHUANG:

18       Q.  Have you ever discussed the issue of

19   unaccompanied minors with anyone from immigration

20   organizations during your tenure at Homeland Security?

21           MR. GARDNER:  Same objection.

22   BY MS. CHUANG:

23       Q.  You can answer.

24       A.  I don't believe so.  Again, I guess

25   immigration organizations -- I did meet a month or so

Page 47

1    ago with representatives of Oxfam, not an immigration

2    organization, a nongovernmental organization that

3    takes an interest in Central America and other places.

4         Q.   What was the subject matter of that meeting?

5         A.   I believe they wanted to talk about temporary

6    protected status.

7         Q.   And did you discuss temporary protected

8    status in that meeting?

9         A.   I did.

10        Q.   What was the discussion about temporary

11   protected status?

12        A.   So there's an upcoming decision -- a series

13   of upcoming decisions that will be made about

14   temporary protected status for various countries, and

15   Oxfam wanted to make their views known to the

16   department.

17        Q.   What other "upcoming decisions"?

18        A.   So the acting secretary will be making

19   decisions about extension or termination regarding, I

20   believe, five countries in the next four or five

21   months.

22        Q.   Has the acting secretary made a decision yet?

23        A.   I don't know.

24        Q.   Besides Oxfam, any other organizations in

25   which you have discussed the issue of unaccompanied

1    minors during your tenure at Homeland Security?

2         A.   Not that I recall.

3         Q.   What about before?

4         A.   Hundreds of conversations during my time in

5    Honduras.

6         Q.   Did any of those conversations involve

7    unaccompanied minors in the context of DACA?

8         A.   Not that I recall.

9         Q.   I'd like to just go back to your position

10   before you became ambassador.  Can you please describe

11   what position you were in before ambassador?

12        A.   So immediately before becoming ambassador to

13   Honduras, I was the -- my title was civilian deputy to

14   the commander of U.S. southern command.

15        Q.   And what dates did you hold that position?

16        A.   Summer of 2013 to summer of 2014.

17        Q.   What were your general duties in that

18   position?

19        A.   Generally speaking, I was a foreign policy

20   adviser to the commander.

21        Q.   John Kelly was the commander; is that

22   correct?

23        A.   He was.

24        Q.   Did you directly report to him?

25        A.   I did.

1          Q.   In your role as the civilian deputy to the

2     commander, did you do any work involving immigration?

3          A.   Yes.

4          Q.   What type of work?

5          A.   So southern command was interested in the

6     flow of people from Central America and other parts of

7     the world to the United States.

8          Q.   So what type of work did you do involving

9     immigration?

10          A.   Well, I mean, southern command doesn't have

11     any operational control over immigration matters.  It

12     was more a subject of interest to the United States

13     government, and specifically at southern command,

14     there was concern that the pathways that are used to

15     traffic people can be used to traffic other things,

16     drugs, weapons, cash, that sort of thing.

17          Q.   Did you advise John Kelly on matters

18     involving the flow of people from Central America and

19     other parts of the world?

20          A.   Yes.

21          Q.   Do you recall what conversations you've had

22     regarding that?

23          A.   I don't.  I don't recall specific

24     conversations, no.

25          Q.   Did any of that work involving immigration

1    matters include unaccompanied minors?

2         A.   So probably.   I left southern command in the

3    summer of 2014, just about the time that those numbers

4    of unaccompanied minors were spiking.   So I'm sure we

5    had conversations about that.

6         Q.   Do you recall any of the conversations you

7    had with John Kelly about that?

8         A.   I don't recall specific conversations, no.

9         Q.   Did you have any conversations with John

10   Kelly about DACA at that time?

11        A.   No, not that I recall.

12        Q.   Do you know what John Kelly's views about

13   DACA were at that time?

14        A.   I don't.

15        Q.   Do you know when DHS first contemplated

16   rescinding DACA?

17        A.   I don't.

18        Q.   What is your specific role in the

19   decision-making process relating to the rescission of

20   DACA?

21        A.   So I'm one of many advisors to the acting

22   secretary of Homeland Security.

23        Q.   What is your specific role in the

24   decision-making process as an advisor?

25        A.   I wouldn't say I had a specific role.  I was

                                                        Page 51

1    one of many voices helping the secretary weigh the

2    potential decisions and potential consequences of such

3    decisions.

4         Q.   Did you provide recommendations to the acting

5    secretary relating to the rescission of DACA?

6         A.   I don't recall offering a specific

7    recommendation.

8         Q.   Did you provide research relating to the

9    rescission of DACA to Acting Secretary Duke?

10        A.   I don't recall providing research.

11        Q.   Can you please describe what kind of voice

12   you had in helping the secretary weigh the potential

13   decisions and potential consequences of rescission of

14   DACA?

15             MR. GARDNER:   At this point I am going to

16   object.   I think we are implicating a little bit of

17   process privilege right now.

18             So I will instruct the witness not to answer

19   that particular question.

20   BY MS. CHUANG:

21        Q.   You stated that you were one of many voices

22   helping the secretary weigh the potential decision and

23   potential consequences of such decisions.   Do you know

24   who the other voices were?

25        A.   I know who some of the voices were, yes.

Page 52

1    Q.  Who were they?

2    A.  So she was certainly listening to legal

3    counsel.  She was certainly listening to U.S.

4    citizenship and immigration services, USCIS, who owned

5    the program within the Department of Homeland

6    Security.  They're the ones who administer that

7    program.  I'm sure she was listening to her front

8    office staff, her chief of staff, and her counselors.

9    And she may have listened to others as well.

10   Q.  Are those entities that you just described

11   all within the Department of Homeland Security?

12   A.  They are.

13   Q.  Do you know if any other departments in the

14   federal government provided a voice in assisting the

15   Secretary weigh the potential decisions and

16   consequences of rescission of DACA?

17   A.  So I don't know specifically.

18   Q.  You had mentioned that legal counsel was one

19   of those voices.

20   A.  Yes.

21   Q.  Who specifically?

22   A.  So the general counsel of the department is

23   Joseph Maher.  And another attorney who was involved

24   was Dimple Shah.  And there may have been others.

25   Q.  What was Joseph Maher's voice in -- do you

1    know what Joseph Maher and Acting Secretary Duke

2    discussed in relation to the rescission of DACA?

3              MR. GARDNER:  Objection.

4              You can answer that question "yes" or "no,"

5    but the content of that would be subject to privilege,

6    but in terms of attorney-client and deliberative

7    process privilege.

8              In other words, you can answer that question

9    with a "yes" or "no," but the content of that would be

10   privileged, and I would instruct you not to answer.

11             Could you repeat the question?

12   BY MS. CHUANG:

13        Q.  Do you know what Joseph Maher and Acting

14   Secretary Duke discussed in relation to the rescission

15   of DACA?

16        A.  I know some of the things they discussed,

17   yes.

18             MS. CHUANG:  I would like to also state for

19   the record that I understand that some of these issues

20   pertaining to the privileges that you are asserting

21   are being disputed currently, and that there is a

22   motion that will be heard on Monday that may address

23   some of these issues.

24             MR. GARDNER:  We have the same understanding.

25   BY MS. CHUANG:

1      Q.  Do you know what was discussed between Dimple

2   Shah and Acting Secretary Duke relating to the

3   rescission of DACA?

4           MR. GARDNER:  Same objection.

5           You can answer that with a "yes" or "no."

6   The contents of that conversation would be subject to

7   the attorney-client privilege, the deliberative

8   process privilege.  I would instruct you not to answer

9   as to the content of those conversations.

10          THE WITNESS:  Okay.

11          Yes, I know some of the discussion that went

12  back and forth.

13  BY MS. CHUANG:

14     Q.  And what is the substance of that

15  conversation between Dimple Shah and Acting Secretary

16  Duke relating to the rescission of DACA?

17          MR. GARDNER:  Objection.  Calls for

18  attorney-client privilege and deliberative process

19  privilege.

20          I instruct the witness not to answer.

21  BY MS. CHUANG:

22     Q.  What were the substance of the conversation

23  between Joseph Maher and Acting Secretary Duke related

24  to the decision, rescission of DACA?

25          MR. GARDNER:  Same objection.  Same

1    instruction.

2    BY MS. CHUANG:

3         Q.   You had also mentioned that another voice

4    involved in this decision-making process was USCIS; is

5    that correct?

6         A.   Yes.

7         Q.   Who specifically at USCIS?

8         A.   So the acting director at that time was James

9    McCament.

10        Q.   Is he still currently the acting director?

11        A.   He is not.

12        Q.   Who is the acting director?

13        A.   So now there's a confirmed director whose

14   name is Francis Cissna.

15        Q.   Besides acting director McCament at that

16   time, anybody else from USCIS?

17        A.   There may have been, but I don't recall

18   specifically.

19        Q.   Do you know the substance of the conversation

20   between James McCament and Acting Secretary Duke

21   relating to the decision of DACA?

22             MR. GARDNER:   I do want to lodge an objection

23   here.

24             You can answer that question with a "yes" or

25   "no."  The substance of those conversations would be

1    subject to deliberative process privilege.

2            And I would instruct you not to answer as to

3    the content.

4            THE WITNESS:  Okay.

5            Yes, I was familiar with some of the

6    discussion that they had.

7    BY MS. CHUANG:

8       Q.  What are the discussions that they had?

9            MR. GARDNER:  Object on the basis of

10   deliberative process, privilege.

11           I instruct the witness not to answer.

12   BY MS. CHUANG:

13      Q.  You also mentioned that there was front

14   office staff, such as the chief of staff, that was

15   involved in the decision-making process relating to

16   the rescission of DACA; is that correct?

17      A.  Yes.  Whether or not they were actually

18   involved in the decision making itself, but they were

19   certainly involved in conversations.

20      Q.  Who specifically?

21      A.  So the chief of staff was Chad Wolf.  Deputy

22   chief of staff is Elizabeth Neumann.  And then there

23   were other counselors who were advisors within the

24   Secretary's front office who would have been involved

25   as well.

                                                    Page 57

 1          Q.   Who are those specific counselors and

 2     advisors?

 3          A.   So Gene Hamilton.   And there may have been

 4     others.

 5          Q.   Can you recall the others?

 6          A.   I can't at this time.

 7          Q.   Do you know the substance of the

 8     conversations between Chad Wolf and Acting Secretary

 9     Duke relating to the rescission of DACA?

10          MR. GARDNER:   Objection to the extent that

11     she's asking for the substance of the conversation.

12     That would be subject to deliberative process

13     privilege.   I instruct you not to answer.   You can

14     answer the question with a "yes" or "no."   If you

15     know, answer.

16          THE WITNESS:   I'm aware of some of the

17     conversation that took place, yes.

18     BY MS. CHUANG:

19          Q.   What is the substance of the conversation

20     that took place between Chad Wolf and Acting Secretary

21     Duke relating to the rescission of DACA?

22          MR. GARDNER:   Objection.   Calls for

23     information subject to deliberative process privilege.

24          I instruct the witness not to answer.

25     BY MS. CHUANG:

1      Q.  Do you know the substance of the

2   conversations between Elizabeth Neumann and Acting

3   Secretary Duke relating to the rescission of DACA?

4      A.  I'm aware of some of the conversation, yes.

5      Q.  Do you know the -- what is the substance of

6   the conversations between Elizabeth Neumann and Acting

7   Secretary Duke relating to the rescission of DACA?

8           MR. GARDNER:  Objection.  That information is

9   subject to deliberative process privilege.

10          I instruct the witness not to answer.

11   BY MS. CHUANG:

12      Q.  Do you know the substance of conversations

13   between Gene Hamilton and Acting Secretary Duke

14   relating to the rescission of DACA?

15      A.  I'm aware of some of the conversation.

16      Q.  What is the substance of the conversation

17   between Gene Hamilton and Acting Secretary Duke

18   relating to the rescission of DACA?

19          MR. GARDNER:  Objection.  That information is

20   subject to deliberative process privilege.

21          I instruct the witness not to answer.

22   BY MS. CHUANG:

23      Q.  Is there anyone else at the Department of

24   Homeland Security that provided a voice to Acting

25   Secretary Duke relating to the rescission of DACA?

1          A.   There may have been, but not that I'm aware.

2          Q.   Is there anyone at The White House that you

3     know of that provided a voice to Acting Secretary Duke

4     relating to the rescission of DACA?

5          A.   I'm not aware.

6          Q.   Is there anyone at the Department of Justice

7     that provided a voice to Acting Secretary Duke

8     relating to the rescission of DACA?

9          A.   I'm not aware.

10          Q.   Is there anyone at any other federal agencies

11     that you know of that provided a voice to Acting

12     Secretary Duke relating to the rescission of DACA?

13          A.   I'm not aware.

14          Q.   Are you aware of any former White House

15     officials that provided a voice to Acting Secretary

16     Duke relating to the rescission of DACA?

17          A.   No, I'm not aware.

18          Q.   Are you aware of any members of Congress that

19     provided a voice to Acting Secretary Duke relating to

20     the rescission of DACA?

21          A.   No, I'm not aware.

22          Q.   Are you aware of any state or local

23     government officials that provided a voice to Acting

24     Secretary Duke relating to the rescission of DACA?

25          A.   No.  I'm not aware.

1          Q.  Are you aware of any nonprofit organizations

2     that provided a voice to Acting Secretary Duke

3     relating to the rescission of DACA?

4          A.  No, I'm not aware.

5          Q.  Are you aware of any immigration

6     organizations that provided a voice to Acting

7     Secretary Duke relating to the rescission of DACA?

8               MR. GARDNER:  Objection.  Vague.

9               THE WITNESS:  I'm not aware.

10    BY MS. CHUANG:

11         Q.  Are you aware of any other members of the

12    public that provided a voice to Acting Secretary Duke

13    relating to the rescission of DACA?

14         A.  No.

15         Q.  Before September 5, did you create any

16    documents relating to the rescission of DACA?

17         A.  I don't recall, but I may have.

18         Q.  Did you create any E-mails relating to the

19    rescission of DACA before September 5?

20         A.  I don't recall, but I may have.

21         Q.  Did you create any memos relating to the

22    rescission of DACA before September 5?

23         A.  I don't recall, but I may have.

24              MS. CHUANG;  I would ask that if you could go

25    back and find them, and I would request that your

Page 61

1    counsel produce them to us.

2              So I want to show you a copy of the DACA

3    rescission memo from Acting Secretary Duke.

4              MR. GARDNER:  Counsel, before we go on, would

5    now be an okay time for a break?  We've been going for

6    a while.

7              MS. CHUANG:  Sure.  Let's take a five-minute

8    break.

9              MR. GARDNER:  Okay.

10             THE VIDEOGRAPHER:  We're going off the record

11   at 8:49.

12             (A recess was taken from 8:49 a.m.

13              to 9:00 a.m.)

14             THE VIDEOGRAPHER:  We're now back on the

15   record at 9:00.

16             MS. CHUANG:  I'd like to enter the

17   administrative record as Exhibit 3.

18             (Deposition Exhibit 3 was marked for

19              identification.)

20   BY MS. CHUANG:

21      Q.  The administrative record is Bates numbered

22   AR 00000001 through AR 00000256.

23             When I asked you about the administrative

24   record --

25             MR. GARDNER:  Sorry.  Please scoot over.

                                                    Page 62

1              THE WITNESS:  This way (indicating)?

2              MR. GARDNER:  Yes.

3      BY MS. CHUANG:

4         Q.  When I asked you about the administrative

5      record before, you had mentioned that you were asked

6      to compile some documents relating to the rescission

7      of DACA; is that correct?

8         A.  So I wasn't -- actually, just to be very

9      precise, I wasn't asked to compile documents.  I was

10     asked to see what I had, and that's what I did.

11        Q.  How do you generally communicate with your

12     colleagues at the Department of Homeland Security?

13        A.  So there are many ways.  There are everything

14     ranging from informal encounters where you walk into

15     someone's office and ask them a question, to formally

16     scheduled meetings to ad hoc meetings, to written

17     communications, whether E-mail or more formal

18     communications.  So there are a wide variety of ways

19     of communicating.

20        Q.  Do those formal communications involve

21     drafting memos?

22        A.  They can.

23        Q.  Have you drafted many memos during your

24     tenure at Department of Homeland Security?

25        A.  So the way it works is I've signed out a lot

1    of communications.  These would be all manor of

2    things.  They're generally drafted by someone else for

3    my signature.  These can range from sort of

4    administrative-type communications to responses to

5    members of Congress who have written to the Secretary

6    asking for information.  So there's -- so yes, I have

7    signed out memos since I've been there.

8         Q.  Approximately how many?

9         A.  I don't know.

10        Q.  50?  Approximately 50?

11        A.  I really don't know.

12        Q.  Would you say it's more than 100?

13        A.  No.

14        Q.  Have you signed off on any of these memos

15   relating to DACA?

16        A.  Not that I recall.

17        Q.  How often do you use E-mail communication to

18   contact other persons?

19        A.  Every day.

20        Q.  Have you sent any E-mails that discussed DACA

21   to any persons?

22        A.  So I don't recall any specific E-mails, but I

23   would say I almost certainly have, yes.

24        Q.  You had mentioned earlier that you had

25   compiled 19 E-mail files relating to your request to

Page 64

1   compile documents; is that correct?

2         A.   So to be very precise, what I did when I was

3   contacted by counsel was I looked in my E-mail

4   folders.  I have an E-mail folder which I created and

5   entitled "DACA," and in that folder I believe there

6   are 19 documents.  So I just had trouble with the word

7   "compile."  I didn't compile anything.  I simply

8   looked to see what I had.  That's what I had.

9         Q.   Is it your practice to put all communications

10   relating to DACA in the E-mail folder entitled "DACA"?

11         A.   It's my practice with any subject matter that

12   I would put E-mails in there that I considered

13   important or relevant.

14         Q.   What is your standard for what is important

15   or relevant?

16         A.   I suppose it's my own standard and what I

17   consider important and relevant to me.

18         Q.   So any --

19         A.   I don't have a written standard that I apply

20   to each of the hundred-and-some E-mails that I get

21   every day.  You may not have a standard like that

22   either.  But I do save E-mails that I consider

23   important and relevant.

24         Q.   In the context of E-mails that pertain to

25   DACA, do you know if you -- if there are E-mails that

Page 65

1    you did not save?

2         A.   I don't know.

3         Q.   Did you check your sent E-mail folder

4    relating to your search for documents about DACA?

5         A.   I did not.

6         Q.   So these 19 E-mails that you did find in the

7    E-mail -- the DACA folder, let's go through the first

8    one.  Do you recall who you were communicating with on

9    that E-mail?

10        A.   So I didn't review any of the E-mails in that

11   folder.  So I don't know what those E-mails are.

12        Q.   So for any of the 19 you don't know any of

13   the persons?

14        A.   I don't.

15        Q.   Do you know the subject matters?

16        A.   DACA.

17        Q.   What pertaining to DACA?

18        A.   I don't know.

19        Q.   Were you discussing the rescission of DACA in

20   any of those E-mails?

21        A.   I don't -- so as I say, just to make it

22   easier for you, I did not review any of those

23   documents.  So I can't tell you what those documents

24   are.

25        Q.   You had also stated before that you were one

Page 66

1    of the voices in the discussion relating to Acting

2    Secretary Duke to assist her in helping her weigh the

3    consequences and the benefits of rescission of DACA;

4    is that correct?

5         A.  Yes.

6         Q.  Did you conduct an independent inquiry into

7    DACA as part of that process?

8              MR. GARDNER:  Objection.  Vague.

9              THE WITNESS:  Could you be more specific?

10             MS. CHUANG:  I would ask that you not counsel

11   your client and just stick to the objection.

12             MR. GARDNER:  Counsel, with all due respect,

13   I did not give a speaking objection.  I said,

14   "Objection.  Vague."

15             MS. CHUANG:  Okay.  Well, it is a bit

16   argumentative.  I'd ask that you refrain from

17   counseling your client.

18             MR. GARDNER:  With all due respect, I did not

19   counsel my client.  But please, continue with your

20   questions.

21   BY MS. CHUANG:

22        Q.  Did you conduct an independent inquiry into

23   that DACA process?

24             MR. GARDNER:  Same objection.

25             THE WITNESS:  No.

1    BY MS. CHUANG:

2         Q.  Did you conduct any research as part of that

3    process?

4         A.  I said I don't recall conducting any formal

5    research.  I'm sure that I read about DACA.

6         Q.  What did you read about DACA?

7         A.  I'm sure I read news articles and probably

8    some historical documents.

9         Q.  What "news articles"?

10        A.  I don't recall.

11        Q.  Did you conduct a Google search or any other

12   type of search relating to news articles?

13        A.  I may have.  I don't recall.

14        Q.  Did you review hard copy articles?

15        A.  I believe I did review some hard copy

16   articles.

17        Q.  What were the hard copy articles?

18        A.  Again, just to make it easier for you, I

19   don't recall any specific articles that I read about

20   DACA, but do I recall reading about DACA.

21        Q.  What are the historical documents that you

22   read?

23        A.  So I believe I read the 2012 Napolitano memo

24   creating DACA.

25        Q.  Did you take any notes when you were reading

```
                                               Page 68

 1    that memo?

 2         A.  No, that's not my practice.

 3         Q.  Did you discuss with anyone, while you were

 4    reading that memo, your thoughts on the memo?

 5         A.  I don't recall.

 6         Q.  Any other historical documents that you

 7    reviewed as part of the process?

 8         A.  Not that I recall.

 9         Q.  So if you could please turn to AR 00000252.

10    This is a memorandum dated September 5, 2017 from

11    Acting Secretary Elaine Duke.

12              MR. GARDNER:  It might be easier if you take

13    the binder clip off.  Just don't mix things up.

14    BY MS. CHUANG:

15         Q.  It's the last three pages.

16         A.  Okay.

17         Q.  Have you ever seen this memo before?

18         A.  Yes.

19         Q.  And what is this memo?

20         A.  This appears to be a memo from the acting

21    secretary, Elaine Duke, to me and others within

22    Homeland Security, rescinding DACA.

23         Q.  Do you need a moment to review the memo?

24         A.  Sure.  Thank you.

25              (The witness reviewed the document.)
```

1           THE WITNESS:  Okay.  I've read the document.

2    BY MS. CHUANG:

3        Q.  You are listed as a recipient of this memo;

4    is that correct?

5        A.  Correct.

6        Q.  I'm going refer to this as "the Duke memo"

7    for the purposes of this deposition.  Okay?

8        A.  Okay.

9        Q.  Why did you receive a copy of the Duke memo?

10       A.  Because I'm the acting head of the office of

11   policy.

12       Q.  And why as acting head of the office of

13   policy would you receive a memo like this?

14       A.  Because this was an important policy decision

15   made by the Acting Secretary.  It was important that I

16   be aware of it.

17       Q.  And you were a part of this important policy

18   decision?

19       A.  So I played a role in -- as I've stated

20   previously, in trying to ensure that the Acting

21   Secretary understood DACA and the decisions and

22   consequences of rescinding or not.

23       Q.  And how did you do that if you didn't do any

24   research or independent inquiries into DACA?  What was

25   the basis for your helping Acting Secretary

1    understand?

2           MR. GARDNER:  Objection.  Compound.

3    Objection.  Vague.  And objection in the sense it

4    called for deliberative process, which I would

5    instruct the witness not to answer questions on.  So

6    maybe if you can rephrase the question, he can take it

7    that way.

8    BY MS. CHUANG:

9        Q.  What was your role in helping Acting

10   Secretary understand DACA and the decision and

11   consequences of rescinding or not?

12       A.  Yeah.  Helping her to understand exactly what

13   DACA is, helping her understand why it was -- why and

14   how it was under challenge.  Helping her understand

15   what her options were, and helping her understand the

16   consequences of those actions.  But again, I was one

17   of many voices.

18       Q.  How did you help Acting Secretary Duke

19   understand what DACA is?

20           MR. GARDNER:  Objection.  Calls for the

21   revelation of information subject to deliberative

22   process privilege.

23           Instruct the witness not to answer.

24   BY MS. CHUANG:

25       Q.  Did you draw on your experience and knowledge

1    to help Secretary Duke understand what DACA is?

2         A.   Not really because I was not an expert on

3    DACA.  I was new to the department.  So I knew and

4    know what DACA is, but I wasn't an expert on it.  My

5    office didn't administer it.  My office are not the

6    lawyers.  But all that -- so I had my own learning

7    curve about DACA, which is why I read about it, but I

8    was part of that deliberative process.

9         Q.   So your learning curve, as you previously

10   stated, involved you reviewing newspaper articles and

11   historical documents from 2012; is that correct?

12        A.   Yes.

13        Q.   Is there anything else that you did as part

14   of your learning about DACA?

15        A.   So I listened closely to the lawyers and to

16   the experts from USCIS, who administer the program.  I

17   learned a lot from them.

18        Q.   Was this in a meeting?

19        A.   So I do recall one meeting.

20        Q.   In person or --

21        A.   In person.

22        Q.   -- over the telephone?

23        A.   In person.

24        Q.   What was the one meeting about?

25        A.   The one meeting --

```
                                          Page 72
 1            THE WITNESS:  This is the deliberative
 2    process but --
 3            MR. GARDNER:  You can answer the question
 4    what the meeting was about.
 5            MS. CHUANG:  I would ask that you please not
 6    confer with counsel during questioning.  Thank you.
 7            MR. GARDNER:  In fairness, Counsel, we are
 8    just deliberating about privilege, and we want to give
 9    you the information that we can properly give you.  So
10    I think he's looking to us to make sure that he's not
11    implicating privilege.
12            MS. CHUANG:  I understand that, and I think
13    that can be done with a simple objection regarding
14    privilege and/or an instruction not to answer.
15            MR. GARDNER:  And that's what we've been
16    doing all along.
17            THE WITNESS:  Sorry.  Could you repeat the
18    question?
19            MS. CHUANG:  Yes.
20       Q.  What was that one meeting about that you
21    referenced?
22       A.  So I recall one meeting with the Acting
23    Secretary and the cast of players that I mentioned
24    earlier where we did exactly that.  For the benefit of
25    the Acting Secretary, we walked through the threat to
```

                                                        Page 73

 1    DACA.  We walked through the program itself, how many

 2    people are affected by it --

 3              MR. GARDNER:  I'm going to object at this

 4    point and instruct the witness not to answer as

 5    implicating deliberative process privilege.

 6              At a high level you can explain what the

 7    subject matter of the meeting was, but the details of

 8    the meeting would be subject to deliberative process

 9    privilege.

10              And I'll instruct the witness not to answer.

11              THE WITNESS:  So the subject of that meeting

12    was to help inform the Acting Secretary's impending

13    decision about the future of DACA.

14    BY MS. CHUANG:

15         Q.  When did this meeting take place?

16         A.  I believe it took place in mid to late

17    August.

18         Q.  And you mentioned the "cast of players" that

19    you had mentioned earlier.  Can you identify them

20    specifically?

21         A.  So I can identify some of them specifically.

22    So the acting secretary was certainly there.  I was

23    certainly there.  Representatives from the office of

24    the general counsel were there.  I believe one of them

25    was Dimple Shah.  And I believe the chief of staff was

1    there.  I believe Gene Hamilton was there, and USCIS

2    was certainly represented.  I don't remember

3    specifically if it was Mr. McCament or not.

4         Q.  Was Chad Wolf there?

5         A.  I believe he was there.  Although I don't

6    recollect specifically whether or not he was.

7         Q.  Was Joseph Maher there?

8         A.  So again, representatives of the general

9    counsel were there.  I do remember Dimple Shah being

10   there.  I don't recall if Mr. Maher was there or not.

11        Q.  Was there anyone else besides those persons

12   you listed there?

13        A.  There may have been, but I don't recall.

14        Q.  How long did this meeting last?

15        A.  My guess is it probably lasted about an hour.

16        Q.  Were any documents reviewed during this

17   meeting?

18        A.  I don't recall specifically, but there may

19   have been documents which gave numbers.  I know the

20   Acting Secretary was interested in how many people are

21   affected and so forth.

22        Q.  What specific numbers do those documents

23   give?

24             MR. GARDNER:  Objection.  To the extent it

25   calls for information subject to deliberative process

1   privilege, instruct the witness not to answer.

2   BY MS. CHUANG:

3        Q.  Any other documents that were reviewed?

4        A.  Not that I recall.

5        Q.  Was there anyone else that was not from the

6   Department of Homeland Security present at the

7   meeting?

8        A.  I don't believe so.

9        Q.  Did you take any notes during the meeting?

10       A.  Not that I recall.

11       Q.  Do you know if any other attendee took notes

12   during the meeting?

13       A.  I don't know.

14       Q.  Besides the document that gave numbers, you

15   stated that there were no other documents reviewed

16   during that meeting; is that correct?

17       A.  No.  I stated that I don't recall any other

18   documents being reviewed at that meeting.

19       Q.  Were any documents created as a result of

20   that meeting?

21       A.  Not that I'm aware of.

22       Q.  So you stated that one of the issues was the

23   threat to DACA.  What is your understanding of the

24   threat to DACA?

25       A.  So a number states -- I believe it was nine,

Page 76

1     had sued to put an end to DACA saying that it was

2     unconstitutional.

3          Q.  So what was the particular threat with

4     respect to that lawsuit?

5          A.  So if that lawsuit was successful, DACA would

6     come to an end.

7          Q.  Do you know what that lawsuit is?

8          A.  Just in general terms, no, I don't know the

9     specifics of the lawsuit.

10         Q.  So you're not familiar with that lawsuit?

11         A.  I'm not familiar with the specifics of that

12    lawsuit, no.

13         Q.  Do you know which member states were part of

14    that lawsuit?

15         A.  I believe one was Texas.  I don't recall what

16    the others were.

17         Q.  So what was discussed with respect to the

18    threat to DACA related to that lawsuit?

19              MR. GARDNER:  Objection.  Calls for

20    disclosure of information subject to deliberative

21    process privilege.

22              I instruct the witness not to answer.

23    BY MS. CHUANG:

24         Q.  Were there any other threats to DACA

25    discussed?

1          MR. GARDNER:  Objection.  Calls for

2     disclosure of information subject to deliberative

3     process privilege.

4          I instruct the witness not to answer.

5          MS. CHUANG:  My question was the existence of

6     any other threats to DACA that was discussed, not the

7     substance.

8          MR. GARDNER:  Fair enough.

9          THE WITNESS:  Not that I'm aware of.

10    BY MS. CHUANG:

11         Q.  Do you know if there are any other threats to

12    DACA besides the litigation you just discussed?

13         A.  I don't.

14         Q.  You had also mentioned that one of the issues

15    discussed was the benefits to DACA; is that correct?

16         MR. GARDNER:  You can answer.

17         THE WITNESS:  By "benefits," do you mean

18    status conferred upon DACA recipients?

19    BY MS. CHUANG:

20         Q.  I was using your language.  You had stated

21    that you had discussed the threat to DACA and the

22    benefits of DACA during the meeting.

23         A.  I'm not sure exactly what I was referring to.

24         Q.  What is your understanding of what the

25    benefits of DACA are?

1          A.   Well, the benefits of DACA are benefits to

2     the beneficiaries of it, which allow them to stay in

3     the United States, not under legal status but with

4     deferred action.  That is that removal operations

5     would be deferred while they enjoyed the benefits of

6     DACA.

7          Q.   Anything else?

8          A.   (Nods head.)

9          Q.   So is that the particular benefit of DACA

10    that was discussed during the meeting?

11               MR. GARDNER:  Objection.  Calls for

12    information subject to deliberative process privilege.

13               I instruct the witness not to answer.

14    BY MS. CHUANG:

15          Q.   You had also mentioned one of the issues that

16    was discussed during that meeting was how many people

17    were affected by it; is that correct?

18          A.   Yes.

19          Q.   How many people are affected by the decision

20    relating to DACA?

21          A.   I believe the number is around 700,000.

22          Q.   What was discussed relating to how many

23    people were affected by it during this meeting?

24               MR. GARDNER:  Objection.  Calls for

25    disclosure of information subject to deliberative

```
                                            Page 79
 1    process privilege.
 2              I instruct the witness not to answer.
 3    BY MS. CHUANG:
 4        Q.  You had also mentioned that generally, it was
 5    to help provide information to Acting Secretary Duke
 6    regarding the impending decision relating to DACA; is
 7    that correct?
 8        A.  Correct.
 9        Q.  What other information was provided to Acting
10    Secretary Duke during this meeting?
11              MR. GARDNER:  Objection.  Calls for
12    information subject to deliberative process privilege.
13    It also calls for information subject to the
14    attorney-client privilege.
15              I instruct the witness not to answer.
16    BY MS. CHUANG:
17        Q.  Did you direct anyone on your staff to help
18    you out -- to help you get up to speed on DACA?
19        A.  I'm sure I asked people questions about DACA,
20    especially about the historic nature.
21        Q.  Who did you ask?
22        A.  I don't recall at this time, but we have a
23    staff of 150 people in the policy shop.
24        Q.  Do you recall if you asked all 150 people in
25    the policy staff?
```

1          A.   No, I wouldn't have done that.

2          Q.   Did you ask your direct reports?

3          A.   I may have.  I mean some of them wouldn't

4    have anything to do with DACA.

5          Q.   Do you recall what you asked your staff to do

6    with respect to helping you get up to speed on DACA?

7          A.   I don't because I was fairly up to speed on

8    it over time.

9          Q.   Do you recall when you asked your staff to

10   help you get up to speed on DACA?

11         A.   This probably would have been in August.

12   Because I just joined the department in mid-July, I

13   was spending a lot of time getting up to speed on a

14   whole wide range of issues ranging from cyber security

15   to aviation security to everything in between.  And

16   so, you know, I would have come to DACA in due time

17   after arriving at the department.

18         Q.   Did you ask your staff to conduct any

19   research into DACA?

20         A.   Not that I recall.

21         Q.   Did you ask your staff to create any memos

22   for you relating to DACA?

23         A.   Not that I recall.

24         Q.   Did you ask your staff to provide any other

25   documentation relating to DACA?

```
                                                  Page 81
 1            A.   Not that I recall.
 2            Q.   When you were appointed in July, were you
 3       aware of the potential for the rescission of DACA?
 4            A.   I believe I had read about the lawsuit.
 5            Q.   Where did you read about the lawsuit?
 6            A.   In the open source media.
 7            Q.   What do you mean when you mean "open source
 8       media"?
 9            A.   Newspapers.
10            Q.   And the lawsuit that you're talking about, is
11       that the one involving the member states, including
12       Texas?
13            A.   Yes.
14            Q.   What specifically did you read about that?
15            A.   Again, I read open source newspaper articles
16       about the lawsuit.
17            Q.   Did you read anything else relating to the
18       potential for the rescission for DACA?
19            A.   Not that I recall.
20                 MS. CHUANG:  I'd like to mark this as
21       Exhibit 4.
22                 (Deposition Exhibit 4 was marked for
23                 identification.)
24       BY MS. CHUANG:
25            Q.   This is a newspaper article from the
```

```
                                        Page 82
 1     Washington Post dated August 24, 2017, entitled "DHS
 2     Reviewing Status of Obama's Deferred Action Program
 3     for Illegal Immigrants."
 4             Please take a moment to review.
 5             (The witness reviewed Exhibit 4.)
 6             THE WITNESS:  Okay.
 7     BY MS. CHUANG:
 8         Q.  What does this article state?
 9         A.  This article discusses a meeting which took
10     place at DHS, the meeting that I described to you
11     earlier.
12         Q.  So this particular meeting described in this
13     article is the August meeting that you had previously
14     described to me; is that correct?
15         A.  It appears to be, yes.
16         Q.  The second paragraph states that "Acting DHS
17     Secretary Elaine Duke and Thomas Homan, the acting
18     head of immigration customs enforcement, were among
19     those who gathered Monday to deliberate over the
20     future of deferred action for childhood arrivals,
21     DACA, according to an agency official with knowledge
22     of the meeting."  Is that correct?
23         A.  That is what it says, yes.
24         Q.  And so would you -- based on the -- this
25     article, the date of the meeting, would it be on or
```

                                                        Page 83

1    around August 21?

2           A.  It would appear to be, yes.

3           Q.  Did Thomas Homan attend the meeting that you

4    had described previously in August?

5           A.  So now that I see his name in print, I recall

6    that he was at the meeting, yes.

7           Q.  This also mentions that's Chad Wolf and

8    Dimple Shah attended the meeting in addition to

9    yourself; is that correct?

10          A.  That is what it says, yes.

11          Q.  So if you'd turn to the second page of the

12   article, the fourth paragraph down states, "In the

13   wake of the legal activity, the DHS officials gathered

14   to 'review the status of DACA and determine next

15   steps' for the program."  Is that what it states?

16          A.  That is what it states.

17          Q.  What did the review of the status of DACA

18   entail?

19               MR. GARDNER:  Objection.  Calls for

20   disclosure of information subject to deliberative

21   process privilege.

22               Instruct the witness not to answer.

23   BY MS. CHUANG:

24          Q.  What was the discussion of the next steps?

25               MR. GARDNER:  Objection.  Calls for

```
                                           Page 84
1    information subject to the deliberative process

2    privilege.

3              I instruct the witness not to answer.

4    BY MS. CHUANG:

5        Q.  Did the attendees of this meeting determine

6    next steps in this meeting?

7              MR. GARDNER:  Objection.  Calls for

8    information subject to the deliberative process

9    privilege.

10             You can answer that question with a "yes" or

11   "no."  Otherwise, I instruct you not to answer.

12             THE WITNESS:  Could you repeat the question?

13   BY MS. CHUANG:

14       Q.  Did the attendees of this meeting determine

15   next steps in this meeting?

16       A.  If by "next steps" you mean a final decision

17   on DACA, that's not my recollection, no.

18       Q.  What is your understanding of what the next

19   steps were?

20             MR. GARDNER:  Objection.  Calls for

21   information subject to deliberative process privilege.

22             I instruct the witness not to answer.

23   BY MS. CHUANG:

24       Q.  What did you specifically discuss in this

25   meeting?
```

```
                                            Page 85
 1              MR. GARDNER:  Objection.  Calls for
 2    information subject to deliberative process privilege.
 3              I instruct the witness not to answer.
 4              It also calls for disclosure of
 5    attorney-client protected information.
 6              And I so instruct.
 7    BY MS. CHUANG:
 8        Q.  What did Acting Secretary Duke discuss in
 9    this meeting?
10              MR. GARDNER:  Objection.  Calls for
11    information subject to deliberative process privilege.
12              I instruct the witness not to answer.
13    BY MS. CHUANG:
14        Q.  What did Thomas Homan discuss in this
15    meeting?
16              MR. GARDNER:  Objection.  Calls for
17    information subject to the deliberative process
18    privilege.
19              I instruct the witness not to answer.
20    BY MS. CHUANG:
21        Q.  What did Chad Wolf discuss in this meeting?
22              MR. GARDNER:  Objection.  Calls for
23    information subject to deliberative process privilege.
24              I instruct the witness not to answer.
25    BY MS. CHUANG:
```

Page 86

1           Q.   What did Dimple Shah discuss in this meeting?

2                MR. GARDNER:   Objection.   Calls for

3      disclosure of information subject to deliberative

4      process privilege, as well as the attorney-client

5      privilege.

6                I instruct the witness not to answer.

7      BY MS. CHUANG:

8           Q.   Now that you have reviewed this article, does

9      it refresh your recollection as to the specific

10     attendees at the meeting?

11          A.   It did.   So I hadn't recalled that Tom Homan

12     was there, and now I do.

13          Q.   Beside the individuals that are noted in this

14     article, did any other persons attend this meeting?

15          A.   So I believe I've already answered that

16     question, haven't I?

17          Q.   No.

18          A.   Okay.   So again, the Acting Secretary was

19     there.   I was there.   Dimple Shah was there.   Now I

20     recall that Tom Homan was there.   There were

21     representatives of USCIS there, and there were -- I'm

22     almost certain -- I am certain Mr. Hamilton was there.

23          Q.   Mr. Hamilton isn't noted in this article,

24     though; correct?

25          A.   I don't see his name in the article.

Page 87

1          Q.   And representatives from USCIS are not noted

2     in this article; is that correct?

3          A.   That appears to be correct.

4          Q.   So is it your understanding that other

5     persons besides those individuals noted in this

6     article attended the meeting?

7          A.   Yes.

8          Q.   And those were Gene Hamilton and

9     representatives from USCIS?

10         A.   Yes.

11         Q.   And who was the representative from USCIS?

12         A.   So again, I don't recall specifically.  James

13    McCament was the acting director at the time.  So it

14    may have been him, or he may have been represented by

15    someone else.  I just don't recall.

16         Q.   What did Gene Hamilton discuss in this

17    meeting?

18              MR. GARDNER:  Objection.  Calls for

19    information subject to the deliberative process

20    privilege, as well as attorney-client privilege.

21              I instruct the witness not to answer.

22    BY MS. CHUANG:

23         Q.   What did the representatives from USCIS

24    discuss at this meeting?

25              MR. GARDNER:  Objection.  Calls for

Page 88

```
 1    information subject to nondisclosure by the
 2    deliberative process privilege as well as
 3    attorney-client privilege.
 4              I instruct the witness not to answer.
 5    BY MS. CHUANG:
 6         Q.  Were any other individuals outside of DHS in
 7    attendance at this meeting?
 8         A.  I'm sorry.  People from outside of DHS?
 9         Q.  Yes.
10         A.  I don't believe so, no.
11         Q.  Besides this August 21 meeting, did you have
12    any other meetings involving DACA?
13         A.  So there may have been.  I don't recall
14    specific meetings related to DACA, but there may have
15    been.
16         Q.  Let's start with July.  Do you recall any
17    specific meetings in July relating to DACA?
18         A.  I don't.
19         Q.  In August, besides this August 21 meeting, do
20    you recall any specific meetings relating to DACA?
21         A.  I don't.
22         Q.  In September, do you recall any specific
23    meetings relating to DACA?
24         A.  I don't.
25         Q.  Did you have any communications with any
```

1   persons relating to DACA outside of this meeting?

2        A.   Yes.

3        Q.   What were they?

4        A.   So again, I don't recall any specific

5   meetings, but there may have been, and there were

6   almost certainly conversations and there are almost

7   certainly E-mails.

8        Q.   And when I ask about communications, I mean

9   in person or electronically or via the telephone.  Do

10   you understand that?

11        A.   I do.

12        Q.   Okay.  In July, did you have any

13   communications with any members of DHS relating to

14   DACA?

15        A.   Again, I simply don't recall specific

16   conversations or meetings, but there certainly may

17   have been.

18        Q.   Did you have any discussions with John Kelly,

19   before he left for The White House, about DACA?

20        A.   I don't recall any.

21        Q.   Did you have any conversations with Acting

22   Secretary Duke in July about DACA?

23        A.   I don't recall any.  She was the deputy at

24   that time.

25        Q.   Besides the meeting that is referenced in

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 954 of 1603 PageID #: 4899

1    this article, did you have any communications with

2    Acting Secretary Duke in the month of August relating

3    to DACA?

4         A.   Again, I don't recall any specific

5    communications with her, but there may have been.

6         Q.   Do you recall any dates in which you may have

7    had these specific communications?

8         A.   I don't.

9         Q.   Did you have any changes with Chad Wolf in

10   the month of July relating to DACA?

11        A.   Not that I recall.

12        Q.   Prior to the rescission of DACA on

13   September 5, did you have any conversations in the

14   month of September with Acting Secretary Duke?

15        A.   Not that I recall.

16        Q.   Did you have any conversations with her about

17   the announcement of the rescission?

18        A.   No, I don't recall a specific conversation

19   about that.

20        Q.   Did you have any conversations with Chad Wolf

21   in the months of August or September relating to DACA?

22        A.   Not that I recall.

23        Q.   Did you have any conversations with Julie

24   Kirchner relating to DACA?

25        A.   No.

                                                    Page 91

1           Q.   Donald Neufeld?

2           A.   No.

3           Q.   James McCament?

4           A.   Possibly.

5           Q.   When?

6           A.   Well, again, James was the acting director of

7      USCIS, which is the component of Homeland Security

8      which manages the DACA program.  So it's very possible

9      I had conversations with him, but I don't recall a

10     specific conversation.

11          Q.   Did you ask James about information about how

12     USCIS administers DACA?

13          A.   So again, I don't recall any specific

14     conversations with James McCament, but I may well have

15     had conversations with him.  That would have been

16     relevant.

17          Q.   Did you have any conversations with Philip

18     Miller relating to DACA?

19          A.   I don't know who Philip Miller is.

20          Q.   Elizabeth Neumann?

21          A.   I don't recall any conversations with

22     Elizabeth Neumann.

23          Q.   Michael Dougherty?

24          A.   I may have had a conversation with Michael

25     Dougherty.

1        Q.   What was the conversation about?

2        A.   Again, I don't recall a specific

3   conversation.  I'm just simply saying I may have.

4        Q.   Frank Wuco?

5        A.   No.

6        Q.   Claire Grady?

7        A.   I don't recall any specific conversations

8   with Claire Grady.

9        Q.   What about Kevin McLeean (sic)?

10       A.   McAleenan.  I don't recall specific

11   conversation with Kevin McAleenan.

12       Q.   John Mahr?

13       A.   I'm not sure who John Mahr is.

14       Q.   I believe he's the general counsel we were

15   discussing before.  I don't know if I'm pronouncing

16   his last name correctly.

17       A.   Joe.  Joseph Maher, yes.

18       Q.   Sorry.

19       A.   I don't recall a specific conversation, but

20   as the general counsel of the agency, obviously he

21   played an important role in conversations.

22       Q.   Was he in the August 21 meeting?

23       A.   Again, I don't recall if he was there

24   specifically but members of his -- at least one member

25   of his team, Dimple Shah was.

1        Q.   Nancy Clark, did you have any conversations

2    with her about DACA?

3        A.   I don't know who she is.

4        Q.   Jonathan Hoffman?

5        A.   I don't recall specific conversation with

6    Jonathan.

7        Q.   Did you have any conversations with President

8    Trump relating to DACA?

9        A.   I did not.

10        Q.   Do you know if anyone at DHS had

11    conversations with President Trump about DACA?

12            MR. GARDNER:  Objection.  Calls for

13    speculation.

14            THE WITNESS:  I don't.

15    BY MS. CHUANG:

16        Q.   Did you have any conversations with Vice

17    President Pence relating to DACA?

18        A.   I did not.

19        Q.   Do you know if anyone at DHS had

20    conversations with Vice President Pence relating to

21    DACA?

22            MR. GARDNER:  Objection.  Calls for

23    speculation.

24            THE WITNESS:  I do not.

25    BY MS. CHUANG:

Page 94

1          Q.  Did you have any conversations with John

2     Kelly, while he was at The White House, about DACA?

3          A.  I did not.

4          Q.  Do you know if anyone at DHS had

5     conversations with him about DACA?

6              MR. GARDNER:  Objection.  Calls for

7     speculation.

8              THE WITNESS:  I do not.

9     BY MS. CHUANG:

10         Q.  Do you know if Acting Secretary Duke had

11    conversations with John Kelly about DACA?

12             MR. GARDNER:  Objection.  Calls for

13    speculation.

14             THE WITNESS:  I do not.

15    BY MS. CHUANG:

16         Q.  Did you have any conversations with Kirstjen

17    Nielsen about DACA?

18         A.  Not that I recall, no.

19         Q.  Do you know if anyone at DHS had

20    conversations with Ms. Nielsen --

21             MR. GARDNER:  Objection.  Calls for

22    speculation.

23    BY MS. CHUANG:

24         Q.  -- about DACA?

25             MR. GARDNER:  Sorry.

Page 95

1                 MS. CHUANG:  That's fine.

2                 THE WITNESS:  No, I do not.

3     BY MS. CHUANG:

4         Q.  Did you have any conversations with Thomas

5     Bossert about DACA?

6         A.  I did not.

7         Q.  Do you know if anyone at DHS had

8     conversations about DACA with Thomas Bossert?

9                 MR. GARDNER:  Objection.  Calls for

10    speculation.

11                THE WITNESS:  I do not.

12    BY MS. CHUANG:

13        Q.  Did you have any communications with Jared

14    Kushner about DACA?

15        A.  I did not.

16        Q.  Do you know if anyone at DHS had any

17    conversations about DACA with Jared Kushner?

18                MR. GARDNER:  Objection.  Calls for

19    speculation.

20                THE WITNESS:  I don't.

21    BY MS. CHUANG:

22        Q.  Did you have any conversations with Stephen

23    Miller about DACA?

24        A.  I did not.

25        Q.  Do you know if anyone at DHS had

1    conversations about DACA with Stephen Miller?

2             MR. GARDNER:  Objection.  Calls for

3    speculation.

4             THE WITNESS:  I do not.

5    BY MS. CHUANG:

6        Q.   Do you know if Acting Secretary Duke had any

7    conversations with Stephen Miller about DACA?

8             MR. GARDNER:  Same objection.

9             THE WITNESS:  I do not.

10   BY MS. CHUANG:

11       Q.  Did you have any communications with Jon

12   Feere about DACA?

13       A.  I don't know who that is.

14       Q.  Do you know if anyone at DHS had

15   conversations with a person named Jon Feere?

16            MR. GARDNER:  Objection.  Calls for

17   speculation.

18            THE WITNESS:  Not that I'm aware of.

19   BY MS. CHUANG:

20       Q.  Did you have communications with John

21   Mashburn about DACA?

22       A.  I don't know who that is.

23       Q.  Do you know if anyone at DHS had

24   conversations with John Mashburn?

25            MR. GARDNER:  Same objection.

1    BY MS. CHUANG:

2         Q.  Or a person named John Mashburn.

3         A.  Not that I'm aware of.

4    BY MS. CHUANG:

5         Q.  Did you have any conversations with Matthew

6    Flynn about DACA?

7         A.  I don't know who that is.

8         Q.  Do you know if DHS had any communications

9    with Matthew Flynn or a person named Matthew Flynn

10   about DACA?

11            MR. GARDNER:  Same objection.

12            THE WITNESS:  Not that I'm aware of.

13   BY MS. CHUANG:

14        Q.  Did you have any conversations with Anthony

15   Paranzino about DACA?

16        A.  I don't know who that is.

17        Q.  Do you know if DHS had any conversations with

18   Anthony Paranzino or a person named Anthony Paranzino?

19            MR. GARDNER:  Same objection.

20            THE WITNESS:  Not that I'm aware of.

21   BY MS. CHUANG:

22        Q.  Did you have any conversations with Ivanka

23   Trump about DACA?

24        A.  I did not.

25        Q.  Do you know if anyone at DHS had

Page 98

1    conversations with Ivanka Trump about DACA?

2              MR. GARDNER:  Same objection.

3              THE WITNESS:  Not that I'm aware of.

4    BY MS. CHUANG:

5         Q.  I believe you had previously mentioned that

6    you did not have any conversations with Jeff Sessions

7    about DACA; is that correct?

8         A.  That's correct.

9         Q.  And in three instances that you've met with

10   him, it was a hello good-bye situation?

11        A.  No.  So there was one instance where I was at

12   a meeting that he was present at, and I did not speak

13   to him or meet with him at that meeting.  That was the

14   drug reduction meeting.  And then I was present at the

15   U.S.-China Law Enforcement Dialogue that he cohosted

16   with Acting Secretary Duke, and I did have some

17   interaction with him there, but we did not discuss

18   DACA.

19        Q.  Is that the extent of your contact with Jeff

20   Sessions while you've been at DHS?

21        A.  It is.

22        Q.  Did you have conversations with anyone else

23   at DOJ relating to DACA?

24        A.  Not that I recall.

25        Q.  Do you know if anyone at DHS had any

1    conversations with anyone at DOJ relating to DACA?

2            MR. GARDNER:  Objection.  Calls for

3    speculation.

4            THE WITNESS:  Not that I'm aware of.

5    BY MS. CHUANG:

6        Q.  Do you know if Secretary Duke had

7    conversations with anyone at DOJ relating to DACA?

8            MR. GARDNER:  Same objection.

9            THE WITNESS:  Not that I'm aware of.

10   BY MS. CHUANG:

11       Q.  Did you have discussions with anyone at the

12   state department relating to DACA?

13           MR. GARDNER:  Objection.  Vague as to time

14   frame.

15   BY MS. CHUANG:

16       Q.  During your tenure at Homeland Security.

17       A.  Yes, I believe I did.

18       Q.  What were those conversations?

19       A.  So I believe I had a conversation with our

20   ambassador in El Salvador.  I believe.  I may be

21   conflating various issues that we were dealing with

22   El Salvador on, but I believe.  And I believe I also

23   had conversations with John Creamer of the western

24   hemisphere bureau at the Department of State.

25       Q.  Who was the ambassador to El Salvador?

Page 100

1        A.   Her name is Jean Manes, M-a-n-e-s.

2        Q.   When was this conversation?

3        A.   So again, I'm worried that I'm conflating

4   various conversations on various topics, but I want to

5   be as transparent as I can.

6             So I do recall speaking with her in August.

7   I'm just not absolutely certain it was DACA related.

8        Q.   What do you recall about the conversation in

9   August with Jean Manes?

10       A.   I recall talking about other things with her,

11  but we may have spoken about DACA as well.

12       Q.   What were the other things besides DACA that

13  you spoke about?

14       A.   We talked about the termination of a refugee

15  program called the Central American Migrants program,

16  CAM.  And we also had a discussion about temporary

17  protected status.

18       Q.   What was specifically discussed about the

19  termination of the refugee camp?

20       A.   It was a discussion of the foreign policy

21  impacting El Salvador and the termination of that

22  program.

23       Q.   What did you specifically discuss with

24  respect to that?

25       A.   It was more that she expressed her concerns

1    about how to handle the announcement of that

2    termination.

3          Q.  What were her specific concerns on how to

4    handle the announcement of that termination?

5          A.  It was just two professional diplomats

6    discussing how one would handle that.

7          Q.  What was your response to her specific

8    concerns about the termination?

9          A.  I was sympathetic to the position she was in

10   where she would have to deliver bad news to the

11   Salvadoran government.

12         Q.  You also mentioned that you discussed TPS, or

13   temporary protected status?

14         A.  Correct.

15         Q.  What was discussed with respect to temporary

16   protected status?

17         A.  Just the discussion of the fact that there

18   are hundreds of thousands of Salvadorans currently in

19   the United States on temporary protected status, and

20   what potential impact there would be to extension or

21   termination of that program.

22         Q.  And what was discussed with respect to the

23   impacts?

24         A.  Again, just a discussion between two

25   professionals of the potential consequences either

1    way.

2         Q.  Was Jean Manes in favor of terminating the

3    program?

4         A.  I don't recall that we got to that point

5    where we were discussing my view or her view.  It was

6    more the fact of an awareness that a decision was

7    pending and is still pending on termination or

8    extension of that program.

9         Q.  What did you and Jean discuss regarding DACA?

10        A.  Again, I'm just trying to be very transparent

11   here.  I'm not certain that we discussed DACA.  I just

12   wanted to flag it in case I did.  So I don't remember

13   any specifics regarding DACA.

14        Q.  Where did this meeting take place?

15        A.  It was in a telephone conversation.

16        Q.  Were there any other communications with Jean

17   Manes about DACA?

18        A.  No, not that I recall.

19        Q.  You also mentioned John Creamer as another

20   Department of State employee with whom you've had

21   discussions regarding DACA; is that correct?

22        A.  Yes.

23        Q.  What was the discussion relating to DACA?

24        A.  Again, a telephone conversation, and I think

25   it was, if I recall correctly, interest on his part in

1    whether or not the program was going to be terminated.

2         Q.   Did he initiate this telephone conversation?

3         A.   I don't recall.

4         Q.   When did this telephone conversation take

5    place?

6         A.   So he's someone that I speak to frequently

7    about a wide range of issues.  So I don't remember

8    specifically when we would have discussed DACA, but my

9    guess is it would have been in August.

10        Q.   And what was his interest in whether DACA

11   would be rescinded or not?

12        A.   So his interest was in foreign policy

13   implications of a decision on DACA.

14        Q.   And what were the foreign policy implications

15   that were discussed?

16        A.   Again, two professional diplomats talking

17   about what the possibilities are and what the foreign

18   policy implications might be, a conversation.

19        Q.   What were the specific foreign policy

20   implications that were discussed?

21        A.   You know, I don't have a great recall of the

22   conversation, but I assume we talked about the

23   countries that would be most affected by a termination

24   of DACA.

25        Q.   What are the countries that would be most

1    affected by a termination of DACA?

2        A.  I think the country most affected by the

3    termination of DACA is Mexico.

4        Q.  Do you recall your conversations surrounding

5    Mexico?

6        A.  Again, just two professional diplomats

7    discussing what the implications might be.

8        Q.  Was John Creamer in favor of terminating

9    DACA?

10       A.  I don't recall him expressing an opinion.

11       Q.  Any other issues discussed besides the

12   foreign policy implications relating to termination of

13   DACA?

14       A.  Again, he's someone I speak to on a weekly

15   basis, and we talk about a whole range of foreign

16   policy issues.  So I don't have a specific

17   recollection of what we discussed in that

18   conversation.

19       Q.  What were your specific responses relating to

20   foreign policy implications relating to DACA?

21       A.  You know, I don't recall what my specific

22   opinions or recommendations were.  A recognition that

23   a termination of DACA would have an impact on Mexico

24   especially.

25       Q.  And in your understanding, how would it have

1    an impact on Mexico especially?

2        A.  So this is all -- we're entering the realm of

3    speculation; right?

4            THE WITNESS:  Is that okay?

5            MR. GARDNER:  You can answer her question.

6            THE WITNESS:  So speculating if DACA were

7    terminated, and if a large number of Mexicans were

8    removed from the United States back to Mexico, that

9    would obviously have an impact on Mexico's economy and

10   perhaps on our foreign policy relations.

11   BY MS. CHUANG:

12       Q.  Would it have a negative impact on Mexico's

13   economy?

14           MR. GARDNER:  Objection.  Calls for

15   speculation.

16           THE WITNESS:  I don't know.

17   BY MS. CHUANG:

18       Q.  Would it have a negative impact on foreign

19   policy relations?

20           MR. GARDNER:  Same objection.

21           THE WITNESS:  (No audible response.)

22   BY MS. CHUANG:

23       Q.  What were the specific opinions that you

24   expressed in this conversation with John Creamer?

25       A.  Again, I don't recall.  I wouldn't ascribe

1    too much to a phone call between two friends and

2    fellow diplomats who are discussing the potential

3    impact of a potential decision.

4         Q.  Do you recall anything else about this

5    conversation with John Creamer?

6         A.  I don't.

7         Q.  Did you have any other communications with

8    anyone from the state department relating to DACA

9    during your tenure at Homeland Security?

10        A.  Not that I recall.

11        Q.  What about any other federal officials aside

12   from the ones that I've already stated?

13        A.  Right.  Not that I recall.

14        Q.  Did you have any conversations with any

15   members of Congress relating to DACA?

16        A.  No.

17        Q.  Did you have any conversations with any state

18   or local government officials relating to DACA?

19        A.  No.

20        Q.  Did you have any conversations with Ken

21   Paxton?

22        A.  I don't know who that is.

23        Q.  Did you have any conversations with Steve

24   Marshall?

25        A.  I don't know who that is.

```
                                            Page 107

 1          Q.  Leslie Rutledge?

 2          A.  I don't know who that is.

 3          Q.  Lawrence Wasden?

 4          A.  Again, I don't know who that is.

 5          Q.  CL Butch Otter?

 6          A.  I don't know who that is.

 7          Q.  Derek Schmidt?

 8          A.  I don't know who that is.

 9          Q.  Kris Kobach?

10          A.  The name sounds familiar, but I'm not

11     precisely sure who that is.

12          Q.  Jeff Landry?

13          A.  I don't know.

14          Q.  Doug Peterson?

15          A.  I don't know who that is.

16          Q.  Alan Wilson?

17          A.  I don't know who that is.

18          Q.  Herbert Slatery, III?

19          A.  I don't know who that is.

20          Q.  Patrick Morrisey?

21          A.  I don't know who that is.

22          Q.  Do you know if anyone at DHS had any contact

23     with any other federal officials besides the ones from

24     DOJ and The White House that I have spoken about?

25               MR. GARDNER:  Objection.  Calls for
```

1    speculation.

2           THE WITNESS:  I don't know.

3    BY MS. CHUANG:

4       Q.  Do you know if anyone from DHS has had

5    communications of any kind with any members of

6    Congress relating to DACA?

7           MR. GARDNER:  Same objection.

8           THE WITNESS:  I don't know.

9    BY MS. CHUANG:

10      Q.  Do you know if anyone from DHS has had

11   contact with any state or local government officials

12   relating to DACA?

13      A.  I don't know.

14      Q.  Have you had any communications with the

15   Center for Immigration Studies relating to DACA?

16      A.  No.

17      Q.  Do you know if anyone at DHS has?

18          MR. GARDNER:  Objection.  Calls for

19   speculation.

20          THE WITNESS:  I don't.

21   BY MS. CHUANG:

22      Q.  Do you know what the Center for Immigration

23   Studies is?

24      A.  A think tank that studies immigration issues.

25      Q.  Did you have any communications with any

1    other members of the public relating to DACA during

2    your tenure at Homeland Security?

3         A.   No.

4         Q.   Were you consulted about the drafting of the

5    Duke memo?

6         A.   No, not specifically.

7         Q.   Were you involved in any drafting of the Duke

8    memo?

9         A.   No.

10        Q.   Prior to receiving the memo, did you see any

11   drafts of the Duke memo?

12        A.   Not that I recall.

13        Q.   Are you aware of any prior drafts of the Duke

14   memo?

15        A.   I'm not.

16        Q.   Do you know who created the first draft of

17   the memo?

18        A.   I don't.  I would assume --

19             MR. GARDNER:  Objection.  Calls for

20   speculation.

21             THE WITNESS:  Sorry.

22   BY MS. CHUANG:

23        Q.   Go ahead.  You can finish your sentence.  You

24   had said that you assumed it was the office --

25        A.   Office of general counsel.

Page 110

1        Q.  And why would you assume that?

2        A.  Because it seems to be a document based on

3    legal grounds.

4        Q.  Do you have any other basis for that

5    assumption?

6        A.  I don't.

7        Q.  So do you know whether the office of general

8    counsel created the first draft of the memo?

9        A.  I don't.

10        Q.  Do you know when a first draft of the memo

11    was created?

12        A.  I don't.

13        Q.  Does the office of general counsel typically

14    get involved in memos relating to policy decisions?

15            MR. GARDNER:  Objection.  Calls for

16    speculation.  Lack of foundation.

17            THE WITNESS:  I would say they almost always

18    get involved in the drafting of documents related to

19    policy decisions because of the legal implications.

20    BY MS. CHUANG:

21        Q.  Do you know if anyone else was involved in

22    the drafting of the Duke memo?

23        A.  I don't.

24        Q.  Do you know whether Acting Secretary Duke

25    drafted a draft of the memo?

1          A.   I don't.

2          Q.   Were you consulted in any way during your

3     tenure relating to the drafting of the memo?

4          A.   You know, I don't recall.

5          Q.   Were you informed by anyone at DHS, or

6     anywhere else, that this memo was being drafted?

7          A.   Yes.  I was aware that a memo was being

8     drafted.

9          Q.   How were you aware?

10              MR. GARDNER:  Objection to the extent it

11     calls for disclosure of information subject to

12     deliberative process privilege.  If you want, Counsel,

13     we can take a break.  I can confer with the witness to

14     see if the information he has would be subject to the

15     privilege, or we can do that at the next break and

16     move on.

17              MS. CHUANG:  We can do that at the next

18     break.  So are you instructing him not to answer this

19     particular question?

20              MR. GARDNER:  Until I get a sense of what

21     information he has and whether it would be subject to

22     privilege.  But I'm happy to handle it whichever way

23     you want to.

24              MS. CHUANG:  I'll try to ask some more

25     specific questions relating to this question right

1    now.  Otherwise, we can get back to this particular

2    question.

3              MR. GARDNER:  That's fine.

4    BY MS. CHUANG:

5         Q.  Is your understanding of the fact that a memo

6    was being drafted, did it come from within DHS?

7         A.  Yes.

8         Q.  Did it come from Acting Secretary Duke?

9         A.  Again, I don't recall how I learned that a

10   memo was being drafted, but I mean I knew that a

11   decision was going to be rendered, and there was,

12   therefore, going to be a memo that would render that

13   decision.

14        Q.  When did you learn about the fact that a memo

15   was being drafted?

16        A.  I don't recall specifically, but it would

17   have been late August, early September.

18        Q.  Do you know when the decision was made to

19   rescind DACA?

20        A.  I don't.

21        Q.  Do you know if it was made in September?

22        A.  So I don't know exactly when the decision was

23   made.

24        Q.  Were you involved in any conversations where

25   the decision was made to rescind DACA?

```
                                                      Page 113
 1          A.   No.
 2          Q.   Were you aware of any conversations where the
 3     decision was made to rescind DACA?
 4          A.   I was involved in deliberative discussions.
 5     But I was not involved in the making of the decision.
 6          Q.   But are you aware of any conversations where
 7     the decision was made to rescind DACA?
 8          A.   I'm not.
 9          Q.   Were you aware of any E-mails or written
10     communications in which the decision was made to
11     rescind DACA?
12          A.   I'm not.
13          Q.   Besides DHS officials, who else was involved
14     in the drafting -- anyone from The White House -- of
15     the Duke memo?
16               MR. GARDNER:  Objection.  Calls for
17     speculation.  Lack of foundation.
18               THE WITNESS:  I don't know.
19     BY MS. CHUANG:
20          Q.   Do you know if the DOJ was involved in the
21     drafting of the Duke memo?
22               MR. GARDNER:  Same objections.
23               Sorry.
24               THE WITNESS:  I don't know.
25     BY MS. CHUANG:
```

                                                          **Page 114**

1          Q.   Do you know if any members of Congress were

2     involved in the drafting of the memo?

3               MR. GARDNER:   Same objections.

4               THE WITNESS:   I don't know.

5     BY MS. CHUANG:

6          Q.   Do you know if any state or local government

7     officials were involved in the drafting of the memo?

8               MR. GARDNER:   Same objections.

9               THE WITNESS:   I don't know.

10    BY MS. CHUANG:

11         Q.   Do you know if any members of Congress were

12    consulted about the drafting of the memo?

13              MR. GARDNER:   Same objections.

14              THE WITNESS:   I don't know.

15    BY MS. CHUANG:

16         Q.   Do you know if any state or local government

17    officials were consulted regarding the drafting of the

18    memo?

19              MR. GARDNER:   Same objections.

20              THE WITNESS:   I don't know.

21    BY MS. CHUANG:

22         Q.   Do you know if the DOJ was consulted

23    regarding the drafting of the memo?

24              MR. GARDNER:   Same objections.

25              THE WITNESS:   I don't know.

1    BY MS. CHUANG:

2        Q.  Do you know if The White House was consulted

3    regarding the drafting of the memo?

4            MR. GARDNER:  Same objections.

5            THE WITNESS:  I don't know.

6    BY MS. CHUANG:

7        Q.  Do you know of any other federal officials

8    other than the ones that I've stated were consulted

9    regarding the drafting of the memo?

10           MR. GARDNER:  Same objection, and also

11   objection, vague.

12           THE WITNESS:  I'm not aware.

13   BY MS. CHUANG:

14       Q.  Do you know if any other federal officials

15   were involved in the drafting?

16           MR. GARDNER:  Same objections.

17           THE WITNESS:  I'm not aware.

18   BY MS. CHUANG:

19       Q.  Do you know if any immigration organizations

20   were involved in the drafting of the memo?

21           MR. GARDNER:  Same objections.  Also

22   objection.  Vague.

23   BY MS. CHUANG:

24       Q.  Do you know if any immigration organizations

25   were involved in the consultation relating to the

```
                                                    Page 116
 1    memo?
 2              MR. GARDNER:  Same objections.
 3              THE WITNESS:  I'm not aware.
 4    BY MS. CHUANG:
 5         Q.  Do you know if any drafts were sent outside
 6    of DHS?
 7         A.  I'm not aware.
 8         Q.  Do you know if any drafts of the memo were
 9    sent to The White House?
10         A.  I don't know.
11         Q.  To DOJ?
12         A.  I don't know.
13         Q.  To members of Congress?
14         A.  I don't know.
15         Q.  To state or local government officials?
16         A.  I don't know.
17         Q.  To any other members of the public?
18         A.  Not that I'm aware of.
19         Q.  To any immigration organizations?
20         A.  Not that I'm aware of.
21         Q.  So you had stated that you have never seen a
22    draft of the memo; is that correct?
23         A.  I don't recall having seen a draft of the
24    memo.
25         Q.  So the only -- the first time that you saw
```

Page 117

1    the Duke memo was when you received it on September 5;

2    is that correct?

3         A.  I believe so.

4         Q.  How did you receive the memo on September 5?

5         A.  I don't recall exactly.  Probably

6    electronically.

7         Q.  Via E-mail?

8         A.  Probably.

9         Q.  Was there a cover E-mail attached to the

10   memo?

11        A.  Not that I recall.

12        Q.  Was that E-mail contained in one of the

13   E-mails in the DACA folder?

14        A.  So again, I don't recall having received the

15   memo by E-mail.  I'm speculating that that's probably

16   how I received it.  Generally speaking, that's how I

17   would receive such a memo.

18        Q.  So if you could turn to AR 00000251 of the

19   administrative record.  It should be right before the

20   prior document that we were discussing.

21        A.  Yes.

22        Q.  So this is the letter from Jeff Sessions to

23   Acting Secretary Duke regarding his advice that DHS

24   should rescind DACA; is that correct?

25        A.  It appears to be correct, yes.

Page 118

1      Q.   Do you want to take a moment to review?

2      A.   Thank you.

3           (The witness reviewed the document.)

4           THE WITNESS:  Okay.

5   BY MS. CHUANG:

6      Q.   Have you ever seen this document before?

7      A.   I believe I have, yes.

8      Q.   When did you see it?

9      A.   I believe I saw it shortly after it was

10  received by the department.

11     Q.   Did you personally receive a copy of this

12  letter?

13     A.   I didn't receive one from the Department of

14  Justice.  I would have received it through DHS

15  channels.

16     Q.   Do you recall specifically how you received

17  this letter?

18     A.   I do not.

19     Q.   Was it circulated to staff within DHS?

20     A.   I don't know.  I know that I have seen the

21  letter.

22     Q.   Do you recall how you saw it?  Was it via

23  E-mail?

24     A.   I don't recall specifically, but it was

25  probably via E-mail.

```
1         Q.  Do you recall if there was a cover E-mail --
2         A.  I don't know.
3         Q.  -- that attached this letter?
4         A.  I don't recall.
5         Q.  What does this letter state?
6         A.  I'm not a lawyer, but the letter seems to
7    state that in the opinion of the attorney general,
8    DACA was unconstitutional and should, therefore, be
9    rescinded.
10        Q.  And is this the -- the lawsuit that's
11   referenced in this particular letter, is that the
12   litigation that you referenced previously when you
13   were discussing a potential threat to DACA?
14        A.  It seems to be, yes.
15        Q.  Have you ever read any of the underlying
16   decisions that are referenced in this document?
17        A.  I have not.
18        Q.  Has anyone ever asked you to read those
19   decisions?
20        A.  No, not that I'm aware of.  Not that I
21   recall.
22        Q.  Do you know if Acting Secretary Duke has read
23   these underlying decisions that are referenced in this
24   letter?
25             MR. GARDNER:  Objection.  Calls for
```

```
                                                    Page 120
 1    speculation.
 2              THE WITNESS:  I don't know.
 3    BY MS. CHUANG:
 4         Q.  Have you ever discussed with anyone at DHS
 5    the underlying decisions that are referenced in this
 6    letter?
 7         A.  Yes.
 8         Q.  What were those discussions?
 9              MR. GARDNER:  Objection.  Calls for
10    information subject to deliberative process privilege.
11              I instruct the witness not to answer.
12    BY MS. CHUANG:
13         Q.  When were those discussions?
14         A.  Those would have been in the same time frame
15    we've been discussing.  So it would have been probably
16    August.
17         Q.  Were there multiple conversations about the
18    underlying decisions?
19         A.  I recall -- this gets into the
20    deliberative --
21              MR. GARDNER:  You can answer the question
22    "yes" or "no," and then as we proceed, we'll take it
23    question by question.
24              MS. CHUANG:  I'll just ask that you don't
25    consult with your attorney.  He will instruct you if
```

1    he believes that there's an instruction that needs to

2    be made.

3              MR. GARDNER:  In fairness, though, Counsel,

4    when it does deal with privilege, he's obviously able

5    and should be communicating with counsel to determine

6    the scope of the privilege.

7              THE WITNESS:  It was just that.  I just want

8    to make sure I stay within the scope.

9    BY MS. CHUANG:

10        Q.  Let me repeat the question.

11        A.  Thank you.

12        Q.  Were there multiple conversations about the

13   underlying decisions that are referenced in this

14   letter?

15             MR. GARDNER:  That's asking for a "yes" or

16   "no" question (sic).  So that is permissible.

17             MS. CHUANG:  I would also ask that you

18   refrain from speaking objections.  Thank you.

19             MR. GARDNER:  Counsel, we're doing this

20   question by question to make sure we have the scope of

21   privilege out.

22             THE WITNESS:  I don't recall how many

23   conversations there were, but I do remember discussing

24   this.

25   BY MS. CHUANG:

1      Q.  Were there multiple conversations?  Were

2  there more than one conversation about the underlying

3  decision?

4      A.  I don't recall.

5      Q.  Do you know who was involved in these

6  conversations about the underlying decisions

7  referenced in this letter?

8      A.  Certainly, the office of general counsel was.

9      Q.  Who from the office of general counsel?

10     A.  Again, the people that I recall being --

11 having conversations with are Dimple Shah and Joseph

12 Maher.

13     Q.  And were you involved in these conversations

14 that involved Dimple Shah and Joseph Maher relating to

15 the underlying decisions referenced in this letter?

16     A.  So again, to be very, very specific, the one

17 conversation that I recall in which we discussed in

18 some detail all of this is the conversation we've

19 already referenced, the August conversation, the

20 August meeting; right?  There may have been other

21 conversations as well, but that's the conversation

22 that I recall, the specific conversation that I

23 recall.

24     Q.  And you don't recall the dates of the other

25 conversations other than the August 21 conversation

Page 123

1   that you referenced?

2       A.  I don't recall any other specific

3   conversations, that's correct.

4       Q.  What was the substance of the multiple

5   conversations relying the underlying decisions

6   relating to the letter?

7           MR. GARDNER:  Objection.  Calls for

8   disclosure of information subject to the deliberative

9   process privilege, as well as the attorney-client

10  privilege.

11          I instruct the witness not to answer.

12  BY MS. CHUANG:

13      Q.  Besides the office of general counsel who

14  else was involved in these conversations relying the

15  underlying decisions referenced in this letter?

16      A.  So again, I'm referring to a single meeting.

17  A single meeting that we've already discussed.  So

18  we've already discussed who was present at that

19  meeting.

20      Q.  You also mentioned that there were other

21  conversations.

22      A.  No.  I said there may have been other

23  conversations.  I don't have a specific recall of it.

24      Q.  What is your basis for believing that there

25  may have been other conversations?

Page 124

1           A.   This was an important issue before the
2      department.
3           Q.   Why was it important to the department?
4           A.   Because the department runs the program in
5      the first instance, and because it was the secretary
6      of Homeland Security who was faced with making a
7      decision about its future.
8           Q.   Do you know if the secretary -- the Acting
9      Secretary consulted with anyone outside of DHS
10     relating to the decision?
11          A.   I don't know with whom she consulted.
12          Q.   Did you have any discussions with anyone
13     after receipt of this letter from Jeff Sessions about
14     the letter?
15          A.   I don't recall discussing the letter with
16     anyone, no.
17          Q.   Did you discuss with any of your staff?
18          A.   Again, I don't recall any discussions of the
19     letter.
20               MS. CHUANG:  I'd like to enter this next
21     document as an exhibit.  It's the Complaint in the
22     State of California, et al., V. the U.S. Department of
23     Homeland Security, et al.  Case No. 17-cv-05235.
24               (Deposition Exhibit 5 was marked for
25               identification.)

```
                                              Page 125

 1    BY MS. CHUANG:

 2        Q.  So I'm not going to ask you to review the

 3    entire document, but I will represent to you that this

 4    is the Complaint that the State of California and

 5    State of Maine, Maryland, and Minnesota filed against

 6    the U.S. Department of Homeland Security relating to

 7    the rescission of DACA, and it's one of the cases in

 8    which we are here today for.

 9            If you could please turn to Document 1-5.

10    It's Exhibit E.  Unfortunately, I don't have a

11    specific page number to refer you to.

12            (A discussion was held off the record.)

13            MS. CHUANG:  If you want to take a moment to

14    review Exhibit E.  It is the USCIS "Frequently Asked

15    Questions" as of April 25, 2017 relating to questions

16    about DACA.

17            (The witness reviewed Exhibit 5.)

18            THE WITNESS:  I don't intend to read the

19    whole thing unless you think I should.

20    BY MS. CHUANG:

21        Q.  You don't need to read the whole thing.  I

22    can point you to the specific pages that I'll be

23    asking about.

24        A.  Okay.

25        Q.  Have you ever seen this document before?
```

Page 126

1        A.   I believe I have.   I believe I've been on the
2   USCIS website.
3        Q.   When did you go on the USCIS website?
4        A.   I don't recall.   It would have been after
5   joining Homeland Security in July.
6        Q.   Before the rescission?
7        A.   Probably.
8        Q.   Did you go on the USCIS as part of your
9   getting up to speed on DACA?
10        A.   I think I probably did, yes.
11        Q.   Do you recall what specific web pages you
12   looked at or documents?
13        A.   I don't, but I believe I looked at this
14   (indicating).
15        Q.   Do you have any understanding of how DACA
16   information is currently shared or not shared between
17   the different agencies of DHS?
18        A.   No, not really.   The program, as you know, is
19   administered by USCIS.
20        Q.   Have you asked anyone or sought that
21   information?
22        A.   No, not specifically.
23        Q.   Do you know whether DACA information is used
24   for immigration enforcement purposes?
25        A.   So my understanding is that DACA is a

Page 127

1    protection from enforcement action.

2         Q.   And do you have an understanding of how the

3    underlying information is protected or not protected?

4         A.   I don't.

5         Q.   Did you read the FAQs with respect to that

6    specific question?

7         A.   I don't recall.

8         Q.   If you go to Page 5 of 23.  Question 19.  And

9    that question states, "Will the information I share in

10   my request for consideration of DACA be used for

11   immigration enforcement purposes."

12        A.   I'll read it.

13             (The witness reviewed the document.)

14             THE WITNESS:  Okay I've read it.

15   BY MS. CHUANG:

16        Q.   Had you read this particular question and

17   answer before?

18        A.   I believe I have.

19        Q.   And what do you understand the information to

20   be that's in this question?

21        A.   You know, I'm not lawyer, nor am I involved

22   in either administering the program or in enforcement

23   of the immigration laws.  So I prefer not to give just

24   my personal opinion.

25        Q.   I would appreciate it if you could tell me

Page 128

1    what your understanding of what is contained in this

2    passage is.

3         A.   Yeah.  So what it means is that generally

4    speaking, people who enjoy the benefit of DACA enjoy

5    deferred action from immigration removal, meaning that

6    their specific information will not be shared for the

7    purposes of renewal -- of removal.  That's my

8    understanding.  Again, I'm not a lawyer.  So you

9    shouldn't take that as a DHS legal opinion about what

10   that means.

11        Q.   And do you understand under what

12   circumstances information may be shared outside of

13   those circumstances?

14             MR. GARDNER:  Objection.  Lack of foundation.

15             THE WITNESS:  I don't know.

16   BY MS. CHUANG:

17        Q.   If you could turn to the Exhibit B.  It's

18   Document 1-2 of the same exhibit.

19        A.   Okay.

20        Q.   I'll give you a moment to review.

21             (The witness reviewed the document.)

22             THE WITNESS:  Okay.

23   BY MS. CHUANG:

24        Q.   Have you seen this document before?

25        A.   I believe I have, yes.

1        Q.   When did you see it?

2        A.   I believe I saw it -- I may have seen it -- I

3    may have seen it in the clearance process before it

4    was issued.  I certainly saw it after.

5        Q.   What do you mean by "clearance process"?

6        A.   So oftentimes, when documents are prepared,

7    they are sent around for clearance of various entities

8    to make sure that they're accurate.  So again, I don't

9    specifically recall seeing this document in the

10   clearance process.  I may have.  And I do recall

11   seeing it certainly after it was issued.

12       Q.   What type of documents are required to go

13   through this clearance process?

14       A.   So I'm not sure "required" is the proper

15   word, but generally speaking, when the department

16   issues paper, it goes through a clearance process to

17   ensure that it is accurate.

18       Q.   When you say, "accurate," what do you mean?

19       A.   To make sure that it reflects the policy of

20   the department, to make sure that it meets legal

21   norms, privacy norms, all sorts of norms.

22       Q.   As well, does it also include making sure

23   that the underlying statements within that particular

24   piece of paper are accurate?

25       A.   Yes, to the best of anyone's ability to

Page 130

1    determine, yes.

2         Q.  Can you please walk me generally through the

3    clearance process, what type of entities are involved?

4    Things like that.

5         A.  So it would depend on the nature of the

6    document.  If you're issuing a document related to

7    aviation security, that would be a different kind of a

8    document than one that's related to cyber security.

9    There would be different equities across the DHS

10   enterprise that would have a specific interest in that

11   issue, and so they would be brought in to that

12   clearance process.

13        Q.  Let's first take these specific FAQs.  So the

14   document that we are currently discussing is the

15   "Frequently Asked Questions:

16            "Rescission Of Deferred Action for Childhood

17   Arrivals,

18            "Release date:  September 5, 2017."

19            I will refer to this document as "the

20   rescission FAQs" for the purposes of this deposition.

21   Okay?  Walk me through the clearance process of this

22   particular document.

23            MR. GARDNER:  Objection.  Lack of foundation.

24   Calls for speculation.

25            THE WITNESS:  So I don't know what the

1    clearance process was for this particular document.

2    BY MS. CHUANG:

3        Q.   You mentioned that you had seen this document

4    as part of the clearance process; is that correct?

5            MR. GARDNER:  Objection.  Mischaracterizes

6    the witness' testimony.

7            THE WITNESS:  So I mentioned that I have seen

8    the document previously, and I said that I may have

9    seen it during the clearance process and that I had

10   certainly seen it after it was issued.

11   BY MS. CHUANG:

12       Q.   For documents of this nature, what is the

13   clearance process?

14       A.   So again, I'm not the originator of this

15   document.  So I don't know what the specific clearance

16   process was for this document.

17       Q.   Do you know what entities are consulted as

18   part of the clearance process?

19       A.   So something like this, which is going out to

20   the public, would probably have been cleared by

21   certainly USCIS, since they are the owners, if you

22   will, of the DACA program.  Probably the Office of

23   Public Affairs, which manages the department's public

24   posture.

25            Probably the office of the general counsel

1      for obvious reasons.  Those come to mind.

2           Q.  Any other entities?

3           A.  There may be other entities.

4           Q.  And are these all internal DHS entities?

5           A.  Yes.

6           Q.  Does the clearance process ever involve

7      clearance through other non-DHS entities?

8           A.  For documents being issued by the Department

9      of Homeland Security, not that I'm aware of.

10          Q.  So you stated that you don't know what the

11     exact clearance process was for this particular

12     rescission FAQ document.

13          A.  That's correct.

14          Q.  Do you know if this document was revised or

15     changed in any way throughout the clearance process?

16          A.  I don't.

17          Q.  Did you review this as part of the clearance

18     process?

19          A.  Again, I don't recall.  I may have seen it

20     during the clearance process.  I certainly saw it upon

21     its issuance.

22          Q.  Approximately when do you think you may have

23     seen this during the clearance process?

24               MR. GARDNER:  Objection.  Misstates the

25     witness' prior testimony.

1              THE WITNESS:  Could you repeat the question?

2      BY MS. CHUANG:

3          Q.  Approximately when do you think you may have

4      seen this document during the clearance process?

5          A.  Again, I don't recall specifically seeing it

6      during the clearance process.  So it would be very

7      difficult for me to say at what point I saw it.  But

8      to help you, the office of policy, when we're called

9      upon to review documents, we would see them fairly

10     late in the review process.

11         Q.  Do the entities as part of the clearance

12     process typically make recommendations as to changes

13     or revisions to documents?

14         A.  They might.

15         Q.  And where are those changes or revisions

16     provided to?

17         A.  Generally, to the originator of the document.

18         Q.  So the particular author of the document or

19     the department within which the author is?

20              MR. GARDNER:  Objection.  Compound.

21     BY MS. CHUANG:

22         Q.  So I can split that question, if you would

23     like.

24         A.  Thank you.

25         Q.  So does the changes or revisions, are they

Page 134

1    provided to the originator of the document?  The

2    author of the document?

3         A.  Again, I don't know exactly how this document

4    was created or cleared, but that would be a typical

5    process, yes.

6         Q.  And are those changes or revisions provided

7    to the department within which the author is staffed?

8         A.  I guess I don't understand the difference.

9         Q.  If you don't know the answer, you can just

10   say you don't know.

11        A.  I don't know.  Thank you.

12        Q.  Did the Duke memo go through the clearance

13   process?

14        A.  I don't recall seeing it go through a

15   clearance process, but I don't know.

16        Q.  Would you be involved in the clearance

17   process of the Duke memo?

18        A.  That's a good question.  Normally not, I

19   suppose.  Normally when -- you know, there are two

20   kinds of memos.  Memos that go up a chain, and memos

21   that come down a chain; right?  So I would more

22   typically be brought into the clearance process of a

23   memo going up the chain to the secretary rather than a

24   memo that's coming down the chain from the secretary.

25        Q.  So you classified the Duke memo as a memo

1   that goes down the chain; is that correct?

2        A.   Well, it's addressed from her to various

3   people who work for her.

4        Q.   Do you know what the clearance process for

5   this particular type of memo that goes down the chain

6   is?

7        A.   I don't.

8        Q.   The rescission FAQs assist in implementing

9   the Duke memo; is that correct?

10       A.   I would say they are exactly what they

11   pretend to be.  So they're the answers to questions

12   that people are going to have about the program.

13       Q.   Why would the rescission FAQs be subject to a

14   potential clearance process while the Duke memo is

15   not?

16            MR. GARDNER:  Objection.  Calls for

17   speculation.  Lack of foundation.

18            THE WITNESS:  I don't know.  And again, what

19   I told you was speculation in any case.  So it would

20   be difficult for me to then get into detail about the

21   difference when I was speculating to begin with.

22   BY MS. CHUANG:

23       Q.   Do you know if the Duke memo went through a

24   process to ensure the accuracy of the Duke memo with

25   respect to reflecting the policy of the department?

1          A.   Again, I don't know what the process was.

2          Q.   Do you know if the Duke memo went through a

3     process to ensure the accuracy of the memo with

4     respect to meeting legal standards?

5          A.   I don't know.

6          Q.   Do you know if the Duke memo went through a

7     process to ensure the accuracy of it with respect to

8     meeting privacy standards?

9          A.   I don't know.

10         Q.   Do you know if the Duke memo went through a

11    process to ensure the accuracy of it with respect to

12    ensuring the underlying statements in the Duke memo

13    were accurate?

14         A.   Again, I don't know what process that memo

15    went through.

16         Q.   Were you involved in the drafting at all of

17    the rescission FAQs?

18         A.   Again, I may have seen them in the clearance

19    process which would have given me an opportunity to

20    become involved, but I don't recall having any input

21    into the FAQs because again, the program is owned by

22    USCIS.

23         Q.   Did you provide any revisions or changes to

24    that FAQs?

25         A.   Not that I recall.

1          Q.   Do you know who created the first draft of

2      the FAQs, the rescission FAQs?

3          A.   I don't.

4          Q.   Do you know when the first draft of the

5      rescission FAQs were created?

6          A.   I don't.

7          Q.   Do you know if any other entity besides DHS

8      was involved in the drafting of the rescission FAQs?

9          A.   I don't.

10         Q.   Do you know if The White House was involved

11     in the drafting of the rescission FAQs?

12         A.   I don't know.

13         Q.   DOJ?

14         A.   I don't know.

15         Q.   Members of Congress?

16         A.   I don't know.

17         Q.   State or local government officials?

18         A.   I don't know.

19         Q.   Immigration organizations?

20         A.   I don't know.

21         Q.   Any other members of the public?

22         A.   Not that I'm aware of.

23         Q.   Do you know if any drafts of the rescission

24     FAQs were sent outside of DHS?

25         A.   Not that I'm aware of.

1              MR. GARDNER:  Would now be a good time for

2     our second break?

3              MS. CHUANG:  I have about 10 more minutes,

4     and then we can take the second break, if that's okay

5     with you.

6              MR. GARDNER:  Okay.

7              MS. CHUANG:   Thank you.  I appreciate it.  I

8     know it's been a while.

9         Q.  Going back to the rescission FAQs, if you go

10    to Question 8.  It's on Page 3.  And the question is

11    will USCIS share the personal information of

12    individuals whose pending requests are denied

13    proactively with ICE for enforcement purposes?"

14        A.  I'll read it.

15             (The witness reviewed the document.)

16             THE WITNESS:  Okay.

17    BY MS. CHUANG:

18        Q.  Do you know who drafted this particular

19    answer?

20        A.  I don't.

21        Q.  Had you seen this as part of your

22    potential -- your review during the clearance process?

23             MR. GARDNER:  Objection.  Mischaracterizes

24    the witness' prior testimony.

25             THE WITNESS:  So again, I have seen this

Page 139

1    document before.  I certainly saw it upon issuance.  I
2    don't recall whether I saw it during the clearance
3    process or not.
4    BY MS. CHUANG:
5        Q.  Do you recall seeing this particular --
6    reading this particular answer when you had previously
7    reviewed it before issuance?
8            MR. GARDNER:  Objection.  Mischaracterizes
9    the witness' prior testimony.
10   BY MS. CHUANG:
11       Q.  When you had reviewed the document before
12   issuance, did you read this particular --
13       A.  So again, just to be very, very clear, I said
14   I may have seen the document during the clearance
15   process.  I certainly did see it upon issuance.  So I
16   can't speculate about having seen a particular
17   question during a clearance process that I don't
18   recall.
19       Q.  Are you in possession of any documents that
20   discuss how DACA information will be protected from
21   disclosure to ICE or CBP now that DACA has been
22   rescinded?
23       A.  Not that I'm aware of.
24       Q.  Do you know of any such documents?
25       A.  I'm not aware of any such documents.

1          Q.   After DACA was rescinded, did DHS provide to

2     any employees instructions on how to handle current

3     DACA recipients when enforcement agents encounter

4     them?

5          A.   I'm not aware of any such instructions.

6          Q.   Did DHS provide to any employees instructions

7     as to how to handle DACA recipients whose deferred

8     action will expire when enforcement agents encounter

9     them after the rescission of DACA?

10         A.   I'm not aware of any such instructions.

11         Q.   Are you aware of a DHS memo that was

12    distributed to border agents after the rescission?

13         A.   I'm not aware of such a document.

14         Q.   You're not aware of a DHS memo that provided

15    guidance on how to treat DACA recipients when they

16    encounter them?

17         A.   I don't recall such a document.

18         Q.   Have you seen any documents that discuss how

19    DACA information will be used after the rescission?

20         A.   I've seen this document.

21         Q.   Is this the only document that you've seen

22    that discusses --

23         A.   The only one what I recall seeing.

24         Q.   Are you aware of any plans to use DACA

25    information for immigration enforcement purposes?

```
                                              Page 141

 1          A.  No.

 2          Q.  Have you had any discussions with any DHS

 3     employees relating to the use of DACA information for

 4     immigration enforcement purposes?

 5          A.  So I believe --

 6              MR. GARDNER:  I'm going to object and

 7     instruct the witness not to answer.  The witness could

 8     answer that question with a "yes" or "no," but beyond

 9     that, that would be subject to deliberative process

10     privilege.

11              THE WITNESS:  Sorry.  Repeat the question.

12     BY MS. CHUANG:

13          Q.  Have you had any discussions with any DHS

14     employees relating to the use of DACA information for

15     immigration enforcement purposes?

16          A.  Yes.

17          Q.  When did those discussions take place?

18          A.  Probably in August.

19          Q.  How many conversations were there?

20          A.  I recall one.

21          Q.  Was this in person or via telephone?

22          A.  In person.

23          Q.  Was it separate from the August 21 meeting

24     that we have discussed previously?

25          A.  No.
```

Page 142

1          Q.   So this discussion was part of the August 21

2     meeting?

3          A.   If I understand correctly, yes.

4          Q.   What was discussed specifically with respect

5     to the use of DACA information for immigration

6     enforcement purposes?

7               MR. GARDNER:   Objection.   That implicates the

8     deliberative process privilege.

9               I instruct the witness not to answer.

10    BY MS. CHUANG:

11         Q.   Who specifically discussed the use of DACA

12    information for immigration enforcement purposes?

13         A.   It was part of the general discussion to

14    inform the Acting --

15              MR. GARDNER:   Objection.   She's asking for

16    the identity of names, which we are not asserting

17    privilege over.   To the extent that you want to get

18    into substance, we do assert that that is subject to

19    the deliberative process privilege.

20              And we instruct you not to answer.

21              MS. CHUANG:   No speaking objections, please.

22              MR. GARDNER:   Counsel, I'm trying to help the

23    witness respond to your questions in a way that does

24    not implicate privilege.

25              MS. CHUANG:   If he misunderstand my question,

1    he can ask me to rephrase it or repeat it.

2            THE WITNESS:  So maybe we should have a

3    discussion here about the role of counsel and --

4    because there seems to be a difference of opinion

5    between --

6            MR. GARDNER:  She's asking you for the

7    identify of individuals.  You may identify those

8    individuals.  The substance of those conversations are

9    subject to deliberative process privilege, and I'll

10   instruct you not to answer.

11           So can you identify for her the individuals?

12           MS. CHUANG:  Please, no speaking objections.

13   I've informed the witness of the role of counsel.

14           The role of counsel is to object when he

15   believes that an objection is necessary.  If he

16   instructs you not to answer, you may not answer.  But

17   if he does not instruct you not to answer, then you

18   must answer the question even if he objects.  He is

19   also not allowed to provide speaking objections to

20   counsel you on the specifics of why he is providing

21   the objection.

22           MR. GARDNER:  However, I can counsel him as

23   to the scope of privilege, which is exactly what's

24   going on right now.  Now, if you want, we can take a

25   break and we can talk off the record about the scope

1    of privilege, or we can try to handle this right here.

2    It's up to you.

3    BY MS. CHUANG:

4        Q.  Would it help if I repeated the question?

5        A.  I think it's best to drill down on the

6    process issue that we have here.  So I am a bit

7    confused.

8            MR. GARDNER:  Let me make a suggestion.  Why

9    don't we take that break.  Let me give him some help.

10           MS. CHUANG:  There is a question pending,

11   though.

12       Q.  So I would appreciate it if I can repeat the

13   question and if you could answer it, and then we can

14   take a break.  Is that okay?

15       A.  I'm not sure because I'm not sure who

16   arbitrates when there's an objection.

17           MR. GARDNER:  Let me make a suggestion.  Let

18   her ask the question, and then we'll take it from

19   there.

20   BY MS. CHUANG:

21       Q.  Who specifically discussed the use of DACA

22   information for immigration enforcement purposes at

23   the August 21 meeting?

24       A.  The people who were there participating in

25   the meeting as part of the process of informing the

1    acting secretary about the implications of a possible

2    end of DACA.

3         Q.   Did you specifically discuss the use of DACA

4    information for immigration enforcement purposes at

5    the August 21 meeting?

6         A.   No, I don't recall discussing that.

7         Q.   Did Thomas Homan discuss the use of

8    information for immigration enforcement purposes at

9    the August 21 meeting?

10        A.   I don't recall specifically who discussed it,

11   but I do recall that there was a discussion.

12        Q.   What was the specific discussion relating to

13   DACA information being used for immigration

14   enforcement purposes?

15             MR. GARDNER:   Objection.

16             Instruct the witness not to answer.

17             Calls for the disclosure of information

18   subject to the deliberative process privilege and the

19   attorney-client privilege.

20   BY MS. CHUANG:

21        Q.   Were there any other conversations or

22   meetings outside of this particular meeting in which

23   the use of DACA information was discussed?

24        A.   Not that I'm aware of.

25        Q.   So you personally didn't participate in any

Page 146

1    other conversations; is that correct?

2         A.   Not that I recall.

3         Q.   And you are not aware of others participating

4    in any such conversations; is that correct?

5         A.   Not that I'm aware of.

6         Q.   Do you believe that DACA information should

7    be shared by USCIS with ICE or CBP for immigration

8    enforcement purposes?

9         A.   You're asking me for my personal opinion?

10        Q.   I'm asking if you believe...

11        A.   Well, I believe the rules and policies of the

12   Department of Homeland Security should be followed and

13   enforced.

14        Q.   Can you please provide an answer to my

15   question.

16        A.   So repeat the question.

17        Q.   Do you believe that DACA information should

18   be shared by USCIS with ICE or CBP for immigration

19   enforcement purposes?

20        A.   Not into the current situation, no.

21        Q.   What do you mean by "current situation"?

22        A.   Not into the current situation of DACA.

23        Q.   Do you mean the fact that DACA is currently

24   not yet formally rescinded?

25        A.   Right.  So if you read the frequently asked

1    questions, it addresses that.

2        Q.  I'm a bit confused.  Do you believe that DACA

3    information should be shared by USCIS with ICE or CBP

4    for immigration enforcement purposes?

5            MR. GARDNER:  Objection.  Asked and answered.

6            THE WITNESS:  So I don't believe it should be

7    proactively provided to law enforcement agencies for

8    the purpose of immigration enforcement proceedings

9    unless the requester poses a risk to national security

10   or public safety, or meets the criteria for the

11   issuance of a notice to appear or a referral to ICE

12   under the criteria.

13   BY MS. CHUANG:

14       Q.  What's your understanding of what

15   "proactively" means?

16           MR. GARDNER:  Objection.  Calls for

17   speculation.

18           MS. CHUANG:  I mean he just stated what his

19   belief was.

20           THE WITNESS:  I stand by what I said.  That's

21   my belief.

22   BY MS. CHUANG:

23       Q.  What is your understanding of what

24   "proactively" means?

25           MR. GARDNER:  Same objection.

Page 148

1          THE WITNESS:  I believe proactively means

2      what it says, is that that information should not be

3      shared proactively except for the reasons stated in

4      the frequently asked questions.  I don't have another

5      answer beyond that.

6      BY MS. CHUANG:

7          Q.  Are you aware of any plans to use DACA

8      information for immigration enforcement purposes after

9      March 5?

10          MR. GARDNER:  Objection.  Calls for

11      disclosure of information subject to the deliberative

12      process privilege.

13          I instruct the witness not to answer.

14          MS. CHUANG:  The question was if he was

15      aware.

16          MR. GARDNER:  You can answer "yes" or "no."

17          THE WITNESS:  I'm not aware.

18      BY MS. CHUANG:

19          Q.  Are you aware of any plans to begin deporting

20      DACA recipients as their deferred action expires?

21          A.  I'm not.

22          Q.  After March 5?

23          A.  I'm not aware.

24          MS. CHUANG:  Should we take a 10-minute

25      break?

```
                                            Page 149
```

1            MR. GARDNER:  Sure.

2            MS. CHUANG:  Thank you very much.  You're

3    holding up great.

4            THE VIDEOGRAPHER:  We're off the record at

5    10:47.

6            (A recess was taken from 10:47 a.m.

7            to 11:00 a.m.)

8            THE VIDEOGRAPHER:  We're now back on record

9    at 11:00.

10

11                      EXAMINATION

12   BY MR. BERENGAUT:

13       Q.  Good morning, Ambassador.  My name is Alex

14   Berengaut.  I am with Covington & Burling, and we

15   represent the University of California and Janet

16   Napolitano.  And I'm going to ask some questions

17   following up on Christine's questions.

18            Earlier in your deposition you used the term

19   "policy goal."  Do you remember that?

20       A.  I don't, but that's okay.

21       Q.  It's a generic term you understand?

22       A.  "Policy goal"?

23       Q.  Yes.

24       A.  Sure.

25       Q.  In determining the department's policy goals,

Page 150

1   would it be fair to say you weigh the costs and

2   benefits of policy options?

3        A.   Generally speaking, yes.

4        Q.   And the more the benefits of an option

5   outweigh the costs, the better a policy it is?

6        A.   Oftentimes, yes.

7        Q.   Are there any times when a policy option is

8   worse even though its benefits outweigh its costs more

9   than any other option?

10       A.   Well, there may be.  I don't know.  Political

11  science discussion.

12       Q.   In your career in government, have you ever

13  encountered such a situation?

14       A.   Generally speaking, you try to do the right

15  thing.

16       Q.   I appreciate that.  My question was about

17  whether you'd ever encountered a situation when in

18  weighing different policy options the best option was

19  one where its costs exceeded its benefits more than

20  any other option?

21       A.   Maybe.  I don't recall a specific incident

22  like that.  I'm sure you're going to take me there.

23       Q.   So in considering the rescission of DACA, one

24  policy option was to rescind DACA; is that correct?

25            MR. GARDNER:  Objection.  Calls for

1    disclosure of information subject to deliberative

2    process privilege.

3              Instruct the witness not to answer.

4    BY MR. BERENGAUT:

5         Q.   Prior to the rescission of DACA, DACA was a

6    policy of the DHS.  Is that fair to say?

7         A.   Yes.

8         Q.   Did that policy have policy benefits and

9    costs?

10             MR. GARDNER:  Objection.  Calls for

11   speculation.  Lack of foundation.

12             THE WITNESS:  Repeat the question, please.

13   BY MR. BERENGAUT:

14        Q.   Did DACA as a policy have costs and benefits?

15        A.   Those are matters of opinion.

16        Q.   Let me ask my question again.  Did DACA as a

17   policy have costs and benefits?

18             MR. GARDNER:  Same objections.

19             THE WITNESS:  I'm sure it did.

20   BY MS. CHUANG:

21        Q.   Do you have an understanding of what some of

22   the benefits of DACA as a policy are?

23        A.   So there were clear benefits of DACA to the

24   beneficiaries of DACA.

25        Q.   Right.  You already testified about the

1    specific benefits that were conveyed to the

2    beneficiaries of the program.  I'm asking about DACA

3    as a policy --

4         A.  Right.

5         Q.  -- in connection with this cost and benefit

6    analysis that we were talking about a minute ago.  My

7    question is do you have an understanding of whether

8    DACA has policy benefits?

9              MR. GARDNER:  Objection.  Lack of foundation.

10             THE WITNESS:  Yeah.  I don't have a clear

11   understanding of what those policy benefits might be.

12   I certainly understand the human benefits of DACA to

13   the beneficiaries of the program.

14   BY MR. BERENGAUT:

15        Q.  Well, let me give you an example.  Are you

16   aware that DACA beneficiaries are employed often?

17        A.  Yes.

18        Q.  And through their employment they contribute

19   economic activity to this country?

20        A.  Yes.

21        Q.  Would you say that that economic activity is

22   a benefit of the DACA program?

23        A.  Yes.

24        Q.  Can you think of any other policy benefits of

25   the DACA program?

1          MR. GARDNER:  Objection.  Lack of foundation.

2          THE WITNESS:  No, not at the moment.

3     BY MR. BERENGAUT:

4          Q.  Do you have an understanding of any policy

5     costs of the DACA program?

6          A.  Yes.

7          Q.  What is that understanding?

8          A.  Again, you have a large body of people who

9     are in legal limbo, and that's not a good policy.

10         Q.  Do you have an understanding of any other

11    policy costs of the DACA program?

12         A.  No.  I'd be happy to answer questions, but I

13    don't, off the top of my head, know.

14         Q.  Now, this policy cost that you described of

15    individuals being in legal limbo, have you seen any

16    documents relating to that policy cost?

17         A.  No.

18         Q.  Have you had any communications with anyone

19    else at DHS relating to that policy cost?

20         A.  No.

21         Q.  To your knowledge, was that policy cost

22    considered in connection with the decision to rescind

23    DACA?

24         MR. GARDNER:  Objection.  Calls for

25    disclosure of information subject to deliberative

Page 154

```
 1    process privilege.

 2              I instruct the witness not to answer.

 3              MR. BERENGAUT:  Sorry.  I was receiving a

 4    note to adjust the microphone on my tie.

 5              MR. GARDNER:  Everyone's a critic.

 6              MR. BERENGAUT:  Is that better?

 7              THE VIDEOGRAPHER:  Yes.  Thank you.

 8              MR. BERENGAUT:  Thank you.

 9         Q.  Let me ask you about some other policy

10    benefits of DACA.  Are you aware that DACA recipients

11    serve in this country's armed forces?

12         A.  Yes.

13         Q.  Would you say their service is a policy

14    benefit of DACA?

15         A.  We certainly thank them for their service,

16    and anyone who serves in our military deserves our

17    gratitude.

18    BY MR. BERENGAUT:

19         Q.  Can you think of any other -- now that we've

20    had a couple of other examples, any other policy

21    benefits of DACA?

22         A.  Not off the top of my head.

23         Q.  Do you have an understanding of what

24    "litigation risk" is?

25         A.  Some understanding.
```

Page 155

1          Q.   What is your understanding?

2          A.   Simply that.   That policy may be at the risk

3     of litigation.

4          Q.   And when you earlier described what you

5     called the "threat to DACA," would that be an example

6     of litigation risk, in your understanding?

7          A.   That's what I was referring to.

8          Q.   Setting aside DACA, are you aware of any

9     other existing policy in your service in government

10    that was rescinded because of litigation risk?

11         A.   Nothing occurs to me.

12         Q.   Are you aware of administration policy goals

13    in the immigration context apart from the rescission

14    of DACA?

15         A.   Yes.

16         Q.   What understanding do you have of those

17    goals?

18         A.   I think the administration's general goals

19    related to administration emphasize the enforcement of

20    our laws.   That's the best way to describe the

21    administration's approach towards immigration.

22         Q.   Are you aware of an administrative --

23    administration policy goal of constructing a wall on

24    the border between the United States and Mexico?

25         A.   I am.

1      Q.  To your knowledge, were these other

2    administration goals in the immigration context

3    considered in connection with the decision to rescind

4    DACA?

5            MR. GARDNER:  Objection.  Calls for

6    disclosure of information subject to deliberative

7    process privilege.

8            Instruct the witness not to answer.

9    BY MR. BERENGAUT:

10      Q.  To your knowledge, was the administration

11    goal of constructing a wall on the border between the

12    United States and Mexico considered in connection with

13    the decision to rescind DACA?

14            MR. GARDNER:  Objection.  Calls for

15    disclosure of information subject to deliberative

16    process privilege.

17            I instruct the witness not to answer.

18    BY MR. BERENGAUT:

19      Q.  If we could go back to the administrative

20    record exhibit, which I believe is Exhibit 1.  It's

21    the document you have right in front of you.  And if

22    we could go back to what --

23            MR. GARDNER:  Exhibit 3?

24            MR. BERENGAUT:  I'm sorry.  Was the

25    administrative record Exhibit 3?  Yeah.  Exhibit 3.

1     Q.  If you could go back to the -- let's see
2   here.  If we can go back to what we were previously
3   calling the Duke memo, which is on Page -252.
4   Starting on Page -252.
5           MR. GARDNER:  It may be easier if you take
6   the binder clip off.  It's the very back here
7   (indicating).
8           You said, "the Duke memo"?
9           MR. BERENGAUT:  Yes, please.  Starting on
10  Page -252.
11          MR. GARDNER:  Got it.
12  BY MR. BERENGAUT:
13     Q.  And if you could turn in particular to -255
14  I'd like to ask you about what is the third bullet on
15  that page.  So if you'd like to take a minute to look
16  at that, that's fine.
17          (The witness reviewed the document.)
18          THE WITNESS:  Okay.
19  BY MR. BERENGAUT:
20     Q.  To your knowledge, was the topic covered in
21  this third bullet, which just for purposes of our
22  transcript I'll read into the record here.  "The
23  Department will adjudicate on an individual
24  case-by-case basis properly filed pending DACA renewal
25  requests and associated applications for employment

1    authorization documents from current beneficiaries

2    that have been accepted by the Department as of the

3    date of this memorandum and from current beneficiaries

4    whose benefits will expire between the date of this

5    memorandum and March 5, 2018 that have been accepted

6    by the Department as of October 5, 2017."

7            Did I read that correctly?

8        A.  I believe you did.

9        Q.  Did the subject matter of this bullet come up

10   during the August meeting that you were discussing

11   with my colleague earlier in this deposition?

12           MR. GARDNER:  Objection.  Calls for

13   disclosure of information subject to deliberative

14   process privilege.

15           I instruct the witness not to answer.

16   BY MR. BERENGAUT:

17       Q.  Do you have an understanding of whether DACA

18   recipients receive communications from DHS in

19   anticipation of their renewal deadlines?

20       A.  I don't.

21       Q.  You don't know whether they receive such

22   communications one way or another?

23       A.  I don't.

24       Q.  Are you aware of any discussions within DHS

25   regarding whether the October 5, 2017 deadline would

Page 159

1    be extended?

2         A.   Yes.

3         Q.   What is your understanding of those

4    discussions?

5              MR. GARDNER:   Objection.  Calls for the

6    disclosure of information subject to the deliberative

7    process privilege.

8              I instruct the witness not to answer.

9    BY MR. BERENGAUT:

10        Q.   Let's go through the same exercise we've done

11   earlier today.  Can you please identify the

12   individuals you are aware of who participated in those

13   discussions?

14        A.   I was present at such a discussion.  I

15   believe Acting Secretary Duke was present.  I believe

16   USCIS was present.  I believe the office of general

17   counsel was present, and there would have been

18   individuals from the Secretary's front office present

19   as well.

20        Q.   It sounds like you're referencing an

21   in-person, physical meeting; is that right?

22        A.   Yes.

23        Q.   Do you remember when that took place?

24        A.   I don't.

25        Q.   Was it a different meeting from the meeting

Case 1:17-cv-05228-NGG-JO  Document 97-1  Filed 12/15/17  Page 1024 of 1603 PageID #: 4969

1    in August that we've been talking about?

2         A.  So I certainly recall such a discussion.

3    Whether it was part of the same meeting or a different

4    meeting, I believe it was part of the same meeting.

5         Q.  Now, to be clear, I'm not asking now

6    specifically about the decision to set the October 5

7    deadline in the first instance.  I asked about that.

8    It was objected to.

9         My question now is about discussions

10   regarding an extension of that deadline once it was

11   set.

12        A.  Yes, I believe there was a separate meeting

13   about extension of DACA.  Now, whether it was on the

14   margins of another meeting or it was a meeting called

15   specifically for that purpose, I don't recall, but I

16   do recall an in-person meeting and a discussion of

17   that.

18        Q.  Do you recall whether that meeting took place

19   after the September 5 announcement of the rescission

20   of DACA?

21        A.  I believe it did.

22        Q.  You mentioned that the people who

23   participated in that meeting were Acting Secretary

24   Duke, and then you said, "USCIS."  Do you remember who

25   specifically from USCIS participated in it?

1        A.   I don't.

2        Q.   You also said that the office of the general

3   counsel was present.  Do you remember who from the

4   general counsel's office was present?

5        A.   I don't, but generally speaking, in

6   discussions related to DACA, either Joseph Maher or

7   Dimple Shah were generally present.

8        Q.   You also mentioned individuals from the

9   Secretary's front office.  Same question.  Do you

10   remember who specifically?

11        A.   I don't.  I don't remember specifically who

12   was there.

13        Q.   How long did this meeting last?

14        A.   So again, I don't recall whether this was a

15   stand-alone meeting or on the margins for a meeting

16   called for another purpose where this came up, but

17   that discussion of renewal probably would have lasted

18   20 minutes, half an hour, something like that.

19        Q.   Was there anyone who participated in that

20   discussion who was not from DHS?

21        A.   No.

22        Q.   To your knowledge, did anyone from The White

23   House provide input into the decision about whether

24   the October 25, 2017 deadline would be extended?

25        A.   Not to my knowledge.

1        Q.   What about the Department of Justice?

2        A.   Not to my knowledge.

3        Q.   What about from any other organization apart

4    from DHS?

5        A.   Not to my knowledge.

6        Q.   Now, during that discussion about whether to

7    extend the October 5 deadline, were there any other

8    topics relating to DACA that were discussed?  And

9    again, I'm only asking at a general level.

10       A.   Not to my recollection.

11       Q.   So that discussion was whether it was a

12   stand-alone meeting or sidelines meeting, that was

13   exclusively focused on this October 5 deadline?

14       A.   That's my recollection.

15       Q.   Apart from the meeting in August which you

16   spoke about, this discussion regarding October 5, were

17   there any other meetings that you participated in

18   regarding the rescission of DACA?

19       A.   So as I've said, I don't recall any specific

20   meetings, but there may well have been.

21       Q.   I'm just wondering whether this recollection

22   about the discussion in connection with the October 5

23   deadline maybe jogs your memory about some other

24   discussions that you may have participated in?

25       A.   So I don't have a recollection of any other

1    specific meetings.

2         Q.   We've talked about policy goals, and I'd like

3    to ask a question about political goals.  Do you know

4    what a "political goal" is?

5         A.   Why don't you explain to me what you mean by

6    "political goal."

7         Q.   An example of a political goal would be to

8    win an election.  Is that an example that is

9    consistent with your understanding of that term?

10        A.   Yes.

11        Q.   Do you have an understanding of what a

12   political goal is?

13        A.   I believe I do.

14        Q.   What is that understanding?

15        A.   That would be -- sorry.  We've been here a

16   long time.  Something like what you described.

17   Something that you would achieve politically, such as

18   winning an election.

19        Q.   To your knowledge, during the discussions

20   related to the rescission of DACA in which you

21   participated, did anyone discuss any political goals?

22             MR. GARDNER:  Objection.  Calls for

23   disclosure of information subject to deliberative

24   process privilege.

25             I instruct the witness not to answer.

Page 164

1    BY MR. BERENGAUT:

2        Q.  Have you seen any documents relating to the

3    rescission of DACA that referenced political goals?

4        A.  No.  I don't recall any such document.

5        Q.  Are you aware -- this goes back to what I was

6    asking about the administration's policy objectives in

7    the immigration context.  As part of those policy

8    objectives, the administration has an agenda for

9    legislation with, like, Congress to enact; is that

10   correct?

11       A.  Yes.

12       Q.  To your knowledge, did the administration's

13   legislative agenda before Congress come up in any

14   discussions relating to the rescission of DACA?

15           MR. GARDNER:  Objection.  Calls for

16   disclosure of information subject to deliberative

17   process privilege.

18           Instruct the witness not to answer.

19   BY MR. BERENGAUT:

20       Q.  Have you seen any document relating to the

21   rescission of DACA that discusses the administration's

22   legislative agenda?

23       A.  No.

24       Q.  Earlier in your deposition you talked about

25   the voices within DHS that fed into the

decision-making process. Do you remember that?
A. I do.
Q. Let me ask you about a few other voices. Are you aware that DACA recipients are employees of companies in this country?
A. I am.
Q. To your knowledge, were any of their employers consulted in connection with the decision to rescind DACA?
A. I'm not aware of that.
Q. Are you aware that DACA recipients are employers of other individuals in this country?
A. Stand to reason.
Q. Are you aware of any -- are you aware of whether any of their employees were consulted in connection with the decision to rescind DACA?
A. I'm not aware of any such consultation.
Q. Are you aware that DACA recipients are students in this country?
A. I am.
Q. To your knowledge, were any of their schools consulted in the decision to rescind DACA?
A. Not to my knowledge.
Q. Are you aware that DACA recipients are teachers in this country?

1          A.   I'm not aware of specific cases, but again,

2    stand to reason.

3          Q.   To your knowledge, were any of their students

4    consulted in connection with the decision to rescind

5    DACA?

6          A.   Not to my knowledge.

7          Q.   Are you aware that DACA recipients are

8    members of faith communities in this country?

9          A.   Again, not specifically, but stands to

10   reason.

11         Q.   To your knowledge, were any of those other

12   faith communities consulted in connection with the

13   decision to rescind DACA?

14         A.   Not that I'm aware of.

15         Q.   Are you aware that DACA recipients are

16   doctors in this country?

17         A.   Again, not specifically, but may well be.

18         Q.   To your knowledge, were any of their patients

19   consulted in connection with their decision to rescind

20   DACA?

21         A.   Not to my knowledge.

22         Q.   You mentioned earlier that you're aware that

23   DACA recipients serve in this country's armed forces?

24         A.   Yes.

25         Q.   To your knowledge, were any of their military

1    commanders consulted in connection with the decision

2    to rescind DACA?

3        A.   Not to my knowledge.

4        Q.   Are you aware that DACA recipients are

5    members much families in this country?

6        A.   That would stand to reason.

7        Q.   To your knowledge, were any of their family

8    members consulted in connection with the decision to

9    rescind DACA?

10       A.   Not to my knowledge.

11       Q.   Do you have an understanding of whether DACA

12   recipients receive mental -- let me strike that.

13            Do you have an understanding of whether any

14   DACA recipients in this country receive mental health

15   counseling in connection with anxiety?

16       A.   I'm not aware of that, no.

17       Q.   What about other mental health conditions?

18       A.   I'm not aware of that.

19       Q.   Do you have any reason to doubt that some

20   DACA recipients in this country receive mental health

21   counseling for anxiety and other mental health

22   conditions?

23       A.   I would have no reason to doubt that.

24       Q.   To your knowledge, were any mental healthcare

25   providers consulted in connection with the decision to

                                                            Page 168

1      rescind DACA?

2          A.  Not to my knowledge.

3          Q.  Do you have an understanding of whether the

4      rescission of DACA will have an effect on the U.S.

5      GDP?

6               MR. GARDNER:  Objection.  Calls for

7      speculation.  Lack of foundation.

8               THE WITNESS:  I don't have a deep

9      understanding of what the impact of a rescission of

10     DACA would be on the U.S. GDP.

11     BY MR. BERENGAUT:

12         Q.  That would be something an economist would

13     probably study; is that right?

14         A.  That would stand to reason.

15         Q.  To your knowledge, were any economists who

16     study the aggregate effect of DACA on the U.S. economy

17     consulted in connection with the rescission of DACA?

18         A.  Not to my knowledge.

19              MR. BERENGAUT:  Thanks.  I have no further

20     questions.  I appreciate your time.

21              THE VIDEOGRAPHER:  We're going off the record

22     at 11:28.

23              (A recess was taken from 11:28 a.m.

24              to 11:34 a.m.)

25              THE VIDEOGRAPHER:  We're now on the record at

Page 169

1    11:34 a.m.

2

3                          EXAMINATION

4    BY MS. MORRISSON:

5        Q.   Hi.  Good morning.  My name is Haley

6    Morrisson, and I represent the Garcia plaintiffs.  Is

7    it your practice to use a calendar to keep track of

8    meetings and other appointments that you attend in a

9    professional capacity?

10       A.   Yes.

11       Q.   Do you personally maintain that calendar?

12       A.   No.

13       Q.   You said you have an office manager?

14       A.   Correct.

15       Q.   What is your office manager's name?

16       A.   Laquon Cuevas.

17       Q.   And does your office manager maintain your

18   calendar?

19       A.   She does.

20       Q.   Is there anyone else who maintains or has

21   access to your calendar?

22       A.   There's nobody else who maintains it.  There

23   are many people who have access to it.

24       Q.   Do you review your calendar on a daily basis?

25       A.   Absolutely.

1        Q.   You testified earlier that you attend

2   meetings at The White House or the Eisenhower building

3   in your current role.  Are those meeting on your

4   calendar?

5        A.   Yes.

6        Q.   Would you have put something like the August

7   21 meeting on your calendar --

8        A.   I would imagine so, yeah.

9        Q.   -- or would you have had your office manager

10  put that meeting on your calendar?

11            Is it a practice that someone might send you

12  a calendar invite to attend a --

13       A.   Yes.

14       Q.   -- meeting like that?

15       A.   Yes.

16       Q.   Do you recall receiving a calendar invite for

17  the August 21 meeting?

18       A.   I don't.  Just by way of perspective, I

19  probably get 20 calendar invites a day.  So the

20  probability of me remembering any one calendar invite

21  is nil.

22       Q.   So you testified earlier that you recall

23  attending the August 21 meeting, but there may have

24  been other meetings relating to DACA; is that right?

25       A.   That's right.

1      Q.  So if you looked on your calendar, would that

2   provide a reminder of when other meetings would have

3   happened?

4      A.  It would.

5      Q.  And would those calendar meetings

6   specifically reference DACA or the subject matter of

7   those meetings?

8      A.  It would depend on what the calendar invite

9   said.

10      Q.  Would the calendar invites identify the other

11   participants in the meeting?

12      A.  Oftentimes they do.  Sometimes they don't.

13      Q.  You testified earlier that the decision to

14   rescind DACA was an important policy decision; is that

15   right?

16      A.  I believe I said something like that, yes.

17      Q.  Do you agree now that it is an important

18   policy decision?

19      A.  I do.

20      Q.  And you testified that you're the acting head

21   of the office of policy; right?

22      A.  I am.

23      Q.  So is it part of the role that you advise on

24   important policy decisions?

25      A.  It is.

1      Q.  In connection with advising on important

2  policy decisions do you or your staff typically write

3  memoranda on these important policy decisions?

4      A.  So I typically don't write memoranda.

5  Members of my staff sometimes do.

6      Q.  Okay.  And do you or members of your staff

7  also provide other written communications in providing

8  this policy advice?

9      A.  Do you mean things like E-mails?

10      Q.  Yes.

11      A.  Yes.

12      Q.  Okay.  And on what basis do you decide

13  whether to provide or write written memoranda or

14  E-mail communications setting forth policy

15  considerations?

16      A.  It's more art than science, honestly.  But

17  oftentimes, you would formalize the process when

18  you're asking someone to make a specific decision

19  about something.

20      Q.  And in connection with providing advice to

21  Acting Secretary Duke on DACA, were you asked to

22  provide written advice?

23      A.  I don't recall providing written advice.

24      Q.  Do you recall being asked to provide written

25  advice?

```
                                           Page 173
 1            A.   I don't.
 2            Q.   In connection with getting up to speed on
 3       DACA, you said you may have directed some of your
 4       staff to assist you.
 5            A.   Yes.
 6            Q.   Would you have provided that direction in an
 7       E-mail to a staff member?
 8            A.   It could have been E-mail.  It could have
 9       been personal conversation.
10            Q.   Do you recall asking for written work product
11       from any of your staff on DACA?
12            A.   The only thing I specifically recall
13       requesting was the 2012 memo which initiated DACA.  I
14       do recall asking to see that specifically.
15            Q.   Do you recall who you asked to provide that
16       to you?
17            A.   I don't.  It would have been someone in our
18       borders, immigration, and trade office.
19            Q.   And for other research related to DACA, who
20       within your department would you have asked?
21            A.   It probably would have been people in that
22       office.
23            Q.   And how many people are in that office?
24            A.   20.
25            Q.   So in connection with advising Acting
```

1    Secretary Duke, you described your role as helping her

2    understand what DACA is, helping her understand why

3    and how it was under challenge, helping her understand

4    what her options were, helping her understand

5    consequences of those actions.  In preparing to

6    provide that advice, did you take any written notes

7    for yourself?

8         A.  Not that I recall.

9         Q.  On what occasions did you communicate your

10   advice on those topics to Secretary Duke?

11        A.  Generally, that would be done in meetings.

12        Q.  And was it -- did you convey that advice at

13   the August 21 meeting?

14        A.  So I did not -- my recollection is that I did

15   not offer advice on a decision.  I offered --

16   obviously, I was one of many voices that offered

17   information about what is DACA, what is the litigation

18   threat.  What are the potential decisions and

19   consequences of such decisions.

20        Q.  How long was the August 21 meeting?

21        A.  Again, I don't recall, but probably about an

22   hour.

23        Q.  And how long did you speak at that meeting?

24        A.  Two minutes.

25        Q.  Other than the two minutes, did you have --

1    do you recall other specific occasions when you

2    provided this information to Secretary Duke or your

3    advice?

4          A.  I don't.

5          Q.  As a follow-up to the August 21 meeting, did

6    anyone ask you to conduct follow-up research or to

7    provide further policy --

8          A.  I don't recall.

9          Q.  -- conversations?

10         A.  Not that I recall.  Sorry.

11         Q.  Do you have an understanding of what will

12   happen to DACA recipients if DACA is terminated?

13         A.  If you mean by "terminated," if you mean

14   there's no congressional action taken?  Is that your

15   question?

16         Q.  Yes.  If DACA is terminated, there's no

17   legislative action, and DACA recipients lose their

18   DACA status?

19         A.  So I don't know what will happen.

20         Q.  Have you asked anyone what will happen to

21   DACA recipients if the program is terminated and

22   there's no legislative action?

23         A.  So I am going to look at my attorney, and I

24   am going to ask him a question because we are about to

25   get into deliberative.

1          MR. GARDNER:  You can answer the "yes" or

2     "no" to the question, and then when we get to the

3     substance, we'll take it question by question.

4          THE WITNESS:  So sorry.  Can you repeat the

5     question?

6     BY MS. MORRISSON:

7          Q.  Have you asked anyone what will happen to

8     DACA recipients if DACA is terminated and there is no

9     legislative action?

10          A.  I'm not sure I asked anyone, but there was a

11     discussion of that.

12          Q.  And when was that discussion?

13          A.  Very same meeting.

14          Q.  Do you recall who asked that question?

15          A.  I don't.

16          Q.  Do you recall if an answer was provided to

17     that question?

18          A.  I don't recall there being a definitive,

19     specific answer.  I recall there being a discussion of

20     what could happen.

21          Q.  Okay.  And was one of the possibilities that

22     DACA recipients could be removed from the

23     United States?

24          MR. GARDNER:  Object.  Instruct the witness

25     not to answer as calling for disclosure of information

1    subject to deliberative process privilege.

2    BY MS. MORRISSON:

3        Q.   Earlier, you testified about a conversation

4    you had with John Kramer from the western hemisphere

5    bureau of the Department of State.  Do you recall that

6    testimony?

7        A.   I do.

8        Q.   You said that in the context of that

9    conversation, you discussed that Mexico would be

10   especially impacted if DACA were terminated?

11       A.   Yes.

12       Q.   And you testified that if DACA were

13   terminated and a large number of Mexicans were removed

14   from the United States that would have a large impact

15   on Mexico's economy on foreign relations.

16       A.   I believe I said it could.  There was a

17   discussion of whether there would be an impact, what

18   that impact might be.

19       Q.   Was one of the considerations if a large

20   number of Mexicans were removed from the

21   United States?

22       A.   I'm sorry?

23       Q.   I believe you said in terms of the

24   potentially large impact on Mexico's economy, one of

25   the factors would be if a large number of Mexicans

1   were removed from the United States.

2       A.   Yes.

3       Q.   So was the potential removal of a large

4   number of Mexicans a consideration that you -- a

5   consequence that you considered?

6           MR. GARDNER:  Objection.  Vague.  Considered

7   when?

8   BY MS. MORRISSON:

9       Q.   In the context of this conversation.

10      A.   So if I understand correctly, obviously, that

11  would be of great interest to the Department of State;

12  right?  So that was the subject of the conversation.

13      Q.   So did you raise the possibility of a large

14  number of Mexicans being removed, or did Mr. Kramer

15  raise that possibility?

16      A.   I don't recall who raised it.

17      Q.   So why do you think that would happen?  Why

18  do you think it's possible that a large number of

19  Mexicans would be removed from the United States?

20      A.   I think the nature of the discussion was what

21  if; right?  So what if DACA came to an end, and what

22  if, as a consequence of that, DACA recipients were

23  removed, what if.  It wasn't a discussion of when or

24  that's going to happen.  It was a discussion between

25  two veteran diplomats about possible foreign policy

1    consequences of a potential decision.

2        Q.  And so what's the intermediary step?  How do

3    you get from if DACA were rescinded to Mexicans being

4    removed from the United States?  Like what were the

5    steps that you walked through to consider these

6    possibilities?

7        A.  I think you're ascribing way too much to a

8    friendly conversation between two friends.  I think

9    you're ascribing an agenda and a logic and a

10   progression that didn't exist.

11       Q.  So as part of that conversation, did you

12   discuss the possibility that the government would use

13   information DACA recipients disclosed as part of their

14   DACA --

15       A.  No, I don't recall --

16       Q.  -- with them?

17           MS. MORRISSON:  No further questions.

18           MS. CHUANG:  I would like to just circle back

19   to the issue that we were discussing regarding the

20   privilege.  Should I sit closer?

21           (Pause in proceedings.)

22

23           MS. CHUANG:  Hi.  For the record, this is

24   Christine Chuang again.  I wanted to circle back

25   regarding the conversation that we were having about

Page 180

1    the different privileges that were being asserted

2    today by your counsel.

3              You've asserted a number of privileges,

4    including the deliberative process privilege.  I

5    wanted to just understand the scope and the extent of

6    that privilege and what you're asserting.

7              MR. GARDNER:  Sure.  We've actually asserted

8    two privileges today.  The first is the

9    attorney-client privilege, and that relates to the

10   fact that as the Ambassador testified, members from

11   the office of general counsel were in that meeting in

12   a confidential setting, providing legal advice that

13   was received by other members of the Department of

14   Homeland Security.

15             With respect to deliberative process

16   privilege, we've tried to be very, I think narrow in

17   its assertion, allowing you to get the identities of

18   individuals who participated in meetings, the high

19   level topics addressed at those meetings, but the

20   substantive deliberations are classic deliberative

21   predecisional information that is subject to the

22   federal deliberative process privilege.

23             MS. CHUANG:  Are you invoking the

24   deliberative process privilege as to any substantive

25   statement that was made during those meetings that we

1    discussed today irrespective of whether the

2    communication was advice or factual statements?

3              MR. GARDNER:  We are objecting to information

4    that is deliberative and predecisional.

5              MS. CHUANG:  I'm sorry.  I don't think that

6    you answered my question.

7              MR. GARDNER:  I feel like I did.  I'm sorry.

8    I'm not trying to be obstreperous.  I mean deliberate

9    process privilege covers information that's delivered

10   in predecisional.  When I made those objections, it

11   was to cover precisely that information.  We can have

12   a disagreement about that, although I don't know that

13   doing that in front of the witness is going to be

14   productive, but that is the scope of our privilege

15   assertion.

16             MS. CHUANG:  So I just want to understand

17   that you're invoking the deliberative process

18   privilege to cover all communications that occurred

19   during those meetings --

20             MR. GARDNER:  No --

21             MS. CHUANG:  -- the substance of all

22   communication that occurred during those meetings.

23             MR. GARDNER:  The substance of those

24   conversations that are deliberative and predecisional

25   are subject to the deliberative process privilege, and

Page 182

1      therefore, the privilege has been invoked and the

2      witness has been instructed not to answer.

3              MS. CHUANG:  Were there any substantive

4      statements that fall outside of that scope of the

5      deliberative process?

6              MR. GARDNER:  Well, I mean the witness has

7      testified at a high level of generality the topics

8      that were addressed at the meeting.  We did not lodge

9      objections to that.  But the specific conversations

10     that contain deliberative predecisional information we

11     did object to, and we did instruct the witness not to

12     answer.

13             MS. CHUANG:  Okay.  Thank you.

14             MR. GARDNER:  You're welcome.

15             MS. CHUANG:  Let's take a two-minute break.

16             THE VIDEOGRAPHER:  Off the record at 11:49.

17             (A recess was taken from 11:49 a.m.

18             to 11:51 a.m.)

19             THE VIDEOGRAPHER:  We're back on the record

20     at 11:51.

21

22                      EXAMINATION

23     BY MS. CHANG:

24         Q.  Good morning, Mr. Nealon.  My name is Cecilia

25     Chang, and work for the National Immigration Law

Page 183

1    Center, and we represent the Batalla Vidal plaintiffs

2    in a lawsuit in the Eastern District of New York.

3          A.   Thank you.

4          Q.   You had testified earlier about the August

5    meeting with Acting Secretary Duke to discuss the

6    status of DACA.  Do you know who convened that

7    meeting?

8          A.   No.  But her meetings would typically be

9    convened by her staff, her front office staff.

10         Q.   What is your -- you used the term "front

11   office staff" several times.  Does that refer to the

12   Acting Secretary's top level counselors?

13         A.   Chief of staff and deputy chief of staff and

14   counselors, generally speaking.

15         Q.   Would Mr. Gene Hamilton be referred to as

16   front office staff?

17         A.   So his title is counselor, but he does work

18   in the front office, yes.

19         Q.   Who determined who should be present at that

20   August meeting?

21              MR. GARDNER:  Objection.  Calls for

22   speculation.

23   BY MS. CHANG:

24         Q.   Do you know who determined who would be

25   present at the August 21 meeting?

1          A.   I don't, but it would generally be the chief

2     of staff or deputy chief of staff.  They would,

3     generally speaking, determine who should be present at

4     a meeting.

5          Q.   Do you know if an agenda was circulated for

6     the August meeting?

7          A.   I don't recall an agenda.

8          Q.   You had testified that Mr. Hamilton was at

9     that meeting; correct?

10         A.   Yes.

11         Q.   Do you recall what his title was at that time

12    in August?

13         A.   So he's a counselor.  That's his title.

14    Counselor.

15         Q.   Do you know who he reports to?

16         A.   I believe he reports to the chief of staff.

17         Q.   And to your understanding at that time in

18    August, was he serving as -- Mr. Hamilton serving as a

19    policy advisor versus a legal advisor?

20         A.   Yes.  So he doesn't work in the office of

21    general counsel.  He works in the front office as an

22    advisor to the secretary.

23         Q.   Were you aware of any -- is the position of

24    counselor -- let me rephrase that.

25              Did Mr. Hamilton hold any other official

1    titles at DHS other than counselor?

2         A.   Do you mean previously?

3         Q.   Previously.

4         A.   So I believe he worked in the office of

5    general counsel at some previous time, but I don't

6    know the dates.

7         Q.   Do you recall approximately when his position

8    changed?

9         A.   I don't believe his position changed, and I

10   am speculating now because I don't know his curriculum

11   vitae.  But I believe he came to the department from

12   Capitol Hill, not from within the department.  So I

13   believe he was in the department, left and came back.

14   That's my belief, but I can't be certain of that.

15        Q.   To your knowledge, his position was

16   counselor, and he did not hold another dual position?

17        A.   That's my understanding.

18        Q.   Would it be typical for Mr. Hamilton to be

19   included in meetings like the August meeting over the

20   status of DACA?

21        A.   Yes.

22        Q.   And would that be at the specific request of

23   the Acting Secretary?

24             MR. GARDNER:  Objection.  Calls for

25   speculation.

Page 186

1    BY MS. CHANG:

2         Q.  Do you know if it was at the specific request

3    of the Acting Secretary?

4         A.  I don't know.

5         Q.  Would your office be able to order

6    Mr. Hamilton to appear at a meeting?

7         A.  We wouldn't order him to appear.  We would

8    invite him to appear.  As you invited me this morning.

9         Q.  Understood.  But you did not do so for the

10   August meeting?

11        A.  I didn't convene the meeting.

12        Q.  Would the general counsel's office request

13   that Mr. Hamilton appear at a meeting?

14        A.  It could.

15        Q.  Do you know if the general counsel's office

16   requested him to appear for the August meeting?

17        A.  I don't.

18        Q.  Do you know if any person who attended the

19   August meeting -- was it the role of any person who

20   appeared at the August meeting to give a specific

21   opinion on the status of DACA?

22        A.  Yes.

23        Q.  Were people trying to provide opinions on

24   different topics about the status of DACA?

25        A.  Yes.

1      Q.  Was it understood among the participants the

2  division of responsibilities providing opinion on the

3  status of DACA?

4           MR. GARDNER:  Objection.  Calls for

5  speculation.

6           THE WITNESS:  You know, it's implicit in that

7  the general counsel will -- is there to provide legal

8  advice.  USCIS as the custodians, and managers of the

9  program would provide information about the program,

10  et cetera, et cetera.

11  BY MS. CHANG:

12      Q.  Did any participants at the August meeting

13  bring any documents with them?

14      A.  I think we already went over this.  I believe

15  that USCIS bought -- brought, you know, documents

16  directly related to the program, numbers and such

17  things, I believe.

18      Q.  Do you recall if Mr. Hamilton brought any

19  documents with him to the meeting?

20      A.  I don't recall.

21      Q.  Do you recall if Mr. Hamilton was charged

22  with providing a specific opinion on anything related

23  to the status of DACA at that meeting?

24      A.  I don't know if he was assigned a specific

25  role or not, if that's what you're asking.

1      Q.  Was it your understanding that Mr. Hamilton's
2  role was to specifically advise the Acting Secretary?
3      A.  So that is his job.  He is an advisor to the
4  secretary.
5      Q.  Does he -- is part of his job responsibility,
6  to your understanding, to advise any other staff
7  member at the department?
8      A.  You know, I'm honestly not an expert on what
9  his precise job description is.  I do know that he is
10  a counselor to the secretary, and his job is to
11  provide her with advice, you know.
12      Q.  Do you recall if Mr. Hamilton was present at
13  the later meeting you had testified to about extension
14  of the October 5 deadline?
15      A.  I don't recall.
16      Q.  To your knowledge, does Mr. Hamilton play a
17  role in the clearance process that you had discussed
18  for department publications?
19      A.  He could.  So depending on the topic of a
20  document, one of the front office counselors would
21  often review it before it went to the Secretary.
22      Q.  Just to clarify, so sometimes the clearance
23  process, one of the entities tasked to review is the
24  front office staff?
25      A.  Correct.

1          Q.   And Mr. Hamilton could be asked to play that

2     role --

3          A.   He could.

4          Q.   -- for the front office?

5               To your knowledge do you know if Mr. Hamilton

6     was involved in the clearance process for the -- for

7     any documents related to the extension -- relating to

8     the -- sorry.  Was Mr. Hamilton involved in the

9     clearance process for any of the FAQ documents that

10    were entered as exhibits?

11         A.   So I don't know specifically.  I do know that

12    the counselors in the front office generally have

13    subject matters that they attend to, whether it's

14    cyber security, aviation security, whatever it is, and

15    Mr. Hamilton covers immigration issues.

16         Q.   So you had testified earlier that the office

17    of general counsel provides legal advice to the

18    Secretary.  Your office provides advice on

19    coordination and policy.  What is your understanding

20    of what the front office staff is responsible for

21    advising on specifically?

22         A.   Well, I mean the front office staff are the

23    Secretary's closest advisors.  They're the people who

24    are with her 18 hours a day, controlling her schedule,

25    controlling the paperwork that gets to her,

                                                    Page 190

1    controlling her meetings and all that.

2         Q.  Do they also advise the Secretary on policy?

3         A.  Sure.

4         Q.  How is the -- their role in advising policy

5    different than the role of your office in advising a

6    policy, or is there overlap?

7              MR. GARDNER:  Objection.  Compound.

8              MS. CHANG:  Let me rephrase that.

9         Q.  How is the role of the front office staff in

10   advising the secretary of policy different than the

11   role of your office?

12        A.  I'd say it's complimentary in that my office

13   sort of marshals the forces of the -- of our office

14   and of the larger enterprise, sends them up to the

15   front office, and then the front office staff takes

16   what they get and reviews it for the secretary.

17        Q.  To your knowledge, is one of the

18   responsibilities of the front office staff in advising

19   the secretary on policy also to cover the political

20   ramifications of policy?

21             MR. GARDNER:  Objection.  Vague.

22             THE WITNESS:  She is a cabinet secretary.  So

23   there are political ramifications of decisions that

24   the Department of Homeland Security makes.

25   BY MS. CHANG:

1     Q.  Would your office advise on political

2     considerations of policy?

3     A.  Somewhat, though we try to limit ourselves to

4     more pure policy.

5     Q.  I know that there's been extensive testimony

6     on conversations you've had, but I'm just going to ask

7     this again for the benefit of my clients.  Have you

8     had any specific conversations with Mr. Hamilton about

9     DACA?

10    A.  So we have been in the same room together as

11    previously -- as I previously testified, in the

12    August 21 meeting.  If the question is have we had

13    conversations separate from that about DACA, I don't

14    recall.

15    Q.  And I have the same question about

16    conversations -- or communications with Mr. Hamilton

17    but with regard to E-mails.

18    A.  Have we exchanged E-mails about DACA?

19    Q.  Yes.

20    A.  We may have.  I don't recall.

21    Q.  And do you recall any telephone conversations

22    with Mr. Hamilton about DACA?

23    A.  I don't.

24    MS. CHANG:  That's it.  Thank you.

25    ///

                                              Page 192

1                      EXAMINATION

2     BY MS. KHAN:

3          Q.  Hi, Mr. Nealon.  My name is Sandra Khan.  I'm

4     with the New York Attorney General's office.  I

5     represent the plaintiff states in New York v. Trump,

6     which is also being heard in the eastern district of

7     New York.

8               I just have a few more questions.

9          A.  Sure.

10         Q.  I apologize if this is a little bit

11    duplicative, but do you mind describing generally what

12    the policy formation -- of the formation process for

13    policy formation at the Department of Homeland

14    Security is?  So to sort of go further with that, you

15    mentioned top down policy; right?  Policy that's

16    coming from the top and down to you and then beyond.

17              So what's the typical process for that policy

18    to come to you and then be implemented?

19         A.  So I think sometimes people imagine that a

20    policy office is a think tank and it comes up with

21    ideas and forms policy and sends them up to decision

22    makers for a decision.  And in fact, life doesn't

23    usually work like that.  There's real life, and there

24    are things going on all the time.  And so those things

25    that touch the Department of Homeland Security need to

1   have a policy hat put on them and sent up for

2   decisions to decision makers.  So that's more how it

3   happens.

4        Q.  And again, I apologize if this was covered.

5   Does that usually happen with memos?  Does it happen

6   with meetings or conversations?

7        A.  Yes.  It happens with all those things.

8        Q.  Okay.  And so with regards specifically to

9   memos, is that something -- would you delegate it to

10  your subordinates to start drafting those memos and

11  then you would review them?  Is that the way that it

12  would work?

13       A.  Yes.  So in the brief time I've been at the

14  department, we really haven't -- we, the office of

15  policy, hasn't really done that many memos.  We have

16  done some, and those would usually be delegated down

17  to subject matter experts for the drafting, and then

18  it would go up through an internal clearance process

19  before it went up, yes.

20       Q.  And so to clarify, these memos would be used

21  strictly for internal purposes, or would these be

22  memos that would be released to the public?

23            MR. GARDNER:  Objection.  Compound.

24            MS. KHAN:  Sorry.

25       Q.  Would these be memos strictly for internal

Page 194

1    purposes?

2         A.   Yes.   Generally speaking, these are internal

3    memos driving towards some decision.

4         Q.   Okay.   Now, with regard to the rescission of

5    DACA, relative to what your experience with is with

6    other policy formations, is there anything different

7    in this instance?

8              MR. GARDNER:   Objection.   Vague.

9    BY MS. KHAN:

10        Q.   So is -- how does the rescission of DACA --

11   the process of the rescission of DACA compare to your

12   experience with regard to other policy formations?

13        A.   I'm struggling a little bit.   I don't see a

14   big difference.

15        Q.   Why not?

16        A.   We're faced with policy decisions all the

17   time.   This was another policy decision that the

18   department was faced with.

19        Q.   Have you been faced with other decisions that

20   have come top down like you mentioned?

21        A.   I think what you're referring to is the fact

22   that the September 5 memo came from the Secretary down

23   because she had made a decision.   I'm not sure that

24   that's very different from other decisions that get

25   made by the Secretary.   I think what's different is

1  that you all entered a memo into the record.  So, but

2  in fact, the Acting Secretary makes decisions every

3  day.

4       Q.  Are there usually memos written about

5  implementation of policy?

6       A.  I don't know if there are memos.  So, for

7  example, the components of the Department of Homeland

8  Security, such as customs and border protection or the

9  Transportation Security Administration, they have to

10  issue orders to their field components all the time

11  about how to implement policies or statutes.  So that

12  happens all the time.

13       Q.  And the clearance process that you mentioned,

14  is that something that's within the context of policy

15  formation, or is that separate?

16       A.  So I think we're -- I'm sorry.  Repeat the

17  question.  I think we're talking about two different

18  things.

19       Q.  So it -- the clearance process that you

20  mentioned, where does that come in when it comes to

21  policy formation, at what point?

22       A.  So if a memo is going up to the Secretary,

23  for example, asking her to make a policy decision,

24  that memo would begin with subject matter experts

25  somewhere across the enterprise and would go up

1    through a chain of command, and at a certain point it

2    would go into an internal clearance process.  And that

3    might happen informally, early in the process, just so

4    that the thing doesn't become fully formed without

5    being informed, or that process might happen once the

6    memo is actually finalized.  Then it could go through

7    an internal clearance process among the various

8    components of DHS for their input, and then it would

9    go up to the front office for the decision.

10        Q.  Thank you for clarifying that.

11        A.  Sure.

12        Q.  To move on to your time as ambassador, did

13   you ever have any communication or -- let me strike

14   that.

15            Did you ever have any contact with the

16   Honduran American community?

17        A.  No.  You know, occasionally --

18   occasionally -- so I never did events in the

19   United States in the Honduran American community.

20   Occasionally, I would bump into people in Honduras who

21   were dual citizens or who lived in the United States

22   with green cards and had come back and would want to

23   talk about things, but that's the extent of it.

24        Q.  So it's safe to say you never met an

25   unaccompanied minor?

1        A.   I don't believe I've never met an

2    unaccompanied minor.

3        Q.   Have you ever met a DACA recipient?

4        A.   Not to my knowledge.

5             MS. KHAN:  That's it for me.

6             THE WITNESS:  Thank you.

7             MS. CHUANG:  I think we're done.

8             MR. GARDNER:  Thank you for respecting his

9    time.  We really do appreciate it.

10             MS. CHUANG:  No problem.

11             THE VIDEOGRAPHER:  This concludes today's

12    deposition.  We're now off the record at 12:10.

13             (Witness excused.)

14             (Deposition concluded at 12:10 P.M.)

15

16

17

18

19

20

21

22

23

24

25

Page 198

1                    C E R T I F I C A T E

2            I do hereby certify that the aforesaid testimony

3      was taken before me, pursuant to notice, at the time

4      and place indicated; that said deponent was by me duly

5      sworn to tell the truth, the whole truth, and nothing

6      but the truth; that the testimony of said deponent was

7      correctly recorded in machine shorthand by me and

8      thereafter transcribed under my supervision with

9      computer-aided transcription; that the deposition is a

10     true and correct record of the testimony given by the

11     witness; and that I am neither of counsel nor kin to

12     any party in said action, nor interested in the

13     outcome thereof.

14

15                    *(signature)*

                 Nancy J. Martin, RMR, CSR

16

17     Dated:  October 14, 2017

18

19

20     (The foregoing certification of this transcript does

21     not apply to any reproduction of the same by any

22     means, unless under the direct control and/or

23     supervision of the certifying shorthand reporter.)

24

25

Page 199

1           INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over carefully

4     and make any necessary corrections. You should state

5     the reason in the appropriate space on the errata

6     sheet for any corrections that are made.

7             After doing so, please sign the errata sheet

8     and date it.  You are signing same subject to the

9     changes you have noted on the errata sheet, which will

10    be attached to your deposition.  It is imperative that

11    you return the original errata sheet to the deposing

12    attorney within thirty (30) days of receipt of the

13    deposition transcript by you.  If you fail to do so,

14    the deposition transcript may be deemed to be accurate

15    and may be used in court.

16

17

18

19

20

21

22

23

24

25

Page 200

1          ACKNOWLEDGMENT OF DEPONENT

2              I, JAMES D. NEALON, do hereby certify

3      that I have read the foregoing transcript of my

4      testimony taken on 9/15/17, and further certify

5      that it is a true and accurate record of my

6      testimony (with the exception of the corrections

7      listed below):

8      Page   Line              Correction

9      ____|_____|_____|_____

10     ____|_____|_____|_____

11     ____|_____|_____|_____

12     ____|_____|_____|_____

13     ____|_____|_____|_____

14     ____|_____|_____|_____

15     ____|_____|_____|_____

16     ____|_____|_____|_____

17     ____|_____|_____|_____

18     ____|_____|_____|_____

19     ____|_____|_____|_____

20     ____|_____|_____|_____

21

22     Signed under the pains and penalties of perjury

23     this _____ day of _____, 20___.

24

                      _____

25                    JAMES D. NEALON

**[& - able]**

| | | | |
|---|---|---|---|
| **&** | **150**  79:23,24 | 198:17 | 124:24 125:17 |
| **&**   1:20 2:10,17 | **1515**  2:6 | **2018**   158:5 | 127:8 130:18 |
| 5:14 6:2,5,16 | **163**  4:17 | **202**   2:13,19,24 | 148:9,22 158:5,6 |
| 149:14 | **169**  4:5 | 3:12,17 | 158:25 160:6,19 |
| **0** | **17**  1:5 124:23 | **20528**   3:11 | 162:7,13,16,22 |
| | **18**  189:24 | **20530**   3:16 | 188:14 194:22 |
| **00000001**   61:22 | **18,000**   36:3,18 | **21**   83:1 88:11,19 | **50**   63:10,10 |
| **00000251**   117:18 | **182**  4:6 | 92:22 122:25 | **510**   2:7 |
| **00000252**   68:9 | **19**   13:18 16:6 | 141:23 142:1 | **6** |
| **00000256**   61:22 | 63:25 64:6 65:6 | 144:23 145:5,9 | |
| **05211**   1:5 | 65:12 127:8 | 170:7,17,23 | **6**   4:11 |
| **05235**   124:23 | **192**  4:7 | 174:13,20 175:5 | **61**   4:13 |
| **1** | **2** | 183:25 191:12 | **662-5367**   2:13 |
| | | **2100**   2:6 | **7** |
| **1**   4:11 5:6 8:21,22 | **2**   4:12,15 33:14,15 | **212**   3:6 | |
| 156:20 | 34:9 41:18 | **23**   127:8 | **7**   4:3 |
| **1-2**   128:18 | **2,500**   30:15 | **24**   82:1 | **700,000**   78:21 |
| **1-5**   125:9 | **20**   3:16 161:18 | **25**   45:20,24 125:15 | **7:32**   1:22 5:1,5 |
| **10**   16:17 138:3 | 170:19 173:24 | 161:24 | **8** |
| 148:24 | 200:23 | **250,000**   12:12 | |
| **100**   63:12 | **200**   2:23 | **252**   157:3,4,10 | **8**   4:11 30:12 |
| **100,000**   32:8 | **20001**   2:13 | **255**   157:13 | 138:10 |
| **10271**   3:6 | **20005**   2:24 | **256**   4:13 | **81**   4:14 |
| **1050**   2:18 | **20036**   2:18 | **3** | **850**   1:21 2:12 5:14 |
| **10:47**   149:5,6 | **2011**   31:16,24 32:2 | | **86**   32:8 |
| **11**   11:22 34:16 | 40:12 | **3**   4:13 37:7 41:17 | **879-0094**   2:7 |
| **1121**   2:23 | **2012**   15:9,13,22 | 61:17,18 138:10 | **8:49**   61:11,12 |
| **11:00**   149:7,9 | 28:1,2,9,15 31:16 | 156:23,25,25 | **9** |
| **11:28**   168:22,23 | 31:24 32:3 40:13 | **30**   199:12 | |
| **11:34**   168:24 | 67:23 71:11 | **305-7583**   3:17 | **9**   4:12 |
| 169:1 | 173:13 | **33**   4:12 28:6 | **9/15/17**   200:4 |
| **11:49**   182:16,17 | **2013**   31:19 32:18 | **4** | **94612**   2:7 |
| **11:51**   182:18,20 | 48:16 | | **955-8500**   2:19 |
| **120**   3:5 | **2014**   11:1 29:11 | **4**   4:14 81:21,22 | **9:00**   61:13,15 |
| **124**   4:16 | 39:1 40:3,9 48:16 | 82:5 | **a** |
| **12:10**   197:12,14 | 50:3 | **416-8534**   3:6 | |
| **13**   1:16 5:1,6 | **2016**   34:16 | **447-3891**   3:12 | **a.m.**   1:22 5:1 |
| **14**   198:17 | **2017**   1:16 5:1,6 | **470-6412**   2:24 | 61:12,13 149:6,7 |
| **149**   4:4 | 10:5,6 16:18 | **5** | 168:23,24 169:1 |
| **14th**   2:23 | 29:11 68:10 82:1 | | 182:17,18 |
| **15**   13:16 14:24 | 125:15 130:18 | **5**   4:16 10:3,5,6 | **aberengaut**   2:14 |
| | 158:6,25 161:24 | 60:15,19,22 68:10 | **ability**   8:1 129:25 |
| | | 90:13 117:1,4 | **able**   7:22 121:4 |
| | | | 186:5 |

| | | | |
|---|---|---|---|
| **absolutely** 100:7 169:25 | 145:1 159:15 160:23 171:20 | 13:6 61:17,21,23 62:4 63:4 117:19 | **agree** 9:5 14:1 29:24 171:17 |
| **accepted** 158:2,5 | 172:21 173:25 | 155:22 156:19,25 | **agreed** 9:5 |
| **access** 169:21,23 | 183:5,12 185:23 | **advice** 14:19 | **agriculture** 30:19 |
| **accuracy** 135:24 | 186:3 188:2 195:2 | 117:23 172:8,20 | **ahead** 31:25 |
| 136:3,7,11 | **action** 4:15 13:3 | 172:22,23,25 | 109:23 |
| **accurate** 35:7,11 | 27:19 78:4 82:2 | 174:6,10,12,15 | **aided** 198:9 |
| 35:24,25 36:10,19 | 82:20 127:1 128:5 | 175:3 180:12 | **aimed** 38:2,17,19 |
| 36:24,25 37:5,16 | 130:16 140:8 | 181:2 187:8 | 41:7 |
| 37:20 38:23,25 | 148:20 175:14,17 | 188:11 189:17,18 | **al** 3:8,8 6:12,12 |
| 41:15,23 42:16 | 175:22 176:9 | **advise** 49:17 | 124:22,23 |
| 129:8,17,18,24 | 198:12 | 171:23 188:2,6 | **alan** 107:16 |
| 136:13 199:14 | **actions** 27:22 | 190:2 191:1 | **alex** 149:13 |
| 200:5 | 70:16 174:5 | **adviser** 48:20 | **alexander** 2:11 6:1 |
| **achieve** 163:17 | **activity** 83:13 | **advising** 172:1 | **allow** 78:2 |
| **acknowledgment** | 152:19,21 | 173:25 189:21 | **allowed** 143:19 |
| 200:1 | **actors** 33:5 38:6 | 190:4,5,10,18 | **allowing** 180:17 |
| **acting** 1:10 10:1 | **ad** 62:16 | **advisor** 50:24 | **ambassador** 11:2 |
| 11:15,17 13:1 | **addition** 83:8 | 184:19,19,22 | 29:10,18,19,20,21 |
| 17:13,15,21 19:4,7 | **address** 53:22 | 188:3 | 31:8 44:1,9 45:6 |
| 23:23 24:3,13 | **addressed** 135:2 | **advisors** 50:21 | 45:20 48:10,11,12 |
| 26:7 43:4,7 47:18 | 180:19 182:8 | 56:23 57:2 189:23 | 99:20,25 149:13 |
| 47:22 50:21 51:4 | **addresses** 147:1 | **affairs** 11:13 12:6 | 180:10 196:12 |
| 51:9 53:1,13 54:2 | **adjudicate** 157:23 | 131:23 | **america** 30:13 |
| 54:15,23 55:8,10 | **adjust** 33:10 154:4 | **affirmed** 7:2 | 40:23 42:9,10 |
| 55:12,15,20 57:8 | **administer** 52:6 | **aforesaid** 198:2 | 47:3 49:6,18 |
| 57:20 58:2,6,13,17 | 71:5,16 | **ag.ny.gov** 3:7 | **america's** 37:11 |
| 58:24 59:3,7,11,15 | **administered** | **agencies** 59:10 | 37:22 39:17 |
| 59:19,23 60:2,6,12 | 126:19 | 126:17 147:7 | **american** 36:7,22 |
| 61:3 66:1 68:11 | **administering** | **agency** 20:7 82:21 | 42:1 100:15 |
| 68:20 69:10,12,15 | 127:22 | 92:20 | 196:16,19 |
| 69:20,25 70:9,18 | **administers** 91:12 | **agenda** 164:8,13 | **analysis** 18:13,14 |
| 72:22,25 73:12,22 | **administration** | 164:22 179:9 | 152:6 |
| 74:20 79:5,9 | 155:12,19,23 | 184:5,7 | **ancestors** 40:20 |
| 82:16,17 85:8 | 156:2,10 164:8 | **agents** 140:3,8,12 | **announcement** |
| 86:18 87:13 89:21 | 195:9 | **aggregate** 168:16 | 90:17 101:1,4 |
| 90:2,14 91:6 | **administration's** | **ago** 21:5 23:22 | 160:19 |
| 94:10 96:6 98:16 | 155:18,21 164:6 | 26:6 35:10 36:3 | **answer** 7:23 8:8 |
| 110:24 112:8 | 164:12,21 | 36:17 39:25 42:9 | 8:13,14 9:23 14:3 |
| 117:23 119:22 | **administrative** | 47:1 152:6 | 15:25 23:9 27:5 |
| 124:8 142:14 | 4:13 12:18,20,25 | | 27:10,13,13 30:9 |

40:15,17,18 44:14
46:23 51:18 53:4
53:8,10 54:5,8,20
55:24 56:2,11
57:13,14,15,24
58:10,21 70:5,23
72:3,14 73:4,10
75:1 76:22 77:4
77:16 78:13 79:2
79:15 83:22 84:3
84:10,11,22 85:3
85:12,19,24 86:6
87:21 88:4 105:5
111:18 120:11,21
123:11 127:17
134:9 138:19
139:6 141:7,8
142:9,20 143:10
143:16,16,17,18
144:13 145:16
146:14 148:5,13
148:16 151:3
153:12 154:2
156:8,17 158:15
159:8 163:25
164:18 176:1,16
176:19,25 182:2
182:12
**answered**  86:15
147:5 181:6
**answering**  8:5
**answers**  135:11
**anthony**  97:14,18
97:18
**anti**  42:12,18,22
**anticipation**
158:19
**anxiety**  167:15,21
**anybody**  55:16
**anymore**  42:23

**anyone's**  129:25
**apart**  155:13
162:3,15
**apologize**  192:10
193:4
**appear**  83:2
147:11 186:6,7,8
186:13,16
**appeared**  186:20
**appears**  34:19
42:15 68:20 82:15
87:3 117:25
**applications**
157:25
**apply**  64:19
198:21
**appointed**  15:15
16:17,19 18:6
28:15 29:7 81:2
**appointments**
169:8
**appreciate**  8:4
127:25 138:7
144:12 150:16
168:20 197:9
**appreciated**  8:10
**approach**  155:21
**appropriate**  199:5
**approximately**
9:14 13:16,18
63:8,10 132:22
133:3 185:7
**april**  125:15
**ar**  61:22,22 68:9
117:18
**arbitrates**  144:16
**area**  27:2
**argumentative**
66:16
**armed**  154:11
166:23

**arrested**  11:8
**arrival**  18:3,5
**arrivals**  13:3
82:20 130:17
**arriving**  80:17
**art**  172:16
**article**  33:20 34:12
34:15,20,23,24
35:5,9,20 36:2
37:1,7,14,17 39:22
41:10 81:25 82:8
82:9,13,25 83:12
86:8,14,23,25 87:2
87:6 90:1
**articles**  15:10,14
15:18 67:7,9,12,14
67:16,17,19 71:10
81:15
**ascribe**  105:25
**ascribing**  179:7,9
**aside**  106:11 155:8
**asked**  13:8 61:23
62:4,5,9,10 79:19
79:24 80:5,9
119:18 125:14
126:20 130:15
146:25 147:5
148:4 160:7
172:21,24 173:15
173:20 175:20
176:7,10,14 189:1
**asking**  28:10 34:6
39:23 57:11 63:6
121:15 125:23
142:15 143:6
146:9,10 152:2
160:5 162:9 164:6
172:18 173:10,14
187:25 195:23
**aspirational**  42:17

**assert**  142:18
**asserted**  180:1,3,7
**asserting**  53:20
142:16 180:6
**assertion**  180:17
181:15
**assigned**  187:24
**assist**  3:4 12:14
66:2 135:8 173:4
**assistance**  31:21
**assistant**  11:12
17:14,17,25 18:1,9
18:12 23:13
**assisting**  52:14
**associated**  16:6
157:25
**asst**  3:11,15
**assume**  103:22
109:18 110:1
**assumed**  109:24
**assumption**  110:5
**asylum**  35:22 36:1
**attached**  117:9
119:3 199:10
**attend**  21:10 24:7
83:3 86:14 169:8
170:1,12 189:13
**attendance**  21:15
88:7
**attended**  25:21
83:8 87:6 186:18
**attendee**  75:11
**attendees**  84:5,14
86:10
**attending**  5:20
170:23
**attorney**  2:4,5,11
2:17,22 3:4,4,21
5:24,24 7:8 8:11
8:14 9:4,8 23:18
23:19,21,22 24:2,9

24:16,23 25:2,6,12
27:7,8,9,12 43:1
52:23 53:6 54:7
54:18 79:14 85:5
86:4 87:20 88:3
119:7 120:25
123:9 145:19
175:23 180:9
192:4 199:12
**attorney's**  6:11
**attorneys**  5:18
  6:14
**audible**  105:21
**august**  19:5 34:16
  73:17 80:11 82:1
  82:13 83:1,4
  88:11,19,19 90:2
  90:21 92:22 100:6
  100:9 103:9
  112:17 120:16
  122:19,20,25
  141:18,23 142:1
  144:23 145:5,9
  158:10 160:1
  162:15 170:6,17
  170:23 174:13,20
  175:5 183:4,20,25
  184:6,12,18
  185:19 186:10,16
  186:19,20 187:12
  191:12
**author**  133:18,19
  134:2,7
**authorization**
  158:1
**avenue**  2:18 3:16
**aviation**  12:7
  80:15 130:7
  189:14
**aware**  28:20,21
  57:16 58:4,15

59:1,5,9,13,14,17
59:18,21,22,25
60:1,4,5,9,11
69:16 75:21 77:9
81:3 96:18 97:3
97:12,20 98:3
99:4,9 109:13
111:7,9 113:2,6,9
115:12,17 116:3,7
116:18,20 119:20
132:9 137:22,25
139:23,25 140:5
140:10,11,13,14
140:24 145:24
146:3,5 148:7,15
148:17,19,23
152:16 154:10
155:8,12,22
158:24 159:12
164:5 165:4,10,11
165:14,14,17,18
165:24 166:1,7,14
166:15,22 167:4
167:16,18 184:23
**awareness**  102:6

### b

**b**  4:9 128:17
**back**  33:1 42:14
  48:9 54:12 60:25
  61:14 105:8 112:1
  138:9 149:8
  156:19,22 157:1,2
  157:6 164:5
  179:18,24 182:19
  185:13 196:22
**bad**  38:5 101:10
**bailey**  3:21 6:18
  6:18
**based**  35:6,11,23
  36:8 82:24 110:2

**basis**  56:9 69:25
  104:15 110:4
  123:24 157:24
  169:24 172:12
**batalla**  2:25 6:8
  183:1
**bates**  61:21
**becoming**  48:12
**began**  11:18,20
  31:19 32:21 40:6
  40:12
**beginning**  1:22
  31:19
**behalf**  6:2,5,7,11
  6:14,17,18,22 7:9
**belief**  147:19,21
  185:14
**believe**  9:19 10:9
  10:20 15:7,23
  16:4 19:4,12
  20:24 21:19 30:14
  35:6 39:1,23,24,25
  40:19,24 41:22,25
  42:5,8,20 43:8
  44:22 46:24 47:5
  47:20 64:5 67:15
  67:23 73:16,24,25
  74:1,5 75:8,25
  76:15 78:21 81:4
  86:15 88:10 92:14
  98:5 99:17,19,20
  99:22,22 117:3
  118:7,9 126:1,1,13
  127:18 128:25
  129:2 141:5 146:6
  146:10,11,17
  147:2,6 148:1
  156:20 158:8
  159:15,15,16
  160:4,12,21
  163:13 171:16

177:16,23 184:16
185:4,9,11,13
187:14,17 197:1
**believes**  121:1
  143:15
**believing**  123:24
**beneficiaries**  78:2
  151:24 152:2,13
  152:16 158:1,3
**benefit**  33:7,8
  72:24 78:9 128:4
  152:5,22 154:14
  191:7
**benefits**  66:3
  77:15,17,22,25
  78:1,1,5 150:2,4,8
  150:19 151:8,14
  151:17,22,23
  152:1,8,11,12,24
  154:10,21 158:4
**berengaut**  2:11
  4:4 6:1,1 149:12
  149:14 151:4,13
  152:14 153:3
  154:3,6,8,18 156:9
  156:18,24 157:9
  157:12,19 158:16
  159:9 164:1,19
  168:11,19
**besieged**  32:15
**best**  129:25 144:5
  150:18 155:20
**better**  15:25 44:15
  150:5 154:6
**beyond**  141:8
  148:5 192:16
**big**  194:14
**binder**  68:13
  157:6
**bit**  51:16 66:15
  144:6 147:2

192:10 194:13
**body** 153:8
**border** 36:5,19
  39:3 140:12
  155:24 156:11
  195:8
**borders** 18:10
  173:18
**bossert** 95:5,8
**bought** 187:15
**branch** 3:21
**break** 8:17,18 14:2
  36:12 61:5,8
  111:13,15,18
  138:2,4 143:25
  144:9,14 148:25
  182:15
**briana** 17:22
**brief** 193:13
**briefly** 42:21
**bring** 10:13 20:7
  31:20 32:19,22
  187:13
**broadway** 3:5
**brought** 130:11
  134:22 187:15,18
**browne** 3:11 6:20
  6:20 9:16
**building** 20:25
  170:2
**bullet** 157:14,21
  158:9
**bump** 196:20
**bureau** 2:4 3:5
  99:24 177:5
**burling** 1:20 2:10
  5:14 6:2,17
  149:14
**butch** 107:5
**bye** 21:18 98:10

**c**

**c** 2:1 3:1 198:1,1
**cabinet** 190:22
**calendar** 169:7,11
  169:18,21,24
  170:4,7,10,12,16
  170:19,20 171:1,5
  171:8,10
**california** 1:2,5,6
  2:3,7,8,15 5:9,12
  5:24 6:3,14,17 7:8
  7:9 124:22 125:4
  149:15
**call** 13:4 106:1
**called** 13:17 23:24
  70:4 100:15 133:8
  155:5 160:14
  161:16
**calling** 157:3
  176:25
**calls** 19:20 54:17
  57:22 70:20 74:25
  76:19 77:1 78:11
  78:24 79:11,13
  83:19,25 84:7,20
  85:1,4,10,16,22
  86:2 87:18,25
  93:12,22 94:6,12
  94:21 95:9,18
  96:2,16 99:2
  105:14 107:25
  108:18 109:19
  110:15 111:11
  113:16 119:25
  120:9 123:7
  130:24 135:16
  145:17 147:16
  148:10 150:25
  151:10 153:24
  156:5,14 158:12
  159:5 163:22

164:15 168:6
183:21 185:24
187:4
**cam** 100:16
**camp** 100:19
**capacity** 1:5,10
  20:2 23:2 25:18
  28:18 169:9
**capita** 30:15
**capitol** 185:12
**cards** 196:22
**career** 150:12
**carefully** 199:3
**case** 1:4 5:11
  12:18,21,24 13:9
  13:12 102:12
  124:23 135:19
  157:24,24
**cases** 125:7 166:1
**cash** 49:16
**cast** 72:23 73:18
**categorically**
  35:17
**category** 26:12
**cbp** 139:21 146:7
  146:18 147:3
**cecilia** 2:22 6:6
  182:24
**center** 1:21 2:12
  2:22 6:7 26:23
  108:15,22 183:1
**central** 30:13 36:7
  36:22 40:23 42:9
  42:10 47:3 49:6
  49:18 100:15
**certain** 21:24 22:2
  26:11 27:21 86:22
  86:22 100:7
  102:11 185:14
  196:1

**certainly** 16:19
  35:25 36:25 37:13
  37:18 38:24 41:25
  42:9 52:2,3 56:19
  63:23 73:22,23
  74:2 89:6,7,16
  122:8 129:4,11
  131:10,21 132:20
  139:1,15 152:12
  154:15 160:2
**certification**
  198:20
**certified** 1:24
**certify** 198:2
  200:2,4
**certifying** 198:23
**cetera** 187:10,10
**chad** 56:21 57:8
  57:20 74:4 83:7
  85:21 90:9,20
**chain** 16:23 17:2
  19:1,18 134:20,21
  134:23,24 135:1,5
  196:1
**challenge** 70:14
  174:3
**chang** 2:22,25 4:6
  6:6,6 182:23,25
  183:23 186:1
  187:11 190:8,25
  191:24
**changed** 132:15
  185:8,9
**changes** 90:9
  133:12,15,25
  134:6 136:23
  199:9
**channels** 118:15
**charged** 29:21
  187:21

**chased** 33:3
**check** 65:3
**chief** 17:3,4,8,12
  17:13,21 20:16
  24:24 52:8 56:14
  56:21,22 73:25
  183:13,13 184:1,2
  184:16
**child** 10:21
**childhood** 13:3
  82:20 130:16
**children** 36:4,8,18
  36:23 44:3,5
**children's** 2:4
**china** 23:24 25:8
  98:15
**christine** 2:5 5:23
  7:7 179:24
**christine's** 149:17
**christine.chuang**
  2:8
**chuang** 2:5 4:3
  5:23,23 7:6,7 8:20
  8:24 10:4 13:24
  19:22 27:4 29:2
  30:6 33:13,17
  34:11 36:14 40:16
  41:21 42:4 46:17
  46:22 51:20 53:12
  53:18,25 54:13,21
  55:2 56:7,12
  57:18,25 58:11,22
  60:10,24 61:7,16
  61:20 62:3 66:10
  66:15,21 67:1
  68:14 69:2 70:8
  70:24 72:5,12,19
  73:14 75:2 76:23
  77:5,10,19 78:14
  79:3,16 81:20,24
  82:7 83:23 84:4

84:13,23 85:7,13
85:20,25 86:7
87:22 88:5 93:15
93:25 94:9,15,23
95:1,3,12,21 96:5
96:10,19 97:1,4,13
97:21 98:4 99:5
99:10,15 105:11
105:17,22 108:3,9
108:21 109:22
110:20 111:17,24
112:4 113:19,25
114:5,10,15,21
115:1,6,13,18,23
116:4 118:5 120:3
120:12,24 121:9
121:17,25 123:12
124:20 125:1,13
125:20 127:15
128:16,23 131:2
131:11 133:2,21
135:22 138:3,7,17
139:4,10 141:12
142:10,21,25
143:12 144:3,10
144:20 145:20
147:13,18,22
148:6,14,18,24
149:2 151:20
179:18,23,24
180:23 181:5,16
181:21 182:3,13
182:15 197:7,10
**circle** 179:18,24
**circulated** 118:19
  184:5
**circumstances**
  128:12,13
**cissna** 55:14
**citizens** 196:21

**citizenship** 52:4
**city** 1:21 2:12
**civil** 3:5,15
**civilian** 48:13 49:1
**cl** 107:5
**claire** 19:5 92:6,8
**clarification** 27:7
**clarify** 188:22
  193:20
**clarifying** 196:10
**clark** 93:1
**class** 27:22
**classic** 180:20
**classified** 134:25
**clay** 2:6
**clear** 8:6 139:13
  151:23 152:10
  160:5
**clearance** 129:3,5
  129:7,10,13,16
  130:3,12,21 131:1
  131:4,9,13,15,18
  132:6,7,11,15,17
  132:20,23 133:4,6
  133:11 134:12,15
  134:16,22 135:4
  135:14 136:18
  138:22 139:2,14
  139:17 188:17,22
  189:6,9 193:18
  195:13,19 196:2,7
**cleared** 131:20
  134:4
**client** 53:6 54:7,18
  66:11,17,19 79:14
  85:5 86:4 87:20
  88:3 123:9 145:19
  180:9
**clients** 191:7
**clip** 68:13 157:6

**closely** 28:19
  71:15
**closer** 179:20
**closest** 189:23
**coffee** 30:19
**cohost** 23:23 24:3
**cohosted** 98:15
**colleague** 158:11
**colleagues** 25:24
  62:12
**come** 76:6 80:16
  112:6,8 132:1
  134:21 158:9
  164:13 192:18
  194:20 195:20
  196:22
**comes** 192:20
  195:20
**comfortable** 42:24
**coming** 24:16
  134:24 192:16
**command** 16:23
  17:3 19:2,18
  48:14 49:5,10,13
  50:2 196:1
**commander** 48:14
  48:20,21 49:2
**commanders**
  167:1
**commissioner**
  25:22
**committing** 38:14
**communicate**
  62:11 174:9
**communicating**
  62:19 65:8 121:5
**communication**
  28:24 63:17 181:2
  181:22 196:13
**communications**
  25:11 62:17,18,20

63:1,4 64:9 88:25
89:8,13 90:1,5,7
95:13 96:11,20
97:8 102:16 106:7
108:5,14,25
113:10 153:18
158:18,22 172:7
172:14 181:18
191:16
**communities** 38:8
166:8,12
**community** 38:9
196:16,19
**companies** 165:5
**compare** 194:11
**compile** 62:6,9
64:1,7,7
**compiled** 63:25
**compiling** 12:17
13:5,19
**complaint** 4:16
124:21 125:4
**complimentary**
190:12
**component** 91:7
**components** 195:7
195:10 196:8
**compound** 13:23
36:11 70:2 133:20
190:7 193:23
**computer** 13:21
14:5,12,14,16
198:9
**concern** 49:14
**concerns** 100:25
101:3,8
**concluded** 197:14
**concludes** 197:11
**conditions** 30:4
42:7 167:17,22

**conduct** 66:6,22
67:2,11 80:18
175:6
**conducting** 67:4
**confer** 72:6 111:13
**conferred** 77:18
**confident** 39:14
**confidential**
180:12
**confirmation** 11:1
11:5
**confirmed** 11:3
19:6,17 55:13
**conflating** 99:21
100:3
**conflictive** 34:25
38:8
**confused** 144:7
147:2
**congress** 10:25
11:6 22:21,23
45:13 59:18 63:5
106:15 108:6
114:1,11 116:13
137:15 164:9,13
**congressional**
45:21,24 175:14
**connecticut** 2:18
**connection** 13:2
152:5 153:22
156:3,12 162:22
165:8,16 166:4,12
166:19 167:1,8,15
167:25 168:17
172:1,20 173:2,25
**consequence**
178:5,22
**consequences** 51:2
51:13,23 52:16
66:3 69:22 70:11
70:16 101:25

174:5,19 179:1
**consider** 64:17,22
179:5
**considerable**
31:21
**consideration**
127:10 178:4
**considerations**
172:15 177:19
191:2
**considered** 64:12
153:22 156:3,12
178:5,6
**considering**
150:23
**consistent** 163:9
**constructing**
155:23 156:11
**consult** 120:25
**consultation**
115:25 165:17
**consulted** 109:4
111:2 114:12,17
114:22 115:2,8
124:9,11 131:17
165:8,15,22 166:4
166:12,19 167:1,8
167:25 168:17
**contact** 19:24
20:10 21:17 22:11
22:13,14,17,21,22
22:25 23:8,18
25:16 26:2,4,5,17
26:20 63:18 98:19
107:22 108:11
196:15
**contacted** 13:7
64:3
**contacts** 22:10
26:13

**contain** 182:10
**contained** 16:15
117:12 128:1
**containing** 14:21
**contains** 15:16,18
15:18
**contemplated**
50:15
**content** 14:23 53:5
53:9 54:9 56:3
**contents** 54:6
**context** 44:5 45:9
46:1 48:7 64:24
155:13 156:2
164:7 177:8 178:9
195:14
**continue** 66:19
**continued** 3:1
**contribute** 152:18
**contributed** 42:6
42:10
**control** 49:11
198:22
**controlling** 189:24
189:25 190:1
**convene** 186:11
**convened** 20:5
25:22 183:6,9
**conversation**
20:21 37:18 44:6
54:6,15,22 55:19
57:11,17,19 58:4
58:15,16 90:18
91:10,24 92:1,3,11
92:19 93:5 99:19
100:2,8 102:15,24
103:2,4,18,22
104:18 105:24
106:5 122:2,17,18
122:19,21,22,25
173:9 177:3,9

[conversation - current]                                                    Page 8

178:9,12 179:8,11
179:25
**conversations**
22:3 24:9,12
25:24 44:2,4,10
45:4,8 46:10 48:4
48:6 49:21,24
50:5,6,8,9 54:9
55:25 56:19 57:8
58:2,6,12 89:6,16
89:21 90:13,16,20
90:23 91:9,14,15
91:17,21 92:7,21
93:1,7,11,16,20
94:1,5,11,16,20
95:4,8,17,22 96:1
96:7,15,24 97:5,14
97:17,22 98:1,6,22
99:1,7,18,23 100:4
104:4 106:14,17
106:20,23 112:24
113:2,6 120:17
121:12,23 122:1,6
122:11,13,21,25
123:3,5,14,21,23
123:25 141:19
143:8 145:21
146:1,4 175:9
181:24 182:9
191:6,8,13,16,21
193:6
**convey** 174:12
**conveyed** 152:1
**coordinate** 12:11
20:8
**coordination** 12:3
12:5,6 20:5 22:15
23:4 25:19,19,20
189:19
**copy** 13:21 61:2
67:14,15,17 69:9

118:11
**correct** 10:16,17
11:3 14:6,9 16:7
16:18 18:25 19:10
19:16 21:19 22:8
28:22,23 32:20
34:18,19,21 37:9
40:3 48:22 55:5
56:16 62:7 64:1
66:4 69:4,5 71:11
75:16 77:15 78:17
79:7,8 82:14,22
83:9 86:24 87:2,3
98:7,8 101:14
102:21 116:22
117:2,24,25 123:3
131:4 132:13
135:1,9 146:1,4
150:24 164:10
169:14 184:9
188:25 198:10
**correction** 200:8
**corrections** 199:4
199:6 200:6
**correctly** 13:7
92:16 102:25
142:3 158:7
178:10 198:7
**correlate** 40:11
**cost** 152:5 153:14
153:16,19,21
**costs** 150:1,5,8,19
151:9,14,17 153:5
153:11
**council** 20:14,15
**counsel** 3:10,11
6:21 13:8 14:19
14:22 52:3,18,22
61:1,4 64:3 66:10
66:12,19 72:6,7
73:24 74:9 92:14

92:20 109:25
110:8,13 111:12
121:3,5,19 122:8,9
123:13 131:25
142:22 143:3,13
143:14,20,22
159:17 161:3
180:2,11 184:21
185:5 187:7
189:17 198:11
**counsel's** 161:4
186:12,15
**counseling** 66:17
167:15,21
**counselor** 183:17
184:13,14,24
185:1,16 188:10
**counselors** 52:8
56:23 57:1 183:12
183:14 188:20
189:12
**countries** 36:7,22
39:3 47:14,20
103:23,25
**country** 29:20,23
29:25 30:4,12
31:6 32:15 35:14
35:18,19 42:13
104:2 152:19
165:5,12,19,25
166:8,16 167:5,14
167:20
**country's** 154:11
166:23
**couple** 35:4
154:20
**court** 1:1 5:11,16
5:21 7:16,19
199:15
**cov.com** 2:14

**cover** 117:9 119:1
181:11,18 190:19
**covered** 157:20
193:4
**covers** 181:9
189:15
**covington** 1:20
2:10 5:14 6:2,16
149:14
**creamer** 99:23
102:19 104:8
105:24 106:5
**create** 60:15,18,21
80:21
**created** 15:13,22
64:4 75:19 109:16
110:8,11 134:4
137:1,5
**creating** 15:24
67:24
**creation** 15:8
18:17
**crime** 38:15
**crimes** 38:15
**criminal** 33:5,8
**criminality** 32:16
**criminals** 42:9
**crisis** 39:1 40:3,6
40:10
**criteria** 147:10,12
**critic** 154:5
**crossing** 39:2,8
**crutcher** 2:17 6:5
**csr** 198:15
**cuevas** 169:16
**current** 11:10
19:23 26:16,19
42:21 140:2
146:20,21,22
158:1,3 170:3

currently 53:21
55:10 101:18
126:16 130:14
146:23
curriculum
185:10
curve 32:23 71:7,9
custodians 187:8
customs 82:18
195:8
cv 1:5 124:23
cyber 12:7 23:25
25:9 80:14 130:8
189:14

**d**

d 1:19 4:1,2 5:7
7:1 200:2,25
d.c. 1:22 2:13,18
2:24 3:11,16 5:1
5:15
daca 10:3 13:4,9
13:12,17 14:8,10
15:8,24 16:6,11
24:10,13 27:16,20
27:21,23 28:7,8,14
28:20,21,22,25
29:6,9,12,12,15
44:5 45:10 46:1
48:7 50:10,13,16
50:20 51:5,9,14
52:16 53:2,15
54:3,16,24 55:21
56:16 57:9,21
58:3,7,14,18,25
59:4,8,12,16,20,24
60:3,7,13,16,19,22
61:2 62:7 63:15
63:20 64:5,10,10
64:25 65:4,7,16,17
65:19 66:3,7,23
67:5,6,20,20,24

68:22 69:21,24
70:10,13,19 71:1,3
71:4,7,14 73:1,13
75:23,24 76:1,5,18
76:24 77:6,12,15
77:18,21,22,25
78:1,6,9,20 79:6
79:18,19 80:4,6,10
80:16,19,22,25
81:3,18 82:21
83:14,17 84:17
88:12,14,17,20,23
89:1,14,19,22 90:3
90:10,12,21,24
91:8,12,18 93:2,8
93:11,17,21 94:2,5
94:11,17,24 95:5,8
95:14,17,23 96:1,7
96:12,21 97:6,10
97:15,23 98:1,7,18
98:23 99:1,7,12
100:7,11,12 102:9
102:11,13,17,21
102:23 103:8,10
103:13,24 104:1,3
104:9,13,20,23
105:6 106:8,15,18
108:6,12,15 109:1
112:19,25 113:3,7
113:11 117:13,24
119:8,13 125:7,16
126:9,15,23,25
127:10 128:4
131:22 139:20,21
140:1,3,7,9,15,19
140:24 141:3,14
142:5,11 144:21
145:2,3,13,23
146:6,17,22,23
147:2 148:7,20
150:23,24 151:5,5

151:14,16,22,23
151:24 152:2,8,12
152:16,22,25
153:5,11,23
154:10,10,14,21
155:5,8,14 156:4
156:13 157:24
158:17 160:13,20
161:6 162:8,18
163:20 164:3,14
164:21 165:4,9,11
165:16,18,22,24
166:5,7,13,15,20
166:23 167:2,4,9
167:11,14,20
168:1,4,10,16,17
170:24 171:6,14
172:21 173:3,11
173:13,19 174:2
174:17 175:12,12
175:16,17,18,21
176:8,8,22 177:10
177:12 178:21,22
179:3,13,14 183:6
185:20 186:21,24
187:3,23 191:9,13
191:18,22 194:5
194:10,11 197:3
daily 22:13 169:24
dangerous 4:12
34:17
date 5:5 11:20
16:20 21:4,22
82:25 130:18
158:3,4 199:8
dated 34:16 68:10
82:1 198:17
dates 15:3 24:22
48:15 90:6 122:24
185:6

day 19:23,23 20:9
20:9 22:9,9,16,16
22:20,20,24,24
23:16,16 25:15,15
26:1,1,16,16,19,19
63:19 64:21
170:19 189:24
195:3 200:23
days 199:12
deadline 158:25
160:7,10 161:24
162:7,13,23
188:14
deadlines 158:19
deal 20:13,16
121:4
dealing 20:12
99:21
decades 41:12
42:9
decide 172:12
decision 10:2 13:2
40:19,20,21 41:13
47:12,22 50:19,24
51:22 54:24 55:4
55:21 56:15,18
69:14,18 70:10
73:13 78:19 79:6
84:16 102:6
103:13 106:3
112:11,13,18,22
112:25 113:3,5,7
113:10 122:3
124:7,10 153:22
156:3,13 160:6
161:23 165:1,8,16
165:22 166:4,13
166:19 167:1,8,25
171:13,14,18
172:18 174:15
179:1 192:21,22

193:2 194:3,17,23
195:23 196:9
**decisions**  47:13,17
47:19 51:2,3,13,23
52:15 69:21
110:14,19 119:16
119:19,23 120:5
120:18 121:13
122:6,15 123:5,15
171:24 172:2,3
174:18,19 190:23
193:2 194:16,19
194:24 195:2
**declaratory**  4:16
**decreased**  31:10
31:12
**deemed**  199:14
**deep**  168:8
**deeply**  37:23 38:4
**defendants**  1:12
**defer**  27:8
**deferred**  4:15 13:3
27:19 78:4,5 82:2
82:20 128:5
130:16 140:7
148:20
**definitive**  176:18
**delegate**  193:9
**delegated**  193:16
**delegations**  45:21
45:21,23,25
**deliberate**  82:19
181:8
**deliberating**  72:8
**deliberations**
180:20
**deliberative**  53:6
54:7,18 56:1,10
57:12,23 58:9,20
70:4,21 71:8 72:1
73:5,8 74:25

76:20 77:2 78:12
78:25 79:12 83:20
84:1,8,21 85:2,11
85:17,23 86:3
87:19 88:2 111:12
113:4 120:10,20
123:8 141:9 142:8
142:19 143:9
145:18 148:11
151:1 153:25
156:6,15 158:13
159:6 163:23
164:16 175:25
177:1 180:4,15,20
180:22,24 181:4
181:17,24,25
182:5,10
**deliver**  101:10
**delivered**  181:9
**demand**  21:9 22:7
25:1,9 42:1
**democratically**
30:16
**deneen**  7:11
**denied**  138:12
**department**  1:9,11
2:3 3:10,14,18,20
5:10 6:19,20,22,24
10:2 11:11,18,21
11:25 12:9,14,24
15:15 16:22,24
18:22 19:14 22:25
23:3,7,17 24:17
25:16,23 28:16
43:10,16,23 47:16
52:5,11,22 58:23
59:6 62:12,24
71:3 75:6 80:12
80:17 99:12,24
102:20 106:8
118:10,13 124:2,3

124:4,22 125:6
129:15,20 132:8
133:19 134:7
135:25 146:12
157:23 158:2,6
162:1 173:20
177:5 178:11
180:13 185:11,12
185:13 188:7,18
190:24 192:13,25
193:14 194:18
195:7
**department's**
26:11 131:23
149:25
**departments**
52:13
**departure**  19:5
20:20,22 21:25
**depend**  130:5
171:8
**dependent**  30:18
**depending**  188:19
**deponent**  3:18
198:4,6 200:1
**deportation**  42:8
**deporting**  41:11
42:5 148:19
**deposed**  7:12
10:16
**deposing**  199:11
**deposition**  1:19
4:11 5:7,13 7:16
8:12,21,22 9:3,5,6
9:9,18 10:11
33:15 61:18 69:7
81:22 124:24
130:20 149:18
158:11 164:24
197:12,14 198:9
199:3,10,13,14

**deputy**  5:23 17:2,4
17:8 19:3,7 48:13
49:1 56:21 89:23
183:13 184:2
**derek**  107:7
**describe**  16:23
26:5 30:3 42:21
48:10 51:11
155:20
**described**  22:4,15
23:5 24:24 25:13
31:7,24 32:2
39:12 40:12 52:10
82:10,12,14 83:4
153:14 155:4
163:16 174:1
**describing**  192:11
**description**  4:10
188:9
**deserves**  154:16
**detail**  122:18
135:20
**details**  73:7
**determine**  83:14
84:5,14 121:5
130:1 184:3
**determined**
183:19,24
**determining**
149:25
**dhs**  4:14 13:8
50:15 82:1,10,16
83:13 88:6,8
89:13 93:10,19
94:4,19 95:7,16,25
96:14,23 97:8,17
97:25 98:20,25
107:22 108:4,10
108:17 111:5
112:6 113:13
116:6 117:23

118:14,19 120:4
124:9 126:17
128:9 130:9 132:4
132:7 137:7,24
140:1,6,11,14
141:2,13 151:6
153:19 158:18,24
161:20 162:4
164:25 185:1
196:8
**dialog** 25:9
**dialogue** 23:25
24:3 98:15
**difference** 134:8
135:21 143:4
194:14
**different** 44:11
126:17 130:7,9
150:18 159:25
160:3 180:1
186:24 190:5,10
194:6,24,25
195:17
**difficult** 39:13
133:7 135:20
**dimple** 52:24 54:1
54:15 73:25 74:9
83:8 86:1,19
92:25 122:11,14
161:7
**diplomats** 101:5
103:16 104:6
106:2 178:25
**direct** 17:9 19:8
40:18 79:17 80:2
198:22
**directed** 173:3
**direction** 173:6
**directly** 17:6
48:24 187:16

**director** 3:15 55:8
55:10,12,13,15
87:13 91:6
**disagreement**
181:12
**disclosed** 179:13
**disclosure** 76:20
77:2 78:25 83:20
85:4 86:3 111:11
123:8 139:21
145:17 148:11
151:1 153:25
156:6,15 158:13
159:6 163:23
164:16 176:25
**discuss** 20:8 21:8
26:11 47:7 68:3
84:24 85:8,14,21
86:1 87:16,24
98:17 100:23
102:9 124:17
139:20 140:18
145:3,7 163:21
179:12 183:5
**discussed** 42:25
43:3,6,9,15 44:7
44:19,23 45:12
46:3,12,18 47:25
53:2,14,16 54:1
63:20 76:17,25
77:6,12,15,21
78:10,16,22
100:18 101:12,15
101:22 102:11
103:8,15,20
104:11,17 120:4
122:17 123:17,18
141:24 142:4,11
144:21 145:10,23
162:8 177:9 181:1
188:17

**discusses** 82:9
140:22 164:21
**discussing** 45:25
65:19 92:15 101:6
102:5 104:7 106:2
117:20 119:13
120:15 121:23
124:15 130:14
145:6 158:10
179:19
**discussion** 35:13
43:22 47:10 54:11
56:6 66:1 83:24
100:16,20 101:17
101:24 102:23
125:12 142:1,13
143:3 145:11,12
150:11 159:14
160:2,16 161:17
161:20 162:6,11
162:16,22 176:11
176:12,19 177:17
178:20,23,24
**discussions** 56:8
89:18 99:11
102:21 113:4
120:8,13 124:12
124:18 141:2,13
141:17 158:24
159:4,13 160:9
161:6 162:24
163:19 164:14
**disputed** 53:21
**distributed** 140:12
**district** 1:1,2 5:11
5:12 6:8 183:2
192:6
**division** 1:3 3:15
5:13 187:2
**divorce** 10:20

**doctors** 166:16
**document** 8:25
15:25 33:19,22
34:2,5,7,8 68:25
69:1 75:14 110:2
117:20 118:3,6
119:16 124:21
125:3,9,25 127:13
128:18,21,24
129:9 130:6,6,8,14
130:19,22 131:1,3
131:8,15,16
132:12,14 133:4
133:17,18 134:1,2
134:3 138:15
139:1,11,14
140:13,17,20,21
156:21 157:17
164:4,20 188:20
**documentation**
80:25
**documents** 9:17
9:19,20,21,22,24
10:8,10,13 13:1,9
13:10,14,16,18
14:18,20,21 15:1,2
15:2,4,8,9,13,14
15:17,19,20,21
16:6,9 18:18
60:16 62:6,9 64:1
64:6 65:4,23,23
67:8,21 68:6
71:11 74:16,19,22
75:3,15,18,19
110:18 126:12
129:6,12 131:12
132:8 133:9,13
139:19,24,25
140:18 153:16
158:1 164:2
187:13,15,19

189:7,9
**doing** 38:3 42:24
72:16 121:19
181:13 199:7
**doj** 98:23 99:1,7
107:24 113:20
114:22 116:11
137:13
**doj.ca.gov** 2:8
**domestic** 20:15
**donald** 91:1
**doubt** 167:19,23
**doug** 107:14
**dougherty** 18:6,9
91:23,25
**dougherty's** 18:8
**draft** 109:16 110:8
110:10,25 116:22
116:23 137:1,4
**drafted** 62:23 63:2
110:25 111:6,8
112:6,10,15
138:18
**drafting** 62:21
109:4,7 110:18,22
111:3 113:14,21
114:2,7,12,17,23
115:3,9,15,20
136:16 137:8,11
193:10,17
**drafts** 109:11,13
116:5,8 137:23
**dramatically**
31:10
**draw** 70:25
**drill** 144:5
**drive** 14:12,15
**driving** 194:3
**dropped** 36:6,21
**drug** 21:9 22:6
25:1,9 35:22

98:14
**drugs** 42:1,1 49:16
**dual** 185:16
196:21
**due** 66:12,18
80:16
**duke** 1:10 10:1
17:1 19:3 23:23
24:4,13 43:4,7
51:9 53:1,14 54:2
54:16,23 55:20
57:9,21 58:3,7,13
58:17,25 59:3,7,12
59:16,19,24 60:2,7
60:12 61:3 66:2
68:11,21 69:6,9
70:18 71:1 79:5
79:10 82:17 85:8
89:22 90:2,14
94:10 96:6 98:16
99:6 109:5,7,11,13
110:22,24 112:8
113:15,21 117:1
117:23 119:22
134:12,17,25
135:9,14,23,24
136:2,6,10,12
157:3,8 159:15
160:24 172:21
174:1,10 175:2
183:5
**duly** 7:2 198:4
**dunn** 2:17 6:5
**duplicative** 192:11
**duties** 11:14 17:16
29:17 48:17

**e**

**e** 2:1,1 3:1,1,11,15
4:1,9 13:17,19
14:4 16:5,10,12,14
17:22 60:18 62:17

63:17,20,22,25
64:3,4,10,12,20,22
64:24,25 65:3,6,7
65:9,10,11,20 89:7
100:1 113:9 117:7
117:9,12,13,15
118:23,25 119:1
125:10,14 172:9
172:14 173:7,8
191:17,18 198:1,1
**earlier** 24:24
63:24 72:24 73:19
82:11 149:18
155:4 158:11
159:11 164:24
166:22 170:1,22
171:13 177:3
183:4 189:16
**early** 21:20 112:17
196:3
**earth** 4:12 34:17
**easier** 65:22 67:18
68:12 157:5
**eastern** 6:8 183:2
192:6
**economic** 41:4
152:19,21
**economist** 168:12
**economists** 168:15
**economy** 30:11,18
105:9,13 168:16
177:15,24
**effect** 7:18 168:4
168:16
**effective** 38:7
**efforts** 37:24 38:1
39:15
**eisenhower** 20:25
170:2
**either** 16:10 20:24
64:22 101:25

127:22 161:6
**el** 39:4 99:20,22,25
100:21
**elaine** 1:10 17:1
19:3 68:11,21
82:17
**elected** 30:16
**election** 163:8,18
**electronically** 89:9
117:6
**elizabeth** 17:4
56:22 58:2,6
91:20,22
**emphasize** 155:19
**employed** 152:16
**employee** 102:20
**employees** 12:12
140:2,6 141:3,14
165:4,15
**employers** 165:8
165:12
**employment**
152:18 157:25
**enact** 164:9
**enacted** 27:25
**encounter** 22:3
140:3,8,16
**encountered** 21:23
150:13,17
**encounters** 62:14
**enforced** 146:13
**enforcement**
23:25 25:9 27:22
82:18 98:15
126:24 127:1,11
127:22 138:13
140:3,8,25 141:4
141:15 142:6,12
144:22 145:4,8,14
146:8,19 147:4,7,8
148:8 155:19

enjoy 128:4,4
enjoyed 78:5
ensure 69:20
129:17 135:24
136:3,7,11
ensuring 136:12
entail 18:15 27:20
83:18
entails 27:21
enter 61:16 124:20
entered 189:10
195:1
entering 105:2
enterprise 12:4,12
130:10 190:14
195:25
entire 125:3
entities 52:10
129:7 130:3
131:17 132:2,3,4,7
133:11 188:23
entitled 34:16 64:5
64:10 82:1
entity 137:7
equities 130:9
errata 199:5,7,9
199:11
especially 79:20
104:24 105:1
177:10
esq 2:5,11
et 3:8,8 6:12,12
124:22,23 187:10
187:10
events 196:18
everyone's 154:5
exact 11:20 132:11
exactly 15:20
70:12 72:24 77:23
112:22 117:5
134:3 135:10

143:23
examination 7:5
149:11 169:3
182:22 192:1
examined 7:3
example 12:7
25:21 26:6 29:10
29:13 32:7 38:3
152:15 155:5
163:7,8 195:7,23
examples 154:20
exceeded 150:19
exception 200:6
exchange 24:20
exchanged 21:21
191:18
exclusively 162:13
excused 197:13
executive 20:25
exercise 159:10
exhibit 4:11,12,13
4:14,16 8:20,22
33:14,15 34:9
41:18 61:17,18
81:21,22 82:5
124:21,24 125:10
125:14,17 128:17
128:18 156:20,20
156:23,25,25
exhibits 189:10
exist 179:10
existence 77:5
existing 155:9
experience 29:25
35:6,12,23 36:9
70:25 194:5,12
expert 71:2,4
188:8
experts 71:16
193:17 195:24

expire 140:8 158:4
expires 148:20
explain 12:22 73:6
163:5
export 30:20
expressed 100:25
105:24
expressing 104:10
extend 162:7
extended 159:1
161:24
extension 47:19
101:20 102:8
160:10,13 188:13
189:7
extensive 191:5
extent 30:19 57:10
74:24 98:19
111:10 142:17
180:5 196:23
extract 15:2

**f**

f 198:1
faced 124:6
194:16,18,19
fact 101:17 102:6
112:5,14 146:23
180:10 192:22
194:21 195:2
factors 32:13
40:25,25 41:2,3,8
42:2 177:25
factual 181:2
fail 199:13
fair 77:8 150:1
151:6
fairly 39:14 80:7
133:9
fairness 72:7
121:3

faith 166:8,12
fall 182:4
familiar 56:5
76:10,11 107:10
families 167:5
family 167:7
faq 132:12 189:9
faqs 127:5 130:13
130:20 135:8,13
136:17,21,24
137:2,2,5,8,11,24
138:9
favor 102:2 104:8
fed 164:25
federal 3:21 52:14
59:10 106:11
107:23 115:7,14
180:22
feel 181:7
feere 96:12,15
fellow 106:2
fewer 39:7
field 195:10
file 12:25 13:15,17
13:20 14:4,21
15:16
filed 5:11 12:21
125:5 157:24
files 9:20 13:19,21
14:7,8,11,17,24
16:5 63:25
filled 17:19,19,24
18:3
final 84:16
finalized 196:6
find 60:25 65:6
fine 95:1 112:3
157:16
finish 8:5 109:23
first 7:2 16:21,21
21:3 27:23,25

28:8 35:9,20 36:6
36:17,21 37:11
39:17 41:11,15
50:15 65:7 109:16
110:8,10 116:25
124:5 130:13
137:1,4 160:7
180:8
**five** 42:13 47:20
47:20 61:7
**flag** 102:12
**flow** 49:6,18
**flynn** 97:6,9,9
**focused** 162:13
**folder** 64:4,5,10
65:3,7,11 117:13
**folders** 64:4
**follow** 28:19 175:5
175:6
**followed** 37:2
146:12
**following** 149:17
**follows** 7:3
**force** 33:5,6 38:5,5
**forces** 154:11
166:23 190:13
**foregoing** 198:20
200:3
**foreign** 48:19
100:20 103:12,14
103:17,19 104:12
104:15,20 105:10
105:18 177:15
178:25
**formal** 62:17,20
67:4
**formalize** 172:17
**formally** 62:15
146:24
**formation** 192:12
192:12,13 195:15

195:21
**formations** 194:6
194:12
**formed** 196:4
**former** 59:14
**forms** 28:24
192:21
**forth** 54:12 74:21
172:14
**foundation** 40:14
41:24 110:16
113:17 128:14
130:23 135:17
151:11 152:9
153:1 168:7
**four** 17:13 19:12
47:20
**fourth** 83:12
**frame** 99:14
120:14
**francis** 55:14
**francisco** 1:3 5:12
**frank** 92:4
**frequent** 20:4
**frequently** 103:6
125:14 130:15
146:25 148:4
**friday** 1:16 5:1
**friendly** 179:8
**friends** 106:1
179:8
**front** 52:7 56:13
56:24 156:21
159:18 161:9
181:13 183:9,10
183:16,18 184:21
188:20,24 189:4
189:12,20,22
190:9,15,15,18
196:9

**fueled** 41:13 42:2
**fuels** 42:2
**full** 7:10 37:8
38:21
**fully** 196:4
**fundamental**
18:18
**further** 168:19
175:7 179:17
192:14 200:4
**future** 73:13 82:20
124:7

**g**

**gang** 31:4 32:9,11
38:18 42:10
**gangs** 35:22
**gangsters** 41:12
42:6
**garcia** 2:20 6:5
169:6
**gardner** 3:15 6:23
6:23 9:16,23
13:23 19:20 27:3
29:1 30:5 33:9
36:11 40:14 41:24
46:15,21 51:15
53:3,24 54:4,17,25
55:22 56:9 57:10
57:22 58:8,19
60:8 61:4,9,25
62:2 66:8,12,18,24
68:12 70:2,20
72:3,7,15 73:3
74:24 76:19 77:1
77:8,16 78:11,24
79:11 83:19,25
84:7,20 85:1,10,16
85:22 86:2 87:18
87:25 93:12,22
94:6,12,21,25 95:9
95:18 96:2,8,16,25

97:11,19 98:2
99:2,8,13 105:5,14
105:20 107:25
108:7,18 109:19
110:15 111:10,20
112:3 113:16,22
114:3,8,13,19,24
115:4,10,16,21
116:2 119:25
120:9,21 121:3,15
121:19 123:7
128:14 130:23
131:5 132:24
133:20 135:16
138:1,6,23 139:8
141:6 142:7,15,22
143:6,22 144:8,17
145:15 147:5,16
147:25 148:10,16
149:1 150:25
151:10,18 152:9
153:1,24 154:5
156:5,14,23 157:5
157:11 158:12
159:5 163:22
164:15 168:6
176:1,24 178:6
180:7 181:3,7,20
181:23 182:6,14
183:21 185:24
187:4 190:7,21
193:23 194:8
197:8
**gathered** 82:19
83:13
**gdp** 168:5,10
**geared** 23:12
**gen** 3:11
**gender** 31:5
**gene** 57:3 58:13,17
74:1 87:8,16

183:15
**general**   2:4 3:4,4
  3:10 5:24 6:14,21
  13:8 23:18,19,21
  23:22 24:2,10,16
  24:23 25:2,6,12
  29:17 43:1 48:17
  52:22 73:24 74:8
  76:8 92:14,20
  109:25 110:7,13
  119:7 122:8,9
  123:13 131:25
  142:13 155:18
  159:16 161:2,4
  162:9 180:11
  184:21 185:5
  186:12,15 187:7
  189:17
**general's**   5:25 7:8
  192:4
**generality**   182:7
**generally**   18:16
  23:11,14 30:3
  48:19 62:11 63:2
  79:4 117:16 128:3
  129:15 130:2
  133:17 150:3,14
  161:5,7 174:11
  183:14 184:1,3
  189:12 192:11
  194:2
**generic**   149:21
**gestures**   8:9
**getting**   37:12
  39:18 80:13 126:9
  173:2
**gibson**   2:17 6:4
**gibsondunn.com**
  2:19
**give**   8:1 15:25
  33:18 40:18 66:13

72:8,9 74:23
  127:23 128:20
  144:9 152:15
  186:20
**given**   136:19
  198:10
**go**   7:14 31:25 40:8
  48:9 60:24 61:4
  65:7 109:23 126:3
  126:8 127:8
  129:12 134:12,14
  134:20 138:9
  156:19,22 157:1,2
  159:10 192:14
  193:18 195:25
  196:2,6,9
**goal**   12:13 149:19
  149:22 155:23
  156:11 163:4,6,7
  163:12
**goals**   12:8,10,11
  149:25 155:12,17
  155:18 156:2
  163:2,3,21 164:3
**goes**   40:22 41:14
  129:16 135:1,5
  164:5
**going**   13:4 33:13
  34:4,6 35:4 42:19
  51:15 61:5,10
  69:6 73:3 103:1
  112:11,12 125:2
  131:19 134:23
  135:12 138:9
  141:6 143:24
  149:16 150:22
  168:21 175:23,24
  178:24 181:13
  191:6 192:24
  195:22

**good**   5:3 7:7 21:18
  30:21 98:10
  134:18 138:1
  149:13 153:9
  169:5 182:24
**google**   67:11
**governance**   41:4
**government**   20:4
  21:13,16 24:5,8
  26:2,14 28:4,5,6
  29:22 30:16,24
  35:2 41:6 46:5
  49:13 52:14 59:23
  101:11 106:18
  108:11 114:6,16
  116:15 137:17
  150:12 155:9
  179:12
**governor**   26:7,10
**grady**   19:5 92:6,8
**gratitude**   154:17
**great**   45:6 103:21
  149:3 178:11
**greatly**   8:10 39:5
**green**   196:22
**ground**   7:14
**grounds**   110:3
**guam**   26:8,10
**guatemala**   39:4
**guatemalans**   39:8
**guess**   46:24 74:15
  103:9 134:8
**guidance**   140:15

**h**

**h**   4:9
**haley**   2:17 6:4
  169:5
**half**   161:18
**hamilton**   57:3
  58:13,17 74:1
  86:22,23 87:8,16

183:15 184:8,18
  184:25 185:18
  186:6,13 187:18
  187:21 188:12,16
  189:1,5,8,15 191:8
  191:16,22
**hamilton's**   188:1
**handle**   101:1,4,6
  111:22 140:2,7
  144:1
**hands**   20:21 21:21
**happen**   175:12,19
  175:20 176:7,20
  178:17,24 193:5,5
  196:3,5
**happened**   171:3
**happens**   193:3,7
  195:12
**happy**   111:22
  153:12
**hard**   13:21 14:12
  14:14 33:11 67:14
  67:15,17
**harm**   41:10
**hat**   193:1
**head**   8:9 69:10,12
  78:8 82:18 153:13
  154:22 171:20
**health**   167:14,17
  167:20,21
**healthcare**   167:24
**hear**   28:14 29:6,9
**heard**   28:3 53:22
  192:6
**hearing**   11:1,5
**heart**   30:13
**held**   5:13 125:12
**hello**   20:20 21:18
  98:10
**help**   44:14 70:18
  71:1 73:12 79:5

79:17,18 80:10
133:8 142:22
144:4,9
**helpful**  44:12
**helping**  38:8 51:1
51:12,22 66:2
69:25 70:9,12,13
70:14,15 80:6
174:1,2,3,4
**hemisphere**  99:24
177:4
**herbert**  107:18
**hi**  169:5 179:23
192:3
**high**  25:22 31:18
31:23 32:1,2
40:11 73:6 180:18
182:7
**highest**  35:10
**hill**  185:12
**historic**  79:20
**historical**  15:8,13
15:17,21 67:8,21
68:6 71:11
**hmorrison**  2:19
**hoc**  62:16
**hoffman**  93:4
**hold**  48:15 184:25
185:16
**holding**  149:3
**homan**  82:17 83:3
85:14 86:11,20
145:7
**homeland**  1:9,11
3:10 5:10 6:21,22
10:2 11:11,19,21
11:25 12:4,9,14,24
15:11,15 16:22
17:1 18:19,22
19:15 24:17 28:16
43:11,18,20,24

44:13,17,21,25
45:14 46:5,8,14,20
48:1 50:22 52:5
52:11 58:24 62:12
62:24 68:22 75:6
91:7 99:16 106:9
109:2 124:6,23
125:6 126:5 132:9
146:12 180:14
190:24 192:13,25
195:7
**homicide**  35:11
**honduran**  29:13
29:14 36:4,18
37:24 38:4,7 39:2
39:7,11,15 196:16
196:19
**hondurans**  29:11
35:21 36:1 39:6
**honduras**  11:2
29:10,18 30:1,4,11
30:12,22,24 31:1,5
31:6,6,9,17,19
32:15,18,21 34:25
35:10,14 36:6,21
37:3,5,24 41:1,6
42:3,6,7,13 44:1,9
45:6,20,22 48:5,13
196:20
**honestly**  172:16
188:8
**hour**  9:14 74:15
161:18 174:22
**hours**  189:24
**house**  18:23 19:25
20:6,10,11,25
22:10,13,14,17
44:8,20,24 59:2,14
89:19 94:2 107:24
113:14 115:2
116:9 137:10

161:23 170:2
**hq.dhs.gov**  3:12
**huh**  20:18
**human**  152:12
**hundred**  64:20
**hundreds**  48:4
101:18

**i**

**ice**  138:13 139:21
146:7,18 147:3,11
**ideas**  192:21
**identification**  8:23
33:16 61:19 81:23
124:25
**identify**  5:19,20
14:20 38:13,14
73:19,21 143:7,7
143:11 159:11
171:10
**identities**  180:17
**identity**  142:16
**iii**  107:18
**illegal**  4:15 42:1
82:3
**illegally**  36:8,24
**imagine**  170:8
192:19
**immediately**  48:12
**immigrants**  4:15
82:3
**immigration**  2:22
6:7 18:10 26:20
26:23,24 27:2,22
40:25 41:3 46:13
46:19,25 47:1
49:2,9,11,25 52:4
60:5 82:18 108:15
108:22,24 115:19
115:24 116:19
126:24 127:11,23
128:5 137:19

140:25 141:4,15
142:5,12 144:22
145:4,8,13 146:7
146:18 147:4,8
148:8 155:13,21
156:2 164:7
173:18 182:25
189:15
**impact**  101:20
104:23 105:1,9,12
105:18 106:3
168:9 177:14,17
177:18,24
**impacted**  177:10
**impacting**  100:21
**impacts**  101:23
**impending**  73:12
79:6
**imperative**  199:10
**implement**  195:11
**implementation**
195:5
**implemented**
192:18
**implementing**
12:15 33:3 135:8
**implicate**  142:24
**implicates**  142:7
**implicating**  51:16
72:11 73:5
**implications**
103:13,14,18,20
104:7,12,20
110:19 145:1
**implicit**  187:6
**importance**  45:7
**important**  64:13
64:14,17,23 69:14
69:15,17 92:21
124:1,3 171:14,17
171:24 172:1,3

**improving** 41:7
**incident** 150:21
**include** 50:1
  129:22
**included** 185:19
**includes** 37:8
**including** 32:16,17
  81:11 180:4
**income** 30:15
**independent** 66:6
  66:22 69:24
**indicated** 198:4
**indicating** 12:25
  62:1 126:14 157:7
**individual** 157:23
**individuals** 18:4
  86:13 87:5 88:6
  138:12 143:7,8,11
  153:15 159:12,18
  161:8 165:12
  180:18
**inflicted** 41:11
**inform** 73:12
  142:14
**informal** 62:14
**informally** 196:3
**information** 57:23
  58:8,19 63:6
  70:21 72:9 74:25
  76:20 77:2 78:12
  78:25 79:5,9,12,13
  83:20 84:1,8,21
  85:2,5,11,17,23
  86:3 87:19 88:1
  91:11 111:11,14
  111:21 120:10
  123:8 126:16,21
  126:23 127:3,9,19
  128:6,12 138:11
  139:20 140:19,25
  141:3,14 142:5,12

144:22 145:4,8,13
145:17,23 146:6
146:17 147:3
148:2,8,11 151:1
153:25 156:6,15
158:13 159:6
163:23 164:16
174:17 175:2
176:25 179:13
180:21 181:3,9,11
182:10 187:9
**informed** 111:5
143:13 196:5
**informing** 144:25
**initiate** 103:2
**initiated** 173:13
**initiative** 21:8
25:1
**injunctive** 4:17
**inner** 20:7
**innovative** 33:3
38:12
**input** 136:20
161:23 196:8
**inquiries** 69:24
**inquiry** 66:6,22
**instance** 21:3,22
22:5 24:15 98:11
124:5 160:7 194:7
**instances** 23:6
25:7 27:13 43:13
45:2,3,18 98:9
**institutionality**
41:5
**instruct** 51:18
53:10 54:8,20
56:2,11 57:13,24
58:10,21 70:5,23
73:4,10 75:1
76:22 77:4 78:13
79:2,15 83:22

84:3,11,22 85:3,6
85:12,19,24 86:6
87:21 88:4 120:11
120:25 123:11
141:7 142:9,20
143:10,17 145:16
148:13 151:3
154:2 156:8,17
158:15 159:8
163:25 164:18
176:24 182:11
**instructed** 182:2
**instructing** 111:18
**instruction** 55:1
72:14 121:1
**instructions** 140:2
140:5,6,10 199:1
**instructs** 8:14
27:12 143:16
**intend** 125:18
**interaction** 98:17
**interest** 47:3 49:12
102:25 103:10,12
130:10 178:11
**interested** 45:23
49:5 74:20 198:12
**interesting** 38:12
**interfere** 8:1
**intermediary**
179:2
**internal** 132:4
193:18,21,25
194:2 196:2,7
**international**
11:12
**interrupt** 33:9
**interviewed** 34:20
**invite** 170:12,16
170:20 171:8
186:8

**invited** 24:6 186:8
**invites** 170:19
171:10
**invoked** 182:1
**invoking** 180:23
181:17
**involve** 48:6 62:20
132:6
**involved** 12:17
13:5 37:23 38:4
52:23 55:4 56:15
56:18,19,24 71:10
109:7 110:14,18
110:21 112:24
113:4,5,13,20
114:2,7 115:15,20
115:25 122:5,13
122:14 123:14
127:21 130:3
134:16 136:16,20
137:8,10 189:6,8
**involving** 44:4
49:2,8,18,25 81:11
88:12
**irrespective** 181:1
**issuance** 132:21
139:1,7,12,15
147:11
**issue** 42:25 43:3,6
43:9,15 44:7,19,23
45:12,23,25 46:3
46:12,18 47:25
124:1 130:11
144:6 179:19
195:10
**issued** 129:4,11
131:10 132:8
**issues** 53:19,23
75:22 77:14 78:15
80:14 99:21 103:7
104:11,16 108:24

129:16 189:15
**issuing** 130:6
**ivanka** 97:22 98:1

**j**

**j** 1:23 198:15
**james** 1:19 4:2 5:7
  7:1,11 55:8,20
  87:12 91:3,6,11,14
  200:2,25
**janet** 1:5 2:15 5:9
  6:3 16:3 149:15
**jared** 95:13,17
**jean** 100:1,9 102:2
  102:9,16
**jeff** 98:6,19 107:12
  117:22 124:13
**jensen** 18:7
**jensen's** 18:11
**job** 22:23 188:3,5
  188:9,10
**joe** 92:17
**jogs** 162:23
**john** 16:17,19,23
  16:25 18:21 19:1
  20:17 48:21 49:17
  50:7,9,12 89:18
  92:12,13 94:1,11
  96:20,24 97:2
  99:23 102:19
  104:8 105:24
  106:5 177:4
**joined** 80:12
**joining** 126:5
**jon** 96:11,15
**jonathan** 93:4,6
**joseph** 52:23,25
  53:1,13 54:23
  74:7 92:17 122:11
  122:14 161:6
**josh** 6:23 9:16

**joshua** 3:15
**joshua.e.gardner**
  3:17
**judgment** 41:2
**julie** 90:23
**july** 11:19,22,23
  16:17 18:23,23
  80:12 81:2 88:16
  88:17 89:12,22
  90:10 126:5
**justice** 2:3,4 3:14
  3:18,20 6:19,24
  22:25 23:3,7,17
  43:17,23 59:6
  118:14 162:1

**k**

**kate** 3:21 6:18
  9:16
**kate.bailey** 3:22
**keep** 169:7
**kelly** 16:17,19,23
  16:25 18:21 19:1
  20:17 21:10,18,23
  24:25 48:21 49:17
  50:7,10 89:18
  94:2,11
**kelly's** 19:4 50:12
**ken** 106:20
**kevin** 92:9,11
**khan** 3:4 4:7 6:10
  6:10 192:2,3
  193:24 194:9
  197:5
**kimberly** 2:11
  6:16
**kin** 198:11
**kind** 51:11 108:5
  130:7
**kinds** 38:20
  134:20

**kirchner** 90:24
**kirstjen** 17:3
  94:16
**knew** 71:3 112:10
**know** 7:15 8:17
  15:19 16:14 19:17
  21:24 23:9,10
  27:16,19 30:10
  42:17 47:23 50:12
  50:15 51:23,25
  52:13,17 53:1,13
  53:16 54:1,11
  55:19 57:7,15
  58:1,5,12 59:3,11
  63:9,11 64:25
  65:2,11,12,15,18
  71:4 74:19 75:11
  75:13 76:7,8,13
  77:11 80:16 91:19
  92:15 93:3,10,19
  94:4,10,19 95:7,16
  95:25 96:6,13,14
  96:22,23 97:7,8,16
  97:17,25 98:25
  99:6 103:21
  104:21 105:16
  106:22,25 107:2,4
  107:6,8,13,15,17
  107:19,21,22
  108:2,4,8,10,13,17
  108:22 109:16
  110:7,10,21,24
  111:4 112:18,21
  112:22 113:18,20
  113:24 114:1,4,6,9
  114:11,14,16,20
  114:22,25 115:2,5
  115:7,14,19,24
  116:5,8,10,12,14
  116:16 118:20,20
  119:2,22 120:2

122:5 124:8,11
  126:18,23 127:21
  128:15 130:25
  131:15,17 132:10
  132:14 134:3,9,10
  134:11,15,19
  135:4,18,23 136:1
  136:2,5,6,9,10,14
  137:1,4,7,10,12,14
  137:16,18,20,23
  138:8,18 139:24
  150:10 153:13
  158:21 163:3
  175:19 181:12
  183:6,24 184:5,15
  185:6,10 186:2,4
  186:15,18 187:6
  187:15,24 188:8,9
  188:11 189:5,11
  189:11 191:5
  195:6 196:17
**knowledge** 29:25
  35:6,12,23 36:9
  70:25 82:21
  153:21 156:1,10
  157:20 161:22,25
  162:2,5 163:19
  164:12 165:7,21
  165:23 166:3,6,11
  166:18,21,25
  167:3,7,10,24
  168:2,15,18
  185:15 188:16
  189:5 190:17
  197:4
**known** 47:15
**kobach** 107:9
**kramer** 177:4
  178:14
**kris** 107:9

| | | | |
|---|---|---|---|
| **krishna** 3:25 5:4 | **learn** 27:23 112:14 | **listened** 52:9 | **maher** 52:23 53:1 |
| **kushner** 95:14,17 | **learned** 28:7,8,25 | 71:15 | 53:13 54:23 74:7 |
| **l** | 29:6 71:17 112:9 | **listening** 52:2,3,7 | 74:10 92:17 |
| | **learning** 71:6,9,14 | **litigation** 77:12 | 122:12,14 161:6 |
| **l** 2:5 | **left** 18:21 19:1 | 119:12 154:24 | **maher's** 52:25 |
| **lack** 40:14 41:3,4 | 21:20 37:2,4 50:2 | 155:3,6,10 174:17 | **mahr** 92:12,13 |
| 41:24 110:16 | 89:19 185:13 | **little** 51:16 192:10 | **mail** 13:17,19 14:4 |
| 113:17 128:14 | **legal** 3:25 5:17 | 194:13 | 16:5 62:17 63:17 |
| 130:23 135:17 | 52:2,18 78:3 | **lived** 196:21 | 63:25 64:3,4,10 |
| 151:11 152:9 | 83:13 110:3,19 | **llp** 2:10,17 | 65:3,7,9 117:7,9 |
| 153:1 168:7 | 128:9 129:20 | **local** 26:2,14 46:4 | 117:12,15 118:23 |
| **landry** 107:12 | 136:4 153:9,15 | 46:11 59:22 | 118:25 119:1 |
| **language** 77:20 | 180:12 184:19 | 106:18 108:11 | 172:14 173:7,8 |
| **laquon** 169:16 | 187:7 189:17 | 114:6,16 116:15 | **mails** 16:10,12,14 |
| **large** 30:19 105:7 | **legislation** 164:9 | 137:17 | 60:18 63:20,22 |
| 153:8 177:13,14 | **legislative** 164:13 | **located** 5:14 | 64:12,20,22,24,25 |
| 177:19,24,25 | 164:22 175:17,22 | **locations** 13:20,22 | 65:6,10,11,20 89:7 |
| 178:3,13,18 | 176:9 | 14:10 | 113:9 117:13 |
| **larger** 190:14 | **legislature** 30:17 | **lodge** 55:22 182:8 | 172:9 191:17,18 |
| **largest** 30:18,19 | **leslie** 107:1 | **logic** 179:9 | **main** 41:3 |
| **lasted** 74:15 | **letter** 117:22 | **long** 9:13 31:15,16 | **maine** 125:5 |
| 161:17 | 118:12,17,21 | 37:18 74:14 | **maintain** 169:11 |
| **late** 73:16 112:17 | 119:3,5,6,11,24 | 161:13 163:16 | 169:17 |
| 133:10 | 120:6 121:14 | 174:20,23 | **maintains** 169:20 |
| **launching** 24:25 | 122:7,15 123:6,15 | **look** 13:20,21 14:5 | 169:22 |
| **law** 2:5,11,17,22 | 124:13,14,15,19 | 14:8,10 157:15 | **makers** 192:22 |
| 2:22 3:21 6:7 | **level** 23:6,10,12,13 | 175:23 | 193:2 |
| 23:24 25:8 98:15 | 23:14 73:6 162:9 | **looked** 9:19 14:12 | **making** 47:18 |
| 147:7 182:25 | 180:19 182:7 | 15:1 64:3,8 | 50:19,24 55:4 |
| **lawrence** 107:3 | 183:12 | 126:12,13 171:1 | 56:15,18 113:5 |
| **laws** 127:23 | **levels** 31:10,12,17 | **looking** 14:4,7 | 124:6 129:22 |
| 155:20 | 31:18,20,23 32:1,2 | 34:25 72:10 | 165:1 |
| **lawsuit** 10:19 76:4 | 32:19 40:11 | **lose** 175:17 | **management** 19:6 |
| 76:5,7,9,10,12,14 | **life** 192:22,23 | **lot** 31:4,18 38:6 | **manager** 17:20 |
| 76:18 81:4,5,10,16 | **limbo** 153:9,15 | 62:25 71:17 80:13 | 169:13,17 170:9 |
| 119:10 183:2 | **limit** 191:3 | **lots** 44:11 | **manager's** 169:15 |
| **lawsuits** 12:23 | **line** 40:7 41:9 | **loud** 33:25 | **managers** 187:8 |
| **lawyer** 119:6 | 200:8 | **m** | **manages** 91:8 |
| 127:21 128:8 | **listed** 69:3 74:12 | | 131:23 |
| **lawyers** 71:6,15 | 200:7 | **m** 100:1 | **managing** 29:21 |
| **lead** 32:11 | | **machine** 198:7 | |

**manes**  100:1,9
  102:2,17
**manner**  38:2
**manor**  63:1
**march**  148:9,22
  158:5
**margins**  160:14
  161:15
**mark**  8:20 33:13
  81:20
**marked**  4:10 8:22
  33:15 61:18 81:22
  124:24
**marshall**  106:24
**marshals**  190:13
**martin**  1:23 5:16
  198:15
**maryland**  125:5
**mashburn**  96:21
  96:24 97:2
**massachusetts**
  3:16
**matter**  5:8 47:4
  64:11 73:7 158:9
  171:6 193:17
  195:24
**matters**  49:11,17
  50:1 65:15 151:15
  189:13
**matthew**  97:5,9,9
**mayhem**  41:13
**mcaleenan**  92:10
  92:11
**mccament**  55:9,15
  55:20 74:3 87:13
  91:3,14
**mcleean**  92:9
**mean**  16:3 37:22
  49:10 77:17 80:3
  81:7,7 84:16 89:8
  112:10 129:5,18

146:21,23 147:18
163:5 172:9
175:13,13 181:8
182:6 185:2
189:22
**meaning**  128:5
**means**  128:3,10
147:15,24 148:1
198:22
**meant**  34:1
**measure**  35:15
39:14
**media**  5:6 28:22
29:5 81:6,8
**medications**  7:25
**meet**  9:8,11 23:21
24:19 46:25 98:13
**meeting**  9:13,15
21:6,8,11,13,20
22:6 24:1,5,13,24
25:3,10,22 26:9
47:4,8 71:18,19,24
71:25 72:4,20,22
73:7,8,11,15 74:14
74:17 75:7,9,12,16
75:18,20 77:22
78:10,16,23 79:10
82:9,10,12,13,22
82:25 83:3,6,8
84:5,6,14,15,25
85:9,15,21 86:1,10
86:14 87:6,17,24
88:7,11,19 89:1,25
92:22 98:12,13,14
102:14 122:20
123:16,17,19
136:4,8 141:23
142:2 144:23,25
145:5,9,22 158:10
159:21,25,25
160:3,4,4,12,14,14

160:16,18,23
161:13,15,15
162:12,12,15
170:3,7,10,14,17
170:23 171:11
174:13,20,23
175:5 176:13
180:11 182:8
183:5,7,20,25
184:4,6,9 185:19
186:6,10,11,13,16
186:19,20 187:12
187:19,23 188:13
191:12
**meetings**  20:5,7
21:1 22:15 23:4
23:11,12,15 24:18
24:21 25:5,13,25
62:16,16 88:12,14
88:17,20,23 89:5
89:16 145:22
162:17,20 163:1
169:8 170:2,24
171:2,5,7 174:11
180:18,19,25
181:19,22 183:8
185:19 190:1
193:6
**meets**  129:20
147:10
**member**  23:7
76:13 81:11 92:24
173:7 188:7
**members**  10:1
20:7,11,13,14
21:14 22:21,22
24:6 25:16 26:17
45:13 59:18 60:11
63:5 89:13 92:24
106:15 108:5
109:1 114:1,11

116:13,17 137:15
137:21 166:8
167:5,8 172:5,6
180:10,13
**memo**  10:5,6,7
61:3 67:23 68:1,4
68:4,17,19,20,23
69:3,6,9,13 109:5
109:8,10,11,14,17
110:8,10,22,25
111:3,6,7 112:5,10
112:12,14 113:15
113:21 114:2,7,12
114:18,23 115:3,9
115:20 116:1,8,22
116:24 117:1,4,10
117:15,17 134:12
134:17,23,24,25
134:25 135:5,9,14
135:23,24 136:2,3
136:6,10,12,14
140:11,14 157:3,8
173:13 194:22
195:1,22,24 196:6
**memoranda**  172:3
172:4,13
**memorandum**
9:25 15:23 68:10
158:3,5
**memory**  162:23
**memos**  60:21
62:21,23 63:7,14
80:21 110:14
134:20,20,20
193:5,9,10,15,20
193:22,25 194:3
195:4,6
**mental**  167:12,14
167:17,20,21,24
**mentioned**  16:5
32:18 52:18 55:3

56:13 62:5 63:24
72:23 73:18,19
77:14 78:15 79:4
98:5 101:12
102:19 123:20
131:3,7 160:22
161:8 166:22
192:15 194:20
195:13,20
**mentions** 83:7
**merit** 1:23
**met** 23:19,22
24:16 26:7 98:9
196:24 197:1,3
**mexicans** 105:7
177:13,20,25
178:4,14,19 179:3
**mexico** 104:3,5,23
105:1,8 155:24
156:12 177:9
**mexico's** 105:9,12
177:15,24
**michael** 2:5 6:13
18:6,8,9 91:23,24
**microphone** 33:10
154:4
**mid** 11:19,23 19:5
73:16 80:12
**migrants** 100:15
**migrate** 40:19
**migration** 38:22
39:18 41:2 45:23
**military** 154:16
166:25
**miller** 91:18,19
95:23 96:1,7
**million** 30:12
**mind** 132:1 192:11
**mine** 41:20
**minnesota** 125:5

**minor** 38:25 40:2
40:10 196:25
197:2
**minors** 39:2,3,8,11
43:1,4,7,10,16
44:8,11,20,24 45:5
45:9,13 46:1,4,13
46:19 48:1,7 50:1
50:4
**minute** 61:7
148:24 152:6
157:15 182:15
**minutes** 138:3
161:18 174:24,25
**mischaracterizes**
131:5 138:23
139:8
**misstates** 132:24
**misunderstand**
142:25
**mix** 68:13
**moment** 22:1
33:18 68:23 82:4
118:1 125:13
128:20 153:2
**monday** 53:22
82:19
**month** 26:6 30:15
46:25 90:2,10,14
**months** 47:21
90:21
**morning** 5:3 7:7
149:13 169:5
182:24 186:8
**morrisey** 107:20
**morrison** 2:17
**morrisson** 4:5 6:4
6:4 169:4,6 176:6
177:2 178:8
179:17

**motion** 53:22
**move** 40:21
111:16 196:12
**multiple** 120:17
121:12 122:1
123:4
**murder** 32:7,12,17

**n**

**n** 2:1 3:1 4:1 100:1
**n.w.** 2:18,23 3:16
**name** 5:4 7:7,10
17:22 55:14 83:5
86:25 92:16 100:1
107:10 149:13
169:5,15 182:24
192:3
**named** 11:2 96:15
97:2,9,18
**names** 142:16
**nancy** 1:23 5:16
93:1 198:15
**napolitano** 1:5
2:15 5:9 6:3 16:3
67:23 149:16
**narrow** 180:16
**nate** 18:7,11
**national** 2:22 6:7
20:14 147:9
182:25
**nature** 79:20
130:5 131:12
178:20
**nazario** 33:20
34:17,24 37:19
39:23
**nazario's** 41:19
**nealon** 1:19 4:2
5:7 7:1,11 9:1
182:24 192:3
200:2,25

**necessary** 31:20
32:19,21 143:15
199:4
**need** 8:17 33:24
68:23 125:21
192:25
**needs** 121:1
**negative** 105:12
105:18
**neighborhoods**
33:2,2 35:1,3
**neither** 198:11
**neufeld** 91:1
**neumann** 17:5
56:22 58:2,6
91:20,22
**never** 10:15
116:21 196:18,24
197:1
**new** 3:3,6,6,7 6:9
6:10,12 21:8
34:15 71:3 183:2
192:4,5,7
**newman** 2:5 6:13
6:13
**news** 15:10,14,18
28:19 29:13,14
67:7,9,12 101:10
**newspaper** 71:10
81:15,25
**newspapers** 28:21
29:5 81:9
**nielsen** 17:4 19:13
94:17,20
**night** 9:12
**nil** 170:21
**nilc.com** 2:25
**nine** 75:25
**nods** 8:9 78:8
**nominated** 19:14

**non**  132:7
**nondisclosure** 88:1
**nongovernmental** 47:2
**nonprofit**  60:1
**normally**  134:18 134:19
**norms**  129:21,21 129:21
**northern**  1:2 5:12 39:4
**northwest**  5:15
**note**  154:4
**noted**  86:13,23 87:1,5 199:9
**notes**  67:25 75:9 75:11 174:6
**notice**  4:11 8:21 9:3,6 147:11 198:3
**number**  4:10 39:5 75:25 78:21 105:7 125:11 177:13,20 177:25 178:4,14 178:18 180:3
**numbered**  61:21
**numbers**  37:2 40:8 50:3 74:19 74:22 75:14 187:16
**numerous**  32:25
**nw**  1:21 2:12

**o**

**o**  17:22
**oakland**  2:7
**oath**  7:18,18
**obama's**  4:14 82:2
**object**  51:16 56:9 73:3 141:6 143:14 176:24 182:11

**objected**  160:8
**objecting**  181:3
**objection**  8:12 13:23 14:1 19:20 27:3,7,9 29:1 30:5 36:11 40:14 41:24 46:15,21 53:3 54:4,17,25 55:22 57:10,22 58:8,19 60:8 66:8,11,13,14 66:24 70:2,3,3,20 72:13 74:24 76:19 77:1 78:11,24 79:11 83:19,25 84:7,20 85:1,10,16 85:22 86:2 87:18 87:25 93:12,22 94:6,12,21 95:9,18 96:2,8,16,25 97:11 97:19 98:2 99:2,8 99:13 105:14,20 107:25 108:7,18 109:19 110:15 111:10 113:16 115:10,11,22 119:25 120:9 123:7 128:14 130:23 131:5 132:24 133:20 135:16 138:23 139:8 142:7,15 143:15,21 144:16 145:15 147:5,16 147:25 148:10 150:25 151:10 152:9 153:1,24 156:5,14 158:12 159:5 163:22 164:15 168:6 178:6 183:21 185:24 187:4

190:7,21 193:23 194:8
**objections**  8:11 113:22 114:3,8,13 114:19,24 115:4 115:16,21 116:2 121:18 142:21 143:12,19 151:18 181:10 182:9
**objectives**  164:6,8
**objects**  143:18
**obstreperous** 181:8
**obvious**  132:1
**obviously**  16:25 37:19 92:20 105:9 121:4 174:16 178:10
**occasion**  28:14
**occasional**  22:14
**occasionally** 196:17,18,20
**occasions**  174:9 175:1
**occur**  21:4
**occurred**  181:18 181:22
**occurs**  155:11
**october**  1:16 5:1,6 158:6,25 160:6 161:24 162:7,13 162:16,22 188:14 198:17
**offer**  174:15
**offered**  174:15,16
**offering**  51:6
**office**  2:4 3:4,10 5:25 6:11,14,21 7:8 11:24 12:1,2,3 13:8 14:8 17:20 20:25 52:8 56:14

56:24 62:15 69:10 69:12 71:5,5 73:23 109:24,25 110:7,13 122:8,9 123:13 131:22,25 133:8 159:16,18 161:2,4,9 169:13 169:15,17 170:9 171:21 173:18,22 173:23 180:11 183:9,11,16,18 184:20,21 185:4 186:5,12,15 188:20,24 189:4 189:12,16,18,20 189:22 190:5,9,11 190:12,13,15,15 190:18 191:1 192:4,20 193:14 196:9
**offices**  1:20 20:6
**official**  1:5,10 11:13 17:15 82:21 184:25
**officials**  21:14,16 22:25 23:3,17 24:6,8 26:3,14 46:5,11 59:15,23 83:13 106:11,18 107:23 108:11 113:13 114:7,17 115:7,14 116:15 137:17
**oftentimes**  129:6 150:6 171:12 172:17
**okay**  9:3 11:24 12:5 27:8 34:10 35:7 54:10 56:4 61:5,9 66:15 68:16 69:1,7,8

82:6 86:18 89:12
105:4 118:4
125:24 127:14
128:19,22 130:21
138:4,6,16 144:14
149:20 157:18
172:6,12 176:21
182:13 193:8
194:4
**once**  160:10 196:5
**ones**  52:6 106:12
107:23 115:8
**open**  81:6,7,15
**operational**  49:11
**operations**  78:4
**opinion**  28:10,12
41:14 104:10
119:7 127:24
128:9 143:4 146:9
151:15 186:21
187:2,22
**opinions**  104:22
105:23 186:23
**opportunity**  41:4
136:19
**option**  150:4,7,9
150:18,20,24
**options**  70:15
150:2,18 174:4
**order**  186:5,7
**orders**  195:10
**organization**
35:16 47:2,2
162:3
**organization's**
35:16
**organizations**
26:21,23 27:1
33:8 46:14,20,25
47:24 60:1,6
115:19,24 116:19

137:19
**original**  199:11
**originator**  131:14
133:17 134:1
**otter**  107:5
**outcome**  198:13
**outside**  88:6,8
89:1 116:5 124:9
128:12 137:24
145:22 182:4
**outweigh**  150:5,8
**overlap**  190:6
**owned**  52:4
136:21
**owners**  131:21
**oxfam**  47:1,15,24

## p

**p**  2:1,1 3:1,1 17:22
**p.m.**  197:14
**page**  4:1 37:7
41:16,17 83:11
125:11 127:8
138:10 157:3,4,10
157:15 200:8
**pages**  4:11,12,13
4:15,17 68:15
125:22 126:11
**pains**  200:22
**paper**  13:15,19
14:7,17,21 15:19
129:16,24
**paperwork**  189:25
**paragraph**  35:9
35:20 36:2,5 37:8
38:22 41:9 42:11
82:16 83:12
**paranzino**  97:15
97:18,18
**parents**  10:20
**part**  12:23 38:17
41:15 66:7 67:2

68:7 69:17 71:8
71:13 76:13
102:25 126:8
131:4,18 132:17
133:11 138:21
142:1,13 144:25
160:3,4 164:7
171:23 179:11,13
188:5
**participants**
171:11 187:1,12
**participate**  23:12
145:25
**participated**
159:12 160:23,25
161:19 162:17,24
163:21 180:18
**participating**
23:11 144:24
146:3
**particular**  13:20
20:11 51:19 76:3
78:9 82:12 111:19
112:1 119:11
127:16 129:23
130:22 131:1
132:11 133:18
135:5 138:18
139:5,6,12,16
145:22 157:13
**partner**  30:18
**parts**  49:6,19
**party**  198:12
**passage**  128:2
**pathways**  49:14
**patients**  166:18
**patrick**  107:20
**pause**  33:12
179:21
**paxton**  106:21

**peaked**  32:7
**peaking**  32:12
**penalties**  200:22
**pence**  93:17,20
**pending**  8:19
102:7,7 138:12
144:10 157:24
**people**  23:10,14
27:22 30:13 33:6
33:7 38:14 44:3
44:12 49:6,15,18
73:2 74:20 78:16
78:19,23 79:19,23
79:24 88:8 122:10
128:4 135:3,12
144:24 153:8
160:22 169:23
173:21,23 186:23
189:23 192:19
196:20
**performing**  11:13
17:16
**performs**  12:3
**period**  28:25
**perjury**  200:22
**permissible**
121:16
**person**  17:24 24:1
25:12 71:20,21,23
89:9 96:15 97:2,9
97:18 141:21,22
159:21 160:16
186:18,19
**personal**  14:14
28:10,12 29:19
40:20,21 127:24
138:11 146:9
173:9
**personally**  118:11
145:25 169:11

personnel  29:22
persons  63:18,21
  65:13 74:11 86:14
  87:5 89:1
perspective
  170:18
pertain  64:24
pertaining  53:20
  65:17
peterson  107:14
petyo  17:22
philip  91:17,19
phone  106:1
physical  159:21
picking  33:11
piece  129:24
place  4:12 18:2
  20:23 21:7 31:7
  34:17 36:6,21
  57:17,20 73:15,16
  82:10 102:14
  103:5 141:17
  159:23 160:18
  198:4
places  47:3
plaintiff  3:7 6:11
  192:5
plaintiffs  1:7 2:20
  2:25 6:5,8 169:6
  183:1
plan  18:19
planned  21:1,6
planning  18:12,14
plans  140:24
  148:7,19
play  188:16 189:1
played  69:19
  92:21
players  72:23
  73:18

playing  39:16
plead  35:22
pleasantries  21:21
please  7:9 16:22
  26:5 30:3,9 33:10
  37:7 44:18 48:10
  51:11 61:25 66:19
  68:9 72:5 82:4
  125:9 130:2
  142:21 143:12
  146:14 151:12
  157:9 159:11
  199:3,7
point  27:6 39:5
  51:15 73:4 102:4
  125:22 133:7
  195:21 196:1
police  33:1,2,5,6
  38:5,5,7,9
policies  146:11
  195:11
policy  11:14 12:1
  12:2,3,6,8,10,11
  12:13,15 20:3,5,8
  20:15 22:15 23:4
  25:19,20 26:11
  48:19 69:11,13,14
  69:17 79:23,25
  100:20 103:12,14
  103:18,19 104:12
  104:16,20 105:10
  105:19 110:14,19
  129:19 133:8
  135:25 149:19,22
  149:25 150:2,5,7
  150:18,24 151:6,8
  151:8,14,17,22
  152:3,8,11,24
  153:4,9,11,14,16
  153:19,21 154:9
  154:13,20 155:2,9

155:12,23 163:2
  164:6,7 171:14,18
  171:21,24 172:2,3
  172:8,14 175:7
  178:25 184:19
  189:19 190:2,4,6
  190:10,19,20
  191:2,4 192:12,13
  192:15,15,17,20
  192:21 193:1,15
  194:6,12,16,17
  195:5,14,21,23
political  150:10
  163:3,4,6,7,12,21
  164:3 190:19,23
  191:1
politically  163:17
poor  41:4
poses  147:9
position  11:10
  18:2 48:9,11,15,18
  101:9 184:23
  185:7,9,15,16
positions  17:18
possession  139:19
possibilities
  103:17 176:21
  179:6
possibility  178:13
  178:15 179:12
possible  91:8
  145:1 178:18,25
possibly  91:4
post  82:1
posture  131:24
potential  51:2,2,12
  51:13,22,23 52:15
  81:3,18 101:20,25
  106:2,3 119:13
  135:14 138:22
  174:18 178:3

179:1
potentially  177:24
practice  64:9,11
  68:2 169:7 170:11
precise  14:25
  15:16 40:7 62:9
  64:2 188:9
precisely  27:24
  37:2,19 107:11
  181:11
predecisional
  180:21 181:4,10
  181:24 182:10
prefer  14:2 127:23
prepare  9:17
prepared  129:6
preparing  174:5
present  3:24 5:19
  9:15 23:4,14 24:4
  24:18,19,25 25:5,6
  25:8,8,23 26:6
  75:6 98:12,14
  123:18 159:14,15
  159:16,17,18
  161:3,4,7 183:19
  183:25 184:3
  188:12
president  1:6
  22:11,18 93:7,11
  93:17,20
president's  29:19
pretend  135:11
prevention  33:4
  38:13
previous  40:8
  185:5
previously  38:3,24
  39:12 69:20 71:9
  82:13 83:4 98:5
  119:12 131:8
  139:6 141:24

157:2 185:2,3
191:11,11
**print** 83:5
**prior** 44:25 90:12
109:10,13 117:20
132:25 138:24
139:9 151:5
**privacy** 129:21
136:8
**privilege** 51:17
53:5,7 54:7,8,18
54:19 56:1,10
57:13,23 58:9,20
70:22 72:8,11,14
73:5,9 75:1 76:21
77:3 78:12 79:1
79:12,14 83:21
84:2,9,21 85:2,11
85:18,23 86:4,5
87:20,20 88:2,3
111:12,15,22
120:10 121:4,6,21
123:9,10 141:10
142:8,17,19,24
143:9,23 144:1
145:18,19 148:12
151:2 154:1 156:7
156:16 158:14
159:7 163:24
164:17 177:1
179:20 180:4,6,9
180:16,22,24
181:9,14,18,25
182:1
**privileged** 53:10
**privileges** 53:20
180:1,3,8
**proactively**
138:13 147:7,15
147:24 148:1,3

**probability**
170:20
**probably** 21:5
27:24 44:2 45:20
50:2 67:7 74:15
80:11 117:5,8,15
118:25 120:15
126:7,10 131:20
131:22,25 141:18
161:17 168:13
170:19 173:21
174:21
**problem** 197:10
**proceed** 120:22
**proceedings** 10:21
33:12 147:8
179:21
**process** 38:4 40:22
50:19,24 51:17
53:7 54:8,18 55:4
56:1,10,15 57:12
57:23 58:9,20
66:7,23 67:3 68:7
70:4,22 71:8 72:2
73:5,8 74:25
76:21 77:3 78:12
79:1,12 83:21
84:1,8,21 85:2,11
85:17,23 86:4
87:19 88:2 111:12
120:10 123:9
129:3,5,10,13,16
130:3,12,21 131:1
131:4,9,13,16,18
132:6,11,15,18,20
132:23 133:4,6,10
133:12 134:5,13
134:15,17,22
135:4,14,24 136:1
136:3,7,11,14,19
138:22 139:3,15

139:17 141:9
142:8,19 143:9
144:6,25 145:18
148:12 151:2
154:1 156:7,16
158:14 159:7
163:24 164:17
165:1 172:17
177:1 180:4,15,22
180:24 181:9,17
181:25 182:5
188:17,23 189:6,9
192:12,17 193:18
194:11 195:13,19
196:2,3,5,7
**produce** 61:1
**product** 173:10
**productive** 181:14
**professional** 101:5
103:16 104:6
169:9
**professionals**
101:25
**program** 4:15
39:11 52:5,7
71:16 73:1 82:2
83:15 91:8 100:15
100:15,22 101:21
102:3,8 103:1
124:4 126:18
127:22 131:22
135:12 136:21
152:2,13,22,25
153:5,11 175:21
187:9,9,16
**programs** 3:21
29:22 33:4 35:1
38:2,17 39:15
41:6
**progression**
179:10

**pronouncing**
92:15
**proper** 129:14
**properly** 72:9
157:24
**protected** 47:6,7
47:11,14 85:5
100:17 101:13,15
101:19 127:3,3
139:20
**protection** 127:1
195:8
**protects** 27:21
**provide** 8:8 38:6,9
38:11 51:4,8 79:5
80:24 136:23
140:1,6 143:19
146:14 161:23
171:2 172:7,13,22
172:24 173:15
174:6 175:7
186:23 187:7,9
188:11
**provided** 9:4
10:18,24 52:14
58:24 59:3,7,11,15
59:19,23 60:2,6,12
79:9 133:16 134:1
134:6 140:14
147:7 173:6 175:2
176:16
**providers** 167:25
**provides** 189:17
189:18
**providing** 51:10
143:20 172:7,20
172:23 180:12
187:2,22
**public** 21:14 24:6
26:17 60:12 109:1
116:17 131:20,23

131:23 137:21
147:10 193:22
**publications**
188:18
**pull** 40:24
**pure** 191:4
**purge** 38:4,5
**purging** 33:5
**purpose** 147:8
160:15 161:16
**purposes** 69:7
126:24 127:11
128:7 130:20
138:13 140:25
141:4,15 142:6,12
144:22 145:4,8,14
146:8,19 147:4
148:8 157:21
193:21 194:1
**pursuant** 9:6
198:3
**push** 40:25 41:2,3
**put** 15:10 64:9,12
76:1 170:6,10
193:1
**putting** 33:1

**q**

**quadrennial** 18:19
**quarterly** 18:18
**question** 8:5,13,18
12:19 13:25 27:10
27:14 29:3 30:7
40:15,19 43:5
44:18 46:16 51:19
53:4,8,11 55:24
57:14 62:15 70:6
72:3,18 77:5
84:10,12 86:16
105:5 111:19,25
112:2 120:21,23
120:23 121:10,16

121:20,20 127:6,8
127:9,16,20 133:1
133:22 134:18
138:10,10 139:17
141:8,11 142:25
143:18 144:4,10
144:13,18 146:15
146:16 148:14
150:16 151:12,16
152:7 160:9 161:9
163:3 175:15,24
176:2,3,3,5,14,17
181:6 191:12,15
195:17
**questioning** 72:6
**questions** 7:15
9:23 14:2 34:4,6
36:13 44:13,15
66:20 70:5 79:19
111:25 125:15,15
130:15 135:11
142:23 147:1
148:4 149:16,17
153:12 168:20
179:17 192:8
**quick** 33:18
**quickly** 33:23

**r**

**r** 2:1 3:1 198:1
**raise** 178:13,15
**raised** 178:16
**ramifications**
190:20,23
**range** 63:3 80:14
103:7 104:15
**ranging** 62:14
80:14
**rate** 32:7,12 35:11
**reached** 31:17
32:2

**read** 6:25 15:2
29:12 33:22,23,24
34:1,8 35:4 67:5,6
67:7,19,22,23 69:1
71:7 81:4,5,14,15
81:17 119:15,18
119:22 125:18,21
127:5,12,14,16
138:14 139:12
146:25 157:22
158:7 199:3 200:3
**reading** 67:20,25
68:4 139:6
**real** 192:23
**really** 63:11 71:2
126:18 193:14,15
197:9
**realm** 105:2
**reason** 7:22
165:13 166:2,10
167:6,19,23
168:14 199:5
**reasons** 31:18
132:1 148:3
**recall** 9:22,24,25
11:22 13:15,17
15:7,20 16:8 22:1
22:6 24:21 25:7
26:13 27:6,24
28:3,12 29:14
43:13,22 44:6
45:2,3,11,18 46:2
46:10 48:2,8
49:21,23 50:6,8,11
51:6,10 55:17
57:5 60:17,20,23
63:16,22 65:8
67:4,10,13,19,20
68:5,8 71:19
72:22 74:10,13,18
75:4,10,17 76:15

79:22,24 80:5,9,20
80:23 81:1,19
83:5 86:20 87:12
87:15 88:13,16,20
88:22 89:4,15,20
89:23 90:4,6,11,15
90:18,22 91:9,13
91:21 92:2,7,10,19
92:23 93:5 94:18
98:24 100:6,8,10
102:4,18,25 103:3
103:21 104:4,10
104:21 105:25
106:4,10,13
109:12 111:4
112:9,16 116:23
117:5,11,14
118:16,22,24
119:1,4,21 120:19
121:22 122:4,10
122:17,22,23,24
123:2,23 124:15
124:18 126:4,11
127:7 129:9,10
132:19 133:5
134:14 136:20,25
139:2,5,18 140:17
140:23 141:20
145:6,10,11 146:2
150:21 160:2,15
160:16,18 161:14
162:19 164:4
170:16,22 172:23
172:24 173:10,12
173:14,15 174:8
174:21 175:1,8,10
176:14,16,18,19
177:5 178:16
179:15 184:7,11
185:7 187:18,20
187:21 188:12,15

[recall - removed]                                                                                                      Page 27

191:14,20,21
**recalled** 86:11
**receipt** 124:13
199:12
**receive** 69:9,13
117:4,17 118:11
118:13 158:18,21
167:12,14,20
**received** 117:1,14
117:16 118:10,14
118:16 180:13
**receiving** 109:10
154:3 170:16
**recess** 61:12 149:6
168:23 182:17
**recipient** 69:3
197:3
**recipients** 77:18
140:3,7,15 148:20
154:10 158:18
165:4,11,18,24
166:7,15,23 167:4
167:12,14,20
175:12,17,21
176:8,22 178:22
179:13
**recognition**
104:22
**recollect** 74:6
**recollection** 10:11
84:17 86:9 104:17
162:10,14,21,25
174:14
**recommendation**
51:7
**recommendations**
51:4 104:22
133:12
**record** 4:13 5:5
12:18,21,25 13:6
53:19 61:10,15,17

61:21,24 62:5
117:19 125:12
143:25 149:4,8
156:20,25 157:22
168:21,25 179:23
182:16,19 195:1
197:12 198:10
200:5
**recorded** 5:7
198:7
**reduce** 25:1 35:2
37:24 38:8
**reduced** 39:5
**reducing** 38:18,19
38:22 39:18
**reduction** 21:9
25:10 39:10,16
98:14
**refer** 16:2 35:17
44:13 69:6 125:11
130:19 183:11
**reference** 171:6
**referenced** 15:17
72:21 89:25
119:11,12,16,23
120:5 121:13
122:7,15,19 123:1
123:15 164:3
**referencing**
159:20
**referral** 147:11
**referred** 183:15
**referring** 39:9
40:1 77:23 123:16
155:7 194:21
**reflected** 37:13
**reflecting** 135:25
**reflection** 37:21
**reflects** 129:19
**refrain** 66:16
121:18

**refresh** 10:10 86:9
**refugee** 100:14,19
**refugees** 25:23
**regard** 191:17
194:4,12
**regarding** 22:6
25:24 26:11 28:22
29:25 47:19 49:22
72:13 79:6 102:9
102:13,21 114:17
114:23 115:3,9
117:23 158:25
160:10 162:16,18
179:19,25
**regards** 193:8
**regents** 1:4 2:14
5:8 6:2
**registered** 1:23
**regular** 26:4
**related** 12:23 13:9
13:12 15:8 16:11
31:4,5 32:9,11
38:18 40:25 54:23
76:18 88:14 100:7
110:18 130:6,8
155:19 161:6
163:20 173:19
187:16,22 189:7
**relates** 180:9
**relating** 14:7
22:14 50:19 51:5
51:8 54:2,16
55:21 56:15 57:9
57:21 58:3,7,14,18
58:25 59:4,8,12,16
59:19,24 60:3,7,13
60:16,18,21 62:6
63:15,25 64:10
65:4 66:1 67:12
78:20,22 79:6
80:22,25 81:17

88:17,20,23 89:1
89:13 90:2,10,21
90:24 91:18 93:8
93:17,20 98:23
99:1,7,12 102:23
104:12,19,20
106:8,15,18 108:6
108:12,15 109:1
110:14 111:3,25
115:25 122:14
123:6 124:10
125:6,15 141:3,14
145:12 153:16,19
162:8 164:2,14,20
170:24 189:7
**relation** 53:2,14
**relations** 105:10
105:19 177:15
**relationship** 30:22
**relative** 194:5
**release** 130:18
**released** 193:22
**relevant** 64:13,15
64:17,23 91:16
**relief** 4:17
**relying** 123:5,14
**remember** 21:25
37:18,19 74:2,9
102:12 103:7
121:23 149:19
159:23 160:24
161:3,10,11 165:1
**remembering**
170:20
**remind** 7:17
**reminder** 171:2
**remotely** 5:20
**removal** 78:4
128:5,7 178:3
**removed** 105:8
176:22 177:13,20

178:1,14,19,23 179:4
**render** 112:12
**rendered** 112:11
**rendering** 10:2
**rene** 3:11 6:20 9:16
**rene.browne** 3:12
**renewal** 128:7 157:24 158:19 161:17
**repairing** 41:10
**repeat** 43:5 44:18 46:16 53:11 72:17 84:12 121:10 133:1 141:11 143:1 144:12 146:16 151:12 176:4 195:16
**repeated** 144:4
**rephrase** 27:11 70:6 143:1 184:24 190:8
**replace** 33:6
**report** 17:6,14 48:24
**reported** 17:7
**reporter** 1:23,24 5:16,21 7:16 37:17 198:23
**reports** 17:9,20 18:13,14 19:8 28:22 29:5 80:2 184:15,16
**represent** 5:17 125:3 149:15 169:6 183:1 192:5
**representative** 29:20 87:11
**representatives** 47:1 73:23 74:8

86:21 87:1,9,23
**represented** 74:2 87:14
**representing** 2:8 2:14,20,25 3:7,18
**reproduction** 198:21
**request** 5:18 60:25 63:25 127:10 185:22 186:2,12
**requested** 186:16
**requester** 147:9
**requesting** 173:13
**requests** 138:12 157:25
**required** 8:13 12:25 27:10 129:12,14
**rescind** 13:2 112:19,25 113:3,7 113:11 117:24 150:24 153:22 156:3,13 165:9,16 165:22 166:4,13 166:19 167:2,9 168:1 171:14
**rescinded** 103:11 119:9 139:22 140:1 146:24 155:10 179:3
**rescinding** 50:16 68:22 69:22 70:11
**rescission** 50:19 51:5,9,13 52:16 53:2,14 54:3,16,24 56:16 57:9,21 58:3,7,14,18,25 59:4,8,12,16,20,24 60:3,7,13,16,19,22 61:3 62:6 65:19 66:3 81:3,18

90:12,17 125:7 126:6 130:16,20 132:12 135:8,13 136:17 137:2,5,8 137:11,23 138:9 140:9,12,19 150:23 151:5 155:13 160:19 162:18 163:20 164:3,14,21 168:4 168:9,17 194:4,10 194:11
**research** 51:8,10 67:2,5 69:24 80:19 173:19 175:6
**reserve** 6:24
**respect** 20:10 22:10,17 23:17 66:12,18 76:4,17 80:6 100:24 101:15,22 127:5 135:25 136:4,7,11 142:4 180:15
**respecting** 197:8
**respond** 142:23
**response** 101:7 105:21
**responses** 63:4 104:19
**responsibilities** 19:23 20:9 22:9 22:16,20,24 23:16 25:15 26:1,16,19 187:2 190:18
**responsibility** 188:5
**responsible** 18:17 189:20
**result** 39:11 75:19

**results** 37:12 39:18,19,21
**return** 199:11
**revelation** 70:21
**reverse** 32:22
**review** 9:17,21 10:7 14:20,23 15:24 16:12 18:19 33:18,24 65:10,22 67:14,15 68:23 82:4 83:14,17 118:1 125:2,14 128:20 132:17 133:9,10 138:22 169:24 188:21,23 193:11
**reviewed** 9:20 13:1 34:9 41:18 68:7,25 74:16 75:3,15,18 82:5 86:8 118:3 125:17 127:13 128:21 138:15 139:7,11 157:17
**reviewing** 4:14 71:10 82:2
**reviews** 190:16
**revised** 132:14
**revisions** 133:13 133:15,25 134:6 136:23
**rifle** 14:25
**right** 6:25 16:20 51:17 105:3 106:13 111:25 117:19 122:20 134:21 143:24 144:1 146:25 150:14 151:25 152:4 156:21 159:21 168:13

170:24,25 171:15
171:21 178:12,21
192:15
**rights** 3:5
**rise** 32:22
**risk** 38:14,14,15
147:9 154:24
155:2,6,10
**rmr** 198:15
**role** 11:15,17 12:4
12:5 17:15,25
18:8,11 39:16
49:1 50:18,23,25
69:19 70:9 92:21
143:3,13,14 170:3
171:23 174:1
186:19 187:25
188:2,17 189:2
190:4,5,9,11
**room** 5:19 191:10
**rules** 7:14 146:11
**run** 38:11
**runs** 124:4
**rutledge** 107:1

**s**

**s** 2:1 3:1 4:9 100:1
**safe** 196:24
**safer** 4:12 34:17
**safety** 147:10
**salvador** 39:4
99:20,22,25
100:21
**salvadoran** 101:11
**salvadorans** 39:8
101:18
**san** 1:3 5:12
**sandra** 192:3
**sania** 3:4 6:10
**sania.khan** 3:7
**sarma** 3:25 5:4

**save** 64:22 65:1
**saw** 40:9 116:25
118:9,22 129:2,4
132:20 133:7
139:1,2
**saying** 42:17 76:1
92:3
**says** 82:23 83:10
148:2
**schedule** 9:4
189:24
**scheduled** 62:16
**schmidt** 107:7
**schools** 165:21
**science** 150:11
172:16
**scoot** 61:25
**scope** 121:6,8,20
143:23,25 180:5
181:14 182:4
**search** 65:4 67:11
67:12
**second** 21:22 22:5
38:21 41:9 82:16
83:11 138:2,4
**secondary** 38:12
**secretaries** 17:14
18:1
**secretary** 1:11
10:1 11:12 13:2
15:24 16:2 17:1,8
17:17,25 18:9,12
19:4,7,14 23:13,23
24:3,13 26:7 43:4
43:7 47:18,22
50:22 51:1,5,9,12
51:22 52:15 53:1
53:14 54:2,15,23
55:20 57:8,20
58:3,7,13,17,25
59:3,7,12,15,19,24

60:2,7,12 61:3
63:5 66:2 68:11
68:21 69:15,21,25
70:10,18 71:1
72:23,25 73:22
74:20 79:5,10
82:17 85:8 86:18
89:22 90:2,14
94:10 96:6 98:16
99:6 110:24 112:8
117:23 119:22
124:5,8,9 134:23
134:24 145:1
159:15 160:23
172:21 174:1,10
175:2 183:5
184:22 185:23
186:3 188:2,4,10
188:21 189:18
190:2,10,16,19,22
194:22,25 195:2
195:22
**secretary's** 56:24
73:12 159:18
161:9 183:12
189:23
**security** 1:10,11
3:10 5:10 6:21,22
10:2 11:11,19,21
11:25 12:4,7,7,9
12:14,24 15:11,15
16:22 17:1 18:19
18:22 19:15 20:14
23:25 24:17 25:9
28:16 43:11,18,21
43:24 44:14,17,21
44:25 45:14 46:6
46:9,14,20 48:1
50:22 52:6,11
58:24 62:12,24
68:22 75:6 80:14

80:15 91:7 99:16
106:9 109:2 124:6
124:23 125:6
126:5 130:7,8
132:9 146:12
147:9 180:14
189:14,14 190:24
192:14,25 195:8,9
**see** 7:15 26:10
62:10 64:8 83:5
86:25 109:10
111:14 118:8
129:1 133:9
139:15 157:1
173:14 194:13
**seeing** 129:9,11
133:5 134:14
139:5 140:23
**seek** 36:1
**seen** 8:25 20:19
21:24 34:12 40:8
68:17 116:21,23
118:6,20 125:25
128:24 129:2,3
131:3,7,9,10
132:19,23 133:4
136:18 138:21,25
139:14,16 140:18
140:20,21 153:15
164:2,20
**send** 170:11
**sending** 36:7,22
**sends** 190:14
192:21
**senior** 11:13 17:15
**sense** 70:3 111:20
**sent** 29:21 63:20
65:3 116:5,9
129:7 137:24
193:1

**sentence**  36:5
    38:21 41:14,15
    42:11 109:23
**separate**  36:13
    141:23 160:12
    191:13 195:15
**september**  10:3,5
    10:6 60:15,19,22
    68:10 88:22 90:13
    90:14,21 112:17
    112:21 117:1,4
    130:18 160:19
    194:22
**series**  47:12
**serve**  33:7 154:11
    166:23
**serves**  154:16
**service**  154:13,15
    155:9
**services**  52:4
**serving**  184:18,18
**sessions**  23:18,20
    23:21,22 24:2,10
    24:16,23 25:2,6,12
    43:1 98:6,20
    117:22 124:13
**set**  12:8,10,13
    160:6,11
**setting**  155:8
    172:14 180:12
**shah**  52:24 54:2,15
    73:25 74:9 83:8
    86:1,19 92:25
    122:11,14 161:7
**shake**  20:20
**share**  127:9
    138:11
**shared**  126:16,16
    128:6,12 146:7,18
    147:3 148:3

**sheet**  199:6,7,9,11
**shook**  21:21
**shop**  79:23
**short**  13:4 23:9
**shorthand**  1:24
    198:7,23
**shortly**  19:4 118:9
**show**  61:2
**showed**  36:4,18
**sic**  92:9 121:16
**sidelines**  162:12
**sign**  6:25 199:7
**signature**  63:3
    198:15
**signed**  62:25 63:7
    63:14 200:22
**significant**  29:24
**signing**  199:8
**simple**  72:13
**simply**  64:7 89:15
    92:3 155:2
**single**  14:2 123:16
    123:17
**sit**  179:20
**situation**  98:10
    146:20,21,22
    150:13,17
**six**  21:5
**size**  30:14
**slatery**  107:18
**solutions**  5:17
**someone's**  62:15
**somewhat**  191:3
**sonia**  33:20 34:17
    34:24 37:1,19
**sorry**  31:25 33:9
    41:16 44:18 61:25
    72:17 88:8 92:18
    94:25 109:21
    113:23 141:11
    154:3 156:24

163:15 175:10
    176:4 177:22
    181:5,7 189:8
    193:24 195:16
**sort**  12:5 18:17,20
    38:10 49:16 63:3
    190:13 192:14
**sorts**  32:16 44:3
    129:21
**sought**  126:20
**sounds**  16:20
    107:10 159:20
**source**  81:6,7,15
**southern**  48:14
    49:5,10,13 50:2
**southwest**  39:2
**space**  199:5
**spanned**  15:4
**speak**  25:2 98:12
    103:6 104:14
    174:23
**speaking**  18:16
    48:19 66:13 100:6
    117:16 121:18
    128:4 129:15
    142:21 143:12,19
    150:3,14 161:5
    183:14 184:3
    194:2
**specialist**  5:4
**specific**  21:19
    22:12 24:21 26:22
    29:4 43:13 45:2,3
    45:18 49:23 50:8
    50:18,23,25 51:6
    57:1 63:22 66:9
    67:19 74:22 86:9
    88:14,17,20,22
    89:4,15 90:4,7,18
    91:10,13 92:2,7,10
    92:19 93:5 101:3

101:7 103:19
    104:16,19,21
    105:23 111:25
    122:16,22 123:2
    123:23 125:11,22
    126:11 127:6
    128:6 130:10,13
    131:15 145:12
    150:21 152:1
    162:19 163:1
    166:1 172:18
    175:1 176:19
    182:9 185:22
    186:2,20 187:22
    187:24 191:8
**specifically**  22:1
    27:12,20 29:16
    39:24 40:1 49:13
    52:17,21 55:7,18
    56:20 73:20,21
    74:3,6,18 81:14
    84:24 87:12 92:24
    100:18,23 103:8
    109:6 112:16
    118:16,24 126:22
    129:9 133:5 142:4
    142:11 144:21
    145:3,10 160:6,15
    160:25 161:10,11
    166:9,17 171:6
    173:12,14 188:2
    189:11,21 193:8
**specifics**  76:9,11
    102:13 143:20
**speculate**  139:16
**speculating**  105:6
    117:15 135:21
    185:10
**speculation**  19:21
    93:13,23 94:7,13
    94:22 95:10,19

96:3,17 99:3
105:3,15 108:1,19
109:20 110:16
113:17 120:1
130:24 135:17,19
147:17 151:11
168:7 183:22
185:25 187:5
**speed** 79:18 80:6,7
80:10,13 126:9
173:2
**spending** 80:13
**spent** 34:25
**spike** 40:9
**spiked** 39:1 40:3
**spiking** 50:4
**split** 133:22
**spoke** 37:1,16
100:13 162:16
**spoken** 100:11
107:24
**sponsored** 35:1
**stable** 30:24
**staff** 17:3,4,8,12
17:13,21 20:16
23:6 24:25 45:21
52:8,8 56:14,14,21
56:22 73:25 79:17
79:23,25 80:5,9,18
80:21,24 118:19
124:17 172:2,5,6
173:4,7,11 183:9,9
183:11,13,13,16
184:2,2,16 188:6
188:24 189:20,22
190:9,15,18
**staffed** 134:7
**stand** 147:20
161:15 162:12
165:13 166:2
167:6 168:14

**standard** 64:14,16
64:19,21
**standards** 136:4,8
**stands** 166:9
**start** 14:17 43:20
44:16 88:16
193:10
**started** 16:21
31:24 43:25
**starting** 157:4,9
**state** 2:3,8 3:3
6:15 7:9,10 25:16
25:23 26:2,13
30:14 38:22 46:4
46:10 53:18 59:22
82:8 99:12,24
102:20 106:8,17
108:11 114:6,16
116:15 119:5,7
124:22 125:4,5
137:17 177:5
178:11 199:4
**stated** 8:13 10:15
21:17 38:3,24
40:2 51:21 65:25
69:19 71:10 75:15
75:17,22 77:20
106:12 115:8
116:21 132:10
147:18 148:3
**statement** 35:24
36:17 37:5,11,12
37:13,16 39:17
41:22 42:14
180:25
**statements** 35:4
36:10 37:8 129:23
136:12 181:2
182:4
**states** 1:1 3:7 5:10
6:11 20:4 30:17

30:21 31:22 35:2
35:9,20,22 36:1,3
36:4,5,8,19,23
37:23 39:17 40:22
41:10,11 42:12
49:7,12 75:25
76:13 78:3 81:11
82:16 83:12,15,16
101:19 105:8
127:9 155:24
156:12 176:23
177:14,21 178:1
178:19 179:4
192:5 196:19,21
**statistics** 35:16
**status** 4:14 47:6,8
47:11,14 77:18
78:3 82:2 83:14
83:17 100:17
101:13,16,19
175:18 183:6
185:20 186:21,24
187:3,23
**statutes** 195:11
**stay** 78:2 121:8
**stayed** 19:8
**step** 179:2
**stephen** 95:22
96:1,7
**steps** 31:20 32:19
32:21,24,25 83:15
83:24 84:6,15,16
84:19 179:5
**steve** 106:23
**stick** 66:11
**stietz** 2:11 6:16,16
**story** 31:15,16
**strategic** 18:19
**street** 1:21 2:6,12
2:23 5:14

**strictly** 193:21,25
**strike** 167:12
196:13
**struggling** 194:13
**students** 165:19
166:3
**studies** 26:24
108:15,23,24
**study** 168:13,16
**subject** 45:6 47:4
49:12 53:5 54:6
56:1 57:12,23
58:9,20 64:11
65:15 70:21 73:7
73:8,11 74:25
76:20 77:2 78:12
78:25 79:12,13
83:20 84:1,8,21
85:2,11,17,23 86:3
87:19 88:1 111:11
111:14,21 120:10
123:8 135:13
141:9 142:18
143:9 145:18
148:11 151:1
153:25 156:6,15
158:9,13 159:6
163:23 164:16
171:6 177:1
178:12 180:21
181:25 189:13
193:17 195:24
199:8
**subordinates**
193:10
**substance** 54:14
54:22 55:19,25
57:7,11,19 58:1,5
58:12,16 77:7
123:4 142:18
143:8 176:3

[substance - think]                                                        Page 32

181:21,23
**substantive** 20:21
  22:3 180:20,24
  182:3
**successful** 76:5
**sued** 76:1
**suggestion** 144:8
  144:17
**suite** 2:6,23
**summer** 48:16,16
  50:3
**supervision** 198:8
  198:23
**support** 37:11,22
  39:15,18
**supporting** 37:24
**suppose** 64:16
  134:19
**sure** 12:19,23 14:4
  16:25 30:10 35:8
  43:12 50:4 52:7
  61:7 67:5,7 68:24
  72:10 77:23 79:19
  92:13 107:11
  121:8,20 129:8,14
  129:19,20,22
  144:15,15 149:1
  149:24 150:22
  151:19 176:10
  180:7 190:3 192:9
  194:23 196:11
**surrounding**
  104:4
**sustains** 42:12
**swear** 5:21
**sworn** 7:2,18
  198:5
**sympathetic** 101:9

**t**

**t** 4:9 17:22 198:1,1
**take** 8:18 9:5,13
  20:23 21:3 31:20
  32:21 61:7 67:25
  68:12 70:6 73:15
  75:9 82:4 102:14
  103:4 111:13
  118:1 120:22
  125:13 128:9
  130:13 138:4
  141:17 143:24
  144:9,14,18
  148:24 150:22
  157:5,15 174:6
  176:3 182:15
**taken** 1:20 5:8
  7:25 61:12 149:6
  168:23 175:14
  182:17 198:3
  200:4
**takes** 47:3 190:15
**talk** 47:5 104:15
  143:25 196:23
**talked** 100:14
  103:22 163:2
  164:24
**talking** 39:21
  81:10 100:10
  103:16 152:6
  160:1 195:17
**tank** 108:24
  192:20
**tasked** 188:23
**teachers** 165:25
**team** 92:25
**telephone** 71:22
  89:9 102:15,24
  103:2,4 141:21
  191:21

**tell** 31:16 35:5
  65:23 127:25
  198:5
**temporary** 26:12
  47:5,7,10,14
  100:16 101:13,15
  101:19
**tennessee** 30:14
**tens** 35:21 41:11
  42:5
**tenth** 1:21 2:12
  5:14
**tenure** 31:8 43:18
  43:20,25 44:16,21
  44:25 45:14 46:5
  46:8,14,20 48:1
  62:24 99:16 106:9
  109:2 111:3
**term** 149:18,21
  163:9 183:10
**terminated** 103:1
  105:7 175:12,13
  175:16,21 176:8
  177:10,13
**terminating** 102:2
  104:8
**termination** 47:19
  100:14,19,21
  101:2,4,8,21 102:7
  103:23 104:1,3,12
  104:23
**terms** 53:6 76:8
  177:23
**tertiary** 38:13
**testified** 7:3 10:20
  11:6 151:25 170:1
  170:22 171:13,20
  177:3,12 180:10
  182:7 183:4 184:8
  188:13 189:16
  191:11

**testifying** 7:19
**testimony** 4:2 8:2
  10:18,22,24 131:6
  132:25 138:24
  139:9 177:6 191:5
  198:2,6,10 200:4,6
**texas** 76:15 81:12
**thank** 9:8 17:23
  27:15,16 36:16
  68:24 72:6 118:2
  121:11,18 133:24
  134:11 138:7
  149:2 154:7,8,15
  182:13 183:3
  191:24 196:10
  197:6,8
**thanks** 168:19
**thereof** 198:13
**thing** 18:20 25:25
  38:10 49:16
  125:19,21 150:15
  173:12 196:4
**things** 12:6 18:16
  32:25 33:3,4
  39:13 49:15 53:16
  63:2 68:13 100:10
  100:12 130:4
  172:9 187:17
  192:24,24 193:7
  195:18 196:23
**think** 9:14 28:9
  40:7 51:16 72:10
  72:12 102:24
  104:2 108:24
  125:19 126:10
  132:22 133:3
  144:5 152:24
  154:19 155:18
  178:17,18,20
  179:7,8 180:16
  181:5 187:14

192:19,20 194:21
194:25 195:16,17
197:7
**third** 22:2,5 36:2,6
36:22 37:8 38:21
39:6 41:9 157:14
157:21
**thirty** 199:12
**thomas** 82:17 83:3
85:14 95:4,8
145:7
**thoughts** 68:4
**thousands** 35:21
41:12 42:6 44:2
44:10 45:4,8
101:18
**threat** 72:25 75:23
75:24 76:3,18
77:21 119:13
155:5 174:18
**threats** 76:24 77:6
77:11
**three** 17:17 20:19
20:23,24 21:25
35:10 41:8 44:10
45:5 68:15 98:9
**tie** 154:4
**time** 5:18 15:11,14
16:1 17:19 20:20
26:25 27:6 28:7,8
28:13,15,25 29:6,7
31:9 32:9 33:11
34:24 36:25 37:16
38:25 39:5 40:7
41:7 43:19,24
44:13 45:19 48:4
50:3,10,13 55:8,16
57:6 61:5 79:22
80:8,13,16 87:13
89:24 99:13
116:25 120:14

138:1 163:16
168:20 184:11,17
185:5 192:24
193:13 194:17
195:10,12 196:12
197:9 198:3
**times** 20:19,23
21:25 34:16 150:7
183:11
**title** 48:13 183:17
184:11,13
**titles** 185:1
**today** 5:5,16 7:23
8:12 9:5 10:11,13
13:4 34:12 125:8
159:11 180:2,8
181:1
**today's** 197:11
**told** 37:20 135:19
**tom** 86:11,20
**top** 153:13 154:22
183:12 192:15,16
194:20
**topic** 157:20
188:19
**topics** 100:4 162:8
174:10 180:19
182:7 186:24
**touch** 192:25
**tps** 101:12
**track** 169:7
**trade** 18:10
173:18
**trading** 30:18
**traffic** 49:15,15
**training** 38:6,9,10
38:12
**transcribed** 198:8
**transcript** 8:6
157:22 198:20
199:13,14 200:3

**transcription**
198:9
**transparent** 100:5
102:10
**transportation**
195:9
**traveled** 35:21
**treat** 140:15
**triangle** 39:4
**tried** 180:16
**trouble** 64:6
**true** 198:10 200:5
**trump** 3:8 6:12
22:18 93:8,11
97:23 98:1 192:5
**truth** 198:5,5,6
**truthful** 8:1
**truthfully** 7:23
**try** 12:11 35:2
38:13,16 111:24
144:1 150:14
191:3
**trying** 41:1 69:20
102:10 142:22
181:8 186:23
**turn** 37:7 68:9
83:11 117:18
125:9 128:17
157:13
**turned** 14:22
**two** 9:19 18:4 22:1
23:22 25:7 36:3,9
36:17 39:3,25
41:12 101:5,24
103:16 104:6
106:1 134:19
174:24,25 178:25
179:8 180:8
182:15 195:17
**type** 25:20,25 31:3
32:3,6 38:1,10

49:4,8 63:4 67:12
129:12 130:3
135:5
**types** 32:14
**typical** 134:4
185:18 192:17
**typically** 23:7
110:13 133:12
134:22 172:2,4
183:8

**u**

**u.s.** 1:9 3:10,14,18
5:11 6:20 23:24
29:22 41:6 48:14
52:3 98:15 124:22
125:6 168:4,10,16
**uh** 20:18
**un** 25:22
**unaccompanied**
36:3,7,18,23 38:25
39:2,7,11 40:2,10
43:1,4,7,10,16
44:3,5,8,11,20,24
45:5,9,13,25 46:4
46:13,19 47:25
48:7 50:1,4
196:25 197:2
**unconstitutional**
76:2 119:8
**underlying** 119:15
119:23 120:5,18
121:13 122:2,6,15
123:5,15 127:3
129:23 136:12
**undersecretaries**
19:11
**undersecretary**
11:14 17:15,16
19:6
**understand** 7:20
8:6,15 12:19,20

13:7,25 18:21
19:13 27:11 29:3
30:7 42:18 53:19
70:1,10,12,13,14
70:15,19 71:1
72:12 89:10
127:19 128:11
134:8 142:3
149:21 152:12
174:2,2,3,4 178:10
180:5 181:16
**understanding**
15:3,5,6,12 18:24
19:15 31:11 32:3
37:4,15 39:10
40:5,11 53:24
75:23 77:24 84:18
87:4 104:25 112:5
126:15,25 127:2
128:1,8 147:14,23
151:21 152:7,11
153:4,7,10 154:23
154:25 155:1,6,16
158:17 159:3
163:9,11,14
167:11,13 168:3,9
175:11 184:17
185:17 188:1,6
189:19
**understood** 69:21
186:9 187:1
**unfilled** 17:18
**unfortunately**
125:10
**unicameral** 30:17
**unit** 5:6
**united** 1:1 5:10
20:3 30:17,21
31:22 35:2,22
36:1,4,8,19,23
37:23 40:22 41:11

42:12 49:7,12
78:3 101:19 105:8
155:24 156:12
176:23 177:14,21
178:1,19 179:4
196:19,21
**university** 1:4,6
2:14 5:8 6:3,17
149:15
**upcoming** 47:12
47:13,17
**uscis** 52:4 55:4,7
55:16 71:16 74:1
86:21 87:1,9,11,23
91:7,12 125:14
126:2,3,8,19
131:21 136:22
138:11 146:7,18
147:3 159:16
160:24,25 187:8
187:15
**usdoj.gov** 3:17,22
**use** 10:10 63:17
140:24 141:3,14
142:5,11 144:21
145:3,7,23 148:7
169:7 179:12
**usually** 20:11,13
192:23 193:5,16
195:4

**v**

**v** 1:8 3:8 5:9 6:12
124:22 192:5
**vague** 27:3 29:1
30:5 46:15 60:8
66:8,14 70:3
99:13 115:11,22
178:6 190:21
194:8
**variety** 62:18

**various** 20:6 47:14
99:21 100:4,4
129:7 135:2 196:7
**verbal** 8:8
**veritext** 5:17
**versus** 184:19
**veteran** 178:25
**vice** 22:11 93:16
93:20
**victims** 38:15
**vidal** 2:25 6:8
183:1
**video** 5:4,7
**videographer** 3:25
5:3 61:10,14
149:4,8 154:7
168:21,25 182:16
182:19 197:11
**videotaped** 1:19
7:17
**view** 102:5,5
**views** 47:15 50:12
**violence** 31:1,3,4,5
31:7,10,12,17,21
31:23 32:1,4,6,9
32:11,14,16,20,22
33:4 35:3,23
37:25 38:9,18,19
39:24 40:12 41:5
42:2,3,10,12,18,22
**violent** 31:6 33:1
35:14,18,19
**virtually** 45:22
**visa** 26:12
**vitae** 185:11
**voice** 51:11 52:14
52:25 55:3 58:24
59:3,7,11,15,19,23
60:2,6,12
**voices** 51:1,21,24
51:25 52:19 66:1

70:17 164:25
165:3 174:16

**w**

**w** 3:4
**wait** 8:4
**wake** 83:13
**walk** 62:14 130:2
130:21
**walked** 21:20
72:25 73:1 179:5
**wall** 155:23
156:11
**want** 34:1 55:22
61:2 72:8 100:4
111:12,23 118:1
121:7 125:13
142:17 143:24
181:16 196:22
**wanted** 7:17 26:10
47:5,15 102:12
179:24 180:5
**wasden** 107:3
**washington** 1:22
2:13,18,24 3:11,16
5:1,15 82:1
**way** 17:7 20:3
62:1,25 70:7
102:1 111:2,22
132:15 142:23
155:20 158:22
170:18 179:7
193:11
**ways** 62:13,18
**we've** 61:5 72:15
120:15 122:18
123:17,18 154:19
159:10 160:1
163:2,15 180:7,16
**weapons** 49:16
**web** 126:11

| | | | |
|---|---|---|---|
| **website** 126:2,3 | 78:13 79:2,15 | **wondering** 13:5 | 183:2 192:4,5,7 |
| **weekly** 104:14 | 82:5,6 83:22 84:3 | 162:21 | **young** 35:21 |
| **weeks** 21:5 23:22 | 84:12,22 85:3,12 | **word** 64:6 129:15 | |
| **weigh** 51:1,12,22 | 85:19,24 86:6 | **words** 41:19 53:8 | |
| 52:15 66:2 150:1 | 87:21 88:4 93:14 | **work** 11:24 14:16 | |
| **weighing** 150:18 | 93:24 94:8,14 | 27:1 42:12,18,22 | |
| **welcome** 182:14 | 95:2,11,20 96:4,9 | 49:2,4,8,25 135:3 | |
| **went** 18:22 36:1 | 96:18 97:12,20 | 173:10 182:25 | |
| 54:11 135:23 | 98:3 99:4,9 105:4 | 183:17 184:20 | |
| 136:2,6,10,15 | 105:6,16,21 108:2 | 192:23 193:12 | |
| 187:14 188:21 | 108:8,20 109:21 | **worked** 28:5 185:4 | |
| 193:19 | 110:17 111:13 | **worker** 26:12 | |
| **western** 99:23 | 113:18,24 114:4,9 | **working** 11:18,21 | |
| 177:4 | 114:14,20,25 | 28:6 | |
| **wha** 1:5 | 115:5,12,17 116:3 | **works** 17:7 62:25 | |
| **whichever** 111:22 | 118:3,4 120:2,11 | 184:21 | |
| **white** 18:22 19:24 | 121:7,22 123:11 | **world** 35:11,14,18 | |
| 20:6,10,11,24 | 125:17,18 127:13 | 49:7,19 | |
| 22:10,13,14,17 | 127:14 128:15,21 | **worried** 100:3 | |
| 44:8,20,24 59:2,14 | 128:22 130:25 | **worse** 150:8 | |
| 89:19 94:2 107:24 | 131:6,7 132:25 | **write** 172:2,4,13 | |
| 113:14 115:2 | 133:1 135:18 | **written** 37:1 62:16 | |
| 116:9 137:10 | 138:15,16,24,25 | 63:5 64:19 113:9 | |
| 161:22 170:2 | 139:9 141:7,7,11 | 172:7,13,22,23,24 | |
| **wide** 62:18 80:14 | 142:9,23 143:2,13 | 173:10 174:6 | |
| 103:7 | 145:16 147:6,20 | 195:4 | |
| **wilson** 107:16 | 148:1,13,17 151:3 | **wuco** 92:4 | |
| **win** 163:8 | 151:12,19 152:10 | **x** | |
| **winning** 163:18 | 153:2 154:2 156:8 | **x** 4:1,9 | |
| **witness** 5:22 6:24 | 156:17 157:17,18 | **y** | |
| 9:24 34:9,10 | 158:15 159:8 | **y** 17:22 | |
| 36:12 40:15 41:18 | 163:25 164:18 | **yeah** 27:19 70:12 | |
| 41:19,25 46:16 | 168:8 176:4,24 | 128:3 152:10 | |
| 51:18 54:10,20 | 181:13 182:2,6,11 | 156:25 170:8 | |
| 56:4,11 57:16,24 | 187:6 190:22 | **year** 11:19 40:8 | |
| 58:10,21 60:9 | 197:6,13 198:11 | **years** 28:6 35:10 | |
| 62:1 66:9,25 | 199:1 | 36:3,17 39:25 | |
| 68:25 69:1 70:5 | **wolf** 56:21 57:8,20 | 42:13 44:10 45:5 | |
| 70:23 72:1,17 | 74:4 83:7 85:21 | **york** 3:3,6,6,7 6:9 | |
| 73:4,10,11 75:1 | 90:9,20 | 6:10,12 34:15 | |
| 76:22 77:4,9,17 | | | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 34

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4
    THE REGENTS OF THE UNIVERSITY OF  ) Case No.
 5  CALIFORNIA and JANET NAPOLITANO,  ) 17-CV-05211-WHA
    in her official capacity as       )
 6  President of the University of    )
    California,                       )
 7                                    )
              Plaintiffs,             )
 8                                    )
         v.                           )
 9                                    )
    U.S. DEPARTMENT OF HOMELAND       )
10  SECURITY and ELAINE DUKE, in her  )
    official capacity as Acting       )
11  Secretary of the Department of    )
    Homeland Security,                )
12                                    )
              Defendants.             )
13  ----------------------------------)
    AND RELATED CASES.                )
14  ----------------------------------)
15
16
17              Wednesday, October 18, 2017
18
19
20       Videotaped deposition of PHILIP T. MILLER,
21  taken at the offices of Gibson, Dunn & Crutcher,
22  1050 Connecticut Avenue NW, Washington, D.C.,
23  beginning at 9:06 a.m., before Nancy J. Martin, a
24  Registered Merit Reporter, Certified Shorthand
25  Reporter.
```

```
 1   A P P E A R A N C E S :
 2
 3              STATE OF CALIFORNIA
                DEPARTMENT OF JUSTICE
 4              OFFICE OF THE ATTORNEY GENERAL
                BUREAU OF CHILDREN'S JUSTICE
 5              BY:  RONALD H. LEE, ESQ.
                1515 Clay Street
 6              Suite 2100
                Oakland, California    94612
 7              (510) 879-0094
                ronald.lee@doj.ca.gov
 8              Representing State of California
 9
10              COVINGTON & BURLING LLP
                BY:  ELIZABETH A. SAXE, ATTORNEY AT LAW
11              One City Center
                850 Tenth Street NW
12              Washington, D.C.    20001
                (202) 662-5367
13              aberengaut@cov.com
                esaxe@cov.com
14              Representing Regents of the University of
                California and Janet Napolitano
15
16
                GIBSON, DUNN & CRUTCHER LLP
17              BY:  ETHAN DETTMER, ESQ.
                     HALEY MORRISSON, ATTORNEY AT LAW
18              1050 Connecticut Avenue, N.W.
                Washington, D.C.    20036
19              (202) 955-8500
                edettmer@gibsondunn.com
20              hmorrisson@gibsondunn.com
                Representing the Garcia Plaintiffs
21
22
23
24
25
```

1   A P P E A R A N C E S:   (CONTINUED)
2
3              NATIONAL IMMIGRATION LAW CENTER
               BY:  TRUDY REBERT, ATTORNEY AT LAW
4              1121 14th Street, N.W.
               Suite 200
5              Washington, D.C.   20005
               (202) 470-6412
6              trebert@nilc.org
               Representing Batalla Vidal Plaintiffs
7
8
               STATE OF NEW YORK
9              OFFICE OF THE ATTORNEY GENERAL
               BY:  ALEX W. FINKELSTEIN, ASSIST. ATTORNEY
10                                    GENERAL
               CIVIL RIGHTS BUREAU
11             120 Broadway
               New York, New York   10271
12             (212) 416-8534
               alex.finkelstin@ag.ny.gov
13             Representing plaintiff states and New York,
               et al. v. Trump, et al.
14
15
               U.S. DEPARTMENT OF HOMELAND SECURITY
16             OFFICE OF THE GENERAL COUNSEL
               BY:  LIANA G.T. WOLF, ASST. GEN. COUNSEL
17             Washington, D.C.   20528
               (202) 447-3891
18             liana.wolf@hq.dhs.gov
               Representing U.S. Department of Homeland
19             Security
20
21
22
23
24
25

```
                                                 Page 4

1   A P P E A R A N C E S:   (CONTINUED)

2

             U.S. DEPARTMENT OF JUSTICE
3            CIVIL DIVISION
             BY:  KATHRYN C. DAVIS, ASST. GEN. COUNSEL
4            20 Massachusetts Avenue N.W.
             Washington, D.C.   20530
5            (202) 305-7583
             kathryn.c.davis@usdoj.gov
6            Representing the U.S. Department of Justice
             and the Deponent
7

8
             U.S. DEPARTMMENT OF HOMELAND SECURITY
9            U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
             BY:  MICHAEL F. ARNOLD,
10               ASSOCIATE LEGAL ADVISOR
             500 12th Street
11           MS 5900
             Washington, D.C.   20536
12           (202) 732-5018
             michael.f.arnold@ice.dhs.gov
13           Representing the U.S. Department of Homeland
             Security, Immigration and Customs
14           Enforcement

15

16      ALSO PRESENT:

17           DAN REIDY, Legal Videographer

18

19

20

21

22

23

24

25
```

Page 5

1                          I N D E X

                                                    PAGE
2
     TESTIMONY OF PHILIP MILLER
3
     BY MR. LEE                                      8
4
     BY MS. SAXE                                     216
5
6                        E X H I B I T S
7    NUMBER        DESCRIPTION                      MARKED
8    Exhibit 22   Notice of Deposition, 6 pages      22
9    Exhibit 23   U.S. Immigration and Customs       23
                  Enforcement, Statement of Philip
10                T. Miller, July 7, 2015, 6 pages
11   Exhibit 24   Declaration of Philip T. Miller,   27
                  3 pages
12
     Exhibit 25   Exhibit B, FAQs, Rescission of     158
13                Deferred Action for Childhood
                  Arrivals, 7 pages
14
     Exhibit 26   Valerie Gonzalez Twitter screen    169
15                shot, 2 pages
16   Exhibit 27   DHS, Privacy Policy Guidance       205
                  Memorandum, April 25, 2017, April
17                25, 2017, 16 pages
18
19                 EXHIBITS PREVIOUSLY MARKED
20                NUMBER                            PAGE
21                Exhibit 9                           24
22                Exhibit 14                         163
23
24
25

1       WASHINGTON, D.C., WEDNESDAY, OCTOBER 18, 2017;

2                       9:06 A.M.

3                        -OoO-

4            THE VIDEOGRAPHER:  Good morning.  We're going

5    on the record at 9:06 a.m. on Wednesday, October 18,

6    2017.  Please note that the microphones are sensitive

7    and may pick up whispering, private conversations, and

8    cellular interference.  Please turn off all cell

9    phones or place them away from the microphones as they

10   can interfere with the deposition audio.  Audio and

11   video recording will continue to take place unless all

12   parties agree to go off the record.

13           This is Media Unit 1 of the video recorded

14   deposition of Philip Miller, taken by counsel for the

15   plaintiff in the matter of The Regents of the

16   University of California and Janet Napolitano in her

17   official capacity as president of the University of

18   California V. U.S. Department of Homeland Security and

19   Elaine Duke in her official capacity as Acting

20   Secretary of the Department of Homeland Security and

21   related cases, filed in the United States District

22   Court for the Northern District of California, the

23   San Francisco division.

24           This deposition is being held at Gibson, Dunn

25   & Crutcher LLP located at 1050 Connecticut Avenue,

Case 1:17-cv-05228-NGG-JO  Document 97-1  Filed 12/15/17  Page 1109 of 1603 PageID #: 5054

1    Northwest, Washington, D.C.  20036.  My name is Dan

2    Reidy from the firm Veritext Legal Solutions, and I am

3    the videographer.

4           The court reporter is Nancy Martin from the

5    firm Veritext Legal Solutions.  I am not authorized to

6    administer an oath.  I am not related to any party in

7    this action, nor am I financially interested in the

8    outcome.

9           Counsel and all present in the room will now

10   state their appearances and affiliations for the

11   record.  If there are any objections to proceeding,

12   please state them at the time of your appearance,

13   beginning with the noticing attorney.

14           MR. LEE:  Good morning.  Ronald Lee with the

15   California Attorney General's office on behalf of the

16   State of California.

17           MS. MORRISSON:  Haley Morrisson with Gibson,

18   Dunn & Crutcher on behalf of the Garcia plaintiffs.

19           MS. SAXE:  Elizabeth Saxe with Covington &

20   Burling on behalf of the Regents of the University of

21   California and Janet Napolitano.

22           MR. DETTMER:  Ethan Dettmer also with Gibson,

23   Dunn on behalf of the plaintiffs in the Garcia case.

24           MS. REBERT:  Trudy Rebert with the National

25   Immigration Law Center, National Immigration Law

1   Center is representing the Batalla Vidal plaintiffs.

2           MR. FINKELSTEIN:  Alex Finkelstein, volunteer

3   attorney for the New York State Attorney General in

4   the state of New York.

5           MS. WOLF:  Liana Wolf, Department of Homeland

6   Security.

7           MR. ARNOLD:  Michael Arnold, ICE.

8           MS. DAVIS:  Kathryn Davis, Department of

9   Justice, Civil Division, Federal Programs branch.  I'd

10  like to reserve the right for the witness to read and

11  sign.

12          THE WITNESS:  Philip Miller.

13          THE VIDEOGRAPHER:  Would the court reporter

14  please swear in the witness.

15

16                   PHILIP MILLER,

17       having been first duly sworn/affirmed,

18        was examined and testified as follows:

19

20                   EXAMINATION

21  BY MR. LEE:

22      Q.  Good morning, Mr. Miller.

23      A.  Good morning.

24      Q.  Can you please state your name for the

25  record?

1    A.   Sure.  My name is Philip Todd Miller.

2    Q.   Mr. Miller, have you been deposed previously?

3    A.   Yes.

4    Q.   Was it in the Jimenez Moreno litigation?

5    A.   That was one.

6    Q.   Okay.  And have you been deposed in other

7    occasions as well?

8    A.   Yes.

9    Q.   So I will discuss those depositions with you

10   a little later, but I understand you probably are

11   familiar with some of the rules of the road for a

12   deposition?

13   A.   Yes, I am.

14   Q.   But just for the completeness of today's

15   record, it's important for me to relay those

16   instructions to you again.  Is that okay?

17   A.   Of course.

18   Q.   The oath that you just took is the same oath

19   as the one you would take as if you were testifying in

20   court.  Do you understand that?

21   A.   Yes, I do.

22   Q.   So under oath you are -- the expectation is

23   that you will tell the full and complete truth during

24   today's proceeding.

25   A.   That was my understanding, yes.

1      Q.   Is there any reason today that would preclude

2   you from being able to tell the full and whole truth

3   to me?

4      A.   No.

5      Q.   Are you under any medication that would

6   prevent your ability to do so?

7      A.   No.

8      Q.   Okay.  And if you realize during the course

9   of today's proceeding that an answer you've given is

10  incorrect or incomplete in any way, will you let me

11  know so that the record can be corrected?

12     A.   Yes, I will.

13     Q.   Thank you.  Now, in the Northern District of

14  California before Judge Alsup, I want to alert you

15  that per Judge Alsup's standing order, deponents and

16  their counsel must make a good faith effort to prepare

17  for depositions and to refresh witness memories on

18  important matters in the suit about which the witness

19  reasonably should be expected to have knowledge.

20          Deponents who claim to lack of recollection

21  during their deposition but who later claim at trial

22  to have had their memories refreshed in the interim

23  may be, among other things, impeached with their

24  previous failures of recollection during their

25  deposition or be subject to preclusion.  Do you

1   understand that?

2        A.   Yes.

3        Q.   Thank you.  Now, for the purposes of today,

4   just in the interest of having a clean record and

5   making the job easy for Nancy, our court reporter,

6   please ensure that we take turns speaking and avoid

7   speaking over each other.

8        A.   I'll do my best.

9        Q.   And it is important for you to provide

10  audible answers as opposed to visual gestures in

11  response to my questions.  Is that okay?

12       A.   I understand.

13       Q.   If you answer my question, I'm going assume

14  that you understood my question.  Is that fine?

15       A.   Yes, it is.

16       Q.   And during the course of today's deposition

17  there will likely be some objections raised by your

18  counsel.  Unless your counsel instructs you not to

19  answer, you can proceed with responding to my

20  question.

21            Is that -- do you understand that?

22       A.   I do.

23       Q.   And if there's any questions I pose that are

24  unclear to you or that would benefit from rephrasing,

25  please don't hesitate to let me know and I will do my

```
                                            Page 12
 1   best.
 2        A.  I will.
 3        Q.  And finally, if you need a break, this is not
 4   an endurance test, just let me know.  I ask only that
 5   we don't take a break while a question is pending.
 6   But other than that, I anticipate being able to
 7   accommodate any breaks you request.
 8        A.  Thank you.
 9        Q.  Okay.  Mr. Miller, did you prepare for
10   today's deposition?
11        A.  Yes.
12        Q.  How did you prepare for today's deposition?
13        A.  I met with counsel yesterday in preparation
14   for today's deposition.
15        Q.  And how long was that meeting?
16        A.  About 3-1/2, 4 hours.
17        Q.  And who did you meet with during this
18   meeting?
19        A.  The three attorneys to my left and another
20   attorney from DOJ, Steven -- I don't recall his last
21   name.
22        Q.  Were any documents provided to you for
23   review?
24        A.  No, they weren't.
25        Q.  Were any documents used to refresh your
```

```
                                                Page 13
 1   recollection?
 2        A.  No, they were not.
 3        Q.  Did you bring any documents with you today?
 4        A.  No.
 5        Q.  Have you been instructed to look for
 6   documents in your possession relating to DACA?
 7        A.  Yes, I have.
 8        Q.  And by "DACA," which is the term I'll be
 9   using many times today, I'm referring to the Deferred
10   Action for Childhood Arrivals program.  Do you
11   understand that?
12        A.  Yes, I understand.
13        Q.  Have you made an attempt to locate documents
14   in your possession relating to DACA?
15        A.  My assistant went through my archives and
16   submitted to counsel all the documents we could
17   identify.
18        Q.  Did you undertake any personal efforts to
19   locate these documents?
20        A.  No.
21        Q.  And who's your assistant?
22        A.  Laura Hernandez-Winkelmann.
23        Q.  And when you referred to "archives," can you
24   please expand on that?
25        A.  Archives within Microsoft Outlook
```

1  environment, a way to take it out of my active E-mail
2  account and send it to archives that doesn't count
3  against the size of my inbox since our inboxes are
4  limited.
5       Q.  So one location of documents in your
6  possession relating to DACA were in -- was in the
7  Microsoft Outlook environment; is that correct?
8       A.  Yes.
9       Q.  Did you have a subfolder where all the
10  documents were located in one place, or were they
11  disbursed throughout the system?
12       A.  I keep my archives by year, by fiscal year.
13  So they would have been in the appropriate location
14  based on which fiscal year the information came out.
15       Q.  Okay.  But not by subject matter or topic?
16       A.  No.
17       Q.  Did your assistant attempt to locate
18  documents in any other location?
19       A.  No.  Excuse me.  No.
20       Q.  Do you have any hard-copy files that were --
21  that may contain documents relating to DACA?
22       A.  No.
23       Q.  Okay.  How about on your hard drive outside
24  of the Microsoft Outlook environment?
25       A.  That's where the archives are.  Archives are

1   outside of -- the way our network is structured, you

2   have limited capacity in your inbox, but then you have

3   an individual drive on the network, and then I also

4   have an external hard drive that I keep my archives

5   on.  So when I travel, I can still access information.

6   And within that environment is where Laura searched.

7           For my office, the way that I managed my

8   records is that everything is within a PST file on one

9   of those locations.

10      Q.  Thank you for that clarification.  Let me

11  ask, do you have any documents relating to DACA not in

12  your E-mail archives but in the existing inbox or --

13  that have not been archived?

14      A.  Undoubtedly, yeah.  She searched the inbox

15  and the archives, you know, to be responsive to the

16  discovery request.

17      Q.  And for the documents in your existing inbox,

18  are documents in there relating to DACA segregated in

19  subfolders?

20      A.  No.

21      Q.  So with respect to the documents in your

22  possession, the E-mails in your possession that are in

23  the current inbox that are also disbursed throughout

24  the inbox without a particular categorization?

25      A.  Yeah, I just keep it chronologically within

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 1118 of 1603 PageID #: 5063

1    the inbox.

2         Q.   How many documents did your assistant locate

3    between --

4         A.   I don't know.

5         Q.   -- between the archives and the existing

6    inbox?

7         A.   I don't know.

8         Q.   Did you review any of the documents that

9    Ms. Hernandez located?

10        A.   No, I did not.

11        Q.   Were you given any instructions not to review

12   those documents?

13        A.   No.

14        Q.   Do you have any understanding as to the

15   process by which Ms. Hernandez used in order to

16   identify documents relating to DACA?

17        A.   No.

18        Q.   Do you know if anyone gave her instructions

19   on how to do so?

20        A.   I don't know personally, no.

21        Q.   You did not give her any instructions?

22        A.   No.

23        Q.   You did not explain, use a search term or any

24   other mechanism in terms of how to locate the

25   documents in your possession?

```
                                               Page 17

 1        A.  No.  The request came in from our attorneys,

 2   and she received it.  She did the search.

 3        Q.  And when you say your "attorneys," are you

 4   talking about the office of general counsel at DHS

 5   level?

 6        A.  No.  ICE level.  The office of principal

 7   legal advisor, the ICE level.

 8        Q.  Did you ever receive any form of a litigation

 9   hold memo?

10        A.  I don't believe so, no.

11        Q.  Do you understand what a litigation hold memo

12   is?

13        A.  Yes.

14        Q.  Have any -- do you believe any documents that

15   you've had relating to DACA have been -- may have been

16   destroyed?

17        A.  I don't believe so, no.

18        Q.  And why not?

19        A.  It's been controversial since 2012.  And so

20   usually, when we're involved in these processes you

21   have, you know, working with all of you wonderful

22   folks around the table for more than 20 years have a

23   pretty good sense of, you know, when we're doing this

24   kind of conversation.  So, you know, in situations

25   like that, controversial programs, whether it's
```

1   related to benefits or enforcement, we usually have a

2   pretty good idea of when we're all going to meet

3   again.  So it's just easier to keep track of all that

4   stuff.

5        Q.  I think I know the answer to this question,

6   but were you involved in any way in the compilation of

7   the administrative record for this case?

8        A.  No.  Excuse me.  No.  Sorry.

9        Q.  Mr. Miller, you explained at the outset of

10  today's proceeding that you have been deposed on

11  multiple occasions.

12       A.  Correct.

13       Q.  Perhaps -- when was the first time you were

14  deposed, month and year, if you remember?

15       A.  I really don't, but it would have been

16  sometime probably in 2009.

17       Q.  And since then how many times have you been

18  deposed do you think?

19       A.  If I had to guess, maybe four or five times.

20       Q.  Okay.  So if we can just start with the very

21  first one, can you give me the details of that

22  deposition.  What was that case about?

23       A.  It was an equal opportunity claim, EEOC

24  claim.

25       Q.  That was filed against which entity?

```
                                            Page 19

  1          A.   Against me.

  2          Q.   Personally?

  3          A.   In my capacity as the Field Office Director.

  4          Q.   And how about the next deposition?

  5          A.   I believe it was another EEO claim.

  6          Q.   And I'm sorry.  For the first one, do you

  7     remember the name of the plaintiff?

  8          A.   I don't.  It was one of my employees that was

  9     terminated, and I don't remember his name.

 10          Q.   And how about the second EEO claim you just

 11     referenced?

 12          A.   It was another employee.  I don't remember.

 13          Q.   Okay.  And when was this next deposition?

 14          A.   It was either -- I believe it was in early

 15     '10, 2010.

 16          Q.   And just moving quickly through the next

 17     ones, how about the next time you were deposed?

 18          A.   Probably the next one may have been Moreno,

 19     if I remember correctly.

 20          Q.   And that would have been in June 2013?

 21          A.   Sometime in '13, yes.

 22          Q.   And since then -- how about the next one?

 23          A.   The next one was -- it was a Flores

 24     deposition, and that would have been -- I can't

 25     remember if it was late '16 or early '17.
```

1          And then there was another EEO, same, and I

2     think that was in 2017 -- or there was one in 2016,

3     one in 2017.

4          Q.   Two EEO claims?

5          A.   Yes.  So that would have been six.

6          Q.   And do you remember the name of the plaintiff

7     in the 2016 EEO proceeding?

8          A.   Felicia Skinner.

9          Q.   And how about the 2017 proceeding?

10         A.   Dorothy Herrera-Niles.

11         Q.   Is it safe to say for both of these

12    proceedings, you were the defendant in your official

13    capacity?

14         A.   Yes.

15         Q.   Have you provided any other depositions?

16         A.   Not that I recall.

17         Q.   Thank you.  Any other testimony that you have

18    provided, for example, in court?

19         A.   Sure.

20         Q.   And on how many occasions have you done that?

21         A.   Well, I was a special agent.  So it would

22    have been, actually going to trial, I think one case

23    in the Southern District of Mississippi went to trial,

24    but I think -- no, I'm sorry.  It was just testimony

25    at a bond hearing.  I don't recall.  It's going way

```
                                             Page 21
 1   back.  That would have been 2003.
 2        Q.  How many times, as a ballpark estimate, have
 3   you testified in open court?
 4        A.  Probably just two or three.
 5        Q.  Okay.  I was worried you might say hundreds.
 6        A.  No.  Most people plead out.
 7        Q.  Okay.  So maybe we can just go through that
 8   very quickly.  The first time you -- I think you were
 9   trying to recall, was relating to a bond proceeding.
10        A.  Uh-huh.
11        Q.  And you think it may have been in 2003?
12        A.  I believe 2003.
13        Q.  How about the next time?
14        A.  I think in that case I don't think we
15   actually had to testify.  I think they took the plea
16   agreement at the last minute.  That was in the
17   Southern District of Alabama.  So I think that was in
18   2004 or 2005, but we didn't actually testify.  So I
19   think that Southern Mississippi bond hearing may have
20   been the only one that I recall specifically.
21        Q.  Thank you for that.
22             Mr. Miller, have you testified before
23   Congress?
24        A.  Yes.
25        Q.  I'm aware of the July 2017 Senate hearing.
```

Page 22

1   Is that one of the times you testified before

2   Congress?

3        A.   That was the only sworn testimony.

4        Q.   Have you testified or addressed Congress in a

5   different capacity?

6        A.   Just meeting individually with members and

7   countless staff briefings.

8             MR. LEE:   And before I forget, let me just go

9   back real quick and introduce as Exhibit 22 a document

10  that's entitled "Plaintiff's Notice of Deposition of

11  Philip T. Miller Pursuant to Federal Rules of

12  Procedure 30(b)(1)."  Just as a formality, I want to

13  make sure this exhibit has been introduced.

14            (Deposition Exhibit 22 was marked for

15            identification.)

16  BY MR. LEE:

17       Q.   Mr. Miller, you are appearing today pursuant

18  to this deposition notice?

19       A.   Yes, I am.

20            MR. LEE:   Thank you.

21            Back to the question of your testimony.  I'd

22  like to just introduce also for the record that

23  testimony.  I may have some more questions about that

24  down the line, but just so we can get some exhibits

25  out of the way, I'd like to mark as Exhibit 23 a

1    document entitled "Statement for Philip T. Miller,

2    Assistant Director of Field Operations Enforcement and

3    Removal Operations Regarding a Hearing on the 2014

4    Humanitarian Crisis at our Border, A Review of the

5    Government's Response to Unaccompanied Minors One Year

6    Later.

7            THE WITNESS:  Thank you.

8            (Deposition Exhibit 23 was marked for

9            identification.)

10   BY MR. LEE:

11       Q.  Mr. Miller, is this document an accurate

12   representation of the testimony you provided to the

13   Senate on July 7, 2015?  Feel free to take a moment to

14   review.

15           (The witness reviewed Exhibit 23.)

16           THE WITNESS:  Yes, I believe this is the

17   statement.

18   BY MR. LEE:

19       Q.  Thank you.  You can just set that aside.

20       A.  Sure.

21       Q.  Any other sworn testimony that we haven't

22   discussed yet?

23       A.  No.

24       Q.  I want to switch gears now and talk a little

25   bit about your professional background, Mr. Miller.

Page 24

1       A.  Certainly.

2       Q.  I know you've done this many times.

3       A.  No problem.

4           THE WITNESS:  Do you mind if I grab more

5   coffee before we start?

6           MR. LEE:  Of course.  Let's go off the record

7   just for a few minutes.

8           THE VIDEOGRAPHER:  We're going off the

9   record.  The time on the video is 9:29 a.m.

10          (A recess was taken from 9:29 a.m. to

11          9:30 a.m.)

12          THE VIDEOGRAPHER:  We're back on the record.

13  The time on the video is 9:30 a.m.

14          (Previously marked Exhibit 9 was handed to

15          the witness.)

16  BY MR. LEE:

17      Q.  Mr. Miller, I'm going to refer you to an

18  exhibit previously marked as Exhibit 9.

19      A.  Thank you.

20      Q.  And I believe the markings may be with a

21  different deposition right now, but I represent to you

22  that this is the same document that we are using, and

23  just per the judge's orders we are not supposed to

24  mark the same exhibit with different numbers.  So

25  thank you for your understanding.

Page 25

1              Mr. Miller, this document has previously been

2      marked as Exhibit 9 and represents a number of

3      different organizational charts reflecting the

4      structure at the U.S. Department of Homeland Security.

5      Does that appear to be the case?

6          A.  Yes.

7          Q.  And I want to take you -- unfortunately,

8      these pages aren't numbered, but if I can take you a

9      couple pages from the back to the organizational chart

10     for ICE.

11             It may be six pages from the back.

12         A.  I have it.

13         Q.  Great.  So just as a tool and an aid for the

14     next series of questions, can you first tell me your

15     current title at ICE?

16         A.  I am the Deputy Executive Associate Director

17     for enforcement removal operations.

18         Q.  And would this position be reflected on this

19     organizational chart?

20         A.  Yes, it is.

21         Q.  And where do you see that?

22         A.  If you look cascading from the -- you have it

23     labeled as "Assistant Secretary," but cascading from

24     that office to the left is enforcement of removal

25     operations, Executive Associate Director, and my

1   position is directly beneath the Executive Associate

2   Director as the deputy.

3         Q.   And how long have you been in this position?

4         A.   Since July of 2015.

5         Q.   Previous to this position, what was your

6   position at ICE?

7         A.   I was the Assistant Director for field

8   operations.

9         Q.   And would that be the next box down that's

10  entitled "Field Operations Assistant Director"?

11        A.   Correct.

12        Q.   Okay.  What was the start and end date of

13  that position?

14        A.   From May of 2013 through July of 2015.

15        Q.   And just going in reverse chronological

16  order, what was your position before that?

17        A.   Field Office Director in New Orleans from

18  September of 2009 until May of 2013.

19        Q.   And is that position reflected on the

20  organizational chart?

21        A.   No, it is not.

22        Q.   With respect to the Field Office Director

23  position, who did you report to?

24        A.   I reported to the assistant director for

25  field operations.

1          Q.   The position that you assumed in May 2013?

2          A.   Yes, sir.

3          Q.   And according to this chart, it appears that

4     as the Field Operations Assistant Director you

5     reported to the Deputy Executive Associate Director;

6     is that correct?

7          A.   Yes, it is.

8          Q.   And that's a position you now hold?

9          A.   That is correct.

10         Q.   When did you first join federal service?

11         A.   I joined the U.S. Army in January of 1992.

12         Q.   Okay.  And when did you begin federal service

13    with the Department of Homeland Security or the

14    Immigration Naturalization Service?

15         A.   I joined the Immigration Naturalization

16    Service in August of 1996.

17              MR. LEE:  I'd like to introduce as the next

18    Exhibit 24 a document entitled "Declaration of Philip

19    T. Miller."

20              (Deposition Exhibit 24 was marked for

21              identification.)

22    BY MR. LEE:

23         Q.   Do you see that?

24         A.   I do.

25         Q.   Are you familiar with this document,

1    Mr. Miller?

2        A.  I reviewed this previously, but I don't

3    recall which case it was for.

4        Q.  Okay.  You answered my next question.  So

5    thank you for that.  You do not recall which case this

6    declaration was for?

7        A.  No.

8        Q.  Does it appear to you that it was signed

9    August 7, 2017?

10       A.  Yes.

11       Q.  And upon your review of this declaration,

12   it's a recitation of your professional history in

13   Paragraphs 1, 2, and 3; correct?

14           (The witness reviewed Exhibit 24.)

15           THE WITNESS:  Yes, it is.

16   BY MR. LEE:

17       Q.  You can set that aside.

18       A.  Thank you.

19       Q.  Starting with your position as the Field

20   Office Director in New Orleans, can you give me some

21   description of your role and responsibilities?

22       A.  I was responsible for a five state area of

23   responsibility that included Louisiana, Mississippi,

24   Alabama, Tennessee, and Arkansas.  I had 21 offices in

25   those five states with approximately 285 employees.

1   We were involved in civil immigration enforcement in

2   those five states from beginning to end, to include

3   both detained and nondetained dockets, and managing a

4   process with Department of Justice, Bureau of Prisons

5   for the institutional hearing program in Bureau of

6   Prisons facilities that were not only in those five

7   states but also included the panhandle of Florida and

8   the state of Kentucky.

9           And we also, although I didn't have direct

10  oversight responsibility, we did support an ICE air

11  operation operating out of the Alexandria

12  International Airport.  I had 14 detention locations

13  in those five states, and we interacted with about 395

14  different sheriff departments in our day-to-day

15  operations.

16      Q.  Did those operations include the apprehension

17  of illegal aliens?

18      A.  Yes.

19      Q.  Was your office directly in charge of the

20  agents that would be identifying and apprehending

21  those individuals?

22      A.  The officers, yes.

23      Q.  You mentioned a "detained and nondetained

24  docket."  Can you expand or clarify what that refers

25  to?

1     A.   Sure.   ERO, I would like to refer to

2  Enforcement and Removal Operations as our normal

3  acronym of "ERO," Edward, Romeo, Oscar.

4     Q.   Sure.

5     A.   ERO has a bifurcated mission.   We have our

6  own proactive law enforcement operations, but we also

7  support DHS at large in terms of any component or

8  subcomponent within DHS that takes a civil immigration

9  action against an individual.   That person or their

10  case comes to ERO for management.   If the person is to

11  be detained, we make a decision about where the person

12  is to be detained and under what conditions.   And if

13  the person is not subject to detention, the case is

14  still managed by our deportation officers in

15  coordination with the Office of Chief Counsel, which

16  are the field attorneys for ICE.

17          And so when I say we have a detained and

18  nondetained docket, we had that area of

19  responsibility, we had a detained court in Oakdale,

20  Louisiana and nondetained courts in New Orleans,

21  Louisiana and Memphis, Tennessee.   So depending on the

22  case and the specific fact pattern of the case, we'd

23  make an individualized assessment on which -- the

24  conditions the person would either be detained under

25  or what kind of supervised release the person would be

1   under, and then calendar the case with DOJ's executive

2   office of immigration review based on which docket the

3   person was going to be managed on.

4        Q.  And just to clarify, I want to unpack that

5   just a little bit.  When you talk about the undetained

6   docket, you are referring to the proceedings for

7   unauthorized aliens who are not in ICE detention?

8        A.  Either for persons who are appearing before

9   the immigration court or persons who have been ordered

10  removed by the immigration court and they are still

11  appealing their case to a higher court, or for

12  whatever reason we cannot remove them from the

13  country, in which case they remain on the nondetained

14  docket on supervised release, if you will, like being

15  on parole from ICE.

16       Q.  And with -- the detained docket refers to

17  individuals that are, in fact, in detention?

18       A.  That is correct.

19       Q.  Are part of -- is part of your responsibility

20  as Field Office Director to issue NTAs, or Notice to

21  Appear?

22       A.  My subordinates, yes.

23       Q.  And can you describe what an NTA is?

24       A.  An NTA is a charging document, or one of the

25  charging documents that are available to ICE.  It is

1    the most common one to place someone into proceedings

2    before the Executive Office of Immigration Review, or

3    EOIR, if we may use that acronym.  What it is, is it

4    lays out both the allegations that we are posing

5    against the individual and then which section or

6    sections of the Immigration Nationality Act, or INA,

7    are in violation based on the fact pattern that we

8    present to the judge.

9        Q.  And are there circumstances under which your

10   subordinates are required by law to issue an NTA?

11       A.  There are charges or predicate offenses that

12   Congress has deemed for the person to be mandatory

13   detention if we issue a charging document, but we

14   always reserve the ability to -- for reasons of

15   prosecutorial discretion to not charge the individual.

16       Q.  And would determinations or decisions about

17   whether to exercise prosecutorial discretion be a

18   decision that fell within your responsibility as the

19   field service, Field Office Director?

20       A.  Yes.  You can use the acronym FOD.  It may be

21   easier for you.

22       Q.  I appreciate that.

23       A.  That's what we call ourselves.

24       Q.  As a former federal employee myself, I do

25   like acronym speak.

```
                                              Page 33
 1        A.   That's right.
 2        Q.   Does your decision about prosecutorial
 3   discretion have to be reviewed by anyone above your
 4   chain of command, or above your position?
 5        A.   It does not have to be -- it does not require
 6   external review, but it may, of course, as all
 7   decisions, may be reviewed all the way up to the
 8   Secretary.
 9        Q.   So you can always seek input if you have not
10   decided or don't feel like you have made or are able
11   to make a decision about a particular case?
12        A.   I was able to make decisions.  It was just if
13   someone wanted the decision to go a different way.
14        Q.   So how would someone say to you, "I think the
15   decision you're making is not the one I would make"?
16        A.   It would usually be opposing counsel or an
17   advocate for the alien would reach out, either to ICE
18   as the component or to DHS, depending on the level of
19   access of the individual attorney or the individual
20   organization.
21        Q.   I see.  So when your decision to charge or
22   not to charge is challenged, that's when it may go up
23   your chain of command?
24        A.   That's one instance of prosecutorial
25   discretion, yes.
```

1      Q.  Can you explain a little bit more just to

2   make sure when I used the term "prosecutorial

3   discretion" and when you use the term that we're

4   talking about the same thing?  Can you explain to me

5   your understanding of prosecutorial discretion?

6      A.  Sure.  Throughout the immigration enforcement

7   life cycle, which is what we call the process, from

8   encounter to removal, there are a number of decision

9   points along that continuum, and at each decision

10  point you have, you know, an opportunity to proceed or

11  not proceed based on the facts that are known to you

12  at that time.

13           Most commonly, that's at time of arrest, time

14  of issuing that charging document, detention decision,

15  and then counsel -- chief counsel's office would have

16  the opportunity once the case is calendared with the

17  immigration court to either proceed or not proceed in

18  the matter before the immigration court.  And then, if

19  you will, or an analogy, it would volley back to us

20  once those proceedings are administratively final, and

21  then the decision point is removal or again, we can

22  decide detain or not detain on post order, from our

23  post order detention authority being different than

24  our preorder, and then a decision point on whether or

25  not to remove.

1            So there are a number of opportunities for

2    prosecutorial discretion throughout the immigration

3    life cycle, and it varies from case to case.

4        Q.  And as the FOD, were you overseeing -- were

5    you overseeing this entire life cycle?

6        A.  Yes.

7        Q.  And so the exercise of prosecutorial

8    discretion throughout this life cycle is something

9    that you had purview over?

10        A.  With the exception of once the case is

11    calendared before the immigration court, yes.

12        Q.  As the FOD, were you responsible for issuing

13    any policies or guidance to your subordinates with

14    respect to how to exercise prosecutorial discretion?

15        A.  Yes.

16        Q.  And are those public documents?

17        A.  No.  They would be considered -- we'd

18    consider them operational guidance and being law

19    enforcement sensitive.

20        Q.  And these operational guidance documents are

21    generated at your level?

22        A.  For my field office, yes.

23        Q.  And how would that document receive the

24    necessary approvals or clearance?

25        A.  I would generally confer with my chief

1    counsel, and if -- at that time it was a female

2    attorney.  If she had questions, we would discuss

3    that.  If she wanted to engage with other attorneys,

4    either at headquarters or other field offices, then we

5    would meet and confer on either the concept of

6    operation or the application of a policy.

7            Many of our policies that are generated

8    nationally, are impacted differently.  As you're well

9    aware what happens in the 9th isn't necessarily what

10   happens in the 5th or the 11th.  And so sometimes I

11   had to issue different guidance for my officers in the

12   5th than I did in the 11th depending on what was being

13   handed down.

14           So there was a lot of interaction with our

15   counsel and her -- you know, her fellows before we

16   would kind of come to consensus on the best way to

17   proceed.

18       Q.  Thank you.

19           Over the course of your time as the FOD, how

20   many of these policy operational guidance documents do

21   you think you've issued?

22       A.  I mean it would be difficult to even guess.

23   I mean not everything was a written document.  Some

24   was -- some were issued in E-mail guidance.  Some were

25   issued verbally to supervisors.  It was very open and

1    collaborative with my subordinate supervisors and

2    giving them opportunities to come forward with

3    questions or allow their employees to come forward

4    with questions and kind of discuss things through.

5            I felt it was important that people

6    understand what they're doing and not just doing it,

7    like animatronically.  So that was something that I

8    stressed with my subordinate managers.  So I mean the

9    idea of one perfect answer was something that I tried

10   to teach them to reject and come up with, you know,

11   solution sets that are practical, given that they're

12   all resourced differently.

13           And then they're all working in different

14   states and they're all working in different -- I had

15   people in different -- you know, 13 different district

16   courts, 3 different circuit courts, 2 different time

17   zones.  So it wasn't usually, you know, one right

18   answer.

19       Q.  Was any of the operational guidance ever

20   delivered just verbally?

21       A.  Yes.

22       Q.  And is that verbal guidance on a case

23   specific basis or verbal guidance that would be

24   broadly applicable?

25       A.  Both.  I mean sometimes they would kind of

                                                          Page 38

1    give me a scenario, "What do we do in this scenario"

2    just so there was consistency.  But when it came to a

3    lot of times with -- you know, as one exemplar

4    encountering somebody in the field who had children,

5    and they would want -- you know, they would want to,

6    like, discuss that.  So my officers would try to reach

7    out, and we would discuss through the best way forward

8    on how to proceed.

9         Q.  So the guidance -- operational guidance is

10   issued by E-mail, by written memoranda and also

11   verbally?

12        A.  Yes.

13        Q.  Any other mechanisms?

14        A.  No.

15        Q.  At the time that you were the FOD who was the

16   Field Operations Assistant Director?

17        A.  There were several.  Kelvin McCormack, Scott

18   Weber, Robin Baker, Dave Venturella, and Chris

19   Shanahan.  I think that was -- I think those were the

20   individuals.

21        Q.  And in your position as the FOD, did you

22   interact with entities outside of DHS?

23        A.  Can you clarify that?

24        Q.  Of course.  In your day-to-day

25   responsibilities as the FOD, did you, for example,

```
                                              Page 39
 1    have the need to liaise with the White House?
 2        A.  No.
 3        Q.  How about with the Department of Justice?
 4        A.  Yes.
 5        Q.  Is that because of your interactions with the
 6    EOIR?
 7        A.  Both the EOIR and the U.S. Attorney's
 8    offices.
 9        Q.  Okay.  And besides those components of the
10    Justice Department, any others?
11        A.  Sometimes the Office of Immigration
12    Litigation will.
13        Q.  Any others?
14        A.  I don't believe so.
15        Q.  Okay.  How about with members of Congress?
16        A.  Occasionally, when they were in district.
17    More commonly with their staff directors, the
18    day-to-day interaction.
19        Q.  How about state or local government
20    officials?
21        A.  Occasionally, but that was rare.
22        Q.  What would those rare occasions entail?
23        A.  Sometimes they would simply have questions
24    about immigration, and it was almost like what we call
25    a 101, just to kind of outline what it is that we're
```

1   doing and why, and sometimes they had questions

2   about -- depending on the state, how to better work

3   with us or what they could do to better align our

4   mission with their mission.

5           And sometimes, you know, the district

6   attorneys, organizations would have questions, and

7   we'd go and -- I'd go with my chief counsel and we'd

8   basically kind of, in the round, if you will, take

9   their questions and respond to their -- you know,

10  their needs.

11      Q.   That makes sense.  Let's move on now to your

12  Field Operations Assistant Director position.  You

13  were promoted in May of 2013?

14      A.   Correct.

15      Q.   Can you expand on the role and

16  responsibilities of that position?

17      A.   Sure.  Similar in some way, except you're

18  dealing with 24 field offices and not 21 offices.  But

19  again, every aspect of the immigration life cycle from

20  start to begin -- from start to end.  That also had --

21  the assistant director job had a little bit more

22  involvement in overseas operations than you do in the

23  field.

24          So even what we're -- our activities

25  overseas, but I was the supervisor for the 24 field

1    offices, and in that capacity provided them guidance

2    and perspective, and then also did a lot of briefings

3    on the Hill, a lot of briefings at the department

4    level.  So kind of as the conduit between the field

5    and Washington, D.C., I had to kind of play that role

6    of interpreting what's being done in the field for

7    people, you know, inside the beltway and then

8    translate Washington speak back out to the field.

9         Q.  In this position did you have to review or

10   clear the operational guidance documents being issued

11   by the various field office directors?

12        A.  No.  Only if they asked for counsel.

13        Q.  When you say, "counsel," your counsel?

14        A.  Yes.  I'm sorry.

15        Q.  Otherwise, they are free to liaise with the

16   internal lawyers to work up their operational

17   guidance?

18        A.  That's correct.  Myself and my counterpart

19   from the office of the principal legal advisor, rather

20   unanimously us trying to micromanage all of the

21   impacts of the various district court and circuit

22   court decisions, we would generally issue broad

23   guidance and allow them the ability to adapt that to

24   their local offices.  And -- but, of course, the same

25   mechanism was in place that if either the FOD or the

1   chief counsel had questions and wanted higher level

2   review, then there was an opportunity for them, that

3   we would sit down with them and kind of talk it

4   through.

5        Q.  So tell me a little bit more about the broad

6   guidance you just mentioned.  Would this be the

7   guidance issued at your level that would apply to all

8   of the field offices?

9        A.  Correct.

10       Q.  What is the procedure for generating this

11  type of guidance?

12       A.  Generally, there will be either an identified

13  problem or an identified confusion or a new policy

14  that comes from the department, and we would draft the

15  operational guidance on implementing that, you know,

16  program or what we see as a systemic shortcoming, and

17  then I would work with my counterpart in OPLA until we

18  came to a decision on the way to best present it.

19          We would have that elevated and cleared

20  within ICE, and then it would be issued and, generally

21  speaking, things coming from my level were viewed in

22  E-mail broadcasts.

23       Q.  When you say, "elevated and cleared within

24  ICE," can you tell me a little bit more about what

25  that process entails?

Page 43

1      A.   Sure.  They would be cleared by the executive

2   associate director for ERO and the principal legal

3   advisor, those two chains of command.  If there was an

4   element of the guidance that may have touched on

5   Homeland Security investigations or HSI, they would

6   have an opportunity to review it.  If there were going

7   to be budgetary impacts, the CFO would get involved in

8   the review and decide whether or not it needed to be

9   socialized to the appropriators, and then it would go

10  to ICE's front office, to the deputy director, and

11  generally speaking, he would decide whether or not we

12  could go ahead and issue it in its current state or if

13  he wanted it more formally issued as a memorandum or a

14  policy directive from the agency.

15      A lot of the things that I did at the field

16  operations level weren't necessarily -- didn't rise to

17  the level of being ICE policy or ICE directives.  So

18  that generally, once the deputy director approved it,

19  we were fine to issue it.

20      Q.   Is there any written documents outlining how

21  various types of guidance documents should be elevated

22  and cleared in order to be finalized?

23      A.   No.

24      Q.   Is it document dependent?

25           MS. DAVIS:  Objection.  Vague.

```
                                           Page 44

 1    BY MR. LEE:

 2         Q.  Does it depend on the guidance?

 3         A.  Yes.

 4         Q.  Would it be fair to say that those entities

 5    within ICE have equities in that guidance document

 6    would have a chance to weigh in, provide input, and

 7    sign off?

 8         A.  Yes.

 9         Q.  Are there any types of guidance documents

10    that need to be elevated all the way to the assistant

11    secretary level?

12         A.  If it was going to be an ICE policy or an ICE

13    directive that would be impacted in the entire

14    organization, then yes.

15         Q.  Okay.  As the Field Operations Assistant

16    Director, who did you report to?

17         A.  The deputy executive associate director.

18         Q.  Sorry.  I didn't understand that.  I

19    apologize.

20              Who was the deputy associate director at that

21    time?

22         A.  Tim Robbins.

23         Q.  And was he in that position for the duration

24    of your time as the Field Operations Assistant

25    Director?
```

1      A.  Yes.

2      Q.  And you indicated earlier that in this

3  position you did a lot of liaising between sort of

4  D.C. headquarters and the field staff around the

5  country; is that correct?

6      A.  Yes, it is.

7      Q.  Okay.  Did you, in that position, have any

8  interactions with the White House?

9      A.  Yes.

10      Q.  In what kind of way?

11      A.  Usually, at the domestic policy counsel

12  level, going to discuss topics that they were either

13  looking to implement or they wanted feedback from ICE

14  on proposals that they were considering.

15      Q.  Were you dealing with like a staff member at

16  the DPC or an actual special assistant --

17      A.  Both.  I've met -- Cecilia Munoz was the

18  director of the DPC at the time, and I've talked with

19  her and her deputy or assistant, I forget, Felicia

20  Escobar was her No. 2.  And sometimes I would meet

21  with Cecilia, sometimes with Felicia, sometimes with

22  staff.  It just depended on the nature and scope of

23  the meeting.

24      Q.  Any other components within the White House?

25      A.  I would sometimes go to National Security

1    staff, meeting with the National Security staff.

2        Q.  And there, again, also with the principals or

3    just at a staff level?

4        A.  No, just a staff level, not the actual

5    National Security Council, but the career staff.

6        Q.  And with the Justice Department, I presume,

7    again, with the U.S. attorney's offices EOIR and OIL?

8        A.  OIL and EOIR, and then also civil rights.

9    Didn't really do much with the executive office of the

10   U.S. attorney's office or whatever -- I forget the

11   exact -- they have their own executive organization

12   over at the U.S. attorney's offices.

13       Q.  I think you're exactly right, the Executive

14   Office of the U.S. Attorneys.

15       A.  Yes.

16       Q.  What was the nature of your interactions with

17   the Civil Rights Division?

18       A.  A couple different times they were trying to,

19   I guess I would say, mediate or moderate between

20   different cities that had questions about immigration

21   enforcement, and trying to understand what was going

22   on with immigration enforcement so they could inform.

23   They're usually cities that were under consent

24   decrees.  Consent decrees.  And so they were trying to

25   understand like how those interacted with immigration

                                                      Page 47

1    enforcement.

2         Q.  To make sure those consent decrees -- the

3    terms of those consent decrees would be consistent --

4         A.  Right.

5         Q.  -- with immigration law?

6         A.  Yes.

7         Q.  Thank you.

8             How about with members of Congress?

9         A.  Different members.  I mean if they had

10   questions about what was going on with enforcement in

11   their district or state, we would go and meet with

12   those.  The Hispanic Caucus several times asked me to

13   come and talk with them about what was going on with

14   UACs and families on the border, and then staff, same

15   thing.  I would do -- every cycle, every two years

16   they have kind of an indoctrination for the new staff

17   with new members, and we would go and kind of do the

18   101 on what ICE and ERO does, and then that would

19   always generate a lot of questions and interest.

20            So I mean in that capacity, as the EAD, I was

21   on the Hill, you know, frequently.  Broad range of

22   topics.

23        Q.  Okay.  Moving to your deputy -- your current

24   position, who do you report to presently?

25        A.  Matthew Albence.

1        Q.   We might as well take care of this right now.

2   Can you go back to your organizational chart,

3   Exhibit 9.

4        A.   Sure.  Okay.

5        Q.   If you can just identify for me some of the

6   other positions identified.  Who is the deputy

7   director?

8        A.   The acting deputy director is Peter Edge.

9        Q.   And the assistant secretary?

10       A.   Tom Homan is the acting director.

11       Q.   Was Mr. Homan ever employed with ERO?

12       A.   Yes.

13       Q.   And can you just give me a little background

14   on his tenure there.

15       A.   He was the assistant director for

16   enforcement, deputy executive associate director and

17   executive associate director.

18       Q.   When you say, "assistant director for

19   enforcement," is that reflected here on this

20   organizational chart?

21       A.   Yes.

22       Q.   Can you help me out with where that is?

23       A.   Bottom left.

24       Q.   Thank you.

25       A.   You're welcome.

                                                        Page 49

 1        Q.   Was there any time in which you reported
 2   directly to Mr. Homan?
 3        A.   During a detail, yes.  When I was up at
 4   headquarters on a detail, but not formally within
 5   chain of command.
 6        Q.   Who is the chief of staff?
 7        A.   Currently?
 8        Q.   Yes, please.
 9        A.   Tom Blank.
10        Q.   You said, "Blank"?
11        A.   Blank, yes.
12        Q.   Does he have a deputy?
13        A.   There's an acting deputy right now.  His name
14   is James Harris.
15        Q.   And who is the principal legal advisor?
16        A.   Tracy Short.
17        Q.   So going back to your current position as a
18   Deputy Executive Associate Director, are there
19   policies and guidance documents that are issued at
20   this level?
21        A.   No.
22        Q.   Are there policies or operational guidance
23   documents issued at the executive associate director
24   level?
25        A.   Yes.

Case 1:17-cv-05228-NGG-JO  Document 97-1  Filed 12/15/17  Page 1152 of 1603 PageID #: 5097

1       Q.  So that would be by Mr. Albence?

2       A.  Correct.

3       Q.  What is the nature of those policies and

4   operational documents?

5           MS. DAVIS:  Objection.  Vague.

6           THE WITNESS:  They're usually clarifying

7   documents or implementing documents for policies and

8   programs that impact all of ERO.  So something that

9   Mr. Albence wants to ensure that the guidance is

10  standardized as much as possible throughout ERO, then

11  the policy or directive would come from him.

12  BY MR. LEE:

13      Q.  Do you recall who was the executive associate

14  director in 2012?

15      A.  Gary Mead.

16      Q.  What was his tenure there, if you recall?

17      A.  I don't remember exactly when he started

18  because I believe he started sometime in 2010 and --

19  but he retired in April of 2013.

20      Q.  And has Mr. Albence been the executive

21  associate director since this new administration?

22      A.  Since February of 2017.

23      Q.  And with respect to the policies and

24  operational guidance documents you discussed at this

25  level, would they go through the same elevation and

1    clearance process that you described earlier today?

2         A.  Yes, sir.

3         Q.  Okay.  In this current position, do you also

4    continue to liaise with the White House?

5         A.  If asked, yes.

6         Q.  Have you had the occasion to deal with the

7    White House?

8         A.  No.

9         Q.  So not in the last two years?  I'm sorry.

10   Excuse me.  You've only been there for a few months;

11   is that correct?

12        A.  I'm sorry?

13        Q.  You've only been the Deputy Associate

14   Director -- oh, you've been there for two-plus years;

15   is that correct?

16        A.  Yes, it is.

17        Q.  Okay.  I'm sorry.

18             Within that span of those two-plus years,

19   you've not had the occasion to liaise with the White

20   House?

21        A.  It's more with the current administration.  I

22   haven't been doing as much with the White House.  So

23   since January.

24        Q.  So to clarify, and I apologize.  I'm getting

25   confused.  Over the span of the time you were Deputy

1   Executive Associate Director your interactions with

2   the White House occurred predominantly this year with

3   the new administration?

4        A.  No, that's incorrect.  It was predominantly

5   with the previous administration.  Since January I've

6   had very little interaction with the White House.

7        Q.  Understood.  Thank you for that.

8            And with the previous administration, what

9   components of the White House were you interacting

10  with?

11       A.  Same.  NSC, DPC, OMB were the primary points.

12  A little bit with legislative affairs on a few topics.

13       Q.  How about with the Justice Department?

14       A.  Same.  Little bit more with Civil Rights, as

15  the deputy.  OIL is the major conduit that we have

16  with DOJ at the headquarters level.  EOIR at the

17  executive level, and Civil Rights on, you know,

18  helping them with the consent decrees.

19           MS. DAVIS:  To clarify, was your question

20  still related to the last administration?

21  BY MR. LEE:

22       Q.  I was really referring just to the time you

23  were the Deputy Executive Associate Director.  So the

24  two years or so you've been there.

25       A.  All of those were -- to clarify all of those

Page 53

1  were with the previous administration.

2      Q.  Okay.  So that helps me.  Under the current

3  administration, has those interactions -- have those

4  interactions changed in any way?

5      A.  I haven't met with anyone from Civil Rights

6  with the new administration.  I continue to meet with

7  OIL and EOIR.  Of course, now my colleague from

8  federal programs is a new addition to the game.

9      Q.  And you've already explained that you've not

10  had interactions with the White House since the new

11  administration?

12      A.  I'll clarify, just OMB, but not DPC or NSC.

13          MR. LEE:  Okay.  It's 10:10.  Do you want to

14  take a brief five-minute?

15          MS. DAVIS:  Sure, if this is a natural break

16  point.

17          THE VIDEOGRAPHER:  We're going off the

18  record.  The time on the video is 10:12 a.m.

19          (A recess was taken from 10:12 a.m.

20          to 10:26 a.m.)

21          THE VIDEOGRAPHER:  Back on the record.  The

22  time on the video is 10:26 a.m.

23  BY MR. LEE:

24      Q.  Mr. Miller, do you understand you're still

25  under oath?

1      A.  Yes, I do.

2      Q.  Mr. Miller, I've been using the term

3  "policies" and "guidance" somewhat interchangeably

4  earlier today.  I want to drill down on that a little

5  bit with you to make sure I understand the categories

6  of documents that are generated at the various levels

7  that we discussed today, at field office level, at the

8  level of the Field Operations Assistant Director, and

9  then at the Executive Associate level.  In your mind,

10  are there different categories of documents that would

11  be issued by these offices?

12      A.  Yes.

13      Q.  Can you explain what those categories are?

14      A.  First, I would say that the difference

15  between policy and operational guidance is that

16  operational guidance kind of gives direct instructions

17  to law enforcement officers on how they should be

18  doing their job.

19          Policy is a little bit broader in scope in

20  that it may entail guidance.  It may entail from what

21  legal authority the direction is being derived, and it

22  may define desired outcomes or specific outcomes that

23  we're looking to achieve, kind of better explaining to

24  all employees.  Because again, starting at the field

25  level, as I told you previously, I thought it was

1    important that everybody in the field office, not just

2    the operators, understand what we're doing and why.

3              Going up to the Assistant Director level, I

4    generally took the same philosophy.  At that level

5    most of what I issued was operational guidance to the

6    LEOs, but sometimes I thought it was important

7    through -- we called them "taskings."  They're E-mail

8    messages that are sent out to all employees, and I

9    thought sometimes it was important that all employees

10   understood what we were doing and not just the law

11   enforcement officers.

12             So in my mind, that's when I would

13   differentiate giving operational guidance to the field

14   office directors for their law enforcement officers,

15   or LEOs, if I may use that acronym, as opposed to

16   talking, you know, in broader terms to all employees

17   within ERO, you know, law enforcement and support.

18             And then when you get into more policy

19   documents at the headquarters level, the same kind of

20   thing that you're trying to point to, either a change

21   at the national level in operating principles or the

22   impact of a specific case, whether that's done, for

23   example, like the field offices in the 9th or

24   something that's done nationally, sometimes it may be

25   important to issue policy that defines why the change

1    is being made, what the scope of that change is, and

2    what we foresee as the impact, and then laying out the

3    expectations of what we want as outcomes based on

4    their change of behavior.

5             At that time, at the field office level, I

6    wasn't really issuing directives.  At the EAD level,

7    the EAD has the flexibility to do any of those.  He

8    can issue operational guidance, if there's something

9    that he wants to define, behaviors or outcomes just

10   for the LEOs, he has the ability to issue that

11   operational guidance.

12            Less common at the EAD level, more frequently

13   done at the field office level because that's the part

14   of the organization that's really, again, doing the

15   interaction between headquarters and the field.  More

16   commonly, the EAD will either issue policy, or if they

17   want something that's better defined, especially

18   concepts or changes that are superseding policy or

19   superseding previous guidance, we currently -- ICE and

20   ERO favor the directive format that actually, you

21   know, defines specifically what's being superseded and

22   kind of in a bit more detail lays out the legal

23   authority, the expected behaviors, defines any terms

24   that may be ambiguous or new, and then talks about, at

25   different levels within the organization, behaviors or

Case 1:17-cv-05228-NGG-JO  Document 97-1  Filed 12/15/17  Page 1159 of 1603 PageID #: 5104

1  responsibilities, probably more responsibilities than

2  behaviors.

3       Q.  So when you used the word "directive," is

4  that also the policy documents that we've been

5  discussing?

6       A.  ICE is in the process of kind of trying to

7  formalize its policy issuance.  At one time most

8  policies were issued via memoranda, and they have been

9  favoring the directive because we think it better

10  defines -- as I said, you know, it better defines

11  terms, it better defines behaviors or expectations.

12  It allows for clear articulation of what the legal

13  precedents are, and then it provides an opportunity to

14  specifically say what is being superseded, if

15  anything, along with the issuance of the directive.

16       Q.  Would it be fair to say, then, the

17  operational guidance documents would implement these

18  directives?

19            MS. DAVIS:  Objection.  Form.

20  BY MR. LEE:

21       Q.  Just to better understand how these documents

22  fit in in relation to each other.

23       A.  It may be required -- it may be necessary,

24  depending on a directive, to issue operational

25  guidance if the field doesn't understand it, but

1    hopefully, if we inside 395 are doing our job, will

2    ensure that it is well defined within the directive,

3    you know, both the responsibilities and the desired

4    outcomes.

5          But it is conceivable that you may have to

6    issue further operational guidance.

7          Q.  And then with respect to the clearance

8    process, just to get some clarity for the record, when

9    we talked about elevating documents potentially up to

10   the deputy director or even assistant secretary level,

11   are we talking about directives or both -- or

12   operational documents as well?

13          MS. DAVIS:  Objection.  Compound.

14          THE WITNESS:  In most instances it's either a

15   policy or directive that's elevated to the level of

16   the Director, certainly.  Or in your organizational

17   chart, the Assistant Secretary, although for us, it's

18   the Director.  Generally speaking, operational

19   guidance is within the component, but there may be

20   instances that it's elevated depending on what you're

21   directing people to do.  It could conceivably go to

22   the Deputy Director's office.  I can't recall that

23   happening, but it -- you know, it would be possible

24   with something that sensitive.

25   BY MR. LEE:

1          Q.   That's very helpful.   Thank you.

2               I want to go back also to our prior

3     discussion about your contacts with the White House in

4     your current position.   Under the prior

5     administration, my understanding is that your

6     interactions with the White House included

7     interactions with domestic policy counsel, the NSC,

8     OMB and leg affairs?

9          A.   Correct.

10         Q.   Can you explain to me, with respect to the

11    DPP (sic), how those interactions arose?

12              MS. DAVIS:   I'm going to object on the

13    grounds of privilege, the deliberative process

14    privilege with respect to any of the content of

15    meetings with White House officials.

16              I instruct you not to answer with respect to

17    content.

18              THE WITNESS:   I mean they wanted somebody

19    from ICE to be involved in the conversations, and

20    since I was running operations, I was the person that

21    was sent to those meetings, and we seemed to work well

22    together.   So I kept getting invited.

23    BY MR. LEE:

24         Q.   So just speaking specifically about the

25    DPP --

1       A.  DPC.

2       Q.  DPC, excuse me.  The DPC, are they requesting

3   your presence at a meeting directly?  Are they

4   communicating with you directly?

5       A.  In the beginning they went through the Deputy

6   Director's office, and to my recollection, the first

7   meeting I went to at the DPC was a joint meeting

8   between ERO and EOIR, and I went along with our

9   assistant director for ICE Health Service Corps and

10  met with Juan Osuna and his team and Felicia Escobar.

11  And I don't even remember the topic, but we were

12  talking about something about immigration corps

13  processes.

14          MS. DAVIS:  Again, I'm going to object on

15  grounds of deliberative process privilege with respect

16  to content.

17          So you're instructed not to answer with

18  respect to content of those conversations.

19          MR. LEE:  Well, with respect Counsel, my

20  question is not addressed to the content of any

21  decision making.  So I don't think the deliberative

22  process privilege will apply.  This is just content

23  about, you know, conversations not related to any

24  particular decisions being made.

25          MS. DAVIS:  Yes.  My instruction still stands

                                                    Page 61

1    with respect to content.

2           MR. LEE:  Understood.  And I'll just make my

3    comment for the record.

4           Thank you, Counsel.

5       Q.  Were these meetings at the invitation of the

6    White House, in this case the DPC?

7       A.  That is my understanding.

8       Q.  And then I think you were about to explain

9    that eventually the DPC just contacted you directly

10   without going through the Deputy Director?

11      A.  At times they would, although I was

12   instructed to refer them to the Deputy Director's

13   office.

14      Q.  Just to go through the chain of command?

15      A.  Correct.

16      Q.  But your understanding is that over the time

17   of the previous administration, that DPC made outreach

18   through the Deputy Director to you for consultation on

19   matters relating to ICE?

20      A.  Correct.

21      Q.  How often were -- how many times do you

22   recall the DPC reaching out to ICE and to you?

23      A.  It was a fairly common occurrence.  I

24   couldn't even venture to give you a number.

25      Q.  So are we talking about multiple times per

                                                    Page 62

1    month?

2         A.   Sometimes, yes.

3         Q.   And you mentioned Ms. Munoz and Ms. Escobar.

4    Were there any other individuals that -- did those

5    individuals invite you or consult with you directly?

6         A.   At times, yes.

7         Q.   Anybody else at the DPC?

8         A.   There were staff members, but I don't really

9    remember their names.

10        Q.   So Ms. Munoz and Ms. Escobar were the key

11   individuals?

12        A.   They were the principals.

13        Q.   Thank you.

14             What was the subject matter of these

15   discussions?

16             MS. DAVIS:  Counsel, again, I'm going to

17   object with respect to deliberative process privilege

18   with respect to the specific details and substance of

19   the content of their conversations.

20             MR. LEE:  I believe the subject matter of the

21   meeting would not be encompassed by this privilege.

22             MS. DAVIS:  Well, I'll instruct the witness

23   not to answer with respect to the content or substance

24   of the conversations themselves.  If there's a general

25   subject matter that he can identify without revealing

 1    privileged information he may so answer.

 2              THE WITNESS:  Most of the meetings focused on

 3    the immigration life cycle, especially as it related

 4    to family units and unaccompanied alien children or

 5    UACs.

 6    BY MR. LEE:

 7         Q.  Do you have any familiarity with any points

 8    of contact with the DPC and the current

 9    administration?

10         A.  No.

11         Q.  Has there been any outreach from the current

12    domestic policy counsel to you, as far as you know?

13         A.  Can you clarify that?  To me directly?

14         Q.  To you directly.

15         A.  No.

16         Q.  How about to the Deputy Director level, at

17    the Deputy Director level to the extent you know?

18         A.  I don't know.

19         Q.  Let's move to the NSC.  I believe you

20    indicated your interactions with the NSC were mainly

21    at the staff level; is that correct?

22         A.  Yes.

23         Q.  And how frequently in the prior

24    administration were these interactions?

25         A.  I would say at least monthly.

1      Q.   And what would be the subject matter of these
2   discussions?
3           MS. DAVIS:  Again, I'm going to object to the
4   extent that you're seeking information about the
5   substance of the meetings as protected by the
6   deliberative process privilege.  To the extent the
7   witness can answer without revealing the content of
8   the conversations, he may do so.
9           MR. LEE:  And, Counsel, for the -- for the
10  sake of getting everyone out of here, I'm okay with a
11  standing objection to that effect if you're
12  comfortable, but I'll defer to you, of course, on
13  that.
14     Q.   Mr. Miller, would you like me to repeat the
15  question?
16     A.   Yes, please.
17     Q.   What would be the general subject matter of
18  the discussions you had under the prior administration
19  with the National Security Council?
20     A.   They would include matters of border
21  security, response to the surge that happened in 2013,
22  or was sustained between 2014 and 2015.  Interaction
23  with our international partners, and other classified
24  topics.
25          Q.   And in the current administration, have you

1  been -- has there been any outreach to you from the

2  National Security Council?

3        A.  Yes.

4        Q.  On how many occasions?

5        A.  It's not been directly with me.  I've been

6  copied.  My subordinate attends regular monthly

7  meetings on recalcitrant countries.

8        Q.  And your subordinate would be --

9        A.  The assistant director for removal.

10       Q.  The removal assistant director; is that

11  correct?

12       A.  Yes.

13       Q.  You have not personally attended any meetings

14  with the NSC?

15       A.  Only because of scheduling conflicts.  I'm

16  invited to the recalcitrant meetings, but I have not

17  attended.

18       Q.  And let me just go back to the Domestic

19  Policy Council meetings.  Were those in person?

20       A.  Primarily in person, yes.

21       Q.  Let's switch to the OMB.  I believe you

22  indicated that you had interactions with that

23  component.  In the prior administration did you have

24  any regular interactions with the OMB?

25       A.  Yes.

1       Q.   And how frequent were those interactions?

2       A.   With the principals, probably at least

3   quarterly, if not more frequently.  With staff,

4   weekly.

5       Q.   And what was the general subject matter of

6   these discussions?

7            MS. DAVIS:  I'll interpose the same objection

8   as I did last time.

9            MR. LEE:  Thank you, Counsel.

10           THE WITNESS:  Just either the formulation or

11  execution of our budget.  ERO has a sizable budget.

12  So there's a lot of interest.

13  BY MR. LEE:

14      Q.   And with the current administration, has

15  there been -- you've indicated you continue to have

16  interaction with the OMB; is that correct?

17      A.   Yes, sir.

18      Q.   And how frequent have those interactions

19  been?

20      A.   About at the same cadence.

21      Q.   And what was the general subject matter of

22  those discussions?

23           MS. DAVIS:  Same objection and instruction.

24           THE WITNESS:  Generally with the budget

25  execution, and then budget formulation.  If I could

```
 1    clarify, some of the OMB meetings there was a member
 2    of the DPC -- I'm sorry.  Yeah.  A member of DPC staff
 3    who attends.  So he is in attendance at some of the
 4    OMB meetings.
 5    BY MR. LEE:
 6         Q.  But the subject matter of those discussions
 7    were -- pertained to the budget?
 8         A.  Budget formulation on a specific topic.
 9         Q.  And not regarding any ICE-related policy
10    issues?
11         A.  It is not related to ICE policy.
12         Q.  Are you aware of whether directives at the
13    Director or Deputy Director level are reviewed or
14    vetted by agencies outside of DHS?
15         A.  Yes.
16         Q.  Can you explain in a little more detail which
17    types of directives may require vetting or clearance
18    outside of the agency.
19         A.  A number of our directives where there's --
20    frequently our directives are reviewed by OIL, the
21    Office of Immigration Litigation at the Department of
22    Justice.  There have been instances where we've been
23    in communication with health and human services on
24    matters relating to UACs.
25         Q.  How about with the Justice Department?
```

Page 68

1        A.   OIL, yes.

2        Q.   Any other component of the Justice

3   Department?

4        A.   Not to my knowledge.

5        Q.   How about with the White House?

6        A.   I don't know of that personally, but I would

7   assume that most of the higher level issues that we

8   deal with, I mean that's part of a normal clearance

9   process.

10        Q.   Sort of at the cabinet level; correct?

11        A.   Correct.

12        Q.   When these directives are formally issued,

13   how are they disseminated within the agency?

14        A.   Generally, via E-mail, and then they're

15   posted on our intranet site.

16        Q.   Are there typically, then, steps taken by

17   respective components within ICE to generate

18   additional follow-up documents in response to that

19   directive?

20             MS. DAVIS:  Objection.  Vague.

21             THE WITNESS:  It would depend on the subject

22   matter.  If we feel there needs to be cascading

23   guidance that would be predicated on the directive.

24   If we think the directive stands on its own, then

25   there's no need to do so.

1    BY MR. LEE

2         Q.   And that would be a judgement call?

3         A.   Correct.

4         Q.   Would that, for example, be a judgment call

5    you would make in your current position?

6         A.   I would make a recommendation to the EAD

7    unless we were asked to issue cascading information.

8         Q.   But I think as you explained earlier, at the

9    EIR level the directives are issued by the Executive

10   Assistant Director?

11        A.   Correct.

12        Q.   With respect to enforcement priorities -- do

13   you understand what I mean when I refer to

14   "enforcement priorities"?

15        A.   Yes.

16        Q.   How does the Department of Homeland Security

17   reach a decision on those priorities?

18        A.   It depends on which iteration.

19        Q.   What do you mean by "iterations"?

20        A.   I've served under four presidents.  Every

21   president does it differently.  Every Secretary does

22   it differently.

23        Q.   Understood.

24        A.   So there isn't an answer for that.  You're

25   talking about policy.  So that would be -- it's kind

1    of somewhat -- in this line of work it's -- you know,

2    there is no one way that policy is issued or policy is

3    generated.

4         Q.  You were just referring to the fact that the

5    methodology was different across administrations; is

6    that correct?

7         A.  Every one.

8         Q.  Okay.  So how about with respect to the prior

9    administration?

10        A.  Well, the two secretaries did it differently

11   again.

12        Q.  Okay.  So how about we start with the first

13   secretary.

14        A.  I wasn't here in D.C. when the guidance was

15   coming out.  So as a field office director, the

16   guidance was promulgated at the component level.  From

17   then Assistant Secretary Morton that laid out the

18   priorities for -- largely for ERO.  It wasn't really

19   impacting on -- it had no impact whatsoever on CBP,

20   Customs and Border Protection, commonly referred to as

21   CBP, nor did it have any real impact on the Office of

22   Investigations or what is now called Homeland Security

23   Investigations.

24             So although it was ICE enforcement

25   priorities, it largely only impacted ERO.

1      Q.  Okay.  How about enforcement priorities

2  issued at the secretary level?

3      A.  As I stated, I was in D.C. when Secretary

4  Napolitano, the beginning of her tenure.  So I don't

5  know what happened in terms of her interaction with

6  Director Morton or any of his subordinates.

7          I only know what came out to the field as

8  priorities came from Director Morton.  And to my

9  knowledge, I don't remember coming from Secretary

10  Napolitano herself.

11      Q.  And how about the next Secretary of Homeland

12  security?

13      A.  Secretary Johnson had a lot of interaction

14  with the components in generating his memoranda that

15  came out November of 2014.  The one that really

16  impacted my organization was ending secure communities

17  and changing to the priority enforcement program.

18      Q.  So it sounds like you have more knowledge

19  about the generation of that enforcement priorities --

20  those enforcement priorities under Secretary Johnson?

21      A.  Correct.

22      Q.  Can you tell me how -- in a little bit more

23  detail how the agency developed those enforcement

24  priorities?

25          MS. DAVIS:  I'm going to interpose the same

1    objection and the same instruction to answer with

2    respect to the content and substantive communications.

3                THE WITNESS:  In general terms, the secretary

4    had a number of meetings with the component principals

5    to get their input on if we were going to limit our

6    enforcement, how should it be limited or focused.

7    BY MR. LEE:

8         Q.   And at this time what position did you hold?

9         A.   In the beginning I was the assistant director

10   for field operations, and during Secretary Johnson's

11   tenure I was promoted to the Deputy Executive

12   Associate Director.

13        Q.   And were you consulted about these

14   enforcement priorities in both positions?

15        A.   Yes.

16        Q.   How frequently were you consulted with

17   respect to this change from ending secure communities

18   to the PEP policy?

19        A.   With the Secretary's senior advisors and

20   senior staffs, very frequently, several times a week.

21        Q.   And you were consulted for the expertise that

22   you provided?

23        A.   They were concerned on impact.  They didn't

24   want it to be so narrowing that we couldn't do our

25   job.  They were cognizant of the impact that it would

```
 1   have on morale, and they didn't want any direct impact
 2   on public safety.
 3        Q.   Were any individuals below your rank
 4   consulted as part of this process?
 5        A.   To my knowledge, no.
 6        Q.   So the consultation went as far down as the
 7   Assistant Director level?
 8        A.   Correct.
 9        Q.   And presumably, your direct reporting line
10   were also involved in those conversations?
11        A.   That's correct.
12        Q.   And how about with respect to the 2000 -- I
13   believe November 2014 enforcement priorities memo?
14        A.   Yes.
15        Q.   Just to help me out.  That's a different memo
16   and a different directive as the one you just
17   described around the shift from secure communities?
18        A.   No.  That's the formal memo itself.
19        Q.   I apologize.
20        A.   At least in my memory, it's one and the same.
21   Although I think there were seven memoranda that day.
22   So...
23             MR. LEE:  I think that's in part why I'm
24   confused.  So let me go ahead and jump.  If I can hand
25   you what was previously marked as Exhibit 3, which is
```

1    the administrative record for this case.

2            THE WITNESS:  Thanks.

3            (The witness reviewed Exhibit 3.)

4    BY MR. LEE:

5        Q.  If I can take you, please, to the page Bates

6    numbered AR221.  Let me know when you're there.

7        A.  I am.

8            MR. LEE:  So Mr. Miller, if you can take a

9    minute to review this document, which is a document

10   dated November 20, 2014 from Secretary Johnson on the

11   subject of policies for the apprehension, detention,

12   and removal of undocumented immigrants.  Let me know

13   when you've had a chance to skim through this

14   document.

15           (The witness further reviewed Exhibit 3.)

16           THE WITNESS:  Very good.

17   BY MR. LEE:

18       Q.  Excellent, Mr. Miller.  If you could just

19   clarify for me, is this a different memo from the

20   directive with respect to secure communities we were

21   just discussing?

22       A.  Yes, it is.  I apologize for confusing the

23   two.

24       Q.  No, not at all.  Let's help each other out

25   today.  There are a lot of documents.  So you've

                                                    Page 75

1    explained to me the process without divulging content

2    of those discussions, the process by which you were

3    consulted with respect to the secure communities

4    policy change.

5            Can you explain to me whether you were

6    similarly consulted with respect to this memo?

7        A.  Yes.

8        Q.  And so to unpack that a little bit, can you

9    explain to me who within the ICE organization was

10   involved in terms of being consulted on the

11   development of this document.

12       A.  It would have been the Directory Director at

13   the time.  Mr. Homan in his capacity as the EAD.

14   Mr. Robbins in his capacity as the deputy EAD.

15   Myself, several of our attorneys.  I'm trying to

16   remember who would have been the acting director at

17   the time.  We had a series of acting directors prior

18   to Ms. Saldana.  So whoever the acting director was at

19   that time would have been consulted as well, but I

20   don't know if that would have been Mr. Sanwag or

21   Mr. Winkowski.

22           You know, without a score card, I can't

23   remember the exact dates of when they were in that

24   capacity.  But whoever it was, one of those two

25   gentlemen would have been consulted.

1          Q.  And when you say, "acting director," you're

2     talking about the acting director of ICE?

3          A.  Correct.

4          Q.  And do you know whether the other -- I use

5     the word "component" sort of generically, if you'll

6     allow me.  Did the consultation also involve HSI,

7     management administration, or the Office of

8     Professional Responsibility?

9               MS. DAVIS:  Objection.  Compound.

10              THE WITNESS:  I do not know whether or not

11    those principals were contacted.  I know that at the

12    meetings I attended, they were not in attendance.

13    BY MR. LEE:

14         Q.  Okay.  And do you have some recollection as

15    to the amount of time in which this document took from

16    sort of inception to finalization?

17         A.  I don't remember when Secretary Johnson

18    started, but I know that soon after his Mother's Day

19    visit to the southwest border, we started talking

20    about changing our enforcement posture in response to

21    the surge and the series of memoranda that came out in

22    November 14 were kind of a collation of those

23    conversations.

24         Q.  So Mother's Day is in May 2014?

25         A.  (Nods head.)

1      Q.  So in about six months' time, if my math is

2   correct, the policies had reached its final form as

3   you see here today?

4      A.  That's my recollection, yes.

5      Q.  Okay.  And through -- in that six-month

6   period, what was sort of the pace of consultations

7   with you?

8      A.  It varied, but I'd say several times a week

9   with his senior advisor and the Deputy Secretary's

10  senior advisor.

11     Q.  That was fairly consistent throughout that

12  six-month period?

13     A.  Correct.

14     Q.  And we'll return to some of these documents.

15  I just wanted to take the chance to clarify confusion

16  around the various November 2014 memos.  But you can

17  put that aside for now.

18          Are you familiar with the February 2017

19  enforcement memo -- enforcement priorities memo issued

20  by then Secretary Kelly?

21     A.  Yes.

22     Q.  Were you consulted in any way with respect to

23  development of that policy?

24     A.  I was not, no.

25     Q.  Did anyone reach out to you inviting you to

1    provide any kind of input on that policy?

2        A.   Not about that policy directly, no.

3        Q.   Do you know if Mr. Albins was invited to any

4    discussions regarding this policy?

5        A.   Yes, he was.

6        Q.   Do you have any understanding as to why

7    consultation reached his level but not to you?

8        A.   I do not.

9        Q.   Do you have any understanding of how many

10   times Mr. Albins was involved?

11       A.   No, I don't.

12       Q.   Switching -- not quite yet.  I'm not

13   switching gears quite yet.

14            I want to talk now about deferred action.

15   We've just discussed enforcement priorities, but with

16   respect to deferred action, are there any directives

17   specifically on the issue of deferred action?

18       A.   Not that I know of, no.

19       Q.   What is your understanding as to why the

20   agency develops enforcement priorities?

21       A.   Every administration wants the INA to be --

22   the Immigration Nationality Act to be applied

23   differently, at least that's been my experience with

24   the last four administrations.  And so enforcement

25   priorities is largely a tool that allows them to do

1    that.

2        Q.  Have -- would you agree with me that the full

3    and immediate enforcement of the INA is not possible

4    based on budgetary concerns?

5        A.  No, I don't agree with that.

6        Q.  Why do you not agree with me as to that

7    point?

8        A.  I think as a cop, if laws are on the books

9    then we should be allowed to enforce them.  Budgetary

10   concerns are secondary decisions to good decision

11   making by officers in the field.

12       Q.  Are you aware of the costs that would be

13   imposed on ICE in order to apprehend and remove all

14   unauthorized persons in the country?

15       A.  Yes.

16       Q.  What would that cost be?

17       A.  I don't have a dollar figure, but it would

18   exceed our current budget for detention and removal.

19       Q.  So operating in the reality of the budget

20   that ICE has been given, would you agree with me that

21   the full and immediate enforcement of the INA would

22   not be possible?

23       A.  No, I don't agree with that.  You're

24   conflating two issues; right?  You're talking about

25   enforcing the law, and then your premise, your

1    primary -- at least the way I'm interpreting your

2    question is that you're predicating your question on

3    applying the INA the way Congress wrote it, the way

4    President Clinton signed it into law requires

5    proactive identification and removal of all persons.

6            That is not a realistic enforcement

7    methodology.  You're conflating a philosophy with

8    actual law enforcement philosophies and tactics.  And,

9    you know, one is a narrative.  One is how cops do

10   their job.

11           That's like if I went to Sacramento and went

12   to the Sacramento police chief and said, "Why aren't

13   you arresting every single person in the city of

14   Sacramento for every single violation of California

15   Penal Code," he would say, "Well, that's ridiculous."

16   Why?  Because it's more important to arrest somebody

17   who just raped a little girl as opposed to somebody

18   who's jaywalking.

19           They're both violation of the law in

20   California.  That's like you coming to me with your

21   question you just posed about an assumption that we

22   shouldn't enforce the law because it costs too much.

23   We should be enforcing the law in a way that's smart,

24   reasonable, and that enhances public safety.  The two

25   are not synonymous.  To draw that conclusion is a

1    philosophy.  It's not based on reality.

2        Q.  In that example you raise about the

3    Sacramento police chief, you would agree with respect

4    to the decision, for example, to prioritize the

5    individual who raped a little girl versus the

6    individual who is jaywalking?

7        A.  Absolutely.

8        Q.  But you don't see the priorities as being

9    affected in any way by the amount of money you have to

10   do your work?

11       A.  No.

12       Q.  Have you or anyone in your office ever had to

13   estimate or budget for the costs of removal?

14       A.  Every year.

15       Q.  Okay.  And do you develop those cost

16   estimates, the budget, in connection with the existing

17   enforcement priorities that are at that time the

18   operative ones?

19       A.  No.  We use historical trends informed by

20   more recent -- more recent enforcement trends.  So

21   we're looking both at historical data and then current

22   information that kind of informs the current state in

23   order to formulate, you know, a projection into the

24   future.  Unfortunately, the way Washington works, that

25   projection is 18 months out.  So it's a challenge,

1     but...

2          Q.  So with respect to changes in the enforcement

3     priorities, the budget estimates for cost removal

4     would not take that change into account?

5          A.  It may if there was a significant change in

6     what we were being asked to do, but those changes

7     occur in a much shorter time frame than our budget

8     formulation process.  So we formulate our budget based

9     on the information that we know 18 months in arrears.

10    And that's why frequently, you see ICE having to get,

11    you know, additional monies provided because we don't

12    really know what the border environment is going to be

13    in 18 months.  We don't know what we're going to be

14    asked to do in the interior in 18 months.  It's very

15    much an inexact science.

16         Q.  Does the budget estimate or projections for

17    the cost of removal involve any societal economic

18    costs --

19         A.  No.

20         Q.  -- to the individuals being removed?

21         A.  No.

22         Q.  So the budget you're talking about is sort of

23    bed space, detention centers, those types of issues,

24    like the operational aspects of apprehending and

25    removing unauthorized persons?

1      A.   That's -- those are subcomponents of a larger

2   budget.   It's -- I mean we look at the entire life

3   cycle.   So, you know, again, as I stated, I think

4   initially, there's both detained and nondetained

5   docket management.   So both have a cost.   Both have

6   personnel costs.   Both have physical plan costs.   Both

7   have, you know, operational costs.   So it's not

8   limited to just one piece of the immigration life

9   cycle but the totality of the immigration life cycle.

10      Q.   Okay.   I'd like to switch gears and talk a

11   little bit about the DACA program itself.   As you

12   know, this lawsuit is around the rescission of the

13   DACA program.   Is that your understanding?

14      A.   That's correct.

15      Q.   Do you have any understanding as to when the

16   DACA program first came into being?

17      A.   2012.

18      Q.   And at that time, you were in New Orleans;

19   correct?

20      A.   Yes, sir.

21      Q.   How did you find out about the implementation

22   of this program?

23      A.   To the best of my recollection, they did a

24   call with the field office directors, the 24 field

25   office directors to tell us the program was coming.

1    And then subsequent to that we received the policy via

2    E-mail, and I'm sure there were subsequent calls or

3    subsequent conversations.  I know I had subsequent

4    conversations with my chief counsel, and then had the

5    task of implementing it, educating and implementing it

6    with the workforce.

7         Q.  What was your reaction to learning of this

8    policy?

9         A.  I think it's a misapplication of a law

10   enforcement tool.

11        Q.  What is your understanding of what this

12   program provided for?

13        A.  It provided an opportunity for persons who

14   were brought here by their parents, generally

15   speaking, in many instances as a child, although some

16   came much older.  It provided them an opportunity to

17   defer an enforcement action, and subsequent to the

18   deferment of the enforcement action, because they were

19   in a deferred action status, they qualified for

20   employment authorization.

21        Q.  Did you have an understanding at the time

22   that those individuals who entered the country after

23   June 15, 2017 were not eligible for protection under

24   DACA?

25        A.  I don't recall that.

1          Q.   Are you aware of that fact today?

2          A.   Can you restate your question?

3          Q.   Of course.   That those individuals who

4     entered the country after June 15, 2007 are not

5     eligible for protection under DACA?

6          A.   I thought you said '17 before.

7               MS. DAVIS:   I believe you did.   Sorry.

8               MR. LEE:   My apologies.

9               THE WITNESS:   Yeah.   I know there was a

10    cutoff date.   I don't recall the exact cutoff date.

11    BY MR. LEE:

12         Q.   Okay.   And at the time that policy was

13    announced, were you aware that eligibility was

14    possible only if the individual had not been convicted

15    of a felony, a significant misdemeanor, or three or

16    more misdemeanors and did not otherwise pose a threat

17    to national security or public safety?

18         A.   Yes.

19         Q.   Were you aware that this determination was

20    made through a submission of biometric data and a

21    background check?

22         A.   I don't know what the processes were for

23    adjudication.   ICE isn't involved in the adjudication

24    of the applications.

25         Q.   Are you involved at all in the background

Page 86

1    check process?

2        A.   No.

3        Q.   And were you aware at the time that renewals

4    would be denied if the individual -- the renewals for

5    DACA would be denied if the criminal history of the

6    beneficiary changed?

7        A.   That was my understanding, yes.

8        Q.   Do you understand what benefits came with

9    receiving DACA?  I think one was the employment

10   authorization document?

11       A.   Yes.

12       Q.   Anything else that you're aware of?

13       A.   If they have an EAD, employment authorization

14   document, commonly referred to as an "EAD," then they

15   can subsequently get a limited use security card.

16   Then kind of that's an acceptable document for lawful

17   employment in the United States.  Those two taken

18   together would fulfill the I-9 requirement, and then

19   throughout the country different states or

20   municipalities promulgated their own programs or

21   regulations based on persons being in that status --

22   I'm sorry.  "Status" is the wrong term.  Having

23   deferred action.

24       Q.   Are you familiar with the series of FAQs that

25   were issued in association -- or in conjunction with

```
                                              Page 87
 1   the 2012 DACA directive?

 2        A.   I'm sure I reviewed them at the time, but I

 3   don't recall them currently.

 4        Q.   Did you have any involvement in 2012 or prior

 5   to that in the development of the DACA program?

 6        A.   No.

 7        Q.   And not in the development of the DACA memo

 8   itself?

 9        A.   No.

10        Q.   And how about in the FAQs I just referenced?

11        A.   No.

12        Q.   Do you have any understanding as to which

13   components within ICE were involved in the development

14   of the DACA program?

15        A.   I do not.

16        Q.   How about with respect to the development of

17   the FAQs?

18        A.   No.

19        Q.   Is ICE -- at the time, going back to 2012,

20   would your office have been involved in the

21   operational aspects of DACA?  Maybe I can clarify.

22        A.   Please.

23        Q.   I'm talking about operationally how to handle

24   the fact that certain individuals that you encounter

25   in the field may have DACA.
```

1      A.   Again, I wasn't at headquarters at the time.

2  So I don't know.  I don't know what they were working

3  on at headquarters.  A lot of predecisional

4  conversations at the headquarters level are not shared

5  with the field before a decision is actually made so

6  as to reduce confusion.  You know, trying to avoid

7  starts and stops in the field.

8           When the memo came out, as I said, I recall

9  talking with my chief counsel and trying to figure out

10 how we were going to implement it, but I don't

11 recall -- I mean I wasn't involved in any

12 conversations at the headquarters level in 2012.

13     Q.   Sure.  Exactly what you just said about how

14 you implement, I'm sort of drilling down to that

15 aspect at sort of the field level.  What steps would

16 you take with respect to implementing the DACA

17 directive?

18     A.   Basically, educating the employees on the

19 qualifying factors, and if I recall correctly, the

20 guidance was to not take enforcement actions against

21 people who had prima facie eligibility for DACA.  So

22 in other words, if we encountered somebody through the

23 criminal alien program who -- you know, in a county

24 jail who had yet to be convicted of a crime that would

25 have precluded them from receiving the DACA benefit,

```
                                                Page 89
 1   then we were not to take any enforcement action.
 2        Q.  Was that a common occurrence, encountering
 3   those individuals?
 4        A.  Absolutely, every day.  That's the core
 5   mission of what we do.
 6        Q.  I'm sorry.  What are you referring to?
 7        A.  The criminal alien program.
 8        Q.  Sure.  I was referencing whether it was a
 9   common occurrence, through the criminal alien program,
10   you had to defer or not take a proceeding against
11   somebody who's already in custody but not yet
12   convicted who had otherwise prima facie eligibility
13   for DACA.
14        A.  That's correct.
15        Q.  That was common?
16        A.  Very much so in the beginning, and then
17   ultimately, they derived the DACA benefit.  But every
18   single person we encountered, the officer had to do an
19   individual analysis of that person, what date, if any,
20   they claim to have come to the United States, and then
21   whether or not they had prima facie eligibility.  So
22   we had to do that for every person we encountered.
23   Just most of our contacts we did through the alien
24   program.  It's the foundation of what we do.
25            But any contact that we had through the
```

1    normal analysis that you're going through in your head

2    when you encounter somebody who's here illegally, now

3    you had to layer over the DACA requirements in that

4    analysis.

5         Q.  So this is some of the operational aspects of

6    how the agents had to do to implement the DACA

7    directive; correct?

8         A.  Yes.

9            MR. LEE:  Okay.  Because we are just running

10   low on minutes on the video, we'll take a quick break.

11           MS. DAVIS:  That sounds good.

12           THE VIDEOGRAPHER:  This concludes Media Unit

13   No. 1.  The time on the video is 11:20 a.m.  We are

14   off the record.

15           (A recess was taken from 11:20 a.m.

16           to 11:29 a.m.)

17           THE VIDEOGRAPHER:  We're back on the record.

18   This is the beginning of Media Unit No. 2.  The time

19   on the video is 11:29 a.m.

20   BY MR. LEE:

21        Q.  Mr. Miller, you understand you're still under

22   oath?

23        A.  Yes, sir, I do.

24        Q.  Where we just left off, we were talking about

25   the operational aspects of implementing DACA, and you

Page 91

1    were explaining that the requirements or the

2    eligibility factors for DACA had to be overlaid sort

3    of with respect to the individuals that you

4    encountered; is that correct?

5         A.  Yes, sir.

6         Q.  Did you generate any operational documents,

7    instructions, manuals, anything of that sort with

8    respect to this overlay?

9         A.  I don't recall doing that in the field.  I

10   mean if it was, I don't recall doing it.  I mean it

11   may have just been verbal.  It may have been clear

12   enough in a memo that we just based it on the memo.  I

13   don't recall doing anything at the field level.

14        Q.  And then as the DACA program continued in its

15   existence from 2012 up to the rescission memo on

16   September 5 of this year, and as you rose through the

17   ranks of ICE, were you aware of any kind of

18   operational level documents relating to the

19   implementation of DACA?

20        A.  Yes.  At some point I became aware -- I don't

21   recall if it was -- I believe it was while I was on

22   detail to headquarters, ICE headquarters.  I became

23   aware of a so-called check sheet, a yes or no check

24   sheet that was being used in the Dallas field office,

25   and I reviewed it, found it to be helpful, and I asked

1    that it be sent out nationally.  And the gentleman who

2    was the acting assistant director for field operations

3    at the time sent it out, but I don't recall the date

4    on when it did -- when it was actually sent to the

5    field.

6            And then people were required, you know, to

7    document their analysis before issuing a charging

8    document.

9        Q.  And do you recall when you encountered this

10   check sheet from the Dallas office?

11       A.  I don't.  It probably would have been the

12   late summer of 2012 because I was on detail to

13   headquarters.

14       Q.  So soon after --

15       A.  Shortly after the memo would have came out.

16       Q.  So you were on detail then?

17       A.  I wasn't on detail when it came out, but

18   shortly thereafter, I was.

19       Q.  Remind me where were you detailed to?

20       A.  I was detailed from New Orleans to ICE

21   headquarters.

22       Q.  In what capacity, what position?

23       A.  It wasn't a vacant IPN.  I was working on

24   special projects for Mr. Mead.

25       Q.  And Mr. Mead --

1          A.   He was the EAD for ERO at the time.

2          Q.   Right.   Thank you.

3               Okay.   If I can refer you, please, back to

4     Exhibit 3, the administrative record and take you to

5     Bates No. Page -251.  And I'd refer you to the

6     sequence of pages from AR251 to -256.  Mr. Miller, do

7     you recognize these documents?

8          A.   Yes, I do.

9          Q.   Can you tell me what they are?

10         A.   The first is a letter from the attorney

11    general to Acting Secretary Duke, and then after that

12    is her -- Acting Secretary's memo to the component

13    heads, who deal largely with either immigration

14    enforcement or immigration benefits.

15         Q.   And the subject of that memorandum is the

16    rescission of the June 12 -- June 15, 2012 DACA

17    program?

18         A.   That's correct.

19         Q.   Did you know that the Department of Homeland

20    Security was considering the rescission of DACA prior

21    to September 5?

22         A.   I knew that they were looking at whether or

23    not the program should remain in its current state or

24    be modified in some way.

25         Q.   And when you say, "they," who are you

1    referring to?

2         A.   The DHS headquarters.

3         Q.   Who within DHS headquarters?

4         A.   I don't know the specific people that were --

5    I know that the office of general counsel was

6    reviewing the program.  I don't know specifically who

7    was doing it.

8         Q.   When did you develop this understanding that

9    this was a possibility?

10        A.   It would have been sometime in the spring of

11   this year.  Spring of 2017.  Probably in April or May.

12        Q.   And how did you develop that understanding?

13        A.   Conversations with my attorney.

14        Q.   And this is conversations with --

15        A.   And ICE, the head of the ERO law division

16   within the office of Principal Legal Advisor.

17        Q.   So just for clarity of the record, this was

18   from -- this was -- this understanding was developed

19   through conversations with someone in the office of

20   the Principal Legal Advisor?

21        A.   Correct.

22        Q.   Who was that person within that office?

23        A.   Adam Loiacono.

24             REPORTER MARTIN:  Adam what?

25             THE WITNESS:  Loiacono.

                                                          Page 95

1    BY MR. LEE:

2         Q.  If you can just say that last name once more,

3    slowly for me.

4         A.  Loiacono.

5         Q.  Loiacono?

6         A.  Yes.

7         Q.  And was this conversation with Mr. Loiacono

8    in a professional context or in sort of in a --

9    through a personal relationship?

10        A.  Professional.

11        Q.  What was the occasion by which you -- how did

12   you have occasion to speak with Mr. Loiacono?

13        A.  He's my attorney, my primary, principal

14   attorney that I go to when I have questions.  We meet

15   periodically to discuss either areas of concern that I

16   have, or he kind of updates me on issues that he's

17   working on with the Office of General Counsel.

18        Q.  So was this -- how often do you speak with

19   him?

20        A.  Almost daily.

21        Q.  So was it in the course of one of these daily

22   conversations that you learned from him of the

23   possibility that DACA would be rescinded or amended?

24        A.  Yeah.  We talked about, you know, if it was

25   to be amended or --

1           MS. DAVIS:  At this point I'm going to object

2     on the basis of the attorney-client privilege and

3     instruct the witness not to answer about the content

4     of his conversations with Mr. Loiacono with respect to

5     this subject.

6     BY MR. LEE:

7          Q.   When, in spring 2017, did this conversation

8     occur?

9          A.   I don't recall the specific date.

10         Q.   How do you know that it was the spring?

11         A.   Because ever since the executive orders came

12    out, we've been reviewing all of ICE policies and

13    procedures to make sure that they're aligned with the

14    executive orders.

15         Q.   Was this conversation in person?

16         A.   Yes.

17         Q.   Were there any subsequent conversations with

18    Mr. Loiacono in which the general subject matter was

19    either the amendment or rescission of DACA?

20           MS. DAVIS:  Again, I'm going to object on the

21    basis of the attorney-client privilege with respect to

22    the substance of his conversations with Mr. Loiacono.

23           I'm going to instruct the witness not to

24    answer.

25           MR. LEE:  May he answer "yes" or "no"?

1            MS. DAVIS:  Can you repeat the question?

2            MR. LEE:  Of course.

3        Q.  Were there any subsequent conversations with

4    Mr. Loiacono in which the general subject matter was

5    either the amendment or the rescission of DACA?

6            MS. DAVIS:  I think you're asking about the

7    subject of those conversations, and the fact that he

8    spoke with them about those subjects would be a

9    privileged fact under the attorney-client privilege.

10            MR. LEE:  Counsel, this is a question about

11    subject matter, not as to the content of what was

12    discussed regarding the potential amendment or

13    rescission of DACA, and I think this is clearly

14    contemplated by Judge Alsup's recent order with

15    respect to allowable lines of questioning in this

16    case.

17            And I mean, and for the record, in

18    yesterday's deposition your colleague, Mr. Gardner --

19    and you're welcome to confer with him -- has permitted

20    the witness to answer these questions at least at a

21    minimum with a "yes" or "no" answer.

22            So I'm going ask you that question once more,

23    and if you'd like to go off the record to confer with

24    Mr. Gardner or anybody else or review Judge Alsup's

25    order from yesterday, we can do that.  But I will ask

1    that question once more and ask for a "yes" or "no"

2    answer, and you can let me know what you decide.

3              MS. DAVIS:  Can you just hold on one second?

4              MR. LEE:  Of course.

5              (Ms. Davis and Mr. Arnold conferred

6              sotto voce.)

7              (Pause in proceedings.)

8              MS. DAVIS:  Can we go off the record so my

9    colleague and I can consult.

10             MR. LEE:  Absolutely.

11             THE VIDEOGRAPHER:  We're going off the

12   record.  The time on the video is 11:40 a.m.

13             (A recess was taken from 11:40 a.m.

14             to 11:43 a.m.)

15             THE VIDEOGRAPHER:  We're back on the record.

16   The time on the video is 11:54 a.m.

17   BY MR. LEE:

18        Q.  Mr. Miller, you understand you are still

19   under oath?

20        A.  Yes, I do.

21        Q.  So let me go back to the question that was

22   pending.  You discussed a spring 2017 meeting with

23   Mr. Loiacono in which he referenced the possible

24   amendment of rescission of DACA; correct?

25             MS. DAVIS:  Objection to the characterization

```
 1   of his testimony.

 2              THE WITNESS:  We talked about DACA, yes.

 3   BY MR. LEE:

 4        Q.  And about the possibility of amendment or

 5   rescission?

 6        A.  Yes.

 7        Q.  And the pending question, were there any

 8   subsequent conversations with Mr. Loiacono in which

 9   the general subject matter was either the amendment or

10   the rescission of DACA?

11        A.  No.

12        Q.  When did you next develop an understanding

13   that the decision to rescind DACA was to be made

14   final?

15        A.  The evening before it was issued.

16        Q.  How did you come to that understanding?

17        A.  I was contacted by our press secretary and

18   asked if I would do a media availability call the

19   following morning.

20        Q.  And who is that press secretary?

21        A.  Liz Johnson.

22        Q.  And is this an individual within the ICE

23   organization or the DHS level?

24        A.  Within ICE.  Let me find where she sits.  I'm

25   sorry.  I guess on here her title is Assistant
```

1    Director, Office of Public Affairs.  So that would be

2    in the upper left-hand quadrant, middle box.

3         Q.  Between the time you spoke with Mr. Loiacono

4    in spring 2017 and the evening of September 4, did you

5    have any discussions with anyone within DHS about the

6    possible amendment or rescission of DACA?

7         A.  No.

8         Q.  Is it your understanding, as a result of the

9    issuance of this memo, that there are individuals who

10   have lost DACA?

11        A.  That's not my understanding of the memo, no.

12        Q.  Okay.  Is it your understanding that under

13   this memo for those individuals whose DACA expires

14   before September 5, and had not yet applied for

15   renewal, would no longer be eligible nor DACA?

16        A.  No.  That's not my understanding.

17        Q.  Is it your understanding that with respect to

18   this category of individuals, that they are still

19   eligible to renew their DACA protection?

20        A.  It was my understanding that they were

21   eligible to file for renewal prior to October 5.

22        Q.  So to be clear, an individual whose DACA

23   expired before September 5 but had not yet applied for

24   renewal -- in other words, there was no pending

25   renewal application for them, that they were eligible

1    to apply by October 5 for renewal?

2         A.   I mean I would have to review the memo.  If

3    you're asking me to recall from memory the specifics

4    of a program that I don't administer, I don't remember

5    the specifics of a program that I don't administer.

6         Q.   Sure.

7         A.   If you'd like me to review it and answer your

8    question, I'm happy to do that.  But if this is a

9    memory game, I'd rather not play that.

10        Q.   My intention is not to play a memory game

11   with you.  My intention is to develop an understanding

12   of what you know about the rescission of DACA and the

13   parameters around the rescission of DACA.

14        A.   Sure.

15        Q.   At this present time, without reviewing the

16   rescission memo and the parameters around the

17   rescission of DACA, you do not know one way or the

18   other whether that category of individuals I just

19   described would be eligible for renewal or not?

20        A.   No.  I think to clarify what I previously

21   said -- and we can ask the court reporter to read it

22   back if you'd like.  But I'm fairly certain, best of

23   my recollection is that folks had until October 5 to

24   apply for renewal.

25        Q.   And that's anybody who had DACA?

1     A.  To the best of my recollection, yes.

2     Q.  Are you aware of any internal DHS meetings

3  that took place to discuss the rescission of DACA?

4     A.  No, I'm not.

5     Q.  You're not aware of whether Mr. Albins, for

6  example, was involved in a meeting to discuss the

7  rescission of DACA?

8     A.  I am not aware of it, no.

9     Q.  Were you ever directed to provide any work

10  product with respect to the possible rescission of

11  DACA?

12     A.  The rescission of DACA, no.

13     Q.  With the implementation -- with the ongoing

14  implementation of DACA?

15         MS. DAVIS:  Objection.  Vague.

16  BY MR. LEE:

17     Q.  I was asking you about work product that

18  Mr. Albins directed you to generate, and you said with

19  respect to the rescission of DACA, you were not asked

20  to generate any such work product; is that correct?

21     A.  That's correct.

22     Q.  How about with the ongoing implementation of

23  DACA?

24     A.  We were asked to produce metrics associated

25  with enforcement actions taken against DACA grantees,

1   but that didn't come from Mr. Albins.  That came from

2   DHS.

3        Q.  And when you say, "metrics associated with

4   enforcement action," can you give me a little more

5   precision there?

6        A.  Persons with DACA who subsequent to the grant

7   of DACA were either arrested or removed.  I'm sorry.

8   I think it was arrested, detained, or removed.

9        Q.  Were you able to generate those metrics?

10       A.  Yes.

11       Q.  From what system -- how did you generate

12   these metrics?

13

14           We obtained the data set from USCIS and

15   treated that through our system of record to see of

16   the persons who were granted DACA, was there a

17   subsequent arrest, detention, or removal.

18       Q.  So would it be fair to say that you overlaid

19   your data on top of the data set you received from

20   USCIS?

21       A.  We took their data set and then took the

22   identifier, the alien registration number from that

23   data set and overlaid that with our system of records

24   to see whether anyone had been arrested, detained, or

25   removed.

1      Q.   Their system contained information about who
2  had DACA?
3      A.   Correct.
4      Q.   And your system contained information about
5  which aliens had been arrested, detained, or removed?
6      A.   Yes, sir.
7      Q.   So you sort of combined those information
8  together?
9      A.   Correct.
10      Q.   Do you know whether this document was
11  identified by your assistant, Ms. Hernandez, and
12  turned over to counsel?
13      A.   I don't know.
14      Q.   This document resided on your hard drive?
15      A.   Yes.
16      Q.   And was it your earlier testimony that
17  Ms. Hernandez -- if you can remind me, did
18  Ms. Hernandez search through your hard drive with
19  respect to documents in your possession relating to
20  DACA?
21      A.   Correct.
22      Q.   She did?
23      A.   Yes, sir.
24      Q.   Were you asked to generate any other kinds of
25  research or work product relating to DACA?

1      A.   No.

2      Q.   This document regarding the metrics of

3  individuals with DACA that had been arrested,

4  detained, or removed, who did you give this document

5  to?

6      A.   Our deputy chief of staff.  The ERO's deputy

7  chief of staff forwarded it to ICE's chief of staff.

8      Q.   When you say, "ERO's deputy chief of staff,"

9  do you mean the actual deputy chief of staff or

10  somebody else within ERO?

11      A.   Somebody else within ERO.

12      Q.   Who was that person?

13      A.   Joseph Simon.

14      Q.   So he's a deputy chief of staff reporting to

15  Mr. Albins?

16      A.   Yes, acting deputy chief of staff.

17      Q.   Is there a chief of staff as well?

18      A.   An acting chief of staff, yes.

19      Q.   And who is that person?

20      A.   Francis Jackson.

21      Q.   Do you, as the Deputy Executive Associate

22  Director, have any other Chief of Staff or Deputy

23  Chief of Staff positions reporting to you?

24      A.   Not directly to me.  There are two acting

25  Deputy Chiefs of Staff and then there's -- I don't

1    know what you would call his title, but there's a

2    gentleman who's a detailed supervisor from the field

3    who handles Congressional and media inquiries, and we

4    kind of all work together in a suite.  Operationally,

5    we're not as neatly aligned as your chart.

6         Q.  The two acting chiefs of staff are

7    individuals who report only to you?

8         A.  They report to Ms. Jackson.

9         Q.  I see.  So if you can remind me, the metrics

10   document you gave to which Deputy Chief of Staff?

11        A.  Tom Blank, who is the Chief of Staff for

12   Mr. Homan, vice Chief of Staff.  That is the block in

13   the upper right quadrant of your chart.

14        Q.  I see.  Do you know what Mr. Blank did with

15   that document?

16        A.  To the best of my knowledge, he sent it to

17   DHS headquarters.

18        Q.  Do you know who at DHS headquarters?

19        A.  Gene Hamilton.

20        Q.  And how do you know that?

21        A.  Because that was the person who originally

22   requested that we run the information.

23        Q.  When was this request made?

24        A.  Sometime in February.

25        Q.  Of 2017?

1      A.  Correct.

2      Q.  Do you recall Mr. Hamilton requesting work on

3  any other aspect of DACA?

4      A.  To my knowledge, no.

5      Q.  Do you communicate with Mr. Hamilton

6  directly?

7      A.  Not usually.  Sometimes if we're at the same

8  meeting in person, but on a regular, reoccurring basis

9  in an official capacity, no.

10      Q.  Have you, in those interactions with

11  Mr. Hamilton, ever discussed DACA?

12      A.  No.

13      Q.  So the only DACA-related communication that

14  you're aware of with Mr. Hamilton was this chain of

15  events that you just described with respect to these

16  metrics?

17      A.  Yes, sir.

18      Q.  Have you been asked to generate these metrics

19  or similar metrics before?

20      A.  Similar, yes.

21      Q.  Under a prior administration?

22      A.  Correct.

23      Q.  Did you do the same thing with respect to

24  getting a data set from USCIS and layering it with the

25  information you have in ICE databases?

1      A.   That's correct.

2      Q.   And who, if you recall, made that request

3  under the prior administration?

4      A.   To the best of my recollection, it would have

5  been most likely either Serena Hoy, who was the senior

6  advisor to Deputy Secretary Mayorkas.  She tracked a

7  lot of those metrics in that capacity, or her

8  capacity, under the previous administration.

9      Q.   Do you have regular interactions with

10  Director Homan?

11      A.   Fairly regularly, yes.

12      Q.   Would that include in-person meetings as well

13  as -- well, let me break it up.  Does that include

14  in-person meetings?

15      A.   Yes.

16      Q.   And do you communicate with him by E-mail as

17  well?

18      A.   Less frequently now that he's the director,

19  but occasionally.

20      Q.   With respect to your interactions with

21  Mr. Homan, did you ever discuss the issue of DACA?

22      A.   Only back with the metrics when the metrics

23  were generated.

24      Q.   Why did you have to approach him with respect

25  to the metrics?

1              MS. DAVIS:  I object with respect to the

2      content of these conversations.  So prior to the DACA

3      decision at issue is clearly deliberative process

4      privilege.

5              And the witness is instructed not to testify

6      with respect to the content of conversations.

7              MR. LEE:  Are you instructing him not to

8      answer the specific question, Counsel?

9              MS. DAVIS:  Yes.

10     BY MR. LEE:

11         Q.  Are you following that instruction?

12         A.  Yes.

13         Q.  Prior to September 5, did you ever come to an

14     understanding as to the rationale for the rescission

15     of DACA as articulated in Secretary Duke's memo?

16         A.  I'm sorry.  Could you clarify that?

17         Q.  Prior to September 5, did you ever develop an

18     understanding as to the reasons for rescinding DACA

19     that you see from Secretary Duke's memo?

20         A.  No.

21         Q.  Are you aware, for example, that there was a

22     threat of litigation presented by the state of Texas

23     and other states in June of 2017?

24         A.  I was aware of the case, but I wasn't

25     following it.

1      Q.  Do you mean you were aware of the case just

2   publicly from public sources or -- let me end the

3   question there.  Is that what you mean, from public

4   sources?

5      A.  Yes.

6      Q.  Did you receive any internal communication

7   about this threat of litigation?

8      A.  No.

9      Q.  Have you ever seen the letter that conveyed

10  that threat of litigation?

11     A.  I don't recall it, no.  Unless it was posted

12  on the Internet, I mean a news source.

13     Q.  Let's go back to Exhibit 3.  We'll stick with

14  this exhibit to minimize the amount of paper

15  shuffling.  If I can take you to the page with Bates

16  No. -238.

17          (Pause in proceedings.)

18  BY MR. LEE:

19     Q.  Mr. Miller, I'm referring you to Exhibit 3,

20  Pages AR238 through -240.  Do you recognize this

21  document?

22     A.  No, I don't.

23     Q.  Okay.  And for the record, this record --

24  this document is a letter dated June 29, 2017 from a

25  collection of attorneys general, including the

1    attorney general of Texas, Ken Paxton, to the attorney

2    general of the United States; is that correct?

3         A.   Yes.

4         Q.   Okay.  And to confirm, you have not seen this

5    letter before, until today?

6         A.   That's correct.

7         Q.   And you have not been involved in any

8    discussions internally with respect to the threat of

9    litigation communicated in this letter?

10         A.   No.

11         Q.   Are you familiar with -- are you aware of

12    any -- I had asked earlier about meetings internally

13    about the rescission of DACA, and your testimony is

14    that you do not -- you are not aware of any such

15    meetings; is that correct?

16         A.   Yes, sir.

17         Q.   How about meetings that were interagency,

18    between DHS and outside agencies with respect to the

19    possible rescission of DACA?

20         A.   I would have no knowledge of those.

21         Q.   I just wanted to make sure I understood your

22    testimony there.

23         A.   Sure.  No problem.

24         Q.   Are you familiar with the -- when you

25    received the communication from the press secretary on

1    the evening of September 4 was -- were there any

2    documents provided to you for review?

3         A.  Not that evening.  The next morning.

4         Q.  So in terms of the communication from the

5    evening prior, was it just an E-mail communication?

6         A.  Yes.

7         Q.  Was there any attachments to that E-mail?

8         A.  No.

9         Q.  And I believe you testified earlier that that

10   communication was regarding your availability for a

11   press briefing?

12        A.  Yes.

13        Q.  Did that communication involve anything else?

14        A.  It was just my availability, and there was

15   some confusion because there were -- this was press

16   and Congressional staff at the same time.  So it was a

17   bunch of back and forth about who was going to do

18   what.

19        Q.  Up until that point, had you reviewed any

20   draft of the September 5 rescission memo?

21        A.  No.

22        Q.  When was the first time you saw the memo

23   itself?

24        A.  The morning of September 5.

25        Q.  Was this before or after it was disseminated

```
                                            Page 113
 1   to the public?
 2        A.  I don't know when it was disseminated to the
 3   public, but I had a copy of it probably a half hour
 4   before the press briefing.
 5        Q.  What time was that press briefing?
 6        A.  If I recall correctly, it was 9:30, I think.
 7        Q.  So you covered one of the ones at 9:30?
 8        A.  Uh-huh.
 9        Q.  And you received the memo at around
10   9:00 o'clock?
11        A.  Correct.
12        Q.  Are you aware that this memo was issued to
13   the public in conjunction with a number of FAQs,
14   frequently asked questions, as well?
15        A.  That's my understanding, yes.
16        Q.  Have you -- when was the first time you saw
17   that document?
18        A.  I received kind of a press packet together
19   that had FAQs as part of that packet.
20        Q.  Prior to the morning of September 5, have
21   you -- had you seen a version of the FAQs before?
22        A.  No.
23        Q.  Were you involved in any aspect of
24   formulating those FAQs?
25        A.  No.
```

1       Q.  With respect to the operational aspects of

2   rescinding DACA, have you since taken any steps to put

3   those operational aspects into place?

4           MS. DAVIS:  I'm sorry.  Can you repeat the

5   question?

6           MR. LEE:  Sure.  I can just ask it again.

7       Q.  Have you taken any steps to implement the

8   rescission of DACA?

9       A.  No.  Largely for our workforce, very little

10  has changed.

11      Q.  You mentioned the use of a checklist at a

12  previous point in time when DACA was in effect to

13  assist the agents with their work when encountering

14  DACA beneficiaries; is that correct?

15      A.  Yes.

16      Q.  Is that a fair characterization?

17          To your knowledge, was the checklist used

18  throughout the summer of 2017 up until the rescission?

19      A.  Yes.

20      Q.  Does it still continue to be used?

21      A.  I'm unsure if they're still using it or

22  they're just verifying that the people either have

23  DACA or not.  Now that we're beyond October 5, I think

24  it's -- the checklist itself is kind of not as useful.

25  Someone either has the benefit or they don't at this

1   point.

2        Q.   The checklist was for the purposes of

3   establishing whether someone may be eligible for DACA?

4        A.   Correct.

5        Q.   Is it your understanding that this checklist

6   was no longer used beginning on October 6?

7        A.   I don't know that for certain.  I know -- I

8   mean that would be -- had the AD for field operations

9   asked my opinion, I think that would have been an

10  appropriate interpretation, but I don't know whether

11  or not she -- she never asked me directly.  So I don't

12  know if she has issued that guidance or not.

13       Q.   You did not make any personal -- you had no

14  personal involvement with respect to the continued or

15  discontinued use of that checklist?

16       A.   Correct.

17       Q.   Have you -- I believe your earlier testimony

18  was not much has changed.  So there's not much

19  operationally that needs to be done in the context of

20  the rescission of DACA?

21       A.   Correct.

22       Q.   So would it be fair to say that you've not

23  generated any work product -- let me rephrase.  Would

24  it be fair to say that you have not generated any

25  directives or operational guidance with respect to the

Page 116

1   rescission of DACA?

2        A.   That's correct.

3        Q.   And do you know of any such documents coming

4   out of Mr. Algins' position?

5        A.   No.

6        Q.   Are you aware of any types of directives or

7   operational guidance that has been generated at the

8   field level?

9        A.   I do not.

10       Q.   Let me take you back to Exhibit 3.  If I can

11  refer you to Page AR251.  And this is a single-page

12  document.  It's a letter from the attorney general of

13  the United States to Acting Secretary Duke.  Do you

14  see that?

15       A.   I do.

16       Q.   Mr. Miller, take a moment to review this

17  letter, and then can you let me know whether you've

18  seen this letter before.

19       A.   Okay.  I have.

20       Q.   When did you see this document?

21       A.   It would have either been on September 5 or

22  6.  I don't recall exactly, but pretty much the same

23  time as getting the signed memo from the Acting

24  Secretary.

25       Q.   Was this part of the press packet you

                                                        Page 117

1    received the morning of September 5?

2          A.   It was not.

3          Q.   So how did you come to get a copy of this

4    letter?

5          A.   I don't recall specifically.  I know we were

6    E-mailed a copy of the letter, again, with the signed

7    memo from the Acting Secretary.  But I don't remember

8    who sent me that E-mail.

9               MR. LEE:  Okay.  I think I am at a fairly

10   natural breaking point, and it is 12:20.  I think it's

11   time for lunch.

12              MS. DAVIS:  Great.

13              THE VIDEOGRAPHER:  We're going off the

14   record.  The time on the video is 12:21 p.m.

15              (A recess was taken from 12:21 p.m.

16              to 1:20 p.m.)

17              THE VIDEOGRAPHER:  We're back on the record.

18   The time on the video is 1:20 p.m.

19              MS. DAVIS:  And as I mentioned while we were

20   off the record, Mr. Miller has a quick clarification

21   that he would like to make.

22              MR. LEE:  Please.

23              THE WITNESS:  Thank you.  I remembered

24   another case that I was deposed in, and that was the

25   Clairmont Apartment case.  I don't remember the

1   plaintiff's name but he was represented by the ACLU.

2   It was in the Middle District of Tennessee involving a

3   gang enforcement operation when I was Field Office

4   Director.  I believe I was deposed while I was the

5   Assistant Director for Field Operations, but it was

6   related to my involvement in the gang operation during

7   my tenure in New Orleans.

8   BY MR. LEE:

9       Q.  That's very helpful.  Thank you for the

10  clarification, Mr. Miller.

11      A.  You're welcome.

12      Q.  Welcome back from lunch, Mr. Miller.  Earlier

13  today, we talked about some of the work product you

14  generated relating to DACA.  And specifically, you

15  referenced creating a metrics regarding the arrest,

16  detention, and removal of DACA beneficiaries.  Do you

17  recall that testimony?

18      A.  Yes.

19      Q.  Please correct me if I'm inaccurate in any

20  way.  To the best of your understanding, that request

21  for the compilation of those metrics came from

22  Mr. Hamilton?

23      A.  Yes.

24      Q.  And I believe it was routed to you through

25  another level within ICE; is that correct?

```
                                              Page 119
1        A.  Yes, sir.
2        Q.  And was that at the Deputy Director level?
3        A.  It was through the Chief of Staff.
4        Q.  The Chief of Staff.  That's right.
5            Were you asked -- are the metrics you're
6    referring to aggregate numbers?
7        A.  Yes.
8        Q.  Were they broken up in any way?
9        A.  Can you clarify that?
10        Q.  Were the metrics broken up or categorized in
11    any different ways besides it being in the aggregate?
12        A.  No.
13        Q.  Not even by time?
14        A.  I don't believe so, no.
15        Q.  So the idea would be for the duration of the
16    DACA program, how many DACA recipients have been
17    arrested, detained, or removed?
18        A.  Yes.  Clarification, it may have been -- they
19    may have stratified it by fiscal year.  I don't recall
20    specifically.  I mean I can say that that's common
21    when we do our reporting, people want to know by
22    fiscal year and then the aggregate.
23        Q.  And stratified is a good word.  Thank you for
24    that.
25            Do you have any understanding as to the
```

Page 120

1    purpose of that request?

2         A.   I believe it was just to update something

3    that we had reported previously, and that was the

4    first ask of the new administration on something we

5    had generated for the previous administration.

6         Q.   When you say, "first ask," what do you mean

7    by that?

8         A.   The first time the new administration had

9    asked us to produce metrics on subsequent -- persons

10   who we took an enforcement action against subsequent

11   to being granted DACA.

12        Q.   Was this the first ask of metrics from you

13   whatsoever from the Trump administration?

14        A.   Well, I mean it wasn't asked directly to me.

15   There's been other -- you know, other reporting

16   requirements that we have on a regular, reoccurring

17   basis.

18        Q.   But with respect to the metrics you were

19   involved in compiling since the beginning of this new

20   administration, was this request the first one that

21   you received?

22        A.   No.

23        Q.   What were some other metrics that you were

24   asked to provide for the new administration?

25             MS. DAVIS:   Counsel, I'm going to object to

1  questions with respect to work product that has been

2  requested under the deliberative process privilege.  I

3  should have made this objection before with respect to

4  the other work product.  However, I'm going to

5  instruct the witness to not answer with respect to

6  work product that was asked of him predecisional to

7  any decisions that were made in consideration of that

8  information.

9       MR. LEE:  The existence of the work product

10  or the content of the work product?

11       MS. DAVIS:  Well, we've talked about the

12  content of the work product, which I think reveals

13  what was asked for and what was considered, or at

14  least what was asked for, and I think that does expose

15  an element of the deliberative process predecisional

16  to policies or decisions that were used -- or that

17  were made at a higher level.  So I'm going to object

18  with respect to more questions about the content of

19  any work product that Mr. Miller created.

20       MR. LEE:  As it relates to DACA.

21       MS. DAVIS:  As it relates to DACA or to any

22  other decision that was made by the department in

23  which this was a request in order to -- you know,

24  through the deliberative process to consider

25  information in forming such a decision.

Page 122

1            MR. LEE:  Well, with respect, Counsel, your

2    definition of the deliberative process privilege,

3    there was no limiting principle.  I mean that

4    essentially exempts -- or your instructions are then

5    to ask Mr. Miller to essentially not opine on any work

6    product he's ever done with the federal government.

7            Work product is probably work that eventually

8    laid to some form of action or decision eventually

9    with the government.  So I cannot think that an

10   appropriate objection would be that even with respect

11   to work product that does not relate to DACA that the

12   deliberative process privilege applies.

13           MS. DAVIS:  Okay.  Perhaps we can lay a

14   foundation, then, with respect to the request, the

15   existence of work product and, I guess, a particular

16   decision or consideration that that request was

17   related to.

18           MR. LEE:  That's fair.  And I will do that.

19   Thank you.

20       Q.  Mr. Miller, you indicated that you have

21   compiled metrics to the Trump administration prior to

22   the specific request relating to the aggregate numbers

23   of DACA beneficiaries that ICE has taken enforcement

24   action against; is that correct?

25       A.  Yes.

1      Q.  Were these metrics, these other metrics

2    related to DACA?

3      A.  No.

4      Q.  What was the nature those requests?  What

5    metrics were you asked to provide is probably a better

6    question?

7      A.  Well, enforcement action, a comparator pre

8    and post PEP, and metrics about UAC and family unit

9    encounters on the southwest border pre and post the

10   executive orders.

11     Q.  When you say, "the executive orders," you're

12   referring to the February executive orders by

13   President Trump?

14     A.  In January.  The ones related to our line of

15   business were issued in January.

16     Q.  That's correct, and thanks for the

17   clarification.

18          So to just make sure I understand and make

19   clear, one of the metrics was metrics involving

20   unaccompanied minors and family unit encounters on the

21   southwest border pre and post the January 2017

22   executive orders?

23     A.  Correct.

24     Q.  Thank you.

25          Any other metrics not related to DACA?

Page 124

1      A.  No.

2      Q.  With respect to the metrics you developed --

3  with respect to the metrics you developed for

4  enforcement actions against DACA beneficiaries, do you

5  know if the information you provided was used

6  publicly?

7      A.  I do not know.

8      Q.  Do you recall in any shape or fashion the

9  number of individuals, DACA beneficiaries that ICE

10  took enforcement action against according to the

11  metrics you compiled?

12      MS. DAVIS:  And I'm going to object to that

13  with respect to the deliberative process privilege to

14  the extent that you're asking for the content of that

15  metrics system itself.  If he can -- he can answer yes

16  or no, but I'm going to object to the revelation of

17  the content of that information.

18      MR. LEE:  Okay.  So you're objecting to him

19  disclosing the number.

20      MS. DAVIS:  Correct.  I believe you asked if

21  he was aware, yes or no.

22      THE WITNESS:  Could you restate, please.

23  BY MR. LEE:

24      Q.  Well, I assume you are aware that you've

25  reached a number as a result of that compilation.

1          A.   Yes.

2               MR. LEE:   And I think where I was going to

3     was for the number itself.   Which you're objecting?

4               MS. DAVIS:   Yes.   Under the deliberative

5     process privilege.

6     BY MR. LEE:

7          Q.   And you intend to follow that instruction?

8          A.   Yes.

9          Q.   The metrics that you compiled, I believe you

10    referenced earlier, required a request for a USCIS

11    data set; is that correct?

12         A.   Yes.

13         Q.   And this USCIS data set included the alien

14    numbers?

15         A.   Yes.

16         Q.   Names?

17         A.   I believe so, yes.

18         Q.   Addresses?

19         A.   That, I don't know.

20         Q.   Any other information?

21         A.   I'm not sure.   I didn't review the status

22    myself.

23         Q.   But the alien number, the "A" numbers and the

24    names you recall were part of this data set?

25         A.   Yes.   CIS keeps most of their data tied to

1    the "A" number.  We tie it to a subject identity

2    number associated with enforcement actions.  So we

3    have to -- that's why we can't treat data in the first

4    person.  We have to get someone else's data set the

5    way that they compile it, and then run it through our

6    system of record.

7         Q.  Do you recall who made the request for this

8    data set?

9         A.  Not individually, no.

10        Q.  It was not you personally?

11        A.  No.

12        Q.  Do you know who in fact received the data set

13   from USCIS in the first instance?  How it sort of came

14   to ICE?

15        A.  I don't.  It would have gone to our

16   statistical tracking unit, and it's a normal course of

17   business that we get data sets from other agencies.

18   So that would have been -- you know, it would have

19   been a normal course of business for that unit to make

20   a request and receive the information.

21        Q.  That's helpful.  And is this statistical

22   unit -- and I apologize, I forgot --

23        A.  Statistical tracking unit?

24        Q.  Statistical tracking unit, is that within ERO

25   or at sort of the larger ICE level?

```
                                              Page 127

 1         A.   It's within ERO.

 2         Q.   Do you supervise the statistical tracking

 3    unit?

 4         A.   No.

 5         Q.   Who does?

 6         A.   It falls under the assistant director for

 7    field operations.

 8         Q.   And as far as you're aware, the request and

 9    transmission of the USCIS data set went through

10    standard procedures and was relayed through the

11    statistical tracking unit?

12         A.   Correct.

13         Q.   Is that data set on your personal systems,

14    your work systems?

15              MS. DAVIS:  Objection.  Vague.

16    BY MR. LEE:

17         Q.   Your work computer.

18         A.   My work computer, no.

19         Q.   The compilation of the metrics, that's on

20    your computer?

21         A.   It's in my E-mail archives.

22         Q.   E-mail archives.

23              Do you know if the data set that was

24    transmitted to the statistical tracking unit, whether

25    that is preserved by that unit?
```

1       A.   Yes.

2       Q.   So as far as you know, that database has not

3   been destroyed?

4       A.   Yes.

5       Q.   It has not been; correct?

6       A.   To my knowledge, it has not been.

7       Q.   Is it your understanding whether that data

8   set can be used for other purposes?

9            MS. DAVIS:  Objection.  Vague.

10           THE WITNESS:  In its current format, not that

11   I'm aware of, no.

12   BY MR. LEE:

13       Q.   But can it be used for different purposes

14   other than for the compilation of the metrics per the

15   request from Mr. Hamilton?

16           MS. DAVIS:  Objection.  Vague.  Speculative.

17           THE WITNESS:  I mean it's a data set.  So I

18   guess, conceivably, it could be used for other

19   analysis, but since I'm not in that unit -- you know,

20   if I were a mathematician, I wouldn't be sitting here

21   today.

22   BY MR. LEE:

23       Q.   We earlier discussed whether any operational

24   documents had been created with respect to the

25   implementation of the DACA rescission, and I believe

1   your testimony is that not much has changed and no

2   such documents have been generated.

3       A.  Correct.

4       Q.  Is anyone in your office in the process of

5   working on any such document?

6       A.  No.

7       Q.  Okay.  Can I ask you to go back to the

8   administrative record, please.

9       A.  Sure.

10      Q.  And we're going to go back to the November

11  2014 enforcement priorities memo at Page AR221.  And

12  we've taken a look at this earlier today.  Do you

13  recall?

14      A.  Yes, I do.

15      Q.  I think it's fair to say that given the --

16  given your role in developing this document that you

17  are familiar with it?

18      A.  I am.

19      Q.  Reviewing Pages 3 to 4, do you see that this

20  memo outlines, very broadly speaking, three priority

21  levels?

22      A.  Yes.

23      Q.  Following on Page 5 you see some discussion

24  of exercising prosecutorial discretion.  Do you see

25  that?

```
                                                    Page 130

 1          A.   I do.

 2          Q.   Digging a little deeper into sort of the

 3     consultation that occurred with you, did you have a

 4     voice in the development of these three priority

 5     levels?

 6          A.   Yes.

 7          Q.   And I believe your testimony is that the

 8     consultation of this document reached down to the

 9     assistant director position, which was at that time

10     your position title?

11          A.   Correct.

12          Q.   Can I take you just to another document

13     within this exhibit, and that is at AR229.  Do you

14     recognize this document?

15          A.   Yes.

16          Q.   This document is the February 20, 2017

17     enforcement priorities memo issued by then Secretary

18     John Kelly?

19          A.   Yes.

20          Q.   Okay.  Can you describe for me how the

21     enforcement priorities have shifted as a result of the

22     change from the 2014 memo we just saw to the document

23     currently in front of you?

24          A.   I think the most succinct way to say it is

25     that whether limiting the application of the INA to
```

1    the specific classes or categories or persons, we were

2    directed to enforce the INA in its totality.

3         Q.   Does this 2017 memo lay out priorities for

4    enforcement?

5         A.   That is not the way that we interpret it.

6    The priorities are really at the field level to

7    prioritize those threats to public safety and national

8    security first, but all persons who are found to be in

9    the country in violation of the INA are amenable to

10   arrest.

11        Q.   Okay.  So perhaps we can address this more

12   specifically by turning to Page 2 in the Subsection A

13   entitled, "The Department's Enforcement Priorities."

14   Do you see that?

15        A.   Uh-huh.

16        Q.   In the second paragraph under that

17   subsection, at the very end of that paragraph it

18   reads, "Department personnel should prioritize for

19   removal of those aliens described by Congress in

20   Sections 212 A-2, A-3, and A-6-C, 235 B and C, and 237

21   A-2 and 4 of the Immigration and Nationality Act."  Do

22   you see that?

23        A.   I do.

24        Q.   Okay.  And do you have an understanding as to

25   what these code provisions refer to?

1      A.   Yes.

2      Q.   Can you describe to me what they refer to?

3      A.   They refer to criminal aliens, those who have

4  committed fraud, those who are amenable to expedited

5  removal, and those that are threats to national

6  security.

7      Q.   Okay.  And then going to the next paragraph,

8  for the record it reads, "Additionally, regardless of

9  the basis of removability, department personnel should

10 prioritize removable aliens who have been convicted of

11 any criminal offense,

12          "2, Have been charged with any criminal

13 offense that has not been resolved,

14          "3, Have committed acts which constitute a

15 chargeable criminal offense,

16          "4, Have engaged in fraud or willful

17 misrepresentation in connection with any official

18 matter before a government agency,

19          "5, Have abused any program related to

20 benefits,

21          "6, Are subject to a final order of removal

22 but have not complied with their legal obligation to

23 depart the United States or,

24          "7, In the judgment of an immigration officer

25 otherwise pose a risk to public safety or national

```
                                              Page 133
 1   security."  Do you see that?
 2        A.  I do.
 3        Q.  Did I read that correctly?
 4        A.  Yes.
 5        Q.  I'd like to get a further understanding of
 6   the interpretation given to each of these
 7   subcategories, if I may.
 8        A.  Okay.  Sure.
 9        Q.  With respect to No. 1, "Having been convicted
10   of any criminal offense."  How is that interpreted by
11   ICE?
12        A.  Someone who has been convicted of any
13   criminal offense.
14        Q.  And this would include any misdemeanor?
15        A.  Correct.
16        Q.  Would that include infractions?
17        A.  Can you define "infractions"?
18        Q.  Criminal infractions.
19        A.  I don't know what that means.
20        Q.  To the best of your understanding, crimes are
21   divided into felonies and misdemeanors?
22        A.  In most states.
23        Q.  This would include someone who was criminally
24   convicted of jaywalking?
25        A.  Yes.
```

1        Q.  And 2, "Have been charged with any criminal

2    offense that has not been resolved."  Is the

3    interpretation of this provision anyone who's been

4    charged but not yet convicted of a particular crime?

5        A.  If they're charged and not convicted and do

6    not have a lawful immigration status, yes.

7        Q.  So this would include someone who was charged

8    with jaywalking but not yet convicted of it?

9            MS. DAVIS:  Object to lack of foundation.

10           THE WITNESS:  Yes.

11   BY MR. LEE:

12       Q.  "Have committed acts which constitute a

13   chargeable criminal offense."  Do you see that?

14       A.  I do.

15       Q.  Would this include -- at whose

16   determination -- I'll strike that.

17           At whose determination would it be as to

18   whether the acts constitute a chargeable criminal

19   offense?

20       A.  I think a conversation that would normally

21   happen between our officers and one of the line

22   attorneys in making a determination in whether or not

23   it rose to that level.

24       Q.  Have you encountered that situation yet?

25       A.  Well, I haven't been on the streets since

Page 135

1    2007.  So no, I haven't personally.

2         Q.  But your understanding and interpretation of

3    this is that it would be at the determination of the

4    agent on the ground in consultation with the Field

5    Office Director?

6         A.  In consultation --

7              MS. DAVIS:  Objection.  Mischaracterization.

8              THE WITNESS:  It would be in consultation

9    with counsel.  Possibly the district attorney's office

10   or the state attorney general's office.  It would

11   depend on the nature of the crime and what the statute

12   is in that respective state.

13   BY MR. LEE:

14        Q.  I want to understand that a little bit

15   further.  How does -- is the term "agent" the correct

16   position title to accord to someone working in the

17   field for ICE?

18        A.  Not for ERO.

19        Q.  Not for ERO.  What would be the correct word?

20        A.  Officer.

21        Q.  Officer.  Thank you.

22             How would an officer come -- arrive at sort

23   of the knowledge that there may have been acts which

24   constitute a chargeable criminal offense?

25        A.  Through the normal course of their

1    investigation, if they're working with our state and
2    local partners and there are people who are under
3    investigation.  It happens at the federal level too.
4    Our federal partners, where they may not have fully
5    developed whatever criminal case that they're pursuing
6    either with -- you know, whatever level of
7    prosecutorial agency you're talking about, and then
8    they decide -- commonly what the U.S. attorney's
9    office calls it is to seek an administrative remedy,
10   which means to apply a civil immigration violation as
11   opposed to pursuing the criminal case, like in a more
12   conspiratal (sic) environment.
13          I mean there has always been, since '96, a
14   charge for committing essential elements of a crime.
15   That's nothing new.  This memo doesn't expand on
16   something that's existed since 1996.  It's just, you
17   know, acknowledging the fact that we have the legal
18   authority to do that.
19       Q.  Okay.  Can an officer make this
20   determination, that a particular individual falls
21   within this sub bullet, No. 3?
22       A.  I'm sorry.  Can you clarify that.
23       Q.  Can an officer on his or her own make the
24   determination based on the series of removal
25   category -- prioritization categories that a

Page 137

1   particular individual they've encountered falls within

2   Item 3?

3        A.  Yes.

4        Q.  They do not have to consult, necessarily,

5   with counsel; is that correct?

6        A.  They don't -- not necessarily to charge

7   someone with that, but it would be, I would say,

8   impractical to not consult with counsel first, and so

9   the prosecutorial -- it's much like at a police

10  department, which I'm sure you're familiar with.

11  Again we'll go back to our friends in Sacramento PD.

12  They can make an arrest, which doesn't necessarily

13  mean the DA is going to prosecute it.  So a lot of DAs

14  encourage, you know, to have those conversations, to

15  have those trainings before they're making the arrest.

16       Much the same way, our officers are entitled

17  or empowered to make those individualized assessments,

18  which doesn't necessarily mean that counsel is going

19  to pursue prosecution.  So rather than going down that

20  path, we encourage them to consult with counsel ahead

21  of time, especially with kind of overlaying state

22  violations with federal statute.

23       Q.  So with No. 3, though, I want to clarify.

24  We're not talking about someone who's already been

25  arrested; correct?

1     A.   That's going to depend on the individual.

2  You know, the totality of somebody's immigration and

3  criminal history is different.  So you may find more

4  through the investigative process.  They could be

5  arrested, to go back to your example, for jaywalking,

6  but, you know, through the investigation of the

7  jaywalker, we find that he's involved in on-line

8  predatorial behavior.  He's doing meth.

9          You know, there's a lot that you find out

10  during an investigation separate and apart -- the

11  initial contact may be -- you know, I mean generally

12  speaking, my 20-plus years of law enforcement, most

13  cities don't actually charge, fingerprint and detain

14  people for jaywalking.  But to follow on with your

15  example, if that's happening, there may be more that

16  that police department or more that that sheriff's

17  department or more that the state police know about

18  that individual.

19          And so that would be a reasonable line of

20  questioning to say, "Hey, why" -- something that you

21  normally cite and release, "Why was this guy

22  fingerprinted" because we don't know if somebody is in

23  the jail unless they submit a booking packet to NCIC.

24  So, you know, there's a reason that the locals didn't

25  cite and release on something that normally would have

                                                    Page 139

1    been cited and been released.

2         Q.  I guess to just get back to a point of

3    clarification.  The sub bullet 3 that we're talking

4    about, I understand it could arise and be triggered

5    under a lot of different scenarios and circumstances.

6    But I want to clarify that Bullet 3 can arise in a

7    situation where no arrest has been made yet.

8         A.  Absolutely.

9         Q.  And going back to, then, who has sort of the

10   discretion and the authority to determine whether a

11   particular individual falls within this category,

12   we've just discussed the fact that an ERO officer

13   himself or herself can make that determination.

14        A.  Yes.

15        Q.  And the examples you cited with respect to

16   consulting with, say, a state AG or state law

17   enforcement officials, that is something they may do

18   but need not do?

19        A.  Correct.

20        Q.  And just to be clear, this determination also

21   need not involve any determination by the FOD?

22        A.  It would require supervisory review for the

23   issuance of the NTA --

24        Q.  Okay.

25        A.  -- but the issuance of, you know, every NTA

1    in the field doesn't rise to the level of the FOD.

2         Q.   Okay.   So it would be some intermediate

3    supervisory chain at the field level?

4         A.   Yes, sir.

5         Q.   Moving to 4, "Have engaged in fraud or

6    willful misrepresentation in connection with any

7    official matter before a government agency."   Does

8    this encompass any matters outside of DHS?

9              MS. DAVIS:   Objection.   Vague.

10             THE WITNESS:   I guess in a clear reading of

11   it, you could say yes.

12   BY MR. LEE:

13        Q.   Okay.   And who determines whether fraud or

14   willful misrepresentation has occurred or has been

15   engaged in?

16        A.   I would think that the agency or the agency

17   that's issuing the NTA or the agency that an ERO

18   officer may be part of in a task force environment

19   that has firsthand knowledge and can testify, if need

20   be, that we'd have to have use authority associated

21   with that fraud or misrepresentation.   I would call to

22   your attention, before we spend a lot of time talking

23   about fraud, that this was issued to not just ERO but

24   also CIS and CBP, which are, generally speaking, the

25   components within DHS that are most involved in fraud

                                                      Page 141

1    detection.

2           Again we're most involved in, you know, a

3    population of persons who are already in the interior

4    of the United States and are generally encountered

5    through their incarceration, either at the county or

6    state level.

7        Q.  And is your interpretation of Bullet 4 -- and

8    I'm calling them bullets even though this is in

9    paragraph form.

10       A.  I understand.  Sure.

11       Q.  Of Bullet 4 that this includes engaging in

12   fraud or willful misrepresentation that has not

13   resulted in any conviction?

14       A.  That would be my interpretation, yes.

15       Q.  So this would include persons an officer

16   believes, based on his or her own assessment, hasn't

17   engaged in fraud or willful misrepresentation?

18       A.  Potentially, yes.

19       Q.  And would the issuance of an NTA, again,

20   follow that same procedure and supervisory review

21   process you just discussed?

22       A.  Yes.

23       Q.  There is no need with respect to Bullet 4 for

24   that individual officer to seek any other kind of

25   approval or sign-off?

1      A.   No.

2      Q.   With No. 5, moving on to Bullet 5, "Abuse any

3  program related to receipt of public benefits" -- let

4  me back up to No. 4.  I apologize, Mr. Miller.

5           It references "official matter before a

6  governmental agency."  Do you see that?

7      A.   I do.

8      Q.   Do you have any idea as to what is defined as

9  an official matter before a governmental agency?

10     A.   I mean other than a common reading of that to

11 be someone going to a government agency to either

12 obtain a benefit or service.  I think that would be a

13 layman's interpretation.  I'm not a fancy attorney

14 like y'all.  So I have to go with common sense

15 reading.

16     Q.   Thank you.  Moving to No. 5, "Abuse any

17 program related to receipt of public benefits."

18 Again, would it be accurate to say that this does not

19 need to result -- this does not require that the

20 particular individual have been convicted of abusing

21 the program, the public benefits program; is that

22 correct?

23     A.   That would be my interpretation.  Otherwise,

24 they would have been captioned by Bullet No. 1.

25     Q.   Okay.  And it would be at, then, the

1    officer's determination and assessment as to whether

2    he or she believes any such abuse is taking place?

3        A.  I would say that they would have to have, you

4    know, something sufficient and use authority for that

5    information to use in court to substantiate any charge

6    associated with this.

7        Q.  When you say, "I would say that they would

8    have something sufficient," is that a conjecture?

9        A.  Well, all these are hypothetical; right?

10   You're asking me if I did this.  I told you I haven't

11   worked the streets since 2007.  So you're asking me

12   what is in the realm of possibility in 2017.  So 17

13   years later, everything I'm saying is hypothetical.

14   Otherwise, we go back to saying I'm not working the

15   streets anymore.  I'm not arresting people.  I'm not

16   generating notices to appear, nor as a first line

17   supervisor am I reviewing them, nor am I an attorney

18   assessing legal sufficiency.

19            So you're asking, you know, what is in the

20   realm of possibility.  I'm trying to answer that to

21   the best of my ability.  If you're asking about the

22   NTAs that I've personally issued since Secretary

23   Kelly's memo, the answer is I haven't issued any.  So

24   maybe I'm not understanding your questions.

25        Q.  No, I think you're understanding my questions

Page 144

1    just fine.  I am talking about the implementation of

2    the February 20, 2017 Secretary Kelly memo --

3          A.   Uh-huh.

4          Q.   -- during which time you are the deputy

5    executive associate director of the ERO?

6          A.   Correct.

7          Q.   And in that capacity I'm simply asking you

8    for your understanding and interpretation of these

9    priority categories listed in this document.  Is that

10   fair?

11         A.   I think it is.

12         Q.   All right.  With respect to the abuse of any

13   program related to receipt of public benefits, s then

14   it's your understanding that for an officer to remove

15   someone based on this -- based on Bullet 5, that they

16   would need some substantiating document or use

17   authority?

18         A.   If an ERO officer was -- I mean there is no

19   corresponding charge associated with that.  So --

20   well, under Section 237 there's a similar charge, or a

21   charge that could be derived from that, and under

22   Section 237 the burden of proof is upon the

23   government.  So if -- and generally, it wouldn't be

24   ERO.

25              Again, I direct you to the first page of this

1    memo.  We were talking about departmental functions,

2    not all of which are ERO.  So that's why I kind of,

3    precedent to our initial conversation, talking about

4    the criminal alien program, our encounter would be an

5    institutional environment was commonly at the county

6    level.

7            If they sought to bring that charge against

8    somebody who was already lawfully admitted, then the

9    purpose would be upon the government.  So yes, we'd

10   have to have some evidence that would substantiate

11   charging somebody with a crime subsequent to their

12   lawful presence.  I cannot speak to how CIS or CBP are

13   applying this.

14       Q.  I definitely understand that you -- I

15   understand the point that these categories broadly are

16   being made applicable to more than just ICE.

17       A.  Right.

18       Q.  And that's helpful.  Thank you.

19            So going back to No. 4, I think with respect

20   to fraud and willful misrepresentation you also

21   referenced "use authority."  Can you just explain to

22   me what you mean by that.

23       A.  There are instances where information is

24   known, classified information that we can't use in

25   immigration court.  So that drives how we charge

1   people sometimes.  You may have to charge somebody as

2   overstaying a B-2 nonimmigrant Visa admission, which

3   is a pretty baseline, fundamental, noncriminal charge,

4   when they're actually involved in a much more

5   dangerous national security conspiracy.

6           But if we don't have use authority for that

7   information, again under Section 237, where the burden

8   of proof is on the government, we have to be able to

9   provide something to the satisfaction of the

10  immigration judge subject to cross-examination or

11  impeachment by imposing counsel.  And if we don't have

12  use authority associated with that, then we can't levy

13  the charge.

14      Q.  But with that -- I understand that use

15  authority would be necessary for the purpose of

16  charging the individual, but the fact that there is

17  any limitations on the use of that evidence doesn't

18  mean they fall outside of Bullet No. 4?

19          MS. DAVIS:  Objection.  Vague.

20          THE WITNESS:  Yeah, could you clarify that?

21  BY MR. LEE:

22      Q.  Yeah.  In that situation you just described

23  with the B-2 Visa, if there was some issue with

24  whether the information around the fraud or willful

25  misrepresentation was rooted in evidence that you

1  could use, can that individual still fall under this

2  bullet for the purposes of prioritizing them for

3  removal?

4        MS. DAVIS:  Objection.  Speculation.

5        THE WITNESS:  I'm still -- I'm not sure.

6  Could you restate that because I think that I said and

7  what you're saying now are two different things, at

8  least what I'm hearing from you is not consistent with

9  what I said previously.

10  BY MR. LEE:

11     Q.  No.  No.  And that's not my intention.  I

12  apologize.

13        I'm trying to understand the significance of

14  use authority in the context of these prioritization

15  categories, these bullets.  Okay?  I understand that

16  the use authority is connected, if I'm understanding

17  you correctly, to whether you can charge a particular

18  person with that provision of the INA.

19     A.  Correct.

20     Q.  Okay.  For someone to fall within Bullet 4,

21  to have engaged in fraud or willful misrepresentation

22  in connection with any official matter before a

23  governmental agency such that they would meet this

24  prioritization category, is the fact that the

25  evidence -- is it required for the officer to have use

1    authority with respect to the evidence surrounding

2    that fraud or willful misrepresentation?

3              MS. DAVIS:  Objection.  Vague.

4              THE WITNESS:  That would be case specific.  I

5    don't think there's a bright line rule.

6    BY MR. LEE:

7         Q.  There's no bright line rule?

8         A.  No.

9         Q.  What I'm trying to understand, and maybe this

10   idea is -- and you can educate me if I'm wrong -- is

11   that an officer can have developed the conclusion that

12   an individual has engaged in fraud or willful

13   misrepresentation as described in Bullet 4, but may

14   also have evidence around that that he cannot use for

15   the purposes of NTA.

16        A.  Yes.

17        Q.  Okay.  And I'm trying to understand simply

18   because he cannot use that information for purposes of

19   charging that particular offense in the NTA, does that

20   mean this person no longer fits within Bullet 4?  And

21   I think your testimony is that's case by case?

22        A.  It's going to be case by case.  That would

23   have to be discussed with counsel and whether or not

24   they could substantiate the charge in court based on

25   the information that they have for use.

1      Q.  And is that -- is this process or

2   case-by-case determination approach documented

3   anywhere?

4      A.  Conversations with counsel documented?  Is

5   that what you're asking?

6      Q.  No.  The fact that in these situations it

7   would be a case-by-case determination, potentially

8   requiring consultation with counsel --

9      A.  All of the target documents are case by case.

10  You know, the individual, you know, whether they're

11  amenable to being put into removal proceedings based

12  on one charge or multiple charges is going to depend

13  on the information on that subject.  You know, they

14  may be convicted of a felony and also overstayed a

15  Visa.

16          So I mean it's going to depend on the case.

17  I mean, there's an infinite number of possibilities

18  when you're talking about, you know, multiple charges

19  being levied against the person.  It's no different in

20  the criminal context that a person can be charged with

21  more than one criminal violation.  They can likewise

22  be charged with more than one civil violations.

23          And there's also, you know, primary functions

24  of our organization that, you know, are really not

25  closely tied to No. 4, which is why it's hard for me

1    to give you bright line rules for something that we

2    generally don't adjudicate.  You know, fraud is

3    usually, as I previously stated, something that's

4    examined more closely by USCIS and CBP, either at the

5    ports of entry or the adjudicative process of benefit

6    applications.

7              So my example on use authority in a national

8    security case is something that my officers would be

9    involved in because of our presence in working with

10   other federal partners.

11             But I mean we don't adjudicate benefit

12   applications, and we don't work at ports of entry.  So

13   that's not one of the primary charges that we use.

14   But given -- you know, now that we're allowed to

15   enforce the full spectrum of the INA, is it possible?

16   Sure.  Anything is possible.  There's many charges and

17   many ways to charge people.

18        Q.  Just so I understand, with respect to whether

19   removal proceedings are initiated against someone on

20   the basis of Bullet 4, that continues to be at the

21   discretion of the individual officer?

22        A.  Yes.

23        Q.  And there's no bright line rule even in the

24   situations where there's a use authority problem to

25   consult with anybody else in the agency?

1          MS. DAVIS:  Objection.  Vague.

2          THE WITNESS:  That would be case specific

3     depending on what's not allowed for use and why.

4     BY MR. LEE:

5          Q.  And are there any procedures or guidance

6     documents around when consultation with counsel is

7     necessary?

8          A.  I don't know of any specific documents, no.

9          Q.  And going back to No. 5 with respect to

10    "Abuse of any programs related to receipt of public

11    benefits," in that context and the use authority issue

12    you raised, is your testimony also that the individual

13    officer can make the determination that someone falls

14    within this category even if the evidence surrounding

15    the abuse was limited under the use authority?

16         MS. DAVIS:  Objection.  Vague.  Speculative.

17    I think asked and answered at this point.

18         THE WITNESS:  Again, I think the memo taken

19    in its totality, it clearly states that the officers

20    can enforce the full spectrum of the INA without

21    categorical preclusions.  So if you're asking could

22    any of these be possibly charged.  To the extent there

23    is a corresponding charge, which there isn't -- if you

24    look at the previously -- the statues that you

25    previously cited and the seven prioritizations,

1   they're not mutually exclusive, nor are they all

2   encompassing, nor is this a prioritization of

3   everything that's in the INA.

4           So I mean I'm really not understanding your

5   question correctly.  If you're asking could someone

6   file a charge, yes.  But the charging document itself

7   is subject to supervisory review, which we've

8   previously discussed.  So someone may think they're

9   amenable to charging somebody with a violation and the

10  supervisor may not concur.

11  BY MR. LEE:

12      Q.  Right.  And I'm not talking about whether a

13  certain offense can be charged in sort of a legal and

14  evidentiary standard for whether something can be put

15  onto an NTA.  I'm talking about when an agent or an

16  officer determines someone falls within these bullets,

17  separate from what they eventually put on the NTA;

18  correct?

19      A.  Potentially, yes.

20      Q.  It's two different analyses.

21      A.  Possibly.

22      Q.  Could be the same, but could be separate;

23  correct?

24      A.  Again, we're talking an infinite number.  You

25  know, we're dealing with people every day, and what

Page 153

1    that person brings to you every day is going to vary.

2         Q.  And I want to clarify that with respect to

3    No. 5, regardless of whether the evidence --

4    regardless of whether there was any use authority

5    issues surrounding the evidence of the abuse of any

6    program related to the receipt of public benefits, the

7    officer retains the discretion to prioritize an

8    individual for removability based on this No. 5

9    bullet?

10            MS. DAVIS:  Objection.  Vague.  Speculative.

11            THE WITNESS:  For arrest, yes.

12   BY MR. LEE:

13        Q.  As a precursor to removal?

14        A.  If the judge orders them removed.  I mean

15   that's a lengthy process, as I'm sure you're well

16   aware.

17        Q.  The life cycle?

18        A.  Yeah.

19        Q.  Okay.  And then moving to No. 6, "Subject to

20   final order of removal but have not complied with

21   their legal obligation to depart the United States."

22   I think that's fairly self-explanatory.

23        A.  For me it is, but so are the other ones.

24   So...

25        Q.  Well, you'll be glad to know this is to me as

1    well.

2         And with No. 7, "In the judgment of an

3    immigration officer otherwise pose a risk to public

4    safety or national security."  Here in the context of

5    ERO would an immigration officer include the ERO

6    officers on the ground?

7         A.  Yes.

8         Q.  And if I'm understanding this Bullet No. 7

9    correctly, this judgement is again -- this discretion

10   is -- again, rests with the line officer?

11        A.  Correct.

12        Q.  Can you help me understand your

13   interpretation and implementation of No. 7 with

14   respect to what would pose a risk -- what

15   circumstances would pose a risk to public safety or

16   national security?

17        A.  Well, frequently, that's when we're having a

18   conversation about either gang membership, gang

19   affiliation, gang support, or persons who are involved

20   or interested in pursuing a relationship with some

21   kind of terrorist organization.

22        Q.  Would this be instances not captured by the

23   other prioritization categories on this page?

24        A.  Sometimes, yes.

25        Q.  What would be an example of one that would

1    fall within No. 7 but not covered by the prior

2    categories here?

3         A.  A lot of soldiers within gangs don't have a

4    criminal history, but if there's information obtained

5    through our investigation to show that there's gang

6    membership or gang affiliation and they're illegally

7    in the country, and thus, amenable to civil arrest,

8    it's a way to take that action based on the

9    investigative information that's available to the

10   officer.

11        Likewise, our officers, they're involved in

12   task force.  There's frequently, as we discussed

13   previously, cases where somebody may be on the

14   periphery of a criminal organization.  They're not

15   really part of the conspiracy, but there is enough of

16   an affiliation that we think that there's a colorable

17   threat if their continued involvement, you know, does

18   involve either a public safety or a national security

19   risk.  So we kind of preemptively take the civil

20   action because they're not part of the criminal

21   process.

22        Q.  What is your understanding of how

23   prosecutorial discretion, as described by this memo,

24   should be exercised with respect to someone who has

25   DACA?

1       A.  With respect to this, if they're still in

2    their status -- or not their status because it isn't a

3    status.  But if the benefit is still current and

4    active and they haven't either committed a subsequent

5    criminal violation or there's not a colorable threat

6    to public safety or national security, then they

7    should be allowed to continue, you know, to exercise

8    that benefit until a later date.

9       Q.  And when you say, "colorable threat to public

10   safety and national security," who makes that

11   determination?

12      A.  That would be something the officer would

13   have to articulate to the satisfaction of his

14   supervisor before the NTA was issued.

15      Q.  Would this include the authority to revoke

16   DACA?

17      A.  CIS terminates DACA, but we would have to

18   make a decision that it's amenable to issuing the

19   charging document before CIS terminates the benefit.

20      Q.  And how about the exercise of prosecutorial

21   discretion with respect to a former DACA grantee,

22   someone who is no longer -- someone who no longer has

23   DACA?

24      A.  If they allow their benefit to expire, then

25   they go back to whatever they were before they had the

1    document -- I mean before they had the benefit, which,

2    generally speaking, is being present without

3    admission.  So they're otherwise amenable to arrest.

4        Q.  Okay.  With respect to how the operational

5    aspects of this memo as it relates to DACA grantees or

6    former DACA grantees, have you generated any

7    documents, policy or operational guidance documents?

8        A.  No.

9        Q.  Do you intend to?

10        A.  No.

11        Q.  Are you aware of whether any of these

12    documents are being generated by your office by the

13    ERO?

14        A.  No.

15        Q.  Okay.  And with respect to what we've just

16    discussed with respect to the operational effects of

17    these categories -- these prioritization categories in

18    the February 2017 memo, have there been any policies

19    or operational guidance documents that's been

20    generated with respect to these prioritization

21    categories?

22        A.  No.

23        Q.  Are you aware of whether the ERO is preparing

24    such information or documents?

25        A.  We are not.

1      Q.  Okay.  Do you, as the Deputy Executive

2   Associate Director, understand whether you or

3   Mr. Albins have any intention of generating such

4   documents?

5      A.  We have no intention.

6         MR. LEE:  I'd like to introduce as the next

7   exhibit what would be No. 25.

8         (Deposition Exhibit 25 was marked for

9         identification.)

10  BY MR. LEE:

11     Q.  I'd like to refer you -- well, let me first

12  identify the document.

13         This document is part of an exhibit to a

14  Complaint filed in this action.  The substance of the

15  document is a September 5, 2017 frequently asked

16  questions rescission of DACA.  Do you see that?

17     A.  I do.

18     Q.  Have you seen these FAQs before, sir?

19     A.  Yes.

20     Q.  I believe you testified earlier that this was

21  provided to you as part of the press packet on the

22  morning of September 5?

23     A.  That's correct.  Or a version of this.  I

24  don't know if it's the exact, same.

25     Q.  I understand.  And if you want to take a

Page 159

1    moment to peruse it, that's fine, but right now I'm

2    specifically only interested in Question 9.

3         A.   Okay.

4         Q.   Here it says -- Question 9 reads, "Can

5    deferred action received pursuant to DACA be

6    terminated before it expires?"

7              The answer, "Yes.  DACA is an exercise of

8    deferred action which is a form of prosecutorial

9    discretion.  Hence, DHS will continue to exercise its

10   discretionary authority to terminate or deny deferred

11   action at any time when immigration officials

12   determine termination or denial of deferred action is

13   appropriate."  Do you see that?

14        A.   I do.

15        Q.   Did I read that correctly?

16        A.   Yes.

17        Q.   Did you have any involvement in developing

18   language with respect to this question?

19        A.   No.

20        Q.   Going back to our earlier discussion about

21   the discretion of immigration officers to issue NTAs

22   on the basis of the February 2017 priorities memo?

23        A.   Yes.

24        Q.   Would this mean that based on any of the

25   listed prioritization categories that an immigration

1  agent could, in his or her discretion, terminate an

2  individual's DACA protection?

3      A.  No.

4      Q.  No.  So -- and why not?

5      A.  As I stated previously, the termination comes

6  from USCIS after the NTA was issued, and I think as

7  I've previously stated, that an officer may prepare an

8  NTA, but it's subject to supervisory approval.  So an

9  individual determination by one officer doesn't

10  necessitate an action by CIS.  It would have to be

11  viewed by a supervisor.  If in fact the NTA is issued

12  after supervisory review, CIS would be notified, and

13  at that point it would be CIS who would terminate

14  DACA.

15      Q.  I want to go back to an earlier answer you

16  provided, and that was with respect to encountering a

17  DACA grantee on the field -- in the field, and the

18  idea that an officer would determine whether there was

19  a colorable threat to public safety or national

20  security.

21      A.  Uh-huh.

22      Q.  Is that standard, a colorable threat to

23  public safety or national security, is that found in

24  any official guidance or policy document?

25      A.  I don't recall, but that has been the

1   standard since the program existed.  That's nothing

2   unique to today.  I mean that was, you know -- that

3   has always been if we encounter somebody and we can

4   determine there's a public safety or national security

5   threat.  It's only a deferment of an enforcement

6   action, and if we think there's enough of a threat to

7   overcome that, then the charging document could be

8   issued, and CIS will terminate the benefit.  That's

9   nothing new in 2017.  That's been since the program

10  started.

11       Q.  With the implementation of the 2017 memo --

12       A.  Uh-huh.

13       Q.  -- is there anything that would preclude an

14  officer from issuing an NTA against a DACA grantee

15  because he believes, for example, under Bullet

16  No. 2 -- No. 3, excuse me, may have committed acts

17  which constitute a chargeable criminal offense?

18            MS. DAVIS:  Objection.  Vague.  Speculative.

19  BY MR. LEE:

20       Q.  You can answer.  I'm sorry.

21       A.  Could you repeat that?

22       Q.  Yes, of course.

23            With the implementation of the 2017 memo, is

24  there anything that would preclude an officer from

25  issuing an NTA against a DACA grantee because he

Page 162

1    believes, for example, that he has committed an act
2    which constitutes a chargeable criminal offense?
3            MS. DAVIS:  Same objection.
4            THE WITNESS:  If the supervisory concurs with
5    the fact patterns laid out by the officer and the
6    supervisor signs the NTA, yes, they can issue an NTA.
7    BY MR. LEE:
8        Q.  So conceivably -- and I understand this is a
9    hypothetical, but I'm talking about, you know, a
10   policy that's currently being implemented, with
11   respect to this policy in encountering a DACA grantee
12   in the field, it is not -- a colorable threat to
13   national security and public safety is not the only
14   grounds by which an agent may determine, an officer
15   may determine to issue an NTA?
16       A.  Well, I answered your specific example, which
17   was committing the essential elements of a crime.  And
18   if we feel that that is serious enough to issue an
19   NTA, then we would consider that a public safety
20   threat.
21           So I mean my previous statement that there
22   has to be a colorable threat to safety and the
23   assessment of committing the essential elements of the
24   crime, at least from an officer's point of view,
25   committing the essential elements of a crime does pose

Page 163

1   a threat to either person or property.  Otherwise, it

2   wouldn't be a crime.

3           MR. LEE:  I'd like to introduce what was

4   previously marked as Exhibit 14.

5           (Previously marked Exhibit 14 was handed to

6           the witness.)

7           MR. LEE:  Again, I think the markings of it

8   may be with another deposition.

9       Q.  And I'll represent to you this is the same

10  document we've been using.  I'd like to take your

11  attention to Question 9, but I guess before I begin,

12  do you recognize this document?

13      A.  Not really.

14      Q.  So to give you a little context, these should

15  be the FAQs that were issued concurrent with the 2012

16  announcement of DACA.

17      A.  Okay.

18      Q.  And you'll see from the current web page on

19  the front, with respect to these FAQs, it says it's

20  archived content and DACA has changed.  So that's sort

21  of from the perspective of what's going on today.  But

22  what follows would be the 2012 FAQs, which I

23  understand that you were not involved in developing.

24      A.  Uh-huh.

25      Q.  You can take a moment if you'd like, but when

1    you're ready, I'd like to turn your attention to

2    Question 9.

3        A.   Okay.   Sure.

4        Q.   Question 9 here asks, "If individuals meet

5    the guidelines for consideration of DACA and are

6    encountered by CBP or ICE, will they be placed into

7    removal proceedings?"

8            And the answer reads, "DACA is intended, in

9    part, to allow CBP and ICE to focus on priority cases

10   under the direction of the Secretary of Homeland

11   Security if an individual meets the guidelines for

12   DACA, CBP or ICE should exercise discretion on a

13   case-by-case basis to prevent qualified individuals

14   from being apprehended, placed the into removal

15   proceedings or removed."   Do you see that?

16       A.   I do.

17       Q.   Did I read that correctly?

18       A.   I believe so.

19       Q.   Was this the policy in effect up until

20   September 5 of this year?

21       A.   I'd say in general terms, yes.   I mean I

22   can't comment on what CIS did in generating these.

23   That may be CIS's perspective, but I think in general,

24   this is consistent with what I've said previously here

25   today.

1      Q.  So your testimony today is that from the

2  perspective of ICE, that ICE, up until September 5 of

3  this year, exercised its discretion on a case-by-case

4  basis to prevent qualifying individuals from being

5  apprehended, placed into removal proceedings or

6  removed?

7           MS. DAVIS:  Objection.  Can you repeat the

8  question?  Sorry.

9  BY MR. LEE:

10     Q.  Yeah.  So your testimony is that from the

11 perspective of ICE, that up until September 5 of this

12 year, it continued to exercise its discretion on a

13 case-by-case basis to prevent qualifying individuals

14 from being apprehended, placed in -- or placed into

15 removal proceedings?

16     A.  I don't know about the temporal part of your

17 question.  I'm trying to -- this is something that's

18 historic from 2012, and you're trying to juxtapose it

19 with a date specific thing.  I'm trying to process

20 through whether I agree with you or not, because

21 that's what you're asking; right?  You're asking

22 whether I agree with the way you've phrased that, and

23 I'm not sure that I do.

24     Q.  Well, I'm just really trying to understand

25 whether what is indicated in this Q&A, which is that

1    ICE will exercise discretion on a case-by-case basis

2    to prevent qualifying individuals from being

3    apprehended, placed into removal proceedings or

4    removed, whether this was being followed by ICE up

5    until September 5.

6        A.   I think it's still being followed by ICE

7    today.  Well, not up to today because we're past

8    October 5.  But, you know, during the period where

9    people could seek to extend their DACA benefit, that

10   was still the case.  And if they are a DACA

11   beneficiary, it's still the case today.

12       Q.   So despite the February -- despite the

13   February 2017 enforcement priorities memo we just

14   discussed, your position is that ICE continued to

15   apply this policy with respect to exercising

16   discretion on a case-by-case basis to prevent

17   qualifying individuals from being apprehended, placed

18   into removal proceedings or removed?

19       A.   Since the DACA -- as I stated previously,

20   since the DACA program was still in effect in

21   February, the kind of worksheet that the officers were

22   using was still being used.  I think both the

23   president and Secretary Kelly were both clear about

24   that.

25       Q.   I'd like to -- let me ask you before I

1    forget.  The rest of the answer here refers to a "law

2    enforcement support center."  Do you see that?

3         A.  I do.

4         Q.  Is the LESC something that sits within ICE?

5         A.  Yes.

6         Q.  And where would it be sort of as a matter of

7    organizational chart?

8         A.  Well, it would be under the assistant

9    director for enforcement, which it seems to have --

10        Q.  That's okay.  I see it.

11        A.  This is all in a different order now.

12        Q.  Now, this answer reads, "If the individuals

13   believe that in light of this policy they should not

14   have been apprehended or placed into removal

15   proceedings, contact the LESC's hotline."  Do you have

16   any understanding of what happens when an individual

17   calls the LESC in this context?

18        A.  I think in general terms, if the person has

19   been arrested and not yet charged and there would

20   be -- they were providing either additional

21   information or clarifying information, then we would

22   have done an individual licensed assessment of whether

23   or not to continue with our enforcement action or to

24   stop it.  And if a charging document had been issued

25   that should not have been issued, it would have been

1    terminated.

2         Q.  Was the LESC continuing to take calls from

3    individuals who believed they were improperly

4    apprehended or placed into removal proceedings up

5    until September 5?

6         A.  I mean that number exists even today.  It's

7    on the detainer notification, I believe.  It's still

8    on the detainer notification.  But the detainer

9    changes a lot.  So I'm trying to recall the current

10   iteration, but it's always a resource that's

11   available.  Many resources are available to either

12   arrestees or detainees or persons that we have --

13   intend to arrest, that they can, you know, provide

14   additional information that may not have been known to

15   ICE at the time of first encounter, or they may not

16   have chosen to disclose to us the time of first

17   encounter.

18        Q.  Has there been any operational changes to how

19   the LESC operates its hotline with respect to these

20   qualifying individuals since the rescission of DACA?

21        A.  No.  I mean people who are DACA beneficiaries

22   remain beneficiaries.  So that is unchanged.  Given

23   that our most frequent contact with folks is in a

24   criminal environment, you know, we would just have

25   to -- again, if they're alleging that the officers

1  erred in either lodging a detainer or issuing a

2  charging document, the LESC would make that

3  information available to a higher level manager, and

4  that they would do a secondary review of the case.

5       Q.  This hotline continues to be in effect?

6       A.  To my knowledge, yes.

7            MR. LEE:  I'd like to mark as Exhibit 26 a

8  document that appears to be printed from TWITTER.COM.

9            (Deposition Exhibit 26 was marked for

10           identification.)

11  BY MR. LEE:

12      Q.  Do you see this?

13      A.  Sure.

14      Q.  Okay.  In this Twitter printout there appears

15  to be an image of a memo dated September 6, 2017 from

16  the acting chief of the U.S. Border Patrol to all

17  chief patrol agents and all directorate chiefs.  Do

18  you see that?

19      A.  I do.

20      Q.  And it's on the letterhead for the CBP?

21      A.  Correct.

22      Q.  Have you seen this memo before?

23      A.  No.

24      Q.  I'm going to give you a moment to review this

25  memo because I have some questions about some of the

1    content.  I understand that you have not seen this

2    particular memo before.

3         A.  Okay.  It's extremely hard to read as well.

4         Q.  I apologize for that.

5              (The witness reviewed Exhibit 26.)

6    BY MR. LEE:

7         Q.  Let me just start simply by indicating the

8    subject of this memo, if I'm reading correctly,

9    Mr. Miller, is "Guidance on the Acting Secretary's

10   Rescission of the Memorandum of June 15, 2012

11   Establishing DACA."

12             Would you agree with me that this appears to

13   be an operational document issued by CBP in response

14   to the rescission of DACA on September 5?

15             MS. DAVIS:  Objection.  Lack of foundation.

16             THE WITNESS:  It appears to be a document

17   issued to one subcomponent within CBP, is what it

18   appears to be to me.

19   BY MR. LEE:

20        Q.  And this is -- in terms of the subcomponent

21   being the recipient, I do see that.  Do you agree with

22   me that this is an operational document with respect

23   to implementing the rescission of DACA?

24             MS. DAVIS:  Same objection.

25             THE WITNESS:  I mean the subject suggests

Page 171

1    that, but I hadn't finished reading it when you

2    started asking questions.

3    BY MR. LEE:

4        Q.  I apologize.  Please take a look.

5        A.  Like I said --

6            (The witness further reviewed Exhibit 26.)

7            THE WITNESS:  Sure.

8    BY MR. LEE:

9        Q.  Now, Mr. Miller, going to the very last

10   paragraph, let me see if I can read this correctly.

11       A.  Good luck.

12       Q.  According to this memo "When an individual

13   who claims to have DACA is encountered, an agent must

14   first process the individual through the E3 system.

15   An individual capacity pending application, that is it

16   has been accepted by USCIS for processing for DACA or

17   DACA renewal should be processed as if they have

18   deferred action under DACA absent derogatory

19   information."

20           Do you have any understanding of the term

21   "derogatory information" as used by CBP?

22       A.  No, I don't.

23       Q.  Does ICE use this terminology?

24       A.  We don't use -- I mean I guess you could say

25   public safety or national security threat.  I mean my

Page 172

1    words that I used with you previously was a colorable

2    public safety or national security threat.  If you

3    want to use the word "derogatory," if you chose to use

4    that word, it would be synonymous, in my mind.  But

5    that's the acting chief's word, not mine.  But I

6    understand what she means by it.

7         Q.  And in your mind, the operating standard is a

8    colorable threat to public safety or national

9    security?

10        A.  Those are my words.  I mean if you use the

11   word "derogatory," it would mean public safety or

12   national security threat.

13        Q.  In that formulation of a colorable threat to

14   public safety, I want to get some clarity.  Would that

15   be the elements of any criminal offense?

16        A.  Potentially.

17            MS. DAVIS:  Objection.  Vague.

18   BY MR. LEE:

19        Q.  Potentially could be fulfilling the elements

20   of any criminal offense; correct?

21            MS. DAVIS:  Objection.  Speculative.

22            THE WITNESS:  As I said previously, I mean

23   it's something that the individual officer would have

24   to articulate to his or her supervisor, and the

25   supervisor would have to concur to the point of

1    issuing the charging document.  Since the individual

2    officers don't issue the charging documents themselves

3    and requires supervisory review, it would be incumbent

4    on the individual officer to articulate what he or she

5    feels is the threat to public safety or national

6    security.

7              Should the provider concur, then they would

8    issue the charging document, notify CIS and terminate

9    the DACA benefit.

10   BY MR. LEE:

11        Q.  Going back to this memo, I want to take you

12   to Page 2, the first full paragraph.  And it reads,

13   "Where an agent finds derogatory information

14   indicating that deferred action under DACA may no

15   longer be appropriate, the agent should" consider

16   USCIS -- excuse me -- "the agent should contact USCIS

17   to determine if the deferred action can be terminated

18   immediately."  Do you see that?

19        A.  I do.

20        Q.  Is there any mechanism you're aware of in ICE

21   where an ICE agent or an ICE officer can contact USCIS

22   to determine if deferred action can be terminated

23   immediately?

24        A.  We issue the charging document first and then

25   contact CIS for the termination.

1      Q.  Is that the only way in which revocation of

2  DACA can be achieved?

3      A.  To my knowledge, termination, yes.  That is

4  how we do it.  I cannot talk to the instructions that

5  a border patrol chief gives to her subordinates.  You

6  would have to talk to Ms. Provost.

7      Q.  Yes, and all I'm trying to do is understand

8  kind of if there's any analog device.  I'm fully

9  understanding that you are not part of CBP.

10          MR. LEE:  I think we are at a good time for a

11  break.

12          MS. DAVIS:  Okay.

13          MR. LEE:  Thank you for your patience.

14          THE VIDEOGRAPHER:  We're going off the

15  record.  This is the end of Media Unit No. 2.  Time is

16  2:40 p.m.

17          (A recess was taken from 2:40 p.m. to

18          3:02 p.m.)

19          THE VIDEOGRAPHER:  We're on the record.  This

20  begins Media Unit No. 3.  The time on the video is

21  3:02 p.m.

22  BY MR. LEE:

23      Q.  Mr. Miller, welcome back.  Do you understand

24  you're still under oath?

25      A.  Yes, sir.

1        Q.  Just right before we took a break, you

2    explained that ICE would issue a charging document

3    first and then contact USCIS for determination.  Do

4    you recall that?

5        A.  Yes.

6        Q.  I just want to understand that process a

7    little bit more.  I understand that ICE issues the

8    charging document, and then what is transmitted to

9    USCIS?

10       A.  My understanding is that it's a call to -- I

11   don't know today.  When I was in the field, we were

12   contacting the Burlington Benefits Center, I think is

13   what it's called, or the CIS office in Burlington,

14   Vermont to let them know that a charging document had

15   been issued.  I believe that it's still -- to my

16   knowledge, it's still the same process unless

17   individual field offices have set something up at the

18   field office level with their counterparts and CIS.

19          Most of our field office -- the office of the

20   field office director is in a city where CIS also has

21   an office.

22       Q.  When you communicate to the benefit center

23   that an NTA had been issued, is it then a matter of

24   course that USCIS will revoke the DACA protection?

25       A.  Terminate, yes.

1       Q.  Terminate?

2       A.  Yes.

3       Q.  They don't then, themselves, consider whether

4   to terminate or not?

5       A.  That's my understanding, correct.

6       Q.  Okay.  Do you have any knowledge of any

7   intention on the part of ICE to initiate enforcement

8   actions against former DACA grantees after --

9   presently?

10      A.  No.

11      Q.  To back up a little bit, you will agree with

12  me that as a result of the termination -- the

13  rescission memorandum, that there are going to be

14  individuals who -- whose DACA protection expires

15  without the ability for renewal?

16      A.  Yes, that's my understanding.

17      Q.  Okay.  And so these individuals, obviously,

18  are not going to be qualifying individuals for DACA?

19      A.  Correct.

20      Q.  And with respect to this growing universe of

21  individuals who are losing that DACA, are there any

22  present intentions on the part of ICE to initiate

23  enforcement actions against them?

24      A.  No.

25      Q.  Are there any present intentions on the part

1    of ICE to initiate enforcement actions against this

2    universe of DACA grantees after March 5 of 2018?

3         A.  No.

4         Q.  And why is that?

5         A.  Simply stated, that if they're not a

6    criminal, then most of our efforts focused on

7    identifying, locating and arresting criminal aliens.

8    Certainly if someone was encountered incidental to a

9    criminal contact and they no longer have a deferred

10   action benefit, they're amenable to arrest.  But in

11   terms of proactively seeking noncriminals, you know,

12   we're pretty much maxed out with our resources and

13   just focusing on criminal aliens.

14        Q.  I'd like to switch gears a little bit and

15   talk about the systems that you maintain at ICE.

16        A.  Sure.

17        Q.  As a general matter, if you can help me, do

18   the immigration components of USCIS, CBP, and ICE

19   operate systems and databases that are unique to their

20   agency?

21        A.  Yes.

22        Q.  The database, for example, that generated the

23   data set from USCIS we talked about earlier today --

24        A.  Correct.

25        Q.  Do you know the name of that database?

1      A.   I do not.

2      Q.   Have you heard of anything called the

3  "central index system"?

4      A.   Yes.

5      Q.   Okay.  And what is that?

6      A.   Central index system is basically a database

7  that has individuals, alien registration numbers,

8  biographic information, information about some of the

9  benefits they may have been granted.  It has some

10  limited case history functionalities, and if they've

11  been issued -- previously issued any kind of card, a

12  permanent resident card or employment authorization

13  card, it may have information about that as well.

14      Q.   And is there an agency that owns this

15  database?

16      A.   It's USCIS.

17      Q.   And with respect to access to the systems and

18  databases operated individually by each component, are

19  there any general protocols as to how a different

20  component can gain access to that system or database

21  that's owned by another?

22      A.   On certain ones that are considered shared

23  information, officers can get access through -- I

24  forget what the acronym stands for, but it's called a

25  PICS identity, and depending on what agency you're

1    with and what your job is, your PICS ID will grant you

2    access to certain databases.  For example, we can look

3    at the USCIS central index system, and we don't have

4    authority to put information into that, but we can

5    query information in there to try to identify an alien

6    registration number or validate that somebody who is

7    not in possession of their card at the time of

8    encounter, that that card has been issued and is

9    still, you know, I guess still current, for lack of a

10   better term, if it's something that expires like an

11   EAD.

12        Q.   What would be considered shared information?

13   Which systems or databases would you say was shared

14   information?

15        A.   We have access to the central index system.

16   We have access to CLAIMS.  We have -- some of the

17   border patrol's arrest information gets ingested into

18   our system of record, which is called EARM.  And that

19   information -- EARM information is also available both

20   to CBP and USCIS if they want to look up case

21   information about an individual who was in removal

22   proceedings or was previously in removal proceedings.

23        Q.   You mentioned something called the PICS ID is

24   that PI CS?

25        A.   P-I-C-S.

1        Q.  P-I-C-S.  And help me understand, is this the
2    ID that you need in order to get access to another
3    system?
4        A.  It identifies you, you know, as an
5    individual.  Since these are, you know, for official
6    use only database systems, everything that we do in
7    it, there's a record of it.  So if there's any
8    allegation of misuse or abuse, then, you know, it's
9    tracked back to the individual officer that accessed
10   the information.
11       Q.  So, for example -- let me just understand.
12   Every ERO employee would have their own PICS ID?
13       A.  Officers for sure.  Not all support personnel
14   have a need to access this information.  It would
15   depend on whether they're direct support of
16   enforcement.  But, for example, the budget folks most
17   likely do not have a PICS ID.  They do not have a need
18   to access this information.
19       Q.  Do you currently have a PICS ID?
20       A.  Yes.
21       Q.  I assume in your previous positions you also
22   had one?
23       A.  Yes.
24       Q.  And as the FOD you also had one?
25       A.  I've had the same one since August of 1996.

1          Q.   Okay.   Beyond using a PICS ID to get access

2     to a system, is there any other clearance or approval

3     you need before you access that system?

4          A.   I mean in general terms, that's worked out in

5     advance.   Like you would say, when I was an

6     immigration inspector, I had access to certain systems

7     that other people didn't.   When I was a deportation

8     officer, I had access to systems that other people

9     didn't need to know.   When I was a special agent, I

10    had different accesses than when I was an inspector.

11    So a lot of it is tied to the positions and the

12    expectation of that position.

13              Certainly, if there's a specific need based

14    on an operational need, you can either -- now you

15    would be going to a different agency.   Back in the INS

16    days you'd be going to a different program, they were

17    called, to demonstrate a need to get access for that

18    system.   If there was general concurrence, you'd get

19    access.   If there was, you know, need for further

20    discussion, the senior managers would have that

21    discussion and make a determination.

22         Q.   So as a general matter, sort of the

23    permissions are set sort of based on the role and

24    responsibility of the particular position?

25         A.   Yes.

1      Q.   Okay.   Back in the day when -- either whether

2    you know now or back when you were the field office

3    director, do you know if the officers in the field

4    have a PICS ID that gave them access to the central

5    indexing system?

6      A.   Yes.

7      Q.   I'm sorry.   I think I should have

8    said central index system.

9      A.   I know what you meant.   We just say, "CIS,"

10   which is confusing because now there's an agency

11   that's CIS.

12         MR. LEE:   And I'm sorry for a technical

13   issue.   Can we just go off the record for a few

14   seconds?

15         THE VIDEOGRAPHER:   We're going off the

16   record.   The time on the video is 3:13 p.m.

17         (A recess was taken from 3:13 p.m.

18         to 3:17 p.m.)

19         THE VIDEOGRAPHER:   We're back on the record.

20   The time on the video is 3:17 p.m.

21   BY MR. LEE:

22      Q.   Mr. Miller, are you familiar with what

23   information is contained in CIS?

24      A.   Yes.

25      Q.   You've accessed CIS yourself in the past?

1      A.   Correct.

2      Q.   I take it publicly not in your more senior

3  positions but earlier in your career?

4      A.   That's correct.

5      Q.   And my understanding is that the CIS system

6  would contain information about DACA beneficiaries; is

7  that correct?

8      A.   It may.  You know, so to your point, around

9  the time that the system was -- I mean that DACA was

10  implemented as a program.  It was generally around the

11  same time that I was no longer directly accessing it

12  and subordinates were, but that is a benefit that may

13  be captured in there.  Certainly, the employment

14  authorization document in theory should be entered.  I

15  mean it's a human system, and you have to key stroke

16  information into it.

17          So subject to information being key stroked

18  into it, it should at least show the employment

19  authorization document.

20      Q.   And do you know whether the information

21  underlying the issuance of the benefit, in this case,

22  the EAD, is that information also captured in the CIS?

23      A.   Not in the central index, no.

24      Q.   Where would that information be instead?

25      A.   To my knowledge it would be in the A file.

1      Q.  In the A file?

2      A.  Correct.

3      Q.  Would that be the individual file --

4      A.  Registration file for the individual

5  applicant, yes.

6      Q.  And are those also in an electronic system?

7      A.  Those were the paper files, much like, you

8  know, your folder there.  And the papers contained

9  therein.  Each individual form for a person that has a

10  history with now DHS, previously DOJ, kind of the

11  totality of their individual history from their first

12  contact with a component or subcomponent up to the

13  current date, that information is captured in the

14  alien registration file.  Some of that information is

15  available electronically.  A lot of it is just in the

16  paper file.

17      Q.  And when you say some of the information is

18  available electronically, can you give me a little bit

19  of detail as to --

20      A.  I mean the database that you're talking about

21  has name, address, date of entry, current immigration

22  status, country of citizenship, country of birth.  I

23  mean there's a lot of fields that, I guess they're

24  discretionary fields, but it may have their social.

25  It may have their driver's license.  It may have their

1    FBI number, if they have an FBI number.  It has fields

2    for case history, again if they're key stroked in.  It

3    has fields for cards that were issued by the

4    department, used by the department generically.

5            I mean there's fields for all of that

6    information, but it's subject to what is key stroked

7    into it.

8        Q.  Do you recall, for example, with an EAD my

9    understanding is and the application form for it, one

10   of the fields would include information about

11   individuals' parents, name of father, name of mother.

12       A.  I can't remember if that's on the EAD

13   application or not.  I know it's in our arrest report,

14   but it's been a long time since I've seen the form to

15   apply for an EAD.

16       Q.  Have you ever seen the names of a

17   beneficiary's parents in the CIS?

18       A.  Absolutely.

19       Q.  How about the names of any other individuals

20   associated with the beneficiary?

21       A.  Not in the central index system, no.

22       Q.  So as far as you recall, it's the beneficiary

23   herself or himself and parents and guardians?

24       A.  Yes.

25       Q.  And no one else?

1          A.  To the best of my recollection, yes.

2          Q.  Now, to be clear, based on the position of

3    Yarrow officers and the role they play, their PICS ID

4    gives them read only access to the CIS?

5          A.  Correct.

6          Q.  And they can access this information without

7    further approval or oversight from anybody else within

8    the department?

9          A.  Correct.

10          Q.  And how about with respect to communication

11    across these components?  Can a line officer pick up

12    the phone and speak to someone at USCIS in furtherance

13    of his or her duties, or does that communication need

14    to be routed internally through ICE first?

15          A.  I think it depends on what information they

16    need and who they're trying to get out.  Certainly, I

17    mean ICE doesn't have a policy that precludes that

18    communication.  Whether or not CIS allows it is

19    something you'd have to ask my counterpart.  A lot of

20    CIS employees now telework and they have a scheduling

21    system that's, you know, unique to that individual

22    adjudicator.  And whether or not he or she is in the

23    office or adjudicating remotely is something that, you

24    know, we wouldn't have firsthand knowledge of.

25               There are instances where there's a specific

1    location that has to be called for specific

2    information, and that's usually done either by a

3    second line supervisor, or in some cases, we'd refer

4    that to chief counsel's office, and he or she would

5    have a designee as the primary point of contact.

6         Q.  As far as, you know, there's no sort of set

7    policy as to when communication can be made directly

8    to another component versus when that communication

9    needs to be filtered through the chain of command?

10        A.  Unless there's specific programs that do

11   exist, but, you know, in general, if someone wanted to

12   call and talk to an adjudicator, there's no preclusion

13   from doing that.

14        Q.  When you say, "adjudicator," are you talking

15   about USCIS employees that are making a determination

16   on applications for benefits?

17        A.  That's adjudication officer, I believe is

18   what they're called now.  They used to be called

19   "examiners."  I believe they're called "adjudication

20   officers" now.

21        Q.  Would this also be the case with other

22   employees at USCIS?  I'm assuming that not all of

23   their employees are adjudication officers.

24        A.  I can't speak to how they're structured now.

25   In the old days we had much more knowledge of -- I'm

1    sorry.  During the INS days we had a greater

2    understanding of how they were structured.  Since they

3    broke up INS and made all the new agencies, we have

4    limited visibility into what their positions are

5    titled and what their roles and responsibilities are,

6    how the organizations are structured.  You have

7    individual points of contact for specific programs,

8    but in terms of like day-to-day interaction, it's much

9    different now that we're separate agencies.

10         Q.  So with my understanding of how ICE officers

11   have access to the CIS, would that access to CIS be a

12   mechanism for ERO to identify DACA recipients?

13         A.  I'm sorry.  Can you say that again.

14         Q.  Would the access by ICE officers to the CIS

15   allow them to identify -- give them the ability to

16   identify DACA recipients?

17         A.  If you're looking at an individual record,

18   you'd be able to see whether or not the EAD was

19   issued.  Again, I don't know if they have a code in

20   the history screen specifically for DACA.  I know that

21   there is an EAD code for deferred action, but it's not

22   mutually exclusive to DACA.  It's just the deferred

23   action code.  So that might be an indicator of whether

24   or not there's a specific code for DACA and CIS.  I

25   don't know that.

1        Q.  And the expiration dates of those EADs are

2   also in the CIS?

3        A.  If it was put in, yes.

4        Q.  Right.  Do you know if applications or

5   applicants for immigration benefits are also in the

6   CIS?

7        A.  I don't know at what point CIS creates a

8   record.  I don't know if it's during the adjudicative

9   process, when they assign the A number and when they

10   create a record.  I'd have to refer you to CIS for

11   that policy.

12        Q.  Now, with respect to the generation of the

13   metrics you discussed earlier from Mr. Hamilton, you

14   explained that the process was to get a data set from

15   USCIS.  Do you recall that?

16        A.  Yes.

17        Q.  Was that data set generated from the central

18   index system?

19        A.  I don't know.  You'd have to ask CIS.

20        Q.  Is your understanding that the data set

21   provided by USCIS included A numbers of DACA

22   beneficiaries?

23        A.  Yes.

24            MS. DAVIS:  Objection.  Vague.

25   BY MR. LEE:

1      Q.  So as far as you know, CIS -- USCIS was able
2  to compile a list of A numbers for those individuals
3  that it had conferred DACA to?
4           MS. DAVIS:  I'm sorry.  Can you repeat the
5  last part?  That he -- you said -- sorry.
6  BY MR. LEE:
7      Q.  As far as you know, Mr. Miller, USCIS is able
8  to generate a list of A numbers for individuals that
9  it had conferred DACA?
10           MS. DAVIS:  Objection.  Vague.
11           THE WITNESS:  Yes.
12  BY MR. LEE:
13      Q.  In your time at the ERO, have you ever
14  received information from USCIS about DACA recipients
15  other than generating -- this instance of generating
16  those metrics?
17      A.  I have not.
18           MS. DAVIS:  Objection.  Vague.
19           THE WITNESS:  No, I have not.
20  BY MR. LEE:
21      Q.  Do you know if -- let me ask, during your
22  time at ICE, have you ever had occasion to proactively
23  ask USCIS for information about DACA beneficiaries
24  other than this instance of generating the metrics?
25      A.  No.

1      Q.  Are you aware of any ICE officers that have

2   approached USCIS for information on DACA recipients?

3      A.  No, I'm not.

4      Q.  Are you aware of any instances of ICE

5   officers accessing CIS to get information about DACA

6   recipients?

7           MS. DAVIS:  Objection.  Vague.

8           THE WITNESS:  I don't know of any instances,

9   no.

10  BY MR. LEE:

11     Q.  And you don't recall that ever happening when

12  you were more at the field level?

13     A.  At the field level there may have been

14  individual instances where we contacted people in

15  jails, and subsequent to identifying that they had an

16  existing A number, we'd have to see, you know, what

17  record was associated with that A number, which is our

18  queryability in USCIS is limited in what we can query.

19  It's usually associated with identifying individuals

20  to determine if they're in a lawful status or have

21  other benefits that would either preclude us taking an

22  enforcement action or require us to charge them with

23  specific charges subsequent to being granted the

24  benefit.

25           For example, if someone is claiming that

1   they're a permanent resident and they're not in

2   possession of their card, we would authenticate that

3   and then see if there's sufficient evidence to charge

4   them with a violation.  There are only certain

5   violations that you can charge a permanent resident

6   with.  So we would have to kind of access that record

7   as part of the investigative process.

8       Q.  Is there, to your understanding, any

9   mechanism that controls the exchange of information

10  between USCIS and ICE with respect to DACA

11  beneficiaries?

12          MS. DAVIS:  Objection.  Vague.

13          THE WITNESS:  To my knowledge, in the systems

14  that I have access to, there's no restrictions that

15  I'm aware of.

16   BY MR. LEE:

17      Q.  And in -- would you agree -- let me rephrase

18  that.  Has the way in which information is exchanged

19  between USCIS and ICE changed in any way since 2012?

20      A.  No.

21      Q.  Let me take you back to what I think I've

22  already marked Exhibit 14.  And as I represented to

23  you, Mr. Miller, these are the frequently asked

24  questions that were generated together with the 2012

25  announcement of DACA.  And I'd like to take you to

Page 193

1    Question 19.

2             Question 19 asks, "Will the information I

3    share in my request for consideration of DACA be used

4    for immigration enforcement purposes?"

5             Answer, "Information provided in this request

6    is protected from disclosure to ICE and CBP for the

7    purpose of immigration enforcement proceedings unless

8    the requester meets the criteria for the issuance of

9    an NTA or referral to ICE under the criteria set forth

10   in USCIS' notice to appear guidance."  Do you see

11   that?

12        A.  I do.

13        Q.  Did I read that correctly?

14        A.  I think so.

15        Q.  Have you seen, specifically, this Q&A before?

16        A.  I may have at some point since 2012, but

17   again, it's a CIS internal document.  It wouldn't have

18   been paramount in my day-to-day duties.

19        Q.  Was there any discussions with you -- well,

20   let me strike that.

21             In your time working in the field, were you

22   ever -- let me strike that.  I apologize.

23             I'm going to take you, actually, to what I

24   believe I previously marked as the frequently asked

25   questions issued together with the rescission memo.

Page 194

1    Give me a moment to locate it.

2            MS. DAVIS:  25?

3            MR. LEE:  Yes.  Exactly.

4        Q.  And let me take you to Question 8.

5    Question 8 reads, "Will USCIS share the personal

6    information of individuals whose pending requests are

7    denied proactively with ICE for enforcement purposes."

8            And the answer reads, "Generally, information

9    provided in DACA requests will not be proactively

10   provided to other law enforcement entities, including

11   ICE and CBP, for the purpose of immigration and

12   enforcement proceedings unless the requester poses a

13   risk to national security or public safety or meets

14   the criteria for an issuance of an NTA or referral to

15   ICE under the criteria."  Do you see that?

16       A.  I do.

17       Q.  Did I read that correctly?

18       A.  Yes.

19       Q.  Do you have any understanding with respect to

20   Question 19 in Exhibit 14 and here Question 8 in

21   Exhibit 25, as to any changes in the circumstances

22   under which it would be permissible for information

23   about DACA beneficiaries to be exchanged between USCIS

24   and ICE?

25       A.  No.

1       Q.  Is it still currently the department's

2  position that information provided in requests for

3  DACA is protected from disclosure to ICE for the

4  purpose of immigration enforcement proceedings unless

5  the requester meets the criteria for the issuance of

6  an NTA or referral to ICE under the criteria set forth

7  in USCIS' NTA guidance?

8       A.  I don't know what USCIS NTA guidance is.  So

9  I can't speak on behalf of CIS and when or if they

10 issue charging documents.

11      Q.  You have not had any discussions in 2017 with

12 USCIS with respect to the information exchange about

13 DACA grantees?

14      A.  No, I haven't.

15      Q.  Are you familiar at all with the NTA

16 guidance?

17      A.  Not CIS' NTA guidance, no.

18      Q.  Now, to clarify, is it the case that both

19 USCIS and ICE have the authority to issue NTAs?

20      A.  That is correct, among other agencies, but

21 yes, those are two within the department.

22      Q.  And presumably CBP as well?

23      A.  That's correct.

24      Q.  And USCIS' NTA guidance is not something that

25 you're familiar with?

1        A.   It is not, nor is it binding on us.

2        Q.   Does ICE have its own NTA guidance?

3        A.   No.  Since the end of the priority

4    enforcement program, we're amenable to issuing NTAs,

5    anyone who's found to be in violation of the INA.  So

6    that's a fundamental part of our training.  So we

7    don't see a need to issue any subsequent guidance.

8        Q.   And just to go back to an earlier part of our

9    discussions, with respect to the FAQs we just

10   discussed, both in the 2012 FAQs and the 2017 FAQs,

11   you did not have any role in developing the wording of

12   those two FAQs?

13       A.   I did not.

14       Q.   Did you have any discussions with anyone in

15   DHS about the wording of those FAQs?

16       A.   No, I didn't.

17            Are you aware of any such conversations

18   between USCIS and ICE with respect to the wording of

19   these FAQs relating to information exchanged?

20       A.   No.

21       Q.   Do you have any knowledge of any instances

22   where DACA information was provided by USCIS to ICE

23   that formed the basis for enforcement action?

24       A.   No, I do not.

25       Q.   Is there any intention on the part of ICE to

1   use DACA information as a basis for immigration

2   enforcement actions?

3        A.  No.

4        Q.  How about after March 5?

5        A.  No.

6           MR. LEE:  Okay.  I think I'm at a natural

7   break point.  Let's take five minutes.  Is that okay?

8           THE VIDEOGRAPHER:  We're going off the

9   record.  The time on the video is 3:42 p.m.

10          (A recess was taken from 3:42 p.m.

11          to 4:02 p.m.)

12          THE VIDEOGRAPHER:  We're back on the record.

13  The time on the video is 4:02 p.m.

14  BY MR. LEE:

15       Q.  Mr. Miller.

16       A.  Good afternoon.

17       Q.  You mentioned with respect to systems and

18  databases at DHS a system called "CLAIMS"?

19       A.  Yes.

20       Q.  Is that the full name of the database?

21       A.  That's the acronym.  I don't know what the

22  full name of the database is.

23       Q.  Is it just the acronym CLAIMS, or is it

24  CLAIMS 3 or a number attached to it?

25       A.  I'm not sure which iteration of CLAIMS

1    they're on now.  CLAIMS has been around for a while,

2    and there's been -- they could be at 3.  They could be

3    at 4.  I'm not sure what version of CLAIMS they're at.

4         Q.  I see.  But it's all based on the same CLAIMS

5    system?

6         A.  Yes, sir.

7         Q.  And can you tell me what information -- well,

8    let me first ask you which agency owns CLAIMS?

9         A.  USCIS.

10        Q.  What does CLAIMS contain?

11        A.  Information about benefit applications.

12        Q.  And so by "benefit applications," do you mean

13   the information contained in applications for

14   immigration benefits?

15             MS. DAVIS:  Objection.  Vague.

16             THE WITNESS:  There's structured fields and,

17   again, to my knowledge, it's all key stroked in.  So

18   it has basic biographic information and then what

19   application was filed and the outcome of the

20   application.

21   BY MR. LEE:

22        Q.  Does this include applications for DACA?

23        A.  Yes.

24        Q.  And so what would be key stroked into CLAIMS

25   would be whatever structured fields are available in

1    that system to capture the information on the DACA

2    application?

3         A.  Yes, sir.

4         Q.  Do ICE officers, ERO officers through their

5    PICS ID have access to CLAIMS?

6         A.  They're able to get it.  It's an access they

7    have to request.  It's not part of the basic set of

8    databases that everyone is granted access to when

9    they're first hired.

10        Q.  To request access to CLAIMS, what procedures

11   would have to be followed?

12        A.  I don't know in totality because I was never

13   a PICS officer.  I was never someone who managed PICS

14   IDs, but to my knowledge, the PICS officer would reach

15   out to his or her counterpart at USCIS and let them

16   know that officer so and so PICS ID XYZ needs to be

17   granted access to CLAIMS.

18        Q.  Does that need to be substantiated in any

19   way?

20        A.  The short answer is yes.  For our officers --

21   deportation officers, yes.  We used to have a

22   bifurcated workforce between deportation officers and

23   immigration enforcement agents, and generally, the

24   immigration enforcement agents didn't have access to

25   CLAIMS but the deportation officers did.

1      Q.  So I guess to get a little more clarity, how

2  would that need be substantiated in terms of

3  justifying the request for the PICS ID to be able to

4  access CLAIMS?

5      A.  Our responsibility before we issue a charging

6  document is to balance both good and bad information,

7  for lack of a better term.  So while we get the bad

8  information from FBIC and the NCIC record, we also

9  have to look at any benefits that may have been

10  granted to the individual or their parents because of

11  derivative or acquired citizenship.

12          So that's why during our arrest process we

13  ask information about the parents, confirm information

14  about the parents, just to ensure that before we take

15  an enforcement action that the person actually still

16  meets the definition of an alien because sometimes we

17  encounter people who don't realize they're U.S.

18  citizens.  So we have to kind of balance the good with

19  the bad before the charging document is issued.

20      Q.  I guess I'm a little unclear.  What in the

21  CLAIMS system would be providing either that good or

22  bad information?

23      A.  CLAIMS would be all good information because

24  it would be about any benefits that may have been

25  granted them by CIS.  I mean if you're encountering

1    somebody in a jail or a prison, they're not going to

2    have on their person a permanent resident card or

3    employment authorization document, or if they have a

4    pending immigrant Visa that got an approved, got 130,

5    which is an application for a permanent Visa, they're

6    not going to have any of that information in their

7    possession.

8          But before you make a determination whether

9    or not to proceed with a charging document, you need

10   to check all of that information, either confirm what

11   they've told you and inform your supervisor, or maybe

12   there's enough information in there to not issue the

13   charging document at all.  It's going to depend on the

14   individual, what he or she did, and, you know, what

15   benefits have already been granted them or are pending

16   with CIS.

17        Q.  So both benefits that may be pending or have

18   already been granted would be reflected in CLAIMS?

19        A.  If it's updated, yes.

20        Q.  So isn't there a fairly widespread need for

21   officers to have access to CLAIMS?

22        A.  Absolutely.

23        Q.  And once an individual gets the access to

24   CLAIMS through the adjustment of the permissions level

25   associated with their PICS ID, is that something that

Page 202

1    just carries forward, so to speak?

2         A.  Generally speaking, yes.

3         Q.  So it's not a permission that is adjusted for

4    a specific one-time purpose?

5         A.  If they maintain the position that they're

6    in, then the assumption would be that they still need

7    access.

8         Q.  Do you have any sense of what proportion of

9    ERO officers have PICS IDs that give them access to

10   CLAIMS?

11        A.  I don't know.  Now that we have what's called

12   a single career track and everyone is a deportation

13   officer, hopefully they're evolving to the point where

14   everybody has access to it because as a deportation

15   officer, you would have a direct need for it.  The

16   historic positions, not so much so.

17        Q.  And with respect to, again, substantiating

18   the need, I don't understand why they may need access,

19   but with respect to substantiating or at least some

20   documentation of this request to get access to CLAIMS,

21   how does that work?

22        A.  As I stated, I don't really know.  I was

23   never a PICS ID -- I was never a PICS officer.  So I

24   don't know what those officers transmit to USCIS.

25        Q.  I guess maybe to take a step back, does

1    anything need to be transmitted from the ICE officer

2    to the ICE, PICS officer?  Can this just be done by

3    phone?  I'm calling the officer to say --

4         A.   Again, I was never a PICS officer.  So you're

5    asking me something I cannot possibly answer.  But I

6    know when I was a FOD, to set up a PICS account, I

7    would have to sign -- there's a standard form to issue

8    a PICS ID, and what would be the baseline databases

9    that the officer would need access to.  But in terms

10   of subsequent -- gaining access to additional

11   databases, I don't have visibility into that.

12        Q.   And there you were talking about the initial

13   request for a PICS ID?

14        A.   Yes.

15        Q.   Okay.  And with respect to the process after

16   you've gotten the PICS ID to go back to the PICS ID

17   officer for an adjustment to the permission level, you

18   do not know presently what documentation or paperwork

19   that might be necessary for that to happen?

20        A.   Correct.

21        Q.   I'd like to just circle back to a couple of

22   quick points.  We never discussed any communications

23   you may have had with DHS personnel about the

24   potential rescission of DACA.  Do you recall?

25        A.   Yes.

1        Q.   Are you aware that on August 21 an internal

2    DHS meeting was held to discuss the rescission of

3    DACA?

4        A.   No, I'm not.

5        Q.   Are you aware of whether a meeting with --

6    including DHS personnel that took place at the White

7    House occurred on August 24 to discuss the rescission

8    of DACA?

9        A.   I'm not aware of that at all.

10        Q.   Okay.  Since September 5 of this year, have

11    you had any discussions with anybody with respect to

12    the rescission of DACA?

13        A.   No.

14        Q.   Have you had any discussions with anyone

15    about the reasons or the basis for the rescission of

16    DACA?

17        A.   No.

18        Q.   Have you had any meetings to discuss

19    enforcement priorities as it relates to DACA grantees

20    or former DACA grantees?

21        A.   No.

22        Q.   We discussed earlier, you know, whether or

23    not operational documents out of ERO were being

24    generated sort of in response to the rescission of

25    DACA, and you indicated that no such documents have

1   been generated; is that correct?

2       A.  Yes.

3       Q.  And that there's no present intention to

4   generate any such documents?

5       A.  That's correct.

6       Q.  And there's nobody else in your office

7   currently working on any such documents?

8       A.  Not that I'm aware of, no.

9       Q.  Did you ever make a suggestion to anyone

10  within DHS that perhaps such operational documents

11  were necessary?

12      A.  I didn't, no.

13      Q.  Did any -- to your knowledge, did anybody

14  else?

15      A.  No.

16      Q.  Did anyone ever instruct you to not produce

17  any operational documents with respect to the

18  rescission of DACA?

19      A.  No.

20          (Deposition Exhibit 27 was marked for

21          identification.)

22          MR. LEE:  I'd like to mark as Exhibit 27 a

23  document dated April 25, 2017 entitled "Privacy Policy

24  Guidance Memorandum."

25      Q.  Mr. Miller, are you familiar with this

1   document?

2        A.   No, I'm not.

3        Q.   Do you ever recall having received this

4   document?

5        A.   I do not recall receiving it, no.

6        Q.   Is this the first time you're seeing this

7   document?

8        A.   Yes.

9        Q.   Do you have any understanding as to the

10  department's privacy act protections with respect to

11  individuals other than U.S. citizens and lawful

12  permanent residents?

13       A.   Yes, I do.

14       Q.   And what is your understanding of those

15  protections?

16       A.   The protections are essentially the same

17  whether the person is legally or illegally in the

18  United States.

19       Q.   And has that -- has the protection that you

20  just described changed in any way during the time

21  you've been with the ERO?

22       A.   To my recollection, it was implemented in

23  2007, and it was unchanged.  I know I said I don't

24  recall ever receiving this, but our ICE privacy

25  officer, she had informed us that she felt that what

1    DHS was doing was going to be more restrictive in

2    terms of limiting, be more limiting in what

3    information we could disclose.

4         Q.  When did she tell you this?

5         A.  Probably in, I would say, in May or June.

6         Q.  Of this year?

7         A.  Yes, sir.

8         Q.  When you say, "more limiting in what

9    information we can disclose," do you mean that the

10   protections have been tightened or that the

11   protections have been loosened?

12        A.  Tightened.

13        Q.  We touched on this earlier, Mr. Miller.  Has

14   DHS ever had to analyze or calculate the impact the

15   rescission of DACA would have on cost of removal,

16   budgetary impacts of removal?

17        A.  No, not to my knowledge.  Just as a variable,

18   as I said previously, we do our budget formulation,

19   but I don't recall anything specific to DACA

20   rescission.

21        Q.  And you have not -- strike that.

22             I'd like to go back to Exhibit 23, please,

23   and discuss the testimony you gave in July 2015 around

24   the topic of unaccompanied minors.

25        A.  I'm sorry.  Which one are we looking at?

```
 1            MS. DAVIS:  (Indicating.)
 2            THE WITNESS:  Okay.
 3   BY MR. LEE:
 4       Q.  Did you come to any conclusion in this
 5   testimony as to the reasons for the surge of
 6   unaccompanied minors arriving at the United States
 7   border?
 8       A.  I don't recall what the conclusion statement
 9   was.  I guess -- if you want me to read what's in
10   here, I can do that.
11       Q.  Well, you can certainly take a moment to just
12   refresh your recollection about this testimony.
13            (The witness reviewed Exhibit 23.)
14            THE WITNESS:  Okay.
15   BY MR. LEE:
16       Q.  In the second paragraph of the very first
17   page do you see that according to your testimony you
18   said, "Among the reasons for this increase are push
19   and pull factors such as better economic conditions in
20   the United States, the desire to be with family
21   members who are already present in the United States,
22   and escalating violence in Central American countries,
23   e.g., violence, street gangs, and drug cartels."  Do
24   you see that?
25       A.  Yes.
```

1      Q.  Did I read that correctly?

2      A.  Yes.

3      Q.  Is it still your opinion today as to the

4   reasons for the increase of unaccompanied minors

5   arriving in the United States border?

6      A.  Those are contributing factors, yes.

7      Q.  Are you aware of any studies or analysis done

8   with respect to the reasons or drivers for the surge

9   of unaccompanied minors at the United States border?

10     A.  Yes.

11     Q.  I'm sorry.  What was your answer?

12     A.  Yes.

13     Q.  Do you recall which studies those were?

14     A.  Many of internal to both -- many of the

15   component agencies within DHS have done either

16   individual assessments based on intelligence that they

17   have, and some of that has been aggregated at the

18   department level by intelligence and analysis

19   components within DHS headquarters.

20     Q.  And when were these analyses done --

21   completed?

22     A.  They've been done iteratively since, you

23   know, really since the end of 2013.  Different

24   organizations have done them at different times.

25   They've updated and refreshed them and added to them

                                          Page 210

1   as either conditions changed or contributing --

2   additional contributing factors were identified.

3        Q.  Are you referring to one single aggregate

4   intelligence report or referring --

5        A.  I'm referring to multiple.  There would have

6   been multiple.

7        Q.  With respect to these analyses, can you tell

8   me at whose direction they were created?

9        A.  I cannot.

10       Q.  Do you contribute to these analysis yourself?

11       A.  Our officers do.  I don't personally.

12       Q.  Is this an annual -- let me break this up.

13  You're referring to multiple reports that would

14  analyze specifically the factors driving the surge of

15  unaccompanied minors -- or the arrival of

16  unaccompanied minors at the United States border?

17       A.  Yes.

18       Q.  Are we talking -- are these reports issued on

19  an annual basis?

20       A.  Not to my knowledge, no.

21       Q.  So one report, I believe you indicated was

22  completed at the end of 2013; is that correct?

23       A.  Yes.

24       Q.  And how about the -- how many reports -- how

25  many other reports are there besides this one?

1      A.  I mean across the USG, I really couldn't

2  comment on the -- that I have read personally probably

3  six or seven, and I --

4      Q.  Oh, USG, U.S. government.

5      A.  I'm sorry.

6      Q.  No problem.

7      A.  U.S. government.

8      Q.  So you were talking about analyses completed

9  not just by DHS but other agencies as well?

10     A.  Yes.

11     Q.  And when was the most recent report that you

12  read, issued or completed?

13     A.  I believe ICE intelligence issued one earlier

14  this year, in 2017.

15     Q.  And are you -- are all these reports

16  housed -- or can be found in the possession of DHS

17  personnel?

18     A.  I don't understand your question.

19     Q.  Do you have possession of these intelligence

20  reports in the possession of your work systems?

21     A.  Some are -- they're all in with one system or

22  another.  Some of them are classified.  They're

23  classified at various levels.  So where they're held

24  depends on how they're classified.

25     Q.  Are they being held within DHS?

1      A.  The ones that I know of within DHS are, yes,

2   housed either within DHS or within one of the

3   components.

4      Q.  Are you aware of whether any of these reports

5   concluded that the DACA program specifically was

6   responsible for the surge of unaccompanied minors to

7   the U.S. border?

8      A.  As I previously stated, these are classified

9   at different levels.  I'm really uncomfortable talking

10  with you in an unclassified environment, and I'm

11  assuming you're not cleared, probably, to read any of

12  these.  So I really can't answer that question based

13  on my obligation as someone with a top secret security

14  clearance.

15     Q.  You presume correctly.  So I will address

16  this issue separately with counsel as necessary, but

17  thank you for that.

18     A.  Thank you.

19     Q.  Now, in addition to the reasons we just

20  identified in your testimony, I believe you made

21  separate conclusions about the reasons for the surge

22  of unaccompanied minors at the border in the

23  declaration that you provided in 2014.

24     A.  Uh-huh.

25     Q.  So if I can take you back to Exhibit 24.

1        A.   Sure.

2        Q.   And I will direct your attention to

3    Paragraph 9 of your declaration --

4        A.   Okay.

5        Q.   -- where it reads, in the second sentence, "I

6    have concluded that implementation of a no bond or

7    high bond policy would significantly reduce the

8    unlawful mass migration of Guatemalans, Hondurans, and

9    Salvadorans."  Do you remember saying that?

10       A.   I do.

11       Q.   Did I read that correctly?

12       A.   Yes, sir.

13       Q.   And with your reference to the migration of

14   Guatemalans, Hondurans, and Salvadorans, are you

15   referring in this declaration to the population of

16   unaccompanied minors that were arriving at the U.S.

17   border?

18       A.   I believe this was specifically addressing

19   families, but I'd have to go back and reread this to

20   see whether this was -- which case this was for.

21            (The witness reviewed the document.)

22            THE WITNESS:  I'll point you to Paragraph 16.

23   This was specifically about family units.

24   BY MR. LEE:

25       Q.   Was this in connection -- was this in

1    connection with the surge of unaccompanied minors in

2    2014 or a wholly separate issue?

3         A.  This is a wholly separate issue.  I mean the

4    surge was concurrent, but this was in support of the

5    use of bonds, bonding mechanisms as a deterrent to

6    family unit illegal migration.  Parents with their

7    children.  Primarily women with their children.

8         Q.  Did you derive this conclusion from the

9    intelligence reports that you've reviewed?

10        A.  In part, yes.

11            MR. LEE:  Okay.  I'm going to take us off the

12   record for a few minutes while I review my notes, if

13   that's okay.

14            MS. DAVIS:  That's fine.

15            THE VIDEOGRAPHER:  We're going off the

16   record.  The time on the video is 4:31 p.m.

17            (A recess was taken from 4:31 p.m.

18            to 4:49 p.m.)

19            THE VIDEOGRAPHER:  We're back on the record.

20   The time on the video is 4:49 p.m.

21   BY MR. LEE:

22        Q.  Mr. Miller, welcome back.

23        A.  Thank you.

24        Q.  You understand you're still under oath?

25        A.  Yes, I do.

1          Q.  I just have a couple of final questions.  I

2    want to go back to the systems discussions we were

3    having and address one other system I'm aware of, and

4    I believe it's called ELIS.  I forgot whether you

5    referenced this yourself earlier.  Is this system

6    E-L-I-S?

7          A.  I have no firsthand knowledge.  I know that

8    it exists, but I've never accessed or used it or just

9    know that it is a CIS system.

10         Q.  Okay.  And you have no understanding of what

11   this system contains?

12         A.  Correct.

13         Q.  Do you have any understanding as to whether

14   ICE officers have any kind of access to ELIS?

15         A.  To my knowledge, no.

16         Q.  Okay.  So it's not that you know they can

17   access it.  You just don't know what it contains.  You

18   don't even know whether any ICE agents can get into

19   ELIS?

20         A.  Correct.

21             MS. DAVIS:  Objection.  Mischaracterization.

22   BY MR. LEE:

23         Q.  Did I mischaracterize your testimony?

24         A.  No.  When I left the field, I don't think

25   ELIS existed.  It came into being when I was at

Page 216

1    headquarters, and to my knowledge, we don't have

2    access to it.

3              MR. LEE:  Okay.  Thank you very much.  I

4    think we can transition quickly to my colleague at

5    Covington & Burling.

6              (Pause in proceedings.)

7

8                   EXAMINATION

9    BY MS. SAXE:

10        Q.  Good afternoon, Mr. Miller.

11        A.  Good afternoon.

12        Q.  Again, my name is Elizabeth Saxe, and I'm

13   with Covington & Burling, and we represent the Regents

14   of the University of California and Janet Napolitano.

15             I would like to go back to a few topics you

16   discussed earlier with Mr. Lee.  I thank you for your

17   patience.  I will do my best not to be too

18   duplicative.

19        A.  No problem.

20        Q.  You described earlier some meetings that you

21   have participated in with OMB; is that correct?

22        A.  Yes, ma'am.

23        Q.  And you testified that a member of President

24   Trump's domestic policy counsel attended some of those

25   meetings; is that correct?

1      A.   Yes, ma'am.

2      Q.   And who was that member of the DPC that

3   attended those meetings?

4      A.   I cannot remember his name.  There's only

5   been two meetings that he's been there.  So I don't

6   remember his name.

7      Q.   And when were those two meetings?

8      A.   One was in, I believe either late May or

9   early June, and the other one was in early October.

10      Q.   You testified earlier that the subject of

11   those meetings with OMB were about the budget

12   formulation on a specific topic; is that correct?

13      A.   Yes.

14      Q.   And what was that specific topic that you

15   were discussing budget formulation for?

16      A.   It's -- the project is called "historic

17   fingerprint enrollment."

18      Q.   And what is that?

19      A.   It's an effort to go back and enroll persons

20   who have had -- we believe have had an enforcement

21   action taken against them under one identity and

22   obtained a benefit under another identity prior to

23   electronic fingerprints being utilized by the

24   department.

25      Q.   And in either of those two meetings that the

1    member from President Trump's domestic policy counsel

2    participated, was there discussion on -- about budget

3    formulation related to DACA or DACA rescission?

4         A.   No.

5         Q.   Next, I'd like to go back to the September 4,

6    2017 conversations that you had with the ICE press

7    secretary.

8         A.   Uh-huh.

9         Q.   And can you remind me again what her name is?

10        A.   Liz Johnson.

11        Q.   And did Liz Johnson call you to discuss your

12   participation in the press briefing?

13        A.   She E-mailed me, and one of her subordinates

14   did call me to try to clarify the confusion between

15   the press event and this Congressional staff event.

16        Q.   And who was the subordinate who called you?

17        A.   Sarah Rodriguez.

18        Q.   What was the confusion between the press

19   event and the Congressional staff event?

20        A.   They wanted me to do both and they were at

21   the same time, and I had the Office of Congressional

22   Relations contacting me to do the staff briefing, and

23   at the same time Liz was contacting me to do the

24   presser.  And different people were on different

25   E-mail chains, and I was the only person on both

1    E-mail chains.  I was trying to figure out which they

2    wanted me to do or if they would move either event.

3         Q.  Who else was on the E-mail chain regarding

4    the press event?

5         A.  I think it was it Liz, Sarah, myself, and

6    then I was corresponding with Mr. Albins and also

7    trying to find someone to cover the press event

8    because I thought they wanted me to do the

9    Congressional event.  And so I added our current

10   assistant director for enforcement, Corey Price.

11        Q.  When you say you were corresponding with

12   Mr. Albins, was that a separate E-mail chain?

13        A.  I forwarded the chain that I had received

14   from Liz to Mr. Albins saying -- finding out which he

15   wanted me to do, and unbeknownst to me, Congressional

16   relations had already reached out to him to find

17   somebody else to do the Congressional because

18   Congressional wanted me to do the press, which led to

19   the confusion because I thought I was doing the

20   Congressional and Corey was doing the press, and

21   actually, Corey was doing the Congressional and I was

22   doing the press.

23        Q.  So did Mr. Albins reply when you forwarded

24   the E-mail?

25        A.  Yes.

Page 220

1      Q.  And what did he say?

2      A.  Essentially that, that he had been dealing

3   with Congressional separately, and that Corey was

4   going to do that.  He wanted me to do the press and

5   have Corey do the Congressional.

6      Q.  Going back to the E-mail chain that you

7   referenced about the Congressional event, who else was

8   on that chain?

9      A.  Ray Covachi, who is the assistant director

10   for Congressional relations.  I know he was on it.

11   Maybe some of the people that work in his office.  I

12   don't recall specifically.  Since I was going to do

13   the press, I kind of dropped off the conversation

14   about the Congressional stuff.

15      Q.  Did you have any discussions with Ms. Johnson

16   prior to the press event about what you would tell the

17   press?

18      A.  That morning we went through the press packet

19   in preparation for the call.

20      Q.  What items were in the press packet?

21      A.  There was a schedule --

22          MS. DAVIS:  I'm going to object.  I think we

23   need to lay some foundation with respect to the press

24   packet to determine if it's deliberative process

25   privileged.

Page 221

1           MS. SAXE:  I'm happy to lay a foundation.  I

2    don't see how it would be subject to the deliberative

3    process privilege considering that a decision was

4    already made and that privilege only applies to

5    predecisional deliberations.

6           MS. DAVIS:  Sure.  The decision I have an

7    issue with is the communication to the public, not the

8    decision for DACA rescission.  So with respect to that

9    decision, talking points or other recommendations may

10   be deliberative process privileged.

11          MS. SAXE:  I'm going to go back to my

12   question, which was what items were in the press

13   packet.  I'm not sure I see how a catalog of the items

14   that were in the press packet could be subject to a

15   deliberative process privilege.

16          MS. DAVIS:  Okay.  If your question is what

17   materials, as in like the title or identification of

18   the materials, then I think that's fine.  I wouldn't

19   object to that.  I think my objection would be to the

20   content of those materials, to the extent that the

21   deliberative process privilege applies.

22          MS. SAXE:  Okay.  Well, why don't we start

23   there.

24      Q.  Mr. Miller, do you recall the specific items

25   that were included in the press packet, the documents?

1      A.  To the best of my recollection, because it

2    was sizable, it had a schedule of events for the day.

3    It had who would be doing which events in terms of

4    assignments of task, and then there were FAQs.  There

5    were suggested RTQs, or responses to questions, and I

6    think, essentially, that was what was in it.

7      Q.  And was the memo from Acting Secretary Duke

8    in the press packet?

9      A.  It may have been.  I knew you would

10   ultimately ask that, and I was trying to recall.  But

11   it was a big packet.  As I think I told your

12   colleague, Mr. Lee earlier, I don't remember if it was

13   in the press packet or we got it subsequent to that.

14   I don't remember the exact time that day that I

15   received it.

16     Q.  Do you recall what events were scheduled for

17   the day?

18     A.  Yes.

19     Q.  And what were those events?

20     A.  Not in any particular order.  This may not be

21   an exhaustive list, but there were certain members

22   that I think Secretary Duke was going to call.  There

23   was the press event that myself and other colleague --

24   DHS colleagues were doing.  There was the

25   Congressional staff notification.  I believe there may

1    have been an IGA call and a governmental affairs call

2    as well.  I wasn't involved in that process at all.

3              I know there was one other call, but we had a

4    scheduling conflict that they wanted me to do, but I

5    couldn't do it and I don't remember the subject of

6    that call.  But I mean it was a lengthy schedule from

7    about 9:30 in the morning until about 3:00 in the

8    afternoon.

9         Q.  Was the press event the only event that you

10   participated in that day?

11        A.  Yes.

12        Q.  Who else participated in the press event?

13        A.  There was a representative from CBP.  I

14   think -- I can't remember if it was Todd Owen or Todd

15   Hoffman, and then I can't remember the gentleman's

16   name from CIS, James.  I can't remember his last name.

17   I always forget his last name.  But we were the three

18   principals doing the majority of the talking, with

19   James doing most of the talking.

20        Q.  And what is James' position with CIS?

21        A.  At that time, he was the acting director.

22   He's currently the deputy director.

23        Q.  Was it James McCament?

24        A.  I'm sorry?

25        Q.  James McCament?

Page 224

1       A.   It may be.

2       Q.   And Todd Owens is with CBP?

3       A.   Yes, office of field operations.

4       Q.   And what is his role?

5       A.   I'm trying to remember his exact title.  They

6    have a much different structure than we do because

7    they have to deal with lawful -- you know, encouraging

8    lawful actions and discouraging unlawful actions.  So

9    they have a rather robust organizational chart.  I

10   don't remember all their specific titles, but

11   essentially, if it was Todd Owen, he is -- I believe

12   he is the deputy over what used to be called

13   "Inspections."  I don't know what they call it, but

14   the people who are operating the airports and seaports

15   that are determining whether or not somebody could be

16   admitted to the United States.

17       Q.   What is Todd Kauffman's role?

18       A.   Todd Hoffman?

19       Q.   Yeah.

20       A.   He's subordinate to Todd Owen.  I just don't

21   remember which of the two Todds was on the call.

22       Q.   Was the press event a call or an in-person?

23       A.   It was a call.

24       Q.   What time of day was it held?

25       A.   I believe it was 9:30 Eastern or thereabouts.

1    It was either 9:30 or 10:00.  I don't remember

2    specifically.

3         Q.  How long did the call last?

4         A.  It was about an hour.

5         Q.  Going back to the other documents that were

6    in the press packet, you said there were FAQs?

7         A.  Yes, ma'am.

8         Q.  Were those the same FAQs that have since been

9    posted on the website?

10        A.  I'd have to compare the two.  Like I said, I

11   didn't review the press packet beforehand, and the

12   first time I've read the CIS FAQs is when your

13   colleague gave them to me today.

14        Q.  And you weren't involved in drafting those

15   FAQs?

16        A.  No, ma'am.

17        Q.  You said there were also suggested responses

18   to possible questions from the press included in the

19   press packet?

20        A.  Yes.

21        Q.  Were you involved in drafting those?

22        A.  No.

23        Q.  Do you recall what the expected questions

24   from the press were that were described in those RTQs?

25             MS. DAVIS:  Objection with respect to

1  privilege, deliberative process privilege.  As I

2  explained, the suggested RTQs seem to be

3  recommendations with respect to public statements,

4  and, you know, as being predecisional to any

5  statements, I think that they are properly privileged,

6  and I'm going to instruct him not to answer unless you

7  have questions with respect to public statements that

8  he actually made that day.

9          MS. SAXE:  I disagree with your assessment

10  that the deliberative process privilege applies.  By

11  your definition, that privilege would encompass

12  essentially every action or communication or piece of

13  work product that the government prepares, and I don't

14  think that that is within the scope of that privilege.

15          I also don't think that because these

16  suggested responses were responses to questions that

17  would be coming from the press and published to the

18  public, the privilege could apply.

19          Are you instructing your client not to

20  answer?

21          MS. DAVIS:  I would instruct him not to

22  answer with any other information than what was

23  publicly said on that call that day.

24  BY MS. SAXE:

25      Q.  Are you choosing not to answer?

1      A.  Yes.

2      Q.  Do you recall specific questions that you

3  received from the press that day?

4      A.  Yes.

5      Q.  What specific questions do you recall?

6      A.  I recall being asked what is the process for

7  the issuance of a notice to appear.  We went through

8  that process.  I was asked about are there any plans

9  to take enforcement action against people whose

10  benefits expire during the course of the maturation,

11  that two-year period, which there are no plans.  And

12  we were asked if that would change after March 6, and

13  I told them that we have no plans for anything after

14  March 6.  I believe those were the focus of the

15  questions of me, or at least the questions that were

16  referred to ICE.

17      Q.  What was the process for the issuance of a

18  notice to appear that you walked through with the

19  press?

20      A.  I told them that generally, our encounters

21  are in a custodial environment.  The officer will

22  interview the suspected illegal alien, or person who's

23  violated their status.  If they determine alien

24  removability, which is our two prong test for probable

25  cause, then they'll continue with a complete

1    interview.  They'll generate the appropriate charging

2    document, send it for supervisory review, along with

3    their arrest report, where they lay out more

4    specifics, and if a supervisor concurs with the

5    officer's conclusions, the notice to appear will be

6    issued.

7            If the person is amenable to detention, he or

8    she will be taken to detention.  Otherwise, they'll be

9    assessed for the appropriate form of supervised

10   release and placed in a nondetained setting to proceed

11   with immigration court.

12       Q.  Did you describe to the press any changes to

13   that process for a notice to appear that would occur

14   as a result of the rescission of DACA?

15       A.  I don't recall if that question was asked of

16   me.

17       Q.  Are there any changes to the process for a

18   notice to appear as a result of the rescission of

19   DACA?

20       A.  In terms of the way I described it in a

21   custodial setting, no.

22       Q.  The next question you were asked by the press

23   was whether there were any plans to take enforcement

24   action against DACA recipients; is that correct?

25       A.  Yes.

1        Q.   And your response was that there were no such

2    plans to take such enforcement action?

3        A.   That's correct.

4        Q.   And the third question was whether there are

5    any plans to take enforcement action after March 6; is

6    that correct?

7        A.   Yes.

8        Q.   March 6, 2018, I should say.

9        A.   Correct.

10       Q.   And your response there was, again, there

11   were no plans to take such enforcement action after

12   March 6, 2018?

13       A.   Correct.

14       Q.   Did the press ask you any other questions?

15       A.   Not that I recall.

16       Q.   Did you make any other statements other than

17   those three that you described to me?

18       A.   I made an opening statement, yes.

19       Q.   What did you say in your opening statement?

20       A.   To the best of my recollection, essentially,

21   for ICE enforcement removal operations, nothing has

22   changed.  Those persons who have the benefit of DACA

23   keep the benefit of DACA unless, you know, they

24   demonstrate that they're a public safety or national

25   security threat, at which time if we conclude that

Page 230

1    they are, we'll issue a notice to appear, and that

2    benefit will be terminated by CIS.  That's not a

3    change to anything since the program's inception.

4         Q.  Did you make that opening statement based

5    upon written notes or a written statement?

6         A.  No.  I just -- you know, that was my opening

7    statement.  Each of the three of us made an opening

8    statement.

9         Q.  You said earlier that prior to the press call

10   you sat down with Ms. Johnson to go over the press

11   packet; is that correct?

12        A.  Yes.

13        Q.  And were -- did Todd and James also

14   participate in that conversation?

15        A.  No.

16        Q.  Did you discuss with Ms. Johnson the fact

17   that you would be making an opening statement?

18        A.  Yes.

19        Q.  Can you tell me about that discussion?

20        A.  She asked me if I had any questions after,

21   you know, reviewing the press packet, and I didn't.

22   And she asked me what I thought, and I said,

23   "Essentially, this isn't a change for us," that the

24   people who have DACA have DACA.  People who don't have

25   DACA, if encountered, they would be amenable to being

1    charged as present without admission.  Nothing has

2    changed essentially for us on that day.

3         Q.  Did Ms. Johnson tell you that you would be

4    asked to give an opening statement?

5         A.  Yes.

6         Q.  Did she discuss with you or make suggestions

7    about the content of that opening statement?

8         A.  I told her what I just told you now, and she

9    was fine with that.

10         Q.  Do you recall specific questions that the

11   press had for whichever Todd it was from border patrol

12   that was at the press event?

13         A.  It wasn't border patrol.  It was office of

14   field operations.

15         Q.  Thank you.  Do you recall specific press

16   questions for Todd?

17         A.  Yes.

18         Q.  What questions do you recall?

19         A.  They were asking questions about the

20   adjudication, advance parole for people who are either

21   out of the country or may seek advanced parole because

22   of their DACA benefit.  They were most concerned about

23   coming into the holiday season.

24         Q.  Do you recall Todd's response to those

25   questions?

1      A.   In general terms, the people who seek

2   advanced parole or obtain advanced parole from USCIS,

3   they're always subject to inspection upon return.  And

4   if -- you know, if -- just having a grant of advanced

5   parole doesn't guarantee anyone a right or a privilege

6   to be paroled into the United States after returning

7   from a foreign departure, and he clarified that point

8   but said in terms of the folks who were out, they were

9   going to continue to recognize that advanced parole

10  and make individual case-by-case decisions.

11          I believe there was a point at which they

12  were no longer going to take applications for advanced

13  parole, but I don't recall -- when he articulated that

14  for the press, I don't recall the specifics of when

15  they were going to stop -- or stop giving advanced

16  parole for DACA recipients.  I know that was

17  discussed.

18      Q.   Do you recall any other questions that were

19  asked of Todd?

20      A.   I do not.

21      Q.   Do you recall any questions that were asked

22  of James?

23      A.   He was asked several, but to be honest, I

24  wasn't really paying close attention because his were

25  very specific about the administration of the program,

1    and I just wasn't, you know, listening to that.  I was

2    dealing with other things.

3        Q.  Do you recall any of the information that

4    James provided about the administration of the

5    program?

6        A.  In general terms, he was reviewing the dates

7    and kind of laying down, you know, what was going to

8    be required for renewals at what point in time.  At

9    what point in time -- there were questions about items

10   received, but he was laying out like if an application

11   comes in but isn't adjudicated prior to certain dates,

12   and what would be returned to the applicants and going

13   through, like, very specifics of the adjudicative

14   process.  Since we're not involved in that process, I

15   wasn't really paying close attention it his answers.

16       Q.  The suggested responses to press questions

17   that were included in the press packet, were those

18   suggested responses to questions that would be asked

19   specifically of ICE, or did they cover broader topics

20   that might have been asked of James and Todd?

21       A.  It was everything.  It came down from the

22   department.  They were very broad.

23       Q.  Do you know who drafted those?

24       A.  I do not.

25       Q.  Were there questions with suggested responses

1  that the press did not ask in that press event?

2      A.  Possibly.  I mean it was a lengthy document.

3      Q.  How lengthy?

4      A.  I think the total document was over 30 pages.

5  I mean I don't remember specifically each part of it,

6  how long it was.

7      Q.  Was that 30 pages the entire press packet?

8      A.  Yes.

9      Q.  Is there anything else about that press call

10  that you haven't told me about so far?

11      A.  No, ma'am.

12      MS. SAXE:  Thank you for your time.  I don't

13  think I have further questions.

14      THE WITNESS:  No problem.  Have a nice day.

15      MR. LEE:  I think we're ready to go off the

16  record.

17      THE VIDEOGRAPHER:  We're going off the

18  record.  The time on the video is 5:18 p.m.

19      (A recess was taken from 5:18 p.m.

20      to 5:23 p.m.)

21      THE VIDEOGRAPHER:  We're back on the record.

22  The time on the video is 5:23 p.m.

23      MS. DAVIS:  I have no questions for the

24  witness.

25      MR. LEE:  Thank you, Counsel.  And for the

1   record, before we adjourn, I'd like to state for the

2   record that based on the pending resolution with

3   respect to Judge Alsup's order yesterday, that

4   plaintiffs in these related actions reserve the right

5   to renotice the deposition of the witness in order to

6   ask questions related to the deliberative process

7   privileges that you've asserted today.

8           MS. DAVIS:  Okay.  And as we discussed,

9   defendants reserve their right to seek relief from

10  that order.

11          MR. LEE:  Of course.  Thank you, Counsel.

12          THE VIDEOGRAPHER:  We're off the record at

13  5:24 p.m.  And this concludes today's testimony given

14  by Philip Miller.  Total number of media units used

15  was three and will be retained by Veritext Legal

16  Solutions.

17          (Witness excused.)

18          (Deposition concluded at 5:24 p.m.)

19

20

21

22

23

24

25

Page 236

1                 C E R T I F I C A T E

2          I do hereby certify that the aforesaid testimony

3     was taken before me, pursuant to notice, at the time

4     and place indicated; that said deponent was by me duly

5     sworn to tell the truth, the whole truth, and nothing

6     but the truth; that the testimony of said deponent was

7     correctly recorded in machine shorthand by me and

8     thereafter transcribed under my supervision with

9     computer-aided transcription; that the deposition is a

10    true and correct record of the testimony given by the

11    witness; and that I am neither of counsel nor kin to

12    any party in said action, nor interested in the

13    outcome thereof.

14

15               Nancy J. Martin, RMR, CSR

16

17    Dated:  October 19, 2017

18

19

20

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying shorthand reporter.)

25

1                     INSTRUCTIONS TO WITNESS

2

3            Please read your deposition over carefully

4       and make any necessary corrections. You should state

5       the reason in the appropriate space on the errata

6       sheet for any corrections that are made.

7               After doing so, please sign the errata sheet

8       and date it.  You are signing same subject to the

9       changes you have noted on the errata sheet, which will

10      be attached to your deposition.  It is imperative that

11      you return the original errata sheet to the deposing

12      attorney within thirty (30) days of receipt of the

13      deposition transcript by you.  If you fail to do so,

14      the deposition transcript may be deemed to be accurate

15      and may be used in court.

16

17

18

19

20

21

22

23

24

25

Page 238

1             ACKNOWLEDGMENT OF DEPONENT

2

3           I hereby declare under penalty of perjury

4     that I have read the foregoing transcript of my

5     deposition and except for any corrections or changes

6     noted on the errata sheet, I hereby subscribe to the

7     transcript as an accurate record of the statements

8     made by me.

9

10

11     _____

12     PHILIP T. MILLER

13

14     _____

15     DATE

16

17

18

19

20

21

22

23

24

25

Page 239

1                    **E R R A T A   S H E E T**

2       IN RE:  REGENTS OF THE UNIVERSITY OF CALIFORNIA

3               vs. U.S. DEPARTMENT OF HOMELAND SECURITY

4       DATE:  10/18/2017

5       PAGE    LINE                    CORRECTION AND REASON

6       _____   _____   _____

7       _____   _____   _____

8       _____   _____   _____

9       _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23

24      _____   _____

25      (DATE)                    PHILIP T. MILLER

[& - 3]

| & | | |
|---|---|---|
| **&**   1:21 2:10,16 6:25 7:18,19 216:5,13 | | |

**0**

**05211**   1:5

**1**

**1**   6:13 22:12 28:13 90:13 133:9 142:24
**10**   19:15
**10/18/2017**   239:4
**101**   39:25 47:18
**10271**   3:11
**1050**   1:22 2:18 6:25
**10:00**   225:1
**10:10**   53:13
**10:12**   53:18,19
**10:26**   53:20,22
**1121**   3:4
**11:20**   90:13,15
**11:29**   90:16,19
**11:40**   98:12,13
**11:43**   98:14
**11:54**   98:16
**11th**   36:10,12
**12**   93:16
**120**   3:11
**12:20**   117:10
**12:21**   117:14,15
**12th**   4:10
**13**   19:21 37:15
**130**   201:4
**14**   5:22 29:12 76:22 163:4,5 192:22 194:20
**14th**   3:4
**15**   84:23 85:4 93:16 170:10

**1515**   2:5
**158**   5:12
**16**   5:17 19:25 213:22
**163**   5:22
**169**   5:14
**17**   1:5 19:25 85:6 143:12
**18**   1:17 6:1,5 81:25 82:9,13,14
**19**   193:1,2 194:20 236:17
**1992**   27:11
**1996**   27:16 136:16 180:25
**1:20**   117:16,18

**2**

**2**   5:15 28:13 37:16 45:20 90:18 131:12,20,21 132:12 134:1 146:2,23 161:16 173:12 174:15
**20**   4:4 17:22 74:10 130:16 138:12 144:2
**200**   3:4
**2000**   73:12
**20001**   2:12
**20005**   3:5
**2003**   21:1,11,12
**20036**   2:18 7:1
**2004**   21:18
**2005**   21:18
**2007**   85:4 135:1 143:11 206:23
**2009**   18:16 26:18
**2010**   19:15 50:18
**2012**   17:19 50:14 83:17 87:1,4,19 88:12 91:15 92:12

93:16 163:15,22 165:18 170:10 192:19,24 193:16 196:10
**2013**   19:20 26:14 26:18 27:1 40:13 50:19 64:21 209:23 210:22
**2014**   23:3 64:22 71:15 73:13 74:10 76:24 77:16 129:11 130:22 212:23 214:2
**2015**   5:10 23:13 26:4,14 64:22 207:23
**2016**   20:2,7
**2017**   1:17 5:16,17 6:1,6 20:2,3,9 21:25 28:9 50:22 77:18 84:23 94:11 96:7 98:22 100:4 106:25 109:23 110:24 114:18 123:21 130:16 131:3 143:12 144:2 157:18 158:15 159:22 161:9,11,23 166:13 169:15 195:11 196:10 205:23 211:14 218:6 236:17
**2018**   177:2 229:8 229:12
**202**   2:12,19 3:5,17 4:5,12
**205**   5:16
**20528**   3:17
**20530**   4:4

**20536**   4:11
**21**   28:24 40:18 204:1
**2100**   2:6
**212**   3:12 131:20
**216**   5:4
**22**   5:8,8 22:9,14
**23**   5:9,9 22:25 23:8,15 207:22 208:13
**235**   131:20
**237**   131:20 144:20 144:22 146:7
**238**   110:16
**24**   5:11,21 27:18 27:20 28:14 40:18 40:25 83:24 204:7 212:25
**240**   110:20
**25**   5:12,16,17 158:7,8 194:2,21 205:23
**251**   93:5
**256**   93:6
**26**   5:14 169:7,9 170:5 171:6
**27**   5:11,16 205:20 205:22
**285**   28:25
**29**   110:24
**2:40**   174:16,17

**3**

**3**   5:11 28:13 37:16 73:25 74:3,15 93:4 110:13,19 116:10 129:19 131:20 132:14 136:21 137:2,23 139:3,6 161:16 174:20 197:24 198:2

[3-1/2 - action]                                                                 Page 2

**3-1/2**   12:16
**30**   22:12 234:4,7
  237:12
**305-7583**   4:5
**395**   29:13 58:1
**3:00**   223:7
**3:02**   174:18,21
**3:13**   182:16,17
**3:17**   182:18,20
**3:42**   197:9,10

**4**

**4**   12:16 100:4
  112:1 129:19
  131:21 132:16
  140:5 141:7,11,23
  142:4 145:19
  146:18 147:20
  148:13,20 149:25
  150:20 198:3
  218:5
**416-8534**   3:12
**447-3891**   3:17
**470-6412**   3:5
**4:02**   197:11,13
**4:31**   214:16,17
**4:49**   214:18,20

**5**

**5**   91:16 93:21
  100:14,21,23
  101:1,23 109:13
  109:17 112:20,24
  113:20 114:23
  116:21 117:1
  129:23 132:19
  142:2,2,16 144:15
  151:9 153:3,8
  158:15,22 164:20
  165:2,11 166:5,8
  168:5 170:14
  177:2 197:4

**204:10**
**500**   4:10
**510**   2:7
**5900**   4:11
**5:18**   234:18,19
**5:23**   234:20,22
**5:24**   235:13,18
**5th**   36:10,12

**6**

**6**   5:8,10 115:6
  116:22 131:20
  132:21 153:19
  169:15 227:12,14
  229:5,8,12
**662-5367**   2:12

**7**

**7**   5:10,13 23:13
  28:9 132:24 154:2
  154:8,13 155:1
**732-5018**   4:12

**8**

**8**   5:3 194:4,5,20
**850**   2:11
**879-0094**   2:7

**9**

**9**   5:21 24:14,18
  25:2 48:3 86:18
  159:2,4 163:11
  164:2,4 213:3
**94612**   2:6
**955-8500**   2:19
**96**   136:13
**9:00**   113:10
**9:06**   1:23 6:2,5
**9:29**   24:9,10
**9:30**   24:11,13
  113:6,7 223:7
  224:25 225:1

**9th**   36:9 55:23

**a**

**a.m.**   1:23 6:2,5
  24:9,10,11,13
  53:18,19,20,22
  90:13,15,16,19
  98:12,13,14,16
**aberengaut**   2:13
**ability**   10:6 32:14
  41:23 56:10
  143:21 176:15
  188:15
**able**   10:2 12:6
  33:10,12 103:9
  146:8 188:18
  190:1,7 199:6
  200:3
**absent**   171:18
**absolutely**   81:7
  89:4 98:10 139:8
  185:18 201:22
**abuse**   142:2,16
  143:2 144:12
  151:10,15 153:5
  180:8
**abused**   132:19
**abusing**   142:20
**acceptable**   86:16
**accepted**   171:16
**access**   15:5 33:19
  178:17,20,23
  179:2,15,16 180:2
  180:14,18 181:1,3
  181:6,8,17,19
  182:4 186:4,6
  188:11,11,14
  192:6,14 199:5,6,8
  199:10,17,24
  200:4 201:21,23
  202:7,9,14,18,20
  203:9,10 215:14

**215:17 216:2**
**accessed**   180:9
  182:25 215:8
**accesses**   181:10
**accessing**   183:11
  191:5
**accommodate**
  12:7
**accord**   135:16
**account**   14:2 82:4
  203:6
**accurate**   23:11
  142:18 237:14
  238:7
**achieve**   54:23
**achieved**   174:2
**acknowledging**
  136:17
**acknowledgment**
  238:1
**aclu**   118:1
**acquired**   200:11
**acronym**   30:3
  32:3,20,25 55:15
  178:24 197:21,23
**act**   32:6 78:22
  131:21 162:1
  206:10
**acting**   1:10 6:19
  48:8,10 49:13
  75:16,17,18 76:1,2
  92:2 93:11,12
  105:16,18,24
  106:6 116:13,23
  117:7 169:16
  170:9 172:5 222:7
  223:21
**action**   5:13 7:7
  13:10 30:9 78:14
  78:16,17 84:17,18
  84:19 86:23 89:1

103:4 120:10
122:8,24 123:7
124:10 155:8,20
158:14 159:5,8,11
159:12 160:10
161:6 167:23
171:18 173:14,17
173:22 177:10
188:21,23 191:22
196:23 200:15
217:21 226:12
227:9 228:24
229:2,5,11 236:12
**actions** 88:20
102:25 124:4
126:2 176:8,23
177:1 197:2 224:8
224:8 235:4
**active** 14:1 156:4
**activities** 40:24
**acts** 132:14 134:12
134:18 135:23
161:16
**actual** 45:16 46:4
80:8 105:9
**ad** 115:8
**adam** 94:23,24
**adapt** 41:23
**added** 209:25
219:9
**addition** 53:8
212:19
**additional** 68:18
82:11 167:20
168:14 203:10
210:2
**additionally** 132:8
**address** 131:11
184:21 212:15
215:3

**addressed** 22:4
60:20
**addresses** 125:18
**addressing** 213:18
**adjourn** 235:1
**adjudicate** 150:2
150:11
**adjudicated**
233:11
**adjudicating**
186:23
**adjudication**
85:23,23 187:17
187:19,23 231:20
**adjudicative** 150:5
189:8 233:13
**adjudicator**
186:22 187:12,14
**adjusted** 202:3
**adjustment**
201:24 203:17
**administer** 7:6
101:4,5
**administration**
50:21 51:21 52:3
52:5,8,20 53:1,3,6
53:11 59:5 61:17
63:9,24 64:18,25
65:23 66:14 70:9
76:7 78:21 107:21
108:3,8 120:4,5,8
120:13,20,24
122:21 232:25
233:4
**administrations**
70:5 78:24
**administrative**
18:7 74:1 93:4
129:8 136:9
**administratively**
34:20

**admission** 146:2
157:3 231:1
**admitted** 145:8
224:16
**advance** 181:5
231:20
**advanced** 231:21
232:2,2,4,9,12,15
**advisor** 4:10 17:7
41:19 43:3 49:15
77:9,10 94:16,20
108:6
**advisors** 72:19
**advocate** 33:17
**affairs** 52:12 59:8
100:1 223:1
**affiliation** 154:19
155:6,16
**affiliations** 7:10
**affirmed** 8:17
**aforesaid** 236:2
**afternoon** 197:16
216:10,11 223:8
**ag** 139:16
**ag.ny.gov** 3:12
**agencies** 67:14
111:18 126:17
188:3,9 195:20
209:15 211:9
**agency** 43:14
67:18 68:13 71:23
78:20 132:18
136:7 140:7,16,16
140:17 142:6,9,11
147:23 150:25
177:20 178:14,25
181:15 182:10
198:8
**agent** 20:21 135:4
135:15 152:15
160:1 162:14

171:13 173:13,15
173:16,21 181:9
**agents** 29:20 90:6
114:13 169:17
199:23,24 215:18
**aggregate** 119:6
119:11,22 122:22
210:3
**aggregated** 209:17
**agree** 6:12 79:2,5
79:6,20,23 81:3
165:20,22 170:12
170:21 176:11
192:17
**agreement** 21:16
**ahead** 43:12 73:24
137:20
**aid** 25:13
**aided** 236:9
**air** 29:10
**airport** 29:12
**airports** 224:14
**al** 3:13,13
**alabama** 21:17
28:24
**albence** 47:25 50:1
50:9,20
**albins** 78:3,10
102:5,18 103:1
105:15 158:3
219:6,12,14,23
**alert** 10:14
**alex** 3:9 8:2
**alex.finkelstin**
3:12
**alexandria** 29:11
**algins** 116:4
**alien** 33:17 63:4
88:23 89:7,9,23
103:22 125:13,23
145:4 178:7 179:5

184:14 200:16
227:22,23
**aliens**   29:17 31:7
104:5 131:19
132:3,10 177:7,13
**align**   40:3
**aligned**   96:13
106:5
**allegation**   180:8
**allegations**   32:4
**alleging**   168:25
**allow**   37:3 41:23
76:6 156:24 164:9
188:15
**allowable**   97:15
**allowed**   79:9
150:14 151:3
156:7
**allows**   57:12 78:25
186:18
**alsup**   10:14
**alsup's**   10:15
97:14,24 235:3
**ambiguous**   56:24
**amenable**   131:9
132:4 149:11
152:9 155:7
156:18 157:3
177:10 196:4
228:7 230:25
**amended**   95:23,25
**amendment**   96:19
97:5,12 98:24
99:4,9 100:6
**american**   208:22
**amount**   76:15
81:9 110:14
**analog**   174:8
**analogy**   34:19
**analyses**   152:20
209:20 210:7

211:8
**analysis**   89:19
90:1,4 92:7
128:19 209:7,18
210:10
**analyze**   207:14
210:14
**animatronically**
37:7
**announced**   85:13
**announcement**
163:16 192:25
**annual**   210:12,19
**answer**   10:9 11:13
11:19 18:5 37:9
37:18 59:16 60:17
62:23 63:1 64:7
69:24 72:1 96:3
96:24,25 97:20,21
98:2 101:7 109:8
121:5 124:15
143:20,23 159:7
160:15 161:20
164:8 167:1,12
193:5 194:8
199:20 203:5
209:11 212:12
226:6,20,22,25
**answered**   28:4
151:17 162:16
**answers**   11:10
233:15
**anticipate**   12:6
**anybody**   62:7
97:24 101:25
150:25 186:7
204:11 205:13
**anymore**   143:15
**apart**   138:10
**apartment**   117:25

**apologies**   85:8
**apologize**   44:19
51:24 73:19 74:22
126:22 142:4
147:12 170:4
171:4 193:22
**appealing**   31:11
**appear**   25:5 28:8
31:21 143:16
193:10 227:7,18
228:5,13,18 230:1
**appearance**   7:12
**appearances**   7:10
**appearing**   22:17
31:8
**appears**   27:3
169:8,14 170:12
170:16,18
**applicable**   37:24
145:16
**applicant**   184:5
**applicants**   189:5
233:12
**application**   36:6
100:25 130:25
171:15 185:9,13
198:19,20 199:2
201:5 233:10
**applications**   85:24
150:6,12 187:16
189:4 198:11,12
198:13,22 232:12
**applied**   78:22
100:14,23
**applies**   122:12
221:4,21 226:10
**apply**   42:7 60:22
101:1,24 136:10
166:15 185:15
226:18 236:22

**applying**   80:3
145:13
**appreciate**   32:22
**apprehend**   79:13
**apprehended**
164:14 165:5,14
166:3,17 167:14
168:4
**apprehending**
29:20 82:24
**apprehension**
29:16 74:11
**approach**   108:24
149:2
**approached**   191:2
**appropriate**   14:13
115:10 122:10
159:13 173:15
228:1,9 237:5
**appropriators**
43:9
**approval**   141:25
160:8 181:2 186:7
**approvals**   35:24
**approved**   43:18
201:4
**approximately**
28:25
**april**   5:16,16
50:19 94:11
205:23
**ar221**   74:6 129:11
**ar229**   130:13
**ar238**   110:20
**ar251**   93:6 116:11
**archived**   15:13
163:20
**archives**   13:15,23
13:25 14:2,12,25
14:25 15:4,12,15
16:5 127:21,22

**area** 28:22 30:18
**areas** 95:15
**arkansas** 28:24
**army** 27:11
**arnold** 4:9 8:7,7
 98:5
**arose** 59:11
**arrears** 82:9
**arrest** 34:13 80:16
 103:17 118:15
 131:10 137:12,15
 139:7 153:11
 155:7 157:3
 168:13 177:10
 179:17 185:13
 200:12 228:3
**arrested** 103:7,8
 103:24 104:5
 105:3 119:17
 137:25 138:5
 167:19
**arrestees** 168:12
**arresting** 80:13
 143:15 177:7
**arrival** 210:15
**arrivals** 5:13
 13:10
**arrive** 135:22
**arriving** 208:6
 209:5 213:16
**articulate** 156:13
 172:24 173:4
**articulated** 109:15
 232:13
**articulation** 57:12
**aside** 23:19 28:17
 77:17
**asked** 41:12 47:12
 51:5 69:7 82:6,14
 91:25 99:18
 102:19,24 104:24

107:18 111:12
113:14 115:9,11
119:5 120:9,14,24
121:6,13,14 123:5
124:20 151:17
158:15 192:23
193:24 227:6,8,12
228:15,22 230:20
230:22 231:4
232:19,21,23
233:18,20
**asking** 97:6 101:3
 102:17 124:14
 143:10,11,19,21
 144:7 149:5
 151:21 152:5
 165:21,21 171:2
 203:5 231:19
**asks** 164:4 193:2
**aspect** 40:19 88:15
 107:3 113:23
**aspects** 82:24
 87:21 90:5,25
 114:1,3 157:5
**asserted** 235:7
**assessed** 228:9
**assessing** 143:18
**assessment** 30:23
 141:16 143:1
 162:23 167:22
 226:9
**assessments**
 137:17 209:16
**assign** 189:9
**assignments** 222:4
**assist** 3:9 114:13
**assistant** 13:15,21
 14:17 16:2 23:2
 25:23 26:7,10,24
 27:4 38:16 40:12
 40:21 44:10,15,24

45:16,19 48:9,15
48:18 54:8 55:3
58:10,17 60:9
65:9,10 69:10
70:17 72:9 73:7
92:2 99:25 104:11
118:5 127:6 130:9
167:8 219:10
220:9
**associate** 4:10
 25:16,25 26:1
 27:5 43:2 44:17
 44:20 48:16,17
 49:18,23 50:13,21
 51:13 52:1,23
 54:9 72:12 105:21
 144:5 158:2
**associated** 102:24
 103:3 126:2
 140:20 143:6
 144:19 146:12
 185:20 191:17,19
 201:25
**association** 86:25
**asst** 3:16 4:3
**assume** 11:13 68:7
 124:24 180:21
**assumed** 27:1
**assuming** 187:22
 212:11
**assumption** 80:21
 202:6
**attached** 197:24
 237:10
**attachments** 112:7
**attempt** 13:13
 14:17
**attendance** 67:3
 76:12
**attended** 65:13,17
 76:12 216:24

217:3
**attends** 65:6 67:3
**attention** 140:22
 163:11 164:1
 213:2 232:24
 233:15
**attorney** 2:4,10,17
 3:3,9,9 7:13,15
 8:3,3 12:20 33:19
 36:2 93:10 94:13
 95:13,14 96:2,21
 97:9 111:1,1
 116:12 135:10
 142:13 143:17
 237:12
**attorney's** 39:7
 46:7,10,12 135:9
 136:8
**attorneys** 12:19
 17:1,3 30:16 36:3
 40:6 46:14 75:15
 110:25 134:22
**audible** 11:10
**audio** 6:10,10
**august** 27:16 28:9
 180:25 204:1,7
**authenticate** 192:2
**authority** 34:23
 54:21 56:23
 136:18 139:10
 140:20 143:4
 144:17 145:21
 146:6,12,15
 147:14,16 148:1
 150:7,24 151:11
 151:15 153:4
 156:15 159:10
 179:4 195:19
**authorization**
 84:20 86:10,13
 178:12 183:14,19

201:3
**authorized** 7:5
**availability** 99:18
112:10,14
**available** 31:25
155:9 168:11,11
169:3 179:19
184:15,18 198:25
**avenue** 1:22 2:18
4:4 6:25
**avoid** 11:6 88:6
**aware** 21:25 36:9
67:12 79:12 85:1
85:13,19 86:3,12
91:17,20,23 102:2
102:5,8 107:14
109:21,24 110:1
111:11,14 113:12
116:6 124:21,24
127:8 128:11
153:16 157:11,23
173:20 191:1,4
192:15 196:17
204:1,5,9 205:8
209:7 212:4 215:3

**b**

**b** 5:6,12 22:12
131:20 146:2,23
**back** 21:1 22:9,21
24:12 25:9,11
34:19 41:8 48:2
49:17 53:21 59:2
65:18 87:19 90:17
93:3 98:15,21
101:22 108:22
110:13 112:17
116:10 117:17
118:12 129:7,10
137:11 138:5
139:2,9 142:4
143:14 145:19

151:9 156:25
159:20 160:15
173:11 174:23
176:11 180:9
181:15 182:1,2,19
192:21 196:8
197:12 202:25
203:16,21 207:22
212:25 213:19
214:19,22 215:2
216:15 217:19
218:5 220:6
221:11 225:5
234:21
**background** 23:25
48:13 85:21,25
**bad** 200:6,7,19,22
**baker** 38:18
**balance** 200:6,18
**ballpark** 21:2
**based** 14:14 31:2
32:7 34:11 56:3
79:4 81:1 82:8
86:21 91:12
136:24 141:16
144:15,15 148:24
149:11 153:8
155:8 159:24
181:13,23 186:2
198:4 209:16
212:12 230:4
235:2
**baseline** 146:3
203:8
**basic** 198:18 199:7
**basically** 40:8
88:18 178:6
**basis** 37:23 96:2
96:21 107:8
120:17 132:9
150:20 159:22

164:13 165:4,13
166:1,16 196:23
197:1 204:15
210:19
**batalla** 3:6 8:1
**bates** 74:5 93:5
110:15
**bed** 82:23
**beginning** 1:23
7:13 29:2 60:5
71:4 72:9 89:16
90:18 115:6
120:19
**begins** 174:20
**behalf** 7:15,18,20
7:23 195:9
**behavior** 56:4
138:8
**behaviors** 56:9,23
56:25 57:2,11
**believe** 17:10,14
17:17 19:5,14
21:12 23:16 24:20
39:14 50:18 62:20
63:19 65:21 73:13
85:7 91:21 112:9
115:17 118:4,24
119:14 120:2
124:20 125:9,17
128:25 130:7
158:20 164:18
167:13 168:7
175:15 187:17,19
193:24 210:21
211:13 212:20
213:18 215:4
217:8,20 222:25
224:11,25 227:14
232:11
**believed** 168:3

**believes** 141:16
143:2 161:15
162:1
**beltway** 41:7
**beneath** 26:1
**beneficiaries**
114:14 118:16
122:23 124:4,9
168:21,22 183:6
189:22 190:23
192:11 194:23
**beneficiary** 86:6
166:11 185:20,22
**beneficiary's**
185:17
**benefit** 11:24
88:25 89:17
114:25 142:12
150:5,11 156:3,8
156:19,24 157:1
161:8 166:9 173:9
175:22 177:10
183:12,21 191:24
198:11,12 217:22
229:22,23 230:2
231:22
**benefits** 18:1 86:8
93:14 132:20
142:3,17,21
144:13 151:11
153:6 175:12
178:9 187:16
189:5 191:21
198:14 200:9,24
201:15,17 227:10
**best** 11:8 12:1
36:16 38:7 42:18
83:23 101:22
102:1 106:16
108:4 118:20
133:20 143:21

186:1 216:17
222:1 229:20
**better** 40:2,3
54:23 56:17 57:9
57:10,11,21 123:5
179:10 200:7
208:19
**beyond** 114:23
181:1
**bifurcated** 30:5
199:22
**big** 222:11
**binding** 196:1
**biographic** 178:8
198:18
**biometric** 85:20
**birth** 184:22
**bit** 23:25 31:5 34:1
40:21 42:5,24
52:12,14 54:5,19
56:22 71:22 75:8
83:11 135:14
175:7 176:11
177:14 184:18
**blank** 49:9,10,11
106:11,14
**block** 106:12
**bond** 20:25 21:9
21:19 213:6,7
**bonding** 214:5
**bonds** 214:5
**booking** 138:23
**books** 79:8
**border** 23:4 47:14
64:20 70:20 76:19
82:12 123:9,21
169:16 174:5
179:17 208:7
209:5,9 210:16
212:7,22 213:17
231:11,13

**bottom** 48:23
**box** 26:9 100:2
**branch** 8:9
**break** 12:3,5 53:15
90:10 108:13
174:11 175:1
197:7 210:12
**breaking** 117:10
**breaks** 12:7
**brief** 53:14
**briefing** 112:11
113:4,5 218:12,22
**briefings** 22:7
41:2,3
**bright** 148:5,7
150:1,23
**bring** 13:3 145:7
**brings** 153:1
**broad** 41:22 42:5
47:21 233:22
**broadcasts** 42:22
**broader** 54:19
55:16 233:19
**broadly** 37:24
129:20 145:15
**broadway** 3:11
**broke** 188:3
**broken** 119:8,10
**brought** 84:14
**budget** 66:11,11
66:24,25 67:7,8
79:18,19 81:13,16
82:3,7,8,16,22
83:2 180:16
207:18 217:11,15
218:2
**budgetary** 43:7
79:4,9 207:16
**bullet** 136:21
139:3,6 141:7,11
141:23 142:2,24

144:15 146:18
147:2,20 148:13
148:20 150:20
153:9 154:8
161:15
**bullets** 141:8
147:15 152:16
**bunch** 112:17
**burden** 144:22
146:7
**bureau** 2:4 3:10
29:4,5
**burling** 2:10 7:20
216:5,13
**burlington** 175:12
175:13
**business** 123:15
126:17,19

**c**

**c** 2:1 3:1 4:1,3
131:20,20 179:25
180:1 236:1,1
**cabinet** 68:10
**cadence** 66:20
**calculate** 207:14
**calendar** 31:1
**calendared** 34:16
35:11
**california** 1:2,5,6
2:3,6,8,14 6:16,18
6:22 7:15,16,21
10:14 80:14,20
216:14 239:2
**call** 32:23 34:7
39:24 69:2,4
83:24 99:18 106:1
140:21 175:10
187:12 218:11,14
220:19 222:22
223:1,1,3,6 224:13
224:21,22,23

225:3 226:23
230:9 234:9
**called** 55:7 70:22
91:23 175:13
178:2,24 179:18
179:23 181:17
187:1,18,18,19
197:18 202:11
215:4 217:16
218:16 224:12
**calling** 141:8
203:3
**calls** 84:2 136:9
167:17 168:2
**capacity** 1:5,10
6:17,19 15:2 19:3
20:13 22:5 41:1
47:20 75:13,14,24
92:22 107:9 108:7
108:8 144:7
171:15
**captioned** 142:24
**capture** 199:1
**captured** 154:22
183:13,22 184:13
**card** 75:22 86:15
178:11,12,13
179:7,8 192:2
201:2
**cards** 185:3
**care** 48:1
**career** 46:5 183:3
202:12
**carefully** 237:3
**carries** 202:1
**cartels** 208:23
**cascading** 25:22
25:23 68:22 69:7
**case** 1:4 7:23 18:7
18:22 20:22 21:14
25:5 28:3,5 30:10

30:13,22,22 31:1
31:11,13 33:11
34:16 35:3,3,10
37:22 55:22 61:6
74:1 97:16 109:24
110:1 117:24,25
136:5,11 148:4,21
148:21,22,22
149:2,2,7,7,9,9,16
150:8 151:2
164:13,13 165:3,3
165:13,13 166:1,1
166:10,11,16,16
169:4 178:10
179:20 183:21
185:2 187:21
195:18 213:20,25
232:10,10
**cases** 1:13 6:21
155:13 164:9
187:3
**catalog** 221:13
**categorical** 151:21
**categories** 54:5,10
54:13 131:1
136:25 144:9
145:15 147:15
154:23 155:2
157:17,17,21
159:25
**categorization**
15:24
**categorized**
119:10
**category** 100:18
101:18 136:25
139:11 147:24
151:14
**caucus** 47:12
**cause** 227:25

**cbp** 70:19,21
140:24 145:12
150:4 164:6,9,12
169:20 170:13,17
171:21 174:9
177:18 179:20
193:6 194:11
195:22 223:13
224:2
**cecilia** 45:17,21
**cell** 6:8
**cellular** 6:8
**center** 2:11 3:3
7:25 8:1 167:2
175:12,22
**centers** 82:23
**central** 178:3,6
179:3,15 182:4,8
183:23 185:21
189:17 208:22
**certain** 87:24
101:22 115:7
152:13 178:22
179:2 181:6 192:4
222:21 233:11
**certainly** 24:1
58:16 177:8
181:13 183:13
186:16 208:11
**certification**
236:21
**certified** 1:24
**certify** 236:2
**certifying** 236:24
**cfo** 43:7
**chain** 33:4,23 49:5
61:14 107:14
140:3 187:9 219:3
219:12,13 220:6,8
**chains** 43:3 218:25
219:1

**challenge** 81:25
**challenged** 33:22
**chance** 44:6 74:13
77:15
**change** 55:20,25
56:1,4 72:17 75:4
82:4,5 130:22
227:12 230:3,23
**changed** 53:4 86:6
114:10 115:18
129:1 163:20
192:19 206:20
210:1 229:22
231:2
**changes** 56:18
82:2,6 168:9,18
194:21 228:12,17
237:9 238:5
**changing** 71:17
76:20
**characterization**
98:25 114:16
**charge** 29:19
32:15 33:21,22
136:14 137:6
138:13 143:5
144:19,20,21
145:7,25 146:1,3
146:13 147:17
148:24 149:12
150:17 151:23
152:6 191:22
192:3,5
**chargeable** 132:15
134:13,18 135:24
161:17 162:2
**charged** 132:12
134:1,4,5,7 149:20
149:22 151:22
152:13 167:19
231:1

**charges** 32:11
149:12,18 150:13
150:16 191:23
**charging** 31:24,25
32:13 34:14 92:7
145:11 146:16
148:19 152:6,9
156:19 161:7
167:24 169:2
173:1,2,8,24 175:2
175:8,14 195:10
200:5,19 201:9,13
228:1
**chart** 25:9,19
26:20 27:3 48:2
48:20 58:17 106:5
106:13 167:7
224:9
**charts** 25:3
**check** 85:21 86:1
91:23,23 92:10
201:10
**checklist** 114:11
114:17,24 115:2,5
115:15
**chief** 30:15 34:15
35:25 40:7 42:1
49:6 80:12 81:3
84:4 88:9 105:6,7
105:7,8,9,14,16,17
105:18,22,23
106:10,11,12
119:3,4 169:16,17
174:5 187:4
**chief's** 172:5
**chiefs** 105:25
106:6 169:17
**child** 84:15
**childhood** 5:13
13:10

**children** 38:4 63:4 214:7,7

**children's** 2:4

**choosing** 226:25

**chose** 172:3

**chosen** 168:16

**chris** 38:18

**chronological** 26:15

**chronologically** 15:25

**circle** 203:21

**circuit** 37:16 41:21

**circumstances** 32:9 139:5 154:15 194:21

**cis** 125:25 140:24 145:12 156:17,19 160:10,12,13 161:8 164:22 173:8,25 175:13 175:18,20 182:9 182:11,23,25 183:5,22 185:17 186:4,18,20 188:11,11,14,24 189:2,6,7,10,19 190:1 191:5 193:17 195:9,17 200:25 201:16 215:9 223:16,20 225:12 230:2

**cis's** 164:23

**cite** 138:21,25

**cited** 139:1,15 151:25

**cities** 46:20,23 138:13

**citizens** 200:18 206:11

**citizenship** 184:22 200:11

**city** 2:11 80:13 175:20

**civil** 3:10 4:3 8:9 29:1 30:8 46:8,17 52:14,17 53:5 136:10 149:22 155:7,19

**claim** 10:20,21 18:23,24 19:5,10 89:20

**claiming** 191:25

**claims** 20:4 171:13 179:16 197:18,23 197:24,25 198:1,3 198:4,8,10,24 199:5,10,17,25 200:4,21,23 201:18,21,24 202:10,20

**clairmont** 117:25

**clarification** 15:10 117:20 118:10 119:18 123:17 139:3

**clarified** 232:7

**clarify** 29:24 31:4 38:23 51:24 52:19 52:25 53:12 63:13 67:1 74:19 77:15 87:21 101:20 109:16 119:9 136:22 137:23 139:6 146:20 153:2 195:18 218:14

**clarifying** 50:6 167:21

**clarity** 58:8 94:17 172:14 200:1

**classes** 131:1

**classified** 64:23 145:24 211:22,23 211:24 212:8

**clay** 2:5

**clean** 11:4

**clear** 41:10 57:12 91:11 100:22 123:19 139:20 140:10 166:23 186:2

**clearance** 35:24 51:1 58:7 67:17 68:8 181:2 212:14

**cleared** 42:19,23 43:1,22 212:11

**clearly** 97:13 109:3 151:19

**client** 96:2,21 97:9 226:19

**clinton** 80:4

**close** 232:24 233:15

**closely** 149:25 150:4

**code** 80:15 131:25 188:19,21,23,24

**coffee** 24:5

**cognizant** 72:25

**collaborative** 37:1

**collation** 76:22

**colleague** 53:7 97:18 98:9 216:4 222:12,23 225:13

**colleagues** 222:24

**collection** 110:25

**colorable** 155:16 156:5,9 160:19,22 162:12,22 172:1,8 172:13

**combined** 104:7

**come** 36:16 37:2,3 37:10 47:13 50:11 89:20 99:16 103:1 109:13 117:3 135:22 208:4

**comes** 30:10 42:14 160:5 233:11

**comfortable** 64:12

**coming** 42:21 70:15 71:9 80:20 83:25 116:3 226:17 231:23

**command** 33:4,23 43:3 49:5 61:14 187:9

**comment** 61:3 164:22 211:2

**committed** 132:4 132:14 134:12 156:4 161:16 162:1

**committing** 136:14 162:17,23 162:25

**common** 32:1 56:12 61:23 89:2 89:9,15 119:20 142:10,14

**commonly** 34:13 39:17 56:16 70:20 86:14 136:8 145:5

**communicate** 107:5 108:16 175:22

**communicated** 111:9

**communicating** 60:4

**communication** 67:23 107:13

110:6 111:25
112:4,5,10,13
186:10,13,18
187:7,8 221:7
226:12
**communications**
72:2 203:22
**communities**
71:16 72:17 73:17
74:20 75:3
**comparator** 123:7
**compare** 225:10
**compilation** 18:6
118:21 124:25
127:19 128:14
**compile** 126:5
190:2
**compiled** 122:21
124:11 125:9
**compiling** 120:19
**complaint** 158:14
**complete** 9:23
227:25
**completed** 209:21
210:22 211:8,12
**completeness** 9:14
**complied** 132:22
153:20
**component** 30:7
33:18 58:19 65:23
68:2 70:16 72:4
76:5 93:12 178:18
178:20 184:12
187:8 209:15
**components** 39:9
45:24 52:9 68:17
71:14 87:13
140:25 177:18
186:11 209:19
212:3

**compound** 58:13
76:9
**computer** 127:17
127:18,20 236:9
**conceivable** 58:5
**conceivably** 58:21
128:18 162:8
**concept** 36:5
**concepts** 56:18
**concern** 95:15
**concerned** 72:23
231:22
**concerns** 79:4,10
**conclude** 229:25
**concluded** 212:5
213:6 235:18
**concludes** 90:12
235:13
**conclusion** 80:25
148:11 208:4,8
214:8
**conclusions**
212:21 228:5
**concur** 152:10
172:25 173:7
**concurrence**
181:18
**concurrent** 163:15
214:4
**concurs** 162:4
228:4
**conditions** 30:12
30:24 208:19
210:1
**conduit** 41:4 52:15
**confer** 35:25 36:5
97:19,23
**conferred** 98:5
190:3,9
**confirm** 111:4
200:13 201:10

**conflating** 79:24
80:7
**conflict** 223:4
**conflicts** 65:15
**confused** 51:25
73:24
**confusing** 74:22
182:10
**confusion** 42:13
77:15 88:6 112:15
218:14,18 219:19
**congress** 21:23
22:2,4 32:12
39:15 47:8 80:3
131:19
**congressional**
106:3 112:16
218:15,19,21
219:9,15,17,18,20
219:21 220:3,5,7
220:10,14 222:25
**conjecture** 143:8
**conjunction** 86:25
113:13
**connected** 147:16
**connecticut** 1:22
2:18 6:25
**connection** 81:16
132:17 140:6
147:22 213:25
214:1
**consensus** 36:16
**consent** 46:23,24
47:2,3 52:18
**consider** 35:18
121:24 162:19
173:15 176:3
**consideration**
121:7 122:16
164:5 193:3

**considered** 35:17
121:13 178:22
179:12
**considering** 45:14
93:20 221:3
**consistency** 38:2
**consistent** 47:3
77:11 147:8
164:24
**conspiracy** 146:5
155:15
**conspiratal** 136:12
**constitute** 132:14
134:12,18 135:24
161:17
**constitutes** 162:2
**consult** 62:5 98:9
137:4,8,20 150:25
**consultation** 61:18
73:6 76:6 78:7
130:3,8 135:4,6,8
149:8 151:6
**consultations** 77:6
**consulted** 72:13
72:16,21 73:4
75:3,6,10,19,25
77:22
**consulting** 139:16
**contact** 63:8 89:25
138:11 167:15
168:23 173:16,21
173:25 175:3
177:9 184:12
187:5 188:7
**contacted** 61:9
76:11 99:17
191:14
**contacting** 175:12
218:22,23
**contacts** 59:3
89:23

**contain** 14:21 183:6 198:10

**contained** 104:1,4 182:23 184:8 198:13

**contains** 215:11 215:17

**contemplated** 97:14

**content** 59:14,17 60:16,18,20,22 61:1 62:19,23 64:7 72:2 75:1 96:3 97:11 109:2 109:6 121:10,12 121:18 124:14,17 163:20 170:1 221:20 231:7

**context** 95:8 115:19 147:14 149:20 151:11 154:4 163:14 167:17

**continue** 6:11 51:4 53:6 66:15 114:20 156:7 159:9 167:23 227:25 232:9

**continued** 3:1 4:1 91:14 115:14 155:17 165:12 166:14

**continues** 150:20 169:5

**continuing** 168:2

**continuum** 34:9

**contribute** 210:10

**contributing** 209:6 210:1,2

**control** 236:23

**controls** 192:9

**controversial** 17:19,25

**conversation** 17:24 95:7 96:7 96:15 134:20 145:3 154:18 220:13 230:14

**conversations** 6:7 59:19 60:18,23 62:19,24 64:8 73:10 76:23 84:3 84:4 88:4,12 94:13,14,19 95:22 96:4,17,22 97:3,7 99:8 109:2,6 137:14 149:4 196:17 218:6

**conveyed** 110:9

**convicted** 85:14 88:24 89:12 132:10 133:9,12 133:24 134:4,5,8 142:20 149:14

**conviction** 141:13

**coordination** 30:15

**cop** 79:8

**copied** 65:6

**cops** 80:9

**copy** 14:20 113:3 117:3,6

**core** 89:4

**corey** 219:10,20 219:21 220:3,5

**corps** 60:9,12

**correct** 14:7 18:12 26:11 27:6,9 28:13 31:18 40:14 41:18 42:9 45:5 50:2 51:11,15

59:9 61:15,20 63:21 65:11 66:16 68:10,11 69:3,11 70:6 71:21 73:8 73:11 76:3 77:2 77:13 83:14,19 89:14 90:7 91:4 93:18 94:21 98:24 102:20,21 104:3,9 104:21 107:1,22 108:1 111:2,6,15 113:11 114:14 115:4,16,21 116:2 118:19,25 122:24 123:16,23 124:20 125:11 127:12 128:5 129:3 130:11 133:15 135:15,19 137:5 137:25 139:19 142:22 144:6 147:19 152:18,23 154:11 158:23 169:21 172:20 176:5,19 177:24 183:1,4,7 184:2 186:5,9 195:20,23 203:20 205:1,5 210:22 215:12,20 216:21,25 217:12 228:24 229:3,6,9 229:13 230:11 236:10

**corrected** 10:11

**correction** 239:5

**corrections** 237:4 237:6 238:5

**correctly** 19:19 88:19 113:6 133:3 147:17 152:5 154:9 159:15

164:17 170:8 171:10 193:13 194:17 209:1 212:15 213:11 236:7

**corresponding** 144:19 151:23 219:6,11

**cost** 79:16 81:15 82:3,17 83:5 207:15

**costs** 79:12 80:22 81:13 82:18 83:6 83:6,7

**council** 46:5 64:19 65:2,19

**counsel** 3:16,16 4:3 6:14 7:9 10:16 11:18,18 12:13 13:16 17:4 30:15 33:16 34:15 36:1 36:15 40:7 41:12 41:13,13 42:1 45:11 59:7 60:19 61:4 62:16 63:12 64:9 66:9 84:4 88:9 94:5 95:17 97:10 104:12 109:8 120:25 122:1 135:9 137:5 137:8,18,20 146:11 148:23 149:4,8 151:6 212:16 216:24 218:1 234:25 235:11 236:11

**counsel's** 34:15 187:4

**count** 14:2

**counterpart** 41:18 42:17 186:19

199:15
counterparts
175:18
countless 22:7
countries 65:7
208:22
country 31:13
45:5 79:14 84:22
85:4 86:19 131:9
155:7 184:22,22
231:21
county 88:23
141:5 145:5
couple 25:9 46:18
203:21 215:1
course 9:17 10:8
11:16 24:6 33:6
36:19 38:24 41:24
53:7 64:12 85:3
95:21 97:2 98:4
126:16,19 135:25
161:22 175:24
227:10 235:11
court 1:1 6:22 7:4
8:13 9:20 11:5
20:18 21:3 30:19
31:9,10,11 34:17
34:18 35:11 41:21
41:22 101:21
143:5 145:25
148:24 228:11
237:15
courts 30:20 37:16
37:16
cov.com 2:13,13
covachi 220:9
cover 219:7
233:19
covered 113:7
155:1

covington 2:10
7:19 216:5,13
create 189:10
created 121:19
128:24 210:8
creates 189:7
creating 118:15
crime 88:24 134:4
135:11 136:14
145:11 162:17,24
162:25 163:2
crimes 133:20
criminal 86:5
88:23 89:7,9
132:3,11,12,15
133:10,13,18
134:1,13,18
135:24 136:5,11
138:3 145:4
149:20,21 155:4
155:14,20 156:5
161:17 162:2
168:24 172:15,20
177:6,7,9,13
criminally 133:23
crisis 23:4
criteria 193:8,9
194:14,15 195:5,6
cross 146:10
crutcher 1:21 2:16
6:25 7:18
cs 179:24
csr 236:15
current 15:23
25:15 43:12 47:23
49:17 51:3,21
53:2 59:4 63:8,11
64:25 66:14 69:5
79:18 81:21,22
93:23 128:10
156:3 163:18

168:9 179:9
184:13,21 219:9
currently 49:7
56:19 87:3 130:23
162:10 180:19
195:1 205:7
223:22
custodial 227:21
228:21
custody 89:11
customs 4:9,13 5:9
70:20
cutoff 85:10,10
cv 1:5
cycle 34:7 35:3,5,8
40:19 47:15 63:3
83:3,9,9 153:17

**d**

d 5:1
d.c. 1:22 2:12,18
3:5,17 4:4,11 6:1
7:1 41:5 45:4
70:14 71:3
da 137:13
daca 13:6,8,14
14:6,21 15:11,18
16:16 17:15 83:11
83:13,16 84:24
85:5 86:5,9 87:1,5
87:7,14,21,25
88:16,21,25 89:13
89:17 90:3,6,25
91:2,14,19 93:16
93:20 95:23 96:19
97:5,13 98:24
99:2,10,13 100:6
100:10,13,15,19
100:22 101:12,13
101:17,25 102:3,7
102:11,12,14,19
102:23,25 103:6,7

103:16 104:2,20
104:25 105:3
107:3,11,13
108:21 109:2,15
109:18 111:13,19
114:2,8,12,14,23
115:3,20 116:1
118:14,16 119:16
119:16 120:11
121:20,21 122:11
122:23 123:2,25
124:4,9 128:25
155:25 156:16,17
156:21,23 157:5,6
158:16 159:5,7
160:2,14,17
161:14,25 162:11
163:16,20 164:5,8
164:12 166:9,10
166:19,20 168:20
168:21 170:11,14
170:23 171:13,16
171:17,18 173:9
173:14 174:2
175:24 176:8,14
176:18,21 177:2
183:6,9 188:12,16
188:20,22,24
189:21 190:3,9,14
190:23 191:2,5
192:10,25 193:3
194:9,23 195:3,13
196:22 197:1
198:22 199:1
203:24 204:3,8,12
204:16,19,20,25
205:18 207:15,19
212:5 218:3,3
221:8 228:14,19
228:24 229:22,23
230:24,24,25

231:22 232:16
**daily**  95:20,21
**dallas**  91:24 92:10
**dan**  4:17 7:1
**dangerous**  146:5
**das**  137:13
**data**  81:21 85:20
103:14,19,19,21
103:23 107:24
125:11,13,24,25
126:3,4,8,12,17
127:9,13,23 128:7
128:17 177:23
189:14,17,20
**database**  128:2
177:22,25 178:6
178:15,20 180:6
184:20 197:20,22
**databases**  107:25
177:19 178:18
179:2,13 197:18
199:8 203:8,11
**date**  26:12 85:10
85:10 89:19 92:3
96:9 156:8 165:19
184:13,21 237:8
238:15 239:4,25
**dated**  74:10
110:24 169:15
205:23 236:17
**dates**  75:23 189:1
233:6,11
**dave**  38:18
**davis**  4:3 8:8,8
43:25 50:5 52:19
53:15 57:19 58:13
59:12 60:14,25
62:16,22 64:3
66:7,23 68:20
71:25 76:9 85:7
90:11 96:1,20

97:1,6 98:3,5,8,25
102:15 109:1,9
114:4 117:12,19
120:25 121:11,21
122:13 124:12,20
125:4 127:15
128:9,16 134:9
135:7 140:9
146:19 147:4
148:3 151:1,16
153:10 161:18
162:3 165:7
170:15,24 172:17
172:21 174:12
189:24 190:4,10
190:18 191:7
192:12 194:2
198:15 208:1
214:14 215:21
220:22 221:6,16
225:25 226:21
234:23 235:8
**day**  29:14,14
38:24,24 39:18,18
73:21 76:18,24
89:4 152:25 153:1
182:1 188:8,8
193:18,18 222:2
222:14,17 223:10
224:24 226:8,23
227:3 231:2
234:14
**days**  181:16
187:25 188:1
237:12
**deal**  51:6 68:8
93:13 224:7
**dealing**  40:18
45:15 152:25
220:2 233:2

**decide**  34:22 43:8
43:11 98:2 136:8
**decided**  33:10
**decision**  30:11
32:18 33:2,11,13
33:15,21 34:8,9,14
34:21,24 42:18
60:21 69:17 79:10
81:4 88:5 99:13
109:3 121:22,25
122:8,16 156:18
221:3,6,8,9
**decisions**  32:16
33:7,12 41:22
60:24 79:10 121:7
121:16 232:10
**declaration**  5:11
27:18 28:6,11
212:23 213:3,15
**declare**  238:3
**decrees**  46:24,24
47:2,3 52:18
**deemed**  32:12
237:14
**deeper**  130:2
**defendant**  20:12
**defendants**  1:12
235:9
**defer**  64:12 84:17
89:10
**deferment**  84:18
161:5
**deferred**  5:13 13:9
78:14,16,17 84:19
86:23 159:5,8,10
159:12 171:18
173:14,17,22
177:9 188:21,22
**define**  54:22 56:9
133:17

**defined**  56:17 58:2
142:8
**defines**  55:25
56:21,23 57:10,10
57:11
**definitely**  145:14
**definition**  122:2
200:16 226:11
**deliberations**
221:5
**deliberative**  59:13
60:15,21 62:17
64:6 109:3 121:2
121:15,24 122:2
122:12 124:13
125:4 220:24
221:2,10,15,21
226:1,10 235:6
**delivered**  37:20
**demonstrate**
181:17 229:24
**denial**  159:12
**denied**  86:4,5
194:7
**deny**  159:10
**depart**  132:23
153:21
**department**  1:9,11
2:3 3:15,18 4:2,6
4:13 6:18,20 8:5,8
25:4 27:13 29:4
39:3,10 41:3
42:14 46:6 52:13
67:21,25 68:3
69:16 93:19
121:22 131:18
132:9 137:10
138:16,17 185:4,4
186:8 195:21
209:18 217:24
233:22 239:3

**department's**
131:13 195:1
206:10
**departmental**
145:1
**departments**
29:14
**departmment** 4:8
**departure** 232:7
**depend** 44:2 68:21
135:11 138:1
149:12,16 180:15
201:13
**depended** 45:22
**dependent** 43:24
**depending** 30:21
33:18 36:12 40:2
57:24 58:20 151:3
178:25
**depends** 69:18
186:15 211:24
**deponent** 4:6
236:4,6 238:1
**deponents** 10:15
10:20
**deportation** 30:14
181:7 199:21,22
199:25 202:12,14
**deposed** 9:2,6
18:10,14,18 19:17
117:24 118:4
**deposing** 237:11
**deposition** 1:20
5:8 6:10,14,24
9:12 10:21,25
11:16 12:10,12,14
18:22 19:4,13,24
22:10,14,18 23:8
24:21 27:20 97:18
158:8 163:8 169:9
205:20 235:5,18

236:9 237:3,10,13
237:14 238:5
**depositions** 9:9
10:17 20:15
**deputy** 25:16 26:2
27:5 43:10,18
44:17,20 45:19
47:23 48:6,8,16
49:12,13,18 51:13
51:25 52:15,23
58:10,22 60:5
61:10,12,18 63:16
63:17 67:13 72:11
75:14 77:9 105:6
105:6,8,9,14,16,21
105:22,25 106:10
108:6 119:2 144:4
158:1 223:22
224:12
**derivative** 200:11
**derive** 214:8
**derived** 54:21
89:17 144:21
**derogatory** 171:18
171:21 172:3,11
173:13
**describe** 31:23
130:20 132:2
228:12
**described** 51:1
73:17 101:19
107:15 131:19
146:22 148:13
155:23 206:20
216:20 225:24
228:20 229:17
**description** 5:7
28:21
**designee** 187:5
**desire** 208:20

**desired** 54:22 58:3
**despite** 166:12,12
**destroyed** 17:16
128:3
**detail** 49:3,4 56:22
67:16 71:23 91:22
92:12,16,17
184:19
**detailed** 92:19,20
106:2
**details** 18:21
62:18
**detain** 34:22,22
138:13
**detained** 29:3,23
30:11,12,17,19,24
31:16 83:4 103:8
103:24 104:5
105:4 119:17
**detainees** 168:12
**detainer** 168:7,8,8
169:1
**detection** 141:1
**detention** 29:12
30:13 31:7,17
32:13 34:14,23
74:11 79:18 82:23
103:17 118:16
228:7,8
**determination**
85:19 134:16,17
134:22 135:3
136:20,24 139:13
139:20,21 143:1
149:2,7 151:13
156:11 160:9
175:3 181:21
187:15 201:8
**determinations**
32:16

**determine** 139:10
159:12 160:18
161:4 162:14,15
173:17,22 191:20
220:24 227:23
**determines** 140:13
152:16
**determining**
224:15
**deterrent** 214:5
**dettmer** 2:17 7:22
7:22
**develop** 81:15
94:8,12 99:12
101:11 109:17
**developed** 71:23
94:18 124:2,3
136:5 148:11
**developing** 129:16
159:17 163:23
196:11
**development**
75:11 77:23 87:5
87:7,13,16 130:4
**develops** 78:20
**device** 174:8
**dhs** 5:16 17:4 30:7
30:8 33:18 38:22
67:14 94:2,3
99:23 100:5 102:2
103:2 106:17,18
111:18 140:8,25
159:9 184:10
196:15 197:18
203:23 204:2,6
205:10 207:1,14
209:15,19 211:9
211:16,25 212:1,2
222:24
**difference** 54:14

**different** 22:5
24:21,24 25:3
29:14 33:13 34:23
36:11 37:13,14,15
37:15,16,16 46:18
46:20 47:9 54:10
56:25 70:5 73:15
73:16 74:19 86:19
119:11 128:13
138:3 139:5 147:7
149:19 152:20
167:11 178:19
181:10,15,16
188:9 209:23,24
212:9 218:24,24
224:6
**differentiate** 55:13
**differently** 36:8
37:12 69:21,22
70:10 78:23
**difficult** 36:22
**digging** 130:2
**direct** 29:9 54:16
73:1,9 144:25
180:15 202:15
213:2 236:23
**directed** 102:9,18
131:2
**directing** 58:21
**direction** 54:21
164:10 210:8
**directive** 43:14
44:13 50:11 56:20
57:3,9,15,24 58:2
58:15 68:19,23,24
73:16 74:20 87:1
88:17 90:7
**directives** 43:17
56:6 57:18 58:11
67:12,17,19,20
68:12 69:9 78:16

115:25 116:6
**directly** 26:1
29:19 49:2 60:3,4
61:9 62:5 63:13
63:14 65:5 78:2
105:24 107:6
115:11 120:14
183:11 187:7
**director** 19:3 23:2
25:16,25 26:2,7,10
26:17,22,24 27:4,5
28:20 31:20 32:19
38:16 40:12,21
43:2,10,18 44:16
44:17,20,25 45:18
48:7,8,10,15,16,17
48:18 49:18,23
50:14,21 51:14
52:1,23 54:8 55:3
58:10,16,18 60:9
61:10,18 63:16,17
65:9,10 67:13,13
69:10 70:15 71:6
71:8 72:9,12 73:7
75:12,16,18 76:1,2
92:2 100:1 105:22
108:10,18 118:4,5
119:2 127:6 130:9
135:5 144:5 158:2
167:9 175:20
182:3 219:10
220:9 223:21,22
**director's** 58:22
60:6 61:12
**directorate** 169:17
**directors** 39:17
41:11 55:14 75:17
83:24,25
**directory** 75:12
**disagree** 226:9

**disbursed** 14:11
15:23
**disclose** 168:16
207:3,9
**disclosing** 124:19
**disclosure** 193:6
195:3
**discontinued** 
115:15
**discouraging**
224:8
**discovery** 15:16
**discretion** 32:15
32:17 33:3,25
34:3,5 35:2,8,14
129:24 139:10
150:21 153:7
154:9 155:23
156:21 159:9,21
160:1 164:12
165:3,12 166:1,16
**discretionary**
159:10 184:24
**discuss** 9:9 36:2
37:4 38:6,7 45:12
95:15 102:3,6
108:21 204:2,7,18
207:23 218:11
230:16 231:6
**discussed** 23:22
50:24 54:7 78:15
97:12 98:22
107:11 128:23
139:12 141:21
148:23 152:8
155:12 157:16
166:14 189:13
196:10 203:22
204:22 216:16
232:17 235:8

**discussing** 57:5
74:21 217:15
**discussion** 59:3
129:23 159:20
181:20,21 218:2
230:19
**discussions** 62:15
64:2,18 66:6,22
67:6 75:2 78:4
100:5 111:8
193:19 195:11
196:9,14 204:11
204:14 215:2
220:15
**disseminated**
68:13 112:25
113:2
**district** 1:1,2 6:21
6:22 10:13 20:23
21:17 37:15 39:16
40:5 41:21 47:11
118:2 135:9
**divided** 133:21
**division** 1:3 4:3
6:23 8:9 46:17
94:15
**divulging** 75:1
**docket** 29:24
30:18 31:2,6,14,16
83:5
**dockets** 29:3
**document** 22:9
23:1,11 24:22
25:1 27:18,25
31:24 32:13 34:14
35:23 36:23 43:24
44:5 74:9,9,14
75:11 76:15 86:10
86:14,16 92:7,8
104:10,14 105:2,4
106:10,15 110:21

110:24 113:17
116:12,20 129:5
129:16 130:8,12
130:14,16,22
144:9,16 152:6
156:19 157:1
158:12,13,15
160:24 161:7
163:10,12 167:24
169:2,8 170:13,16
170:22 173:1,8,24
175:2,8,14 183:14
183:19 193:17
200:6,19 201:3,9
201:13 205:23
206:1,4,7 213:21
228:2 234:2,4
**documentation**
202:20 203:18
**documented** 149:2
149:4
**documents** 12:22
12:25 13:3,6,13,16
13:19 14:5,10,18
14:21 15:11,17,18
15:21 16:2,8,12,16
16:25 17:14 31:25
35:16,20 36:20
41:10 43:20,21
44:9 49:19,23
50:4,7,7,24 54:6
54:10 55:19 57:4
57:17,21 58:9,12
68:18 74:25 77:14
91:6,18 93:7
104:19 112:2
116:3 128:24
129:2 149:9 151:6
151:8 157:7,7,12
157:19,24 158:4
173:2 195:10

204:23,25 205:4,7
205:10,17 221:25
225:5
**doing** 17:23 37:6,6
40:1 51:22 54:18
55:2,10 56:14
58:1 91:9,10,13
94:7 138:8 187:13
207:1 219:19,20
219:21,22 222:3
222:24 223:18,19
237:7
**doj** 12:20 52:16
184:10
**doj's** 31:1
**doj.ca.gov** 2:7
**dollar** 79:17
**domestic** 45:11
59:7 63:12 65:18
216:24 218:1
**dorothy** 20:10
**dpc** 45:16,18
52:11 53:12 60:1
60:2,2,7 61:6,9,17
61:22 62:7 63:8
67:2,2 217:2
**dpp** 59:11,25
**draft** 42:14 112:20
**drafted** 233:23
**drafting** 225:14,21
**draw** 80:25
**drill** 54:4
**drilling** 88:14
**drive** 14:23 15:3,4
104:14,18
**driver's** 184:25
**drivers** 209:8
**drives** 145:25
**driving** 210:14
**dropped** 220:13

**drug** 208:23
**duke** 1:10 6:19
93:11 116:13
222:7,22
**duke's** 109:15,19
**duly** 8:17 236:4
**dunn** 1:21 2:16
6:24 7:18,23
**duplicative** 216:18
**duration** 44:23
119:15
**duties** 186:13
193:18

**e**

**e** 2:1,1 3:1,1 4:1,1
5:1,6 14:1 15:12
15:22 36:24 38:10
42:22 55:7 68:14
84:2 108:16 112:5
112:7 117:6,8
127:21,22 215:6
218:13,25 219:1,3
219:12,24 220:6
236:1,1 239:1,1,1
**e.g.** 208:23
**e3** 171:14
**ead** 47:20 56:6,7
56:12,16 69:6
75:13,14 86:13,14
93:1 179:11
183:22 185:8,12
185:15 188:18,21
**eads** 189:1
**earlier** 45:2 51:1
54:4 69:8 104:16
111:12 112:9
115:17 118:12
125:10 128:23
129:12 158:20
159:20 160:15
177:23 183:3

189:13 196:8
204:22 207:13
211:13 215:5
216:16,20 217:10
222:12 230:9
**early** 19:14,25
217:9,9
**earm** 179:18,19
**easier** 18:3 32:21
**eastern** 224:25
**easy** 11:5
**economic** 82:17
208:19
**edettmer** 2:19
**edge** 48:8
**educate** 148:10
**educating** 84:5
88:18
**edward** 30:3
**eeo** 19:5,10 20:1,4
20:7
**eeoc** 18:23
**effect** 64:11
114:12 164:19
166:20 169:5
**effects** 157:16
**effort** 10:16
217:19
**efforts** 13:18
177:6
**eir** 69:9
**either** 19:14 30:24
31:8 33:17 34:17
36:4,5 41:25
42:12 45:12 55:20
56:16 58:14 66:10
93:13 95:15 96:19
97:5 99:9 103:7
108:5 114:22,25
116:21 136:6
141:5 142:11

150:4 154:18 155:18 156:4 163:1 167:20 168:11 169:1 181:14 182:1 187:2 191:21 200:21 201:10 209:15 210:1 212:2 217:8,25 219:2 225:1 231:20
**elaine**   1:10 6:19
**electronic**   184:6 217:23
**electronically**   184:15,18
**element**   43:4 121:15
**elements**   136:14 162:17,23,25 172:15,19
**elevated**   42:19,23 43:21 44:10 58:15 58:20
**elevating**   58:9
**elevation**   50:25
**eligibility**   85:13 88:21 89:12,21 91:2
**eligible**   84:23 85:5 100:15,19,21,25 101:19 115:3
**elis**   215:4,14,19,25
**elizabeth**   2:10 7:19 216:12
**else's**   126:4
**employed**   48:11
**employee**   19:12 32:24 180:12
**employees**   19:8 28:25 37:3 54:24

55:8,9,16 88:18 186:20 187:15,22 187:23
**employment**   84:20 86:9,13,17 178:12 183:13,18 201:3
**empowered** 137:17
**encompass**   140:8 226:11
**encompassed** 62:21
**encompassing** 152:2
**encounter**   34:8 87:24 90:2 145:4 161:3 168:15,17 179:8 200:17
**encountered**   88:22 89:18,22 91:4 92:9 134:24 137:1 141:4 164:6 171:13 177:8 230:25
**encountering**   38:4 89:2 114:13 160:16 162:11 200:25
**encounters**   123:9 123:20 227:20
**encourage**   137:14 137:20
**encouraging**   224:7
**endurance**   12:4
**enforce**   79:9 80:22 131:2 150:15 151:20
**enforcement**   4:9 4:14 5:9 18:1 23:2 25:17,24 29:1 30:2,6 34:6 35:19

46:21,22 47:1,10 48:16,19 54:17 55:11,14,17 69:12 69:14 70:24 71:1 71:17,19,20,23 72:6,14 73:13 76:20 77:19,19 78:15,20,24 79:3 79:21 80:6,8 81:17,20 82:2 84:10,17,18 88:20 89:1 93:14 102:25 103:4 118:3 120:10 122:23 123:7 124:4,10 126:2 129:11 130:17,21 131:4 131:13 138:12 139:17 161:5 166:13 167:2,9,23 176:7,23 177:1 180:16 191:22 193:4,7 194:7,10 194:12 195:4 196:4,23 197:2 199:23,24 200:15 204:19 217:20 219:10 227:9 228:23 229:2,5,11 229:21
**enforcing**   79:25 80:23
**engage**   36:3
**engaged**   132:16 140:5,15 141:17 147:21 148:12
**engaging**   141:11
**enhances**   80:24
**enroll**   217:19
**enrollment**   217:17

**ensure**   11:6 50:9 58:2 200:14
**entail**   39:22 54:20 54:20
**entails**   42:25
**entered**   84:22 85:4 183:14
**entire**   35:5 44:13 83:2 234:7
**entities**   38:22 44:4 194:10
**entitled**   22:10 23:1 26:10 27:18 131:13 137:16 205:23
**entity**   18:25
**entry**   150:5,12 184:21
**environment**   14:1 14:7,24 15:6 82:12 136:12 140:18 145:5 168:24 212:10 227:21
**eoir**   32:3 39:6,7 46:7,8 52:16 53:7 60:8
**equal**   18:23
**equities**   44:5
**ero**   30:1,3,5,10 43:2 47:18 48:11 50:8,10 55:17 56:20 60:8 66:11 70:18,25 93:1 94:15 105:10,11 126:24 127:1 135:18,19 139:12 140:17,23 144:5 144:18,24 145:2 154:5,5 157:13,23 180:12 188:12

190:13 199:4
202:9 204:23
206:21
ero's   105:6,8
errata   237:5,7,9
237:11 238:6
erred   169:1
esaxe   2:13
escalating   208:22
escobar   45:20
60:10 62:3,10
especially   56:17
63:3 137:21
esq   2:5,17
essential   136:14
162:17,23,25
essentially   122:4,5
206:16 220:2
222:6 224:11
226:12 229:20
230:23 231:2
establishing   115:3
170:11
estimate   21:2
81:13 82:16
estimates   81:16
82:3
et   3:13,13
ethan   2:17 7:22
evening   99:15
100:4 112:1,3,5
event   218:15,15,19
218:19 219:2,4,7,9
220:7,16 222:23
223:9,9,12 224:22
231:12 234:1
events   107:15
222:2,3,16,19
eventually   61:9
122:7,8 152:17

everybody   55:1
202:14
evidence   145:10
146:17,25 147:25
148:1,14 151:14
153:3,5 192:3
evidentiary
152:14
evolving   202:13
exact   46:11 75:23
85:10 158:24
222:14 224:5
exactly   46:13
50:17 88:13
116:22 194:3
examination   8:20
146:10 216:8
examined   8:18
150:4
examiners   187:19
example   20:18
38:25 55:23 69:4
81:2,4 102:6
109:21 138:5,15
150:7 154:25
161:15 162:1,16
177:22 179:2
180:11,16 185:8
191:25
examples   139:15
exceed   79:18
excellent   74:18
exception   35:10
exchange   192:9
195:12
exchanged   192:18
194:23 196:19
exclusive   152:1
188:22
excuse   14:19 18:8
51:10 60:2 161:16

173:16
excused   235:17
execution   66:11
66:25
executive   25:16,25
26:1 27:5 31:1
32:2 43:1 44:17
46:9,11,13 48:16
48:17 49:18,23
50:13,20 52:1,17
52:23 54:9 69:9
72:11 96:11,14
105:21 123:10,11
123:12,22 144:5
158:1
exemplar   38:3
exempts   122:4
exercise   32:17
35:7,14 156:7,20
159:7,9 164:12
165:12 166:1
exercised   155:24
165:3
exercising   129:24
166:15
exhaustive   222:21
exhibit   5:8,9,11,12
5:12,14,16,21,22
22:9,13,14,25 23:8
23:15 24:14,18,18
24:24 25:2 27:18
27:20 28:14 48:3
73:25 74:3,15
93:4 110:13,14,19
116:10 130:13
158:7,8,13 163:4,5
169:7,9 170:5
171:6 192:22
194:20,21 205:20
205:22 207:22
208:13 212:25

exhibits   5:19
22:24
exist   187:11
existed   136:16
161:1 215:25
existence   91:15
121:9 122:15
existing   15:12,17
16:5 81:16 191:16
exists   168:6 215:8
expand   13:24
29:24 40:15
136:15
expectation   9:22
181:12
expectations   56:3
57:11
expected   10:19
56:23 225:23
expedited   132:4
experience   78:23
expertise   72:21
expiration   189:1
expire   156:24
227:10
expired   100:23
expires   100:13
159:6 176:14
179:10
explain   16:23 34:1
34:4 54:13 59:10
61:8 67:16 75:5,9
145:21
explained   18:9
53:9 69:8 75:1
175:2 189:14
226:2
explaining   54:23
91:1
explanatory
153:22

**expose** 121:14
**extend** 166:9
**extent** 63:17 64:4
  64:6 124:14
  151:22 221:20
**external** 15:4 33:6
**extremely** 170:3

**f**

**f** 4:9 236:1
**facie** 88:21 89:12
  89:21
**facilities** 29:6
**fact** 30:22 31:17
  32:7 70:4 85:1
  87:24 97:7,9
  126:12 136:17
  139:12 146:16
  147:24 149:6
  160:11 162:5
  230:16
**factors** 88:19 91:2
  208:19 209:6
  210:2,14
**facts** 34:11
**fail** 237:13
**failures** 10:24
**fair** 44:4 57:16
  103:18 114:16
  115:22,24 122:18
  129:15 144:10
**fairly** 61:23 77:11
  101:22 108:11
  117:9 153:22
  201:20
**faith** 10:16
**fall** 146:18 147:1
  147:20 155:1
**falls** 127:6 136:20
  137:1 139:11
  151:13 152:16

**familiar** 9:11
  27:25 77:18 86:24
  111:11,24 129:17
  137:10 182:22
  195:15,25 205:25
**familiarity** 63:7
**families** 47:14
  213:19
**family** 63:4 123:8
  123:20 208:20
  213:23 214:6
**fancy** 142:13
**faqs** 5:12 86:24
  87:10,17 113:13
  113:19,21,24
  158:18 163:15,19
  163:22 196:9,10
  196:10,12,15,19
  222:4 225:6,8,12
  225:15
**far** 63:12 73:6
  127:8 128:2
  185:22 187:6
  190:1,7 234:10
**fashion** 124:8
**father** 185:11
**favor** 56:20
**favoring** 57:9
**fbi** 185:1,1
**fbic** 200:8
**february** 50:22
  77:18 106:24
  123:12 130:16
  144:2 157:18
  159:22 166:12,13
  166:21
**federal** 8:9 22:11
  27:10,12 32:24
  53:8 122:6 136:3
  136:4 137:22
  150:10

**feedback** 45:13
**feel** 23:13 33:10
  68:22 162:18
**feels** 173:5
**felicia** 20:8 45:19
  45:21 60:10
**fell** 32:18
**fellows** 36:15
**felonies** 133:21
**felony** 85:15
  149:14
**felt** 37:5 206:25
**female** 36:1
**field** 19:3 23:2
  26:7,10,17,22,25
  27:4 28:19 30:16
  31:20 32:19,19
  35:22 36:4 38:4
  38:16 40:12,18,23
  40:25 41:4,6,8,11
  42:8 43:15 44:15
  44:24 45:4 54:7,8
  54:24 55:1,13,23
  56:5,13,15 57:25
  70:15 71:7 72:10
  79:11 83:24,24
  87:25 88:5,7,15
  91:9,13,24 92:2,5
  106:2 115:8 116:8
  118:3,5 127:7
  131:6 135:4,17
  140:1,3 160:17,17
  162:12 175:11,17
  175:18,19,20
  182:2,3 191:12,13
  193:21 215:24
  224:3 231:14
**fields** 184:23,24
  185:1,3,5,10
  198:16,25

**figure** 79:17 88:9
  219:1
**file** 15:8 100:21
  152:6 183:25
  184:1,3,4,14,16
**filed** 6:21 18:25
  158:14 198:19
**files** 14:20 184:7
**filtered** 187:9
**final** 34:20 77:2
  99:14 132:21
  153:20 215:1
**finalization** 76:16
**finalized** 43:22
**finally** 12:3
**financially** 7:7
**find** 83:21 99:24
  138:3,7,9 219:7,16
**finding** 219:14
**finds** 173:13
**fine** 11:14 43:19
  144:1 159:1
  214:14 221:18
  231:9
**fingerprint** 138:13
  217:17
**fingerprinted**
  138:22
**fingerprints**
  217:23
**finished** 171:1
**finkelstein** 3:9 8:2
  8:2
**firm** 7:2,5
**first** 8:17 18:13,21
  19:6 21:8 25:14
  27:10 54:14 60:6
  70:12 83:16 93:10
  112:22 113:16
  120:4,6,8,12,20
  126:3,13 131:8

137:8 143:16
144:25 158:11
168:15,16 171:14
173:12,24 175:3
184:11 186:14
198:8 199:9 206:6
208:16 225:12
**firsthand** 140:19
186:24 215:7
**fiscal** 14:12,14
119:19,22
**fit** 57:22
**fits** 148:20
**five** 18:19 28:22
28:25 29:2,6,13
53:14 197:7
**flexibility** 56:7
**flores** 19:23
**florida** 29:7
**focus** 164:9 227:14
**focused** 63:2 72:6
177:6
**focusing** 177:13
**fod** 32:20 35:4,12
36:19 38:15,21,25
41:25 139:21
140:1 180:24
203:6
**folder** 184:8
**folks** 17:22 101:23
168:23 180:16
232:8
**follow** 68:18 125:7
138:14 141:20
**followed** 166:4,6
199:11
**following** 99:19
109:11,25 129:23
**follows** 8:18
163:22

**force** 140:18
155:12
**foregoing** 236:21
238:4
**foreign** 232:7
**foresee** 56:2
**forget** 22:8 45:19
46:10 167:1
178:24 223:17
**forgot** 126:22
215:4
**form** 17:8 57:19
77:2 122:8 141:9
159:8 184:9 185:9
185:14 203:7
228:9
**formal** 73:18
**formality** 22:12
**formalize** 57:7
**formally** 43:13
49:4 68:12
**format** 56:20
128:10
**formed** 196:23
**former** 32:24
156:21 157:6
176:8 204:20
**forming** 121:25
**formulate** 81:23
82:8
**formulating**
113:24
**formulation** 66:10
66:25 67:8 82:8
172:13 207:18
217:12,15 218:3
**forth** 112:17 193:9
195:6
**forward** 37:2,3
38:7 202:1

**forwarded** 105:7
219:13,23
**found** 91:25 131:8
160:23 196:5
211:16
**foundation** 89:24
122:14 134:9
170:15 220:23
221:1
**four** 18:19 69:20
78:24
**frame** 82:7
**francis** 105:20
**francisco** 1:3 6:23
**fraud** 132:4,16
140:5,13,21,23,25
141:12,17 145:20
146:24 147:21
148:2,12 150:2
**free** 23:13 41:15
**frequent** 66:1,18
168:23
**frequently** 47:21
56:12 63:23 66:3
67:20 72:16,20
82:10 108:18
113:14 154:17
155:12 158:15
192:23 193:24
**friends** 137:11
**front** 43:10 130:23
163:19
**fulfill** 86:18
**fulfilling** 172:19
**full** 9:23 10:2 79:2
79:21 150:15
151:20 173:12
197:20,22
**fully** 136:4 174:8
**functionalities**
178:10

**functions** 145:1
149:23
**fundamental**
146:3 196:6
**further** 58:6 74:15
133:5 135:15
171:6 181:19
186:7 234:13
**furtherance**
186:12
**future** 81:24

**g**

**g.t.** 3:16
**gain** 178:20
**gaining** 203:10
**game** 53:8 101:9
101:10
**gang** 118:3,6
154:18,18,19
155:5,6
**gangs** 155:3
208:23
**garcia** 2:20 7:18
7:23
**gardner** 97:18,24
**gary** 50:15
**gears** 23:24 78:13
83:10 177:14
**gen** 3:16 4:3
**gene** 106:19
**general** 2:4 3:9,10
3:16 8:3 17:4
62:24 64:17 66:5
66:21 72:3 93:11
94:5 95:17 96:18
97:4 99:9 110:25
111:1,2 116:12
164:21,23 167:18
177:17 178:19
181:4,18,22
187:11 232:1

233:6
**general's**   7:15
135:10
**generally**   35:25
41:22 42:12,20
43:11,18 55:4
58:18 66:24 68:14
84:14 138:11
140:24 141:4
144:23 150:2
157:2 183:10
194:8 199:23
202:2 227:20
**generate**   47:19
68:17 91:6 102:18
102:20 103:9,11
104:24 107:18
190:8 205:4 228:1
**generated**   35:21
36:7 54:6 70:3
108:23 115:23,24
116:7 118:14
120:5 129:2 157:6
157:12,20 177:22
189:17 192:24
204:24 205:1
**generating**   42:10
71:14 143:16
158:3 164:22
190:15,15,24
**generation**   71:19
189:12
**generically**   76:5
185:4
**gentleman**   92:1
106:2
**gentleman's**
223:15
**gentlemen**   75:25
**gestures**   11:10

**getting**   51:24
59:22 64:10
107:24 116:23
**gibson**   1:21 2:16
6:24 7:17,22
**gibsondunn.com**
2:19,20
**girl**   80:17 81:5
**give**   16:21 18:21
28:20 38:1 48:13
61:24 103:4 105:4
150:1 163:14
169:24 184:18
188:15 194:1
202:9 231:4
**given**   10:9 16:11
37:11 79:20
129:15,16 133:6
150:14 168:22
235:13 236:10
**gives**   54:16 174:5
186:4
**giving**   37:2 55:13
232:15
**glad**   153:25
**go**   6:12 21:7 22:8
24:6 33:13,22
40:7,7 43:9,12
45:25 47:11,17
48:2 50:25 58:21
59:2 61:14 65:18
73:24 95:14 97:23
98:8,21 110:13
129:7,10 137:11
138:5 142:14
143:14 156:25
160:15 182:13
196:8 203:16
207:22 213:19
215:2 216:15
217:19 218:5

221:11 230:10
234:15
**going**   6:4 11:13
18:2 20:22,25
24:8,17 26:15
31:3 43:6 44:12
45:12 46:21 47:10
47:13 49:17 53:17
55:3 59:12 60:14
61:10 62:16 64:3
71:25 72:5 82:12
82:13 87:19 88:10
90:1 96:1,20,23
97:22 98:11
112:17 117:13
120:25 121:4,17
124:12,16 125:2
129:10 132:7
137:13,18,19
138:1 139:9
142:11 145:19
148:22 149:12,16
151:9 153:1
159:20 163:21
169:24 171:9
173:11 174:14
176:13,18 181:15
181:16 182:15
193:23 197:8
201:1,6,13 207:1
214:11,15 220:4,6
220:12,22 221:11
222:22 225:5
226:6 232:9,12,15
233:7,12 234:17
**gonzalez**   5:14
**good**   6:4 7:14 8:22
8:23 10:16 17:23
18:2 74:16 79:10
90:11 119:23
171:11 174:10

197:16 200:6,18
200:21,23 216:10
216:11
**gotten**   203:16
**government**   39:19
122:6,9 132:18
140:7 142:11
144:23 145:9
146:8 211:4,7
226:13
**government's**   23:5
**governmental**
142:6,9 147:23
223:1
**grab**   24:4
**grant**   103:6 179:1
232:4
**granted**   103:16
120:11 178:9
191:23 199:8,17
200:10,25 201:15
201:18
**grantee**   156:21
160:17 161:14,25
162:11
**grantees**   102:25
157:5,6 176:8
177:2 195:13
204:19,20
**great**   25:13 117:12
**greater**   188:1
**ground**   135:4
154:6
**grounds**   59:13
60:15 162:14
**growing**   176:20
**guarantee**   232:5
**guardians**   185:23
**guatemalans**
213:8,14

**guess** 18:19 36:22
46:19 99:25
122:15 128:18
139:2 140:10
163:11 171:24
179:9 184:23
200:1,20 202:25
208:9
**guidance** 5:16
35:13,18,20 36:11
36:20,24 37:19,22
37:23 38:9,9 41:1
41:10,17,23 42:6,7
42:11,15 43:4,21
44:2,5,9 49:19,22
50:9,24 54:3,15,16
54:20 55:5,13
56:8,11,19 57:17
57:25 58:6,19
68:23 70:14,16
88:20 115:12,25
116:7 151:5 157:7
157:19 160:24
170:9 193:10
195:7,8,16,17,24
196:2,7 205:24
**guidelines** 164:5
164:11
**guy** 138:21

**h**

**h** 2:5 5:6 239:1
**haley** 2:17 7:17
**half** 113:3
**hamilton** 106:19
107:2,5,11,14
118:22 128:15
189:13
**hand** 73:24 100:2
**handed** 24:14
36:13 163:5

**handle** 87:23
**handles** 106:3
**happen** 134:21
203:19
**happened** 64:21
71:5
**happening** 58:23
138:15 191:11
**happens** 36:9,10
136:3 167:16
**happy** 101:8 221:1
**hard** 14:20,23
15:4 104:14,18
149:25 170:3
**harris** 49:14
**head** 76:25 90:1
94:15
**headquarters** 36:4
45:4 49:4 52:16
55:19 56:15 88:1
88:3,4,12 91:22,22
92:13,21 94:2,3
106:17,18 209:19
216:1
**heads** 93:13
**health** 60:9 67:23
**heard** 178:2
**hearing** 20:25
21:19,25 23:3
29:5 147:8
**held** 6:24 204:2
211:23,25 224:24
**help** 48:22 73:15
74:24 154:12
177:17 180:1
**helpful** 59:1 91:25
118:9 126:21
145:18
**helping** 52:18
**helps** 53:2

**hernandez** 13:22
16:9,15 104:11,17
104:18
**herrera** 20:10
**hesitate** 11:25
**hey** 138:20
**high** 213:7
**higher** 31:11 42:1
68:7 121:17 169:3
**hill** 41:3 47:21
**hired** 199:9
**hispanic** 47:12
**historic** 165:18
202:16 217:16
**historical** 81:19,21
**history** 28:12 86:5
138:3 155:4
178:10 184:10,11
185:2 188:20
**hmorrisson** 2:20
**hoffman** 223:15
224:18
**hold** 17:9,11 27:8
72:8 98:3
**holiday** 231:23
**homan** 48:10,11
49:2 75:13 106:12
108:10,21
**homeland** 1:9,11
3:15,18 4:8,13
6:18,20 8:5 25:4
27:13 43:5 69:16
70:22 71:11 93:19
164:10 239:3
**hondurans** 213:8
213:14
**honest** 232:23
**hopefully** 58:1
202:13
**hotline** 167:15
168:19 169:5

**hour** 113:3 225:4
**hours** 12:16
**house** 39:1 45:8,24
51:4,7,20,22 52:2
52:6,9 53:10 59:3
59:6,15 61:6 68:5
204:7
**housed** 211:16
212:2
**hoy** 108:5
**hq.dhs.gov** 3:18
**hsi** 43:5 76:6
**huh** 21:10 113:8
131:15 144:3
160:21 161:12
163:24 212:24
218:8
**human** 67:23
183:15
**humanitarian**
23:4
**hundreds** 21:5
**hypothetical**
143:9,13 162:9

**i**

**ice** 8:7 17:6,7
25:10,15 26:6
29:10 30:16 31:7
31:15,25 33:17
42:20,24 43:17,17
44:5,12,12 45:13
47:18 56:19 57:6
59:19 60:9 61:19
61:22 67:9,11
68:17 70:24 75:9
76:2 79:13,20
82:10 85:23 87:13
87:19 91:17,22
92:20 94:15 96:12
99:22,24 107:25
118:25 122:23

124:9 126:14,25
133:11 135:17
145:16 164:6,9,12
165:2,2,11 166:1,4
166:6,14 167:4
168:15 171:23
173:20,21,21
175:2,7 176:7,22
177:1,15,18
186:14,17 188:10
188:14 190:22
191:1,4 192:10,19
193:6,9 194:7,11
194:15,24 195:3,6
195:19 196:2,18
196:22,25 199:4
203:1,2 206:24
211:13 215:14,18
218:6 227:16
229:21 233:19
**ice's** 43:10 105:7
**ice.dhs.gov** 4:12
**idea** 18:2 37:9
119:15 142:8
148:10 160:18
**identification**
22:15 23:9 27:21
80:5 158:9 169:10
205:21 221:17
**identified** 42:12
42:13 48:6 104:11
210:2 212:20
**identifier** 103:22
**identifies** 180:4
**identify** 13:17
16:16 48:5 62:25
158:12 179:5
188:12,15,16
**identifying** 29:20
177:7 191:15,19

**identity** 126:1
178:25 217:21,22
**ids** 199:14 202:9
**iga** 223:1
**illegal** 29:17 214:6
227:22
**illegally** 90:2
155:6 206:17
**image** 169:15
**immediate** 79:3,21
**immediately**
173:18,23
**immigrant** 201:4
**immigrants** 74:12
**immigration** 3:3
4:9,13 5:9 7:25,25
27:14,15 29:1
30:8 31:2,9,10
32:2,6 34:6,17,18
35:2,11 39:11,24
40:19 46:20,22,25
47:5 60:12 63:3
67:21 78:22 83:8
83:9 93:13,14
131:21 132:24
134:6 136:10
138:2 145:25
146:10 154:3,5
159:11,21,25
177:18 181:6
184:21 189:5
193:4,7 194:11
195:4 197:1
198:14 199:23,24
228:11
**impact** 50:8 55:22
56:2 70:19,21
72:23,25 73:1
207:14
**impacted** 36:8
44:13 70:25 71:16

**impacting** 70:19
**impacts** 41:21
43:7 207:16
**impeached** 10:23
**impeachment**
146:11
**imperative** 237:10
**implement** 45:13
57:17 88:10,14
90:6 114:7
**implementation**
83:21 91:19
102:13,14,22
128:25 144:1
154:13 161:11,23
213:6
**implemented**
162:10 183:10
206:22
**implementing**
42:15 50:7 84:5,5
88:16 90:25
170:23
**important** 9:15
10:18 11:9 37:5
55:1,6,9,25 80:16
**imposed** 79:13
**imposing** 146:11
**impractical** 137:8
**improperly** 168:3
**ina** 32:6 78:21
79:3,21 80:3
130:25 131:2,9
147:18 150:15
151:20 152:3
196:5
**inaccurate** 118:19
**inbox** 14:3 15:2,12
15:14,17,23,24
16:1,6

**inboxes** 14:3
**incarceration**
141:5
**inception** 76:16
230:3
**incidental** 177:8
**include** 29:2,16
64:20 108:12,13
133:14,16,23
134:7,15 141:15
154:5 156:15
185:10 198:22
**included** 28:23
29:7 59:6 125:13
189:21 221:25
225:18 233:17
**includes** 141:11
**including** 110:25
194:10 204:6
**incomplete** 10:10
**incorrect** 10:10
52:4
**increase** 208:18
209:4
**incumbent** 173:3
**index** 178:3,6
179:3,15 182:8
183:23 185:21
189:18
**indexing** 182:5
**indicated** 45:2
63:20 65:22 66:15
122:20 165:25
204:25 210:21
236:4
**indicating** 170:7
173:14 208:1
**indicator** 188:23
**individual** 15:3
30:9 32:5,15
33:19,19 81:5,6

85:14 86:4 89:19
99:22 100:22
136:20 137:1
138:1,18 139:11
141:24 142:20
146:16 147:1
148:12 149:10
150:21 151:12
153:8 160:9
164:11 167:16,22
171:12,14,15
172:23 173:1,4
175:17 179:21
180:5,9 184:3,4,9
184:11 186:21
188:7,17 191:14
200:10 201:14,23
209:16 232:10
**individual's** 160:2
**individualized**
30:23 137:17
**individually** 22:6
126:9 178:18
**individuals** 29:21
31:17 38:20 62:4
62:5,11 73:3
82:20 84:22 85:3
87:24 89:3 91:3
100:9,13,18
101:18 105:3
106:7 124:9 164:4
164:13 165:4,13
166:2,17 167:12
168:3,20 176:14
176:17,18,21
178:7 185:11,19
190:2,8 191:19
194:6 206:11
**indoctrination**
47:16

**inexact** 82:15
**infinite** 149:17
152:24
**inform** 46:22
201:11
**information** 14:14
15:5 63:1 64:4
69:7 81:22 82:9
104:1,4,7 106:22
107:25 121:8,25
124:5,17 125:20
126:20 143:5
145:23,24 146:7
146:24 148:18,25
149:13 155:4,9
157:24 167:21,21
168:14 169:3
171:19,21 173:13
178:8,8,13,23
179:4,5,12,14,17
179:19,19,21
180:10,14,18
182:23 183:6,16
183:17,20,22,24
184:13,14,17
185:6,10 186:6,15
187:2 190:14,23
191:2,5 192:9,18
193:2,5 194:6,8,22
195:2,12 196:19
196:22 197:1
198:7,11,13,18
199:1 200:6,8,13
200:13,22,23
201:6,10,12 207:3
207:9 226:22
233:3
**informed** 81:19
206:25
**informs** 81:22

**infractions** 133:16
133:17,18
**ingested** 179:17
**initial** 138:11
145:3 203:12
**initially** 83:4
**initiate** 176:7,22
177:1
**initiated** 150:19
**input** 33:9 44:6
72:5 78:1
**inquiries** 106:3
**ins** 181:15 188:1,3
**inside** 41:7 58:1
**inspection** 232:3
**inspections** 224:13
**inspector** 181:6,10
**instance** 33:24
126:13 190:15,24
**instances** 58:14,20
67:22 84:15
145:23 154:22
186:25 191:4,8,14
196:21
**institutional** 29:5
145:5
**instruct** 59:16
62:22 96:3,23
121:5 205:16
226:6,21
**instructed** 13:5
60:17 61:12 109:5
**instructing** 109:7
226:19
**instruction** 60:25
66:23 72:1 109:11
125:7
**instructions** 9:16
16:11,18,21 54:16
91:7 122:4 174:4
237:1

**instructs** 11:18
**intelligence**
209:16,18 210:4
211:13,19 214:9
**intend** 125:7 157:9
168:13
**intended** 164:8
**intention** 101:10
101:11 147:11
158:3,5 176:7
196:25 205:3
**intentions** 176:22
176:25
**interact** 38:22
**interacted** 29:13
46:25
**interacting** 52:9
**interaction** 36:14
39:18 52:6 56:15
64:22 66:16 71:5
71:13 188:8
**interactions** 39:5
45:8 46:16 52:1
53:3,4,10 59:6,7
59:11 63:20,24
65:22,24 66:1,18
107:10 108:9,20
**interagency**
111:17
**interchangeably**
54:3
**interest** 11:4 47:19
66:12
**interested** 7:7
154:20 159:2
236:12
**interfere** 6:10
**interference** 6:8
**interim** 10:22
**interior** 82:14
141:3

intermediate
140:2
internal 41:16
102:2 110:6
193:17 204:1
209:14
internally 111:8
111:12 186:14
international
29:12 64:23
internet 110:12
interpose 66:7
71:25
interpret 131:5
interpretation
115:10 133:6
134:3 135:2 141:7
141:14 142:13,23
144:8 154:13
interpreted
133:10
interpreting 41:6
80:1
interview 227:22
228:1
intranet 68:15
introduce 22:9,22
27:17 158:6 163:3
introduced 22:13
investigation
136:1,3 138:6,10
155:5
investigations
43:5 70:22,23
investigative
138:4 155:9 192:7
invitation 61:5
invite 62:5
invited 59:22
65:16 78:3

inviting 77:25
involve 76:6 82:17
112:13 139:21
155:18
involved 17:20
18:6 29:1 43:7
59:19 73:10 75:10
78:10 85:23,25
87:13,20 88:11
102:6 111:7
113:23 120:19
138:7 140:25
141:2 146:4 150:9
154:19 155:11
163:23 223:2
225:14,21 233:14
involvement 40:22
87:4 115:14 118:6
155:17 159:17
involving 118:2
123:19
ipn 92:23
issuance 57:7,15
100:9 139:23,25
141:19 183:21
193:8 194:14
195:5 227:7,17
issue 31:20 32:10
32:13 36:11 41:22
43:12,19 55:25
56:8,10,16 57:24
58:6 69:7 78:17
108:21 109:3
146:23 151:11
159:21 162:6,15
162:18 173:2,8,24
175:2 182:13
195:10,19 196:7
200:5 201:12
203:7 212:16
214:2,3 221:7

230:1
issued 36:21,24,25
38:10 41:10 42:7
42:20 43:13 49:19
49:23 54:11 55:5
57:8 68:12 69:9
70:2 71:2 77:19
86:25 99:15
113:12 115:12
123:15 130:17
140:23 143:22,23
156:14 160:6,11
161:8 163:15
167:24,25 170:13
170:17 175:15,23
178:11,11 179:8
185:3 188:19
193:25 200:19
210:18 211:12,13
228:6
issues 67:10 68:7
79:24 82:23 95:16
153:5 175:7
issuing 34:14
35:12 56:6 92:7
140:17 156:18
161:14,25 169:1
173:1 196:4
item 137:2
items 220:20
221:12,13,24
233:9
iteration 69:18
168:10 197:25
iterations 69:19
iteratively 209:22

**j**

j 1:23 236:15
jackson 105:20
106:8

jail 88:24 138:23
201:1
jails 191:15
james 49:14
223:16,19,20,23
223:25 230:13
232:22 233:4,20
janet 1:5 2:14 6:16
7:21 216:14
january 27:11
51:23 52:5 123:14
123:15,21
jaywalker 138:7
jaywalking 80:18
81:6 133:24 134:8
138:5,14
jimenez 9:4
job 11:5 40:21
54:18 58:1 72:25
80:10 179:1
john 130:18
johnson 71:13,20
74:10 76:17 99:21
218:10,11 220:15
230:10,16 231:3
johnson's 72:10
join 27:10
joined 27:11,15
joint 60:7
joseph 105:13
juan 60:10
judge 10:14,15
32:8 97:14,24
146:10 153:14
235:3
judge's 24:23
judgement 69:2
154:9
judgment 69:4
132:24 154:2

**july**  5:10 21:25 23:13 26:4,14 207:23
**jump**  73:24
**june**  19:20 84:23 85:4 93:16,16 109:23 110:24 170:10 207:5 217:9
**justice**  2:3,4 4:2,6 8:9 29:4 39:3,10 46:6 52:13 67:22 67:25 68:2
**justifying**  200:3
**juxtapose**  165:18

**k**

**kathryn**  4:3 8:8
**kathryn.c.davis**  4:5
**kauffman's**  224:17
**keep**  14:12 15:4,25 18:3 229:23
**keeps**  125:25
**kelly**  77:20 130:18 144:2 166:23
**kelly's**  143:23
**kelvin**  38:17
**ken**  111:1
**kentucky**  29:8
**kept**  59:22
**key**  62:10 183:15 183:17 185:2,6 198:17,24
**kin**  236:11
**kind**  17:24 30:25 36:16 37:4,25 39:25 40:8 41:4,5 42:3 45:10 47:16 47:17 54:16,23 55:19 56:22 57:6

69:25 76:22 78:1 81:22 86:16 91:17 95:16 106:4 113:18 114:24 137:21 141:24 145:2 154:21 155:19 166:21 174:8 178:11 184:10 192:6 200:18 215:14 220:13 233:7
**kinds**  104:24
**knew**  93:22 222:9
**know**  10:11 11:25 12:4 15:15 16:4,7 16:18,20 17:21,23 17:24 18:5 24:2 34:10 36:15 37:10 37:15,17 38:3,5 40:5,9 41:7 42:15 47:21 52:17 55:16 55:17 56:21 57:10 58:3,23 60:23 63:12,17,18 68:6 70:1 71:5,7 74:6 74:12 75:20,22 76:4,10,11,18 78:3 78:18 80:9 81:23 82:9,11,12,13 83:3 83:7,12 84:3 85:9 85:22 88:2,2,6,23 92:6 93:19 94:4,5 94:6 95:24 96:10 98:2 101:12,17 104:10,13 106:1 106:14,18,20 113:2 115:7,7,10 115:12 116:3,17 117:5 119:21 120:15 121:23 124:5,7 125:19

126:12,18 127:23 128:2,19 133:19 136:6,17 137:14 138:2,6,9,11,17,22 138:24 139:25 141:2 143:4,19 149:10,10,13,18 149:23,24 150:2 150:14 151:8 152:25 153:25 155:17 156:7 158:24 161:2 162:9 165:16 166:8 168:13,24 175:11,14 177:11 177:25 179:9 180:4,5,8 181:9,19 182:2,3,9 183:8,20 184:8 185:13 186:21,24 187:6 187:11 188:19,20 188:25 189:4,7,8 189:19 190:1,7,21 191:8,16 195:8 197:21 199:12,16 201:14 202:11,22 202:24 203:6,18 204:22 206:23 209:23 212:1 215:7,9,16,17,18 220:10 223:3 224:7,13 226:4 229:23 230:6,21 232:4,16 233:1,7 233:23
**knowledge**  10:19 68:4 71:9,18 73:5 106:16 107:4 111:20 114:17 128:6 135:23 140:19 169:6

174:3 175:16 176:6 183:25 186:24 187:25 192:13 196:21 198:17 199:14 205:13 207:17 210:20 215:7,15 216:1
**known**  34:11 145:24 168:14

**l**

**l**  215:6
**labeled**  25:23
**lack**  10:20 134:9 170:15 179:9 200:7
**laid**  70:17 122:8 162:5
**language**  159:18
**large**  30:7
**largely**  70:18,25 78:25 93:13 114:9
**larger**  83:1 126:25
**late**  19:25 92:12 217:8
**laura**  13:22 15:6
**law**  2:10,17 3:3,3 7:25,25 30:6 32:10 35:18 47:5 54:17 55:10,14,17 79:25 80:4,8,19,22 80:23 84:9 94:15 138:12 139:16 167:1 194:10
**lawful**  86:16 134:6 145:12 191:20 206:11 224:7,8
**lawfully**  145:8
**laws**  79:8
**lawsuit**  83:12

**lawyers** 41:16
**lay** 122:13 131:3
  220:23 221:1
  228:3
**layer** 90:3
**layering** 107:24
**laying** 56:2 233:7
  233:10
**layman's** 142:13
**lays** 32:4 56:22
**learned** 95:22
**learning** 84:7
**led** 219:18
**lee** 2:5 5:3 7:14,14
  8:21 22:8,16,20
  23:10,18 24:6,16
  27:17,22 28:16
  44:1 50:12 52:21
  53:13,23 57:20
  58:25 59:23 60:19
  61:2 62:20 63:6
  64:9 66:9,13 67:5
  69:1 72:7 73:23
  74:4,8,17 76:13
  85:8,11 90:9,20
  95:1 96:6,25 97:2
  97:10 98:4,10,17
  99:3 102:16 109:7
  109:10 110:18
  114:6 117:9,22
  118:8 121:9,20
  122:1,18 124:18
  124:23 125:2,6
  127:16 128:12,22
  134:11 135:13
  140:12 146:21
  147:10 148:6
  151:4 152:11
  153:12 158:6,10
  161:19 162:7
  163:3,7 165:9

169:7,11 170:6,19
  171:3,8 172:18
  173:10 174:10,13
  174:22 182:12,21
  189:25 190:6,12
  190:20 191:10
  192:16 194:3
  197:6,14 198:21
  205:22 208:3,15
  213:24 214:11,21
  215:22 216:3,16
  222:12 234:15,25
  235:11
**left** 12:19 25:24
  48:23 90:24 100:2
  215:24
**leg** 59:8
**legal** 4:10,17 7:2,5
  17:7 41:19 43:2
  49:15 54:21 56:22
  57:12 94:16,20
  132:22 136:17
  143:18 152:13
  153:21 235:15
**legally** 206:17
**legislative** 52:12
**lengthy** 153:15
  223:6 234:2,3
**leos** 55:6,15 56:10
**lesc** 167:4,17
  168:2,19 169:2
**lesc's** 167:15
**letter** 93:10 110:9
  110:24 111:5,9
  116:12,17,18
  117:4,6
**letterhead** 169:20
**level** 17:5,6,7
  33:18 35:21 41:4
  42:1,7,21 43:16,17
  44:11 45:12 46:3

46:4 49:20,24
  50:25 52:16,17
  54:7,8,9,25 55:3,4
  55:19,21 56:5,6,12
  56:13 58:10,15
  63:16,17,21 67:13
  68:7,10 69:9
  70:16 71:2 73:7
  78:7 88:4,12,15
  91:13,18 99:23
  116:8 118:25
  119:2 121:17
  126:25 131:6
  134:23 136:3,6
  140:1,3 141:6
  145:6 169:3
  175:18 191:12,13
  201:24 203:17
  209:18
**levels** 54:6 56:25
  129:21 130:5
  211:23 212:9
**levied** 149:19
**levy** 146:12
**liaise** 39:1 41:15
  51:4,19
**liaising** 45:3
**liana** 3:16 8:5
**liana.wolf** 3:18
**license** 184:25
**licensed** 167:22
**life** 34:7 35:3,5,8
  40:19 63:3 83:2,8
  83:9 153:17
**light** 167:13
**likewise** 149:21
  155:11
**limit** 72:5
**limitations** 146:17
**limited** 14:4 15:2
  72:6 83:8 86:15

151:15 178:10
  188:4 191:18
**limiting** 122:3
  130:25 207:2,2,8
**line** 22:24 70:1
  73:9 123:14
  134:21 138:7,19
  143:16 148:5,7
  150:1,23 154:10
  186:11 187:3
  239:5
**lines** 97:15
**list** 190:2,8 222:21
**listed** 144:9
  159:25
**listening** 233:1
**litigation** 9:4 17:8
  17:11 39:12 67:21
  109:22 110:7,10
  111:9
**little** 9:10 23:24
  31:5 34:1 40:21
  42:5,24 48:13
  52:6,12,14 54:4,19
  67:16 71:22 75:8
  80:17 81:5 83:11
  103:4 114:9 130:2
  135:14 163:14
  175:7 176:11
  177:14 184:18
  200:1,20
**liz** 99:21 218:10,11
  218:23 219:5,14
**llp** 2:10,16 6:25
**local** 39:19 41:24
  136:2
**locals** 138:24
**locate** 13:13,19
  14:17 16:2,24
  194:1

**located**   6:25 14:10
  16:9
**locating**   177:7
**location**   14:5,13
  14:18 187:1
**locations**   15:9
  29:12
**lodging**   169:1
**loiacono**   94:23,25
  95:4,5,7,12 96:4
  96:18,22 97:4
  98:23 99:8 100:3
**long**   12:15 26:3
  185:14 225:3
  234:6
**longer**   100:15
  115:6 148:20
  156:22,22 173:15
  177:9 183:11
  232:12
**look**   13:5 25:22
  83:2 129:12
  151:24 171:4
  179:2,20 200:9
**looking**   45:13
  54:23 81:21 93:22
  188:17 207:25
**loosened**   207:11
**losing**   176:21
**lost**   100:10
**lot**   36:14 38:3 41:2
  41:3 43:15 45:3
  47:19 66:12 71:13
  74:25 88:3 108:7
  137:13 138:9
  139:5 140:22
  155:3 168:9
  181:11 184:15,23
  186:19
**louisiana**   28:23
  30:20,21

**low**   90:10
**luck**   171:11
**lunch**   117:11
  118:12

**m**

**ma'am**   216:22
  217:1 225:7,16
  234:11
**machine**   236:7
**mail**   14:1 15:12
  36:24 38:10 42:22
  55:7 68:14 84:2
  108:16 112:5,7
  117:8 127:21,22
  218:25 219:1,3,12
  219:24 220:6
**mailed**   117:6
  218:13
**mails**   15:22
**maintain**   177:15
  202:5
**major**   52:15
**majority**   223:18
**making**   11:5 33:15
  60:21 79:11
  134:22 137:15
  187:15 230:17
**managed**   15:7
  30:14 31:3 199:13
**management**
  30:10 76:7 83:5
**manager**   169:3
**managers**   37:8
  181:20
**managing**   29:3
**mandatory**   32:12
**manuals**   91:7
**march**   177:2
  197:4 227:12,14
  229:5,8,12

**mark**   22:25 24:24
  169:7 205:22
**marked**   5:7,19
  22:14 23:8 24:14
  24:18 25:2 27:20
  73:25 158:8 163:4
  163:5 169:9
  192:22 193:24
  205:20
**markings**   24:20
  163:7
**martin**   1:23 7:4
  94:24 236:15
**mass**   213:8
**massachusetts**   4:4
**materials**   221:17
  221:18,20
**math**   77:1
**mathematician**
  128:20
**matter**   6:15 14:15
  34:18 62:14,20,25
  64:1,17 66:5,21
  67:6 68:22 96:18
  97:4,11 99:9
  132:18 140:7
  142:5,9 147:22
  167:6 175:23
  177:17 181:22
**matters**   10:18
  61:19 64:20 67:24
  140:8
**matthew**   47:25
**maturation**
  227:10
**maxed**   177:12
**mayorkas**   108:6
**mccament**   223:23
  223:25
**mccormack**   38:17

**mead**   50:15 92:24
  92:25
**mean**   36:22,23
  37:8,25 47:9,20
  59:18 68:8 69:13
  69:19 83:2 88:11
  91:10,10 97:17
  101:2 105:9 110:1
  110:3,12 115:8
  119:20 120:6,14
  122:3 128:17
  136:13 137:13,18
  138:11 142:10
  144:18 145:22
  146:18 148:20
  149:16,17 150:11
  152:4 153:14
  157:1 159:24
  161:2 162:21
  164:21 168:6,21
  170:25 171:24,25
  172:10,11,22
  181:4 183:9,15
  184:20,23 185:5
  186:17 198:12
  200:25 207:9
  211:1 214:3 223:6
  234:2,5
**means**   133:19
  136:10 172:6
  236:23
**meant**   182:9
**mechanism**   16:24
  41:25 173:20
  188:12 192:9
**mechanisms**   38:13
  214:5
**media**   6:13 90:12
  90:18 99:18 106:3
  174:15,20 235:14

**mediate** 46:19
**medication** 10:5
**meet** 12:17 18:2
  36:5 45:20 47:11
  53:6 95:14 147:23
  164:4
**meeting** 12:15,18
  22:6 45:23 46:1
  60:3,7,7 62:21
  98:22 102:6 107:8
  204:2,5
**meetings** 59:15,21
  61:5 63:2 64:5
  65:7,13,16,19 67:1
  67:4 72:4 76:12
  102:2 108:12,14
  111:12,15,17
  204:18 216:20,25
  217:3,5,7,11,25
**meets** 164:11
  193:8 194:13
  195:5 200:16
**member** 45:15
  67:1,2 216:23
  217:2 218:1
**members** 22:6
  39:15 47:8,9,17
  62:8 208:21
  222:21
**membership**
  154:18 155:6
**memo** 17:9,11
  73:13,15,18 74:19
  75:6 77:19,19
  87:7 88:8 91:12
  91:12,15 92:15
  93:12 100:9,11,13
  101:2,16 109:15
  109:19 112:20,22
  113:9,12 116:23
  117:7 129:11,20

130:17,22 131:3
  136:15 143:23
  144:2 145:1
  151:18 155:23
  157:5,18 159:22
  161:11,23 166:13
  169:15,22,25
  170:2,8 171:12
  173:11 193:25
  222:7
**memoranda** 38:10
  57:8 71:14 73:21
  76:21
**memorandum**
  5:16 43:13 93:15
  170:10 176:13
  205:24
**memories** 10:17
  10:22
**memory** 73:20
  101:3,9,10
**memos** 77:16
**memphis** 30:21
**mentioned** 29:23
  42:6 62:3 114:11
  117:19 179:23
  197:17
**merit** 1:24
**messages** 55:8
**met** 12:13 45:17
  53:5 60:10
**meth** 138:8
**methodology** 70:5
  80:7
**metrics** 102:24
  103:3,9,12 105:2
  106:9 107:16,18
  107:19 108:7,22
  108:22,25 118:15
  118:21 119:5,10
  120:9,12,18,23

122:21 123:1,1,5,8
  123:19,19,25
  124:2,3,11,15
  125:9 127:19
  128:14 189:13
  190:16,24
**michael** 4:9 8:7
**michael.f.arnold**
  4:12
**micromanage**
  41:20
**microphones** 6:6,9
**microsoft** 13:25
  14:7,24
**middle** 100:2
  118:2
**migration** 213:8
  213:13 214:6
**miller** 1:20 5:2,10
  5:11 6:14 8:12,16
  8:22 9:1,2 12:9
  18:9 21:22 22:11
  22:17 23:1,11,25
  24:17 25:1 27:19
  28:1 53:24 54:2
  64:14 74:8,18
  90:21 93:6 98:18
  110:19 116:16
  117:20 118:10,12
  121:19 122:5,20
  142:4 170:9 171:9
  174:23 182:22
  190:7 192:23
  197:15 205:25
  207:13 214:22
  216:10 221:24
  235:14 238:12
  239:25
**mind** 24:4 54:9
  55:12 172:4,7

**mine** 172:5
**minimize** 110:14
**minimum** 97:21
**minors** 23:5
  123:20 207:24
  208:6 209:4,9
  210:15,16 212:6
  212:22 213:16
  214:1
**minute** 21:16
  53:14 74:9
**minutes** 24:7
  90:10 197:7
  214:12
**misapplication**
  84:9
**mischaracterizat...**
  135:7 215:21
**mischaracterize**
  215:23
**misdemeanor**
  85:15 133:14
**misdemeanors**
  85:16 133:21
**misrepresentation**
  132:17 140:6,14
  140:21 141:12,17
  145:20 146:25
  147:21 148:2,13
**mission** 30:5 40:4
  40:4 89:5
**mississippi** 20:23
  21:19 28:23
**misuse** 180:8
**moderate** 46:19
**modified** 93:24
**moment** 23:13
  116:16 159:1
  163:25 169:24
  194:1 208:11

**money** 81:9
**monies** 82:11
**month** 18:14 62:1
  77:5,12
**monthly** 63:25
  65:6
**months** 51:10 77:1
  81:25 82:9,13,14
**morale** 73:1
**moreno** 9:4 19:18
**morning** 6:4 7:14
  8:22,23 99:19
  112:3,24 113:20
  117:1 158:22
  220:18 223:7
**morrisson** 2:17
  7:17,17
**morton** 70:17 71:6
  71:8
**mother** 185:11
**mother's** 76:18,24
**move** 40:11 63:19
  219:2
**moving** 19:16
  47:23 140:5 142:2
  142:16 153:19
**multiple** 18:11
  61:25 149:12,18
  210:5,6,13
**municipalities**
  86:20
**munoz** 45:17 62:3
  62:10
**mutually** 152:1
  188:22

**n**

**n** 2:1 3:1 4:1 5:1
**n.w.** 2:18 3:4 4:4
**name** 7:1 8:24 9:1
  12:21 19:7,9 20:6
  49:13 95:2 118:1

177:25 184:21
  185:11,11 197:20
  197:22 216:12
  217:4,6 218:9
  223:16,16,17
**names** 62:9 125:16
  125:24 185:16,19
**nancy** 1:23 7:4
  11:5 236:15
**napolitano** 1:5
  2:14 6:16 7:21
  71:4,10 216:14
**narrative** 80:9
**narrowing** 72:24
**national** 3:3 7:24
  7:25 45:25 46:1,5
  55:21 64:19 65:2
  85:17 131:7 132:5
  132:25 146:5
  150:7 154:4,16
  155:18 156:6,10
  160:19,23 161:4
  162:13 171:25
  172:2,8,12 173:5
  194:13 229:24
**nationality** 32:6
  78:22 131:21
**nationally** 36:8
  55:24 92:1
**natural** 53:15
  117:10 197:6
**naturalization**
  27:14,15
**nature** 45:22
  46:16 50:3 123:4
  135:11
**ncic** 138:23 200:8
**neatly** 106:5
**necessarily** 36:9
  43:16 137:4,6,12
  137:18

**necessary** 35:24
  57:23 146:15
  151:7 203:19
  205:11 212:16
  237:4
**necessitate** 160:10
**need** 12:3 39:1
  44:10 68:25
  139:18,21 140:19
  141:23 142:19
  144:16 180:2,14
  180:17 181:3,9,13
  181:14,17,19
  186:13,16 196:7
  199:18 200:2
  201:9,20 202:6,15
  202:18,18 203:1,9
  220:23
**needed** 43:8
**needs** 40:10 68:22
  115:19 187:9
  199:16
**neither** 236:11
**network** 15:1,3
**never** 115:11
  199:12,13 202:23
  202:23 203:4,22
  215:8
**new** 3:8,11,11,13
  8:3,4 26:17 28:20
  30:20 42:13 47:16
  47:17 50:21 52:3
  53:6,8,10 56:24
  83:18 92:20 118:7
  120:4,8,19,24
  136:15 161:9
  188:3
**news** 110:12
**nice** 234:14
**nilc.org** 3:6

**niles** 20:10
**nods** 76:25
**noncriminal** 146:3
**noncriminals**
  177:11
**nondetained** 29:3
  29:23 30:18,20
  31:13 83:4 228:10
**nonimmigrant**
  146:2
**normal** 30:2 68:8
  90:1 126:16,19
  135:25
**normally** 134:20
  138:21,25
**northern** 1:2 6:22
  10:13
**northwest** 7:1
**note** 6:6
**noted** 237:9 238:6
**notes** 214:12 230:5
**notice** 5:8 22:10
  22:18 31:20
  193:10 227:7,18
  228:5,13,18 230:1
  236:3
**notices** 143:16
**noticing** 7:13
**notification** 168:7
  168:8 222:25
**notified** 160:12
**notify** 173:8
**november** 71:15
  73:13 74:10 76:22
  77:16 129:10
**nsc** 52:11 53:12
  59:7 63:19,20
  65:14
**nta** 31:23,24 32:10
  139:23,25 140:17
  141:19 148:15,19

152:15,17 156:14
160:6,8,11 161:14
161:25 162:6,6,15
162:19 175:23
193:9 194:14
195:6,7,8,15,17,24
196:2
**ntas**  31:20 143:22
159:21 195:19
196:4
**number**  5:7,20
25:2 34:8 35:1
61:24 67:19 72:4
103:22 113:13
124:9,19,25 125:3
125:23 126:1,2
149:17 152:24
168:6 179:6 185:1
185:1 189:9
191:16,17 197:24
235:14
**numbered**  25:8
74:6
**numbers**  24:24
119:6 122:22
125:14,23 178:7
189:21 190:2,8
**nw**  1:22 2:11

**o**

**o'clock**  113:10
**oakdale**  30:19
**oakland**  2:6
**oath**  7:6 9:18,18
9:22 53:25 90:22
98:19 174:24
214:24
**object**  59:12 60:14
62:17 64:3 96:1
96:20 109:1
120:25 121:17
124:12,16 134:9

220:22 221:19
**objecting**  124:18
125:3
**objection**  43:25
50:5 57:19 58:13
64:11 66:7,23
68:20 72:1 76:9
98:25 102:15
121:3 122:10
127:15 128:9,16
135:7 140:9
146:19 147:4
148:3 151:1,16
153:10 161:18
162:3 165:7
170:15,24 172:17
172:21 189:24
190:10,18 191:7
192:12 198:15
215:21 221:19
225:25
**objections**  7:11
11:17
**obligation**  132:22
153:21 212:13
**obtain**  142:12
232:2
**obtained**  103:14
155:4 217:22
**obviously**  176:17
**occasion**  51:6,19
95:11,12 190:22
**occasionally**  39:16
39:21 108:19
**occasions**  9:7
18:11 20:20 39:22
65:4
**occur**  82:7 96:8
228:13
**occurred**  52:2
130:3 140:14

204:7
**occurrence**  61:23
89:2,9
**october**  1:17 6:1,5
100:21 101:1,23
114:23 115:6
166:8 217:9
236:17
**offense**  132:11,13
132:15 133:10,13
134:2,13,19
135:24 148:19
152:13 161:17
162:2 172:15,20
**offenses**  32:11
**office**  2:4 3:9,16
7:15 15:7 17:4,6
19:3 25:24 26:17
26:22 28:20 29:19
30:15 31:2,20
32:2,19 34:15
35:22 39:11 41:11
41:19 43:10 46:9
46:10,14 54:7
55:1,14 56:5,13
58:22 60:6 61:13
67:21 70:15,21
76:7 81:12 83:24
83:25 87:20 91:24
92:10 94:5,16,19
94:22 95:17 100:1
118:3 129:4 135:5
135:9,10 136:9
157:12 175:13,18
175:19,19,20,21
182:2 186:23
187:4 205:6
218:21 220:11
224:3 231:13
**officer**  89:18
132:24 135:20,21

135:22 136:19,23
139:12 140:18
141:15,24 144:14
144:18 147:25
148:11 150:21
151:13 152:16
153:7 154:3,5,10
155:10 156:12
160:7,9,18 161:14
161:24 162:5,14
172:23 173:4,21
180:9 181:8
186:11 187:17
199:13,14,16
202:13,15,23
203:1,2,3,4,9,17
206:25 227:21
**officer's**  143:1
162:24 228:5
**officers**  29:22
30:14 36:11 38:6
54:17 55:11,14
79:11 134:21
137:16 150:8
151:19 154:6
155:11 159:21
166:21 168:25
173:2 178:23
180:13 182:3
186:3 187:20,23
188:10,14 191:1,5
199:4,4,20,21,22
199:25 201:21
202:9,24 210:11
215:14
**offices**  1:21 28:24
36:4 39:8 40:18
40:18 41:1,24
42:8 46:7,12
54:11 55:23
175:17

[official - overlaid]                                                           Page 32

**official**  1:5,10 6:17
  6:19 20:12 107:9
  132:17 140:7
  142:5,9 147:22
  160:24 180:5
**officials**  39:20
  59:15 139:17
  159:11
**oh**  51:14 211:4
**oil**  46:7,8 52:15
  53:7 67:20 68:1
**okay**  9:6,16 10:8
  11:11 12:9 14:15
  14:23 18:20 19:13
  21:5,7 26:12
  27:12 28:4 39:9
  39:15 44:15 45:7
  47:23 48:4 51:3
  51:17 53:2,13
  64:10 70:8,12
  71:1 76:14 77:5
  81:15 83:10 85:12
  90:9 93:3 100:12
  110:23 111:4
  116:19 117:9
  122:13 124:18
  129:7 130:20
  131:11,24 132:7
  133:8 136:19
  139:24 140:2,13
  142:25 147:15,20
  148:17 153:19
  157:4,15 158:1
  159:3 163:17
  164:3 167:10
  169:14 170:3
  174:12 176:6,17
  178:5 181:1 182:1
  197:6,7 203:15
  204:10 208:2,14
  213:4 214:11,13

  215:10,16 216:3
  221:16,22 235:8
**old**  187:25
**older**  84:16
**omb**  52:11 53:12
  59:8 65:21,24
  66:16 67:1,4
  216:21 217:11
**once**  34:16,20
  35:10 43:18 95:2
  97:22 98:1 201:23
**ones**  19:17 81:18
  113:7 123:14
  153:23 178:22
  212:1
**ongoing**  102:13,22
**ooo**  6:3
**open**  21:3 36:25
**opening**  229:18,19
  230:4,6,7,17 231:4
  231:7
**operate**  177:19
**operated**  178:18
**operates**  168:19
**operating**  29:11
  55:21 79:19 172:7
  224:14
**operation**  29:11
  36:6 118:3,6
**operational**  35:18
  35:20 36:20 37:19
  38:9 41:10,16
  42:15 49:22 50:4
  50:24 54:15,16
  55:5,13 56:8,11
  57:17,24 58:6,12
  58:18 82:24 83:7
  87:21 90:5,25
  91:6,18 114:1,3
  115:25 116:7
  128:23 157:4,7,16

  157:19 168:18
  170:13,22 181:14
  204:23 205:10,17
**operationally**
  87:23 106:4
  115:19
**operations**  23:2,3
  25:17,25 26:8,10
  26:25 27:4 29:15
  29:16 30:2,6
  38:16 40:12,22
  43:16 44:15,24
  54:8 59:20 72:10
  92:2 115:8 118:5
  127:7 224:3
  229:21 231:14
**operative**  81:18
**operators**  55:2
**opine**  122:5
**opinion**  115:9
  209:3
**opla**  42:17
**opportunities**  35:1
  37:2
**opportunity**  18:23
  34:10,16 42:2
  43:6 57:13 84:13
  84:16
**opposed**  11:10
  55:15 80:17
  136:11
**opposing**  33:16
**order**  10:15 16:15
  26:16 34:22,23
  43:22 79:13 81:23
  97:14,25 121:23
  132:21 153:20
  167:11 180:2
  222:20 235:3,5,10
**ordered**  31:9

**orders**  24:23
  96:11,14 123:10
  123:11,12,22
  153:14
**organization**
  33:20 44:14 46:11
  56:14,25 71:16
  75:9 99:23 149:24
  154:21 155:14
**organizational**
  25:3,9,19 26:20
  48:2,20 58:16
  167:7 224:9
**organizations**  40:6
  188:6 209:24
**original**  237:11
**originally**  106:21
**orleans**  26:17
  28:20 30:20 83:18
  92:20 118:7
**oscar**  30:3
**osuna**  60:10
**outcome**  7:8
  198:19 236:13
**outcomes**  54:22,22
  56:3,9 58:4
**outline**  39:25
**outlines**  129:20
**outlining**  43:20
**outlook**  13:25 14:7
  14:24
**outreach**  61:17
  63:11 65:1
**outset**  18:9
**outside**  14:23 15:1
  38:22 67:14,18
  111:18 140:8
  146:18
**overcome**  161:7
**overlaid**  91:2
  103:18,23

**overlay** 91:8
**overlaying** 137:21
**overseas** 40:22,25
**overseeing** 35:4,5
**oversight** 29:10
  186:7
**overstayed** 149:14
**overstaying** 146:2
**owen** 223:14
  224:11,20
**owens** 224:2
**owned** 178:21
**owns** 178:14 198:8

## p

**p** 2:1,1 3:1,1 4:1,1
  179:25 180:1
**p.m.** 117:14,15,16
  117:18 174:16,17
  174:18,21 182:16
  182:17,18,20
  197:9,10,11,13
  214:16,17,18,20
  234:18,19,20,22
  235:13,18
**pace** 77:6
**packet** 113:18,19
  116:25 138:23
  158:21 220:18,20
  220:24 221:13,14
  221:25 222:8,11
  222:13 225:6,11
  225:19 230:11,21
  233:17 234:7
**page** 5:1,20 74:5
  93:5 110:15
  116:11,11 129:11
  129:23 131:12
  144:25 154:23
  163:18 173:12
  208:17 239:5

**pages** 5:8,10,11,13
  5:15,17 25:8,9,11
  93:6 110:20
  129:19 234:4,7
**panhandle** 29:7
**paper** 110:14
  184:7,16
**papers** 184:8
**paperwork** 203:18
**paragraph** 131:16
  131:17 132:7
  141:9 171:10
  173:12 208:16
  213:3,22
**paragraphs** 28:13
**parameters**
  101:13,16
**paramount** 193:18
**parents** 84:14
  185:11,17,23
  200:10,13,14
  214:6
**parole** 31:15
  231:20,21 232:2,2
  232:5,9,13,16
**paroled** 232:6
**part** 31:19,19
  56:13 68:8 73:4
  73:23 113:19
  116:25 125:24
  140:18 155:15,20
  158:13,21 164:9
  165:16 174:9
  176:7,22,25 190:5
  192:7 196:6,8,25
  199:7 214:10
  234:5
**participate** 230:14
**participated**
  216:21 218:2
  223:10,12

**participation**
  218:12
**particular** 15:24
  33:11 60:24
  122:15 134:4
  136:20 137:1
  139:11 142:20
  147:17 148:19
  170:2 181:24
  222:20
**parties** 6:12
**partners** 64:23
  136:2,4 150:10
**party** 7:6 236:12
**path** 137:20
**patience** 174:13
  216:17
**patrol** 169:16,17
  174:5 231:11,13
**patrol's** 179:17
**pattern** 30:22 32:7
**patterns** 162:5
**pause** 98:7 110:17
  216:6
**paxton** 111:1
**paying** 232:24
  233:15
**pd** 137:11
**penal** 80:15
**penalty** 238:3
**pending** 12:5
  98:22 99:7 100:24
  171:15 194:6
  201:4,15,17 235:2
**people** 21:6 37:5
  37:15 41:7 58:21
  88:21 92:6 94:4
  114:22 119:21
  136:2 138:14
  143:15 146:1
  150:17 152:25

166:9 168:21
  181:7,8 191:14
  200:17 218:24
  220:11 224:14
  227:9 230:24,24
  231:20 232:1
**pep** 72:18 123:8
**perfect** 37:9
**period** 77:6,12
  166:8 227:11
**periodically** 95:15
**periphery** 155:14
**perjury** 238:3
**permanent** 178:12
  192:1,5 201:2,5
  206:12
**permissible**
  194:22
**permission** 202:3
  203:17
**permissions**
  181:23 201:24
**permitted** 97:19
**person** 30:9,10,11
  30:13,24,25 31:3
  32:12 59:20 65:19
  65:20 80:13 89:18
  89:19,22 94:22
  96:15 105:12,19
  106:21 107:8
  108:12,14 126:4
  147:18 148:20
  149:19,20 153:1
  163:1 167:18
  184:9 200:15
  201:2 206:17
  218:25 224:22
  227:22 228:7
**personal** 13:18
  95:9 115:13,14
  127:13 194:5

**personally**  16:20
  19:2 65:13 68:6
  126:10 135:1
  143:22 210:11
  211:2
**personnel**  83:6
  131:18 132:9
  180:13 203:23
  204:6 211:17
**persons**  31:8,9
  79:14 80:5 82:25
  84:13 86:21 103:6
  103:16 120:9
  131:1,8 141:3,15
  154:19 168:12
  217:19 229:22
**perspective**  41:2
  163:21 164:23
  165:2,11
**pertained**  67:7
**peruse**  159:1
**peter**  48:8
**philip**  1:20 5:2,9
  5:11 6:14 8:12,16
  9:1 22:11 23:1
  27:18 235:14
  238:12 239:25
**philosophies**  80:8
**philosophy**  55:4
  80:7 81:1
**phone**  186:12
  203:3
**phones**  6:9
**phrased**  165:22
**physical**  83:6
**pi**  179:24
**pick**  6:7 186:11
**pics**  178:25 179:1
  179:23 180:12,17
  180:19 181:1
  182:4 186:3 199:5

199:13,13,14,16
  200:3 201:25
  202:9,23,23 203:2
  203:4,6,8,13,16,16
**piece**  83:8 226:12
**place**  6:9,11 14:10
  32:1 41:25 102:3
  114:3 143:2 204:6
  236:4
**placed**  164:6,14
  165:5,14,14 166:3
  166:17 167:14
  168:4 228:10
**plaintiff**  3:13 6:15
  19:7 20:6
**plaintiff's**  22:10
  118:1
**plaintiffs**  1:7 2:20
  3:6 7:18,23 8:1
  235:4
**plan**  83:6
**plans**  227:8,11,13
  228:23 229:2,5,11
**play**  41:5 101:9,10
  186:3
**plea**  21:15
**plead**  21:6
**please**  6:6,8 7:12
  8:14,24 11:6,25
  13:24 49:8 64:16
  74:5 87:22 93:3
  117:22 118:19
  124:22 129:8
  171:4 207:22
  237:3,7
**plus**  51:14,18
  138:12
**point**  34:10,21,24
  53:16 55:20 79:7
  91:20 96:1 112:19
  114:12 115:1

117:10 139:2
  145:15 151:17
  160:13 162:24
  172:25 183:8
  187:5 189:7
  193:16 197:7
  202:13 213:22
  232:7,11 233:8,9
**points**  34:9 52:11
  63:7 188:7 203:22
  221:9
**police**  80:12 81:3
  137:9 138:16,17
**policies**  35:13 36:7
  49:19,22 50:3,7,23
  54:3 57:8 74:11
  77:2 96:12 121:16
  157:18
**policy**  5:16 36:6
  36:20 42:13 43:14
  43:17 44:12 45:11
  50:11 54:15,19
  55:18,25 56:16,18
  57:4,7 58:15 59:7
  63:12 65:19 67:9
  67:11 69:25 70:2
  70:2 72:18 75:4
  77:23 78:1,2,4
  84:1,8 85:12
  157:7 160:24
  162:10,11 164:19
  166:15 167:13
  186:17 187:7
  189:11 205:23
  213:7 216:24
  218:1
**population**  141:3
  213:15
**ports**  150:5,12
**pose**  11:23 85:16
  132:25 154:3,14

154:15 162:25
**posed**  80:21
**poses**  194:12
**posing**  32:4
**position**  25:18
  26:1,3,5,6,13,16
  26:19,23 27:1,8
  28:19 33:4 38:21
  40:12,16 41:9
  44:23 45:3,7
  47:24 49:17 51:3
  59:4 69:5 72:8
  92:22 116:4 130:9
  130:10 135:16
  166:14 181:12,24
  186:2 195:2 202:5
  223:20
**positions**  48:6
  72:14 105:23
  180:21 181:11
  183:3 188:4
  202:16
**possession**  13:6,14
  14:6 15:22,22
  16:25 104:19
  179:7 192:2 201:7
  211:16,19,20
**possibilities**
  149:17
**possibility**  94:9
  95:23 99:4 143:12
  143:20
**possible**  50:10
  58:23 79:3,22
  85:14 98:23 100:6
  102:10 111:19
  150:15,16 225:18
**possibly**  135:9
  151:22 152:21
  203:5 234:2

post 34:22,23
123:8,9,21
posted 68:15
110:11 225:9
posture 76:20
potential 97:12
203:24
potentially 58:9
141:18 149:7
152:19 172:16,19
practical 37:11
pre 123:7,9,21
precedent 145:3
precedents 57:13
precision 103:5
preclude 10:1
161:13,24 191:21
precluded 88:25
precludes 186:17
preclusion 10:25
187:12
preclusions
151:21
precursor 153:13
predatorial 138:8
predecisional 88:3
121:6,15 221:5
226:4
predicate 32:11
predicated 68:23
predicating 80:2
predominantly
52:2,4
preemptively
155:19
premise 79:25
preorder 34:24
preparation 12:13
220:19
prepare 10:16
12:9,12 160:7

prepares 226:13
preparing 157:23
presence 60:3
145:12 150:9
present 4:16 7:9
32:8 42:18 101:15
157:2 176:22,25
205:3 208:21
231:1
presented 109:22
presently 47:24
176:9 203:18
preserved 127:25
president 1:6 6:17
69:21 80:4 123:13
166:23 216:23
218:1
presidents 69:20
press 99:17,20
111:25 112:11,15
113:4,5,18 116:25
158:21 218:6,12
218:15,18 219:4,7
219:18,20,22
220:4,13,16,17,18
220:20,23 221:12
221:14,25 222:8
222:13,23 223:9
223:12 224:22
225:6,11,18,19,24
226:17 227:3,19
228:12,22 229:14
230:9,10,21
231:11,12,15
232:14 233:16,17
234:1,1,7,9
presser 218:24
presumably 73:9
195:22
presume 46:6
212:15

pretty 17:23 18:2
116:22 146:3
177:12
prevent 10:6
164:13 165:4,13
166:2,16
previous 10:24
26:5 52:5,8 53:1
56:19 61:17 108:8
114:12 120:5
162:21 180:21
previously 5:19
9:2 24:14,18 25:1
28:2 54:25 73:25
101:20 120:3
147:9 150:3
151:24,25 152:8
155:13 160:5,7
163:4,5 164:24
166:19 172:1,22
178:11 179:22
184:10 193:24
207:18 212:8
price 219:10
prima 88:21 89:12
89:21
primarily 65:20
214:7
primary 52:11
80:1 95:13 149:23
150:13 187:5
principal 17:6
41:19 43:2 49:15
94:16,20 95:13
principals 46:2
62:12 66:2 72:4
76:11 223:18
principle 122:3
principles 55:21
printed 169:8

printout 169:14
prior 59:2,4 63:23
64:18 65:23 70:8
75:17 87:4 93:20
100:21 107:21
108:3 109:2,13,17
112:5 113:20
122:21 155:1
217:22 220:16
230:9 233:11
priorities 69:12,14
69:17 70:18,25
71:1,8,19,20,24
72:14 73:13 77:19
78:15,20,25 81:8
81:17 82:3 129:11
130:17,21 131:3,6
131:13 159:22
166:13 204:19
prioritization
136:25 147:14,24
152:2 154:23
157:17,20 159:25
prioritizations
151:25
prioritize 81:4
131:7,18 132:10
153:7
prioritizing 147:2
priority 71:17
129:20 130:4
144:9 164:9 196:3
prison 201:1
prisons 29:4,6
privacy 5:16
205:23 206:10,24
private 6:7
privilege 59:13,14
60:15,22 62:17,21
64:6 96:2,21 97:9
109:4 121:2 122:2

122:12 124:13
125:5 221:3,4,15
221:21 226:1,1,10
226:11,14,18
232:5
**privileged** 63:1
97:9 220:25
221:10 226:5
**privileges** 235:7
**proactive** 30:6
80:5
**proactively**
177:11 190:22
194:7,9
**probable** 227:24
**probably** 9:10
18:16 19:18 21:4
57:1 66:2 92:11
94:11 113:3 122:7
123:5 207:5 211:2
212:11
**problem** 24:3
42:13 111:23
150:24 211:6
216:19 234:14
**procedure** 22:12
42:10 141:20
**procedures** 96:13
127:10 151:5
199:10
**proceed** 11:19
34:10,11,17,17
36:17 38:8 201:9
228:10
**proceeding** 7:11
9:24 10:9 18:10
20:7,9 21:9 89:10
**proceedings** 20:12
31:6 32:1 34:20
98:7 110:17
149:11 150:19

164:7,15 165:5,15
166:3,18 167:15
168:4 179:22,22
193:7 194:12
195:4 216:6
**process** 16:15 29:4
34:7 42:25 51:1
57:6 58:8 59:13
60:15,22 62:17
64:6 68:9 73:4
75:1,2 82:8 86:1
109:3 121:2,15,24
122:2,12 124:13
125:5 129:4 138:4
141:21 149:1
150:5 153:15
155:21 165:19
171:14 175:6,16
189:9,14 192:7
200:12 203:15
220:24 221:3,10
221:15,21 223:2
226:1,10 227:6,8
227:17 228:13,17
233:14,14 235:6
**processed** 171:17
**processes** 17:20
60:13 85:22
**processing** 171:16
**produce** 102:24
120:9 205:16
**product** 102:10,17
102:20 104:25
115:23 118:13
121:1,4,6,9,10,12
121:19 122:6,7,11
122:15 226:13
**professional** 23:25
28:12 76:8 95:8
95:10

**program** 13:10
29:5 42:16 71:17
83:11,13,16,22,25
84:12 87:5,14
88:23 89:7,9,24
91:14 93:17,23
94:6 101:4,5
119:16 132:19
142:3,17,21,21
144:13 145:4
153:6 161:1,9
166:20 181:16
183:10 196:4
212:5 232:25
233:5
**program's** 230:3
**programs** 8:9
17:25 50:8 53:8
86:20 151:10
187:10 188:7
**project** 217:16
**projection** 81:23
81:25
**projections** 82:16
**projects** 92:24
**promoted** 40:13
72:11
**promulgated**
70:16 86:20
**prong** 227:24
**proof** 144:22
146:8
**properly** 226:5
**property** 163:1
**proportion** 202:8
**proposals** 45:14
**prosecute** 137:13
**prosecution**
137:19
**prosecutorial**
32:15,17 33:2,24

34:2,5 35:2,7,14
129:24 136:7
137:9 155:23
156:20 159:8
**protected** 64:5
193:6 195:3
**protection** 70:20
84:23 85:5 100:19
160:2 175:24
176:14 206:19
**protections** 206:10
206:15,16 207:10
207:11
**protocols** 178:19
**provide** 11:9 44:6
78:1 102:9 120:24
123:5 146:9
168:13
**provided** 12:22
20:15,18 23:12
41:1 72:22 82:11
84:12,13,16 112:2
124:5 158:21
160:16 189:21
193:5 194:9,10
195:2 196:22
212:23 233:4
**provider** 173:7
**provides** 57:13
**providing** 167:20
200:21
**provision** 134:3
147:18
**provisions** 131:25
**provost** 174:6
**pst** 15:8
**public** 35:16 73:2
80:24 85:17 100:1
110:2,3 113:1,3,13
131:7 132:25
142:3,17,21

144:13 151:10
153:6 154:3,15
155:18 156:6,9
160:19,23 161:4
162:13,19 171:25
172:2,8,11,14
173:5 194:13
221:7 226:3,7,18
229:24
**publicly** 110:2
124:6 183:2
226:23
**published** 226:17
**pull** 208:19
**purpose** 120:1
145:9 146:15
193:7 194:11
195:4 202:4
**purposes** 11:3
115:2 128:8,13
147:2 148:15,18
193:4 194:7
**pursuant** 22:11,17
159:5 236:3
**pursue** 137:19
**pursuing** 136:5,11
154:20
**purview** 35:9
**push** 208:18
**put** 77:17 114:2
149:11 152:14,17
179:4 189:3

**q**

**q&a** 165:25
193:15
**quadrant** 100:2
106:13
**qualified** 84:19
164:13
**qualifying** 88:19
165:4,13 166:2,17

168:20 176:18
**quarterly** 66:3
**query** 179:5
191:18
**queryability**
191:18
**question** 11:13,14
11:20 12:5 18:5
22:21 28:4 52:19
60:20 64:15 80:2
80:2,21 85:2 97:1
97:10,22 98:1,21
99:7 101:8 109:8
110:3 114:5 123:6
152:5 159:2,4,18
163:11 164:2,4
165:8,17 193:1,2
194:4,5,20,20
211:18 212:12
221:12,16 228:15
228:22 229:4
**questioning** 97:15
138:20
**questions** 11:11,23
22:23 25:14 36:2
37:3,4 39:23 40:1
40:6,9 42:1 46:20
47:10,19 95:14
97:20 113:14
121:1,18 143:24
143:25 158:16
169:25 171:2
192:24 193:25
215:1 222:5
225:18,23 226:7
226:16 227:2,5,15
227:15 229:14
230:20 231:10,16
231:18,19,25
232:18,21 233:9
233:16,18,25

234:13,23 235:6
**quick** 22:9 90:10
117:20 203:22
**quickly** 19:16 21:8
216:4
**quite** 78:12,13

**r**

**r** 2:1 3:1 4:1 236:1
239:1,1
**raise** 81:2
**raised** 11:17
151:12
**range** 47:21
**rank** 73:3
**ranks** 91:17
**raped** 80:17 81:5
**rare** 39:21,22
**rationale** 109:14
**ray** 220:9
**reach** 33:17 38:6
69:17 77:25
199:14
**reached** 77:2 78:7
124:25 130:8
219:16
**reaching** 61:22
**reaction** 84:7
**read** 8:10 101:21
133:3 159:15
164:17 170:3
171:10 186:4
193:13 194:17
208:9 209:1 211:2
211:12 212:11
213:11 225:12
237:3 238:4
**reading** 140:10
142:10,15 170:8
171:1
**reads** 131:18
132:8 159:4 164:8

167:12 173:12
194:5,8 213:5
**ready** 164:1
234:15
**real** 22:9 70:21
**realistic** 80:6
**reality** 79:19 81:1
**realize** 10:8
200:17
**really** 18:15 46:9
52:22 56:6,14
62:8 70:18 71:15
82:12 131:6
149:24 152:4
155:15 163:13
165:24 202:22
209:23 211:1
212:9,12 232:24
233:15
**realm** 143:12,20
**reason** 10:1 31:12
138:24 237:5
239:5
**reasonable** 80:24
138:19
**reasonably** 10:19
**reasons** 32:14
109:18 204:15
208:5,18 209:4,8
212:19,21
**rebert** 3:3 7:24,24
**recalcitrant** 65:7
65:16
**recall** 12:20 20:16
20:25 21:9,20
28:3,5 50:13,16
58:22 61:22 84:25
85:10 87:3 88:8
88:11,19 91:9,10
91:13,21 92:3,9
96:9 101:3 107:2

108:2 110:11
113:6 116:22
117:5 118:17
119:19 124:8
125:24 126:7
129:13 160:25
168:9 175:4 185:8
185:22 189:15
191:11 203:24
206:3,5,24 207:19
208:8 209:13
220:12 221:24
222:10,16 225:23
227:2,5,6 228:15
229:15 231:10,15
231:18,24 232:13
232:14,18,21
233:3
**receipt** 142:3,17
144:13 151:10
153:6 237:12
**receive** 17:8 35:23
110:6 126:20
**received** 17:2 84:1
103:19 111:25
113:9,18 117:1
120:21 126:12
159:5 190:14
206:3 219:13
222:15 227:3
233:10
**receiving** 86:9
88:25 206:5,24
**recess** 24:10 53:19
90:15 98:13
117:15 174:17
182:17 197:10
214:17 234:19
**recipient** 170:21
**recipients** 119:16
188:12,16 190:14

191:2,6 228:24
232:16
**recitation** 28:12
**recognize** 93:7
110:20 130:14
163:12 232:9
**recollection** 10:20
10:24 13:1 60:6
76:14 77:4 83:23
101:23 102:1
108:4 186:1
206:22 208:12
222:1 229:20
**recommendation**
69:6
**recommendations**
221:9 226:3
**record** 6:5,12 7:11
8:25 9:15 10:11
11:4 18:7 22:22
24:6,9,12 53:18,21
58:8 61:3 74:1
90:14,17 93:4
94:17 97:17,23
98:8,12,15 103:15
110:23,23 117:14
117:17,20 126:6
129:8 132:8
174:15,19 179:18
180:7 182:13,16
182:19 188:17
189:8,10 191:17
192:6 197:9,12
200:8 214:12,16
214:19 234:16,18
234:21 235:1,2,12
236:10 238:7
**recorded** 6:13
236:7
**recording** 6:11

**records** 15:8
103:23
**reduce** 88:6 213:7
**refer** 24:17 30:1
61:12 69:13 93:3
93:5 116:11
131:25 132:2,3
158:11 187:3
189:10
**reference** 213:13
**referenced** 19:11
87:10 98:23
118:15 125:10
145:21 215:5
220:7
**references** 142:5
**referencing** 89:8
**referral** 193:9
194:14 195:6
**referred** 13:23
70:20 86:14
227:16
**referring** 13:9
31:6 52:22 70:4
89:6 94:1 110:19
119:6 123:12
210:3,4,5,13
213:15
**refers** 29:24 31:16
167:1
**reflected** 25:18
26:19 48:19
201:18
**reflecting** 25:3
**refresh** 10:17
12:25 208:12
**refreshed** 10:22
209:25
**regarding** 23:3
67:9 78:4 97:12
105:2 112:10

118:15 219:3
**regardless** 132:8
153:3,4
**regents** 1:4 2:14
6:15 7:20 216:13
239:2
**registered** 1:24
**registration**
103:22 178:7
179:6 184:4,14
**regular** 65:6,24
107:8 108:9
120:16
**regularly** 108:11
**regulations** 86:21
**reidy** 4:17 7:2
**reject** 37:10
**relate** 122:11
**related** 1:13 6:21
7:6 18:1 52:20
60:23 63:3 67:9
67:11 107:13
118:6 122:17
123:2,14,25
132:19 142:3,17
144:13 151:10
153:6 218:3 235:4
235:6
**relates** 121:20,21
157:5 204:19
**relating** 13:6,14
14:6,21 15:11,18
16:16 17:15 21:9
61:19 67:24 91:18
104:19,25 118:14
122:22 196:19
**relation** 57:22
**relations** 218:22
219:16 220:10
**relationship** 95:9
154:20

relay   9:15
relayed   127:10
release   30:25
    31:14 138:21,25
    228:10
released   139:1
relief   235:9
remain   31:13
    93:23 168:22
remedy   136:9
remember   18:14
    19:7,9,12,19,25
    20:6 50:17 60:11
    62:9 71:9 75:16
    75:23 76:17 101:4
    117:7,25 185:12
    213:9 217:4,6
    222:12,14 223:5
    223:14,15,16
    224:5,10,21 225:1
    234:5
remembered
    117:23
remind   92:19
    104:17 106:9
    218:9
remotely   186:23
removability
    132:9 153:8
    227:24
removable   132:10
removal   23:3
    25:17,24 30:2
    34:8,21 65:9,10
    74:12 79:18 80:5
    81:13 82:3,17
    103:17 118:16
    131:19 132:5,21
    136:24 147:3
    149:11 150:19
    153:13,20 164:7

164:14 165:5,15
    166:3,18 167:14
    168:4 179:21,22
    207:15,16 229:21
remove   31:12
    34:25 79:13
    144:14
removed   31:10
    82:20 103:7,8,25
    104:5 105:4
    119:17 153:14
    164:15 165:6
    166:4,18
removing   82:25
renew   100:19
renewal   100:15,21
    100:24,25 101:1
    101:19,24 171:17
    176:15
renewals   86:3,4
    233:8
renotice   235:5
reoccurring   107:8
    120:16
repeat   64:14 97:1
    114:4 161:21
    165:7 190:4
rephrase   115:23
    192:17
rephrasing   11:24
reply   219:23
report   26:23 44:16
    47:24 106:7,8
    185:13 210:4,21
    211:11 228:3
reported   26:24
    27:5 49:1 120:3
reporter   1:24,25
    7:4 8:13 11:5
    94:24 101:21
    236:24

reporting   73:9
    105:14,23 119:21
    120:15
reports   210:13,18
    210:24,25 211:15
    211:20 212:4
    214:9
represent   24:21
    163:9 216:13
representation
    23:12
representative
    223:13
represented   118:1
    192:22
representing   2:8
    2:14,20 3:6,13,18
    4:6,13 8:1
represents   25:2
reproduction
    236:22
request   12:7 15:16
    17:1 106:23 108:2
    118:20 120:1,20
    121:23 122:14,16
    122:22 125:10
    126:7,20 127:8
    128:15 193:3,5
    199:7,10 200:3
    202:20 203:13
requested   106:22
    121:2
requester   193:8
    194:12 195:5
requesting   60:2
    107:2
requests   123:4
    194:6,9 195:2
require   33:5 67:17
    139:22 142:19
    191:22

required   32:10
    57:23 92:6 125:10
    147:25 233:8
requirement
    86:18
requirements   90:3
    91:1 120:16
requires   80:4
    173:3
requiring   149:8
reread   213:19
rescind   99:13
rescinded   95:23
rescinding   109:18
    114:2
rescission   5:12
    83:12 91:15 93:16
    93:20 96:19 97:5
    97:13 98:24 99:5
    99:10 100:6
    101:12,13,16,17
    102:3,7,10,12,19
    109:14 111:13,19
    112:20 114:8,18
    115:20 116:1
    128:25 158:16
    168:20 170:10,14
    170:23 176:13
    193:25 203:24
    204:2,7,12,15,24
    205:18 207:15,20
    218:3 221:8
    228:14,18
research   104:25
reserve   8:10 32:14
    235:4,9
resided   104:14
resident   178:12
    192:1,5 201:2
residents   206:12

**resolution** 235:2
**resolved** 132:13
   134:2
**resource** 168:10
**resourced** 37:12
**resources** 168:11
   177:12
**respect** 15:21
   26:22 35:14 50:23
   58:7 59:10,14,16
   60:15,18,19 61:1
   62:17,18,23 69:12
   70:8 72:2,17
   73:12 74:20 75:3
   75:6 77:22 78:16
   81:3 82:2 87:16
   88:16 91:3,8 96:4
   96:21 97:15
   100:17 102:10,19
   104:19 107:15,23
   108:20,24 109:1,6
   111:8,18 114:1
   115:14,25 120:18
   121:1,3,5,18 122:1
   122:10,14 124:2,3
   124:13 128:24
   133:9 139:15
   141:23 144:12
   145:19 148:1
   150:18 151:9
   153:2 154:14
   155:24 156:1,21
   157:4,15,16,20
   159:18 160:16
   162:11 163:19
   166:15 168:19
   170:22 176:20
   178:17 186:10
   189:12 192:10
   194:19 195:12
   196:9,18 197:17

202:17,19 203:15
   204:11 205:17
   206:10 209:8
   210:7 220:23
   221:8 225:25
   226:3,7 235:3
**respective** 68:17
   135:12
**respond** 40:9
**responding** 11:19
**response** 11:11
   23:5 64:21 68:18
   76:20 170:13
   204:24 229:1,10
   231:24
**responses** 222:5
   225:17 226:16,16
   233:16,18,25
**responsibilities**
   28:21 38:25 40:16
   57:1,1 58:3 188:5
**responsibility**
   28:23 29:10 30:19
   31:19 32:18 76:8
   181:24 200:5
**responsible** 28:22
   35:12 212:6
**responsive** 15:15
**rest** 167:1
**restate** 85:2
   124:22 147:6
**restrictions**
   192:14
**restrictive** 207:1
**rests** 154:10
**result** 100:8
   124:25 130:21
   142:19 176:12
   228:14,18
**resulted** 141:13

**retained** 235:15
**retains** 153:7
**retired** 50:19
**return** 77:14
   232:3 237:11
**returned** 233:12
**returning** 232:6
**revealing** 62:25
   64:7
**reveals** 121:12
**revelation** 124:16
**reverse** 26:15
**review** 12:23 16:8
   16:11 23:4,14
   28:11 31:2 32:2
   33:6 41:9 42:2
   43:6,8 74:9 97:24
   101:2,7 112:2
   116:16 125:21
   139:22 141:20
   152:7 160:12
   169:4,24 173:3
   214:12 225:11
   228:2
**reviewed** 23:15
   28:2,14 33:3,7
   67:13,20 74:3,15
   87:2 91:25 112:19
   170:5 171:6
   208:13 213:21
   214:9
**reviewing** 94:6
   96:12 101:15
   129:19 143:17
   230:21 233:6
**revocation** 174:1
**revoke** 156:15
   175:24
**ridiculous** 80:15
**right** 8:10 24:21
   33:1 37:17 46:13

47:4 48:1 49:13
   79:24 93:2 106:13
   119:4 143:9
   144:12 145:17
   152:12 159:1
   165:21 175:1
   189:4 232:5 235:4
   235:9
**rights** 3:10 46:8,17
   52:14,17 53:5
**rise** 43:16 140:1
**risk** 132:25 154:3
   154:14,15 155:19
   194:13
**rmr** 236:15
**road** 9:11
**robbins** 44:22
   75:14
**robin** 38:18
**robust** 224:9
**rodriguez** 218:17
**role** 28:21 40:15
   41:5 129:16
   181:23 186:3
   196:11 224:4,17
**roles** 188:5
**romeo** 30:3
**ronald** 2:5 7:14
**ronald.lest** 2:7
**room** 7:9
**rooted** 146:25
**rose** 91:16 134:23
**round** 40:8
**routed** 118:24
   186:14
**rtqs** 222:5 225:24
   226:2
**rule** 148:5,7
   150:23
**rules** 9:11 22:11
   150:1

| | | | |
|---|---|---|---|
| **run** 106:22 126:5 | **says** 159:4 163:19 | **secretary's** 72:19 | 198:4 208:17,24 |
| **running** 59:20 | **scenario** 38:1,1 | 77:9 93:12 170:9 | 213:20 221:2,13 |
| 90:9 | **scenarios** 139:5 | **section** 32:5 | **seeing** 206:6 |
| | **schedule** 220:21 | 144:20,22 146:7 | **seek** 33:9 136:9 |
| **s** | 222:2 223:6 | **sections** 32:6 | 141:24 166:9 |
| | **scheduled** 222:16 | 131:20 | 231:21 232:1 |
| **s** 2:1 3:1 4:1 5:6 | **scheduling** 65:15 | **secure** 71:16 72:17 | 235:9 |
| 144:13 179:25 | 186:20 223:4 | 73:17 74:20 75:3 | **seeking** 64:4 |
| 180:1 215:6 239:1 | **science** 82:15 | **security** 1:10,11 | 177:11 |
| **sacramento** 80:11 | **scope** 45:22 54:19 | 3:15,19 4:8,13 | **seen** 110:9 111:4 |
| 80:12,14 81:3 | 56:1 226:14 | 6:18,20 8:6 25:4 | 113:21 116:18 |
| 137:11 | **score** 75:22 | 27:13 43:5 45:25 | 158:18 169:22 |
| **safe** 20:11 | **scott** 38:17 | 46:1,5 64:19,21 | 170:1 185:14,16 |
| **safety** 73:2 80:24 | **screen** 5:14 188:20 | 65:2 69:16 70:22 | 193:15 |
| 85:17 131:7 | **seaports** 224:14 | 71:12 85:17 86:15 | **segregated** 15:18 |
| 132:25 154:4,15 | **search** 16:23 17:2 | 93:20 131:8 132:6 | **self** 153:22 |
| 155:18 156:6,10 | 104:18 | 133:1 146:5 150:8 | **senate** 21:25 23:13 |
| 160:19,23 161:4 | **searched** 15:6,14 | 154:4,16 155:18 | **send** 14:2 228:2 |
| 162:13,19,22 | **season** 231:23 | 156:6,10 160:20 | **senior** 72:19,20 |
| 171:25 172:2,8,11 | **second** 19:10 98:3 | 160:23 161:4 | 77:9,10 108:5 |
| 172:14 173:5 | 131:16 187:3 | 162:13 164:11 | 181:20 183:2 |
| 194:13 229:24 | 208:16 213:5 | 171:25 172:2,9,12 | **sense** 17:23 40:11 |
| **sake** 64:10 | **secondary** 79:10 | 173:6 194:13 | 142:14 202:8 |
| **saldana** 75:18 | 169:4 | 212:13 229:25 | **sensitive** 6:6 35:19 |
| **salvadorans** 213:9 | **seconds** 182:14 | 239:3 | 58:24 |
| 213:14 | **secret** 212:13 | **see** 25:21 27:23 | **sent** 55:8 59:21 |
| **san** 1:3 6:23 | **secretaries** 70:10 | 33:21 42:16 77:3 | 92:1,3,4 106:16 |
| **sanwag** 75:20 | **secretary** 1:11 | 81:8 82:10 103:15 | 117:8 |
| **sarah** 218:17 | 6:20 25:23 33:8 | 103:24 106:9,14 | **sentence** 213:5 |
| 219:5 | 44:11 48:9 58:10 | 109:19 116:14,20 | **separate** 138:10 |
| **sat** 230:10 | 58:17 69:21 70:13 | 129:19,23,24 | 152:17,22 188:9 |
| **satisfaction** 146:9 | 70:17 71:2,3,9,11 | 131:14,22 133:1 | 212:21 214:2,3 |
| 156:13 | 71:13,20 72:3,10 | 134:13 142:6 | 219:12 |
| **saw** 112:22 113:16 | 74:10 76:17 77:20 | 158:16 159:13 | **separately** 212:16 |
| 130:22 | 93:11 99:17,20 | 163:18 164:15 | 220:3 |
| **saxe** 2:10 5:4 7:19 | 108:6 109:15,19 | 167:2,10 169:12 | **september** 26:18 |
| 7:19 216:9,12 | 111:25 116:13,24 | 169:18 170:21 | 91:16 93:21 100:4 |
| 221:1,11,22 226:9 | 117:7 130:17 | 171:10 173:18 | 100:14,23 109:13 |
| 226:24 234:12 | 143:22 144:2 | 188:18 191:16 | 109:17 112:1,20 |
| **saying** 143:13,14 | 164:10 166:23 | 192:3 193:10 | 112:24 113:20 |
| 147:7 213:9 | 218:7 222:7,22 | 194:15 196:7 | 116:21 117:1 |
| 219:14 | | | |

158:15,22 164:20
165:2,11 166:5
168:5 169:15
170:14 204:10
218:5
**sequence** 93:6
**serena** 108:5
**series** 25:14 75:17
76:21 86:24
136:24
**serious** 162:18
**served** 69:20
**service** 27:10,12
27:14,16 32:19
60:9 142:12
**services** 67:23
**set** 23:19 28:17
103:14,19,21,23
107:24 125:11,13
125:24 126:4,8,12
127:9,13,23 128:8
128:17 175:17
177:23 181:23
187:6 189:14,17
189:20 193:9
195:6 199:7 203:6
**sets** 37:11 126:17
**setting** 228:10,21
**seven** 73:21
151:25 211:3
**shanahan** 38:19
**shape** 124:8
**share** 193:3 194:5
**shared** 88:4
178:22 179:12,13
**sheet** 91:23,24
92:10 237:6,7,9,11
238:6
**sheriff** 29:14
**sheriff's** 138:16

**shift** 73:17
**shifted** 130:21
**short** 49:16 199:20
**shortcoming**
42:16
**shorter** 82:7
**shorthand** 1:24
236:7,24
**shortly** 92:15,18
**shot** 5:15
**show** 155:5 183:18
**shuffling** 110:15
**sic** 59:11 136:12
**sign** 8:11 44:7
141:25 203:7
237:7
**signature** 236:14
**signed** 28:8 80:4
116:23 117:6
**significance**
147:13
**significant** 82:5
85:15
**significantly** 213:7
**signing** 237:8
**signs** 162:6
**similar** 40:17
107:19,20 144:20
**similarly** 75:6
**simon** 105:13
**simply** 39:23
144:7 148:17
170:7 177:5
**single** 80:13,14
89:18 116:11
202:12 210:3
**sir** 27:2 51:2 66:17
83:20 90:23 91:5
104:6,23 107:17
111:16 119:1
140:4 158:18

**shift** 174:25 198:6
199:3 207:7
213:12
**sit** 42:3
**site** 68:15
**sits** 99:24 167:4
**sitting** 128:20
**situation** 134:24
139:7 146:22
**situations** 17:24
149:6 150:24
**six** 20:5 25:11 77:1
77:5,12 211:3
**sizable** 66:11
222:2
**size** 14:3
**skim** 74:13
**skinner** 20:8
**slowly** 95:3
**smart** 80:23
**social** 184:24
**socialized** 43:9
**societal** 82:17
**soldiers** 155:3
**solution** 37:11
**solutions** 7:2,5
235:16
**somebody** 38:4
59:18 80:16,17
88:22 89:11 90:2
105:10,11 138:22
145:8,11 146:1
152:9 155:13
161:3 179:6 201:1
219:17 224:15
**somebody's** 138:2
**somewhat** 54:3
70:1
**soon** 76:18 92:14
**sorry** 18:8 19:6
20:24 41:14 44:18

51:9,12,17 67:2
85:7 86:22 89:6
99:25 103:7
109:16 114:4
136:22 161:20
165:8 182:7,12
188:1,13 190:4,5
207:25 209:11
211:5 223:24
**sort** 45:3 68:10
76:5,16 77:6
82:22 88:14,15
91:2,7 95:8 104:7
126:13,25 130:2
135:22 139:9
152:13 163:20
167:6 181:22,23
187:6 204:24
**sotto** 98:6
**sought** 145:7
**sounds** 71:18
90:11
**source** 110:12
**sources** 110:2,4
**southern** 20:23
21:17,19
**southwest** 76:19
123:9,21
**space** 82:23 237:5
**span** 51:18,25
**speak** 32:25 41:8
95:12,18 145:12
186:12 187:24
195:9 202:1
**speaking** 11:6,7
42:21 43:11 58:18
59:24 84:15
129:20 138:12
140:24 157:2
202:2

**special** 20:21
45:16 92:24 181:9
**specific** 30:22
37:23 54:22 55:22
62:18 67:8 94:4
96:9 109:8 122:22
131:1 148:4 151:2
151:8 162:16
165:19 181:13
186:25 187:1,10
188:7,24 191:23
202:4 207:19
217:12,14 221:24
224:10 227:2,5
231:10,15 232:25
**specifically** 21:20
56:21 57:14 59:24
78:17 94:6 117:5
118:14 119:20
131:12 159:2
188:20 193:15
210:14 212:5
213:18,23 220:12
225:2 233:19
234:5
**specifics** 101:3,5
228:4 232:14
233:13
**spectrum** 150:15
151:20
**speculation** 147:4
**speculative** 128:16
151:16 153:10
161:18 172:21
**spend** 140:22
**spoke** 97:8 100:3
**spring** 94:10,11
96:7,10 98:22
100:4
**staff** 22:7 39:17
45:4,15,22 46:1,1

46:3,4,5 47:14,16
49:6 62:8 63:21
66:3 67:2 105:6,7
105:7,8,9,14,16,17
105:18,22,23,25
106:6,10,11,12
112:16 119:3,4
218:15,19,22
222:25
**staffs** 72:20
**standard** 127:10
152:14 160:22
161:1 172:7 203:7
**standardized**
50:10
**standing** 10:15
64:11
**stands** 60:25 68:24
178:24
**start** 18:20 24:5
26:12 40:20,20
70:12 170:7
221:22
**started** 50:17,18
76:18,19 161:10
171:2
**starting** 28:19
54:24
**starts** 88:7
**state** 2:3,8 3:8
7:10,12,16 8:3,4
8:24 28:22 29:8
39:19 40:2 43:12
47:11 81:22 93:23
109:22 135:10,12
136:1 137:21
138:17 139:16,16
141:6 235:1 237:4
**stated** 71:3 83:3
150:3 160:5,7
166:19 177:5

202:22 212:8
**statement** 5:9 23:1
23:17 162:21
208:8 229:18,19
230:4,5,7,8,17
231:4,7
**statements** 226:3
226:5,7 229:16
238:7
**states** 1:1 3:13
6:21 28:25 29:2,7
29:13 37:14 86:17
86:19 89:20
109:23 111:2
116:13 132:23
133:22 141:4
151:19 153:21
206:18 208:6,20
208:21 209:5,9
210:16 224:16
232:6
**statistical** 126:16
126:21,23,24
127:2,11,24
**statues** 151:24
**status** 84:19 86:21
86:22 125:21
134:6 156:2,2,3
184:22 191:20
227:23
**statute** 135:11
137:22
**step** 202:25
**steps** 68:16 88:15
114:2,7
**steven** 12:20
**stick** 110:13
**stop** 167:24
232:15,15
**stops** 88:7

**stratified** 119:19
119:23
**street** 2:5,11 3:4
4:10 208:23
**streets** 134:25
143:11,15
**stressed** 37:8
**strike** 134:16
193:20,22 207:21
**stroke** 183:15
**stroked** 183:17
185:2,6 198:17,24
**structure** 25:4
224:6
**structured** 15:1
187:24 188:2,6
198:16,25
**studies** 209:7,13
**stuff** 18:4 220:14
**sub** 136:21 139:3
**subcategories**
133:7
**subcomponent**
30:8 170:17,20
184:12
**subcomponents**
83:1
**subfolder** 14:9
**subfolders** 15:19
**subject** 10:25
14:15 30:13 62:14
62:20,25 64:1,17
66:5,21 67:6
68:21 74:11 93:15
96:5,18 97:4,7,11
99:9 126:1 132:21
146:10 149:13
152:7 153:19
160:8 170:8,25
183:17 185:6
217:10 221:2,14

223:5 232:3 237:8
**subjects**  97:8
**submission**  85:20
**submit**  138:23
**submitted**  13:16
**subordinate**  37:1
37:8 65:6,8
218:16 224:20
**subordinates**
31:22 32:10 35:13
71:6 174:5 183:12
218:13
**subscribe**  238:6
**subsection**  131:12
131:17
**subsequent**  84:1,2
84:3,3,17 96:17
97:3 99:8 103:6
103:17 120:9,10
145:11 156:4
191:15,23 196:7
203:10 222:13
**subsequently**
86:15
**substance**  62:18
62:23 64:5 96:22
158:14
**substantiate**  143:5
145:10 148:24
**substantiated**
199:18 200:2
**substantiating**
144:16 202:17,19
**substantive**  72:2
**succinct**  130:24
**sufficiency**  143:18
**sufficient**  143:4,8
192:3
**suggested**  222:5
225:17 226:2,16
233:16,18,25

**suggestion**  205:9
**suggestions**  231:6
**suggests**  170:25
**suit**  10:18
**suite**  2:6 3:4 106:4
**summer**  92:12
114:18
**superseded**  56:21
57:14
**superseding**  56:18
56:19
**supervise**  127:2
**supervised**  30:25
31:14 228:9
**supervision**  236:8
236:24
**supervisor**  40:25
106:2 143:17
152:10 156:14
160:11 162:6
172:24,25 187:3
201:11 228:4
**supervisors**  36:25
37:1
**supervisory**
139:22 140:3
141:20 152:7
160:8,12 162:4
173:3 228:2
**support**  29:10
30:7 55:17 154:19
167:2 180:13,15
214:4
**supposed**  24:23
**sure**  9:1 20:19
22:13 23:20 30:1
30:4 34:2,6 40:17
43:1 47:2 48:4
53:15 54:5 84:2
87:2 88:13 89:8
96:13 101:6,14

111:21,23 114:6
123:18 125:21
129:9 133:8
137:10 141:10
147:5 150:16
153:15 164:3
165:23 169:13
171:7 177:16
180:13 197:25
198:3 213:1 221:6
221:13
**surge**  64:21 76:21
208:5 209:8
210:14 212:6,21
214:1,4
**surrounding**
148:1 151:14
153:5
**suspected**  227:22
**sustained**  64:22
**swear**  8:14
**switch**  23:24 65:21
83:10 177:14
**switching**  78:12
78:13
**sworn**  8:17 22:3
23:21 236:5
**synonymous**
80:25 172:4
**system**  14:11
103:11,15,23
104:1,4 124:15
126:6 171:14
178:3,6,20 179:3
179:15,18 180:3
181:2,3,18 182:5,8
183:5,9,15 184:6
185:21 186:21
189:18 197:18
198:5 199:1
200:21 211:21

215:3,5,9,11
**systemic**  42:16
**systems**  127:13,14
177:15,19 178:17
179:13 180:6
181:6,8 192:13
197:17 211:20
215:2

**t**

**t**  1:20 5:6,10,11
22:11 23:1 27:19
236:1,1 238:12
239:1,1,25
**table**  17:22
**tactics**  80:8
**take**  6:11 9:19
11:6 12:5 14:1
23:13 25:7,8 40:8
48:1 53:14 74:5,8
77:15 82:4 88:16
88:20 89:1,10
90:10 93:4 110:15
116:10,16 130:12
155:8,19 158:25
163:10,25 168:2
171:4 173:11
183:2 192:21,25
193:23 194:4
197:7 200:14
202:25 208:11
212:25 214:11
227:9 228:23
229:2,5,11 232:12
**taken**  1:21 6:14
24:10 53:19 68:16
86:17 90:15 98:13
102:25 114:2,7
117:15 122:23
129:12 151:18
174:17 182:17
197:10 214:17

[taken - thought]

217:21 228:8
234:19 236:3
**takes** 30:8
**talk** 23:24 31:5
42:3 47:13 78:14
83:10 174:4,6
177:15 187:12
**talked** 45:18 58:9
95:24 99:2 118:13
121:11 177:23
**talking** 17:4 34:4
55:16 58:11 60:12
61:25 69:25 76:2
76:19 79:24 82:22
87:23 88:9 90:24
136:7 137:24
139:3 140:22
144:1 145:1,3
149:18 152:12,15
152:24 162:9
184:20 187:14
203:12 210:18
211:8 212:9 221:9
223:18,19
**talks** 56:24
**target** 149:9
**task** 84:5 140:18
155:12 222:4
**taskings** 55:7
**teach** 37:10
**team** 60:10
**technical** 182:12
**telework** 186:20
**tell** 9:23 10:2
25:14 42:5,24
71:22 83:25 93:9
198:7 207:4 210:7
220:16 230:19
231:3 236:5
**temporal** 165:16

**tennessee** 28:24
30:21 118:2
**tenth** 2:11
**tenure** 48:14
50:16 71:4 72:11
118:7
**term** 13:8 16:23
34:2,3 54:2 86:22
135:15 171:20
179:10 200:7
**terminate** 159:10
160:1,13 161:8
173:8 175:25
176:1,4
**terminated** 19:9
159:6 168:1
173:17,22 230:2
**terminates** 156:17
156:19
**termination**
159:12 160:5
173:25 174:3
176:12
**terminology**
171:23
**terms** 16:24 30:7
47:3 55:16 56:23
57:11 71:5 72:3
75:10 112:4
164:21 167:18
170:20 177:11
181:4 188:8 200:2
203:9 207:2 222:3
228:20 232:1,8
233:6
**terrorist** 154:21
**test** 12:4 227:24
**testified** 8:18 21:3
21:22 22:1,4
112:9 158:20
216:23 217:10

**testify** 21:15,18
109:5 140:19
**testifying** 9:19
**testimony** 5:2
20:17,24 22:3,21
22:23 23:12,21
99:1 104:16
111:13,22 115:17
118:17 129:1
130:7 148:21
151:12 165:1,10
207:23 208:5,12
208:17 212:20
215:23 235:13
236:2,6,10
**texas** 109:22 111:1
**thank** 10:13 11:3
12:8 15:10 20:17
21:21 22:20 23:7
23:19 24:19,25
28:5,18 36:18
47:7 48:24 52:7
59:1 61:4 62:13
66:9 93:2 117:23
118:9 119:23
122:19 123:24
135:21 142:16
145:18 174:13
212:17,18 214:23
216:3,16 231:15
234:12,25 235:11
**thanks** 74:2
123:16
**theory** 183:14
**thereabouts**
224:25
**thereof** 236:13
**thing** 34:4 47:15
55:20 107:23
165:19

**things** 10:23 37:4
42:21 43:15 147:7
233:2
**think** 18:5,18 20:2
20:22,24 21:8,11
21:14,14,15,17,19
33:14 36:21 38:19
38:19 46:13 57:9
60:21 61:8 68:24
69:8 73:21,23
79:8 83:3 84:9
86:9 97:6,13
101:20 103:8
113:6 114:23
115:9 117:9,10
121:12,14 122:9
125:2 129:15
130:24 134:20
140:16 142:12
143:25 144:11
145:19 147:6
148:5,21 151:17
151:18 152:8
153:22 155:16
160:6 161:6 163:7
164:23 166:6,22
167:18 174:10
175:12 182:7
186:15 192:21
193:14 197:6
215:24 216:4
219:5 220:22
221:18,19 222:6
222:11,22 223:14
226:5,14,15 234:4
234:13,15
**third** 229:4
**thirty** 237:12
**thought** 54:25
55:6,9 85:6 219:8
219:19 230:22

**threat** 85:16
109:22 110:7,10
111:8 155:17
156:5,9 160:19,22
161:5,6 162:12,20
162:22 163:1
171:25 172:2,8,12
172:13 173:5
229:25
**threats** 131:7
132:5
**three** 12:19 21:4
85:15 129:20
130:4 223:17
229:17 230:7
235:15
**tie** 126:1
**tied** 125:25 149:25
181:11
**tightened** 207:10
207:12
**tim** 44:22
**time** 7:12 18:13
19:17 21:8,13
24:9,13 34:12,13
34:13 36:1,19
37:16 38:15 44:21
44:24 45:18 49:1
51:25 52:22 53:18
53:22 56:5 57:7
61:16 66:8 72:8
75:13,17,19 76:15
77:1 81:17 82:7
83:18 84:21 85:12
86:3 87:2,19 88:1
90:13,18 92:3
93:1 98:12,16
100:3 101:15
112:16,22 113:5
113:16 114:12
116:23 117:11,14

117:18 119:13
120:8 130:9
137:21 140:22
144:4 159:11
168:15,16 174:10
174:15,20 179:7
182:16,20 183:9
183:11 185:14
190:13,22 193:21
197:9,13 202:4
206:6,20 214:16
214:20 218:21,23
222:14 223:21
224:24 225:12
229:25 233:8,9
234:12,18,22
236:3
**times** 13:9 18:17
18:19 21:2 22:1
24:2 38:3 46:18
47:12 61:11,21,25
62:6 72:20 77:8
78:10 209:24
**title** 25:15 99:25
106:1 130:10
135:16 221:17
224:5
**titled** 188:5
**titles** 224:10
**today** 10:1 11:3
13:3,9 22:17 51:1
54:4,7 74:25 77:3
85:1 111:5 118:13
128:21 129:12
161:2 163:21
164:25 165:1
166:7,7,11 168:6
175:11 177:23
209:3 225:13
235:7

**today's** 9:14,24
10:9 11:16 12:10
12:12,14 18:10
235:13
**todd** 9:1 223:14,14
224:2,11,17,18,20
230:13 231:11,16
232:19 233:20
**todd's** 231:24
**todds** 224:21
**told** 54:25 143:10
201:11 222:11
227:13,20 231:8,8
234:10
**tom** 48:10 49:9
106:11
**tool** 25:13 78:25
84:10
**top** 103:19 212:13
**topic** 14:15 60:11
67:8 207:24
217:12,14
**topics** 45:12 47:22
52:12 64:24
216:15 233:19
**total** 234:4 235:14
**totality** 83:9 131:2
138:2 151:19
184:11 199:12
**touched** 43:4
207:13
**track** 18:3 202:12
**tracked** 108:6
180:9
**tracking** 126:16
126:23,24 127:2
127:11,24
**tracy** 49:16
**training** 196:6
**trainings** 137:15

**transcribed** 236:8
**transcript** 236:21
237:13,14 238:4,7
**transcription**
236:9
**transition** 216:4
**translate** 41:8
**transmission**
127:9
**transmit** 202:24
**transmitted**
127:24 175:8
203:1
**travel** 15:5
**treat** 126:3
**treated** 103:15
**trebert** 3:6
**trends** 81:19,20
**trial** 10:21 20:22
20:23
**tried** 37:9
**triggered** 139:4
**trudy** 3:3 7:24
**true** 236:10
**trump** 3:13 120:13
122:21 123:13
**trump's** 216:24
218:1
**truth** 9:23 10:2
236:5,5,6
**try** 38:6 179:5
218:14
**trying** 21:9 41:20
46:18,21,24 55:20
57:6 75:15 88:6,9
143:20 147:13
148:9,17 165:17
165:18,19,24
168:9 174:7
186:16 219:1,7
222:10 224:5

**turn** 6:8 164:1
**turned** 104:12
**turning** 131:12
**turns** 11:6
**twitter** 5:14
  169:14
**twitter.com.** 169:8
**two** 20:4 21:4 43:3
  47:15 51:9,14,18
  52:24 70:10 74:23
  75:24 79:24 80:24
  86:17 105:24
  106:6 147:7
  152:20 195:21
  196:12 217:5,7,25
  224:21 225:10
  227:11,24
**type** 42:11
**types** 43:21 44:9
  67:17 82:23 116:6
**typically** 68:16

**u**

**u.s.** 1:9 3:15,18 4:2
  4:6,8,9,13 5:9
  6:18 25:4 27:11
  39:7 46:7,10,12,14
  136:8 169:16
  200:17 206:11
  211:4,7 212:7
  213:16 239:3
**uac** 123:8
**uacs** 47:14 63:5
  67:24
**uh** 21:10 113:8
  131:15 144:3
  160:21 161:12
  163:24 212:24
  218:8
**ultimately** 89:17
  222:10

**unaccompanied**
  23:5 63:4 123:20
  207:24 208:6
  209:4,9 210:15,16
  212:6,22 213:16
  214:1
**unanimously**
  41:20
**unauthorized** 31:7
  79:14 82:25
**unbeknownst**
  219:15
**unchanged** 168:22
  206:23
**unclassified**
  212:10
**unclear** 11:24
  200:20
**uncomfortable**
  212:9
**underlying** 183:21
**understand** 9:10
  9:20 11:1,12,21
  13:11,12 17:11
  37:6 44:18 46:21
  46:25 53:24 54:5
  55:2 57:21,25
  69:13 86:8 90:21
  98:18 123:18
  135:14 139:4
  141:10 145:14,15
  146:14 147:13,15
  148:9,17 150:18
  154:12 158:2,25
  162:8 163:23
  165:24 170:1
  172:6 174:7,23
  175:6,7 180:1,11
  202:18 211:18
  214:24

**understanding**
  9:25 16:14 24:25
  34:5 59:5 61:7,16
  78:6,9,19 83:13,15
  84:11,21 86:7
  87:12 94:8,12,18
  99:12,16 100:8,11
  100:12,16,17,20
  101:11 109:14,18
  113:15 115:5
  118:20 119:25
  128:7 131:24
  133:5,20 135:2
  143:24,25 144:8
  144:14 147:16
  152:4 154:8
  155:22 167:16
  171:20 174:9
  175:10 176:5,16
  183:5 185:9 188:2
  188:10 189:20
  192:8 194:19
  206:9,14 215:10
  215:13
**understood** 11:14
  52:7 55:10 61:2
  69:23 111:21
**undertake** 13:18
**undetained** 31:5
**undocumented**
  74:12
**undoubtedly**
  15:14
**unfortunately**
  25:7 81:24
**unique** 161:2
  177:19 186:21
**unit** 6:13 90:12,18
  123:8,20 126:16
  126:19,22,23,24
  127:3,11,24,25

128:19 174:15,20
  214:6
**united** 1:1 6:21
  86:17 89:20 111:2
  116:13 132:23
  141:4 153:21
  206:18 208:6,20
  208:21 209:5,9
  210:16 224:16
  232:6
**units** 63:4 213:23
  235:14
**universe** 176:20
  177:2
**university** 1:4,6
  2:14 6:16,17 7:20
  216:14 239:2
**unlawful** 213:8
  224:8
**unpack** 31:4 75:8
**unsure** 114:21
**update** 120:2
**updated** 201:19
  209:25
**updates** 95:16
**upper** 100:2
  106:13
**uscis** 103:14,20
  107:24 125:10,13
  126:13 127:9
  150:4 160:6
  171:16 173:16,16
  173:21 175:3,9,24
  177:18,23 178:16
  179:3,20 186:12
  187:15,22 189:15
  189:21 190:1,7,14
  190:23 191:2,18
  192:10,19 193:10
  194:5,23 195:7,8
  195:12,19,24

196:18,22 198:9
199:15 202:24
232:2
**usdoj.gov**  4:5
**use**  16:23 32:3,20
34:3 55:15 76:4
81:19 86:15
114:11 115:15
140:20 143:4,5
144:16 145:21,24
146:6,12,14,17
147:1,14,16,25
148:14,18,25
150:7,13,24 151:3
151:11,15 153:4
171:23,24 172:3,3
172:10 180:6
197:1 214:5
**useful**  114:24
**usg**  211:1,4
**usually**  17:20 18:1
33:16 37:17 45:11
46:23 50:6 107:7
150:3 187:2
191:19
**utilized**  217:23

**v**

**v**  1:8 3:13 6:18
**vacant**  92:23
**vague**  43:25 50:5
68:20 102:15
127:15 128:9,16
140:9 146:19
148:3 151:1,16
153:10 161:18
172:17 189:24
190:10,18 191:7
192:12 198:15
**valerie**  5:14
**validate**  179:6

**variable**  207:17
**varied**  77:8
**varies**  35:3
**various**  41:11,21
43:21 54:6 77:16
211:23
**vary**  153:1
**venture**  61:24
**venturella**  38:18
**verbal**  37:22,23
91:11
**verbally**  36:25
37:20 38:11
**verifying**  114:22
**veritext**  7:2,5
235:15
**vermont**  175:14
**version**  113:21
158:23 198:3
**versus**  81:5 187:8
**vetted**  67:14
**vetting**  67:17
**vice**  106:12
**vidal**  3:6 8:1
**video**  6:11,13 24:9
24:13 53:18,22
90:10,13,19 98:12
98:16 117:14,18
174:20 182:16,20
197:9,13 214:16
214:20 234:18,22
**videographer**  4:17
6:4 7:3 8:13 24:8
24:12 53:17,21
90:12,17 98:11,15
117:13,17 174:14
174:19 182:15,19
197:8,12 214:15
214:19 234:17,21
235:12

**videotaped**  1:20
**view**  162:24
**viewed**  42:21
160:11
**violated**  227:23
**violation**  32:7
80:14,19 131:9
136:10 149:21
152:9 156:5 192:4
196:5
**violations**  137:22
149:22 192:5
**violence**  208:22,23
**visa**  146:2,23
149:15 201:4,5
**visibility**  188:4
203:11
**visit**  76:19
**visual**  11:10
**voce**  98:6
**voice**  130:4
**volley**  34:19
**volunteer**  8:2
**vs**  239:3

**w**

**w**  3:9
**walked**  227:18
**want**  10:14 22:12
23:24 25:7 31:4
38:5,5 53:13 54:4
56:3,17 59:2
72:24 73:1 78:14
119:21 135:14
137:23 139:6
153:2 158:25
160:15 172:3,14
173:11 175:6
179:20 208:9
215:2
**wanted**  33:13 36:3
42:1 43:13 45:13

59:18 77:15
111:21 187:11
218:20 219:2,8,15
219:18 220:4
223:4
**wants**  50:9 56:9
78:21
**washington**  1:22
2:12,18 3:5,17 4:4
4:11 6:1 7:1 41:5
41:8 81:24
**way**  10:10 14:1
15:1,7 18:6 20:25
22:25 33:7,13
36:16 38:7 40:17
42:18 44:10 45:10
53:4 70:2 77:22
80:1,3,3,23 81:9
81:24 93:24
101:17 118:20
119:8 126:5
130:24 131:5
137:16 155:8
165:22 174:1
192:18,19 199:19
206:20 228:20
**ways**  119:11
150:17
**we've**  57:4 67:22
78:15 96:12
121:11 129:12
139:12 152:7
157:15 163:10
**web**  163:18
**weber**  38:18
**website**  225:9
**wednesday**  1:17
6:1,5
**week**  72:20 77:8
**weekly**  66:4

**weigh**  44:6
**welcome**  48:25
    97:19 118:11,12
    174:23 214:22
**went**  13:15 20:23
    60:5,7,8 73:6
    80:11,11 127:9
    220:18 227:7
**wha**  1:5
**whatsoever**  70:19
    120:13
**whichever**  231:11
**whispering**  6:7
**white**  39:1 45:8,24
    51:4,7,19,22 52:2
    52:6,9 53:10 59:3
    59:6,15 61:6 68:5
    204:6
**wholly**  214:2,3
**widespread**
    201:20
**willful**  132:16
    140:6,14 141:12
    141:17 145:20
    146:24 147:21
    148:2,12
**winkelmann**
    13:22
**winkowski**  75:21
**witness**  8:10,12,14
    10:17,18 23:7,15
    23:16 24:4,15
    28:14,15 50:6
    58:14 59:18 62:22
    63:2 64:7 66:10
    66:24 68:21 72:3
    74:2,3,15,16 76:10
    85:9 94:25 96:3
    96:23 97:20 99:2
    109:5 117:23
    121:5 124:22

128:10,17 134:10
135:8 140:10
146:20 147:5
148:4 151:2,18
153:11 162:4
163:6 170:5,16,25
171:6,7 172:22
190:11,19 191:8
192:13 198:16
208:2,13,14
213:21,22 234:14
234:24 235:5,17
236:11 237:1
**wolf**  3:16 8:5,5
**women**  214:7
**wonderful**  17:21
**word**  57:3 76:5
    119:23 135:19
    172:3,4,5,11
**wording**  196:11
    196:15,18
**words**  88:22
    100:24 172:1,10
**work**  40:2 41:16
    42:17 59:21 70:1
    81:10 102:9,17,20
    104:25 106:4
    107:2 114:13
    115:23 118:13
    121:1,4,6,9,10,12
    121:19 122:5,7,7
    122:11,15 127:14
    127:17,18 150:12
    202:21 211:20
    220:11 226:13
**worked**  143:11
    181:4
**workforce**  84:6
    114:9 199:22
**working**  17:21
    37:13,14 88:2

92:23 95:17 129:5
135:16 136:1
143:14 150:9
193:21 205:7
**works**  81:24
**worksheet**  166:21
**worried**  21:5
**written**  36:23
    38:10 43:20 230:5
    230:5
**wrong**  86:22
    148:10
**wrote**  80:3

| x |
|---|

**x**  5:1,6
**xyz**  199:16

| y |
|---|

**y'all**  142:14
**yarrow**  186:3
**yeah**  15:14,25
    67:2 85:9 95:24
    146:20,22 153:18
    165:10 224:19
**year**  14:12,12,14
    18:14 23:5 52:2
    81:14 91:16 94:11
    119:19,22 164:20
    165:3,12 204:10
    207:6 211:14
    227:11
**years**  17:22 47:15
    51:9,14,18 52:24
    138:12 143:13
**yesterday**  12:13
    97:25 235:3
**yesterday's**  97:18
**york**  3:8,11,11,13
    8:3,4

| z |
|---|

**zones**  37:17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 35

```
 1        IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
 2

 3   ------------------------x
                            )
 4   MARTIN JONATHAN BATALLA   )
     VIDAL, et al.,           )
 5                           )
            Plaintiffs,  )
 6                      ) Case No.
            v         ) 1:16-CV-04756(NGG)(JO)
 7                           )
     ELAINE C. DUKE, Acting   )
 8   Secretary Department of   )
     Homeland Security        )
 9   JEFFERSON BEAUREGARD      )
     SESSION III, Attorney     )
10   General of the United    )
     States,and DONALD J TRUMP,)
11   President of the UNITED   )
     STATES,                 )
12                           )
            Defendants.  )
13                           )
     ------------------------x
14

15         Deposition of DONALD NEUFELD

16              Washington, DC

17         Wednesday, October 18, 2017

18              9:16 a.m.

19

20   Job No.: 37566

21   Pages: 1 - 211

22   Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

1        IN THE UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
2

3   ------------------------x
                            )
4   MARTIN JONATHAN BATALLA   )
    VIDAL, et al.,           )
5                           )
            Plaintiffs,  )
6                      ) Case No.
          v        ) 1:16-CV-04756(NGG)(JO)
7                      )
    ELAINE C. DUKE, Acting    )
8   Secretary Department of  )
    Homeland Security        )
9   JEFFERSON BEAUREGARD       )
    SESSION III, Attorney     )
10   General of the United    )
    States,and DONALD J TRUMP,)
11   President of the UNITED   )
    STATES,                 )
12                         )
            Defendants.  )
13                         )
    ------------------------x
14

15        Deposition of DONALD NEUFELD, held at US

16  Conference of Mayors, 1620 I Street, NW,

17  Washington 20006 pursuant to Notice, before Donna

18  Marie Lewis, Registered Professional Reporter and

19  Notary Public of and for the District of Columbia.

20

21

22

1        A P P E A R A N C E S

2   ON BEHALF OF PLAINTIFFS:

3        JEROME N. FRANK LEGAL SERVICES
         ORGANIZATION AT YALE LAW SCHOOL
4         BY:  DAVID CHEN, LAW STUDENT INTERN
             MICHAEL WISHNIE, ESQUIRE
5          VICTORIA ROECK, LAW STUDENT INTERN
         Yale Law School
6         127 Wall Street
         New Haven CT 06511
7          Telephone: (203) 432-4800
         Email: michael.wishnie@yale.edu
8

9        NATIONAL IMMIGRATION LAW CENTER
         BY: JOSHUA A. ROSENTHAL, ESQUIRE
10           KAREN C. TUMLIN, ESQUIRE
         P.O. Box 70067
11         Los Angeles, CA 90070
         Telephone: (213) 639-3900
12

13        GIBSON,DUNN & CRUTCHER, LLP
         BY:  ANDREW WILHELM, ESQUIRE
14         1050 Connecticut Avenue, NW
         Washington, D C 20036
15         Telephone: 202 887-3556
         Email: awilhelm@gibsondunn.com
16

17
         COVINGTON & BURLING, LLP
18         BY:  IVANO M VENTRESCA, ESQUIRE
         Telephone: 202 662-5203
19          Email: iventresca@cov.com

20

21

22

 1   APPEARANCES:  (Continued)

 2   ON BEHALF OF PLAINTIFFS: (Continued)

 3
             MAKE THE ROAD NEW YORK
 4
             BY: CARLOS VARGAS, ESQUIRE
 5                SCOTT FOLETTA, ESQUIRE
                  CAROLINA FUNG FENG, ESQUIRE
 6            301 Grove Street
             Brooklyn, NY 11237
 7            Telephone: 718 727-1222
                       929 244-3456
 8                     917 251-1373
             Emails: carlos.vargas@maketheroadny.org
 9                   scott.foletta@maketheroadny.org
                   carolina.fungfen@maketheroadny.org
10

11
             NEW YORK ATTORNEY GENERAL'S OFFICE
12            BY:  SANIA W. KHAN, ESQUIRE
             120 Broadway
13            New York, NY 10271
             Telephone: (212) 416-8534
14            Email: sania.khan@ag.ny.gov

15

16            STATE OF CALIFORNIA, DEPT OF JUSTICE
             OFFICE OF THE ATTORNEY GENERAL
17            BUREAU OF CHILDREN'S JUSTICE
             BY: MICHAEL L. NEWMAN, DIRECTOR
18            300 S. Spring Street
             Suite 1702
19            Los Angeles, CA 90013
             Telephone: 213 897-2642
20            Email: michael.newman@doj.ca.gov

21

22

1   APPEARANCES: (Continued)

2

3   ON BEHALF OF DEFENDANTS:

4        UNITED STATES DEPARTMENT OF JUSTICE
          BY:  KATE BAILEY, TRIAL ATTORNEY
5

6        U S DEPARTMENT OF HOMELAND SECURITY
          U S CITIZENSHIP AND IMMIGRATION SERVICES
7         BY: EVAN R. FRANKE, ESQUIRE
          20 MASSACHUSETTS AVENUE, NW,
8          Suite 4210
          Washington, DC 20529-2120
9          Telephone: (202) 272-1446
          Facsimile: (202) 272-1405
10          Email: Evan.Franke@dhs.gov

11

12        U S DEPARTMENT OF HOMELAND SECURITY
          OFFICE OF THE GENERAL COUNSEL
13         BY: REID COX, ATTORNEY-ADVISOR

14

15        U S DEPARTMENT OF JUSTICE
          BY: JOHN TYLER, ESQUIRE
16

17

18

19

20

21

22

1          I N D E X

2   WITNESS:

3     DONALD NEUFELD

4   EXAMINATION BY:                        PAGE

5     Mr. Chen                    11

6     Ms. Khan                    156

7     Mr. Ventresca               171

8     Mr. Newman                  190

9

10          E X H I B I T S

11   NEUFELD
     EXHIBITS:        DESCRIPTION           PAGE
12

13   No. 38    Defendant's Objections and Responses  57

14   No. 39    Declaration of Donald Neufeld        171

15

16

17

18

19

20

21

22

1            P-R-O-C-E-E-D-I-N-G-S

2            THE VIDEOGRAPHER:  Good morning.  We are

3    going on the record at 9:16 a.m. on October 18,

4    2017.  Please note that the microphones are

5    sensitive.  They pick up whispering and private

6    conversations and cellular interference.  Please

7    turn off all cell phones or place them away from

8    the microphones as they can interfere with the

9    deposition audio.  The audio/video recording will

10   continue to take place unless all parties agree to

11   go off the record.

12           This is media unit 1 of the video

13   recorded deposition of Donald Neufeld, taken by

14   counsel for the plaintiff in the matter of Martin

15   Jonathan Batalla Vidal, et al., v. Elaine C. Duke,

16   et al., filed in the United States District Court

17   for the Eastern District of New York, Case

18   number 1:16-CV-04756(NGG)(JO).

19           The deposition is being held at

20   United States Conference of Mayors located at 1620

21   I Street, Northwest, 4th floor, Washington, D C.

22           My name is Gene Aronov.  I'm with

DONALD NEUFELD
10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE
8

1   Veritext Legal Solutions and I'm the videographer.

2   The court reporter is Donna Lewis from the firm

3   Olender Reporting.

4        I'm not authorized to administer an

5   oath.  I'm not related to any party in this

6   action, nor am I financially interested in the

7   outcome.

8        Counsel and all present in the room and

9   everyone attending remotely will now state their

10  appearances and affiliations for the record.  If

11  there are any objections to the proceedings,

12  please state them at the time of your appearance

13  beginning with noticing attorney.

14       MR CHEN:  David Chen, law student intern

15  with the Jerome N. Frank Legal Services

16  Organization at Yale Law School.

17       MR. WISHNIE:  Michael Wishnie, Jerome N.

18  Frank Legal Services Organization, Yale Law

19  School.

20       MS. ROECK:  Victoria Roeck, law student

21  intern with Jerome N. Frank Legal Services

22  Organization at Yale Law School.

1        MR. ROSENTHAL:  Joshua Rosenthal,

2    National Immigration Law Center.

3        MS. TUMLIN:  Karen Tumlin, National

4    Immigration Law Center --(mumbling)

5        MR. WILHELM:  Andrew Wilhelm, Gibson,

6    Dunn & Crutcher for the Garcia matter.

7        MR. VENTRESCA:  Ivano Ventresca,

8    Covington & Burling for the University of

9    California and Janet Napolitano.

10       MR. VARGAS:  Carlos Vargas -- plaintiff.

11       THE COURT REPORTER:  I can't hear you.

12       MR. VARGAS:  Carlos Vargas, plaintiff.

13       MR. FOLETTA:  Scott Foletta, Make the

14    Road, New York.

15       MS. FUNG FENG:  Carolina Fung Feng.

16       MS. KHAN:  Sania Khan for the New York

17    Attorney General's Office on behalf of the United

18    States, the New York division.

19       MR. NEWMAN:  Michael Newman of the

20    California Department of Justice on behalf of

21    plaintiff states in the California versus DHS

22    matter.

1          MS. BAILEY:  Kate Bailey, United States

2    Department of Justice, on behalf of defendants.

3          MR. FRANKE:  Evan Franke, United States

4    Citizenship and Immigration Services on behalf of

5    defendants.

6          MR. COX:  Reid Cox, DHS, Office of the

7    General Counsel on behalf of defendants.

8          MR. TYLER:  John Tyler, United States

9    Department of Justice on behalf of defendants.

10         THE WITNESS:  Donald Neufeld, United

11   States Citizenship and Immigration Services, and

12   I'm the deponent.

13         THE VIDEOGRAPHER:  Would the court

14   reporter please swear in the witness.

15   Whereupon,

16          D O N A L D   N E W F E L D

17   after having been first duly sworn by the Notary

18   Public was examined and testified as follows:

19         THE VIDEOGRAPHER:  You may proceed.

20         MR CHEN:  Good morning, Mr. Neufeld.

21   Thank you for being here.  My name is David Chen.

22   I'm the law student intern of the Jerome N. Frank

1   Legal Services Organization at Yale Law School and

2   I'll be taking your deposition today.

3          Before we begin we would like to

4   establish for the record that counsel has agreed

5   to the following stipulations; First, does counsel

6   stipulate that all objections except as to form

7   are preserved?

8          MR. TYLER:  Yes.

9          MR CHEN:  Second, does counsel stipulate

10  and waive the right to review and sign the

11  transcript of the deposition?

12         MR. TYLER:  We do not.

13         MR CHEN:  Okay.  Noted.

14         EXAMINATION ON BEHALF OF PLAINTIFF

15  BY MR CHEN:

16     Q    Mr. Neufeld, have you ever taken a

17  deposition before?

18     A    Yes.

19     Q    Well, just to remind you let me go over

20  some of the ground rules before getting to the

21  questions.  First, I will be asking you the

22  questions.   If there is something that you do not

1   understand please let me know.  If you answer the

2   question I will assume that you've understood the

3   question.  Do you understand?

4       A   Yes.

5       Q   In order for the court reporter to take

6   an accurate transcript of today's deposition I ask

7   that you -- that all of your responses be made

8   verbally.  For example, please say yes instead of

9   nodding your head.  Do you understand?

10      A   Yes.

11      Q   And your attorney may make an objection

12  to a question but we will not stop the deposition

13  to address the objections.  You are still required

14  to answer the question unless your attorney

15  instructs you not to answer.  Do you understand?

16      A   Yes.

17      Q   If you must consult your attorney I ask

18  that you first answer any pending questions unless

19  you need to talk to your attorney about a matter

20  of privilege.  Do you understand?

21      A   Yes.

22      Q   And, Mr. Neufeld, are you taking any

1    medications or drugs of any kind that might make

2    it difficult for you to understand and answer my

3    questions today?

4        A    No.

5        Q    Do you suffer from any conditions that

6    would impair your ability to provide accurate and

7    complete testimony?

8        A    No.

9        Q    Is there any other reason you cannot

10   give full and complete testimony today?

11       A    No.

12       Q    Mr. Neufeld, did you do anything to

13   prepare for today's deposition?

14       A    Other than meeting with counsel

15   yesterday, no.

16       Q    Did you speak with -- did you speak with

17   anyone besides counsel?

18       A    No.

19       Q    Did you review any documents in

20   preparation for today's deposition?

21       A    No.

22       Q    Have you brought any materials with you

1   to assist with your testimony today?

2        A    No.

3        Q    How long did you speak with counsel in

4   preparation for today's deposition?

5        A    I didn't time it, but it was probably

6   about an hour, hour and a half.

7        Q    And when did you speak with counsel?

8        A    Yesterday afternoon.

9        Q    In total how long have you spent

10  preparing to be deposed?

11       A    An hour, an hour and a half.

12       Q    Other than what we have discussed have

13  you done anything else to prepare for today's

14  deposition?

15       A    No.

16       Q    When you were deposed previously,

17  Mr. Neufeld, in what case were you deposed?

18       A    I don't recall.  A few years ago.

19       Q    When?  Do you know about when you were

20  last deposed?

21       A    Several years ago, I don't recall the

22  specific date.

1      Q     Do you know generally around what time

2   that was?

3      A     No.

4      Q     Do you recall in what matter it was

5   concerning that you were deposed?

6      A     I do not.

7      Q     Do you remember what court it was in

8   which you were deposed?

9      A     No.

10      Q     And what was -- do you remember at all

11   what the nature of the case was?

12      A     No.

13      Q     Were there any other times you were

14   deposed?

15      A     I believe there was, but I have a long

16   career and I don't remember specifically another

17   time --

18      Q     -- Do you remember how many -- about how

19   many times you were deposed?

20      A     I'm only confident of one that I was

21   just referencing.

22      Q     So let's turn first to your role at the

1   Department of Homeland Security.  What is your

2   current position at the Department of Homeland

3   Security?

4       A    I'm the associate director for Service

5   Center Operations.

6       Q    From this point forward I will refer to

7   Service Center Operations as SCOPS, if that is all

8   right?  And for the court reporter, that's spelled

9   S-C-O-P-S.

10          So is SCOPS within USCIS, Mr. Neufeld?

11      A    Yes.

12      Q    And USCIS is a component within DHS?

13      A    Yes.

14      Q    When did you begin your role as

15  associate director of SCOPS?

16      A    January or February of 2010.

17      Q    Have you held any other positions at

18  DHS?

19      A    Yes.

20      Q    What were those positions?

21      A    I was the deputy associate director for

22  domestic operations.

1     Q     And around what time, when were you the

2  deputy associate director for domestic operations?

3     A     That was the position I held before

4  January 2010.

5     Q     When did you begin that position?

6     A     I'm not certain but I think that was

7  2009 and I don't remember the month.

8     Q     And did you -- did you have any position

9  within DHS before that?

10     A     Yes.  I was the chief of field

11  operations immediately before that and that would

12  have begun in 2007.  Again, I'm not clear on the

13  month.

14     Q     And before that?

15     A     I was the service center director for

16  the California service center.

17     Q     And how long were you working at that --

18  in that position?

19     A     I believe I started that position in

20  2003.

21     Q     In total, Mr. Neufeld, how long have you

22  been working at DHS?

DONALD NEUFELD

10/18/2017

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

18

1    A    Since it was created.

2    Q    And can you give me the date around what

3    time that it was?

4    A    I should know this.  I think it was

5    March 2010 -- I mean 2003.

6    Q    And were you working in the government

7    prior to that?

8    A    Yes.

9    Q    Where were you working prior to the

10   creation of DHS?

11   A    The Legacy Immigration and

12   Naturalization Service.

13   Q    How long had you been working at that

14   agency for?

15   A    Since September 1983.

16   Q    Okay.  I want to turn to SCOPS and its

17   role.  Can you explain what the SCOPS office does?

18   A    So we are a component within USCIS.  The

19   headquarters component where I -- my offices we

20   oversee the operations of five service centers.

21   Q    Can you expand a bit more on what you

22   mean by the operations of the service centers?

1   What are those operations?

2      A    The service centers are responsible for

3   adjudicating benefit requests under the

4   Immigration Nationality Act.

5      Q    Did SCOPS process requests for the

6   Deferred Action for Childhood Arrivals and

7   Accompanying Work Authorization applications?

8      A    Yes.

9      Q    So you are familiar with the DACA

10  program?

11     A    Yes.

12     Q    Can you describe your responsibilities

13  as in your role as the associate director of

14  SCOPS?

15     A    I oversee the operations of the five

16  service centers.

17     Q    Is there anything else that you are

18  responsible for?

19     A    I represent the interests of service

20  center operations with my colleagues and the rest

21  of the agency and the department.

22     Q    Is there anything else?

1      A    No.

2      Q    Do you oversee the processing of DACA

3   applications?

4      A    Yes.

5      Q    So who reports directly to you,

6   Mr. Neufeld?

7      A    The deputy associate director for

8   service center operations.

9      Q    Who is that?

10     A    That position is vacant now so there is

11   somebody in an acting capacity.

12     Q    Who is the acting deputy director?

13     A    Carrie Selby.

14     Q    Carrie Selby.  And who reports to Carrie

15   Selby?

16     A    This gets complicated because it is an

17   acting situation.  So right now the service center

18   directors are reporting to me through that

19   position, but that's only for this interim period

20   where there is an acting individual.

21     Q    And normally how does the chain of

22   command work?

DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017

21

```
 1      A    Normally the five service center

 2   directors would report to the deputy associate

 3   director who reports to me.

 4      Q    Are you in regular contact with the

 5   directors of the service centers?

 6      A    Yes.

 7      Q    How often are you in contact with them?

 8      A    It varies, but usually at least weekly.

 9      Q    And in what form does this contact take

10   place?

11      A    Usually by email or telephone or video

12   conferencing, sometimes in person.

13      Q    Do they compile reports for you or

14   documents on a regular basis?

15      A    Yes.

16      Q    Do they keep you apprized of the work

17   performed at the service centers?

18      A    Yes.

19      Q    How often do they update you?

20      A    We have a weekly check-in which they can

21   bring up whatever information they would like to

22   share.
```

1     Q     Can you describe what is communicated

2    during these weekly check-ins?

3     A     Any matters of interest.  Usually they

4    are operationally focused so whatever issues might

5    be arising at the center that need attention, how

6    well they are performing, where the backlogs are

7    developing, that sort of thing.

8     Q     Anything else that they might keep you

9    apprized of?

10     A     Well, it is open to anything anybody

11    wants to bring up.

12     Q     And do they prepare memoranda in

13    preparation for this check-in?

14     A     No.

15     Q     Do they -- do they keep you apprized of

16    the number of immigration related requests that

17    each service center has processed?

18     A     Not normally.

19     Q     Do they keep you apprized of the number

20    of DACA applications processed?

21     A     No, not normally.

22     Q     So within these weekly check-ins with

1   the service center directors are there -- is there

2   any agenda created beforehand?

3      A    Infrequently.

4      Q    How often would sometimes these agendas

5   be created?

6      A    So I believe we started having an

7   agenda, maybe within the last two months and it's

8   been weekly since then.

9      Q    Are there minutes coming out of these

10  check-ins?

11     A    No.  No.

12     Q    Are there any written records of what

13  was discussed at these check-ins?

14     A    No.

15     Q    To whom do you directly report,

16  Mr. Neufeld?

17     A    To the deputy director of USCIS.

18     Q    Who is that, Mr. Neufeld?

19     A    James McCament.

20     Q    Do you report to anyone else?

21     A    Directly, no.

22     Q    So let's now turn to the processing of

1   DACA applications that was conducted at your

2   office.  As part of your official duties you

3   oversaw the processing of DACA applications.  Is

4   that correct?

5       A    That's correct.

6       Q    So I want to focus my understanding of

7   that process and I want to focus on the process

8   specifically prior to your office learning about

9   the decision to terminate DACA.  So I would like

10  to go step by step through each process beginning

11  with when an individual submits an initial DACA

12  application.  Is that all right?

13      A    Yes.

14      Q    So at the beginning of the application

15  process DACA applications are sent to lockboxes.

16  Is that correct?

17      A    Do you mean DACA applications?

18      Q    Yes?

19      A    Yes.

20      Q    How many of lockboxes are there?

21      A    I don't recall specifically.

22      Q    After arriving at those lockboxes they

1   are reviewed for completeness.  Correct?

2       A    Yes.

3       Q    And if an application is missing a

4   component, for example there is no attached filing

5   fee or if it's unsigned it would be rejected.

6   Correct?

7       A    Yes.

8       Q    How did SCOPS handle rejected

9   applications?

10      A    We wouldn't be the ones rejecting them.

11   It would be rejected by the lockbox.

12      Q    How do -- do you know how the lockbox

13   handled rejected applications?

14      A    No.

15      Q    Were application -- were applicants

16   notified of the rejection?

17      A    I believe so, yes.

18      Q    Do you know how they were notified?

19      A    I believe by letter, with the rejected

20   application would come a notice instructing them

21   that it had been rejected.

22      Q    You said that they would be issued a

1   letter.  Is that correct?

2       A   I don't know the specific format.  What

3   I do know is that when the physical application or

4   request would be rejected that along with that

5   rejection would be some sort of communication

6   explaining that it had been rejected.

7       Q   Would it be sent back to the applicant?

8       A   Yes.  I am not sure how if they were

9   represented how that would be handled.

10      Q   Who manages those lockboxes, Mr.

11   Neufeld?

12      A   The Treasury Department.

13      Q   So, it would be the Treasury Department

14   that evaluates the applications for completeness

15   and would reject them and send the notice back.

16   Is that correct?

17      A   The Treasury Department has a contract

18   with banks that manage the lockboxes.

19      Q   If upon initial review the application

20   moves forward were applicants also notified?

21      A   Can you repeat that?

22      Q   If upon initial review by the lockboxes

1   the application moves forward are applicants

2   notified?

3       A    They would receive a receipt notice.

4       Q    Were renewal applications processed in

5   the same way as initial DACA applications?

6       A    With respect to the lockbox process?

7       Q    Right now we're still on the lockbox

8   process.

9       A    Yes.

10      Q    So they are reviewed for completion,

11  notified of denial, and receive a receipt if the

12  application is forwarded.  Is that correct?

13      A    That's correct.

14      Q    What happens once an application is

15  approved at the lockboxes?

16      A    The lockbox wouldn't approve, they would

17  only accept or reject.

18      Q    What happens if the lockbox -- what

19  happens if an application is accepted by a

20  lockbox?  What happens next?

21      A    Then the lockbox -- I'm not sure of the

22  process that they use.  But they are responsible

1   for the data entry into our systems.  I'm not sure

2   exactly how that process works.  I believe they

3   have their own system but they do data entry into

4   it and then it is transmitted to our system so

5   that we have an electronic record of the filing.

6       Q    What system is that?

7       A    Our system?

8       Q    Yes.

9       A    It has changed over time.  It was

10  initially claims 3.  Now it is ELIS.  E-L-I-S.

11          (Court reporter requested

12  clarification.)

13          THE WITNESS:  E-L-I-S.

14  BY MR CHEN:

15      Q    Do you know what the system that the

16  lockbox managers use?

17      A    I do not.

18      Q    Who would know?  Do you know who would

19  know what system that was?

20      A    The manager of our Office of Intake and

21  Document Production.

22      Q    Who, what is the name of your manager?

1      A    Ernest DeStefano.

2      Q    Once the accepted applications are

3   logged do they move on to the service centers?

4      A    Yes.

5      Q    At the service centers who reviewed each

6   DACA application?

7      A    The typical process would be that it

8   would be reviewed by an immigration services

9   officer.

10      Q    Were DACA applications processed

11   anywhere else besides these service centers?

12      A    They are only adjudicated at service

13   centers.  A very small percentage in the last

14   several years have been referred to a field office

15   for interview but they did not make the final

16   decision.  They would -- after the interview they

17   would send it back to the service center for the

18   final decision.

19      Q    Do you know approximately how many

20   applications were referred to a field office for

21   an interview?

22      A    It would be a few hundred.

1    Q    Do you know what percentage of that is

2  to the total number of DACA applications?

3    A    I do not, but it is a very small

4  percentage.

5    Q    Approximately how many USCIS immigration

6  officers work at each service center?

7    A    It varies.  Most of these -- let me

8  clarify.  Things have changed over the years, but

9  for the majority of the time the cases have been

10  processed at either the Nebraska service center.

11  Most of the cases are processed at Nebraska

12  service center or the California service center.

13  The officer component at each of those has also

14  changed.  I would imagine that it's around

15  probably 400 adjudicators, officers at each of

16  those centers.

17    Q    And what about with the other three

18  service centers?

19    A    Vermont service center is approximately

20  the same size.

21       The Texas service center is a smaller

22  center, so it probably -- although it has grown

1   recently.  It's probably closer to the 300 range.

2          The Potomac service center is the newest

3   center.  It is the smallest center and I think

4   that they have maybe 200 officers.

5      Q    And so DACA applications are processed,

6   you said that DACA applications are primarily

7   processed in the Nebraska and the California

8   service centers.  Is that correct?

9      A    That's correct.

10     Q    But the other three service centers also

11  process DACA applications.  Is that correct?

12     A    The Vermont service center processes a

13  very small number and those would relate to DACA

14  requests where the requester may have had another

15  benefit request in the T and U nonimmigrant

16  categories or the Violence Against Women Act

17  request.  I just don't -- well, the Potomac

18  service center has never processed DACA requests.

19  I don't recall the Texas service center's role.  I

20  believe that they have processed them at some

21  point in the past but it was a very short period

22  of time and not very large numbers.

1    Q    Once a DACA application arrives at a

2   service center what happens next?

3    A    I don't know specifically.  The general

4   process is that the files would be received in the

5   mailroom, processed by a contractor, staged.  The

6   system -- in an automated way the system would

7   conduct background checks.  And depending on the

8   results of those background checks if there were

9   hits then they would go to a dedicated group of

10   officers at the center that would review the --

11   the information.  Other than that the files would

12   sit on a shelf until there was an officer

13   available.  The process usually first in, first

14   out.  They go to an officer for review.  If the

15   officer determines it's approvable then they would

16   approve it.  If there were -- if they determined

17   that additional evidence is necessary then they

18   would initiate a request for additional evidence.

19   If it -- they determined that it should be denied

20   then they would deny it.

21    Q    What criteria do INS adjudicators

22   consider when deciding to approve or deny a

1    request for deferred action?

2        A    The criteria listed in the June 2012

3    memo issued by Janet Napolitano.

4        Q    Did immigration adjudicators use any

5    other criteria?

6        A    All of the criteria flows from that.  It

7    was -- the refinement of that criteria has been

8    developed through publication of FAQs, frequently

9    asked questions on the website.

10       Q    And so are all of the criteria that

11   immigration adjudicators would use, are they on

12   the FAQ website?

13       A    Yes.

14       Q    If the request for deferred action is

15   approved were applicants notified of the approval?

16       A    Yes.

17       Q    How were they notified?

18       A    They would receive an approval notice

19   and they would receive an employment authorization

20   document.

21       Q    Is that through the mail or through some

22   other communication?

1      A     The mail.

2      Q     If they were denied -- if their

3   application was denied were they notified?

4      A     Yes.

5      Q     Are they notified of the reasons for

6   denial?

7      A     Yes.

8      Q     Can you give me an example of what a

9   reason for denial might be?

10      A     One of the criteria is they would have

11   to have arrived under the age of 31 before the

12   date of issuance of the memo.  So if they -- if

13   they had not demonstrated then the case -- then

14   their request would be denied.

15      Q     Is there any quality control to ensure

16   that the -- that immigration adjudicators are

17   adjudicating based upon the set criteria?

18      A     So adjudicators are trained and they are

19   closely monitored by their supervisor.  Cases are

20   reviewed by their supervisor when they first begin

21   to adjudicate them and then when the supervisor is

22   satisfied that they have demonstrated the

1  capabilities then typically their cases are not

2  reviewed.

3      Q    What does the training that immigration

4  adjudicators receive involve?

5      A    It would be training provided on site.

6  I don't know the content or the length of time.

7      Q    Were there training documents or manuals

8  involved?

9      A    I'm sure there were.

10      Q    Do you know what those documents were?

11      A    No.

12      Q    Let me return back to the notices if an

13  applicant -- an applicant's application is

14  approved.  You mentioned before that USCIS used

15  the Claims 3 system and then the ELIS system.

16  Were they notified through those systems?

17      A    I don't understand the question.

18      Q    How were applicants whose applications

19  were approved, how were they -- how were the

20  notices for them generated?

21      A    I'm actually not entirely clear on that

22  process.  I know that they would be system

1   generated notices.  But where they are printed,

2   how they are mailed I know has changed over time

3   and I'm not confident I know the current process.

4       Q    Do you know what the previous process

5   was?

6       A    They would have been generated on site

7   at the center where the adjudicator was assigned

8   and then the contractor would have placed them in

9   the mail.

10      Q    Do you know how long it took the notice

11  once mailed to reach an individual?

12      A    I do not.

13      Q    Do you know who might know that

14  information?

15      A    No.

16      Q    Were renewal applications processed in

17  the same way at the service centers as initial

18  applications?

19      A    No.

20      Q    What were the differences?

21      A    So renewal requests, they are processed

22  in ELIS and there is a system processing that goes

1   on for them that is different than for the initial

2   filing.  So an initial request is -- every one of

3   those is presented to an adjudicator and they are

4   reviewing either paper that was filed with it or

5   images of paper that are in the system, scanned

6   into the system.  Renewal requests are -- there is

7   a internal process that's automated where

8   depending on the results of background checks,

9   depending on checks that are conducted within the

10   system some cases may go through to completion

11   without being presented individually to an

12   officer.

13       Q    You mentioned some cases.  How do you --

14   what are those cases that go through without being

15   presented to an officer?

16       A    With the renewal request the individual

17   would have already demonstrated eligibility

18   previously for DACA.  So at the time of the

19   renewal request we are basically focused on the

20   results of new background checks that were run and

21   travel.  So part of the -- under the DACA program

22   if the individual travels without advance parole

1   that would -- abroad outside of the United States,

2   that would terminate their DACA status.  So the

3   system will check to see if the applicant either

4   answered the question that they had traveled with

5   or without advance parole, but also check other

6   systems to see whether we had record of their

7   travel.  If any of those would have come up

8   positive then the case would fall out of the

9   automated process and get referred to an officer

10  for manual review to determine eligibility.  So

11  typically the process was mini-checks were

12  conducted.  Depending on the results of those

13  checks the case could either be completed

14  automatically in the system or be referred to an

15  individual officer for review.

16      Q    Were there any other differences between

17  renewal processing and initial application

18  processing?

19      A    Not that I can think of.

20      Q    If a renewal application was approved

21  were applicants also notified of the approval?

22      A    Yes.

1    Q    And how was that approval -- what form

2    did that notice?

3    A    They would receive an approval notice in

4    the mail and the EAD, employment authorization

5    document.

6    Q    You said that renewal applications were

7    processed through the ELIS system.  Were they

8    processed through any other system?

9    A    Claims 3.  I'm actually not confident in

10    that answer.

11    Q    Do you know who would know whether

12    renewal applications were processed through Claims

13    3?

14    A    Individual officers might know.  I --

15    there -- I don't know -- we have people in our

16    agency who would know that, I just don't recall.

17    Q    Who in your agency supervises these

18    electronic systems?

19    A    That's the chief of our Office of

20    Information Technology.

21    Q    Who is the chief of office --

22    A    That position is currently vacant.

1    Q    Is there an acting chief officer?

2    A    Yes.  And his name is Keith Jones.

3    Q    Okay.  So I want to focus now on the

4    notice procedures that SCOPS issued to DACA

5    applicants and DACA recipients.  Now I'm still

6    focusing on the process prior your office learning

7    about the decision to terminate DACA.

8         Did SCOPS have policies directing

9    adjudicators to send notices to DACA applicants

10   about updates to the status of their application?

11   A    I'm not following the question.

12   Q    Did SCOPS have policies about sending

13   notices to DACA applicants when the status of

14   their application changed when it was updated?

15   A    Well, first I need to clarify.  SCOPS

16   doesn't have its own policies.  We only follow the

17   policies of USCIS.

18   Q    Does USCIS have those policies about

19   sending notices?

20   A    I'm not sure whether it's by policy or

21   regulation, but we -- nonetheless, we do issue

22   approval notices, the request for evidence.  And

1   that's -- those are policy decisions at some point

2   that were made that people need to be notified of

3   approval, denial.

4       Q    So how were those -- how were those

5   decisions to issue those notices made?

6       A    As I said, I don't recall whether they

7   are by regulation.  I believe they're caught up by

8   regulation.

9       Q    Were you involved in the making of those

10  decisions to send notices?

11      A    No.

12      Q    Were those decisions -- were those

13  policies or regulations written down anywhere?

14      A    If it's a regulation then it's codified

15  in our regulations.

16      Q    So how does -- how does an individual

17  employee, immigration adjudicator know to send a

18  notice when, for example, someone is -- someone's

19  application is approved?

20      A    Well, as I said the system will generate

21  the notice upon approval in the system by the

22  officer.  Same goes for denial notices.

1    Q    Do you know when these policies were

2  set?

3    A    Are we talking specifically about DACA

4  or all adjudications?

5    Q    Specifically about DACA.

6    A    So it would have been since the

7  beginning of the program.

8    Q    So since the beginning of the program

9  SCOPS or USCIS had sent these -- had sent notice

10  to DACA recipients when their status changed or

11  updated?

12    A    Yes.

13    Q    Did USCIS send notices for when a DACA

14  recipient's DACA status was terminated for

15  whatever reason before it expired?

16    A    Yes.

17    Q    Did USCIS ever send notices to DACA

18  recipients notifying them about changes to the

19  DACA program?

20        MR. TYLER:  Objection.  Vague.

21  BY MR CHEN:

22    Q    Do you understand the question,

1   Mr. Neufeld?

2       A    I don't know what you mean by changes to

3   the program.

4       Q    Are you aware of when -- if the DACA

5   program changed since it was first issued in 2012?

6           MR. TYLER:  Objection.  Vague.

7           THE WITNESS:  I still -- I don't know

8   what you mean by program.

9   BY MR CHEN:

10      Q    The -- did USCIS ever issue notices to

11  remind DACA recipients to renew their

12  applications?

13      A    Yes.

14      Q    And about when did they send these

15  notices?

16      A    That changed over time.  I think we

17  started initially with sending them a notice at

18  the 120 day point.  So, 120 days before their

19  current DACA would have expired we would issue a

20  notice.  And then that changed to six months

21  advance notice.

22      Q    When did that change?

1      A    I don't recall specifically, probably at

2   least a year ago.

3      Q    So generally it was around 2016, late

4   2016?

5      A    I don't recall specifically.  It might

6   have been earlier.

7      Q    What was the rationale?  Why were -- why

8   did that policy change?

9        MR. TYLER:  Objection.  Lack of

10   foundation.

11   BY MR CHEN:

12      Q    Do you know when the -- why the policies

13   changed from 120 days to 180 days?

14      A    I know that advocacy groups were

15   complaining that that was insufficient notice and

16   that not enough people were applying early enough

17   so that they could prevent a lapse of their DACA

18   status.

19      Q    Do you know who these advocacy groups

20   were?

21      A    I don't recall specific groups.

22      Q    Do you know generally who these groups

1   were?

2       A    No.

3       Q    Were there any other reasons for

4   changing the notice from 120 to 180 days?

5       A    Not that I recall.

6       Q    Were you involved in the establishment

7   of these notice processes?

8       A    In some ways, yes.

9       Q    Can you explain what ways you were

10  involved?

11      A    With the stand-up of the DACA program

12  there was a -- there were many meetings in the

13  early days comprised of many people from different

14  parts of the agency working through how best to

15  stand up this program and there were many

16  conversations at that time about whether and when

17  to issue reminder notices and I participated in

18  those conversations.

19      Q    And do you know about when those

20  conversations happened?

21      A    In the first 60 days following the

22  issuance of the memo.

1      Q    Do you know who else was involved in

2   those conversations?

3      A    There were many people involved in those

4   conversations.  I can recall some of them.

5      Q    Can you name some of the individuals who

6   you can recall?

7      A    Ali Mayorkas (phonetic), Denice Vanison.

8   Laurie Shalabaum (phonetic).  Many different

9   people from counsel.  Dan Renaud, Tracy Renaud.

10   Many people.

11      Q    Were you -- what were some of the

12   factors that you considered in setting those

13   notice policies?

14      A    I need to repeat that SCOPS doesn't set

15   policy.  So there were many discussions at the

16   executive level.  For the most part those

17   conversations were about how to implement policy

18   decisions that were being made at the department

19   level.

20      Q    And can you explain what those policy

21   decisions at the department level were?

22      A    Let me think.  One of them would have

1   been -- you know, whether we are going to issue

2   reminder notices again, how far in advance to

3   issue the reminder notices.  There were -- there

4   were a lot of issues in the early days surrounding

5   what types of crimes would be disqualifying.

6        Q    So are you saying that the policy to

7   issue reminder notices was made at the department

8   level?

9        A    I believe so, yes.

10       Q    Do you know who was involved in making

11  those policies?

12       A    At the department level?

13       Q    Yeah.

14       A    No.  Other than our director

15  participated, I'm sure.

16       Q    Do you know when those policies were

17  set?

18       A    Well, the majority of policy decisions

19  needed to be made in the first 60 days because

20  that was the time we had to stand up the program

21  and we needed to inform the public.

22       Q    So were the policy to -- was the policy

1   to make, to issue reminder notices made within the

2   60 days?

3       A   I believe so, yes.

4       Q   Were you involved in the making of those

5   policies?

6       A   I was involved in discussions about how

7   we could issue notices.  I was not in the decision

8   making process for that policy.  I was not part of

9   the group that decided that.

10      Q   Were you consulted at all in that

11  decision to make --

12      A   Yes.

13      Q   -- policy?  What was the nature of that

14  consultation?

15      A   To offer how we might implement that

16  policy if it were adopted.

17      Q   What was your recommendation to how

18  SCOPS might implement that policy?

19          MR. TYLER:  Object on the grounds of

20  privilege.  It is deliberative process

21  information.  Direct the witness not to answer.

22

1   BY MR CHEN:

2       Q    Were you -- did you write any memoranda

3   or documents in response to the consultation about

4   how to implement the policy?

5       A    I don't believe so.  There may be email

6   messages around that subject dating back to that

7   time period.

8       Q    Do you know -- so around what time were

9   those email messages?

10      A    As I said, this -- all of this was in

11  the first 60 days.

12      Q    Do you know who were the recipients of

13  those email messages?

14      A    No, because I don't even recall specific

15  email messages.

16      Q    Let's return to the DACA notices to

17  renew that were sent to DACA applicants.  What did

18  these notices say?

19      A    I don't know specifically.

20      Q    Do you remember generally what they

21  said?

22      A    It was a reminder that their DACA time

1   period was expiring and that they should submit a

2   new -- a request for renewal if they wanted to

3   extend.

4       Q    Was there a time period that the notices

5   recommended DACA applicants submit their renewals?

6       A    That changed over the course of the

7   years of operation.  I believe originally that

8   recommended time period was 120 to 150 days in

9   advance.  And then that evolved to -- I'm not

10  certain.  I know that we began encouraging people

11  to apply 150 days in advance or more.

12      Q    Did SCOPS have a name for these notices?

13  How did they refer to the notices?

14      A    Reminder notices.

15      Q    Reminder notices.  Did SCOPS send

16  reminder notices to all DACA recipients whose

17  status was about to expire?

18      A    For a period of time, yes.

19      Q    What period of time was that?

20      A    From the beginning of the DACA program

21  until -- I don't recall specifically, but within

22  the last year I believe we have stopped issuing

1    those notices.

2        Q    Within the last year, do you know about

3    what time within the last year?

4        A    No.

5        Q    Do you know who might know that

6    information?

7        A    I don't know who, I know there are

8    records that would relate to that.

9        Q    What are the -- do you know who created

10   these records?

11       A    No.

12       Q    Do you know when these records were

13   created?

14       A    No.

15       Q    What were the nature of these records?

16   Were they memoranda or reports?

17       A    I don't know.

18       Q    So how are you aware that there are

19   records relating to the termination of these

20   notices?

21       A    I know that there were communications to

22   the team that would have been responsible for

1   development of the capability to issue those

2   notices in ELIS not -- that they did not need to

3   work on that capability.

4       Q    Who are these individuals that were

5   sending these communications?

6       A    I'm not sure.

7       Q    Did they send them to you?  The

8   communications that you referred to, did the --

9   were the communications sent to you, Mr. Neufeld?

10      A    Not that I recall.

11      Q    So how were you aware, made aware of

12   these communications?

13      A    I'm aware that the decision was made and

14   I'm aware that it was communicated in some way.  I

15   don't know specifically the vehicle of

16   communication to the developers.

17      Q    Who informed you that the -- that the

18   decision was made?

19      A    Kathy Nuebel.

20      Q    Do you know about when she informed you

21   of that decision?

22      A    Several months ago.  I don't recall more

1    specifically than that.

2        Q    When, in what form did she inform you?

3    Was this a conversation?

4        A    Email messages.

5        Q    Who -- do you know who else -- who else

6    was on that email -- sorry, was CCed on that

7    email?

8        A    I do not.

9        Q    Do you recall what the subject of the

10   email was?

11       A    The subject line, I do not.

12       Q    Was this in response to a previous

13   email?

14       A    It was in response to me raising the

15   question as to whether we would develop that

16   capability in ELIS.

17       Q    Do you know about when you sent that

18   request?

19       A    Several months ago is all I can recall.

20       Q    In that email that was sent to you, do

21   you remember if there were any attachments to the

22   email?

1       A    I do not recall.

2       Q    Who is Kathy Nuebel?

3       A    She is the chief of the Office of Policy

4    and Strategy within USCIS.

5       Q    Were there any other communications

6    about the decision not to -- the decision to stop

7    issuing renewal notices?

8          MR. TYLER:  Objection.  Lack of

9    foundation.

10   BY MR CHEN:

11      Q    Are you aware of any other

12   communication?

13      A    Of?

14      Q    Are you aware of any other

15   communications about the decision to terminate

16   those renewal notices?

17      A    I'm aware that -- I know that I sent

18   messages to my subordinate team that that

19   capability would not be being developed.

20      Q    When were those -- how were you made

21   aware of those messages?

22      A    Well, they were my messages.

1    Q    Sorry.  You -- when did you send these

2    messages?

3    A    It would have been contemporaneous with

4    the rest of these messages and that was several

5    months ago and I don't recall specific dates.

6    Q    What did you -- do you remember what you

7    communicated to your subordinates in those

8    messages?

9        MR. TYLER:  Objection.  Vague.

10       THE WITNESS:  I communicated to them

11   that the capability would not be being developed

12   in ELIS to issue reminder notices.

13   BY MR CHEN:

14   Q    Do you know why USCIS stopped sending

15   the renewal notices?

16   A    I know that I was asked whether there

17   would be costs involved and I answered yes.

18   Q    Who asked you about those costs?

19   A    Kathy Nuebel.

20   Q    Do you know about when she asked you

21   about them?

22

1      A    It's all in the same time period that I

2   don't recall specifically.

3      Q    You said that there would be costs

4   involved.  Do you know what those costs -- what

5   you mean by that?  Can you explain further?

6      A    What I meant by that were the

7   development costs with programming the system to

8   have that capability.

9      Q    What are those development costs?

10     A    I don't know specifically.

11     Q    Did you -- do you know generally what

12   those costs might be?

13     A    We have to pay people to do the

14   programming.

15     Q    Did you ever communicate to Kathy Nuebel

16   about how much those costs were?

17     A    I don't think so because I don't know

18   what they would be specifically.

19     Q    Did you know generally what those costs

20   were at all?

21     A    Not that I recall.

22        MR CHEN:  So I am -- for the record, I

 1   am now handing to the court reporter what is

 2   marked as Exhibit 1.  If you could please mark

 3   this as Exhibit 1.

 4          (Whereupon, Exhibit No. 1 marked for

 5   identification.)

 6          MR CHEN:  And I'm also handing a copy of

 7   what is marked as Exhibit 1 to Mr. Neufeld.

 8          MR. TYLER:  Do you have additional

 9   copies for counsel?

10          MR CHEN:  I'm handing a copy to

11   Mr. Tyler.

12          MR. TYLER:  Do you have more than one

13   copy so I can --

14          MR. WISHNIE:  We don't have sufficient

15   copies for the whole table.

16          MR CHEN:  No.  But for myself in

17   addition to the deponent?

18          MR. WISHNIE:  Yes.

19          MR. TYLER:  So there are two copies of

20   that?

21          MR CHEN:  Yes.  We have one copy just

22   for the deponent and one for the court reporter.

1   Can I request that this exhibit be marked as

2   Exhibit 38, please.

3          (Whereupon, Exhibit No. 38 was marked

4   for identification.)

5   BY MR CHEN:

6      Q    And for the record the document is

7   titled defendant's objections and responses to

8   plaintiff's first set of interrogatories to

9   defendants dated October 16, 2017.

10         Mr. Neufeld, if you could, it is a long

11   document so you don't need to take -- you don't

12   need to read through the whole thing.  But if you

13   could take a look at page 31, please.  And

14   familiarize yourself with the last three

15   paragraphs, please.

16         MR. TYLER:  Beginning with the automatic

17   generation?

18         MR CHEN:  Yes.

19   BY MR CHEN:

20      Q    Can you let me know when you've

21   familiarized yourself with the document, please?

22      A    Yes.  I've read it.

1    Q    Okay.  So according to this document the

2    SCOPS transitioned from the Claims 3 system for

3    printing up renewal notices to the electronic

4    print management server.  Is that correct?

5    A    Yes.

6    Q    Do you know when that transition

7    occurred?

8    A    I don't know anything more than what's

9    stated in this document.

10    Q    And it's dated in the document that

11    transition occurred around July 2017.  Is that

12    correct?

13    A    Yes.

14    Q    According to this document -- well,

15    Mr. Neufeld, is it true that the decision not to

16    develop renewal notice, the renewal notice feature

17    in the electronic print management server was due

18    to significant operational costs associated with

19    rebuilding the service?

20        MR. TYLER:  Objection.  Lack of

21    foundation.

22

DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017

60

1   BY MR CHEN:

2       Q    Do you know if that -- if the decision

3   not to develop the renewal notice feature for the

4   electronic print management server was due to

5   significant operation costs associated with

6   rebuilding the service?

7       A    I know that that's what I was told.

8       Q    Who were you told by, Mr. Neufeld?

9       A    Kathy Nuebel.

10      Q    Can you explain the relationship between

11  the electronic print management server, which by

12  the way I will refer to now as EPMS for the

13  record.  Can you explain the relationship between

14  the EPMS system and the ELIS system, Mr. Neufeld?

15      A    No.

16      Q    Do you know who might be able to explain

17  that relationship?

18      A    Someone in our IT shop, so possibly

19  Keith Jones.

20      Q    Is it true that the renewal notice

21  feature was never developed for the ELIS system?

22          MR. TYLER:  Objection.  Lack of

1   foundation.

2   BY MR CHEN:

3       Q    Do you know whether the renewal notice

4   feature was ever developed for the ELIS system?

5       A    Yes.

6       Q    And was it developed for the ELIS

7   system?

8       A    No.

9       Q    So let me focus first on the migration

10  from the Claims 3 server, the EPMS print server.

11  And I apologize if I am a bit slow on this because

12  there are quite a few technical details.

13          Do you know how many DACA requests in

14  the Claims 3 system were handled by the EPMS

15  system?

16      A    I do not.

17      Q    Do you know how many -- who would know?

18      A    No, I don't.

19      Q    So according to this document on page 31

20  in the second paragraph towards the end it states

21  that the overwhelming majority of pending DACA

22  requests were then handled by ELIS and had been

1    adjudicated in ELIS until approximately February

2    1, 2016.

3             Does that refresh your memory about how

4    many DACA applications were then handled in the

5    Claims 3 system?

6        A    No.

7        Q    Do you know why SCOPS migrated from the

8    Claims 3 system to the EPMS system?

9        A    It's not SCOPS.  These are decisions

10   that are made at the agency level, so I don't know

11   the specific reasons.

12       Q    Would you know the general reason why

13   USCIS migrated?

14       A    That the EPMS is supposed to be more

15   efficient, that was the one reason that I know of.

16       Q    Do you know of any other reasons?

17       A    No.

18       Q    Can you explain further what you mean by

19   more efficient?

20       A    No.

21       Q    Were you involved in the decision to

22   migrate from Claims 3 to the EPMS system?

1       A    No.

2       Q    Were you consulted about that decision?

3       A    No.

4       Q    Do you know who was involved in that

5    decision?

6       A    Individuals in our IT shop would have

7    been involved in that.  I don't know specifically

8    who.

9       Q    And did you ever communicate with these

10   individuals in the IT shop about the migration

11   with the decision to migrate?

12      A    Not that I recall specifically.

13      Q    Did you have any general conversations

14   about the migration from the Claims 3 system to

15   the EPMS system?

16      A    Not that I recall.

17      Q    Were you aware that the EPMS print

18   service system did not have the renewal notice

19   functionality when the decision to switch that

20   system was made?

21      A    No.

22      Q    Were you aware -- were you -- did you

1   ever become aware that the EPMS system did not

2   have the renewal notice functionality?

3       A    Not specifically that it was because of

4   EPMS.  I knew that in -- we didn't have -- we no

5   longer had the capability of issuing the reminder

6   notices without specifically programming a system

7   to do that.  Whether it was EPMS or Claims 3 I

8   didn't know specifically or I don't remember

9   specifically.

10      Q    Who made you aware of the fact that

11  you -- that SCOPS did not have the capability?

12      A    I believe it was Alex King.

13      Q    And who is Alex King, Mr. Neufeld?

14      A    He is the branch chief with DACA in my

15  SCOPS organization that doesn't -- that has --

16  manages the DACA portfolio for SCOPS.

17      Q    Do you know when he made you aware that

18  you didn't have this functionality?

19      A    No.

20      Q    Do you know around what time?

21      A    No.

22

1   Q    Do you remember what -- how Alex King

2   informed you?

3   A    Yes.  He walked into my office.

4   Q    So this was a discussion?

5   A    Yes.

6   Q    Was there anyone else involved in that

7   discussion?

8   A    No.

9   Q    And did you inquire as to why SCOPS no

10  longer had that functionality?

11  A    Not that I recall.

12  Q    Were you concerned at all that SCOPS no

13  longer had that functionality?

14       MR. TYLER:  Objection.  Vague.

15  BY MR CHEN:

16  Q    Were you -- did you inquire as to why

17  there was no -- that SCOPS did not have the

18  functionality to build in renewal notices despite

19  having had renewal notices since the beginning of

20  the program?

21  A    I recall noting to myself that that

22  meant that we wouldn't be able to produce reminder

1   notices that had been the standard practice.

2       Q    Did the lack of that functionality

3   bother you at all?

4        MR. TYLER:  Objection.  Vague.

5        THE WITNESS:  I don't get bothered by

6   these things.  I noted it as something that would

7   need to be addressed one way or the other either

8   that we would either build the capability or we

9   wouldn't be able to continue producing the

10  notices.

11  BY MR CHEN:

12      Q    Did you have any reaction at all that

13  SCOPS would no longer have this renewal notice

14  capability?

15       MR. TYLER:  Objection.  Vague.

16       THE WITNESS:  I noted, as I said, that a

17  decision would have to be made of whether to build

18  that capability or not.

19  BY MR CHEN:

20      Q    And were you involved in the decision

21  not to build that capability?

22      A    I elevated the decision, the need for a

1   decision to Kathy Nuebel.

2       Q    Do you know approximately when you

3   elevated that?

4       A    Around the same time period.

5       Q    Why did you?  Do you know why you

6   elevated that -- that information to Kathy Nuebel?

7       A    Because policy decisions are not made

8   within SCOPS.

9       Q    Did SCOPS ever make an attempt to build

10  in the renewal notice feature?

11          MR. TYLER:  Objection.  Lack of

12  foundation.

13          THE WITNESS:  SCOPS doesn't build

14  capabilities.  That's -- that would be our OIT

15  shop.

16  BY MR CHEN:

17      Q    Do you know if the IT shop attempted to

18  build in the renewal notice feature?

19      A    I don't -- I really don't understand

20  your question.  You mean after -- like when or?

21      Q    For the EPMS system are you aware of

22  whether SCOPS or the IT department within SCOPS

1   made an attempt to build in the renewal notice

2   feature?

3       A   I am not.

4       Q   Do you know what it would have taken to

5   build in the renewal notice feature for the EPMS?

6       A   I do not.

7       Q   You said previously that building in the

8   renewal notice feature would have operational

9   costs.  Is that true?

10      A   It would -- there would have been costs

11  involved in developing that capability.

12      Q   What was the basis for that knowledge,

13  Mr. Neufeld?

14      A   My general knowledge of how IT systems

15  works.  Somebody has to program them to do things

16  and there is a cost associated with that.

17      Q   Did you ever inform Kathy Nuebel about

18  the specific costs of building in that feature?

19      A   Not that I recall.

20      Q   Has USCIS ever before decided not to

21  notify a specific group of DACA recipients about

22  renewal?

1      A    Before either of these two times?

2      Q    Yes.

3      A    No.

4      Q    I want to return to the -- the exhibit

5   that I just handed you on page 31.  The document

6   says that USCIS transitioned from the Claims 3

7   system to the ELIS system in which DACA requests

8   have been adjudicated since approximately February

9   1, 2016.  Is that correct?  This is in the --

10  sorry, the first paragraph of page 31, the second

11  sentence.

12     A    I'm sorry.  What is the question?

13     Q    Is it correct that USCIS transitioned

14  from the Claims 3 system to the ELIS system in

15  approximately around February 1, 2016?

16     A    I believe so, yes.

17     Q    So if SCOPS continued its practice of

18  sending out renewal notices 180 days before an

19  applicant's expiration the first notices for cases

20  under the ELIS system would have been sent out

21  approximately August 1, 2017.  Is that correct?

22     A    Yes.

1       Q    But the renewal notice feature was never

2    developed for that ELIS system?  Is that correct?

3       A    Correct.

4       Q    Do you know if the ELIS system issued

5    other types of notices besides renewal notices?

6       A    The technicalities of which system does

7    what I don't know.  I know that cases that we

8    processed in ELIS will receive approval notices,

9    receipt notice, request for additional evidence,

10    notices of intent to deny.

11       Q    Do you know of any other -- any

12    differences between the ELIS system and the Claims

13    3 system?

14            MR. TYLER:  Objection.  Vague.

15            THE WITNESS:  They're completely

16    different systems.

17    BY MR CHEN:

18       Q    So besides the lack of functionality for

19    renewal notice in ELIS were there other

20    differences regarding notices between the Claims 3

21    system and the ELIS system?

22            MR. TYLER:  Objection.  Lack of

1   foundation.  Vague.

2          THE WITNESS:  I don't know specifically

3   the differences between the two system with

4   respect to notice generation.

5   BY MR CHEN:

6      Q    Do you know who would know?

7      A    Someone in our OIT shop.

8      Q    Do you know what the cost of developing

9   ELIS's capacity to issue renewal notices is?

10     A    No.

11     Q    Do you know what the costs for the ELIS

12   system in developing other notices such as the

13   notices that you've just mentioned?

14     A    No.

15     Q    Is the ELIS system more sophisticated

16   than the Claims 3 system?

17         MR. TYLER:  Objection.  Vague.

18         THE WITNESS:  If by sophisticated you

19   mean is it -- use different technology, yes.

20   BY MR CHEN:

21     Q    At the time that you -- do you know who

22   made the decision to transition to the ELIS

1   system?

2       A    By individual, no.

3       Q    Do you know what department made the

4   decision to transition to the ELIS system?

5       A    It's an agency wide decision that I am

6   not sure what role the department plays in that or

7   certainly I don't recall what role it played back

8   when this decision was made.

9       Q    Did you have any involvement in the

10  decision to transition to the ELIS system?

11      A    There are -- there have been meetings

12  with the development -- over time with the

13  development of capabilities within ELIS and the

14  migration of case processing from Claims 3 to

15  ELIS.  And I'm part of a group that the membership

16  and the name of that group has changed over time,

17  but overall this time I have been a participant in

18  meetings where there are discussions about what

19  would be appropriate for development in ELIS with

20  respect to which case types would be migrated from

21  Claims 3 into ELIS.  So I would receive updates,

22  participate in discussions.  The final decision

DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017

73

1   about what the migration of case work from Claims

2   3 to ELIS is not made by that group, it's made by

3   others and so I don't know.

4       Q    Do you know by others do you know who

5   you're -- who are you referring to?

6       A    I know that our deputy and our director

7   played a role in those decisions.  What I don't

8   know is to what level that role was autonomous or

9   they were consulting with others.  Or were -- you

10   know, whether the decision was made by others at

11   the department above them.

12      Q    Did they ever discuss the transition to

13   the ELIS system specifically with respect to DACA

14   applications with you?

15      A    Yes.

16      Q    When did they discuss this with you?

17      A    It would have been before we migrated,

18   but I don't know how long before.

19      Q    Did they ever consult you about that

20   migration?

21      A    Who is they?

22      Q    The deputy and the director that you

 1   mentioned, did they consult you about the decision

 2   to migrate specifically DACA applications to the

 3   ELIS system?

 4       A    I don't know if consultation is the

 5   right word.  There were discussions about the

 6   migration of DACA case work from Claims 3 into

 7   ELIS, yes.

 8       Q    Do you provide your input into those

 9   discussions?

10           MR. TYLER:  Objection.  Vague.

11           THE WITNESS:  I don't know what you mean

12   by input.

13   BY MR CHEN:

14       Q    Did you ever provide any recommendations

15   about whether DACA applications should migrate to

16   the ELIS system or not?

17       A    I don't recall specifically, no.

18       Q    At the time that the DACA applications

19   were transitioned to the ELIS system were you

20   aware that ELIS did not have the renewal notice

21   capability?

22       A    No.

1      Q    Did you ever become -- when did you

2    become aware that the ELIS system did not have the

3    renewal notice capability?

4      A    When Alex King came to my office and

5    said so as such.

6      Q    Do you know if your office had planned

7    to implement the renewal notice capability for the

8    ELIS system?

9          MR. TYLER:  Objection.  Vague.

10          THE WITNESS:  I don't understand.

11    BY MR CHEN:

12     Q    Do you know why the -- do you know why

13    SCOPS did not implement the renewal notice

14    capability for the ELIS system?

15     A    SCOPS doesn't develop IT capabilities.

16    The decision not to build that capability was

17    conveyed to me by Kathy Nuebel.

18     Q    Do you know why USCIS did not develop

19    those capabilities?

20     A    Not specifically.

21     Q    Generally, do you know?

22     A    I know that I was asked would there be

1   development costs and I said yes.

2       Q    Were you asked about any specifics with

3   regard to development costs?

4       A    Not that I recall.

5       Q    Do you know what it would have taken to

6   develop the renewal notice capability through

7   ELIS?

8           MR. TYLER:  Objection.  Vague.

9   BY MR CHEN:

10      Q    Do you know how much it would have cost?

11      A    No.

12      Q    To implement the renewal notice

13  capability?

14      A    I do not.

15      Q    In your communications with Kathy

16  Nuebel, was the potential for termination of the

17  DACA program ever discussed?

18      A    In which -- I'm confused.

19      Q    When -- in your discussions with Kathy

20  Nuebel about the renew -- about implementing the

21  renewal notices, was the potential termination of

22  the DACA program ever discussed?

1          MR. TYLER:  Objection.  Vague.

2     BY MR CHEN:

3          Q     Do you understand the question,

4     Mr. Neufeld?

5          A     If you mean in the email exchange about

6     whether or not we should -- when I elevated the

7     question or the issue that we wouldn't have the

8     capability of issuing those reminder notices

9     without investing in that development, did either

10    of us mention DACA being discontinued?  I don't

11    recall specifically whether that was part of that

12    discussion.

13         Q     Do you remember generally if it was part

14    of that discussion?

15         A     No.

16         Q     Did you ever discuss the potential

17    termination of the DACA program with Kathy Nuebel?

18         A     Yes.

19         Q     In what form did that discussion take

20    place?

21         A     In person, telephone, meetings.

22         Q     Do you know around when those

1   discussions took place?

2      A   Around when would have been sometime

3   since she arrived, which was after -- sometime

4   after Trump came into office and ever since.

5      Q   Let's start with the meetings.  Were

6   there any -- do you know -- do you recall any

7   specific meetings in which you discussed the

8   potential termination of the DACA program with

9   Kathy Nuebel?

10     A   Yes.

11     Q   When did those specific meetings --

12  specific meetings occur?

13     A   I don't recall the specific date.  On

14  September 5th there was the announcement issued

15  about the wind down of DACA.  And very shortly

16  before that, I believe it was the week before

17  that, there was a specific meeting that involved

18  Kathy Nuebel discussing the wind down.

19     Q   And did you discuss -- did you discuss

20  the fact that ELIS did not have renewal notice

21  capabilities in that meeting?

22     A   No.

1      Q    Who else was part of that meeting?

2      A    James McCament, Tracy Renaud.  Gene

3   Hamilton I believe participated by phone.  There

4   was another individual -- individual on the phone

5   that I don't recall his name or even where he

6   worked.  I believe there may have been one or two

7   others.  I couldn't recall specifically who they

8   were.

9      Q    What was the subject of that meeting?

10   Do you remember?

11      A    The wind down of DACA.

12      Q    Was there an agenda for that meeting?

13      A    No.

14      Q    Were there any written materials

15   generated for that meeting?

16      A    Not that I recall.

17      Q    Do you know if someone took notes or

18   minutes of that meetings?

19      A    I don't believe so.

20      Q    Were written minutes shared afterwards?

21      A    No.

22      Q    Do you know what was discussed at that

1   meeting?

2       A    Yes.

3       Q    What was the content of the discussion?

4           MR. TYLER:  I'll object on the grounds

5   of deliberative process privilege, attorney/client

6   privilege, attorney work product privilege.

7   Directing the witness not to answer.

8           MR CHEN:  Just for the record I want to

9   briefly note our objection to the invocation of

10   the deliberative process instruction in this

11   deposition.  First, we don't think it's

12   appropriate to invoke that privilege generally in

13   this case because plaintiffs are challenging the

14   agency's decision making process and even if the

15   privilege does apply in this case we don't think

16   the government has met it's burden of making a

17   sufficient showing of the elements in that

18   specific instance.  And I want to also note that

19   plaintiff's position is that the defendants have

20   waived attorney/client privilege over any

21   materials that bear on the legality of the DACA

22   program.  Defendants stated that one of DHS's

1   primary reasons for rescinding DACA was its

2   purported illegality, and thus the agency

3   incorporated by reference into it's policy legal

4   arguments about the lawfulness of the DACA

5   program.  So I just want to put that in the

6   record.

7            Should we take a break at this point?

8            (Multiple voices discussing going off

9   the record.)

10            THE VIDEOGRAPHER:  We are going off of

11   the record.  This is the end of media unit number

12   1.  The time is at 10:41 a.m.

13            (The proceeding recessed from 10:42 a.m.

14   to 10:55 a.m.)

15            THE VIDEOGRAPHER:  This is the beginning

16   of media unit number 2.  The time is 10:55 a.m.

17   BY MR CHEN:

18      Q    Mr. Neufeld, I want to return back to

19   the renewal notices under the ELIS system and just

20   clarify time lines.  So, as you discussed earlier

21   DACA requests were being adjudicated under the

22   ELIS system since approximately February 2016.  Is

 1   that correct?

 2      A    Yes.

 3      Q    And you had previous -- previously said

 4   that ELIS was generating other types of notices

 5   besides renewal notices.  Is that correct?

 6      A    Yes.

 7      Q    Were those notices printed through the

 8   ELIS system?

 9      A    I don't know.

10      Q    Do you know if they were printed through

11   the Claims 3 system?

12      A    I don't believe a case adjudicated in

13   ELIS would result in Claims 3 printing notices,

14   no.

15      Q    Do you know if the ELIS system has

16   notice printing capabilities?

17      A    I know that cases we adjudicate in ELIS

18   have notices printed.  I don't know the mechanics

19   of that process.

20      Q    Do you know during the transition in

21   February 2016 if ELIS handled only initial DACA

22   applications or did they also handle renewal

1    applications?

2       A    I don't recall.

3       Q    Has SCOPS ever discontinued sending

4    renewal notices for a period of time since the

5    DACA program was initiated?

6       A    Other than what we have been talking

7    about, no.

8       Q    So when you were informed that -- so

9    when you were informed about the decision not to

10   rebuild the renewal notice functionality were you

11   concerned that DACA applicants might not

12   issue their -- apply for renewal notices on time?

13          MR. TYLER:  Objection, vague.

14          THE WITNESS:  I don't have a concern one

15   way or the other.  My concern is to implement the

16   policy objectives of the administration.

17   BY MR CHEN:

18      Q    Did you believe -- did you believe that

19   as a result of not issuing renewal notices that

20   some DACA applicants would not renew on time?

21          MR. TYLER:  Objection.  Vague.  Lacks

22   foundation.

1        THE WITNESS:  I don't have an opinion on

2     that.

3     BY MR CHEN:

4        Q    Did you have any belief that DACA

5     applicants would not be able to renew on time

6     because they did not receive renewal notices?

7        A    No.

8        Q    Did SCOPS take other steps to notify

9     DACA recipients about their options for renewal

10    under the ELIS system?

11       A    That's not a function of SCOPS.

12       Q    Do you know if USCIS took steps to

13    notify DACA recipients about renewing under the

14    ELIS system?

15       A    We have a communications component that

16    communicates on issues of how to apply, when to

17    apply, that sort of thing.  And I know that there

18    is information that they post on our website, so

19    yes.

20       Q    Do you know if the communications team

21    issued any notices to DACA recipients about

22    renewal under the ELIS system?

1     A    No -- I guess I'm confused about the

2    question.  I thought before you were asking about

3    whether we had communicated in some way to DACA

4    holders.

5        Q    Besides the website do the

6    communications use any other means to communicate

7    that DACA recipients had an option for renewal?

8         MR. TYLER:  Objection.  Vague.

9         THE WITNESS:  I don't know.

10   BY MR CHEN:

11       Q    Do you know who would know?

12       A    Our Office of Communications.  Our

13   Office of Customer Service and Public Engagement.

14       Q    Is that office within SCOPS or is it

15   within USCIS?

16       A    They are components within USCIS.

17       Q    You mentioned earlier there would be

18   development costs to implementing renewal notices

19   under the ELIS system, correct?  I'm curious, who

20   would have added the renewal notice capabilities?

21   Was that someone within SCOPS or was it an outside

22   vendor?

1      A    It would not have been SCOPS.

2      Q    Would it have been an outside vendor?

3      A    I'm not sure of the arrangement of how

4    the system gets programmed.  It would have been

5    the responsibility of our Office of Information

6    Technology to make that happen and how they do

7    that I do not know.

8      Q    Do you know if they would have

9    contracted out to an outside vendor?

10     A    I know that they do contract out to

11   outside vendors.  I don't know how they -- whether

12   they contracted out -- you know, what they

13   contract out to different vendors or what they do

14   in-house.

15     Q    I want to turn now to your office's

16   implementation of the DACA termination.  Are you

17   familiar with Acting Secretary Duke's September 5,

18   2017 memo terminating the DACA program?

19     A    Yes.

20     Q    When did you first learn that the DACA

21   program would be terminated?

22     A    Well, I knew that it was a campaign

1   promise of the president.

2       Q    When did you learn of the final decision

3   to terminate the DACA program?

4       A    The final decision, when it was issued

5   on September 5.

6       Q    You did not -- you didn't learn about --

7   you didn't learn that the DACA program would be

8   terminated prior to that date?

9          MR. TYLER:  Objection.  Vague.

10         THE WITNESS:  I learned that they --

11  there was the meeting that I referenced before

12  where there were discussions about the wind down

13  of the DACA program.

14  BY MR CHEN:

15      Q    At that meeting were you aware that the

16  DACA program would be terminated?

17         MR. TYLER:  Objection.  I will direct

18  the witness not to answer on grounds of privilege,

19  deliberative process privilege, attorney/client

20  privilege, attorney work product privilege.

21         MR CHEN:  I just want to note for the

22  record that plaintiffs again object to the

1   deliberative process privilege and the

2   attorney/client privilege instructions for the

3   same reasons as previously stated.  I won't keep

4   repeating it, but that objection stands with

5   respect to all deliberative process privilege

6   instructions going forward and attorney/client

7   privilege instructions going forward.

8   BY MR CHEN:

9       Q    From whom were you made aware of the

10  decision to terminate the DACA program?

11       MR. TYLER:  Vague.  Are you referring to

12  the final decision?

13  BY MR CHEN:

14      Q    The final decision?

15      A    I learned of it from reading the memo on

16  September 5.

17      Q    Did you ever receive that memo prior to

18  September 5?

19      A    No.

20      Q    Did you even receive a draft of that

21  memo?

22      A    No.

1     Q    How did you feel about the decision to

2   terminate DACA?

3          MR. TYLER:  Objection.  Vague.

4          THE WITNESS:  What do you mean by feel?

5   BY MR CHEN:

6     Q    Did you have any reaction?

7          MR. TYLER:  Objection.  Vague.

8   BY MR CHEN:

9     Q    Do you understand the question,

10  Mr. Neufeld?

11    A    I don't know what you're getting at.  My

12  reaction was I had to implement the direction of

13  the memo.

14    Q    Did you have an opinion about whether

15  the termination of DACA was a good thing?

16         MR. TYLER:  Objection.  Calls for a

17  personal opinion.

18         THE WITNESS:  I don't have an opinion

19  one way or the other.

20  BY MR CHEN:

21    Q    So you had no opinion about the ending

22  of the program you oversaw on a daily basis?

1          MR. TYLER:  Objection.  Argumentative,

2   mischaracterizes testimony, vague, and you are

3   asking for a personal opinion.

4   BY MR CHEN:

5          Q    Were you ever consulted about the

6   implementation of the DACA termination?

7          A    Yes.

8          Q    When were you consulted?

9          A    Prior to September 5 and then at times

10   after September 5.

11          Q    Let's start with consultations prior to

12   September 5.  When did those consultations occur?

13          A    The first meeting that I recall is the

14   one that I referenced earlier that was shortly

15   before September 5, probably the week before.

16          Q    And you said that this was an in-person

17   meeting.  Is that correct?

18          A    Many of us were gathered in person

19   around the table and there were as I recall two

20   participants by phone.

21          Q    Did you bring any documents to this

22   meeting?

1       A    No --

2              MR. TYLER:  -- Objection.  Asked and

3    answered.

4    BY MR CHEN:

5       Q    What was the nature of the consultation?

6              MR. TYLER:  Objection.  Direct the

7    witness not to answer on grounds of the

8    deliberative process privilege, the

9    attorney/client privilege, the attorney work

10   product.

11   BY MR CHEN:

12      Q    Did you suggest extending the September

13   5 deadline?

14             MR. TYLER:  Same objection.  Directing

15   the witness not to answer.

16   BY MR CHEN:

17      Q    Did you suggest sending notices to

18   individuals to renew?

19             MR. TYLER:  Same objection.  Directing

20   the witness not to answer.

21   BY MR CHEN:

22      Q    Did SCOPS make any preparations to

DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                    92

1    change its processing procedures in anticipation

2    of the DACA termination?

3         MR. TYLER:  Objection.  Vague.

4         THE WITNESS:  If you mean did we plan

5    for wind down before the September 5 notice, no.

6    BY MR CHEN:

7         Q    Did you communicate the decision to

8    terminate DACA to SCOPS employees down the chain

9    of command?

10        A    I insured that down the chain of command

11   everyone was aware of the September 5 memo, yes.

12        Q    And when did you make that

13   communication?

14        A    I don't recall specifically.

15        Q    Was that --

16        A    -- It would have been on September 5,

17   but when and how I don't recall specifically.

18        Q    Did your office prepare any memoranda

19   concerning the implementation of the DACA

20   termination?

21        A    No, I don't believe so.

22        Q    Did your office prepare any other

1   documents?

2        MR. TYLER:  Objection.  Vague.

3   BY MR CHEN:

4     Q    Concerning the implement of the DACA

5   termination?

6        MR. TYLER:  Same objection.  Vague.

7        THE WITNESS:  I don't understand what

8   you mean by documents?

9   BY MR CHEN:

10    Q    For example memoranda or reports or

11  notes?

12       MR. TYLER:  Same objection.

13       THE WITNESS:  I didn't prepare any

14  memorandum following the memo that came from the

15  secretary, no.

16  BY MR CHEN:

17    Q    Did SCOPS -- did you make any other

18  preparations for the DACA termination?

19    A    No.

20    Q    Were you involved in drafting documents

21  to the public about the DACA termination?

22    A    I don't recall specifically -- SCOPS

1   doesn't promulgate external messaging on any

2   topic.  But it may have been that I saw drafts

3   that the Office of Communications or customer

4   service and public engagement developed.  That

5   often happens and probably has happened.  I don't

6   recall specifically though.

7        Q    Do you remember when these -- when you

8   saw these drafts?

9        A    No.

10        Q    Do you remember if it was prior to

11   September 5?

12        A    I didn't see anything drafted on public

13   messaging prior to September 5, no.

14        Q    What were these drafts of, do you

15   remember, Mr. Neufeld?

16        A    What were -- what drafts are we

17   referring to?

18        Q    You mentioned that you saw drafts from

19   the Office of Communications?

20        A    No.  I said that it is typical that

21   public messaging goes through a vetting process

22   and SCOPS is one of many components that would be

1   included in the vetting of such messages.  Most

2   likely I or members of my team were involved in

3   messaging that has happened since September 5.  I

4   don't recall specifically which messages those

5   would have been.

6       Q    Do you recall generally what those

7   messages would have been?

8       A    Well, I'm responding to your question

9   about DACA communications, so it would have been

10   about DACA communications.

11       Q    And would these drafts have -- would

12   have been website FAQs or news releases?  Are

13   those the types of drafts of communications you

14   are referring to?

15       A    Yes.

16       Q    Do you remember what these documents

17   said?

18       A    No.

19          MR. TYLER:  I'll object.  Lack of

20   foundation.

21   BY MR CHEN:

22       Q    Do you know what these documents said

1   generally?

2          MR. TYLER:  Same objection.  Lack of

3   foundation.

4          THE WITNESS:  I don't know which

5   specific documents you are referring to.

6   BY MR CHEN:

7      Q    You mentioned that other members of your

8   office would have seen these drafts of

9   communications.  Who are those members?

10     A    Messages relating to DACA in the vetting

11  process would normally be reviewed by Alex King,

12  branch chief responsible for the DACA portfolio.

13  My chief of staff Susan Arroyo.

14     Q    Anybody else?

15     A    Carrie Selby the acting deputy associate

16  director.

17     Q    Do you know who else would have reviewed

18  these communication drafts?

19     A    No.

20     Q    So prior to September 5 besides the

21  meeting that you referenced did you participate in

22  any other discussions about the termination of the

1    DACA program?

2        A    Since the beginning of the DACA program

3    we have talked about the end of the DACA program.

4        Q    Can you explain more?  Can you explain

5    what you mean by talking about the end of the DACA

6    program?

7        A    I mean that when it was stood up it was

8    understood that it was a temporary program and

9    that it would likely or maybe terminate or change

10   at some point in the future and those

11   conversations have been ongoing since June 2012.

12       Q    How about from since January 20, 2018

13   when President Trump came into office and

14   September 5, besides that one particular meeting

15   you mentioned did you participate in any other

16   discussions about the potential termination of the

17   DACA program?

18       A    Other than conversations with others

19   about whether it would or would not -- you know,

20   what would the president decide to do, no.

21   Speculation -- speculative conversations would be

22   how I characterize them.

1      Q     Mr. Neufeld, apart from the DACA

2   termination memo itself did you receive any other

3   instructions from DHS about how to implement the

4   DACA termination memo?

5      A    Not that I recall.

6      Q     Did you receive any instructions from

7   government officials outside of DHS about how to

8   implement the DACA termination memo?

9      A    No.

10     Q     Did you receive any instruction about

11   how to process late initial applications received

12   after September 5, 2017?

13     A    Late initial applications, yes.

14     Q     What were those instructions?

15     A    That they would be rejected.

16     Q     Where in the process would they be

17   rejected?

18     A    At the lockbox.

19     Q     Did SCOPS receive any instruction about

20   how to process renewal applications received after

21   October 5, 2017?

22     A     Yes.

DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017
99

1     Q     And what were those instructions?

2     A     That they would be generally rejected

3  but that we would consider requests for late filed

4  renewal requests coming from Puerto Rico or the

5  Virgin Islands.

6     Q     When you refer to generally rejected

7  were they also -- would they also have been

8  rejected at the lockbox?

9     A     Yes.

10     Q     Who provided these instructions?

11     A     The deputy and the director.

12     Q     And do you remember what form these

13  instructions came in?

14     A     I remember being told verbally in

15  meetings afterwards -- you know, after September

16  5.

17     Q     What were -- do you remember when these

18  meetings took place besides that they were after

19  September 5?

20     A     Discussions about how to handle late

21  renewal filings after October 5 I don't recall

22  specifically, but they happened in the few days

1   leading up to that and then afterwards, so end of

2   September, early October.

3        Q    What about the instructions about

4   rejecting late initial applications after

5   September 5, 2017?  When did you receive those

6   instructions?

7        A    Shortly after September 5, I don't

8   recall specifically.

9        Q    Do you remember if it was on the date of

10  September 5 or afterwards?

11       A    I don't recall.

12       Q    So was there at any point after

13  September 5 when SCOPS received late initial

14  applications but did not have any instructions

15  about how to process those applications?

16       A    No.

17       Q    So what did SCOPS do with late initial

18  applications after September 5 but before SCOPS

19  received instructions about how to process them?

20       A    They are currently on hold pending

21  rejection.

22       Q    Were they on hold at the lockboxes?

DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

1      A    Yes.  A small number of people have

2    submitted -- I don't know whether they are renewal

3    and initials.  I know that for sure they include

4    initial filings that have been misfiled at --

5    directly to one or more of the service centers.

6    Rather then sending to the lockboxes they are

7    supposed to, people have sent to the wrong

8    address.

9      Q    And how were they handled?

10     A    They were initially held and then within

11   the last couple of days we gave the instruction

12   for them to be forwarded to the lockbox.

13     Q    And at the lockboxes were they then

14   subsequently rejected?

15     A    I don't know whether they have processed

16   them for rejection.  I think they are still on

17   hold, but I'm not sure.

18     Q    Were you part of any meetings in

19   which --

20     A    Let me -- can I clarify?

21     Q    Absolutely.

22     A    I know that the lockbox is holding some

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 1495 of 1603 PageID #: 5440

1    late filings.  I don't recall as we sit here

2    whether they are only renewal applications or if

3    they are renewal requests and initial requests.

4        Q    So just to clarify, Mr. Neufeld, you are

5    saying the lockboxes are currently as of this

6    moment holding those late filings?

7        A    As of my last awareness of the issue,

8    yeah, I believe that they were holding some cases.

9    Like I said, I don't remember whether they are

10   both types of filings or just the renewals.

11   Thinking about it more I think it might just be

12   the renewals that they are holding.

13       Q    So does this mean, Mr. Neufeld, that

14   immigration officers under SCOPS never saw, never

15   evaluated late initial applications received after

16   September 5, 2017?

17           MR. TYLER:  Objection.  Vague.

18           THE WITNESS:  I think I understand.

19   Officers are not being -- they are not receiving

20   cases that were filed after September 5.

21   BY MR CHEN:

22       Q    Did officers receive applications

1    filed -- renewal applications filed after October

2    5, 2017?

3        A    No.

4        Q    You mentioned earlier that you received

5    instructions about how to process applications

6    received after September 5 and applications

7    received after October 5.  Were you in -- were you

8    part of any meetings in which these discussions to

9    formulate these instructions were made?

10       A    Yes.

11       Q    And can you tell me when?  When those

12   meetings occurred?

13       A    Related to renewal filings?

14       Q    Let's start with initial applications

15   after September 5 and then we can move to renewal

16   filings.  So for initial applications?

17           MR. TYLER:  What's the question, please?

18   BY MR CHEN:

19       Q    Were you part of any meetings in which

20   the decision about how to implement -- sorry.

21           Were you part of any meetings in which

22   the decision to create the instructions for

1    processing late initial applications was

2    formulated?

3        A    Yes.

4        Q    When were -- when did those meetings

5    occur?

6        A    Either on September 5 or shortly

7    thereafter.

8        Q    Do you know who was present at those

9    meetings?

10       A    No.  There have been many meetings

11   involving many people at different times.  And

12   when I say that there are meetings where this was

13   discussed I don't recall any meetings being called

14   for the specific purpose of this topic.  So the

15   reason I'm having trouble recalling is because

16   they're not meetings that were called solely for

17   this purpose.  They're just general meetings that

18   we have at the executive level and they included

19   these discussions at different times and I don't

20   recall the specific dates.

21       Q    Were there immediate -- were there any

22   meetings within -- that you can recall, within the

1   week of September 5 in which instructions about

2   how to process late initial applications were

3   discussed?

4       A    There were definitely meetings in which

5   we discussed that topic.  I don't recall what

6   dates or times.

7       Q    Do you remember how many meetings

8   approximately there were?

9       A    No.

10      Q    Do you keep a calendar of these

11  meetings?

12      A    Well, as I said they weren't -- they

13  weren't meetings for the purpose of discussing how

14  to handle late initial filings, so my calendar

15  wouldn't reflect that.

16      Q    But --

17      A    I have a calendar that has my meetings

18  on it.  It only will indicate what was discussed

19  if the person who scheduled the meeting put a

20  subject on the calendar invitation.

21      Q    You mentioned that this -- these

22  meetings were between members of the agency

1   executive level.  Is that correct?

2        A    Yes.

3        Q    And who do you mean by members of the

4   agency executive level?

5        A    So that back in September that would

6   have been the acting director, the acting deputy

7   director, the other associate directors such as

8   myself, the chief of the Office of Policy and

9   Strategy, the Office of Chief Counsel.  Beyond

10  that I'm not sure.

11       Q    Do you remember in these meetings

12  whether you were consulted about how late initial

13  applications would be processed?

14       A    I was not consulted about how we would

15  process them.

16       Q    Did you have any meetings regarding how

17  late renewal applications would be processed?  By

18  late renewal applications I mean ones received

19  after October 5, 2017.

20       A    Again, I don't recall any meeting called

21  for that purpose.  I do know that we had meetings

22  in which that was discussed.

1    Q    Do you know what was discussed at those

2    meetings?

3    A    Yes.

4    Q    And what was the subject of those

5    discussions?

6    A    Well, depending on the meeting it could

7    have been any number of things.

8    Q    Do you recall some examples of the

9    subjects that were discussed at those meetings?

10    A    How we would handle requests for --

11    handle filings that were received after October 5

12    coming from areas that may have been impacted by

13    the hurricanes.

14    Q    Do you know approximately when those

15    discussions occurred?

16    A    Again, a few days before October 5 and

17    then thereafter.

18    Q    Who was -- who was involved in

19    discussions about extending this October 5

20    deadline?

21    A    Well, I wouldn't characterize it as

22    extending the October 5 deadline.

1    Q    How would you characterize it?

2    A    How to handle requests that were

3  received after October 5 deadline.

4    Q    Who was involved in these discussions

5  about how to handle applications?

6    A    Tracy Renaud, the acting deputy; James

7  McCament, the acting director; Kathy Nuebel,

8  Office of Chief Policy and Strategy; Craig Symons,

9  Office of Chief Counsel.

10    Q    So is it true that several days prior to

11  the October 5 deadline USCIS, DHS announced that

12  it would accept late renewals from Puerto Rico and

13  the U S Virgin Islands?

14    A    I believe so, yes.  That we would

15  consider requests.

16    Q    Did SCOPS receive any renewal

17  applications filed after October 5 from Puerto

18  Rico or the U S Virgin Islands?

19    A    Yes.

20    Q    To your knowledge about how many did

21  SCOPS receive?

22    A    Again, we don't receive them directly.

DONALD NEUFELD                                        10/18/2017

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                    109

1   They would be filed at the lockbox.  I'm aware of

2   six requests that came in from Puerto Rico after

3   October 5 at the lockbox.

4        Q    And what about from the U S Virgin

5   Islands?

6        A    I don't know whether we had any from the

7   U S Virgin Islands.

8        Q    Do you know who -- do you know who would

9   know?

10        A    Ernest DeStefano, Office of Intake and

11   Document Production.

12        Q    How has SCOPS processed these renewals

13   from Puerto Rico or the U S Virgin Islands?

14        A    The requests are filed at the lockbox.

15   The lockbox was instructed by Tracy Renaud who is

16   now back to her regular position as the associate

17   director for management which oversees the lockbox

18   or the Office of Intake and Document Production

19   that oversees the lockbox.  She gave instruction

20   to Ernest DeStefano that those, they should review

21   those late filed cases and send them to me for my

22   review with a recommendation.  And so as of

1   yesterday I made the decision to go ahead and

2   accept those six late filings.

3       Q    So all six filings from Puerto Rico have

4   been accepted?

5       A    I have given the instruction for them to

6   be accepted.  I don't know where they are in the

7   process.

8       Q    And by giving the instruction to be

9   accepted you mean that they have been granted the

10   request for deferred action?

11      A    No, I did not mean that.

12      Q    What did you mean?

13      A    I mean that the lockbox will receive

14   them and ingest them into the system for normal

15   processing.

16      Q    And so for these applications an

17   immigration officer will review these applications

18   in the same way that they reviewed applications

19   prior to September 5?

20      A    Yes.

21      Q    Is that correct?  Besides your personal

22   review at the lockbox did this process differ at

1   all from how DACA normally processes DACA

2   applications prior to September 5?

3          MR. TYLER:  Objection.  Vague.

4          THE WITNESS:  The only processing that's

5   been done is they have been accepted at the

6   lock -- they have been received at the lockbox and

7   I have given the instruction for them to be

8   accepted and processed.

9   BY MR CHEN:

10     Q    Mr. Neufeld, were you consulted in DHS's

11  decision to accept on a case by case basis

12  renewals from Puerto Rico and U S Virgin Islands

13  filed late?

14     A    No.  I wouldn't characterize it as

15  consult.

16     Q    How would you characterize it?

17     A    I would characterize it as me asking

18  what we should do and receiving instruction.

19     Q    When did you ask what SCOPS should do

20  about late filed notices from Puerto Rico?

21     A    When I became aware that there were late

22  filings.

DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017
112

1    Q    So you did not ask what should be done

2   with these late filings until after October 5?

3    A    I was aware that the agency had

4   communicated in some way.  I don't remember seeing

5   the actual communication that we would consider

6   late filed requests from Puerto Rico and the

7   Virgin Islands.  I don't know -- I don't -- I

8   don't recall whether we had conversations or not

9   about how that process would work.  But when they

10  were received then it became -- I needed to know

11  so that's when I asked for sure.  Not saying that

12  there weren't any conversation before that, but

13  they weren't decisive if there were any.

14   Q    Prior to October 5 did you participate

15  in any discussions about how to handle late filed

16  applications?

17   A    As I said there were meetings in which

18  the topic of late filed applications was

19  discussed.  I wouldn't necessarily call it being

20  consulted.  There was awareness that that would

21  happen.

22   Q    And you participated in those meetings?

DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                  113

1      A    Yes.

2      Q    Do you know if -- do you know if DHS

3  considered waiving or extended the October 5

4  deadline for other applicants outside of Puerto

5  Rico and the U S Virgin Islands?

6      A    I do not know.

7      Q    Do you know who would?

8      A    Whoever -- no, I don't know that they

9  happened so I don't know who would.

10      Q    In those meetings that you just referred

11  to in which you discussed how to handle U S Virgin

12  Islands and Puerto Rico applications did you --

13  were you aware of discussions of late -- how to

14  handle late applications from other locations?

15      A    No.

16      Q    Were you ever aware of -- were you ever

17  aware of considering extending or waiving the

18  October deadline -- October 5 deadline for people

19  living in Houston or Florida who were affected by

20  the hurricanes?

21      A    No.

22      Q    Were you ever aware that extending --

1  deadline for October 5 for those individuals was

2  ever considered?

3     A    No.

4     Q    Do you know why DHS did not extend the

5  October 5 deadline for other applicants besides

6  those living in Puerto Rico and the U S Virgin

7  Islands?

8     A    No.

9     Q    Did you ever inquire about why the

10  October 5 deadline was not extended for other

11  applicants?

12     A    No.

13     Q    Were you ever concerned that it was not

14  extended for other applicants?

15        MR. TYLER:  Objection.  Vague.

16        THE WITNESS:  My only concern is to

17  understand how I'm supposed to process cases that

18  are filed.

19  BY MR CHEN:

20     Q    To your knowledge how many eligible

21  individuals submitted their DACA renewal between

22  September 5 and October 5, 2017?

1     A    I don't know.

2     Q    Did you receive any reports about how

3  many eligible individuals submitted their DACA

4  renewal applications?

5     A    I have received email messages that --

6  indicating a number that are eligible and have not

7  filed.

8     Q    Do you know what that number -- do you

9  recall what that number was?

10     A    The last number I saw was like 22,000.

11     Q    Do you remember when was that you

12  received that last communication?

13     A    Either Friday or Tuesday.

14     Q    Of this week?

15     A    Of this week, yes.  And Friday of last

16  week.

17     Q    Between September 25 and October 5, 2017

18  are you aware of any errors SCOPS made in

19  processing individual DACA renewals?

20         MR. TYLER:  Objection.  Vague.

21         THE WITNESS:  I'm not aware of any

22  errors.

1    BY MR CHEN:

2        Q    Are you aware of instances in which

3    SCOPS rejected applications filed in that time

4    period that should not have been rejected?

5        A    No.

6        Q    Are you aware of instances in which

7    applications were accepted in that time period but

8    should not have been accepted?

9        A    No.

10       Q    Mr. Neufeld, when did you first become

11   aware that DHS was considering terminating the

12   DACA program?

13       A    I've assumed that they were considering

14   that since the election.

15       Q    What was the basis of that assumption?

16       A    Media reports.

17       Q    Beside -- besides the media were there

18   any other indications that the DHS was considering

19   terminating the DACA program that you were aware

20   of?

21           MR. TYLER:  Objection.  Vague.

22           THE WITNESS:  I'm --

1        (Court reporter requested

2    clarification.)

3        THE WITNESS:  What are you getting at?

4    I don't understand.

5    BY MR CHEN:

6        Q    Were there any indications to you

7    besides the media that DHS was actively

8    considering ending the DACA program?

9        A    I have assumed that they were from the

10   beginning and I recall one sentence in a

11   conversation that Kathy Nuebel mentioned that the

12   department is -- you know, considering DACA or

13   something along those lines.

14       Q    When did you recall that this sentence

15   was said?

16       A    I don't recall specifically, but I

17   would -- it has been several weeks.  Like before

18   September 5.  Probably in August timeframe, I

19   would imagine.

20       Q    Was this sentence communicated to you in

21   email?

22       A    No.

1     Q     In a conversation?

2     A     Yes.

3     Q     And were other people involved in that

4     conversation?

5     A     No.

6     Q     Where did that conversation occur?

7     A     My office.

8     Q     Do you remember what else was discussed

9     as part of that conversation?

10    A     No.

11    Q     Was there anyone else present at the

12    time?

13    A     No.

14    Q     So prior to September 5, 2017 were you

15    aware of any meetings discussing the termination

16    of the DACA program?

17         MR. TYLER:  Objection.  Asked and

18    answered.

19    BY MR CHEN:

20    Q     You can still answer the question,

21    Mr. Neufeld.

22    A     Can you repeat the question?

1    Q    Prior to September 5 were you aware of

2    any meetings discussing the decision to terminate

3    the DACA program?

4    A    I was aware of the one meeting that I

5    attended.

6    Q    Was -- were there other meetings that

7    you were aware of?

8    A    No.

9    Q    Were you aware of meetings that you did

10   not attend?

11        MR. TYLER:  I'll object on grounds of

12   vagueness.

13        THE WITNESS:  I'm not aware of specific

14   meetings.  I have an assumption that there were

15   conversations happening at the department level.

16   BY MR CHEN:

17   Q    Were those conversations ever

18   communicated to you?

19   A    No.

20   Q    What was the basis of that assumption?

21   A    Media reports.

22   Q    Were you ever consulted about --

1   specifically about setting the October 5, 2017

2   deadline for renewal applications?

3      A    What was the question again?

4      Q    Were you ever consulted specifically

5   about the October 5 -- the decision to set the

6   October 5 deadline?

7      A    I don't think so.

8      Q    Do you know why the October 5 deadline

9   was set?

10     A    No.

11     Q    Were you ever consulted about the

12  decision to set the March 5, 2018 deadline?

13     A    I don't believe so.

14     Q    Do you know why that date was set?

15     A    I don't.

16     Q    Did you ever have discussions with other

17  government officials about the -- let's start with

18  are you aware of the letter from the Texas

19  Attorney General's Office sent on June 29 about

20  requesting that the government rescind the DACA

21  program?

22     A    No.  Had a general awareness that there

1   were issues going on with the court.  I don't

2   recall specifically a letter being issued by a --

3       Q    -- Are you aware that the state of Texas

4   sent a letter asking the federal -- asking the

5   Department of Justice and DHS to terminate the

6   DACA programs?

7       A    No.

8       Q    Mr. Neufeld, were you aware of -- were

9   you aware that the state of Texas had requested

10   that the Department of Justice and the Department

11   of Homeland Security terminate the DACA program?

12          MR. TYLER:  I'll object to counsel's

13   characterization of the Texas letter.

14          THE WITNESS:  I'm aware that in the

15   litigation there basically was a threat made that

16   DACA would be added to the litigation if the DACA

17   program had not been terminated by a certain

18   deadline and I don't recall what it was.

19   BY MR CHEN:

20       Q    So did you discuss that threat as you

21   characterized it with other individuals in DHS?

22       A    I'm sure it was mentioned.  We didn't

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                122

1    discuss in a meaningful way what that -- how that

2    should impact my operations.

3        Q    Did you discuss it in any other

4    capacity?

5        A    No.  What I would say is there was

6    speculation in conversations I had with colleagues

7    about whether that would back prompt something

8    from the department or the president.

9        Q    Did you have other conversations?

10       A    No.

11       Q    Are you aware of Attorney General

12   Session's letter recommending to Secretary Duke --

13   Acting Secretary Duke, recommending that DACA be

14   terminated?

15       A    Yes.

16       Q    Did you ever have discussions about that

17   letter with other individuals in DHS?

18           MR. TYLER:  I'll object to the extent

19   that the question calls for a revelation of the

20   consultive discussions, discussions with counsel

21   in regard to that subject matter.

22

1   BY MR CHEN:

2      Q    So were you -- did you have discussions

3   with attorney general -- about the -- about the

4   letter with other individuals in DHS?

5          MR. TYLER:  I will try to be clear with

6   my objection.  To the extent that calls for an

7   answer about what might have occurred at the

8   meetings that Mr. Neufeld has testified about.  If

9   it calls for a response that would inform you of

10   the subject matter of that meeting, what was

11   discussed, what factors were discussed I'm

12   directing the witness not to answer that question.

13  BY MR CHEN:

14     Q    To be clear, I'm asking specifically

15  whether you have or have not discussed that, the

16  letter with individuals within DHS?

17         MR. TYLER:  Same objection applies.

18         MR. WISHNIE:  So that the record is

19  clear between objection and instruction, you are

20  instructing him not to answer the yes or no

21  question?

22         MR. TYLER:  I'm asking to the extent

 1   that counsel is seeking or his question seeks

 2   information about what was discussed at this

 3   consultative meeting that Mr. Neufeld has

 4   testified in which counsel were present and which

 5   the termination of DACA was discussed, if that

 6   touches upon that meeting, that discussion then

 7   I'm directing him not to answer the question.  If

 8   you are asking did he have water cooler

 9   conversations with colleagues at SCOPS about the

10   AG's letter he can respond to that question.

11   BY MR CHEN:

12       Q    Did you ever discuss the termination of

13   DACA with Acting Secretary Duke?

14       A    No.

15       Q    Did you ever discuss the termination of

16   DACA with acting director of USCIS James McCament?

17       A    Yes.

18       Q    When did you have these discussions?

19       A    Again, the ending of DACA has been a

20   topic of conversation since DACA was instituted

21   and James McCament has been involved in a

22   leadership position of some sort for about that

1   whole process, that whole time period.

2       Q    When did James McCament become acting

3   director of USCIS?

4       A    I don't remember the exact timeframe.

5   It was earlier this year.

6       Q    Did you have -- did you have meetings

7   with Mr. McCament about discussing the termination

8   of the DACA program?

9       A    Yes.

10      Q    So where -- when did those meetings

11  occur?  Let's start with any specific meetings

12  that you remember?

13      A    Probably the most recent meeting would

14  have been my biweekly check-in with him in which

15  the topic of the DACA wind down was discussed.

16      Q    Were there meetings prior to September

17  5, 2017 in which you discussed the decision to

18  terminate DACA with Mr. McCament?

19      A    Yes.

20      Q    Let's start from that timeline.  Can

21  you -- what was -- let's start with the specific

22  meetings you might remember with Mr. McCament.  Do

1    you know when those meetings occurred?

2       A    Well, the most significant meeting where

3    it was talked in a real way about something that

4    was likely or possible to happen was the meeting

5    that I have already referenced.  It happened the

6    week before the announcement.  During that Labor

7    Day weekend there were telephone conversations

8    about that topic as well.

9       Q    And who was part of those -- who were

10   part of those telephone conversations?

11      A    The same individuals that I referenced

12   as being in the meeting that took place the week

13   before.

14      Q    And were these follow up conversations

15   from that first meeting that you mentioned?

16      A    Yes.

17      Q    What was the subject of discussion of

18   those meetings?

19      A    The wind down of DACA.

20      Q    So at that point had you been aware that

21   DHS had already decided to terminate the DACA

22   program?

1        MR. TYLER:  Objection.  Vague.

2    Argumentative.

3        THE WITNESS:  I will -- it needs to be

4    clear that I didn't know about a decision, a final

5    decision until the final decision was issued on

6    September 5.

7    BY MR CHEN:

8        Q    So when you referenced -- when you

9    characterized discussion about the wind down of

10   the DACA program what did you mean by wind down?

11       MR. TYLER:  I'm going to direct the

12   witness not to answer.  He's obviously referring

13   to the consultative process to which we've

14   objected before.  So I'm going to direct the

15   witness not to answer on the same privileges;

16   attorney/client, deliberative process privilege,

17   attorney work product privilege.

18   BY MR CHEN:

19       Q    So besides the one meeting that you

20   referred to a week before September 5 as well as

21   the phone conversations were there any other

22   meetings in which you and Mr. McCament were

1   present about the decision to terminate the DACA

2   program?

3          MR. TYLER:  Again, objection.  Vague.

4          THE WITNESS:  There wasn't a decision

5   until September 5 as far as I know.  And so I

6   wouldn't characterize any meeting before then as

7   being about the decision, the final decision.

8   BY MR CHEN:

9      Q    Let me rephrase that.  Were you aware of

10  any -- do you remember any meetings between you

11  and Mr. McCament besides the two conversations

12  that you mentioned about the consideration to

13  terminate the DACA program?

14     A    I remember not specific meetings.  I

15  remember many references to the possible

16  termination of DACA repeatedly prior to September

17  5, but not meetings for the purpose of discussing

18  how to do that or what options might be or

19  anything along those lines.

20     Q    Did you ever discuss consideration of

21  the DACA termination with anyone outside of DHS?

22         MR. TYLER:  Objection.  Vague.

1   BY MR CHEN:

2       Q    Do you understand the question.

3   Mr. Neufeld?

4       A    Yes.  And I can answer it, yes.

5       Q    Did you discover -- did you ever discuss

6   the consideration of the termination of DACA

7   within the Department of Justice?

8       A    I don't know whether the individual that

9   I referenced previously as being on the

10   telephone -- I don't know whether he worked for

11   DOJ or worked for the department or any other.  I

12   know he was a government employee, but I don't

13   know whether he was DHS or DOJ or somebody else.

14      Q    Was there anyone else potentially within

15   DOJ that -- or you believe within DOJ that you

16   discussed considering the termination of DACA?

17      A    No.

18      Q    Did you ever discuss the consideration

19   to termination DACA with anyone within the White

20   House?

21      A    No.

22      Q    So you previously said that you had

1   discussed the consideration of termination of DACA

2   with people outside of DHS.  Who are those

3   individuals?

4         MR. TYLER:  Objection.  I believe you

5   mischaracterized testimony.

6         THE WITNESS:  I have had conversations

7   since the beginning of DACA about the DACA program

8   and its likely end at some point with neighbors,

9   relatives, many people.

10  BY MR CHEN:

11     Q    Did you discuss the term -- the

12  considerations to terminate DACA with individuals

13  within the government besides those that you just

14  previously mentioned?

15     A    Again, I have numerous colleagues and

16  the possibility of the termination of DACA was

17  widely discussed, but not in a planning sense.

18  More in terms of its news, it would affect our

19  operations and just a topic of conversation like

20  that.  Not for planning purposes or deliberating

21  how to do it.

22     Q    Were the reasons for the DACA

DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                10/18/2017
                                                                        131

1   termination communicated to you?

2        A    In the memo.

3        Q    Were they communicated to you in any

4   other way?

5             MR. TYLER:  I will again object to the

6   extent that you are trying to delve into

7   consultative conversations that the witness has

8   already testified to in which amongst other

9   participants counsel were present.  I going to

10   direct that he not answer that question on grounds

11   of privilege.  Same privileges that I have been

12   citing to.

13   BY MR CHEN:

14       Q    Just to be clear, Mr. Neufeld, I'm

15   simply asking whether the reasons were

16   communicated to you or not, besides those in the

17   memo, not the contents of those reasons.

18            MR. TYLER:  I'll object on vagueness.  I

19   don't know what time we are now talking about.

20   BY MR CHEN:

21       Q    My question applies to any time whether

22   the reasons for the DACA termination?

1       A    How about this.  I'm not aware of any

2    other reasons besides those that are stated in the

3    memo.

4       Q    Did you ever inquire into the reasons

5    why DACA was terminated?

6       A    No.  It was clear in the memo.

7       Q    Did you ever inquire whether there were

8    other reasons besides those in the memo?

9       A    No.

10      Q    Besides the memo were there reasons for

11   the October 5 deadline ever communicated to you?

12      A    No.

13      Q    And besides the memo were there reasons

14   for the March 5 deadline ever communicated to you

15   --

16      A    -- No.

17      Q    And did you ever inquire into the

18   reasons other than those in the memo?

19      A    No.

20      Q    About those deadlines?

21      A    No.

22           MR. WISHNIE:  Why don't we go off of the

1   record for a moment?

2          MR. TYLER:  Off record.

3          THE VIDEOGRAPHER:  We are going off of

4   the record.  This is the end of media unit

5   number 2.  The time is 11:59 p.m.

6          (The proceeding recessed from 11:59 a.m.

7   to 12:57 p.m.)

8          THE VIDEOGRAPHER:  We are back on the

9   record.  This is the beginning of media unit

10   number 3 and it's 12:57 p.m.

11   BY MR CHEN:

12      Q    Mr. Neufeld, I wanted to circle back to

13   the DACA application process a little bit prior to

14   September 5, 2017.  In your experience as

15   associate director of SCOPS are you aware of how

16   many DACA applicants apply for renewal, how many

17   file for renewal after they fall out of status, in

18   other words after their applications expire?

19      A    I don't know the number.

20      Q    Do you know generally whether it is --

21   what percentage or how many individuals?

22      A    I know -- just to be clear you are

DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017

134

1    asking about how many people apply for renewal

2    after their original period expired?

3       Q    Yes.

4       A    It has fluctuated.  I have seen reports.

5    I don't remember the specifics of them.  I know

6    that it is at times it has been -- I think it has

7    been as high as maybe 60 percent that were filing

8    within -- you know, within, ahead of time.  And

9    then other times it has been much less.  In other

10   words where the majority of our receipts in a

11   particular month might be from folks where their

12   status had already expired.

13      Q    And what is -- what are these reports

14   that you are referring to?

15      A    These are weekly reports that are

16   produced by a contractor who no longer works with

17   us but used to work with us.  And now it is

18   somebody in my shop.

19      Q    And they -- these are -- are they

20   updates about the number of DACA applicants, DACA

21   applications that are being processed by SCOPS?

22      A    Yes.  It's -- it's a weekly report

1   that -- on renewals and initials and it provides a

2   bunch of different data points with respect to the

3   receipts and pending cases.  I don't think there

4   is anything on it that is about -- you know, those

5   who have not applied, that sort of thing.  It is

6   about the case work that we have either received

7   and have pending or recently completed.

8       Q    Who are those -- so you said previously

9   it used to be an independent contractor.  Do you

10   remember the name of the contractor?

11      A    Oh, it's been different people in that

12   role.

13      Q    Is it -- when -- and then you said has

14   transitioned to someone in your office.  When did

15   that transition occur?

16      A    We ended the contract and took that work

17   in-house probably maybe two months ago, month and

18   a half, something like that.

19      Q    And who in your -- who in SCOPS had been

20   producing these reports after transitioning

21   in-house?

22      A    The name of the individual, I don't

1    recall who it got assigned to.  I know that it

2    comes under Bob Baco (phonetic) who is the branch

3    chief for the team that compiles all of our

4    reports.

5        Q    Do you know what office that's within in

6    SCOPS or is there not a particular office that

7    responsibility belongs to?

8        A    I don't remember what the title of the

9    branch is.  We have a branch that is responsible

10   for pulling reports together out of the systems

11   that we process cases in.

12       Q    And are you aware of any data about the

13   number of DACA renewal applicants that file their

14   renewal notices within two weeks of the deadline

15   for when their statuses would expire?

16       A    I have not to my recollection seen any

17   reports like that.

18       Q    Do you know generally how many people --

19   how many DACA applicants usually file for renewal

20   within two weeks or within a few weeks before

21   their application, their statuses expire?

22       A    I don't know.

1      Q     So the reports about individuals who

2    file for renewal applications after their statuses

3    expire, was that information ever known to DHS

4    leadership?

5      A    I didn't pass it on to them.  I shared

6    those weekly reports, not necessarily every week

7    but fairly frequently with my leadership, the

8    deputy, and the director.  And I'm not sure who

9    they may have passed that along to.

10      Q     And were you sharing these reports

11    around -- did you ever stop sharing these reports?

12      A     Yes.  But only for a short period of

13    time.

14      Q     But -- so, have you been sharing these

15    reports with DHS leadership or the leadership that

16    you specifically mentioned up until September 5,

17    2017?

18      A    Yes.

19      Q     Regarding the DACA termination and the

20    decision to termination DACA were you ever

21    consulted about the feasibility of the October 5

22    deadline?

1          MR. TYLER:  Objection.  Vague.

2          THE WITNESS:  If by consultation you

3    mean operationally -- I guess that would be my

4    question.  What do you mean by feasibility?

5    BY MR CHEN:

6       Q    Before September 5 did anyone from DHS

7    leadership ask you whether the -- ask whether the

8    October 5 deadline would be feasible?

9          MR. TYLER:  I'll object.  Vague.

10         THE WITNESS:  It's still kind of back to

11   what you mean by feasible.

12   BY MR CHEN:

13      Q    Did anybody ask whether it would be

14   possible for your office to process renewal

15   applications who were eligible to be renewed by

16   October 5?

17      A    No.

18      Q    Did anyone inquire into the operational

19   difficulty of or the operational difficulty about

20   processing those renewal applications by October

21   5?

22         MR. TYLER:  Object.  Assumes facts not

1   in evidence.

2          THE WITNESS:  No.

3   BY MR CHEN:

4      Q    Did anybody consult you about the

5   feasibility of the March 5 deadline?

6      A    No.

7      Q    So after September 5 how many renewal,

8   late -- sorry.

9          After October 5, 2017 how many late

10  renewal notices to your knowledge did the USCIS

11  receive?

12         MR. TYLER:  Objection.  Vague.

13         THE WITNESS:  Do you mean how many

14  requests were filed after the deadline?

15  BY MR CHEN:

16     Q    I'm sorry, yes.  So renewal requests.

17  How many -- to your knowledge how many were filed

18  after the renewal deadline on October 5?

19     A    I don't know for certain.  I believe

20  that I have heard the number 4,000 have been filed

21  after.

22     Q    And where did you hear that from?

1      A    I think from Tracy Renaud.  It was when

2    she was -- well, we have had this transition again

3    where she used to be our acting deputy and now she

4    is the associate director for management.  But

5    either way she would be over the Office of Intake

6    and Document Production.  She is the one I think

7    who has mentioned that number as the number that

8    had been -- come in --

9      Q    And just --

10     A    Since October 5.

11     Q    And just to clarify, from October 5

12   until what date did you hear that this number was

13   for?

14     A    Last week sometime.

15     Q    Do you know about how many late renewal

16   applications were from the state of Texas?

17     A    No.

18     Q    Okay.  Do you know how many applications

19   would have been from the state of Florida?

20     A    No.

21     Q    Do you know who might know this

22   information?

1      A     Perhaps the Office of Intake and

2    Document Production.

3      Q     Mr. Neufeld, you stated before that you

4    began your role as associate director of SCOPS

5    around 2010.  Is that correct?

6      A     That's correct.

7      Q     And the DACA program was implemented in

8    2012.  Is that correct?

9      A     Yes.

10     Q     So did you hold your current position

11   when DACA was first implemented?

12     A     Yes.

13     Q     Were you involved in this decision to

14   initiate the DACA program?

15     A     No.

16     Q     Were you involved in the implementation

17   of the DACA program?

18     A     Yes.

19     Q     What was the nature of your involvement

20   in that implementation?

21     A     Ultimately I oversee the operations that

22   adjudicate those benefit requests.  In the initial

1   stand up of the program I wasn't involved in

2   deciding whether or when to stand it up.  But when

3   the memo came out we had 60 days to stand it up

4   and I was part of the management team that

5   collectively worked out the process that we would

6   employ.

7        Q    Did you ever -- were you ever consulted

8   about the decision to start to initiate the DACA

9   program prior to its initiation?

10       A    No.

11       Q    Do you remember if before -- do you

12   remember if around 2010 you co-authored a memo to

13   the director of USCIS recommending that DHS grant

14   deferred action to certain undocumented

15   immigrants?

16       A    I remember not co-authoring that memo.

17       Q    You remember specifically not

18   co-authoring that memo?

19       A    Yes.

20       Q    Do you know then why your name is on it?

21       A    Because whoever drafted it put my name

22   on it.

DONALD NEUFELD

10/18/2017

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

143

1    Q    Did you have any involvement in the

2    creation of that memo?

3    A    No.

4    Q    Do you remember -- do you know why

5    whoever drafted it put your name on that memo?

6    A    No.

7    Q    Are you aware of the contents of that

8    memo at all?

9    A    Yes, but I've forgotten most of it.  But

10   I'm aware.

11   Q    What do you remember from that memo?

12   A    It enumerated many options for the

13   administration to consider with respect to policy

14   objectives that they had.

15   Q    And what were some of the options, do

16   you remember?

17   A    Something along the lines of the DACA

18   program was referenced.  I don't think it was

19   called DACA.  But deferred action for childhood

20   arrivals -- not called that, but I think that was

21   in there.  There was an option to embrace some

22   court decisions saying that TPS -- a grant of

1   temporary protected status would allow for folks

2   to adjust status even if they had entered

3   illegally.

4       Q    Did the memo site any benefits to the

5   grant of deferred action to these young

6   immigrants?

7       A    I don't remember.

8       Q    Did you authorize that memo?

9       A    No.

10      Q    Did that memo ultimately recommend that

11  DHS should grant deferred action to certain young

12  immigrants?

13      A    I don't remember.  That memo was a

14  draft, is the important thing to keep in mind.

15      Q    Is it your understanding that there are

16  policy benefits to the DACA program?

17          MR. TYLER:  Objection.  Vague.  Asking

18  for personal opinion.

19  BY MR CHEN:

20      Q    You can still answer the question,

21  Mr. Neufeld.

22      A    I'm aware that the people who decided to

1   institute it felt that there were benefits in

2   doing so.

3       Q    What do you think?

4          MR. TYLER:  Same objection.  Vague.

5   Personal -- asks for personal opinion.

6          THE WITNESS:  Are you really asking my

7   personal opinion about DACA?

8   BY MR CHEN:

9       Q    I'm interested in what you think about

10  the policy benefits of the DACA program?

11      A    I think that it is unclear what

12  ultimately the benefits are.  Clearly it benefits

13  individuals who receive it for the short run.  I

14  haven't formed an opinion on whether it is good

15  for the country or not.

16      Q    Do you know if these -- the benefits

17  that you said other people had considered were

18  considered in the decision to terminate the DACA

19  program?

20          MR. TYLER:  I'm sorry.  Could you repeat

21  that question?

22

1    BY MR CHEN:

2        Q    Do you know if the benefits that you

3    were aware of, were they considered in the

4    decision to terminate the DACA program?

5            MR. TYLER:  Objection.  It's vague.

6    Lack of foundation.

7            THE WITNESS:  I don't know what was

8    considered in the termination of the program.

9    BY MR CHEN:

10       Q    In your tenure as associate director of

11   SCOPS are you aware of any documents of DHS

12   concerning the legality of the DACA program?

13       A    I'm aware of the Sessions letter or memo

14   or whatever it was that cited that.

15       Q    Any other documents that you are aware

16   of?

17       A    No.

18       Q    Are you aware of any documents produced

19   by the Department of Justice about the legality of

20   the DACA program?

21       A    No.

22       Q    Are you aware of any documents produced

1   by the White House about the legality of the

2   program?

3       A    No.

4       Q    Are you aware of any communications

5   between DHS and the state of Texas related to the

6   termination of the DACA program?

7           MR. TYLER:  Objection.  Vague.

8           THE WITNESS:  I'm not aware of any

9   communication between the department and the state

10  of Texas.

11  BY MR CHEN:

12      Q    What about the state attorney general of

13  Texas?

14          MR. TYLER:  Same objection.

15          THE WITNESS:  I don't have visibility to

16  communications between the department and the

17  state of Texas, the attorney general.

18  BY MR CHEN:

19      Q    In any communications about the DACA

20  termination has anyone said anything about

21  immigrants that was offensive?

22      A    No.

1     Q     You mentioned previously that you have

2   spoken with acting director of the USCIS James

3   McCament about the DACA termination.   Correct?

4     A     Yes.

5     Q     In those conversations has he ever

6   referred to DACA recipients as criminals?

7     A     As a population, no.

8     Q     Has he ever referred to individual DACA

9   recipients as criminals?

10          MR. TYLER:  Objection.  Vague.

11          THE WITNESS:  I will say that all of us

12   who are managing the program are aware that some

13   applicants are criminals and we have terminated

14   DACA -- people with DACA because of criminal

15   activity and that has definitely been discussed.

16   BY MR CHEN:

17     Q     Has he ever suggested that DACA

18   recipients don't deserve to be in this country?

19     A     No.

20     Q     Do you understand the term racial slur?

21     A     As is commonly meant, yes.

22          MR. TYLER:  I'll still object on grounds

1    of vagueness.

2    BY MR CHEN:

3        Q    Has he ever used a racial slur in these

4    conversations?

5        A    No.

6        Q    Has he ever referred to DACA recipients

7    as a population by race?

8        A    No.

9        Q    Has he ever referred to individual DACA

10   recipients by race?

11           MR. TYLER:  Objection.  Vague.

12           THE WITNESS:  When there are discussions

13   about particular cases where the individual is

14   from might be part of the facts that are

15   considered -- not facts that are considered, but

16   we would know that somebody is from Mexico or from

17   wherever in discussing that.

18   BY MR CHEN:

19       Q    And has he ever mentioned reasons for

20   terminating DACA besides the legality of the DACA

21   program?

22       A    No.

1     Q    And you mentioned previously that you

2   have been in meetings and conversations with Gene

3   Hamilton about the DACA program.  Is that correct?

4     A    Yes.

5     Q    And so, has he ever referred to DACA

6   recipients as criminals?

7         MR. TYLER:  I'll object again to the

8   extent he has identified Mr. Hamilton as having

9   taken part in this meeting that the substance of

10  which we are objecting to on three privileges.  So

11  to the extent you are asking him to go back to

12  that meeting and report what was said by whom I'm

13  going to object on grounds of deliberative process

14  privilege, attorney/client privilege, and attorney

15  work product privilege.

16        MR. WISHNIE:  And you are also going to

17  instruct the witness?  Is that right?  I want to

18  make a clear record here for the court.

19        MR. TYLER:  -- Yes.

20  BY MR CHEN:

21    Q    Outside of that meeting, same question,

22  have you heard Mr. Hamilton refer to DACA

1   recipients as criminals?

2        A    No --

3           MR. TYLER:  -- Objection.  Lack of

4   foundation.  You can answer.

5           THE WITNESS:  No.

6   BY MR CHEN:

7        Q    Has Mr. Hamilton ever suggested that

8   DACA recipients do not deserve to be in this

9   country according to your -- to your knowledge?

10          MR. TYLER:  Objection.  Lack of

11  foundation.

12          THE WITNESS:  No.

13  BY MR CHEN:

14       Q    To your knowledge has Mr. Hamilton ever

15  used a racial slur to refer to DACA recipients?

16       A    No.

17       Q    And to your knowledge has he ever

18  referred to DACA recipients as a population by

19  race?

20       A    No.

21       Q    And to your knowledge has Mr. Hamilton

22  ever mentioned reasons to terminate DACA besides

1   the legality of the DACA program?

2           MR. TYLER:  Object.  I will direct the

3   witness not to answer if this question elicits

4   conversations that took place in this meeting.

5   BY MR CHEN:

6       Q    To your knowledge outside of the

7   meeting?

8       A    No.

9           MR. WISHNIE:  Let's just have a moment.

10   We are just about done.  We can stay on the record

11   for a moment.

12   BY MR CHEN:

13      Q    I want to return just really quickly to

14   the late filed applications after October 5.  So

15   you mentioned that there were six applications

16   filed late from Puerto Rico.  Is that correct?

17      A    That's correct.

18      Q    You also mentioned that you had approved

19   all six or accepted is the term that you used?

20      A    Directed that they be accepted.

21      Q    You directed that they be accepted.  And

22   did you use any criteria -- what criteria did you

1   apply to evaluate whether they should be accepted?

2      A    Whether or not the hurricane that

3   impacted Puerto Rico played a role in preventing

4   the timely filing.

5      Q    And you concluded that it had played

6   some role in the filing of these six applications.

7   Is that correct?

8      A    Yes.

9      Q    How did you come to that conclusion?

10     A    Five of them were postmarked shortly

11  before October 5 and it was reasonable to conclude

12  that the hurricane likely impacted the timely

13  delivery -- you know, that they would be received

14  before October 5.  The other one was filed shortly

15  afterward and as I recall the requester stated

16  that the hurricane had impacted them getting it

17  timely filed.

18     Q    And you had also mentioned that after

19  October 5 you had -- SCOPS had received about

20  4,000 late file notices.  Is that correct?

21     A    No.  What I said is that Tracy Renaud

22  indicated to me that it was approximately 4,000

1   that had been filed at the lockbox.

2       Q    Do you know if those 4,000 were all

3   rejected?

4       A    I don't know whether they have in fact

5   been rejected or if they have been flagged for

6   rejection but not yet processed.

7       Q    Do you know if SCOPS or USCIS plans to

8   reject those 4,000 applications?

9       A    Yes, that is the current plan.

10      Q    Do you know if the October 5 deadline

11  caused more applications than usual between the 30

12  day window of October 5 -- sorry, September 5 and

13  October 5?

14      A    No, I don't.

15      Q    Do you know how many usually -- how many

16  applications, renewal applications are usually

17  filed within a 30-day period?

18      A    I do not.  I see reports but I don't

19  remember what the numbers are.

20      Q    And would those -- are these reports

21  that you are referring to the same reports that

22  you mentioned -- mentioned before updating you

DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

1   about the work of SCOPS?

2      A    Yes.

3      Q    Did the October 5 deadline cause any

4   operational difficulties at SCOPS?

5           MR. TYLER:  Objection.  Vague.

6           THE WITNESS:  I can answer to the extent

7   that the deadline is a deadline, is a filing

8   deadline.  And so there aren't any impacts from

9   the filing deadline that we would experience in

10   service in our operations.

11   BY MR CHEN:

12      Q    Did the number of applications that came

13   in between -- within that time period cause any

14   operational difficulties?

15      A    No.

16      Q    And finally with the 4,000 notices that

17   Ms. Renaud let you know about that was filed after

18   October 5, do you know if SCOPS is considering the

19   filing -- the postmark date as a reason to

20   consider these applications on a case by case

21   basis?

22      A    It's not a SCOPS's decision.  Lockboxes

1   are the ones that handle it.  And what they do

2   comes from direction that they receive through the

3   Office of Intake and Document Production.  But all

4   of that is just reflective of the instruction that

5   the department or USCIS policy or decision on

6   that.  And all of that is to say the -- it's a

7   long way of saying that they are not considering

8   postmarks.  It has to be physically received by

9   the filing deadline.

10          MR CHEN:  Okay.  Nothing further from

11   Batalla Vidal plaintiffs.

12          MR. TYLER:  Going off of the record for

13   change of counsel.

14          THE VIDEOGRAPHER:  We are going off of

15   the record.  The time is 1:23 p.m.

16          (Whereupon, proceedings recessed from

17   1:23 p.m. to 1:26 p.m.)

18          THE VIDEOGRAPHER:  We are back on the

19   record.  The time is 1:26 p.m.

20             EXAMINATION ON DEFENDANTS

21   BY MS. KHAN:

22      Q   Hi, Mr. Neufeld.  My name is Sania Khan.

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                      157

1    I'm from the New York State Attorney General's

2    Office and I represent the plaintiff states which

3    comprises 17 states that are part of the New York

4    v. Trump litigation which is being heard alongside

5    the Batalla Vidal litigation.  But you don't have

6    to worry about that.

7            So I just have a few questions for you

8    today.  The first question is how would you

9    describe your three most important job duties?

10       A    Well, they're all related.  I oversee

11   the operations, service center operations and so I

12   make sure that the group of people that work in

13   the service centers have what they need to

14   effectively do their jobs.  I'm also responsible

15   to make sure that they are performing their work

16   with a high degree of accuracy and quality.  And

17   to the extent possible that we are making timely

18   decisions for those who file.

19       Q    Okay.  Who those -- for those who file

20   DACA or generally?

21       A    For everything.

22       Q    Okay.  So in the context of accuracy

1    would efficiency be part of this operational duty?

2        A    Yes, we need to be efficient so that we

3    can make the best use of the resources that we

4    have so that we can timely process requests.

5        Q    How do you -- how do you become more

6    efficient?

7        A    Through constant review of our processes

8    and thinking of ways to be more efficient.  I hate

9    to use the same word, but -- you know, ways that

10   we can achieve the same thing with less of an

11   investment of the cost or resources.

12       Q    So if you could describe to me in a very

13   practical sense how those analyses are done to

14   become more efficient?

15           MR. TYLER:  I'll object.  It calls for a

16   narrative answer.  You can break it down, please.

17   BY MS. KHAN:

18       Q    Do you -- do you create analyses with

19   regard to the efficiency of -- of the operations?

20       A    No.  We have various ways of looking at

21   efficiency.

22       Q    What are those ways?

1      A    That primary way is to look at the

2    number of cases that are completed and the

3    investment of officer hours that was required to

4    achieve that number of completions.

5      Q    So in the context of -- sorry.  Are we

6    still on the record?  Okay.  Sorry.

7           So in the context of DACA specifically

8    how did you measure -- how did you measure

9    efficiency of the implementation of the program?

10     A    From an efficiency perspective again, it

11   was what level of resources were invested to

12   achieve the completions that we did.

13     Q    Were there any other sort of operational

14   measurements done on the implementation of DACA?

15        MR. TYLER:  Objection.  Vague.

16   BY MS. KHAN:

17     Q    You can still answer it.

18     A    Can you repeat the question?

19     Q    Sure.  Were there any operation -- on

20   the operational measurements or metrics used on

21   the implementation of DACA?

22     A    Certainly.  So that weekly report that I

1    discussed previously gives a lot of like I said

2    different data points.  And among them are -- is

3    an identification of the number of cases and

4    waiting for a particular action and how long they

5    have been waiting for that action to occur.

6        Q    Are there any -- are there any analyses

7    or data collection done -- strike that actually.

8            Is there any data collection done as to

9    the demographics of the DACA applicants?

10           MR. TYLER:  Objection.  Vague.

11   BY MS. KHAN:

12       Q    You can answer.

13       A    I think I can answer this way.  That the

14   office -- let me get this straight.  The Office of

15   Performance and Quality produces -- I think it's a

16   quarterly report that gives some demographic

17   characteristics of the filing population.

18       Q    Who sees that quarterly report?

19       A    It's published on the website.

20       Q    So I'm going to go down a list of

21   specific types of data and I just want to know if

22   any of these types of data were ever compiled by

1    your team.  So specifically were there any -- was

2    there any data or analyses done as to how many

3    DACA grantees are federal government employees?

4        A    Not by my team.

5        Q    Was there any data analyses done as to

6    how many DACA grantees are small business owners?

7        A    Not by my team.

8        Q    Was there any data analyses compiled as

9    to the average income of DACA grantees?

10       A    Not by my team.

11       Q    The same question for how many DACA

12   grantees are home owners?

13       A    Not by my team.

14       Q    How many DACA -- the same question for

15   how many DACA grantees are in the military?

16       A    Not by my team.

17       Q    Same question for DACA grantees who are

18   doctors?

19       A    Not by my team.

20       Q    Same question for DACA grantees who are

21   teachers?

22       A    Not by my team.

1      Q    Was there any analysis done as to the

2   impact of the recision of DACA on the operational

3   aspect of your -- of what you oversee?

4          MR. TYLER:  Objection.  Vague.

5   BY MS. KHAN:

6      Q    You can still answer.

7      A    I don't -- can you restate?

8      Q    Yeah, I can restate it.  So were there

9   any analyses done as to the economic impact of the

10  rescission of DACA by your team?

11         MR. TYLER:  Same objection.  Vague.

12         THE WITNESS:  Economic impact on what?

13  BY MS. KHAN:

14     Q    On your -- on the operational aspect of

15  your team?

16         MR. TYLER:  Still vague.  Objection.

17  BY MS. KHAN:

18     Q    Okay.  Let me start over.  So --

19     A    Maybe I can say it this way.  I don't do

20  economic analysis of the costs of the programs

21  that we administer.  That would be done by the

22  chief financial officer.

DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017
163

1     Q    Right.  I apologize.  I think this is --

2   this is on me.  The economic -- so you talked

3   earlier about the costs of the database change,

4   the costs of creating a new system for renewal

5   notices.  Is that correct?

6     A    Yes.

7     Q    Okay.  So would you measure that as an

8   economic cost in the context of the operational

9   system of the implementation of DACA?

10     A    I wouldn't.  Like I said, ultimately the

11   CFO would look to all of the costs of

12   administering the program.

13     Q    So what analyses were done with regard

14   to the DACA program?

15         MR. TYLER:  Objection.  Lack of

16   foundation.  Vague.

17   BY MS. KHAN:

18     Q    You can still answer.

19     A    Yeah, but I don't understand what you

20   are asking.

21     Q    Okay.  That's a valid point.  Were there

22   any analyses done as to the efficacy of DACA --

DONALD NEUFELD

10/18/2017

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

164

1    strike that.

2          Give me one second.

3          So were you ever questioned about the

4    potential operational impact of the termination of

5    DACA?

6          MR. TYLER:  Objection.  Vague.

7    BY MS. KHAN:

8      Q    You can still answer if you understand

9    it.

10     A    I don't know what you mean by

11   operational impacts.

12     Q    How it would -- I'm asking were you ever

13   asked about how the recision of DACA would impact

14   your job, for example?

15     A    No.

16     Q    Okay.  Were you asked about how it would

17   impact the service centers?

18     A    No.

19     Q    Were you asked about how the recision of

20   DACA would impact anyone that you -- that you

21   supervise?

22          MR. TYLER:  I'll object on the grounds

1   of vagueness.

2         THE WITNESS:  I was not asked about how

3   ending of DACA would impact the people that I

4   supervise.

5   BY MS. KHAN:

6     Q   Okay.  Moving on.  Are you aware of the

7   information sharing policies with regard to DACA

8   applications and grantees?

9     A   I'm aware that there are some.  I

10  don't -- I don't know the ins and outs

11  specifically what is allowed and what is not

12  allowed.

13    Q   What are you aware of?

14    A   That there is a -- somewhere near where

15  the requester signs there is a statement that

16  spells out what the policies are.

17    Q   And were you ever asked about those

18  policies when they were being formulated?

19        MR. TYLER:  Objection.  Vague.

20        THE WITNESS:  I wasn't asked about them,

21  no.  There were discussions early on in that 60

22  day period, again, as to what that language should

1   be.  I don't recall specifics of those

2   conversations other than that they happened.

3   BY MS. KHAN:

4       Q    Okay.  So are you aware of what the

5   current policy is with regard to information

6   sharing of DACA applicants or grantees?

7       A    Again, I have a general awareness that

8   there are restrictions on the proper use of it.

9   But I wouldn't want to say specifically because I

10  will get it wrong.

11      Q    Okay.  So it's safe to say that you are

12  not aware of any change in policy on that front?

13      A    That's correct.

14      Q    Did you provide any sort of statistical

15  information with regard to -- strike that.

16          Were you asked to provide any

17  statistical information in the context of the DACA

18  program with regard to the recision?

19          MR. TYLER:  Objection.  Vague.

20          THE WITNESS:  Do you mean the

21  termination?  I'm not --

22

DONALD NEUFELD                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                    167

1    BY MS. KHAN:

2        Q    -- Yes.  Yes.  The termination of DACA.

3        A    No.

4        Q    You were not asked to provide any sort

5    of statistical information on the operational

6    aspects of the DACA program?

7            MR. TYLER:  Objection.

8    BY MS. KHAN:

9        Q    In the context -- it's a long quest --

10   in the context of the termination?

11           MR. TYLER:  Objection.  Vague.

12           THE WITNESS:  I can answer it this way.

13   I wasn't -- SCOPS has the weekly report that we

14   have produced weekly for a long time.  That report

15   continues to be produced and I was not asked for

16   any other sort of reporting besides that.

17   BY MS. KHAN:

18       Q    And just to be clear, who does the

19   weekly report go to?

20       A    It comes into me and then I forward it

21   to James McCament and back until recently Tracy

22   Renaud in her capacity as the deputy.  And Kathy

1    Nuebel who is the chief of policy and strategy.

2         Q     And are you aware if any of those

3    individuals then forward it on to anyone else?

4         A    I am not aware.

5         Q     Have you ever met an unaccompanied

6    minor?

7              MR. TYLER:  Objection.  Vague.

8              THE WITNESS:  What do you mean by

9    unaccompanied minor?

10   BY MS. KHAN:

11        Q     Someone who is DACA eligible?

12        A     Well, in my position I have met with

13   members of the community advocating and among them

14   were people who had DACA, so yes.

15        Q     And what was your impression in those

16   meetings?

17             MR. TYLER:  Objection.  Vague.  Calls

18   for personal opinion.

19             THE WITNESS:  My opinion with respect to

20   what?

21   BY MS. KHAN:

22        Q    To who they are, how they are?

1          MR. TYLER:  Same objection.

2          THE WITNESS:  We weren't there for me to

3    form opinions about whether they are good people

4    or not and I didn't form an opinion along those

5    lines.  I was there to listen to what they had to

6    say at the time.

7    BY MS. KHAN:

8        Q    Was any of that done in the context of

9    your professional duties?

10       A    Yes.  What I'm talking about was all in

11   my professional duties.

12       Q    Did that -- did that -- those meetings

13   for example, did they impact any decisions that

14   you made in the operational context?

15       A    So the one meeting that I can think of

16   that comes clear is a meeting at the DHS

17   headquarters that was attended by Ali Mayorkas,

18   the deputy secretary at the time, and others.  And

19   it was different advocacy groups for DACA that

20   were basically pressing for even speedier

21   processing of their cases.

22       Q    And what did you do?

1          MR. TYLER:  Objection.  Vague.

2          THE WITNESS:  We listened to their

3   concerns and took that, considered that as a

4   reason among many why timely processing is

5   important.  But timely processing is important for

6   just about everything that we do.

7          MS. KHAN:  I don't think I have any

8   further question at this point.

9          THE WITNESS:  Thank you.

10          MS. KHAN:  Thank you.

11          (Court reporter requests clarification.)

12          THE COURT REPORTER:  Another examiner?

13          MS. KHAN:  Yes.  There's about three

14   more.

15          MR. VENTRESCA:  Sorry.

16          THE COURT REPORTER:  That's all right.

17   I just need to get the name.

18          MR. VENTRESCA:  Musical chairs exercise

19   here.

20          THE COURT REPORTER:  And you are?

21          MR. VENTRESCA:  Ivano Ventresca.

22          THE COURT REPORTER:  And you're on here?

1          MR. VENTRESCA:  Hopefully.  I should be

2     the second one.

3          EXAMINATION ON BEHALF OF DEFENDANTS

4     BY MR. VENTRESCA:

5         Q    Hi, Mr. Neufeld.  My name is Ivano

6     Ventresca. I'm with Covington and Burling and we

7     represent the University of California and Janet

8     Napolitano in the North District of California

9     cases.  I'm going to try not to repeat any ground

10    to not make the day any longer, but I'm just going

11    to have some follow up questions.  First I would

12    like to mark this as Exhibit 38.  I'm not sure

13    where we are on the -- 39.  39.  Copies for the

14    record.

15         (Whereupon, Exhibit No. 39 was marked

16    for identification.)

17    BY MR. VENTRESCA:

18        Q    For the record this is the declaration

19    of Donald W. Neufeld filed in the state of Texas

20    v. United States of America case in the Southern

21    District of Texas.  Mr. Neufeld, do you recognize

22    this document?

DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                172

1      A    Yes.

2      Q    Is this the declaration that you filed

3   in the state of Texas v. United States case in the

4   Southern District of Texas on January 30, 2015?

5      A    I have not reread through the whole

6   thing, but it looks like it probably is.

7      Q    If you turn to --

8      A    It's got my signature.

9      Q    Yeah.  I was going to say if you turn to

10  the last page.  So it is your signature?

11     A    Yes.

12     Q    And you declared under penalty of

13  perjury that what you submitted in this

14  declaration was true and correct?

15     A    Yes.

16     Q    So you don't need to read the whole

17  thing.  I'm just going to direct you to a couple

18  of pages.  But first, who asked you to prepare

19  this declaration?

20     A    Oh, I don't remember.

21     Q    Do you remember what the purpose of the

22  declaration was?

1    A    Well, not specifically.  I don't know --

2  what do you mean what was the purpose?

3    Q    Well, do you know why you were asked to

4  submit a declaration in this case, this case being

5  the Texas case?

6    A    If I'm not mistaken I did at least two

7  of them.

8    Q    Right.  I think you did three.

9    A    Three.  Okay.  Yeah.  So I don't -- I

10  don't know without reading this I don't remember,

11  I don't know which one this one is.

12    Q    Okay.  Well, I would like to direct you

13  to paragraph 15.  It's on page -- did you find it?

14    A    Yes.

15    Q    Could you just read the first sentence

16  of paragraph 15?

17    A    Out loud?

18    Q    Yes, please.

19    A    A DACA request is denied when a USCIS

20  adjudicator on a case by case basis determines

21  that the requester has not demonstrated that they

22  satisfy the guidelines for DACA or when an

1   adjudicator determines that deferred action should

2   be denied even though the threshold guidelines are

3   met.

4        Q    So do you agree that the USCIS

5   adjudicator could deny a deferred action request

6   under DACA even if the category guidelines for

7   DACA were met?

8        A    Yes.

9        Q    So could we next turn to paragraph 18

10   which should just be on the flip side of the page.

11   And so turning to the first sentence of paragraph

12   18.  I can read this one aloud.  It says; even if

13   it is determined that a requester has satisfied

14   the threshold DACA guidelines the USCIS may

15   exercise discretion to deny a request where other

16   factors make the grant of deferred action

17   inappropriate.

18        Do you agree with that statement?

19        A    Yes.

20        Q    And then in paragraph -- the next two

21   sentences in paragraph 18 give examples of when

22   USCIS exercises that discretion.  Is that right?

1       A    Yes.

2       Q    Okay.  And that third sentence that

3    starts with, as another example.  It states; when

4    USCIS learned that a DACA requester falsely

5    claimed to be a U S citizen and had prior removal

6    as an exercise of discretion USCIS denied their

7    request even though those issues are not

8    specifically part of the DACA guidelines.

9          Do you agree with that statement?

10      A    I'm sure that it is accurate.  I don't

11   remember that case at this point in time.

12      Q    So that statement that you made says

13   that there was a case in which USCIS denied a DACA

14   request even where the DACA guidelines were not

15   met?

16      A    Yes.

17      Q    Okay.  And then if we could turn to

18   paragraph 24 which is a couple of pages.  So at

19   the very -- the very last sentence paragraph of

20   24.  Well, it's the -- well, it's the last full

21   sentence.  It states; requests have also been

22   denied on the basis that deferred action was not

1   appropriate for other reasons not expressly set

2   forth in 2012 DACA memorandum such as evidence of

3   immigration fraud.

4           Do you agree with that statement?

5       A   Yes.

6       Q    And so is that consistent with what we

7   just discussed in that there were cases in which

8   USCIS denied DACA requests even where the

9   guidelines of DACA were met?

10      A   Yes.

11      Q    And then the sentence in paragraph 24

12  that's going to go onto the next page starts;

13  until very recently USCIS lacked any ability to

14  automatically track and sort the reasons for DACA

15  denials and it still lacks the ability to do so

16  for all DACA denials except for very recent ones.

17          Is it correct -- does that statement

18  mean that as of this date of the declaration

19  January 30, 2015 USCIS had the ability to track

20  the reasons for DACA denials?

21      A   Yes, but I don't know the specific ways

22  we can categorize the type of denial.

1    Q    Okay.  So to follow up on that.  So as

2    of this -- as of the day of this declaration, so

3    January 30, 2015 could USCIS determine if a DACA

4    request was denied on the basis of discretion?

5        A    I don't know.

6        Q    Okay.  And just to wrap up this

7    declaration.  On the very last page on your

8    signature page.  So the last sentence above the, I

9    declare, sentence.  So that sentence states;

10   finally in DACA USCIS exercises its discretion by

11   otherwise denying a request for other factors not

12   included in the guidelines but make the grant of

13   deferred action inappropriate.

14          So again, is that consistent with what

15   we have been discussing in that USCIS will deny,

16   could deny DACA requests even where the DACA

17   guidelines were met?

18       A    Yes.

19       Q    Okay.  So I would like to switch

20   documents now.  And this has already been marked I

21   believe as Exhibit 3.  It's the administrative

22   record, specifically the recision memorandum.  I

DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017

178

1   think it has been called the Duke memorandum.

2          THE COURT REPORTER:  Did you want it

3   marked?

4          MR. VENTRESCA:  Well, it's part of what

5   was Exhibit 3.  So we can mark it if that's

6   easier.

7          MR. TYLER:  This is so I'm clear -- this

8   is my first deposition.  This is a continuation of

9   exhibits that have been entered in the previous

10   depositions?

11          MR. VENTRESCA:  Yes.  So the

12   administrative record was previously entered and

13   this is just part of it.  So we can mark it, or.

14          THE COURT REPORTER:  Mark it as what?

15   40 or three?

16          MR. VENTRESCA:  Three.  No?

17          MR. COX:  Except for that's not all of

18   three.  Three, that is the whole administrative

19   record.

20          MR. TYLER:  If you've identified -- you,

21   counsel, has identified Exhibit 3 to be the entire

22   administrative record then I don't know that we

1   can refer to this as Exhibit 3.

2          MR. VENTRESCA:  Okay.  We can make it

3   Exhibit 40.

4          MR. NEWMAN:  Can we go off of the

5   record, please?

6          THE VIDEOGRAPHER:  Off of the record.

7   The time is 1:52 p.m.

8          (Whereupon, Exhibit No. 3 previously

9   marked was identified.)

10          (The proceeding recessed from 1:52 p.m.

11   to 1:55 p.m.)

12          THE VIDEOGRAPHER:  We are back on the

13   record.  The time is 1:55 p.m.

14   BY MR. VENTRESCA:

15      Q    Mr. Neufeld, I'm going to show you a

16   portion of Exhibit 3 that starts with the Bates

17   page number ending in 252 and ends with Bates page

18   number 256.  For the record it is the recision of

19   the June 15, 2012 memorandum.  Do you recognize

20   the document?

21      A    Yes.

22      Q    I would like to turn your attention to

1    footnote one which is on the Bates page number

2    ending in 253.  Do you see that?

3        A    Yes.

4        Q    Could you read me footnote one?

5        A    Significantly while the DACA denial

6    notice indicates the decision to deny is made in

7    the unreviewable discretion of USCIS, USCIS has

8    not been able to identify specific denial cases

9    where an applicant appeared to satisfy the

10   programmatic categorical criteria as outlined in

11   the June 15, 2012 memorandum but still had his or

12   her application denied based solely upon

13   discretion.

14       Q    Is that a correct statement?

15            MR. TYLER:  Objection.  Foundation.

16   Form.

17            THE WITNESS:  I don't know whether it's

18   correct.

19   BY MR. VENTRESCA:

20       Q    So when you in your declaration, which

21   was Exhibit 39, at paragraph 18 stated that USCIS

22   learned that a DACA requester falsely claimed to

DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017

181

1    be a U S citizen and had prior removals, as an

2    exercise of discretion USCIS denied the request

3    even though those issues are not specifically part

4    of the DACA guidelines is that not an example of

5    a -- as this memorandum states, the denial case

6    where the applicant appeared to satisfied the

7    programmatic categorical criteria?

8        A    The difficulty I have with saying

9    whether that's accurate or not is understanding

10   what was intended by identify.

11       Q    What is your understanding?

12       A    I didn't write it so I don't know.  I

13   know that in my declaration I was made aware of

14   cases that were -- that we had denied -- the

15   examples of cases that were denied were presented

16   to me by my staff whom I have every reason to

17   believe was accurate.

18       Q    Right.

19       A    However, I didn't personally review

20   those cases and I don't know whether those cases,

21   how those cases -- I don't know if the cases are

22   identified in some way that you could pull them

1   and review them without reviewing all of the cases

2   to find them.

3       Q    But you were able to identify those

4   cases, you or your staff?  Is that right?

5       A    My staff were able to recall that there

6   were cases that had been denied with these fact

7   patterns.

8       Q    Could you tell me who --

9       A    -- did it -- it's a different thing to

10  say -- again, it comes down to what does identify

11  mean.  If it means -- you know -- you know,

12  specific information and that is now identifiable

13  with a case number and whatnot, then I don't know

14  whether we're able to now identify those specific

15  cases that were referenced in my declaration.

16      Q    Okay.  So could you tell me who on your

17  staff identified the cases referenced in your

18  declaration?

19      A    I believe it was Jerry Rigdon who had

20  the position that is now encumbered by Alex King

21  that I have referred to about before.  So it is

22  the branch chief for the branch that has the DACA

1   portfolio.

2       Q    Could you spell his last name?

3       A    R-I-G-D-O-N.

4       Q    Anyone else?

5       A    No.

6       Q    So Jerry Rigdon would have the

7   individual who could have identified?

8       A    As I recall -- it is going back a couple

9   of years now.  It's a little fuzzy, but I think

10  that was him.

11      Q    Do you know how Jerry would have found

12  these cases?

13      A    I don't, other than that he was in

14  regular communication with the teams at the

15  centers that were adjudicating cases.

16      Q    Is there a reason why Mr. Rigdon would

17  have been able to find these cases but Acting

18  Secretary Duke would not have been able to find

19  these cases?

20          MR. TYLER:  Objection.  Vague.  Lack of

21  foundation.

22          THE WITNESS:  Can you repeat the

1   question?

2   BY MR. VENTRESCA:

3       Q    Sure.  Let's start.  So it seems -- do

4   you agree that Acting Secretary Duke -- well, let

5   me rephrase.  Do you agree that USCIS as

6   represented in the memorandum did not identify

7   specific denial cases where USCIS exercised

8   discretion?

9           MR. TYLER:  I'll object to the form of

10  the question.  I mean the document speaks for

11  itself, so.  I object on form and vagueness.

12  BY MR. VENTRESCA:

13      Q    You can answer.

14      A    I don't understand what you're asking

15  me.

16      Q    So in this memorandum USCIS did not

17  identify specific denial cases where USCIS

18  exercised discretion to deny a DACA request.  Your

19  staff was able to find such specific cases.  Do

20  you know why your staff was able to find such

21  cases but USCIS in this memo was not able to find

22  those cases?

1      A    I think it comes back again to what does

2    identify mean.  I don't recall the specific

3    circumstances of how the examples were brought to

4    my attention.  I don't know or at least I don't

5    remember whether they were coming from the memory

6    of adjudicators who had adjudicated those cases,

7    which is different than identifying those cases

8    from the 800,000 that we've adjudicated and

9    putting your finger on that's the case that we're

10   talking about.  There is a difference.  And so

11   that's -- I think that's to me where the tension

12   is coming from here.

13      Q    Were you consulted about the substance

14   of this footnote?

15      A    I don't recall being consulted.

16      Q    Did you review this footnote before it

17   was published in its final form?

18      A    Not that I recall.

19      Q    And could you give me your understanding

20   of the meaning of the word identified that make

21   this footnote accurate?

22      A    It's the difference between putting

DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

1   your -- being able to put your finger on a case,

2   pull it, and review it now versus somebody

3   remembering that they adjudicated this case.  Both

4   you can say -- the case could have been

5   adjudicated but the fact that we can't identify it

6   now in the stack of 800,000 is the difference I'm

7   talking about.

8       Q    Did anyone ask -- did anyone at USCIS or

9   DHS ask to review your declaration that you

10   submitted on January 30, 2016?

11          MR. TYLER:  Objection.  Lack of

12   foundation.

13          THE WITNESS:  Nobody asked me to review

14   my declaration.

15   BY MR. VENTRESCA:

16       Q    Do you know if anyone at DHS reviewed

17   that declaration in the preparation of this

18   recision memorandum?

19       A    I do not know.

20       Q    Just a couple more questions.  We'll

21   switch -- switch topics.  You recently testified

22   about that immigration advocacy groups that you

1   had met with them about the change in the

2   processing times.  Is that right?

3      A    No.  The purpose of the meeting was for

4   them to convey their desire that the processing

5   times be quicker.

6      Q    Are you aware if immigration advocacy

7   groups were consulted with respect to the recision

8   of DACA?

9      A    I'm not aware.

10     Q    And you are aware that DACA recipients

11  serve in the military?

12     A    I'm aware of that, yes.

13     Q    Are you aware of whether of any of their

14  supervising officers were contacted with respect

15  to the recision of DACA?

16     A    I'm not aware.

17     Q    And are you aware that DACA recipients

18  are students at schools and universities?

19     A    Yes.

20     Q    Are you aware of whether those

21  universities were contacted with respect to the

22  recision of DACA?

1      A    I'm not aware.

2      Q    And are you aware that DACA recipients

3   are employers?

4      A    I believe so.

5      Q    Do you know if any of the employees of

6   DACA recipients have been contacted with respect

7   to the recision of DACA?

8      A    I'm not aware.

9      Q    And one kind of final set of questions.

10  Have you overseen deferred -- other deferred

11  action programs besides DACA?

12     A    Program is a word that has different

13  meanings, but within -- the SCOPS portfolio of

14  benefit adjudications includes requests under the

15  Violence Against Women Act, VAWA, and T's and U's,

16  nonimmigrants.  And as I recall -- I don't recall

17  the specifics.  All three of those I think have

18  some of those requests can result in deferred

19  action being authorized.

20     Q    Okay.  For ease I'll refer to them as

21  deferred action programs here.

22         MR. TYLER:  I will object to counsel's

1   characterization of them as programs.

2   BY MR. VENTRESCA:

3       Q    Have you overseen deferred action

4   programs that have ended, as in they have

5   terminated or lapsed?

6       A    Not that I recall and I don't believe

7   so.

8       Q    Are you aware of any discussions with

9   respect to terminating the deferred action

10  requests that you have discussed, the Violence

11  Against Women Act and the T and U visas -- of any

12  discussions to termination those programs due the

13  litigation risk?

14      A    Not that I'm aware of.

15      Q    Have you -- are you aware of any

16  discussions to terminate those programs due to

17  their illegality?

18          MR. TYLER:  I again object to counsel's

19  mischaracterization of these as programs.

20          THE WITNESS:  I'm not aware of any

21  discussions to change the way deferred action is

22  handled for those programs for any reason.

1        MR. VENTRESCA:  Okay.  That's all I

2    have.

3        (Court reporter request.)

4        THE VIDEOGRAPHER:  We are going off of

5    the record.  The time is 2:05 p.m.

6        (Whereupon, the proceeding recessed from

7    2:05 p.m. to 2:16 p.m.)

8        THE VIDEOGRAPHER:  We are back on the

9    record.  This is the beginning of media unit

10   number 4.  The time is 2:16 p.m.

11       EXAMINATION ON BEHALF OF DEFENDANTS

12   BY MR. NEWMAN:

13       Q    Hello, sir.  My name is Michael Newman

14   from the California Attorney General's Office on

15   behalf the state of California.  Thank you very

16   much.  I have a few additional questions.

17       A    Sure.

18       Q    Is it accurate to say that you stated in

19   your earlier testimony that you had 4,000

20   applications received at the lockbox after October

21   5 of this year?

22       A    What I said was Tracy Renaud indicated

1    that there were about 4,000 that had been filed

2    after October 5 and were at the lockbox.  And I

3    have to say that I don't know for a fact whether

4    those are just renewals or could include some

5    initial filings.  I just don't know.

6        Q    Is it also accurate to state that you

7    said that you anticipate all of those will be

8    rejected?

9        A    Yes.

10       Q    Okay.  Do you have any data on the

11   rejected applications?

12           MR. TYLER:  Objection.  Vagueness.

13   BY MR. NEWMAN:

14       Q    I can rephrase.  Do you capture any data

15   regarding the applications?

16       A    SCOPS does not, but OIDP would have data

17   on rejected requests.

18       Q    What would that data include?

19       A    I don't know specifically.  I have not

20   seen a report.

21       Q    Are you aware as to whether that data

22   will be released publicly?

1    A    I'm not aware.

2    Q    You referenced a report.  Do you

3  generally get those reports?

4    A    I'm saying I haven't seen a report.  I'm

5  sure that they capture that data.

6    Q    Okay.  You have not seen a report?

7    A    On the number of rejected -- sorry.  I

8  have not seen a report of the reject -- number of

9  rejected requests after either of the deadlines,

10  at least not to my recollection.

11    Q    Okay.  And I apologize.  It was my fault

12  on the misunderstanding.  I asked you before about

13  a report on the data regarding the rejected

14  application.  Are you referring to data as only

15  the number of applications?

16    A    That was the reference I was making, but

17  I haven't seen any other data either.

18    Q    Okay.  Have you seen data regarding the

19  location of filing or of mailing of the

20  applications?

21    A    I have seen -- I'm aware of the six

22  cases that came from Puerto Rico because they were

1   flagged for my attention to review.  Other than

2   that I have not seen specific data on rejected

3   filings based on state of origin or anything else.

4        Q    Are you aware of whether the 4,000

5   applications currently in the lockbox,

6   approximately, will be recorded, will have their

7   data recorded as regards a number of data points

8   including state of origin?

9        MR. TYLER:  I will object on this

10  ground.  Counsel is -- the deponent has testified

11  that he heard hearsay statements about a 4,000

12  number.  So it is just that.  So I will object to

13  counsel's characterization of this as fact.

14       MR. NEWMAN:  Okay.

15       MR. TYLER:  This 4,000 number.

16       MR. NEWMAN:  Okay.

17       THE WITNESS:  So the question is what?

18  BY MR. NEWMAN:

19       Q    The question is are you aware of data

20  points that are obtained from applications that

21  come into the lockbox?

22       A    I am not aware of specific data points.

1     Q    Okay.  You stated earlier that you were

2   aware of information sharing policies but not

3   involved in the development of the policy.  Are

4   both of those statements about your earlier

5   statement correct?

6          MR. TYLER:  I'll object.  Compound.

7          THE WITNESS:  What is the first part of

8   that question?

9   BY MR. NEWMAN:

10     Q    Okay.  I will ask it separately.  Do you

11   recall stating earlier that you were aware of

12   information sharing policies generally?

13     A    Yes.

14     Q    Is it accurate to state that you

15   testified earlier that you were not involved in

16   the development of the policies?

17     A    That's difficult for this reasons; I

18   didn't have a role in developing, in deciding what

19   the policy would be.  I was engaged in discussions

20   about the wording that was used on the -- you

21   know, around the signature block on the form

22   itself.

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 1588 of 1603 PageID #: 5533

1    Q    When you say form, are you referring to

2   the form that the applicant needs to file?

3    A    The form I-821D.

4    Q    Are you involved in any way in

5   evaluating information sharing requests regarding

6   the information on these forms?

7         MR. TYLER:  I'll object.  Vagueness.

8   Vague.

9         THE WITNESS:  I'm confused about what --

10  what do you mean by information sharing and

11  involvement?

12  BY MR. NEWMAN:

13   Q    I will represent to you that there may

14  be requests at various times from different people

15  both within Department of Homeland Security and

16  outside the Department of Homeland Security to

17  obtain information regarding DACA applicants.

18   A    I would not be involved in handling

19  those requests.

20   Q    Do you know who is?

21   A    It would depend on what the request

22  specifically was.

1    Q    Can you delineate the different manners

2    in which requests would be made for information

3    and who would handle those?

4         MR. TYLER:  Objection.  Compound.

5    Vague.

6         THE WITNESS:  So depending -- I don't

7    have a lot of personal knowledge about how

8    information is shared with other components in the

9    department or externally.  I am aware, unless it

10   has changed, that there -- I believe there is a

11   form that an individual in ICE can submit to

12   request information.  Other than the general

13   awareness that that form exists I don't know who

14   processes it or what the content is or anything

15   along those lines.

16   BY MR. NEWMAN:

17   Q    Who does process it?

18   A    I just -- I don't know.

19   Q    Do you have any indication of what

20   bureau or sub-unit of the Department of Homeland

21   Security processes it?

22   A    No.  This -- the context that I'm

1   talking about it would be a request coming into

2   USCIS from another component outside of USCIS

3   asking for information.  I don't know who would

4   process that.  You know, what information they

5   have to review or anything.  Just generally aware

6   that there is a form for that.

7       Q    At any point are you made aware of

8   whether a request is granted?

9       A    No.

10       Q    Do any of your subordinates have

11   responsibility for collating data?

12           MR. TYLER:  Objection.  Vague.

13           THE WITNESS:  If you mean in reference

14   to responding to a information request?

15   BY MR. NEWMAN:

16       Q    I'm sorry.

17       A    Then my guess here is that it depends on

18   where that information exists.  So it would not

19   surprise me that I have people in service

20   center -- in service centers responding to

21   requests.  But I'm personally not involved in that

22   and I have not had visibility much into the

1   specifics of that process.

2       Q    So just --

3       A    These are requests for records, is the

4   context that I'm talking about.  Not data about

5   like the number of people filing or anything.

6   It's about specific information that's tied to a

7   specific individual.  So those are records

8   requests.

9            The records policies are not managed by

10  SCOPS, they are managed by our records division in

11  the -- I forget the name.  The IRIS director.  But

12  I don't remember what I-R-I-S stands for.

13           And many records are housed by that

14  director under that division.  And so I would

15  imagine many of these requests would be processed

16  by them.  If they relate to an active file that we

17  would have in our holdings then I'm sure that we

18  are involved in some way, my staff would be

19  involved in some way in responding to that.  But

20  to what level or what decisions they have to make

21  I'm not personally knowledgeable.

22      Q    Would the process that you just

1    delineated be the process whether it comes from

2    within the Department of Homeland Security or

3    outside of the Department of Homeland Security or

4    would there be a different process?

5        A    I don't know of any other process.

6        Q    Okay.  Would the same process apply for

7    both Immigration and Customs Enforcement as for

8    Customs and Border Patrol?

9            MR. TYLER:  Objection.  Vague.

10           THE WITNESS:  The form that I was

11   referencing, I believe, I'm not certain.  I

12   believe it's for use by any other DHS component

13   that would include CBP or ICE.

14   BY MR. NEWMAN:

15       Q    Do you have actual knowledge of any

16   instance in which one of your subordinates was

17   involved in collecting information in response to

18   one of the requests that we have just been

19   referencing?

20           MR. TYLER:  Objection.  Vague.

21           THE WITNESS:  I -- I don't have

22   knowledge of specific requests and how they were

1   handled.  I know that we have at each service

2   center there is a background check unit and there

3   is a center fraud detection office component.

4   Either of those components can interact with law

5   enforcement to include ICE and CBP.  And I don't

6   know -- I don't have visibilty to the day-to-day

7   interactions that happen with respect to specific

8   case handling.

9   BY MR. NEWMAN:

10      Q    Are you aware of any changes in policy

11   regarding handling of requests for information

12   within the last year?

13      A    No.

14      Q    Have you ever been involved -- you

15   testified earlier -- I will stop.  Let me rephrase

16   the question.

17          You testified earlier that you had not

18   been involved in the winding down of any other

19   deferred action program.  Is that correct?

20      A    Well, I took issue with calling them

21   programs, but I have not been involved in changes

22   that would affect large numbers of deferred action

1   requests.

2       Q    Okay.  So my question is a little

3   broader than that.  Have you been involved in any

4   capacity with the winding down of any program in

5   your federal government career?

6          MR. TYLER:  Objection.  Vague.

7          THE WITNESS:  I have a long career and

8   over the course of that career laws have been

9   enacted that changed things and so I have been

10   involved in those.  I have been involved in the

11   sunset of 245(i), numerous other statutes that

12   have expired or changes that have been made by

13   Congress, policy changes from administrations.

14   BY MR. NEWMAN:

15       Q    And you reference that you had an issue

16   with calling it -- with calling DACA a program?

17       A    Well, not so much whether DACA is a

18   program, but you were asking me whether I had been

19   involved in the wind down of other deferred action

20   programs.  And I wouldn't personally categorize

21   the other context in which we make decision about

22   deferred action as being related to -- as being

1  programmatic.  So in the T, U, and VAWA -- the T,

2  U, and VAWA adjudication, that's a program in my

3  mind.  Deferred action goes along with those

4  programs, but it is not an independent program.

5      Q    So are you aware of any other programs

6  that you just referenced as independent programs?

7      A    Involving deferred action --

8      Q    Involving deferred action?

9      A    -- that SCOPS adjudicates?  No.

10     Q    Does the VAWA program utilize renewal

11  notices for people to renew their status under

12  that program?

13     A    No.

14     Q    Does the U visa program utilize renewal

15  notices to renew status under that program?

16     A    I don't believe so, no.

17     Q    Does the T visa program utilize renewal

18  notices to renew status under that program?

19     A    Not that I'm aware of, no.

20     Q    When you were first assigned the

21  responsibility of overseeing the wind down process

22  within -- by your subordinates of DACA program,

1  did you come up with a plan or some other road map

2  to guide your subordinates in engaging in the wind

3  down?

4      A    It depends on what you mean by plan.  So

5  we need -- we are in the process of figuring out

6  the allocation of resources for the coming year

7  and so as we are working on that larger -- you

8  know, allocation of resources.  The DACA workload

9  is one of them.  And yes, we are aware of the fact

10  that the DACA program is going away so we will

11  consider that in how we allocate resources.  But

12  that's pretty much the extent -- extent of it.

13  From an operational perspective our work just goes

14  away.

15      Q    When you use the word resources do you

16  mean anything other that employees or staff?

17      A    No.  I mean staff.

18      Q    Okay.  Are there any nonemployee costs

19  associated with the wind down of the DACA program?

20      A    Do you mean costs that are incurred

21  because the program is winding down?

22      Q    Yes.

1      A    I'm not aware of any other than whatever

2   costs there are with notices and with the

3   communications strategy, that sort of thing.  I'm

4   sure there is a cost to that.

5      Q    Did you have any contracts in place with

6   contractors to assist with the administration of

7   the DACA program?

8           MR. TYLER:  Objection.  Vague.

9           THE WITNESS:  We have contractors in --

10   that SCOPS utilizes at the service centers in

11   support of all of the benefit requests that we

12   handle there including DACA.  And so frankly,

13   those expenses will be reduced when the DACA

14   workload goes away.

15   BY MR. NEWMAN:

16      Q    So when you say the expenses are being

17   reduced are you terminating contracts?

18      A    No.

19      Q    So are there services for which you have

20   contracted to implement DACA that you are now not

21   going to be utilizing as a result of the

22   non-implementation of DACA?

DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017
205

1      A    We -- SCOPS has one contract that would

2   be impacted at all by DACA, that's the overarching

3   contract that provides basic essentially clerical

4   services at all of the service centers.  And for

5   the most part those services are paid for by the

6   piece.  And so when the work is reduced then we

7   pay them less because they are doing less work.

8   But there is not a contract that is going away

9   because of DACA.

10      Q    Okay.  We spoke a little earlier about

11   the strategic plan that you put in place for the

12   wind down of DACA.  Is that correct?

13      A    You asked me a question.

14      Q    Is there any point at which that

15   strategic plan has been not been fulfilled or

16   there have been any issues with the implementation

17   of that strategic plan?

18          MR. TYLER:  I'll object, compound.  I'll

19   object on grounds, vague.  What you mean by

20   strategic plan.

21          THE WITNESS:  If you could restate the

22   question that would be helpful.

1   BY MR. NEWMAN:

2       Q    Have you had any technical difficulties

3   with the wind down of DACA?

4       A    No.

5       Q    Did you have to engage in any training

6   of the line staff related to the wind down

7   process?

8       A    No.  As I said, the main operational

9   impact here is that the workload is going away, so

10   that the important thing for employees to

11   understand is that it is going away and when its

12   going away.  The actual adjudications aren't

13   changing that I can -- I can't think of anything

14   that's changing specifically with respect to the

15   adjudications.

16          What will be important for them to

17   understand -- because the cases have not been

18   delivered for adjudication yet.  They will need to

19   understand that for example the six cases that are

20   being accepted after the filing deadline, that

21   those are okay to process even though the memo

22   would indicate that they can't be accepted after

1    October 5.

2        Q    Do you have any plans to train them on

3    the processing of additional applications like you

4    just delineated?

5            MR. TYLER:  Objection.  Vague.

6            THE WITNESS:  These are precisely six

7    cases, so it's not going to involve a lot of

8    training.  It would be just conveying to the folks

9    who adjudicate them that they are okay to process.

10   BY MR. NEWMAN:

11       Q    And how do you intend to communicate

12   that?

13       A    I actually haven't thought of that yet.

14       Q    You said you were asked about the costs

15   associated with the wind down of DACA and you

16   replied that there were costs?

17           MR. TYLER:  I'll object to counsel's

18   characterization of the testimony.

19           THE WITNESS:  I don't recall saying

20   that.

21   BY MR. NEWMAN:

22       Q    Okay.  Were you ever asked about costs

1  of winding down DACA?

2     A   No.

3     Q   Do you anticipate that you will have any

4  remaining workload on DACA following the March 5

5  termination date of DACA?

6        MR. TYLER:  Objection.  Speculation.

7        THE WITNESS:  We are projecting that we

8  will still have work remaining to be adjudicated

9  after March 5.

10  BY MR. NEWMAN:

11     Q   What will that work consist of?

12     A   Whatever cases that we have not gotten

13  around to completing.

14        MR. NEWMAN:  Okay.  I have no further

15  questions.

16        MR. TYLER:  Done?

17        MR. NEWMAN:  Do we need to confer before

18  we terminate?

19        MR. TYLER:  Off of the record.

20        THE VIDEOGRAPHER:  We are going off of

21  the record.  The time is 2:38 p.m.

22        (The proceeding recessed from 2:38 p.m.

1    to 2:40 p.m.)

2             THE VIDEOGRAPHER:  We are back on the

3    record.  The time is 2:40 p.m.  We are off of the

4    record at 2:40 p.m.  And this concludes today's

5    testimony given by Donald Neufeld.  Total number

6    of units used is four and will be retained by

7    Veritext Legal Solutions.

8             (Whereupon, at 2:40 p.m., the above

9    proceedings was adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

Case 1:17-cv-05228-NGG-JO Document 97-1 Filed 12/15/17 Page 1603 of 1603 PageID #: 5548
DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017
210

1          REPORTER'S CERTIFICATE

2          I, DONNA M. LEWIS, RPR, Certified

3    Shorthand Reporter, certify;

4          That the foregoing proceedings were

5    taken before me at the time and place therein set

6    forth, at which time the witness, Donald Neufeld,

7    was put under oath by me;

8          That the testimony of the witness, the

9    questions propounded and all objections and

10   statements made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed;

13         I declare that I am not of counsel to

14   any of the parties, nor in any way interested in

15   the outcome of this action.

16         As witness, my hand and notary seal this

17   19th day of October, 2017.

18

19         _____
           Donna M. Lewis, RPR
20         Notary Public

21   My Commission expires:
     March 14, 2018
22