# EXHIBIT 36

The Washington Post

**Health & Science**

# Zinke backs shrinking more national monuments and shifting management of 10

By **Juliet Eilperin**  December 5

Interior Secretary Ryan Zinke on Tuesday called on President Trump to shrink a total of four national monuments and change the way six other land and marine sites are managed, a sweeping overhaul of how protected areas are maintained in the United States.

Zinke's final report comes a day after Trump signed proclamations in Utah that downsized two massive national monuments there — Bears Ears by 85 percent and Grand Staircase-Escalante by nearly 46 percent. The president had directed Zinke in April to review 27 national monuments established since 1996 under the Antiquities Act, which gives the president broad authority to safeguard federal lands and waters under threat.

In addition to the Utah sites, Zinke supports cutting Nevada's Gold Butte and Oregon's Cascade-Siskiyou, though the exact reductions are still being determined. He also would revise the proclamations for those and the others to clarify that certain activities are allowed.

The additional monuments affected include Northeast Canyons and Seamounts in the Atlantic Ocean; both Rose Atoll and the Pacific Remote Islands in the Pacific Ocean; New Mexico's Organ Mountains-Desert Peaks and Rio Grande Del Norte, and Maine's Katahdin Woods and Waters.

"The Antiquities Act over time has done great things for our country, and it has protected some of our greatest treasures," he said in a call with reporters. But its power had been "abused," he said, with monument designations extending far beyond the objects they were designed to protect.

Some of the objects defined in past proclamations, he noted, were too abstract: "Stars, biological diversity, remoteness, emptiness."

Zinke criticized the federal government's past action halting motorized vehicle traffic in Cascade-Siskiyou until a transportation plan could be finalized, saying it interfered with local cross-country ski operators' ability to maintain trails.

For several sites, Zinke recommended amending the monuments' proclamation language to ensure activities such as grazing, hunting and fishing can continue. While these practices often go on even after a presidential designation, Zinke said he wants to make that legality clear because ranchers have felt marginalized and fear they will face future restrictions.

In the case of New Mexico's national monuments, Zinke said, he listened to the state's two Democratic senators and others in deciding not to modify their boundaries. Still, he wanted "to make sure that the proclamation protects the long-standing grazing [in parts] of those monuments" and that management of Organ Mountains-Desert Peaks does not interfere with U.S. Customs and Border Protection operations in the area.

Sen. Martin Heinrich (D-N.M.) wasn't buying the explanation. He blasted Zinke in a statement, saying the "report is based on hearsay and erroneous data", and the secretary and Trump "have turned a deaf ear to the overwhelming consensus to protect New Mexico's conservation legacy."

The administration is already facing multiple lawsuits over the president's decision Monday to scale back both Bears Ears, a sacred tribal site designated last year by former president Barack Obama, and Grand Staircase-Escalante, a reservoir of prehistoric fossils Bill Clinton established in 1996.

More litigation could be coming. Oregon Attorney General Ellen Rosenblum said to Zinke in a letter in July that the state was "ready to take appropriate legal action" if Trump rescinds or reduces the size of Cascade-Siskiyou.

Interior received more than  2.5 million comments on the review, and they "overwhelmingly" said all of the monuments should remain unchanged, Zinke wrote in his report. But he attributed the extreme tilt to "a well-orchestrated national campaign organized by multiple groups."

"I don't yield to public pressure," Zinke said Tuesday. "Sound public policy is not based on threats of lawsuit. It's doing what's right."

The final document is almost identical to the draft Zinke submitted to the White House this summer, and much of the language is vague. For example, it appears to open the door to commercial fishing in three marine monuments where this practice is either being phased out or is already banned. Yet the report calls for amending the sites' proclamations to allow regional councils "to make fishery-management decisions as authorized by the Magnuson-Stevens Fishery Conservation and Management Act."

"That's something that our members have argued for from the beginning," said Bob Vanasse, who serves as executive director for the commercial fishing industry group Saving Seafood. The act, he added, is broadly viewed as "one of the best laws in the world" in terms of sustainability.

But Tom Wathen, a vice president at the Pew Charitable Trusts, which works on environmental and other issues, said in an email that commercial fishing within the marine monuments "would undermine the protection provided for these habitats and for the threatened whales, turtles, fish and seabirds that gather there."

In the report, Zinke also finalized his recommendations to create three new national monuments: at Kentucky's Camp Nelson, a Civil War training site for African American soldiers; at the home of Medgar Evers, a civil rights activist who was assassinated by a white supremacist, in Jackson, Miss., and at the Badger-Two Medicine area in Zinke's home state of Montana.

The secretary said he was "fairly confident" Trump would accept all of his recommendations, and he intends to brief him "multiple times" in coming weeks to get his sign-off. Zinke also rejected the idea that any of these alterations of existing monuments would amount to relinquishing control of federal land, describing such criticism as "nefarious, false and a lie."

House Natural Resources Committee Chairman Rep. Rob Bishop (R-Utah) commended Zinke on Tuesday for "actually listening to the people on the local level" and Trump for showing "some real courage against well-funded litigation machines."

Bishop and members of the Utah congressional delegation have introduced legislation that would create a new national park out of a portion of Grand Staircase-Escalante, to be called Escalante Canyons National Park.

"I know other people say this, but I'm telling you: Dude, there's nothing quite like Utah," said Rep. Chris Stewart (R), the bill's lead sponsor. "Utah is an extraordinary state when it comes to natural beauty. We want to share that with as many people as we can."

Zinke said "Interior would be supportive" of establishing a national park along the lines of Stewart's bill.

Sharon Buccino, who directs the land and wildlife program at the Natural Resources Defense Council, an advocacy group, said in a statement that "Zinke's report, like yesterday's outrageous and illegal actions by his boss, makes it crystal clear: the Trump administration is waging a war on our treasured national monuments — by land, sea and air."

Buccino called Stewart's bill "part and parcel of the same attack."

*Dino Grandoni contributed to this report.*

💬 **421 Comments**

Juliet Eilperin is The Washington Post's senior national affairs correspondent, covering how the new administration is transforming a range of U.S. policies and the federal government itself. She is the author of two books—one on sharks, and another on Congress, not to be confused with each other—and has worked for the Post since 1998.
🐦 Follow @eilperin

# EXHIBIT 37

Case 1:17-cv-05228-NGG-JMS   Document 97-2   Filed 12/15/17   Page 8 of 275 PageID #: 5556





**Donald J. Trump** ✔
@realDonaldTrump

Follow

Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!

5:38 PM - 5 Sep 2017

**24,201** Retweets   **92,819** Likes



💬 40K        �nabla 24K        93K

**DCResisterBee**   @DC_Resister_Bee · Sep 6

Replying to @realDonaldTrump

Trump rescinds #DACA

800,000 young adults + kids at risk of deportation

Can't "revisit" racism



# EXHIBIT 38

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | |
| Plaintiffs, | CIVIL ACTION NO. 17-cv-5228 |
| v. | **DECLARATION OF DR. STEPHEN PITTI** |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

Dr. Stephen J. Pitti, Ph.D., pursuant to 28 U.S.C. § 1746, declares as follows:

## A. INTRODUCTION

1.      I am a tenured full Professor of History and American Studies at Yale University in New Haven, Connecticut. I was appointed Assistant Professor in 1998 and was promoted to Associate Professor in 2003 and full professor in 2005.

2.      I received a B.A. in History, *magna cum laude*, from Yale College in 1991. I received an M.A. in 1994 and a Ph.D. in 1998 in U.S. history from Stanford University. I was a President's Postdoctoral Fellow in the Department of History at U.C. San Diego from 1997-98.

1

3.      My primary field of research and teaching centers on Mexicans and Mexican Americans in the U.S. Southwest.

4.      I teach or have taught the following graduate-level and undergraduate-level courses: Introduction to U.S. Historiography, Latinos in the 20th Century, Race and Civil Rights, Immigration to the United States, History of Latinas/os in the U.S., History of Mexican Americans Since 1848, Chicana/o Cultural History, and Introduction to Ethnicity, Race and Migration.

**B.  QUALIFICATIONS**

5.      I am the inaugural Director of Yale's Center for the Study of Race, Indigeneity, and  Transnational Migration. This academic and research center, which supports research and teaching on race, indigenous studies, and migration, houses Yale's undergraduate Ethnicity, Race, and Migration Program.

6.      I was appointed to a three-year term, 2016-2019, as a Distinguished Lecturer for the Organization of American Historians (OAH). Founded in 1907, OAH is the largest professional society dedicated to the teaching and study of American history.

7.      I serve as a Series Editor for the "Politics and Culture in Modern America" book series for the University of Pennsylvania Press. I also served as an advisor to the Peabody Award-Winning series, "Latino Americans" on PBS and the "Bridging Cultures: Latino Americans Project" for the National Endowment for the Humanities and the American Library Association.

8.      As a member of the National Parks Service (NPS) Advisory Board from 2013 to 2017, I have advised the NPS Director and the Secretary of the Interior; I have chaired the National Historic Landmarks Committee; and I have served as a member of the Latino Scholars Panel for the National Parks Service. In 2007, I provided expert testimony to the United States Congress in 2007 on the history of Mexican immigration to the United States.

9.      I am the author of two major publications that examine the history of Mexicans and Mexican Americans: The Devil in Silicon Valley: Race, Mexican Americans, and Northern California (Princeton University Press, 2003) and American Latinos and the Making of the United States (Eastern National Press, 2012), and numerous articles and book reviews in academic

and popular journals. A more complete listing of my publications and academic papers can be found in my attached curriculum vitae. See Ex. A.

## C.  ASSIGNMENT

10.     I prepared an expert report on December 10, 2017. In my expert report, I conducted a historical analysis of the treatment of Mexican Americans, both antecedent and recent, the use of racial "codewords", and the rhetoric used by President Trump and other Trump officials, which resulted in the September 5, 2017 decision to terminate the Deferred Action for Childhood Arrivals program (DACA). See Ex. B (including all factual sources).

## D.  RESEARCH METHODS

11.     Drawing from my experience as an academically trained professional historian and scholar, I examined both primary and secondary materials that covered immigration, contemporary public policy, as well as a range of other topics about the treatment of Mexicans, Mexican Americans, and Latinos in the United States. I undertook this broader examination because historians have long recognized that, in order to gain a better understanding of a particular event, one must understand the broader historical context within which the event occurred.

12.     With changes in social norms altering the form and expression of racial animus, historians and political scientists have developed an interpretive methodology that draws conclusions about the existence of animus. Conclusions are drawn in part by carefully examining public discourse to understand the use of code words by government officials, politicians, and members of the public. Using this accepted interpretive methodology, I examined primary and secondary sources to ascertain if code words were used to achieve or attempt to achieve political objectives. I paid particular attention to statements made by those identified in public or in depositions as the decision-makers with respect to DACA's termination.

## E.  SUMMARY OF OPINIONS

13.     Animus directed at Latinos has often been driven by electoral politics. In recent years, a concern about the "Mexicanization" of the United States has often framed public policy debates, including debates about youth in immigrant families and about public education. Anti-

immigrant politicians and advocates have expressed considerable opposition to both immigrant children and the U.S.-born children of immigrants. Politicians and activists working on recent political campaigns have encouraged opposition to Mexicans, Mexican Americans, and other Latinos. This animus, now directed at DACA grantees, has developed from historical anti-Latino animus and the history of racial segregation in education. Recipients of DACA and other immigrants have been represented as an obstacle to the well-being of "everyday Americans," to national security, to public health, and to the safety of the American public.

14.     At the same time, racial code words have become ever more important, and they have shaped how politicians send messages to voters and protect themselves from charges of racism. Instead of explicitly stating animus, politicians may refer to immigrants as "illegals," as criminals, security risks, and enemies of the United States. The most powerful and enduring example of racially coded speech intended to remind voters and others of the dangers associated with Latinos in the United States has been "the wall," a phrase intended to remind Americans of many threatening narratives about Latinos.

15.     In the 2016 political campaign, President Trump used racial code words to describe Mexicans as criminals, animals, and threats to white voters. In addition, then-candidate Trump's animus towards Latinos, and towards immigrants, has been characterized by significant exaggeration about the demographic size of the immigrant population and their negative impact on U.S. society; about the number of Latinos arriving each week in the United States; about the lack of border enforcement under the Obama presidency; about the number of convicted criminals in the population of undocumented residents; about candidate Hillary Clinton's stated intentions regarding border enforcement and immigrant access to health care; and more.

16.     Many of the President's appointees and associates involved in the decision to terminate DACA have also shared President Trump's open animus against ethnic Mexicans, Mexican immigrants, and Latinos. They include: Attorney General Jeff Sessions; a member of Trump's transition team, Kansas Secretary of State Kris Kobach; a White House senior policy adviser, Stephen Miller; and several representatives from anti-immigrant organizations such as the

Center for Immigration Studies (CIS) and the Federation for American Immigration Reform (FAIR), and Numbers USA. Many other leaders prominent in the Trump Administration were involved in anti-immigrant politics in Arizona, which provided a testing ground and model for national Republican Party responses to the "Latino Threat."

17.     When properly understood within the context of the history and contemporary discrimination directed against Mexicans, Mexican Americans, and Latinos, it is my expert opinion that President Trump and others who worked for his campaign and in his Administration have long expressed animus towards ethnic Mexicans and other Latinos. President Trump and others associated with his presidential campaign and Administration have drawn upon and used racial code words, and have benefitted from racism against Latinos. Racial animus against ethnic Mexicans shaped their decision to terminate DACA.

## F.  FINDINGS

18.     Throughout the course of United States history, racism has sometimes been expressed as  an explicit ideology in which groups were clearly defined along racial lines, and in which they  were marked as superior or inferior in racial terms. This explicit ideology developed alongside and justified the development of racialized slavery and the quotas used to preserve the racial status quo in the early to mid-twentieth century.

19.     Because of changing social norms, explicit calls to racial superiority or inferiority or explicit calls for racial discrimination are less frequently found in public discourse by government officials, politicians, and members of the public. Instead, government officials, politicians, and members of the public often resort to racially coded speech that stands in for racial and racist ideology that was previously stated explicitly. For more than fifty years, coded speech has been, above all, a political tool. One of the most explicit acknowledgements about racially coded speech and its political efficacy was made by Republican political strategist Lee Atwater:

> You start out in 1954 by  saying, "Nigger, nigger, nigger." By  1968 you can't say  "nigger" — that hurts you. Backfires. So you say stuff like forced busing, states' rights  and all that stuff. You're getting so abstract now, you're talking about cutting taxes, and  all these things you're talking about are totally

economic things and a byproduct of them  is, blacks get hurt worse than whites. . . . So anyway you look at it, race is coming on the back burner."

20.     Examining public discourse for code words is a widely accepted interpretive methodology to surmise whether or not animus affects or helps to determine political outcomes. Historians and other academic experts recognize that animus does not require explicit, public declarations of racial ideology that racism has persisted across the centuries. An attention to history and careful analysis of the use of coded racial appeals in contemporary political discourse provide the keys to understanding the links between racial animus and politics in the twenty-first century.

21.     Today, politicians often speak in "code" about the dangers posed by immigrants and non-whites, about their radicalism or promiscuity or hygiene, to stimulate strong reactions in their constituents much like a "dog whistle" prompts a response in a canine. It allows politicians to insist on their own opposition to institutional racism and their sensitivity to a diverse set of constituents. Statements of general support from anti-immigrant activists have often been interspersed in recent years with far harsher statements about Latinos. By 2016, then-candidate Trump and members of his campaign could scoff at any suggestion that they harbored racial animus, countering with charges that liberals who mention race as a social problem are themselves the real racists. But there can be little doubt that political speech about DACA grantees and other immigrants has been meant to send a message, to elicit racial loyalty and to stimulate strong reactions in white voters.

### History of Anti-Latino Animus

22.     To understand why Attorney General Jeff Sessions used a word such as "filth" to characterize Mexican immigrants in April 2017, or to understand why Kansas Secretary of State Kris Kobach – who, according to depositions, was in close touch with Gene Hamilton from "day one" of the Trump Administration – argued that DACA grantees "represent a cross section of the illegal alien population" which includes "criminals," it is critical to recognize the importance of racial animus."

23.     "Racial scripts" about different societal groups, though discredited, often continue

to shape contemporary racial animus. Racial scripts, as one historian notes, "show how power is always at stake in racial categorization and how, once formed, those racial categories can easily be transferred to new groups." For example, racial scripts explain why Mexican Americans are still not deemed fully American and are largely equated with illegality. The "racial script" about Latinos is based in a long history of anti-Latino animus.

24. U.S. westward expansion during the mid-nineteenth century and concerns during and after the war between the United States and Mexico about the future incorporation of ethnic Mexicans into the national community shaped this country's racial animus. Many scholars recognize that early twentieth century Mexican immigration prompted fears in the United States about the "brown tide" that seemed to be "flooding" across the Southwestern border. Fear of the "Mexicanization" of the United States led to racial violence; to mass deportation; and to discrimination in housing, jury selection, public education and voting rights.

25. Stereotypes about Mexicans as criminals and a threat to public safety developed in the early- and mid-twentieth century. During the Great Depression of the 1930s, politicians and other white Americans pointed to Mexican immigrants and their U.S.-born children as causes of the nation's economic trouble, high unemployment among U.S. citizens, worrisome crime in major cities, and the spike in political radicalism. Several authors popularized images of Mexican Americans as indolent, unproductive, un-American, and often drunk, including John Steinbeck, Ernest Hemingway and Jack Kerouac.

26. As a result, the "racial script" about Latinos has led to the persistence of negative ideas associated with Latinos – their perceived links to criminality, disease, political radicalism, and so forth. When explicit talk of racial inferiority came to seem less appropriate in literary, media, and government circles by the 1940s and 1950s, new code words were introduced to represent Latinos that gestured back to the long history of racial animus in the United States.

27. Racial animus took on new forms during the 1970s and 1980s. As the United States worried about new immigration and stiff economic competition abroad, stereotypical portraits of Latinos continued to emphasize their dangerous, criminal and unproductive qualities, their status

as temporary laborers but not permanent residents, and often their weak intellects and fitness for only manual labor.

28.     Immigrants are a more acceptable target than U.S. citizens for articulations of racial animus. The ongoing use of the term "illegal" to refer to ethnic Mexicans, both documented and undocumented residents, and the strong association between Mexicanness and criminality in public discourse and political discussions, has kept alive older concerns about Latinos as suspected criminals, as non-citizens, and as marginal to the national community.

29.     As such, among politicians and in polite company, recent racial animus has often centered on recently-arrived immigrants, especially foreign minorities who can be characterized through established racial scripts. As sociologists recognized, after surveying the *New York Times, Washington Post, Wall Street Journal*, and *Los Angeles Times* from 1965-1995, political candidates discovered the political advantages to be gained in demonizing Latino immigrants.

30.     References to dangerous "illegals," hordes of newcomers and drug runners, problems presented by immigrants with low standards of living, the arrogance of radicals who disregard American individualism, the ubiquity of law breakers and welfare cheats — these contemporary representations of Latinos suggest but do not require explicit declarations of group inferiority. At times they imply that Latinos share undesirable traits with other racialized groups in the United States. And they provide a political shorthand that allows Americans "to construct Mexicans as inferior" or dangerous without needing to reference biological, scientific discourses of racial superiority and inferiority.

31.     Since the 1960s, politicians who claim to be antiracist have increasingly relied on racial codewords as a key feature of their political discourse. Elected officials and political candidates have used coded speech to mobilize segments of the voting population, and fellow activists and party members, and politicians have galvanized white voters through veiled references to the threats posed by African Americans or non-white immigrants.

32.     Many political candidates participated in "dog whistle politics" even if they were not avowed racists, and recent racial politics have been strategic more often than they have been

deeply felt. Many candidates and government officials have reputations as "racial moderates," but opt to harness racial divisions to their agenda of getting elected. In other words, it was not about racism; instead, it was about winning.

33.     The same is likely true of at least some prominent politicians and policymakers who have articulated anti-Latino animus in recent years. Racial animus towards Latinos has often emphasized that Latin Americans are in effect attempting to "reconquer" the United States through migration. The "Latino Threat Narrative" posits that Latinos are unwilling or incapable of integrating, of becoming part of the national community. Rather, they are part of an invading force from south of the border that is bent on reconquering land that was formerly theirs (the U.S. Southwest) and destroying the American way of life.

34.     Since the 1970s, pundits and politicians have stoked that fear by suggesting that Mexicans would achieve their "reconquista" if new arrivals continued to settle and if the children of immigrants continued to establish themselves as permanent residents of the United States. In 1974, for example, the cover of *American Legion* magazine depicted "illegal aliens" storming across the U.S.-Mexico border, arriving to the East Coast by ship, and swimming to Florida from the Caribbean. By the early-1980s, journalists for *U.S. News and World Report, Time Magazine*, and other national publications warned that "Los Angeles is being invaded" and that new migrants saw themselves as "not an illegal alien but a reconquistador." In 1994, California Governor Pete Wilson lamented in response to a federal judge striking down California's Proposition 187, a ballot measure that barred undocumented residents from accessing social services, that "the massive and unlawful migration of foreign nationals…constitutes an invasion of the state of California against which the United States is obligated to protect California."

35.     Over the last twenty-five years, this narrative has continued to circulate and shape discussions of Mexican immigration. CIS, FAIR and Numbers USA successfully mobilized journalists, politicians and the public to block both President Bush's 2007 proposal creating a pathway to citizenship for undocumented immigrants and President Obama's attempts at immigration reform. The creation of the Department of Homeland Security following the attacks

of September 11, 2001 solidified connections between immigration concerns and discourse about national security. In this context, questions were raised not only about immigrants as security risks, but also about the loyalty of U.S.-born Latinos.

### Arizona as Political Laboratory

36.     Drawing from *reconquista* rhetoric, many words and phrases used in political speech today conjure up the "Latino Threat Narrative." Talk of building a wall on the U.S.-Mexico border, and of stopping the Latino "invasion" are prominent examples.

37.     In the early-twenty first century, the state of Arizona became the national center of anti-immigrant, and anti-Latino, political mobilization. Anti-immigrant activists in Arizona focused on two major efforts. First, they worked to draw sharp rhetorical lines – between white citizens and radical Latinos, between "us" and "them," and between citizens and non-citizens. Second, they worked to develop legislative proposals and ballot propositions that would so diminish the rights of immigrants, of members of mixed-status families, and of others who felt their effects (including U.S. Latino citizens) that unwanted Arizonans would leave the state. As a presidential candidate in 2012, Mitt Romney later announced his own support for similarly harsh policies that would lead to "self-deportation."

38.     From around 2000 to 2014, the region was center-stage in dramatic confrontations about the Latino Threat Narrative. Suggesting that the Latino community was the source of problems with Arizona's schools and crime rates, Arizona developed new, punitive laws, and law enforcement officers increased immigrant raids of Latino communities. Arizona lawmakers denied bail to immigrants charged with felonies and denied undocumented immigrants access to welfare services. Arizona legislators cracked down on day laborers and required the use of E-Verify. They passed laws targeting immigrant access to public schools, English-language education, and adult education. And they proposed bills that attempted to limit the rights of U.S. citizen children born to undocumented parents.

39.     The region provided Republicans a laboratory for developing anti-immigrant rhetoric, and dog whistle politics, to win over white voters in advance of the 2016 election.

Between 2001 and 2010, Arizona saw an intense escalation of racialized rhetoric and the popularization of the Latino Threat Narrative. In highlighting the dangers of Latino criminals, welfare cheats, "anchor babies," public school kids, and others, Arizona lawmakers focused special attention on Latino youth in their demonization of immigrants. Leaders such as Sheriff Joe Arpaio at times eliminated any distinction between "illegals" and Hispanics/Latinos who were U.S. citizens in discussing their efforts. "They hate me, the Hispanic community," Arpaio noted, "because they're afraid they're going to be arrested. And they're all leaving town, so I think we're doing something good, if they're leaving."

40.     National organizations and leaders later involved in the Trump campaign and Administration – including Kris Kobach and FAIR – played critical roles in developing these Arizona strategies, exporting them to other states, and then assuring that they would define Republican national politics. FAIR and some members of the Republican party understood Arizona's strident anti-immigrant model as expedient and beneficial for the national GOP. Republicans had known for decades that they had little to gain by increasing the number of potential Latino voters – most of whom voted in the late-twentieth and early-twenty first centuries for Democratic candidates. FAIR was transparent about its own intentions to limit Latino political power through immigration reform in 2013, writing that "as long as our nation's immigration policies continue to bring millions of poorly educated and poorly skilled immigrants to the United States, Republicans will have little chance to attract new voters."

41.     Referencing DACA and other calls to provide "amnesty" to undocumented immigrants, FAIR President Dan Stein argued that "Republicans in the House have a unique opportunity to do what is … best for their own political interests by refusing to accede to special interest demands for amnesty and massive increases in immigration." FAIR concluded that Latino immigration and increased voting would only "increas[e] the gap for Republican candidates" in the future.

42.     Republicans followed the Arizona model as what was "best for their own political interests," determining that a strong GOP fight against undocumented immigrants, and against

11

DACA, provided a viable option also for galvanizing white voters. Prominent figures such as Kobach who have been key to the national anti-immigrant movement, and to the rescinding of DACA, were involved in these discussions in Arizona and elsewhere. Kobach authored several articles analyzing how states might intervene on immigration issues that had traditionally been controlled by the federal government. Kobach advised Sheriff Joe Arpaio in developing the Maricopa County Sheriff Department's harsh policies towards undocumented immigrants, and Kobach also advised State Senator Russell Pearce on the development of Senate Bill 1070, the far-reaching "Show Me Your Papers" legislation in 2010 that required Arizona police to ask anyone under "reasonable suspicion" for their citizenship papers.

43.     President Trump's campaign and Administration adopted and elaborated on the Arizona strategy of demonizing undocumented immigrants. Then-candidate Trump expressed admiration for Arizona's anti-immigrant movement, and in July 2015 he tweeted to Governor Jan Brewer encouraging her to "Keep throwing those giant hand grenades into the amnesty debate. You're pissing off all the right people in the GOP." Then-candidate Trump later expressed more admiration for Arizona's Jan Brewer, naming her a potential Vice Presidential running mate, and he drew attention to his friendship and alliance with Arizona Sheriff Joe Arpaio, who had endorsed then-candidate Trump for President in January 2016.

44.     Then-candidate Trump chose Arizona as the site of his major campaign address on immigration on August 31, 2016, and again chose Arizona a year later to give a major address on immigration in August 2017. During the August 31, 2016 speech, the candidate stated that "Together we can save American lives, American jobs, and American futures. Together we can save America itself." He continued:

> This election, and I believe this, is our last chance to secure the border, stop illegal immigration and reform our laws to make your life better. I really believe this is it. This is our last time. November 8. November 8. You got to get out and vote on November 8.

45.     Officials in President Trump's campaign and Administration rearticulated the Latino Threat Narrative and called upon anti-immigrant activists nationwide to look to Arizona as

a political beacon. In noting the importance of building a wall on the U.S.-Mexico border, President Trump stated: "Arizona knows better than most exactly what I'm talking about." President Trump followed Sheriff Joe Arpaio who had stated that "A growing movement among not only Mexican nationals but also some Mexican-Americans contends that the United States stole the territory that is now California, Arizona, and Texas, for a start, and that massive immigration over the border will speed and guarantee the reconquista of these lands, returning them to Mexico." Sheriff Arpaio had further highlighted his disgust with the uncleanliness of Latin Americans in 2009:

> All these people that come over, they could come with disease. There's no control, no health checks or anything. They check fruits and vegetables, how come they don't check people? No one talks about that! They're all dirty.

46.     Likewise, Jeff Sessions chose to deliver major addresses about immigration in Arizona, as in April 2017, when Sessions announced in Nogales, Arizona: "the Department of Justice's Renewed Commitment to Criminal Immigration Enforcement." President Trump pushed the GOP to adopt a version of hard-line, anti-immigrant politics common in Arizona, to marginalize members of the GOP who took a more moderate stance, to encourage the self-deportation of immigrant families, and to win the White House by mobilizing racial animus in white voters.

47.     Especially after the passage of SB 1070 in 2010, Republicans such as then-candidate Trump, Sessions, and Kobach invested heavily in advancing Arizona's political model of promoting anti-Latino animus. As President, Trump would call Sheriff Arpaio an "American patriot" and praised him for having "kept Arizona safe!" While a federal judge found Arpaio guilty of racially profiling Latinos, President Trump insisted in August 2017 – just days before his Administration rescinded DACA – that Arpaio had in fact "done a great job for the people of Arizona, he's very strong on borders, very strong on illegal immigration, he is loved in Arizona." President Trump told a Phoenix audience that:

13

The most sacred duty of government is to protect the lives of its citizens, and that includes securing our borders, and enforcing our immigration laws. (APPLAUSE)

By the way, I'm just curious. Do the people in this room like Sheriff Joe? (APPLAUSE)

So, was Sheriff Joe convicted for doing his job? That's why... (APPLAUSE)

He should have had a jury, but you know what? I'll make a prediction. I think he's going to be just fine, OK?

48.     A few weeks later, President Trump pardoned Arpaio of federal charges of criminal contempt.

49.     Arizona's political model was an enormously attractive successor to the GOP's powerful "Southern Strategy" of earlier decades. Anti-immigration hyperbole motivated voters and, after SB 1070 passed, the state's climate of exaggeration, deception and racial stereotyping continued. Arizona Republicans established an approach to demonizing Latino immigrants, and mobilizing white voters, through racial code words. After 2010, anti-immigrant activists raised "haunting" questions about immigrant and U.S.-born Latinos in states such as Alabama, South Carolina, Georgia, Indiana, and Utah, which led to proposed bills in those states modeled on Arizona SB 1070.  Kobach took what he learned in Arizona to those regions in advance of the 2016 election.

### The Role of John Tanton's Organizations: CIS, FAIR and Numbers USA

50.     Important aspects of the current anti-immigrant movement in the United States were shaped by individuals who expressed explicit fears about the "Mexicanization" of the United States in the 1970s and 1980s. Chief among them was John Tanton, founder of the three most prominent anti-immigrant groups, *I.E.*, CIS, FAIR and Numbers USA, all of which have played key roles in the development of President Trump's immigration policies. Active since the late-1970s, Tanton has been linked to white supremacist movements and once commented that: "I've come to the point of view that for European-American society and culture to persist requires a European-American majority, and a clear one at that."

51.     Tanton's ideologies were further expressed in a 1986 memo, where he defined

Latinos as a clear threat to the future of the nation, worried that "illegal aliens" would be given "political power," observed that Latinos were "simply more fertile" than white Americans, and urged activists to focus on "drugs and the border." Later, Tanton's book *The Immigration Invasion* crystalized and further popularized the idea of a Latino threat.

52.     From the beginning of his presidential run, President Trump and others in his campaign have supported the animus against Latinos promoted by organizations such as FAIR, CIS, and Numbers USA. President Trump has elevated members of Tanton's organizations and their followers to positions of political leadership, including:

53.     ***Jeff Sessions*** (Alabama Senator, Attorney General): As Senator, Jeff Sessions provided a keynote at FAIR's national advisory board meeting in 2007, where he was given the "Franklin Society Award" bestowed upon "rare individuals who have made a real difference." When Sessions became Ranking Member of the Senate Judiciary Committee in 2009, the executive director of Numbers USA announced that the organization considered Sessions "the No. 1 champion for the American workers on immigration issues." Senator Jeff Sessions read a tribute to Numbers USA into the Congressional Record in May 2012 "to recognize the 15th anniversary of Numbers USA, a national grassroots organization that advocates for immigration policies that seek to serve the national interest." FAIR called him a "true immigration reformer" in October 2016. FAIR President Dan Stein announced his organization's support of the Attorney General nominee immediately after the November election: "It's hard to imagine a better pick for the Attorney General position than Senator Jeff Sessions."

54.     ***Kellyane Conway*** (Campaign Manager and Counselor to the President): Conway's polling firm worked closely with FAIR in advance of the 2016 election cycle. According to FAIR President Dan Stein, "FAIR began working with Kellyanne Conway as far back as 1996, and we have used her for polling virtually every year since then. We take it as a certain amount of personal pride, is that when she became the campaign manager for Donald Trump—first successful woman to lead, you know, a successful presidential campaign—she was possessed of intimate professional knowledge of the immigration issue as it related to the voter concerns. And we saw that influence

helping to shape Donald Trump's positions and statements once she came on board."

55.    *John Feere* (adviser to Thomas D. Homan, the acting director of Immigration and Customs Enforcement): While at CIS as a legal policy analyst, Feere promoted legislation to end automatic citizenship for US-born children of undocumented immigrants. He argued that bearing a child on US soil provides an immigrant access to welfare and other social benefits, which has spurred a rise in what he calls "birth tourism," the practice of foreigners traveling to the United States to give birth to add a US citizen to the family. In one CIS article, Feere questioned whether children brought to the United States at an early age were sufficiently assimilated or loyal to this nation to be granted any type of legal status.

56.    *Lou Barletta* (Pennsylvania Congressman, and member of President Trump's transition team): A member of FAIR's national board of advisers, Barletta made national news in developing anti-immigrant measures as mayor of Hazleton, Pennsylvania.

57.    *Kris Kobach* (Kansas Secretary of State, advisor of President Trump's transition team): Counsel for FAIR's legal affiliate, the Immigration Reform Law Institute, and legal counsel for anti-immigrant efforts in Arizona, Alabama, Pennsylvania, Missouri, and elsewhere, Kobach has claimed primary credit for developing Trump's immigration policies, as well as the current approach to immigration adopted by the GOP.

58.    *Stephen Miller* (Communications Director for Senator Sessions, Senior Policy Advisor for President Trump): As a member of Jeff Sessions' staff since 2009, Miller worked closely with FAIR. Robert Law, the organization's director of government relations, predicted that "I would not be surprised if Stephen [Miller] played a large role in crafting Trump's platform. Every single component of it is basically what we have fought for, for a very long time."

59.    *Julie Kirchner* (Policy Advisor for "Trump for President" campaign, and Ombudsman of the U.S. Citizenship and Immigration Services): Kirchner served as FAIR's Executive Director for ten years, and she has frequently provided Congressional testimony on immigration issues.

60.    These individuals, and others who have worked closely with Attorney General

Sessions and with FAIR, CIS, and Numbers USA, have taken the lead in reshaping immigration policy under President Trump. And, several were also closely involved in the rescinding of DACA.

### The Trump Campaign and Administration, and Racial Animus

61.   Anti-immigrant politics in Arizona and other states had made clear the electoral value of "dog whistling" about the Latino Threat in advance of the 2016 elections. Members of the Trump campaign and Administration have been very attentive to political language, and to communicating messages to voters about immigration. Senior policy advisor Stephen Miller has acknowledged "how important words are in the immigration debate." In fact, much of the debate about DACA grantees, and about other immigrants, has been a contest over language, with President Trump and Sessions and others seeking to advance particular understandings of the Latino Threat, of illegality, and more.

62.   In advance of then-candidate Trump's 2015 announcement of his candidacy for president, Miller delivered a major address at CIS regarding the need to recapture terms such as "immigration reform" that had been defined, in his view, by business interests and spokespersons who favor undocumented immigrants. He advocated, as well, for broad public and political use of the term "illegal alien" which had, he suggested, been replaced with inaccurate and distorting terminology: "'illegal alien' … became 'illegal immigrant' became 'undocumented immigrant' became 'immigrant without papers' became 'new American,' which is what it is now."

63.   The repeated use by President Trump and others of the word "illegal" to refer to undocumented immigrants has been no accident. Terms such as "illegal alien," "criminal alien," "alien criminal," "criminal," "drug dealer," "gang member," and "cartel," among others, have been used by the Trump campaign and Administration, and by other politicians, to urge voters – often referred to in contrasting terms as "good Americans," "tax payers," "hard-working citizens," "members of our communities," and the like – of the importance of building a "wall" to protect us from them, and of the central "threat" that many Latinos pose to the United States.

64.   Social media is one tool used by many politicians today, including President Trump, where terms like these can be reiterated and social categories can be defined. Addressing an Arizona

audience in August 2017, President Trump noted that "the advantage I have is that we do have a big voice. And you know, they're always saying, like Twitter or social media – if I didn't have social media, I wouldn't be able to get the word out. I probably wouldn't be standing here, right? I probably wouldn't be standing here right now."

65.     In representing immigrants as a danger to society, and in attempting to draw white voters together to face Mexicans as "external" enemies, President Trump and members of his campaign and Administration have repeatedly denied being racists or bigots, even as they have welcomed support from white supremacists and hate groups. CIS, for example, advertises itself as "pro-immigrant." In speeches delivered in September 2016 in Maryland and Florida, then-candidate Trump assured voters that "People who want their immigration laws enforced, and their borders secured, are not racists. They are patriotic Americans of all backgrounds who want their jobs and families protected."

66.     The United States has seen a recent rise in reported acts of racially-motivated violence against Latinos. Some pundits and politicians seemed to endorse this sort of animus and violence. In March 2006, "well-known white nationalist radio host and blogger Hal Turner proclaimed, 'All of you who think there's a peaceful solution to these invaders [immigrants] are wrong. We're going to have to start killing these people.'" Similarly, then-candidate Trump did not consistently distance himself from talk of violence on the campaign trail. When two brothers in Boston beat a homeless Latino man in August 2015, declaring that "Donald Trump was right, all these illegals need to be deported," then-candidate Trump again concluded simply that "They love this country and they want this country to be great again. They are passionate."

67.     However, this denial of racial animus is consistent with dog whistle politics. President Trump has characteristically charged his accusers with being the real racists: "Hillary Clinton is a bigot who sees people of color [applause] only as votes, not as human beings worthy of a better future," he announced in Mississippi. Like Arizona restrictionists who denied any anti-Latino animus, then-candidate Trump has even proclaimed his "love" for Mexicans, or that there are "great people" in Mexico, and in May 2016 he tweeted a photo of himself eating a taco bowl in

18

Trump Tower with the message "I love Hispanics!" Campaign spokesperson Katrina Pierson acknowledged on CNN in August 2016 that when President Trump seemed for a brief period during the campaign to embrace a less dogmatic approach to border militarization and immigration enforcement, the candidate's "change in words" did not mean he had actually "changed his position on immigration," only that he was looking for more palatable ways to express the same message.

68.     **The Trump Administration's Animus: "Us" vs. "Them"**In recent years, racial codewords have drawn upon distinctions of citizenship to heighten political concerns about ethnic Mexicans and to mobilize white voters. These distinctions have referenced racial stereotypes, and they have often been rooted in animus. Despite the fact that many immigrants live in mixed-status families, sharp contrasts have been drawn between "real Americans" and "immigrants" by members of the Trump campaign and Administration. Then-candidate Trump articulated such contrasts when he announced his candidacy for president in June 2015:

> When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people.

The dichotomies in candidate Trump's announcement were strong, clear, and rooted in racial thinking. People of Mexican descent are distinct. "They" are problems, "they" are drug dealers, "they" are criminals, and "they" are rapists. Even the "good people" among them are fundamentally different than "us."

69.     These types of distinctions have been continually reiterated and affirmed by members of the campaign and the Administration. John Kelly, for example, tweeted on July 28, 2016 that with the election of President Trump, "Real Americans will finally have someone who speaks for them - and not immigrants - working in the White House. #tcot #MAGA."

70.     President Trump and others associated with his campaign and Administration drew upon past experiences in Arizona and elsewhere to highlight distinctions between Americans, or those they consider their political base, and Latinos. Corruption, criminality, dishonesty,

irresponsible financial management, and an incapacity to self-govern have been prominent in these stereotypes about Latinos. In July 2014, for example, President Trump tweeted to ask "When will the U.S. stop sending $'s to our enemies, i.e. Mexico and others." In February 2015 he tweeted "The Mexican legal system is corrupt, as is much of Mexico. Pay me the money that is owed me now - and stop sending criminals over our border." The following month he tweeted "Mexico's court system corrupt. I want nothing to do with Mexico other than to build an impenetrable WALL and stop them from ripping off U.S." A few weeks later he tweeted "The border is wide open for cartels & terrorists. Secure our border now. Build a massive wall & deduct the costs from Mexican foreign aid!" In April 2015, he told an audience that "we need leadership. We can't allow … Mexico to rip us off."

71.     Then-candidate Trump continued to refer to Mexicans as an "enemy" of the United States, and in particular to white working class voters, in various ways over the following three years. Following others who had long questioned the loyalty of Mexican Americans to the United States, in May 2016 the candidate tweeted about unnamed protesters seen "proudly waving Mexican flags" who apparently burnt U.S. flags at a political protest in California. In August 2017, President Trump's speech about immigration in Phoenix provided a good example of the President's effort to create a racialized sense of national unity – described here as being on the same American "team" – by referencing the need to fight enemies at home and abroad.

72.     President Trump and others frequently galvanized voters sympathetic to the white working class by making Latino immigrants, and any political groups that supported DACA or a path to citizenship for undocumented residents, seem like the puppets of heartless corporations and corrupt, faraway political elites. He linked the threat of NAFTA – Mexico taking jobs away from white workers in the Midwest and South – to the threat posed by Latinos – undocumented immigrants who drove down local wages and thereby threatened the few opportunities that remained for longtime residents. This political rhetoric turned a rhetoric of class conflict in the U.S. into racial animus against Mexicans and other Latinos.

73.     President Trump told a Phoenix audience that "The fundamental problem with the

20

immigration system in our country is that it serves the needs of wealthy donors, political activists and powerful, powerful politicians." Trump told a Mississippi audience that Hillary Clinton "wants a country without borders. She wants trade deals written for the benefit of foreign corporations. She wants a government that ignores the will of the people. [*booing*]"

74.     In emphasizing the threat of immigrants, then-candidate Trump has suggested a close political alliance between Mexican Americans and "Mexican illegals," arguing that "they" (Latinos) share a common agenda regardless of citizenship. In July 2015, for example, he tweeted that "#JebBush has to like the Mexican illegals because of his wife," suggesting that his opponent's Mexican American spouse would make Bush overly sympathetic to undocumented immigrants.

75.     In June 2016, then-candidate Trump then stated that U.S. District Court Judge Gonzalo Curiel, who had been born in Indiana, ruled against him in a court case because "He's a Mexican." CNN Host Jake Tapper countered that "he's a legal citizen," a Mexican American, but Trump insisted that the judge's "very unfair rulings" were an irrational response to the fact that "I'm building a wall," and that "it's a wall between Mexico [and the United States], not another country." According to Trump, Curiel's Mexican American heritage meant that he could not rule impartially, and that he had an "inherent conflict of interest" because of the candidate's announced policies related to immigration. House Speaker Paul Ryan labeled Trump's allegation "the textbook definition of a racist comment."

76.     Other Trump associates and allies have also suggested that Mexican Americans and other Hispanics who opposed the candidate or the president are more loyal to Mexico than to the United States. Adviser Stephen Miller, for example, explained that the Latinos who stepped down from the National Hispanic Advisory Council for Trump in protest of an incendiary speech given in Arizona in September 2016 were simply "professional amnesty lobbyists."

77.     The "us vs. them" rhetoric dovetails with states' rights rhetoric, and with arguments that the states need to protect their citizens in the face of foreign influences, a political language long associated with the racial politics of the GOP. Rhetoric about the Mexicanization of Arizona, and arguments about the need for more punitive national and local approaches to immigration

enforcement, are bound up with critiques of the Obama Administration's apparent unwillingness to stop undocumented migration.

78.     The sharp distinctions that President Trump and others emphasize between Americans and Mexicans, federal corruption and the will of the people, rational citizenship and ethnic loyalty, and our interests and theirs, suggest that managing immigrants and their children will define the future of the United States. These misrepresentations of immigrants and their family members proved critical in the representation of DACA grantees by members of the Trump Administration.

### The Trump Administration's Animus: Latinos as Security Risks

79.     As articulated by President Trump and his advisers, anti-Latino racial animus has drawn upon old fears of Latin American political radicalism to portray immigrants and the U.S.-born as threats to democracy. Candidate and President Trump, and members of his campaign and Administration, have used discredited statistics to support their arguments for curtailing immigration and building a wall on the U.S.-Mexico border, and for emphasizing that just a few terrorists crossing with "them" might destroy "us." In the twenty-first century, opposition to Muslims in the United States, and fears that terrorists would enter the country through Mexico, have led to common associations in political campaigns between ethnic Mexicans and Middle Eastern terrorists. President Trump and others have therefore connected the Latino Threat to the threat of global terrorism.

80.     After 9/11, the U.S. Congress passed legislation that harnessed immigration regulation to national security issues, including the USA Patriot Act of 2001, the Homeland Security Act of 2002, the Enhanced Border Security and Visa Entry Reform Act of 2002, the Intelligence Reform and Terrorism Prevention Act of 2004, the REAL ID Act of 2005, and the Secure Fence Act of 2006. Politicians in border states played on new fears of "outsiders," and anxieties about "Mexicanization" dominated political discussions over the following decade. Websites, internet blogs, and social media have propelled nativist fears and driven fears of the

*reconquista* around the country.

81.     When he announced his campaign for president in June 2015, then-candidate Trump spoke about Mexican immigrants immediately prior to addressing contemporary "Islamic terrorism" and Middle Eastern politics. On the campaign trail, Trump linked immigrant youth directly to terrorism, and he suggested a strong link between Latinos and Middle Eastern refugees. "Since 9/11," he told an audience in North Carolina, "hundreds of immigrants and their children have been implicated in terrorism and terrorist-related activity in the United States." The political use of racial codewords that raise concerns about radicalism – including words such as "Raza" and "Aztlán" – has allowed politicians to represent ethnic Mexicans as a threatening and cohesive   group. President Trump and others have argued for "extreme vetting" both of Middle Eastern refugees – as potential terrorists – and of Latin American immigrants – as equally important threats to the nation. "In the Cold War," President Trump told an Ohio audience, "we had an ideological screening test. The time is overdue to develop a new screening test for the threats we face today."

82.     President Trump has often pivoted between discussions of Middle Eastern terrorists and Latino immigrants in order to connect these two threats. Following an attack on U.S. forces in Kabul, Afghanistan, President Trump redefined "security" for a Mississippi audience to remind them of the dangers posed by Mexico and Latin American immigrants: "Our jobs have moved to other countries. Islamic terrorism has spread within our shores. And an open border has crushed low-income workers and threatened, and I mean totally threatened, our security." He promised a Phoenix audience in August 2017 that "believe me, one way or the other, we're going to get that wall. Immigration security is also a matter, remember this, of national security. That's why we're implementing tough new vetting and screening protocols to keep radical Islamic terrorists out of our country."

**The Trump Administration's Animus: Fears of "Reconquest"**

83.     President Trump promoted fears of Mexico's "reconquest" of the United States

during his presidential campaign, and the campaign slogan "America First" was in part an affirmation that his Administration would stop that process. As Senator, Jeff Sessions had expressed his desire to allow the arrival of immigrants "who really desire to be an American and who want to be a part of our society and deeply desire to make a permanent move, and who want to create a new allegiance from their prior country to their new home in the United States," a clear critique of Latino immigrants whom Sessions believed were not in fact loyal to the United States.

84.      Stephen Miller, President Trump, and others in the current Administration have focused attention on the dangers of "chain migration" as a reference to the dangers of slow demographic takeover by Latin Americans. As Miller has stated, "chain migration" occurs when undocumented residents arrive to the United States, receive visas, go on welfare, attend schools, "and then that person can bring in a relative who can bring in a relative who can bring in a relative." DACA grantees are represented as threats to the United States important to this chain migration. The backlash against perceived "Mexicanization" through "chain migration" has surged over the last ten years.

85.      Under this view, DACA grantees can be understood as dangerous "fifth columnists." President Trump and other members of his campaign and Administration have repeatedly asserted that illegal immigrants and their families threaten the very existence of the United States. This is political language intended to resonate with audiences who have long been worried about a *reconquista*. "We better get smart. We better get tough," then-candidate Trump urged voters in Erie, Pennsylvania. "And if we're not smart and we're not tough, we're not going to have a country left. And one of the things I have to talk to you about before I leave is our borders. Illegal immigrants are pouring into our country." In Arizona, then-candidate Trump told a crowd that Hillary Clinton "doesn't know what she's doing except open borders and let everybody come in and destroy our country by the way."

86.      John Kelly similarly told a Senate Armed Services Committee meeting in 2015 that ISIS had been encouraging terrorists to "infiltrate the southern border" of the United States, and that

> In addition to thousands of Central Americans fleeing poverty and violence, foreign nationals from countries like Somalia, Bangladesh, Lebanon, and Pakistan are using the region's human smuggling networks to enter the United States. While many are merely seeking economic opportunity or fleeing war, a small subset could potentially be seeking to do us harm.

87.     In the twenty-first century, discussions of Latinos that referenced wars, invasions, shifting political loyalties, chain migration, and the multi-generational attachments of immigrants to their home countries could be used by the Trump campaign and Administration to remind voters that Latin Americans threatened to overrun the United States and, perhaps, undermine U.S. sovereignty.

**The Trump Administration's Animus: Entitlements, Veterans, and Voting Rights**

88.     Since at least the nineteenth century, politicians and organizations have opposed the arrival of new immigrants by highlighting stories and statistics that purport to prove that immigrants drain local and national welfare coffers, and steal other benefits and opportunities that rightly belong to native-born, white U.S. citizens. Such narratives urge voters and others to take for granted that Latinos "abuse," "overburden," or "take advantage of" the political system and welfare state.

89.     These types of arguments have been repeated by Trump and his associates. In announcing the RAISE Act in early-August 2017, the President argued that it would "preven[t] new migrants and new immigrants from collecting welfare, and protects U.S. workers from being displaced.  And that's a very big thing.  They're not going to come in and just immediately go and collect welfare.  That doesn't happen under the RAISE Act.  They can't do that." Later that month, then-candidate Trump told a Phoenix audience that "years of uncontrolled immigration have … put great burdens on local schools and hospitals."

90.     On the campaign trail, then-candidate Trump repeatedly made erroneous claims that immigrants were the cause of financial strain on the welfare system. These claims represented immigrant workers and families as poor, unproductive, and drawn to the United States by the availability of food stamps and free health care. Claims about opportunistic Latinos as drains on

the welfare state have also shaped political rhetoric about Puerto Rico and its U.S. citizens in the aftermath of Hurricane Maria. President Trump appealed to stereotypes about Latinos as welfare-dependent, lazy, and a political burden when he tweeted on September 30th that Puerto Ricans "want everything to be done for them when it should be a community effort."

91.     In advance of the November 2016 election and in the Oval Office, President Trump and others also argued that undocumented immigrants enjoy benefits that are denied to U.S. citizens. President Trump depicts DACA grantees as a group seeking entitlements that they have not in fact earned. It was often suggested that "elites" in the United States supported undocumented immigration, and supported DACA, in order to undercut the well-being of working-class and middle-class white Americans. For Steven Camarota of CIS, the mismanagement and overreach of the DACA program hurt "working class voters … the very people who put Trump over the top." It is, he argued, therefore "time to end DACA" precisely because "[t]he employment situation for those [working class voters] without a college education continues to look bleak." Attorney General Jeff Sessions told a Virginia audience in October 2017 that "This is a compassionate country and lawfully admits more immigrants than any country in the world, but we must recognize that our generous system is being terribly abused."

92.     President Trump and others contrasted the "benefits" provided to undocumented immigrants, including DACA grantees, with those provided to military veterans – U.S. residents who truly deserve adequate care and generous support from their government. In 2014, the candidate tweeted to criticize President Obama's "dysfunctional Administration when Illegal Aliens get free & better medical care then our Veterans. What a disgrace." In July 2015, the candidate tweeted that "There Are Homeless Veterans in USA & yet Illegal Aliens Get Government Housing." In August 2015, he contrasted immigrants with military veterans on public radio, arguing that undocumented residents of the United States "by the way are treated better than our vets. You know are vets are incredible. No, no, the illegal immigrants in many cases, not in all cases, but in many cases are treated better than our veterans." In August 2016, then-candidate Trump told an Arizona crowd that "we have to listen to the concerns that working people, our

forgotten working people, have over the record pace of immigration and its impact on their jobs, wages, housing, schools, tax bills and general living conditions."

93.     President Trump emphasized that Obama's executive actions on immigration, including DACA, were also part of the overextension of the welfare state, tied to irresponsible Democratic social service policies such as the Affordable Care Act. In June 2014, President Trump urged his Twitter followers to "Imagine how much tax money it will cost Americans when Obama legalizes 25 million illegal aliens&gives [sic] them free ObamaCare." In September 2016, then-candidate Trump asked voters in Texas to consider how Hillary Clinton will "afford to give lifetime welfare and entitlements to illegal immigrants." And he told a Pennsylvania audience that Clinton "wants to give Obamacare to illegal immigrants and wants a total government takeover of care. Her plan also gives Social Security and Medicare to illegal immigrants, by making them citizens – bankrupting these programs for Americans." Talk of DACA grantees and other immigrants here seems intended to persuade voters of poor fiscal management by the Democratic Party.

94.     On the campaign trail, President Trump continually reframed discussions of DACA to emphasize that voters should be worried less about Latino kids and their families, and more about the future of white American youth. Citizen kids are the real "Dreamers" who matter, President Trump argued, and their futures are imperiled by the presence of violent immigrants. He told a crowd in Mississippi that:

> Hillary Clinton only talks about the separation of families who choose to come here illegally. I want to focus on the American families who have been permanently separated from their children because of the sanctuary cities and open borders that Hillary Clinton so strongly supports. [*booing*] Where is the sanctuary for American children? Where is that sanctuary? The dreamers we never talk about are the young Americans. Why aren't young Americans dreamers also? I want my dreamers to be young Americans. [*applause*]

95.     Making clear that Latino beneficiaries of DACA were also dangerous to "young American dreamers," Trump demanded to know why "our leaders spend so much time talking about how to help people here illegally, they're here illegally … but they don't try helping

American citizens, some of whom have been devastated by what's happened to their children and their families?" DACA as a program therefore seemed to represent the Obama Administration's turn away from defending and supporting young citizens – especially white citizens – of the United States.

96.     Trump repeated these arguments as President. Addressing a joint session of Congress in 2017, he highlighted the case of a 17-year-old U.S. citizen "with unlimited potential who was getting ready to go to college where he would have excelled as a great quarterback" who had been "viciously murdered by an illegal immigrant gang member." Trump rallied voters by drawing attention to young American citizens such as "21 year old Sarah Root" who had been killed by an undocumented immigrant, according to the candidate, one day after she "graduated from college with a 4.0, [the] top student in her class...." In arguing that "American children" were the real "American dreamers," the candidate followed an argument developed by CIS, whose writers in 2012 had warned when DACA was implemented that Obama was intent to see the "destruction of their innocent children's futures and of their children's American dreams" in order to provide "amnesty" for undocumented immigrant youth. President Trump emphasized that undocumented immigrants, including DACA grantees, stood in the way of improving public education for other Americans. "For the money we are going to spend on illegal immigration over the next 10 years," he told one crowd, "we could provide 1 million at-risk students with a school voucher, which so many people are wanting."

97.     Further, President Trump's campaign, eager to demonize Latino populations for its own political gain, alleged that undocumented immigrants engage in massive voter fraud. President Trump told audiences that they needed to anticipate voter fraud, alleging in October 2017 that "They're letting people pour into the country so they can go and vote." Elsewhere he told supporters that "there's the issue of illegal immigrants voting." Republicans associated with the Trump campaign and Administration have continued to associate Latinos with voter fraud. This underscores a narrative about immigrants as cheats, and it helps to define the threat that Latinos – including DACA grantees – seem to pose to U.S. citizenship. It is also a call that

summons voters to the polls interested in countering the power of "illegal" voters and in affirming the rights of real citizens.

98.    In sum, during and after his presidential campaign, President Trump drew a stark contrast between immigrants, even DACA grantees, and our "incredible" U.S. military veterans and promising youth. His campaign stressed that undocumented immigrants abuse the welfare state by stealing from entitlement programs meant to serve U.S. citizens. And Trump and others urged voters to understand that their focus should remain above all on the security and advancement of white citizens whose well-being was threatened by programs such as DACA.

**The Trump Administration's Animus: Latinos as Unassimilable and a Cultural Threat**

99.    President Trump and members of his campaign and Administration have repeatedly asserted that Latinos and other ethnic Mexicans are incapable of, or uninterested in, assimilating into the United States. These concerns about Latinos' disinterest in assimilation harkens back to the *reconquista* narrative. For example, as a Senator, Jeff Sessions expressed concerns about the "cultural problems" brought by current immigrants. Influential organizations such as FAIR have pressed concerns about the assimilation of Latinos and how the growing number of U.S. residents of Latin American descent, including citizens, is reshaping American culture. Michael Hethmon, General Counsel for FAIR's Immigration Reform Law Institute admitted in 2012 that he was motivated by concern about the changing "demographic makeup of the entire country. You know, what they call 'minority-majority." He anticipated negative consequences: "How many countries have gone through a transition like that – peacefully, carefully? It's theoretically possible, but we don't have any examples."

100.    President Trump and his supporters have raised questions about the assimilation of DACA grantees and other Latinos. Steven Camarota of CIS denounced President Obama's claim that young people who had received deferred status were "Americans in their heart, in their minds, in every single way but on paper." Camarota argued instead that most Hispanic DACA grantees were either "functionally illiterate" or had "only 'basic' English ability."

101.    Speaking about immigration in Phoenix in August 2016, then-candidate Trump

emphasized that worries about whether Latin American immigrants will in fact become loyal Americans "are valid concerns expressed by decent and patriotic citizens from all backgrounds, all over." He called assimilation "an important word," noting that "we want to ensure that it works." And he urged listeners "to be honest about the fact that not everyone who seeks to join our country will be able to successfully assimilate. Sometimes it's just not going to work out. It's our right, as a sovereign nation to choose immigrants that we think are the likeliest to thrive and flourish and love us."

102.     In making such claims, President Trump has referred to the Spanish language as "Mexican" speech, racializing and warning about its use in the United States. He and other politicians have followed a deep tradition of argumentation that has positioned Latin American culture, including the Spanish language, as dangerous, un-American, unassimilable, and perhaps subversive. In making these arguments, politicians have followed the lead of organizations such as U.S. English, another organization founded by John Tanton.

103.     President Trump and his associates stoked fears about the cultural Latinization of the United States by raising concern about the "unprecedented" number of immigrants currently living in the United States. He denounced political opponents who had any significant connection to Mexican culture. Mocking fellow Republican Jeb Bush in August 2015, President Trump tweeted "Jeb Bush is crazy, who cares that he speaks Mexican, this is America, English!" President Trump subsequently seemed to use Spanish on several occasions to remind listeners of the cultural differences between Latinos and other Americans. During his final presidential debate with Clinton, for example, he referred to criminals crossing the U.S.-Mexico border as "bad hombres"; and in a press conference about Hurricane Maria, he seemed to mock island residents in his dramatic pronunciation of "Puerto Rico."

104.     In addition, following advisor Stephen Miller and Senator Jeff Sessions and others committed to prioritizing the arrival of English-speaking immigrants, President Trump called for new national quotas and emphasized the need "to select immigrants based on their likelihood of success in U.S. society." Senator Sessions in 2006 clearly portrayed Latino immigrants as

30

undesirable under a new quota system, telling the Senate that, "Fundamentally, almost no one coming from the Dominican Republic to the United States is coming here because they have a provable skill that would benefit us and that would indicate their likely success in our society."

105.    Sessions also went on record in 2015 supporting an immigration reform modeled on the 1924 Johnson-Reed Act, an Act that provided Nazi Germany a model for racial thinking, and that Sessions applauded for having allowed the United States to accept "assimilated immigrants, and it was good for America." That Act implemented a national quota system. At his major speech on immigration delivered in Phoenix in August 2016, then-candidate Trump promised to return to an immigration model based on the 1924 national quota system, declaring that his Administration would "keep immigration levels measured by population share within historical norms."

106.    These talking points about the 1924 Act had been developed by John Tanton in the 1980s. Speaking to supporters thirty years ago, Tanton had urged them to push for a "moratorium" on new immigration, and to make that argument by celebrating the fact that "the pause in immigration between 1930-1950, combined with the assimilating experience of fighting side-by-side in the trenches in World War II, gave us a needed pause so that we could assimilate the mass of people who came in the early years of the century."

107.    When President Trump announced major new immigration policy in early-August 2017, he referred to the need to change the 1965 Act and return to the 1924 model of national quotas, calling his Administration's effort the "biggest change in 50 years" to the immigration system. In March 2016, future Trump advisor Michael Anton defended a quota system that would privilege future European immigrants because it would bring "skills" and values to the United States, and those are "accustom[ed] to liberty."

108.    President Trump's campaign slogan "America First" clearly signaled an affirmation of U.S. culture and the English language in the face of rising numbers of immigrants. In his "Remarks on Immigration" delivered in Phoenix in August 2016, then-candidate Trump urged voters to "remember, under a Trump Administration it's called America first. Remember

31

that."

109.    In raising concerns about Latin American assimilation, anti-immigrant policymakers and others associated with the Trump Administration have warned about the growing use of the Spanish language in the United States; they have raised concerns about immigrants' "skills" to raise questions about the mental abilities of Latinos and their capacity to adjust to life in the U.S.; and they have suggested establishing national quotas that would likely give preference to immigrants from other parts of the world, and that would gesture to the racial thinking embedded in the 1924 Immigration Act.

### The Trump Administration's Animus: "They're bringing crime"

110.    Throughout his campaign, President Trump referred to Latinos as "criminal aliens" and "bad hombres." Politicians discussing crime and public safety  have drawn upon deeply-rooted stereotypes of ethnic Mexicans as violent, knife-wielding criminals to call for increased deportations,  policing of urban neighborhoods,  or border enforcement.

111.    These have long been stereotypes and associations pushed by anti-immigrant organizations and politicians motivated, at least in part, by racial animus. John Tanton authored an article entitled "Immigration and Criminality in the U.S.A." in 1993 that linked contemporary criminality to the 1965 Immigration Act, that highlighted immigrant gang activities, and that argued for greater border enforcement in order to reduce the number of "alien prison inmates."

112.    Independent think tanks such as the Migration Policy Institute and Pew Research Center have determined that President Trump and others in his campaign significantly exaggerated the number of "non-citizen criminals" in the United States. Researchers have found no "relationship between immigrant population size by any measure and violent crime, even when controlling for a variety of economic and demographic factors."

113.    Prior to announcing his candidacy for president, President Trump had gone on record to associate Latinos and African Americans with criminality. "Sadly, the overwhelming amount of violent crime in our major cities is committed by blacks and Hispanics," he tweeted in

2013, "a tough subject-must be discussed." In 1989, he spent $85,000 on full-page ads in the four daily papers in New York City to demand a return to the death penalty in the Central Park Five case which (wrongly) accused Latino and African American teenagers of raping a white woman, stating that "muggers and murderers should be forced to suffer." Even after the teenagers' sentences were vacated, President Trump wrote in a 2014 *New York Daily News* editorial that those teenagers did "not exactly have the pasts of angels," and he did not retract his statements.

114.    On the campaign trail then-president Trump repeatedly labeled Latino immigrants as "killers" and "murderers" and "cartel" members and "gang members" and other dangerous criminals. When he announced his presidential candidacy in June 2015 he stated that immigrants crossing the U.S.-Mexico border were "bringing drugs. They're bringing crime." And he tweeted that "Druggies, drug dealers, rapists and killers are coming across the southern border. When will the U.S. get smart and stop this travesty?" He later tweeted that "We Must Stop the Crime and Killing Machine That Is Illegal Immigration. Rampant Problems Will Only Get Worse."

115.    Members of Trump's Administration have also marked "Dreamers" and other Latinos with the tag of criminality. When the DREAM Act was considered by Congress in 2010, Stephen Miller, who was at the time spokesperson for Republicans on the Senate Judiciary Committee, emphasized that "Democrat leaders in Washington are asking Americans to pick up the tab for a proposal that would offer amnesty to millions – including those with criminal records." When President Obama announced the DACA program in 2011, groups such as CIS insisted that every undocumented immigrant regardless of age or employment fell under the category of "illegal aliens," and that it was dangerous for "ICE to wait until an illegal alien commits a serious crime or two before considering deportation." The CIS legal policy analyst Jon Feere further argued that "an illegal alien should be removed from the country at the first possible opportunity, before a serious crime is committed." He admitted that it is "true that most illegal immigrants are not violent," but he insisted that all were "still likely involved in ID fraud," and that immigrants who had not yet committed a crime would likely be arrested for "public intoxication" or "DUIs" in the future. Notably, Mr. Feere later became a member of candidate Trump's Immigration Policy Team

33

and, after President Trump's inauguration, became an ICE senior adviser.

116.    A CIS writer insisted in 2012 that by implementing DACA "the Administration has callously sacrificed countless numbers of American children who are the victims of illegal alien-driven identity theft and other job-related felonies." Stephen Miller similarly asked a crowd during the Trump campaign to consider "how many of our children are dead because of Sanctuary cities?" As Attorney General, Jeff Sessions has contended that "jurisdictions that adopt so-called 'sanctuary policies' also adopt the view that the protection of criminal aliens is more important than the protection of law-abiding citizens and of the rule of law." Gene Hamilton further admitted in a deposition that in advance of the announcement that DACA was being rescinded he had asked others in DHS to provide information about "how many DACA grantees have ever been convicted of a crime."

117.    Reminders of the Latino Threat provided President Trump a way to highlight law and order, and to align himself politically with law enforcement. In accepting the Republican nomination in July 2016, then-candidate Trump reminded the Cleveland audience that "I have been honored to receive the endorsement of America's Border Patrol Agents, and will work directly with them to protect the integrity of our lawful, lawful, lawful immigration system. Lawful." He told audiences that undocumented immigrants "mock" law enforcement officials, and he promised that "our local police will be so happy that they don't have to be abused by these [criminal immigrant] thugs anymore." President Trump called for new legislation named after law enforcement officers who had been killed by immigrants that would help assure "that criminal immigrants and terrorists are swiftly, really swiftly, identified and removed." His campaign called for tripling the number of ICE officers in order to identify "the most dangerous criminal illegal immigrants in America who have evaded justice just like Hillary Clinton has evaded justice."

118.    In all of this, President Trump and others contrasted criminal aliens with law enforcement, and the public health problems associated with Latin Americans with the vitality and strength of U.S. society. President Trump as candidate and president, along with his appointees and advisers, focused enormous attention on the presence of transnational Latin American "gangs"

and "cartels" to characterize the threat of young Latinos in the United States, to call for greater border enforcement, and to suggest the importance of rescinding DACA. He called gang members crossing the border "true animals," and he promised that "the gangs and cartels and criminal syndicates terrorizing our people will be stripped apart one by one. Their day is over."

119.    Much of that focus was directed to the Central American gang MS-13, and both stories of gang violence and images of tattooed gang members were repeated to portray immigrant youth not as "Dreamers" – aspiring students, military officers, and everyday Americans – but as something more sinister. Trump and others in his Administration referenced the Salvadoran gang MS-13 to characterize all Latinos regardless of nationality, including ethnic Mexicans. Campaign supporters and policymakers rarely mentioned MS-13's origins in El Salvador. Attorney General Jeff Sessions warned that "Because of an open border and years of lax immigration enforcement, MS-13 has been sending both recruiters and members to regenerate gangs that previously had been decimated, and smuggling members across the border as unaccompanied minors." President Trump emphasized that as president he would assure that "Border crossings will plummet" and then "gangs will disappear."

120.    President Trump invited voters to join him in declaring war on Latin American cartels in the United States, and he berated the Democrats for not taking seriously this Latino Threat. Speaking to a Phoenix crowd in August 2017, just weeks in advance of the DACA announcement issued by Sessions, President Trump celebrated Sheriff Joe Arpaio (whom he would soon pardon) and told attendees that

> The people of Arizona know the deadly and heartbreaking consequences of illegal immigration, the lost lives, the drugs, the gangs, the cartels, the crisis of smuggling and trafficking. MS-13 – we're throwing them out so fast, they never got thrown out of anything like this. We are liberating towns out on Long Island. We're liberating.
>
> Can you imagine, in this day and age – in this day and age in this country, we are liberating towns. This is like from a different age. We are taking these people. They don't shoot people, because it's too fast and not painful. They cut them up into little pieces. These are animals. We are getting them out of here. We're throwing them in jails, and we're throwing them out of the country. We're liberating our towns. (APPLAUSE)

You've seen it. You've lived it, and you elected me to put a stop to it. And we are doing a phenomenal job of putting a stop to it. That I can tell you. (APPLAUSE)

After years of defending other countries borders – can you believe we fight for other countries; we want to defend their borders – we're finally defending our own borders.

Here, a rhetoric of liberating towns, "taking these people," fighting the "animals," and defending U.S. borders is a language of war, one in which President Trump's campaign urged American voters to see Latinos as dangerous enemies.

### The Trump Administration's Animus: Latinos as Gang Members

121.   President Trump has characterized Latino immigrants, including DACA grantees, as criminals, gang members and threats to the community. The Administration referred to "gangs" and "cartels" in characterizing Latino youth. "We are putting MS-13 in jail and getting them the hell out of our country," President Trump noted. "They've taken over towns and cities and we are being really brutal with MS-13 and that's what we should be. They are a bad group and somebody said they are as bad as al-Qaida, which is a hell of a reference."

122.   MS-13 allowed the campaign to remind voters about Latino violence and to tell audiences that Hillary Clinton supported dangerous "catch and release" policies. A focus on MS-13 also allowed the candidate and president to emphasize the danger of any amnesty program, or anything like DACA, that might inadvertently include members of these Latin American cartels. Then-candidate Trump repeatedly argued on the campaign trail in 2016 that the existing policy of "open borders" had led to the murder of "wonderful Americans" by Latino immigrants. He turned moments on the campaign trail into memorial services to denounce Latino immigrants for violent crimes against U.S. citizens. Then-candidate Trump aligned himself with widows and other grieving family members to demonize his political opponent. Standing with "working families," a term intended to suggest white Americans of modest means, then-candidate Trump offered statements such as the following: "I've spent time with the families of wonderful Americans whose loved ones were killed by the open borders and Sanctuary Cities that Hillary Clinton supports."

123.   By focusing on immigrants as past, present, or future criminals, President Trump

criminalized DACA grantees and associated them with MS-13. Others involved in the Trump campaign did the same. A CIS fellow alleged in October 2015 that the Obama Administration was well aware that at least some DACA grantees had been gang members. As a presidential candidate Trump told audiences that the Obama Administration's decision "not to enforce" immigration laws through DACA and other executive acts led directly to the problem of criminal aliens. Then-candidate Trump promised Arizonans that "We will terminate the Obama Administration's deadly, and it is deadly, non-enforcement policies that allow thousands of criminal aliens to freely roam our streets, walk around, do whatever they want to do, crime all over the place."

124.    When then DHS Secretary John Kelly affirmed in March 2017 that while DACA holders are required "to obey the law" in order to maintain that status, "some of them don't," he affirmed the link between young Latinos and dangerous criminality. Mark Krikorian, CIS Director, did the same when he tweeted in October 2017 that the state of Georgia "Issues Far More Drivers Licenses to DACA Recipients than Feds Say Live Here," connecting DACA grantees to legal fraud. In March 2017, Kelly also tweeted about the criminality of Latino youth, noting that "even if they are nine years old, we are taking them out."

### The Trump Administration's Animus: Protecting "Our Children"

125.    To demonize Latino immigrants and "close the border," President Trump and others sought to shift voters' focus away from what were commonly seen as the positive traits of DACA grantees, and from the fact that because they had crossed the border as children they might be seen as innocent of any crime, to focusing on Latinos as criminals posing threat to white citizens, and in particular to American children and teenagers. On the campaign trail, candidate Trump announced that "the media ignores the plight of Americans who have lost their children to illegal immigrants, but spends day after day pushing for amnesty for those here in total violation of the law," a clear effort to link the well-being of white American youth with the rescinding of DACA.

126.    President Trump and others characterized Latino youth as dangerous criminals, and

they argued that the well-being of white American children depended upon increased border enforcement and the deportation of undocumented residents. This version of the Latino Threat Narrative – changing the subject from DACA to criminals and cartels – became more important as the Trump campaign progressed. Senator and future Attorney General Jeff Sessions issued a "critical alert" in late-October 2016, just in advance of election day, declaring "a crisis at our southwest border" that centered on the arrival of terrorists and criminals. "Without a commitment to deport aliens who violate our immigration laws," Sessions warned, "we lose our ability to protect our communities from criminal aliens, terrorism, and cartel-related crime and violence." One of candidate Trump's final tweets before the November 2016 election reaffirmed the campaign's emphasis on labeling immigrants as criminals. On November 4th the candidate promised New Hampshire voters that "We will end illegal immigration, stop the drugs, deport all criminal aliens & save American lives!"

127.    President Trump and others in his Administration continued to describe Latinos in these ways after the election.  In President Trump's first post-election national television interview, he reaffirmed the importance of targeting immigrants as criminals in telling Lesley Stahl of CBS that "What we are going to do is get the people that are criminal and have criminal records, gang members, drug dealers, we have a lot of these people, probably 2 million, it could be even 3 million, we are getting them out of our country or we are going to incarcerate. But we're getting them out of our country, they're here illegally."

128.    In attempting to galvanize Republican lawmakers and voters from coast to coast, the Trump Administration has defined the Latino Threat, and in particular the MS-13 threat, as a national emergency. Attorney General Sessions claimed in April 2017 that there are now more than 10,000 members of MS-13 in at least forty states. Addressing a joint session of Congress in February 2017, President Trump announced that he had ordered "an aggressive strategy to dismantle the criminal cartels that have spread across our Nation." He announced that "We will stop the drugs from pouring into our country and poisoning our youth," that "my Administration has answered the pleas of the American people for immigration enforcement and border security,"

38

that "we will soon begin the construction of a great wall along our southern border," and that "we are removing gang members, drug dealers and criminals that threaten our communities and prey on our citizens." Just days in advance of the rescinding of DACA in 2017, President Trump reassured another audience that "One by one we are finding the gang members, the drug dealers and the criminals who prey on our people. We are throwing them out of the country or we're putting the hell [sic], fast in jail."

The Trump Administration's Animus: "They're Rapists"

129.    Then-candidate Trump also characterized Mexican immigrants as "rapists" when he announced his presidential campaign. Several weeks later he told a CNN host that "if you look at the statistics of people coming, you look at the statistics on rape, on crime, on everything coming in illegally into this country it's mind-boggling!" When the host corrected his statistics, then-candidate Trump insisted that "somebody's doing the raping, Don! I mean somebody's doing it! Who's doing the raping? Who's doing the raping?" Then-candidate Trump also issued statements via twitter to support his claim that border-crossers were connected to sexual violence.  That same month he tweeted "@AnnCoulter don't worry... we clearly don't have an illegal alien criminal problem. #AdiosAmerica" with a screenshot of a Google search results for "illegal alien rape." In September 2016, he announced in Houston the detention of "an illegal immigrant in the Austin area who is responsible for nearly a dozen sexual assaults," and a crime in California "by an illegal immigrant who … had been convicted for child rape."

130.    While it is not always stated, the migrant "rapists" referenced here are clearly men, and President Trump's repeated association of "Mexicans" and "illegals" with "rapists" echoed longstanding racial animus against Latinos that labeled both immigrants and the U.S.-born as sexual predators. This Latino Threat Narrative and others drew upon established fears of Latino men and other non-whites as rapists. Author Ann Coulter's bestselling book decrying Mexican immigration had contended that "America is just bringing in a lot of rapists," and  President Trump had tweeted in May 2015 ".@AnnCoulter's new book—'Adios, America! The Left's Plan to Turn Our Country into a Third World Hellhole'– is a great read. Good job!" After then-candidate Trump

39

pointed to the danger of Mexican immigrant rapists in his campaign announcement, Ann Coulter celebrated the fact that "nobody talked about Hispanic child-rape until now. That was in his opening speech!"

131.    In fact, then-candidate Trump and others used references to male immigrants as rapists and sexual threats for political gain throughout his campaign. During the Republican primary race, for example, candidate Trump charged opponent Marco Rubio as being soft on immigrants who had committed acts of sexual violence, tweeting in February 2016 that "Little Marco Rubio gave amnesty to criminal aliens guilty of 'sex offenses.' DISGRACE!" The implication that "Little Marco" was not big enough to handle the menacing physicality of Latinos depended on historical stereotypes about Latin American masculinity and sexuality. It also raised questions about whether a Latino candidate such as Rubio could and would protect women from sexual violence.

132.    In categorizing Mexicans as rapists, then-candidate Trump alerted white voters that "criminal immigrants" threatened their wives and daughters, and he portrayed himself as the candidate who would protect white women facing a dangerous invasion of their homes and bedrooms. Following the October 2016 Vice Presidential debate, future White House Press Secretary Sean Spicer tweeted that ".@timkaine wants to [talk] tough on crime - fails to talk about defending rapists and murders."

### The Trump Administration's Animus: "Vomit" and "Filth"

133.    Because of the strong rhetorical link between ethnic Mexicans and negative attributes, policymakers have strategically referenced the dangers posed by Mexicans and Mexican Americans in terms of public health, physical safety, and bodily integrity. President Trump has repeatedly done this, as when he told the Texas Patriots PAC that "Everything's coming across the border: the illegals, the cars, the whole thing. It's like a big mess. Blah. It's like vomit." Few other U.S. national politicians in recent years have been so brazen in characterizing immigrants in such vulgar bodily terms.

134.    Established stereotypes about Mexicans as dirty and unclean have long provided

anti-immigrant organizations with a way to reference the dangers that migrants pose to public health in the United States. It was therefore no accident that Attorney General Jeff Sessions referenced Mexicans' "filth" in a major speech on immigration delivered in April 2017. Such language resonates with deep, historical animosity against Latinos in the United States as Mexicans have been described as early as 1855 as "the most inferior of the race" or "a herd of filthy, vile, degenerate, diseased, sub-human Spics," disparaged for "their filthy habits," and criticized for showing "no ambition to rise beyond the station where destiny, dirt, ignorance and sloth have placed them."

135.    In the first months of the Obama presidency, some pundits and politicians had blamed an outbreak of influenza on immigrant Mexicans despite the fact that fears of the virus, and its association with Mexico, were exaggerated. In later months, when large numbers of Central American refugees crossed into the United States, politicians and members of the press identified young Latinos as a national health threat. Arizona Sheriff Joe Arpaio highlighted the uncleanliness of Latin Americans in 2009:

> All these people that come over, they could come with disease. There's no control, no health checks or anything. They check fruits and vegetables, how come they don't check people? No one talks about that! They're all dirty.

Leaders of the American Family Association in 2015 blamed Central American immigrants for spreading measles and Enterovirus D68, despite the lack of any evidence, and argued that immigrants brought dangerously poor hygiene from Latin America:

> We [in the United States] have vaccinations and hygiene and cleanliness and we teach people in western civilization how to go to the bathroom properly, how to take care of things, how to do things in a sanitary way. Do you not think that when we open our borders to a glut of people from another world who have never been trained, don't know that, that that's not going to bring in disease?"

136.    Some blamed the purported arrival of disease-ridden Latinos on DACA grantees, concluding that youth from Central America were encouraged by lax immigration enforcement and excellent educational opportunities to come to the United States after 2012.

137.    As a political candidate, Trump frequently racialized Mexicans by referring to them

as a threat to public health. In July 2015, soon after announcing his candidacy, President Trump declared that Mexicans were responsible for "tremendous infectious disease ... pouring across the border." He tweeted to "@SenTedCruz In addition to the criminals among the illegal aliens what about all the infectious diseases they brought to US." Others involved in his campaign and Administration similarly fanned fears about Latin Americans as disease agents. John Kelly told a Senate committee in 2015 that terrorists might intentionally spread ebola "as a weapon" into the United States through migrants and refugees. "It's a scary proposition," he concluded.

### The Trump Administration's Animus: Anchor Babies and Families

138.    Republican opposition to immigrant youth, and to DACA grantees in particular, fits into a long history of animus that centers on fears and concerns about Latino youth, including those born in the United States. Those fears drove the forced sterilization of ethnic Mexican women in California and other states during the twentieth century. While the *reconquista* narrative developing since the 1970s has focused primary attention on the "invasion" of the United States, worries about Latinas giving birth in this country has been just as important.

139.    In 1979, Labor secretary Ray Marshall worried that "the children of today's illegal aliens" might be "the seeds of a bitter civil-rights struggle in the 1990s." And Stanford historian David Kennedy warned in 1996 that U.S.-born Latinos might create "a kind of Chicano Quebec … in the American Southwest." Such fears prompted John Tanton to see the problem of immigration control as a problem of global population control. Aligning himself with environmental organizations worried about overpopulation, Tanton pushed for border enforcement and birth control in the hope that non-European immigrants would not come to the United States and have children. "Can homo contraceptivus compete with homo progenitiva if borders aren't controlled?" he asked, contrasting white citizens with Latin Americans.

140.    In recent years, anti-immigrant organizations in the United States have become more intent to deny rights to immigrant families, immigrant children, and the growing numbers of U.S.-born citizens with immigrant parents. Peter Brimelow, author of the influential book *Alien Nation*, founded the website VDARE.com (named after Virginia Dare, the "first white child" born

42

in the New World) to underscore the importance of reducing non-white reproduction, and he used that white nationalist platform to promote the careers of politicians such as Kobach and President Trump. Politicians proposed eliminating birthright citizenship in the name of reducing undocumented immigration. Senator Jeff Sessions stated his opposition to birthright citizenship:

> People do not believe you should be able to break into America, have a baby and then the baby becomes a citizen, and the whole family says, 'We can't go home. My child is a citizen. It's an unfair way to gain priority in the application for legal immigration into America.

As the 2016 Republican presidential candidate, President Trump announced that he would also deny citizenship to U.S.-born children of immigrants – so-called "anchor babies."

141.    While the United States had provided racially-segregated education for Latino children for many decades, animus towards young immigrants has also focused on representing Latinos as mentally deficient or unsuitable for higher education. These were important themes in Arizona's anti-immigrant efforts during the early-twenty-first century. Racial animus has shaped educational policies, and President Trump referenced longstanding questions about the intelligence of Latinos, and of immigrant kids including DACA grantees, when he told supporters in June 2015 that Mexico does not send "its best and finest" to the United States.

142.    Codewords for Latino inferiority – many of which referenced Mexican immigrants – justified discriminatory practices in education. Tanton, for example, asked his followers to consider "What are the differences in educability between Hispanics (with their 50% dropout rate) and Asiatics (with their excellent school records and long tradition of scholarship)?" States such as California, Arizona, Kansas, Alabama, and Georgia have passed laws to discourage the public education of immigrant children or make it impossible for them to attend local public universities, and Kobach worked on a FAIR lawsuit in 2004 to fight a Kansas statute providing in-state college tuition to undocumented immigrants.

143.    Latino students have therefore been a source of concern for politicians for decades, raising worries about assimilation, radical politics, chain migration, racial integration, and more.

The opposition of President Trump, Jeff Sessions, Kris Kobach, and others to DACA students fits into a pattern of historical nativism directed at both immigrant and U.S.-born Latinos students that began in the early-twentieth century.

### The Trump Administration's Animus: "The Wall"

144.    Anti-immigrant politicians, activists, and voters have found many ways to characterize the threat of Latinos in recent years, as the preceding pages make clear. President Trump, Sessions, Kobach, Miller, and others have referenced historical characterizations of immigrants and their children as disease-ridden, dirty, subversive, lazy, dishonest, criminal, cruel, stupid, insensitive, violent, and more. References to these dangers posed by Latinos in general, and by Mexican and Central American immigrants in particular, proved critical to Republican efforts to mobilize voters and unite the GOP in 2016. As noted earlier, however, contemporary politicians resist speaking too forcefully, too often, in ways that directly reference racial or ethnic inferiority. Few politicians see themselves as racists, and fewer still see an electoral advantage in being associated with open racial animus. Such an association risks alienating members of the public who believe that biological distinctions of race, and gross declarations about inferiority, are offensive and dangerous. Politicians have therefore used racial code words, and dog whistle politics, to articulate their positions and their views in ways that resonate with historical narratives and seem more acceptable to contemporary Americans.

145.    During the Trump campaign, and in the first months of the Trump Administration, the term that has been used most often and most successfully to convey racial animus towards Latinos, and to remind voters of the Latino Threat Narrative, is "the wall." Kobach claims to have played a major role in designing plans to build and pay for that wall. As candidate and president, Donald Trump has repeatedly promised to erect a militarized barrier between the United States and Mexico in the interest of protecting citizenship, jobs, public health, public safety, national security, the welfare system, and more. White House counselor Kellyanne Conway reminded Americans just days prior to the rescinding of DACA that "The president ran on building the wall, won on building the wall, and has remained steadfastly committed to doing it. Anybody who's

surprised by that has not been paying attention for over two years."

146.    As Conway noted, references to constructing a wall were critical to the Trump campaign, and talk of further militarizing the border has resonated with large numbers of voters in the United States familiar with the Latino Threat Narrative. Those references have reminded audiences of the distinctions between "us" and "them"; and talk of "the wall" has been open and wide-ranging enough to allow listeners the opportunity to recall and prioritize the best reasons for building such a barrier. Some voters might see it protecting "us" against job- or welfare-stealing immigrants; others might think first about the need to block MS-13 and other criminal organizations, drug dealers, and rapists; and others might prioritize controlling the arrival of diseased refugees or stopping undocumented immigrants from voting in U.S. elections. President Trump, Kobach, Miller, Sessions, and their associates on the campaign or in the White House have urged voters to worry about various combinations of all of these threats, making "the wall" a powerful "dog whistle" to summon a wide range of negative sentiments related to Latinos in recent years.

147.    "The wall" is not an entirely new racial codeword. Other Republicans in the past who pushed anti-immigrant agendas to build electoral support promised to build such a barrier to protect voters from the Latino Threat. Pat Buchanan based his 1996 presidential campaign – clearly grounded in racial animus against Latinos – on that guarantee. In 2006, Iowa Congressman Steve King proposed building an electrified fence along the U.S.-Mexican border, noting that "We do this to livestock all the time." In the 2012 primary season, Republican candidate Herman Cain demanded an electrified fence: "It's going to be 20 feet high. It's going to have barbed wire on the top. It's going to be electrified. And there's going to be a sign on the other side saying, 'It will kill you – Warning.'"

148.    Many racial code words have informed recent immigration policies, guiding how Americans understand "the wall" and how they understand programs such as DACA. Understanding how "the wall" and other codewords work requires an understanding of historical context, of concepts such as chain migration, and an appreciation of the ways that politicians have

45

articulated the threats associated with Latino youth.

### G.  CONCLUSIONS

149．  Racial code words link race to other categories of devaluation. In recent years, politicians have connected Latinos as a group to criminality, terrorism, cultural depravity, racial mixing, sexual violence, voter fraud, and other threats. Animus towards Latinos has been a key feature of contemporary U.S. politics, and it certainly proved critical during the Trump presidential campaign. Racial animus shapes discussions of immigration, border enforcement, and policies affecting undocumented residents of the United States – including those covered by DACA. Racially coded speech has played a central role in  mobilizing the electorate since the 1960s, and that racially coded language – or "dog whistle  politics" – has taken new forms in recent decades as politicians have stoked and responded to  the "Latino Threat." In characterizing Latinos, President Trump and other politicians  have  drawn  upon  well-established,  negative stereotypes  while developing new ones.

150.    In sum, a climate of racial animus has surrounded recent political campaigns, including the Trump presidential campaign. Anti-immigrant politics in twenty-first century Arizona provided a testing ground and a model for national Republican Party responses to the Latino Threat. Many leaders important to the Trump campaign, and prominent in the Trump Administration, were involved in Arizona efforts to halt immigration and restrict the rights of resident immigrants. Organizations founded by John Tanton – CAIR, FAIR, and Numbers USA – have been key to the development of President Trump's immigration policies, including his decision to rescind DACA. Many leading members of President Trump's Administration and advisers to the President, including Jeff Sessions and Kris Kobach and Stephen Miller, have strong ties to one or more of these organizations. Anti-immigrant politicians have described DACA grantees and other immigrants as a danger to "everyday Americans," to national security, to public health, and to the safety of the American public. The Trump Administration has routinely exaggerated the number of undocumented immigrants in the United States and their negative impact on U.S. society. The racially coded speech used by the Trump campaign, and by the Trump

Administration, reminds voters of the "Latino Threat." In recent years, the most powerful and enduring political term for this purpose has been "the wall," a phrase that coalesces many threatening racial narratives, and that shapes discussions and debates about DACA grantees.


Executed on December __9__, 2017

_____
Dr. Stephen Pitti, Ph.D.

47

# EXHIBIT A

# Stephen J. Pitti

Yale RITM Center                                    (203) 432-0560
Yale University                                     (203) 887-3700
PO Box 208236                                       stephen.pitti@yale.edu
New Haven, CT 06511                                 @latinohistory

ACADEMIC EMPLOYMENT:

| | |
|---|---|
| 2016- | Founding Director of the Center for the Study of Race, Indigeneity, and Transnational Migration (RITM) at Yale |
| 2008- | Head of Ezra Stiles College, Yale University |
| 2005- | Professor of History and American Studies, Yale University |
| 2005-2015: | Chair of Program in Ethnicity, Race, and Migration, Yale University |
| 2003-2005: | Associate Professor of History and American Studies, Yale University |
| 1998-2003: | Assistant Professor of History and American Studies, Yale University |
| 1997-1998: | President's Postdoctoral Fellow, Department of History, U.C. San Diego |

GOVERNMENT EMPLOYMENT:

| | |
|---|---|
| 2013-2017: | Member of the National Parks System Advisory Board |
| 2013-2017: | Chair of the Landmarks Committee of the National Parks Service |

EDUCATION:

| | |
|---|---|
| 1998: | Ph.D. in U.S. History, Stanford University. |
| 1994: | M.A. in U.S. History, Stanford University |
| 1991: | B.A. in History, magna cum laude, Yale College |

PUBLICATIONS—BOOKS:

Editor of *American Latinos and the Making of the United States: A Theme Study* (Washington DC: National Park Advisory Board, 2013).

*American Latinos and the Making of the United States* (Washington DC: Eastern National Press, 2012).

*The Devil in Silicon Valley:  Mexicans and Mexican Americans in Northern California* (Princeton, NJ:  Princeton University Press, 2003).

BOARDS, STEERING, REVIEW AND SELECTION COMMITTEES:

*Education and Public Service:*

Founder and Chair of the Yale Bassett Award for Community Engagement
(http://ritm.yale.edu/yale-bassett-awards)
Board of Directors, Freedom University in Atlanta, GA (2014-)
Selection Committee for the Soros Fellowship for New Americans (2014-2015)
Steering Committee for the Council of Heads of College at Yale (2011-2013)
Executive Committee of the Yale-New Haven Teachers Institute (2007-present)
New Haven Ward 1 Democratic Committee (2004-2006)


*Research and Publishing:*

Series Co-Editor for "Politics and Culture in Modern America," University of Pennsylvania
Press (2013-)
Advisory Council for the Chicano Studies Oral History Project at the Bancroft Library (2016-)
Editorial Board, *U.S. Latino Oral History Journal* (2015-)
Board of Directors, Yale Indian Papers Project (2014-)
Yale Faculty Advisory Committee for the Beinecke Library (2009-present)
Editorial Board, *Yale Journal of Latin American Studies* (1998-2009)
Advisory Board, *Yale International Forum* (1998-2006)


*Public History and Public Humanities:*

Advisory Board, Franke Program in Science & the Humanities, Yale University (2017-)
Presenter, Public History Institute Organized by the Gilder Lehrman Center for the Study of
Slavery, Resistance and Abolition at Yale University, and the National Museum of African
American History and Culture in Washington D.C. (2017)
Organizer of the Yale-Smithsonian Latina/o History Internship Program, 2016-17
Advisory Board, American Architectural Foundation Project to broaden cultural heritage and
preservation work with underrepresented communities (2016-)
Proposal Reviewer, Sloan Foundation (2016)
Advisor for *Bridging Cultures: Latino Americans* Project, National Endowment for the
Humanities and American Library Association (2014-2015)
LGBTQ Expert Scholars Panel of the National Parks Service (2014-)
National Parks System Advisory Board (2013-2017)
Chair of the National Historic Landmarks Committee of the National Parks Service (2013-2017)
Latino Expert Scholars Panel of the National Parks Service (2011-present)
Advisory Board for "Latino Americans," 6-episode historical series on PBS (2011-2013)
Executive Board, Howard R. Lamar Center for the Study of Frontiers and Borders (1999-2007)

ACADEMIC LEADERSHIP AND SERVICE

*Profession*:

Advisory Council for the Chicano Studies Oral History Project at the Bancroft Library, U.C. Berkeley (2016-)
Program Committee, "Imagining Latina/o Studies: Past, Present, and Future, An International Latina/o Studies Conference," Chicago (2013-2014)
Regional Program Committee, Organization of American Historians (2004-2006)
Advisory Board, Bracero History Project, Smithsonian Institution, National Museum of American History (2005-2010)
Taft Prize Committee for Best Book in Labor History (2005, 2006, 2007)
University of Missouri Peer Reviewer, University Grant Applications (2005)
Chair of the 2002 Wise-Susman Prize Committee, American Studies Association (2002)
Undergraduate Mentor for the Minority Undergraduate Research Fellowship (1999-2003)
Graduate Mentor, California State University Pre-Doctoral Program for Minority Students (2000)
Manuscript Reviews (Journals): *American Historical Review, Journal of American History, Pacific Historical Review*, *Agricultural History*, *Latino Studies*, *Aztlán*, *Hispanic American Historical Review*, *Comparative Studies in Society and History*
Manuscript Reviews (Academic Presses): University of Arizona Press, University of New Mexico Press, Kansas University Press, University of Chicago Press, Cornell University Press, University of North Carolina Press, University of Pennsylvania Press, University of Texas Press, Duke University Press, Longman Press, Marshall Cavendish


*Yale College and Yale University*: General

Founding Director of the Center for Race, Indigeneity, and Transnational Migration (RITM) (2016-)
Head ("Master") of Ezra Stiles College (2008-present)
Member of the University Committee to Establish Principles on Renaming (2016)
Member of the Yale College Committee on Admissions and Financial Aid (2003-2004, 2012-2016)
Member of the Yale-NUS College Advisory Committee (2014-2016)
Member of the University Budget Committee (2010-2013)
Member of the Standing Committee on Yale College Expansion (2014-2016)
Member of the Faculty Advisory Committee of the Yale-New Haven Teachers Institute (2007-present)
Member of the Yale Faculty Advisory Committee on Athletics (2013-present)
Faculty Advisor to the Yale Men's Basketball Team (2015-present)
Chair (2010-2012) and Member (2010-2015) of the Creative and Performing Arts Committee
Chair of the Committee on Teaching in the Residential Colleges at Yale (2010-2012)
Member of the Yale University Provost's Diversity Committee (2009-2012)
Member of the Planning Committee for the Inauguration of Yale President Peter Salovey (2013)
Member of the Faculty Advisory Committee for the Beinecke Library (2011-present)
Member of the President's Minority Advisory Committee (2006-2009)
Member of the Education and Student Life Committee (2013-present)
Member of the Committee on Yale College Education (2001-2003)

3

Member of the Steering Committee of the McDougal Center in the Yale Graduate School (2003, 2004)

Member of the Steering Committee for Yale College (1999-2001)

*Yale College and Yale University: Staff and Personnel*

Chair of the President's Nominating Committee for New Heads of Colleges (2016)

Chair of Search Committee for Dean of Ezra Stiles College (2009-2010, 2015-2016)

Chair of Search for Associate Director of the Center for the Study of Race, Indigeneity, and Transnational Migration (2016)

Member of Search Committee for Senior Administrative Assistant for the Center for the Study of Race, Indigeneity, and Transnational Migration (2016)

Co-Chair of Annual Freshperson Counselor Selection Committee in Ezra Stiles College (2008-present)

Member of the Search Committee for the Dean of the Native American Cultural Center (2014-2015)

Member of the Search Committee for Yale Dean of Undergraduate Admissions (2013)

Member of the Search Committee for Dean of Yale College (2004)

Member of the Search Committee for Dean of Trumbull College (2001, 2004)

Member of the Graduate Teaching Award Committee (2003, 2004)

Member of the Search Committee for Assistant Dean of the Office for Diversity and Equal Opportunity in Yale Graduate School (2000, 2006)

*Yale College and Yale University: Student Life, Fellowships, and Diversity*

Chair (2006-present) and Member (1999-present) of the Faculty Advisory and Selection Committee of the Mellon-Mays and Bouchet Fellowships

Member of the Advisory Board of the Native American Cultural Center at Yale (2012-)

Selection Committee for Carlos Moreno Prize in Yale College (2006-present)

Site Visits of Japanese (Osaka, Tokyo), Korean (Seoul), and Mandarin (Beijing) Language Programs for the Light Fellowship (2010)

Member of the Gordon-Grand Fellowship Committee (2009-2012)

John Morton Blum Graduate Fellowship Committee (2006, 2007)

Director of the Mellon Senior Forum in Trumbull College (1999-2005)

Faculty Advisor for MEChA [Movimiento Estudiantil Chicano de Aztlán] (1998-2007)

Faculty Advisor for the United Farm Workers Support Committee (1998-2004)

Moore Fund Selection Committee, Yale College (2000, 2001)

Postdoctoral Selection Committee, Howard Lamar Center for the Study of Frontiers and Borders (2001, 2004)

Selection Committee for Prize Dissertation Fellowships in Yale Graduate School (2003)

Selection Committee for Mellon-Bouchet Fellowship (1998-present)

Selection Committee for Beinecke Scholars Program (2000)

Selection Committee for Freshperson Ethnic Counselor Position (1999)

Selection Committee for Latino Alumni Senior Prize (2003-present)

4

*Yale History Department*:

Chair of Clay Postdoctoral Fellowship Selection Committee (2013)
Departmental Diversity Liaison (2005-2010)
Search Committee for Professor of Native American History (2007)
Chair of Promotion Committee for Associate Professor Mary Lui (2007)
Chair of Promotion Committee for Assistant Professor Jennifer Klein (2006-2007)
Member of Review Committee for Assistant Professor Lillián Guerra (2006)
Member of Promotion Committee for Assistant Professor Mary Lui (2005-2006)
Author of History Department Mentoring Program for Junior Faculty (2005)
Co-Chair of Departmental Web Page Committee (2000)
Spanish language examiner (1998-present)
Undergraduate Prize Committee (1999)
Graduate Admissions Committee (2000, 2003, 2006, 2009, 2013, 2015)
Search Committee for an Assistant Professor of U.S.-World Relations, Department of History,
    Yale University (2000)


*Yale American Studies Program*:

Executive Committee, American Studies Program (1998-present)
Member of Promotion Committee for Assistant Professor Laura Barraclough (2016-17)
Director of Undergraduate Studies (2002-2004)
Search Committee for an Assistant Professor of Native American Studies (2004)
Undergraduate Studies Committee (1999-2000, 2005)
Spanish language Examiner (1998-present)
Graduate Admissions Committee (1999, 2003, 2004-present)
Search Committee for an Assistant Professor of Asian American History (1999).


*Yale Ethnicity, Race, and Migration Program*:

Member of the Senior Faculty Search Committee in Ethnic Studies (2016-17)
Chair of Program (2005-2015)
Chair of the Program's Review Committee to Review the ER&M Program (2006, 2012)
Director of the Ethnicity, Race, and Migration Postdoctoral and Predoctoral Associates Program
    (2005-2011)
Member of the Executive Committee (1998-present)
Member of the Roe Cloud Fellowship Selection Committee (2013)
Search Committee for Assistant Professor of Latina/o Literature (2010)
Director of Undergraduate Studies (2000-2001)


PRESENTATIONS ON DIVERSITY, COLLEGE RECRUITING, ADVISING, AND
        RESIDENTIAL LIFE:

"Driving College Readiness, Access and Completion Via Innovative Partnerships," College
    Board Conference, Las Vegas, October 2014.

5

"Introduction," Gala Dinner at the Mellon-Mays Undergraduate Fellowship Conference, Atlanta, June 2014.

"The Internationalization and the Diversification of Higher Education in the United States"; New Asia College; Chinese University of Hong Kong; December 2013.

"Liberal Arts Education in the United States"; Lingnan College, Sun Yat Sen University; Zhuhai, China; November 2013.

"Residential Colleges and Undergraduate Advising in the United States"; Lingnan College, Sun Yat Sen University; Guangzhou, China; November 2013.

"Selective College Admissions: Orientation for Latino Students"; six presentations with the Dean of Undergraduate Admissions of Yale College at public high schools in Houston and San Antonio, Texas; September 2013.

"Selective College Admissions: Orientation for Native and Latino High School Students"; six presentations with the Director of the Native American Cultural Center at Yale at public high schools in Albuquerque and Santa Fe, New Mexico; February 2013.

"Negotiating the University," Welcome Lecture for Cultural Connections Program for Yale Freshmen, August 2011.


FELLOWSHIPS, HONORS, AND AWARDS:

| | |
|---|---|
| 2017: | Américo Paredes Distinguished Lecturer, University of Texas |
| 2017: | Yale Latino Alumni Association Inaugural Leadership Award |
| 2016: | Commendation from the Yale Corporation for Contributions to Yale Committee to Establish Principles of Renaming |
| 2016: | Hermano Ernesto Samano Espiritu Dorado Award from Kappa Chapter of La Unidad Latina, Lambda Upsilon Lambda Fraternity |
| 2002-2005: | Kempf Fund Award, Latina/o Studies Lecture Series, Yale Council for International and Area Studies |
| 2001-2002: | Morse Junior Faculty Fellowship (year-long sabbatical awarded) |
| 1999: | Faculty Research Grant, Yale Center for International and Area Studies |
| 1997-1998: | President's Postdoctoral Fellowship, History Department, University of California at San Diego |
| 1996-1997: | Ford Foundation Doctoral Fellowship |
| 1995-1996: | Whiting Doctoral Fellowship |
| 1995-1996: | Mellon Fellowship, Stanford History Department |
| 1995-1996: | Stanford Humanities Center Dissertation Fellowship |
| 1995-1996: | Visiting Scholar, Julian Samora Research Institute, Michigan State University |
| 1989-1991: | Mellon Foundation Research Fellowship |


PUBLICATIONS—ARTICLES AND BOOK CHAPTERS:

"The Numbers Won't Speak for Themselves," *Inside Higher Education*, September 12, 2017 (co-authored with Nolan Cabrera and Angela Valenzuela).

"In the Spirit of Selma: Nine Students Arrested in Georgia for Protesting Discriminatory Education Policies," *Huffington Post*, January 13, 2015.

"Immigration – What's Love Got to Do with It?" *New American Media*, October 6, 2013.

"Congressman King, Cantaloupe Calves and Drug Mules," *Huffington Post*, July 25, 2013.

6

"Core Essay" for *American Latinos and the Making of the United States* (National Parks Theme Study, 2012).

"Forward" in *Mexicans in San José* by Nannette Regua and Arturo Villarreal (Charleston: Arcadia Press, 2009).

"César Chávez and Cold War Revolutionaries," in *In From the Cold: The Cold War in Latin America*, eds. Gilbert Joseph and Daniela Spenser (Durham: Duke University Press, 2008).

"Forward" in *Latino America: A State By State Encyclopedia*, ed. Mark Overmyer-Velázquez (Westport: Greenwood Press, 2008).

"History of Puerto Ricans," "History of Californios," "History of Nicaraguans," "History of Argentineans," and more than sixty additional essays for the Latina/o History Project at www.latinohistory.com

"Building Transnational Ties:  Mexicans in the United States," in Joseph Tuchin and Andrew Selee, ed. *Mexico's Politics and Society in Transition* (Lynne Rienner Press, 2003).

"Ernesto Galarza, Mexican Immigration, and Farm Labor Organizing in Post-War California," in *The Countryside in the Age of the State* eds. Robert Johnston and Catherine McNicol Stock (Cornell University Press, 2001).

"Ernesto Galarza Remembered:  A Reflection on Graduate Studies in Chicano History," in *Voices of a New Chicano History* eds. Refugio Rochín and Dennis Valdés (Michigan State University Press, 2000).

"The Latino Politics Behind the Music," *The Yale International Forum* (May 2000).


PUBLICATIONS--BOOK REVIEWS:

Benny J. Andrés, Jr. *Power and Control in the Imperial Valley: Nature, Agribusiness, and Workers on the California Borderland, 1900-1940* in *Choice* (February 2015).

Edward S. Casey and Mary Watkins, *Up Against the Wall: Re-Imagining the U.S.-Mexico Border* in *Choice* (January 2015).

George Harwood Phillips, *Chiefs and Challengers: Indian Resistance and Cooperation in Southern California, 1769-1906* in *Choice* (September 2014).

A. Gabriel Meléndez, *Hidden Chicano Cinema: Film Dramas in the Borderlands* in *Choice* (October 2013).

Steven W. Hackel, *Junípero Serra: California's Founding Father*, in *Choice* (September 2013).

Claudia Milian, *Latining America: Black-Brown Passages and the Coloring of Latino/a Studies* in *Choice* (July 2013).

Rudy P. Guevarra, Jr. *Becoming Mexipino: Multiethnic Identities and Communities in San Diego* in *Choice* (November 2012).

David Hayes-Bautista, *El Cinco de Mayo: An American Tradition* in *Choice* (September 2012)

Daniel Dohan, *The Price of Poverty: Money, Work, and Culture in the Mexican American Barrio* in *Labor History* (2006).

John Francis Burke, *Mestizo Democracy* in *Western Historical Quarterly* (2006).

James E. Elfers, *The Tour to End All Tours:  The Story of Major League Baseball's 1913-1913-1914 World Tour* in *Nine: A Journal of Baseball History* (2005).

Glenna Matthews, *Silicon Valley, Women, and the California Dream: Gender, Class, and Opportunity in the Twentieth Century* in *Journal of American History* (March 2004).

John Walton, *Storied Land:  Community and Memory in Monterey* in *Pacific Historical Review* (Fall 2002).

George L. Henderson, *California and the Fictions of Capital* in *Business History Review* (Winter 2000).

Edward J. Escobar's *Race, Police, and the Making of a Political Identity*, in *New Mexico Historical Review* (October 2000).

George J. Sánchez, *Becoming Mexican American*, in *The Historian* (Fall 1994).

<u>EXPERT REPORTS FOR CIVIL RIGHTS CASES AND THE U.S. CONGRESS</u>

*Rosy Girón de Reye,s et al. v. Waples Mobile Home Park, Limited Partnership, et. al*; U.S. Court of Appeals for the Fourth Circuit (2017); Brief of Amici Curiae in Support of Appeal and Reversal, with Laura K. Gómez (UCLA), Ian Hanez-López (UC Berkeley), and Michael A. Olivas (University of Houston; 38 pages.

*Maya Arce et. al., Plaintiffs v. Diane Douglas, et. al., Defendants*; U.S. District Court for the District of Arizona concerning Arizona House Bill 2281 (2016); 98 pages.

*Valle del Sol et. al., Plaintiffs v. Michael B. Whiting et. al.*, Defendants; U.S. District Court for the District of Arizona concerning Arizona Senate Bill 1070 (2014); 97 pages.

"Testimony Before the U.S. House of Representatives Committee on the Judiciary Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law," (http://judiciary.house.gov/hearings/april2007/pitti070419.pdf), April 2007.

<u>WORKS-IN-PROGRESS</u>:

*The World of Cesar Chávez* (under contract with Yale University Press).

*Leaving California: Race from the Golden State* (Book manuscript in process, in conversation with Harvard University Press).

<u>ACADEMIC PAPERS AND INVITED LECTURES</u>:

"Mexican American History in Tough Times," Américo Paredes Distinguished Lecture, University of Texas, October 2017.

"The Emboldening Potential of Dr. George J. Sánchez's Scholarship: A Roundtable," Pacific Coast Branch of the American Historical Association, July 2016.

"Fighting for Empowerment: Grassroots Leadership, Race, and Activism in the Twentieth Century" (chair), Organization of American Historians Conference, April 2016.

"América Adelante: Latino Leadership and Influence in the U.S.," Keynote for Harvard Kennedy School Center for Public Leadership Conference, March 2016.

"US-Cuban Relations," "Baseball in Cuba," and "Histories of Cuban Music" lectures in Havana, Cuba, for the Association of Yale Alumni, October 2015.

"Remembering the Delano Grape Strike: 50 Years Later," Bakersfield Community College, September 2015.

"Latinos in 20th and 21st Century Nebraska," Keynote for the Institute of Ethnic Studies at the University of Nebraska-Lincoln, April 2015.

"Ferguson and Beyond: An Open Conversation on Race, Policing, and Ferguson" Yale University, January 2015.

8

"LGBT Public History in the United States," White House Symposium on LGBT History, June 2014.

"Latinos in Public History," Freedom University, Atlanta, Georgia, April 2014.

"From Braceros to Civil Rights: The World of César Chávez," Northwestern University, February 2014.

"Civil Rights and Religiosity in the United States," Yale-National University of Singapore, Singapore, November 2013.

"Stubborn Sources-Adventures in the Archive" (Chair) for "Interdisciplinary Americas: The Legacies of African American Studies, American Studies, and History at Yale" Conference, November 2013.

"Plurinationalism and the Ecuadorian Diaspora," for "Sumak Kawsay, Good Living: Visions for Achieving Environmental and Social Justice in Ecuador and the US," Yale University, September 2013.

"Young Americans and Immigrant Rights," Wesleyan University, August 2013.

"The Making of America: Untold Stories from American Latino History," National Council of La Raza Conference "Superworkshop," New Orleans, July 2013.

"Old Migrants, New Youth," Yale-National University of Singapore, July 2013.

"Demographics and the U.S. Workforce," Arts and Ideas Festival, New Haven, June 2013.

"Fundamentals of Doing History in the National Park Service," Organization of American Historians Conference, San Francisco, April 2013.

"From Mexican Pueblos, Barrios, to the Racial/Ethnic Borderlands in American Cities, Celebrating Albert Camarillo," Organization of American Historians Conference, San Francisco, April 2013.

"Ethnicity, Race, and Cultural Integration in the United States," China-Yale Youth Leaders Dialogue 2013, April 2013.

"Mexican Food: Yesterday and Today," for Book and Snake Society, New Haven, March 2013.

"Welcome to Yale," Association of Yale Alumni Plenary Gathering, November 2012.

"Race and Ethnicity in the Contemporary United States," for the Chinese Communist Party's Central Party School – Yale Senior Government Leadership Program, August 2012.

"Political Coalitions on Campus," First Annual Lecture to Yale College Sophomores of Color, April 2012.

"Latinos and Public History in the United States," National Council of La Raza Plenary Session, Las Vegas, July 2012.

"Manuel Gamio and the Anthropology of Mexican Immigration", Indigenous Visions: Rediscovering the World of Franz Boas, New Haven, September 2011.

"Rural Radicals in the Postwar California Fields," for the Race , Radicalism, and Repression on the Pacific Coast and Beyond Conference, University of Washington, May 2011.

"The Passions of César Chávez," Boston University, February 2008.

"Dynamics of Immigration and Integration in the Western Hemisphere," Council on Foreign Relations, New York City, May 2007.

"The Carceral West," Western Historians in New England Conference, Amherst College, May 2007.

"IRCA and Immigration Reform in the 1980s," Testimony before the House Subcommittee on Immigration, Washington DC, April 2007.

"César Chávez and the Chicano Movement in the 1970s," Warren Center, Harvard University, April 2007.

"The Farmworker Movement," University of Iowa, March 2007.

"The Passions of César Chávez," Northwestern University, February 2007.

9

"New Approaches to Mexican Immigration," panel commentator at the Pacific Coast Branch of the American Historical Association, Stanford, August 2006.

"Movements for Bracero Justice," Gilder Lehrman Center, October 2005.

"Roundtable on Albert Camarillo," Western History Association, Tempe, October 2005.

"Cesar Chávez and Catholic Movements for Justice," UC Santa Barbara, 6 January 2005.

"How to Create Ethnic Studies Departments and Programs," at Connecticut College, 9 April 2004.

"Making Chicano Studies a National Project," "Thinking Social/National Formations: Ethnic Studies and American Studies Encounters" Conference, Columbia University, 3 April 2004.

"César Chávez, the Chicano Movement, and the March to Sacramento," University of New Mexico, 12 March 2004.

"What Was the Chicano Movement?" Davis Center, Princeton University, 3 April 2003.

"Migración durante la guerra fría," invited panelist for México, el Cáribe y América Central en la Guerra Fría, Seminario Internacional, Mexico City, 8 November 2002.

"Mercurial Fortunes: Transnational Latinos in Northern California," University of Michigan, 29 January 2002.

"Transnational Lives:  Mexican Immigrants in the 20th and 21st Centuries," Keynote American Studies Lecture, Connecticut College, 6 December 2001.

Commentator, "The Politics of Bilingualism in California," American Studies Association, Detroit, 13 October 2000.

"Mexican American Rural Politics in California," Organization of American Historians, St. Louis, 30 March 2000

"Gay and Lesbian History in the U.S.," Trumbull College Master's Tea with historian George Chauncey, Yale University, 16 February 2000.

"The Challenges of Building an Ethnic Studies Program," Trumbull College Fellows Meeting, Yale University, 27 January 2000.

Commentator, ""Rethinking Empires, Nations, and Borderlands at the U.S.-Mexico Border," X Reunión de Historiadores Mexicanos y Norteamericanos, Fort Worth, 22 November 1999.

"Ernesto Galarza and California Farmworkers," Western Historical Association Conference, Portland, 6 October 1999.

"Industrial Mining in 19th Century California," Beinecke Library, 18 September 1999.

"The Contours of Chicana/o History," invited lecture for the Cultural Connections Orientation program, Yale University, 24 August 1999.

"Racial Politics in Postwar San José:  Urbanizing Mexican Americans and Civil Rights," Unimagined Futures:  The Racial Economy of Postwar Metropolitan California Conference, Stanford University, 21 May 1999.

"Introduction," ETHY2K Conference, Yale University, 27 February 1999.

"Immigration and Human Rights," public talk on the 50th anniversary of the UN Declaration of Human Rights, Women's Center, Yale University, 10 December 1998.

"The United Farm Workers and New Labor Unionism" (public talk) UFW Support Committee, 10 October 1998.

Conference commentator, "Contested Terrain: `The Middle Place,' `El Norte,' or "The Southwest?' Five Centuries of Communities Staking Their Claims on the Land" Beinecke Library, Yale University, 2-3 October, 1998.

"Transnational Politics in the Mercury Mines:  Mexican Immigrant Labor Activism at the New Almaden Mines, 1863-1865," California American Studies Association/Rocky Mountain American Studies Association Joint Conference, Albuquerque, 14 April 1998.

10

"One Hundred Percent Americans?  The Community Service Organization, MAPA, and the
American G.I. Forum in San José, 1952-1970," American Studies Association
Conference, Kansas City, 2 November 1996.

"The State of Chicano History in California," Plenary Session of the California Council for the
Promotion of History Conference, Sacramento, 19 October 1996.

"Mexican and Mexican American Women in Postwar Politics," Stanford Humanities Center,
Stanford, 6 June 1996.

"Positions in Chicano History and Ethnic Studies," Panel commentator, Towards a New Chicano
History Conference, Michigan State University, East Lansing, 23 April 1996.

"Representations of Post-War Mexican Migration," American Studies Association Conference,
Pittsburgh, 11 November 1995.

"Fieldwork and Community Research in San José," Stanford Humanities Center, 3 December
1995.

"The Politics of Citizenship in San José," Pacific Coast Branch of the American Historical
Association, Honolulu, 12 August 1995.

"Ernesto Galarza, Mexican Immigration, and the Politics of U.S. Citizenship," Southwestern
Historical Association, Dallas, 20 March 1995.


MEDIA:

On-camera interviews for Episode 1 of "Latino Americans" on PBS (2013).

Advisory Board for Peabody Award-Winning "Latino Americans," 6-episode historical series on
PBS (2011-2013)

Advisory Board for "Before Silicon Valley:  A Migrant Path to Mexican American Civil
Rights," film proposal to the National Endowment for the Humanities (2011-present)

"Conversations with American Latino Expert Scholars Panel," National Parks Service
(http://www.nps.gov/latino/latinovideo.html)

"Latinos and World War II:  A Response to Ken Burns," WNPR radio interview for "Where We
Live," Hartford, May 2007.

"The History of Anti-Latino Racism in California," Sunday Conversation with Larry Bensky,
KPFA [Pacifica] Radio, Berkeley, California, January 2003.

On-camera interview for segment on "Manifest Destiny," in *The Unfinished Nation* (Part 1) for
PBS, 2003.

On-Camera interview for PBS documentary "The Unfinished Nation," 26 August 2002.

"The Explosion of the Zoot Suit Riots:  Will the 21st Century Become the USA's Latina/o
Century?" WRNI Radio, Providence, Rhode Island, October 2000.

Researcher for The Fight in the Fields, PBS documentary on the history of farm workers,
Paradigm Productions, 1995-96.


CONFERENCES, SYMPOSIA, AND MAJOR EVENTS ORGANIZED

Co-Organizer of "Racism, Antisemitism, and the Radical Right" Conference at Yale (2017)

Co-Organizer of "Out of the Desert: Legacies of Incarceration" Symposium at Yale (2017)

Organizer and Chair of Ethnic Studies Conference in Honor of Don Nakanishi (2016)

Organizer and Host of Symposium on Student Research for Center for the Study of Race, Indigeneity, and Transnational Migration (2016)

Founder and Organizer of EMERGE Future Scholars Institute for 100 High School Seniors in the Houston Independent School District at Yale (July 2014, June 2015, July 2016)

Organizer and Chair of Multiple Voices Phase II Workshop in West Virginia: The National Historic Landmark Program in the 21st-Century (2016)

Organizer and Chair of Multiple Voices: The National Historic Landmark Program in the 21st-Century Conference in Arlington, VA (2015)

Chair of White House Symposium on LGBT History (June 2014).

Organizer of First Residential College Reunion at Yale (800 guests), (2012)

Organizer and Host of Annual Commencement Ceremonies in Ezra Stiles College (800 guests), (2009-present)

Organizer and Host of Annual Medieval (K)night Festivities in Ezra Stiles College (400 guests), (2009-present)

Organizer and Host of Poetry Reading and Discussion with Inaugural Poets Richard Blanco and Elizabeth Alexander (2013)

Organizer and Host of Lecture and Discussion with Dave Levin, founder of KIPP Charter Schools (2012)

Organizer and Host of Lecture and Discussion with former New Mexico Governor Bill Richardson (2011)

Organizer and Host of Reading and Discussion with Pulitzer Prize-Winning author Junot Díaz (2010)

Organizer and Host of "Writing African American History for a Popular Audience," symposium with Kareem Abdul-Jabbar (2009)

Organizer and Host of "Ethnic Studies in the World," a series of six invited speakers (2006-2007)

Organizer and Host of "Latina/o Studies Lecture Series," a series of four invited speakers (2004-2005)

Organizer and Host of "Workers of the World: Who Wins and Who Loses in the New Globalization?" with David Bacon (2004)

Organizer and Host of "Media and the War in Iraq" with Larry Bensky (2003)

Co-Organizer and Co-Host of "(A)Live at Yale:  Ethnic Studies" (2000)

Co-Organizer and Co-Host of "El Año del Diamante:  30 Years of MEChA at Yale," Ethnic Studies Teach-In, Yale University (2000)

Co-Organizer and Co-Host of "ETHNY2K" Conference with David Montejano and Lisa Lowe (1999)


TEACHING: GRADUATE

- *Working Group in Latina/o Studies*. Graduate reading and writing seminar, in partnership with the Smithsonian Latino Center.
- *Introduction to U.S. Historiography*.  Graduate reading seminar, required for 1st-year students in History and American Studies.
- *Latinos in the 20th Century*.  Graduate reading seminar, History and American Studies.
- *Readings in Puerto Rican History*. Graduate reading seminar, History and American Studies.
- *Race and Civil Rights*.  Graduate reading seminar, History, American Studies, and African American Studies.
- *Readings in Latina/o History*.  Graduate reading seminar, History and American Studies.

- *Race and Ethnicity in the American West*.  Graduate reading seminar, History and American Studies.
- *Chicana/o Historiography*.  Graduate Reading Seminar for History and American Studies, Yale University
- *Immigration to the United States*.  Summer course for visiting Asian scholars in the Yale-China Program, Yale University.

## TEACHING: UNDERGRADUATE

- *Histories of Latinas/os in the US*.  Undergraduate seminar for History, American Studies, and ER&M.
- *Radical California*. Undergraduate seminar for History, American Studies, and ER&M.
- *Junior Seminar in American Studies*.  Interdisciplinary introduction for majors to selected topics and methodologies (co-taught).
- *History of Mexican Americans Since 1848*.  Introductory lecture course for History and American Studies, and for the Program in Ethnicity, Race, and Migration (ER&M), Yale University.
- *Mexican Immigration in the United States*.  Advanced research seminar for History and American Studies, and for ER&M, Yale University.
- *Chicana/o Cultural History*.  Undergraduate seminar for History, American Studies, and ER&M.
- *Race and Ethnicity in the Far West*.  Advanced research seminar for History and American Studies, and for ER&M, Yale University.
- *Introduction to Ethnicity, Race, and Migration*.  Sophomore seminar for ER&M majors, co-taught with Patricia Pessar, Yale University.
- *ER&M Senior Colloquium:  Theoretical and Methodological Issues*.  Required research seminar for the Ethnicity, Race, and Migration program.
- *ER&M Junior Seminar*. Required methods seminar for the Ethnicity, Race, and Migration Program.
- *Cultural Hybridity and Latino Literature*.  Directed Research Project, Department of Spanish.

## POSTDOCTORAL FELLOWS DIRECTED (15):

| | |
|---|---|
| Nancy Khalil: | Postdoctoral Fellow in the Center for the Study of Race, Indigeneity, and Transnational Migration (2017-18); "Contemporary Islamophobia in the United States" |
| Irene Garza: | Postdoctoral Fellow in the Center for the Study of Race, Indigeneity, and Transnational Migration (2017-18); "Latinas/os in the U.S. Military" |
| Stephanie Teves: | Postdoctoral Fellow in the Center for the Study of Race, Indigeneity, and Transnational Migration (2016-17); "Defiant Indigeneity: The Politics of Hawaiian Performance" |
| María Quintana: | Postdoctoral Fellow in the Center for the Study of Race, Indigeneity, and Transnational Migration (2016-17); "Contracting Freedom: Race, Empire, and U.S. Labor Importation Programs, 1942-1964" |

13

| Genevieve Carpio: | Clay Postdoctoral Fellow in History (2013-2015); "Organizing the Inland Empire: Regional & Racial Formation in Southern California, 1880-1980" |
| Amina el-Annan: | Postdoctoral Fellow in ER&M and American Studies (2012-2014); "Multiple Orients: Urban Dream Maps, Creative Currency and the Countercultures of Modernity" |
| Julio Capó: | Postdoctoral Fellow in ER&M and American Studies (2010-2012); "It's Not Queer to Be Gay: Miami and the Emergence of the Gay Rights Movement, 1945-1995" |
| Wilson Valentín: | Postdoctoral Fellow in ER&M and American Studies (2010-2012); "Bodega Surrealism: The Emergence of Latina/o Artivists in New York City, 1976-Present" |
| Rani Neutill: | Postdoctoral Fellow in ER&M and American Studies (2009-2010); "The Intimacies of Hatred" |
| Raymond Orr: | Postdoctoral Fellow in ER&M and American Studies (2009-2010); "Pain and Profit in the Making of the Indigenous World" |
| Kornel Chang: | Postdoctoral Fellow in ER&M and American Studies (2008-2010); "Pacific Connections: The Making of the U.S.-Canadian Borderlands" |
| Zareena Grewal: | Postdoctoral Fellow in ER&M and American Studies (2006-2008); "Islam is a Foreign Country: American Muslims and the Global Crisis of Authority" |
| Denise Khor: | Postdoctoral Fellow in ER&M and Film Studies (2007-2009); "Asian Americans at the Movies: Race, Labor, and Migration in the Transpacific West, 1900--1945" |
| Elaine Peña: | Postdoctoral Fellow in ER&M and Religious Studies (2007-2008); "Performing Piety: Making Space Sacred with the Virgin of Guadalupe" |
| Alexandra Vázquez: | Postdoctoral Fellow in ER&M, Theater Studies, and American Studies (2006-2008); "Listening in Detail: Performances of Cuban Music" |

DOCTORAL STUDENTS:

*Primary Advisor -- Completed (8):*

Allyson Brantley
Assistant Professor of History,
University of La Verne

Mike Amezcua
Assistant Professor of History
University of Notre Dame

Ana Minian
Assistant Professor of History,
Stanford University

Sara Hudson
Fellow, U.S. Department of Justice

Anita Seth
Staff Director
HERE Union Local 34

April Merleaux
Associate Professor of History
Florida International University

14

Julie Weise
Associate Professor of History
University of Oregon

Geraldo Cadava
Associate Professor of History
Northwestern University

*Doctoral Committees – Completed (9):*

Ashley Riley Sousa
Assistant Professor
Middle Tennessee State

Lisa Ramos
Lecturer in History
Texas A&M University

Fredy González
Assistant Professor of History
University of Colorado

Brian Herrera
Assistant Professor of Performance
Studies, Princeton University

Monica Martínez
Assistant Professor of American
Studies, Brown University

Mark Overmyer-Velásquez
Associate Professor of History
University of Connecticut

Kaysha Corinealdi
Assistant Professor of Liberal Arts
Emerson College

Benjamin Johnson
Associate Professor of History
Loyola University of Chicago

Lori Flores
Associate Professor of History
SUNY Stony Brook

*Current Doctoral Student Advisees*

Damian Vergara Bracamontes
Yale American Studies '19

"Migrant Resiliency: Navigating Illegality in
San Diego, 1986-2016"

Pedro Regalado
Yale American Studies '19

"Reimagining Metropolis: Latinas/os
and the Post-Industrialization of New York"

Iliana Rodríguez
Yale American Studies '19

"Constructing Mexican Metro-Atlanta,
1985-2016"

María Angie Díaz
Yale American Studies '20

"Mexican American Memories in Houston"

Monique Flores Ulysses
Yale History '21

"Race and Masculinity at the US-Mexico
Border"

Hector Peralta                                    "Chicanx Communities and Education in
American Studies '22                              Yale California"


TEACHER EDUCATION AND PUBLIC OUTREACH

Organizer of EMERGE Future Scholars Institute for 100 High School Seniors in the Houston
    Independent School District at Yale (July 2014, June 2015, July 2016)
"Mexicans in the 20th Century United States," Teaching American History Grant, Hamden, CT.
    (2010)
Instructor, Yale-New Haven Teachers Institute (2006, 2007)
"Immigration and Public Policy in the American West," Institute for New York City Teachers
    (2007)
"Latinos in the 20th Century," Institute for Teachers at Salem State University (2006)
"Immigration in American History," Weeklong Institute for Teachers at the University of
    Delaware (2006)


EXTERNAL PROMOTION REVIEWS (TENURE, PROMOTION):

Arizona State University                          University of California at San Diego
Harvard University                                University of Chicago
Northwestern University                           University of Massachusetts-Amherst
Notre Dame University                             University of Michigan
Princeton University                              University of Minnesota
University of Alabama                             University of Missouri-Kansas City
University of Arkansas                            University of Nebraska
University of California at Irvine                University of Texas at Austin
University of California at Los Angeles           University of Texas at San Antonio
University of California at Riverside             University of Washington


PROFESSIONAL AFFILIATIONS:

American Studies Association
Latin American Studies Association
Latina/o Studies Association
Organization of American Historians
Western Historical Association
National Association of Chicana/o Studies


LANGUAGES:

Spanish (fluency) and Portuguese (reading)

16

REFERENCES:

Peter Salovey
President of Yale University
peter.salovey@yale.edu

Richard Levin
Former President of Yale University
richard.levin@yale.edu

Jonathan Holloway
Provost of Northwestern
jonathan.holloway@yale.edu

Jeremiah Quinlan
Yale College Dean of Admissions
jeremiah.quinlan@yale.edu

Sharon Kugler
University Chaplain
sharon.kugler@yale.edu

Jon Jarvis
Former Director of the National Park Service
jjonbjarvis@gmail.com

Camille Lizarríbar
Yale College Dean of Student Affairs
camille.lizarribar@yale.edu

Vicki Ruíz
Distinguished Professor of History
UC Irvine
vruiz@uci.edu

George J. Sánchez
Vice Dean for Diversity & Strategic Initiatives
University of Southern California
georges@usc.edu

# EXHIBIT B

# Expert Report of Stephen J. Pitti

*State of New York, et al v. Donald Trump et al*

**Stephen J. Pitti**
Department of History
American Studies
Program Yale University
PO Box 208236
New Haven, CT 06511

# TABLE OF CONTENTS

**Page**

I.    EXPERIENCE AND QUALIFICATIONS ................................................................. 1

II.   INTRODUCTION ................................................................................................... 2

III.  SUMMARY OF ARGUMENT ............................................................................... 3

IV.   THE REPORT ........................................................................................................ 7
   A.  A Significant History of Racial Animus ......................................................... 7
   B.  Understanding Racial Animus and Racial Scripts .......................................... 9
   C.  Anti-Latino Animus in Recent U.S. History ................................................ 13

V.    RACIAL "CODEWORDS" IN RECENT U.S. POLITICS ..................................... 16
   A.  "Dog Whistle Politics" ................................................................................ 18
   B.  The Threat of Reconquest ........................................................................... 23
   C.  Arizona as Political Laboratory ................................................................... 25
      1.  Hostility to Latino Youth ....................................................................... 30
      2.  A Focus on Latinos as a Criminal Threat ............................................... 31
      3.  Driving Latinos Out of the State ........................................................... 31
      4.  Efforts to Mobilize White Voters .......................................................... 31
   D.  The "Arizona Strategy" and National Politics ............................................. 32
      1.  The Influence of John Tanton's Organizations ....................................... 34

VI.   THE TRUMP CAMPAIGN AND ADMINISTRATION, AND RACIAL ANIMUS .......... 35
   A.  Denial of Racial Animus .............................................................................. 37
   B.  Connections with Tanton's Organizations .................................................... 38

VII.  CHARACTERISTICS OF ANIMUS IN THE CAMPAIGN AND ADMINISTRATION ... 40
   A.  "Us" vs. "Them" .......................................................................................... 41
   B.  Equating Mexicans and Mexican Americans ................................................ 44
   C.  Latinos as Security Risks ............................................................................. 45
   D.  Fears of "Reconquest" ................................................................................. 47
   E.  Entitlements, Veterans, and Voting Rights ................................................... 50
      1.  Welfare and Benefits .............................................................................. 51
      2.  Protecting "American Families" ............................................................. 54
      3.  Protecting American Voters .................................................................... 55
   F.  Unassimilable and a Cultural Threat ............................................................ 57
      1.  "Mexican Speech" .................................................................................. 59
      2.  Racial Quotas ........................................................................................ 60
   G.  "They're bringing drugs. They're bringing crime" ....................................... 62
      1.  Criminalizing "Dreamers" ..................................................................... 64
      2.  "Cartels" in the Suburbs ........................................................................ 65
      3.  Dreamers as Gang Members ................................................................... 68
      4.  Protecting "Our Children" ...................................................................... 71
   H.  "They're Rapists" ........................................................................................ 74
   I.  "Vomit" and "Filth" ..................................................................................... 77
   J.  Anchor Babies and Families ......................................................................... 79
   K.  The Wall ..................................................................................................... 82

VIII.   CONCLUSIONS AND OPINIONS ................................................................................ 84

IX.   BIBLIOGRAPHY ........................................................................................................ 85

## I.      EXPERIENCE AND QUALIFICATIONS

I am a full Professor of History and American Studies at Yale University and a Distinguished Lecturer for the Organization of American Historians from 2016 to 2019. I am also the inaugural Director of Yale's Center for the Study of Race, Indigeneity, and Transnational Migration. My primary field of research and teaching centers on the experiences of Mexicans and Mexican Americans in the U.S. Southwest. I am the author of two major publications that examine this history (*The Devil in Silicon Valley: Race, Mexican Americans, and Northern California* [Princeton University Press, 2003] and *American Latinos and the Making of the United States* [Eastern National Press, 2012]), and articles and book reviews in academic and popular journals. I advised the Peabody Award-Winning series "Latino Americans" on PBS and the "Bridging Cultures: Latino Americans Project" organized by the National Endowment for the Humanities and the American Library Association. I am an editor for the "Politics and Culture in Modern America" book series at the University of Pennsylvania Press. I am also a member of the Editorial Board of the *U.S. Latino Oral History Journal.* As a member of the National Parks Service Advisory Board from 2013 to 2017, I have advised the NPS Director and the Secretary of the Interior; I have chaired the National Historic Landmarks Committee; and I have served as a member of the Latino Scholars Panel for the National Parks Service. I chaired a White House Committee on LGBT History in 2014, and I have worked with secondary school teachers and high school students around the country. I provided expert testimony to the United States Congress in 2007 on the history of Mexican immigration to the United States. I earned my Ph.D. at Stanford University, I have held a postdoctoral fellowship at the University of California at San Diego and I have taught at Yale University since 1998. I was promoted to Professor at Yale in 2005.

## II.    INTRODUCTION

Donald Trump and others in his administration have long expressed animus towards ethnic Mexicans and other Latinos. That animus was articulated on June 16, 2015, when Trump's announcement of his presidential candidacy emphasized the dangers of Mexican immigration. On that day Trump promised that he would "immediately terminate President Obama's illegal executive order on immigration, immediately," assuring that voters understood his opposition to DACA and the centrality of anti-immigrant rhetoric in his political campaign.[1]

A significant academic literature and a wide body of scholarship addresses the history of racial animus against Mexican Americans, Mexican immigrants, and Latinos in the United States which confirms that those populations have been subjected to longstanding and pervasive discrimination. In what follows, I rely on my expertise as an historian and my experiences as a teacher of undergraduates and graduate students. I also draw from my involvement in professional historical associations, my work convening seminars for high school teachers around the country, and my leadership in public history programming for the National Parks Service, for the National Endowment for the Humanities, and for other organizations.

I demonstrate that racial animus has played a very important role in American politics. I show that animus directed at Latinos has often been driven by electoral politics, and that since the 1960s racially coded speech has been central to many tense political contests around the country. In recent years a concern about the "Mexicanization" of the United States has often framed public policy debates, including debates about youth in immigrant families and about public education. Racial code words have become ever more important, and they have shaped how politicians send messages to voters and protect themselves from charges of racism. I show that Donald J. Trump and others associated with his presidential campaign and administration have drawn upon and used those racial code words, that they have benefitted from racism against Latinos, and that discussions about

---

[1] "Donald Trump, Ceo, Trump Organization, Delivers a Presidential Campaign Announcement," *Political Transcript Wire*, June 16, 2015,
https://search.proquest.com/docview/1688681159/citation/36EF9DEC737141BBPQ/1.

Deferred Action for Childhood Arrivals (DACA) were shaped by racial animus against ethnic Mexicans.

The following pages illustrate how politicians and activists working on recent political campaigns have encouraged opposition to Mexicans, Mexican Americans, and other Latinos. This has been true in many parts of the United States, but political movements in states such as Arizona have been particularly important. There and elsewhere, nativist fears combined with anxieties about changes in education, about the demographic growth of the immigrant and U.S.-born population, and about the dominance of the English language have focused negative attention on Latino communities and marked them as easy targets for political attack.

It is important to clarify, however, that while Trump and others have adopted this political strategy, other Republicans have taken a different approach. In 1979, when he announced his candidacy for president, Ronald Reagan urged fellow politicians and American voters to realize that "It is time we stopped thinking of our nearest neighbors [Canada and Mexico] as foreigners."[2] Other Democrats and Republicans over the last forty years have refused to make hyperbolic, exaggerated claims about Latinos based in racial animus.

### III.   SUMMARY OF ARGUMENT

I demonstrate that, in speeches and tweets and other public pronouncements, Donald J. Trump and others associated with his Administration have often expressed animus towards ethnic Mexicans and other Latinos. The President has described them as criminals, animals, and threats to white voters; he has called them rapists; he has suggested that Mexican immigrants do not represent "the best" of Mexico; he has associated Latin American immigrants and their families with Middle Eastern terrorists; and he has accelerated fears that people of Mexican descent living in both the United States and Mexico represent a threat to the well-being of white Americans from coast to coast. These stereotypical labels draw upon the nation's history of racial animus. Polarizing rhetoric seems to have been used for political purposes by both the Trump campaign and the Trump administration.

---

[2] Ronald Reagan, "November 13, 1979: Announcement for Presidential Candidacy," Miller Center, November 13, 1979, https://millercenter.org/the-presidency/presidential-speeches/november-13-1979-announcement-presidential-candidacy.

It is worth noting, as well, that other associates and appointees of Trump have expressed open animus against ethnic Mexicans, Mexican immigrants, and Latinos. They include Attorney General Jeff Sessions, who announced the rescinding of DACA on behalf of the President; Kansas Secretary of State Kris Kobach, who was a member of Trump's transition team, who played a major role in crafting the 2016 Republican platform on immigration, and who had designed earlier anti-immigrant laws in Arizona and Alabama and elsewhere that provided a template for Trump between 2015 and 2017;[3] White House senior policy adviser and head of the Domestic Policy Council Stephen Miller, formerly Director of Communications for Senator Jeff Sessions, a Trump campaigner in Colorado, and an individual considered by some "Trump's top immigration adviser";[4] advisor Michael Anton of the National Security Council; Mark Krikorian of the Center for Immigration Studies, who was often cited by Trump in campaign speeches, who leads an organization that champions reducing immigration, and that has been accused of anti-Semitism, and who attended at least one meeting at the Department of Homeland Security in 2017 (Hamilton deposition, 189);[5] Joe Arpaio, former Sheriff of Maricopa County who was convicted in federal court for racially profiling Latino communities; and others.

It is my understanding that a recent deposition revealed that members and allies of the Trump administration present at the meetings in which the rescinding of DACA was discussed included Elaine Duke, John Kelly, Rachel Brand, Jeff Sessions, Stephen Miller, and Gene Hamilton (Hamilton deposition, 106-107), and that John Kelly and Stephen Miller presided over one meeting in the Roosevelt Room of the White House. (Hamilton deposition, 109) John Feere was also present in at least one DHS meeting where DACA was discussed. (McCament deposition, 121) I note that Hamilton, Feere, and others have close connections to FAIR and other organizations discussed below.

---

[3] Bryan Lowry, "Kris Kobach Helps Add Border Wall, Same-Sex Marriage, Gun Planks to GOP Platform," *Wichita Eagle*, July 13, 2016, http://www.kansas.com/news/politics-government/article89362087.html.

[4] Jonathan Blitzer, "How Stephen Miller Single-Handedly Got the U.S. to Accept Fewer Refugees," *The New Yorker*, October 13, 2017, https://www.newyorker.com/news/news-desk/how-stephen-miller-single-handedly-got-the-us-to-accept-fewer-refugees.

[5] "Mark Krikorian, Who Urges Cutting Immigration, Gains Relevance In Trump Era," NPR.org, accessed October 20, 2017, http://www.npr.org/2017/04/10/523311475/mark-krikorian-who-urges-cutting-immigration-gains-relevance-in-trump-era.

Depositions reveal that, prior to election day, Gene Hamilton, now Senior Counselor to the Secretary of Homeland Security, discussed with Stephen Miller and others on the Trump transition the plan to rescind DACA. (Hamilton deposition, 69). Beginning in January 2017, Hamilton provided policy advice to Secretary of Homeland Security John Kelly on immigration matters and recommended that DACA be rescinded in early-February 2017 (Hamilton deposition, 85-86); he made the same recommendation to Acting Secretary Duke in early-August 2017.

Donald Trump cultivated the support of anti-immigrant figures on the campaign trail and has offered several of them prominent positions to establish policies regarding undocumented immigrants, DACA recipients, and the U.S.-Mexico border. When Senator Jeff Sessions endorsed Trump for president in February 2016, candidate Trump told Alabamans that "when I talk about immigration and when I talk about illegal immigration and all the problems with crime and everything else, I think of a great man … Senator Jeff Sessions!" Sessions in turn riled up the crowd with opening remarks about the threat posed by Latinos: "You have asked for 30 years, and politicians have promised for 30 years, to fix illegal immigration. Have they done it? [no!] Donald Trump will do it!"[6]

Reviewing the President's record, one political scientist has concluded that "It could be … that he's particularly comfortable trafficking in racist language…. the most benign explanation of his behavior is that he's very comfortable being around racists."[7]

Trump's animus towards Latinos, and towards immigrants, has been characterized by significant exaggeration about the demographic size of the immigrant population; about the number of Latinos arriving each week in the United States; about the lack of border enforcement under the Obama presidency; about the number of convicted criminals in the population of undocumented residents; about candidate Hillary Clinton's stated intentions regarding border enforcement and immigrant access to health care; and more.

As more information becomes available through depositions and other processes in the

---

[6] *Senator Jeff Sessions Endorses Donald Trump* (Madison, Alabama, 2016), https://www.youtube.com/watch?v=Is0sNyjPeX8.
[7] Marc Fisher, "Trump and Race: Decades of Fueling Divisions," *Washington Post*, August 16, 2017, sec. Politics, https://www.washingtonpost.com/politics/trump-and-race-decades-of-fueling-divisions/2017/08/16/5fb3cd7c-8296-11e7-b359-15a3617c767b_story.html.

coming months regarding DACA; regarding federal policies directed at Latinos, immigrants, and youth in the United States; and regarding the Trump campaign and administration, I reserve the right to update this report and add additional material.

The pages that follow suggest the following general conclusions:

- First, there is a long history of discrimination and prejudice against Latinos, and in particular against Mexicans and Mexican Americans, in the United States. This history includes acts of vigilante and state violence, housing and job discrimination, opposition to intermarriage, denial of naturalization and voting rights, discrimination in jury selection, and more.

- Second, opposition to Latin American immigrants has long shaped racial animus against Latinos who are citizens of the United States. Anti-immigrant animus against "illegals" and dangerous foreigners has driven racial animus, and politicians and pundits have deepened fears of the "Mexicanization" of the United States since the 1990s.

- Third, racial animus has often been advanced through racially coded speech. Coded articulations of racial animus have been popularized by political candidates and political movements seeking to galvanize voters and other followers.

- Fourth, a climate of racial animus has surrounded recent political campaigns, including the Trump presidential campaign.

- Fifth, anti-immigrant politics in twenty-first century Arizona provided a testing ground and a model for national Republican Party responses to the "Latino Threat." Many leaders important to the Trump campaign, and prominent in the Trump administration, were involved in Arizona efforts to halt immigration and restrict the rights of resident immigrants.

- Sixth, organizations founded by John Tanton – the Center for Immigration Studies (CIS), the Federation for American Immigration Reform (FAIR), and Numbers USA – have been key to the development of Trump's immigration policies, including his decision to rescind DACA. Many leading members of Trump's administration and advisers to the President, including Jeff Sessions, Kris Kobach, and Stephen Miller, have strong ties to

one or more of these organizations, and members of CIS, FAIR, and Numbers USA attended at least one meeting to discuss immigration policy at the Department of Homeland Security in 2017 (Hamilton deposition, 189).

• Seventh, recipients of DACA and other immigrants have been represented as an obstacle to the well-being of "everyday Americans," to national security, to public health, and to the safety of the American public. Their opponents have used racially-coded speech to represent them as criminals, security risks, and enemies of the United States.

• Eighth, the Trump administration has routinely exaggerated the number of undocumented immigrants in the United States and their negative impact on U.S. society.

• Ninth, anti-immigrant politicians and advocates have expressed considerable opposition to both immigrant children and the U.S.-born children of immigrants. This animus, now directed at DACA recipients, has developed from historical anti-Latino animus, and the history of racial segregation in education, and efforts to control Latina reproduction.

• Tenth, there are many examples of racially coded speech intended to remind voters and others of the dangers associated with Latinos in the United States. In recent years, the most powerful and enduring has been "the wall," a phrase intended to remind Americans of many threatening narratives about Latinos during the 2016 election.

## IV.     THE REPORT

### A.  A Significant History of Racial Animus

"It is important to understand," two sociologists have recently shown, "that immigrants take their position within a society that has historically racialized its population."[8] To understand why Attorney General Jeff Sessions used a word such as "filth" to characterize Mexican immigrants in April 2017, or to understand why Kansas Secretary of State Kris Kobach – who was in close touch with Gene Hamilton from "day one" of the Trump administration (Hamilton deposition, 109) --

---

[8] Rogelio Sáenz and Karen Manges Douglas, "A Call for the Racialization of Immigration Studies: On the Transition of Ethnic Immigrants to Racialized Immigrants," *Sociology of Race and Ethnicity* 1, no. 1 (2015): 166–80; Daniel Martínez HoSang, *Racial Propositions: Ballot Initiatives and the Making of Postwar California* (Berkeley: University of California Press, 2010).

argued that DACA recipients "represent a cross section of the illegal alien population" which includes "criminals," it is critical to recognize the importance of racial animus.[9]

Historians have produced thousands of books and articles on nineteenth and twentieth-century race relations.[10] Throughout the course of United States history, racism has sometimes been expressed as an explicit ideology in which groups were clearly defined along racial lines, and in which they were marked as superior or inferior in racial terms. Racial ideologies shaped immigration policy in the United States, as when Congress passed Chinese exclusion (1882), when the 1924 National Origins Act created quotas for Northern and Western European countries to "preserve … the racial status quo in the United States" and "guarantee … racial homogeneity"; when the United States created an agricultural guest labor program with Mexico in 1942; when the Executive Branch launched "Operation Wetback" in the 1950s to deport undocumented Mexicans; when the 1965 Hart-Cellar Act restricted immigration from the Western Hemisphere; when California Proposition 187 ("Save Our State") denied public assistance to undocumented residents in 1994; and so forth.

Because ethnic Mexicans (a term denoting both Mexican Americans and Mexican immigrants) have long comprised roughly 70% of the Latino population, perceptions and ideas about ethnic Mexicans have played a key role in defining anti-Latino racism. Demeaning portrayals of Mexican immigrants as "illegals," and as dangerous, criminal, unproductive, sexually promiscuous, dishonest, or anti-American, have shaped broader thinking about Latinos for many decades. These ideas have played key roles in discussions about both the U.S.-Mexico border and Latin American border crossers. "Stereotypes regarding the Latina/o population proliferate in U.S. public discourse," according to one recent author, "fueled by media reports and perpetuated by some politicians, most of which goes unchallenged even while it contributes to the notion that Latino immigrants are a

---

[9] Maxwell Tani, "Trump Adviser Tells DACA Recipients to 'Go Home and Get in Line,'" *Business Insider*, September 5, 2017, http://www.businessinsider.com/kris-kobach-immigration-daca-get-in-line-2017-9; Jeff Sessions, "Attorney General Jeff Sessions Delivers Remarks Announcing the Department of Justice's Renewed Commitment to Criminal Immigration Enforcement," April 11, 2017, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-announcing-department-justice-s-renewed.

[10] See Winthrop D. Jordan, *White over Black: American Attitudes toward the Negro, 1550-1812* (Chapel Hill: University of North Carolina Press, 1968). Historian George Fredrickson noted in 1971 that "Unlike Brazil and other Latin American countries, the United States has been a genuinely racist society." Fredrickson, "Social Origins of American Racism," in George M. Fredrickson, *The Arrogance of Race: Historical Perspectives on Slavery, Racism, and Social Inequality* (Middletown, CT: Wesleyan University Press, 1988), 190.

dangerous threat to the nation. These include stereotypes that they are uneducated peasants, drug dealers, on welfare, and crime-prone."[11] There is significant evidence that Donald Trump and others in his administration have engaged in explicitly racial thinking about different societal groups, including Latinos.[12]

### B. Understanding Racial Animus and Racial Scripts

Animus directed towards Latinos was often explicit in the nineteenth and early-twentieth century, advanced in part through derogatory keywords such as "greaser" and "wetback" that marked Mexicans' inferiority. While such "explicit and rationalized" racial animus is still sometimes expressed, animus is now made most clear through social relations — how groups are treated, which institutions and jobs groups can access in American society, where and how people are allowed to live and express themselves, who is allowed to participate in electoral politics, the ways in which communities experience policing and incarceration, and so forth.[13] For much of U.S. history, African Americans, Latinos, and others experienced mob violence and extralegal terror, educational discrimination, the denial of voting rights, and other clear examples of racial animus that were not always accompanied by simultaneous ideological declarations of racial inferiority and superiority. It is in part because animus does not require explicit, public declarations of racial ideology that racism has persisted across the centuries, enduring the egalitarian revolutions of the late-eighteenth century and gaining strength in the twentieth century even after "ideological

---

[11] Ramiro Martínez Jr., "Revisiting the Role of Latinos and Immigrants in Police Research," in *Race, Ethnicity, and Policing: New and Essential Readings*, ed. Stephen Rice and Michael White (New York: New York University Press, 2010), 437.

[12] Jennifer Rubin, "Trump's Ingrained Racism: Trump Cultivated Racial Bias and Built Himself a Following through Racist Stunts and Rhetoric.," *Washington Post* (blog), September 28, 2016, https://search.proquest.com/docview/1824118855/citation/683F2C2D10A74725PQ/1; Michael D'Antonio, "Trump's Move to End DACA Has Roots in America's Long, Shameful History of Eugenics," *Los Angeles Times*, September 14, 2017, https://search.proquest.com/docview/1938894620/abstract/618E1C81BC1946B9PQ/1; Scott Shane, "Combative, Populist Steve Bannon Found His Man in Donald Trump," *The New York Times*, November 27, 2016, https://www.nytimes.com/2016/11/27/us/politics/steve-bannon-white-house.html; Isaac Stanley-Becker, "In Trump's GOP, Jeff Sessions Goes from Fringe to Prime Time," *Washington Post*, July 18, 2016, https://www.washingtonpost.com/politics/in-trumps-gop-sessions-rockets-from-the-fringe-to-prime-time/2016/07/18/1fc04d14-490b-11e6-acbc-4d4870a079da_story.html; "How White House Advisor Stephen Miller Went from Pestering Hispanic Students to Designing Trump's Immigration Policy - Univision," accessed October 20, 2017, http://www.univision.com/univision-news/politics/how-white-house-advisor-stephen-miller-went-from-pestering-hispanic-students-to-designing-trumps-immigration-policy.

[13] On racial animus, see Fredrickson, *The Arrogance of Race*, 189.

racism [was] discredited in the educated circles of a dominant group."[14]

Scholars have emphasized that contemporary animus towards certain groups is now less often shaped by explicit references to group difference and ideologies of racial inferiority. But past "racial scripts" about different societal groups, even descriptions and narratives and "scripts" that have been thoroughly discredited, often continue to shape contemporary racial animus. Scholars have emphasized that these historical scripts shape negative ideas still associated with Latinos – their perceived links to criminality, disease, political radicalism, and so forth. These racial scripts have also kept alive ideas that Latinos who are U.S. citizens, even those whose families have resided in the country for many generations, do not really belong to the body politic. Racial scripts explain, in other words, "why Mexican Americans are still not deemed fully American and are largely equated with illegality."[15]

An attention to history, and careful analysis of the use of coded racial appeals in contemporary political discourse, provide keys to understanding the links between historical racial animus and racial animus as it is expressed in twenty-first century politics. History also helps explain why Latinos have experienced racial segregation in education, employment, jury selection, and housing, and other forms of discriminatory treatment, as well as racial violence.[16]

Racial animus was shaped by U.S. westward expansion during the mid-nineteenth century and by concerns during and after the war between the United States and Mexico (1846-1848) about the future incorporation of ethnic Mexicans into the national community. South Carolina Senator John C. Calhoun noted in 1848 that "We have never dreamt of incorporating into our Union any but the Caucasian race – the free white race …. Ours, sir, is the Government of a white race. The greatest misfortunes of Spanish America are to be traced to the fatal error of placing these colored races on an

---

[14] Fredrickson, 189.

[15] Natalia Molina, *How Race Is Made in America: Immigration, Citizenship, and the Historical Power of Racial Scripts* (Berkeley: University of California Press, 2013), 16.

[16] More than five hundred ethnic Mexicans were victims of lynching or mob violence between 1848 and 1928, and the discriminatory policing of Latino communities since World War II is well-documented. Benjamin Heber Johnson, *Revolution in Texas: How a Forgotten Rebellion and Its Bloody Suppression Turned Mexicans into Americans*, Western American Series (New Haven: Yale University Press, 2003); Richard Delgado, "The Law of the Noose: A History of Latino Lynching," *Harvard Civil Rights-Civil Liberties Law Review* 44, no. 2 (2009): 297–312; William D. Carrigan and Clive Webb, *Forgotten Dead: Mob Violence Against Mexicans in the United States, 1848-1928* (New York: Oxford University Press, 2013).

equality with the white race ...."[17] Scholars have noted that "first encounters with Mexicans [in the nineteenth century] tended to fix some basic outlines and to become the prototypes of late Anglo-Saxon images of all Hispanics."[18] Early hostility and prejudice shaped how U.S. politicians and pundits, and the broader public, subsequently understood Puerto Ricans, Cubans, Dominicans, Central Americans, and others in the Caribbean and Latin America who were targeted by U.S. foreign policy or arrived as migrants into the mainland United States.[19]

For more than a hundred years, Latinos have been represented as sexually promiscuous and dangerous by U.S. observers. Throughout the late-nineteenth century, politicians and journalists and others in the United States often registered disgust with the idea of incorporating large numbers of "mixed-race" Latinos. Writer James Shepherd Pike, for example, opposed the territorial acquisition of Cuba on the grounds that the island was dominated by "black, mixed, degraded, and ignorant, or inferior races"; and journalist Samuel Hazard worried about the annexation of Dominicans who "are neither pure black nor pure white" but "are mixed in every conceivable degree."[20]

In part because Latinos seemed to be the product of too much racial mixing, explicit concerns were also articulated about whether Latinos could and should be assimilated into the United States as permanent residents. Authors such as James Fenimore Cooper, Helen Hunt Jackson, Stephen Crane, and John Steinbeck popularized images of Mexican Americans as indolent, unproductive, un-American, and often drunk, representations that shaped how voters and elected officials treated Latino communities. The use of these stereotypes accelerated when the U.S. witnessed the arrival of large numbers of Mexican immigrants in the early-1900s. Into the mid-twentieth century, writers such as Willa Cather, John Reed, Katherine Anne Porter, Dashiell Hammett, Raymond Chandler,

---

[17] José A. Cobas, Jorge Duany, and Joe R. Feagin, "Racializing Latinos: Historical Background and Current Forms," in *How the United States Racializes Latinos: White Hegemony and Its Consequences*, ed. José A. Cobas, Jorge Duany, and Joe R. Feagin (Boulder: Paradigm Publishers, 2009), 4.

[18] Joan W. Moore and Harry Pachon, *Hispanics in the United States* (Englewood Cliffs, N.J.: Prentice-Hall, 1985), 4.

[19] Writing in the prizewinning *Oxford History of the American West*, Clyde Milner noted the importance by the early-1900s of "hostile attitudes toward the Hispanic culture and citizenry" by white Americans. Historian Carlos A. Schwantes asserted that such "racial and ethnic prejudice was pervasive." Clyde A. Milner II, "National Initiatives," in The Oxford History of the American West eds. Clyde A. Milner II, Carol A. O'Connor, and Martha A. Sandweiss (New York: Oxford University Press, 1994), 168, 184; Carlos A. Schwantes, "Wage Earners and Wealth Makers," in The Oxford History of the American West eds. Clyde A. Milner II, Carol A. O'Connor, and Martha A. Sandweiss (New York: Oxford University Press, 1994), 442.

[20] Cobas, Duany, and Feagin, "Racializing Latinos: Historical Background and Current Forms," 5.

Ernest Hemingway, and Jack Kerouac offered damaging portrayals.[21] David Starr Jordan, the former Chancellor of Stanford University, voiced a view common in 1925 that "the Mexican peon, who for the most part can never be fit for citizenship . . . is giving our stock a far worse dilution than ever came from Europe."[22] Linguist and interdisciplinary scholar Otto Santa Ana has shown that early-twentieth century Mexican immigration prompted fears in the United States about the "brown tide" that seemed to be "flooding" across the Southwestern border.[23] Prominent historians have noted that "during the first decade of the [twentieth] century, and especially after the Mexican Revolution, nativist hostility to the Mexicans intensified."[24]

When explicit talk of racial inferiority came to seem less appropriate in literary, media, and government circles by the 1940s and 1950s, new code words were introduced to represent Latinos that gestured back to the long history of racial animus in the United States. Stereotypes about Mexicans and Puerto Ricans as criminals and a threat to public safety had developed in the early- and mid-twentieth century, and those descriptions persisted after World War II. A Chicago police sergeant was one of many who affirmed the innate criminality of Mexicans on racial grounds, noting that "Indian and Negro blood does not mix very well. That is the trouble with the Mexican; he has too much Negro blood."[25]

During the Great Depression of the 1930s, politicians and other white Americans pointed to Mexican immigrants and their U.S.-born children as causes of the nation's economic trouble, high unemployment among U.S. citizens, worrisome crime in major cities, and the spike in political radicalism. This was the decade, paradoxically, in which Mexican Americans born in states such as California and Texas felt increasingly proud of their U.S. citizenship, eager to purchase homes in local neighborhoods, and committed to American institutions. But many white Americans preferred Latinos

---

[21] Harold Augenbraue and Ilan Stavans, eds. Growing Up Latino: Memoirs and Stories (New York: Houghton Mifflin, 1993), xxv-xxvii.
[22] Leo R. Chavez, The Latino Threat: Constructing Immigrants, Citizens, and the Nation (Stanford: Stanford University Press, 2013), 26.
[23] Otto Santa Ana, Brown Tide Rising: Metaphors of Latinos in Contemporary American Public Discourse (Austin: University of Texas Press, 2002), http://site.ebrary.com/lib/yale/Doc?id=10245773.
[24] Jacqueline Jones, Peter H. Wood, Thomas Borstelmann, Elaine Tyler May, and Vicki L. Ruiz, Created Equal: A Social and Political History of the United States. Volume II, From 1865 (New York: Longman Press, 2003), 647.
[25] Martínez, "Revisiting the Role of Latinos and Immigrants in Police Research," 438.

as temporary "sojourners" rather than permanent settlers.[26]

Despite significant participation as military personnel and wartime workers during the 1940s, Latinos in the post-World War II period experienced discrimination as a population considered un-patriotic, unassimilable, politically radical, sexually promiscuous, and unclean. Racial animus was reinforced by political rhetoric, institutional common sense, and the unspoken assumptions of voters and politicians. After World War II, the backlash against African American and Latino civil rights was often justified through the defense of property rights, public decency, public health, or economic prosperity. Biology was less commonly assumed to define destiny, but race still "remain[ed] a fundamental organizing principle," and racial animus continued to define American society.[27] From the 1950s through the 1970s, Latinos addressed racial animus in rural and urban areas of the United States, and in schools and city halls; they campaigned on behalf of Latino elected officials; and they challenged "racial scripts" still visible in television commercials, Hollywood films, popular music, and political campaigns.

### C.     Anti-Latino Animus in Recent U.S. History

Open declarations of racial superiority and inferiority were mostly discredited by the 1970s, but racial animus has nonetheless shaped the more recent United States. Thomas Byrne Edsall and Mary D. Edsall have shown that late-twentieth century politics moved racial animus in new directions, that

> Considerations of race are now deeply imbedded in the strategy and tactics of politics, in competing concepts of the functions and responsibilities of government, and in each voter's conceptual structure of moral and partisan identity. Race helps define liberal and conservative ideologies, shapes the presidential coalitions of the Democratic and Republican parties, provides a harsh new dimension to concern over taxes and crime, drives a wedge through alliances of the working classes and the poor, and gives both momentum and vitality to the drive to establish a national majority inclined by income and demography to support policies benefiting the affluent and the upper middle class.[28]

---

[26] Richard White, "It's Your Misfortune and None of My Own": A New History of the American West (Norman: University of Oklahoma Press, 1991), 446.

[27] Howard Winant, *Racial Conditions: Politics, Theory, Comparisons* (Minneapolis: University of Minnesota Press, 1994), 2.

[28] Thomas Byrne Edsall and Mary D. Edsall, *Chain Reaction: The Impact of Race, Rights, and Taxes on American Politics* (New York: Norton, 1991), 53.

Racial animus, in other words, took on new forms during the 1970s and 1980s. As the United States worried about new immigration and stiff economic competition abroad, that era witnessed the simultaneous emergence of "model minority" rhetoric about Asian Americans — a seemingly positive stereotype that was used to denigrate African Americans as lazy — and new hostilities directed towards those communities that echoed earlier forms of anti-Asian violence. Since the 1970s, stereotypical portraits of Latinos have continued to emphasize their dangerous, criminal, and unproductive qualities, their status as temporary laborers but not permanent residents, and often their weak intellects and fitness for only manual labor. Anti-immigrant politicians have frequently contrasted Latinos with European immigrants who arrived before the 1924 Immigration Act in order to portray Latinos as unassimilable and less loyal to the United States than earlier generations of European immigrants.   While most Latinos in the late-twentieth and early-twenty first centuries were born in the United States, and while these communities have included middle class and more wealthy Latinos, racialized portrayals of this sort defined ethnic Mexicans as unproductive, and outside of the community of white, middle class Americans.

The late-twentieth century's anti-immigrant movement was shaped by individuals and organizations who expressed quite explicit fears about the Mexicanization of the United States. Chief among them was John Tanton, founder of three prominent anti-immigrant groups that have influenced Attorney General Jeff Sessions, President Donald Trump, and others. Those organizations (FAIR, the Center for Immigration Studies, and Numbers USA) are discussed in depth elsewhere in this report.

Tanton began to shape the modern anti-immigrant movement in the 1970s, and his ideologies were expressed in the 1986 "WITAN III" memorandum written for followers and collaborators.[29] His memorandum, intended to "guide our discussion of the non-economic consequences of immigration to California, and by extension, to the rest of the United States," defined Latinos as a clear threat to the future of the nation. Tanton urged activists to consider whether new immigrants will "vote democratic or republican." He worried that "illegal aliens" would be enumerated on the

---

[29] Elena R. Gutiérrez, *Fertile Matters: The Politics of Mexican-Origin Women's Reproduction* (University of Texas Press, 2008).

census "and used to apportion congressional and state house seats, thereby guaranteeing them political power." He called Latinos "simply more fertile" than white Americans ("perhaps this is the first instance in which those with their pants up are going to get caught by those with their pants down!"). He urged activists to focus on "drugs and the border." He raised concerns that immigrants would not assimilate, that Latinos would make the Catholic Church more influential in the United States, and that the "common language" of English would no longer bind together the nation's residents in the future.[30] These positions were clearly based in racial animus. Tanton admitted that "One of my prime concerns is about the decline of folks who look like you and me."[31]

In part because of the efforts of Tanton and his followers, immigrants became a more acceptable target than U.S. citizens for articulations of racial animus. The ongoing use of the term "illegal" to refer to ethnic Mexicans, both documented and undocumented residents, and the strong association between Mexicanness and criminality in public discourse and political discussions, has kept alive older concerns about Latinos as suspected criminals, as non-citizens, and as marginal to the national community.[32]

Among politicians and in polite company, recent racial animus has often centered on recently-arrived immigrants. "Direct attacks on minorities with respect to their race is today off-limits," legal scholar Kevin R. Johnson notes, and racial animus has been "displaced to foreign minorities," especially those who can be characterized through established racial scripts.[33] Surveying the *New York Times*, *Washington Post*, *Wall Street Journal*, and *Los Angeles Times* between 1965 and 1995, two sociologists found that politicians and journalists articulated a growing sense of crisis as

---

[30] John Tanton, "'WITAN Memo' III," Southern Poverty Law Center, October 10, 1986, https://www.splcenter.org/fighting-hate/intelligence-report/2015/witan-memo-iii.

[31] Jason DeParle, "The Anti-Immigration Crusader," *The New York Times*, April 17, 2011, http://www.nytimes.com/2011/04/17/us/17immig.html?pagewanted=all.

[32] In 1999, the *Arizona Republic* offered the example of Joshua Ramírez, "a fourth-generation American of Mexican descent," who told reporters that "I get the wetback comments … I'm asked to produce proof of citizenship when I apply for a job -- and I don't even speak Spanish." Ramírez recounted experiences of racial violence, of being "kicked and punched by a gang of boys who swore at him and told him they don't like 'illegal aliens'" in the parking lot of a local restaurant. Lisa Magaña and Robert Short, "The Social Construction of Mexican and Cuban Immigrants by Politicians," *Review of Policy Research* 19, no. 4 (Winter 2002): 87; Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America*, Politics and Society in Twentieth-Century America (Princeton: Princeton University Press, 2004); Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol* (Berkeley: University of California Press, 2010).

[33] Kevin R. Johnson, *The "Huddled Masses" Myth: Immigration and Civil Rights* (Philadelphia: Temple University Press, 2004), 15–16.

candidates "discovered the political advantages to be gained by demonizing Latino immigrants" and "the media discovered that the trope of a border under siege made for dramatic copy."[34] Into the twenty-first century, anti-immigrant detractors have used old tropes to describe Latinos as threats to Western civilization, as threats to white womanhood, as threats to American teenagers, as threats to national security, as threats to public health, and more.

References to dangerous "illegals," hordes of newcomers and drug runners, problems presented by immigrants with low standards of living, the arrogance of radicals who disregard American individualism, the ubiquity of law breakers and welfare cheats — these contemporary representations of Latinos suggest but do not require explicit declarations of group inferiority. At times they imply that Latinos share undesirable traits with other racialized groups in the United States. And they provide a political shorthand that allows Americans "to construct Mexicans as inferior" or dangerous without needing to reference biological, scientific discourses of racial superiority and inferiority.[35]

## V.      RACIAL "CODEWORDS" IN RECENT U.S. POLITICS

Responding to the Obama administration's 2011 announcement that it would take "particular care" before deporting students, military veterans, and other undocumented residents who were deemed "low-risk," groups such as the Center for Immigration Studies insisted that every undocumented immigrant regardless of age or employment fell under the category of "illegal aliens," and that it was dangerous for "ICE to wait until an illegal alien commits a serious crime or two before considering deportation." In the interest of "public safety," Jon Feere of CIS argued, "an illegal alien should be removed from the country at the first possible opportunity, *before* a serious crime is committed." He admitted that it is "true that most illegal immigrants are not violent," but he insisted that all were "still likely involved in ID fraud," and that immigrants who had not yet committed a crime would likely future be arrested for "public intoxication" or DUIs" in the

---

[34] Douglas S. Massey and Karen A. Pren, "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America," *Population and Development Review* 37, no. 1 (March 2012): 5–7.
[35] Molina, *How Race Is Made in America*, 21.

future."[36]  Feere is now advisor to the Acting Director of Immigration and Customs Enforcement (ICE).

Recent hostility to immigrants has driven the racialization of U.S.-born Latinos. Two scholars recently concluded that "…although there are legal differences between immigrants, the ability of the public and the media to make this distinction is less clear, which makes Latinos in general more susceptible to prejudice and discrimination because they share many phenotypic and cultural traits with immigrants."[37]  In 2012, a stranger who saw Los Angeles Mayor Antonio Villaraigosa walking in downtown Sacramento told the U.S.-born politician to "go back to Mexico."[38]

Rhetorical animus has driven vigilantism, and the United States has seen a recent rise in reported acts of racially-motivated violence against Latinos. In April 2006, for example, skinheads in Houston screaming "White power!" assaulted a 16-year-old U.S.-born Latino youth; and they called him "a 'wetback' and 'spic' as they beat him unconscious before sodomizing him with a patio umbrella, burning him with cigarettes, and attempting to carve a swastika into his chest." That same month, two white men in Salt Lake City "attacked an undocumented Latino high school student as he walked to school. The brutalizers called the boy a 'stupid wetback' and told him to, 'Go back to your country, you don't belong here.'" And in East Hampton, New York,

> three Latino teenagers were 'lured into a shed by a neo-Nazi skinhead … and then threatened and terrorized with a chainsaw and machete,' while the perpetrator yelled "White power!" and "Heil Hitler!" As the attacker chased the Latino teens around with a chainsaw, he screamed, "This is how you run across the border."

Some pundits and politicians seemed to endorse this sort of animus and violence. In March 2006, "well-known white nationalist radio host and blogger Hal Turner proclaimed, 'All of you who think there's a peaceful solution to these invaders [immigrants] are wrong. We're going to have to start

---

[36] Jon Feere, "'Low-Priority' Illegals? Obama Amnesty and Enforcement Priorities Endanger Public Safety," CIS.org, August 29, 2011, https://cis.org/Feere/Lowpriority-Illegals-Obama-Amnesty-and-Enforcement-Priorities-Endanger-Public-Safety.

[37] Anna Ochoa O'Leary and Azucena Sanchez, "Anti-Immigrant Arizona: Ripple Effects and Mixed Immigration Status Households under 'Policies of Attrition' Considered," *Journal of Borderlands Studies* 26, no. 1 (December 20, 2011): 118.

[38] Marcos Bretón, "California's Top Latino Candidates Face a Tougher Enemy than Trump: Fellow Democrats," *Sacramento Bee*, November 5, 2017, http://www.sacbee.com/news/local/news-columns-blogs/marcos-breton/article182660766.html.

killing these people." Several days later, one of the founding members of the Minutemen "called for neo-Nazi organizations to start 'an anonymous propaganda campaign warning that any further illegal immigrants will be shot, maimed or seriously messed-up upon crossing the border.'" Jim Gilchrist, cofounder of the Minutemen, said that "I will not promote violence … but I will not stop others who might pursue it."[39]

Trump did not consistently distance himself from talk of violence on the campaign trail. When two brothers in Boston beat a homeless Latino man in August 2015, declaring that "Donald Trump was right, all these illegals need to be deported," Trump concluded simply that "They love this country and they want this country to be great again. They are passionate."[40]

A.   **"Dog Whistle Politics"**

Since the 1960s politicians who claim to be antiracist have increasingly relied on racial codewords as a key feature of their political discourse. Elected officials and political candidates have used coded speech to mobilize segments of the voting population, and fellow activists and party members, and politicians have galvanized white voters through veiled references to the threats posed by African Americans or non-white immigrants.[41]

U.C. Berkeley Law professor Ian Haney López has shown how and why politicians often speak in "code" about the dangers posed by immigrants and non-whites, about their radicalism or promiscuity or hygiene, to "stimulate strong reactions" in their constituents much "like a dog whistle" prompts a response in a canine. That political language attracts important constituents, but it remains inaudible or inoffensive to some, and it allows politicians to insist on their own opposition to institutional racism and their sensitivity to a diverse set of constituents. The meaning of their codewords and the intent of "racial pandering" can be "easily denied," Haney López notes,

---

[39] Chris Zepeda-Millán, *Latino Mass Mobilization: Immigration, Racialization, and Activism* (New York: Cambridge University Press, 2017), 139–40.

[40] Alan Rappeport, "A Beating in Boston, Said to Be Inspired by Donald Trump's Immigrant Comments - First Draft. Political News, Now. - The New York Times," *New York Times*, August 20, 2015, https://www.nytimes.com/politics/first-draft/2015/08/20/a-beating-in-boston-said-to-be-inspired-by-donald-trumps-immigrant-comments/?_r=0.

[41] Lamenting that political leaders relied upon racial animus to divide and motivate the electorate at a time of growing economic inequality, scholars Thomas Byrne Edsall and Mary D. Edsall emphasized in 1991 that "in spite of American success in eliminating legally protected racial subjugation, race remains a powerful wedge issue…." Edsall and Edsall, *Chain Reaction*, 284.

and politicians can in turn accuse those who oppose codewords of political opportunism or "reverse racism."[42]

By the 1990s, former Ku Klux Klan leaders such as David Duke could promote white supremacy while simultaneously claiming to be antiracists. By 2016, Donald Trump and members of his campaign could scoff at any suggestion that they harbored racial animus, countering with charges that liberals who mention race as a social problem are themselves the real racists. Attorney General Jeff Sessions similarly insisted that he held no animus towards undocumented youth, and that the rescinding of DACA "does not mean they are bad people or that our nation disrespects or demeans them in any way."[43]

But there can be little doubt that political speech about DACA recipients and other immigrants has been meant to send a message, to "elicit racial loyalty," and to "stimulat[e] strong reactions" in white voters. Statements of general support from anti-immigrant activists have often been interspersed in recent years with far harsher statements about Latinos. Haney López argues that

> This makes dog whistling a more complicated phenomenon than other sorts of surreptitious politics. It involves … three basic moves: a punch that jabs race into the conversation through thinly veiled references to threatening nonwhites, for instance to welfare cheats or illegal aliens; a parry that slaps away charges of racial pandering, often by emphasizing the lack of any direct reference to a racial group or any use of an epithet; and finally a kick that savages the critic for opportunistically alleging racial victimization.[44]

These practices are deeply rooted in U.S. political culture. Alabama segregationist George Wallace, a key architect of "dog whistle politics" during the 1960s, successfully branded himself as a national figure and not a Southern racist by substituting seemingly non-racial arguments about "States' rights" in the place of explicit defenses of racial segregation. Wallace thereby established how "fear and hate could be mobilized without mentioning race itself except to deny that one is a racist." Wallace knew that "few non- southerners wanted to embrace overt racism in 1963," and his "use of nonracial language allowed a substantial minority of Americans to

---

[42] Ian Haney-López, *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class* (New York: Oxford University Press, 2014), 2–11.

[43] Jeff Sessions, "Attorney General Sessions Delivers Remarks on DACA" (Washington, D.C., September 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

[44] Haney-López, *Dog Whistle Politics*, 2–11.

maintain the illusion that the issue [of the integration of the University of Alabama] was indeed an abstract constitutional question" centering on states' rights.[45]

Senator Barry Goldwater helped to assure that racial codewords would come to dominate U.S. politics. Intent to win the Presidency in 1964, Goldwater shaped a "Southern Strategy" for his party that focused on mobilizing white voters through veiled racial appeals. Precisely because Democrats were strategizing about ways to bring in African American voters, Goldwater and other leaders of the GOP moved to solidify the support of the white electorate. Reporting on a 1963 Republican National Committee meeting in Denver, journalist Robert Novak found that:

> A good many, perhaps a majority of the party's leadership, envision substantial political gold to be mined in the racial crisis by becoming in fact, though not in name, the White Man's Party. 'Remember,' one astute party worker said quietly . . . 'This isn't South Africa. The white man outnumbers the Negro 9 to 1 in this country.'"[46]

Campaigners understood, however, that they could not make explicitly racial appeals to voters in a way that echoed too closely the language of South African's regime, or of the sort of pre-World War II racism that had been discredited in many circles by the 1960s and 1970s.

As a presidential candidate, Goldwater made strategic appeals to white voters, emphasizing that he opposed the Civil Rights Act in the name of states' rights and freedom of association rather than African American inferiority. Goldwater in 1964

> convinced many Southern voters to vote Republican for the first time ever, and in the Deep South, comprised of those five states with the highest black populations, Goldwater won outright. The anti-New Deal Republican carried Louisiana, Georgia, Alabama, Mississippi, and South Carolina, states in which whites had never voted for a Republican president in more than minuscule numbers. This was a shocking transformation, one that can only be explained by Goldwater's ability to transmit a set of codes that white voters readily understood as a promise to protect racial segregation.[47]

In 1968, Richard Nixon adopted a political strategy that drew from Wallace's blueprint — making successful, seemingly non-racial appeals to white voters in the North and West.

---

[45] Dan T. Carter, *From George Wallace to Newt Gingrich: Race in the Conservative Counterrevolution, 1963-1994*, The Walter Lynwood Fleming Lectures in Southern History (Baton Rouge, LA ; London: Louisana State University Press, 1996), 4, 6.
[46] Quoted in Haney-López, *Dog Whistle Politics*, 18.
[47] Haney-López, 21.

When Republican strategist Kevin Phillips published *The Emerging Republican Majority* in 1969, he anticipated that his party could ride the Southern strategy to victories nationwide because many white voters felt alienated by "the political emergence of the Cuban and Mexican-American minorities, joined with Negroes and white radicals in a Democratic alliance."[48] He urged Republicans to refine their political language. As the *New York Times* described it in 1970, a rhetoric that the *New York Times* called a veiled "hostility to blacks and browns."[49] Nixon's emphasis on "law and order" in his 1968 campaign similarly capitalized on racial animus — specifically concerns about urban violence in African American neighborhoods — but Nixon avoided naming African Americans as a threat or hindrance to the United States in ways that would draw unnecessary criticism. He stressed, instead, concerns about African American radicalism and their need to adapt better to dominant U.S. institutions.

This approach proved successful. Nixon's campaign in many ways established a template used by many subsequent politicians, one in which candidates could depend heavily on codewords laden with racial meaning while distancing themselves from explicit racial animus, one in which politicians could raise alarm bells about the growing political power of non-whites without being easily categorized as racists. In 1981, Republican political strategist Lee Atwater traced the GOP's strategic use of race and emphasized that Reagan's election the previous year showed that the Party had learned how to effectively mobilize white voters:

> You start out in 1954 by saying, "Nigger, nigger, nigger." By 1968 you can't say "nigger" — that hurts you. Backfires. So you say stuff like forced busing, states' rights and all that stuff. You're getting so abstract now, you're talking about cutting taxes, and all these things you're talking about are totally economic things and a byproduct of them is, blacks get hurt worse than whites. And subconsciously maybe that is part of it. I'm not saying that. But I'm saying that if it is getting that abstract, and that coded, that we are doing away with the racial problem one way or the other. You follow me — because obviously sitting around saying, "We want to cut taxes and we want to cut this," is much more abstract than even the busing thing, and a hell of a lot more abstract than "Nigger, nigger." So anyway you look at it, race is coming on the back burner."[50]

---

[48] James Boyd, "Nixon's Southern Strategy: It's All in the Charts," *New York Times*, May 17, 1970.

[49] Boyd.

[50] Haney-López, *Dog Whistle Politics*, 57.

These practices became more subtle and nuanced, and conservative think tanks shaped new political rhetoric. For example, strategists at the Heritage Foundation pushed the Reagan administration to focus on affirmative action as a "wedge issue," and Reagan rolled back New Deal programs by warning voters of "welfare queens driving cadillacs," "strapping young bucks" buying steaks with food stamps, and "welfare cheats" who had little regard for honest taxpayers.[51] A similar approach would be key in the Republicans' twenty-first century "Arizona Strategy" meant to demonize undocumented immigrants and drive them out of the country, a strategy adopted and elaborated by Trump's campaign and administration.

For more than fifty years, coded speech has been, above all, a political tool. Many political candidates have participated in "dog whistle politics" even if they are not avowed racists, and recent racial politics have been strategic more often than they have been deeply felt. Many candidates and government officials — including Wallace, Goldwater, and Nixon —had reputations as "racial moderates," but "each opted to harness racial divisions to their agenda of getting elected. This was not about racism," Haney-López concludes, "it was about winning."[52]

The same is likely true of at least some prominent politicians and policymakers who have articulated anti-Latino animus in recent years. By the 1990s, the strategic use of racial animus to mobilize white voters had become routine. Anti-immigrant activists referenced overt versions of racial animus familiar in earlier decades. John Tanton, the founder of the late-twentieth century anti-immigration movement, was criticized for taking money from the Pioneer Fund, an organization devoted to "race betterment," for attempting to create a pro-eugenics organization during the 1990s, and for making antisemitic remarks.[53] The organizations that he founded were less clearly tied to such ideas and movements that had fallen out of favor, but the Federation for American Immigration Reform (FAIR) continued until at least 2011 to align itself with Tanton.

---

[51] Haney-López, 58–70.
[52] Haney-López, 48.
[53] "FAIR Chairman Sings Praises of Racist Founder John Tanton," Southern Poverty Law Center, September 9, 2011, https://www.splcenter.org/hatewatch/2011/09/09/fair-chairman-sings-praises-racist-founder-john-tanton.

## B.      The Threat of Reconquest

Recent racial animus has often emphasized that Latin Americans are in effect attempting to "reconquer" the United States through migration. Since the 1970s, pundits and politicians have stoked that fear by suggesting that Mexicans would achieve their *reconquista* if new arrivals continued to settle and if the children of immigrants continued to establish themselves as permanent residents of the United States. In 1974, for example, the cover of *American Legion Magazine* depicted "illegal aliens" storming across the U.S.-Mexico border, arriving to the East Coast by ship, and swimming to Florida from the Caribbean.[54] Others raised similar concerns, and by 1976 some who were convinced that Latinos would never assimilate into the United States began to suggest that Mexican Americans and others would create a Southwestern separatist movement much like Canada faced with Quebec. By the early-1980s, journalists for *U.S. News and World Report*, *Time Magazine*, and other national publications had warned that "Los Angeles is being invaded" and that new migrants saw themselves as "not an illegal alien but a reconquistador."[55]

This "Latino Threat Narrative" defined discussions of, and assumptions about, immigrant and U.S.-born Latinos. In one scholar's words,

> The Latino Threat Narrative posits that Latinos are not like previous immigrant groups, who ultimately became part of the nation. According to the assumptions and taken-for-granted 'truths' inherent in this narrative, Latinos are unwilling or incapable of integrating, of becoming part of the national community. Rather, they are part of an invading force from south of the border that is bent on reconquering land that was formerly theirs (the U.S. Southwest) and destroying the American way of life.[56]

Anthropologist Leo Chávez notes that "during the 1990s, the Mexican invasion and reconquest were at the heart of a veritable publishing industry that emerged, playing on the public's fears of immigration." In 1994, for instance, pundit and politician Patrick Buchanan authored an article in the *Los Angeles Times* that speculated that most Americans would soon trace their family roots to Africa, Asia, Latin America, the Middle East, or the Pacific islands instead of Europe. He expressed concern that California and Texas "will have tens of millions of people whose linguistic, historic and cultural

---

[54] Chavez, *The Latino Threat*, 29.
[55] Chavez, 31–32.
[56] Chavez, 3.

roots are in Mexico." That demographic transformation reminded Buchanan of "Eastern Ukraine, where 10 million Russian-speaking 'Ukrainians' now look impatiently to Moscow, not Kiev, as their cultural capital," and it suggested that "America could see, in a decade, demands for Quebec-like status for Southern California."[57]

This reconquest narrative connected concerns about the racial transformation of the United States with security concerns stressing that Latinos were disloyal to the United States and committed to a foreign power. It was no surprise, then, that when a federal judge in 1994 issued a permanent injunction against California's anti-immigrant Proposition 187, a ballot measure that prohibited undocumented residents from accessing social services, Governor Pete Wilson appealed by contending that "the massive and unlawful migration of foreign nationals … constitutes an invasion of the state of California against which the United States is obligated to protect California."[58]

Over the last twenty-five years, this narrative has continued to circulate and shape discussions of Mexican immigration. The creation of the Department of Homeland Security following the attacks of September 11, 2001 solidified connections between immigration concerns and discourse about national security. In this context, questions were raised not only about immigrants as security risks, but also about the loyalty of U.S.-born Latinos. Journalists at the *Washington Times* and other conservative news outlets argued that Latino politicians who had once belonged to the Mexican American student group MEChA in high school or college, including Los Angeles Mayor Antonio Villaraigosa and California Lieutenant Governor Cruz Bustamante, were members of a political movement that "envisions a sovereign Hispanic nation called the Republica del Norte that would encompass Northern Mexico, Baja California, California, Arizona, New Mexico and Texas."[59] And author, founder of the Minutemen organization, and anti-immigrant activist Jim Gilchrist wrote in 2006 that

> millions of Mexican illegal immigrants are pouring into the United States. None of these illegal aliens are checked in any way. They live in the United States while

---

[57] Chavez, 34.

[58] Daniel M. Weintraub, "Wilson Sues U.S. Over Immigrants' 'Invasion': Politics: Governor Calls on Federal Government to Reimburse the State for the Costs of Educating Undocumented Children. Legal Experts Say the Claim Has Almost No Chance of Succeeding.," *Los Angeles Times*, September 23, 1994, http://articles.latimes.com/1994-09-23/news/mn-42037_1_illegal-immigrants.

[59] "Mexican Aliens Seek to Retake 'Stolen' Land," *The Washington Times*, April 16, 2006.

swearing their allegiance to Mexico. By their sheer presence and numbers, those in the *Reconquista* movement believe that a time will come when they can take political control of local communities where Hispanics are the majority. The ultimate dream of the *Reconquista* movement is that political control can be gained in one or more southwestern states. *Reconquista* activists plan that the states controlled by Mexican immigrants would secede from the United States and join Mexico, much as the southern states seceded during the American Civil War and formed the Confederacy.[60]

Similar claims were made by other authors, as journalists and scholars warned in the 1990s and 2000s about the threat of a Latino takeover. The Federation for American Immigration Reform has recommended such books (including those by Brimelow, Buchanan, Coulter, Huntington, and Tancredo) to policymakers and voters.[61] And it is important to note that Professor Samuel Huntington was Kris Kobach's adviser and mentor at Harvard.[62]

Drawing from *reconquista* rhetoric, many words and phrases used in political speech today conjure up the "Latino Threat" narrative. Talk of building a wall on the U.S.-Mexico border, and of stopping the Latino "invasion," both discussed at length in later sections of this report, are prominent examples. Since at least the late 1970s, political conservatives have also suggested that Latinos are politically subversive, despite overwhelming evidence to the contrary —Mexican American patriotism, the faith of Mexican American young people in U.S. political institutions, and Latinos' cultural assimilation.

C. **Arizona as Political Laboratory**

In the early-twenty first century, the state of Arizona became the national center of anti-immigrant, and anti-Latino, political mobilization. The region provided Republicans a laboratory for developing anti-immigrant rhetoric, and dog whistle politics, to win over white voters in advance of

---

[60] Jim Gilchrist, "The Reconquista Movement: Mexico's Plan for the American Southwest," Human Events: Powerful Conservative Voices, July 27, 2006.

[61] "Suggested Reading On Immigration | Federation for American Immigration Reform," accessed October 26, 2017, https://fairus.org/issue/publications-resources/suggested-reading-immigration. The books recommended by FAIR include Peter Brimelow, *Alien Nation: Common Sense about America's Immigration Disaster* (New York: Random House, 1995); Patrick J. Buchanan, *The Death of the West: How Dying Populations and Immigrant Invasions Imperil Our Country and Civilization* (New York: Thomas Dunne Books, 2002); Ann H. Coulter, *Adios, America!: The Left's Plan to Turn Our Country into a Third World Hellhole* (Washington, D.C: Regnery Publishing, 2015); Samuel P. Huntington, *Who Are We?: The Challenges to America's National Identity* (New York: Simon & Schuster, 2004); Thomas G. Tancredo, *In Mortal Danger: The Battle for America's Border and Security* (Nashville, Tenn.: WND Books, 2006).

[62] Leah Nelson, Evelyn Schlatter, and Heidi Beirich, "When Mr. Kobach Comes to Town: Nativist Laws & the Communities They Damage.," A Special Report from the Southern Poverty Law Center (Motgomery, Alabama, January 2011).

25

the 2016 election.[63]  Hyperbolic political rhetoric about both Latin American immigrants and Latino U.S. citizens was critical to recent Arizona politics. Fears of "reconquest" prompted Arizona State Senator Russell Pearce to author many aggressive anti-immigrant bills and not "back off until we resolve this problem of this illegal invasion. Invaders, that's what they are. They're invaders on the American sovereignty and it can't be tolerated."[64]  While Pearce and others denied harboring racial animus, some other Republicans disagreed, including State Senator Jerry Lewis, who likened Pearce's approach to Mexicans as "something akin to maybe 1964 Alabama."[65]

Anti-immigrant activists in Arizona focused on two major efforts. First, they worked to draw sharp rhetorical lines -- between white citizens and radical Latinos, between "us" and "them," and between citizens and non-citizens. Second, they worked to develop legislative proposals and ballot propositions that would so diminish the rights of immigrants, of members of mixed-status families, and of others who felt their effects (including U.S. Latino citizens) that unwanted Arizonans would leave the state. As a presidential candidate in 2012, Mitt Romney later announced his own support for similarly harsh policies that would lead to "self-deportation."

National organizations and leaders involved in the Trump campaign and administration – including Kris Kobach and the Federation for American Immigration Reform (FAIR) – played critical roles in developing these Arizona strategies, exporting them to other states, and then assuring that they would define Republican national politics.[66]  Jeff Sessions chose to deliver major addresses about immigration in Arizona, as in April 2017 when Sessions announced in Nogales "the

---

[63] States such as California, did develop harsh immigration measures prior to 2007 that guided efforts in Arizona. And while statewide efforts in Arizona provided a roadmap for the Trump campaign, places like Hazleton, Pennsylvania, where Kris Kobach had helped lawmakers design city ordinances in 2006 punishing landlords who rented property to undocumented residents, and employers who hired them, did become, in the words of then-mayor and future Congressman Lou Berlatta, "the symbol of hope for many around the country" eager to pass anti-immigrant legislation. Larry King, "Federal Appeals Court Strikes down Hazleton's Immigration Ordinances," *Philadelphia Inquirer*, September 10, 2010.
[64] Steve Inskeep, "The Man Behind Arizona's Toughest Immigrant Laws," *Morning Edition* (National Public Radio, March 12, 2008), http://www.npr.org/templates/transcript/transcript.php?storyId=88125098.
[65] Rachel Weiner, "Arizona Recall: Why Russell Pearce Lost," *Washington Post* (blog), November 9, 2011, https://www.washingtonpost.com/blogs/the-fix/post/arizona-recall-why-russell-pearce-lost/2011/11/09/gIQALj6a5M_blog.html.
[66] In supporting SB 1070 in the state, President of FAIR Dan Stein noted "the incredible public safety and fiscal challenges poses by Arizona's border crisis." Dan Stein, "Immigration Decision a Victory for Arizona - But It Has Its Pitfalls," Fox News, June 25, 2012, http://www.foxnews.com/politics/2012/06/25/arizona-immigration-decision-victory-for-state-but-has-its-pitfalls.html.

Department of Justice's Renewed Commitment to Criminal Immigration Enforcement."[67] Donald Trump also expressed admiration for Arizona's anti-immigrant movement, and in July 2015 he tweeted to Governor Jan Brewer encouraging her to "Keep throwing those giant hand grenades into the amnesty debate. You're pissing off all the right people in the GOP."[68] Trump later expressed more admiration for Arizona's Jan Brewer, naming her a potential Vice Presidential running mate, and he drew attention to his friendship and alliance with Arizona Sheriff Joe Arpaio, who had endorsed Trump for President in January 2016.[69] Donald Trump chose Arizona as the site of his major campaign address on immigration on August 31, 2016. There the candidate stated that "Together we can save American lives, American jobs, and American futures. Together we can save America itself." He continued:

> This election, and I believe this, is our last chance to secure the border, stop illegal immigration and reform our laws to make your life better. I really believe this is it. This is our last time. November 8. November 8. You got to get out and vote on November 8.[70]

Trump also chose to deliver another major address on immigration in Arizona a year later, in August 2017.

In Arizona, Republicans such as Sessions and Kobach and Trump rearticulated the Latino Threat narrative and called upon anti-immigrant activists nationwide to look to Arizona as a political beacon. "Arizona knows better than most exactly what I'm talking about," Trump noted about the importance of building a wall on the U.S.-Mexico border.[71] Trump and his campaign pushed the GOP to adopt a version of hard-line, anti-immigrant politics common in Arizona, to marginalize members of the GOP who took a more moderate stance, to encourage the self-deportation of immigrant families, and to win the White House by mobilizing racial animus in white voters.

---

[67] Sessions, "Remarks Announcing the Department of Justice's Renewed Commitment to Criminal Immigration Enforcement."

[68] Donald J. Trump, "@rdbrewer4 Trump: Keep Throwing Those Giant Hand Grenades into the Amnesty Debate. You're Pissing off All the Right People in the GOP.," Tweet, *@realdonaldtrump* (blog), July 10, 2015, https://twitter.com/realdonaldtrump/status/619195073658515457.

[69] Jose A. DelReal and Ed O'Keefe, "Arizona Sheriff Joe Arpaio Endorses Trump," *Washington Post*, January 26, 2016, sec. Post Politics, https://www.washingtonpost.com/news/post-politics/wp/2016/01/26/arizona-sheriff-joe-arpaio-endorses-trump/.

[70] Donald J. Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona" (Phoenix, August 31, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119805.

[71] Trump.

FAIR and other organizations, and some members of the Republican party, understood Arizona's strident anti-immigrant model as expedient and beneficial for the national GOP, following the lead of Republican politicians who tried to capitalize on anti-African American animus in the 1970s and 1980s. Republicans had known for decades that they had little to gain by increasing the number of potential Latino voters – most of whom voted in the late-twentieth and early-twenty first centuries for Democratic candidates. John Tanton had anticipated as much in 1986, and the Federation for American Immigration Reform was transparent about its own intentions to limit Latino political power through immigration reform in 2013, writing that "as long as our nation's immigration policies continue to bring millions of poorly educated and poorly skilled immigrants to the United States, Republicans will have little chance to attract new voters." Referencing DACA and other calls to provide "amnesty" to undocumented immigrants, FAIR President Dan Stein argued that "Republicans in the House have a unique opportunity to do what is … best for their own political interests by refusing to accede to special interest demands for amnesty and massive increases in immigration." The organization concluded that Latino immigration and increased voting would only "increase[e] the gap for Republican candidates" in the future.[72]

Other Republicans followed the Arizona model as what was "best for their own political interests," determining that a strong GOP fight against undocumented immigrants, and against DACA, provided a viable option also for galvanizing white voters. Prominent figures such as Kris Kobach who have been key to the national anti-immigrant movement, and to the rescinding of DACA, were involved in these discussions in Arizona and elsewhere. Kobach advised Sheriff Arpaio in developing the Maricopa County Sheriff Department's harsh policies towards undocumented immigrants, and Kobach also advised State Senator Russell Pearce on the development of Senate Bill 1070, the far-reaching "Show Me Your Papers" legislation in 2010 that required Arizona police to ask anyone under "reasonable suspicion" for their citizenship papers. Even after many of the Arizona legislative acts and ballot propositions targeting immigrants had

---

[72] "New Analysis by FAIR Shows That Support for Illegal Alien Amnesty and Increased Immigration Would Harm, Not Help, Republicans Politically | Federation for American Immigration Reform," October 24, 2013, https://fairus.org/press-releases/new-analysis-fair-shows-support-illegal-alien-amnesty-and-increased-immigration.

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 107 of 275 PageID #: 5655

been struck down in court, the *New York Times* and others understood that Kobach's national influence had increased.[73]

Especially after the passage of SB 1070 in 2010, Republicans such as Donald Trump, Jeff Sessions, and Kris Kobach invested heavily in advancing Arizona's political model of promoting anti-Latino animus.[74] As President, Trump would call Sheriff Arpaio an "American patriot" and praised him for having "kept Arizona safe!"[75] While a federal judge found Arpaio guilty of racially profiling Latinos, Trump insisted in August 2017 – just days before his administration rescinded DACA -- that Arpaio had in fact "done a great job for the people of Arizona, he's very strong on borders, very strong on illegal immigration, he is loved in Arizona."[76] Trump told a Phoenix audience that

> The most sacred duty of government is to protect the lives of its citizens, and that includes securing our borders, and enforcing our immigration laws. (APPLAUSE)
>
> By the way, I'm just curious. Do the people in this room like Sheriff Joe? (APPLAUSE)
>
> So, was Sheriff Joe convicted for doing his job? That's why... (APPLAUSE)
>
> He should have had a jury, but you know what? I'll make a prediction. I think he's going to be just fine, OK?[77]

Within weeks, Trump would pardon Arpaio of federal charges of criminal contempt.

Arizona's political model was an enormously attractive successor to the GOP's powerful "Southern Strategy" of earlier decades. From around 2000 to 2014, the region was center-stage in dramatic confrontations about the Latino Threat.[78] Arizona Republicans established an approach to

[73] Ari Berman, "The Man Behind Trump's Voter-Fraud Obsession," *The New York Times*, June 13, 2017, sec. Magazine, https://www.nytimes.com/2017/06/13/magazine/the-man-behind-trumps-voter-fraud-obsession.html.

[74] Josh Barro, "Before Donald Trump, There Was Jan Brewer," *The New York Times*, February 10, 2016, sec. The Upshot, https://www.nytimes.com/2016/02/11/upshot/before-donald-trump-there-was-jan-brewer.html.

[75] Donald J. Trump, "I Am Pleased to Inform You That I Have Just Granted a Full Pardon to 85 Year Old American Patriot Sheriff Joe Arpaio. He Kept Arizona Safe!," Tweet, *@realdonaldtrump* (blog), August 7, 2017, https://twitter.com/realdonaldtrump/status/901263061511794688?lang=en.

[76] Ashley Parker, "Trump Defends Arpaio Pardon, Assumed 'Ratings Would Be Far Higher' by Announcing during Hurricane," *Washington Post*, August 28, 2017, sec. Post Politics, https://www.washingtonpost.com/news/post-politics/wp/2017/08/28/trump-defends-pardon-of-former-arizona-sheriff-joe-arpaio/.

[77] "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said," *Time Magazine*, August 23, 2017.

[78] The state developed new, punitive laws, and law enforcement officers increased immigrant raids of Latino communities. Lawmakers denied bail to immigrants charged with felonies and denied undocumented immigrants access to welfare services. Legislators cracked down on day laborers and required the use of E-Verify. They passed laws targeting immigrant access to public schools, English-language education, and adult education. And they proposed bills that attempted to limit the rights of U.S. citizen children born to undocumented parents.

demonizing Latino immigrants, and mobilizing white voters through racial code words. Anthropologist Anna Ochoa O'Leary has shown that Arizona's "openly inflammatory anti-immigrant rhetoric … aggravated social divisions and rekindled fears that have always 'haunted' the U.S. imaginary: Latinos are foreigners; disaffected Americans who do not belong to U.S. society."[79] After 2010, anti-immigrant activists raised "haunting" questions about immigrant and U.S.-born Latinos in states such as Alabama, South Carolina, Georgia, Indiana, and Utah. Kris Kobach took what he learned in Arizona to those regions in advance of the 2016 election. And Senator Jeff Sessions led the effort at the national level to prevent the Department of Justice from filing lawsuits against states that passed harsh laws on behalf of undocumented immigrants and others.[80]

Anti-immigrant politics in early-twenty-first century Arizona emphasized four themes that would be copied by the Trump campaign administration:

### 1. Hostility to Latino Youth

It was no accident that anti-immigrant politics in Arizona were connected to young people and to educational debates, as elected officials explained the importance of driving noncitizen families out of the state in order to address problems in Arizona public schools. Prominent Republicans blamed Latino communities for Arizona's educational problems, and emotional arguments about those issues framed policymakers' arguments. Perhaps not surprisingly, State Superintendent of Education Tom Horne publicized Sheriff Joseph Arpaio's endorsement of his reelection campaign in 2014: "He's the toughest sheriff in the world, and I'm the toughest State Superintendent in the world."[81] Highlighting a prominent theme in discussions of the Latino *reconquista* of the United States, Arizona State Senator Russell Pearce argued, for example, that "the 'anchor baby' thing needs to be fixed.… Anchor babies are an unconstitutional declaration of citizenship to those born of non-Americans. It's wrong, and it's immoral."[82]

[79] Anna Ochoa O'Leary et al., "Assault on Ethnic Studies," in *Arizona Firestorm: Global Immigration Realities, National Media, and Provincial Politics* (New York: Rowman & Littlefield Publishers, 2012), 102.

[80] Siddhartha Mahanta, "GOP Showdown With Justice Department Over Immigration," *Mother Jones*, November 10, 2011, http://www.motherjones.com/politics/2011/11/sessions-demint-vitter-immigration-state-bill-arizona-alabama-south-carolina-georgia/.

[81] Horne, Thomas, Deposition Transcript of Thomas Horne, No. CV 10-623 TUC AWT (United States District Court for the District of Arizona February 1, 2016).

[82] Two Arizona "birthright bills" (SB 1308 and SB 1309) aimed at denying citizenship to U.S.-born children whose parents could not prove they were themselves legal residents were discussed in the State Senate in 2011. They would

### 2.  A Focus on Latinos as a Criminal Threat

Debates about immigration enforcement in Arizona also focused on controlling crime, a theme that has long defined the racialization of Latinos, and that would be very prominent in the Trump campaign. Kobach and Pearce blamed Latino immigrants for creating a new climate of uncontrolled violence and fear in Arizona. This rhetorical strategy proved critical with voters despite the fact that crime rates in the border region had declined in 2010 (according to the FBI), as had undocumented immigration (according to the Border Patrol).[83]

### 3.  Driving Latinos Out of the State

In 2010, Senate Bill 1070, the "Support Our Law Enforcement and Safe Neighborhoods Act," crystallized those trends. SB 1070 was the work of Kris Kobach and Pearce. Elected Secretary of State in Kansas in 2010, Kobach had already authored articles analyzing how states might intervene on immigration issues that had traditionally been controlled by the federal government.[84] SB 1070 aimed to push noncitizens, particularly Latinos, out of the United States. Section 1 of SB 1070 announced that "The legislature declares that the intent of this act is to make attrition through enforcement the public policy of all state and local government agencies in Arizona."[85] It advanced efforts by Sheriff Arpaio, who had announced on national television in 2009 that his law enforcement tactics had a similar intention; it shaped legislation in other states; it set the stage for later Republican efforts at the national level to encourage, in presidential candidate Mitt Romney's words, "self-deportation"; and it defined the approach that Trump would take as a candidate and as president.

### 4.  Efforts to Mobilize White Voters

It seems clear that many Arizona politicians supported SB 1070 and other anti-immigrant

---

have required Arizona (and perhaps other states) to distinguish between the birth certificates of "natural born United States Citizens" -- those who had been born to "at least one parent who owes no allegiance to any foreign sovereignty" -- and those who had been born to non-U.S. citizen parents. Both bills made it out of committee but failed to pass on the third and final vote on the Senate floor. Natalie Cisneros, "'Alien' Sexuality: Race, Maternity, and Citizenship," *Hypatia*, 2013, 301–2, http://onlinelibrary.wiley.com/doi/10.1111/hypa.12023/full.
[83] Randal C. Archibold, "On Border Violence, Truth Pales Compared to Ideas," *The New York Times*, June 19, 2010, sec. U.S., http://www.nytimes.com/2010/06/20/us/20crime.html.
[84] Jeff Biggers, *State Out of the Union: Arizona and the Final Showdown Over the American Dream* (New York: Nation Books, 2012), 73–74.
[85] Gabriel J. Chin, Carissa Byrne Hessick, and Marc L. Miller, "Arizona Senate Bill 1070: Politics through Immigration Law," in *Arizona Firestorm: Global Immigration Realities, National Media, and Provincial Politics*, ed. Otto Santa

efforts because they understand that anti-immigration hyperbole could motivate voters.[86]  The state's climate of exaggeration, deception, and racial stereotyping continued after its passage in 2010.  New attacks on Latino immigrants and their U.S.-born children centered on birthright citizenship and the need to change the Fourteenth Amendment, and national politicians such as Kobach and Sessions were also involved in those developments.  As with SB 1070, these attacks were undertaken by politicians with voter approval in mind.

Between 2001 and 2010, Arizona therefore saw an intense escalation of racialized rhetoric and the popularization of the Latino Threat narrative.  In highlighting the dangers of Latino criminals, welfare cheats, "anchor babies," public school kids, and others, Arizona lawmakers focused special attention on Latino youth in their demonization of immigrants.  Leaders such as Joe Arpaio at times eliminated any distinction between "illegals" and Hispanics/Latinos who were U.S. citizens in discussing their efforts.  "They hate me, the Hispanic community," Arpaio noted, "because they're afraid they're going to be arrested. And they're all leaving town, so I think we're doing something good, if they're leaving."[87]

D.    The "Arizona Strategy" and National Politics

National organizations such as the Federation for American Immigration Reform (FAIR) pressed legislators in other states to pass anti-immigrant laws similar to Arizona's SB 1070. More than twenty states saw movements to pass such laws after 2010.[88] Dan Stein, the president of FAIR, promised that his organization "will be working hard in states all across America to try to build on this and other legal successes [in Arizona] that help affirm the states' role in solving America's immigration crisis." He affirmed that "the battle has only just begun."[89]  When Republicans in the

---

Ana and Celeste González de Bustamante (New York: Rowman & Littlefield Publishers, 2012), 78.

[86] Governor Brewer's support of SB 1070 stemmed from strategic political calculations of the sort common in dog whistle politics. The Maricopa County Supervisor Mary Rose Wilcox noted that Brewer "is running in a primary that leans heavily to the right. She had to outright the right, and that's what she did." After Brewer learned in March 2010 that her campaign was in trouble, that she was polling behind State Treasurer Dean Martin in the Republican race as well as the potential Democratic opponent, she began to refer to Arizona as the "front lines" of a war zone, and to accuse President Obama of working against the national interest. Ginger Rough, "Signing Arizona Immigration Law Was Never a Question for Governor," *Arizona Republic*, June 1, 2010.

[87] Complaint of United States of America v. Maricopa County, Arizona; Maricopa County Sheriff's Office; and Joseph M. Arpaio, in his official capacity of Sheriff of Maricopa County, Arizona (May 10, 2012).

[88] William Arrocha, "From Arizona's S.B. 1070 to Georgia's H.B. 87 and Alabama's H.B. 56: Exacerbating the Other and Generating New Discourses and Practices of Segregation," *California Western Law Review* 48, no. 2 (2012): 248.

[89] Stein, "Dan Stein."

Georgia legislature wrote a bill modeled on Arizona's SB 1070, "its main sponsor ... asked FAIR to review an early draft and credited Numbers USA with helping to mobilize local supporters."[90] Kris Kobach was involved in the writing of that bill. Following Arizona's lead in limiting undocumented student access to public education, the Georgia State Board of Regents also effectively banned those young people from attending its state universities in 2010.

In 2011, Republicans in Alabama passed a law (HB 56) modeled on Arizona's SB 1070 that Kris Kobach also helped to write. Republicans in Alabama had trumpeted the dangers of Latino criminality in advance of 2011, as Governor Bob Riley announced several years before that "we won't stand idly by and do nothing when we catch illegal aliens, some who have committed crimes like armed robbery, rape and drug smuggling, in our state."[91] As with Arizona's "attrition through enforcement," Alabama's HB 56 was intended to make the state so inhospitable to immigrants that Latinos would depart the state. But HB56 went beyond SB1070 by prohibiting undocumented immigrants from enrolling in any public school beyond high school, and by requiring schools and parents to report the immigration status of young people. It required immigrants to carry documents proving their legal status at all times; it criminalized unauthorized residents of the United States; it made it illegal for landlords to rent to undocumented immigrants; and it provided tax disincentives for the hiring of non-citizens. Republican Representative Micky Hammon, the main sponsor of HB 56, celebrated the law as "a jobs-creation bill for Americans." He also argued that it would deter new immigration and dissuade permanent settlement: "We really want to prevent illegal immigrants from coming to Alabama and to prevent those who are here from putting down roots."[92]

Following the passage of HB 56, Kobach boasted that "Alabama is now the new No. 1 state for immigration enforcement," and Senator Jeff Sessions provided at least tacit support for that bill.[93] The Alabama Senator skirted any acknowledgment of the law's negative impact on Latino youth -- 34,000 of whom stopped attending schools because they feared ICE raids.[94] When radio host Laura

---

[90] DeParle, "The Anti-Immigration Crusader."

[91] Jim Kouri, "The Big Lie About Immigration Enforcement," The Post Chronicle, November 17, 2008.

[92] Julia Preston, "Alabama Passes Far-Reaching Anti-Immigration Law," *The New York Times*, June 3, 2011, sec. U.S., https://www.nytimes.com/2011/06/04/us/04immig.html.

[93] Preston.

[94] MJ Lee, "Fearful Hispanic Students Skip Class," *POLITICO*, October 4, 2011, http://www.politico.com/news/stories/1011/65098.html.

Ingraham asked Sessions "Do you think it's bad all these Hispanic kids have disappeared from the schools? Do you think that's a bad thing?" Sessions replied that these were "unpleasant, unfortunate consequences" of "allow[ing] a situation to occur for decades that large numbers of people are in the country illegally."[95] It should be noted, however, that many of the Latino young people who stopped attending school in Alabama were citizens born to non-citizen parents, and that Sessions showed little interest in the negative impact on that population, preferring instead to lump together the undocumented and U.S. citizens.

### 1. The Influence of John Tanton's Organizations

In Alabama and elsewhere, anti-immigrant organizations and leaders – including members of the Trump campaign and administration -- have cultivated deep connections to groups motivated by racial animus towards Latinos. Attorney General Sessions and his current and former advisors have strong ties to organizations such as the Center for Immigration Studies (CIS), Numbers USA, and the Federation for American Immigration Reform (FAIR), all of them founded by John Tanton.[96] Linda Chavez, a former aide to President Reagan, once called Tanton "the most influential unknown man in America."[97]

Active since the late-1970s, Tanton has been linked to white supremacist movements and once commented that "I've come to the point of view that for European-American society and culture to persist requires a European-American majority, and a clear one at that." Tanton's influential 1994 book *The Immigration Invasion* crystallized and further popularized the Latino Threat, *reconquista* rhetoric developed in the 1980s and 1990s.[98] And Tanton's organizations became more powerful in the twenty-first century. When President Bush proposed creating a pathway to citizenship for undocumented immigrants in 2007, FAIR and CIS and Numbers USA successfully mobilized journalists and politicians and members of the general public to block that effort:

---

[95] Marie Diamond, "Sen. Sessions: It's Not Sad That Immigrant Children Are Too Scared To Go To School, It's Sad They're Even Here," *ThinkProgress*, October 6, 2011, https://thinkprogress.org/sen-sessions-its-not-sad-that-immigrant-children-are-too-scared-to-go-to-school-it-s-sad-they-re-7806097ec771/.
[96] The Center for Immigration Studies had been founded in 1985 "to make the restriction of immigration a legitimate position for thinking people." Numbers USA was founded in 1997 to influence policymakers in states and in Washington D.C. DeParle, "The Anti-Immigration Crusader."
[97] DeParle.
[98] Wayne Lutton and John Tanton, *The Immigration Invasion* (Monterey, Va: Social Contract Press, 1994).

> FAIR rallied talk show hosts. The Center for Immigration Studies churned out studies of the bill's perceived flaws. Numbers USA jammed the Capitol's phones.
>
> Their success became the stuff of lore. They "lit up the switchboard for weeks," said Senator Mitch McConnell of Kentucky, the Republican leader, explaining his decision to oppose the bill. "And to every one of them, I say today: "Your voice was heard."[99]

These groups were also successful during the Obama years in restricting legislative progress on immigration reform. The *New York Times* reported in 2011 that "the Center for Immigration Studies joined [FAIR and Numbers USA] in December in defeating the Dream Act, which sought to legalize some people brought to the United States illegally as children."[100]

These organizations would play a very important role in Trump's campaign, in his administration, and in the decision to rescind DACA in 2017.

## VI.    THE TRUMP CAMPAIGN AND ADMINISTRATION, AND RACIAL ANIMUS

Politicians have long capitalized upon racial animus against nonwhites – including Mexican immigrants and Mexican Americans – for electoral purposes. Disquiet among white voters has also been defined (even encouraged) by organizations and individuals who were not elected officials — white citizens' councils, for example, or anti-busing groups based in neighborhoods, or independent think tanks. Politicians who sought the support of those groups and others signaled their opposition to African American and Latino political demands through the use of codewords (illegals, welfare queens, hardworking taxpayers, and more) in ways that referenced racial animus without embracing ideological racism or going on record with explicit statements about all of the threats posed by non-whites in the United States.

Anti-immigrant politics in Arizona and other states had made clear the electoral value of "dog whistling" about the Latino Threat in advance of the 2016 elections. Governing and running for office over the last ten years have depended heavily on advancing "the idea … that normal people must be protected from all those who threaten their security and quality of life – unreconstructable welfare subjects, muggers, prostitutes, the homeless, pimps, gang members, petty criminals, drug

offenders, murderers, and the like," and politicians have increasingly blamed "illegal immigrants – typically imagined as Mexicans" for these threats to security and quality of life.[101]

There were many such examples in the Trump campaign. Journalist Katy Waldman urged readers in November 2016, for example, to

> consider his reliance on dog whistles and buzzwords. Trump returns again and again to "radical Islamic terror," as if the incantatory phrase presented an argument in itself. Urging his supporters to monitor polling places in urban districts, he said: "Go down to certain areas. … Make sure other people don't come in and vote five times." *Certain areas. Other people.*[102]

Members of the Trump campaign and administration have been very attentive to political language, and to communicating messages to voters about immigration. Adviser Stephen Miller has acknowledged "how important words are in the immigration debate." In fact, much of the debate about DACA recipients, and about other immigrants, has been a contest over language, with Trump and Sessions and others seeking to advance particular understandings of the Latino Threat, of illegality, and more. In advance of Trump's 2015 announcement of his candidacy for president, Miller delivered a major address at the Center for Immigration Studies (founded by Tanton) regarding the need to recapture terms such as "immigration reform" that had had been defined, in his view, by business interests and spokespersons who favor undocumented immigrants. He advocated, as well, for broad public and political use of the term "illegal alien" which had, he suggested, been replaced with inaccurate and distorting terminology: "'illegal alien' … became 'illegal immigrant' became 'undocumented immigrant' became 'immigrant without papers' became 'new American,' which is what it is now."[103] Social media is one tool used by many politicians today, including Trump, where terms like these can be reiterated and social categories can be defined. Addressing an Arizona audience in August 2017, Trump noted that "the advantage I have is that we do have a big voice. And you know, they're always saying, like Twitter or social media -- if I didn't have social

---

[101] Jonathan Xavier Inda, *Targeting Immigrants: Government, Technology, and Ethics* (Malden, MA ; Oxford: Blackwell Pub, 2006), 20–21.
[102] Katy Waldman, "Trump's Tower of Babble," *Slate*, November 2, 2016, http://www.slate.com/articles/news_and_politics/politics/2016/11/how_donald_trump_uses_language_and_why_we_can_t_stop_listening.html.
[103] "2015 Katz Award Ceremony Transcript," CIS.org, May 31, 2015, https://cis.org/2015-Katz-Award-Ceremony-Transcript.

media, I wouldn't be able to get the word out. I probably wouldn't be standing here, right? I probably wouldn't be standing here right now."[104]

The repeated use by Trump and others of the word "illegal" to refer to undocumented immigrants has been no accident. Terms such as "illegal alien," "criminal alien," "alien criminal," "criminal," "drug dealer," "gang member," and "cartel," among others, have been used by the Trump campaign and administration, and by other politicians, to urge voters – often referred to in contrasting terms as "good Americans," "tax payers," "hard-working citizens," "members of our communities," and the like – of the importance of building a "wall" to protect us from them, and of the central "threat" that many Latinos pose to the United States.

## A. Denial of Racial Animus

In representing immigrants as a danger to society, and in attempting to draw white voters together to face Mexicans as "external" enemies, Donald Trump and members of his campaign and administration have repeatedly denied being racists or bigots, even as they have "welcomed support from white supremacists and hate groups."[105] The Center for Immigration Studies advertises itself as "Pro-immigrant." In New Hampshire, Trump lambasted the Clinton campaign for charging him with racism. "When Democratic policies fail, they are left with only this one tired argument: 'You're racist. You're racist. You're racist,'" he said. "They keep saying it: 'You're racist.' It's a tired, disgusting argument, and it's so totally predictable."[106] In speeches delivered in September 2016 in Maryland and Florida, Trump assured voters that "People who want their immigration laws enforced, and their borders secured, are not racists. They are patriotic Americans of all backgrounds who want their jobs and families protected."[107]

---

[104] "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said."
[105] Cierra Bailey, "CNN Hosts Laugh As Pierson Denies Trump's Immigration Flip-Flop," Carbonated.TV, August 2016, http://www.carbonated.tv/news/cnn-hosts-laugh-as-pierson-denies-trumps-immigration-flipflop.
[106] Maggie Haberman and Michael D. Shear, "Donald Trump, Wavering on Immigration, Finds Anger in All Corners," *New York Times*, August 25, 2016, sec. Politics, https://www.nytimes.com/2016/08/26/us/politics/donald-trump-immigration.html.
[107] Donald J. Trump, "Address to the National Guard Association of the United States 138th General Conference & Exhibition at the Baltimore Convention Center in Baltimore, Maryland" (Baltimore, September 12, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119205; Donald J. Trump, "Remarks at a Rally at the James L. Knight Center in Miami, Florida" (Miami, September 16, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119208.

This denial of racial animus is consistent with dog whistle politics. Trump has characteristically charged his accusers with being the real racists: "Hillary Clinton is a bigot who sees people of color [*applause*] only as votes, not as human beings worthy of a better future," he announced in Mississippi.[108] Like Arizona restrictionists who denied any anti-Latino animus, Trump has even proclaimed his "love" for Mexicans, or that there are "great people" in Mexico, and in May 2016 he tweeted a photo of himself eating a taco bowl in Trump Tower with the message "I love Hispanics!"[109] Campaign spokesperson Katrina Pierson acknowledged on CNN in August 2016 that when Trump seemed for a brief period during the campaign to embrace a less dogmatic approach to border militarization and immigration enforcement, the candidate's "change in words" did not mean he had actually "changed his position on immigration," only that he was looking for more palatable ways to express the same message.[110] A number of prominent Hispanic Republicans who had supported Trump abandoned the "National Hispanic Advisory Council for Trump" in Fall 2016, noting that they felt like "props" in the candidate's anti-immigrant efforts, and that their organization seemed "to be simply for optics and I do not have the time or energy for a scam."[111]

## B. Connections with Tanton's Organizations

In fact, from the beginning of his presidential run, Trump and others in his campaign have supported the animus against Latinos promoted by organizations such as FAIR, CIS, and Numbers USA. Trump has elevated members of Tanton's organizations and their followers to positions of political leadership, including:

> *Jeff Sessions* (Alabama Senator, Attorney General): As Senator, Jeff Sessions provided a keynote at FAIR's national advisory board meeting in 2007, where he was given the "Franklin Society Award" bestowed upon "rare individuals who have made a real difference."[112] When Sessions became Ranking Member of the

---

[108] Donald J. Trump, "Remarks at the Mississippi Coliseum in Jackson, Mississippi" (Jackson, Mississippi, August 24, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=123198.

[109] Donald J. Trump, "Happy #CincoDeMayo! The Best Taco Bowls Are Made in Trump Tower Grill. I Love Hispanics!," Tweet, *@realDonaldTrump* (blog), May 5, 2016.

[110] *Katrina Pierson: Trump Didn't Change Immigration Stance, He Just Changed the Words He Used* (CNN, 2016), https://www.youtube.com/watch?time_continue=8&v=FoMwlIvR9FM.

[111] Alexander Burns and Maggie Haberman, "Tensions Deepen Between Donald Trump and R.N.C.," *The New York Times*, September 2, 2016, https://www.nytimes.com/2016/09/03/us/politics/donald-trump-rnc-reince-priebus.html; Katie Glueck and Kyle Cheney, "Several Hispanic Trump Surrogates Reconsider Support," *Politico*, September 1, 2016, http://www.politico.com/story/2016/09/donald-trump-hispanic-leaders-arizona-immigration-227615.

[112] Mahwish Khan, "FAIR Advertisement," America's Voice, September 14, 2009, https://americasvoice.org/content/fair_advertisement/.

Senate Judiciary Committee in 2009, the executive director of Numbers USA announced that the organization considered Sessions "the No. 1 champion for the American workers on immigration issues."[113] Senator Jeff Sessions read a tribute to NumbersUSA into the Congressional Record in May 2012 "to recognize the 15th anniversary of Numbers USA, a national grassroots organization that advocates for immigration policies that seek to serve the national interest … NumbersUSA was an active leader in an outgunned coalition that stood up to virtually all the elites in Washington. The big lobbies pulled out all the stops, spent millions of dollars, and bore down hard in their push for mass amnesty. But Goliath fell to the grassroots David, whose faxes, e-mails, rallies, visits to our offices, and phone calls registered the clear message that the American people would not accept Washington rewarding lawbreaking. The overwhelming grassroots response actuated by the Numbers USA coalition was most evident when citizens called Capitol Hill in such volume that it shut down the Senate's telephone system."[114] FAIR called him a "true immigration reformer" in October 2016.[115] FAIR President Dan Stein announced his organization's support of the Attorney General nominee immediately after the November election: "It's hard to imagine a better pick for the Attorney General position than Senator Jeff Sessions."[116]

*Kellyane Conway* (Campaign Manager and Counselor to the President): Conway's polling firm worked closely with FAIR in advance of the 2016 election cycle. According to FAIR President Dan Stein, "FAIR began working with Kellyanne Conway as far back as 1996, and we have used her for polling virtually every year since then. We take it as a certain amount of personal pride, is that when she became the campaign manager for Donald Trump—first successful woman to lead, you know, a successful presidential campaign—she was possessed of intimate professional knowledge of the immigration issue as it related to the voter concerns. And we saw that influence helping to shape Donald Trump's positions and statements once she came on board."

*John Feere* (adviser to Thomas D. Homan, the acting director of Immigration and Customs Enforcement): A former legal policy analyst for the Center for Immigration Studies, "while at CIS, Feere promoted legislation to end automatic citizenship for US-born children of undocumented immigrants. He argued that bearing a child on US soil provides an immigrant access to welfare and other social benefits, which has spurred a rise in what he calls 'birth tourism,' the practice of foreigners traveling to the United States to give birth to add a US citizen to the family…. In one article published by CIS, Feere questioned whether

[113] "No. 1 Champion for American Workers Chosen as Ranking Member of Judiciary Committee," May 5, 2009, https://www.numbersusa.com/content/news/may-5-2009/no-1-champion-american-workers-chosen-ranking-member-judiciary-committee.html.
[114] Jeff Sessions, "Recognizing 15th Anniversary of NumbersUSA," in *Congressional Record*, vol. 158:63, 2012, S2919–20.
[115] "Nearly One Million Aliens With Final Removal Orders Remain in the United States," *Federation for American Immigration Reform* (blog), October 25, 2016, https://fairus.org/legislative-updates/legislative-update-10252016#4.
[116] "FAIR Congratulates Senator Jeff Sessions for Nomination as Attorney General," November 18, 2016, https://www.prnewswire.com/news-releases/fair-congratulates-senator-jeff-sessions-for-nomination-as-attorney-general-300365959.html.

children brought to the United States at an early age were sufficiently assimilated or loyal to this nation to be granted any type of legal status."[117]

*Lou Barletta* (Pennsylvania Congressman, and member of Trump's transition team): A member of FAIR's national board of advisers, Barletta made national news in developing anti-immigrant measures as mayor of Hazleton, Pennsylvania.[118]

*Kris Kobach* (Kansas Secretary of State, advisor of Trump's transition team): Counsel for FAIR's legal affiliate, the Immigration Reform Law Institute, and legal counsel for anti-immigrant efforts in Arizona, Alabama, Pennsylvania, Missouri, and elsewhere, Kobach has claimed primary credit for developing Trump's immigration policies, as well as the current approach to immigration adopted by the GOP.

*Stephen Miller* (Communications Director for Senator Sessions, Senior Policy Advisor for President Trump): As a member of Jeff Sessions' staff since 2009, Miller worked closely with FAIR. Robert Law, the organization's director of government relations, predicted that "I would not be surprised if Stephen [Miller] played a large role in crafting Trump's platform. Every single component of it is basically what we have fought for, for a very long time."[119]

*Julie Kirchner* (Policy Advisor for "Trump for President" campaign, and Ombudsman of the U.S. Citizenship and Immigration Services): Kirchner served as FAIR's Executive Director for ten years, and she has frequently provided Congressional testimony on immigration issues. She is considered a close associate of Iowa Congressman Steve King.[120]

These individuals, and others who have worked closely with Attorney General Sessions and with FAIR, CIS, and Numbers USA, have taken the lead in reshaping immigration policy under President Trump. Several of them were also closely involved in the rescinding of DACA.

## VII.   CHARACTERISTICS OF ANIMUS IN THE CAMPAIGN AND ADMINISTRATION

As the following pages make clear, policymakers have portrayed "illegals" and their communities as a menace to the English language; they have argued that immigrants and their children might undermine the American middle class; and they have expressed fear that Latinos will compromise the public health of everyday Americans. Recurring representations of Latinos and African Americans as lazy have shaped debates about immigrants as welfare cheats. And

---

[117] Maria Santana, "Hard-Line Anti-Illegal Immigration Advocates Hired at 2 Federal Agencies," *CNN*, April 12, 2017, http://www.cnn.com/2017/04/11/politics/trump-administration-immigration-advisers/index.html.

[118] Dana Liebelson, "10 Years Ago, These People Tried To Drive Undocumented Immigrants Out Of Town. Now, They're Advising Trump.," *Huffington Post*, December 2, 2016, sec. Politics, https://www.huffingtonpost.com/entry/fair-donald-trump-immigration_us_584190d4e4b0c68e048059a2.

[119] Stephanie Akin, "The Other 'Steve' in the White House," *Roll Call*, February 13, 2017, sec. politics, https://www.rollcall.com/news/politics/stephen-miller-white-house.

[120] D'Antonio, "Trump's Move to End DACA Has Roots in America's Long, Shameful History of Eugenics."

longstanding stereotypes about unpatriotic Latinos continue to mark these communities as "un-American," politically radical, ungrateful for what the United States offers, and perhaps unfit for citizenship.

### A.   "Us" vs. "Them"

"When Mexico sends its people … they're not sending you."
Donald Trump's announcement of his presidential candidacy (June 2015)

In recent years, racial codewords have drawn upon distinctions of citizenship to heighten political concerns about ethnic Mexicans and to mobilize white voters. These distinctions have referenced racial stereotypes, and they have often been rooted in animus. Despite the fact that many immigrants live in mixed-status families, sharp contrasts have been drawn between "real Americans" and "immigrants" by members of the Trump campaign and administration. Trump articulated such contrasts when he announced his candidacy for president in June 2015:

When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people.

The dichotomies in Trump's announcement were strong, clear, and rooted in racial thinking. People of Mexican descent are distinct. "They" are problems, "they" are drug dealers, "they" are criminals, and "they" are rapists. Even the "good people" among them are fundamentally different than "us." These types of distinctions have been continually reiterated and affirmed by members of the campaign and the administration. John Kelly, for example, tweeted on July 28, 2016 that with the election of Trump, "Real Americans will finally have someone who speaks for them - and not immigrants- working in the White House. #tcot #MAGA."[121]

Trump and others associated with his campaign and administration drew upon past experiences in Arizona and elsewhere to highlight distinctions between Americans, or those they consider their political base, and Latinos. Corruption, criminality, dishonesty, irresponsible financial management, and an incapacity to self-govern have been prominent in these stereotypes

---

[121] John Kelly, "Real Americans Will Finally Have Someone Who Speaks for Them - and Not Immigrants- Working in the White House. #tcot #MAGA," *Twitter* (blog), July 28, 2017, https://twitter.com/ChiefJohnKelly/status/891114189707649024.

about Latinos. In July 2014, for example, Trump tweeted to ask "When will the U.S. stop sending $'s to our enemies, i.e. Mexico and others."[122] In February 2015 he tweeted "The Mexican legal system is corrupt, as is much of Mexico. Pay me the money that is owed me now - and stop sending criminals over our border."[123] The following month he tweeted "Mexico's court system corrupt. I want nothing to do with Mexico other than to build an impenetrable WALL and stop them from ripping off U.S."[124] A few weeks later he tweeted "The border is wide open for cartels & terrorists. Secure our border now. Build a massive wall & deduct the costs from Mexican foreign aid!"[125] In April 2015 he told an audience that "we need leadership. We can't allow … Mexico to rip us off."[126]

He continued to refer to Mexicans as an "enemy" of the United States, and in particular to white working class voters, in various ways over the following three years. Trump's focus on the ways that Mexico used NAFTA to steal American jobs was one such theme. Those allegations resonated with Ross Perot's arguments during the 1992 presidential season that "a great sucking sound" signaled the economic growth of Mexico and the decline of the United States.[127] Following others who had long questioned the loyalty of Mexican Americans to the United States, in May 2016 the candidate tweeted about unnamed protesters seen "proudly waving Mexican flags" who apparently burnt U.S. flags at a political protest in California.[128] That story was picked up by Breitbart and other news outlets.[129] In August 2017, Trump's speech about immigration in Phoenix provided a good example of the President's effort to create a racialized sense of national unity –

---

[122] Donald J. Trump, "When Will the U.S. Stop Sending $'s to Our Enemies, i.e. Mexico and Others.," Tweet, *@realDonaldTrump* (blog), July 4, 2014, https://twitter.com/realDonaldTrump/status/487316463204986880.

[123] Donald J. Trump, "The Mexican Legal System Is Corrupt, as Is Much of Mexico. Pay Me the Money That Is Owed Me Now - and Stop Sending Criminals over Our Border," Tweet, *@realDonaldTrump* (blog), February 24, 2015.

[124] Donald J. Trump, "Mexico's Court System Corrupt.I Want Nothing to Do with Mexico Other than to Build an Impentrable WALL and Stop Them from Ripping off U.S.," Tweet, *@realDonaldTrump* (blog), March 5, 2015.

[125] Donald J. Trump, "The Border Is Wide Open for Cartels & Terrorists. Secure Our Border Now. Build a Massive Wall & Deduct the Costs from Mexican Foreign Aid!," Tweet, *@realDonaldTrump* (blog), March 30, 2015.

[126] *"Celebrating the American Dream" with Donald Trump and Mattress Mack, a Discussion Hosted by the Texas Patriots PAC*, 2015, http://www.carbonated.tv/news/donald-trump-border-immigrants-vomit-2015-video.

[127] Joshua P. Meltzer and Dany Bahar, "NAFTA under Trump—the Myths and the Possibilities," February 23, 2017, https://www.brookings.edu/blog/up-front/2017/02/23/nafta-under-trump-the-myths-and-the-possibilities/.

[128] Donald J. Trump, "Everybody Is Talking about the Protesters Burning the American Flags and Proudly Waving Mexican Flags. I Want America First - so Do Voters!," Tweet, *@realdonaldtrump* (blog), May 11, 2016, https://twitter.com/realdonaldtrump/status/727137190967435265?lang=en.

[129] Alex Swoyer, "Photos: California Protesters Burn American Flag, Donald Trump Responds," Breitbart, May 2, 2016, http://www.breitbart.com/2016-presidential-race/2016/05/02/photos-california-protesters-burn-american-flag/.

described here as being on the same American "team" – by referencing the need to fight enemies at home and abroad.[130]

Trump and others frequently galvanized voters sympathetic to the white working class by making Latino immigrants, and any political groups that supported DACA or a path to citizenship for undocumented residents, seem like the puppets of heartless corporations and corrupt, faraway political elites. He linked the threat of NAFTA – Mexico taking jobs away from white workers in the Midwest and South – to the threat posed by Latinos – undocumented immigrants who drove down local wages and thereby threatened the few opportunities that remained for longtime residents. This political rhetoric turned a rhetoric of class conflict in the U.S. into racial animus against Mexicans and other Latinos. Trump told a Phoenix audience that "The fundamental problem with the immigration system in our country is that it serves the needs of wealthy donors, political activists and powerful, powerful politicians."[131]  Trump told a Mississippi audience that Hillary Clinton "wants a country without borders. She wants trade deals written for the benefit of foreign corporations. She wants a government that ignores the will of the people. [*booing*]"[132]

The "us vs. them" rhetoric dovetailed with states' rights rhetoric, and with arguments that the states need to protect their citizens in the face of foreign influences, a political language long associated with the racial politics of the GOP. Rhetoric about the Mexicanization of Arizona, and arguments about the need for more punitive national and local approaches to immigration enforcement, were bound up with critiques of the Obama administration's apparent unwillingness to stop undocumented migration. Scholar Anna Sampaio notes that these anti-immigrant efforts "centered on critiques of the federal government (particularly for its failure to halt the entry of unauthorized immigrants) and the danger of increasingly violent drug cartels. In this context, the security discourse shifted from protecting the homeland and its dependents to safeguarding the needs of individual property owners and the state's desire to withhold public services to protect its budget.[133]

---

[130] "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said."
[131] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."
[132] Trump, "Remarks at the Mississippi Coliseum in Jackson, Mississippi."
[133] Anna Sampaio, *Terrorizing Latina/o Immigrants : Race, Gender, and Immigration Politics in the Age of Security* (Philadelphia: Temple University Press, 2015), 145–46.

### B.  Equating  Mexicans and Mexican Americans

In  emphasizing  the  threat  of  immigrants,  Trump  has  suggested  a  close  political  alliance between  Mexican  Americans  and  "Mexican  illegals,"  arguing  that  "they"  (Latinos)  share a common agenda regardless  of citizenship.  In July 2015, for  example,  he tweeted  that #JebBush has to like the Mexican  illegals  because  of his wife,"  suggesting  that his opponent's  Mexican  American  spouse would  make  Bush  overly  sympathetic  to  undocumented  immigrants.[134]  In  June 2016 Trump then stated  that U.S. District  Court  Judge Gonzalo  Curiel,  who had  been born in Indiana,  ruled  against him  in a court case because  "He's a Mexican."  CNN Host Jake Tapper countered  that "he's a legal citizen,"  a  Mexican  American,  but  Trump  insisted  that  the  judge's  "very  unfair  rulings"  were  an irrational  response  to the fact that "I'm building  a wall,"  and that "it's a wall between  Mexico  [and the United  States],  not another  country."  According  to Trump,  Curiel's  Mexican  American  heritage meant that he could not rule impartially,  and that he had an "inherent  conflict  of interest"  because of the candidate's  announced  policies  related  to immigration.[135]  CNN host Jake Tapper asked: "If you are  saying  he cannot  do his job  because  of his race,  is that  not the definition  of racism?"[136]  House Speaker Paul Ryan also labeled Trump's allegation  "the textbook definition  of a racist comment."[137]

Other  Trump  associates  and  allies  have  also  suggested  that  Mexican  Americans  and  other Hispanics  who opposed the candidate  or the president  are more loyal to Mexico  than to the United States.  Adviser  Stephen  Miller,  for  example,  explained  that  the Latinos  who stepped  down  from  the National  Hispanic  Advisory  Council  for Trump  in protest of an incendiary  speech  given  in Arizona in September  2016 were simply  "professional  amnesty  lobbyists."[138]  In California,  a voter suspicious of Mexican  American  politicians  running  for statewide  office  admitted  that "I'm afraid to give more power to Hispanics  until  we get our illegal  immigration  down."[139]

The  sharp  distinctions  that  Trump  and others  emphasize  between  Americans  and Mexicans,

---

[134] Donald J. Trump, "@RobHeilbron: @realDonaldTrump #JebBush Has to like the Mexican Illegals Because of His Wife," Tweet, *@realDonaldTrump* (blog), July 4, 2015.

[135] Brent Kendall, "Trump Says Judge's Mexican Heritage Presents 'Absolute Conflict,'" *Wall Street Journal*, June 3, 2016, http://www.wsj.com/articles/donald-trump-keeps-up-attacks-on-judge-gonzalo-curiel-1464911442.

[136] Jake Tapper, "Tapper to Trump '…is That Not the Definition of Racism?,'" *CNN Press Room*, June 3, 2016, http://cnnpressroom.blogs.cnn.com/2016/06/03/tapper-to-trump-is-that-not-the-definition-of-racism/.

[137] Fisher, "Trump and Race."

[138] Burns and Haberman, "Tensions Deepen Between Donald Trump and R.N.C."

[139] Bretón, "California's Top Latino Candidates Face a Tougher Enemy than Trump: Fellow Democrats."

federal corruption and the will of the people, rational citizenship and ethnic loyalty, and our interests and theirs, suggest that managing immigrans and their children will define the future of the United States. "We're not going to have a country left," Republicans speculated, if immigrants are allowed to "destroy our country." This hyperbole, and these misrepresentations of immigrants and their family members, proved critical in the representation of DACA recipients by members of the Trump administration.

### C. Latinos as Security Risks

As articulated by Trump and his advisers, anti-Latino racial animus has drawn upon old fears of Latin American political radicalism to portray immigrants and the U.S.-born as threats to democracy. These claims have a long history that stretches back to the nineteenth century, and in 1986, President Ronald Reagan announced that undocumented immigration from communist countries in Latin America was a real danger, and that "terrorists and subversives are just two days' driving time from Harlingen, Texas."[140] Trump has argued forcefully that "immigration security is a vital part of our national security."[141] In the twenty-first century, opposition to Muslims in the United States, and fears that terrorists would enter the country through Mexico, have led to common associations in political campaigns between ethnic Mexicans and Middle Eastern terrorists. Attorney General John Ashcroft announced in 2002 that "in this new war on terrorism our enemy's platoons infiltrate our borders …. [T]heir tactics rely on evading recognition at the border and escaping detection within the United States."[142] Chief of Staff John Kelly recently tweeted that "we are still fighting communism in the form of immigrants. #maga."[143] Political candidates and elected officials have gone so far as to paint Latinos as racists, as cultural nationalists with a hatred for Western civilization, and as a closed community that seeks to conquer, or re-conquer, the Southwest. Candidate and president Trump, and members of his campaign and administration, have also used discredited statistics to support their arguments for curtailing

---

[140] Massey and Pren, "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America," 7.
[141] Donald J. Trump, "Remarks at the Union League of Philadelphia in Philadelphia, Pennsylvania" (Philadelphia, September 7, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119177.
[142] Sampaio, *Terrorizing Latina/o Immigrants*, 79.
[143] John Kelly, "We Are Still Fighting Communism in the Form of Immigrants. #maga," *Twitter* (blog), July 20, 2017, https://twitter.com/ChiefJohnKelly/status/888233650256588805.

immigration and building a wall on the U.S.-Mexico border, and for emphasizing that just a few terrorists crossing with "them" might destroy "us."

Trump and others have therefore connected the Latino Threat to the threat of global terrorism. The attacks in New York City on September 11, 2001 were critical to linking the Latino Threat to broader security concerns. As legal scholar Kevin Johnson has shown, that violent act "had adverse impacts on the Mexican immigrant community in the United States, as well as on all other immigrants."[144] The U.S. Congress would soon pass legislation "that harnessed immigration regulation to national security issues," including the USA Patriot Act of 2001, the Homeland Security Act of 2002, the Enhanced Border Security and Visa Entry Reform Act of 2002, the Intelligence Reform and Terrorism Prevention Act of 2004, the REAL ID Act of 2005, and the Secure Fence Act of 2006.[145] Politicians in border states played on new fears of "outsiders," and anxieties about "Mexicanization" dominated political discussions over the following decade.[146] Websites, internet blogs, and social media have "propelled nativist fears" and driven fears of the *reconquista* around the country.[147]

When he announced his campaign for president in June 2015, Trump spoke about Mexican immigrants immediately prior to addressing contemporary "Islamic terrorism" and Middle Eastern politics.[148] On the campaign trail, Trump linked immigrant youth directly to terrorism, and he suggested a strong link between Latinos and Middle Eastern refugees. "Since 9/11," he told an audience in North Carolina, "hundreds of immigrants and their children have been implicated in terrorism and terrorist-related activity in the United States."[149] The political use of racial codewords that raise concerns about radicalism – including words such as "Raza" and "Aztlán" -- has allowed politicians to represent ethnic Mexicans as a threatening and cohesive group. Sometimes

---

[144] Kevin R. Johnson, *Opening the Floodgates: Why America Needs to Rethink Its Borders and Immigration Laws* (New York: New York University Press, 2007), 109, http://site.ebrary.com/lib/yale/Doc?id=10210080.

[145] Jaime R. Águila, "Immigration and Politics," *Aztlan* 38, no. 2 (Fall 2013): 141.

[146] Samantha Hauptman, *The Criminalization of Immigration: The Post 9/11 Moral Panic* (El Paso: LFB Scholarly Publishing LLC, 2013).

[147] Lee Bebout, "The Nativist Aztlan: Fantasies and Anxieties of Whiteness on the Border," *Latino Studies* 10, no. 3 (Autumn 2012): 293.

[148] "Donald Trump, Ceo, Trump Organization, Delivers a Presidential Campaign Announcement."

[149] Donald J. Trump, "Remarks at High Point University in High Point, North Carolina" (High Point, North Carolina, September 20, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119192.

they have mocked ethnic politics as merely silly – as when Trump told a New Hampshire town hall audience that Hispanics prefer to be called "Latinos … in that area."[150] More often, Trump and others have argued for "extreme vetting" both of Middle Eastern refugees – as potential terrorists – and of Latin American immigrants – as equally important threats to the nation. "In the Cold War, Trump told an Ohio audience, "we had an ideological screening test. The time is overdue to develop a new screening test for the threats we face today."[151]

Trump has often pivoted between discussions of Middle Eastern terrorists and Latino immigrants in order to connect these two threats. Following an attack on U.S. forces in Kabul, Afghanistan, Trump redefined "security" for a Mississippi audience to remind them of the dangers posed by Mexico and Latin American immigrants: "Our jobs have moved to other countries. Islamic terrorism has spread within our shores. And an open border has crushed low-income workers and threatened, and I mean totally threatened, our security."[152] He promised a Phoenix audience in August 2017 that "believe me, one way or the other, we're going to get that wall. Immigration security is also a matter, remember this, of national security. That's why we're implementing tough new vetting and screening protocols to keep radical Islamic terrorists out of our country."[153]

As policymakers and pundits emphasized that Latin Americans were a security threat, political discussions of Latinos in the twenty-first century have made overt and implicit references to terrorists, to "radical Islamists," and to revolutionaries and subversives.

### D. Fears of "Reconquest"

Donald Trump promoted fears of Mexico's "reconquest" of the United States during his presidential campaign, and the campaign slogan "America First" was in part an affirmation that his administration would stop that process. As Senator, Jeff Sessions had expressed his desire to allow the arrival of immigrants "who really desire to be an American and who want to be a part of our society and deeply desire to make a permanent move, and who want to create a new allegiance from

---

[150] Sean Colarossi, "Ignorant Donald Trump Insults Hispanics At Practice Town Hall Event In New Hampshire," *Politicus USA* (blog), October 6, 2016, http://www.politicusa.com/2016/10/06/ignorant-donald-trump-insults-hispanics-practice-town-hall-event-hampshire.html.
[151] Donald J. Trump, "Remarks at Youngstown State University in Youngstown, Ohio" (Youngstown, Ohio, August 15, 2016).
[152] Trump, "Remarks at the Mississippi Coliseum in Jackson, Mississippi."
[153] "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said."

their prior country to their new home in the United States," a clear critique of Latino immigrants whom Sessions believed were not in fact loyal to the United States.[154]

Stephen Miller, Donald Trump, and others in the current administration have focused attention on the dangers of "chain migration" as a reference to the dangers of slow demographic takeover by Latin Americans. DACA recipients are represented as threats to the United States as important to this chain migration. In accounts by Trump and others, undocumented residents arrive to the United States, receive visas, go on welfare, attend schools, "and then that person can bring in a relative who can bring in a relative who can bring in a relative, and that's why they call it chain migration."[155] The backlash against perceived "Mexicanization" through "chain migration" has surged over the last ten years.

*Reconquista* rhetoric played an important role in states' rights calls, and politicians and citizens' groups popularized "grossly inflated statistics and simplistic rhetoric … to inflame xenophobia," as when Jim Gilchrist claimed in 2006 that at least 30 million illegal immigrants lived in the United States, and that another four to five million would arrive each year.[156]

In supporting Trump's campaign, former Congressman Tom Tancredo warned in April 2016 about Mexico's effort to establish a "colony" in the Southwest. Tancredo argued that "are seen as extensions of the Mexican state and partners in Mexico's plans," and that Mexico's "policy of dual citizenship is only the visible tip of the iceberg of a strategic plan for active and overt involvement in American politics to advance Mexican government interests.[157] Tancredo's 2017 article entitled "You Think Russia Tries to Influence American Politics? Think Mexico First" equated Mexican immigrants and Mexican Americans, suggesting that DACA recipients and even U.S. citizens of Mexican descent who have lived in the United States for up to seven generations might be loyal to Mexico:

---

[154] Jeff Sessions, "Comprehensive Immigration Reform Act of 2007," § United States Senate (2007), S6433.

[155] Anna Giaritelli, "Stephen Miller Predicts 'Unstoppable' Momentum for Trump's Immigration Plan," *Washington Examiner*, August 2, 2017, http://www.washingtonexaminer.com/stephen-miller-predicts-unstoppable-momentum-for-trumps-immigration-plan/article/2630443.

[156] Jim Gilchrist and Jerome R Corsi, *Minutemen: The Battle to Secure America's Borders* (Los Angeles, CA: World Ahead Pub., 2006).

[157] Tom Tancredo, "Mexico Is Sending Us Colonists, Not Immigrants," Breitbart, April 30, 2016, http://www.breitbart.com/2016-presidential-race/2016/04/30/mexico-sending-us-colonists-not-immigrants/.

Mexico officially conveys Mexican citizenship to the children of Mexicans born in the United States– they have dual citizenship from birth, and thus, they can vote in Mexican elections just like their parents. By law, this dual citizenship is conveyed to ALL Mexicans born in the U.S., and it does not matter if a Mexican immigrant becomes a naturalized U.S. citizen, he is still a citizen of Mexico. [158]

In this version, DACA recipients can be understood as dangerous "fifth columnists," just as Japanese Americans born in the United States were seen as a security threat to the U.S. during World War II. Trump and other members of his campaign and administration have repeatedly asserted that illegal immigrants and their families threaten the very existence of the United States. This is political language intended to resonate with audiences who have long been worried about a *reconquista*. "We better get smart. We better get tough," Trump urged voters in Erie, Pennsylvania. "And if we're not smart and we're not tough, we're not going to have a country left. And one of the things I have to talk to you about before I leave is our borders. Illegal immigrants are pouring into our country."[159] In Arizona Trump told a crowd that Hillary Clinton "doesn't know what she's doing except open borders and let everybody come in and destroy our country by the way."[160] In these speeches and others, Trump followed Sheriff Joe Arpaio who had stated that "A growing movement among not only Mexican nationals but also some Mexican-Americans contends that the United States stole the territory that is now California, Arizona, and Texas, for a start, and that massive immigration over the border will speed and guarantee the reconquista of these lands, returning them to Mexico."[161]

Other pundits have emphasized that Mexico and Central America are significant security threats to the United States, and that migrants and refugees import radicalism and violence to this country. For example, Pat Buchanan announced on MSNBC in 2009 that "Mexico is the greatest foreign policy crisis I think America faces in the next 20, 30 years." He asked viewers "Who is going to care, 30 years from now whether a Sunni or a Shia is in Baghdad or who's ruling in Kabul? We're going to have 135 million Hispanics in the United States by 2050, heavily concentrated in the southwest. The question is whether we're going to survive as a country."[162] John Kelly similarly told

---

[158] Tom Tancredo, "Tancredo: You Think Russia Tries to Influence American Politics? Think Mexico First," Breitbart, July 25, 2017, http://www.breitbart.com/big-government/2017/07/25/tancredo-think-russia-tries-influence-american-politics-think-mexico-first/.
[159] Donald J. Trump, "Remarks at Erie Insurance Arena in Erie, Pennsylvania" (Erie, Pennsylvania, August 12, 2016).
[160] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."
[161] Chavez, *The Latino Threat*, 44.
[162] Chavez, 1.

a Senate Armed Services Committee meeting in 2015 that ISIS had been encouraging terrorists to "infiltrate the southern border" of the United States, and that

> In addition to thousands of Central Americans fleeing poverty and violence, foreign nationals from countries like Somalia, Bangladesh, Lebanon, and Pakistan are using the region's human smuggling networks to enter the United States. While many are merely seeking economic opportunity or fleeing war, a small subset could potentially be seeking to do us harm.[163]

In the twenty-first century, discussions of Latinos that referenced wars, invasions, shifting political loyalties, chain migration, and the multi-generational attachments of immigrants to their home countries could be used by the Trump campaign and administration to remind voters that Latin Americans threatened to overrun the United States and, perhaps, undermine U.S. sovereignty.

## E. Entitlements, Veterans, and Voting Rights

Since at least the nineteenth century, politicians and organizations have opposed the arrival of new immigrants by highlighting stories and statistics that purport to prove that immigrants drain local and national welfare coffers, and that they steal other benefits and opportunities that rightly belong to native-born, white U.S. citizens. And since Reconstruction, some pundits and politicians have claimed that African Americans effectively "steal" the rights of citizenship or place unfair welfare burdens on white Americans. These types of arguments have been repeated by Trump and his associates. In announcing the RAISE Act in early-August 2017, for example, the President argued that it would "preven[t] new migrants and new immigrants from collecting welfare, and protects U.S. workers from being displaced. And that's a very big thing. They're not going to come in and just immediately go and collect welfare. That doesn't happen under the RAISE Act. They can't do that."[164] Later that month, Trump told a Phoenix audience that "years of uncontrolled immigration have … put great burdens on local schools and hospitals."[165]

---

[163] *Gen. John Kelly at the Senate Armed Services Committee: Latin American Smuggling Networks Could Facilitate ISIS Entrance into U.S.*, accessed October 24, 2017, https://www.youtube.com/watch?v=Lxh6ANP3BO8.
[164] Donald J. Trump, Senator Tom Cotton, and Senator David Perdue, "Remarks by President Trump, Senator Tom Cotton, and Senator David Perdue on the RAISE Act and Green Card Reform," August 2, 2017, https://www.whitehouse.gov/the-press-office/2017/08/02/remarks-president-trump-senator-tom-cotton-and-senator-david-perdue.
[165] "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said."

50

These types of arguments have long been important in anti-Mexican and anti-Latino movements, driving animus during the 1910s, the 1920s, the 1930s, and the 1950s, and they have helped to define contemporary opposition to the arrival of recent Latino migrants in Arizona and other states since the 1970s. The Republican-led movement in California to pass Proposition 187 in California denying state services to undocumented immigrants was also critical in the national campaign linking Latinos to welfare fraud.[166] Such narratives urge voters and others to take for granted that Latinos "abuse," "overburden," or "take advantage of" the political system and welfare state.

### 1. Welfare and Benefits

On the campaign trail, Trump repeatedly made erroneous claims that immigrants were the cause of financial strain on the welfare system. This claim represented immigrant workers and families as poor, unproductive, and drawn to the United States by the availability of food stamps and free health care. Claims about opportunistic Latinos as drains on the welfare state have also shaped political rhetoric about Puerto Rico and its U.S. citizens in the aftermath of Hurricane Maria. Trump appealed to stereotypes about Latinos as welfare-dependent, lazy, and a political burden when he tweeted on September 30th that Puerto Ricans "want everything to be done for them when it should be a community effort."[167]

Promising to preserve the "safety net" for voters in Iowa, President Trump maintained that "others [immigrants] don't treat us fairly. That's why I believe the time has come for new immigration rules which say that those seeking admission into our country must be able to support themselves financially and should not use welfare for a period of at least five years. And we'll be putting in legislation to that effect very shortly."[168] *The Hill* criticized that speech as intentionally misleading, noting that "such a law is already in effect and has been in place since 1996. Known as

---

[166] HoSang, *Racial Propositions*.

[167] Donald J. Trump, ..."...Want Everything to Be Done for Them When It Should Be a Community Effort. 10,000 Federal Workers Now on Island Doing a Fantastic Job.," Tweet, *@realDonaldTrump* (blog), September 4, 2017, https://twitter.com/realDonaldTrump/status/914089888596754434?ref_src=twsrc%5Etfw&ref_url=https%3A%2F%2F www.nbcnews.com%2Fstoryline%2Fpuerto-rico-crisis%2Fsan-juan-s-mayor-pleads-trump-you-are-killing-us-n806116.

[168] Robert Farley et al., "FactChecking Trump's Iowa Rally," FactCheck.org, July 5, 2017, http://www.factcheck.org/2017/06/factchecking-trumps-iowa-rally/.

the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, the legislation was passed during the administration of former President Bill Clinton and said that an immigrant is 'not eligible for any Federal means-tested public benefit' for five years, which starts on the date the immigrant enters the country."[169] But Trump later repeated such misleading claims in Ohio:

> those seeking to immigrate into our country should be able to support themselves financially, and should not be able to use welfare for themselves or their household for a period of at least five years…. We don't want people that come into our country and immediately go on welfare and stay there for the rest of their lives.[170]

DACA recipients, in this account of Latino immigrants, must be understood as a group seeking entitlements that they have not in fact earned.

In advance of the November 2016 election and in the Oval Office, Trump and others also argued that undocumented immigrants enjoy benefits that are denied to U.S. citizens. It was often suggested that "elites" in the United States supported undocumented immigration, and supported DACA, in order to undercut the well-being of working-class and middle-class white Americans. When DACA was announced, one author writing for the Center for Immigration Studies emphasized that

> It should come as no surprise that the elites who oversaw the decline of religion in the United States, who took America down the road toward bankruptcy, and who routinely employ illegal aliens all support this amnesty program.

> These religious, political, and business elites turn their backs on American citizens and their children because they won't join their corrupted churches, won't support their corrupt political activities, and won't work as virtual indentured servants while their taxes go to bail out corrupt businesses.[171]

Here, the Center for Immigration Studies tied immigrants to corruption, much as Trump focused on a "corrupt Mexico," and in ways reminiscent of broader discussions in the United States of Latin American political and economic malfeasance. For Steven Camarota of CIS, the mismanagement and overreach of the DACA program in particular hurts "working class voters … the very people who

---

[169] Mallory Shelbourne, "Trump Wants to Keep New Immigrants from Getting Welfare — Which Is Already Law," The Hill, June 21, 2017, http://thehill.com/homenews/administration/338901-trumps-suggests-creating-law-that-has-been-enacted-since-1996.

[170] *President Trump's Full Ohio Rally* (CNN Politics, 2017), http://www.cnn.com/videos/politics/2017/07/25/trump-youngstown-rally-full-speech.cnn.

[171] Ronald W. Mortensen, "Obama Administration's DREAM Decree – Compassion or Child Abuse?," CIS.org, June 21, 2012, https://cis.org/Mortensen/Obama-Administrations-DREAM-Decree-Compassion-or-Child-Abuse.

put Trump over the top." It is, he argued, therefore "time to end DACA" precisely because "The employment situation for those [working class voters] without a college education continues to look bleak."[172]

Trump and others contrasted the "benefits" provided to undocumented immigrants, including DACA recipients, with those provided to military veterans – U.S. residents who truly deserve adequate care and generous support from their government. In 2014 the candidate tweeted to criticize President Obama's "dysfunctional Administration when Illegal Aliens get free & better medical care then our Veterans. What a disgrace."[173] Several months later he retweeted a *Breitbart* article that made a similar claim.[174] In July 2015 the candidate tweeted that "There Are Homeless Veterans in USA & yet Illegal Aliens Get Government Housing."[175] In August 2015, he contrasted immigrants with military veterans on public radio, arguing that undocumented residents of the United States "by the way are treated better than our vets. You know are vets are incredible. No, no, the illegal immigrants in many cases, not in all cases, but in many cases are treated better than our veterans."[176] In August 2016 Trump told an Arizona crowd that "we have to listen to the concerns that working people, our forgotten working people, have over the record pace of immigration and it's impact on their jobs, wages, housing, schools, tax bills and general living conditions."[177]

Trump emphasized that Obama's executive actions on immigration, including DACA, were also part of the overextension of the welfare state, tied to irresponsible Democratic social service policies such as the Affordable Care Act. In June 2014 Trump urged his Twitter followers to "Imagine how much tax money it will cost Americans when Obama legalizes 25 million illegal

---

[172] Steven Camarota, "Time to End DACA," *National Review*, August 3, 2017, http://www.nationalreview.com/article/450080/obamas-illegal-amnesty-trump-should-end-daca.

[173] Donald J. Trump, ""@BackOnTrackUSA. What a Dysfunctional Administration When Illegal Aliens Get Free & Better Medical Care Then Our Veterans. What a Disgrace.," Tweet, *@realdonaldtrump* (blog), July 12, 2014, https://twitter.com/realdonaldtrump/status/492147543329869825.

[174] Donald J. Trump, "Via @BreitbartNews by@mboyle1: "Obama's Amnesty Will Give Illegal Aliens Public Benefits"Http://Www.Breitbart.Com/Big-Government/2014/11/17/Exclusive-Report-Obama-s-Executive-Amnesty-Will-Put-Illegal-Aliens-On-Welfare-Public-Benefits-Like-Obamacare-and-More …," Tweet, *@realdonaldtrump* (blog), November 17, 2014, https://twitter.com/realdonaldtrump/status/534795106113843200.

[175] Donald J. Trump, "@_EOD  I Believe We Have Passed That Point. There Are Homeless Veterans in USA & yet Illegal Aliens Get Government Housing," Tweet, *@realdonaldtrump* (blog), July 12, 2015, https://twitter.com/realdonaldtrump/status/623156677769056256.

[176] Domenico Montanaro, "Donald Trump In 9 Quotes And 200 Seconds," NPR.org, August 29, 2015, http://www.npr.org/sections/itsallpolitics/2015/08/29/435849800/donald-trump-in-9-quotes-and-200-seconds.

[177] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."

aliens&gives [sic] them free ObamaCare."[178] In September 2016 Trump asked voters in Texas to consider how Hillary Clinton will "afford to give lifetime welfare and entitlements to illegal immigrants."[179] And he told a Pennsylvania audience that Clinton "wants to give Obamacare to illegal immigrants and wants a total government takeover of care. Her plan also gives Social Security and Medicare to illegal immigrants, by making them citizens – bankrupting these programs for Americans."[180] Talk of DACA recipients and other immigrants here seems intended to remind voters of poor fiscal management by the Democratic Party, an example of Democratic overreach, "big government," and immigrant fraud. Attorney General Jeff Sessions told a Virginia audience in October 2017 that "This is a compassionate country and lawfully admits more immigrants than any country in the world, but we must recognize that our generous system is being terribly abused."[181]

### 2. Protecting "American Families"

On the campaign trail, Trump continually reframed discussions of DACA to emphasize that voters should be worried less about Latino kids and their families, and more about the future of white American youth. Citizen kids are the real "Dreamers" who matter, Trump argued, and their futures are imperiled by the presence of violent immigrants. He told a crowd in Mississippi that

> Hillary Clinton only talks about the separation of families who choose to come here illegally. I want to focus on the American families who have been permanently separated from their children because of the sanctuary cities and open borders that Hillary Clinton so strongly supports. [*booing*]
>
> Where is the sanctuary for American children? Where is that sanctuary? The dreamers we never talk about are the young Americans. Why aren't young Americans dreamers also? I want my dreamers to be young Americans. [*applause*][182]

Making clear that Latino beneficiaries of Deferred Action were also dangerous to "young American dreamers," Trump demanded to know why "our leaders spend so much time talking about how to

---

178 Donald J. Trump, "@BackOnTrackUSA:Imagine How Much Tax Money It Will Cost Americans When Obama Legalizes 25 Million Illegal Aliens&gives Them Free ObamaCare," Tweet, *@realdonaldtrump* (blog), July 2, 2014, https://twitter.com/realdonaldtrump/status/486388989062946817.
179 Donald J. Trump, "Remarks at the Remembrance Project Luncheon at the Omni Houston Hotel at Westside in Houston, Texas" (Houston, September 17, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119207.
180 Donald J. Trump, "Remarks at a Rally at Sun Center Studios in Chester Township, Pennsylvania" (Chester Township, Pennsylvania, September 22, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119189.
181 "Sessions Targets Four 'Sanctuary Cities' for Punishment," NBC News, October 12, 2017, https://www.nbcnews.com/politics/white-house/sessions-targets-four-sanctuary-cities-punishment-n810131.
182 Trump, "Remarks at the Mississippi Coliseum in Jackson, Mississippi."

help people here illegally, they're here illegally … but they don't try helping American citizens, some of whom have been devastated by what's happened to their children and their families?"[183]   DACA as a program therefore seemed to represent the Obama administration's turn away from defending and supporting young citizens – especially white citizens – of the United States.

Trump repeated these arguments as President. Addressing a joint session of Congress in 2017, he highlighted the case of a 17-year-old U.S. citizen "with unlimited potential who was getting ready to go to college where he would have excelled as a great quarterback" who had been "viciously murdered by an illegal immigrant gang member."[184]  Trump rallied voters by drawing attention to young American citizens such as "21 year old Sarah Root" who had been killed by an undocumented immigrant, according to the candidate, one day after she "graduated from college with a 4.0, [the] top student in her class...."[185]  In arguing that "American children" were the real "American dreamers," the candidate followed an argument developed by the Center for Immigration Studies, whose writers in 2012 had warned when DACA was implemented that Obama was intent to see the "destruction of their innocent children's futures and of their children's American dreams" in order to provide "amnesty" for undocumented immigrant youth.[186]  Trump emphasized that undocumented immigrants, including DACA recipients, stood in the way of improving public education for other Americans.  "For the money we are going to spend on illegal immigration over the next 10 years," he told one crowd, "we could provide 1 million at-risk students with a school voucher, which so many people are wanting."[187]

### 3.  Protecting American Voters

Politicians eager to demonize Latino populations for their own political gain have alleged for a hundred years that undocumented immigrants engage in massive voter fraud, and Trump and his supporters made such charges during the presidential campaign.  This likely reflects in part the influence of Kris Kobach on the campaign, as well as strategic electoral decisions.  Kobach has been

---

[183] Trump.
[184] Donald J. Trump, "February 28, 2017:  Address to Joint Session of Congress" (Washington, D.C., February 28, 2017), 28, https://millercenter.org/the-presidency/presidential-speeches/february-28-2017-address-to-joint-session-congress.
[185] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."
[186] Mortensen, "Obama Administration's DREAM Decree – Compassion or Child Abuse?"
[187] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."

the Republican Party's national leader in recent years in tying undocumented immigrants to voter fraud. In May 2016 Trump was interviewed by Chuck Todd on NBC:

> Todd: Do you want to see the voting laws changed to make it easier to vote?

> Trump: I want to see voting laws so that people that are citizens can vote. Not so people that can walk off the street and can vote, or so that illegal immigrants can vote.[188]

Soon after news outlets such as CNN reported a sharp increase in Latino naturalization rates in September 2016, politicians such as Iowa Congressman Steve King announced that he knew about "significant evidence" of voter fraud in that population.[189] Trump then told audiences that they needed to anticipate voter fraud, alleging in October 2017 that "They're letting people pour into the country so they can go and vote."[190] Elsewhere he told supporters that "there's the issue of illegal immigrants voting." Trump went on to cite a summary of an academic study supporting his claim that had been summarized in the *Washington Post*. That academic study had been discredited by researchers, as other observers quickly noted. But Trump erroneously and dramatically warned voters to consider the question: "Could non-citizens decide the November election?" Raising fears of immigrant fraud, he told the crowd that "More than 14 percent of non-citizens in both 2008 and 2010 samples indicated that they were registered to vote" and opined sarcastically "Oh, isn't that wonderful." Trump went on to declare that "because non-citizens tend to favor Democrats' — to put it mildly — 'Obama won more than 80 percent of the votes of non-citizens in the 2008 sample.'" He charged the media with failing to cover the story: "You don't read about this, right? They don't tell you about this." And he asserted that non-citizen voting in the 2008 election had accounted for Democratic victories at the local level, and that it might have accounted for Obama's win in North Carolina.[191]

---

[188] Zachary Roth, "Far-Right Nativists Eye Kris Kobach for Donald Trump's Vice President," MSNBC, May 23, 2016, http://www.msnbc.com/msnbc/far-right-nativists-eye-kris-kobach-donald-trumps-vice-president.

[189] Evan Perez and Daniella Diaz, "GOP Senators Ask DHS about 'Rush' to Process Citizens Ahead of Election," CNN, September 23, 2016, http://www.cnn.com/2016/09/22/politics/department-of-homeland-security-citizenship-2016-election/index.html; Julia Manchester CNN, "Rep. Steve King: 'Significant Evidence' of Voter Fraud," *CNN*, October 17, 2016, http://www.cnn.com/2016/10/17/politics/donald-trump-voter-fraud-steve-king/index.html.

[190] Colin Campbell, "Trump: 'They'Re Letting People Pour into the Country so They Can Go and Vote'," accessed October 11, 2017, https://www.yahoo.com/news/trump-theyre-letting-people-pour-into-the-country-so-they-can-go-and-vote-152735577.html.

[191] *Donald Trump Rally in Green Bay, Wisconsin* (Green Bay, Wisconsin, 2016), https://www.youtube.com/watch?v=oQYXBcq7nd4&feature=youtu.be&t=2h2m20s.

Republicans associated with the Trump campaign and administration have continued to associate Latinos with voter fraud since November 2016. This underscores a narrative about immigrants as cheats, and it helps to define the threat that Latinos – including DACA recipients -- seem to pose to U.S. citizenship. It is also a call that summons voters to the polls interested in countering the power of "illegal" voters and in affirming the rights of real citizens. Republican politicians have returned to such narrative often in recent months and years, suggesting that Democrats participated in illegitimate voting practices. Immediately following the 2016 presidential election, Nevada's Republican chairman suggested that election officials in the Las Vegas area had even "kept a poll open 'til 10 o'clock at night so a certain group could vote. You feel free right now? You think this is a free or easy election?"[192]

Recent discussions of improper voting, of political corruption, and of irresponsible government practices have helped to define what voters and politicians meant when they discussed the illegality of Latinos. During and after his presidential campaign, Trump drew a stark contrast between immigrants, even DACA recipients, and our "incredible" U.S. military veterans and promising youth. His campaign stressed that undocumented immigrants abuse the welfare state by stealing from entitlement programs meant to serve U.S. citizens. And Trump and others urged voters to understand that their focus should remain above all on the security and advancement of white citizens whose well-being was threatened by programs such as DACA.

**F. Unassimilable and a Cultural Threat**

Trump and members of his campaign and administration have repeatedly asserted that Latinos and other ethnic Mexicans are incapable of, or uninterested in, assimilating into the United States. Detractors have often focused on the debased nature of Latino culture itself. Elected officials have articulated this form of cultural racism in recent decades, as when Arizona State Senator Karen Johnson declared in 2005 that "the culture of the United States is being destroyed. The illegals don't want to be a part of American culture. They want to bring their Mexican-Hispanic culture here."[193]

---

[192] Tim Mak, "Trump Ends His Campaign—Surprise, Surprise—by Insulting Latinos," *The Daily Beast*, November 7, 2016, sec. politics, https://www.thedailybeast.com/articles/2016/11/07/trumps-ends-his-campaign-surprise-surprise-by-insulting-latinos.

[193] Patricia Gándara, "From Gonzales to Flores: A Return to the 'Mexican Room'?," in *Arizona Firestorm: Global Immigration Realities, National Media, and Provincial Politics*, ed. Otto Santa Ana and Celeste González de

Similar claims by Trump and others in his campaign and administration echo the arguments of writers such as Samuel Huntington, who argued in 2000 that "The invasion of over 1 million Mexican civilians is a comparable threat [to the invasion of a million Mexican soldiers] to American societal security, and Americans should react against it with comparable vigor. Mexican immigration looms as a unique and disturbing challenge to our cultural integrity, our national identity, and potentially to our future as a country." Concerns about Latinos' disinterest in assimilation thus referred back to the *reconquista* narrative, a point made more explicit by Huntington in 2004: "If this trend continues, it could produce a consolidation of the Mexican-dominant areas into an autonomous, culturally and linguistically distinct, economically self-reliant bloc within the United States."[194]

Influential organizations such as FAIR have pressed concerns about the assimilation of Latinos and how the growing number of U.S. residents of Latin American descent, including citizens, is reshaping American culture. Michael Hethmon, General Counsel for the Immigration Reform Law Institute, which works under FAIR, admitted in 2012 that he was motivated by concern about the changing "demographic makeup of the entire country. You know, what they call 'minority-majority.'" He anticipated negative consequences: "How many countries have gone through a transition like that — peacefully, carefully? It's theoretically possible, but we don't have any examples."[195] As a Senator, Jeff Sessions expressed concerns about the "cultural problems" brought by current immigrants.[196]

Trump and his supporters have raised questions about the assimilation of DACA recipients and other Latinos. Steven Camarota of the Center for Immigration Studies denounced President Obama's claim that young people who had received deferred status were "Americans in their heart, in their minds, in every single way but on paper." Camarota argued instead that

> Contrary to media portrayals, [DACA] applicants need not identify as Americans or demonstrate any affinity for American culture. For example, travel to and from their

---

Bustamante (New York: Rowman & Littlefield Publishers, 2012), 122.
[194] Chavez, *The Latino Threat*, 47.
[195] David A. Fahrenthold, "Self-Deportation Proponents Kris Kobach, Michael Hethmon Facing Time of Trial," *Washington Post*, April 24, 2012, sec. Politics,
https://www.washingtonpost.com/politics/2012/04/24/gIQAe6lheT_story.html.
[196] Sessions, Comprehensive Immigration Reform Act of 2007, S6433.

native countries does not invalidate applicants' five-year period of "continuous" U.S. residence, as long as the trips are "brief, casual, and innocent." Furthermore, applicants are not required to speak English."

Camarota then argued that most Hispanic DACA recipients were either "functionally illiterate" or had "only 'basic' English ability."[197] Trump has argued that "we also have to be honest about the fact that not everyone who seeks to join our country will be able to successfully assimilate."[198] The President has promoted immigration reforms, arguing that they "will help ensure that newcomers to our wonderful country will be assimilated, will succeed, and will achieve the American Dream."[199]

Speaking about immigration in Phoenix in August 2016, Trump emphasized that worries about whether Latin American immigrants will in fact become loyal Americans "are valid concerns expressed by decent and patriotic citizens from all backgrounds, all over." He called assimilation "an important word," noting that "we want to ensure that it works." And he urged listeners "to be honest about the fact that not everyone who seeks to join our country will be able to successfully assimilate. Sometimes it's just not going to work out. It's our right, as a sovereign nation to choose immigrants that we think are the likeliest to thrive and flourish and love us."[200]

1.   **"Mexican Speech"**

In making such claims, Trump has referred to the Spanish language as "Mexican" speech, racializing and warning about its use in the United States. He and other politicians have followed a deep tradition of argumentation that has positioned Latin American culture, including the Spanish language, as dangerous, un-American, unassimilable, and perhaps subversive. In making these arguments, politicians have followed the lead of organizations such as U.S. English, founded by John Tanton.

Trump and his associates stoked fears about the cultural Latinization of the United States by raising concern about the "unprecedented" number of immigrants currently living in the United States. He denounced political opponents who had any significant connection to Mexican culture. Mocking fellow Republican Jeb Bush in August 2015, Trump tweeted "Jeb Bush is crazy, who cares

---

[197] Camarota, "Time to End DACA."
[198] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."
[199] Trump, Cotton, and Perdue, "Remarks by President Trump, Senator Tom Cotton, and Senator David Perdue on the RAISE Act and Green Card Reform."
[200] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."

that he speaks Mexican, this is America, English!"[201] Trump subsequently seemed to use Spanish on several occasions to remind listeners of the cultural differences between Latinos and other Americans. During his final presidential debate with Clinton, for example, he referred to criminals crossing the U.S.-Mexico border as "bad hombres"; and in a press conference about Hurricane Maria, he seemed to mock island residents in his dramatic pronunciation of "Puerto Rico."

## 2. Racial Quotas

Following advisor Stephen Miller and Senator Jeff Sessions and others committed to prioritizing the arrival of English-speaking immigrants, Trump called for new national quotas and emphasized the need "to select immigrants based on their likelihood of success in U.S. society." Senator Sessions in 2006 clearly portrayed Latino immigrants as undesirable under a new quota system, telling the Senate that "Fundamentally, almost no one coming from the Dominican Republic to the United States is coming here because they have a provable skill that would benefit us and that would indicate their likely success in our society."[202]

Sessions also went on record in 2015 supporting an immigration reform modeled on the 1924 Johnson-Reed Act, an Act that provided Nazi Germany a model for racial thinking, and that Sessions applauded for having allowed the United States to accept "assimilated immigrants, and it was good for America."[203] At his major speech on immigration delivered in Phoenix in August 2016, Trump promised to return to an immigration model based on the 1924 national quota system, declaring that his administration would "keep immigration levels measured by population share within historical norms."[204]

These talking points about the 1924 Act had been developed by John Tanton in the 1980s. Speaking to supporters thirty years ago, Tanton had urged them to push for a "moratorium" on new

---

[201] Donald J. Trump, "@YoungYoung54: @JeriHyatt @megynkelly @JebBush So True. Jeb Bush Is Crazy, Who Cares That He Speaks Mexican, This Is America, English !!," Tweet, @realdonaldtrump (blog), August 11, 2015, https://twitter.com/realdonaldtrump/status/635998754546548737?lang=en.
[202] *Senator Jeff Sessions on Dominican Republic Immigrants* (U.S. Senate, 2016), https://www.c-span.org/video/?c4631811/sen-jeff-sessions-dominican-republic-immigrants.
[203] Historian David Reimers commented that "I don't know any historian who would tell you the 1920s law wasn't a racist law. That was what it was all about. They didn't try to hide that."
Adam Serwer, "Jeff Sessions's Unqualified Praise for a 1924 Immigration Law," *The Atlantic*, January 10, 2017, https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.
[204] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."

immigration, and to make that argument by celebrating the fact that "the pause in immigration between 1930-1950, combined with the assimilating experience of fighting side-by-side in the trenches in World War II, gave us a needed pause so that we could assimilate the mass of people who came in the early years of the century." Referencing the quota system in the 1924 Act, Tanton urged opponents of contemporary immigration to explain to the U.S. public that the country needs to "Take a break, catch-up, eliminate a backlog, take a breather."[205]

Pundits such as Patrick Buchanan made a similar argument in the early twenty-first century. In *The Death of the West: How Dying Populations and Immigrant Invasions Imperil Our Country and Civilization*, Buchanan stated boldly that "Mexicans not only come from another culture, but millions are of another race. History and experience teach us that different races are far more difficult to assimilate." Buchanan asserted that

> America is not their home; Mexico is; and they wish to remain proud Mexicans. They have come here to work. Rather than assimilate, they create Little Tijuanas in U.S. cities. . . . With their own radio and TV stations, newspapers, films, and magazines, the Mexican Americans are creating an Hispanic culture separate and apart from America's larger culture. They are becoming a nation within a nation.[206]

This is precisely the argument made by the Trump administration. When Trump announced major new immigration policy in early-August 2017, he referred to the need to change the 1965 Act and return to the 1924 model of national quotas, calling his administration's effort the "biggest change in 50 years" to the immigration system.[207] In March 2016, future Trump advisor Michael Anton offered an erudite defense of a quota system that would privilege future European immigrants who would bring "skills" and values to the United States, and who are "accustom[ed] to liberty":

> Machiavelli and Montesquieu (and so many others) further teach us that differing histories, laws, religions, habits, and even climates differentiate the peoples of the world in ways that are not so easy to change—and accustom to liberty some better than others…. Equality means that we may not rule another without his consent. It does not mean that you can take anyone from anywhere and make him, overnight, a good American simply on the basis of his natural right not to be ruled without his consent.[208]

---

[205] Tanton, "'WITAN Memo' III."
[206] Buchanan, *The Death of the West*, 125–26.
[207] Trump, Cotton, and Perdue, "Remarks by President Trump, Senator Tom Cotton, and Senator David Perdue on the RAISE Act and Green Card Reform."
[208] Publius Decius Mus, "Toward a Sensible, Coherent Trumpism," *The Unz Review*, March 10, 2016,

Trump's campaign slogan "America First" clearly signaled an affirmation of U.S. culture and the English language in the face of rising numbers of immigrants. In his "Remarks on Immigration" delivered in Phoenix in August 2016, Trump urged voters to "remember, under a Trump administration it's called America first. Remember that."[209]

In raising concerns about Latin American assimilation, anti-immigrant policymakers and others associated with the Trump administration have warned about how growing use of the Spanish language in the United States; they have raised concerns about immigrants' "skills" to raise questions about the mental abilities of Latinos and their capacity to adjust to life in the U.S.; and they have suggested establishing national quotas that would likely give preference to immigrants from other parts of the world, and that would gesture to the racial thinking embedded in the 1924 Immigration Act.

### G. "They're bringing drugs. They're bringing crime"

Throughout his campaign, Trump referred to Latinos as "criminal aliens" and "bad hombres."[210] Politicians discussing crime and public safety have drawn upon deeply-rooted stereotypes of ethnic Mexicans as violent, knife-wielding criminals to call for increased deportations, policing of urban neighborhoods, or border enforcement.

These have long been stereotypes and associations pushed by anti-immigrant organizations and politicians motivated, at least in part, by racial animus. John Tanton, founder of FAIR and U.S. English and other organizations, authored an article entitled "Immigration and Criminality in the U.S.A." in 1993 that linked contemporary criminality to the 1965 Immigration Act, that highlighted immigrant gang activities, and that argued for greater border enforcement in order to reduce the number of "alien prison inmates."[211] Arizona Governor Jan Brewer affirmed in 2010 that "the majority of the people that are coming to Arizona and trespassing are now becoming drug mules …. The drug

---

http://www.unz.com/article/toward-a-sensible-coherent-trumpism/.

[209] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."

[210] Carolina Moreno, "Here's Why Trump's 'Bad Hombres' Comment Was So Offensive," *Huffington Post* (blog), October 20, 2016, https://www.huffingtonpost.com/entry/heres-why-trumps-bad-hombres-comment-was-so-offensive_us_5808e121e4b0180a36e9b995.

[211] John Tanton and Wayne Lutton, "Immigration and Criminality in the U.S.A.," *Journal of Social, Political and Economic Studies* 18, no. 2 (1993): 217–34.

cartels have taken control of the immigration. So they are criminals."[212]  Independent  think  tanks such as the Migration  Policy  Institute  and Pew Research Center  have  determined  that Trump and others in his campaign  significantly  exaggerated  the  number  of "non-citizen  criminals"  in the United States.[213]  Researchers  have  found  no  "relationship  between  immigrant  population  size  by any measure  and  violent  crime,  even  when  controlling  for a variety  of economic  and  demographic factors."[214]

Prior to announcing  his candidacy  for president,  Donald Trump had gone on record to associate Latinos  and African  Americans  with criminality.  In 1989 he spent $85,000 on full-page  ads in the four  daily  papers  in New York City to demand  a return  to the death penalty  in the Central Park Five case which  involved  Latino  and African  American  defendants,  stating  that "muggers  and murderers should  be forced to suffer."[215]

"Sadly,  the overwhelming  amount  of violent  crime  in our major cities  is committed  by blacks and Hispanics,"  he tweeted in 2013, "a tough  subject-must  be discussed."[216]  On the campaign  trail Trump repeatedly  labeled Latino  immigrants  as "killers"  and "murderers"  and "cartel"  members  and "gang  members"  and other dangerous  criminals.  When  he announced  his presidential  candidacy  in June 2015 he stated that immigrants  crossing  the U.S.-Mexico  border were "bringing  drugs.  They're bringing crime."  And he tweeted that "Druggies,  drug dealers,  rapists and killers  are coming  across the southern  border. When  will  the U.S. get smart and stop this travesty?"[217]  He later  tweeted that "We Must Stop the Crime and Killing  Machine  That Is Illegal  Immigration.  Rampant  Problems  Will

[212] Sampaio, *Terrorizing Latina/o Immigrants*, 147.

[213] "Understanding the Potential Impact of Executive  Action on Immigration  Enforcement," migrationpolicy.org,  July 13, 2015, https://www.migrationpolicy.org/research/understanding-potential-impact-executive-action-immigration-enforcement; Jeffrey S. Passel and D'Vera  Cohn, "Unauthorized  Immigrant  Population  Stable for Half a Decade," *Pew Research Center* (blog), September 21, 2016, http://www.pewresearch.org/fact-tank/2016/09/21/unauthorized-immigrant-population-stable-for-half-a-decade/.

[214] David Green,  "The Trump Hypothesis: Testing Immigrant  Populations as a Determinant of Violent and Drug-Related Crime  in the United States*," *Social Science Quarterly* 97, no. 3 (September 1, 2016): 519, https://doi.org/10.1111/ssqu.12300.

[215] "Sessions Targets Four 'Sanctuary Cities' for Punishment."

[216] Donald J. Trump, "Sadly, the Overwhelming  Amount of Violent Crime in Our Major Cities Is Committed  by Blacks and Hispanics-a Tough Subject-Must Be Discussed.," Tweet, *@realDonaldTrump* (blog), June 5, 2013, https://twitter.com/realDonaldTrump/status/342190428675796992.

[217] Donald J. Trump, "Druggies, Drug Dealers, Rapists and Killers Are Coming across the Southern Border. When Will the U.S. Get Smart and Stop This Travesty?," Tweet, *@realdonaldtrump* (blog), June 11, 2015, https://twitter.com/realdonaldtrump/status/612083064945180672.

Only Get Worse."[218]

### 1. Criminalizing "Dreamers"

Members of Trump's administration have marked "dreamers" and other Latinos with the tag of criminality.  When the DREAM Act was considered by Congress in 2010, Stephen Miller, who was at the time spokesperson for Republicans on the Senate Judiciary Committee, emphasized that "Democrat leaders in Washington are asking Americans to pick up the tab for a proposal that would offer amnesty to millions -- including those with criminal records."[219] A writer at the Center for Immigration Studies insisted in 2012 that by implementing DACA "the administration has callously sacrificed countless numbers of American children who are the victims of illegal alien-driven identity theft and other job-related felonies."[220] Stephen Miller similarly asked a crowd during the Trump campaign to consider "how many of our children are dead because of Sanctuary cities?"[221]  As Attorney General, Jeff Sessions has contended that "jurisdictions that adopt so-called 'sanctuary policies' also adopt the view that the protection of criminal aliens is more important than the protection of law-abiding citizens and of the rule of law."[222] Gene Hamilton admitted in deposition that in advance of the announcement that DACA was being rescinded he had asked others in DHS to provide information about "how many DACA recipients have ever been convicted of a crime." (Hamilton deposition, 211)

Trump's anti-immigrant politics also played an important role in his celebration of local policing, and he referred to police forces in urban areas and at the U.S.-Mexico border to emphasize the dangers of "criminal immigrants." Reminders of the "Latino Threat" provided the candidate and president a way to highlight law and order, and to align himself politically with law enforcement. In accepting the Republican nomination in July 2016, Trump reminded the Cleveland audience that "I

---

[218] Donald J. Trump, "We Must Stop the Crime and Killing Machine That Is Illegal Immigration. Rampant Problems Will Only Get Worse. Take Back Our Country!," Tweet, @realDonaldTrump (blog), August 9, 2015, https://twitter.com/realDonaldTrump/status/630906211790102528.

[219] "Republicans Slam DREAM Act for Including Immigrants With Criminal Records," Text.Article, Fox News, December 8, 2010, http://www.foxnews.com/politics/2010/12/08/republicans-slam-dream-act-allowing-immigrants-criminal-records.html.

[220] Mortensen, "Obama Administration's DREAM Decree – Compassion or Child Abuse?"

[221] See http://link.brightcove.com/services/player/bcpid1764219419001?bckey=AQ~~,AAAAAETmrZQ~,EVFEM4AKJdRI6UgfPhFgV0s-3wZ2v95n&bctid=4997510422001.

[222] 12/14/2017  1:32:00  PM

have been honored to receive the endorsement of America's Border Patrol Agents, and will work directly with them to protect the integrity of our lawful, lawful, lawful immigration system. Lawful."[223]  He told audiences that undocumented immigrants "mock" law enforcement officials, and he promised that "our local police will be so happy that they don't have to be abused by these [criminal immigrant] thugs anymore." He blamed immigrants' disrespect and violence towards the police on the fact that the Obama administration had "recklessly gutted" the Secure Communities Program. Trump called for new legislation named after law enforcement officers who had been killed by immigrants that would help assure "that criminal immigrants and terrorists are swiftly, really swiftly, identified and removed." His campaign called for tripling the number of ICE officers in order to identify "the most dangerous criminal illegal immigrants in America who have evaded justice just like Hillary Clinton has evaded justice." He urged audiences to "just ask the Border Patrol about Hillary Clinton. You won't like what you're hearing."[224]

As president he told a Phoenix crowd in August 2017 that "I met with the Border Patrol and I met with ICE, and these are incredible people; the job they do." At that same event he celebrated Chief of Staff John Kelly, who had formerly been Secretary of the Department of Homeland Security, and then reminded supporters that "We respect and cherish our ICE officers and our Border Patrol agents, and we respect and cherish our police officers, and our firemen, and all of our uniform services. (APPLAUSE)."[225]  Trump told a Texas audience the following month that "the Border Patrol Agents, who endorsed me, warned that Hillary Clinton's plan would put the entire country in grave danger – they called it radical, deeply dangerous, and warned it would trigger an unprecedented national crisis."[226]

## 2. "Cartels" in the Suburbs

In all of this, Trump and others contrasted criminal aliens with law enforcement, and the public health problems associated with Latin Americans with the vitality and strength of U.S. society.

---

[223] Donald J. Trump, "Address Accepting the Presidential Nomination at the Republican National Convention in Cleveland, Ohio" (Cleveland, July 21, 2016).
[224] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."
[225] "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said."
[226] Trump, "Remarks at the Remembrance Project Luncheon at the Omni Houston Hotel at Westside in Houston, Texas."

The candidate emphasized protecting America's youth: "Even the best-laid plans cannot always protect our youth, and increasingly, many adults, from the scourge of drugs," he told audiences in Pennsylvania and Virginia. "We lose thousands of our fellow Americans every year to opioid use. I will stop the drug inflow from our borders. These drugs come over the border and make their way into our urban and rural communities, and into our suburbs."[227]

Trump as candidate and president, along with his appointees and advisers, focused enormous attention on the presence of transnational Latin American "gangs" and "cartels" to characterize the threat of young Latinos in the United States, to call for greater border enforcement, and to suggest the importance of rescinding President Obama's executive order calling for Deferred Action. He called gang members crossing the border "true animals," and he promised that "the gangs and cartels and criminal syndicates terrorizing our people will be stripped apart one by one. Their day is over."[228]

Much of that focus was directed to the Central American gang MS-13, and both stories of gang violence and images of tattooed gang members were repeated to portray immigrant youth not as "Dreamers" -- aspiring students, military officers, and everyday Americans – but as something more sinister. Trump and others in his administration referenced the Salvadoran gang MS-13 to characterize all Latinos regardless of nationality, including ethnic Mexicans. Campaign supporters and policymakers rarely mentioned MS-13's origins in El Salvador. Attorney General Jeff Sessions warned that "Because of an open border and years of lax immigration enforcement, MS-13 has been sending both recruiters and members to regenerate gangs that previously had been decimated, and smuggling members across the border as unaccompanied minors."[229] Trump emphasized that as president he would assure that "Border crossings will plummet" and then "gangs will disappear."[230]

Trump invited voters to join him in declaring war on Latin American cartels in the United States, and he berated the Democrats for not taking seriously this Latino Threat. Speaking to a

---

[227] Trump, "Remarks at a Rally at Sun Center Studios in Chester Township, Pennsylvania"; Donald J. Trump, "Remarks at a Rally at Berglund Center in Roanoke, Virginia" (Roanoke, Virginia, September 24, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119203.
[228] Farley et al., "FactChecking Trump's Iowa Rally"; Donald J. Trump, "Remarks at the Charlotte Convention Center in Charlotte, North Carolina" (Charlotte, August 18, 2016).
[229] *Clip of Attorney General Sessions on Transnational Criminal Organizations*, 2017, https://www.c-span.org/video/?c4666617/sessions-ms-13.
[230] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."

Phoenix crowd in August 2017, just weeks in advance of the DACA announcement issued by Sessions, President Trump celebrated Sheriff Joe Arpaio (whom he would soon pardon) and told attendees that

> The people of Arizona know the deadly and heartbreaking consequences of illegal immigration, the lost lives, the drugs, the gangs, the cartels, the crisis of smuggling and trafficking. MS-13 -- we're throwing them out so fast, they never got thrown out of anything like this. We are liberating towns out on Long Island. We're liberating.
>
> Can you imagine, in this day and age -- in this day and age in this country, we are liberating towns. This is like from a different age. We are taking these people. They don't shoot people, because it's too fast and not painful. They cut them up into little pieces. These are animals. We are getting them out of here. We're throwing them in jails, and we're throwing them out of the country. We're liberating our towns. (APPLAUSE)
>
> You're seen it. You've lived it, and you elected me to put a stop to it. And we are doing a phenomenal job of putting a stop to it. That I can tell you. (APPLAUSE)
>
> After years of defending other countries borders -- can you believe we fight for other countries; we want to defend their borders -- we're finally defending our own borders.[231]

Here, a rhetoric of liberating towns, "taking these people," fighting the "animals," and defending U.S. borders is a language of war, one in which Trump's campaign urged Americans to see Latinos as dangerous enemies.

Trump was not the only Republican in the United States who mobilized white voters by crafting a political message about the dangers presented by Latino gang members. Trump's focus in fact drew heavily from earlier Republican campaigns, and it anticipated subsequent electoral strategies. During a close 2010 U.S. Senate race in Nevada, Republican Sharron Angle developed a television advertisement that featured three menacing young "illegal aliens." "Each was standing looking directly at the camera, wearing casual clothing, sweatshirts and jackets," according to one account. "One wore a baseball cap backwards. Across the image were the words, in bold, 'ILLEGAL ALIENS.'" That same photograph was later used by Louisiana's Republican Senator David Vitter in his 2010 race. But all of this was fear mongering and political theater. The image was a fake, and its subjects had few if any connections to either Nevada or Louisiana. The photograph had been taken in Mexico, and "there is no evidence [that the men in the picture] were ever in the United States as

---

[231] "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said."

undocumented immigrants. However, being 'Mexican looking' was enough to create the message that Latino immigrants represented a problem and that a vote for the political candidate would help fix the problem."[232]

Nonetheless, MS-13 has continued to be a convenient tool for politicians looking to motivate voters. In 2017, Virginia Senate candidate Ed Gillespie attempted to tie his Democratic opponent to Latino gang violence, running a television advertisement stressing that "MS-13 is a menace, yet Ralph Northam voted in favor of sanctuary cities that let dangerous illegal immigrants back on the street, increasing the threat of MS-13." Republicans in other races ran similar campaigns. Seeking election as County Executive on Long Island, former Republican State Senator Jack Martins of Nassau County sent voters a mailer, paid for by the State GOP, that

> shows three shirtless Latino men, covered in tattoos and representing MS-13, the vicious gang begun by Central American immigrants in Los Angeles that now menaces Long Island. "Meet Your New Neighbors!" a headline above them says, adding this about Mr. Martins's Democratic opponent: "Laura Curran will roll out the welcome mat for violent gangs like MS-13!" Ms. Curran, the text says, is "MS-13's choice for county executive."[233]

Democrats likened that Republican strategy in Virginia and New York to the Willie Horton attack ads against Michael Dukakis in 1988.[234]

### 3.  Dreamers as Gang Members

Trump clearly compared DACA recipients and MS-13 members, and while he occasionally distinguished the two – telling a reporter that MS-13 is "a little different than the dreamer case, right? … We are not after the dreamers. We are after the criminals" -- the administration nonetheless referred constantly to "gangs" and "cartels" in characterizing Latino youth in subsequent months. "We are putting MS-13 in jail and getting them the hell out of our country," Trump noted. "They've taken over towns and cities and we are being really brutal with MS-13 and that's what we should be. They are a bad group and somebody said they are as bad as al-Qaida, which is a hell of a reference."[235]

---

[232] Chavez, *The Latino Threat*, 2.

[233] Laura Vozzella and Fenit Nirappil, "Virginia Republican's Ad Ties Opponent to MS-13. Democrats Compare It to 'Willie Horton,'" *Washington Post*, September 22, 2017, sec. Virginia Politics, https://www.washingtonpost.com/local/virginia-politics/virginia-republicans-ad-ties-opponent-to-ms-13-democrats-compare-it-to-willie-horton/2017/09/20/28d673bc-9e49-11e7-8ea1-ed975285475e_story.html.

[234] Vozzella and Nirappil.

[235] "Excerpts from AP Interview with President Donald Trump," *Associated Press*, April 21, 2017,

MS-13 allowed the campaign to remind voters about Latino violence and to tell audiences that Hillary Clinton supported dangerous "catch and release" policies. A focus on MS-13 also allowed the candidate and president to emphasize the danger of any amnesty program, or anything like DACA, that might inadvertently include members of these Latin American cartels. Trump repeatedly argued on the campaign trail in 2016 that the existing policy of "open borders" had led to the murder of "wonderful Americans" by Latino immigrants, to "so much needless suffering, so much preventable death." He turned moments on the campaign trail into memorial services to denounce Latino immigrants for violent crimes against U.S. citizens. Trump aligned himself with widows and other grieving family members to demonize his political opponent. Standing with "working families," a term intended to suggest white Americans of modest means, Trump offered speeches such as the following:

> I've spent time with the families of wonderful Americans whose loved ones were killed by the open borders and Sanctuary Cities that Hillary Clinton supports.
>
> I've embraced the crying parents who've lost their children to violence spilling across our border. Parents like Laura Wilkerson and Michelle Root and Sabine Durden and Jamiel Shaw whose children were killed by illegal immigrants.
>
> My opponent supports Sanctuary Cities.
>
> But where was the Sanctuary for Kate Steinle? Where was the Sanctuary for the children of Laura, Michelle, Sabine and Jamiel?
>
> Where was the Sanctuary for every other parent who has suffered so horribly?
> These moms and dads don't get a lot of consideration from our politicians. They certainly don't get apologies. They'll never even get the time of day from Hillary Clinton.
>
> But they will always come first to me.
>
> Listen closely: we will deliver justice for all of these American Families. We will create a system of immigration that makes us all proud.
>
> Hillary Clinton's mistakes destroy innocent lives, sacrifice national security, and betray the working families of this country.[236]

By focusing on immigrants as past, present, or future criminals, Trump criminalized DACA recipients and associated them with MS-13. Others involved in the Trump campaign did the same. A Fellow of the Center for Immigration Studies alleged in October 2015 that the Obama

administration was well aware that at least some DACA recipients had been gang members.[237] As a presidential candidate Trump told audiences that the Obama administration's decision "not to enforce" immigration laws through DACA and other executive acts led directly to the problem of criminal aliens. Other Republican politicians and activists agreed. In July 2014, Senator Ted Cruz responded to the arrival of Central American refugee children with a bill barring the Obama administration from using tax money to expand DACA. The "terrible humanitarian crisis … at the border," Cruz argued, was a result of policies such as DACA which encouraged "dangerous drug cartels and transnational gangs" to smuggle Central American children into the United States with impunity. Those arguments won support in some quarters. D.A. King of the Dustin Inman Society issued a "Hooray for Ted Cruz!" statement for "not extending the DACA trick" to new groups of immigrants.[238] In a similar way, Trump promised Arizonans that "We will terminate the Obama administration's deadly, and it is deadly, non-enforcement policies that allow thousands of criminal aliens to freely roam our streets, walk around, do whatever they want to do, crime all over the place."[239] He told a Houston audience that

> Every day we fail to enforce our laws is a day when a loving parent is at risk of losing their child.
>
> It's happening every single day.
>
> All across this country, dining room tables have an empty seat at the family dinner table, because our government abandoned its duty and failed to enforce the laws.
>
> There are a lot of numbers in the immigration debate. But let me give you the most important number of all. That most important number of all is the number of American lives it is acceptable to lose in the name of illegal immigration. Let me tell you what that number is: ZERO.[240]

When Trump's Secretary of Homeland Security John Kelly affirmed in March 2017 that while DACA holders are required "to obey the law" in order to maintain that status, "some of them don't," he affirmed the link between young Latinos and dangerous criminality.[241] Mark Krikorian,

---

[237] David North, "Are DACA Aliens Gang Members? USCIS Does Not Want to Know," CIS.org, October 16, 2015, https://cis.org/North/Are-DACA-Aliens-Gang-Members-USCIS-Does-Not-Want-Know.

[238] "Sen. Ted Cruz Moves Front And Center In GOP Response To Border Crisis," *Legal Monitor Worldwide*, July 22, 2014.

[239] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."

[240] Trump, "Remarks at the Remembrance Project Luncheon at the Omni Houston Hotel at Westside in Houston, Texas."

[241] Dean DeChiaro, "Kelly: Homeland Isn't Targeting Law-Abiding 'Dreamers,'" *Roll Call*, March 29, 2017,

Director of the Center for Immigration Studies, did the same when he tweeted in October 2017 that the state of Georgia "Issues Far More Drivers Licenses to DACA Recipients than Feds Say Live Here," connecting DACA recipients to legal fraud.[242] In March 2017, Kelly also tweeted about the criminality of Latino youth, noting that "even if they are nine years old, we are taking them out."[243]

### 4. Protecting "Our Children"

To demonize Latino immigrants and "close the border," Trump and others sought to shift voters' focus away from what were commonly seen as the positive traits of DACA recipients, and from the fact that because they had crossed the border as children they might be seen as innocent of any crime, to focusing on Latinos as criminals posing threat to white citizens, and in particular to American children and teenagers. On the campaign trail, Trump announced that "the media ignores the plight of Americans who have lost their children to illegal immigrants, but spends day after day pushing for amnesty for those here in total violation of the law," a clear effort to link the well-being of white American youth with the rescinding of DACA.[244] Trump was direct when he suggested that his Democratic presidential opponent cared more about keeping non-citizen Latino families together through DACA and similar programs than she cared about the safety and security of U.S. citizens: "Hillary Clinton … talks constantly about her fears that families will be separated, but she's not talking about the American families who have been permanently separated from their loved ones because of a preventable homicide, because of a preventable death, because of murder."[245]

These arguments by Trump and others characterized Latino youth as dangerous criminals, and they argued that the well-being of white American children depended upon increased border enforcement and the deportation of undocumented residents. "I have met with many of the great parents who lost their children to sanctuary cities and open borders. So many people, so many, many

---

https://www.rollcall.com/news/policy/kelly-homeland-isnt-targeting-law-abiding-dreamers.

[242] Mark Krikorian, "Ga. Issues Far More Drivers Licenses to DACA Recipients Than Feds Say Live Here Http://Insideradvantage.Com/2017/10/11/Ga-Issues-Far-More-Drivers-Licenses-to-Daca-Recipients-than-Feds-Say-Live-Here/ … That's Not Suspicious, No siree.," Tweet, *@MarkSKrikorian* (blog), October 3, 2017, https://twitter.com/MarkSKrikorian/status/920714194168811526.

[243] John Kelly, "Even If They Are Nine Years Old, We Are Taking Them Out," *Twitter* (blog), March 24, 2017, https://twitter.com/ChiefJohnKelly/status/845301313655242753.

[244] Trump, "Remarks at the Mississippi Coliseum in Jackson, Mississippi."

[245] Trump, "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona."

people. So sad," he told an audience in Arizona.[246] "Our border will be protected and our children will be safe, very, very safe," Trump promised supporters in Michigan and Washington State.[247] Other Republican political candidates have repeated this argument to mobilize voters in tight electoral contests. Jack Martins of Nassau County, New York, contended in 2017 that "we have children who are being hacked to death by machetes, that's reality," and that his Democratic opponent did not take seriously the task of "fighting violent gangs who are killing our children."[248]

This version of the Latino Threat narrative – changing the subject from DACA to criminals and cartels -- became more important as the Trump campaign progressed. Senator and future Attorney General Jeff Sessions issued a "critical alert" in late-October 2016, just in advance of election day, declaring "a crisis at our southwest border" that centered on the arrival of terrorists and criminals. "Without a commitment to deport aliens who violate our immigration laws," Sessions warned, "we lose our ability to protect our communities from criminal aliens, terrorism, and cartel-related crime and violence."[249] One of Trump's final tweets before the November 2016 election reaffirmed the campaign's emphasis on labeling immigrants as criminals. On November 4th the candidate promised New Hampshire voters that "We will end illegal immigration, stop the drugs, deport all criminal aliens & save American lives!"[250]

Trump and others in his administration continued to describe Latinos in these ways after the election. In Trump's first post-election national television interview, he reaffirmed the importance of targeting immigrants as criminals in telling Lesley Stahl of CBS that "What we are going to do is get the people that are criminal and have criminal records, gang members, drug dealers, we have a lot of these people, probably 2 million, it could be even 3 million, we are getting them out of our

---

[246] Trump.

[247] Donald J. Trump, "Remarks at the Summit Sports and Ice Complex in Dimondale, Michigan" (Dimondale, Michigan, August 19, 2016); Donald J. Trump, "Remarks at the XFinity Arena in Everett, Washington" (Everett, Washington, August 30, 2016), The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119806.

[248] Alex Costello, "Martins Under Fire For MS-13 Mailer," Levittown, NY Patch, November 1, 2017, https://patch.com/new-york/levittown-ny/martins-under-fire-ms-13-mailer; Stacey Sager, "LI Political Ad Includes 'MS-13's Choice' for County Executive," ABC7 New York, November 2, 2017, http://abc7ny.com/2596411/.

[249] Theodore Bunker, "Sen. Jeff Sessions: Over 800,000 Illegal Border Crossings Last Year," Newsmax, October 31, 2016, http://www.newsmax.com/Newsfront/Jeff-Sessions-Illegals-Border-Crossings/2016/10/31/id/756224/.

[250] Donald J. Trump, "Thank You NH! We Will End Illegal Immigration, Stop the Drugs, Deport All Criminal Aliens&save American Lives! Watch Http://Bit.Ly/2embjxvNH  Pic.Twitter.Com/JBeQEMLyth," Tweet, *@realdonaldtrump* (blog), November 3, 2016, https://twitter.com/realdonaldtrump/status/794611850499489793.

country or we are going to incarcerate. But we're getting them out of our country, they're here illegally."[251]

In subsequent months Trump and others continued to call attention to the killing of Kate Steinle and others by undocumented immigrants. When Steinle's killer was exonerated on murder charges, Trump called it "a disgraceful verdict" and wrote "No wonder the people of our Country are so angry with Illegal Immigration."[252] A few hours later he tweeted that "The Kate Steinle killer came back and forth over the weakly protected Obama border, always committing crimes and being violent, and yet this info was not used in court. His exoneration is a complete travesty of justice. BUILD THE WALL!"[253] Trump promised that "The Schumer/Pelosi Democrats are so weak on Crime that they will pay a big price in the 2018 and 2020 Elections," and he tweeted that the decision in the Steinle case was "Such a miscarriage of Justice in San Francisco."[254] Other politicians involved in Trump immigration policies made similar statements. Congressman Steve King tweeted that "The illegal alien who, no one disagrees, killed Kate Steinle is found NOT guilty in sanctuary city, San Francisco. Sickening! I will spare no effort to do my own killing – of all amnesty in every form!" King added that "The death of Americans at the hands of illegals continues."[255] Kris Kobach affirmed that "San Francisco's sanctuary policy led to Kate Steinle's death. The open borders liberals who continue to defend sanctuary policies are putting American lives at risk."[256]

---

[251] "President-Elect Trump Speaks to a Divided Country," *Sixty Minutes*, November 13, 2016, https://www.cbsnews.com/news/60-minutes-donald-trump-family-melania-ivanka-lesley-stahl/.

[252] Donald J. Trump, "A Disgraceful Verdict in the Kate Steinle Case! No Wonder the People of Our Country Are so Angry with Illegal Immigration.," Tweet, *@realdonaldtrump* (blog), November 11, 2017, https://twitter.com/realdonaldtrump/status/936437372706836480.

[253] Donald J. Trump, "The Kate Steinle Killer Came Back and Back over the Weakly Protected Obama Border, Always Committing Crimes and Being Violent, and yet This Info Was Not Used in Court. His Exoneration Is a Complete Travesty of Justice. BUILD THE WALL!," Tweet, *@realdonaldtrump* (blog), December 7, 2017, https://twitter.com/realdonaldtrump/status/936551346299338752.

[254] Trump; Donald J. Trump, "Such a Total Miscarriage of Justice in San Francisco!Https://Twitter.Com/Dbongino/Status/936415283224465410 …," Tweet, *@realdonaldtrump* (blog), December 8, 2017, https://twitter.com/realdonaldtrump/status/937297341266190336.

[255] Steve King, "The Illegal Alien Who, No One Disagrees, Killed Kate Steinle Is Found NOT Guilty in Sanctuary City, San Francisco. Sickening! I Will Spare No Effort to Do My Own Killing -of All Amnesty in Every Form!," Tweet, *@SteveKingIA* (blog), December 9, 2017, https://twitter.com/SteveKingIA/status/936593489852338176; Steve King, "As Kate Steinle's Killer, to the Joy of the Left, Is Found NOT Guilty When NO ONE Disagrees -He Killed Her! The Death of Americans at the Hands of Illegals Continues. Here Another Example:Https://Pgj.Cc/HYxtrJ," Tweet, *@SteveKingIA* (blog), December 9, 2017, https://twitter.com/SteveKingIA/status/93659423708019545073.

[256] Kris W. Kobach, "In Short, San Francisco's Sanctuary Policy Led to Kate Steinle's Death. The Open Borders Liberals Who Continue to Defend Sanctuary Policies Are Putting American Lives at Risk.," Tweet, *@KrisKobach1787* (blog), December 11, 2017, https://twitter.com/KrisKobach1787/status/936623682943881217.

In attempting to galvanize Republican lawmakers and voters from coast to coast, the Trump administration has defined the Latino Threat, and in particular the MS-13 threat, as a national emergency. Attorney General Sessions claimed in April 2017 that there are now more than 10,000 members of MS-13 in at least forty states.[257] Addressing a joint session of Congress in February 2017, Trump announced that he had "ordered the Departments of Homeland Security and Justice, along with the Department of State and the Director of National Intelligence, to coordinate an aggressive strategy to dismantle the criminal cartels that have spread across our Nation." He announced that "We will stop the drugs from pouring into our country and poisoning our youth," that "my Administration has answered the pleas of the American people for immigration enforcement and border security," that "we will soon begin the construction of a great wall along our southern border," and that "we are removing gang members, drug dealers and criminals that threaten our communities and prey on our citizens." Affirming the criminal threat of Latino and other immigrants in the United States, and that his administration would meet this threat, Trump told Congress and other viewers that he had "ordered the Department of Homeland Security to create an office to serve American Victims. The office is called VOICE –– Victims Of Immigration Crime Engagement."[258] Just days in advance of the rescinding of DACA in 2017, Trump reassured another audience that "One by one we are finding the gang members, the drug dealers and the criminals who prey on our people. We are throwing them out of the country or we're putting the hell [sic], fast in jail."[259]

### H.  "They're Rapists"

Donald Trump also characterized Mexican immigrants as "rapists" on the day in 2015 when he announced his presidential campaign. Several weeks later he told a CNN host that "if you look at the statistics of people coming, you look at the statistics on rape, on crime, on everything coming in illegally into this country it's mind-boggling!" When the host corrected his statistics, Trump insisted that "somebody's doing the raping, Don! I mean somebody's doing it! Who's doing the raping?

---

[257] *Clip of Attorney General Sessions on Transnational Criminal Organizations.*
[258] Trump, "February 28, 2017," 2.
[259] "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said."

Who's doing the raping?"[260] Trump also issued statements via twitter to support his claim that border-crossers were connected to sexual violence.[261]  That same month he tweeted "@AnnCoulter don't worry... we clearly don't have an illegal alien criminal problem. #AdiosAmerica" with a screenshot of a google search results for "illegal alien rape."[262] In September 2016 he announced in Houston the detention of "an illegal immigrant in the Austin area who is responsible for nearly a dozen sexual assaults," and a crime in California "by an illegal immigrant who … had been convicted for child rape."[263] In April 2017 he told a reporter that "We are cleaning out cities and towns of hard-line criminals, some of the worst people on Earth, people that rape and kill women, people that are killing people just for the sake of having fun."[264]

While it is not always stated, the migrant "rapists" referenced here are clearly men, and Trump's repeated association of "Mexicans" and "illegals" with "rapists" echoed longstanding racial animus against Latinos that labeled both immigrants and the U.S.-born as sexual predators.

This Latino Threat narrative and others drew upon established fears of Latino men, African American men, and other non-whites as rapists. Author Ann Coulter's bestselling book decrying Mexican immigration had contended that "America is just bringing in a lot of rapists," and Trump had tweeted in May 2015 ".@AnnCoulter's new book—'Adios, America! The Left's Plan to Turn Our Country into a Third World Hellhole'-- is a great read. Good job!" After Trump pointed to the danger of Mexican immigrant rapists in his campaign announcement, Ann Coulter celebrated the fact that "nobody talked about Hispanic child-rape until now. That was in his opening speech!"[265]

Critics of Trump and Coulter's association between "Mexicans" and "rapists" compared this Republican political strategy to George H.W. Bush's 1988 political advertisement showing "a black

---

[260] Michael McLaughlin, "Donald Trump Goes After Immigrants Again, Claiming To Have Facts," *Huffington Post*, July 1, 2015, https://www.huffingtonpost.com/2015/07/01/donald-trump-immigrants_n_7709798.html.

[261] Donald J. Trump, "Via @mrctv by Ben Graham: 'Border Reports Back Up Trump's "Rapists" Claim'Http://Www.Mrctv.Org/Blog/Trump-under-Fire-Mexican-Rapists-Comments-He-Isnt-Wrong#.Sl0rro:4Z1T …," Tweet, @*realdonaldtrump* (blog), July 4, 2015, https://twitter.com/realdonaldtrump/status/618866429891317761.

[262] Donald J. Trump, "@slucch24: @AnnCoulter Don't Worry... We Clearly Don't Have an Illegal Alien Criminal Problem. #AdiosAmerica Pic.Twitter.Com/2LKr8zoSwy," Tweet, @*realdonaldtrump* (blog), June 9, 2015, https://twitter.com/realdonaldtrump/status/615674101110337536.

[263] Trump, "Remarks at the Remembrance Project Luncheon at the Omni Houston Hotel at Westside in Houston, Texas."

[264] "Excerpts from AP Interview with President Donald Trump."

[265] Carlos Lozada, TEM CSL_CITATION  {"citationID":"v0EN8SfR","properties":{"formattedCitation":"{\\*Washington Post E Blogs*, August 3, 2015.

man who had raped a white woman and assaulted her husband while free on a Massachusetts prison-furlough program that was supported by Michael Dukakis, the Democratic candidate."[266] The focus on Mexicans as rapists echoes Trump's emphasis on MS-13 and criminal cartels as emblematic immigrant organizations, and Trump's 1989 response to the so-called "Central Park Five" case in New York in which he had called for the death penalty for five Latino and African American teenager youth — aged 14, 15, and 16 -- accused (wrongly) of raping a white woman. Trump wrote in a 2014 *New York Daily News* editorial that those teenagers did "not exactly have the pasts of angels," and he did not retract his statements after the sentences of the accused were vacated.

Trump and others used references to male immigrants as rapists and sexual threats for political gain during his campaign. During the Republican primary race, for example, Trump charged opponent Marco Rubio as being soft on immigrants who had committed acts of sexual violence, tweeting in February 2016 that "Little Marco Rubio gave amnesty to criminal aliens guilty of 'sex offenses.' DISGRACE!"[267] The implication that "Little Marco" was not big enough to handle the menacing physicality of Latinos depended on historical stereotypes about Latin American masculinity and sexuality. It also raised questions about whether a Latino candidate such as Rubio could and would protect women from sexual violence.

In categorizing Mexicans as rapists, Trump alerted white voters that "criminal immigrants" threatened their wives and daughters, and he portrayed himself as the candidate who would protect white women facing a dangerous invasion of their homes and bedrooms. Following the October 2016 Vice Presidential debate, future White House Press Secretary Sean Spicer tweeted that ".@timkaine wants to [talk] tough on crime - fails to talk about defending rapists and murders."[268] When faced with serious allegations that Trump himself was guilty of past sexual harassment and misconduct, Stephen Miller responded to CNN in March 2016 that "You want to talk about women's

---

[266] The Editorial Board, "Opinion | Willie Horton, Updated for the Trump Era," *The New York Times*, November 5, 2017, https://www.nytimes.com/2017/11/05/opinion/jack-martins-long-island-ad.html.
[267] Donald J. Trump, "Little Marco Rubio Gave Amnesty to Criminal Aliens Guilty of 'Sex Offenses.' DISGRACE!Http://Cis.Org/ Vaughan/Senate-Bill-Rewards-Protects-Lawbreakers-Undermines-Law-Enforcement …," Tweet, @*realdonaldtrump* (blog), February 3, 2016, https://twitter.com/realdonaldtrump/status/704019808363352069.
[268] Trump retweeted this tweet. Sean Spicer, ".@timkaine Wants to Tough on Crime  - Fails to Talk about Defending Rapists and Murders #VPDebate," Tweet, @*seanspicer* (blog), October 10, 2016, https://twitter.com/seanspicer/status/783479279870996480.

issues? Here's something we should be talking about. It is a fact: As a result of uncontrolled migration into this country -- you can look this up, it's a statistic from Equality Now -- half a million U.S. girls in this country are at risk of female genital mutilation."[269]

## I.   "Vomit" and "Filth"

Because of the strong rhetorical link between ethnic Mexicans and negative attributes, policymakers have strategically referenced the dangers posed by Mexicans and Mexican Americans in terms of public health, physical safety, and bodily integrity. Trump has repeatedly done this, as when he told the Texas Patriots PAC that "Everything's coming across the border: the illegals, the cars, the whole thing. It's like a big mess. Blah. It's like vomit."[270] Few other U.S. national politicians in recent years have been so brazen in characterizing immigrants in such vulgar bodily terms.

Established stereotypes about Mexicans as dirty and unclean have long provided anti-immigrant organizations with a way to reference the dangers that migrants pose to public health in the United States. It was therefore no accident that Attorney General Jeff Sessions referenced Mexicans' "filth" in a major speech on immigration delivered on April 2017. That language resonates with deep, historical animosity against Latinos in the United States as partially captured in the following:

> "The Mexicans seem the most inferior of the race... The Hispano-Americans fill mainly low and servile employments, and in general engage only in such occupations as do not very severely tax either mind or body. They show no ambition to rise beyond the station where destiny, dirt, ignorance and sloth have placed them." (1855)[271]

> "The Mexicans at Sherman School have bad social habits and are not clean. American parents don't want their lily white daughters rubbing shoulders with the Mexicans with their filthy habits." (1927)[272]

> "Can't you find some worthwhile subject, instead of a herd of filthy, vile, degenerate, diseased, sub- human Spics. Our once great country is being overrun and befouled with these worthless, mixed-blood mongrels who spray graffiti on all our properties, steal just about anything they can get their wretched hands on and who like to rape

---

[269] Eric Bradner CNN, "Trump Aide: Immigration Increases Risk of Female Genital Mutilation," CNN, March 27, 2016, http://www.cnn.com/2016/03/27/politics/stephen-miller-donald-trump-female-genital-mutilation/index.html.

[270] *"Celebrating the American Dream" with Donald Trump and Mattress Mack, a Discussion Hosted by the Texas Patriots PAC.*

[271] Frank Soulé, John H. Gihon, and James Nisbet, *The Annals of San Francisco* (New York: D. Appleton and Company, 1855), 472.

[272] Rudy Guevarra, *Becoming Mexipino: Multiethnic Identities and Communities in San Diego* (New Brunswick: Rutgers University Press, 2012), 49.

white girls. White power, now, always and forever." (1976)[273]

"John James said the [Minutemen chapter in Central Florida] aims to get politicians to honor the oath they took to protect the nation from the 'invasion' of 'illegals' he believes are responsible for bringing once-eradicated diseases and Central American criminal gangs to America's small towns." (2006)[274]

In the first months of the Obama presidency, some pundits and politicians had blamed an outbreak of influenza on immigrant Mexicans despite the fact that fears of the virus, and its association with Mexico, were exaggerated.[275] In later months, when large numbers of Central American refugees crossed into the United States, politicians and members of the press identified young Latinos as a national health threat. Arizona Sheriff Joe Arpaio highlighted the uncleanliness of Latin Americans in 2009:

All these people that come over, they could come with disease. There's no control, no health checks or anything. They check fruits and vegetables, how come they don't check people? No one talks about that! They're all dirty.[276]

"Coming to a community near you," announced a newspaper in Augusta, Georgia, "tuberculosis, scabies, measles and swine flu."[277] Leaders of the American Family Association in 2015 blamed Central American immigrants for spreading measles and Enterovirus D68, despite any evidence of a connection, and argued that immigrants brought dangerously poor hygiene from Latin America:

We [in the United States] have vaccinations and hygiene and cleanliness and we teach people in western civilization how to go to the bathroom properly, how to take care of things, how to do things in a sanitary way. Do you not think that when we open our borders to a glut of people from another world who have never been trained, don't know that, that that's not going to bring in disease?"[278]

Some blamed the arrival of disease-ridden Latinos on DACA recipients, concluding that youth from Central America were encouraged by lax immigration enforcement and excellent educational opportunities to come to the United States after 2012.[279]

---

[273] Dick Rogers, "Low and Inside. Letter to the Editor," *Car and Driver*, November 1976.
[274] Brittney Booth, "New Group Joins Battle for Border: Minutemen Chapter Targets Area's Illegals," *News-Journal*, October 15, 2006, http://www.lexisnexis.com/hottopics/lnacademic/?
[275] Marc Lacey and Andrew Jacobs, "Even as Fears of Flu Ebb, Mexicans Feel Stigma," *New York Times*, May 5, 2009.
[276] Rubén Navarrette, "Sheriff Joe Is Definitely Off the Rails in Arizona," *Contra Costa Times*, October 15, 2009, http://www.lexisnexis.com/hottopics/lnacademic/?
[277] "Enough to Make You Sick: Immigration Crisis at Border Has the Makings of a Health Crisis," *Augusta Chronicle*, July 24, 2014, http://www.lexisnexis.com/hottopics/lnacademic/?
[278] Brian Tashman, "Sandy Rios: Migrant Kids Spread Disease Because They Don't Know 'How To Go To The Bathroom Properly,'" Right Wing Watch, March 3, 2015, http://www.rightwingwatch.org/post/sandy-rios-migrant-kids-spread-disease-because-they-dont-know-how-to-go-to-the-bathroom-properly/.
[279] "Influx of Central American Kids Underscores Broken U.S. Immigration System," *Daily Oklahoman*, June 13,

As a political candidate, Donald Trump frequently racialized Mexicans by referring to them as a threat to public health. In July 2015, soon after announcing his candidacy, Trump declared that Mexicans were responsible for "tremendous infectious disease ... pouring across the border."[280] He tweeted to "@SenTedCruz In addition to the criminals among the illegal aliens what about all the infectious diseases they brought to US."[281] Others involved in his campaign and administration similarly fanned fears about Latin Americans as disease agents. John Kelly told a Senate committee in 2015 that terrorists might intentionally spread ebola "as a weapon" into the United States through migrants and refugees. "It's a scary proposition," he concluded.[282]

### J. Anchor Babies and Families

Republican opposition to immigrant youth, and to DACA recipients in particular, fits into a long history of animus that centers on fears and concerns about Latino youth, including those born in the United States. Those fears drove the forced sterilization of ethnic Mexican women in California and other states during the twentieth century. While the *reconquista* narrative developing since the 1970s has focused primary attention on the "invasion" of the United States, worries about Latinas giving birth in this country has been just as important. Fear of "reconquest through reproduction," as one scholar puts it, has remained central to anti-Latino animus over the last thirty years, and it has played a fundamentally critical role in recent Republican efforts targeting Latino immigrants.[283]

Fears of the 1.5 generation (immigrant children) and of U.S. born citizens born to Latin American parents have been stoked by pundits and policymakers for decades. In 1979, Labor secretary Ray Marshall worried that "the children of today's illegal aliens" might be "the seeds of a bitter civil-rights struggle in the 1990s." And Stanford historian David Kennedy warned in 1996 that U.S.-born Latinos might create "a kind of Chicano Quebec … in the American Southwest."[284] Such fears prompted John Tanton – founder of CIS, FAIR, and Numbers USA – to see the problem of

---

2014, http://www.lexisnexis.com/hottopics/lnacademic/?

[280] Rupert Neate and Jo Tuckman, "Donald Trump: Mexican Migrants Bring 'Tremendous Infectious Disease' to US," *The Guardian*, July 7, 2015.

[281] Donald J. Trump, "@thegre8_1: @SenTedCruz In Addition to the Criminals among the Illegal Aliens What about All the Infectious Diseases They Brought to US," Tweet, *@realdonaldtrump* (blog), July 10, 2015, https://twitter.com/realdonaldtrump/status/618229195181826049.

[282] *Gen. John Kelly*.

[283] Chavez, *The Latino Threat*, 35.

[284] Chavez, 31–35.

immigration control as a problem of global population control. Aligning himself with environmental organizations worried about overpopulation, Tanton pushed for border enforcement and birth control in the hope that non-European immigrants would not come to the United States and have children. "Can homo contraceptivus compete with homo progenitiva if borders aren't controlled?" he asked, contrasting white citizens with Latin Americans.[285]

In recent years, anti-immigrant organizations in the United States have become more intent to deny rights to immigrant families, immigrant children, and the growing numbers of U.S.-born citizens with immigrant parents. In the 1990s, California Governor Pete Wilson asserted that "some illegals come here simply to have a child born on U.S. soil. That, of course, renders the child eligible for a host of public benefits…. The 14th Amendment to the Constitution was never intended to be a reward for illegal immigration; it's time to change it."[286] California Republicans introduced state legislation to deny pre-natal care and public education to undocumented immigrants, convinced that denying services to children would limit border crossings. Peter Brimelow, author of the influential book *Alien Nation*, founded the website VDARE.com (named after Virginia Dare, the "first white child" born in the New World) to underscore the importance of reducing non-white reproduction, and he used that white nationalist platform to promote the careers of politicians such as Kobach and Trump. [287] Politicians in Arizona proposed eliminating birthright citizenship in the name of reducing undocumented immigration. Senator Jeff Sessions stated his opposition to birthright citizenship:

> People do not believe you should be able to break into America, have a baby and then the baby becomes a citizen, and the whole family says, 'We can't go home. My child is a citizen. It's an unfair way to gain priority in the application for legal immigration into America.[288]

Iowa Congressman Steve King formally introduced such a bill (HR 140) in January 2013. This anti-immigrant narrative emphasized that Latinas were hypersexual, "imminent threats to the country's financial welfare," and that it was important "to mark their children as permanent foreigners."[289] As the 2016 Republican presidential candidate, Donald Trump announced that he would also deny

---

[285] Tanton, "'WITAN Memo' III."
[286] Gutiérrez, *Fertile Matters*, 114.
[287] Roth, "Far-Right Nativists Eye Kris Kobach for Donald Trump's Vice President."
[288] Manu Raju and Scott Wong, "McCain Backs Citizenship Hearings," POLITICO, August 3, 2010, http://politi.co/dpqOx8.
[289] Sampaio, *Terrorizing Latina/o Immigrants*, 148.

citizenship to U.S.-born children of immigrants – so-called "anchor babies."[290]

While the United States had provided racially-segregated education for Latino children for many decades, animus towards young immigrants has also focused on representing Latinos as mentally deficient or unsuitable for higher education. These were important themes in Arizona's anti-immigrant efforts during the early-twenty-first century. Racial animus has shaped educational policies, and Trump referenced longstanding questions about the intelligence of Latinos, and of immigrant kids including DACA recipients, when he told supporters in June 2015 that Mexico does not send "its best and finest" to the United States.

Codewords for Latino inferiority – many of which referenced Mexican immigrants -- justified discriminatory practices in education. A 1962 report by one Arizona school superintendent, for example, blamed the problems of "minority children" on "cultural handicaps."[291] John Tanton had similarly asked his followers to consider "What are the differences in educability between Hispanics (with their 50% dropout rate) and Asiatics (with their excellent school records and long tradition of scholarship)?"[292]

States such as California, Arizona, Kansas, Alabama, and Georgia have passed laws to discourage the public education of immigrant children or make it impossible for them to attend local public universities, and Kris Kobach worked on a FAIR lawsuit in 2004 to fight a Kansas statute providing in-state college tuition to undocumented immigrants.[293] Arizona Republicans passed legislation in 2010, since declared unconstitutional, banning ethnic studies programs that had a demonstrated record of success with Latino high school students.

Latino students have therefore been a source of concern for politicians for decades, raising worries about assimilation, radical politics, chain migration, racial integration, and more. The opposition of Donald Trump, Jeff Sessions, Kris Kobach, and others to DACA students fits into a

---

[290] Stephen Braun, "Trump: Repeal Citizenship of Illegal Immigrants' U.S.-Born Children," *The Mercury News*, August 17, 2015, http://www.mercurynews.com/2015/08/17/trump-repeal-citizenship-of-illegal-immigrants-u-s-born-children/.
[291] Eric V Meeks, *Border Citizens: The Making of Indians, Mexicans, and Anglos in Arizona*, 1st ed (Austin: University of Texas Press, 2007), 196.
[292] Tanton, "'WITAN Memo' III."
[293] Alia Beard Rau, "Arizona Immigration Law Was Crafted by Rising Star Activist," accessed October 29, 2017, http://archive.azcentral.com/news/articles/2010/05/31/20100531arizona-immigration-law-kris-kobach.html.

pattern of historical nativism directed at both immigrant and U.S.-born Latinos students that began in the early-twentieth century.

## K. The Wall

Anti-immigrant politicians, activists, and voters have found many ways to characterize the threat of Latinos in recent years, as the preceding pages make clear. Trump, Sessions, Kobach, Miller, and others have referenced historical characterizations of immigrants and their children as disease-ridden, dirty, subversive, lazy, dishonest, criminal, cruel, stupid, insensitive, violent, and more. References to these dangers posed by Latinos in general, and by Mexican and Central American immigrants in particular, proved critical to Republican efforts to mobilize voters and unite the GOP in 2016. As noted in the early pages of this report, however, contemporary politicians resist speaking too forcefully, too often, in ways that directly reference racial or ethnic inferiority. Few politicians see themselves as racists, and fewer still see an electoral advantage in being associated with open racial animus. Such an association risks alienating members of the public who believe that biological distinctions of race, and gross declarations about inferiority, are offensive and dangerous. Politicians have therefore used racial code words, and dog whistle politics, to articulate their positions and their views in ways that resonate with historical narratives and seem more acceptable to contemporary Americans.

During the Trump campaign, and in the first months of the Trump administration, the term that has been used most often and most successfully to convey racial animus towards Latinos, and to remind voters of the Latino Threat narrative, is "the wall." Kris Kobach claims to have played a major role in designing plans to build and pay for that wall.[294] As candidate and president, Donald Trump has repeatedly promised to erect a militarized barrier between the United States and Mexico in the interest of protecting citizenship, jobs, public health, public safety, national security, the welfare system, and more. White House counselor Kellyanne Conway reminded Americans just days prior to the rescinding of DACA that "The president ran on building the wall, won on building the wall, and has remained steadfastly committed to doing it. Anybody who's surprised by that has not

---

[294] Jonathan Shorman, "Kris Kobach Advised Donald Trump on Border Wall Plan," *Topeka Capital-Journal*, April 10, 2016, http://cjonline.com/news-state-government-local-state/2016-04-10/kris-kobach-advised-donald-trump-border-wall-plan.

been paying attention for over two years."[295]

As Conway noted, references to constructing a wall were critical to the Trump campaign, and talk of further militarizing the border has resonated with large numbers of voters in the United States familiar with the Latino Threat narrative. Those references have reminded audiences of the distinctions between "us" and "them"; and talk of "the wall" has been open and wide-ranging enough to allow listeners the opportunity to recall and prioritize the best reasons for building such a barrier. Some voters might see it protecting "us" against job- or welfare-stealing immigrants; others might think first about the need to block MS-13 and other criminal organizations, drug dealers, and rapists; and others might prioritize controlling the arrival of diseased refugees or stopping undocumented immigrants from voting in U.S. elections. Trump, Kobach, Miller, Sessions, and their associates on the campaign or in the White House have urged voters to worry about various combinations of all of these threats, making "the wall" a powerful "dog whistle" to summon a wide range of negative sentiments related to Latinos in recent years.

"The wall" is not an entirely new racial codeword. Other Republicans in the past who pushed anti-immigrant agendas to build electoral support promised to build such a barrier to protect voters from the Latino Threat. Pat Buchanan based his 1996 presidential campaign – clearly grounded in racial animus against Latinos -- on that guarantee. In 2006, Iowa Congressman Steve King proposed building an electrified fence along the U.S.-Mexican border, noting that "We do this to livestock all the time."[296] In the 2012 primary season, Republican candidate Herman Cain demanded an electrified fence: "It's going to be 20 feet high. It's going to have barbed wire on the top. It's going to be electrified. And there's going to be a sign on the other side saying, 'It will kill you — Warning.'"[297]

Many racial code words have informed recent immigration policies, guiding how Americans understand "the wall" and how they understand programs such as DACA. Understanding how "the wall" and other codewords work requires an understanding of historical context, of concepts such as chain migration, and an appreciation of the ways that politicians have articulated the threats

---

[295] Melissa Quinn, "Kellyanne Conway: Trump Is 'Going to Stick to Building That Wall, and He Wants the Money to Pay for It,'" *Washington Examiner*, August 24, 2017, http://www.washingtonexaminer.com/kellyanne-conway-trump-is-going-to-stick-to-building-that-wall-and-he-wants-the-money-to-pay-for-it/article/2632446.
[296] Alicia R Schmidt Camacho, "Fayetteville, Arkansas: Racial Policing and the Assertion of White Primacy" n.d.
[297] Chavez, *The Latino Threat*, 3.

associated with Latino youth. New variations of coded phrases and terms will likely appear in the coming months and years. How they operate in U.S. politics will depend on political context and political intent.

## VIII.    CONCLUSIONS AND OPINIONS

The scholar Lisa Marie Cacho notes that "stereotypes are degrading because they link race to other categories of devaluation."[298] Racial code words have done just that in recent years by allowing politicians to connect Latinos as group to criminality, terrorism, cultural depravity, racial mixing, sexual violence, voter fraud, and other threats. Animus towards Latinos has been a key feature of contemporary U.S. politics, and it certainly proved critical during the Trump presidential campaign. Racial animus shaped discussions of immigration, border enforcement, and policies affecting undocumented residents of the United States – including those covered by Deferred Action for Childhood Arrivals.

Scholars have proven that racially coded speech has played a central role in mobilizing the electorate since the 1960s, and that racially coded language – or "dog whistle politics" – has taken new forms in recent decades as politicians have stoked and responded to the "Latino Threat." In characterizing Latinos, Trump and other politicians have drawn upon well-established, negative stereotypes while developing new ones.

I have reached the following conclusions:

- First, the history of discrimination and prejudice against Latinos shapes the contemporary United States.
- Second, politicians and pundits have deepened fears of the "Latino Threat" in recent decades.
- Third, racial animus has often been advanced through racially coded speech. A climate of racial animus has surrounded recent political campaigns, including the Trump presidential campaign.
- Fourth, anti-immigrant politics in twenty-first century Arizona provided a testing ground and a model for national Republican Party responses to the "Latino Threat." Many leaders

---

[298] Lisa Marie Cacho, *Social Death: Racialized Rightlessness and the Criminalization of the Unprotected* (New York: New York University Press, 2012), 3.

important to the Trump campaign, and prominent in the Trump administration, were involved in Arizona efforts to halt immigration and restrict the rights of resident immigrants.

- Fifth, organizations founded by John Tanton – the Center for Immigration Studies, the Federation for American Immigration Reform, and Numbers USA – have been key to the development of Trump's immigration policies, including his decision to rescind DACA. Many leading members of Trump's administration and advisers to the President, including Jeff Sessions and Kris Kobach and Stephen Miller, have strong ties to one or more of these organizations.

- Sixth, anti-immigrant politicians have described DACA recipients and other immigrants as a danger to "everyday Americans," to national security, to public health, and to the safety of the American public.

- Seventh, the Trump administration has routinely exaggerated the number of undocumented immigrants in the United States and their negative impact on U.S. society.

- Eighth, contemporary animus towards Latino immigrant children and the U.S.-born children of immigrants, including DACA recipients, has developed from historical anti-Latino animus, the history of racial segregation in education, and efforts to control Latina reproduction.

- Finally, the racially coded speech used by the Trump campaign, and by the Trump administration, reminds voters of the "Latino Threat." In recent years, the most powerful and enduring political term for this purpose has been "the wall," a phrase that coalesces many threatening racial narratives, and that shaped discussions and debates about DACA recipients.

## IX.    BIBLIOGRAPHY

"2015 Katz Award Ceremony Transcript." CIS.org, May 31, 2015. https://cis.org/2015-Katz-Award-

Ceremony-Transcript.

Águila, Jaime R. "Immigration and Politics." *Aztlan* 38, no. 2 (Fall 2013): 131–49.

Akin, Stephanie. "The Other 'Steve' in the White House." *Roll Call*, February 13, 2017, sec. politics. https://www.rollcall.com/news/politics/stephen-miller-white-house.

Archibold, Randal C. "On Border Violence, Truth Pales Compared to Ideas." *The New York Times*, June 19, 2010, sec. U.S. http://www.nytimes.com/2010/06/20/us/20crime.html.

Arrocha, William. "From Arizona's S.B. 1070 to Georgia's H.B. 87 and Alabama's H.B. 56: Exacerbating the Other and Generating New Discourses and Practices of Segregation." *California Western Law Review* 48, no. 2 (2012).

Bailey, Cierra. "CNN Hosts Laugh As Pierson Denies Trump's Immigration Flip-Flop." Carbonated.TV, August 2016. http://www.carbonated.tv/news/cnn-hosts-laugh-as-pierson-denies-trumps-immigration-flipflop.

Barro, Josh. "Before Donald Trump, There Was Jan Brewer." *The New York Times*, February 10, 2016, sec. The Upshot. https://www.nytimes.com/2016/02/11/upshot/before-donald-trump-there-was-jan-brewer.html.

Bebout, Lee. "The Nativist Aztlan: Fantasies and Anxieties of Whiteness on the Border." *Latino Studies* 10, no. 3 (Autumn 2012): 290–313.

Berman, Ari. "The Man Behind Trump's Voter-Fraud Obsession." *The New York Times*, June 13, 2017, sec. Magazine. https://www.nytimes.com/2017/06/13/magazine/the-man-behind-trumps-voter-fraud-obsession.html.

Biggers, Jeff. *State Out of the Union: Arizona and the Final Showdown Over the American Dream*. New York: Nation Books, 2012.

Blitzer, Jonathan. "How Stephen Miller Single-Handedly Got the U.S. to Accept Fewer Refugees." *The New Yorker*, October 13, 2017. https://www.newyorker.com/news/news-desk/how-stephen-miller-single-handedly-got-the-us-to-accept-fewer-refugees.

Board, The Editorial. "Opinion | Willie Horton, Updated for the Trump Era." *The New York Times*, November 5, 2017. https://www.nytimes.com/2017/11/05/opinion/jack-martins-long-island-ad.html.

Booth, Brittney. "New Group Joins Battle for Border: Minutemen Chapter Targets Area's Illegals." *News-Journal*. October 15, 2006. http://www.lexisnexis.com/hottopics/lnacademic/?

Boyd, James. "Nixon's Southern Strategy: It's All in the Charts." *New York Times*, May 17, 1970.

Braun, Stephen. "Trump: Repeal Citizenship of Illegal Immigrants' U.S.-Born Children." *The Mercury News*. August 17, 2015. http://www.mercurynews.com/2015/08/17/trump-repeal-citizenship-of-illegal-immigrants-u-s-born-children/.

Bretón, Marcos. "California's Top Latino Candidates Face a Tougher Enemy than Trump: Fellow Democrats." *Sacramento Bee*, November 5, 2017. http://www.sacbee.com/news/local/news-columns-blogs/marcos-breton/article182660766.html.

Brimelow, Peter. *Alien Nation: Common Sense about America's Immigration Disaster*. New York: Random House, 1995.

Buchanan, Patrick J. *The Death of the West: How Dying Populations and Immigrant Invasions Imperil Our Country and Civilization*. New York: Thomas Dunne Books, 2002.

Bunker, Theodore. "Sen. Jeff Sessions: Over 800,000 Illegal Border Crossings Last Year." Newsmax, October 31, 2016. http://www.newsmax.com/Newsfront/Jeff-Sessions-Illegals-Border-Crossings/2016/10/31/id/756224/.

Burns, Alexander, and Maggie Haberman. "Tensions Deepen Between Donald Trump and R.N.C." *The New York Times*, September 2, 2016. https://www.nytimes.com/2016/09/03/us/politics/donald-trump-rnc-reince-priebus.html.

Cacho, Lisa Marie. *Social Death: Racialized Rightlessness and the Criminalization of the Unprotected*. New York: New York University Press, 2012.

Camarota, Steven. "Time to End DACA." *National Review*, August 3, 2017. http://www.nationalreview.com/article/450080/obamas-illegal-amnesty-trump-should-end-daca.

Campbell, Colin. "Trump: 'They'Re Letting People Pour into the Country so They Can Go and Vote'." Accessed October 11, 2017. https://www.yahoo.com/news/trump-theyre-letting-people-pour-into-the-country-so-they-can-go-and-vote-152735577.html.

Carrigan, William D., and Clive Webb. *Forgotten Dead: Mob Violence Against Mexicans in the United States, 1848-1928*. New York: Oxford University Press, 2013.

Carter, Dan T. *From George Wallace to Newt Gingrich: Race in the Conservative Counterrevolution, 1963-1994*. The Walter Lynwood Fleming Lectures in Southern History. Baton Rouge, LA ; London: Louisana State University Press, 1996.

*"Celebrating the American Dream" with Donald Trump and Mattress Mack, a Discussion Hosted by the Texas Patriots PAC*, 2015. http://www.carbonated.tv/news/donald-trump-border-immigrants-vomit-2015-video.

Chavez, Leo R. *The Latino Threat: Constructing Immigrants, Citizens, and the Nation*. Stanford: Stanford University Press, 2013.

Chin, Gabriel J., Carissa Byrne Hessick, and Marc L. Miller. "Arizona Senate Bill 1070: Politics through Immigration Law." In *Arizona Firestorm: Global Immigration Realities, National Media, and Provincial Politics*, edited by Otto Santa Ana and Celeste González de Bustamante, 73–95. New York: Rowman & Littlefield Publishers, 2012.

Cisneros, Natalie. "'Alien' Sexuality: Race, Maternity, and Citizenship." *Hypatia*, 2013. http://onlinelibrary.wiley.com/doi/10.1111/hypa.12023/full.

*Clip of Attorney General Sessions on Transnational Criminal Organizations*, 2017. https://www.c-span.org/video/?c4666617/sessions-ms-13.

CNN, Eric Bradner. "Trump Aide: Immigration Increases Risk of Female Genital Mutilation." CNN, March 27, 2016. http://www.cnn.com/2016/03/27/politics/stephen-miller-donald-trump-female-genital-mutilation/index.html.

CNN, Julia Manchester. "Rep. Steve King: 'Significant Evidence' of Voter Fraud." *CNN*, October 17, 2016. http://www.cnn.com/2016/10/17/politics/donald-trump-voter-fraud-steve-king/index.html.

Cobas, José A., Jorge Duany, and Joe R. Feagin. "Racializing Latinos: Historical Background and Current Forms." In *How the United States Racializes Latinos: White Hegemony and Its Consequences*, edited by José A. Cobas, Jorge Duany, and Joe R. Feagin, 1–14. Boulder: Paradigm Publishers, 2009.

Complaint of United States of America v. Maricopa County, Arizona; Maricopa County Sheriff's Office; and Joseph M. Arpaio, in his official capacity of Sheriff of Maricopa County, Arizona (May 10, 2012).

Costello, Alex. "Martins Under Fire For MS-13 Mailer." Levittown, NY Patch, November 1, 2017. https://patch.com/new-york/levittown-ny/martins-under-fire-ms-13-mailer.

Coulter, Ann H. *Adios, America!: The Left's Plan to Turn Our Country into a Third World Hellhole*. Washington, D.C: Regnery Publishing, 2015.

D'Antonio, Michael. "Trump's Move to End DACA Has Roots in America's Long, Shameful History of Eugenics." *Los Angeles Times*, September 14, 2017. https://search.proquest.com/docview/1938894620/abstract/618E1C81BC1946B9PQ/1.

DeChiaro, Dean. "Kelly: Homeland Isn't Targeting Law-Abiding 'Dreamers.'" *Roll Call*, March 29, 2017. https://www.rollcall.com/news/policy/kelly-homeland-isnt-targeting-law-abiding-dreamers.

Delgado, Richard. "The Law of the Noose: A History of Latino Lynching." *Harvard Civil Rights-Civil Liberties Law Review* 44, no. 2 (2009): 297–312.

DelReal, Jose A., and Ed O'Keefe. "Arizona Sheriff Joe Arpaio Endorses Trump." *Washington Post*, January 26, 2016, sec. Post Politics. https://www.washingtonpost.com/news/post-politics/wp/2016/01/26/arizona-sheriff-joe-arpaio-endorses-trump/.

DeParle, Jason. "The Anti-Immigration Crusader." *The New York Times*, April 17, 2011. http://www.nytimes.com/2011/04/17/us/17immig.html?pagewanted=all.

Diamond, Marie. "Sen. Sessions: It's Not Sad That Immigrant Children Are Too Scared To Go To School, It's Sad They're Even Here." *ThinkProgress*, October 6, 2011. https://thinkprogress.org/sen-sessions-its-not-sad-that-immigrant-children-are-too-scared-to-go-to-school-it-s-sad-they-re-7806097ec771/.

"Donald Trump, Ceo, Trump Organization, Delivers a Presidential Campaign Announcement." *Political Transcript Wire*. June 16, 2015. https://search.proquest.com/docview/1688681159/citation/36EF9DEC737141BBPQ/1.

*Donald Trump Rally in Green Bay, Wisconsin*. Green Bay, Wisconsin, 2016. https://www.youtube.com/watch?v=oQYXBcq7nd4&feature=youtu.be&t=2h2m20s.

Edsall, Thomas Byrne, and Mary D. Edsall. *Chain Reaction: The Impact of Race, Rights, and Taxes on American Politics*. New York: Norton, 1991.

"Enough to Make You Sick: Immigration Crisis at Border Has the Makings of a Health Crisis." *Augusta Chronicle*. July 24, 2014. http://www.lexisnexis.com/hottopics/lnacademic/?

"Excerpts from AP Interview with President Donald Trump." *Associated Press*, April 21, 2017. https://apnews.com/182009c26d70499a97d486afa8d7a34d.

Fahrenthold, David A. "Self-Deportation Proponents Kris Kobach, Michael Hethmon Facing Time of Trial." *Washington Post*, April 24, 2012, sec. Politics. https://www.washingtonpost.com/politics/2012/04/24/gIQAe6lheT_story.html.

"FAIR Chairman Sings Praises of Racist Founder John Tanton." Southern Poverty Law Center, September 9, 2011. https://www.splcenter.org/hatewatch/2011/09/09/fair-chairman-sings-praises-racist-founder-john-tanton.

"FAIR Congratulates Senator Jeff Sessions for Nomination as Attorney General," November 18, 2016. https://www.prnewswire.com/news-releases/fair-congratulates-senator-jeff-sessions-for-nomination-as-attorney-general-300365959.html.

Farley, Robert, Eugene Kiely, Brooks Jackson, and Lori Robertson. "FactChecking Trump's Iowa Rally." FactCheck.org, July 5, 2017. http://www.factcheck.org/2017/06/factchecking-trumps-iowa-rally/.

Feere, Jon. "'Low-Priority' Illegals? Obama Amnesty and Enforcement Priorities Endanger Public Safety." CIS.org, August 29, 2011. https://cis.org/Feere/Lowpriority-Illegals-Obama-Amnesty-and-Enforcement-Priorities-Endanger-Public-Safety.

Fisher, Marc. "Trump and Race: Decades of Fueling Divisions." *Washington Post*, August 16, 2017, sec. Politics. https://www.washingtonpost.com/politics/trump-and-race-decades-of-fueling-divisions/2017/08/16/5fb3cd7c-8296-11e7-b359-15a3617c767b_story.html.

Fredrickson, George M. *The Arrogance of Race: Historical Perspectives on Slavery, Racism, and Social Inequality*. Middletown, CT: Wesleyan University Press, 1988.

Gándara, Patricia. "From Gonzales to Flores: A Return to the 'Mexican Room'?" In *Arizona Firestorm: Global Immigration Realities, National Media, and Provincial Politics*, edited by Otto Santa Ana and Celeste González de Bustamante, 121–43. New York: Rowman & Littlefield Publishers, 2012.

*Gen. John Kelly at the Senate Armed Services Committee: Latin American Smuggling Networks Could Facilitate ISIS Entrance into U.S.* Accessed October 24, 2017. https://www.youtube.com/watch?v=Lxh6ANP3BO8.

Giaritelli, Anna. "Stephen Miller Predicts 'Unstoppable' Momentum for Trump's Immigration Plan." *Washington Examiner*. August 2, 2017. http://www.washingtonexaminer.com/stephen-miller-predicts-unstoppable-momentum-for-trumps-immigration-plan/article/2630443.

Gilchrist, Jim. "The Reconquista Movement: Mexico's Plan for the American Southwest." Human Events: Powerful Conservative Voices, July 27, 2006.

Gilchrist, Jim, and Jerome R Corsi. *Minutemen: The Battle to Secure America's Borders*. Los Angeles, CA: World Ahead Pub., 2006.

Glueck, Katie, and Kyle Cheney. "Several Hispanic Trump Surrogates Reconsider Support." *Politico*, September 1, 2016. http://www.politico.com/story/2016/09/donald-trump-hispanic-leaders-arizona-immigration-227615.

Green, David. "The Trump Hypothesis: Testing Immigrant Populations as a Determinant of Violent and Drug-Related Crime in the United States*." *Social Science Quarterly* 97, no. 3 (September 1, 2016): 506–24. https://doi.org/10.1111/ssqu.12300.

Guevarra, Rudy. *Becoming Mexipino: Multiethnic Identities and Communities in San Diego*. New Brunswick: Rutgers University Press, 2012.

Gutiérrez, Elena R. *Fertile Matters: The Politics of Mexican-Origin Women's Reproduction*. University of Texas Press, 2008.

Haberman, Maggie, and Michael D. Shear. "Donald Trump, Wavering on Immigration, Finds Anger in All Corners." *New York Times*, August 25, 2016, sec. Politics. https://www.nytimes.com/2016/08/26/us/politics/donald-trump-immigration.html.

Haney-López, Ian. *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class*. New York: Oxford University Press, 2014.

Hauptman, Samantha. *The Criminalization of Immigration: The Post 9/11 Moral Panic*. El Paso: LFB Scholarly Publishing LLC, 2013.

Hernández, Kelly Lytle. *Migra!: A History of the U.S. Border Patrol*. Berkeley: University of California Press, 2010.

Horne, Thomas. Deposition Transcript of Thomas Horne, No. CV 10-623 TUC AWT (United States District Court for the District of Arizona February 1, 2016).

HoSang, Daniel Martínez. *Racial Propositions: Ballot Initiatives and the Making of Postwar California*. Berkeley: University of California Press, 2010.

"How White House Advisor Stephen Miller Went from Pestering Hispanic Students to Designing Trump's Immigration Policy - Univision." Accessed October 20, 2017. http://www.univision.com/univision-news/politics/how-white-house-advisor-stephen-miller-went-from-pestering-hispanic-students-to-designing-trumps-immigration-policy.

Huntington, Samuel P. *Who Are We?: The Challenges to America's National Identity*. New York: Simon & Schuster, 2004.

Inda, Jonathan Xavier. *Targeting Immigrants: Government, Technology, and Ethics*. Malden, MA ; Oxford: Blackwell Pub, 2006.

"Influx of Central American Kids Underscores Broken U.S. Immigration System." *Daily Oklahoman*. June 13, 2014. http://www.lexisnexis.com/hottopics/lnacademic/?

Inskeep, Steve. "The Man Behind Arizona's Toughest Immigrant Laws." *Morning Edition*. National Public Radio, March 12, 2008. http://www.npr.org/templates/transcript/transcript.php?storyId=88125098.

Johnson, Benjamin Heber. *Revolution in Texas: How a Forgotten Rebellion and Its Bloody Suppression Turned Mexicans into Americans*. Western American Series. New Haven: Yale University Press, 2003.

Johnson, Kevin R. *Opening the Floodgates: Why America Needs to Rethink Its Borders and Immigration Laws*. New York: New York University Press, 2007. http://site.ebrary.com/lib/yale/Doc?id=10210080.

———. *The "Huddled Masses" Myth: Immigration and Civil Rights*. Philadelphia: Temple University Press, 2004.

Jordan, Winthrop D. *White over Black: American Attitudes toward the Negro, 1550-1812*. Chapel Hill: University of North Carolina Press, 1968.

*Katrina Pierson: Trump Didn't Change Immigration Stance, He Just Changed the Words He Used*. CNN, 2016. https://www.youtube.com/watch?time_continue=8&v=FoMwIIvR9FM.

Kelly, John. "Even If They Are Nine Years Old, We Are Taking Them Out." *Twitter* (blog), March 24, 2017. https://twitter.com/ChiefJohnKelly/status/845301313655242753.

———. "Real Americans Will Finally Have Someone Who Speaks for Them - and Not Immigrants- Working in the White House. #tcot #MAGA." *Twitter* (blog), July 28, 2017. https://twitter.com/ChiefJohnKelly/status/891114189707649024.

———. "We Are Still Fighting Communism in the Form of Immigrants. #maga." *Twitter* (blog), July 20, 2017. https://twitter.com/ChiefJohnKelly/status/888233650256588805.

Kendall, Brent. "Trump Says Judge's Mexican Heritage Presents 'Absolute Conflict.'" *Wall Street Journal*, June 3, 2016. http://www.wsj.com/articles/donald-trump-keeps-up-attacks-on-judge-gonzalo-curiel-1464911442.

Khan, Mahwish. "FAIR Advertisement." America's Voice, September 14, 2009. https://americasvoice.org/content/fair_advertisement/.

King, Larry. "Federal Appeals Court Strikes down Hazleton's Immigration Ordinances." *Philadelphia Inquirer*, September 10, 2010.

King, Steve. "As Kate Steinle's Killer, to the Joy of the Left, Is Found NOT Guilty When NO ONE Disagrees-He Killed Her! The Death of Americans at the Hands of Illegals Continues. Here Another Example:Https://Pgj.Cc/HYxtrJ." Tweet. @*SteveKingIA* (blog), December 9, 2017. https://twitter.com/SteveKingIA/status/936594237080195073.

———. "The Illegal Alien Who, No One Disagrees, Killed Kate Steinle Is Found NOT Guilty in Sanctuary

89

City, San Francisco. Sickening! I Will Spare No Effort to Do My Own Killing-of All Amnesty in Every Form!" Tweet. @*SteveKingIA* (blog), December 9, 2017. https://twitter.com/SteveKingIA/status/936593489852338176.

Kobach, Kris W. "In Short, San Francisco's Sanctuary Policy Led to Kate Steinle's Death. The Open Borders Liberals Who Continue to Defend Sanctuary Policies Are Putting American Lives at Risk." Tweet. @*KrisKobach1787* (blog), December 11, 2017. https://twitter.com/KrisKobach1787/status/936623682943881217.

Kouri, Jim. "The Big Lie About Immigration Enforcement." The Post Chronicle, November 17, 2008.

Krikorian, Mark. "Ga. Issues Far More Drivers Licenses to DACA Recipients Than Feds Say Live Here Http://Insideradvantage.Com/2017/10/11/Ga-Issues-Far-More-Drivers-Licenses-to-Daca-Recipients-than-Feds-Say-Live-Here/ … That's Not Suspicious, Nosiree." Tweet. @*MarkSKrikorian* (blog), October 3, 2017. https://twitter.com/MarkSKrikorian/status/920714194168811526.

Lacey, Marc, and Andrew Jacobs. "Even as Fears of Flu Ebb, Mexicans Feel Stigma." *New York Times*. May 5, 2009.

Lee, MJ. "Fearful Hispanic Students Skip Class." *POLITICO*, October 4, 2011. http://www.politico.com/news/stories/1011/65098.html.

Liebelson, Dana. "10 Years Ago, These People Tried To Drive Undocumented Immigrants Out Of Town. Now, They're Advising Trump." *Huffington Post*, December 2, 2016, sec. Politics. https://www.huffingtonpost.com/entry/fair-donald-trump-immigration_us_584190d4e4b0c68e048059a2.

Lowry, Bryan. "Kris Kobach Helps Add Border Wall, Same-Sex Marriage, Gun Planks to GOP Platform." *Wichita Eagle*. July 13, 2016. http://www.kansas.com/news/politics-government/article89362087.html.

Lozada, Carlos. "Did Ann Coulter's New Book Help Inspire Trump's Mexican 'Rapists' Comments?" *Washington Post – Blogs*, August 3, 2015.

Lutton, Wayne, and John Tanton. *The Immigration Invasion*. Monterey, Va: Social Contract Press, 1994.

Magaña, Lisa, and Robert Short. "The Social Construction of Mexican and Cuban Immigrants by Politicians." *Review of Policy Research* 19, no. 4 (Winter 2002): 78–94.

Mahanta, Siddhartha. "GOP Showdown With Justice Department Over Immigration." *Mother Jones*, November 10, 2011. http://www.motherjones.com/politics/2011/11/sessions-demint-vitter-immigration-state-bill-arizona-alabama-south-carolina-georgia/.

Mak, Tim. "Trump Ends His Campaign—Surprise, Surprise—by Insulting Latinos." *The Daily Beast*, November 7, 2016, sec. politics. https://www.thedailybeast.com/articles/2016/11/07/trumps-ends-his-campaign-surprise-surprise-by-insulting-latinos.

"Mark Krikorian, Who Urges Cutting Immigration, Gains Relevance In Trump Era." NPR.org. Accessed October 20, 2017. http://www.npr.org/2017/04/10/523311475/mark-krikorian-who-urges-cutting-immigration-gains-relevance-in-trump-era.

Martínez, Ramiro, Jr. "Revisiting the Role of Latinos and Immigrants in Police Research." In *Race, Ethnicity, and Policing: New and Essential Readings*, edited by Stephen Rice and Michael White, 435–49. New York: New York University Press, 2010.

Massey, Douglas S., and Karen A. Pren. "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America." *Population and Development Review* 37, no. 1 (March 2012): 1–29.

McLaughlin, Michael. "Donald Trump Goes After Immigrants Again, Claiming To Have Facts." *Huffington Post*, July 1, 2015. https://www.huffingtonpost.com/2015/07/01/donald-trump-immigrants_n_7709798.html.

Meeks, Eric V. *Border Citizens: The Making of Indians, Mexicans, and Anglos in Arizona*. 1st ed. Austin: University of Texas Press, 2007.

Meltzer, Joshua P., and Dany Bahar. "NAFTA under Trump—the Myths and the Possibilities," February 23, 2017. https://www.brookings.edu/blog/up-front/2017/02/23/nafta-under-trump-the-myths-and-the-possibilities/.

"Mexican Aliens Seek to Retake 'Stolen' Land." *The Washington Times*, April 16, 2006.

Molina, Natalia. *How Race Is Made in America: Immigration, Citizenship, and the Historical Power of Racial Scripts*. Berkeley: University of California Press, 2013.

Montanaro, Domenico. "Donald Trump In 9 Quotes And 200 Seconds." NPR.org, August 29, 2015. http://www.npr.org/sections/itsallpolitics/2015/08/29/435849800/donald-trump-in-9-quotes-and-200-seconds.

Moore, Joan W., and Harry Pachon. *Hispanics in the United States*. Englewood Cliffs, N.J: Prentice-Hall, 1985.

Moreno, Carolina. "Here's Why Trump's 'Bad Hombres' Comment Was So Offensive." *Huffington Post* (blog), October 20, 2016. https://www.huffingtonpost.com/entry/heres-why-trumps-bad-hombres-comment-was-so-offensive_us_5808e121e4b0180a36e9b995.

Mortensen, Ronald W. "Obama Administration's DREAM Decree – Compassion or Child Abuse?" CIS.org, June 21, 2012. https://cis.org/Mortensen/Obama-Administrations-DREAM-Decree-Compassion-or-Child-Abuse.

Navarrette, Rubén. "Sheriff Joe Is Definitely Off the Rails in Arizona." *Contra Costa Times*. October 15, 2009. http://www.lexisnexis.com/hottopics/lnacademic/?

"Nearly One Million  Aliens With Final Removal Orders Remain in the United States." *Federation for American Immigration Reform* (blog), October 25, 2016. https://fairus.org/legislative-updates/legislative-update-10252016#4.

Neate, Rupert, and Jo Tuckman. "Donald Trump: Mexican Migrants Bring 'Tremendous Infectious Disease' to US." *The Guardian*. July 7, 2015.

Nelson, Leah, Evelyn Schlatter, and Heidi Beirich. "When Mr. Kobach Comes to Town: Nativist Laws & the Communities They Damage." A Special Report from the Southern Poverty Law Center. Motgomery, Alabama, January 2011.

"New Analysis by FAIR Shows That Support for Illegal Alien Amnesty and Increased Immigration Would Harm, Not Help, Republicans Politically | Federation for American Immigration Reform," October 24, 2013. https://fairus.org/press-releases/new-analysis-fair-shows-support-illegal-alien-amnesty-and-increased-immigration.

Ngai, Mae M. *Impossible Subjects: Illegal Aliens and the Making of Modern America*. Politics and Society in Twentieth-Century America. Princeton: Princeton University Press, 2004.

"No. 1 Champion for American Workers Chosen as Ranking Member of Judiciary Committee," May 5, 2009. https://www.numbersusa.com/content/news/may-5-2009/no-1-champion-american-workers-chosen-ranking-member-judiciary-committee.html.

North, David. "Are DACA Aliens Gang Members? USCIS Does Not Want to Know." CIS.org, October 16, 2015. https://cis.org/North/Are-DACA-Aliens-Gang-Members-USCIS-Does-Not-Want-Know.

O'Leary, Anna Ochoa, Andrea J. Romero, Nolan L. Cabrera, and Michelle Rascón. "Assault on Ethnic Studies." In *Arizona Firestorm: Global Immigration Realities, National Media, and Provincial Politics*, 97–120.  New York: Rowman & Littlefield Publishers, 2012.

O'Leary, Anna Ochoa, and Azucena Sanchez. "Anti-Immigrant Arizona: Ripple Effects and Mixed Immigration Status Households under 'Policies of Attrition' Considered." *Journal of Borderlands Studies* 26, no. 1 (December 20, 2011): 115–33.

Parker, Ashley. "Trump Defends Arpaio Pardon, Assumed 'Ratings Would Be Far Higher' by Announcing during Hurricane." *Washington Post*, August 28, 2017, sec. Post Politics. https://www.washingtonpost.com/news/post-politics/wp/2017/08/28/trump-defends-pardon-of-former-arizona-sheriff-joe-arpaio/.

Passel, Jeffrey S., and D'Vera Cohn. "Unauthorized Immigrant Population Stable for Half a Decade." *Pew Research Center* (blog), September 21, 2016. http://www.pewresearch.org/fact-tank/2016/09/21/unauthorized-immigrant-population-stable-for-half-a-decade/.

Perez, Evan, and Daniella Diaz. "GOP Senators Ask DHS about 'Rush' to Process Citizens Ahead of Election." CNN, September 23, 2016. http://www.cnn.com/2016/09/22/politics/department-of-homeland-security-citizenship-2016-election/index.html.

"President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said." *Time Magazine*, August 23, 2017.

*President Trump's Full Ohio Rally*. CNN Politics, 2017.

http://www.cnn.com/videos/politics/2017/07/25/trump-youngstown-rally-full-speech.cnn.

"President-Elect Trump Speaks to a Divided Country." *Sixty Minutes*, November 13, 2016. https://www.cbsnews.com/news/60-minutes-donald-trump-family-melania-ivanka-lesley-stahl/.

Preston, Julia. "Alabama Passes Far-Reaching Anti-Immigration Law." *The New York Times*, June 3, 2011, sec. U.S. https://www.nytimes.com/2011/06/04/us/04immig.html.

Publius Decius Mus. "Toward a Sensible, Coherent Trumpism." *The Unz Review*, March 10, 2016. http://www.unz.com/article/toward-a-sensible-coherent-trumpism/.

Quinn, Melissa. "Kellyanne Conway: Trump Is 'Going to Stick to Building That Wall, and He Wants the Money to Pay for It.'" *Washington Examiner*, August 24, 2017. http://www.washingtonexaminer.com/kellyanne-conway-trump-is-going-to-stick-to-building-that-wall-and-he-wants-the-money-to-pay-for-it/article/2632446.

Raju, Manu, and Scott Wong. "McCain Backs Citizenship Hearings." POLITICO, August 3, 2010. http://politi.co/dpqOx8.

Rappeport, Alan. "A Beating in Boston, Said to Be Inspired by Donald Trump's Immigrant Comments - First Draft. Political News, Now. - The New York Times." *New York Times*, August 20, 2015. https://www.nytimes.com/politics/first-draft/2015/08/20/a-beating-in-boston-said-to-be-inspired-by-donald-trumps-immigrant-comments/?_r=0.

Rau, Alia Beard. "Arizona Immigration Law Was Crafted by Rising Star Activist." Accessed October 29, 2017. http://archive.azcentral.com/news/articles/2010/05/31/20100531arizona-immigration-law-kris-kobach.html.

Reagan, Ronald. "November 13, 1979: Announcement for Presidential Candidacy." Miller Center, November 13, 1979. https://millercenter.org/the-presidency/presidential-speeches/november-13-1979-announcement-presidential-candidacy.

"Republicans Slam DREAM Act for Including Immigrants With Criminal Records." Text.Article. Fox News, December 8, 2010. http://www.foxnews.com/politics/2010/12/08/republicans-slam-dream-act-allowing-immigrants-criminal-records.html.

Rogers, Dick. "Low and Inside. Letter to the Editor." *Car and Driver*, November 1976.

Roth, Zachary. "Far-Right Nativists Eye Kris Kobach for Donald Trump's Vice President." MSNBC, May 23, 2016. http://www.msnbc.com/msnbc/far-right-nativists-eye-kris-kobach-donald-trumps-vice-president.

Rough, Ginger. "Signing Arizona Immigration Law Was Never a Question for Governor." *Arizona Republic*, June 1, 2010.

Rubin, Jennifer. "Trump's Ingrained Racism: Trump Cultivated Racial Bias and Built Himself a Following through Racist Stunts and Rhetoric." *Washington Post* (blog), September 28, 2016. https://search.proquest.com/docview/1824118855/citation/683F2C2D10A74725PQ/1.

Sáenz, Rogelio, and Karen Manges Douglas. "A Call for the Racialization of Immigration Studies: On the Transition of Ethnic Immigrants to Racialized Immigrants." *Sociology of Race and Ethnicity* 1, no. 1 (2015): 166–80.

Sager, Stacey. "LI Political Ad Includes 'MS-13's Choice' for County Executive." ABC7 New York, November 2, 2017. http://abc7ny.com/2596411/.

Sampaio, Anna. *Terrorizing Latina/o Immigrants : Race, Gender, and Immigration Politics in the Age of Security*. Philadelphia: Temple University Press, 2015.

Santa Ana, Otto. *Brown Tide Rising: Metaphors of Latinos in Contemporary American Public Discourse*. Austin: University of Texas Press, 2002. http://site.ebrary.com/lib/yale/Doc?id=10245773.

Santana, Maria. "Hard-Line Anti-Illegal Immigration Advocates Hired at 2 Federal Agencies." *CNN*, April 12, 2017. http://www.cnn.com/2017/04/11/politics/trump-administration-immigration-advisers/index.html.

Schmidt Camacho, Alicia R. "Fayetteville, Arkansas: Racial Policing and the Assertion of White Primacy." Unpublished Paper, n.d.

"Sen. Ted Cruz Moves Front And Center In GOP Response To Border Crisis." *Legal Monitor Worldwide*, July 22, 2014.

*Senator Jeff Sessions Endorses Donald Trump*. Madison, Alabama, 2016. https://www.youtube.com/watch?v=Is0sNyjPeX8.

*Senator Jeff Sessions on Dominican Republic Immigrants*. U.S. Senate, 2016. https://www.c-span.org/video/?c4631811/sen-jeff-sessions-dominican-republic-immigrants.

Serwer, Adam. "Jeff Sessions's Unqualified Praise for a 1924 Immigration Law." *The Atlantic*, January 10, 2017. https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

Sessions, Jeff. "Attorney General Jeff Sessions Delivers Remarks Announcing the Department of Justice's Renewed Commitment to Criminal Immigration Enforcement." April 11, 2017. https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-announcing-department-justice-s-renewed.

———. "Attorney General Sessions Delivers Remarks on DACA." Washington, D.C., September 5, 2017. https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

———. Comprehensive Immigration Reform Act of 2007, § United States Senate (2007).

———. "Recognizing 15th Anniversary of NumbersUSA." In *Congressional Record*, 158:63:S2919–20, 2012.

"Sessions Targets Four 'Sanctuary Cities' for Punishment." NBC News, October 12, 2017. https://www.nbcnews.com/politics/white-house/sessions-targets-four-sanctuary-cities-punishment-n810131.

Shane, Scott. "Combative, Populist Steve Bannon Found His Man in Donald Trump." *The New York Times*, November 27, 2016. https://www.nytimes.com/2016/11/27/us/politics/steve-bannon-white-house.html.

Shelbourne, Mallory. "Trump Wants to Keep New Immigrants from Getting Welfare — Which Is Already Law." The Hill, June 21, 2017. http://thehill.com/homenews/administration/338901-trumps-suggests-creating-law-that-has-been-enacted-since-1996.

Shorman, Jonathan. "Kris Kobach Advised Donald Trump on Border Wall Plan." *Topeka Capital-Journal*. April 10, 2016. http://cjonline.com/news-state-government-local-state/2016-04-10/kris-kobach-advised-donald-trump-border-wall-plan.

Soulé, Frank, John H. Gihon, and James Nisbet. *The Annals of San Francisco*. New York: D. Appleton and Company, 1855.

Spicer, Sean. ".".@timkaine Wants to Tough on Crime - Fails to Talk about Defending Rapists and Murders #VPDebate." Tweet. @*seanspicer* (blog), October 10, 2016. https://twitter.com/seanspicer/status/783479279870996480.

Stanley-Becker, Isaac. "In Trump's GOP, Jeff Sessions Goes from Fringe to Prime Time." *Washington Post*, July 18, 2016. https://www.washingtonpost.com/politics/in-trumps-gop-sessions-rockets-from-the-fringe-to-prime-time/2016/07/18/1fc04d14-490b-11e6-acbc-4d4870a079da_story.html.

Stein, Dan. "Immigration Decision a Victory for Arizona - But It Has Its Pitfalls." Fox News, June 25, 2012. http://www.foxnews.com/politics/2012/06/25/arizona-immigration-decision-victory-for-state-but-has-its-pitfalls.html.

"Suggested Reading On Immigration | Federation for American Immigration Reform." Accessed October 26, 2017. https://fairus.org/issue/publications-resources/suggested-reading-immigration.

Swoyer, Alex. "Photos: California Protesters Burn American Flag, Donald Trump Responds." Breitbart, May 2, 2016. http://www.breitbart.com/2016-presidential-race/2016/05/02/photos-california-protesters-burn-american-flag/.

Tancredo, Thomas G. *In Mortal Danger: The Battle for America's Border and Security*. Nashville, Tenn.: WND Books, 2006.

Tancredo, Tom. "Mexico Is Sending Us Colonists, Not Immigrants." Breitbart, April 30, 2016. http://www.breitbart.com/2016-presidential-race/2016/04/30/mexico-sending-us-colonists-not-immigrants/.

———. "Tancredo: You Think Russia Tries to Influence American Politics? Think Mexico First." Breitbart, July 25, 2017. http://www.breitbart.com/big-government/2017/07/25/tancredo-think-russia-tries-influence-american-politics-think-mexico-first/.

Tani, Maxwell. "Trump Adviser Tells DACA Recipients to 'Go Home and Get in Line.'" *Business Insider*, September 5, 2017. http://www.businessinsider.com/kris-kobach-immigration-daca-get-in-line-2017-9.

Tanton, John. "'WITAN Memo' III." Southern Poverty Law Center, October 10, 1986. https://www.splcenter.org/fighting-hate/intelligence-report/2015/witan-memo-iii.

Tanton, John, and Wayne Lutton. "Immigration and Criminality in the U.S.A." *Journal of Social, Political and Economic Studies* 18, no. 2 (1993): 217–34.

Tapper, Jake. "Tapper to Trump '…is That Not the Definition of Racism?'" *CNN Press Room*, June 3, 2016. http://cnnpressroom.blogs.cnn.com/2016/06/03/tapper-to-trump-is-that-not-the-definition-of-racism/.

Tashman, Brian. "Sandy Rios: Migrant Kids Spread Disease Because They Don't Know 'How To Go To The Bathroom Properly.'" Right Wing Watch, March 3, 2015. http://www.rightwingwatch.org/post/sandy-rios-migrant-kids-spread-disease-because-they-dont-know-how-to-go-to-the-bathroom-properly/.

Trump, Donald J. "A Disgraceful Verdict in the Kate Steinle Case! No Wonder the People of Our Country Are so Angry with Illegal Immigration." Tweet. *@realdonaldtrump* (blog), November 11, 2017. https://twitter.com/realdonaldtrump/status/936437372706836480.

———. "Address Accepting the Presidential Nomination at the Republican National Convention in Cleveland, Ohio." Cleveland, July 21, 2016.

———. "Address to the National Guard Association of the United States 138th General Conference & Exhibition at the Baltimore Convention Center in Baltimore, Maryland." Baltimore, September 12, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119205.

———. "'@BackOnTrackUSA. What a Dysfunctional Administration When Illegal Aliens Get Free & Better Medical Care Then Our Veterans. What a Disgrace." Tweet. *@realdonaldtrump* (blog), July 12, 2014. https://twitter.com/realdonaldtrump/status/492147543329869825.

———. "@BackOnTrackUSA:Imagine How Much Tax Money It Will Cost Americans When Obama Legalizes 25 Million Illegal Aliens&gives Them Free ObamaCare." Tweet. *@realdonaldtrump* (blog), July 2, 2014. https://twitter.com/realdonaldtrump/status/486388989062946817.

———. "@_EOD  I Believe We Have Passed That Point. There Are Homeless Veterans in USA & yet Illegal Aliens Get Government Housing." Tweet. *@realdonaldtrump* (blog), July 12, 2015. https://twitter.com/realdonaldtrump/status/623156677769056256.

———. "Everybody Is Talking about the Protesters Burning the American Flags and Proudly Waving Mexican Flags. I Want America First - so Do Voters!" Tweet. *@realdonaldtrump* (blog), May 11, 2016. https://twitter.com/realdonaldtrump/status/727137190967435265?lang=en.

———. "February 28, 2017: Address to Joint Session of Congress." Washington, D.C., February 28, 2017. https://millercenter.org/the-presidency/presidential-speeches/february-28-2017-address-joint-session-congress.

———. "Happy #CincoDeMayo! The Best Taco Bowls Are Made in Trump Tower Grill. I Love Hispanics!" Tweet. *@realDonaldTrump* (blog), May 5, 2016.

———. "I Am Pleased to Inform You That I Have Just Granted a Full Pardon to 85 Year Old American Patriot Sheriff Joe Arpaio. He Kept Arizona Safe!" Tweet. *@realdonaldtrump* (blog), August 7, 2017. https://twitter.com/realdonaldtrump/status/901263061511794688?lang=en.

———. "Little Marco Rubio Gave Amnesty to Criminal Aliens Guilty of 'Sex Offenses.' DISGRACE!Http://Cis.Org/Vaughan/Senate-Bill-Rewards-Protects-Lawbreakers-Undermines-Law-Enforcement …." Tweet. *@realdonaldtrump* (blog), February 3, 2016. https://twitter.com/realdonaldtrump/status/704019808363352069.

———. "Mexico's Court System Corrupt.I Want Nothing to Do with Mexico Other than to Build an Impentrable WALL and Stop Them from Ripping off U.S." Tweet. *@realDonaldTrump* (blog), March 5, 2015.

———. "@rdbrewer4 Trump: Keep Throwing Those Giant Hand Grenades into the Amnesty Debate. You're Pissing off All the Right People in the GOP." Tweet. *@realdonaldtrump* (blog), July 10, 2015. https://twitter.com/realdonaldtrump/status/619195073658515457.

———. "Remarks at a Rally at Berglund Center in Roanoke, Virginia." Roanoke, Virginia, September 24, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119203.

———. "Remarks at a Rally at Sun Center Studios in Chester Township, Pennsylvania." Chester Township, Pennsylvania, September 22, 2016. The American Presidency Project.

http://www.presidency.ucsb.edu/ws/?pid=119189.

———. "Remarks at a Rally at the James L. Knight Center in Miami, Florida." Miami, September 16, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119208.

———. "Remarks at Erie Insurance Arena in Erie, Pennsylvania." Erie, Pennsylvania, August 12, 2016.

———. "Remarks at High Point University in High Point, North Carolina." High Point, North Carolina, September 20, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119192.

———. "Remarks at the Charlotte Convention Center in Charlotte, North Carolina." Charlotte, August 18, 2016.

———. "Remarks at the Mississippi Coliseum in Jackson, Mississippi." Jackson, Mississippi, August 24, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=123198.

———. "Remarks at the Remembrance Project Luncheon at the Omni Houston Hotel at Westside in Houston, Texas." Houston, September 17, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119207.

———. "Remarks at the Summit Sports and Ice Complex in Dimondale, Michigan." Dimondale, Michigan, August 19, 2016.

———. "Remarks at the Union League of Philadelphia in Philadelphia, Pennsylvania." Philadelphia, September 7, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119177.

———. "Remarks at the XFinity Arena in Everett, Washington." Everett, Washington, August 30, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119806.

———. "Remarks at Youngstown State University in Youngstown, Ohio." Youngstown, Ohio, August 15, 2016.

———. "Remarks on Immigration at the Phoenix Convention Center in Phoenix, Arizona." Phoenix, August 31, 2016. The American Presidency Project. http://www.presidency.ucsb.edu/ws/?pid=119805.

———. "@RobHeilbron: @realDonaldTrump #JebBush Has to like the Mexican Illegals Because of His Wife." Tweet. *@realDonaldTrump* (blog), July 4, 2015.

———. "Sadly, the Overwhelming Amount of Violent Crime in Our Major Cities Is Committed by Blacks and Hispanics-a Tough Subject-Must Be Discussed." Tweet. *@realDonaldTrump* (blog), June 5, 2013. https://twitter.com/realDonaldTrump/status/342190428675796992.

———. "@slucch24: @AnnCoulter Don't Worry... We Clearly Don't Have an Illegal Alien Criminal Problem. #AdiosAmerica Pic.Twitter.Com/2LKr8zoSwy." Tweet. *@realdonaldtrump* (blog), June 9, 2015. https://twitter.com/realdonaldtrump/status/615674101110337536.

———. "Such a Total Miscarriage of Justice in San Francisco!Https://Twitter.Com/Dbongino/Status/936415283224465410 …." Tweet. *@realdonaldtrump* (blog), December 8, 2017. https://twitter.com/realdonaldtrump/status/937293741266190336.

———. "Thank You NH! We Will End Illegal Immigration, Stop the Drugs, Deport All Criminal Aliens&save American Lives! Watch Http://Bit.Ly/2embjxvNH Pic.Twitter.Com/JBeQEMLyth." Tweet. *@realdonaldtrump* (blog), November 3, 2016. https://twitter.com/realdonaldtrump/status/794611850499489793.

———. "The Border Is Wide Open for Cartels & Terrorists. Secure Our Border Now. Build a Massive Wall & Deduct the Costs from Mexican Foreign Aid!" Tweet. *@realDonaldTrump* (blog), March 30, 2015.

———. "The Kate Steinle Killer Came Back and Back over the Weakly Protected Obama Border, Always Committing Crimes and Being Violent, and yet This Info Was Not Used in Court. His Exoneration Is a Complete Travesty of Justice. BUILD THE WALL!" Tweet. *@realdonaldtrump* (blog), December 7, 2017. https://twitter.com/realdonaldtrump/status/936551346299338752.

———. "The Mexican Legal System Is Corrupt, as Is Much of Mexico. Pay Me the Money That Is Owed Me Now - and Stop Sending Criminals over Our Border." Tweet. *@realDonaldTrump* (blog), February 24, 2015.

———. "@thegre8_1: @SenTedCruz In Addition to the Criminals among the Illegal Aliens What about

All the Infectious Diseases They Brought to US." Tweet. @*realdonaldtrump* (blog), July 10, 2015. https://twitter.com/realdonaldtrump/status/618229195181826049.

———. "Via @BreitbartNews by @mboyle1: "Obama's Amnesty Will Give Illegal Aliens Public Benefits"Http://Www.Breitbart.Com/Big-Government/2014/11/17/Exclusive-Report-Obama-s-Executive-Amnesty-Will-Put-Illegal-Aliens-On-Welfare-Public-Benefits-Like-Obamacare-and-More …." Tweet. @*realdonaldtrump* (blog), November 3, 2014. https://twitter.com/realdonaldtrump/status/534795106113843200.

———. "Via @mrctv by Ben Graham: 'Border Reports Back Up Trump's "Rapists" Claim'Http://Www.Mrctv.Org/Blog/Trump-under-Fire-Mexican-Rapists-Comments-He-Isnt-Wrong#.Sl0rro:4Z1T …." Tweet. @*realdonaldtrump* (blog), July 4, 2015. https://twitter.com/realdonaldtrump/status/618866429891317761.

———. …"...Want Everything to Be Done for Them When It Should Be a Community Effort. 10,000 Federal Workers Now on Island Doing a Fantastic Job." Tweet. @*realDonaldTrump* (blog), September 4, 2017. https://twitter.com/realDonaldTrump/status/914089888596754434?ref_src=twsrc%5Etfw&ref_url=https%3A%2F%2Fwww.nbcnews.com%2Fstoryline%2Fpuerto-rico-crisis%2Fsan-juan-s-mayor-pleads-trump-you-are-killing-us-n806116.

———. "We Must Stop the Crime and Killing Machine That Is Illegal Immigration. Rampant Problems Will Only Get Worse. Take Back Our Country!" Tweet. @*realDonaldTrump* (blog), August 9, 2015. https://twitter.com/realDonaldTrump/status/630906211790102528.

———. "When Will the U.S. Stop Sending $'s to Our Enemies, i.e. Mexico and Others." Tweet. @*realDonaldTrump* (blog), July 4, 2014. https://twitter.com/realDonaldTrump/status/487316463204986880.

———. "@YoungYoung54: @JeriHyatt @megynkelly @JebBush So True. Jeb Bush Is Crazy, Who Cares That He Speaks Mexican, This Is America, English !!" Tweet. @*realdonaldtrump* (blog), August 11, 2015. https://twitter.com/realdonaldtrump/status/635998754546548737?lang=en.

Trump, Donald J., Senator Tom Cotton, and Senator David Perdue. "Remarks by President Trump, Senator Tom Cotton, and Senator David Perdue on the RAISE Act and Green Card Reform." August 2, 2017. https://www.whitehouse.gov/the-press-office/2017/08/02/remarks-president-trump-senator-tom-cotton-and-senator-david-perdue.

"Understanding the Potential Impact of Executive Action on Immigration Enforcement." migrationpolicy.org, July 13, 2015. https://www.migrationpolicy.org/research/understanding-potential-impact-executive-action-immigration-enforcement.

Vozzella, Laura, and Fenit Nirappil. "Virginia Republican's Ad Ties Opponent to MS-13. Democrats Compare It to 'Willie Horton.'" *Washington Post*, September 22, 2017, sec. Virginia Politics. https://www.washingtonpost.com/local/virginia-politics/virginia-republicans-ad-ties-opponent-to-ms-13-democrats-compare-it-to-willie-horton/2017/09/20/28d673bc-9e49-11e7-8ea1-ed975285475e_story.html.

Waldman, Katy. "Trump's Tower of Babble." *Slate*, November 2, 2016. http://www.slate.com/articles/news_and_politics/politics/2016/11/how_donald_trump_uses_language_and_why_we_can_t_stop_listening.html.

Weiner, Rachel. "Arizona Recall: Why Russell Pearce Lost." *Washington Post* (blog), November 9, 2011. https://www.washingtonpost.com/blogs/the-fix/post/arizona-recall-why-russell-pearce-lost/2011/11/09/gIQALj6a5M_blog.html.

Weintraub, Daniel M. "Wilson Sues U.S. Over Immigrants' 'Invasion' : Politics: Governor Calls on Federal Government to Reimburse the State for the Costs of Educating Undocumented Children. Legal Experts Say the Claim Has Almost No Chance of Succeeding." *Los Angeles Times*, September 23, 1994. http://articles.latimes.com/1994-09-23/news/mn-42037_1_illegal-immigrants.

Winant, Howard. *Racial Conditions: Politics, Theory, Comparisons*. Minneapolis: University of Minnesota Press, 1994.

Zepeda-Millán, Chris. *Latino Mass Mobilization: Immigration, Racialization, and Activism*. New York: Cambridge University Press, 2017.

# EXHIBIT 39

JUSTICE NEWS

**Attorney General Sessions Delivers Remarks on DACA**

Washington, DC ~ Tuesday, September 5, 2017

---

**Remarks as prepared for delivery**

Good morning. I am here today to announce that the program known as DACA that was effectuated under the Obama Administration is being rescinded.

The DACA program was implemented in 2012 and essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program, to 800,000 mostly-adult illegal aliens.

This policy was implemented unilaterally to great controversy and legal concern after Congress rejected legislative proposals to extend similar benefits on numerous occasions to this same group of illegal aliens.

In other words, the executive branch, through DACA, deliberately sought to achieve what the legislative branch specifically refused to authorize on multiple occasions. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens.

We inherited from our Founders—and have advanced—an unsurpassed legal heritage, which is the foundation of our freedom, safety, and prosperity.

As the Attorney General, it is my duty to ensure that the laws of the United States are enforced and that the Constitutional order is upheld.

No greater good can be done for the overall health and well-being of our Republic, than preserving and strengthening the impartial rule of law. Societies where the rule of law is treasured are societies that tend to flourish and succeed.

Societies where the rule of law is subject to political whims and personal biases tend to become societies afflicted by corruption, poverty, and human suffering.

To have a lawful system of immigration that serves the national interest, we cannot admit everyone who would like to come here. That is an open border policy and the American people have rightly rejected it.

Therefore, the nation must set and enforce a limit on how many immigrants we admit each year and that means all can not be accepted.

This does not mean they are bad people or that our nation disrespects or demeans them in any way. It means we are properly enforcing our laws as Congress has passed them.

It is with these principles and duties in mind, and in light of imminent litigation, that we reviewed the Obama Administration's DACA policy.

Our collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program, which was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit.

The Fifth Circuit specifically concluded that DACA had not been implemented in a fashion that allowed sufficient discretion, and that DAPA was "foreclosed by Congress's careful plan."

In other words, it was inconsistent with the Constitution's separation of powers. That decision was affirmed by the Supreme Court by an equally divided vote.

If we were to keep the Obama Administration's executive amnesty policy, the likeliest outcome is that it would be enjoined just as was DAPA. The Department of Justice has advised the President and the Department of Homeland Security that DHS should begin an orderly, lawful wind down, including the cancellation of the memo that authorized this program.

Acting Secretary Duke has chosen, appropriately, to initiate a wind down process. This will enable DHS to conduct an orderly change and fulfill the desire of this administration to create a time period for Congress to act—should it so choose. We firmly believe this is the responsible path.

Simply put, if we are to further our goal of strengthening the constitutional order and the rule of law in America, the Department of Justice cannot defend this type of overreach.

George Washington University Law School Professor Jonathan Turley in testimony before the House Judiciary Committee was clear about the enormous constitutional infirmities raised by these policies.

He said: "In ordering this blanket exception, President Obama was nullifying part of a law that he simply disagreed with.....If a president can claim sweeping discretion to suspend key federal laws, the entire legislative process becomes little more than a pretense…The circumvention of the legislative process not only undermines the authority of this branch but destabilizes the tripartite system as a whole."

Ending the previous Administration's disrespect for the legislative process is an important first step. All immigration policies should serve the interests of the people of the United States—lawful immigrant and native born alike.

Congress should carefully and thoughtfully pursue the types of reforms that are right for the American people. Our nation is comprised of good and decent people who want their government's leaders to fulfill their promises and advance an immigration policy that serves the national interest.

We are a people of compassion and we are a people of law. But there is nothing compassionate about the failure to enforce immigration laws.

Enforcing the law saves lives, protects communities and taxpayers, and prevents human suffering. Failure to enforce the laws in the past has put our nation at risk of crime, violence and even terrorism.

The compassionate thing is to end the lawlessness, enforce our laws, and, if Congress chooses to make changes to those laws, to do so through the process set forth

by our Founders in a way that advances the interest of the nation.

That is what the President has promised to do and has delivered to the American people.

Under President Trump's leadership, this administration has made great progress in the last few months toward establishing a lawful and constitutional immigration system. This makes us safer and more secure.

It will further economically the lives of millions who are struggling. And it will enable our country to more effectively teach new immigrants about our system of government and assimilate them to the cultural understandings that support it.

The substantial progress in reducing illegal immigration at our border seen in recent months is almost entirely the product of the leadership of President Trump and his inspired federal immigration officers. But the problem is not solved. And without more action, we could see illegality rise again rather than be eliminated.

As a candidate, and now in office, President Trump has offered specific ideas and legislative solutions that will protect American workers, increase wages and salaries, defend our national security, ensure the public safety, and increase the general well-being of the American people.

He has worked closely with many members of Congress, including in the introduction of the RAISE Act, which would produce enormous benefits for our country. This is how our democratic process works.

There are many powerful interest groups in this country and every one of them has a constitutional right to advocate their views and represent whomever they choose.

But the Department of Justice does not represent any narrow interest or any subset of the American people. We represent all of the American people and protect the integrity of our Constitution. That is our charge.

We at Department of Justice are proud and honored to work to advance this vision for America and to do our best each day to ensure the safety and security of the American people.

Thank you.

---

**Speaker:**
Attorney General Jeff Sessions

**Topic(s):**
Immigration

**Attachment(s):**
Download ag_letter_re_daca.pdf

**Component(s):**
Office of the Attorney General

*Updated September 5, 2017*

# EXHIBIT 40



*State of California*

# Office of the Attorney General

XAVIER BECERRA
ATTORNEY GENERAL

July 21, 2017

The Honorable Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Avenue, N.W.
Washington, DC 20500

RE:     June 29, 2017 letter from Ken Paxton re *Texas, et al., v. United States, et al.*,
        Case No. 1:14-cv-00254 (S.D. Tex.)

Dear Mr. President:

        We write to urge you to maintain and defend the Deferred Action for Childhood
Arrivals program, or DACA, which represents a success story for the more than three-
quarters of a million "Dreamers" who are currently registered for it.  It has also been a
boon to the communities, universities, and employers with which these Dreamers are
connected, and for the American economy as a whole.

        Since 2012, nearly 800,000 young immigrants who were brought to this country
as children have been granted DACA after completing applications, submitting to and
passing a background check, and applying for a work permit.  In the case of young adults
granted DACA, they are among our newest soldiers, college graduates, nurses and first
responders.  They are our neighbors, coworkers, students and community and church
leaders.  And they are boosting the economies and communities of our states every day.
In fact, receiving DACA has increased recipients' hourly wages by an average of 42
percent[1] and given them the purchasing power to buy homes, cars and other goods and
services, which drives economic growth for all.[2]

        In addition to strengthening our states and country, DACA gives these bright,
driven young people the peace of mind and stability to earn a college degree and to seek
employment that matches their education and training.  The protection afforded by

---

        [1] Tom Wong, et al., Center for American Progress, *New Study of DACA Beneficiaries Shows
Positive Economic and Educational Outcomes* (Oct. 18, 2016),
https://www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-
beneficiaries-shows-positive-economic-and-educational-outcomes/ (last visited July 17, 2017).
        [2] *See, e.g.*, United We Dream, *New National Survey of DACA Recipients: Proof That Executive
Action Works* (Oct. 18, 2016), https://unitedwedream.org/press-releases/new-national-survey-of-daca-
recipients-proof-that-executive-action-works/ (last visited July 10, 2017) (finding that 95 percent of DACA
beneficiaries are working, and that 54 percent bought their first car and 12 percent bought their first home
after receiving DACA).

President Donald J. Trump
July 21, 2017
Page 2

DACA gives them dignity and the ability to fully pursue the American dream.  For many, the United States is the only country they have ever known.

The consequences of rescinding DACA would be severe, not just for the hundreds of thousands of young people who rely on the program—and for their employers, schools, universities, and families—but for the country's economy as a whole.  For example, in addition to lost tax revenue, American businesses would face billions in turnover costs, as employers would lose qualified workers whom they have trained and in whom they have invested.[3]  And as the chief law officers of our respective states, we strongly believe that DACA has made our communities safer, enabling these young people to report crimes to police without fear of deportation.

You have repeatedly expressed your support for Dreamers.  Today, we join together to urge you not to capitulate to the demands Texas and nine other states set forth in their June 29, 2017, letter to Attorney General Jeff Sessions.  That letter demands, under threat of litigation, that your Administration end the DACA initiative.  The arguments set forth in that letter are wrong as a matter of law and policy.

There is broad consensus that the young people who qualify for DACA should not be prioritized for deportation.  DACA is consistent with a long pattern of presidential exercises of prosecutorial discretion that targeted resources in a constitutional manner.  Indeed, as Justice Antonin Scalia recognized in a 1999 opinion, the Executive has a long history of "engaging in a regular practice . . . of exercising [deferred action] for humanitarian reasons or simply for its own convenience."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999). DACA sensibly guides immigration officials' exercise of their enforcement discretion and reserves limited resources to address individuals who threaten our communities, not those who contribute greatly to them.

Challenges have been brought against the original DACA program, including in the Fifth Circuit, but none have succeeded.  On the other hand, in a case relating to Arizona's efforts to deny drivers' licenses to DACA recipients, the Ninth Circuit stated that it is "well settled that the [DHS] Secretary can exercise deferred action." *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 967-968 (9th Cir. 2017).  The court also observed that "several prior administrations have adopted programs, like DACA, to prioritize which noncitizens to remove."  *Id.* at 976.[4]

As the Fifth Circuit was careful to point out in its ruling in the *Texas* case, the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")

---

[3] Jose Magaña-Salgado, Immigrant Legal Resource Center, *Money on the Table: The Economic Cost of Ending DACA* (Dec. 2016), https://www.ilrc.org/sites/default/files/resources/2016-12-13_ilrc_report_-_money_on_the_table_economic_costs_of_ending_daca.pdf (last visited July 17, 2017).

[4] In another opinion relating to the Arizona law, while deciding the appeal before it on other grounds, the Ninth Circuit stated that given the "broad discretion" that Congress gave to the executive branch "to determine when noncitizens may work in the United States," the President's decision to authorize (indeed, strongly encourage) DACA recipients to work was legally supported.  *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014).

President Donald J. Trump
July 21, 2017
Page 3

initiative that was struck down is "similar" but "not identical" to DACA. *Texas v. United States*, 809 F.3d 134, 174 (5th Cir. 2015). Indeed, as DHS Secretary Kelly pointed out in a press conference the day after his June 15 memorandum explaining that DACA would continue, DACA and DAPA are "two separate issues," appropriately noting the different populations addressed by each program. Notably, only a fraction of the 25 states which joined with Texas in the DAPA case before the Supreme Court chose to co-sign the letter threatening to challenge DACA.

Among other significant differences, DACA has been operative since 2012 while DAPA never went into effect. More than three-quarters of a million young people, and their employers, among others, have concretely benefitted from DACA, for up to five years. The interests of these young people in continuing to participate in DACA and retain the benefits that flow from DACA raise particular concerns not implicated in the pre-implementation challenge to DAPA. Further, the Fifth Circuit placed legal significance on the "economic and political magnitude" of the large number of immigrants who were affected by DAPA, *Texas*, 809 F.3d at 181; thus, it is notable that many fewer people have received DACA (about 800,000) than would have been eligible for DAPA (up to 4.3 million).

One additional, but related, issue concerns DHS's current practices regarding DACA recipients. A number of troubling incidents in recent months raise serious concerns over whether DHS agents are adhering to DACA guidelines and your repeated public assurances that DACA-eligible individuals are not targets for arrest and deportation. We urge you to ensure compliance with DACA and consistent enforcement practices towards Dreamers.

Mr. President, now is the time to affirm the commitment you made, both to the "incredible kids" who benefit from DACA and to their families and our communities, to handle this issue "with heart." You said Dreamers should "rest easy." We urge you to affirm America's values and tradition as a nation of immigrants and make clear that you will not only continue DACA, but that you will defend it. The cost of not doing so would be too high for America, the economy, and for these young people. For these reasons, we urge you to maintain and defend DACA, and we stand in support of the effort to defend DACA by all appropriate means.

                                        Sincerely,


XAVIER BECERRA                          GEORGE JEPSEN
California Attorney General             Connecticut Attorney General


MATTHEW DENN                            KARL A. RACINE
Delaware Attorney General               District of Columbia Attorney General

President Donald J. Trump
July 21, 2017
Page 4

DOUGLAS S. CHIN
Hawaii Attorney General

LISA MADIGAN
Illinois Attorney General

TOM MILLER
Iowa Attorney General

JANET T. MILLS
Maine Attorney General

BRIAN FROSH
Maryland Attorney General

MAURA HEALEY
Massachusetts Attorney General

LORI SWANSON
Minnesota Attorney General

HECTOR BALDERAS
New Mexico Attorney General

ERIC T. SCHNEIDERMAN
New York Attorney General

JOSH STEIN
North Carolina Attorney General

ELLEN F. ROSENBLUM
Oregon Attorney General

JOSH SHAPIRO
Pennsylvania Attorney General

PETER F. KILMARTIN
Rhode Island Attorney General

TJ DONOVAN
Vermont Attorney General

MARK HERRING
Virginia Attorney General

BOB FERGUSON
Washington State Attorney General

cc:    The Honorable John F. Kelly, Secretary of Homeland Security
       The Honorable Jeff Sessions, Attorney General of the United States

# EXHIBIT 41

U.S. Citizenship and
Immigration Services

# Frequently Asked Questions

*FAQs updated April 25, 2017*

**General Information for All Requestors**

- **What is Deferred Action for Childhood Arrivals?**
- **DACA Process**
- **Background Checks**
- **After USCIS Makes a Decision**

**Initial Requests for DACA**
**Renewal of DACA**
**Travel**
**Criminal Convictions**
**Miscellaneous**

## I. General Information for All Requestors

**A. What is Deferred Action for Childhood Arrivals?**

As the Department of Homeland Security (DHS) continues to focus its enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety, DHS will exercise prosecutorial discretion as appropriate to ensure that enforcement resources are not expended on low priority cases, such as individuals who came to the United States as children and meet other key guidelines. Individuals who demonstrate that they meet the guidelines below may request consideration of deferred action for childhood arrivals (DACA) for a period of two years, subject to renewal for a period of two years, and may be eligible for employment authorization.

You may request consideration of DACA if you:

1. Were under the age of 31 as of June 15, 2012;
2. Came to the United States before reaching your 16th birthday;
3. Have continuously resided in the United States since June 15, 2007, up to the present time;
4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;
5. Had no lawful status on June 15, 2012, meaning that:

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 185 of 275 PageID #: 5733

- You never had a lawful immigration status on or before June 15, 2012, or
- Any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, a significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

**Individuals can call U.S. Citizenship and Immigration Services (USCIS) at 1-800-375-5283 with questions or to request more information on DACA.** Those with pending requests can also use a number of online self-help tools which include the ability to check case status and processing times, change your address, and send an inquiry about a case pending longer than posted processing times or non-delivery of a card or document.

**Q1: What is deferred action?**
A1: Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon **unlawful presence**, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer **lawful status** upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence.

Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment." DHS can terminate or renew deferred action at any time, at the agency's discretion.

**Q2: What is DACA?**
A2: On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of two years, subject to renewal, and would then be eligible for work authorization.

Individuals who can demonstrate through verifiable documentation that they meet these guidelines will be considered for deferred action. Determinations will be made on a case-by-case basis under the DACA guidelines.

**Q3: Is there any difference between "deferred action" and DACA under this process?**
A3: DACA is one form of deferred action. The relief an individual receives under DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.

**Q4: If my removal is deferred under the consideration of DACA, am I eligible for employment authorization?**
A4: Yes. Under existing regulations, if your case is deferred, you may obtain employment authorization from USCIS provided you can demonstrate an economic necessity for employment.

**Q5: If my case is deferred, am I in lawful status for the period of deferral?**
A5: No. Although action on your case has been deferred and you do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status.

The fact that you are not accruing unlawful presence does not change whether you are in lawful status while you remain in the United States. However, although deferred action does not confer a lawful immigration status, your period of stay is

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 186 of 275 PageID #: 5734

authorized by the Department of Homeland Security while your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time. **Individuals granted deferred action are not precluded by federal law from establishing domicile in the U.S.**

Apart from the immigration laws, "lawful presence," "lawful status" and similar terms are used in various other federal and state laws. For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state or local authorities.

**Q6: Can I renew my period of deferred action and employment authorization under DACA?**
A6: Yes. You may request consideration for a renewal of your DACA. Your request for a renewal will be considered on a case-by-case basis. If USCIS renews its exercise of discretion under DACA for your case, you will receive deferred action for another two years, and if you demonstrate an economic necessity for employment, you may receive employment authorization throughout that period.

Return to top.

**B. DACA Process**

**Q7: How do I request consideration of DACA?**
A7: To request consideration of DACA (either as an initial request or to request a renewal), you must submit Form I-821D, Consideration of Deferred Action for Childhood Arrivals to USCIS. Please visit uscis.gov/i-821d before you begin the process to make sure you are using the most current version of the form available. This form must be completed, properly signed and accompanied by a Form I-765, Application for Employment Authorization, and a Form I-765WS, Worksheet (PDF, 235 KB), establishing your economic need for employment. If you fail to submit a completed Form I-765 (along with the accompanying filing fees for that form, please see the Form I-821D page for more information), USCIS will not consider your request for deferred action. Please read the form instructions to ensure that you answer the appropriate questions (determined by whether you are submitting an initial or renewal request) and that you submit all the required documentation to support your initial request.

You must file your request for consideration of DACA at the USCIS Lockbox. You can find the mailing address and instructions at www.uscis.gov/i-821d. As of June 5, 2014, requestors must use the new version of the form.  After your Form I-821D, Form I-765, and Form I-765 Worksheet have been received, USCIS will review them for completeness, including submission of the required fee, initial evidence and supporting documents (for initial filings).

If it is determined that the request is complete, USCIS will send you a receipt notice. USCIS will then send you an appointment notice to visit an Application Support Center (ASC) for biometric services, if an appointment is required. Please make sure you read and follow the directions in the notice. Failure to attend your biometrics appointment may delay processing of your request for consideration of deferred action, or may result in a denial of your request. You may also choose to receive an email and/or text message notifying you that your form has been accepted by completing a Form G-1145, E-Notification of Application/Petition Acceptance.

Each request for consideration of DACA will be reviewed on an individual, case-by-case basis. USCIS may request more information or evidence from you, or request that you appear at a USCIS office. USCIS will notify you of its determination in writing.

**Note:** All individuals who believe they meet the guidelines, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS through this process. Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their deportation

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 187 of 275 PageID #: 5735

officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information visit ICE's website at www.ice.gov/daca.

**Q8: Can I obtain a fee waiver or fee exemption for this process?**
A8: There are no fee waivers available for employment authorization applications connected to DACA. There are very limited fee exemptions available. Requests for fee exemptions must be filed and favorably adjudicated before an individual files his/her request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must submit a letter and supporting documentation to USCIS demonstrating that you meet one of the following conditions:

- You are under 18 years of age, have an income that is less than 150 percent of the U.S. poverty level, and are in foster care or otherwise lacking any parental or other familial support; or

- You are under 18 years of age and homeless; or

- You cannot care for yourself because you suffer from a serious, chronic disability and your income is less than 150 percent of the U.S. poverty level; or,

- You have, at the time of the request, accumulated **$10,000** or more in debt in the past 12 months as a result of unreimbursed medical expenses for yourself or an immediate family member, and your income is less than 150 percent of the U.S. poverty level.

You can find additional information on our Fee Exemption Guidance Web page. Your request must be submitted and decided before you submit a request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must provide documentary evidence to demonstrate that you meet any of the above conditions at the time that you make the request. For evidence, USCIS will:

- Accept affidavits from community-based or religious organizations to establish a requestor's homelessness or lack of parental or other familial financial support.

- Accept copies of tax returns, bank statement, pay stubs, or other reliable evidence of income level. Evidence can also include an affidavit from the applicant or a responsible third party attesting that the applicant does not file tax returns, has no bank accounts, and/or has no income to prove income level.

- Accept copies of medical records, insurance records, bank statements, or other reliable evidence of unreimbursed medical expenses of at least $**10,000.**

- Address factual questions through Requests for Evidence (RFEs).

**Q9: If individuals meet the guidelines for consideration of DACA and are encountered by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE), will they be placed into removal proceedings?**
A9: DACA is intended, in part, to allow CBP and ICE to focus on priority cases. Under the direction of the Secretary of Homeland Security, if an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended, placed into removal proceedings, or removed. If individuals believe that, in light of this policy, they should not have been apprehended or placed into removal proceedings, contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q10: Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?**
A10: This process is open to any individual who can demonstrate he or she meets the guidelines for consideration, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention).

**Q11: If I am not in removal proceedings but believe I meet the guidelines for consideration of DACA, should I seek to place myself into removal proceedings through encounters with CBP or ICE?**

A11: No. If you are not in removal proceedings but believe that you meet the guidelines, you should submit your DACA request to USCIS under the process outlined below.

**Q12: Can I request consideration of DACA from USCIS if I am in immigration detention under the custody of ICE?**
A12: No. If you are currently in immigration detention, you may not request consideration of DACA from USCIS. If you think you may meet the guidelines of this process, you should identify yourself to your deportation officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information, visit ICE's website at www.ice.gov/daca.

**Q13: If I am about to be removed by ICE and believe that I meet the guidelines for consideration of DACA, what steps should I take to seek review of my case before removal?**
A13: If you believe you can demonstrate that you meet the guidelines and are about to be removed, you should immediately contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q14: What should I do if I meet the guidelines of this process and have been issued an ICE detainer following an arrest by a state or local law enforcement officer?**
A14: If you meet the guidelines and have been served a detainer, you should immediately contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q15: If I accepted an offer of administrative closure under the case-by-case review process or my case was terminated as part of the case-by-case review process, can I be considered for deferred action under this process?**
A15: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you have accepted an offer of administrative closure or termination under the case-by-case review process.

**Q16: If I declined an offer of administrative closure under the case-by-case review process, can I be considered for deferred action under this process?**
A16: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you declined an offer of administrative closure under the case-by-case review process.

**Q17: If my case was reviewed as part of the case-by-case review process but I was not offered administrative closure, can I be considered for deferred action under this process?**
A17: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you were not offered administrative closure following review of your case as part of the case-by-case review process.

**Q18: Can I request consideration of DACA under this process if I am currently in a nonimmigrant status (e.g. F-1, E-2, H-4) or have Temporary Protected Status (TPS)?**
A18: No. You can only request consideration of DACA under this process if you currently have no immigration status and were not in any lawful status on June 15, 2012.

**Q19: Will the information I share in my request for consideration of DACA be used for immigration enforcement purposes?**
A19: Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any

administrative, civil, or criminal matter.

**Q20: If my case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?**

A20: If your case is referred to ICE for purposes of immigration enforcement or you receive an NTA, information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians. However, that information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

**Q21: Will USCIS verify documents or statements that I provide in support of a request for DACA?**

A21: USCIS has the authority to verify documents, facts, and statements that are provided in support of requests for DACA. USCIS may contact education institutions, other government agencies, employers, or other entities in order to verify information.

[Return to top.](#)

## C. Background Checks

**Q22: Will USCIS conduct a background check when reviewing my request for consideration of DACA?**
A22: Yes. You must undergo biographic and biometric background checks before USCIS will consider your DACA request.

**Q23: What do background checks involve?**
A23: Background checks involve checking biographic and biometric information provided by the individuals against a variety of databases maintained by DHS and other federal government agencies.

**Q24: What steps will USCIS and ICE take if I engage in fraud through the new process?**
A24: If you knowingly make a misrepresentation, or knowingly fail to disclose facts, in an effort to obtain DACA or work authorization through this process, you will be treated as an immigration enforcement priority to the fullest extent permitted by law, and be subject to criminal prosecution and/or removal from the United States.

[Return to top.](#)

## D. After USCIS Makes a Decision

**Q25: Can I appeal USCIS' determination?**
A25: No. You cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies your request for consideration of DACA.

You may request a review of your I-821D denial by contacting USCIS' National Customer Service Center at 1-800-375-5283 to have a service request created if you believe that you actually did meet all of the DACA guidelines and you believe that your request was denied because USCIS:

- Denied the request based on abandonment, when you actually responded to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) within the prescribed time;

- Mailed the RFE or NOID to the wrong address although you had changed your address online at www.uscis.gov **or** with a customer service representative on the phone and submitted a Form AR-11, Change of Address, before USCIS issued the RFE or NOID.
  - To ensure the address is updated on a pending case as quickly as possible, we recommend that customers submit a change of address request at www.uscis.gov/addresschange.  Please note that only an online change of address or a Form AR-11 submission will satisfy the legal requirements for notifying the agency of an address change. Therefore, if you called a customer service representative to change your address, please be sure you have also submitted your address change online or with a Form AR-11.
- Denied the request on the grounds that you did not come to the United States prior to your 16th birthday, but the evidence submitted at the time of filing shows that you did arrive before reaching that age.
- Denied the request on the grounds that you were under age 15 at the time of filing but not in removal proceedings, while the evidence submitted at the time of filing show that you indeed were in removal proceedings when the request was filed;
- Denied the request on the grounds that you were 31 or older as of June 15, 2012, but the evidence submitted at the time of filing shows that you were under the age of 31 as of June 15, 2012;
- Denied the request on the grounds that you had lawful status on June 15, 2012, but the evidence submitted at the time of filing shows that you indeed were in an unlawful immigration status on that date;
- Denied the request on the grounds that you were not physically present in the United States on June 15, 2012, and up through the date of filing, but the evidence submitted at the time of filing shows that you were, in fact, present;
- Denied the request due to your failure to appear at a USCIS Application Support Center (ASC) to have your biometrics collected, when you in fact either did appear at a USCIS ASC to have this done or requested prior to the scheduled date of your biometrics appointment to have the appointment rescheduled; or
- Denied the request because you did not pay the filing fees for Form I-765, Application for Employment Authorization, when you actually did pay these fees

If you believe your request was denied due to any of these administrative errors, you may contact our National Customer Service Center at 1-800-375-5283 or 1-800-767-1833 (TDD for the hearing impaired). Customer service officers are available Monday – Friday from 8 a.m. – 6 p.m. in each U.S. time zone.

**Q26: If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?**

A26: If you have submitted a request for consideration of DACA and USCIS decides not to defer action in your case, USCIS will apply its policy guidance governing the referral of cases to ICE and the issuance of Notices to Appear (NTA). If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, your case will not be referred to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances. For more detailed information on the applicable NTA policy, visit www.uscis.gov/NTA. If after a review of the totality of circumstances USCIS determines to defer action in your case, USCIS will likewise exercise its discretion and will not issue you an NTA.

**Q27: Can my deferred action under the DACA process be terminated  before it expires?**

A27: Yes.

 DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.

Return to top.

## II. Initial Requests for DACA

**Q28: What guidelines must I meet to be considered for deferred action for childhood arrivals (DACA)?**

A28: Under the Secretary of Homeland Security's June 15, 2012 memorandum, in order to be considered for DACA, you must submit evidence, including supporting documents, showing that you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA. U.S. Citizenship and Immigration Services (USCIS) retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

**Q29: How old must I be in order to be considered for deferred action under this process?**

A29:

- If you have never been in removal proceedings, or your proceedings have been terminated before your request for consideration of DACA, you must be at least 15 years of age or older at the time of filing and meet the other guidelines.

- If you are in removal proceedings, have a final removal order, or have a voluntary departure order, and are not in immigration detention, you can request consideration of DACA even if you are under the age of 15 at the time of filing and meet the other guidelines.

- In all instances, you must have been under the age of 31 as of June 15, 2012, to be considered for DACA.

**Q30: I first came to the United States before I turned 16 years old and have been continuously residing in the United States since at least June 15, 2007. Before I turned 16 years old, however, I left the United States for some period of time before returning and beginning my current period of continuous residence. May I be considered for deferred action under this process?**

A30: Yes, but only if you established residence in the United States during the period before you turned 16 years old, as evidenced, for example, by records showing you attended school or worked in the United States during that time, or that you lived in the United States for multiple years during that time. In addition to establishing that you initially resided in the United States before you turned 16 years old, you must also have maintained continuous residence in the United States from June 15, 2007, until the present time to be considered for deferred action under this process.

**Q31: To prove my continuous residence in the United States since June 15, 2007, must I provide evidence documenting my presence for every day, or every month, of that period?**

A31: To meet the continuous residence guideline, you must submit documentation that shows you have been living in the United States from June 15, 2007, up until the time of your request. You should provide documentation to account for as much of the period as reasonably possible, but there is no requirement that every day or month of that period be specifically accounted for through direct evidence.

It is helpful to USCIS if you can submit evidence of your residence during at least each year of the period. USCIS will review the documentation in its totality to determine whether it is more likely than not that you were continuously residing in the United States for the period since June 15, 2007. Gaps in the documentation as to certain periods may raise doubts as to your continued residence if, for example, the gaps are lengthy or the record otherwise indicates that you may have been outside the United States for a period of time that was not brief, casual or innocent.

If gaps in your documentation raise questions, USCIS may issue a Request for Evidence to allow you to submit additional documentation that supports your claimed continuous residence.

Affidavits may be submitted to explain a gap in the documentation demonstrating that you meet the five-year continuous residence requirement. If you submit affidavits related to the continuous residence requirement, you must submit two or more affidavits, sworn to or affirmed by people other than yourself who have direct personal knowledge of the events and circumstances during the period as to which there is a gap in the documentation. Affidavits may only be used to explain gaps in your continuous residence; they cannot be used as evidence that you meet the entire five-year continuous residence requirement.

**Q32: Does "currently in school" refer to the date on which the request for consideration of deferred action is filed?**
A32: To be considered "currently in school" under the guidelines, you must be enrolled in school on the date you submit a request for consideration of deferred action under this process.

**Q33: Who is considered to be "currently in school" under the guidelines?**
A33: To be considered "currently in school" under the guidelines, you must be enrolled in:

- a public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets state requirements;

- an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; or

- an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other state-authorized exam (e.g., HiSet or TASC) in the United States.

Such education, literacy, career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under state law, or in passing a GED exam or other state-authorized exam in the United States, include, but are not limited to, programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations. Programs funded by other sources may qualify if they are programs of demonstrated effectiveness.

In assessing whether such programs not funded in whole or in part by federal, state, county or municipal grants or administered by non-profit organizations are of demonstrated effectiveness, USCIS will consider the duration of the program's existence; the program's track record in assisting students in obtaining a regular high school diploma or its recognized equivalent, in passing a GED or other state-authorized exam (e.g., HiSet or TASC), or in placing students in postsecondary education, job training, or employment; and other indicators of the program's overall quality. For individuals seeking to demonstrate that they are "currently in school" through enrollment in such a program, the burden is on the requestor to show the program's demonstrated effectiveness.

**Q34: How do I establish that I am currently in school?**

A34: Documentation sufficient for you to demonstrate that you are currently in school may include, but is not limited to:

- evidence that you are enrolled in a public, private, or charter elementary school, junior high or middle school, high school or secondary school; alternative program, or homeschool program that meets state requirements; or

- evidence that you are enrolled in an education, literacy, or career training program (including vocational training) that:
  - has a purpose of improving literacy, mathematics, or English, or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; and
  - is funded, in whole or in part, by federal, state, county or municipal grants or is administered by non-profit organizations, or if funded by other sources, is a program of demonstrated effectiveness; or

- evidence that you are enrolled in an education program assisting students in obtaining a high school equivalency diploma or certificate recognized under state law (such as by passing a GED exam or other such state-authorized exam [for example, HiSet or TASC]), and that the program is funded in whole or in part by federal, state, county or municipal grants or is administered by non-profit organizations or if funded by other sources, is of demonstrated effectiveness.

Such evidence of enrollment may include: acceptance letters, school registration cards, letters from a school or program, transcripts, report cards, or progress reports which may show the name of the school or program, date of enrollment, and current educational or grade level, if relevant.

## Q35: What documentation may be sufficient to demonstrate that I have graduated from high school?

A35: Documentation sufficient for you to demonstrate that you have graduated from high school may include, but is not limited to, a high school diploma from a public or private high school or secondary school, a certificate of completion, a certificate of attendance, or an alternate award from a public or private high school or secondary school, or a recognized equivalent of a high school diploma under state law, or a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC) in the United States.

## Q36: What documentation may be sufficient to demonstrate that I have obtained a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC)?

A36: Documentation may include, but is not limited to, evidence that you have passed a GED exam, or other state-authorized exam (e.g., HiSet or TASC), and, as a result, have received the recognized equivalent of a regular high school diploma under state law.

## Q37: If I am enrolled in a literacy or career training program, can I meet the guidelines?

A37: Yes, in certain circumstances. You may meet the guidelines if you are enrolled in an education, literacy, or career training program that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement. Such programs include, but are not limited to, programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations, or if funded by other sources, are programs of demonstrated effectiveness.

## Q38: If I am enrolled in an English as a Second Language (ESL) program, can I meet the guidelines?

A38: Yes, in certain circumstances. Enrollment in an ESL program may be used to meet the guidelines if the ESL program is funded in whole or in part by federal, state, county or municipal grants, or administered by non-profit organizations, or if funded by other sources is a  program of demonstrated effectiveness. You must submit direct documentary evidence that the program is funded in whole or part by federal, state, county or municipal grants, administered by a non-profit organization, or of demonstrated effectiveness.

## Q39: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met the education guidelines?

A39: No. Evidence not listed in Chart #1 will not be accepted to establish that you are currently in school, have graduated or obtained a certificate of completion from high school, or have obtained a GED or passed another state-authorized exam

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 194 of 275 PageID #:
5742

(e.g., HiSet or TASC). You must submit any of the documentary evidence listed in Chart #1 to show that you meet the education guidelines.

**Q40: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met certain initial guidelines?**

A40: Evidence other than those documents listed in Chart #1 may be used to establish the following guidelines and factual showings if available documentary evidence is insufficient or lacking and shows that:

- You were physically present in the United States on June 15, 2012;

- You came to the United States before reaching your 16th birthday;

- You satisfy the continuous residence requirement, as long as you present direct evidence of your continued residence in the United States for a portion of the required period and the circumstantial evidence is used only to fill in gaps in the length of continuous residence demonstrated by the direct evidence; and

- Any travel outside the United States during the period of required continuous presence was brief, casual, and innocent.

However, USCIS will not accept evidence other than the documents listed in Chart #1 as proof of any of the following guidelines to demonstrate that you:

- Were under the age of 31 on June 15, 2012; and

- Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

For example, even if you do not have documentary proof of your presence in the United States on June 15, 2012, you may still be able to satisfy the guideline. You may do so by submitting credible documentary evidence that you were present in the United States shortly before and shortly after June 15, 2012, which, under the facts presented, may give rise to an inference of your presence on June 15, 2012 as well. However, evidence other than that listed in Chart #1 will not be accepted to establish that you have graduated high school. You must submit the designated documentary evidence to satisfy that you meet this guideline.

Chart #1 provides examples of documentation you may submit to demonstrate you meet the initial guidelines for consideration of deferred action under this process. Please see the instructions of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for additional details of acceptable documentation.

| **Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines** | |
|---|---|
| Proof of identity | <ul><li>Passport or national identity document from your country of origin</li><li>Birth certificate with photo identification</li><li>School or military ID with photo</li><li>Any U.S. government immigration or other document bearing your name and photo</li></ul> |
| Proof you came to U.S. before your 16th birthday | <ul><li>Passport with admission stamp</li><li>Form I-94/I-95/I-94W</li></ul> |

| | |
|---|---|
| | • School records from the U.S. schools you have attended |
| | • Any Immigration and Naturalization Service or DHS document stating your date of entry (Form I-862, Notice to Appear) |
| | • Travel records |
| | • Hospital or medical records |
| | • Rent receipts or utility bills |
| | • Employment records (pay stubs, W-2 Forms, etc.) |
| | • Official records from a religious entity confirming participation in a religious ceremony |
| | • Copies of money order receipts for money sent in or out of the country |
| | • Birth certificates of children born in the U.S. |
| | • Dated bank transactions |
| | • Automobile license receipts or registration |
| | • Deeds, mortgages, rental agreement contracts |
| | • Tax receipts, insurance policies |
| Proof of immigration status | • Form I-94/I-95/I-94W with authorized stay expiration date |
| | • Final order of exclusion, deportation, or removal issued as of June 15, 2012 |
| | • A charging document placing you into removal proceedings |
| Proof of presence in U.S. on June 15, 2012 | • Rent receipts or utility bills |
| | • Employment records (pay stubs, W-2 Forms, etc.) |
| | • School records (letters, report cards, etc.) |
| Proof you continuously resided in U.S. since June 15, 2007 | • Military records (Form DD-214 or NGB Form 22) |
| | • Official records from a religious entity confirming participation in a religious ceremony |
| | • Copies of money order receipts for money sent in or out of the country |
| | • Passport entries |
| | • Birth certificates of children born in the U.S. |
| | • Dated bank transactions |
| | • Automobile license receipts or registration |
| | • Deeds, mortgages, rental agreement contracts |
| | • Tax receipts, insurance policies |
| Proof of your education status at the time of requesting consideration of DACA | • School records (transcripts, report cards, etc.) from the school that you are currently attending in the United States showing the name(s) of the school(s) and periods of school attendance and the current educational or grade level |

| | |
|---|---|
| | • U.S. high school diploma, certificate of completion, or other alternate award |
| | • High school equivalency diploma or certificate recognized under state law |
| | • Evidence that you passed a state-authorized exam, including the GED or other state-authorized exam (for example, HiSet or TASC) in the United States |
| Proof you are an honorably discharged veteran of the U.S. Armed Forces or the U.S. Coast Guard | • Form DD-214, Certificate of Release or Discharge from Active Duty |
| | • NGB Form 22, National Guard Report of Separation and Record of Service |
| | • Military personnel records |
| | • Military health records |

**Q41: May I file affidavits as proof that I meet the initial guidelines for consideration of DACA?**
A41: Affidavits generally will not be sufficient on their own to demonstrate that you meet the guidelines for USCIS to consider you for DACA. However, affidavits may be used to support meeting the following guidelines only if the documentary evidence available to you is insufficient or lacking:

- Demonstrating that you meet the five year continuous residence requirement; and
- Establishing that departures during the required period of continuous residence were brief, casual and innocent.

If you submit affidavits related to the above criteria, you must submit two or more affidavits, sworn to or affirmed by people other than yourself, who have direct personal knowledge of the events and circumstances. Should USCIS determine that the affidavits are insufficient to overcome the unavailability or the lack of documentary evidence with respect to either of these guidelines, it will issue a Request for Evidence, indicating that further evidence must be submitted to demonstrate that you meet these guidelines.

USCIS will not accept affidavits as proof of satisfying the following guidelines:

- You are currently in school, have graduated or obtained a certificate of completion or other alternate award from high school, have obtained a high school equivalency diploma or certificate (such as by passing the GED exam or other state-authorized exam [for example, HiSet or TASC]), or are an honorably discharged veteran from the Coast Guard or Armed Forces of the United States;
- You were physically present in the United States on June 15, 2012;
- You came to the United States before reaching your 16th birthday;
- You were under the age of 31 on June 15, 2012; and
- Your criminal history, if applicable.

If the only evidence you submit to demonstrate you meet any of the above guidelines is an affidavit, USCIS will issue a Request for Evidence, indicating that you have not demonstrated that you meet these guidelines and that you must do so in order to demonstrate that you meet that guideline.

**Q42: Will I be considered to be in unlawful status if I had an application for asylum or cancellation of removal pending before either USCIS or the Executive Office for Immigration Review (EOIR) on June 15, 2012?**
A42: Yes. If you had an application for asylum or cancellation of removal, or similar relief, pending before either USCIS or EOIR as of June 15, 2012, but had no lawful status, you may request consideration of DACA.

**Q43: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but violated my immigration status (e.g., by engaging in unauthorized employment, failing to report to my employer, or failing to pursue a full course of study) before June 15, 2012. May I be considered for deferred action under this process?**

A43: No, unless the Executive Office for Immigration Review terminated your status by issuing a final order of removal against you before June 15, 2012.

**Q44: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012 but "aged out" of my dependent nonimmigrant status as of June 15, 2012. May I be considered for deferred action under this process?**

A44: Yes. For purposes of satisfying the "had no lawful status on June 15, 2012," guideline alone, if you were admitted for "duration of status" or for a period of time that extended past June 14, 2012 but "aged out" of your dependent nonimmigrant status, on or before June 15, 2012, (meaning you turned 21 years old on or before June 15, 2012), you may be considered for deferred action under this process.

**Q45: I was admitted for "duration of status" but my status in SEVIS is listed as terminated on or before June 15, 2012. May I be considered for deferred action under this process?**

A45: Yes. For the purposes of satisfying the ""had no lawful status on June 15, 2012," guideline alone, if your status as of June 15, 2012, is listed as "terminated" in SEVIS, you may be considered for deferred action under this process.

**Q46: I am a Canadian citizen who was inspected by CBP but was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**

A46: In general, a Canadian citizen who was admitted as a visitor for business or pleasure and not issued an I-94, Arrival/Departure Record, (also known as a "non-controlled" Canadian nonimmigrant) is lawfully admitted for a period of six months. For that reason, unless there is evidence, including verifiable evidence provided by the individual, that he or she was specifically advised that his or her admission would be for a different length of time, the Department of Homeland Security (DHS) will consider for DACA purposes only, that the alien was lawfully admitted for a period of six months. Therefore, if DHS is able to verify from its records that your last non-controlled entry occurred on or before Dec. 14, 2011, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012 and you may be considered for deferred action under this process.

**Q47: I used my Border Crossing Card (BCC) to obtain admission to the United States and was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**

A47: Because the limitations on entry for a BCC holder vary based on location of admission and travel, DHS will assume that the BCC holder who was not provided an I-94 was admitted for the longest period legally possible—30 days—unless the individual can demonstrate, through verifiable evidence, that he or she was specifically advised that his or her admission would be for a different length of time. Accordingly, if DHS is able to verify from its records that your last admission was using a BCC, you were not issued an I-94 at the time of admission, and it occurred on or before May 14, 2012, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under this process.

**Q48: Do I accrue unlawful presence if I have a pending initial request for consideration of DACA?**

A48: You will continue to accrue unlawful presence while the request for consideration of DACA is pending unless you are under 18 years of age at the time of the request. If you are under 18 years of age at the time you submit your request, you will not accrue unlawful presence while the request is pending, even if you turn 18 while your request is pending with USCIS. If action on your case is deferred, you will not accrue unlawful presence during the period of deferred action. However, having action deferred on your case will not excuse previously accrued unlawful presence.

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 198 of 275 PageID #: 5746

Return to top.

## III. Renewal of DACA

**Q49: When should I file my renewal request with U.S. Citizenship and Immigration Services (USCIS)?**

A49: USCIS strongly encourages you to submit your Deferred Action for Childhood Arrivals (DACA) renewal request between 150 days and 120 days before the expiration date located on your current Form I-797 DACA approval notice and Employment Authorization Document (EAD). Filing during this window will minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request.

USCIS' current goal is to process DACA renewal requests within 120 days. You may submit an inquiry about the status of your renewal request after it has been pending more than 105 days. To submit an inquiry online, please visit egov.uscis.gov/e-request.

- **Please Note:** Factors that may affect the timely processing of your DACA renewal request include, but are not limited to:
  - Failure to appear at an Application Support Center (ASC) for a scheduled biometrics appointment to obtain fingerprints and photographs. No-shows or rescheduling appointments will require additional processing time.
  - Issues of national security, criminality or public safety discovered during the background check process that require further vetting.
  - Issues of travel abroad that need additional evidence/clarification.
  - Name/date of birth discrepancies that may require additional evidence/clarification.
  - The renewal submission was incomplete or contained evidence that suggests a requestor may not satisfy the DACA renewal guidelines and USCIS must send a request for additional evidence or explanation

**Q50: Can I file a renewal request outside the recommended filing period of 150 days to 120 days before my current DACA expires?**

A50: USCIS strongly encourages you to file your renewal request within the recommended 150-120 day filing period to minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request. Requests received earlier than 150 days in advance will be accepted; however, this could result in an overlap between your current DACA and your renewal. This means your renewal period may extend for less than a full two years from the date that your current DACA period expires..

If you file after the recommended filing period (meaning less than 120 days before your current period of DACA expires), there is an increased possibility that your current period of DACA and employment authorization will expire before you receive a decision on your renewal request. If you file after your most recent DACA period expired, but within one year of its expiration, you may submit a request to renew your DACA. If you are filing beyond one year after your most recent period of DACA expired, you may still request DACA by submitting a new initial request.

**Q51: How will USCIS evaluate my request for renewal of DACA:**

A51: You may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you:

- Did not depart the United States on or after Aug. 15, 2012, without advance parole;
- Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and
- Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not

Case 1:17-cv-05228-NGG-VMS    Document 97-2    Filed 12/15/17    Page 199 of 275 PageID #: 5747

otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA renewal. USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

**Q52 Do I accrue unlawful presence if I am seeking renewal and my previous period of DACA expires before I receive a renewal of deferred action under DACA? Similarly, what would happen to my work authorization?**

A52: Yes, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will accrue unlawful presence for any time between the periods of deferred action unless you are under 18 years of age at the time you submit your renewal request.

Similarly, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will not be authorized to work in the United States regardless of your age at time of filing until and unless you receive a new employment authorization document from USCIS.

**Q53. Do I need to provide additional documents when I request renewal of deferred action under DACA?**

A53.  No, unless you have *new* documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS in a previously approved DACA request. USCIS, however, reserves the authority to request at its discretion additional documents, information or statements relating to a DACA renewal request determination.

CAUTION: If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

**Q54.  If I am no longer in school, can I still request to renew my DACA?**

A54.  Yes. Neither Form I-821D nor the instructions ask renewal requestors for information about continued school enrollment or graduation. The instructions for renewal requests specify that you may be considered for DACA renewal if you met the guidelines for consideration of initial DACA, including the educational guidelines and:

1. Did not depart the United States on or after August 15, 2012, without advance parole;
2. Have continuously resided in the United States, up to the present time, since you submitted your most recent request for DACA that was approved; and
3. Have not been convicted of a felony, a significant misdemeanor or three or more misdemeanors, and are not a threat to national security or public safety.

**Q55.  If I initially received DACA and was under the age of 31 on June 15, 2012, but have since become 31 or older, can I still request a DACA renewal?**

A55. Yes. You may request consideration for a renewal of DACA as long as you were under the age of 31 as of June 15, 2012.

## IV. Travel

**Q56: May I travel outside of the United States before I submit an initial Deferred Action for Childhood Arrivals (DACA) request or while my initial DACA request remains pending with the Department of Homeland Security (DHS)?**

A56: Any unauthorized travel outside of the United States on or after Aug. 15, 2012, will interrupt your continuous residence and you will not be considered for deferred action under this process. Any travel outside of the United States that occurred on or after June 15, 2007, but before Aug. 15, 2012, will be assessed by U.S. Citizenship and Immigration Services (USCIS) to

determine whether the travel qualifies as brief, casual and innocent. (See Chart #2.)

CAUTION: You should be aware that if you have been ordered deported or removed, and you then leave the United States, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences.

**Q57: If my case is deferred under DACA, will I be able to travel outside of the United States?**
A57: Not automatically. If USCIS has decided to defer action in your case and you want to travel outside the United States, you must apply for advance parole by filing a [Form I-131, Application for Travel Document](#) and paying the applicable fee ($575). USCIS will determine whether your purpose for international travel is justifiable based on the circumstances you describe in your request. Generally, USCIS will only grant advance parole if your travel abroad will be in furtherance of:

- humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- educational purposes, such as semester-abroad programs and academic research, or;
- employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Travel for vacation is not a valid basis for advance parole.

You may not apply for advance parole unless and until USCIS defers action in your case under the consideration of DACA. You cannot apply for advance parole at the same time as you submit your request for consideration of DACA. All advance parole requests will be considered on a case-by-case basis.

If USCIS has deferred action in your case under the DACA process after you have been ordered deported or removed, you may still request advance parole if you meet the guidelines for advance parole described above.

**CAUTION:** However, for those individuals who have been ordered deported or removed, before you actually leave the United States, you should seek to reopen your case before the Executive Office for Immigration Review (EOIR) and obtain administrative closure or termination of your removal proceeding. Even after you have asked EOIR to reopen your case, you should not leave the United States until after EOIR has granted your request. If you depart after being ordered deported or removed, and your removal proceeding has not been reopened and administratively closed or terminated, your departure may result in your being considered deported or removed, with potentially serious future immigration consequences. If you have any questions about this process, you may contact U.S. Immigration and Customs Enforcement (ICE) through the local ICE Office of the Chief Counsel with jurisdiction over your case.

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Q58: Do brief departures from the United States interrupt the continuous residence requirement?**
A58: A brief, casual and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States, your absence will be considered brief, casual and innocent if it was on or after June 15, 2007, and before Aug. 15, 2012, and:

1. The absence was short and reasonably calculated to accomplish the purpose for the absence;
2. The absence was not because of an order of exclusion, deportation or removal;
3. The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation or removal proceedings; and
4. The purpose of the absence and/or your actions while outside the United States were not contrary to law.

Once USCIS has approved your request for DACA, you may file Form I-131, Application for Travel Document, to request advance parole to travel outside of the United States.

CAUTION: If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Travel Guidelines (Chart #2)**

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| On or after June 15, 2007, but before Aug. 15, 2012 | Brief, casual and innocent | No |
| | For an extended time<br><br>Because of an order of exclusion, deportation, voluntary departure, or removal<br><br>To participate in criminal activity | Yes |
| On or after Aug. 15, 2012, and before you have requested deferred action | Any | Yes. You cannot apply for advance parole unless and until DHS has determined whether to defer action in your case and you cannot travel until you receive advance parole.<br><br>In addition, if you have previously been ordered deported and removed and you depart the United States without taking additional steps to address your removal proceedings, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences. |
| On or after Aug. 15, 2012, and after you have requested deferred action | Any | |

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 202 of 275 PageID #: 5750

| On or after Aug. 15, 2012 and after receiving DACA | Any | It depends. If you travel after receiving advance parole, the travel will not interrupt your continuous residence. However, if you travel *without* receiving advance parole, the travel *will* interrupt your continuous residence. |
|---|---|---|

### Q59: May I file a request for advance parole concurrently with my DACA package?

A59: Concurrent filing of advance parole is not an option at this time.  DHS is, however, reviewing its policy on concurrent filing of advance parole with a DACA request.  In addition, DHS is also reviewing eligibility criteria for advance parole.  If any changes to this policy are made, USCIS will update this FAQ and inform the public accordingly.

[Return to top.](#)

## V. Criminal Convictions

### Q60: If I have a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors, can I receive an exercise of prosecutorial discretion under this new process?

A60: No. If you have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, you will not be considered for Deferred Action for Childhood Arrivals (DACA) except where the Department of Homeland Security (DHS) determines there are exceptional circumstances.

### Q61: What offenses qualify as a felony?

A61: A felony is a federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year.

### Q62: What offenses constitute a significant misdemeanor?

A62: For the purposes of this process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE). Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion. DHS retains the discretion to determine that an individual does not warrant deferred action on the basis of a single criminal offense for which the individual was sentenced to time in custody of 90 days or less.

### Q63: What offenses constitute a non-significant misdemeanor?

A63: For purposes of this process, a non-significant misdemeanor is any misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Is not an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; and

2. Is one for which the individual was sentenced to time in custody of 90 days or less. The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by ICE.

Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.

**Q64: If I have a minor traffic offense, such as driving without a license, will it be considered a non-significant misdemeanor that counts towards the "three or more non-significant misdemeanors" making me unable to receive consideration for an exercise of prosecutorial discretion under this new process?**
A64: A minor traffic offense will not be considered a misdemeanor for purposes of this process. However, your entire offense history can be considered along with other facts to determine whether, under the totality of the circumstances, you warrant an exercise of prosecutorial discretion.

It is important to emphasize that driving under the influence is a significant misdemeanor regardless of the sentence imposed.

**Q65: What qualifies as a national security or public safety threat?**
A65: If the background check or other information uncovered during the review of your request for deferred action indicates that your presence in the United States threatens public safety or national security, you will not be able to receive consideration for an exercise of prosecutorial discretion except where DHS determines there are exceptional circumstances. Indicators that you pose such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States.

**Q66: Will offenses criminalized as felonies or misdemeanors by state immigration laws be considered felonies or misdemeanors for purpose of this process?**
A66: No. Immigration-related offenses characterized as felonies or misdemeanors by state immigration laws will not be treated as disqualifying felonies or misdemeanors for the purpose of considering a request for consideration of deferred action under this process.

**Q67: Will DHS consider my expunged or juvenile conviction as an offense making me unable to receive an exercise of prosecutorial discretion?**
A67: Expunged convictions and juvenile convictions will not automatically disqualify you. Your request will be assessed on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted. If you were a juvenile, but tried and convicted as an adult, you will be treated as an adult for purposes of the DACA process.

Return to top.

# VI. Miscellaneous

**Q68: Does deferred action provide me with a path to permanent resident status or citizenship?**
A68: No. Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

**Q69: Can I be considered for deferred action even if I do not meet the guidelines to be considered for DACA?**
A69: This process is only for individuals who meet the specific guidelines for DACA. Other individuals may, on a case-by-case basis, request deferred action from U.S. Citizenship and Immigration Services (USCIS) or U.S. Immigration and Customs Enforcement (ICE) in certain circumstances, consistent with longstanding practice.

**Q70: How will ICE and USCIS handle cases involving individuals who do not satisfy the guidelines of this process but believe they may warrant an exercise of prosecutorial discretion under the June 2011 Prosecutorial Discretion Memoranda?**
A70: If USCIS determines that you do not satisfy the guidelines or otherwise determines you do not warrant an exercise of prosecutorial discretion, then it will decline to defer action in your case. If you are currently in removal proceedings, have a final order, or have a voluntary departure order, you may then request ICE consider whether to exercise prosecutorial discretion.

**Q71: How should I fill out question 9 on Form I-765, Application for Employment Authorization?**
A71: When you are filing a Form I-765 as part of a DACA request, question 9 is asking you to list those Social Security numbers that were officially issued to you by the Social Security Administration.

**Q72: Will there be supervisory review of decisions by USCIS under this process?**
A72: Yes. USCIS has implemented a successful supervisory review process to ensure a consistent process for considering requests for DACA.

**Q73: Will USCIS personnel responsible for reviewing requests for DACA receive special training?**
A73: Yes. USCIS personnel responsible for considering requests for consideration of DACA have received special training.

**Q74: Must attorneys and accredited representatives who provide pro bono services to deferred action requestors at group assistance events file a Form G-28 with USCIS?**

A74: Under 8 C.F.R. §§ 292.3 and 1003.102, practitioners are required to file a Notice of Entry of Appearance as Attorney or Accredited Representative when they engage in practice in immigration matters before DHS, either in person or through the preparation or filing of any brief, application, petition, or other document. Under these rules, a practitioner who consistently violates the requirement to file a Form G-28 may be subject to disciplinary sanctions; however on Feb. 28, 2011, USCIS issued a statement indicating that it does not intend to initiate disciplinary proceedings against practitioners (attorneys and accredited representatives) based solely on the failure to submit a Notice of Entry of Appearance as Attorney or Accredited Representative (Form G-28) in relation to pro bono services provided at group assistance events. DHS is in the process of issuing a final rule at which time this matter will be reevaluated.

**Q75: When must an individual sign a Form I-821D as a preparer?**
A75: Anytime someone other than the requestor prepares or helps fill out the Form I-821D, that individual must complete Part 5 of the form.

**Q76: If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?**
A76: You may, as you determine appropriate, provide individuals requesting DACA with documentation which verifies their employment. This information will not be shared with ICE for civil immigration enforcement purposes under section 274A of the Immigration and Nationality Act (relating to unlawful employment) unless there is evidence of egregious violations of criminal statutes or widespread abuses.

**Q77: Can I request consideration for deferred action under this process if I live in the Commonwealth of the Northern Mariana Islands (CNMI)?**

A77: Yes, in certain circumstances. The CNMI is part of the United States for immigration purposes and is not excluded from this process. However, because of the specific guidelines for consideration of DACA, individuals who have been residents of the CNMI are in most cases unlikely to qualify for the program. You must, among other things, have come to the United States before your 16th birthday and have resided continuously in the United States since June 15, 2007.

Under the Consolidated Natural Resources Act of 2008, the CNMI became part of the United States for purposes of immigration law only on Nov. 28, 2009. Therefore entry into, or residence in, the CNMI before that date is not entry into, or residence in, the United States for purposes of the DACA process.

USCIS has used parole authority in a variety of situations in the CNMI to address particular humanitarian needs on a case-by-case basis since Nov. 28, 2009. If you live in the CNMI and believe that you meet the guidelines for consideration of deferred action under this process, except that your entry and/or residence to the CNMI took place entirely or in part before Nov. 28, 2009, USCIS is willing to consider your situation on a case-by-case basis for a grant of parole. If this situation applies to you, you should make an appointment through INFOPASS with the USCIS ASC in Saipan to discuss your case with an immigration officer.

**Q78: Someone told me if I pay them a fee, they can expedite my DACA request. Is this true?**

A78: No. There is no expedited processing for deferred action. Dishonest practitioners may promise to provide you with faster services if you pay them a fee. These people are trying to scam you and take your money. Visit our Avoid Scams page to learn how you can protect yourself from immigration scams.

Make sure you seek information about requests for consideration of DACA from official government sources such as USCIS or the DHS. If you are seeking legal advice, visit our Find Legal Services page to learn how to choose a licensed attorney or accredited representative.

**Q79: Am I required to register with the Selective Service?**

A79:  Most male persons residing in the U.S., who are ages 18 through 25, are required to register with Selective Service. Please see link for more information. [Selective Service].

**Q80: How can I tell if an employer is discriminating against me because I am a DACA recipient?**

A80: An employer may be engaging in discrimination if the employer:

- Demands that an employee show specific documents or asks for more or different documents than are required to complete Form I-9, Employment Eligibility Verification, or create an E-Verify case; or

- Rejects documents from the Lists of Acceptable Documents that reasonably appear to be genuine and relate to the employee, including a work authorization document because it has a future expiration date or because of an employee's prior unauthorized status.

The Civil Rights Division of the U.S. Department of Justice has an office dedicated to ensuring that employers do not discriminate against individuals who are permitted to work in the U.S. These include DACA recipients who have been granted work authorization. If you think your employer may be discriminating against you, contact the Immigrant and Employee Rights Section (IER) at 1-800-255-7688 (TDD for the deaf and hard of hearing: 1-800-237-2515).

For more information about unfair employment practices against DACA recipients, please read IER's factsheet in English (PDF) or Spanish (PDF).

For additional resources and information about workers' rights, visit www.justice.gov/crt/worker-information.

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 206 of 275 PageID #: 5754

Return to top.

Last Reviewed/Updated: 02/08/2017

# EXHIBIT 42

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 208 of 275 PageID #: 5756

# How will USCIS evaluate my request for renewal of DACA:

You may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA AND you:

1. Did not depart the United States on or after Aug. 15, 2012, without advance parole;

2. Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and

3. Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA renewal. USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

## Not what you're looking for?

🔍  Ask your question here                                    Search

## Similar Questions

If I am no longer in school, can I still request to renew my DACA?

What guidelines must I meet to be considered for deferred action for childhood arrivals (DACA)?

Can my deferred action under the DACA process be terminated before it expires?

# EXHIBIT 43

Department of Homeland Security
U.S. Citizenship and Immigration Services

**I-797, Notice of Action**

# THE UNITED STATES OF AMERICA

| Receipt Number | USCIS Account Number | Case Type | |
|---|---|---|---|
| IOE0900414397 | 002054432260 | I821D - CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS | |
| Receipt Date | Priority Date | | |
| 03/02/2016 | 02/28/2016 | | |
| | | DANIEL  RAMIREZ MEDINA | |
| Notice Date | Page | | |
| 05/05/2016 | 1 of 1 | | |

RAMIREZ MEDINA, DANIEL

**Notice Type:** Approval Notice
Valid from: 05/05/2016 to 05/04/2018

Notice of Deferred Action:

This notice is to inform you regarding U.S. Citizenship and Immigration Services's (USCIS) decision on your Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

USCIS, in the exercise of its prosecutorial discretion, has decided to defer action in your case. Deferred action is an exercise of prosecutorial discretion by USCIS not to pursue the removal of an individual from the United States for a specific period. Deferred action does not confer or alter any immigration status.

Unless terminated, this decision to defer removal action will remain in effect for 2 years from the date of this notice.

This form does not constitute employment authorization, nor may it be used in place of an Employment Authorization Document. The 90-day period for reviewing Form I-765, Application for Employment Authorization, filed together with Form I-821D begins as of the date of this approval notice. If Form I-765 is granted, you will receive your Employment Authorization Document separately by mail. Subsequent criminal activity after your case has been deferred is likely to result in termination of your deferred action. This notice does not provide permission to travel outside of the United States.

You are required to notify USCIS if you change your address. You may use the Alien's Change of Address Card, Form AR-11, to report a new address. That form may be found at www.uscis.gov. There is no fee for this change of address form.

NOTICE: USCIS and the U.S. Department of Homeland Security (DHS) reserve the right to verify the information submitted in this request and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of the verification will be used to determine whether termination of deferred action and/or removal proceedings are appropriate if, for example, the requestor committed fraud or misrepresentation in his or her request for consideration of deferred action for childhood arrivals, or engaged in subsequent criminal activity following the submission of his or her request. Individuals for whom removal action is deferred under Deferred Action for Childhood Arrivals may, in the sole discretion of USCIS and DHS, be provided an opportunity to address derogatory information before deferred action is terminated and/or removal proceedings are initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS/Nebraska Service Center
P.O. Box 82521
Lincoln NE 68501-2521

Customer Service Telephone: 800-375-5283



# EXHIBIT 44

Case 1:17-cv-05228-NGG-VMS Document 97-2 Filed 12/15/17 Page 213 of 275 PageID #: 5761

# POLITICO



Homeland Security Secretary John Kelly sought to mollify senators who have for weeks been outraged by the Trump administration's hard-edged immigration policies. | AP Photo

## Wary Democrats look to Kelly for answers on immigration
Senate Democrats wanted reassurances from Homeland Security Secretary John Kelly.

By **TED HESSON** and **SEUNG MIN KIM** | 03/29/2017 09:13 PM EDT

Senate Democrats met with Homeland Security Secretary John Kelly on Wednesday to seek reassurances that there would be boundaries to President Donald Trump's plan to intensify immigration enforcement.

In some cases, Kelly delivered. The former Marine general told senators that border agents would

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 214 of 275 PageID #:
5762

not separate mothers and children at the border, unless a mother was sick or injured. He also said his department would not target enrollees in the Deferred Action for Childhood Arrivals Program, which grants deportation relief to undocumented immigrants brought to the U.S. at a young age.

But an undercurrent of frustration ran through the meeting, according to interviews with roughly half the more than 20 senators in attendance.

Privately, Kelly sought to mollify senators who have for weeks been outraged by the Trump administration's hard-edged immigration policies. During the meeting at the Capitol, which lasted nearly two hours, the DHS secretary told Democrats that the administration was still mainly targeting for deportation those who had committed crimes, and that they didn't even have the manpower to deport all undocumented immigrants in the country, according to one senator.

Several Democrats weren't convinced, including Sen. Bob Menendez of New Jersey. "Basically, even though the secretary portrays that we're only going after the bad apples, and criminals and this and that, the reality is — I pointed out to him — that his new memo on priorities makes everybody technically eligible for deportation," Menendez said in an interview after the meeting. "He didn't deny that."

---

**CONGRESS**
## Senate steps up as House Russia probe flails
By **AUSTIN WRIGHT** and **MARTIN MATISHAK**

---

Several other senators echoed that sentiment.

"Frustration would be a good word," said Sen. Patty Murray (D-Wash.). "He stated that he was not separating children from their parents, but that's not been our experience." On the topic of keeping families together, Sen. Kamala Harris (D-Calif.) said, "He didn't guarantee it."

ADVERTISING

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 215 of 275 PageID #: 5763



Speaking with reporters after the meeting, Kelly generally affirmed his positions on families at the border and DACA enrollees. He also called on members of Congress to change laws if they don't agree with them. "They may not like what I have to say, in terms of how we're doing business, but they deserve as elected representatives of the people to hear what I have to say," he said. "Honest men and women should be able to disagree on a lot of things and we do."

Of the DACA program, Kelly said both the government and individuals have an obligation to honor the terms of the policy. "The DACA status is a commitment, not only by the government towards the DACA person, or the so-called Dreamer, but by that person to obey the law," Kelly said. "I don't care what you read, or what people say, we have not, in my time picked up someone who was covered by DACA. We have not done that."

## Sign up here for POLITICO Huddle

☑ ly play-by-play of congressional news in your inbox.

> Your email…

By signing up you agree to receive email newsletters or alerts from POLITICO. You can unsubscribe at any time.

Since Trump took office, though, several current or former DACA recipients have been arrested by federal immigration authorities, including a 24-year-old man in the Seattle area who was released on bail by an immigration judge Wednesday. Federal immigration officers contend he admitted to membership in a gang once they encountered him.

The news from Kelly seemed to placate some Democrats, if not win them over entirely. Sen. Dick Durbin (D-Ill.) said he "breathed a little sigh of relief" at Kelly's DACA stance, which he said "was the policy of the Obama administration, too." Durbin said the program "is still very much alive" —

and credited Kelly for it.

"Many people would have doubted that that ever would be the case, and I think he is one of the major reasons for it," Durbin said.

At the meeting, Kelly spoke of the importance of addressing the factors that drive migrants north from Central American countries, such as Honduras, Guatemala and El Salvador. He said the administration plans to organize a conference in Miami before the summer with presidents and business leaders from those countries to discuss ways to improve social and economic conditions in the region.

Kelly said Mexico wants to co-host the event and that Canada and Colombia would attend as observers. "We're trying to improve the state of life in the Central American republics so those people don't have to come up here," he said.

*Elana Schor contributed to this report.*

# EXHIBIT 45

Case 1:17-cv-05228-NGG-VMS   Document 97-2   Filed 12/15/17   Page 218 of 275 PageID #: 5766

Center for American Progress

IMMIGRATION

# Thousands of DACA Recipients Are Already Losing Their Protection From Deportation

By Tom Jawetz and Nicole Prchal Svajlenka  | Posted on November 9, 2017, 6:00 am



AP/Reed Saxon

A child sits on a man's shoulders among demonstrators in favor of Deferred Action for Childhood Arrivals during a protest at the historic Plaza de Los Angeles on September 5, 2017.

Each day that Congress delays acting on the Dream Act from now until March 5, 2018, approximately 122 people will lose their Deferred Action for Childhood Arrivals (DACA) protection. That is 851 people each week, and more than 7,900 since the announcement. The logic behind this number is straightforward: The 22,000 eligible DACA recipients who did not successfully apply to renew their DACA will, as a result, see their DACA protections expire in the 181 days between September 5, 2017 and March 5, 2018.

DACA has allowed nearly 800,000 young people who came to the United States as children to live, work, and study without fear of detention and deportation. When President Donald Trump terminated the program on September 5, 2017, he gave the 154,000 DACA recipients whose protections were set to expire between then and March 5, 2018, just 30 days to submit costly and arduous renewal applications. The administration presented its phase-out approach as the "least disruptive" way forward and claimed that it would afford Congress six months to take action before current DACA recipients began to lose protection.

But the reality is that with every passing day, DACA recipients lose their protections and become vulnerable to a regime of enforcement overdrive. Shortly after the October 5 deadline, the U.S. Department of Homeland Security announced that 22,000 DACA recipients did not meet the Trump administration's arbitrary deadline for renewal. Much as the administration is currently attempting to sabotage open enrollment for Affordable Care Act coverage by shortening the enrollment period and pulling back from promotional efforts, the administration did nothing to encourage eligible DACA recipients to ensure that their renewal applications were received on or before October 5. Moreover, it ignored bipartisan requests to extend the enrollment period, particularly for people in hurricane-stricken areas like Texas and Florida.

## Estimated number of young people that have lost DACA since September 5, 2017



Losing DACA comes with profound consequences.

Without DACA these young people will no longer be protected from detention and deportation. This is especially worrisome given that DACA recipients entrusted the federal government with personal identifying information for themselves and their family members long before the Trump administration expanded its deportation priorities to cover just about any unauthorized immigrant. In fact, months before the Trump administration terminated DACA it had already arrested and detained a series of DACA recipients, including Daniel Ramirez Medina, Riccy Enriquez Perdomo, and Daniela Vargas.

Once their DACA expires, these young people will lose their work authorization and likely be forced out of employment. The largest survey of

DACA recipients found that 91 percent of those with DACA were employed. Losing their jobs will have repercussions for DACA recipients that reverberate with their families and their employers who will incur at least $3.4 billion in turnover costs.

Another consequence of losing DACA is that many of these young people will lose their access to a driver's license. While DACA recipients may obtain driver's licenses in every state, licenses are only available to the larger unauthorized population in 12 states and the District of Columbia.

Lastly, without DACA many young people will face new barriers to pursuing higher education. While at least 20 states offer in-state tuition to unauthorized immigrants, other states extend in-state tuition only to DACA recipients. Losing the ability to pay in-state tuition could make it extremely difficult for some to afford tuition and enroll in the upcoming spring semester. One such state is Virginia. Ángel Cabrera, president of Virginia's George Mason University, estimates that, once their DACA expires, between 150 and 300 currently enrolled students may be unable to afford tuition and be forced to leave the university.

By March 5, 2018, approximately 22,000 DACA recipients already will have lost status and face the challenges listed above. But that number will only be the beginning. Come March 6, 2018, the number of people losing DACA each day will significantly increase, until no protections remain for the nearly 800,000 Dreamers who have been making enormous contributions since they first received DACA.

When members of Congress and the president talk about delaying consideration of the Dream Act until some time in the future, they are not only playing with the fears and anxieties of hundreds of thousands of DACA recipients who stand to lose protection beginning in March, but are discounting the real harms already taking place for tens of thousands of DACA recipients. Advocates that regularly call upon Congress to pass the #DreamActNow are focused not only on averting the crisis ahead of us, but also preventing the ongoing crisis from getting any worse.

*Tom Jawetz is the vice president of Immigration Policy at American Progress. Nicole Prchal Svajlenka is a senior policy analyst of Immigration Policy at American Progress.*

Center for American Progress

© 2017 - Center for American Progress

# EXHIBIT 46

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et. al.*,

        Plaintiffs,

   v.

DONALD TRUMP, *et. al.*,

        Defendants,

No. 1:17-CV-5228

## DECLARATION OF LUIS H. ZAYAS

I, Luis H. Zayas, declare as follows:

I make this declaration based on my personal knowledge and if called to testify I could and would do so competently as follows:

**I.** **Qualifications**

1. I am a licensed psychologist and licensed clinical social worker in the State of Texas. Previously, I held psychology licenses in New York and Missouri and a clinical social work license in New York. I hold a Master of Science degree in social work (1975), and a Master of Arts (1984), Master of Philosophy (1985), and Doctor of Philosophy (1986) in developmental psychology, all from Columbia University in the City of New York. I have been a practicing clinician since 1975 in child and adolescent psychiatry and primary care medicine.

2. I am presently dean of the Steve Hicks School of Social Work at the University of Texas at Austin where I also occupy the Robert Lee Sutherland Chair in Mental Health and Social Policy. I am a professor of psychiatry at the Dell Medical School of The University of Texas at Austin. A copy of my curriculum vitae is attached hereto as Exhibit A.

3. I have held academic positions at Washington University in St. Louis, Fordham University, Albert Einstein College of Medicine, and Columbia University. I have held clinical positions at Blythedale Children's Hospital (Valhalla, NY); New York Hospital-Cornell Medical Center (now New York-Presbyterian/Weill Cornell Medical Center, New York City); and Montefiore Medical Center (Bronx, NY).

4. My background encompasses clinical practice, teaching and research in child and adolescent mental health, child development, and family functioning. My specialty has been on

1

Declaration of Luis H. Zayas, PhD
November 28, 2017

minority and immigrant families and their children.  I have conducted research in prenatal and

postpartum depression, child-rearing values, ethnicity in psychiatric diagnosis, and suicide

attempts of young Hispanic females.  My research has been funded by the National Science

Foundation and the National Institutes of Health (specifically, the National Institute of Mental

Health, National Institute of Child Health and Human Development, and National Institute on

Minority Health and Health Disparities).  Since 2006, I have focused my clinical and research

attention on the U.S.-born and foreign-born children undocumented immigrants, mostly from

Mexico and Central America.

5.   I have published over 115 papers in peer-reviewed scientific and professional journals

and two books, *Latinas Attempting Suicide: When Cultures, Families, and Daughters Collide*

(Oxford University Press, 2011), and *Forgotten Citizens: Deportation, Children, and the Making*

*of American Exiles and Orphans* (Oxford University Press, 2015).  A complete list of my

publications is included in my CV.

6.   Since 2006, I have testified as expert witness in 19 cancellation of removal cases in

immigration court.  Since 2014, I have provided evaluations of 14 families held in immigration

detention centers in Karnes, Dilley, and Conroe, Texas). I wrote a declaration on the impact of

detaining refugee children and mothers in detention centers that was included in *R.I.L-R v*

*Johnson* (2015) and *Flores v Johnson* (2015), both heard in federal court.  I also provided an

affidavit as expert witness but did not testify In the Matter of Fuentes (San Antonio, 2014) on

children's psychological functioning, Attention-Deficit/Hyperactivity Disorder, and childhood

trauma.  I gave expert witness testimony on the psychological effects of immigration detention

- 2 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

on children and families in *Grassroots Leadership Inc. v Texas Department of Family and Protective Services (2016)* heard in Travis County, Texas district court challenging the licensing of immigration family detention centers as childcare centers.

7.   I am making this declaration to provide my considered opinions concerning the psychological and developmental issues of growing up undocumented in the United States.  Most of these children were brought to the United States by their parents in early and middle childhood and adolescence.  Many of these young adults are eligible for the Deferred Action for Childhood Arrivals (DACA) program.

8.   My opinions in this declaration are derived from (a) my knowledge of the behavioral and social science research literature on undocumented immigrant children in the United States, and (b) my 42 years of experience as a licensed social worker and psychologist conducting evaluation and treatment of children, adolescents, and families.  In this declaration, I include relevant scientific literature in forming my conclusions (listed in section V. Literature Cited).

## II. <u>Scientific Reports on Undocumented Immigrant Youth Applicable to DACA Recipients</u>

### A. Finding: DACA Youth Develop Identities as Americans

9.   Undocumented immigrant youth in the DACA category have grown up in the United States, feeling themselves to be "average American kids."  As the United States has been their home since their earliest memories, these youth have attended school in the United States, learned the national anthem, and studied U.S. history, music, literature, and geography.  At school and in their daily lives, DACA youth have learned all of the behaviors, values, and activities that define "Americans."  While they may be bilingual in their parents' languages of

- 3 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

origin, youth raised in the United States speak English as their first or native language, a key

component of national identity (more in section II.B.). They pledge allegiance to the U.S. flag,

engage in authentically American traditions like Thanksgiving and Fourth of July, abide by the

laws of the land, aspire to college and affluence, and seek the same advantages of being

American that their peers enjoy. Like other American children—their friends and peers—

undocumented youth do all the things that children do who are their classmates, neighbors, and

playmates. Critics and supporters of U.S. immigration and deportation policy agree that this set

of youth grow up as Americans (Haskins, Greenburg, & Fremstad, 2004).

10. What distinguishes undocumented youth from other youth is that they have to worry

about their parents' or their own ejection from the United States. Their peers do not. Martinez et

al. (2015) showed through a systematic review of the literature that anti-immigration policies had

negative effects on the mental health of undocumented immigrant adults—some who are DACA

eligible—including depression, anxiety, and post-traumatic stress disorders. Undocumented

children and their siblings suffer privations, challenges, hardships, and stresses that put their

health, mental health, and educational progress at risk. Science bears this out.

**B. Finding: English is the Native Language of DACA Youth**

11. Undocumented immigrant youth in the DACA-eligible age group are typically English-

dominant. It is the language of their socialization and education in the United States, and the

media they consume. English has helped them integrate effectively into the social fabric of

schools and communities, and to form friendships across ethnicities and race. As language is

linked to national identity, English adds to their self-definition as Americans, and is the language

- 4 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

of their social references and personal identities.

12. Legal immigrants as well as undocumented immigrants encourage their children to master English, knowing it is the gateway to success in the United States. A 2011 Pew Hispanic Center survey (Taylor et al., 2012) showed that Hispanics perceive English as the language for their children's success in the United States. From the second generation onward, the Pew survey confirms, immigrant families make English the primary language of their homes, a fact that has been shown to occur with every wave of immigrants to our shores.

13. Research shows that heavy involvement in English-intensive contexts helps immigrant youth raise their language competence and facilitate social and civic engagement (McKay-Semmler & Kim, 2014). DACA youth who speak English are likelier to (a) succeed in school and engage in extracurricular activities; (b) feel better about themselves and their futures, regardless of legal status; and (c) gain access to resources, social supports and information that prepares them for participation in educational and occupational roles.

14. DACA-eligible young adults are often bilingual, an advantage for cognitive maturation and executive functioning (i.e., mental processes of organizing, planning, strategizing, attending, short-term or "working memory,"[1] creativity, problem solving remembering, inhibiting some behaviors, and managing time and space; Engel de Abreu et al., 2012; Kalashnikova & Mattock, 2014). This bilingual advantage is a complex neuro-lingual process that enhances executive

---

[1] Working memory refers to the brain's system for storing and managing information for short-term use. It is the capacity to hold many pieces of facts, or transitory information such as visual images and verbal information, so that it can be manipulated for the purposes of application and communication. Language comprehension, reasoning, and problem-solving and mathematical abilities are thought to depend on working memory.

- 5 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

functions (e.g., attention-switching; Adesope et al., 2010; Bialystok et al., 2009).  In fact,

functional magnetic resonance imaging research shows that bilingualism exercises the brain's

executive functions, particularly skills of language switching and resolving conflicts between

languages (Luk et al., 2011).  Mastery of English and bilingual skills prepare DACA youth for

full participation in occupational roles and civic engagement, and they contribute to the

competitive advantage that the United States needs in a competitive global economy.

15. Knowing that English is learned as the first language and is attached to their identities as

Americans, we can extrapolate from extant research that DACA recipients who are parents or

will become parents of U.S. citizen children will continue to use English as the first language in

the home.  Therefore, they confer onto their offspring the linguistic and cognitive advantages that

will build their identities as American citizens and lead to success in the U.S. labor market.

**C. Finding: Living as an Undocumented Immigrant Child is Highly Stressful**

16. Research on the effects of living everyday lives as undocumented youth in mixed-status

families among DACA-eligible youth points to the hardships they endure and must overcome.

"Mixed-status family" refers to a unit in which some members hold legal status and others do

not.  Typically, such a family consists of undocumented parents and U.S. citizen-children but

mixed-status families have considerable range and complexity.  Thus, it is possible that one

parent is undocumented and the other a U.S. citizen or legal permanent resident.  A mixed-status

family may contain older children who are undocumented and, depending on their ages, some

may be eligible for DACA and others ineligible.  Younger siblings are usually U.S. citizens.  Not

all mixed-status families are the same and not all face identical situations but they do suffer from

- 6 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

the cumulative effect of threat of deportation.  Deportability inspires fears of separation among

children regardless of their own legal status or family members' actual involvement with

immigration officials (Dreby, 2012).

17. DACA-eligible and other undocumented youth have to be constantly alert, possibly

hyper-alert to threats that can destabilize their families (e.g., when a parent is stopped by the

police; when immigration enforcement patrols are within sight; Ayon, 2014; Brabeck & Xu,

2010; Chavez et al., 2012).  This unremitting worry destabilizes families and has injurious

effects on children's well-being and sense of security (see section II.E.).  As they mature into

adolescence and young adulthood, undocumented youth have to go through a process of

"retooling" their everyday routines, survival skills, aspirations, and social patterns (Gonzales,

2011).

18. My research on U.S.-born children of undocumented immigrants sheds light on the

effects of undocumented status and deportation on DACA youth in mixed-status families.  In a

study funded by the National Institute for Child Health and Human Development, we

interviewed U.S. citizen-children of Mexican heritage in mixed-status families (some that

included DACA-eligible older siblings).  Some citizen-children in our sample lived in Mexico

with their deported parents and siblings.  Others in our sample lived in the United States in the

care of family members (including DACA-recipient older siblings) after their parents'

deportation. A third group, used as controls, had experienced no deportation of family members.

We found that children fearful of their parents or siblings' deportations were likely to experience

high levels of anxiety disorders, including separation anxiety disorder (Zayas, 2015; Zayas et al.,

- 7 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

2015).  Children's self-concept and perception was lower for those with deported parents than those without.  Children affected directly by parental deportation had higher levels of depressive symptoms and were more likely to report emotional problems, including negative mood, physical symptoms, and negative self-esteem, than those without deportation experiences.

19. We also found that stressors that U.S. citizen-children faced with respect to their parents' deportability included the inability to communicate with friends about their status and worries (Gulbas et al., 2015), not unlike the experiences of DACA-eligible youth.  Loss of supportive school networks and fear of violence in the destination country were mentioned almost exclusively by citizen-children who showed depressive symptoms.  Family financial struggles were also cited as key stressors.

**D. Finding: Economic Hardship Destabilizes Families, Truncates Educational Opportunities, and Imperils Health**

20. Economic insecurity and hardship calls for families to alter their daily routines to find means for survival while protecting against discovery by immigration enforcement.  Frequent moves and a general lack of stability can cause considerable distress.  The sudden loss of both a parent and a home can be devastating; it is a loss of familiar physical environments, activities, routines, and social support networks that have provided a sense of identity and belonging (Adam & Chase-Lansdale, 2002; Zayas & Gulbas, 2017).  Frequent moves, like those that many DACA youth and young adults face after a parent's arrest or because of fear of deportation, are associated with a wide range of detrimental social, educational, and psychological outcomes.  Families that have suffered disintegration due to deportation face significant financial losses and

- 8 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

emotional turmoil that take a heavy toll on the members.  Undocumented immigrant youth and

their parents face challenges to securing financial and basic needs for their families (Ayon,

2014).  Unequal access to educational opportunities and healthcare, and housing and food

insecurity can compromise the health and development of citizen-children.

21. Developmental research has long shown the powerful links between economic hardship

and children's behavioral and educational outcomes.  Persistent, even transitory poverty can have

detrimental effects on children's measured intelligence, school achievement, and social and

emotional functioning (Blair & Raver, 2012; McLoyd, 1989, 1998; McLoyd et al., 2009;

Yoshikawa et al., 2012).  Children who live in unabated or episodic poverty generally do worse

than children who have never faced economic hardship.  Poverty takes a tremendous toll on the

child's future by eliminating opportunities that facilitate success.  For example, educational

opportunities for children living in economically deprived areas are likely to be substandard, and

health problems associated with poverty both challenge healthy development itself and interfere

with academic performance (Zigler & Hall, (2000; p. 9).

22. Economic hardship is one reason—another is wariness about revealing their legal

status—that undocumented immigrant parents are less likely to enroll their young children in

preschool than U.S. citizens or legal permanent residents (Crosnoe, 2006; Hernandez et al., 2008;

Kalil & Crosnoe, 2009; Matthews & Ewen, 2006).  The emotional, physical, and intellectual

environment that a child is exposed to in the early years of life affects early learning, self-

regulation, and perhaps brain organization (Barajas, Philipsen, & Brooks-Gunn, 2008).  At the

age of two, low-income children demonstrated an average IQ 4.4 points lower than two-year-

- 9 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

olds from higher-income households.  Poor children are more likely to show emotional or

behavioral problems persisting later into childhood as a direct result of the stresses associated

with poverty.

23. Poverty affects a family's food security, which in turn affects children's health.  Research

shows that there is more food insecurity among children of unauthorized Latin American

immigrants than U.S.-born children (Kalil & Chen, 2008).  In 2003, children suffering from food

insecurity were twice as likely to be in poor health, with approximately 30 percent higher

hospitalization rates as higher-income children (Cook et al., 2003).  While health inequalities in

the United States have decreased over the past decade, poorer families are still less likely to stay

up-to-date on immunizations and routine visits, preventing the child from receiving sufficient

primary care and basic illness prevention measures.  In 2007, 76.5 percent of poor children had

received the recommended immunizations, as compared with 84.1 percent of their wealthier

counterparts.  Furthermore, only 67.9 percent of uninsured children had a usual care provider, in

contrast to 93.5 percent of insured children (AHRQ, 2009).  As a result, fewer poor or uninsured

children receive access to sufficient primary care, ultimately leading to higher rates of child

hospitalization due to untreated afflictions or deficient illness prevention (Aber et al., 1997;

Cousineu et al., 2009).

24. Because of the substandard housing that economically challenged families can afford,

children in poverty are often exposed to higher lead, toxin, and noise levels, crowding, and

greater risk of accidental injury or death (Aber et al., 1997; Evans, 2006).  Hospitalization due to

asthma, bacterial pneumonia, dehydration, gastroenteritis, and parasitic diseases are common for

- 10 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

impoverished children; hospitalization for asthma alone is four times higher for impoverished children than for those at an economic advantage. Lead poisoning in old and substandard buildings is known to affect the neurological pathways of the child's brain that result in learning disabilities, speech disorders, and increased hyperactivity, impulsivity, and aggression. Lead poisoning has been found to reduce their measured IQ scores by three points per 10 micrograms of lead per deciliter of blood (Evans, 2006). Household and neighborhood pollutants lead not to temporary afflictions but rather long-lasting ones. And by restricting access to healthcare, the lives of the most vulnerable are further imperiled.

25. Undocumented immigrants, for example, have about 1.7 fewer physician visits per year than U.S. citizens of Hispanic descent and 2.1 fewer visits when compared to U.S.-born individuals (Ortega et al., 2007). This is not surprising since Latino children are more likely to live in families with incomes below the federal poverty level compared to non-Hispanic White families (Ortega et al., 2009). Fifty-six percent of children with undocumented parents live below the poverty level compared to 27 percent of children with documented parents but who are not citizens, and 15 percent of those with parents who are citizens. Research shows that barriers to access to medical care are limited by costs, mistrust of providers, and DACA youth's fear of disclosure (Raymond-Flesch et al., 2014). Mental health care is the greatest unmet need cited by DACA eligible youth and DACA recipients in recent studies.

26. Fear of having their undocumented status discovered is one reason that parents do not access services for their undocumented or even U.S. citizen-children (Yoshikawa, 2011). Brabeck and Xu (2010) report that as the legal vulnerability of undocumented parents increases

Declaration of Luis H. Zayas, PhD
November 28, 2017

so too does the impact that detention and deportation has on their families. Mothers with direct experience with the deportation system feel great vulnerability to deportation and the effects it would have on them and their families.

27. The exception to these dire findings is that DACA recipients have access to education and health for themselves and for their U.S. born offspring. With DACA, young adults can confidently pursue employment that is stable which, in turn, opens avenues to accessing healthcare and higher education. As parents of citizen-children, DACA recipients can receive regular pediatric care for their children and themselves. In doing so, DACA youth protect their families and the public health.

**E. Finding: Persistent Stress and Trauma Harms the Mind and Body**

28. DACA recipients are highly susceptible to the effects of stress and trauma on human physiology. As shown above, living under persistent stress and trauma harms DACA youth educationally, emotionally, and financially. But, persistent stress and trauma harms them physiologically. Based on what science has shown about human stress physiology, DACA eligible youth and young adults can be impaired through the effects of intense and prolonged "adverse childhood experiences."[2] DACA youth face the unrelenting fear and worry of arrest, detention, and deportation. As shown above they encounter economic hardship and residential instability, limited health access and educational and employment opportunities, ruptures in

---

[2] Adverse childhood experiences (ACE) refers to stressful or traumatic events that occur and accumulate during childhood and adolescence. The greater the number of ACE a person reports the greater the association with chronic physical and mental conditions, quality of life, and life expectancy in adulthood (Bethell et al., 2014; Felitti et al., 1998; Finkelhor et al., 2013; Thoresen et al., 2015; Van Niel et al., 2014).

Declaration of Luis H. Zayas, PhD
November 28, 2017

family unity, and limitations on social integration. As such, there is a real danger of damage to their physical and mental health. One pathway is by the effect of stress on the neuroendocrine system.

29. The human endocrine system is pivotal to adaptation. It is critical to survival. Stressful situations and stimuli activate neural, neuroendocrine and neuroendocrine-immune mechanisms in the body, part of the brain's role in regulating the body's internal sensations. As the brain anticipates needs and prepares the body to respond to threats and other fears, it activates the Hypothalamic-Pituitary-Adrenal Axis (HPA axis), a complex set of interactions of glands that protects the human system against acute danger and ongoing stress (Engelman et al., 2004; Miller et al., 2007).

30. However, HPA axis dysfunction occurs when stress does not remit, as is often the case of DACA youth. In environments of chronic or frequent activation of the HPA response, like the ones that undocumented DACA youth experience, the brain's energy is depleted and can begin to fail due to fatigue (Peters et al., 2017). This chronic overexertion of the HPA axis wears down the body; it is the physiological consequences of having the neuroendocrine response system experiencing a heightened state of activity (McEwen & Stellar, 1993). Eventually it induces illnesses and weakens the body's immune system. The results can be permanent damage to the brain's architecture and functioning, making it difficult to cope with future stress. When there is dysfunction of the HPA axis, problems such as insomnia, chronic fatigue syndrome, alcoholism, and psychiatric illnesses (e.g., mood disorders, including anxiety, attention deficit hyperactivity, bipolar, major depressive, and post-traumatic stress disorders) emerge.

Declaration of Luis H. Zayas, PhD
November 28, 2017

31. Therefore, the conditions that DACA young adults face if the DACA law is rescinded—the uncertainty about their futures and the fears and worry that come about because of their legal status—have the potential of damaging the brains and functioning of a generation of young adults.

## III. Benefits of DACA Enrollment to Society and Population Health

32. There is a growing scientific literature that demonstrates empirically the benefits of undocumented young adults enrolling in DACA.  Gonzales et al. (2014) report that receiving DACA allowed young adults to take steps toward greater financial independence and social integration into U.S. institutions by expanding recipients' employment options.  Those with post-secondary education and access to family and community resources benefitted the most in integrating into the mainstream of society.  Siemons et al. (2017) also found that increasing access to opportunities and resources were perceived by DACA-eligible youth as beneficial to their mental health and well-being.  Indeed, Anaya et al. (2014) report that DACA has allowed undocumented young adults to pursue higher education, particularly in medicine.  Given the shortage of physicians in the United States, as Anaya et al. aver, matriculating DACA eligible students in medical schools will have a salutary effect on population health, the healthcare delivery system, and the national economy.  Much of the success of DACA young adults in American society is an indication of their resilience and grit.

33. Recent reports in some of the leading scientific journals (*Science; The Lancet; The New England Journal of Medicine; Social Science and Medicine*) address the public health consequences of rescinding DACA.  In a study that compared changes in mental and physical

- 14 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

health outcomes among DACA youth with undocumented youth ineligible for DACA, the rates of moderate or severe psychological distress in the DACA eligible group fell by nearly 40 percent relative to rates in the DACA-ineligible group (Venkataramani et al., 2017). Sudhinaraset et al. (2017) found that DACA eligibility improves health outcomes through four potential social determinants: economic stability, educational opportunities, social and community contexts, and access to health care. When these social determinants were in place, young adults DACA recipients showed improved mental health and sense of well-being. Thus, there is benefit to the U.S. population in retaining DACA and protecting the nation's public health

34. Similar research on DACA beneficiaries showed significant improvement after DACA was implemented. Patler and Pirtle (2017) show that DACA recipients are more likely to complete a vocational or bachelor's degree than those who were not enrolled, and having DACA was related to lower levels of psychological distress. However, as the DACA recipients rose in level of education (bachelor's degree and higher) and viewed their futures with optimism, they had higher odds of reporting distress (i.e., stress, nervousness, anxiety), negative emotions (i.e., anger, fear, sadness, embarrassment, shame), and worry (about being deported or a family member being deported) than those without DACA. This paradoxical effect stems from the fact that DACA young adults with higher educational attainment had a greater appreciation of what *not having DACA* would mean to their futures. For young adults DACA recipients with young children the loss of DACA will be worse: it would have a two-generational impact (harming them and their children). The fact that having DACA did not reduce worries about family

Declaration of Luis H. Zayas, PhD
November 28, 2017

deportation attests to the fact that even some level of legal presence does not mitigate the fear of deportation of parents and siblings.

35. In another impressive study, the effects of eligibility for DACA showed a two-generational effect: DACA eligibility created positive mental health conditions among young mothers that in turn resulted in fewer diagnoses of adjustment and anxiety disorders in their U.S. citizen-children (Haimueller et al., 2017). These studies show that terminating DACA will have adverse public health effects on both DACA youth and their U.S.-born offspring.

## IV. **Conclusion and Opinion**

36. Rescinding DACA will have negative immediate and long-term effects on the psychological and medical wellbeing of hundreds of thousands of DACA-eligible young adults. In addition to the individual human costs borne by these young people in the form of personal anguish and mental health distress, there is an enormous potential impact on our nation's public health, posing widespread, population-level adverse effects on mental health and public health (Venkataramani & Tsai, 2017). As these youth recede into the shadows of our society if DACA is ended, they will not seek medical care when they need it, placing themselves and others around them at risk for illness. They will be less likely to seek health and mental health care because of the genuine fear that they will be identified to immigration enforcement. Instead of a well-educated, highly skilled, and motivated part of our labor force, DACA eligible individuals, some highly educated and skilled workers, will live on the margins of our society.

37. Based on my clinical and research experience and expertise as well my knowledge of the scientific literature on mental health and human functioning presented in this declaration, I can

- 16 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

say with certainty that DACA youth have faced numerous challenges in their young lives. Their suffering and emotional pain will be long lasting, and very likely permanent, as adduced by the scientific literature, if they continue to live with uncertainty about their future security and the potential disenfranchisement from U.S. society. Eliminating an important public policy that has reduced mental health suffering and increased civic and economic engagement, such as DACA, will have untold effects on DACA-eligible youth, their U.S.-born children, their extended families, and American citizens who will have to bear the costs and needs of these youth.

38. The healing process, in my view, cannot begin while DACA youth live with their legal status uncertain and their identities as Americans questioned and rebuffed by the only government they have known. Growing up as Americans in identity and in every other manner except for documentation—the fate of having been brought to the United States as dependent minor children—has given them hope and optimism. The fact of their success in educational and occupational endeavors is a reflection on American society which has conveyed for centuries its optimism and the limitless potential to achieve the "American dream" through hard work and perseverance. The harm that DACA may be terminated and their lives thrown into turmoil will leave long-lasting damage, some of which may be irreversible.

## IV. Compensation

39. I have received no compensation for my participation in this case.

40. The opinions expressed in this declaration are my own and do not reflect the opinion of The University of Texas at Austin.

41. I reserve the right to amend or supplement this report as appropriate upon receipt of

- 17 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

additional information or documents.

I declare under penalty of perjury under the laws of the United States and the District of

Columbia that the foregoing is true and correct.

Executed this 28th day of November, 2017, at Austin, Texas.

Luis H. Zayas, Ph.D.

## V. Literature Cited

Aber, J. L., Bennett, N. G., Conley, D. C., & Li, J. (1997). The effects of poverty on child health and development. *Review of Public Health. 18*, 463-483.

Adam, E. K., & Chase-Lansdale, L. (2002). Home sweet home(s): Parental separations, residential moves, and adjustment problems in low-income adolescent girls. *Developmental Psychology. 38*, 792-805.

Adesope, O. O., Lavin, T., Thompson, T., & Ungerleider, C. (2010). Systematic review and meta-analysis on the cognitive benefits of bilingualism. *Review of Educational Research, 80*, 207–245.

Agency for Healthcare Research and Quality (2009). *National healthcare quality report, 2009.* Washington, DC: U.S. Department of Health and Human Services.

Anaya, Y.B-M., del Rosario, M., Doyle, L., & Hayes-Bautista, D.E. (2014). Undocumented students pursuing medical education: The implications of Deferred Action for Childhood Arrivals (DACA). *Academic Medicine, 89,* 1599-1602.

Ayon, C. (2014). Service needs among Latino immigrant families: Implications for social work practice. *Social Work, 59*, 13-23

Barajas, R., Philipsen, N., & Brooks-Gunn, J. (2008). Cognitive and emotional outcomes for children in poverty. In D. Crane & T. Heaton (Eds.), *Handbook of families and poverty.* Thousand Oaks, CA: Sage Publications.

Bethell, C.D., Newacheck, P., Hawes, E., Halfon, N. (2014). Adverse childhood experiences: Assessing the impact on health and school engagement and the mitigating role of resilience. *Health Affairs, 33*, 2106-2115

Bialystok, E., Craik, F. I. M., Green, D. W., & Gollan, T. H. (2009). Bilingual minds. *Psychological Science in the Public Interest, 10*, 89–129.

Blair, C., & Raver, C. C. (2012). Child development in the context of adversity: Experiential canalization of brain and behavior. *American Psychologist, 67*, 309-318.

Brabeck, K., & Xu, Q. (2010). The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration. *Hispanic Journal of Behavioral Sciences, 32,* 341-361.

Chavez, J. M., Lopez, A., Englebrecht, C. M., & Viramontez Anguiano, R. P. (2012). *Sufren los niños*: Exploring the impact of unauthorized immigration status on children's well-being. *Family Court Review, 50,* 638–649.

Cook, J.T., Frank, D.A., Berkowitz, C., Black, M.M, Casey, P.H., Cutts, D.B., Meyers, A.F., Zaldivar, N., Skalicky, A., Levenson, S., Heeren, T., & Nord, M. (2003). Food insecurity is associated with adverse health outcomes among human infants and toddlers. *The Journal of Nutrition, 134*, 1432-1438.

Cousineu, M.R., Farias, A.J., & Pickering, T. (2009). *Preventable hospitalizations among children in Los Angeles County and the impact of the CHI.* University of Southern California Center for Community Health Studies.

Crosnoe, R. (2006). *Mexican roots, American schools: Helping Mexican immigrant children succeed.* Palo Alto, CA: Stanford University Press.

Declaration of Luis H. Zayas, PhD
November 28, 2017

Dreby, Joanna (2012). The burden of deportation on children in Mexican immigrant families. *Journal of Marriage and the Family, 74,* 829-845.

Engel de Abreu, P. M. J., Cruz-Santos, A., Tourinho, C. J., Martin, R., & Bialystok, E. (2012). Bilingualism enriches the poor: Enhanced cognitive control in low-income minority children. *Psychological Science, 23*, 1364–1371.

Engelmann, M., Landgraf, R., & Wotjak, C.T. (2004). The hypothalamic-neurohypophysial system regulates the hypothalamic–pituitary–adrenal axis under stress: an old concept revisited. *Frontiers in Neuroendocrinology, 25,* 132–149.

Evans, G. W. (2006). Child development and the physical environment. *Annual Reviews, 57,* 423–51.

Felitti, V. J., Anda, R. F., Nordenberg, D., Williamson, D. F., Spitz, A. M., Edwards, V., . . . Marks, J. S. (1998). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults: The Adverse Childhood Experiences (ACE) Study. *American Journal of Preventive Medicine*, *14*, 245–258.

Finkelhor, D., Turner, H. A., Shattuck, A., & Hamby, S. L. (2013). Violence, crime, and abuse exposure in a national sample of children and youth: An update. *JAMA Pediatrics, 167*, 614–621.

Gonzales, R. (2011). Learning to be legal: Undocumented youth and shifting legal contexts in the transition to adulthood. *American Sociological Review, 76,* 602-619.

Gonzales, R., Terriquez, V., & Ruszczyk, S. P. (2014). Becoming DACAmented: Assessing the short-term benefits of Deferred Action for Childhood Arrivals (DACA). *American Behavioral Scientist, 58,* 1852-1872.

Gulbas, L. E., Zayas, L. H., Yoon, H., Szlyk, H., Aguilar-Gaxiola, S., & Natera, G. (2015). Deportation experiences and depression among U.S. citizen-children with undocumented Mexican parents. *Child: Care, Health, and Development, 42,* 220-230

Hainmueller, J. Lawrence, D., Martén, L., Black, B., Figueroa, L., Hotard, M., Jiménez, T.R., Mendoza, F., & Rodriguez, M. I. (2017). Protecting unauthorized immigrant mothers improves their children's mental health. *Science, 357,* 1041–1044.

Haskins, R., Greenburg, M., & Fremstad, S. (2004).  Federal policy for immigrant children: Room for common ground? *Future of Children, 14,* 1-6.

Hernandez, D.J., Denton, S.E., & Macartney, S.E. (2008). Children in immigrant families: Looking to America's future. *Social Policy Report (Society for Research in Child Development), XXII,* 3-22

Kalashnikova, M. & Mattock, K. (2014). Maturation of executive functioning skills in early sequential bilingualism. *International Journal of Bilingual Education and Bilingualism*, 17, 111-123.

Kalil, A., & Chen, J.-H. (2008). Mothers' citizenship status and household food insecurity among low-income children of immigrants. *New Directions in Child and Adolescent Research, 121,* 43-62.

Kalil, A., & Crosnoe, R. (2009). Two generations of educational progress in Latin American immigrant families in the United States. In E. Grigorenko & R. Takanishi (Eds.), *Immigration, diversity, and education* (pp. 188-204). New York: Routledge.

Luk, G., Green, D., Abutalebi, J., & Grady, C. L. (2011). Cognitive control for language switching in bilinguals: A quantitative metaanalysis of functional neuroimaging studies. *Language and Cognitive Processes, 27,* 1479-1488.

Martinez, O., Wu, E., Sandfort, T., Dodge, B., Carballo-Dieguez, A., Pinto, R., Rhodes, S., Moya, E., & Chavez-Baray, S. (2015). Evaluating the impact of immigration policies on health status among undocumented immigrants: A systematic review. *Journal of Immigrant and Minority Health, 17,* 947-970.

Matthews, H., & Ewen, D. (2006). *Reaching all children? Understanding early care and education participation among immigrant families.* Washington, DC: Center for Law and Social Policy.

McEwen, B.S., & Stellar, E. (1993). Stress and the individual: Mechanisms leading to disease. *Archives of Internal Medicine.* 153, 2093–101.

McKay-Semmler, K., & Kim, Y. Y. (2014). Cross-cultural adaptation of Hispanic youth: A study of communication patterns, functional fitness, and psychological health. *Communication Monographs, 81,* 1-24.

McLoyd, V. C. (1989). Socialization and development in a changing economy: The effects of paternal job and income loss on children. *American Psychologist, 44,* 293-302.

McLoyd, V. C. (1998). Socioeconomic disadvantage and child development. *American Psychologist,53, 1*85-204.

Miller, G.E., Chen, E., & Zhou, E.S. (2007). "If it goes up, must it come down?" Chronic stress and the

- 19 -

Declaration of Luis H. Zayas, PhD
November 28, 2017

hypothalamic–pituitary–adrenocortical axis in humans. *Psychological Bulletin. 133*, 25–45.

Ortega, A.N., Fang, H., Perez, V. H., Rizzo, J. A., Carter-Pokras, O., Wallace, S.P., & Gelberg, L. (2007). Health care access, use of services, and experiences among undocumented Mexicans and other Latinos. *Archives of Internal Medicine, 26*, 2354-2360.

Ortega, A. N., Horwitz, S. M., Fang, H., Kuo, A. A., Wallace, S. P., & Inkelas, M. (2009). Documentation status and parental concerns about development in young US children of Mexican origin. *Academic Pediatrics, 9*, 278-82.

Patler, C., & Pirtle, W. L. (2017). From undocumented to lawfully present: Do changes in legal status impact psychological wellbeing among Latino immigrant young adults. *Social Science and Medicine,* Online First (March 9).

Peters, A., McEwen, B.S. & Friston, K. (2017) Uncertainty and stress: Why it causes diseases and how it is mastered by the brain. *Progress in Neurobiology, 156*, 164-188.

Raymond-Flesch, M., Siemons, R., Pourat, H., Jacobs, K., & Brindis, C. D. (2014). "There is no help out there and if there is, it's really hard to find": A qualitative study of the health concerns and health care access of Latino "DREAMers." *Journal of Adolescent Health, 55,* 323-328.

Siemons, R., Raymond-Flesch, M., Auerswald, C.L., & Brindis, C.D. (2017). Coming of age on the margins: Mental health and wellbeing among Latino immigrant young adults eligible for Deferred Action for Childhood Arrivals (DACA). *Journal of Immigrant and Minority Health, 19,* 543-551.

Sudhinaraset, M., To, T.M., Ling, I., Melo, J., & and Chavarin, J. (2017). The influence of Deferred Action for Childhood Arrivals on undocumented Asian and Pacific Islander young adults: Through a social determinants of health lens. *Journal of Adolescent Health, 60,* 741-746.

Taylor, P., Lopez, M. H., Martinez, J. H., & Velasco, G. (2012). *When labels don't fit: Hispanics and their views of identity.* Washington, DC: Pew Hispanic Center.

Thoresen, S., Myhre, M., Wentzel-Larsen, T., Aakvaag, H. F., & Hjemdal, O. K. (2015). Violence against children, later victimisation, and mental health: A cross-sectional study of the general Norwegian population. *European Journal of Psychotraumatology, 6*, Article 26259.

Van Niel, C., Pachter, L. M., Wade, R., Jr Felitti, V. J., Jr, & Stein, M. T. (2014). Adverse events in children: Predictors of adult physical and mental conditions. *Journal of Developmental & Behavioral Pediatrics*, *35*, 549–551.

Venkataramani, A., Shah, S. J., O'Brien, R., Kawachi, I., & Tsai, A. C. (2017). Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: A quasi-experimental study. *The Lancet Public Health, 2, 175–181.*

Venkataramani, A., & Tsai, A. (2017). Dreams Deferred — The Public Health Consequences of Rescinding DACA. *New England Journal of Medicine, 377,* 1707-1709.

Yoshikawa, H. (2011). *Immigrants raising citizens: Undocumented parents and their young children.* New York: Russell Sage Foundation.

Yoshikawa, H., Aber, J. L., & Beardslee, W. R. (2012). The effects of poverty on the mental, emotional, and behavioral health of children and youth: Implications for prevention. *American Psychologist, 67*, 272-284.

Zayas, L. H. (2015). *Forgotten Citizens: Deportation, children, and the making of American exiles and orphans.* New York: Oxford University Press.

Zayas, L. H., Aguilar-Gaxiola, S., Yoon, H., & Natera Rey, G. (2015).  The distress of citizen-children with detained and deported parents. *Journal of Child and Family Studies, 24* (11), 3213-3223.

Zayas, L. H., & Gulbas, L. E. (2017). Processes of belonging for citizen-children of undocumented Mexican immigrants. *Journal of Child and Family Studies, 26,* 2463-2474.

Zigler, E. F., & Hall, N. W. (2000). *Child Development and Social Policy.* McGraw-Hill.

# EXHIBIT A

**LUIS H. ZAYAS**

## Education

| | | | |
|---|---|---|---|
| PhD | 1986 | Columbia University | Developmental Psychology |
| MPhil | 1985 | Columbia University | Developmental Psychology |
| MA | 1984 | Columbia University | Developmental Psychology |
| MS | 1975 | Columbia University | Social Work |
| BA | 1973 | Manhattan College | Economics/Liberal Arts |
| Certificate | 1989 | Westchester Center for the Study of Psychoanalysis & Psychotherapy Training in Psychoanalysis & Psychotherapy (1985-1989) | |

## Current Positions
## Academic

2012-    Dean
         Robert Lee Sutherland Chair in Mental Health and Social Policy
         Steve Hicks School of Social Work
         University of Texas at Austin

2013-    Affiliated faculty, Lozano Long Institute for Latin American Studies/Benson The University of Texas at Austin, College of Liberal Arts

2017-    Professor of Psychiatry, Dell Medical School, University of Texas at Austin

## Community and Professional Service

207-     American Academy of Social Work and Social Welfare, Board of Directors, Member

2016-    Young Voices of Austin (community chorus), Board of Directors, Member

2014-18  St. Louis Group for Excellence in Social Work Research and Education (Research I universities), President, 2016-2018; Member-at-Large, 2014-2016

2015-17  Council on Contemporary Families, Board of Directors

2015-17  Lozano Long Institute for Latin American Studies (LLILAS), University of Texas at Austin, Executive Committee

2014-    Migrant Clinicians Network, Austin, TX, Member, External Advisory Board

2014-16  Austin-Travis County Children's Mental Health Leadership Team

2014-17  National Association of Deans and Directors of Schools of Social Work Member at Large

2014-    *Revista de Trabajo Social*, Pontificia Universidad Católica de Chile, Santiago. Member, Editorial Board

Zayas, Luis H.

2013-    El Buen Samaritano Episcopal Mission, Austin, TX
         Member, Board of Directors

**Previous Academic Experience**

2002-11  Washington University in St. Louis
         Shanti K. Khinduka Distinguished Professor of Social Work (2002-2011)
         Associate Dean for Faculty (2005-2007).
         Director, Center for Latino Family Research (2005-2011)
         Professor of Psychiatry, Washington University School of Medicine (2004-11).

1990-05  Albert Einstein College of Medicine
         Visiting Associate Professor of Family Medicine (1995-2005)
         Associate Professor of Family Medicine (1992-95)
         Visiting Clinical Assistant Professor of Psychiatry (1995-2002)
         Assistant Clinical Professor Psychiatry (1990-95)

1991-02  Fordham University
         Professor of Social Work (1999-2002)
         Associate Professor (1995-1999)
         Director, Center for Hispanic Mental Health Research (1999-2002)
         Director, Pre-Doctoral Research Training in Minority Mental Health (2001-03)
         Research Associate, Hispanic Research Center (1991-95)
         Adjunct Associate Professor of Psychology (1989-95)
         Ford Foundation Postdoctoral Fellow (1987-88)

1980-89  Columbia University
         Adjunct Associate Research Scholar (1988-89)
         Assistant Professor of Social Work (1982-88)
         Lecturer (1980-82)
         Project Director, Hispanic Development Project (1985-88)
         Faculty Field Instructor, Puerto Rican Community Mental Health Project
         (1980-82)

1976-82  College of Mount Saint Vincent
         Adjunct Instructor in Sociology
         Consulting Director, social work program

1978     Westchester Community College
         Adjunct Instructor of Human Services

1976     Manhattan College
         Adjunct Lecturer in Sociology

2

Zayas, Luis H.

**Clinical Practice and Pre-Professional Experience**

2006-        Independent practice in evaluation of citizen-children in deportation cases

1980-2000 Independent practice (part-time). Psychotherapy and family therapy

1990-95      Montefiore Medical Center, Department of Family Medicine
             Psychosocial Unit Coordinator, Comprehensive Health Care Center (1992-95)
             Psychosocial Faculty/Assistant Attending Psychologist, Residency Program in
             Social Medicine

1988-90      Fordham-Tremont Community Mental Health Center, NY, Clinical Supervisor

1978-80      The New York Hospital-Cornell Medical Center
             Clinical Social Worker in child & adolescent psychiatric OPD
             Payne-Whitney Psychiatric Clinic

1975-78      Blythedale Children's Hospital, NY, Pediatric Social Worker

1974-75      Lenox Hill Hospital, NY, Medical Social Work Intern

1973-74      Mobilization for Youth, NY, Social Work Intern, Juvenile Court Program

1972-73      United States Committee for UNICEF, NY, Intern

1970         World Youth Assembly, United Nations, NY, Interpreter (June)

**Awards and Honors**

2016         Carl A. Scott Memorial Lecture, Council on Social Work Education (Annual
             Program Meeting, Atlanta, GA)

2016         BUILDing SCHOLARS Mentor Award, University of Texas, El Paso

2012         Fellow, American Academy of Social Work and Social Welfare (inducted
             November 2012)

2007         Distinguished Faculty Award, George Warren Brown School of Social Work,
             Washington University in St. Louis

2004-05      Outstanding Faculty Mentor, Graduate Student Senate of Washington University,

3

Zayas, Luis H.

1993        Economic and Cultural Diversity Award (for work with AIDS orphans and their families), American Family Therapy Academy ($2,500 award)

**Research & Training Grants**

2017-19     National Institute on Minority Health and Health Disparities—Principal Investigator "Why Adolescent Latinas Attempt Suicide More than Other Females" (R21 MD012338-01).  Funded: $409,711.

2016        National Institute on Minority Health and Health Disparities—Principal Investigator "Undocumented, Unaccompanied, and Citizen: Charting Research Directions for Children of Immigration" (R13 MD010415-01). Funded: $50,000

2012-15     Health Resources and Services Administration—Principal Investigator "Mental and Behavioral Health Education and Training Program" (MO1HP25200). Funded: $480,275

2011-13     National Institute of Child Health and Human Development—Principal Investigator "Exploring the Effects of Parental Deportation on U.S. Citizen Children" (R21HD068874-01). Funded: $426,856

2010-11     Fathers' Support Center, Saint Louis—Project Director of Manual Development for "Family Formation Program." Funded: $31,218

2011        Fathers' Support Center, Saint Louis—Program Evaluator "Citibank Financial Education Curriculum Program." Funded: $8,641

2010-11     Lutheran Foundation of Saint Louis—Project Director, "Mental Health Service for *Casa de Salud.*" Funded: $75,000

2010-12     National Institute of Mental Health—Principal Investigator "Adapting Interventions for Diverse Ethnocultural Families" (R13MH086306) Funded: $156,000

2008-11     National Institute of Mental Health—Co-Principal Investigator "Systems of Care for New Moms: Integrating Depression Treatment" (R34 MH083085). Funded: $450,000

2008-10     Procter & Gamble Fund—Project Director "Inspiring Leaders Improving Our Communities" speakers' series. Funded: $10,000

4

Zayas, Luis H.

2005-10    New York Council on Adoptable Children (from Administration for Children and Families/DHHS)—Co-Investigator, Program Evaluator "Realizing Open Adoption Dreams." Funded: $1,500,000

2006-11    Puerto Rican Family Institute, Inc. (from Administration for Children and Families/DHHS)—Co-Investigator, Program Evaluator "Building Pathways for Latino Fathers." Funded: $900,000

2006-09    National Institute of Mental Health—Principal Investigator "Developing Interventions for Latino Children, Youth and Families" (R13 MH077403-01). Funded: $189,320

2005-10    National Institute of Mental Health—Associate Director (2005-2006) (Enola Proctor, PI) "Mental Health Services Pre-doctoral and Post-doctoral Training Program." (T32 MH19960-11)

2005-10    National Institute of Mental Health—Principal Investigator "Sociocultural Processes in Latina Teen Suicide Attempts" (R01 MH070689-01A1). Funded: $1,733,337

2003-05    National Institute of Mental Health—Principal Investigator "Hispanicity, Language and Psychiatric Diagnosis" (R21 MH065921). Funded: $278,560

2001-03    National Institute of Mental Health—Principal Investigator "Predoctoral Research Training in Minority Mental Health" (T32 MH20074). Funded $1,117,503

1999-03    National Institute of Mental Health—Principal Investigator "Center for Hispanic Mental Health Research" (R24 MH60002). Funded $2,245,368
Minority Supplement to grant for Manny J. Gonzalez, D.S.W., ($212,192)

1998-03    National Institute of Mental Health—Principal Investigator "Reducing Perinatal Depression and Enhancing Parenting" (R24 MH57936). Funded $1,321,503
Minority Supplement to grant for Zulema E. Suárez, Ph.D. ($242,000)

1993-95    National Institute of Child Health and Human Development—Co-Investigator (Busch-Rossnagel, P.I.) "Development in Puerto Rican and Dominican Toddlers" (1 RO1 HD30590). Funded $500,000

1993-95    Department of Family Medicine, Montefiore Medical Center
Chairman's Fund Faculty Research Grants"
Co-Principal Investigator (with Philip Ozuah, MD) "Mercury Use in *Espiritismo.*" Funded: $2,500
Co-Principal Investigator (with Marji Gold, MD) "Barriers to Ophthalmic Screening among Hispanic Diabetics" Funded $2,500

5

Zayas, Luis H.

1991-93    Alcoholic Beverage Medical Research Foundation—Principal Investigator
           "Factors associated with alcohol use by Hispanic men in early adulthood."
           Funded: $75,000

1988-89    National Science Foundation—Principal Investigator "Attachment and Mastery
           Motivation in Hispanic Infants" (RII-8812284 planning grant). Funded: $12,000

1987-88    National Research Council—Ford Foundation Postdoctoral Fellow
           (Developmental Psychology). Funded: $25,000 plus research expenses

1974-75    NIMH Psychiatric Traineeship, Columbia University (Full tuition).


**Past Professional and Community Service**

2013-16    St. Louis Group (SSWs in Research 1 universities)
           Member at Large, Executive Committee

2012-15    National Association of Social Workers, Washington, DC
           Member, Book Committee, NASW Publications

2012-15    University of Massachusetts Medical School, Worcester, MA
           Chair, External Advisory Committee, Center for Health Equity Intervention
           Research (CHEIR)

2010-12    National Institutes of Health, Center for Scientific Review
           Member, College of CSR Reviewers

2006-09    George Washington University, Center for Health and Health Care in Schools
           Member, National Advisory Committee, Caring Across Communities: Addressing
           Mental Health Needs of Diverse Children and Youth

2005-09    National Institutes of Health, Center for Scientific Review
           Member, Psychosocial Development, Risk and Prevention Study Section

1999-00    National Institute of Mental Health, Member, Services Research Review
           Committee

1996-      National Institutes of Health, Center for Scientific Review, Reviewer, Occasional
           Chair

1996-99    National Institute of Mental Health, Member, Child Psychopathology and
           Treatment Review Committee

6

Zayas, Luis H.

1990-00    National Research Council, Member (1990-93, 1996), Chair (1999, 2000), Evaluation Panel in Psychology, Ford Foundation Predoctoral Fellowships for Minorities

1988-89    National Research Council, Member, Ford Foundation Fellows' Conference Planning Committee

**Professional Affiliations and Licenses**
American Psychological Association
Council on Social Work Education
National Association of Social Workers
Society for Social Work and Research

State of Texas Licensed Psychologist #36381 (issued 2012)
State of Texas Licensed Clinical Social Worker #57642 (issued 2013)
State of Missouri Licensed Psychologist #2002030464 (2002-2013)
State of New York Licensed Psychologist # 010116 (1989-2005)
State of New York Licensed Clinical Social Worker # 017492 (1975-2005)

**Publications**
*Books*

*Forgotten Citizens: Deportation, Children, and the Making of American Exiles and Orphans.* (2015, Oxford University Press)
- Finalist, 2016 Hamilton Book Award, University of Texas Co-Operative Society.
- Honorable Mention, 2016 Outstanding Social Work Book Award, Society for Social Work and Research

*Latinas Attempting Suicide: When Cultures, Families, and Daughters Collide*.  (2011, Oxford University Press)

*Peer-Review Journal Articles and Chapters*

121.  Szlyk, H., Gulbas, L. E., & **Zayas, L. H.** (under review). "I just kept it to myself:" The roles of secrets and silence among Latina teenage suicide attempters. *Family Process.*

120.  **Zayas, L. H.** (in press). Immigration enforcement practices harm refugee children and citizen-children. *Zero to Three Journal*

119.  Berger Cardoso, J., Brabeck, K., Stinchcomb, D., Heidbrink, L., Acosta Price, O., Gil-García, O., Crea, T.M., & **Zayas, L.H.** (*in press*). Integration for unaccompanied migrant

7

Zayas, Luis H.

youth in the United States: A call for research. *Journal of Ethnic and Migration Studies*

118. Hausmann-Stabile, C., Gulbas, L., **Zayas, L.H.**, & Dobel, S. (forthcoming). Lecciones Aprendidas en una Década Estudiando las Conductas Suicidas en Adolescentes. Fundacion Tierra de Esperanza (Eds.), *Niñez y Adolescencia: Aprendizajes y Desafíos para su Bienestar*. Concepción, Chile.

117. **Zayas, L.H.**, Brabeck. K.M., Cook Heffron, L., Dreby, J., Calzada, E.J., Parra-Cardona, J.R., Dettlaff, A.J., Heidbrink, L., Perreira, K.M., & Yoshikawa, H. (2017). Charting directions for research on immigrant children affected by undocumented status. *Hispanic Journal of Behavioral Sciences, 39 (4),*

116. **Zayas, L. H.**, & Gulbas, L. E. (2017). Processes of belonging for citizen-children of undocumented Mexican immigrants. *Journal of Child and Family Studies, 26,* 2463-2474. doi: 10.1007/s10826-017-0755-z

115. Hausmann-Stabile, C., Gulbas, L.E., & **Zayas, L. H.** (2017). Treatment narratives of suicidal Latina teens. *Archives of Suicide Research.*

114. Gulbas, L.E. & **Zayas, L.H.** (2017).  Exploring the effects of U.S. immigration enforcement on the well-being of citizen-children in Mexican immigrant families. *The Russell Sage Foundation Journal of the Social Sciences, 3 (4),* 53-69.

113. Hausmann-Stabile, C., Gulbas, L. E., & **Zayas, L. H.** (2016). Growing up in the US Inner City: Exploring the adolescent development and acculturation of urban suicidal Latinas. In S. J. Schwartz & J. B. Unger (Eds.), *The Oxford Handbook of Acculturation and Health* (pp. 221-237). New York: Oxford University Press. doi: 10.1093/oxfordhb/9780190215217.013.17

112. **Zayas, L. H.** (2016). Foreword. In A.J. Dettlaff & R. Fong (Eds.), *Immigrant and refugee children and families: Culturally responsive practice* (pp. xi-xiii).  New York: Columbia University Press.

111. Sanchez, D., Whittaker, T., Hamilton, W., & **Zayas, L. H.** (2015). Exploring the links between marianismo, perceived discrimination, substance use, psychological distress and sexual risk behaviors in Latina preadolescent girls. *Cultural Diversity and Ethnic Minority Psychology, 22,* 395-407.

110. Gulbas, L. E., **Zayas, L. H.**, Yoon, H., Szlyk, H., Aguilar-Gaxiola, S., & Natera, G. (2015). Deportation experiences and depression among U.S. citizen-children with undocumented Mexican parents. *Child: Care, Health, and Development, 42,* 220-230.

8

Zayas, Luis H.

109. Gulbas, L., Hausmann-Stabile, C., De Luca, S., Tyler, T.R., & **Zayas, L.H.** (2015). An exploratory study of non-suicidal self-injury and suicidal behavior in adolescent Latinas. *American Journal of Orthopsychiatry, 85,* 302-314.

108. **Zayas, L. H.**, Aguilar-Gaxiola, S., Yoon, H., & Natera Rey, G. (2015). The distress of citizen-children with detained and deported parents. *Journal of Child and Family Studies, 24* (11), 3213-3223.

107. **Zayas, L. H.**, & Bradlee, M. (2015). Children of undocumented immigrants: Imperiled developmental trajectories. In E. P. Salett & D. R. Koslow (Eds.), *Race, ethnicity and self* (pp. 63-84). Washington, DC: National Association of Social Workers.

106. Gulbas, L.E. & **Zayas, L.H.** (2015) Examining the interplay among family, culture, and Latina teen suicidal behavior. *Qualitative Health Research, 25(5),* 689-699.

105. **Zayas, L.H.**, Hausmann-Stabile, C., & De Luca, S.M. (2014). Chapter 15—Suicidal behaviors and U.S. Hispanic youth: Social, psychological, and cultural factors and challenges for interventions. In D. A. Lamis & N. J. Kaslow (Eds.), *Advancing the science of suicidal behavior: Understanding and intervention* (pp. 269-282). Hauppauge, NY: Nova Science Publishers.

104. **Zayas, L.H.**, & Bradlee, M. (2014). Exiling children, creating orphans: When immigration policies hurt citizens. *Social Work, 59,* 167-175.

103. Sampson, M., **Zayas, L.H.,** & Seifert, S.B. (2013). Treatment engagement using motivational interviewing for low-Income, ethnically diverse mothers with postpartum depression. *Clinical Social Work Journal, 41*, 387-394

102. Hausmann-Stabile, C., Gulbas, L., & **Zayas, L.H.** (2013). Aspirations of Latina adolescent suicide attempters: "Tomorrow I won't have to wake up to my future." *Hispanic Journal of Behavioral Sciences, 35,* 390-406.

101. **Zayas, L.H.**, & Sampson, M. (2013). Perinatal depression and treatments for U.S. Latinas: A review of research findings. In S. Lara-Cinisomo & K. Wisner (Eds.), *Perinatal depression among Spanish-Speaking Women: A Global perspective on prevalence, treatment, and outcomes* (pp. 65-82). NY: Springer.

100. **Zayas, L.H.**, & Gulbas, L.E. (2012). Are suicide attempts by adolescent Latinas a cultural idiom of distress? *Transcultural Psychiatry, 49,* 719- 735.

99. Nolle, A.P., Gulbas, L., Kuhlberg, J.A., & **Zayas, L.H.** (2012). Sacrifice for the sake of the family: Expressions of familism by Latina teens in the context of suicide. *American Journal of Orthopsychiatry, 82,* 319–327.

9

Zayas, Luis H.

98.  Peña, J. B., **Zayas, L. H.,** Cabrera-Nguyen, P., & Vega, W. A. (2012).  U.S. cultural involvement and its association with suicidal behavior among youths in the Dominican Republic. *American Journal of Public Health, 102,* 664–671.

97.  **Zayas, L.H.,** Bellamy, J.L., & Proctor, E. (2012). Considering the multiple service contexts in cultural adaptations: The case for parenting interventions.  In R. Brownson, G. Colditz, & E. Proctor, *Dissemination and implementation research in health: Translating science to practice* (pp. 483-497). New York: Oxford University Press.

96.  Hausmann-Stabile, C., Kuhlberg, J.A., **Zayas, L.H.,** Nolle, A.P., & Cintron, S. (2012). Means, intent, lethality, behaviors, and psychiatric diagnoses in Latina adolescent suicide attempters. *Professional Psychology: Research and Practice, 43*(3), 241-248.

95.  Hausmann-Stabile, C., **Zayas, L.H.,** Hauser, D., Carvajal, C., Mejia, C., & Nieves, D. (2011). Challenges and solutions for Latin American-trained international medical graduates in psychiatry residency. *International Journal of Mental Health, 40,* 29-40.

94.  **Zayas, L.H.,** Hausmann-Stabile, C., & Kuhlberg, J.A. (2011).  Can mother-daughter relations reduce the chance of a suicide attempt among Latinas? *Depression Research and Treatment.*

93.  Hausmann-Stabile, C., **Zayas, L.H.,** Runes, S., Abenis-Cintron, A., & Calzada, E. (2011). *Ganando confianza*: Research focus groups with immigrant Mexican mothers. *Education and Training in Developmental Disabilities, 46,* 3-10.

92.  Peña, J.B., Matthieu, M.M., **Zayas, L.H.,** Masyn, K.E., & Caine, E.D. (2011). Co-occurrence of risk behaviors among White, Black, and Hispanic US high school adolescents who have attempted suicide, 1999 to 2007. *Social Psychiatry and Psychiatric Epidemiology, 47*, 29-42.

91.  Peña, J.B. Kuhlberg, J.A., Zayas, L.H., Baumann, A.A., Gulbas, L., Hausmann-Stabile, C., & Nolle, A.P. (2011) Familism, family environment, and suicide attempts among Latina youth. *Suicide and Life*‐*Threatening Behavior, 41,* 330-341.

90.  Gulbas, L.E., **Zayas, L.H.,** Nolle, A.P., Hausmann-Stabile, C., Kuhlberg, J.A., Baumann, A.A., & Peña, J.B. (2011). Family relationships and Latina teen suicide attempts: Reciprocity, asymmetry, and detachment. *Families in Society, 92,* 317-323.

89.  **Zayas, L.H.,** Drake, B., & Jonson-Reid, M. (2011). Overrating or dismissing the value of evidence-based practice: Consequences for clinical practice. *Clinical Social Work Journal, 39,* 400-405.

Zayas, Luis H.

88.  Baumann, A.A., Kuhlberg, J.A., & **Zayas, L.H.** (2010). Familism, mother-daughter mutuality, and suicide attempts of adolescent Latinas. *Journal of Family Psychology, 24,* 616-624.

87.  **Zayas, L.H.** (2010). Protecting citizen-children safeguards our common future. *Journal of Health Care for the Poor and Underserved, 21, 809-814.*

86.  Kuhlberg, J.A., Peña, J.B., **Zayas, L.H.** (2010). Familism, parent-adolescent conflict, self-esteem, internalizing behaviors and suicide attempts among adolescent Latinas. *Child Psychiatry and Human Development, 41,*425-440.

85.  **Zayas, L.**, Gulbas, L.E., Fedoravicius, N., & Cabassa, L.J. (2010). Patterns of distress, precipitating events, and reflections on suicide attempts by young Latinas. *Social Science and Medicine, 70,* 1773-1779.

84.  **Zayas, L.H.,** Torres, L.R., & Kyriakakis, S. (2010). Culturally competent assessment of Latino clients. In R. Furman & N. Negi (Eds.), *Social Work Practice with Latinos: Key Issues and Emerging Themes* (pp. 161-183).  Chicago, IL: Lyceum Books.

83.  **Zayas, L.H.** (2010). Seeking models and methods for cultural adaptation of interventions: Commentary on the special section. *Cognitive and Behavioral Practice, 17,* 198-202.

82.  **Zayas, L.H.,** Bright, C., Alvarez-Sanchez, T., & Cabassa, L.J. (2009). Acculturation, familism and mother-daughter relations among suicidal and non-suicidal adolescent Latinas. *Journal of Primary Prevention, 30,* 351-369.

81.  **Zayas, L.H.**, Hausmann-Stabile, C., & Pilat, A.M. (2009).  Recruiting urban Latina adolescents and their families: Challenges and lessons learned in suicide attempts research. *Youth & Society, 40,* 591-602.

80.  **Zayas, L.H.** & Torres, L.R. (2009). Culture and masculinity: When therapist and patient are Latino men. *Clinical Social Work Journal, 37,* 294-302.

79.  **Zayas, L.H.**, Torres, L. R., & Cabassa, L.J. (2009). Clinician ethnicity in diagnostic, symptom, and functional assessments of Hispanic outpatients. *Community Mental Health Journal, 45*, 97-105.

78.  **Zayas, L.H.,** Borrego, J., & Doménech Rodríguez, M. (2009). Parenting interventions for Latino familias and children. (Invited chapter). In F. Villaruel, G. Carlo, M. Azmitia, N. Cabrera, & J. Chahin (Eds), *Handbook of Latino Psychology: Developmental and Community Based Perspectives* (pp. 291-307). Sage Publications.

77.  Peña, J.B., Wyman, P.A., Brown, C.H., Matthieu, M.M., Olivares, T.E., Hartel, D., & **Zayas, L.H.** (2008). Immigration generation status and its association with suicide attempts, substance use, and depressive symptoms among Latino adolescents in the United

11

Zayas, Luis H.

States. *Prevention Science, 9,* 299-310.

76. **Zayas, L.H.** (2008). Commentary on Rojas et al. 2007 in Lancet. *Evidence-Based Mental Health.*

75. **Zayas, L.H.**, & Pilat, A.M. (2008). Suicidal behavior in Latinas: Explanatory cultural factors and implications for intervention. *Suicide and Life-Threatening Behavior, 38,* 334-342.

74. Torres, L.R., Cabassa, L.J., **Zayas, L.H.**, & Alvarez-Sánchez, T.A. (2008). Assessing psychosocial stressors in Hispanic outpatients: Does clinician ethnicity matter? *Psychiatric Services, 58,* 690-692.

73. Torres, L.R., Peña, J.B., Westhoff, W.W. & **Zayas, L.H.** (2008). A cross-national comparison of adolescent alcohol and drug use behaviors: U. S. Hispanics and youth in the Dominican Republic. *Journal of Drug Issues, 38,*149-170.

72. Goldston, D., Molock, S.D., Whitbeck, L., Murakami, J.L., **Zayas, L.H.**, & Nakayama Hall, G. (2008). Cultural considerations in adolescent suicide prevention and psychosocial treatment. *American Psychologist, 63,* 14-31.

71. Drake, B., Hovmand, P., Jonson-Reid, M., & **Zayas, L.H.** (2007). Adopting and teaching evidence-based practice in masters level social work programs. *Journal of Social Work Education, 43*, 431-446.

70. Torres, L. R., **Zayas, L.H.**, Cabassa, L. J., & Perez, M.C. (2007). Diagnosing co-occurring substance related disorders: Agreement between SCID, Hispanic and non-Hispanic clinicians. *Journal of Clinical Psychiatry, 68,* 1655-1662

69. Cavazos-Rehg, P., **Zayas, L.H.**, & Spitznagel, E.L. (2007). Legal status, emotional well-being and subjective health status of Latino immigrants. *Journal of the National Medical Association, 99*, 1126–1131.

68. Aisenberg, E., Trickett, P. Mennen, F. Saltzman, W., & **Zayas, L.H.** (2007).  Maternal depression and adolescent behavior problems: An examination of mediation among immigrant Latino mothers and their adolescent children exposed to community violence. *Journal of Interpersonal Violence, 22*, 1227-1249

67. **Zayas, L.H.**, Cabassa, L. J., Perez, M. C., & Cavazos-Rehg, P. (2007). Using interpreters in diagnostic research and practice: Pilot results and recommendations. *Journal of Clinical Psychiatry, 68,* 924-928.

66. Cabassa, L. J. & **Zayas, L.H.** (2007). Latino immigrants' intentions to seek depression care.  *American Journal of Orthopsychiatry, 77,* 231-242.

65. Cabassa, L. J., Lester, R., & **Zayas, L.H.** (2007). "It's like being in a labyrinth:" Hispanic

Zayas, Luis H.

immigrants' perceptions of depression and attitudes toward treatments. *Journal of Immigrant Health, 9,* 1-16.

64. Cavazos-Rehg, P., **Zayas, L.H.**, Walker, M.S., & Fisher, E.B. (2006). Evaluating an abbreviated version of the Hispanic Stress Inventory for Immigrants. *Hispanic Journal of Behavioral Sciences, 28,* 498-515.

63. McKee, M. D., **Zayas, L.H.**, Fletcher, J., Boyd, R. C., & Nam, S. H. (2006). Results of an intervention to reduce perinatal depression among low-income minority women in community primary care. *Journal of Social Service Research, 32,* 63-81.

62. Cabassa, L. J., **Zayas, L.H.**, & Hansen, M. (2006). Latino adults' access to mental health services: A review of epidemiological studies. *Administration and Policy in Mental Health and Mental Health Services Research, 33,* 316-330.

61. Boyd, R. C., **Zayas, L.H.**, & McKee, M. D. (2006). Mother-infant interaction, life events and prenatal and postpartum depressive symptoms among urban minority women in primary care. *Maternal and Child Health Journal, 10,* 139-148.

60. **Zayas, L.H.**, Cabassa, L. J., Perez, M. C., & Howard, M. O. (2005). Clinician-patient ethnicity in psychiatric diagnosis: A pilot study with Hispanics. *Journal of Ethnic & Cultural Diversity in Social Work, 14,* 93-109.

59. **Zayas, L.H.**, Cabassa, L. J., & Perez, M.C. (2005). Capacity-to-consent in psychiatric research: Development and preliminary testing of a screening tool. *Research on Social Work Practice, 15,* 545-556.

58. **Zayas, L.H.**, Lester, R. J., Cabassa, L. J., & Fortuna, L. R. (2005). "Why do so many Latina teens attempt suicide?": A conceptual model for research. *American Journal of Orthopsychiatry, 75,* 275-287.

57. **Zayas, L.H.**, Jankowski, K.R.B., & McKee, M. D. (2005). Parenting competency across pregnancy and post-partum among urban minority women. *Journal of Adult Development, 12*, 53-62.

56. **Zayas, L.H.**, McKee, M. D., & Jankowski, K.R.B. (2004). Adapting psychosocial intervention research to urban primary care environments: A case example. *Annals of Family Medicine, 2*, 504-508.

55. McKee, M. D., Jankowski, K. R. B., & **Zayas, L.H.** (2004). Breastfeeding intention and practice in an urban minority population: Relationship to maternal depressive symptoms and mother-infant closeness. *Journal of Reproductive and Infant Psychology, 22*, 167-181.

13

Zayas, Luis H.

54. **Zayas, L.H.**, Gonzalez, M. J., & Hanson, M. (2003) "What do I do now?": On teaching evidence-based interventions for social work practice. *Journal of Teaching in Social Work, 23,* 59-72.

53. **Zayas, L.H.** (2003). Service-delivery factors in the development of practice guidelines. In A. Rosen & E. K. Proctor (Eds.), *Developing practice guidelines for social work interventions: Issues, methods, and research agenda* (pp. 193-206). New York: Columbia University Press.

52. **Zayas, L.H.**, Jankowski, K., & McKee, M. D. (2003). Prenatal and postpartum depression among low-income Dominican and Puerto Rican women. *Hispanic Journal of Behavioral Sciences, 25,* 370-385.

51. Fisher, C. B., Hoagwood, K., Boyce, C., Duster, T., Frank, D. A., Grisso, T., Levine, R. J., Macklin, R., Spencer, M. B., Takanishi, R., Trimble, J. E., & **Zayas, L.H.** (2002). Research ethics for mental health science involving ethnic minority children and youth. *American Psychologist, 57,* 1024-1040.

    Reprinted in: Kazdin, A. E. (Ed.) (2016). *Methodological issues and strategies in clinical research, Fourth Edition* (pp. 525-543). Washington, DC: American Psychological Association.

50. Turner, S., Kaplan, C., **Zayas, L.H.**, & Ross, R. (2002). Suicide attempts by adolescent Latinas: An exploratory study of individual and family correlates. *Child and Adolescent Social Work Journal, 19,* 357-374.

49. **Zayas, L.H.**, & Rojas-Flores, L. (2002). Learning from Latino parents: Combining etic and emic approaches to designing interventions. In J. M. Contreras, K. A. Kerns, & A. M. Neal-Barnett (Eds.), *Latino children and families in the United States* (pp. 233-249). Westport: Greenwood/Praeger Publishers.

48. Cunningham, M., & **Zayas, L.H.** (2002). Reducing depression in pregnancy: Designing multimodal interventions. *Social Work, 47,* 114-123.

47. **Zayas, L.H.**, Cunningham, M., McKee, M. D., & Jankowski, K. R. B. (2002). Depression and negative life events among pregnant African-American and Hispanic women. *Women's Health Issues, 12,* 16-22.

46. **Zayas, L.H.** (2001). Incorporating struggles with racism and ethnic identity in therapy with adolescents. *Clinical Social Work Journal, 29,* 361-373.

45. McKee, M. D., Cunningham, M., Jankowski, K. R. B., & **Zayas, L.H.** (2001). Health-related functional status in pregnancy: Relationship to depression and social support in a multi-ethnic population. *Obstetrics and Gynecology, 97,* 988-993.

14

Zayas, Luis H.

44. Dyche, L., & **Zayas, L.H.** (2001).  Cross-cultural empathy and training the contemporary psychotherapist. *Clinical Social Work Journal, 29,* 245-258.

43. Malgady, R. G., & **Zayas, L.H.** (2001). Cultural and linguistic considerations in psychodiagnosis with Hispanics: The need for an empirically informed process model. *Social Work, 46,* 39-49.

42. **Zayas, L.H.**, Canino, I., & Suárez, Z. E. (2001). Parenting in mainland Puerto Rican families: Child-rearing for health and success.  In N.B. Webb (Ed.), *Multicultural parent-child and family relationships* (pp. 133-156). New York: Columbia University Press.

41. Evans, M. E., Mejía-Maya, L. J., **Zayas, L.H.**, Boothroyd, R., & Rodriguez, O. (2001). Conducting research in culturally diverse inner city neighborhoods: Some lessons learned. *Journal of Transcultural Nursing, 12,* 6-14.

40. Kail, B., **Zayas, L.H.**, & Malgady, R. G. (2000). Depression, acculturation, and motivations for alcohol use among young Colombian, Dominican, and Puerto Rican men. *Hispanic Journal of Behavioral Sciences, 22,* 64-77.

39. **Zayas, L.H.**, Kaplan, C., Turner, S., Romano, K., & Gonzalez-Ramos, G.  (2000). Understanding suicide attempts by adolescent Hispanic females. *Social Work, 45,* 53-63.

38. **Zayas, L.H.** (1999). Family and culture in HIV care for a Latino adolescent. In J. Blustein, C. Levine, & N. N. Dubler (Eds.), *The adolescent alone: Decision making in health care in the United States* (pp. 239-242). New York: Cambridge University Press.

37. Morrison, R.S., **Zayas, L.H.**, Mulvihill, M., Baskin, S.A., & Meier, D. E. (1998). Barriers to completion of health care proxies: An examination of ethnic difference. *Archives of Internal Medicine, 158,* 2493-2497.

36. Morrison, R. S., **Zayas, L.H.**, Mulvihill, M., Baskin, S. A., & Meier, D. E. (1998). Barriers to completion of health care proxy forms: A qualitative analysis of ethnic differences. *Journal of Clinical Ethics, 9,* 118-126.

35. **Zayas, L.H.**, Rojas, M., & Malgady, R. G. (1998). Alcohol, drug use, and depression among Hispanic men in early adulthood. *American Journal of Community Psychology, 26,* 425-438.

34. Gonzalez-Ramos, G., **Zayas, L.H.**, & Cohen, E. V. (1998). Child-rearing values of low income, urban Puerto Rican mothers of preschool children. *Professional Psychology: Practice and Research, 29,* 377-382.

Zayas, Luis H.

33. Canino, I., & **Zayas, L.H.** (1997). Puerto Rican children. In G. Johnson-Powell, J. Yamamoto, G. E. Wyatt, & W. Arroyo (Eds.), *Transcultural child development: Psychological assessment and treatment* (pp. 61-79) New York: Wiley & Sons.

32. **Zayas, L.H.**, Evans, M. E., Mejía, L., & Rodriguez, O. (1997). Cultural competency training for staff serving Hispanic families with a child in psychiatric crisis. *Families in Society, 78*, 405-412.

31. Romano, K., & **Zayas, L.H.** (1997). Motherless children: Family interventions with AIDS orphans. In E. Congress (Ed.), *Multicultural perspectives in working with families* (pp. 109-124). New York: Springer.

30. Planos, R., **Zayas, L.H.**, Busch-Rossnagel, N. A. (1997). Mental health factors and teaching behaviors among low income Hispanic mothers. *Families in Society, 78*, 4-12.

29. **Zayas, L.H.**, Torres, L., Malcolm, J., & DesRosiers, F. S. (1996). Clinicians' definitions of ethnic-sensitive practice. *Professional Psychology: Research and Practice, 27,* 78-82.

28. **Zayas, L.H.**, & Dyche, L. A. (1995). Suicide attempts in Puerto Rican adolescent females: A sociocultural perspective and family treatment approach. In J.K. Zimmerman & G.M. Asnis (Eds.), *Treatment approaches with suicidal adolescents* (Volume 12, The Einstein Psychiatry Monograph Series, pp. 203-218). New York: John Wiley.

27. Dyche, L., & **Zayas, L.H.** (1995). The value of curiosity and naiveté for the cross-cultural psychotherapist. *Family Process, 34*, 389-399.

26. Zimmerman, J. K., & **Zayas, L.H.** (1995). Suicidal adolescent Latinas: Culture, female development, and restoring the mother-daughter relationship. In S. Canetto & D. Lester (Eds.), *Women and suicide* (pp. 120-132). New York: Springer.

25. **Zayas, L.H.** (1995). Family functioning and child rearing in an urban environment. *Journal of Developmental and Behavioral Pediatrics, 16* (Suppl.), 21-24.

24. Planos, R., **Zayas, L.H.**, Busch-Rossnagel, N. A. (1995). Acculturation and teaching behaviors of Dominican and Puerto Rican mothers. *Hispanic Journal of Behavioral Sciences, 17,* 225-236.

23. **Zayas, L.H.** (1994). Hispanic family ecology and early childhood socialization: Health care implications. *Family Systems Medicine, 12*, 315-325.

22. **Zayas, L.H.**, & Solari, F. (1994). Early childhood socialization in Hispanic families: Culture, context, and practice implications. *Professional Psychology: Research and Practice, 25*, 200-206.

Zayas, Luis H.

21. **Zayas, L.H.**, & Romano, K. (1994). Adolescents and parental death from AIDS. In B. O. Dane & C. Levine (Eds.). *The new orphans: AIDS and the family* (pp. 59-76). Westport. CT: Auburn House.

20. **Zayas, L.H.** (1992). Childrearing, social stress and child abuse: Clinical considerations with Hispanic families. *Journal of Social Distress and the Homeless, 1*, 291-309.

19. **Zayas, L.H.**, and Busch-Rossnagel, N. A. (1992). Pregnant Hispanic women: A mental health study.  *Families in Society, 73*, 515-521.

18. **Zayas, L.H.**, & Dyche, L. A. (1992). Social workers training primary care physicians: Essential psychosocial principles.  *Social Work, 37*, 247-252.

17. Busch-Rossnagel, N. A., & **Zayas, L.H.** (1991). Hispanic adolescents. In R. Lerner, A. Peterson, & J. Brooks-Gunn (Eds.), *Encyclopedia of adolescence* (pp. 492-498). NY: Garland Publishing.

16. Rodriguez, O., & **Zayas, L.H.** (1990). Hispanic adolescents and antisocial behavior: Sociocultural factors and treatment implications. In A. R. Stiffman & L. Davis (Eds.), *Ethnic issues in adolescent mental health* (pp. 147-171). Beverly Hills, CA: Sage.

15. **Zayas, L.H.** (1989). Data collection in child assessment: Approaches to student supervision. *The Clinical Supervisor, 7*, 75-88.

14. **Zayas, L.H.** (1989). A retrospective on the "suicidal fit" in mainland Puerto Ricans. *Hispanic Journal of Behavioral Sciences, 11*, 46-57.

13. Schilling, R. F., Schinke, S. P., Nichols, S. E., **Zayas, L.H.**, Miller, S. O., Orlandi, M. A., & Botvin, G. J. (1989). AIDS prevention research with black and Hispanic drug users. *Public Health Reports, 104*, 2-11.

12. **Zayas, L.H.**, & Katch, M. (1989). Contracting with adolescents: An ego-psychological approach. *Social Casework, 70*, 3-9.

11. **Zayas, L.H.** (1988). Thematic features in the manifest dreams of expectant fathers. *Clinical Social Work Journal, 16*, 282-296.

10. Schinke, S. P., Moncher, M. S., Palleja, J., **Zayas, L.H.**, & Schilling, R. F. (1988). Hispanic youth, substance abuse, and stress: Implications for prevention research. *International Journal of the Addictions, 23*, 809-826.

9. **Zayas, L.H.**, & Palleja, J. (1988). Puerto Rican familism: Considerations for family therapy. *Family Relations, 37*, 260-264.

8. **Zayas, L.H.** (1987). As son becomes father: Reflections of expectant fathers on their fathers in dreams. *The Psychoanalytic Review, 74*, 443-464.

Luis H. Zayas, Ph.D

7. **Zayas, L.H.**, Schinke, S. P., & Casareno, D. (1987). Hispanic adolescent fathers: At risk and underresearched. *Children and Youth Services Review, 9*, 235-248.

6. **Zayas, L.H.** (1987). Toward an understanding of suicide risks in young Hispanic females. *Journal of Adolescent Research, 2*, 1-11.

5. Schinke, S. P., Schilling, R. F., Palleja, J., & **Zayas, L.H.** (1987). Prevention research among ethnic-racial minority group adolescents. *The Behavior Therapist, 10*, 151-155.

4. **Zayas, L.H.** (1987). Psychodynamic and developmental aspects of expectant and new fatherhood: Clinical derivatives from the literature. *Clinical Social Work Journal, 15*, 8-21.

3. Bryant, C., & **Zayas, L.H.** (1986). Initial moves with school-family conflicts: Entering, engaging, and contracting. *Child and Adolescent Social Work Journal, 3*, 87-100.

2. **Zayas, L.H.**, & Lewis, B. H. (1986). Fantasy role-playing for mutual aid in children's groups: A case illustration. *Social Work with Groups, 9*, 53-66.

1. **Zayas, L.H.**, & Bryant, C. (1984). Culturally-sensitive treatment of adolescent Puerto Rican girls and their families. *Child and Adolescent Social Work Journal, 1*, 235-253.

# EXHIBIT 47

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
|                 Plaintiffs, | |
|      v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
|                 Defendants. | |

## DECLARATION OF DANA RUBIN

I, Dana Rubin, hereby declare as follows:

1. My name is Dana Rubin.  I am an attorney licensed in the District of Columbia.

2. I have personal knowledge of the matters set forth below.

3. I represent a client named J.S.[1] She is 19 years old. She lives in Washington D.C.

4. J.S. was born in Honduras. Her mother brought her to the United States when she was six years old. She has lived in the United States for thirteen years.

5. J.S. graduated from a public high school in the District of Columbia. She is currently employed full-time at a local small business in the District of Columbia while caring for her young son. She has also taken classes at the University of the District of Columbia.

6. J.S.'s mother kicked her out of the family's home when she was thirteen years old. She stayed with friends for several years, before becoming a ward of the District.

7. Receiving DACA has had an enormous impact on J.S.'s life.

8. She works to support her child. Because of DACA, she was able to get a social security card and employment authorization. If she could not work, she would be reliant on government assistance to support her child.

9. J.S. will age out of foster care when she turns 21. Without DACA, she does not know how she will be able to continue working or support her child or herself.

10. She has no contact with anyone in Honduras and has not been there since she was a small child.

11. J.S.'s home is the District of Columbia. Her family is here. She works and goes to school here.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 27th day of September, 2017,

Dana Rubin

---

[1] My client wishes to remain anonymous due to her fear of repercussions for sharing her story.

# EXHIBIT 48

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

**Pursuant to 28 U.S.C. §1746(2), I, Anarelly Morales Sanjuan, hereby declare as follows:**

1. I am 25 years old. I was born in Mexico, but have lived in the United States since the age of 7, first in North Carolina, and since 2009, in New York City.

2. On January 16, 2014,  and then again on February 9, 2016, the United States Department of Homeland Security granted me Deferred Action for Childhood Arrivals (DACA), along with work authorization.

3.  I am the mother of two children, both of whom were born in the United States and are United States Citizens. I am also the partner-for the past three years-of a United States Citizen.

4. I work as a manager at Bluestone Lane, where I am responsible for payroll, stocking and staffing. The store I manage is one of the busiest in our company, with average earnings of approximately $152,000 per month.

5. At Bluestone Lane, I manage fourteen employees. I have just been informed that, in two weeks, my employer will be promoting me to managing an additional store. I was also recently honored as Manager of the Quarter.

6. I earn approximately $65,000 per year. These earnings allow my family to live in a two-bedroom apartment in New York City, and to send our children to Catholic School. I am proud that my long hours and commitment to hard work allow my children access to a safe life and a good education.

7. If DACA is terminated, I will lose the right to work lawfully in the United States. This will cause me to lose my job, and my employer to lose a valuable employee. I have been with the company for four years, and have risen through the ranks after first working in the kitchen.

8. Also, if I lose my job, our children will have to leave their school, and our family will lose our home and our health insurance. We will be unable to survive financially without my income.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of September, 2017

_____

Anarelly Morales Sanjuan

# EXHIBIT 49

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>           Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>           Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

1.  I came to the U.S. when I was 11 years old from Mexico with my mother and brother.

2.  I grew up in Keizer, Oregon and graduated from McNary High School in 2011.

3.  I was one of the first Oregonians to apply for the Deferred Action for Childhood Arrivals (DACA) program when the application opened in August 2012. My application was approved in October of 2012, and I have remained in the program ever since. My deferred action status expires in September of 2018 if it is not renewed.

4.  After my DACA status was approved, in the winter of 2012, I enrolled at Chemeketa Community College. I was also able to get paid job as a community organizer with Causa. I pay taxes in Oregon. During my time as a community organizer with Causa, I worked on issues related to driver cards and tuition equity (eligibility for in-state tuition for undocumented students).

5.  In the fall of 2013 I enrolled at the University of Oregon. I also applied and became a Wayne Morse Scholar at the Wayne Morse Center for Law and Politics majoring in economics. I was not receiving any state or federal financial aid.

6.  In Winter of 2015 I got a job working full time for Wells Fargo Bank. I took a leave of absence from the University of Oregon in order to pursue this employment. In 2016 I moved to Key Bank, as a full time relationship manager. Within Key Bank, I have been offered the opportunity to begin investment license training, paid for by the bank, in mid-September of this year. My job at Key Bank is dependent on maintaining my DACA status.

7.  I have taken advantage of the advance parol program through DACA to visit Mexico for one week in 2015 at the invitation President of Mexico in order to participate in an educational and cultural program to help build a stronger relationship between the United States and Mexico. Other than that, I have not been back to Mexico since I left when I was 11. I have a brother and sister also in the DACA program. My brother has a child who is a U.S. citizen. I

Page 2 -  DECLARATION OF HUGO NICOLAS
JND/a2c/8480083-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

am concerned that if the program ends, my family might not be split up, not be able to sustain themselves, and not be able to obtain education.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED September 5 , 2017.

HUGO DANIEL NICOLAS MUNOS

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# EXHIBIT 50

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>               Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>               Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## DECLARATION OF G.L.

I, G.L, declare as follows:

1. I am over the age of eighteen. I have personal knowledge of the matters stated herein, and
   if called as a witness, I could and would testify competently thereto.

2. In 2002, when I was 11 years old, I came to the United States from Honduras with my
   mother who was fleeing domestic violence.

3. I am a resident of Richmond, Virginia.

4. I gave birth to my child who was born in the United States.

5. In 2012, the year that the Deferred Action for Childhood Arrivals ("DACA") was
   enacted, I applied for DACA and attained DACA status. Subsequently, I received a social
   security number and work authorization, which allowed me to be employed.

6. Currently, I am employed as a receptionist and taking night classes at an online college. I
   couldn't have achieved any of these things without DACA.

7. Any revocation of DACA would have a huge impact on my life. I will be unable to
   provide for myself or my child financially or afford to continue to pursue my educational
   goals.

8. I want to have an opportunity to give back to this country, and to the communities that
   have supported me throughout my life. Allowing DACA to continue would allow me to
   continue to live, work, and contribute to the economy and communities of America
   which is my home.

Executed on:  September 27, 2017

_____

G.L.