# EXHIBIT 51

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>    Plaintiffs,<br><br>  v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>    Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

I, Laura Carothers Graham, hereby declare as follows:

1.      I am the Managing Attorney for the Delaware Medical-Legal Partnership & Immigration Program in the Delaware Community Legal Aid Society, Inc. ("CLASI").

2.      CLASI provides equal access to justice and has been improving lives since 1946 by providing free civil legal services to marginalized communities.

3.      CLASI is committed to racial and ethnic fairness in the delivery of our services.

4.      As the Managing Attorney for the Delaware Medical-Legal Partnership & Immigration Program, my work with CLASI is to represent immigrant victims of crimes, abuse, and neglect, as well as clients referred through our Medical-Legal Partnerships.  Our immigration program is funded by the Federal Office of Violence Against Women, and the State Criminal Justice Council, and we provide immigration services related to the U visa for victims of crime, the T visa for victims of human trafficking, Violence Against Women Act Petitions for victims of family violence, and Special Immigrant Juvenile Petitions for dependent minors who have been abused, abandoned or neglected by their parent(s).  Our Medical-Legal Partnership Program partners with several Delaware health-care providers in order to screen for and represent patient-clients on civil legal issues related to the social determinants of their health, including immigration legal issues beyond the scope of the cases enumerated above.

5.      CLASI has 22 attorneys and 49 staff members.  Seven attorneys handle immigration cases in the Immigration and Medical-Legal Partnership Program.  Twenty percent of CLASI staff are bilingual in the English and Spanish languages.

6.      Currently, CLASI of Delaware handles approximately 150 immigration related cases annually.

7.      Upon information and belief, the State of Delaware bar only has a few practicing immigration attorneys.

8.      The rescission of the Deferred Action for Childhood Arrivals ("DACA") will have a sizable impact on the CLASI's Medical-Legal Partnership caseload and limited resources. CLASI may have to revise its intake of legal representation if the rescission of DACA creates a significant number of immigrant related cases.

9.      I am also the chair of the immigration committee of the Domestic Violence Coordinating Council ("DVCC").  DVCC was created by statute, at 13 *Del. C.* § 2101 *et seq*, in 1993 in order to improve Delaware's response to domestic violence.

10.     In a September 12, 2017 meeting of the DVCC immigration committee, several members of Delaware law enforcement expressed concern about the termination of DACA and the chilling effect that will have on non-Citizens availing themselves to the criminal justice system when they are victims.  Law enforcement's expressed concern mirrors what I am experiencing in my immigration cases.

11.    In Delaware, there has been significant decrease in numbers of non-English speaking victims that sought law enforcement help since the election of the current Administration.  The Delaware figures correlate with the national figures on this issue.

12.    Delaware's total Protection from Abuse ("PFA") filings – civil petitions seeking a stay away order and ancillary relief for victims of family violence – have increased since last year, but those numbers drop when focusing on non-English speaking victims. Based upon data provided by the Delaware Family Court, from January to April 30, 2016: 931 PFA petitions were filed.  From January to April 30, 2017: 1055 PFAs were filed.  However, the Domestic Violence Advocacy Program ("DVAP") reports PFA inquiries and filings for non-English speaking victims have decreased.  Per DVAP, from January to May 2016: 247 Spanish-speaking victims inquired about the PFA process, and 22 filed PFA petitions.  Whereas from January to May 2017: 197 Spanish-speaking victims inquired about the PFA process, and only 7 filed PFA petitions.  Thus one can surmise that while the general population of Delaware has increasingly filed PFA petitions, the number of PFAs filed by non-English speaking Delawareans have significantly decreased.

13.    In my legal practice, I have experienced that immigrant victims are rejecting legal advice and are declining to seek law enforcement or Family Court recourse to protect themselves, and often their children, from their assailants, out of fear of federal immigration enforcement or deportation. Specifically, some of my clients, and non-Citizens who have consulted with CLASI about their rights, have avoided seeking PFA orders or contacting law enforcement regarding crimes, because of fear of deportation and federal immigration enforcement.  Some of my immigrant victims have expressed such significant concern regarding deportation and immigration enforcement that they will not attend court appearances because this Administration has indicated that it may arrest and seek to deport people near and around courthouses and other public spaces, which were previously not utilized in enforcement actions.  That has an outsized effect on the safety of our Delaware community, because when non-Citizens are fearful to report the crimes against them, law enforcement is unable to effectively investigate crimes, rendering all of the Delaware community less safe.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this **27ᵀᴴ** day of September, 2017.

Laura Carothers Graham
Managing Attorney
Delaware        Medical-Legal        Partnership        &
Immigration Program
Delaware Community Legal Aid Society, Inc.

# EXHIBIT 52

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

              Plaintiffs,

     v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

              Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

**DECLARATION OF THOMAS G. AMBROSINO AND MARY M. BOURQUE**

We, Thomas G. Ambrosino and Mary M. Bourque, declare as follows:

1.      We collectively represent the city of Chelsea, Massachusetts, and the Chelsea Public Schools.

      a.      Thomas G. Ambrosino is the City Manager for Chelsea, which is a city of almost 40,000 residents located in Suffolk County. Chelsea is the smallest city in Massachusetts in land area, less than two square miles, and the twenty-sixth most densely populated incorporated place in the country.

      b.      Mary M. Bourque is the Superintendent of Schools for the Chelsea Public Schools, a gateway school system serving a diverse population of 6,338 students from prekindergarten through grade twelve and beyond.

2.      One or both of us has personal knowledge of each of the matters set forth below.

3.      Almost sixty-five percent of Chelsea's population is Latino, and forty-four percent of its population is foreign born, the largest foreign born population in Massachusetts.

4.       Many DACA grantees and DACA-eligible individuals live in Chelsea, although the precise numbers are unknown.

5.      Chelsea's DACA grantees are part of the fabric of our community.  They include students, workers, sons and daughters, and parents.  Many live in households with family members who depend on them, and some of these family members are American citizens.

6.      The DACA program has made our city stronger, allowing residents to come out of the shadows and pursue educational and workforce opportunities that were previously unavailable to them.  DACA has allowed Chelsea residents to access driver's licenses, home and

car loans, and to better support their families. Many of Chelsea's DACA grantees are tax payers, and all are consumers in our local economy.

7.      DACA has had a positive impact on Chelsea's schools.  With the promise of college and career, DACA has motivated more students to graduate and to achieve at higher levels.  At least 20 DACA grantee graduates from the Chelsea High School class of 2017 are currently attending college, and a similar number of DACA grantees graduated and went on to college for the last few years.

8.      Since the federal government's announcement that DACA will be terminated, many Chelsea residents and students are now frightened about their future and wary of going to school and work.  This has already had a negative effect on the City's morale and economy and on the school environment.

9.      If DACA is terminated, it will have a direct, adverse effect on the City of Chelsea and the Chelsea Public Schools.

10.     The City has at least one young, talented employee working in its administration who is a DACA grantee.  She is a rising star in the City's financial organization.  If DACA is terminated and she loses her work authorization, it will adversely impact the City's operations and cost us time, money, and effort in replacing her and training her replacement.

11.     The Chelsea Public Schools have at least one teacher who is a DACA grantee.  If she loses her work authorization, the schools will lose a talented teacher in 2019, when her work authorization expires.  It will cost us time and money to replace her and any other DACA grantee teachers and to train replacements.

12.     The termination of DACA will also have an adverse impact on student achievement across the district.  Students who do not see a future for themselves beyond high

school will not work hard and embrace education toward college and career.  Other students who enjoy financial support from a family member's ability to work may have to drop out of school to support themselves financially.

13.     Lower academic achievement and a decrease in students completing high school will negatively impact our schools' and district's "accountability status," and could cause us to fall from a Level 3 to a Level 4 or 5 status.  This decrease in status would require removal of administrators and teachers as well as increased funding streams from the Department of Elementary and Secondary Education to engage the schools in turnaround.  It would also harm our community, as families are less likely to buy homes in lower-performing school districts.

14.     As DACA grantee students experience greater anxiety about their futures, guidance counselors and other staff will need to spend more time with these students to help support them as they plan for an uncertain future.

15.     DACA's termination will also threaten public safety and welfare.  DACA grantees who fear that they could soon be deported are already losing trust in police and other local authorities.  In turn, they are less likely to report violence, crime, abuse and other harms to the community.

16.     Finally, the fear and lack of economic resources that will result from the termination of DACA will hurt our local economy.  DACA allowed its grantees to spend more money in the local economy; these residents will now be more likely to stay home and cut their expenses.  They will be more likely to fall into poverty, hurting the wellbeing and economy of Chelsea and its residents.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 26th DAY OF

SEPTEMBER, 2017,

_____
Thomas G. Ambrosino


_____
Mary M. Bourque

# EXHIBIT 53

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | |
| Plaintiffs, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| v. | **DECLARATION OF MARCELO M. SUÁREZ-OROZCO, PH.D.** |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

I, Marcelo M. Suárez-Orozco, declare:

1.      I am the Wasserman Dean of the Graduate School of Education and Information Studies at the University of California, Los Angeles ("UCLA"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.      In my role as the Wasserman Dean of UCLA's Graduate School of Education and Information Studies, I lead two academic departments, 16 nationally renowned research institutes, and two innovative demonstration schools. My research focuses on conceptual and empirical problems in cultural psychology and psychological anthropology with an emphasis on the study of migration, globalization, and education. I have authored, co-authored, or edited almost 40 books and over 150 articles and book chapters on these topics, including on the relationship between immigration, education, and achievement. My Curriculum Vitae is attached as Exhibit A.

3.      A substantial body of research documents the negative educational, developmental, physical, psychological, and other effects that growing up without authorized immigration status has on children, adolescents, and young adults. DACA provided a safe and reliable mechanism through which young immigrants who were brought to this country through no fault of their own—often at a young age—could integrate more fully into the American communities in which they were raised.

4.      DACA has enabled approximately 750,000 young immigrants to integrate into and contribute more to communities across the country; its rescission will snatch these youngsters from the stability they have come to expect and force them back into a life in the shadows as unauthorized immigrants. The research is clear:  current DACA recipients who are forced to return to unauthorized immigration status will experience myriad negative educational, developmental, physical, psychological, and other effects because of DACA's rescission.[1]

---

[1] *See, e.g.*, Suárez-Orozco, Carola, *Conferring Disadvantage: Behavioral and Developmental Implications for Children Growing up in the Shadow of Undocumented Immigration Status*, 38 J. DEVELOPMENTAL & BEHAV. PEDIATRICS 424 (2017); Hirokazu Yoshikawa, Carola Suarez-Orozco, & Roberto G. Gonzales, *Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence*, 27 J. OF RES. ON ADOLESCENCE 4 (2017).

### The Benefits of DACA

5.      Recipients of DACA status share a number of defining characteristics. First, they came to this country at a young age, through no volition of their own. Because of this, DACA recipients grew up in American society and have been socialized as Americans.

6.      Most DACA recipients received some or all of their K-12 education at American schools. Although their American education created opportunities, such as pursuing higher education, DACA recipients' undocumented status imposed burdens not faced by their citizen peers. For example, without their DACA status, youths cannot legally work in this country and face other hurdles such as the inability to open a bank account or travel freely.

7.      DACA enabled its recipients to engage fully with society and pursue opportunities to better their lives and the lives of those around them. With the promise that they could freely live, work, travel, and pursue an education, DACA recipients enrolled in universities like UCLA, got jobs to help support their families and pay for the educations, and pursued internships and other endeavors that enriched their lives and our communities.

8.      Studies of the impact of DACA reveal the measurable benefits that accrue to individuals gaining legal protections. Participation in DACA has been associated with greater experiences of incorporation and integration into U.S. society. These include greater sense of national belonging,[2] civic participation,[3] and involvement in college activities.[4] Rates of obtaining a driver's license, obtaining health care, opening bank accounts, and applying for credit cards are also higher.[5] There is also some

---

[2] *See, e.g.*, Robert T. Teranishi, Carola Suárez-Orozco, & Marcelo Suárez-Orozco, *In the Shadows of the Ivory Tower: Undocumented Undergraduates in the Uncertain Era of Immigration Reform.* INSTITUTE FOR IMMIGRATION, GLOBALIZATION, AND EDUCATION, UCLA (2015), *available at* http://www.undocuscholars.org/assets/undocuscholarsreport2015.pdf; Tom Wong & Carolina Valdivia, *In Their Own Words: A National Survey of Undocumented Millennials.* UNITED WE DREAM (2014), *available at* https://unitedwedream.org/words-nationwide-survey-undocumented-millennials/

[3] Tom Wong & Carolina Valdivia, *supra* note 2.

[4] Robert T. Teranishi, *et al.*, *supra* note 2.

[5] Roberto G. Gonzales, Veronica Terriquez, & Stephen P. Ruszczyk, *Becoming DACAmented: Assessing the Short-Term Benefits of DACA (Deferred Action for Childhood Arrivals).* 58 AMERICAN BEHAVIORAL SCIENTIST 1852-1872 (2014).

evidence that those who apply for and are awarded DACA attain higher levels of education, although the pathways of causality are not clear (those who apply for DACA may be positively selected).[6]

9.       Put simply, DACA has provided young immigrants with many important benefits. For example, the UCLA study of childhood arrivals by the UndocuScholars Project found that 85.5 percent of students with DACA reported a positive impact on their education. DACA recipients indicated enjoying higher rates of working, greater housing & transportation stability, greater success in gaining access to both scholarships and internships. Lastly, 94 percent of DACA recipients indicated a wish to apply for U.S. citizenship if eligible.[7]

10.       Research points to the mechanisms by which protection against deportation can bring improvement in an immigrant child's life trajectory. First, most simply, such protection eliminates the fear and anxiety that flow from the constant concerns deportation and sudden forced family separations. Like removing a hobble, this allows a child, youth and emerging adult to ascend developmentally, grow psychologically more secure, and attain greater educational success. Second, protections serve to remove tangible barriers to economic opportunity and social integration that arise from unauthorized status. Third, protections foster social trust and civic engagement with the institutions of society. Basic social science research has documented these outcomes in a variety of empirical, conceptual, and methodological traditions.[8]

11.       Research further suggest that even a temporary work permit, such as those granted under DACA, can set in motion a process that brings economic benefits first to the immigrants, in the form of higher wages, and then to the public sector, in the form of higher tax revenue, and then to the nation as a whole, in the form of a more productive labor force. Permission to work under DACA provides unauthorized immigrants with better educational opportunities, a shield against workplace exploitation, and grant freedom to move across the labor market to find work that best suits their skills.

---

[6] Robert T. Teranishi, *et al.*, *supra* note 2.

[7] *Id.*

[8] Robert Suro, Marcelo M. Suárez-Orozco, & Stephanie L. Canizales, *Removing Insecurity: How American Children Will Benefit From President Obama's Executive Action on Immigration.* TOMAS RIVERA POLICY INSTITUTE AT USC & THE INSTITUTE FOR IMMIGRATION, GLOBALIZATION, AND EDUCATION AT UCLA (2015).

## The Negative Effects of The Rescission of DACA

12.     Rescinding DACA will thrust its young recipients back into turmoil and anxiety of living with unauthorized immigration status, thwarting the measurable gains in human and social capital that DACA has enabled.

13.     Research on the negative effects of undocumented status sheds light onto the consequences that DACA recipients will face when they lose the benefits that DACA promised. In particular, DACA recipients who lose their DACA status will likely face a slew of negative educational, developmental, physical, and psychological consequences.

### *The Negative Educational and Developmental Consequences of DACA's Rescission*

14.     Multiple studies have shown that children who grow up undocumented exhibit lower levels of cognitive development and emotional well-being throughout early childhood and adolescence than comparable children whose parents have no immigration issues. The research that has produced this finding carefully isolated the impact of immigration status from other factors such as low incomes or low levels of education among the parents.

15.     As early as ages two and three, children growing up undocumented or with undocumented parents had lower cognitive skills as measured by standardized tests than comparable samples of children of parents who have no immigration issues. Research shows that the lack of a documented status is harmful to children's development—particularly their cognitive and language skills. These findings are based on a study of 380 newborns recruited hours after birth in public hospitals in New York City and then followed for three years with assessments of the children and in-depth interviews with the parents. Conducted by Hirokazu Yoshikawa, a developmental psychologist formerly at Harvard and now a professor at New York University's Steinhardt School of Culture, Education, and Human Development, the research offers a detailed assessment of how the everyday experiences of undocumented parents differ from legal immigrants in ways that can affect their children's development.

16.     Professor Yoshikawa's research shows that parents are reluctant to interact with any government agencies to the point that children may not receive any resources for which they are eligible, and fear of interacting with the authorities could leave them vulnerable to criminal exploitation whether by smugglers, loan sharks or unscrupulous landlords. Undocumented immigrants tend to have more

restricted social connections of the sort that can help in childrearing as parents are cautious about interacting with neighbors, coworkers or even a playmate's parents out of fear their status will be discovered. Finally, undocumented parents are more likely to experience exploitative work conditions, including unsafe workplaces, longer hours and lower pay. Professor Yoshikawa's study found evidence of lower cognitive skills as early as twenty-four months and concluded that household-level "economic hardship and psychological distress—feelings of depression, anxiety, and worry—were responsible for this effect." At thirty-six months, additional effects on cognitive skills were associated with undocumented status in the household and "the disastrous work conditions of the undocumented parents in the sample, combined with lower access to center-based child care."[9]

17.     A more generalized study based on a large data set similarly concluded that the children growing up unauthorized are at greater risk of lower levels of development in the grade school years. That finding emerged from an analysis of data from the 2005 California Health Interview Survey, which has a sample of 43,020 households. The large sample enabled a team of researchers from the Institute for Social Science Research at the University of California Los Angeles to study developmental risks for children based on household level immigration status while controlling for other factors such as education, income and employment.[10]

18.     Many of the same impediments to full development observed in early childhood may apply to middle childhood, including less frequent use of service, such as afterschool enrichment programs, and greater social isolation of family networks.

19.     Moreover, by middle childhood, a child's cognitive skills and perspective-taking have developed to a point where he or she may have become aware of legal status—their own and that of their parents and siblings.[11] At this stage in a child's development, "concern over the family's legal

---

[9] HIROKAZU YOSHIKAWA, IMMIGRANTS RAISING CITIZENS: UNDOCUMENTED PARENTS AND THEIR YOUNG CHILDREN (2011).

[10] Alexander N. Ortega et al., *Documentation Status and Parental Concerns about Development in Young U.S. Children of Mexican Origin.* 9 ACADEMIC PEDIATRICS 278-282.

[11] Carola Suárez-Orozco et al., *Growing Up in the Shadows: The Developmental Implications of Unauthorized Status*, 81 HARV. EDUC. REV. 438, 452 (2011).

vulnerabilities begins to seep into consciousness. They become more cognizant of the culture of fear in which they live. Spanish-language television and radio frequently feature stories of deportations, and in some homes, it is a topic of family conversation that children begin to metabolize."[12]

20.     At this stage in a child's development, he or she is beginning to make social comparisons. A child's recognition that his or her family is different can "affect self-esteem, increase anxiety, and produce internalizing symptoms" associated with depression and acting out behaviors.[13]

21.     Development in adolescence implicates additional consequences of not having documented legal status. "[T]he key developmental task of adolescence is the formation of a stable sense of identity, along with finding one's place within the community beyond immediate family. Identity formation is, in part, achieved by mastering culturally marked rites of passage, such as obtaining a driver's license, getting a first job, and, for many, going off to college. Unauthorized youth are unable to fully partake in these normative coming of age rituals; moreover, their identity formation is complicated when they come to face a negative social mirror that portrays them as illegitimate and unwanted. For many adolescents who are unauthorized or are living in mixed-status homes, adolescence is a time when liminality first comes to fully destabilize their fragile world."[14]

22.     Although family and K-12 schooling often provide unauthorized adolescent immigrants with relative protections, moving into young adulthood and the public sphere is shocking and renders youth particularly vulnerable. These youth must "learn to be illegal. Although they might have been under the initial illusion that they would have similar access to the opportunity structure as their authorized peers, they are now confronted with limited life opportunities." These youth learn that they are vulnerable to deportation and have drastically limited educational and employment choices.[15]

---

[12] *Id.*

[13] *Id.*

[14] *Id.* at 453. *See also* CAROLA SUÁREZ-OROZCO & MARCELO M. SUÁREZ-OROZCO, CHILDREN OF IMMIGRATION (2001); CAROLA SUÁREZ-OROZCO, ET AL., LEARNING A NEW LAND: IMMIGRANT STUDENTS IN AMERICAN SOCIETY (2008).

[15] Carola Suárez-Orozco, *supra* note 11, at 454.

23.     The consequences of a young immigrant's undocumented status manifest in a variety of ways. For example, one survey of over 909 college students found statistically higher levels of anxiety in young college students who are unauthorized immigrants compared to standard measures of their peers in the general population.[16]

24.     In sum, the negative consequences of unauthorized status, including limited access to services and opportunities, fear of deportation and forced family separations, have long-term and tangible developmental effects on the lives of their children and youth. Eliminating these negative consequences increases a child's cognitive development and well-being in childhood, middle-childhood, and adolescence.

*The Negative Physical and Health Consequences of DACA's Rescission*

25.     Research suggests household-level undocumented status poses obstacles to access many means-tested benefits. An in-depth study of three communities by Randolph Capps and colleagues at the Urban Institute revealed that families go to great lengths to avoid contact with social service providers despite their children's program or service eligibility for fear of being identified as undocumented and deported.[17]

26.     Researchers from the Center for Family and Demographic Research analyzed data collected by the Survey of Program Dynamics and found that food insecurity among the children of non-citizens has been higher and more persistent since the passing of the Personal Responsibility and Work Opportunity Reconciliation Act, which made non-citizens ineligible for federally funded food assistance programs.

---

[16] Robert T. Teranishi, *et al.*, *supra* note 2.

[17] Children and youth with unauthorized status are excluded from most means-tested federal and associated state programs. This includes sources of health or mental health care such as Medicaid, Medicare, or Children's Health Insurance Programs (CHIP) (aside from emergency care and care provided during the perinatal and immediate postnatal period); publicly funded job training; public housing; Supplemental Nutrition Assistance (SNAP, or Food Stamps); the Earned Income Tax Credit; Social Security; and cash welfare assistance (TANF or Temporary Assistance for Needy Families). Unauthorized immigrants are also ineligible for the expanded health insurance coverage through exchanges provided by the Affordable Care Act.

27.     Using national data from the Early Childhood Longitudinal Study—Kindergarten (ECLS-K) cohort, public policy researchers Ariel Kalil and Jen-Hao Chen found that children with immigrant mothers who are not U.S. citizens are more than twice as likely to experience food insecurity than children of mothers with similar socioeconomic characteristics but who are native born. Limited or uncertain access to nutrition can contribute to a range of developmental problems, from lower cognitive skills in early childhood and higher anxiety among adolescents.[18]

*The Negative Psychological Consequences of DACA's Rescission*

28.     The negative impacts of unauthorized status extend to the psychological harm to young, undocumented immigrants. These psychological effects of "unauthorized status on development across the life span are uniformly negative, putting children and youth at risk of lower educational performance, economic stagnation, blocked mobility and ambiguous belonging. In all, the data suggest an alarming psychological formation."[19]

29.     Drawing on interviews with 91 parents and 110 children in 80 households, sociologist Joanna Dreby reports that children in Mexican immigrant families (even when the children are U.S. citizens) express fear and anxiety about potential forced family separations. Notable, she found that children and youth fearing familial separations and deportations come to distrust law enforcement officials.[20] Landale and colleagues found higher internalizing (depression, anxiety, withdrawal) and externalizing (aggressive and acting out) behavioral problems in a sample of Mexican-origin, primary-school-age children with unauthorized parents, relative to their counterparts with documented or citizen parents.[21]

---

[18] Ariel Kalil & Jen-Hao Chen, *Mother's Citizenship Status and Household Food Insecurity Among Low-Income Children of Immigrants.* In H. Yoshikawa and N. Way eds. *Beyond the Family: Contexts of Immigrant Children's Development.* 121 DIRECTIONS FOR CHILD AND ADOLESCENT DEVELOPMENT 43-62.

[19] Carola Suárez-Orozco, *supra* note 11.

[20] JOANNA DREBY, EVERYDAY ILLEGAL: WHEN POLICIES UNDERMINE IMMIGRANT FAMILIES (2015).

[21] Nancy S. Landale, Jessica Halliday Hardie, R.S. Oropesa, & Marianne M. Hillemeier, *Behavioral Functioning Among Mexican-Origin Children: Does Parental Legal Status Matter?* 56 J HEALTH SOC BEHAV. 2-18 (2015).

30.     UCLA scholar Leisy J. Abrego's study based on 200 interviews conducted between 1998 and 2010 with Central American immigrants in Los Angeles and Phoenix and in sending communities, found that fear of detention and deportation generated "normalized but cumulative injurious effects" in work, family and school contexts. Some of those effects include restricted social integration and impeded upward mobility.[22]

31.     A recent UCLA study of undocumented youth who were brought to the United States as children and are now in college found very high levels of anxiety due to fears of deportation. The UndocuScholars Project at UCLA conducted a survey of 909 undocumented undergraduates in 2014 and found that more than three-quarters expressed worries about being deported and more than half reported knowing someone who had been deported. These worries and other aspects of the insecurity that comes from being unauthorized translated into measurable consequences for the respondents' health. Among male subjects 28.5 percent produced scores on a standard anxiety screening that were above the cutoff for a clinical diagnosis; for females, it was 36.7 percent. In comparison, the shares in a population of college students with no reason to fear deportation would be 4 percent and 9 percent, respectively.[23]

32.     In summary, rescinding DACA will return the youth who have benefited from the program back into the shadows of society, and to living in the state of fear and precariousness that triggers the negative consequences described above. Without DACA's promise that they can pursue their education and work and travel freely, these young people—who are Americans in every way except on paper—will likely lose the motivation to pursue their education, the means to work and support themselves and their families, and the psychological and social stability upon which they have come to rely.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 27, 2017, at Los Angeles, California.

---

[22] Cecilia Menjívar, & Leisy J. Abrego, *Legal Violence: Immigration Law and the Lives of Central American Immigrants.* 117 AMERICAN JOURNAL OF SOCIOLOGY 1380-1421 (2012).

[23] Robert T. Teranishi, *et al.*, *supra* note 2.

Marcelo M. Suárez-Orozco

# EXHIBIT A

Marcelo M. Suárez-Orozco
Wasserman Dean
& Distinguished Professor
UCLA Graduate School of Education and Information Studies
Moore Hall 2320
405 Hilgard Avenue
Los Angeles, CA 90095-1521
Email: mms-o@gseis.ucla.edu
Tel: (310) 825-8308

## EDUCATION

Ph.D., Department of Anthropology, University of California, Berkeley (1986).

M.A., Department of Anthropology, University of California, Berkeley (1981).

A.B., Department of Psychology, University of California, Berkeley (1980).

## EXPERIENCE

Wasserman Dean, Graduate School of Education and Information Studies, UCLA, 2015-

Dean, Graduate School of Education and Information Studies, UCLA, 2012-14.

Distinguished Professor of Education, Graduate School of Education ad Information Studies, UCLA, 2012-

University Professor, New York University, 2005-2012.

The Courtney Sale Ross University Professor of Globalization and Education, New York University, 2004-2012.

Special Advisor to the Chief Prosecutor, The International Criminal Court, The Hague, The Netherlands, 2012.

The Fisher Membership Fellow, Institute for Advanced Study, Princeton, NJ, 2009-2010.

Scholar in Residence, Ross Institute, East Hampton, New York, 2003-2004.

The Victor S. Thomas Professor of Education, Harvard University Graduate School of Education 2001-2004.

<u>Professor,</u> Human Development and Psychology, Harvard University Graduate School of Education, 1995-2001.

<u>Faculty Associate,</u> The Weatherhead Center for International Affairs, Harvard University, 1997-2004.

<u>Norbert Elias Lectureship,</u> Amsterdam School for Social Sciences, The Netherlands, May 1996.

<u>Directeur d'Etudes Associé,</u> école des hautes études en sciences sociales, Paris, 1997.

<u>Visiting Associate Professor,</u> Department of Human Development and Psychology, Harvard University Graduate School of Education, 1994-1995.

<u>Associate Professor,</u> Department of Anthropology, University of California, San Diego, Fall 1992-1995.

<u>Adjunct Associate Professor,</u> Department of Psychiatry, University of California, San Diego, Fall 1994-1995.

<u>Visiting Associate Professor,</u> Facultat de Psicologia, Universitat de Barcelona (Spain), Summer 1993.

<u>Fellow,</u> Center for Advanced Study in the Behavioral Sciences, Stanford, 1992-1993.

<u>Assistant Professor,</u> Department of Anthropology, University of California, San Diego, 1988-1992.

<u>Visiting Associate Professor,</u> Centrum voor Sociale en Culturele Antropologie, Katholieke Universiteit te Leuven (Belgium), Winter 1989.

<u>Lecturer,</u> Department of Anthropology, University of California, San Diego, Fall 1987 and Spring 1988.

<u>Visiting Assistant Professor,</u> Anthropology Board, University of California, Santa Cruz, Fall 1986 and Spring 1987.

<u>Visiting Assistant Professor,</u> Graduate School of Education, University of California, Santa Barbara, Winter 1987.

<u>Visiting Lecturer,</u> Department of Education, University of California, Santa Barbara, 1986.

<u>Visiting Lecturer,</u> Anthropology Board, University of California, Santa Cruz, 1986.

<u>Teaching Associate,</u> Department of Anthropology, University of California, Berkeley. (Introduction to Socio-cultural Anthropology, Fall 1985).

<u>Research Assistant,</u> Institute of Human Development, University of California, Berkeley.  6/85-11/85.

1384

Teaching Assistant, Department of Anthropology, University of California, Berkeley. (Introduction to Socio-cultural Anthropology, Summer 1985).

Teaching Associate, Department of Anthropology, University of California, Berkeley. (Culture and Personality, Spring 1984).

Research Assistant, Institute of Human Development, University of California, Berkeley. 9/83-6/84.

Teaching Assistant, Department of Anthropology, University of California, Berkeley. (Introduction to Socio-cultural Anthropology, Spring 1983).

Teaching Associate, Department of Anthropology, University of California, Berkeley. (Culture and Personality, Winter 1983).

Teaching Assistant, Department of Anthropology, University of California, Berkeley. (Introduction to Socio-cultural Anthropology, Summer 1982).

Research Assistant, Graduate School of Education, University of California, Berkeley. 2/81-1/83.

Reader, Department of Anthropology, University of California, Berkeley. Responsible for grading examinations for the following courses: Psycho-social Problems in Changing Cultures (Fall 1983); Folk Narrative (Spring 1982); Psycho-social Problems in Changing Cultures (Winter 1982); The Forms of Folklore (Fall 1982); The Forms of Folklore (Summer 1981); Myth (Summer 1981); Culture and Personality (Winter 1981); Mexico and Central America (Fall 1981); Psycho-social Problems in Changing Cultures (Summer 1980).

---

## ADMINISTRATION

---

Dean, Graduate School of Education and Information Studies, UCLA, 2012-

Co-Director, Immigration Studies at New York University, 2004-2012.

Co-Director. Institute for Globalization and Education in Metropolitan Settings (IGEMS), New York University, 2005-2012.

Co-Director, Harvard Immigration Projects, Harvard University Graduate School of Education, 1997-2004.

Executive Committee, David Rockefeller Center for Latin American Studies (DRCLAS), Harvard University, 1996-2003.

---

## PUBLICATIONS

---

<u>Books, Edited Books, & Volumes</u>

1. Suárez-Orozco, Marcelo M. *Central American Refugees and U.S. High Schools: A Psychosocial Study of Motivation and Achievement.* Stanford: Stanford University Press, 1989.* Book based on doctoral dissertation: *In Pursuit of A Dream,* Winner of the American Educational Research Association (Division G) Best Doctoral Dissertation Award (1988); Winner of the R. Boyer Award for Outstanding Research in Psychological Anthropology, University of California, Berkeley (1986)

2. Suárez-Orozco, Marcelo M. and George De Vos. "Status Inequality: The Self in Culture*." Cross-Cultural Research and Methodology Series 15*. Newbury Park, London, and New Delhi: Sage Publications, 1990.

3. Suárez-Orozco, Marcelo M., ed. "Belonging and Alienation." *A Special Issue of The Journal of Psychohistory and Psychoanalytic Anthropology* 18, no. 4 (1991): 371-546.*

4. Suárez-Orozco, Marcelo M., ed. "Migration, Minority Status, and Education: European Dilemmas and Responses in the 1990s." *Theme Issue of Anthropology & Education Quarterly* 22, no. 2 (1991): 99-199.*

5. Suárez-Orozco, Marcelo M. "Antropología psicoanalítica." *Psicología dinámica en la Universidad Volúmen 9*. Translation and preface by C. Joanne Crawford. Barcelona: Hogar del Libro, 1991.

6. Suárez-Orozco, Marcelo M., George Spindler, and Louise Spindler, eds. *The Making of Psychological Anthropology II.* Fort Worth: Harcourt Brace, 1994.

7. Suárez-Orozco, Marcelo M., and Carola Suárez-Orozco. *Transformations: Immigration, Family Life, and Achievement Motivation Among Latino Adolescents*. Stanford: Stanford University Press, 1995.* Winner of the Social Policy Book Award, Society for Research on Adolescents, 1996.

8. Suárez-Orozco, Marcelo M., ed. *Crossings: Mexican Immigration in Interdisciplinary Perspectives.* Cambridge: David Rockefeller Center for Latin American Studies and Harvard University Press, 1998.*

9. Suárez-Orozco, Marcelo M., and Antonius C.G.M. Robben, eds. *Cultures under Siege: Collective Violence and Trauma.* London and New York: Cambridge University Press, 2001.*

10. Suárez-Orozco, Marcelo M., and Carola Suárez-Orozco. *Children of Immigration.* Cambridge: Harvard University Press, 2001.*

11. Suárez-Orozco, Marcelo M., and Mariela Páez, eds. *Latinos: Remaking America.* Cambridge and Berkeley: David Rockefeller Center for Latin American Studies at Harvard University and University of California Press, 2002.*

12. Suárez-Orozco, Marcelo M., and Carola Suárez-Orozco. *La infancia de la inmigración.* Madrid: Ediciones Morata, 2003. (Spanish version of Children of Immigration)*

1386

13. Suárez-Orozco, Marcelo M., and Desiree Qin-Hilliard, eds. *Globalization: Culture and Education in the Millennium.* Berkeley: University of California Press, 2004.*

14. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard, eds. *The New Immigration: An Interdisciplinary Reader.* New York and London: Routledge, 2005.

15. Suárez-Orozco, Marcelo M., ed. *Learning in the Global Era: International Perspectives on Globalization and Education.* Berkeley: University of California Press, 2007.*

16. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Irina Todorova. *Learning a New Land: Immigrant Students in American Society.* Cambridge: The Belknap Press of Harvard University Press, 2008. Winner of the Virginia and Warren Stone Prize, Awarded Annually by Harvard University Press for an Outstanding Book on Education and Society, 2008.

17. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. *Històries d´immigració: la comprensió dels patrons de rendiment escolar dels joves immigrants nouvinguts.* Barcelona: Fundació Jaume Bofill, 2008.

18. Suárez-Orozco, Marcelo M., and Mariela Páez, eds. *Latinos: Remaking America, Second Edition.* Cambridge and Berkeley:  David Rockefeller Center for Latin American Studies at Harvard University and University of California Press, 2009.*

19. Suárez-Orozco, Marcelo M., and Carolyn Sattin, eds. *Educating the Whole Child for the Whole World: The Ross School Model and Education for the Global Era.* New York: New York University Press, 2010.*

20. Suárez-Orozco, Marcelo M., Vivian Louie, and Roberto Suro, eds. *Writing Immigration: Scholars and Journalists in Dialogue,* xi-264. Berkeley and Los Angeles: University of California Press, 2011.*

21. Suárez-Orozco, Marcelo M., James Banks, and Miriam Ben-Peretz, eds. *Global Migration, Diversity, and Civic Education: Improving Policy and Practice,* v-243. New York: Teachers College Press & The National Academy of Education, 2016.

Edited Book Series: Interdisciplinary Perspectives on the New Immigration (Routledge) & The New Americans (LFB Scholarly Publications)

22. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard, eds. *Interdisciplinary Perspectives on the New Immigration: Theoretical Perspectives.* New York and London: Routledge, 2001.

23. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard, eds. *Interdisciplinary Perspectives on the New Immigration: The New Immigrant in the American Economy.* New York and London: Routledge, 2001.

24. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard, eds. *Interdisciplinary Perspectives on the New Immigration: The New Immigrant in American Society.* New York and London: Routledge, 2001.

25. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard, eds. *Interdisciplinary Perspectives on the New Immigration: The New Immigrant and the American Family*. New York and London: Routledge, 2001.

26. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard, eds. *Interdisciplinary Perspectives on the New Immigration: The New Immigrant and American Schools*. New York and London: Routledge, 2001.

27. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard, eds. *Interdisciplinary Perspectives on the New Immigration: The New Immigrant and Language*. New York and London: Routledge, 2001.

28. Canniff, Julie G. "Cambodian Refugees' Pathways to Success: Developing A Bi-Cultural Identity." *The New Americans Series*. Edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2001.

29. Bagchi, Ann D. "Making Connections: A Study of Networking Among Immigrant Professionals." *The New Americans Series*. Edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2001.

30. Fry, Brian N. "Responding to Immigration: Perception of Promise and Threat." In *The New Americans Series,* edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2001.

31. Karas, Jennifer. "Bridges and Barriers: Earnings and Occupational Attainment Among Immigrants." In *The New Americans Series,* edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2002.

32. Dantes Debiaggi, Sylvia D. "Changing Gender Roles: Brazilian Immigrant Families In The U.S." In *The New Americans Series,* edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2002.

33. Stritikus, Tom. "Immigrant Children and The Politics of English-Only: Views From The Classroom." In *The New Americans Series,* edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2002.

34. Sarmiento, Socorro T. "Making Ends Meet: Income-Generating Strategies Among Mexican Americans." *The New Americans Series*. Edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2002.

35. Chua, Lee-Beng. "Psycho-Social Adaptation and the Meanings of Achievement For Chinese Immigrants." In *The New Americans Series,* edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2002.

36. Brittain, Carmina. "Transitional Messages: Experiences of Chinese and Mexican Immigrants in American Schools." In *The New Americans Series*, edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2002.

37. Baluja, Kaari F. "Gender Roles At Home And Abroad: The Adaptation of Bangladeshi Immigrants." In *The New Americans Series,* edited by Carola Suárez-Orozco and Marcelo Suárez-Orozco. New York: LFB Scholarly Publication, 2003.

1388

<u>Articles & Book Chapters</u>

1. Suárez-Orozco, Marcelo M. "A Study of Argentine Soccer: The Dynamics of Its Fans and Their Folklore." *The Journal of Psychoanalytic Anthropology* 5, no. 1 (1982): 7-28.*

2. Suárez-Orozco, Marcelo M. "Freud Encounters fin de siècle Anthropology:  The Case of Totem and Taboo.*" Kroeber Anthropological Society Papers* 61 & 62 (1983): 129-147.*

3. Suárez-Orozco, Marcelo M. and Alan Dundes. "The Piropo and the Dual Image of Women in the Spanish-Speaking World." *Journal of Latin American Lore* 10, no. 1 (1984): 111-133.*

4. Suárez-Orozco, Marcelo M. "Men's Lives:  A Review." *American Anthropologist* 86, no. 4 (1984): 1050-1051.*

5. Suárez-Orozco, Marcelo M. and George A. De Vos. "Child Development in Japan and the United States: Perspectives of Cross-Cultural Comparisons." In *Child Development and Education in Japan,* edited by Hiroshi Azuma, Kenji Hakuta, and Harold Stevenson, 289-298.  New York: W. Freeman and Company, 1986.

6. Suárez-Orozco, Marcelo M. "Spaanse Amerikanen: Vergeli jkende beschouwingen en onderwijsproblemen." *Tweede Generatie Immigrantenjongeren* (1986): 21-49.*

7. Suárez-Orozco, Marcelo M. "Towards a Psycho-Social Understanding of Hispanic Adaptation to United States Schooling." In *Success or Failure?  Learning & the Language Minority Student,* edited by H. T. Trueba, 156-168. Cambridge, MA:  Newbury House, 1987.

8. Suárez-Orozco, Marcelo M. "Transformations in Perception of Self and Social Environment in Mexican Immigrants." In *People in Upheaval,* edited by S. Morgan and Elizabeth F. Colson, 129-143. Staten Island: Center for Migration Studies, 1987.*

9. Suárez-Orozco, Marcelo M. and Alan Dundes. "The Piropo and the Dual Image of Women in the Spanish-Speaking World." In *Parsing Through Customs: Essays by a Freudian Folklorist,* 118-144. Madison: University of Wisconsin Press, 1987. [Reprint of entry 3]*

10. Suárez-Orozco, Marcelo M. "Hispanic Americans: Comparative Considerations and the Educational Problems of Children." *International Migration (Geneva)* 25, no. 2 (1987): 141-164.*

11. Suárez-Orozco, Marcelo M. "The Treatment of Children in the 'Dirty War':  Ideology, State Terrorism and the Abuse of Children in Argentina." In *Child Survival,* edited by Nancy Scheper-Hughes, 227-246. Dordrecht: D. Reidel Publishing Company, 1987.

12. Suárez-Orozco, Marcelo M. " 'Becoming Somebody': Central American Immigrants in U.S. Inner-City Schools." *Anthropology and Education Quarterly* 18, (1987): 287-298.*

13. Suárez-Orozco, Marcelo M. and George A De Vos. "Sacrifice and the Experience of Power." *The Journal of Psychoanalytic Anthropology* 10, no. 4 (1987): 309-340.*

14. Suárez-Orozco, Marcelo M. "Is Aversion a form of Repression?" *The Journal of Psychohistory and Psychoanalytic Anthropology* 15, no. 3 (1988): 266-270.*

1389

15. Suárez-Orozco, Marcelo M. Review of *Shamanism, Colonialism, and the Wild Man:  A Study in Terror and Healing*, by Michael Taussig.  *The Journal of Ritual Studies* 2, no. 2 (1988): 272-275.*

16. Suárez-Orozco, Marcelo M. Review of *Freud, Women, and Morality,* by Eli Sagan." *The Journal of Psychohistory and Psychoanalytic Anthropology* 16, no. 2 (1988): 213-216.*

17. Suárez-Orozco, Marcelo M.  "A Footnote to the Idea of Cultural Evolution in Anthropological Perspective: Comments on the Role of Adaptation in Psychohistorical Evolution." *The Journal of Psychohistory and Psychoanalytic Anthropology* 16, no. 4 (1989): 372-379.*

18. Suárez-Orozco, Marcelo M. "Psychosocial Aspects of Achievement Motivation among Recent Hispanic Immigrants." In *What do Anthropologists Have to Say About Dropouts?*, edited by H. T. Trueba, George Spindler and Louise Spindler, 99-116. London: The Falmer Press, 1989.

19. Suárez-Orozco, Marcelo M. Review of *Ethnic Differences: Schooling and Social Structure among the Irish, Italians, Jews, and Blacks in an American City, 1880-1935*, by Joel Perlmann. *The Annals of the American Academy of Political and Social Science* 510, (July 1990): 208-210.*

20. Suárez-Orozco, Marcelo M. "Expressive Behavior: The Study of Folklore, Projective Tests and Ritual in Psychoanalytic Anthropology." *Connecticut Review* 12, no. 2 (1990): 53-69.*

21. Suárez-Orozco, Marcelo M. "Speaking of the Unspeakable: Towards a Psychosocial Understanding of Responses to Terror." *Ethos* 18, no. 3 (1990): 353-383.*

22. Suárez-Orozco, Marcelo M and Alan Dundes. "Una Interpretación Psicocultural del Piropo." *Revista de Investigaciones Folklóricas. Instituto de Ciencias Antropológicas, Universidad de Buenos Aires (Argentina)* 5, no. 1 (1990): 17-25. [Spanish version of entry 3]*

23. Suárez-Orozco, Marcelo M. "George A. De Vos and the Making of Psychoanalytic Anthropology." *Special Issue of The Journal of Psychohistory and Psychoanalytic Anthropology* 18, no. 4 (1991): 371- 407.*

24. Suárez-Orozco, Marcelo M. "The Heritage of Enduring a 'Dirty War:' Psychosocial Aspects of Terror in Argentina, 1976-1988." *Special Issue of The Journal of Psychohistory and Psychoanalytic Anthropology* 18, no. 4 (1991): 469-505.*

25. Suárez-Orozco, Marcelo M. "Migration, Minority Status and Education: European Dilemmas and Responses in the 1990s." *Theme Issue of Anthropology and Education Quarterly* 22, no. 2 (1991): 99-120.*

26. Suárez-Orozco, Marcelo M. "Dialogue and the Transmission of Culture: The Spindlers and the Making of American Anthropology." *Anthropology and Education Quarterly* 22, no. 3 (1991): 281-291.*

27. Suárez-Orozco, Marcelo M. and George A. De Vos. Preface to "An Ethnography of Empowerment." In *Crossing Cultural Borders: Education for Immigrant Families in America*, by Concha Delgado-Gaitan and Henry T. Trueba, 1-9. London: The Falmer Press, 1991.

28. Suárez-Orozco, Marcelo M. "Immigrant Adaptation to Schooling: A Hispanic Case." In *Minority Status and Schooling: A Comparative Study of Immigrant and Involuntary Minorities,* edited by Margaret A. Gibson and John U. Ogbu, 37-61. New York: Garland Press, 1991.

29. Suárez-Orozco, Marcelo M. "A Grammar of Terror: Psycho-Cultural Responses to State Terrorism in 'Dirty War' and Post 'Dirty War' Argentina." In *The Paths to Domination, Resistance and Terror,* edited by Carolyn Nordstrom and JoAnn Martin, 219-259. Berkeley, Los Angeles and Oxford: University of California Press, 1992.*

30. Suárez-Orozco, Marcelo M. "Learning Culture: The Spindlers' Contributions to the Making of American Anthropology." In *The Psychoanalytic Study of Society*, edited by L. Bryce Boyer and Ruth Boyer, 45-58. Hillsdale: The Analytic Press, 1992.*

31. Suárez-Orozco, Marcelo M. " 'Becoming Somebody': Central American Immigrants in U. S. Inner-City Schools."  In *Minority Education: Anthropological Perspectives*, edited by Evelyn Jacob and Cathie Jordan, 129-143. Norwood: Ablex Publishing Co. [Reprint of entry 12]

32. Suárez-Orozco, Marcelo M.  and Carola Suárez-Orozco. "La Psychologie culturelle des immigrants hispaniques aux Etats-Unis: Implications pour la Recherche en éducation." *Revue Française de Pédagogie* 101, (1992): 27-44.*

33. Suárez-Orozco, Marcelo M. "A Psychoanalytic Study of Argentine Soccer." In *The Psychoanalytic Study of Society Volume 18*, edited by L. Bryce Boyer, Ruth M. Boyer and Stephen M. Sonnenberg, 211-234. Hillsdale: The Analytic Press, 1993.*

34. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Hispanic Cultural Psychology: Implications for Education Theory and Research." In *Renegotiating Cultural Diversity in American Schools*, edited by Patricia Phelan and Ann Locke Davidson, 108-138. New York: Teachers College Press, 1993.  [English version of entry 32] *

35. Suárez-Orozco, Marcelo M., George Spindler and Louise Spindler. Preface to *The Making of Psychological Anthropology II*, edited by Marcelo M. Suárez-Orozco, George Spindler and Louise Spindler, vii-viii. Fort Worth: Harcourt Brace, 1994.

36. Suárez-Orozco, Marcelo M. "Remaking Psychological Anthropology." In *The Making of Psychological Anthropology II*, edited by Marcelo M. Suárez-Orozco, George Spindler and Louise Spindler, 8-59. Fort Worth: Harcourt Brace, 1994.

37. Suárez-Orozco, Marcelo M. "Doing Psychological Anthropology at the Fin de Siècle." In *The Making of Psychological Anthropology II*, edited by Marcelo M. Suárez-Orozco, George Spindler and Louise Spindler, 158-194. Fort Worth: Harcourt Brace, 1994.

38. Suárez-Orozco, Marcelo M. "Terrorized Bodies: Torture, Disappearances and the Exegesis of the Unspeakable." In *Body Image in Cultural Context: Interdisciplinary Essays,* edited by Irma Dosamantes, 108-130. Los Angeles: DMT Publications, UCLA Center for Pacific Rim Studies, 1994.

39. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "The Cultural Psychology of Hispanic Immigrants." In *Handbook of Hispanic Cultures in the United States: Anthropology,* edited by Thomas Weaver, 129-146. Houston, TX: Arte Público Press, 1994.

**1391**

40. Suárez-Orozco, Marcelo M and George A. De Vos. "Culture and Achievement Motivation in Education."  In *The International Encyclopedia of Education Second Edition,* edited by Torsten Husén and T. Neville Postlethwaite, 1236-1241. Oxford: Pergamon, 1994.*

41. Suárez-Orozco, Marcelo M. "Ambivalent Liaisons: George A. De Vos and the Psychoanalytic Study of Society." In *The Psychoanalytic Study of Society*, edited by L. Bryce Boyer, Ruth M. Boyer, and Howard F. Stein, 89-122. Hillsdale & London: The Analytic Press, 1994.*

42. Suárez-Orozco, Marcelo M. "Anxious Neighbors: Belgium and Its Immigrant Minorities."  In *Controlling Immigration: A Global Perspective*, edited by Wayne A. Cornelius, Philip L. Martin, and James F. Hollifield, 237-268. Stanford: Stanford University Press, 1994.*

43. Suárez-Orozco, Marcelo M. "Perspectivas etnográficas en la época post-moderna."  In *La socialización en la escuela y la integración de las minorías: Perspectivas etnográficas en el análisis de la educación de los años 90*, edited by Isabel Martínez and Ana Vásquez-Bronfman, 83-96. Madrid (Spain): Aprendizaje, S. L. P., 1995.

44. Suárez-Orozco, Marcelo M. "The Need for Strangers: Proposition 187 and the Immigration Malaise." *Multicultural Review* 4, no.2 (1995):17-23 and 56-58.*

45. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "The Cultural Patterning of Achievement Motivation: A Comparison of Mexican, Mexican Immigrant, Mexican American, and Non-Latino White American Students." In *California's Immigrant Children: Theory, Research, and Implications for Educational Policy*, edited by Rúben G. Rumbaut and Wayne Cornelius, 161-190. La Jolla: Center for U.S.- Mexican Studies, 1995.

46. Suárez-Orozco, Marcelo M. "What  Do Immigrants Want?" *Enfoque*, 3-11. La Jolla: Center for U.S.- Mexican Studies, 1995.

47. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Migration: Generational Discontinuities and the Making of Latino Identities." In *Ethnic Identity: Creation, Conflict, and Accommodation. Third Edition,* edited by George A. DeVos and Lola Romanucci-Ross, 321-347. Walnut Creek, London, and New Delhi: Alta Mira Press, 1995.

48. Suárez-Orozco, Marcelo M., Carola E. Suárez-Orozco, and George De Vos. "Migrazione e Status de Minoranza: L'Adattamento dei Giovani Messicani negli Stati Uniti." In *Criminologia Psichiatria Forense e Psicologia Giudiziaria*, edited by Vicenzo Mastronardi, 467-493. Rome: Univesitá di Roma, 1996.  [Italian version of entry 45]*

49. Suárez-Orozco, Marcelo M. "Writing a Grammar of Immigration." *DRCLAS Newsletter, David Rockefeller Center for Latin American Studies at Harvard University,* 3-8, 1996.

50. Suárez-Orozco, Marcelo M. "California Dreaming: Proposition 187 and the Cultural Psychology of Racial and Ethnic Exclusion." *Anthropology and Education Quarterly* 27, no. 2  (1996): 151-167.*

51. Suárez-Orozco, Marcelo M. "Etnografische perspectieven in het Postmoderne tijdperk: Implicaties voor transcultureel-pedagogisch ondezroek." *Cultuur en Migratie* 13, no. 2 (1996): 11-10. [Dutch version of entry 43]*

52. Suárez-Orozco, Marcelo M. "Unwelcome Mats." *Harvard Magazine,* 32-55, July-August 1996.

53. Suárez-Orozco, Marcelo M. " 'Becoming Somebody': Central American Immigrants in U. S. Inner-City Schools." In *Beyond Black and White: New Faces and Voices in U.S. Schools,* edited by Maxine Seller and Lois Weis, 115-129. Albany: State University of New York Press, 1997. [Reprint of entry 12]*

54. Suárez-Orozco, Marcelo M. "Psychological Anthropology." In T*he Dictionary of Anthropology,* edited by Thomas J. Barfield, 381-383. Oxford: Blackwell, 1997.*

55. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Interdisciplinary Perspectives on Latino Adolescence." *Society for Research on Adolescence Newsletter*, 3-6, Fall 1997.

56. Suárez-Orozco, Marcelo M. "The Cultural Psychology of Immigration." In *Health and Social Services Among International Labor Migrants: A Comparative Perspective*, edited by Gilberto Cárdenas and Antonio Ugalde, 131-149. Austin: The University of Texas Center for Mexican American Studies Books, 1997.

57. Suárez-Orozco, Marcelo M. "State Terrors: Immigrants and Refugees in the Post-National Space." In *Ethnic Identity and Power: Cultural Contexts of Political Action in School and Society,* edited by Yali Zhou and Enrique T. Trueba, 238-319. Albany: State University of New York Press, 1998.*

58. Suárez-Orozco, Marcelo M. Introduction to *Crossings: Mexican Immigration in Interdisciplinary Perspectives*, edited by Marcelo M. Suárez-Orozco, 1-50. Cambridge: David Rockefeller Center for Latin American Studies and Harvard University Press, 1998.*

59. Suárez-Orozco, Marcelo M. Epilogue to *Crossings: Mexican Immigration in Interdisciplinary Perspectives*, edited by Marcelo M. Suárez-Orozco, 413-419. Cambridge: David Rockefeller Center for Latin American Studies and Harvard University Press, 1998.*

60. Suárez-Orozco, Marcelo M., Carola E. Suárez-Orozco, and Peter Roos. "Cultural, Educational, Legal Perspectives on Immigration: Implications for School Reform."  In *Law and School Reform: Six Strategies for Promoting Educational Equity*, edited by Jay Heubert, 160-204. New Haven: Yale University Press, 1999.*

61. Suárez-Orozco, Marcelo M. "Perspectives Ethnographiques dans le Contexte Post-Moderne." In *Recherches Ethnographiques en Europe et Amérique du Nord,* edited by Ana Vasquez and Isabel Martinez, 111-130. Paris: Anthropos, 1999.  [French version of entry 43]*

62. Suárez-Orozco, Marcelo M. "Latin American Immigration to the United States."  In *The United States and Latin America: The New Agenda*, edited by James Dunkerley and Victor Bulmer-Thomas, 227-244. Cambridge and London: David Rockefeller Center for Latin American Studies, Harvard University and Institute of Latin American, University of London. Distributed by Harvard University Press, 1999.*

63. Suárez-Orozco, Marcelo M. "A Psychoanalytic Study of Argentine Soccer." In *Psychoanalysis and Culture at the Millennium,* edited by Nancy Ginsburg and Roy Ginsburg, 64-95. New Haven and London: Yale University Press, 1999. [Reprint of entry 1]*

64. Suárez-Orozco, Marcelo M. and Alan Dundes. "Una interpretación psicocultural del piropo en América Latina."  In *Folklore urbano: Vigencia de la leyenda y los relatos tradicionales*, edited by Martha Blache, 143-172. Buenos Aires: Ediciones Colihue, 1999.  [Reprint of entry 22]

65. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Some Conceptual Considerations in the Interdisciplinary Study of Immigrant Children."  In *Culture, Ethnicity and Migration,* edited by Marie-Claire Foblets and C. L. Pang, 199-221. Leuven: Acco Leuven/Leudsen, 2000.

66. Suárez-Orozco, Marcelo M. and Doris Sommer. "Becoming Latinos." *DRCLAS Newsletter, David Rockefeller Center for Latin American Studies at Harvard University, 3-5,* Spring 2000.

 67. Suárez-Orozco, Marcelo M. "The Global Traffic in Human Organs: Commentary." *Current Anthropology* 41, no 2. (2000): 217-218.*

68. Suárez-Orozco, Marcelo M. and Antonius C.G.M. Robben. Preface to *Cultures under Siege: Collective Violence and Trauma in Interdisciplinary Perspectives*, edited by  Antonius C.G.M. Robben and Marcelo M. Suárez-Orozco, xi-xii. Cambridge: Cambridge University Press, 2000.*

69. Suárez-Orozco, Marcelo M. and Antonius C.G.M. Robben. "Interdisciplinary Perspectives on Violence and Trauma." In *Cultures under Siege: Collective Violence and Trauma in Interdisciplinary Perspectives*, edited by Antonius C.G.M. Robben and Marcelo M. Suárez-Orozco, 1-41. Cambridge: Cambridge University Press, 2000.*

70. Suárez-Orozco, Marcelo M. and Antonius C.G.M. Robben. "The Management of Collective Trauma." In *Cultures under Siege: Collective Violence and Trauma in Interdisciplinary Perspectives*, edited by Antonius C.G.M. Robben and Marcelo M. Suárez-Orozco, 43-47. Cambridge: Cambridge University Press, 2000.*

71. Suárez-Orozco, Marcelo M. and Antonius C.G.M. Robben. "Cultural Responses to Collective Trauma." In *Cultures under Siege: Collective Violence and Trauma in Interdisciplinary Perspectives*, edited by Antonius C.G.M. Robben and Marcelo M. Suárez-Orozco, 155-157. Cambridge: Cambridge University Press, 2000.*

72. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Immigrant Voices: Conceptual Considerations in the Interdisciplinary Study of Immigrant Children." In *Immigrant Voices: In Search of Educational Equity*, edited by Enrique T. Trueba and Lilia Bartolomé, Eds. Pp. 17-35. Boulder, CO: Rowman & Littlefield Publishers, Inc. 2000.

73. Suárez-Orozco, Marcelo M. "Everything You Ever Wanted To Know About Assimilation But Were Afraid To Ask." *Daedalus Journal of the American Academy of Arts and Sciences* 129, no.4 (Fall 2000): 1-30.*

74. Suárez-Orozco, Marcelo M.and Doris Sommer. "Becoming Latinas." In *Las relaciones culturales entre América Latina y Estados Unidos después de la Guerra fria,* edited by Ellen Spielman. Berlin: Wissenschaftlicher Verlag, 2000.

75. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Children of Immigration: An Excerpt." *DRCLAS Newsletter, David Rockefeller Center for Latin American Studies at Harvard University,* 53, Spring/Summer 2001.

76. Suárez-Orozco, Marcelo M. "Mexican Immigration. ReVista." *Harvard Review of Latin America*, 40-41, Fall 2001.

77. Suárez-Orozco, Marcelo M. "The Need for Strangers: Proposition 187 and the Immigration Malaise."  In *Immigrant Politics and the Public Library*, edited by Susan Luévano-Milina, 17-30. Westport: Greenwood Press, 2001. [Reprint of entry 44]

78. Suárez-Orozco, Marcelo M.,Carola Suárez-Orozco, and Desiree Qin-Hilliard. Series Introduction to *Interdisciplinary Perspectives on the New Immigration. Six Volume Series,* edited by Marcelo Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin-Hilliard. New York and London: Routledge, 2001.

79. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard. Volume Introduction to *Interdisciplinary Perspectives on the New Immigration: Theoretical Perspectives,* edited by Marcelo Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin-Hilliard, ix-xi. New York and London: Routledge, 2001.

80. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard. Volume Introduction to *Interdisciplinary Perspectives on the New Immigration: The New Immigrant in the American Economy,* edited by Marcelo Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin-Hilliard, ix-xii. New York and London: Routledge, 2001.

81. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard. Volume Introduction to *Interdisciplinary Perspectives on the New Immigration: The New Immigrant in American Society,* edited by Marcelo Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin-Hilliard, ix-xi. New York and London: Routledge, 2001.

82. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard. Volume Introduction to *Interdisciplinary Perspectives on the New Immigration: The New Immigrant and the Family,* edited by Marcelo Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin-Hilliard, ix-xi. New York and London: Routledge, 2001.

83. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard. Volume Introduction to *Interdisciplinary Perspectives on the New Immigration: The New Immigrant and American Schools* edited by Marcelo Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin-Hilliard, ix-xii. New York and London: Routledge, 2001.

84. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Desiree Qin-Hilliard. Volume Introduction to *Interdisciplinary Perspectives on the New Immigration: The New Immigrant and Language* edited by Marcelo Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin-Hilliard, ix-xii. New York and London: Routledge, 2001.

85. Suárez-Orozco, Marcelo M. "Globalization, Immigration, and Education: The Research Agenda." *Harvard Educational Review* 71, no. 3 (Fall 2001): 345-365.*

86. Suárez-Orozco, Marcelo M. "Inmigración latinoamericana en los Estados Unidos." *Temas, Cultura, Ideología, Sociedad* 26, (Fall 2001): 4-13. [Spanish version of entry 62]*

87. Suárez-Orozco, Marcelo M. "Global Shifts: U.S. Immigration and the Cultural Impact of Demographic Change." In *Seismic Shifts: The Economic Impact of Demographic Change,* edited by Jane S. Little and Robert K. Triest, 179-188. Boston: Federal Reserve Bank of Boston Conference Series No. 46, 2001.*

88. Suárez-Orozco, Marcelo M. "Immigration and Migration: Cultural Concerns." In *International Encyclopedia of the Social and Behavioral Sciences*, edited by Neil Smelser and Paul Bates, 7211-7217. Oxford: Pergamon, 2001.*

89. Suárez-Orozco, Marcelo M. and Mariela Páez. "Introduction, Latinos Remaking America." In *Latinos: Remaking America,* edited by Marcelo M. Suárez-Orozco and Mariela Páez, 1-39. Berkeley and London: University of California Press, 2002.*

90. Suárez-Orozco, Marcelo M. and Mariela Páez. "Histories, Migrations and Communities." In *Latinos: Remaking America,* edited by Marcelo M. Suárez-Orozco and Mariela Páez, 40-45. Berkeley and London: University of California Press, 2002.*

91. Suárez-Orozco, Marcelo M. and Mariela Páez. "Health, Families, Languages, Education, and Politics" In  *Latinos: Remaking America,* edited by Marcelo M. Suárez-Orozco and Mariela Páez, 207-215. Berkeley and London: University of California Press, 2002.*

92. Suárez-Orozco, Marcelo M. and  Mariela Páez. "Latinos in the 21st Century." *Harvard Journal of Hispanic Policy* 14, (2002): 49-75.*

93. Suárez-Orozco, Marcelo M. "Globalization and the Democratic Space: Why What Happens After School Matters."  In *Afterschool Education: Approaches to an Emerging Field,* edited by Gina Biancarosa, and Nadine Dechausay, Gil C. Noam, 97-102. Cambridge: Harvard Education Press, 2003.

94. Suárez-Orozco, Marcelo M. "The Challenge of a Changing Nation."  In *The 21st Century Principal: Current Issues in Leadership and Policy,* edited by Milli Pierce and Deborah L. Stapleton, 29-34. Cambridge: Harvard Education Press, 2003.

95. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco.  "The Impact of H. R. 1 for English Language Learners and Immigrant Students. In The Challenge for Education Reform: Standards, Accountability, Resources, and Policy."  *The Aspen Institute Congressional Program* 18, no. 2 (2003): 41-52.

96. Suárez-Orozco, Marcelo M. and Howard Gardner. "Educating Billy Wang for the World of Tomorrow." *Education Week.*  xxii, num. 8 (October 22, 2003): 34 & 44.

97. Suárez-Orozco, Marcelo M. "Right Moves? Immigration, Globalization, Utopia and Dystopia." In *American Arrivals: Anthropology Engages the New Immigration*, edited by Nancy Foner, 45-74. Santa Fe: School of American Research Press, 2003.*

98. Suárez-Orozco, Marcelo M. "The Treatment of Children in the 'Dirty War:' Ideology, State Terrorism, and the Abuse of Children in Argentina." In *Violence in War and Peace*, edited by Philippe Bourgois and Nancy Scheper-Hughes, 378-388. Oxford: Blackwell, 2004.  [Reprint of entry 11]

99. Suárez-Orozco, Marcelo M. "Everything You Ever Wanted To Know About Assimilation But Were Afraid To Ask." In *Life in America: Identity and Everyday Experience,* edited by Lee D. Baker, 45-62. Oxford: Blackwell, 2004. [Reprint of entry 73]

100. Suárez-Orozco, Marcelo M. "Beyond National Boundaries: Immigration and the Flow of Labor." In *The Future of Peace in the Twenty-First Century: A Multicultural and Multidisciplinary Reader and Sourcebook for the Second Centenary of the Nobel Peace Prize,* edited by R. Carazo,N. N. Kittrie, and J. R. Mancham, 277-287. Durham: Carolina Academic Press, 2003.

101. Suárez-Orozco, Marcelo M. and Desiree Qin-Hilliard. "Globalization: Education and Culture in the New Millennium." In *Globalization: Education and Culture in the New Millennium,* edited by Marcelo M. Suárez-Orozco and Desiree Qin-Hilliard, 1-37. Berkeley: University of California Press, 2004.*

102. Suárez-Orozco, Marcelo M. "Wandering Souls: The Interpersonal Concerns of Adolescent Immigrants." In *Cross-Cultural Dimensions in Conscious Thought: Narrative Themes in Comparative Context,* edited by George A. DeVos and Eric DeVos, 463-495. Boulder: CO: Rowman & Littlefield, 2004.

103. Suárez-Orozco, Marcelo M. Carola Suárez-Orozco, and Desiree Qin-Hilliard. "The New Immigration: Interdisciplinary Perspectives." In *The New Immigration: An Interdisciplinary Reader*, edited by Marcelo M. Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin, ix-xiv. New York and London: Routledge, 2005.

104. Suárez-Orozco, Marcelo M. "Right Moves? Immigration, Globalization, Utopia and Dystopia." In *The New Immigration: An Interdisciplinary Reader*, edited by Marcelo M. Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin, 3-19. New York and London: Routledge, 2005. [Reprint of entry 100]

105. Suárez-Orozco, Marcelo M. "Everything You Ever Wanted To Know About Assimilation But Were Afraid To Ask." In *The New Immigration: An Interdisciplinary Reader*, edited by Marcelo M. Suárez-Orozco, Carola Suárez-Orozco, and Desiree Qin, 67-83. New York and London: Routledge, 2005. [Reprint of entry 173]

106. Suárez-Orozco, Marcelo M. "Rethinking Education in the Global Era." *Phi Delta Kappan: A Professional Journal for Education*, (November 2005): 209-212.

107. Suárez-Orozco, Marcelo M. "International Migration." In *Report of the First Global Colloquium of University Presidents on Academic Freedom and International Migration*, edited by Michael Doyle, 36-48. New York: Columbia University, 2005.

108. Suárez-Orozco, Marcelo M. "Everything You Ever Wanted To Know About Immigration But Were Afraid To Ask." In *Passing Lines: Sexuality and Immigration,* edited by Brad Epps, Bill Johnson González, and K. Valens, 51-67. Cambridge: David Rockefeller Center for Latin American Studies and Harvard University Press, 2005.*

109. Suárez-Orozco, Marcelo M. "Statement on Globalization and Education." *The Pontifical Academy of Sciences and the Pontifical Academy of Social Sciences*, Extra Series 6& 25, 1-26. Vatican City, 2006.

110. Suárez-Orozco, Marcelo M. Introduction to *Forty Cent Tip: Stories of New York City Immigrant Workers*, vii-viii. Providence: Next Generation Press, 2006.

111. Suárez-Orozco, Marcelo M. "America's Immigration Advantage." *The Washington Post*, A15, March 6, 2006.

112. Suárez-Orozco, Marcelo M. and Roberto Suro. "Introduction to Rethinking Global Migration, New Realities, New Opportunities, New Challenges." *Publications of The Pew Hispanic Center*, Washington DC, 2006. http://pewhispanic.org/otherpublications/

113. Suárez-Orozco, Marcelo M. "Stranger Anxieties: US Immigration and Its Discontents." *Harvard International Review,* 2006.  http://hir.harvard.edu/websymposia/3/ *

114. Suárez-Orozco, Marcelo M. "Globalización: Cultura y Educación en el Milenio."  In *Globalización y justicia internacional,* edited by Irma Adriana Gomez Cavazos, 129-177. Mexico, DF: Secretaría de Relaciones Exteriores; Fondo de Cultura económica; and Pontificia Academia de las Ciencias Sociales, 2007.*

115. Suárez-Orozco, Marcelo M. and Carolyn Sattin. "Wanted: Global Citizens." *Educational Leadership* 64, no. 7, (April 2007): 58-62.

116. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Education." In *The New Americans: A Guide to Immigration Since 1965*, edited by Helen B. Marrow, Reed Ueda, Mary C. Waters, 243-257. Cambridge: Harvard University Press, 2007.*

117. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Globalization, Immigration, and Education: Recent US Trends." In *Globalization and Education,* edited by Pierre Lena, Edmond Malinvaud, Marcelo Sanchez Sorondo,93-126. Berlin and New York: Walter de Gruyter, 2007. *

118. Suárez-Orozco, Marcelo M. and Carolyn Sattin. "Introduction: Learning in the Global Era." In *Learning in the Global Era: International Perspectives on Globalization and Education*, edited by Marcelo M. Suárez-Orozco, 1-43.  Berkeley: University of California Press, 2007*
126. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Moving Stories: Immigrant Youth Adapt to Change." *DuBois Review* 4, no.1, (Spring 2007): 251-259.*

119. Suárez-Orozco, Marcelo M. "International Migration: The Human Faces of Globalization." In *Charity and Justice in the Relations Among Peoples and Nations,* edited by Mary Ann Glendon, Juan J. Llach, and Marcelo Sanchez Sorondo, 421-441. Vatican City: The Pontifical Academy of Social Sciences Acta 13, 2007.*

120. Suárez-Orozco, Marcelo M. and Carolyn Sattin. "Education in the Global Era." In *International Perspectives on Education*, edited by Albert Ross, 96-102. New York: The H.W. Wilson Company, 2007.

121. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Immigration Youth Adapt to Change." *Harvard Law and Policy Review: Official Journal of the American Constitution Society for Law and Policy* (2007).  http://www.hlpronline.com/2007/04/suarez-orozco_01.html  *

122. Suárez-Orozco, Marcelo M. and Carolyn Sattin. "Educating the Children of Immigrants in the United States: A Call to Action." In *Immigrant Children Can Succeed: Lesson from Around the World*, edited by Bertelsmann Stiftung, 46-59. Gurtesloh, Germany: Verlag Bertelsmann Stiftung, 2008.*

123. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco.  "Children and Immigration." In *The Child: An Encyclopedic Companion,* edited by Richard Shweder, 481-486. Chicago and London: The University of Chicago Press, 2009.*

124. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Globalization, Immigration, and Schooling." In *The Routledge International Companion to Multicultural Education,* edited by James A. Banks, 62-76. New York: Routledge, 2009.

125. Suárez-Orozco, Marcelo M. "Western Union World." *Harvard Business Review, Breakthrough Ideas for 2009*, 2009.  http://hbr.org/web/2009/hbr-list/western-union-world *

126. Suárez-Orozco, Marcelo M. and Francisco X. Gayta. "Preface: Latinos Remaking America." In *Latinos: Remaking America*. Second Edition, updated with a new preface, edited by Mariela Páez and Marcelo M. Suárez-Orozco, xi-xxi. Cambridge and Berkeley:  David Rockefeller Center for Latin American Studies at Harvard University and University of California Press, 2009.*

127. Suárez-Orozco, Marcelo M. "The Remittance Hole." *Americas Quarterly* (Spring 2009): 84-89.*

128. Suárez-Orozco, Marcelo M. "Foreword-Young Lives on Hold: The College Dreams of Undocumented Students." In *Young Lives on Hold: The College Dreams of Undocumented Students*, by Roberto Gonzalez, 2-3. New York: The College Board, 2009.

129. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Educating Latino Immigrant Students in the Twenty-First Century: Principles for the Obama Administration."*Harvard Educational Review* 79, no. 2 (Summer 2009): 327-340.*

130. Suárez-Orozco, Marcelo M. "The Transatlantic Dialogue on Migration." *La Pietra Policy Dialogues* I, (Fall 2009): 9-11.

131. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Children of Migrant Populations." In *International Encyclopedia of Education Volume 4*, edited by Eva Baker, Barry McGaw, Penelope Peterson, 629-635. Oxford: Elsevier, 2010.*

132. Suárez-Orozco, Marcelo M. Foreword to *Asian in the Ivory Tower: Dilemmas of Racial Inequality in American Higher Education*, by Robert Teranishi, xii-xvi. New York: Teachers College Press, 2010.

133. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "The Psychological Experience of Immigration." In *Psychological Anthropology: A Reader on Self and Culture,* edited by Robert E. LeVine, 329-344. Sussex, UK: Wiley Blackwell Press, 2010.*

134. Suárez-Orozco, Marcelo M. "Education and the Globalization Paradigm." In *International Perspectives on the Goals of Universal Basic and Secondary Education,* edited by Joel Cohen and Martin B. Malin, 203-212. Cambridge: The American Academy of Arts and Sciences, 2010.*

135. Suárez-Orozco, Marcelo M., Carolyn Sattin-Bajaj, and Carola Suárez-Orozco. "Architectures of Care: Educating the Whole Child for the Whole World." In *Educating the Whole Child for the Whole World: The Ross School Model and Education for the Global Era,* edited by Carolyn Sattin and Marcelo M. Suárez-Orozco, 1-24. New York: New York University Press, 2010.*

136. Suárez-Orozco, Marcelo M. and Carolyn Sattin-Bajaj.  Conclusion in *Educating the Whole Child for the Whole World: The Ross School Model and Education for the Global Era,* edited by Carolyn Sattin and Marcelo M. Suárez-Orozco, 195-199. New York: New York University Press, 2010.*

137. Suárez-Orozco, Marcelo M., Carolyn Sattin-Bajaj, and Carola Suárez-Orozco. "Making Migration Work." *Peabody Journal of Education* 85, no. 4 (2010): 535-551.*

138. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Robert Teranishi. "Immigrants in Community Colleges." *The Future of Children* 21, no. 1 (Spring 2011): 153-169. http://futureofchildren.org/futureofchildren/publications/journals/article/index.xml?journalid=74&articleid=544&sectionid=3751&submit *

139. Suárez-Orozco, Marcelo M., et al. "Migrations and Schooling." *Annual Reviews of Anthropology* 40 (October 2011): 311-328.*

140.  Suárez-Orozco, Marcelo M., Vivian Louie, and Roberto Suro. Preface to *Writing Immigration: Scholars and Journalists in Dialogue,* edited by Vivian Louie, Marcelo M. Suárez-Orozco, and Roberto Suro, ix-xxvi. Berkeley and Los Angeles: University of California Press, 2011.*

141. Suárez-Orozco, Marcelo M., C. Suárez-Orozco, R. Teranishi., and H. Yoshikawa. "Growing Up in the Shadows: Developmental Implications of Unauthorized Status." *Harvard Educational Review* 81, no. 3 (Fall 2011): 438-472.*

142. Suárez-Orozco, Marcelo M. "The Dream Deferred." *Americas Quarterly* 6, no. 2 (Spring 2012): 142-147.

143. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Immigration in the Age of Global Vertigo." In *Arizona Firestorm: Global Immigration Realities, National Media, and Provincial Politics,* edited by Celeste G. Bustamante and Otto Santa Ana, 253-276. Lanham, MD: Rowman & Littlefield Publishers, 2012.

144. Suárez-Orozco, Marcelo M. and Sukhmani Singh.  "The 'generous heart': Teachers and immigrants in the 21st century." *Teacher Education and Practice* 12, no. 4 (Fall 2012): 585-588.*

145. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Transnationalism of the Heart: Families Across Borders." In *What Is Parenthood?  Contemporary Debates about the Family,* edited by Daniel Cere and Linda C. McClain, 279-298. New York: New York University Press. 2013.*

146. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Conferring Disadvantage: Immigration, Schools, and the Family." In *Education, Justice, and Democracy,* edited by Danielle Allen and Robert Reich, 133-154. Chicago: University of Chicago Press, 2013.

**1400**

147. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Taking Perspective: Context, Culture and History Cultural." *New Directions for Child and Adolescent Development* 141 (Fall 2013): 9-23.*

148. Suárez-Orozco, Marcelo M., Dalal Katsiaficas, and Carola Suárez-Orozco. "Children of the Unauthorized: Domains of Compromise in Development." In *The Criminalization of Immigration: Contexts and Consequences,* edited by Alissa R. Ackerman and Rich Furman, Editors, 239-253. Durham: Carolina Academic Press, 2014.*

149. Suárez-Orozco, Marcelo M. "Teaching Howard, Teaching with Howard." In *Mind, Work, and Life: A Festschrift on the Occasion of Howard Gardner's 70th Birthday*, edited by Mindy Kornhaber and Ellen Winner, 2014. http://goo.gl/a2IRIN

150. Suárez-Orozco, Marcelo M., et al. *Statement on Trafficking in Human Beings.* Vatican City: The Pontifical Academies of Sciences and Social Sciences and the Fédération Internationale Des Associations De Médecins Catholiques*, 2013. http://goo.gl/oInly4

151. Suárez-Orozco, Marcelo M., et al*. Statement on Bread and Brain, Education and Poverty*. Vatican City: The Pontifical Academies of Sciences and Social Sciences, 2013. http://goo.gl/RuCL2A

152. Suárez-Orozco, Marcelo M., et al. *Youth Civic Development and Education. A Consensus Report*. Seattle: Center on Adolescence and Center for Multicultural Education at University of Washington, 2014. http://goo.gl/Uk6htk

153. Suárez-Orozco, Marcelo M., Carola Suárez-Orozco, and Robert Teranishi. "In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform." Los Angeles: The UndocuScholar Project at the Institute for Immigration, Globalization & Education at UCLA, 2015. http://bit.ly/1CIAO52

154. Suárez-Orozco, Marcelo M. "Las Tres Caras de Herodes: Éxodo de Criaturas, Migraciones Catastróficas y Vida en Sombras." *Multidisciplinary Journal of Educational Research* 4, no. 3 (2014). http://goo.gl/l9d82w *

155. Suárez-Orozco, Marcelo M., Stephanie Canizales, and Robert Suro. *Removing Insecurity*. Los Angeles: Tomás Rivera Policy Institute at USC and the Institute for Immigration, Globalization, and Education at UCLA, 2015. http://bit.ly/1GVhToB

156. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "The Empire of Suffering: Trafficking of Children in the Global Millennium." *Trafficking In Human Beings: Modern Slavery,* Scripta Varia, 2-3 122. Vatican City:The Pontifical Academies of Sciences and Social Sciences, 2013.http://goo.gl/YC8Bey

157. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Structuring Opportunity for Immigrant Origin Children." In *Bread and Brain, Education and Poverty,* Scripta Varia 3-4 125. Vatican City: The Pontifical Academies of Sciences and Social Sciences, 2014. http://goo.gl/Ux09Zd

158. Suárez-Orozco, Marcelo M. "Migration: Cultural Aspects."  In *International Encyclopedia of the Social & Behavioral Sciences, 2nd edition* 15, edited by James D. Wright, 427-432. Oxford: Elsevier, 2015. *

159. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Children of Immigration." *Kappan Magazine,* 8-14, December 2015/January 2016. http://bit.ly/1WSlgnD

160. Suárez-Orozco, Marcelo M. "A Reunion." In *Education and Equality*, edited by Danielle Allen, 62-76. Chicago: University of Chicago Press, 2016.*

161. Suárez-Orozco, Marcelo M. "Public Research Universities in the 21st Century." In *Bulletin of the American Academy of Arts and Sciences,* 43-44. Cambridge: American Academy of Arts and Sciences, 2016.

162. Suárez-Orozco, Marcelo M., James Banks, and Miriam Ben-Peretz. Preface to *Global Migration, Diversity, and Civic Education: Improving Policy and Practice*, edited by James Banks, Miriam Ben-Peretz, and Marcelo Suárez-Orozco, vii-x. New York: Teachers College Press & The National Academy of Education, 2016.*

163. Suárez-Orozco, Marcelo M. and Minas Michikyan. "Introduction: Education for Citizenship in the Age of Globalization and Mass Migration" In *Global Migration, Diversity, and Civic Education*, edited by James Banks, Miriam Ben-Peretz, and Marcelo Suárez-Orozco, 1-25. New York: Teachers College Press & The National Academy of Education, 2016.*

164. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "The Sustainable Planet: Towards an Education for Sustainability." In *Children and Sustainable Development: A Challenge for Education*, edited by Antonio M. Battro, Pierre Léna, Marcelo Sánchez Sorondo and Joachim Von Braun. Cham, Switzerland: Springer, 2017.


Op-Eds

1. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Immigrant Children and the American Project." *Education Week* (2000): 1-6.

2. Suárez-Orozco, Marcelo M. "Who Stays?" *Newsday*, B4, July 22 2001.

3. Suárez-Orozco, Marcelo M. "Bush's Immigration Plan: Obsolete, Unambitious." *Houston Chronicle*, B12, July 26, 2001.

4. Suárez-Orozco, Marcelo M. "U.S. Immigration Policy Blind to Reality." *The Miami Herald,* B7, July 29, 2001.

5. Suárez-Orozco, Marcelo M., et al. "Globalizzazione ed Educazione. L'Osservatore Romano." *The Pontifical Academies of Sciences and Social Sciences,* March 9, 2006.

6. Suárez-Orozco, Marcelo M. "A Question of Assimilation." *U. S. News & World Report*, 34-36, March 13, 2006.

7. Suárez-Orozco, Marcelo M. "Beware of simplistic immigration solutions." *San Jose Mercury News*, 13, March 26, 2006.

8. Suárez-Orozco, Marcelo M. "Throw out the Tests." *The New York Times,* April 28, 2009. http://roomfordebate.blogs.nytimes.com/2009/04/28/what-we-learn-from-school-tests/#marcelo

9. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "From Obama, Children of Immigration need Hope and DREAM." *U. S. News and World Report* , May 6, 2009. http://politics.usnews.com/opinion/articles/2009/05/06/from-obama-children-of-immigration-need-hope-and-dream.html?errors=socialweb_1

10. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco.  "Despite Sotomayor Nomination Latino Education Academic Gap Still Huge." *The Huffington Post,* May 27, 2009. http://www.huffingtonpost.com/marcelo-m-suarezorozco-and-carola-suarezorozco/despite-sotomayor-nominat_b_208319.html

11. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Ignoring the Needs of English Language Learners." *The New York Times,* August 3, 2009. http://roomfordebate.blogs.nytimes.com/2009/08/03/what-do-school-tests-measure/#orozco

12. Suárez-Orozco, Marcelo M. "Aleph by the Bosphorus." *Newsweek Istanbul,*  April 19, 2009. http://www.newsweekturkiye.com/haberler/detay/28496/Bogaz-daki-Alef?reload=true

13. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "More Diverse, Less Prepared." *The Huffington Post*, September 5, 2009. http://www.huffingtonpost.com/marcelo-m-suarezorozco-and-carola-suarezorozco/more-diverse-less-prepare_b_277956.html

14. Suárez-Orozco, Marcelo M. and Carolyn Sattin. "Charter School Fail Immigrants." *The Huffington Post,* September 30, 2009. http://www.huffingtonpost.com/carolyn-sattinbajaj/charter-schools-fail-immi_b_305338.html

15. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Dedicated to Molingualism." *The New York Times*, February 7, 2010. http://roomfordebate.blogs.nytimes.com/2010/02/07/will-americans-really-learn-chinese/#orozco

16. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "The Education of Michelle Obama." *The Huffington Post,* May 22, 2010. http://www.huffingtonpost.com/marcelo-m-suarezorozco-and-carola-suarezorozco/the-education-of-michelle_b_585733.html

17. Suárez-Orozco, Marcelo M. and Nancy Scheper-Hughes. "The Fox." *The Huffington Post,*  July 16, 2010.  http://www.huffingtonpost.com/m-suarezorozco/the-fox_b_647751.html?ir=Politics

18. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Broken System, Broken Families." *The Huffington Post,* July 19, 2010. http://www.huffingtonpost.com/marcelo-m-suarezorozco-and-carola-suarezorozco/broken-system-broken-fami_b_650395.html

19. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Anti-Anti Immigration: Principles to Make Migration Work." *The Huffington Post,* September 7, 2010. http://www.huffingtonpost.com/marcelo-m-suarezorozco-and-carola-suarezorozco/antianti-immigration-prin_b_706609.html

20. Suárez-Orozco, Marcelo M. and Roberto Suro "From Ellis Island to an electrified fence, why America is so torn on immigration." *The Washington Post,* B3, October 23, 2011. http://wapo.st/rg4Cka

21. Suárez-Orozco, Marcelo M. "What would Aristotle Think?" *The New York Times. Room for Debate,* January 30, 2012. http://www.nytimes.com/roomfordebate/2012/01/29/is-learning-a-language-other-than-english-worthwhile/what-would-aristotle-think?scp=1&sq=suarez-orozco&st=cse

22. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "In Immigration Never, Never Land: Anachronistic, Out-of-Touch." *The Huffington Post,*  February 21, 2012. http://www.huffingtonpost.com/marcelo-m-suarezorozco-and-carola-suarezorozco/immigration-policy_b_1286799.html

23. Suárez-Orozco, Marcelo M. "Cheating Ourselves." *The Huffington Post,*  September 11, 2012. http://ampersand.gseis.ucla.edu/op-ed-by-suarez-orozcos-in-huffington-post-looks-at-harvard-cheating-incident/

24. Suárez-Orozco, Marcelo M. "Nation's Largest Workforce Provider Under Siege." *The Huffington Post,* October 26, 2012. http://www.huffingtonpost.com/m-suarezorozco/nations-largest-workforce_b_2025728.html

25. Suárez-Orozco, Marcelo M. "California Dreaming." *The Huffington Post,* November 8, 2012. http://www.huffingtonpost.com/m-suarezorozco/california-proposition-30-schools_b_2092692.html

26. Suárez-Orozco, Marcelo M. "What the Sandy Hook Shooting Robbed Us All Of." *U.S. News and World Report,* December 20, 2012. http://www.usnews.com/opinion/articles/2012/12/20/what-the-sandy-hook-shooting-robbed-us-all-of

27. Suárez-Orozco, Marcelo M. "Both Democrats and GOP Still Have Much to Learn About Latinos." *U.S. News and World Report,* November 16, 2012. http://www.usnews.com/opinion/articles/2012/11/16/both-democrats-and-gop-still-have-much-to-learn-about-latinos

28. Suárez-Orozco, Marcelo M. and Imelda Nava-Landeros. "A Golden APPLE for California's Teachers." *The Huffington Post,* January 8, 2013. http://www.huffingtonpost.com/imelda-navalanderos/a-golden-aple-for-califor_b_2434559.html?utm_hp_ref=california-propositions

29. Suárez-Orozco, Marcelo M. and Rashmita Mistry. "Preschool Makes a Difference for Poor Immigrant Children." *The New York Times*, February 25, 2013. http://goo.gl/LSVJld

30. Suárez-Orozco, Marcelo M. "L.A. Without Lots of Immigration Would Be a Sorry Place." *ZócaloPublicSquare.org,* March 11, 2013. http://goo.gl/oWUyYT

31. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Immigrant Kids, Adrift" *The New York Times*, April 22, 2013. http://nyti.ms/1Xqjz0S

32. Suárez-Orozco, Marcelo M. "The Elephant in the (Class)room." *U.S. News and World Report*, September 19, 2013. http://bit.ly/1demFCS

33. Suárez-Orozco, Marcelo M. and Jane Margolis. "Handing out iPads to students isn't enough." *The Los Angeles Times*, January 19, 2014. http://goo.gl/c9rcp4

34. Suárez-Orozco, Marcelo M. and Karen Hunter Quartz. "School Communities: Committing to the Futures of Immigrant Students." *The Huffington Post*, April 30, 2014. http://goo.gl/gEYWZU

35. Suárez-Orozco, Marcelo M. "Immigration is a Family Matter." *U.S. News and World Report*, August 22, 2014. http://goo.gl/Wodb1M

36. Suárez-Orozco, Marcelo M. and Robert Suro. "Think of Undocumented Immigrants as Parents, Not Problems." *The New York Times*, April 27, 2015. http://nyti.ms/1zfSKVE

37. Suárez-Orozco, Marcelo M. and Carola Suárez-Orozco. "Words Matter." *U.S. News and World Report*, September 10, 2015. http://bit.ly/1JXhd1D

38. Suárez-Orozco, Marcelo M. "An immigrant pope for the age of mass migration." *Boston Globe*, September 21, 2015. http://bit.ly/1Gde6RE

39. Suárez-Orozco, Marcelo M. and Louis Gomez. "Learning from the Genome of American Schooling." *HuffPost Education,* February 4, 2016. http://huff.to/1PlgiKQ

40. Suárez-Orozco, Marcelo M. "America's First Latin American President?" *U.S. News and World Report*, July 20, 2016. http://bit.ly/2aeNI64

41. Suárez-Orozco, Marcelo M. and Robert Suro. "Children are the new dispossessed." *Medium,* January 17, 2017. https://medium.com/@suro_26975/children-are-the-new-dispossessed-37f54c5ce6ad#.8oezd98c9

42. Suárez-Orozco, Marcelo M., Antonio Battro, and Marcelo Sanchez Sorondo. "El drama de los desplazados golpea más a los niños." *La Nación, Buenos Aires,* March 18, 2017. http://www.lanacion.com.ar/1994997-el-drama-de-los-desplazados-golpea-mas-a-los-ninos

43. Suárez-Orozco, Marcelo. "Build Bridges, Not Walls." *U.S. News and World Report*, May 24, 2017. http://bit.ly/2scMvnl

## SELECTED INVITED PRESENTATIONS

The Catastrophic Migrations of the 21st Century: Implications of Education and Schooling. The Pontifical Academy of Sciences, the Pontifical Academy of Social Sciences, The Holy See. Ethics in Action 3: Migrants and Refugees, Vatican City, May 25, 2017.

Humanism and Mass Migration. Keynote Address. The Pontifical Academy of Sciences, the Pontifical Academy of Social Sciences [The Holy See] and the UCLA Graduate School of Education and Information Studies Workshop on Humanitarianism and Mass Migration. University of California Los Angeles, January 18, 2017.

Global Migration, Diversity, and Civic Education. Keynote Address. Center for Multicultural Education. The University of Washington, Seattle. February 10, 2017.

Learning in the Age of Complexity and Diversity. Invited Address. Second Annual Dyslexia Summit-Cognitive Diversity Project: Embracing Difference. Beckman Hall, Chapman University, Orange California, October 28, 2016.

Globalization 2.0: Further Thoughts on Children & Youth in an Interconnected World. Inaugural Address. Learning Outside the Lines: Children and Youth in an Interconnected World. College of Behavioral and Social Sciences, University of Maryland, College Park, September 28, 2016.

Citizenship in the Age of Globalization. Plenary Session with Howard Gardner. The Future of Learning. Project Zero Harvard University, Cambridge MA, July 26, 2016.

Public Scholarship & Immigrant Students. AERA Presidential Session. Washington, DC, April 10, 2016.

Public Scholarship on Global Migration & Structural Inclusion. AERA Presidential Session, Washington, DC, April 8, 2016.

The Empire of Suffering: Rethinking Mass Migration in the Age of Dystopia. Colloquium Series. Department of Sociology, University of Pennsylvania, PA. April 1, 2016.

From Local to Global: Public Research Universities in the 21st Century. (With UCLA Chancellor Gene Block, UCR Chancellor Kim Wilcox and AAAS President Jonathan Fanton). American Academy of Arts and Sciences. UCLA, Los Angeles, CA. February 4, 2016.

Education in the Age of Mass Migration. The 2016 Carl and Alice Daeufer Endowed Education Lecture. The University of Hawai'i, Mānoa, College of Education. Hawai'i, January 20, 2016.

Mass Migration & Education in the 21st Century – Policy Options: A view from the World of Research and Practice. Invited Address to the Legislature, State of Hawai'i. Honolulu, HI, January 21, 2016.

Immigration Today. Chancellor's Thought Leaders Series. The Chancellor's Residency, The University of Hawai'i at Mānoa, January 21, 2016.

The Empire of Suffering:  Further Thoughts on Mass Migration in the Age of Dystopia. Keynote Address. Transforming Migrations, UC Irvine 50th Anniversary Academic Symposia, Irvine, CA, October 9, 20115.

Rethinking Education in the Age of Vertigo. Keynote Address. California Association for Asian and Pacific American Education. California State University at Northridge, Northridge, CA, July 31, 2015.

The Ninth Circuit in the Age of Mass Migration. Keynote Address. 2015 Ninth Circuit Judicial Conference. San Diego, CA, July 14, 2015.

After Immigration: New Anxieties in the Age of Global Vertigo. Keynote Address. Paulo Freire Institute, UCLA, April 24, 2015.

In the Shadows of the Ivory Tower: Findings from America's First Survey of Undocumented College Students. Invited Lecture. Steinhardt Institute for Higher Education, New York University, NYC, April 2, 2015.

Undocumented Undergraduates in American Colleges. Invited Lecture. Center for American Progress. Washington, DC. March 31, 2015.

Globalization, Mass Migration and Inequality: Further Thoughts on Education in the Age of Vertigo. The Marian Miner Cook Athenaeum Series, Claremont University Consortium, Claremont, CA, March 3, 2015.

Unaccompanied Child Migration 2.0. Invited Address. Unaccompanied Child Migration Symposium. The Kenan Institute for Ethics at Duke University, Durham, NC, February 23, 2015.

Educating Immigrant Children for the 21st Century. Keynote Address. Early Childhood Education and Care & Early Language Learning Conference. Council of Europe, the Italian Presidency, and the Italian Ministry of Education. The Loris Malaguzzi International Center, Reggio Children. Reggio Emilia, Italy, December 17, 2014.

Demographic Shifts: Impacts on Education. Invited Keynote. The National Academy of Education. The National Academy of Sciences, Washington DC, November 15, 2014.

Rethinking Education in the Age of Global Vertigo: Further Thoughts on Globalization, Immigration and Inequality. Keynote Address. Third Annual Research Colloquium, California State University Northridge, CA, October 29, 2014.

Education and Equality: A Response to Danielle Allen. Discussant: The Tanner Lectures on Human Values, Center for Ethics in Society, Stanford University, CA, October 9, 2014.

Education Tools and Methods. Roundtable Discussion, Session Chair. The Blouin Creative Leadership Summit. The Museum of Modern Art, New York, NY, September 24, 2014.

The Three Faces of Herod: Unaccompanied Children at the US Southern Border. Vatican Symposium on International Migration and Development. Invited Lecture. Mexican Ministry of Foreign Affairs & the Holy See, Mexico, DF, July 14, 2014.

Global Migration-Demographic & Cultural Changes. Invited Lecture. Contributions Council of the Conference Board. National Civil Rights Museum, Memphis, TN. June 24, 2014.

Education for Hyper-Diversity. UCLA Student Affairs Staff Meeting, UCLA, Los Angeles, CA, May 5, 2014.

The Children of Immigrants at School: A Comparative Look at Integration in the United States and Western Europe. Introductory Address. The Graduate Center CUNY, New York. May 1, 2014.

Access in Education: Why Civil Rights in Schools Still Matter. Roundtable Discussion. UCLA, GSE&IS Dean's Distinguished Speaker Series, UCLA, Los Angeles, CA, April 14, 2014.

Education and Immigration. Roundtable Discussion. Conversation with an Expert, Edward. R. Roybal Learning Center, Los Angeles, CA, April 10, 2014.

Education in the Age of Mass Migration and Superdiversity. Invited Keynote. Conference on Heritage/Community Languages, UCLA. Los Angeles, CA, March 7, 2014.

Making a Difference in Urban Schools: Drawing Lessons from the Field. Introductory Address. UCLA, GSE&IS Dean's Distinguished Speaker Series, UCLA, Los Angeles, CA, February 24, 2014.

Education and Educating in the Age of Migration and Superdiversity. Invited Keynote. International Conference: Migration and Education, University of Hildesheim, Hildesheim, Germany, February 20, 2014.

Rethinking Migration and Education in the Age of Global Vertigo. Invited Lecture. Hertie School of Governance, Berlin, Germany, February 19, 2014.

Making Education Work for Latinas. Roundtable Discussion. GSE&IS Dean's Distinguished Speaker Series, UCLA, Los Angeles, CA, December 2, 2013.

Educating Immigrant Children. Invited Lecture. Bread and Brain, Education and Poverty, Pontifical Academy of Sciences, Casina Pio IV, Vatican City, Rome, November 4, 2013.

The Empire of Suffering: Trafficking of Children in the Global Millennium. Invited Lecture. Trafficking in Human Beings: Modern Slavery. Pontifical Academy of Sciences, Casina Pio IV, Vatican City, November 2, 2013.

Rethinking Immigration & Education in the Global Era. Invited Lecture. University of Southern California, Los Angeles, CA, October 29, 2013.

Latinos in the 21st Century: Continuities and Change. Invited Keynote. Florida State University, Tallahassee, FL, October 15, 2013.

Today is the Future. Univision Education Town Hall. Roundtable Discussion. Ackerman Grand Ballroom, UCLA, Los Angeles, CA, October 4, 2013.

Education Methods and Ideas. Invited Address. The Blouin Creative Leadership Summit. The Metropolitan Club, New York, NY, September 24, 2013.

From Blackboards to iPads: Examining Education in the 21st Century. Roundtable Discussion. Education Policy Salon, Los Angeles, CA, September 16, 2013.

Beyond Immigration Reform. Televised Education Town Hall. National Council of La Raza Annual Meeting. New Orleans, Louisiana, July 20, 2013.

Education for Citizenship in the Public University-Israel & the US. Invited Address. Association for Israel Studies 29th Annual Meeting. UCLA School of Law, Los Angeles, CA, June 24, 2013.

Education Minor Spring Reception. Invited Keynote. Department of Education, UCLA, Los Angeles, CA June 4, 2013.

The Future of California: Immigration & Education. Keynote Address. Antioch University Board of Trustees Forum, Santa Barbara, CA, May 29, 2013.

Human Development in Latino Contexts: Cultural, Neural, and Applied Perspectives. Invited Lecture. UCLA, Los Angeles, CA, May 23, 2013.

What Would Immigration Reform Mean for Los Angeles? Invited Zócalo/Azteca America/ California Community Foundation Roundtable, The California Endowment, Los Angeles, CA, May 1, 2013.

Improbable Scholars: The Rebirth of a Great American School System and a Strategy for America's Schools. Roundtable Discussion. UCLA, GSE&IS Dean's Distinguished Speaker Series, UCLA, Los Angeles, CA, April 24, 2014.

Globalization and Education: Implications for Business. Invited Keynote. ATT Business Forum, ATT Headquarters, Dallas, TX, April 17, 2013.

Latino Youth in America: The Education Imperative. Invited Keynote. Kansas State University, Manhattan, Kansas, March 27, 2013.

Issues of Identity: Immigration's Echo & Alternate Perspectives on Definitions of Civic Engagement. (Carola Suárez-Orozco, Marcelo Suárez-Orozco & Maria Hernandez). Invited Address. Youth Civic Development and Education Conference, Stanford University Graduate School of Education, Stanford, CA, February 7, 2013.

Policy Scholars on Undocumented Students. Roundtable Discussion. Graduate Student Policy Seminar, ASHE, The Cosmopolitan Hotel, Las Vegas, NV, November 14, 2012.

Immigration, Education, and Language Research, Invited Lecture. GSE&IS, UCLA. Los Angeles, CA, November 9, 2012.

(Re) Imagining Immigration and Education in the Era of Global Vertigo. Keynote Address. Imagining a World where it is Easier to Love. Celebrating the 10th Anniversary of the Paulo Freire Institute at UCLA, Los Angeles, CA, September 19, 2012.

The Futures of Learning Roundtable Discussion K. Anthony Appiah, Howard Gardner, and Marcelo M. Suárez-Orozco.) Harvard University Graduate School of Education. Cambridge, MA, August 3, 2012.

Immigration in America Today: New Data, New Opportunities, New Constraints. Keynote Address. The United Nations Alliance for Civilization Fellows Program. Institute for International Education, United Nations Plaza, May 7, 2012.

Educating the Whole Child for the Whole World. Keynote Address. The National Reading Campaing/Campagne sur la Lecture. Simon Fraser University, Vancouver, Canada, May 2, 2012.

Educating Children for the 21st Century. Rutgers University Graduate School of Education Keynote Address, Rutgers, NJ, March 27, 2012.

Educating the Whole Child for the Whole World. The Rivers School of Weston, Weston, MA, March 26, 2012

The New Normal in American Immigration. Keynote Address. Harvard Club of New York City, New York, March 21, 2012.

Growing Up in the Shadows: The Children of the Unauthorized Come of Age. Invited Address, Conference on "Immigration in the Wake of the Great Recession," The Thomas Rivera Policy Institute, University of Southern California, Los Angeles, March 5, 2012.

In the Shadows: The Educational Implications of Unauthorized Status. (Carola Suárez-Orozco and Marcelo Suárez-Orozco). Keynote Address. The 29th Teachers College Annual Winter Roundtable. Teachers College of Columbia University, New York, February 24, 2012.

Rethinking Immigration and Education in the Age of Global Vertigo. Keynote Address, The Center for Civic Engagement, College of Arts and Sciences, College of Education and Human Sciences, Department of Psychology, Department of Anthropology and UNL Research Council and the Faculty Senate Convocations Committee, University of Nebraska, Lincoln, February 6,

Educating Immigrant Children for the 21st Century: Lessons from around the World. The Lincoln Community Foundation. Lincoln Nebraska, February 7, 2012.

Globalization and Education. Keynote Address. Heritage Languages and Social Cohesion. Lycée Français de New York. New York, November 5, 2011.

Immigration and Business after the Crisis. Keynote Address, Grand Valley State University School of Business, Grand Rapids, Michigan, October 13, 2011.

Acting on the Dream: Immigrant Students at the Crossroads. Hispanic Heritage Celebration. Keynote Address. The Intercultural Center for Peace, Northern Florida State University, Jacksonville, Florida, October 3, 2011.

The Futures of Immigration: Scholars and Journalists in Dialogue. The Nieman Foundation for Journalism at Harvard, Cambridge MA, September 30, 2011.

Education and Global Civil Society. Dialogues on the Global Civil Society with the Right Honourable Gordon Brown, former Prime Minister of the United Kingdom. New York University, NYC, September 21, 2011.

Further Reflections on Education for the Global Era. Invited Address. The Blouin Creative Leadership Summit. The Metropolitan Club, New York City, September 20, 2011.

Immigration and Education in the Age of Global Vertigo. Invited Address with an introduction by Dean Delia Garcia. College of Education, Florida International University, Miami, Florida, September 14, 2011.

Global Migrations: Identities and Education for the 21st Century. Invited address Tercer Encuentro Mundial: Valores y Cultura de la Legalidad with His Holiness the 14th Dalai Lama of Tibet. Monterrey, Mexico, September 9, 2011.

Immigration: The Long View. Keynote Address. Yale Summer Institute on Colonial Latin America. El Museo del Barrio, New York City, July 8, 2011.

Immigration Nation? Keynote Address. The Harvard Club, New York City. May 18, 2011.

Immigration Today: Japan-US Comparisons. Invited Address. International Conference on Immigration in Japan and the U.S. School of International Relations and Pacific Studies. University of California, San Diego, CA, May, 6, 2007.

Acting on the Dream. Keynote Address, Dominican Studies Institute Research Library. The City College of New York, April 28, 2011.

Immigration in Troubled Times. Invited Lecture. Goldman School of Public Policy, U. C. Berkeley, CA, April 21, 2011.

Educating the Whole Child for the Whole World. Keynote Address. Graduate School of Education, Rutgers University, Rutgers, NJ, April 15, 2011.

Immigration and the Family: Theoretical Considerations. Invited Lecture. The NORFACE Research Programme on Migration. University College London, April 8, 2011.

Immigration and Education in the 21st Century. Keynote Address, New York Department of Education, The Museum of the City of New York, March 8, 2011.

Rethinking Immigration in the Era of Vertigo. Keynote Address, NYU in Boca Raton (NYU Alumni Office and NYU Development Office), Florida, February 23, 2011.

Immigration and Language. Keynote Address. The Minority Student Achievement Network Conference. University of Massachusetts, Amherst, December 7, 2010.

Immigration's Vertigo. Invited Lecture. American Academy of Child Psychiatry Annual Meeting. Ney York City, October 30, 2010.

Rethinking Latino Education. Keynote Address. Center for Latino Policy Research. University of California, Berkeley, CA, October 28, 2010.

Latinos in North America: Educational Implications in the Global Era. Keynote Address. 5th Hispanic Congress on Education. The Spanish Speaking Education Network, York University, Toronto, Canada, October 23, 2010.

The Global Migration Vertigo. The Dow Lecture on Conflict and Community, Saginaw Valley State University. Saginaw, Michigan, October 12, 2010.

Globalization and Education, 2.0. Keynote Address, the United Nations International School. New York, October 11, 2010.

Latinos and Immigration. Keynote Address, Harvard Faculty Club, Cambridge, MA. October 8, 2010.

Rethinking Latino Immigration and Health. Keynote Address. The Latino Health Forum, Harvard Medical School, Boston, MA, October 7, 2010.

**1411**

Global Migration: New Realities. Keynote Address. Fondazione Cariplo/Bertelssman Stitfung International Conference on No Dialogue, No Citizenship. Teatro Piccolo Grassi, Milano, Italy, October 1, 2010.

Anti-Anti Immigration. Invited Lecture. Department of Anthropology and Center for Latin American Studies. University of California, Berkeley, CA, September 24, 2010.

Education; Technology and the Democracy of Knowledge in the Global Era. Invited Lecture. Blouin Creative Leadership Summit. The Metropolitan Club. New York, September 23, 2010.

Arizona's Firestorm: A Conversation between President Vicente Fox and Marcelo M. Suárez-Orozco moderated by Chrystia Freeland http://www.youtube.com/watch?v=RTsTYd6MG6A . Google Zeitgeist. Camel Back, Arizona, September 14, 2010.

State, School and Diversity in the Era of Mass Migration. Keynote Address. Calouste Gulbenkian Foundation, Lisbon, Portugal, June 7, 2010.

Learning a New Land: Latino Immigrant Students in American Society. Keynote Address. Princeton University Symposium on Latinos in America. Princeton, NJ April 10, 2010.

The Italian Immigration Crisis through American Eyes. The Second Annual Transatlantic Dialogue on Migration. Villa La Pietra, NYU, Florence, Italy. March 17, 2010.

Rethinking Global Migration. Keynote Address. The Nassau Club. Princeton, NJ, February 17, 2010.

Reflections Immigration and the Struggle for Civil Rights. Keynote Address. Martin Luther King, Jr. and the Dream Act. New York University School of Law, January 18, 2010.

Immigration's Unbearable Normalcy: Further Thoughts on Global Migration. Institute for Advanced Study, Princeton, NJ, January 14, 2010.

Immigrant Youth In Public Participation. The Public Participation Network. MacArthur Foundation. Charles Hotel, Cambridge, MA, January 7, 2010.

Immigration through the Eyes of Young People. Keynote Address on International Migrants Day, United Nations Headquarters. United Nations, New York, Dec. 18, 2009.

Rethinking Immigration in the Age of Global Vertigo. Keynote Address. Migrations and Transnational Identities: Crossing Borders, Bridging Disciplines. The Humanities Institute at Stony Brook, Nov. 13, 2009.

Rethinking Immigration, Education, and Language in the Age of Global Vertigo. Keynote Address. King Juan Carlos of Spain Center Conference on Immigration, Education and Language: A Spain/USA Perspective. New York University, November 12, 2009.

The New, New Immigration. Keynote Address. Migration Studies Project. Penn State University. November 2, 2009.

The State of Latino Children and Youth. Keynote Address. National Council of La Raza Children's Symposium. Washington, D.C., October 22, 2009.

Immigration, Race and the Academy. Keynote Address. Race in the Academy Lectures. Graduate School of Education, University of Pennsylvania. October 21, 2009.

A Cultural Psychology of Immigration in the Age of Global Vertigo. The Distinguished Lecture Series. The Graduate School, Princeton University, Princeton, NJ, October 14, 2009.

Immigration and Education. Keynote Address. Hispanic Heritage Month, University of Arkansas, Little Rock. October 5, 2009.

Education: Cognitive and Digital Tools for the Minds of the Next Generation. The Global Creative Leadership Summit. Louise Blouin Foundation and the United Nations Office for Partnerships. The Metropolitan Club, New York. September 24, 2009.

Globalization and the Future of Learning. A conversation with Howard Gardner and Fernando Reimers. The Future of Learning Workshop. Project Zero. Harvard Graduate School of Education, August 5, 2009.

Latino Immigration and Education. Keynote Address. The Northeastern Illinois University Symposium on Latinos in Chicago. June 6, 2009.

Biliteracy and Immigration: The Power to Connect. Keynote Address. Michigan Association of Bilingual Education. Michigan State University, East Lansing, MI May 15, 2009.

Immigration and Health. Keynote Address. Harvard School of Public Health. California Endowment Fellows Program. Cambridge, MA, May 4, 2009.

Immigrants in Dialogue. The Second United Nations Alliance for Civilization Forum. United Nations, Istanbul, Turkey, April 7, 2009.

Global Migration and Education in the 21st Century. Keynote Address. BahçeŞehir Üniversitesi, Istanbul, Turkey, March 18, 2009.

Rethinking Integration in the Global Era. The Immigrant and the City. Villa La Pietra, NYU Florence, March 23, 2009.

Immigration and the Future of Education. UNCW Leadership Lecture Series. University of North Carolina at Wilmington, February 9, 2009.

Exploring Immigration. Keynote Address, State University of New York at Old Westbury. February 5, 2009.

Learning a New Land: Mixed Methods in the Study of Immigration. UCLA Graduate School of Education and Information Studies, January 30, 2009.

Immigration and Universal Human Rights. Hope, Critique & Possibility: Universal Rights in Societies of Difference on the 60th anniversary of the Universal Declaration of Human Rights. Harvard Law School, Cambridge, MA, November 20, 2008.

The Perfect Storm: Immigration, Schools and the State. Keynote Address. Bertelsmann Foundation 11th Conference on School Developments in Germany, Gurtersloh, Germany, November 11, 2008.

Mass Migration: The Human Face of Globalization. Keynote Address. Migration: The Syracuse University Symposium.  Syracuse, New York, October 28, 2008.

Learning a New Land: Immigrant Youth and the Globalization of America. Keynote Address, The 25th Symposium Lecture Series, Center for Multicultural Education, University of Washington, Seattle, WA, October 24, 2008.

Covering Immigration: Journalists and Scholars. Introductory Address. The Neiman Foundation for Journalism at Harvard University and Immigration Studies at NYU conference on Immigration Today, Cambridge, MA, October 3, 2008.

Interdisciplinary Reflections on Comparative Migration. Keynote Address. The President's Lecture Series, Western Connecticut State University, Danbury, CT, September 17, 2008.

The New Immigration to the United States. Dinner Address. United States Conference of Catholic Bishops. Washington, DC, July 28, 2008.

Global Flow: How Migration is changing the World. Dinner Address. The Board of Directors of the Western Union Company. The Peninsula Hotel, New York City, July 24, 2008.

Immigrant Youth: The Research Agenda. Keynote Address. The Funders Meeting of The Annie E. Casey Foundation. Baltimore, MA, June 23, 2008.

The New Inter-American Migration System. Keynote Address, The Western Union Latin American Agents Meeting, Panama City, Panama, June 3, 2008.

Immigrant Youth in Interdisciplinary Perspectives: New Findings from the LISA Study of the Harvard Immigration Projects. Keynote Address. Fundació Jaume Bofill, Barcelona, Spain, May 12, 2008.

Education, Globalization, and Culture. Keynote Address. CIIMU, the City Barcelona, and the University of Barcelona Symposium on Educacion, globalizacion e interculturalidad, Barcelona, May 15, 2008.

Immigrant Children, Youth, and Families: New Findings from the LISA Study. Cornell University's National Children, Youth and Families at Risk (CYFAR) Conference, San Antonio, Texas, May 8, 2008.

Psycho-Social Reflections on Immigration Today. Keynote Address. Immigration and HIV/AIDS. New York. St. Vincent's Hospital and NYU Hospital, The Kimmel Center, New York University, May, 2, 2008.

Immigration and American Democracy. The Lawrenceville School Senior's Capstone Lecture. Princeton, NY, April 15, 2008.

Immigration and Globalization. Class of '48 Lecture, the Burgin Center's Simon Theatre, Mercersburg Academy, Mercersburg, PA, April 14, 2008.

1414

Why Migrate? Keynote Address. The First Year Experience, SUNY Old Westbury, NY, April 7, 2008.

Immigration and the Law: Comparative Reflections. Invited Address, New York University School of Law, NY, April 4, 2008.

Immigration and Latin America Today. Keynote Address. The Honors College, Kent State University, Kent, Ohio, April 1, 2008.

Dual Language: A Passport to Global Citizenship. Keynote Address. New York City Department of Education Dual Language Symposium, New York University, NY, March 27, 2008.

Education for Citizenship in the Global Era (with Carola Suarez-Orozco, Howard Gardner and The Hon. Graziano Del Rio. Mayor of Reggio Emilia). Centro Internationale Loris Malaguzzi, Reggio Emilia, Italy, March 18, 2008.

Learning a New Land: Immigrant Students in American Society. Keynote Address. International Education Student Conference, New York University, NY, March 13, 2008.

Global Moves: How Migration is changing the World. Keynote Address. Western Union Kickoff Conference, Fort Lauderdale, FL, February 12, 2008.

Waves of Migration: Implications for Stakeholders in Business and Society. Keynote Address. Joint Meeting of the Contributions Council I and II, Arizona State University, Tempe, AZ, February 5, 2008.

Immigration, Education and Integration: The View from the United States. Invited address. The Bertelsmann Foundation Conference of Global Immigration, Education, and Integration, Berlin January 24, 2008.

Writing Immigration. Keynote Address. The Neiman Foundation for the Study of Journalism, Harvard University. Cambridge, MA, December 12, 2007.

Rethinking Immigration and Education. Keynote Address. Annual Meeting of the Texas Educational Agency Leadership Council, Dallas, TX, November 7, 2007.

Immigration and Education Today. Keynote Address. Grand Rapids Community College, Grand Rapids MI, October 24, 2007.

Integration and Education in the 21st Century. Invited Address at the German Foreign Office, Berlin, October 17, 2007.

Education for Globalization. Keynote Address. Pittsburgh Area Independent School Teachers' Association Annual Conference, Pittsburgh, PA, October 8, 2007.

Immigrants in the US Education System and Abroad. Keynote Address. Jobs for the Future Double the Numbers National Conference, Washington, DC, October 4, 2007.

What is Globalization? Keynote Address to the Faculty. The Ross School, East Hampton, New York. August, 20, 2007.

Migration Today; Reflections on the Mexican Experience in Longitudinal Perspective. (Carola Suárez-Orozco and Marcelo Suárez-Orozco). Keynote Address. Universidad Popular Autonoma del Estado de Puebla, Mexico, August 9, 2007.

Migration and Culture: A Dialogue for Integration. Roundtable with the Hon. Felipe González. Former Prime Minister of Spain, the Hon. Dominique de Villepin, Former Prime Minister of France, Joseph Stiglitz and others. The Atman Foundation, Madrid, Spain, June 15, 2007.

The Schooling Pathways of Immigrant Youth. Keynote Address. Jaume Bofill Foundation and Universitat Oberta de Catalunya, Barcelona, Spain, May 22, 2007.

The Access of Immigrants and Their Families to a Decent Standard of Living. Keynote Address. The Pontifical Academy of Social Sciences XVIII Plenary Session on Charity and Justice in the Relations Between Nations. Vatican City, May, 1, 2007.

The Education of Immigrant Students: 25 Years After Plyer v Doe. Invited Presidential Panel. AERA Annual Meeting, Chicago, Ill. April 10, 2007.

Good Work in the Global Era. Invited Fireside Chat – with Howard Gardner. AERA Annual Meeting, Chicago, Ill. April 9, 2007.

Global Moves: How immigration is transforming the U.S. Keynote Address. Department of Educational Leadership and Policy Studies, Southern Connecticut State University, New Haven, April 2, 2007.

Immigration and American Citizenship. The Weil Lecture on American Citizenship. University of North Carolina at Chapel Hill, March 28, 2007.

Rethinking Latin American Immigration to the United States. Keynote Address. The Institute for the Study of the Americas, University College, London, March 14, 2007.

Immigration and the Family. Invited lecture. Annual Meeting of the National Center for Family Literacy. Orlando, FL, March 3, 2007.

Immigration and Education: The Texas Experience in Global Context. Keynote Address. Annual Meeting of the Texas Educational Agency Leadership Council, Austin, TX, January 10, 2007.

Race and Immigration: Challenges and Opportunities for the New American Majority. Moderator. El Museo del Barrio, New York, December 9, 2006.

Reflections on Global Migration: The US Case. Invited lecture. The Africa House Conference of International Migration, New York University, NY, December 5, 2006.

Migration and Education in the Global Era. Keynote Address. Annual Meeting of the Association for the Study of Higher Education, Anaheim, CA, November 3, 2006.

Immigration Reform. Keynote Address. New York University School of Law Conference on Immigration and the Law, New York, October 27, 2006.

Moving Stories: The Academic Pathways of Immigrant Youth (with Carola Suárez-Orozco). Keynote Address. The Askwith Forum at Harvard University, Graduate School of Education, Cambridge, MA, October 23, 2006.

Migration in the Americas. Keynote Address to School Assembly. Phillips Academy, Andover, MA, October 11, 2006.

Covering Immigration: What Every Journalist Needs to Know but is Afraid to Ask. Keynote Address. Neiman Foundation for Journalism at Harvard University, Cambridge, MASS, September 27, 2006.

Who is An American? The Immigration Debate After 9/11. Keynote Address. The Gerald R. Ford Presidential Museum and the Hauenstein Center for Presidential Studies, Grand Rapids, Michigan, September 19, 2006.

The New Immigration: Conceptual and Empirical Considerations. Keynote Address. Columbia Basin College Faculty Development Conference, Pasco, Washington, September 14, 2006.

Immigration Today: US Dilemmas and Options. Keynote Address. Kennesaw State University's Conference on Georgia's Undocumented Workforce, Kennesaw, Georgia September 8, 2006.

Education and the Challenges of Globalization. Keynote Address. Manhattan's Region 9 Principals and Senior Leadership Annual Conference. Stuyvesant High School New York, August 30, 2006.

Globalization and Education. Keynote Address.  American Educational Research Association and Teachers College, Columbia University, New York, August 19, 2006.

Educating Students for the 21st Century. Keynote Address. National Conference of State Legislators. Nashville, TN, August 18, 2006.

Immigrants and the Achievement Gap (with Carola Suárez-Orozco). Invited presentation. The Achievement Gap Initiative at Harvard University. Kennedy School of Government, Cambridge, Massachusetts, June 19m 2006.

Rethinking Global Migration: New Realities, New Opportunities, New Challenges with the Hon. Mary Robinson, Former President of Ireland and Former UN High Commissioner for Human Rights and the Hon. Luis Ernesto Derbez, Foreign Minister of Mexico. New York University, New York, May 25, 2006.

Immigrant Students in the 21st Century. Keynote Address, The Massachusetts Elementary School Principals Association Annual Meeting, Cape Cod, Massachusetts, May 4, 2006.

Latin American Emigration Today: Data, Concepts, and Reflections. Keynote Address. International Migration: The Human Consequences of Globalization. Second Colloquium of the Ministry of Foreign Affairs and the Pontifical Academy of Social Sciences, Mexico City, Mexico, March 27, 2006.

Global Migration Today: The Best of Times, The Worst of Times. Speakers on the Square Lecture. New York University, New York, March 23, 2006.

The Second Generation. Invited Lecture Delivered to the NYU School of Law, New York, March 21, 2006.

Immigration Policy Today: US Perspectives. Keynote Address Delivered to Visiting Dignitaries of the United States Department of State, New York City, March 16, 2006.

Globalization and Education. Keynote Address. Annual Meeting of the National Association of Independent Schools. Fleet Center, Boston MA, March 1, 2006.

The Latino Second Generation: What is New? What is Different? Keynote Address. The Young Latino Second Generation Conference. Telemundo/NBC,Nokia Theatre, New York City, February 28, 2006.

Globalization, Immigration and Education. Keynote Address. The Penn Ethnography Forum. University of Pennsylvania, PA, February 24, 2006.

Immigration and Education Today. Presentation to the Dean's Council, Steinhardt School of Education, New York University, New York, January 23, 2006.

Globalization and Education. Keynote Address. Join Workshop of the Pontifical Academy of Sciences and the Pontifical Academy of Social Sciences. Vatican City, November 17, 2005.

Educating the Global City, IGEMS Inaugural. The Great Hall, Cooper Union. New York City, November 1, 2005.

Rethinking the New Immigration. Invited Address. Centrum voor Sociale en Culturele Antropologie, Katholieke Universiteit te Leuven, Belgium, October 26, 2005.

Globalization, Immigration and Education: Some empirical findings and conceptual problems in an emerging field. Keynote Address. The Leuven Seminar on Globalization. Catholic University of Leuven, Belgium. October 25, 2005.

Globalization, Culture and Education. Keynote Address. The Antwerpen Seminar. Antwerp University, Belgium, October 24, 2005.

Doing Research on Diversity: The Fellows Forum. The National Academy of Education. Teachers College, Columbia University, New York, October 21, 2005.

Building the Harvard Immigration Projects. Invited Address, the National Academy of Education. Teachers College, Columbia University, New York, October 20, 2005.

Moving Stories: The Lives and Dreams of Immigrant Youth. Keynote Address. The Lynch School of Education. Boston College. Boston, MA, October 5, 2005.

Immigration Today: What Every Journalist Needs to Know. Keynote Address. The University of Maryland Journalism Fellows. September 28, 2005.

1418

Globalization and Education in the Hartland. Keynote Address. The Omaha Public Schools. Omaha, Nebraska. September 27, 2005.

Exodo: Latin American Emigration and its Consequences. Keynote Address O BRASIL NO FLUXO DAS MIGRAÇÕES INTERNACIONAIS:  SIMPÓSIO INTERNACIONAL, Universidade Pontifícia Católica de São Paulo. Brazil, September 17, 2005.

Immigrant Cultural Psychologies. Keynote Address. Department of Social Psychology, University of Sao Paulo. Brazil, September 16, 2005.

Beyond Tolerance: Globalization and Education in Troubled Times. Keynote Address. Facing History and Ourselves First Global Symposium. Boston, MA, August 11, 2005.

Education for All? The 25th Anniversary Tällberg Forum, Her Majesty Queen Silvia in attendance. Tällberg, Sweden, August 3, 2005.

Rethinking Latino Studies. Keynote Address. 2nd Annual Harvard Latino Studies Research Symposium. Harvard University, Cambridge, MA, May 13, 2005.

Everything you ever wanted to know about Cultural Psychology but were afraid to ask. The Monroe Stein Colloquium Lecture. New York University, Steinhardt School of Education. New York, April 28, 2005.

Globalization and Education: Reflections on John U. Ogbu's Contributions to a Future Field. The John U. Ogbu Memorial Lecture. Department of Anthropology. University of California, Berkeley, April 18, 2005.

Rethinking Immigration and Education in the Era of Accountability. Presidential Invited Session. American Educational Research Association. Montreal, Canada, April 15, 2005.

Education, Immigration, and Globalization: Diversity, Complexity and the Democratic Promise. Presidential Invited Session. American Educational Research Association. Montreal, Canada, April 12, 2005.

Interdisciplinary Reflections on the New Immigration. Invited Address. Department of Psychology. New School University. New York, April 7, 2005.

Global Understanding: Learning and Education in Troubled Times. Keynote Address. The First International Conference on Globalization and Learning. Stockholm, Sweden, March 18, 2005.

Moving Stories: Rethinking Immigration and Education in the Global Era. Keynote Address. Annual Meeting of the Sociology of Education Association. Asilomar, CA. February 19, 2005.

Psychosocial Perspectives on the New Immigration. Invited Address. Department of Community Psychology, New York University. February 14, 2005.

Immigration Today. Keynote Address. Emerson College Department of Performance Art Workshop on Immigration Today. January 27, 2005.

1419

Globalization, Immigration and Education. A conversation between President John Sexton and Marcelo M. Suárez-Orozco. The Steinhardt School of Education and the Ross Institute. January 25, 2005.

Global Migration. Paper presented to the UN Secretary-General's First Annual Global Colloquium of University Presents. Columbia University. January 19, 2005.

Anthropological Reflections on the Sense of History. Invited Address. The Sense of History: Uses and Abuses of the Past. Club of 3. Schlosshotel Cecilienhof Am Neuen Garten, Potsdam, Germany. December 4, 2004.

Conceptual and Empirical Aspects of the New Immigration. Keynote Address Baruch College Workshop on Trends in Mexican Immigration to the United States. September 24, 2004.

Interdisciplinary Research in the Social Sciences. Keynote Address. Harvard University/LASPAU Conference on New Developments in the Social Sciences. Lamont Library, Harvard College. July 16, 2004.

Latino Paradoxes. Keynote Address (read in absentia). The Latino Health Paradox Conference. Harvard School of Public Health. June 24, 2004.

Beyond Tolerance. Co-convener and Presenter. The Ross Institute and the Survivors of the Shoah Visual History Foundation Workshop on Tolerance and Education. June 16, 2004.

Education and Globalization. Keynote Address. Globalization and Social Justice Conference. The Vatican's Pontifical Academy of Social Sciences and the Secretary of State, Mexico. June 4. 2004.

Immigration and Globalization: Interdisciplinary Perspectives. Keynote Address. Immigration Today Conference. Centrum voor Sociale en Culturele Antropologie, Katholieke Universiteit te Leuven (Belgium), June 1, 2004.

Reflections on Education and Globalization. American Academy of Arts and Sciences, Cambridge, MA. May 13, 2004.

Immigration: Three Paradoxes, Two Disciplines, One Claim. Invited Address. Department of Humanities and Social Sciences. Steinhardt School of Education. New York University, NY. March 23, 2004.

Thinking Inter-Disciplines. Invited Address. The Harvard Interdisciplinary Project. Project Zero, Harvard University, Cambridge, MA. March 18, 2004.

Immigration and Well–Being. Keynote Address. Loma Linda University, Loma Linda, California. March 11, 2004.

Immigration in the Study of Race, Culture and Power in the Educational Process. Invited Address. Teaching Race: Race, Culture and Power in the Educational Process. University of New Hampshire, NH. October 31, 2003.

Thinking Through Latino Immigration. Keynote Address. Morton College Faculty Day, Cicero, Ill. August 21, 2003.

Promoting Social Cohesion through Education. Invited Address. The Organization for Economic Co-operation and Development (OECD). Paris. July 3, 2003.

Immigration, Globalization, and Education. (Lectures in Berlin, Hamburg, Düsseldorf, Wiesbaden, and Munich). (Carola Suárez-Orozco and Marcelo M. Suárez-Orozco). Invited Lecture Tour Organized by the US Embassy, Germany. June 23-June 27, 2003.

Immigration and Education: Preliminary Findings from the Harvard Immigration Projects (Two Lectures). (Carola Suárez-Orozco and Marcelo M. Suárez-Orozco). Invited Lectures delivered to the City of Stockholm, Sweden. June 17 and 18, 2003.

Latinos: Remaking America. Invited Keynote Address. Dealing with Difference Summer Institute. Western Illinois University. Macomb, Ill. May 18, 2003.

Current Issues in Migration Policy. Invited presentation with the Hon. Dr. Rita Sussmuth, Former Speaker of the German Bundestag. The Goethe-Institut Inter Nationes.  Boston, May 7, 2003.

Immigrants Mean Business. Invited Lecture. Harvard Business School. May 1, 2003.

Globalization and Child Development: The Research Agenda. Invited Address. The 2003 SRCD Biennial Meeting. Tampa, FL. April 26, 2003.

Global Moves: Migration, Education, Utopia, and Distopia. Keynote Address. Educational Democracy, Citizenship, and the New Immigration Conference. University of Illinois. Champaign Urbana, April 12, 2003.

Education, Culture and Immigration. Invited Address. The Weyland Public Schools, Weyland, MA, April 11, 2003.

The Handley Lecture on Human Values. Invited Address. The Pingry School, Martinsville, New Jersey. April 4, 2003.

Immigration and Education. (Three Lectures). (Marcelo Suárez-Orozco and Carola Suárez-Orozco). Invited lectures delivered to the East Hampton School District and the Ross Institute of New York. East Hampton, NY.  March 21 and 22, 2003.

The Impact of HR 1 on Immigrant and English Language Learners. (Carola Suárez-Orozco and Marcelo M. Suárez-Orozco). Invited Address. The Aspen Institute Congressional Program. Montego Bay, Jamaica. February 18, 2003.

Latinos in the US: Academic Perspectives. Invited Address. The US-Spain Council. Madrid, February 6, 2003.

New Developments in Latin American Immigration to the United States. Invited Address. David Rockefeller Center for Latin American Studies Regional Office. Santiago de Chile.  January 8, 2003.

Latinos in Cities. Invited Address. Invited Address. The Newark Public Library, Newark, NJ, October 3, 2002.

Remaking the Geography of California Identities. Invited Address. The Geography of California Identities Conference. Stanford University, April 26, 2002.

Latinos Mean Business. Invited Address. The David Rockefeller Center for Latin American Studies Corporate Partners Program.  Harvard University, April 19, 2002.

Global Engagement: Immigrant Youth and the Process of Schooling (Carola Suárez-Orozco and Marcelo M. Suárez-Orozco). Fifth Roberta Grodberg Prize Lecture, 9th Biennial Meeting of the Society for Research on Adolescence. New Orleans, April 12, 2002.

A Kinder, Gentler Cultural Psychology for the New Millennium. Keynote Address. Boston Area Cultural Psychology Study Group. April 9, 2002.

Latinos: Remaking the Americans. Inaugural Address. David Rockefeller Center for Latin American Studies Symposium on "The Other Latinos." Harvard University, April 5, 2002.

Education, Culture, and Globalization. World Economic Forum Dinner Hosted by Mrs. Courtney Ross Holst Commentary with Her Highness Shiekha Mousa bint Nasser Al-Misnad, Emira of Qatar and the Honorable Hillary Rodham Clinton, and Howard Gardner. New York City, NY, February 1st, 2002.

Children and Violence: Psychocultural Perspectives. Invited Address. Harvard Children's Initiative. Harvard Faculty Club, Cambridge, MA, December 4, 2001.

Thinking through the Immigrant Paradox. Faculty Seminar. Department of Social Medicine, Harvard Medical School. Boston, MA, December 3, 2001.

Immigration and Education Reform. The Principal's Center Forum on Educational Reform. Harvard University Graduate School of Education. Cambridge, MA, November 9, 2001.

Law and Immigration After September 11. Law and Immigration Conference, Harvard Law School. Cambridge, MA, November 8, 2001.

Caribbeans on the Move: Comments on Recent Developments in the Study of Haitian Immigration. Conference on Haitian Immigration to the United States. David Rockefeller Center for Latin American Studies, Harvard University. Cambridge, MA, October 26, 2001.

Globalization: The Research Agenda. Keynote address delivered to Board of Directors, Cambridge College. The Rockefeller Bothers Conference Center at Pocantico, Tarrytown, New York. October 17th, 2001.

The New Anthropology of Immigration: Comparative Reflections of Recent Developments in Latin American, Caribbean, and Asian Immigration. Advanced Seminar. School for American Studies, Santa Fe, New Mexico. October 10, 2001.

Rethinking Culture: Immigration, Assimilation, and Acculturation in the Global Era. Keynote Address. The Federal Reserve Bank of Boston 46th Economic Conference on Seismic Shifts: The Economic Impact of Demographic Change. Chatham, MA. June 12, 2001.

The New Immigration: Some Interdisciplinary Reflections. Invited Address. The Harvard Club of New York City, May 24, 2001.

Psychosocial Perspectives on the Children of Immigration. Invited paper read to the Judge Baker Children's Center, Harvard Medical School. May 16, 2001.

Thinking Through the New Census. Invited Address. The Advisory Committee Meeting of the David Rockefeller Center for Latin American Studies, Harvard University. Cambridge, MA, May 12, 2001.

Rethinking Mexican Immigration to the US. Invited paper read to the conference on the Changing Agenda of the U.S.-Mexico Relationship. David Rockefeller Center for Latin American Studies, Harvard University. Cambridge, MA, April 23, 2001.

Immigrant Children: What We Know and Know We Know It. Invited paper read to the Annual Meeting of the American Educational Research Association.  Seattle, Washington, April 11, 2001.

Reflections on Immigration and (Homo)Sexuality. Invited Address. Passing Lines: Immigration and (Homo)Sexuality Conference. David Rockefeller Center for Latin American Studies, Harvard University. Cambridge, MA, April 5, 2001.

The Longitudinal Study of Immigrant Lives: An Introduction to the Longitudinal Immigrant Student Adaptation Study. Invited Address. The Murray Research Center for the Study of Lives. Radcliffe Institutes for Advanced Study, Cambridge, MA, March 20, 2001.

Global Acts: Immigrant Children, Education, and the Post-National. Invited paper read to the Visiting Committee, Harvard Graduate School of Education, Cambridge, MA, March 14, 2001.

Thinking Through Globalization. Invited Address. Joint meeting of the Centers for Asian American Studies, Latin American Studies, and Latino Studies, University of Massachusetts, Amherst, MA, February 15, 2001.

Recent Theoretical Currents in the Study of Immigration.  Invited paper read to the Immigration and Religion Interfaculty Initiative, Harvard University, Cambridge, MA, December 13, 2000.

Rethinking the Urban. Invited paper read to the Dean's Weekend, Graduate School of Education, Harvard University, Cambridge, MA, December 2, 2000.

Educational Challenges for Haitian Immigrant Youth: Perspectives from the Harvard Immigration Projects. Invited Address. The Haitian Studies Association Meeting Twelfth Annual Conference. West Palm Beach, Florida, October 25th, 2000.

Childhood Depression Among Immigrants. Invited paper read to the Childhood Depression Research Center. Judge Baker Children's Center, Harvard Medical School. October 18, 2000.

Freedom and Responsibility in the Global Era of Migrations and Transnationalism. Keynote Address. Freedom and Responsibility: A National Conference of the Association Montessori Internationale. Boston, MA. July 23, 2000.

Immigration Today. Invited Address.  The International Press Institute. Boston, MA, May 2, 2000.

Immigration and the Blurring of Boundaries. Paper read to the invited session on 'Blurred Boundaries: The Cultural Politics of Racial Identity in the New Millennium.' American Educational Research Association.  New Orleans, LA, April 25, 2000.

Immigrant Students in the Cusp of the New Millennium. American Educational Research Association.  New Orleans, LA, April 24, 2000.

Latinos in the United States: The Research Agenda. Invited Address. The Center for US Studies, Universidad de la Habana, Cuba.  April 19, 2000.

Keynote Address. The Second Institute on Cultural and Linguistic Diversity. Brown University, Providence, RI, April 10, 2000.

Latinos in the 21st Century: Introduction. Latinos in the 21st Century: Mapping the Research Agenda, David Rockefeller Center for Latin American Studies, Harvard University. Cambridge, MA, April 6, 2000.

Latinos in the United States: The Research Agenda. Invited Address. People en Español, Time-Warner. New York City, NY, March 3, 2000.

Keynote Address. Spencer Foundation Conference on the Role of Educational Ethnography in Pedagogy.  University of Huston, TX, February 11, 2000.

Assimilation: Distopia, Utopia, and In-Between. Invited paper read to the Social Science Research Council Workshop on Ethnic Customs, Assimilation, and American Law.  Phoenix, AZ, January 14, 2000.

Assimilation: Who Needs It? Invited paper read to the Russell Sage Foundation. New York City, January 5, 2000.

Rethinking Identity. Invited paper read to the Harvard Haitian Alliance Conference on The Haitian Identity Crisis: Cultural Pride and Preservation or Denial and Assimilation. Lowell House, Harvard University. December 16, 1999.

Identities and Styles of Adaptation: Theoretical Reflections on the First Wave of Data from the Harvard Immigration Project. Invited paper read to the Annual Meeting of the American Anthropological Association.  Chicago, IL, November 21,1999.

Reflections on Hate Crimes. Invited Paper read to the Harvard Foundation Panel on Hate Crimes in America: The Search for Solutions.  Sanders Theater, Harvard University. November 10, 1999.

EU-USA Border Controls: Some Comparative Considerations. Invited Paper read to the Workshop on Border Control, State Power and Economic Integration: Perspectives from Europe and North America.  Weatherhead Center for International Affairs, Harvard University. June 5, 1999.

1424

The New Bostonians: Immigration and the Sociocultural Remaking of an American Metropolis. The Lowell Lecture. The Bostonian Society, Old State House, Boston. May 4, 1999.

Some Theoretical Considerations in the Study of Immigration. Invited Paper read to the Weatherhead Center for International Affairs, Harvard University. April 29, 1999.

Immigrant Children: What Do We Know? What Do Schools Need to Do? Keynote Address. All Means All Conference. The School District of Philadelphia. March 13, 1999.

The Children of Immigrants: Everything You Ever Wanted to Know About Assimilation but Were Afraid to Ask. Invited Paper read to the Chicano/Latino Policy Project. Institute for the Study of Social Change, University of California, Berkeley. March 5, 1999.

Getting It Right About Immigrant Children's Development: Some Interdisciplinary Reflections. Invited Paper read to Conference on Getting It Right about Children's Development: The Influences of Nurture and Nature. Harvard Children's Initiative and the American Academy of Arts and Sciences. February 5, 1999.

Writing Immigration: Interdisciplinary Observations. Invited paper read to the Conference on Writing Immigration: Academic and Journalistic Perspectives. David Rockefeller Center for Latin American Studies, Harvard University. December 10,1998.

Immigration and Population in Psychocultural Perspectives. Invited paper read to the Annual Meeting of the American Anthropological Association. Philadelphia, PA, December 4,1998.

Interdisciplinary Approaches to the Study of Immigration. Invited paper read to the Annual Meeting of the American Anthropological Association. Philadelphia, PA, December 4,1998.

Immigration and the 'Free Exercise of Culture.' Invited paper read to the Social Science Research Council Workshop on the Free Exercise of Culture. Stanford, CA, November 6,1998.

Psychocultural Approaches to Immigration Research. Invited paper read to the program in Medical Anthropology, Department of Anthropology, Harvard University. October 30, 1998.

Latin American Immigration to the United States. Invited paper read to the Conference on the United States, Latin America, and Europe: Analysis of the New Agenda. First Annual Hewlett Conference on Latin America, University of London and the David Rockefeller Center for Latin American Studies, Harvard University. October 17, 1998.

Immigration Today: Theoretical Problems in the Study of Children. Keynote address, Urban Superintendents Program Advisory Committee, Harvard University Graduate School of Education. October 8, 1998.

Anthropological Perspectives in the Study of Immigrant Children. Invited paper read to the Workshop on Immigrant Children. Bendheim Thoman Center for Research on Child Wellbeing, Office of Population Research, Princeton University. May 8, 1998.

Culture and the Education of Immigrant Children. Invited paper read to the American Educational Research Association, San Diego, California. April 17, 1998.

Everything You Ever Wanted To Know About Transnationalism but Were Afraid to Ask. Invited paper read to the Conference on Transnationalism and the Second Generation, Harvard University. April 4, 1998.

The Cultural Psychology of Immigration: Implication for Psychiatry. Invited paper read to the Department of Psychiatry Harvard University. April 6, 1998.

Latin American Immigration to the United States: Some Interdisciplinary Observations. Invited paper read to the Institute of Latin American Studies, University of London. March 6, 1998.

The Anthropological Study of Immigration: Reflections on a Decade of Research. Invited paper read to the Institute of Latin American Studies, University of London. March 11, 1998.

Rethinking the Study of Identity: Some Interdisciplinary Reflections. Invited paper read to the Children's Studies Conference on Youth, Identity, and Achievement, Harvard University, February 27, 1998.

Crossings: Some Interdisciplinary Reflections on the New Immigration. Invited paper read to the Joint Seminar of the Administrative Fellows, Harvard University, January 21, 1998.

Three Anthropological Themes in the Study of  Immigration. Invited paper read to the Instituto Nacional de Antropología, Buenos Aires, Argentina. December 22, 1997.

 North-South Relations: The Issue of Latin American Immigration to the United States. Invited paper read to the Harvard Club of Argentina, Buenos Aires, Argentina. December 18, 1997.

The Cultural Psychology of the Second Generation. Invited paper read to the Second Generation Symposium. The Jerome Levy Economics Institute of Bard College, New York. October 24, 1997.

Some Thoughts on the New Immigration: Implications for Issues of Education Research. Keynote speech read to the conference on Immigration and Education: Issues and Research. Spencer Foundation/UCLA. August 8, 1997.

Social Violence in Interdisciplinary Perspective. Invited paper read (in absentia) to Biannual Meeting of the Society for Psychological Anthropology, San Diego, CA. August 7, 1997.

The Impossible Professions: Rethinking Psychoanalysis and Social Theory. Invited paper read to the conference on Mothering: Diverse Families, Diverse Theories. Women's Studies Program, Brandeis University, April 13, 1997.

Psychodynamic and Cultural Factors in Immigrant Adaptation. Invited paper read to the conference on Immigration and the Sociocultural Remaking of the North American Space. David Rockefeller Center for Latin American Studies, Harvard University, April 12, 1997.

Immigration: The Next Fifty Years. Invited keynote speech read at the opening of the first Immigration Center of the Children's Aid Society, New York, New York. March 13, 1997.

Immigration and the 'New' New Yorkers.  Invited paper read to the Harvard Club of New York, March 13, 1997.

1426

Everything You Ever Wanted to Know About Immigration but Were Afraid to Ask. Invited paper read to the Monthly Latin American Faculty Luncheon, David Rockefeller Center for Latin American Studies, Harvard University. March 6, 1996.

Immigration Today: The Grammar of a Transnational Malaise. Invited paper read to the NPI, Department of Psychiatry, University of California, Los Angeles, January 23, 1997.

What do Immigrants Want? What does Los Angeles Want? Invited paper read to the Harvard Club of Los Angeles, January 23, 1997.

State Terrors: Immigration in Comparative Perspective. Paper presented to the Annual Meeting of the American Anthropological Association.  San Francisco, CA, November 20, 1996.

Immigration and the Socio-Cultural Remaking of the North American Space: Implications Schooling in the 21st Century. Invited paper read to the Initiatives for Children, American Academy of Arts and Sciences, Cambridge, November 16, 1996.

The New Immigration: Implications for Schooling and Society. Invited paper read to the 24th Annual Conference of the Texas Association for Bilingual Education, Fort Worth, Texas, November 15, 1996.

Comparative Perspectives on the 'New Immigration.' Invited paper read to the Asian American Studies Center, University of Houston, Texas, November 14, 1996.

Psychological Anthropology Today. Invited paper read to 'The Power of Ideas' Speaker Series, Wheelock College, Boston, November 13, 1996.

Immigration and Socio-Cultural Remaking of American Democracy: Perspectives from Cultural Psychology. Invited paper read to the Program in Human Development Colloquium Series, Department of Psychology, Boston University, October 30, 1996.

Is the New Immigration Good for America? Is the New America Good for Immigrant Children? Research on the Schooling and Mental Health of Immigrant Children. Invited paper read to the Judge Baker Center, Children's Hospital, Harvard Medical School, October 23, 1996.

Immigrants and Refugees in the Space of Post Nationality. Invited paper read to the international conference on Civilization and Its Enduring Discontents: Violence and Aggression in Psychoanalytic and Anthropological Perspective. Bellagio Study and Conference Center, Como, Italy. September 2-6, 1996.

Cultures Under Siege/Migrants Under Siege. Invited paper read to the international conference on Cultures Under Siege: Psychological Anthropology on Violence and Aggression in the Late Twentieth Century in Celebration of the 360th Anniversary of Utrecht University. Utretch, The Netherlands. August 29-30, 1996.

New Psychologies, Old Psychologies, Cultural Psychologies. Invited paper read to the international conference on New Psychologies.  Stonefield Castle, Tarbert, Loch Fyne, Scotland. June 28-July 1, 1996.

Immigration and the Collective Anxieties at the End of the Century. The Norbert Elias Lecture. Amsterdam School for Social Science Research, The Netherlands. May 28, 1996.

The Cultural Psychology of Growing Up Latino in America. Invited paper read to the session Growing Up American: Dilemmas of the New Second Generation. The American Association for the Advancement of Science Annual Meeting, Baltimore. February 10, 1996.

Immigration and Schooling in Contemporary Societies. Invited paper read to the Culture, Psychology, and Education Conference, Harvard Graduate School of Education. January 12, 1995.

The Political, Cultural, and Psychological Aspects of Immigration. Invited paper read to the Workshop on the Political and Cultural Aspects of Immigration in America, Harvard College. December 9, 1995.

Writing a Grammar of Immigration. Invited paper read to the Monthly Latin American Faculty Luncheon, David Rockefeller Center for Latin American Studies, Harvard University. December 7, 1995.

Socio-Cultural Distopia and the Issue of Diversity. Invited paper read to the Conference Achievement: The Bell Curve is Not and Explanation. The Principals' Center, Harvard Graduate School of Education. October 5, 1995.

The Cultural Psychology of Immigration. Invited paper read (in absentia) to the Workshop on International Migration, Human Services Policies and Health. Granada, Spain,  May 25 & 26, 1995.

Psychocultural Perspectives on Anti-Immigration. Invited paper read to the Conference on Psychoanalytic Perspectives on Neo-Fascism & Anti-Immigration Politics: Trends in Europe and the United States. Co-sponsored by the San Francisco Psychoanalytic Institute's Extension Division; the University of California at Berkeley's Center for Western European Studies, Doreen B. Townsend Center for the Humanities, and the Health and Medical Sciences Program. Alumni House, University of California, Berkeley May 6 & 7, 1995.

Impossible Attachments: The Need for Strangers and the Immigration Malaise. Invited paper presented to the Department of Anthropology, Harvard University, May 1, 1995.

What is Exclusion Anyway? A Psychocultural Approach to the Other Side of Inclusion. Invited paper presented to the Principals' Center Spring Conference, "What is Inclusion Anyway?" Harvard University Graduate School of Education, April 27, 1995.

Immigrant Families: A View from Cultural Psychology. Invited paper presented to the Department of Child Study, Tufts University, April 13, 1995.

Transformations: Generational Discontinuities of Immigration in Transnational Perspective. Tenure Review Lecture read to the Harvard University Graduate School of Education, April 6, 1995.

Psychoanalysis and Culture. Invited paper read to the Department of Human Development and Psychology, Harvard University Graduate School of Education, March 2, 1995.

Immigration: Setting the Context. Invited paper read to the Harvard Forum In or Out? Immigration and Proposition 187. Harvard University Graduate School of Education, February 15, 1995.

Language Minority Adolescents and School Success. Invited paper read to the Conference on Academic Achievement for Urban Adolescents. Harvard University Graduate School of Education, February 4, 1995.

California Dreaming: Proposition 187 and the Immigration Delirium. Invited paper read to the Colloquium in Human Development, Department of Human Development and Psychology, Harvard University Graduate School of Education, December 12, 1994.

Migration and Motivation. Invited paper read to the Russell Sage Foundation. New York City, November 17, 1994.

Recent Themes in Cultural Psychology. Paper read to the Boston Area Cultural Psychology Forum. Harvard University Graduate School of Education, October 14, 1994.

Migration and the Development of Interethnic Group Relations. Paper read to the Research Symposium on the Development of Interethnic Group Relations During Childhood and Adolescence. Carnegie Council on Adolescent Development. Washington, DC, September 29, 1994.

Democracy and Difference in the Post-Utopian Moment. Paper read (in absentia) to the International Conference on Democracy and Difference. University of Cape Town, South Africa, May 5-7, 1994.

The Organization of Hatred. Paper read to the University of California Interdisciplinary Psychoanalytic Consortium, UCLA Lake Arrowhead Conference Center, April 22-24, 1994.

Ethnic Malaise: Schooling Immigrants and Refugees in a Post-Utopian Moment. Paper read to the Department of Human Development, Harvard University, March 23, 1994.

Ethnographic Perspectives in Educational Analysis. Paper read to the International Workshop on Ethnographic Perspectives in Educational Analysis in the 1990s (Jointly Sponsored by the Unité de Sociologie de L'éducacion, CNRS, Paris and the Fundación "la Caixa"). Barcelona, Spain, October 29, 1993.

Immigrant Cultural Psychology: Methodological Considerations. Paper read to the Department of Social Psychology, University of Barcelona, Spain, October 27, 1993.

Terror at the Fin de Siècle: The Systematization of Hatred in a Paranoid Era. Invited Paper read to the Biannual Meeting of the Society for Psychological Anthropology, Montreal, Canada, October 8, 1993.

Migration and Urban Education: The View from Brussels. Paper read (in absentia) to the Research Workshop on Educational Change and Educational Knowledge. Department of Curriculum and Instruction. University of Wisconsin, Madison, WI, June 18, 1993.

Latino Cultural Psychology: Family Life and the Patterning of Achievement Motivation Among Mexicans, Mexican Immigrants, Mexican Americans, and non-Hispanic "Mainstream" Adolescents. Paper presented to the Department of Psychology, University of California, Santa Cruz, CA, May 17, 1993.

Terror and Mimesis in the Continent of the 'Disappeareds.' Paper presented to the Center for Latin American Studies, University of California, Berkeley, CA, April 26, 1993.

Quo Vadis Anthropology? Partial Answers and a Guided Tour of Violin Playing in Four Cultures. Paper presented to the 'Wednesday Evening Seminar,' Center for Advanced Study in the Behavioral Sciences, Stanford, CA, April 14, 1993.

Anxious Neighbors: Immigrant Minorities in Belgium. Paper presented to the Research Workshop on Controlling Illegal Immigration: A Global Perspective.  Center for U. S. - Mexican Studies, University of California, San Diego, La Jolla, CA, March 18-20, 1993.

Latino Immigrants in Urban Schools: Psycho-Cultural Perspectives. Paper presented to the Conference on Immigrant Students in California Schools. Center for U.S.-Mexican Studies, University of California, San Diego, La Jolla, CA, January 23, 1993.

Hot Wars, Cold Wars, Dirty Wars: Mourning and Memory in the Continent of the 'Disappears.' Paper presented to the Faculty Colloquium, Department of Anthropology, Stanford University, CA, October 19, 1992.

Immigrants in the U. S and Europe: A Framework for Comparison. Invited paper presented to the Graduate Group in Social Relations, University of California, Irvine, CA, May 7, 1992.

Minority Status and Urban Education: A Theoretical Framework for Comparisons. Paper presented to the Annual Meeting of the American Educational Research Association.  San Francisco, CA, April 22, 1992.

Variability in Minority School Performance: Comments on Recent U. S. and European Findings. Invited paper presented to the Annual Meeting of the American Educational Research Association.  San Francisco, CA, April 23, 1992.

Tortured Bodies: Towards a Semiotics of the Unspeakable. Invited paper presented to the Body Image: A Cross-Cultural Perspective Conference. The UCLA Center for Pacific Rim Studies, University of California, Los Angeles, CA, April 4, 1992.

The Cultural Psychology of Hispanic Immigrants: Implications for Educational Research. Invited paper presented the Cultural Diversity: Implications for Schools and Learning Conference. Center for Research on the Context of Secondary School Teaching, School of Education, Stanford University, Stanford, CA, October 5, 1991.

Die Grammatik des Terrors: psychosoziale Aspekte der Teleologie des Überlebenden. Fallbeispiele in den USA lebender Jugendlicher aus Mittelamerika. Invited paper presented to the Fifth Annual Meeting of the Congress on Culture and Psychosocial Conditions in Latin America. Department of Psychiatry, University of Hamburg, Germany, September 20, 1991.

Migration, Mental Health, and Education: Recent Developments in United States and European Research. Invited paper presented to the Biennial Congress of the World Federation for Mental Health. Mexico City, Mexico, August 19, 1991.

Educating Migrant Youths in Europe and the United States. Invited paper presented at the congress on Advances in Education. Universidad de las Americas, Mexico City, Mexico, August 17, 1991.

The Anthropology of Diversity. Invited paper presented to the IRA Lecture Series, College of Health and Human Services, San Diego State University, San Diego, CA, February 26, 1991.

Studying Fantasy Cross-Culturally: The Thematic Apperception Test in Anthropological Research. Invited paper presented to the Institute of Personality Assessment and Research, University of California, Berkeley, CA, February 19, 1991.

Culture, Society and Schooling in Plural Settings: Comparative Dilemmas and Opportunities in the 1990s. Invited paper presented to the conference on Recent Contributions to the Study of Culture, Society and Schooling in Plural Societies. Division of Education, University of California, Davis, CA, October 12, 1990.

Latin American Systems of Terror and their Aftermath: Anthropological and Psychological Perspectives. Invited paper presented to the conference on Children in War. Sigmund Freud Center, Hebrew University of Jerusalem, Israel, June 26, 1990.

Some Psychocultural Strategies for Research with Children in War. Invited paper presented to the conference on Children in War. Sigmund Freud Center, Hebrew University of Jerusalem, Israel, June 27, 1990.

Psychological Responses to Political Terror: The Argentine 'Dirty War' Paradigm. Paper presented to the Psychoanalytic Interdisciplinary Seminar. Department of Psychiatry, School of Medicine, University of California, San Diego, CA, June 12, 1990.

Comments on the Japanese Experience in Latin America. Invited paper presented to the conference on Japan's Relations with Latin America: Implications for the United States. Center for Iberian and Latin American Studies, University of California, San Diego, CA, April 27, 1990.

The Uncanny in the Continent of the 'Disappeareds:' From Mourning to Political Discourse in 'Dirty War' and Post 'Dirty War' Argentina. Paper presented to an invited session of the American Ethnological Society, Atlanta, GA, April 26, 1990.

Addressing Issues of Race and Culture in the Education of Minority Students: Some Reflections on Current U.S. and European Scholarship. Invited paper presented to the conference on Addressing Issues of Race, Culture & Gender in the Education of Minority Students. Southwest Center for Educational Equity. Palo Alto, CA, March 23rd, 1990.

Recent Currents in Cultural Anthropology. Invited paper presented to the Annual meeting of the International Baccalaureate Society. Los Angeles, CA, February 5th, 1990.

Celebrating Diversity: Minority Status and Educational Dilemmas in Europe and the U.S.-- Thoughts on Cross-Cultural Comparisons. Paper presented to the Celebrating Diversity Conference. California State Department of Education, State of California. Oakland, CA, January 19th, 1990.

Race, Ethnicity and Schooling: Current Themes in U.S. and European Research Findings. Paper presented to the Symposium on Race, Ethnicity and Schooling. Division of Education and Center for Cooperative Educational Research,  University of California, Davis, CA, January 26th, 1990.

Towards a Psychosocial Understanding of Responses to Terror: The Case of New Arrivals from Central America in a U.S. Inner City. Paper presented to the Research Seminar,  Center for US-Mexican Studies. University of California, San Diego, CA, May 31st, 1989.

Migration, Minority Status and the Future of Europe: Notes on the Prospectives of Cross-Cultural Comparisons. Paper presented to the Migration and Autonomy Colloquium. Center for Western European Studies, Institute of International Studies. University of California, Berkeley, CA, March 28th, 1989.

The Anthropology of Terror. Paper presented to a session of the American Anthropological Association 87th Annual Meeting, Phoenix, AZ,  November 16-20, 1988.

A Grammar of Terror: Psycho-Cultural Responses to State Terrorism in 'Dirty War' and Post 'Dirty War' Argentina. Paper presented to an invited session of the American Anthropological Association 87th Annual Meeting, Phoenix, AZ,  November 16-20, 1988.

Culture and Motivation.  Paper presented to the Graduate School of Education, Stanford University, Stanford, CA, June 8th, 1988.

Psychocultural Aspects of Masculinity and Paternity in Latin America.  Paper presented to the Conference on the Family. Department of Psychology, Sonoma State University, Sonoma, CA, May 14th, 1988.

Psychocultural Aspects of Motivation. Paper presented to the Dean's Seminar. Graduate School of Education, Stanford University, Stanford, CA, March 3rd, 1988.

Against all Odds: Hispanic Immigrants in Inner City Schools.  Paper presented to the Stanford Dropout Conference.  Stanford University, Stanford, CA, February 26th, 1988.

Survivors' Teleology and the Psycho-Cultural Exegesis of Human Motivation.  Paper presented to a seminar of the Department of Anthropology, Princeton University, Princeton, NJ, February 5th, 1988.

Psychology and Culture in the Study of Human Motivation:  A Theoretical Footnote from a Psycho-Social Ethnography.  Paper presented to a seminar of the Department of Anthropology, University of California, Los Angeles, CA, January 6th, 1988.

'Becoming Somebody': Psycho-Cultural Aspects of Motivation among Central American Immigrants.  Paper presented to a seminar of the Department of Anthropology, University of California, San Diego, CA, October 12th, 1987.

Some Psycho-Cultural Aspects of Human Motivation.  Paper presented to a Symposium of the Linguistic Minority Research Institute, University of California, Santa Barbara, CA, May 16th, 1987.

The War to end all Worlds: Children and the Family in the Dirty Side of Argentina's 'Dirty War.'  Paper presented to an invited session of the American Ethnological Society, San Antonio, TX, May 1st, 1987.

Hermes in the Barrios: A Psycho-Cultural Critique of Motivation Theory.  Paper presented to the Department of Anthropology, The University of Chicago, Chicago, IL, April 27th, 1987.

Central Americans in the U.S.: A Study of Ethnic Adaptation and Adjustment.  Paper presented to the Graduate School of Education, The University of Pennsylvania, PA, April 15th, 1987.

Sex and Power in Soccer and War: A Latin America Case Study. Paper presented to the University of California Symposium on Sex, Power and Sports: Male Perspectives. Berkeley, CA, April 2nd, 1987.

The Central American Culture of Terror in Thematic Apperception Narratives: A Psycho-Cultural Interpretation.  Paper presented to a session of the 31st Annual Meeting of the Kroeber Anthropological Society. University of California, Berkeley, CA, March 7th, 1987.

Thinking About Motivation in Cultural Terms.  Paper presented to the Office for Research on Educational Equity, Graduate School of Education, University of California, Santa Barbara, CA, February 27th, 1987.

Survival, Guilt and Achievement: Family Dynamics and the Psycho-Social Contexts of Motivation among Recent Immigrants from Central America.  Paper presented to Educational Policy Studies, School of Education, University of Wisconsin-Madison, WI, June 1986.

Escape to Freedom: Intra-familial Dynamics among New Arrivals from War-torn Central America.  Paper presented to the Anthropology Board of Studies, University of California, Santa Cruz, CA, May 1986.

Immigrant Adaptation: Theoretical Lessons from a Hispanic Case.  Paper presented to an invited session of the American Anthropological Association 84th Annual Meeting, Washington, D.C., December 4-8, 1985.

Opportunity, Family Dynamics and Achievement:  The Socio-Cultural Context of Motivation Among Recent Immigrants from Latin America. Paper presented to the University of California Symposium on Linguistic Minorities and Education. Tahoe City, CA, May 30th-June 1st, 1985.

International Migration and Psycho-Social Adaptation:  The Case of the Hispanic Americans. Paper presented to the Symposium on Education and Cultural Identity:  Hispanic America and Canada.  Institute for International Studies, University of California, Berkeley, CA, April 1985.

A Psycho-Social Approach to Understanding Hispanic Adaptation to the U.S. Paper presented to a session of the American Anthropological Association 83rd Annual Meeting, Denver, CO, 1984.

Hispanic School Problems: An Anthropological Approach.  Paper presented to a session of the Kroeber Anthropological Society 28th Annual Meeting, University of California, Berkeley, CA, 1984.

Macho Semiotics:  The Image of Women in Latin American Male Folklore.  Paper presented to a session of the Kroeber Anthropological Society 27th Annual Meeting, University of California, Berkeley, CA, 1983.

---

SERVICE

---

Chair of the Committee to Review the UCLA Vice Provost for Graduate Education & Dean of the Graduate Division, 2016.

Member of the Executive Advisory Board, UCLA David Geffen School of Medicine Center for Child Anxiety Resilience Education and Support [CARES], 2015- http://carescenter.ucla.edu/executive-advisory-board

Trustee, Carnegie Foundation for the Advancement of Teaching, 2015- http://bit.ly/1LJBKLk

Member of the Advisory Board, X-Prize Global Learning, 2015- http://bit.ly/1KnoWEV

Member of the Board, Stiftung Universität Hildesheim, Education Research and Teacher Quality in Germany, 2015-

Chair of the Committee to Review the UCLA Vice Provost for International Studies, 2014.

Member of the Committee to Review the UCLA Dean of Social Sciences, 2014.

Member of the UC Links Review Committee, University of California. Office of the President, 2013-

Member of the Search Committee, Dean UCLA Extension School, 2013.

Member of the International Scientific Advisory Board, EU Seven Nation Study, Reducing Early School Leaving in the European Union, Brussels, 2012-

EVC-Provost Dean's Council 2012-

Member of the Editorial Board, Aztlán: A Journal of Chicano Studies, 2012-

Member of the UC Links Proposals Review Committee, Office of the President, University of California, 2012.

Member of the Research Advisory Committee, National Academy of Education, 2011-2015.

Member of the Search Committee, UCLA Extension Dean Search, 2012-13.

Member of the Fellowships Committee, The Paul and Daisy Soros Fellowship for New Americans, 2011–2012.

Member of the Admissions Committee, Department of Humanities and Social Sciences in the Professions, New York University, 2006-2007, 2007-2008, 2008-2009, and 2009-2010.

Member of the Faculty Board, New York University Press, 2009-2012.

Member of the Executive Committee, Center for Latin American and Caribbean Studies, New York University, 2009-

Member of the University-Wide Faculty Advisory Committee on Academic Priorities, New York University, 2007-2008.

Member of the Committee to Review University Professors, New York University, 2008.

Member of the Search Committee, Department of Communications, New York University, 2006-2007.

Member of the Committee to Review University Professors, New York University, 2005.

Member of the University-Wide Faculty Advisory Committee on Academic Priorities, New York University, 2005-2006.

Member of the Search Committee for the Director, Institute for Human Development and Contextual Change, New York University, 2005-2006.

Member of the Search Committee, Department of Social and Cultural Analysis, Faculty of Arts and Sciences, New York University, 2005-2006.

Member of the Advisory Committee, The Modern Language Association, A Map of Languages in the United States, 2005-2009

Member of the International Scholars Board of Advisors. Facing History and Ourselves, 2005-

Member of the Board of Directors, The Ross Institute for Advanced Study and Innovation in Education, 2005-2010.

Member of the International Education Search Committee. New York University, 2005.

Honorary Member of the Board, Ethnos: Investigación y Divulgación en Ciencias Humanas. Barcelona, Spain, 2003-

Member of the Advisory Board, American Anthropological Association Initiative on Understanding Race and Human Variation, 2002-2004.

Member of the Editorial Advisory Board, Harvard Journal of Hispanic Policy, John F. Kennedy School of Government, Harvard University, 2002-2005.

Member of the Graduate School of Education Dean Search Advisory Committee, Harvard University, 2001-2002.

Member of the Graduate School of Education Human Development and Psychology Search Committee, Harvard University, 2001-2002.

Member of the Harvard Committee on Employment and Contracting Policies ("Living Wage Committee"). (Senior Faculty Representative), Harvard University, 2001.

Member of the Gender Studies Advisory Committee, Harvard University Graduate School of Education, 2001.

Member of the Advisory Committee, Research Program on Cultural Contact, Russell Sage Foundation, 2001-2003

Member of the Series Advisory Board, Landscapes of Childhood, Wayne State University Press, 2000-2007.

Member of the Professorial Advisory Committee, Judge Baker Children's Center, Harvard Medical School, 2000-2003.

Member of the Selection Committee, Harvard Fellows on Race, Culture and Education, Harvard University Graduate School of Education 2000-2001.

Member of the Board of Directors, Society for Psychological Anthropology, American Anthropological Association, 1998-2001.

Nominator, MacArthur Fellows Program, The John D. and Catherine T. MacArthur Foundation, 1999.

Member of the Task Force, Weatherhead Center for International Affairs, Harvard University, 1998-99.

Member of the Advisory Committee, The Henry A. Murray Research Center of The Radcliffe Institutes for Advanced Study, 1997- 2001.

Member of the Editorial Board, Educational Researcher, American Educational Research Association, 1999-2000.

Member of the International Scientific Board Revista Investigación en Salud, Guadalajara, Jalisco, México, 1999-.

Member of the Faculty Advisory Board, Harvard University Native American Program, 1999-2003.

Chair of the Search Committee, Department of Human Development and Psychology. Harvard University Graduate School of Education, 1998.

Member of the American Anthropological Association Cultural Diversity Publication Committee, 1997-98.

Member of the International Education Search Committee, Harvard University Graduate School of Education, 1996-97.

Member of the Policy Committee. David Rockefeller Center for Latin American Studies, Harvard University, 1996-2003.

Member of the Search Committee. The Robert F. Kennedy Visiting Professorship in Latin American Studies. Harvard University, 1996-2003.

Member of the Steering Committee, Risk and Prevention Program, Harvard University Graduate School of Education, 1995-96.

Advisory Editor, Encyclopedia of American Immigrant Cultures, Human Relations Area Files, Yale, 1995-1997.

Member of the International Advisory Council, Center for U.S.-Mexican Studies, University of California, San Diego, 1995-2001.

Member of the Program Advisory Committee, Spencer Foundation, 1995-1996.

Member of the Committee on Degrees, Harvard University Graduate School of Education, 1995-96 and 1996-97.

Member of the Faculty Recruiting Committee, Harvard University Graduate School of Education, 1995-96 & 1997-98.

Senior Advisory Review Panel, Cultural Anthropology, National Science Foundation, 1994.

Member of the Committee on International Education, Harvard University Graduate School of Education, 1994-1995.

Outside Ph. D. Examiner, Department of Social Psychology, University of Barcelona (Spain), July and October 1993.

Associate Editor, Anthropology and Education Quarterly, 1988 to 1992.

Member of the Academic Advisory Council, Center for U.S.-Mexican Studies, University of California, San Diego, 1988 to 1990.

Contributing Editor, The Journal of Psychohistory, 1988.

Member of the Advisory Committee, Center for Iberian and Latin American Studies [CILAS], University of California, San Diego, 1988 to 1995.

Member of the Faculty Graduate Group in Latin American Studies, CILAS, University of California, San Diego, 1988 to 1995.

Member of the Faculty Group in Teacher Education, University of California, San Diego, 1988-1995.

Member of the Executive Committee, CILAS, University of California, San Diego, 1989 to 1995.

Member of the Committee, Urban Studies Program, University of California, San Diego, 1990 to 1995.

Convening Member, Center for German and European Studies, University of California, Berkeley, 1991-1994.

Graduate Advisor, Department of Anthropology, University of California, San Diego, 1993 to 1994.

Undergraduate Advisor, Department of Anthropology, University of California, San Diego, 1988-1989 and 1989-1990.

| AWARDS, FELLOWSHIPS, GRANTS & GIFTS |
| --- |

The Capital Campaign for UCLA GSE&IS (Chancellorian Goal of 70 Million by 2019; raised $77 million by 2017)

Ford Foundation [Bridging the Compassion Gap] (Grant 2017-18,  $1,000,000)

Carnegie Corporation of New York [The UCLA School Network] (Grant 2016-2018, $1,500,000)

Mrs. Courtney Ross [Humanism and Mass Migration] (Gift 2016, $75,000)

Anonymous [Humanism and Mass Migration] (Gift 2016, $50,000)

Spencer Foundation [Humanism and Mass Migration] (Grant 2016, $35,000)

W. T. Grant Foundation [Humanism and Mass Migration] (Grant 2016, $25,000)

Ford Foundation [Changing the Immigration Narrative] (Grant 2015-16,  $100,000)

The Spencer Foundation [Immigration, Social Cohesion, and Cultural Sustainability] Grant 2013-14, $50,000)

Ford Foundation [The UndocuScholar Survey] (Grant 2013-14,  $100,000)

Anonymous [The UndocuScholar Survey] (Grant 2013-14, 32,000)

William T. Grant Foundation [The Role of Settings on Relational and Academic Engagement for Latino Community College Students] (Grant 2012-2013,  $25,000)

Ford Foundation [Research on Immigrants in Community College] (Grant 2011-12,  $350,000)

Carnegie Corporation of New York [Civic Trust and Engagement among Immigrant Youth: a Pilot Study] (Grant 2011-12, $325,000)

1438

William T. Grant Foundation [The Role of Settings on Relational and Academic Engagement for Latino Community College Students] (Grant 2010-2012,  $499,201)

The Richard Fisher Membership, Institute for Advanced Study, Princeton, NJ (Fellowship, 2009-2010)

Covering Immigration: Academic and Journalistic Perspectives. Western Union Foundation. (Grant 2008-2009, $10,000)

Pathways to Opportunity for the Children of Immigrants in North America and Europe. Western Union Foundation. (Grant 2008-2009, $75,000)

The Bank of Sweden Tercentenary Foundation (Riksbankens Jubileumsfond, RJ), Electrum Foundation / Kista Science City, Microsoft, Swedish Research Council (Vetenskapsrådet) (with others) [Globalization and Learning] (Grant 1.2 M. Swedish Crowns)

William T. Grant Foundation [Longitudinal Immigrant Student Adaptation] (Grant 2003-2004 $15,000)

Mrs. Courtney Ross Holst [Education for Globalization] (Gift 2003, $30,000)

William T. Grant Foundation [Longitudinal Immigrant Student Adaptation] (Grant 2003-2004 $25,000)

Mrs. Courtney Ross Holst [Education for Globalization] (Gift 2002, $70,000)

Harvard University Provost's Fund for Interfaculty Initiatives [Immigration and Well-Being] (Grant 2000-20001, $75,000)

Rockefeller Foundation of New York City [The New Americas] (Grant 2002-2006, $245,000)

David Rockefeller Center for Latin American Studies, Harvard University (with Howard Gardner) [Education for Globalization] (Grant 2002 $5,000)

Dean's Venture Fund, Graduate School of Education, Harvard University (with Howard Gardner) [Education for Globalization] (Grant 2002, $29,500)

Spencer Foundation (with Carola Suárez-Orozco) [Longitudinal Immigrant Student Adaptation] (Grant 2002-2003, $380,800)

William T. Grant Foundation (with Carola Suárez-Orozco) [Longitudinal Immigrant Student Adaptation] (Grant 2001-2002 $200,000)

Spencer Foundation (with Carola Suárez-Orozco) [Longitudinal Immigrant Student Adaptation] (Grant 2001-2002, $50,000)

Spencer Foundation [Latinos in the 21st Century: Mapping the Research Agenda] (Grant 2000-2001, $40,000)

Harvard University Provost's Fund for Interfaculty Initiatives [Latinos in the 21st Century: Mapping the Research Agenda] (Grant 2000-20001, $10,000)

William T. Grant Foundation (with Carola Suárez-Orozco) [Longitudinal Immigrant Student Adaptation] (Grant 1999-2001, $492,913)

Spencer Foundation (with Carola Suárez-Orozco) [Longitudinal Immigrant Student Adaptation] (Grant 1997-2002, $479,100)

National Science Foundation (with Carola Suárez-Orozco) [Longitudinal Immigrant Student Adaptation] (Grant 1997-2002, $768,129)

William T. Grant Foundation (with Carola Suárez-Orozco) [Longitudinal Immigrant Student Adaptation] (Grant 1997-2000, $462.584)

Carnegie Corporation (with others) [Children's Studies at Harvard] (Grant, 1997-1999, over $1,000,000).

David Rockefeller Center for Latin American Studies, Harvard University [Immigration and the Sociocultural Remaking of the North American Space] (Grant, 1997-1998)

The Center for International Affairs, Harvard University [New Developments in Mexican Immigration to the United States] (Grant, 1997-1998)

Bellagio Study and Conference Center, The Rockefeller Foundation, Como, Italy [Social Violence in Interdisciplinary Perspectives]  (Residency Fellowship September, 1996)

Spencer Foundation [Migration and Urban Education: The Case of Mexican-Americans] (Grant, 1992-1993)

Center for Advanced Study in the Behavioral Sciences, Stanford, (Fellowship 1992-1993)

Center for German and European Studies, University of California, Berkeley [Migration and Urban Education: U. S./ Europe Comparisons] (Grants,1991-1992 and 1992-1993)

National Science Foundation (with others) [Controlling Immigration: A Global Perspective] (Grant, 1991-1993)

Mellon Foundation Grant [Comparative Political Economy of Immigration] (Grant,1991-1992)

Chancellor's Summer Faculty Fellowship, University of California, San Diego (1990)

Academic Senate Research Grant, University of California, San Diego (1990)

University of California Consortium on Mexico and the United States [UC-MEXUS] Grants (Grants, 1990 and 1991)

Academic Senate Research Grant, University of California, San Diego (1989)

Academic Senate Research Grant, University of California, San Diego (1988)

American Educational Research Association (Division G) Best Doctoral Dissertation Award (1988)

Tinker Field Research Grant (1988)

The Robert H. Lowie Graduate Scholarship, University of California, Berkeley (1985-1986)

The University of California Regents Fellowship (1983-1984)

The Wollemberg Scholarship, University of California, Berkeley (1980)

Phi Beta Kappa

The Undergraduate and Graduate Scholastic Honor Society, University of California, Berkeley

<div style="border:1px solid black; text-align:center;">

HONORS

</div>

Member of the American Academy of Arts and Sciences (Elected April 2014)

The Virginia and Warren Stone Prize, Awarded Annually by Harvard University Press for an Outstanding Book on Education and Society, 2008

Orden Mexicana del Águila Azteca (The Mexican Order of the Aztec Eagle), 2006

New York's 25 Most Influential Hispanics El Diario, New York City, 2005

Member of the National Academy of Education (Elected April 2004)

America's 100 Most Influential Hispanics. Hispanic Business Magazine, 2001

Master of Arts, Honoris Causa, Harvard University (1995)

ALANA (African, Latino, Asian and Native American) Outstanding Faculty Member Recognition Award. Harvard University (1995)

Social Policy Book Award, Society for Research on Adolescents, 1996 (For Transformations: Immigration, Family Life, and Achievement Motivation Among Latino Adolescents.  Carola E. and Marcelo M. Suárez-Orozco. Stanford, CA: Stanford University Press. 1995)

The R. Boyer Award for Outstanding Research in Psychological Anthropology, University of California, Berkeley (1986)

## COURSES

Fiat Lux Seminar: Reimagining Urban Education, UCLA
Globalization and Education, NYU Abu Dhabi
Culture and Human Development; Globalization and Education
Good Work in the Global Era (with Howard Gardner)
Psychological Anthropology; Cultural Psychology
Anthropology and Education;
Psycho-Social Problems in Changing Cultures;
Fieldwork Methods; Comparison of Cultures;
Immigration, Ethnicity, and Education;
Latino Cultures;
Introduction to Cultural Anthropology;
Latin American Societies and Cultures;
Contemporary Central America; Folklore;
Themes in Cross-Cultural Psychiatry (UCSD School of Medicine).

## PERSONAL DATA

Citizenship:  U.S. (born in Lomas de Zamora, Argentina, September 21, 1956)

Civil Status:  Married to Carola Suárez-Orozco in January 1977.  We have two children, Marisa Suárez-Orozco (born in San Francisco, CA, 12/31/1983) and Lucas Suárez-Orozco (born in San Diego, CA, 3/9/1990)

## REFERENCES

Danielle Allen, Director, Edmond J. Safra Center for Ethics at Harvard University
Professor, Department of Government and Graduate School of Education, Harvard University

James A. Banks, The Kerry and Linda Killinger Endowed Chair in Diversity Studies and Director of the Center for Multicultural Education at the University of Washington, Seattle

Gene Block, UCLA Chancellor

John H. Coatsworth, Provost of Columbia University

Howard Gardner, The John H. and Elisabeth A. Hobbs Professor of Cognition and Education, Harvard University, Graduate School of Education

Kathleen McCartney, President, Smith College

Gary Orfield, Professor of Education, Law, Political Science and Urban Planning & Co-Director, Civil Rights Project/Proyecto Derechos Civiles at UCLA

Cristina M. Rodríguez, Professor of Law, Yale Law School

Roberto Suro, Professor of Communication, the Annenberg School for Communication & Journalism; Professor of Policy, School of Policy, Planning and Development; and Director The Tomás Rivera Policy Institute University of Southern California

Scott Waugh, UCLA Provost and Executive Vice Chancellor

Mary Waters, The M. E. Zuckerman Professor of Sociology, Harvard University

* Refereed Publication

July 2017

# EXHIBIT 54

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et. al.*,

               Plaintiffs,

     v.

DONALD TRUMP, *et. al.*,

               Defendants,

No. 1:17-CV-5228

NOV 22, 2017

1        **<u>Declaration of Leighton Ku</u>**

2    I, Leighton Ku, declare as follows:

3    1.  My name is Leighton Ku and I am over eighteen years of age.  I have personal

4        knowledge of and could testify in Court concerning the following statements of fact.

5    2.  I am a Professor of Health Policy and Management and Director of the Center for Health

6        Policy Research at the Milken Institute School of Public Health, George Washington

7        University in Washington, DC.

8    3.  I am a health policy researcher and expert with over 25 years of experience.  I have

9        conducted substantial research about immigrant health, health care, and costs.  I have

10       authored or co-authored more than a dozen articles and reports about immigrant health

11       issues, including articles in peer-reviewed journals such as <u>Health Affairs</u> and <u>American</u>

12       <u>Journal of Public Health</u>, as well as reports published by diverse non-profit organizations

13       including the Migration Policy Institute, the Cato Institute, the Center on Budget and

14       Policy Priorities and the Commonwealth Fund, as well as many more articles and reports

15       on other subjects.  I have testified before the U.S. Senate Finance Committee about

16       immigrant health issues and provided analyses and advice to state governments and non-

17       governmental organizations in many states about immigrant health.   I have taught

18       research methods and statistics at the graduate level for over 20 years.  I also am a

19       voluntary (unpaid) Executive Board member for the District of Columbia's Health

20       Benefits Exchange Authority, which governs the District's health insurance marketplace,

21       formed under the federal Affordable Care Act.

22   4.  I have a PhD. in Health Policy from Boston University (1990) and Master of Public

23       Health and Master of Science degrees from the University of California at Berkeley

1

NOV 22, 2017

1      (1979).  Prior to becoming a faculty member at George Washington University, I was on

2      the staff of the Urban Institute and the Center on Budget and Policy Priorities.

3    5.  I have attached my Curriculum Vitae as Exhibit B to this Declaration.

4

5                  **Deferred Action for Childhood Arrivals**

6    6.  My declaration describes the potential effects of the termination of the Deferred Action

7      for Childhood Arrivals (DACA) program on health and health care access and the

8      implications and costs of the loss of DACA status on states.

9    7.  In this declaration I provide (a) general background about health insurance coverage and

10     health care services use of and by DACA recipients and undocumented immigrants, (b) a

11     brief review of research about how DACA improves mental health and how the loss of

12     DACA could worsen it, (c) estimates of potential state-level costs due to the loss of

13     DACA status and (d) a brief discussion of the role of DACA recipients as health care

14     providers and the potential effects of loss of this component of the health workforce.

15

16                  **Background Information**

17    8.  Under DACA, recipients are protected from deportation, can receive authorization to

18     work legally and can engage in other activities of civil society, such as continue their

19     education, obtain drivers' licenses, etc.  Without DACA, they could lose these benefits

20     and privileges.  Work authorization is a particularly important benefit under DACA.  The

21     survey and analysis conducted by Professor Tom Wong reveals that 91% of DACA

NOV 22, 2017

1      recipients are employed.  His data indicate that 57% of the DACA recipients have private

2      health insurance or other benefits through their employment.[1]

3      9.   Although DACA recipients have certain privileges, federal law and policy does not

4           accord them eligibility for federal health insurance benefits, including Medicaid, the

5           health insurance program for low-income populations. Nor are they permitted to enroll in

6           the health insurance marketplaces (or exchanges) formed under the Affordable Care Act

7           or to receive federal health insurance premium tax credits that are designed to make this

8           insurance more affordable.  Despite their protected status, DACA recipients are barred

9           from federal health insurance assistance, like other undocumented immigrants.  State or

10          local governments may opt to offer public insurance coverage for certain undocumented

11          immigrants, including DACA recipients, using state or local funds without federal

12          funding support.[2]  For example, the District of Columbia supports a state-funded Health

13          Care Alliance, which provides medical assistance to low-income adults not eligible for

14          Medicaid including undocumented immigrants and DACA recipients; no federal funding

15          is used.[3]  New York State provides Medicaid coverage to DACA recipients, but not other

16          undocumented immigrants, without federal funding support.[4]

---

[1] Declaration of Tom K. Wong, University of California, San Diego, Sept. 27, 2017, for *N.Y. et al., v. Trump et al.*, 17-cv-5228 (ECF 55-5).

[2] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.

[3] District of Columbia Department of Health Care Finance.  Health Care Alliance. https://dhcf.dc.gov/service/health-care-alliance

[4] New York State Department of Health.  GIS 13 MA/011:Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens. https://www.health.ny.gov/health_care/medicaid/publications/gis/13ma011.htm.

NOV 22, 2017

1    The only federal health insurance benefit available to low-income undocumented

2    immigrants is very limited emergency Medicaid coverage (42 USC § 1396b (v)).[5]  The

3    costs of their emergency care (e.g., emergency room care, ambulance, etc.) can be

4    covered under Medicaid.  However, this limited benefit does not provide broader

5    coverage for other ambulatory or inpatient hospital services, prescription drugs, etc.  It

6    provides reimbursement to providers for emergency care rendered to low-income

7    undocumented immigrants for acute conditions that could jeopardize the life or health of

8    the person, including labor and delivery costs for children born to undocumented

9    immigrant mothers.  Hospitals are separately required to provide emergency care, to at

10    least screen and stabilize their emergency medical conditions, to all potential patients

11    regardless of insurance coverage or citizenship status, under the Emergency Medical

12    Treatment and Active Labor Act (EMTALA, 42 USC § 1395dd).  The Medicaid

13    emergency care benefit essentially provides a mechanism to reimburse providers for the

14    emergency care they are otherwise required to offer to low-income undocumented

15    immigrants.

16    10. In addition, many community-based health care providers provide free- or subsidized

17    ambulatory health care services to undocumented aliens, including those who are

18    uninsured.  Perhaps most important, community health centers that receive federal grants

19    under Section 330 of the Public Health Service Act, sometimes also called Federally

20    Qualified Health Centers (FQHCs), including the subset of Migrant Health Centers that

21    focus on care for migrant workers, are required to provide primary health care to all

---

[5] A previous limited federal grant program, called "Section 1011," provided federal funding for emergency care for undocumented immigrants separate from Medicaid, but that program has now expired.  https://www.cms.gov/Regulations-and-Guidance/Legislation/UndocAliens/.

4

NOV 22, 2017

1    patients regardless of insurance or immigration status.  Many other "safety net providers"

2    – including non-profit, charitable and state or local public clinics – often provide free or

3    subsidized uncompensated care to uninsured persons, including undocumented

4    immigrants, although the basis for providing that care varies.  In some cases, state or

5    local laws or policies require them to provide care to the uninsured.  In other cases it is a

6    matter of clinical practice and a belief in charitable mission.

7    11. Because of the barriers they face in securing health insurance coverage, non-citizen

8    immigrants, which include DACA recipients, undocumented immigrants and other

9    immigrants who have been legally admitted but are not citizens, are much more likely to

10   be uninsured than U.S. born or naturalized citizens and to have less private insurance and

11   less Medicaid coverage, even when one compares low-income (below 200% of the

12   poverty line) non-citizen immigrants and citizen adults.  The lack of insurance creates

13   financial barriers and as a result non-citizens have substantially less access to and use of

14   medical services, including primary health care services, emergency medical care,

15   hospital care and most other forms of health care, than citizens.[6]

16   12. DACA status enables recipients to work and many are thereby able to obtain

17   employment-based private health insurance, which is the dominant form of insurance in

18   the United States.  If DACA protections are lost, the former DACA recipients would lose

19   their work authorization and, as a result, would lose their jobs and their employer-based

20   health insurance.  If they are not working they have few other options to obtain health

21   insurance, other than emergency Medicaid.  Moreover, if the breadwinner in a family

22   loses his or her job and private health insurance, his or her dependents may also lose their

---

[6] See, for example, Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues. Migration Policy Institute, June 2013.  www.migrationpolicy.org

NOV 22, 2017

1    insurance coverage, even if they are U.S. born citizens.  In principle, a person without

2    employer-based health insurance, Medicaid, or other publicly subsidized coverage, could

3    purchase individual (non-group) health insurance on the private market.  The sad reality,

4    however, is that individual health insurance is expensive and a person who is no longer

5    employed or who has low income generally cannot afford individual health insurance

6    premiums.  Thus, the health insurance prospects for undocumented immigrants without

7    DACA status and employment are bleak.

8

9                    **Mental Health Consequences of the Loss of DACA Protections**

10   **13.** States have an inherent interest in the well-being, public health and safety of their

11   residents; terminating DACA protections undermines the interests of states.  Even though

12   DACA does not generally provide health insurance benefits, research indicates that

13   DACA improves the mental health of recipients, by reducing stress related to their

14   undocumented status and the fear of adverse actions, such as deportation, loss of work,

15   loss of educational opportunities, separation from their families, etc.  Research, including

16   studies published in peer-review journals by investigators at Harvard Medical School,[7] [8]

17   the University of California at Davis,[9] and the Universities of California at Berkeley and

---

[7] Venkataramani AS, Shah SJ, O'Brien R, Kawachi I, Tsai AC. Health consequences of
the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a
quasiexperimental study. *Lancet Public Health.* 2017; 2(4): e175-e181.
[8] Venkataramani AS, Tsai AC.  Dreams Deferred: the Public Health Consequences of
Rescinding DACA.  *New Eng J Med.*  2017; 377(18):1707-9.
[9] Patler C, Laster, Pirtle W. From undocumented to lawfully present: do changes to legal status
impact psychological wellbeing among Latino immigrant young adults? *Soc Sci Med* 2017
March 9 (Epub ahead of print).

NOV 22, 2017

1      at San Francisco,[10] show that the receipt of DACA has significantly reduced

2      psychological stress and improves mental health status.  The researchers warn that the

3      loss of DACA protections will lead to higher stress and additional mental health

4      problems for hundreds of thousands of people. In addition, a study by Stanford

5      University researchers found that the DACA status that protected mothers also led to

6      better mental health status for their US-born citizen children; children feel more secure

7      when their parents have legal status.  This shows the broader repercussions of changes in

8      DACA policy which can even affect citizen children.[11] The stress caused by loss of

9      DACA protections could compound the harmful effects of employment and economic

10     loss and could result in additional demands placed on our mental health and social

11     welfare systems system and, in some cases, may lead to increased risk of disruptive

12     behavior that could pose broader risks and further tax our social, educational and criminal

13     justice systems. DACA helped many youth and young adults "come out of the shadows."

14     Loss of legal status will push them back into the shadows and jeopardizes the mental

15     health of DACA recipients and their families, with broader societal effects within states.

16

17               **Estimates of Potential Health Costs at State Levels Due to the Loss of DACA**

18     14. The loss of DACA protections would harm states because the loss of private health

19     insurance coverage will increase public expenditures for emergency Medicaid and other

---

10 Siemons R, Raymond-Flesh M, Auerswald CL, Brindis CD.  Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA).  *J Immigr Minor Health*. 2017 Jun;19(3):543-551. doi: 10.1007/s10903-016-0354-x.

11 Hainmueller J, Lawrence D, Martén L, et al. Protecting unauthorized immigrant mothers improves their children's mental health. *Science* 2017 August 31 (Epub ahead of print).

NOV 22, 2017

1    uncompensated care for those who become uninsured, creating additional financial

2    burdens on the state.  In this section, I describe how the loss of employment and

3    employer-based health insurance would push former DACA recipients to emergency

4    medical care reimbursed by Medicaid and other community-based uncompensated care.

5    Even though they may still be able to get these services, these are not optimal forms of

6    health care and would still leave many former DACA recipients with reduced access to

7    medical care, which could endanger their health.  The limited nature of these benefits is

8    unlikely to be adequate to accommodate the additional mental health stress caused by the

9    loss of DACA status, described above, as well as other illnesses, accidents and diseases

10   that could afflict any individual, citizen or immigrant alike.

11   15. In this section, I estimate potential financial costs for each state if DACA protections are

12       lost.  DACA status provides work authorization to young adults who would otherwise be

13       without legal status and thereby enables them to work legally.  A majority of working

14       DACA recipients get private health insurance through their jobs.  Loss of work

15       authorization would cause them to lose their jobs.  Even if they get jobs without work

16       authorization, they are subject to exploitation and are unlikely to be offered job benefits

17       like health insurance or pension benefits.  The loss of or degradation of employment

18       would trigger the loss of employment benefits, like health insurance coverage for them

19       and their dependents.  In principle, some of those losing employment-based insurance

20       might be able to purchase individual (non-group) health insurance on the private market,

21       but without the income of a job, the cost of individual health insurance would be

22       prohibitive and essentially unaffordable.  As noted earlier, undocumented immigrants are

23       ineligible for Medicaid or health insurance marketplaces (exchanges) and premium tax

NOV 22, 2017

1 credits.  As a result, they must instead resort to reliance on emergency Medicaid coverage

2 and/or community-based care for those without insurance, such as that provided by

3 community health centers or state or local public health clinics.

4 16. I use recent data from national survey data to estimate the costs of emergency Medicaid

5 costs and community-based care in each of the states that are plaintiffs in this case

6 (Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Iowa,

7 Massachusetts, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode

8 Island, Vermont, Virginia and Washington), as well as for the nation, if DACA recipients

9 lose their status and, as a result, lose employment and private health insurance coverage.

10 17. For estimates of the number of people affected, I draw on estimates of employment and

11 private insurance coverage in the Plaintiff States, provided in the Declaration of Professor

12 Tom Wong of the University of California at San Diego,[12] based on his survey of DACA

13 recipients, to estimate the effects of potential loss of employment and private insurance

14 coverage. Professor Wong's survey indicated that 91% of DACA recipients were

15 currently employed and 57% had a job with private health insurance.  I also provide an

16 estimate of the overall national effects (including states not on the list of plaintiffs), based

17 on data reported by the U.S. Citizenship and Immigration Services, the agency which

18 administers DACA.  As of June 30, 2017, 793,026 young people who were brought to the

19 U.S. as children without documentation were approved under DACA across the overall

20 United States.[13]

---

[12] Declaration of Tom K. Wong, University of California, San Diego, Sept. 27, 2017, for *N.Y. et al., v. Trump et al.*, 17-cv-5228 (ECF 55-5).
[13] U.S. Citizenship and Immigration Services.  Deferred Action for Childhood Arrivals Data (Through June 30, 2017), :

NOV 22, 2017

1      18. For estimates of the implications and costs of alternative sources of medical care that

2      former DACA recipients are likely to use I draw on my own analyses of the Center for

3      Disease Control and Prevention's 2016 National Health Interview Survey (NHIS) and the

4      Agency for Healthcare Research and Quality's 2015 Medical Expenditure Panel Survey

5      (MEPS). I am an experienced analyst of these data and have published numerous studies

6      using these nationally representative health survey data.

7      19. The NHIS and MEPS data do not directly indicate who receives DACA, but permit an

8      estimate of DACA eligibility, based on the criteria of being non-citizen immigrants

9      between the ages of 18 and 36 in the U.S. for more than 5 years who are not participating

10      in Medicaid.  (I exclude Medicaid recipients since DACA recipients are not eligible for

11      Medicaid, except emergency Medicaid coverage).  I use Prof. Wong's estimate that 57%

12      of employed DACA recipients get insurance through work.  (My analysis of NHIS data

13      show that 55% of the DACA group who are working have private insurance, about the

14      same as Prof. Wong's estimate of employer-based insurance coverage among DACA

15      recipients.  Two separate data sources yield almost the same estimate, corroborating each

16      other). The loss of DACA status and work authorization would trigger the loss of their

17      jobs and therefore their private health insurance.

18      20. The 2016 NHIS data indicates that DACA-type adults who are not working have a 19

19      percent probability of using emergency room care in the last 12 months.  Since the loss of

20      DACA coverage would result in the loss of work authorization, legal work and

21      employment-based insurance, it is reasonable to assume that about 19% of former DACA

22      recipients would need to rely on emergency Medicaid to pay their emergency medical

---

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

NOV 22, 2017

1        bills.  To estimate the costs of emergency medical care, I relied on analyses of MEPS

2        data and estimated that the average annual cost of emergency room care received by an

3        18-36 year old immigrant who had been in the U.S. for more than five years was $1,275

4        in 2015.  I used estimates of national health expenditure price increases per capita from

5        2015 to 2018, conducted by the federal Centers for Medicare and Medicaid Services[14], to

6        estimate that the annual cost would rise by 13.7% to $1,450 each for the 19% of adults

7        who had previously been privately-insured working DACA recipients in each state, but

8        who would now be uninsured.

9    21. I estimated the costs of community-based uncompensated care that would be received by

10       the newly uninsured immigrant adults, due to the loss of DACA status.  For this, I drew

11       on estimates by Teresa Coughlin and her colleagues at the Urban Institute.[15]  That study

12       estimated that in 2013, the average uninsured person received uncompensated medical

13       care costing $1,702 per person, of which 26% was provided as uncompensated care at

14       publicly-supported state or local community-based ambulatory sites, such as community

15       health centers or state or local clinics; this is equal to $449 in community-based

16       ambulatory care per uninsured in 2013. This amount was inflated by 24.6% to account for

17       health care cost inflation between 2013 and 2018 to $559 per uninsured person.  I

18       multiplied this amount by the number of former DACA recipients who would lose their

19       jobs and private health insurance in each state.

---

[14] Centers for Medicare and Medicaid Services.  National Health Expenditures. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/index.html

[15] Coughlin T, Holahan J, Caswell K, McGrath M.  *Uncompensated Care for the Uninsured, 2013: A Detailed Examination.*  Kaiser Commission on Medicaid and the Uninsured.  May 2014. https://kaiserfamilyfoundation.files.wordpress.com/2014/05/8596-uncompensated-care-for-the-uninsured-in-2013.pdf

NOV 22, 2017

1    22. The additional public costs that would be borne at state levels in 2018 are shown in Table

2         1 below, based on the methods and sources described above.  These are annual costs in

3         2018; the cumulative costs over several years would be substantially higher.  These

4         estimates are conservative, since they do not include the additional costs that might be

5         borne by states if dependents of DACA recipients – their spouses or children – lose

6         private health insurance if the DACA recipient loses his or her job.

**Table 1.  Estimates of Additional State-Level Costs Due to the Loss of DACA Status, 2018**

| State | Number DACA Recipients Currently Employed | Number Who Could Become Uninsured If They Lose Their Jobs | Number Who Could Require Emergency Room Care If Uninsured | 2018 Costs of Additional Medicaid Emergency Room Care Due to Loss of DACA | 2018 Costs of Additional Community-Based Uncompensated Care Due to Loss of DACA | Sum: Total 2018 Additional Public Health Costs Due to Loss of DACA |
|---|---|---|---|---|---|---|
| Colorado | 15,281 | 8,710 | 1,655 | $2,399,114 | $4,872,939 | **$7,272,053** |
| Connecticut | 4,560 | 2,599 | 494 | $715,919 | $1,454,133 | **$2,170,052** |
| Delaware | 1,326 | 756 | 144 | $208,182 | $422,847 | **$631,028** |
| Dist Columbia | 707 | 403 | 77 | $110,999 | $225,454 | **$336,453** |
| Hawaii | 532 | 303 | 58 | $83,524 | $169,649 | **$253,173** |
| Illinois | 42,537 | 24,246 | 4,607 | $6,678,301 | $13,564,572 | **$20,242,873** |
| Iowa | 2,570 | 1,465 | 278 | $403,489 | $819,544 | **$1,223,034** |
| Massachusetts | 7,360 | 4,195 | 797 | $1,155,519 | $2,347,021 | **$3,502,540** |
| New Mexico | 6,250 | 3,563 | 677 | $981,249 | $1,993,055 | **$2,974,304** |
| New York | 38,848 | 22,143 | 4,207 | $6,099,128 | $12,388,191 | **$18,487,320** |
| North Carolina | 25,094 | 14,304 | 2,718 | $3,939,753 | $8,002,195 | **$11,941,948** |
| Oregon | 10,347 | 5,898 | 1,121 | $1,624,477 | $3,299,542 | **$4,924,019** |
| Pennsylvania | 5,468 | 3,117 | 592 | $858,475 | $1,743,684 | **$2,602,159** |
| Rhode Island | 1,141 | 650 | 124 | $179,137 | $363,852 | **$542,989** |
| Vermont | 221 | 126 | 24 | $34,717 | $70,516 | **$105,233** |
| Virginia | 11,195 | 6,381 | 1,212 | $1,757,613 | $3,569,960 | **$5,327,573** |
| Washington | 16,394 | 9,345 | 1,775 | $2,573,855 | $5,227,863 | **$7,801,717** |
| **Subtotal** | **189,831** | **108,204** | **20,559** | **$29,803,450** | **$60,535,017** | **$90,338,467** |
| **US Total** | **721,654** | **411,343** | **78,155** | **$113,299,482** | **$230,127,255** | **$343,426,737** |

Source: Estimates by Leighton Ku, November 2017 using methods and data described in the text.

13

23. Estimates of additional costs that would be borne by the Plaintiff States and for the overall nation in 2018 are presented below.  These estimates are based on the loss of employment-based health insurance coverage and the need to rely on public sources of care, such as emergency Medicaid and community-based safety net services.

24. For Colorado, the loss of DACA status could increase public health care costs by $7.3 million in 2018, including $2.4 million in Medicaid emergency room costs and $4.9 million in community-based uncompensated care costs.

25. For Connecticut, the loss of DACA status could increase public health care costs by $2.2 million in 2018, including $0.7 million in Medicaid emergency room costs and $1.5 million in community-based uncompensated care costs.

26. For Delaware, the loss of DACA status could increase public health care costs by $0.6 million in 2018, including $0.2 million in Medicaid emergency room costs and $0.4 million in community-based uncompensated care costs.

27. For the District of Columbia, the estimates described above indicate that the loss of DACA status could increase public health care costs by $0.3 million in 2018, including $0.1 million in Medicaid emergency room costs and $0.2 million in community-based uncompensated care costs.  However, circumstances could differ for the District, compared to other states.  The District of Columbia has a Health Care Alliance program which is supported by state funds and that provides limited coverage for low-income people ineligible for Medicaid, including the undocumented.  The District estimated that

14

the loss of DACA protections could increase enrollment and costs in the Alliance, costing the District $283,000 per month in 2018.[16]

28. For Hawaii, the loss of DACA status could increase public health care costs by $0.3 million in 2018, including $0.1 million in Medicaid emergency room costs and $0.2 million in community-based uncompensated care costs.

29. For Illinois, the loss of DACA status could increase public health care costs by $20.2 million in 2018, including $6.7 million in Medicaid emergency room costs and $13.6 million in community-based uncompensated care costs.

30. For Iowa, the loss of DACA status could increase public health care costs by $1.2 million in 2018, including $0.4 million in Medicaid emergency room costs and $0.8 million in community-based uncompensated care costs.

31. For Massachusetts, the loss of DACA status could increase public health care costs by $3.5 million in 2018, including $1.1 million in Medicaid emergency room costs and $2.3 million in community-based uncompensated care costs.  Massachusetts has other state-funded health programs, including MassHealth and the Health Safety Net Program, which could also provide limited coverage; the costs of providing care in these programs could be higher than my estimate.

32. For New Mexico, the loss of DACA status could increase public health care costs by $3.0 million in 2018, including $1.0 million in Medicaid emergency room costs and $2.0 million in community-based uncompensated care costs.

33. For New York, the loss of private insurance due to the rescission of DACA status could increase public health care costs by $18.5 million in 2018, including $6.1 million in

---

[16] Declaration of Claudia Schlosberg, District of Columbia Dept. of Health Care Finance, Sept. 26, 2017, for *N.Y. et al., v. Trump et al.*, 17-cv-5228 (ECF 55-110).

Medicaid emergency room costs and $12.4 million in community-based uncompensated care costs.  New York currently provides Medicaid to DACA recipients, as it does to certain other legal non-citizen immigrants, but it uses state funds only, without federal matching, to cover DACA recipients.  Under current law, the loss of DACA status would mean that current DACA recipients would need to use emergency Medicaid and community-based uncompensated care, as estimated above.  It is possible that New York might choose to amend its state rules and extend Medicaid to former DACA recipients; this would impose additional costs to the state which are higher than those that I estimate above.

34.  For North Carolina, the loss of DACA status could increase public health care costs by $11.9 million in 2018, including $3.9 million in Medicaid emergency room costs and $8.0 million in community-based uncompensated care costs.

35. For Oregon, the loss of DACA status could increase public health care costs by $4.9 million in 2018, including $1.6 million in Medicaid emergency room costs and $3.3 million in community-based uncompensated care costs.

36. For Pennsylvania, the loss of DACA status could increase public health care costs by $2.6 million in 2018, including $0.9 million in Medicaid emergency room costs and $1.7 million in community-based uncompensated care costs.

37. For Rhode Island, the loss of DACA status could increase public health care costs by $0.5 million in 2018, including $0.2 million in Medicaid emergency room costs and $0.4 million in community-based uncompensated care costs.

38. For Vermont, the loss of DACA status could increase public health care costs by $0.1 million in 2018, including $0.03 million in Medicaid emergency room costs and $0.07

million in community-based uncompensated care costs.  (Tom Wong's analysis did not include employment effects for Vermont, so I used data from the U.S. Citizenship and Immigration Services[17] to identify the number of DACA recipients in Vermont and then used methods similar to those described above.)

39. For Virginia, the loss of DACA status could increase public health care costs by $5.3 million in 2018, including $1.8 million in Medicaid emergency room costs and $3.6 million in community-based uncompensated care costs.

40. For Washington State, the loss of DACA status could increase public health care costs by $7.8 million in 2018, including $2.6 million in Medicaid emergency room costs and $5.2 million in community-based uncompensated care costs.

41. In total, I estimate that the Plaintiff States could experience at least $90 million more in public expenditures in 2018 due to the loss of DACA protections for residents of their states, including $30 million in emergency Medicaid costs and $61 million in community-based uncompensated care costs.  As noted, because of special programs that exist in certain states, the actual cost could be higher.  Over multiple years, the cumulative cost would be far higher.

42. Using similar methods for the overall United States (50 states and the District of Columbia), the total estimated impact of the loss of DACA status is at least $343 million in 2018, of which $113 million is for Medicaid emergency room costs and $230 million is for community-based uncompensated care costs. All told, this could lead more than 400,000 individuals to lose private health insurance coverage and to become uninsured.

---

[17] U.S. Citizenship and Immigration Services.  Deferred Action for Childhood Arrivals Data (Through June 30, 2017), :
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

**Effects of the Loss of DACA Recipients as Health Care Providers**

43. DACA recipients are not only patients who use health care services; many are health care professionals and support staff, such as physicians, nurses, medical aides, etc., who care for patients, including U.S. born citizens and others.  A large share of the nation's health workforce is immigrant. Immigrant health care professionals not only provide needed manpower for patient care, they also provide diversity, language skills and cultural understanding that help meet the health needs of diverse American patients.  The loss of DACA status would lead them to lose work authorization, which would lead to the loss of their jobs and the loss of the service that they render to the community.  DACA termination could also cause students to lose eligibility for educational opportunities or scholarships, which may keep them from becoming health professionals.  The loss of DACA status would create hardships for the organizations that employ current and future health care professionals, as well as the patients for whom they care.  States have an inherent interest in maintaining the supply and quality of medical care for their residents, and this jeopardizes that interest.

44. The Migration Policy Institute analyzed data from the Census Bureau's American Community Surveys and estimated that 5,300 current DACA recipients are health care professionals (e.g., doctors, nurses, technicians) and another 8,600 are health care support staff (e.g., medical aides, home health staff, etc.).[18]  Health professionals typically provide care to hundreds of patients in a year, so the loss of several thousand health

---

[18] Zong J, Soto A, Batalova J, Gelatt J, Capps R.  A *Profile of Current DACA Recipients by Education, Industry and Occupation*.  Washington, DC: Migration Policy Institute.  Nov. 2017. www.migrationpolicy.org.

professionals would disrupt care for hundreds of thousands of patients living in states across the country.  More are engaged in other positions in health care organizations, such as management, computer services, food service, etc.  The Migration Policy Institute support estimated that 40,700 DACA recipients work in the education, health care or social services industry.  Health care executives representing numerous hospitals have written President Trump, explaining the importance of DACA recipients as valued members of their health care workforce and how their employment is vital to their patients.[19]

45.  In addition, large numbers of DACA recipients are training to become future health care professionals, including physicians, nurses, etc.; the loss of status would short-circuit their dreams and the service they would render to others in the future.  The American Association of Medical Colleges has noted that a substantial number of DACA recipients have applied for or are enrolled in medical colleges and cancellation of DACA would imperil their education and their ability to serve patients in the future.[20]  Even after a DACA recipient has completed medical school, he or she must typically complete post-graduate medical residency to become a fully qualified physician, but the loss of work authorization would endanger their residencies.[21]  Similar problems are likely to occur for those in training for nursing and other health professions.

---

[19] Hochman R, et al.  Letter to President Trump regarding DACA. Sept. 2, 2017. https://www.chausa.org/docs/default-source/media-resources/catholic-health-care-system-ceos-ltr-to-president-trump-re-daca-9-2-2017.pdf
[20] Cited by Japsen B.  How Trump's Move to End DACA May Worsen the Doctor Shortage. *Forbes.* Sept. 5, 2017.  https://www.forbes.com/sites/brucejapsen/2017/09/05/how-trumps-move-to-end-daca-worsens-the-doctor-shortage/#6a7f47b65b06
[21] Weinstein D, Saldana F.  DACA and the Dream of Becoming a Physician.  *New Eng J Med.* 2017; 377:1913-1915.

46. The loss of immigrant health workers could have adverse effects on the long-term care of frail elderly and disabled individuals: large numbers of DACA recipients work as home health workers, providing community-based care to senior citizens and those with disabilities in their homes.[22]  Reductions in the number of health workers through the cancellation of DACA would create hardships for the health facilities that employ them and the patients who rely on them for care.  It is particularly worth noting that the Medicaid program is the leading payer for long-term care services in the U.S.  The lack of suitably trained long-term care staff will adversely affect state Medicaid programs and limit the ability of these state programs to provide the care that they are obligated to offer to Medicaid recipients.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge.

Respectfully submitted,

_____

Leighton Ku, PhD, MPH

November 22, 2017

---

[22] Scheiber N,Abrams R.  What Older Americans Stand to Lose If Dreamers are Deported.  *New York Times.  S*ept. 7, 2017.

# EXHIBIT A

# CURRICULUM VITAE

## LEIGHTON KU

Professor of Health Policy and Management        Telephone:   (202) 994-4143
Director, Center for Health Policy Research
Department of Health Policy and Management
Milken Institute School of Public Health
The George Washington University        E-mail:  lku@gwu.edu
950 New Hampshire Ave, NW, 6th Floor
Washington, DC 20052

## Summary

Leighton Ku, PhD, MPH, is a professor of health policy and management at the George Washington University (GW).  He is a nationally known health policy and health services researcher and expert with more than 25 years of experience.  He has expertise in diverse areas, including health reform, access to care for low-income populations, Medicaid, preventive services, the health care safety net, cost and benefits of health services, and immigrant health.  He directs the Center for Health Policy Research, a multidisciplinary research center, which includes physicians, attorneys, economists, health management and policy experts and others, with more than 20 faculty and dozens of staff; it has a research portfolio in excess of $25 million.   He has been principal investigator for a large number of studies with support from the National Institutes of Health, Centers for Disease Control and Prevention, Centers for Medicare and Medicaid Services, the Commonwealth Fund and Robert Wood Johnson Foundation, and other sources. In the course of his career at GW, the Center on Budget and Policy Priorities and the Urban Institute, he has worked with federal and state executive and legislative agencies, health care organizations, advocates and others in research, technical assistance, strategic advice and advocacy.   As a faculty, he has taught research methods and policy analysis at the graduate level for more than 20 years and guided a large number of students through dissertations and other research.  As a member of his community, he helped establish and guide the District of Columbia's Health Benefits Exchange Authority as a founding member of its Executive Board.

## Education

| | |
|---|---|
| 1990 | Ph.D., Health Policy, Boston University (Pew Health Policy Fellow in a joint program of Boston University and Brandeis University) |
| 1979 | M.P.H., Public Health, University of California, Berkeley |
| 1979 | M.S., Nutritional Sciences, University of California, Berkeley |
| 1975 | A.B. (honors), Biochemistry, Harvard College |

## Professional Background

| | |
|---|---|
| 2012 - present | Executive Board, District of Columbia Health Benefit Exchange Authority (voluntary position). |
| 2008 - present | Director, Center for Health Policy Research, The George Washington University |
| 2008  - present | Professor of Health Policy and Management (with tenure), Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University. |

| 2015- Feb. 2016 | Interim Chair, Department of Health Policy and Management |
|---|---|
| 2000 - 2008 | Senior Fellow, Center on Budget and Policy Priorities, Washington, DC |
| 1992 - present | Adjunct Professor in Public Policy and Public Administration, Trachtenberg School of Public Policy and Administration, The George Washington University. Began as Associate Professorial Lecturer. |
| 1990 - 2000 | Principal Research Associate. The Urban Institute, Washington, DC.  Began as Research Associate I. |
| 1989 - 1990 | Research Manager, SysteMetrics/McGraw-Hill, Cambridge, MA. |
| 1987 - 1989 | Pew Health Policy Fellow, Health Policy Institute, Boston University and the Heller School, Brandeis University |
| 1980 - 1987 | Program Analyst, Office of Analysis and Evaluation and Supplemental Food Programs Division, Food and Nutrition Service, U.S. Dept. of Agriculture, Alexandria, VA and Washington, DC. |
| 1975 - 1976 | Registered Emergency Medical Technician, Dept. of Health and Hospitals, Boston, MA |

## Publications Authored or Co-authored in Peer-Reviewed Journals

[Aggregate measures of scholarly productivity: H-index = 42, I10-index = 98 (according to Google Scholar as of March 31, 2017)]

Ku, L., Steinmetz, E., Bysshe, T., Bruen, B. Crossing Boundaries: Medicaid and Public Health Collaborations to Help Smokers Quit, Public Health Reports, 2017 Feb, Vol. 132(2) 164-170.

Han, X., Luo, Q,  Ku, L. Medicaid Expansions and Increases in Grant Funding Increased the Capacity of Community Health Centers, Health Affairs, 2017 Jan.; 36 (1):49-56.

Lantz, P., Rosenbaum, S., Ku, L., Iovan, S. Pay for Success Initiatives in the U.S.:  Potential and Challenges as a Strategy for Population Health Improvement, Health Affairs, 2016 Nov; 35:2053-2061

Pittman, P., Masselink, L., Bade, L. Frogner, B., Ku, L. Determining Medical Staff Configurations in Community Health Centers: CEO Perspectives.  Journal of Healthcare Management, 61(5): 364-77, Sept./Oct 2016.

Frogner, B., Pittman, P., Masselink, L., Ku, L., Do Years of Experience with EHRs Matter for Productivity in Community Health Centers? Journal of Ambulatory Care Management. 2017 Jan/Mar; 40(1): 36-47.

Ku, L., Brantley, E., Bysshe, T., Steinmetz, E., Bruen, B.  How Medicaid and Other Public Policies Affect Utilization of Tobacco Cessation. Preventing Chronic Diseases, 2016 Oct;13:160234. DOI: http://dx.doi.org/10.5888/pcd13.160234.2016.

Labarthe, D. Goldstein, L., Antman, E., Arnett, D.., Fonarow, G., Alberts, M., Hayman, L., Khera, A., Sallis, J., Daniels, S., Sacco, R., Li, S., Ku, L., Lantz, P.  Robinson, J., Creager, M., Van Horn, L., Kris-

Etherton, P., Bhatnagar, A. and Whitsel, L. Evidence-Based Policy Making: Assessment of the American Heart Association's Strategic Policy Portfolio.  Circulation, 2016 May 3; 133(18):e615-53.

Ku, L.  Letter: Treating Unhealthy Behaviors: The Author Replies.  Health Affairs, 35(3):551, March 2016.

Bruen, B.K., Steinmetz, E., Bysshe, T.  Glassman, P. and Ku, L.  Care for Potentially Preventable Dental Conditions in Operating Rooms by Medicaid Children, Journal of the American Dental Association, 2016 Sept. :147(9):702-708 (cover story)

Steinmetz, E., Berger, S., Cabanas, J., Horton, K., Ranou, J. Sasson, C., Seiler, N., Ku, L. Cardiopulmonary Resuscitation Training for High School Students: A Cost-Effectiveness Analysis. under review, 2016.

Ku, L., Bysshe, T., Steinmetz, E., Bruen B.  Health Reform, Medicaid Expansions and Women's Cancer Screening, Women's Health Issues, Feb. 2016.  http://dx.doi.org/10.1016/j.whi.2016.01.0

August, E., Steinmetz, E., Gavin, L., Rivera, M., Pazol, K., Moskosky, S., Weik, T., and Ku, L. Projecting the Unmet Need and Costs for Contraception Services after Health Care Reform, American Journal of Public Health. 106(2): 334–341, Feb. 2016. doi:10.2105/AJPH.2015.302928

Ku, L. Bruen, B., Steinmetz, E. Bysshe, T.  Medicaid Tobacco Cessation: Big Gaps Remain In Efforts To Get Smokers To Quit, Health Affairs,  35:62-70, Jan. 2016; doi:10.1377/hlthaff.2015.0756

Ku, L. Capsule Commentary: Unauthorized Immigrants: Contributing to Medicare, But Left Out, Journal of General Internal Medicine, 31(1):100, Jan. 2016.

Ku, L.  Immigrants Face Barriers Both as Health Care Patients and Providers,  Harvard Health Policy Review, 15(1):22-24, Fall 2015.

Jones, E., Ku, L. Sharing a Playbook: Integrated Care in Community Health Centers, American Journal of Public Health. 105(1). 2028-2034, October 2015,   doi: 10.2105/AJPH.2015.302710

Zur, J., Ku, L.  Factors Associated with Geographic Variation in Psychiatric Prescription Drug Expenditures among Medicaid Beneficiaries, Journal of Behavioral Health Services & Research, epub ahead of print July 24, 2015, doi: 10.1007/s11414-015-9471-x.

Ku, L., Frogner, B., Steinmetz, E., Pittman, P.  Community Health Centers Use Diverse Staffing and Can Provide Lessons for Other Medical Practices, Health Affairs  34(1):95-103, Jan. 2015.

Jones, E., Ku, L., Smith, S., Lardiere, M. County Workforce, Reimbursement, and Organizational Factors Associated with Behavioral Health Capacity in Health Centers, Journal of Behavior and Health Services Research, 2014 Apr;41(2):125-39.

Bruen, B., Ku, L., Lu, X. and Shin, P.  No Evidence That Primary Care Physicians Offer Less Care To Medicaid, Community Health Center Or Uninsured Patients, Health Affairs, 32(9): 1624-30, Sept. 2013.

Ku, L., Steinmetz, E., Bruen, B, Continuous Eligibility Policies Stabilize Medicaid Coverage for Children and Could Be Extended to Adults with Similar Results, Health Affairs, 32(9): 1576-82, Sept. 2013.

Ku, L., Sharac, J., Bruen, B., Thomas, M. and Norris, L.  Increased Use of Dental Services by Children Covered by Medicaid: 2000-2010 Medicare and Medicaid Research Review 3(3): E1-E12.  July 2013. doi: http://dx.doi.org/10.5600/mmrr.003.03.b01

Levy, A., Bruen, B. and Ku, L. Health Care Reform and Women's Insurance Coverage for Breast and Cervical Cancer Screening.  Preventing Chronic Disease.  9: 120069.  Oct. 25, 2012.  DOI: http//dx.doi.org/10.5888/pcd9.120069.

Levy, A., Bruen, B., and Ku, L.  The Potential Employment Impact of Health Reform on Working-Age Adults With Disabilities, Journal of Disability Studies.  30 May 2012. DOI: 10.1177/1044207312446225

Willard, R., Shah, G., Leep, C. and Ku, L..  Impact of the 2008-2010 Economic Recession on Local Health Departments, Journal of Public Health Management and Practice, 18(2):106-114, Mar/Apr. 2012.

Richard, P., West, K. and Ku, L. The Return on Investment of a Medicaid Tobacco Cessation Program in Massachusetts PLoS ONE, 7(1): e29665, January 2012.  doi: 10.1371/journal.pone.0029665. Available at http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0029665

Rosenbaum, S.  Ku, L., Lantz, P., et al. Examining the Evidentiary Basis of Congress's Commerce Clause Power to Address Individuals' Health Insurance Status, BNA's Health Care Policy Report, Feb. 6, 2012, p 1-9.

Richard, P., Ku, L., Dor, A., Tan, E., Shin, P., and Rosenbaum, S.  Cost Savings Associated with the Use of Community Health Centers. Journal of Ambulatory Care Management, 35(1): 50-59. Jan-Mar. 2012.

Ku, L., Jones, E., Shin, P., Burke, F.R., and Long, S. Safety-net providers after health care reform: lessons from Massachusetts Archives of Internal Medicine, 171(15): 1379-84, Aug. 8, 2011.

Bruen, B., Ku, L., Burke, M. and Buntin, M. More Than Four in Five Office-Based Physicians Could Quality for Federal Electronic Health Record Incentives. Health Affairs, 30(3): 472-80, Mar. 2011.

Ku, L., Jones, K., Shin, P., Bruen, B. and Hayes, K.  The States' Next Challenge — Securing Enough Primary Care for an Expanded Medicaid Population. New England Journal of Medicine 364(6):493-95, Feb. 10, 2011. Also supplementary appendix available at http://www.nejm.org/doi/suppl/10.1056/NEJMp1011623/suppl_file/nejmp1011623_appendix.pdf

Ku, L.  Ready, Set, Plan, Implement.  Executing Medicaid's Expansion Health Affairs, 29(6): 1173-77, June 2010.

Ku, L. and Pervez, F. Documenting Citizenship in Medicaid: The Struggle Between Ideology and Evidence, Journal of Health Politics, Policy and Law, 35(1): 5-28, February 2010.

Ku, L. Medical and Dental Care Utilization and Expenditures Under Medicaid and Private Health Insurance, Medical Care Research and Review, 66(4):456-71, August 2009.

Ku, L. Health Insurance Coverage and Medical Expenditures for Immigrants and Native-Born Citizens in the United States, American Journal of Public Health, 99(7): 1322-28, July 2009.

Ku, L. and Broaddus, M. Public and Private Health Insurance: Stacking Up the Costs, Health Affairs, 27(4):w318-327, June 2008.  Also, Technical Appendix: Public and Private Health Insurance: Stacking Up the Costs, at http://content.healthaffairs.org/cgi/content/full/hlthaff.27.4.w318/DC2.

[Note between 2000 and 2008, I was working at the Center on Budget and Policy Priorities and was not principally working on refereed publications.]

Ku, L. Improving Health Insurance and Access to Care for Children in Immigrant Families, <u>Ambulatory Pediatrics</u>, 7(6):412-20, November 2007.

Ponce, N.,  Ku, L., Cunningham, W. and Brown, E.R., Language Barriers to Health Care Access Among Medicare Beneficiaries, <u>Inquiry</u>, 43(1):66–76, Spring 2006.

Ku, L. and Flores, G. Pay Now or Pay Later: Providing Interpreter Services In Health Care, <u>Health Affairs</u>, 24(2) 435-44, March/April 2005.

Park, E., Ku, L. and Broaddus, M., More Than 900,000 Children Will Lose Health Insurance Due to Reductions in Federal SCHIP Funding, <u>International Journal of Health Services</u>, 33(2), 2003.

Ku, L. The Number of Americans Without Health Insurance Rose in 2001 and Appears to Be Continuing to Rise in 2002, <u>International Journal of Health Services</u>, 33(2), 2003.

Lessard, G. and Ku, L. Gaps in Coverage for Children in Immigrant Families, <u>The Future of Children</u>, 13(1):101-115, Spring 2003.

Ku, L., St. Louis, M., Black, C., Aral, S., Turner, C., Lindberg, L. and Sonenstein, F., Risk Behaviors, Medical Care and Chlamydial Infection Among Young Men in the United States, <u>American Journal of Public Health,</u> 92(7): 1140-42, July 2002.

Ku, L., and Matani, S., Left Out: Immigrants' Access to Health Care and Insurance, <u>Health Affairs</u>, 20(1):247-56, Jan./Feb. 2001.

Ku, L., Ellwood, M., Hoag, S., Ormond, B., and Wooldridge, J., The Evolution of Medicaid Managed Care Systems and Eligibility Expansions, <u>Health Care Financing Review</u>, 22(2):7-29, Winter 2000.

Coughlin, T., Ku, L.  and Kim, J., Reforming the Medicaid Disproportionate Share Program in the 1990s, <u>Health Care Financing Review</u>, 22(2):137-58, Winter 2000.

Ku, L. and Coughlin, T., Sliding Scale Premium Health Insurance Programs: Four States' Experience, <u>Inquiry</u>, 36(4):471-80, Winter 2000.

Lindberg, L., Ku, L. and Sonenstein, F., Adolescents' reports of reproductive health education, 1988 and 1995. <u>Family Planning Perspectives</u>, 32(5):220-6, Sept./Oct. 2000.

Porter, L. and Ku, L.  Use of Reproductive Health Services Among Young Men, 1995 <u>Journal of Adolescent Health</u>, 27(3):186-94, September 2000.

Bradner, C., Ku, L. and Lindberg, L. Older, but Not Wiser: How Do Men Get AIDS and Sexually Transmitted Disease Information after High School?, <u>Family Planning Perspectives</u>, 32(1):33-39, January/February 2000.

Lindberg, L.D., Ku, L., and Sonenstein, F.  Adolescent Males' Combined Use of Condoms with Partners' Use of Female Contraceptive Methods, <u>Maternal and Child Health Journal</u>, 2(4): 201-9, Spring 1999.

Ku, L., Sonenstein, F., Lindberg. L., Bradner, C., Boggess, S., and Pleck, J. Understanding Changes in Sexual Activity Among Young Metropolitan Men: 1979 to 1995, Family Planning Perspectives, 30(6): 256-62, November/ December 1998.

Ku, L. and Hoag, S., Medicaid Managed Care and the Marketplace, Inquiry, 35(3):332-45, Fall 1998.

Ellwood, M.R. and Ku, L., Welfare and Immigration Reforms: Unintended Side Effects for Medicaid, Health Affairs, 17(3):137-51, May/June 1998.

Sonenstein, F., Pleck, J., Ku, L., Lindberg, L. and Turner, C. Changes in Sexual Behavior and Condom Use Among Teenaged Males: 1988 to 1995, American Journal of Public Health, 88(6):956-959, June 1998.

Turner, C, Ku, L., Rogers, S., Lindberg, L, Pleck, J. and Sonenstein, F., Adolescent Sexual Behavior, Drug Use and Violence: New Survey Technology Detects Elevated Prevalence Among U.S. Males, Science, 280:867-73, May 8, 1998.

Ku, L., Sonenstein, F., Turner, C., Aral, S. and Black, C., The Potential of Integrated Representative Surveys about STDs and Risk Behaviors, Sexually Transmitted Diseases, 24(5):299-309, May 1997.

Lindberg, L.D., Sonenstein, F., Ku, L. and Levine, G., Young Men's Experience with Condom Breakage, Family Planning Perspectives, 29(3): 132-36, May/June 1997.

Pleck, J.H., Sonenstein, F. and Ku, L. Black-white Differences in Adolescent Males' Substance Use: Are They Explained by Underreporting in Blacks?, Journal of Gender, Culture, and Health, 2, 247-265, 1997

Lindberg, L., Sonenstein, F., Ku, L. and Martinez, G. Age Differences Between Minors Who Give Birth and Their Adult Partners, Family Planning Perspectives, 29(2):52-60, March/April 1997.

Sonenstein, F., Ku, L. and Schulte, M., Reproductive Health Care -- Patterns in a Changing Health Care Market, Western Journal of Medicine, 163(3 Suppl):7-14, September 1995.

Ku, L. and Coughlin, T., Medicaid Disproportionate Share and Other Special Financing Programs, Health Care Financing Review, 16(3): 27-54, Spring 1995.

Holahan, J., Coughlin, T., Ku, L., Lipson, D. and Rajan, S., Insuring the Poor through Medicaid 1115 Waivers, Health Affairs, 14(1): 200-17, Spring 1995.

Coughlin, T., Ku, L., Holahan, J., Heslam, D. and Winterbottom, C. State Responses to the Medicaid Spending Crisis: 1988 to 1992, Journal of Health Politics, Policy and Law, 19(4):837-64, Winter 1994.

Ku, L., Sonenstein, F., and Pleck, J., The Dynamics of Young Men's Condom Use During and Between Relationships, Family Planning Perspectives, 26(6): 246-251, November/ December 1994.

Pleck, J., Sonenstein, F., and Ku, L., Attitudes Toward Male Roles: A Discriminant Validity Analysis, Sex Roles, 30(7/8):481-501, 1994.

Ku, L., Sonenstein, F., and Pleck, J., Factors Affecting First Intercourse Among Young Men, Public Health Reports, 108(6):680-94, November/December 1993.

Ku, L., Sonenstein, F., and Pleck, J., Neighborhood, Work and Family: Influences on the Premarital Behaviors of Adolescent Men, Social Forces, 72(2):479-503, December 1993.

6

Ku, L., Sonenstein, F., and Pleck, J., Young Men's Risk Behaviors for HIV Infection and Sexually Transmitted Diseases, 1988 through 1991, <u>American Journal of Public Health</u>, 83(11):1609-15, November 1993.

Pleck, J., Sonenstein, F., and Ku, L., Changes in Adolescent Males' Use of and Attitudes Towards Condoms: 1988-91, <u>Family Planning Perspectives</u>, 25(3):100-105, 117, May/June 1993.

Pleck, J., Sonenstein, F., and Ku, L. Masculine Ideology: Its Impact on Adolescent Males' Heterosexual Relationships, <u>Journal of Social Issues</u>, 49(3):11-30, 1993.

Ku, L., Sonenstein, F., and Pleck, J., The Association of AIDS Education and Sex Education with Sexual Behavior and Condom Use Among Teenage Men, <u>Family Planning Perspectives</u>, 24(3):100-106, May/June 1992 (erratum, <u>Family Planning Perspectives</u>, 25(1):36, January/February 1993).

Ku, L., Sonenstein, F., and Pleck, J., Patterns of HIV Risk and Preventive Behaviors Among Teenage Men, <u>Public Health Reports</u>, 107(2):131-38, March/April 1992.

Sonenstein, F., Pleck, J., and Ku, L., Levels of Sexual Activity Among Adolescent Males in the United States, <u>Family Planning Perspectives</u>, 23(4):162-67, July /August 1991.

Pleck, J., Sonenstein, F., and Ku, L., Adolescent Males' Condom Use: The Influence of Perceived Costs-Benefits on Consistency, <u>Journal of Marriage and the Family,</u> 53:733-45, August 1991.

Pleck, J., Sonenstein, F., and Ku, L., Contraceptive Attitudes and Intention to Use Condoms in Sexually Experienced and Inexperienced Adolescent Males, <u>Journal of Family Issues,</u> 11(3):294-312, Sept. 1990.

Ku, L., Ellwood, M.R., and Klemm, J., Deciphering Medicaid Data: Issues and Needs, <u>Health Care Financing Review,</u> 1990 Annual Supplement, p. 35-45.

Ku, L. and Fisher, D., Attitudes of Physicians Toward Health Care Cost Containment Policies, <u>HSR: Health Services Research</u>, 25(1):25-42, April 1990 (Part I).

Sonenstein, F., Pleck, J. and Ku, L., Sexual Activity, Condom Use and AIDS Awareness Among Adolescent Males, <u>Family Planning Perspectives</u>, 21(4):152-58, July/August 1989.

Branch, L. and Ku, L., Transition Probabilities to Disability, Institutionalization and Death for the Elderly Over a Decade, <u>Journal of Aging and Health</u>, 1(3):370-408, August 1989.

Ku, L., Early Prenatal Enrollment in the WIC Program, <u>Public Health Reports</u>, 104(3): 301-06, May/June 1989.

Ku, L., Shapiro, L., Crawford, P., and Huenemann, R., Body Composition and Physical Activity in Eight Year Old Children, <u>American Journal of Clinical Nutrition</u>, 34(12):2770-75, 1981.

Persellin, R. and Ku, L. Effects of Steroid Hormones on Human Polymorphonuclear Leukocyte Lysosomes, <u>Journal of Clinical Investigation</u>, 54(4):919-25, 1974.

## **Books Authored or Co-authored**

Ku, L., Lin, M. and Broaddus, M., <u>Improving Children's Health: A Chartbook about the Roles of Medicaid and SCHIP:  2007 Edition</u>, Center on Budget and Policy Priorities, Jan. 2007.

Ku, L. and Nimalendran, S. Improving Children's Health: A Chartbook About the Roles of Medicaid and SCHIP, Center on Budget and Policy Priorities, Jan. 15. 2004

Coughlin, T., Ku, L. and Holahan, J., Medicaid Since 1980: Costs, Coverage and the Shifting Alliance Between the Federal Government and the States, Washington, DC: Urban Institute Press, 1994. (Selected by *Choice* as one of ten outstanding academic books for 1994.)

Sorensen, E., Bean, F., Ku, L. and Zimmerman, W.,  Immigrant Categories and the U.S. Job Market: Do They Make a Difference?, Urban Institute Report 92-1, Washington, DC: Urban Institute Press, 1992.

## Articles or Chapters in Books (Refereed)

Ku, L. (contributor), CCH;s Law, Explanation and Analysis of the Patient Protection and Affordable Care Act, Vol.1, Commerce Clearinghouse, Wolters Kluwer, 2010.

Ku. L., Changes In Immigrants' Use of Medicaid and Food Stamps: the Role of Eligibility and Other Factors, in Immigrants and Welfare, edited by Michael Fix, Russell Sage Foundation and Migration Policy Institute, 2009, p, 153-92.

Ku, L. and Papademetrios, D.G., Access to Health Care and Health Insurance: Immigrants and Immigration, in Securing America's Future: U.S. Immigrant Integration Policy Reader, M. Fix, editor, Migration Policy Institute, Feb. 2007.

Sonenstein, F.L., Ellen, J.  Pleck, J.H., Ku, L..  Taking Risks: Understanding Adolescents' Behavior, in STDs in Adolescents:  Challenges for the 21st Century, edited by P. Hitchcock,  et al. New York: Oxford University Press Inc.1999.

Ku, L., Wooldridge, J., Rajan, S., Ellwood, M., Dubay, L., Coughlin, T., Hoag, S.  and Wall.  S.,  The New Generation of Statewide Medicaid Managed Care Programs: State Health Reform Projects in Hawaii, Oklahoma, Rhode Island and Tennessee in Remaking Medicaid: Managed Care for the Public Good, edited by Steve Davidson and Steve Somers, San Francisco: Jossey-Bass, Inc., 1998, p. 147-78.

Wooldridge, J., Ku, L., Coughlin, T., Dubay, L., Ellwood, M., Rajan, S.  and Hoag, S., Reforming State Medicaid Programs: First Year Implementation Experiences from Three States, in Contemporary Managed Care, edited by Marsha Gold, Health Administration Press, pp. 211-26, 1998.

Sonenstein, F., Ku, L., and Pleck, J.  Measuring Sexual Behavior Among Teenage Males in the U.S., in Researching Sexual Behavior: Methodological Issues, Bancroft, J., ed., Bloomington, IN: Indiana University Press, p. 87-105, 1997.

Turner, C.F., Ku, L., Sonenstein, F.L. and Pleck, J.H., Impact of Audio-CASI on Reporting of Male-male Sexual Contacts: Preliminary Findings from the National Survey of Adolescent Males, in Health Survey Research Methods: Conference Proceedings, Warnecke, R.B., ed., Hyattsville, MD: National Center for Health Statistics, p.  171-76, 1995.

Pleck, J., Sonenstein, F., and Ku, L., Problem Behaviors and Masculinity Ideology in Adolescent Males, in Adolescent Problem Behaviors: Issues and Research, R. Ketterlinus and M. Lamb, eds.,  Hillsdale, NJ: Erlbaum, 1994, p. 165-186.

Holahan, J., Coughlin, T., Ku, L., Heslam, D. and Winterbottom, C.,  Understanding the Recent Growth in Medicaid Spending, in Medicaid Financing Crisis: Balancing Responsibilities, Priorities and Dollars, D. Rowland, J. Feder and A. Salganicoff, eds., Washington, DC: AAAS Press, 1993, p. 23-44.

Sonenstein, F., Pleck, J. and Ku, L., Paternity Risk Among Adolescent Males in Young Unwed Fathers: Changing Roles and Emerging Policies, R. Lerman and T. Ooms, eds., Philadelphia, PA: Temple Univ. Press, p. 99-116, 1993.

Pleck, J., Sonenstein, F., and Ku, L., Masculine Ideology and Its Correlates in Gender Issues in Contemporary Society, S. Oskamp and M. Constanzo, eds., Claremont Symposium on Applied Social Psychology, Newbury Park: Sage Publications, p. 85-110, 1993.

## **Translational and Other Papers, Reports and Publications**

### *Health Policy*

[Note:  Reports marked with [PR] went through an external peer-review process prior to release.]

Ku, L., Seiler, N.  Medicaid Expansions Help States Cope with the Opioid Epidemic.  GW Dept of Health Policy and Management.  July 25, 2017.

Ku, L.  Cutting immigrants' access to health insurance would drive up costs for many Americans. *Washington Post*, Letter to the Editor.  July 18, 2017.

Ku, L., Steinmetz, E., Brantley, E., Holla, N., Bruen, B.  The Better Care Reconciliation Act: Economic and Employment Consequences for States.  Commonwealth Fund, July 6, 2017. http://www.commonwealthfund.org/publications/issue-briefs/2017/jul/bcra-economic-employment-consequences-states

Ku, L., Steinmetz, E., Brantley, E., Holla, N., Bruen, B.  The American Health Care Act: Economic and Employment Consequences for States.  Commonwealth Fund, June 14, 2017.  [PR] http://www.commonwealthfund.org/publications/issue-briefs/2017/jun/ahca-economic-and-employment-consequences
[Like the January 6th report, the June 14 and July 6 reports gained considerable interest and was widely cited by the media and by federal and state policy officials. This series of reports were among the most often downloaded reports for the Commonwealth  Fund.]

Ku, L., Paradise, J., Thompson, V.  Data Note: Medicaid's Role in Providing Access to Preventive Care for Adults. Kaiser Commission for Medicaid and the Uninsured.  May 17, 2017. http://kff.org/medicaid/issue-brief/data-note-medicaids-role-in-providing-access-to-preventive-care-for-adults/

Ku, L.  In podcast:  ACA Repeal Waves Goodbye to 3 Million Jobs and $1.5 Trillion.  The Working Life. May 10, 2017.  http://www.workinglife.org/politics/episode-29-aca-repeal-waves-goodbye-to-3-million-jobs-1-5-trillion/

Ku, L., Brantley, E.  Medicaid Work Requirements: Who's at Risk?  *Health Affairs Blog*, April 12, 2017. http://healthaffairs.org/blog/2017/04/12/medicaid-work-requirements-whos-at-risk/

Ku, L., Brantley, E.  Myths about the Medicaid Expansion and the "Able-Bodied." *Health Affairs Blog*, March 6, 2017.  http://healthaffairs.org/blog/2017/03/06/myths-about-the-medicaid-expansion-and-the-able-bodied/

Ku, L.  In podcast: The Financial Consequences of ACA Repeal.  The Commonwealth Fund.  Feb. 15, 2017. http://www.commonwealthfund.org/interactives-and-data/multimedia/podcasts/new-directions-in-health-care/the-impact-of-aca-repeal

Bennett J, Brown C, Ku L, Bruen B.  The Economic, Fiscal and Employment Effects of Health Care Modernization in Oklahoma.  State Chamber (of Commerce) Research Foundation.  Feb. 1, 2017. [PR] http://www.okstatechamber.com/sites/www.okstatechamber.com/files/OK%20Study%20-%20REMI%20FINAL.pdf

Mitchell, K.  Interview with Leighton Ku.  GW Expert: Repealing Obamacare Would Hurt Patients, Economy.  GW Today.  Jan. 17, 2017.   https://gwtoday.gwu.edu/gw-expert-repealing-obamacare-would-hurt-patients-economy

Ku, L. Steinmetz, E., Brantley, E., Bruen, B.  Repealing Federal Health Reform: The Economic and Employment Consequences for States.  Brief, Commonwealth Fund, Jan. 6, 2017. http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Jan/Repealing-Federal-Health-Reform [PR]

Ku, L. Steinmetz, E., Brantley, E., Bruen, B.  The Economic and Employment Consequences of Repealing Federal Health Reform: A 50 State Analysis.  Milken Institute School of Public Health, George Washington University.  Jan. 6, 2017. https://publichealth.gwu.edu/sites/default/files/downloads/HPM/Repealing_Federal_Health_Reform.pdf [PR]

[Note: The Jan. 6 reports were reported widely in numerous media including CBS, NBC, NPR, *Forbes, Fortune, the Atlanti*c, etc.  Findings were frequently cited by Congressmen and Senators in Congressional floor debates about repeal of the Affordable Care Act.]

Ku, L., Steinmetz, E., Bruen, B. Changes in Insurance Coverage and Cardiovascular Risk for U.S. Adults in States Expanding and Not Expanding Medicaid. Dec. 2016  George Washington University and American Heart Association.  [PR] https://publichealth.gwu.edu/sites/default/files/downloads/HPM/Americans%20Cardiovascular%20Risk%20and%20Changes%20in%20Health%20Insurance%20Coverage%20Dec%2016.pdf

Ku, L.   DC Health Link Has Expanded Health Insurance Coverage In The District.  DC Health Benefits Exchange Authority, Sept. 29, 2016 [no author listed] http://hbx.dc.gov/sites/default/files/dc/sites/hbx/publication/attachments/SurveyReportGainedCoverage%20final.pdf

Ku, L. Up in smoke: We'll spend billions tomorrow for not helping poor people quit smoking today, *The Conversation*.  July 12, 2016. https://theconversation.com/up-in-smoke-well-spend-billions-tomorrow-for-not-helping-poor-people-quit-smoking-today-60686

Ku, L.  The Role Of Medicaid In Pay For Success Models For Supportive Housing For Chronically Homeless Individuals: Opportunities And Challenges, Report to Office of the Assistant Secretary for Planing and Evaluation, HHS, under review. [PR]

Regenstein, M., Jewers, M., Nocella, K., Goldberg, D., Strasser, J., Ku, L., Mullan, F.  Cost Estimates for Training a Resident in a Teaching Health Center.  Report to HRSA.  GW Dept. of Health Policy and Management, Feb. 2016. [PR]

Lantz, P, Rosenbaum S., Ku, L. et al.  Opportunities for Pay for Success Demonstrations in HHS Programs, Office of the Assistant Secretary for Planning and Evaluation, HHS, forthcoming. [PR]

Ku, L., Steinmetz, E., Bruen B., Bysshe, T.  Effects of the Affordable Care Act on Health Insurance Coverage of Americans at Risk of Cardiovascular Disease, Washington, DC: American Heart Association.  Jan. 2016.

Ku, L., Steinmetz, E, Bysshe, T.  Continuity of Medicaid Coverage in an Era of Transition, Washington, DC: Association of Community Affiliated Plans, Nov. 1, 2015. [PR]

Ku, L., Bysshe, T., Steinmetz, E., Bruen B.  Health Reform and the Implications for Cancer Screening.  Report to American Cancer Society, Sept. 2015

Ku, L., Bysshe, T., Wu, X.  The Changing Community Health Center Workforce: 2007-13, GW Health Workforce Research Center, Sept. 22, 2015. [PR]

Ku, L., Mullan, F., Serrano, C., Barber, Z., Shin, P.  Teaching Health Centers: A Promising Approach for Building Primary Care Workforce for the 21st Century.  Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 40, March 10, 2015.
http://www.rchnfoundation.org/?p=4651

Rosenbaum, S., Ku, L, and others (unnamed authors).  *Amici Curiae* Brief Of Public Health Deans, Chairs, And Faculty And The American Public Health Association In Support Of Respondents to the Supreme Court of the United States re: *King v Burwell.*  Jan. 28, 2015. [PR]

Ku, L.  Covering the Uninsured Through DC Health Link: Report on the First Year.  DC Health Benefits Exchange Authority, Dec. 26, 2014.  http://hbx.dc.gov/node/978322  [PR]

Ku, L., Bruen, B., Steinmetz, E., Bysshe, T.  The Economic and Employment Costs of Not Expanding Medicaid in North Carolina: A County-Level Analysis. Dec. 2014.  Cone Health Foundation and Kate B. Reynolds Charitable Trust. At  www.ncmedicaidexpansion.com {PR]

Ku, L., Bruen, B., Steinmetz, E., Brown, C., Motamedi, R., Stottlemyer C.  Economic and Employment Effects of Expanding KanCare.  Kansas Hospital Association, Nov. 2014  at http://www.kha-net.org/.

Steinmetz, E., Bruen, B, Ku, L.  Children's Use of Dental Care in Medicaid:  Federal Fiscal Years 2000 – 2012. Report to CMS, Oct. 2014.  Posted at http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/dental-trends-2000-to-2012.pdf. [PR]

Stewart, A., Cox, M. Ku, L.  Health Insurance Benefits Advisors: Understanding Responsibilities, Regulations, Restrictions and Relevance in Implementing the Affordable Care Act.  GW Dept of Health Policy, Sept. 2014.  [PR]

Ku, L. Zur, J. Jones, E., Shin, P.Rosenbaum, S. How Medicaid Expansions and Future Community Health Center Funding Will Shape Capacity to Meet the Nation's Primary Care Needs: A 2014 Update Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 37, June 18, 2014.  [PR]

11

Miller, V., and Ku, L. The Impact of Government Transfer Programs on State and Regional Personal Incomes, Department of Health Policy Issue Brief, April 30, 2014.

Ku, L. Strengthening Immigrants' Health Access: Current Opportunities GW Department of Health Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29/

Ku, L. Zur, J. Jones, E., Shin, P.Rosenbaum, S. How Medicaid Expansions and Future Community Health Center Funding Will Shape Capacity to Meet the Nation's Primary Care Needs  Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 34, Nov. 18. 2013

Paradise J, Rosenbaum S, Shin P, Sharac J, Alvarez C, Zur J, Ku L. Providing outreach and enrollment assistance: lessons learned from community health centers in Massachusetts. The Henry J. Kaiser Family Foundation. September 24, 2013. Available at: http://kff.org/health-reform/issue-brief/providing-outreach-and-enrollment-assistance-lessons-learned-from-community-health-centers-in-massachusetts/

Ku, L, and Steinmetz, E.  Bridging the Gap: Continuity and Quality of Coverage in Medicaid, Washington DC: Association of Community Affiated Plans. Sept. 2013.  [PR]

Ku, L.  The Bipartisan Senate Immigration Bill: Implications for Health Coverage and Health Access, GW Department of Health Policy, Aug. 8, 2013

Ku, L. The Senate Immigration Bill's Impact on Health Care, blog posted at www.cmwf.org, Aug. 8, 2013. [PR]

Ku, L. Comprehensive Immigration Reform and Health Care: CBO's Analysis of S. 744, Dept of Health Policy report, June 20, 2013.  Also posted on *HealthReformGPS.org*.

Ku, L. Explaining Recent Changes in CBO Projections of Health Insurance Coverage and Costs under the Affordable Care Act, Implementation Brief posted on www.*HealthReformGPS.org*, June 5, 2013.

Ku, L.  Medicaid Expansions Using Private Plans: The Role of Premium Assistance and Cost-Sharing, commentary in www.*HealthReformGPS*.org April 2013. http://www.healthreformgps.org/resources/medicaid-expansions-using-private-plans-the-role-of-premium-assistance-and-cost-sharing-2/

Ku, L. and Bruen, B.  Poor Immigrants Use Public Benefits At a Lower Rate than Poor Native-Born Citizens, *Economic Development Bulletin* No. 17, Washington, DC: Cato Institute.  March 4, 2013 http://www.cato.org/sites/cato.org/files/pubs/pdf/edb17.pdf   [PR]

Brown, C., Motamedi, R., Stottlemeyer, C., Bruen, B. and Ku, L.  Economic and Employment Effects of Expanding Medicaid in Iowa, Regional Economic Models, Inc. and George Washington University. Prepared for Iowa Hospital Association. Mar. 2013. http://blog.iowahospital.org/wp-content/uploads/2013/03/IA-Medicaid-Expansion-Econ-Full-Report.pdf

Brown, C., Motamedi, R., Stottlemeyer, C., Bruen, B. and Ku, L.  Economic and Employment Effects of Expanding Medicaid in Arizona, Regional Economic Models, Inc. and George Washington University. Prepared for Arizona Hospital and Healthcare Association. Feb. 2013. http://www.azhha.org/member_and_media_resources/documents/ArizonaMedicaidExpansionReportREMI2-28-13_000.pdf

Brown, C., Motamedi, R., Stottlemeyer, C., Bruen, B. and Ku, L.  Economic and Employment Effects of Expanding Medicaid in Arkansas, Regional Economic Models, Inc. and George Washington University.

Prepared for Arkansas Hospital Association. Feb. 2013.
http://www.arkhospitals.org/Misc.%20Files/ReportBriefAppendix.pdf

Brown, C., Motamedi, R., Stottlemeyer, C., Bruen, B. and Ku, L.  Economic and Employment Effects of Expanding Medicaid in Kansas, Regional Economic Models, Inc. and George Washington University. Prepared for Kansas Hospital Association. Feb. 2013.
http://m.kha-net.org/communications/mediareleases/102615.aspx

Ku, L. and Bruen, B.  The Use of Public Assistance Benefits by Citizens and Non-citizen Immigrants in the United States.  Working Paper, Cato Institute, Feb. 2013. [PR]

Ku, L. and Jewers, M.  Health Care for Immigrants: Policies and Current Issues.  Migration Policy Institute, June 2013.  www.migrationpolicy.org [PR]

Ku, L., Bruen, B., and Steinmetz, E.  Task 9: Medicaid DSH Simulation: Final Report Report to the Office of the Assistant Secretary for Planning and Evaluation. Jan. 2013.  [PR]

Ku, L., Bruen, B., Steinmetz, E. and Beeson, T.  Task 7: Medicaid DSH Analytic Report Report to the Office of the Assistant Secretary for Planning and Evaluation. Oct. 2012. [PR]

Ku, L. Cartwright-Smith, L., Sharac, J.,  Steinmetz, E., Lewis, J. and Shin, P. Deteriorating Access to Women's Health Services in Texas: Potential Effects of the Women's Health Program Affiliate Rule, Geiger Gibson/RCHN CHF Research Collaborative Brief, Issue No. 31. October 11, 2012

Ku, L., Regenstein, M., Shin, P., Mead, H., Levy, A., Buchanan, K., Byrne, F. Coordinating and Integrating Care for Safety Net Patients: Lessons from Six Communities. George Washington University Dept. of Health Policy, May 21, 2012.

Ku, L., Levy, A., and Bruen, B.  The Potential Primary Care Crisis in Texas: A County-Based Analysis Report for Methodist Healthcare Ministries, April 2012.

Ku, L., Cunningham, M., Goetz-Goldberg, D., Darnell, J., Hiller, M. Quality Incentives for Federally Qualified Health Centers, Rural Health Clinics and Free Clinics: A Report To Congress, report prepared for U.S. Department of Health and Human Services for submission to Congress, January 23, 2012. [PR]

Ku, L.  Saving Money: The Massachusetts Medicaid Tobacco Cessation Benefit: A Policy Paper. Partnership for Prevention.  Jan. 2012.
http://www.prevent.org//data/images/roi%20policy%20paper_a.pdf

Ku, L., Levy, A., Lantz, P. and Pierre-Matthieu, R.  Options for CDC's Cancer Screening Programs: Implications of the Affordable Care Act.  Report to the American Cancer Society and Centers for Disease Control and Prevention, Nov. 15, 2011.  [PR]

Ku, L. Regenstein, M., Shin, P., Mead, H., Levy, A. Buchanan, K. and Byrne, F. Coordinating and Integrating Care for Safety Net Patients:  Lessons from Six Communities, Draft Report to the Commonwealth Fund, Sept. 2011.  [PR]

Ku, L., Regenstein, M., Shin, P., Bruen, B. and Byrne, F.R. Improving the Integration and Coordination of Safety Net Health Providers Under Health Reform: Key Issues, Commonwealth Fund Pub 1552, Oct. 2011.  Posted at http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2011/Oct/
1552_Ku_promoting_integration_safetynet_providers_under_reform_ib.pdf  [PR]

Ku, L., Shin, P., Jones, E. and Bruen, B.  Transforming Community Health Centers into Patient-Centered Medical Homes: The Role of Payment Reform, Report to the Commonwealth Fund, Sept. 28, 2011. Posted at http://www.commonwealthfund.org/Publications/Fund-Reports/2011/Sep/Transforming-Community-Health-Centers.aspx. [PR]

Ku, L. and Ferguson, C.  Medicaid Works: A Review of How Public Insurance Protects the Health and Finances of Low-Income Families and Individuals. First Focus and George Washington Univ. Dept. of Health Policy, June 2011.

Ku, L. Medicaid in the Bull's Eye.:  Blog posted at *Health Affairs* blog website.  April 15, 2011. http://healthaffairs.org/blog/2011/04/15/medicaid-in-the-bulls-eye.

Rosenbaum, S., Shin, P., Ku, L. Who Are the Health Center Patients Who Risk Losing Care Under the House of Representatives Proposed FY 2011 Spending Reductions?. Issue No. 20.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative Feb 24, 2011.

Ku, L., Richard, P., Dor, A., Tan, E., Shin, P., Rosenbaum, S.  Strengthening Primary Care to Bend the Cost Curve: The Expansion of Community Health Centers Through Health Reform, Brief No. 19.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative, June 30, 2010.

Ku, L., Shin, P., Bruen, B.  Can Health Care Investments Stimulate the Economy?.  Blog posted at *Health Affairs* blog website, March 16, 2010. http://healthaffairs.org/blog/2010/03/16/can-health-care-investments-stimulate-the-economy/

Shin, P.,Bruen, B., Jones, E. Ku, L. Rosenbaum, S.  The Economic Stimulus: Gauging the Early Effects of ARRA Funding on Health Centers and Medically Underserved Populations and Communities, Brief No. 17.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Feb. 2010.

Shin P, Bruen B, Ku L, Mead KH, Regenstein M, Rosenbaum S, Buchanan K, Smith K. The Early Impact of ARRA on Community Health Centers: Analysis of HCQR2. Report to Health Resources and Services Administration, Rockville, MD. February 2010.

Ku, L., Rosenbaum, S., Shin, P. Using Primary Care to Bend the Cost Curve: The Potential Impact of Health Center Expansion in Senate Reforms. Brief No. 16. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Oct 14, 2009.

Shin, P., Ku, L., Mauery, R., Finnegan, B., Rosenbaum, S. Estimating the Economic Gains for States as a Result of Medicaid Coverage Expansions for Adults, Brief No. 15. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Oct 7, 2009.

Ku, L., Richard, P., Dor, A., Tan, E., Shin, P., Rosenbaum, S. Using Primary Care to Bend the Curve: Estimating the Impact of a Health Center Expansion on Health Care Costs. Brief No. 14. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Sep 1, 2009.

Ku, L. Do Medicaid and CHIP Measure Errors Correctly?. Dept. of Health Policy, George Washington Univ. Aug. 4, 2009.

Ku, L., Shin, P., Rosenbaum, S. Estimating the Effects of Health Reform on Health Centers' Capacity to Expand to New Medically Underserved Communities and Populations. Issue No. 11. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Washington, DC. Jul 23, 2009.

Rosenbaum, S., Jones, E., Shin, P. and Ku, L. National Health Reform: How Will Medically Underserved Communities Fare? Geiger Gibson / RCHN Community Health Foundation Research Collaborative, Washington, DC. July 9, 2009.

Ku, L., MacTaggart, P., Pervez, F. and Rosenbaum. S.  Improving Medicaid's Continuity and Quality of Care, Association for Community Affiliated Plans, July 2009.  [PR]

Finnegan, B., Ku, L., Shin, P., Rosenbaum, S. Boosting Health Information Technology in Medicaid: The Potential Effect of the American Recovery and Reinvestment Act. Geiger Gibson / RCHN Community Health Foundation Research Collaborative, Washington, DC. July 7, 2009.

Ku, L. Expanding Coverage for Low-income Americans: Medicaid or Health Insurance Exchanges? Blog posted at *Health Affairs* blog website, June 23, 2009.  http://healthaffairs.org/blog/2009/06/23/expanding-coverage-for-low-income-americans-medicaid-of-health-insurance-exchanges/

Shin, P. Ku, L., Jones, E., Finnegan, B. and Rosenbaum, S.  Financing Community Health Centers As Patient- And Community-Centered Medical Homes:  A Primer, George Washington Univ., May 27, 2009. [PR]

Ku, L., Jones, E., Finnegan, B., Shin, P., and Rosenbaum, S. Community Health Centers in the Midst of Massachusetts' Health Reform:  How Is the Primary Care Safety Net Faring? Kaiser Commission on Medicaid and the Uninsured and Geiger Gibson Community Health Program.  March 2009. [PR]

Ku, L. Restoring Medicaid and SCHIP Coverage to Legal Immigrant Children and Pregnant Women: Implications for Community Health and Health Care for Tomorrow's Citizens, Geiger Gibson/RCHN Community Health Foundation Research Brief, Jan. 13, 2009.

Ku, L. and Feiden, K.  Examining the Health Consequences of the 2008-09 Recession, Rapid Public Health Policy Response Project, GW School of Public Health and Health Services, January 2009.

Ku, L. The Dial and the Dashboard: The Child Well-Being Index and Public Policy, prepared for the Foundation for Child Development, Jan. 2009.

Jones, E., Ku, L., Lippi, J., Whittington, R., and Rosenbaum, S. Designation of Medically Underserved and Health Professional Shortage Areas: Analysis of the Public Comments on the Withdrawn Proposed Regulation. Geiger Gibson/RCHN Community Health Foundation Research Brief #5. September 2008.

Shin, P., Ku, L., Jones, E., and Rosenbaum, S. Grantee-Level Estimates Show that 31 Percent of All Health Centers would Fail to Meet Tier Two Status under HRSA's Proposed MUA/MUP/HPSA Designation Regulations. Geiger Gibson/RCHN Community Health Foundation Research Brief #3. May 2008.

Shin, P., Ku, L., Jones, E. and Rosenbaum, S.  Analysis of the Proposed Rule on Designation of Medically Underserved Populations and Health Professional Shortage Areas, (report and highlights) Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Department of Health Policy, The George Washington University, revised May 1, 2008.

Ku, L. and Lindblom, E. (authors not named) Expanding Children's Health Insurance And Raising Federal Tobacco Taxes Helps Low-Income Families, Joint Paper of the Center on Budget and Policy Priorities and the Campaign for Tobacco-Free Kids, Oct. 16, 2007.

L. Ku, 'Crowd-Out' Is Not the Same as Voluntarily Dropping Private Health Insurance for Public

Program Coverage, Center on Budget and Policy Priorities, Sept. 27, 2007

R. Greenstein and L. Ku (authors not named) Charge That Bipartisan SCHIP Compromise Bill Aids Undocumented Immigrants Is False, Center on Budget and Policy Priorities, Sept. 25, 2007.

L. Ku, Collateral Damage: Children Can Lose Coverage When Their Parents Lose Health Insurance, Center on Budget and Policy Priorities, Sept. 17, 2007.

L. Ku (author not named), More Americans, Including More Children, Now Lack Health Insurance, Center on Budget and Policy Priorities, Aug. 31, 2007.

L. Ku, New Research Shows Simplifying Medicaid Can Reduce Children's Hospitalizations, Center on Budget and Policy Priorities, June 11, 2007.

Ku, L., Comparing Public and Private Health Insurance for Children, Center on Budget and Policy Priorities, May 11, 2007.

Ku, L., Reducing Disparities in Health Coverage for Legal Immigrant Children and Pregnant Women, Center on Budget and Policy Priorities, April 20, 2007.

Ku, L., Census Revises Estimates of the Number of Uninsured People, Center on Budget and Policy Priorities, April 5, 2007.

Ku, L., Schneider, A. and Solomon, J.,  The Administration Again Proposes to Shift Federal Medicaid Costs to States, Center on Budget and Policy Priorities, Feb.14, 2007.

Ku, L. Medicaid Costs Are Growing More Slowly Than Costs For Medicare or Private Insurance, Center on Budget and Policy Priorities, Nov. 13, 2006.

Ku, L. and Broaddus, M. Coverage of Parents Helps Children, Too, Center on Budget and Policy Priorities, Oct. 20, 2006.

Ku, L. Paying for Language Services in Medicare: Preliminary Options & Recommendations, National Health Law Program and Center on Budget and Policy Priorities, Oct. 2006. (www.healthlaw.org/library.cfm?fa=detail&id=118637&appView=folder)

Ku, L. and Broaddus, M. Is Medicaid Responsible for the Erosion of Employer-Based Health Coverage?, Center on Budget and Policy Priorities, Sept. 22, 2006.

Greenstein, R., Ku, L. and Dean, S. Survey Indicates House Bill Could Deny Voting Rights To Millions Of U.S. Citizens, Center on Budget and Policy Priorities, Sept. 22, 2006.

Ku, L., Cohen Ross, D. and Broaddus, M.  Documenting Citizenship and Identity Using Data Matches: A Promising Strategy for State Medicaid Programs, Center on Budget and Policy Priorities, Sept. 1, 2006.

Ku, L. Why Immigrants Lack Adequate Access to Health Care and Health Insurance, Migration Information Source, Migration Policy Institute, Sept. 2006. [PR](www.migrationinformation.org/Feature/display.cfm?id=417)

Kogan, R., Ku, L., et al. Budget Process Bill Would Result in Deep Cuts in Medicare and Medicaid, Center on Budget and Policy Priorities, Aug. 9, 2006.

Ku, L. Revised Medicaid Documentation Requirement Jeopardizes Coverage for 1 To 2 Million Citizens, Center on Budget and Policy Priorities, July 13, 2006.

Ku, L. Using Information Technology to Document Citizenship in Medicaid, Center on Budget and Policy Priorities, June 20, 2006.

Ku, L. The Slowdown in Medicaid Expenditure Growth, Center on Budget and Policy Priorities, March 13, 2006.

Ku, L. and Broaddus, M.  New Requirement For Birth Certificates or Passports Could Threaten Medicaid Coverage For Vulnerable Beneficiaries: A State-By-State Analysis, Center on Budget and Policy Priorities, Revised Feb. 17, 2006.

Ku, L. Cohen Ross, D. and Broaddus, M. Survey Indicates Deficit Reduction Act Jeopardizes Medicaid Coverage for 3 to 5 Million U.S. Citizens, Center on Budget and Policy Priorities, Revised Feb. 17, 2006.

Schneider, A., Ku, L., et al. Administration's Medicaid Proposals Would Shift Federal Costs to States, Center on Budget and Policy Priorities, Feb. 14, 2006.

Ku, L. and Cohen Ross, D. New Medicaid Requirement Is Unnecessary and Could Impede Citizens' Coverage, Center on Budget and Policy Priorities, Revised Jan. 4, 2006.

Wachino, V., Ku, L., et al. Medicaid Provisions of House Reconciliation Bill Both Harmful and Unnecessary Senate Bill Achieves Larger Savings Without Reducing Access to Care, Center on Budget and Policy Priorities, Dec. 9, 2005

Ku, L., Wachino, V. and Greenstein, R. The House Reconciliation Bill's Provisions On Medicaid Co-Payments and Premiums: Are They Mild or Harsh? Center on Budget and Policy Priorities, Nov. 22, 2005.

Wachino, V., Ku, L. , et al. An Analysis of The National Governors Association's Proposals For Short-Run Medicaid Reform Center on Budget and Policy Priorities, Oct. 14, 2005.

Ku, L. and Wachino, V. Don't Shift Medicaid's Costs onto Those Who Can Least Afford Them The Hill, July 20, 2005.

Ku, L. Medicaid: Improving Health, Saving Lives, Center on Budget and Policy Priorities, July 19, 2005.

Ku, L., New Research Sheds Light on Risks from Increasing Medicaid Cost-Sharing and Reducing Medicaid Benefits, Center on Budget and Policy Priorities, July 18, 2005.

Ku, L. And Wachino, V. Medicaid Commission Named By Secretary Leavitt Lacks Balance, Center on Budget and Policy Priorities, July 10, 2005

Ku, L. and Wachino, V. Assessing The National Governors Association's Proposals To Allow Increases In Cost-Sharing Charges To Medicaid Beneficiaries, Center on Budget and Policy Priorities, July 7, 2005.

Ku, L. and Wachino.V.  The Effect Of Increased Cost-Sharing In Medicaid: A Summary Of Research Findings, Center on Budget and Policy Priorities, Revised, July 7, 2005.

Ku, L. and Broaddus, M. Out-Of-Pocket Medical Expenses For Medicaid Beneficiaries Are Substantial And Growing, Center on Budget and Policy Priorities, May 31, 2005.

17

Ku, L. and Solomon, J. Is Missouri's Medicaid Program Out-of-Step and Inefficient?, Center on Budget and Policy Priorities, April 4, 2005.

Wachino, V., Schneider, A. and Ku, L. Medicaid Budget Proposals Would Shift Costs To States And Be Likely To Cause Reductions In Health Coverage: Administration's Proposal Also Implies Cap On Federal Funding, Center on Budget and Policy Priorities, Feb. 18, 2005

Ku, L., Broaddus, M. and Wachino, W. Medicaid and SCHIP Protected Insurance Coverage for Millions of Low-Income Americans, Jan. 31, 2005

Ku, L. and Wachino, V. The Potential Impact of Eliminating TennCare and Reverting to Medicaid: A Preliminary Analysis, Center on Budget and Policy Priorities, Nov. 15, 2004.

Ku, L., Deschamps, E. and Hilman, J., The Effects of Copayments on the Use of Medical Services and Prescription Drugs in Utah's Medicaid Program, Center on Budget and Policy Priorities, Nov. 2, 2004.

Ku, L. Will the New TennCare Cutbacks Help Tennessee's Economy? Center on Budget and Policy Priorities, July 8, 2004.

Ku, L. and Nimalendran, S. Losing Out: States Are Cutting 1.2 to 1.6 Million Low-Income People from Medicaid, SCHIP and Other State Health Insurance Programs, Center on Budget and Policy Priorities, Dec. 22, 2003.

Ku, L. and Broaddus, M. Funding Health Coverage For Low-Income Children In Washington, Center on Budget and Policy Priorities, Nov. 10, 2003.

Ku, L., Report Documents Growing Disparities in Health Care Coverage Between Immigrant and Citizen Children as Congress Debates Immigrant Care Legislation, Center on Budget and Policy Priorities, Oct. 14, 2003

Ku, L. CDC Data Show Medicaid and SCHIP Played a Critical Counter-Cyclical Role in Strengthening Health Insurance Coverage during the Economic Downturn, Center on Budget and Policy Priorities, Rev. Oct. 8, 2003.

Ku, L., How Many Low-Income Medicare Beneficiaries In Each State Would Be Denied The Medicare Prescription Drug Benefit Under The Senate Drug Bill? Center on Budget and Policy Priorities, July 31, 2003.

Ku, L., State Fiscal Relief Provides An Opportunity To Safeguard Medicaid Budgets, Center on Budget and Policy Priorities, June 4, 2003

Ku, L., Charging the Poor More For Health Care: Cost-Sharing In Medicaid, Center on Budget and Policy Priorities, May 7, 2003.

Ku, L., Fremstad, S. and Broaddus, M. Noncitizens' Use Of Public Benefits Has Declined Since 1996, Center on Budget and Policy Priorities, April 14, 2003.

Nathanson, M. and Ku, L. Proposed State Medicaid Cuts Would Jeopardize Health Insurance Coverage For 1.7 Million People: An Update, Center on Budget and Policy Priorities, Mar. 21, 2003.

Ku, L., Shift In Costs From Medicare To Medicaid Is A Principal Reason For Rising State Medicaid Expenditures, Center on Budget and Policy Priorities, March 3, 2003.

Ku, L., The Medicaid-Medicare Link: State Medicaid Programs Are Shouldering A Greater Share of The Costs Of Care For Seniors And People With Disabilities, Center on Budget and Policy Priorities, Feb. 25, 2003.

Ku, L., and Broaddus, M. Why Are States' Medicaid Expenditures Rising? Jan. 13, 2003.

Cohen-Ross, D. and Ku, L. Quarterly Status Reporting Could Jeopardize The Health Coverage Of Hundreds Of Thousands Of Eligible Low-Income Californians, Center on Budget and Policy Priorities, Revised Dec. 23, 2002

Ku, L., et al., Proposed State Medicaid Cuts Would Jeopardize Health Insurance Coverage for One Million People, Center on Budget and Policy Priorities, Dec. 23, 2002.

Ku, L. and Cohen-Ross, D. Staying Covered: The Importance of Retaining Health Insurance Coverage for Low-income Families, Commonwealth Fund, Dec. 2002.  (One of the most frequently downloaded Commonwealth Fund reports in 2006.) [PR]

Ku, L., New CDC Data Show the Importance of Sustaining Medicaid and SCHIP Coverage as Private Health Insurance Erodes in 2002, Center on Budget and Policy Priorities, Revised Oct. 8, 2002.

Ku, L., Cohen-Ross, D. and Nathanson, M. State Medicaid Cutbacks and the Federal Role In Providing Fiscal Relief to States, Center on Budget and Policy Priorities,  Revised. Aug. 8, 2002

Ku, L. and Park, E., Improving Transitional Medicaid to Promote Work and Strengthen Health Insurance Coverage, Center on Budget and Policy Priorities, April 29, 2002.

Capps, R., Ku, L. et al. How Are Immigrants Faring After Welfare Reform?  Preliminary Evidence from Los Angeles County and New York City, Report to the Office of the Assistant Secretary for Planning and Evaluation, Dept. of Health and Human Services, March 2002.  Available at http://aspe.hhs.gov/hsp/immigrants-faring02/index.htm.  [PR]

Broaddus, M., et al. Expanding Family Coverage: States' Medicaid Eligibility Policies for Working Families in the Year 2000, Center on Budget and Policy Priorities, Revised Feb. 2002.

Ku, L., and Park, E., Administration's Regulation to Reduce Medicaid Upper Payment Limit Would Further Worsen State Budget Crises, Center on Budget and Policy Priorities, Dec. 11, 2001.

Ku, L. and Park, E., Federal Aid to State Medicaid Programs Is Falling While the Economy Weakens, Center on Budget and Policy Priorities, Oct. 6, 2001.

Ku, L. and Rothbaum, E. Many States Are Considering Medicaid Cutbacks in the Midst of the Economic Downturn, Center on Budget and Policy Priorities, October 26, 2001.

Park, E. and Ku, L., Health Care Provisions of House Ways And Means Committee Stimulus Package Offer Little Help for the Health Insurance Needs of Unemployed Workers, Center on Budget and Policy Priorities, Oct. 19, 2001.

Park, E. and Ku, L., Temporary Medicaid Improvements As Part of a Stimulus Package, Center on

19

Budget and Policy Priorities, Oct. 9, 2001.

Ku, L., Counting the Uninsured: A Guide for the Perplexed, Center on Budget and Policy Priorities, Sept. 21, 2001

Park, E. and Ku, L. Administration Medicaid and SCHIP Waiver Policy Encourages States to Scale Back Benefits Significantly and Increase Cost-Sharing for Low-Income Beneficiaries, Center on Budget and Policy Priorities, August 15, 2001.

Ku, L. and Guyer, J., Medicaid Spending: Rising Again But Not to Crisis Levels, Center on Budget and Policy Priorities, April 20, 2001.

Broaddus, M. and Ku, L., Nearly 95 Percent of Low-Income Uninsured Children Now Are Eligible for Medicaid or SCHIP, Center on Budget and Policy Priorities, Dec. 6, 2000.
12/6/00

Ku, L. and Freilich, A., Caring for Immigrants: Health Care Safety Nets in Los Angeles, New York, Miami and Houston, Kaiser Commission on Medicaid and the Uninsured, Feb. 2001.

Holahan, J., Ku, L., and Pohl, M., Is Immigration Responsible for the Growth in the Number of Uninsured People? Kaiser Commission on Medicaid and the Uninsured, March 2001.

Ku, L. and Blaney, S., Health Coverage for Legal Immigrant Children: New Census Data Highlight Importance of Restoring Medicaid and SCHIP Coverage, Center on Budget and Policy Priorities, Revised. Oct. 10, 2000.

Ormond, B., Ku, L. and Bruen, B. Engine of Change or One Force among Many? Section 1115 Demonstration Projects and Trends in Medicaid Expenditures (Baltimore, MD: Health Care Financing Administration, February 2001).

Ku, L., Limiting Abuses of Medicaid Financing: HCFA's Plan to Regulate the Medicaid Upper Payment Limit, Center on Budget and Policy Priorities, Sept. 27, 2000.

Ku, L. and Broaddus, M., The Importance of Family-Based Insurance Expansions: New Research on the Effects of State Health Reforms, Center on Budget and Policy Priorities, September 5, 2000.

Ku, L. and Matani, S., Immigrants' Access to Health Care and Insurance on the Cusp of Welfare Reform, Assessing the New Federalism Discussion Paper 00-03, Washington, DC: The Urban Institute, June 2000.

Ku, L. and Garrett, B., How Welfare Reform and Economic Factors Affected Medicaid Participation: 1984-96, Assessing the New Federalism Discussion Paper 00-01, Washington, DC: The Urban Institute, February 2000.

Ku, L., Ellwood, M., Hoag, S., Ormond, B., and Wooldridge, J., The Evolution of Medicaid Managed Care Systems and Eligibility Expansions in Section 1115 Projects. Final report to the Health Care Financing Administration, from the Urban Institute and Mathematica Policy Research, Inc., May 2000. [PR]

Coughlin, T., Ku, L. and Kim, J., Reforming the Medicaid Disproportionate Share Program in the 1990s, Assessing the New Federalism, The Urban Institute, Discussion Paper 99-14, (joint release with Commonwealth Fund), 1999. [PR]

20

Ku, L. and Bruen, B., The Continuing Decline in Medicaid Coverage, Assessing the New Federalism Brief A-37, The Urban Institute, December 1999.

Ku, L., Ullman, F. and Almeida, R., What Counts? Determining Medicaid and CHIP Eligibility for Children, Assessing the New Federalism Discussion Paper 99-05, Washington, DC: The Urban Institute, 1999.

Ku, L. and Hoag, S. Medicaid Managed Care and the Marketplace: State Health Reforms in Hawaii, Oklahoma, Rhode Island and Tennessee, Report to the Health Care Financing Administration from the Urban Institute and Mathematica Policy Research, February 1998.

Ku, L.  and Kessler, B.  The Number and Cost of Immigrants on Medicaid: National and State Estimates, Report to the Office of the Assistant Secretary for Planning and Evaluation from the Urban Institute, December 1997. [PR]

Ku, L., Berkowitz, A., Ullman, F. and Regenstein, M. Health Policy for Low-Income People in Mississippi, Assessing the New Federalism, Washington, DC: The Urban Institute, December 1997. [PR]

Nichols, L., Ku, L., Norton, S. and Wall, S. Health Policy for Low-Income People in Washington Assessing the New Federalism, Washington, DC: The Urban Institute, November 1997. [PR]

Ku, L.  and Wall, S. The Implementation of Oklahoma's Medicaid Reform Program: SoonerCare, Report to the Health Care Financing Administration from the Urban Institute and Mathematica Policy Research, October 1997. [PR]

Ku, L.  and Coughlin, T., The Use of Sliding Scale Premiums in Subsidized Insurance Programs, Urban Institute Working Paper, March 1997. [PR]

Ku, L.  and Coughlin, T., How the New Welfare Reform Law Affects Medicaid, Assessing New Federalism Policy Brief No. A-7, the Urban Institute, February 1997. [PR]

Wooldridge, J., Ku, L., Coughlin, T., Dubay, L., Ellwood, M., Rajan, S.  and Hoag, S., Reforming State Medicaid Programs: First Year Implementation Experiences from Three States, Mathematica Policy Research, January 1997. [PR]

Wooldridge, J., Ku, L., Coughlin, T., Dubay, L., Ellwood, M., Rajan, S.  and Hoag, S.,  Implementing State Health Care Reform: What Have We Learned from the First Year?  The First Annual Report of the Evaluation of Health Reform in Five States.  Report to the Health Care Financing Administration, from Mathematica Policy Research Inc. and the Urban Institute, December 1996.  [PR]

Ku, L., Wade, M.  and Dodds, S., How Cost-Reimbursement Affected Patients, Health Centers and Medicaid: The Federally Qualified Health Center Program, Report to the Health Care Financing Administration, from the Urban Institute and Mathematica Policy Research, Inc., August 1996.

Long, S., Ciemnecki, A., Coughlin, T., Kenney, G., Ku, L., Mitchell, J., Rajan, S., Rosenbach, M., Thornton, C., Wade, M., Zuckerman, S., Designing an Evaluation of the Medicaid Health Reform Demonstrations, Report to the Health Care Financing Administration, from the Urban Institute, Center for Health Economics Research and Mathematica Policy Research, Inc., Feb. 1996.

Holahan, J., Coughlin, T., Liu, K., Ku, L., Kuntz, C., Wade, M. and Wall, S.  Cutting Medicaid Spending in Response to Budget Caps, Report to the Kaiser Commission on the Future of Medicaid, Sept. 1995. [PR]

Wade, M., Ku., L. and Dodds, S. (1995).  The Impact of the Medicaid FQHC Program on Center Users, FQHCs and the Medicaid Program, Urban Institute Working Paper 06428-03, May 1995.

Ku, L. and Coughlin, T.  Medicaid Disproportionate Share and Related Programs: A Fiscal Dilemma for the States and the Federal Government, Report to the Kaiser Commission on the Future of Medicaid from the Urban Institute, December 1994.

Holahan, J., Coughlin, T., Ku, L., Lipson, D. and Rajan, S., Increasing Insurance Coverage through Medicaid Waiver Programs, Urban Institute Working Paper 06433-005-01, November 1994.

Rajan, S., Coughlin, T., Ku, L., Holahan, J. and Lipson, D., Increasing Insurance Coverage through Medicaid Waiver Programs: Case Studies, Urban Institute Working Paper 06433-005-02, November 1994.

Ku, L., Publicly Supported Family Planning in the United States: Financing of Family Planning Services. Report to the Kaiser Family Foundation, The Urban Institute, June 1993.

Holahan, J., Coughlin, T., Ku, L., Heslam, D. and Winterbottom, C.,  The States' Response to Medicaid Financing Crisis: Case Studies Report, Health Policy Center Report 6272-02, The Urban Institute, December 1992 (revised).

Sonenstein, F., Ku, L., Juffras, J. and Cohen, B., Promising Prevention Programs for Children,  Report to the United Way of America, The Urban Institute, March 1991.

Ellwood, M.R. and Ku, L., Summary and Policy Recommendations: Studies on Health Care Services to Severely Disabled Children, Report Submitted to the Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/ McGraw-Hill, August 1990.

Ku, L., Who's Paying the Big Bills?: Very High Cost Pediatric Hospitalizations in California in 1987, Report to Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/McGraw-Hill, August 1990.

Sonenstein, F., Ku, L., Adams, E.K, and Orloff, T.,  Potential Research Strategies to Evaluate the Effect of Transitional Medicaid and Child Care Benefits, Report to the Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/McGraw-Hill, May 1990.

### HIV/AIDS and Reproductive Health

Lindberg, L., Ku, L. and Sonenstein, F.  Minor Mothers and Adult Fathers: Age Differences Between Teen Mothers and Their Partners,  Urban Institute Working Paper, 1996.

Sonenstein, F.L., Pleck, J.H. and Ku, L., Why Young Men Don't Use Condoms: Factors Related to Consistency of Utilization, Sexuality and American Policy Seminar Series, Kaiser Family Foundation and American Enterprise Institute for Public Policy Research, Washington, D.C., May 1995.

Ku, L. and the NSAM Study Team, Preliminary Results of the Pretest for the National Survey of Adolescent Males, Report to the Centers for Disease Control and Prevention and the National Institute for Child Health and Human Development, November 1994.

Ku, L., Levine, G. and Sonenstein, F., State STD Reporting Rules and Research Surveys, Report to the Centers for Disease Control and Prevention, September 1994.

Sonenstein, F., Pleck, J., and Ku, L., The Male Side of the Equation, <u>TEC Networks</u>, 33:3-4, June 1992.

Sonenstein, F., Pleck, J., and Ku, L.,  <u>Influences on Adolescent Male Premarital Sexual Behavior</u>, Final Report to the Office of Population Affairs, DHHS from Urban Institute, May 1992.

Sonenstein, F., Pleck, J. and Ku, L., Sex and Contraception Among Adolescent Males,  <u>TEC Networks</u>, 29:1-3, June 1991.

Sonenstein, F., Pleck, J., Calhoun, C., and Ku, L., <u>1988 National Survey of Adolescent Males: A User's Guide to the Machine Readable Files and Documentation</u>, Data Set G6, Data Archives on Adolescent Pregnancy and Pregnancy Prevention, Los Altos, CA: Sociometrics Corp, 1991.

Sonenstein, F., Pleck, J., Calhoun, C., and Ku, L., <u>Determinants of Contraceptive Use by Adolescent Males</u>, Final Report to the National Institute for Child Health and Human Development, Urban Institute, February 1991.

***Food and Nutrition Policy***

Ku, L., Debating WIC, <u>The Public Interest</u>, 135: 108-12, Spring 1999. [PR]

Ku, L., Cohen, B. and Pindus, N., Full Funding for WIC: A Policy Review, Washington, DC: Urban Institute Press, 1994.

Ku, L., Long, S., Brayfield, A. and others, <u>Low-Income Children's Nutritional Needs and Participation in USDA's Food Assistance Programs</u>.  Final Report to the Food and Nutrition Service, USDA from the Urban Institute, September 1993.

Ku, L., Institutional Participation in the National School Lunch and Breakfast Programs, Final Report to the Food and Nutrition Service, USDA from the Urban Institute, March 1993.

Ku, L., Reported Meal Production Costs and Reimbursement Rates in the National School Lunch Program, Draft Report to the Food and Nutrition Service, USDA from the Urban Institute, April 1992.

Ku, L., Brayfield, A., and others, Evaluation of Low-Income Children's Nutritional Needs and Participation in USDA's Food Assistance Programs: Conceptual Assessment.  Report to Food and Nutrition Service, USDA from the Urban Institute, February 1992.

Ku, L. and McKearn, M. Effects of the Temporary Emergency Food Assistance Program (TEFAP) on Displacement of Commercial Sales, (with the Economic Research Service and Mathematica Policy Research), Report to Congress, U.S. Dept. of Agriculture, August 1987.*  [PR]

Ku, L. and Dalrymple, R., Differences Between SIPP and Food and Nutrition Service Program Data on Child Nutrition and WIC Program Participation, <u>Survey of Income and Program Participation (SIPP) Working Papers</u>, No. 8707, Bureau of the Census, May 1987.

Ku, L., Nutritional Research Relating to Infant Feeding in the WIC Program, Report to the Assistant Secretary for Food and Consumer Services, June 1986.*

Richman, L., Hidelbaugh, T., McMahon-Cox, N., Ku, L., Dayton, C.M. and Goodrich, N.  <u>Study of WIC Participant and Program Characteristics</u>, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture (with Ebon Research Systems and Abt Associates Inc.), April 1986. [PR]

Ku, L., Abbot, J. and Forchheimer, M., <u>The Feasibility, Costs and Impacts of a Universal School Lunch Program</u>, Draft Report to Congress, U.S. Dept. of Agriculture, June 1985.

Puma, M. and Ku, L., Economic Analysis of the Temporary Emergency Food Assistance Program, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture, May 1985.* [PR]

Ku, L. and Nichols, A., <u>Report on the Food Bank Demonstration Project</u>, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture, April 1984.* [PR]

*       These reports were issued as official Agency or Department reports with no listed authors. In addition, Leighton Ku wrote numerous proposed and final regulations and legislative and budget reports while on the staff of the Food and Nutrition Service. In many cases, these were published in the <u>Federal Register</u>, <u>Congressional Record</u> and related Federal series.

## Presentations and Testimony

Ku, L. Economic and Employment Effects of the Better Care Reconciliation Act. Testimony to the Maryland Legislative Health Insurance Coverage Protection Commission, Annapolis House of Delegates, Aug. 1, 2017. Similar presentation at REMI webinar, Aug. 2, 2017.

Ku, L. Economic and Employment Effects of the American Health Care Act. Presentation at AcademyHealth Annual Research Conference, New Orleans, June 25, 2017. Similar presentations at Policy in the Trump Era: National, State, and Regional Economic Impacts Conference, Hall of States, Washington, D.C. June 19, 2017 and at Medicaid Policy Conference, Council of State Governments, Washington, DC, June 29, 2017.

Ku, L. Repealing Obamacare: Effects on the Health Workforce. Presentation at AcademyHealth Annual Research Conference, New Orleans, June 26, 2017.

Brantley, E., Ku, L. Promoting Tobacco Cessation: The Role of Medicaid and Other Policies. Poster at AcademyHealth Annual Research Conference, New Orleans, June 26, 2017.

Ku, L. The Future of Medicaid. Conference on Obamacare After Obama. Southern Illinois Healthcare/Southern Illinois University School of Law. Springfield, IL, May 19, 2017.

Brantley, E. Ku, L. Linking Data to Uncover Medicaid's Role in Cessation. National Conference on Tobacco or Health, Austin TX, March 23, 2107.

Ku, L. The Future of Medicaid and the Safety Net. Health Policy Expert Series. Milken Insitute School of Public Health. March 21, 2017.

Ku, L. Financial Consequences of ACA Repeal. Podcast, Feb. 15, 2017
http://www.commonwealthfund.org/interactives-and-data/multimedia/podcasts/new-directions-in-health-care/the-impact-of-aca-repeal

Ku, L. Repealing Health Reform: Economic and Employment Consequences for States. REMI Seminar, Washington, DC. Jan. 27, 2016. Similar national webinar Feb. 1, 2017.

Ku, L. Pay for Success Demonstrations of Supportive Housing for Chronically Homeless Individuals: The Role of Medicaid. Association for Public Policy and Management Research Conference, Washington, DC. Nov. 4, 2016.

Ku, L.  Immigrants and Community Health Centers.  Pennsylvania Association of Community Health Centers, Lancaster PA.  Oct. 12, 2016.

Ku, L. Moving Medicaid Data Forward (discussant).  Mathematica Policy Research, Washington, DC Oct. 11, 2016.

Ku, L.  Medicaid Can Do More to Help Smokers Quit, Michael Davis Lecture, University of Chicago, Oct. 4, 2016.  Similar seminar at Univ. of Maryland, Sept. 15, 2016.

Ku, L. and Borkowski, L.  Publish or Perish: Advice for Publishing for Peer-Reviewed Journals in Health Policy. GW Department of Health Policy & Management seminar, Sept. 20, 2016.

Ku, L.  Family Planning, Health Reform and Potential Restrictions on Coverage or Access,  presented at Contraception Challenged: Putting *Zubik v. Burwell* in Context, sponsored by National Family Planning and Reproductive Health Association meeting at Capitol Visitors Center, Washington, DC, June 7, 2016.

Ku, L. Russell, T. et al.  Debate on the Role of Public Programs in Care for the Poor.  Benjamin Rush Institute, Washington, DC, April 1, 2016.

Brantley, E., Ku, L. Improved Access and Coverage Under The ACA: Are Immigrants at the Table?, presented at GW Research Day, March 30, 2016.  (Won prize for best policy and practice research.)

Ku, L. The Role of the Health Care Safety Net, Virginia Commonwealth University, Richmond, March 17, 2016.

Ku, L., Steinmetz, E., Bysshe, T.  Medicaid Continuity of Coverage in an Era of Transition.  Webinar for Association of Community-Affiliated Plans, Nov. 2, 2015.

Ku, L. Bruen, B., Steinmetz, E., Bysshe, T.  Trends in Tobacco Cessation Among Medicaid Enrollees, presented at AcademyHealth Annual Research Meeting, Minneapolis, June 15, 2015.

Ku, L. Using Economic Impact Analysis in Medicaid Advocacy, presented at AcademyHealth Annual Research Meeting, Minneapolis, June 13, 2015.

Ku, L. The Translation of Health Services Research into Policy Related to the Affordable Care Act, Presented at American Association of Medical Colleges, March 20, 2015.

Ku, L.  Policy and Market Pressures on Safety Net Providers, National Health Policy Conference, Feb. 10, 2015.

Ku, L. 'Economic and Employment Costs of Not Expanding Medicaid in North Carolina, Cone Health Foundation, Greensboro, NC, Jan. 9, 2015.

Ku, L.  Health Reform: How Did We Get Here, What the Heck Is Going On and What Next? Keynote Address: Medical Librarians Association, Alexandria VA, Oct. 20, 2014.

Ku, L. Health Reform and the Safety Net.  Testimony before Maryland Community Health Resources Commission.  Annapolis, MD, Oct. 2, 2014.

Ku, L. Some Key Issues in Health Reform. Presented at American Association for the Advancment of Science Health Policy Affinity Group Meeting, Washington, DC July 24, 2014.

Ku, L., Curtis, D. Barlow P.  District of Columbia's Health Benefits Exchange at the Launch of a State-Based Exchange: Challenges and Lessons Learned Georgetown Law School Summer Session on Health Reform,  July 23, 2014.

Ku, L.  The Big Picture on Medicaid for State Legislators  Presented at Council of State Governments. Medicaid Workshop for Health Leaders, Washington, DC June 20, 2014.

Ku, L., Frogner, B., Steinmetz, E., Pittman, P.  Many Paths to Primary Care: Flexible Staffing and Productivity in Community Health Centers, Presented at Annual Research Conference AcademyHealth, San Diego, CA, June 10, 2014.

Ku, L. Zur, J., Jones, E., Shin, P, and Rosenbaum, S.  How Medicaid Expansions and Post-ACA Funding Will Affect Community Health Centers' Capacity.  Presented at Annual Research Conference AcademyHealth, San Diego, CA, June 9, 2014.

Ku, L. Critical Issues for Community Health Centers, Alliance for Health Reform briefing, Commonwealth Fund, Washington, DC.  May 16, 2014.

Ku, L.  Immigrants' Health Access: At the Nexus of Welfare, Health and Immigration Reform, Keynote talk at Leadership Conference on Health Disparities, Harvard Medical School, Boston, MA May 6, 2014.

Ku, L.  Wellness and the District of Columbia. District of Columbia Chamber of Commerce forum, Washington, DC, March 11, 2014.

Ku, L.  Health Care for Immigrant Families: A National Overview. Congressional Health Justice Summit, Univ. of New Mexico - Robert Wood Johnson Center for Health Policy, Albuquerque, NM, Sept. 7, 2013.

Ku, L.  Health Reform: Promoting Cancer Prevention and Care.  Talk to DC Citywide Navigators Network, Washington, DC, July 15, 2013.

Ku, L. Analyzing Policies to Promote Prevention and Health Reform.  Seminar at the Centers for Disease Prevention and Promotion, Atlanta, GA.  July 10, 2013.

Ku, L. Medicaid: Key Issues for State Legislators.  Council on State Governments, Medicaid Workshop for Health Leaders, Washington, DC, June 22, 2013.

Ku. L. and Steinmetz, E.  Improving Medicaid's Continuity of Care: An Update.  Association of Community Plans Congressional Briefing, May 10, 2013.

Ku, L. (with C. Brown, R. Motamedi, C. Stottlemeyer and B. Bruen) Economic and Employment Impacts of Medicaid Expansions.  REMI Monthly Policy Seminar, Washington, DC, April 24, 2013.

Ku, L. Building Texas' Primary Care Workforce, Legislative Briefing: Health Care Coverage Expansion & Primary Care Access in Texas, Center on Public Priorties and Methodist Healthcare Ministries, Texas Capitol, Austin, TX, Mar. 8, 2013

Ku, L. and Jewers, M.  Health Care for Immigrants: Policies and Issues in a New Year. Presentation to Conference on  After the Election: Policies Affecting Young Children of Immigrants, Migration Policy Institute, Washington, DC, Jan. 17, 2013.

Ku, L. Health Reform and the New Health Insurance Exchanges: Issues for Indiana Families, Indiana Family Impact Seminar at Indiana State Legislature, Nov. 19, 2012.

Ku, L.  Pediatric Preventive Medical and Dental Care: The Role of Insurance and Poverty, AcademyHealth Annual Research Meeting, Orlando, FL, June 24, 2012.

Ku, L. A Medicaid Tobacco Cessation Benefit: Return on Investment, Webinar for Partnership for Prevention and Action to Quit, Feb. 8, 2012.

Ku, L. Safety Net Financing Issues, Webinar for National Workgroup on Integrating a Safety Net, National Academy for State Health Policy, Feb. 6, 2012

Ku, L.  How Medicaid Helps Children: An Introduction.  Briefing to Congressional Children's Health Caucus, Jan. 25, 2012

Ku, L. Market Access Webinar: Provider Access: Coordinating Medicaid & Exchanges: Continuity of Services & the Role of Safety Net Providers, Webinar for Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, Dec. 15, 2011.

Ku, L. The Safety Net: An Evolving Landscape, Presented to Grantmakers in Health, Washington, DC. Nov. 3, 2011.  [Similar talks in Orlando, FL to Blue Cross Blue Shield of Florida Foundation, Feb. 17, 2012 and in Williamsburg, VA to Williamsburg Community Health Foundation Apr. 3, 2012 and to Virginia Health Foundation, Nov. 13, 2012]

Ku, L. Open Access Publishing.  Presented at forum for GW Medical Center faculty and staff, Oct. 24, 2011.

Ku, L. and Levy, A.  Implications of Health Reform for CDC's Cancer Screening Programs: Preliminary Results, Presentation to National Breast and Cervical Cancer Early Detection Program and Colorectal Cancer Control Program Directors Meeting, Atlanta, GA, Oct. 21, 2011.

Ku, L. Coordinating Medicaid & Exchanges: Continuity of Services & the Role of Safety Net Providers, Presented to America's Health Insurance Plans, Washington, DC. Sept. 16, 2011.

Ku, L. The Potential Impact of Health Reform on CDC's Cancer Screening Programs: Preliminary Results, Presented to NBCCEDP Federal Advisory Committee Meeting, Atlanta, GA, Jun. 17, 2011.  (Similar presentations to the American Cancer Society, Sept. 2011.)

Ku, L. Crystal Balls and Safety Nets: What Happens After Health Reform?  Presented at AcademyHealth, Seattle, WA, June 2011.

Ku, L. Strengthening Primary Care to Bend the Cost Curve: Using Research to Inform U.S. Policy, International Community Health Center Conference, Toronto, Canada, June 2011

Ku, L. Integrating/Coordinating Care for Safety Net Providers: Issues and Local Examples, International Community Health Center Conference, Toronto, Canada, June 2011.

Ku, L. Health Reform: Federal Implementation and More Unanswered Questions Presented at American Society of Public Administration, Baltimore, MD, Mar. 14, 2011.

Ku, L.  Key Issues in the Confusing World of Health Reform, Presented to Industrial College of the

Armed Forces, National Defense University, Washington, DC, Feb. 25, 2011.

Ku, L. Reducing Disparities and Public Policy Conflicts, Institute of Medicine Workshop on Reducing Disparities in Life Expectancy, Washington, DC, Feb. 24, 2011.

Ku, L. Primary Care, Hospitalizations and Health Reform, American Enterprise Institute Workshop, Washington, DC, Feb. 17, 2011.

Ku, L. The Promise and Perils of Health Policy for Asians in the United States, Invited keynote talk at 4th International Asian Health and Wellbeing Conference, Univ. of Auckland, New Zealand, NZ, July 6, 2010.  Similar talk at symposium sponsored by the New Zealand Office of Ethnic Affairs, Wellington, NZ, July 8, 2010.

Ku, L., Strengthening Primary Care to Bend the Cost Curve: The Expansion of Community Health Centers Through Health Reform, Briefing for Senate and House staff and media, convened by Sen. Bernie Sanders (VT), Russell Senate Office Building, June 30, 2010.

Ku, L. Ready, Set, Plan, Implement.  Executing Medicaid's Expansion, *Health Affairs* Conference on Health Reform, Washington, DC, June 8, 2010.

Ku, L. Coordinating Care Among Safety Net Providers, Primary Care Forum, National Academy of State Health Policy, Alexandria, VA, June 2, 2010.

Ku, L. Title VI: The Role of Culturally Competent Communication in Reducing Ethnic and Racial Health Care Disparities, National Minority AIDS Education and Training Center Spring Symposium, Howard Univ.  May 29, 2010.

Ku, L. American Health Reform as Massive Incrementalism, American Association for Budget and Program Analysis, Nov. 24, 2009.

Ku, L. The Health Care Safety Net and Health Reform, National Academy of Public Administration, Conference on Health Care for the Future, Nov. 22, 2009.

Ku, L. The Health of Latino Children, National Council of La Raza Symposium on Latino Children and Youth, Oct. 22, 2009.

Ku, L. What the Obama Administration Will Mean for Child Health, AcademyHealth preconference session on Child Health, Chicago, IL June 2009.

Ku, L. Immigrants and health reform,  6th Annual Immigration and Law Conference, Georgetown Univ. Law School, Migration Policy Institute and Catholic Legal Immigration Network, Washington, DC, June 24, 2009.

Ku, L. From the Politics of No! to the Potential for Progress, invited keynote talk about immigrant policy and research to Society for Research in Child Development, Denver, CO, April 1, 2009.

Ku, L. Strengthening the Primary Care Safety Net, National Association of Community Health Centers, Policy and Issues Conference, March 26, 2009.

Ku, L. The Dial and the Dashboard: Assessing the Child Well-Being Index, Presentation to the Board of the Foundation for Child Development, March 3, 2009.

Ku, L. Key Data Concerning Health Coverage for Legal Immigrant Children and Pregnant Women, invited presentation to Senate staff, Jan. 13, 2009.

Ku, L. Comparing the Obama and McCain Health Plans, George Washington Univ. Medical School Alumni Conference, Sept. 27, 2008.

Ku, L. The Future of Medicaid, Medicaid Congress, sponsored by Avalere Health and Health Affairs, Washington, DC, June 5, 2008.

Ku, L. A Brief Appreciation of Health Advocates: Progress Made, Some Setbacks, Challenges Ahead, Public Interest Law Center of Philadelphia Conference, Philadelphia, PA, May 14, 2008.

Ku, L. Financing Health Care Reform in New Jersey: Making Down Payments on Reform, Rutgers-AARP Conference, New Brunswick, NJ. Mar. 18, 2008

Ku, L., Perez, T. and Lillie-Blanton, M.  Immigration and Health Care-What Are the Issues, Kaiser Family Foundation HealthCast, webcast interview March 12, 2008.

Ku, L. How Research Might Affect SCHIP Reauthorization, Child Health Services Research Meeting at AcademyHealth, Orlando, FL, June 2, 2007.

Ku, L. Immigrant Children and SCHIP Reauthorization, Capital Hill Briefing conducted by the Population Resource Center, April 20, 2007.

Ku, L. Health Policy and Think Tanks, Robert Wood Johnson Health Policy Fellows, Institute of Medicine, June 2006.  Similar talk in other years.

Ku, L. Medicaid Reform and Mental Health, National Alliance for the Mentally Ill, Annual Conference, Austin, TX, June 20, 2005.

Ku, L. Cost-sharing in Medicaid and SCHIP: Research and Issues, National Association of State Medicaid Directors, Washington, DC, Nov. 18, 2004.  Similar talk given to National Academy of State Health Policy, St. Louis, MO, Aug. 2, 2004.

Ku, L. Coverage of Poverty-Level Aged and Disabled in Mississippi's Medicaid Program, Testimony to Mississippi Senate Public Health and Welfare Committee, Aug. 24, 2004

Ku, L. Medicaid Managed Care Issues, Testimony to Georgia House of Representatives Appropriations Committee, March 2, 2004.

Ku, L. Medi-Cal Budget Issues, Testimony to Joint Hearing of California Senate Budget and Health and Human Services Committees, Feb. 26, 2003.

Ku, L. New Opportunities to Improve Health Care Access and Coverage, American College of Emergency Physicians, May 1, 2001.

Ku, L., Medicaid DSH and UPL: Perplexing Issues, National Association of Public Hospitals Health Policy Fellows Conference, Washington, DC, Mar. 20, 2001.

Ku, L., Insurance Coverage and Health Care Access for Immigrant Families, Testimony Before the U.S. Senate Finance Committee, Washington, DC, March 13, 2001.

Ku, L. Increasing Health Insurance Coverage for Low-Income Families and Children, Insuring the Uninsured Project Conference, Sacramento, CA, Feb. 13, 2001.

Ku, L., Concerning the Healthy Families Program Parent Expansion Proposal, Testimony Before a Joint Hearing of the California Senate Health and Human Services and Insurance Committees and Budget and Fiscal Review Subcommittee # 3, Sacramento, CA, January 30, 2001.

Ku, L., Insurance Trends and Strategies for Covering the Uninsured, National Health Law Program Conference, Washington, DC, Dec. 3, 2000.

Ku, L., Improving Health Care Access and Coverage: New Opportunities for States in 2001, Midwest Leadership Conference, Council of State Governments, Minneapolis, MN, August 6, 2000.

Ku, L., Health Care for Immigrants: Recent Trends and Policy Issues,  Alliance for Health Reform, Washington, DC, August 2, 2000.  Similar talks in Miami at Florida Governor's Health Care Summit and in San Diego at California Program on Access to Care conference.

Ku, L. and Matani, S., Immigrants' Access to Health Care and Insurance on the Cusp of Welfare Reform, presented at Association for Health Services Research Conference, Los Angeles, CA, June 25, 2000.

Ku, L. and Matani, S. Immigrants and Health Care: Recent Trends and Issues, presented to the Association of Maternal and Child Health Programs meeting, Washington, DC, March 7, 2000.

Ku, L., Ellwood, M., Hoag, S., Ormond, B. and Wooldridge, J. Building a Newer Mousetrap: the Evolution of Medicaid Managed Care Systems and Eligibility Expansions in Section 1115 Projects, presented at American Public Health Association meeting, Chicago, IL, Nov. 10, 1999.

Ku, L. Young Men's Reproductive Health: Risk Behaviors and Medical Care@, presented at D.C. Campaign to Prevent Teen Pregnancy Meeting, Washington, DC, Oct. 19, 1999.

Ku, L., Medicaid and Welfare Reform: Recent Data, presented at Getting Kids Covered Conference, sponsored by National Institute for Health Care Management and Health Resources and Services Administration, Washington, DC, Oct. 6, 1999.

Ku, L. and Garrett, B., How Welfare Reform and Economic Factors Affected Medicaid Participation, presented at Association for Health Services Research meeting, Chicago, IL, June 29, 1999.

Recent Factors Affecting Young Men's Condom Use, presented to conference sponsored by National Campaign to Prevent Teen Pregnancy and Advocates for Youth, Washington, DC, February 1999.

Medicaid, Welfare Reform and CHIP: The Growing Gulf of Eligibility Between Children and Adults, presented to National Association of Public Hospitals and Health Systems, Washington, DC, and to Generations United, Washington, DC, September 1998.

Sliding Scale Premiums and Cost-Sharing: What the Research Shows presented at workshop on CHIP: Implementing Effective Programs and Understanding Their Impacts, Agency for Health Care Policy and Research User Liaison Program, Sanibel Island, FL, June 30, 1998.

Ku, L., Sonenstein, F., Boggess, S., and Pleck, J. Understanding Changes in Teenage Men's Sexual Activity: 1979 to 1995, presented at 1998 Population Association of America Meetings, Chicago, IL, April 4, 1998.

Welfare Reform, Immigrants and Medicaid presented at Annual Meeting of the Association of Maternal and Child Health Programs, Washington, DC, March 9, 1998.  Similar talk presented at  Association for Health Services Research Meeting, Washington, DC, June 23, 1998.

Medicaid Policy and Data Issues: An Overview presented to National Committee on Vital and Health Statistics, DHHS, September 29, 1997.

How Welfare Reform Will Affect Medicaid Coverage presented to National Ryan White Title IV Program Conference, Washington, DC, November 8, 1996.

Ku, L., Rajan, S., Wooldridge, J., Ellwood, M., Coughlin, T., and Dubay, L. Using Section 1115 Demonstration Projects to Expand Medicaid Managed Care in Tennessee, Hawaii and Rhode Island, presented at Association of Public Policy and Management, Pittsburgh, Nov.  1, 1996.

The Federal-State Partnership in Medicaid: Is Divorce Inevitable or Would Therapy Be Enough? presented to Council of State Governments Conference on Managing the New Fiscal Federalism, Lexington, KY, May 10, 1996.

The Male Role in the Prevention of Teen Pregnancy, presented to the Human Services Committee, National Council of State Legislatures, Washington, DC, May 9, 1996

Implications of Converting Medicaid to a Block Grant with Budget Caps, presented to American Medical Association State Legislation Meeting, Aventura, FL, Jan. 1996 and to the American Psychiatric Association Public Policy Institute, Ft. Lauderdale, FL, March 1996.

Medicaid: Program Under Reconstruction, presented at Speaker's Forum at New York City Council, September 12, 1995.

State Health Reform Through Medicaid Section 1115 Waivers, presented at Pew Health Policy Conference, Chicago, IL, June 3, 1995.

Setting Premiums for Participants in Subsidized Insurance Programs, presented at Conference on the Federal-State Partnership for State Health Reform, sponsored by HCFA, the National Academy of State Health Policy and RTI, March 15, 1995.

Medicaid Disproportionate Share and Related Programs: A Fiscal Dilemma for the Federal Government and the States, with Teresa Coughlin, presented to the Kaiser Commission on the Future of Medicaid, November 13, 1994.

Full Funding for WIC: A Policy Review, with Barbara Cohen and Nancy Pindus, presented at Dirksen Senate Office Building, Washington, DC, in a panel hosted by the Center on Budget and Policy Priorities, Bread for the World, the Food Research and Action Center and the National Association of WIC Directors, May 5, 1994.

The Financing of Family Planning Services in the U.S., presented at the Institute of Medicine, National Academy of Sciences on February 15, 1994 and at the American Public Health Association meeting, San Francisco, CA, October 25, 1993.

Using SUDAAN to Adjust for Complex Survey Design in the National Survey of Adolescent Males, with John Marcotte and Karol Krotki, briefing at National Institute of Child Health and Human Development, Rockville, MD, April 2, 1992.

The Association of HIV/AIDS Education with Sexual Behavior and Condom Use Among Teenage Men in the United States with Freya Sonenstein and Joseph Pleck, presented at the Seventh International Conference on AIDS, Florence, Italy, June 1991.

Patterns of HIV-Related Risk and Preventive Behaviors Among Teenage Men in the United States, with Freya Sonenstein and Joseph Pleck, paper presented at the Sixth International Conference on AIDS, San Francisco, CA, June 23, 1990.

Trends in Teenage Childbearing, Pregnancy and Sexual Behavior, paper presented at the American Sociological Association Meeting, Washington, D.C., August 15, 1990.

Research Designs to Assess the Effect of WIC Participation by Pregnant Women on Reducing Neonatal Medicaid Costs, briefing to Congressional staff, February 1987.

Testimony about the Special Supplemental Food Program for Women, Infants and Children (WIC), with Frank Sasinowski, presented to House Education and Labor Committee on behalf of the American Public Health Association, March 1983.

## Media

Leighton Ku has extensive experience with electronic and print media.  He has been interviewed by ABC, NBC, CBS, Fox, PBS, National Public Radio, CNN, Bloomberg TV, BBC and other television or radio news broadcasts and webcasts.  He has been quoted in the *New York Times, Los Angeles Times, Washington Post, Wall Street Journal, USA Today, Christian Science Monitor, Politico, Buzzfeed,* and trade publications (such as *Modern Health Care, Nation's Health* or *CQ HealthBeat, Kaiser Health News*), etc.  He has been an online contributor to the *Washington Post.*  He was a regular panelist on a radio talk show about health policy, broadcast on WMAL in the Washington DC region.  He has been cited as an expert by *PolitiFact* and related fact-checking sources.

## Service and Honors

Member, Executive Board, District of Columbia Health Benefits Exchange Authority (2012-2017) (The board  governs the new health insurance exchange for the District of Columbia, based on the Patient Protection and Affordable Care Act.  Appointed by the Mayor and approved by the City Council).  Chair of the Research Committee and Information Technology Committee.  Led working groups that developed the financial sustainability plan for the Exchange, dental plans, standardized benefit plans and changes required in light of threats to the ACA.  2012-now.

Commonwealth Fund, top ten most frequently downloaded reports (2006).

Award for promoting racial and economic justice, Mississippi Center for Justice, 2005

Service award from the National WIC Directors Association (2002).

*Choice* (the magazine of the American Library Association for academic publications), top ten academic books of the year (1994)

Pew Health Policy Fellow, Boston University and Brandeis University, 1987-1990.

## Other Service and Honors

Faculty Advisor, GW Health Policy Student Association, 2016-now

Member, AcademyHealth/NCHS Health Policy Fellowship Program board.  2016-now

Affiliated faculty, Jacobs Institute of Women's Health, 2015-now.

Advisory Board, Remaining Uninsured Access to Community Health Centers (REACH) Project, Univ. of California Los Angeles, 2015-present

Member, DC Metro Tobacco Research and Instruction Consortium (MeTRIC). 2014- present

Member, Health Workforce Research Institute, GW, 2013-present.

Member, National Advisory Board, Public Policy Center of University of Iowa, 2014-present

Chair/Vice Chair, Advocacy Interest Group, AcademyHealth, 2014-present.

Member, Advisory Committee on Non-Health Effects of the Affordable Care Act, Russell Sage Foundation, Dec. 2013.

Member, Technical Expert Group on the Affordable Care Act and the National Survey of Family Growth, National Center for Health Statistics, Centers for Disease Control and Prevention, Nov. 2013

Member, Steering Committee, GW Institute of Public Policy, 2013-now

Member, External Review Committee for Department of Family Science for the University of Maryland School of Public Health, 2012.

GW Faculty Senator, representing School of Public Health and Health Services, 2010-12.

Member of numerous University, School and Departmental committees.  2008-present.

National Institutes of Health, member of various grant review study sections (1996-now).

Invited reviewer.  Committee on National Statistics.  National Academy of Sciences.  Databases for Estimating Health Insurance Coverage for Children.  2010-11.

Grant reviewer.  Robert Wood Johnson Public Health and Law program.  2010.

Invited reviewer, Institute of Medicine report on family planning services in the U.S., 2009.

External reviewer for faculty promotion and tenure for Harvard Medical School, Univ. of California at Los Angeles, Boston University, University of Maryland, Portland State Univ., Baruch College, etc., 2008-present.

Commonwealth Fund, top ten most frequently downloaded reports (2006) for a report I co-authored with Donna Cohen Ross.

Award for promoting racial and economic justice, Mississippi Center for Justice, 2005

Submitted expert affidavits in federal, state and local lawsuits including: *Wood, et al. v. Betlach,* (Medicaid cost sharing), *Lozano v. City of Hazleton* (immigrant rights), *Spry, et al., v. Thompson*

(Medicaid cost-sharing), *Dahl v. Goodno* (Medicaid cost-sharing), *Newton-Nations, et al., v. Rogers* (Medicaid cost-sharing) and *Alford v. County of San Diego* (cost-sharing for a local health program).  The affidavits resulted in supportive court decisions in all these cases.

Board Member and Treasurer, Alliance for Fairness in Reforms to Medicaid (2002-2008)

Urban Institute, founding member, Institutional Review Board (1997-2000)

National Health Research Institute (Taiwan's NIH) grant reviewer (1999).

Urban Institute, member, Diversity Task Force (1995)

*Choice* (the magazine of the American Library Association for academic publications), top ten academic books of the year (1994) for a book I co-authored with Teresa Coughlin and John Holahan.

Pew Health Policy Fellow, Boston University and Brandeis University, 1987-1990.

## Professional Society Memberships and Service

AcademyHealth (formerly Association for Health Services Research), Program Selection Committees (multiple years), chair Advocacy Interest Group (2014-now).
American Public Health Association
Association of Public Policy and Management, Program Selection Committees (many years)

## Editorial Peer Review Service

Associate editor, *BMC Health Services Research,* 2009 – 2013.

Reviewer for numerous journals, including *Health Affairs, New England Journal of Medicine, Journal of the American Medical Association, Pediatrics, American Journal of Public Health Inquiry, Medical Care, HSR, Medicare and Medicaid Research Review, American Journal of Preventive Medicine, Family Planning Perspectives, Journal of Association of Public Policy and Management,* etc. (1990 to now)

## Public Health Practice Portfolio

Consultant, Centers for Disease Control and Prevention, Office of the Associate Director for Policy, on 6|18 Initiative (2016).

Expert Advisor, Russell Sage Foundation.  Non-health effects of the Affordable Care Act.  (2013).

Expert Advisor, Revisions to the National Survey of Family Growth, National Center for Health Statistics, CDC (2013)

Member, Technical Advisory Committee for Monitoring the Impact of the Market Reform and Coverage Expansions of the Affordable Care Act, sponsored by ASPE. (2013)

Member, Executive Board, District of Columbia Health Benefits Exchange Authority (2012-17).   The board governs the new health insurance exchange for the District.  (Nominated by the Mayor and appointed by the City Council).  Chair of the IT and Eligibility Committee and various working groups.

Member, Technical Advisory Group for the Design of the Evaluation of the Medicaid Expansion Under the ACA, sponsored by ASPE (2012)

Member, National Workgroup on Integrating the Safety Net, National Academy of State Health Policy, July 2011 – 2013.

Member, National Advisory group for Iowa Safety Net Integration project, 2011-2013.

Foundation for Child Development, Selection Committee, Young Scholars Program, 2008-2015.

Foundation for Child Development, Advisory Committee, Child Well-Being Index, 2008-present

Member, National Advisory Board, Center on Social Disparities on Health, University of California at San Francisco, 2005-2008.

National Campaign to Prevent Teen Pregnancy, Member, Effective Programs and Research Task Force (2000)

**Doctoral Students Mentored/Advised**

**Dissertations Completed**
Prof. Peter Shin (chair)
Prof. Megan McHugh
Dr. Sarah Benatar
Dr. Emily Jones (chair)
Dr. Saqi Cho (chair)
Dr. DaShawn Groves (chair)
Dr. Heitor Werneck
Dr. Brad Finnegan (chair)

**In Progress**
Evelyn Lucas-Perry (chair)
Brian Bruen
Nina Brown
Darla Bishop
Kyle Peplinski
Christal Ramos
Shin Nozaki
Kristal Vardaman (chair)
Ollie Ganz
Maliha Ali
Jessica Sharac (chair)
Serena Phillips
Mariellen Jewers

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>                    Plaintiffs,<br><br>       v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>                    Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## PLAINTIFFS' EXPERT WITNESS DISCLOSURE OF LEIGHTON KU, PH.D.

Pursuant to Federal Rule of 26(a)(2)(B), the following disclosure of the expert testimony

of Leighton Ku, Ph.D. is made by the Plaintiff States:

**(i)     A complete statement of all opinions the witness will express and the basis and reasons for them:**

A copy of my declaration that will be submitted in support of the Plaintiff States motion

for preliminary injunction is attached as Exhibit A.

1

**(ii)      The facts or data considered by the witness in forming the opinions the witness will express:**

The facts and/or data that I considered in forming the opinions expressed in the declaration attached as Exhibit A include the following: the allegations in the Plaintiff States' Amended Complaint, declarations from Prof. Tom Wong and from Claudia Schlossberg of the District of Columbia, and all sources and facts referenced or mentioned in the declaration attached as Exhibit A.

**(iii)     Any exhibits that will be used to summarize or support the opinions the witness will express:**

None known at this time. Both I and the Plaintiff States reserve the right to amend this disclosure should any exhibit be used to summarize my opinions at the time of any hearing or trial before this Court.

**(iv)     The witness's qualifications, including a list of all publications authored in the previous 10 years;**

A copy of my *curriculum vitae*, which includes all publications that I have authored in whole or in part in the previous 10 years, is attached as Exhibit B.

**(v)      A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition:**

I have not testified as an expert at trial or by deposition in any case during the previous 4 years.  I have prepared material that could be used as declarations or affidavits for two potential cases, unrelated to this issue, but suits have not yet been filed and remain confidential for the time being.  My CV notes prior cases in which I served as an expert.

**(vi)    A statement of the compensation to be paid for the study and testimony in the case.**

I will be paid $3000 for my study and testimony in this case.


Dated: November 22, 2017

_____
Leighton Ku, Ph.D.

3

# EXHIBIT 55

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

         Plaintiffs,

   v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

         Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

## DECLARATION OF MICHAEL BZDYRA

Pursuant to 28 U.S.C. 1746, I, Michael Bzdyra, having been duly sworn, depose and say, based on my personal knowledge and belief:

1. I am the Commissioner of the State of Connecticut Department of Motor Vehicles ("DMV" or "the Department").

2. DMV is the state agency that oversees driver's licenses, vehicle registration and other functions related to motor vehicles.

1

3.   I was appointed as Commissioner of the Department in March, 2016.  Previously I was employed as Acting Deputy Commissioner for the Department from September, 2014 through February, 2016, and as Executive Assistant to the Commissioner of Motor Vehicles from January, 2011 through August, 2014.

4.   I am responsible for overseeing all functions and employees of the Department, which consists of 727 full-time and 97 part-time employees.  My current duties generally include those enumerated in section 14-3 of the Connecticut General Statutes.

5.   I have either personal knowledge of the matters set forth below or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered from DMV records by others within the organization.

6.   Since 2012, Connecticut has granted driver's licenses to approximately 5000 residents of Connecticut who are beneficiaries of the Deferred Action for Childhood Arrivals (DACA) program.

7.   It is highly probable that since the DACA program went into effect in 2012, DACA grantees have also registered cars in Connecticut, although the numbers are not readily accessible through DMV's data collection process.   In addition to purchase and ownership documents, DACA grantees would only be required to show their driver's licenses to register a vehicle in the state.

8.   DACA grantees who have purchased and registered a vehicle in Connecticut have paid sales tax if the vehicle was purchased from a dealer, or use tax on a private purchase.

9.   After registering a vehicle, a DACA grantee, like any other the owner, would also pay motor vehicle property tax to the municipality where the owner lives or where the vehicle is garaged.

10. The DACA grantees who have driver's licenses and registered vehicles also purchase automobile insurance, are likely to have used local driving schools for driver training and pay applicable licensing, registration, title and other fees to the State of Connecticut.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

MICHAEL BZDYRA

DATED: September 20, 2017

# EXHIBIT 56

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>               Plaintiffs,<br><br>     v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>               Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

# OFFICE OF THE SECRETARY OF STATE

**JESSE WHITE** • Secretary of State

## <u>DECLARATION</u>

Pursuant to 28 U.S.C. 1746(2), I, Jesse White, hereby declare as follows:

1.  I am the Secretary of State for the State of Illinois. I have served as Secretary of State since 1999; the longest-serving Secretary of State in the history of the State of Illinois.

2.  As Secretary of State, I administer many departments that affect the lives of the citizens of the State of Illinois, including Driver Services and Vehicle Services, Business Services, the Illinois Securities Department, the Illinois State Library, the Illinois State Archives and the Secretary of State Police. Through these Departments, my Office deals more directly with the citizens of the State of Illinois than any other state agency.

3.  The Deferred Action for Childhood Arrivals (DACA) program was instituted in 2012 to protect the immigrants who came to the United States of America as children from deportation, to allow them to work, to further their education, to move forward with their lives, and to continue to contribute to society in the United States. These immigrant children, many now grown up, are commonly known as "Dreamers."

4.  It is estimated that there are 800,000 immigrants that have benefitted from DACA, including over 42,000 Dreamers in the State of Illinois. To qualify for DACA, the Dreamers have received background checks, attended colleges and universities, have work authorizations and serve in the United States Military. That last point is something I relate to strongly, having served three different times in military service, including with the 101st Airborne Division of the United States Army. Dreamers serving in the United States Military have my utmost admiration and respect.

5.  The Dreamers are here through no fault of their own. As a group, they are displaying the values that we in the United States consider so important: getting an education, working hard, raising families, and contributing to their communities. The Dreamers have lived in this country for most of their lives. They consider themselves Americans.  We are a nation of immigrants. A change in their immigration status, with the potential for deportation, goes against the values and principles of fairness and equality held dear by the American people and as espoused in the Constitution of the United States.

6.  Operationally, the rescission of DACA will adversely affect the administration of the Office of the Secretary of State. Those 42,000 Dreamers in Illinois have state-issued identification cards and drivers licenses, having taken the appropriate steps to obtain a valid driver's license which include attending driving school, passing all the tests and obtaining vehicle insurance. They own motor vehicles which are registered, titled and licensed in the State of Illinois. They own businesses and property in this State. As a result, the Dreamers have paid and are paying title and licensing fees, business licensing fees and taxes, income tax, sales tax, use taxes and other taxes and fees. The Dreamers are positively contributing to the State of Illinois.

7.  If DACA is rescinded, the operations of the Office of the Secretary of State will be adversely impacted. Along with the significant loss of revenue from all of the fees and taxes mentioned above, this Office will face undetermined costs and system disruptions related to the determination of eligibility for renewal of licenses and other benefits and services. In addition, this could potentially jeopardize road safety. Illinois will be required to amend administrative rules, regulations and laws to conform to the rescission of DACA.

8.  Based on the foregoing, I am expressing my strong opposition to the federal government's ill-conceived plan to rescind the Deferred Action to Childhood Arrivals program. The Dreamers deserve the same opportunities of this great land as the many immigrants that came before them.

I declare under penalties of perjury under the laws of the United States of America and of the State of Illinois that the foregoing is true and correct. This Declaration is made on the 27th day of September, 2017 in the State of Illinois.

**ILLINIOIS SECRETARY OF STATE**

**JESSE WHITE**

# EXHIBIT 57



# Identification (ID) requirements

**The RMV requires you to provide the required identification for each different type of credential you apply for even if you already have a Massachusetts ID, Liquor ID, or driver's license.**

## Overview

All customers must provide a valid Social Security number (SSN), which will be verified with the Social Security Administration (SSA). If you do not have a SSN, you must provide a valid foreign passport with an I-94 and acceptable visa status as well as a Social Security Denial Notice (not more than 60 days old) issued by the SSA.

For customers 18 years of age and older, customers must submit documents that prove the following three aspects of identity:

- Massachusetts residency
- Signature
- Date of birth

For customers under the age of 18, only a document that proves date of birth is required and these customers are not required to submit proof of Massachusetts residency or signature. Refer to the Acceptable Identification Documents list.

All identification documents must be originals unless otherwise indicated. Photocopies will not be accepted. In addition, the same document may not be used identification requirement.

TELL US WHAT YOU THINK

Case 1:17-cv-05228-NGG-VMS   Document 97-3   Filed 12/15/17   Page 158 of 397 PageID #: 5981

## Additional Resources

 **Acceptable Identification Documents**  (PDF 142.75 KB)

 **Document Requirements Chart**  (PDF 277.18 KB)

# Translation policy

If you present a document that is not written or printed in the English language, it must be accompanied by a translation that is certified by a bilingual teacher at an accredited Massachusetts college, university, or private language school, by a bilingual notary public, or by the local consulate for the document's country of origin.

If translated by a teacher or consulate, the translation must be printed on the letterhead of the consulate, college, university, or private language school and it must be properly formatted. This must be printed on the translator's letterhead, completed by the translator, and submitted to the RMV with the foreign language document.

If translated by a notary, the translation must have the notary's official seal.

## Additional Resources

 **Translation Certificate Sample**  (PDF 6.56 KB)

# Social Security number (SSN) requirements

You must have a valid Social Security number (SSN) to apply fo

TELL US WHAT YOU THINK

Case 1:17-cv-05228-NGG-VMS   Document 97-3   Filed 12/15/17   Page 159 of 397 PageID #: 5982

license, or ID card, including a replacement or a renewal. The RMV will validate the SSN you provide against computer records at the Social Security Administration (SSA). If you do not have an SSN, you may request an application for one by calling (800) 772-1213.

If you are not a citizen and do not have an SSN, you should apply for one at a Social Security Office as soon as possible. If you are denied an SSN, you may still qualify for a Massachusetts driver's license if you can meet other identification requirements proving your age, signature, and Massachusetts residency. However, to prove that you applied for an SSN, you must present the written notice the SSA provided you, which informed you that you were not eligible for an SSN.

The RMV requires your SSN to confirm your identity and to maintain your license and driving records.

## Additional Resources

 **Social Security Administration**

# Visa classification codes

Any visa presented must indicate an authorized stay in the U.S. of at least 12 months (from the date of application at the RMV) to be eligible for a MA license or ID card.

## Acceptable visa classes

The following visa classes are acceptable for processing a learner's permit, driver's license, and Mass ID Card transaction.

- A-1 through A-3
  - The visa holder is eligible for a learner's permit, driver's license, or ID card only if the customer presents a letter from the Office of Foreign Missions (OFM) stating that he/she is not eligible for a United States State Department license and meets all identification requirements.
- DV

TELL US WHAT YOU THINK

- E-1 through E-2

- E-3 and E-3D

- F-1 through F-2
  - The visa holder must present an I-20 certificate of eligibility

  - The I-20 should state that the customer is enrolled in a Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, or Vermont school.

  - The visa holder's I-94 must be endorsed with Duration of Status. (The I-94 can be either a paper version from US Customs and Border Protection or a printout of an electronic version downloaded from their website: www.cbp.gov/i94

- G-1 through G-5

- H-1B through H-4

- I

- J-1 through J-2
  - The visa holder must present a I-20/DS-2019 (earlier known as the IAP-66) certificate of eligibility.

  - The visa holder's I-94 must be endorsed with Duration of Status. (The I-94 can be either a paper version from US Customs and Border Protection or a printout of an electronic version downloaded from their website: www.cbp.gov/i94

- K-1 through K-4

- L-1 through L-2

- M-1 through M-2
  - The visa holder must present an I-20 certificate of eligibility.

  - The I-20 should state that the customer is enrolled in a Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, or Vermont school.

  - The visa holder's I-94 must be endorsed with Duration of Status. (The I-94 can be either a paper version from US Customs and Border Protection or a printout of an electronic version downloaded from their website: www.cbp.gov/i94

- N-1 through N-2

- O-1 through O-3

- Q-1 through Q-3

TELL US WHAT YOU THINK

- R-1 through R-2

- S-5 through S-7

- TN

- TD

- V-1 through V-3

## Unacceptable visa classes

The following visa classes do not prove legal presence, and are therefore not acceptable for learner's permit, driver's license, and Mass ID Card transactions:

- B-1 through B-2 and B1-B2 multiple (this is tourist or business only)

- C1 through C-3

- D

- NATO

- W-B

- W-T

If a customer has a visa classification listed as not acceptable, he/she is not eligible for a Massachusetts learner's permit, driver's license, or Mass ID, but may be eligible for a Liquor ID. Any valid visa is acceptable for obtaining a Liquor ID.

**Did you find the information you were looking for on this page?***

◯ Yes    ◯ No

SEND FEEDBACK

TELL US WHAT YOU THINK

# EXHIBIT 58

Exhibit 6 to
Thomas Declaration

## State of North Carolina

Department of Justice
PO Box 629
Raleigh, North Carolina
27602

ROY COOPER
ATTORNEY GENERAL

REPLY TO:  Grayson G. Kelley
           (919) 716-6400
FAX:       (919) 716-0135

January 17, 2013

J. Eric Boyette
Acting Commissioner
Division of Motor Vehicles
3101 Mail Service Center
Raleigh, North Carolina 27699-3101

Dear Commissioner Boyette:

Former Commissioner Michael Robertson has asked this office for a legal opinion as to whether, under North Carolina law, drivers licenses can be issued to individuals who have been granted deferred action under the Deferred Action for Childhood Arrivals ("DACA") program announced by the Department of Homeland Security on June 15, 2012. Commissioner Robertson's letter states the Division of Motor Vehicles ("DMV") will not issue licenses to individuals participating in the DACA program unless North Carolina law requires them to be issued.

North Carolina's Uniform Driver's License Act is codified as Chapter 20, Article 2 of the North Carolina General Statutes. General provisions concerning the issuance of driver's licenses are set out in N.C. Gen. Stat. §20-7. Subsection (b1) of that section contains the requirements for a license application, which must include proof of residency in the state and the applicant's valid social security number. Subsections (b3) and (b4) describe types of documentation that are considered acceptable proof of residency.

Subsection (f), which delineates the requirements for duration and renewal of licenses, states that a license of shorter than normal duration should be issued "when the applicant holds valid documentation issued by, or under the authority of, the United States government that demonstrates the applicant's legal presence of limited duration in the United States. In no event shall a license of limited duration expire later than the expiration of the authorization for the applicant's legal presence in the United States." Subsection (s) further states, in part:

> (s) Notwithstanding the requirements of subsection (b1) of this section that an applicant present a valid social security number, the Division shall issue a drivers license of limited duration, under subsection (f) of this section, to an applicant

Commissioner J. Eric Boyette
January 17, 2013
Page 2

> present in the United States who holds valid documentation issued by, or under the authority of, the United States government that demonstrates the applicant's legal presence of limited duration in the United States if the applicant presents that valid documentation and meets all other requirements for a license of limited duration.

These provisions, read together, reflect a legislative intent that, assuming all other statutory requirements are met, DMV is required to issue licenses of limited duration to applicants presenting valid documentation demonstrating the applicant's legal presence of limited duration in the United States. It is therefore necessary to review the legal posture of individuals participating in the DACA program to respond to the question posed.

The DACA program was initiated through a policy directive dated June 15, 2012, from Director of Homeland Security Janet Napolitano to U.S. Customs and Border Protection, U.S. Citizenship and Immigration Services and U.S. Immigration and Customs Enforcement regarding the exercise of prosecutorial discretion in the enforcement of immigration laws against certain young people brought to the United States as children. Under the criteria established, individuals who came to the United States under the age of sixteen and are presently under the age of thirty; have continuously resided in the United States for five years; are currently in school, graduated from high school, or an honorably discharged veteran; have not been convicted of any serious criminal offense; and meet several other requirements are now eligible for classification as low priority individuals for whom removal action will be deferred for two years. Individuals who are approved for deferred action under the DACA program may also apply for employment authorization in accordance with 8 C.F.R. §274a.12 and a Social Security number and card. Deferred action under the DACA program does not provide lawful, permanent, immigrant status or lawful nonimmigrant status such as a tourist visa. *See* U.S. Citizenship and Immigration Services, "Frequently Asked Questions About DACA" - Questions 1, 6 and 7.

The specific question posed is whether individuals accorded deferred status pursuant to the DACA program, and present valid documentation issued by the United States government that demonstrates "legal presence of limited duration in the United States," must be issued a North Carolina drivers license of limited duration in accordance with N.C. Gen. Stat. §20-7(s). Based upon our review of the historical background and legal concepts applicable to prosecutorial discretion and deferred status in the enforcement of immigration laws, we believe that individuals who present documentation demonstrating a grant of deferred action by the United States government are legally present in the United States and entitled to a drivers license of limited duration, assuming all other criteria are met.

Commissioner J. Eric Boyette
January 17, 2013
Page 3

This conclusion should not be construed to suggest that individuals granted deferred status under the DACA program have "lawful status" in the United States. Lawful immigration status is generally understood to refer to specific formal classifications for immigrants who have been granted permanent resident status, or temporary, non-immigrant status for certain purposes. Secretary Napolitano's memorandum, in fact, specifically states: "This memorandum confers no substantive right, immigration status or pathway to citizenship."

There exists, however, a recognized legal distinction in immigration law between "lawful status" and "lawful presence." *See* U.S. Citizenship and Immigration Services, "Frequently Asked Questions" - Question 6 ("There is a significant difference between "unlawful presence" and "unlawful status"). Formal lawful immigration status is generally considered to refer to specific classifications through which individuals are granted permanent immigrant status; temporary permission to be in the United States for specified purposes; or other limited classifications established by law. Deferred status, on the other hand, is a grant of permission to remain in the country for a specified period of time without receiving formal immigration status. The grant of deferred status therefore establishes lawful presence for the period of deferment. An informative description of this distinction is included in the Expert Report and Declaration of Former Immigration and Naturalization Service General Counsel Bo Cooper, and that of Professor Stephen W. Yale-Loehr, which were prepared in connection with the lawsuit *Arizona Dream Act Coalition, et al. v. Brewer, et al.* (U.S. District Court for the District of Arizona, No. 2:12-cv-02546-DGC).

It is therefore our opinion that individuals who have been granted deferred action under the Deferred Action for Childhood Arrivals policy directive are lawfully present in the United States during the period of deferment. As such, N.C. Gen. Stat. §20-7(s), which states that DMV shall issue a drivers license of limited duration to persons who present valid documentation demonstrating deferment and meet all other statutory requirements, requires that such licenses be issued.

Please contact me if we can provide additional assistance.

Very Truly Yours,

Grayson G. Kelley
Chief Deputy Attorney General

GGK/ml

# EXHIBIT 59

# UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, <br><br> Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) <br><br> **DECLARATION OF ROSSANA ROSADO** |

### DECLARATION OF ROSSANA ROSADO

Pursuant to 28 U.S.C. § 1746(2), I, Rossana Rosado, hereby declare as follows:

1.      I am the Secretary of State for New York State.

2.      I have compiled the information in the statements set forth below through New York State personnel who have assisted me in gathering this information from New York State agencies.

3.      New York State is the fourth largest state in the United States of America in 2017, with a population of 19.74 million. New York prides itself on its rich ethnic diversity as New Yorkers hail from over 200 nations.

4.      New York State has a strong interest in prohibiting any practice that denies equal protection of the laws or otherwise discriminates on the basis of race, color, or national origin. New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. *See* N.Y. Exec. Law § 290.

5.      New York's diversity has always been its greatest strength. For example, in 2016, the Governor's Advisory Council on Diversity and Inclusion was created to help accelerate the rate of progress of recruiting more racial and ethnic minorities to work in state government.  That same year, the New York State Board of Regents passed a resolution permitting  Deferred Action for Childhood Arrival ("DACA") recipients to be eligible for teaching and nursing licenses. *See* Comm. of Educ. Regs. §§ 59.4; 80-1.3; Ex. A (New York State Board of Regents Press Release, Feb. 24, 2016).

6.      New York State has over 50 agencies whose missions entail providing or supervising the administration of certain basic services to all residents.  This includes, but is not limited to providing educational aid, family assistance, health, and mental hygiene benefits and services,

financing and maintaining the State's transportation infrastructure, regulating labor practices, protecting the environment, establishing a park system, and providing for the protection and safety of the public.

7.      The DACA program has been beneficial to the people of the State of New York. Obtaining DACA status has allowed DACA recipients, many of whom are long-term residents of New York, to work legally across industries, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits. DACA grantees also contribute significantly to the State and local revenues and tax bases.

8.      Across its various agencies, New York State currently employs at least 5 DACA recipients including a management specialist, an addiction counselor, a senior-level engineer, a student assistant, and of particular note, an Empire State Fellow. The Empire State Fellows Program is a full-time leadership training program that prepares the next generation of talented professionals for careers as New York State policy-makers. New York State invests significant resources in providing educational and professional development programs to the Fellows, and relies on these investments to sustain a diverse workforce in senior leadership roles.

9.      New York State has relied on the work of DACA grantees to not only fulfill their professional duties, but also to help foster an inclusive and diverse and community. But New York State would be prohibited by federal law from continuing to employ DACA grantees once their work authorizations expire.  The termination of the DACA program would therefore pose a grave threat to New York State's ability to have a diverse and inclusive state government workforce, and result in the loss of the unique and significant contributions from these members of its community.

10.     Terminating DACA would significantly disrupt state operations.  To fill the vacancies of DACA grantee employees, New York State would have to expend significant effort, time, and financial resources in order to find and train appropriate replacements. New York State may also experience undesirable delays and disruptions in the provision of necessary services.

11.     Moreover, to have New York State DACA employees living in constant fear of arrest and deportation due to the termination of DACA is damaging to those individuals and the State agencies where they work.

12.     More broadly, terminating DACA will cause the State to expend additional resources. Specifically, it will impose additional health care costs on New York State. New York State currently funds emergency Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 of Am. Compl. (Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013). Terminating DACA may reduce access to Medicaid for current DACA grantees. Individuals in New York who are not DACA grantees may only qualify for Medicaid coverage of care and services necessary to treat an emergency condition. Terminating DACA will require New York to either seek a State legislative change to maintain current Medicaid coverage formerly DACA-eligible immigrants with state dollars only or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

13.     Overall, the termination of DACA will result in significant harm to New York State through the disruption of state operations and expenditure of additional resources to compensate for the loss of current or future state employees.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 15th day of December, 2017

/s/ Rossana Rosado
Rossana Rosado

# EXHIBIT 60

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

**<u>DECLARATION OF ALEJANDRA PEREZ</u>**

I, Alejandra Perez, hereby declare as follows:

1. I arrived in the United States in 2006 when I was twelve years old. I moved to South Seattle three years later, in 2009, when I was fifteen.

2. I first-applied for Deferred Action for Childhood Arrivals (DACA) in November 2012 and received it in February 2013. At the time, I was a first year student at the University of Washington Bothell.  After receiving work authorization, I was able to work as a Social Justice Organizer on campus, where I organized events, facilitated dialogues, and created professional development trainings for the entire campus community.

3. I also worked every summer while in college. I worked at Cleveland High School, my alma mater, as a Program Coordinator for Project 206, a summer transition program for incoming 9th graders.

4. As a DACA recipient with employment authorization, I was also able to apply for a Social Security number (SSN).

5. Receiving an SSN was incredibly important for me and my family. I was able to apply for several credit cards and build my credit. After building my credit, I purchased cars for both me and my family.

6. So far, I have purchased three cars and I pay car tabs with the Washington Department of Licensing on each one.  Every year, the cost of the three car tabs total approximately $1,082.50 per year.

7. Most recently, my credit has allowed me and my brother, also a DACA recipient, to purchase a home for our family in South Seattle. We closed on the house in March 2017. According to my files, I will pay $1,397.41 in property taxes to King County,

DECLARATION OF ALEJANDRA PEREZ - 1

Washington in 2017. Going forward, my property taxes will be approximately $2,395.56 per year.

8. Since graduating from the University of Washington - Bothell in 2016 with with a double major in Society, Ethics, and Human Behavior and American and Ethnic Studies, Since June 2016, I've worked as a College & Career Success Coordinator for the Community Center for Education Results, supporting the Road Map Project. In that capacity, I work with school districts and community partners in creating equitable tools and resources for low-income students and students of color in South King County to access postsecondary education and earn a degree or credential.

9. My plan is to continue working at the non-profit. It allows me to earn money, which I can then spend to support my family.

10. I've renewed my DACA status twice since I first applied. My current DACA status expires in February 2019.

11. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Alejandra Perez

Place signed: Seattle, WA
City, State

Date: 09/01/2017

DECLARATION OF ALEJANDRA PEREZ - 2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Unit
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# EXHIBIT 61

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF GLORIA ODUYOYE

I, Gloria Oduyoye, declare as follows:

1.  I am over the age of eighteen. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.  I am a twenty-five year old resident living in Virginia. Virginia is my home.

3.  I am the child of Nigerian immigrants and was born in England. In 1993, when I was one year old, I came to the United States from England to live with my father who was in medical school.

4.  In 2012, I applied for DACA and attained DACA status. Subsequently, I was able to obtain my driver's license, and eventually buy my first car. I graduated with honors from Wesleyan College with a dual bachelor's degree in political science and music. I am currently enrolled at William & Mary School of Law as a third year law student and expect to graduate in January 2018. I could not have achieved any of these things without DACA.

5.  Any revocation of DACA would have a huge negative impact in my life. My entire life will change. I will be unable to provide for my family and myself financially or afford to continue to pursue my educational goals. Finally, I will lose the hope and protection from deportation and return to the shadows that make life so difficult.

6.  As a scholar by nature and an advocate by heart, I have tirelessly applied my education to the beginnings of a career in advocacy, public policy, and law. I have contributed to my community in Virginia through my consistent community service with the Black Law Students Association, the Immigration Law & Service Society, and the Virginia

Intercollegiate Immigrants' Association for the past three years. I am a community leader and influencer.

7. I want to have an opportunity to give back to this country, and to the communities, and academic institutions that have supported me throughout my life. Allowing DACA to continue would allow me to continue to live, work, and contribute to the economy and communities of America which is my home.

Executed on:  September 29, 2017

Gloria Oduyoye

# EXHIBIT 62

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

        Plaintiffs,

   v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

        Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

## DECLARATION OF I.V.

I, I.V., hereby declare as follows:

1.  My name is I.V.  I am 25 years old and currently live in Massachusetts.

2.  I have personal knowledge of the matters set forth below.

3.  I was born in the Dominican Republic and lived there until I was 8 years old.  At that time, my parents, who were already living in the United States, arranged to bring me to the U.S. to live with them.  I moved to Lawrence, Massachusetts.

4.  I spent the rest of my childhood in Lawrence and attended both private and public schools. In 2014, I graduated with a degree in political science from a public university in Massachusetts.

5.  I applied for DACA almost as soon as it was announced in 2012.  Receiving DACA was a huge help to me.  It allowed me to get a social security card and a driver's license.  I was able to buy a car.  Even though I had already been paying taxes for years, I was finally able to pay with a social security number, not just my temporary tax ID.  I was also able to travel to the Dominican Republic to visit family members who I hadn't seen in over 15 years.

6.  Having DACA status allowed me to get a job as a Resident Assistant at my university.  After I graduated, I was able to get a job working for a local Massachusetts official doing constituent outreach.  I then worked for two years in the office of a private attorney.  After that I got a job working in Massachusetts state government, which I still have today.  None of this would have been possible without the work permit that DACA made possible.

7.  My long-term dream is to attend law school to become an immigration attorney.  I want to help other people with immigration needs.

8.  If DACA went away, I would lose my work permit, my driver's license, and my ability to support myself. I would certainly lose my current job. Even the prospect of losing DACA is deeply stressful to think about. I have had DACA for five years and have benefited enormously from the program. Losing it now would be a huge loss.

9.  DACA is an incredibly important program. Lots of young people have been able to buy houses, start businesses, build wealth, and get good jobs. DACA has helped not just these individuals, but also their families and communities. Taking it away would not just hurt DACA recipients, it would also hurt their families and communities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5 day of September, 2017.

I.V.

# EXHIBIT 63

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>                    Plaintiffs,<br><br>          v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>                    Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

**DECLARATION OF I.T.**

I, I.T., declare as follows:

1.  My name is I.T.  I am 18 years old and a student at the Massachusetts Institute of Technology in Cambridge, Massachusetts.

2.  I have personal knowledge of the matters set forth below.

3.  I was born in Monterrey, Mexico, and was brought to the United States by my parents when I was 8 years old.  I was too young to understand what was going on, but my parents tell me that they were really struggling financially in Mexico and came to the U.S. to try to make a better living.  My father, for example, was making less than $20 a week working in Mexico, and was having a very hard time supporting our family.

4.  We lived in South Carolina for almost two years, and then moved to Houston, Texas, where I went to middle and high school.

5.  I applied for and received DACA status at the beginning of 2017.  I applied for DACA because I needed to get a job to help support my family.

6.  Receiving DACA status has helped me enormously.  I was able to get a social security number, which allowed me to get a paid internship at AT&T and a job as a cook in a restaurant.  I was also able to get my driver's license, which allowed me to get to and from work.

7.  I don't know if I would have been able to attend college without DACA.  College is expensive, and working has allowed me to help pay for college and support my family.

8.  I applied to MIT because I am passionate about engineering and making the world a better place.  Someday I would like to work for NASA, Boeing, or perhaps the Air Force, inventing ways to make people's lives better through technology.  I could also see myself founding my

1

own company and applying for patents. I am particularly interested in autonomous

equipment and ways to help aircraft travel at the speed of sound without using so much fuel.

9. Losing DACA status would make my life extraordinarily difficult. I would lose my social

security card and my driver's license, and therefore my ability to work and support myself

and my family through school. I would also face the threat of deportation, which would

destroy my future at MIT and send me back to a country that I left when I was a little boy.

10. DACA helps so many students. I know so many young people whose lives have been

changed through the program. We are good people, with good intentions. We only want to

make a better life for ourselves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___4___ day of September, 2017.

_____I.T_____

I.T.

# EXHIBIT 64

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

                Plaintiffs,

      v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

                Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

**DECLARATION OF CHANCELLOR
KRISTINA M. JOHNSON**

## DECLARATION OF CHANCELLOR KRISTINA M. JOHNSON

Pursuant to 28 U.S.C. § 1746(2), I, Kristina M. Johnson, hereby declare as follows:

1. I am the Chancellor of the State University of New York ("SUNY" or "university").

2. I have compiled the information in the statements set forth below through SUNY personnel who have assisted me in gathering this information from SUNY campuses.

3. SUNY is the largest comprehensive university system in the United States, comprised of 64 institutions including research universities, academic medical centers, liberal arts colleges, community colleges, colleges of technology and an online learning network. Each year SUNY students and faculty across the state make significant contributions to research in the fields of medicine, engineering, technology, among others.

4. SUNY educates approximately 440,000 students in more than 7,500 degree and certificate programs and nearly 2 million in workforce and professional development programs. SUNY draws students from every state in the United States and 160 nations around the world and has over 3 million alumni.

5. SUNY was founded as a university of opportunity, educating all, including those who would not be admitted to other institutions of higher education because of their race, religion or national origin. As a public university system, SUNY's core mission is to ensure that all of its students, whatever their background, have access to high-quality education and training that develops the skills and knowledge necessary to build a rewarding life and career.

6. To ensure that SUNY is able to execute its mission, SUNY is equally invested in its employees. This includes attracting and retaining the best and most diverse talent possible to promote a community which reflects its mission as a university of opportunity.

7. On January 24, 2017, SUNY demonstrated its continuing commitment to diversity, equity, and inclusion when the SUNY Board of Trustees passed a resolution affirming  its  strong support  for  the  rights  of  undocumented  students  and,  in  particular,  the continuation of the DACA program (attached as Exhibit A).

8. Across its various campuses, SUNY currently employs 37 DACA recipients  including two faculty members, four adjunct faculty members, three grant writers, two custodial workers, one registered nurse, one respiratory therapist, one public safety officer, and a variety of assistants including an assistant for Institutional Advancement, four graduate assistants, two nursing assistants, one office assistant, and fifteen general student assistants.

9. These employees play critical roles within their respective areas of employment, including teaching, performing research, securing funding, providing healthcare, ensuring public safety, cleanliness and maintenance of the campuses, as well as a variety of other necessary services.

10. As a result of the termination of DACA, SUNY employees who are DACA grantees would lose their work authorizations. SUNY would be prohibited by federal law from continuing to employ DACA grantees once their work authorizations expire. Therefore, SUNY would lose the unique and significant contributions from these members of its community. SUNY has relied on the work of DACA grantees to not only fulfill their professional duties, but also to help foster a diverse and inclusive community.

4

11. To fill the vacancies of DACA grantee employees, SUNY would have to expend time, effort and financial resources in order to find and train suitable replacements. SUNY may also experience undesirable delays and disruptions in the provision of necessary services at some of its campuses.

12. The loss of SUNY's DACA grantee employees could also have a negative impact on the students we serve as well as the SUNY community at large. The loss of faculty, adjunct faculty and graduate assistants may disrupt students' education by requiring new faculty to take over classes, and/or delaying classes while suitable replacements are found. Perhaps more importantly, students will lose the opportunity to learn from these DACA employees and benefit from their unique experiences and knowledge base.

13. Moreover, to have SUNY's DACA employees living in constant fear of arrest and deportation due to the termination of DACA is damaging to those individuals and the SUNY community as a whole.

14. Overall, terminating DACA will weaken SUNY's ability to carry out its mission as a university of opportunity, and cause it to expend time, effort and financial resources to hire and train new employees to replace the DACA grantee employees.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 5th day of December, 2017

/s/ Kristina M. Johnson
Kristina M. Johnson
Chancellor, State University of New York

# EXHIBIT 65

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746(2), I, Camilla Glatt, hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at Columbia Basin College. My job title is Vice President for Human Resources & Legal Affairs. My job description is attached as Document No. 1.

3. There is at least 1 employee at Columbia Basin College who is a recipient of Deferred Action for Childhood Arrivals (DACA).

4. The DACA recipient is employed as an Outreach & Retention Specialist. That employee's job description is attached as Document No. 2. The employee serves students in the Cyber Security Program and others in an effort to meet the mission of the College.

5. Columbia Basin College spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of September, 2017

Camilla Glatt

DECLARATION OF CAMILLA GLATT                    1                    ATTORNEY GENERAL OF WASHINGTON
                                                                    800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA 98104-3188
                                                                    (206) 464-7744

**Document No. 1**

## JOB DESCRIPTION

Employee Name:               Camilla Glatt
Job Title:                   Vice President for Human Resources & Legal Affairs
Reports to:                  President
Exempt/FLSA                  Yes
Prepared Date:               August 20, 2007
Approved Date:               February 19, 2008

A  POSITION OBJECTIVES

The Vice President for Human Resources & Legal Affairs will direct and coordinate all aspects of Human Resources, Labor Relations and Legal Affairs including recruitment, benefits, leaves, compensation, contracts, classification, employee development and training, faculty and classified bargaining, diversity initiatives, discrimination and harassment complaints, and disciplinary actions. Additionally, the position is responsible for the College's legal practices, preparation of written opinions and guidance for college management in regards to grievances, complaints and lawsuits.

The Vice President for Human Resources & Legal Affairs is responsible for coordination and implementation of strategic Human Resources, Labor Relations and Legal Affairs functions. This position plays a key role in advancing the relationships between the institution and the two collective bargaining groups (faculty and classified staff) that are integral to the success of the College's mission and goals.

This is a contracted, exempt management position that reports to the College President.

B  SUPERVISORY RESPONSIBILITIES

Yes

C  ESSENTIAL FUNCTIONS – DUTIES AND RESPONSIBILITIES

- Develop, recommend and carry out approved personnel/human resources programs in support of the strategic goals identified by the Board of Trustees and the President;
- Review, develop and recommend College policies and procedures and assure consistency/compliance with state and federal regulations; maintain the College's policy Operations Manual and assure of compliance with the Washington Administrative Code;
- Design and execute strategies for the administration and communication of HR law, regulations, and policies as well as industry trends, best practices, and operating guidelines for existing and new developments of the College;
- Serve as the College's primary human resource interface with the Washington State Office of the Attorney General;
- Advise the President and the Board of Trustees, in conjunction with the Assigned Assistant Attorney General, on all personnel

and legal matters concerning the College;

- Serve as the College's Title IX Coordinator assuming all responsibility for leadership, coordination and oversight of the College's Non-Discrimination & Harassment Policy & Grievance Procedure assuring compliance with Title IX of the Educational Amendments Act of 1972;
- Serve as the Affirmative Action Officer, Public Records Officer, and Appointing Authority for Classified Staff Personnel;
- Serve as the lead member of the CBC negotiation team during contract negotiations and promote effective labor/management relations;
- Work in collaboration with CBC managers, investigate and recommend employee disciplinary action consistent with CBC policies, procedures and appropriate collective bargaining agreement(s);
- Research information to develop and implement Board policies or human resource policies and procedures to guide the daily operations of the College;
- Interact with administrators, supervisors and employees to assess department/division human resource needs including, but not limited to, organizational structures, staffing, configurations and organizational development;
- Responsible for the overall coordination and implementation of programs related to the College's Equal Opportunity and Affirmative Action Program including development of the plan, identification of problem areas and assisting in arriving at solutions, serving as liaison between the College and enforcement agencies and community organizations, and providing training to staff to prevent disparate and/or harassment of employees or students who are members of affected groups;
- Coordinate the administration of all salary programs, including application of the provisions of the faculty negotiated agreement, compliance with the Washington State Department of Personnel Classified Staff Salary Schedule guidelines; implementation of the administrative/exempt compensation plan and administration of the hourly pay program;
- Coordinate all aspects of recruitment activities for academic, administrative and classified positions, including implementation of strategies to achieve affirmative action and diversity objectives and goals;
- Serve on College committees and provide leadership to College committees as may be designated by the President; act as the College's liaison to external agencies and organizations regarding human resource matters (i.e. State Board for Community and Technical Colleges, Washington State Department of Personnel, Department of Labor and Industries, Department of Employment Security, Human Rights Commission and other organizations);
- Lead, participate in, or coordinate projects, committees or task

forces as assigned by the President;
- Discharge other administrative assignments, as directed by the President; and
- Fulfill other duties as assigned.

<u>Common Duties Established by the College</u>

1. Serve as a member of the designated College committees, councils, and teams; serve on President's Cabinet;
2. Provide leadership in accordance with the Mission, Vision, and Values established by the College, furthering goals and strategic initiatives;
3. Ensure areas of responsibility operate effectively within the policies and procedures of the College and applicable governing agencies;
4. Train, supervise and evaluate employees in accordance with negotiated agreements, applicable state and federal laws, and College policies and procedures; and
5. Work to achieve and support affirmative action goals as established by the College.

| D | BUDGET RESPONSIBILITY | Human Resources, Legal Affairs and HR College Support |

E   COMPETENCIES

- Organizational Strategy – Demonstrated experience aligning and expanding programs based on the organization's mission, structures, and resources.
- Communication – Demonstrated experience creating and maintaining open communications regarding resources, priorities, and expectations. Effective problem-solving skills as well as strong oral and written communication skills.
- Collaboration – Demonstrated experience building and leveraging networks and partnerships to advance the mission, vision, and goals of an institution.
- Budget Management – Demonstrated experience developing and administering operating budgets, preparing financial reports, and ensuring compliance with federal and state regulations.
- Project Management – Demonstrated experience initiating, implementing, and coordinating multiple projects and priorities while meeting timelines.
- Personnel Management – Strong and effective interpersonal skills working with faculty and administration to ensure compliance with state and local policies and procedures.
- Professionalism – Demonstrated courage to take risks, make difficult decisions, and accept responsibility.
- Advocacy – Demonstrated experience working with staff and

student of great diversity in socioeconomic, cultural, and ethnic background, including those with different levels of academic preparation and varying physical and learning abilities.

F   QUALIFICATIONS

- Juris Doctorate degree and five (5) years of progressively responsible leadership in the areas of human resources administration, human resources development, policy and program development, labor and employee/faculty relations, benefits, classification collective bargaining, ADA and FMLA requirements, affirmative action strategic human resource planning and supporting a diverse workforce.

**Preferred/Desired Education**

- Mastery of human resources policies, procedures and regulatory requirements;
- Knowledge of labor relations law and practices, and experience with collective bargaining, contract negotiation and contract administration;
- Strong leadership and coaching skills;
- The ability to balance strategic focus with operational perspective (articulate vision, execute strategic initiatives, and manage the operations of College HR team);
- Excellent communication skills; written, verbal, presentation, and interpersonal;
- The ability to manage a multicultural workforce;
- Experience in public and/or academic environments;
- Familiarity with academic, community college or university institutions.

**Special Requirements/Conditions of Employment**

- Washington State Bar License

G   PHYSICAL
    REQUIREMENTS

- Occasional need to lift at least 20 pounds;
- Ability to sit and stand for long periods of time;
- Frequent need for oral, written and auditory communication;
- Frequent repetitive hand and wrist motions;
- Occasional need for travel;
- Ability to work in fast paced and sometimes stressful services environment.

H   WORKING
    CONDITIONS

Work week is Monday – Friday, 7:30 a.m. – 4:30 p.m. however working hours will vary due to work demands and changes in the College's schedule. Some evening and weekend work is to be expected.

**Document No. 2**

## JOB DESCRIPTION

Employee Name:
Job Title:                      Outreach/Retention Specialist for the Bachelors of Science in Cyber
                                Security Program
Reports to:                     Associate Dean for Student Retention & Completion
Exempt/FLSA                     Yes
Prepared Date:                  April 8, 2016
Approved Date:                  April 8, 2016 (newly assigned supervisor)

A   POSITION           The Outreach and Retention Specialist for the Bachelors of Applied
    OBJECTIVES         Science (BAS) in Cyber Security Program will develop and then
                       implement a recruiting and retention plan to include strategies to
                       attract a diverse pool of student candidates, coordinate and provide
                       assistance to enrolled students, and monitor student progress toward
                       completion. The Outreach and Retention Specialist will report to the
                       Associate Dean for Student Retention & Completion.

B   SUPERVISORY        N/A
    RESPONSIBILITIES

C   ESSENTIAL          • Assist the Dean and other Columbia Basin College faculty and
    FUNCTIONS –DUTIES    staff in implementing the Cyber Security Bachelor Program
    AND                  goals and objectives;
    RESPONSIBILITIES   • Develop strategies to recruit, enroll, retain and graduate
                         students in Bachelor Program and collaborate with existing
                         College departments such as Outreach and Student Success &
                         Engagement in these efforts;
                       • Collaborate with other campus BAS program staff to support
                         shared marketing, outreach, recruitment, and retention
                         processes and advising programs;
                       • Assist in the oversight of the Program application process,
                         student handbook, and recruiting materials in both printed and
                         electronic formats;
                       • Conduct informational sessions on the Program in the
                         community, the College and organizational settings and ensure
                         effective handling of inquiries concerning prerequisites,
                         curriculum, enrollment procedures, transferability of previous
                         coursework, and/or College services from prospective students
                         online, by phone, at events, or in-person;
                       • Develop and implement an orientation, as well as other student
                         activities/offerings to support and retain students;
                       • Implement tutoring and other support offerings to assist the
                         special needs of the Bachelor adult-student population;
                       • Coordinate with Student Services to ensure Cyber Security
                         students receive services and resources to support their
                         continued enrollment as well as specialized services germane to
                         the Program;

- Develop and implement an advising model that assists students in designing and revising educational plans, as necessary, to meet their individual goals;
- Monitor student academic progress and implement student success workshops or other support offerings to maximize cohort retention;
- Recommend BAS in Cyber Security courses and other general education course scheduling;
- Collaborate with Instructional Support to support faculty efforts in utilizing appropriate eLearning technology, establishing Bachelor Program smart classrooms, and supporting faculty efforts to utilize appropriate eLearning technology;
- Maintain accurate records for reporting purposes, assessment activities and ensure accurate student coding;
- Provide other support as needed to the Dean for activities such as assessment, curriculum development, and accreditation; and
- Other duties as assigned.

D   BUDGET
    RESPONSIBILITY

None

E   COMPETENCIES

Project Management: Develop project plans; coordinate projects; communicate change and progress; complete projects on time and budget; and manage project team activities.

Teamwork: Balance team and individual responsibilities; exhibit objectivity and openness to other views; give and welcome feedback; contribute to building a positive team spirit; put success of team above own interest; able to build morale and group commitment to goals and objectives; and support everyone's effort to succeed.

Visionary Leadership: Display passion and optimism; inspire respect and trust; mobilize others to fulfill the vision; and provide vision and inspiration to peers and subordinates.

Change Management: Develop workable implementation plans; communicate changes effectively; build commitment and overcome resistance; prepare and support those affected by change; and monitor transition and evaluate results.

Leadership: Exhibit confidence in self and others; inspire and motivate others to perform well; can effectively influence the actions and opinions of others; accept feedback from others; and give appropriate recognition to others.

Quality Management: Look for ways to improve and promote quality; and demonstrate accuracy and thoroughness.

**Business Acumen:** Understand business implications of decision; display orientation to profitability; demonstrate knowledge of market and competition; and align work with strategic goals.

**Cost Consciousness:** Work within approved budget; develop and implement cost savings measures; contribute to profits and revenues; conserve organizational resources.

F    REQUIRED QUALIFICATIONS

- Bachelor's degree in computer science, education, communications, student development, business administration or related field from an accredited college or university;
- Experience in student recruitment and advising in a college setting;
- Proficient in Microsoft Office; and
- Commitment to diversity and cultural sensitivity with experience in working with diverse populations.

**Preferred Qualifications:**

- Master's degree in computer science, education, communications, student development, business administration or related field;
- Knowledge and understanding of computer science education;
- Experience in advising, retention and other student support services in a college setting;
- Knowledge about current best practices and research findings relative to student retention programs and services; and
- Instructional experience in a college setting.
- 

G    PHYSICAL REQUIREMENTS

- Occasional need to lift at least 20 pounds;
- Ability to sit and stand for long periods of time;
- Frequent need for oral, written and auditory communication;
- Frequent repetitive hand and wrist motions;
- Occasional need for travel;
- Ability to work in fast paced and sometimes stressful services environment.

H    WORKING CONDITIONS

Work week is Monday – Thursday, 7:00 a.m. – 4:30 p.m. and Friday 7:00 a.m. - Noon; however working hours may vary due to work demands and some evening and weekend work is expected and will be required.

# EXHIBIT 66

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746(2), I, Emily Schuh hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at the City of Anacortes. My job title is Director of Administrative Services. My job is to oversee the City's Administrative Services Department, which provides oversight and management of human resources, risk management, municipal court services, public defense services, Anacortes Senior Activity Center, and municipal fiber.

3. There is at least one employee at the City of Anacortes who is a recipient of Deferred Action for Childhood Arrivals (DACA).

4. The City DACA recipient is a trusted employed whose job duties are essential to City operations. This individual works in a small department whose operations would be severely impacted by the loss of an employee.

5. The City of Anacortes spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of September, 2017

ECSchuh SPHR

Emily C Schuh

[Printed Name]

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

               Plaintiffs,

     v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

               Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

# EXHIBIT 67

Pursuant to 28 U.S.C. § 1746(2), I, <u>Kimberly Ann Garza</u>, hereby declare as follows:

1.  I am over the age of eighteen and competent to testify herein.

2.  I am employed at Big Bend Community College. My job title is Vice-President of Human Resources & Labor. In this position, I report to the college President and have administrative responsibility for developing, implementing and maintaining a full range of human resource programs and services including planning, recruitment, benefits, leaves, compensation, contracts, classification, training, disciplinary actions, affirmative action/equal employment opportunities, employee and labor relations, complaint investigations, and adherence to applicable laws and regulations.

3.  There are at least 1 full-time and 3 part-time employees at Big Bend Community College who are recipients of Deferred Action for Childhood Arrivals (DACA).

4.  These employees provide direct services to students in areas such as academic support, financial aid, and student programs.

5.  Big Bend Community College spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6.  The termination of DACA will be disruptive to operations, have a negative impact on the students we serve, and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>1</u> day of September, 2017

[Name]

DECLARATION OF Kimberly Ann Garza

1

# EXHIBIT 68

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

---

STATE OF NEW YORK, *et. al.*,

        Plaintiffs,

    v.

UNITED STATES OF AMERICA, *et. al.*,

        Defendants,

No. 1:17-CV-5228

**DECLARATION**

---

Pursuant to 28 U.S.C. § 1746(2), I, Viridiana Carrizales, hereby declare as follows:

1. I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. I am the Managing Director of DACA Corps Member Support at Teach For America (TFA).

3. Teach For America finds, develops, and supports a diverse network of leaders who expand opportunity for children from classrooms, schools, and every sector and field that shapes the broader systems in which schools operate.  We recruit remarkable and diverse individuals to become teachers in low-income communities. They commit to teach for two years and are hired by our partner public schools across the country. During these two years, they are called TFA corps members.  Since 1990, when our program began, we have brought over 56,000 talented teachers and leaders to classrooms in low-income communities across America, including New York, Colorado, Connecticut, Massachusetts, New Mexico, and Illinois as well as five other states.

4. Teach For America is a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code.  While we operate in 53 regions within 36 states and the District of Columbia, we are only incorporated in one state, Connecticut, where we were incorporated as a nonprofit corporation in 1989.  TFA is managed and controlled by a Board of Directors; a Chief Executive Officer supervises, manages and controls the general day-to-day administration of TFA, subject to the oversight of the Board.  Our headquarters is in New York City.

5. Deferred Action For Childhood Arrivals (DACA) allows qualified young adults to apply for DACA status and receive renewable, two-year work permits and temporary relief from deportation. DACA is life-altering for young immigrants, who are able to work, obtain driver's licenses, get health insurance, open bank accounts and provide for their families.

6. As one of our nation's leading recruiters of teachers in receipt of DACA for public schools, Teach For America has an interest in maintaining DACA because it allows talented, diverse college graduates to serve as teachers and leaders.

7. In 2013, Teach For America was among the first organizations to recruit college graduates with DACA status into the workforce. Our first DACA cohort consisted of two teachers hired in one district.

8. Since 2013, our DACA cohort has grown.  Nationwide, in 2017, 190 Teach For America alumni and corps members with DACA status are working in classrooms to expand educational opportunities for more than 6,000 students in 11 states. Another 10 DACA alumni are promoting equity in the nonprofit, corporate, and higher education sectors, including one enrolled in medical school and one on staff at Teach For America.

9. In the state of New York, there are currently 11 DACA TFA corps members and 2 DACA TFA alumni.  Twelve of the thirteen TFA New York corps members and alumni still teach in the classroom, and one is part of TFA staff.  All 12 corps members and alumni impact over 540 students in New York.

10. TFA DACA corps member and alumni presence in other relevant states: in Colorado, there are currently 2 TFA corps members and 11 TFA alumni; in Connecticut, 2 TFA corps members; in Illinois, 7 current TFA corps members and 3 alumni; in Massachusetts, 2 TFA corps members; in New Mexico, 1 TFA corps member and 1 alum.

11. In keeping with TFA's mission, our DACA teachers work in shortage-area subjects and hard-to-staff schools. Some examples (we withheld last names for privacy reasons): Vanessa teaches social studies in a high-poverty New York City school. Priscilla teaches science just ten minutes from the border of Mexico. Many of our DACA teachers are bilingual, or they bring Ivy League educations to the classroom.  Many others serve as role models and navigators for students who face the intersecting challenges of poverty and undocumented status.

12. If DACA ends, or the administration stops approving or renewing DACA applications, DACA teachers and leaders, including 190 TFA alumni and corps members with DACA status, would lose their ability to work and would be at risk of deportation—a far cry from the pathway to citizenship these individuals deserve.  Ending DACA would severely undercut TFA's national effort to increase academic success among all students, but particularly undocumented students, since we've learned that DACA teachers provide tremendous help to undocumented youth as they navigate the barriers they face; students would lose the chance to connect with teachers who mirror their life experiences and act as remarkable role models.

13. Ending DACA without a solution in place would have other far-reaching impacts on our students and communities.  Many K-12 students in the United States are undocumented or have one undocumented parent at home.  If DACA is rescinded, they will lose the legal pathway to driver's licenses, jobs, and higher education. They could be separated from their families or deported to countries they've never known as home.

14. Teach For America is proud of the impact our DACA leaders have made on our corps, communities, and country. We will continue to provide them legal assistance and financial support during this time of uncertainty.

Date: 9/29/2017

_____
Viridiana Carrizales

# EXHIBIT 69

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746(2), I, Bitta Mostofi, hereby declare as follows:

1.  I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.  I am the Acting Commissioner for the City of New York's Mayor's Office of Immigrant Affairs. I have been employed by the Mayor's Office of Immigrant Affairs since 2014. In my capacity as the Acting Commissioner, I provide advice and guidance to the Mayor's Office of Immigrant Affairs and staff in other divisions of the Mayor's Office and other City agencies on a range of issues related to immigration.

3.  The Mayor's Office of Immigrant Affairs, established in the Charter of the City of New York in 2001 by referendum, develops and implements policies designed to assist immigrants across the city.[1]

4.  The City of New York has long welcomed immigrants. In 2003, the Mayor issued two executive orders, which remain in effect today and have been reaffirmed by the present Mayor, to protect the confidentiality of immigrants' information and encourage their ability to access City services.[2]

5.  Nearly forty percent of the City's population is foreign-born.

6.  Since the creation of the federal Deferred Access for Childhood Arrivals (DACA) program, in 2012, the Mayor's Office of Immigrant Affairs has led the City's efforts to assist DACA-eligible immigrants to learn about and apply for the program and to take advantage of the opportunities that receiving DACA provides.

7.  The Mayor's Office of Immigrant Affairs estimates that more than 30,000 New York City residents have received DACA, and up to 50,000 more may still be eligible.

---

[1] NYC Charter § 18.
[2] NYC Executive Orders 34 and 41 of 2003.

1

8.   Among the 30,000-plus New York City DACA recipients, the Mayor's Office of Immigrant Affairs is aware that some are currently employed with City agencies as well as City-based public benefit corporations such as the Health and Hospitals Corporation. The City does not track employees by their particular status, and therefore does not have a firm count of the number of City employees who are DACA recipients, but the Mayor's Office of Immigrant Affairs has worked with a number of agencies that employ DACA recipients.

9.   Over the course of the past five years and several months since the creation of DACA, the Mayor's Office of Immigrant Affairs has devoted significant resources and staff time to raise awareness about the DACA program and help constituents learn more about the process and connect to legal service providers and others to assist them.

10. The Mayor's Office of Immigrant Affairs and other City agencies have conducted large-scale public education to inform immigrant residents about the opportunities presented by DACA, including protection from removal, employment authorization, access to a Social Security number, and the ability to travel abroad with Advance Parole from federal immigration authorities.

11. In addition, the Mayor's Office of Immigrant Affairs has provided public education about additional opportunities available under New York State law and policies, including eligibility for a driver license or other state-issued identification from the New York State Department of Motor Vehicles, eligibility for Medicaid public health insurance (depending on income), and eligibility for certain professional licenses through the New York State Education Department's Office of the Professions.

12. In 2014, the Mayor's Office of Immigrant Affairs led a citywide outreach and public education campaign to provide information to immigrant New York City residents about DACA and to provide assistance to DACA recipients whose renewal applications were coming due.

13. In 2016, the Mayor's Office of Immigrant Affairs, with philanthropic support from the New York State Health Foundation, launched a citywide outreach and public education campaign to provide information to DACA recipients and potential DACA applicants about the eligibility for public health insurance conferred by DACA.

14. The Mayor's Office of Immigrant Affairs has conducted research on the effect of the rescission of the DACA program, in a number of areas.

15. The rescission of the DACA program will have a significant deleterious effect on not only those immigrants who have enrolled in the program, but also on the City itself.

16. As a result of the rescission of the DACA program, the Mayor's Office of Immigrant Affairs' research projects that New York City DACA recipients will lose approximately $545 million per year in marginal wages, resulting in an estimated loss to the City of about $19 million per year in local income tax revenue.[3]

17. In addition, as a result of the rescission of the DACA program, the Mayor's Office of Immigrant Affairs' research indicates that many families will suffer economically as a result of their DACA recipient family member's loss of work authorization.

---

[3] These estimates were arrived at based on estimates of the number of DACA recipients in New York City, data reported in a national survey conducted in August 2017 (described at Tom K Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, CENTER FOR AMERICAN PROGRESS, August 28, 2017, *available at* www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow), and analysis of the New York State and New York City tax codes.

18. Based on personal knowledge, the rescission of the DACA program will hinder the ability of the Mayor's Office of Immigrant Affairs and other City agencies to support the population of New York City immigrants who have received DACA, as well as their family members, employers, educational institutions, health care facilities, and more.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  6th  day of September, 2017

/s/ Bitta Mostofi_____

Bitta Mostofi
Acting Commissioner
Mayor's Office of Immigrant Affairs
City of New York
253 Broadway, 14th Floor
New York, New York 10007

# EXHIBIT 70

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746(2), I, Judy Kennedy, hereby declare as follows:

1. I am the Mayor of the City of Newburgh (the "City"), with offices at City Hall, 83 Broadway, Newburgh, NY. I have been the City's Mayor since January 1, 2012.

2. The City of Newburgh is located in the Hudson Valley region of New York State, and is home to approximately 28,200 residents, according to the U.S. Census Bureau.

3. The City has significantly benefited both socially and economically from its diverse immigrant population. Approximately 25% of the City's residents are foreign-born. These residents live, work, go to school and meaningfully contribute to the Newburgh community.

4. The City of Newburgh has long been committed to maintaining an inclusive and welcoming community for all its residents, regardless of immigration status. For example, in March 2017, the City Council of Newburgh passed a resolution declaring the City a "Safe and Welcoming" jurisdiction, meaning that our local police department and government will not do more than is legally required to enforce federal immigration law.

5. On September 5, 2017, the Department of Homeland Security announced that it would end the Deferred Action for Childhood Arrival("DACA") program. Terminating DACA will have a profound irreparable impact on the City of Newburgh.

6. I know of at least24 DACA recipients who currently live, work, or attend school in the City of Newburgh. The City is likely home to many other DACA.

7. Several DACA recipients attend public school in the Newburgh Enlarged City School District. I am aware of DACA recipients at the local high school who are high achieving, who volunteer with local non-profits, and who plan to attend college and pursue careers in healthcare and education.

8. Without DACA, these students will find it more difficult to pursue these goals. They will have difficulty obtaining financial aid for college, and obtaining internships and employment to further their careers. Terminating DACA may lead these students to forgo college altogether.

9. Moreover, terminating DACA will prevent these students from working at non-profits to improve their communities, and may separate these students from their school

communities.  The City of Newburgh has an interest in reaping the benefits of a diverse and inclusive community.

10. I know of at least one DACA recipient in the City of Newburgh who currently works in public service, specifically in education.  Without DACA that individual would no longer be eligible to work for community, and her employer, a public entity that spent time and resources to train her, would lose the benefit of her services.

11. In addition, DACA recipients in Newburgh work in a variety of additional sectors. Among others, DACA recipients in Newburgh work in healthcare, construction and education.

12. In Newburgh the healthcare, construction and education sectors has a substantive impact on the local economy.  In addition, DACA recipients work at non-profits that work hard to improve the Newburgh community and ensure justice for all the City's residents.

13. These sectors in Newburgh depends on highly trained and qualified employees.  With the termination of DACA, DACA recipients will no longer have work authorization. Employers in healthcare, construction and education will thus lose the services of the highly qualified and trained DACA recipients currently working in those sectors. Moreover, the applicant pool for those sectors will also lose qualified and trained applicants.

14. Losing trained and qualified staff in these industries will not only hurt the particular companies in those sectors, it will also harm the economic outlook of the City of Newburgh.

15. The DACA recipients working in Newburgh earn incomes on which they pay local income taxes.  Terminating the DACA program, will result in the loss of this tax income to the City of Newburgh.

16. Moreover, DACA recipients in Newburgh own homes, and pay local property taxes on those properties.

17. Beyond the detrimental economic impact, the DACA rescission would have a destructive effect on the social fabric of the City of Newburgh. Immigrants, including DACA recipients, live throughout Newburgh's various neighborhoods and communities.

18. Termination of the DACA program may result in the relocation of DACA recipients, now subject to deportation, from Newburgh.  Several DACA recipients in Newburgh are part of mixed-status families, in which a DACA recipient is the parent, spouse or sibling to a U.S. Citizen.  In some cases the DACA recipient is the primary caregiver.  The termination of DACA will likely threaten the stability of these mixed-status families.

19. Moreover, rescinding the DACA program may result in the fracturing of communities as residents flee or become subject to federal government deportation.

20. Thus, rescinding DACA will negatively impact economic growth, reduce tax revenues, harm the City's interest in diversity and inclusion, and threaten the stability of families and communities in the City of Newburgh.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3 day of October, 2017.

Mayor Judy Kennedy

# EXHIBIT 12

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

# EXHIBIT 71

## DECLARATION OF JAMES B. MILLIKEN

Pursuant to 28 U.S.C. § 1746 (2), I, James B. Milliken, hereby declare as follows:

1.      I am Chancellor of The City University of New York ("CUNY" or "University"), a position which I have held since June 2014.   As Chancellor, I am the chief executive, educational and administrative officer of CUNY, its senior and community colleges and other educational divisions and units.  Prior to holding my current position, I served as President of the University of Nebraska for ten years, and prior to that I served as Senior Vice President of the 16-campus University of North Carolina.   I also hold an appointment as Distinguished Professor of Law at the CUNY Law School.  I have personal knowledge of the matters set forth below, or have knowledge of those matters based on my review of information and records gathered by members of my staff.

2.      The City University of New York is the nation's largest urban university, with twenty-four campuses, including senior and community colleges and graduate and professional institutions.  The University has an enrollment of approximately 274,000 full and part-time undergraduate and graduate students and nearly 276,000 students enrolled in adult and continuing education programs.

3.      As is set forth in Section 6201 of the New York State Education Law, CUNY was established as an "integrated system of higher education" with a continuing commitment to academic excellence and equal access and opportunity for students, faculty and staff from all ethnic and racial groups and from both sexes.  CUNY has had a special mission to provide an affordable and excellent education for residents of New York City from disadvantaged backgrounds.  Led by this historic mandate, CUNY has become among the most accessible, affordable and respected universities in the country.

4.       As is set forth below, since it went into effect in 2012, the DACA program has provided an important cohort of CUNY students with legal protections and financial opportunities that have enhanced their ability to take full advantage of a CUNY education.  This result furthers CUNY's mission to make higher education available to all who wish to attain it.  The DACA program has also benefitted the University itself, as DACA students contribute their unique perspective and enthusiasm inside and outside the classroom, making CUNY an even more vibrant place to study.   Finally, DACA furthers CUNY's mission to supply an educated workforce to the State and City of New York, as graduates with DACA status can go on to employment in professions needed by the State and City.

5.       Students without lawful immigration status through no fault of their own face a number of barriers to accessing and obtaining higher education, including paying tuition and living expenses, obtaining a job to support themselves and sometimes family members, and overcoming psychological obstacles such as anxiety, stress and feelings of exclusion.   DACA has removed some of these barriers for CUNY students.  By providing for work authorization, DACA has helped these students finance the cost of their college educations by working at higher-paying jobs, and has also enabled them to obtain valuable paid work experience and internships in their field to prepare them for career- track positions after college.  By providing temporary protection from deportation, it has reduced stress and anxiety and enabled them to focus on their education.  Accordingly, the DACA program has played a significant role in allowing these students to meet their educational goals at the University.

6.       Although CUNY does not collect data on the specific number of students with DACA status, CUNY is aware that there are hundreds, if not more, DACA students enrolled at the University.  A private scholarship, TheDream.US, which is available only to students in

2

DACA or Temporary Protected Status (TPS) has advised the University that it has awarded approximately 800 scholarships to CUNY students since the Spring 2015 semester; it is reasonable to assume that most of these are DACA students.   Consistent with research regarding DACA students in higher education generally, DACA students at CUNY generally perform well academically.  Of the 474 CUNY students who were receiving TheDream.US scholarship in Spring 2017, close to 70 percent have maintained a cumulative grade point average of 3.0 or higher.  Such students, who are residing in New York through no act of their own, are clearly strivers who are taking the educational opportunities they been have afforded seriously.

7.      If the DACA program were eliminated, it would have a severe impact on CUNY's DACA students.   The elimination of work authorization could likely result in some students having to withdraw from the University, due to lack of resources.    They would be subject to deportation and likely lose their sense of educational purpose, which would undoubtedly impact their retention and academic success.

8.      One of CUNY's critical roles as an institution of higher education is to provide students with the skills necessary for them to be successful in their chosen field, regardless of whether this requires an associate's degree, a bachelor's degree, or graduate or professional education.    By providing students with work authorization, DACA allows these students to work in the field of study while in school and after graduation.   Moreover, in the State of New York, students in DACA status can now be licensed in the professions and can become lawyers, nurses, teachers and have other professional employment that requires licensure by the State. CUNY invests significant financial and human resources in teaching all of its students, and this investment is coupled with the investment that the City and State of New York have already

3

made in K-12 with regard to these students.  The DACA program ensures that, at least for this group of immigrant students, CUNY's resources, as well as those of the City and the State, are being fully taken advantage of.

9.      With its home in the nation's largest and most diverse city, CUNY recruits and attracts a student body that is extraordinarily diverse by any measure, including in country of origin, language, culture, race, ethnicity, religion, geography, family income, age, and educational background.   New York City is home to one of the largest immigrant populations in the country and CUNY has a historic tradition of educating immigrants.   CUNY students identify with 216 different ancestries and speak 189 different languages.   Thirty seven percent of CUNY students were born outside of the United States mainland.

10.      As is described in its 2016-2020 Master Plan adopted by the University's Board of Trustees, CUNY has recognized the increasing importance of providing global perspectives to its students.   Studying alongside students from other countries can expose students to different cultures and ideas, enliven their classroom experiences, expand their networks and horizons and engender a sense of global citizenship. DACA students contribute to these specific goals of the Master Plan and CUNY's special mission to serve all residents of New York City regardless of class, race or immigration status.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September _5_, 2017.

James B. Milliken
Chancellor
The City University of New York

4

# EXHIBIT 72

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

                Plaintiffs,

     v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

                Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

## DECLARATION OF PHILIP A. BALLINGER

I, PHILIP A. BALLINGER, state as follows:

1.      I am over the age of eighteen and competent to testify herein.

2.      I am the Associate Vice Provost for Enrollment and Undergraduate Admissions at the University of Washington in Seattle, Washington.  I have been employed by the University of Washington ("University") in admissions since 2003.  I have been a college admissions professional for over 25 years in both public and private institutions of higher education.

3.      As the Associate Vice Provost for Enrollment and Undergraduate Admissions, I am responsible for undergraduate admissions and the development and implementation of undergraduate admission and enrollment policies at the University.  I also provide leadership and management of the offices of Admissions, Financial Aid, the Office of the University Registrar, and International Student Services.

4.      While the University does not keep centralized records of students who may be eligible for or registered in the Deferred Action for Childhood Arrivals (DACA) program, based on interactions that I and others on my staff have had with our enrolled and newly-admitted students,  I am confident that more than a hundred students enrolled at the University during the 2016-2017 academic year were DACA participants, and that more than a hundred applicants who have confirmed an intent to enroll here starting Autumn Quarter 2017 (for the 2017-2018 academic year) are eligible for, or participating in, the program.

5.      It is my understanding that if the DACA program is discontinued, many of the currently enrolled and newly admitted University students who are participating in (or eligible to participate in) the program will likely not be able to continue with their studies here. They will lose their ability to work legally, and therefore lose the ability to support themselves while studying.  Many will also have an understandable fear that they may be deported. (Even a

DECLARATION OF PHILIP BALLINGER                    1                    **ATTORNEY GENERAL OF WASHINGTON**

delayed termination of the program will obviously greatly heighten this fear.) In the course of my career, I have witnessed many times the negative effects that this type of stress can have on a student's ability to thrive in a rigorous academic environment like the University.  Admission to the University is exceptionally competitive -- all these students have had to work incredibly hard just to get here, and the University's academic programs are challenging even for our very brightest students.   The prospect of having all that effort go to waste would no doubt be devastating, and may cause many of these students to simply give up and drop out.

6.       If these students are not able to continue with their education because DACA is rescinded, I am concerned that the University community will lose the significant contributions that these students are able to make to the overall academic experience here on campus.  Based on my years of experience as a university admissions and enrollment professional engaged in the development of higher education admissions policies, I (together with most of my peers in my profession) have come to recognize the value of having, in every class cohort, students who bring a variety of perspectives and life experiences into the academic community.  Having a student body with a diversity of viewpoints and backgrounds fosters a robust learning environment for all.  DACA eligible students inherently have a set of life experiences and perspectives that are very different from those of other students.  Many, if not most of them, are the first in their families to attend college, and they enrich our community by being able to share with their classmates - in a variety of settings both in and out of the classroom - their life

//

//

//

//

//

DECLARATION OF PHILIP BALLINGER                2                **ATTORNEY GENERAL OF WASHINGTON**

experiences and the unique understandings they have gained by virtue of those experiences.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this ___5th___ day of September 2017.

PHILIP A. BALLINGER

# EXHIBIT 73

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

**Declaration of Mary R. Jeka**

I, Mary R. Jeka, subject to perjury, state as follows:

1. I am the Senior Vice President and General Counsel at Tufts University.  In that capacity, I have personal knowledge of the facts to which I attest in this Declaration.

2. The Trustees of Tufts College, known to the public as Tufts University, is a nonprofit institution of higher education in Massachusetts.  Tufts University was granted a Charter in 1852 and opened in 1855.  Tufts' mission, as adopted by the Board of Trustees in 2013, is to be a "student-centered research university dedicated to the education and application of knowledge, committed to providing transformational experiences for students and faculty in an inclusive and collaborative environment where creative scholars generate bold ideas, innovate in the face of complex challenges, and distinguish themselves as active citizens of the world."

3. Tufts University is comprised of the following schools and a college: the School of Arts & Sciences, the School of Engineering, the School of Medicine, the Sackler School of Graduate Biomedical Sciences, the School of Dental Medicine, the Friedman School of Nutrition Sciences and Policy, the Fletcher School of Law and Diplomacy, the Cummings School of Veterinary Medicine and the Jonathan M. Tisch College of Civic Life. Approximately 11,500 students are currently enrolled in Tufts' degree or certificate programs across its many undergraduate, graduate, and professional schools.

4. Tufts' core values include a commitment to equal opportunity, inclusion, accessibility, and diversity. Consequently, Tufts welcomes all undergraduate applicants regardless of citizenship status. Undocumented students, with or without Deferred Action for Childhood Arrivals (DACA), who apply to Tufts are treated identically to any other U.S. citizen or permanent resident. (http://admissions.tufts.edu/applu/first-year-students/undocumented-students/).

5. Tufts University is proud to welcome DACA and undocumented students and recognizes that many DACA and undocumented students must overcome enormous challenges to gain acceptance here.  Their commitment to attend and graduate from Tufts speaks to their resilience and determination.  Tufts takes pride in the diversity of its university community and DACA and undocumented students bring critical perspectives, insights and experiences to our academic and campus life.

6. Tufts is committed to invest in the success of DACA and undocumented students. To that end, Tufts provides financial aid, free immigration law clinics, and resource support to DACA students so that they can participate fully in educational and co-curricular programming.

7. Despite the university's efforts to support DACA and undocumented students, their immigration status can pose significant barriers to educational access.   For example, typically, 40 to 45 percent of Tufts undergraduates study abroad. Before studying abroad, DACA students must secure advanced parole, which allows them to travel outside the United States without losing their DACA status. This year, Tufts was pleased to support its first DACA student who planned to study abroad this spring.  Unfortunately, due to the elimination of the DACA program and the cancellation of advance parole, this student can no longer study abroad without risking his DACA status and potential deportation.

8. Terminating the DACA program raises these and many other Hobson's choices for our 26 DACA students.  By eliminating the important protections granted under the DACA program, these students will all soon be placed in an undocumented status. Such a position entails the constant fear of deportation, hardships from limited employment opportunities and great uncertainty about their future.  Elimination of the program jeopardizes the ability of these students to fully participate in the Tufts community.

9. Tufts DACA students are clear about what the elimination of the DACA program means for them and for us:

> *Without DACA, there's a certain loss of hope in the notion that I'll one day be able to apply all that I've learned at Tufts University to the country that I love dearly.*

--Tufts DACA Student
Anonymous

10. Tufts faculty members can attest to the importance of this program and the contributions made by its recipients in their classrooms and our community as a whole:

> a. *Before DACA, undocumented immigrants--even those with higher education--could not translate their academic achievement into professional success. Lack of legal status was a "master status", in sociological speak, that flattened their chances for success and destroyed their Americanized beliefs that hard work will pay off. After DACA was enacted in 2012, various national studies show its recipients have seen massive improvements in educational attainment, employment, income, and mental health. At Tufts, it means they become eligible to work and take internships crucial to their development and preparation for the future.  They live, study, and work with less fear than before; as their teacher and advisor, I can literally "see" their mental health and optimism improved, and their stress abated, while their counterparts without DACA struggle more. Eliminating DACA will rank among the most harmful*

2

> *stains on American history. I am proud to work at Tufts, however, an institution that will continue its work of recruiting, accepting, supporting, and educating undocumented students whether they have DACA or not. This is one of the most important human and civil rights issues of our time.*

--Helen B. Marrow, PhD
Associate Professor of Sociology
Author of New Destination Dreaming: Immigration, Race, and Legal Status in the Rural American South

> b. *Ending DACA without a pathway to permanent residency or citizenship is cruel and un-American. I know several young people, some are my students, whose lives have been utterly transformed by DACA. Suddenly, they had access to driver's licenses, jobs, and higher education. They had a chance at a life. But most importantly, they stopped being so afraid. I know this fear and uncertainty too well. I came to the United States from the Philippines when I was three years old. It wasn't until I was in high school that I found out I was undocumented and our family was mixed-status. We worked on fixing this complicated administrative issue and got lucky when the president at the time, Ronald Reagan, showed leadership and compassion by signing the Immigration and Control Act of 1986. We were granted amnesty and began the process of gaining US citizenship, which I did not have until almost ten years later, after I graduated college. Even though I was on a pathway to citizenship, I did not feel comfortable until the swearing-in ceremony. I teach writing at my alma mater and I am full of respect for my students who continue to work and study amidst this demoralizing news. I urge Congress to protect the Dreamers, who are Americans except on paper.*

--Grace Talusan
Lecturer, English Department

11. Tufts President Anthony P. Monaco has strongly supported both our DACA and undocumented students. He has joined with fellow presidents in calling for the continuation of the DACA program- http://president.tufts.edu/blog/2016/11/30/supporting-and-protecting-our-daca-and-undocumented-students/ Under his leadership, Tufts will continue in its commitment to provide DACA students with the resources they need to learn and thrive at Tufts.  As he stated in a letter of support to the community, following the September 5, 2017 announcement eliminating the DACA program:

> *Since our founding, Tufts has been rooted in the values of inclusion and diversity. These values—so important to our community—have prompted us to join with other colleges and universities in calling for the*

*continuation of the DACA program. Tufts strongly opposes terminating DACA, and I promise that we will continue to advocate in court and with elected leaders to communicate our unwavering support of the program.*

*DACA and undocumented students have often overcome enormous challenges to study at Tufts. They can be proud of their accomplishments, and we are grateful for their contributions to the university community. We will continue to honor our commitment to our DACA and undocumented students, providing them with our unequivocal support so they can receive the quality education that they well deserve. I believe this support is in the very best tradition of Tufts as a university.*

--Anthony P. Monaco
President, Tufts University


SIGNED UNDER THE PENALTY OF PERJURY THIS 6TH DAY OF SEPTEMBER 2017.


_____

Mary R. Jeka
TUFTS UNIVERSITY
Senior Vice President and General Counsel

4

# EXHIBIT 74

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>          Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>          Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

I, Juan Salgado, hereby declare and affirm:

1. I am Chancellor for the City Colleges of Chicago (CCC), having been appointed by the Board of Trustees on April 6, 2017 and having commenced my tenure as Chancellor on May 1, 2017.

2. I am over the age of 18 and competent to testify.

3. I have either personal knowledge of the matters set forth below or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered from CCC records by others within the organization.

4. Pursuant to state law, CCC is an "open enrollment" institution and accepts all students qualified to complete any one of its programs (110 ILCS 805/3-17).

5. CCC serves approximately 90,000 students from every neighborhood in the City of Chicago, including some students who currently participate in or are eligible for DACA.

6. CCC operates under the principle that a diverse student population benefits all students because students from different backgrounds and nationalities bring a unique perspective to the classroom, which enriches the learning experience of their classmates.

7. CCC welcomes students from all backgrounds and does not require proof of citizenship as a requirement to register for study.  Applications submitted by potential students with DACA status are reviewed in the same manner as all other applications.

8. CCC currently offers the Star Scholarship program to all students regardless of immigration status, including those who are participants in the DACA program.  The Star Scholarship allows students who graduate from Chicago public high schools with a 3.0 grade point average and test nearly college-ready to attend college tuition-free.

9.  I have read the Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA).

10. Based on my experience and the shared experience of those CCC employees in the Student Affairs Office, the rescission of DACA could impact hundreds of CCC students who would be in danger of being prevented from continuing and completing their studies at CCC as the result of potential enforcement actions by the federal government. Furthermore, based on my experience, certain students may choose to leave CCC because they can no longer afford to attend classes without work authorization that was previously provided through DACA.

11. Such actions would be damaging to those affected students, as well as their classmates who would be deprived of the classroom contributions and perspectives from those students who may not be able to continue their education at CCC.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and complete to the best of my knowledge.

Executed this 27th day of September, 2017

Juan Salgado
Chancellor

# EXHIBIT 75

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>          Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>          Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

**Declaration of Executive Vice President and Vice President for Academic Affairs Barbara J. Wilson**

I, Barbara J. Wilson, hereby declare and affirm as follows:

1. I am of full legal age and competent to testify herein.

2. I am the Executive Vice President and Vice President for Academic Affairs of the University of Illinois System ("U of I System" or "System").

3. I have compiled the information in the statements set forth below through U of I System personnel who have assisted me in gathering this information from our three universities.

4. The U of I System is comprised of three best-in-class universities, a major healthcare enterprise with a hospital and clinics that provide care for largely underserved populations, an Extension network that takes our leading-edge scholarship to every corner of our state, and a growing online learning network. The System includes Tier 1 research universities in Urbana-Champaign and Chicago that make significant contributions to breakthrough discovery that drives innovation, progress and economic development in the fields of engineering, medicine, technology and the arts, among many others.

5. The System is Illinois' largest educator and has seen enrollment grow for five straight years, to a record 83,000-plus students in undergraduate, graduate and professional programs that include many ranked among the nation's best. The System transforms the lives of students and alters the trajectory of families, with 24 percent of all students coming from underrepresented ethnic and racial groups and about 23 percent of undergraduates identifying as first-generation students. A global reputation for academic excellence attracts students from every state in our nation and 136 countries around the world. The System employs nearly 25,000 faculty and staff, and awards more than 20,000 degrees every year, adding to its network of more than 700,000 alumni worldwide.

1

6. The U of I System grew from the land-grant movement that redefined higher education and led America's evolution from an agrarian society to the industrial revolution to today's electronic digital age. The University of Illinois at Urbana-Champaign is an original land-grant campus, created to open the doors of higher education to the children from all socioeconomic backgrounds. In the 150 years since, as it grew from a single campus to three, the System has never wavered from that core mission – ensuring a high-quality, life-changing education for every deserving student, regardless of her or his background.

7. The Deferred Action for Childhood Arrivals (DACA) policy reflects the U of I System's bedrock commitment to access and opportunity, supporting qualified undocumented students and nurturing the talents that will help lift their lives and their communities.

8. The repeal of DACA could affect more than 350 students and nearly 100 employees across the U of I System. Students who are now DACA grantees could lose their work authorizations, which could cost them their jobs and ability to pay for their education.

9. As a result of repeal, DACA grantee students also could face an increased risk of arrest and deportation from the country they call home.

10. Repealing DACA runs counter to the spirit of opportunity and inclusion that has made U.S. higher education a model for the world. The collective interests of our state and nation are best served by unlocking the talents of every deserving student and providing a diverse campus culture that prepares our graduates to excel in an increasingly global workplace.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 27th day of September 2017.

Barbara J. Wilson

Executive Vice President and Vice President for Academic Affairs

# EXHIBIT 76

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>       Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>       Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## DECLARATION OF REINA GUEVARA

I, Reina Guevara, hereby declare as follows:

1. My name is Reina Guevara.  I am 26 years old.  I live in Dorchester, Massachusetts.

2. I have personal knowledge of the matters set forth below.

3. I was born in Yucuaiquin, El Salvador during the civil war.  When I was very young, my mother's life was threatened and she had to flee for the United States.  I stayed in El Salvador and lived with my grandparents.  The civil war ended but El Salvador was still not safe. When I was 10 years old I was sexually assaulted.  My life was in danger.  My mother brought me to the United States to keep me safe.  I was 11 when I arrived here.

4. Before DACA, my life was difficult and complicated.  I had to start working when I was 15 years old to help support my family, but without a work permit I could only get jobs that paid less than minimum wage.  About 9 years ago, I was detained by Immigration and Customs Enforcement and given a deportation order.  I lived in constant fear that I would be separated from my mother and family again.

5. I applied for DACA as soon as I could in 2012.  Receiving DACA changed my life.  I was able to get a work permit and a social security card.  I was able to find a better job to help my family.  I pay state and federal taxes.  I have also been able to plan for my future.

6. I attended Bunker Hill Community College on a scholarship.  I would not have received the scholarship without DACA.

7. I graduated from Bunker Hill last year and am now attending UMass Boston.  I'm studying philosophy and public policy.

1

8. I just started a job as the Development Director of the Student Immigration Movement. After college, I want to continue working in the non-profit sector helping undocumented immigrants navigate the process to access higher education.

9. I couldn't have accomplished any of these things without DACA. Because of DACA, I pay in-state tuition at UMass. I also receive a partial scholarship that requires me to take a certain number of credits each semester. Without in-state tuition, I couldn't afford to keep up with the credit requirements, I would lose my scholarship, and would have to drop out of school.

10. If I lost DACA, my deportation order would be effective again. I would be at immediate risk of being separated from my family and sent back to El Salvador.

11. My mother brought me to the United States because I wasn't safe in El Salvador. I haven't been back to El Salvador in 16 years.

12. Boston is my home. My family is here. I work and go to school here. My future is here.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of September, 2017.

Reina Guevara

2

# EXHIBIT 77

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

                Plaintiffs,

      v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

                Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

I, Fatima Preciado, declare:

1.     I am 19 years old and a sophomore at Portland State University ("PSU") majoring in Political Science.  I have personal knowledge of the matter stated herein.  I came to the United States with my parents from Michoacán, Mexico when I was 4 years old. I grew up in Salem, Oregon and graduated from McKay High School.  I aspire to graduate from PSU and become a lawyer.  I have been awarded scholarships from PSU and outside organizations such Kaiser Permanente, the Boys and Girls Club.  This year I was awarded the Presidential Scholarship from PSU.

2.     I have been involved in the Oregon community in many ways. I have volunteered many hours to register voters and have worked on voter turnout. After the November elections, worried about the future of Deferred Action for Childhood Arrivals ("DACA"), I told my story on OPB's Think Out Loud, and on KGW, KATU, and other local media outlets, speaking up for those who were too afraid.

3.     I filed for DACA program in 2013 because my mother needed help and, after approval, I was able to get a work permit.  I was also able to get an Oregon driver's license.  I worked as a waitress in a restaurant in Salem.  I have worked as a paid intern with ~~CAUSA~~, CAUSA P.P.M Oregon's Latino immigrant rights organization and paid income taxes Oregon.  Currently I am employed by PSU in the undergraduate admissions office and as a student ambassador.  There are also paid positions.

4.     My deferred status expires in April 2019.  My family has been living in Oregon for 17 years and I have not been back to Mexico.  I have never met my relatives in Mexico.  I have two other siblings with DACA deferrals and my youngest sibling, who is 7, was born in the United States and is a citizen.  I'm afraid that if the DACA program ends, my family will be split up.  I am also afraid that if the DACA program ends, it will be more difficult for me to complete my education on time because, although I currently have scholarships that will cover tuition for 12 credits per term, I need to take more than that in order to graduate on time in four years.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Currently, I am paying out of pocket for the extra credits I need to graduate on time, I would likely not be able to do that if the DACA program ended and I could no longer work legally.  I will also have more trouble paying for housing, food, books and other expenses, and may need to move home and commute to school in order to conserve costs.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: September 1, 2017.

FATIMA PRECIADO

Page 3 -   DECLARATION OF FATIMA PRECIADO
JND/a2c/8480091-v1

# EXHIBIT 78

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>             Plaintiffs,<br><br>     v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>             Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## DECLARATION OF ALLYSON SURIA

I, Allyson Suria, declare as follows:

1.  I am over the age of eighteen. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.  I am a twenty-one year old resident living in Virginia. Virginia is my home.

3.  In 2004, when I was 8 years old, I came to the United States from El Salvador.

4.  I graduated from high school in Arlington, Virginia where I was an Honor student.

5.  In 2012, I applied for DACA and attained DACA status. Subsequently, I received a social security number for work authorization and a work permit, which allowed to have access to previously unattainable employment opportunities, and a financial option to enroll in an institution of higher education paying in-state tuition. I was able to obtain my driver's license, open my first bank account, and obtain my first internship at my local Credit Union as a part-time job and eventually work my way to become the Executive Assistant. Most importantly, I was able to let go of the fear of being deported at any minute.

6.  I am currently enrolled in Northern Virginia Community College where I am majoring in Business Administration with a concentration in Finance. My educational goal is to transfer to George Mason University in the next year. I am also currently employed as the Executive Assistant at Arlington Community Federal Credit Union. I could not have achieved any of these things without DACA.

7.  Any revocation of DACA would have a huge negative impact in my life.  My entire life will change. I will be unable to provide for myself financially or afford to continue to pursue my educational goals. I will lose my job at organization that I have come to love in my three year tenure. I will be forced to pay out of state tuition rates to complete my

education. I will lose my healthcare. Finally, I will lose the hope and protection from deportation and return to the shadows that make life so difficult.

8.  I want to have an opportunity to give back to this country, and to the communities, and academic institutions that have supported me throughout my life. The American culture is engraved in my blood and I share the same values of Liberty and Freedom that many American citizens hold dear. Allowing DACA to continue would allow me to continue to live, work, and contribute to the economy and communities of America which is my home.

Executed on:  September 28, 2017

_____
Allyson Suria

# EXHIBIT 79

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF DANIELIS ANDREA DOS SANTOS TORREZ

I, Danielis Andrea Dos Santos Torrez, declare as follows:

1.  I am over the age of eighteen. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.  I am a twenty-three year old resident living in Richmond, Virginia.

3.  In 1994, when I was 3 months old, I came to the United States from Venezuela. I have been living in Virginia since 2005.

4.  I graduated from a Virginia high school in 2012 at the age of 18, the same year that the Deferred Action for Childhood Arrivals ("DACA") was enacted.

5.  In 2012, I applied for DACA and attained DACA status. Subsequently, I received a social security number for work authorization and a work permit, which allowed to have access to previously unattainable employment opportunities, and a financial option to enroll in an institution of higher education paying in-state tuition. I enrolled as a student at John Tyler Community College and also began to work as a dental assistant. I couldn't have achieved any of these things without DACA.

6.  I am currently employed as a dental assistant at a dental office in Virginia.

7.  During the year of 2016 my DACA renewal was delayed for three months and my employer had to put me on leave until the renewal process was completed. When that happened, I felt like my world crashed around me because I was unable to pay my bills. It was an extremely stressful situation.

8.  If DACA is repealed, my world will crash around me again, but with no hope of renewal. Without DACA status, I will be unable to provide for myself financially or afford to

continue to pursue my educational goals. I will also feel betrayed by my country I call home: I did what I was asked to do by my government when I came out from the shadows and allowed myself to be known as an undocumented individual in order to attain DACA status, but now this information I shared with my government will harm me if DACA is repealed. I am no less American than a person born in the United States; Virginia is my home.

9. I want to have an opportunity to give back to this country, and to the communities, and academic institutions that have supported me throughout my life. Allowing DACA to continue would allow me to continue to live, work, and contribute to the economy and communities of America where I have spent all of my life.

Executed on:  September 27, 2017

Danielis Andrea Dos Santos Torrez

# EXHIBIT 80

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>       Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>       Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## DECLARATION OF RICK MIRANDA

I, RICK MIRANDA, declare as follows:

1.      I am over the age of eighteen and competent to testify herein.

2.      I am the Provost and Executive Vice President at Colorado State University. I joined the faculty at Colorado State University as an Assistant Professor in 1982. I became Chair of the Department of Mathematics in 1997, and Dean of the College of Natural Sciences in 2002. I became Provost and Executive Vice President in 2009, and my responsibilities include overseeing academic programming and faculty affairs on campus to help fulfill the land-grant mission of Colorado State University. Specifically, as Provost and Executive Vice President, I manage the areas of Enrollment and Access, Research, Student Affairs, University Operations, Faculty Affairs, International Affairs, Information Technology, Libraries, Undergraduate Affairs, and all eight colleges at Colorado State University.

3.      I have either personal knowledge of the matters set forth below or, with respect to those matters for which I lack personal knowledge, have reviewed information gathered from university records by my staff and others within the organization.

4.      Colorado State University is a comprehensive graduate research institution and offers comprehensive array of baccalaureate, master's, and doctoral programs, and the university holds exclusive statewide authority for programs in agriculture, forestry, natural resources, and veterinary medicine. As Colorado's land-grant university, Colorado State University has a unique mission in the state of Colorado. The land-grant concept of a balanced program of teaching, research, extension, public service, and engagement provides the foundation for the university's teaching and research programs. In addition, as Colorado's land-grant university,

Colorado State University has a mission to provide access to a high-quality, affordable education to all with the talent and commitment to earn a CSU degree.

5. Colorado State University is committed to a foundational principle of inclusive excellence, recognizing that our institutional success depends on how well we welcome, value, and affirm all members of the Colorado State University community. Only through the inclusion of the rich diversity of students, staff, faculty, administrators, and alumni can the university – a marketplace of ideas -- truly be excellent in its pursuits.

6. At Colorado State University, we believe that diversity benefits everyone. Engaging with people from all walks of life and backgrounds allows students to experience new and unique ways of thinking. Colorado State University students who are registered in the Deferred Action for Childhood Arrivals (DACA) program are critical to this effort. Most of these students are the first in their families to go to college. They have different life experiences and perspectives that enhance the learning environment, and they also tend to be high academic achievers. DACA students are an integral part of the Colorado State University community and an asset to the state of Colorado; these are students who are excelling in highly competitive and challenging majors who are highly likely to remain in Colorado and contribute as taxpayers and skilled workers once they graduate. Nearly all of these students graduated from Colorado high schools and have strong family ties to the state. For most, it is the only home they know.

7. The State of Colorado supports Colorado State University's efforts to recruit students enrolled in the DACA program. In 2013, the Governor signed into law Senate Bill 13-033, known as the ASSET Bill, which permits students who are eligible for DACA to pay in-state tuition at any Colorado public college or university. DACA students may also apply for College Opportunity Fund stipends to offset the cost of their education.

8.      There are approximately 189 students who are enrolled at Colorado State University and participate in the DACA program.  If the DACA program is discontinued, many of the currently admitted Colorado State University students who are participating in that program will likely not be able to continue their studies at the university.  They will lose their ability to work legally, and therefore lose the ability to support themselves while pursuing their educational studies.  Many also have an understandable fear that they will be deported.  Also, those DACA students pursuing a degree that requires non-classroom work experience will find their path to graduation blocked.  Further, if some of these students nevertheless remain enrolled and graduate, they will find themselves unable to find employment.

9.      If these Colorado State University students are unable to continue their education because DACA is rescinded, I have concerns that the university community and Colorado will lose the significant contributions that these students bring to the overall academic and educational experience at Colorado State University.  They expand the intellectual vigor of the university and increase the diversity of the university community.  In addition, losing those DACA students would result in the loss of more than approximately $4.5 million dollars in revenue for the university, assuming those students are full-time and living on campus.  The loss of these DACA students would have a significant negative impact on the university's operating budget.

10.     I declare under penalty of perjury under the laws of the State of Colorado that the foregoing is true and complete to the best of my knowledge.

DATED this 26th day of September, 2017.

RICK MIRANDA

# EXHIBIT 81

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>               Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>               Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## DECLARATION OF RYAN JAMES HAGEMANN

Pursuant to 28 U.S.C. § 1746(2), I, Ryan James Hagemann, hereby declare as follows:

1.      I am over the age of 18.  I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.      I am Vice President and General Counsel of Western Oregon University ("WOU").  In that capacity, I serve as the chief legal officer of WOU.  I am also the Secretary to the Board of Trustees of WOU.  In that capacity, I serve as the chief administrative officer to the Board of Trustees, and I oversee WOU's public affairs, governmental affairs, strategic initiatives, human resources, and institutional research.  In performing my duties related to institutional research, I am responsible for overseeing WOU's efforts to collect and analyze data pursuant to its institutional research goals—*i.e.*, on any matters that impact the university and its functioning.  That includes, as pertinent here, data related to student enrollment and tuition.

3.      In addition to my current service at WOU, I have been involved in higher education in Oregon since 2001.  I started at the Oregon Department of Justice as an Assistant Attorney General assigned to both the Education and Labor & Employment Sections where I represented Oregon's public universities.  In 2004, I was employed by the then-Oregon University System ("OUS")—a legal entity, since dissolved, that was comprised of all of Oregon's public universities.  I served as General Counsel of OUS from 2007 until it was dissolved in June 2015, at which point I began my current duties at WOU in July 2015.  Finally, I obtained my bachelor's degree in politics from Whitman College in 1994, and my juris doctorate from the University of Oregon School of Law in 2001.

4.      WOU is a public university located in Monmouth, Oregon.  WOU includes both the College of Education and the College of Liberal Arts and Sciences, and has a total enrollment of approximately 6,000 students.  WOU creates lasting opportunities for student success through transformative education and personalized support.  As the first public institution of higher education established in Oregon, WOU upholds an enduring commitment to the value of

Page 2 -    DECLARATION OF RYAN JAMES HAGEMANN
        J1B/a2c/8493336-v5

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

teaching and learning. WOU's academic and co-curricular activities enhance the economic, cultural, and intellectual vitality of this region and the world at large. To serve the greater good, WOU educates individuals in an accessible and supportive environment. WOU's students enjoy a personalized experience in a comprehensive, mid-sized public university. The knowledge and abilities cultivated in WOU's graduate programs also meet compelling needs for work, service, and leadership beyond its campus. WOU empowers its students, employees, and alumni to lead meaningful, responsible lives.

5.      As part of its educational mission, WOU is firmly committed to the values of accessibility, accountability, collaboration, community, diversity and respect, empowerment, excellence, and sustainability and stewardship. In particular, WOU's commitment to diversity and respect represents not merely a commitment to abstract ideals, but rather, a commitment to the concrete and vital educational goals of fostering equity and inclusion; appreciation for the complexity of the world; and strength drawn from the variety of our students' backgrounds, abilities, cultural experiences, identities, knowledge domains, and means of expression. To that end, WOU relies on the diversity of its student body in order to foster an educational community that is trustworthy, caring, and a safe environment for the cultivation of peace, civility, and social justice. WOU also relies on the diversity of its student body in order to form connections extending beyond the classroom, across campus, and into the local and global communities.

6.      WOU also is a partner institution of TheDream.US project, a non-profit organization that assists non-citizens to attend institutions of higher learning in the United States by offering tuition assistance. WOU partners with TheDream.US for both in-state and out-of-state students. For out-of-state students who qualify for assistance from TheDream.US, WOU is able to charge 150% of current resident tuition rates. Such out-of-state students receive up to $80,000 from TheDream.US for four years of education. This academic year (2017–18) is the first year that WOU has participated in the TheDream.US program for out-of-state students, and WOU has accepted five such students. If those students withdraw from WOU as a result of the

Page 3 -   DECLARATION OF RYAN JAMES HAGEMANN
            J1B/a2c/8493336-v5

DACA rescission—as it is expected that they would—WOU would lose nearly $65,000 in revenue from combined tuition and mandatory fees for this academic year alone. WOU's total projected loss for those five students over the next four years, at current rates, would be nearly $260,000. It is reasonable to expect that WOU would lose tuition and fee revenue from its partnership with TheDream.US project because, in order to be eligible for a TheDream.US scholarship, scholars must either be DACA recipients, or have applied for DACA, or be in Temporary Protected Status (TPS) with the U.S. Citizenship and Immigration Services (USCIS).[1]

7.      WOU does not specifically collect data or track the number of DACA recipient students enrolled at WOU. However, WOU is subject to Oregon's "tuition equity" law, codified at Or. Rev. Stat. § 352.287. Under that statute, an Oregon public university "shall exempt a student who is not a citizen or a lawful permanent resident of the United States from paying nonresident tuition and fees for enrollment" if the student meets certain criteria. Currently, there are 42 students at WOU (separate from the five out-of-state students who are registered to start at WOU in Fall 2017 through the above-described TheDream.US project) who pay in-state tuition and fees, pursuant to the tuition equity law. WOU is aware that a substantial number of those 42 students are DACA recipients. If only half of those 42 students drop out as a result of the DACA rescission—a conservative estimate—then WOU will suffer a loss of revenue from combined tuition and mandatory fees, for the current academic year, of nearly $200,000, as well as an additional amount of lost revenue from those students that live on-campus in student residence halls. When a student lives on-campus, there are separate fees for room and board that would be lost if any or all of WOU's tuition equity students left the university due to the rescission of

---

[1]      In-state students, including those who receive tuition assistance from a TheDream.US scholarship, are eligible for tuition equity under Oregon law. This declaration addresses such tuition equity students—as well as the relationship between tuition equity students, DACA recipients, and estimated loss in tuition revenue—in Paragraphs 7 and 8, *infra*.

Page 4 -   DECLARATION OF RYAN JAMES HAGEMANN
          J1B/a2c/8493336-v5

DACA. If all 42 students were to leave, losses from tuition and mandatory fees would total nearly $400,000.

8.      It is reasonable to expect that DACA rescission will cause many of the 42 tuition-equity students, and the five TheDream.US scholarship recipient students, to cease their education at WOU because of cost. Although the Oregon Opportunity Grant—the need-based state grant program for postsecondary education—could in theory help to alleviate the financial burden of attending higher education for some Oregon resident DACA recipient students, the rescission of DACA—a clear pathway for such students to demonstrate eligibility for state financial aid programs—could mean that the cost of a public college education in Oregon would be prohibitive. Moreover, with DACA's rescission being ultimately effective in March 2018, the confusion generated by rescission occurring in the middle of an academic year, in addition to the demographic realities of enrollment trends in Oregon, makes it substantially likely that lost enrollment would not be replaced and would, in fact, lead to substantial loss in tuition and fee revenue. WOU, as many universities in Oregon and beyond, has experienced modest enrollment declines in each of the past two years, demonstrating the difficulty in simply replacing the loss of up to 47 students (42 in-state tuition equity students, and five non-resident TheDream.US scholarship recipients). The loss of approximately $450,000 in revenue in the middle of the academic year, as well as residence halls with numerous empty rooms, would be profound.

9.      I am aware, through my administrative duties as well as my personal interactions with our student body and faculty, that actions such as the DACA rescission cause tremendous psychological and emotional distress to our undocumented students, and to our university community at large. This distress is not limited to feelings of discomfort; it in fact has profound implications for the mental health and functionality of our students. This, in turn, distracts from our students' learning and grossly undermines our ability to fulfil our educational mission, the specifics of which are detailed in Paragraph 5, above. As Vice President & General Counsel, I have participated in several campus panel discussions and forums at which undocumented

Page 5 -   DECLARATION OF RYAN JAMES HAGEMANN
J1B/a2c/8493336-v5

students share personal stories of the psychological and emotional distress caused by the uncertainty and actions of the Trump administration.  I have worked closely with faculty members assisting and advocating for undocumented students who, in turn, share stories of psychological and emotional distress experienced by WOU's tuition equity and DACA students.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED September 2 /, 2017.

RYAN JAMES HAGEMANN

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# EXHIBIT 82

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>           Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>           Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## DECLARATION OF MARJORIE TRUEBLOOD-GAMBLE

Pursuant to 28 U.S.C. § 1746(2), I, Marjorie Trueblood-Gamble, hereby declare as follows:

1.      I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.      I am the Director of Diversity and Inclusion, and Title IX Coordinator, for Southern Oregon University ("SOU").  As Director of Diversity and Inclusion, my duties are to provide strategic advice to senior leadership pertaining to diversity-related issues, especially as they relate to policy and procedure. Through this role I collaborate with others to develop and implement initiatives to foster a more inclusive and equitable campus. As Title IX Coordinator, my duties are to oversee our proceedings, under federal law, related to allegations of sexual and gender-based discrimination and to ensure that such proceedings are fair and impartial.  I began my current position three years ago.  Prior to that, I was the SOU Associate Director for Student Life and Inclusion for approximately three years.  I also worked in higher education prior to that, in Ohio, as the Assistant Director of Multicultural Affairs and Admissions at Kenyon College, a position that I held from 2007 through 2011.  Prior to that, I worked throughout 2006 at Earlham College in Richmond Indiana, as an Area Director.  I earned my bachelor's degree (BA) in psychology at Earlham College in 2004, and I earned my master's degree (MA) in executive development for non-profit management from Ball State University in 2006.

3.      SOU is a public liberal arts college located in Ashland, Oregon.  SOU has a most recently tabulated (Fall 2016) student enrollment of 6,088, including 4,295 fulltime students. SOU is an inclusive campus community dedicated to student success, intellectual growth, and responsible global citizenship.  SOU is committed to providing its students with a challenging and practical liberal arts education centered on student learning, accessibility, and civic engagement; academic programs, partnerships, public service, outreach, sustainable practices, and economic development activities that address regional needs such as health and human services, business, and education; and outstanding programs that draw on and enrich our unique

Page 2 -   DECLARATION OF MARJORIE TRUEBLOOD-GAMBLE
J1B/a2c/8490661-v1

arts community and bioregion.  According to the most recently available data (2016), 837 of SOU's 6,088 students self-identify as racial or ethnic minorities—539 of which identify as Hispanic.

4.     SOU does not specifically collect data or track the number of Deferred Action for Childhood Arrivals ("DACA") recipient students enrolled at SOU.  However, I am aware of several DACA students who have disclosed their status to myself or other SOU employees during the administration of their educational services at SOU.  In addition, SOU is subject to Oregon's "tuition equity" law, codified at Or. Rev. Stat. § 352.287.  Under that statute, an Oregon public university "shall exempt a student who is not a citizen or a lawful permanent resident of the United States from paying nonresident tuition and fees for enrollment" if the student meets certain criteria.  SOU currently has several students who pay in-state tuition and fees pursuant to the exemption provided under the tuition equity law.  Although SOU does not know the exact number of its DACA students, I am aware that at least half of SOU's tuition-equity students are in fact DACA recipients.

5.     SOU also employs DACA recipients.  Currently, there is at least one DACA recipient employed by SOU.

6.     The rescission of the DACA program harms SOU in a variety of ways.  First, it harms SOU's revenues derived from currently-enrolled students.  DACA recipient students taking 15 credits per term at the base resident tuition rate pay approximately $9,266 in tuition and mandatory fees per academic year.  Although some DACA recipient students may elect to continue their education at SOU, it is highly likely that some DACA recipient students will drop out, either upon or in anticipation of rescission.  It is likely that DACA recipient students who are no longer able to work—either at SOU or elsewhere in the community—will be unable to continue to afford higher education and will leave the university.  In addition, it makes little sense for DACA recipient students to continue their education when they are subject to arrest and deportation, and when they cannot apply their education by working in the community.  And

Page 3 -   DECLARATION OF MARJORIE TRUEBLOOD-GAMBLE
          J1B/a2c/8490661-v1

obviously, any student who actually is arrested and deported will be unable to continue their education at SOU. Thus, for every full time DACA recipient student that either drops out, or is forced out, as a result of DACA rescission, SOU will lose at least $9,266 annually.

7.      In recent years, SOU has frequently experienced either flat enrollment or lower enrollment. For this reason, SOU's financial stability relies in part on the retention and completion of its entire student population. The revenue lost due to the departure of one or more DACA students would not likely be replaced by the enrollment of a non-DACA student; rather it would instead likely result in a loss of the revenue otherwise provided by the departing DACA student.

8.      Second, it is likely that DACA rescission will harm SOU's future revenues. Prospective students who lose their DACA recipient status are likely to be deterred from applying to and enrolling at SOU. Such students likely will elect not to expend the resources to obtain an education at SOU when they are unable to finance their education through work, or to apply their education by working in the United States after graduation. The threat of arrest and deportation likely will also deter such students from expending the resources to seek higher education.

9.      Third, DACA rescission harms SOU's educational mission. SOU is an inclusive campus dedicated to student success, intellectual growth, and responsible global citizenship. We believe that without diversity, including the diversity citizenship and perspective that our DACA students add to our campus, the educational process and experience for all of our students will be diminished.

10.     Fourth, DACA rescission is likely to harm SOU's relationship with its non-DACA tuition equity students. We know that many students on our campus are greatly concerned about the increase of xenophobic behaviors on college campuses and beyond. The rescission of DACA not only heightens the concerns felt by our DACA students, but it causes emotional distress to other students concerned that their culture, lifestyle or perspective will be

Page 4 -   DECLARATION OF MARJORIE TRUEBLOOD-GAMBLE
          J1B/a2c/8490661-v1

the next one slated to be marginalized by government action, and it leaves them questioning SOU's willingness and ability to support students born outside and within the United States.

11.     Fifth, DACA rescission is likely to impact outreach programs for students not yet enrolled in higher education.  We have a number of outreach programs that support Southern Oregon's growing Hispanic population, including DACA students and students who have members of their families that are DACA recipients.  SOU has spent the past six years cultivating educational programs that serve the region's growing Hispanic population.  This includes our Pirates to Raiders, Bulldogs to Raiders, Cesar Chavez Leadership Conference, and Academia Latina programs, among others.  Each of these programs is designed, in part, to teach young Hispanic students that attending college is achievable and to connect them with SOU as a college of choice.  I noticed during our summer outreach programs that there was increased anxiety amongst the prospective students—they were questioning what educational opportunities they might have and whether they would truly be welcomed at SOU.  The rescission of DACA has the potential of causing these prospective SOU students, with whom we have fostered relationships for up to six years, to be diverted away from SOU and entirely away from higher education.

12.     Sixth, I am aware that DACA recipient students at SOU have been very distressed since the election and inauguration of President Trump.  Although I have not personally met with DACA recipient students since President Trump announced the discontinuation of the DACA program, such students are certain to be even more distressed now.  This distress not only harms

Page 5 -    DECLARATION OF MARJORIE TRUEBLOOD-GAMBLE
            J1B/a2c/8490661-v1

our DACA recipient students' subjective wellbeing—it also further harms SOU's educational mission, because it distracts them from their studies.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED September 20 , 2017.


MARJORIE TRUEBLOOD-GAMBLE

Page 6 -   DECLARATION OF MARJORIE TRUEBLOOD-GAMBLE
J1B/a2c/8490661-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# EXHIBIT 83

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>            Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>            Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

Pursuant to 28 U.S.C. § 1746(2), I, Charlene Alexander, hereby declare as follows:

1.     I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.     I am employed by Oregon State University ("OSU") and serve as Vice President and Chief Diversity Officer. Prior to joining OSU, I was a Professor of Counseling Psychology and a Professor in the College of Education at Ball State University. I subsequently directed the School Counseling Program in the Department of Counseling Psychology at Ball State. In 2013, I became Ball State's Associate Provost for Diversity and Director of the university's Office of Institutional Diversity. Additionally, I am a naturalized U.S. citizen, coming to the United States to attend college, and understand first-hand the immigration process and the responsibilities of citizenship.

3.     Oregon State University is a comprehensive, research intensive public land-grant university whose mission statement provides: "As a land grant institution committed to teaching, research and outreach and engagement, Oregon State University promotes economic, social, cultural and environmental progress for the people of Oregon, the nation and the world. The mission is achieved by producing graduates competitive in the global economy, supporting a continuous search for new knowledge and solutions and maintaining a rigorous focus on academic excellence, particularly in the three Signature Areas: Advancing the Science of Sustainable Earth Ecosystems, Improving Human Health and Wellness, and Promoting Economic Growth and Social Progress."

4.     Oregon State University has a current enrollment population of 30,354 students. OSU is committed to equitable student success, which includes a commitment to educational access for Deferred Action for Childhood Arrivals ("DACA") recipients – also known as "Dreamers." OSU does not specifically collect data or track the number of DACA recipient students enrolled at OSU. However, OSU is subject to Oregon's "tuition equity" law, codified at Or. Rev. Stat. § 352.287. Under that statute, an Oregon public university "shall exempt a student

Page 2 -   DECLARATION OF CHARLENE ALEXANDER

who is not a citizen or a lawful permanent resident of the United States from paying nonresident tuition and fees for enrollment" if the student meets certain criteria. *Id.* at (1).

5.      Currently there are 40 students at OSU who pay in-state tuition and fees, pursuant to the tuition equity law.  OSU understands a substantial portion of those students are DACA recipients. OSU expects that DACA students may elect to drop out of the university if they face the imminent threat of arrest and deportation, would be unable to finance their education through work, or would be unable to apply their education in the United States by working after graduation. Additionally, any student who is actually arrested and deported would not be able to continue their education at OSU. Thus, if DACA recipient students were to drop out as a result of the rescission of DACA, the projected financial loss to OSU would be up to and including approximately $705,000.

6.      The mission of OSU as a land grant institution is to promote economic, social, cultural and environmental progress for the people of Oregon.  We know the impact that DACA students have had on the economic, social and cultural climate at OSU. The implications of the loss of those students to our university and the state of Oregon are significant. First however, as an institution committed to equity and inclusion, we must examine the impact of this decision on DACA students at OSU personally.

7.      These impacts are financial, psychological, and social. DACA students rely on the ability to work to support not only their education, but in many instances family members. Additionally, we are also cognizant of the mental health implications of these actions. Instances of anxiety, depression, feelings of betrayal and PTSD symptoms have been reported. DACA students have developed deep relationships in the state of Oregon and contribute in volunteer hours to the essence of the communities in which OSU has a presence. The distress DACA students experience undermines OSU's educational mission because it distracts from students' studies, and in some cases, requires OSU to divert finite counseling and financial or academic

Page 3 -   DECLARATION OF CHARLENE ALEXANDER
KEB/a2c/8492602-v1

advising resources to assist those students, rendering those resources unavailable to other students who may also need them.

8.      OSU understands that we achieve excellence through diversity and this decision impedes our ability to reach our strategic goals. We remain committed to our mission and vision for the state of Oregon and to the success of our DACA students.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED September _15_, 2017.


CHARLENE ALEXANDER

Page 4 -    DECLARATION OF CHARLENE ALEXANDER
KEB/a2c/8492602-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# EXHIBIT 84

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

                    Plaintiffs,

      v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

                    Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

Pursuant to 28 U.S.C. § 1746(2), I, Christina Ridder, hereby declare as follows:

1.      I am over the age of 18.  I have personal knowledge—based on the performance of my professional duties, my training and experience, and upon my review of pertinent business records—of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.      I am the Assistant Vice President for Student Access and Success, Diversity, and Multicultural Student Services at Portland State University ("PSU").  In that capacity, my primary duty is to perform diversity and inclusion work for and with students, with the focus of ensuring that students successfully graduate from PSU.  Such work entails holistic, wrap-around advising for students, *i.e.*, providing students with the services they need in order to succeed at PSU.  Because students from diverse backgrounds often have unique needs, the diversity and inclusion focus of my work is to provide the unique services needed by students to support them in their growth and development.  Some examples include: referrals to Student Health and Counseling, community services, Student Legal Services, Financial Services, or Housing; providing programs regarding their identity; and providing supplemental academic, cultural and community advising.  I began my current position at PSU in November 2012.  Prior to that, I worked in higher education at the University of Texas at Austin ("UT") for 16 years.  I began at UT as a program coordinator in 1996, I became the diversity recruiter for the UT business school in 1999, the assistant director of student life for the business school in 2005, and I became the director of student life for the business school in 2009.  I obtained my bachelor's degree (BA) in interpersonal communication from Nebraska Wesleyan University in 1993.  I obtained my master's degree (MS) in college student personnel from Kansas State University in 1996.  Finally, I obtained my doctorate (PhD) in higher education administration from UT in 2011.

3.      PSU is Oregon's most diverse and affordable public research university.  As such, it offers tremendous opportunity to over 27,000 students from all backgrounds.  PSU's core institutional mission is to serve and sustain a vibrant urban region through our creativity,

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

collective knowledge, and expertise; to be dedicated to collaborative learning, innovative research, sustainability and community engagement; to educate a diverse community of lifelong learners; and to have a global impact through research and teaching.  Moreover, PSU is dedicated to the following values: to promote access, inclusion, and equity as pillars of excellence; to commit to curiosity, collaboration, stewardship, and sustainability; to strive for excellence and innovation that solves problems; and to treat everyone with integrity and respect. Through its pursuit of these missions and dedication to these values, PSU serves as an anchor institution—*i.e.*, it provides the Portland region with a highly educated population, it has a substantial economic impact, and it makes distinctive contributions to the Portland region's culture.  It also contributes unique scholarship and research that supports quality of life through problem solving, and it delivers on its access mission of contributing to a highly educated and diverse community.

4.    PSU does not specifically collect data or track the number of Deferred Action for Childhood Arrivals ("DACA") recipient students enrolled at PSU.  However, PSU is subject to Oregon's "tuition equity" law, codified at Or. Rev. Stat. § 352.287.  Under that statute, an Oregon public university "shall exempt a student who is not a citizen or a lawful permanent resident of the United States from paying nonresident tuition and fees for enrollment" if the student meets certain criteria.  Currently, there are approximately 100 students at PSU who pay in-state tuition and fees, pursuant to the tuition equity law.  Although PSU does not know the exact number, I am aware that a certain percentage of those tuition-equity students are in fact DACA recipients.   I am also aware that PSU employs DACA recipients in various capacities, including as student employees and graduate assistants.

5.    As an urban public university, PSU's student body includes a significant number of students who are first-generation students, non-traditional students, students with children, returning veterans, and others with significant personal and financial responsibilities.  As a

Page 3 -    DECLARATION OF CHRISTINA RIDDER
JND/a2c/8491269-v1

result, a significant number of PSU's students work full-time or part-time while also pursuing their higher education.

6.      The rescission of the DACA program harms PSU in a variety of ways.  First, it harms PSU's revenues derived from currently-enrolled students.  DACA recipient students taking 15 credits per term at the base resident tuition rate pay tuition of $7,403 per academic year, and mandatory fees of $1,380 per academic year, for a total of $8,783 per academic year. Students may also pay for classes outside of the academic year (*i.e.*, during the summer); pay a variety of other fees; and pay for services on campus, such as dining, parking, housing, etc. Although some DACA recipient students may elect to continue their education at PSU, we assess that it is highly likely that some DACA recipient students will drop out, either upon or in anticipation of rescission.  It is likely that DACA recipient students who are no longer able to work—either at PSU or elsewhere in the community—will be unable to continue to afford higher education and will leave the university.  In addition, it makes little sense for DACA recipient students to continue their education when they are subject to arrest and deportation, and when they cannot apply their education by working in the community.  And obviously, any student who actually is arrested and deported will be unable to continue their education at PSU.  Thus, for every full time DACA recipient student that either drops out, or is forced out, as a result of DACA rescission, PSU will lose *at least* $8,783 annually.

7.      Second, DACA rescission will likely harm PSU's future revenues derived from prospective students.  As an access institution, PSU strives to enroll every prospective student who meets PSU's admission standards and seeks an education at PSU.  Accordingly, we assess that PSU's future revenues will be negatively impacted by the fact that students, who would otherwise have qualified for DACA, likely will elect not to apply to PSU in the first place.  The threat of arrest and deportation, and the inability of such students to work in the United States, will strongly disincentive such students from expending the resources to obtain an education at PSU.

Page 4 -    DECLARATION OF CHRISTINA RIDDER

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

8.      Third, because it will deprive PSU of current and future students, DACA rescission will result in a loss to PSU's alumni community.  Such loss may reasonably be expected to result not only in decreased financial contributions from alumni, but also a loss in other contributions, as PSU alumni frequently donate their time and talent to their alma mater. The degradation of PSU's alumni base will also result in a decreased ability to connect current students with alumni, for purposes of mentoring, networking, and career development.

9.      Fourth, DACA rescission will harm PSU's offices and departments that rely on student employees.  PSU employs students in a variety of capacities, such as office assistants, student mentors, program planners, graduate assistants, *etc*.  I am aware that some DACA recipient students work in such capacities.  We employ such students for their cultural expertise, talent, and contributions to our offices.  Loss of these student employees will harm PSU departments and the services they provide to our students and community.

10.     Fifth, DACA rescission will harm PSU by depriving it of non-student employees who are DACA recipients.  As both an employer and an institution of higher education, PSU expends significant resources on the training and ongoing professional development of employees.  The retention of employees is a core PSU human resources policy and practice, and the federally-required layoff of staff is a harm to the university.

11.     Sixth, DACA rescission harms PSU's educational mission.  PSU was created specifically as an access institution and quickly developed a social justice mission—one fundamental to, and thus inseparable from, its educational mission.  For example, in its early days, PSU's educational and social justice mission was to serve veterans returning from the battlefields of World War II.  From its start of 220 students in 1946, to its current role of serving over 27,000 students, PSU has become the most diverse institution in Oregon with 28% of our students identifying as a racial/ethnic minority.  That very diversity drives the educational excellence central to the PSU educational mission, in that it allows all students to learn from each other through their in-classroom and out-of-classroom co-curricular experiences.  Our

Page 5 -   DECLARATION OF CHRISTINA RIDDER
JND/a2c/8491269-v1

students benefit from guided discussions and difficult conversations about race, history, and contemporary issues, including the issue of immigration.  The loss of DACA recipient students would create a loss of nuanced and deep learning for other students.  Simply put, those voices and experiences—so critical to our students' learning and development—will be gone.

12.     Seventh, from my recent personal interactions and communications with both returning and prospective students, I know that DACA rescission has already generated significant mental and emotional distress among enrolled and prospective DACA recipient students.  In particular, DACA recipient students are tremendously stressed about their ability to plan for their futures, including both immediate plans (for example, finishing their degrees) and long term plans (for example, finding employment).  This stress is compounded by the fact that some of our DACA recipient students are first-generation college students, who are counted-upon by their families as a source of future financial stability.  Thus, DACA rescission has profound implications for the mental health and functionality of our students—a phenomenon that, in turn, distracts from our students' learning and grossly undermines our ability to fulfil our educational mission.

13.     Finally, it is important to note that PSU's educational mission is not limited to the work that our students perform in the classroom. The Portland region retains many of our alumni who work and raise families within miles of the university.  The motto of PSU, "Let Knowledge Serve the City," is reflective of the connection that we have to the greater community.  The loss of any student harms the ability of PSU to fulfill our mission; however the loss of our DACA students also impacts the economic stability of an entire community of people in Portland.

Page 6 -    DECLARATION OF CHRISTINA RIDDER
JND/a2c/8491269-v1

Many of our students are looking to support their extended families and to bring stability to their neighborhoods. Removing the potential for success for our DACA recipient students will impact future generations, in turn harming our state and region.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED September , 2017.

CHRISTINA RIDDER

Page 7 -  DECLARATION OF CHRISTINA RIDDER
JND/a2c/8491269-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# EXHIBIT 85

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>         Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>         Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

Pursuant to 28 U.S.C. § 1746(2), I, Dennis Galvan, hereby declare as follows:

1.      I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.      I am employed by the University of Oregon ("U of O") and serve as Vice Provost for International Affairs and Professor in the Political Science and International Studies Departments. I am also the Executive Director of the Global Studies Institute, which promotes international research, teaching, and outreach at the University of Oregon.

3.      The University of Oregon is a public research university whose mission statement includes the U of O's "devotion to educating the whole person, and fostering the next generation of transformational leaders and informed participants in the global community. Through these pursuits, we enhance the social, cultural, physical, and economic wellbeing of our students, Oregon, the nation, and the world. * * * We value our diversity and seek to foster equity and inclusion in a welcoming, safe, and respectful community. * * *"

4.      The University of Oregon has a current enrollment of approximately 23,630 students. U of O is committed to equitable student success, which includes a commitment to educational access for Deferred Action for Childhood Arrivals ("DACA") recipients – also known as "Dreamers." The University of Oregon does not specifically collect data or track the number of DACA recipient students enrolled at U of O. However, U of O is subject to Oregon's "tuition equity" law, codified at Or. Rev. Stat. § 352.287. Under that statute, an Oregon public university "shall exempt a student who is not a citizen or a lawful permanent resident of the United States from paying nonresident tuition and fees for enrollment" if the student meets certain criteria. *Id.* at (1).

5.      Currently there are approximately 20 students at U of O who pay in-state tuition and fees, pursuant to the tuition equity law, and U of O believes most if not all of those students are DACA recipients. U of O estimates at least 100 additional students may also be DACA

Page 2 -   DECLARATION OF DENNIS GALVAN
         KEB/a2c/8497503-v1

recipients. If those students were to drop out as a result of the rescission of DACA, U of O would experience a loss of their tuition revenue.

      6.      In addition to the loss of DACA recipient students, the University of Oregon expects it would see a chilling effect on future enrollment at U of O of students who would have been DACA eligible, as the risk-benefit calculation of attending university shifts. Fear-based dropping-out of college depresses human capital development, undermines the overall skill level of the Oregon workforce, and diminishes the ability of Oregon to meet its growing need for skilled positions which require higher education. Decreasing college education opportunities weakens economic development in a state in which 25% of all jobs are international trade dependent and thereby require global education skills.

      7.      The cancellation of DACA may also create a secondary chilling effect on the enrollment of students who have various kinds of ambiguous documentation status.  These students may also eschew university enrollment in order to avoid risky exposure. For example, potential students who are asylum seekers, recipients of official asylum status, those born in the United States (but to undocumented parents), or who come from a family of mixed documentation status, may avoid engagement with the U of O altogether.

      8.      The University of Oregon has been working hard to expand diversity in our student population, with considerable outreach to the state's growing Latino population, which is numerically largest in the Portland area. We can expect worried families and students, both DACA recipients, and from populations that feel profiled and targeted by current policies (e.g., Latinos, African-Americans, Muslims, immigrants in general) to take steps to lower their risk exposure. This may include avoiding contact with government entities, such as public universities, and staying closer to home for schooling (for many potential U of O students from populations mentioned above, home is the Portland area). Excellent students who might benefit from programs only found in Oregon at the University of Oregon – such as sustainable

Page 3 -   DECLARATION OF DENNIS GALVAN
         KEB/a2c/8497503-v1

agriculture, sports business, and certain science disciplines – will be prevented from pursuing their educational dreams, and the U of O will be deprived of those students.

9.      DACA cancellation weakens the educational mission of the University of Oregon because it saps one of our most critical resources: diversity. Our classrooms, labs, formal debates and informal discussions will be less well-informed, less engaged with the real world, and less educationally effective. Consequently, the rest of our student body will be less well-prepared for the reality of a multicultural workforce as a result of the systemic exclusion of students raised in the United States by non-documented parents. As the University of Oregon's President Schill noted, "our many differences enrich this institution's learning environment, enhance the student experience, and are essential to our mission of teaching, research, and service." Michael H. Schill, *Statement on DACA and Support for Students* (Sept. 4, 2017), *available at* https://president.uoregon.edu/statement-daca-and-support-students. DACA cancellation undermines that mission.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED September 15, 2017.

DENNIS GALVAN

Page 4 -   DECLARATION OF DENNIS GALVAN

# EXHIBIT 86

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

              Plaintiffs,

    v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

              Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

## Declaration of Dr. Larry H. Dietz

I, Dr. Larry H. Dietz, hereby declare and affirm:

1. I am the President of Illinois State University ("ISU") and have been employed in this capacity since March 2014.  Before serving as President, I was employed in 2011 as the Vice President of Student Affairs.  Prior to that position, I served as vice chancellor for Student Affairs at Southern Illinois University Carbondale (SIUC) for 10 years and have served in other leadership positions at University of Missouri-Kansas City and Iowa State University for 28.

2. I have personal knowledge of the facts set forth below, or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered from University records by others within the organization.

3. Illinois State University is a body corporate and politic of the State of Illinois located in Normal, Illinois.  Illinois State University was founded in 1857 as the first public institution of higher education in the state.  ISU's motto is "gladly we learn and teach." As a public university, ISU's mission calls for the University to work as a diverse community of scholars with a commitment to fostering a small-college atmosphere with large-university opportunities.

4. Diversity is a core value at Illinois State University, and the University welcomes all applicants regardless of citizenship status to attract the most talented and committed students. Undocumented students or "dreamers," with or without participation in the Deferred Action for Childhood Arrivals ("DACA"), who apply to ISU are treated identically to any other U.S. citizen or permanent resident.  DACA recipients, and all undocumented students, who complete at least three years of high school in Illinois  (or recognized equivalent) are eligible for in-state tuition under Illinois law, 110 ILCS 675/20-88.   Should DACA be repealed, the

likelihood that undocumented students would continue to apply and enroll in the University would be significantly diminished.

5. ISU has a total enrollment of 20,784 undergraduate and graduate students for the fall of 2017 coming from Illinois, 46 states, and more than 72 different countries.  ISU has undocumented students presently enrolled in the University, some of whom are participants in the DACA program.  ISU also employs DACA recipients in a variety of different roles at the University.

6. The repeal of DACA would affect ISU students starting and completing their education.  The loss of the DACA program may jeopardize the ability of students who are DACA grantees to pay for their education and access financial-aid opportunities available to them.  In addition, the repeal and current limitations on the DACA program may prevent the ability of DACA recipients to access and participate in study-abroad programs, research projects, other educational opportunities, as well as scholarly work and travel opportunities.  The repeal of DACA could also jeopardize faculty, scholars, and staff who may lose work authorizations under the DACA program.

7. Overall, repealing DACA could undermine ISU's efforts to support our University community's ability to meet challenges, not in a climate of fear, but in a spirit of collegiality and community.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 26th day of September, 2017.


Dr. Larry H. Dietz
President, Illinois State University

# EXHIBIT 87

President Donald J. Trump
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500


August 14, 2017


Dear President Trump:

As immigration law teachers and scholars, we write to express our position that the executive branch has legal authority to implement Deferred Action for Childhood Arrivals (DACA 2012). This letter provides legal analysis about DACA 2012. In our view, there is no question that DACA 2012 is a lawful exercise of prosecutorial discretion. Our conclusions are based on years of experience in the field and a close study of the U.S. Constitution, administrative law, immigration statutes, federal regulations and case law. As the administration determines the future of DACA 2012, understanding its legal foundation and history is critical.

DACA 2012 was announced by the President, and implemented in a memorandum by the Secretary of Homeland Security, on June 15, 2012.[1] It enables qualifying individuals to request a temporary reprieve from removal known as "deferred action." Deferred action is one form of prosecutorial discretion in immigration law and has been used for decades by the Department of Homeland Security (DHS) (and formerly the Immigration and Naturalization Service (INS)) and over several administrations.[2]

Whether a requesting individual receives deferred action under DACA 2012 is at the discretion of DHS. Qualifying individuals may request DACA 2012 if they came to the United States before the age of sixteen; are currently in school or have graduated; have continuously resided in the United States since June 15, 2007; have not been convicted of a felony, "significant misdemeanor," or three or more non-significant misdemeanors; do not otherwise pose a threat to public safety or national security; and otherwise warrant protection as a matter of discretion.[3]

---

[1] *See* Barack Obama, President, Remarks by the President on Immigration (June 15, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration; Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Prot. et al. (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[2] *See* Shoba Sivaprasad Wadhia, *Beyond Deportation The Role of Prosecutorial Discretion in Immigration Cases* 14-32 (2015) ("Wadhia, *Beyond Deportation*"); Shoba Sivaprasad Wadhia, *The History of Prosecutorial Discretion in Immigration Law*, 64 Am. U. L. Rev. 1285, 1296-97 (2015) ("Wadhia, *History of Prosecutorial Discretion*"); Michael A. Olivas, *Dreams Deferred: Deferred Action, Prosecutorial Discretion, and the Vexing Case(s) of DREAM Act Students*, 21 Wm. & Mary Bill of Rts. J. 463, 475–92 (2012); Shoba Sivaprasad Wadhia, *Sharing Secrets: Examining Deferred Action and Transparency in Immigration Law*, 10 U.N.H. L. Rev. 1, 21-22 (2012) ("Wadhia, *Sharing Secrets*").

[3] DHS requires that DACA applicants: "1. Were under the age of 31 as of June 15, 2012; 2. Came to the United States before reaching your 16th birthday; 3. Have continuously resided in the United States since June 15, 2007, up to the present time; 4. Were physically present in the United States on June 15, 2012, and at the time of making your

1

Individuals who are granted DACA 2012 receive a two-year period in deferred action and also gain eligibility to apply for employment authorization.

The legal authority for DACA 2012 originates from the U.S. Constitution. Article II, Section Three (the Take Care Clause) states in part that the President "shall take Care that the Laws be faithfully executed."[4] Inherent in the function of the "Take Care Clause" is the ability of the President to target some immigration cases for removal and to use prosecutorial discretion favorably in others. As described by the U.S. Supreme Court:

> [W]e recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to "take Care that the Laws be faithfully executed."[5]

As early as 1976, former INS General Counsel Sam Bernsen executed a legal opinion that identified the Take Care Clause as the primary source for prosecutorial discretion in immigration matters. He wrote: "The ultimate source for the exercise of prosecutorial discretion in the Federal Government is the power of the President. Under Article II, Section 1 of the Constitution, the executive power is vested in the President. Article II, Section 3, states that the President 'shall take care that the laws be faithfully executed.'"[6]

The U.S. Supreme Court has also recognized the role of prosecutorial discretion in the immigration system. In *Arizona v United States*, the Court noted that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials . . . . Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all . . . ."[7]

Congress created the Immigration and Nationality Act (the Act or INA) in 1952 and it remains the primary statutory authority for immigration law today.[8] Importantly, Congress has delegated most discretionary immigration functions to DHS. Section 103 of the Act provides that

---

request for consideration of deferred action with USCIS; 5. Had no lawful status on June 15, 2012; 6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and 7. Have not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety." *Consideration of Deferred Action for Childhood Arrivals (DACA)*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca (last updated Dec. 22, 2016).

[4] U.S. Const. art. II, § 3.

[5] Shoba Sivaprasad Wadhia, *In Defense of DACA, Deferred Action, and the DREAM Act*, 91 Tex. L. Rev. See Also 59, 63 (2013) (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)).

[6] Memorandum from Sam Bernsen, Gen. Counsel, Immigration & Naturalization Serv., to Comm'r, Immigration & Naturalization Serv. 2 (July 15, 1976), https://www.ice.gov/doclib/foia/prosecutorial-discretion/service-exercise-pd.pdf.

[7] 567 U.S. 387, 396.

[8] *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended in scattered sections of 8 U.S.C.); *Immigration and Nationality Act*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/laws/immigration-and-nationality-act (last updated Sept. 10, 2013).

"[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens . . . ."[9]

Congress has repeatedly acknowledged that the Executive has power to grant "deferred action" for certain categories of people such as victims of crimes and human trafficking.[10] Additionally, previous administrations have announced deferred action programs to protect qualifying individuals. For example, under the George W. Bush administration, U.S. Citizenship and Immigration Services (part of DHS) announced a deferred action program for students affected by Hurricane Katrina[11] and later developed a program for the widows of U.S. citizens.[12] Moreover, Congress also recognized legal authority for immigration prosecutorial discretion in INA § 242(g), which bars judicial review of three specific prosecutorial discretion decisions by the agency: to commence removal proceedings, to adjudicate cases, and to execute removal orders.[13]

Another important legal source for deferred action is Title 8 of the Code of Federal Regulations. Section 274a.12(c)(14) dates to 1981 and is the product of notice and comment rulemaking.[14] This regulation specifically identifies deferred action by name and allows individuals granted deferred action to apply for work authorization upon a showing of "economic necessity."[15] Over the last two decades, thousands of individuals have applied for and received work authorization based on a deferred action grant.[16]

There are also agency guidance documents related to deferred action issued by DHS (and formerly INS) over the last four-plus decades. The 1976 legal opinion by former INS General Counsel Sam Bernsen cites to the Take Care Clause of the U.S. Constitution, as well as statutory and case law from as early as 1825 to affirm the exercise of prosecutorial discretion in immigration.[17] It was around this time when INS published its first guidance on deferred action in the form of an "Operations Instruction." This "Operations Instruction" stated "(ii) Deferred action. In every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for deferred action category."[18] Since 1975, deferred action has been identified in several subsequent

---

[9] 8 U.S.C. § 1103(a)(1) (2012).

[10] *See* 8 U.S.C. § 1227(d)(4) (2012), INA § 237(d)(4).

[11] *See* Press Release, U.S. Citizenship and Immigration Services, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005), https://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_11_25_05_PR.pdf; *see also* 70 Fed. Reg. 70,992 (Nov. 25, 2005).

[12] *See* DHS Establishes Interim Relief for Widows of U.S. Citizens, U.S. Department of Homeland Security (June 9, 2009), http://www.dhs.gov/news/2009/06/09/dhs-establishes-interim-relief-widows-us-citizens. *See generally* Wadhia, *Beyond Deportation*, *supra*, ch.4.

[13] 8 U.S.C. § 1252(g) (2012).

[14] *See* 8 C.F.R. § 274a.12(c)(14); *Unconstitutionality of Obama's Executive Actions on Immigration: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. (2015) (statement of Stephen H. Legomsky); *Reining in Amnesty: Texas v. U.S. and Its Implications: Hearing Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts, S. Comm. on the Judiciary*, 114th Cong. (2015) (statement of Jill E. Family); Shoba Sivaprasad Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6 Colum. J. Race & L. 1 (2016) ("Wadhia, *Demystifying Employment Authorization*").

[15] 8 C.F.R. § 274a.12(c)(14).

[16] *See* Wadhia, *Demystifying Employment Authorization*, *supra*, at 25.

[17] Memorandum from Sam Bernsen, *supra*, at 2.

[18] (Legacy) Immigration and Naturalization Service, Operations Instructions, O.I. § 103.1(a)(1)(ii) (1975); *see also*

3

guidance documents.[19] Guidance documents are common in administrative law and are a recognized form of agency action under the Administrative Procedure Act.[20]

At tension with the aforementioned body of law is a letter sent by ten state Attorneys General to the administration requesting that DACA 2012 be rescinded.[21] This letter refers to DACA 2012 as "unlawful" and does so without citing to the foundational legal authorities behind deferred action. Furthermore, the letter conflates deferred action, "lawful presence" and work authorization in ways that are legally unsound and unclear. Finally, the letter itself shoehorns arguments into *Texas v. United States*, a lawsuit that never included the core of DACA 2012, and instead involved policies that are at this point in time moot.[22] Moreover, a previous lawsuit challenging DACA 2012 failed on jurisdictional grounds and would inevitably inform any future challenge.[23]

While the scope of this letter is to describe the legal foundation for DACA 2012, it is important to highlight the history and inevitability of prosecutorial discretion in immigration enforcement. Prosecutorial discretion exists because the government has limited resources and lacks the ability to enforce the law against the entire undocumented population. Recognizing this resource limitation, Congress has charged the Secretary of DHS with "establishing national immigration enforcement policies and priorities."[24] Prosecutorial discretion and policies like DACA 2012 also have a humanitarian dimension, and such factors have long driven deferred action decisions. Finally, DACA 2012 has been an unqualified policy success, allowing over three-quarters of a million recipients to continue their education, receive professional licensing, find employment, and pay taxes into Social Security and other tax coffers.[25]

---

Wadhia, *Beyond Deportation, supra* at ch. 2; Shoba Sivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Conn. Pub. Int. L.J. 243, 247-52 (2010); Shoba Sivaprasad Wadhia, *Sharing Secrets*, *supra*, at 9-11 (2012); Leon Wildes, *John Lennon v. The U.S.A.: The Inside Story of the Most Bitterly Contested and Influential Deportation Case in United States History* (2016).

[19] Wadhia, *History of Prosecutorial Discretion*, *supra*; Shoba Sivaprasad Wadhia, *The Aftermath of United States v. Texas: Rediscovering Deferred Action*, Yale J. on Reg.: Notice & Comment Blog (Aug. 8, 2017, 12:19 PM), http://yalejreg.com/nc/the-aftermath-of-united-states-v-texas-rediscovering-deferred-action-by-shoba-sivaprasad-wadhia.

[20] *Reining in Amnesty: Texas v. U.S. and Its Implications: Hearing Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts, S. Comm. on the Judiciary*, 114th Cong. (2015) (statement of Jill E. Family)

[21] Letter from Ken Paxton, Att'y Gen. of Texas et al., to Jefferson B. Sessions, Att'y Gen. of the United States (June 29, 2017) https://www.texasattorneygeneral.gov/files/epress/DACA_letter_6_29_2017.pdf?cachebuster:5.

[22] *Texas v. United States* involves challenges to two deferred action policies announced two years after the original DACA policy was announced. The two later policies, popularly known as "DACA +" and "DAPA," were enjoined by a federal district court in Brownsville, Texas, and later by the Fifth Circuit Court of Appeals. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). Although the Supreme Court reviewed the case, the Court was equally divided. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam). A majority of the Supreme Court never ruled on the case, and the litigation never reached beyond the preliminary injunction stage. On June 15, 2016, DHS issued a memorandum rescinding DAPA. Memorandum from John F. Kelly, Dep't of Homeland Security Sec'y, to Kevin K. McAleenan, Acting Comm'r U.S. Customs and Border Prot., et al., (June 15, 2017), https://www.dhs.gov/sites/default/files/publications/DAPA%20Cancellation%20Memo.pdf.

[23] *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015).

[24] 6 U.S.C. § 202(5) (2016).

[25] *See, e.g.*, Tom K. Wong et al., *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Center for American Progress (Oct. 18, 2016), https://www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes.

This letter outlines the legal foundation for DACA 2012 and confirms that maintaining such a policy falls squarely within the Executive's discretion. The legal authority for the Executive Branch to operate DACA 2012 is crystal clear. As such, choices about its future would constitute a policy and political decision, not a legal one. As the administration decides how best to address DACA 2012, we hope that the legal foundation and history for this policy is addressed wisely and that decisions on the future of DACA 2012 are made humanely.

Thank you for your attention.

*Shoba Sivaprasad Wadhia*

Shoba Sivaprasad Wadhia Esq.*
Samuel Weiss Faculty Scholar &
Clinical Professor of Law
Director, Center for Immigrants' Rights Clinic
Penn State Law

Jill E. Family
Commonwealth Professor of Law and
Government
Widener University Commonwealth Law
School

Michael A. Olivas
William B. Bates Distinguished Chair in
Law
University of Houston Law Center

CC:     John F. Kelly, White House Chief of Staff
        Elaine C. Duke, Acting Secretary of Homeland Security

*\* All institutional affiliations are for identification purposes only and do not signify institutional endorsement of this letter*

Stephen Yale-Loehr                          Hiroshi Motomura
Professor of Immigration Law Practice       Susan Westerberg Prager Professor of Law
Cornell Law School                          University of California Los Angeles

5

Lenni Benson
Professor of Law, Director Safe Passage
Project Clinic
New York Law School

Roxana C. Bacon
Adjunct Professor
University of Miami School of Law

Renee C. Redman
Adjunct Professor of Law
University of Connecticut School of Law

Kristina M. Campbell
Professor of Law
UDC David A. Clarke School of Law

Caitlin Barry
Director, Farmworker Legal Aid Clinic
Villanova University Charles Widger School
of Law

Jessica Anna Cabot
Clinical Teaching Fellow
University of Connecticut School of Law

Sarah Song
Professor of Law and Political Science
U.C. Berkeley School of Law

Geoffrey Hoffman
Director, University of Houston Law Center
Immigration Clinic
University of Houston Law Center

Randi Mandelbaum
Distinguished Clinical Professor of Law
Rutgers Law School

Stephen Legomsky
John S. Lehmann University Professor
Emeritus
Washington University School of Law

Maryellen Fullerton
Professor of Law
Brooklyn Law School

Polly J. Price
Asa Griggs Candler Professor of Law
Emory University School of Law

Linda Bosniak
Distinguished Professor
Rutgers Law School

David Baluarte
Associate Clinical Professor of Law
Washington and Lee University School of
Law

Jennifer Lee
Assistant Clinical Professor of Law
Temple University Beasley School of Law

Karen Musalo
Bank of America Foundation Chair in
International Law
Professor & Director, Center for Gender and
Refugee Status
U.C. Hastings College of the Law

Melynda Barnhart
Visiting Associate Professor
New York Law School

Janet Beck
Visiting Assistant Clinical Professor
University of Houston Law Center

6

Kevin Ruser
Professor of Law
University of Nebraska College of Law

Benjamin Casper Sanchez
Director, James H. Binger Center for New
Americans
University of Minnesota Law School

Dr. Barbara Harrell-Bond
Emerita Professor, Refugee Studies Centre
University of Oxford

Leti Volpp
Robert D. and Leslie Kay Raven Professor of
Law
U.C. Berkeley School of Law

Deborah M. Weissman
Reef C. Ivey II Distinguished Professor of
Law
University of North Carolina School of Law

Michael J Churgin
Raybourne Thompson Centennial Professor in
Law
University of Texas at Austin

César Cuauhtémoc García Hernández
Associate Professor of Law
University of Denver Sturm College of Law

Enid Trucios-Haynes
Professor of Law
Brandeis School of Law, University of
Louisville

Miriam Marton
Assistant Clinical Professor of Law
University of Tulsa College of Law

Christopher N. Lasch
Associate Professor
University of Denver Sturm College of Law

Michael J. Wishnie
William O. Douglas Clinical Professor of
Law Yale Law School

Rubén G. Rumbaut
Distinguished Professor
University of California, Irvine

Hiroko Kusuda
Clinic Professor
Loyola New Orleans College of Law

Maureen A. Sweeney
Associate Professor
University of Maryland Carey School of Law

David Abraham
Professor of Immigration and Citizenship
Law University of Miami School of Law

Alina Das
Professor of Clinical Law
New York University School of Law

Elissa Steglich
Clinical Professor
University of Texas School of Law

Violeta R. Chapin
Clinical Professor of Law
University of Colorado Law School

Marisa Cianciarulo
Associate Dean for Academic Affairs and
Professor of Law
Chapman University

Kate Griffith
Associate Professor
Cornell University School of Industrial and
Labor Relations

Stephen Wizner
William O. Douglas Clinical Professor
Emeritus and Professorial Lecturer
Yale Law School

Peter Margulies
Professor of Law
Roger Williams University School of Law

Prerna Lal
Staff Attorney and Clinical Supervisor
EBCLC, a clinic of Berkeley Law
U.C. Berkeley School of Law

Theo Liebmann
Clinical Professor of Law
Hofstra Law School

Sylvia Lazos
Justice Myron Leavitt Professor
William S Boyd School of Law, University of
Nevada Las Vegas

Rachel E. Rosenbloom
Professor of Law
Northeastern University School of Law

John A Scanlan
Emeritus Professor of Law
Maurer School of Law, Indiana University-
Bloomington

Denise Gilman
Director, Immigration Clinic
University of Texas Law School

Stella Burch Elias
Professor
University of Iowa College of Law

Jennifer Moore
Professor of Law
University of New Mexico School of Law

Charles Shane Ellison
Special Assistant Professor of Law in the
Immigrant and Refugee Clinic
Creighton University School of Law

Marissa Montes
Co-Director, Immigrant Justice Clinic
Loyola Law School

Howard F. Chang
Earle Hepburn Professor of Law
University of Pennsylvania Law School

Estelle M. McKee
Clinical Professor
Cornell Law School

Laila L.Hlass
Professor of Practice
Tulane University School of Law

Stewart Chang
Associate Professor of Law and Director of
the Center for International and Comparative
Law
Whittier Law School

Sarah Sherman-Stokes
Associate Director of the Immigrants' Rights
and Human Trafficking Program
Boston University School of Law

Sabi Ardalan
Assistant Clinical Professor
Harvard Law School

Charles H. Kuck
Adjunct Professor
Emory Law School

Rebecca Sharpless
Clinical Professor
University of Miami School of Law

Jennifer Nagda
Lecturer
University of Pennsylvania Law School

Linda Tam
Clinical Instructor
U.C. Berkeley School of Law

Philip L. Torrey
Managing Attorney, Harvard Immigration
and Refugee Clinical Program
Harvard Law School

David B. Thronson
Professor of Law and Associate Dean for
Experiential Education
Michigan State University College of Law

Veronica T. Thronson
Clinical Professor of Law, Director,
Immigration Law Clinic
Michigan State University College of Law

Peter L. Markowitz
Professor of Law
Cardozo School of Law

Christina Pollard
Visiting Assistant Professor
University of Arkansas School of Law

Laura A Hernandez
Professor of Law
Baylor Law School

Rebecca Kitson
Adjunct Professor of Law
University of New Mexico School of Law

Irene Scharf
Professor of Law
University of Mass Dartmouth School of Law

Maria Woltjen
Lecturer
University of Chicago Law School

Michelle A. McKinley
Bernard B. Kliks Professor of Law
University of Oregon School of Law

Gabriel J. Chin
Edward L. Barrtt Jr. Chair & Martin Luther
King Jr. Professor of Law
U.C. Davis School of Law

Ericka Curran
Immigration Clinic Professor
Florida Coastal School of Law

Jennifer Lee Koh
Professor of Law
Western State College of Law

Anil Kalhan
Associate Professor of Law
Drexel University Kline School of Law

Kari Hong
Assistant Professor
Boston College Law School

Holly S. Cooper
Lecturer and Co-Director of the Immigration
Law Clinic
U.C. Davis School of Law

9

Julia Vazquez
Directing Attorney & Lecturer of Law
Southwestern Law School

Anita Sinha
Assistant Professor of Law
American University, Washington College of Law

Victor C. Romero
Professor of Law
Penn State Law

Alan Hyde
Distinguished Professor
Rutgers Law School

Kit Johnson
Associate Professor of Law
University of North Dakota School of Law

Mary Holper
Associate Clinical Professor
Boston College Law School

Jon Weinberg
Professor of Law
Wayne State University

Gloria Valencia-Weber
Professor Emerita
University of New Mexico School of Law

Sarah Paoletti
Practice Professor of Law and Director,
Transnational Legal Clinic
University of Pennsylvania School of Law

Monika Batra Kashyap
Visiting Assistant Professor of Law
Seattle University School of Law

Margaret H. Taylor
Professor of Law
Wake Forest University School of Law

Kathleen Kim
Professor of Law
Loyola Law School Los Angeles

Susan Hazeldean
Assistant Professor
Brooklyn Law School

Joanne Gottesman
Clinical Professor of Law and Director,
Immigrant Justice Clinic
Rutgers Law School

Sabrina Rivera
Staff Attorney/Adjunct Faculty
Western State College of Law

Lynn Marcus
Professor of the Practice; Co-Director,
Immigration Law Clinic
University of Arizona James E. Rogers
College of Law

Raquel E. Aldana
Associate Vice Chancellor for Chancellor for
Academic Diversity and Professor of Law
U.C. Davis School of Law

Andrew Moore
Associate Professor of Law
University of Detroit Mercy School of Law

Jayesh Rathod
Professor of Law
American University, Washington College of
Law

Mariela Olivares
Associate Professor of Law
Howard University School of Law

Muneer I. Ahmad
Clinical Professor of Law and Deputy
Director for Experiential Education
Yale Law School

Sheila Velez Martinez
Jack and Lovell Olender Professor of Asylum
Refugee and Immigration Law
University of Pittsburgh School of Law

Richard A. Boswell
Professor of Law
U. C. Hastings College of the Law

Ediberto Roman
Professor of Law & Director of Immigration
and Citizenship Initiatives
Florida International University

# EXHIBIT 88

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>          Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>          Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

**Declaration of Biddy Martin**

I, Carolyn A. ("Biddy") Martin, declare as follows:

1.      I am the president of Trustees of Amherst College, known to the public as Amherst College ("Amherst").  I have been employed in this capacity since 2011.

2.      I have either personal knowledge of the matters set forth below or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered from the College's records by others within the organization.

3.      Amherst College is a private residential liberal arts college founded in 1821. Amherst enrolls approximately 1,850 undergraduate students in pursuit of its mission to educate students from all backgrounds so that they may seek, value, and advance knowledge, engage the world around them, and lead principled lives of consequence.

4.      Consistent with our motto, *terras irradient* ("let them give light to the world"), Amherst College considers it a moral imperative to actively identify, recruit, and enroll the most promising students regardless of their financial circumstance or immigration status – including DACA and undocumented students.  Over the past fifteen years in particular, Amherst College has achieved unparalleled success in assembling one of the most diverse student bodies of any institution of higher education in the world.  The college values this diversity as essential to enhancing intellectual inquiry and preparing students to lead lives of global consequence.  The college's strategic plan confirms the value of that diversity, noting: "as diversity has increased, the quality of the students has also risen by every standard measure."

5.      Critical to that diversity has been the enrollment of talented DACA students, who bring invaluable individual perspectives, experiences, and contributions to the college's

1

purposefully small residential community.  Each of these students earned admission to the college on the basis of their own merit, often overcoming substantial odds to attain both academic and non-academic success in spite of living in constant fear of deportation and without the myriad benefits that are made available to persons who are considered to be lawfully present in this country.

6.      Amherst College invests substantial resources in supporting all of its students – including its DACA students.  Among other things, Amherst's specific support for DACA students includes: a) designating a significant portion of a newly-created staff position to serving the needs of DACA and undocumented students; and b) paying for consultations with an immigration attorney.

7.      Notwithstanding significant efforts by Amherst College to support its DACA students, the decision to rescind DACA in particular prevents DACA students from experiencing the full range of opportunities made available to all other students at Amherst College.  For example, among the graduating classes of 2016 and 2017, approximately forty-five percent (45%) participated in study abroad opportunities.  During the time period in which DACA was effective, at least three Amherst College students with DACA status were able to take advantage of this opportunity.  The elimination of the DACA program and the cancellation of advance parole render the college's DACA students unable to participate in study abroad opportunities without risking loss of their DACA status and deportation upon their return from study abroad.  Thus far, at least two Amherst College DACA students have cancelled their study abroad plans due to concerns that the DACA program would be rescinded.

8.     As another example: eighty-nine percent (89%) of the graduating class of 2017 was employed by the college for at least one semester.  These mostly on-campus jobs provide students opportunities to develop important skills, in addition to further enhancing their resumes and post-graduation employment prospects.  These students also provide vital services to the college, from admission tour guides who play an important role in introducing prospective students and their families to the college, to student researchers who provide critical assistance to professors while making important discoveries that benefit not only the college, but occasionally the world.  Unfortunately, the rescission of DACA, and the work authorizations that were provided under DACA, will prevent Amherst College from making these critical employment opportunities available to DACA students, thus depriving those students of opportunities overwhelmingly utilized by their peers.

9.     The rescission of DACA creates complications for students with regard to off-campus employment and post-graduation employment prospects as well.  At least one Amherst College DACA student has already received a post-graduation offer of employment. The rescission of DACA effectively precludes this student from accepting this offer of employment because the student will no longer be eligible to work in the U.S. once the student's current work authorization expires.  The lack of continued work authorization has also harmed this student's ability to apply for other jobs, as most applications require some form of disclosure of whether the student is eligible to work in the United States.

10.    In addition to the aforementioned practical ways in which DACA students are harmed by the decision to rescind DACA, they also face very real consequences that affect their well-being and participation in the classroom and the Amherst College community.

3

Amherst College professor Leah Schmalzbauer has provided me the following summary of the effects she has witnessed first-hand:

    a.  I have been working closely with several undocumented and DACA students for the past three years.  During this time, I have noted the high levels of anxiety and stress that undocumented students carry, and I have noted the way in which getting DACA helped alleviate that anxiety and stress.  DACA moreover enabled students to pursue opportunities and expand their aspirations in powerful ways.  Every DACA student with whom I have worked told me that they would not have gone to college without DACA and they would not have set high professional goals.  Their aspirations now include lawyer, professor, and journalist.  But perhaps most importantly, DACA gave my students a sense of belonging in this country, and a sense of being valued that they did not have when they were undocumented.  In the weeks leading up to the rescission of DACA and currently, the DACA students with whom I am working closely are struggling emotionally.  They are terrified that they will be separated from their families.  Some have had emotional breakdowns and/or have been diagnosed with medical or mental health issues as a result of the stress.  Some don't even feel safe seeking professional support.

11.    Secondary to the very real harm incurred by DACA students, Amherst College also suffers harm from the rescission of DACA in various ways.

    a.  Due to concerns about the inability to receive financial assistance in the form of campus employment, medical/mental health issues related to the rescission

4

of DACA, and diminished prospects of post-graduation employment, many DACA beneficiaries and undocumented individuals may not enroll or even apply to Amherst College in the first place. For similar reasons, students who have already enrolled may feel that they are unable to continue their college education.  If new DACA and undocumented students do not apply, or if current students are forced to drop out, the college will be deprived of a critical source of the diversity we so highly value.  Moreover, if current DACA students are forced to drop out, the college will be deprived of the contributions those students were making both inside and outside the classroom.  Even those DACA students who remain enrolled may be less active on campus, thus further depriving the college of the full extent of their contributions.

b.  The college must allocate additional institutional funds to help DACA students: i) fund their education without the benefit of campus employment; and ii) pay for additional legal consultations necessitated by the decision to rescind DACA.

c.  The college risks losing valuable current employees – including student employees – as their DACA status and accompanying work authorization expire.  In addition, the college would incur additional expenses to hire and train employees to fill any such vacancies.  Furthermore, the rescission of DACA precludes the college from hiring otherwise qualified candidates for various positions moving forward.

d.  The college has expended and will continue to have to expend significant resources in monitoring developments related to DACA – particularly the rescission of the DACA program.  This includes the creation and update of dedicated resource webpages, regular meetings by an internal crisis response team, ongoing communications to the campus community, and targeted education efforts regarding the confidentiality of student information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of September, 2017

Carolyn A. ("Biddy") Martin

6

# EXHIBIT 89

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

          Plaintiffs,

    v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

          Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

**DECLARATION OF SONYA STEPHENS**

I, Sonya Stephens, declare as follows:

1. I am Sonya Stephens, Acting President at Mount Holyoke College, a highly selective, nondenominational, residential, research liberal arts college for women, located in South Hadley, Massachusetts.

2. I have either personal knowledge of the matters set forth below or, with respect to those matters for which I do not have personal knowledge, I have reviewed information gathered from College records by others within the institution.

3. Mount Holyoke was founded in 1837 and is the first of the historic Seven Sisters. Mount Holyoke's mission is to provide an intellectually adventurous education in the liberal arts and sciences through academic programs recognized internationally for their excellence and range; to draw students from all backgrounds into an exceptionally diverse and inclusive learning community with a highly accomplished, committed, and responsive faculty and staff; to continue building on the College's historic legacy of leadership in the education of women; and to prepare students, through a liberal education integrating curriculum and careers, for lives of thoughtful, effective, and purposeful engagement in the world.

4. Our 2,202 students hail from 47 states and 57 countries. Twenty-seven percent of MHC students are international citizens, and 27 percent of domestic students identify as African American, Asian American, Latina, Native American or multiracial. Fifty-seven percent of incoming first-year students were in the top 10 percent of their high school classes.

5. Access for low- and moderate-income students and for students from underrepresented groups is central to Mount Holyoke's mission. In fact, 65 percent of our students this past year received need-based aid, with average packages of grants, scholarships, and loans exceeding $38,000, and more than 26 percent of our domestic students received Pell Grants. Overall, Mount Holyoke provides its students with more than $44 million a year in need-based financial aid with funds drawn from the endowment and annual giving to the College. That figure represents nearly one-third of the College's annual budget.

6. We currently have some known DACA students on campus. We have graduated 12 students in the past four years who were undocumented or known participants in the DACA program.

7. At Mount Holyoke College, our mission is to draw students from all backgrounds into an exceptionally diverse and inclusive learning environment and to prepare them for purposeful engagement in the world. Our community is enriched by the experiences and intellectual contributions of talented DACA students who must often overcome great obstacles and demonstrate significant perseverance to pursue their studies and their goals.

8. Elimination of the DACA program will likely bring immediate economic and other hardships to students here who are under DACA protection. These hardships will likely include loss of access to on-campus employment opportunities and educational financing options as well as a possible inability to remain in the nation to continue their Mount Holyoke educations.

9. DACA has proven itself to be of significant benefit not only to hundreds of thousands of students, but also to the nation as a whole. The program provides access to educational and employment opportunities for students, while building pathways for them to pursue the American dream. In the process, they become fully engaged contributors to the economies and communities in which they live and work and demonstrate their dedication to this country and its ideals.

10. Furthermore, in addition to the significant anxieties the Trump Administration's recent announcements about the DACA program have caused for DACA recipients (and for their loved ones, friends, and acquaintances), many members of the Mount Holyoke community, the American public, and the world community are dismayed that rescission of the DACA program represents a profound breaking of faith on the part of our national government with some of the most vulnerable members of our society. Betrayals of this sort do long-term damage to trust in our government and its leaders at a time when wise, humane, and forthright leadership is sorely needed.

I declare under the penalty of perjury the foregoing is true and correct.

Executed this 27 day of September, 2017

*Sonya C Stephens*

Sonya Stephens
Acting President
Mount Holyoke College

# EXHIBIT 90

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>                Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>                Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |



**BROWN**

**Richard M. Locke**
Provost
Professor of Political Science an
International and Public Affairs

## DECLARATION OF RICHARD M. LOCKE, PROVOST, BROWN UNIVERSITY

My name is Richard M. Locke, and I am professor of political science and international and public affairs at Brown University and currently serve as Provost of Brown.

Brown University takes great pride in cultivating a diverse and inclusive community of highly talented students, faculty and staff who are essential to fulfilling our mission at the highest levels, which is:

*To serve the community, the nation, and the world by discovering, communicating, and preserving knowledge and understanding in a spirit of free inquiry, and by educating and preparing students to discharge the offices of life with usefulness and reputation.*

The intellectual rigor of our academic community is both enhanced by and dependent upon the contributions of exceptionally promising individuals with different viewpoints, experiences and intellectual pursuits. Having students from diverse races, ethnicities, nationalities, cultural heritages and perspectives is central to our quest to engage in research and teaching that yields solutions to some of the most pressing societal issues that we confront in our increasingly complex world.

Brown University enrolls approximately 9400 students, each with a different personal story, but who share a common goal – to use their substantial intellectual assets and educational experience to make a difference in the world, locally and globally. Although Brown University does not keep centralized records of students who are participating in the Deferred Action for Childhood Arrival (DACA) program, we are aware that there are DACA students in both the undergraduate and graduate programs, including the School of Public Health and Warren Alpert Medical School. We estimate that Brown has approximately 12 students enrolled in DACA.

DACA students contribute a variety of perspectives, knowledge, skills and life experiences to our academic community, and to all educational and social aspects of Brown University. Many of the DACA program students are the first in their families to attend college. These students strengthen and enrich our community, both within and outside the classroom.

The ability to work legally is essential for many DACA students, since they are not eligible for federal financial aid and may need to work to supplement any

other sources of aid. For those students, the loss of the ability to support themselves or gain valuable experience while studying will jeopardize their opportunities to complete their studies and move into the world of employment.

While it is critical to understand the value and importance the students participating in the DACA program bring to campus life at Brown University, it is just as crucial to understand the consequences of their absence. With the end of DACA, students would be at risk for deportation. This would bring a level of fear and uncertainty to the campus and create a tense, unhealthy environment for our entire community. The discontinuance of DACA would jeopardize the capacity of these individuals to contribute to and take full advantage of their Brown education; significantly reduce the academic and social experience at Brown University for all associated with this distinguished institution; and it would undermine our nation's ability to benefit fully from these smart, skilled and highly capable individuals.

The repeal of the DACA would have a profound adverse impact on the academic and social community at Brown University. Students who, in good faith, pursued this program to enable them to join our community would suddenly be at risk of losing educational, employment and personal opportunities that are possible only if the DACA program is continued.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Date this 21 of September, 2017.

Richard M. Locke, Provost, Brown University

# EXHIBIT 91

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF DONALD STRANEY

I, DONALD STRANEY, do declare and would competently testify as follows:

1.      I am the Vice President for Academic Planning and Policy for the University of

Hawai'i System ("UH").  I have over 38 years in higher education experience including 7 years

as the Chancellor of the University of Hawai'i at Hilo and 8 years as the Dean of the College of

Science and professor of biology at California State Polytechnic University, Pomona.  As the

Vice President for Academic Planning and Policy, I provide executive leadership in setting forth

the system wide academic vision and goals for the university.

2.      I have personal knowledge of the matters set forth herein, or for those matters

which I do not have personal knowledge, I have reviewed information gathered from UH records

or databases by UH employees.

3.      UH was founded in 1907 and today it includes 3 universities, 7 community

colleges, and community based learning centers across Hawai'i.  For Fall 2017, more than

51,000 students are enrolled at UH.  UH has awarded more than 11,000 degrees for each of the

last four academic years to local, national, and international students.

4.      UH is steadfast in its commitment to serve all members of our community,

regardless of citizenship status.

5.      Over three years ago, the UH Board of Regents adopted a policy to extend

eligibility for resident tuition rates to undocumented students, including but not limited to those

who have filed for Deferred Action for Childhood Arrivals ("DACA").

6.      Presently, there are 16 students who have reported their DACA status to UH and

who are pursing various degrees at multiple UH campuses.

7.    UH's undocumented students are an integral part of the UH community.  If DACA is terminated abruptly it will have a negative effect upon UH and its faculty and students. Without the benefit of in-state tuition rates, DACA students may have to withdraw from UH and discontinue their education.  Upon information and belief, these students will face possible arrest and deportation despite their contributions to UH and to our broader community.

8.    In academia, the loss of culturally diverse students with different life experiences reduces the quality of classroom discussions and impedes the development of new perspectives and ideas for other students and faculty.

9.    If our undocumented students must withdraw from our university, UH will lose its educational and financial investment in these students who we believe will benefit and serve the local, national, and international workforce.

10.    Terminating DACA will harm UH and its commitment to provide environments in which faculty, staff and students can discover, examine critically, and preserve and transmit the knowledge, wisdom, and values that will help ensure the survival of and quality of life for present and future generations.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

DATED:  Honolulu, Hawai'i,  _September 26_ , 2017.

DONALD O. STRANEY

# EXHIBIT 92

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>            Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>            Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

**DECLARATION OF W. TAYLOR REVELEY, III**

Pursuant to 28 U.S.C. § 1746 (2), I, W. Taylor Reveley III, hereby declare as follows:

1. I am President of the College of William Mary ("William & Mary" or "the university"), and have served in that capacity since September 2008.  I had previously served as interim president of the university for six months, and as dean of William & Mary Law School for almost a decade.  Before joining William & Mary, I practiced law at Hunton & Williams LLP for 28 years, including nine years as the firm's managing partner.  As President, I serve as the chief executive officer of William & Mary.  I have personal knowledge of the matters set forth below or have knowledge of those matters based on my review of information and records gathered by members of my staff.

2. William & Mary is a public, liberal arts university with over 6,000 undergraduate students and over 2,300 graduate students.[1]  William & Mary recruits and attracts a diverse student body.  Our students come from all 50 states, the District of Columbia, and 60 foreign countries.  William & Mary is dedicated to a diverse student and faculty population.  Among the university's goals, as set out in its Mission Statement, are to attract outstanding students from diverse backgrounds and to develop a diverse faculty which is nationally and internationally recognized for excellence in both teaching and research.[2]

---

[1] See http://www.wm.edu/about/wmataglance/index.php.
[2] See William & Mary Mission Statement at
http://www.wm.edu/about/administration/provost/about/mission/index.php.

3.   William & Mary has approximately 23 students enrolled across the university in 2017 who are participants in the Citizenship and Immigration Services' Deferred Action for Childhood Arrivals ("DACA").[3]

4.   William & Mary DACA-enrolled students make valuable contributions to the university, through their classroom participation, their extra-curricular engagements, and their commitment to independent study and research.  The DACA program provides meaningful benefits to its DACA student population and the rest of the university community.  For instance, the DACA program provides its William & Mary students with legal protections and financial opportunities that have enhanced their ability to take full advantage of our educational programs.[4]  The DACA program has also benefitted William & Mary as a whole because DACA students contribute their unique perspectives inside and outside the classroom and help the university foster a culture of inclusion.

5.   For as long as they have active DACA protection, DACA students enrolled at William & Mary can pursue their courses of study and fully invest themselves in their educational endeavors, without fear of sudden detention or removal.  Discontinuance of DACA would withdraw the educational opportunities these students enjoy and subject them to deportation.

6.   The elimination of the DACA program would also lessen the effect of William & Mary's investment of significant financial and human resources in its students and in preparing a

---

[3] This calculation reflects students who opted to self-identify.  William & Mary estimates that actual numbers are higher.

[4] DACA students domiciled in Virginia are eligible to apply for in-state tuition.  See http://www.schev.edu/docs/default-source/tuition-aid-section/financial-aid/dacafaqs.pdf.

Page 3 of 4

well-trained workforce. Most significantly, the elimination of the DACA program would hinder William & Mary's pursuit of diversity and inclusion and cut against its core goal of attracting outstanding students and faculty from diverse backgrounds.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on: September 29, 2017

W. Taylor Reveley III

# EXHIBIT 93

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>            Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>            Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

## DECLARATION OF JUDY MOHR PETERSON, PhD

I, JUDY MOHR PETERSON, do declare and would competently testify as follows:

1.     I am the Administrator of the Med-QUEST Division, Department of Human Services, State of Hawaii. I have held the position since July 1 2015.

2.     I have personal knowledge of the matters set forth herein, or for those matters for which I do not have personal knowledge, I have reviewed information gathered from Med-QUEST records or by Med-QUEST employees.

3.     The Med-QUEST Division provides eligible low-income adults and children access to health and medical coverage through managed care plans. Med-QUEST administers Hawaii's Medicaid program, QUEST Integration.

4.     I am aware of DACA, and the recent announcement that the DACA program is being terminated.

5.     The termination of DACA will likely cause more people to rely on state-funded and/or state administered public health care and other benefits, and thus impose additional costs on Hawaii.

6.     Through Hawaii's state-administered Medicaid One-Time Emergency services, Med-QUEST reimburses hospitals for emergency and urgent services provided to qualifying uninsured Hawaii patients. This would include DACA grantees, who may be eligible for the Medicaid One-Time Emergency services even though they are not U.S. citizens.

I declare under penalty of law that the foregoing is true and correct to the best of my knowledge.

DATED:  Honolulu, Hawaii, September 29, 2017.

JUDY MOHR PETERSON, PhD

# EXHIBIT 94

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>       Plaintiffs,<br><br>  v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>       Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

I, Stephen M. Groff, hereby declare as follows:

1.      I am the Director of the Division of Medicaid and Medical Assistance ("DMMA").

2.      DMMA administers the Medicaid and Children's Health Insurance Program ("CHIP") programs in Delaware.

3.      The rescission of the Deferred Action for Childhood Arrivals ("DACA") will likely create a financial burden on the State of Delaware if and when DACA recipients need Emergency and Labor/Delivery Services.

4.      Assuming that DACA recipients had access to employer-sponsored or other commercial health care coverage, the loss of deferred status would likely result in a loss of that coverage.

5.      Consequently, those former DACA recipients may be eligible for Emergency and Labor/Delivery Services.

6.      The State of Delaware must offer Emergency and Labor/Delivery Services to uninsured individuals pursuant to 42 CFR 440.255 and 16 Del. Admin. C. §143301 (Medicaid Eligibility for Illegally Residing Nonqualified Aliens).  The Delaware Medicaid program pays for the services and receives 50% match from the federal Medicaid program.

7.      The rescission of DACA will likely cause former DACA recipients to seek State-sponsored Emergency and Labor/Delivery Services.  This would impose a direct financial burden upon the State of Delaware.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed this 26th day of September, 2017.



Stephen M. Groff
Director
Division of Medicaid and Medical Assistance

# EXHIBIT 95

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et. al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, *et. al.*,<br><br>Defendants. | No. 1:17-CV-5228 |

**DECLARATION OF CLAUDIA SCHLOSBERG**

Pursuant to 28 U.S.C. § 1746(2), I, Claudia Schlosberg hereby declare as follows:

1. I am over the age of 18 and competent to testify herein.

2. I am employed as the Senior Deputy Director/State Medicaid Director with the District of Columbia (District) Department of Health Care Finance (DHCF). I have held my position since May of 2015.

3. DHCF is the Single State Medicaid agency for the District, and is also responsible for administering other District health insurance and public benefit programs.

4. One benefit program administered by DHCF is the D.C. HealthCare Alliance. *See* D.C. Code § 7-771.07(2).

5. The D.C. HealthCare Alliance provides certain baseline health insurance benefits, and is generally available to residents of the District who are not eligible for Medicaid and who live in households with income below 200% of the Federal Poverty Level and have countable resources less than $4000. *See generally* 22-B District of Columbia Municipal Regulations (DCMR) 3304.

6. The D.C. HealthCare Alliance is paid for entirely with District tax revenues.

7. The estimated average cost for DHCF to deliver D.C. HealthCare Alliance benefits to an individual is Three Hundred Fifty-Five Dollars and Seventy-Five Cents ($353.75) per month for Fiscal Year 2018, according to DHCF's Agency Fiscal Officer.

8. District residents currently participating in the Deferred Action on Childhood Arrivals (DACA) program are allowed to work legally, and so can either procure health insurance through an employer, or earn money to purchase private health insurance.

9. Terminating the DACA program could cause any District residents who are DACA recipients, and who, when unemployed, meet the criteria for the D.C. HealthCare Alliance, to fall back onto that insurance program of last resort.

10. Pushing these individuals into the D.C. HealthCare Alliance could force the District to spend additional money on that program and harm District finances, as well as preventing the District from spending the money on other priorities.

11. I have been told that information from the Department of Homeland Security indicates that there are about 800 individuals in the District participating in DACA in 2017.

12. If all of those 800 individuals became new enrollees in the D.C. HealthCare Alliance as a result of DACA being terminated it could cost the District an additional Two Hundred Eighty-Three Thousand Dollars ($283,000.00) per month in Fiscal Year 2018.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   9/26/17

CLAUDIA SCHLOSBERG

# EXHIBIT 96

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et. al.*,

Plaintiffs,

v.

DONALD TRUMP, *et. al.*,

Defendants,

No. 1:17-CV-5228

## Declaration of Ike Brannon

I, Ike Brannon, declare as follows:

1. I am currently an economist who is president of the consulting firm Capital Policy Analytics. I also have an affiliation with the Cato Institute.

2. I received my MA and Ph.D. in Economics from Indiana University.

3. I was an economics professor in the University of Wisconsin System from 1994-2002. In 2001 I was given tenure and promoted to associate professor.

4. Since then I have worked in Washington DC, for (in order) the Office of Management and Budget, the Congressional Joint Economic Committee, THe Senate Finance Committee, The U.S. Treasury, and the House Energy and Commerce Committee.

5. In 2008 I was chief economist for the John McCain for president campaign.

6. My coauthor, Logan Albright, received his Master's Degree in economics in 2011 from Georgia State University, and has worked as a policy analyst in Washington, DC for the last five years, including positions at think tanks and policy organizations such as the American Action Forum, FreedomWorks, Free the People, and Capital Policy Analytics.

7. Whereas the President has expressed a desire to end Deferred Action for Childhood Arrivals (DACA) program, we conducted a thorough investigation of the economic and fiscal costs that such action would impose on the federal government, and to the economy as a whole and published that research in January 2017.

8. We recently updated this analysis to break down these costs by state, using survey data from DACA recipients.

9. My co-author Logan Albright and I began our analysis by comparing DACA recipients to those immigrants who hold H-1B visas. These are high-skilled, well-educated immigrants who are demographically analogous to DACA students, all of whom must necessarily enroll in higher education programs in order to be eligible.

Declaration of Ike Brannon                    1                    ATTORNEY GENERAL OF WASHINGTON
                                                                   Civil Rights Unit
                                                                   800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA  98104
                                                                   (206) 442-4492

10. The average DACA recipient is 22 years old, employed, and a student. 17 percent of them are on track to complete an advanced degree. The college attrition rate of DACA recipients is miniscule compared to domestic students, an indication of the exceptional caliber of the DACA students. H-1B holders are generally between 25 and 34, employed, and most have completed degrees. In short, we posit that they look like what DACA recipients will look like in a few years' time.

11. We begin our analysis by using a study from the Hoover Institute[1] on the economic impact of expanding the H-1B visa program as our baseline. We adjusted that estimate by the difference in the number of recipients and the difference in income. To conform to Congressional budget procedures we compiled a ten year aggregate cost.

12. We determined that, if DACA recipients were completely analogous to H-1B holders, their removal would constitute a budgetary loss of $127 billion and a GDP loss of $512 billion.

13. We adjusted for the fact that DACA recipients, being younger and not completely done with their education, earn on average roughly 43 percent of what H-1B holders earn. What's more, the population of DACA recipients is about 750,000, compared to the 660,000 H-1B holders the Hoover study examined, so we adjusted for these differences.

14. From this, we determined that, over a ten-year window, a repeal of DACA would cost the federal government $60 billion in lost revenue, and the economy as a whole $215 billion in lost GDP.

15. As a way of confirming our result, we consulted a study from the National Research Council that estimated the average long-term fiscal impact for immigrants who remain in the country for an extended period of time. This result coincided with our own nearly perfectly ($59.3 billion versus our $60 billion).

---

[1] http://www.hoover.org/sites/default/files/uploads/aafs/2013/05/Estimating-the-Economic-and-Budgetary-Effects-of-H-1B-Reform-In-S.744.pdf

Declaration of Ike Brannon                     2

16. There are DACA recipients in 35 states and the District of Columbia. Using survey data from the Center for American Progress,[2] we estimated the total cost of repealing DACA for each of the relevant states, based on the proportion of DACA recipients who live locally.

17. Of the 50 states, California will bear the highest cost, with over 30 percent of DACA recipients. Factoring in budgetary and economic effects, California's total cost over a ten year window would be $84.2 billion (See Table 1).

18. It is important to note that these estimates are conservative, as DACA recipients will likely end up being more productive than their current salaries indicate, as they age and complete their degrees. Nor does this analysis factor in the enforcement cost of physically deporting recipients, should the program be eliminated.

19. In summary, the repeal or rollback of the DACA program would have a significant and negative fiscal and economic impact on the country, and would disproportionately affect the various states in which DACA recipients are most prevalent.

20. Accompanying this statement is a list of my publications over the past decade.

21. The state of Washington paid us $3,000 for completing this statement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and complete to the best of my knowledge.

Executed on the 6th of December, 2017.

_____
Ike Brannon, Ph.D.

_____
Logan Albright, M.A.

---

[2]https://cdn.americanprogress.org/wp-content/uploads/2015/07/DACA-Wong_NILC_CAP-Codebook-PDF.pdf

| | **Table 1: Cost of DACA Repeal By State 2018-2028** | | |
|---|---|---|---|
| **State** | **Budget Cost (Millions $)** | **Economic Cost (Millions $)** | **Total Cost (Millions $)** |
| AL | 258 | 924.5 | 1,182.5 |
| AZ | 2,826 | 10,126.5 | 12,952.5 |
| CA | 18,372 | 65,833 | 84,205 |
| CO | 768 | 2,752 | 3,520 |
| CT | 642 | 2,300.5 | 2,942.5 |
| DC | 900 | 3,225 | 4,125 |
| DE | 258 | 924.5 | 1,182.5 |
| FL | 5,910 | 21,177.5 | 27,087.5 |
| GA | 1,158 | 4,149.5 | 5,307.5 |
| HI | 126 | 451.5 | 577.5 |
| IA | 258 | 924.5 | 1,182.5 |
| IL | 1,926 | 6,901.5 | 8,827.5 |
| IN | 642 | 2,300.5 | 2,942.5 |
| KS | 384 | 1,376 | 1,760 |
| MA | 258 | 924.5 | 1,182.5 |
| MD | 642 | 2,300.5 | 2,942.5 |
| MI | 768 | 2,752 | 3,520 |
| MN | 126 | 451.5 | 577.5 |
| MO | 126 | 451.5 | 577.5 |
| NE | 126 | 451.5 | 577.5 |
| NJ | 384 | 1376 | 1760 |

| | | | |
|---|---|---|---|
| NM | 258 | 924.5 | 1,182.5 |
| NV | 126 | 451.5 | 577.5 |
| NY | 10,794 | 38,678.5 | 49,472.5 |
| NC | 2,184 | 7,826 | 10,010 |
| OH | 126 | 451.5 | 577.5 |
| OK | 126 | 451.5 | 577.5 |
| OR | 384 | 1,376 | 1,760 |
| PA | 258 | 924.5 | 1,182.5 |
| SC | 258 | 924.5 | 1,182.5 |
| TN | 258 | 924.5 | 1,182.5 |
| TX | 5,142 | 18,425.5 | 23,567.5 |
| UT | 384 | 1,376 | 1,760 |
| VA | 1,026 | 3,676.5 | 4,702.5 |
| WA | 1,800 | 6,450 | 8,250 |

Declaration of Ike Brannon

5

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| Cato Institute | "When Does Antitrust Activity Stifle Innovation?" | Winter 2017-2017 | Article | | Antitrust |
| Regulation | "What Is a Life Worth?" | Winter 2004 | Journal Article | | Life's Worth |
| Regulation | "How the Packers Lost Out" | Winter 2002 | Journal Article | Michael F. Gorman | Economy |
| Regulation | "Obfuscation at the EPA" | Summer 2011 | Journal Article | | EPA |
| Regulation | "Lure of the Big City" | Summer 2011 | Book Review | Edward Glaeser | The allure of big cities |
| Regulation | "When DC Freezes Over" | Summer 2010 | Journal Article | | Snow Clearance |
| Regulation | "Yet Another Pop Econ Book" | Summer 2008 | Book Review | Tim Harford | Economics |
| Cato Institute | "A Liberal Heretic Contradicts Piketty" | Spring 2015 | Article | | Smalltown USA |
| Cato Institute | "Income Inequality and the NBA" | Spring 2014 | Article | | Income |
| National Affairs | "Rethinking Tax Benefits for Home Owners" | Spring 2014 | Journal Article | | Tax Reform |
| Regulation | "Remembering the Man Behind Rational Expectations" | Spring 2006 | Journal ARticle | | John Muth |
| Regulation | "A Collapsing Housing Bubble?" | Spring 2006 | Journal Article | Suzanne Stewart | Housing Bubble |
| Regulation | "Treating the Unserious Seriously" | Spring 2005 | Book Review | Robert Hahn | Economic Regulation |
| Cato Journal | "Nudge: Improving Decisions about Health, Wealth, | Fall 2008 | Book Review | Richard H. Thaler and | Improving Economic Decisions |
| Regulation | "FDR at Breakfast" | Fall 2007 | Book Review | Amity Shlaes | Great Depression |
| The Weekly Standard | "Tax Reform Must Not Keep Tax Breaks for Real Estate" | 11/8/17 | Article | | Tax Reform |
| Forbes Online | "Hugh Hewitt's Phony Budget Accounting In Defense | 11/7/17 | Op-Ed | | Mortgage Interest Deduction |
| Forbes Online | "How State Pension Funds--And 401k Managers-- | 11/2/17 | Op-Ed | | State Pension Funds and 401Ks |
| Forbes Online | "What Do Manufacturers Want from Tax Reform? | 10/24/17 | Op-Ed | | Tax Reform |
| The Weekly Standard | "Kevin Warsh, Candidate for Federal Reserve Chair, Is | 10/6/17 | Article | | Federal Reserve |
| The Weekly Standard | "How Tax Employee-Ownership is One Thing our | 10/4/17 | Article | | Tax Reform |
| Cato At Liberty | "The Dubious Defense of the Jones Act" | 9/28/17 | Blog Post | | Jones Act |
| Forbes Online | "A System On Trial: South Korean Political Reform | 9/28/17 | Op-ed | Jared Whitley | South Korean political reform |
| The Weekly Standard | "In Pursuit of the Second Best Policy" | 9/21/17 | Article | | Flood Insurance |
| Cato At Liberty | "The Green Investment Pension Con" | 9/19/17 | Blog Post | | Green Investment |
| Daily Record (NC) | "Employer Tax Cuts Help Employees" | 9/19/17 | Op-ed | | Employer tax cuts |
| Newsweek | "RESCINDING DACA WILL COST THE US ECONOMY | 9/17/17 | Article | | Immigration |
| The Weekly Standard | "Cutting the Corporate Tax Can Help Workers. Really." | 9/13/17 | Article | | Tax Reform |
| Weekly Standard | "Cutting the Corporate Tax Can Help Workers. Really." | 9/13/17 | Op-ed | | Corporate tax rate |
| The Weekly Standard | "Bring on the Hurricane Irma Bowl!" | 9/7/17 | Article | | NFL |
| The Weekly Standard | "How Not to Fix Fannie Mae and Freddie Mac" | 9/5/17 | Article | | Financial Crisis |
| Time Magazine | "Hurricane Harvey Proved We Need More Flood | 9/5/17 | Op-ed | Ari Blask | NFIP |
| Cato At Liberty | "The Economic and Budgetary Cost of Repealing DACA | 8/31/17 | Blog Post | | DACA |
| Cato At Liberty | "Will Harvey Reform Flood Insurance" | 8/31/17 | Blog Post | | Flood Insurance |
| SSRN | "Corporate Income Taxes and Labor: An Investigation | 8/30/17 | Policy Analysis | | Income Tax |
| The Weekly Standard | "The Sordid Prosecution of Aaron Schock" | 8/25/17 | Article | | Aaron Schock |
| The Weekly Standard | "Ode to a Couch" | 8/21/17 | Article | | Garbage |
| Forbes Online | "President Moon's Anti-Corporate Policies Jeopardize | 8/14/17 | Op-ed | | South Korea's anti-corporate |
| The Weekly Standard | "Remembering Glen Campbell" | 8/9/17 | Article | | Glenn Campbell |
| Politico | "The government's hidden housing subsidy for the | 8/8/17 | Op-ed | Ari Blask | Federal flood insurance |
| The Weekly Standard | "Rename the Rose Fitzgerald Greenway" | 8/4/17 | Article | | Rose Fitzgerald Greenway |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "The Deep State Takes on Tillerson" | 8/3/17 | Article | | Rex Tillerson |
| The Weekly Standard | "A Tough But Telling Race in Virginia" | 8/2/17 | Article | | Virginia Elections |
| Forbes Online | "Puerto Rico's Fuzzy Economics" | 7/31/17 | Op-ed | | Puerto Rico |
| The Weekly Standard | "Will Illinois Need a Federal Bailout?" | 7/27/17 | Article | | Illinois' debt crisis |
| The Weekly Standard | "Still Stupid" | 7/27/17 | Article | | Economy |
| The Hill | "The private alternative to the National Flood | 7/20/17 | Op-ed | Ari Blask | Flood Insurance |
| The Hill Online | "The private alternative to the National Flood | 7/20/17 | Op-ed | Ari Blask | Federal flood insurance |
| Cato Institute | "Reforming the National Flood Insurance Program: | 7/19/17 | Policy Analysis | Ari Black | Flood Insurance |
| Hudson Institute | "Tax Reform and the Republican Manufacturing and | 7/10/17 | Policy Analysis | Thomas J. | Tax Reform |
| Peoria Journal Star | "Brannon: Hello Uncle Sam, goodbye Illinois | 6/29/17 | Op-Ed | | Illinois |
| Peoria Journal Star (IL) | "Brannon: Hello Uncle Sam, goodbye Illinois | 6/29/17 | Op-ed | | Illinois' debt crisis |
| Weekly Standard | "Will Illinois Need a Federal Bailout?" | 6/27/17 | Op-ed | | Whether Illinois will need a |
| Cato At Liberty | "Towards a Private Flood Insurance Market" | 6/20/17 | Blog Post | | Private Flood insurance |
| Cato At Liberty | "The Impetus for GSE Reform" | 6/15/17 | Blog Post | | GSE Reform |
| The Weekly Standard | "The Solar Power Market Is Under Threat--From One of | 6/9/17 | Article | | Solar Power |
| Weekly Standard | "The Solar Power Market Is Under Threat--From One of | 6/9/17 | Op-ed | | The solar power industry |
| The Weekly Standard | "David Malpass, Treasury's Conservative Standard | 6/6/17 | Article | | Department of Treasury |
| The Weekly Standard | "Never Eat Lunch at Your Desk" | 6/5/17 | Article | | Lunch |
| Cato At Liberty | "The Wall Street Journal Declares "Creditor Emptor"" | 5/24/17 | Blog Post | | Puerto Rico |
| The Weekly Standard | "Puerto Rico's Faux Pension Reform" | 5/24/17 | Article | | Puerto Rico |
| Weekly Standard | "Puerto Rico's Faux Pension Reform" | 5/24/17 | Article | | Puerto Rico Pension Plan |
| Forbes Online | "How Would Corporate Tax Reform Benefit Workers?" | 5/22/17 | Op-ed | | Corporate tax reform |
| Investor's Business Daily | "The High Cost Of Not Paying Your Bills: Puerto Rico's | 5/22/17 | Op-ed | | Puerto Rico |
| The Weekly Standard | "Take a Hike" | 5/22/17 | Article | | Government Subsidies |
| Milwaukee Wisconsin Journal | "Flanders, Brannon: Repeal minimum markup law" | 5/21/17 | Op-ed | | Minimum markup laws |
| The Weekly Standard | "No, Dems Haven't Cracked the Code for Winning Over | 5/15/17 | Article | | National Election |
| The Hill | "Beryllium broadside: Obama's last-minute rule-making | 5/10/17 | Op-Ed | | Economy |
| The Hill Online | "Beryllium broadside: Obama's last-minute rulemaking | 5/10/17 | Op-ed | | Workplace regulations |
| Cato At Liberty | "A New Approach for Occupational Licensing in | 5/8/17 | Blog Post | | Occupational Licensing |
| The Weekly Standard | "The Wheels of Change Turn Slowly" | 4/27/17 | Article | | Economy |
| The Weekly Standard | "Oxfam Is Opposing Corporate Tax Reform That Would | 4/18/17 | Article | | Tax Reform |
| Weekly Standard | "Oxfam Is Opposing Corporate Tax Reform That Would | 4/18/17 | Op-ed | | Corporate tax reform |
| The Weekly Standard | "Time to Fix Fannie and Freddie" | 4/10/17 | Article | | Financial Crisis |
| The Weekly Standard | "How Tax Reform Could Hasten Housing-Finance | 4/6/17 | Article | | Tax Reform |
| Cato At Liberty | "Puerto Rico Continues to Ignore Congress" | 4/5/17 | Blog Post | | Puerto Rico |
| The Weekly Standard | "Rock and Roll Hall of Fame Hoochie Coo" | 4/5/17 | Article | | Rock and Roll Hall of Fame |
| Cato At Liberty | "Marketplace Radio Laments Uber's Victims: | 4/4/17 | Blog Post | | Investment Banks |
| Cato At Liberty | "Puerto Rico's Half-Hearted Stab at Fiscal Reform | 3/20/17 | Blog Post | | Puerto Rico |
| Forbes Online | "Rushed Beryllium Rule Deserves A Second Look" | 3/15/17 | Op-Ed | | Beryllium |
| National Review | "The Ture-Kennedy Blueprint" | 3/15/17 | Book Review | | "JFK and the Reagan Revolution: |
| Forbes Online | "Improve, Don't Destroy, The Gig Economy" | 2/27/17 | Op-Ed | | Gig Economy |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| Weekly Standard | "The House Tax Reform Plan Is Not a Fundraising Ploy" | 2/24/17 | Op-ed | | Tax reform |
| Weekly Standard | "How One Company's Perfidy Makes Your Cell Phone | 2/23/17 | Op-ed | | Perfidy in America |
| Weekly Standard | "How One Company's Perfidy Makes Your Cell Phone | 2/23/17 | Op-ed | | Perfidy in America |
| The Weekly Standard | "How One Company's Perfidy Makes Your Cell Phone | 2/22/17 | Article | | Corporate Finances |
| Forbes Online | "It's More Important To Get Puerto Rican Pension | 2/21/17 | Op-ed | | Puerto Rican pension reform |
| Forbes Online | "It's More Important To Get Puerto Rican Pension | 2/21/17 | Op-ed | | Puerto Rican pension reform |
| The Weekly Standard | "Bob Michel, House GOP Statesman Across Five | 2/17/17 | Article | | Bob Michael |
| The Weekly Standard | "Revenge of the Nerds" | 2/14/17 | Article | | Tax Reform |
| The Weekly Standard | "Let's Boost Building" | 2/13/17 | Article | | Infrastructure |
| The Weekly Standard | "Housing's Drag on the Economy" | 2/13/17 | Article | | Economy |
| The Weekly Standard | "How the NFL Can Make a Bigger Investment to | 2/1/17 | Article | | NFL |
| The Weekly Standard | "What Dow 20,000 Means" | 1/25/17 | Article | | Economy |
| The Weekly Standard | "The Pro Bowl Takes a Step Toward Resembling a Real | 1/24/17 | Article | | NFL |
| The Weekly Standard | "Liberal Opposition to New Housing Reaches its | 1/23/17 | Article | | Infrastrcture |
| Cato At Liberty | "The Economic and Fiscal Impact of Repealing DACA" | 1/18/17 | Blog Post | | DACA |
| Forbes Online | "The High Costs Of An Immediate Repeal Of DACA" | 1/18/17 | Op-ed | | Repealing DACA |
| The Weekly Standard | "Puerto Rico's New Governor Should be Given Time to | 1/16/17 | Article | | Puerto Rico |
| The Weekly Standard | "How Trump Can Repeal and Replace DACA" | 12/22/16 | Article | | Immigration |
| Weekly Standard | "How Trump Can Repeal and Replace DACA" | 12/22/16 | Op-ed | | Trump repealing DACA |
| The Hill | "Will Trump let the EU kill a US manufacturing deal?" | 12/20/16 | Op-Ed | | Economy |
| The Weekly Standard | "The FDA--Finally--Sees the Light on Chantix" | 12/20/16 | Article | | FDA |
| The Hill | "Puerto Rico's path forward shouldn't include old | 12/13/16 | Op-Ed | Logan Albright | Puerto Rico |
| Peoria Journal Star | "Spotlight: Cutting corporate tax rates would help | 12/9/16 | Op-Ed | | Tax Reform |
| Peoria Journal Star (IL) | "Cutting corporate tax rates would help Peoria" | 12/9/16 | Op-ed | | Cutting corporate taxes |
| The Weekly Standard | "Puerto Rico Is Using a Phony Pension Crisis to | 12/7/16 | Article | | Puerto Rico |
| Cato At Liberty | "Problems with Paid Family Leave Redux" | 12/5/16 | Blog Post | | Family Leave |
| Desert Sun | "Column: Here's how to begin fixing colleges" | 12/4/16 | Column | | Education |
| Forbes Online | "How And Why We Should Fix The Biodiesel Tax Credit" | 12/4/16 | Op-Ed | | Tax Credits |
| Cato At Liberty | "DC's Paid Family Leave Bucks the Trend—and | 11/28/16 | Blog Post | | Economy |
| The Weekly Standard | "The Dangerous Ideological Roots of Climate | 11/18/16 | Article | | Environment |
| The Weekly Standard | "Puerto Rico's Oversight Board May Be on the Verge of | 11/17/16 | Article | | Puerto Rico |
| Cato At Liberty | "Washington DC Progressives Fight to Preserve Gas | 11/4/16 | Blog Post | | Gas Stations |
| The Weekly Standard | "The 'Unofficial' Gear of Major League Baseball" | 11/1/16 | Article | | MLB |
| Foundation for Economic | "Is Parking Really "Free" If You Can't Find Any?" | 10/28/16 | Article | | Transportation |
| Cato At Liberty | "Why Don't We Allow Markets to Dictate Parking | 10/27/16 | Blog Post | | Parking Policy |
| The Weekly Standard | "Harry Caray Is My Wingman" | 10/24/16 | Article | | MLB |
| Weekly Standard | "Harry Caray Is My Wingman" | 10/24/16 | Op-ed | | Harry Caray |
| The Weekly Standard | "A Chicago Cubs Love Story" | 10/17/16 | Article | | MLB |
| The Hill | "How Puerto Rico's oversight board can follow others' | 10/13/16 | Op-Ed | | Puetro Rico |
| The Weekly Standard | "As Goes Puerto Rico So Go the States?" | 10/10/16 | Article | | MLB |
| Cato At Liberty | "Ending the Tax Breaks for Real Estate" | 10/7/16 | Blog Post | | Tax Policy |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "Incompetence Is No Reason for a Government Agency | 10/7/16 | Article | | FDA |
| Cato At Liberty | "The Answer Is a New Government Program. What's | 10/4/16 | Blog Post | | Limited Government |
| The Weekly Standard | "The Complicated Dynamics of Insurance Companies | 10/3/16 | Article | | Insurance |
| Weekly Standard | "The Complicated Dynamics of Insurance Companies | 10/3/16 | Op-ed | | Obamacare |
| Lincoln Times-News (NC) | "The reason why the poverty rate fell" | 9/16/16 | Op-ed | | Poverty |
| Cato At Liberty | "The Reason Why the Poverty Rate Fell" | 9/13/16 | Blog Post | | Poverty |
| The Weekly Standard | "Up in Smoke" | 9/12/16 | Article | | FDA |
| Weekly Standard | "Up in Smoke" | 9/12/16 | Op-ed | | FDA warning labels and smoking |
| Cato At Liberty | "Tentative Steps Away from the Gas Tax and towards a | 9/6/16 | Blog Post | | Tax Policy |
| Cato At Liberty | "It's Time to End the Government's Outsized Role in | 8/4/16 | Blog Post | | Finance |
| Cato At Liberty | "How Growth Can Impact Spending and Why Spending | 8/3/16 | Blog Post | | Economy |
| Cato At Liberty | "Sales Tax Holidays Make for Terrible Tax Policy" | 7/28/16 | Blog Post | | Tax Policy |
| Cato At Liberty | "The Tyranny of Free Parking" | 7/19/16 | Blog Post | | Free Parking |
| The Hill | "Global Warming Alarmist Reveals The Anti-Science | 7/8/16 | Op-ed | | Reducing drug deaths through |
| The Hill | "Legalize marijuana and reduce deaths from drug | 7/8/16 | Op-Ed | | Marijuana |
| The Weekly Standard | "Puerto Rico's False Deadline" | 6/28/16 | Article | | Puerto Rico |
| The Weekly Standard | "For Whom the Bridge Tolls" | 6/24/16 | Article | | Infrastructure |
| The Weekly Standard | "Treasury's Tax Regulations Will Dampen Domestic | 6/21/16 | Article | | Department of Treasury |
| Weekly Standard | "Treasury's Tax Regulations Will Dampen Domestic | 6/21/16 | Op-ed | | Tax regulations |
| The Hill | "How the Puerto Rico rescue makes state pensioners | 6/13/16 | Op-Ed | | Puerto Rico |
| The Hill Online | "How the Puerto Rico rescue makes state pensioners | 6/13/16 | Op-ed | | State pensions |
| The Weekly Standard | "Fixing Regulatory Overreach" | 6/13/16 | Article | | Federal Regulation |
| Weekly Standard | "Fixing Regulatory Overreach" | 6/13/16 | Op-ed | | Financial regulatory overreach |
| The Weekly Standard | "How to Change Bankruptcy Law" | 6/6/16 | Article | | Bankruptcy |
| Weekly Standard | "How to Change Bankruptcy Law" | 6/6/16 | Op-ed | | Bankruptcy laws |
| The Weekly Standard | "The Gig Is Up" | 5/30/16 | Article | | Economy |
| Weekly Standard | "The Gig Is Up" | 5/30/16 | Op-ed | | U.S. economy |
| RealClearMarkets | "The 'Gig' Economy Is Great For the U.S. Economy" | 5/26/16 | Article | | Economy |
| The Weekly Standard | "Treasury Pretends Not to Know What a 'Bailout' Is" | 5/20/16 | Article | | Department of Treasury |
| Weekly Standard | "Treasury Pretends Not to Know What a 'Bailout' Is" | 5/20/16 | Op-ed | | Puerto Rico's debt crisis |
| The Hill | "What we do in Puerto Rico sets a precedent, like it or | 5/5/16 | Op-Ed | | Puerto Rico |
| The Hill Online | "What we do in Puerto Rico sets a precedent, like it or | 5/5/16 | Op-ed | | Puerto Rico's debt problems |
| RealClearMarkets | "Puerto Rico Contagion Will Cost Taxpayers" | 5/2/16 | Article | | Puerto Rico |
| RealClearMarkets | "Treasury and Fed Team Up to Create the Next | 4/28/16 | Article | | Department of Treasury |
| Cato At Liberty | "Who Are the Victims of the Volkswagen Scandal? Not | 4/26/16 | Blog Post | | Volkswagon Scandal |
| TribTalk | "Texas' strong economic growth is a cause — and | 4/26/16 | Article | | Immigration |
| The Weekly Standard | "We Need a Serious Approach to International Tax | 4/25/16 | Article | | Tax Reform |
| Cato At Liberty | "Food Labeling Regulations Are Bad for Your Health" | 4/22/16 | Blog Post | | Food Labels |
| Cato At Liberty | "Let's Name Something Cool after Prince. And Stop | 4/22/16 | Blog Post | | Naming Rights |
| Peoria Journal Star | "Op-Ed: Who would benefit from a per-mile fee? | 4/22/16 | Op-Ed | | Transportation |
| The Weekly Standard | "Luck o' the Turkish" | 4/20/16 | Article | | Turkey |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "Andrew Ross Sorkin's Misplaced Faith in the Non- | 4/15/16 | Article | | FSOC |
| Cato At Liberty | "If the Laws are Inconvenient, Just Change Them: The | 4/14/16 | Blog Post | | Puerto Rico |
| The Hill | "Let Obama have his Supreme Court justice, in | 4/14/16 | Op-Ed | | Tax Reform |
| The Weekly Standard | "Government Takes Aim at Fitness Instructors" | 4/11/16 | Article | | Department of Labor |
| The Weekly Standard | "The Proposed Puerto Rico Bailout is Good on Rhetoric | 4/8/16 | Article | | Puerto Rico |
| Foundation for Economic | "Feds' Crazy Plan: Make Risky Loans, Don't Charge for | 3/18/16 | Article | | Federal Regulation |
| The Weekly Standard | "Tax Policy, Not Luck of the Irish, Is Responsible For | 3/17/16 | Article | | Tax Reform |
| Cato At Liberty | "Government-Directed Lending Comes to America" | 3/16/16 | Blog Post | | Government Lending |
| The Weekly Standard | "Higher Ed, Higher Prices" | 3/14/16 | Article | | Education |
| Cato At Liberty | "Stop Encouraging Homeownership" | 3/10/16 | Blog Post | | Homeownership |
| Cato At Liberty | "The Administration's Puerto Rico Jujitsu Threatens the | 3/3/16 | Blog Post | | State's Rights/Puerto Rico |
| The Weekly Standard | "Dusty Agonistes" | 3/2/16 | Article | | MLB |
| The Hill | "What would a Puerto Rican bankruptcy look like?" | 2/24/16 | Op-Ed | | Tax Reform |
| The Weekly Standard | "Let Them Go Bankrupt" | 2/22/16 | Article | | Student Loans |
| Cato At Liberty | "Using Congressional Budget Rules To (Not) Save | 2/5/16 | Blog Post | | Congressional Budget |
| The Weekly Standard | "Why It's So Important To Get Puerto Rico's Reform | 2/2/16 | Article | | Puerto Rico |
| The Weekly Standard | "Retire This Idea" | 2/1/16 | Article | | State Debt |
| The Weekly Standard | "The Pro Bowl Should At Least Resemble an Actual | 1/30/16 | Article | | NFL |
| The Weekly Standard | "Don't Abandon All Hope" | 1/25/16 | Article | | Tax Reform |
| The Weekly Standard | "Oxfam, Schmoxfam" | 1/19/16 | Article | | Wealth Distribution |
| The Weekly Standard | "D.C. Bobos Sabotage Housing Construction to Protect | 1/13/16 | Article | | DC Construction |
| Cato At Liberty | "Will the Natural Monopoly in Energy Distribution | 1/6/16 | Blog Post | | Energy Distribution |
| Cato At Liberty | "The States Have No Business Creating Their Own | 12/18/15 | Blog Post | | State's Rights/Economy |
| The Weekly Standard | "Pulling Away Punch Bowls" | 12/16/15 | Article | | Economy |
| The Weekly Standard | "The Unending Morass of Housing Finance Reform" | 12/9/15 | Article | | Housing Finance |
| Cato At Liberty | Inequality Delenda Est | 12/8/15 | Blog Post | | Inequality |
| The Weekly Standard | "The Reform Next Time" | 12/4/15 | Article | | Social Security |
| Cato At Liberty | "Food Labels Kill" | 12/1/15 | Blog Post | | Food Labels/FDA |
| The Hill | "US should respond to OECD tax project with an | 11/30/15 | Op-Ed | | Tax Reform |
| The Weekly Standard | "The Paris Trap" | 11/29/15 | Article | | Environment |
| The Weekly Standard | "Princeton Protestors Hand College Fundraisers a | 11/23/15 | Article | | Education |
| The Weekly Standard | "Liz Warren Moves to Sabotage Tax Reform" | 11/20/15 | Article | | Tax Reform |
| The Weekly Standard | "Goldman's Inexplicable Grip on the Fed" | 11/12/15 | Article | | Federal Reserve |
| The Hill | "A politically viable Puerto Rico reform plan" | 11/9/15 | Op-Ed | | Puerto Rico |
| The Weekly Standard | "Bill Walker 'Alters the Deal,' and Threatens Alaska's | 10/27/15 | Article | Jared Whitley | Economy |
| The Weekly Standard | "Patently Ridiculous" | 10/21/15 | Article | | Patents |
| The Weekly Standard | "How to Succeed in the Hinterland" | 10/12/15 | Article | | Economy |
| The Weekly Standard | "A Brief Exegesis of the Central Illinois Music Scene" | 10/2/15 | Article | | Illinois |
| The Weekly Standard | "Saving Puerto Rico from the Federal Government" | 9/28/15 | Article | | Puerto Rico |
| The Hill | "How investment in transportation infrastructure | 9/23/15 | Op-Ed | | Transportation |
| The Weekly Standard | "Yellen Punts" | 9/18/15 | Article | | Federal Reserve |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| Bloomberg BNA | "U.S. Business Loses Big From Lack of Transportation | 9/17/15 | Article | Mike Gorman | Infrastructure |
| The Weekly Standard | "No More Denali Commissions" | 9/14/15 | Article | | Environment |
| The Weekly Standard | "Labor's Wishful Thinking" | 9/14/15 | Article | | Department of Labor |
| The Weekly Standard | "In Amending the EB-5 Program, First Do No Harm" | 9/10/15 | Article | | Immigration |
| The Weekly Standard | "The Food Truck Farce, Continued" | 9/9/15 | Article | | Public Property |
| The Weekly Standard | "In Defense of the 'Cadillac Tax" | 9/3/15 | Article | | Tax |
| The Weekly Standard | "Fixing the Grid and Improving Energy Policy" | 8/26/15 | Article | | Energy Policy |
| The Weekly Standard | "In Washington, D.C., Parking Policy Dictates Housing | 8/25/15 | Article | | Housing Policy |
| The Weekly Standard | "Stock Markets Have the China Syndrome" | 8/24/15 | Article | | Economy |
| The Weekly Standard | "Pathetic Spin from Goldman Sachs" | 8/19/15 | Article | | Economy |
| The Weekly Standard | "Even Economists Can't Invest" | 8/17/15 | Article | | Economy |
| City Journal | "Parking for a Price" | 8/13/15 | Article | Bryan Weaver | Transportation |
| The Weekly Standard | "Kill the Coins" | 8/13/15 | Article | | Monetary Policy |
| The Hill | "Is retirement planning about to become more | 8/10/15 | Op-Ed | | Retirement |
| The Hill | "A problem Congress can't solve" | 6/30/15 | Op-Ed | | Congress |
| Peoria Journal Star | "Op-Ed: Central Illinois needs Uber" | 6/12/15 | Op-Ed | | Economy |
| The Hill | "How Obama could hijack tax reform" | 5/26/15 | Op-Ed | | Tax Reform |
| The Weekly Standard | "Fixing Puerto Rico" | 5/25/15 | Article | | Puerto Rico |
| The Weekly Standard | "Jamaal Strikes Blow for Diversity in NPR Fantasyland" | 5/6/15 | Article | | Race |
| The Weekly Standard | "India Needs to Enforce Its Trade Agreements" | 5/4/15 | Article | | India |
| The Weekly Standard | "Housing Subsidies: A Play in One Act" | 4/29/15 | Article | | Housing Subsidies |
| American Enterprise Institute | "The case for 'an innovation box'" | 4/28/15 | Article | | Economy |
| The Hill | "When a Chinese 'anti-corruption' drive is anything | 4/21/15 | Op-Ed | Jared Whitley | China |
| The Hill | "Can there be a role for the government in the advent | 4/16/15 | Op-Ed | | Crypto Currency |
| RealClearMarkets | "Jeff Bezos May Have Found Amazon's Latest Money | 4/15/15 | Article | | Amazon |
| The Federalists | "Ivy Leagues Shame Kids For Making Their Way In The | 4/10/15 | Article | | Education |
| The Weekly Standard | "How Chinese Regulatory Authorities Impose | 3/30/15 | Article | | China |
| Peoria Journal Star | "In the Spotlight: Peoria should auction food trucks to | 3/27/15 | Op-Ed | | Food Trucks |
| The Hill | "More must be done to improve access to biosimilar | 3/19/15 | Op-Ed | | Health |
| The Weekly Standard | "Republicans Appoint Keith Hall to Head CBO" | 3/2/15 | Article | | CBO |
| CNBC | "Puerto Rico's economic woes are only short-term" | 2/11/15 | Article | | Puerto Rico |
| The Weekly Standard | "The Food Truck Farce" | 2/4/15 | Article | | DC Subsidies |
| The Weekly Standard | "An Epic Fail from the New York Times" | 1/29/15 | Article | | Journalism |
| The Weekly Standard | "Obama's Latest Giveaway . . ." | 1/26/15 | Article | | Federal Subsidies |
| The Weekly Standard | "Conservatives Should Buy Obama's Tax Increase—If | 1/21/15 | Article | | Tax Reform |
| The Weekly Standard | "Federal Regs Making it Difficult for Members of | 1/14/15 | Article | | Federal Regulation |
| The Weekly Standard | "Get Biosimilars to the Market Place" | 1/9/15 | Article | | Health |
| American Enterprise Institute | "Congress should help small communities by amending | 1/6/15 | Article | | Dodd-Frank |
| The Weekly Standard | "A Year Later, the Exchanges Still Stink" | 12/29/14 | Article | | Economy |
| The Weekly Standard | "The White House's College Report Card Will | 12/24/14 | Article | | Education |
| The Weekly Standard | "Why Are Urban Hospitals Closing Everywhere, but | 11/25/14 | Article | Devorah Goldman | Health |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "How to Make the Inversion Problem Even Worse" | 10/21/14 | Article | | Department of Treasury |
| The Weekly Standard | "A Legislative Sleight of Hand for Fannie Mae and | 9/30/14 | Article | | Financial Crisis |
| George W. Bush Institute | "When a Minimum Wage is Not a Minimum Wage" | 9/23/14 | Blog Post | | Minimum Wage |
| American Enterprise Institute | "Why the Government Won't Let Colleges Reduce | 9/17/14 | Article | | Education |
| George W. Bush Institute | "Paying for paving: Tax driving, not gas" | 9/16/14 | Blog Post | | Tax Reform |
| George W. Bush Institute | "How Britain's Tax Reform Boosted Economic Growth" | 9/15/14 | Blog Post | | British Tax Reform |
| The Weekly Standard | "A Peorian Makes Sense of Turkey" | 9/8/14 | Article | | Turkey |
| American Enterprise Institute | "The Minimum Wage Can Never Be High Enough" | 9/7/14 | Article | | Minimum Wage |
| The Weekly Standard | "The Costs of a Miscarriage of Justice" | 9/4/14 | Article | | Legal |
| The Weekly Standard | "Paying for Paving" | 8/11/14 | Article | | Transportation |
| The Weekly Standard | "Detroit Hard Luck City" | 7/25/14 | Article | | Detroit |
| The Weekly Standard | "The Administration's Cynical Fight Against Corporate | 7/23/14 | Article | | Tax Reform |
| George W. Bush Institute | "The tax inversion manufactured crisis" | 7/22/14 | Blog Post | | Tax Inversion |
| The Federalists | "No, Corporate Tax Inversions Are Not An Unpatriotic | 7/22/14 | Article | | Tax Reform |
| The Weekly Standard | "'Student Loan Relief Now'" | 6/30/14 | Article | | Education |
| George W. Bush Institute | "More Economic Growth is Possible and Will Soon | 6/23/14 | Blog Post | | Economy |
| The Weekly Standard | "PAYGO Begone" | 6/16/14 | Article | | Federal Budget |
| George W. Bush Institute | "Tax Policy the Texas Way--in Washington, D.C." | 6/6/14 | Blog Post | | Tax Policy |
| The Weekly Standard | "Tax Policy the Texas Way—in Washington, D.C." | 6/3/14 | Article | | Tax Reform |
| American Enterprise Institute | "New Flight Rules Are a Heavy Load" | 5/25/14 | Article | | Transportation |
| The Hill | "Why Fannie and Freddie's failed stress test proves | 5/22/14 | Op-Ed | | Financial Crisis |
| George W. Bush Institute | "Is the Time Ripe for a Revolution in Transportation | 4/28/14 | Blog Post | | Transportation Funding |
| George W. Bush Institute | "Rule of Law for me but not for Thee" | 4/28/14 | Blog Post | | Rule of Law |
| The Weekly Standard | "Rule of Law For Me, Not For Thee" | 4/28/14 | Article | | Property Laws |
| R Street Institute | "Rethinking tax benefits for home owners" | 4/24/14 | Policy Analysis | Zackary Hawley, | Tax Reform |
| R Street Institute | "Homesick: How housing tax breaks benefit the | 4/22/14 | Policy Analysis | Andrew Hanson | Tax Reform |
| George W. Bush Institute | "Sisyphus and Tax Reform" | 3/28/14 | Blog Post | | Tax Reform |
| RealClearMarkets | "Economic Sanctions On Russia Would Be Worse Than | 3/23/14 | Article | | Russia |
| Cato Institute | "The Paths to Mortgage Finance Reform and Their | 3/18/14 | Policy Analysis | Mark A. Calabria | Mortgage Finance Reform |
| The Weekly Standard | "Don't Guarini Me, Bro!" | 3/17/14 | Article | | Tax Reform |
| The Weekly Standard | "I've Saved Thousands of Dollars Waiting to Get on | 3/10/14 | Article | | Healthcare |
| The Weekly Standard | "I've Been Trying Since November—But I Still Can't Sign | 2/7/14 | Article | | Healthcare |
| George W. Bush Institute | "Innovation and Productivity Go Hand in Hand" | 1/30/14 | Blog Post | | Economy |
| The Weekly Standard | "How to Fix the Pro Bowl" | 1/25/14 | Article | | NFL |
| National Review | "How the Obama Administration Stole Fannie and | 1/22/14 | Article | | Financial Crisis |
| George W. Bush Institute | "Praise for French Policy Reforms" | 1/17/14 | Blog Post | | French Policy |
| George W. Bush Institute | "Immigration and the Texas Boom" | 1/7/14 | Blog Post | | Immigration |
| George W. Bush Institute | "The Tax Reform Chasm Widens" | 12/26/13 | Blog Post | | Tax Reform |
| The Weekly Standard | "After a Month of Trying, I Still Can't Sign Up for | 12/26/13 | Article | | Healthcare |
| George W. Bush Institute | "Environmental Solutions by Fiat" | 12/23/13 | Blog Post | | Environment |
| The Weekly Standard | "Subsidizing Rich and Poor" | 12/23/13 | Article | | Government Subsidies |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| George W. Bush Institute | "Tax Reform: Break-Up Edition" | 12/12/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Homer Simpson's Bear Tax: DC Edition" | 11/21/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Growth Won't Save Entitlements" | 10/31/13 | Blog Post | | Economy |
| The Weekly Standard | "Europe Leads the Way?" | 10/14/13 | Article | | Economy |
| George W. Bush Institute | "A Better Way to Measure Growth" | 10/8/13 | Blog Post | | Economy |
| George W. Bush Institute | "California's Perfect Tax Scam" | 9/30/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "The Rich Are Different. So What?" | 9/23/13 | Blog Post | | Economy |
| George W. Bush Institute | "Who Should be Teaching College?" | 8/17/13 | Blog Post | | Education |
| George W. Bush Institute | "Making Policy the Wrong Way" | 8/13/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Baby Steps to Tax Reform" | 8/1/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "The Death of Growth Has Been Greatly Exaggerated" | 7/29/13 | Blog Post | | Economy |
| George W. Bush Institute | "Stopping the Mandarins" | 7/23/13 | Blog Post | | China |
| George W. Bush Institute | "Tax Reform Would Play Well in Peoria" | 7/19/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Capitalism & Chocolate-Chip Cookies" | 7/8/13 | Blog Post | | Economy |
| George W. Bush Institute | "The Case for a Carbon Tax" | 6/27/13 | Blog Post | | Environment/Tax Reform |
| American Enterprise Institute | "Warning Pollution" | 6/26/13 | Article | | Environment |
| George W. Bush Institute | "Patent Wars Restrain Growth" | 6/14/13 | Blog Post | | Patents |
| George W. Bush Institute | "Is There a Future for Driverless Cars?" | 6/7/13 | Blog Post | | Technology |
| George W. Bush Institute | "Changing How We Pay Teachers" | 5/22/13 | Blog Post | | Education |
| The Weekly Standard | "A Glimmer of Hope for the Illinois GOP" | 5/22/13 | Article | | Illinois |
| Salon | "How a fight with Rick Santorum made an IRS | 5/17/13 | Article | | IRS |
| RealClearMarkets | "Why You Just May Come to Like a Carbon Tax" | 5/14/13 | Article | | Environment |
| George W. Bush Institute | "Taxes Hurt Competitiveness Abroad" | 5/13/13 | Blog Post | | Tax Reform |
| R Street Institute | "We're Already Paying a Carbon Tax in Disaster Relief" | 5/13/13 | Op-Ed | | Environment |
| George W. Bush Institute | "Saving on Snacks, the Washington Way" | 5/1/13 | Blog Post | | Economy |
| George W. Bush Institute | "Spending Without Stimulus" | 4/23/13 | Blog Post | | Economy |
| George W. Bush Institute | "Time for a Carbon Tax?" | 4/22/13 | Blog Post | | Environment/Tax Reform |
| RealClearMarkets | "It's time to ask Cyprus for a real concession" | 4/22/13 | Op-Ed | | Cyprus |
| The Weekly Standard | "Waiting for Obama" | 4/22/13 | Article | | Tax Reform |
| The Weekly Standard | "Not Worth the Paper It's Printed On" | 4/19/13 | Article | | OMB |
| The Weekly Standard | "Waiting for Obama" | 4/13/13 | Op-Ed | | Executive Branch |
| George W. Bush Institute | "Haircuts for the Wrong Heads" | 4/4/13 | Blog Post | | Banking |
| George W. Bush Institute | "Striking a Deal on Social Security" | 3/22/13 | Blog Post | | Social Security |
| RealClearMarkets | "It's Time To Ask Cyprus for a Real Concession" | 3/22/13 | Article | | Cyprus |
| George W. Bush Institute | "What 4% Growth Would Mean For America" | 3/21/13 | Blog Post | | Economy |
| Salon | "How Republicans really view Social Security" | 3/18/13 | Article | | Social Security |
| George W. Bush Institute | "Silver Linings Playbook" | 3/13/13 | Blog Post | | Economy |
| George W. Bush Institute | "Sequester: In Search Of Leadership" | 2/27/13 | Blog Post | | Legislative Branch |
| George W. Bush Institute | | 2/13/13 | Blog Post | | Government Lending |
| George W. Bush Institute | "The True Cost of the Fiscal Cliff Deal" | 2/13/13 | Blog Post | | Legislative Branch |
| George W. Bush Institute | "Canada Turns the Tables on the U.S." | 2/13/13 | Blog Post | | Canada |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| The Weekly Standard | "Why We Might Get Tax Reform" | 2/11/13 | Article | | Tax Reform |
| George W. Bush Institute | "No Canary in the Coal Mine … Yet" | 2/6/13 | Blog Post | | Economy |
| George W. Bush Institute | "Resisting Automatic Savings" | 2/1/13 | Blog Post | | Banking |
| George W. Bush Institute | "Tax Cuts Require Entitlement Reform" | 2/1/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Why Keynesian Economics Died" | 2/1/13 | Blog Post | | Economy |
| George W. Bush Institute | "Public Pension Plans Face Insolvency" | 2/1/13 | Blog Post | | Pension |
| George W. Bush Institute | "Backing Away from the Cliff" | 2/1/13 | Blog Post | | Economy |
| George W. Bush Institute | "Moving the Growth Debate Beyond Taxes" | 2/1/13 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Pension Shortfalls: A Bipartisan Opportunity?" | 2/1/13 | Blog Post | | Pension |
| George W. Bush Institute | "The Hidden Cost of Unreliable Transportation" | 9/25/12 | Blog Post | | Transportation |
| George W. Bush Institute | "Productivity Growth: The Numbers and the Reality" | 9/11/12 | Blog Post | ` | Economy |
| George W. Bush Institute | "Growth Fuels Turkey's Promise" | 8/31/12 | Blog Post | | Turkey |
| George W. Bush Institute | "The Battle Over the Regulatory State" | 8/14/12 | Blog Post | | Regulation |
| George W. Bush Institute | "Quarterbacks, Vigilantes, and Economic Growth" | 8/9/12 | Blog Post | | Economy |
| George W. Bush Institute | "The Wrong Reason for the Right Policy" | 8/1/12 | Blog Post | | Economy |
| George W. Bush Institute | "Counting on Living Longer" | 7/30/12 | Blog Post | | Age and Economy |
| George W. Bush Institute | "The Benefits of Growth: Slow but Inexorable" | 7/12/12 | Blog Post | | Economy |
| George W. Bush Institute | "The Italian Job: Improving Productivity and | 7/8/12 | Blog Post | | Economy |
| George W. Bush Institute | "In Defense of Finance" | 6/29/12 | Blog Post | | Finance |
| American Enterprise Institute | "The Costliest Regulation You've Never Heard Of" | 6/21/12 | Article | | Federal Regulation |
| George W. Bush Institute | "Problems with Productivity … or Not" | 6/19/12 | Blog Post | | Economy |
| George W. Bush Institute | "A Tax Deal That Is No Bargain" | 6/15/12 | Blog Post | | Tax Reform |
| The Weekly Standard | "Another Bad Sign: Productivity Falls by .9 Percent" | 6/8/12 | Article | | Economy |
| George W. Bush Institute | "Letting Innovators Innovate" | 6/7/12 | Blog Post | | Regulation |
| George W. Bush Institute | "Luddites, Lumps of Labor, and a Laundry List of Illogic" | 5/31/12 | Blog Post | | Economy |
| George W. Bush Institute | "Real Investment Instead of Short-Term Stimulus" | 5/24/12 | Blog Post | | Investments |
| George W. Bush Institute | "The Importance of Productivity" | 5/18/12 | Blog Post | | Economy |
| George W. Bush Institute | "Short Run Productivity Measures Tell Us Little" | 5/10/12 | Blog Post | | Economy |
| George W. Bush Institute | "Enjoying Every Sandwich: Life Expectancy and | 5/4/12 | Blog Post | | Age and Economy |
| The Weekly Standard | "OECD's Prescription to Raise Taxes Is the Wrong | 4/30/12 | Article | | Tax Reform |
| George W. Bush Institute | "Lessons from the 1%: How to Get Ahead in Life" | 4/27/12 | Blog Post | | Economy |
| The Weekly Standard | "Obama Administration Stops Foreigners from Clogging | 4/24/12 | Article | | Immigration |
| American Enterprise Institute | "About Those Better Roads in China" | 4/18/12 | Article | | China |
| George W. Bush Institute | "The Cost of Increasing Tax Rates On Capital Gains and | 4/16/12 | Blog Post | | Tax Reform |
| George W. Bush Institute | "Making Future Generations Foot the Bill" | 4/10/12 | Blog Post | | Economy |
| The Weekly Standard | "Year 104 and Counting: A Cubs Fan Survival Strategy" | 4/4/12 | Article | | MLB |
| National Review | "Domestic Oil Policies Do Impact Oil Prices" | 3/29/12 | Article | | Oil |
| The Weekly Standard | "O Canada!" | 3/28/12 | Article | Logan Albright | Canada |
| George W. Bush Institute | "How Growth Benefits Us All — the 1990s vs. the | 3/23/12 | Blog Post | | Economy |
| The Weekly Standard | "Ryan's Tax Plan Moves the Ball" | 3/21/12 | Article | | Tax Reform |
| George W. Bush Institute | "Should Peorians Care about Corporate Tax Reform? | 3/15/12 | Blog Post | | Tax Reform |

List of Ike Brannon's Publications

| Publication | Title | Date | Type of Piece | Co-Authors | General Subject Matter |
|---|---|---|---|---|---|
| George W. Bush Institute | "China's Retreat from State-Directed Capitalism" | 3/9/12 | Blog Post | | China |
| George W. Bush Institute | "Material Progress and the Plight of the Poor" | 3/1/12 | Blog Post | | Economy |
| The Weekly Standard | "Obama Burdens the Banks" | 1/23/12 | Article | Sam Batkins | Banking |
| The Weekly Standard | "À la Gloire de L'économie Française" | 1/20/12 | Article | | France |
| The Weekly Standard | "Mortgaging Our Future" | 12/26/11 | Article | Eli Lehrer | Economy |
| The Weekly Standard | "Who Benefits from the Mortgage Interest | 12/21/11 | Article | Andrew Hanson, Zach | Mortgage |
| American Enterprise Institute | "Why Unemployment Is Worse Than You Think" | 12/13/11 | Article | Matt Thoman | Unemployment |
| The Weekly Standard | "A Cure for the Housing Blues" | 11/7/11 | Article | | Housing |
| The Weekly Standard | "Privatizing the Liquor Market" | 11/4/11 | Article | Elizabeth Lowell | Privitization |
| National Review | "Halloween on the Hill" | 10/31/11 | Article | | Washington,D.C. |
| The Hill | "Zeroing in on simplifying the tax system" | 10/17/11 | Op-Ed | Eli Lehrer | Tax Reform |
| The Weekly Standard | "Let's Start All Over Again" | 10/17/11 | Article | Eli Lehrer | Tax Reform |
| National Review | "Increasing Foreign Investment, the Chicago Way" | 10/12/11 | Article | | Foreign Investment |
| American Action Forum | "European Disunion" | 9/26/11 | Article | | Europe |
| American Enterprise Institute | "European Disunion" | 9/22/11 | Article | Matt Thoman | Europe |
| The Weekly Standard | "Time for an Honest Accounting of Our Disaster | 9/13/11 | Article | | Federal Budget |
| National Review | "Let's Have Infrastructure Investment, But the Right | 9/8/11 | Article | | Infrastructure |
| National Review | "Stimulus Still Creating Jobs?" | 9/6/11 | Article | | Economy |
| The Weekly Standard | "The Mortgage Interest Boondoggle" | 8/15/11 | Article | Benjamin Gitis | Mortgage |
| American Action Forum | "THE DOWNGRADE: WHAT IT IS AND WHAT IT ISN'T" | 8/6/11 | Article | | Economy |
| National Review | "The Downgrade: What It Is And What It Isn't" | 8/5/11 | Article | | Economy |
| American Action Forum | "Dodd-Frank Turns One" | 7/22/11 | Article | Sam Batkins | Legislation |
| American Action Forum | "NEW URBANISM ISN'T GOING TO SAVE THE | 7/21/11 | Article | | Economy |
| American Action Forum | "HOW REFORM OF THE U.S. CORPORATE TAX CODE | 7/19/11 | Article | Doug Holtz-Eakin, | Tax Reform |
| American Action Forum | "Obfuscation At The EPA" | 6/30/11 | Article | Sam Batkins | EPA |
| American Action Forum | "Lure Of The Big City" | 6/29/11 | Book Review | | "Triumph of the City: How Our |
| American Action Forum | "EMPLOYMENT EFFECTS OF REDUCING CAPITAL GAINS | 6/28/11 | Article | Willam Melick, Eric | Tax Reform |
| American Enterprise Institute | "The Upside of Voter ID Initiatives" | 6/16/11 | Article | | Voter ID |
| American Action Forum | "A DIFFERENT ROUTE TO REDEMPTION FOR ANTHONY | 6/14/11 | Article | | Anthony Weiner |
| American Action Forum | "Blaming The Speculators And Other Fairy Tales" | 5/17/11 | Article | | Oil |
| American Enterprise Institute | "Who Really Stands to Win in the Union Fights?" | 5/11/11 | Article | | Union |
| American Action Forum | "Export-Import Bank: Obstacles and Options for | 5/1/11 | White Paper | Elizabeth Lowell | Export-Import Bank |
| The Weekly Standard | "All Benefits, No Costs" | 4/11/11 | Article | Sam Batkins | Federal Regulations |
| American Action Forum | "The Disaster Playbook For Investors" | 4/1/11 | Article | Ken Solow | Investing |
| The Weekly Standard | "What Happened to Loeb's Deli?" | 3/14/11 | Article | | Economy |
| The Weekly Standard | "Hop Aboard the Nanny Train" | 3/12/10 | Article | | DC Metro |
| Cato Institute | "The Troubling Return of Keynesianism" | 1/1/09 | Policy Analysis | Chris Edwards | Keynesianism |

# EXHIBIT 97

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## Declaration of Alan Essig, Meg Wiehe, and Misha Hill

We, Alan Essig, Meg Wiehe, and Misha Hill declare as follows:

1. We are tax policy experts working for the Institute on Taxation and Economic Policy (ITEP). ITEP is a non-profit, nonpartisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies. ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure and public safety. ITEP researchers use a tax incidence model to produce distributional and revenue analyses of current tax systems and proposed changes at the federal, state, and local level.

   a. Alan Essig has been the Executive Director of ITEP since April 2017. He holds a master's degree from the Nelson A. Rockefeller College of Public Affairs and Policy at the State University of New York at Albany and an undergraduate degree from the State University of New York at Buffalo.

   b. Meg Wiehe is the Deputy Director of ITEP. She has worked with ITEP since 2010. Meg is nationally recognized expert on state and local taxation. She studies, writes and provides commentary and insight to a wide range of audiences on historical and current trends in state tax and budget policy. In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families as well as the intersection of fiscal policies and state and local governments' ability to fund basic public priorities, including education, infrastructure and health care. Meg has conducted hundreds of revenue and distributional analyses of proposed tax changes in more than 40 states using ITEP's microsimulation tax model. She also is a lead author of ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.* Meg holds a Master of Public Administration from the Maxwell School at Syracuse University and a Bachelor of Arts in Anthropology from the University of Virginia.

  c. Misha Hill has been a State Policy Fellow at ITEP since 2016. She holds a Master of Public Policy from The George Washington University and Bachelor of Arts in Hispanic Studies from the University of Pennsylvania.

2. According to U.S. Citizenship and Immigration Services (USCIS), the agency that administers Deferred Action for Childhood Arrivals (DACA), as of the second quarter of March 31, 2017 over 880,000 young people who were brought to the United States as children without documentation are currently enrolled in DACA.[1] The Migration Policy Institute, a non-profit, non-partisan think tank that analyzes the movement of people worldwide, estimates an additional 450,000 individuals are eligible for DACA but not currently enrolled.[2]

3. We used the above estimates of the current population receiving and eligible for but not receiving Deferred Action for Childhood Arrivals (DACA) in each state to estimate the annual aggregate state and local tax contributions of the DACA-eligible population.

4. Young undocumented immigrants eligible for or enrolled in DACA, like all people living and working in the U.S., pay state and local income, property, sales, and excise taxes.  We estimate that the total DACA-eligible population contributes more than $2 billion annually in state and local taxes. $1.6 billion of that is from the population currently enrolled in DACA. The following assumptions were made to calculate the sales and excise, income, and property taxes of the DACA-eligible population:

  a. Taxpaying units and employment status:

    i. ITEP's analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

    ii. The employment rate of immigrants depends on legal status

---

[1] Deferred Action for Childhood Arrivals Process (Through Fiscal Year 2017, 2nd Qtr). Available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr2.pdf

[2] Migration Policy Institute, "Deferred Action for Childhood Arrivals (DACA) Data Tools." Availablehttp://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

iii.  2016 national survey of 1,308 DACA recipients found that 87 percent of respondents were employed.[3] DACA enrollees pay the same income taxes (in states with income taxes) as other lawfully present individuals. DACA enrollees receive a temporary social security number which allows them to file federal and state income taxes and, additionally payroll taxes are deducted from their paychecks.

iv.  The previously mentioned national survey also found that prior to obtaining DACA only 51% of survey respondents were employed. Our analysis assumes that 51% of the population that is eligible for DACA but not currently enrolled are employed.

b.  Income of DACA-eligible population

i.  Immigrant wages change depending on legal status. Undocumented workers earn $22,029 a year on average and granting DACA status increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress.  The average wages applied to the estimated DACA working population in ITEP's analysis are:

- $23,901 for the DACA-eligible population working and enrolled in the program.
- $22,029 for the DACA-eligible population working, but not enrolled in the program.

c.  Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state.

i.  ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers

---

[3] "Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey." Center for American Progress, https://cdn.americanprogressaction.org/content/uploads/2016/10/21111136/2016-daca_survey_draft_updated-FINAL2.pdf

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL

3

at various income levels under state and local tax law in place as of December 31, 2014. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels. This report applies effective tax rates calculated in the 2015 *Who Pays?* report to the DACA eligible population.

d.   We estimate that the DACA-eligible population contributes $282 million in state and local income taxes annually.

    i.   Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 740,400 DACA-enrolled workers are fully complying with state personal income taxes. Personal income tax effective rates in each state were applied accordingly. Various studies have estimated between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers. This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost. Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

    ii.   Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers. The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
4

e.  We estimate the DACA-eligible population contributes $496 million annually in state and local property taxes.  The DACA-eligible population pays property taxes either directly as homeowners, or indirectly through higher rents as tenants.

    i.  The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state. This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state. The ITEP model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

f.  We estimate the DACA-eligible population contributes $1.24 billion annually in state and local sales and excise taxes. The DACA-eligible population, like anyone purchasing goods or services, pays consumption taxes directly at the point of sale on taxable items.

    i.  Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service. It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

5.  A useful way to compare taxes paid across income levels is the effective tax rate. This is the total of all taxes paid - income, property, and sales and excise - as a share of income. The DACA-eligible population pays an average effective tax rate of 8.9%. ITEP's 2015 report, *Who Pays: A Distributional Analysis of the Tax Systems in All Fifty States* found that the middle 20% of taxpayers pays on average an effective tax rate of 9.4%, and the top 1% of taxpayers pays just 5.4% of their income in taxes.[4] This

---

[4] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

means the DACA-eligible population pays state and local taxes at a similar rate to middle income taxpayers across the country.

6. We also estimate that if DACA protections were lost the population would continue to contribute to state and local revenues, but at much lower levels. We estimate a total loss of $797 million in state and local tax revenues.

   a. DACA protections increase state and local tax contributions because they increase employment rates, increase average salaries, and increase the share paying state personal income taxes from 50 to 100 percent. Surveys of DACA recipients found that after receiving DACA protections respondents were employed at higher rates and earned higher wages. This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers, pursue advanced degrees, and protects them from wage theft by unscrupulous employers. Thus, a loss of DACA protections would eliminate the revenue gained from the increased salaries DACA affords.

7. There are residents of every state that are eligible for or enrolled in DACA, which means every state revenue stream could be harmed by the loss of DACA protections. Some examples relevant to this case below:

   a. 23,000 Colorado residents are eligible for or receiving DACA, and contributing $33.9 million in state and local taxes. If DACA protections were lost their contributions would decrease by $16.4 million to $17.4 million.

   b. 11,000 Connecticut residents are eligible for or receiving DACA, and contributing $17.6 million in state and local taxes. If DACA protections were lost their contributions would decrease by $5.4 million to $12.1 million.

   c. 3,000 Delaware residents are eligible for or receiving DACA, and contributing $2.4 million in state and local taxes. If DACA protections were lost their contributions would decrease by $1 million to $2.4 million.

   d. 2,000 residents of the District of Columbia are eligible for or receiving DACA, and contributing $2.7 million in local taxes. If DACA protections were lost their contributions would decrease by $946,000 to $1.7 million.

e.  2,000 Hawaii residents are eligible for or receiving DACA, and contributing $3.2 million in state and local taxes. If DACA protections were lost their contributions would decrease by $870,000 to $2.3 million.

f.  68,000 Illinois residents are eligible for or receiving DACA, and contributing $131 million in state and local taxes. If DACA protections were lost their contributions would decrease by $54.7 million to $76.2 million.

g.  4,000 Iowa residents are eligible for or receiving DACA, and contributing $6.8 million in state and local taxes. If DACA protections were lost their contributions would decrease by $3.2 million to $3.5 million.

h.  19,000 Massachusetts residents are eligible for or receiving DACA, and contributing $24.2 million in state and local taxes. If DACA protections were lost their contributions would decrease by $9.2 million to $15 million.

i.  10,000 New Mexico residents are eligible for or receiving DACA, and contributing $18.8 million in state and local taxes. If DACA protections were lost their contributions would decrease by $7.5 million to $11.2 million.

j.  76,000 New York residents are eligible for or receiving DACA, and contributing $140 million in state and local taxes. If DACA protections were lost their contributions would decrease by $55 million to $84 million.

k.  41,000 North Carolina residents are eligible for or receiving DACA, and contributing $63.6 million in state and local taxes. If DACA protections were lost their contributions would decrease by $29 million to $39.5 million.

l.  15,000 Oregon residents are eligible for or receiving DACA, and contributing $20 million in state and local taxes. If DACA protections were lost their contributions would decrease by $11 million to $8.9 million.

m.  15,000 Pennsylvania residents are eligible for or receiving DACA, and contributing $20.7 million in state and local taxes. If DACA protections were lost their contributions would decrease by $7.5 million to $13.2 million.

n.  3,000 Rhode Island residents are eligible for or receiving DACA, and contributing $3.8 million in state and local taxes. If DACA protections were lost their contributions would decrease by $1.2 million to $2.6 million.

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
7

o. About 100 Vermont residents are eligible for or receiving DACA, and contributing $140,000 in state and local taxes. If DACA protections were lost their contributions would decrease by $48,000 to $92,000.

p. 30,000 Virginia residents are eligible for or receiving DACA, and contributing $34.7 million in state and local taxes. If DACA protections were lost their contributions would decrease by $12.7 million to $20 million.

q. And in Washington State 27,000 DACA-eligible persons contribute $51 million in state and local taxes. If DACA protections were lost their contributions would decrease by $19 million to $32 million.

8. For all the foregoing reasons, in our professional opinions rescinding DACA would reduce the state and local tax contributions of the population eligible for DACA by at least half. This would hamper state and local revenues and hurt their economies.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

Respectfully submitted,

_____
Alan Essig

_____
Meg Wiehe

_____
Misha Hill

September 21, 2017
_____
Date

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
8

# EXHIBIT 98

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## JOINT DECLARATION OF JOHN P. PELISSERO
## AND MARGARET FAUT CALLAHAN

We, John Pelissero and Margaret Callahan, pursuant to 28 U.S.C. § 1746(2), subject to the penalty of perjury, declare as follows:

1. The undersigned both have personal knowledge of the facts set forth herein and are competent to testify to those facts. They make this joint declaration in their official capacities as provosts for Loyola University of Chicago.

2. John P. Pelissero, PhD, is provost and a professor of political science at Loyola University of Chicago, where he has served as a member of the faculty for over 30 years. He holds a BA in political science earned from Marquette University in 1975; Masters' degrees in political science and Public Administration from the University of Oklahoma; and a PhD in political science from the University of Oklahoma in 1983. Dr. Pelissero's University leadership roles began in 2003 with his appointment as the first associate provost for curriculum development. From 2005–10 he was vice provost for the Division of Academic Affairs, responsible for budgeting, enrollment management, faculty development, and institutional research. He was named provost in May 2010, and served in the position until July 2015 when he was appointed interim president of the University. In August 2016, he resumed his role as provost. As the University's chief academic officer, he leads academic affairs, including two colleges, seven schools, two institutes, the University Centers of Excellence, and University Libraries. He is a member of the President's Cabinet and is responsible for enrollment management and strategic planning.

3. Margaret Faut Callahan, CRNA, PhD, FNAP, FAAN, is provost of the Loyola University of Chicago Health Sciences Division and a member of the President's Cabinet. She leads all

academic initiatives in the division, which includes the Stritch School of Medicine, Marcella

Niehoff School of Nursing, and the Graduate School's biomedical programs. She received her

Bachelor of Science in Nursing from Loyola and has more than 35 years of experience in health

care and higher education. Before coming to the University, she served as interim provost at

Marquette University and dean and professor of the University's College of Nursing. She holds a

Master of Science in Nursing and a Doctor of Philosophy in Nursing Science from Rush

University College of Nursing, and she is a Fellow of both the American Academy of Nursing

and the National Academies of Practice.

4. Loyola University of Chicago is a private institution, founded in 1870 and sponsored by

the Society of Jesus (the Jesuits), serving approximately 16,700 graduate and undergraduate

students. Its mission is grounded in the school's Ignatian heritage of faith, encompassing a

profound commitment to the poor and to issues of social responsibility and justice. As stated in

the school's Mission and Identity statement, one of the central characteristics of a Jesuit

education is the "commitment to service that promotes justice: using learning and leadership in

openhanded and generous ways to ensure freedom of inquiry, the pursuit of truth and care for

others."

5. The admission and enrollment of DACA students is fully consistent with the Jesuit and

Catholic values that permeate the institution of Loyola University of Chicago. As a Catholic

university, we firmly believe in the dignity of each person and in the promotion of social justice.

The dignity or worth of persons calls us to steward the talents of qualified applicants rather than

reject their contributions for arbitrary and arcane reasons. Social justice requires that we foster

the conditions for full participation in the community by all members of our community. Our

approach echoes a long tradition articulated by the U.S. Conference of Catholic Bishops of advocacy for immigrant members of our communities.

6. Consistent with its mission and its Ignatian heritage, Loyola University of Chicago has proudly welcomed DACA students through its doors since soon after the DACA program was initiated in 2012. Loyola does not require students to self-identify as DACA recipients; nonetheless, the University has welcomed DACA students throughout its three Chicago-area campuses:

    a. Beginning in 2013, Loyola's Stritch School of Medicine was the first medical school nationwide to openly accept students with DACA status. The school aggressively supported the creation of a loan program through the Illinois Finance Authority, offering interest-free loans to Stritch students in return for a promise to pay back the principal and work for four years in an underserved Illinois community following graduation. The first DACA students to enroll at Stritch are currently in their fourth and final year of medical school, and additional DACA students are included in each of the medical school's current classes.

    b. In the summer of 2014, the Student Government of Loyola Chicago partnered with the Latin American Student Organization to open up a scholarship fund for undocumented Loyola undergraduate students who demonstrate financial need but do not qualify for federal financial aid. Arising from this effort, the University began offering scholarship support to DACA students in the fall of 2014. The following year, the Loyola undergraduate student body voted to support a $2.50 contribution from each student to support the Magis Scholarship fund, and in December of 2015, the University's Board of Trustees unanimously approved the students' vote to add an individual $2.50 student

fee each semester. In addition, through a separate program now known as the Dreamer Scholarship, beginning in 2015 the University began offering full-scholarship awards to a number of DACA students in each entering class. Through both of these undertakings, Loyola University of Chicago now provides financial support for a significant number of DACA students who would otherwise be unable to attend the school.

c. In 2015, Loyola enrolled its first class of students at Arrupe College, a newly-established two-year junior college program. Arrupe College seeks to serve non-traditional college students with limited financial means. Many of Arrupe's students are first-generation college attendees, and many of them come from immigrant communities in and around the Chicago area. Like its main undergraduate campus, Loyola's Arrupe College has welcomed DACA students, whose presence advances the University's goal of creating a broad and diverse community that will enhance the educational experience of all Loyola students. At present, Arrupe College has enrolled a significant number of students who have identified themselves as having DACA status, as well as an unknown number of other DACA recipients who have not identified themselves to the University.

7. The DACA program has provided important benefits to the students, faculty and staff of Loyola University. All of the individuals with DACA status studying throughout Loyola have confronted extraordinary challenges just to arrive at our doors, and a good number of them are the first in their families to attend college. They are woven into the fabric of our communities and have made important contributions both in and out of our classrooms. Their presence enriches the educational and cultural experiences of all of our students, contributing to a more

diverse and robust academic climate on all of our campuses and in all of our programs. They are our future doctors, lawyers, nurses, teachers, business owners, and leaders who join us in lifting up the most marginalized in our world. Loyola University of Chicago is committed to their success.

8. If the DACA program is discontinued, many students will have an understandable fear that they may be deported, a circumstance likely to interfere with their ability to thrive in a challenging academic environment and make meaningful contributions to our community. Beyond this, many of them will likely not be able to continue with their studies at Loyola. They will lose their ability to work legally, and therefore lose the ability to support themselves while studying. Ending the program will also adversely impact current students' ability to make important future contributions to the welfare of the State of Illinois. For example, the students with DACA status who will graduate with medical degrees this year may be unable to continue their training at the residency level and may be unable to fulfill their obligations to serve underserved patients in the state of Illinois. Additionally, they may have no ability to service their loan burdens and will thus be at risk of defaulting on their obligations to the state of Illinois. All of this will cause substantial and irreparable harm not only to our DACA recipients and their families, but also to all of the constituents of Loyola University of Chicago, including students, faculty and staff. It defies understanding that we as a country would squander the wealth of talent, commitment, and grit exhibited by this extraordinary group of people who we know as our colleagues, our classmates, and our neighbors.

The undersigned declare under penalty of perjury that to the best of their knowledge, the foregoing is true and correct.

Executed this _26th_ day of September, 2017.

Case 1:17-cv-05228-NGG-VMS   Document 97-3   Filed 12/15/17   Page 386 of 397 PageID #: 6209

John P. Pelissero

Margaret Faut Callahan

6

# EXHIBIT 99

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>         Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>         Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

DECLARATION OF DR. PAUL ROTH, M.D., M.S

Pursuant to 28 U.S.C. Sec. 1746, I hereby declare:

1.     I am over the age of 18 and competent to testify.

2.     I am the Executive Vice President and Chancellor of the University of New Mexico Health Sciences Center (UNMHSC), the Dean of the University of New Mexico School of Medicine and Chief Executive Officer of the University of New Mexico Health Sciences Center.

3.     The UNMHSC employs a total of approximately 8000 individuals, including professional and support staff, and its colleges and schools have an average enrollment totaling 1,966 students, some of whom may be participants in the Deferred Action for Childhood Arrivals (DACA) program. .

4.    The Academic programs within the UNMHSC include the College of Nursing, College of Pharmacy, College of Population Health, School of Medicine, and Biomedical Education Research Program.

5.    I graduated from George Washington University School of Medicine in 1976 and completed my family practice residency in 1979 at the UNM School of Medicine. I completed a BS in 1969 and an MS in biology in 1972, both at Fairleigh Dickinson University.

6.    I am a member of the Liaison Committee on Medical Education, which accredits all U.S. and Canadian medical schools and am a board member of the Association of Academic Health Centers, whose Administrative Board I previously chaired, and a board member of the Association of Academic Health Centers.

7.    I have served on the United States Department of Health and Human Services' Public Health Emergency Advisory Council, and was a member of the joint Department of Homeland Security and Department of State "Secure Borders/Open Doors" advisory committee, as well as the Transition Task Force for Homeland Security during the President George W. Bush administration.

8.    I am a board member and past chair of the Greater Albuquerque Chamber of Commerce.

9.    I also founded the UNM Center of Disaster Medicine and created the nation's first Disaster Medical Assistance Team.

10.    I was a founder of UNM's emergency medicine residency program, past chair of the Department of Emergency Medicine, a fellow in the American College of Emergency Physicians, and served as chair of the Association of American Medical Colleges Council of Deans.

11.     I oversee four health professional colleges (Medicine, Nursing, Pharmacy and Population Health) and the UNM Health System (UNM Hospitals, UNM Medical Group, Inc., and UNM Sandoval Regional Medical Center). The UNM Health System is New Mexico's largest referral center for complex injuries and diseases and includes the region's only Level I trauma center.

12.     The UNM Health Sciences Center is the single most important training ground for New Mexico's physicians, nurses, pharmacists, and other health professionals, some of whom may work and attend classes as beneficiaries of DACA.

13.     The students, faculty and staff who make up the UNMHSC are among our best and brightest.  They bring both talent and dedication to the improved health of New Mexico's largely rural and underserved areas.

14.     With the contemplated changes to DACA, a DACA student currently enrolled in a four-year or six-year medical program would have to weigh the benefits of continued education and clinical experience against the potential for deportation.

15.     In my roles with the Health Sciences Center, I have had the pleasure of knowing UNM students and graduates who are DACA recipients. These individuals are part of a cohort of students have expressed their commitment to practicing as medical professionals in remote areas of New Mexico, where finding medical care is sometimes challenging.

16.     New Mexico's population benefits from the training and expertise of all of our students, including  DACA recipients; they provide significant health gains, services, and care for New Mexico residents whose medical needs are most complex.

17.     I declare under penalty of perjury that the foregoing is true and correct.

Paul Roth, M.D., M.S.
Executive Vice President and Chancellor for Health Sciences,
Chief Executive Officer, UNM Health System,
Dean, School of Medicine
University of New Mexico Health Sciences Center
1117 Stanford NE
Albuquerque NM 87131

Dated This 26th of September, 2017

# EXHIBIT 100

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>          Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>          Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |

Pursuant to 28 U.S.C. § 1746(2), I, Alice Cuprill-Comas, hereby declare as follows:

1.      I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.      I am the General Counsel of the Oregon Health and Science University ("OHSU") in Oregon.

3.      OHSU is committed to equitable student success, which includes a commitment to educational access for Deferred Action for Childhood Arrivals ("DACA") recipients – also known as "Dreamers."

4.      As Oregon's only academic medical center, OHSU's mission is to: (a) educate tomorrow's health professionals, scientists, engineers and managers in top-tier programs that prepare them for a lifetime of learning, leadership and contribution; (b) explore new basic, clinical and applied research frontiers in health and biomedical sciences, environmental and biomedical engineering and information services, and translate these discoveries, wherever possible, into applications in the heath and commercial sectors; (c) deliver excellence in healthcare, emphasizing the creation and implementation of new knowledge and cutting edge technologies; and (d) lead and advocate for programs that improve health for all Oregonians, and extend OHSU's education, research and healthcare missions through community service, outreach and partnerships.

5.      I have confirmed that DACA recipients are registered students in OHSU's degree-granting programs and that OHSU employs DACA recipients.

6.      Rescinding DACA will adversely impact current DACA recipients enrolled at OHSU who will be unable to plan for the future, study abroad, simultaneously work to pay costs and fees, and obtain certain financial aid and scholarships.  These harms will damage the educational mission of OHSU and its ability to meet the healthcare workforce needs of the State of Oregon.

Page 2 -    DECLARATION OF ALICE CUPRILL-COMAS
JND/a2c/8490632-v2

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

7.      Make OHSU has encouraged DACA recipients to apply for admission as part of its strong commitment to diversity, equity and inclusion. These students often have had to overcome significant challenges in order to gain acceptance and bring critical perspectives, insights and experience to OHSU.  Rescinding DACA will cause many high-achieving students to drop out.  As a result OHSU will lose the diversity and enrichment this population brings to our university community.

8.       Rescission of the DACA program would affect OHSU's revenues derived from currently-enrolled students. A DACA recipient student enrolled in OHSU's Doctor of Dental Medicine program at the resident tuition rate, for example, pays $44,324 per academic year. Thus, for each full time DACA recipient student that either drops out, or is force out, as a result of DACA rescission, OHSU will lose annual revenue.

9.      If current DACA students are forced to drop out, OHSU will also lose the value of the financial assistance it has granted to and the other resources it has spent educating students who ultimately do not graduate.

10.     DACA rescission will likely harm OHSU's future revenues derived from prospective students.  The threat of arrest and deportation, and the inability of such students to work in the United States, will strongly disincentivize such students from expending the resources to obtain an education at OHSU.  Without DACA, OHSU will likely see a decline in enrollment, exacerbating the shortage of healthcare professionals in Oregon, particularly in rural areas.

11.     OHSU has invested significant amounts of time and money to hire and train the DACA recipients that it employs.  Stripping DACA recipients of the ability to work legally will adversely affect OHSU as it will lose the value of its investment, as well as the services of qualified and trained employees.

Page 3 -    DECLARATION OF ALICE CUPRILL-COMAS
JND/a2c/8490632-v2

**I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.**

Executed this 19th day of September 2017, at Portland, Oregon.

_____
Alice Cuprill-Comas,
General Counsel
Oregon Health & Science University

Page 4 -   DECLARATION OF ALICE CUPRILL-COMAS
JND/a2c/8490632-v2