# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MARTIN JONATHAN BATALLA VIDAL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> KIRSTJEN NIELSEN, Secretary, <br> Department of Homeland Security, *et al.*, <br><br> *Defendants*. | Case No. 16-cv-4756 (NGG) (JO) |
| STATE OF NEW YORK, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD TRUMP, President of the <br> United States, *et al.*, <br><br> *Defendants*. | Case No. 17-cv-5228 (NGG) (JO) |

## BRIEF AMICI CURIAE OF CURRENT AND FORMER LAW ENFORCEMENT LEADERS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................................................ 1

INTRODUCTION ...................................................................................................................... 2

ARGUMENT ............................................................................................................................. 3

    I.    DACA Fosters Effective Law Enforcement. ................................................................. 3

      A.   "Community Policing" Is Essential to Effective Law Enforcement. .............................. 3

      B.   DACA Promotes Cooperation with Law Enforcement. .................................................. 4

      C.   DACA Aids Law Enforcement by Facilitating Access to Identification. ....................... 8

    II.   DACA Helps Law Enforcement Protect Vulnerable Individuals from Crime and

        Exploitation. ................................................................................................................ 10

    CONCLUSION ........................................................................................................................ 14

## Table of Authorities

**Statutes**

8 U.S.C. § 1324a(h)(3)................................................................................................10

8 C.F.R. § 274a.12(c)(14) .........................................................................................10

Pub. L. No. 106-386, 114 Stat. 1491 (2000) .............................................................7

**Executive and Congressional Materials**

*Oversight of the Administration's Misdirected Immigration Enforcement Policies: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary*, 114th Cong. 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n)..................................4, 6, 11

Soc. Security Admin., SSA Publ'n No. 05-10096, Social Security Numbers for Noncitizens (June 2015), *available at* http://www.ssa.gov/pubs/EN-05-10096.pdf ..................................10

U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., OMB No. 1615-0040, Instructions for I-765 Application for Employment Authorization (Nov. 2015), *available at* https://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf .........................................10

U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., *Victims of Criminal Activity:  U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status (last updated Aug. 25, 2017) ..................................................7

U.S. Dep't of Justice, Office of Cmty. Oriented Policing Servs., *Enhancing Community Policing with Immigrant Populations* (Apr. 2010), *available at* https://ric-zai-inc.com/Publications/cops-w0747-pub.pdf ..........................................................................10

**Other Authorities**

Angelica S. Reina, Brenda J. Lohman & Marta María Maldonado, *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593 (2013)...............................................................13

Anita Khashu, Police Found., *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* (2009), https://www.policefoundation.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf..............................4, 12, 13

Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593 (2011) ...............................................................11, 12, 13

Jacob Bucher, Michelle Manasse & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159 (2010) ......12

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015) ..............13

Leslye Orloff, Levi Wolberg & Benish Anver, Nat'l Ctr. on Domestic & Sexual Violence, *U-Visa Victims and Lawful Permanent Residency* (Sept. 6, 2012), http://www.ncdsv.org/images/NIWAP_U-VisaVictimsAndLawfulPermanentResidency_9-6-12.pdf........................8

Nat'l Immigration Law Ctr., *Local Law Enforcement Leaders Oppose Mandates to Engage in Immigration Enforcement* (Aug. 2013), https://www.nilc.org/wp-content/uploads/2017/02/Law-Enforcement-Opposition-to-Mandates-2013-08-30.pdf....................................................6

Mark Hugo Lopez & Susan Minushkin, Pew Hispanic Center, *2008 National Survey of Latinos: Hispanics See Their Situation in U.S. Deteriorating; Oppose Key Immigration Enforcement Measures* (Sept. 18, 2008), http://pewhispanic.org/reports/report.php?ReportID=93 .............4

Michael Corkery & Jessica Silver-Greenberg, *Banks Reject New York City IDs, Leaving 'Unbanked' on Sidelines*, N.Y. Times, Dec. 23, 2015.................................................................9

Natalia Lee et al., Nat'l Immigrant Women's Advocacy Project, *National Survey of Service Providers on Police Response to Immigrant Crime Victims, U Visa Certification and Language Access* (Apr. 16, 2013), http://www.niwap.org/reports/Police-Response-U-Visas-Language-Access-Report-4.6.13.pdf .......................................................................................8

Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230 (2005) ................................................13

Nik Theodore, Dep't of Urban Planning & Policy, Univ. of Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (May 2013), www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF ...................................................................................................................5

New York City Dep't of Investigation, Office of the Inspector General for the New York Police Dep't, *When Undocumented Immigrants are Crime Victims:  An Assessment of NYPD's Handling of U Visa Certification Requests* at 1 (July 2017), https://www.1.nyc.gov/assets/doi/reports/pdf/2017/07-28-2017-U-Visa-Rpt-Release.pdf ......................................................6

Police Exec. Research Forum, *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement* (2012), http://www.policeforum.org/assets/docs/Free_Online_Documents/Immigration/voices%20from%20across%20the%20country%20-%20local%20law%20enforcement%20officials%20discuss%20the%20challenges%20of%20immigration%20enforcement%202012.pdf.......................................................5, 9

Robert C. Davis, Edna Erez & Nancy Avitabile, *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183 (2001) .............................................................................................................................6

Roberto G. Gonzales, *DACA's beneficiaries landed good jobs, enrolled in college, and contributed to society*, Vox Media, Sept. 5, 2017, https://www.vox.com/2017/9/2/16244380/ daca-benefits-trump-undocumented-immigrants-jobs .........................................................7, 8

Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* (June 2014), http://www.immigrationpolicy.org/special-reports/two-years-and-counting-assessing-growing-power-daca ...........................................................................................................7, 8

S. Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South* (Apr. 2009), http://www.splcenter.org/sites/default/files/downloads/UnderSiege.pdf ..........................11, 12

Zenén Jaimes Pérez, United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* (June 2015), http://unitedwedream.org/wp-content/uploads/2015/10/DACA-report-final-1.pdf ............7, 10

## INTEREST OF AMICI CURIAE

Amici Current and Former Law Enforcement Leaders file this brief as amici curiae in support of Plaintiffs.  Amici are a leading national association of local law enforcement executives and current and former individual police chiefs, sheriffs, and law enforcement leaders.  Amici have deep and wide-ranging expertise in local law enforcement and in cooperative federal-state law enforcement activities.  They are intimately familiar with the difficulties of performing critical law enforcement functions in communities where immigrants fear the police and therefore are especially vulnerable to exploitation and crime.

Amici's experience in keeping their communities safe has taught them the critical importance of bringing immigrants and their families "out of the shadows" and into their broader communities.   Trust and cooperation are essential to public safety, and sound police work is undermined when undocumented immigrants fear interacting with law enforcement.  This fear, moreover, leaves undocumented immigrants more vulnerable to crime and exploitation, leading to more violence in the communities that amici are charged with protecting.

The Deferred Action for Childhood Arrivals ("DACA") program protects from deportation nearly 800,000 individuals brought to this country as children.  Under DACA, these individuals, who have undergone background checks and lived continuously in the United States since 2007, have been permitted to live, work, and study in this country without fear of deportation.  Amici have witnessed firsthand how the DACA program has helped law enforcement officers to keep their communities safe by taking away the fear of removal from these nearly 800,000 individuals who are active members of their communities.  A full list of amici is attached as Exhibit A.

**INTRODUCTION**

The lessons that amici have learned in protecting their communities shed important light on the issues raised in this case. Community policing, a philosophy that calls for trust and engagement between law enforcement and those whom they protect, is vital to effective police work and, in turn, to public safety. That trust is undermined when undocumented individuals fear interaction with the police, and law enforcement suffers as a result. Extensive evidence shows that, especially without programs such as DACA in place, undocumented immigrants—and their lawfully present family and neighbors—fear that turning to the police to report crimes or engaging with the police as they investigate crimes will bring adverse immigration consequences. As a result, immigrant communities are less willing to report crimes or cooperate with police investigations. This fundamental breakdown in trust poses a major challenge for police not only as they seek to protect communities but also as they attempt to allocate resources sensibly in the interest of public safety.

DACA ameliorates these problems by addressing an important reason that many individuals fear cooperating with law enforcement. As experience with DACA has shown, when immigrants are permitted to step out of the shadows, they are much more willing to work cooperatively with police. As explained below, nearly two-thirds of DACA recipients reported being less afraid of law enforcement, and 59 percent indicated that they would report a crime now in a situation in which they would not have reported it before entering the program. DACA further aids law enforcement by facilitating access to identification, such as federal employment authorization documents. Lack of identification in immigrant communities often leads to undue burdens on police, potentially turning a simple traffic stop into an hours-long detour to fingerprint

someone at the police station.  When police are able to identify victims, witnesses, and potential suspects without those sorts of delays, valuable law enforcement resources are spared.

DACA also benefits public safety by helping law enforcement to protect a population uniquely vulnerable to exploitation and violent crime.  Numerous studies show that undocumented individuals' fear of interactions with law enforcement makes them attractive targets for many forms of crime and abuse.  Undocumented immigrants, for instance, face increased wage theft and other forms of exploitation in the workplace.  With limited access to bank accounts (in substantial part because of their lack of identification), they have been dubbed by some as "walking ATMs" and are frequently targeted for robbery.  Undocumented individuals are also especially vulnerable to domestic abuse because they often afraid to turn to law enforcement for help against abusive partners.

By eliminating an important reason to fear law enforcement, by providing work authorization and access to identification, and by building trust between police and immigrants with longstanding ties to the United States, DACA aids community policing and makes recipients less vulnerable to crime and exploitation.  In doing so, DACA provides vital support to police charged with protecting everyone in their communities.

## ARGUMENT

### I.    DACA Fosters Effective Law Enforcement.

#### A.  "Community Policing" Is Essential to Effective Law Enforcement.

As one major city police chief has explained, the experience of policing cities across the country has taught law enforcement officers that, "[t]o do our job, we must have the trust and

respect of the communities we serve."[1]  In order to stop crime, police officers "need the full cooperation of victims and witnesses."[2]

This common-sense philosophy has come to be called "community policing."  Community policing is an approach to policing whereby police officers engage communities in a working partnership to reduce crime and promote public safety.[3]  It thus requires police to interact with neighborhood residents in a manner that will build trust and improve the level of cooperation with the police department.[4]  When that relationship of trust is missing—as it is when people believe that contacting police could lead to deportation for themselves or others—community policing breaks down and the entire community is left at greater risk of exploitation and violence.

**B.  DACA Promotes Cooperation with Law Enforcement.**

The reality of millions of undocumented immigrants living in the United States poses significant challenges to effective community policing.

According to a Pew survey, 57 percent of Latinos in the United States indicate that they worry about deportation—of themselves, family members, or close friends—and 40 percent worry about it "a lot."[5]  This fear necessarily affects cooperation and communication with the police.

---

[1] *Oversight of the Administration's Misdirected Immigration Enforcement Policies: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary,* 114th Cong. 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), *available at* http://www.judiciary.senate.gov/imo/media/doc/07-21-15%20Manger%20Testimony.pdf.

[2] *Id.*

[3] *See* Anita Khashu, Police Found., *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* (Apr. 2009) (citing Mark H. Moore, *Problem-Solving and Community Policing*, Modern Policing (Michael Tonry & Norval Morris eds., 1992)), *available at* https://www.policefoundation.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf.

[4] *Id.*

[5] Mark Hugo Lopez & Susan Minushkin, Pew Hispanic Ctr., *2008 National Survey of Latinos: Hispanics See Their Situation in U.S. Deteriorating; Oppose Key Immigration Enforcement*

Immigrants and their family members and neighbors who may be U.S. citizens or lawfully present often assume that interaction with police could have adverse consequences for themselves or a loved one. Even when local authorities play no role in immigration enforcement, many immigrants still associate police with immigration authorities, or expect police to inquire about immigration status.[6]

As a result, immigrant communities in general, and undocumented immigrants in particular, are less likely to trust and cooperate with local police. In one survey of Latinos in four major cities designed to assess the impact of police involvement in immigration enforcement on public safety and police-community relations, 70 percent of undocumented immigrants and 44 percent of all Latinos said they would be less likely to contact law enforcement authorities if they were victims of a crime for fear that the police would ask them or people they know about their immigration status; and 67 percent of undocumented immigrants and 45 percent of all Latinos said they would be less likely to voluntarily offer information about, or report, crimes because of the same fear.[7]

---

*Measures* at ii (Sept. 18, 2008), http://pewhispanic.org/reports/report.php ?ReportID=93.

[6] *See, e.g.*, Police Exec. Research Forum, *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement* 2 (2012), http://www.policeforum.org/ assets/docs/Free_Online_Documents/Immigration/voices%20from %20across%20the%20country%20-%20local%20law%20enforcement%20officials%20discuss% 20the%20challenges %20of%20immigration%20enforcement%202012.pdf ("[S]ome members of the public . . . may have a misperception that because immigration is governed by laws, all law enforcement agencies have responsibility for enforcing those laws. . . . Police chiefs note that immigrants often have this misperception, which often makes them reluctant to contact local police . . . .").

[7] Nik Theodore, Dep't of Urban Planning & Policy, Univ. of Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (May 2013), www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF; *see also id.* at 1 ("Survey results indicate that the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, . . . exacerbating their mistrust of law enforcement authorities.").

This problematic atmosphere of mistrust is felt by police as well.  In one study, two-thirds of the law enforcement officers polled held the view that recent immigrants reported crimes less frequently than others.[8]  Those surveyed also indicated that the crimes underreported by immigrants most often are serious ones, with domestic violence and gang violence at the top of the list.[9]  The widely recognized fear among immigrants of interacting with law enforcement poses a fundamental challenge for community policing.  Police cannot prevent or solve crimes if victims or witnesses are unwilling to talk to them because of concerns that they or their loved ones or neighbors will face adverse immigration consequences.  As the president of the Major Cities Chiefs Association has explained to Congress, "[c]ooperation is not forthcoming from persons who see their police as immigration agents."[10]  Moreover, as cautioned by one official, "immigrants will never help their local police to fight crime once they fear we have become immigration officers."[11]

The underreporting of crimes by recent immigrants is a problem for the criminal justice system.[12]  The most immediate consequence, of course, is that serious crimes go unreported and unpunished.  At a broader level, undercounting the incidence of crime in areas where immigrant communities live leads to the under-allocation of law enforcement resources to those

---

[8] Robert C. Davis, Edna Erez & Nancy Avitabile, *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183, 187 (2001).

[9] *Id.* at 188-9. *See also* New York City Dep't of Investigation, Office of the Inspector General for the New York Police Dep't, *When Undocumented Immigrants are Crime Victims:  An Assessment of NYPD's Handling of U Visa Certification Requests* at 1 (July 2017), *available at* https://www.1.nyc.gov/assets/doi/reports/pdf/2017/07-28-2017-U-Visa-Rpt-Release.pdf   ("For undocumented people who are victims of crimes . . . fear of deportation can stand in the way of cooperation – a fact their abusers readily exploit.")

[10] Statement of Tom Manger, *supra* note 1, at 2.

[11] National Immigration Law Center, *Local Law Enforcement Leaders Oppose Mandates to Engage in Immigration Enforcement* 2 (Aug. 2013) (statement of Chief Acevedo), https://www.nilc.org/wp-content/uploads/2017/02/Law-Enforcement-Opposition-to-Mandates-2013-08-30.pdf.

[12] Davis et al., *supra* note 8, at 188.

communities.[13]   As one official explained, when criminal behavior goes unreported, "[c]rime multiplies" and "[u]nresolved resentments grow in the community."[14]   Another added that the underreporting of crime "keeps fear at very high levels and diminishes quality of life."[15]

DACA has helped to ameliorate these problems and improve public safety more broadly. Nearly eight in ten recipients of DACA relief reported that they are now less afraid of deportation,[16] two-thirds reported being less afraid of law enforcement, and 59 percent of DACA recipients surveyed said that they would report a crime now in a situation in which they would not have reported it before.[17]   If DACA were to remain in place, those who qualify for the program would not revert to old reasons to fear ordinary encounters with law enforcement.   Instead, they would retain greater freedom to cooperate in the protection of their communities without worrying about how their good deed might be punished—for example, by causing them to be separated from their family members, siblings, or loved ones.

Lessons learned from implementation of the Violence Against Women Act of 2000[18] are instructive.   With that Act, congress created the U visa to provide immigration relief to undocumented victims of certain crimes.[19]   Like DACA qualification, a U visa allows recipients

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] Zenén Jaimes Pérez, United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* 23 (June 2015), http://unitedwedream.org/wp-content/uploads/2015/10/DACA-report-final-1.pdf.

[17] Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* 9 (June 2014), http://www.immigrationpolicy.org/special-reports/two-years-and-counting-assessing-growing-power-daca; Roberto G. Gonzales, *DACA's beneficiaries landed good jobs, enrolled in college, and contributed to society*, Vox Media, Sept. 5, 2017, https://www.vox.com/2017/9/2/16244380/daca-benefits-trump-undocumented-immigrants-jobs.

[18] Pub. L. No. 106-386, 114 Stat. 1491 (2000).

[19] *See* U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-human-

to identify themselves, receive temporary relief from removal, and obtain verified government identification.[20]  The benefits for law enforcement have been striking.  A recent study indicated that U visa applicants and recipients, freed of the need to remain in the shadows, became far more likely to cooperate with law enforcement in the detection, investigation, and prosecution of crimes.[21]  Indeed, more than 99 percent stated that they were willing to cooperate with the police, and 70 percent were in fact asked to—and did—provide assistance related to crimes committed against them.[22]  That U-visa holders who seek lawful permanent residency are expected to provide "reasonably requested information and assistance" to law enforcement in connection with the crimes that qualify them for immigration relief undoubtedly helps explain the especially high level of cooperation, but the protections offered by the U-visa are what enable that cooperation.[23]  Another study revealed that three-quarters of law enforcement officers view U visas as beneficial in encouraging victims to come forward and report crimes.[24]

### C. DACA Aids Law Enforcement by Facilitating Access to Identification.

A further benefit of DACA for effective policing follows from the greater availability of identification.  Because most states do not issue driver's licenses or other identification to undocumented immigrants, law enforcement often face serious difficulties reliably identifying

---

trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status (last updated Aug. 25, 2017).

[20] *See id.*

[21] *See* Leslye Orloff, Levi Wolberg & Benish Anver, Nat'l Ctr. on Domestic & Sexual Violence, *U-Visa Victims and Lawful Permanent Residency* 5-6 (Sept. 6, 2012), http://www.ncdsv.org/images/NIWAP_U-VisaVictimsAndLawfulPermanentResidency_9-6-12.pdf.

[22] *Id.*

[23] *See id.* at 5 (internal quotation marks omitted). As set forth *supra*, note 17, there is a similar result from the DACA program, which involves no expectation of law enforcement cooperation.

[24] Natalia Lee et al., Nat'l Immigrant Women's Advocacy Project, *National Survey of Service Providers on Police Response to Immigrant Crime Victims, U Visa Certification and Language Access* 21 (Apr. 16, 2013), *available at* http://www.niwap.org/reports/Police-Response-U-Visas-Language-Access-Report-4.6.13.pdf.

undocumented community members.  Ready access to identification aids law enforcement in the most basic of ways: if the police cannot verify who someone is, it becomes much harder to identify witnesses and victims, investigate potential suspects, and perform critical tasks like searching for a criminal history, investigating outstanding warrants, and determining whether someone poses a threat.[25]

Even the simplest traffic stop can lead to an unnecessary waste of valuable law enforcement resources if an individual cannot be identified.  If an officer stops a motorist who does not have a license or other verifiable identification, the officer may have no other option than to arrest the individual, bring him to the station, and obtain fingerprint information in order to identify the individual.  As one police chief has explained, "[w]hen we stop cars and the driver doesn't have a driver's license, there are very few options for the officers and troopers."[26]  The only way to reliably identify the individual may be through fingerprints, requiring a detour to "jail so we can find out who they are."[27]  Another former police chief lamented the "manpower" required and time lost—"up to two to three hours to determine who an arrestee is"—which could be devoted to more pressing law enforcement concerns.[28]

Recipients of DACA are eligible to apply for a federal employment authorization document ("EAD").  The EAD comes in the form of a card issued by U.S. Citizenship and Immigration

---

[25] Police Exec. Research Forum, *supra* note 6, at 15; *see also* Michael Corkery & Jessica Silver-Greenberg, *Banks Reject New York City IDs, Leaving 'Unbanked' on Sidelines*, N.Y. Times, Dec. 23, 2015 (describing municipal identification and stating, "[t]he mayor emphasized that the cards were developed with input from the New York City Police Department and said the department had been one of the biggest backers of the program. 'They want every New Yorker on the street to have an ID card; it greatly improves the work of the NYPD,' Mr. de Blasio said.").

[26] *See id.* at 15-16.

[27] *Id.* at 16.

[28] *Id.* at 15.

Services, and includes the recipient's photograph.[29]   Individuals who receive employment authorization also are eligible to obtain a Social Security number and card.[30]   Because DACA has expanded availability of identification, it has assisted law enforcement officers' ability to identify those whom they encounter.[31]   Instead of time-consuming, wasteful, and potentially antagonistic encounters with individuals who pose no public safety concern, police have more time to focus on higher priorities in keeping their communities safe.

## II.     DACA Helps Law Enforcement Protect Vulnerable Individuals from Crime and Exploitation.

DACA has yielded another vital public safety benefit: protecting individuals who are attractive targets for criminals.

As discussed above, undocumented immigrants as well as their families fear interactions with police and are reluctant to report crimes when doing so is accompanied by the fear of removal. No one knows this better than the predators who seek to take advantage of immigrant communities' vulnerabilities.   These communities face a range of misconduct, from abuse by unscrupulous employers to domestic and gang violence.[32]   "When immigrants come to view their local police

---

[29] *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14); *see also* U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs., OMB No. 1615-0040, Instructions for I-765 Application for Employment Authorization (Nov. 2015) (describing EAD as a "card" and requiring two passport-style photos), *available at* https://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf.

[30] *See* Soc. Sec. Admin., SSA Publ'n No. 05-10096, Social Security Numbers for Noncitizens (June 2015), *available at* http://www.ssa.gov/pubs/EN-05-10096.pdf.

[31] More than 90 percent of recipients of relief under DACA report that they have acquired a driver's license or other identification. Pérez, *supra* note 16, at 20.

[32] *See* U.S. Dep't of Justice, Office of Cmty. Oriented Policing Servs., *Enhancing Community Policing with Immigrant Populations* 16 (Apr. 2010), *available at* https://ric-zai-inc.com/Publications/cops-w0747-pub.pdf.

and sheriffs with distrust because they fear deportation, it creates conditions that encourage criminals to prey upon victims and witnesses alike."[33]

This phenomenon has been termed the "deportation threat dynamic."[34]   The logic is straightforward: "(1) an unauthorized migrant seeks, and finds, employment; (2) a person, such as an employer or criminal, identifies the migrant as unauthorized; (3) that person commits a crime against the migrant, such as wage theft, another workplace violation, or robbery; and (4) the migrant does not report the crime to law enforcement," fearing immigration consequences.[35]

This phenomenon is widespread in the workplace.  In a number of studies, between 40 and 80 percent of mostly undocumented immigrants reported being victims of wage theft.[36]   Many immigrants also reported other types of worksite abuse.[37]   In one study, 32 percent of respondents said that they had suffered on-the-job injuries—and most of these individuals, after being injured, were fired, not paid lost wages, or denied medical care by their employers.[38]

The deportation threat dynamic fuels not only exploitation but also outright violence.  An advocate reported that, when one worker attempted to collect wages his employer owed him, "[t]he contractor raised his shirt and showed he had a gun—and that was enough. . . . He didn't have to

---

[33] Statement of Tom Manger, *supra* note 1, at 2.

[34] Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593 (2011).

[35] *Id.* at 610.

[36] *See id.* (finding that 2 of 5 respondents reported wage theft since arriving in New Orleans, and citing Nik Theodore, Abel Valenzuela, Jr. & Edwin Meléndez, *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 WorkingUSA: J. Labor & Soc. 407 (Dec. 2006), finding a wage theft rate of approximately 50% in New York); S. Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South* 6 (Apr. 2009) (finding that 41% of those surveyed across the South had experienced wage theft, and 80% had in New Orleans), http://www.splcenter.org/sites/default/files/downloads/UnderSiege.pdf.

[37] Fussell, *supra* note 34, at 604.

[38] S. Poverty Law Ctr., *supra* note 36, at 6.

say any more.  The worker left."[39]  DACA recipients are currently eligible to receive work authorization, and many are currently working or pursuing higher educational opportunities. Revocation of their work authorization will leave them more vulnerable to exploitation and even violent crime.

This same lawlessness plaguing undocumented communities extends well beyond the workplace.  Nearly two-thirds of undocumented migrant workers participating in a Memphis study reported being the victim of at least one crime, most commonly theft or robbery.[40]  Respondents indicated that fewer than a quarter of these crimes were reported to the police, and *only one* was reported by the victim himself.[41]

As this study suggests, robbery and similar crimes pose a particular threat to undocumented individuals, who typically do not have bank accounts, in part because of their inability to obtain government-issued identification.[42]  Moreover, many of these immigrants live in group apartments and are unable to store valuables in a safe place at home.[43]  As a result, undocumented immigrants are known to carry large amounts of cash, making robbing them an especially lucrative proposition.  The risk to the perpetrators, meanwhile, is minimal because the victims are too afraid to report the crime to the police.

---

[39] *Id.* at 7 (internal quotation marks omitted).
[40] Jacob Bucher, Michelle Manasse & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 (2010).
[41] *Id.* at 165.
[42] Fussell, *supra* note 34, at 604; S. Poverty Law Ctr., *supra* note 36, at 6, 25.
[43] Khashu, *supra* note 3, at 25; *see also* Bucher, Manasse & Tarasawa, *supra* note 40, at 164, 167-68 (finding that a large majority of surveyed undocumented migrants workers lived with at least three others and identifying a strong relationship between number of cohabitants and crime).

The targeting of undocumented immigrants for robbery has become so widespread that these individuals have been labeled "walking ATMs"—or the subjects of "amigo shopping."[44]  In a study of largely undocumented immigrants helping to rebuild New Orleans in the wake of Hurricane Katrina, the immigrants reported robbery and physical assault at more than *ten times* the rate experienced by the general population.[45]  In another survey, 53 percent of law enforcement officers held the view that undocumented immigrants were especially likely to be victims of robbery and theft.[46]

There is also evidence that undocumented immigrants are especially vulnerable to domestic violence.  Studies have shown that abusive partners may utilize the threat of deportation in order to maintain power and control over their victims.[47]  When the abusing partner has lawful status, financial dependence on that partner may similarly allow for the perpetuation of violence.[48]

Seventy percent of participants in one study of domestic abuse victims said that immigration status was a major impediment to their seeking help or reporting their abuse to the authorities and thereby permitting the violence to continue.[49]  In another study, the single largest

---

[44] *See* Fussell, *supra* note 34, at 604-05; S. Poverty Law Ctr., *supra* note 36, at 25; Khashu, *supra* note 3, at 25.

[45] *See* Fussell, *supra* note 34, at 604.

[46] *Id.*

[47] *See, e.g.*, Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 330 (2015) (citing several studies); Angelica S. Reina, Brenda J. Lohman & Marta María Maldonado, *''He Said They'd Deport Me'': Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013).  The latter study cited a participant who explained that a partner "beat me up and I could have called the police because that was what I thought to do . . . but he threatened me . . . he told me that if I called the police I was going to lose out . . . because they [police officers] . . . would . . . take me, because I didn't have legal documents." *Id.*

[48] *See, e.g.*, Messing, *supra* note 47, at 330.

[49] Reina, Lohman & Maldonado, *supra* note 47, at 600.

factor independently affecting the rate at which battered immigrant Latina women called the police was identified as immigration status.[50]

In short, should DACA recipients lose their work authorizations and once again fear removal from the United States, their lack of status will embolden exploitative employers and criminals alike and thus diminish the safety of entire communities.  By permitting these young individuals to live and work openly, DACA eliminates a significant barrier to an open and trusting relationship with law enforcement.  Continuing DACA will enable police to better fight crime and serve all those whom they are charged with protecting.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Plaintiffs' Motion, this Court should grant the relief sought by the Plaintiffs.

December 22, 2017

Respectfully Submitted,

/s/ Caryn C. Lederer

Matthew J. Piers
Chirag G. Badlani
Caryn C. Lederer
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 West Madison St., Suite 4000
Chicago, IL 60602
Phone: (312) 580-0100
*Counsel for Amici Curiae*

Joshua A. Geltzer (D.C. Bar No. 1018768)
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, D.C. 20001
Phone: (202) 662-9042
Email: jg1861@georgetown.edu

---

[50] Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230, 237 (2005).

# Exhibit A

**EXHIBIT A: LIST OF AMICI**[*]

- The National Organization of Black Law Enforcement Executives (NOBLE), serves as the conscience of law enforcement by being committed to Justice by Action, with nearly 60 chapters and representing over 3,000 members worldwide, including chief executive officers and command level law enforcement officials from federal, state, county, and municipal law enforcement agencies, and other criminal justice practitioners;

- Chief Art Acevedo, Houston, Texas, Police Department

- Deputy Chief Carmen Best, Seattle, Washington, Police Department

- Chief Richard Biehl, Dayton, Ohio, Police Department

- Chief Chris Burbank, Salt Lake City, Utah, Police Department (retired)

- Sheriff Jerry Clayton, Washtenaw County, Michigan, Sheriff's Office

- Ronald Davis, Former Director, United States Department of Justice, Office of Community Oriented Policing Services (COPS Office); Chief (Ret.), East Palo Alto, California, Police Department

- Commissioner William Evans, Boston, Massachusetts, Police Department

- Chief Kenneth Ferguson, Framingham, Massachusetts, Police Department

- Asst. Chief Randy Gaber, Madison, Wisconsin, Police Department

- Sheriff Edward Gonzalez, Harris County, Texas, Sheriff's Office

- Chief Ronald Haddad, Dearborn, Michigan, Police Department

- Sheriff Mike Haley, Washoe County, Nevada, Sheriff's Office (retired)

- Chief Chris Magnus, Tucson, Arizona, Police Department

- Sheriff Bill McCarthy, Polk County, Iowa, Sheriff's Office

- Lieutenant Andy Norris, Tuscaloosa County, Alabama, Sheriff's Office

- Sheriff Joe Pelle, Boulder County, Colorado, Sheriff's Office

---

[*] Affiliations of individual amici are provided for identification purposes only.

- Director Mark Prosser, Storm Lake, Iowa, Department of Public Safety

- Commissioner Charles Ramsey, Philadelphia, Pennsylvania Police Department (retired)

- Chief Celestino Rivera, Lorain, Ohio, Police Department

- Chief Michael Tupper, Marshalltown, Iowa, Police Department

- Sheriff John Urquhart King County, Washington, Sheriff's Office

- Sheriff Lupe Valdez, Dallas County, Texas, Sheriff's Department

- Chief Roberto Villasenor, Tucson, Arizona, Police Department (retired)

- Sheriff Richard Wiles, El Paso County, Texas, Sheriff's Office

- Chief Jeri Williams, Phoenix, Arizona, Police Department