**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KIRSTJEN M. NIELSEN, in her official capacity as Secretary of Homeland Security, *et al.,*<br><br>Defendants. | No. 16-cv-4756 (NGG) (JO) |
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, *et al.,*<br><br>Defendants. | No. 17-cv-5228 (NGG) (JO) |

**BRIEF OF LEGAL SERVICES ORGANIZATIONS AS *AMICI CURIAE*
REGARDING HARM TO THEIR CLIENTS AND THE PUBLIC INTEREST IN
SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE .................................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................................... 2

I.   THE RESCISSION OF DACA CAUSES SIGNIFICANT HARM TO AMICI'S DACA CLIENTS, MOST OF WHOM HAVE NO VIABLE OPTION TO OBTAIN LEGAL IMMIGRATION STATUS AND AVOID DEPORTATION. ................................ 3

    A.   Most DACA Recipients Are Not Eligible for Humanitarian or Family-Based Forms of Immigration Relief ...................................................................... 5

    B.   DACA Recipients Are Not Eligible for Relief Based on Their Length of Time in the U.S., No Matter How Well-Spent. ................................................... 8

    C.   Without DACA, Most DACA Recipients Will Become Undocumented and Suffer Significant Related Harms. ............................................................ 9

II.   THE RESCISSION OF DACA CAUSES FEAR IN THE COMMUNITY ABOUT ACCESSING PUBLIC SERVICES, WHICH HARMS THE PUBLIC INTEREST. .......... 12

    A.   DACA Recipients and Other Immigrants Are Afraid to Access Health and Other Social Services, and to Attend School, Out of Fear of Deportation. .............. 12

    B.   When Immigrants Are Afraid to Access Services, Public Health, Safety, and Community Economic Interests Are Negatively Impacted. ..................................... 17

CONCLUSION ......................................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ayeni v. Holder*,
  617 F.3d 67 (1st Cir. 2010)....................................................................................8

*Gomez-Perez v. Holder*,
  569 F.3d 370 (8th Cir. 2009)...............................................................................8, 9

*Hernandez v. Gonzalez*,
  437 F.3d 341 (3d Cir. 2006).................................................................................8, 9

*Tejado v. Holder*,
  776 F.3d 965 (8th Cir. 2015)................................................................................8

**Statutes and Regulations**

8 U.S.C. § 1101(a)(42)................................................................................................5

8 C.F.R. § 204.11.......................................................................................................5

INA § 101 ...............................................................................................................5, 6

INA § 201 ...................................................................................................................5

INA § 203 ...................................................................................................................5

INA § 212 ................................................................................................................6, 7

INA § 240A ................................................................................................................8

INA § 241 ...................................................................................................................5

INA § 244(a) (1994) (repealed 1996) .......................................................................8

INA § 245 ...................................................................................................................6

**Legislative Materials**

H.R. 1918, 107th Cong. (2001)..................................................................................3

H.R. 5131, 109th Cong. (2006)..................................................................................3

H.R. 1275, 110th Cong. (2007)..................................................................................3

H.R. 1842, 112th Cong. (2011)..................................................................................3

H.R. 1468, 115th Cong. (2017) ............................................................................3

H.R. 3591, 115th Cong. (2017) ............................................................................3

S. 1291, 107th Cong. (2001) ...............................................................................3

S. 1545, 108th Cong. (2003) ...............................................................................3

S. 2075, 109th Cong. (2005) ...............................................................................3

S. 2205, 110th Cong. (2007) ...............................................................................3

S. 729, 111th Cong. (2010) .................................................................................3

S. 3992, 111th Cong. (2010) ...............................................................................3

S. 952, 112th Cong. (2011) .................................................................................3

S. 1615, 115th Cong. (2017) ...............................................................................3

*Report and analysis of immigration and nationality law*, 2. Senate Judiciary
    Subcommittee Holds Hearing on the DREAM Act, 88 No. 25 Interpreter Releases
    1594 (July 4, 2011) ......................................................................................3

## Administrative & Executive Materials

Letter from Secretary Jeh Johnson, U.S. Dep't of Homeland Sec., to Honorable Judy
    Chu, U.S. House of Rep. (Dec. 30, 2016) .................................................10

Memorandum from Acting Secretary Elaine C. Duke, Memorandum on Rescission of
    Deferred Action for Childhood Arrivals (DACA) (Sept. 5, 2017) ..................... *passim*

Memorandum from Secretary Janet Napolitano, *Exercising Prosecutorial Discretion
    with Respect to Individuals Who Came to the United States as Children* (June 15,
    2012) ..........................................................................................................4

Supplemental Nutrition Assistance Program (SNAP), United States Department of
    Agriculture:  Food and Nutrition Service (Jan. 30, 2017) ...........................16

United States Citizenship and Immigration Services, DACA Frequently Asked
    Questions .............................................................................................7, 12

Visa Bulletin for October 2017, U.S. Dep't of State, Bureau of Consular Affairs
    (Sept. 11, 2017) .......................................................................................6

Women, Infants, and Children (WIC), United States Department of Agriculture:
    Food and Nutrition Service (Aug. 15, 2017) ............................................16

**Other Authorities**

Annie Lowrey, *Trump's anti-immigrant policies are scaring families away from the safety net*, The Atlantic (Mar. 24, 2017) ..........................................................15, 16, 17

Anna North, *DACA helped some immigrants finally get health care. Now they could lose it*, Vox (Sept. 28, 2017) ...........................................................................13, 17

Bill Ong Hing, *Immigration Sanctuary Policies: Constitutional and Representative of Good Policing and Good Public Policy*, 2 IRVINE L. REV. 247 (2012) .......................18

Caitlin Dickerson, *For DACA Recipients, Losing Protection and Work Permits Is Just the Start*, The New York Times (Sept. 7, 2017) ................................................9, 10, 11

Carolyn Jones, *Immigration crackdown taking heavy toll on California students*, San Jose Mercury News (Oct. 5, 2017) ................................................................15

*Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, 1465 United Nations Treaty Series (Dec. 10, 1984) ....................................5

Dara Lind, *What happens to a family when they have equal rights, and then lose them?* Vox (Dec. 14, 2017) ...................................................................................15

David Becerra, *et al.*, *Fear vs. Facts: Examining the Economic Impact of Undocumented Immigrants in the U.S.*, 39 J. SOC. & SOC. WELFARE 111 (2012) ........................18

Debra J. Robbin, *When Undocumented Immigrants Don't Report Crime, We All Suffer*, WBUR (Sept. 22, 2017) ...................................................................18

*Deferred Action for Childhood Arrivals (DACA): Funding Opportunities for Philanthropy*, Grantmakers Concerned with Immigrants and Refugees (Oct. 29, 2017) ..........................................................................................................4

Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, The New York Times (Apr. 30, 2017) ....................................................................14

Jessica Ferger, *Rescinding DACA Could Spur a Public Health Crisis, from Lost Services to Higher Rates of Depression, Substance Abuse*, Newsweek (Sept. 6, 2017) ..........................................................................................................10

Jose Magaña-Salgado, *et al., Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center (Oct. 2017) ..........................................................................................10

Julia Carrie Wong, *Fear and uncertainty for Dreamers as DACA ends: "Where am I going to go?*, The Guardian (Sept. 5, 2017) ..........................................................11

Julianne Zuber, *Healthcare for the Undocumented: Solving a Public Health Crisis in the U.S.*, 28 J. CONTEMP. HEALTH L. & POLICY 350 (2012) ..................................17, 18

iv.

Leisy J. Abrego, *Legal Consciousness of Undocumented Latinos: Fear and Stigma as Barriers to Claims-Making for First- and 1.5-Generation Immigrants*, 45 LAW & SOC'Y REV. 337 (2011) ................................................................................18

Madeline Kenney, *Berwyn grandmother of 10 facing deportation sues DHS over visa delay*, Chicago Sun Times (Sept. 18, 2017).................................................................6

Mark Keierleber, *Trump's immigration crackdown is traumatizing a generation of children*, The Guardian (Aug. 23, 2017).....................................................................15

Priscilla Alvarez, *Will DACA Parents Be Forced to Leave Their U.S.-Citizen Children Behind?*, The Atlantic (Oct. 21, 2017) .........................................................11

Results from Tom K. Wong, *et al.*, *2017 National DACA Study*, CENTER FOR AMERICAN PROGRESS (Aug. 28, 2017) ...............................................................2, 7, 10

Richard Gonzales, *DACA Recipients Worry What The Government Will Do With Their Private Information*, NPR (Sept. 9, 2017) .........................................................12

Stephanie Kuo, *Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times*, Houston Public Media (Sept. 15, 2017)..........................13

Susana Martinez and Sheila Neville, *Help for Undocumented Victims of Crime*, 44 CLEARINGHOUSE REV. 129 (2010) ..................................................................18

Tom K. Wong *et al.*, *Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey*, 2 J. OF MIGRATION AND HUMAN SECURITY 4 (2014) ......................5, 9

Virginia Fay, *Back Into the Shadows: Immigrants Retreat From Needed Services as Deportation Fears Loom*, KQED News (June 15, 2017) .................................13, 14, 15

## INTEREST OF AMICI CURIAE[1]

*Amici* are legal services organizations that provide immigration legal services.[2]  *Amici* include the following twenty-three organizations: Asian Law Alliance, Brooklyn Defender Services, Canal Alliance, Centro Legal de la Raza, Children's Law Center of Massachusetts, Community Legal Services in East Palo Alto (CLSEPA), Dolores Street Community Services, East Bay Sanctuary Covenant, Heartland Alliance's National Immigrant Justice Center (NIJC), Hebrew Immigrant Aid Society (HIAS) Pennsylvania, Immigrant Legal Resource Center (ILRC), Just Neighbors, Legal Aid Justice Center, Legal Aid Society of San Mateo County, Legal Services for Children (LSC), Justice Center of Southeast Massachusetts, Massachusetts Law Reform Institute (MLRI), National Justice for Our Neighbors, New York Legal Assistance Group, Northwest Immigrant Rights Project, OneJustice, Rocky Mountain Immigrant Advocacy Network, and Services, Immigrant Rights, and Education Network (SIREN).  Many of *amici*'s clients are youth who were eligible for the recently rescinded Deferred Action for Childhood Arrivals ("DACA") program.  *Amici* provide legal counseling to these youth to guide them through the intricacies of the immigration system.  As a result of their interaction with undocumented immigrants generally and DACA-eligible individuals in particular, *amici* understand the complex legal challenges now facing DACA grantees in light of the rescission of DACA and have observed the negative effects on their clients.[3]  They are well-positioned to articulate the nature of the irreparable harm at issue and the reasons an injunction serves the public interest.[4]

---

[1] The Court has granted *amici*'s motion for leave to file this brief. *See* Mot. for Leave to File *Amicus* Br., Dkt. 148 in 16-CV-4756; Dkt. 121 in 17-CV-5228; Order dated Dec. 21, 2017.
[2] Descriptions of each *amicus* organization are provided in Appendix A.
[3] Some legal services organizations and related public interest organizations experience harm themselves, as institutions.  This issue is addressed in an *amicus* brief to be filed by another set of *amici*. *See* Mot. for Leave to File *Amicus* Br., Dkt. 176 in 16-CV-4756 and Dkt. 147in 17-CV-5228.
[4] Counsel for *amici* have interviewed and received information from the legal services organizations that are filing

1

## SUMMARY OF ARGUMENT

The rescission of the DACA program announced by the Department of Homeland Security ("DHS") on September 5, 2017[5] causes real and imminent harm to young people who were eligible for protection from deportation under DACA.  More than half of these DACA-eligible individuals were six years old or younger when they first came to the United States; all were younger than sixteen years old.  Results from Tom K. Wong *et al.*, *2017 National DACA Study*, CENTER FOR AMERICAN PROGRESS at 9 (Aug. 28, 2017) ("*2017 National DACA Study*").[6] These young people now face a frightening and uncertain future in the United States, despite prior assurances by the government that by coming forward and applying for DACA, they would be protected from negative immigration enforcement action.

The vast majority of DACA grantees will be left without any protection from deportation when their current status expires.  DACA grantees will also lose work authorization, leading them to lose their jobs, health insurance, and countless other benefits.  Losing DACA will force many of them into a life of hiding and constant fear of removal from the only country they have ever known.

The decision to rescind DACA has intensified fear of accessing vital services in the immigrant community.  As their DACA status expires, DACA recipients will join the ranks of immigrants who have no protection against deportation and are afraid that if they go to school or work, access medical services, or report a crime, they will become targets for deportation.  This fear is not only harmful to those directly affected but also dangerous for public health and safety.

---

this brief.  Information throughout the brief that relates to these organizations' clients was obtained through these interviews and related requests for information.
[5] Memorandum from Acting Secretary Elaine C. Duke, *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)* (Sept. 5, 2017) ("Rescission Memorandum"), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.
[6] *Available at* https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf.

A preliminary injunction prohibiting the government from enforcing the Rescission Memorandum and from using information obtained in any DACA application, except as previously provided under the DACA program, is necessary in order to prevent irreparable harm to this community of young immigrants and is in the public interest.

## ARGUMENT

I.   **THE RESCISSION OF DACA CAUSES SIGNIFICANT HARM TO *AMICI'S* DACA CLIENTS, MOST OF WHOM HAVE NO VIABLE OPTION TO OBTAIN LEGAL IMMIGRATION STATUS AND AVOID DEPORTATION.**

The rescission of DACA will put DACA recipients at risk for deportation and strip them of their eligibility for work permits.  Without DACA, most DACA recipients are ineligible for any protection from deportation under current law.  Indeed, DACA was only necessary because Congress failed to pass the Development, Relief, and Education for Alien Minors Act ("DREAM Act"),[7] which would have created a path to citizenship for many DACA-eligible individuals, commonly referred to as "Dreamers."  The DREAM Act's proponents sought to provide a much-needed legal solution for undocumented young people who had been present in the United States from childhood, and, in some cases were not aware until adulthood of their lack of status. Proponents recognized that Dreamers grew up in the U.S. but had no other option for staying legally in the United States.  *Report and analysis of immigration and nationality law*, 2. Senate Judiciary Subcommittee Holds Hearing on the DREAM Act, 88 No. 25 Interpreter Releases 1594 (July 4, 2011).  Congress attempted (but failed) to pass legislation (including the DREAM Act) protecting this class of young immigrants approximately fourteen times since 2001, both as stand-alone legislation and as part of comprehensive immigration reform.[8]

---

[7] H.R. 1842, 112th Cong. (2011); S. 952, 112th Cong. (2011).

[8] *See, e.g.*, H.R. 1918, 107th Cong. (2001); S. 1291, 107th Cong. (2001); S. 1545, 108th Cong. (2003); S. 2075, 109th Cong. (2005); H.R. 5131, 109th Cong. (2006); S. 2205, 110th Cong. (2007); H.R. 1275, 110th Cong. (2007); S. 729, 111th Cong. (2010); S. 3992, 111th Cong. (2010); H.R. 1842, 112th Cong. (2011); S. 952, 112th Cong. (2011); H.R. 1468, 115th Cong. (2017); H.R. 3591, 115th Cong. (2017); S. 1615, 115th Cong. (2017).

In response to Congress's failed attempts to provide relief to these young immigrants, President Obama issued an Executive Order in June 2012 enacting DACA.  *See* Memorandum from Secretary Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012).[9]  DACA granted a renewable two-year period of deferred action (protection from deportation) and work authorization.  *Id.*  Although DACA does not offer a path to legal status or citizenship, "it provides tangible opportunities for young immigrants to participate more fully in our society and economy."  *Deferred Action for Childhood Arrivals (DACA):  Funding Opportunities for Philanthropy*, Grantmakers Concerned with Immigrants and Refugees (Oct. 29, 2017).[10]  The DACA program allowed recipients to live without fear of deportation and to overcome many of the hardships associated with undocumented status.

When their current period of deferred action expires, DACA recipients will be cast back into legal uncertainty, without any protection from deportation.  Their loss is substantial and the consequences are dire:  they will lose the ability to remain legally in the U.S. and will have no means of earning a living.  Most DACA recipients do not qualify for any form of immigration relief, such as humanitarian-based forms of relief or family-based visas.  And for the few who may qualify for other relief, successfully *obtaining* relief is nearly impossible under current immigration law.  Thus, for the vast majority of DACA grantees*, there is no other option* and they will become undocumented when their deferred status expires.

---

[9] *Available at* https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.
[10] *Available at*
https://www.gcir.org/sites/default/files/resources/GCIR%20DACA%20Funding%20Opportunities_1.pdf.

**A.      Most DACA Recipients Are Not Eligible for Humanitarian or Family-Based Forms of Immigration Relief.**

Very few DACA recipients are eligible for immigration relief under current law. *Amici* routinely screened DACA-eligible individuals for humanitarian and family-based forms of relief before providing assistance applying for DACA,[11] but most DACA recipients had not suffered the requisite trauma to qualify for humanitarian forms of relief, and did not qualify for family-based relief.[12] The majority of DACA recipients do not qualify for other immigration options, such as student or work visas, either. Indeed, a 2014 study found that only 14.3% of DACA-eligible young people potentially qualified for any other form of relief. Tom K. Wong, *et al.*, *Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey*, 2 J. OF MIGRATION AND HUMAN SECURITY 4, 287-304 (2014). The rescission of DACA therefore leaves the vast majority of DACA recipients without any protection from deportation.

Humanitarian-based options are narrowly tailored forms of relief that typically require that applicants suffered significant trauma in their country of origin or in the U.S. For example, asylum and its related forms of relief require that applicants suffered or will suffer extreme harm in their countries of origin.[13] 8 U.S.C. § 1101(a)(42); INA § 101(a)(42)(A).[14] Similarly, Special Immigrant Juvenile Status ("SIJS") confers status on young immigrants who have been abused, abandoned or neglected. INA § 101(a)(27); 8 C.F.R. § 204.11. "U" and "T" visas provide relief

---

[11] Ruling out other forms of relief was a crucial part of the DACA application process, as many other forms of relief, unlike DACA, confer a path to legal permanent residence and citizenship.

[12] To qualify for family-based relief, applicants must be an *immediate relative*, defined as a spouse, unmarried child under 21, or a parent (if the child is 21 years or older) of a U.S. citizen. INA § 201(b)(2)(A)(i). Older and married children of U.S. citizens and spouses and unmarried children of lawful permanent residents are also eligible for visas, but are subject to numerical limitations each year. INA § 203.

[13] Asylum applicants often seek withholding of removal and relief under the Convention Against Torture as well. INA § 241(b)(3); *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, 1465 United Nations Treaty Series at 85 (Dec. 10, 1984), https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-9&chapter=4&lang=en.

[14] The Immigration and Nationality Act ("INA") is comprised of a series of sections of Title 8 of the United States Code ("USC"). Hereinafter, federal immigration statutes are only referenced to their INA classification.

for victims of certain qualifying crimes and human trafficking, respectively, while the Violence

Against Women Act ("VAWA") allows certain battered spouses, children, and parents to petition

for legal status without the involvement of their abusive spouse, parent, or child.  INA §

101(a)(15)(U) (U Visas); INA § 101(a)(15)(T) (T visas); INA § 245 (VAWA).[15]  But individuals

who spent most of their lives in the United States and have not experienced significant harm or

violence in their lives simply do not qualify for these forms of relief.

Most DACA grantees are not eligible for family-based immigration relief because they

do not have a qualifying relative.  Among the few DACA recipients who do have a qualifying

relative, many are not eligible to apply to adjust status from within the country because they last

entered the country without permission.[16]  As a result, these DACA recipients would have to

leave the country to apply for a family-based visa, and then would face strict bars to re-entry, due

to their previous "unlawful presence" in the United States.[17]  INA § 212(a)(9)(B)-(C).

Undocumented immigrants who have accrued unlawful presence are barred from re-entry for

three years, ten years, or permanently, depending on their length of unlawful presence and

number of entries.  INA §§ 212(a)(9)(B)(i)(I)-(II) and 212(a)(9)(C).  Those who entered the

---

[15] Even in the rare situation that a DACA-eligible individual qualifies for an alternative form of relief, the waiting time for that relief can be many years.  For example, the current waiting time for a U visa is approximately five to ten years.  Even an interim work permit through a U visa application currently takes about three years to process, and individuals waiting for U visa approval have been subjected to enforcement by Immigration and Customs Enforcement ("ICE") during this waiting period.  *Amici* and others report that U visa applicants have been detained in recent months despite having a pending U visa applications.  *See also* Madeline Kenney, *Berwyn grandmother of 10 facing deportation sues DHS over visa delay*, Chicago Sun Times (Sept. 18, 2017), https://chicago.suntimes.com/chicago-politics/berwyn-grandmother-of-10-facing-deportation-sues-dhs-over-visa-delay/.

[16] Family-based petitions also take years to process.  Seventy-eight percent of DACA recipients are from Mexico. The government is currently processing visa petitions filed in March 1996 for unmarried Mexican sons and daughters of U.S. citizens.  Visa Bulletin for October 2017, U.S. Dep't of State, Bureau of Consular Affairs (Sept. 11, 2017), https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2018/visa-bulletin-for-october-2017.html.

[17] "Unlawful presence" is when an undocumented immigrant "is present in the United States after the expiration of the period of stay authorized . . . or is present within the United States without being admitted or paroled."  INA § 212(a)(9)(B)(ii).

country more than once without inspection and have been unlawfully present for a total of more than one year are *permanently* barred.  INA § 212(a)(9)(C).

DACA recipients do not continue to accrue "unlawful presence" once their DACA application is approved—but, once their DACA status expires, they will again accrue unlawful presence.  *See* United States Citizenship and Immigration Services, DACA Frequently Asked Questions ("USCIS DACA FAQs"), Question 1.  Most DACA recipients have already accrued some unlawful presence and are subject to time bars.  Accrual of "unlawful presence" for the purpose of the three and ten year bars begins once an undocumented immigrant turns 18.  INA §§ 212(a)(9)(B)(iii)(I).  Therefore, DACA recipients would have accrued "unlawful presence" between the time they turned 18 and the date they received protection from deportation, *i.e.*, the date their DACA application was approved.  Because the average age of a DACA grantee in 2017 is 25 years old, and DACA was implemented in 2012, an average DACA grantee who applied for DACA as soon as it was available was 20 years old at the time of application and thus would have accrued two years of unlawful presence (from the time they were 18 in 2010 until they received the DACA grant in 2012).  *See 2017 National DACA Study* at 13.  This would result in a ten-year bar to re-entering the United States.  INA §§ 212(a)(9)(B)(iii)(II).  Even the three and ten year bars, in practice, are complete barriers to relief, because applicants would need to leave their families, jobs, schools, and for most, the only country they have ever known, in order to wait out the time-bar.  The standards for obtaining a waiver of unlawful presence are so difficult to meet that even for the very few DACA recipients who might qualify for family-based adjustment of status, it is an illusory form of relief at best.

7

**B.     DACA Recipients Are Not Eligible for Relief Based on Their Length of Time in the U.S., No Matter How Well-Spent.**

Contrary to popular perception, there is no form of relief available to young immigrants on the basis that they have lived in the United States for most of their lives, even if they have been exemplary members of the community and excelled academically.  DACA also did not create a "loophole" by which eligible young people could "cut in line" for relief for which they would have had to wait longer if they had stayed in their home countries.  Rather, DACA provided young people who were already here and had no viable recourse for immigration relief with temporary work permits and protection from deportation.

Prior to immigration reform in 1996, immigrants in deportation proceedings could ask an immigration judge to grant "suspension of deportation," which took the "good moral character" of an immigrant into account.[18]  This form of relief was only available if an immigrant was in removal proceedings *and* would either endure extreme hardship if deported or had a U.S. citizen or a lawful permanent resident ("LPR") family member who would endure extreme hardship if the applicant were deported.  In 1996, Congress eliminated "suspension of deportation," and replaced it with a form of cancellation of removal that removed consideration of hardship to the applicant and imposed a higher burden on the applicant to show hardship to a U.S. citizen or LPR family member.[19]  INA § 240A(b); *see Hernandez v. Gonzalez*, 437 F.3d 341, 346-47 (3d

---

[18] "Suspension of deportation" required:  (1) continuous physical presence in the U.S. for at least seven years; (2) good moral character during those seven years; and (3) that deportation would result in extreme hardship to the applicant or the applicant's citizen or lawful permanent resident spouse, parent, or child.  INA § 244(a) (1994) (repealed 1996).

[19] Most applicants are unable to avoid deportation through cancellation of removal unless they can show that deportation would result in "exceptional and extremely unusual hardship" to a U.S. citizen or LPR spouse, parent or child.  INA § 240A.  This standard is a very demanding one that generally requires a showing that a U.S. citizen or LPR family member suffers from a severe chronic medical condition and requires special medical attention and financial support.  *See Ayeni v. Holder*, 617 F.3d 67, 67, 73 (1st Cir. 2010) (upholding lower court decision that even evidence of petitioner's inability to provide medical care for his children's chronic and serious health issues, which included severe asthma, migraine headaches, and attention deficit hyperactivity disorder, did not meet hardship standard).  Demonstrating that emotional harm will be caused by the separation of family members or financial hardship is insufficient.  *Tejado v. Holder*, 776 F.3d 965, 969 (8th Cir. 2015) (emotional harm); *Gomez-Perez v.*

8

Cir. 2006) (noting the "practical effect . . . [is] that a far larger number of immigrants are now removable under the new law, while a much smaller number are eligible for any form of relief from removal"). As with "suspension of deportation," only immigrants in removal proceedings and with a qualifying relative (hardship to the applicant is no longer sufficient) are able to seek cancellation of removal. Given that most DACA recipients do not have a qualifying relative at all (Wong, *Paths to Lawful Immigration Status*), no less a qualifying relative who would endure extreme hardship, this option is inapplicable to most DACA recipients.

As a result, for the vast majority of DACA recipients who do not qualify for humanitarian or family-based immigration relief, there is no procedure, other than DACA, to protect them from deportation.

### C.   Without DACA, Most DACA Recipients Will Become Undocumented and Suffer Significant Related Harms.

Given the small number of DACA recipients who actually qualify for immigration relief and the legal hurdles faced by the small minority of those that do qualify, the reality is that most DACA recipients will become undocumented as a result of the Rescission Memorandum. They will not be able to work legally and will not have any protection from deportation—and will suffer numerous harms as a result. The elimination of DACA "reverberate[s] far beyond th[e] privileges" of legally living and working in the United States. Caitlin Dickerson, *For DACA Recipients, Losing Protection and Work Permits Is Just the Start*, The New York Times (Sept. 7, 2017) (*"Losing Protection"*).[20]

The positive impact of the DACA program—both to its recipients and to American society more generally—should not be underestimated. "Since DACA began, thousands of

---

*Holder*, 569 F.3d 370, 373 (8th Cir. 2009) (financial hardship).
[20] *Available at* https://www.nytimes.com/2017/09/07/us/daca-losses-immigration.html.

Dreamers have been able to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."  Letter from Secretary Jeh Johnson, U.S. Dep't of Homeland Sec., to Honorable Judy Chu, U.S. House of Rep. (Dec. 30, 2016).[21]  After the implementation of DACA, approximately 80% of DACA grantees obtained driver's licenses for the first time.  *2017 National DACA Study* at 9.  Many also obtained financial aid for higher education.  *See* Dickerson, *Losing Protection*.  Further, after receiving DACA, approximately 65% of DACA grantees age 25 and under and approximately 54% of DACA grantees over age 25 pursued educational opportunities they previously could not pursue.  *2017 National DACA Study* at 7.  Approximately 70% of DACA recipients "earn[ed] more money, which . . . helped [them] become financially independent."  *Id*. at 3.  As the result of their employment, many DACA recipients also obtained employer-based health insurance.[22]  *See* Jessica Ferger, *Rescinding DACA Could Spur a Public Health Crisis, from Lost Services to Higher Rates of Depression, Substance Abuse*, Newsweek (Sept. 6, 2017).[23]  These benefits that DACA recipients have relied on, benefits that many U.S. citizens "take for granted and cannot even imagine living without," will disappear with the rescission of DACA.  Dickerson, *Losing Protection.*  For DACA recipients, this will result in undeniable harm as it will mean an inability

---

[21] *Available at* https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.

[22] Rescinding DACA will also have a significant economic effect, as employers will have to terminate the employment of DACA grantees once their deferred status expires. This will result in a reduction in contributions made to Social Security and Medicare, both by the employee and employer, of approximately $39.3 billion over 10 years.  Jose Magaña-Salgado, et al., *Draining the Trust Funds*: *Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center at 2, 9 (Oct. 2017), https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf.

[23] *Available at* http://www.newsweek.com/daca-immigration-heath-care-access-mental-health-660539.

to continue their education, support themselves and their families financially, and "keep a roof over their heads." *Id.*

Many DACA recipients will also be forced to make heart-breaking decisions about the future of their families, and in particular of their U.S. citizen children. DACA recipients who are parents must choose whether to take their U.S. citizen children with them if they are deported, or face long-term and possibly permanent separation. Priscilla Alvarez, *Will DACA Parents Be Forced to Leave Their U.S.-Citizen Children Behind?*, The Atlantic (Oct. 21, 2017) (because of the rescission of DACA, an estimated 200,000 children are now at risk of losing their DACA recipient parents).[24] If they decide to leave their U.S. citizen children in the U.S., they need to make legal, practical, and financial arrangements for the care of their children. DACA recipients who may be subject to deportation must also spend time and resources to protect their property, assets, and finances in case they are deported. These harms are not speculative. A recent study profiled a DACA recipient who "was born in Mexico, but came to the U.S. at the age of nine. She received DACA when she was studying for a master's degree at Stanford. She bought a house, married another DACA recipient, and has two children who are U.S. citizens." Julia Carrie Wong, *Fear and uncertainty for Dreamers as DACA ends: "Where am I going to go?*," The Guardian (Sept. 5, 2017).[25] This DACA recipient is not eligible for immigration relief, so she and her partner are having to consider options "to protect [their] daughters in case [they] are deported." *Id.* at 2. *Amici* are aware of countless similar situations among their clients, which cause a significant amount of stress and anxiety.

---

[24] *Available at* https://www.theatlantic.com/politics/archive/2017/10/donald-trump-daca/543519/.
[25] *Available at* https://www.theguardian.com/us-news/2017/sep/05/dreamers-daca-trump-ends-program-fears-for-future

The rescission of DACA creates significant turmoil for DACA recipients and their families, who have planned their futures around the promises of DACA.  Now, most will once again become undocumented immigrants, with all the uncertainty and anxiety that entails, and without the ability to work legally, obtain health insurance, legally drive in many states, pay for college, purchase homes, and make plans for their lives.[26]

## II.   THE RESCISSION OF DACA CAUSES FEAR IN THE COMMUNITY ABOUT ACCESSING PUBLIC SERVICES, WHICH HARMS THE PUBLIC INTEREST.

In light of a political climate increasingly hostile to immigrants, intensified by the rescission of DACA, many in the immigrant community are understandably fearful of deportation and afraid to access services.  When DACA protections expire, *amici*'s DACA clients will no longer be protected from deportation and, like other undocumented immigrants, may be afraid to access services.  This situation endangers public health and safety.

### A.   DACA Recipients and Other Immigrants Are Afraid to Access Health and Other Social Services, and to Attend School, Out of Fear of Deportation.

In the wake of recent increasing immigration enforcement activity and the Rescission Memorandum, there is evidence that anxiety is causing undocumented immigrants, including DACA recipients, to avoid utilizing health services and refrain from reporting crimes.  Some members of the immigrant community are even avoiding school and work.  For example, *amicus* organization Centro Legal de la Raza has a client whose family members stopped working

---

[26] DACA recipients are at even more risk than other undocumented immigrants because they provided personal and sensitive information to the government as part of the DACA application process, including addresses, employers, photos, and fingerprints.  Now, the government has stated that although the personal information will not be "proactively provided" to other law enforcement entities and ICE, that may change and be "rescinded at any time without notice." *See* USCIS DACA FAQs at Question 8; Richard Gonzales, *DACA Recipients Worry What The Government Will Do With Their Private Information*, NPR (Sept. 9, 2017), http://www.npr.org/2017/09/09/549678003/daca-recipients-worry-what-the-government-will-do-with-their-private-information.

because of fear of workplace raids.  Several *amici* organizations have been providing "Know

Your Rights" presentations in order to alleviate these concerns in the community.

   Many undocumented immigrants avoid visiting hospitals or clinics for fear of

deportation.  *See* Anna North, *DACA helped some immigrants finally get health care.  Now they*

*could lose it*, Vox (Sept. 28, 2017) ("*DACA helped get health care*").[27]  For example,

undocumented immigrant women may not access necessary prenatal health care, which can lead

to a wide range of detrimental health outcomes.  North, *DACA helped get health care*.

Anecdotal evidence demonstrates that avoidance behavior, motivated by fear, abounds.  As one

non-profit organization observed, "[w]hat we're finding and hearing from all over the country is

a huge concern about whether or not seeking routine care and preventative care as well as care

for their children, who may be documented, is going to put those families in jeopardy of

deportation . . . .  What we heard was a real significant uptick in no-show rates."  Stephanie Kuo,

*Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times*,

Houston Public Media (Sept. 15, 2017).[28]  Indeed, fear of deportation is so strong that one

undocumented immigrant woman stopped accessing and receiving cancer treatments because she

was terrified of being identified and detained if she continued using health services given reports

of increased immigration enforcement.  Virginia Fay, *Back Into the Shadows: Immigrants*

*Retreat From Needed Services as Deportation Fears Loom*, KQED News (June 15, 2017) ("*Back*

*Into the Shadows*").[29]  *Amici* have observed this phenomenon, as well.  Medical professionals

have informed *amicus* organization ILRC that undocumented immigrants treated in emergency

---

[27] *Available at* https://www.vox.com/identities/2017/9/28/16351866/daca-health-care-reproductive-health-undocumented-immigrants.

[28] *Available at* https://www.houstonpublicmedia.org/articles/news/2017/09/15/237573/undocumented-immigrants-putting-health-on-hold-out-of-fear-anxiety-in-uncertain-times/.

[29] *Available at* https://ww2.kqed.org/news/2017/06/15/back-into-the-shadows-immigrants-retreat-from-needed-services-as-deportation-fears-loom/.

rooms have failed to return to the hospital for critical follow-up treatment out of fear of deportation.

Undocumented immigrants are also increasingly afraid to report crimes to law enforcement, fearing that any interaction with a governmental entity could lead to deportation. Police departments across the nation worry about how the increasingly fearful climate will affect their relationships with immigrant communities and their ability to solve crimes. As one police captain explained, undocumented immigrants "will see law enforcement and the justice system as something that is now less accessible . . . and potentially threatening . . . because they're concerned that the federal government will somehow get that information and use it to deport them." *Id.* Police in many major cities have observed significantly decreased reporting of sexual and domestic violence by Latina women during the first few months of 2017, compared to the same time period in 2016. *Id.* (sharp downturn in Houston, Los Angeles, and San Francisco); *see also* Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, The New York Times (Apr. 30, 2017) (sharp downturn in cities in Colorado and Maryland).[30] Advocates report that many domestic violence survivors who are undocumented are too afraid of contact with police to seek life-saving restraining orders, report abuse, or seek U visas. Fay, *Back Into the Shadows*. They further note that undocumented survivors are even afraid to stay at shelters. *Id.* When "survivors do come in for help, they are often so scared that they won't stay more than a few days or a week." *Id. Amicus* organizations report experiences with multiple clients who have endured horrific domestic violence but are too afraid to report the abuse due to their immigration status. Some immigrants are even afraid to come to *amici*'s offices to be screened for immigration relief, for fear of encountering ICE.

---

[30] *Available at* https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html.

14

Fear in the community has led to increased absenteeism among immigrant students in schools across the nation. *See* Carolyn Jones, *Immigration crackdown taking heavy toll on California students*, San Jose Mercury News (Oct. 5, 2017) ("*Immigration crackdown taking heavy toll*");[31] Mark Keierleber, *Trump's immigration crackdown is traumatizing a generation of children*, The Guardian (Aug. 23, 2017)[32] (noting that school officials from New York to New Mexico are preparing for "increased anxiety and absenteeism among students of immigrant families" and that more and more students are dropping out of school). Educators have also observed that some students are having increased difficulty concentrating in the classroom as a result of recent anti-immigration policies. Jones, *Immigration crackdown taking heavy toll; see also* Dara Lind, *What happens to a family when they have equal rights, and then lose them?* Vox (Dec. 14, 2017) (reporting incidences of elementary school students coming to the office administrator "wracked with sudden anxiety that their parents won't be there when they come home"). Some immigrant parents have even expressed fear of sending their children to school, in case "they're taken in an ICE raid during the day and their children have no one to return home to." Fay, *Back Into the Shadows*.

Immigrant families are also reluctant to access social services due to fear of deportation. Social scientists have pointed out that "anti-immigrant sentiment and increased deportation activity has had a long history of causing eligible families to drop out and shy away" from safety net programs. Annie Lowrey, *Trump's anti-immigrant policies are scaring families away from the safety net*, The Atlantic (Mar. 24, 2017) ("*Trump's anti-immigrant policies*").[33] In many

---

[31] *Available at* http://www.mercurynews.com/2017/10/05/immigration-crackdown-taking-heavy-toll-on-california-students/?platform=hootsuite.

[32] *Available at* https://www.theguardian.com/us-news/2017/aug/23/us-immigration-children-schools-trump.

[33] *Available at* https://www.theatlantic.com/business/archive/2017/03/trump-safety-net-latino-families/520779/?utm_source=nl-atlantic-weekly-032417.

cases, families eligible for these vital programs have mixed immigration status—for example,

"undocumented parents with children with birthright citizenship."[34]  *Id.*  Eligible mixed-status

families are declining to enroll in, or even un-enrolling from programs such as the Supplemental

Nutrition Assistance Program ("SNAP")[35] and Women, Infants, and Children ("WIC"), out of

fear that enrollment will put undocumented family members at risk of deportation.[36]  Lowrey,

*Trump's anti-immigrant policies*.  Eligible families are withdrawing from other anti-poverty

programs as well.  *Id.*  For instance, Eisner Health, a health care provider, compared monthly

enrollment averages from December 2016 through February 2017 with data from 2016, and

reported a 20% drop in food stamp enrollment, a 54% drop in Medicaid enrollment among

children, and an 82% drop in enrollment in a local health program.  *Id.*  Re-enrollment in these

programs has declined by 40%.  *Id.*  The community's avoidance of these crucial services will

likely result in "long-term consequences on the health, nutrition, and school performance of the

youngest members of these families," many of whom are U.S. citizens.  *Id.*

Even immigrants who have already received a form of relief from deportation, such as

asylum, are experiencing an uptick in anxiety.  Several *amici* have received calls from asylees

concerned that the DACA rescission might result in the revocation of their asylum status or mean

that they should take further steps to protect themselves from deportation.  Other clients are

afraid to apply affirmatively for any form of relief because they worry about what will happen if

relief is denied or later rescinded, like DACA.

---

[34] Such mixed immigration family status families are increasingly common—nearly six million citizen children live in such households.  *Id.*

[35] Supplemental Nutrition Assistance Program (SNAP), United States Department of Agriculture: Food and Nutrition Service (Jan. 30, 2017), https://www.fns.usda.gov/snap/supplemental-nutrition-assistance-program-snap.

[36] Women, Infants, and Children (WIC), United States Department of Agriculture:  Food and Nutrition Service (Aug. 15, 2017), https://www.fns.usda.gov/wic/women-infants-and-children-wic.

Due to the rescission of DACA, many young people are now thrust into the precarious position of considering whether accessing medical care, reporting crimes, going to school, or enrolling in social services could negatively affect their ability to remain in the United States. And for the immigrant community at large, the rescission of DACA has only worsened anxiety, in an era already fraught with uncertainty and fear.

**B.      When Immigrants Are Afraid to Access Services, Public Health, Safety, and Community Economic Interests Are Negatively Impacted.**

When individuals are too scared to seek essential services for fear of deportation, the risks for individual and public health safety increase significantly.  Indeed, the "administration's actions and directives ostensibly target the 11 million unauthorized immigrants who live in the United States, but they *will also harm millions of American citizens all across the country who live and work beside these immigrants every day*."  Lowrey, *Trump's anti-immigrant policies* (emphasis added).

Considerable risks to individual and public health are associated with the community's anxiety about accessing healthcare.  When individuals do not seek preventive care (including vaccines), fill vital prescriptions, or care for acute conditions until they experience an emergency, both the risk of public health crises and the price of health care can rise. "Ultimately, keeping undocumented immigrants from getting necessary health care is bad for everyone. . . . Health care is more expensive when people can't get it until they're very sick. And lack of health care increases the risk of chronic illness, which can make people unable to work or be active in their communities."  North, *DACA helped get health care; see also* Julianne Zuber, Healthcare for the Undocumented: *Solving a Public Health Crisis in the U.S.*, 28 J. CONTEMP. HEALTH L. & POLICY 350, 370 (2012) ("Placing barriers to accessing regular health care for undocumented immigrants threaten[s] community resilience because those with pre-

existing health conditions are more vulnerable to . . . severe effects from a disease outbreak or

public health emergency."). Moreover, anxiety and fear of the consequences of being

undocumented, including deportation and lack of future access to health care, could lead to acute

mental health concerns. *See* David Becerra, *et al.*, *Fear vs. Facts: Examining the Economic*

*Impact of Undocumented Immigrants in the U.S.*, 39 J. SOC. & SOC. WELFARE 111, 118 (2012);

Leisy J. Abrego, *Legal Consciousness of Undocumented Latinos: Fear and Stigma as Barriers to*

*Claims-Making for First- and 1.5-Generation Immigrants*, 45 LAW & SOC'Y REV. 337, 370

(2011) (risk of permanent anxiety for undocumented immigrants).

The public's safety is also put at risk. When victims of and witnesses to crime are afraid

to approach law enforcement, crime goes underreported. *See* Susana Martinez and Sheila

Neville, *Help for Undocumented Victims of Crime*, 44 CLEARINGHOUSE REV. 129, 141 (2010).

The reluctance to report crime is dangerous not only to undocumented immigrant victims, but to

society as a whole. *See* Bill Ong Hing, *Immigration Sanctuary Policies: Constitutional and*

*Representative of Good Policing and Good Public Policy*, 2 UC IRVINE L. REV. 247, 303 (2012)

(noting that the entire community is safer when the immigrant community trusts law

enforcement). "When the community and law enforcement are not engaged, we miss

opportunities to interrupt current and future violence. As a result, everyone's public safety is put

at risk." Debra J. Robbin, *When Undocumented Immigrants Don't Report Crime, We All Suffer*,

WBUR (Sept. 22, 2017).[37]

The decision to rescind DACA has increased fear in the immigrant community and added

thousands of young people to the group of people afraid of deportation. The resulting reduction

in use of public health, safety, educational, and social services is harmful to the public interest.

---

[37] *Available at* http://www.wbur.org/cognoscenti/2017/09/22/undocumented-immigrants-report-crimes-debra-j-robbin.

**CONCLUSION**

The rescission of DACA irreparably harms DACA recipients by depriving them of their only real opportunity to pursue the American Dream.  It also instills a fear among DACA recipients and all immigrants alike that is harmful to American society as a whole.  On behalf of their clients and the communities they serve, *amici curiae* urge this Court to issue a declaratory judgment that the Rescission Memorandum is unlawful and unconstitutional and to grant a nationwide injunction in order to prevent further harm and damage to the public interest.


Dated:  December 22, 2017                    By: */s/ Kara C. Wilson*
                                                                       Kara C. Wilson

                                                     Maureen P. Alger
                                                     Monique R. Sherman
                                                     Kara C. Wilson
                                                     Joan R. Li
                                                     COOLEY LLP
                                                     3175 Hanover Street
                                                     Palo Alto, CA  94304-1130
                                                     Telephone: (650) 843-5000

                                                     Attorneys for *Amici Curiae*

19