# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN M. NIELSEN, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## PLAINTIFF STATES' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' 12(b)(6) MOTION TO DISMISS

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT................................................................................................1

LEGAL STANDARD...............................................................................................................2

ARGUMENT ............................................................................................................................3

I.     PLAINTIFF STATES HAVE STATED A CLAIM THAT THE TERMINATION OF DACA VIOLATES THE SUBSTANTIVE PROTECTIONS OF THE APA.....................................................................................3

    A. Plaintiff States Have Standing Under the APA, As They Are Within the Zone of Interests of the INA .........................................................................3

    B. Plaintiff States Have Stated a Claim That Defendants' Termination of DACA Was Arbitrary and Capricious ............................................................6

        1. Plaintiff States' Substantive APA Claims Are Exempt from 12(b)(6) Dismissal at this Stage of the Litigation, in Light of the Incompleteness of the Administrative Record .............................7

        2. In Any Event, Plaintiffs States Have Alleged that Defendants Failed to Provide A Rational Evidence-Based Explanation For Their Reversal of Policy ..................................................................8

           a. Defendants failed to provide a reasoned, evidence-based explanation for their rationale that DACA is unlawful..............................9

           b. Defendants failed to provide a reasoned, evidence-based explanation for their rationale that they terminated DACA because of litigation risk ........................................................10

        3. Defendants Failed To Account For Reliance Interests Created By DACA Or Consider Steps To Mitigate The Harm Of Termination....................................................................................13

        4. Defendants' Rationales for Terminating DACA Are Pretextual and Seek to Mask An Impermissible Basis for their Decision .......................15

II.    PLANTIFF STATES HAVE STATED A CLAIM THAT THE TERMINATION OF DACA IS PROCEDURALLY INVALID UNDER THE APA BECAUSE DEFENDANTS FAILED TO OFFER AN OPPORTUNITY FOR NOTICE AND COMMENT ................................. 15

i

III.   PLAINTIFF STATES HAVE STATED A CLAIM THAT
       DEFENDANTS' TERMINATION OF DACA IS PROCEDURALLY
       INVALID UNDER THE RFA......................................................................................19

IV.    PLAINTIFF STATES HAVE STATED A CLAIM THAT THE
       TERMINATION OF DACA VIOLATES EQUAL PROTECTION .........................19

       A.  Plaintiff States Have Alleged That Defendants' Termination of DACA
           Violates Equal Protection Because It Was Based, In Part, On Animus
           Towards Latinos...........................................................................................21

       B.  Defendants' Citation to Selective Enforcement Case Law is Unavailing
           Because Plaintiff States Are Not Brining A   Selective Prosecution
           Claim.............................................................................................................23

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amerijet Int'l, Inc, v. Pistole*
    753 F.3d 1343 (D.C. Cir. 2014) .................................................................. 11

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2014) ........................................................ 18, 22

*Assn. of Data Processing Serv. Orgs., Inc. v. Camp*,
    397 US 150 (1970) ................................................................................... 4

*Bank of Am. Corp. v. City of Miami*,
    137 S. Ct. 1296 (2017) ............................................................................ 6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 554 (2007) .............................................................................. 23

*Benten v. Kessler*,
    799 F. Supp. 281 (E.D.N.Y. 1992) ......................................................... 17

*Chamber of Commerce of U.S. v. Whiting*,
    563 U.S. 582 (2011) ............................................................................... 5

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) .................................................................... 2

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) .............................................................................. 21

*Cmty. Nutrition Inst. v. Young*,
    818 F.2d 943 (D.C. Cir. 1987) ........................................................... 16,17

*Consumer Energy Council v. FERC*,
    673 F.2d 425 (D.C. Cir. 1982) ............................................................... 17

*Dandridge v. Williams*,
    397 U.S. 471 (1970) .............................................................................. 20

*DeCanas v. Bica*,
    424 U.S. 351 (1976) ............................................................................... 5

*Dimaren v. I.N.S.*,
    398 F. Supp. 556 (S.D.N.Y. 1974) ......................................................... 18

*Dist. Hosp. Ptnrs., LLP v. Sebelius*,
    794 F. Supp. 2d 162 (D.D.C. 2011) ....................................................... 7,8

iii

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec*,
   653 F.3d 1 (D.C. Cir. 2011) ................................................................................ 16

*Encino Motorcars LLC v. Navarro*,
   136 S.Ct. 2117 (2016) ..................................................................................... 14

*FCC v. Fox Television Stations*,
   556 U.S. 502 (2009) .................................................................................... 11,14

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
   93 F.3d 897, 899 (D.C. Cir. 1996) ........................................................................ 6

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .......................................................................................... 3

*Hawaii v. Trump*,
   2017 WL 6554184 (9th Cir. Dec. 22, 2017) ............................................................ 6
   859 F.3d 741, 765 (9th Cir Jun. 12, 2017) ............................................................. 6

*Heller v. Doe*,
   509 U.S. 312 (1993) ........................................................................................ 23

*Hertz. Corp. v. City of N.Y.*,
   1 F.3d 121, 125 (2d Cir. 1993) ........................................................................... 2

*In re Kirstjen M. Nielsen, Sec'y of Homeland Sec.*,
   No. 17-3345 (2d Cir. Dec. 27, 2017), ECF. No. 172 ................................................ 8

*Int'l Union of Mine Workers v. U.S. Dep't of Labor*,
   358 F.3d 40 (D.C. Cir. 2004) ............................................................................ 11

*Judge Rotenberg Educational Center Inc. v. Blass*,
   882 F. Supp. 2d 371 (E.D.N.Y. 2012) ................................................................... 2

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S.Ct. 1377, 1389 (2014) .............................................................................. 4

*Levi & Korsinsky, LLP v. Bower*,
   2015 WL 10437758 (S.D.N.Y. Feb. 16, 2015) ........................................................ 4

*Long Island Head Start Child Dev. Servs. v. N.L.R.B.*,
   460 F.3d 254 ................................................................................................ 14

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209, 225 (2012) .................................................................................. 4

*Michigan v. EPA*,
   213 F.3d 663 (D.C. Cir. 2000) .......................................................................... 19

*Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*,
   815 F. Supp. 2d 679 (S.D.N.Y. 2011) ................................................................... 4

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ........................................................................ 6, 8,9,14

*Nw. Min. Ass'n v. Babbitt*,
   5 F. Supp. 2d 9 (D.D.C. 1998) ................................................................. 19

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) (en banc) ........................................................ 11

*Pac. Shores Props., LLC v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013) ................................................................. 25

*Parco v. Morris*,
   426 F. Supp. 976 (E.D. Pa. 1977) .............................................................. 18

*Plyler v. Doe*,
   457 U.S. 202 (1982) ........................................................................ 20-21

*Pub. Citizen v. Heckler*,
   653 F. Supp. 1229 (D.D.C. 1986) ............................................................... 15

*Pyke v. Cuomo*,
   258 F.3d 107 (2d Cir. 2001) ................................................................... 24

*Rajah v. Mukasey*,
   544 F.3d 427, 439 (2d Cir. 2008) ECF. No. 71-1 ............................................... 24-25

*Randle v. Alexander*,
   960 F. Supp. 2d 457, 476 (S.D.N.Y. 2013) ...................................................... 23

*The Regents of the University of California, et al., v. DHS, et al.*,
   17-cv-05211 (Jan. 9, 2018) ..................................................................... 3

*Romer v. Evans*
   517 U.S. 620 (1996) ......................................................................... 21, 23

*Salazar v. King*,
   822 F.3d 61 (2d Cir. 2016) ..................................................................... 4

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................................... 13

*Swedish Am. Hosp. v. Sebelius*,
   691 F. Supp. 2d 80 (D.D.C. 2010) ............................................................... 8

*Sweet v. Sheahan*,
   235 F.3d 80, 83 (2d Cir. 2000) ................................................................. 2

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90, 94 (D.C. Cir. 1997) .............................................................. 16

*Syracuse Peace Counsel v. FCC*
   867 F.2d 654, 657-659 (D.C. Cir. 1989) ........................................................ 13

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court sub nom, U.S. v. Texas,*
    136 S. Ct. 2271 (2016) ........................................................................................ 5, 9-10, 12, 17

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973) ........................................................................................ 20-21, 23, 25

*U.S. Telecom Ass'n v. FCC,*
    400 F.3d 29 (D.C. Cir. 2005) ........................................................................................ 19

*United States v. Armstrong*
    517 U.S. 456 (1996) ........................................................................................ 24

*United States v. Picciotto,*
    875 F.2d 345 (D.C. Cir. 1989) ........................................................................................ 16

*United States. v. Texas,*
    13 S.Ct. 2271 (2016), 2016 WL 836758 ........................................................................................ 5, 9, 12

*United States. v. U.S. Dist. Court for the N. Dist. of Cal.,*
    875 F.3d. 1200 (9th Cir. 2017) (quoting Watford, J. dissenting), vacated, *In re. U.S.*, 138
    S.Ct. 371 ........................................................................................ 14

*United States v. Windsor,*
    133 S.Ct 2675 (2013) ........................................................................................ 21, 23

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
    749 F.2d 788 (D.C. Cir. 1984*)* ........................................................................................ 7, 8

*Washington v. Davis,*
    426 U.S. 229 (1976) ........................................................................................ 20

*Weizmann Inst. of Sci. v. Neschis,*
    229 F. Supp. 2d 234 (S.D.N.Y. 2002) ........................................................................................ 4

*White v. Shalala,*
    7 F.3d 296 (2d Cir. 1993) ........................................................................................ 16

*Wong Wing Hang v. I.N.S.,*
    360 F.2d 715 (2d. Cir. 1966) ........................................................................................ 15

*Yale-New Haven Hosp. v. Leavitt,*
    470 F.3d 71, 79 (2d Cir. 2006) ........................................................................................ 8

*Ysursa v. Pocatello Educ. Ass'n,*
    555 U.S. 353 (2009) ........................................................................................ 19

**FEDERAL STATUTES**

Administrative Procedure Act (APA) ........................................................................................ *passim*

Regulatory Flexibility Act  (RFA) ........................................................................................ 1, 4, 19

Immigration and Nationality Act (INA) .............................................................................................3-6

**FEDERAL REGULATIONS**

8 C.F.R. § 274a.12(c)(14) ............................................................................................................. 4

## PRELIMINARY STATEMENT

Consistent with this country's long history of deferring immigration enforcement for humanitarian and other reasons, the Department of Homeland Security ("DHS") implemented the Deferred Action for Childhood Arrivals Program ("DACA") in 2012. Through DACA, DHS exercised discretion to grant deferred action, on a case-by-case basis and after review of an extensive application and criminal background check, to select individuals—specifically, young people who were brought to this country as children, grew up here, and were actively engaged in higher education, employment, or military service. By postponing deportation proceedings for eligible individuals, DACA allowed nearly one million young people—ninety-three percent of whom are Latino—to work, pursue education, and participate in their communities without constant fear of deportation, at great benefit to Plaintiff States' treasuries and institutions.

On September 5, 2017, Defendants suddenly and arbitrarily changed course and terminated this five-year program without a reasoned explanation or consideration of the impact on hundreds of thousands of DACA recipients, their employers, their families—including family members who are U.S citizens and legal permanent residents—and their broader communities. Plaintiff States then filed the instant lawsuit alleging that the termination was arbitrary and capricious in violation of the substantive provisions of the Administrative Procedure Act ("APA"). Plaintiff States also allege that Defendants violated the procedural requirements of the APA and Regulatory Flexibility Act ("RFA") by terminating the DACA program without notice, opportunity for public comment, or required analysis of the impact on small businesses, nonprofits, and governmental jurisdictions ("small entities").

In addition to violating the APA, the termination of DACA is also the latest Executive act borne out of Defendants' animus towards Latino immigrants. For nearly two years, Defendants

1

have used false and inflammatory rhetoric to advance their agenda to expel Latino immigrants from the country. In baselessly misrepresenting these immigrants as "rapists," "criminals," and "thugs," and declaring their desire to rid the nation of "bad hombres," Defendants have not hesitated to publicly reveal their antipathy towards Latino immigrants. Because animus-based decision-making is *per se* irrational and plainly fails constitutional muster, Plaintiff States have also alleged a violation of the Fifth Amendment's equal protection guarantee.

Defendants' motion to dismiss these claims under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) fails in every respect. As an initial matter, because the administrative record is incomplete, Plaintiff States' substantive APA claims are categorically *exempt* from dismissal. In any event, Plaintiff States' have prudential standing under the APA as they fall within the zone of interests of the Immigration and Nationality Act ("INA"); and the Amended Complaint's detailed allegations of Defendants' irrational, improper, and unlawful conduct state sufficiently plausible claims for relief to survive a motion to dismiss.

## LEGAL STANDARD

Courts reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (reversing dismissal). Dismissal is only appropriate where "'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief,'" *id*. (quoting *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000)).[1]

---

[1] *See also Judge Rotenberg Educational Ctr. Inc. v. Blass*, 882 F. Supp. 2d 371, 376 (E.D.N.Y. 2012) (same) (quoting *Hertz. Corp. v. City of N.Y.*, 1 F.3d 121, 125 (2d Cir. 1993)).

**ARGUMENT**

**I.   PLAINTIFF STATES HAVE STATED A CLAIM THAT THE TERMINATION OF DACA VIOLATES THE SUBSTANTIVE PROTECTIONS OF THE APA.**

Plaintiff States have adequately alleged substantive defects in Defendants' decision to terminate DACA in violation of the APA.[2] The APA requires courts to "hold unlawful and set aside [final federal] agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "contrary to constitutional right."[3] 5 U.S.C. § 706(2)(A) & (B); *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Plaintiff States may bring a claim under the APA because they fall within the zone of interests of the INA. Further, it would be premature for the Court to dismiss Plaintiffs' APA claims before a full administrative record has been produced. Lastly, the Amended Complaint sets forth detailed allegations, which must be taken as true at this stage, that the abrupt termination of DACA was arbitrary, capricious, and an abuse of discretion.[4] Specifically, Plaintiff States allege that Defendants failed to provide a reasoned rationale for the termination of DACA, instead grounding the decision in unsupported pronouncements offered against a backdrop of animus.

**A.  Plaintiff States Have Standing Under the APA, As They Are Within the Zone of Interests of the INA.**

Contrary to Defendants' arguments (Defs.' Mot. to Dismiss, ECF No. 71-1 at 29-30),

---

[2] The Plaintiff States' allegations in the Amended Complaint are in substance the same as those made by plaintiffs in *The Regents of the Univ. of Cal., et al., v. D.H.S. et al.*, in the Northern District of California ("NDCAL"). On January 9, 2018, the Court in that case found that plaintiffs were likely to succeed on their claim that the termination of DACA was arbitrary and capricious and in violation of 5 U.S.C. 706(2)(A). Order Alsup, J., Denying Fed. R. Civ. P. 12(b)(1) Dismissal and Granting Provisional Relief, *The Regents of the University of California, et al., v. DHS, et al.*, 17-cv-05211 at 29 (Jan. 9, 2018) ("NDCAL Prov. Relief Ord.").

[3] Defendants did not challenge the finality or ripeness of the termination of DACA.

[4] See Pl. States' Am. Compl., ECF No. 54, ¶¶ 6, 9, 38, 53, 80-86, 253-256.

Plaintiff States have met the required threshold to bring a claim under the APA,[5] by asserting interests that are within the zone of interests under the INA. *See Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016) ("To bring a claim under the APA a plaintiff must satisfy Article III's standing requirements … and assert interests that are arguably within the zone of interests to be protected or regulated by the statute she claims was violated"). As this Court noted in its November 9 Order, the zone-of-interests test "is not meant to be especially demanding."  ECF. No. 104 at 46, citing *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (holding that the zone of interests test is applied "in keeping with Congress's evident intent to make agency action presumptively reviewable").[6]

The INA regulates the parameters under which non-citizens can be employed in the United States. *See* 8 U.S.C. §1324a (Unlawful Employment of Aliens); 8 C.F.R. § 274a.12(c)(14) (regulation created pursuant to 1324a allowing recipients of deferred action to apply for work authorization if they can show "economic necessity for employment"); *see also* NDCAL Prov. Relief Order at 4:1-8. Here, Plaintiff States directly employ DACA grantees[7] in a variety of

---

[5] As this Court held in its November 9 Order, Plaintiff States have Article III standing to bring their APA, RFA and Equal Protection claims. *See* Order Garaufis, J., ECF. No. 104 at 38-40.

[6] *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1389 (2014) (internal citations omitted) (stating that when analyzing zone of interests under the APA the "benefit of any doubt goes to the plaintiff"); *Assn. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 US 150, 154, (1970) (recognizing even "aesthetic, conservational, and recreational" interests as well as "economic values" qualify to be in the zone of interests (internal citations and quotation marks omitted)).

[7] Plaintiff States request that the Court take judicial notice of certain declarations cited to in support of Plaintiff States' Motion for Preliminary Injunction, which discuss Plaintiff States as employers, specifically—ECF. No. 97-3, Ex. 64, pp.190-91, ¶¶ 8. 10-14 (Johnson Decl., SUNY), Ex. 59, pp. 169-70, ¶¶ 8-11,13 (Rosado Decl., NY Secretary of State), Ex. 68, pp.209-10, ¶¶ 5,7, 8-12 (Carrizales Decl., Teach for America). Plaintiff States allege in their Amended Complaint that their States employ DACA recipients and the declarations substantiate this in a way that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691–92 (S.D.N.Y. 2011) (taking judicial notice of declarations); *Levi & Korsinsky, LLP v. Bower*, 2015 WL 10437758, at *2, n. 2 (S.D.N.Y. Feb. 16, 2015) (taking judicial notice of the information provided in a declaration submitted in support of a motion to dismiss); *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 246-47 n.20 (S.D.N.Y. 2002) (taking judicial notice of

capacities, including as faculty at State universities, nurses, information technology specialists, and public safety officers.[8] School districts within Plaintiff States also employ DACA grantees as teachers, and public healthcare institutions hire DACA grantees who are doctors to work in underserved or high-demand communities.[9] The States will also be hampered in their efforts to recruit and hire strong candidates for open positions as the INA will restrict them from hiring individuals who would otherwise be DACA grantees.[10] Further, the INA establishes interests in the "regulation of immigration and naturalization and sets the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (*quoting DeCanas v. Bica*, 424 U.S. 351, 353, 359, (1976)) (internal quotations omitted). In regulating licensing to drive cars, open businesses, and operate in certain professional capacities (e.g. as a lawyer or doctor), the States take account of the immigration status of their residents and make judgment calls as to who should be included in licensing schemes. Moreover, the States have relied on immigration classifications under the INA to decide who will be eligible for certain state benefits. [11]  The termination of DACA

---

documents filed in New York state court, including a transcript of a hearing, in considering a Rule 12(b)(6) motion to dismiss).

[8] ECF. No. 54, ¶¶ 189-190; ECF. No. 55-62, ¶¶ 4-6 (Monroe Decl., WA DOE); ECF. No. 55-61, ¶ 10 (Heatwole Decl., UMass); ECF. No. 55-64, ¶¶ 3-6 (Glatt Decl., Columbia Basin College); ECF. No. 55-65, ¶¶ 3-6 (Kaplan Decl., WA DSHS); ECF. No. 55-92, ¶¶ 3-6 (Jones Decl., WA Office of Treasurer); ECF. No. 55-113, ¶¶ 3-6 (Schuh Decl., Anacortes); ECF. No. 55-130, ¶¶ 3-6 (Conly Decl., WA DVA); ECF. No. 55-91, ¶¶ 3-6 (Garza Decl., Big Ben Community College); ECF. No. 55-58, ¶ 7 (Loera Decl., WSU); ECF. No. 55-111 ¶¶ 10-11 (Decl. Ambrosino & Bourque, City of Chelsea, MA and Chelsea Public Schools).

[9] *See* ECF. No. 55-94, ¶¶ 8-11 (Cuevas, Decl., Oregon dentist); ECF. No. 55-52, ¶¶ 8,15 (Mostafi Decl., MOIA); ECF. No. 55-176, ¶ 10 (Kennedy Decl., City of Newburgh); *see also* ECF. No. 97-3, Ex. 68, p. 210, ¶ 11 (Carrizales Decl., Teach For America).

[10] *See* ECF. No. 55-176, ¶¶ 7-14, 17; ECF. No. 55-111, ¶¶ 4-16; ECF. No. 55-113, ¶¶ 3-6; ECF. No. 55-11, ¶¶ 7-12 (Carrizales Decl., Teach for America).

[11] *See also Texas v. United States*, 809 F.3d 134, 155-63 (5th Cir. 2015), *aff'd by an equally divided court sub nom, U.S. v. Texas*, 136 S. Ct. 2271 (2016) (finding the state of Texas to be in the zone of interests of the INA, and to have standing under the APA, due to the anticipated cost of "spending millions of dollars to subsidize driver's licenses" to Deferred Action for Parents of Americans ("DAPA") and DACA-plus grantees).

will require the States to revisit laws, regulations, and policies that have contemplated the DACA program and its significance under the INA. *See* ECF. No. 54, ¶¶ 34-36, 206-210; ECF. No. 55-98, ¶ 10 (Decl. Naveed).  For example, since 2015, Connecticut has granted drivers' licenses to approximately 5,000 DACA grantees who are Connecticut residents, many of whom have purchased and registered vehicles in the State. *Id.* at ¶ 207(a). Licensing schemes such as this would be compromised by the termination of DACA. Injuries of these types have been recognized to fall  "within the zone of interests of the INA." *See* NDCAL Prov. Relief Order at 28:9;  *Hawaii v. Trump*, 2017 WL 6554184, at *9 (9th Cir. Dec. 22, 2017) (concluding that State's interests in "enroll[ing] students and hir[ing] faculty members" fall within "the zone of interests of the INA" and are therefore judicially reviewable under the APA) (quoting *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017)); *Hawaii*, 859 F.3d 741, 765 (same).

Defendants rely on inapposite authority when asserting that no specific provision of the INA "even arguably" protects the States from "bearing any incidental effects" from the termination of DACA.  ECF. No. 71-1 at 20-21 (citing *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996).  *Federation for American Immigration Reform* involved a "private anti-immigration organization whose members *were not* impacted by the immigration policy at issue."  NDCAL Prov. Relief Ord. at 28, n. 12. (emphasis added).  As demonstrated by the record in this case, Plaintiff States and their residents will be profoundly impacted by the termination of DACA, in the context of specific provisions of the INA. *See Id.*

### B.  Plaintiff States Have Stated a Claim That Defendants' Termination of DACA Was Arbitrary and Capricious.

Plaintiff States have adequately pleaded that Defendants' termination of DACA was arbitrary and capricious, an abuse of discretion, and unlawful, in violation of the APA. As the Supreme Court held in *Motor Vehicle Mfrs. Ass'n v. State Farm*, federal agencies must offer

reasoned, evidence-based rationales for agency decisions under the APA. 463 U.S. 29, 41-42 (1983). In terminating DACA, Defendants failed to offer reasoned, evidence-based rationales for the termination; failed to analyze all relevant issues and factors, including the significant reliance interests created by DACA; and provided pretextual reasons as cover for a decision that was irrational and animus-driven.[12]

1. Plaintiff States' Substantive APA Claims Are Exempt from 12(b)(6) Dismissal at this Stage of the Litigation, in Light of the Incompleteness of the Administrative Record.

Because Plaintiff States' substantive APA claims assert defects in the rationality and reasonableness of the Defendants' decisional process, they are not susceptible to dismissal at this stage of the litigation absent a complete administrative record. Although certain challenges to administrative action—such as claims that a rule is facially inconsistent with a statute—may be resolved on a 12(b)(6) motion, claims that challenge "the Agency's reasons" or its "rule-making process" cannot be dismissed before the agency presents the complete administrative record against which such claims are evaluated. *Dist. Hosp. Ptnrs., LLP v. Sebelius*, 794 F. Supp. 2d 162, 171-73 (D.D.C. 2011) (discussing this distinction and collecting cases); *see also, e.g.*, *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984*)* ("To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of the whole record.").

As Magistrate Judge Orenstein found in his October 19, 2017 Order, the administrative record before this Court is "manifestly incomplete."[13] Orenstein, MJ., Mem. & Order at 2-3, ECF. No. 65. On mandamus review, the Second Circuit agreed that the administrative record submitted

---

[12] ECF. No. 54, ¶¶ 6, 9, 38, 53, 80-86, 253-256; ECF. No. 55-74 ("DACA Termination Memo").

[13] In his December 28, 2017 order, Judge Orenstein again compelled completion of the administrative record, ECF. No. 182.

by Defendants lacks certain factual materials referenced by the Acting Secretary's termination memorandum and that the record appears incomplete in other respects too. Order Den. Writ of Mandamus at 3, *In re Kirstjen M. Nielsen, Sec'y of Homeland Sec.*, No. 17-3345 (2d Cir. Dec. 27, 2017), ECF. No. 172. Thus, to defend the rationality of their decision making, defendants must wait until such time as they have produced a complete record and then move for summary judgment.[14] Multiple cases confirm that agencies cannot use a 12(b)(6) motion, submitted before producing the complete record, as a vehicle to preemptively establish the rationality and legality of their decision-making process as a matter of law. *See, e.g.*, *Dist. Hosp. Ptnrs.*, 794 F. Supp. 2d at 171-73 (D.D.C. 2011) (denying 12(b)(6) motion filed before production of administrative record because claim challenged agency's reasons and the rationality of its decision-making process); *Swedish Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 88-89 (D.D.C. 2010) (same).

### 2. In Any Event, Plaintiff States Have Alleged that Defendants Failed to Provide A Rational, Evidence-Based Explanation For Their Reversal of Policy.

When an agency reverses course on a policy it must provide "a reasoned analysis" for its reversal. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 41-42 (1983); *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 79 (2d Cir. 2006) ("[R]eview is particularly searching" when the agency changes "[a] settled course of behavior."). However, Defendants' memo cites only two reasons for

---

[14]Defendants miss the mark in suggesting that they can rely on certain documents from their incomplete administrative record because those documents were incorporated by reference into Plaintiffs' complaints or publicly available. ECF 71-1 MTD at 12 n. 1. As discussed *infra*, if the Court is to decide the instant motion to dismiss, it must do so with a complete administrative record. Thus, Defendants have inappropriately asked the Court to rely on an Administrative Record that they have not yet completed, and which very well may omit information that would be favorable to Plaintiffs. *See Heckler*, 749 F.2d at 792. And at least some of the documents missing from Defendants' proffered administrative record are not currently available to Plaintiffs or this Court. *See* Order Den. Writ of Mandamus at 2 (discussing missing basis for the Acting Secretary's factual assertion that "[United States Citizenship and Immigration Services] has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the [original DACA] memorandum, but still had his or her application denied based solely upon discretion.").

terminating DACA: the program's purported unlawfulness and relatedly, the risk of litigation associated with continuing it.[15] ECF. No. 55-74. Defendants' complete and utter failure to substantiate or support these asserted reasons falls far short of the standard of reasoned, evidence-based rationales set forth in *State Farm*. 463 U.S. at 41-42; see, ECF. No. 54, ¶¶ 6, 9, 31-38, 53, 80-86, 253-256; ECF. No. 55-74.

    a. Defendants failed to provide a reasoned, evidence-based explanation for their rationale that DACA is unlawful.

Plaintiff States have sufficiently pled that terminating DACA based on the program's purported unlawfulness is arbitrary and capricious given that Defendants previously concluded that DACA was legal and provided no reasoned explanation for changing their position after five years of DACA being in effect.  Specifically, Defendants previously endorsed arguments and lengthy explanations regarding why the DACA program was lawful, as contained in the U.S. Department of Justice's ("DOJ") 2014 Office of Legal Counsel ("OLC") memorandum, and filed briefs with the Fifth Circuit and the U.S. Supreme Court. *See* OLC, DHS's Authorization to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others (Nov. 19, 2014); Appellant's Br., *Texas v. United States,* 809 F.3d 134 (5th Cir. 2015), 2015 WL 1611821; Br. of U.S., *United States. v. Texas*, 13 S.Ct. 2271 (2016), 2016 WL 836758.  Even after the change in administration, Defendants continued the DACA program pursuant to these legal analyses. ECF. No. 54, ¶¶ 50, 53. Defendants now argue that their conclusion that DACA was unlawful is "strongly supported by the Fifth Circuit's decision in *Texas*

---

[15] In the NDCAL Provisional Relief Order, the court concluded that the only "reason given in the administrative record for rescission was DACA's purported illegality." NDCAL Prov. Relief Ord. at 39. In fact, the court deemed Defendants' belated argument that "DHS acted within its discretion in managing its litigation exposure in the Fifth Circuit" to be a "post hac rationale" warranting automatic rejection. *Id*. at 38. Even accepting the post-hoc rationale that the decision to end DACA rested on a litigation-management assessment (rather than on a ruling of illegality), the California court held the rationale arbitrary and capricious. *Id.* at 40.

*v. United States* and affirmed by the Supreme Court." ECF. No. 71-1, at 27-28.

Yet they failed to provide any analysis or evidence to support this complete reversal in position, as required under the APA. ECF. No. 54, ¶¶ 22-23, 31-38, 81-85, 253-256, ECF No. 55-74. The decisions arising out of *Texas v. United States* do not hold that DACA is unlawful. Rather, the *Texas* holding applied to Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), which offered deferred action to the parents of U.S. Citizens and Lawful Permanent Residents, *not* DACA. Moreover, the Fifth Circuit explicitly recognized legally significant differences between these two programs, explaining that "for a number of reasons, any extrapolation [of DAPA] from DACA must be done carefully." *Id.* at 173-74; *see also* NDCAL Prov. Relief Ord. at 35:10-13; 37:25-26 (finding Attorney General's opinion that DACA has the same "legal and constitutional defects" as DAPA to be an "overstatement" and stating "the DAPA litigation was not a death knell for DACA"). Indeed, the legality of the original DACA policy was never at issue in *Texas* and no court has held DACA itself unlawful or found DACA or DAPA to be unconstitutional. *Texas,* 809 F.3d at 146 n3. *See also* NDCAL Prov. Relief Ord. at 29:7-8 (stating that Defendants' conclusion that DACA is unlawful is "a flawed legal premise"). Therefore, Defendants' reliance on the *Texas* decisions to support their decision to terminate DACA fails.

   b.  Defendants failed to provide a reasoned, evidence-based explanation for their rationale that they terminated DACA because of litigation risk.

Plaintiff States have sufficiently pled that Defendants' termination of DACA based on litigation risk was arbitrary and capricious as they failed to provide a reasoned explanation. Plaintiff States' allegations refute Defendants' claim that they terminated DACA based on litigation risk. First, Defendants provided *no* assessment of the litigation risk, including how, if at all, they weighed competing factors and determined that litigation risk was a "'good'" reason to terminate

10

DACA. ECF. No. 71-1 at 24 (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)). In fact, Defendants merely "traded" a lawsuit challenging DACA for many suits filed by plaintiffs in this action and others. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (en banc) (rejecting litigation risk rationale as "implausible" where agency "deliberately traded one lawsuit for another").

Defendants completely miss the mark in arguing (ECF. No. 71-1 at 26) that the Acting Secretary's "independent conclusion, based on reasonable predictive judgment about litigation risk" is a sufficient basis for upholding her decision. As an initial matter, as this Court has determined, the decision to terminate DACA was a joint decision of DHS and DOJ, not an independent decision of the Acting Secretary.[16] Further, agencies must set forth the reasons for agency actions. "[C]onclusory statements will not do; an agency's statement must be one of reasoning." *Amerijet Int'l, Inc, v. Pistole* 753 F.3d 1343, 1350 (D.C. Cir. 2014). Accepting Defendants' contrary position that the agency was not required to explain the bases for their judgment would frustrate judicial review, leaving agencies unbounded to declare conclusions for agency actions without providing reasoned explanations as required under the APA.

The Termination Memo simply lacks any reasoned explanation, as required by the APA, of how the Acting Secretary and Attorney General predicted that maintaining DACA, a program that no court has found to be unlawful, would not only lead to a lawsuit, but also an end to the program. *See Int'l Union of Mine Workers v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004)(when seeking to reverse policy based on risk of litigation and, in this case, a resulting injunction, an agency must explain why it determined that case law was "fatal" to the prior policy); *see also* NDCAL Prov. Relief Ord. at 39-40 (finding Defendants' litigation risk rationale

---

[16] Garaufis, J. Mem and Order Oct. 17, at 10, ECF. No. 63.

11

insufficient under the APA because they failed to consider "the *differences* between DAPA and DACA that might have led to a different [litigation] result").

Defendants belatedly assert that their decision to terminate DACA was rational because they only had *two* options: "wind the program down in an orderly fashion . . .or allow the judiciary to potentially shut down the program completely and immediately." ECF. No. 71-1 at 22, 24-25. Yet Defendants fail to explain why they concluded that there were only these two options. Nor do they offer any support or analysis, as required by the APA, for their hypothetical that the judiciary would have caused an immediate and chaotic end to DACA. ECF. No. 55-74.[17]

In fact, the allegations in the Amended Complaint, ECF. No. 54 at ¶¶ 9, 38, 81-86, 91-99, 254-255, 260-263, demonstrate how the termination—which was implemented with "minimal formal guidance," without consideration of the relevant factors, and without input from the affected parties through notice and comment—is anything but orderly. For example, despite the demands of the renewal process, including the need to pay a substantial application fee, Defendants opted to adhere to only a one-month deadline for all renewal applications. See ECF. No. 54, ¶¶ 4-5, 27-28, 82; ECF. No. 55-74. Further, Defendants' decision to terminate DACA has already caused harm and chaos to DACA grantees, Plaintiff States, and to our institutions and treasuries, which will only be exacerbated once the program is terminated. ECF. No. 54, ¶¶ 7-9, 38, 100-232. Plaintiff States have averred that universities in the States will lose students and faculty, and local school districts will lose eminently qualified teachers, with some losses likely to occur during the current academic year. ECF. No. 54, ¶¶ 195-197, 200, 219. The States' regulatory systems and

---

[17] Plaintiff States allege (and Defendants acknowledge) that the litigation risk at issue stems from the State of Texas's threat to include a challenge to DACA in a suit that was pending in the Southern District of Texas, as outlined in a letter to Attorney General Sessions from Texas Attorney General Ken Paxton. ECF. No. 54, ¶¶ 73-80; ECF. No. 71-1 at 9. That letter, however, requests a "phase out" of the DACA program and notes that Texas's request "does not require the Executive Branch to immediately rescind DACA or Expanded DACA permits that have already been issued." ECF. No. 55-177. Defendants immediate and chaotic scenario assumes, without explanation, that even if the State of Texas had won its lawsuit, the court would grant relief beyond what Texas itself requested.

educational institutions will be disrupted and many States will lose employees. ECF. No. 54, ¶¶ 189-207, 211-224. A rational decision with a true concern for order would anticipate these foreseeable problems, weigh them in an evidence-based analysis, and seek means to avoid or mitigate them.

Finally, Defendants argue that even if their analysis of litigation risk was defective, and the Acting Secretary and Attorney General relied on erroneous legal conclusions, the Court should still uphold their decision because it was also based on a separate policy judgment that "immigration decisions of this magnitude should be left to Congress." ECF. No. 71-1 at 26. This was not provided as a reason for ending DACA in the Termination Memo. Indeed, Defendants assert this as a rationale for the *first* time in the instant Motion. Therefore, this argument should be dismissed, as a post hoc rationale. *See SEC v. Chenery Corp*., 332 U.S. 194, 196, (1947) (the court "may not supply a reasoned basis for the agency's action that the agency itself has not given"); *see also* NDCAL Prov. Relief Ord. at 38 n. 16 (finding Defendants' argument that the decision to terminate DACA was also based on a separate policy judgment unsupported by the record.)[18]

3. Defendants Failed to Account for Reliance Interests Created by DACA or Consider Steps to Mitigate the Harm of Termination.

As alleged in Plaintiff States' Amended Complaint, ECF. No. 54, ¶¶ 22-23, 31-38, 45-46, 81-84, Defendants' new position rests upon "factual findings that contradict those which underlay its prior policy" in a context where "the prior policy [has] engendered serious reliance interests."

---

[18] In any event, Defendants' argument on this point fails. Defendants cite to *Syracuse Peace Counsel v. FCC* for the proposition that "[i]f an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions." 867 F.2d 654, 657-659 (D.C. Cir. 1989); ECF. No. 71-1 at 26. However, Defendants' reliance on *Syracuse Peace Counsel* is misplaced because there is no basis in the Termination Memo to suggest that they executed a policy judgment separate from litigation risk or that "in the absence of [perceived] constitutional problems the [agency] would have reached the same outcome." 867 F.2d at 657-659; *see also* NDCA Prov. Relief Ord. at 38 n. 16 (finding Defendants' reliance on *Syracuse* to be misapplied in identical arguments.).

*FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009); *see also* NDCAL Prov. Relief Ord. at 42. Undeniably, the termination of DACA constitutes a complete reversal of prior policy that has engendered serious reliance interests. Accordingly, it requires Defendants to also adequately explain why they have now decided to discount the considerations that led them to create DACA, maintain it for five years, and vigorously defend it in court. Defendants complete failure to address this key question is glaring.

An Executive action, such as the termination of DACA, that has the potential to disrupts millions of lives calls for "'extensive study and analysis.'" *United States. v. U.S. Dist. Court for the N. Dist. of Cal.*, 875 F.3d. 1200, 1206, n4 (9th Cir. 2017) (quoting Watford, J. dissenting), *vacated*, *In re. U.S.,* 138 S.Ct. 371. The termination of DACA will impose substantial costs on grantees and their communities. ECF. No. 54, ¶¶ 187-232. But the Termination Memo declines to offer "even [a] minimal level of analysis," and altogether ignored the vast and profound impacts of their action and the serious reliance interests engendered —a point that Defendants' motion to dismiss does not address at all. *Encino Motorcars LLC v. Navarro*, 136 S. Ct., 2117, 2120 (2016). Defendants' apparent failure to "examine the relevant data" during the decision-making process renders their decision to terminate DACA arbitrary and capricious. *Long Island Head Start Child Dev. Servs. v. N.L.R.B.*, 460 F.3d 254, 257-258 (citing *State Farm*, 463 U.S. at 43); *see also* NDCAL Prov. Relief Ord. at 40 (stating that the Acting Secretary "committed a serious error" by failing to "weigh DACA's programmatic objectives as well as the reliance interests of DACA recipients" against any purported litigation risk). As a result of this lack of analysis, Defendants terminated DACA without any measures to mitigate the adverse effects of this decision.

As Plaintiff States sufficiently allege, Defendants' failure to consider these interests render their decision to terminate DACA arbitrary and capricious.

14

4.   <u>Defendants' Rationales for Terminating DACA Are Pretextual and Seek to Mask An Impermissible Basis for their Decision.</u>

An agency's stated reasons for an action cannot be pretextual, *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986). (ECF. No. 54, ¶¶ 6, 57-70, 73-86); see *infra* Section IV. Defendants' contradictory rationales for terminating DACA seek to mask the true basis for their decision—animus toward Latinos, who make up 93% of DACA grantees. ECF. No. 54, ¶¶ 6, 57-70). As discussed *infra* at Section IV, statements by President Trump and  senior officials leading up to the termination of DACA that describe Latino immigrants as "rapists,"  "criminals,"  and "thugs," ECF. No. 54, ¶¶ 57-70, demonstrate that Defendants' action was driven in part by invidious discrimination against Latinos and a commitment to "punish and disparage immigrants." ECF. No. 54, ¶¶ 6, 71-72, 81, 84. Where an agency rests its action on such an "impermissible basis," it abuses its discretion. *Wong Wing Hang v. I.N.S.*, 360 F.2d 715, 718-19 (2d. Cir. 1966). Plaintiff States' allegations of Defendants' animus towards Latinos, ECF. No. 54, ¶¶ 6, 57-70, combined with the allegations of Defendants' arbitrary and wholly inadequate decision-making process, ECF. No. 54, ¶¶ 9, 38, 45-46, 81-86, 91-99, demonstrate that their stated reasons for terminating DACA are not only implausible, but pretextual. Plaintiff States have alleged that Defendants' decision was based on invidious discrimination and, as such, was contrary to law and an abuse of discretion in violation of the APA.

**II.   PLAINTIFF STATES HAVE STATED A CLAIM THAT THE TERMINATION OF DACA IS PROCEDURALLY INVALID UNDER THE APA BECAUSE DEFENDANTS FAILED TO OFFER AN OPPORTUNITY FOR NOTICE AND COMMENT.**

Defendants argue that Plaintiff States have failed to state a procedural claim under the APA, asserting that the termination of DACA was a "classic example" of a general statement of policy exempt from notice and comment. ECF. No. 71-1 at 28-31. This argument fails because the

Plaintiff States have alleged facts sufficient to show that the termination binds the discretion of DHS and its officials and, therefore, is not a general statement of policy excepted from the APA's notice and comment requirement.

The APA requires notice and comment for all agency-promulgated rules that do not fall within certain narrow exemptions, including an exemption for "general statements of policy." 5 U.S.C. § 553(b)(A); *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989) (exemptions to notice and comment "must be narrowly construed"). As Defendants point out, exempted general statements of policy "are binding on neither the public nor the agency." ECF. No. 71-1 at 30, quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). Instead, they simply "inform[] the exercise of discretion by agents and officers in the field." ECF. No. 71-1 at 30, quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). Rules that require notice and comment ("legislative rules"), on the other hand, have a "present binding effect" on agency discretion.[19] *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec,* 653 F.3d 1, 7 (D.C. Cir. 2011) (citation omitted). In analyzing whether the termination of DACA qualifies as a general statement of policy, Defendants thus appropriately focus on whether the termination binds the discretion of the agency and its officials.

Defendants incorrectly assert that the Termination Memo simply "describes how pending and future deferred action requests will be 'adjudicate[d]—on an individual, case-by-case basis,'" ECF. No. 71-1 at 30 (quoting ECF. No. 55-74). This characterization is misleading. The part of the Termination Memo that Defendants cite applied only to certain renewal requests submitted between September 5 and October 5, 2017, and thus to a very narrow subset of DACA requests

---

[19] Rules that do not fall within one of these exemptions are interchangeably referred to as "legislative" or "substantive" rules. We use the term "legislative," consistent with the preference identified by the Second Circuit. *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993).

that were adjudicated on a case-by-case basis. After that period, DHS retained *no* discretion to adjudicate *any* DACA requests, whether for initial or renewal applications. Indeed, the Termination Memo mandates refusal of DACA requests, stating that DHS, immediately upon issuance of the Memo, "[w]ill reject all [new] DACA initial requests," "[w]ill not approve any new Form I-131 applications for advance parole," and "[w]ill administratively close all pending Form I-131 applications for advance parole" filed pursuant to the DACA program. ECF. No. 55-74. The Termination Memo further states that, after October 5, 2017, DHS "[w]ill reject all DACA renewal requests." *Id.* This type of "[m]andatory, definitive language is a powerful, even potentially dispositive, factor" in distinguishing a legislative rule from a general statement of policy. *Young,* 818 F.2d at 947. Indeed, the word "will" (as opposed to "may") can be decisive in determining that an action is not a general statement of policy because "use of 'will' indicates the statement is in fact a binding norm." *Id.* at 946.

Defendants point out that past deferred action programs have "rarely" been enacted through notice and comment rulemaking. However, Defendants also adopt the view that a legal challenge to DACA would "yield similar results" to *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), ECF. No. 71-1 at 9 (quoting ECF. No. 55-74 at 4), in which the Fifth Circuit court held that notice and comment rulemaking was required for DAPA and expanded DACA. Thus, Defendants now implicitly endorse a view that DACA itself should have been subject to notice and comment.[20]

---

[20] In its November 9, 2017, Memorandum & Order, this Court rejected Defendants' argument that subjecting the termination to notice and comment would render DACA "void *ab initio,*" as the court could determine that the termination was a substantive rule, even if DACA itself was not. ECF. No. 104 at 35. Indeed, regardless of whether an underlying rule was promulgated correctly, notice and comment requirements apply to its termination if the termination is a substantive rule. *Consumer Energy Council v. FERC,* 673 F.2d 425, 447-448 (D.C. Cir. 1982). Defendants erroneously assert that notice and comment requirements do not apply to the termination of "a rule that was defective precisely because it had failed to go through notice and comment in the first place." ECF. No. 71-1 at 29, n.7. That logic has been specifically rejected in this district, when government actors "boldly [sought] to take refuge in their failure to follow rule and comment procedures in their promulgation" of a rule that they subsequently terminated without notice and comment. *Benten v. Kessler*, 799 F. Supp. 281, 289 (E.D.N.Y. 1992). The court

Further, the termination of DACA more clearly binds agency discretion than the implementation of DACA (or other deferred action programs). DACA allowed individuals to apply for deferred action based on certain criteria and provided guidelines by which DHS exercised prosecutorial discretion in considering those applications on a case-by-case basis. ECF. No. 54, ¶¶ 22, 26; ECF. No. 55-16, 55-34. *Cf. Dimaren v. I.N.S.*, 398 F. Supp. 556, 559 (S.D.N.Y. 1974) (immigration policy memorandum was exempt from notice and comment because agency officials were free to give it "whatever weight [they] deemed appropriate," so it did not bind their discretion); *see also* NDCAL Prov. Relief Order at 34-35.[21] The termination, on the other hand, prohibits agency officials from considering any DACA application, so there remains no case-by-case analysis or discretion. *Cf. Parco v. Morris*, 426 F. Supp. 976, 984-985 (E.D. Pa. 1977) (termination of a policy that granted extended stay in the U.S. for individuals awaiting a certain type of visa required notice and comment because it stripped agency officials of discretion to offer relief under the terms of the policy). Thus, Plaintiff States have plausibly alleged that the DACA termination binds DHS and its agents to a single course of action when it comes to DACA applications, renewals, and advanced parole requests and therefore is a rule subject to APA's notice and comment requirements.[22] Because Defendants failed to engage in notice and comment prior to terminating DACA, Plaintiff States have sufficiently stated a claim that Defendants violated the procedural

---

concluded that a rule that failed to follow proper notice requirements "is not a nullity" so notice and comment requirements may be found to apply to its termination. *Id.*

[21] NDCAL Prov. Relief Order  (citing *Arpaio v. Obama*, 27 F. Supp. 3d 185, 209, n. 13 (D.D.C. 2014)) (recognizing that "as of December 2014, 36,680 requests for deferred action under DACA were denied and another 42, 632 applicants were rejected as not eligible"" which "reflect[s] that case-by-case review is in operation").

[22] Defendants' claim that individual DACA grantees might, hypothetically, be eligible for some other form of deferred action or immigration relief through another channel (*see* ECF. No. 54, ¶ 82, ECF. No. 55-74) is not relevant to this analysis, as it does not affect the binding nature of the rule with respect to DACA-related requests, which will all be categorically denied.

provisions of the APA.

### III. PLAINTIFF STATES HAVE STATED A CLAIM THAT DEFENDANTS' TERMINATION OF DACA IS PROCEDURALLY INVALID UNDER THE RFA.

The RFA requires an analysis of a rule's effects on small entities. 5 U.S.C. §§ 601(2), 603(a) 604(a).  Defendants argue that Plaintiff States have failed to state a claim under the RFA because the termination is supposedly not a legislative rule within the meaning of the APA.  *See* ECF. No. 71-1 at 39-40.   But that argument lacks merit for the reasons discussed in Part II, *supra*.

As alleged by the Plaintiff States, DHS did not perform the required RFA analysis to determine the rule's effects on small entities, many of which will suffer a direct adverse effect from the termination. ECF. No. 54, ¶¶ 211-224, 228-229. Because Plaintiff States have stated a sufficient claim that notice and comment rulemaking is required under the APA, they have also stated a claim that RFA rulemaking was required. *Cf. U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (FCC should have provided notice of a rule under the APA, so the RFA's requirements were applicable).[23]

### IV. PLAINTIFF STATES HAVE STATED A CLAIM THAT THE TERMINATION OF DACA VIOLATES EQUAL PROTECTION.

The Fifth Amendment's Due Process Clause "contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups."

---

[23] In a footnote, Defendants additionally assert that the Plaintiff States cannot bring a claim under the RFA because they are not "'small entities' entitled to seek judicial review under the RFA." ECF. No. 71-1 at 40 n.9. The States allege, however, that terminating DACA will have a direct, adverse effect on their small governmental jurisdictions. ECF. No. 54, ¶¶ 211-224. These small governmental jurisdictions, which are included in the definition of "small entities" under 5 U.S.C. § 601(6), are political subdivisions of the States. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009) ("'Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities' . . . but are instead 'subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions.'" (internal citations omitted)). Plaintiff States have standing under the RFA to represent the interests of these political subdivisions. *Cf. Michigan v. EPA*, 213 F.3d 663, 688 (D.C. Cir. 2000) (reaching merits of state's RFA claim); *U.S. Telecomm. Ass'n*, 400 F.3d at  42-43 (RFA claim brought by national association representing small carriers); *Nw. Min. Ass'n v. Babbitt*, 5 F.Supp. 2d 9, 13 n.3 (D.D.C. 1998) (noting that an association could have associational standing to represent the interests of its members under the RFA).

19

*Washington v. Davis*, 426 U.S. 229, 239 (1976).  This equal protection guarantee applies to citizens and non-citizens alike.  *Plyler v. Doe*, 457 U.S. 202, 210 (1982).  A foundational principle of equal protection jurisprudence is that government action motivated by racial, ethnic, or other animus is *per se* illegitimate. *See, e.g.*, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Thus, even under the most deferential form of judicial review, governmental action must both "be rationally based *and* free from invidious discrimination" to pass constitutional muster.  *Dandridge v. Williams*, 397 U.S. 471, 487 (1970) (emphasis added).

Defendants' termination of DACA fails the most basic equal protection analysis. As Plaintiff States allege, the termination of DACA is simply the latest action in Defendants' campaign of animus-driven statements and conduct towards Latinos. Defendants cannot cure the odious constitutional defect underlying DACA's termination by claiming that it was motivated by litigation risk, rather than ill will.  As evidenced by Plaintiff States' lawsuit, and numerous others, the termination of DACA does not rationally further the purpose of avoiding litigation.  *See supra* Part I.B.2.b. Additionally, as discussed *supra* Part I.B.2.a, Defendants do not point to any viable evidence that DACA was unconstitutional, rendering their professed concern about DACA's unlawfulness irrational, if not outright implausible. Likewise, Defendants' mischaracterization of Plaintiff States' equal protection claim as one alleging selective enforcement is a red herring that has already been rejected by this Court. ECF. No. 104 at 24. Rather, Plaintiff States' have properly alleged that the termination of the entire DACA program—which *eliminates* DHS's ability to exercise its enforcement discretion regarding deferred action status for DACA recipients—was irrational, motivated by animus, and fails any standard of equal protection review.[24]

---

[24] Despite the deference afforded the Executive branch in immigration matters, the Supreme Court has explicitly stated that undocumented individuals have the same right to be protected from animus-based government policies as citizens

**A.  Plaintiff States Have Alleged That Defendants' Termination of DACA Violates Equal Protection Because It Was Based, In Part, On Animus Towards Latinos.**

Animus towards any group is never a legitimate reason for government action.[25]  For example, in *Romer v. Evans*, the Supreme Court analyzed a state constitutional amendment that stripped homosexuals, but no other group, from heightened protection against discrimination.  517 U.S. 620, 624 (1996).  Although homosexuals were not entitled to these heightened protections as a matter of law, the Court nonetheless invalidated the amendment, finding that it "impos[ed] a broad and undifferentiated disability on a single named group, and "its sheer breadth is so discontinuous with the reasons offered for it that the amendment *seems inexplicable by anything but animus* toward the class that it affects[.]" *Id.* at 632 (emphasis added).  Similarly, in *Moreno*, the Supreme Court struck down an amendment to the federal Food Stamp Act that terminated food stamp eligibility for households comprised of unrelated individuals.  413 U.S. at 528, 538.  Because the "scant" legislative history revealed that the amendment was motivated by animus towards hippies and hippie communes, the Court found that it could not survive even deferential judicial review.

The statements of record in this case more than satisfy the standard set forth in *Romer* and *Moreno*.  As alleged in Plaintiff States' Amended Complaint, Defendants have repeatedly demonstrated racial animus towards Latinos, who comprise 93% of all DACA recipients. For example, during his candidacy for President, Defendant Donald Trump, compared Mexican immigrants to rapists, stating: "When Mexico sends its people . . . They're bringing drugs. They're

---

and all other individuals. *See Plyler*, 457 U.S. at 210 ("the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government.").

[25] *See United States v. Windsor*, 133 S.Ct 2675, 2695-96 (2013) (striking down federal legislation based on animus towards LGBT individuals); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (striking down zoning law based on irrational prejudice towards the mentally disabled); *Moreno*, 413 U.S. at 538 (striking down legislation regarding federal benefits because it was based on animus towards hippies).

bringing crime. They're rapists." ECF. No. 54, ¶58.[26] Similarly, candidate-Trump referred to anti-Trump protestors who carried the Mexican flag as "criminals" and "thugs." *Id.* ¶ 61.

In another incident, after hearing about two men who urinated on a sleeping Latino man, beat him with a metal pole and told police that "Donald Trump was right; all these illegals need to be deported," candidate Trump described the assailants as merely "passionate" men who "want this country to be great again." *Id.* ¶ 64. At least twice during both his presidency and candidacy when discussing the issue of immigration, President Trump opted to unnecessarily inject race into the conversation and state his desire to get the "bad" "hombres"—the Spanish word for male—out of America. *Id.* ¶¶ 65-66.[27]

The Administration injected disparaging comments about DACA recipients into the decision to terminate DACA itself. When President Trump's appointed attorney general, Jeff Sessions, announced the termination of DACA, he claimed, without support, that the program had "yielded terrible humanitarian consequences" and "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." ECF. No. 54, ¶ 81. He characterized DACA as a "[f]ailure to enforce the laws" that has "put our nation at risk of crime, violence, and even terrorism." ECF. No. 55-75. Attorney General Sessions' statements bookend years of disparaging statements about Latino immigrants that led to DACA's termination.

Each of these statements by Defendants offends the basic notion of fairness and equality

---

[26] Along the same lines, during a presidential debate, candidate-Trump again expressed his distaste for Latino immigrants stating: "The Mexican government is much smarter, much sharper, much more cunning. And they send the bad ones over because they don't want to pay for them." *Id.* ¶ 59.

[27] Additionally, less than two weeks before the termination of DACA, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who had been sentenced to criminal contempt for failing to comply with a judicial order to stop racially profiling Latinos. *Id.* ¶ 67-68. After issuing the pardon, President Trump referred to former Sheriff Arpaio as "an American patriot." *Id.* ¶ 69.

that underlies equal protection analysis. Collectively, these statements give rise to a plausible claim that Defendants' termination of DACA—a substantial step in actualizing then-candidate and now-President Trump's commitments to remove Latino immigrants from this country—violates equal protection.[28]

Finally, even under the most deferential standard of rational basis review, the decision to terminate DACA fails. A policy "fails rational-basis review" . . . when it rest on grounds wholly irrelevant to achievement of the [stated] objective." *Heller v. Doe*, 509 U.S. 312, 324 (1993). Defendants claim that they terminated DACA to avoid litigation over the continuation of the program because, in their view, DACA is unlawful and unconstitutional. As discussed, supra I.B.2a, that purported justification lacks legal and factual support. Defendants' sudden about-face in position for no legitimate reason is thus the hallmark of irrational action, especially in light of the wide-ranging harms that their actions present. On this basis alone, Defendants' motion to dismiss must be denied.[29]

## B. Defendants' Citation to Selective Enforcement Case Law is Unavailing Because Plaintiff States Are Not Bringing a Selective Prosecution Claim

Although it is true that selective prosecution or enforcement is one type of government

---

[28] Contrary to Defendants' argument, it is irrelevant that the allegations of animus do not involve the specific drafter of the DACA termination memo. Neither the *Moreno* nor *Romer* Court required evidence of animus by the drafter or enactor of the policy at issue to conclude that the policy was driven by animus. In those cases it was sufficient that direct evidence of animus existed in the legislative history, *see Moreno*, 413 U.S. at 534, or that indirect evidence existed by the "sheer breadth" of the policy itself, *Romer*, 517 U.S. at 632. Plaintiff States' allegations demonstrate that both are present here. Further, at the motion to dismiss stage, Plaintiff States are not required or expected to produce detailed evidence of animus by all decisionmakers, before the opportunity for extensive discovery. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 556 (2007) (stating that pleading requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" substantiating Plaintiffs' claims); *Randle v. Alexander*, 960 F. Supp. 2d 457, 476 (S.D.N.Y. 2013) (finding that because Plaintiff's equal protection claim alleging race discrimination "is plausible, he need not flesh out his allegations with details that can be obtained only through discovery").

[29] Additionally, where, as here, Plaintiffs present strong evidence of animus, the policy violates the Fifth Amendment's equal protection guarantee, regardless whether a legitimate purpose exists because "no legitimate purpose overcomes [the federal government's] purpose and effect to disparage and injure…" *Windsor*, 133 S.Ct at 2696.

action that can violate equal protection, *Pyke v. Cuomo*, 258 F.3d 107, 108-09 (2d Cir. 2001), Defendants miscast Plaintiff States' equal protection claim as challenging individual enforcement decisions.  Plaintiff States instead claim that the termination of DACA was a facially neutral decision that had an adverse effect on Latinos and was motivated, in part, by animus toward that racial group.[30]  Accordingly, Defendants' citations to selective enforcement cases such as *United States v. Armstrong* and *Rajah v. Mukasey,* ECF. No. 71-1 at 31-33, are wholly inapposite.

Furthermore, *Armstrong* and *Rajah* are easily factually distinguishable from the case at bar.  In *Armstrong*, the plaintiffs alleged that the Defendants violated equal protection principles by exclusively prosecuting African-Americans for certain drug offenses.  517 U.S. 456, 458-59 (1996). Rejecting the plaintiffs' argument, the Supreme Court explained that selective enforcement claims require plaintiffs to demonstrate that "similarly situated individuals of a different race were not prosecuted," which plaintiffs had failed to do. *Id.* This reasoning has no application here, because the "similarly situated" requirement does not apply to equal protection claims where the plaintiff alleges "that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus."  *Pyke*, 258 F.3d at 110. Plaintiff States make ample allegations that demonstrate that Defendants' animus towards Latinos was a motivating factor in their decision to terminate DACA.[31]

Similarly, *Rajah* dealt with the government's emergency and "clearly tailored" response

---

[30] *See also* ECF. No. 104, at 23 (acknowledging that "Plaintiffs do not challenge an agency's failure or refusal to prosecute or take enforcement actions with respect to certain violations of law. Instead, they challenge Defendants' affirmative decision to eliminate a program by which DHS exercised prosecutorial discretion with respect to a large number of undocumented immigrants.").

[31] *See also Armstrong*, 517 U.S. at 464 (distinguishing the plaintiffs' selective enforcement claim from equal protection claims alleging that a prosecutor decided to prosecute "based on an unjustifiable standard such as race," which the Court acknowledged would be unconstitutional).

to the 9/11 terrorist attacks. 544 F.3d 427, 439 (2d Cir. 2008).[32]   In contrast, Defendants' termination of DACA was not a response to a legitimate national security threat and was in no way tailored in effect.   Rather, as Plaintiff States have alleged, the termination was a wholesale withdrawal of DACA status for *all* recipients, in part, to further the illegitimate purpose of furthering Defendants' animus towards the racial group that primarily benefited from the program.[33] This bears no resemblance to the governmental decision-making analyzed in *Rajah*.

Lastly, because this case does not involve a selective enforcement claim, it is irrelevant that 7% of DACA recipients affected by the termination are non-Latino. In *Moreno*, the fact that the Food Stamp amendment impacted a broader class of individuals than the hippie class targeted by the government - - including, the plaintiffs in that case - -  did not save the Act's constitutionality.  413 U.S. at 532.[34] The same reasoning applies here. Accordingly, Defendants' motion to dismiss Plaintiff States' equal protection claim should be denied.

## CONCLUSION

For the reasons set forth above, Plaintiff States respectfully request that the Court deny Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) in its entirety.

---

[32] In *Rajah*, the federal government was armed with actual knowledge that adult males from certain countries had been involved in the 9/11 terrorist attacks; it therefore declined to extend immigration eligibility for non-lawful permanent resident individuals who fell within that discrete class.  The federal government *did not* impose broad and harsh changes to its immigration policy that were unconnected to the specific facts at hand.  Accordingly, women, individuals with similar ethnicity or religion from different countries unconnected to the attack, and children, were not affected.  Thus, even in that unique threat to national security, the government's policy survived constitutional scrutiny because it was "clearly tailored" to combat the precise threat at hand.  *Id.* at 439.

[33] Moreover, for an individual to be DACA-eligible, DHS must have found that they did not pose a threat to national security.  ECF No. 54 ¶ 24(d).

[34] *See also Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 (9th Cir. 2013) ("The principle that overdiscrimination is prohibited undergirds all of constitutional and statutory anti-discrimination law . . . .").

Dated: January 12, 2018

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By:  */s Lourdes M. Rosado*
     Lourdes M. Rosado, Bureau Chief
     Brooke Tucker, Assistant Attorney
     General*
     Sania Khan, Assistant Attorney General
     Diane Lucas, Assistant Attorney General
     Ajay Saini, Assistant Attorney General
     Alex Finkelstein, Volunteer Assistant
     Attorney General
     Civil Rights Bureau
     Office of the New York State Attorney
     General
     120 Broadway, 23rd Floor
     New York, NY 10271
     Lourdes.Rosado@ag.ny.gov
     Sania.Khan@ag.ny.gov
     Diane.Lucas@ag.ny.gov
     Ajay.Saini@ag.ny.gov
     Tel. (212) 416-6348
     Fax (212) 416-8074
     *admission pending*

MAURA HEALEY
Attorney General for the Commonwealth of
Massachusetts

By:  */s Abigail B. Taylor*
     Jonathan B. Miller
     Genevieve C. Nadeau (*pro hac vice*)
     Abigail B. Taylor (*pro hac vice*)
     Assistant Attorneys General
     Office of the Attorney General
     One Ashburton Place
     Boston, MA 02108
     Jonathan.Miller@state.ma.us
     Genevieve.Nadeau@state.ma.us
     Abigail.Taylor@state.ma.us
     Tel. (617) 727-2200

BOB FERGUSON
Attorney General of the State Washington

By:  /s/ *Robert W Ferguson*
     Robert W. Ferguson (*pro hac vice*)
     Attorney General
     Colleen M. Melody (*pro hac vice*)
     Civil Rights Unit Chief
     Marsha Chien (*pro hac vice*)
     Assistant Attorney General
     Office of the Attorney General
     800 Fifth Avenue, Suite 2000
     Seattle, WA 98104
     ColleenM1@atg.wa.gov
     MarshaC@atg.wa.gov
     Tel. (206) 464-7744

26

**GEORGE JEPSEN**
Attorney General of the State of Connecticut

By:  */s Mark K. Kohler*
     Mark F. Kohler (*pro hac vice*)
     Assistant Attorney General
     Connecticut Office of the Attorney
     General
     55 Elm Street, P.O. Box 120
     Hartford, CT 06106
     Mark.Kohler@ct.gov
     Tel. (860) 808-5020

**KARL A. RACINE**
Attorney General for the District of Columbia

By:  */s Robyn R. Bender*
     Robyn R. Bender*
     Deputy Attorney General
     Public Advocacy Division
     441 4th Street, NW
     Suite 650 North
     Washington, DC 20001
     Robyn.Bender@dc.gov
     Tel. (202) 724-6610
     Fax (202) 730-0650

**DOUGLAS S. CHIN**
Attorney General of the State of Hawaii

By:  */s Donna H. Kalama*
     Donna H. Kalama (*pro hac vice*)
     Deputy Attorney General
     State of Hawaii, Department of the
     Attorney General
     425 Queen Street
     Honolulu, HI 96813
     Donna.H.Kalama@hawaii.gov
     Tel. (808) 586-1224

**LISA MADIGAN**
Attorney General of the State of Illinois

By:  */s Anna P. Crane*
     Anna P. Crane, Assistant Attorney
     General (*pro hac vice*)
     Karyn L. Bass Ehler,
     Chief, Civil Rights Bureau
     Harpreet Khera, Deputy Bureau Chief,
     Special Litigation Bureau
     Caitlyn McEllis, Assistant Attorney
     General
     Jeff VanDam, Assistant Attorney Genera
     Civil Rights Bureau
     Office of the Illinois Attorney General
     100 W. Randolph Street
     Chicago, IL 60601
     Anna.Crane@atg.state.il.us
     Tel. (312) 814-3400
     Fax (312) 814-3212

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By:   */s Nathan Blake*
      Nathan Blake (*pro hac vice*)
      Deputy Attorney General
      Office of the Attorney General of Iowa
      1305 E. Walnut Street
      Des Moines, IA 50319
      Nathan.Blake@iowa.gov
      Tel. (515) 281-4325
      Fax (515) 281-4209

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By:   */s Tania Maestas*
      Tania Maestas, (*pro hac vice*)
      Deputy Attorney General
      Ari Biernoff, Assistant Attorney General
      Jennie Lusk, Assistant Attorney General
      New Mexico Office of the Attorney
      General
      408 Galisteo St.
      Santa Fe, NM 87501
      ABiernoff@nmag.gov
      Tel. (505) 490-4060
      Fax (505) 490-4883

**MATTHEW DENN**
Attorney General of the State of Delaware

By:   *s/ Aleine Cohen*
      Aaron Goldstein*
      State Solicitor
      Aleine Cohen (*pro hac vice*)
      Deputy Attorney General
      Delaware Department of Justice
      820 N. French St.
      Wilmington, DE 19801
      Aaron.Goldstein@state.de.us
      Aleine.Cohen@state.de.us
      Tel. (302) 577-8400

**PETER KILMARTIN**
Attorney General of the State of Rhode Island

By: */s Rebecca T. Partington*
      Rebecca T. Partington (*pro hac vice*)
      Chief, Civil Division
      Michael W. Field (*pro hac vice*)
      Assistant Attorney General
      Adam D. Roach (*pro hac vice*)
      Special Assistant Attorney General
      RI Office of the Attorney General
      150 South Main Street
      Providence, RI 02903
      RPartington@riag.ri.gov
      MField@riag.ri.gov
      ARoach@riag.ri.gov
      Tel. (401) 274-4400

**JOSH STEIN**
Attorney General of the State of North
Carolina

By:   */s Sripriya Narasimhan*
      Sripriya Narasimhan*
      North Carolina Department of Justice
      114 W. Edenton Street
      Raleigh, NC 27603
      SNarasimhan@ncdoj.gov
      Tel. (919) 716-6400

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By:   */s Brian De Haan*
      Brian De Haan*
      Assistant Attorney General
      Trial Attorney
      Brian.A.DeHaan@doj.state.or.us
      Tel. (971) 673-1880
      Fax (971) 673-5000

**JOSH SHAPIRO**
Attorney General of the Commonwealth of
Pennsylvania

By:   */s Jonathan Scott Goldman*
      Jonathan Scott Goldman*
      Executive Deputy Attorney General,
      Civil Law Division
      Michael J. Fischer, (*pro hac vice*)
      Chief Deputy Attorney General, Impact
      Litigation Section
      Office of Attorney General
      16th Floor, Strawberry Square
      Harrisburg, PA 17120
      MFischer@attorneygeneral.gov
      Tel. (717) 787-3391

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

By:   */s Benjamin D. Battles*
      Benjamin D. Battles, (*pro hac vice*)
      Solicitor General
      Julio A. Thompson*, Assistant Attorney
      General, Civil Rights Unit
      Office of the Vermont Attorney General
      109 State Street
      Montpelier, VT 05609
      Benjamin.Battles@vermont.gov
      Tel. (802) 828-5500
      Fax (802) 828-3187

**MARK R. HERRING**
Attorney General of the Commonwealth of
Virginia

By:   */s Matthew R. McGuire*
      Matthew R. McGuire (*pro hac vice*)
      Acting Deputy Solicitor General
      202 North Ninth Street
      Richmond, VA 23219
      MMcguire@oag.state.va.us
      Tel. (804) 786-7773

**JOHN W. HICKENLOOPER**
Governor of the State of Colorado

By:   */s Jacki Cooper Melmed*
      Jacki Cooper Melmed
      Special Assistant Attorney General*
      Chief Legal Counsel
      136 State Capitol Building
      Denver, Colorado 80203
      Jackic.Melmed@state.co.us
      Tel. (303) 866-3788
      (* Limited Appointment)