**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KIRSTJEN M. NIELSEN, *et al.*, <br><br> Defendants. | No. 16-cv-4756 (NGG) (JO) |
| STATE OF NEW YORK, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, *et al.*, <br><br> Defendants. | No. 17-cv-5228 (NGG) (JO) |

**MEMORANDUM OF LAW IN OPPOSITION TO
<u>PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.  Deferred Action Generally............................................................... 3

    B.  DACA and DAPA....................................................................... 4

    C.  The *Texas* Litigation ...................................................................... 5

    D.  Rescission of DACA ...................................................................... 6

    E.  Plaintiffs' Motions for a Preliminary Injunction ................................. 7

    F.  The Northern District of California Preliminary Injunction ................. 8

LEGAL STANDARD.......................................................................................... 9

ARGUMENT ..................................................................................................... 9

    I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ............................ 10

        A.  Plaintiffs' Claims Are Not Justiciable ...................................... 10

        B.  The Acting Secretary Rationally Explained Her Decision to Rescind DACA ...................................................................... 10

        C.  The Rescission is a General Statement of Policy Not Subject to the Requirements of Notice-and-Comment Rulemaking Procedures or the Regulatory Flexibility Act ...................................................................... 34

        D.  The Rescission Does Not Violate Equal Protection Principles................................... 41

    II.  THE REMAINING FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION................................................................... 46

        A.  Plaintiffs Have Not Shown Any Risk of Irreparable Harm That Would Be Remedied By The Injunctive Relief That They Seek............................................. 46

        B.  Balancing of the Equities and the Public Interest Disfavor Injunctive Relief.......................................................................... 49

        C.  Any Injunctive Relief Should Be Narrowly Drawn .................................... 49

CONCLUSION.................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*A.X.M.S. Corp. v. Friedman*,
   948 F. Supp. 2d 319 (S.D.N.Y. 2013)..................................................................... 48

*Adair v. England*,
   183 F. Supp. 2d 31 (D.D.C. 2002) ......................................................................... 33

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
   215 F.3d 61 (D.C. Cir. 2000) .................................................................................. 20

*Amfac Resorts LLC v. Dep't of Interior*,
   143 F. Supp. 2d 7 (D.D.C. 2001) ........................................................................... 33

*Arizona v. United States*,
   567 U.S. 387 (2012) ........................................................................................... 3, 49

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015), *cert denied*, 136 S. Ct. 900 (2016) .................................. *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................ 41

*Brady v. FERC*,
   416 F.3d 1 (D.C. Cir. 2005) .................................................................................... 18

*Buckingham Corp. v. Carp*,
   762 F.2d 257 (2d Cir. 1985).................................................................................... 48

*Camp v. Pitts*,
   411 U.S. 138 (1973)................................................................................................ 29

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979)................................................................................................ 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)........................................................................................... 11, 33

*Coal. on Sensible Transp. v. Dole*,
   826 F.2d 60 (D.C. Cir. 1987) .................................................................................. 33

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010)........................................................................................ 9

*Commercial Drapery Contractors v. United States*,
    133 F.3d 1 (D.C. Cir. 1998) ............................................................. 33

*Consumer Energy Council v. FERC*,
    673 F.2d 425 (D.C. Cir. 1982) ......................................................... 39

*Dep't of Agriculture v. Moreno*,
    413 U.S. 528 (1973) .......................................................................... 44

*Dep't of Natural Res. & Envtl. Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015) ............................................................. 20

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ...................................................................... 16

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................... 14, 15

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) .......................................................................... 29

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005) ............................................................. 46

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................... 19, 35, 42

*Ikelionwu v. United States*,
    150 F.3d 233 (2d Cir. 1998) ............................................................. 28

*James Madison Ltd. by Hecht v. Ludwig*,
    82 F.3d 1085 (D.C. Cir. 1996) ......................................................... 33

*Kadrmas v. Dickinson Pub. Sch.*,
    487 U.S. 450 (1988) .......................................................................... 46

*Lewis v. Casey*,
    518 U.S. 343 (1996) .......................................................................... 50

*Lewis v. Thompson*,
    252 F.3d 567 (2d Cir. 2001) ............................................................. 46

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .................................................................... 34, 38

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 39

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) ......................................................... 35

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ........................................................................... 50

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985) ........................................................................... 27

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ............................................................................. 9

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ......................................................... 24

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ....................................................................... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983) ......................................................... 11, 13, 18, 20

*Nw. Mining Ass'n v. Babbitt*,
    5 F. Supp. 2d 9 (D.D.C. 1998) ......................................................... 41

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ............................................................... 9

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
    851 F.2d 1424 (D.C. Cir. 1988) ....................................................... 37

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ........................................................................... 33

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ......................................................... 35

*New York v. Reilly*,
    969 F.2d 1147 (D.C. Cir. 1992) ................................................. 18, 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................... 49

*Noel v. Chapman*,
    508 F.2d 1023 (2d Cir. 1975)................................................................. 36

*Organized Village of Kake v. U.S. Dep't of Agriculture*,
    795 F.3d 956 (9th Cir. 2015) ................................................................. 23

*Pac. Gas & Elec. Co. v. FPC*,
    506 F.2d 33 (D.C. Cir. 1974)................................................................. 35

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015).................................................................. 34, 35

*Plyler v. Doe*,
    457 U.S. 202 (1982)..................................................................... 45, 46

*Rajah v. Mukasey*,
    544 F.3d  (2d Cir. 2008)....................................................................... 42

*Regents of Univ. of Cal. v. DHS*,
    No. 17-5211-WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018)...................................... *passim*

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
    525 U.S. 471 (1999)............................................................... 3, 4, 37, 42

*Ricci v. DeStefano*,
    557 U.S. 557 (2009)........................................................................... 22

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)................................................................. 47

*Romer v. Evans*,
    517 U.S. 620 (1996)..................................................................... 44, 45

*Rusu v. INS*,
    296 F.3d 316 (4th Cir. 2002) ................................................................. 45

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)............................................................................ 29

*Sec'y of Agriculture v. Cent. Roig Ref. Co.*,
    338 U.S. 604 (1950)........................................................................... 18

*Sendra Corp. v. Magaw*,
    111 F.3d 162 (1997)........................................................................... 28

*Shepard v. NLRB,*
    459 U.S. 344 (1983) ............................................................................ 13

*Sierra Club v. Jackson,*
    833 F. Supp. 2d 11 (D.D.C. 2012) ...................................................... 23

*Sunward Elecs., Inc. v. McDonald,*
    362 F.3d 17 (2d Cir. 2004) .................................................................... 9

*Syracuse Peace Council v. FCC,*
    867 F.2d 654 (D.C. Cir. 1989) ............................................................ 25

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ...................................................... *passim*

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017) ........................................................................ 50

*Troy Corp. v. Browner,*
    120 F.3d 277 (D.C. Cir. 1997) ............................................................ 11

*U.S. ex rel. Parco v. Morris,*
    426 F. Supp. 976 (E.D. Pa. 1977) ...................................................... 39

*U.S. Telecom Ass'n v. FCC,*
    400 F.3d 29 (D.C. Cir. 2005) .............................................................. 41

*United Mine Workers of America v. U.S. Dep't of Labor,*
    358 F.3d 40 (D.C. Cir. 2004) .............................................................. 23

*United States v. Armstrong,*
    517 U.S. 456 (1996) ............................................................................ 42

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ............................................................................ 45

*United States v. Merkt,*
    794 F.2d 950 (5th Cir. 1986) .............................................................. 45

*United States v. Texas,*
    136 S. Ct. 2271 (2016) .......................................................................... 5

*United States v. Texas,*
    137 S. Ct. 285 (2016) ............................................................................ 5

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................................................ 42

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ........................................................................................ 41

*Washington v. Davis,*
    426 U.S. 229 (1976) ........................................................................................ 42

*Wayte v. United States,*
    470 U.S. 598 (1985) .................................................................................... 38-39

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................................ 9, 40

**Statutes**

5 U.S.C. § 553 ........................................................................... 34, 35, 39, 41

5 U.S.C. § 601 ........................................................................................ 41

5 U.S.C. § 604 ........................................................................................ 41

5 U.S.C. § 611 ........................................................................................ 41

5 U.S.C. § 701 ........................................................................................ 37

5 U.S.C. § 706 ........................................................................................ 10

8 U.S.C. § 1103 ............................................................................. 3, 22, 30

8 U.S.C. § 1158 ......................................................................................... 3

8 U.S.C. § 1182 ......................................................................................... 3

8 U.S.C. § 1227 ......................................................................................... 3

8 U.S.C. § 1229b ....................................................................................... 3

8 U.S.C. § 1252(g) .................................................................................. 37

15 U.S.C. § 1392 (repealed 1994) ........................................................... 20

28 U.S.C. § 1292(b) ................................................................................ 37

28 U.S.C. § 2401 .................................................................................... 28

42 U.S.C. § 7412 ........................................................................................ 19

**Regulations**

8 C.F.R. § 274a.12(c)(14) .................................................................... 3, 4, 48

**Other Authorities**

1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.3 (5th ed. 2010) ................................ 35

Andorra Bruno, et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23, Cong. Research Serv. (July 13, 2012)
   https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-
   Service-Report1.pdf ............................................................................................ 36

Barack Obama, The White House*, Remarks by the President on Immigration*
   (June 15, 2012), http://go.usa.gov/xnXFY .................................................... 16, 17, 30

Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM)
   https://twitter.com/realDonaldTrump/status/905228667336499200) ................................ 31, 32

DOJ, Attorney General's Manual on the Administrative Procedure Act (1947) ........................ 34

Mem. from the Attorney General to All Federal Prosecutors (May 10, 2017),
   https://www.justice.gov/opa/press-release/file/965896/download ............................................ 39

Presidential Memoranda, The White House,
   *President Donald J. Trump's Letter to House and Senate Leaders &*
   *Immigration Principles and Policies* (Oct. 8, 2017),
   https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-
   house-and-senate-leaders-immigration .................................................................... 31

Press Release, DHS
   Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
   https://go.usa.gov/xncuM.................................................................... 12, 18, 22, 31

Statement from President Trump, Sept. 5, 2017,
   https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president
   -donald-j-trump .................................................................................... 32-33

USCIS.gov,
*Approximate Active DACA Recipients: Sex and Age Group As of September 4, 2017*,
   https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and
   %20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA
   /daca_population_data.pdf .................................................................................... 46

**INTRODUCTION**

The Rescission Policy challenged here provides for an orderly wind-down of Deferred Action for Childhood Arrivals (DACA), an exercise of prosecutorial discretion that, from the start, conferred no legally enforceable rights and was explicitly enacted as a temporary, stopgap measure.  Pursuant to the Rescission Policy, recipients whose DACA expires before March 5, 2018, had the opportunity to renew their deferred action for an additional two years, and current DACA recipients will maintain their deferred action status for the remaining duration of their deferred-action grants.  Plaintiffs in these two related actions nonetheless seek, in the form of what is nominally preliminary injunctive relief, the immediate and wholesale reinstatement of that discretionary enforcement policy.

This Court should reject that invitation because Plaintiffs cannot meet the exacting standard for preliminary relief.  Plaintiffs are unlikely to succeed on the merits of their Administrative Procedure Act (APA) claims (even if they are justiciable) because the then-Acting Secretary of Homeland Security Elaine C. Duke adequately explained her decision to wind down DACA:  A legally indistinguishable policy (including an expansion of DACA) had been enjoined on a nationwide basis by a district court in Texas; that injunction was upheld by the United States Court of Appeals for the Fifth Circuit; that decision, in turn, was affirmed by an equally divided Supreme Court; and the same plaintiffs were about to sue over DACA before the same judge in Texas. Faced with the nearly inevitable prospect of an immediate, nationwide injunction against DACA, the Acting Secretary chose an orderly wind-down.  Due to the near-certainty that DACA otherwise would have been abruptly invalidated in its entirety, that decision was eminently reasonable, and certainly not arbitrary and capricious.

1

Plaintiffs also argue that the Rescission Policy was subject to the APA's notice-and-comment requirements (and the Regulatory Flexibility Act), but those requirements are inapplicable to a general statement of policy like this one, and Plaintiffs' argument is self-defeating in any event because DACA itself likewise was adopted without notice and comment. Some of the Plaintiffs also argue that DACA should be restored because its rescission was secretly motivated by discriminatory animus supposedly harbored by the President of the United States, but even if they had alleged a rigorous factual basis for such a claim—and they have not even attempted to meet that high standard—it would still get them nowhere, as none of their allegations are in any way connected to the actual agency decision maker.

Nor can Plaintiffs demonstrate that any of the harms they have identified can be resolved by a preliminary injunction entered by this Court now. Plaintiffs raise concerns about lost professional opportunities, the inability to make long-term plans, and the angst surrounding the Rescission Policy, but none of these harms can be ameliorated by the temporary judicial relief that Plaintiffs seek, which will last only through the end of this litigation, and will still leave them without any permanent lawful immigration status. Nor can Plaintiffs demonstrate that the balance of the equities and the public interest weigh in their favor. Finally, the relief that Plaintiffs seek— a wholesale but temporary reinstatement of the DACA policy nationwide—is overbroad and improper. That is particularly so now that a district court in the Northern District of California has already entered a preliminary injunction that requires the government to largely maintain the DACA policy, as it existed on September 4, 2017—including for the benefit of these Plaintiffs in the Eastern District of New York.

Plaintiffs' motions for a preliminary injunction should be denied.

# BACKGROUND

## A.     Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the Immigration and Nationality Act (INA) along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). Department of Homeland Security (DHS) officials first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum or parole, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 483 (1999).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016). Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the

government which gives some cases lower priority"). Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former Immigration and Naturalization Service (INS) have adopted more than 20 such policies over the past 50 years.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, *see, e.g.*, 8 C.F.R. § 274a.12(c)(14), but a grant of deferred action does not confer lawful immigration status or provide a defense to removal. To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484-85.

### B.    DACA and DAPA

On June 15, 2012, then-Secretary Janet Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo), *Batalla Vidal* ECF No. 77-1. DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. *Id.* at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to renewal. *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

In 2014, DHS expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37-41 (hereinafter DAPA Memo). DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo 3 (AR 39). The DAPA Memo also expanded DACA by adjusting the date-of-entry requirement from June 2007 to January 2010, removing the age cap, and extending the DACA renewal period from two to three years. *Id.* at 3-4 (AR 39-40).

### C.    The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states. Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of DAPA and expanded DACA. *Texas v. United States*, 809 F.3d 134, 147-48 (5th Cir. 2015). Like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the Administrative Procedure Act's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. The Fifth Circuit also held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA and expanded DACA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184, 186 (footnotes omitted). That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Mem. for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec., Re: *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235-37.  Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, noting that it suffers from the same legal flaws that the courts had identified in expanded DACA and DAPA.  See AR 238-40 (Paxton Letter).

### D.   Rescission of DACA

Faced with imminent litigation, then-Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 (Rescission Policy or Policy).  As she explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  Rescission Policy 4 (AR 255).  Specifically, she quoted the Attorney General's recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted).  Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- *For current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

- *For initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- *For DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255).

### E.    Plaintiffs' Motions for a Preliminary Injunction

While the *Batalla Vidal* Plaintiffs have brought a panoply of claims, their motion for a preliminary injunction focuses on two claims brought pursuant to the APA.  First, the *Batalla Vidal* Plaintiffs allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it lacks a rational explanation; second, they allege that the rescission violates the APA because it was issued without notice and comment.  The *Batalla Vidal* Plaintiffs also bring a procedural claim under the Regulatory Flexibility Act (RFA).  The *State of New York* Plaintiffs seek a preliminary injunction on similar grounds, as well as under the equal protection component

7

of the Due Process Clause of the Fifth Amendment, alleging that the rescission of DACA was motivated by discriminatory animus toward Latinos.

The *Batalla Vidal* Plaintiffs ask the Court to "direct[] Defendants to restore the DACA program pending final adjudication on the merits." *Batalla Vidal,* Mem. of Law in Support of Pls.' Mot. for Prelim. Inj. (*Batalla Vidal* Mot.) at 40, ECF No. 123-1.  The *State of New York* Plaintiffs seek a more specific order that would among other things, "immediately reinstate the implementation of the DACA program, nationwide, to conditions in existence prior to Defendants' termination, using the same means, methods, and policies for considering granting requests for deferred action, employment authorization, and advanced parole as were utilized prior to Defendants' termination of DACA."  *State of New York* Proposed Order at 2, ECF No. 96-3. Plaintiffs thus request an order compelling the government to continue to consider DACA requests (and related discretionary relief) from a broad class of individuals who are not before this Court.

### F.   The Northern District of California Preliminary Injunction

On January 9, 2018, the United States District Court for the Northern District of California (Alsup, J.), in parallel litigation challenging the rescission of DACA, entered a nationwide injunction that provides Plaintiffs nearly all of the relief that they are seeking here.  *See Regents of Univ. of Cal. v. DHS*, No. 17-5211-WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018).  The district court in *Regents* ordered the following relief:

> For the foregoing reasons, defendants **ARE HEREBY ORDERED AND ENJOINED**, pending final judgment herein or other order, to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments, with the exceptions (1) that new applications from applicants who have never before received deferred action need not be processed; (2) that the advance parole feature need not be continued for the time being for anyone; and (3) that defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application.

*Id.* at *27-28.  Defendants immediately began taking steps to comply with the *Regents* order and, earlier this evening, USCIS issued public guidance with instructions on submitting DACA renewal requests.  *See* USCIS.gov, *Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction* (Jan. 13, 2018), https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis and citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  And where, as here, "[a] plaintiff . . . seeks a preliminary injunction that will alter the status quo," the plaintiff "must demonstrate a 'substantial' likelihood of success on the merits." *Id.* (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).[1]

## ARGUMENT

Even if they are justiciable, Plaintiffs' claims are deeply flawed on the merits, and Plaintiffs are therefore unlikely to succeed on any of them.  The other preliminary injunction factors also

---

[1] To the extent there is any meaningful distinction between the *Winter* standard and the "serious questions" formulation at times used by the Second Circuit—primarily (but not exclusively) in pre-*Winter* case law, *see Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 36-38 (2d Cir. 2010)—this Court need not consider that nuance here.  Both sets of Plaintiffs explicitly embrace the full *Winter* standard, in which Plaintiffs bear the burden to show all four necessary elements, including that success on the merits is "likely." *See Batalla Vidal* Mot. at 9; *State of New York*, Mem. of Law in Support of Pls.' Mot. for Prelim. Inj. (*State of New York* Mot.) at 3, ECF No. 96-1.

weigh against temporary injunctive relief—especially now that the United States District Court for the Northern District of California has ordered DHS to provide nearly all the relief that Plaintiffs are looking for here.  Only Congress can now provide the certainty and stability that Plaintiffs seek, in the form of a permanent lawful immigration status.  This Court need not and should not enter a legally unwarranted and factually unnecessary preliminary injunction.

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.   Plaintiffs' Claims Are Not Justiciable.

As explained in Defendants' motions to dismiss, *Batalla Vidal* ECF Nos. 95, 207; *State of New York* ECF No. 71, none of Plaintiffs' claims are justiciable.  This Court largely rejected Defendants' jurisdiction and justiciability arguments in its November 9, 2017 Memorandum and Order.  *Batalla Vidal* ECF No. 104 (Nov. 9, 2017 Mem. & Order); *State of New York* ECF No. 85. Because that order is now subject to an interlocutory appeal, Defendants will say nothing further about those arguments here, other than that they provide a threshold reason to hold that Plaintiffs are unlikely to succeed on the merits of any of their claims.

### B.   The Acting Secretary Rationally Explained Her Decision to Rescind DACA.

Even if the decision to rescind DACA were subject to judicial review, it was not arbitrary and capricious.  Agencies are free to change course on policy matters so long as they provide a rational explanation and the new policy is legally permissible.  Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the virtual certainty of a nationwide injunction based on controlling Fifth Circuit precedent, which would have prompted an immediate—and chaotic—end to the policy.

Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A)-(B).  The agency's

decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citation omitted). Agency action is arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id.*

The Rescission Policy amply meets these "minimal standards of rationality," *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), particularly in view of the near-certain litigation loss in the pending *Texas* lawsuit. Then-Acting Secretary Duke explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's view that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty.

The Acting Secretary was thus "faced with two options:  wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately."  Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017) (hereinafter Duke Statement), https://go.usa.gov/xncuM.  She reasonably opted for an orderly rescission, which she considered "the least disruptive option."  *Id*.  There was nothing at all irrational about that decision or the explanation for it.

**1.**  Plaintiffs claim that the Rescission Policy provides "almost no reasons at all" for the rescission of DACA, leaving them merely "to guess" at the Acting Secretary's reasoning.  *Batalla Vidal* Mot. at 13-14.  That argument blinks reality.  Even if the agency were not free to revoke deferred action at any time for any reason—or, indeed, for no reason, *see, e.g.*, *Arpaio*, 797 F.3d at 17; DAPA Memo 2 (AR 38)—no guesswork is required here:  As the balance of their briefs demonstrate, Plaintiffs clearly comprehend the basis for the Acting Secretary's decision.  For example, while Plaintiffs purport to be perplexed by the Acting Secretary's reference to the litigation risk posed by the *Texas* case, *Batalla Vidal* Mot. at 12-13, they understood this rationale well enough to devote separate sections of their briefs to addressing it, *id*. at 20-23 (arguing that "'Litigation Risk' cannot justify the DACA Termination"); *State of New York* Mot. at 5-6 (arguing that an agency may "reverse policy based on a purported risk of litigation" only in certain circumstances).  Likewise, while they claim to be confused by the Attorney General's views on DACA's legality, which they deem too "cursory," *State of New York* Mot. at 7; *see Batalla Vidal* Mot. at 24 n.14, their briefs also separately address this issue, *Batalla Vidal* Mot. at 23-25 (arguing that the "determination that DACA is unlawful is legally erroneous").

At bottom, then, Plaintiffs' argument reduces to a claim that the Rescission Policy was just too short. *See, e.g.*, *id.* at 12 n.5 (complaining that "two of th[e] five pages" of the decision memo are taken up by the "'Background' section"). But under the APA, whether an agency's decision is sustainable turns not on its length, but its rationality. Here, there is no reason to adopt Plaintiffs' myopic focus on the "one sentence" setting forth the Acting Secretary's conclusion, *id.* at 11-12, while ignoring the rest of the document, which lays the foundation for that conclusion and elaborates on the reasoning behind it. *See* Rescission Policy 1 (AR 252) (noting, in the introduction, that DACA will be rescinded "[f]or the reasons . . . outlined below"); *id.* at 2-3 (AR 253–54) (explaining, as background, that DAPA and expanded DACA were "substantially similar" to DACA, that the Fifth Circuit had invalidated the DAPA Memo, and that the Attorney General had concluded that "it is likely that potentially imminent litigation would yield similar results with respect to DACA" (citation omitted)). Indeed, Plaintiffs' suggestion that length should be determinative calls into question the rationality of the original DACA Memo itself, which spanned only three pages. *See* DACA Memo 1-3 (AR 1-3).

The Court must "uphold a decision"—even if it is made with "less than ideal clarity"—as long as "the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quotation omitted); *see also, e.g.*, *Shepard v. NLRB*, 459 U.S. 344, 348, 350-51 (1983). Here, the Acting Secretary's decision is clear, and her path is plain. Plaintiffs' suggestions to the contrary are unconvincing.

The *Batalla Vidal* Plaintiffs also fault DHS for its alleged failure to "explain the change to their information-sharing policy." *Batalla Vidal* Mot. at 14. That explanation is simple: the alleged "change" *never happened*, and there is therefore nothing that DHS could have said about it. As Plaintiffs acknowledge in a footnote (and as is confirmed in an attachment to the *Batalla*

13

*Vidal* Third Amended Complaint), DHS recently clarified this issue to remove any doubt on the matter.  In FAQs issued on November 30 and December 7, 2017, the agency confirmed that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." *Batalla Vidal* 3d Am. Compl. Ex. M, Q5; *see also id.* Ex. L, Q5.  While the policy "may be modified, superseded, or rescinded at any time"—which "ha[d] always been the case"—nothing in the Rescission Policy purports to change it.  *Id.* Ex. M, Q5.  Plaintiffs' refusal to drop this claim—in the face of unequivocal confirmation that it lacks any factual basis—is perplexing.  At a minimum, Plaintiffs are unlikely to succeed on the merits of such a claim, nor are Plaintiffs suffering any injury at all, let alone irreparable harm that entitles them to injunctive relief on this basis.

**2.**  Plaintiffs next argue that the Acting Secretary failed to sufficiently "acknowledge" or "expla[in]" a "policy reversal."  *Batalla Vidal* Mot. at 18-20 (citation omitted).  But in the Rescission Policy, the Acting Secretary not only expressly "rescind[ed] the June 15, 2012 [DACA] memorandum," Rescission Policy 1 (AR 252), but fully explained why that policy shift was preferable.  That is all the APA requires, as the Supreme Court held in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

In *Fox*, the Court considered the adequacy of the FCC's explanation for a policy change barring the broadcasting of fleeting expletives.  *Id*. at 505.  The Second Circuit had set aside the policy change under the APA, reasoning that "agency action that changes prior policy" "requir[es] a more substantial explanation" than when an agency acts in the first instance.  *Id*. at 514.  The Supreme Court reversed, finding "no basis in the [APA] or in our opinions for a requirement that all agency change be subject to more searching review" or some sort of "heightened standard." *Id*.  On the contrary, the Court explained, when an agency changes course it "need not demonstrate

14

to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

Here, the Acting Secretary's explanation was more than adequate. Plaintiffs do not dispute that the Rescission Policy "is permissible" under the INA. *Id.* The Acting Secretary fully explained that there are "good reasons" for it, *id.*, particularly given the substantial doubts about legality and litigation risk posed by the proceedings in *Texas* and the consequent potential for massive disruption were the policy immediately enjoined. And there was of course a "conscious change of course," *id.*, because the Acting Secretary expressly "rescind[ed]" the 2012 DACA Memo. Rescission Policy 1 (AR 252). The APA requires no more.

To be sure, an agency must "sometimes" provide a "more detailed justification than what would suffice for a new policy created on a blank slate"—"when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515 (citation omitted). But this is not such a case. The purported "findings" that Plaintiffs pluck from the DACA Memo—*e.g.*, that "Our Nation's immigrations laws must be enforced in a strong and sensible manner," *Batalla Vidal* Mot. at 18 (quoting AR 2)—are not "factual findings" at all, *Fox*, 556 U.S. at 515, but policy pronouncements. Moreover, the Acting Secretary's justification for the policy change was that *controlling legal precedent* had changed: after DACA was enacted, DAPA *and* expanded DACA were invalidated by the Fifth Circuit in a decision that was affirmed by an equally divided Supreme Court and that necessarily applied to DACA itself.

15

*See infra* Part I.B.5.  It is difficult to think of a more compelling basis for a change in agency position.[2]

This case thus bears no resemblance to *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), the only case Plaintiffs cite where an agency's explanation for a policy change was found insufficient in view of the reliance interests at stake.  *Batalla Vidal* Mot. at 17; *State of New York* Mot. at 5, 12.  In *Encino*, the Department of Labor had long interpreted the Fair Labor Standards Act not to require car dealerships to pay overtime to a category of employees known as "service advisors."  136 S. Ct. at 2122-24.  The agency reversed course in 2011, more than 30 years down the line, but "gave almost no reasons at all" for the shift.  *Id*. at 2127.  The Court declined to give *Chevron* deference to the agency's new interpretation, finding its explanation lacking in view of the "significant reliance interests involved."  *Id*. at 2126.  In particular, over "decades of industry reliance" on the prior policy, the dealerships and their employees had "negotiated and structured their compensation plans against th[e] background understanding" that overtime pay was not required—plans that the new policy effectively upended.  *Id*.

*Encino* is *not* "close on point," *Regents*, 2018 WL 339144, at *24, but inapposite in every material respect.  To begin, no similarly "longstanding" reliance interests are present here. *Encino*, 136 S. Ct. at 2126.  By its own terms, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion."  DAPA Memo 2 (AR 38).  And when he announced DACA in 2012, then-President Barack Obama explained that it was a "not a permanent fix" but a "temporary stopgap measure," and urged Congress to act "because these kids deserve to plan their lives in more than two-year increments."

---

[2] For the same reason, the Court should reject Plaintiffs' contention that Defendants inadequately explained their "departure from their prior views regarding DACA's legality," as reflected in their *Texas* briefs and in Office of Legal Counsel opinions, *Batalla Vidal* Mot. at 18–19; *State of New York* Mot. at 7–8, as explained in Part I.B.5, *infra*.

The White House, *Remarks by President Obama on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY.  Even assuming that DACA was lawful, a prosecutorial discretion policy that can be revoked in the agency's discretion, at any time, for any reason, cannot create legally cognizable reliance interests—and certainly not beyond the stated duration (generally two years) of deferred action grants, which were not truncated by the Rescission Policy.  *See* Defs.' Oct. 27, 2017 Mot. to Dismiss, *Batalla Vidal* ECF No. 95, at 34-36 (explaining why Plaintiffs fail to state a procedural due process claim).  And more fundamentally, as discussed, the Acting Secretary here did not make a policy change heedless of any reliance interests, but rather was impelled to act by the near-certain invalidation of DACA by the courts, such that her orderly wind-down process reasonably took into account any reliance interests under the circumstances.[3]

3.  Plaintiffs contend that, in adopting the Rescission Policy, the Acting Secretary "failed to consider all factors relevant" to the decision—specifically, the economic effects of rescission and its consequences for DACA recipients.  *Batalla Vidal* Mot. at 19-20; *see State of New York* Mot. at 10-11.  For starters, this argument fails to reckon with the reality—referenced in the Acting Secretary's memo—that continued litigation would, in all likelihood, have led to an abrupt, complete, and court-ordered end to DACA.  Indeed, the Acting Secretary's decision to opt instead for an orderly wind-down of the policy likely ameliorated, rather than exacerbated, the effects about which Plaintiffs complain, as she was fully aware.  Thus, the Acting Secretary cannot fairly

---

[3] Equally unpersuasive is the *Batalla Vidal* Plaintiffs' argument that the Rescission Policy "imposed arbitrary deadlines" that were inadequately explained.  *Batalla Vidal* Mot. at 14.  Given that DACA was an exercise of prosecutorial discretion, revocable at any time, that the agency could well have ended immediately, *see Arpaio*, 797 F.3d at 17, there was certainly nothing arbitrary about deciding to wind it down gradually over a two-and-a-half-year period.  Moreover, Plaintiffs still point to no individual who missed the "October 5, 2017 deadline for receipt of renewal requests" due to a lack of notice, *Batalla Vidal* Mot. at 14, and thus lack standing to challenge it, as the Court already concluded, *see* Defs.' Mot. Dism. 3d Am Compl. (Batalla Vidal ECF No. 207) at 9-10 (citing Mem. & Order at 37-38).  And if Plaintiffs were correct that it is arbitrary to allow individuals to request renewal if their status "expires on March 5, 2018," but to "deny the same opportunity" to those "whose deferred action expires the following day," *Batalla Vidal* Mot. at 14, then the government could never set deadlines for anything; that sort of alleged "arbitrariness" is an unavoidable consequence of all deadlines.

be said to have inadequately weighed other "programmatic objectives . . . [or] reliance interests" against the obvious litigation risk, *Regents*, 2018 WL 339144, at *24, as the APA did not require her to ponder how to prevent the unavoidable, *see State Farm*, 463 U.S. at 43 (an agency must simply "examine the relevant data and articulate a satisfactory explanation for its action").

Moreover, the Rescission Policy itself recognizes that, while DACA recipients were "eligibl[e] to request employment authorization" documents, enabling them to work lawfully in the United States, Rescission Policy 2 (AR 253), that eligibility would sunset along with the DACA policy, *id.* at 4 (AR 255), necessarily leading to changes in the workforce over the following two and a half years.  Likewise, recognizing that DACA recipients would no longer be considered lawfully present once their deferred action expired, the Acting Secretary explained that she was "very aware of the consequences of this action, and . . . sympathize[d] with the DACA recipients whose futures may now be less certain."  Duke Statement.  It was such considerations—*i.e.*, the "complexities associated with winding down the program," *id.*—that influenced her to allow DACA to sunset over a number of years, rather than abruptly end the policy herself or under court order.  That these factors did not upend her ultimate decision to rescind the policy, however, is no reason to set that decision aside, because clinging to DACA in the face of the *Texas* litigation would have been quixotic rather than rational.

Even where a statute sets forth specific factors for an agency to consider, if Congress "did not assign the specific weight the [agency] should accord each of these factors, the [agency] is free to exercise [its] discretion in this area."  *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) (citation omitted); *Brady v. FERC*, 416 F.3d 1, 6 (D.C. Cir. 2005); *see also Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 611-12 (1950) (where statutorily mandated "consideration[s]" are not "mechanical or self-defining standards," they indicate Congress's

recognition that they involve "wide areas of judgment and therefore of discretion").  Here, of course, no statute dictates the factors for an agency to consider in granting or rescinding deferred action; on the contrary, deferred action is an exercise of prosecutorial discretion committed to agency discretion, precisely because (among other things) it "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  Indeed, the original DACA memorandum providing for the granting of deferred action expressly stated that it conferred no substantive rights.  Thus, Congress has not instructed the agency to give the considerations urged by Plaintiffs any particular weight—or, indeed, any weight at all.  That they did not receive conclusive weight in the final calculus, as Plaintiffs demand, is therefore no reason to disturb the agency's decision, especially given their futility in this context.  *See, e.g.*, *Reilly*, 969 F.2d at 1150.

Plaintiffs' passing suggestion that the agency was required to conduct some sort of formal cost-benefit analysis before rescinding DACA, *Batalla Vidal* Mot. at 18-19; *State of New York* Mot. at 10, is even farther off the mark.  They cite *Michigan v. EPA* for the proposition that to "ignore costs as part of [the] requirement to engage in 'reasoned decisionmaking'" is arbitrary and capricious.  *Batalla Vidal* Mot. at 19 (quoting *Michigan v. EPA*, 135 S. Ct. 2699, 2706-07 (2015)).  But in that case, the statute itself required consideration of costs:  Congress directed the EPA to regulate power plant emissions "if [it] finds such regulation is appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A)—a phrase that the Court viewed as "an instruction to [the] . . . agency" to pay "at least some attention to cost[s]," *Michigan*, 135 S. Ct. at 2706-08.  Here, by contrast, there is no such statutory directive—a critical distinction that *Regents* fails to seriously grapple with, 2018 WL 339144, at *25—and thus no compulsion to transform a straightforward legal policy decision concerning enforcement of the immigration laws into an accounting exercise or a

19

macro-economic assessment. The agency did not perform a formal cost-benefit analysis when it

adopted DACA, *see* DACA Memo 1-3 (AR 1-3), and one was not required by its rescission.[4]

Equally unpersuasive is Plaintiffs' contention that the Acting Secretary gave inadequate

consideration to their preferred policy alternatives. *Batalla Vidal* Mot. at 19-20; *State of New*

*York* Mot. at 11-12. On arbitrary-and-capricious review, an agency is not held to account for

every conceivable policy alternative, *State Farm*, 463 U.S. at 51; it need only explain the rejection

of "significant alternatives," *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C.

Cir. 2000), that would "achieve the same outcome" as its chosen course, *Del. Dep't of Nat. Res.*

*& Envtl. Control v. EPA*, 785 F.3d 1, 17 (D.C. Cir. 2015), *as amended* (July 21, 2015). That

principle was satisfied here. Plaintiffs suggest that unspecified "chang[es]" to "the way the

program is administered" would have been preferable to outright rescission. *Batalla Vidal* Mot.

at 20; *see State of New York* Mot. at 12. But that vague suggestion is so devoid of content that it

hardly qualifies as a "significant alternative," *Allied Local*, 215 F.3d at 80, and Plaintiffs fail to

explain how it would remedy the central flaw identified by the Fifth Circuit—a lack of genuine

case-by-case discretion—as effectively as the Rescission Policy. Likewise, while the *Regents*

court suggested that DHS could instead "instruct its adjudicators to exercise discretion, on a[n]

individualized basis, to make sure applicants" are "deserving of deferred action," 2018 WL

339144, at *20, that is, for all intents and purposes, just what the Rescission Policy does. As the

---

[4] Plaintiffs likewise misread *State Farm*, which, contrary to their assertion, does not require an analysis of "the costs as well as the benefits" of agency action irrespective of the statutory text. *Batalla Vidal* Mot. at 19 (quoting *State Farm*, 463 U.S. at 54); *State of New York* Mot. at 9. Indeed, if that were true, there would have been no need for the Court in *Michigan* to parse the text of the Clean Air Act for such a directive. *Cf. Michigan*, 135 S. Ct. at 2707-08. Rather, in *State Farm*, much as in *Michigan*, the statute directed the agency to issue motor vehicle safety standards that were "reasonable, practicable, and appropriate," *State Farm*, 463 U.S. at 33 (quoting 15 U.S.C. § 1392(f)(3) (repealed 1994); accordingly, the agency "look[ed] at the costs as well as the benefits" of the regulation, and the Court said merely that "[t]he agency [wa]s correct to" do so, *id.* at 54.

Policy itself makes clear, deferred action remains available today, as it was before DACA, "on an individual, case-by-case basis." Rescission Policy 4 (AR 255).

**4.** Plaintiffs argue that "'litigation risk' cannot justify the DACA termination" because it is a "*post-hoc* rationalization" that, in any event, "cannot suffice as reasoned decisionmaking" lest the APA be rendered a dead letter. *Batalla Vidal* Mot. at 20-22 (capitalization omitted); *see State of New York* Mot. at 6. They are wrong on both counts.[5]

To begin, the notion that "litigation risk" is nothing but an after-the-fact rationalization for the Rescission Policy is squarely refuted by the record, and the court in *Regents* erred in concluding otherwise. The Policy itself discusses the adverse rulings from the Fifth Circuit and Supreme Court with respect to DAPA; the similarities between DAPA and DACA; Texas's threat to amend its complaint to challenge DACA; the Attorney General's view that "it is likely that potentially imminent litigation would yield similar results with respect to DACA," and the Acting Secretary's decision after considering all this that she "should" (*not* "must") wind-down DACA. Rescission Policy 3-4 (AR 254-55) (quoting Sessions Letter (AR 251)). Thus, the *Regents* court was simply wrong to assert that "[n]owhere in the administrative record did the Attorney General or the agency consider . . . litigation risk." 2018 WL 339144, at *23. If there were any doubt on that score, the Acting Secretary's contemporaneous statement dispels it: She clearly noted that her decision was prompted by "recent litigation" that threatened to "allow the judiciary to

---

[5] As the Court noted in the course of addressing Defendants' justiciability arguments, "Plaintiffs must identify some source of law, other than the APA's 'arbitrary and capricious' standard, against which the court can review their claims" in the context of these considerations. Nov. 9, 2017 Mem. & Order at 22. As explained in Defendants' motion to dismiss the *Batalla Vidal* Third Amended Complaint, Plaintiffs have failed to do so, and the sources of law applicable to determining the legality of DACA do not provide a standard by which to judge litigation risk associated with continuing the policy. *See* Defs.' Dec. 26, 2017 Mot. to Dismiss, *Batalla Vidal* ECF No. 207, at 13.

potentially shut the program down completely and immediately." Duke Statement. Plaintiffs' suggestion otherwise is specious.[6]

Plaintiffs' contention that it is irrational for litigation risk to inform an agency's decisionmaking is equally mistaken. The Supreme Court's decision in *Ricci v. DeStefano*, 557 U.S. 557 (2009), provides a useful comparison. There, a city government had to decide whether to certify the results of a promotional exam for firefighters that had a disparate impact on minority applicants. *Id*. at 562. The city faced potential litigation either way: If it certified the results, minority applicants threatened to bring a disparate *impact* lawsuit under Title VII; if it refused, applicants who would have been promoted threatened to bring a disparate *treatment* lawsuit. *Id*. at 562-63. Reconciling these competing obligations, the Court held that the city could rescind the test results—and thereby engage in "intentional discrimination"—so long as it had a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails" to do so. *Id*. at 585. If it is permissible to make race-conscious employment decisions based on serious litigation risk, then surely it is not irrational for an agency to consider litigation risk when making discretionary policy decisions, let alone a decision to wind-down a non-enforcement policy that conferred no rights on anyone. And here, there was far more than a "strong basis" for the Acting Secretary to

---

[6] Although Plaintiffs have not raised the argument, the *Regents* order was also based in part on the conclusion that, under 8 U.S.C. § 1103(a)(1), then-Acting Secretary Duke had no discretion whatsoever to do anything but immediately rescind the DACA policy once the Attorney General concluded it was unlawful. *See Regents*, 2018 WL 339144, at *23. This argument stems from the unsupported premise that the statutory language in question was intended to apply to a legal policy decision about how DHS exercises its enforcement discretion. In fact, the provision merely provides statutory confirmation that legal determinations by the Board of Immigration Appeals, Immigration Judges, and the Executive Office of Immigration Review (all of which exercise authority delegated from the Attorney General) are not subject to reversal by DHS. And both the Attorney General's letter and the Rescission Policy are drafted on the assumption that the final decision was for the Acting Secretary alone, who chose to wind the policy down in an orderly fashion, rather than end it immediately. In any case, even adopting a broader reading of that statutory language, the Acting Secretary's independent litigation-risk judgment still supports the Rescission, whether or not the Attorney General was correct that DACA was unlawful.

believe that continuing to administer DACA would subject the agency to liability, particularly given the adverse precedent in the Fifth Circuit that was directly on point.

The cases that Plaintiffs cite are not to the contrary:  None deals with circumstances comparable to those presented here, where the agency explained that binding precedent effectively made the outcome of further litigation in the same court preordained.  In *Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012) (cited at *Batalla Vidal* Mot. at 22), for example, the court rejected the agency's reliance on "litigation risk" because the decision on review made "no mention" of that rationale, and the administrative record "belie[d] EPA's purported concern" on that score.  *Id*. at 34.  In *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015) (en banc) (cited in *Batalla Vidal* Mot. at 22), the court dismissed as "implausible" the agency's explanation that the challenged rule—which exempted one national forest from certain construction and logging restrictions—would "reduce[] the potential for conflicts" *in other lawsuits*, given that those "lawsuits involved forests other than the Tongass, so it is impossible to discern how an exemption for the Alaska forest would affect them."  *Id*. at 969-70.  And in *United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40 (D.C. Cir. 2004) (cited in *Batalla Vidal* Mot. at 22; *State of New York* Mot. at 6), the court recognized that an adverse out-of-circuit precedent was "indeed a caution" for the agency, but found the agency's explanation insufficient because it referred only to the "possible adverse effect" of the decision without "explain[ing] why it came to deem the . . . decision fatal" to its policy.  *Id*. at 44 (citation omitted).  Here, in contrast, the Acting Secretary's decision expressly relies on litigation risk, Rescission Policy 3 (AR 254) (finding it "likely" that "potentially imminent litigation" would invalidate DACA), and makes plain why the *Texas* decision spelled the end not just for DAPA

and expanded DACA, but for original DACA as well, given the absence of any material distinction among the policies.

This case also presents no threat of an "end-run around the APA." *Batalla Vidal* Mot. at 21. Unlike in *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015), here the agency has not attempted to "circumvent the rulemaking process"—which was not required in any event—"through litigation concessions." *Id*. at 557. On the contrary, the agency vigorously litigated a materially indistinguishable policy all the way up to the Supreme Court. Having lost that battle, however, the agency reasonably recognized that a challenge to DACA would in all likelihood meet the same fate. Far from end-running the APA, the agency has declined to frontally assault the courts. That is commendable, not irrational.

**5.** Plaintiffs contend that the Rescission Policy should be set aside "[t]o the extent that [it] relied on the Attorney General's determination that DACA is unlawful"—a determination they claim is "legally erroneous." *Batalla Vidal* Mot. at 23-25. This argument is mistaken for several independent reasons.

To begin, the Acting Secretary did not rely on the Attorney General's letter solely for its assessment of DACA's legality, but instead concluded that DACA "should" be wound down after considering, among other things, the assessment that it was "likely" that a legal challenge to DACA "would yield similar results" as the successful challenge to DAPA in view of the resulting Fifth Circuit precedent. Rescission Policy 3 (AR 254). That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis to sustain the agency's decision. In particular, the Fifth Circuit affirmed the invalidation of not just DAPA, but expanded DACA, and the differences between expanded DACA and original DACA—the length of the

24

deferred-action period and modified age and durational requirements—are indisputably immaterial to the Fifth Circuit's legal rationale.  *See Batalla Vidal* Mot. at 27-28.

Moreover, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment, even if the two determinations are arguably "intertwined."  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").  Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected.  Sessions Letter (AR 251).  But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits" that "Congress had not otherwise acted to provide by law."  Rescission Policy 2 (AR 253).  This Court could, therefore, sustain the Acting Secretary's decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

In any event, while this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*. Plaintiffs argue that "DACA is a lawful use of prosecutorial discretion," *Batalla Vidal* Mot. at 23, repeating many of the arguments that the government pressed in the *Texas* case, *see id*. at 23-24; *State of New York* Mot. at 7-8.  The court in *Regents* did the same.  2018 WL 339144, at *17-22. But for better or worse, those arguments were decisively rejected by the Fifth Circuit, whose

decision was affirmed by an equally divided Supreme Court.  Thus, while Plaintiffs emphasize that, on its face, the "DACA program was consistent with th[e] type of discretion long sanctioned under immigration law," *Batalla Vidal* Mot. at 24, the Fifth Circuit disagreed, and found that discretion to be illusory in practice, *Texas*, 809 F.3d at 172-73.

Plaintiffs offer a handful of reasons why the Court should disagree with the Fifth Circuit's decision in *Texas*, encouraging the Court to undertake an independent assessment of DACA's legality.  None are persuasive.

First, although *Texas* invalidated DAPA, a "separate program" from DACA, *Batalla Vidal* Mot. at 24; *see State of New York* Mot. at 6 n.5, the Fifth Circuit also upheld the injunction of an *expanded version of DACA* itself, and there is no principled legal distinction between original DACA and expanded DACA.  And as for the possibility of drawing a distinction between *DAPA* and DACA, the Fifth Circuit's decision was based on the "important similarities" between the policies.  *Texas*, 809 F.3d at 174.  As the court explained:  "Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171-72; nevertheless, "there was evidence from *DACA's* implementation that [this] discretionary language was pretextual," *id*. at 173 (emphasis added).  While that finding had to be "extrapolat[ed]" to invalidate DAPA, *id*., it *directly* dooms DACA itself—a point that the *Regents* court failed to appreciate in straining to distinguish the policies.  2018 WL 339144, at *21.  At a minimum, the writing was on the wall, which is evident to any reader of the *Texas* opinions and the relevant DHS memos.  Indeed, the *Texas* injunction also applied to the DAPA Memo's provisions expanding DACA.  And while Plaintiffs note that the Fifth Circuit did not rest its holding on constitutional grounds, *Batalla Vidal* Mot. at 25; *State of New York* Mot. at 6 n.5, they of course do not deny that it nevertheless found DAPA and expanded

26

DACA unlawful, as the Attorney General and Acting Secretary recognized.  Rescission Memo 3 (AR 254) (noting Attorney General's view that DACA has "the same legal . . . defects" as DAPA and expanded DACA).

Moreover, that "eligibility for DACA," unlike DAPA, "is not dependent on the immigration status of family members" hardly points in favor of its legality, as Plaintiffs suggest. *Batalla Vidal* Mot. at 25; *see Regents*, 2018 WL 339144, at *22 (attempting a similar distinction). To be sure, the Fifth Circuit found DAPA unlawful in part because it was inconsistent with the INA, which already "prescribes how parents may derive an immigration classification on the basis of their child's status." *Texas*, 809 F.3d at 186.  But if DACA has "no such analogue in the INA," *Regents*, 2018 WL 339144, at *22, then it is on even shakier—not firmer—ground than DAPA. *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) ("[Where] a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it"—a "presumption that . . . is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement.").  In any event, as the Fifth Circuit noted, to the extent Congress has implicitly approved prior deferred action policies, those policies served as interim measures providing aliens with "bridges from one legal status to another." *Texas*, 809 F.3d at 184.  DAPA, however, created no such bridge; rather, it granted deferred action "to persons who have never had a legal status and may never receive one." *Id.* DACA is no different on that score.

Second, although this Court may not be bound by the Fifth Circuit's opinion in *Texas*, *see Batalla Vidal* Mot. at 23, 24 n.15, that is beside the point:  DHS was so bound, because it faced

further litigation—in the same case, before the same judge, bound by the same circuit precedent—over a materially indistinguishable policy that was thus almost certain to be invalidated.[7]

Third, Plaintiffs argue that the *Texas* decision is "not persuasive" when read against the government's previous arguments in that case and elsewhere, *State of New York* Mot. at 6 n.5; *see id.* at 7-8 & n.7—arguments they claim are "inconsistent" with Defendants' position here, *Batalla Vidal* Mot. at 18-19. That, too, is beside the point: Those arguments were firmly rejected in a Fifth Circuit opinion that was affirmed by an equally divided Supreme Court, and the government, having exhausted its appeal options, was bound to respect that decision given the absence of any plausible prospect of a different result in the pending litigation. The same is true of the Office of Legal Counsel's (OLC) preliminary view that the proposed version of DACA would be lawful. *Id.* at 18; *State of New York* Mot. at 7. That "preliminary" conclusion was conditioned on the proviso that "it was critical that . . . the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis." OLC Op. 18 n.8 (AR 21). Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice. *Texas*, 809 F.3d at 176.[8]

---

[7] The *Regents* court was mistaken to suggest that because DACA had been in place for "five years," the "doctrine of laches" would have been a "powerful" defense to the *Texas* plaintiffs' impending challenge. 2018 WL 339144, at *24. Unless another statute provides otherwise, the default six-year statute of limitations for claims against the United States applies to APA actions, 28 U.S.C. § 2401(a); *Sendra Corp. v. Magaw*, 111 F.3d 162, 165 (1997), and "[w]hen a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period," *Ikelionwu v. United States*, 150 F.3d 233, 238 (2d Cir. 1998). In any event, in an agency review case, that a reviewing court might have proceeded differently than the agency decision maker is insufficient to set aside agency action as arbitrary and capricious.

[8] The *Regents* court questioned the Fifth Circuit's conclusion that the low denial rate for DACA requests meant that any discretion afforded to DHS officials was illusory. 2018 WL 339144, at *20. In particular, the *Regents* court pointed to a declaration submitted by DHS in *Texas* asserting that DACA was, in fact, a case-specific process under which there were "several instances of discretionary denials," *id.* (citing *Texas*, 809 F.3d at 175 (citing Decl. of Donald Neufeld)), an argument that persuaded a dissenting judge, *id.* (citing *Texas*, 809 F.3d at 210 (King, J., dissenting)). But the Fifth Circuit majority squarely rejected the argument, concluding that "those denials were not discretionary" at all, "but instead were required because of failures to meet DACA's objective criteria." 809 F.3d at 175 n.140; *see also id.* at 172 n.130. It is that holding, not the views of the dissenting panelist, to which the agency (and the district court in Texas) is now bound.

**6.**   As a last gasp, Plaintiffs suggest that the Rescission Policy should be set aside because the rationale supporting it was "pretextual" and offered in "bad faith," as evidenced by supposedly "conflicting" statements made by officials other than the actual decisionmaker.   *Batalla Vidal* Mot. at 26; *see State of New York* Mot. at 12.   Notably, Plaintiffs cannot seem to agree on what, exactly, this was pretext for.   The *New York* Plaintiffs claim that the "true basis" for the decision was "animus toward Latinos."   *State of New York* Mot. at 13.   The *Batalla Vidal* Plaintiffs suggest that it was to gain "political leverage" to encourage Congress to enact legislation addressing this and other immigration issues.   *Batalla Vidal* Mot. at 26-27.   Regardless, this theory is flawed from start to finish.

**a.**   To begin, Plaintiffs' attempts to rely on material outside the administrative record as evidence of pretext, *see id.* at 26 n.19, should be rejected.   As the Supreme Court has repeatedly explained, when there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding."   *Camp v. Pitts*, 411 U.S. 138, 143 (1973).   "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted), "not some new record made initially in the reviewing court," *Camp*, 411 U.S. at 142.   Plaintiffs cannot rely on material outside the administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).   Plaintiffs' attempt to rely on deposition transcripts and other extra-record material should therefore be rejected at the outset.

**b.**   Critically, Plaintiffs identify nothing contradictory about the *Acting Secretary's* stated justification for the Rescission Policy.   Plaintiffs seek to create a factual issue about who the

"actual decisionmaker" was, suggesting variously that it was the President, or the Attorney General, perhaps "joint[ly]" with each other or with the Acting Secretary—only to suggest that, in the end, the Court "need not determine" the issue at all. *Batalla Vidal* Mot. at 27-28 & n.22. But this is not a factual issue, it is a legal one, and as a matter of law, the decision necessarily fell to the Acting Secretary of Homeland Security—the only official vested with authority under the INA to make it. *See* 8 U.S.C. § 1103(a)(1). Because none of the supposedly "conflicting" statements are from the Acting Secretary herself, Plaintiffs fail to show that her reasons for adopting the Rescission Policy were pretextual.

Plaintiffs submit that the Acting Secretary could not truly have been concerned about DACA's legality because, rather than end DACA immediately, she allowed it to gradually sunset. *Batalla Vidal* Mot. at 26-27; *State of New York* Mot. at 12-13. But, as explained above, the orderly wind-down of DACA is an appropriate response to the litigation risk facing the government as well as any legally cognizable reliance interests even potentially at stake (and the agency's own operational needs). In any event, it is difficult to see how this argument helps Plaintiffs: If the wind-down itself is illegal, the solution would not be to extend DACA indefinitely, but to end it immediately. And in any event, Plaintiffs point to no legal authority for the proposition that either the Constitution or the APA forbids an orderly wind-down of a policy in the face of concerns about its legality.

Because there is no basis, let alone a strong one, to conclude that the Acting Secretary did not actually believe and rest on her reasonable concerns about DACA's legality, it would be entirely permissible even if Plaintiffs were correct that she had the *additional* motive of wishing to encourage Congress to enact legislation addressing the legal status of DACA recipients. *Batalla Vidal* Mot. at 22-27. Indeed, spurring legislative action on immigration is a legitimate

policy goal that has been shared across administrations.  When the President announced DACA in 2012, he said, "Precisely because this is temporary, Congress needs to act," and he called on it "to pass the DREAM Act."  Barack Obama, The White House, *Remarks by the President on Immigration*, *supra* at 16-17.  When the former Secretary expanded DACA in 2014, he noted that the policy created no "immigration status or pathway to citizenship.  Only an Act of Congress can confer these rights."  DAPA Memo 5 (AR 41).  Thus, the Acting Secretary was in good company when, in announcing the Rescission Policy, she "urge[d] Congress to use its Constitutional authority to . . . find a legislative solution."  Duke Statement.  The Acting Secretary's desire for a "legislative solution" mirrors President Trump's goal that Congress "legalize DACA" and adopt "legislation addressing the status of [DACA] recipients."  *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200;  Presidential Memoranda, The White House, *President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies* (Oct. 8, 2017), https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration.  There is nothing at all inappropriate about those suggestions, nor are they inconsistent with the Rescission Policy itself, which rests on the premise that any policy of deferred action on the scale of DACA should be enacted only by Congress.

**c.**  Plaintiffs' reliance on statements by officials other than the Acting Secretary is even further afield.  That other officials might have supported the Rescission Policy for different reasons does not indicate that the reasons given by the actual decisionmaker—the Acting Secretary—were pretextual.

Moreover, even if statements of officials other than the decisionmaker were relevant, none plausibly gives rise to a cognizable inference of pretext here. Plaintiffs suggest, for example, that the Acting Secretary's assessment of litigation risk with respect to DACA was a pretense because, at one deposition, when asked whether there is "any [DHS] policy on how to deal with threats to sue by state or local officials," one of her subordinates responded: "[T]hat sounds like the craziest policy you could ever have" because "[y]ou could never do anything if you were always worried about being sued." *Batalla Vidal* Ex. MM at 205–207 (Hamilton Dep.) (cited in *Batalla Vidal* Mot. at 27; *State of New York* Mot. at 12-13). But Plaintiffs rip that statement out of context: Read in conjunction with the broader discussion, it is clear that the deponent was responding to the question whether DHS has a *general* policy of considering "litigation risk" in the context of *each* agency decision—something the agency has never claimed and that might make little sense. Regardless, whatever the merits of such a policy as a general matter might be (or whether the agency has any such policy), that says nothing about how DHS might choose to address litigation risk in a *particular* case, especially where, as here, there was controlling adverse precedent and the consequent potential for massive disruption flowing from an abrupt (and highly likely) court-ordered termination. Plaintiffs' reliance on this isolated, off-hand comment as supposed "evidence" of pretext is misplaced.

Plaintiffs also cast aspersions on the President's tweet indicating that, if Congress "can't" pass a legislative fix for DACA recipients, he "will revisit the issue!" *State of New York* Mot. at 13 (quoting Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 p.m); *see Batalla Vidal* Mot. at 26-27. But that comment is fully consistent with the President's clearly stated view that "the program is unlawful and unconstitutional and cannot be successfully defended in court." *See* Statement from President Trump (Sep. 5, 2017), https://www.whitehouse.gov/the-press-

office/2017/09/05/statement-president-donald-j-trump.   Far from undercutting the Acting

Secretary's rationale for rescinding the policy, the comment emphasized the need for legislative

action and expressed the President's intention to revisit Administration policies on childhood

arrivals—not the legality and defensibility of the DACA program—if Congress did not timely

act.  That stated intention simply reflects the government's obligation to "consider . . . the wisdom

of its policy on a continuing basis, for example, in response to changed factual circumstances, or

a change in administrations."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545

U.S. 967, 981 (2005) (internal citation omitted).

    **d.**   More fundamentally, Plaintiffs fall far short of making the "strong showing of bad

faith or improper behavior" necessary to overcome the presumption of regularity.  *Overton Park*,

401 U.S. at 420.  To do so, they "must make a significant showing—variously described as a

'strong,' 'substantial,' or 'prima facie' showing . . . indicative of bad faith."  *Amfac Resorts, LLC

v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).  They cannot meet this burden with

"vague" allegations, *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 72 (D.C. Cir. 1987),

"conclusory statements," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir.

1996), or "inadmissible hearsay," *Commercial Drapery Contractors, Inc. v. United States*, 133

F.3d 1, 7 (D.C. Cir. 1998).  Rather, they must proffer "serious, nonconclusory allegation[s] of bad

faith" or independent evidence of improper conduct.  *Coal. on Sensible Transp.*, 826 F.2d at

72.  Indeed, Plaintiffs "must present 'well-nigh irrefragable proof' of bad faith or bias on the part

of governmental officials" to overcome the presumption that the agency discharged its duties in

good faith.  *Adair v. England*, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) (citations omitted).  Plaintiffs

fail to meet this high burden, as none of the statements to which they point even arguably

demonstrates bad faith.  In sum, even if generously interpreted, at most the statements invoked

by Plaintiffs show that various officials other than the actual decisionmaker may not have fully agreed with all of the reasons that the Acting Secretary articulated for her decision. That some officials may have different perspectives on these issues may show disagreement, but it is no sign of bad faith, let alone strong evidence of it.[9]

### C. The Rescission is a General Statement of Policy Not Subject to the Requirements of Notice-and-Comment Rulemaking Procedures or the Regulatory Flexibility Act.

Plaintiffs also cannot succeed in arguing that DHS was required to engage in full notice-and-comment rulemaking procedures before rescinding the DACA policy. The APA generally requires an agency to follow notice-and-comment procedures before promulgating rules. 5 U.S.C. § 553(b), (c); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). But the APA exempts "general statements of policy" from that requirement unless another statute provides otherwise, 5 U.S.C. § 553(b)(3)(A), and none does here. The Rescission Policy is exempt from the APA's notice-and-comment requirements because it is a general statement of policy regarding how DHS will exercise its enforcement discretion under the INA. In attempting to recast the Rescission Policy as a substantive rule, as opposed to policy guidance, Plaintiffs mischaracterize both the nature of the Rescission and its effect on the availability of deferred action.[10]

**1.** General statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting Dep't of Justice, Attorney General's Manual on the APA 30 n.3 (1947)). They "serve a dual purpose": both to "inform[] the public concerning the agency's future plans and priorities for

---

[9] The *State of New York* Plaintiffs also suggest that these statements reflect a hidden motive of invidious discrimination. As explained in Part I.D., *infra*, none of these statements are about DACA recipients, none can bear the weight that Plaintiffs ascribe to them, and none have any connection to the actual decision maker.

[10] The district court in *Regents* recently granted the government's motion to dismiss identical notice-and-comment (and Regulatory Flexibility Act) claims. *See Regents*, Order Granting in Part Defs.' Mot. to Dismiss, ECF No. 239 (N.D. Cal. Jan. 12, 2018), at 4 ("[T]he rescission memorandum is a general statement of policy.").

exercising its discretionary power," as well as to "'educate' and provide direction to the agency's personnel in the field, who are required to implement . . . policies and exercise . . . discretionary power in specific cases." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987). And a "general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).

By contrast, legislative rules adopted through notice-and-comment procedures have the force and effect of law, and thus create legally-enforceable rights or obligations in regulated parties. *Perez*, 135 S. Ct. at 1203; *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979). In other words, an "agency action that . . . would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). The APA generally leaves to the agency the choice of which mode to employ. *See* 5 U.S.C. § 553(b). If an agency chooses to issue a statement of policy rather than a legislative rule through notice-and-comment rulemaking, that choice has consequences: The agency's statements in the policy have "no binding effect on members of the public or on courts." 1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.3, at 419 (5th ed. 2010).

A quintessential use of policy statements is for an agency to announce how and when it will pursue (or forbear from) enforcement, in the exercise of its discretion. Such enforcement policies explain how the agency intends to exercise a power that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. Unlike legislative rules adopted after notice-and-comment, such enforcement policies do not establish or alter any legally-enforceable rights or obligations of third parties. And such policies can readily be changed, in response to changing circumstances, funding, and priorities.

35

**2.** Applying these principles, the Rescission Policy can only be viewed as a general statement of policy. Indeed, DHS and its predecessor, the INS, have exercised their enforcement discretion through the use of deferred action and similar policies dozens of times over more than half a century, without following notice-and-comment procedures. *See* Andorra Bruno et al., Analysis of June 15, 2012 DHS Memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 20-23, Cong. Research Serv. (July 13, 2012), https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf. Plaintiffs offer no persuasive reason for treating the Rescission Policy differently.

The text of the Rescission Policy reinforces the point again and again. It is a "memorandum." Rescission Policy 1 (AR 252). The Acting Secretary issued it as an "exercise of [her] authority in establishing national immigration policies and priorities." Rescission Policy 4 (AR 255). It instructs DHS personnel on the manner in which they are to exercise the agency's discretionary enforcement authority on a prospective basis. *See Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("[G]eneral statements of policy are rules directed primarily at the staff of an agency describing how it will conduct agency discretionar[y] functions, while other rules [*i.e.*, legislative rules] are directed primarily at the public in an effort to impose obligations on them." (internal citation omitted; emphasis added)). The Policy does not act to immediately deprive any current DACA recipients of their deferred action, but describes how pending and future requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy 4 (AR 255). It acknowledges the settled principle, recognized by both Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such

"otherwise lawful enforcement . . . prerogatives," *id.* at 5 (AR 256).  It "does not . . . create any

right or benefit, substantive or procedural, enforceable at law by any party."  *Id.*  And no alien has

an enforceable right to obtain deferred action under DACA or any other policy regardless.  *See* 8

U.S.C. § 1252(g); *AADC*, 525 U.S. at 485.  Deferred action "remains discretionary and reversible,"

*Arpaio*, 797 F.3d at 17—as it has been through each of the previous policies adopted without

"cumbersome and time-consuming rulemaking proceedings."  *Nat'l Ass'n of Regulatory Util.

Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).[11]

    **3.**  Plaintiffs' attempt to portray the Rescission Policy as a substantive rule is unpersuasive.

Plaintiffs argue that "the Duke Memo uses mandatory, definitive language to establish blanket,

binding rules that leave no room for an agency's discretion in handling deferred action requests

received from childhood arrivals."  *Batalla Vidal* Mot. at 30; *see also State of New York* Mot. at

24.  This mischaracterizes the nature of the DACA Rescission and the availability of deferred

action generally.  Deferred action was available on a discretionary basis before the DACA policy

(albeit on a more limited and case-specific basis), and it remains available today.  DACA is not

the only manner by which individuals obtain deferred action, as the long history of similar policies

evinces.  That a particular policy permitting a class of individuals to seek deferred action based on

certain criteria is being rescinded does not mean that DHS officials are prohibited from later

---

[11] This Court's recent opinion certifying an interlocutory appeal under 28 U.S.C. § 1292(b) supports Defendants' understanding of the Rescission Policy as exempt from notice-and-comment requirements.  The Court explained correctly that DACA, "at least on [its] face, simply provide[d] guidelines for the exercise of immigration authorities' prosecutorial discretion."  Jan. 8, 2018 Mem. & Order at 5 (emphasis added).  Even accepting the premise that the termination of DACA "present[s] special considerations not found in *Chaney* and other challenges to non-enforcement decisions," *id.* at 6—which this Court has previously held forecloses Defendants' jurisdictional argument under 5 U.S.C. § 701(a)(2)—that does not change the fact that the rescission of DACA is a general statement of policy directed toward nothing other than modifying "guidelines for the exercise of immigration authorities' prosecutorial discretion."  Jan. 8, 2018 Mem. & Order at 5.  In other words, regardless of whether *Chaney* is applicable, the Court's (accurate) understanding of the nature of DACA and its rescission confirms that notice-and-comment rulemaking was not required here.

extending that deferred action on an individualized basis to persons regardless of if they are former DACA recipients, and nothing in the Rescission Policy indicates otherwise.

Plaintiffs assert that the Rescission Policy "removed agents' ability to use prosecutorial discretion for individuals who met the DACA eligibility criteria, regardless of individual circumstance[s]," *Batalla Vidal* Mot. at 31, but that is simply untrue.  In fact, nothing in the Rescission Policy prevents DHS officials from exercising their pre-existing (and still-existing) discretion to confer deferred action on an individual former DACA recipient, or even upon groups of former DACA recipients, under appropriate individualized criteria.  The Secretary remains free to establish (or revoke) other deferred-action policies, in her discretion; to grant (or deny) deferred action as to any individual under other policies, or no policy at all, in her discretion; to revoke a grant of deferred action, in her discretion; and to pursue removal, in her discretion.   In short, the Rescission Policy does not bind regulated parties or the courts in any way; it is an announcement of the manner in which DHS currently intends to exercise its prosecutorial discretion on a forward-looking basis.  It does not even "bind" DHS in any meaningful sense; the Rescission Policy reflects nothing more than DHS's return to true case-by-case adjudication of requests for deferred action.[12]

Moreover, it is common for senior prosecutors to set bright-line policies directing the exercise of discretion by individual prosecutors.  For example, the "passive enforcement policy" adopted by the Attorney General and approved in *Wayte v. United States*, 470 U.S. 598, 601-02,

---

[12] Plaintiffs' argument that the Rescission Policy is a substantive rule because of its effect on the availability of advance parole for DACA recipients, *Batalla Vidal* Mot. at 31; *State of New York* Mot. at 24, is similarly flawed. The potential availability of advance parole, under separate regulations not otherwise at issue in this case, is a highly discretionary consequence of receiving deferred action; it is an aspect of the Secretary's authority under the INA. Accordingly, the Secretary may use statements of policy to "advise the public prospectively of the manner in which [DHS] proposes to exercise [its] discretionary power" concerning deferred action, as well as the consequences that follow from that exercise due to separate regulations. *See Vigil*, 508 U.S. at 197 (citations omitted). The Rescission Policy announced a prospective change instructing the agency to discontinue processing applications for advance parole "under standards associated with the DACA program." Rescission Policy 4 (AR 255). In light of the broader decision to begin an orderly wind-down of DACA itself, the Secretary acted well within her discretion in making adjustments to the availability of advance parole without the full notice-and-comment process.

613 (1985), limited the discretion of prosecutors to pursue charges against those who had not self-reported their violation of the law.  And earlier this year the Attorney General issued a memorandum instructing all federal prosecutors to "charge and pursue the most serious, readily provable offense" in all federal criminal prosecutions, expressly rescinding two earlier, more lenient policies.  *See* Mem. from the Attorney General to All Federal Prosecutors (May 10, 2017), https://www.justice.gov/opa/press-release/file/965896/download.  If enforcement policies lacking an *additional* layer of case-specific discretion triggered notice-and-comment requirements, such policies would be unlawful.[13]

**4.**  Plaintiffs' argument is nonsensical for the additional reason that, if winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place.  But because the DACA Memo itself was not adopted through notice and comment, on Plaintiffs' own theory it would be void *ab initio*—leaving Plaintiffs without any remedy.  Plaintiffs essentially ask this Court to strike down the rescission of DACA on a legal theory that would immediately thereafter *compel* the rescission of DACA.  As explained in Defendants' motions to dismiss, that is reason enough to dismiss this claim.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff must show "injury will be 'redressed by a favorable decision'").[14]

---

[13] Curiously, the *State of New York* Plaintiffs rely heavily on an Eastern District of Pennsylvania decision that explicitly declined to follow Second Circuit authority.  *See U.S. ex rel. Parco v. Morris*, 426 F. Supp. 976, 984-85 (E.D. Pa. 1977) (noting that the Court was "bound by the Third Circuit's decision" in another case, and explaining that the court "will not follow" the Second Circuit's decision in *Noel*, 508 F.3d at 1023).  To be sure, *Noel* itself acknowledged that the definition of a "general statement of policy" is "enshrouded in considerable smog"; but it also noted that "[o]ne scholar has suggested that it may be that 'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionary functions, while other rules are directed primarily at the public in an effort to impose obligations on them."  *Noel*, 508 F.3d at 1030 (internal citation omitted).  The government would prevail under that definition.

[14] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect."  *Consumer Energy Council v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982).  That holding, however, concerned the rescission of a rule, promulgated after notice and comment, which was allegedly defective on other grounds—not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445-46.  If an agency

The *Batalla Vidal* Plaintiffs argue that "[t]he APA requirements apply to rescission regardless of how the program was initially created." *Batalla Vidal* Mot. at 32 n.26. But Defendants' argument is *not* that the APA does not apply because DACA did not go through notice and comment, it is that these Plaintiffs, who seek an order from this Court reinstating the DACA policy, *Batalla Vidal* Mot. at 40; *State of New York* Proposed Order at 2, cannot obtain such an order on a legal theory that would confirm that DACA itself is (and always was) unlawful. Recognizing this common-sense reality would not, as Plaintiffs suggest, "create perverse incentives" in which an agency could "evade notice-and-comment by simply declaring their belief that a prior rule was unlawfully promulgated," *Batalla Vidal* Mot. at 32—the problem is not created by any belief of *DHS*, it is created by the inherent contradiction between *Plaintiffs'* legal theory and the relief that they seek. Plaintiffs ask this Court to do the impossible—to issue an order reinstating a policy on a legal theory that would confirm the illegality of that policy. An injunction—an equitable remedy—is not available under these circumstances, even if Plaintiffs were right about the need for notice-and-comment rulemaking. *See Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

**5.** The *State of New York* Plaintiffs suggest explicitly (as do the *Batalla Vidal* Plaintiffs implicitly) that the public interest in this particular agency decision supports their claim that notice-and-comment rulemaking is required. *State of New York* Mot. at 26; *see Batalla Vidal* Mot. at 28-29. But they have nothing to cite for that proposition except scattered out-of-circuit dicta. In fact, the question whether an agency rule requires notice-and-comment rulemaking has nothing to do with how "important" the rule is, and Plaintiffs' "important rule" exception is at odds with the

---

has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go those procedures to cure the underlying defect.

well-settled proposition that federal courts do not have the authority to expand the APA's procedural requirements—even if a court is confident that the agency's decision-making process would be improved by such additional process, or because the agency is faced with a particularly important issue. *Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (rejecting the argument that the APA "merely establishes lower procedural bounds and that a court may routinely require more than the minimum when an agency's proposed rule addresses complex or technical factual issues or 'Issues of Great Public Import'").

**6.**  Plaintiffs' Regulatory Flexibility Act (RFA) claims fail for the same reasons as their notice-and-comment claims.  The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "[w]hen an agency promulgates a final rule under section 553 of . . . title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking," *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required. Because those procedures were not required here, the RFA is inapplicable.[15]

### D.      The Rescission Does Not Violate Equal Protection Principles

**1.**  The *State of New York* Plaintiffs (but not the *Batalla Vidal* Plaintiffs) seek preliminary injunctive relief on their Equal Protection claim.  As explained in both of Defendants' motions to dismiss, no Plaintiff states a plausible Equal Protection claim in these matters, and the *State of*

---

[15] Plaintiffs also lack standing to raise an RFA claim for an additional reason: They allege no facts to demonstrate that they are "small entities" entitled to judicial review under the RFA.  *See* 5 U.S.C. § 601(6) (defining "small entity"); *id.* § 611(a)(1) (restricting judicial review to "a small entity that is adversely affected or aggrieved"); *see also, e.g.*, *Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a 'small entity.'").  Plaintiffs' conclusory assertions on this score, *see, e.g.*, *State of New York* Am. Compl. ¶¶ 211-16, 228, 273; *Batalla Vidal* 3d Am. Compl. ¶¶ 69, 187, should not be assumed true on a motion to dismiss, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009), nor do they support preliminary injunctive relief.  Nor should the Court give any weight to the *State of New York* Plaintiffs' allegations about "small-governmental jurisdictions," businesses, or non-profits that are not before this Court.  *State of New York* Am. Compl. ¶¶ 211-16, 228, 273.  The mere fact that an entity is geographically located within a state does not provide that state standing to bring claims on its behalf.

*New York* motion for a preliminary injunction does not demonstrate otherwise.  To succeed on such a claim, Plaintiffs must overcome the presumption that government officials "properly discharged their official duties" when making prosecutorial decisions, by making plausible and specific factual allegations that offer "clear evidence to the contrary."  *United States v. Armstrong*, 517 U.S. 456, 464 (1996).  That is because, as in *Armstrong*, Plaintiffs' claim of a hidden discriminatory motive underlying this exercise of prosecutorial discretion invades "a 'special province' of the Executive."  *Id.* at 464 (quoting *Chaney*, 470 U.S. at 832).  And as "[t]hese concerns are greatly magnified in the deportation context," Plaintiffs must satisfy *Armstrong*'s "particularly demanding" standard.  *AADC*, 525 U.S. at 489, 490.  They have not done so.

Plaintiffs' have not offered any clear evidence of discriminatory intent.  First, Plaintiffs suggest that the rescission of DACA has a disparate impact on Latinos, who allegedly account for 93% of approved DACA requestors.  *State of New York* Mot. at 13.  But "a racially disproportionate impact" alone is never sufficient to establish discriminatory intent, *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977), even in a purely domestic context, *see Washington v. Davis*, 426 U.S. 229, 242 (1976), and especially in a case like this in which the plausible alternative explanations—*i.e.*, that those statistics are explained by accident of geography, not discrimination—overwhelm the inference Plaintiffs seek to draw.  (The Rescission Policy is, of course, facially neutral in its applicability.)  Indeed, in *Armstrong*, the Supreme Court found insufficient allegations of discriminatory intent where evidence suggested that 100% of prosecutions for certain drug-trafficking offenses closed by the federal defender's office in a given year involved African-American defendants.  517 U.S. at 470; *see also Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008) (rejecting a similar discriminatory-enforcement challenge, in a case in which individuals were required to register under a program that singled out aliens from certain

identified countries, in which almost all of the selected countries were "predominantly Muslim," rejecting the argument that that fact alone was evidence that "the Program was motivated by an improper animus"). Any change to the DACA policy would likely have had a disparate impact on Latinos—as nearly any change to this country's immigration policies could have a disparate impact on this group; that is not evidence of discrimination.

Second, Plaintiffs rely heavily on allegations of statements made by President Trump (most before he took the oath of office) in arguing that the historical background of the Acting Secretary's decision supports a finding of discriminatory intent. *State of New York* Mot. at 12-15. None of those statements by the President, however, provides any evidence of a secret discriminatory motive for the rescission of DACA by then-Acting Secretary Duke, let alone the sort of clear evidence that would be required to support such a claim. The statements do not address the actual decision at issue—the rescission of DACA—nor were they made by the Acting Secretary, the only official vested with authority under the INA to make the decision at issue. Plaintiffs appear to assume without explanation that any immigration-related statements by President Trump should be attributed to all "Defendants" or "administration officials" or "senior officials." *State of New York* Mot. at 12, 13, 15. But the identity of the relevant decision maker under the APA is not a question of fact; it is a settled issue of law.[16] In any case, although the Court can and should reject

---

[16] As Defendants have explained in this and prior filings, *see, e.g.*, *Batalla Vidal* ECF No. 207 at 22 n.9, Acting Secretary Duke was the only government official with the *legal* authority to rescind a DHS policy that had been operated by DHS for the past five years—regardless of the (undisputed) *factual* involvement by the White House and the Attorney General. In any case, even accepting the premise that the Attorney General is a relevant decision maker, Plaintiffs only cite to one statement made by the Attorney General, and they materially misrepresent it. Plaintiffs are simply incorrect that the Attorney General "described Mexicans as 'filth.'" *State of New York*, Mot. at 15. The full remarks—which are available on the DOJ website, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-announcing-department-justice-s-renewed—make clear that the Attorney General's reference to "filth" was a reference—with no connection to DACA—to the "brutal machete attacks and beheadings" carried out by "MS-13 and the cartels." It is Plaintiffs alone who have connected and generalized those comments about violent criminal activity to any particular race, ethnicity, or nationality as a whole.

this claim without any analysis of past statements by the President, Plaintiffs ignore the fact that when the President has actually spoken about DACA recipients in particular, he has generally been supportive—which is entirely inconsistent with Plaintiffs' theory of "unambiguous" animus.[17]

Third, Plaintiffs claim that the Acting Secretary's stated reasons for the Rescission Policy are pretextual, and are designed to mask the true motive: invidious discrimination. *State of New York* Mot. at 15. But Plaintiffs' offer no support for a finding that the Acting Secretary's stated reasons for adopting the Rescission Policy were pretextual, as Defendants explained above. *See supra*, at 28. In fact, the Acting Secretary rationally explained her decision to wind down DACA, given the imminent risk of a disruptive, nationwide injunction.

Rather than engaging with the applicable standards set forth in *Armstrong* and *AADC*, Plaintiffs rely almost entirely on *Romer v. Evans*, 517 U.S. 620, 632 (1996), and *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973), but neither case involves decisions relating to prosecutorial discretion or immigration, and neither is inconsistent with Defendants' interpretation of *Armstrong* or *AADC*. *Romer* and *Moreno* stand for the unremarkable proposition that "'a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.'" *Romer*, 517 U.S. at 634-35 (quoting *Moreno*, 413 U.S. at 534). But that principle has no applicability here, as applied to a government action that is neutral on its face (unlike the anti-LGBT state constitutional amendment, in *Romer*, and the congressional enactment restricting food stamps for certain households, in *Moreno*), and as applied to governmental action that is justified by (at an absolute minimum) "legitimate public policies which justify the incidental disadvantages they impose on certain persons," *Romer*, 517 U.S. at 635—such as DHS's rational desire to avoid massive litigation risk and an immediate nationwide injunction shutting down DACA entirely.

---

[17] *See, e.g.*, *Batalla Vidal* 3d Am. Compl. ¶ 110 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!....").

Defendants agree that "animus can never constitute a legitimate state interest," *State of New York* Mot. at 17, but that principle does not apply here.

Moreover, if Plaintiffs were correct that the "'sheer breadth' of Defendants' termination of DACA" is "'inexplicable by anything but animus,'" *Id.* at 16-17 (quoting *Romer*, 517 U.S. at 632), then it is difficult to understand why, among other things, DHS would allow the program to gradually wind-down over a two-and-a-half year period, rather than end it immediately and entirely. Nor is Plaintiffs' grim view consistent with the President's support of efforts to provide *permanent* (and unquestionably lawful) relief to DACA recipients in the form of legislation.[18]

**2.** The *State of New York* Plaintiffs also argue halfheartedly that this case implicates a "special constitutional sensitivity" under the Supreme Court's decision in *Plyler v. Doe*, 457 U.S. 202 (1982), because DACA recipients were generally brought to this country in violation of federal immigration law through no fault of their own. *State of New York* Mot. at 18-20. The supposed implications of that "sensitivity" are not entirely clear from Plaintiffs' briefs. In any case, *Plyler* holds only that "[i]f the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest." *Plyler*, 457 U.S. at 230. At the outset, this argument is inapplicable on its face to DACA recipients who are *not* children—which includes

---

[18] Although they refuse to concede it explicitly, *see State of New York* Mot. at 17 n.35, Plaintiffs' reliance on *Romer* and *Moreno*—two cases about rational-basis review—suggests that they understand that the rescission of DACA is *not* subject to any form of heightened scrutiny. In fact, under *Armstrong* and *AADC*, Plaintiff must bring a clear case of discrimination to overcome the strong presumption of regularity that attaches to government action of this sort, and they have failed to meet that high substantive standard. In any case, even if some form of strict scrutiny did apply, the orderly and lawful enforcement of the immigration laws is a compelling state interest. *See, e.g.*, *United States v. Merkt*, 794 F.2d 950, 956 (5th Cir. 1986); *cf. United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975) (public interest demands effective measures to prevent illegal entry of aliens); *Rusu v. INS*, 296 F.3d 316, 321 (4th Cir. 2002) (recognizing that, "[b]ecause of the Government's compelling interest in controlling immigration," due process requirements may be relaxed in immigration context).

the vast majority of DACA recipients.[19]  And the fact that all DACA recipients *used to be* children cannot justify any special constitutional treatment; all of us *used to be* children.

More fundamentally, *Plyler* was explicitly decided in the unique context of public education—a subject about which the Rescission Policy is silent.  *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 459 (1988)  ("We have not extended [the holding of *Plyler*] beyond the 'unique circumstances,' *id.*, at 239 (Powell, J., concurring), that provoked its 'unique confluence of theories and rationales,' *id.*, at 243 (Burger, C.J., dissenting).") (quoting *Plyler* 457 U.S at 239, 243).[20]  Before and after the creation of DACA, and before and after the rescission of DACA, minors without lawful immigration status (including but not limited to DACA recipients) may seek a public education, and states that deny them that right may run afoul of *Plyler*.  But there is simply nothing in *Plyler* that has anything to say about the actual enforcement (or lack thereof) of the federal immigration laws, or about how DHS exercises prosecutorial discretion.[21]

## II.   THE REMAINING FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION

### A.   Plaintiffs Have Not Shown Any Risk of Irreparable Harm That Would Be Remedied By The Injunctive Relief That They Seek.

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).  The moving

---

[19] As of September 4, 2017, approximately 0.3% of DACA recipients were under the age of 16; 28.5% were between the ages of 16 and 20; 36.7% were between 21 and 25; 23.7% were between 26 and 30; and 10.9% were between 31 and 36.  The median age was 23, and the interquartile range was 20 to 27 years old.  USCIS.gov, *Approximate Active DACA Recipients: Sex and Age Group As of September 4, 2017*, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[20] To be sure, the Second Circuit has once applied *Plyler* outside the context of public education.  *See Lewis v. Thompson*, 252 F.3d 567 (2d Cir. 2001) (holding that the denial of automatic eligibility for Medicaid coverage at birth violated the equal protection rights of certain children).  But that case is no help to Plaintiffs here because, among other reasons, the Second Circuit relied on the fact that the plaintiff-children in *Lewis* were United States citizens, and therefore had an even "stronger" claim than the plaintiff-children in *Plyler*.  *See id.* at 591.

[21] Once again, even if heightened scrutiny under *Plyler* were applicable, the government has a compelling interest in the orderly and lawful enforcement of the immigration laws.  *See supra* at 45 n.18.

party therefore must show that irreparable harm is likely before any other elements may be considered. *See id.* To satisfy the irreparable harm requirement, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if [the Court] waits until the end of trial to resolve the harm.'" *Id.* (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1999)).

Under current circumstances, the harms identified by Plaintiffs are neither likely nor imminent. *Batalla Vidal* Plaintiffs rely on alleged harms to three named plaintiffs and one "putative class member." *Batalla Vidal* Mot. at 36-37. But none of those individuals faces *imminent* expiration of their DACA. *See Batalla Vidal* Mot. Ex. CCC ¶ 47 (Gustavo Galicia's DACA expires August 2018); Ex. EEE ¶ 3 (Carlos Vargas's DACA expires September 2018); Ex. III ¶ 2 (Carolina Fung Feng's DACA expires August 2018); Ex. LLL ¶ 2 (Eliana Fernandez's DACA expires November 2018). This case may very well have been fully litigated to final judgment before any of those harms come to pass—even ignoring the fact that the preliminary injunction already entered in the Northern District of California allows all of them to seek another two-year renewal of their DACA.

Plaintiffs also cite a variety of alleged harms related to the potential loss of work authorization for those whose DACA is set to expire. For example, the *State of New York* Plaintiffs reference alleged harms stemming from (1) the loss of services by "highly qualified employees in government," *State of New York* Mot. at 29; (2) the loss of revenue in the form of student tuition if students choose to stop attending public educational institutions as a result of their inability to work, *id*. at 30 (citing *e.g.* Ex. 17 ¶ 5; Ex. 71 ¶ 7; Ex. 72 ¶ 5); (3) increased costs if individuals lose health care coverage currently obtained through their employer, *id*. at 31-32; and (4) the impact of

"smaller consumer and legal workforce bases" for state and local economies, *id*. at 33.  The *Batalla Vidal* Plaintiffs allege similar harms.  *See Batalla Vidal* Mot. at 37 (discussing access to medical treatment and loss of earnings).  As for Plaintiff MRNY, it alleges an "imminent loss of twelve employees."  *Id*. at 38.

Even accepting all of these facts as true and that all of those harms are truly irreparable, none of these alleged harms are imminent, or even likely, given the preliminary injunction recently issued in the Northern District of California litigation.  That order requires DHS to permit individuals who were previously granted DACA to submit new renewal requests, and to process those requests.  If DHS determines that they qualify for a renewal of their DACA, those individuals may also receive new work authorizations, *see* 8 C.F.R. § 274a.12(c)(14), and the harms about which Plaintiffs are concerned would simply not come to pass.  Of course, any injunctive relief "must address the injury alleged to be irreparable," and a court "should not grant the injunction if it would not so prevent that injury."  *A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 336 (S.D.N.Y. 2013); *see also Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985) (noting that "[t]he linchpin of . . . interim relief is that the threatened irreparable harm will be prevented by [an] injunction").  Because these alleged harms have *already* been prevented by another court, they provide no basis for granting the request for injunctive relief advanced here.

Finally, the *Batalla Vidal* Plaintiffs refer to alleged longer-term harms stemming from an inability to "plan for the future and make commitments, whether familial, career-based, academic, or otherwise."  *Batalla Vidal* Mot. at 38.  However, a preliminary injunction would only provide

temporary, short-term relief, and would dissolve upon the conclusion of these lawsuits.  Only a permanent *legislative* solution will provide DACA recipients with the security that they seek.[22]

### B.      Balancing of the Equities and the Public Interest Disfavor Injunctive Relief.

The final two factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion.  These factors merge when the government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The federal government possesses broad authority over the subject of immigration and the status and presence of aliens in this county.  *Arizona v. United States*, 567 U.S. 387, 394 (2012). This includes significant discretion as to whether, and under what circumstances, to grant discretionary relief to individuals without a lawful immigration status, including through deferred action.  The injunctive relief sought by Plaintiffs would frustrate and displace both the Secretary's substantive judgment as to how her prosecutorial discretion should be exercised, as well as her further judgment as to how best to transition between policies, while providing minimal, if any, relief from the harms identified by Plaintiffs for the reasons discussed above—especially now that DHS is already subject to a similar preliminary injunction. Accordingly, this factor weighs against granting these Plaintiffs an additional injunction.

### C.      Any Injunctive Relief Should Be Narrowly Drawn.

The Court should deny Plaintiffs' motions in their entirety.  If, however, the Court were to disagree, it nevertheless should reject Plaintiffs' sweeping request to "immediately reinstate the implementation of the DACA program, nationwide, to conditions in existence prior to Defendants'

---

[22] The court in *Regents* found that the plaintiffs had not "justif[ied] a provisional injunction requiring DHS to resume accepting applications for advance parole" and accordingly did not order any such relief.  *Regents*, 2018 WL 339144, at *28.  The same applies here.  The sole argument offered regarding harm arising from the unavailability of advance parole pertains to the alleged inability of students to "fully participate in a variety of activities," which could allegedly "shrink the capacity of state and private educational institutions to offer such programming to their entire student body."  *State of New York* Mot. at 31.  Such a suggestion is far too speculative and attenuated to support injunctive relief regarding advance parole.

termination." *State of New York* Proposed Order at 2.  Such relief would be clearly overbroad, especially to the extent it applies to individuals who are not parties to this action and whose claims are not currently addressed in Plaintiffs' motions.  Constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries.  Article III requires that "a plaintiff must demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).  "The remedy" sought must therefore "be limited to the inadequacy that produced the injury in fact."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  And equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Accordingly, any injunction the Court enters should thus be limited to relieving the specific injury of only those individual Plaintiffs whom the Court determines have a cognizable claim and will suffer irreparable harm in the absence of an injunction.  At a minimum, this would require that any injunction sweep no broader than the one already ordered by the district court in the Northern District of California, which, although overbroad itself in the government's view, recognized some important limitations: that "new applications from applicants who have never before received deferred action need not be processed," that "the advance parole feature need not be continued for the time being for anyone," and that "defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." *Regents*, 2018 WL 339144, at *27.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for a preliminary injunction.

Dated: January 13, 2018                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           RICHARD P. DONOGHUE
                                           United States Attorney

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           JENNIFER D. RICKETTS
                                           Director, Federal Programs Branch

                                           JOHN R. TYLER
                                           Assistant Branch Director

                                           BRAD P. ROSENBERG
                                           Senior Trial Counsel

                                           */s/ Stephen M. Pezzi*
                                           STEPHEN M. PEZZI (D.C. Bar #995500)
                                           KATE BAILEY
                                           RACHAEL L. WESTMORELAND
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.
                                           Washington, DC  20530
                                           Tel.:  (202) 305-8576
                                           Fax:  (202) 616-8470
                                           Email: stephen.pezzi@usdoj.gov

                                           JOSEPH A. MARUTOLLO
                                           Assistant U.S. Attorney
                                           United States Attorney's Office
                                           Eastern District of New York
                                           271-A Cadman Plaza East, 7th Floor
                                           Brooklyn, NY  11201
                                           Tel:  (718) 254-6288
                                           Fax:  (718) 254-7489
                                           Email:  joseph.marutollo@usdoj.gov

                                           *Counsel for Defendants*

51