# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA,<br><br>     Plaintiffs,<br><br>  v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ~~ELAINE C. DUKE~~CHAD WOLF, in ~~her~~his official capacity as Acting Secretary of Homeland Security; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,<br><br>     Defendants. | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO)<br><br><br>~~FIRST~~SECOND AMENDED SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## **INTRODUCTION**

1.     The States of New York, Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and the District of Columbia (the "States") bring this action to protect the States—including their residents, employers, small governmental jurisdictions, regulatory systems, and educational institutions—against the unlawful actions of the President of the United States and the federal government.

2.      Since 2012, the Deferred Action for Childhood Arrivals ("DACA") program has

protected from deportation and extended work authorization to ~~approximately 800~~over 825,000

young people who grew up in this country, most of whom have known no home other than the

United States.

3.      DACA has allowed these young people to live, study, and work in the States (and

throughout the country) as contributors and leaders in their communities. DACA grantees attend

public and private universities, and are employed by companies, nonprofit organizations, and

governmental agencies and institutions, all of which benefit from their skills and productivity.

DACA grantees also provide financial support to their families, help to grow the economy, and

contribute significantly to State and local revenues and tax bases.

4.      On September 5, 2017, the Defendants definitively and categorically terminated

the DACA program, as detailed in a U.S. Department of Homeland Security ("DHS")

Memorandum (~~"~~by former Acting Secretary of Homeland Security Elaine Duke ("2017 DHS

Memorandum"). ~~-~~*See* Ex. 74[1] (Memorandum from Acting Secretary Elaine ~~Kelly~~Duke to James

McCament, Acting Director of U.S. Citizenship and Immigration Services, *Rescission of*

*Deferred Action for Childhood Arrivals*, September 5, 2017).

~~5.1.      Pursuant to the DHS Memorandum, the federal government will only issue~~

~~renewals for grantees whose benefits expire before March 5, 2018, provided they apply for~~

~~renewal by October 5, 2018. DHS immediately ceased accepting all new applications under~~

~~DACA.~~

---

[1] References to Exs. 1 to 179 in this Second Amended Supplemental Complaint are to the Exhibits docketed on October 4, 2017, at ECF No. 55.  References to Exs. 180 and 181 are to the Exhibits appended to this Second Amended Supplemental Complaint and filed on August 27, 2020.

6.5.    Ending DACA is a culmination of President's Trump's oft-stated commitments—whether personally held, stated to appease some portion of his constituency, or some combination thereof—to punish and disparage immigrants, especially those with Mexican roots, who make up more than 78 percent of DACA grantees. *See* Ex. 1 (Updated USCIS, *Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017*, June 8, 2017).

6.    Pursuant to the 2017 DHS Memorandum, the federal government began only to issue renewals for grantees whose benefits expire before March 5, 2018, provided they apply for renewal by October 5, 2018. DHS immediately ceased accepting all new applications under DACA.

7.    In 2018, this Court entered a preliminary injunction requiring DHS to continue processing renewal applications. *See Batalla Vidal v. Duke*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018). The federal government petitioned for certiorari while its appeal was pending before the Second Circuit, and the Supreme Court granted that petition along with the federal government's petitions for certiorari in parallel litigation in the Ninth Circuit and the U.S. District Court for the District of Columbia.

8.    On June 18, 2020, the Supreme Court held that Duke's 2017 rescission of DACA was arbitrary and capricious under the APA. *See Department of Homeland Security v. Regents of Univ. of California* ("*Regents*"), 140 S. Ct. 1891, 1915 (2020). Among other things, the Supreme Court expressly affirmed in full a summary judgment ruling "that DACA's rescission was unlawful and must be set aside." *NAACP v. Trump*, 315 F. Supp. 3d 457, 473 (D.D.C. 2018); *see Regents*, 140 S. Ct. at 1916 & n.7. Shortly thereafter, the Supreme Court denied the federal government's petition for certiorari from a Fourth Circuit summary judgment ruling vacating the 2017 rescission of DACA as arbitrary and capricious under the APA. *Casa de Md. v. U.S. Dep't*

3

*of Homeland Security*, 924 F.3d 684, 706 (4th Cir. 2019), *cert. denied*, — S.Ct. —, 2020 WL 3492650 (Mem.) (U.S. June 29, 2010) (No. 18-1469).

9.      On June 30, 2020, the Fourth Circuit issued the mandate associated with its summary judgment ruling. Mandate, *Casa de Maryland*, 18-1521, ECF No. 71 (4th Cir. June 30, 2020).  The issuance of that mandate had the effect of vacating the 2017 DACA rescission nationwide. *See, e.g., New York v. U.S. Dep't of Homeland Sec.*, No. 19-3591, 2020 WL 4457951, at *31 (2d Cir. Aug. 4, 2020) (describing the effect of a final judgment vacating agency action under the APA).

10.      Notwithstanding *Regents* and the Fourth Circuit's mandate, DHS did not recommence processing DACA applications but instead "generally held" applications "in anticipation of potential policy changes." Ex. 180 (Chad F. Wolf, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,"* July 28, 2020 (Wolf Memo)).

11.      On July 28, 2020, Defendant Chad Wolf—in his capacity as purported Acting Secretary of Homeland Security—issued a memorandum directing DHS to make interim changes to DACA while Wolf considered whether to fully rescind DACA. *Id.* In particular, the Wolf Memo orders DHS to reject all new initial DACA applications, to change the renewal period for current beneficiaries from two years to one year, and to reject all advance parole applications absent exceptional circumstances. *Id.* at 7-8.

12.      The Wolf Memo purports to apply these changes retroactively to all applications submitted after the June 18, 2020 *Regents* decision. Ex. 180 at 7 (Wolf Memo).

13.      Because Defendant Wolf was improperly serving in the role of Acting Secretary of Homeland Security in violation of the Federal Vacancies Reform Act of 1998 ("FVRA"), 5

4

U.S.C. § 3341 *et seq.*, and the Homeland Security Act of 2002, 6 U.S.C. § 111 *et seq.*  ("HSA"), he lacked the authority to issue the memorandum or to direct the changes to DACA pursuant to it.  Accordingly, the Wolf Memo is an ultra vires agency action that was void ab initio.

7.14.   The consequence of ~~the President's decision~~Defendants' decisions is that hundreds of thousands of young people who have availed themselves of the program will ultimately lose some or all of its protections, and will be exposed to removal when their authorizations expire.

8.15.   Individuals who have relied on DACA are now even more vulnerable to removal than before the program was initiated, as they turned over sensitive information to the federal government in their applications. Despite the federal government's repeated promises that it would not use such information to conduct enforcement measures, the 2017 DHS Memorandum ~~does~~and Wolf Memo do not explain how the government will keep that information secure, nor does it provide any assurances that immigration enforcement agents will not use such information to find and remove those who applied for DACA.

9.16.   Terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will harm hundreds of thousands of the States' residents, injure State-run colleges and universities, upset the States' workplaces, damage the States' economies, hurt State-based businesses and nonprofits, negatively affect the States' small governmental jurisdictions, and disrupt the States' statutory and regulatory interests.

10.17.  The States respectfully request that the Court invalidate the Wolf Memo and the portions of the 2017 DHS Memorandum challenged here, and vacate any changes effected to the DACA program by the Wolf Memo. Further, the States ask that the Court enjoin the federal

government from using personal information gathered for the DACA program in immigration enforcement.

## JURISDICTION AND VENUE

~~11.~~18.   The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

~~12.~~19.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Eastern District of New York.

~~13.~~20.   The States bring this action to redress harms to their proprietary and sovereign interests and their interests as *parens patriae*.

## PARTIES

### PLAINTIFFS

~~14.~~21.   The Plaintiff States of New York,[2] Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and the District of Columbia, represented by and through their Attorneys General,[3] are sovereign states[4] of the United States of America.

~~15.~~22.   The States are aggrieved and have standing to bring this action because of the injuries to the States caused by the termination of DACA or failure to restore DACA to its pre-

---

[2] The State of New York is represented by and through its Attorney General, Eric T. Schneiderman. Governor Andrew M. Cuomo is the chief executive officer of the State of New York and  is responsible  for overseeing the operations of the State of New York and ensuring that its laws are faithfully executed.

[3] Colorado is represented by and through Governor John W. Hickenlooper's Chief Legal Counsel, who has been designated a Special Assistant Attorney General for purposes of representing Colorado in this matter.

[4] The District of Columbia, which is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government of the United States, shall be included herein as a "State" for ease of reference.

September 5, 2017 status, including immediate and irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests.

## DEFENDANTS

16.23.  Defendant Donald Trump is the President of the United States, and authorized the issuance of the DHS Memorandum that purports to terminate DACA.. He is sued in his official capacity.

17.24.  Defendant DHS is a federal cabinet agency responsible for implementing the DACA program. DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

18.25.  Defendant United States Citizenship and Immigration Services ("USCIS") is an Operational and Support Component agency within DHS. USCIS is the sub-agency responsible for administering the DACA program.

19.26.  Defendant U.S. Immigration and Customs Enforcement ("ICE") is an Operational and Support Component agency within DHS. ICE is responsible for enforcing federal immigration law, including identifying, apprehending, detaining, and removing non-citizens.

20.27.  Defendant Elaine C. DukeChad Wolf is the Acting Secretary of the DHS. SheHomeland Security.[5] He is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees USCIS and ICE. SheHe is sued in herhis official capacity.

21.28.  Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and termination of the DACA program.

---

[5] Plaintiffs refer to Defendant Wolf by reference to the title DHS has designated for him, without conceding that he is lawfully exercising the powers of that position, as alleged in Plaintiffs' Ninth Claim for Relief below.

## GENERAL ALLEGATIONS

**Establishment of the DACA Program**.

22.29.  On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum"). *See* Ex. 13 (2012 DACA Memorandum). Under DACA, "certain young people who were brought to this country as children and know only this country as home" could request deferred action for a period of two years, subject to renewal. *Id.* at 1-2. DACA grantees also were eligible for work authorizations so that they could work legally in the United States during the deferred action period, pursuant to long-standing federal regulation. *See id.*; 8 C.F.R. § 274a.12(c)(14) (providing that "an alien who has been granted deferred action" may obtain work authorization upon demonstrating economic necessity).

23.30.  Deferred action is a well-established form of prosecutorial discretion under which the federal government forbears from taking removal action against an individual for a designated period of time. According to the 2012 DACA memorandum, it was appropriate for the government to exercise such discretion for DACA grantees because immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *See* Ex. 13 at 1.

24.31.  The 2012 DACA Memorandum provided that an applicant could be considered for an exercise of prosecutorial discretion only if he or she:

    a.  came to the United States before the age of sixteen;

    b.  continuously resided in the United States for at least five years preceding June 15, 2012, and was present in the United States on that date;

c.  was in enrolled in school on the date of his/her application, had graduated

from high school, had obtained a general education development certificate, or

was an honorably discharged veteran of the Coast Guard or Armed Forces of

the United States;

d.  had not been convicted of a felony offense, a significant misdemeanor

offense, or multiple misdemeanor offenses, and did not otherwise pose a

threat to national security or public safety; and

e.  was not over the age of thirty on June 15, 2012.

*Id.* at 1.

25.32.  USCIS described DACA as follows: "Deferred action is a discretionary

determination to defer a removal action of an individual as an act of prosecutorial discretion. For

purposes of future inadmissibility based upon unlawful presence, an individual whose case has

been deferred is not considered to be unlawfully present during the period in which deferred

action is in effect. An individual who has received deferred action is authorized by DHS to be

present in the United States, and is therefore considered by DHS to be lawfully present during

the period deferred action is in effect. However, deferred action does not confer lawful status

upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."

*See* Ex. 14, Question 1 (USCIS Help Center, *DACA FAQs*).

**The DACA Application Process.**

26.33.  Under DACA, "[a]ll individuals who believe[d] they [met] the guidelines" could

"affirmatively request consideration of DACA from USCIS" through an established process.

After receiving the applicant's forms, evidence, supporting documents and application fee,

USCIS "review[ed] them for completeness," considered complete applications "on an individual,

case-by-case basis," and notified applicants of its determination in writing. *See* Ex. 16 (USCIS Help Center, *How do I request consideration of DACA?*).

27.34.  In order to apply for the DACA program, applicants had to submit extensive documentation establishing that they met the eligibility criteria. Applicants also had to submit a Form I-765 Application for Employment Authorization, and pay a $495 fee. *See* Ex. 14 at Questions 28-41; *see also* Ex. 17 (USCIS, I-821D, *Consideration of Deferred Action for Childhood Arrivals*) (explaining that the filing fee for a DACA application could not be waived).

28.35.  DACA applicants were required to undergo biometric and biographic background checks. When conducting these checks, DHS reviewed the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies." *See* Ex. 14 at Question 23. If any information "indicate[d] that [the applicant's] presence in the United States threaten[ed] public safety or national security," the applicant was ineligible for DACA absent "exceptional circumstances." *Id.* at Question 65.

29.36.  Once individuals were admitted into the DACA program, internal USCIS "Standard Operating Procedures" dictated that, absent an "Egregious Public Safety" issue, DACA grantees were not to be terminated from the program until the government provided a "Notice of Intent to Terminate" which "thoroughly explain[ed]" the grounds for the termination." *See* Ex. 18 at 132, Appendix I (DHS, *National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals*, Apr. 4, 2013). DHS policy further provided that recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of participation in the DACA program. *Id.*

30.37.  At the expiration of their two-year DACA term, grantees could seek renewal, and were considered for renewal if they met the guidelines for consideration as well as other specified criteria. *See* Ex. 19 (USCIS Help Center, *How will USCIS evaluate my request for renewal of DACA?*).

**Benefits Provided Under the DACA Program.**

31.38.  DACA confers numerous benefits on its grantees.

32.39.  Notably, DACA grantees are granted the right not to be arrested or detained based solely on their immigration status during the time period during which their deferred action is in effect. *See* Ex. 14 at Question 9.

33.40.  DACA grantees also are granted eligibility for work authorization. As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action . . . .'" *Id.* at Question 1.

34.41.  DACA grantees are eligible to receive certain public benefits. These include Social Security, retirement, and disability benefits. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d).

35.42.  DACA enables grantees to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants. *See* Ex. 5 ¶¶ 12, 16, 22 (Decl. Wong).

36.43.  DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books." *See* Ex. 15 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu, Dec. 30, 2016).

37.44.  These positive effects have rippled throughout the States' economies. As DHS recognized more than four years after the implementation of DACA, our nation "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future." *Id.*

38.45.  Terminating DACA or failing to restore DACA to its pre-September 5, 2017 status would not only rip away the life-changing benefits to individual DACA grantees, but would also reverse the benefits to the community at large, including to innumerable small businesses, non-profits, and governments.[6]

**The Government's Assurances That the Information Provided by DACA Applicants Would be Kept Confidential and Not Used for Enforcement.**

39.46.  When the DACA program was first implemented, many eligible young people were reluctant to voluntarily disclose information that could help facilitate their removal from the United States. To encourage applications, DHS repeatedly promised applicants that information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes." *See* Ex. -15 (Letter from Sec'y Johnson).

40.47.  USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]nformation provided in [a DACA request] is protected from disclosure to ICE

---

[6] *See* e.g., Ex. 20 (Ike Brannon, *The Economic and Fiscal Impact of Repealing DACA*, the Cato Institute, Jan. 18, 2017) ("The deportation of DACA participants would cost the American economy billions of dollars, as well as billions of tax dollars foregone, while doing little to address the true concerns that Americans may have about unauthorized immigrants."); Ex. 21 (Tom Wong, *et al.*, *DACA Grantees' Economic and Educational Gains Continue to Grow*, Center for American Progress,  Aug. 28, 2017) (quoting multiple DACA grantees whose small businesses will suffer or even close if DACA is terminated); Ex. 22 (Tom Wong *et al.*, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Center for American Progress, Oct. 18, 2016) (study showing that 9 percent of DACA grantees work at non-profits, a significant percentage work in education, and 6 percent started their own business, including one owner who employs nine people and hopes to continue to grow and "hire even more people from the community" [internal brackets and quotation marks omitted]).

and CBP for the purpose of immigration enforcement proceedings." *See* Ex. 25 (USCIS Help Center, *Will the information I share in my request for DACA be used for immigration enforcement purposes?*).

41.48.  USCIS affirmatively represented to DACA applicants that, except in limited circumstances, their case would not be "referred to ICE for purposes of removal proceedings" even if UCSIS decided not to defer action on a case. *See* Ex. 26 (USCIS Help Center, *If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?*).

42.49.  In the exceptional circumstance in which USCIS referred a DACA applicant to ICE, USCIS affirmatively represented to DACA applicants that "information related to [their] family members or guardians that is contained in [their] request [would] not be referred to ICE for purposes of immigration enforcement against family members or guardians." *See* Ex. 27 (USCIS Help Center, *If my DACA case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?*).

43.50.  USCIS affirmatively represented to employers of DACA applicants that, except in limited circumstances, if they provided an employee "with information regarding his or her employment to support a request for consideration of DACA," the information would not be "shared with ICE for civil immigration enforcement purposes." *See* Ex. 28 (USCIS Help Center, *If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?*).

44.51.  The government's representations that, absent exceptional circumstances, information provided by a DACA grantee would not be used against him or her for later

13

immigration enforcement proceedings were unequivocal and atypical. For example, the federal government does not make the same representations for participants in other similar programs, such as Temporary Protected Status. These assurances were key to the success of the DACA program. By making repeated, unique, and strong representations, the federal government induced persons to rely on those representations and apply to become DACA grantees despite the potential risks.

**The Government's Commitment to Continuity and Fair Treatment for DACA Grantees.**

45.52.  Numerous public officials from both political parties have reinforced the federal government's promise to provide continuity and fair treatment to DACA grantees, and have recognized that DACA grantees have relied on the government's representations in applying for DACA. For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are hundreds of thousands of DACA grantees who have "relied on the U.S. government's representations" about DACA, and asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored." *See* Ex. -15.

46.53.  On December 19, 2016, then-President-elect Trump stated in an interview with TIME magazine that he would find an accommodation for DACA grantees, stating, "We're going to work something out that's going to make people happy and proud." *See* Ex. 29 (Michael Scherer, *Person of the Year 2016*, TIME Magazine, Dec. 19, 2016). He further recognized, "[DACA grantees] got brought here at a very young age, they've worked here, they've gone to school here. Some were good students. Some have wonderful jobs. And they're in never-never land because they don't know what's going to happen." Id.

14

47.54.  Again, on January 18, 2017, then President-elect Trump promised in an interview with Fox & Friends that he was working on a plan to make DACA grantees "very happy." *See* Ex. 30 (Francesca Chambers, *Trump signals he's softening on immigration as he says he's 'working on a plan' that will make DREAMers 'very happy,'* Daily Mail, Jan. 18, 2017). He further stated, "We're working on a plan right now. And that plan, over the next two to three months, is going to come out. And it's a plan that's going to be very firm, but it's going to have a lot of heart." Id.

48.55.  In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" DACA grantees, who have "organize[d] [their] li[ves] around" the DACA program. *See* Ex. 31 (CNN, *Transcript of CNN Town Hall with Speaker Paul Ryan*, Jan. 12, 2017).

49.56.  On January 25, 2017, President Trump again stated in an interview with David Muir that "[DACA grantees] shouldn't be very worried. I do have a big heart." *See* Ex. 32 (ABC News, *Transcript of ABC News anchor David Muir interview with Donald Trump*, Jan. 25, 2017).

50.57.  In February 2017, then-Secretary of DHS John Kelly issued a memorandum relating to enforcement priorities. This memorandum terminated "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," including prior enforcement priorities, but left DACA unchanged. *See* Ex. 2 (Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Enforcement of the Immigration Laws to Serve the National Interest*, Feb. 20, 2017); *see also* Ex. 10 (*Q&A: DHS Implementation of the Executive Order on Enhancing Public*

*Safety in the Interior of the United States*, Feb. 21, 2017) ("Q22: Do these memoranda affect recipients of Deferred Action for Childhood Arrivals (DACA)? A22: No.").

~~51.~~58.   On March 29, 2017, Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer." *See* Ex. 33 (Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico, Mar. 29, 2017).

~~52.~~59.   On April 21, 2017, President Trump represented that his Administration's policy was not to deport DACA grantees, and suggested that they "should rest easy." *See* Ex. 34 (The Associated Press, Interview Transcript, Apr. 21, 2017).

~~53.~~60.   On June 15, 2017, Secretary Kelly issued a memo terminating~~ ~~ the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program created in 2014, but keeping DACA in place. *See* Ex. 23 (Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents*, June 15, 2017).

~~54.~~61.   The government's commitment to the DACA program was further communicated to young people through DHS's publication entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA)" (the "DACA SOP"). *See* Ex. 18. This document includes more than 150 pages of specific instructions for granting or denying deferred action.

~~55.~~62.   Moreover, the approval notice granting deferred action under DACA listed only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA. *See* Ex. 24 (USCIS, DACA Approval Notice).

16

~~56.~~63.   In reliance on these representations, hundreds of thousands of young people applied to participate in the DACA program, or sought renewal of their benefits since 2017. *See* Ex. 1.

**President Trump's Statements about Mexicans.**

~~57.~~64.   Despite these various and repeated promises to DACA grantees made by the federal government and by President Trump, including a recognition of DACA's continued legal viability, value, and successes, President Trump has a long history of disparaging Mexicans, who comprise the vast majority of DACA grantees.

~~58.~~65.   In announcing his presidential campaign, then-candidate Trump compared Mexican immigrants to rapists, stating: "When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people." *See* Ex. 35 (Washington Post, *Transcript of Donald Trump's Presidential Bid Announcement*, June 16, 2015).

~~59.~~66.   During the first Republican presidential debate, then-candidate Trump again stated his distaste for immigrants from Mexico: "The Mexican government is much smarter, much sharper, much more cunning. And they send the bad ones over because they don't want to pay for them. They don't want to take care of them." *See* Ex. 36 (Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News, Aug. 6, 2015).

~~60.~~67.   Soon after, on August 25, 2015, then-candidate Trump refused to answer questions about immigration posed by Jorge Ramos, a Mexican-American and the top news anchor at Univision, a Spanish-language news network. After sending his bodyguard to physically remove Mr. Ramos, then-candidate Trump derisively told Mr. Ramos to "Go back to

17

Univision." *See* Ex. 37 (Phillip Rucker, *First, Trump booted Univision anchor Jorge Ramos out of his news conference. Then things got interesting*, The Washington Post, Aug. 25, 2015).

61.68.  In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag as "criminals" and "thugs." *See* Ex. 38 (Donald Trump, "The protestors in New Mexico were thugs who were flying the Mexican Flag," Twitter, May 25, 2016); *See* Ex. 39 (Donald Trump, "Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals," Twitter, June 4, 2016).

62.69.  In June 2016, then-candidate Trump impugned the integrity of a federal judge presiding over a lawsuit against one of his businesses because the judge is Hispanic. Trump commented that Judge Gonzalo Curiel's rulings against him "[H]as to do with perhaps that I'm very, very strong on the border. . . Now, he is Hispanic, I believe. He is a very hostile judge to me." *See* Ex. 40 (Jose A. -DelReal and Katie Zezima, *Trump's personal, racially tinged attacks on federal judge alarm legal experts*, The Washington Post, June 1, 2016).

63.70.  In an interview with CBS News on June 5, 2016, then-candidate Trump again reiterated his anti-Mexican views, noting that "[Judge Curiel]'s a member of a club or society very strongly, pro-Mexican, which is all fine. But I say he's got bias." *See* Ex. 41 (CBS News, Transcript of Face the Nation, June 5, 2016). Judge Curiel is a member of the San Diego Chapter of the La Raza Lawyers Association. *See* Ex. 42 (Michelle Ye Hee Lee, *Trump supporters' false claim that Trump U judge is a member of a pro-immigrant group*, The Washington Post, June 7, 2016).

64.71.  On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole. They later told police that "Donald Trump was right; all these illegals need to be deported." When asked about the incident, then-candidate Trump failed to condemn

18

the men, instead describing them as "passionate." *See* Ex. 43 (Adrian Walker, *'Passionate'*
*Trump fans behind homeless man's beating?*, The Boston Globe, Aug. 21, 2015). Specifically,
Trump stated, "[i]t would be a shame . . . I will say that people who are following me are very
passionate. They love this country and they want this country to be great again. They are
passionate. Id.

65.72.  In October 2016, during a presidential debate, then-candidate Trump responded to
a question about immigration by stating: "We have some bad hombres here and we're going to
get them out." *See* Ex. 44 (Katie Zezima, *Trump on immigration: There are 'bad hombres' in the*
*United States*, The Washington Post, Aug. 30, 2017).

66.73.  On January 27, 2017, newly-inaugurated President Trump and Mexico's President
Peña Nieto discussed President Trump's proposal for a border wall over the phone. During that
transcribed conversation, President Trump again referred to "hombres" stating: "You have some
pretty tough hombres in Mexico that you may need help with, and we are willing to help you
with that big-league. But they have to be knocked out and you have not done a good job of
knocking them out." *See* Ex. 45 (Greg Miller *et. al.*, *Full Transcripts of Trump's Calls with*
*Mexico and Australia*, The Washington Post, Aug. 3, 2017).

67.74.  On August 25, 2017, President Trump pardoned former Maricopa County Sheriff
Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal
judge's order to stop racially profiling Latinos. *See* Ex. 46 (Julie Hirschfield Davis and Maggie
Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal*
*Immigration*, The N.Y. Times, Aug. 25, 2017).

68.75.  Sheriff Arpaio had been detaining people ostensibly because they had violated the
law. But in practice, his office detained huge numbers of individuals solely because they looked

Latino, without any reasonable suspicion of illegal conduct. *See generally Melendres v. Arpaio*, Findings of Fact & Conclusions of Law, 2:07-cv-02513-GMS, ECF Doc. No.579 (D. Az. May 24, 2013). After a federal court enjoined that practice in 2011, Arpaio continued his unlawful and discriminatory practices unabated, "announc[ing] to the world and to his subordinates that he was going to continue business as usual no matter who said otherwise." *United States v. Arpaio*, Findings of Fact & Conclusions of Law, 2:16-cr-01012-SRB, ECF Doc. No. 210 at 13 (D. Ariz. July 31, 2017). On July 31, 2017, a federal court held Arpaio in criminal contempt, holding that he had willfully acted in "flagrant disregard" of the injunction. *Id.*

69.76.  Before issuing the pardon, President Trump asked, "Was Sheriff Joe convicted for doing his job?" *See* Ex. 46. (Davis and Haberman, *Trump Pardons Joe Arpaio*). After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio "an American patriot." *Id.*

70.77.  As President Trump's statements about Mexico and those with Mexican origins demonstrate, the President is willing to disparage Mexicans in a misguided attempt to secure support from his constituency.

**Trump Administration's Threatening Statements about Deporting Immigrants.**

71.78.  On June 13, 2017, Acting ICE Director Thomas Homan testified in front of the House Appropriations Committee's Subcommittee on Homeland Security, stating as to "every immigrant in the country without papers," that they "should be uncomfortable. You should look over your shoulder. And you need to be worried." *Hearing on the ICE and CBP F.Y. 2018 Budget Before the Subcomm. on Homeland Security of the H. Comm. on Appropriations*, 115th Cong. (2017) 2017 WLNR 18737622.

72.79.  On April 19, 2017, United States Attorney General Jefferson B. Sessions stated in an interview on Fox News' "Happening Now," program—in response to a question regarding the

deportation of a DACA recipient—that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported." -Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017).

**President Trump Terminates DACA in Response to the Litigation Threats of a State Found ~~To~~to Have Discriminated Against Latinos/Hispanics Nine Times Since 2012.**

~~73.~~80.  On June 29, 2017, the Attorneys General of ten states, led by the State of Texas, sent U.S. Attorney General Sessions a letter threatening to add claims to litigation currently pending in the Southern District of Texas "to challenge both the DACA program and the remaining expanded DACA permits," if the Executive Branch did not agree to end the DACA program by September 5, 2017. Ex. 177 (Letter from Ken Paxton *et.al.* to Attorney General Jeff Sessions, June 29, 2017).

~~74.~~81.  The demand that President Trump eliminate DACA is part of a history of intentional discrimination against Latinos/Hispanics by the State of Texas.

~~75.~~82.  Over the preceding decade, federal courts have repeatedly found the State of Texas liable for engaging in unlawful discrimination based on race and/or national origin.

~~76.~~83.  For example, in *Texas v. United States*, 887 F. Supp. 2d 133, 161 (D.D.C. 2012), three federal judges blocked a Congressional and State House redistricting plan after finding that it "was enacted with discriminatory purpose."

~~77.~~84.  The litigation eventually culminated in a ruling by a three-judge panel on August 15, 2017 finding, again, that the 2010 congressional districts had been created with "racially discriminatory intent" against Latinos and African American voters. *Perez v. Abbott*, SA-11-CV-360, 2017 U.S. Dist. LEXIS 129982, at *55 (W.D. Tex. Aug. 15, 2017).

78.85.  On October 9, 2014, in separate litigation challenging a state voter photo identification ("ID") law, a Texas federal district court judge found that the provision had been "imposed with an unconstitutional discriminatory purpose" and "constitute[d] an unconstitutional poll tax." *Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014).

79.86.  On remand from the Fifth Circuit, a federal district court concluded that the 2011 Legislature intentionally discriminated against minority voters by requiring presentation of a photo ID when casting their ballots. *Veasey v. Abbott*, 2017 U.S. Dist. LEXIS 54253, at *14-18 (S.D. Tex. Apr. 10, 2017).

80.87.  DHS issued the 2017 DHS Memorandum terminating DACA on September 5, 2017, in direct response to the threats of the State of Texas and the other ten states, fulfilling the demand of a State marked with a history of racial and national origin discrimination.

**President Trump Backtracks on His Promise and Terminates DACA.**

81.88.  Attorney General Sessions announced the termination of DACA via a live press conference. He explained, without evidence, "The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *See* Ex. 75 (DOJ, *Attorney General Sessions Delivers Remarks on DACA*, Prepared Remarks, Sept. 5, 2017).

82.89.  Under the 2017 DHS Memorandum, which accompanied this announcement, the government's new policy provides no discretion to approve new applications on a case-by-case basis. Instead, the 2017 DHS Memorandum is a final decision that an entire class of people is no longer eligible for deferred action, employment authorization, and other benefits. Per the 2017 DHS Memorandum, DHS "[w]ill reject all DACA initial requests and associated applications for

Employment Authorization Documents filed after the date of this memorandum."- DHS will also reject all renewal applications it receives after October 5, 2017, and all renewal applications for authorizations that expire after March 5, 2018.- *See* Ex. 74 (DHS Memorandum).

83.90.   In issuing the 2017 DHS Memorandum, the federal government misleadingly claimed that DACA was unconstitutional, *see* Ex. 74, despite the fact that no court has made that determination, and despite previous determinations by DOJ and DHS, including under the Trump administration, that DACA is lawful and should be left in place. -In fact, as recently as June 15, 2017, then-Secretary of Homeland Security John Kelly chose to allow DACA to continue (while terminating -the DAPA program) "after consulting with the Attorney General."- *See* Ex. 23

84.91.   Even after the announcement, the government's position on the reasoning for the termination has been unclear and inconsistent. -On the day of the termination, President Trump re-tweeted a statement that "We are a nation of laws. -No longer will we incentivize illegal immigration."- *See* Ex. 47 (Josh Saul, *Jeff Sessions Always Wanted to Deport Undocumented Immigrant Youth. Now He Can*, Newsweek, Sept. 5, 2017). -The President appears to have deleted this tweet.- Later on September 5, the President tweeted, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" *See* Ex. 48 (Donald J. Trump, Twitter, Sept. 5, 2017). On September 14, 2017, he tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really! ....." *See* Ex. 50 (Donald J. Trump, Twitter, Sept. 14, 2017).

85.92.   As a result of the 2017 DHS Memorandum, DACA grantees whose benefits expire after March 5, 2018 will immediately lose their employment authorization, as well as

other vital benefits, such as social security cards, driver's licenses, financial aid, disability and health benefits, among others.

86.93.   They also may lose their homes and communities if the program is allowed to expire. An internal White House memo reported on by CNN stated that DHS now is urging DACA grantees "to prepare for and arrange their departure from the United States" when their DACA terms end. *See* Ex. 88 (Tal Kopan & Jim Acosta, *Admin Memo: DACA recipients should prepare for departure from the United States*, CNN, Sept. 5, 2017). This threat of deportation is consistent with past references to deportation of DACA grantees, such as a statement by Attorney General Sessions in response to a question regarding the deportation of a DACA grantee that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported." *See* Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017).

87.94.   President Trump also has taken affirmative steps to reduce the privacy protections applicable to DACA grantee information. In January 2017, President Trump issued an Executive Order directing all agencies, including DHS, to "ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information." *See* Ex. 76 (Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," Jan. 25, 2017). In response to the Executive Order, DHS adopted a privacy policy that "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement." *See* Ex. 51 (DHS, *Privacy Policy 2017-01 Questions & Answers,* Apr. 27, 2017).

24

88.95.   The 2017 DHS Memorandum provides no assurance to DACA grantees, or direction to USCIS and ICE, that information contained in DACA applications cannot be used for the purpose of future immigration enforcement proceedings.

89.96.   To the contrary, on the same day that the 2017 DHS Memorandum was issued, DHS changed its public guidance about the use of DACA application data for immigration enforcement. DHS removed the webpage containing the assurance that, absent exceptional circumstances, DACA application data "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings." *Cf.* Ex. 25 (containing link to USCIS webpage that now contains an error alert and a message stating, "The page you are looking for may not exist or is temporarily unavailable."). The same day, DHS posted a new policy governing the use of information provided by DACA applicants. DHS now states that USCIS "[g]enerally" will not "proactively provid[e] information obtained through DACA to ICE and CBP. *See* Ex. 89 (DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals,* Sept. 5, 2017). The new policy imposes no restrictions on USCIS providing DACA data at the request of ICE, CBP, or any other law enforcement entity. *Id.* DHS also reserves the right to change its new policy "at any time without notice" and states that the policy "may not be relied upon" by any party. *Id.*

90.97.   DACA grantees thus immediately face the risk that information they provided to the federal government could be used against them at any time, without notice, for purposes of immigration enforcement, including detention or removal.

**The Defendants' Failure to Notify Certain DACA Grantees of the October 5, 2017 Renewal Deadline.**

91.98.   Before the termination of DACA, Defendants had a written policy and practice allowing DACA grantees to submit their renewal application up to one year after the date of

25

expiration of their participation in DACA. If DACA grantees failed to renew within one year of the expiration date, they had the option to re-apply as initial applicants. *See* Ex. 14 (USCIS FAQs – Q50).

92.99.   In addition, USCIS and DHS had a long-standing practice of using the address information they maintain for DACA grantees to send individualized notices to those grantees regarding their renewal expiration dates. *See* Ex. 178 (DACA Renewal Notice).

93.100.  On information and belief, no standard renewal notices have been provided to DACA grantees whose participation in DACA expires between February 6, 2018 and March 5, 2018. Prior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120-150 days prior to expiration, i.e., by November 2017, in order to avoid a lapse in deferred action and employment authorization. *See, e.g., id.* However, since the termination, Defendants have not yet sent this group of DACA grantees any notices regarding when and how they can renew.

94.101.  On information and belief, the government sent standard renewal notices up until August 1, 2017 for DACA grantees whose participation in DACA expires by January 2018, informing the grantees they had the standard 120-150 days prior to the expiration date to renew if they wished to "avoid a lapse in [their] period of deferred action and employment authorization". *See, e.g., id.* However, in light of DHS's decision to impose an absolute cut-off date of October 5, 2017 for all renewal applications, the information conveyed in these notices is now incorrect. The notices misleadingly suggest to DACA grantees that they have several additional months beyond October 5 to renew their DACA status without a gap in employment authorization. Moreover, the faulty renewal notices were not followed with individualized corrected notices

26

informing this group of grantees that there is a new, absolute October 5 deadline for renewal, and that DACA grantees will no longer have up to one year after the date of expiration of their DACA to submit a renewal application.

95.102.  As a result of Defendants' failure to provide individualized notice regarding the new October 5, 2017 renewal deadline to DACA grantees whose participation expires before March 5, 2018, individuals who received no notice or incorrect notice of the new deadline may be forever ineligible to renew their participation in DACA. These DACA grantees will no longer be protected from deportation and will lose work authorization that they may have otherwise had. They may also lose health insurance, social security cards, driver's licenses and other benefits.

96.103.  On October 3, 2017, DHS issued a press release stating that "[o]f the approximately 154,200 individuals whose DACA is set to expire between Sept. 5, 2017, and March 5, 2018, just over 106,000 either have renewal requests currently pending with USCIS, or have already had USCIS adjudicate their renewal request."- *See* Ex. 82 (DHS Press Release *Department of Homeland Security Acting Secretary Elaine Duke Reminds Eligible DACA Recipients to File Renewal Requests,* October 3, 2017). Therefore, up to one third of DACA grantees who are eligible for renewal had not applied as of two days before the October 5, 2017 deadline.

**The Government's Failure to Notify DACA Grantees of their Inability to Renew Their DACA Status If It Expires After March 5, 2018.**

97.104.  On information and belief, Defendants' termination of DACA was solely communicated to DACA grantees through the publication of DHS's memorandum on September 5, 2017 on the DHS website and by a concurrent television announcement from Attorney

27

General Sessions. *See* Ex. 74 (DHS Memo); *See* Ex. 75 (*Attorney General Sessions Delivers Remarks on DACA*).

98.105.  On information and belief, the government did not and does not plan to issue individualized notices to any DACA grantees informing them of the termination of DACA and their inability to renew if their DACA status expires after March 5, 2018.

99.106.  Many DACA grantees relied upon their ability to apply to renew DACA in making important decisions related to their employment, education and families, among other things.

**The Government's Failure to Comply with the Supreme Court's Invalidation of the DACA Rescission and Subsequent Vacatur of that Rescission.**

107.    Ignoring the Supreme Court's June 18, 2020 *Regents* decision holding that Defendants' 2017 rescission of DACA was arbitrary and capricious, 140 S. Ct. at 1915, and the subsequent vacatur of the rescission by the Fourth Circuit on June 30, 2020, DHS failed to recommence processing DACA applications.  Instead, it "generally held" applications "in anticipation of potential policy changes."  Wolf Memo at 7.

**The Wolf Memo Orders Interim Changes to DACA Pending DHS's Consideration of Fully Rescinding the DACA Program.**

108.    In the Wolf Memo, issued on July 28, 2020, Defendant Wolf announced that "I am considering anew the DACA policy," that "the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission," and that, "in the exercise of my authority and discretion in establishing national immigration policies and priorities . . . I am rescinding the Nielsen Memorandum and Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of the full rescission."  Wolf Memo at 4.

28

109. Specifically, the Wolf Memo orders DHS to reject all new initial applications, to change the renewal period for current beneficiaries from two years to one year, and to reject all advance parole applications absent exceptional circumstances. *Id.* at 7-8.

110. The Wolf Memo purports to apply these changes retroactively to all applications submitted after the Supreme Court's June 18, 2020 *Regents* decision. *Id.* at 7.

111. On August 21, 2020, DHS Deputy Director of Policy Joseph Edlow issued a memorandum purporting to implement the Wolf Memo, instructing USCIS officials to take the actions directed by the Wolf Memo. Ex. 181.

**Defendant Wolf Lacked the Authority to Issue the Wolf Memo.**

112. The U.S. Government Accountability Office ("GAO") concluded that Defendant Wolf has never lawfully served in the role of Acting Secretary of Homeland Security because his assumption of that role violated the FVRA and HSA.

113. Article II of the Constitution requires that the President obtain the "Advice and Consent" of the Senate for Cabinet officials.

114. The FVRA established a default framework for authorizing acting officials to fill Senate-confirmed roles, with three options for who may serve as an acting official. 5 U.S.C. § 3345. Under this framework, (1) the "first assistant to the office" of the vacant officer generally becomes the acting official, *id.* § 3345(a)(1), unless (2) the President appoints someone already serving in a different Senate-confirmed position, *id.* § 3345(a)(2), or (3) the President authorizes "an officer or employee" of the relevant agency to serve as the acting official if the officer or employee has held a position in the agency above the GS-15 pay rate for 90 days or more within the preceding year, *id.* § 3345(a)(3). The FVRA further provides that a position may be occupied by an acting official for a maximum of 210 days. *Id.* § 3346. This framework

29

is the "exclusive means" for authorizing acting officials unless a specific statute authorizes "the President, a court, or the head of an Executive department" to designate one. *Id.* § 3347.

115.    DHS has such a statute—the HSA—which establishes an order of succession for the Acting Secretary, expressly superseding the FVRA's default options.  6 U.S.C. § 113(g). First in line under the HSA is the Deputy Secretary, and then the Under Secretary for Management. *Id.* §§ 113(a)(1)(A), 113(g)(1). After these two offices, the order of succession is set by the Secretary of Homeland Security. *Id.* § 113(g)(2).

116.    Under the FVRA, official actions taken by unlawfully serving acting officials "shall have no force or effect" and "may not be ratified" after the fact, including acting officials that assume their roles through agency-specific statutes like the HSA.  5 U.S.C. § 3348(d)(1), (2).

117.    Secretary Kirstjen Nielsen was the most recent Senate-confirmed Secretary of Homeland Security. On February 15, 2019, she exercised her power under the HSA to set an order of succession for the position of Acting Secretary of DHS should the Deputy Secretary and Under Secretary of Management positions be vacant. She did so by amending the existing order of succession that had been issued by then-Secretary Jeh Johnson in 2016—Delegation 00106.

118.    Nielsen's February Delegation provided two grounds for accession of an Acting Secretary: (1) the Secretary's death, resignation, or inability to perform the functions of the office; and (2) the Secretary's unavailability to act during a disaster or catastrophic emergency. Each ground set forth the order of succession that would govern under those circumstances. In the case of the Secretary's death, resignation, or inability to perform the functions of office, Executive Order 13753—the most recent prior amendment to the order of succession in the Department—would govern the order of succession. If the Secretary were unavailable to act

during a disaster or catastrophic emergency, the order of succession would be governed by Annex A to the February Delegation.

119.    At the time of the February Delegation, the orders of succession found in E.O. 13753 and Annex A were identical; the first four positions in the order of succession for both were as follows: (1) Deputy Secretary; (2) Under Secretary of Management, (3) Administrator of the Federal Emergency Management Agency (FEMA) and (4) Director of the Cybersecurity and Infrastructure Security Agency (CISA).  The February Delegation further provided that officials who were only acting in the listed positions (rather than appointed to those positions) were ineligible to serve as Acting DHS Secretary, such that the position of Acting Secretary would pass to the next Senate-confirmed official.

120.    Nielsen originally announced her resignation from the Secretary position effective April 7, 2019. Under the order of succession in effect at that time, and in view of the vacancy in the Deputy Secretary position, the Acting Secretary position would have been assumed by Claire Grady, the Deputy Under Secretary for Management. *See* 6 U.S.C. §§ 113(a)(1)(A), 113(g)(1). But Nielsen then purported to remain in office until April 10, and Grady resigned on April 9.

121.    Before leaving office on April 10, 2019, Nielsen made a partial amendment to DHS's order of succession. In this April Delegation, Nielsen retained the two separate grounds for accession to the role of Acting Secretary: vacancies arising from Secretary's death, resignation, or inability to perform the functions of office were still governed by E.O. 13753, and vacancies arising from the Secretary's unavailability to act during a disaster or catastrophic emergency were still governed by Annex A to the Delegation. Nielsen also did not amend E.O. 13753, which continued to govern the order of succession in the event of a vacancy created by the Secretary's death, resignation or inability to perform the functions of the office. Secretary

31

Nielsen did, however, amend Annex A, which set forth the order of succession for when the Secretary is unavailable to act during a disaster or catastrophic emergency; the new order of succession was as follows: (1) Deputy Secretary; (2) Under Secretary of Management; (3) Commissioner of U.S. Customs and Border Protection (CBP), and (4) Administrator of FEMA.

122.    Senate-confirmed Commissioner of CBP Kevin McAleenan then assumed the role of Acting Secretary, supposedly pursuant to Annex A. Yet E.O. 13753 rather than Annex A governed the relevant order of succession because the vacancy in the position of Secretary was created by Nielsen's resignation, not through the Secretary's unavailability during a disaster or catastrophic emergency.

123.    On November 8, 2019, McAleenen substituted Annex A for E.O. 13753 to govern the order of succession when the Secretary dies, resigns, or is unable to perform the functions of office. McAleenan then directed the order of succession in Annex A to be: (1) Deputy Secretary, (2) Under Secretary of Management; (3) Commissioner of CBP; and (4) Under Secretary for Strategy, Policy, and Plans. On November 13, 2019, McAleenan resigned as both Acting Secretary and Commissioner of CBP. Because the first three positions in the line of succession were vacant, the Senate-confirmed Under Secretary of Strategy, Policy, and Plans—Chad Wolf—assumed the role of Acting Secretary.

124.    On November 15, 2019, two days after Wolf assumed the Acting Secretary role, the Chairman of the House of Representatives Committee on Homeland Security and the Acting Chairwoman of the House Committee on Oversight and Reform wrote a letter to the head of GAO "to express serious concerns with the legality of the appointment" of Chad Wolf as Acting

32

Secretary of DHS and Ken Cuccinelli as Senior Official Performing the Duties of Deputy Secretary.

125.    In particular, the Chairman and Acting Chairwoman expressed concern that Wolf was serving in violation of the FVRA and HSA because former Acting Secretary McAleenan did not lawfully assume the Acting Secretary position, and so McAleenan had no authority to make the changes to DHS's order of succession that formed the basis for Wolf's accession to Acting Secretary.

126.    On August 14, 2020, GAO issued a report responding to the Chairman and Acting Chairwoman's request, and assessing the legality of the appointment of Chad Wolf as Acting Secretary of DHS and Ken Cuccinelli as Senior Official Performing the Duties of Deputy Secretary. GAO, *DHS-Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, File No. B-331650, Aug. 14, 2020.

127.    In the report, GAO explained that "[i]n the case of vacancy in the positions of Secretary, Deputy Secretary, and Under Secretary of Management, the HSA provides a means for an official to assume the title of Acting Secretary pursuant to a designation of further order of succession by the Secretary." *Id.* at 11. Based on the amendments Secretary Nielsen made to the order of succession in April 2019, GAO concluded that the Senate-confirmed CBP Commissioner (McAleenan) "would have been the appropriate official" to serve as Acting Secretary only if Secretary Nielsen had been "unavailable to act during a disaster or catastrophic emergency." *Id.* at 7.

128.    GAO concluded that because Secretary Nielsen had *resigned*, E.O. 13753 controlled under "the plain language of the April Delegation." *Id.* GAO explained that after

33

Nielsen's resignation, then-Director of CISA, Christopher Krebs, should have assumed the position Acting Secretary because he was the first Senate-confirmed official in the E.O. 13753 order of succession, which governed following a Secretary's resignation.[7] *Id.* at 8 & n.11. GAO noted that although "McAleenan assumed the title of Acting Secretary upon the resignation of Secretary Nielsen," "the express terms of the existing [succession] designation required [Krebs] to assume that title" and so "McAleenan did not have authority to amend the Secretary's existing designation." *Id.* at 11. GAO thus concluded that Wolf and Cuccinelli were improperly serving in their acting roles because they assumed those acting roles under "[the] invalid order of succession" established by McAleenan in November 2019. *Id.*

129.    GAO recognized that Secretary Nielsen's conduct may have suggested that she intended McAleenan to become Acting Secretary upon her resignation, but GAO concluded that "it would be inappropriate, in light of the clear express directive of the April Delegation"— which provided that McAleenan would only take over if Nielsen was unavailable to act during a disaster or catastrophic emergency—to interpret the order of succession based on post-hoc actions." *Id.* at 9. GAO did not assess the consequences of Wolf's and Cuccinelli's unlawful appointments and instead referred that question to the DHS Office of Inspector General. *Id.* at 11.

130.    Because Defendant Wolf unlawfully assumed the position of Acting Secretary of Homeland Security in violation of the FVRA and HSA. Under the plain terms of the FVRA, all official actions taken by Wolf as Acting Secretary—including his issuance of the Wolf Memo— are therefore invalid.

---

[7] The FEMA Administrator had resigned a week before Nielsen resigned. (GAO, *DHS-Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, File No. B-331650, Aug. 14, 2020).

## HARM TO PLAINTIFF STATES

~~100.~~131.       The States will suffer harm as a result of the termination of the DACA program or failure to restore DACA to its pre-September 5, 2017 status, including immediate and irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests.

## PLAINTIFF STATE OF NEW YORK

~~101.~~132.       The State of New York is home to an estimated ~~76~~80,000 or more DACA-eligible residents. ~~See~~[8] Approximately 28,180 active DACA recipients live in New York.[9] ~~Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).~~

~~102.~~133.       As of ~~June 30, 2017~~March 31, 2020, USCIS reported that it had approved ~~42,503~~40,807 initial DACA applications and ~~62,850~~83,987 renewals for residents of New York. ~~See~~[10] ~~Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 63 (Decl. Wong).~~

~~103.~~134.       Obtaining DACA status has allowed these individuals, many of whom are long-term residents of New York, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

~~104.~~135.       ~~An~~As of October 4, 2017, an estimated 38,848 New York DACA grantees ~~a~~were employed. *See* Ex. 5 ¶ 64 (Decl. Wong). An estimated 2,295 ~~a~~were business owners. *Id.*

---

[8] *See* Migration Policy Institute, National and State Estimates of Immigrant Populations Eligible for the Deferred Action for Childhood Arrivals (DACA) Program, June 2020, *available at* https://www.migrationpolicy.org/sites/default/files/datahub/State%20Estimates%20of%20DACA-Eligible%20Population_June%202020.xlsx ("June 2020 MPI Estimates").

[9] *See* USCIS, Approximate Active DACA Receipts – March 31, 2020 (July 22, 2020), *available at* https://www.uscis.gov/sites/default/files/document/data/Approximate%20Active%20DACA%20Receipts%20-%20March%2031%2C%202020.pdf ("USCIS March 2020 Estimates").

[10] *See* USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Status, by Fiscal Year, Quarter, and Case Status: Aug. 15, 2012-Mar. 31, 2020 (July 22, 2020), *available at* https://www.uscis.gov/sites/default/files/document/data/I914t_visastatistics_fy2020_qtr4.pdf ("USCIS March 2020 Quarterly Report").

35

An estimated 19,084 awere in school, and 13,645 are currentlywere pursuing a bachelor's degree or higher. *Id*. ¶ 65.

136.    An estimated 9,200 DACA recipients in New York are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[11]

105.137.    In addition to the many harms identified below, *see* ¶¶ 188 233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the New York economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $140 million annually in state and local taxes in New York—a contribution that maywas estimated to drop by $55 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-year period, impact the New York economy with $10.7 billion in budgetary costs and $38.6 billion economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $238.8 million annually in state and local taxes in New York.[12]

---

[11] *See* Nicole Prchal Svajlenka, Center for American Progress, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Center for American Progress (Apr. 6, 2020), https://www.americanprogress.org/issues/immigration/news/2020/04/06/482708/demographic-profile-daca-recipients-frontlines-coronavirus-response/ ("CAP COVID-19 Report").

[12] *See* Nicole Prchal Svajlenka & Philip E. Wolgin, Center for American Progress, What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition (Apr. 6, 2020), https://www.americanprogress.org/issues/immigration/news/2020/04/06/482676/know-demographic-economic-impacts-daca-recipients-spring-2020-edition/ ("CAP Demographic and Economic Impacts Report").

## PLAINTIFF COMMONWEALTH OF MASSACHUSETTS

106.138.      The Commonwealth of Massachusetts is home to an estimated 1917,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[13] Approximately 5,480 DACA recipients live in Massachusetts.[14]

107.139.      As of June 30, 2017March 31, 2020, USCIS reported that it had approved 8,0537,654 initial DACA applications and 12,85716,257 renewals for residents of Massachusetts. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 55 (Decl. Wong).[15]

108.140.      Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Massachusetts, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

109.141.      AnAs of October 4, 2017, an estimated 7,360 Massachusetts DACA grantees awere employed. *See* Ex. 5 ¶ 56 (Decl. Wong). An estimated 435 awere business owners. *Id.* An estimated 3,616 awere in school, and 2,585 currently awere pursuing a bachelor's degree or higher. *Id*. ¶ 57.

142.      An estimated 2,000 DACA recipients in Massachusetts are frontline workers in sectors that are essential for the Commonwealth's COVID-19 response: health care, education, and food-related jobs.[16]

110.143.      In addition to the many harms identified below, *see* ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the

[13] *See* June 2020 MPI Estimates.

[14] *See* USCIS March 2020 Estimates.

[15] *See* USCIS March 2020 Quarterly Report.

[16] *See* CAP COVID-19 Report.

Massachusetts economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $24.2 million annually in state and local taxes in Massachusetts—a contribution that maywas estimated to drop by $9.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-year period, impact the Massachusetts economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $32.5 million annually in state and local taxes in Massachusetts.[17]

### PLAINTIFF STATE OF WASHINGTON

111.144.    The State of Washington is home to an estimated 2726,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[18] Approximately 16,030 DACA recipients live in Washington.[19]

112.145.    As of June 30, 2017March 31, 2020, USCIS reported that it had approved 17,93719,308 initial DACA applications and 17,90643,442 renewals for residents of Washington. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 87 (Decl. Wong).[20]

113.146.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Washington, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

---

[17] *See* CAP Demographic and Economic Impacts Report.

[18] *See* June 2020 MPI Estimates.

[19] *See* USCIS March 2020 Estimates.

[20] *See* USCIS March 2020 Quarterly Report.

114.147.        AnAs of October 4, 2017, an estimated 16,394 Washington DACA grantees awere employed. *See* Ex. 5 ¶ 88 (Decl. Wong). -An estimated 969 awere business owners. *Id.* An estimated 8,054 awere in school, and 5,758 currently arewere pursuing a bachelor's degree or higher. *Id.* ¶ 89.

148.    An estimated 6,400 DACA recipients in Washington are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[21]

115.149.        In addition to the many harms identified below, *see* ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Washington economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $51 million annually in state and local taxes in Washington—a contribution that maywas estimated to drop by $19 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-year period, impact the Washington economy with $1.8 billion in budgetary costs and $6.4 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). -DACA recipients currently contribute an estimated $90.5 million annually in state and local taxes in Washington.[22]

---

[21] *See* CAP COVID-19 Report.

[22] *See* CAP Demographic and Economic Impacts Report.

## PLAINTIFF STATE OF COLORADO

~~116.~~150.        The State of Colorado is home to an estimated 23,000 or more DACA-eligible residents. ~~See Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).~~ [23]Approximately 14,520 DACA recipients live in Colorado.[24]

~~117.~~151.        As of ~~June 30, 2017~~March 31, 2020, USCIS reported that it had approved ~~17,310~~18,555 initial DACA applications and ~~15,322~~41,107 renewals for residents of Colorado. ~~See Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 27 (Decl. Wong).~~[25]

~~118.~~152.        Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Colorado, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

~~119.~~153.        ~~An~~As of October 4, 2017, an estimated 15,281 Colorado DACA grantees ~~a~~were employed. See Ex. 5 ¶ 28 (Decl. Wong). An estimated 935 ~~a~~were business owners. Id. An estimated 7,772 ~~a~~were in school, and 5,557 ~~currently are~~were pursuing a bachelor's degree or higher. Id. ¶ 29.

154.    An estimated 4,300 DACA recipients in Colorado are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[26]

~~120.~~155.        In addition to the many harms identified below, see ¶¶ ~~188-233~~234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Colorado economy generally. Stripping DACA grantees of the ability to work legally will cause

---

[23] See June 2020 MPI Estimates.

[24] See USCIS March 2020 Estimates.

[25] See USCIS March 2020 Quarterly Report.

[26] See CAP COVID-19 Report.

many to lose their jobs, resulting, among other things, in less tax revenue for the State.

According to one estimate, as of October 4, 2017, DACA-eligible residents contributed

approximately $33.9 million annually in state and local taxes in Colorado—a contribution that

maywas estimated to drop by $16.4 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe

and Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-

year period, impact the Colorado economy with $768 million in budgetary costs and $2.7 billion

in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute

an estimated $58.7 million annually in state and local taxes in Colorado.[27]

## PLAINTIFF STATE OF CONNECTICUT

121.156.    The State of Connecticut is home to an estimated 11,000 or more DACA-

eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[28] Approximately 3,560 DACA

recipients live in Connecticut.

122.157.    As of June 30, 2017March 31, 2020, USCIS reported that it had approved

4,989886 initial DACA applications and 6,76410,479 renewals for residents of Connecticut. *See*

Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 31 (Decl. Wong).[29]

123.158.    Obtaining DACA status has allowed these individuals, many of whom are

long-term residents of Connecticut, to work legally, acquire driver's licenses, open bank

accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public

universities, and obtain employer-based health insurance, among other benefits.

124.159.    AnAs of October 4, 2017, an estimated 4,560 Connecticut DACA grantees

awere employed. *See* Ex. 5 ¶ 32 (Decl. Wong). An estimated 269 awere business owners. *Id.* An

---

[27] *See* CAP Demographic and Economic Impacts Report.

[28] *See* June 2020 MPI Estimates.

[29] *See* USCIS March 2020 Quarterly Report.

estimated 2,240 ~~a~~were in school, and 1,602 ~~currently are~~were pursuing a bachelor's degree or higher. *Id.* ¶ 33.

160.    An estimated 1,300 DACA recipients in Connecticut are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[30]

~~125.~~161.    In addition to the many harms identified below, *see* ¶¶ ~~188-233~~234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Connecticut economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contribute~~d~~ approximately $17 million annually in state and local taxes in Connecticut—a contribution that ~~may~~was estimated to drop by $5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate ~~suggests~~predicted that terminating DACA would, over a ten-year period, impact the Connecticut economy with $642 million in budgetary costs and $2.3 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $21.8 million annually in state and local taxes in Connecticut.[31]

---

[30] *See* CAP COVID-19 Report.

[31] *See* CAP Demographic and Economic Impacts Report.

## PLAINTIFF STATE OF DELAWARE

~~126.~~162.        The State of Delaware is home to an estimated 3,000 or more DACA-eligible residents. ~~See Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[32]~~ Approximately 1,310 DACA recipients live in Delaware.[33]

~~127.~~163.        As of ~~June 30, 2017~~March 31, 2020, USCIS reported that it had approved 1,~~451~~532 initial DACA applications and ~~1,583~~3,581 renewals for residents of Delaware. ~~See Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 35 (Decl. Wong).[34]~~

~~128.~~164.        Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Delaware, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

~~129.~~165.        ~~An~~As of October 4, 2017, an estimated 1,326 Delaware DACA grantees ~~a~~were employed. *See* Ex. 5 ¶ 36 (Decl. Wong). An estimated 651 ~~a~~were in school, and 466 ~~currently are~~were pursuing a bachelor's degree or higher. *Id.* ¶ 37.

~~130.~~166.        In addition to the many harms identified below, *see* ¶¶ ~~188-233~~234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Delaware economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contribute~~d~~ approximately $2.4 million annually in state and local taxes in Delaware—a contribution that ~~may~~was estimated to drop by $1 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and

---

[32] *See* June 2020 MPI Estimates.

[33] *See* USCIS March 2020 Estimates.

[34] *See* USCIS March 2020 Quarterly Report.

Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-year period, impact the Delaware economy with $258 million in budgetary costs and $924 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $4.3 million annually in state and local taxes in Delaware.[35]

## PLAINTIFF THE DISTRICT OF COLUMBIA

131.167.    The District of Columbia ("District") is home to an estimated 2,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[36] Approximately 600 DACA recipients live in the District.[37]

132.168.    As of June 30, 2017March 31, 2020, USCIS reported that it had approved 7738 initial DACA applications and 1,299701 renewals for residents of the District. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 39 (Decl. Wong).[38]

133.169.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of the District, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

134.170.    AnAs of October 4, 2017, an estimated 707 District DACA grantees awere employed. *See* Ex. 5 ¶ 40 (Decl. Wong). An estimated 347 awere in school, and 248 currently arewere pursuing a bachelor's degree or higher. *Id.* ¶ 41.

---

[35] *See* CAP Demographic and Economic Impacts Report.

[36] *See* June 2020 MPI Estimates.

[37] *See* USCIS March 2020 Estimates.

[38] *See* USCIS March 2020 Quarterly Report.

171.    An estimated 200 DACA recipients in the District are frontline workers in sectors that are essential for the District's COVID-19 response: health care, education, and food-related jobs.[39]

135.172.    In addition to the many harms identified below, *see* ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the District's economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $2.7 million annually in state and local taxes in the District—a contribution that maywas estimated to drop by $946,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-year period, impact the District's economy $900 million in budgetary costs and $3.2 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $2.9 million annually in local taxes in the District.[40]

---

[39] *See* CAP COVID-19 Report.

[40] *See* CAP Demographic and Economic Impacts Report.

## PLAINTIFF STATE OF HAWAII

~~136.~~173.        The State of Hawaii is home to an estimated ~~2~~4,000 or more DACA-eligible residents. ~~*See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[41]~~ Approximately 340 DACA recipients live in Hawaii.[42]

~~137.~~174.        As of ~~June 30, 2017~~March 31, 2020, USCIS reported that it had approved ~~582~~368 initial DACA applications and ~~2,179~~935 renewals for residents of Hawaii. ~~*See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 43 (Decl. Wong).[43]~~

~~138.~~175.        Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Hawaii, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

~~139.~~176.        ~~An~~As of October 4, 2017, an estimated 532 Hawaii DACA grantees ~~a~~were employed. *See* Ex. 5 ¶ 44 (Decl. Wong). An estimated 261 ~~a~~were in school, and 187 ~~currently are~~were pursuing a bachelor's degree or higher. *Id.* ¶ 45.

177.    An estimated 100 DACA recipients in Hawaii are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[44]

~~140.~~178.        In addition to the many harms identified below, *see* ¶¶ ~~188-233~~234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Hawaii economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in a loss of tax revenue for the State.

---

[41] *See* June 2020 MPI Estimates.

[42] *See* USCIS March 2020 Estimates.

[43] *See* USCIS March 2020 Quarterly Report.

[44] *See* CAP COVID-19 Report.

According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $3.2 million annually in state and local taxes in Hawaii—a contribution that maywas estimated to drop by $870,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-year period, impact the Hawaii economy $126 million in budgetary costs and $451.5 million economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $3.1 million annually in state and local taxes in Hawaii.[45]

**PLAINTIFF STATE OF ILLINOIS**

141.179.      The State of Illinois is home to an estimated 6867,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[46] Approximately 33,940 DACA recipients live in Illinois.[47]

142.180.      As of June 30, 2017March 31, 2020, USCIS reported that it had approved 42,53745,002 initial DACA applications and 39,70297,003 renewals for residents of Illinois. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 47 (Decl. Wong).[48]

143.181.      Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Illinois, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

144.182.      AnAs of October 4, 2017, an estimated 38,879 Illinois DACA grantees awere employed. *See* Ex. 5 ¶ 48 (Decl. Wong).  An estimated 2,297 awere business owners. *Id.*

---

[45] *See* CAP Demographic and Economic Impacts Report.

[46] *See* June 2020 MPI Estimates.

[47] *See* USCIS March 2020 Estimates.

[48] *See* USCIS March 2020 Quarterly Report.

An estimated 19,099 ~~a~~were in school, and 13,656 ~~currently are~~were pursuing a bachelor's degree or higher. *Id*. ¶ 49.

       183.    An estimated 11,400 DACA recipients in Illinois are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[49]

      ~~145.~~184.    In addition to the many harms identified below, *see* ¶¶ ~~188-233~~234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Illinois economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $131 million annually in state and local taxes in Illinois—a contribution that ~~may~~was estimated to drop by $54.7 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate ~~suggests~~predicted that terminating DACA would, over a ten-year period, cost the Illinois economy $1.9 billion in lost tax revenue and $6.9 billion overall. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $209.5 million annually in state and local taxes in Illinois.[50]

---

[49] *See* CAP COVID-19 Report.

[50] *See* CAP Demographic and Economic Impacts Report.

## PLAINTIFF STATE OF IOWA

146.185.    The State of Iowa is home to an estimated 4,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[51] Approximately 2,420 DACA recipients live in Iowa.[52]

147.186.    As of June 30, 2017March 31, 2020, USCIS reported that it had approved 2,812920 initial DACA applications and 3,1207,054 renewals for residents of Iowa. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 51 (Decl. Wong).[53]

148.187.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Iowa, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

149.188.    AnAs of October 4, 2017, an estimated 2,570 Iowa DACA grantees awere employed. *See* Ex. 5 ¶ 52 (Decl. Wong). An estimated 152 awere business owners. *Id.* An estimated 1,263 awere in school, and 903 currently arewere pursuing a bachelor's degree or higher. *Id.* ¶ 53.

189.    An estimated 1,100 DACA recipients in Iowa are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[54]

150.190.    In addition to the many harms identified below, *see* ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Iowa economy generally. Stripping DACA grantees of the ability to work legally will cause

---

[51] *See* June 2020 MPI Estimates.

[52] *See* USCIS March 2020 Estimates.

[53] *See* USCIS March 2020 Quarterly Report.

[54] *See* CAP COVID-19 Report.

many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $6.8 million annually in state and local taxes in Iowa—a contribution that ~~may~~was estimated to drop by $3.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate ~~suggests~~predicted that terminating DACA would, over a ten-year period, impact the Iowa economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). Yet another estimate predict~~s~~ed that the state's GDP would contract by $55.83 million if DACA is terminated. *See* Ex. 85 ¶ 9 (Decl. Swenson, Iowa St. University). DACA recipients currently contribute an estimated $11.1 million annually in state and local taxes in Iowa.[55]

## PLAINTIFF STATE OF NEW MEXICO

~~151.~~191.    The State of New Mexico is home to an estimated ~~10~~8,000 or more DACA-eligible residents. ~~*See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).~~[56] Approximately 5,690 DACA recipients live in New Mexico.[57]

~~152.~~192.    As of ~~June 30, 2017~~March 31, 2020, USCIS reported that it had approved ~~6,838~~7,616 initial DACA applications and ~~5,622~~14,994 renewals for residents of New Mexico. ~~*See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 59 (Decl. Wong).~~[58]

193.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of New Mexico, to work legally, acquire driver's licenses, open bank accounts,

---

[55] *See* CAP Demographic and Economic Impacts Report.

[56] *See* June 2020 MPI Estimates.

[57] *See* USCIS March 2020 Estimates.

[58] *See* USCIS March 2020 Quarterly Report.

access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits. ~~An~~

194.    As of October 4, 2017, an estimated 6,250 New Mexico DACA grantees ~~a~~were employed. *See* Ex. 5 ¶ 60 (Decl. Wong). -An estimated 369 ~~a~~were business owners. *Id.* An estimated 3,070 ~~a~~were in school, and 2,195 ~~currently are~~were pursuing a bachelor's degree or higher. *Id.* ¶ 61.

195.    An estimated 1,900 DACA recipients in New Mexico are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[59]

~~153.~~196.        In addition to the many harms identified below, *see* ¶¶ ~~188-233~~234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the New Mexico economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 2017, DACA-eligible residents contribute~~d~~ approximately $18.8 million annually in state and local taxes in New Mexico—a contribution that ~~may~~was estimated to drop by $7.5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate ~~suggests~~predicted that terminating DACA would, over a ten-year period, impact the New Mexico economy with $258 million in budget costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $18.6 million annually in state and local taxes in New Mexico.[60]

---

[59] *See* CAP COVID-19 Report.

[60] *See* CAP Demographic and Economic Impacts Report.

## PLAINTIFF STATE OF NORTH CAROLINA

154.197.     The State of North Carolina is home to an estimated 41,38,000 or more DACA-eligible residents. See Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[61] Approximately 24,050 DACA recipients live in North Carolina.[62]

155.198.     As of June 30, 2017March 31, 2020, USCIS reported that it had approved 27,45529,665 initial DACA applications and 23,61967,232 renewals for residents of North Carolina. See Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 67 (Decl. Wong).[63]

156.199.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of North Carolina, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

157.200.     AnAs of October 4, 2017, an estimated 24,094 North Carolina DACA grantees awere employed. See Ex. 5 ¶ 68 (Decl. Wong). An estimated 1,483 awere business owners. Id. An estimated 12,327 awere in school, and 8,814 currently arewere pursuing a bachelor's degree or higher. Id. ¶ 69.

201.     An estimated 7,600 DACA recipients in North Carolina are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[64]

158.202.     In addition to the many harms identified below, see ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the

---

[61] See June 2020 MPI Estimates.
[62] See USCIS March 2020 Estimates.
[63] See USCIS March 2020 Quarterly Report.
[64] See CAP COVID-19 Report.

North Carolina economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $63.6 million annually in state and local taxes in North Carolina—a contribution that ~~may~~was estimated to drop by $29 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate ~~suggests~~predicted that terminating DACA would, over a ten-year period, impact the North Carolina economy with $2.1 billion in budgetary costs and $7.8 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $80.3 million annually in state and local taxes in North Carolina.[65]

### PLAINTIFF STATE OF OREGON

~~159.~~203.        The State of Oregon is home to an estimated ~~15~~14,000 or more DACA-eligible residents. ~~*See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).~~[66] Approximately 9,710 DACA recipients live in Oregon.[67]

~~160.~~204.        As of ~~June 30, 2017~~March 31, 2020, USCIS reported that it had approved ~~11,321~~12,060 initial DACA applications and ~~10,275~~27,595 renewals for residents of Oregon. ~~*See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 71 (Decl. Wong).~~[68]

~~161.~~205.        Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Oregon, to work legally, acquire driver's licenses, open bank accounts,

---

[65] *See* CAP Demographic and Economic Impacts Report.

[66] *See* June 2020 MPI Estimates.

[67] *See* USCIS March 2020 Estimates.

[68] *See* USCIS March 2020 Quarterly Report.

access lines of credit, purchase homes and cars, have more ready access to in-state tuition, and obtain employer-based health insurance, among other benefits.

162.206.    AnAs of October 4, 2017, an estimated 10,347 Oregon DACA grantees awere employed. *See* Ex. 5 ¶ 72 (Decl. Wong). An estimated 611 awere business owners. *Id.* An estimated 5,083 awere in school, and 3,634 currently arewere pursuing a bachelor's degree or higher. *Id.* ¶ 73.

207.    An estimated 4,800 DACA recipients in Oregon are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[69]

163.208.    The State of Oregon's revenue structure relies heavily on income taxes, including capital gains for investors, wages paid to workers, and corporate taxes that are directly linked to profitability. *See* Ex. 126 ¶ 9 (Decl. Read).

164.209.    In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Oregon economy generally. Eliminating DACA grantee Oregonians' ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the state and impairment of the state's economic health. See, e.g., Ex. 100 ¶ 6 (Decl. Nicolas). According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $20 million annually in state and local taxes in Oregon—a contribution that maywas estimated to drop by $11 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-year period, impact the Oregon economy with $384 million in budgetary costs and $1.3 billion in economic costs. *See*

---

[69] *See* CAP COVID-19 Report.

Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $39.9 million annually in state and local taxes in Oregon.[70]

165.210.     In addition, the inability to work legally and enjoy the other benefits of legal status such as better access to credit and the banking system will make it more difficult, if not impossible, for DACA grantee Oregonians to start businesses that contribute to the State's economy and overall financial health. *See* Ex. 126 ¶ 12 (Decl. Read).

166.211.     In addition to the direct benefits to state programs of increased state revenues, the State is also an investor and a borrower. *See* Ex. 126 ¶¶ 5-9 (Decl. Read). The State's credit rating, cost of borrowing, and the performance of the State's investments are all tied to the overall economic health of the State. *See* Ex. 126 ¶ 9 (Decl. Read). A reduced state tax base, and potential downward pressure on corporate performance, has the potential to adversely affect these interests as well. Many of the companies in which Oregon and Oregonians have holdings have expressed concern that the rescission of the DACA program is a threat and will be disruptive to their employees, their productivity, and their competitiveness. Any such disruption or downward pressure on corporate profits also potentially affects Oregon as a taxing entity and a shareholder.

### PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

167.212.     The Commonwealth of Pennsylvania is home to an estimated 1514,000 or more DACA-eligible residents. See Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).[71] Approximately 4,480 DACA recipients live in Pennsylvania.[72]

---

[70] *See* CAP Demographic and Economic Impacts Report.

[71] *See* June 2020 MPI Estimates.

[72] *See* USCIS March 2020 Estimates.

168.213.     As of June 30, 2017March 31, 2020, USCIS reported that it had approved 5,982669 initial DACA applications and 9,87512,703 renewals for residents of Pennsylvania. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 75 (Decl. Wong). [73]

169.214.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Pennsylvania, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

170.215.     AnAs of October 4, 2017, an estimated 5,468 Pennsylvania DACA grantees awere employed. *See* Ex. 5 ¶ 76 (Decl. Wong). -An estimated 323 awere business owners. *Id.* An estimated 2,686 awere in school, and 1,920 currently arewere pursuing a bachelor's degree or higher. *Id.* ¶ 77.

216.     An estimated 1,700 DACA recipients in Pennsylvania are frontline workers in sectors that are essential for the Commonwealth's COVID-19 response: health care, education, and food-related jobs.[74]

171.217.     In addition to the many harms identified below, *see* ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Pennsylvania economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $20.7 million annually in state and local taxes in Pennsylvania—a contribution that maywas estimated to drop by $7.5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate suggestspredicted that terminating DACA would, over a ten-

---

[73] *See* USCIS March 2020 Quarterly Report.

[74] *See* CAP COVID-19 Report.

year period, impact the Pennsylvania economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). -DACA recipients currently contribute an estimated $19.9 million annually in state and local taxes in Pennsylvania.[75]

## PLAINTIFF STATE OF RHODE ISLAND

172.218.      The State of Rhode Island is home to an estimated 3,000 or more DACA-eligible residents. *See Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).*[76]  Approximately 890 DACA recipients live in Rhode Island.[77] As of March 31, 2020, USCIS reported that it had approved 1,168 initial DACA applications and 2,630 renewals for residents of Rhode Island.[78]

173.   As of June 30, 2017, USCIS had approved 1,248 initial DACA applications and 2,019 renewals for residents of Rhode Island. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 79 (Decl. Wong).

174.219.      Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Rhode Island, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

175.220.      AnAs of October 4, 2017, an estimated 1,141 Rhode Island DACA grantees awere employed. *See* Ex. 5 ¶ 80 (Decl. Wong). An estimated 560 awere in school, and 401 currently arewere pursuing a bachelor's degree or higher. -*Id*. ¶ 81.

---

[75] *See* CAP Demographic and Economic Impacts Report.

[76] *See* June 2020 MPI Estimates.

[77] *See* USCIS March 2020 Estimates.

[78] *See* USCIS March 2020 Quarterly Report.

221.     An estimated 200 DACA recipients in Rhode Island are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[79]

176.222.     In addition to the many harms identified below, *see* ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Rhode Island economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. The Rhode Island Office of Management and Budget ("RIOMB") estimates that the termination of DACA could lead to over $1 million in lost state and local income, real estate and vehicle taxes. *See* Ex. 128 ¶ 3 (Decl. Womer, RIOMB). According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $3.8 million annually in state and local taxes in Rhode Island—a contribution that maywas predicted to drop by $1.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). According to the Institute on Taxation and Economic Policy ("ITEP"), the State of Rhode Island alone will lose $2.6 million in state and local taxes if DACA protections are lost. *See* Ex. 54. (Misha Hill and Meg Wiehe, *State and Local Contributions of Young Undocumented Immigrants*, Institute on Taxation and Economic Policy, April 25, 2017). According to the Center for American Progress, Rhode Island will lose over $61 million in annual GDP loss from removing DACA workers. *See id*. DACA recipients currently contribute an estimated $3.9 million annually in state and local taxes in Rhode Island.[80]

---

[79] *See* CAP COVID-19 Report.

[80] *See* CAP Demographic and Economic Impacts Report.

**PLAINTIFF STATE OF VERMONT**

177.223.	The As of October 4, 2017, the State of Vermont is was home to an estimated 100 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Approximately 20 DACA recipients live in Vermont.[81]

178.224.	As of June 30, 2017 March 31, 2020, USCIS reported that it had approved 4412 initial DACA applications and 19955 renewals for residents of Vermont. *See* Ex. 1 (Updated USCIS Data).[82]

179.225.	Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Vermont, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

180.226.	An As of October 4, 2017, an estimated 37 DACA grantees a we re employed in Vermont. *See* Ex. 53 (Nicole Prchal Svajlenka, *et. al.*, A New Threat to DACA Could Cost States Billions of Dollars, Center for American Progress, July, 21, 2017).

181.227.	In addition to the many harms identified below, *see* ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Vermont economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $140,000 annually in state and local taxes in Vermont—a contribution that may was estimated to drop by $48,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate suggests predicted that terminating DACA would, over a ten-year

---

[81] *See* USCIS March 2020 Estimates.

[82] *See* USCIS March 2020 Quarterly Report.

period, cost the Vermont economy $2.4 million in Gross Domestic Product. *See* Ex. 53 (Prchal Svajlenka, *et. al.*, *A New Threat to DACA*).

## PLAINTIFF COMMONWEALTH OF VIRGINIA

~~182.~~228.      The Commonwealth of Virginia is home to an estimated ~~30~~27,000 or more DACA-eligible residents. ~~*See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).~~[83] Approximately 9,410 DACA recipients live in Virginia.[84]

~~183.~~229.      As of ~~June 30, 2017~~March 31, 2020, USCIS reported that it had approved 12,~~248~~368 initial DACA applications and ~~15,296~~27,411 renewals for residents of Virginia. ~~*See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 83 (Decl. Wong).~~[85]

~~184.~~230.      Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Virginia, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

~~185.~~231.      ~~An~~As of October 4, 2017, an estimated 11,195 Virginia DACA grantees ~~a~~were employed. *See* Ex. 5 ¶ 84 (Decl. Wong).  An estimated 661 ~~a~~were business owners. *Id.* An estimated 5,499 ~~a~~were in school, and 3,932 currently ~~a~~were pursuing a bachelor's degree or higher. *Id.* ¶ 85.

232.     An estimated 2,700 DACA recipients in Virginia are frontline workers in sectors that are essential for the Commonwealth's COVID-19 response: health care, education, and food-related jobs.[86]

---

[83] *See* June 2020 MPI Estimates.

[84] *See* USCIS March 2020 Estimates.

[85] *See* USCIS March 2020 Quarterly Report.

[86] *See* CAP COVID-19 Report.

186.233.    In addition to the many harms identified below, *see* ¶¶ 188-233234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Virginia economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimateAs of October 4, 2017, DACA-eligible residents contributed approximately $34.7 million annually in state and local taxes in Virginia—a contribution that maywas estimated to drop by $12.7 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Virginia economy with $1 billion in budgetary costs and $3.6 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute approximately $48.7 million annually in state and local taxes in Virginia.[87]

## HARM TO PLAINTIFF STATES BY CATEGORY

***Diversity, Inclusion, and Constitutional Values.***

187.234.    The States have an interest in prohibiting the deprivation of life, liberty or property without due process, and in preventing any practice that denies equal protection of the laws or otherwise discriminates on the basis of race, color, or national origin. For example:

a. New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. And New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. *See* N.Y. Exec. Law § 290.

b. Washington has declared that practices that discriminate against any of its inhabitants because of race, color, or national origin are matters of public concern

[87] *See* CAP Demographic and Economic Impacts Report.

61

that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code 49.60.010.

c.  Colorado welcomes people of all backgrounds. Colorado law prohibits unlawful discrimination against people based on, among other things, race, national origin, and ancestry. *See* C.R.S. § 24-34-601; C.R.S. § 24-34-402; C.R.S. § 24-34-502.

d.  The State of Connecticut has a strong public policy mandating inclusion, and state law forbids discrimination in education, employment, and public accommodations, and other public goods and rights based on race, national origin, and ancestry. *See* Conn. Gen. Stat. §§ 46a-60 (employment); 46a-64 (public accommodations); 10-15c (public education); 46a-75 (other educational and vocational programs).

d.e. The Illinois Human Rights Act, 775 ILCS 5/1 *et seq.*, establishes a public policy "to secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her … national origin." *See* 775 ILCS 5/1-102(A). It further establishes a public policy "to prevent discrimination based on citizenship status in employment." *See* 775 ILCS 5/1-102(C).

f.  Delaware law broadly prohibits discrimination in multiple areas, including public accommodations, insurance, and employment. *See* Del. Code. Ann. tit. 6, § 4500-4516; Del. Code. Ann. tit. 18, § 2304(22); Del. Code. Ann. tit. 19, § 711. The Delaware Equal Accommodations Law "is intended to prevent, in places of public accommodations, practices of discrimination against any person" on numerous bases, including race, color, or national origin. *See* Del. Code. Ann. tit. 6, § 4501.

The law is to be "liberally construed to the end that the rights herein provided for all people. . . may be effectively safeguarded." *Id.*

e.g. The Council of the District of Columbia enacted the District's Human Rights Act "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit," including discrimination based on national origin. *See* D.C. Code Ann. § 2-1401.01. The District's Human Rights Act prohibits discrimination in a broad range of areas including employment, education, places of public accommodation, public services, housing and commercial space accommodations, the sale of motor vehicle insurance and the rental of motor vehicles.

f.h. Through a long tradition of including and incorporating foreign-born persons into its institutions, businesses, and governments, New Mexico has become one of the most socially and politically diverse states. New Mexico enshrined in its state constitution three provisions protecting the Spanish language and those who speak it. *See* N.M. Const. art. VII, § 3 (stating that "[t]he right of any citizen of the state to vote, hold office or sit upon juries shall never be restricted, abridged or impaired on account of . . . language . . . or inability to speak, read or write the English or Spanish languages except as otherwise provided in this constitution"); N.M. Const. art. XII, § 8 (requiring teachers to become proficient in English and Spanish); and N.M. Const. art. XII. § 10 (guaranteeing that "[c]hildren of Spanish descent in the state of New Mexico shall never be denied the right and privilege of admission and attendance in the public schools or other public educational institutions of the state, and they shall never be classed in separate schools, but

63

shall forever enjoy perfect equality with other children in all public schools and educational institutions of the state").

~~g.~~i. Oregon has codified its state policy that practices of unlawful discrimination against any of its inhabitants because of religion or national origin are "a matter of state concern," and that such discrimination "menaces the institutions and foundation of a free democratic state." *See* ORS § 659A.006.

~~h.~~j. Pennsylvania's laws reflect its commitment to values of diversity, multiculturalism and openness to others of different races and nationalities. For example, Pennsylvania's Human Relations Act recognizes that an individual's opportunity to obtain employment, public accommodation, housing accommodation and commercial property without discrimination on the basis of "race, color, familial status … ancestry [and] national origin" is a "civil right" that is "enforceable" under Pennsylvania law. *See* 43 P.S. § 953. *See also* 43 P.S. § 955.

~~i.~~k. In keeping with its history of freedom of conscience, equality and tolerance, Rhode Island has prohibited practices that discriminate against any of its inhabitants because of race, color, or national origin. *See* R.I. Constitution Article 1, section 2; R.I. Gen. Laws 12-19-38 (Hate Crimes Sentencing Act); R.I. Gen. Laws § 42-112-1 (The Civil Rights Act of 1990); R.I. Gen. Laws 28-5-1 (Fair Employment Practices Act); R.I. Gen. Laws 34-37-1 (Fair Housing Practices Act).

188.235.       The States also have an interest in ensuring that their residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

**Harm to States as Employers.**

189.236.       The States have an interest in maintaining qualified, trained workforces.

190.237.       Terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will cause the States to lose qualified State employees. Many DACA recipients work in government or at state-run institutions, and they were hired because of their specialized skills and qualifications. The States expended time and funds to hire, train, and manage DACA recipients. If these individuals become ineligible to work, the States will lose the value of their investment and the services of employees who perform important functions for the States. They will also incur the costs associated with the need to recruit, hire, and train replacements. *See, e.g.*, Ex. 52 ¶ 8 (Decl. Mostofi, NYC Mayor's Office of Immigrant Affairs); Ex. 56 ¶¶ 2-4 (Decl. Quinonez); Ex. 70 ¶ 6 (Decl. I.V.); Ex. 61 ¶ 10 (Decl. Heatwole, UMass); Ex. 62 ¶ 3 (Decl. Monroe, Wash. Dept. of Ecology); Ex. 65 ¶ 3 (Decl. Kaplan, WA Dept. of Social and Health Svcs.); Ex. 92 ¶ 3 (Decl. Jones, Wash. Treasury); Ex. 91 ¶ 3 (Decl. Garza, Big Bend Community College); Ex. 64 ¶ 3 (Decl. Glatt, Columbia Basin College); Ex. 58 ¶ 4 (Decl. Loera, Wash. State Univ.); Ex. 130 ¶ 3 (Decl. Conly, WA Dept. of Veterans Affairs); Ex. 113 ¶ 3 (Decl. Schuh, City of Anacortes, WA); Ex. 157 ¶ 9-10 (Decl. Ridder, Portland State Univ.); Ex. 154 ¶ 11 (Decl. Cuprill-Comas, Oregon Health and Science Univ.); Ex. 153 ¶¶ 6, 9 (Decl. Karpilo, Eastern Oregon Univ.); Ex. 156 ¶¶ 9-10 (Decl. Mitsui, Portland Community College); Ex. 167 ¶¶ 3-6 (Decl. Reveley, College of William & Mary); Ex. 134 ¶¶ 31, 37 (Decl. Herbst, Univ. of Conn.);

Ex. 124 ¶¶ 4, 11 (Decl. Salaveria, Hawaii Dept. of Business, Economic Development and

Tourism); Ex. 168 ¶¶ 3-7 (Decl. Cabrera, George Mason Univ.).

***Harm to State Colleges and Universities.***

191.238.      The States have an interest in the special contributions that DACA

grantees make to State colleges and universities as students, employees, and alumni.

192.239.      Terminating DACA or failing to restore DACA to its pre-September 5,

2017 status will harm the ability of the States' colleges and universities, including public

universities, to satisfy their educational missions and prepare the States' residents for the

workforce. *See* Ex. 61 ¶¶ 5-7 (Decl. Heatwole); Ex. 146 ¶¶ 12-13 (Decl. Clark *et al.,* Mass. State

Univ. Pres.); Ex. 134 ¶¶ 15-38 (Decl. Herbst); Ex. 133 ¶¶ 15-24 (Decl. Pachis, Eastern Conn.

State Univ.); Ex. 136 ¶¶ 1, 4 (Decl. Hardwick, Univ. of the District of Columbia); Ex. 166 ¶¶ 4-7

(Decl. Sullivan, Univ. of Vermont); Ex. 167 ¶¶ 5-6 (Decl. Reveley); Ex. 137 ¶¶ 4-10 (Decl.

Straney, Univ. of Hawaii); Ex. 131 ¶¶ 4-9 (Decl. Miranda, Colorado State Univ.); Ex. 132 ¶¶ 3-

10 (Decl. Allen, Univ. of Colorado); Ex. 135 ¶¶ 3-14 (Decl. Rakes, Delaware Tech. Community

College); Ex. 152 ¶¶ 10-11, 21 (Decl. Mathewson & Pareja, Univ. of New Mexico School of

Law); Ex. 149 (New Mexico Council of Univ. Presidents Letter); Ex. 157 ¶ 6 (Decl. Ridder); Ex

159 ¶ 5 (Decl. Galvan, Univ. of Oregon); Ex. 155 ¶ 5 (Decl. Alexander, Oregon State Univ.); Ex.

154 ¶¶ 7, 10 (Decl. Cuprill-Comas); Ex. 153 ¶ 7 (Decl. Karpilo); Ex. 160 ¶¶ 7-8 (Decl.

Hagemann, Western Oregon Univ.); Ex. 158 ¶ 6 (Decl. Trueblood-Gamble, Southern Oregon

Univ.); Ex. 168 ¶¶ 3-7 (Decl. Cabrera); Ex. 86 ¶¶ 7-9 (Decl. Wadhia, Penn. St. University); Ex.

142 ¶¶ 4-5 (Decl. Edgehill-Walden, Northern Illinois Univ.); Ex. 145 ¶ 15 (Decl. Kennedy, Mass. Community Colleges' Presidents' Council).

~~193.~~240.        DACA has made it possible for many young people to attend colleges and universities in the States, as work authorization allows DACA grantees to work both while they pursue their education and after graduation. More than 90~~%~~ percent of DACA grantees report that DACA allowed them to pursue educational opportunities previously unavailable to them. *See* Ex. 5 ¶ 18 (Decl. Wong).  For example:

a.   The University of Colorado estimates that there are over 200 DACA grantees enrolled across the University. Ex. 132 ¶ 5 (Decl. Allen). Colorado State University has approximately 189 DACA grantees. Ex. 131 ¶ 8 (Decl. Miranda).

b.   Connecticut's state and private colleges and universities welcome DACA grantees. To cite just one instances: Eastern Connecticut State University is home to 205 DACA recipient from across the country, as part of a scholarship program that enables undocumented students from "locked out" states, or states that do not allow undocumented students to attend public college, to pursue a college education.[88]

~~b.~~c.Delaware Technical and Community College ("DTCC") has at least 148 DACA students and at least another 242 graduates who are DACA grantees. *See* Ex. 135 ¶ 5 (Decl. Rakes). Many of DTCC's DACA students are nontraditional learners who support their families in addition to pursuing their education. *Id.* ¶ 8. Another approximate 75 DACA grantees currently attend Delaware State University

---

[88] *See* Press Release, *Eastern Hosts Press Conference in Support of DACA* (Nov. 13, 2019), https://www.easternct.edu/news/_stories-and-releases/2019/11-november/eastern-hosts-press-conference-in-support-of-daca.html.

("DSU"). *See* Ex. 66 (Scott Gross, *DSU immigrant students fear Trump's DACA decision*, Delawareonline, Sept. 2, 2017). During the 2019-2020 school year, there were about 150 DACA grantees enrolled at DSU.[89]

c.d. PresentlyAs of September 2017, there awere 16 students who haved reported their DACA status to the University of Hawaii and who awere pursuing various degrees at multiple University campuses. Ex. 137 ¶ 6 (Decl. Straney). As of Spring 2020, the University of Hawaii had 17 DACA students.

d.e. In the University of Illinois System, approximately 350 of its students and 100 of its employees would be affected by the termination of DACA. Ex. 143 ¶ 8 (Decl. Wilson, Univ. of Illinois System).

e.f. In New York, both the State University of New York ("SUNY") and the City University of New York ("CUNY") have encouraged DACA grantees to apply as part of their strong commitment to diversity, equity, and inclusion. *See* Ex. 12 ¶ 10 (Decl. Milliken, CUNY); Ex. 99 (Decl. Johnson, SUNY). At CUNY, hundreds of DACA grantees have enrolled in the university, many with the benefit of full scholarships. *See* Ex. 12 ¶ 6 (Decl. Milliken); Ex. 171 ¶8 (Decl. Park).

f.g. Many of Oregon's public colleges and universities, including Portland State University, the University of Oregon, Oregon State University, Oregon Health and Science University, Eastern Oregon University, Western Oregon University, Southern Oregon University and Portland Community College enroll, and in some cases employ, DACA grantees. *See* Ex. 157 ¶ 4 (Decl. Ridder); Ex. 159 ¶ 5 (Decl.

---

[89] Delaware State University, *1st Dreamer Class Graduates* (May 16, 2020), https://www.desu.edu/news/2020/05/1st-dreamer-class-graduates.

Galvan); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 154 ¶ 5 (Decl. Cuprill-Comas); Ex.

153 ¶¶ 5-6 (Decl. Karpilo); Ex. 160 ¶¶ 6-7 (Decl. Hagemann); Ex. 158 ¶¶ 4-5

(Decl. Trueblood-Gamble); Ex. 156 ¶¶ 6, 9 (Decl. Mitsui); Ex. 94 ¶¶ 5-8 8 (Decl.

Ramirez Cuevas); Ex. 101 ¶¶ 1, 3 (Decl. Preciado).

g.h. Many institutions of higher education in Virginia have students presently enrolled

in their educational programs who are DACA grantees. According to the State

Council of Higher Education for Virginia ("SCHEV"), the Commonwealth's

coordinating body for higher education, there are more than 1,300 DACA

students in Virginia attending institutions of higher education. *See* Ex. 127 ¶¶ 4

(Decl. Blake, SCHEV).

h.i. According to the Washington Student Achievement Council ("WSAC"), the state

agency that advances educational opportunities in Washington, there are more

than 1,400 DACA students in Washington attending institutions of higher

education. *See* Ex. 59 ¶ 9 (Decl. Thompson, WSAC). More than one hundred

DACA grantees attend the University of Washington, based in Seattle. *See* Ex. 57

¶ 4 (Decl. Ballinger, Univ. of Wash.). More than 150 DACA grantees attend

Washington State University, based in Pullman. *See* Ex. 58 ¶ 4 (Decl. Loera,

Wash. State Univ.).

i.j. Many public colleges and universities in the States have diverse student

populations, including a high percentage of Latino/Hispanic students and students

who are first generation Americans and first in their families to attend college, as

well as undocumented students. *See, e.g.*, Ex. 162 (Letter from Meghan Hughes,

Community College of Rhode Island); Ex. 150 ¶ 7 (Decl. Abdallah, University of

New Mexico). Although many such schools do not keep data on immigration status, they know that they have DACA grantees as alumni and current students. *See* Ex. 163 (Letter from Frank Sánchez, Rhode Island College President); Ex. 164 ¶ 6 (Decl. Farish, Roger Williams University); Ex. 161 (Letter from Richard M. Locke, Brown University Provost); Ex. 86 ¶ 6 (Decl. Wadhia); Ex. 146 ¶ 9 (Decl. Clark et al.).

194.241.        DACA grantees who are residents of Connecticut, Delaware, District of Columbia, Hawaii, Illinois, New Mexico, Massachusetts, Virginia, or Washington receive in-state tuition at public universities within their state of residence and/or are eligible for other financial assistance. *See* C.R.S. § 23-7-110; Ex. 132 ¶ 4 (Decl. Allen); 110 ILCS 305/7e-5; Ex. 131 ¶ 7 (Decl. Miranda); Ex. 134 ¶ 8 (Decl. Herbst); Ex. 7 (Mass. Dept. of Higher Education Memorandum, *Residency Status for Tuition Classification Purposes – Deferred Action for Childhood Arrivals*, Nov. 21, 2012); Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 146 ¶ 7 (Decl. Clark et al.); Ex. 133 ¶¶ 8-12 (Decl. Pachis); Conn. Gen. Stat. § 10a-29; Ex. 135 ¶¶ 11-12 (Decl. Rakes); Ex. 136 ¶ 610 (Decl. Hardwick); Ex. 150 ¶ 12 (Decl. Abdallah); Or. Rev. Stat. § 352.287; Ex. 167 ¶ 4 (Decl. Reveley); Ex. 106 ¶ 5 (Decl. Suria); Ex. 137 ¶ 5 (Decl. Straney); Ex. 157 ¶ 4 (Decl. Ridder); Ex. 94 ¶ 7 (Decl. Ramirez Cuevas).

195.242.        WithoutIf the DACA program is terminated or not restored to its pre-September 5, 2017 status, talented young immigrants will be less likely to apply to and attend State schools because they will not be able to afford tuition given the loss of available financial assistance (in some of the States) and the likelihood that they will not be able to work legally upon graduation (in all the States). Those already enrolled will be less likely to finish their education at State schools due to the loss of current and future earning potential. *See* Ex. 12 ¶ 7-8

(Decl. Milliken); Ex. 56 ¶ 7 (Decl. Quinonez); Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 146 ¶¶ 8, 12 (Decl. Clark *et al*.); Ex. 72 ¶ 5 (Decl. Teodoro); Ex. 132 ¶ 7 (Decl. Allen); Ex. 131 ¶ 8 (Decl. Miranda); Ex. 136 ¶ 6 (Decl. Hardwick); Ex. 69 ¶¶ 8, 10 (Decl. Mendes); Ex. 60 ¶¶ 6, 9 (Decl. Guevara); Ex. 145 ¶ 8 (Decl. Kennedy); Ex. 135 ¶¶ 7-10 (Decl. Rakes); Ex. 139 ¶ 6 (Decl. Dietz, Illinois State Univ.); Ex. 143 ¶ 8 (Decl. Wilson); Ex. 106 ¶ 7 (Decl. Suria); Ex. 105 ¶ 5 (Decl. Oduyoye); Ex. 134 ¶¶ 16-17 (Decl. Herbst); Ex. 137 ¶ 7 (Decl. Straney); Ex. 152 ¶¶ 18-20 (Decl. Mathewson & Pareja); Ex. 101 ¶ 4 (Decl. Preciado); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 168 ¶ 6 (Decl. Cabrera); Ex. 160 ¶¶ 7-8 (Decl. Hagemann); Ex. 153 ¶¶ 7-8 (Decl. Karpilo); Ex. 95 ¶ 8 (Decl. Solano); Ex. 157 ¶¶ 6-7 (Decl. Ridder); Ex. 159 ¶¶ 5-6 (Decl. Galvan);  Ex. 158 ¶¶ 6, 8, 11 (Decl. Trueblood-Gamble); Ex. 154 ¶¶ 7-10 (Decl. Cuprill-Comas); Ex. 133 ¶ 13 (Decl. Pachis); Ex. 57 ¶ 4 (Decl. Ballinger); Ex. 58 ¶ 5 (Decl. Loera); Ex. 163 (Sánchez Letter, Rhode Island College); Ex. 165 ¶ 4 (Decl. Linde, Rhode Island College); Ex. 166 ¶ 6 (Decl. Sullivan); Ex. 167 ¶¶ 4-5 (Decl. Reveley); Ex. 164 ¶ 7 (Decl. Farish); Ex. 171 ¶¶7-9 (Decl. Park).

196.243.      Additionally, DACA students enrolled in programs that require employment authorization or entail licensing requirements to complete elements of the program—such as paid internships, clinical placement, residency training, or programs that require significant lab or field work—will be severely and adversely impacted if DACA is terminated, or not restored to its pre-September 5, 2017 status. Indeed, these students may not be able to complete the academic requirements of their degrees. *See, e.g.*, Ex. 12 ¶ 8 (Decl. Milliken); Ex. 61 ¶ 6 (Decl. Heatwole); Ex. 135 ¶ 9 (Decl. Rakes); Ex. 136 ¶ 7 (Decl. Hardwick); Ex. 166 ¶¶ 6-7 (Decl. Sullivan); Ex. 134 ¶ 33 (Decl. Herbst); Ex. 132 ¶ 7 (Decl. Allen); Ex. 131 ¶ 8 (Decl. Miranda); Ex. 152 ¶ 19 (Decl. Mathewson & Pareja); Ex. 145 ¶ 9 (Decl. Kennedy); Ex 6 ¶¶ 13-15 (Decl. C. Andrade).

71

197.244.      DACA students in graduate programs at public universities in the States will be significantly affected by the termination of the DACA program or failure to restore it to its pre-September 5, 2017 status because the loss of employment authorization needed for graduate assistantship (research or teaching) will likely mean the loss of tuition waivers and other benefits such as subsidized health, dental, and vision insurance for the students and their families. The loss of graduate assistants also is a significant harm to the States because of the services they provide in assisting faculty and instructing students. *See* Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 134 ¶¶ 31-32 (Decl. Herbst).

198.245.      Losing these talented young immigrants will deprive the States' schools of the special and unique contributions and perspectives they bring to campus communities, both as students and alumni. *See, e.g.*, Ex. 57 ¶¶ 4-6 (Decl. Ballinger); Ex. 58 ¶¶ 4-8 (Decl. Loera); Ex. 61 ¶ 7 (Decl. Heatwole); Ex. 132 ¶¶ 6-7 (Decl. Allen);  Ex. 131 ¶ 9 (Decl. Miranda); Ex. 134 ¶¶ 19-26, 36-38 (Decl. Herbst); Ex. 133 ¶¶ 23-24 (Decl. Pachis); Ex. 135 ¶¶ 3, 13 (Decl. Rakes); Ex. 137 ¶¶ 7-8, 10 (Decl. Straney); Ex. 139 ¶¶ 3, 4, 7 (Decl. Dietz); Ex. 152 ¶¶ 10, 18, 21 (Decl. Mathewson & Pareja); Ex. 157 ¶ 11 (Decl. Ridder); Ex. 159 ¶¶ 8-9 (Decl. Galvan); Ex. 155 ¶¶ 6, 8 (Decl. Alexander); Ex. 154 ¶ 7 (Decl. Cuprill-Comas); Ex. 153 ¶ 10 (Decl. Karpilo); Ex. 160 ¶ 5 (Decl. Hagemann); Ex. 158 ¶ 9 (Decl. Trueblood-Gamble); Ex. 163 (Sánchez Letter); Ex. 165 ¶ 4 (Decl. Linde); Ex. 166 ¶¶ 6-7 (Decl. Sullivan); Ex. 167 ¶¶ 4-5 (Decl. Reveley); Ex. 136 ¶ 8 (Decl. Hardwick); Ex. 145 ¶¶ 10-11 (Decl. Kennedy).

199.246.      The States' public universities and colleges will also suffer direct financial harm, including lost tuition revenue and scholarship funds, if DACA students are forced to withdraw or are unable to enroll. *See, e.g.*, Ex. 57 ¶¶ 4-6 (Decl. Ballinger); Ex. 58 ¶¶ 4-8 (Decl. Loera,); Ex. 61 ¶ 7 (Decl. Heatwole); Ex. 134 ¶¶ 27-28 (Decl. Herbst); Ex. 133 ¶¶ 17-18 (Decl.

Pachis); Ex. 136 ¶ 8 (Decl. Hardwick); Ex. 137 ¶ 9 (Decl. Straney); Ex. 157 ¶¶ 6-7 (Decl.

Ridder); Ex. 159 ¶ 5 (Decl. Galvan); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 154 ¶ 8 (Decl. Cuprill-

Comas); Ex. 153 ¶¶ 7-8 (Decl. Karpilo); Ex. 160 ¶¶ 6-8 (Decl. Hagemann); Ex. 158 ¶ 6 (Decl.

Trueblood-Gamble); Ex. 163 (Sánchez Letter); Ex. 164 ¶ 9 (Decl. Farish); Ex. 132 ¶ 10 (Decl.

Allen); Ex. 131 ¶ 9 (Decl. Miranda); Ex. 145 ¶¶ 10-14 (Decl. Kennedy). In at least one state

(Oregon), current demographic and enrollment trends and other factors suggest that this lost

revenue will not be replaced by other students for many universities, and will represent an

absolute loss of revenue. *See* Ex. 160 ¶ 8 (Decl. Hagemann); Ex. 158 ¶ 7 (Decl. Trueblood-

Gamble); Ex. 157 ¶ 7 (Decl. Ridder).

200.247.    ~~Terminating DACA~~The termination of DACA or failure to return DACA

to its pre-September 5, 2017 status also will impose additional tangible costs on our public

colleges and universities, which already have ~~begun to experience~~experienced disruption as a

result of uncertainty over the future of the program and are preparing for the likelihood of

expending additional resources to address the detrimental effects of DACA termination. *See,

e.g.*, Ex. 61 ¶¶ 8-9 (Decl. Heatwole); Ex. 134 ¶¶ 35, 38 (Decl. Herbst); Ex. 136 ¶¶ 8-9 (Decl.

Hardwick); Ex. 157 ¶ 12 (Decl. Ridder); Ex. 155 ¶ 7 (Decl. Alexander); Ex. 153 ¶ 11 (Decl.

Karpilo); Ex. 160 ¶ 9 (Decl. Hagemann); Ex. 158 ¶¶ 10, 12 (Decl. Trueblood-Gamble); Ex. 132 ¶

9 (Decl. Allen); Ex. 167 ¶ 6 (Decl. Reveley).

201.248.    ~~Terminating DACA~~The termination of DACA or failure to return DACA

to its pre-September 5, 2017 status will further deprive the States of the earning potential of

graduates from public colleges and universities who are most likely to stay in-State and join the

States' workforces. ~~*See, e.g.*, Ex. 132 ¶ 9 (Decl. Allen).~~ For example:

a.  Nine out of ten Massachusetts public higher education graduates remain in the State, working or pursuing further education. See Ex. 93 (Mass. Dept. of Higher Education, *Time to Lead, The Need for Excellence in Public Higher Education*, Sept. 2012).

b.  The majority of Iowa public higher education graduates remain in Iowa, working or pursuing further education. See Ex. 67 at 26 (The University of Iowa Pomerantz Career Center, 2015-2016 Annual Report); Ex. 68 (Iowa State University 6-Month Post Graduation Status, 2014-2015; Ex. 73 at 2 (Career Ready, University of Northern Iowa Career Services, 2016).

c.  Nearly 90% percent of Community College of Rhode Island graduates stay in Rhode Island after graduation to live and raise their families. Ex. 162 (Hughes Letter).

d.  About 75 percent of Connecticut's public college and university graduates stay in Connecticut to begin their careers.[90] At Eastern Connecticut State University, which hosts a nationwide scholarship program for DACA grantees, the in-state retention rate is even higher: Approximately 85 to 87 percent of Eastern Connecticut State University graduates stay in Connecticut after graduation to "contribute[] to the growth and vitality of Connecticut's economy." Ex. 133 ¶ 16 (Decl. Pachis).

202.249.    Terminating DACA will also undermine the investment in and efforts to develop a well-educated workforce that can contribute to the States' overall economies and

---

[90] *See* Connecticut Business and Industry Association, *Why College Graduates Choose Connecticut* (Jan. 29, 2020), https://www.cbia.com/news/economy/why-college-graduates-choose-connecticut/.

competitiveness, and the States' ability to meet certain critical workforce needs such as healthcare in rural areas. *See, e.g.*, Ex. 159 ¶ 6 (Decl. Galvan); Ex. 154 ¶¶ 6, 10 (Decl. Cuprill-Comas); Ex. 156 ¶ 11 (Decl. Mitsui). ~~Currently~~As of October 4, 2017, 100 DACA grantees are medical students and medical resident physicians at schools that are members of the Association of American Medical Colleges, and approximately two-thirds of these DACA grantees are pursuing their medical education in one of the States. *See* Ex. 114 ¶ 4 (Decl. Prescott, Association of American Medical Colleges). ~~ ~~Aspiring DACA-grantee physicians contribute to a diverse and culturally responsive workforce to meet the needs of underserved populations. *See id.* ¶¶ 5-6. Terminating DACA or failing to to return DACA to its-pre-September 5, 2017 status will cause the States to lose specific investments that they have made in this workforce and will leave significant gaps in the States' healthcare workforce. *See id.* ¶ 7; Ex. 85 ¶¶ 5-6 (Decl. Swenson). ~~ ~~For example:

    a.  In Illinois, DACA grantees have participated in a loan program, through the Illinois Finance Authority, in which students receive interest-free loans so long as they agree to repay the principal and commit to four years of work in an underserved Illinois community following their graduation. Ex. 141 ¶ 6 (Decl. Pelissero & Callahan, Loyola Univ. of Chicago). Without DACA, underserved Illinois communities will lose access to these committed medical professionals. *Id.* ¶ 8.

    b.  Oregon's legislature has established a program to provide scholarships to health professional students who commit to practicing in rural and underserved areas of the state for a period of time following graduation. *See* ORS 348.303. ~~At least one dental student participant in this program is a DACA recipient who will likely not~~

~~be able to complete his commitment to practice dentistry in an underserved area~~

~~of Oregon.  *See* Ex. 94 ¶¶ 4, 9-18 (Decl. Ramirez Cuevas).~~

~~203.~~250.        The nation's leading private universities will suffer harms if DACA is

terminated~~.~~ or not restored to its pre-September 5, 2017 status. As of October 4, 2017, for

example, Harvard University~~, for example, has~~ had more than 50 DACA students ~~currently~~

enrolled. ~~~~*See* Ex. 96 ¶ 6 (Decl. Madsen, Harvard Univ.). ~~~~Tufts University ha~~s~~d more than 25

DACA students~~.~~ as of that date. *See* Ex. 97 ¶ 8 (Decl. Jeka, Tufts Univ.). Brown University ha~~s~~d

approximately 12 DACA students~~.~~ as of that date. *See* Ex. 161 (Locke Letter). Roger Williams

University, home to Rhode Island's only law school, ha~~s~~d at least six DACA students as of that

date. *See* Ex. 164 ¶ 6 (Decl. Farish). These students often have had to overcome significant

challenges in order to gain acceptance and bring critical perspectives, insights, and experiences

to their universities. They make important and lasting contributions, including through their

classroom participation, their extracurricular engagements, and their commitment to independent

study and research. *See, e.g.*, Ex. 97 ¶ 5 (Decl. Jeka); Ex. 96 ¶¶ 5, 7, 12 (Decl. Madsen); Ex. 144

¶¶ 4-5 (Decl. Martin, Amherst College); Ex. 147 ¶ 7 (Decl. Stephens, Mount Holyoke College);

Ex. 140 ¶¶ 4, 6, 9 (Decl. Jensen, Illinois Wesleyan Univ.); Ex. 141 ¶¶ 4, 5, 6, 7,8 (Decl. Pelissero

& Callahan); Ex. 138 ¶¶ 6, 11 (Decl. Salgado, City Colleges of Chicago); Ex. 164 ¶¶ 8-9 (Decl.

Farish); Ex. 161 (Locke Letter).

~~204.~~251.        Employment authorization gives these students and their universities an

assurance that they may put their talents to use in the United States job market after graduation,

benefitting the States and the nation as a whole. ~~~~*See, e.g.*, Ex. 96 ¶¶ 12-15 (Decl. Madsen); Ex.

161 (Locke Letter); Ex. 144 ¶ 9 (Decl. Martin, Amherst); Ex. 147 ¶¶ 8-9 (Decl. Stephens). The

New Mexico legislature in January 2020 passed amendments to permit professional licensure

eligibility without regard to citizenship status or lawful presence, SB 137, signed March 6, 2020, a measure directly benefitting DACA students. Two of the most effective spokeswomen for the amendments to professional licensure laws were then students themselves—one, a law student now graduated and serving immigrants seeking citizenship status; the other, a medical student now in surgical rotations, whose intent is to serve the immigrant community in public health settings.

205.252.    DACA has allowed these students to step outside the shadow of their immigration status and to participate fully as members of academic and campus communities in ways that likely would not be possible otherwise. *See, e.g.*, Ex. 140 ¶¶ 7, 8 (Decl. Jensen); Ex. 97 ¶ 7 (Decl. Jeka); Ex. 96 ¶ 12 (Decl. Madsen); Ex. ¶ 7 (Decl. Martin, Amherst). Terminating DACA or failing to restore it to its pre-September 5, 2017 status will take important opportunities away from DACA students and reintroduce fear and uncertainty into their lives, with significant adverse effects on these students, their universities, and the broader community. *See* Ex. 140 ¶¶ 7, 8 (Decl. Jensen); Ex. 97 ¶¶ 8-10 (Decl. Jeka); Ex. 96 ¶ 13 (Decl. Madsen); Ex. 144 ¶ 10 (Decl. Martin, Amherst); Ex. 148 ¶ 6 (Decl. Martin, Northeastern Univ.); Ex. 147 ¶ 10 (Decl. Stephens); Ex. 161 (Locke Letter); Ex. 103 ¶ 8 (Decl. Perla); Ex. 106 ¶ 7 (Decl. Suria); Ex. 105 ¶ 5 (Decl. Oduyoye); Ex. 104 ¶ 7 (Decl. G.L.); Ex. 102 ¶¶ 12-14 (Decl. Juarez); Ex. 152 ¶ 19 (Decl. Mathewson & Pareja); Ex. 151 ¶¶ 14, 16 (Decl. Roth, UNMHSC); Ex. 107 ¶¶ 7-8 (Decl. Torrez).

***Harm to State Law, Regulation, and Policy.***

206.253.    The States have an interest in preserving their legal, regulatory, and policy frameworks that take the DACA program into account.

77

207.254.    Many of the States have enacted laws, promulgated regulations, and/or established policies that contemplate and rely on the DACA program. -If DACA is terminated or not restored to its pre-September 5, 2017 status, these legal, regulatory, and policy regimes will be harmed.- For example:

a.  Since 2012, Connecticut has granted driver's licenses to approximately 5,000 DACA grantees who are Connecticut residents, many of whom have also purchased and registered vehicles in Connecticut. *See* Ex. 121 ¶¶ 6-7 (Decl. Bzdyra). -DACA grantees who have purchased and registered vehicles will have paid Connecticut sales tax and local property taxes for such vehicles.- *Id.* ¶¶ 8-9.

b.  Illinois has enacted laws to enable DACA grantees to participate in the economy professionally. These include providing that no person in Illinois shall be prohibited from receiving a law license solely because he or she is not a citizen and explicitly allowing DACA grantees to apply for a license to practice law. *See* 705 Ill. Comp. Stat. 205/2. DACA grantees are also eligible to receive state-issued identification cards and drivers' licenses; own motor vehicles which are registered, titled and licensed in the state of Illinois; and own businesses and property in Illinois. *See* Ex. 125 ¶ 6 (Decl. White, Illinois Secretary of State). The Office of the Illinois Secretary of State will be adversely impacted if DACA is terminated by the loss of revenue from licensing fees and taxes, as well as costs and system disruptions related to eligibility determinations of license renewals for DACA recipients. *Id.* ¶ 7. Illinois administrative rules, regulations and laws will also need to be amended to conform to the changes in the DACA program. *Id.*

   c.   Under DACA, thousands of young Massachusetts and Oregon residents are able to receive social security cards and thereby have access to driver's licenses, which they depend on to attend heath care appointments, to commute to work and school, and to attend to other necessities for themselves and their family members. *See* Ex. 9 (Mass. Registry of Motor Vehicles, *Social Security Number (SSN) Requirements*); ORS 807.021 (proof of legal presence required to issue, renew or replace driver license); Ex. 175 (Attorney General Advisory Letter to Acting Commissioner J. Eric Boyette, Jan.17, 2013); Ex. 101 ¶ 3 (Decl. Preciado); Ex. 71 ¶¶ 5-7, 9 (Decl. I.T.); Ex. 69 ¶¶ 7-8 (Decl. Mendes); Ex. 70 ¶¶ 5, 8 (Decl. I.V.). Terminating DACA will make it impossible for these individuals to apply for new licenses or renew the licenses they have, leading to a number of adverse outcomes, including a decrease in licensing fees paid to the States, a decrease in productivity of these residents, and an increase in unlicensed drivers on the road.

***Harm to Public Health and Health Care Costs.***

208.255.    The States have an interest in protecting the public health and in minimizing health care costs expended by the States.

209.256.    Terminating DACA or failing to restore it to its pre-September 5, 2017 status will harm public health and impose additional health care costs on the States. Work authorization allows DACA grantees to access employer-sponsored health benefits. *See, e.g.*, Ex. 72 ¶ 4 (Decl. Teodoro); Ex. 69 ¶¶ 6, 10 (Decl. Mendes); Ex. 171 ¶18 (Decl. Park); Ex. 172 ¶8 (Decl. Morales); Ex. 110 ¶ 8 (Decl. Schlosberg, District of Columbia Department of Health Care Finance). In fact, more than 50% of DACA grantees have obtained employer-provided

insurance. *See* Ex. 5 ¶ 12 (Decl. Wong). Without these benefits, more of the States' residents are likely to forgo needed health care, including preventive care, which will create more costly health problems in the long run. It also will cause more people to rely on state-funded and/or state-administered public health care and other benefits and thus impose additional costs on the States. For example:

a. Colorado provides emergency Medicaid regardless of immigration status, which covers the hospital delivery of children for qualified undocumented immigrants. *See* Ex. 78 at 1-2 (Colorado Department of Health Care Policy and Financing letter dated June 28, 2005).

b. Delaware provides limited emergency and labor/delivery services to residents whose immigration status otherwise keeps them from accessing health care benefits and services. *See* Ex. 122 ¶¶ 6-7 (Decl. Groff).

c. The D.C. HealthCare Alliance is the District of Columbia's state-sponsored insurance program of last resort. *See* Ex. 110 ¶¶ 6, 9 (Decl. Schlosberg); *see also* D.C. Code § 7-771.07(2). The placement of all of the individuals in the District participating in the DACA program in 2017 onto the D.C. HealthCare Alliance would require the District to spend additional money on that program, harm District finances, and prevent the District from spending that money on other public health priorities. *See* Ex. 110 ¶ 10 (Decl. Schlosberg). In fact, the placement of these individuals onto the D.C. HealthCare Alliance could cost the District an additional $283,000 per month in District of Columbia Fiscal Year 2018. *See id.* ¶ 12.

d.   Under Hawaii's Prepaid Health Care Act, Haw. Rev. Stat. ch. 393, Hawaii employers are required to provide regular employees who meet wage requirements with coverage under a qualifying prepaid group health care plan. *See* Haw. Rev. Stat. § 393-11. The termination of DACA will likely cause more people to rely on Hawaii's state-administered Medicaid One-Time Emergency services. Hawaii reimburses hospitals for emergency and urgent services provided to qualifying uninsured Hawaii patients, including undocumented immigrants. Ex. 123 ¶¶ 5-6 (Decl. Peterson, Med-QUEST Division, Hawaii Department of Human Services).

e.   In Massachusetts, DACA grantees who lose employer-based coverage may be eligible for MassHealth, a state-funded health insurance program. *See* Ex. 83 ¶¶ 5-7 (Decl. Caplan, Mass. Executive Office of Health and Human Services). In addition, Massachusetts will very likely have to cover some, if not all, of the costs of health care visits for these individuals through its state-administered Health Safety Net program or other programs. *Id.* ¶¶ 8-9. Finally, some DACA grantees who lose employer-based coverage will likely use providers, like community-based health centers, that are funded in part by grants and other funding streams available through the state. *Id.* ¶¶ 10-14.

210.257.   The State of New York State currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 (Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013). Terminating DACA may reduce access to Medicaid for current

81

DACA grantees. The State of New York State currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See Id.* Individuals in New York who are not DACA grantees may only qualify for Medicaid coverage of care and services necessary to treat an emergency condition. Terminating DACA will require New York to either seek a State legislative change to maintain current Medicaid coverage formerly DACA-eligible immigrants with state dollars only or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

***Harm to Small Cities, Counties, and Towns.***

211.258.    The States have an interest in preventing economic and other harm to their small cities, towns, counties, and other small governmental jurisdictions.

212.259.    Terminating DACA or failing to restore it to its pre-September 5, 2017 status will harm small governmental jurisdictions in the States. If DACA is terminated, small governmental jurisdictions will lose talented and trained employees, adversely affecting operations and costing time, money, and effort to replace and retrain these employees. *See, e.g.*, Ex. 111 ¶¶ 10-11 (Decl. Ambrosino & Bourque, City of Chelsea, MA and Chelsea Public Schools); Ex. 113 ¶¶ 4-6 (Decl. Schuh). Many of these employees are highly skilled workers, including in critical fields such as nursing. *See, e.g.*, Ex. 135 ¶¶ 10, 13 (Decl. Rakes); Ex. 98 ¶ 7, 10-11 (Naveed).

213.260.    Terminating DACA or failing to restore it to its pre-September 5, 2017 status will have a direct, adverse effect on economies and sales tax revenues of small cities and towns, as DACA grantees will lose their jobs and refrain from buying goods and services from local vendors. *See, e.g.*, Ex. 111 ¶ 16 (Decl. Ambrosino & Bourque); Ex. 176 ¶¶ 8-10, 13 (Decl. Kennedy, City of Newburgh).

214.261.    DACA grantees average higher earning capacities than their undocumented peers and are able to better participate in the States' economies, for example by purchasing homes and cars that are taxed by our state and local authorities. *See* Ex. 5 ¶ 16 (Decl. Wong). If DACA is terminated or not restored to its pre-September 5, 2017 status, cities and towns will lose other local tax revenue, including real estate taxes and motor vehicle excise taxes, from DACA grantees who can no longer access lines of credit or afford to buy cars or homes.

215.262.    If DACA is terminated or not restored to its pre-September 5, 2017 status, small governmental jurisdictions will lose the benefits that full access by and participation of a diverse community fosters through community activities, including, for example, activities in libraries and local government-sponsored recreational camps or sports leagues. *See, e.g*, Ex. 109 ¶¶ 5-6 (Decl. Meyer, New Castle County, Del.). The termination of DACA or failure to restore it to its pre-September 5, 2017 status will also have a destructive effect on local industries of small governmental jurisdictions that rely on the work of highly qualified and trained DACA recipients. Ex. 176 ¶¶ 4, 8-10, 13 (Decl. Kennedy, City of Newburgh).

216.263.    Terminating DACA or failing to restore it to its pre-September 5, 2017 status will also adversely affect public safety, health, and wellbeing in the States' cities, towns, and schools. Without DACA status, DACA grantees afraid of deportation will be less likely to report violence, abuse, crimes or other harms to the community. If DACA is terminated or not restored to its pre-September 5, 2017 status, 53% of current DACA grantees may be less likely to report a crime they witnessed; 47% may be less likely to report a crime even if they were the victim; 48% may be less likely to go to the hospital if they suffered an injury, and 60% may be less likely to report wage theft by their employer. *See* Ex. 5 ¶ 24 (Decl. Wong). This will make it

harder for local police and other officials to provide for the public safety and welfare. *See, e.g.*, Ex. 111 ¶ 15 (Decl. Ambrosino & Bourque); Ex. 108 ¶¶ 7-10 (Decl. Hughes); Ex. 109 ¶ 6 (Decl. Meyer); Ex. 116 ¶¶ 10-13 (Decl. Graham, Delaware Community Legal Aid Society, Inc.). For example, since the Trump Administration announced plans to end DACA, Delaware law enforcement and legal aid have recognized an increased reluctance among Delaware immigrants to engage with aspects of the criminal justice system—even when that interaction would have been to protect their own victim rights. *See, e.g.*, Ex. 108 ¶¶ 7-10 (Decl. Hughes); Ex. 116 ¶¶ 10-13 (Decl. Graham).

***Harm to School Districts, Including Small School Districts.***

217.264.      The States have an interest in effectively educating elementary and secondary students and in preventing economic harm to small and large school districts.

218.265.      If DACA is terminated or not restored to its pre-September 5, 2017 status, public school districts will suffer financial harm as well as harm to their educational missions.

219.266.      The termination of DACATerminating DACA or failing to restore it to its pre-September 5, 2017 status will cause school districts to lose talented and experienced teachers and other staff members who are DACA grantees, adversely affecting student education and costing time, money, and effort to replace and retrain these employees. *See* Ex. 111 ¶ 11 (Decl. Ambrosino & Bourque); Ex. 79 (Whaley, *Denver Public Schools say ending DACA would have "catastrophic" effect*, Denver Post, Aug. 31, 2017).

220.267.      In Connecticut, Colorado, Illinois, Massachusetts, New Mexico, and New York, Teach for America has placed teachers who are DACA grantees in shortage-area subjects and hard-to-staff schools in low-income communities. *See* Ex. 11 ¶¶ 3, 11 (Decl. Carrizales, Teach For America). Terminating DACA or failing to restore it to its pre-September 5, 2017

84

status will not only deprive schools of their employees, but also deprive students of teachers whose live experiences may mirror their own lives. *Id.* ¶¶ 10, 11.

221.268.     Public elementary and secondary schools have a constitutional obligation to educate students irrespective of immigration status. *See Plyler v. Doe*, 457 U.S. 202 (1982). The termination of DACA or failure to restore it to its pre-September 5, 2017 status will harm the States' ability to educate DACA-eligible students as required by federal law. *See* Ex. 111 ¶¶ 12,14 (Decl. Ambrosino & Bourque); Ex. 112 ¶ 3-4 (Decl. Kanninen, Arlington, VA Public Schools).

222.269.     If DACA-eligible students are no longer able to work legally after high school or cannot afford to go to college, these students will be less motivated to achieve in school. *See* Ex. 111 ¶ 12 (Decl. Ambrosino & Bourque); Ex. 112 ¶ 3 (Decl. Kanninen). This will result in lower scores and higher dropout rates for these students. *See* Ex. 111 ¶ 12 (Decl. Ambrosino & Bourque).

223.270.     Poorer performance will impact school districts' accountability ratings and could require removal of administrators and teachers as well as increased state funding to flow to these school districts. *See, e.g.*, Ex. 179 (Mass. Dep't of Early and Secondary Educ., *School Leader's Guide to the 2017 Accountability Determinations*, Sept. 2017). Decreased school performance will also negatively impact the community, with families not wanting to buy homes in a lower-performing district. *See* Ex. 111 ¶ 13 (Decl. Ambrosino & Bourque).

224.271.     Finally, DACA-eligible students will experience higher levels of anxiety about their futures and their families' futures, and will require additional counseling and support from guidance counselors and other school personnel, costing school districts time and money. *See* Ex. 111 ¶ 14 (Decl. Ambrosino & Bourque).

*Harm to Businesses and Nonprofits.*

225.272.    The States have an interest in their tax revenues, economies, and the financial well-being of their businesses and nonprofits.

226.273.    Immigration is an important economic driver in the States. Many of the States' workers are immigrants, and many of those immigrant workers are DACA grantees. *See, e.g.*, Ex. 5 ¶¶ 28, 32, 36, 40, 44, 48, 52, 56, 60, 64, 68, 72, 76, 80, 84, 88 (Decl. Wong); Ex. 126 ¶ 11 (Decl. Read, Oregon State Treasurer); Ex. 95 ¶ 7 (Decl. Solano); Ex. 101 ¶ 4 (Decl. Preciado); Ex. 100 ¶ 6 (Decl. Nicolas); Ex. 124 ¶¶ 4, 10-11 (Decl. Salaveria); Ex. 168 ¶ 3 (Decl. Cabrera); Ex. 120 ¶ 4 (Decl. Romero, Barrera Legal Group, PLLC); Ex. 174 ¶¶ 4,6,8 (Decl. Wylde, Partnership for NYC); Ex. 81 ¶¶ 2-3, 5-6 (Decl. Pinsky, ABNY). Many companies in the States are dependent on DACA grantees to operate and grow their businesses. The market for highly skilled workers and employees is extremely competitive. Terminating DACA grantees' work authorization will inhibit the States' companies' ability to adequately staff their organizations, develop their workforces, recruit talent, and maintain trained employees. The Center for American Progress estimates that it costs businesses roughly one-fifth of a worker's salary to replace a worker due to productivity loss, the cost of hiring and training a new employee, and ramp-up periods for new employees. *See* Ex. 80 (Heather Boushey and Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Center for American Progress, November 16, 2012).

227.274.    If companies lose employees and recruiting efforts are less successful, their ability to develop and deliver successful products and services may be adversely affected. *See e.g.*, Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90 ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks); Ex. 84 ¶¶ 4-11 (Decl. Kalvert, TripAdvisor);

Ex. 119 ¶¶ 5-6 (Decl. Tingen, Tingen & Williams, PLLC); Ex. 174 ¶¶ 5-8 (Decl. Wylde, Partnership for NYC). For example:

    a.   Colorado's talented workforce has attracted major industries to the State, including aerospace, high-tech, start-ups, and STEM-based employers. Many companies in Colorado rely heavily on immigrants to operate their business. Terminating DACA or failing to restore it to its pre-September 5, 2017 status will disrupt these companies with DACA employees that are forced to terminate qualified and talented employees.

    a.b. Terminating DACA or failing to restore it to its pre-September 5, 2017 status will kneecap Connecticut's technology-driven economy, which dependent on immigrant workers: Nearly a quarter of employees in the state's vital science, technology, engineering, and math sector are immigrants.[91]

    c.   In Hawaii, businesses rely heavily on immigrants who bring their talent, knowledge, and expertise to Hawaii's labor force. *See* Ex. 124 ¶ 4 (Decl. Salaveria). Because of Hawaii'sPrior to the increase in unemployment caused by the COVID-19 crisis, Hawaii had a very low unemployment rate, and the state's businesses have had difficulty filling their vacant positions. *Id*. ¶ 8. TheIf or when the COVID-19 crisis ends, and Hawaii returns to the low level of unemployment that was previously the trend, the departure of the DACA population from Hawaii's workforce will eventually cause even greater difficulty for Hawaii employers, and have a negative impact on Hawaii's economy. *Id*. ¶ 11.

---

[91] *See* New American Economy, *Immigrants and the Economy in Connecticut*, https://www.newamericaneconomy.org/locations/connecticut/.

b.d.  Agriculture and forestry are two of Virginia's largest private industries. The Virginia Department of Agriculture and Consumer Services estimates that approximately 1,944 of Virginia's DACA grantees employed in primary agricultural production. *See* Ex. 129 ¶ 3 (Decl. Gooden, Virginia Sec'y of Agriculture and Forestry). Further, a percentage of DACA recipients are also likely to be regulated pesticide applicators. The loss of DACA status for these individuals would harm agricultural production and reduce income to Virginia from pesticide applicator licensing fees. *See id*. ¶ 7.

c.c.  In Washington, DACA grantees work for the largest companies as software engineers, finance professionals, and retail and sales associates, including for Amazon, Microsoft and Starbucks. *See* Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90 ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks).

d.f. In New York, businesses depend on the work of DACA grantees. *See* Ex. 170 ¶¶ 3, 7-8, 10 (Decl. Schwartz, Univision); Ex. 169 ¶ 7 (Decl. Greenberg, Warby Parker); Ex. 172 ¶¶ 4-5 (Decl. Morales); Ex. 174 ¶¶ 4-8 (Decl. Wylde, Partnership for NYC). DACA recipients are the consumer base for many New York businesses. Ex. 170 ¶¶ 5-6 (Decl. Schwartz, Univision); Ex. 169 ¶¶ 6-7 (Decl. Greenberg, Warby Parker). DACA grantees also provide diverse perspectives, and promote inclusiveness. Ex. 170 ¶¶ 3-9 (Decl. Schwartz, Univision); Ex. 169 ¶¶ 8-11 (Decl. Greenberg, Warby Parker); Ex. 174 ¶¶ 5,8 (Decl. Wylde, Partnership for NYC); ; Ex. 81 ¶¶ 2-8 (Decl. Pinsky, ABNY).

228.275.    The impact on small businesses and nonprofit organizations will be especially stark. For entities with limited staff and operating budgets, losing even one skilled and trained DACA grantee employee will place an economic strain on operations, hiring, and training. *See, e.g,* Ex. 118 ¶¶ 9-11 (Decl. Igneri); Ex. 117 ¶¶ 5-8 (Decl. Tracy); Ex. 120 ¶ 4 (Decl. Romero); Ex. 119 ¶¶ 5-6 (Decl. Tingen). Further, many DACA grantees contribute their talents to nonprofits in a range of fields, including education and civic engagement. *See, e.g*, Ex. 55 ¶¶ 8-9 (Decl. Perez); Ex 98 ¶ 12 (Decl. 98 Naveed).

229.276.    The mission of nonprofit organizations in the States will also be adversely affected by the termination of DACA or failure to restore it to its pre-September 5, 2017 status. Ex. 174 ¶¶ 3-8 (Decl. Wylde, Partnership for NYC). Many nonprofit organizations in the States serve immigrant communities, including by providing legal services and advocacy. Termination of DACA or failure to restore it to its pre-September 5, 2017 status will throw families into crisis, creating higher demand for services from organizations with limited resources. *See* Ex.

117 ¶¶ 12-14 (Decl. Tracy, Brazilian Worker Center); Ex. 115 ¶¶ 2-7 (Decl. Tack-Hooper, Am. Civil Liberties Union of Delaware); Ex. 116 ¶¶ 2-8 (Decl. Graham).

***Harm to Families.***

230.277.    The States have an interest in protecting the welfare of all of their residents, including the families of DACA grantees.

231.278.    Terminating DACA or failing to restore it to its pre-September 5, 2017 status will harm the general welfare of the States' DACA grantees and their families in profound ways. Most DACA grantees live in households with family members who are American citizens. One expert survey estimates that 73% percent of DACA grantees in the country live with a citizen sibling, spouse, or child. *See* Ex. 5 ¶ 34 (Decl. Wong). Terminating DACA or failing to restore it to its pre-September 5, 2017 status will lead to increased uncertainty in these mixed-status families, and it will increase the likelihood of splitting DACA grantees from their citizen family members. *See e.g.*, Ex. 176 ¶ 12 (Decl. Kennedy, City of Newburgh). Moreover, many of these families rely on the income of a DACA grantee, and DACA termination the termination of DACA or failure to return DACA to its pre-September 5, 2017 status will threaten their financial and housing security. *See, e.g.*, Ex. 87 ¶ 8 (Decl. Rubin); Ex. 135 ¶ 8 (Decl. Rakes); Ex. 157 ¶¶ 12-13 (Decl. Ridder); Ex. 172 ¶¶ 4-5, 7-8 (Decl. Morales); Ex. 173 ¶¶ 3, 5-6 (Decl. Hidalgo Hernandez).

232.279.    Many DACA grantees also have families overseas, including parents and siblings. DACA had made it possible for these grantees to visit family members, often for the first time in years. *See, e.g.*, Ex. 72 ¶ 7 (Decl. Teodoro); Ex. 70 ¶ 5 (Decl. I.V.). Terminating DACA or failing to restore it to its pre-September 5, 2017 status will cause DACA grantees to lose touch with these family members and become further estranged from their countries of

origin, making the prospect of deportation even more injurious to DACA grantees and their families.

## FIRST CAUSE OF ACTION

### (Fifth Amendment – Equal Protection)

233.280.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

234.281.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

235.282.     The 2017 DHS Memorandum and Wolf Memo target individuals for discriminatory treatment, without lawful justification.

236.283.     The 2017 DHS Memorandum wasand Wolf Memo were motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group.

237.284.     The discriminatory terms and application of the 2017 DHS Memorandum and Wolf Memo cannot be sufficiently justified by federal interests, under any standard of review.

238.285.     Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

239.286.     Defendants' violation causes ongoing harm to the States and their residents.

## SECOND CAUSE OF ACTION

### (Fifth Amendment – Due Process – Information Use)

240.287.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

241.288.        The Due Process Clause of the Fifth Amendment requires that actions taken by the federal government be fundamentally fair.

242.289.        Given the federal government's prior representations about the allowable uses of information provided by DACA applicants, the change to DHS's policy of protecting against the disclosure of information in DACA applications and renewal requests is fundamentally unfair.

243.290.        Also given the federal government's prior representations about the allowable uses of information provided by DACA applicants, the new policy's refusal to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement—including identifying, apprehending, detaining, or deporting non-citizens—is fundamentally unfair.

244.291.        Through their actions above, Defendants have violated the due process guarantee of the Fifth Amendment.

245.292.        Defendants' violation causes ongoing harm to the States and their residents.

## THIRD CAUSE OF ACTION

### (Equitable Estoppel)

246.293.        The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

247.294.        The doctrine of equitable estoppel prevents injustice where the government has made representations on which individuals have reasonably and detrimentally relied.

92

248.295.      In order to encourage DACA applications, Defendants made repeated, affirmative statements about the protections that would be given to the personal information provided by DACA applicants. Defendants also placed affirmative restrictions on the use of such information for purposes of immigration enforcement.

249.296.      In submitting DACA applications and renewal requests, DACA applicants reasonably and detrimentally relied on Defendants' affirmative representations and conduct.

250.297.      Defendants should be equitably estopped from revoking DHS's longstanding, affirmative policy of protecting against the disclosure of information in DACA applications and renewal requests.

251.298.      Equitable estoppel should also bar Defendants from implementing DHS's new policy of refusing to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement, including to identify, apprehend, detain, or deport non-citizens.

252.299.      Failure to estop Defendants from revoking DHS's previous policy and imposing the new policy will harm the States and their residents.

## FOURTH CAUSE OF ACTION

**(Administrative Procedure Act – Substantively Arbitrary and Capricious, Abuse of Discretion, Contrary to Constitution or Statute)**

253.300.      The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

254.301.      The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute. In implementing the 2017 DHS Memorandum and terminating DACA with minimal formal guidance, federal

93

agencies have taken unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

255.302.      In promulgating and implementing the 2017 DHS Memorandum, federal agencies have abused their discretion, and acted arbitrarily and capriciously and otherwise not in accordance with law, in violation of the APA.

256.303.      Defendants' violation causes ongoing harm to the States and their residents.

## FIFTH CAUSE OF ACTION

### (Administrative Procedure Act – Procedurally Arbitrary and Capricious, Notice and Comment)

257.304.      The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

258.305.      The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

259.306.      DHS is an "agency" under the APA. 5 U.S.C. § 551(1).

260.307.      The actions that DHS has taken to implement the 2017 DHS Memorandum are "rules" under the APA. 5 U.S.C. § 551(4).

261.308.      In promulgating and implementing the 2017 DHS Memorandum, federal agencies have categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States. Federal agencies did not follow the procedures required by the APA before taking action impacting these substantive rights.

262.309.      With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking. 5 U.S.C. § 553.

94

263.310.     The Defendants promulgated and relied upon the rules established by the 2017 DHS Memorandum without authority and without notice-and-comment rulemaking in violation of the APA.

264.311.     The States will be impacted because they have not had the opportunity to comment on the termination of DACA.

265.312.     Defendants' violation causes ongoing harm to the States and their residents.

**SIXTH CAUSE OF ACTION**

**(Regulatory Flexibility Act – Failure to Issue Regulatory Flexibility Analyses)**

266.313.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

267.314.     The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment. 5 U.S.C. §§ 603-604.

268.315.     "Small entities" for purposes of the RFA includes small businesses, small nonprofits, and small governmental jurisdictions. 5 U.S.C. § 601(6).

269.316.     The promulgation and implementation of the 2017 DHS Memorandum and Wolf Memo established "rules" under the RFA. 5 U.S.C. § 601(2).

270.317.     Implementation of the 2017 DHS Memorandum and Wolf Memo is likely to have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 602(a)(1).

271.318.       Defendants have not issued the required analyses of DHS's new rules.

272.319.       Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

273.320.       Defendants' violation causes ongoing harm to the States, their small governmental jurisdictions, nonprofits, and businesses, and their residents.

## SEVENTH CAUSE OF ACTION

### -(Fifth Amendment-Procedural Due Process)

274.321.       The Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

275.322.       The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests or property interests without due process of law.

276.323.       Defendants have failed to provide DACA grantees with the due process to which they are entitled, by failing to provide them with adequate notice about the procedures and timeline for renewing their DACA status.

277.324.       Defendants have failed to provide DACA grantees with the due process to which they are entitled, by failing to give them adequate notice about the general termination of the DACA program after March 5, 2018 and by failing to provide DACA grantees adequate notice of their inability to apply for renewal of their DACA status after March 5, 2018.

278.325.       Defendants are thus depriving Plaintiff States' residents of their liberty and property interests in living and working in the United States without providing them adequate notice or opportunity to be heard.

279.326.      Defendants' conduct violates the Due Process Clause of the Fifth Amendment.

280.327.      Defendants' violations cause ongoing harm to the States and their residents.

## EIGHTH CAUSE OF ACTION

### (Administrative Procedure Act – Arbitrary and Capricious, Contrary to Law, Excess of Statutory Authority – July 2020 Wolf Memo)

328.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

329.    The Administrative Procedure Act ("APA"), prohibits federal agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or that is in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C).

330.    Defendants' implementation of the Wolf Memo to make interim changes to the DACA program are not supported by any reasonable explanation for the agency action, fail to assess the harms of applying the policy retroactively, fail to consider the significant reliance interests at stake, and were ordered by an agency official acting in his position without lawful authority, and are therefore arbitrary, capricious, contrary to law, and in excess of Defendants' statutory authority, in violation of the APA.

331.    Defendants' violation causes ongoing harm to the States and their residents.

## NINTH CAUSE OF ACTION

### (Federal Vacancies Reform Act and Homeland Security Act)

332.    The Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

333.    Under the FVRA, an agency action taken by an unlawfully serving acting official "shall have no force and effect" and "may not be ratified" after the fact.  5 U.S.C. § 3348(d)(1), (2).

334.    The HSA establishes an order of succession for the position of Acting Secretary of Homeland Security. 6 U.S.C. § 113(a)(1)(A), 113(g)(1), 113(g)(2).

335.    Defendant Wolf's predecessor, Acting Secretary Kevin McAleenan, was not the lawful successor to former Secretary Kirstjen Nielsen, and therefore lacked the authority to amend DHS's order of succession that made Defendant Wolf next in line for the acting role. Because, under the FVRA, 5 U.S.C. § 3348(d)(1).  McAleenan's amendments to the order of succession were performed without lawful authority, they "shall have no force and effect." In turn, Defendant Wolf's assumption of the role of Acting Secretary based on McAleenan's ultra vires amendment to the succession order is also unlawful under the HSA and FVRA.

336.    Because Defendant Wolf is unlawfully serving as Acting Secretary, the official actions he has taken in that role, including making changes to the DACA program through the Wolf Memo, are ultra vires actions that are void ab initio under the plain terms of the FVRA. Under the FVRA, the changes to the DACA program ordered by the Wolf Memo therefore have "no force and effect." 5 U.S.C. § 3348(d)(1).

337.    Defendants' violation causes ongoing harm to the States and their residents.

**PRAYER FOR RELIEF**

Wherefore, the States pray that the Court:

a.  Declare that the 2017 DHS Memorandum terminating the DACA program isand the Wolf Memo changing the DACA program are unauthorized by and contrary to the Constitution and laws of the United States;

98

b.   Declare that the actions that DHS has taken to implement the 2017 DHS Memorandum terminating the DACA program and the Wolf Memo changing the DACA program are procedurally unlawful under the APA;

c.   Declare that the actions that DHS has taken to implement the 2017 DHS Memorandum terminating the DACA program and the Wolf Memo changing the DACA program are substantively unlawful under the APA;

d.   Declare that the actions that DHS has taken to implement the 2017 DHS Memorandum terminating the DACA program and the Wolf Memo changing the DACA program are unlawful under the RFA;

e.   Declare that Defendant Wolf's service as Acting Secretary of Homeland Security is unlawful under the FVRA and HSA;

f.   Declare that the Wolf Memo is invalid under the Federal Vacancies Reform Act and Homeland Security Act;

g.   Vacate the changes the Wolf Memo effected to the DACA program;

e.h. Enjoin Defendants from terminating or amending the DACA program, including enjoining the Defendants from limiting rights to submit applications to renew DACA benefits, pending further orders from this Court;

f.i.  Enjoin Defendants from revoking the DHS policy protecting DACA application and renewal data from disclosure to ICE, CBP, or any other agency for purposes of immigration enforcement;

g.j.  Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA applicant or

member of any DACA applicant's family, or take any action against a DACA applicant's current or former employer; ~~and~~

k.   Hold the Wolf Memo invalid and vacate the changes the Wolf Memo effected to DACA; and

~~h.~~l. Award such additional relief as the interests of justice may require.

100

DATED: ~~October 4, 2017~~August 28, 2020

~~**ERIC T. SCHNEIDERMAN**~~
**LETITIA JAMES**
Attorney General of the State of New York

~~By:~~   ~~*/s Lourdes M. Rosado*~~
~~Lourdes M. Rosado, Bureau Chief~~
~~Sania Khan, Assistant Attorney General~~
~~Diane Lucas, Assistant Attorney General~~
~~Ajay Saini, Assistant Attorney General~~
~~Civil Rights Bureau~~
~~Office of the New York State Attorney~~
~~General~~
~~120 Broadway, 23rd Floor~~
~~New York, NY 10271~~
~~Lourdes.Rosado@ag.ny.gov~~
~~Sania.Khan@ag.ny.gov~~
~~Diane.Lucas@ag.ny.gov~~
~~Ajay.Saini@ag.ny.gov~~
~~Tel. (212) 416-6348~~
~~Fax (212) 416-8074~~

By: */s/ Matthew Colangelo*
Matthew Colangelo,
Chief Counsel for Federal Initiatives
Sania Khan, Assistant Attorney General
Joseph Wardenski, Senior Trial Counsel
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Matthew.Colangelo@ag.ny.gov
Tel. (212) 416-6057
Fax (212) 416-6007

**MAURA HEALEY**
Attorney General for the Commonwealth
of Massachusetts

By:   ~~/s Abigail B. Taylor~~
~~Jonathan B. Miller~~
~~Genevieve C. Nadeau (*pro hac vice*)~~
~~Abigail B. Taylor (*pro hac vice*)~~
~~Assistant Attorneys General~~
~~Office of the Attorney General~~
~~One Ashburton Place~~
~~Boston, MA 02108~~
~~Jonathan.Miller@state.ma.us~~
~~Genevieve.Nadeau@state.ma.us~~
~~Abigail.Taylor@state.ma.us~~
~~Tel. (617) 727-2200~~

By:  /s/ Abigail B. Taylor
        Abigail B. Taylor (*pro hac vice*)
        David Ureña
        Assistant Attorneys General
        Office of the Attorney General
        One Ashburton Place
        Boston, MA 02108
        Abigail.Taylor@mass.gov
        David.Urena@mass.gov
        Tel. (617) 727-2200


**WILLIAM TONG**
Attorney General
State of Connecticut

By:  /s/ Joshua
Perry
        Joshua Perry*
        Special Counsel for Civil Rights
        Office of the Attorney General
        165 Capitol Avenue
        Hartford, CT 06106
        Joshua.perry@ct.gov
        (860) 808-5372


*Pro hac vice motion pending


**BOB FERGUSON**
Attorney General of the State of Washington

By:   ~~/s/ Robert W Ferguson~~
~~Robert W. Ferguson (*pro hac vice*)~~
~~Attorney General~~
~~Colleen M. Melody (*pro hac vice*)~~
~~Civil Rights Unit Chief~~
~~Marsha Chien (*pro hac vice*)~~
~~Assistant Attorney General~~
~~Office of the Attorney General~~
~~800 Fifth Avenue, Suite 2000~~
~~Seattle, WA 98104~~
~~ColleenM1@atg.wa.gov~~
~~MarshaC@atg.wa.gov~~
~~Tel. (206) 464-7744~~

By:  /s/ Robert W Ferguson
        Robert W. Ferguson (*pro hac vice*)
        Attorney General
        Colleen M. Melody (*pro hac vice*)
        Civil Rights Unit Chief
        Marsha Chien (*pro hac vice*)
        Assistant Attorney General
        Office of the Attorney General
        800 Fifth Avenue, Suite 2000
        Seattle, WA 98104
        ColleenM1@atg.wa.gov
        MarshaC@atg.wa.gov
        Tel. (206) 464-7744


**KARL A. RACINE**
Attorney General for the District of Columbia

By:  /s/ Kathleen Konopka
        Deputy Attorney General
        Public Advocacy Division
        400 6th Street, NW
        Washington, DC 20001
        Kathleen.Konopka@dc.gov
        Tel. (202) 724-6610

**~~GEORGE JEPSEN~~**
**CLARE E. CONNORS**
Attorney General of the State of
~~Connecticut~~Hawaii

~~By:~~     ~~/s Mark K. Kohler~~
          ~~Mark F. Kohler (*pro hac vice*)~~
          ~~Assistant Attorney General~~
          ~~Connecticut Office of the Attorney~~
          ~~General~~
          ~~55 Elm Street, P.O. Box 120~~
          ~~Hartford, CT 06106~~
          ~~Mark.Kohler@ct.gov~~
          ~~Tel. (860) 808-5020~~

By:  /s/ Robert T. Nakatsuji
          Robert T. Nakatsuji (*pro hac vice*)
          Deputy Attorney General
          State of Hawaii, Department of the
          Attorney General
          425 Queen Street
          Honolulu, HI 96813
          Robert.T.Nakatsuji@hawaii.gov
          Tel. (808) 586-1360

**KWAME RAOUL**
**~~KARL A. RACINE~~**
Attorney General ~~for~~of the ~~District~~State of
~~Columbia~~Illinois

~~By:~~     ~~/s Robyn R. Bender~~
          ~~Robyn R. Bender*~~
          ~~Deputy Attorney General~~
          ~~Public Advocacy Division~~
          ~~441 4th Street, NW~~
          ~~Suite 650 North~~
          ~~Washington, DC 20001~~
          ~~Robyn.Bender@dc.gov~~
          ~~Tel. (202) 724-6610~~
          ~~Fax (202) 730-0650~~

By:  /s/ Jeffrey J. VanDam
          Jeffrey J. VanDam
          Public Interest Counsel
          Office of the Illinois Attorney General
          100 W. Randolph Street
          Chicago, IL 60601
          jvandam@atg.state.il.us
          Tel. (312) 814-3400
          Fax (312) 814-3212

DOUGLAS S. CHIN
Attorney General of the State of Hawaii

By: /s Donna H. Kalama
Donna H. Kalama (*pro hac vice*)
Deputy Attorney General
State of Hawaii, Department of the
Attorney General
425 Queen Street
Honolulu, HI 96813
Donna.H.Kalama@hawaii.gov
Tel. (808) 586-1224

LISA MADIGAN
Attorney General of the State of Illinois

By: /s Anna P. Crane
Anna P. Crane, Assistant Attorney
General (*pro hac vice*)
Karyn L. Bass Ehler,
Chief, Civil Rights Bureau
Harpreet Khera, Deputy Bureau Chief,
Special Litigation Bureau
Caitlyn McEllis, Assistant Attorney
General
Jeff VanDam, Assistant Attorney Genera
Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Anna.Crane@atg.state.il.us
Tel. (312) 814-3400
Fax (312) 814-3212

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By: /s Nathan Blake
Nathan Blake (*pro hac vice*)
Deputy Attorney General
Office of the Attorney General of
Iowa
1305 E. Walnut Street
Des Moines, IA 50319
Nathan.Blake@iowa.gov
Tel. (515) 281-4325
Fax (515) 281-4209

By: /s/ Nathan Blake
Nathan Blake (*pro hac vice*)
Deputy Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut Street
Des Moines, IA 50319
nathan.blake@ag.iowa.gov
Tel. (515) 281-4325
Fax (515) 281-4209

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By: /s Tania Maestas
Tania Maestas, (*pro hac vice*)
Deputy Attorney General
Ari Biernoff, Assistant Attorney General
Jennie Lusk, Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87501
ABiernoff@nmag.gov
Tel. (505) 490-4060
Fax (505) 490-4883

By: /s/ Tania Maestas
Tania Maestas (*pro hac vice*)
Chief Deputy Attorney General
Jennie Lusk, Assistant Attorney General
Civil Rights Bureau Chief
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87501
tmaestas@nmag.gov
Tel. (505) 490-4060
Fax (505) 490-4883

104

~~MATTHEW DENN~~
**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

~~By:~~   ~~*s/ Aaron Goldstein*~~
~~Aaron Goldstein\*~~
~~State Solicitor~~
~~Aleine Cohen\*~~
~~Deputy Attorney General~~
~~Delaware Department of Justice~~
~~820 N. French St.~~
~~Wilmington, DE 19801~~
~~Aaron.Goldstein@state.de.us~~
~~Aleine.Cohen@state.de.us~~
~~Tel. (302) 577-8400~~

By:  /s/ *Christian Douglas Wright*
Christian Douglas Wright (*pro hac vice*)
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE  19801
christian.wright@delaware.gov
Phone: (302) 577-8600

**JOSHUA H. STEIN**
Attorney General of the State of North Carolina

By:  /s/ *Sripriya Narasimhan*
Sripriya Narasimhan\*
Deputy General Counsel
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
SNarasimhan@ncdoj.gov
Tel. (919) 716-6400

\*Application for pro hac vice admission forthcoming

PETER ~~KILMARTIN~~NERONHA
Attorney General of the State of Rhode Island

~~By:~~   ~~*/s Rebecca T. Partington*~~
~~Rebecca T. Partington (*pro hac vice*)~~
~~Chief, Civil Division~~
~~Michael W. Field (*pro hac vice*)~~
~~Assistant Attorney General~~
~~Adam D. Roach (*pro hac vice*)~~
~~Special Assistant Attorney General~~
~~RI Office of the Attorney General~~
~~150 South Main Street~~
~~Providence, RI 02903~~
~~RPartington@riag.ri.gov~~
~~MField@riag.ri.gov~~
~~ARoach@riag.ri.gov~~
~~Tel. (401) 274-4400~~

By: /s/ *Michael W. Field*
Michael W. Field\*
*Assistant Attorney General*
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x 2380
mfield@riag.ri.gov

\*Application for pro hac vice admission forthcoming

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By:  /s/ *Brian de Haan*
Brian de Haan, Assistant Attorney General
Trial Attorney
brian.a.dehaan@doj.state.or.us
Tel. (971) 673-1880
Fax (971) 673-5000

**JOSH SHAPIRO**
Attorney General of the Commonwealth of Pennsylvania

By: */s/ Aimee D. Thomson*
        Aimee D. Thomson*
        Deputy Attorney General
        Impact Litigation Section
        1600 Arch St., Suite 300
        Philadelphia, PA 19103
        athomson@attorneygeneral.gov
        Tel. (267) 374-2787

* Application for admission forthcoming

**MARK R. HERRING**
Attorney General of the Commonwealth of Virginia

By: */s/  Michelle S. Kallen*
        Michelle S. Kallen (*pro hac vice*)
        Deputy Solicitor General
        202 North Ninth Street
        Richmond, VA 23219
        mkallen@oag.state.va.us
        Tel. (804) 786-7240

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

By: */s/ Benjamin D. Battles*
        Benjamin D. Battles
        Solicitor General
        Julio A. Thompson, Assistant Attorney
        General, Director, Civil Rights Unit
        Office of the Vermont Attorney General
        109 State Street
        Montpelier, VT 05609
        Benjamin.Battles@vermont.gov
        Tel. (802) 828-5500

**PHILIP J. WEISER**
Attorney General of the State of Colorado

By: */s/ Eric R. Olson*
        Eric R. Olson (pro hac vice)
        Solicitor General
        Office of the Attorney General
        Colorado Department of Law
        1300 Broadway, 10th Floor
        Denver, CO 80203
        Phone: (720) 508-6548
        Eric.Olson@coag.gov

~~**JOSH STEIN**~~
~~Attorney General of the State of North Carolina~~

~~By:~~    ~~*/s Sripriya Narasimhan*~~
        ~~Sripriya Narasimhan*~~
        ~~North Carolina Department of Justice~~
        ~~114 W. Edenton Street~~
        ~~Raleigh, NC 27603~~
        ~~SNarasimhan@ncdoj.gov~~
        ~~Tel. (919) 716-6400~~

~~**ELLEN F. ROSENBLUM**~~
~~Attorney General of the State of Oregon~~

~~By:~~    ~~*/s Brian De Haan*~~
        ~~Brian De Haan*~~
        ~~Assistant Attorney General~~
        ~~Trial Attorney~~
        ~~Brian.A.DeHaan@doj.state.or.us~~
        ~~Tel. (971) 673-1880~~
        ~~Fax (971) 673-5000~~

~~**JOSH SHAPIRO**~~
~~Attorney General of the Commonwealth of Pennsylvania~~

~~**THOMAS J. DONOVAN, JR.**~~
~~Attorney General of the State of Vermont~~

~~By:~~    ~~*/s Benjamin D. Battles*~~
        ~~Benjamin D. Battles, (*pro hac vice*)~~
        ~~Solicitor General~~

106

By:    */s Jonathan Scott Goldman*
       Jonathan Scott Goldman*
       Executive Deputy Attorney General,
       Civil Law Division
       Michael J. Fischer, (*pro hac vice*)
       Chief Deputy Attorney General, Impact
       Litigation Section
       Office of Attorney General
       16th Floor, Strawberry Square
       Harrisburg, PA 17120
       MFischer@attorneygeneral.gov
       Tel. (717) 787-3391

Julio A. Thompson*, Assistant Attorney
General, Civil Rights Unit
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
Benjamin.Battles@vermont.gov
Tel. (802) 828-5500
Fax (802) 828-3187

**MARK R. HERRING**
Attorney General of the Commonwealth of
Virginia

By:    */s Matthew R. McGuire*
       Matthew R. McGuire (*pro hac vice*)
       Acting Deputy Solicitor General
       202 North Ninth Street
       Richmond, VA 23219
       MMcguire@oag.state.va.us
       Tel. (804) 786-7773

**JOHN W. HICKENLOOPER**
Governor of the State of Colorado

By:    */s Jacki Cooper Melmed*
       Jacki Cooper Melmed
       Special Assistant Attorney General*
       Chief Legal Counsel
       136 State Capitol Building
       Denver, Colorado 80203
       Jackie.Melmed@state.co.us
       Tel. (303) 866-3788
       (* Limited Appointment)