# Exhibit 3



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

| | |
|---|---|
| MEMORANDUM FOR: | Mark Morgan<br>Senior Official Performing the Duties of Commissioner<br>U.S. Customs and Border Protection |
| | Matthew Albence<br>Senior Official Performing the Duties of Director<br>U.S. Immigration and Customs Enforcement |
| | Joseph Edlow<br>Deputy Director of Policy<br>U.S. Citizenship and Immigration Services |
| FROM: | Chad F. Wolf<br>Acting Secretary |
| SUBJECT: | **Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"** |

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Ever since, the policy has been subject to substantial controversy. In recent years, Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined that the 2017 and 2018 memoranda had not complied with certain requirements for doing so. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. Accordingly, the Court concluded that the rescission must be vacated and remanded to DHS so that it "may consider the problem anew." Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain immediate changes to the DACA policy to facilitate my thorough consideration of how to address DACA in light of the Supreme Court's decision. For the reasons outlined below, pending my full reconsideration of the DACA policy, I direct DHS personnel to take all appropriate actions to reject all pending and future initial requests for DACA, to reject all

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

**Background**

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy. The policy provided for the granting of deferred action to certain individuals with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria. The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal. Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization. The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so. The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA. The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect. In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA). In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote. On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well. The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy. On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy. The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

Litigation challenging the Duke Memorandum promptly ensued. As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia. The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy. The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects. Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus. Slip op. at 9. But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy." Id. at 11. Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA. Id. And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy." Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem. In making that determination, the Court declined to consider the Nielsen Memorandum. Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action." Id. at 14. As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26. The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew." Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York. Id.

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies. Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy. To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy. More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission. At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration. Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission. Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:** There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy. And yet, although various proposals have been advanced to do that, Congress has so far declined to take action. Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest. As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure. For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship. Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy. In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement. I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them. DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws. I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children. It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain. Of course, the DACA policy would not apply to children who are sent or brought to this country today. But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward. By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**: In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified. In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim. First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted. Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances. Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS. As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients.  They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients.  They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide.  And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy.  And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please.  In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist.  Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole.  Accordingly, that has been the status quo for more than two years.  It makes sense to continue that approach while I reconsider whether to rescind or revise the policy.  If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time.  And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year.  Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it.  And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal.  They will merely have to seek renewal on an annual, rather than biannual, basis.  In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis.  Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period.  But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS.  DHS personnel should consider whether it is possible to

reduce renewal fees during this interim period of reconsideration. In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency. Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes. Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1] Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps. I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty. Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis. Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period. Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1] Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied. Many were rejected, while some were accepted and receipted. To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum makes any change to that policy.

* * * * *

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS. Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.