# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CASA DE MARYLAND, INC., et al

       Plaintiffs,

v.                                                                    Civil No. 20-2118-PX

WOLF, et al

       Defendant.

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
_____

August 3, 2020

ROBRET K. HUR
United States Attorney, District of Maryland

Jane E. Andersen
*Assistant United States Attorney*
(D.MD Bar No. 802834)
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770
(301) 344-4422

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATUTORY AND REGULATORY FRAMEWORK .......................................................2

    A.  Statutory Framework for Employment Authorization for Asylum Seekers ...........................2

    B.  Regulatory Framework Related to Employment Authorization Applications Filed by Asylum Applicants...........................................................................................................2

    C.  Development and Publication of the Final 30 Day-Time Frame Removal Rule ("Final Timeframe Rule") ...........................................................................................................4

    D.  Development and Publication of the Final Rule on Asylum Application, Interview, and Employment Authorization ("Broader EAD Final Rule") .............................................6

    E.  Federal Vacancies Reform Act and the Appointment of Chad Wolf as Acting Secretary of Homeland Security ........................................................................................................9

LEGAL STANDARD ......................................................................................................10

ARGUMENT....................................................................................................................10

    I.  PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS..........................................................................................................................10

    A.  APA Review of Final Agency Rules ................................................................................10

    B.  The Final Timeframe Rule Was Promulgated Pursuant to Proper Procedure, Reflects Reasoned Decision-making, and is Not Arbitrary or Capricious ...................................12

       i.  The Final Timeframe Rule Was Properly Considered With the Broader Eligibility Requirements ...................................................................................................................12

i

ii.   The Final Timeframe Rules Properly Considered the Harms to Bona Fide Asylum
Seekers ...................................................................................................................16

iii.  DHS Properly Explained Why a Defined Timeframe Was Not Included .......................17

iv.   DHS Properly Explained Why It is Removing the 30-day Processing Requirement .......18

C.   The Final Broader EAD Rule Was Promulgated Pursuant to Proper Procedure, Reflects
Reasoned Decision-making, and is Not Arbitrary or Capricious ....................................20

i.    The Final Broader EAD Rule Was Properly Considered With the Timeframe Rule .......20

ii.   The Final Broader EAD Rules Properly Considered the Harms to Bona Fide Asylum
Seekers ...................................................................................................................21

iii.  The Final Broader EAD Rules Properly Established the Problem it Addresses ..........23

D.   Acting Secretary Wolf is Properly Serving as the Acting Secretary for Homeland Security
Pursuant to 6 U.S.C. 113(g)(2) ...................................................................................25

i.    Secretary Kirstjen Nielsen's April 10, 2019 Succession Order was Lawful....................25

ii.   Secretary Nielsen's April 10, 2019 Succession Order Applied to All Vacancies ..............26

iii.  Acting Secretary Kevin McAleenan Lawfully Served as Acting Secretary, His Further
Succession Delegation of November 8, 2019 is Lawful, and Acting Secretary Chad Wolf is
Lawfully Serving as Acting Secretary..............................................................................27

II.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE .......................................28

A.   Plaintiffs Have Not Demonstrated They Will Suffer Irreparable Harm if the Timeframe
Rule is not Stayed Pending Resolution of this Action ....................................................30

ii

B.   Plaintiffs Have Not Demonstrated They Will Suffer Irreparable Harm if the Broader EAD
Rule is not Stayed Pending Resolution of this Action ....................................................................30

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR
OF THE DEFENDANTS ........................................................................................................32

IV.   ANY RELIEF SHOULD BE NARROW AND LIMITED TO THE PLAINTIFFS..........34

CONCLUSION....................................................................................................................35

# INTRODUCTION

To be granted asylum in the United States, an individual must establish that she has experienced persecution or has a well-founded fear of future persecution on account of one of the five protected grounds: race, religion, nationality, membership in a particular social group, or political opinion. Only a small fraction of asylum applicants is eventually granted status. Once an individual is granted asylum, that person is automatically permitted to work incident to status as an asylee. 8 U.S.C. § 1158(c)(1). While an individual's application for asylum is pending, there is no right to work. 8 U.S.C. § 1158(d)(2) ("[a]n applicant for asylum is not entitled to employment authorization.") Although Congress did not provide asylum applicants the right to work, it did grant the Department of Homeland Security (DHS) the discretionary authority to provide for such authorization. Congress limited DHS's authority in one important way, however: "An applicant who is not otherwise eligible for employment authorization shall not be granted work authorization prior to 180 days after the date of filing of the application for asylum." 8 U.S.C. § 1158(d)(2).

This case challenges two rules recently promulgated by DHS, after periods of notice and comment, related to employment authorization to individuals who have applied for, but have not yet been granted, asylum. The first rule, referred to herein as the "Timeframe Rule" repeals a rule that was promulgated over 20 years ago that required DHS to grant or deny applications for employment authorization to asylum seekers within 30 days of submission to ensure U.S. Citizenship and Immigration Services (USCIS) has sufficient time to receive, screen, and process the EAD applications. The second rule, referred to herein as the "Broader EAD Rule," modifies regulations governing asylum applications, interviews, and eligibility for employment authorization based on a pending asylum application in order to address the national emergency and humanitarian crisis at the

1

border. Both rules were promulgated in accordance with the Administrative Procedure Act (APA) after a 60-day notice and comment period and careful consideration of the problem and facts at issue. DHS articulated a satisfactory explanation for the promulgation of both final rules. For the reasons addressed below, plaintiffs' motion for a preliminary injunction should be denied.

## STATUTORY AND REGULATORY FRAMEWORK

### A. Statutory Framework for Employment Authorization for Asylum Seekers

Section 103(a) of the Immigration and Nationality Act (INA) 8 U.S.C. 1103(a), authorizes the Secretary of Homeland Security to administer and enforce the immigration and nationality laws and to establish such regulations as deemed necessary for carrying out such authority. The current statutory framework was adopted in 1996 with the passage of the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA), which states that an applicant for asylum is "not entitled to employment authorization," and may not be granted an employment authorization document (EAD) based on a pending asylum application prior to 180 days after filing of the asylum application. 8 U.S.C. 1158(d)(2). The statute leaves to the discretion of the Secretary to otherwise prescribe by regulation the terms and conditions of employment authorization for asylum applicants. The regulatory regime surrounding employment authorization for asylum applicants that was subsequently established is briefly outlined in the following section, as well as the regulatory changes made in the two challenged rulemakings.

### B. Regulatory Framework Related to Employment Authorization Applications Filed by Asylum Applicants

The Refugee Act of 1980 established the current asylum and refugee system. In the years following the Refugee Act's enactment, the number of asylum applications steadily increased and the United States saw a steady rise in illegal immigration. 85 Fed. Reg. 38532 at 38544. A contributing

2

factor to these increases was regulations that provided individuals with employment authorization based on pending asylum application, thereby incentivizing the filing of non-meritorious asylum claims or other forms of relief for the purpose of obtaining employment authorization. *Id.* at 38544. Specifically, the implementing regulations for IRCA provided that aliens could receive an interim EAD if INS did not adjudicate the application for employment authorization within 60 days (former 8 CFR 274a.12(c) and (d)).[1] In 1990, the INS promulgated a regulation providing interim EADs to any alien who had filed a non-frivolous asylum application, and allowed for renewal of employment authorization for the time needed to adjudicate the asylum application (former 8 CFR 208.7(a)). *Id.* at 38544.

In 1994, as part of a series of reforms to the overall asylum process, the Department of Justice (DOJ) made regulatory amendments to streamline the adjudication process for asylum applications submitted to the INS and to separate asylum adjudications from the employment authorization process. 59 Fed. Reg. 62284, 62290 (Dec. 5, 1994). The purpose of the rule was to "discourage applicants from filing meritless [asylum] claims solely as a means to obtain employment authorization," so that asylum officers and IJs could "concentrate their efforts on approving meritorious claims." *Id.* In order to disincentivize the filing of meritless claims, the 1994 rule provided that applicants must wait 150 days after the filing of a complete asylum application before becoming eligible to apply for employment authorization rather than being immediately authorized with the filing of an asylum application. *Id.* The 1994 rule also established a self-imposed 30-day timeframe for INS to adjudicate

---

[1] The 60-day period was subsequently extended to 90-days with the publication of the final rule, *Powers and Duties of Service Officers; Availability of Service Records, Control of Employment of Aliens*, 56 Fed. Reg. 41767-01 (Aug. 23, 1991).

such EAD applications.[2] *Id.* at 62289-90 (Dec. 5, 1994), codified at 8 C.F.R. § 208.7 (1994). The 180-day time frame for EAD eligibility was codified by Congress in IIRIRA in 1996.

The current regulatory regime provides that asylum applicants filing after January 4, 1995, will be granted employment authorization if several criteria are met. 8 CFR 208.7. Over time, given the growing backlog and delays in asylum adjudication that can extend from months into years, it became clear that these asylum reform-era regulations were insufficient to disincentivize non-meritorious asylum applications for the purpose of seeking employment authorization, thereby necessitating (in part) the challenged rulemakings that update this regulatory scheme.

## C.   Development and Publication of the Final 30 Day-Time Frame Removal Rule ("Final Timeframe Rule")

In the Spring of 2018, DHS provided public notice of its intent to amend the 30-day regulatory timeframe to adjudicate EAD applications by asylum seekers.[3] On September 9, 2019, USCIS proposed to amend the 30-day regulatory timeframe. 84 Fed. Reg. 47148 ("Proposed Timeframe Rule"). During a 60-day comment period, DHS received over 3,200 comments. After review and analysis of public comments, it published the Final Timeframe Rule on June 22, 2020, keeping all material respects from the Proposed Timeframe Rule. 85 Fed. Reg. 37502.

DHS provided multiple reasons for promulgating the Proposed and Final Timeframe Rule. Specifically, the 30-day timeframe in 8 CFR 208.7(a)(1) was established more than 20 years ago when INS adjudicated EAD applications at local INS offices. *Id.* The 30-day timeframe does not account

---

[2] The 180-day time frame was based on processing time frame goals that DOJ had set for asylum officers and immigration judges to adjudicate asylum cases that appeared reasonable at that time, when the volume of cases was substantially lower. Current adjudication time is often beyond two years. 85 Fed. Reg. at 38563.

[3] *See* Office of Information and Regulatory Affairs' Spring 2018 Unified Agenda, available at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201804&RIN=1615-AC19.

for the current volume of applications and no longer reflects current operational realities. *Id.* at 37507-08. Increases in EAD applications have outpaced USCIS' resources over the last 20 years. *Id.* at 37508. The level of fraud sophistication and national security concerns posed today are more complex than they were 20 years ago. Lastly, changes in intake and document production to reduce fraud and address threats to national security, as well as the time necessary for appropriate vetting to address such concerns, are not reflected in the current regulatory timeframe. 85 Fed. Reg. 37518. Thus, DHS proposed and finalized its rule to remove this temporal limitation.

Additionally, on May 22, 2015, plaintiffs in *Rosario v. USCIS*, No. C15-0813JLR (W.D. Wash.), brought a class action in the U.S. District Court for the Western District of Washington to compel USCIS to comply with the 30-day provision of 8 CFR 208.7(a)(1). On July 26, 2018, the court enjoined USCIS from failing to adhere to the 30-day deadline for adjudicating EAD applications. Compliance with the court order places an extraordinary strain on already strained agency resources. *Id.* at 37510.[4]

DHS thoughtfully responded to the comments received. USCIS stated in the Final Timeframe Rule that it believed[5] that under the new rule, adjudications will align with DHS processing times achieved in FY 2017. *Id.* at 37503. Pre-*Rosario*, USCIS adjudicated approximately 78 percent of applications within 60 days. *Id.* The change was intended to ensure USCIS has sufficient time to receive, screen, and process requests for asylum application-based employment authorization and to reduce fraud. 85 Fed. Reg. at 37502.

---

[4] USCIS has moved the Court to vacate the court's injunction "as of the effective date of the amendment to 8 C.F.R. § 208.7(a)(1), and has advised the court of this litigation.

[5] This assumption does not take into account any delays related to COVID-19. *See* 85 Fed. Reg. 37502 at 37503.

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 11 of 40 PageID #:
8019
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 10 of 39

**D.    Development and Publication of the Final Rule on Asylum Application, Interview, and Employment Authorization ("Broader EAD Final Rule")**

In the Fall of 2018, DHS provided public notice of its intent to modify regulations governing employment authorization for asylum applicants.[6] The following spring, on April 29, 2019, the White House issued a "Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System," which, among other things, directed the Secretary of Homeland Security to propose regulations to bar aliens who entered or attempted to enter the U.S. unlawfully from receiving employment authorization prior to adjudication of their asylum application and immediately revoke employment authorization of those aliens denied asylum or ordered removed. *See* 2019 Daily Comp. Pres. Doc. 251 (Apr. 29, 2019). The PM stated that the "strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty and noted that "[t]he purpose of [the] memorandum is to strengthen asylum procedures to safeguard our system against rampant abuse of our asylum process." *Id.*

On November 14, 2019, DHS published a notice of proposed rulemaking, with a 60-day comment period. *See* 84 Fed. Reg. 62374 ("Broader EAD NPRM"). The NPRM proposed to modify regulations governing asylum applications, interviews, and eligibility for employment authorization based on a pending asylum application in order to, *inter alia*, address the national emergency and humanitarian crisis at the border. On January 13, 2020, the Broader EAD NPRM comment period closed. DHS received 1,074 comment submissions. On June 26, 2020, after careful consideration of

---

[6] *See* Office of Information and Regulatory Affairs' Fall 2018 Unified Agenda, *available at* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201810&RIN=1615-AC27 ("The Department of Homeland Security (DHS) plans to propose regulatory amendments intended to promote greater accountability in the application process for requesting employment authorization and to deter the fraudulent filing of asylum applications for the purpose of obtaining Employment Authorization Documents (EADs).").

the public comments, DHS published the Final Rule, addressing comments, making numerous revisions to the proposed rule based on public comments, and providing a reasoned, detailed analysis in support of its decisions. 85 Fed. Reg. 38532.

The Broader EAD NPRM and Final Rule's objectives to address the national emergency and humanitarian crisis at the border are multi-fold. The overarching impetus of the rule is to mitigate ongoing harms to asylum seekers caused by waves of economic migrants abusing and taxing the asylum system. *See e.g.*, 85 Fed. Reg at 38544. DHS crafted the regulation to disincentivize illegal entry into the United States, as well as reduce incentives for aliens to file frivolous, fraudulent, or otherwise non-meritorious asylum applications in order to obtain employment authorization. *Id.* at 38533. The rule seeks to address the asylum application backlog, which has grown at an unprecedented rate beginning in 2016, and has hindered efficient receipt, processing and timely adjudication of asylum applications in recent years. *Id.* at 38545. DHS also sought to increase efficiencies in the asylum EAD adjudication process generally. *Id.* at 38533. The rule strives to reduce incentives for applicants to delay asylum proceedings to extend their period of employment authorization. *Id.* Some of the major provisions contained in the NPRM that were altered, modified, and/or accepted in the Final Rule are discussed below.

First, in order to remove incentives for individuals to file asylum applications as a means to secure employment authorization, and to streamline the EAD adjudication process, the Broader EAD NPRM proposed to extend the time period applicants must wait to be eligible to be granted an EAD following the filing of an asylum application from 180 days, not including delays caused or requested by the applicant, to 365 calendar days. 84 Fed. Reg. 62374 at 62388-89. In other words, DHS proposed

Case 1:17-cv-05228-NGG-VMS  Document 273-8  Filed 08/28/20  Page 13 of 40 PageID #:
8021
Case 8:20-cv-02118-PX  Document 41  Filed 08/03/20  Page 12 of 39

to no longer use the 180-Day Asylum EAD Clock[7] and instead, deny EAD applications if there is an unresolved applicant-caused delay at the time the EAD application was adjudicated by the agency. After careful consideration of comments, DHS amended the Broader EAD Final Rule so that an EAD application would be denied if the asylum case was subject to an applicant-caused delay at the time the EAD application is filed, rather than date of adjudication. 85 Fed. Reg. 38532 at 38537-38.

Second, as part of the efforts to reform the asylum system, reduce the asylum backlog, incentivize bona fide asylum applicants to file sooner, and discourage aliens from filing skeletal, frivolous, and fraudulent asylum applications, the Broader EAD NPRM proposed to exclude from EAD eligibility aliens who failed to file for asylum within one year of the date of their last arrival in the U.S. as required by statute, unless and until an asylum officer or immigration judge determined a statutory exception or if the applicant was an unaccompanied alien child (UAC). 84 Fed. Reg. 62374 at 62390. In response to the concerns raised by commenters regarding retroactive application, DHS narrowed application of this provision to only aliens who filed their underlying asylum application on or after August 25, 2020 effective date. 85 Fed. Reg. 38532 at 38537.

Third, in the Broader EAD NPRM, DHS proposed to bar aliens from EAD eligibility if they entered or attempted to enter the U.S. at a place and time other than lawfully through a U.S. port of entry, with limited exceptions for good cause. The good cause exception was clarified in the Final Rule based upon comments received. 84 Fed. Reg. 62374 at 62392; 85 Fed. Reg. 38532 at 385537. Further, DHS modified the effective date for this provision such that EAD eligibility is only curtailed if an alien's illegal entry or attempted entry occurs after August 25, 2020. *Id.* at 38537.

---

[7] See EOIR-USCIS joint notice, *The 180-day Asylum EAD Clock Notice,*
*https://www.uscis.gov/sites/default/files/Asylum_Clock_Joint_Notice_-_revised_06-08-2018.pdf (last updated June 8, 2018).*

Fourth, The Broader EAD NPRM proposed to extend EAD ineligibility to a wider range of criminal behavior. DHS received public comments that criticized the agency for creating an EAD criminal bar scheme that deviated from bars to asylum. In the Broader EAD Final Rule, DHS discarded its proposed criminal bars in their entirety and instead aligned the EAD criminal bars to those enumerated in the joint DOJ/DHS Asylum Bars Rule as well as existing statutory criminal bars to asylum. 85 Fed. Reg. 38532 at 38537. The Asylum Bars Final Rule has not been published and made effective.

Finally, DHS carefully analyzed commenters' concerns about the NPRM's retroactive application to employment authorization applications pending prior to the effective date and determined to only apply the final rule's provisions to those EAD applications filed after the final rule's August 25, 2020, effective date. As a result, all initial and renewal EAD applications filed by asylum applicants pending prior to the effective date of the final rule are exempt from the rule's provisions.

### E. Federal Vacancies Reform Act and the Appointment of Chad Wolf as Acting Secretary of Homeland Security

In 1998, Congress enacted the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345-3349d, to govern the designation of acting officials to perform the duties of a Senate-confirmed executive office when the incumbent officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office." *Id.* § 3345(a). "[T]he person serving as an acting officer" under the FVRA may serve "for no longer than 210 days beginning on the date the vacancy occurs," subject to extensions while a nomination is under consideration, rejected, withdrawn, or returned by the Senate. *Id.* § 3346(a). In the National Defense Authorization Act for Fiscal Year 2017, Congress added section

113(g)(2) to the Homeland Security Act (title 6 United States Code), which states, "Notwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."

For an accurate statement of the authority supporting Chad Wolf's appointment as Acting Secretary of Homeland Security, the Court is referred to the Declarations of Juliana Blackwell, Deputy Executive Secretary, within the Office of the Executive Secretary, DHS (Blackwell Decl.), and Neal J. Swartz, Associate General Counsel for DHS (Swartz Decl), annexed hereto.

## LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id. at* 20. "[C]ourts considering whether to impose preliminary injunctions must separately consider each *Winter* factor." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013).

## ARGUMENT

## I.  PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  APA Review of Final Agency Rules

An agency final rule may only be set aside if the rule is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When an agency intends to establish a binding legislative rule, it must have statutory authority to do so and follow the

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 16 of 40 PageID #:
8024
Case 8:20-cv-02118-PX   Document 31   Filed 08/03/20   Page 15 of 39

notice-and-comment procedures for "informal rulemaking" under the APA. *See* 5 U.S.C. § 553(b); *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-20 (1979). Informal rulemaking requires an agency to place notice of proposed rulemakings in the Federal Register, solicit comments on a rulemaking docket, and respond to significant comments along with the final rule containing a concise statement of the rule's basis and purpose in the Federal Register. 5 U.S.C. § 553(b)-(c); *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. __, 207 L.Ed.2d 819, 840 (2020). The Court may not impose procedural requirements beyond what the APA or the enabling act requires. *Id.* ("we have repeatedly rejected courts' attempts to impose 'judge-made procedur[es]' in addition to the APA mandates."). Courts routinely presume that government officials "'have properly discharged their official duties.'" *Almy v. Sebelius*, 679 F.3d 297, 309 (4th Cir. 2012) (quoting *United States v. Chem. Found. Inc.*, 272 U.S. 1, 14-15 (1926)); *Shieldalloy Metallurgical Corp. v. NRC*, 707 F.3d 371, 388 (D.C. Cir. 2013) (agency action is entitled to a presumption of regularity).

An agency rule is "arbitrary or capricious" if the agency: (1) relied on factors which Congress has not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or, (4) offered an explanation so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Review under the "arbitrary and capricious" standard is "searching and careful," but "narrow." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377-78 (1989); see *also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The ultimate question under this narrow standard of review is whether the agency's action was reasonable. *FCC v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009). Courts should uphold a "decision [of] less than ideal clarity… if the agency's

path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004). In cases like this one, which does not concern a statutory gap but rather the express grant of authority to prescribe rules and standards, the agency's "judgment [is owed] more than mere deference of weight," and courts give the agency interpretation controlling weigh unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Lindeen v. Securities and Exchange Commission*, 825 F.3d 646, 656 (D.C. Cir. 2016); *see City of Los Angeles v. Barr*, 929 F.3d 1163, 1177 (9th Cir. 2019) (in such circumstances "agency's promulgations are entitled to more than mere deference or weight; rather, they are entitled to legislative effect").

**B.  The Final Timeframe Rule Was Promulgated Pursuant to Proper Procedure, Reflects Reasoned Decision-making, and is Not Arbitrary or Capricious**

Plaintiffs allege that the Timeframe Rule should be stayed, arguing that: (i) it was improperly considered separately from the Broader EAD Rules; (ii) DHS failed to consider the harms to bona fide asylum seekers; (iii) DHS failed to properly explain why a defined timeline was not included; and (iv) DHS failed to properly explain why it will no longer prioritize deciding initial EAD applications filed by asylum applicants. Plaintiffs are unable to establish the likelihood of success on the merits with respect to any of these grounds. The Timeframe Rule was promulgated after a 60-day notice of comment period, is consistent with Congressional delegated authority, and is rational in all respects.

**i.  The Final Timeframe Rule Was Properly Considered With the Broader Eligibility Requirements**

Plaintiffs' argue that DHS was required to consider the Timeframe Rule and the Broader EAD Rules together in one rulemaking process, and that the Agency's refusal to do so violated the APA in three ways: by (1) depriving the public of a meaningful opportunity to comment on relevant and important issues; (2) failing to identify and respond to relevant, significant issues raised, to the

12

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 18 of 40 PageID #:
8026
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 17 of 39

extent the public did comment on the interaction of the two rules; and (3) failing to consider important aspects of the problem. *See* Plaintiffs' Memorandum of Law (PI Motion) at 11-17.

It was wholly rational for the agency to initiate two separate notice and comment periods for two rules that were promulgated for different purposes, and doing so did not deprive the public with a meaningful opportunity to comment. The purpose of the Timeframe Rule is to ensure USCIS has sufficient time to receive, screen, and process the EAD applications. 85 Fed. Reg. 37502, 37502-37503. In contrast, the Broader EAD Rule is intended to modify regulations governing asylum applications, interviews, and eligibility for asylum application-based employment authorization in order to address the national emergency and humanitarian crisis at the border. 85 Fed. Reg. 38532, 38543.

Each NPRM informed the public about the existence of the other, and did not prohibit the public from providing comment on the impact one rule may have on another. *See* 84 Fed. Reg. 47148; Fed. Reg. 62374-75. In fact, the Timeframe NPRM itself addressed the possibility of some impacts of the Broader EAD Rules. 84 Fed. Reg. 47148 at 47150. ("USCIS recognizes that the impacts of this proposed rule could be overstated if the provisions in the broader asylum EAD NPRM are finalized as proposed."). Approximately 10 submission were received that provided comments on the Broader EAD propose rules. The Agency considered and responded to these comments and provided a rational explanation as to why the comments were deemed to be out of scope. Moreover, the Agency responded to the substance of the comments and rationally explained why the Broader EAD NPRM, if promulgated, was not material to whether or not the Timeframe Rule should be promulgated. See 85 Fed. Reg. 37502 at 37530-31 ("USCIS disagrees with the comment claim based on a reduction of EADs under the broad rule because of increased ineligibility. USCIS would still receive many EAD filings, although it is possible that more applications may not be approved due to the additional and/or

13

modified eligibility criteria proposed. In reality, because of the added criteria under the broader proposed rule, adjudication may become more complex."). The Agency further considered and discussed the impact that the Broader EAD Rules, if promulgated, could have on its analysis. See 85 Fed. Reg. 37502 at 37504. ("USCIS recognizes that the impacts of this final rule could be overstated if the provisions of…the broader asylum EAD NPRM would limit or delay eligibility for employment authorization for certain asylum applicants. Accordingly, if the population of aliens is less than estimated as a result of the broader asylum EAD rule, the estimated impacts of this rule could be overstated because the population affected may be lower than estimated in this rule.").

Thus, contrary to plaintiffs' assertion, the public was not prevented from providing comment on the interaction between the two proposed rules, DHS considered these comments, recognized the impacts that the Broader EAD Rule may have if promulgated, and then rationally concluded that possibility of the Broader EAD being finalized did not alter the result with respect to the Timeframe Rule. This is all the APA requires.

The cases relied upon by plaintiffs are distinguishable in material ways. In *United Farm Workers*, for example, the Agency sought a 10-day notice and comment period seeking to revoke a 2008 regulation and reinstate the earlier 1987 regulation. 702 F.3d 755, 769 (4th Cir. 2012). Because the two regulations had already gone through the notice and comment process, and because the Agency expressed a need for expediency, the Agency solicited comments solely with respect to whether the 2008 regulation should be suspended, and explained that it would not consider comments concerning the substance or merits of the 2008 or 1987 regulation. It was in this context that the Court found that the Agency had violated the APA's notice and comment requirements. The Court noted that the purpose of the suspension was due to difficulties in operating the program at issue under the 2008

14

regulations, "including a lack of resources, inability to implement operations, and processing delays." *Id* at 770. Based upon this purpose, the Court concluded that it was necessary for the agency to consider whether "the 2008 regulations was more or less efficient than the review process provided in the 1987 regulations," since the 1987 regulations would replace the 2008 regulation is repealed. *Id.* Similarly, *California v. United States DOI*, 381 F. Supp. 3d 1153, 1174 (N.D. Cal. 2019) considered an Agency's two separate rulemaking processes used to repeal an existing rule and to replace that same rule. In contrast to those facts, the two rules at issue in this case are not alternatives to one another, nor were they promulgated for the same purpose. This is an important distinction. Nor was the public directed to withhold any comments concerning any interaction between the two rules. And perhaps most importantly, DHS did consider, address, and explain the impact that the promulgation of the Broader EAD NPRM could have on the Timeframe Rule. None of these facts were present in *United Farm Workers* or *California*.

Plaintiffs also cite to *Bedford Cnty. Mem'l Hosp. v. Health & Human Servs.*, 769 F.2d 1017, 1020 (4th Cir. 1985) for the proposition that an agency must identify and respond to relevant, significant issues raised. As addressed above, DHS did just that here. Finally, plaintiffs' citation to *Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (1983) is misplaced largely because that regulatory scheme was so different in kind from the regulatory scheme here. There, the Court was faced with the FCC's decision to deregulate an industry in the face of a Congressional mandate requiring the FCC to regulate the industry "in the public interest." *Id.* at 1420. Here, in contrast, Congress expressly provided that no right to employment authorization exists and left it to the discretion of DHS to determine if and how such authorization should be afforded. Moreover, when the Court in *United Church of Christ* referred to a concurrent rulemaking process, it did not hold, or even suggest, that the

15

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 21 of 40 PageID #:
8029
Case 8:20-cv-02118-PX   Document 34-1   Filed 08/03/20   Page 20 of 39

FCC was required to proceed in one notice and comment period. Instead, it held that the FCC was required to "give sufficient consideration" to the proposed rules in the concurrent rulemaking proceeding. This is exactly what DHS did here.

### ii. The Final Timeframe Rules Properly Considered the Harms to Bona Fide Asylum Seekers

Plaintiffs next argue that DHS failed to account for harms that the Timeframe Rule may inflict upon bona fide asylum seekers. *See* PI Motion at 17-20. Plaintiffs are incorrect. DHS expressly acknowledged the numerous comments stating, "asylum seekers would lose wages and benefits as a result of delayed entry into the U.S. labor force, which will cause an outsized, devastating amount of harm to this already-vulnerable community." 85 Fed. Reg. 37502 at 37526. In response to these concerns, DHS acknowledged that the Rule may delay an applicant's entry into the workforce if the application requires more than 30 days to process, and that during any period of delay, the applicant's support network would be required to provide additional assistance. *Id.* In addressing these concerns, DHS explained its expectation that processing times would be similar to the FY 2017 pre-*Rosario* processing times, such that the Rule could potentially result in an average delay of 31 calendar days. *Id.*; *see also* 85 Fed Reg 37503 ("In FY 2017, prior to the *Rosario v. USCIS* court order…the adjudication processing times…exceeded the regulatory-set timeframe of 30 days more than half the time. However, USCIS adjudicated approximately 78 percent of applications within 60 days."). Thus, it cannot be said that DHS failed to consider and balance this anticipated harm with the needs to provide for an increase in processing time for some applications when necessary. In addition to the harms to bona fide asylum seekers, DHS also addressed costs related to socioeconomic factors and impacts. 85 Fed. Reg. 37502 at 37527-28. This is all the APA requires.

### iii. DHS Properly Explained Why a Defined Timeframe Was Not Included

Plaintiffs allege that DHS acted in an arbitrary and capricious manner by failing to explain why it did not impose any deadline on itself to adjudicate EAD applications. In doing so, plaintiffs argue that DHS "relied on a legally illegitimate explanation for this action: the desire to be free of any accountability." *See* PI Motion at 23. Here, contrary to the fact found in *Action on Smoking & Health v. Civil Aeronautics Bd.*, 699 F.2d 1209, 1217 (1983), which plaintiffs rely upon, DHS carefully analyzed the data, considered alternatives, balanced the competing interests, and provided a detailed rational explanation for the final rule. First, USCIS acknowledged the importance of accountability:

> USCIS acknowledges the importance of accountability and continuously seeks to improve and streamline work processes to improve efficiency and provide accurate and timely adjudicative decisions. As with any adjudication, USCIS posts processing times for these applications so that applicants can understand what to expect. Applicants have avenues to address excessive delays through case status inquiries, expedite requests when circumstances warrant, and even judicial redress through filing a mandamus action to compel a decision. Removing the 30-day timeframe does not absolve USCIS of its responsibility to adjudicate applications as quickly and efficiently as possible but does reconcile changes in processing requirements for vetting as well as increasing application volume.

85 Fed. Reg. 37502 at 37511.

Second, DHS explicitly considered alternative timeframes of 45, 60, or 90 days. 85 Fed. Reg. 37502, 37513, 37521. The Agency provided a detailed and reasoned explanation as to the why an alternative timeframe was not adopted:

> USCIS determined not to incorporate a new regulatory timeframe because USCIS is unable to plan its workload and staffing needs with the level of certainty that a binding timeframe may require, and has no way of predicting what national security and fraud concerns may be or what procedures will be necessary in the future….
> The processing of EAD applications is not simple, and increases in asylum-based filings in recent years, coupled with the changes to intake and vetting procedures, have placed a great strain on agency resources that lead to an increased processing time.

17

> DHS recognizes that removing the timeframe may cause concern to applicants regarding potential delays in adjudication; however, USCIS expects to return to the adjudicatory timeframe before *Rosario*...

85 Fed. Reg. 37502 at 37521. It was further explained that:

> DHS has seen a drastic increase in asylum applications in recent years, and this increase was not anticipated, and therefore could not have been considered when the former INS promulgated the 30-day timeframe more than 20 years ago. To promulgate another timeframe could lead to similar results and delays should volumes increase further in the future.

*Id.* at 37513.

Thus, contrary to plaintiffs' characterization that DHS simply pointed "to a need for flexibility," it did much more than that. In addition to the above discussion, DHS detailed how the asylum process has changed since the current self-imposed 30-day rule was promulgated more than 20 years ago. *Id.* at 37509. DHS explained, for example, how fraud has become more sophisticated over the last 20 years. *Id.* at 37516. This, combined with maintaining appropriate vetting while processing historically high numbers of applications, resulted in DHS concluding that the current 30-day timeframe untenable without diverting significant resources from other benefit request types. *Id.* at 37518. As such, there can be no dispute that DHS complied with the APA by articulating a satisfactory explanation.

### iv. DHS Properly Explained Why It is Removing the 30-day Processing Requirement

Plaintiffs next argue that DHS failed to "reasonably explain its departure from its prior position that it should decide initial EAD applications from asylum applicants within 30 days," given that "it had previously decided that initial asylum-applicant EADs should be treated differently because they are situated differently." *See* PI Motion at 24. To be clear, there is nothing impermissible

18

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 24 of 40 PageID #:
8052
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 23 of 39

with an agency changing its mind because of a change of administrations, change of facts, or other

factors. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., Inc.*, 545 U.S. 967 (2005); *see also*

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *Mayo Found. v. United States*, 562 U.S.

44, 53-55 (2011). Moreover, an agency is not required to justify its policy change by reasons more

substantial than those required to adopt a policy in the first instance. *See Fox Television Stations*, 556

U.S. 502, 514-15, 19 (2009).

As addressed above, there can be no dispute that a thorough and detailed explanation was

provided as to why the previously self-imposed 30-day timeframe needed to be altered. Instead,

plaintiffs' assert more specifically that DHS did not sufficiently address the distinction between

employment-based EADs and those for asylum applicants. Plaintiffs are mistaken and mischaracterize

the issue as one of prioritization. DHS explained:

> DHS recognizes that AC21[8] related to employment-based applications do not
> necessarily involve the same humanitarian considerations. However, DHS also notes
> that though AC21 was primarily focused on employment-based immigration, it did
> provide for automatic extension of EADs for those who have properly filed asylum
> applications. *See* 8 CFR 274a.13(d)(1). The purpose of the discussion referenced by the
> commenter is to make clear why DHS rejected the option of changing the 30-day
> asylum applicant EAD processing timeframe to 90 days. As DHS wrote in the
> proposed rule, maintaining any adjudication timeframe for this EAD would
> unnecessarily constrict adjudication workflows. Ultimately, USCIS is unable to plan its
> workload and staffing needs with the level of certainty that a binding timeframe may
> require, and has no way of predicting what national security and fraud concerns may
> be or what procedures would be necessary in the future.

---

[8] AC21 refers to the regulation governing employment-based immigrant and nonimmigrant visa programs. *See* 81 Fed.
Reg. 82398.

19

Fed. Reg. 37502 at 37513. Thus, while over 20-years ago, it was believed that EAD applications for asylum seekers could be adjudicated in 30-days, history has proven this assumption incorrect. Thus, DHS rationally removed the 30-day processing provision in accordance with the APA.

**C.      The Final Broader EAD Rule Was Promulgated Pursuant to Proper Procedure, Reflects Reasoned Decision-making, and is Not Arbitrary or Capricious**

Plaintiffs allege that the Broader EAD Rule should be stayed, arguing that: (i) it was improperly considered separately from the Timeframe Rule; (ii) DHS failed to consider the harms to bona fide asylum seekers; and (iii) DHS failed to establish the problem it purported to address. Plaintiffs are unable to establish the likelihood of success on the merits with respect to any of these grounds. Instead, the Broader EAD Rule was promulgated after a notice of comment period, is consistent with Congressional delegated authority, and is rational in all respects.

**i.      The Final Broader EAD Rule Was Properly Considered With the Timeframe Rule**

For all the same reasons as addressed above, it was rational and proper for the Agency to proceed through two separate notice and comment procedures given that the two Rules had different purposes. With respect to the Broader EAD Rule specifically, plaintiffs assert that whether USCIS "would take 30 days or an unregulated amount of time to adjudicate an application…was 'relevant and important' to the Broader EAD Rule. *See* PI Motion at 11-12. As was anticipated for the Timeframe Rule, the Broader Rule considered and addressed the anticipated adjudication times for EAD applications indicating that it would be similar, despite the regulatory changes. *See* 85 Fed. Reg. 38532 at 38566-89 ("From 2017 to 2020, over 80 percent of (c)(8) EADs were processed within 60 days. . . Although there is nothing in this rule that specifically will drive the EAD processing times significantly higher, on average, it is possible that some applications could take longer to process, as

20

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 26 of 40 PageID #:
8054
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 25 of 39

some of the conditions in the rule could require more resources and add complexity to adjudicative review."*), and id.* at 38612 (noting that USCIS estimates that in the future, after implementation of these rules, the processing time for EADs based on a pending asylum application will be approximately 69 days.). And as addressed more fully below, DHS acknowledged that work authorization for some bona fide asylum seekers would be delayed as a result of the Rule, but ultimately concluded that the benefits outweighed any such harm. Finally, as further evidence that DHS considered any overlap between the two rules is DHS's creation of a carve out for *Rosario* class members. *See* 85 Fed. Reg. 38532 at 38534 at n.5. As such, there was no APA violation.

### ii. The Final Broader EAD Rules Properly Considered the Harms to Bona Fide Asylum Seekers

Contrary to plaintiffs' argument, the Final Broader EAD Rule properly considered harms to bona fide asylum seekers. In fact, consistent with the 1994 rulemaking, *see* 85 Fed. Reg. 38532 at 38561 n. 102, the primary impetus of the Broader EAD Rule is to mitigate ongoing harm to bona fide asylum seekers and provide more immediate protection to bona fide asylum seekers. *See e.g.* 85 Fed. Reg. 38532 at 38543, 44, 54, 56, 58, 61, 84. For example, it was explained:

> DHS remains committed to finding options to curb abuse of the asylum system while prioritizing bona fide asylum seekers. DHS has considered alternatives, including taking no action, rescinding its regulation conferring employment authorization to all asylum seekers, hiring more staff, and accepting forms electronically. In addition to this rulemaking, DHS has undertaken a range of initiatives to address the asylum adjudication backlog and mitigate its consequences for bona fide asylum seekers, agency operations, and the integrity of the asylum system. These efforts include: (1) Revised scheduling priorities including changing from First in First out ("FIFO") order processing to LIFO; (2) staffing increases and retention initiatives; (3) acquiring new asylum division facilities; (4) assigning refugee officers to the Asylum Division; (5) conducting remote screenings; and (6) launching a pilot program for applicants seeking a route to immigration court to request cancellation of removal. USCIS already accepts several forms electronically, and is considering steps to accept the Form I-765 electronically in the future. These efforts are a top priority for the agency.

21

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 27 of 40 PageID #:
8053
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 26 of 39

*Id.* at 38584-38585.

DHS expressly noted the considerable impact on asylum applicants and provided a detailed

and reasoned explanation as to why it nevertheless finalized the rule, including, *inter alia*:

> DHS recognizes that this rule may have a substantial impact on asylum applicants, but does not agree that a 365-day waiting period for employment authorization is overly burdensome, cruel, or precludes aliens from becoming self-sufficient. For at least 24 years, the statutory and regulatory scheme set the expectation that asylum applicants must wait a minimum of 6 months, often much longer due to applicant-caused delays, before asylum applicants may apply for employment authorization. Therefore, it is not reasonable for asylum applicants to come to the United States with the expectation that they will be employment authorized immediately upon their arrival.

> … DHS believes that employment authorization must be carefully regulated, not only to protect U.S. workers, but also to maintain the integrity of the U.S. immigration system. DHS has identified (c)(8) employment authorization, with its low eligibility threshold and nearly limitless renewals, coupled with the lengthy adjudication and judicial processes, as a driver for economic migrants who are ineligible for lawful status in the United States to file frivolous, fraudulent, and otherwise non-meritorious asylum applications…. DHS acknowledges that the extended period for which aliens will not be employment authorized may impact their access to other services, but this is a temporary period. In the interim, access to some services can be mitigated by organizations that provide these services without charge….

> …Finally, DHS believes that the reforms made by this rule and recent procedural changes, like LIFO, will significantly reduce the number of filings solely for economic reasons, which in turn will ensure that bona fide asylum seekers have their claims decided in an expeditious manner…

*Id.* at 38565-38566.

In assessing the harm, DHS notes that "the average affirmatively filed asylum application

completed by USCIS was decided in 166 days in 2018," which leads to immediate employment

authorization for those the Agency grants asylum. 85 Fed. Reg. 38532 at 38608. In promulgating the

Broader EAD Rule, DHS "seeks to balance deterrence of those abusing the asylum process for

economic purposes and providing more timely protection to those who merit such protection, which

22

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 28 of 40 PageID #:
8056
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 27 of 39

includes immediate and automatic employment authorization when the asylum application is granted."
*Id.* at 38585. Accordingly, it cannot be said that DHS failed to consider the impact on bona fide asylum
applicants, or failed to provide a reasoned explanation, for the final rule. While plaintiffs may disagree
with the ultimate result, such a disagreement does not violate the APA.

### iii.   The Final Broader EAD Rules Properly Established the Problem it Addresses

Contrary to plaintiffs' arguments, the final rule discussed previous efforts to reform the
asylum system, explained why further reform is necessary, and cited Congressional testimony,
agency statistics, secondary sources, and newspaper reporting to establish the problem the rule
addresses. *See e.g.*, *id.* at 38544-46. Further, DHS responded to similar criticism in the final rule:

> DHS disagrees that this rule fails to state a sufficient rationale or lacks data to support
> the changes made by this rule. The data illustrate a clear picture of a longstanding,
> critical and growing crisis in the U.S. asylum system and the need for strengthened
> laws. Border enforcement resources, detention space, and adjudication capacity are
> far outpaced by the numbers of aliens illegally entering the United States and claiming
> asylum each year. Historical data indicate that only about twenty percent of these
> applicants are eligible for asylum. This rule, standing alone, is not intended to solve
> every aspect of the crisis in the asylum system. It is one of several measures that the
> Administration is combining to mitigate the crisis and ensure the integrity of the
> immigration system and security of our communities. According to CBP data from
> FY 2019, the level of aliens unlawfully attempting to cross the Southern border
> reached a twelve-year high and nearly doubled from the same period in the previous
> fiscal year. This increase demands that DHS respond to this crisis and strengthen and
> enforce our immigration laws. According to one DOJ–EOIR snapshot measuring
> eleven years of data, of the approximately 81% of USCIS credible fear referrals to IJs,
> only 17% of these aliens are granted asylum by an IJ. While approximately one third
> of adjudicated asylum applications stemming from a positive credible fear finding are
> granted, the commenter fails to acknowledge that about forty five percent of aliens
> with a positive credible fear finding fail to pursue their asylum claims and are therefore
> never adjudicated. According to another DOJ–EOIR snapshot, in FY 2019, DOJ–
> EOIR granted only 15.25 percent of asylum applications filed by aliens found to have
> a credible fear. Over the past five years, the average DOJ–EOIR asylum grant rate of
> cases originating with a credible fear claim is only 14.25 percent. This rule is designed
> to reduce the number of aliens who leave their home countries seeking economic
> opportunities in the United States by gaming the asylum system and its attendant

> employment authorization. DHS does not dispute that some applicants may have
> filed for asylum in good faith, but will still have their application denied. Nonetheless,
> by implementing this rule along with other measures, the integrity of the asylum
> system will be bolstered. DHS remains committed to finding options to curb abuse
> of the asylum system while prioritizing bona fide asylum seekers. DHS has considered
> alternatives, including taking no action, rescinding its regulation conferring
> employment authorization to all asylum seekers, hiring more staff, and accepting
> forms electronically. In addition to this rulemaking, DHS has undertaken a range of
> initiatives to address the asylum adjudication backlog and mitigate its consequences
> for bona fide asylum seekers, agency operations, and the integrity of the asylum
> system.

85 Fed. Reg. 38532 at 38584. Plaintiffs do not appear to dispute that the ability to obtain work

authorization through the asylum system can be an incentive for some individuals to file non-

meritorious applications. Nor do plaintiffs' appear to dispute the historical accuracy of the problem

that has sought to be mitigated by the Agency and Congress. Instead, plaintiffs purport that additional,

more detailed, data showing the extent of the problem of economic migrants who use the asylum

system as a means to obtain work authorization is necessary. As set forth above, data collected by the

Agency provides a strong inference that the asylum system is being utilized by economic migrants

without a good-faith basis to apply for asylum. Plaintiffs' demand for more exacting proof is simply

more than the APA requires. Indeed, "'[a]n agency's predictive judgments about areas that are within

the agency's field of discretion and expertise are entitled to *particularly deferential* review'" and "need not

rest on 'pure factual determinations.'" *EarthLink, Inc.*, 462 F.3d at 213 (quoting *In re Core Commc'ns,*

*Inc.*, 455 F.3d 267, 282 (D.C. Cir. 2006) & *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 594 (1981))

(emphasis in original). "Judicial deference in the immigration context is of special importance, for

executive officials 'exercise especially sensitive political functions that implicate questions of foreign

relations.'" *Negusie v. Holder*, 555 U.S. 511, 517 (2009) (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988));

*accord Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 56–57 (2014); *see also Jama v. Immigration & Customs Enf't*,

24

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 30 of 40 PageID #:
8058
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 29 of 39

543 U.S. 335, 348 (2005) (citing *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). And "a challenge to the agency's assumptions must be more than an effort by [a party] to substitute its own analysis for the agency's." *New York*, 824 F.3d at 1022. Here, while DHS acknowledged that the rule was not intended to "solve every aspect of the crisis in the asylum system," 85 Fed. Reg. 38532, 38584, an agency must be afforded discretion to make changes that it reasonably believes will have an impact on the identified problem.

### D. Acting Secretary Wolf is Properly Serving as the Acting Secretary for Homeland Security Pursuant to 6 U.S.C. 113(g)(2)

#### i. Secretary Kirstjen Nielsen's April 10, 2019 Succession Order was Lawful

Kirstjen Nielsen served as Secretary of Homeland Security between December 5, 2017 and April 10, 2019, as evidenced by the FVRA form notifying various congressional committees of the vacancy and designation of an Acting Secretary. Swartz Decl. at Ex. 5. Notwithstanding then-Secretary Nielsen's resignation letter of April 7, 2019, she remained as Secretary until April 10, 2019. *Id. see also*, Blackwell Decl at ¶ 6. Before she vacated the position, then-Secretary Nielsen issued an order on April 9, 2019 under 6 U.S.C. § 113(g)(2), expressly designating the order of succession for the Department of Homeland Security in which she stated, "I hereby designate the order of succession for the Secretary of Homeland Security as follows." Blackwell Decl. at Ex. 3. Then-Secretary Nielsen's order was unqualified and without exceptions or limitations, as was the memorandum that she signed, which contained an action line noting that "I hereby designate the order of succession for the Secretary of Homeland Security as follows." *Id.* By approving the accompanying order, she designated her desired order of succession for Acting Secretary. *Id.* at 2, and *see* Swartz Decl. ¶ 3.

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 31 of 40 PageID #:
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 30 of 39
8059

### ii. Secretary Nielsen's April 10, 2019 Succession Order Applied to All Vacancies

Plaintiffs argue that then-Secretary Neilson's succession designation "only changed the order of succession for unavailability due to a disaster or catastrophic emergency. PI Motion at 29. This is incorrect. The amendment that then-Secretary Nielsen signed explains no fewer than five times that she was designating a new "order of succession." *See* Blackwell Decl. at Ex. 3.[9] Plaintiffs' mistaken belief is based upon their reliance on a non-binding document. Specifically, DHS Delegation 00106, an administrative document that collects orders of succession, does not override or change official action taken by then-Secretary Nielsen. DHS Delegation 00106, "is an administrative document that is periodically updated to consolidate and maintain in a single document the orders of succession for many senior positions in DHS". Swartz Decl. ¶ 4. An administrative document that incompletely incorporates the Secretary's explicit order cannot supersede the Secretary's lawful order of succession.[10] *See id.* ¶ 6. The signed order amending the DHS order of succession for Acting Secretary

---

[9] The subject of the memorandum then-Secretary Nielsen signed was "Designation of an Order of Succession for the Secretary." Decl. of Juliana Blackwell, Ex. 3, Designation of an Order of Succession for the Secretary (April 9, 2019) at 1. The summary of the memorandum explained "you have expressed your desire to designate certain officers of [DHS] in order of succession to serve as Acting Secretary." Id. The action line of the memorandum noted that "[b]y approving the attached document, you will designate your desired order of succession for the [DHS Secretary]." Id. at 2. The memorandum's attachment was titled "Amending the Order of Succession in the Department of Homeland Security." Id. The text of the memorandum's attachment said, "By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security . . .").

[10] Section II.A of the original December 2016 DHS Delegation 00106 remained unchanged in the April 2019 update. As a result, section II.A said that "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016." DHS Delegation 00106. The lack of any conforming revision to section II.A was an inadvertent, ministerial error. Then-Secretary Nielsen did not change the "order of succession for the Secretary of Homeland Security" only to have a prior Executive Order continue to govern the order of succession within DHS. Notably, Executive Order 13753—which was signed in December 2016—predated the legislative amendment to 6 U.S.C. § 113(g)(2) that delegated the authority to set the DHS order of succession to the Secretary. Because then-Secretary Nielsen clearly exercised her statutory authority under § 113(g)(2) to designate the order of succession, there is no logical way to construe the unchanged reference to

26

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 32 of 40 PageID #:
8040
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 31 of 39

"was effective when she signed the order on April 9, 2019" and "would have controlled the order of

succession even if DHS Delegation No. 00106 was never updated to reflect the April 9, 2019 change."

*Id.* In sum, a Secretary's unequivocal exercise of authority delegated to her by statute cannot be

displaced by an administrative document. Then-Secretary Nielsen's April 2019 memorandum was

valid and clearly applied to any type of vacancy.

### iii. Acting Secretary Kevin McAleenan Lawfully Served as Acting Secretary, His Further Succession Delegation of November 8, 2019 is Lawful, and Acting Secretary Chad Wolf is Lawfully Serving as Acting Secretary

Pursuant to the April 9, 2019 designation of the DHS order of succession, the Customs and

Board Patrol Commissioner was third in the line to serve as Acting Secretary, behind the Deputy

Secretary and Under Secretary for Management. Blackwell Decl. at Exs. 1, 3. When then-Secretary

Nielsen resigned, then-CBP Commissioner Kevin McAleenan became the Acting Secretary by

operation of this succession order. *See* Swartz Decl. ¶ 5, Exs. 3–4.

Plaintiffs' argument that Acting Secretary Wolf is not lawfully the Acting Secretary must fail.

Mr. McAleenan properly served as Acting Secretary not pursuant to the FVRA and its 210-day

timeline, but instead pursuant to 6 U.S.C. § 113(g)(2). The FVRA is not the exclusive scheme for

acting service if there is an express office-specific statutory provision for succession. 5 U.S.C. §

3347(a). Long after the FVRA's enactment, Congress added 6 U.S.C §113(g)(2) through the National

Defense Authorization Act for Fiscal Year 2017 (Pub. L. No. 114- 328, § 1903, enacted on Dec. 23,

---

Executive Order 13753 in an administrative implementing document as anything other than an inadvertent oversight. In fact, DHS later corrected that oversight, removing the reference to Executive Order 13753 from section II.A DHS Delegation 00106 entirely. *See* Blackwell Decl. at Ex. 4. Accordingly, any potential inconsistency between then-Secretary Nielsen's April 9, 2020 order amending the order of succession and section II.A DHS Delegation 00106 is clearly the result of an inadvertent administrative oversight that has since been corrected.

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 33 of 40 PageID #:
8041
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 32 of 39

2016). As noted above, section 113(g)(2) authorizes a Secretary of Homeland Security to designate officers of the Department in further order of succession. The Secretary's statutory authority under section 113(g)(2) to designate the order of succession exists "[n]otwithstanding chapter 33 of title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). As the lawfully serving Acting Secretary, then-Acting Secretary McAleenan designated a new order of succession on November 8, 2019, pursuant to his authority under 6 U.S.C. § 113(g)(2). Blackwell Decl. at Ex. 4. This placed the Under Secretary for Strategy, Policy, and Plans next in the order of succession for Acting Secretary, after the positions of the Deputy Secretary, Under Secretary for Management, and CBP Commissioner. Blackwell Decl. at Ex. 2. Although then-Acting Secretary McAleenan designated this succession order 214 days after Secretary Nielsen's vacancy began, the 210-day time line does not pertain to designations pursuant to section 113(g)(2).

On November 13, 2019, then-Acting Secretary McAleenan resigned from the Department. Mr. Chad Wolf, the Senate-confirmed Under Secretary for Strategy, Policy, and Plans, became Acting Secretary, because the Deputy Secretary, Under Secretary for Management, and Commissioner of CBP positions were vacant. Blackwell Decl. at Ex. 2. As such, Acting Secretary Wolf is lawfully serving in that position.

## E.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

An injunction must be denied unless plaintiffs can demonstrate irreparable harm if the rules are not stayed. *Wisconsin Gas Co.*, 758 F.2d at 674 (explaining that because movants could not establish irreparable harm, the court need not address any of the other applicable factors). To establish irreparable harm, plaintiffs must show more than the "possibility" of irreparable harm, but instead

28

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 34 of 40 PageID #:
8042
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 33 of 39

must show that irreparable harm is "likely" absent an injunction. *Winter v. NRDC, Inc.,* 555 U.S. 7, 22, (2008). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Plaintiffs must demonstrate the "likelihood that immediate irreparable harm will occur" and not just a "fear of speculative or remote future injury." *Hodges v. Abraham*, 253 F. Supp. 2d 846, 864 (D.S.C. 2002). "Bare allegations of what is likely to occur are of no value" because the district court must make the determination of "whether the harm will *in fact* occur." *Wisconsin Gas*, 758 F.2d at 674 (emphasis original). Irreparable harm must be "both certain and great; it must be actual and not theoretical," and "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wisconsin Gas*, 758 F.2d at 674.

As an initial matter, all plaintiffs are organizations and not individuals seeking asylum. As such, because organizations to do not submit EAD applications on their own behalf, plaintiffs cannot establish that they will suffer irreparable harm if the rules are not stayed. The plaintiffs instead speculate about the general loss of revenue and increased expenses they may have to incur based upon, *inter alia*, the need to increase expense for research and education and training. Such general and speculative allegations, without any showing or accounting, is insufficient to demonstrate irreparable harm to warrant a stay. Moreover, as addressed below, the plaintiffs' fail to allege any irreparable harm that stems directly from the Timeframe Rule or Broader EAD Rule in particular.

**A.      Plaintiffs Have Not Demonstrated They Will Suffer Irreparable Harm if the Timeframe Rule is not Stayed Pending Resolution of this Action**

Whether any asylum seeker who applies for EAD on or after August 21, 2020 will suffer irreparable harm if the final rule is implemented is purely speculative. First, it must be recognized that "the average affirmatively filed asylum application completed by USCIS was decided in 166 days in 2018. 85 Fed. Reg. 38532, 38608. This means, on average, for those affirmative asylum seekers granted asylum by the Agency, work authorization is available prior to the need to have an EAD application even adjudicated under the current law. Even for those asylum applicants who will rely upon EAD applications, USCIS anticipates that under the new Timeframe Rule, processing times will be similar to the FY 2017 pre-*Rosario* processing times, meaning the best estimate is that the Rule would result in an average delay of 31[11] calendar days. *Id*; *see also* 85 Fed Reg at 37503. It cannot be said that a 31-day delay of work authorization would constitute irreparable harm to an individual, or to any of the plaintiff organizations. And of course, if any applicant believes that their application is pending for an unreasonable amount of time, avenues to address excessive delays exist. 85 Fed. Reg. 37502, 37511; *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) (reasoning that "[t]he possibility that adequate compensatory and other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm.").

**B.      Plaintiffs Have Not Demonstrated They Will Suffer Irreparable Harm if the Broader EAD Rule is not Stayed Pending Resolution of this Action**

Plaintiffs allege their clients may be harmed in obtaining employment authorization by the Broader EAD Rule's amended waiting period (180 days minimum, to 365 calendar days for eligibility),

---

[11] This assumption does not take into account any delays that may be the result of the current COVID situation.

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 36 of 40 PageID #:
8044
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 35 of 39

and state generally that their clients may not qualify under the new eligibility criteria. Both contentions are speculation, do not amount to imminent harm, and do not meet the burden to warrant injunctive relief. As noted, "the average affirmatively filed asylum application completed by USCIS was decided in 166 days in 2018," which leads to immediate employment authorization for those granted asylum by the Agency. 85 Fed. Reg. 38532 at 38608. Thus, the 365-day waiting period will not even be applicable to many asylum seekers. Additionally, it is entirely likely that certain applicants will receive an EAD *more* quickly under the new 365-calendar day rule than under the current 180-day waiting period because calculation of the latter includes delays in the asylum adjudication caused or requested by the applicant, whereas the former does not. 85 Fed. Reg. 38532, 38547-48 ("The 180-day Asylum EAD Clock excludes delays requested or caused by the applicant and does not run again until the applicant cures the delay or until the next scheduled event in a case, such as a postponed interview, or a continued hearing); s*ee* EOIR-USCIS joint notice, *The 180-day Asylum EAD Clock Notice*., https://www.uscis.gov/sites/default/files/Asylum_Clock_Joint_Notice_-_revised_06-08-2018.pdf (last updated June 8, 2018). This means that the time an applicant utilizes to find an attorney or assemble evidence, for example, will not affect the 365-day waiting period; instead, only unresolved applicant-caused delays in the adjudication of the asylum application that exist on the date the initial EAD application is filed will affect eligibility for employment authorization. 85 Fed. Reg. 38532 at 38549.

Finally, many of the Broader EAD Rule's provisions are prospective and only apply to behavior that will occur on or after August 25, 2020. For example, the illegal entry bar, one-year-filing-bar, and new criminal bars only apply to future behavior. Plaintiffs fail to establish how any of the eligibility criteria might apply to their clients, and therefore fails to amount to imminent harm.

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 37 of 40 PageID #:
8045
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 36 of 39

### C.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF THE DEFENDANTS

Before granting injunctive relief, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief' and "should pay particular regard for the public consequences in employment the extraordinary remedy of injunction." *Winter v. NRDC, Inc.,* 555 U.S. 7, 24, 129 S. Ct. 365, 376-77 (2008) (citations omitted) ("the District Court and the Ninth Circuit significantly understated the burden the preliminary injunction would impose on the Navy's ability to conduct realistic training exercises, and the injunction's consequent adverse impact on the public interest in national defense."). When the Government is a party, the balance of equities and the public interest should be considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As discussed in detail above, the purpose of the Timeframe Rule is to ensure that USCIS has sufficient time to receive, screen, and process applications for an initial grant of employment authorization, based on a pending asylum application. 85 Fed. Reg. at 37502. This change would also reduce opportunities for fraud and protect the security-related processes undertaken for each EAD application. 85 Fed. Reg. at 37502. Moreover, the Timeframe Rule is necessary to permit DHS to reallocate limited resources that have been diverted to comply with the *Rosario* order. Should this Court stay the Timeframe Rule, USCIS will necessarily be required to continue to divert significate resources from other immigration benefit request types, which will cause irreparable harm. As such, a stay of this goal would be against the public interest.

With respect to the Broader EAD Rule, the purpose the rule is, *inter alia*, to curb abuse of the asylum system while prioritizing bona fide asylum seekers. 85 Fed. Reg. 38532, 38584-38585. A stay

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 38 of 40 PageID #:
8046
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 37 of 39

of the Broader EAD Rule would be against the public interest, because the interest in addressing the crisis at the Southern border and its strain on sovereignty, rule of law, and resources, coupled with the ongoing harm to bona fide applicants lost in a pool of non-meritorious applicants, outweighs the speculative harm alleged by Plaintiffs. It is always in the public interest to protect the country's borders and enforce its immigration laws, and the requested injunction would frustrate the federal government's "law enforcement and public safety interests," *Maryland v. King*, 567 U.S. 1301, 1303 (2012), and the "public interest in effective measures to prevent the entry of illegal aliens" at the Nation's borders, *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). *See also Landon v. Plasencia*, 459 U.S. 21, 34 (1982). Here, there can be no dispute that since 2016, the United States has experienced an unprecedented surge in the number of aliens who enter the country unlawfully across the southern boarder. *See* 85 Fed. Reg. 38532, 38545. In FY 2019, for example, CBP apprehended over 800,000 individuals attempting to enter the U.S. illegally, which is more than double the year prior. *Id.* There is consistent historical evidence that approximately 20 percent or less of such asylum claims will be successful. *Id.* The large influx has consumed an inordinate amount of DHS's resources, which includes surveilling, apprehending, screening, and processing the aliens who enter the country, detaining many aliens pending further proceedings, and representing the United States in immigration court proceedings. *Id.* The surge has also consumed substantial resources at DOJ–EOIR, whose IJs adjudicate asylum claims. *Id.* In order to maintain the very integrity of the asylum system, it is imperative that DHS take all necessary measures to create disincentives to come to the United States for aliens who do not fear persecution based on the five protected grounds of race, religion, nationality, political opinion, or membership in a particular social group, or fear torture. *Id.*

Case 1:17-cv-05228-NGG-VMS   Document 273-8   Filed 08/28/20   Page 39 of 40 PageID #:
80441
Case 8:20-cv-02118-PX   Document 41   Filed 08/03/20   Page 38 of 39

Finally, weighing against injunctive relief, the Government asks the Court to consider the fact that USCIS had notified the public and its employees that, absent congressional intervention, USCIS may need to furlough over 13,000 USCIS employees. *See* Deputy Director for Policy Statement on USCIS' Fiscal Outlook, https://www.uscis.gov/news/news-releases/deputy-director-for-policy-statement-on-uscis-fiscal-outlook (last visited July 30, 2020). While initially scheduled to go into effect on August 3, 2020, USCIS informed employees it was able to delay the furloughs until August 30, 2020.

### D.   ANY RELIEF SHOULD BE NARROW AND LIMITED TO THE PLAINTIFFS

Article III requires that a "remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Injunctions that go beyond Plaintiffs' own injuries exceed the power of a court sitting in equity, which must limit injunctions to "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). "[T]he purpose of" preliminary equitable relief "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). Courts thus "need not grant the total relief sought by the applicant but may mold [their] decree to meet the exigencies of the particular case." *Id.*; *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 126, 129 (D.D.C. 2015), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017) ("the Court has not finally determined that the [action] is unlawful," so "the need for narrow tailoring ... is particularly important," and any "injunction should be limited in scope to protect only" parties). Accordingly, the Fourth Circuit has held that nationwide injunctions may be broader than necessary

34

Case 1:17-cv-05228-NGG-VMS  Document 273-8  Filed 08/28/20  Page 40 of 40 PageID #:
8048
Case 8:20-cv-02118-PX  Document 41  Filed 08/03/20  Page 39 of 39

in APA case. *Virginia Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language of the APA ... requires us to exercise such far-reaching power."). Accordingly, should this Court find that an injunction is warranted, it must be narrowly tailored and need not be nation-wide.

Here, the Timeframe Rule and the Broader EAD Rule have different purposes and should be analyzed separately. Similarly, the Broader EAD Final Rule amends seven separate regulations and contains many provisions relating to the filing of the asylum application and asylum interviews that are not being challenged Here, plaintiffs focus primary on the purported imminent harm associated with the 365-day waiting period. Should the Court find immediate harm based upon one or some of the rules, but not all the rules, the Court should not enjoin the whole rulemaking. Indeed, DHS included a severability clause in 208.7(c) that would permit this Court to stay one provision without staying the entire rule, should the Court find that appropriate.

## CONCLUSION

Wherefore, the defendants request that plaintiff's motion for a stay or preliminary injunction be denied.

Respectfully submitted,

ROBERT K. HUR
United States Attorney

    Jane E. Andersen    /s/
Jane E. Andersen (Bar No: 802834))
Assistant United States Attorney
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770
(301) 344-4422
Jane.Andersen@usdoj.gov