# Exhibit 13

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.B.-B., *et al.*,<br><br>              *Plaintiffs*,<br><br>       v.<br><br>MARK A. MORGAN, Acting Commissioner, United States Customs and Border Protection, *et al.*,<br><br>              *Defendants*. | Case No. 20-cv-846-RJL<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Case 1:17-cv-05228-NGG-VMS   Document 273-13   Filed 06/28/20   Page 2 of 21 PageID #:
8133
Case 1:20-cv-00846-RJL   Document 24   Filed 06/01/20   Page 2 of 20

# TABLE OF CONTENTS

**Page**

ARGUMENT ..................................................................................................................... 1

    A.    CBP Did Not Lawfully Approve the MOA. .................................................... 1

        1.    Defendants Violated the FVRA By Unilaterally Overriding Its
            Default Rule. ........................................................................................ 1

        2.    The FVRA's Time Limits Expired Before Morgan Approved the
            MOA. .................................................................................................... 3

    B.    The MOA Cannot Be Ratified. ...................................................................... 5

        1.    Mr. Wolf Is Not the Legitimate DHS Acting Secretary and Cannot
            Ratify the MOA. .................................................................................. 5

        2.    The FVRA Prohibits Ratification of the MOA. .................................... 6

    C.    The MOA Violates the Immigration and Nationality Act. ................................. 10

    D.    Without the MOA, CBP Agents Would Not Have Conducted Plaintiffs'
        Credible Fear Interviews. ................................................................................ 13

    E.    Injunctive Relief Is Warranted. ....................................................................... 15

CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC,*
    No. 18-1334, slip op. (U.S. June 1, 2020) .................................................................................2

*L.M.-M. v. Cuccinelli,*
    2020 WL 985376 (D.D.C. Mar. 1, 2020)...................................................................6, 8, 9, 15

*M.M.V. v. Barr,*
    1:19-cv-02773-ABJ (D.D.C.) ......................................................................................................13

*Matal v. Tam,*
    137 S. Ct. 1744 (2017)...................................................................................................................9

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014)...................................................................................................................2

*NRLB v. SW Gen., Inc.,*
    137 S. Ct. 929 (2017).........................................................................................................1, 2, 3, 8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 345 (2012)...............................................................................................................8

*Trump v. IRAP,*
    137 S. Ct. 2080 (2017).................................................................................................................15

*United States Ass'n of Reptile Keepers, Inc. v. Jewell,*
    106 F. Supp. 3d 125 (D.D.C. 2015)..........................................................................................15

**Statutes**

5 U.S.C. § 3345 .................................................................................................................................3, 4

5 U.S.C. § 3346 .....................................................................................................................................3

5 U.S.C. § 3347 .................................................................................................................................8, 9

5 U.S.C. § 3348 .........................................................................................................................4, 6, 7, 9

6 U.S.C. § 112 ...................................................................................................................................7, 8

6 U.S.C. § 113 .......................................................................................................................................7

6 U.S.C. § 211 .......................................................................................................................................7

6 U.S.C. § 271 .......................................................................................................................................7

Case 1:17-cv-05228-NGG-VMS    Document 273-12    Filed 06/28/20    Page 5 of 21 PageID #:
Case 1:20-cv-00846-RJL    Document 24    Filed 06/01/20    Page 4 of 20
8135

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

6 U.S.C. § 542 ............................................................................................................7

8 U.S.C. § 1158 .........................................................................................................11

8 U.S.C. § 1225 ....................................................................................................10, 11

8 U.S.C. § 1229a .......................................................................................................11

8 U.S.C. § 1252 .............................................................................................11, 13, 14

28 U.S.C. § 509 ...........................................................................................................9

Act of July 23, 1868, ch. 227, § 2, 15 Stat. 168, 168 ...............................................4

**Other Authorities**

144 Cong. Rec. S12823 (daily ed. Oct. 21, 1998) .....................................................4

23 Op. O.L.C. 60 (1999) .............................................................................................4

*Deputy Commissioner Robert E. Perez*, https://www.cbp.gov/about/leadership-
    organization/deputy-commissioner ......................................................................2

Morton Rosenberg, Cong. Research Serv., No. 98-892, *The New Vacancies Act:
    Congress Acts to Protect the Senate's Confirmation Prerogative* (1998) ..............8

Office of Legal Counsel, *Designating an Acting Dir. of the Bureau of Consumer
    Fin. Prot.*, 2017 WL 6419154 (Nov. 25, 2017) ....................................................3

S. Rep. No. 105-250 (1998) ...............................................................................2, 6, 8, 9

Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*,
    2017 Cato Sup. Ct. Rev. 151 .................................................................................8

**Rules and Regulations**

Fed. R. Evid. 201(b)(2) ...............................................................................................2

8 C.F.R. § 208.30(d) .................................................................................................11

84 Fed. Reg. 55,251, 55,265 (Oct. 16, 2019),
    https://www.govinfo.gov/content/pkg/FR-2019-10-16/pdf/2019-21980.pdf ...........2

84 Fed. Reg. 67,279, 67,281 (Dec. 9, 2019),
    https://www.govinfo.gov/content/pkg/FR-2019-12-09/pdf/2019-26445.pdf ...........2

Case 1:17-cv-05228-NGG-VMS  Document 273-12  Filed 06/28/20  Page 6 of 21 PageID #:
8136
Case 1:20-cv-00846-RJL  Document 24  Filed 06/31/20  Page 5 of 20

On May 12, 2020, this Court held a hearing on Plaintiffs' motion for a preliminary injunction. By minute entry, the Court then authorized the parties to file supplemental pleadings based on issues raised during argument. Plaintiffs respectfully submit this supplemental brief.

## ARGUMENT

### A.    CBP Did Not Lawfully Approve the MOA.

Plaintiffs have established two independent reasons that Mark Morgan's approval of the MOA was unlawful: (1) his designation as Acting CBP Commissioner violated the FVRA's "first assistant" rule, and (2) his approval came after the FVRA's time limits on acting service had expired. Either reason is sufficient to establish that Plaintiffs are likely to succeed on the merits.

#### 1.    *Defendants Violated the FVRA By Unilaterally Overriding Its Default Rule.*

As the Supreme Court has explained, 5 U.S.C. § 3345(a)(1) creates a "mandatory and self-executing" default rule: "The first assistant '*shall* perform' acting duties" of an office when it becomes vacant. *NRLB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017). "The President"—and no one else—"may override that default rule by directing [a different person] to become the acting officer instead," *id.* at 935, and *only if* that choice meets the criteria of § 3345(a)(2) or (a)(3).

But Defendants take a different view: "it was the Acting Secretary['s] revision of th[e] order of succession that controls here, whether or not it was influenced by . . . the White House." Tr. 28–29. Defendants contend that the *agency head* can unilaterally override the default rule by fiat, directing Morgan to be the acting officer instead of the first assistant as required by law. And according to Defendants, the agency head can do so without obeying the restrictions in § 3345(a)(2) or (a)(3). *See* Tr. 7–14. None of this is correct. *See SW Gen., Inc.*, 137 S. Ct. at 935.

As Plaintiffs explained at the hearing, on November 13, 2019—when Defendants claim that the vacancy began—CBP had a Deputy Commissioner in place (Robert Perez) who was the

"first assistant" to the office of the Commissioner.[1]  Thus, Mr. Perez automatically became Acting Commissioner on November 13 by operation of law.  Yet Acting Secretary Chad Wolf sought to override § 3345(a)(1) because he preferred Morgan as the Acting Commissioner instead.

Mr. Wolf's maneuver conflicts with the FVRA.  If permitted, "an agency [could] always replace the default Acting Officer with anyone they want, whenever they want, and without the President's involvement, simply [by] replacing the first assistant."  Tr. 11.  Accepting this view would give the executive branch license to ignore the requirements of the FVRA and the Appointments Clause itself:  Agencies could simply choose their own acting officers, without restriction, by designating anyone as a vacant office's new first assistant.  That would undermine the "critical structural safeguard" of the Senate's advice and consent, *SW Gen.*, 137 S. Ct. at 935 (quote omitted), a safeguard "designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty," *id.* at 949 (Thomas, J., concurring) (quoting *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2593 (2014) (Scalia, J., concurring in the judgment)); *see Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, No. 18-1334, slip op. at 6–7 (U.S. June 1, 2020).

Contrary to Defendants' claims, obeying the Appointments Clause and the FVRA "does not mean that the duties of [the CBP Commissioner] needed to go unperformed."  *SW Gen.*, 137 S. Ct. at 944.  The Deputy Commissioner is exactly the type of "career official with knowledge of

---

[1]   *See* Dkt. 17-1, at ECF p. 57, 80–81 (the Deputy Commissioner was designated as the first assistant until November 14); PI Mem., Ex. 14 (Robert Perez was "the current deputy commissioner"); *see also* 84 Fed. Reg. 55,251, 55,265 (Oct. 16, 2019), https://www.govinfo.gov/content/pkg/FR-2019-10-16/pdf/2019-21980.pdf (Perez was Deputy Commissioner in October 2019); 84 Fed. Reg. 67,279, 67,281 (Dec. 9, 2019), https://www.govinfo.gov/content/pkg/FR-2019-12-09/pdf/2019-26445.pdf (Perez remained Deputy Commissioner in December 2019); Fed. R. Evid. 201(b)(2) (allowing judicial notice of facts "readily determined from sources whose accuracy cannot reasonably be questioned").

Case 1:17-cv-05228-NGG-VMS   Document 273-13   Filed 06/28/20   Page 8 of 21 PageID #:
8138
Case 1:20-cv-00846-RJL   Document 24   Filed 06/01/20   Page 8 of 20

the office" whom Congress expected would typically fill vacancies under the FVRA.  *See* S. Rep.
No. 105-250 at 12; *Deputy Commissioner Robert E. Perez*, https://www.cbp.gov/about/leadership-organization/deputy-commissioner.  Wolf replaced him not to keep the agency running, but
because he preferred someone else.  To be sure, "*the President* could have appointed another
person to serve as the acting officer" under § 3345(a)(2) or (a)(3), and the President "had a wide
array of individuals to choose from."  *SW Gen.*, 137 S. Ct. at 944 (emphasis added).  "The
President, however, did not do so," *id.*, as Defendants conceded, Tr. 28.  Thus, Morgan's service
violated the FVRA, and he could not legally approve the MOA.  *See SW Gen.*, 137 S. Ct. at 944.

  **2.**  ***The FVRA's Time Limits Expired Before Morgan Approved the MOA.***

  Even if 5 U.S.C. § 3345 could have permitted Morgan to become CBP's new Acting
Commissioner in November 2019, Defendants would still need to show that the vacancy began
that month.  If the vacancy instead began the previous April, *see* PI Reply 7–9, the time limits of
5 U.S.C. § 3346 expired well before Morgan approved the MOA.  And contrary to Defendants'
position, the vacancy indeed began in April, when Kevin McAleenan stopped performing the
Commissioner's duties and directed someone else to run the agency in his place.

  Defendants argue that, as long as McAleenan still held the Commissioner's office, there
was no "vacancy" within the meaning of the FVRA.  As they put it, McAleenan "only became
Acting Secretary by virtue of his position as the Senate-confirmed Commissioner of CBP. . . .
[T]he only reason he was permitted to ascend to the Acting Secretary role was because . . . he still
held that office." Tr. 27.  According to Defendants, temporary vacancies that arise when an officer
is "unable to perform the functions and duties of the office," 5 U.S.C. § 3345(a), are not vacancies
under the FVRA.  But this contradicts the statute's plain text.  *See id. and* § 3346(a) (referencing
"a vacancy caused by sickness").  Even the Justice Department has repudiated Defendants' view.
*See* Office of Legal Counsel, *Designating an Acting Dir. of the Bureau of Consumer Fin. Prot.*,

2017 WL 6419154, at *3 (Nov. 25, 2017) ("an officer is 'unable to perform the functions and duties of the office' during both short periods of unavailability, such as a period of sickness, and potentially longer ones" (citing 23 Op. O.L.C. 60, 61 (1999)).[2]

Despite all evidence, *see* PI Reply 7–9, Defendants also insist that McAleenan "continued to serve as the CBP Commissioner while serving as Acting Secretary." Defs. Opp. 38. Yet Defendants failed to substantiate that claim during the hearing, just as they failed to do so in their opposition. In fact, the only evidence Defendants cited proves the opposite. *See* PI Reply 9. That evidence shows that McAleenan, *by his own estimation*, was unable to perform the duties of CBP Commissioner once he began work as the purported Acting Secretary of DHS. He immediately handed over the reins to someone else, whom he ordered to act as Commissioner for as long as he was serving as Acting Secretary. That person (first John Sanders, then Mark Morgan) proceeded to run CBP as its "Acting Commissioner." PI Mem. 11 & n.9; *id.*, Ex. 1, at 5 (July MOA). The only thing that changed in November 2019, when McAleenan left government, was that this temporary vacancy became a permanent one. But the vacancy began in April when McAleenan first became "unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). Thus, the FVRA's time limits expired well before Morgan approved the MOA on behalf of CBP.[3]

---

[2]   The Vacancies Act, which the FVRA amended, has *always* covered temporary vacancies: for 130 years, the Act referred to "death, resignation, absence, or sickness." Act of July 23, 1868, ch. 227, § 2, 15 Stat. 168, 168. Congress broadened that language even further in the FVRA, *see* 5 U.S.C. § 3345(a), in order "[t]o make the law cover all situations when the officer cannot perform his duties," 144 Cong. Rec. S12823 (daily ed. Oct. 21, 1998) (Sen. Thompson).

[3]   Even if the time limits had not expired, *and* Morgan's appointment were lawful, Defendants still would need to demonstrate that Mark Koumans had the authority to approve the MOA on behalf of USCIS. *See* Tr. 5. But in January 2020, the office of USCIS Director was vacant. And as Defendants concede, no one could lawfully have served as the Acting Director, because the FVRA's time limits for that office had expired. Defs. Opp. 34 n.8. In that situation, the FVRA prohibited anyone, except the Secretary of Homeland Security, from "perform[ing] any function or duty of such office." 5 U.S.C. § 3348(b)(2). And one of those functions or duties

4

Case 1:17-cv-05228-NGG-VMS   Document 273-13   Filed 06/09/20   Page 10 of 21 PageID #:
8140
Case 1:20-cv-00846-RJL   Document 24   Filed 06/01/20   Page 9 of 20

**B.      The MOA Cannot Be Ratified.**

Because Defendants' execution of the MOA violated the FVRA in multiple ways, they now stake their prospects on Chad Wolf's purported "ratification" of the MOA, which they argued at the hearing "resolves . . . any potential defect in the service of the individual officers at issue in this case." Tr. 18.  But Wolf's purported ratification—like the MOA itself—is invalid.

### 1.      *Mr. Wolf Is Not the Legitimate DHS Acting Secretary and Cannot Ratify the MOA.*

Chad Wolf cannot ratify anything because he is not lawfully serving as Acting Secretary of DHS.  Wolf holds that position only because of an order signed by the former Acting Secretary, Kevin McAleenan.  Defs. Opp. 7.  But McAleenan himself held that position unlawfully, so his attempt to make Wolf his successor is void under the FVRA.  *See* PI Mem. 18–20.

Although Defendants argue that McAleenan's tenure was lawful, *see* Defs. Opp. 6–7, 36; Defs.' Ratif. Notice 5 n.2, the records they have cited do not support their claim.  Instead, those records show that the last Senate-confirmed DHS Secretary, Kirstjen Nielsen, changed the order of succession for temporary vacancies caused by emergencies but left in place the order of succession for *permanent vacancies caused by resignations*, which continued to be "governed by Executive Order 13753."  Dkt. 17-1, at ECF p.12.  Only much later, in November 2019, did DHS change the succession order for permanent vacancies, this time substituting a new succession order in place of the executive order.  Pls.' Resp. to Ratif. Notice 2–4.

At the hearing, Defendants changed their tune, claiming instead that Secretary Nielsen's change to the order of succession "was not implemented per her direction." Tr. 29.  According to

---

was establishing USCIS policy for performing credible fear adjudications. *See infra* at 7 n.4. Thus, in January 2020, no one but the Secretary could have approved the MOA on behalf of USCIS.  Koumans's approval of the MOA therefore had "no force or effect." *Id.* § 3348(d)(1).

Case 1:20-cv-00846-RJL   Document 24   Filed 06/01/20   Page 11 of 20

Defendants, "it was essentially an error in how it was implemented from Secretary Nielsen's direction, and that was fixed subsequently [in November] to remove any reference to the Executive Order." Tr. 30. In short, Defendants argue they are not bound by the express terms of the order of succession because, according to counsel, it *should have* said something different. That is a stunning proposition.

Defendants also asserted without support that there is some "ambiguity in the record" concerning the meaning of the succession order. Tr. 29. But they identified no ambiguity, or any plausible textual basis for their position. Nor have they cited any record evidence, or any declaration from Nielsen or others involved in updating the succession order, to support their account of what Nielsen intended. Instead, Defendants ask the Court to ignore the plain text of their own document in favor of counsel's naked assertion that the order does not mean what it says.

In short, despite a full opportunity to submit whatever evidence they wished, Defendants have failed to show that either McAleenan or Wolf validly became Acting Secretary. As a result, Wolf's purported ratification of the MOA is without force and effect under the FVRA.

### 2. *The FVRA Prohibits Ratification of the MOA.*

Even if Wolf were lawfully serving as Acting Secretary, the FVRA prohibits ratification of the MOA. The FVRA makes clear that, when "any person" who is not validly filling a vacant office performs a "function or duty" of that office, the person's action "shall have no force or effect" and "may not be ratified" by others. 5 U.S.C. § 3348(d). This rule against ratification is critical to the FVRA's effectiveness. Without it, the possibility of ratification would mean that "no consequence will derive from an illegal acting designation." S. Rep. No. 105-250 at 8 (1998).

For purposes of § 3348(d), the FVRA defines a "function or duty" as including "any function or duty of the applicable office that is established by statute and is required by statute to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2)(A). This standard

is met when a statute "provide[s] that the function or duty at issue is assigned to one particular office." *L.M.-M. v. Cuccinelli*, 2020 WL 985376, at *21 (D.D.C. Mar. 1, 2020).

This rule against ratification applies here. The decision to commit CBP to the terms of the MOA—including the new responsibilities and the new uses of resources and personnel it entails—is a decision assigned by statute exclusively to the office of CBP Commissioner. *See* PI Mem. 12–13. The Homeland Security Act (HSA) makes the Commissioner the "head" of CBP, 6 U.S.C. § 211(b)(1), and entrusts him with "the management of U.S. Customs and Border Protection," *id.* § 211(d); *see id.* § 211(c) (listing duties). The HSA also directs the Commissioner to "administer" the immigration laws in coordination with other agencies, *id.* § 211(c)(8), to establish "standard operating procedures," *id.* § 211(c)(16) & (k), and to "[e]stablish and oversee the administration of the policies for performing the Border Patrol . . . functions" vested in CBP, *id.* § 542 Note. No statute assigns these functions and duties to any other official. Instead, the HSA makes clear that the Commissioner "shall perform the functions specified by law for [the Commissioner]'s office." *Id.* § 113(f); *see id.* § 113(a)(1)(C). The consequence is that no one may ratify Mark Morgan's approval of the MOA on behalf of CBP. 5 U.S.C. § 3348(d)(2).[4]

Defendants have no persuasive response. They rely entirely on a provision that vests the DHS Secretary with the functions of all Department officials and permits the Secretary to delegate some of those functions to others. *See* 6 U.S.C. § 112(a)(3), (b)(1). As Defendants see it, because "the Secretary performs the functions and duties of all officers in his department," Tr. 20, and

---

[4]    Likewise, no one may ratify Mark Koumans's approval of the MOA on behalf of USCIS. *Id.* Establishing USCIS's policies for making credible fear determinations is a "function or duty" assigned by statute exclusively to the USCIS Director: "The Director . . . shall establish the policies for performing such functions as are . . . vested in the Director by law," 6 U.S.C. § 271(a)(3)(A), and one of those functions is "[a]djudicat[ing] . . . asylum and refugee applications," along with "[a]ll other adjudications," *id.* § 271(b)(3), (5). The MOA establishes policies for performing such adjudications. *See* Complaint, Ex. A, at 1.

7

because the Secretary may re-delegate his functions and duties, *any* responsibility assigned by statute to *any* DHS official may be ratified, notwithstanding § 3348.

But the text, structure, and purpose of the law refute that notion.  The delegation provision on which Defendants rely states that it applies "except as otherwise provided by this chapter." 6 U.S.C. § 112(b)(1).  As that caveat expressly confirms, the general vesting-and-delegation provision in § 112 cannot overcome the assignment of specific powers to specific officers elsewhere in the HSA."[I]t is a commonplace of statutory construction that the specific governs the general."  *SW Gen.*, 137 S. Ct. at 941 (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 345 (2012)) (quote omitted).Permitting the general language of that provision to trump the specific language of the CBP and USCIS statutes would also lead to untenable results. For example, the Secretary could withdraw the statutory authority of the USCIS Director to establish that agency's policies, and instead reassign that authority to "any officer, employee, or organizational unit of the Department," 6 U.S.C. § 112(b)(1), even while a Senate-confirmed officer is properly serving as USCIS Director.

Moreover, "[i]t was the pervasive use of those vesting-and-delegation statutes . . . that convinced Congress of the need to enact the FVRA" in the first place.  *L.M.-M.*, 2020 WL 985376, at *23 (quoting S. Rep. No. 105-250 at 7).  In the 1970s, the Department of Justice adopted the position that any agency "whose authorizing legislation" includes a general vesting-and-delegation provision "d[id] not have to comply" with the predecessor to the FVRA. Morton Rosenberg, Cong. Research Serv., No. 98-892, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative*, at 1 (1998).  But because virtually *all* federal departments are governed by such provisions, this interpretation rendered that statute "largely toothless."  Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151, 155.

In response, Congress enacted the FVRA and made it "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office." 5 U.S.C. § 3347(a). And while Congress permitted certain exemptions from the FVRA's restrictions, *id.* § 3347(a)(1), (2), Congress explicitly provided that statutes that merely "provid[e] general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head" cannot be used to avoid compliance with the FVRA. *Id.* § 3347(b); *see* S. Rep. No. 105-250 at 17. Thus, "the mere fact that a department head is also vested with all functions specifically vested in other department officers and employees cannot, standing alone, defeat the enforcement mechanisms found in the FVRA's vacant-office provision." *L.M.-M.*, 2020 WL 985376, at *21.

Indeed, that outcome would undo Congress's careful work in enacting the FVRA. "[E]very cabinet-level department has some version of [a] vesting and delegation statute," *id.* at *23 (quote omitted), so this logic "would cover all (or almost all) departments subject to the FVRA," *id.* at *20, exempting all of their officers from § 3348's penalty. Defendants' interpretation thus produces a quintessentially "absurd result," *Matal v. Tam*, 137 S. Ct. 1744, 1756 n.4 (2017), effectively interpreting § 3348's penalty out of existence.[5]

Defendants' only other response is to cite internal DHS documents that supposedly permit officials besides the USCIS Director to transfer USCIS's authority to other agencies. *See* Tr. 20. That is a non-sequitur. The FVRA prohibits an action from being ratified when Congress has assigned the authority over that action to a specific officer by statute. 5 U.S.C. § 3348(a)(1) &

---

[5]    Indeed, as Defendants see it, Congress failed to account for the very controversy that incited the FVRA's passage—the Clinton administration's designation of Bill Lann Lee as the acting head of the Justice Department's Civil Rights Division after the Senate declined to confirm him to that office. *See* Rosenberg, *supra*, at 1. Because the Attorney General, like the Secretary of Homeland Security, is vested with all the powers of his or her Department, *see* 28 U.S.C. § 509, no action taken by an improperly serving head of the Civil Rights Division could ever be ineligible for ratification under § 3348(d), according to Defendants' interpretation.

Case 1:17-cv-05228-NGG-JMS   Document 273-13   Filed 06/08/20   Page 15 of 21 PageID #:
8145
Case 1:20-cv-00846-RJL   Document 24   Filed 06/01/20   Page 14 of 20

(d)(2). Internal delegations of authority within DHS are obviously not statutory assignments of authority made by Congress. And this response, even by its own terms, relates only to *USCIS's approval* of the MOA. Defendants have cited no DHS documents that even purport to allow someone other than CBP's Commissioner to approve a policy like this on behalf of CBP.

In sum, neither DHS's internal delegations, nor the Secretary's vesting-and-delegation statute, changes the conclusion here: Morgan's act of approving the MOA cannot be ratified.

## C. The MOA Violates the Immigration and Nationality Act.

Although Plaintiffs' case under the FVRA is overwhelming, this Court need not resolve the FVRA questions raised here to grant Plaintiffs a preliminary injunction. Plaintiffs have also brought claims under other statutes, and Defendants effectively conceded at argument that Plaintiffs are entitled to prevail on their claim under the INA.

The INA sets forth specific and clear requirements concerning who may conduct credible fear interviews. Only "asylum officers" may conduct these interviews, and only after receiving "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum] applications." 8 U.S.C. § 1225(b)(1)(B) & (E).

Defendants have conceded that CBP agents *do not* receive the full scope of training provided to full-time adjudicators of asylum applications. *See* PI Reply 17–18. During the hearing, Defendants doubled down on their claim that this "full scope of training" is "not required," based on their judgment that the "discrete" task of conducting credible fear interviews is so limited that the training given to full-time asylum adjudicators is not necessary. Tr. 23–24. But that notion contravenes the text of § 1225(b)(1), under which the full scope of training *is* required before anyone can conduct a credible fear interview. The statute does not allow Defendants to provide only a subset of that training, regardless of their justification. Congress spoke unambiguously: anyone who conducts credible fear interviews *must* receive training comparable to that provided

10

Case 1:17-cv-05228-NGG-JMS   Document 273-18   Filed 06/08/20   Page 15 of 21 PageID #:
Case 1:20-cv-00846-RJL   Document 24   Filed 06/01/20   Page 16 of 20
8146

to full-time adjudicators of asylum applications.

Moreover, Congress had good reason to reject Defendants' view that conducting credible fear interviews requires only limited training. Those interviews require officers to use significantly more independent knowledge and interviewing skills than ordinarily required in full-scale asylum interviews. In an asylum interview, the burden is on the *applicant* to articulate the basis for asylum and to present evidence justifying that claim. 8 U.S.C. § 1158(b)(1)(B). Asylum interviews are also typically held weeks or months after an application is filed (*see id.* § 1158(b)(1)(D)(5)), so applicants have had time to begin to heal from trauma, seek counsel, and gather evidence. And if an asylum officer denies asylum, the asylum seeker can seek review in the immigration courts— and ultimately in the federal courts of appeals. *See* 8 U.S.C. §§ 1158(d)(5)(A)(iv), 1229a, 1252(a)(2)(B)(ii) (allowing judicial review of denials of asylum relief under § 1158(a)).

In a credible fear interview, by contrast, the *asylum officer* is required to "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture . . . ." 8 C.F.R. § 208.30(d). Moreover, the question at the credible fear stage is not whether an applicant is in fact eligible for asylum, but whether, in a future proceeding, there is a "significant possibility" that he or she "*could establish* eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added). To elicit the necessary information, asylum officers must bring their own knowledge to bear. *Id.* (requiring officers to consider the credibility of the applicant's statements and "such other facts as are known to the officer"). To identify all potentially relevant bases for asylum, officers must understand the complex law of asylum (both statutory and case law), and also understand the political, social, and religious conditions in the country from which each applicant comes. And officers must have interviewing skills sufficient to elicit the necessary information from frightened and traumatized children and adults in the face of cultural and

11

language barriers, only days after those individuals have completed difficult journeys.

Asylum officers conducting credible fear interviews must also make determinations based on incomplete evidence. And the limited review such determinations receive in the immigration courts are *based on the interviewer's notes*. Further, an erroneous determination that an asylum seeker lacks a credible fear results in the asylum seeker's immediate deportation to a country where she may face serious danger. In other words, the life of asylum seekers is quite literally in the hands of the person conducting the credible fear interview. Congress therefore had ample reason to require that interviewers receive the *same* training given to full-time asylum adjudicators, not a dramatically truncated subset of that training.

It is, however, undisputed that CBP officers receive substantially *less* training—at best about half of the training—than that provided to full-time asylum adjudicators.[6] And the MOA expressly requires that CBP agents receive *only* this abbreviated "[Credible Fear] for CBP training." Dkt. 3-1, at 2 (see § 4.B.ii). It does *not* require that CBP agents receive the same training given to full-time asylum adjudicators, as Defendants admit.[7] By providing for this inadequate training, the MOA violates the requirements expressly set by Congress in the INA. That violation,

---

[6]   As Plaintiffs made clear at the hearing, "the baseline" of training that CBP agents receive is 80 hours of training, and "we don't know if they received anything more than that." Tr. 32. Defendants have said only that CBP agents receive approximately "80 hours of distance training and *up to* 120 hours of face-to-face training." Dkt. 17-6 at 6. In other words, CBP agents receive—at most—5 weeks of training, and many may receive significantly less. By contrast, full-time adjudicators of asylum applications receive a minimum of 9 weeks of formal training, and those doing substantial amounts of credible fear interviews generally receive 4 weeks of additional training plus ongoing training on a weekly basis. PI Mem. 23–24.

[7]   *See* Dkt. 3-1, § 4.B.ii (requiring CBP to identify agents and officers to "participate in CF for CBP training"); *id.* § 4.C.i (requiring agents and officers to receive "CF for CBP training" conducted by USCIS). Defendants claim that "[t]he required training under the MOA is fully consistent with the INA's requirements" because "the Asylum Division has developed and deployed trainings." Defs. Opp. 20–21. But Defendants' belief as to the adequacy of that training is immaterial. What matters is whether the training required by and deployed under the MOA in fact satisfies the statutory requirements, and it plainly does not.

standing alone, provides sufficient grounds to conclude that Plaintiffs are likely to prevail on the merits of their INA claim and are entitled to a preliminary injunction.

## D. Without the MOA, CBP Agents Would Not Have Conducted Plaintiffs' Credible Fear Interviews.

At the hearing, Defendants again conceded that this Court "is properly reviewing the January 2020" MOA. Tr. 19. But they continued to insist that the MOA is superfluous because, in their view, the 2019 delegation by Ken Cuccinelli is sufficient to enable the use of CBP agents to perform credible fear interviews. *See* Tr. 20–22. That remains wrong.

Notably, Defendants did not (and cannot) reconcile their claim that the MOA is irrelevant with the fact that the 2019 delegation expressly makes the use of CBP agents "[s]ubject to the terms of" an MOA. Dkt. 17-4, Ex. 1, at 1. Defendants also failed to explain how their claim can be squared with their argument in *M.M.V. v. Barr*, 1:19-cv-02773-ABJ (D.D.C.), that the July 2019 MOA between USCIS and CBP authorized CBP agents to conduct credible fear interviews. Nor did Defendants explain why, having prevailed on that argument, they should be permitted to take a contrary position here. *See* PI Reply 2–3; Pls.' Resp. to Ratif. Notice 6.

Instead, Defendants admitted that "the January MOA provides the *operational implementation* of this delegation." Tr. 21 (emphasis added). As Plaintiffs noted, Tr. 31–32, that admission echoes numerous statements in Defendants' briefs. *See* Defs. Opp. 18, 19, 24, 25, 26, 28. Without that implementation, the 2019 delegation could not have resulted in the actual use of CBP agents to conduct credible fear interviews. Thus, as Defendants' repeated admissions make clear, regardless of any prior delegation that may have been a legal prerequisite, the MOA itself is a "written procedure" that "implements" the credible-fear statute. 8 U.S.C. § 1252(e)(3)(A).

Because the MOA was operationally essential—defining the procedures under which CBP agents were authorized to conduct Plaintiffs' interviews—Defendants' argument that the MOA

was not "required to capture CBP's consent" to the 2019 delegation could not carry the day even if it were correct.  Tr. 21.  But it is not correct: the MOA was required for that purpose too.

Defendants' own evidence states that USCIS functions may not be transferred to CBP without the consent of CBP's Commissioner, Dkt. 17-4, Ex. 1, at 2, and that the 2019 delegation is subject to the later execution of an MOA, *id.* at 1.  During the hearing, Defendants identified no source besides the challenged MOA that could possibly have provided the "consent" that they acknowledge was required.  Instead, Defendants floated the novel idea that this consent may be "provided more or less informally," Tr. 22, apparently without written approval by the head of CBP.  Yet their own policies and the 2019 delegation itself expressly require the "consent" of "the Commissioner of CBP."  Dkt. 17-4, Ex. 1, at 2.  Without a properly serving Commissioner, CBP cannot provide this consent.  *Id.*  The delegation alone, therefore, could not even complete a theoretical transfer of authority over credible fear interviews to CBP, much less define the rules and enable all of the logistical steps necessary for CBP agents to exercise that authority in practice.[8]

Moreover, if a bare delegation of authority were sufficient to trigger the 60-day period in § 1252(e)(3)(B), USCIS could insulate any credible-fear policy from judicial review.  The agency could simply make a general delegation of authority, wait out the 60-day period, and then implement that delegation in any fashion whatsoever, regardless of whether it violates the law.  In other words, Defendants believe that the window for judicial review can close before a delegation of authority ever has real-world consequences—or is even known to the public.  But under the plain statutory text, the 60-day period for filing suit against credible-fear policies begins to run

---

[8]    Defendants also suggested that the MOA is simply the "renewal" or "continuation" of a different MOA signed in July 2019.  Tr. 25.  That suggestion, too, is contrary to the record. The July MOA stated that it *could* be extended by a signed renewal, PI Mem., Ex. 4, ¶ 8, but Defendants elected not to issue such a renewal.  Instead, they allowed the July MOA to expire and later approved a new MOA that includes different terms.  *See* Tr. 15–16.

Case 1:17-cv-05228-NGG-VMS   Document 273-13   Filed 06/03/20   Page 20 of 21 PageID #:
8150
Case 1:20-cv-00846-RJL   Document 24   Filed 06/01/20   Page 19 of 20

when a policy is "implemented," 8 U.S.C. § 1252(e)(3)(B), not when an agency makes a background delegation of authority that is necessary before the policy can be implemented.

In short, this Court's jurisdiction to review the MOA—which remains undisputed—means that this Court has the authority to grant all of the relief that Plaintiffs seek.

**E.    Injunctive Relief Is Warranted.**

Because Plaintiffs are likely to succeed on the merits, and because the other relevant factors also weigh in their favor, they are entitled to "a preliminary injunction that prevents the[ir] deportation . . . pending the resolution of this case, as well as preventing the MOA from being implemented going forward." Tr. 34.  Injunctive relief is clearly permitted here.  PI Reply 24–25. And that relief should not be limited to Plaintiffs.  Rather, further implementation of the MOA should be enjoined pending resolution of this case, so that others will not be subject to the same irreparable harm that Plaintiffs have experienced.  *See Trump v. IRAP*, 137 S. Ct. 2080, 2087 (2017) ("We leave the injunctions entered by the lower courts in place with respect to respondents *and those similarly situated* . . . ." (emphasis added)); *id.* (staying the injunctions only with respect to differently situated foreign nationals abroad); *cf. United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 128–29 (D.D.C. 2015) (limiting injunction to the plaintiffs "because there is no evidence of irreparable harm to persons other than Plaintiffs"); *L.M.-M*, 2020 WL 985376, at *25 (declining only to extend *retroactive* injunctive relief beyond the plaintiffs).

<u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully ask that this Court preliminarily enjoin Plaintiffs' removal from the United States and implementation of the MOA pending disposition of this matter.

Case 1:17-cv-05228-NGG-VMS  Document 273-13  Filed 06/08/20  Page 21 of 21 PageID #:
8151
Case 1:20-cv-00846-RJL  Document 24   Filed 06/01/20   Page 20 of 20

Dated: June 1, 2020

Respectfully submitted,


*/s/ Julie Carpenter*
Julie Carpenter
DC Bar No. 418768
TAHIRIH JUSTICE CENTER
6402 Arlington Boulevard, Suite 300
Falls Church, VA 22042
Phone: (571) 286-6183
juliec@tahirih.org

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org
brian@theusconstitution.org

Attorneys for Plaintiffs