No. 18-1521 (L), No. 18-1522

# In the United States Court of Appeals for the Fourth Circuit

―――――――――――――――――――

CASA DE MARYLAND, *et al.*,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants-Appellees*.

―――――――――――――――――――

On Appeal from the United States District Court
for the District of Maryland, Greenbelt Division
Case No. 8:17-cv-02942 (Hon. Roger W. Titus)

―――――――――――――――――――

### JOINT APPENDIX VOLUME II OF III
―――――――――――――――――――

John A. Freedman
Emily Newhouse Dillingham
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@arnoldporter.com
emily.dillingham@arnoldporter.com

*Counsel for Plaintiffs-Appellants*

(additional counsel listed on inside cover)

Mark B. Stern
Abby C. Wright
Thomas Pulham
U.S. DEPARTMENT OF JUSTICE
Civil Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000
(202) 514-8151 (fax)
Mark.Stern@usdoj.gov
Abby.Wright@usdoj.gov
Thomas.Pulham@usdoj.gov

*Counsel for Defendants-Appellees*

AR1253

Elizabeth J. Bower
Kevin B. Clark
Priya R. Aiyar
WILLKIE FARR & GALLAGHER
    LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000
(202) 303-2252 (fax)
ebower@willkie.com
kclark@willkie.com
paiyar@willkie.com

Dennis A. Corkery
WASHINGTON LAWYERS'
    COMMITTEE FOR CIVIL
    RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, NW
Suite 400
Washington, DC 20036
(202) 319-1000
(202) 319-1010 (fax)
dennis_corkery@washlaw.org

Ajmel A. Quereshi
HOWARD UNIVERSITY SCHOOL
    OF LAW
2900 Van Ness Street, NW
Washington, DC 20008
(202) 216-5574
(202) 682-1312 (fax)
aquereshi@naacpldf.org

*Counsel for Plaintiffs-Appellants*

# JOINT APPENDIX
## TABLE OF CONTENTS

| ECF No. | Date | Document | Page |
|---|---|---|---|
| **VOLUME I** | | | |
| N/A | N/A | MD District Court Docket Report in 8:17-cv-02942 | J.A. 1 |
| 1 | 10/05/2017 | Complaint (redacted version) | J.A. 37 |
| 8 | 10/10/2017 | Letter Requesting Conference | J.A. 98 |
| 62 | 11/01/2017 | Transcript of Status Conference before Judge Roger W. Titus | J.A. 100 |
| 20 | 11/01/2017 | Order Granting Motion to Omit Individual Plaintiffs' Home Addresses from Caption | J.A. 124 |
| 26 | 11/15/2017 | Notice of Filing Administrative Record | J.A. 125 |
| 26-1 | 11/15/2017 | Ex. 1: Administrative Record | J.A. 129 |
| 27 | 11/15/2017 | Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment | J.A. 385 |
| 27-1 | 11/15/2017 | Memorandum of Law in Support of Motion to Dismiss | J.A. 387 |
| 27-2 | 11/15/2017 | Proposed Order in Support of Motion to Dismiss | J.A. 459 |
| 28 | 11/21/2017 | Order re: Motion to Dismiss | J.A. 460 |
| 29 | 11/28/2017 | Plaintiffs' Opposition to Motion to Dismiss or, in the Alternative for Summary Judgment | J.A. 461 |

AR1255

| ECF No. | Date | Document | Page |
|---------|------|----------|------|
| | | **VOLUME II** | |
| 29-1 | 11/28/2017 | Declaration of John A. Freedman | J.A. 531 |
| 29-2 | 11/28/2017 | Exhibits 1-9 to Declaration of John Freedman | J.A. 536 |
| 29-2 | 11/28/2017 | Ex. 1: November 9, 2017 Memorandum & Order, *Batalla Vidal v. Duke* | J.A. 536 |
| 29-2 | 11/28/2017 | Ex. 2: Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories, *Batalla Vidal v. Duke* | J.A. 559 |
| 29-2 | 11/28/2017 | Ex. 3: February 20, 2017 Memorandum by John Kelly | J.A. 600 |
| 29-2 | 11/28/2017 | Ex. 4: June 15, 2017 Memorandum by John Kelly | J.A. 607 |
| 29-2 | 11/28/2017 | Ex. 5: October 20, 2017 Deposition of Gene Hamilton | J.A. 611 |
| 29-2 | 11/28/2017 | Ex. 6: September 14, 2017 Pre-Motion Status Conference, *Batalla Vidal v. Duke* | J.A. 619 |
| 29-2 | 11/28/2017 | Ex. 7: October 23, 2017 Memorandum Opinion, *Int'l Refugee Assistance Project v. Trump* | J.A. 655 |
| 29-2 | 11/28/2017 | Ex. 8: October 19, 2017 Memorandum & Order, *Batalla Vidal v. Duke* | J.A. 709 |
| 29-2 | 11/28/2017 | Ex. 9: National Standard Operating Procedures on Deferred Action for Childhood Arrivals | J.A. 713 |
| 29-3 | 11/28/2017 | Exhibits 10-22 to Declaration of John A. Freedman | J.A. 978 |

**AR1256**

| ECF No. | Date | Document | Page |
|---|---|---|---|
| 29-3 | 11/28/2017 | Ex. 10:  September 5, 2017 White House Press Release | J.A. 978 |
| 29-3 | 11/28/2017 | Ex. 11:  September 5, 2017 remarks by Attorney General Jeff Sessions | J.A. 983 |
| 29-3 | 11/28/2017 | Ex. 12:  September 5, 2017 Twitter post | J.A. 987 |
| 29-3 | 11/28/2017 | Ex. 13:  November 17, 2017 USCIS guidance | J.A. 989 |
| 29-3 | 11/28/2017 | Ex. 14:  Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I-821D 13 | J.A. 991 |
| 29-3 | 11/28/2017 | Ex. 15:  USCIS DACA FAQs page | J.A. 1006 |
| 29-3 | 11/28/2017 | Ex. 16:  Sample DACA Approval Notice from USCIS | J.A. 1026 |
| 29-3 | 11/28/2017 | Ex. 17:  DHS Privacy Impact Assessment for DACA, DHS/USCIS/PIA-045 | J.A. 1028 |
| 29-3 | 11/28/2017 | Ex. 18:  April 27, 2017 Privacy Policy Guidance Memorandum | J.A. 1054 |
| 29-3 | 11/28/2017 | Ex. 19:  September 5, 2017 DHS Press Release | J.A. 1072 |
| 29-3 | 11/28/2017 | Ex. 20:  January 7, 2009 Privacy Policy Guidance Memorandum | J.A. 1078 |
| 29-3 | 11/28/2017 | Ex. 21:  DHS PowerPoint presentation on DACA | J.A. 1085 |
| 29-3 | 11/28/2017 | Ex. 22:  December 30, 2016 letter sent by Secretary of Homeland Security Jeh Johnson | J.A. 1091 |

**AR1257**

| ECF No. | Date | Document | Page |
|---|---|---|---|
| | | **VOLUME III** | |
| 29-4 | 11/28/2017 | Declaration of Elizabeth Bower | J.A. 1094 |
| 29-5 | 11/28/2017 | Exhibits to Declaration of Elizabeth Bower | J.A. 1106 |
| 29-5 | 11/28/2017 | Ex. 1:  Plaintiffs' First Set of Interrogatories and Requests for Production | J.A. 1106 |
| 29-5 | 11/28/2017 | Ex. 2A:  ND. Cal. Requests for Production | J.A. 1124 |
| 29-5 | 11/28/2017 | Ex. 2B:  ND. Cal. Requests for Admission | J.A. 1151 |
| 29-5 | 11/28/2017 | Ex. 2C:  ND. Cal. Interrogatories | J.A. 1168 |
| 29-5 | 11/28/2017 | Ex. 3A:  E.D.N.Y. Requests for Admission | J.A. 1179 |
| 29-5 | 11/28/2017 | Ex. 3B:  E.D.N.Y. Requests for Admission | J.A. 1192 |
| 29-5 | 11/28/2017 | Ex. 3C:  E.D.N.Y. Requests for Production | J.A. 1207 |
| 29-5 | 11/28/2017 | Ex. 3D:  E.D.N.Y. Requests for Production, Set Two | J.A. 1226 |
| 29-6 | 11/28/2017 | Declaration of Casa de Maryland | J.A. 1235 |
| 29-7 | 11/28/2017 | Declaration of OneAmerica | J.A. 1240 |
| 29-8 | 11/28/2017 | Declaration of Junta for Progressive Action, Inc. | J.A. 1247 |

**AR1258**

| ECF No. | Date | Document | Page |
|---|---|---|---|
| 30 | 12/05/2017 | Defendants' Reply in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment | J.A. 1253 |
| 30-1 | 12/05/2017 | Ex. 1:  Declaration of Rachel Westmoreland | J.A. 1286 |
| 31 | 12/11/2017 | Order Giving Notification of Federal Rule of Civil Procedure 56(f) | J.A. 1290 |
| 33 | 12/14/2017 | Correspondence re: Response to Court's 56(f) Notice | J.A. 1291 |
| 63 | 12/15/2017 | Transcript of Motion Hearing on Motion to Dismiss | J.A. 1292 |
| 36 | 01/17/2018 | Plaintiffs' Notice of Supplemental Authority | J.A. 1359 |
| 36-1 | 01/17/2018 | Ex. 1:  January 9, 2018 Opinion in the consolidated Northern District of California DACA cases | J.A. 1362 |
| 36-2 | 01/17/2018 | Ex. 2:  January 12, 2018 Opinion in the consolidated Northern District of California DACA cases | J.A. 1411 |
| 37 | 01/19/2018 | Defendants' Response to Plaintiffs' Notice of Supplemental Authority | J.A. 1425 |
| 40 | 02/14/2018 | Plaintiffs' Notice of Supplemental Authority | J.A. 1429 |
| 40-1 | 02/14/2018 | Ex. 1:  February 13, 2018 Opinion in the consolidated Eastern District of New York DACA cases | J.A. 1431 |
| 41 | 02/21/2018 | Defendants' Response to Plaintiffs' Second Notice of Supplemental Authority | J.A. 1486 |
| 42 | 03/05/2018 | Memorandum Opinion | J.A. 1489 |

**AR1259**

| ECF No. | Date | Document | Page |
|---|---|---|---|
| 43 | 03/05/2018 | Order Granting in Part and Denying in Part Motion to Dismiss or, in the Alternative, for Summary Judgment | J.A. 1519 |
| 45 | 03/09/2018 | Notice Regarding the Permanent Injunction | J.A. 1521 |
| 46 | 03/12/2018 | Memorandum Order re: Injunction | J.A. 1527 |
| 47 | 03/14/2018 | Joint Status Report | J.A. 1528 |
| 48 | 03/15/2018 | Memorandum/Order Granting Status Report | J.A. 1531 |
| 49 | 03/15/2018 | Amended Order Granting in Part and Denying in Part Motion to Dismiss or, in the Alternative, for Summary Judgment | J.A. 1532 |
| 52 | 04/27/2018 | Notice of Appeal by Plaintiffs | J.A. 1534 |
| 53 | 05/04/2018 | Notice of Appeal by Defendants | J.A. 1537 |

AR1260

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

</div>

| | | |
|---|---|---|
| CASA DE MARYLAND, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Case No. 17-cv-2942 (RWT) |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

<div align="center">

**DECLARATION OF JOHN A. FREEDMAN IN OPPOSITION TO**
**GOVERNMENT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

</div>

Pursuant to Title 28 U.S.C. Section 1746,  I,  John A. Freedman, hereby declare as follows:

1.      I am over the age of eighteen and I testify truthfully based on the best of my knowledge.

2.      I am a partner at Arnold & Porter Kaye Scholer LLP and counsel for Plaintiffs in this action.  This Declaration is submitted in support of Plaintiffs' Memorandum in Opposition to the Motion to Dismiss, filed concurrently herewith.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of  the November 9, 2017 Memorandum & Order entered  in the Eastern District of New York case *Batalla Vidal v. Duke*, No. 16-4756, 2017 WL 5201116.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of the Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories to Defendants entered in the Eastern District of New York case *Batalla Vidal v. Duke*, No. 16-4756.

<div align="center">

1

</div>

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the February 20, 2017 Memorandum sent by then Secretary of Homeland Security John Kelly with the subject, "Enforcement of the Immigration Laws to Serve the National Interest."

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the June 15, 2017 Memorandum sent by then Secretary of Homeland Security John Kelly with the subject, "Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents."

7.      Attached hereto as **Exhibit 5** is an excerpt of a true and correct copy of the unedited transcript of the October 20, 2017 deposition of Gene Hamilton in the Northern District of California case *Regents of University of California et al v. United State*, 17-05211.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the transcript of the September 14, 2017  Pre-Motion Status Conference in the Eastern District of New York case *Batalla Vidal v. Duke*, No. 16-4756.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the October 23, 2017 Memorandum Opinion entered  in the District of Maryland case *Int'l Refugee Assistance Project v. Trump*, No. 17-0361, 2017 WL 4674314.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of the October 19, 2017 Memorandum & Order entered in the Eastern District of New York case, *Batalla Vidal v. Duke*, No. 16-4756 ECF No. 89.

11.      Attached hereto as **Exhibit 9** is a copy of the National Standard Operating Procedures ("SOP") on Deferred Action for Childhood Arrivals, published by DHS on April 4, 2013.  This document is a true and correct copy of the SOP that was obtained from LexisNexis

2

AR1262

and bears redactions reflecting it was provided to American Immigration Council and National Immigration Law Center in response to a FOIA request.

12.  Attached hereto as **Exhibit 10** is a true and correct copy of the White House's September 5, 2017 Press Release titled, "President Donald J. Trump Restores Responsibility and the Rule of Law to Immigration," which was last viewed in the form attached on November 28, 2017.

13.  Attached hereto as **Exhibit 11** is a true and correct copy of Attorney General Jeff Sessions' September 5, 2017 remarks titled, "Attorney General Sessions Delivers Remarks on DACA," which was last viewed in the form attached on November 28, 2017.

14.  Attached hereto as **Exhibit 12** is a true and correct copy of a post published by Donald J. Trump on his personal Twitter account at 5:38pm on September 5, 2017.

15.  Attached hereto as **Exhibit 13** is a true and correct copy of November 17, 2017 USCIS guidance titled, "USCIS Guidance on DACA Renewal Requests Affected by Mail Service Issues."

16.  Attached hereto as **Exhibit 14** is a true and correct copy of the Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I-821D 13 (Jan. 9, 2017 ed.).

17.  Attached hereto as **Exhibit 15** is a true and correct copy of the USCIS DACA FAQs page, which was last viewed in the form attached on November 27, 2017.

18.  Attached hereto as **Exhibit 16** is a sample DACA Approval Notice from USCIS, which is a true and correct copy of a document obtained through the University of Washington's

3

Appeal: 18-1521  Case 1:17-cv-05228-NGG-VMS  Document 282-7  Filed 07/02/2087  Filed 09/04/20  Page 12 of 1026 PageID #: 9603

Case 8:17-cv-02942-RWT   Document 29-1   Filed 11/28/17   Page 4 of 5

Office of the Univesity Registrar at https://registarar.washington.edu/i-797-daca-approval_sample/, and was last viewed in the form attached on November 28, 2017.

19.    Attached hereto as **Exhibit 17** is a true and correct copy of the August 15, 2012 DHS Privacy Impact Assessment for DACA, DHS/USCIS/PIA-045.

20.    Attached hereto as **Exhibit 18** is a true and correct copy of the April 27, 2017 Privacy Policy Guidance Memorandum issued by DHS's Acting Chief Privacy Officer Jonathan R. Cantor with the subject, "DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information."

21.    Attached hereto as **Exhibit 19** is a true and correct copy of the September 5, 2017 DHS press release titled, "Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA).

22.    Attached hereto as **Exhibit 20** is a true and correct copy of the January 7, 2009 Privacy Policy Guidance Memorandum issued by DHS's then Chief Privacy Officer Hugo Teufel III with the subject, "DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons."

23.    Attached hereto as **Exhibit 21** is an excerpt of a true and correct copy of a DHS Powerpoint presentation on DACA prepared on June 2014, which was last viewed in the form attached on November 28, 2017.

24.    Attached hereto as **Exhibit 22** is a true and correct copy of a December 30, 2016 letter sent by Secretary of Homeland Security Jeh Johnson to members of Congress.

4

J.A. 534                                             AR1264

I declare under penalty of prejury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 28th day of November, 2017.

John A. Freedman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Telephone: (202)-942-5000
Facsimile: (202) 942-5999
John.Freedman@apks.com

5

# EXHIBIT 1

AR1266

2017 WL 5201116
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Martin Jonathan BATALLA VIDAL et al., Plaintiffs,
v.
Elaine C. DUKE, Acting Secretary, Department
of Homeland Security, et al., Defendants.
State of New York et al., Plaintiffs,
v.
Donald Trump, President of the
United States, et al., Defendants.

16-CV-4756 (NGG) (JO)
|
16-CV-5228 (NGG) (JO)
|
Signed 11/09/2017

**Attorneys and Law Firms**

Amy S. Taylor, Brooklyn, NY, Justin B. Cox, National Immigration Law Center, Atlanta, GA, Marisol Orihuela, Michael J. Wishnie, Muneer Ahmad, Jerome N. Frank Legal Services Organization, Inc. Yale Law School, New Haven, CT, Clement Lee, Jackson Heights, NY, Jessica Hanson, Karen C. Tumlin, Mayra B. Joachin, National Immigration Law Center, Los Angeles, CA, Joshua Rosenthal, National Immigration Law Center, Washington, DC, for Plaintiffs.

Antonio Alarcon, pro se.

Adam Kirschner, Brad Rosenberg, Brett Shumate, Daniel Halainen, Kate Bailey, Stephen M. Pezzi, U.S. Department of Justice, Washington, DC, Joseph Anthony Marutollo, Scott Dunn, United States Attorneys Office, Brooklyn, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge

**\*1** Plaintiffs in the above-captioned cases challenge the rescission of the Deferred Action for Childhood Arrivals ("DACA") program, as well as other actions

that Defendants are alleged to have taken in connection with the rescission of that program. Defendants have moved to dismiss these cases for lack of subject-matter jurisdiction and for failure to state a claim. (See Defs. Mot. to Dismiss (Dkt. 95)[1]; Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mem.") (Dkt. 95-1).) For the reasons that follow, the court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss for lack of subject-matter jurisdiction and RESERVES RULING on Defendants' motion to dismiss for failure to state a claim.

**I. BACKGROUND**
The court begins by providing some background on the DACA program, the steps Defendants have taken to end it, and the increasingly complicated procedural history of these cases.

**A. Factual Background**

1. Deferred Action

The DACA program originates in a mismatch between the number of individuals unlawfully present in the United States and DHS's ability to remove these individuals from the country. As of 2014, for example, approximately 11.3 million removable individuals were present in the United States.[2] (The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. at 1 (2014) ("OLC Op.") (Admin. R. ("AR") (Dkt. 77-1) at 4).) DHS has the resources to remove only a small percentage of these individuals—specifically, about 400,000 per year, or less than four percent of the total, as of 2014. (Id. at 1; DHS, 2015 Yearbook of Immigration Statistics tbl. 39 (2016) (listing 333,341 removals and 129,122 "returns" for the year 2015).) Because of the "practical fact" that it cannot deport all these individuals, the Executive Branch has significant discretion to prioritize the removal of some and to deprioritize the removal of others. See Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." Id. "Deferred

Batalla Vidal v. Baker, Slip Copy (2017)
2017 WL 5201116

action," sometimes referred to as "nonpriority status," is "in effect, an informal administrative stay of deportation," Lennon v. INS, 527 F.2d 187, 191 n.7 (2d Cir. 1975), by which immigration authorities decide not to initiate, or decide to halt, removal proceedings "for humanitarian reasons or simply for ... convenience," Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) ("AAADC"). Immigration authorities have used deferred action and similar policies on numerous occasions since at least the early 1960s. Arpaio, 797 F.3d at 16 (citing OLC Op. at 7-8, 12-13). Although deferred action was initially "developed without express statutory authorization," AAADC, 525 U.S. at 484 (quoting 6 C. Gordon et al., Immigration Law and Procedure § 72.03(2)(h) (1998)), it has since been referenced in the Immigration and Nationality Act ("INA") and in DHS regulations, see 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (making certain individuals "eligible for deferred action and work authorization"); 8 C.F.R. § 274a.12(c) (14) (authorizing certain recipients of deferred action to apply for work authorization).

## 2. DACA and DAPA

**\*2** In 2012, the Obama Administration created the DACA program by issuing a memorandum stating that DHS would consider according deferred action to certain undocumented immigrants who entered the United States as children. (Mem. from Janet Napolitano, Sec'y of DHS, to David V. Aguilar, Acting Comm'r, CBP, et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) (the "2012 DACA Memo") (AR 1).) The 2012 DACA Memo directed CBP, USCIS, and ICE to consider exercising prosecutorial discretion with respect to individuals without lawful immigration status who (1) were under the age of sixteen when they entered the United States; (2) had been continuously present in the United States for at least the five years leading up to June 15, 2012; (3) were currently in school, had graduated from high school or obtained GEDs, or were honorably discharged veterans; (4) had not been convicted of felonies, significant misdemeanors, or multiple misdemeanors, and did not "otherwise pose[ ] a threat to national security or public safety"; and (5) were not above the age of thirty. (Id.) Individuals who met these criteria, passed a background check, and were granted relief "on a case by case basis" were shielded from removal and eligible to apply for work

authorization, subject to renewal every two years. (Id. at 2-3.) The 2012 DACA Memo made clear, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship," but only "set forth policy for the exercise of discretion within the framework of the existing law." (Id. at 3.) Following the issuance of the 2012 DACA Memo, approximately 800,000 individuals have been granted deferred action and work authorization under the program. (Second Am. Compl. ("SAC") (Dkt. 60) ¶ 73; USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status, Fiscal Year 2012-2017 (June 30, 2017) (Am. Compl. ("State Pls. Am. Compl."), Ex. 1 (No. 17-CV-5228, Dkt. 55-1)).)

In 2014, the Obama Administration announced a new deferred action program for the parents of U.S. citizens and lawful permanent residents, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). (Mem. from Jeh Charles Johnson, Sec'y of DHS, to Leon Rodriguez, Dir., USCIS., et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (the "2014 DAPA Memo") (AR 37).) The 2014 DAPA Memo also expanded the DACA program by (1) permitting individuals born before June 15, 1981, to apply for deferred action; (2) extending the term of the benefits obtained under the DACA program from two to three years; and (3) adjusting the date-of-entry requirement so that individuals who entered the United States before January 1, 2010, could obtain deferred action and work authorization. (Id. at 3-4.) The court refers to these changes to the DACA program as the "DACA Expansion."

Following the issuance of the 2014 DAPA Memo, twenty-six states, led by Texas, filed suit in the U.S. District Court for the Southern District of Texas, claiming that the DAPA program violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 550 et seq., and the Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 3. See Texas v. United States, 86 F. Supp. 3d 591, 598 (S.D. Tex. 2015). On February 16, 2015, the district court concluded that those states had standing to sue and were likely to succeed on the merits of their procedural APA claim that the 2014 DAPA Memo was invalid because it constituted a "substantive rule," not a "general statement of policy," and thus should have been

Batalla Vidal v. Nielsen, Slip Copy (2017)
2017 WL 5201116

promulgated through notice-and-comment rulemaking. Id. at 671-72. The court issued a nationwide injunction against the implementation of the DAPA program, id. at 677-78, and the DACA Expansion, id. at 678 n.111. The Fifth Circuit affirmed that decision, finding that the plaintiff states were likely to succeed both on their claim that the 2014 DAPA Memo should have been made through notice-and-comment procedures and on their claim that the memo was substantively Contrary to the INA. Texas v. United States, 809 F.3d 134, 178, 186 (5th Cir. 2015) (as revised). The Fifth Circuit declined to reach the plaintiff states' Take Care Clause claim. Id. at 146 n.3. The decision was affirmed by an equally divided Supreme Court. See 136 S. Ct. 2271 (Mem.).

## 3. DAPA Rescission

The Executive Branch's immigration-enforcement priorities shifted with the election of President Donald Trump. Shortly after his Inauguration, President Trump issued an executive order that cast doubt on the exemption of "classes or categories of removable aliens from potential enforcement." Exec. Order 13,768, Enhancing Public Safety in the Interior of the United States, 82 Fed. Reg. 8799 (Jan. 25, 2017). The following month, then-Secretary of DHS John Kelly implemented that order by issuing a memorandum rescinding "all existing conflicting directives, memoranda, or field guidance regarding enforcement of our immigration laws and priorities for removal," except for the DACA and DAPA programs, which he left in place. (Mem. from John Kelly, Sec'y, DHS, to Kevin McAleenan, Acting Comm'r, CBP, et al., Enforcement of the Immigration Laws to Serve the National Interest at 2 (Feb. 20, 2017) (AR 230).) Four months later, Secretary Kelly issued another memorandum, which rescinded the DAPA program and the DACA Expansion based on "the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities." (Mem. from John F. Kelly, Sec'y, DHS, to Kevin K. McAleenan, Acting Comm'r, CBP, et al., Rescission of November 20, 2014, Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") at 3 (June 15, 2017) (AR 235).) That memorandum did not, however, rescind the original DACA program or revoke the three-year-long deferred action and work authorization issued between the announcement of the DACA Expansion and

the Southern District of Texas's issuance of a preliminary injunction against that program. (Id. at 2 & n.3).

## 4. DACA Rescission

**\*3** Following the rescission of the 2014 DAPA Memo, Texas Attorney General Ken Paxton wrote on behalf of eleven states to Attorney General Jeff Sessions to demand that the "Executive Branch" rescind the 2012 DACA Memo. (Ltr. from Ken Paxton, Att'y Gen. of Texas, to Hon. Jeff Sessions, Att'y Gen. of the U.S. (June 29, 2017) at 2 (AR 239).) Paxton warned that, if DHS did not act to end the DACA program, the plaintiff states would amend their complaint in Texas v. United States to challenge the DACA program and the remaining work permits issued under the DACA Expansion. (Id. at 2.)

Thereafter, Attorney General Sessions wrote to Acting DHS Secretary Elaine Duke to "advise that [DHS] should rescind" the 2012 DACA Memo.[3] (Letter from Jefferson B. Sessions, III, Att'y Gen. of the U.S., to Elaine C. Duke, Acting Sec'y, DHS (the "Sessions Letter") (AR 251).) The Attorney General opined that DACA was unconstitutional and that the Texas plaintiffs would likely prevail in their anticipated challenge to the program:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. Then-Secretary of Homeland Security

AR1269

John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

(Id. (citation omitted).)

On September 5, 2017, Defendants rescinded the DACA program.[4] The Attorney General announced the decision at a press conference, and Acting Secretary Duke implemented the decision by issuing a memorandum (the "DACA Rescission Memo") to her subordinates. (DOJ, Press Release, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca; Mem. from Elaine C. Duke, Acting Sec'y, DHS, to James W. McCament, Acting Dir., USCIS, et al., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (AR 252).) Duke pointed to the rulings of the Fifth Circuit and the Supreme Court in the Texas litigation, as well as to the Attorney General's "legal determination" that DACA was " 'an open-ended circumvention of immigration laws' " and " 'an unconstitutional exercise of authority' ":

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012[,] DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

(Id. at 3-4 (quoting Sessions Letter).)

*4 Rather than terminating the DACA program outright, the DACA Rescission Memo provided for a phased "wind down" of the program. First, DHS would

consider initial applications for deferred action and work authorization that it had received as of September 5, 2017. (DACA Rescission Memo at 4.) Second, DHS would "adjudicate—on an individual, case by case basis" requests for renewal of deferred action and work authorization "from current beneficiaries whose benefits will expire between [September 5, 2017,] and March 5, 2018 that have been accepted by [DHS] as of October 5, 2017." (Id.) DHS would not consider other applications for deferred action or work authorization under the DACA program. (Id.) Existing grants of deferred action and work authorization would remain in effect "for the remaining duration of their validity periods," though DHS would retain the authority to terminate or deny deferred action when it deemed appropriate. (Id.) Under the DACA Rescission Memo, the benefits granted as part of the DACA program will therefore expire gradually over the next two years.

**B. Procedural Background**

1. Prior to the DACA Rescission

The first of the above-captioned cases, Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.), predates the Trump Administration's decision to rescind the DACA program. In that case, Plaintiff Martin Batalla Vidal initially challenged DHS's compliance with the nationwide injunction issued by the Southern District of Texas in Texas v. United States. Batalla Vidal applied for deferred action and work authorization in November 2014 and, in February 2015, was notified that he had received deferred action and work authorization for the next three years under the terms of the DACA Expansion. (Compl. (Dkt. 1) ¶ 32.) On May 14, 2015, however, DHS revoked his three-year work authorization, citing the Texas injunction, and replaced it with a two-year permit. (Id. ¶¶ 34-36.) Batalla Vidal challenged that decision, contending that the Texas plaintiffs lacked standing to seek, and the Southern District of Texas lacked jurisdiction to issue, a nationwide injunction. (Id. ¶¶ 43-47.) Batalla Vidal subsequently amended his complaint to add the nonprofit organization MRNY as a plaintiff and name then-Director of USCIS Leon Rodriguez as a defendant. (Am. Compl. (Dkt. 29).) In November 2016, the Batalla Vidal Plaintiffs moved with Defendants' consent to stay briefing in the case "[d]ue to uncertainty regarding the future of the [DACA] program." (Pls. Nov.

21, 2016, Mot. to Stay (Dkt. 35); Apr. 4, 2017, Joint Mot. to Stay (Dkt. 40).)

### 2. Following the DACA Rescission

Following Defendants' announcement of the decision to rescind the DACA program, Plaintiffs brought these actions challenging that decision and certain other actions that Defendants have taken relating to that decision. On September 6, 2017, fifteen states and the District of Columbia [5] filed suit challenging both the rescission of the DACA program and DHS's alleged changes in its policy regarding the use of DACA applicants' information for immigration-enforcement purposes. (State Pls. Compl. (No. 17-CV-5228, Dkt. 1) ¶¶ 269-301.) The State Plaintiffs asserted claims under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the APA, and the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12 (the "RFA"). (Id.) Two weeks later, the Batalla Vidal Plaintiffs again amended their complaint to assert certain claims similar to those brought by the State Plaintiffs, as well as a claim that Defendants violated the Due Process Clause by failing to notify DACA recipients that they needed to renew their deferred action and work authorization by October 5, 2017. (SAC ¶¶ 160-66.) Finally, the State Plaintiffs amended their complaint to add claims (1) challenging the notice provided to DACA recipients of the rescission of the DACA program; and (2) further challenging the change in DHS's information-use policy. (State Pls. Am. Compl. (No. 17-CV-5228, Dkt. 54) ¶¶ 246-52, 274-80.) Together, Plaintiffs now assert the following claims:

**\*5   Equal Protection.** Both sets of Plaintiffs allege that the decision to rescind the DACA program violated the equal-protection principles incorporated in the Due Process Clause of the Fifth Amendment to the U.S. Constitution, see Bolling v. Sharpe, 347 U.S. 497, 498-500 (1954), because that decision was motivated by improper considerations. (SAC ¶¶ 167-70; State Pls. Am. Compl. ¶¶ 233-39.) The State Plaintiffs allege that the DACA Rescission Memo "target[s] individuals for discriminatory treatment, without lawful justification" and that it was "motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group." (State Pls. Am. Compl. ¶¶ 235-36.) The Batalla Vidal Plaintiffs allege that President Trump, Attorney General Sessions, and Acting Secretary Duke violated the Due Process Clause

in deciding to rescind the DACA program because that decision "targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups," and "was substantially motivated by animus toward Latinos and, in particular, Mexicans." (SAC ¶¶ 169-70.)

**Due Process—Individualized Notice.** Both sets of Plaintiffs also contend that Defendants violated the Fifth Amendment's Due Process Clause by failing to provide DACA recipients with adequate notice of the decision to rescind the DACA program. (SAC ¶¶ 160-66; State Pls. Am. Compl. ¶¶ 274-80.) In particular, the Batalla Vidal Plaintiffs allege that, prior to the DACA Rescission Memo, DHS advised DACA recipients to submit applications to renew their deferred action and work authorization "as soon as possible" and, in particular, 120-150 days before expiration, to ensure that those benefits did not expire before DHS could process the renewal applications. (SAC ¶ 164.) Following the issuance of the DACA Rescission Memo, Defendants did not send individual revised notices to alert DACA recipients who were eligible to renew their deferred action and work authorization (i.e., individuals whose benefits expired before March 5, 2018) that they only had until October 5, 2017, to do so. (Id. ¶ 165.) The State Plaintiffs allege that Defendants violated the Due Process Clause of the Fifth Amendment by failing to provide DACA recipients with "adequate notice" about "the procedures and timeline for renewing their DACA status," "the general termination of the DACA program after March 5, 2018," or "their inability to apply for renewal of their DACA status after March 5, 2018." (State Pls. Am. Compl. ¶¶ 276-77.)

**Due Process—Information-Use Policy.** Both sets of Plaintiffs assert that DHS impermissibly backtracked on its representations that it would use information gleaned from DACA applications for immigration-enforcement purposes only in limited circumstances. (SAC ¶¶ 151, 153; State Pls. Am. Compl. ¶¶ 240-45.) While, as discussed below, the Batalla Vidal Plaintiffs fold this challenge into their substantive APA claim, the State Plaintiffs challenge this decision as "fundamentally unfair," in violation of the Due Process Clause of the Fifth Amendment. (State Pls. Am. Compl. ¶ 243.)

**Equitable Estoppel—Information-Use Policy.** The State Plaintiffs argue that the doctrine of equitable estoppel bars DHS from changing its policy regarding the use of DACA applicants' information. (Id. ¶¶ 246-52.) The State

Batalla Vidal v. Duke, Slip Copy (2017)
2017 WL 5201116

Plaintiffs allege that Defendants, having "made repeated affirmative statements about the protections that would be given to the personal information provided by DACA applicants" and "placed affirmative restrictions on the use of such information for purposes of immigration enforcement" (id. ¶ 248), are now estopped from using that information for immigration-enforcement purposes (id. ¶¶ 250-51). The court refers to this claim, together with Plaintiffs' constitutional information-use policy claims, as Plaintiffs' "information-use policy claims."

**APA—Arbitrary and Capricious.** Both sets of Plaintiffs challenge the decision to end the DACA program under the APA as substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). (SAC ¶¶ 149-54; State Pls. Am. Compl. ¶¶ 253-56.) The Batalla Vidal Plaintiffs contend that Attorney General Sessions and Acting Secretary Duke acted arbitrarily and capriciously by deciding to end the DACA program and by changing DHS's policy regarding the confidentiality of DACA applicants' information because those decisions "(a) lack a rational explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors." (SAC ¶ 151.) The State Plaintiffs argue that the implementation of the DACA Rescission Memo and termination of the DACA program "with minimal formal guidance" constituted arbitrary, capricious, and unlawful action in violation of Section 706 of the APA. (State Pls. Am. Compl. ¶ 254-55.) The court refers to these claims together as Plaintiffs' "substantive APA claims."

**\*6  APA—Notice and Comment.** Both sets of Plaintiffs also contend that DHS's implementation of the DACA Rescission Memo constitutes a substantive or legislative

"rule" for purposes of the APA, and thus needed to be made through notice-and-comment rulemaking procedures. See 5 U.S.C. § 553. (SAC ¶¶ 144-48; State Pls. Am. Compl. ¶¶ 257-65.) In particular, the Batalla Vidal Plaintiffs argue that the DACA Rescission Memo is a substantive rule, "as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria." (SAC ¶ 146.) The State Plaintiffs, on the other hand, argue that the promulgation and implementation of the DACA Rescission Memo "categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States," impacting those beneficiaries' "substantive rights." (State Pls. Am. Compl. ¶ 261.) The court refers to these claims together as Plaintiffs' "procedural APA claims."

**RFA.** Finally, both sets of Plaintiffs assert claims under the RFA. Plaintiffs claim that Defendants violated the RFA by issuing the DACA Rescission Memo without conducting an analysis of the rescission's impact on "small entities." (SAC ¶¶ 155-59; State Pls. Am. Compl. ¶¶ 266-73.) MRNY alleges that it is a "small organization" that is directly affected by the DACA Rescission Memo and thus has a cause of action under the RFA. (SAC ¶ 156.) The State Plaintiffs assert that they and their "small governmental jurisdictions, nonprofits, and businesses, and their residents" are harmed by Defendants' failure to conduct such a regulatory impact analysis. (State Pls. Am. Compl. ¶ 273.) The court refers to these claims as Plaintiffs' "RFA claims."

The following chart summarizes these claims:

*a. Table: Claims Presented*

| Challenged Action | Cause of Action | **Batalla Vidal v. Duke** [6] | **New York v. Trump** [7] |
|---|---|---|---|
| Termination of the DACA program | Due Process Clause | Fifth claim, ¶¶ 167-70 | First claim, ¶¶ 233-39 |
| | APA (substantive) | Second claim, ¶¶ 149-54 | Fourth claim, ¶¶ 253-56 |

|  | APA (procedural) | First claim, ¶¶ 144-48 | Fifth claim, ¶¶ 257-65 |
|---|---|---|---|
|  | RFA | Third claim, ¶¶ 155-59 (MRNY only) | Sixth claim, ¶¶ 266-73 |
| Notification of DACA recipients of (1) the termination of the DACA program and (2) revised renewal deadlines | Due Process Clause | Fourth claim, ¶¶ 160-66 (notice of revised renewal deadlines only) | Seventh claim, ¶¶ 274-80 |
| Changes to DHS policy regarding the use of DACA applicants' information for immigration-enforcement purposes | Due Process Clause |  | Second claim, ¶¶ 240-45 |
|  | APA (substantive) | Second claim, ¶¶ 149-51, 153-54 |  |
|  | Equitable estoppel |  | Third claim, ¶¶ 246-52 |

### 3. District Court Proceedings

The parties have vigorously litigated these actions before this court. Although the full procedural history can be discerned from the relevant dockets, the court provides the following limited summary of the proceedings to date.

Consistent with the regular practice of courts in this district in civil cases, discovery matters were referred to the magistrate judge assigned to the case, Magistrate Judge James Orenstein, to decide in the first instance. See 28 U.S.C. § 636(b)(1)(A); Local Civ. R. 72.2. After soliciting the views of the parties as to whether discovery should proceed (Sept. 15, 2017, Order (Dkt. 58)), Judge Orenstein authorized discovery to proceed over Defendants' objections (Tr. of Sept. 26, 2017, Hr'g (Docket Number Pending) 26:21-27:22). Judge Orenstein then issued a case management and scheduling order (the "Case Management Order"), which confirmed the

Batalla Vidal v. Duke, Slip Copy (2017)
2017 WL 5201116

previously announced discovery schedule. (Sept. 27,
2017, Order (Dkt. 67).) Of particular relevance to these
proceedings, the Case Management and Scheduling Order
required Defendants to produce, by October 6, 2017, an
administrative record as well as a privilege log describing
"every document considered within any component of the
executive branch as part of the process of determining
the policy and actions at issue in these actions that are
not being produced and as to which the defendants would
assert a claim of privilege, regardless of whether the
defendants deem such ... record to be part of the official
administrative record." (Id. ¶¶ II(c) (the "Privilege Log
Requirement").)

*7   Defendants promptly challenged the Case
Management Order. On September 29, 2017, Defendants
filed a motion before this court "seek[ing] relief from"
the Privilege Log Requirement, which, they argued,
"raise[d] substantial separation-of-powers concerns," to
the extent it could be read as applying to White House
communications, and required Defendants to assert
privilege with respect to documents that were not properly
included in the administrative record. (Sept. 29, 2017,
Defs. Mot. to Vacate (Dkt. 69) ("Defs. Sept. 29 Mot.") at
2-5.) Defendants also argued that it would be impossible
to comply with the Privilege Log Requirement within the
deadline set by the Case Management Order (id. at 5),
and that the court should consider threshold arguments
for dismissal of these cases before allowing discovery
to proceed (id. at 5-6). Defendants did not specifically
argue that discovery was inappropriate, although they
reincorporated arguments against discovery by reference
to a letter they had filed with Judge Orenstein a week
earlier and briefly outlined three "threshold dismissal
arguments." (Id. at 1, 5-6; see also Defs. Sept. 22, 2017,
Ltr. Regarding Discovery (Dkt. 65).)

The court issued two orders in response to Defendants'
objections. The first order extended the deadline for
complying with the Privilege Log Requirement by two
weeks, so that the court could consider whether the
as-yet-unproduced administrative record was adequate
and whether Defendants retained the presumption that
they had correctly compiled the record. (Oct. 3, 2017,
Order (Dkt. 72).) Defendants subsequently asked the
court to narrow the Privilege Log Requirement or vacate
it entirely. (Defs. Oct. 10, 2017, Reply in Supp. of
Mot. to Vacate (Dkt. 80) at 2.) At the same time,
Defendants also asked the court to stay discovery pending

resolution of Defendants' anticipated dispositive motions,
which Defendants averred would "raise arguments that
are strong, purely legal, and completely dispositive of
Plaintiffs' claims." (Id. at 4.) Defendants did not, however,
specifically identify what those arguments were (instead
cross-referencing their September 29 Motion and string-
citing to authority discussed below) or address any of the
factors that courts in this district consider in analyzing
whether a party has demonstrated "good cause" to stay
discovery. See Fed. R. Civ. P. 26(c); Richards v. N. Shore
Long Island Jewish Health Sys., No. 10-CV-4544 (LDW)
(ETB), 2011 WL 4407518, at *1 (E.D.N.Y. Sept. 21, 2011).

The court then issued its second order, which narrowed
the scope of the Privilege Log Requirement but denied
Defendants' request to stay discovery. (Oct. 17, 2017
Mem. & Order (the "Oct. 17 M&O") (Dkt. 86).) With
respect to Defendants' arguments that discovery outside
the administrative record was inappropriate, the court
noted that Defendants had not identified any reason why
its review of Plaintiffs' information-use policy and notice
claims should be limited to an administrative record that
only purported to document the decision to rescind the
DACA program. (Id. at 3-5.) The court declined to vacate
the Privilege Log Requirement before Judge Orenstein
decided whether the administrative record was complete.
(Oct. 17 M&O at 5-6.) The court agreed, however, that the
Privilege Log Requirement should be narrowed to exclude
materials other than DHS and DOJ communications. (Id.
at 7-9.) Finally, the court declined to exempt DOJ from
the Privilege Log Requirement, as Defendants had failed
to explain their apparent reversal in position regarding
whether Attorney General Sessions was responsible for
the decision to rescind the DACA program. (Id. at 9-10.)

The following evening, Defendants renewed their motion
to stay discovery, this time threatening to seek mandamus
review if the court did not address their objections by
2 p.m. the following day. (Defs. Oct. 18, 2017, Mot. to
Stay (Dkt. 87).) The court ruled expeditiously on these
requests. On October 19, 2017, Judge Orenstein issued an
order granting Plaintiffs' motion to compel Defendants to
produce a complete administrative record. (Oct. 19, 2017,
Order Granting Motion to Produce (Dkt. 89).) The same
day, this court issued another memorandum and order,
granting in part and denying in part Defendants' motion
for a stay. (Oct. 19, 2017, Mem. & Order (the "Oct. 19
M&O") at 9-11.) In light of Defendants' ongoing (and, this
time, factually substantiated) concerns about the burdens

AR1274

Batalla Vidal v. Duke, Slip Copy (2017)
2017 WL 5201116

of complying with the Privilege Log Requirement, the court agreed to stay the Privilege Log Requirement except with respect to documents directly considered by the Attorney General, Acting Secretary Duke, and their subordinates who directly advised them on the decision to end the DACA program. (Id.) The court concluded, however, that Defendants had not demonstrated "good cause" warranting a stay of discovery (id. at 4-9), nor that they were entitled to a stay pending mandamus review (id. at 11-12).

*8 On October 20, 2017, the U.S. Court of Appeals for the Second Circuit issued an emergency stay of discovery and record supplementation in proceedings before this court, contingent on Defendants' filing a full petition for a writ of mandamus by 3 p.m. on October 23, 2017. (Oct. 20, 2017, USCA Order (Dkt. 91).) Four days later, the Second Circuit issued a second order, which extended the stay pending determination of the mandamus petition but deferred ruling on that petition "until such time as the district court has considered and decided expeditiously issues of jurisdiction and justiciability." (Oct. 24, 2017, USCA Order (Dkt. 99).) In light of that order, the court directed the parties to file supplemental briefs as to whether the court "lacks jurisdiction to consider the claims raised in [these cases] or why such claims are otherwise non-justiciable." (Oct. 24, 2017, Order.) In response to that order, Defendants filed the motion to dismiss currently before the court. That motion not only argues that the court lacks jurisdiction to hear these cases, but also contends that Plaintiffs fail to state a claim upon which relief should be granted and that the court should not grant a nationwide injunction, should it decide that Plaintiffs are entitled to relief. [8]

## II. LEGAL STANDARDS

Pursuant to the Second Circuit's direction, the court addresses only "issues of jurisdiction and justiciability" at this point in the proceedings. (Oct. 24, 2017, USCA Order; Oct. 27, 2017, Order (Dkt. 98).) Accordingly, the court will consider only those portions of Defendants' motion to dismiss that challenge the court's subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Under Rule 12(b)(1), the court must dismiss a claim "for lack of subject matter jurisdiction ... when the ... court lacks the statutory or constitutional power to adjudicate

it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). When considering a Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). Nevertheless, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.' " Id. (quoting Makarova, 201 F.3d at 113). "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." Id. (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)).

## III. DISCUSSION

Defendants raise four challenges to the court's authority to hear the above-captioned cases. First, Defendants argue, these cases are not justiciable under the APA because the decision to rescind the DACA program was "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2). (Defs. Mem. at 12-17.) Second, Defendants contend that the decision to terminate the DACA program constitutes a denial of deferred action, judicial review of which is barred by Section 1252(g) of the INA. See 8 U.S.C. § 1252(g). (Id. at 17-19.) Third, they maintain, the Batalla Vidal Plaintiffs lack standing to bring certain claims (id. at 28-29, 34-35, 37), and the State Plaintiffs lack Article III standing to bring any claims (id. at 19-21). Fourth, Defendants assert, the State Plaintiffs and MRNY cannot bring claims under the APA because they assert interests that fall outside the "zone of interests" protected by the INA. (Id. at 19-20.) The court addresses each argument in turn.

### A. Committed to Agency Discretion by Law

*9 Defendants first argue that these cases are non-justiciable because the decision to end the DACA program was committed to DHS's exclusive discretion by law. The court disagrees. Certain agency decisions, including decisions not to institute enforcement action, are presumptively immune from judicial review under the APA because they are "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821 (1985). But the rescission of the DACA program was not such a decision, nor have Defendants explained why Section 701(a)(2) precludes review of Plaintiffs' constitutional claims or other claims challenging actions other than the decision to rescind the DACA program. [9]

AR1275

*Batalia Vidal v. Duke*, Slip Copy (2017)
2017 WL 5201116

### 1. Statutory and Equitable Claims

Section 701(a)(2) of the APA does not preclude judicial review of Plaintiffs' statutory and equitable claims. "Under the APA, a party aggrieved by agency action is generally 'entitled to judicial review thereof.' " *Westchester v. U.S. Dep't of Hous. and Urban Dev.*, 778 F.3d 412, 418 (2d Cir. 2015) (quoting 5 U.S.C. § 702). "There is a strong presumption favoring judicial review of administrative action." *Salazar v. King*, 822 F.3d 61, 75 (2d Cir. 2016). Judicial review is not available, however, "to the extent that ... statutes preclude judicial review," 5 U.S.C. § 701(a)(1), or "agency action is committed to agency discretion by law," § 701(a)(2). The latter is "a very narrow exception" to the presumption of reviewability of agency action under the APA, and it applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Chaney*, 470 U.S. at 830 (agency action is unreviewable "if a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"). "To determine whether there is 'law to apply' that provides 'judicially manageable standards' for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." *Salazar*, 822 F.3d at 76 (quoting *Chaney*, 470 U.S. at 830). These enactments supply "law to apply" because they may govern the agency's exercise of its own discretion. *See id.* at 76-77 (citing *INS v. Yueh-Shaoi Yang*, 519 U.S. 26, 32 (1996)); *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 158-59 (D.C. Cir. 2006).

#### a. "Law to Apply"

Here, there is "law to apply," permitting meaningful judicial review of Plaintiffs' statutory claims. Plaintiffs assert statutory claims under the APA and RFA. With respect to Plaintiffs' procedural APA and RFA claims, the relevant "law to apply" is found in the APA and RFA themselves, both of which specify procedures that agencies must follow when engaging in "substantive" or

"legislative" rulemaking. *See* 5 U.S.C. §§ 553, 604. The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable. *See Lincoln v. Vigil*, 508 U.S. 182, 195-98 (1993); *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134) (D.C. Cir. 1995); *N.Y.C. Employees' Ret. Sys. v. SEC*, 45 F.3d 7, 11 (2d Cir. 1995)).

**\*10** There is also "law to apply" permitting meaningful judicial review of Plaintiffs' substantive APA claims. In order to satisfy Section 706(2)(a), Plaintiffs must identify some source of law, other than the APA's "arbitrary and capricious" standard, against which the court can review their claims: "If agency actions could be challenged as 'arbitrary and capricious,' without reference to any other standard, then § 701(a)(2)'s limitation on APA review would amount to no limitation at all, and nothing would ever be 'committed to agency discretion by law.' " *Lunney v. United States*, 319 F.3d 550, 559 n.5 (2d Cir. 2003). The court agrees that Plaintiffs have identified "law to apply" to these claims. In deciding to rescind the DACA program, Defendants expressly and exclusively relied on a legal determination that the program was unlawful and could not be sustained in court. (Sessions Letter, AR 251; DACA Rescission Memo, AR 253-55.) The court may review that rationale in light of, among other sources, the text of the INA and other statutes, the history of the use of deferred action by immigration authorities, and the OLC Opinion. [10] While Defendants attempt to recast the decision to rescind the DACA program as the product of a discretionary "balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of 'potentially imminent litigation' that could throw DACA into immediate turmoil" (Defs. Mem. at 15), that argument is unsupported by the text of the Sessions Letter and the DACA Rescission Memo.

Defendants' argument that the <u>decision</u> to rescind the DACA program is unreviewable, notwithstanding the "substantive legal" <u>rationale</u> given for that decision (Defs. Mem. at 15), is unpersuasive. Defendants correctly note that unreviewable agency action does not become reviewable simply because "the agency gives a reviewable reason for otherwise unreviewable action." (Defs. Mem. at 13 (quoting *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) ("<u>BLE</u>")).) *See <u>BLE</u>*, 482 U.S. at 283 ("[A] common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief ...

Batalla Vidal v. Duke, Slip Copy (2017)
2017 WL 5201116

that the law will not sustain a conviction. That is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review."). That argument simply begs the question, however, of whether the decision to rescind DACA is actually unreviewable. While it may be true that a presumptively unreviewable decision does not become subject to judicial review simply because the decisionmaker expresses a "reviewable" rationale, see id., the decision to rescind the DACA program was not inherently such a decision, as the following section discusses in detail.

*b. Prosecutorial Discretion*

Nor does the decision to end the DACA program fall within a class of decisions traditionally regarded as presumptively immune from judicial review under Section 701(a)(2) of the APA. (Defs. Mem. at 12-14.) Defendants assert that the decision to rescind the DACA program constitutes "an exercise of enforcement discretion" that is "entrusted to the agency alone" and immune from judicial review. (Id. at 15.) The court concludes, however, that the decision to eliminate the DACA program—a program by which certain undocumented immigrants could request immigration authorities to exercise prosecutorial discretion with respect to them—was not itself a presumptively unreviewable exercise of enforcement discretion.

Defendants rely in particular on Chaney, which held that decisions not to take enforcement action were presumptively not subject to judicial review under the APA. In Chaney, the Court rejected an attempt by a group of prisoners awaiting execution by lethal injunction to force the Food and Drug Administration to take enforcement action to prevent the use of certain drugs for capital punishment. See Chaney, 470 U.S. at 823-25, 830-33. The Court held that a regulator's refusal to take enforcement action was presumptively unreviewable, because decisions not to take enforcement action typically "involve[ ]a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," id. at 831, and do not implicate the agency's exercise of "coercive power over an individual's liberty or property rights, and thus do[ ] not infringe upon areas that courts often are called to protect," id. at 832.

*11 The decision to rescind DACA is unlike the non-enforcement decision at issue in Chaney. First, Plaintiffs do not challenge an agency's failure or refusal to prosecute or take enforcement actions with respect to certain violations of law. Instead, they challenge Defendants' affirmative decision to eliminate a program by which DHS exercised prosecutorial discretion with respect to a large number of undocumented immigrants. The DACA Rescission Memo curtails (if it does not eliminate outright) DHS's ability to exercise prosecutorial discretion with respect to individuals previously eligible to request deferred action. Although the DACA Rescission Memo notes that it does not limit DHS's "otherwise lawful enforcement or litigation prerogatives," it makes clear that DHS "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after [September 5, 2017]" and "[w]ill reject all DACA renewal requests and associated applications for Employment Authorization Documents" inconsistent with the terms of the Memo. This affirmative decision to constrain DHS's prosecutorial discretion cannot be analogized to an exercise of prosecutorial discretion, which would be presumptively immune from judicial review. Cf. Texas, 809 F.3d at 165-69 (creation of the DAPA program was reviewable because it was a "affirmative agency action," not an exercise of enforcement discretion). Second, Plaintiffs do not challenge non-enforcement decisions, which do not subject individuals to the "coercive power" of the state. Chaney, 470 U.S. at 831. To the contrary, the rescission of the DACA program subjects individuals who previously enjoyed some protection from removal to coercive state authority. Third, Defendants' decision to rescind the DACA program does not appear to have been motivated by a "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." See id. Instead, Defendants stated that they were required to rescind the DACA program because it was unlawful, which suggests both that Defendants did not believe that they were exercising discretion when rescinding the program and that their reasons for doing so are within the competence of this court to review. (Sessions Letter; DACA Rescission Memo at 4.) The decision to rescind the DACA program is thus manifestly unlike the non-enforcement decision at issue in Chaney. While courts have also held that agency decisions to take (as opposed to refrain from taking) enforcement action are also unreviewable under the APA when there are no

Appeal: 18-1521  Case 1:17-cv-05228-NGG-VMS  Document 282-7  Filed 07/02/2018  Filed 09/04/20  Page 26 of 1026 PageID #:
9617

Batalla Vidal v. Duke, Slip Copy (2017)
Case 8:17-cv-02942-RWT  Document 29-2  Filed 11/28/17  Page 13 of 442
2017 WL 5201116

judicially manageable standards for reviewing the agency's discretion in choosing to bring an enforcement action, see Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n, 528 F.3d 310, 316-19 (4th Cir. 2008); Twentymile Coal, 456 F.3d at 155-59, those cases are inapposite because there is "law to apply" to review the decision to rescind DACA.

Finally, Defendants' arguments that Section 701(a)(2) precludes judicial review of Plaintiffs' suits focus on the decision to rescind the DACA program. Defendants do not explain why the alleged decision to change DHS's policy regarding the use of DACA applicants' information should be immune from judicial review. To the contrary, there is "law to apply" in reviewing that decision (namely, DHS's prior statements about the uses of DACA applicants' information), and the court does not understand how the change in that policy can be analogized to the sorts of decisions, such as enforcement and non-enforcement decisions, that courts have recognized as presumptively exempt from judicial review. Accordingly, to the extent the Batalla Vidal Plaintiffs also challenge DHS's alleged change in information-use policy as part of their substantive APA claim, that claim is reviewable. (SAC ¶¶ 151, 153-54.)

## 2. Constitutional Claims

Nor does Section 701(a)(2) preclude judicial review of Plaintiffs' constitutional claims. It is well-established that "even where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated." Padula v. Webster, 822 F.2d 97, 101 (D.C. Cir. 1987); accord Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 347 (4th Cir. 2001)); Woodward v. United States, 871 F.2d 1068, 1072-73 (Fed. Cir. 1989).

In Webster v. Doe, 486 U.S. 592 (1988), the Court rejected the Government's argument that Section 701(a)(2) barred a former CIA employee from bringing constitutional claims challenging his termination from the agency. Because the National Security Act of 1947 vested the CIA Director with authority over firing decisions, the decision to fire the plaintiff because of his sexual orientation had been "committed to agency discretion by law," and he could not challenge that decision under the APA. Id. at 594-95, 599-601. The National Security Act did

not expressly preclude review of constitutional claims, however, so the Court would not presume that such claims were unreviewable. Id. at 603-04 (noting that the Court has held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," in order to "avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (quoting Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n. 12 (1986))). Similarly, Defendants identify no express indication that Congress intended to preclude judicial review of the actions at issue in these cases. While DHS undoubtedly exercises "wide discretion ... in the enforcement of the immigration laws" (Defs. Mem. at 16), that is insufficient to preclude review of Plaintiffs' constitutional claims.

## 3. Deference to the Executive Branch on Immigration Matters Does Not Counsel a Different Result

**\*12** Lastly, Defendants contend that the court should read Section 701(a)(2) broadly in light of the Executive Branch's wide discretion to enforce the immigration laws. (Id. at 16-17.) The Supreme Court, however, has applied the "strong presumption in favor of judicial review of administrative action" in the immigration context. See INS v. St. Cyr, 533 U.S. 289, 299 (2001). Defendants' specific arguments for a broad reading of Section 701(a)(2) likewise unavailing. While Defendants argue that judicial review of these cases is inappropriate because review could slow down the Executive Branch's removal of undocumented immigrants from this country, 8 U.S.C. § 1252(g) already precludes individuals in removal proceedings from delaying those proceedings by claiming that they were improperly denied deferred action. See AAADC, 525 U.S. at 485. In any event, those concerns do not apply to these cases, as the court discusses in Section III.B below. Defendants also argue that judicial review of immigration decisions is inappropriate because judicial review "may involve 'not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives' or other sensitive matters." (Defs. Mem. at 16 (quoting AAADC, 525 U.S. at 490).) Defendants' stated rationale for rescinding the DACA program, however, turns wholly on questions of U.S. constitutional and administrative law, not sensitive law-enforcement, intelligence, or foreign-policy issues. In any event, vague speculation that judicial

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Filed: 07/02/2018   Doc: 28-2   Filed 09/04/20   Page 27 of 1026 PageID #: 9618

Batalla Vidal v. Duke, Slip Copy (2017)   Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 14 of 442
2017 WL 5201116

review might somehow implicate foreign-policy concerns is insufficient to justify a presumption that immigration cases are not subject to judicial review. See Washington v. Trump, 847 F.3d 1151, 1161 (9th Cir. 2017) ("[T]he Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration...."), reconsid. en banc denied, 853 F.3d 933 (9th Cir. 2017), superseded by 858 F.3d 1168 (9th Cir. 2017). While the court is sensitive to the deference warranted to the Executive Branch in this sphere, Defendants' claims for deference cannot substitute for the "clear and convincing evidence" that Congress intended to restrict judicial review of administrative action. Sharkey v. Quarantillo, 541 F.3d 75, 84 (2d Cir. 2008) (internal quotation marks and citation omitted).

**B. INA Jurisdictional Bar**
Nor does the INA divest the court of jurisdiction to hear this case. That Act contains a provision, 8 U.S.C. § 1252(g), that limits judicial review of certain actions "by or behalf of any alien arising from" certain deportation proceedings. 8 U.S.C. § 1252(g); see AAADC, 525 U.S. at 472. As explained below, that provision has no bearing on these cases, which do not arise from one of the three specifically enumerated actions by immigration authorities that trigger application of the statute. Moreover, by its terms, Section 1252(g) does not apply to claims brought by MRNY or the State Plaintiffs.

**1. Programmatic Challenges to DACA-Related Decisions**

First, the court considers whether Section 1252(g) strips the court of jurisdiction to hear Plaintiffs' challenges to the decision to rescind the DACA program. The court begins, as usual, with the text of the statute. In relevant part, Section 1252(g) provides as follows:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) ... no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate

cases, or execute removal orders against any alien under this chapter.

(emphasis added). As the Court has stated, this "provision applies only to three discrete actions that the Attorney General make take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" AAADC, 525 U.S. at 482. Accordingly, the court must consider whether Plaintiffs' suits "arise from [a] decision or action by [DHS[11]] to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g).

They do not. Defendants' termination of the DACA program does not, by itself, "commence proceedings, adjudicate cases, or execute removal orders against any alien." Id. By rescinding the DACA program, Defendants eliminated a set of guidelines identifying a discrete class of undocumented immigrants who were eligible to apply for deferred action. (See 2012 DACA Memo.) That decision, by itself, did not trigger any specific enforcement proceedings.[12] Nor do the individual Batalla Vidal Plaintiffs attack decisions by DHS to "commence proceedings, adjudicate cases, or execute removal orders" against them or any other specific individuals. Each of those Plaintiffs has received deferred action (see SAC 3-42), and the record does not suggest that any are currently in removal proceedings and seek to challenge the end of the DACA program as a means of obstructing those proceedings. Instead, Plaintiffs bring broad, programmatic challenges to Defendants' decisions (1) to end the DACA program; (2) to provide limited notice of that decision to DACA recipients; and (3) to change DHS's information-use policy. None of those constitutes a "decision or action ... to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g); cf. Texas, 809 F.3d at 164 (creation of DAPA reviewable because "decision to grant lawful presence to millions of [undocumented immigrants] on a class-wide basis" was not enumerated in the text of Section 1252(g)). Accordingly, Section 1252(g) does not bar judicial review of challenges to those decisions.

*13 This conclusion comports with both the plain meaning of the statute and with the Supreme Court's decision in AAADC. First, AAADC makes clear that Section 1252(g) only limits judicial review with respect to suits arising from certain enumerated decisions by

Batalla Vidal v. Duke, Slip Copy (2017)
2017 WL 5201116

immigration authorities. Writing for the Court, Justice Scalia specifically rejected the notion that Section 1252(g) was "a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.'" 525 U.S. at 482. Instead, "[t]he provision applies only to [the] three discrete actions" referenced above. Id. While "[t]here are of course many other decisions or actions that may be part of the deportation process," the Court stated, "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." Id. Defendants' argument that Section 1252(g) encompasses challenges to the decision to end the DACA program because "[t]he denial of continued deferred action is a necessary step in commencing enforcement proceedings at some later date" (Defs. Mem. at 18), is thus at odds with AAADC.

Second, the reasoning of AAADC does not support extending Section 1252(g) to encompass challenges to the decision to rescind DACA. In AAADC, the Court reasoned that Section 1252(g) must have been intended to limit judicial review of denials of deferred action:

> Section 1252(g) seems clearly designed to give some measure of protection to "no deferred action" decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases of separate rounds of judicial intervention outside the streamlined process that Congress has designed [ (i.e., for judicial review of final orders of removal) ].

525 U.S. at 485. These limits were "entirely understandable" in order to prevent "the deconstruction, fragmentation, and hence prolongation of removal proceedings" that could result if immigrants were allowed to attack in-process removal proceedings by claiming that they were singled out by immigration authorities for adverse treatment. Id. at 487; see id. at 487-92. Because the Batalla Vidal Plaintiffs challenge the programmatic decision to rescind DACA, rather than attempting to obstruct their specific removal proceedings by claiming that they were improperly denied deferred action, these cases do not implicate the concern raised in AAADC.

Accordingly, Section 1252(g) does not preclude review of these actions.

### 2. Claims by MRNY and the State Plaintiffs

Moreover, Section 1252(g) does not preclude judicial review of the claims brought by MRNY or the State Plaintiffs in particular. Again, the court begins with the text of the statute. Section 1252(g) only bars suits "by or on behalf of any alien arising from the decision or action ... to commence proceedings, adjudicate cases, or execute removal orders against any alien." (emphasis added). But neither MRNY nor the State Plaintiffs are suing "on behalf of any alien" in removal proceedings or subject to an order of removal. Instead, MRNY sues in its own right, because it claims that the rescission of DACA has interfered with its operations. (SAC ¶¶ 54-57.) Likewise, the State Plaintiffs sue not "on behalf of any alien," but instead to vindicate their own proprietary and quasi-sovereign interests.[13] (State Pls. Opp'n to Mot. to Dismiss ("State Pls. Opp'n") (No. 17-CV-5228, Dkt. 82) at 19-22.) MRNY and the State Plaintiffs seek to assert their own rights and the rights of the general public, not those of individual immigrants in removal proceedings or subject to orders of removal. There is no reason why Section 1252(g) would deprive the court of jurisdiction over their claims, brought on their own behalf.

### C. Standing
**\*14** The court next considers whether Plaintiffs have established that they have standing to sue. Defendants only cursorily raise Article III standing defenses. (Defs. Mem. at 19-20, 34, 37.) "Because the standing issue goes to this [c]ourt's subject matter jurisdiction," however, "it can be raised sua sponte." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005).

Under the U.S. Constitution, federal courts may hear only certain "cases" or "controversies." U.S. Const. art. III, § 2. This "case-or-controversy requirement" means that a plaintiff must have "standing," or a sufficient interest in a live dispute, to sue in federal court. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1546-47 (2016). At its "irreducible constitutional minimum," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), standing consists of three elements:

Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 29 of 1026 PageID #: 9620

Batalla Vidal v. Nielsen, Slip Copy (2017) Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 16 of 442
2017 WL 5201116

To establish Article III standing, [Plaintiffs] must demonstrate: "(1) injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."

Allco Fin. Ltd. v. Klee, 861 F.3d 82, 95 (2d Cir. 2017) (quoting W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008)); accord Lujan, 504 U.S. at 560-61. The "first and foremost" of these three requirements, "injury-in-fact" requires a plaintiff to "show that he or she suffered an invasion of a legally protected interest that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks and citation omitted) (quoting Lujan, 504 U.S. at 560). To be "imminent," the injury must be "certainly impending"; "allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398,409 (2013) (internal quotation marks, alteration, and citation omitted). The second and third requirements, "causation" and "redressability," require a plaintiff to demonstrate that the "injury-in-fact" he or she suffers is "fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386 (2014) (citing Lujan, 504 U.S. at 560). A plaintiff need not, however, demonstrate that the defendant was the proximate or "but-for" cause of the injury-in-fact. Id. at 1391 n.6; Rothstein v. UBS AG, 708 F.3d 82, 91-92 (2d Cir. 2013).

The court considers standing separately with respect to each claim raised in each case. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" with respect to each claim and form of relief sought. Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 53 n.3 (2006) ("FAIR"). The court therefore considers whether, for each claim raised in each of these two actions, at least one plaintiff has standing to sue.

## 1. Batalla Vidal Plaintiffs

### a. DACA Rescission Claims

**\*15** Defendants unsurprisingly do not contest that the Batalla Vidal Plaintiffs have standing to challenge the decision to rescind the DACA program. If the DACA program ends, the individual Batalla Vidal Plaintiffs almost certainly will lose their work authorization, the availability of which turns on their status as recipients of deferred action. See 8 C.F.R. § 274a.l2(c)(14). Loss of their ability to work in the United States is clearly an "injury-in-fact" fairly traceable to the rescission of the DACA program. Additionally, if they were to lose their deferred action, the individual Batalla Vidal Plaintiffs would be subject to removal from the United States. There is nothing "speculative" about the possibility that they would actually be removed. See Hedges v. Obama, 724 F.3d 170, 195-97 (2d Cir. 2013) (to establish standing, a plaintiff who is clearly in violation of a "recent and not moribund" statute need not affirmatively demonstrate the government's intent to enforce the statute, absent "a disavowal by the government or another reason to conclude that no such intent exist[s]" (quoting Doc v. Bolton, 410 U.S. 179, 188 (1973))); cf. Amnesty Int'l, 568 U.S. at 410-16 (no standing where alleged injury-in-fact rested on a "speculative" "chain of contingencies"). Those harms are "fairly traceable" to the termination of the DACA program and would be redressed by the vacatur of that decision. The Batalla Vidal Plaintiffs thus have Article III standing to challenge the decision to rescind the DACA program.

The Batalla Vidal Plaintiffs also have standing to challenge the process by which Defendants decided to end the DACA program. Plaintiffs have standing to assert procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest ... that is the ultimate basis of [their] standing." Lujan, 504 U.S. at 573 n.8. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. EPA, 549 U.S. 497, 518 (2007). Here, there is "some possibility" that if Defendants had subjected the decision to rescind the DACA program to notice and comment and analyzed the impact of that decision on small entities, they would have

reached a different outcome. Accordingly, the Batalla Vidal Plaintiffs also have Article III standing to assert their procedural APA claim, and MRNY has Article III standing to assert its RFA claim.

Defendants contend that Plaintiffs cannot assert procedural APA claims because, if the decision to rescind the DACA program was a "substantive" or "legislative" rule requiring notice-and-comment rulemaking, then, "a fortiori so was enacting the policy in the first place," and the DACA program itself was thus "void ab initio—leaving Plaintiffs without a remedy." (Defs. Mem. at 28-29.) It does not follow, however, that if the rescission of the DACA program required notice and comment, the program's creation necessarily required notice and comment as well. (See Defs. Mem. at 29 n.7.) While Defendants might be correct on the merits (an issue that the court does not consider or resolve at this time), all that Article III requires is that Plaintiffs show that their alleged injury would be redressed by the ruling they seek—i.e., that the decision to rescind DACA should be vacated because it was procedurally defective.

### b. Information-Use Policy Claim

The Batalla Vidal Plaintiffs also have standing to challenge the alleged changes to DHS's information-use policy. To obtain deferred action and work authorization under DACA, an applicant was required to provide USCIS with extensive personal information, including his or her home address, height, weight, hair and eye color, fingerprints, photograph, and signature, and submit to a background check. (See USCIS, Form I-821D: Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60-1)) at ECF pp.6-8; USCIS, Instructions for Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60-1)) at ECF p.3.) The Batalla Vidal Plaintiffs also allege that DACA applicants "routinely provided" other personal information, "including copies of school records, pay stubs, bank statements, passports, birth certificates, and similar records," in support of their applications. (SAC ¶ 70.) They contend that this information will enable DHS to deport them more easily once their deferred action expires. (Id. ¶ 127.) The court agrees. It is not difficult to infer that this information would facilitate DHS's ability to remove these individuals from the country. This increased likelihood of removal is sufficiently concrete,

imminent, and traceable to Defendants' alleged conduct to establish standing.

**\*16** Defendants argue that Plaintiffs lack standing to pursue their information-use policy claims because "[n]o Plaintiff plausibly alleges that the agency has in fact used his DACA information for any enforcement purpose, much less initiated enforcement proceedings against him as a result, or that there is any imminent threat of this occurring." (Defs. Mem. at 37.) The individual Batalla Vidal Plaintiffs need not wait, however, until they are deported to have standing to press this claim. Once their deferred action expires, they will be subject to removal from the United States, and the court will presume that Defendants will enforce the immigration laws against them. See Hedges, 724 F.3d at 197. Nor will the court ignore the obvious reality that many DACA recipients will be removed from the country when their deferred action expires. (See, e.g., State Pls. Am. Compl. ¶ 71 (quoting a statement by Acting Director of ICE Thomas Homan that undocumented immigrants "should be uncomfortable" and "should look over [their] shoulder[s]" and "be worried").) The threat of removal based on information provided to DHS is sufficiently imminent as to constitute injury-in-fact.

### c. Notice Claim

The Batalla Vidal Plaintiffs lack standing, however, to assert their notice claim. In their Second Amended Complaint, the Batalla Vidal Plaintiffs allege that, following the enactment of the DACA Rescission Memo, Defendants failed to send DACA recipients whose status expired by March 5, 2018, individualized notices "advising them that they must apply to renew DACA by October 5, 2017 or be forever ineligible to renew their status." (SAC ¶ 165; see id. at 3, 48, 103-05, 160-66.) As Defendants correctly note, however, the Batalla Vidal Plaintiffs have not alleged that any of them missed the October 5, 2017, deadline or suffered other adverse effects from not receiving such individualized notice. (Defs. Mem. at 34-35.) Nor, even drawing all reasonable inferences in Plaintiffs' favor, does the Second Amended Complaint show that MRNY was injured by Defendants' failure to provide DACA recipients with individualized notice of the renewal deadline.[14] While the Second Amended Complaint alleges that "MRNY has not been able to reach four DACA recipients to inform them that they

Appeal 12-1521-cv-05228-NCG-VMS Filed 07/02/2827 Filed 09/05/20 Page 31 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS Document 29-2 9622

Batalla Vidal Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 18 of 442
2017 WL 5201116

need to renew now" (SAC ¶ 48), that does not support the reasonable inferences either that those individuals failed to apply for renewal or that such failure was "fairly traceable" to Defendants' actions.[15] In the absence of a showing that anyone has been harmed by a failure to receive notice of the change to the application deadline, the Batalla Vidal Plaintiffs have not demonstrated that they have Article III standing to bring this claim.

### 2. State Plaintiffs

The court next considers whether the State Plaintiffs have Article III standing. As the Court has noted, the ordinary rules of standing are somewhat different when a state is a plaintiff. States are "not normal litigants for the purposes of invoking federal jurisdiction," and they are entitled to "special solicitude" when they seek to vindicate their "proprietary" or "quasi-sovereign" interests.[16] Massachusetts v. EPA, 549 U.S. at 518. This does not mean, however, that states have unbridled license to sue.

### a. The State Plaintiffs Have Standing to Challenge the DACA Rescission

**\*17** The State Plaintiffs have Article III standing to challenge Defendants' decision to rescind the DACA program, as well as the procedures by which that decision was made and implemented, based on that decision's impacts to the State Plaintiffs' proprietary interests. States, "like other associations and private parties," may have a "variety of proprietary interests" that they may vindicate in court. Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601-02 (1982) ("Snapp"). A state has proprietary interests, for example, in its ownership of land, id. at 601, and in its relationships with its employees, see Indiana v. IRS, 38 F. Supp. 3d 1003, 1009 (S.D. Ind. 2014) ("The Defendants recognize, as they must, that a State and its political subdivisions may sue in their capacity as employers."). A state also has proprietary interests in its "participat[ion] in a business venture," Snapp, 458 U.S. at 601, and in the operation of state-run institutions, such as state colleges and universities, Washington, 847 F.3d at 1159-61; Aziz v. Trump, 231 F. Supp. 3d 23, 32-33 (E.D. Va. 2017).

Here, the State Plaintiffs have amply alleged and documented that the rescission of DACA would harm the states' proprietary interests as employers and in the operation of state-run colleges and universities. (State Pls. Am. Compl. ¶ 190 (states employ "[m]any DACA recipients").). For example, the State of Washington represents that it employs DACA recipients within state government (e.g., Decl. of Paul Quinonez ¶¶ 1-6 (State Pls. Am. Compl., Ex. 56 (Dkt. 55-56)); Decl. of E. Alexandra Monroe ¶ 3-4 (State Pls. Am. Compl., Ex. 62 (Dkt. 55-62))) and at state-run colleges and universities (e.g., Decl. of Lucila Loera ¶ 4 (State Pls. Am. Compl., Ex. 58 (Dkt. 55-58))). If DACA were rescinded, these employees would lose their work authorization, and the State of Washington would incur expenses in identifying, hiring, and training their replacements. (State Pls. Am. Compl. ¶ 190.) Accordingly, the State of Washington has standing to assert equal protection and substantive APA claims challenging the decision to end the DACA program. Moreover, Washington has standing to challenge the procedures by which Defendants decided to end the DACA program, because "there is some possibility" that, if DHS complied with notice-and-comment and RFA rulemaking procedures, it might "reconsider the decision." See Massachusetts v. EPA, 549 U.S. at 518. Because Washington has established its standing to assert substantive and procedural APA and RFA claims, the State Plaintiffs therefore have Article III standing to bring these claims. See FAIR, 547 U.S. at 53 n.3.

Defendants' arguments that State Plaintiffs lack Article III standing because they would be only "incidentally" harmed by the rescission of the DACA program are without merit. (See Defs. Mem. at 19.) Defendants protest that "[i]t would be extraordinary to find Article III standing" based on a state's assertions of "alleged harms to their residents, employees, tax bases, health expenditures, and educational experiences at their universities," as "virtually any administration of federal law by a federal agency could have such effects." (Id.) That a federal policy may have sweeping, adverse effects on states and state-run institutions is not, however, a convincing argument that states should not have standing to challenge that policy. Moreover, Defendants' position is irreconcilable with their own stated rationale for rescinding the DACA program. Defendants have stated that they rescinded the DACA program because it suffered from the same legal flaws as the DAPA program and could not be defended in court against the threatened challenge by Texas and

Appeal 18-1521-cv-05228-NGG-VMS Filed 07/02/2827 Filed 09/04/20 Page 32 of 1026 PageID #: 9623

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 19 of 442
Batalla Vidal v. Duke, Slip Copy (2017)
2017 WL 5201116

other state plaintiffs. That necessarily assumes that at least one of the plaintiff states in the <u>Texas</u> litigation has standing to challenge the existence of the DACA program. <u>Cf. Texas</u>, 809 F.3d at 150-62 (finding standing based on the likely costs of having to issue drivers licenses to DAPA beneficiaries). Defendants offer no convincing reason why states should have standing to challenge the DACA program but not to challenge the decision to end that program. [17]

### b. The State Plaintiffs Lack Standing to Bring Notice and Information-Use Policy Claims

**\*18** Whether the State Plaintiffs can assert their notice or information-use policy claims, however, is a close question. In order to assert these claims, the State Plaintiffs must identify some cognizable proprietary or quasi-sovereign interest that was harmed by Defendants' challenged conduct—<u>i.e.</u>, (1) with respect to the notice claim, Defendants' communication of its decision to rescind the DACA program and impose an October 5, 2017, renewal deadline; and (2) with respect to the information-use policy claims, the alleged change in DHS policy regarding the use of DACA applicants' information. In the court's view, the State Plaintiffs have not identified any interests harmed by these actions that they can sue the federal government to redress, and so they lack standing to bring these claims.

### i. Proprietary Interests

While the State Plaintiffs allege that their proprietary interests will be harmed by the termination of DACA (State Pls. Am. Compl. ¶¶ 15, 100), they do not identify any proprietary interests that have been or will be harmed by Defendants' alleged failure to provide DACA recipients with "adequate notice" of the "procedures and timeline for renewing their DACA status," "about the general termination of the DACA program after March 5, 2018," or "of [DACA recipients'] inability to apply for renewal of their DACA status after March 5, 2018" (<u>id.</u> ¶¶ 276-78; <u>cf.</u> State Pls. Mem. at 19-21). It is certainly conceivable that many DACA recipients who were eligible to renew their deferred action and work authorization under the DACA Rescission Memo failed to do so before the October 5, 2017 deadline. (State Pls. Am. Compl. ¶ 96 (noting that "up to one third of DACA grantees who

are eligible for renewal had not applied as of two days before the ... deadline").) The State Plaintiffs' Amended Complaint does not provide a sufficient basis for the court to conclude, however, that (1) such failures to renew were "fairly traceable" to Defendants' decision not to provide each DACA recipient with individualized notice of the change in application procedures and timelines; or (2) that these failures to renew harmed any State Plaintiff's proprietary interests (for example, by depriving a state employee of work authorization). <u>See Amnesty Int'l</u>, 568 U.S. at 410-16. Accordingly, the State Plaintiffs fail to assert a proprietary interest that would give them standing to bring their notice claim. [18]

Nor do the State Plaintiffs identify a cognizable proprietary interest harmed by the alleged change to DHS's information-use policy. The State Plaintiffs' information-use policy claims challenge not the decision to rescind DACA itself, but the alleged changes in DHS's information-use policy, which, Plaintiffs allege, will facilitate the deportation of DACA applicants. As discussed above, the court accepts that these changes (if true) will likely result in more undocumented immigrants' removal from the United States. (<u>See</u> State Pls. Am. Compl. ¶ 86.) The State Plaintiffs have not, however, identified any cognizable harm to their proprietary interests that would result from the removal of their undocumented residents. The State Plaintiffs have proffered evidence that the removal of DACA beneficiaries would grievously affect state economies. (<u>See</u> Decl. of Dr. Ike Brannon ¶¶ 12, 14 (State Pls. Am. Compl., Ex. 4 (Dkt. 55-4)) (estimating that the removal of DACA recipients from the United States "would cost ... the economy as a whole $215 billion in lost GDP," with impacts falling hardest on states with the largest number of DACA recipients).) Despite the scale of these impacts, the State Plaintiffs' own authority makes clear that states lack standing to bring a "claim ... that actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues." <u>Wyoming v. Oklahoma</u>, 502 U.S. 437, 448 (1992). Absent some showing of injury to their own proprietary interests (for example, "direct injury in the form of a loss of specific tax revenues," <u>id.</u>), the State Plaintiffs cannot maintain their information-use policy claims based on alleged harms to their proprietary interests.

 AR1284

Appeal: 18-1521 Doc: 29-2 Filed: 07/02/2018 Pg: 33 of 1026
Case 1:17-cv-05228-NGG-VMS Document 28-7 Filed 09/04/20 Page 33 of 1026 PageID #: 9624
Batalla Vidal Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 20 of 442
2017 WL 5201116

### ii. *Quasi-Sovereign Interests*

**\*19** Accordingly, the court will consider whether the State Plaintiffs can assert these claims parens patriae to vindicate their quasi-sovereign interests. States may bring parens patriae (literally, "parent of the country") suits to vindicate what the Court has characterized as "quasi-sovereign" interests. See Snapp, 458 U.S. at 600-02. There are no bright-line rules for which interests qualify as "quasi-sovereign." See id. at 600, 607; 13B Charles A. Wright et al., Federal Practice and Procedure § 3531.11.1, at 117 (3d ed. 2008) ("Wright & Miller"). In general, however, the Court has recognized that a state has quasi-sovereign interests in the "health and well-being—both physical and economic—of its residents in general," in protecting state "residents from the harmful effects of discrimination," and in challenging the discriminatory denial of a state's "rightful status within the federal system." Id. at 607, 609. There are, however, at least two notable limitations on states' parens patriae standing.

First, to be "quasi-sovereign," the state's interests must be sufficiently generalized that the state is seeking to vindicate its citizens' welfare, rather than simply pressing suit on behalf of its individual residents. See id. at 607 ("[M]ore must be alleged than injury to an identifiable group of individual residents...."). A state cannot sue parens patriae when it is "merely litigating as a volunteer the personal claims of its citizens." Pennsylvania v. New Jersey, 426 U.S. 660, 665 (1976).

Second, special considerations are present when a state brings a parens patriae suit against the federal government. See 13B Wright & Miller § 3531.11.1, at 96. In Massachusetts v. Mellon, 262 U.S. 447 (1923), the Court rejected Massachusetts's attempt to bring a parens patriae suit challenging a federal statute as unconstitutional. See id. at 485-86. "While the state, under some circumstances, may sue in [a parens patriae] capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae ...." Id. (emphasis added); see also Snapp, 458 U.S. at 609 n.16 ("A State does not have standing as parens patriae to bring an action against the Federal Government."). The Court has rejected the argument, however, that Massachusetts v. Mellon bars all state parens patriae claims against

the federal government. See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2664 n.10 (2015) (observing that "[t]he cases on the standing of states to sue the federal government seem to depend on the kind of claim that the state advances" (quoting Richard Fallon et al., Hart and Wechsler's The Federal Courts and the Federal System 263-66 (6th ed. 2009))). Compare Massachusetts v. EPA, 549 U.S. at 520 n.17, with id. at 538-39 (Roberts, C.J., dissenting). Instead, states may sue the federal government parens patriae to enforce rights guaranteed by a federal statute. See Massachusetts v. EPA, 549 U.S. at 520 n.17; see also New York v. Sebelius, No. 1:07-CV-1003 (GLS) (DRH), 2009 WL 1834599, at \*12 (N.D.N.Y. June 22, 2009) (collecting cases). Massachusetts v. EPA expressly did not disturb the settled rule, however, that a state may not sue parens patriae to "protect her citizens from the operation of federal statutes." Massachusetts v. EPA. 549 U.S. at 520 n.17 (quoting Georgia v. Penn. R. Co., 324 U.S. 439, 447 (1945)).

The court concludes that the State Plaintiffs lack standing to bring either their notice and information-use policy claims. With respect to their notice claim, the State Plaintiffs have not argued or demonstrated that Defendants' alleged failure to provide DACA applicants with adequate notice of changes in the DACA program and renewal deadline has actually harmed "the health and well-being" of state residents or any other cognizable quasi-sovereign interest. See Snapp, 458 U.S. at 607. (Cf. State Pls. Am. Compl. 15, 100; State Pls. Opp'n at 21-22.) Even if they had done so, they would be challenging federal enforcement of federal immigration laws as unconstitutional, which Massachusetts v. Mellon prohibits. See Massachusetts v. EPA, 549 U.S. at 520 n.17 ("[T]here is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what Mellon prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)."). For the same reason, the State Plaintiffs also lack standing to assert their information-use policy claims. Even assuming, as discussed above, that the change in information-use policy will facilitate the removal of undocumented immigrants from these states, and that this removal will harm the "health and well-being—both physical and economic" of state residents, see Snapp, 458 U.S. at 607, the thrust of the State Plaintiffs' information-use policy claims is to challenge as fundamentally unfair a change in federal policy that

will facilitate the federal government's enforcement of the immigration laws.

**\*20** The State Plaintiffs' argument that they merely seek to "enforce—as opposed to overturn or avoid—application of a federal statute" is unpersuasive. (State Pls. Opp'n at 21 n.11) Plaintiffs plainly seek to invalidate federal action as unconstitutional. Such claims more closely resemble constitutional challenges to application of federal statutes, which <u>Massachusetts v. Mellon</u> prohibits states from asserting <u>parens patriae</u>, than suits to enforce compliance with federal statutory law, which <u>Massachusetts v. EPA</u> permits states to bring <u>parens patriae</u>. When challenging federal action on constitutional grounds, "it is no part of [the state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." <u>Massachusetts v. Mellon</u>, 262 U.S. at 485-86. <u>But see Aziz</u>, 231 F. Supp. 3d at 31-32 (concluding that "a state is not be barred by the <u>Mellon</u> doctrine from a <u>parens patriae</u> challenge to executive action when the state has grounds to argue that the executive action is contrary to federal statutory or <u>constitutional</u> law" (emphasis added)).

The court concludes, therefore, that the State Plaintiffs lack standing to assert their notice and information-use policy claims.

### D. Whether State Plaintiffs Have Cause of Action under the APA

Lastly, Defendants assert that neither MRNY's nor the State Plaintiffs' claims are justiciable because those Plaintiffs do not assert interests that are "arguably within the zone of interests ... protected or regulated by the statute ... in question." (Defs. Mem. at 21 (quoting <u>Clarke v. Secs. Indus. Ass'n</u>, 479 U.S. 388, 395 (1987) (first alteration added)).) To bring suit under the APA, a plaintiff "must satisfy not only Article III's standing requirements, but an additional test: [t]he interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 224 (2012) ("<u>Match-E-Be-Nash</u>") (quoting <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Camp</u>, 397 U.S. 150, 153 (1970)). This test "is not meant to be especially demanding' " and "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed

that Congress intended to permit the suit.' " <u>Id.</u> (quoting <u>Secs. Indus. Ass'n</u>, 479 U.S. at 399).

Critically, for the court's current purposes, whether MRNY and the State Plaintiffs assert interests falling within the "zone of interests" protected by the APA is not a question of "jurisdiction" or "justiciability." As the Supreme Court has explained, the question of whether a plaintiff falls within the zone of interests protected by a statute is not properly classed as an issue of "prudential standing," but is instead an issue of "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." <u>Lexmark Int'l</u>, 134 S. Ct. at 1387. That issue "goes not to the court's jurisdiction —that is, '<u>power</u>'—to adjudicate a case, but instead to whether the plaintiff has adequately pled a claim." <u>Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n</u>, 768 F.3d 183, 201 (2d Cir. 2014) (citing <u>Lexmark Int'l</u>, 134 S. Ct. at 1387 n.4,1389 n.5); <u>see also</u> <u>Casper Sleep, Inc. v. Mitcham</u>, 204 F. Supp. 3d 632, 637-38 (S.D.N.Y. 2016) (arguments for dismissal for lack of "prudential standing" were appropriately addressed under Rule 12(b)(6), not Rule 12(b)(1), of the Federal Rules of Civil Procedure). Because this argument does not raise an issue of "jurisdiction or justiciability," the court does not address it here.

### IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for lack of subject-matter jurisdiction (Dkt. 95) is GRANTED IN PART and DENIED IN PART. The following claims are dismissed:

- <u>Batalla Vidal v. Duke</u>, No. 16-CV-4756:

    **\*21** • Fourth claim for relief (Due Process Clause—Notice)

- <u>New York v. Trump</u>, No. 17-CV-5228:

    - Second claim for relief (Due Process Clause—Information-Use Policy)

    - Third claim for relief (Equitable Estoppel—Information-Use Policy)

    - Seventh claim for relief (Due Process Clause—Notice)

Defendants' motion to dismiss for lack of subject-matter jurisdiction is denied with respect to all other claims. The court RESERVES RULING on Defendants' motion to dismiss for failure to state a claim.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 5201116

Footnotes

1     Except as noted, all docket citations refer to the docket in Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.). For convenience, the court refers to the Plaintiffs in Batalla Vidal v. Duke as the "Batalla Vidal Plaintiffs"; Plaintiff Make the Road New York as "MRNY"; the Plaintiffs in New York v. Trump, No. 17-CV-5228 (E.D.N.Y.), as the "State Plaintiffs"; the U.S. Department of Homeland Security as "DHS"; U.S. Customs and Border Protection as "CBP"; U.S. Citizenship and Immigration Services as "USCIS"; U.S. Immigration and Customs Enforcement as "ICE"; and the U.S. Department of Justice as "DOJ."

2     "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." Arizona v. United States, 567 U.S. 387, 396 (2012) (citing 8 U.S.C. § 1227).

3     While the letter is not dated, the PDF of the AR dates the letter September 4, 2017. (See also Defs. Mem. at 9.)

4     Defendants maintain that, as a legal matter, Acting Secretary Duke is solely responsible for the decision to rescind the DACA program. (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate (Dkt. 80) at 3-4.) As the court has noted, however, Defendants previously represented to the court that the Attorney General and Acting Secretary Duke jointly decided to end the DACA program. (Tr. of Sept. 14, 2017, Hr'g (Docket Number Pending) 13:17-14:06, 24:21-24, 26:1-6; Oct. 17, 2017, Mem. & Order (Dkt. 86) at 9-10.) Defendants had not then, and still have not, presented this court with any reason why it should disregard their earlier representations as to who decided to end the DACA program. (See Oct. 17, 2017, Mem. & Order at 10; Oct. 19, 2017, Mem. & Order at 10-11.) For purposes of this motion, however, nothing turns on the question of whether Acting Secretary Duke acted alone or with the Attorney General and the President when terminating the DACA program, so the court simply refers to the actions of "Defendants" in this regard.

5     The State Plaintiffs were initially comprised of the States of North Carolina, Hawaii, New York, Washington, Iowa, Oregon, Rhode Island, Vermont, Illinois, Connecticut, New Mexico, and Delaware; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the District of Columbia. (State Pls. Compl. (No. 17-CV-5228, Dkt. 1).) Colorado has since joined the case. (State Pls. Am. Compl. (No. 17-CV-5228, Dkt. 54).)

6     All citations refer to the SAC.

7     All citations refer to the State Plaintiffs' Amended Complaint.

8     Prior to filing their Motion to Dismiss, Defendants requested and received leave to file an overlong brief "in order ... to fully present their dismissal arguments in these cases." (Defs. Oct. 25, 2017, Appl. for Leave to File Excess Pages (Dkt. 94); Oct. 26, 2017, Order Granting Defendants' Application for Leave to File Excess Pages.) That application did not expressly indicate that Defendants intended to present arguments for dismissal for failure to state a claim under Rule 12(b)(6), as opposed to just the "jurisdiction and justiciability" arguments specifically referenced by the Second Circuit's and this court's October 24, 2017, orders. Defendants would not have required these excess pages had they confined their briefing to those issues. (See Oct. 27, 2017, Order (Dkt. 98).)

9     It is not clear whether Section 701(a)(2) limits the court's jurisdiction or instead forms an "essential element" of a claim for relief under the APA. Sharkey v. Quarantillo, 541 F.3d 75, 87-88 (2d Cir. 2008); accord Conyers v. Rossides, 558 F.3d 137, 143 n.8 (2d Cir. 2009). Nothing turns on this distinction here, however, because Section 701(a)(2) does not shield Defendants' actions from judicial review.

10     The State Plaintiffs also assert a claim for equitable estoppel. (State Pls. Am. Compl. ¶¶ 246-52.) With respect to the State Plaintiffs' equitable estoppel claim, the court assumes for the sake of argument that the relevant "law to apply" may be found in DHS's past statements and practices regarding the use of DACA applicants' information. See Salazar, 822 F.3d at 76-77. (See State Pls. Am. Compl. ¶¶ 39-44.) The court need not decide this question, however, because, as discussed below, the State Plaintiffs lack standing to assert this claim. (See infra Section III.C.2.b.)

11     As part of transferring many immigration-related responsibilities from the Attorney General to the Secretary of DHS, the Homeland Security Act of 2002 provides that statutory references "to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary [of DHS], other official,

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 28-2 Filed 07/02/2018 Filed 09/04/20 Pg: 36 of 1026 Page 36 of 1026 PageID #: 9627

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 23 of 442

Batalla Vidal v. Duke, Slip Copy (2017)
2017 WL 5201116

    or component of [DHS] to which such function is so transferred." 6 U.S.C. § 557; Shabaj v. Holder, 718 F.3d 48, 51 n.3 (2d Cir. 2013).

12    Defendants have represented publicly that no action will be taken against DACA recipients prior to March 5, 2018. (See, e.g., Donald J. Trump (@realDonaldTrump), Twitter.com (Sept. 7, 2017, 6:42 a.m.), https://twitter.com/realdonaldtrump/status/905788459301908480 ("For all of those (DACA) that are concerned about your status during the 6 month period, you have nothing to worry about—No action!").)

13    While a parens patriae suit is in some sense brought by a state "on behalf of" its citizens, "[t]he asserted quasi-sovereign interests will be deemed sufficiently implicated to support parens patriae standing only if 'the injury alleged affects the general population of a State in a substantial way.' " Puerto Rico ex rel. Quiros v. Bramkamp, 654 F.2d 212, 215 (2d Cir. 1981) (emphasis added) (quoting Maryland v. Louisiana, 451 U.S. 725, 738 (1981)). A state cannot sue parens patriae simply to assert its citizens' personal claims. See Pennsylvania v. New Jersey, 426 U.S. 660, 665-66 (1976) (per curiam) (collecting cases). To the extent the State Plaintiffs attempt to bring parens patriae claims based on harm to their quasi-sovereign interests, those claims are not "on behalf of" specific immigrants, but instead seek to protect the general welfare of their residents. In any event, as the court discusses below, the State Plaintiffs lack parens patriae standing to bring these claims.

14    The court also notes that the renewal deadline provided by the DACA Rescission Memo was not significantly different than that provided by existing DHS policy. The State Plaintiffs allege that "[p]rior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120-150 days prior to expiration ... in order to avoid a lapse in deferred action and employment authorization." (State Pls. Am. Compl. ¶ 93.) Under the DACA Rescission Memo, a DACA recipient whose deferred action and work authorization was set to expire on March 4, 2018, was required to file an application for renewal by October 5, 2018—i.e., 150 days before those benefits were set to expire.

15    Even if those conditions were met, it is not clear that MRNY would have organizational standing to bring this claim. See Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) ("[O]ur prior cases ... have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm.")

16    The Court has categorized a state's litigation interests using the trichotomy of "sovereign," "quasi-sovereign," and "proprietary" interests. See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601 (1982) ("Snapp"). Proprietary interests are those that a state may have akin to a private party, such as ownership of land or participation in a business venture. Id. at 601. Sovereign interests are interests the state has in its capacity as a state, such as "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" and "the demand for recognition from other sovereigns." Id. "Quasi-sovereign" interests are harder to define but "consist of a set of interests that the State has in the well-being of its populace." Id. at 602; see also id. at 607 ("[T]he articulation of [quasi-sovereign] interests is a matter for case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract....").

17    Defendants' arguments to the contrary are unpersuasive. (Defs. Mem. at 21.) First, Defendants argue that neither the Acting Secretary nor the Attorney General "expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings." (Id.) Jurisdiction is, however, a prerequisite to a ruling on the merits, so the plaintiff states could prevail in their threatened challenge to the DACA program only if they had standing. Second, Defendants argue that "it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place," and that the Executive Branch has "an independent duty to consider the legality of ... policies regardless of whether they are judicially reviewable." (Id.) The DACA Rescission Memo does not indicate, however, that Defendants actually considered these issues when deciding to rescind the DACA program. Finally, Defendants argue that the adoption of the DACA program could have been reviewed as an abdication of DHS's statutory responsibilities—a grounds for justiciability that would not apply to the decision to rescind the program. (Id. at 21-22.) The Fifth Circuit expressly did not rely on that theory of standing, 809 F.3d at 150, nor is there any indication that the Attorney General or Acting Secretary considered it in rescinding the DACA program.

18    In this circuit, the State Plaintiffs need not demonstrate, however, that the individuals they seek to protect must themselves meet the injury-in-fact, causation, and redressability requirements of Article III. See Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 338-39 (2d Cir. 2009), aff'd in relevant part by an equally divided court, 564 U.S. 410, 420 (2011).

---

**End of Document**                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Appeal 19-1521 Document 28-2 Filed 07/02/2019 Page 37 of 75
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 37 of 1026 PageID #: 9628

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 24 of 442

# EXHIBIT 2

AR1289

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

MARTÍN JONATHAN BATALLA VIDAL,
ANTONIO ALARCON, ELIANA FERNANDEZ,
CARLOS VARGAS, MARIANO
MONDRAGON, and CAROLINA FUNG FENG,
on behalf of themselves and all other similarly
situated individuals, and MAKE THE ROAD
NEW YORK, on behalf of itself, its members, its
clients, and all similarly situated individuals,

               Plaintiffs,

v.

ELAINE C. DUKE, Acting Secretary, Department
of Homeland Security, JEFFERSON
BEAUREGARD SESSIONS III, Attorney General of
the United States, and DONALD J. TRUMP,
President of the United States,

               Defendants.

Case No. 16-cv-4756 (NGG)(JO)

**DEFENDANTS' OBJECTIONS
AND RESPONSES TO
PLAINTIFFS' FIRST SET OF
INTERROGATORIES TO
DEFENDANTS**

(Garaufis, J.)
(Orenstein, M.J.)

       Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Civil Rules of the

United States District Courts for the Southern and Eastern Districts of New York, in accordance

with the Order of the Honorable James Orenstein, U.S. Magistrate Judge, dated September 27,

2017, Defendants, by and through counsel, provide the following Objections and Responses to

Plaintiffs' First Set of Interrogatories. Defendants' objections and responses are based on

information known to Defendants at this time, and are made without prejudice to additional

objections should Defendants subsequently identify additional grounds for objection, or should

additional or different information become available. The information submitted herewith is

being provided in accordance with the Federal Rules of Civil Procedure, which generally permit

discovery of matters not privileged that are relevant to the claims or defenses in this civil action

1

    **AR1290**

and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(l). Accordingly, Defendants do
not, by providing such information, waive any objection to its admissibility on the grounds of
relevance, materiality, privilege, competency, or any other appropriate ground.  Defendants
reserve the right to amend, supplement, or alter these objections and responses at any time.  A
statement that Defendants will produce documents in response to any of Plaintiffs' requests for
production is not meant to imply that such documents exist, but only that Defendants will
produce them if they do exist and can be located based on a search that is proportional to the
reasonable needs of this case, and subject to any of Defendants' objections to Plaintiffs' requests
for production.

## OBJECTIONS WHICH APPLY TO ALL INTERROGATORIES

1.      Separate and apart from the specific objections set forth below, Defendants object
to any discovery taking place in this case to the extent such discovery is brought pursuant to
claims purportedly under the Administrative Procedure Act, as resolution of any such claims
should be based upon the administrative record compiled by the Department of Homeland
Security.

2.      Defendants object to any discovery taking place before resolution of Defendants'
forthcoming dispositive motions.

3.      Defendants object to Plaintiffs' Interrogatories to the extent that they seek (a)
attorney work product; (b) communications protected by the attorney-client privilege; (c)
information protected by the deliberative-process privilege, the joint defense privilege, common
interest privilege, or law enforcement privilege; (d) material the disclosure of which would
violate legitimate privacy interests and expectations of persons not party to this litigation; (e)
information protected by any form of executive privilege; or (f) any other applicable privilege or
protection. Defendants object to Plaintiffs' Interrogatories to the extent they assume that certain

2

types of information exist. By providing these objections, Defendants do not hereby imply that information exists that is responsive to Plaintiffs' Interrogatories.

4. Each and every response contained herein is subject to the above objections, which apply to each and every response, regardless of whether a specific objection is interposed in a specific response. The making of a specific objection in response to a particular request is not intended to constitute a waiver of any other objection not specifically referenced in the particular response.

5. Defendants specifically reserve the right to make further objections as necessary to the extent that additional issues arise as to the meaning of and/or information sought by discovery.

6. Defendants object to the extent that any request is contrary to any future and further order(s) of the Court.[1]

## OBJECTIONS TO DEFINITIONS

7. Defendants object to the inclusion of definitions for any term not relied on in these Interrogatories. Any requirement that Defendants respond to such definitions in the abstract is not proportional to the needs of the case and the burden of such a response outweighs its likely benefit, which is none. Defendants do not hereby waive any future objection to the definition of such terms or to the employment of Defendants' own definition of such terms.

8. Defendants object to the definition of "Defendants" as overly broad and outside of the scope of discovery. Fed. R. Civ. P. 26(b)(1). Defendants interpret the definition of Defendants to mean Attorney General Jefferson B. Sessions, III, in his official capacity, as well as the following components of the Department of Justice: the Office of the Attorney General (OAG), the Office of the Deputy Attorney General (ODAG), the Office of the Associate Attorney General (OASG), the Office of Legal Counsel (OLC), the Civil Rights Division (CRT),

---

[1] Pursuant to Defendants' prior reservation of the right to make additional objections should they subsequently identify additional grounds for objection, this objection has been added to Defendants' previous objections on October 16, 2017.

the Civil Division (CIV), the Office of the Solicitor General (OSG); and Elaine C. Duke, Acting
Secretary of Homeland Security (DHS), in her official capacity, as well as the relevant offices
within the following components of DHS: Headquarters, U.S. Customs and Border Protection
(CBP), U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration
Services (USCIS). The components listed are relevant as those in which searches for responsive
information relevant to decisions about the exercise of DHS's prosecutorial discretion in the
form of deferred action could conceivably be proportional to the likelihood of locating such
information and its likely benefit to the litigation. Information from the Executive Office of the
President will not be provided in response to these Interrogatories. *See Cheney v. U.S. District
Court*, 542 U.S. 367, 388 (2004).

9.    Defendants object to the definition of "date" as overbroad and unduly burdensome.
Defendants interpret date to mean "the exact date, month, and year, if ascertainable." To the
extent an approximation is required, it will be provided and will be designated as such. The
approximation will not include a description about "relationship to other events."

10.    Defendants object to the definition of "identify" in reference to an individual as
improperly requiring the disclosure of material, the disclosure of which would violate legitimate
privacy interests and expectations of persons not party to this litigation.

11.    Defendants object to the definition of "identify" in reference to a document
because that definition is unduly burdensome and goes beyond the requirements of Fed. R. Civ.
P. 34 and Local Rule 26.3(c)(4).

12.    Defendants object to the definition of "Department of Homeland Security" as
overbroad. Defendants will construe Department of Homeland Security to mean the relevant
offices within the following relevant components of the Department of Homeland Security:
Headquarters, CBP, ICE and USCIS, which are the components of DHS which are likely to have
responsive information.

13.    Defendants object to the definition of "DHS employee" or "DHS employees" as

4

AR1293

overly broad. DHS employee or employees will be construed to mean any current or former employee, in his or her official capacity as a DHS employee, of a relevant office within a relevant component of DHS: Headquarters, CBP, ICE, and USCIS.

14.    Defendants object to the definition of "DOJ employee" or "DOJ employees" as overly broad. DOJ employee or employees will be construed to mean any current or former employee, in his or her official capacity as a DOJ employee, of OAG, ODAG, OASG, OLC, OSG, CRT, or CIV.

15.    Defendants object to the definition of "USCIS employee" or "USCIS employees" as overly broad. USCIS employee or employees will be construed to mean any current or former employee, in his or her official capacity as a USCIS employee, of a relevant office within USCIS.

16.    Defendants object to the definition of "Trump Administration" on the basis that it is overbroad. Defendants will interpret Trump Administration to mean President Donald Trump in his official capacity as President, as well as any other current or former employee, in his/her official capacity, of the Executive Office of the President since January 20, 2017.

17.    Defendants object to the definition of the phrase "DACA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by DACA, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

18.    Defendants object to the definition of the phrase "DACA recipient" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by DACA, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

19.    Defendants object to the definition of the phrase "DAPA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action that would have been afforded by the DAPA policy had it been implemented, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

5

AR1294

20.    Defendants object to the definition of the phrase "expanded-DACA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by the DACA policy, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

21.    Defendants object to the definition of "staff" as overly broad. Staff will be construed to mean any current or former employee, official, or contractor whose information is within the possession, custody, or control of a relevant component of a relevant agency in carrying out official agency business.

22.    Defendants object to the definition of "Reason" or "Reasons" as overly broad, and not sufficient to permit a reasoned inquiry or response. Defendants will construe "Reason" or "Reasons" to mean the basis for Defendants' actions.

23.    Defendants object to the definition of the term "process" on the basis that it is overbroad in its inclusion of "other persons," and its inclusion of "Defendants" rather than the single Defendant to whom this Request for Production is directed. Defendants also object to the definition of the term "process" in that it includes communications, meetings, and discussions, whether or not those communications, meetings, and discussions had any relationship to any challenged action or decision with regard to the exercise of prosecutorial discretion in the form of deferred action.

24.    Defendant objects to the inclusion of a definition of "present for" as vague in its inclusion of "telephone presence" and "any form of electronic presence." Defendant will interpret the term "present for" to mean "a participant in a meeting, conversation, or discussion, whether in person, by telephone, by videoconference, or by other live communications method."

25.    Defendant objects to the definition of "discussion" or "discussions" as vague and overbroad to the extent it includes "any communication" in addition to the specified methods set forth in the definition.

26.    Defendant objects to the definition of "relating to" and "relate to" as overly broad, particularly in their inclusion of the terms "Setting forth," "mentioning," and "referring to." Defendant will construe "relate to" or "relating to" based on the context of potentially responsive

6

AR1295

documents to include only those documents "describing," "discussing," "commenting upon," "supporting" or "contradicting" the topic in question to a sufficient extent as to shed light on the parties' claims or defenses.

27.    Defendants object to the definitions in paragraphs 25-27 as overly broad. Defendants will interpret the requests in accordance with the definitions in Local Rule 26.3(d), or, for terms not defined in the Local Rules, using the plain meaning of the words included in the request.

## OBJECTIONS TO INSTRUCTIONS

28.    Defendants object to Instruction 1 as overly broad.  Defendants will respond to Interrogatories on the basis of a reasonable inquiry consistent with the obligations of Fed. R. Civ. P. 26(b)(1) and 26(g).

29.    Defendants object to Instruction 2 to the extent that it implies any obligation outside of the scope of Fed. R. Civ. P. 26(b)(5) and Fed. R. Civ. P. 33(b)(3).  Defendants will comply with the requirements of the Federal Rules of Civil Procedure and the local rules of this Court.

30.    Defendants object to Instruction 3 to the extent that it implies any obligation outside the scope of Fed. R. Civ. P. 26(b)(1) and Fed. R. Civ. P. 33.  Defendants will comply with the requirements of the Federal Rules of Civil Procedure and the local rules of this Court.

31.    Defendants object to Instruction 4 to the extent that it goes beyond the requirements of Fed. R. Civ. P. 33(d)(1).  Defendants will comply with the requirements of the Federal Rules of Civil Procedure and the local rules of this Court.

32.    Defendants object to Instruction 5 to the extent that it goes beyond the requirements of Local Rule 26.3(c)(3).  Defendants will comply with the requirements of the local rules of this Court.

## OBJECTIONS AND RESPONSES
## TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

**Interrogatory No. 1**

7

    AR1296

Please state the reason or reasons for Defendants' decision to terminate the DACA program, including the factors Defendants considered when making the decision, and the weight assigned to each factor.

**Objections to Interrogatory No. 1**

1. Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2. Defendants object to the portion of Interrogatory No. 1 seeking "the weight assigned to each factor" as vague and not capable of yielding a reasoned response.

3. Defendants object to the portion of Interrogatory No. 1 seeking "the factors Defendants considered when making the decision" as seeking information that is not relevant to the party's claims or defenses to the extent that this portion of Interrogatory No. 1 seeks information other than the reason or reasons for Defendants' decision.

4. Defendants object to Interrogatory No. 1 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) any other applicable privilege or protection.

5. Defendants object to Interrogatory No. 1 as containing three discrete subparts: (1) the reason or reasons for Defendants' decision; (2) the factors Defendants considered; and (3) the weight assigned to each factor. To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to each of these three sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 1**

Subject to these objections, Defendant DHS states that the reasons for the rescission of the DACA policy are set forth in Acting Secretary of Homeland Security Elaine Duke's

8

AR1297

memorandum dated September 5, 2017 to James W. McCament, Acting Director, U.S.

Citizenship and Immigration Services (USCIS), Thomas D. Homan, Acting Director U.S.

Immigration and Customs Enforcement (ICE), Kevin K. McAleenan, Acting Commissioner,

U.S. Customs and Border Protection (CBP), Joseph B. Maher, Acting General Counsel,

Ambassador James D. Nealon, Assistant Secretary International Engagement, and Julie M.

Kirchner, Citizenship and Immigration Services Ombudsman, regarding *Rescission of the June

15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to

Individuals Who Came to the United States as Children* ("DACA Rescission Memorandum"),

which is publicly available and included in the certified Administrative Record filed in this

action on October 6, 2017.  The Administrative Record also contains non-privileged information

actually considered by the Acting Secretary in connection with that decision.


**Interrogatory No. 2**

Please state the reason or reasons for Defendants' decisions (a) to terminate the DACA
program on September 5, 2017; (b) to set March 5, 2018, as the end date for renewals; (c)
to set October 5, 2017, as the deadline for renewal applications; and (d) to stop accepting
initial applications or renewal applications, from DACA recipients whose status expired
by September 5, 2017, as of September 5, 2017.

**Objections to Interrogatory No. 2**

    1.    Defendants incorporate by reference the above objections which apply to all

interrogatories as well as the objections to the definitions and instructions.

    2.    Defendants object to Interrogatory No. 2 to the extent that the request seeks (a)

attorney work product; (b) communications protected by the attorney-client privilege, (c)

information protected by the deliberative-process privilege, the joint defense privilege, common

interest privilege, or law enforcement privilege; (d) material the disclosure of which would

violate legitimate privacy interests and expectations of persons not party to this litigation; (e)

information protected by any form of executive privilege, including the presidential

communications privilege; or (f) any other applicable privilege or protection.


9

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Filed: 07/02/2018 Document 282-7 Pg: 47 of 1026 Filed 09/04/20 Page 47 of 1026 PageID #: 9638

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 34 of 442

3. Defendants object to Interrogatory No. 2 as containing four discrete subparts, as labeled (a) through (d). To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to each of these four sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 2**

Subject to these objections, Defendant DHS incorporates by reference herein its response to Interrogatory Number 1 in response to part (a) of this Interrogatory. Defendant DHS further states in response to part (a) that upon receiving the Attorney General's September 4, 2017 letter concluding DACA to be unlawful, Defendant DHS acted quickly to comply with the law by rescinding DACA and to mitigate litigation risk presented by Texas and the other plaintiff-states' assertion that they would amend the complaint in *Texas v. United States* to challenge DACA. Defendant DHS also incorporates by reference its response to Interrogatory 1 in response to parts (b), (c) and (d) of this Interrogatory and further states that the Acting Secretary, in considering both the Attorney General's advice regarding the unlawfulness and litigation-related vulnerabilities of DACA, as well as the complexities associated with winding down the policy, determined to provide a limited window in which USCIS will adjudicate certain requests for DACA and associated applications meeting certain parameters, as described in the DACA Rescission Memorandum. The deadlines referenced in parts (b), (c) and (d) of this Interrogatory were selected in order to facilitate the orderly wind-down of DACA without suddenly terminating deferred action for all DACA recipients.

The Acting Secretary decided to stop accepting initial DACA request or renewal requests from DACA recipients whose DACA expired before September 5, 2017, as of September 5, 2017, in accordance with the Acting Secretary's decision to rescind the DACA policy as of that date. Initial and renewal DACA requests already received by USCIS as of September 5, 2017, continue to be adjudicated.

10

AR1299

October 5, 2017 was selected as the deadline for DHS acceptance of renewal requests for DACA grants set to expire between September 5, 2017 and March 5, 2018, in order to provide a limited grace period for such DACA recipients to properly file their renewal requests. The October 5 deadline was selected in order to not disadvantage DACA recipients with DACA grants set to expire between September 5, 2017, and March 5, 2018, who had not yet sought renewal, as compared with DACA recipients with DACA grants set to expire between September 5, 2017, and March 5, 2018, who had already submitted renewal requests as of September 5, 2017. The six-month timeframe was also selected in part because it is consistent with USCIS's prior practice of sending DACA recipients reminder notices approximately 180 days in advance of expiration encouraging those recipients to request renewal 150 to 120 days in advance of expiration of their current period of deferred action under DACA. October 5, 2017 was further selected as the deadline for submitting renewal requests for DACA grants set to expire between September 5, 2017 and March 5, 2018, due to operational considerations, in order to provide USCIS with sufficient time to adjudicate the majority of renewal requests before March 5, 2018.

Similarly, March 5, 2018 was selected as the end date for renewals in order to facilitate an efficient and orderly wind-down of DACA without suddenly terminating deferred action for all DACA recipients.

**Interrogatory No. 3**

Please identify the date, location, participants, and subject of any meetings or conversations among staff of the Department of Justice, Department of Homeland Security, and Executive Office of the President between January 20, 2017, and September 5, 2017, during which a decision was made on continuing or terminating the DACA program.

**Objections to Interrogatory No. 3**

1. Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2. Defendants object to Interrogatory No. 3 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common

11

interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

3.      Defendants object to the interrogatory to the extent that it purports to require the identification of the date, location, participants, and subject of any meetings involving the Executive Office of the President. *See Cheney v. U.S. District Court*, 542 U.S. 367, 388 (2004).

4.      Defendants object to Interrogatory No. 3 to the extent that it incorrectly assumes that "a decision was made" as part of a meeting or discussion.

5.      Defendants object to Interrogatory No. 3 as containing four discrete subparts: (1) "identify the date . . . of any meetings . . ."; (2) "identify the . . . location . . . of any meetings . . ."' (3) "identify the . . . participants . . . of any meetings . . ."; and (4) "identify the . . . subject of any meetings . . . ." To the extent possible based on the time permitted, a reasonable review of their records, and consistent with the above objections, Defendants will provide a non-privileged answer to each of these four sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 3**

Subject to these objections, Defendant DHS responds to Interrogatory Number 3 only on behalf of DHS and states as follows:

A decision not to rescind DACA at that time was made by former Secretary of Homeland Security John Kelly on February 20, 2017, as reflected in his February 20, 2017 Memorandum entitled *Enforcement of the Immigration Laws to Serve the National Interest*. Multiple internal, pre-decisional, deliberative and attorney-client privileged meetings, conversations, and communications among DHS staff took place prior to issuance of that memorandum.

A decision to rescind DAPA and expanded DACA was made by former Secretary of Homeland Security John Kelly on June 15, 2017, as reflected in his June 15, 2017 Memorandum entitled, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")*. Multiple internal, pre-

12

Appeal: 18-1521  Case 1:17-cv-05228-NGG-VMS  Doc: 70-1  Document 282-7  Filed: 07/02/2018  Filed 09/04/20  Pg: 50 of 1026  Page 50 of 1026 PageID #: 9641

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 37 of 442

decisional, deliberative and attorney-client privileged meetings, conversations, and communications among DHS staff took place prior to issuance of that memorandum.

Defendant DHS incorporates by reference herein its response to Interrogatory Number 1. The decision to rescind DACA was made by Acting Secretary of Homeland Security Elaine C. Duke on September 5, 2017, as reflected in her September 5, 2017 Memorandum entitled, *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."*  Multiple internal, pre-decisional, deliberative and attorney-client privileged meetings, conversations, and communications among DHS staff took place prior to issuance of that memorandum.

Defendant DHS reserves the right to supplement this response with any additional relevant, responsive, non-privileged information that is within its possession, custody, or control and capable of being ascertained with reasonable diligence.

### Interrogatory No. 4

Please identify the date, location, participants, and subject of any meetings or conversations among staff of the Department of Justice, Department of Homeland Security, and Executive Office of the President, between January 20, 2017, and September 5, 2017, during which decisions were made (a) to terminate the DACA program on September 5, 2017; (b) to set March 5, 2018, as the end date for renewals; (c) to set October 5, 2017, as the deadline for renewal applications; and (d) to stop accepting initial applications or renewal applications from DACA recipients whose status expired by September 5, 2017, as of September 5, 2017.

### Objections to Interrogatory No. 4

1.      Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.      Defendants object to Interrogatory No. 4 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e)

13

AR1302

information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

    3.    Defendants object to the interrogatory to the extent that it purports to require the identification of the date, location, participants, and subject of any meetings involving the Executive Office of the President. *See Cheney v. U.S. District Court*, 542 U.S. 367, 388 (2004).

    4.    Defendants object to Interrogatory No. 4 to the extent that it incorrectly assumes that "decisions were made" as part of a meeting or discussion.

    5.    Defendants object to Interrogatory No. 4 as containing four discrete subparts, as labeled (a) through (d). To the extent possible based on the time permitted, a reasonable review of their records, and consistent with the above objections, Defendants will provide a non-privileged answer to each of these four sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 4**

Defendant DHS responds to Interrogatory Number 4 only on behalf of DHS and states as follows:

Defendant DHS incorporates by reference herein its response to Interrogatory Numbers 1 and 3. The decision to rescind DACA was made by Acting Secretary of Homeland Security Elaine C. Duke on September 5, 2017, as reflected in her September 5, 2017 Memorandum entitled, *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."* That memorandum also reflects the Acting Secretary's decision with respect to the deadlines referenced in parts (b)-(d) of this Interrogatory and other parameters for adjudicating DACA requests. Multiple internal, pre-decisional, deliberative and attorney-client privileged meetings, conversations, and communications among DHS staff took place prior to issuance of that memorandum.

Defendant DHS reserves the right to supplement this response with any additional relevant, responsive, non-privileged information that is within its possession, custody, or control and capable of being ascertained with reasonable diligence.

14

**Interrogatory No. 5**

Please identify the date, location, participants, and subject of any meetings or conversations that Defendants conducted between June 1, 2017 and September 5, 2017, with representatives or staff of a state that participated in the *Texas v. United States* litigation, regarding the decision whether to continue or terminate the DACA program.

**Objections to Interrogatory No. 5**

1.    Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.    Defendants object to Interrogatory No. 5 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

3.    Defendants object to Interrogatory No. 5 as vague and overbroad to the extent it seeks information about meetings or conversations with individuals, the identity of which or whom is immaterial to the claims in this litigation, and because the burden of responding is disproportionate to the needs of this case.

4.    Defendants object to Interrogatory No. 5 to the extent it seeks information from Civil Division litigation counsel, as retrieving any such information would be overly broad and unduly burdensome due to the nature of the Civil Division's representation of the interests of the United States.

5.    Defendants object to Interrogatory No. 5 as seeking information that is not relevant because the legal validity of DACA does not depend on the details of any particular litigation, including the details of the *Texas v. United States* litigation, but rather, to legal principles set forth by the judiciary in its rulings.

15

6.      Defendants object to Interrogatory No. 5 as containing four discrete subparts: (1) "identify the date . . . of any meetings . . ."; (2) "identify the . . . location . . . of any meetings . . ."' (3) "identify the . . . participants . . . of any meetings . . ."; and (4) "identify the . . . subject of any meetings . . . ."  To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to each of these four sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

7.      Defendants object to Interrogatory No. 5 as overbroad to the extent that "a state that participated in" includes all 26 plaintiff states and over fifteen states that participated as amici.  Defendants also object to Interrogatory No. 5 as vague and overbroad to the extent that "representatives or staff of a state" could be interpreted to encompass any state employee or any other person "represent[ing]" any of the numerous states that "participated in" the *Texas v. United States* litigation.  This overbroad request would thereby seek records of every meeting or discussion held between Defendants and hundreds of thousands of individuals who constitute "staff" or "representatives" of the more than 40 states that "participated" in some way in the litigation.  Accordingly, Defendants will construe "representatives or staff of a state" to be limited to those persons known to have authority to represent the plaintiff states in high-level decision-making regarding the litigation.[2]

**Response to Interrogatory No. 5**

Subject to these objections, Defendant DOJ has identified the following meetings and conversations between officials of the Department of Justice and state officials with authority in the *Texas v. United States* litigation:

| Date | No. of Mtgs. | Location | Participant Names and Titles | Meeting Subject |
|------|--------------|----------|------------------------------|-----------------|
| Summer 2017 | Multiple | Telephone | - Career attorneys in the Civil Division, U.S. Dep't of Justice | Future proceedings in *Texas v. United States* litigation |

---

[2] Pursuant to Defendants' prior reservation of the right to make additional objections should they subsequently identify additional grounds for objection, this objection has been added to Defendants' previous objections on October 16, 2017.

16

AR1305

| Date | No. of Mtgs. | Location | Participant Names and Titles | Meeting Subject |
|---|---|---|---|---|
| | | | - Counsel for plaintiff-states | |
| June 29, 2017 (approximate) | 1 | Telephone | - Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Scott Keller, Solicitor General, Texas | Forthcoming correspondence in *Texas v. United States* litigation |
| Aug. 17, 2017 | 1 | Telephone | - Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Scott Keller, Solicitor General, Texas | Responses to pending motions and possibility of staying *Texas v. United States* litigation |
| Late Aug., 2017 | 1 or 2 | Telephone | - Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Scott Keller, Solicitor General, Texas | Future proceedings in *Texas v. United States* litigation and United States plans for a decision regarding DACA policy |
| Late Aug. 2017 Or early Sept. 2017 | 1 | Telephone | - Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Danielle Cutrona, Counselor to AG Sessions<br>- Scott Keller, Solicitor General, Texas | Future proceedings in *Texas v. United States* litigation and United States plans for a decision regarding DACA policy |
| Week preceding Sept. 5, 2017 | 1 | Telephone | - Jefferson B. Sessions, III, Attorney General of the United States<br>- Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Jesse Panuccio, Principal Deputy Associate Attorney General, U.S. Dep't of Justice<br>- Danielle Cutrona, Counselor to Attorney General Sessions<br>- Ken Paxton, Attorney General, Texas<br>- Other Texan attorneys | Proceedings in *Texas v. United States* litigation |

Additionally, Defendant DHS states, on behalf of itself:

| Date | No. of Mtgs. | Location | Participant Names and Titles | Meeting Subject |
|---|---|---|---|---|
| Aug. 8, 2017 | 1 | Telephone | - Gene Hamilton, Senior Counselor to Acting Secretary<br>- Michael Toth, Representative of the Texas Attorney General's Office | The June 29, 2017 letter from Texas Attorney General Ken Paxton to United States Attorney General Jefferson B. Sessions, requesting the Secretary of DHS phase out and rescind DACA by September 5, 2017. |
| Aug. 28, 2017 (approximate) | 1 | Telephone | - Gene Hamilton, Senior Counselor to Acting Secretary<br>- Michael Toth, Representative of the Texas Attorney General's Office | Possible follow-up call regarding same subject. |

Defendants reserve the right to supplement this response with any additional relevant, responsive, non-privileged information that is within its possession, custody, or control and capable of being ascertained with reasonable diligence.

**Interrogatory No. 6**

17

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Filed: 07/02/2018   Document 282-7   Filed 09/04/20   Page 55 of 1026 PageID #: 9646

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 42 of 442

Please identify any and all Department of Homeland Security, Department of Justice, or other White House staff who were consulted for, participated in, or contributed to analysis of the lawfulness of the DACA program; the decision whether to continue or terminate the DACA program; or any decision regarding the nature of the DACA termination between January 20, 2017 and September 5, 2017.

**Objections to Interrogatory No. 6**

    1.    Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

    2.    Defendants object to Interrogatory No. 6 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

    3.    Defendants object to the interrogatory to the extent that it purports to require the identification of White House staff who were consulted for, participated in, or contributed to the analysis of the issues that are subject to this request. *See Cheney v. U.S. District Court*, 542 U.S. 367, 388 (2004).

    4.    Defendants object to Interrogatory No. 6 as vague and overbroad to the extent it seeks information about persons who "were consulted for, participated in, or contributed to analysis..." to the extent it seeks information about individuals with mere peripheral involvement, as the identity of such individuals is not relevant, such individuals are unlikely to have relevant information, and identifying all such individuals would be excessively burdensome and disproportionate to the needs of the case. Defendants will construe Interrogatory No. 6 to seek information about non-White House individuals who participated materially in the subject of this Interrogatory.

    5.    Defendants object to Interrogatory No. 6 as vague and overbroad to the extent it seeks information about "any decision regarding the nature of the DACA termination."

18

J.A. 577

AR1307

Defendants will construe Interrogatory No. 6 to seek information about the decisions challenged in this litigation.

6.    Defendants object to Interrogatory No. 6 as containing three discrete subparts regarding: (1) "analysis of the lawfulness of the DACA program"; (2) "the decision whether to continue or terminate the DACA program"; or (3) "any decision regarding the nature of the DACA termination." To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to each of these three sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 6**

Subject to these objections, Defendants have identified to date the following individuals as having consulted for, participated in, or contributed to the topics listed in the sub-parts of the interrogatory:

| NAME | TITLE |
|---|---|
| DOJ | |
| Chad A. Readler | Assistant Attorney General (Acting), Civil Division |
| Curtis E. Gannon | Assistant Attorney General (Acting), Office of Legal Counsel (OLC) |
| Daniel L. Koffsky | Deputy Assistant Attorney General, OLC |
| Danielle Cutrona | Counselor to the Attorney General |
| Edwin Kneedler | Deputy Solicitor General |
| Henry C. Whitaker | Deputy Assistant Attorney General, OLC |
| Jefferson B. Sessions, III | Attorney General |
| Jeffrey B. Wall | Principal Deputy Solicitor General |
| Jeremy Bylund | Deputy Associate Attorney General |
| Jesse Panuccio | Principal Deputy Associate Attorney General |
| Jody Hunt | Chief of Staff to the Attorney General |
| Laura E. Heim | Attorney-Adviser, OLC |
| Noel Francisco | Solicitor General |
| Rachael Tucker | Counsel to the Attorney General |
| Rachel Brand | Associate Attorney General |
| Rosemary Hart | Special Counsel, OLC |
| Scott G. Stewart | Counsel to the Assistant Attorney General, OLC |
| Zack Tripp | Assistant to the Solicitor General |

19

AR1308

| DHS[3] | |
|---|---|
| Adam V. Loiacono | Deputy Principal Legal Advisor for Enforcement and Litigation, ICE |
| Ben Cassidy | Assistant Secretary, DHS Office of Legislative Affairs (OLA) |
| Chad Wolf | Acting Chief of Staff to the Acting Secretary |
| Craig Symons | USCIS Chief Counsel |
| Dimple Shah | Deputy General Counsel |
| Donald Neufeld | Associate Director, Service Center Operations Directorate |
| Elaine Duke | Acting Secretary of Homeland Security |
| Elizabeth Neumann | Deputy Chief of Staff to the Acting Secretary |
| Ernest DeStefano | Chief, Office of Intake and Data Production (Acting Deputy Associate Director, Service Center Operations Directorate July 8, 2017 – September 8, 2017) |
| Gene Hamilton | Senior Counselor to the Acting Secretary |
| Gillian Christensen | Senior Advisor, Office of External Affairs |
| James D. Nealon | Assistant Secretary for International Engagement |
| James W. McCament | Deputy Director (then Acting Director) of USCIS |
| Jennifer Higgins | Associate Director, Refugee, Asylum and International Operations Directorate (then Acting Deputy Director) |
| John Feere | Senior Advisor, ICE |
| Joseph B. Maher | Acting General Counsel |
| Joseph Moore | Chief Financial Officer |
| Julie Koller | Deputy Associate Chief Counsel, Enforcement and Operations, CBP Office of the Chief Counsel |
| Kathy Nuebel-Kovarik | Chief of the USCIS Office of Policy and Strategy |
| Lora Ries | Acting Chief of Staff (August 28, 2017 to the present) |
| Michael Dougherty | Assistant Secretary for Border, Immigration and Trade Policy |
| Nader Baroukh | Associate General Counsel |
| Thomas D. Homan | Acting Director of U.S. Immigrations and Customs Enforcement (ICE) |
| Todd Hoffman | Executive Director, Admissibility and Passenger Programs, Office of Field Operations |
| EXECUTIVE OFFICE OF THE PRESIDENT | |
| Andrew Bremberg | Assistant to the President and the Director of the Domestic Policy Council for President Trump |
| Donald McGahn | White House Counsel and Assistant to the President |
| Gregory Katsas | Deputy Assistant and Deputy Counsel to President Trump |

[3] The USCIS personnel listed below were aware of, participated in meetings and/or conversations, and or provided operational information related to DACA rescission or wind-down before September 5, 2017.

20

AR1309

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Filed: 07/02/2018   Document 282-7   Filed 09/04/20   Page 58 of 1026 PageID #: 9649

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 45 of 442

| John Bash | Special Assistant and Associate Counsel |
|---|---|
| John Kelly | White House Chief of Staff |
| Kirstjen Nielsen | Principal Deputy White House Chief of Staff |
| Marc Short | White House Director of Legislative Affairs and Deputy Assistant to the President |
| Mick Mulvaney | Director, Office of Management and Budget |
| Rick Dearborn | White House Deputy Chief of Staff for Legislative, Intergovernmental Affairs and Implementation |
| Robert Porter | White House Staff Secretary |
| Stephen Miller | Senior Advisor for Policy |

Defendants reserve the right to supplement this response with any additional relevant, responsive, non-privileged information that is within its possession, custody, or control and capable of being ascertained with reasonable diligence.

**Interrogatory No. 7**

Please state the number of DACA recipients who are eligible to apply for DACA renewal between September 6, 2017 and October 5, 2017, both nationally and for each state. Please also state the number of DACA recipients who have applied for DACA renewal since September 5, 2017, broken down by date (both the date the application was received and the date a decision was made), and the total number that were granted, rejected on the merits, returned without adjudication on the merits due to the date the renewal application was received, or denied for any other reason (broken down by the reason for denial).

**Objections to Interrogatory No. 7**

1.    Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.    Defendants object to Interrogatory No. 7 to the extent that the request seeks information protected by the law enforcement privilege; material the disclosure of which would

21

violate legitimate privacy interests and expectations of persons not party to this litigation; or any other applicable privilege or protection.

      3.      Defendants object to Interrogatory No. 7 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information for which the burden of examining, auditing, compiling, abstracting and/or summarizing the records required to derive or ascertain the answer to this interrogatory would outweigh the likely benefit.

      4.      Defendants object to Interrogatory No. 7 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information disproportionate to the needs of the case.

      5.      Defendants object to Interrogatory No. 7 as containing seven discrete subparts regarding: (1) "the number of DACA recipients who are eligible . . . nationally"; (2) "the number of DACA recipients who are eligible . . . for each state"; (3) "the number of DACA recipients who have applied for DACA renewal"; (4) "the total number that were granted"; (5) "the total number . . . rejected on the merits"; (6) "the total number . . . returned without adjudication"' and (7) "the total number . . . denied for any other reason."   To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to the first three sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.  Defendants object to answering sub-parts four through seven as these sub-parts exceed Plaintiffs' limit on interrogatories under Fed. R. Civ. P. 33.

**Response to Interrogatory No. 7**

      Subject to these objections, Defendant USCIS responds that the number of DACA recipients who were eligible under the parameters of the DACA Rescission Memorandum to request DACA renewal between September 6, 2017, and October 5, 2017 (i.e., individuals with

AR1311

valid DACA on September 5, 2017 whose DACA expired or expires between September 5, 2017 and March 5, 2018), nationally is approximately 154,200, based on best available information.

Defendant USCIS further responds that as of October 11, 2017, the estimated number of DACA recipients who were eligible under the parameters of the September 5, 2017 DACA Rescission Memorandum to request DACA renewal between September 6, 2017, and October 5, 2017, by state is approximately as follows, based on best available information:

| State/Territory | Count of Individuals |
|---|---|
| Alabama | 880 |
| Alaska | 20 |
| American Samoa | <10 |
| Arizona | 5,370 |
| Arkansas | 1,070 |
| Armed Forces Americas | <10 |
| Armed Forces Pacific | <10 |
| California | 41,300 |
| Colorado | 3,860 |
| Connecticut | 980 |
| Delaware | 290 |
| District of Columbia | 140 |
| Florida | 5,860 |
| Georgia | 4,860 |
| Guam | <10 |
| Hawaii | 80 |
| Idaho | 740 |
| Illinois | 8,650 |
| Indiana | 1,820 |
| Iowa | 540 |

23

| | |
|---|---|
| Kansas | 1,480 |
| Kentucky | 680 |
| Louisiana | 460 |
| Maine | <10 |
| Maryland | 2,160 |
| Massachusetts | 1,380 |
| Michigan | 1,270 |
| Minnesota | 1,300 |
| Mississippi | 280 |
| Missouri | 700 |
| Montana | 20 |
| Nebraska | 690 |
| Nevada | 2,140 |
| New Hampshire | 60 |
| New Jersey | 4,170 |
| New Mexico | 1,420 |
| New York | 7,610 |
| North Carolina | 4,730 |
| North Dakota | 20 |
| Northern Marianas | <10 |
| Ohio | 890 |
| Oklahoma | 1,350 |
| Oregon | 2,390 |
| Pennsylvania | 1,080 |
| Puerto Rico | 30 |
| Rhode Island | 240 |
| South Carolina | 1,370 |

24

| | |
|---|---|
| South Dakota | 50 |
| Tennessee | 1,660 |
| Texas | 28,200 |
| Utah | 2,080 |
| Virgin Islands | <10 |
| Virginia | 2,230 |
| Washington | 3,900 |
| West Virginia | 30 |
| Wisconsin | 1,580 |
| Wyoming | 160 |

Defendant USCIS further responds that the number of DACA recipients who have requested renewal of DACA since September 5, 2017, broken down by date the request was received and the date a decision was made is approximately as follows, based on best available information:

| Count of Individuals | |
|---|---|
| Received Date | Total |
| 09/05/2017 | 4,239 |
| 09/06/2017 | 961 |
| 09/07/2017 | 1,215 |
| 09/08/2017 | 1,791 |
| 09/11/2017 | 4,415 |
| 09/12/2017 | 3,018 |
| 09/13/2017 | 1,953 |
| 09/14/2017 | 2,608 |
| 09/15/2017 | 2,600 |

AR1314

| 09/18/2017 | 6,417 |
|---|---|
| 09/19/2017 | 2,068 |
| 09/20/2017 | 1,843 |
| 09/21/2017 | 2,284 |
| 09/22/2017 | 2,714 |
| 09/25/2017 | 5,965 |
| 09/26/2017 | 2,881 |
| 09/27/2017 | 2,509 |
| 09/28/2017 | 3,545 |
| 09/29/2017 | 3,649 |
| 10/02/2017 | 8,401 |
| 10/03/2017 | 4,412 |
| 10/04/2017 | 5,624 |
| 10/05/2017 | 3,863 |
| **Grand Total** | **78,975** |

| Count of Individuals | |
|---|---|
| **Decision Date** | **Total** |
| 09/21/2017 | 5 |
| 09/22/2017 | 3 |
| 09/25/2017 | 5 |
| 09/27/2017 | 733 |
| 09/28/2017 | 64 |
| 09/29/2017 | 658 |
| 10/02/2017 | 429 |
| 10/03/2017 | 8 |

AR1315

| 10/04/2017 | 23 |
|---|---|
| 10/05/2017 | 168 |
| 10/06/2017 | 53 |
| 10/07/2017 | 1 |
| 10/10/2017 | 54 |
| 10/11/2017 | 1 |
| 10/12/2017 | 7,676 |
| **Grand Total** | **9,881** |

Defendant USCIS further responds that of the number of DACA recipients who requested renewal since September 5, 2017, the total number who have been granted renewal as of October 13, 2017, was approximately 9,863, and the total number who have been denied renewal as of that date is approximately 18, based on best available information. USCIS databases do not capture the specific reasons for denial of a DACA request. Individualized case-by-case review would be required, which is unduly burdensome, particularly if the number of DACA denials increases.

Defendant USCIS further responds that as of October 12, 2017, of the number of DACA recipients who requested renewal since September 5, 2017, the total number whose requests were "rejected on the merits" was approximately 10,197, based on best available information. USCIS interprets "rejected on the merits" to mean a rejection that was not based solely on the date the renewal request was received.

Finally, Defendant USCIS responds that as of October 12, 2017, of the number of DACA recipients who requested renewal since September 5, 2017, the total number whose requests were "returned without adjudication due to the date the renewal application was received" was: 0, based on best available information. As of October 12, 2017, USCIS has received approximately 4,152 DACA renewal requests on or after October 6, 2017, based on best available data, that likely will be rejected once USCIS finishes a full account of the DACA renewal requests received.

27

## Interrogatory No. 8

Please explain the process, procedures, channels of review, or allocations of responsibility for policy development, including for promulgating a legislative rule, interpretive rule, general statement of policy, or guidance, that were in effect from January 20, 2017 until the present.

## Objections to Interrogatory No. 8

1. Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2. Defendants object to Interrogatory No. 8 as exceeding the total limit on written interrogatories, including all discrete subparts, under Fed. R. Civ. P. 33.

3. Defendants object to Interrogatory No. 8 as containing four discrete subparts regarding: (1) "process"; (2) "procedures"; (3) "channels of review"; and (4) "allocations of responsibility." To the extent Plaintiffs have not already exceeded the total limit on interrogatories under Fed. R. Civ. P. 33, Defendants treat each of the sub-parts as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

4. Defendants object to Interrogatory No. 8 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) any other applicable privilege or protection.

5. Defendants object to Interrogatory No. 8 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information that is overly broad as it seeks information about any policy or procedure whatsoever and any aspect of policy development whatsoever, not in any way limited to DACA and thus having no conceivable relationship to the claims and defenses in this litigation.

6.      Defendants object to Interrogatory No. 8 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information disproportionate to the needs of the case.

7.      Defendant objects on the basis that the request is vague and does not provide an adequate description upon which to base a reasonable inquiry.

## Response to Interrogatory No. 8

Defendants have objected to this interrogatory in full and cannot identify a meaningful, narrowing construction that would yield a response relevant to the issues in this litigation.

## Interrogatory No. 9

Please identify the kinds of notices that were sent to DACA recipients since January 20, 2017, which mention renewing their DACA status. Please state, for each kind of notice, the time period during which the notices were sent, the number of individuals who were sent the notice, the time at which each notice was sent in relation to the date that the DACA recipient's status expired, and all languages that the notice was translated into. Please identify any changes that were made to the notice templates, any changes that were made to the dates such notices were mailed, and state the reason or reasons for the changes made, as of September 5, 2017.

## Objections to Interrogatory No. 9

1.      Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.      Defendants object to Interrogatory No. 9 as exceeding the total limit on written interrogatories, including all discrete subparts, under Fed. R. Civ. P. 33.

3.      Defendants object to Interrogatory No. 9 as containing eight discrete subparts regarding: (1) "identify the kinds of notices"; (2) "state . . . the time period during which the notices were sent"; (3) "state . . . the number of individuals"; (4) "state . . . the time at which each notice was sent in relation to the date . . ."; (5) "state . . . all languages that the notice was translated into"; (6) "identify any changes that were made to the notice templates"; (7) "identify

AR1318

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Filed: 07/02/2018   Document 282-7   Filed 09/04/20   Page 67 of 1026 PageID #:
9658

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 54 of 442

any changes that were made to the dates"; and (8) "state the reason or rea[s]ons for the changes
made." To the extent Plaintiffs have not already exceeded the total limit on interrogatories under
Fed. R. Civ. P. 33, Defendants treat each of the sub-parts as separate interrogatories for the
purpose of Plaintiffs' total limit on interrogatories.

   4. Defendants object to Interrogatory No. 9 to the extent that the request seeks
information protected by the law enforcement privilege; material the disclosure of which would
violate legitimate privacy interests and expectations of persons not party to this litigation; or any
other applicable privilege or protection.

   5. Defendants object to Interrogatory No. 9 as seeking information that is not
relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests
information for which the burden of examining, auditing, compiling, abstracting and/or
summarizing the records required to derive or ascertain the answer to this interrogatory would
outweigh the likely benefit.

   6. Defendants object to Interrogatory No. 9 as seeking information that is not
relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests
information disproportionate to the needs of the case.

   7. Defendants object to Interrogatory No. 9 as vague to the extent it seeks "kinds of
notices", which is not a term that has been defined or is subject to ready definition on its face.
Defendants will construe "kinds of notices" to mean the titles of notices sent.

**Response to Interrogatory No. 9**

   Subject to these objections, Defendant USCIS responds that a single type of notice was
sent to DACA recipients since January 20, 2017, which mentioned renewing DACA. This
automatically generated notice ("180-day notice') was in use from approximately April 2015 to
approximately July 15, 2017. In most cases, the 180-day notice was sent to DACA recipients
approximately 178-180 days in advance of their most recent DACA expiration date. The notice,
to which no changes were made between January 20, 2017 and approximately July 15, 2017
when USCIS ceased issuing the notice, stated in part:

<div align="center">30</div>

"Our records indicate that U.S. Citizenship and Immigration Service (USCIS) granted DACA in your case and that your current period of deferred action will expire in less than 180 days."

The 180-day notice was not translated from English into other languages.

The automatic generation of the 180-day notice was utilized only for DACA requests that were receipted into the CLAIMS 3 system. This feature was never developed for or implemented in the ELIS system in which DACA requests have been adjudicated since approximately February 1, 2016.

This automatic generation feature was phased out in CLAIMS 3 in July 2017 as CLAIMS 3 notice printing migrated from the CLAIMS 3 print server to the Electronic Print Management System (EPMS). In June/July 2017, USCIS made a policy and operational decision not to rewrite the 180-day reminder notice service for CLAIMS 3 cases to EPMS due to significant operational costs associated with re-building this service, and the fact that the overwhelming majority of pending DACA requests were by then handled in ELIS and had been adjudicated in ELIS since approximately February 1, 2016.

For a break out of the time period on or after January 20, 2017, during which the 180-day notices were sent, the number of individuals who were sent the notice, and the time at which each notice was sent in relation to the date that the individual's DACA was set to expire, based on best available information, Defendant USCIS responds with the following chart:

| U.S. Citizenship and Immigration Services |
|---|
| Form I-821D, Consideration of Deferred Action for Childhood Arrivals |
| Count of DACA Expiration Notices Sent |
| Grouped by number of Days between Notice Sent and DACA Expiration |

31

Appeal: 18-1521 - 05228-1e2 Filed: 07/02/2827 Filed 09/04/20 Page 69 of 1026 PageID #: Case 1:17-cv-05228-NGG-VMS Document 282-7 9660

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 56 of 442

|  | Number of days' notice before DACA expiration date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Expiration Notice Sent Date | 84 | 107 | 112 | 149 | 176 | 177 | 178 | 179 | 180 | Total |
| 01/20/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 307 | 307 |
| 01/23/17 | 0 | 0 | 0 | 0 | 0 | 0 | 3,375 | 2,922 | 438 | 6,735 |
| 01/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,060 | 1,194 | 3,254 |
| 01/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,118 | 2,118 |
| 01/27/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 260 | 260 |
| 01/29/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 95 | 48 | 143 |
| 01/30/17 | 0 | 0 | 0 | 0 | 0 | 0 | 291 | 268 | 1,366 | 1,925 |
| 01/31/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 239 | 239 |
| 02/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 02/03/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 424 | 424 |
| 02/06/17 | 0 | 0 | 0 | 0 | 0 | 0 | 391 | 408 | 421 | 1,220 |
| 02/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 286 | 286 |
| 02/08/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 37 | 37 |
| 02/09/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 02/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 437 | 437 |
| 02/13/17 | 0 | 0 | 0 | 0 | 0 | 0 | 417 | 427 | 427 | 1,271 |
| 02/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 210 | 211 |
| 02/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 | 22 |
| 02/17/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 412 | 412 |
| 02/18/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 304 | 304 |
| 02/19/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 98 | 103 |
| 02/21/17 | 0 | 0 | 0 | 0 | 0 | 64 | 233 | 405 | 278 | 980 |
| 02/22/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 12 |
| 02/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,495 | 2,495 |

AR1321

Appeal 18-1521 — 05228.e2 Filed 07/02/2827 Filed 09/05/20 Page 70 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20
9661

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 57 of 442

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/27/17 | 0 | 0 | 0 | 0 | 0 | 0 | 4,111 | 4,269 | 323 | 8,703 |
| 02/28/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,525 | 2,805 | 5,330 |
| 03/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 29 |
| 03/03/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,900 | 2,900 |
| 03/06/17 | 0 | 0 | 0 | 0 | 0 | 0 | 2,843 | 314 | 219 | 3,376 |
| 03/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 136 | 136 |
| 03/08/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 77 | 77 |
| 03/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| 03/13/17 | 0 | 0 | 0 | 0 | 0 | 0 | 281 | 322 | 2,724 | 3,327 |
| 03/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,111 | 2,111 |
| 03/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 142 | 142 |
| 03/17/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,998 | 1,998 |
| 03/20/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,703 | 2,692 | 1,889 | 6,284 |
| 03/21/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 253 | 253 |
| 03/22/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 78 | 78 |
| 03/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,838 | 1,838 |
| 03/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,116 | 3,116 |
| 03/26/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 3,019 | 3,024 |
| 03/27/17 | 0 | 0 | 0 | 0 | 0 | 0 | 282 | 318 | 1,753 | 2,353 |
| 03/28/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 273 | 273 |
| 03/29/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 152 | 152 |
| 03/31/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 240 | 240 |
| 04/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| 04/03/17 | 0 | 0 | 0 | 1 | 0 | 0 | 320 | 284 | 318 | 923 |
| 04/04/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,913 | 1,913 |
| 04/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 243 | 243 |
| 04/09/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,579 | 550 | 2,129 |

J.A. 592    AR1322

Appeal: 18-1521    Case 1:17-cv-05228-NGG-VMS    Document 292-7    Filed 07/02/2827    Filed 09/04/20    Page 71 of 1026 PageID #: 9662

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 58 of 442

| 04/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,474 | 972 | 1,605 | 4,051 |
| 04/11/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 187 | 187 |
| 04/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 106 | 106 |
| 04/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 7 |
| 04/17/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,696 | 3,040 | 273 | 5,009 |
| 04/18/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 138 | 138 |
| 04/21/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 254 | 254 |
| 04/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 314 | 204 | 291 | 809 |
| 04/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 138 | 138 |
| 04/27/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| 04/28/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 259 | 259 |
| 04/29/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 |
| 05/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 2,010 | 3,269 | 242 | 5,521 |
| 05/02/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,033 | 2,429 | 5,462 |
| 05/03/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 05/04/17 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 05/05/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 248 | 248 |
| 05/08/17 | 0 | 0 | 0 | 0 | 0 | 0 | 248 | 354 | 322 | 924 |
| 05/09/17 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 194 | 195 |
| 05/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 05/12/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 248 | 248 |
| 05/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,177 | 116 | 1,437 | 2,730 |
| 05/16/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,746 | 2,746 |
| 05/18/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 05/19/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 255 | 255 |
| 05/21/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 1 | 16 |
| 05/22/17 | 0 | 0 | 0 | 0 | 0 | 0 | 298 | 292 | 293 | 883 |

AR1323

| 05/23/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 184 | 185 |
|----------|---|---|---|---|---|---|---|---|-----|-----|
| 05/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,277 | 1,277 |
| 05/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 40 |
| 05/26/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,486 | 2,486 |
| 05/30/17 | 0 | 0 | 0 | 0 | 0 | 845 | 905 | 3,414 | 55 | 5,219 |
| 05/31/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,110 | 5,110 |
| 06/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 103 | 103 |
| 06/02/17 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 246 | 247 |
| 06/05/17 | 0 | 0 | 0 | 0 | 0 | 0 | 847 | 2,434 | 4,398 | 7,679 |
| 06/06/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,040 | 1,040 |
| 06/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,067 | 5,888 | 9,955 |
| 06/08/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 100 |
| 06/09/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 235 | 235 |
| 06/12/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,794 | 3,486 | 459 | 5,739 |
| 06/13/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,356 | 2,965 | 4,321 |
| 06/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,934 | 1,934 |
| 06/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 97 | 97 |
| 06/16/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 984 | 984 |
| 06/19/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 1,309 | 3,427 | 5,736 |
| 06/20/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,195 | 2,195 |
| 06/21/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,878 | 2,878 |
| 06/22/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 93 | 93 |
| 06/23/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 212 | 212 |
| 06/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 381 | 6,720 | 7,101 |
| 06/26/17 | 0 | 0 | 0 | 0 | 0 | 0 | 392 | 266 | 5,180 | 5,838 |
| 06/30/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 230 | 230 |
| 07/03/17 | 0 | 0 | 0 | 0 | 0 | 0 | 4,538 | 4,111 | 3,709 | 12,358 |

35

AR1324

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/05/17 | 0 | 0 | 0 | 0 | 7 | 0 | 1,535 | 0 | 228 | 1,770 |
| 07/06/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 64 | 64 |
| 07/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,186 | 1,186 |
| 07/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,757 | 1,885 | 1,142 | 4,784 |
| 07/11/17 | 0 | 0 | 0 | 0 | 3 | 0 | 6 | 0 | 1,250 | 1,259 |
| 07/12/17 | 0 | 0 | 0 | 0 | 3 | 11 | 1 | 2 | 1,535 | 1,552 |
| 07/13/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 119 | 119 |
| 07/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 201 | 201 |
| 07/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,901 | 1,901 |
| **Total** | 1 | 1 | 1 | 1 | 13 | 920 | 34,239 | 52,906 | 112,496 | 200,578 |

Dated: October 16, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

/s/ Brad P. Rosenberg
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
KATE BAILEY (MD Bar #1601270001)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530

36

Tel.: (202) 514-3374
Fax: (202) 616-8460
Email: brad.rosenberg@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
Tel: (718) 254-6288
Fax: (718) 254-7489
Email: joseph.marutollo@usdoj.gov

*Counsel for Defendants*

AR1326

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2017, I caused to be served the

foregoing DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS'

FIRST SET OF INTERROGATORIES TO DEFENDANTS via e-mail upon:

| | |
|---|---|
| Lourdes Rosado | lourdes.rosado@ag.ny.gov |
| Diane Lucas | diane.lucas@ag.ny.gov |
| Abigail Taylor | abigail.taylor@state.ma.us |
| Genevieve Nadeau | Genevieve.Nadeau@MassMail.State.MA.US |
| Colleen Melody | ColleenM1@ATG.WA.GOV |
| Marsha Chien | MarshaC@ATG.WA.GOV |
| Jerome Frank Legal Servs. Org. | BatallaVidal_LSO@mailman.yale.edu |
| Batalla | Batalla@nilc.org |
| Amy Taylor | amy.taylor@maketheroadny.org |
| Scott Foletta | scott.foletta@maketheroadny.org |
| Alexa Schapira | Alexia.Schapira@maketheroadny.org |
| Justin Cox | cox@nilc.org |

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG

38

## VERIFICATION

Based on information that I obtained in the course of my official USCIS duties, I declare under penalty of perjury that the substance of the USCIS narrative responses to these Interrogatories are true and correct.

DATE: _October 16, 2017_     SIGNATURE: _James W. M^cPamant_

AR1328

## VERIFICATION

I, Scott Krause, am the Executive Secretary of the United States Department of Homeland Security (DHS). Based on information that I obtained in the course of my official DHS duties, I declare under penalty of perjury that the substance of the DHS Headquarters narrative responses to these Interrogatories are true and correct.

Executed on October 16, 2017

_Scott Krause_

Scott Krause

AR1329

Appeal 12-1521 05228-2 Filed 07/02/2012 Pg 76 of 72
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 78 of 1026 PageID #: 9669

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 65 of 442

# EXHIBIT 3

AR1330

Appeal 18-1521 05228-NCG-VMS Filed 07/02/2017 Filed 09/04/20 Page 79 of 1026 PageID #:
Case 1:17-cv-05228-NCG-VMS Document 282-7 9670

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 66 of 442

Secretary
U.S. Department of Homeland Security
Washington, DC 20528



Homeland
Security

February 20, 2017

MEMORANDUM FOR:      Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM:                John Kelly
Secretary

SUBJECT:             **Enforcement of the Immigration Laws to Serve the National
Interest**

This memorandum implements the Executive Order entitled "Enhancing Public Safety in
the Interior of the United States," issued by the President on January 25, 2017. It constitutes
guidance for all Department personnel regarding the enforcement of the immigration laws of the
United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement
(ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration
Services (USCIS). As such, it should inform enforcement and removal activities, detention
decisions, administrative litigation, budget requests and execution, and strategic planning.

www.dhs.gov

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Filed: 07/02/2018 Document 28-27 Filed 09/04/20 Pg: 80 of 1026 Page 80 of 1026 PageID #: 9671

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 67 of 442

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

## A. The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

2

Appeal: 12-1521 Case 1:17-cv-05228-NGG-VMS Filed: 07/02/2027 Document 28-27 Filed 09/04/20 Page 81 of 1026 PageID #: 9672

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 68 of 442

### B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

3

AR1333

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

## C. Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

## D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

4

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

### E. Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F. Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G. Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

5

AR1335

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

## H. Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

## I. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

6

Appeal 18-1521   Case 1:17-cv-05228-NGG-VMS   Filed 07/02/2018   Doc 85 of 570   Page 85 of 1026 PageID #: 9676

# EXHIBIT 4

AR1337

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Filed: 07/02/2018 Document 282-7 Filed 09/04/20 Pg: 86 of 576 Page 86 of 1026 PageID #: 9677

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 73 of 442



*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528

## Homeland Security

June 15, 2017

MEMORANDUM FOR:   Kevin K. McAleenan
                  Acting Commissioner
                  U.S. Customs and Border Protection

                  James W. McCament
                  Acting Director
                  U.S. Citizenship and Immigration Services

                  Thomas D. Homan
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  Joseph B. Maher
                  Acting General Counsel

                  Michael T. Dougherty
                  Assistant Secretary for Border, Immigration, and Trade Policy

FROM:             John F. Kelly

SUBJECT:          Rescission of November 20, 2014 Memorandum Providing for
                  Deferred Action for Parents of Americans and Lawful Permanent
                  Residents ("DAPA")

On January 25, 2017, President Trump issued Executive Order No. 13768, "Enhancing
Public Safety in the Interior of the United States." In that Order, the President directed federal
agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable
aliens," and established new immigration enforcement priorities. On February 20, 2017, I issued
an implementing memorandum, stating that "the Department no longer will exempt classes or
categories of removable aliens from potential enforcement," except as provided in the
Department's June 15, 2012 memorandum establishing the Deferred Action for Childhood
Arrivals ("DACA") policy[1] and November 20, 2014 memorandum providing for Deferred
Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and for the

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising
Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

www.dhs.gov

AR1338

**Rescission of November 20, 2014 DAPA Memorandum**
Page 2

expansion of DACA[2].  After consulting with the Attorney General, I have decided to rescind the November 20, 2014 DAPA memorandum and the policies announced therein.[3]  The June 15, 2012 DACA memorandum, however, will remain in effect.

**Background**

     The November 20, 2014 memorandum directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."  This process was to be known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA."

     To request consideration for deferred action under DAPA, the alien must have satisfied the following criteria:  (1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[ ] the grant of deferred action inappropriate."  The Memorandum also directed USCIS to expand the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and to lengthen the period of deferred action and work authorization from two years to three ("Expanded DACA").

     Prior to implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas.  In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide on the ground that the plaintiff states were likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") by failing to comply with notice-and-comment rulemaking requirements.  *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).  The Fifth Circuit Court of Appeals affirmed, holding that Texas had standing, demonstrated a substantial likelihood of success on the merits of its APA claims, and satisfied the other requirements for a preliminary injunction.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4) and did not issue a substantive opinion.  *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

     The litigation remains pending before the district court.

---

[2] Memorandum from Jeh Johnson. Sec'y, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

[3] This Memorandum does not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time.  I remind our officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis, and (2) such a grant may be terminated at any time at the agency's discretion.

AR1339

**Rescission of November 20, 2014 DAPA Memorandum**
Page 3


**Rescission of November 20, 2014 DAPA Memorandum**

      I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities. After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum.

AR1340

# EXHIBIT 5

AR1341

|  | 1 | UNEDITED ROUGH DRAFT - GENE HAMILTON |
|--|---|---|
| 09:15:20 | 2 | P-R-O-C-E-E-D-I-N-G-S |
| 09:15:20 | 3 | THE VIDEOGRAPHER:  Good morning.  We |
| 09:15:23 | 4 | are going on the record at 9:00 a.m. on Friday -- |
| 09:15:26 | 5 | excuse me, 9:13 a.m. on Friday, October 20, 2017. |
| 09:15:32 | 6 | This is media unit one of the video recorded |
| 09:15:35 | 7 | deposition of Gene Hamilton taken by counsel for |
| 09:15:40 | 8 | the plaintiff in the matter of Martin Jonathan |
| 09:15:44 | 9 | Batalla Vidal, et al., v.  Elaine C. Duke, Acting |
| 09:15:49 | 10 | Secretary of the Department of Homeland Security; |
| 09:15:50 | 11 | Jefferson Beauregard Sessions III, Attorney |
| 09:15:58 | 12 | General of the United States; and Donald J. |
| 09:16:01 | 13 | Trump, President of the United States. |
| 09:16:04 | 14 | This is filed in the United States |
| 09:16:06 | 15 | District Court for the Eastern District of |
| 09:16:09 | 16 | New York.  This deposition is being held at the |
| 09:16:12 | 17 | offices of the Conference of Mayors located at |
| 09:16:17 | 18 | 1620 I Street, Northwest, Washington, D C 20006. |
| 09:16:22 | 19 | My name is Dan Raki from the firm of |
| 09:16:25 | 20 | Veritext Legal Solutions and I am the |
| 09:16:28 | 21 | videographer.  The court reporter this morning is |
| 09:16:31 | 22 | Donna Lewis from the firm Olender Court |

1

J.A. 612

AR1342

|          |    |                                                    |
|----------|----|----------------------------------------------------|
|          | 1  | UNEDITED ROUGH DRAFT - GENE HAMILTON               |
| 10:58:23 | 2  | BY MS. TUMLIN:                                      |
| 10:58:26 | 3  | Q    Did Attorney General Sessions provide a        |
| 10:58:27 | 4  | strong recommendation to acting Secretary Duke     |
| 10:58:31 | 5  | that he felt the DACA program should be            |
| 10:58:34 | 6  | terminated?                                         |
| 10:58:35 | 7  | MR. GARDNER:  Objection.  Vague.                    |
| 10:58:36 | 8  | THE WITNESS:  What do you mean by                   |
| 10:58:36 | 9  | recommendation?  Let me tell you, the attorney     |
| 10:58:42 | 10 | general sent a letter that said that the program   |
| 10:58:46 | 11 | was generally speaking illegal and                 |
| 10:58:50 | 12 | unconstitutional.  I don't know what other course  |
| 10:58:53 | 13 | of action you would expect for him to advocate if  |
| 10:58:57 | 14 | that is his legal conclusion about the program.    |
| 10:59:04 | 15 | Q    Was -- did you participate in any              |
| 10:59:11 | 16 | meetings to determine whether or not the DACA      |
| 10:59:16 | 17 | program should be terminated?                       |
| 10:59:18 | 18 | A    Yes.                                           |
| 10:59:19 | 19 | Q    When is the first meeting that you             |
| 10:59:23 | 20 | remember participating in to discuss whether the   |
| 10:59:26 | 21 | DACA program should be terminated?                  |
| 10:59:32 | 22 | A    When is the first meeting with whom?           |

94

AR1343

|   | 1 | UNEDITED ROUGH DRAFT - GENE HAMILTON |
|---|---|---|
| 10:59:34 | 2 | Internal to DHS? |
| 10:59:41 | 3 | Q    Let's start with that.  Let's start |
| 10:59:43 | 4 | with the first internal to DHS meeting that you |
| 10:59:48 | 5 | participated in in which the question of whether |
| 10:59:52 | 6 | DACA should be terminated was discussed? |
| 10:59:56 | 7 | A    Sometime in August. |
| 11:00:01 | 8 | Q    August, mid August? |
| 11:00:03 | 9 | A    Mid to late August. |
| 11:00:05 | 10 | Q    And who was at that meeting? |
| 11:00:13 | 11 | MR. GARDNER:  You can answer.  All she |
| 11:00:15 | 12 | is asking is identity, not substance. |
| 11:00:17 | 13 | THE WITNESS:  To the best of my |
| 11:00:18 | 14 | recollection the attendees at that meeting were |
| 11:00:21 | 15 | the acting secretary, chief of staff Chad Wolf, |
| 11:00:25 | 16 | deputy chief of staff Elizabeth Newman, myself, |
| 11:00:30 | 17 | our acting under secretary for policy strategy |
| 11:00:34 | 18 | and plans Jim Newman.  Potentially his acting |
| 11:00:39 | 19 | chief of staff Graham Petgill, I believe Dimple |
| 11:00:45 | 20 | Shah deputy general counsel, acting director |
| 11:00:50 | 21 | Homan from ICE, his principal legal adviser Tracy |
| 11:00:58 | 22 | Short.  I believe his special adviser John |

95

J.A. 614                                        AR1344

Appeal: 18-1521 · 05228-2 · Filed: 07/02/2017 · Pg: 09/04/20 · Page 93 of 1026 PageID #: 9684

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | UNEDITED ROUGH DRAFT - GENE HAMILTON                     |
| 11:01:01 | 2  | Theory.  Acting commissioner Kevin Macaknee.  I          |
| 11:01:08 | 3  | don't remember her title.  One of his attorneys          |
| 11:01:11 | 4  | Julie Collar.  Potentially I don't recall if the         |
| 11:01:18 | 5  | chief of staff was there.  James McCament, the           |
| 11:01:22 | 6  | acting now deputy director of USCIS but was the          |
| 11:01:27 | 7  | acting director.  Francis Cissna in his former           |
| 11:01:31 | 8  | capacity as director of immigration policy at            |
| 11:01:35 | 9  | DHS.  There may have been assistant secretary of         |
| 11:01:47 | 10 | legislative affairs Ben Cassidy.  And potentially        |
| 11:01:53 | 11 | our assistant secretary of public affairs                |
| 11:01:55 | 12 | Jonathan Hoffman.  I don't recall specifically.          |
| 11:01:59 | 13 | BY MS. TUMLIN:                                            |
| 11:02:00 | 14 | Q    Was that an in-person or telephone                  |
| 11:02:02 | 15 | meeting?                                                  |
| 11:02:03 | 16 | A    In-person.                                           |
| 11:02:03 | 17 | Q    Was that at DHS headquarters?                       |
| 11:02:07 | 18 | A    It was.                                              |
| 11:02:07 | 19 | Q    Approximately how long did that meeting             |
| 11:02:09 | 20 | last?                                                     |
| 11:02:10 | 21 | A    I don't know maybe an hour or so.                    |
| 11:02:13 | 22 | Q    Who convened the meeting?                           |

```
         1              UNEDITED ROUGH DRAFT - GENE HAMILTON
11:06:45 2   part of?

11:06:45 3        A    Yes.

11:06:46 4        Q    When approximately was that meeting?

11:06:49 5        A    Around the same time a few days later.

11:06:53 6        Q    A few days later?

11:06:55 7        A    Yes.

11:06:56 8        Q    Late August?

11:06:57 9        A    Yes.

11:06:57 10       Q    Who was at that meeting?

11:06:59 11            MR. GARDNER:  You can indicate the

11:07:02 12  identity of individuals that attended.

11:07:04 13            THE WITNESS:  (name list) There was a

11:07:06 14  meeting in the Roosevelt room of the White House

11:07:10 15  at which chief of staff John Kelly was present.

11:07:14 16  Principal deputy chief of staff Kirstjen Nielsen

11:07:18 17  was present.  Deputy Chief of staff Rick Dearborn

11:07:21 18  was present.  Senior policy adviser to the

11:07:24 19  president Stephen Miller was present.  I believe

11:07:27 20  the staff secretary Rob Porter was present.

11:07:30 21  White House counsel Don McGahn began was present.

11:07:34 22  I believe the assistant -- or the director of
```

103

AR1346

Appeal 18-1521   Case 1:17-cv-05228-NGG-VMS   Filed: 07/02/2018   Document 282-7   Filed 09/04/20   Page 95 of 1026 PageID #:
9686

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | UNEDITED ROUGH DRAFT - GENE HAMILTON                     |
| 11:07:40 | 2  | White House legislative affairs Mark Short was           |
| 11:07:45 | 3  | present at least for a time.  The director of            |
| 11:07:47 | 4  | management and budget been Mick Mulvaney was             |
| 11:07:49 | 5  | present.  I was present.  Acting secretary Duke          |
| 11:07:53 | 6  | was present.  Acting director McCament was               |
| 11:07:55 | 7  | present.  Acting chief of staff Chad Wolf was            |
| 11:08:00 | 8  | present.  The attorney general was present.  His         |
| 11:08:04 | 9  | chief of staff Jodi Hunt was present, the                |
| 11:08:07 | 10 | associate attorney general Rachel Brand was              |
| 11:08:09 | 11 | present.  Counsel to the attorney general                |
| 11:08:12 | 12 | Danielle Cutrona was present.  And I don't recall        |
| 11:08:18 | 13 | anybody else.  Oh, I'm sorry.  Deputy secretary          |
| 11:08:21 | 14 | of state John Sullivan was present I believe,            |
| 11:08:25 | 15 | could be wrong.                                          |
| 11:08:28 | 16 | BY MS. TUMLIN:                                           |
| 11:08:28 | 17 | Q    That's a lot of people.  You may have               |
| 11:08:30 | 18 | already said this but was John Bash present?             |
| 11:08:33 | 19 |                                                          |
| 11:08:36 | 20 | A    I think he -- I don't recall                        |
| 11:08:39 | 21 | specifically but he my have been there.  I               |
| 11:08:41 | 22 | believe there were one or two staffer from the           |

104

J.A. 617

AR1347

|          |    | UNEDITED ROUGH DRAFT - GENE HAMILTON                    |
|----------|----|--------------------------------------------------------|
| 11:08:43 | 2  | White House counsel as well as I apologize the         |
| 11:08:47 | 3  | director of the domestic counsel Andrew Bremberg       |
| 11:08:49 | 4  | was present and potentially one or two of his          |
| 11:08:53 | 5  | staff.  I don't remember.  I may be conflating         |
| 11:08:56 | 6  | meetings.  There were many on other issues.            |
| 11:08:59 | 7  | Q    Approximately how long did that meeting           |
| 11:09:02 | 8  | last?                                                  |
| 11:09:02 | 9  | A    Might have been an hour and a half.               |
| 11:09:04 | 10 | Q    Okay.  Do you know who convened that              |
| 11:09:08 | 11 | meeting?                                               |
| 11:09:11 | 12 | A    What do you mean convened?                        |
| 11:09:14 | 13 | Q    Who invited people to come to the                 |
| 11:09:16 | 14 | meeting?                                               |
| 11:09:18 | 15 | A    Who sent out the physical invitation or           |
| 11:09:21 | 16 | who called the meeting in a pulled it together?        |
| 11:09:27 | 17 | Q    Who -- both who sent out the physical             |
| 11:09:30 | 18 | invitation first?                                      |
| 11:09:31 | 19 | A    I don't know.                                     |
| 11:09:32 | 20 | Q    Who brought the meeting together, made            |
| 11:09:35 | 21 | it happen?                                             |
| 11:09:37 | 22 | A    I don't know.                                     |

105

J.A. 618

AR1348

# EXHIBIT 6

AR1349

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    --------------------------------x
                                        16-CV-4756(NGG-JO)
 3    MAKE THE ROAD NEW YORK and
      MARTIN JONATHAN BATALLA VIDAL,
 4                                      United States Courthouse
              Plaintiffs,              Brooklyn, New York
 5
              -against-                September 14, 2017
 6                                      2:30 p.m.
      KATHY A. BARAN, ET AL.,
 7
              Defendants.
 8
      --------------------------------x
 9

10        TRANSCRIPT OF CIVIL CAUSE FOR PRE MOTION CONFERENCE
            BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
11              UNITED STATES SENIOR DISTRICT JUDGE
          UNITED STATES MAGISTRATE JUDGE JAMES ORENSTEIN
12

13    APPEARANCES

14    Attorneys for Plaintiff: JEROME N. FRANK LEGAL SVCS. ORG.
                               P.O. BOX 209090
15                             New Haven, Connecticut 06520
                               BY:  MICHAEL J. WISHNIE, ESQ.
16                             SUSANNA D. EVARTS(STUDENT INTERN)

17                             NATIONAL IMMIGRATION LAW CENTER
                               3435 Wilshire Boulevard, Suite 1600
18                             Los Angeles, California 90010
                               BY:  KAREN TUMLIN, ESQ.
19                                  JUSTIN COX, ESQ.
                                    MAYRA JOACHIN, ESQ.
20                                  MARISOL ORIHUELA, ESQ.
                                    MUNEER I. AHMAD, ESQ.
21                                  JESSICA HANSON, ESQ.

22                             MAKE THE ROAD NEW YORK
                               301 Grove Street
23                             Brooklyn, New York 11237
                               BY:  AMY S. TAYLOR, ESQ.
24

25
```

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 132

```
 1
 2   Attorneys for Defendant:
                               U.S. DEPARTMENT OF JUSTICE
 3                             CIVIL DIVISION
                               FEDERAL PROGRAMS BRANCH
 4                             950 Pennsylvania Avenue, N.W.
                               Washington, D.C. 20530
 5                             BY   BRETT A. SHUMATE,
                                    DEPUTY ASSISTANT ATTORNEY GENERAL
 6                                  JOHN R. TYLER, ASSISTANT BRANCH DIR.
                                    BRAD ROSENBERG, SR. TRIAL COUNSEL
 7
                               UNITED STATES ATTORNEY'S OFFICE
 8                             Civil Division
                               271 Cadman Plaza East
 9                             Brooklyn, New York 11201
                               BY:  JOSEPH A. MARUTOLLO, AUSA
10                                  SUSAN L. RILEY, CHIEF CIVIL DIVISION
11
12
13
14
15
16
17
18
19   Court Reporter:          Georgette K. Betts, RPR, CSR, OCR
                               Phone:   (718)804-2777
20                             Fax:     (718)804-2795
                               Email:   Georgetteb25@gmail.com
21
22
23   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
24
25
```

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 133

AR1351

```
 1            THE COURT:  You may be seated in the back and on the
 2   side.  Call the case, please.
 3            THE COURTROOM DEPUTY:  Everybody on the Vidal matter
 4   please state your appearances for the record.
 5            THE COURT:  All right.  For the plaintiff.
 6            MR. WISHNIE:  Good afternoon, Your Honor, for
 7   plaintiffs, Michael Wishnie, Jerome N. Frank Legal Services
 8   Organization, Yale Law School.  With me today is law student
 9   intern, Susanna Evarts.  Ms. Evarts will be prepared to
10   address the Court regarding the claims set forth in our
11   filings.
12            Attorney Karen Tumlin of the National Immigration
13   Law Center will be prepared to address the Court regarding
14   case management and scheduling, any matters like that.  I'll
15   invite everybody else to introduce themselves.
16            THE COURT:  That's fine, please go ahead.
17            MR. COX:  Justin Cox with the National Immigration
18   Law Center.
19            MS. JOACHIN:  Mayra Joachin, National Immigration
20   Law Center.
21            MS. HANSON:  Jessica Hanson, National Immigration
22   Law Center.
23            MS. TAYLOR:  Amy Taylor, Make The Road New York.
24            MS. ORIHUELA:  Marisol Orihuela, Jerome N. Frank
25   Legal Services Organization.
```

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter
Add. 134

J.A. 622

AR1352

Appeal: 18-1521    Document: 22-2    Filed: 07/02/2018    Pg: 101 of 572
Case 1:17-cv-05228-NGG-VMS    Document 82-7    Filed 09/04/20    Page 101 of 1026 PageID #: 9692
Case 8:17-cv-02846-RWT    Document 33-2, Filed 11/08/17, Page 98 of 442

4

```
 1              MR. AHMAD:  Muneer Ahmad, Jerome N. Frank Legal

 2    Services Organization.

 3              THE COURT:  Thank you.  Yes.

 4              MS. RILEY:  Good afternoon, Your Honor, Susan Riley,

 5    chief of the civil division in the U.S. Attorney's Office.

 6              THE COURT:  Nice to see you again, Ms. Riley.

 7              MS. RILEY:  Thank you, Your Honor.

 8              I'd like to introduce to you our Deputy Assistant

 9    Attorney General for the civil division in Washington, D.C.,

10    Brett Shumate.  He will be presenting the government's

11    arguments today.

12              Also at counsel table is John Tyler, an assistant

13    director in the Federal Programs Branch in the civil division

14    Department of Justice in Washington, D.C.  With us also is

15    Brad Rosenberg, also of the Federal Programs Branch of the

16    civil division in Washington, D.C.  Lastly, but not least, Joe

17    Marutollo of our offices, USAO office, chief of immigration

18    litigation.

19              THE COURT:  He has replaced Mr. Dunn?

20              MS. RILEY:  Yes, he has, Your Honor.

21              THE COURT:  Who has taken the bench in New York

22    City.

23              MS. RILEY:  Yes, he has.

24              THE COURT:  How nice for him.

25              MS. RILEY:  Yes, it is, Your Honor.
```

```
 1              THE COURT:  All right.  It's nice to see every one

 2     from out of town, New Haven and Washington.

 3              With me is Magistrate Judge James Orenstein, who is

 4     also assigned to this case and we thought for the purposes of

 5     efficiency the two of us would preside over this proceeding.

 6     You may be seated.

 7              This case was brought last year and it was, in

 8     effect, stayed while the political process continued and here

 9     we are on September 14th, 2017, and we've been asked by the

10     plaintiffs to file a second amended complaint.

11              So why don't we start with the application made by

12     the plaintiff.

13              MS. EVARTS:  Good afternoon, Your Honor, thank you.

14     I would like to first start by introducing my client, Martin

15     Batalla Vidal and many members of Make the Road New York who

16     are with us today.

17              THE COURT:  Where is your client?

18              MR. VIDAL:  Right here, Your Honor.

19              THE COURT:  Nice to meet you.

20              MS. EVARTS:  Second, with your permission, I would

21     like to state the case briefly as we see it.

22              THE COURT:  Have you been keeping up with all the

23     news from Washington and Florida that's been articulated by

24     the President in the last 12 hours about this case -- not

25     about this case about the DACA situation?
```

6

1      MS. EVARTS:  Yes, I have, Your Honor.

2      THE COURT:  Okay, fine.  I'll be asking the other

3 side a few questions about that.  Go ahead.

4      MS. EVARTS:  The Trump administration's decision to

5 terminate the DACA program was both heartless and cruel and it

6 was also illegal.  The purpose of the Administrative Procedure

7 Act, the APA, is to ensure that when an agency undertakes

8 action that it think through its decision and it think through

9 the cost of taking that action and make a deliberate decision,

10 especially -- this is especially true when people's lives are

11 at stake.

12      THE COURT:  They didn't follow the Administrative

13 Procedure Act when the established DACA, did they?  That was

14 done without an opportunity for notice and comment, right?

15      MS. EVARTS:  That is correct, Your Honor.

16      THE COURT:  So going in there hasn't been -- the APA

17 wasn't followed but you're saying they should be following it

18 in connection with the rescission.

19      MS. EVARTS:  Yes.

20      THE COURT:  Is that it?

21      MS. EVARTS:  We are, Your Honor.

22      THE COURT:  Okay.

23      MS. EVARTS:  And while we fully acknowledge that an

24 agency can change its policy, when it does it needs to be

25 legal, it cannot be pretextual and it needs to be

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 137

J.A. 625

AR1355

```
 1   constitutional.  The agency has failed all three of those.
 2              After its termination of the DACA program, we
 3   proposed to amend our complaint in order to bring claims,
 4   statutory claims and constitutional claims.  Our statutory
 5   claims arise under the Administrative Procedure Act and the
 6   Regulatory Flexibility Act.  And our constitutional claims
 7   arise under the equal protection guarantee of the Fifth
 8   Amendment along with the due process clause of the Fifth
 9   Amendment.
10              And I can describe the claims in more depth if you
11   would like, Your Honor.
12              THE COURT:  Well, briefly speaking, you are
13   proposing to amend the complaint, according to your letter, to
14   make certain claims for individuals who are not yet plaintiffs
15   in the case, right?
16              MS. EVARTS:  That is correct, Your Honor.
17              THE COURT:  And also to make claims on behalf of a
18   class or a number of classes.
19              MS. EVARTS:  That is correct, Your Honor.
20              THE COURT:  Can you describe the class or classes
21   that you propose to include in your amended complaint.
22              MS. EVARTS:  Yes, Your Honor.  We propose a
23   nationwide class that would be nationwide.  And I can get into
24   more detail.  We also expect in our class certification
25   motion, if you grant us leave to amend our complaint, that we
```

**AR1356**

8

 1  will also more fully flesh out the particular aspects of the

 2  class that we propose.

 3          THE COURT:  When could you have this second amended

 4  complaint filed so we can move along with this case, and as

 5  the government -- as the Attorney General has established

 6  certain deadlines for making application to extend these

 7  permits.

 8          Just state your name for the court reporter.

 9          MS. TUMLIN:  Absolutely.  Karen Tumlin for

10  plaintiffs.  Your Honor, the plaintiffs are prepared to file

11  our second amended complaint on Tuesday, the 19th, if that

12  would work for the Court.

13          THE COURT:  All right.  And so you are pretty far

14  along then in preparing your second amended complaint.

15          MS. TUMLIN:  We're working diligently, Your Honor.

16          THE COURT:  Okay, well, that's what weekends are

17  for.

18          MS. TUMLIN:  Turns out.

19          THE COURT:  Let me just ask the government --

20  welcome, first of all, sir.

21          MR. SHUMATE:  Thank you, Your Honor.

22          THE COURT:  Let me just ask you, are you the career

23  person in your position at the justice department or are you

24  the political appointee?

25          MR. SHUMATE:  I'm the political appointee, Your

1    Honor.

2            THE COURT:  Which means you know more about what the

3    President is thinking than a career person would.

4            MR. SHUMATE:  I don't think you should assume that,

5    Your Honor, but --

6            THE COURT:  Okay.

7            MR. SHUMATE:  -- I'm the Deputy Assistant Attorney

8    General for the Federal Programs.

9            THE COURT:  Well, it is nice to have you here.

10           MR. SHUMATE:  Thank you.

11           THE COURT:  So I take it from your correspondence

12   that you don't object to the filing of the second amended

13   complaint.

14           MR. SHUMATE:  That's correct, Your Honor.

15           First of all, I just wanted to say that we recognize

16   the importance of this case, the significance of the issues

17   that are presented, and the public interest in the case.  So

18   we obviously have no objection to the filing of the amended

19   complaint.  We see it makes perfect sense to move this case

20   along quickly, so we're not opposing the amended complaint.

21           What the government would be willing to do is file a

22   motion to dismiss within 30 days of when we see the amended

23   complaint.  Even though we typically have 60 days, we're

24   willing to move very quickly to put the Court in a position to

25   address what we think are fundamental flaws in the claims that

1    the plaintiffs propose to bring by the end of the year.  And

2    as you know, there is a March deadline in DHS's memorandum.

3    In the event the Court does not dismiss the case, we feel the

4    Court should do that, the Court will be able to take some

5    action and we can move to PI briefing potentially next year if

6    the plaintiffs so choose to do so.

7          But we think the best course of action would be, for

8    example, if the plaintiffs were to file the amended complaint

9    next week, we would file a motion to dismiss within 30 days,

10    say October 20th, the plaintiffs could have another 30 days or

11    so to file an opposition, which we would propose

12    November 17th, we would file a reply on December 15th and then

13    the Court could hold a hearing, if it decided to do so, at the

14    end of the year and the Court would be in a position to make

15    the decision on our motion to dismiss end of this year, early

16    next year.  So that would --

17          THE COURT:  Okay.  Let me just ask you this.  Isn't

18    there -- there's a first deadline that was set forth by the

19    Attorney General in his statement and that I think was

20    October 5th.  What was that deadline for?

21          MR. SHUMATE:  So it's actually -- October 5th,

22    that's correct, it is actually a DHS deadline for renewal

23    applications for certain categories of individuals whose

24    permits expire.  So, yes, that deadline is upcoming.

25          One thing the plaintiffs had asked us to consider is

Appeal: 18-1521   Doc: 28-2   Filed: 07/02/2018   Pg: 108 of 572
Case 1:17-cv-05228-NGG-VMS   Document 28-27   Filed 09/04/20   Page 108 of 1026 PageID #: 9699

Case 8:17-cv-02434-TWT   Document 55-2   11/06/2017   Page 144 of 356

1    whether DHS would consider extending that deadline in light of
2    the hurricanes in Texas and Florida.  We took that issue very
3    seriously, we took it to DHS, they have considered our
4    request.  Their position right now is that that deadline will
5    remain October 5th as of now, but I am authorized to say that
6    they are actively considering whether to extend the deadline
7    in light of the hurricanes.  So that's what I know about the
8    October 5th deadline.  As of right now, it still stands.
9              THE COURT:  I'm more concerned about the October 5th
10   deadline in terms of how it might prejudice the rights of
11   certain persons who are already covered by the DACA
12   certificates or permits, work permits and so on that have
13   already been issued.  And so I'm not worried -- I mean, we're
14   all concerned about what has happened with the hurricanes, but
15   if you're living in Michigan or in Oregon or in Vermont, you
16   don't have a problem with the hurricane, you've got a problem
17   with the fact that based on this deadline you may be preempted
18   from making an application to extend the benefit that you
19   received under DACA.  So since this is a nationwide program, I
20   think we should just not focus on people in the impacted areas
21   from the hurricanes, we need to focus on everybody.  If this
22   is going to be an application for a nationwide class, we have
23   to think of the whole country, so -- and then there's also the
24   question of whether DHS and the immigration officials have the
25   latitude, absent DACA, to grant certain applications

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 142

Case 1:17-cv-05228-NGG-VMS   Document 82-7   Filed 09/04/20   Page 109 of 1026 PageID #:
9700

```
 1    irrespective of whether DACA exists and whether this, in

 2    effect, creates a legislative rule on the part of DHS that

 3    bars people, based on their classification, from being

 4    considered for this kind of benefit or remedy or exception to

 5    the general rule.

 6              I'm just wondering, have you all thought about the

 7    question of whether that kind of hard and fast deadline for

 8    certain categories of individuals covered by DACA would, in

 9    effect, constitute a legislative rule, irrespective of whether

10    the creation of DACA violated that in effect the requirement

11    that legislative rules not be established.

12              MR. SHUMATE:  Thank you, Your Honor.  We certainly

13    understand the plaintiffs' concern about the October 5th

14    deadline.  In DHS's judgment, 30 days was a sufficient amount

15    of time to allow individuals to complete the paperwork to file

16    for renewals.  I think there is a virtue in having a clear

17    deadline that people know about, that's clear and why we're

18    reporting.  So in their discretion they thought that was

19    appropriate and, in their defense, Your Honor, this is a

20    decision that has been made to wind down the program.  It was

21    not an abrupt decision, so the program is not ending

22    immediately.  Nobody is losing their DACA benefits

23    immediately.  The opportunity has been provided to renew

24    certain applications and so we think that is eminently

25    reasonable.
```

```
1              And our position in the case is that this decision
2     to rescind DACA is not subject to judicial review of the APA
3     at all.  So it is not subject to the arbitrary and capricious
4     decision-making requirement, it's not subject to notice in
5     common rule making, so this was an eminently reasonable
6     decision that, you know, it's an exercise of prosecutorial
7     discretion.  We had to decide how to wind it down in some way,
8     so they felt this was just a reasonable way to establish some
9     deadlines so folks would have clear notice of what the
10    deadlines would be.
11             THE COURT:  Well, the Attorney General said in his
12    statement that DACA is unconstitutional and yet in this
13    process you're allowing people to renew, certain people, whose
14    coverage ends by a certain time to renew even though it is an
15    allegedly unconstitutional procedure.  Is that what -- do I
16    get that right or do I get that wrong?
17             MR. SHUMATE:  That is right.  The Attorney General
18    and DHS both decided that this is an unlawful program and what
19    they decided was -- it was a decision based on litigation
20    risk.  That if we did not wind down the program in a
21    responsible way it was very likely that the other states were
22    going to go to the Southern District of Texas and ask for an
23    immediate preliminary injunction in which case the program
24    could have been ended immediately.  So in their judgment what
25    they decided to do is we're going to have a responsible way to
```

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

```
 1   wind this program down that gives folks a chance to know when
 2   the deadlines are, gives an opportunity to apply for renewal
 3   permits so people aren't losing their benefits immediately.
 4   So it was a decision based on litigation risk that if we
 5   didn't wind this down in a responsible way, then the District
 6   Court in Texas would do it for us.
 7           MS. TUMLIN:  If I may speak briefly to the
 8   October 5th and the notice issue.  Leaving aside the
 9   tremendous turmoil that states and individuals impacted by the
10   hurricanes but looking at the entire country, one of the
11   things that we're greatly troubled by as plaintiffs and would
12   like to address to the Court is, the renewal process for DACA
13   how it has worked traditionally is 180 days before someone's
14   work authorization in DACA is set to expire they get a notice
15   and that notice directs them to file the renewal application
16   between 120 and 150 days.  And those notices -- and I think
17   the government can of course correct me if this is not the
18   case -- have continued to go out, but what that means with the
19   hard and fast October 5th deadline is, individuals whose DACA
20   is expiring between February and March, have received notices
21   that are false and misleading in this context that has
22   changed.  They don't state that you only have until
23   October 5th and our understanding is there is no plan to
24   provide individualized notice that provides the right date and
25   provide a warning to individuals that if they don't submit
```

Appeal: 18-1521  Document: 28-2  Filed: 07/02/2018  Pg: 112 of 572
Case 1:17-cv-05228-NGG-VMS  Document 28-7  Filed 09/04/20  Page 112 of 1026 PageID #: 9703
Case 0:17-33115 Document 55-2 11/09/2017 ID: 6589928 Page 148 of 256 of 412
15

```
1    their renewal applications three weeks from today, not in the

2    120- or 150-day window, that they risk losing their chance to

3    renew.

4           THE COURT:  I see.  So let me just move on to the

5    next question, which is after you file your second amended

6    complaint, assuming that the problem isn't resolved

7    legislatively by the political branches, if you will, of the

8    federal government, between now and October 5th --

9           MS. TUMLIN:  Correct.

10          THE COURT:  -- then do you anticipate requesting

11   some kind of preliminary injunctive relief?  What can we

12   expect, what can the Court expect from the plaintiffs, the

13   new -- the current plaintiff and any additional plaintiffs at

14   that point.  I'm just trying to plan for what may happen.  My

15   hope would be, frankly, that the executive branch would put a

16   voluntary halt to this, the termination process, to permit

17   Congress and the President to find a legislative solution so

18   the courts are not involved.

19          There are apparently 800,000 individuals who are

20   affected potentially by what's happening with DACA, and that

21   doesn't even cover family members of those people who are also

22   potentially affected.  There are people who are working

23   supporting families.  We're not talking about people who are

24   children, we're talking about people who are grown and in the

25   work force many, many of them, and they support families, they
```

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 146

1  support their parents, they support their own children some of

2  them.  This is a much wider situation than just the

3  individuals.  And this affects others as well.  They pay

4  taxes, they pay rent, they pay for mortgages, they support

5  their communities, and so I'm concerned, the Court is

6  concerned that the government if it proceeds with these

7  arbitrary deadlines, which is what they are, they are just

8  arbitrary deadlines, that the consequence will be far greater

9  in scope than simply you can't apply and down the road some

10  judge or the Congress will solve the problem and all will be

11  well, all right.  We can't expect that in this environment

12  that is a likely outcome.  It's a hoped for outcome.  And from

13  what the President has said in the last 24 hours, I'm

14  encouraged that this can be resolved by a legislative

15  solution.  But you're here because you anticipate that it may

16  not be resolved by a legislative solution.  So I'm just

17  wondering whether you have a plan since you're plaintiffs.

18        MS. TUMLIN:  Yes.

19        THE COURT:  So tell us, give us a little bit of a

20  hint as to where we're going to go from here apart from the

21  filing of a second amended complaint.

22        MS. TUMLIN:  Absolutely, Your Honor, I appreciate

23  that.  And I'd like to do that in two tracks:  One, talking

24  about what the Court might anticipate what plaintiffs' plan

25  might be for the October 5th and then we can turn to the other

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 147

J.A. 635

AR1365

Appeal: 18-1521    Document: 28-2    Filed: 07/02/2018    Pg: 114 of 572
Case 1:17-cv-05228-NGG-VMS    Document 82-7    Filed 09/04/20    Page 114 of 1026 PageID #:
9705
Case 8:17-cv-02942-RWT    Document 55-2    Filed 11/23/19    Page 151 of 442
Case 8:17-cv-02942-RWT    Document 28-2    Filed 11/09/2017    Page 150 of 256

```
 1    deadline, which is the March deadline.

 2              So with respect to whether any type of injunctive

 3    relief or temporary restraining order would be sought in

 4    advance of the October 5th deadline, a couple of things would

 5    be useful.  I think having, first and foremost, a date certain

 6    by when the defendants can provide an answer whether the

 7    government will voluntarily extend that deadline and perhaps

 8    coming back and having another conference when we're closer to

 9    that date, perhaps around September the 25th would be amenable

10    to plaintiffs or 26th.  We're sitting three weeks today from

11    the deadline for October 5th.  But at that point we can make a

12    determination and be ready to set a schedule if we were still

13    in a situation where the defendants had not moved the

14    October 5th date and it became necessary to seek immediate

15    relief.  So that would be one plan, Your Honor.

16              We could -- if that became necessary, a need for

17    temporary restraining order that's something we could file on

18    Monday, October the 2nd.

19              THE COURT:  So you're saying something like

20    Thursday, September 28th might be a good date?

21              MS. TUMLIN:  I was suggesting the Monday or Tuesday,

22    the 25th or 26th for a conference, Your Honor, to see the

23    defendants may have more information at that time and then if

24    we're in resolution, terrific, we can focus on the March 5th

25    date.  If not, we could proceed to set a schedule for a
```

Appeal: 18-1521    Document: 26-2    Filed: 07/02/2018    Pg: 115 of 572
Case 1:17-cv-05228-NGG-VMS    Document 2227    Filed 09/04/20    Page 115 of 1026 PageID #: 9706
Case 8:17-cv-02504-DKC    Document 56-2    11/20/2017    21:53:03    Page 103 of 442

18

1    temporary restraining order if that's still necessary.

2         THE COURT:  Let me hear from the deputy assistant

3    attorney general.

4         MR. SHUMATE:  Thank you, Your Honor.  We obviously

5    have no objection to coming back for another status

6    conference.  I think we can also just engage with the

7    plaintiffs and let them know the government's position or file

8    a letter with the Court letting the Court know what DHS has

9    decided on the October 5th deadline.  It may obviate the need

10   for a status conference, I can't speak to that now, it's still

11   actively under consideration.

12        THE COURT:  Well, let me say this with great respect

13   for the Department of Homeland Security, that it would be

14   helpful if we could try to avoid judicial intervention in this

15   case if all that it takes, at least at this point, is to

16   extend one deadline, the reason for which is unknown to me and

17   probably unknown to many people, but which is so close in time

18   that taking into account the President's comments where he

19   said in a tweet today -- I do follow the President's tweets --

20   Does anybody really want to throw out good, educated and

21   accomplished young people who have jobs, some serving in the

22   military, question mark.  Really.  And I think that the

23   message that's being sent is that there is room for a solution

24   and to set -- to keep a deadline that is so close in time to

25   today while a solution is being engineered -- and it's

```
 1    difficult to engineer these solutions for reasons that I need

 2    not go into, you can read about them in the media -- that it

 3    would be useful to take some of the pressure off the various

 4    parties, particularly those who are affected, these people,

 5    these good, educated and accomplished young people who the

 6    President speaks about with admiration, so that way at least

 7    we wouldn't have to deal with a potential judicial

 8    intervention at this early stage and we would give the

 9    Congress and the President the opportunity to work through

10    some of the difficulties that they may face in engineering the

11    solution.  And that's really -- that's the Court's hope.  The

12    Court can stay out of this and that the political branches of

13    the government can resolve this.  And it would appear there is

14    some progress being made in that regard and DHS I believe

15    would be well served by giving that process the chance to bear

16    fruit.

17              So I wish you would take that back to your client.

18              Who is the secretary of DHS now that General Kelly

19    has become Chief of Staff?

20              MR. SHUMATE:  Acting Secretary Duke.

21              THE COURT:  You know, General Kelly, according to

22    the Daily News at least, was at the dinner last night at the

23    White House with the democratic leaders of the House and the

24    Senate where the President and leadership, the minority

25    leadership had a discussion about this very issue, so he's
```

```
1    very familiar with this situation and I'm sure he could be

2    helpful as well.

3              MR. SHUMATE:  Yes, Your Honor, we will absolutely

4    take your concerns back to our clients.

5              I think one thing to keep in mind is if the

6    plaintiffs intend to move for a TRO or a preliminary

7    injunction so close to that October 5th deadline, we do have

8    serious concerns about the merits of their claims.  That they

9    are going to ask for that type of emergency relief, they are

10   going to have a show a likelihood of success in the merits,

11   so --

12             THE COURT:  I know all the rules.

13             MR. SHUMATE:  Right.  We think it really makes sense

14   to initiate a briefing schedule on our motion to dismiss so we

15   can get moving quickly to put the Court in a position to

16   address what we think are substantial defects in their claims.

17   So what we would propose --

18             THE COURT:  But that motion to dismiss goes beyond

19   October 5th, right?

20             MR. SHUMATE:  Yes.

21             THE COURT:  The schedule -- we don't even have a

22   motion until when, according to your schedule?

23             MR. SHUMATE:  October 20th.  But the plaintiffs have

24   not yet indicated whether they for certain intend to move for

25   a TRO or a preliminary injunction before that October 5th
```

1   deadline.  So I think barring some kind of a commitment that

2   they intend to do that, it would be well served and Court

3   would be to go ahead and initiate a briefing schedule on our

4   motion to dismiss.

5           THE COURT:  What is the injury to the government in

6   moving the date by which someone would have to apply for a

7   continuation of a work permit, for instance, from October 5th

8   to December 15th for instance, just for the sake of argument?

9   What is the harm that's done in that situation when all it

10  basically does is it affords the Congress during the latter

11  part of this session and the White House to draw up and enact

12  a legislative solution.

13          MR. SHUMATE:  The harm would be, Your Honor,

14  interference with a decision that is committed to the

15  executive branch.  This is all about prosecutorial discretion.

16  The deferred action is a restraint on deportation.  It's a

17  decision not to deport.

18          So if an Article III Court were to second guess the

19  decisions of the executive branch has made about how to

20  exercise its prosecutorial discretion, that would be

21  interference with the executive branch's prerogatives in terms

22  of how it exercises discretion under the immigration laws.

23          THE COURT:  Well, I understand that argument and I

24  even made that argument when I was chief counsel of the FAA in

25  Washington from time to time, but the flip side of that is

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 152

22

1  that the President has said that he doesn't want to throw out

2  good, educated and accomplished young people who have jobs,

3  some serving in the military.  And so it might appear to be

4  arbitrary and capricious to establish a hard and fast policy

5  that would throw these people out of the country even though

6  they meet all of these wonderful standards that he recognizes

7  and he is, after all, not the Secretary of Homeland Security,

8  he's the president.  So his own statements would belie any

9  effort to throw these people out without good cause and it

10  would just seem to be arbitrary and I'm not concluding that,

11  but it could be argued with some merit that it constitutes an

12  arbitrary and capricious act if it doesn't afford the DHS with

13  flexibility where it is a hard and fast rule.  And so that's

14  one of my concerns.

15       So take that back to your clients so that they

16  understand that the Court has deep concerns about how this

17  would play out if there isn't some flexibility and movement

18  with regard to this date that's been established for

19  October 5th.  That's the only date that I'm concerned about

20  right now.

21       The ultimate outcome of this case should not be in a

22  Court of law in my opinion.  It should be handled by the

23  political branches.  But if it can't be handled by the

24  political branches, I have an obligation within the law to

25  protect the 800,000 people or at least those who are within my

 1   jurisdiction, which could be tens of thousands of people, from

 2   any arbitrary and capricious implementation of legislative

 3   rule, which this may or may not be.

 4          I just want you to understand that in view of where

 5   we are today, this afternoon, I don't know about tomorrow,

 6   this afternoon it would make sense in my view to be more

 7   flexible about the cutoff date so that we could actually

 8   resolve this in a more orderly and appropriate way.

 9          That's what I would like you to take back to the

10   acting secretary.

11          MR. SHUMATE:  Absolutely, Your Honor.

12          THE COURT:  Thank you.  Judge Orenstein.

13          JUDGE ORENSTEIN:  Thank you, Judge Garaufis.  I

14   wanted to jump in only because you teed up the issue and it's

15   going to affect something that I'll be addressing when we get

16   to other pretrial matters.

17          I want to understand the harm relating to the

18   October 5th deadline.  Are you saying the harm that you're

19   seeking to avoid is not necessarily related to the deadline

20   itself but to judicial control of the deadline?

21          MR. SHUMATE:  I would also say that there is a

22   concern that if we start pushing this October 5th deadline

23   back we're going to jam officials at the DHS who process the

24   applications.

25          JUDGE ORENSTEIN:  Right.

```
1              MR. SHUMATE:  So they need a certain amount of time
2    to process the flood of applications.  I'm not sure exactly
3    how much time they need, but that's something we can talk
4    about --
5              JUDGE ORENSTEIN:  That's a separate issue.
6              MR. SHUMATE:  Separate issue.
7              JUDGE ORENSTEIN:  In terms of the harm arising from
8    the wrong branch of government making the decision, I'm just
9    having trouble understanding what you're saying.  Is it that
10   the harm is infringing on the Executive's exercise of
11   prosecutorial discretion as to when to discontinue its
12   exercise of prosecutorial discretion that it believes to be an
13   unconstitutional exercise of that discretion?
14             MR. SHUMATE:  That's correct, Your Honor.
15             JUDGE ORENSTEIN:  You want to control how long you
16   do something that you believe to be unconstitutional.
17             MR. SHUMATE:  Because this is a matter -- the
18   enforcement and --
19             JUDGE ORENSTEIN:  Why are you doing something that's
20   unconstitutional at all?
21             MR. SHUMATE:  Because the Attorney General decided
22   that it would be harsh -- we'd be in a much different
23   situation if the Attorney General had decided we need to end
24   this program now.  We need to wind this down in an orderly
25   fashion.  So it wasn't just a decision that DACA is
```

```
1    unconstitutional, it was also a policy judgment that in light

2    of the importance of this issue that really Congress should

3    make this decision, we're going to wind this down in an

4    orderly manner rather than just cutting it off tomorrow, which

5    would be -- you know, I'm sure we would be arguing about TRO

6    in a different matter, so --

7              JUDGE ORENSTEIN:  But if the judiciary says it's

8    appropriate under applicable law for that process that you

9    believe to be unconstitutional to go longer, that itself is an

10   unconstitutional intrusion on the President.

11             MR. SHUMATE:  I think it would be a violation of

12   separation of powers or --

13             JUDGE ORENSTEIN:  Thank you.

14             MR. SHUMATE:  Yes, Judge.

15             THE COURT:  And the other question is, with regard

16   to those whose DACA status expires after March 5th, 2018,

17   those individuals would be barred from applying for a renewal.

18   I don't know where that date came from but that's the other

19   piece of this.

20             MR. SHUMATE:  I think --

21             THE COURT:  So, in other words, it would be okay to

22   extend someone's coverage by DACA if their status expires

23   before March 5th that would be okay, but it would be

24   unconstitutional and improper to extend someone whose coverage

25   expires after March 5th, 2018.
```

26

1          MR. SHUMATE:  These are decisions that are committed

2     to the executive branch and the Attorney General and DHS

3     decided that in the exercise of their discretion, they're

4     going to wind down this program that had substantial

5     litigation risk, that they believe as a policy matter really

6     Congress should make this decision.  Let's give a six-month

7     window to wind this down in an orderly fashion.

8          Yes, they may seem arbitrary, but these are

9     decisions that are best left by the -- decisions best made by

10    the executive branch because these are competing policy

11    interests.  So while they may seem arbitrary in the abstract,

12    these are decisions that have to be committed to the executive

13    branch or else courts are going to be second guessing.  If

14    October 5th is arbitrary what's to say that November 5th isn't

15    arbitrary or December 5th isn't arbitrary.  So it's entirely

16    reasonable for the government to set a hard deadline, that is,

17    everybody knows about, that folks have 30 days to meet that

18    deadline.

19          So, again, we will go back to DHS and absolutely

20    express the Court's concern about that deadline.  But I do

21    believe that that is an eminently reasonable decision to make

22    by the executive branch in their discretion.  We're going to

23    wind this down in an orderly fashion, let's set October 5th as

24    the deadline for these renewal applications and March 5th as

25    the deadline to wind down the program altogether.

```
 1              THE COURT:  Now you've got a president who has

 2    basically said that this is going to affect all these

 3    wonderful people and we have to find a legislative solution

 4    and you're putting the President, in effect, up against the

 5    wall and he's got to solve this problem by a date that's been

 6    set by a bureaucrat at the Department of Homeland Security.  I

 7    don't understand how that makes sense if the President has

 8    already stated he's committed to finding a political solution,

 9    meaning that the political branches, Congress and the

10    President would find a solution.  Isn't it time to go back --

11    and you said you will, but it's not just -- you're not just

12    doing it for the Court, you're doing it for the administration

13    that -- and there are people who, obviously, oppose this kind

14    of solution that the President is hinting at and there's going

15    to be give and take, and the concern of the Court is that

16    October 5th is three weeks away and the date that was set was

17    set before the president made his statements and it would make

18    a lot of sense from various vantage points to extend this

19    deadline.  And you know something about deadlines, they can be

20    extended.  No one will be harmed by extending this deadline.

21    Certainly not the $800,000 people who are sweating over

22    whether someone is going to knock on their door and send them

23    to a country they don't even know, where they speak a language

24    they don't even speak.

25              So, on the one hand, those are the only -- they are
```

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 158

```
 1    really the only people who are going to be injured here.  The
 2    other people who are going to be injured are people who have a
 3    political axe to grind or they have a philosophical
 4    disagreement or whatever it happens to be, but you can
 5    always -- the fact is you can always deport them later if you
 6    can't reach an agreement and the courts let you do it.  You
 7    can always deport them later.  And they're not going to object
 8    to being here an extra six months or an extra year while you
 9    find them.
10           So I don't see what the -- there is no harm done, in
11    the Court's view, by allowing this legislative process to play
12    out and not establishing this October 5th deadline and also
13    barring people whose permits expire after, what is it,
14    March 5th from applying.  You can always deny them.  You have
15    discretion.  And that's another point that has to be made.
16           Even without DACA, the Department of Homeland
17    Security would still have discretion to allow people to remain
18    in the United States.  So you don't need DACA for that.  DACA
19    established a protocol that helped the people at Homeland
20    Security understand what the priorities of the prior
21    administration were, that's what DACA did.  It was not a
22    statute, it wasn't even a formal rule making.  So that's
23    another concern -- just add that to my concern for your
24    clients.
25           Is there anything else before we set your schedule
```

1    for your motion to dismiss?

2            Anything else from the plaintiff?

3            MS. TUMLIN:  No, Your Honor, we'd be happy to move

4    on to scheduling on the motion to dismiss and then class cert.

5            THE COURT:  Okay.  On the motion to dismiss, tell me

6    what your schedule is.

7            MR. SHUMATE:  So our thought was as soon as they

8    file the amended complaint we would file our motion to dismiss

9    within 30 days, I think that would probably put us around

10   October 20.  The plaintiffs could have 30 days to file an

11   opposition, so around November 17th, and then we could file a

12   reply December 15th and the Court could hold a hearing after

13   that.

14           THE COURT:  All right, any disagreement over that,

15   that schedule?

16           MS. TUMLIN:  No, Your Honor, that's workable.  The

17   one thing plaintiffs would be interested perhaps preceding

18   around the October 20th date would be a meet and confer with

19   the government on a Rule 26 discovery schedule, and then a

20   date to present a report to the Court.

21           JUDGE ORENSTEIN:  We'll take that up separately and

22   that's on the agenda for today.

23           THE COURT:  Okay.  And judge Orenstein will be

24   handling that whole discovery process and he'll go over that

25   with you in a few minutes.

1          MS. TUMLIN:  Your Honor, just to clarify, we did

2    have a chance to confer with the defendants that under these

3    dates we think it would be efficient for plaintiffs to be

4    moving on those same dates for our class cert.  So on the

5    October 20th date you would receive the motion for class

6    certification from the plaintiffs with the defendants' motion

7    under Rule 12 and then we would oppose and reply on the same

8    dates.

9          THE COURT:  Is that agreeable?

10         MR. SHUMATE:  Yes, Your Honor.

11         THE COURT:  So both sides will be sending me

12   Christmas presents in December.

13         MS. TUMLIN:  Many.

14         THE COURT:  I want to thank you all.

15         All right.  Which brings us to the discovery issue.

16         JUDGE ORENSTEIN:  Right.  You want to be heard,

17   Mr. Shumate?

18         MR. SHUMATE:  Sure.

19         JUDGE ORENSTEIN:  Go ahead.

20         MR. SHUMATE:  Oh, no, I'm sorry.

21         JUDGE ORENSTEIN:  Let me just frame the issue.  So

22   as Ms. Tumlin was saying, the issue comes with a Rule 26

23   conference and let me ask you, have the parties conferred

24   already about just the threshold issue of whether there is

25   discovery and what discovery is appropriate at this stage?

Appeal: 18-1521    Doc: 23-2    Filed: 07/02/2018    Pg: 129 of 572    Page 128 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS   Document 82-7   Filed 09/04/20
9719

Case 8:17-cv-02542-RWT   Document 29-2   Filed 11/28/17   Page 113 of 442
Case 1:17-cv-02325-DKC   Document 55-2   11/09/2017   2105090   Page 64 of 256
31

```
 1              MR. SHUMATE:  Yes, we have.

 2              THE COURT:  What have you come up with?

 3              MR. SHUMATE:  Our position is that no discovery is

 4    appropriate in this case.  The primary claims that are being

 5    brought are APA claims, which typically are not susceptible to

 6    discovery they're -- the Court makes a decision based on the

 7    record that is before the Court, we don't look behind that

 8    record.  So we have decisions, the Court -- you know, assuming

 9    the claims survive a motion to dismiss, the Court will decide

10    whether this action on its face is arbitrary and capricious.

11    So at least for the APA claims we don't think discovery is

12    appropriate.

13              On the constitutional claims, again, we don't think

14    discovery is appropriate.  We think those claims are

15    susceptible to a motion to dismiss.

16              JUDGE ORENSTEIN:  But typically at least my cases, I

17    know Ms. Riley knows this because I've had the U.S. Attorney's

18    Offices in many cases and some of her colleagues are here,

19    typically the mere fact that the motion to dismiss is not in

20    itself a reason to postpone discovery and, as we've been

21    talking about it at some length today, the parties on both

22    sides, obviously the plaintiffs and the class that they hope

23    to represent and the many government officials who have

24    administrative tasks, they all have an interest in knowing

25    what's coming on October 5th and March 5th.  It strikes me
```

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 162

32

```
 1    that if there is going to be discovery there's going to be
 2    little enough time to do it to allow an orderly resolution of
 3    the merits.
 4            So here's what I'm going to propose.  I really don't
 5    anticipate we can give you all a fair chance to argue the
 6    issue much less have resolve today, but I would like to very
 7    quickly we'll set a schedule very quickly to confer about this
 8    and tee up with your respective positions in letters two
 9    things:  One, the threshold issue of whether discovery should
10    proceed and, second, this will require a real meet and confer,
11    assuming that it does, what it should look like, what
12    deadlines we should set, how if at all it should be phased.
13    To the extent it goes forward there are going to be, I'm sure,
14    some very contentious issues because I know you want to rely
15    on a very concrete administrative record, I imagine you want
16    to get into the intent of various actors and that will
17    implicate the question of depositions.  Please identify the
18    issues that are going to divide you and come up with a
19    proposal for getting done what you would agree has to be done
20    if discovery goes forward and what issues need to be resolved,
21    because we need to address them quickly.
22            MR. SHUMATE:  Your Honor, we will certainly do that.
23    I would just say here that the government will strongly oppose
24    any discovery here and to the extent the Court wants to move
25    quickly and plaintiffs want to move quickly, any attempt to
```

1   get discovery of cabinet officials is going to be strongly

2   opposed by the government.

3            JUDGE ORENSTEIN:  I anticipate that there are a lot

4   of contentious issues here, I'm not making an assumption one

5   way or the other about how they play out, but if the parties

6   are going to get the rulings that they need in time to have a

7   practical effect, we're going to have to have those discovery

8   issues resolved quickly.  So I want you to get started on

9   meeting and conferring.

10           Unless there's an objection to this schedule I'd

11  like to have your respective positions, I don't care if it's

12  two letters or one, your respective positions on the threshold

13  issue of whether it should go forward by next Friday and so I

14  guess that would be the 23rd, a week from tomorrow.

15           MS. TUMLIN:  Twenty-second.

16           MR. SHUMATE:  Twenty-second.

17           THE COURT:  The 22nd.

18           JUDGE ORENSTEIN:  The 22nd, okay.  Thank you.  I was

19  looking at the wrong date.

20           So by September 22nd your respective positions and

21  accompanying that either a joint proposal or competing

22  proposals for a schedule.  To the extent you can identify

23  issues that you agree would need to be decided within a

24  discovery regime and you want to propose dates for getting

25  those done, all the better.  And then let's -- I don't know if

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 164

1   you want to do this as a joint conference.

2          THE COURT:  Yes, what I'm going to do here is I'm

3   setting a status conference for Tuesday, September 26th at

4   4:00 p.m.  It would be earlier but I have a -- I'm spending a

5   great deal of time with the criminal division in Washington on

6   a fraud trial next week and the week after and the week after

7   and the week after.  So my trial day ends at 4:00 p.m. and

8   we'll take you promptly at 4:00 o'clock.

9          JUDGE ORENSTEIN:  We'll address these issues there

10   as well.

11          MR. SHUMATE:  Just to be clear, what are we prepared

12   to discuss on the status conference, the discovery issues, the

13   October 5th deadline as well.

14          THE COURT:  Oh, yes, absolutely.

15          You're going to tell me all about your discussions

16   with your client, about how cooperative your client is going

17   to be with my suggestion.

18          MR. SHUMATE:  I will.

19          JUDGE ORENSTEIN:  Anything else that we thought we

20   needed to address in terms of discovery issues that have to be

21   resolved early on.

22          THE COURT:  Anything else from the plaintiff?

23          MS. TUMLIN:  No, Your Honor.

24          JUDGE ORENSTEIN:  Thank you.

25          MS. TUMLIN:  Your Honors.

Appeal: 18-1521    Document: 2    Filed: 07/03/2018    Pg: 132 of 572
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 132 of 1026 PageID #: 9723

Case 8:17-cv-02459-RWT    Document 29-2    Filed 11/28/18    Page 169 of 442

35

1          THE COURT:  Does the plaintiff have anything else

2    for today?

3          MS. TUMLIN:  No, thank you, Your Honors.

4          THE COURT:  All right.  Is there anything else from

5    the defense?

6          MR. SHUMATE:  No, Your Honor, thank you both.

7          THE COURT:  Thank you very much everyone.

8          (Matter concluded.)

9

10                    *     *     *     *     *

11

12    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

13

14    s/ Georgette K. Betts            September 15, 2017

15    GEORGETTE K. BETTS               DATE

16

17

18

19

20

21

22

23

24

25

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

Add. 166

Appeal: 18-1521    Doc: 28-2    Filed: 07/02/2018    Pg: 133 of 572    Page 133 of 1026 PageID #:
9724
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 120 of 442

# EXHIBIT 7

AR1385

Appeal 18-1521-cv-05228NCG-VMS Filed 07/02/2018 Pg 134 of 572 Page 134 of 1026 PageID #: 9725

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 121 of 442
International Refugee Assistance Project v. Trump, Slip Copy (2017)
2017 WL 4674314

KeyCite Blue Flag - Appeal Notification
Appeal Filed by INTL. REFUGEE ASSISTANCE v. DONALD J. TRUMP, 4th Cir., October 23, 2017

2017 WL 4674314
Only the Westlaw citation is currently available.
United States District Court,
D. Maryland.

INTERNATIONAL REFUGEE
ASSISTANCE PROJECT, et al., Plaintiffs,
v.
Donald J. TRUMP, in his official capacity as
President of the United States, et al., Defendants.
Iranian Alliances Across Borders, et al., Plaintiffs,
v.
Donald J. Trump, in his official capacity as
President of the United States, et al., Defendants.
Eblal Zakzok, et al., Plaintiffs,
v.
Donald J. Trump, in his official capacity as
President of the United States, et al., Defendants.

Civil Action No. TDC–17–0361, Civil Action No.
TDC–17–2921, Civil Action No. TDC–17–2969
|
Signed 10/17/2017

**Synopsis**
**Background:** Individuals and organizations brought action for declaratory and injunctive relief against President of the United States and Executive Branch officials and agencies, challenging under the Establishment Clause and the Immigration and Nationality Act (INA) a Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad). Plaintiffs filed motion for preliminary injunction.

**Holdings:** The District Court, Theodore D. Chuang, J., held that:

[1] plaintiffs were likely to succeed on merits of claim that Proclamation violated INA's prohibition of national origin discrimination in issuing immigrant visas;

[2] plaintiffs were likely to succeed on merits of claim that Proclamation's findings regarding detriment to national interest were insufficient to invoke President's delegated authority under INA to suspend entry of aliens or a class of aliens;

[3] plaintiffs were not likely to succeed on merits of claim that Proclamation conflicted with Congress's detailed system governing issuance of immigrant and nonimmigrant visas; and

[4] challengers were likely to succeed on merits of Establishment Clause claim.

Motion granted in part and denied in part.

West Headnotes (71)

[1] **Courts**
Operation and effect in general
A judgment of the Court of Appeals, which is vacated as moot, is stripped of its binding effect.

Cases that cite this headnote

[2] **Federal Civil Procedure**
In general;injury or interest
To invoke the judicial power of the federal courts under Article III, a litigant must have standing. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

[3] **Federal Civil Procedure**
In general;injury or interest
**Federal Civil Procedure**
Causation;redressability
A plaintiff establishes Article III standing by demonstrating: (1) a concrete and particularized injury that is actual or imminent; (2) that is fairly traceable to the challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision. U.S. Const. art. 3, § 2, cl. 1.

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

Cases that cite this headnote

**[4]**  **Federal Civil Procedure**
  ⟜ In general;injury or interest
  To have statutory standing, the plaintiff must have interests that fall within the zone of interests protected by the law invoked.

Cases that cite this headnote

**[5]**  **Federal Civil Procedure**
  ⟜ In general;injury or interest
  Article III standing must be established for each claim. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[6]**  **Federal Civil Procedure**
  ⟜ In general;injury or interest
  **Federal Courts**
  ⟜ Case or Controversy Requirement
  The presence of one plaintiff with Article III standing renders a claim justiciable. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[7]**  **Aliens, Immigration, and Citizenship**
  ⟜ Injunction
  **Declaratory Judgment**
  ⟜ Subjects of relief in general
  United States citizens and lawful permanent residents satisfied injury-in-fact element for Article III standing to seek declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation exceeded President's delegated authority under INA; plaintiffs had immediate family members who were nationals of the designated countries and who were currently in the process of securing a visa to come to U.S. as immigrants, and plaintiffs alleged that they were harmed by

prolonged separation from those immediate family members who were unable to travel to U.S. under Proclamation's terms. U.S. Const. art. 3, § 2, cl. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

**[8]**  **Federal Civil Procedure**
  ⟜ In general;injury or interest
  A threat of an injury that is real and immediate can support Article III standing. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[9]**  **Associations**
  ⟜ Actions by or Against Associations
  For an organization's claim of Article III standing, the court conducts the same inquiry as in the case of an individual. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[10]**  **Associations**
  ⟜ Actions by or Against Associations
  An organization suffers an injury-in-fact, as element for Article III standing, when a defendant's actions impede its efforts to carry out its mission. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[11]**  **Associations**
  ⟜ Actions by or Against Associations
  An injury to an organization that is sufficient to support Article III standing generally does not arise from a decision to expend resources on member education or litigation in response to legislation. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

International Refugee Assistance Project v. Trump, Not Reported in... 2017 WL 4674314

[12] **Aliens, Immigration, and Citizenship**
   Injunction
**Declaratory Judgment**
   Subjects of relief in general

Injuries alleged to proprietary and organizational interests of plaintiff organizations were sufficient to satisfy injury-in-fact element for Article III standing to seek declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation exceeded President's delegated authority under INA; organizations alleged that Proclamation would disrupt their upcoming conferences and events in U.S. by preventing individuals from designated countries from attending, and by disrupting organizations' ability to raise money, to train their staff, and to convene programs on topics of significance to their mission of fostering the free flow of ideas. U.S. Const. art. 3, § 2, cl. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[13] **Associations**
   Actions by or Against Associations
**Declaratory Judgment**
   Subjects of relief in general

Plaintiff organizations, which engaged in exchanges of ideas with foreign nationals who visited the United States or which focused on refugee resettlement, fell within zone of interests protected by INA, as required for statutory standing to seek declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran,

Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation exceeded President's delegated authority under INA; organizations that engaged in exchanges of ideas had substantial interest in effective operation of INA's provisions for admitting foreign scholars and other foreign nationals to U.S. as nonimmigrants to attend educational conferences, and refugee resettlement organization needed to engage foreign-national employees familiar with parts of the world with refugee populations and needed periodically to have those employees travel to and from U.S. for planning, direction, and training. Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[14] **Associations**
   Actions by or Against Associations

To establish associational standing, an organization must establish that: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Cases that cite this headnote

[15] **Associations**
   Actions by or Against Associations

To establish associational standing, an organization must make specific allegations establishing that at least one identified member has suffered or will suffer harm.

Cases that cite this headnote

[16] **Associations**
   Actions by or Against Associations

J.A. 658

AR1388

Appeal: 18-1521 Case 1:17-cv-02228-NCG-VMS Filed: 07/02/2018 Doc: 197 Document 82-7 Filed 09/04/20 Page 137 of 1026 PageID #: 9728

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 124 of 442

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

**Declaratory Judgment**
⬥ Subjects of relief in general

Two organizations satisfied the requirement of identifying at least one individual member who would have standing to sue in member's own right, as element for organizations' associational standing under Article III to seek declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation exceeded President's delegated authority under INA; identified individual members were United States citizens or lawful permanent residents seeking to secure an immigrant visa for a close relative in one of the designated countries. U.S. Const. art. 3, § 2, cl. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[17] **Associations**
⬥ Actions by or Against Associations
**Declaratory Judgment**
⬥ Subjects of relief in general

Two organizations satisfied the requirement that their claims on behalf of individual members were germane to organizations' purposes, as element for organizations' associational standing under Article III to seek declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation exceeded President's delegated authority under INA; one organization had purpose of fostering greater understanding and dialogue with Middle East nations, including one or more of the designated countries, and

other organization had purpose of helping Yemeni American business owners navigate immigration issues they faced. U.S. Const. art. 3, § 2, cl. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[18] **Constitutional Law**
⬥ Freedom of Religion and Conscience

To have Article III standing to assert an Establishment Clause claim, a plaintiff must meet the same elements as for any other claim: (1) a cognizable injury; (2) that is fairly traceable to the defendant's actions; and (3) there is a likelihood that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1.

Cases that cite this headnote

[19] **Constitutional Law**
⬥ Freedom of Religion and Conscience

To show an injury, as element for Article III standing in the context of the Establishment Clause, the plaintiff must have personal contact with the alleged establishment of religion resulting in a personal injury, and the injury can take the form of noneconomic, intangible harm to spiritual beliefs, such as feelings of marginalization and exclusion, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion that they are outsiders who are not full members of the political community. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1.

Cases that cite this headnote

[20] **Civil Rights**
⬥ Injury and Causation
**Declaratory Judgment**

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

⌇⟶ Subjects of relief in general

Individual plaintiffs sufficiently alleged their personal contact with the alleged establishment of religion, as required for Article III standing to seek declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that the Proclamation violated the Establishment Clause; plaintiffs alleged personal injuries through prolonged separation from close relatives who would be barred from entry to United States under the Proclamation, and several plaintiffs alleged specific intangible injuries, such as feeling attacked, targeted, and disparaged by Proclamation's hostility to Muslims and fearing for their safety as a result, and feeling like a "second-class citizen." U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; Immigration and Nationality Act § 212(f), 8 U.S.C.A. § 1182(f); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[21]  **Associations**
⌇⟶ Actions by or Against Associations

**Declaratory Judgment**
⌇⟶ Subjects of relief in general

Two organizations satisfied requirement that their Establishment Clause claims on behalf of individual members were germane to organizations' purposes, as element for organizations' associational standing under Article III to seek declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad); one organization had the purpose of fostering understanding of the Middle East, in which there were many predominantly Muslim nations, and other organization was founded in part to oppose

what its members perceived to be a Muslim ban arising from an earlier Executive Order. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; Immigration and Nationality Act § 212(f), 8 U.S.C.A. § 1182(f); Executive Order No. 13,769, Jan. 27, 2017, 82 Fed. Reg. 8977, 2017 WL 412752; Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[22]  **Aliens, Immigration, and Citizenship**
⌇⟶ Injunction

**Civil Rights**
⌇⟶ Preliminary Injunction

**Declaratory Judgment**
⌇⟶ Federal officers and boards

Claims of individual plaintiffs, whose family members were already in process of seeking visas, satisfied ripeness requirement for justiciability, in action for declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation violated Establishment Clause and exceeded President's delegated authority under INA; while family members had not been denied both a visa and a waiver from Proclamation's restrictions, denial of visas was generally mandated based on Proclamation's plain language, and waiver process itself presented additional hurdle not faced by other visa applicants and that would delay family reunification, thus creating a harm not contingent on future events. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[23]  **Federal Courts**

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

**Nature of dispute;concreteness**

A claim is generally not ripe, and therefore is not justiciable, if it is based on contingent future events.

Cases that cite this headnote

[24] **Federal Courts**
  **Fitness and hardship**

In assessing ripeness, as required for justiciability, courts are to consider the fitness of the issues for decision and the hardship to the parties of withholding judicial consideration.

Cases that cite this headnote

[25] **Aliens, Immigration, and Citizenship**
  **Injunction**
  **Civil Rights**
  **Preliminary Injunction**
  **Declaratory Judgment**
  **Federal officers and boards**

Fitness of issues for decision and hardship to parties of withholding judicial consideration weighed in favor of finding ripeness, as required for justiciability of claims for declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation violated Establishment Clause and exceeded President's delegated authority under INA; Proclamation was in final form, case was not dependent on facts that might derive from visa application process or process to obtain waiver from Proclamation's restrictions, and withholding judicial consideration until waivers were adjudicated would cause undue hardship to individual plaintiffs through prolonged separation from family members. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No.

9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[26] **Aliens, Immigration, and Citizenship**
  **Injunction**
  **Declaratory Judgment**
  **Federal officers and boards**

Doctrine of consular nonreviewability was not applicable as a bar to justiciability of claims for declaratory and injunctive relief with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation violated Establishment Clause and exceeded President's delegated authority under INA; plaintiffs were not challenging individual visa decisions by consular officers, and instead were challenging Proclamation's overarching travel ban policy. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[27] **Aliens, Immigration, and Citizenship**
  **Right of review or intervention;standing**
  **United States**
  **Review of presidential actions**

Individuals and organizations were adversely affected or aggrieved, as required for standing under Administrative Procedure Act (APA) to seek judicial review of Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), based on allegations that Proclamation exceeded President's delegated authority under INA; plaintiffs were within INA's zone of interests and were injured by denial of immigrant or nonimmigrant visas

for family members or for expected conference attendees. 5 U.S.C.A. § 702; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[28]  **Aliens, Immigration, and Citizenship**
     Decisions reviewable

Agency action existed, for purposes of final agency action requirement for judicial review under Administrative Procedure Act (APA), as to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), which was challenged based on allegations that Proclamation exceeded President's delegated authority under INA, though President, as a defendant, was not the head of a federal department or agency, where other defendants were federal agency officials who would implement the Proclamation, and against whom injunctive relief was sought. 5 U.S.C.A. § 704; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[29]  **United States**
     Review of presidential actions

Judicial review of the legality of a Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.

Cases that cite this headnote

[30]  **Administrative Law and Procedure**
     Judicial Review of Administrative Decisions

There is a strong presumption in favor of judicial review of administrative action.

Cases that cite this headnote

[31]  **Aliens, Immigration, and Citizenship**
     Decisions reviewable

Finality existed, for purposes of final agency action requirement for judicial review under Administrative Procedure Act (APA), as to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), which was challenged based on allegations that Proclamation exceeded President's delegated authority under INA; Proclamation was already in effect as to certain individuals and was being enforced by federal agencies. 5 U.S.C.A. § 704; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[32]  **Aliens, Immigration, and Citizenship**
     Jurisdiction and venue

A matter committed to agency discretion by law, which would not be subject to judicial review under Administrative Procedure Act (APA), was not presented in action challenging Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), which challenge was based on allegations that Proclamation exceeded President's delegated authority under INA to suspend entry by aliens and classes of aliens based on finding of detriment to national interest; a manageable standard existed for evaluating President's exercise of discretion under INA. 5 U.S.C.A. § 701(a)(2); Immigration and Nationality Act §§ 212(f), 215(a)(1), 8 U.S.C.A. §§ 1182(f), 1185(a)(1); Presidential Proclamation No.

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[33] **Injunction**
  ⟜ Grounds in general;multiple factors
  To obtain a preliminary injunction, moving parties must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.

Cases that cite this headnote

[34] **Injunction**
  ⟜ Extraordinary or unusual nature of remedy
  **Injunction**
  ⟜ Clear showing or proof
  Because a preliminary injunction is an extraordinary remedy, it may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

Cases that cite this headnote

[35] **Constitutional Law**
  ⟜ Necessity of Determination
  Courts should be extremely careful not to issue unnecessary constitutional rulings.

Cases that cite this headnote

[36] **Aliens, Immigration, and Citizenship**
  ⟜ Power to regulate in general
  The formulation of immigration policies is entrusted exclusively to Congress.

Cases that cite this headnote

[37] **Aliens, Immigration, and Citizenship**
  ⟜ Immigrant Visas
  **Aliens, Immigration, and Citizenship**

  ⟜ Grounds for Denial of Admission or Exclusion
  President's delegated authority under INA, to suspend entry by aliens and classes of aliens based on finding of detriment to national interest, is limited by INA's bar on national origin discrimination in issuing immigrant visas. Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f).

Cases that cite this headnote

[38] **Aliens, Immigration, and Citizenship**
  ⟜ Immigrant Visas
  **Aliens, Immigration, and Citizenship**
  ⟜ Grounds for Denial of Admission or Exclusion
  **United States**
  ⟜ Review of presidential actions
  INA's prohibition of national origin discrimination in issuing immigrant visas provided a basis for challenging Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), though suspension of entry was not literally a suspension of issuance of immigrant visas; visa issuance and entry usually went hand-in-hand because an immigrant could not seek entry without first obtaining an immigrant visa and because receiving an immigrant visa was meaningless without later receiving permission to enter, and the Proclamation made clear that its intended effect was to deny the issuance of immigrant visas. Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

1 Cases that cite this headnote

[39] **Aliens, Immigration, and Citizenship**
  ⟜ Injunction

Challengers were likely to succeed on merits, as element for preliminary injunction, as to claim that Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad) violated INA's prohibition of national origin discrimination in issuing immigrant visas; Proclamation made clear that its intended effect was to deny the issuance of immigrant visas based on nationality. Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[40]    **Aliens, Immigration, and Citizenship**
    ⇨ Immigrant Visas

    **Aliens, Immigration, and Citizenship**
    ⇨ Visa Proceedings

    **Aliens, Immigration, and Citizenship**
    ⇨ Grounds for Denial of Admission or Exclusion

    **United States**
    ⇨ Review of presidential actions

    INA, by stating that nothing in its prohibition of national origin discrimination in issuing immigrant visas was to be construed as limiting Secretary of State's authority to determine the procedures for the processing of immigrant visa applications, did not provide basis for upholding an allegedly discriminatory Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad); that statement applied only to Secretary of State, and Proclamation's imposition of indefinite travel ban based on nationality, after a 90-day pause in earlier Executive Order, could not be fairly construed as a change in procedures. Immigration and Nationality Act §§ 202(a)(1)(A, B), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A, B), 1182(f), 1185(a)(1); Executive Order No.

13,780, § 2(c), March 6, 2017, 82 Fed. Reg. 13209, 2017 WL 875616; Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[41]    **Aliens, Immigration, and Citizenship**
    ⇨ Injunction

    Challengers were likely to succeed on merits, as element for preliminary injunction, as to claim that findings of detriment to national interest, in Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), were insufficient to invoke President's delegated authority under INA to suspend entry of aliens or a class of aliens; Proclamation did not provide examples of vetting failures involving nationals from designated countries that resulted in entry of terrorists or others who should not have been admitted, Proclamation's choices to include or exclude countries in the designations were questionable, and Proclamation appeared to be overbroad with regard to its purported goals. Immigration and Nationality Act §§ 212(f), 215(a)(1), 8 U.S.C.A. §§ 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[42]    **Aliens, Immigration, and Citizenship**
    ⇨ Decisions reviewable

    **United States**
    ⇨ Review of presidential actions

    Court would not be improperly second-guessing a decision that was appropriately committed to the President by exercising judicial review for claim that Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad) exceeded President's

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 07/03/2018 Doc: 142 Pg: 143 of 1026 Page 143 of 1026 PageID #: 9734

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 130 of 442

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

delegated authority under INA to exclude aliens or a class of aliens based on finding of detriment to national interest; judicial review of whether executive action exceeded statutory authority was plainly within the purview of the courts. Immigration and Nationality Act § 212(f), 8 U.S.C.A. § 1182(f); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[43]  **United States**
        Review of presidential actions
Judicial review of whether executive action by the President exceeds statutory authority is within the purview of the courts.

Cases that cite this headnote

[44]  **Aliens, Immigration, and Citizenship**
        Injunction
Challengers were not likely to succeed on merits, as element for preliminary injunction, as to claim that Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad) exceeded President's delegated authority under INA to suspend entry by aliens and classes of aliens based on finding of detriment to national interest, by allegedly conflicting with Congress's detailed system governing issuance of immigrant and nonimmigrant visas and by allegedly conflicting with Congress's policy judgments when addressing the problem of information-sharing by foreign governments, such as enactment of and amendments to Visa Waiver Program (VWP). Immigration and Nationality Act §§ 212(f), 217(a)(1, 3, 12), (c)(2), 291, 8 U.S.C.A. §§ 1182(f), 1187(a)(1, 3, 12), (c)(2), 1361; Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[45]  **Constitutional Law**
        Advancement, endorsement, or sponsorship of religion; favoring or preferring religion
The core harm of a violation of the Establishment Clause is the dissemination of a public message that the Government has adopted an official policy of favoring one religion. U.S. Const. Amend. 1.

Cases that cite this headnote

[46]  **Aliens, Immigration, and Citizenship**
        Immigrant Visas
        **Aliens, Immigration, and Citizenship**
        Judicial review and intervention
A consular officer's denial of a consular visa, which is challenged as being in violation of constitutional rights, is "bona fide," on judicial review to determine whether there is a facially legitimate and bona fide reason for the denial, if there has been no affirmative showing of bad faith by the officer.

Cases that cite this headnote

[47]  **Aliens, Immigration, and Citizenship**
        Judicial review and intervention
On judicial review to determine whether there is a facially legitimate and bona fide reason for a consular officer's denial of a consular visa, which denial is challenged as being in violation of constitutional rights, if there is a particularized showing of bad faith, a court should then look behind the officer's action to evaluate its justification.

Cases that cite this headnote

[48]  **Civil Rights**
        Preliminary Injunction
Challengers were likely to succeed on merits, as element for preliminary injunction, as to Establishment Clause claim that facially legitimate reason, i.e., national security, that was proffered for Presidential Proclamation indefinitely barring entry by nationals from

J.A. 665

AR1395

six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad) was not bona fide and instead was pretext for anti-Muslim bias; challengers offered substantial direct evidence, including statements from the President and his advisors during the campaign, after the election, and after the President took office, that the Proclamation was motivated by a desire to ban Muslims as a group from entering the United States, and implementation and enforcement of two earlier Executive Orders, which had fundamentally the same underlying architecture as the Proclamation and which had been issued within the past nine months, had been preliminarily enjoined based on likely success of Establishment Clause challenges. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 212(f), 215(a)(1), 8 U.S.C.A. §§ 1182(f), 1185(a)(1); Executive Order No. 13,769, Jan. 27, 2017, 82 Fed. Reg. 8977, 2017 WL 412752; Executive Order No. 13,780, § 2(c), March 6, 2017, 82 Fed. Reg. 13209, 2017 WL 875616; Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[49]     **Constitutional Law**
           *Neutrality*

The Establishment Clause mandates governmental neutrality between religions, and between religion and nonreligion. U.S. Const. Amend. 1.

Cases that cite this headnote

[50]     **Constitutional Law**
           *Establishment of Religion*

Under the *Lemon v. Kurtzman* test, to withstand an Establishment Clause challenge: (1) an act must have a secular purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster an excessive

government entanglement with religion. U.S. Const. Amend. 1.

Cases that cite this headnote

[51]     **Constitutional Law**
           *Secular purpose*

In Establishment Clause cases, purpose matters, and thus, when determining whether an act has a secular purpose, as element of *Lemon v. Kurtzman* test for surviving an Establishment Clause challenge, the purpose element is not satisfied by the identification of any secular purpose, given the ease of finding some secular purpose for almost any government action. U.S. Const. Amend. 1.

Cases that cite this headnote

[52]     **Constitutional Law**
           *Secular purpose*

While governmental statements of purpose generally receive deference when applying the secular purpose element of the *Lemon v. Kurtzman* test for surviving an Establishment Clause challenge, an identified secular purpose must be genuine, not a sham, and not merely secondary to a religious objective. U.S. Const. Amend. 1.

Cases that cite this headnote

[53]     **Constitutional Law**
           *Secular purpose*

If a religious purpose for the government action is the predominant or primary purpose, and the secular purpose is secondary, the secular purpose element of the *Lemon v. Kurtzman* test for surviving an Establishment Clause challenge has not been satisfied. U.S. Const. Amend. 1.

Cases that cite this headnote

[54]     **Constitutional Law**
           *Secular purpose*

An assessment of the purpose of an action, when applying the secular purpose

element of the *Lemon v. Kurtzman* test for surviving an Establishment Clause challenge, is a common task for courts, and an understanding of official objective can emerge from readily discoverable fact without any judicial psychoanalysis of the decisionmaker. U.S. Const. Amend. 1.

Cases that cite this headnote

[55]     **Constitutional Law**
         ❧ Secular purpose

In determining purpose, when applying the secular purpose element of the *Lemon v. Kurtzman* test for surviving an Establishment Clause challenge, a court acts as an objective observer who considers the traditional external signs that show up in the text, legislative history, and implementation of the statute or comparable official act. U.S. Const. Amend. 1.

Cases that cite this headnote

[56]     **Constitutional Law**
         ❧ Secular purpose

When applying the secular purpose element of the *Lemon v. Kurtzman* test for surviving an Establishment Clause challenge, because the world is not made brand new every morning, the court must consider the historical context of a challenged action and the specific sequence of events leading up to it. U.S. Const. Amend. 1.

Cases that cite this headnote

[57]     **Constitutional Law**
         ❧ Establishment of Religion

Because reasonable observers have reasonable memories, past Establishment Clause violations are relevant to the assessment of present government actions. U.S. Const. Amend. 1.

Cases that cite this headnote

[58]     **Constitutional Law**

[59]     **Constitutional Law**
         ❧ Establishment of Religion

When faced with allegations of a successive Establishment Clause violation, a court must not lapse into the role of an absentminded objective observer, but must instead remain familiar with the history of the government's action and remain competent to learn what history has to show. U.S. Const. Amend. 1.

Cases that cite this headnote

[59]     **Constitutional Law**
         ❧ Secular purpose

In determining purpose, when applying the secular purpose element of the *Lemon v. Kurtzman* test for surviving an Establishment Clause challenge, past actions do not forever taint present ones, and while courts should reject an implausible claim that governmental purpose has changed, they should also take account of genuine changes in constitutionally significant conditions. U.S. Const. Amend. 1.

Cases that cite this headnote

[60]     **Constitutional Law**
         ❧ Establishment of Religion

It is possible that a government may begin with an impermissible purpose, or create an unconstitutional effect, but later take affirmative actions to neutralize the Establishment Clause violation, and in assessing whether curative effects are sufficient to overcome an objective observer's impression of an impermissible Establishment Clause violation, governmental curative actions would need to not only persuasively present a primary nonreligious effect, but also disassociate the government action from its previous religious effect, and specifically, the governmental cure should be: (1) purposeful; (2) public; and (3) at least as persuasive as the initial Establishment Clause violation. U.S. Const. Amend. 1.

Cases that cite this headnote

[61]     **Aliens, Immigration, and Citizenship**

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 07/03/2018 Pg: 146 of 572 Page 146 of 1026 PageID #: 9737

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 133 of 442

International Refugee Assistance Project v. Trump, Slip Copy (2017)
2017 WL 4674314

⟶ Grounds for Denial of Admission or Exclusion

**Constitutional Law**
⟶ Particular Issues and Applications

Establishment Clause inquiry, for Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), did not end with fact that, within the four corners of the Proclamation, there was no explicit distinction among countries based on religion; Establishment Clause violation could arise from facially neutral government action, a simple check on the demographics of the geographic area affected by the Proclamation, with a combined population that was predominantly Muslim, revealed that its impact closely aligned with religious affiliation, and inclusion of two non-majority-Muslim nations, North Korea and Venezuela, did not persuasively show a lack of religious purpose behind the Proclamation. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 212(f), 215(a)(1), 8 U.S.C.A. §§ 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[62]    **Constitutional Law**
⟶ Secular purpose

In Establishment Clause cases, it is the opinion of the reasonable observer that controls, and secular purposes that can be discerned only if one burrows into a difficult-to-access record do little to assure the public that the government is not endorsing a religious view. U.S. Const. Amend. 1.

Cases that cite this headnote

[63]    **Civil Rights**
⟶ Preliminary Injunction

Likelihood of irreparable harm from the alleged Establishment Clause violation existed, as element for preliminary

injunction, in action challenging Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad); any Establishment Clause violation occurred the moment government action took place. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 212(f), 215(a)(1), 8 U.S.C.A. §§ 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[64]    **Aliens, Immigration, and Citizenship**
⟶ Injunction

Likelihood of irreparable harm, from President allegedly exceeding his delegated authority under INA, existed, as element for preliminary injunction, in action challenging Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad); plaintiffs seeking immigrant visas for family members had a threatened injury from delayed family reunification that could not be compensated by money damages at a later trial. Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[65]    **Aliens, Immigration, and Citizenship**
⟶ Injunction
**Civil Rights**
⟶ Preliminary Injunction

Balancing of equities favored preliminary injunction, extending only to individuals with bona fide relationship with an individual or entity in the United States, with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly

AR1398

International Refugee Assistance Project v. Trump,...F.Supp.3d...(2017)
2017 WL 4674314

Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), which allegedly violated the Establishment Clause and exceeded President's delegated authority under INA; plaintiffs faced significant, irreparable harm from prolonged separation from family members and from alleged Establishment Clause violation, Executive Branch officials and agencies would not be directly harmed by preliminary injunction preventing them from enforcing a Proclamation likely to be found unconstitutional, and officials and agencies had not shown that national security could not be maintained without an unprecedented multicountry travel ban. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

1 Cases that cite this headnote

[66]     **Civil Rights**
     Preliminary Injunction

Preventing an Establishment Clause violation provides a significant public benefit, for purposes of public interest factor for granting a preliminary injunction. U.S. Const. Amend. 1.

Cases that cite this headnote

[67]     **Aliens, Immigration, and Citizenship**
     Injunction

The public interest was a factor favoring preliminary injunction with respect to Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad), which allegedly exceeded President's delegated authority under the INA; the INA represented a judgment by Congress that immigration policy should not discriminate on basis of nationality, and the significant public interest in national security was not paramount. Immigration and

Nationality Act §§ 202(a)(1)(A), 212(f), 215(a)(1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

[68]     **Injunction**
     Discretion as to scope of relief

A federal district court has wide discretion to fashion appropriate injunctive relief in a particular case.

Cases that cite this headnote

[69]     **Injunction**
     Specificity, vagueness, overbreadth, and narrowly-tailored relief

Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.

Cases that cite this headnote

[70]     **Injunction**
     Geographical scope of relief

Nationwide injunctions are appropriate if necessary to afford relief to the prevailing party.

Cases that cite this headnote

[71]     **Aliens, Immigration, and Citizenship**
     Injunction
     **Civil Rights**
     Preliminary Injunction

Nationwide preliminary injunction was warranted, in action by individuals and organizations, alleging that Presidential Proclamation indefinitely barring entry by nationals from six predominantly Muslim countries (Iran, Libya, Syria, Yemen, Somalia, and Chad) violated the Establishment Clause and exceeded President's delegated authority under INA; the individual and organizational plaintiffs

were located in different parts of the United States, an Establishment Clause violation would have impacts beyond the personal interests of individual parties, and a fragmented approach would run afoul of constitutional and statutory requirement for uniform immigration law and policy. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 202(a)(1)(A), 212(f), 215(a) (1), 8 U.S.C.A. §§ 1152(a)(1)(A), 1182(f), 1185(a)(1); Presidential Proclamation No. 9645, § 2(a, b, c, e, g, h), Sept. 24, 2017, 82 Fed. Reg. 45161, 2017 WL 4231190.

Cases that cite this headnote

**Attorneys and Law Firms**

David Robert Rocah, Deborah A. Jeon, Nicholas Taichi Steiner, Sonia Kumar, ACLU of Maryland, Baltimore, MD, Justin B. Cox, Atlanta, GA, Cecillia D. Wang, Cody Wofsy, American Civil Liberties Union San Francisco, CA, Daniel Mach, David D. Cole, Heather Lynn Weaver, ACLU Foundation, Washington, DC, David Hausman, Hina Shamsi, Hugh Handeyside, Lee Gelernt, Omar C. Jadwat, Sarah L. Mehta, Spencer E. Amdur, American Civil Liberties Union, New York, NY, Esther Sung, Karen C. Tumlin, Melissa S. Keaney, Nicholas Espiritu, Los Angeles, CA, for Plaintiffs.

Arjun Garg, Daniel Stephen Garrett Schwei, Michelle Bennett, United States Department of Justice, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

THEODORE D. CHUANG, United States District Judge

*1 For the third time this year, President Donald J. Trump has issued an order banning the entry into the United States, with some exceptions, of nationals of multiple predominantly Muslim nations. At issue is whether this latest travel ban should be enjoined by this Court because it is the latest incarnation of the "Muslim ban" originally promised by President Trump as a candidate for the presidency, and thus violates the

Establishment Clause of the First Amendment to the United States Constitution, or because the issuance of the travel ban exceeds the President's delegated authority under the Immigration and Nationality Act to suspend the entry into the United States of classes of immigrants and nonimmigrants. For the reasons set forth below, the Court concludes that a preliminary injunction is warranted.

**INTRODUCTION**

On January 27, 2017, President Trump issued Executive Order 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO–1"), 82 Fed. Reg. 8977 (Jan. 27, 2017), which barred the entry into the United States of nationals of seven predominantly Muslim countries for a 90–day period. On February 7, 2017, Plaintiffs International Refugee Assistance Project ("IRAP"), HIAS, Inc., and seven individuals (collectively, "the IRAP Plaintiffs"), filed a Complaint in this Court alleging that EO–1 violated the Establishment Clause of the First Amendment, U.S. Const. amend. I; the equal protection component of the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V; the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537 (2012); the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb–4 (2012); the Refugee Act, 8 U.S.C. §§ 1521–1524 (2012); and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2012).

On March 6, 2017, after EO–1 was enjoined by other federal courts, President Trump issued Executive Order 13,780 ("EO–2"), which bears the same title as EO–1 and was scheduled to go into effect and supplant EO–1 on March 16, 2017. 82 Fed. Reg. 13209 (Mar. 9, 2017). Section 2(c) of EO–2 suspended for 90 days the entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen. On March 10, 2017, the IRAP Plaintiffs amended their Complaint to seek the invalidation of EO–2, alleging the same causes of action pleaded in their original Complaint. The IRAP Plaintiffs also filed a motion for a preliminary injunction against the enforcement of EO–2, on Establishment Clause and INA grounds. On March 15, 2017, this Court enjoined enforcement of Section 2(c) after finding that the IRAP Plaintiffs were likely to succeed on their claim that EO–2 violated the Establishment Clause. *Int'l Refugee Assistance Project v. Trump* ("*IRAP*"), 241 F.Supp.3d 539 (D. Md. 2017). This Court's Order was then appealed

Appeal 18-1521 cv-02228-NCG-VMS Filed 07/02/2018-7 Pg ID 149 04/50 2 Page 149 of 1026 PageID #: 9740

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 136 of 442
International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

to and in substantial part affirmed by the United States Court of Appeals for the Fourth Circuit, sitting *en banc*. *Int'l Refugee Assistance Project v. Trump* ("*IRAP*"), 857 F.3d 554 (4th Cir. 2017). In light of the expiration of EO–2, the Fourth Circuit's judgment has since been vacated as moot by the United States Supreme Court. *Trump v. Int'l Refugee Assistance Project*, No. 16-1436, ––– U.S. ––––, –––– S.Ct. ––––, ––– L.Ed.2d ––––, 2017 WL 4518553 (Oct. 10, 2017).

**\*2** On September 24, 2017, President Trump issued Presidential Proclamation 9645, entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public–Safety Threats" ("Proclamation"), which will bar indefinitely the entry into the United States of some or all nationals of Iran, Libya, Somalia, Syria, Yemen, Chad, North Korea, and Venezuela. 82 Fed. Reg. 45161 (Sept. 27, 2017).

On October 3, 2017, Iranian Alliances Across Borders ("IAAB") and Doe Plaintiffs 1–6 (collectively, the "IAAB Plaintiffs") filed a Complaint in this Court asserting that the Proclamation violates the INA, the Establishment Clause, the Free Speech Clause of the First Amendment, and the equal protection and procedural due process components of the Due Process Clause of the Fifth Amendment. On October 5, 2017, the IRAP Plaintiffs, now consisting of IRAP, HIAS, Middle East Studies Association ("MESA"), Arab–American Association of New York ("AAANY"), Yemeni–American Merchants Association ("YAMA"), John Does No. 1 and 3–5, Jane Doe No. 2, Muhammed Meteab, Mohamad Mashta, Grannaz Amirjamshidi, Fakhri Ziaolhagh, Shapour Shirani, and Afsaneh Khazaeli, filed a Second Amended Complaint in which they repeated their prior causes of action and extended them to the Proclamation, added a second claim under the INA alleging that the Proclamation exceeded the President's statutory authority, and added a claim that the Proclamation violated the procedural due process protections of the Fifth Amendment. On October 6, 2017, in a separate case, Eblal Zakzok, Sumaya Hamadmad, Fahed Muqbil, John Doe No. 1, and Jane Does No. 2–3 (collectively, "the Zakzok Plaintiffs") filed a Complaint stating causes of action under the Establishment Clause, the INA, and the APA. On October 12, 2017, the IAAB Plaintiffs amended their Complaint to add the Iranian Students' Foundation ("ISF"), an affiliate of IAAB at the University of

Maryland College Park, as a Plaintiff. The IAAB Plaintiffs subsequently filed a Motion for Leave, which the Court has since granted, seeking to file declarations from representatives of ISF in support of the Motion for a Preliminary Injunction.

Each of these three separate cases name some or all of the following as Defendants: President Trump; the U.S. Department of Homeland Security; the U.S. Department of State; Elaine C. Duke, Acting Secretary of Homeland Security; Rex W. Tillerson, Secretary of State; Dan Coats, Director of National Intelligence; Jefferson Beauregard Sessions, III, Attorney General; Kevin K. McAleenan, Acting Commissioner of U.S. Customs and Border Protection; James McCament, Acting Director of U.S. Citizenship and Immigration Services. All of the Plaintiffs seek injunctive and declaratory relief.

On October 6, 2017, the IRAP Plaintiffs filed a Motion for a Preliminary Injunction in which they ask this Court to enjoin the Proclamation in its entirety before it takes effect. The IAAB and Zakzok Plaintiffs have also each filed a Motion for a Preliminary Injunction and have joined in the arguments of the IRAP Plaintiffs. Defendants filed a consolidated brief in opposition to the Motions on October 12, 2017, and Plaintiffs filed separate reply briefs on October 14, 2017. The Court held a hearing on the Motion on October 16, 2017. With the matter fully briefed and argued, the Court now issues its findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Public Statements
**\*3** On December 7, 2015, then-presidential candidate Donald J. Trump posted a "Statement on Preventing Muslim Immigration" on his campaign website in which he "call[ed] for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on." Joint Record ("J.R.") 85. Trump promoted the Statement on Twitter that same day, stating that he had "[j]ust put out a very important policy statement on the extraordinary influx of hatred & danger coming into our country. We must be vigilant!" J.R. 209. In a March 9, 2016 interview with CNN, Trump stated his belief that "Islam hates us," and that the United States had "allowed this propaganda to spread all through the country that [Islam] is a religion of

International Refugee Assistance Project v. Trump, Not Reported in... 2017 WL 4674314

peace." J.R. 255–57. Then, in a March 22, 2016 Fox Business interview, Trump reiterated his call for a ban on Muslim immigration, asserting that his call for the ban had gotten "tremendous support" and that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country." J.R. 261.

In a May 11, 2016 appearance on *On the Record*, Trump stated that he would ask former New York City Mayor Rudolph W. Giuliani to lead a group to "look at the Muslim ban or temporary ban," that there "has to be something," and that he had "[g]reat Muslim friends who are telling me you are so right. ... [T]here is something going on that we have to get to the bottom of." J.R. 513. In a June 13, 2016 speech, Trump stated that "[w]e have to control the amount of future immigration into this country to prevent large pockets of radicalization from forming inside America," noting that "[e]ach year, the United States permanently admits more than 100,000 immigrants from the Middle East, and many more from Muslim countries outside the Middle East." J.R. 528.

In a July 24, 2016 interview on *Meet the Press* soon after he accepted the Republican nomination, Trump was asked about the "Muslim ban." J.R. 219. Trump responded that immigration should be "immediately suspended" "from any nation that has been compromised by terrorism until such time as proven vetting mechanisms have been put in place." J.R. 219. When questioned whether this formulation was a "rollback" of his December 2015 call for a "Muslim ban," Trump disagreed, stating "I don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territories." J.R. 220. He explained that "[p]eople were so upset when I used the word Muslim," so he was instead "talking territory instead of Muslim." *Id.* During the October 9, 2016 Presidential Debate, when asked by the moderator about his proposed "Muslim ban," he explained that the "Muslim ban" had "morphed into an extreme vetting from certain areas of the world." J.R. 591.

On December 21, 2016, when asked whether a recent attack in Germany affected his proposed Muslim ban, President–Elect Trump replied, "You know my plans. All along, I've proven to be right. 100% correct." J.R. 245. In a written statement about the events, he lamented the attack on people "prepared to celebrate the Christmas holiday" by "ISIS and other Islamic terrorists [who] continually

slaughter Christians in their communities and places of worship as part of their global jihad." J.R. 245.

## II. Executive Order 13,769

On January 27, 2017, a week after his inauguration, President Trump issued EO–1 in which, pursuant to 8 U.S.C. § 1182(f), the President suspended for 90 days the entry into the United States of immigrant and nonimmigrants who were nationals of Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen, based on his finding that such entry was "detrimental to the interests of the United States." EO–1 § 3(c). Each of these countries has a predominantly Muslim population, including Iraq, Iran, and Yemen, which are more than 99 percent Muslim. The provision allowed for exceptions on a "case-by-case basis" when such an exception was "in the national interest." EO–1 § 3(g). EO–1 also required changes to the refugee screening process "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." EO–1 § 5(b). It further provided that during this 90–day period, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence ("DNI"), was to initiate a review process beginning with "a review to determine the information needed from any country" to assess whether an individual from that country applying for a "visa, admission, or other benefit ... is not a security or public-safety threat," the generation of a list of countries that do not provide adequate information of this nature, and a consultation process to request such information from those countries. EO–1 § 3(a)-(d). At the end of this review process, the Secretary of Homeland Security was required to "submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit entry of foreign nationals ... from countries that do not provide the information requested." EO–1 § 3(e).

**\*4** When preparing to sign EO–1, President Trump remarked, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.' We all know what that means." J.R. 142. That same day, President Trump stated in an interview on the Christian Broadcasting Network that EO–1 would give preference in refugee applications to Christians. Referring to Syria, President Trump stated that "[i]f you were a Muslim you could come in, but if you were a Christian, it was almost impossible," a situation that he thought was "very,

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

very unfair." J.R. 201. The day after EO–1 was issued, President Trump assured reporters that implementation of EO–1 was "working out very nicely and we're going to have a very, very strict ban." J.R. 123. That same day, Mayor Giuliani appeared on Fox News and asserted that President Trump told him he wanted a Muslim ban and asked Giuliani to "[s]how me the right way to do it legally." J.R. 247. Giuliani, in consultation with others, proposed that the action be "focused on, instead of religion ... the areas of the world that create danger for us," specifically "places where there are [*sic*] substantial evidence that people are sending terrorists into our country." J.R. 247–248.

EO–1 prompted several legal challenges, including an action filed in the United States District Court for the Western District of Washington based on the Due Process, Establishment, and Equal Protection Clauses of the Constitution that resulted in a nationwide temporary restraining order ("TRO") issued on February 3, 2017 against several sections of EO–1. *See, e.g., Washington v. Trump*, C17–0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017). On February 9, 2017, the United States Court of Appeals for the Ninth Circuit, construing the order as a preliminary injunction, upheld the entry of the injunction. *Washington v. Trump*, 847 F.3d 1151, 1165–66 (9th Cir. 2017). Although it did not reach the Establishment Clause claim, the Ninth Circuit noted that the asserted claim raised "serious allegations" and presented "significant constitutional questions." *Id.* at 1168. On February 13, 2017, the United States District Court for the Eastern District of Virginia found a likelihood of success on the merits of an Establishment Clause claim and issued an injunction against enforcement of Section 3(c) of EO–1 as to Virginia residents or students enrolled a Virginia state educational institution. *Aziz v. Trump*, 234 F.Supp.3d 724, 739 (E.D. Va. 2017).

In response to the injunctions against EO–1, President Trump maintained at a February 16, 2017 news conference that EO–1 was lawful but that a new Order would be issued. J.R. 91. Stephen Miller, Senior Policy Advisor to the President, described the changes being made to the Order as "mostly minor technical differences," emphasizing that the "basic policies are still going to be in effect." J.R. 319. White House Press Secretary Sean Spicer stated that "[t]he principles of the [second] executive order remain the same" and described EO–1 as a legal exercise of the President's

power "to suspend immigration." J.R. 78, 118. As of February 12, 2017, Trump's Statement on Preventing Muslim Immigration remained on his campaign website. J.R. 207.

### III. Executive Order 13,780

On March 6, 2017, President Trump issued EO–2, which was scheduled to go into effect and supplant EO–1 on March 16, 2017. Section 2(c) of EO–2 reiterated the 90-day ban on entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen, but removed Iraq from the list. EO–2 applied only to individuals outside the United States who did not have a valid visa as of the issuance of EO–1 and who had not obtained one prior to the effective date of EO–2. In addition, the travel ban expressly exempted lawful permanent residents ("LPRs"), dual citizens traveling under a passport issued by a country not on the banned list, asylees, and refugees already admitted to the United States, and it provided a list of specific scenarios under which a case-by-case waiver could be granted.

To justify its restrictions on entry by nationals of the listed countries, EO–2 stated that "the conditions in these countries present heightened threats" because each country is "a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." EO–2 § 1(d) (citing information from the State Department's *Country Reports on Terrorism 2015* ). EO–2 stated that, as a result, the governments of the listed countries were less willing or able to provide necessary information for the visa or refugee vetting process, such that there was a heightened chance that individuals from these countries would be "terrorist operatives or sympathizers." EO–2 § 1(d). EO–2 therefore concluded that the risk of admitting individuals from these countries was "unacceptably high" because the United States was unable "to rely on normal decision-making procedures" about their travel. EO–2 § 1(b)(ii), (f). EO–2 disavowed that EO–1 was motivated by religious animus.

**\*5** EO–2 also stated that "Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States" and referenced two Iraqi refugees who were convicted of terrorism-related offenses and a naturalized U.S. citizen who came to the United States from Somalia as a child refugee and had been convicted of a plot to detonate a bomb at a Christmas

J.A. 673

AR1403

tree lighting ceremony. EO–2 § 1(h). It did not identify any instances of individuals who came from Iran, Libya, Sudan, Syria, or Yemen engaging in terrorist activity in the United States.

Like EO–1, EO–2 instructed the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, to conduct a worldwide review to determine whether additional information from foreign governments was needed to enable the United States to determine whether a foreign national applying for a visa or for admission was a security or public safety threat. The Secretary of Homeland Security was then required to submit a report within 20 days providing the results of the review, including listing countries that do not provide adequate information and identifying the needed information. The Secretary of State was then required to request that the listed countries begin providing the needed information within 50 days. At the end of the 50–day period, the Secretary of Homeland Security was to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means." EO–2 § 2(f). The Secretary of Homeland Security could also identify other countries for other restrictions or limitations that would be appropriate.

The same day that EO–2 was issued, Attorney General Jefferson B. Sessions, III and Secretary of Homeland Security John F. Kelly submitted a letter to the President recommending a temporary suspension on the entry to the United States of nationals of certain countries so as to facilitate a review of security risks in the immigration system. Upon the issuance of EO–2, Secretary of State Rex Tillerson described it as "a vital measure for strengthening our national security." J.R. 115. In a March 7, 2017 interview, Secretary of Homeland Security Kelly stated that the Order was not a Muslim ban but instead was focused on countries with "questionable vetting procedures," but noted that there were 13 or 14 countries with questionable vetting procedures, "not all of them Muslim countries and not all of them in the Middle East." J.R. 150. Other White House officials, noting that EO–2's provisions were temporary, stated that the ban might

be extended past 90 days and to additional countries. J.R. 116.

**IV. Litigation on EO–2**

On March 10, 2017, the IRAP Plaintiffs amended their Complaint to seek the invalidation of EO–2, alleging the same causes of action pleaded in their original Complaint. The IRAP Plaintiffs also filed a motion for a preliminary injunction against the enforcement of EO–2, on Establishment Clause and INA grounds. On March 15, 2017, this Court enjoined enforcement of Section 2(c) after finding that the IRAP Plaintiffs were likely to succeed on their claim that EO–2 violated the Establishment Clause. *IRAP*, 241 F.Supp.3d at 566. The same day, the United States District Court for the District of Hawaii issued a TRO, later converted to a preliminary injunction, barring enforcement of Sections 2 and 6 of EO–2. *Hawaii v. Trump*, 241 F.Supp.3d 1119, 1140 (D. Haw. 2017).

**\*6** This Court's Order was appealed to and in substantial part affirmed by the Fourth Circuit on May 25, 2017. *IRAP*, 857 F.3d 554, 606 (4th Cir. 2017) (en banc). In so ruling, the Fourth Circuit described EO–2 as one that "drips with religious intolerance, animus, and discrimination." *Id.* at 572. After finding that an individual plaintiff had standing to challenge the ban and concluding that upon a showing of bad faith it could "look behind" a proffered "facially legitimate" reason for the action, the court applied standard Establishment Clause analysis to conclude that because EO–2 "cannot be divorced from the cohesive narrative linking it to the animus that inspired it ... the reasonable observer would likely conclude that [EO–2's] primary purpose is to exclude persons from the United States on the basis of their religious beliefs." *IRAP*, 857 F.3d at 586, 590–92, 601.

Meanwhile, the Ninth Circuit affirmed in substantial part the preliminary injunction ordered by the District of Hawaii on the grounds that EO–2 exceeded the President's authority under the INA, primarily in that it did not contain a sufficient finding of detrimental interest as required by the statute and that it violated the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas. *Hawaii v. Trump*, 859 F.3d 741, 774, 779 (9th Cir. 2017). The Government sought review of both the Fourth Circuit and Ninth Circuit decisions by the United States Supreme Court, which consolidated the cases for argument. *Trump v. Int'l Refugee Assistance Project* and *Trump v. Hawaii*, ——

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

U.S. ----, 137 S.Ct. 2080, 2086, 198 L.Ed.2d 643 (2017) (granting writ of certiorari). Pending resolution of those appeals, the Supreme Court declined the Government's request to stay the injunctions of EO–2 in their entirety, but ordered a partial stay of the injunctions to permit their enforcement against only foreign nationals who lack a credible claim of a bona fide relationship with a person or organization within the United States. *Id.* at 2087.

[1] In light of the expiration of EO–2, the Supreme Court requested supplemental briefing on whether the case relating to EO–2 is now moot. *Trump v. IRAP*, No. 16-1436, --- U.S. ----, --- S.Ct. ----, L.Ed.2d ----, 2017 WL 2405595 (Sept. 25, 2017). On October 10, 2017, after that supplemental briefing, the Supreme Court vacated the judgment of the Fourth Circuit with instructions to dismiss as moot the challenge to EO–2. The Supreme Court expressed no opinion on the merits.[1] *Trump v. IRAP*, No. 16-1436, ----U.S. ----, --- S.Ct. ----, L.Ed.2d ----, 2017 WL 4518553 (Oct. 10, 2017).

### V. Public Statements Since EO–2
At a March 16, 2017 rally, President Trump reported to the audience that EO–2 had been enjoined and described it as a "watered down version of the first one" that had been "tailor[ed]" by lawyers in response to prior legal challenges. J.R. 652–53. He emphasized that "we ought to go back to the first one and go all the way, which is what I wanted to do in the first place." J.R. 653.

On May 21, 2017, President Trump delivered a speech in Riyadh, Saudi Arabia to Arab and Muslim leaders as part of the Arab Islamic American Summit. Speaking as "a representative of the American people" delivering "a message of friendship and hope," he decried terrorism, but cautioned that "the nations of the Middle East cannot wait for American power to crush this enemy for them," but instead "have to decide what kind of future they want for themselves." *President Trump's full speech from Saudi Arabia on global terrorism*, Wash. Post (May 21, 2017), https://goo.gl/viJRg2. They had to "honestly confront" the "crisis of Islamic extremism and the Islamists and Islamic terror of all kinds." *Id.*

*7 In a June 3, 2017 tweet, President Trump emphasized the "need to be smart vigilant and tough," and asserted, "We need the Travel Ban as an extra level of safety!" J.R. 662. In a series of tweets on June 5, 2017 referencing

the court decisions relating to EO–1 and EO–2, President Trump stated, "[t]he lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!" J.R. 664. He reiterated that "[t]he Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to [the Supreme Court]," and advised the Justice Department to "ask for an expedited hearing of the watered down Travel Ban before the Supreme Court—& seek much tougher version!" *Id.* The following day, White House Press Secretary Sean Spicer stated that President Trump's tweets should be "considered official statements by the president of the United States." J.R. 667.

In an August 17, 2017 tweet, Trump endorsed what appears to be an apocryphal story involving General John J. Pershing and a purported massacre of Muslims with bullets dipped in a pig's blood, advising people to "[s]tudy what General Pershing ... did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!" J.R. 679. In a September 15, 2017 tweet, President Trump again insisted that "the travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!" J.R. 705.

### VI. Presidential Proclamation 9645
On September 24, 2017, President Trump issued Presidential Proclamation 9645, which immediately supplanted EO–2 as to foreign nationals who lack a credible claim of a bona fide relationship with a person or organization within the United States, and which is slated to go into effect on October 18, 2017 for all other individuals covered by its terms. The Proclamation stated that in a July 9, 2017 report issued pursuant to the requirements of EO–2, the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, had selected baseline criteria for assessing the sufficiency of the information provided by foreign governments to permit the United States to confirm the identities of individuals seeking to enter the country and make a security assessment about them.

Three categories of information were identified. The first is "identity-management information," consisting of information necessary to confirm that individuals are who they claim to be. Criteria for assessing the sufficiency of information provided include whether a foreign government employs electronic passports

J.A. 675

AR1405

embedded with data on the holder's identity, reports lost or stolen passports, and provides other identity-related information not contained in passports. The second category is "national security and public-safety information," relating to whether individuals seeking to enter the United States pose a national security or public safety risk, the criteria for which include whether a foreign government provides information on known or suspected terrorists and individuals' criminal histories, shares exemplars of its passports and national identity documents, or impedes the transfer of information about passengers and crew traveling to the United States. The third category is "national security and public-safety risk assessment," relating to risk indicators about the country itself, the criteria for which include whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program, and whether it regularly refuses to accept its nationals subject to final orders of removal from the United States.

According to the Proclamation, pursuant to the process set forth in EO–2, nearly 200 countries were evaluated based on these criteria. Of those, 16 nations were found to be "inadequate" and 31 were found to be at risk of becoming so. In accordance with Section 2(d) of EO–2, those nations were given 50 days to bring their information-sharing practices into compliance with United States expectations. At the end of that 50-day period, eight countries were determined to have continued inadequate information-sharing practices: Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen. In a September 15, 2017 report to the President ("the DHS Report"), the Acting Secretary of Homeland Security recommended that entry restrictions be imposed on all of those countries with the exception of Iraq. Although Somalia's information-sharing practices were found to be adequate, the Acting Secretary of Homeland Security recommended that Somalia also be subjected to entry restrictions.

**\*8** As a result, the Proclamation states that "absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States" of nationals from Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen (the "Designated Countries") "would be detrimental to the interests of the United States." Procl. pmbl. Specifically, the Proclamation suspends the entry of all immigrants from seven of the eight Designated Countries, excepting only Venezuela.

The ban on entry by nonimmigrants is "more tailored," with a narrower ban imposed on countries with mitigating circumstances such as a willingness to play a substantial role in combatting terrorism. Procl. § 1(h)(iii).

As to specific countries previously subject to EO–2's travel ban, the Proclamation suspends entirely the entry of Iranian nationals on both immigrant and nonimmigrant visas, with an exception for individuals traveling on nonimmigrant, student ("F" and "M") and exchange visitor ("J") visas. However, Iranians traveling on F, M, and J visas are to be subjected to enhanced screening and vetting. As justification, the Proclamation asserts that Iran is a source of significant terrorist threats and a designated state sponsor of terrorism, and that it fails adequately to cooperate with the United States to identify security risks, has at least one unspecified national security risk factor, and refuses to accept its nationals slated for deportation.

The Proclamation suspends entry of all Libyan nationals as immigrants, as well as entry of nonimmigrants using business ("B–1"), tourist ("B–2"), or business/tourist ("B–1/B–2") visas. These restrictions are based on the conclusions that Libya does not provide adequate public safety or terrorism-related information, has deficiencies in its identity-management protocols, has at least one unspecified national security risk factor, and does not reliably accept its nationals slated for deportation.

The entry of nationals from Somalia traveling on immigrant visas is suspended entirely, and adjudications for all nonimmigrant visas are to be subjected to additional scrutiny. According to the Proclamation, these restrictions are justified by the facts that the United States does not recognize the Somali electronic passport, Somalia has been designated a terrorist safe haven, and large parts of Somalia are outside the control of the central government such that its ability to share information about criminal and terrorist risks is compromised.

Regarding Syria, the Proclamation suspends entirely the entry of all Syrian nationals, both immigrants and nonimmigrants, on the basis that Syria does not cooperate with the United States in identifying security risks, is a source of significant terrorist threats and has been designated a state sponsor of terrorism, does not provide adequate public safety or terrorism-related information,

Appeal 18-1521 Case 1:17-cv-05228-NGG-VMS Filed: 07/02/2018 Document 282-7 Filed 09/04/20 Page 155 of 1026 PageID #: 9746

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 142 of 442
International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

has deficiencies in its identity-management protocols, and has at least one unspecified national security risk factor.

The Proclamation suspends entirely the entry of Yemeni nationals as immigrants, as well as entry of Yemeni nonimmigrants traveling under B–1, B–2, and B–1/B–2 nonimmigrant visas. As justification, the Proclamation notes that Yemen does not provide adequate public safety or terrorism-related information, has deficiencies in its identity-management protocols, has at least one national security risk factor, and has a terrorist presence.

As for countries identified for the first time in the Proclamation, entry of Chad nationals as immigrants is suspended entirely, as is entry of nonimmigrants using B–1, B–2, or B–1/B–2 visas. In support of this determination, the Proclamation asserts that Chad fails to provide adequate public safety and terrorism-related information, and that the nation has at least one unspecified national security risk factor.

*9 All entry of North Korean visa holders, immigrant or nonimmigrant, is entirely suspended, because North Korea has reportedly failed in any way to cooperate or engage in information sharing with the United States.

Venezuela is the only designated country for which entry of immigrants is not suspended. Limitations on the entry of Venezuelan nationals are confined to barring entry of specific government officials and their immediate family members, who are suspended from traveling to the United States on B–1, B–2, and B–1/B–2 visas. All other Venezuelan nationals are to be subjected to enhanced screening and vetting procedures but are not otherwise banned from entry. The Proclamation reasons that although Venezuela fails to provide adequate terrorism-related or public safety information, has at least one unspecified national security risk factor, and does not reliably receive its nationals slated for deportation, there are other, unspecified sources available for verifying the identities of Venezuelan nationals.

These suspensions apply to foreign nationals of the Designated Countries who (1) are outside the United States on the applicable effective date of the Proclamation; (2) do not have a valid visa as of the applicable effective date of the Proclamation; and (3) are not among those entitled to receive a new visa or other travel document because their visas were revoked or canceled pursuant

to EO–1. Excepted from the suspensions are a number of other individuals, including LPRs; dual nationals if traveling on a passport issued by a non-designated country; and foreign nationals who have been granted asylum status or who have been already admitted to the United States as refugees.

In addition to these delineated exceptions, the Proclamation provides for waivers, to be granted on a case-by-case basis by either a State Department consular officer or an official of United States Customs and Border Protection ("CBP"), based on criteria to be developed by the Secretary of State and the Secretary of Homeland Security. Any waiver granted by a consular officer would allow both the issuance of a visa and subsequent entry to the United States on that visa. The Proclamation expressly provides that waivers may be granted only upon a showing that (1) denying entry would cause the foreign national undue hardship, (2) allowing entry would not pose a national security or public safety threat, and (3) entry would be in the national interest.

The Proclamation charges the Secretary of Homeland Security, in consultation with the Secretary of State, to devise a process for determining whether the suspensions should be continued, terminated, modified, or supplemented. At 180-day intervals, the Secretary of Homeland Security, after consultation with the Secretary of State, the Attorney General, the DNI, and any other appropriate agency heads, is to submit a report and recommendations to the President on whether any such changes should be made, including whether similar suspensions should be imposed on additional countries. In addition, the Secretary of Homeland Security, after consulting with these same officials, may recommend modifications to the list of suspended countries at any time.

*10 As noted, the Proclamation is already in effect as to foreign nationals currently barred by EO–2. For all other covered foreign nationals, it becomes effective on October 18, 2017.

In a joint declaration, 49 former national security, foreign policy, and intelligence officials who served in the White House, Department of State, Department of Homeland Security, Department of Defense, the Central Intelligence Agency, the United States Senate, and as ambassadors in Republican and Democratic Administrations, some of

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 28-7 Filed 07/03/2018 Pg: 156 of 572 Page 156 of 1026 PageID #: 9747

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 143 of 442

International Refugee Assistance Project v. Trump, Not Reported in... 2017 WL 4674314

whom were aware of the available intelligence relating to potential terrorist threats to the United States as of January 19, 2017, state that "[a]s a national security measure," the Proclamation is "unnecessary" and is of "unprecedented scope." J.R. 770. Excluding North Korea and Venezuela, the Proclamation blocks over 150 million people from entering the United States on the basis of their nationality, despite the fact that "concrete evidence" has shown that "country-based bans are ineffective." J.R. 771. The officials note that the Proclamation has internal inconsistencies, such as its uneven application to nonimmigrant visas, which are the most frequently used visas from the banned nations, and its failure to block individuals from non-Muslim majority countries with "widely-documented" problems with information sharing, such as Belgium. J.R. 773. On this score, the officials note that no terrorist acts have been committed on U.S. soil by nationals of the Designated Countries in the last 40 years, and that no intelligence as of January 19, 2017 suggested any such potential threat. Nor, the former officials assert, is there any rationale for the abrupt shift from individualized vetting to group bans, particularly in light of the fact that the present system of individualized vetting places the burden of proving identity and eligibility for travel on the person seeking a visa.

**VII. The Plaintiffs**
Plaintiffs, a combination of 23 individuals ("the Individual Plaintiffs") and seven organizations ("the Organizational Plaintiffs"), assert that they will suffer harm from the implementation of the Proclamation in the form of prolonged separation of family members located in the Designated Countries and stigmatizing injuries arising from the anti-Muslim animus of the travel ban. Of the Individual Plaintiffs, nine are U.S. citizens or LPRs who have an approved visa petition on behalf of an Iranian-national parent, child, or sibling, consisting of IRAP Plaintiffs John Doe No. 4, Shapour Shirani, Fakhri Ziaolhagh, and Afsaneh Khazaeli; and IAAB Doe Plaintiffs Nos. 1–5. Two Plaintiffs, IAAB Doe Plaintiff No. 6 and Grannaz Amirjamshidi seek nonimmigrant visas for their Iranian-national mother or mother-in-law to visit the United States. Four Plaintiffs are U.S. citizens or LPRs with an approved visa petition for their Syrian-national family members, consisting of Mohamad Mashta, [2] IRAP Plaintiff Jane Doe No. 2, and Zakzok Plaintiffs Jane Does No. 1–2. Zakzok Plaintiff Eblal Zakzok, an LPR, has submitted an immigrant visa

petition for his Syrian-national daughter but it has not been approved, and Zakzok Plaintiff Sumaya Hamadmad has a sister, a Syrian national, who has applied for a nonimmigrant visa to visit the United States for an academic project. IRAP Plaintiffs John Doe No. 5 and Fahed Muqbil are U.S. citizens who have approved immigrant visa petitions for their Yemeni-national wife and mother, respectively. Zakzok Plaintiff Jane Doe No. 3 is a U.S. citizen who has a pending immigrant visa petition for her Somali fiancée. Three of the Individual Plaintiffs, specifically Mohammed Meteab, and IRAP John Does Nos. 1 and 3, are LPRs of Iranian or Iraqi descent who do not have immediate family members from one of the Designated Countries seeking an immigrant or nonimmigrant visa.

**\*11** Of the Organizational Plaintiffs, three primarily provide services to clients. IRAP provides legal services to its clients, displaced persons around the world seeking to come to the United States, to help them navigate the refugee or immigrant application process. HIAS provides a variety of services to refugees, including assisting their clients with refugee resettlement in the United States. AAANY primarily serves the Arab–American and Arab immigrant community in New York City by providing legal and other services to its clients.

The remaining Organizational Plaintiffs convene events on issues relating to the Middle East or advocate on behalf of their members. MESA consists of over 2,400 graduate students and faculty around the world focused on the field of Middle Eastern studies. YAMA, a membership organization of Yemeni American merchants, seeks to protect its members from harassment and to assist them with immigration issues. IAAB organizes youth camps, educational events, and international conferences for the Iranian diaspora, including inviting prominent scholars from outside the country to speak at events. ISF is an affiliate of IAAB and organizes events and fundraisers for its members, approximately 30 Iranian American students at the University of Maryland. Additional facts relating to certain Organizational Plaintiffs are contained in the Court's discussion of standing. *See infra* part I.A.

**CONCLUSIONS OF LAW**

In this Motion, Plaintiffs seek a preliminary injunction based on their claims that the Proclamation violates (1) the

J.A. 678

AR1408

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

Immigration and Nationality Act, (2) the Establishment Clause, and (3) the Equal Protection Clause.

## I. Justiciability

Defendants raise several arguments that Plaintiffs' claims are not justiciable. Specifically, they assert that Plaintiffs lack standing, the claims are not ripe, the claims are barred by the doctrine of consular nonreviewability, and the statutory claims are not reviewable under the APA.

### A. Standing

[2] [3] [4] [5] [6] Article III of the Constitution limits the judicial power of the federal courts to actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To invoke this power, a litigant must have standing. *Hollingsworth v. Perry*, ––– U.S. ––––, 133 S.Ct. 2652, 2661, 186 L.Ed.2d 768 (2013). A plaintiff establishes standing by demonstrating (1) a "concrete and particularized" injury that is "actual or imminent," (2) "fairly traceable to the challenged conduct," (3) and "likely to be redressed by a favorable judicial decision." *Id.*; *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007). For claims involving a statutory cause of action, a plaintiff must also have interests that fall within the "zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ––– U.S. ––––, 134 S.Ct. 1377, 1388, 188 L.Ed.2d 392 (2014). Standing must be established for each claim. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). The presence of one plaintiff with standing renders a claim justiciable. *Bostic v. Schaefer*, 760 F.3d 352, 370–71 (4th Cir. 2014).

#### 1. Immigration and Nationality Act

The various Individual Plaintiffs assert standing based on the allegation that they are harmed by the prolonged separation from close family members who are unable to travel to the United States under the terms of the Proclamation. The Supreme Court has reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner challenging the application of the immigration laws to that foreign individual. *See Kerry v. Din*, –––U.S. ––––, 135 S.Ct. 2128, 2131, 2138–42, 192 L.Ed.2d 183 (2015) (considering an action brought by a U.S. citizen challenging the denial of her husband's visa); *Kleindienst v. Mandel*, 408 U.S. 753, 756, 762–65, 92

S.Ct. 2576, 33 L.Ed.2d 683 (1972) (considering the merits of a claim brought by American plaintiffs challenging the denial of a visa to a Belgian journalist whom they had invited to speak in various academic forums in the United States); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (stating that because standing relates to a court's power to hear and adjudicate a case, it is normally "considered a threshold question that must be resolved in [the litigant's] favor before proceeding to the merits"); *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986) ("Presumably, had the Court harbored doubts concerning federal court subject matter jurisdiction in *Mandel*, it would have raised the issue on its own motion."). Other courts have done the same. *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (considering an action by a United States citizen challenging the denial of her husband's visa and holding that the citizen had a procedural due process right to a "limited judicial inquiry regarding the reason for the decision"); *Allende v. Shultz*, 845 F.2d 1111, 1114 & n.4 (1st Cir. 1988) (evaluating the merits of a claim brought by scholars and leaders who extended invitations to a foreign national challenging the denial of her visa).

**\*12** The United States Court of Appeals for the District of Columbia Circuit has found that U.S. citizens and residents have standing to challenge the denial of visas to individuals in whose entry to the United States they have an interest. *See Abourezk*, 785 F.2d at 1050 (finding that U.S. citizens and residents had standing to challenge the denial of visas to foreigners whom they had invited to "attend meetings or address audiences" in the United States); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469, 471 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1, 117 S.Ct. 378, 136 L.Ed.2d 1 (1996) ("*LAVAS*"). In LAVAS, the court held that U.S. resident sponsors had standing to assert that the State Department's failure to process visa applications of Vietnamese citizens in Hong Kong violated one of the same provisions at issue here, 8 U.S.C. § 1152, based on the cognizable injury of prolonged "separation of immediate family members" resulting from the State Department's inaction. *Id.* at 471. And in a related case, the Ninth Circuit held that an individual plaintiff had standing to challenge EO–2 where the plaintiff's mother-in-law was a Syrian national with a pending immigration visa application, because the

Appeal: 18-1521 Case 1:17-cv-02228-CCG-VMS Filed: 07/02/2018 Document 139-2 Pg: 159 of 572 Page 158 of 1026 PageID #: 9749

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 145 of 442

"prolonged separation" from her constituted a sufficient injury-in-fact. *Hawaii*, 859 F.3d at 763.

**[7]** **[8]** Here, several Individual Plaintiffs, specifically IRAP Plaintiffs John Doe No. 4, John Doe No. 5, Jane Doe No. 2, Shapour Shirani, and Fakhri Ziaolhagh; IAAB Plaintiffs Doe Plaintiff No. 1, Doe Plaintiff No. 3, Doe Plaintiff No. 4, and Doe Plaintiff. No. 5; and Zakzok Plaintiffs Eblal Zakzok, John Doe No. 1, and Jane Doe No. 2 have standing to assert their claims that the Proclamation violates the INA. Each of these Plaintiffs are U.S. citizens or lawful permanent residents who have immediate family members who are nationals of the Designated Countries and currently in the process of securing a visa to come to the United States as immigrants. As one illustrative example, John Doe No. 4 is a U.S. citizen whose wife is an Iranian national seeking an immigrant visa to join him in the United States. Other Plaintiffs, including IRAP Plaintiff Grannaz Amirjamshidi, IAAB Plaintiff Doe Plaintiff No. 6, and Zakzok Plaintiff Sumaya Hamadmad have standing as U.S. citizens who are separated from close family members who are nationals of Designated Countries seeking nonimmigrant visas to travel to the United States. The Proclamation's indefinite ban on the issuance of immigrant and nonimmigrant visas for nationals of the Designated Countries has imposed an actual, imminent injury on these Plaintiffs by prolonging their separation from their family members. *See LAVAS*, 45 F.3d at 471; *Hawaii*, 859 F.3d at 763. Because a "threat" of an injury that is "real and immediate" can support standing, *Friends of the Earth, Inc. v Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000), it is not necessary that the family member's visa application already be denied. Where the Proclamation halts issuance of visas to nationals of the Designated Countries indefinitely, the threat is quite real.

This injury is "fairly traceable" to the challenged practice in that the implementation of the travel ban imposed by the Proclamation would cause the prolonged separation, and an injunction against the Proclamation would likely redress that injury. *See Hollingsworth*, 133 S.Ct. at 2661. The Court therefore finds that these Individual Plaintiffs have standing to assert the claim that the Proclamation violates the INA.

**[9]** **[10]** **[11]** The Organizational Plaintiffs assert standing for the INA claim in their own right and on behalf of their members. For an organization's claim of standing, the Court conducts the same inquiry as in the case of an individual. *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012). An organization suffers an injury-in-fact when "a defendant's actions impede its efforts to carry out its mission." *Lane*, 703 F.3d at 674; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). However, an injury to an organization generally does not arise from a decision to expend resources on member education or litigation in response to legislation. *See Lane*, 703 F.3d at 675.

**\*13** **[12]** Here, several organizations have asserted sufficient injury to their proprietary and organizational interests to constitute an injury-in-fact for standing purposes. Both MESA and IAAB argue that the Proclamation will disrupt upcoming conferences and events in the United States by preventing individuals from the Designated Countries from attending. Specifically, the Proclamation would bar scholars from some of the Designated Countries from MESA's annual meeting in November, including one prospective attendee from Iran, which would harm MESA financially because approximately half of MESA's budget is derived from the annual meeting. The inability of scholars to travel to the annual meeting would also hinder the exchange of ideas among scholars and thus adversely impact MESA's mission of "fostering study and public understanding of the Middle East." J.R. 430–31. Likewise, the Proclamation will prevent Iranian nationals from attending IAAB's International Conference on the Iranian Diaspora, scheduled for April 2018 in New York, at which scholars, students, journalists, artists, and community leaders gather to exchange ideas on issues affecting the worldwide Iranian community. Where approximately half of the invited speakers for this event typically come from Iran, the inability of Iranian nationals to travel to the United States would hinder IAAB's mission of "address[ing] issues affecting the Iranian Diaspora community." Kharazzi Aff. ¶ 17, IAAB Mot. Prelim. Inj. Ex. 1, ECF No. 26–3. Although the Proclamation excepts Iranian nationals traveling on a student (F and M) or exchange visitor (J) visa, such visas typically are for individuals enrolling in an academic or vocational

program or in a specific exchange visitor program such as an au pair, summer camp, or summer work travel program. *See* 22 C.F.R. §§ 41.61–41.62 (2017); U.S. Dep't of State, 9 Foreign Affairs Manual §§ 402.5–5–402.5–6. Attendees at educational, professional, or business conferences would generally use a B–1 visa, which is now unavailable to Iranian nationals. *See* 9 Foreign Affairs Manual § 402.2–5(B)(5) (stating that one of the permitted activities on a B–1 visa is to "participate in scientific, educational, professional, or business conventions, conferences, or seminars"). The Proclamation also impacts IRAP's ability to bring one of its Syrian-national employees back to the United States to participate in its annual, week-long strategic planning and training retreat at its headquarters in New York, which would adversely impact IRAP's operations and mission.

These injuries are not "merely speculative." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). MESA has described at least one specific individual from Iran who would attend the MESA annual meeting and whose fees would have to be refunded if he cannot attend, and IRAP has referenced a specific employee who cannot receive the in-person training and participate in strategic planning at its annual retreat. Even without identifying specific individuals who will definitely be barred from entry into the United States to attend its events, IAAB has alleged that the Proclamation presently constrains their efforts to recruit attendees for their upcoming meetings and conferences and to secure their arrival in time for the events. *Cf. Hawaii* 859 F.3d at 766 (finding that Hawaii had standing based on its interest in students attending the University of Hawaii). Thus, the Proclamation would injure MESA, IAAB, and IRAP by impeding their efforts to accomplish their missions and by disrupting their ability to raise money, train staff, and convene programs designed to foster the free flow of ideas on topics of significance to their organization's purpose. *See Lane*, 703 F.3d at 674.

[13] MESA, IAAB, and IRAP also fall within the zone of interests protected by the INA. Where MESA's purpose is to foster "study and public understanding of the Middle East," J.R. 431–32, and IAAB is focused on "address[ing] issues affecting the Iranian Diaspora Community, Kharazzi Aff. ¶ 17, these organizations necessarily engage in collaboration and exchange with foreign nationals who visit the United States. Accordingly, they necessarily have a substantial interest in the effective operation of the

INA, particularly its provisions for admitting foreign scholars and other foreign nationals to the United States as nonimmigrants to attend educational conferences. *See, e.g.*, 9 Foreign Affairs Manual § 402.2–5(B)(5). Likewise, as an organization focused on refugee resettlement, IRAP has a need to engage foreign-national employees familiar with parts of the world with refugee populations and periodically to have those employees travel to and from the United States for planning, direction, and training. It, too, has an ongoing interest in operation of the INA's nonimmigrant visa provisions. *See* 9 Foreign Affairs Manual § 402.2–5(B)(3) (stating that one of the permitted activities on a B–1 visa is to "consult with business associates"). Thus, as organizations that depend on the entry of foreign nationals into the United States under the INA, MESA, IAAB, and IRAP are within the zone of interest of the law. *See Abourezk*, 785 F.2d at 1050–51 (finding that organizations that invited foreign nationals to the United States to speak at a rally had a cognizable stake in the Government's interpretation of a provision of the INA).

The Court also finds that these organizational injuries are fairly traceable to Defendants' actions and likely to be redressed by a favorable decision because the Proclamation imposes an entry ban on nationals from the Designated Countries who would otherwise be able to apply for visas to enter the United States and participate in the organizational events. *See Hollingsworth*, 133 S.Ct. at 2661. Therefore, the Court finds that MESA, IAAB, and IRAP each have standing to challenge the Proclamation as a violation of the INA.

**\*14** [14] [15] Finally, several organizations can assert standing as representatives of their members. To establish associational standing, an organization must establish that (1) its members would have standing to sue in their own right; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130 (stating that a single member with standing in his or her own right is sufficient to establish that an organization has standing). An organization must "make specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at*

*Broadlands, LLC,* 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Summers v. Earth Island Inst.,* 555 U.S. 488, 498, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)).

**[16]** MESA and YAMA both identify at least one individual member who is a U.S. citizen or LPR seeking to secure an immigrant visa for a close relative from one of the Designated Countries. MESA alleges that one of its members of Syrian descent is imminently filing a petition seeking an immigrant visa for his mother-in-law, a Syrian national. YAMA asserts that one of its members, "Ahmed," is a U.S. citizen whose wife has petitioned for his Yemeni national wife and their five Yemeni national children to immigrate to the United States.

**[17]** The interests raised by Plaintiffs' claims are germane to the organizations' purposes. MESA seeks to foster greater understanding and dialogue with Middle East nations, including one or more of the Designated Countries. YAMA, in part, seeks to help Yemeni American business owners navigate immigration issues they face. Plaintiffs' interest in obtaining an injunction to preserve the ability of foreign nationals from the Designated Countries to travel to the United States squarely relates to both of these missions. Finally, where the claims in these cases consist of constitutional and statutory challenges to the Proclamation, there is no discernible reason why the participation of individual members, as opposed to their representatives in the form of the organization, is required for the effective advancement of this lawsuit. With all the requirements met, the Court concludes that MESA and YAMA have standing to assert their INA claims on behalf of their members. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

**2. Establishment Clause**

**[18]** **[19]** To have standing to assert an Establishment Clause claim, a plaintiff must meet the same elements as for any other claim: (1) a cognizable injury, (2) fairly traceable to the defendant's actions; and (3) a likelihood that the injury will be redressed by a favorable decision. *Suhre v. Haywood Cty.,* 131 F.3d 1083, 1085 (4th Cir. 1997). To show an injury in the context of the Establishment Clause, the plaintiff must have "personal contact with the alleged establishment of religion" resulting in a personal injury. *Id.* at 1086. The injury can take the form of noneconomic, intangible harm

to spiritual beliefs, such as "[f]eelings of marginalization and exclusion" because "one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion that they are outsiders, not full members of the political community." *Moss v. Spartanburg Cty. Sch. Dist. Seven,* 683 F.3d 599, 607 (4th Cir. 2012); *see Suhre,* 131 F.3d at 1086; *Awad v. Ziriax,* 670 F.3d 1111, 1122–23 (10th Cir. 2012) (holding that a Muslim plaintiff residing in Oklahoma suffered a cognizable injury in the form of condemnation of his religion and exposure to "disfavored treatment" based on a voter-approved state constitutional amendment prohibiting Oklahoma state courts from considering Sharia law); *Catholic League v. City & Cty. of San Francisco,* 624 F.3d 1043, 1048 (9th Cir. 2010) (stating that a "psychological consequence" constitutes a concrete injury where it is "produced by government condemnation of one's own religion or endorsement of another's in one's own community"). The injury, however, needs to be a "personal injury suffered" by the plaintiff "*as a consequence* of the alleged constitutional error." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

**\*15** **[20]** Here, multiple Individual Plaintiffs have asserted "personal contact" with the Proclamation's alleged Establishment Clause violation to demonstrate standing. As discussed above, multiple Plaintiffs have asserted that they have been personally injured by the Proclamation through the harm of prolonged separation from close relatives who would be barred from entry to the United States under the Proclamation. *See supra* Part I.A.1. Thus, contrary to Defendants' claim, they are asserting a personal injury sustained as a consequence of the alleged constitutional error, not an injury to others. *See Suhre,* 131 F.3d at 1086 (finding that "unwelcome direct contact with a religious display that appears to be endorsed by the state" is a personal injury). It is this personal impact that separates the claims of Plaintiffs here from those in *Valley Forge,* in which the plaintiffs had merely read about a conveyance of property to a religious institution that they believed to be unfairly advantageous, *Valley Forge,* 454 U.S. at 468–69, 485, 102 S.Ct. 752, or in *In re Navy Chaplaincy,* 534 F.3d 756, 764 (D.C. Cir. 2008), in which Protestant Navy chaplains alleging that Catholic chaplains received a preference in the chaplain retirement system had observed the impact of the alleged

International Refugee Assistance Project v. Trump,    F.Supp.3d ---- (2017)
2017 WL 4674314

Establishment Clause violation on others but had not suffered any personal consequences from it, *id.* at 764–65.

Several of these Plaintiffs have also asserted specific, intangible injuries resulting from this personal contact with the alleged Establishment Clause violation. Among the IRAP Plaintiffs, John Doe No. 4 states that he "felt insulted" by EO–1 and received "more suspicious looks from people," which caused him to feel that "I am being labeled as a Muslim more often," and that the Proclamation "has made me feel this more strongly" such that "I continue to feel demeaned by the ban." J.R. 461–62. Jane Doe No. 2 states that she understands the Proclamation to fulfill campaign promises to condemn her religion, which has made her feel depressed and has caused her to question whether to remain in the United States because she does not want her children to face discrimination. Afsaneh Khazaeli states that the Proclamation and the predecessor travel bans have made him feel like a "second-class citizen" and has made his family the target of abuse and discrimination. J.R. 465–66. Shapour Shirani states that the anti-Muslim nature of the travel ban has made the separation from his wife "more painful," and the Proclamation has made him "feel even worse" and worry that discrimination against Muslims will persist and interfere with his rights. J.R. 476–77.

Of the IAAB Plaintiffs, Doe Plaintiff No. 2, Doe Plaintiff No. 3, Doe Plaintiff No. 5, and Doe Plaintiff No. 6 have all expressed similar intangible harms arising from the Proclamation's alleged Establishment Clause violation. For example, Doe Plaintiff No. 2 states that because the Proclamation "targets" her based on her religion, "I feel insecure and I fear for my safety and the safety of my loved ones," and "I feel that I am being treated as an outsider in my own country." Jane Doe No. 2 Aff. ¶ 9, IAAB Mot. Prelim. Inj. Ex. 3, ECF No. 26–5. Doe Plaintiff No. 3 has stated that she fears the Proclamation will result in "more hatred and attacks against my community" such that "I fear for my safety and the safety of my loved ones." Jane Doe No. 3 Aff. ¶ 9, IAAB Mot. Prelim. Inj. Ex. 4, ECF No. 26–6. Both Doe Plaintiff No. 5 and Doe Plaintiff No. 6 express that they feel attacked, targeted, and disparaged by the Proclamation's hostility to Muslims and that they fear for their safety as a result.

Zakzok Plaintiffs Fahed Muqbil, Eblal Zakzok, Sumaya Hamadmad, John Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 all express that they feel condemned,

stigmatized, attacked, or discriminated against as a result of the Proclamation. For example, Fahed Muqbil feels "as if I and my fellow American Muslims are unwanted, different, and somehow dangerous" as a result of the Proclamation. Fahed Muqbil Decl.¶ 15, Zakzok Mot. Prelim. Inj. Ex. 1, ECF No. 6–1.

These feelings of marginalization constitute an injury in fact in an Establishment Clause case. *See Moss*, 683 F.3d at 607 (holding that a Jewish father and daughter suffered an injury when they felt like "outsiders" upon receiving a school letter stating that academic credit was available for taking a class at a Christian bible school). Furthermore, these injuries are traceable in whole or in part to the Proclamation, and an injunction is likely to redress these injuries by removing the stigma associated with the Proclamation. Multiple Individual Plaintiffs can establish both a personal contact with the alleged establishment of religion through the prolonged separation from their family members and a direct injury from the Proclamation through their feelings of marginalization and exclusion. These Plaintiffs include IRAP Plaintiffs John Doe No. 4, Jane Doe No. 2, and Shapour Shirani; IAAB Plaintiffs Doe Plaintiff No. 3, Doe Plaintiff No. 5, and Doe Plaintiff No. 6; and Zakzok Plaintiffs Eblal Zakzok, Jane Doe No. 2, and Sumaya Hamadmad.

*16 Finally, MESA and YAMA, which have standing to assert an INA claim based on their representation of members injured by the Proclamation, likewise have standing to assert an Establishment Clause claim on behalf of their members. As discussed above, both have asserted that at least one specific member faces prolonged separation from a close relative as a result of the Proclamation. *See supra* Part I.A.1. Both also assert that the same member has experienced feelings of marginalization or emotional distress as a result of the Proclamation's alleged anti-Muslim message. According to MESA, the various versions of the travel ban have caused its member "extreme stress" and "ma[d]e him feel unwelcome, even more so now that he is a citizen." J.R. 429. According to YAMA, Ahmed, one of its members facing a prolonged separation from family, states that the ban has made him "scared here in the United States because the message is coming from the highest people in government that Muslims are terrorists." J.R. 486.

[21] Where both of these organizations have at least one member with both a personal contact with the

J.A. 683

AR1413

International Refugee Assistance Project v. Trump, Not Reported in... 2017 WL 4674314

alleged establishment of religion and a direct injury as a result of it, the injury-in-fact requirement has been satisfied. Since MESA serves to foster understanding of the Middle East, in which there are many predominantly Muslim nations, and YAMA was founded in part to oppose what its members perceived to be a Muslim ban arising from EO–1, the interests they seek to protect through an Establishment Clause claim are germane to their organizations' purposes. *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. Lastly, as discussed above, there is no discernible reason why the individual members themselves must participate in this suit, rather than their membership organization. *Id.* Accordingly, MESA and YAMA have standing to assert an Establishment Clause claim on behalf of their members.

Having found that multiple Individual and Organizational Plaintiffs have standing to assert both INA and Establishment Clause claims, the Court need not address whether the remaining Plaintiffs have standing. By not addressing those arguments, the Court does not convey any view on whether those Plaintiffs have standing to assert one or more claims.

## B. Ripeness

**[22]** **[23]** The Government also argues that Plaintiffs' claims are not ripe because their relatives have not yet been denied both a visa and a waiver. For the Individual Plaintiffs discussed above whose family members are already in the process of seeking visas, denial of visas is generally mandated because they are ineligible based on the plain language of the Proclamation. Although a claim is generally not ripe if it is based on contingent future events, *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998), the potential to receive a waiver does not render the claims unripe because the waiver process itself presents an additional hurdle not faced by other visa applicants which would delay reunification, thus creating a harm not contingent on future events. *See Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1541 (11th Cir. 1994) (finding in a Fair Housing Act action that plaintiffs' claim was ripe where, "assuming that [plaintiffs] successfully prove at trial that this [challenged] additional hurdle was interposed with discriminatory purpose and/or with disparate impact, then the additional hurdle itself is illegal whether or not it might have been surmounted").

**[24]** **[25]** In assessing ripeness, courts are to consider the fitness of the issues for decision and the hardship to the parties of withholding judicial consideration. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). Where this case centers on legal issues arising from the Proclamation, which has been issued in its final form, and is not dependent on facts that may derive from application of the waiver process, it is now fit for decision. *See Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). In light of the individual Plaintiffs' circumstances, withholding judicial consideration of their claims until waivers are adjudicated would cause undue hardship in the form of additional prolonged separation. The Court therefore finds that the claims are now ripe.

## C. Consular Nonreviewability

**\*17** Defendants argue that Plaintiffs' claims are not justiciable pursuant to the doctrine of consular nonreviewability, citing *Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999). Defendants also cite *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950), in which the Supreme Court held that a foreign national could not challenge the country and deny her a hearing to which she would ordinarily be entitled. *Id.* at 547, 70 S.Ct. 309. Defendants assert that, taken together, these cases establish that any judicial review of the President's decision to exclude an alien for any reason is unreviewable.

**[26]** Plaintiffs, however, challenge not individual visa decisions by consular officers, but the overarching travel ban policy imposed by the Proclamation. *See Hawaii*, 859 F.3d at 768 (rejecting the argument that consular nonreviewability barred judicial review of statutory claims challenging EO–2 and noting that "[c]ourts can and do review both constitutional and statutory challenges to the substance and implementation of immigration policy") (citation omitted); *Washington*, 847 F.3d at 1162; *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985) (distinguishing challenges to consular decisions on individual visa applications from a challenge to general operational instructions promulgated by the Immigration and Naturalization Service); *cf. Immigration and Naturalization Serv. v. Chadha*, 462 U.S. 919, 940–41, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (noting that although Congress has plenary authority over immigration, the Court could still review

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

an immigration statute to ensure that it implemented that authority by "constitutionally permissible means"). The Defendants' reliance on *Knauff* and *Saavedra Bruno* is thus misplaced. These decisions relate only to aliens appealing individual denials of entry into the United States. *Knauff*, 338 U.S. at 539, 70 S.Ct. 309; *Saavedra Bruno*, 197 F.3d at 1155, 1163–64. Where Plaintiffs include U.S. citizens asserting statutory and constitutional claims challenging a broader policy as opposed to individual consular determinations, the doctrine of consular nonreviewability is not applicable. *See Hawaii*, 859 F.3d at 768–69; *see also IRAP*, 857 F.3d at 587.

**D. APA**

Defendants assert that the APA has foreclosed the Plaintiffs' statutory claims on multiple grounds. The APA provides standing for any party that is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; *see LAVAS*, 45 F.3d at 471. This general grant of standing is subject to several limitations. Judicial review is available only for "final agency action," 5 U.S.C. § 704, and is not available if "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

**[27]** First, Defendants argue that Plaintiffs cannot bring a claim under the APA because they are not "adversely affected or aggrieved" within the meaning of the APA. As discussed above, the Individual Plaintiffs and several Organizational Plaintiffs are within the zone of interests of the INA and are injured by the denial of immigrant or nonimmigrant visas for family members or expected conference attendees. *See supra* Part I.A.1. They are thus "adversely affected or aggrieved" by Defendants' use of their authority under the INA. 5 U.S.C. § 702; *see LAVAS*, 45 F.3d at 471–72 (finding that U.S. family members of Vietnamese nationals desiring to be processed for visas in Hong Kong but ordered to return to Vietnam were "aggrieved" under the APA and within the "zone of interests" of the INA); *Abourezk*, 785 F.2d at 1051 (finding that U.S. citizens who invited foreign nationals to speak were "aggrieved" by the State Department's interpretation of an INA definition that led to the exclusion of the intended speakers).

**\*18 [28] [29] [30] [31]** Second, Defendants assert that judicial review is not available because the Proclamation was issued by the President, not the head of a federal department or agency, and thus is not a "final agency

action" within the meaning of the APA. In *Franklin v. Massachusetts*, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), the Supreme Court held that the President is not subject to the APA such that his actions cannot be reviewed under that law. *Id.* at 800–01, 112 S.Ct. 2767. To the extent that the Plaintiffs seek an injunction against the President himself, this argument has merit. *See id.* at 802, 112 S.Ct. 2767 (stating that "a grant of injunctive relief against the President himself is extraordinary and should ... raise[ ] judicial eyebrows"); *see also IRAP*, 857 F.3d at 605. However, Plaintiffs have named as defendants federal agency officials who will implement the Proclamation. "[I]t is now well established" that "[r]eview of the legality of a Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996) (permitting judicial review of an Executive Order through a suit against the Secretary of Labor). Such review is warranted because there is a "strong presumption in favor of judicial review of administrative action." *Immigration and Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). As for Defendants' claim that the agency action to date is not "final," the Proclamation is already in effect as to certain individuals and is being enforced by federal agencies, and, as discussed above in relation to ripeness, a formal denial of a visa or waiver is not necessary for the case to be subject to review. *See supra* Part I.B.

**[32]** Third, Defendants claim that review of the Proclamation is foreclosed by 5 U.S.C. § 701(a)(2) as "committed to agency discretion by law." Under their view, Congress committed the use of § 1182(f) to the sole discretion of the President, such that a reviewing court has no manageable standard by which to evaluate it. Despite the Government's asserted claim of a lack of intelligible standard, courts have had no difficulty reaching the merits of challenges to the President's use of § 1182(f). *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 187, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); *Hawaii*, 859 F.3d at 770–74; *cf. Abourezk*, 785 F.2d at 1051 (finding that the INA "does not commit to unguided agency discretion the decision to exclude an alien").

More generally, courts have regularly reviewed Presidential action, including action taken in the context of foreign policy and immigration, to ensure that it fits within the bounds of federal statutes. *See, e.g., Sale*, 509

International Refugee Assistance Project v. Trump, Slip Copy... 2017 WL 4674304

U.S. at 187, 113 S.Ct. 2549 (reviewing on the merits an INA challenge to President's use of § 1182(f)); *Dames & Moore v. Regan*, 453 U.S. 654, 669–88, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (reviewing on the merits an Executive Order regarding the attachment of Iranian assets pursuant to the International Emergency Economic Powers Act); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (establishing the framework for judicial review of Presidential action). Defendants' contention that the Plaintiffs cannot contest the Proclamation in court cannot square with this body of precedent. The Court therefore finds that this case is justiciable and proceeds to the merits of the Plaintiffs' claims.

**II. Legal Standard**

[33]  [34]  To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 129 S.Ct. 365.

**III. Likelihood of Success on the Merits**

[35]  Because "courts should be extremely careful not to issue unnecessary constitutional rulings," *Am. Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161, 109 S.Ct. 1693, 104 L.Ed.2d 139 (1989) (per curiam), the Court first addresses the statutory claims and then proceeds, if necessary, to the constitutional claim.

**A. Immigration and Nationality Act**

*19  [36]  Plaintiffs assert that the Proclamation violates provisions of the INA. The formulation of immigration policies is entrusted exclusively to Congress. *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954). In the Immigration and Nationality Act of 1952, Pub. L.

82–414, 66 Stat. 163, Congress delegated some of its power to the President in the form of what is now Section 212(f) of the INA, codified at 8 U.S.C. § 1182(f) ("§ 1182(f)"), which provides that:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

Congress has also authorized the President to take action relating to entry into the United States in what is now Section 215(a) of the INA, codified at 8 U.S.C. § 1185(a) ("§ 1185(a)"):

> Unless otherwise ordered by the President, it shall be unlawful—
>
> (1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1). The Proclamation relies on these two provisions as the statutory authority for the President's action.

Plaintiffs assert that the Proclamation violates the INA in three ways. First, they argue, as they did in challenging EO–2, that the Proclamation violates Section 202(a) of the INA, codified at 8 U.S.C. § 1152(a) ("§ 1152(a)"), which bars discrimination on the basis of nationality in the issuance of immigrant visas. Second, they assert that the Proclamation fails to comply with the requirement in § 1182(f) that the President find that the suspension of entry by nationals from the Designated Countries would "be detrimental to the interests of the United States." Third, they contend that the Proclamation exceeds the authority granted by § 1182(f) because it effectively re-

writes portions of the INA or otherwise intrudes on Congress's legislative power.

### 1. Nationality Discrimination

Plaintiffs argue that the Proclamation's suspension of entry into the United States by immigrants from the Designated Countries violates the INA's bar on discrimination based on nationality in the issuance of immigrant visas. In opposition, the Government asserts that the Proclamation was lawful because it was issued pursuant to § 1182(f), which grants the President broad authority to bar the entry of immigrants, and that the non-discrimination provisions of § 1152(a) do not limit the President's § 1182(f) authority.

Section 1152(a) provides that, with certain exceptions:

> No person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of his race, sex, nationality, place of birth, or place of residence[.]

8 U.S.C. § 1152(a)(1)(A).

Section 1152(a) was enacted as part of the Immigration and Nationality Act of 1965, which was adopted expressly to abolish the "national origins system" imposed by the Immigration Act of 1924, which keyed yearly immigration quotas for particular nations to the percentage of foreign-born individuals of that nationality who were living in the continental United States, based on the 1920 census, in order to "maintain, to some degree, the ethnic composition of the American people." H. Rep. No. 89–745, at 9 (1965). President Lyndon B. Johnson sought this reform because the national origins system was at odds with "our basic American tradition" that we "ask not where a person comes from but what are his personal qualities." *Id.* at 11.

**\*20** **[37]** In reviewing the motion for a preliminary injunction of EO-2, this Court considered the interplay between § 1182(f) and § 1152(a) and concluded, based on canons of statutory construction, that the President's authority under § 1182(f) is limited by the § 1152(a) bar on discrimination based on nationality in the issuance of immigrant visas. *See IRAP*, 241 F.Supp.3d at 553–56.

The Court reaches the same conclusion here as to both § 1182(f) and § 1185(a). Under the canon that a later-adopted provision controls over an earlier one, § 1152(a), enacted in 1965, controls over § 1182(f) and the relevant text of § 1185(a)(1), enacted in 1952. [3] *See Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). Section 1152(a) is also the more specific provision, in that it requires a particular result, namely non-discrimination in the issuance of immigrant visas on specific, enumerated bases, while § 1182(f) and § 1185(a) mandate no particular action, but instead set out general parameters for the President's power to bar entry and impose rules and regulations on entry and departure. Thus, to the extent that § 1152(a) may conflict with § 1182(f) and § 1185(a) on whether the President can bar the issuance of immigrant visas based on nationality, § 1152(a), as the more specific provision, controls. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012) ("The general/specific canon is perhaps the most frequently applied ... To eliminate the contradiction, the specific provision is construed as the exception to the general one."); *Edmond v. United States*, 520 U.S. 651, 657, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."); *United States v. Smith*, 812 F.2d 161, 166 (4th Cir. 1987).

Finally, it is highly significant that § 1152(a) explicitly excludes certain sections of the INA from its scope, specifically §§ 1101(a)(27), 1151(b)(2)(A)(i), and 1153, but does not exclude § 1182(f) or § 1185(a) from its reach. 8 U.S.C. § 1152(a)(1)(A). The absence of any reference to § 1182(f) or § 1185(a) among these exceptions provides strong evidence that Congress did not intend for those provisions to be exempt from the anti-discrimination provision of § 1152(a). *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836, 121 S.Ct. 1934, 150 L.Ed.2d 45 (2001) ("[T]he mention of some implies the exclusion of others not mentioned."); *Reyes–Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001) (noting that Congress "knows how to expand the jurisdictional reach of a statute"). Thus, pursuant to § 1152(a), a proclamation under § 1182(f) or § 1185(a) may not discriminate in the issuance of immigrant visas.

This conclusion is consistent with that of the Ninth Circuit, which found a likelihood of success on the merits of the claim that EO-2's ban on entry by immigrants based on nationality exceeded the President's § 1182(f) authority,

AR1417

concluding that "§ 1152(a)(1)(A)'s non-discrimination mandate cabins the President's authority under § 1182(f)." *Hawaii,* 859 F.3d at 778. To reach this determination, the Ninth Circuit similarly applied the canons of statutory construction and relied on the facts that § 1152(a) was more recently enacted, § 1152(a) was the more specific statute, and § 1182(f) was not listed among sections of the INA exempt from the non-discrimination requirements of § 1152(a)(1)(A). *See id.* at 778.

[38] The Government argues that the Proclamation does not conflict with § 1152(a) because it suspended the entry of immigrants, not the issuance of visas. There is a textual difference. Section 1182(f) authorizes the President to bar "entry" to certain classes of aliens. 8 U.S.C. § 1182(f). Section 1152(a) bars discrimination based on nationality in the "issuance of an immigrant visa." *Id.* § 1152(a)(1) (A). These activities, however, usually go hand-in-hand. An immigrant cannot seek entry without first obtaining an immigrant visa. But receiving an immigrant visa is meaningless without later receiving permission to enter. Thus, the denial of entry to immigrants would generally have the effect of causing the denial of immigrant visas. *See Hawaii,* 859 F.3d at 776 (holding that the EO-2's suspension on entry "in substance operates as a ban on visa issuance on the basis of nationality"); *see also IRAP,* 857 F.3d at 637 (Thacker, J., concurring) ("Here, the ultimate effect of what EO-2 actually *does* is require executive agencies to deny visas based on nationality."). If § 1182(f) can be used to deny entry based on nationality, "the President could circumvent the limitations set by § 1152(a)(1)(A) by permitting the issuance of visas to nationals of ... designated countries, but then deny them entry. Congress could not have intended to permit the President to flout § 1152(a) so easily." *Hawaii,* 859 F.3d at 777.

*21 There may be scenarios under which denial of entry based on nationality under § 1182(f) or § 1185(a) could be deemed to have such a limited impact that it would not also effect a denial of an immigrant visa. For example, a nationality-based denial of entry of limited duration, such as during a specific urgent national crisis or public health emergency, that was not designed to halt visa issuances but instead simply to impose a delay or limitations on migration, arguably would not result in discrimination in the issuance of immigrant visas in violation of § 1152(a). President Reagan's 1986 decision to bar entry to Cuban nationals in retaliation for Cuba's

suspension of an immigration agreement and facilitation of illegal migration into the United States, the only historical example of the use of § 1182(f) authority to bar entry based on nationality, falls into this category. That bar of entry, by its own terms, was to continue only until "the restoration of normal migration procedures between the two countries." Proclamation 5,517, 51 Fed. Reg. 30,470 (Aug. 22, 1986). Likewise, President Carter's invocation of 8 U.S.C. § 1185(a)(1) in response to the Iran Hostage Crisis authorized "limitations and exceptions on the rules and regulations governing the entry" of Iranians into the United States without any reference to visa issuance. Exec. Order 12,172, 44 Fed. Reg. 67947 (Nov. 26, 1979); Exec. Order 12,206, 45 Fed. Reg. 24,101 (Apr. 7, 1980). Accordingly, when considering EO-2, which imposed only a 90-day "temporary pause" during which some entry could have been denied without impacting the issuance of visas, this Court drew a distinction between entry and visa issuance. *See IRAP,* 241 F.Supp.3d at 556.

[39] Here, however, the Proclamation has no specified end date and no requirement of renewal. Where the Proclamation has effectively imposed a permanent, rather than temporary, ban on immigrants from the Designated Countries, and has effectively stopped the issuance of immigrant visas indefinitely, the bar on entry is the equivalent of a ban on issuing immigrant visas based on nationality. This conclusion is supported by the Proclamation itself, which, even more than EO-2, makes clear that its intended effect is to deny the issuance of immigrant visas, in violation of § 1152(a). First, unlike EO-2, which generally barred entry by nationals of the Designated Countries, the Proclamation explicitly and specifically targets nationals seeking to immigrate to the United States. The Proclamation states, "For all but one of those 7 countries ... I am restricting the entry of all immigrants." Procl. § 1(h)(ii). Second, the text of the Proclamation reveals that its primary effect is not that nationals of the Designated Countries holding immigrant visas will be denied entry at the border by CBP, but that the State Department and consular officers will stop issuing immigrant visas to such nationals. Indeed, the Proclamation actually permits entry by any nationals holding approved visas. *Id.* § 3(a)(iii). Thus, as a result of the Proclamation, Defendants will effect the travel ban by no longer issuing immigrant visas to nationals of the Designated Countries. Moreover, the fact that the Proclamation provides that the Secretary of State and consular officers may grant waivers to the entry

ban, Procl. § 3(c), further reveals that the Proclamation generally imposes a ban on visa issuance, because those officials' statutory role is to issue visas, not to oversee actual entry into the United States. *See* 8 U.S.C. § 1101(a) (16) (stating that an "immigrant visa" is "issued by a consular officer"). Indeed, the Proclamation erases the line between the issuance of a visa and entry into the United States when it specifically provides that a waiver issued by a consular officer "will be effective both for the issuance of a visa and for any subsequent entry on that visa." Procl. § 3(c)(iii). Finally, any claim that the Proclamation relates only to the question of entry to the United States is belied by its multiple references to visa issuance, including the provision stating that "visa adjudications for nationals of Somalia and decisions regarding their entry as nonimmigrants should be subject to additional scrutiny." Procl. § 2(h)(ii). Notably, the State Department publicly describes the Proclamation not as limiting entry, but as a "Presidential Proclamation on Visas." *New Presidential Proclamation on Visas September 24, 2017*, U.S. Department of State, Bureau of Consular Affairs (Sept. 24, 2017), https://travel.state.gov/content/ travel/en/news/important-announcement.html. Because § 1152(a) does not permit such discriminatory denials of immigrant visas, the Proclamation exceeds the President's statutory authority under § 1182(f) and § 1185(a). *See Abourezk*, 785 F.2d at 1061 (noting that the President's authority in the immigration context derives from "the statutory authority conferred by Congress").

**\*22** Defendants' remaining arguments do not alter this conclusion. Defendants unpersuasively claim that § 1182(f) and § 1185(a) do not conflict with § 1152(a) because they "limit the universe of individuals eligible to receive visas" to which the non-discrimination provision of § 1152(a) would apply. This argument fails because there is nothing in the text of either statute that remotely suggests that they serve any function relating to visa eligibility. Moreover, acceptance of the Government's construction, under which discrimination would be permitted before the application of the non-discrimination provision, would render § 1152(a) meaningless. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (stating that "all parts of a statute, if at all possible, are to be given effect").

**[40]** Likewise, the Court finds unpersuasive Defendants' assertion that nationality discrimination is permissible under 8 U.S.C. § 1152(a)(1)(B), which states that

"[n]othing in [§ 1152(a)] shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed." This provision applies only to the Secretary of State and thus does not provide a basis to uphold discriminatory action in a Presidential Proclamation. More importantly, where the Proclamation now imposes an indefinite travel ban based on nationality, rather than a 90–day "pause," such an action cannot fairly be construed as a change in "procedures" or the "location" of visa processing. § 1152(a)(1)(B).

The Court therefore finds that Plaintiffs are likely to succeed on the merits of their claim that the Proclamation violates the non-discrimination provision of § 1152(a) to the extent it bars entry by immigrants on the basis of nationality. Because this argument does not apply to nonimmigrants seeking entry to the United States, the Court must consider Plaintiffs' remaining statutory arguments.

### 2. Section 1182(f) Finding

**[41]** Plaintiffs further contend that the President has failed to make an adequate finding to support his invocation of authority under § 1182(f). Section 1182(f) requires that the President *find* that the entry of a class of aliens *would be detrimental* to the *interests of the United States*. 8 U.S.C. § 1182(f) (emphasis added); *see also Hawaii*, 859 F.3d at 770, 774 (concluding that EO–2 did not contain adequate findings that the entry of nationals from the countries subject to that travel ban would be detrimental to the interests of the United States). The INA does not define key elements of this requirement, such as "find" or "detrimental to the interests of the United States." *See* 8 U.S.C. § 1101 (defining terms used in the INA). "Classes of aliens" is also not defined, but examples are given in 8 U.S.C. § 1182(a). These examples include aliens who have "engaged in a terrorist activity," § 1182(a)(3)(B)(i)(I), and "illegal entrants and immigration violators," § 1182(a)(6). None of these examples are based on nationality. *See* §§ 1182(a)(1)–(10).

The President explicitly made the finding that "absent the security measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons" barred from entry by the proclamation

"would be detrimental to the interests of the United States." Procl. pmbl. In support of that finding, the Proclamation describes two purposes. First, the Proclamation helps to prevent the "entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States." Procl. § 1(h)(i). Second, the Proclamation will help "elicit improved identity-management and information-sharing protocols and practices from foreign governments" and thus "advance foreign policy, national security, and counterterrorism objectives." *Id.* The Proclamation contains additional information in support of its conclusion that a ban on entry of Designated Country nationals will further these two goals. With regard to addressing information deficiencies, the Proclamation states that "information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols of the United States," and, citing the September 15, 2017 DHS Report, concludes that seven of the Designated Countries "continue to have 'inadequate identity-management protocols, information-sharing practices, and risk factors." Procl. § 1(b), (g). It further states that Somalia, although not identified as inadequate in the DHS Report, "lacks command and control of its territory" such that its ability to share information about nationals who pose terrorist risks is compromised. *Id.* § 2(h)(i). Without this information from the Designated Countries, the President finds, nationality-based restrictions are needed to prevent the entry of individuals about whom there is insufficient risk information. *Id.* § 1(h)(i). According to the Proclamation, a nationality-based policy also fits with the diplomatic purpose of the Proclamation to encourage foreign governments to improve their information-sharing practices. *See Hawaii*, 859 F.3d at 772 n.13 (noting that the two past nationality-based entry bans as to Cuba and Iran were for "retaliatory diplomatic measures responsive to government conduct").

**\*23** Plaintiffs assert compelling arguments that the Proclamation's nationality-based restrictions are not actually necessary. Under current policy, applicants for immigrant or nonimmigrant visas, not their governments, are required to produce the information necessary to demonstrate that they are eligible to enter the United States. *See* 8 U.S.C. § 1361. Dozens of former national security officials have stated that this travel ban is unnecessary, that it serves no national security purpose,

and that there is no evidence that the United States needs to shift away from this individualized vetting system to nationality-based bans. *See* Joint Decl. of Former Nat'l Sec. Officials, J.R. 770. Notably, the Proclamation does not provide examples of vetting failures involving nationals from the Designated Countries that resulted in the entry of terrorists or others who should not have been admitted.

Plaintiffs also question the choices made in the Proclamation given that Somalia met the Proclamation's baseline criteria and was included in the entry ban, while Iraq did not meet the baseline criteria but was not included. Procl. § 1(g), 2(h). Further, the Proclamation appears to be overbroad with regard to its purported goals. It prohibits almost all Designated Country nationals from entering the United States, regardless of age, health, or even connection to the Designated Country itself. At least one of the Plaintiffs, Dr. Sumaya Hamadmad, seeks to reunite with her sister, a Syrian national who has spent her entire life in Jordan, about whom the Syrian government would have no relevant information.

Under a more robust standard of review, these criticisms might carry the day. But there is no requirement that a § 1182(f) entry restriction meet more stringent standards found elsewhere in the law, such as that it be "narrowly tailored" or the "least restrictive means" to obtain its stated aims. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); 42 U.S.C. § 2000bb–1(b)(2) (2012). The text of § 1182(f) does not even require the President to find that suspending the entry of a class of aliens would be detrimental to national security, only that it is detrimental to the *interests* of the United States. 8 U.S.C. § 1182(f). Under this broad standard, previous § 1182(f) proclamations have provided far less detail regarding their findings. *See, e.g.,* Proclamation 8,015, 71 Fed. Reg. 28,541 (May 12, 2006) (barring entry of members of the Government of Belarus based on "the importance to the United States of fostering democratic institutions in Belarus"); Exec. Order. No. 12,807, 57 Fed. Reg. 21,133 (May 24, 1992) (barring entry of "any defined vessel carrying [illegal] aliens" based on a finding that "there continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally"). Against this background, the Court cannot

J.A. 690

AR1420

conclude that Plaintiffs are likely to succeed on their claim that the Proclamation fails to make a finding of detrimental interest sufficient to invoke § 1182(f).

### 3. Section 1182(f) Authority

Lastly, Plaintiffs argue that the Proclamation's ban on entry of nationals from the Designated Countries exceeds the authority granted to the President in § 1182(f). Specifically, Plaintiffs assert that the Proclamation effectively revises the INA by imposing alternative visa issuance criteria that conflict with statutory criteria and thereby overrides Congress's policy judgments, particularly those made in establishing the Visa Waiver Program ("VWP"). Defendants counter that (1) the issue of whether the Proclamation exceeds the authority granted in § 1182(f) is not judicially reviewable; and (2) even if subject to review, the Proclamation is an appropriate use of the President's broad authority under § 1182(f). Although the Proclamation also relies on § 1185(a)(1), the parties do not argue that this section provides broader authority than § 1182(f). Therefore, the Court need only consider whether the Proclamation exceeds the President's delegated authority under § 1182(f).

**\*24** **[42]** **[43]** The Court first addresses Defendants' claim that the President's exercise of authority pursuant to § 1182(f) is not subject to judicial review. In Defendants' view, review of § 1182(f) would be inappropriate because it would amount to a second-guessing of a decision that is appropriately committed to the President. Yet the Supreme Court had no difficulty reaching the merits of a challenge asserting that the President's use of § 1182(f) to blockade illegal migrants from Haiti violated another provision of the INA. *See Sale*, 509 U.S. at 170–74, 187, 113 S.Ct. 2549. Moreover, in evaluating Plaintiffs' argument, the Court is not second-guessing the President's discretion, but examining whether the Proclamation fits within the President's grant of authority. Such review of whether executive action exceeds statutory authority is plainly within the purview of the courts. *See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry*, — U.S. ——, 135 S.Ct. 2076, 2090, 192 L.Ed.2d 83 (2015) (reviewing whether the President's decision to not list "Jerusalem, Israel" as a birthplace on a passport conflicted with a provision of the 2003 Foreign Relations Authorization Act); *Dames & Moore*, 453 U.S.

at 668, 101 S.Ct. 2972 (stating, in reviewing a claim that President Carter's actions in freezing Iranian assets during the Iran Hostage Crisis exceeded his statutory and constitutional authorities, that "the validity of the President's action, at least so far as separation-of-powers principles are concerned, hinges on a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action"). Thus, the Court rejects the argument that it may not review Plaintiffs' claim that the Proclamation exceeds the authority granted in § 1182(f).

**[44]** Plaintiffs' claim centers on two alleged transgressions. First, Plaintiffs argue that the Proclamation imposes new criteria on the issuance of visas that conflict with Congress's statutorily established criteria. Indeed, although the text of § 1182(f) authorizes the President only to "suspend the entry" of classes of immigrants and nonimmigrants, the Proclamation goes further. The Proclamation does not stop nationals of the Designated Countries from entering the United States if they already have a valid visa or if they are able to obtain one through the processes described in the Proclamation. Rather, as with EO–2, the Proclamation effectuates the travel ban by using the visa issuance process. *See Hawaii*, 859 F.3d at 777 (noting the Government's acknowledgment that "the entry ban" under EO–2 "would be implemented through visa denials"). Thus, Plaintiffs correctly observe that the Proclamation goes beyond mere suspension of entry and delves into the criteria for issuing visas to nationals of the Designated Countries. Specifically, the Proclamation allows a consular officer to issue waivers to such nationals that would be "effective both for the issuance of a visa and for any subsequent entry on that visa." Procl. § 3(c)(iii). These waivers may be granted only if a foreign national demonstrates that denial of entry would cause "undue hardship," that entry would not pose a threat to the United States, and that entry will be in the "national interest." Procl. §§ 3(c)(i)(A), (C). The Proclamation then directs the Secretary of State and the Secretary of Homeland Security to establish guidance for consular officials to use when making waiver determinations and establishes factors that the guidance must consider along with specific factual scenarios that would generally justify a waiver.

Arguably, these criteria conflict with Congress's detailed system governing the issuance of immigrant and

International Refugee Assistance Project v. Trump, Not Reported in... 
2017 WL 4674314

nonimmigrant visas. As part of this system, Congress places on applicants for visas the burden to establish eligibility, including to show that they do not fall into any categories of individuals ineligible for visas. *See* 8 U.S.C. § 1361; *id.* § 1182(a). These categories include those with possible links to terrorism or criminal activity. *See* 8 U.S.C. §§ 1182(a)(2)-(3)(B). Plaintiffs thus assert, with some force, that the Proclamation adds additional criteria that nationals of the Designated Countries must satisfy before they can obtain an immigrant or nonimmigrant visa to gain entry to the United States. This addition of such criteria, Plaintiffs argue, impermissibly replaces Congress's list of criteria with the President's own. The Court agrees that, as constructed, the Proclamation effectively adds new criteria for the issuance of visas and entry by nationals of certain countries beyond those formally imposed by Congress.

*25 Second, Plaintiffs argue that the Proclamation exceeds the bounds of § 1182(f) because it conflicts with Congress's policy judgments in addressing the same problem purportedly addressed by the Proclamation: poor information sharing by foreign governments. As evidence, Plaintiffs reference the VWP, established by Congress, which allows nationals of certain foreign countries to enter the United States for periods of less than 90 days without a visa. 8 U.S.C. § 1187(a)(1). To be eligible for this program, a country must meet certain standards relating to cooperation and the sharing of information with the United States. § 1187(c)(2). Notably, many of the standards applied to determine if a country qualifies for the VWP are strikingly similar to those considered in the Proclamation. For example, among the criteria for VWP eligibility are whether a country provides its nationals with an electronic machine-readable passport containing biographic and biometric data, § 1187(a)(3), and whether the country reports lost and stolen passports to the United States, § 1187(c)(2)(D). The Proclamation lists these same criteria as "identity management information" considered in the assessment whether a country should be added to the travel ban list. Procl. § 1(c)(i). Other VWP criteria include whether a foreign government shares information on whether its nationals traveling to the United States pose a security threat, 8 U.S.C. § 1182(c)(2)(F), the same type of information considered by the Proclamation under the category of "National security and public-safety information," Procl. § 1(c)(ii). Likewise, the VWP considers whether a country is a safe haven for terrorists, 8 U.S.C. § 1187(a)(12)(D)(ii)(III), and whether

the country generally accepts the repatriation of its own nationals subject to orders of removal from the United States, § 1187(c)(2)(E). These factors, along with whether a country is a participant in the VWP program itself, are the "National security and public-safety risk assessment" factors considered by the Proclamation in assessing whether a country should be subject to the travel ban. Thus, in determining which countries to subject to a travel ban, the Proclamation duplicates many of the same criteria, and revisits many of the same issues, that Congress considered in crafting the VWP.

Further, the Proclamation imposes a travel ban on some of the same nations, based on the some of the same criteria, on which Congress imposed lesser restrictions in its recent amendments to the VWP. In 2015, Congress amended the VWP to exclude individuals from participating countries who were dual citizens of, or had traveled to, Iraq, Syria, a country designated by the State Department as a state sponsor of terrorism (Iran, Syria, and Sudan), or other countries designated by the Department of Homeland Security (Libya, Somalia, and Yemen). *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, Pub. L. No. 114–113, Div. O, Title II, § 203, 129 Stat. 2242 (codified at 8 U.S.C. § 1187(a)(12)). For example, a French national who had traveled to Syria or was also a Syrian national would not be eligible for visa-free travel to the United States, even though France is a VWP country. Instead, Congress required such an individual to apply for a nonimmigrant visa and submit to a consular interview and adjudication by a consular officer. *See* 8 U.S.C. § 1187(a)(12). In light of this statutory scheme, Plaintiffs argue that the Proclamation exceeds the bounds of § 1182(f) because it conflicts with Congress's policy judgments relating to the same issues and same nations. The Court agrees with Plaintiffs that the Proclamation addresses some of the same issues considered by Congress, specifically, information sharing by foreign nations relating to travel of foreign nationals to the United States and the consequences for failing to engage in it, and that the Proclamation imposes significantly more restrictive limitations that go beyond what Congress has previously imposed.

Contrary to the Defendants' characterization, Plaintiffs' claim is not one of implied repeal. *See Branch v. Smith*, 538 U.S. 254, 273, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003) (establishing the standard for claims that a later

Appeal 18-1521, Document 20-3, Filed 07/02/2018, Page 171 of 1026
Case 1:17-cv-05228-NGG-VMS Document 52-7 Filed 09/04/20 Page 171 of 1026 PageID #: 9762

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 158 of 442

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

provision has effectively revealed a prior provision). No one is arguing that § 1182(f) has effectively been repealed. Rather, Plaintiffs' argument appears to be that Congress's legislative action, in enacting the VWP and criteria for issuance of visas, has implicitly limited the President's § 1182(f) authority to bar intrusions into these areas. In a different context, the Supreme Court recognized a similar theory when it held that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken separately and more specifically to the topic at hand." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (holding that the Food and Drug Administration's statutory authority to regulate medical "devices" did not extend to regulation of tobacco, in part because Congress's frequent legislation relating to tobacco signaled that Congress did not intend that result). Indeed, not only has Congress amended the VWP as recently as 2015, but it has regularly revised various aspects of the immigration statute affecting visa issuance over the past 15 years. *See, e.g.,* Consolidated Appropriations Act, Pub. L. No. 110–161, Div. J, § 691(d), 121 Stat. 1844 (2008) (designating the Taliban as a terrorist organization representatives of which are inadmissible under the INA); Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108–458, § 7203, 118 Stat. 3638 (requiring that all visa applications be reviewed and adjudicated by a consular officer). Thus, Plaintiffs have offered a legitimate theory that the Proclamation has gone beyond suspending entry into legislating changes to Congress's statutory scheme.

**\*26** However, this theory is undermined in two ways. First, with respect to the new visa issuance criteria arising from the waiver provisions, § 1182(f) explicitly grants the President the authority not just to suspend entry, but to "impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Thus, even if the waiver requirements are deemed to be additional criteria that must be met by an alien seeking admission, a fair reading of § 1182(f) is that it allows the President to impose such additional restrictions outside of previously listed requirements.

Second, it is not clear that the Proclamation directly conflicts with the judgments reflected in Congress's construction of the VWP. The VWP covers certain participating countries that have agreed to abide by certain conditions set by the United States, including

information-sharing conditions, in exchange for visa-less travel to the United States for their nationals. *See* 8 U.S.C. § 1187(c)(2). It does not directly address whether nationals of certain non-VWP countries should be subject to even greater scrutiny than the standard visa issuance process. Likewise, the 2015 amendments related to the treatment of nationals of VWP countries who were either dual nationals of or had traveled to certain countries, including five of the countries covered by the Proclamation. *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015 § 203. Those individuals are not affected by the Proclamation. *See* Procl. § 3(b)(iv) (excepting dual nationals of Designated Countries traveling on a passport of a different country). Thus, although the Proclamation and the VWP address similar problems and consider similar factors, the two are not in such conflict that the VWP could fairly be deemed to foreclose the restrictions imposed through the Proclamation pursuant to § 1182(f). The Court therefore does not conclude that there is a likelihood of success on the claim that the Proclamation has effectively legislated changes to the INA in contravention of Congressional intent.

Finally, Plaintiffs point to the sheer scope of the Proclamation and argue that it must be beyond the limit of any authority delegated by Congress. Indeed, the Proclamation is unique among past invocations of § 1182(f). Of the 42 proclamations issued pursuant to § 1182(f) or § 1185(a)(1) prior to EO–1, none have sought to ban entry by nationals of more than one country at once, let alone eight countries with approximately 150 million nationals. *See* Kate M. Manuel, Cong. Research Serv., R44743, Executive Authority to Exclude Aliens: In Brief 6–10 (2017). The only uses of § 1182(f) or § 1185(a)(1) to bar entry by nationals of a specific country were triggered by a specific foreign policy dispute: the Iran Hostage Crisis and a decision by the Cuban government to cancel a migration agreement with the United States. Exec. Order No. 12,172, 44 Fed. Reg. 67947; Exec. Order No. 12,206, 45 Fed. Reg. 24,101; Proclamation No. 5,517, 51 Fed. Reg. 30,470. None explicitly affected the issuance of visas to the same extent as the Proclamation. Indeed, most § 1182(f) proclamations were issued in response to a discrete event and were limited to a specific group of individuals associated with that event. Manuel, *supra*, at 6–10. As a typical example, President Clinton invoked § 1182(f) to suspend entry of Sudanese government and military officials for their

failure to comply with a United Nations Security Council Resolution. *See, e.g.,* Proclamation No. 6,958, 61 Fed. Reg. 60,007 (Nov. 22, 1996); *see also* Exec. Order No. 13,606, 77 Fed. Reg. 24,571 (Apr. 22, 2012) (suspending entry of certain persons associated with human rights abuses by the Iranian and Syrian governments through the use of information technology). Thus, the Proclamation is unprecedented in its combination of a broad sweep impacting millions of people based on their nationality, its imposition of additional criteria for visa issuance, and its arguable conflict with Congressional immigration policy. If there is an example of a § 1182(f) order, past or present, that exceeds the authority of that statute, it would be this one.

**\*27** But other than the specific nationality restriction of § 1152(a), Plaintiffs have not identified, nor has the Court found, any clear limit on the President's authority under § 1182(f) that this proclamation has crossed. Nor have Plaintiffs cited any case where a court has struck down a § 1182(f) order as beyond the scope of that provision. In the only Supreme Court decision considering such an argument, the Court held that the statute gave "the President ample power to establish a naval blockade" to prevent Haitian migrants from entering the United States. *Sale*, 509 U.S. at 187, 113 S.Ct. 2549. Rather, courts have generally recognized that § 1182(f) provides the President with a "sweeping proclamation power." *Abourezk*, 785 F.2d at 1049 n. 2; *see Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992) (stating that § 1182(f) provides the President with "broad discretionary authority"); *Allende*, 845 F.2d at 1117–1118 (stating that § 1182(f) grants the President "vast power to exclude any individual alien or class of aliens whose entry might harm the national interest"); *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980) (referring to § 1182(f) as an "extreme power").

The text of the statute itself is similarly unhelpful for discerning its limit. As discussed above, § 1182(f) does not impose a time limit on the President, stating that any restriction is "for such period as he shall deem necessary." 8 U.S.C. § 1182(f). The President can impose restrictions on "any aliens or [ ] any class of aliens." *Id.* The President is not required to find that entry would be detrimental to the nation's security, only to its "interests," a term that encompasses any number of reasons. *Id.*

Nevertheless, Plaintiffs are correct that there must be some limit on § 1182(f) authority. *See, e.g., Kent v. Dulles*, 357 U.S. 116, 129–30, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (holding that a broad statute authorizing the Secretary of State to issue passports under rules established by the President did not allow the Secretary to deny passports to Communists due to constitutional considerations); *Zemel v. Rusk*, 381 U.S. 1, 7, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (noting that statutes affecting foreign relations often "leave the exercise of power to [the President's] unrestricted judgment," but that does not mean that the President has "totally unrestricted freedom of choice"). For example, Plaintiffs persuasively argue that the use of § 1182(f) to rewrite immigration law, such as to ban all family-based immigrant visas, would likely go too far. But that line has yet to be drawn. Where the Proclamation does not clearly run afoul of any identified limit on § 1182(f) authority with regard to nonimmigrant visas, the Court cannot find that Plaintiffs have shown a likelihood of success on the merits of this claim. Because Plaintiffs' statutory arguments do not support their requested relief in its entirety, the Court must consider their constitutional claims.

**B. Establishment Clause**
Plaintiffs assert that the Proclamation's ban on citizens from the Designated Countries is the next step in a "clear and direct chain" that began with President Trump's campaign promise to ban Muslims from entering the United States and continued through EO–1 and EO–2. IRAP Mot. Prelim. Inj. at 24. They argue that the Proclamation therefore violates the Establishment Clause.

**1. Legal Standard**

Defendants first argue that Plaintiffs' Establishment Clause claim summarily fails upon application of the standard set forth in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). Under *Mandel*, pursuant to Congress's plenary power over immigration, courts review a claim that a consular officer denied a visa in contravention of constitutional rights only to determine whether there was a "facially legitimate and bona fide reason" for the denial, in which case the court will not "look behind the exercise of that discretion." *Id.* at 770, 92 S.Ct. 2576 (rejecting a claim that the denial of a visa to Mandel, a Marxist, violated the First Amendment

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

rights of professors who invited him to speak because the Government offered the facially legitimate reason that on a prior visit, Mandel had engaged in activities outside the scope of his visa). Although *Mandel* involved the denial of an individual visa, the Supreme Court extended the use of the "facially legitimate and bona fide" standard to a categorical immigration determination in *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), where a father alleged that the INA's grant of an immigration preference to illegitimate children based on their relationship with their mothers, but not their fathers, violated the Equal Protection Clause. *Id.* at 788–89, 795, 97 S.Ct. 1473.

**\*28** **[45]** There are persuasive reasons to conclude that the *Mandel* standard does not apply to Plaintiffs' Establishment Clause claim. First, there is a more recent line of cases recognizing that courts must not simply defer to the political branches when constitutional rights are at stake. *See Zadvydas v. Davis*, 533 U.S. 678, 695, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (emphasizing that in immigration matters, the judicial branch is not required wholly to defer to the political branches because their plenary "power is subject to important constitutional limitations"); *Chadha*, 462 U.S. at 940–41, 103 S.Ct. 2764 (underscoring that even when another branch of government has "plenary authority," courts may still review whether that branch chose "a constitutionally permissible means of implementing that power"). Here, where the right at issue arises from the Establishment Clause, the *Mandel* standard is a poor fit because the core harm of a violation of the Establishment Clause, as opposed to the Free Speech Clause or the Equal Protection Clause, is not a limitation on an individual's right—whether to speak, listen, or be treated equally to another—but the dissemination of a public message that the Government has adopted an official policy of favoring one religion. A "facially legitimate and bona fide" standard designed to evaluate an individual visa determination is therefore not compatible with a fair evaluation of that public message, which necessarily requires some evaluation of the purpose behind the message. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 532, 113 S.Ct. 2217 (stating that an Establishment Clause violation consists of "an official purpose" to disapprove of a religion). Notably, the Supreme Court has not applied the *Mandel* standard to an Establishment Clause claim.

**[46]** **[47]** Nevertheless, in light of the Fourth Circuit's application of *Mandel* to its review of EO–2, *see IRAP*, 857 F.3d at 588–91, Plaintiffs do not seriously contest, and this Court accepts, the applicability of *Mandel*. The Court then looks to the concurring opinion of Justice Kennedy in *Kerry v. Din*, — U.S. ——, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015), to understand the distinction between "facially legitimate" and "bona fide." *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (citation omitted). An action is "facially legitimate" if there is a valid reason for it on the face of the action. *Din*, 135 S.Ct. at 2140–41 (Kennedy, J. concurring). An action is "bona fide" if there has been no "affirmative showing of bad faith" by the decisionmaker. *Id.* at 2141. Based on *Din*, this Court concludes that if there is a particularized showing of bad faith, a court should then "look behind" the action to evaluate its justification. *Id.* at 2140–41; *see also IRAP*, 857 F.3d at 590–91.

**[48]** Here, the Proclamation states that the President, pursuant to § 1182(f) and § 1185(a), is suspending entry into the United States of nationals from the Designated Countries "to protect the security and interests of the United States and its people." Procl. pmbl. This national security interest is a facially legitimate reason for the actions set forth in the Proclamation, to the extent authorized by those statutes. *See Din*, 135 S.Ct. at 2140 (Kennedy, J. concurring).

Plaintiffs, however, assert that the Proclamation's proffered national security rationale is not the true motivation behind the restrictions, but is instead a pretext for an anti-Muslim bias. In support of their assertion of bad faith, Plaintiffs, as part of their challenge to EO–2, previously offered President Trump's statements during his presidential campaign calling for a "Muslim ban"; his statements that he would fulfill his campaign promise of a Muslim ban by focusing on territories rather than religion; EO–1, adopted without agency consultation, which targeted only majority-Muslim countries and contained preferences for religious minorities within those countries; and statements of President Trump and his advisors that EO–2 had the same policy goals as EO–1. Plaintiffs also pointed to the continued focus in EO–

AR1425

Case 1:17-cv-05228-NGG-VMS   Document 57-7   Filed 09/04/20   Page 174 of 1026 PageID #: 9765

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 161 of 442
International Refugee Assistance Project v. Trump, Not Reported in F.Supp.3d (2017)
2017 WL 4674314

2 on countries with majority-Muslim populations, and what they asserted was a lack of correlation between the stated national security aims of EO–2 and the mechanisms outlined to achieve it. Based on these facts, this Court concluded that the primary purpose for EO–2 was to effect the equivalent of a Muslim ban. *IRAP*, 241 F.Supp.3d at 560, 562–63. The Court now reaffirms that finding for purposes of the present analysis.

**\*29** In their challenge to the Proclamation, Plaintiffs link it to this history of bad faith by noting that the Proclamation is the specific result of the President's directive in EO–2 that agencies develop a list of countries to be subject to a travel ban. They have supplemented the previous factual record with statements by President Trump since and toughening of the travel ban. They again note what they see as the misalignment between the stated national security goals of the ban and the means implemented to achieve them. They also assert that the Proclamation continues disproportionately to affect Muslims, despite the inclusion of two non-Muslim majority nations on the list of Designated Countries. This combined record provides facts that plausibly allege with sufficient particularity an affirmative showing of bad faith in the stated rationale for the Proclamation. *Din*, 135 S.Ct. at 2141 (Kennedy, J., concurring).

Having found that Plaintiffs have plausibly alleged that the Government's stated, facially legitimate, reason for the Proclamation is not bona fide, this Court "look[s] behind" that stated reason. *See id.* at 2140–41. The Court thus turns to a traditional constitutional analysis, in this case by applying the traditional tests for evaluating an Establishment Clause claim. *See Zadvydas*, 533 U.S. at 695, 121 S.Ct. 2491; *Chadha*, 462 U.S. at 940–41, 103 S.Ct. 2764; *see also IRAP*, 857 F.3d at 590–91.

**[49]  [50]** The First Amendment prohibits any "law respecting an establishment of religion," U.S. Const. amend. I, and "mandates governmental neutrality between religion and religion, and between religion and nonreligion," *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). When a government action does not differentiate among religions on its face, courts apply the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to evaluate an Establishment Clause challenge. *See Hernandez v. C.I.R.*, 490 U.S. 680, 695, 109 S.Ct. 2136, 104 L.Ed.2d

766 (1989). Under *Lemon*, to withstand an Establishment Clause challenge (1) an act must have a secular purpose, (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) it must not "foster 'an excessive government entanglement with religion.' " *Id.* at 612–613, 91 S.Ct. 2105 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). All three prongs of the test must be satisfied. *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

**[51]  [52]  [53]** As the first prong of the *Lemon* test makes clear, in Establishment Clause cases, "purpose matters." *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 n.14, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). Thus the purpose test is not satisfied by the identification of any secular purpose. *McCreary*, 545 U.S. at 865 n.13, 125 S.Ct. 2722. Such a rule "would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action." *Id.* ("[A]n approach that credits *any* valid purpose ... has not been the way the Court has approached government action that implicates establishment." (emphasis added)). Although governmental statements of purpose generally receive deference, an identified secular purpose must be "genuine, not a sham, and not merely secondary to a religious objective." *Id.* at 864, 125 S.Ct. 2722. Further, if a religious purpose for the government action is the predominant or primary purpose, and the secular purpose is "secondary," the purpose test has not been satisfied. *Id.* at 860, 862–65, 125 S.Ct. 2722; *see also Edwards*, 482 U.S. at 594, 107 S.Ct. 2573 (finding a violation of the Establishment Clause where the "primary purpose" of the challenged act was "to endorse a particular religious doctrine").

**[54]  [55]  [56]** An assessment of the purpose of an action is a "common" task for courts. *McCreary*, 545 U.S. at 861, 125 S.Ct. 2722. An "understanding of official objective" can emerge from "readily discoverable fact" without "any judicial psychoanalysis" of the decisionmaker. *Id.* at 862, 125 S.Ct. 2722. In determining purpose, a court acts as an "objective observer" who considers "the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." *McCreary*, 545 U.S. at 862, 125 S.Ct. 2722 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000)). Because "the world is not made brand new every morning," *McCreary*, 545

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

U.S. at 866, 125 S.Ct. 2722 (quoting *Santa Fe*, 530 U.S. at 315, 120 S.Ct. 2266), the Court must also consider the "historical context" of a challenged action and the "specific sequence of events" leading up to it. *Edwards*, 482 U.S. at 594–95, 107 S.Ct. 2573. Such evidence is "perfectly probative" and considering it is a matter of "common sense," because when determining purpose, courts are "forbid[den] ... 'to turn a blind eye to the context in which [the] policy arose.'" *McCreary*, 545 U.S. at 866, 125 S.Ct. 2722 (quoting *Santa Fe*, 530 U.S. at 315, 120 S.Ct. 2266).

### 2. Historical Context

**\*30** This Court previously applied the *Lemon* test to EO–2 and found that it likely failed the purpose prong because there was substantial direct evidence that the travel ban was motivated by a desire to ban Muslims as a group from entering the United States. *IRAP*, 241 F.Supp.3d at 560, 562–63. In making this factual determination, the Court relied largely on a record of public statements made by President Trump and his advisors before his election, before the issuance of EO–1, and after the decision to issue EO–2. *Id.* at 558–59, 562, 564. *See Green v. Haskell Cty. Bd. of Comm'rs*, 568 F.3d 784, 801 (10th Cir. 2009) (considering quotations from county commissioners that appeared in news reports in finding that a Ten Commandments display violated the Establishment Clause); *Glassroth v. Moore*, 335 F.3d 1282, 1282, 1284–85, 1297 (11th Cir. 2003) (finding an Establishment Clause violation based on a record that included the state chief justice's campaign materials, including billboards and television commercials, proclaiming him to be the "Ten Commandments Judge").

That record revealed that on December 7, 2015, while still a Republican primary candidate, Trump posted a "Statement on Preventing Muslim Immigration" on his campaign website "calling for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on." J.R. 85. Then in a March 22, 2016 Fox Business interview, Trump reiterated his call for a ban on Muslim immigration, explaining that his call for the ban had gotten "tremendous support" and that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country." J.R. 261. On December 21, 2016, when asked whether a recent attack in Germany affected his proposed Muslim ban, President–Elect Trump replied, "You know my plans. All along, I've proven to be right. 100% correct." J.R. 245. After becoming the Republican presidential nominee, Trump clarified his plans for a Muslim ban. In a July 24, 2016 interview on *Meet the Press*, Trump asserted that immigration should be immediately suspended "from any nation that has been compromised by terrorism." J.R. 219. When questioned whether his new formulation was a "rollback" of his call for a "Muslim ban," he described it as an "expansion" and explained that "[p]eople were so upset when I used the word Muslim," so he was instead "talking territory instead of Muslim." J.R. 220.

Within a week of taking office, President Trump issued EO–1. Upon signing it, President Trump remarked, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.' We all know what that means." J.R. 142. The next day, Mayor Giuliani asserted on Fox News that President Trump told him he wanted a Muslim ban and asked Giuliani to "[s]how me the right way to do it legally." J.R. 247. Giuliani explained that, after consulting with others, he proposed that the action be "focused on, instead of religion ... the areas of the world that create danger for us," specifically "places where there are [sic] substantial evidence that people are sending terrorists into our country." J.R. 247–48.

EO–1 mirrored this rhetoric. It suspended for 90 days the immigrant and nonimmigrant entry into the United States of aliens from Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen, all countries where the vast majority of the population is Muslim. The stated purpose of this suspension was to "protect the American people from terrorist attacks by foreign nationals admitted to the United States." EO–1 pmbl. EO–1 cautioned that this threat required the United States to be "vigilant during the visa-issuance process," a process that "plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States." EO–1 § 1. However, EO–1 contained no facts tying the seven banned countries to any particular terror threats or to any visa-issuance failures. EO–1 also expressly drew distinctions based on religion, requiring that refugee claims on the basis of religious persecution be prioritized for individuals who were members of a minority religion in their country of nationality.

**\*31** EO–1 was issued without traditional interagency consultation. Considering this abbreviated process, the

J.A. 697

AR1427

Appeal: 18-1521 Case 1:17-cv-02228-NCG-VMS Filed: 07/02/2018 Doc: 57 Document 29-2 Filed 09/04/2018 Page 176 of 1026 PageID #: 9767

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 163 of 442

International Refugee Assistance Project v. Trump, Not Reported in F.Supp.3d... (2017)
2017 WL 4674314

similarity between the provisions of EO–1 and the public statements about the form the promised Muslim ban would take, the express references to religion within its text, and the lack of any articulated connection between the scope of the ban and particular national security threats, this Court concluded, in resolving the motion for a preliminary injunction against EO–2, that there was a "convincing case" that the purpose of EO–1 was "to accomplish, as nearly as possible, President Trump's promised Muslim ban" through a policy of restricting entry of nationals of predominantly Muslim countries deemed to be dangerous territory. *IRAP*, 241 F.Supp.3d at 558–59. This Court reaffirms this finding for purposes of the present analysis.

That conclusion echoed the determination of the United States District Court for the Eastern District of Virginia, which had enjoined EO–1 on Establishment Clause grounds. *Aziz*, 234 F.Supp.3d at 730, 737–38 (quoting from a July 17, 2016 interview during which then-candidate Trump, upon hearing a tweet stating "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional," responded "So you call it territories. OK? We're gonna do territories."). Similarly, in reviewing a TRO halting EO–1, the Ninth Circuit opined that an Establishment Clause claim as to EO–1 raised "serious allegations" and presented "significant constitutional questions." *Washington*, 847 F.3d at 1168.

EO–2 followed only six weeks after EO–1. EO–2 again instituted a 90–day suspension of entry from Designated Countries. However, EO–2 removed Iraq from the list of Designated Countries, which was otherwise the same, exempted certain categories of individuals from the ban, and delineated other categories of individuals who might be eligible for a case-by-case waiver. It also removed the preference for refugees from religious minorities and contained no express mention of religion. EO–2 contained a more fulsome factual predicate for its stated national security purpose, asserting that there is a heightened risk that individuals from the Designated Countries will be "terrorist operatives or sympathizers" because each Designated Country is "a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," such that their governments will therefore be less willing or able to "share or validate important information about individuals seeking to travel to the United States." EO–2 § 1(d).

EO–2 required that the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, conduct a "worldwide review to identify whether, and if so what, additional information" would be needed from each foreign country to adjudicate a visa application and determine that the applicant is not a security threat. EO–2 § 2(a). A report on that review was to be submitted 20 days after the effective date of EO–2. Then, the Secretary of State was to begin a 50–day process of requesting that foreign governments bring their practices into compliance with any of the report's recommendations. After that period, the Secretary of Homeland Security, after consultation with the Secretary of State and the DNI, was to "submit to the President of list of countries recommended for inclusion in a Presidential proclamation that would prohibit entry of appropriate categories of foreign nationals of countries that have not provided the information requested." EO–2 § 2(e). This review and recommendation plan (collectively, the "DHS Review") was largely unchanged from a comparable review process contained in EO–1.

In public statements, the Trump Administration repeatedly emphasized that EO–2 was, in substance, the same as EO–1. On February 16, 2017, before EO–2 was issued, Stephen Miller, Senior Policy Advisor to the President, characterized the changes made as "mostly minor technical differences" and asserted that the "basic policies are still going to be in effect." J.R. 319. When EO–2 was signed on March 6, 2017, White House Press Secretary Sean Spicer emphasized that "[t]he principles of the [second] executive order remain the same" as those of EO–1. J.R. 118. EO–2 itself explicitly stated that changes from EO–1, particularly the addition of exemption and waiver categories, were made to address "judicial concerns." EO–2 § 1(i).

**\*32** Considering EO–2 in this context, this Court concluded that despite the modifications from EO–1 and the removal of any reference to religion, the history of public statements "continued to provide a convincing case that the purpose of EO–2 remains the realization of the long-envisioned Muslim ban." *IRAP*, 241 F.Supp.3d at 559. In so finding, the Court determined that the core policy outcome of a ban on entry of nationals from the Designated Countries remained intact, that EO–2 continued to have the same practical mechanics of a Muslim ban by another name that President Trump

J.A. 698

AR1428

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

had so publicly described, and that the national security rationale, under the circumstances, represented at most a secondary purpose for the travel ban. *Id.* at 559–60, 562-63. This Court accordingly found that the Plaintiffs were likely to succeed on their claim that EO–2 violated the Establishment Clause. *Id.* at 560, 564; *see also IRAP,* 857 F.3d at 601. The Court reaffirms this finding for purposes of the present analysis.

[57] [58] It is against this backdrop that the Court must now assess the likelihood of success of Plaintiffs' claim that the Proclamation violates the Establishment Clause. Because "reasonable observers have reasonable memories," past Establishment Clause violations are relevant to the assessment of present government actions. *McCreary,* 545 U.S. at 866, 874, 125 S.Ct. 2722. *See Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 315, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (rejecting the argument, in a case involving successive school-prayer policies, that adoption of a new, facially neutral school-prayer policy "insulates the continuation of such prayers from constitutional scrutiny," because any such inquiry "must include an examination of the circumstances surrounding its enactment"). When faced with allegations of a successive Establishment Clause violation, a court must thus not lapse into the role of "an absentminded objective observer," but must instead remain "familiar with the history of the government's action and competent to learn what history has to show." *McCreary,* 545 U.S. at 866, 125 S.Ct. 2722. Here, where EO–1 and EO–2 were each likely to violate the Establishment Clause, and the third iteration, the Proclamation, was issued close on their heels—within nine and six months, respectively—it is "common sense" that the Proclamation stands in their shadow. *McCreary,* 545 U.S. at 855, 869–72, 874, 125 S.Ct. 2722 (evaluating the purpose of a third proposed display of the Ten Commandments in light of two prior proposals made within the course of a year).

[59] [60] However, past actions do not "forever taint" present ones. *McCreary,* 545 U.S. at 874, 125 S.Ct. 2722. While courts should reject an "implausible claim that governmental purpose has changed," they should also "take account of genuine changes in constitutionally significant conditions." *Id.* The Supreme Court has not articulated what kind of changes are necessary to obviate the taint of a prior Establishment Clause violation. On this point, *Felix v. City of Bloomfield,* 841 F.3d 848 (10th Cir. 2016), cited by Defendants,

is instructive. In *Felix,* the United States Court of Appeals for the Tenth Circuit stated that "it is possible that a government may begin with an impermissible purpose, or create an unconstitutional effect, but later take affirmative actions to neutralize" the Establishment Clause violation. *Id.* at 863. In assessing "whether curative effects are sufficient to overcome an objective observer's impression" of an impermissible Establishment Clause violation, governmental curative actions would have "not only to persuasively present a primary nonreligious effect, but also to disassociate the [government action] from its previous religious effect." *Id.* Specifically, the governmental cure should be (1) "purposeful," (2) "public," and (3) "at least as persuasive" as the initial Establishment Clause violation. *Id.*

### 3. The Proclamation

The Government argues that the Proclamation does not violate the Establishment Clause because unlike EO–2, it is based on a worldwide review by the Acting Secretary of Homeland Security of information-sharing practices and other factors relevant to the visa issuance process. A comparison of the two orders reveals certain changes that support this argument. First, the Proclamation describes the review process conducted in advance of the Proclamation's issuance, which included consideration of baseline criteria for assessing available information relevant to the visa issuance process, an assessment of each country against those factors, the consultation with foreign governments to increase compliance, and recommendations on restrictions for countries whose compliance remains inadequate. Procl. §§ 1(e), (f). Second, the Proclamation also alters the list of Designated Countries. In EO–1 and EO–2, all the banned countries were majority-Muslim; the Proclamation's Designated Countries include two non-majority Muslim countries: North Korea and Venezuela. Like EO–2, the Proclamation includes certain exceptions and authorizes case-by-case waivers, but its restrictions are more finely tuned, with distinctions made for most of the Designated Countries as to particular kinds of visas subject to suspension.

*33 [61] Defendants also emphasize that the Proclamation makes no express distinctions based on religion. As with EO–2, the fact that, within the four corners of the document, there is no explicit distinction

among countries based on religion does not end the inquiry. Establishment Clause violations can arise from facially neutral government action. *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 699–702, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994); *cf. Church of the Lukumi Babalu Aye,* 508 U.S. at 534, 542, 113 S.Ct. 2217 (holding that a facially neutral city ordinance prohibiting animal sacrifice and intended to target the Santeria faith violated the Free Exercise Clause because "the Free Exercise clause, like the Establishment Clause, extends beyond facial discrimination" and action targeting religion "cannot be shielded by mere compliance with the requirement of facial neutrality"). As in *Kiryas Joel,* where a facially neutral delegation of civic power to "qualified voters" of a village predominantly comprised of followers of Satmas Hasidism was deemed to be a "purposeful and forbidden" violation of the Establishment Clause, a simple check on the demographics of the geographic area affected by the Proclamation, with a combined population that is predominantly Muslim, reveals that its impact closely aligns with religious affiliation. *Kiryas Joel,* 512 U.S. at 699–702, 114 S.Ct. 2481.

Likewise, the inclusion of two non-majority Muslim nations, North Korea and Venezuela, does not persuasively show a lack of religious purpose behind the Proclamation. The Venezuela ban is qualitatively different from the others because it extends only to government officials, and the ban on North Korea will, according to Department of State statistics, affect fewer than 100 people, only a fraction of one percent of all those affected by the Proclamation. In short, the inclusion of Venezuela and North Korea in the Proclamation has little practical consequence. The Court must therefore still assess whether, as has occurred in other Establishment Clause cases, the insertion of these countries was "a litigating position" rather than an earnest effort to "cast off" the prior "unmistakable" objective. *McCreary,* 545 U.S. at 871–72, 125 S.Ct. 2722 (finding that the addition of secular texts to a Ten Commandments display did not remedy a prior Establishment Clause violation).

As with EO–2, the Court must consider not whether the Proclamation has stated a nonreligious purpose for the travel ban, but whether that purpose is, in fact, the primary purpose for the travel ban, rather than a purpose secondary to the religious animus that the Court has found, and continues to find, to be the

primary purpose for the EO–2. *McCreary,* 545 U.S. at 860, 862–65, 125 S.Ct. 2722. The Court also considers whether the governmental curative action since EO–2 was purposeful, public, and "at least as persuasive as the initial endorsement of religion." *Felix,* 841 F.3d at 863. At the outset of this analysis, the Court notes that, on its face, the Proclamation is not entirely independent of the President's history of public advocacy for a Muslim ban. In a July 24, 2016 interview on Meet the Press, then-candidate Trump, when asked about his proposed "Muslim ban," responded by stating that "[w]e must immediately suspend immigration from any nation that has been compromised by terrorism until such time as proven vetting mechanisms have been put in place." J.R. 219–20. When asked if this formulation represented a "rollback" of the Muslim ban, President Trump answered that it was an "expansion," noting that he was now "looking at territories" because "[p]eople were so upset when I used the word Muslim." J.R. 220. President Trump's characterization of the Muslim ban on that occasion, as a suspension of immigration until vetting mechanisms have been implemented, appears to mirror the contours of the Proclamation. Likewise, the permanent travel ban imposed by the Proclamation was forecast at the time of EO–1 and EO–2. On January 30, 2017, three days after issuing the 90–day ban under EO–1, ostensibly for the purpose of conducting an internal review of vetting procedures, President Trump seemed to predict the results of that review, stating, "we're going to have a very, very strict ban." J.R. 123. Shortly after the issuance of EO–2, White House officials, noting that EO–2's provisions were temporary, stated that the ban might be extended past 90 days and to additional countries. J.R. 116.

**\*34** Upon consideration of the text of EO–1, EO–2, and the Proclamation, there are substantial reasons to question whether the asserted national security purpose has now indeed become the primary purpose. First, the underlying architecture of the prior Executive Orders and the Proclamation is fundamentally the same. Each of these executive actions bans the issuance of immigrant and nonimmigrant visas on the basis of nationality to multiple majority-Muslim countries on the basis of concerns about terrorism. The Proclamation does not abandon this fundamental approach, but rather doubles down on it, because rather than imposing a temporary, 90–day travel ban, the Proclamation establishes an indefinite travel ban,

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

which is subject to periodic review, but which would become permanent in the absence of additional action.

Although the Government frames the Proclamation review process as an independent action that has cured any taint from EO–2, a close read of EO–1 and EO–2 reveals that the outcome of the DHS Review was at least partially pre-ordained. It is undisputed that the DHS Review was conducted pursuant to the President's directive, contained in both EO–1 and EO–2, mandating a review of information-sharing practices, but that directive also telegraphed the expected recommendations. Specifically, EO–2 instructed that the Secretary of Homeland Security "shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals." EO–2 § 2(e), *see* EO–1 § 2(e) (omitting the phrase "appropriate categories of"). This language does not permit the Secretary to recommend that no nationality-based travel ban is necessary. The language of EO–2 thus indicates that the President had decided, even before the study had been conducted, that regardless of the results, some nationals would be subject to a travel ban. Where EO–2 contemplated and planned for the very type of travel ban imposed by the Proclamation, the Proclamation cannot be framed as an independent product of bureaucratic operation.

Moreover, a comparison of EO–2 with the Proclamation reveals that many of the criteria considered in the DHS Review, and used to justify the ban on specific countries in the Proclamation, were substantially similar to those used to select the list of countries banned by EO–2. EO–2 explained its choice of countries by noting that some or all were "a state sponsor of terrorism," had "been significantly compromised by terrorist organizations," and made it difficult for the United States to deport their nationals because they "typically delay issuing, or refuse to issue, travel documents." EO–2 § 1(d). These factors largely track the "National security and public-safety risk assessment" factors considered in the DHS Review, which include whether a country is a "known or potential terrorist safe haven" and "fails to receive its nationals subject to final orders of removal from the United States." Proclamation § 1(c)(iii). Likewise, EO–2 ostensibly selected banned countries in part because country circumstances diminished "the foreign government's willingness or ability to share or validate important information about individuals seeking to travel

to the United States," a consideration that encompasses many of the "Identity-management information" and "National security and public-safety information" criteria used as the baseline for the DHS Report. *Id.* § 1(c)(i)-(ii).

Many of EO–2's specific findings about banned countries are also substantially the same as those described in the Proclamation. For example, EO–2 noted as one factor in banning Iran that it "regularly fails to cooperate with the United States Government in identifying security risks," EO–2 § 2(e)(i), while the Proclamation concluded that "Iran does not cooperate with the United States in counterterrorism efforts," Procl. § 2(b) (i). EO–2 justified the ban on Somalia in part because "most countries do not recognize Somali identity documents," EO–2 § 2(e) (iii), one of the same factors used to justified the Somali ban in the Proclamation, *see* Procl. § 2(h)(i). In both orders, the ban on Syria is justified in part by the fact that Syria is a state sponsor of terrorism and does not cooperate with the United States in addressing security or terrorism risks. This substantial overlap between EO–2 and the Proclamation in terms of the criteria considered and applied in identifying countries to ban undermines the characterization of the Proclamation's determination to impose a travel ban as the product of an independent evaluation unconnected to the earlier, tainted travel bans, and further suggests that many of the results may have been pre-ordained. Where the President ordered the submission of a list of countries to be banned, and the criteria used to arrive at that list substantially aligned with those he applied to generate the list of banned countries in the tainted EO–2, it is not surprising that agency officials acting in good faith could and did propose a similar list of countries to be banned in the Proclamation.

**\*35** Some of the specific determinations made in the Proclamation, by deviating from the general findings of the DHS Review, also undermine the argument that the Designated Countries were selected by an independent process completely untethered to the President's earlier statements advocating for a Muslim ban. For example, although the Proclamation's travel ban is purportedly designed to combat deficient information-sharing practices, Somalia, which was found to have adequate information-sharing practices, is nevertheless on the list of Designated Countries and is subject to a ban on all immigrants from that nation. Somalia is a majority-Muslim country that was included in the list of Designated Countries in both EO–1 and EO–2.

Venezuela, meanwhile, a non-majority Muslim nation, was determined to have inadequate information-sharing practices, to have at least one national security risk factor, and to not reliably receive its nationals slated for deportation. Despite these deficiencies, only officials of the Venezuelan government are barred from entry. Thus, by its own terms, the Proclamation did not simply rely on the results of an objective information-sharing review but instead made certain subjective determinations that resulted in a disproportionate impact on majority-Muslim nations, and a greater alignment with the travel ban of EO–2, than would otherwise flow from the objective factors considered in the review. Moreover, the exception given to Venezuela serves to reveal that information-sharing deficiencies do not necessarily warrant a broad, nationality-based ban.

That fact brings into relief a continued lack in the Proclamation, as in EO–1 and EO–2, of facts establishing that a broad nationality-based travel ban is justified by possible failures in the visa-issuance process and the terrorist and public safety threats that the Proclamation's ban is meant to thwart. While the President's findings may meet the low bar of "detrimental interest," 8 U.S.C.§ 1182(f); *see supra* part II.A.2, they do not explain why the broad travel ban is necessary in a way that convincingly demonstrates that its primary purpose is now unrelated to religious animus. As discussed above, a nationality-based travel ban against eight nations consisting of over 150 million people is unprecedented. Since the enactment of § 1182(f), only two of the 42 invocations of that authority have sought to bar entry based on nationality, and in those cases only against a single nation and in response to a specific diplomatic dispute with that nation. *See* Exec. Order No. 12,172, 44 Fed. Reg. 67947; Exec. Order No. 12,206, 45 Fed. Reg. 24,101; Proclamation No. 5,517, 51 Fed. Reg. 30,470. Such a ban was not even imposed after the September 11, 2001 attacks. Furthermore, while EO–1 and EO–2 sought to justify the travel ban based on prior acts of terrorism involving nationals of the Designated Countries, Defendants offer no evidence, even in the form of classified information submitted to the Court, showing an intelligence-based terrorism threat justifying a ban on entire nationalities; rather, the Proclamation relies primarily on the lack of information sharing from the Designated Countries. Numerous distinguished former national security officials have attested to the unique nature of this travel ban and the lack of a discernible national security rationale for it,

including any rationale that would flow from information-sharing deficiencies. Notably, in the context of the VWP, Congress as recently as 2015 examined this same issue and responded with legislation that falls well short of any kind of nationality-based travel ban. *See supra* part III.A.3. Thus, the Proclamation fails adequately to explain not the need to respond to information-sharing deficiencies, but the need for the specific response of an unprecedented, sweeping nationality-based travel ban against majority-Muslim nations.

The Court does not reference the record evidence showing the apparent disconnect between the identified problem and the broad, nationality-based travel ban to evaluate the merits of the travel ban as a national security matter. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (stating that generally, courts should afford deference to national security and foreign policy judgments of the Executive Branch). Nor does it question that information-sharing deficiencies can have a national security impact and should be addressed. Rather, it considers this context only to assess whether the Proclamation persuasively establishes that the primary purpose of the travel ban is no longer religious animus. Based on the facts that the Proclamation's ban generally resembles President Trump's earlier description of the Muslim ban, EO–2 dictated the Proclamation's outcome of a recommended list of nations to be subjected to a travel ban, the criteria used to select countries were highly correlated with those used to select the countries for EO–2, the terms of the Proclamation's travel ban skew against Muslim nations as compared to the objective measures applied in the DHS Review, and the proposed response has not been adequately explained as a necessary one to the identified problem, the Court cannot conclude that the Proclamation sufficiently offers a "purposeful" curative action that establishes that the taint of EO–2 no longer underlies the travel ban. *See Felix*, 841 F.3d at 863.

**\*36** **[62]** To the extent that the Government might have provided additional evidence to establish that national security is now the primary purpose for the travel ban, it has not done so. It has not offered classified information such as the September 15, 2017 DHS Report which, even though not "public," could have been submitted to the Court to explain the shift in purpose. Of course, even if such evidence was forthcoming, its value in obviating the taint of the earlier Executive Orders would be limited. As

AR1432

noted, in Establishment Clause cases, it is the opinion of the reasonable observer that controls. *McCreary,* 545 U.S. at 866, 125 S.Ct. 2722 (quoting *Santa Fe,* 530 U.S. at 315, 120 S.Ct. 2266). Purposes that can be discerned only if one "burrow[s] into a difficult-to-access" record do little to "assure [the public] that the government is not endorsing a religious view." *Felix,* 841 F.3d at 863.

Beyond the Proclamation itself, Defendants have offered only one additional "public" statement to bolster the case that the Proclamation is now cured of religious animus: a speech by the President delivered in Saudi Arabia in May 2017 in which he made various positive statements about Islam. *See Felix,* 841 F.3d at 863. Such a statement, however, did not in any way repudiate the President's prior intention to impose a Muslim ban. Particularly where, in August 2017, President Trump tweeted a statement that a method hostile to Islam—shooting Muslims with bullets dipped in pig's blood—should be used to deter future terrorism, there is no record of public statements showing any change in the President's intentions relating to a Muslim ban.

Rather, the only other available public statements not only fail to advance, but instead undermine, the position that the primary purpose of the travel ban now derives from the need to address information-sharing deficiencies. Even while interagency consultation regarding the travel ban took place behind closed doors, another conversation continued in the public eye. The day after EO-2 was enjoined, President Trump proclaimed at a rally that it had been a "watered down version of the first one" that had been "tailor[ed]" by lawyers to respond to legal challenges. J.R. 652–53. He suggested instead that "we ought to go back to the first one and go all the way, which is what I wanted to do in the first place." J.R. 653. In a June 3, 2017 tweet, days after the Fourth Circuit's opinion upholding this Court's injunction against EO–2, President Trump declared in a tweet that "We need the Travel Ban as an extra level of safety!" J.R. 662. On June 5, 2017, President Trump tweeted that "[t]he Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to [the Supreme Court]," and that "the Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court—& seek much tougher version!" J.R. 664. Then, on September 15, 2017, the same day that the Acting Secretary of Homeland Security submitted her report, President Trump again called for an

expansion of the travel ban, tweeting that "the travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!" J.R. 705.

Thus, while Defendants assert that the Proclamation's travel ban was arrived at through the routine operations of the government bureaucracy, the public was witness to a different genealogy, one in which the President—speaking "straight to the American people," J.R. 667 —announced his intention to go back to and get even tougher than in EO–1 and EO–2. Notably, the June 5 tweet calling for a "much tougher version" reveals that even before President Trump had received any reports on the DHS Review that ostensibly identified the need for a travel ban, the first of which he received over a month later on July 9, 2017, the President had already decided that the travel ban would continue. His September 15, 2017 tweet calling for a "far larger, tougher" travel ban, issued the same day that that the final report was received, reinforced this position. Against the backdrop of two prior Executive Orders that this Court and others have deemed likely violated the Establishment Clause, *see, e.g., Aziz,* 234 F.Supp.3d at 739 and *Hawaii,* 241 F.Supp.3d at 1137–38, this Court is obligated to pay attention to such statements. *See McCreary,* 545 U.S. at 866, 125 S.Ct. 2722 (cautioning courts that they cannot become "an absentminded objective observer," but must instead remain "familiar with the history of the government's action and competent to learn what history has to show"). The reasonable observer using a "head with common sense" would rely on the statements of the President to discern the purpose of a Presidential Proclamation. *McCreary,* 545 U.S. at 874, 125 S.Ct. 2722. Here, those statements do not offer "persuasive" rejection of the President's prior calls for a Muslim ban, or his stated intention to use a ban on certain "dangerous territory" to effectuate a Muslim ban, *Felix,* 841 F.3d at 863, nor do they show that the stated intention to impose a Muslim ban has been "repealed or otherwise repudiated," *McCreary,* 545 U.S. at 871–72, 125 S.Ct. 2722. Rather, they cast the Proclamation as the inextricable re-animation of the twice-enjoined Muslim ban, and, in echoes of *McCreary,* convey the message that the third iteration of the ban—no longer temporary—will be the "enhanced expression" of the earlier ones. *Id.* at 872, 125 S.Ct. 2722.

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 82-7 Filed 09/04/20 Page 182 of 1026 PageID #: 9773

International Refugee Assistance Project v. Trump, Not Reported in... Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 169 of 442
2017 WL 4674314

**\*37** The "initial" announcement of the Muslim ban, offered repeatedly and explicitly through President Trump's own statements, forcefully and persuasively expressed his purpose in unequivocal terms. Under *Felix*, the Government's cure must be made "as persuasively as the initial" violation. *Felix*, 841 F.3d at 863. Here, the Court concludes that where the Proclamation itself is not sufficiently independent of EO-2 to signal a purposeful, persuasive change in the primary purpose of the travel ban, and there were no other public signs that "as persuasively" as the original violation established a different primary purpose for the travel ban, it cannot find that a "reasonable observer" would understand that the primary purpose of the Proclamation's travel ban is no longer the desire to impose a Muslim ban. *See McCreary*, 545 U.S. at 872, 125 S.Ct. 2722 (finding that a third version of a Ten Commandments display continued to have a primarily religious purpose); *Felix*, 841 F.3d at 863. The Court therefore finds that Plaintiffs have demonstrated that they are likely to succeed on the merits of their Establishment Clause claim. Having reached this conclusion, the Court need not address Plaintiffs' likelihood of success on their Equal Protection Clause claim.

## IV. Irreparable Harm

**[63]** Having concluded that Plaintiffs have established a likelihood of success on the merits on their § 1152(a) and Establishment Clause claims, the Court turns to whether they have shown a likelihood of irreparable harm. The Supreme Court has held that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (finding irreparable harm upon a violation of the freedom of association). The Fourth Circuit has applied this holding to cases involving the freedom of speech and expression. *E.g.*, *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190, 191–92 (4th Cir. 2013); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). Although the Fourth Circuit has not held that a violation of the Establishment Clause likewise necessarily results in irreparable harm, other circuits have. *See, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006); *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986); *Am. Civil Liberties Union of Ill. v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir. 1986) (finding

irreparable harm in an Establishment Clause case and stating that the "harm is irreparable as well as substantial because an erosion of religious liberties cannot be deterred by awarding damages to the victims of such erosion").

Here, as in *Elrod*, "First Amendment interests were either threatened or in fact being impaired at the time relief was sought." 427 U.S. at 373, 96 S.Ct. 2673. "[W]hen an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303. The Court accordingly finds that Plaintiffs have established a likelihood of irreparable harm arising from their Establishment Clause claim at the time the Proclamation takes effect.

**[64]** The Court also finds that Plaintiffs with a family member seeking an immigrant visa have established a likelihood of irreparable harm as a result of the Proclamation's violation of the INA. Irreparable harm occurs when the threatened injury impairs a court's ability to grant an effective remedy, such as a harm that cannot be compensated by money damages at a later trial. *See Hawaii*, 859 F.3d at 782; *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998). The injury must be likely, not merely speculative, in order to be considered irreparable. Wright & Miller, *supra*, § 2948.1. Without an injunction, Plaintiffs will be subjected to imminent and irreparable harm as a result of the prolonged separation from their family members caused by the Proclamation. *Hawaii*, 859 F.3d at 782 (considering separation from family members in finding a likelihood of irreparable harm); *see also IRAP*, 857 F.3d at 611–12 (Keenan, J., concurring). The absence of a family member cannot be cured through a later payment of money damages, and is therefore irreparable. For the same reason that Plaintiffs' claims are ripe, the injury is not speculative, despite the Proclamation's waiver provisions. *See supra* part I.B. Thus, Plaintiffs have shown irreparable harm as a result of the Proclamation.

## V. Balance of the Equities

**\*38** **[65]** In balancing the equities, the Court considers the significant, irreparable harm Plaintiffs would face both from the prolonged separation from family members and the Establishment Clause violation. While Plaintiffs would likely face irreparable harm in the absence of an injunction and would plainly benefit from an injunction, Defendants are not directly harmed by a

AR1434

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

preliminary injunction preventing them from enforcing a Proclamation likely to be found unconstitutional. *See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Aziz*, 234 F.Supp.3d at 738.

At the same time, the Supreme Court has stated that "no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). Although the Proclamation seeks to further information-sharing and diplomatic purposes, Defendants have not shown that national security cannot be maintained without an unprecedented eight-country travel ban. An injunction would not grant entry to any individual foreign national, but would only preclude the use of a blanket ban. Even with an injunction, visa applicants from the Designated Countries would be screened through the standard, individualized vetting process under which the burden is on individual applicants to prove that they are not inadmissible to the United States. 8 U.S.C. § 1361. An injunction would not shift or lessen that burden or prevent the denial of any particular visa application. Thus, as a general matter, the balance of the equities favors the issuance of an injunction.

However, in partially staying the injunction of EO–2, the Supreme Court noted that the balance of equities varies depending on a foreign national's strength of connection to the United States. *See Trump*, 137 S.Ct. at 2088. For those individuals who lack "a credible claim of a bona fide relationship with a person or entity in the United States," the equities shift such that Defendants' interest in national security prevails over any harms resulting from the Proclamation's likely Establishment Clause or INA violations. *See id.* Accordingly, this factor supports an injunction extending only to individuals with a bona fide relationship with an individual or entity in the United States, as discussed below.

**VI. Public Interest**
[66] Preventing an Establishment Clause violation provides a significant public benefit. The Supreme Court has recognized the "fundamental place held by the Establishment Clause in our constitutional scheme." *Wallace v. Jaffree*, 472 U.S. 38, 60, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). The Founders "brought into being our Nation, our Constitution, and our Bill of Rights with its prohibition against any governmental establishment of religion" because they understood that "governmentally

established religions and religious persecution go hand in hand." *Engel v. Vitale*, 370 U.S. 421, 432–33, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). When the government chooses sides among religions, the "inevitable result" is "hatred, disrespect, and even contempt" from those who adhere to different beliefs. *See id.* at 431, 82 S.Ct. 1261. Thus, to avoid sowing seeds of division in our nation, upholding this fundamental constitutional principle at the core of our Nation's identity serves a significant public interest.

[67] The Court also finds that granting an injunction on the Proclamation's violation of the INA advances the public interest. Section 1152(a) represents a judgment by Congress that our immigration policy should not discriminate on the basis of nationality. To the extent that this judgment is undermined by the Proclamation, the public interest is furthered by an injunction on those grounds.

*39 Although the Government's interest in national security is a significant public interest, for the reasons discussed above, *see supra* part V, those interests are not paramount in this instance. Accordingly, the Court finds that the public interest favors an injunction.

**VII. Scope of Relief**
The Plaintiffs' Establishment Clause and § 1152(a) arguments focused primarily on the travel ban for citizens of the eight Designated Countries in Section 2 of the Proclamation. The Court will therefore enjoin Section 2 only, subject to the following exceptions.

As discussed above, because the balance of equities favor Defendants as to visa applicants with no ties to the United States, the injunction is limited to barring enforcement of Section 2 against those individuals "who have a credible claim of a bona fide relationship with a person or entity in the United States." *Trump*, 137 S.Ct. at 2088. For individuals, the injunction covers visa applications by individuals with immediate family members, such as parents, children, or siblings, as well as "grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States." *Id.*; *Hawaii v. Trump*, 871 F.3d 646, 658 (9th Cir. 2017) (clarifying the scope of the injunction against EO–2). For organizations, the connection must be "formal, documented, and formed in the ordinary course" rather than for the purposes of evading the Proclamation. *Trump*, 137 S.Ct. at 2088. For example, IRAP's employee

or an invited speaker for MESA's annual meeting or IAAB's conference would qualify. *See id.* (including a "lecturer invited to address an American audience" and a "worker who accepted an offer of employment" within the scope of the injunction). A member of MESA or another membership organization who formally joined the organization before the date of the injunction and seeks to enter the United States for organized activities or meetings of the association would also fall within its scope. *See id.* Pursuant to the Supreme Court's stay of the Ninth Circuit's determination that a refugee with a formal sponsorship assurance from a U.S. resettlement agency has a bona fide connection to the United States, the Court concludes that clients of IRAP and HIAS, and those similarly situated, are not covered by the injunction absent a separate bona fide relationship as defined above. *See id.* at 2088; *Hawaii,* 871 F.3d at 661–64 (finding that a refugee with a formal sponsorship assurance from a U.S. resettlement agency has a bona fide connection to the United States); *Trump v. Hawaii,* No. 17A275, ―――― U.S. ―――, ― S.Ct. ―――, ― L.Ed.2d ―――, 2017 WL 3975174 (Sept. 11, 2017) (staying the Ninth Circuit mandate "with respect to refugees covered by a formal assurance").

The injunction also will not apply to travelers from Venezuela or North Korea because the balance of equities favors Defendants with respect to those two countries. Section 1152(a) provides no basis to support an injunction relating to Venezuela because the Proclamation does not bar immigrants from Venezuela. Given the extremely limited number of visas typically issued to individuals from North Korea, Plaintiffs have neither argued nor shown how any individuals from that nation with a bona fide relationship to a person or entity in the United States will be harmed by the § 1152(a) violation. Likewise, they have not shown how travelers from Venezuela or North Korea would be harmed by the likely Establishment Clause violation. Accordingly, the injunction will not apply to nationals of Venezuela or North Korea.

**\*40** Finally, in light of the constitutional concerns associated with enjoining the President of the United States, this injunction does not apply to the President and instead applies only to the other Defendants and the federal officials who will actually enforce the Proclamation. *See Franklin,* 505 U.S. at 800–01, 112 S.Ct. 2767.

**[68]** **[69]** **[70]** The injunction will apply nationwide. It is "well established" that a federal district court has "wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp,* 956 F.2d 1300, 1308 (4th Cir. 1992); *see also Texas v. United States,* 809 F.3d 134, 188 (5th Cir. 2015) (holding that the "Constitution vests the District Court with 'the judicial Power of the United States,' " which "extends across the country" (quoting U.S. Const. art. III § 1)), *aff'd by an equally divided court,* ―― U.S. ――, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016). Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). However, nationwide injunctions are appropriate if necessary to afford relief to the prevailing party. *See id*; *Richmond Tenants Org., Inc.,* 956 F.2d at 1308–39; *Texas,* 809 F.3d at 188.

**[71]** The Court has found that Plaintiffs are likely to succeed on their claims that Section 2 of the Proclamation violates the Establishment Clause and § 1152(a). The Individual and Organizational Plaintiffs are located in different parts of the United States, indicating that nationwide relief may be appropriate. *Richmond Tenants Org., Inc.,* 956 F.2d at 1309 (holding that a nationwide injunction was "appropriately tailored" because the plaintiffs lived in different parts of the country). Moreover, although the Government has argued that relief should be strictly limited to the specific interests of Plaintiffs, an Establishment Clause violation has impacts beyond the personal interests of individual parties. *Joyner v. Forsyth Cty.,* 653 F.3d 341, 355 (4th Cir. 2011) ("[T]hese plaintiffs are not so different from other citizens who may feel in some way marginalized on account of their religious beliefs and who decline to risk the further ostracism that may ensue from bringing their case to court or who simply lack the resources to do so."); *City of St. Charles,* 794 F.2d at 275 (stating that a violation of the Establishment Clause causes "harm to society"). Here, nationwide relief is appropriate because this case involves an alleged violation of the Establishment Clause by the federal government manifested in immigration policy with nationwide effect. *See Decker v. O'Donnell,* 661 F.2d 598, 618 (7th Cir. 1980) (affirming a nationwide injunction in a facial challenge to a federal statute and regulations on Establishment Clause grounds).

J.A. 706

AR1436

Nationwide relief is also warranted on the § 1152(a) claim, with respect to applicants for immigrant visas, because under these facts, a "fragmented" approach "would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington,* 847 F.3d at 1166–67. "Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly,* and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Texas,* 809 F.3d at 187–88 (footnotes omitted). Accordingly, Section 2 of the Proclamation, with the exceptions and to the extent described above, will be enjoined on a nationwide basis.

## CONCLUSION

**\*41** For the foregoing reasons, Plaintiffs' Motions for a Preliminary Injunction are GRANTED IN PART and DENIED IN PART. The Court will issue a preliminary injunction barring enforcement of Section 2 of the Proclamation, subject to the terms stated in the separate Order.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, the Court finds that the Plaintiffs have standing to maintain this civil action and have established that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of injunctive relief, and that the balance of the equities and the public interest favor an injunction.

Accordingly, it is hereby ORDERED that:

1. Plaintiffs' Motions for a Preliminary Injunction, TDC–17–0361 ECF No. 205, TDC–17–2921 ECF No. 26, TDC–17–2969 ECF No.2, are GRANTED IN PART and DENIED IN PART.

2. The Motions are GRANTED as to Section 2 of Presidential Proclamation 9645 ("Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public–Safety Threats"). **All Defendants with the exception of the President of the United States; all officers, agents, and employees of the Executive Branch of the United States government; and anyone acting under their authorization or direction, are ENJOINED from enforcing Section 2 of Presidential Proclamation 9645 except with regard to:**

   **a. Sections 2(d) and 2(f) of the Proclamation;**

   **b. Individuals lacking a credible claim of a bona fide relationship with a person or entity in the United States, as defined in the accompanying Memorandum Opinion.**

3. This Preliminary Injunction is granted on a nationwide basis and prohibits the enforcement of Section 2 of Presidential Proclamation 9645 in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas, with the above exceptions, pending further orders from this Court.

4. The Motion is DENIED as to the President of the United States and as to all other provisions of Presidential Proclamation 9645.

5. Plaintiffs are not required to pay a security deposit.

6. The Court declines to stay this ruling or hold it in abeyance should an emergency appeal of this Order be filed.

**All Citations**

--- F.Supp.3d ----, 2017 WL 4674314

## Footnotes

1    Because the judgment of the Fourth Circuit has been vacated as moot, it has been "strip[ped] of its binding effect." *Deakins v. Monaghan,* 484 U.S. 193, 200, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988). Accordingly, this Court does not rely on the Fourth Circuit's opinion as controlling authority and will review all legal questions decided by the Fourth Circuit anew, without reliance on that Court's prior decision. However, as confirmed at the hearing on the Motions, the parties agree that the Court may cite the Fourth Circuit opinion as persuasive authority, so this Court does so on a limited basis.

J.A. 707

AR1437

International Refugee Assistance Project v. Trump, --- F.Supp.3d ---- (2017)
2017 WL 4674314

2    At the time the IRAP Amended Complaint was filed, Plaintiff Mohamad Mashta had an approved I–130 visa petition for his Syrian-national wife and was awaiting a visa for her. At the hearing, counsel informed the Court that Mashta's wife had been granted a visa and that she is on her way to the United States, which appears to render his claim moot.

3    Section 1185 was amended in 1978, to broaden its applicability beyond times of war or national emergency, but the operative language of § 1185(a)(1) remained unchanged. *See* Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95–426, § 707(a), 92 Stat. 992–993 (1978).

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

AR1438

# EXHIBIT 8

AR1439

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MARTÍN JONATHAN BATALLA VIDAL, et al.          MEMORANDUM
                                    Plaintiffs,          AND ORDER
          - against -
ELAINE C. DUKE, et al.,                              16-CV-4756 (NGG) (JO)
                                    Defendants.
--------------------------------------------------------------X
--------------------------------------------------------------X
STATE OF NEW YORK, et al.                          17-CV-5228 (NGG) (JO)
                                    Plaintiffs,
          - against -
DONALD TRUMP, et al.,
                                    Defendants.
--------------------------------------------------------------X

James Orenstein, Magistrate Judge:

In a letter motion filed on October 13, 2017, the plaintiffs seek to compel the defendants to complete their production of the administrative record. *See* Docket Entry ("DE") 84 ("Motion").[1] The defendants submitted a letter opposing the motion on October 16, 2017. DE 85 ("Opp."). On October 17, 2017, the Honorable William Alsup, United States District Judge, granted a similar motion in a series of parallel cases pending in the Northern District of California. *See Regents of the University of California, et al. v. United States Department of Homeland Security, et al.*, 17-CV-5235 (WHA) ("*Regents*"), DE 79 (Order re Motion to Complete Administrative Record) (N.D. Cal. Oct. 17, 2017) ("*Regents* Opinion"). As briefly explained below, and for essentially the same reasons as those set forth in Judge Alsup's opinion, I grant the motion to compel.

I assume the reader's familiarity with the proceedings in this case, as well as with Judge Alsup's opinion in *Regents*. In short, the plaintiffs contend that the defendants have applied the wrong legal standard to define the contours of the administrative record; that the record before the

_____
[1] Unless otherwise noted, citations to docket entry numbers refer to the docket in *Batalla Vidal*.

**AR1440**

court suffices to rebut the presumption of regularity normally afforded the government in reviewing an administrative decision, thereby warranting an order to complete the record over the defendants' protestation of completeness; and that the defendants improperly conflate distinct legal standards in opposing an order to complete the record rather than to supplement it. Motion at 2-6. The defendants do not quibble with the plaintiffs' unassailable identification of the legal standard for defining the record, but contend that the unquestionably different formulation that they used in compiling the record is its functional equivalent; that they have adhered to that standard, and that notwithstanding the explicit request for relief to the contrary, the plaintiffs are actually seeking discovery beyond the record, rather than merely all of what is properly within it. In each instance, the facts before the court and applicable law plainly support the plaintiffs' arguments and refute those proffered by the defendants.

The parties now agree that the administrative record includes all information "*directly or indirectly* considered by the final decision makers in making their decision." Motion at 2 (citing, *inter alia*, *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012) (internal citations omitted) (emphasis in original), Opp. at 2 (quoting Motion at 2). That standard goes well beyond the specific documents that Acting Secretary Duke personally reviewed before issuing the memorandum that formally effected the administrative decision at issue in this litigation. To the contrary, it also encompasses all documents and materials that were before the decision makers' agencies and the non-privileged work and recommendations' of the decision makers' subordinates. *See*, *e.g.*, *Regents* Opinion at 3; *Bar MK Ranches v. Yuetter*, 994 F.2d 735 (10th Cir. 1993); *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).[2]

---

[2] I refer to "decision makers" in the plural, rather than to Acting Secretary Duke alone, because as the Honorable Nicholas G. Garaufis, United States District Judge, observed in his Memorandum and Order dated October 17, 2017, DE 86, the defendants "have repeatedly represented to this

J.A. 711

AR1441

The plaintiffs, like their counterparts in *Regents* (where the defendants produced the same materials as the purported administrative record), have adequately established that the administrative record produced to date is manifestly incomplete. *See generally Regents* Opinion at 5-8. I concur with Judge Alsup's conclusion that the defendants have "excluded highly relevant materials from the administrative record[.]" *Id.* at 7. Even if Acting Secretary Duke can properly be considered the sole relevant decision maker, "[i]t is evident that [she] considered information directly, or indirectly, through the advice of other agencies and others within her own agency." *Id.* at 8; *see also* DE 86 (Judge Garaufis's Memorandum and Order) at 10.

Accordingly, for the reasons set forth above, I grant the motion to compel and respectfully direct the defendants to complete production of the administrative record by 3:00 p.m., Eastern Daylight Time, on October 27, 2017.

SO ORDERED.

Dated: Brooklyn, New York
October 19, 2017

_____/s/_____
James Orenstein
U.S. Magistrate Judge

---

court that Attorney General Jeff Sessions and Acting Secretary Duke jointly decided to rescind the DACA program." *See* DE 86 at 10 (citing examples). Moreover, as Judge Alsup pointed out in *Regents*, the White House has issued official statements that "repeatedly emphasized the President's direct role in decisions concerning DACA." *Regents* Opinion at 6 (citing examples). In addition, the President himself has taken time away from his official duties to make public statements about the decision at issue here in which he unambiguously characterized himself as the decision maker. *See, e.g.,* Donald J. Trump, status update dated September 5, 2017 (the same day as the administrative decision challenged here) ("Congress now has 6 months to legalize DACA …. If they can't, *I will revisit this issue!*"), https://twitter.com/realDonaldTrump/status/905788459301908480 (emphasis added).

3

AR1442

# EXHIBIT 9

AR1443

Appeal: 18-1521    Doc: 28-3    Filed: 07/03/2018    Pg: 192 of 572
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 192 of 1026 PageID #: 9783

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 179 of 442



**National Standard Operating Procedures (SOP)**

# Deferred Action for Childhood Arrivals (DACA)
## (Form I-821D and Form I-765)

Prepared by:  Service Center Operations Directorate

**April 4, 2013**
**Version 2.0**

## 1.0   REVISION HISTORY

| Revision History | | | | |
|---|---|---|---|---|
| **Version** | **V02** | **Date Released** | 4/4/2013 | **Changes Made By** | SCOPS |

**Reason for SOP Update**

| | Reason | Chapter/Section | Page No(s). |
|---|---|---|---|
| 1 | New Guidance | Chapter 2, ROIQ | 14 |
| 2 | New Guidance | Chapter 2, Childhood Arrivals | 18 |
| 3 | New Guidance | Chapter 2, DACA Requestors in Immigration Detention | 19 |
| 4 | New Guidance | Chapter 5, Homebound Biometrics Capturing | 27 |
| 5 | New Guidance | Chapter 7, Commonwealth of the Mariana Islands Note Eligible | 42 |
| 6 | New Guidance | Chapter 7, Initial DACA Package | 43 |
| 7 | New Guidance | Chapter 7, DACA Guidelines | 44 |
| 8 | New Guidance | Chapter 8, Unobtainable A-Files | 45 |
| 9 | New Guidance | Chapter 8, A-File Requests from USCIS Field/Asylum Offices | 46 |
| 10 | New Guidance | Chapter 8, Unlawful Immigration Status on June 15, 2012 | 52 |
| 11 | New Guidance | Chapter 8, Continuous Residence | 55 |
| 12 | New Guidance | Chapter 8, Education | 58 |
| 13 | New Guidance | Chapter 8, Public or Private, Elementary… | 60 |
| 14 | New Guidance | Chapter 8, Graduated From School | 67-68 |
| 15 | New Guidance | Chapter 8, Misdemeanors | 83 |
| 16 | New Guidance | Chapter 8, Requesting Certified Court Disposition | 84 |
| 17 | New Guidance | Chapter 8, Expunged or Vacated Convictions | 86 |
| 18 | New Guidance | Chapter 8, Juvenile Delinquency | 87 |
| 19 | New Guidance | Chapter 8, DACA Requestors in Immigration Detention | 88-89 |
| 20 | New Guidance | Chapter 8, Non-EPS Cases | 91 |
| 21 | New Guidance | Chapter 8, Notice of Intent to Deny | 102 |
| 22 | New Guidance | Chapter 8, Denials – After RFE or NOID | 105 |
| 23 | New Guidance | Chapter 8, Denials – Supervisory Review | 106 |
| 24 | Correction | Chapter 12, Application Annotations | 115 |
| 25 | New Guidance | Chapter 12, Denials | 119 |
| 26 | New Guidance | Chapter 15, Prescribed Conditions for Advance Parole | 135 |
| 27 | New Guidance | Chapter 15, Advance Parole Requested for Humanitarian Purposes | 136 |
| 28 | New Guidance | Chapter 15, Advance Parole Requested for Educational Purposes | 137 |
| 29 | New Guidance | Chapter 15, Advance Parole Requested for Employment Purposes | 137 |

**Note:  SOP revisions listed are reflected in blue font.**

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

# Table of Contents

| Chapter | Page # |
|---|---|
| 1: Definitions and Applicability to DACA | 6-15 |
| 2: Introduction | 16-20 |
| 3: Summary of the Overall Process Flow for DACA Filings | 20-22 |
| 4: Lockbox Intake | 23-24 |
| 5: Service Center Intake | 25-32 |
| 6: Background and Security Checks | 33-41 |
| 7: DACA Overview | 42-44 |
| 8: Adjudication of the DACA Request | |
|    A. Procedural Overview | 45-46 |
|    B. System Searches | 47 |
|    C. Determining if Guidelines are Met | 48-69 |
|    D. Economic Necessity | 70 |
|    E. Removal Proceedings | 71-76 |
|    F. Fingerprints and RAP Sheets | 77-79 |
|    G. Evaluating Issues of Criminality, Public Safety, and National Security | 80-93 |
|       • Court Dispositions | 84-86 |
|       • Arrests and Convictions | 87 |
|       • Public Safety Concerns | 88 |
|       • National Security Concerns | 88 |
|       • Immigration Detention | 88-89 |
|       • Handling Procedures | 90-93 |
|    H. Adjudicating Form I-821D, Part 3, Criminal, National Security and Public Safety Information | 94-96 |
|    I. Fraud Review and Fraud Referrals | 97-100 |
| 9: Decisions | |
|    A. Request for Evidence | 101 |
|    B. Notice of Intent to Deny | 102 |
|    C. Approvals | 103-104 |
|    D. Denials | 105-109 |
|       • Supervisory Review | 106 |
| 10: Post Denial Process | 110 |
| 11: Returned Mail | 111 |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

AR1446

# Table of Contents

| Chapter | Page # |
|---|---|
| 12: Employment Authorization | |
|     A.   General Information | 112-113 |
|     B.   Adjudication | 114-119 |
|     C.   Replacement Cards | 120 |
| 13: Customer Service - Use of Service Request Management Tool (SRMT) to Respond to Requests to Review Certain Denials | 121-131 |
| 14: DACA Termination | 132-134 |
| 15: Processing Form I-131, Application for Travel Document, for Individuals With Approved Form I-821D, Consideration of Deferred Action for Childhood Arrivals (DACA) | 135-136 |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

Version April 4, 2013          4

J.A. 717                                                    AR1447

Appeal 18-1521 Case 1:17-cv-05228-NGG-VMS Filed 07/02/2018 Document 282-7 Filed 09/04/20 Page 196 of 1026 PageID #: 9787

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 183 of 442

# Appendices

**Appendix A:** June 15, 2012, Secretary of Homeland Security memorandum entitled, <u>Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children</u>.

**Appendix B:** November 7, 2011, memorandum entitled, Revised <u>Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens</u>.

**Appendix C:** Overview of the Background Check Process

**Appendix D:** DACA RFE Call Ups

**Appendix E:** Notice of Intent to Deny Call-Ups

**Appendix F:** DACA Denial Template

**Appendix G:** SRMT Responses

**Appendix H:** SRMT Denial Template

**Appendix I:** Notice of Intent to Terminate Deferred Action for Childhood Arrivals and Termination Notice

**Appendix J:** Notice of Intent to Deny Review Policy

**Appendix K:** DACA Denial Call-Ups

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013          5

AR1448

Appeal: 18-1521   Document: 28-3   Filed: 07/02/2018   Pg: 197 of 572
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20   Page 197 of 1026 PageID #: 9788

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 184 of 442

# Chapter 1: Definitions and Applicability to DACA

| | |
|---|---|
| **Absconder** | An alien who failed to surrender to DHS for removal after receiving a final order of deportation, exclusion, or removal. |
| **Aggravated Felon** | Any alien who has been convicted of a criminal offense within the definition of 101(a)(43) of the Immigration and Nationality Act (Act). |
| **Alias** | An additional name (e.g., nickname, maiden name, or married name) or an assumed name. |
| **Ancillary Application** | Applications for travel, employment authorization, or applications that do not convey an immigrant or nonimmigrant status, and are filed in connection with a primary or an underlying application or petition. |
| **ASC** | Application Support Center. The ASCs, which are located throughout the United States and its outlying territories, facilitate the capture of fingerprints and biometric data. |
| **BCU** | Background Check Unit. A work unit located at each of the Service Centers and the National Benefits Center. The BCU is responsible for reviewing and resolving (b)(7)(E) hits and other criminal, national security, and public safety concerns in accordance with Agency policy. |
| **BCU DACA Team** | A specialized team within the BCU that specifically reviews and adjudicates issues of criminality arising from DACA requests. The team may consist of Immigration Services Officers, as well as officers assigned to CARRP, NTA issuance, and Triage duties, and the analysts who support them. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 199 of 572
Case 1:17-cv-05228-NGG-VMS    Document 28-7    Filed 09/04/20    Page 198 of 1026 PageID #: 9789

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 185 of 442

# Definitions and Applicability to DACA, Continued

**Brief, Casual, and Innocent Absence**

A brief, casual, and innocent absence from the United States before August 15, 2012 will not interrupt continuous residence for purposes of DACA. An absence will be considered brief, casual, and innocent, if:

(1) The absence was short and reasonably calculated to accomplish the purpose of the absence;

(2) The absence was not the result of an order of exclusion, deportation, or removal;

(3) The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and

(4) The purpose of the absence from the United States or actions while outside of the United States were not contrary to law.

This definition of a brief, casual, and innocent absence has its basis in case law and was codified into the regulations for the Temporary Protected Status (TPS) program. Elements of this definition of brief, casual, and innocent will be used for individuals requesting DACA. See 8 C.F.R. §244.1. See also "Continuous Residence" below for additional circumstances that will not break continuous residence.

---

**CFDO**

The Center Fraud Detection Operations (CFDO) is the Fraud Detection and National Security (FDNS) organization within Service Centers. The CFDO is comprised of FDNS officers under the direction of an FDNS supervisor who reports directly to the CFDO Assistant Center Director (ACD). While most CFDO work occurs in an office environment, some Service Centers conduct administrative investigations in support of FDNS's field operations.

---

**CLAIMS (C3)**

Computer - Linked Application Information Management System Version 3. A case management application system to track and process the adjudication of applications, petitions, and other requests for immigration benefits and services.

---

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Appeal: 18-1521    Case 1:17-cv-05228-NGG-VMS    Document 29-2    Filed 07/02/2018    Pg: 199 of 502    Page 199 of 1026 PageID #: 9790

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 186 of 442

## Definitions and Applicability to DACA, Continued

| | |
|---|---|
| **Continuous Residence** | The DACA requestor is to reside in the United States for the entire period specified in the guidelines for DACA to be considered. An alien shall not be considered to have failed to maintain continuous residence in the United States by reason of a brief, casual, and innocent absence as defined within this section. |
| **CARRP** | Controlled Application Review and Resolution Program. This program outlines the process to identify, record, and adjudicate applications/petitions/requests where a National Security concern is identified. |
| **DACA** | Deferred Action for Childhood Arrivals |
| **Deferred Action** | Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. Deferred action does not confer any lawful status. |
| **DNR** | Does Not Relate. A determination by USCIS personnel of whether a security check result relates to a DACA requestor. |
| **Egregious Public Safety (EPS) Concern** | Any case where routine systems and background checks indicate that an individual is under investigation for, has been arrested for (without disposition), or has been convicted of, a specified crime, including but not limited to, murder, rape, sexual abuse of a minor, trafficking in firearms or explosives, or other crimes listed in the November 7, 2011, memorandum entitled <u>Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens</u>. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Definitions and Applicability to DACA, Continued

| | |
|---|---|
| **Evidence** | **Affidavits** |

Affidavits generally will not be sufficient on their own to demonstrate that a requestor meets the DACA guidelines. However, affidavits may be used to support the following guidelines when primary and secondary evidence are unavailable:

- A gap in the documentation demonstrating that the requestor meets the five year continuous residence requirement; and
- A shortcoming in documentation with respect to the brief, casual and innocent departures during the five years of required continuous presence.

Two or more affidavits, sworn to or affirmed by people other than the requestor, who have direct personal knowledge of the events and circumstances, can be submitted. If the affidavits are not sufficient to establish that the guideline is met, issue an RFE using RFE DACA 302 call up in Appendix D.

USCIS will not accept affidavits as proof of satisfying the following guidelines:

- The requestor is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a general education development certificate, or is an honorably discharged veteran from the Coast Guard or Armed Forces of the United States;
- The requestor was physically present in the United States on June 15, 2012;
- The requestor came to the United States before reaching his/her 16th birthday;
- The requestor was under the age of 31 on June 15, 2012; and
- The requestor's criminal history, if applicable.

Weigh the assertions in the affidavit in light of the totality of all the evidence presented. When evaluating what weight to give an affidavit, take the following into consideration:

- An affidavit needs to be signed and dated;
- The identity of the affiant needs to be readily ascertainable from the information in the affidavit;
- The affidavit should state the relationship between the affiant and the DACA requestor and contain facts that are relevant to the guideline the requestor seeks to meet;
- The affidavit should state the basis of the affiant's knowledge and exhibit first-hand knowledge of the fact asserted.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013        9

AR1452

## Definitions and Applicability to DACA, Continued

| | |
|---|---|
| Evidence (Continued) | **Preponderance of the Evidence**<br>A DACA requestor is to establish by a preponderance of the evidence that he/she meets the guidelines for the exercise of prosecutorial discretion in the form of deferred action. Under this standard, the requestor must demonstrate that it is more likely than not that he or she meets those guidelines. The preponderance of the evidence standard is a lower standard of proof than both the "clear and convincing evidence" standard and the "beyond a reasonable doubt" standard applicable to criminal cases.<br><br>**Primary Evidence**<br>Primary evidence is evidence which, on its face, proves a fact. In the DACA context, an example of primary evidence that could be submitted to satisfy the age guideline would be a birth certificate. An example of primary evidence that could be submitted to satisfy all or part of the continuous residence guideline would be rental agreements or school records in the DACA requestor's name.<br><br>**Secondary Evidence**<br>Secondary evidence must lead the officer to conclude that it is more likely than not (in other words, probable) that the fact sought to be proven is true. For example, if an individual is unable to obtain a copy of his birth certificate to establish his date of birth, baptismal records issued by a church showing that an individual was born at a certain time would be acceptable secondary evidence of the birth for purposes of satisfying the DACA age guideline. Similarly, to satisfy the continuous residence guideline under DACA, rental agreements in the name of the DACA requestor's parent could be acceptable secondary evidence demonstrating periods of the requestor's residence in the United States, if corroborating evidence in the file (for example, school or medical records) points to the DACA requestor's residence at that address.<br><br>**Sufficiency of the Evidence**<br>The sufficiency of all evidence is judged according to its relevance, consistency, and credibility. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013    10

## Definitions and Applicability to DACA, Continued

| | |
|---|---|
| Evidence (Continued) | **Totality of the Evidence**<br>For DACA, the totality of the documentary evidence should be reviewed to determine whether the facts needed to establish a specific guideline have been demonstrated. In many instances, an adjudicator may be satisfied based upon the review of all the documentary evidence, that it is more likely than not that a specific guideline has been meet even if the record does not contain one specific document that, in fact, satisfies the guideline. For example, if a DACA requestor is unable to submit a specific document evidencing his/her presence in the United States on June 15, 2012, he/she may be able to satisfy this guideline by submitting various forms of credible documentation evidencing that he/she was present in the United States shortly before and shortly after June 15, 2012 from which the officer could infer, based on the totality of the evidence, that the individual was present in the United States on June 15, 2012. (Note: evidence upon which one may infer that a fact has been demonstrated is also known as "circumstantial evidence," a term that appears in many DACA public information documents). |

Officers must see documentary evidence (either primary or secondary) in order to determine if the following guidelines have been met:
- Requestor was under the age of 31 on June 15, 2012; and
- Requestor is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States

Officers may not infer from other sources that either of these two guidelines have been met.

Officers should look to the totality of the evidence (meaning that facts can be inferred from one or more sources) to determine if the following guidelines have been met:
- The requestor was physically present in the United States on June 15, 2012;
- The requestor came to the United States before reaching his/her 16th birthday;
- The requestor satisfies the continuous residence requirement, (as long as he or she presented clear documentation of continuous residence in the United States for a portion of the required five-year period and any other evidence submitted supports a finding that the requestor was actually residing in the U.S. during the period for which he has not provided clear documentary evidence of such residence); and
- Any travel outside the United States during the five years of required continuous presence was brief, casual, and innocent.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)<br>This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

AR1454

## Definitions and Applicability to DACA, Continued

| | |
|---|---|
| **Evidence** (Continued) | For the remaining guidelines, i.e., the requestor was in unlawful status on June 15, 2012, has no disqualifying criminal convictions, and does not otherwise pose a threat to public safety or national security, the information presented by the DACA requestor on his/her Form I-821D in combination with background and security checks, routine systems checks, supporting evidence submitted by the requestor, and any other information on file, may establish that these guidelines have been met. |
| **Front End Check** | Security and systems checks performed upon the receipt of an application or petition or other requests to screen for national security, EPS, fraud, or other criminal concerns. |
| **HQ FDNS** | Headquarters Office of the Fraud Detection and National Security Directorate of USCIS. |
| **Hit** | A record returned by a security or background check system in response to a query that may relate to the subject being queried. |
| **Interpol** | International Criminal Police Organization, the world's largest international police organization. This organization facilitates cross-border police cooperation and supports and assists all organizations, authorities, and services whose mission is to prevent or combat international crime. |
| **JTTF** | Joint Terrorism Task Force. The JTTF is run by the Federal Bureau of Investigation (FBI). The JTTF is comprised of small groups of highly trained, locally based members from U.S. law enforcement and intelligence agencies. JTTF is responsible for all domestic and international terrorism matters. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

**Version April 4, 2013**    12

**AR1455**

## Definitions and Applicability to DACA, Continued

| | |
|---|---|
| **KST** | Known or Suspected Terrorist.  (b) (7)(E) |



| | |
|---|---|
| **National Security (NS) Concern** | An NS Concern exists when an individual or organization has been determined to have an articulable link to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in §§ 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Act. This determination requires that the case be handled according to the CARRP policy outlined in the memorandum issued on April 11, 2008. |
| **NCIC** | The National Crime Information Center (NCIC) is a database maintained by the FBI.  NCIC includes the Interstate Identification Index (NCIC III) that allows authorized users to access criminal history information. Access to NCIC III is limited to FDNS personnel only.  FDNS personnel may only access NCIC III when an individual has been determined to have, or is likely to have, a link to a current or planned criminal activity and the case is referred to FDNS for further investigation with the appropriate law enforcement agency, when a reasonable suspicion of fraud is identified that may be referred to ICE for criminal investigation or when an individual has been determined to be involved in current or planned terrorist activity.  Prior to accessing NCIC III information, USCIS personnel who are TECS users must first complete the NCIC Certification Course. |
| **NCTC** | National Counterterrorism Center. In August 2004, the President established NCTC, a multi-agency organization, to serve as the primary organization for the U.S. Government for integrating and analyzing all intelligence pertaining to terrorism and counterterrorism (CT) and to conduct strategic operational planning by integrating all instruments of national power. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552) This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

## Definitions and Applicability to DACA, Continued

| | |
|---|---|
| **No Match** | This annotation is used on the Record of ▓▓(b) (7)(E)▓▓ if a ▓(b) (7)(E)▓ query results in no ▓(b)(7)(E)▓ hit. |
| **Non-KST** | A Non-KST NS concern includes all other NS concerns, regardless of the source, including but not limited to: associates of KSTs, unindicted coconspirators, terrorist organization members, persons involved with providing material support to terrorists or terrorist organizations, and agents of foreign governments. |
| **Primary Name and DOB** | The name and date of birth provided by an applicant, petitioner, or requestor as his/her given name and date of birth. This is generally listed in the first part of the application/petition/request. |
| **Relates** | This annotation is used on the ROIQ if a ▓(b) (7)(E)▓ query results in a hit that closely corresponds to the subject queried. |
| **Resolution** | A determination of the effect or relevance of the available information on the eligibility of the applicant, requestor, petitioner, beneficiary, or derivative for the benefit or request sought. |
| **ROIQ** | Record of IBIS Query. This form is used to record the search criteria queried and the results of those queries. The ROIQ was revised on March 5, 2013 to include checkbox "R" for requestors. |
| **SNAP** | Scheduling and Notification of Applicants For Processing. An automated system that schedules appointments for individuals to submit biometric information to ASCs. |
| **Secretary's Memorandum** | The June 15, 2012, memorandum entitled, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, issued by the Secretary of Homeland Security. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Definitions and Applicability to DACA, Continued

| | |
|---|---|
| **Security Check** | A specific check or a combination of checks required for each application, petition, or request conducted in accordance with Agency policy. |
| **System Match** | A record returned by ▓(b)(7)(E)▓ in response to a query, the subject of which may or may not relate to the subject being queried. This is the same as a ▓(b)(7)(E)▓ Hit. |
| **TECS** | TECS is formerly known as the Treasury Enforcement Communications System/Interagency Border Inspection System.   TECS is an automated enforcement and inspection lookout system that combines information from multiple agencies, databases, and system interfaces to compile data relating to national security risks, public safety issues, current or past targets of investigations, and other law enforcement concerns. The system is maintained by U.S. Customs and Border Protection. |
| **VGTOF** | Violent Gang and Terrorist Organization File. The VGTOF file has been designed to provide identifying information about violent criminal gangs and terrorist organizations and members of those gangs and organizations to law enforcement personnel. This information serves to warn law enforcement officers of the potential danger posed by violent individuals and to promote the exchange of information about these organizations and members to facilitate criminal investigations. USCIS has access to VGTOF through NCIC. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

# Chapter 2: Introduction

**Purpose**  This SOP describes the procedures Service Centers are to follow when adjudicating DACA requests.  This SOP includes the procedures for processing Form I-821D, Consideration of Deferred Action for Childhood Arrivals, and Form I-765, Application for Employment Authorization.  It also describes the procedures for adjudicating advance parole requests for individuals whose removal has been deferred under DACA and who need to travel outside of the United States for educational, employment, or humanitarian purposes.

**References**  For DACA:  Memorandum issued June 15, 2012, <u>Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children</u>, by Secretary of Homeland Security Janet Napolitano to U.S. Customs and Border Protection; U.S. Citizenship and Immigration Services; and Immigration and Customs Enforcement.  <u>See</u> Appendix A for a copy of the Secretary's memorandum.

**For Employment Authorization:**  8 C.F.R. § 274a.12(c)(14) is the legal authority for employment authorization based on a grant of deferred action.  The (c)(33) code will be used to distinguish EAD grants under DACA from EAD grants under other forms of deferred action.   <u>See</u> also the Secretary's memorandum, which provides that USCIS shall accept applications to determine whether individuals whose removal has been deferred under DACA qualify for work authorization during the period of deferred action.

**Fraud Cases**  All officers are required to review cases for the possibility of fraud.  All officers should review the case based on the standard fraud referral protocols and the additional guidance provided in Chapter 8, Section K of this SOP.

**Applicability**  This SOP is applicable to all Service Center personnel performing adjudicative and clerical functions or review of those functions.  Personnel outside of Service Centers performing duties related to DACA processing will be similarly bound by the provisions of this SOP.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

**Version April 4, 2013**    16

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 07/02/2018 Doc: 209-2 Filed 09/04/20 Pg: 208 of 572 Page 208 of 1026 PageID #: 9799

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 195 of 442

## Introduction, Continued

| | |
|---|---|
| **Conflict Resolution** | Any provision of the Act or 8 C.F.R. found by Headquarters Service Center Operations Directorate (SCOPS) to be in conflict with this SOP will take precedence over the SOP; any individual who identifies such an apparent conflict will report the matter immediately to the DACA SISO POC, who will in turn report the conflict to SCOPS.<br><br>If any apparent conflict is noted between this SOP and policy or guidance documents, the matter should be reported to SCOPS through the supervisory chain of command. |
| **Revisions** | SCOPS will issue numbered revisions to this SOP.  No other document will be considered a valid modification.<br><br>*Version Control*<br>All personnel who maintain a hard copy of the SOP will ensure that it is the latest version.  An electronic copy of the latest version will be posted per local procedures.  The training unit will archive all prior electronic versions of this SOP. |
| **Additional Resources** | For additional resources on DACA, please see a supervisor or training coordinator for DACA training presentations and modules. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

## Introduction, Continued

**DACA Overview**

On June 15, 2012, the Secretary of Homeland Security issued a memorandum entitled, <u>Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children</u>. In this memorandum, the Secretary provides guidelines for exercising prosecutorial discretion on a case -by-case basis to defer removal action of individuals who were brought to the United States as children. By issuing this memorandum, the Secretary recognized that, as a general matter, these individuals lacked the requisite intent to violate the law when they entered the United States as children. Therefore, the Secretary determined that additional measures are necessary to ensure that enforcement resources are not expended on these low priority cases, but rather, on those who meet DHS's enforcement priorities.

**Childhood Arrival**

For purposes of considering an individual for DACA under the Secretary's memorandum, an individual may be favorably considered for DACA if he/she:

1. Entered without inspection before June 15, 2012, or his or her lawful immigration status expired as of June 15, 2012. For DACA purposes, the phrase "in unlawful status as of June 15, 2012" means that he/she never had a lawful immigration status on or before June 15, 2012, or any unlawful status or parole that he/she obtained prior to June 15, 2012 had expired before June 15, 2012;
2. Was under the age of 31 as of June 15, 2012;
3. Came to the United States prior to reaching his/her 16th birthday;
4. Has continuously resided in the United States since June 15, 2007, up to the date of filing;
5. Was present in the United States on June 15, 2012, and at the time of making his/her request for consideration of deferred action with USCIS;
6. Is currently in school at the time of filing, has graduated or obtained a certificate of completion from a U.S. high school, has obtained a GED certificate or other equivalent State authorized exam in the United States, or is an honorably discharged veteran of the U.S. Coast Guard or U.S. Armed Forces; and
7. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013**      18

# Introduction, Continued

**DACA Requests Filed with USCIS**

USCIS will process all DACA requests, regardless of whether the individual is in removal proceedings (unless the individual is in immigration detention under the custody of ICE) or subject to a final order of removal. Depending on when the order was issued, this could be an order of deportation, exclusion or removal.  A complete DACA package consists of concurrently filed Forms I-821D, Consideration of Deferred Action for Childhood Arrivals and I-765, Application for Employment Authorization, with the worksheet, Form I-765WS. Forms I-821D and I-765 must be filed concurrently. DACA requests will be adjudicated by all four Service Centers.

**DACA Requestors in Immigration Detention**

USCIS lacks the authority to consider requests from individuals who are in immigration detention under the custody of ICE at the time of filing Form I-821D and remain in immigration detention as of the date Form I-821D is adjudicated.  Since the Lockbox is currently unable to reject these cases, the Center may receive a Form I-821D when the requestor was in immigration detention under the custody of ICE at the time of filing. Whenever this occurs, the Center should follow the procedures in Chapter 8, Section G. Evaluating Issues of Criminality, Public Safety, and National Security, Continued.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013        19

AR1462

## Introduction, Continued

**Lockbox**

All DACA requests are filed, with applicable fees, and with the appropriate USCIS Lockbox. DACA filings mistakenly mailed to a Service Center will be forwarded to the appropriate Lockbox for processing. Requests received at a Lockbox Facility will be electronically scanned into OnBase (the Lockbox intake system) and all pertinent fields will be populated in CLAIMS 3 (C3) into the Form I-821 screen, but with a new category "3" as the basis for requesting DACA. While Forms I-821for TPS, and I-821D for DACA are very similar, when Form I-821 appears in CLAIMS with category "3" (to denote that it is actually an I-821D for DACA), only those fields pertaining to the DACA request will be active.



The file containing the Form I-821D and Form I-765 will be forwarded to the appropriate Service Center for adjudication, based on the agreed upon routing logic between Service Centers and Lockbox.

The Lockbox will screen DACA requests to determine whether they have been filed correctly with USCIS.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

# Chapter 3: Summary of Overall Process Flow For DACA Filings

**Introduction**     This section summarizes the general process flow for an initial DACA request, from intake at the Lockbox, to the point of a final decision.

**Process Flow**     Step 1:
Intake occurs at the Lockbox per the agreed upon Lockbox/SCOPS business rules.

Step 2:
Service Center Records performs the A-number look-up and validation process.

Step 3:
Data is populated into C3 via the Lockbox-Service Center interface.

Step 4:
Lockbox creates and ships A-Files/T-Files to the appropriate Service Center based on the agreed upon routing.

Step 5:
Service Centers receive the files and perform file intake functions.

Step 6:
ASC appointments are scheduled via SNAP by the Service Center pursuant to local procedures.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid 'need-to-know' basis without prior approval from the originator

Appeal: 18-1521   Document 28-2   Filed: 07/02/2018   Pg: 213 of 572   Case 1:17-cv-05228-NGG-VMS   Document 92-7   Filed 09/04/20   Page 213 of 1026 PageID #: 9804

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 200 of 442

# Summary of Overall Process Flow For DACA Filings, Continued

**Process Flow (Continued)**

**Step 7:**
In parallel to the SNAP scheduling process, background and security checks are initiated via ▮(b) (7)(E)▮

**Step 8:**
The Service Center must look for the following to determine the next steps:
- Whether the DACA requestor appeared at the ASC for biometrics capture and whether the FBI returned the fingerprint results (fingerprint results are required only for those 14 years and older); and
- Whether ▮(b) (7)(E)▮ fingerprint results returned derogatory information impacting the exercise of discretion for DACA.

**Step 9:**
The Service Center will take adjudicative action.

**Step 10:**
The process flow splits off here, depending on the results from the FBI, the ▮(b)(7)(E)▮ check, on whether an adjudication hold should be placed on the request. A DACA request will be routed based on these results, as laid out in the chart below:

| (b) (7)(E) | |
|---|---|
| No hit | are routed to an officer for adjudication. |
| A hit | is routed to adjudications from BCU with the annotation Does Not Relate (DNR); or |
| | is routed to BCU for confirmation and vetting of the related hit. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013     22

# Chapter 4: Lockbox Intake

**Rejection Criteria**

The Lockbox will use the following rejection criteria for DACA filings:

Rejection of Form I-821D:
- Missing Signature on either Form I-821D or Form I-765;
- Missing or wrong fee for Form I-765 (Expecting $465 total, which includes the biometrics fee, unless the individual fits within certain fee exemptions established for DACA requestors and an exemption has been previously approved);
- Missing Required Fields – needed for ingestion to C3:
  - Family Name
  - Address: or
  - Date of Birth:
- Form I-821D received without Form I-765;
- Filed from a foreign address;
- Form I-131 for advance parole received with Form I-821D (If the Form I-131 is filed with a separate check, only the Form I-131 will be rejected and the Form I-821D and Form I-765 will be accepted);
- The requestor was 31 years or older on June 15, 2012;
- The requestor is under 15 at time of filing and does not indicate that he/she is in removal proceedings in Question 3.b. of Form I-821D.

Rejection of Form I-765 (based on DACA grant):
- Missing or wrong fee (Expecting $465 total, including the biometrics fee, unless the individual fits within certain fee exemptions established for DACA requestors and an exemption has been previously approved); or
- Missing Signature.

*The "stand-alone" Form I-765s filed by those whose removal has been deferred under DACA by ICE will be processed at the National Benefit Center. Prior to the decision that USCIS will process all DACA requests to include those in removal proceedings, ICE did defer removal for some DACA requestors.*

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

J.A. 736

AR1466

## Lockbox Intake, Continued

| | |
|---|---|
| **A#<br>Validation/<br>Assignment** | The Lockbox will perform the following:<br><br>• A# validation is triggered by the Form I-821D;<br>• If the requestor provides an A# that matches the Central Index System (CIS) based upon the same name and date of birth, the A# is retained and cloned to the Form I-765;<br>• If the A# provided by the requestor is incorrect, the transaction goes to the queue for research. If the correct A# is found in USCIS systems, it is inserted into the Form I-821D record and cloned to the Form I-765. If no A# is found in USCIS systems, then an A# is assigned to Form I-821D and cloned to the Form I-765;<br>• If there is no A# on the Form I-821D, the transaction goes to the queue for research. If the correct A# is found, it will be inserted into the Form I-821D record and cloned to the Form I-765. If no A# is found in USCIS records (manual search), then the A# is assigned to Form I-821D and cloned to the Form I-765.<br><br>Research is completed by Service Center staff remotely accessing the Lockbox intake system. DACA requests with a missing or invalid A# are routed to USCIS to review. USCIS may correct the A# or assign a new A#. |

**Record of Proceeding (ROP)**

The Lockbox will assemble the DACA files in the following order:

| Records Side | Non-Records Side |
|---|---|
| Valid Form G-28 | Form G-28 (not-valid) face down |
| Form I-821D | Property Envelope (facing backward and upside down) |
| Form I-765WS | |
| Form G-1145 | |
| Attorney's Letter (if applicable) | |
| Passport | |
| Birth Certificate | |
| Form I-94 | |
| Other Supporting Documentation (e.g., school transcripts and relating envelope) | |
| Form I-765 (2 requestor's photos will be placed in a ziplock bag and stapled to the Form I-765) | |
| Address Side of Envelope | |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013        24

# Chapter 5: Service Center Intake

**Incoming Files**

The contractor will perform the following actions:
- Open the boxes from the Lockbox;
- Date stamp and check the manifest against the files in the boxes;
- Separate A-file and T-files;
- Perform "new add" for the receipt files, A-files, and T-files, as well as consolidate Forms I-821D and I-765 into the A-file/T-file in the National File Tracking System (NFTS);
- T-files – locate the A-file(s) using the NFTS inquiry screen and if the A-file(s) are located outside the Service Center, initiate the A-file request;
- A-files – Perform "new add the A-file" into the Central Index System (CIS); and
- Deliver DACA files to work distribution. Responsible Party Codes (RPCs) are used to track the location of files at the Service Center. An NFTS barcode is placed on each shelf, box, or drawer in which DACA files are stored.

The Service Center will perform the following actions:
- Perform a Quality Assurance review on a random sample of incoming DACA files. ROP order, proper acceptance, and correct matching data on the form compared with the CLAIMS record, will all be reviewed. Any errors will be recorded and reported back to the Lockbox service provider for process improvement steps. Corrections will be made at the Service Center.
- Initiate an automated ▮(b)(7)(E)▮ check of the DACA requestor's name(s) and date(s) of birth; and
- Review and resolve any identified hit (performed by BCU officers).

<u>See</u> Chapter 6 for more detailed information relating to background checks.

**Biometric Capture**

The Service Center will perform the following actions:
- Compile **daily bulk scheduling** requests and send them to the ASC for SNAP scheduling; and
- Fill officer work orders, as biometric and fingerprint results post for DACA requestors.

*Continued next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013**     25

AR1468

Appeal: 18-1521    1:17-cv-02528-GLR    Document: 28-7    Filed: 07/02/2018    Pg: 205 of 572    Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 217 of 1026 PageID #: 9808

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 204 of 442

## Service Center Intake, Continued

**Biometric Rescheduling**

All reschedule requests will go through the centralized rescheduling facility. The centers will be notified via a spreadsheet from the centralized rescheduling facility upon rescheduling of an original ASC appointment.

The requestor can reschedule multiple times within 87 days of the initial ASC appointment date. If the requestor fails to appear at the ASC within the 87 days, the DACA request will be denied for abandonment.

If the requestor asks for an appointment beyond 30 days into the future, the centralized rescheduling facility will send a scanned request to the Service Center for processing. The rescheduled ASC appointment date is not to exceed the 87-day window.

**Biometric No Shows**

If a requestor is originally scheduled for an ASC appointment and does not appear, the center should issue RFE DACA 130. The RFE should include other deficiencies identified during the review of the request. A written response to the RFE is not required, provided that the requestor goes to the rescheduled ASC appointment and no other evidence is requested.

The centers will be notified via a spreadsheet from the centralized rescheduling facility upon rescheduling of an original ASC appointment. The center will then hold the case for the new appointment, and if the requestor fails to appear again, or if the requestor fails to reschedule a second appointment within 87 days based on that RFE, the case will be denied for abandonment.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

| **Homebound Biometrics Capturing** | If a requestor is unable to attend the biometrics appointment at the ASC due to medical limitations, the ASC notice directs the requestor to call the National Customer Service Center (NCSC) telephone line. The NCSC will create a SRMT and route it to the Service Center according to the designation within the receipt number of Form I-821D. Once the SRMT has been created, the Center will initiate contact with SCOPS for assistance. |
|---|---|

- The Center will email HQSCOPSDACA with subject line: "Homebound DACA Requestor" and include the information provided by the requestor in the SRMT concerning medical limitations, contact information, and the SRMT referral ID {e.g., ETC.334.12.00177.CIN}.

- Once the email is received, SCOPS/SPB will coordinate with the Field Operations Directorate (FOD)/Operations Support Branch (OSB) to designate a District/Field Office that has a mobile unit to capture the required biometrics.

- SCOPS will email FOD to ask for assistance in biometric capturing for the homebound DACA requestor and identify a Center POC for the District/Field Office to liaise with if questions arise.

- Once notified, SCOPS will instruct the Service Center to transfer the SRMT to the designated District/Field Office for completion.

- The District/Field Office will contact the DACA requestor to make arrangements for biometrics capturing. Biometrics capturing should occur within 30 days of the transfer. The District/Field Office will notify the Center POC if there are extenuating circumstances that will delay the capturing of biometrics beyond 30 days.

- The Center should monitor the SRMT to ensure biometrics are captured within 30 days of the transfer.

- If 30 days have elapsed from the date of the transfer and no action has occurred, the Center should notify SCOPS/SPB so follow-up can occur with FOD/OSB.

Once collected, the mobile unit's live scan will be uploaded into the Benefits Biometric Support System (BBSS), or if the mobile unit is unavailable at the time of biometrics capturing, the District/Field Office will send the two FD-258 cards and photo material to the designated Center POC for appropriate action.

| **Officer Work Orders** | The contractor will perform the following actions: |
|---|---|

- In accordance with local procedures, screen prints may be provided to officers to reduce the need to search systems at the point of adjudication; and
- Adjudication ready DACA files will be delivered to officers.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013     27

AR1470

## Service Center Intake, Continued

| | |
|---|---|
| **Non-Sufficient Funds (NSF)** | *Background* |

This section addresses the procedures to be used for completing the non-sufficient funds (NSF) cases. The NSF cases are identified by the Burlington Finance Center (BFC) and are listed in the NSF "New Bill Report" in the Federal Finance Management Service (FFMS) system.

For DACA, Forms I-821D and I-765 must be filed concurrently. There is no fee for Form I-821D. The $380 fee is required for Form I-765. The $85 biometrics fee is also required. Lockbox will be looking for $465, either in one check or in two checks. The I-765 fee and the biometrics fee will be bundled in C3 and listed as one fee -- $465. If the DACA requestor does not remit $465, Lockbox will reject the entire filing. Even when the proper fee has been remitted, it is possible that payment may be returned due to NSF. The NSF can occur in a combination of scenarios: the fees are paid in one check and the entire check is returned as NSF; or the fee is paid in two checks and either or both checks are returned as NSF. Failure of either fee or both fees to clear the bank, or being made good within the 14 calendar days allowed, will result in denial of Form I-821D and rejection of Form I-765. See Chapter 9 for more information on the denial.

*Retrieving the New Bill Listing Report in FFMS*

Fee payments in the form of personal checks, cashier checks, or money orders are submitted along with a DACA request. When a discrepancy is found in a payment, such as stale, dated, or without sufficient funds, etc., the bank will notify the Burlington Finance Center (BFC) in Vermont. These non-payment checks or money orders are referred to as bounced checks. The BFC will compile all the bounced checks and enter the data into the FFMS system, create an invoice number for each bounced check case, and place them on the bounced check "New Bill Report." The Service Center Records Divisions, on a daily basis, access this data via the FFMS website to download a bounced check "New Bill Report."

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

**Version April 4, 2013**    28

AR1471

## Service Center Intake, Continued

**Non-Sufficient Funds (NSF)** (continued)

*Invoicing the Payee*

Along with listing the case in FFMS, the BFC will also mail an invoice to the payee of the fee, requesting that the new payment be sent to them and that a $30 NSF charge also be paid. The $30 NSF charge is assessed on <u>each</u> bounced check.

*Notifying the DACA Requestor*

The Service Center will mail an informational notice on the I-797C to the DACA requestor regarding the specific NSF payment. In this case, the DACA requestor will receive the NSF notice, regardless of whether they are the payee or not. In this manner, both the payee and the DACA requestor receive notification if they are different parties.

*Placing Case in Hold Status*

To reflect the hold status of the case, the action codes will be recorded in C3, are as follows:

 CHECK BOUNCED, CASE NOT YET COMPLETED and CHECK DEFICIENCY NOTICE 1 SENT

Place file on a hold shelf.

*Completion procedure when case is paid*

The bounced check paid cases are identified by Burlington Finance Center and are listed in the bounced check "Paid Activity Report" in the FFMS system. The Service Center Records Divisions access this data daily via the FFMS website to download the bounced check Paid Activity Report.

*Continued on next page*

**FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)**
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013      29

## Service Center Intake, Continued

**Non-Sufficient Funds (NSF) (continued)**

*System Update Steps*

The CLAIMS GUI I-765 record will be accessed. The new paid date from the Paid Activity Report will become the new Received Date in the record.

The remittance screen will be updated with the action code: ▮(b) (7)(E)▮FEE COLLLECTED ELSEWHERE

A modified receipt notice will be printed and mailed reflecting the new Received Date. The action code recording this is: ▮(b)(7)(E)▮ MODIFIED RECEIPT NOTICE 1 SENT

The hold status will be removed from the record. The action code recording this is: ▮(b)(7)(E)▮ BOUNCED CHECK CORRECTED ON CASE NOT YET COMPLETED

The case is now ready to proceed again through the pre-adjudication process. Schedule the biometrics appointment in SNAP and place the file on the biometrics hold shelf.

*Mailing the Receipt notice*

The receipt notice states:
"This is to notify you that we have received full payment for the above referenced application or petition and processing has resumed. Your filing date has been adjusted to reflect the receipt of payment. We will notify you separately of our decision on the application or petition."

*Completion procedure when case remains unpaid*

Unless fee exempt, the DACA requestor has 14 calendar days from the invoice date to submit proper payment by credit card, money order or cashier's check to the BFC. The proper payment is $465 -- $380 for the Form I-765 and $85 for the biometrics fee. If the $465 was paid in two checks, either check exceeding the 14 calendar days allowed to correct NSF status will result in rejection of Form I-765.

- Pull the files that have been staged on the bounced check hold shelf for over 14 days and verify the case in the CLAIMS system and determine the bounced check "paid" status in FFMS.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Service Center Intake, Continued

**Non-Sufficient Funds (NSF)** (continued)

The FFMS "Status" box indicates "OPEN"

The "Open" status means the BFC has not received the bounced check payment in full from the debtor. After the 14-day hold on the bounced check hold shelf, a C3/GUI application/petition shall be pulled from the hold shelf for review. If it has been over 14 days past due and the case status shows "Open" in FFMS and there is no indication of a "Change of the Due Date" made by the BFC in the in the Customer Log (RM043) screen, reject the Form I-765 as "untimely paid."

Recording the Rejection

The case is accessed in C3 and the action code recorded is: (b) (7)(E)
BOUNCED CHECK NOT CORRECTED, REJECTED

Form I-765 form will be closed by the Records Analyst in this manner:
In the "Action Block" of the application, stamp in red or black ink **"REJECTED Bounced Check."**

A memorandum is printed from a template in MS Word recording the following data:

- Today's Date
- Form Type
- A# (if available)
- Receipt #
- Date Rejected
- Invoice #
- Amount
- Debtor's Name (Optional)

Place this memo on the top of the right side of the DACA A-file.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013     31

**AR1474**

## Service Center Intake, Continued

**Non-Sufficient Funds (NSF)** (continued)

*Mailing the Rejection*

A rejection notice printed on I-797 is generated from C3 and mailed to the requestor. It reads:

> We previously notified you that the payment for the filing fee in the above case was returned. The Burlington Finance Center did not receive payment within 14 days of the invoice.

> Your application or petition has been rejected as improperly filed. Any previously assigned priority or processing date is no longer applicable. A new application or petition must be filed, and a new fee is required, if you wish to pursue the benefit. Personal Checks will not be accepted.

*Disposition of the I-821D*

After processing the rejection for Form I-765 due to the NSF, on **the same day**, route the A-file to a DACA Supervisory Immigration Services Officer for issuance of a denial for the Form I-821D.

The denial should be issued per the instructions in Chapter 9 of this SOP.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

**Version April 4, 2013**      32

# Chapter 6: Background and Security Checks

**Introduction**

Background and security checks will be conducted for all DACA requests. As part of the background check, USCIS requires that specific security checks or a combination of checks are completed for Forms I-821D and I-765. The background checks refer to the analysis of the results of the security checks or any other identified concern relating to national security or public safety and the actions required to resolve the concern. The resolution must be conducted in accordance with current NaBISCOP and CARRP policies.

Fraud related concerns that arise during the course of background and security checks should be addressed according to the March 2011 SOP, 2008 ICE/USCIS MOA and Chapter 8, Section K of this SOP. Fraud related issues will be referred to CFDO.

The following specific background and security checks apply to DACA requestors:

(b) (7)(E)

**Responsibility**

All DACA requestors with national security issues, (b) (7)(E) hits, or other criminality concerns will be processed by the BCU DACA team per the following guidance:

- **National Security:** All (b) (7)(E) national security issues will be resolved through the established CARRP process. All cases with National Security concerns will be resolved and adjudicated by the CARRP officer attached to the BCU DACA Team.



*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013**    33

AR1476

## Background and Security Checks, Continued

**Responsibility** (continued)



| | |
|---|---|
| **System Updates for DACA File Movement Into and BCU** | For reporting purposes, DACA file movement into and out of the BCU will require the following updates in C3: |

- "Sent to Background Check Unit (BCU) for Resolution" (b) (7)(E) when sending a DACA request to the BCU; and
- "Received from Background Check Unit (BCU) with Resolution" (b) (7)(E) when receiving a DACA request from the BCU for final processing.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Background and Security Checks, Continued

**Overview of Background Check Process**

Appendix C illustrates a high level overview of the background check process once potentially derogatory information has been identified as a result of the security checks, or from other sources.



### A. Procedures for confirming a match

USCIS personnel must:

- Determine if the subject of the derogatory information relates to the requestor; and
- Compare the information from the security check or other source to the biographic, biometric information, and physical descriptors about the individual.

USCIS personnel may use any combination of available identifiers, to assist in the determination. While USCIS officers primarily rely on best judgment and experience in determining whether the information relates to the individual, USCIS personnel should consult with a supervisor if there is any uncertainty as to whether the information relates to the DACA requestor. If there continues to be any uncertainty about the match, supervisors may work through their chain of command and with HQ, if necessary.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013**     35

## **Background and Security Checks,** Continued

| | |
|---|---|
| Overview of Background Check Process (continued) | **B. Triage Information**<br><br>1. *Conclusive Match*<br>Once it is determined that the information relates to the individual, USCIS personnel must determine if the results fall into the following categories, which require special processing: |

- National Security;
- EPS or other criminal cases; or
- Articulated immigration Fraud.

Criminal hits, which involve a violation of U.S., state, or local criminal law, but do not rise to the level of an EPS concern, as defined in the November 7, 2011, NTA memorandum, impact each case differently and should be considered during the adjudication process to determine if such activity is germane to the request for consideration of deferred action for childhood arrivals. Criminal activity occurring outside of the United States (including foreign convictions) that may be revealed during routine background checks or which the requestor may have disclosed on the deferred action request, factor into the evaluation of whether the requestor poses a public safety concern, under the totality of the circumstances.

2. *Inconclusive Match*
When USCIS officers are unable to confirm the match after exhausting available electronic systems searches and other resources, personnel must consult their chain of command to determine the appropriate follow-up action. In some instances, **(b) (7)(E)** RFE to confirm the match, or other appropriate action may be required. USCIS personnel must then document the hit, include a statement in the Resolution Memorandum or other memoranda, as required, explaining the inconclusive nature of the match determination, the actions taken to resolve the hit, and refer the case to the appropriate unit or field office to confirm the match. If USCIS personnel are still unable to confirm the match, refer the case through the chain of command.

**C. Resolve Concern**
Resolution may require a variety of activities to be completed by the BCU which include, but are not limited to **(b) (7)(E)**

**(b) (7)(E)**

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

Version April 4, 2013     36

Appeal: 18-1521    Document: 28-2    Filed: 07/02/2018    Pg: 228 of 572
Case 1:17-cv-05228-NGG-VMS    Document 28-7    Filed 09/04/20    Page 228 of 1026 PageID #: 9819

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 215 of 442

## Background and Security Checks, Continued

**Overview of Background Check Process (continued)**

Deconfliction is the coordination between USCIS and another governmental agency or record owner to ensure that planned adjudicative activities (e.g., interview, request for evidence, site visit, decision to grant or deny, issue an NTA, and the timing of such) do not compromise or impede an ongoing investigation or other record owner interest.

**D. Document the Resolution**
Each hit requires documentation by the BCU DACA Team member of any resolution. Review the specific information for each background and security check for more information on documenting the resolution.

**E. Adjudication**
Once the NS/EPS/other criminal concern has been resolved, the BCU DACA ISO should proceed with adjudication.

 USCIS will conduct  batch queries on the ████████ all DACA requests within 15 calendar days of initial receipt. The objective of

In addition, USCIS has access to other types of records, referred to as "hot files." The following records are "hot files":

- Wants/Warrants;
- Foreign Fugitives;
- Missing Persons;
- Registered Sex Offenders;
- Deported Felons;
- Supervised Release;
- Protection Orders;
- Terrorist Organization Members; and
- Violent Gang Members.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013**    37

Appeal 18-1521 Case 1:17-cv-05228-NGG-VMS Document 28-2 Filed 07/03/2018 Page 229 of 572 Page 229 of 1026 PageID #: 9820

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 216 of 442

## Background and Security Checks, Continued


(continued)

Officers must determine whether the result of a security check relates to the subject or does not relate (DNR). Officers review and resolve security checks and complete the background checks. For (b)(7)(E) procedures, search criteria and best practices, refer to the current NaBISCOP policy.



The following items, if present, must be reviewed in the DACA A-file for name and DOB combinations and aliases, (b)(7)(E)

- Form I-821D;
- Form I-765;
- All supporting documents; and
- Any other documents in the A-file relating to the DACA request including, but not limited to the following:

  ▪ Passports;
  ▪ Visas;
  ▪ Border Crossing Cards (BCC);
  ▪ Forms I-94;
  ▪ Birth Certificates;
  ▪ Marriage Certificates;
  ▪ Divorce Decrees;
  ▪ Diplomas/Academic Transcripts;
  ▪ Student Identification Cards;
  ▪ Military Identification Cards;
  ▪ Driver's Licenses;
  ▪ Social Security Cards; or
  ▪ Business/Membership Cards.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013      38

Appeal: 18-1521   Doc: 28-3   Filed: 07/03/2018   Pg: 230 of 572
Case 1:17-cv-05228-NGG-VMS   Document 82-7   Filed 09/04/20   Page 230 of 1026 PageID #: 9821

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 217 of 442

## **Background and Security Checks,** Continued



*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

AR1482

## Background and Security Checks, Continued

| | |
|---|---|
| **Resolution Memorandum** | The resolution memorandum is the formal documentation of the reconciliation of a related hit. This is a mandatory action that must be completed before rendering a final adjudicative decision. Before completing the adjudication, the officer should ensure that each resolution memorandum completely resolves the hit. For a related hit, a separate resolution memorandum must be completed for each subject with a related hit and each file containing a related hit. For procedures and formats for the resolution of related hits, refer to the current NaBISCOP policy. |
| **FBI Fingerprint Check** | The FBI Fingerprint Check provides summary information of an individual's administrative or criminal record within the United States. The FBI Fingerprint Check is conducted through the Integrated Automated Fingerprint Identification System (IAFIS). The IAFIS is a national fingerprint and criminal history system maintained by the FBI's Criminal Justice Information System (CJIS) Division. State, local, and Federal law enforcement agencies submit fingerprints and corresponding administrative or criminal history information to IAFIS. Participation by state and local agencies is not mandatory, so the FBI Fingerprint check does not contain records from every jurisdiction. The information contained in the record is obtained using prior fingerprint submissions to the FBI related to arrests and, in some instances, Federal employment, naturalization, or military service. |



Issues of criminality arising from an IDENT, IDENT handling procedures, and adjudication of the case based on the IDENT, are addressed more fully in Chapter 8, Section G of this SOP.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Background and Security Checks, Continued

| | |
|---|---|
| **FBI Fingerprint Check Procedures** | All individuals filing a DACA request will be scheduled for biometrics capture (photo, fingerprints, and signature) at an ASC regardless of whether biometrics were captured for the requestor from a previous filing with USCIS within the last 15 months. DACA requestors under the age of 14 will have the press print captured instead of full fingerprints. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

# Chapter 7: DACA Overview

| | |
|---|---|
| **Filing** | All individuals requesting DACA must file their request individually and satisfy the DACA guidelines in their own right; USCIS will not consider deferring removal action of an individual under DACA based on their familial relationship to someone who has received DACA. There is no derivative DACA. |
| **Commonwealth of the Northern Mariana Islands (CNMI) Not Eligible** | The CNMI is part of the United States and is not excluded from this process. However, because of the specific guidelines for DACA, individuals who have been residents of the CNMI are in most cases unlikely to qualify for the program because they must, among other things, have come to the United States before their 16th birthday and have resided continuously in the United States since June 15, 2007. |
| | Under the Consolidated Natural Resources Act of 2008, the CNMI became part of the United States for purposes of immigration law only on November 28, 2009. Therefore, entry into, or residence in, the CNMI before that date is not entry into, or residence in, the United States for purposes of DACA. |
| | USCIS has used parole authority in a variety of situation in the CNMI to address particular humanitarian needs on a case-by-case basis since November 28, 2009. If an individual lives in the CNMI and believes that he or she meets the guidelines for DACA except that his or her entry and/or residence to the CNMI took place entirely or in part before November 28, 2009, USCIS will consider the situation on a case-by-case basis for a grant of parole. Individuals who believe this situation applies to them are instructed to make an appointment through INFOPASS with the USCIS Application Support Center in Saipan to discuss their case with an immigration officer. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013      42

## DACA Overview, Continued

**Initial DACA Package**

A complete DACA package must include the following items:

1. Form **I-821D**, Consideration of Deferred Action for Childhood Arrivals, properly filed with proper signature.
2. Form **I-765**, Application for Employment Authorization with **I-765 WS**, properly filed with proper signature, the base filing fee, and the biometric services fee. The fees for Form I-765, and the biometric services fee are not eligible for fee waiver consideration.*
3. Evidence of identity to include date of birth, which would establish compliance with the upper and lower age limits.
4. Evidence of entry prior to the requestor's 16th birthday.
5. Evidence of continuous residence since June 15, 2007, up to the date of filing.
6. Evidence of unlawful status on June 15, 2012, if admitted or paroled.
7. Evidence of presence in the United States on June 15, 2012.
8. Evidence that any absences from the United States during the required period of continuous residence were brief, casual, and innocent absences.
9. Evidence that the requestor is currently in school at the time of filing, graduated or obtained a certificate of completion from a U.S. high school, public or private college, or university or community college, obtained a general educational certificate (GED) or other equivalent State-authorized exam in the United States, or is an honorably discharged veteran of the Coast Guard or U.S. Armed Forces.

*If the requestor has been determined exempt from the fee. The DACA package must be accompanied by the exemption approval letter from USCIS Headquarters.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

## DACA Overview, Continued

**DACA Guidelines**

An individual meeting the following guidelines may be favorably considered for DACA if, under the totality of the circumstances, he/she:

1. Entered without inspection before June 15, 2012, or his or her lawful immigration status expired as of June 15, 2012.  For DACA purposes, the phrase "in unlawful status as of June 15, 2012" means that he/she never had a lawful immigration status on or before June 15, 2012, or any unlawful status or parole that he/she obtained prior to June 15, 2012 had expired before June 15, 2012;
2. Was under the age of 31 as of June 15, 2012 (Born after June 15, 1981 so was not age 31 or older on June 15, 2012);
3. Came to the United States prior to reaching his/her 16th birthday;
4. Has continuously resided in the United States since June 15, 2007, up to the date of filing;
5. Was present in the United States on June 15, 2012, and at the time of making his/her request for consideration of deferred action with USCIS;
6. Is currently in school at the time of filing, has graduated or obtained a certificate of completion from a U.S. high school, has obtained a GED certificate or other equivalent State authorized exam in the United States, or is an honorably discharged veteran of the U.S. Coast Guard or U.S. Armed Forces; and
7. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

# Chapter 8: Adjudication of The DACA Request

## A. Procedural Overview

| | |
|---|---|
| **Evaluating the Evidence** | When evaluating the evidence submitted in support of a request for DACA consideration, refer to the discussion of the different types of evidence, the weight to be given to such evidence, and the standards of proof, all of which are discussed in Chapter 1. |
| **Request for Evidence (RFE) versus Notice of Intent to Deny (NOID)** | Officers will **NOT** deny a DACA request solely because the DACA requestor failed to submit sufficient evidence with the request (unless there is sufficient evidence in our records to support a denial). As a matter of policy, officers will issue an RFE or a Notice of Intent to Deny (NOID). |
| | If additional evidence is needed, issue an RFE whenever possible. |
| | When an RFE is issued, the response time given shall be 87 days. A list of DACA RFE call-ups and the actual templates can be found in Appendix D. |
| | When a NOID is issued, the response time given shall be 33 days. |
| **Unobtainable A-files** | After requesting an A-file from the FCO, there may be occasions when there is no response or the file cannot be released (e.g., pending interview, etc.). After three unsuccessful attempts to obtain the file from a field office via CIS or from ICE, adjudicate the DACA filing from the T-file. |
| | If the A-file is with ICE, the center should send three requests via CIS using standard procedures. However, if the A-file is not received from ICE within the 30 days allowed after the initial request, the center's Records Section should also send a manifest containing a list of the A-files requested from ICE to the designated ICE e-mail box, which has been created specifically for the DACA workload. The center's Records Section has this e-mail box and will designate a primary and an alternate Point of Contact who will send the manifest. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

AR1488

Appeal: 18-1521 Document: 28-7 Filed: 07/02/2018 Pg: 237 of 502 Page 237 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 237 of 1026 PageID #:
9828

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 224 of 442

**A-File Requests from USCIS Field/Asylum Office**

Centers may release an A-file to a USCIS Field Office or Asylum Office without SCOPS approval whenever the A-file request is based upon adjudication of a pending of a pending Form I-589, Form I-485 (or motion to reopen/reconsider I-485), or Form N-600 located within the requesting office <u>unless</u> the requestor's case contains novel, complex, or sensitive information (i.e., national security concern, currently in detention, etc.).

In these instances, Centers are instructed to notify SCOPS of the novel, complex, or sensitive information within the case and wait for approval to release the A-file.

Whenever the A-file is released to a USCIS Field Office or Asylum Office, Centers will hold adjudication of the Form I-821D and I-765 and send the A-file with the DACA forms pending. Prior to release, Centers should coordinate with their Records Division to identify a POC within the requesting office to inform the POC that the A-file must be returned as soon as final adjudication is rendered so that appropriate action can be taken on the DACA forms.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013        46

AR1489

## B. System Searches



FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

Version April 4, 2013      47

AR1490

# C. Determining if Guidelines are Met

| | |
|---|---|
| **Introduction** | Individuals may be considered for DACA upon showing that they meet the prescribed guidelines by a preponderance of the evidence. The evidentiary standards are discussed in Chapter 1. If additional information is needed for DACA consideration, issue an RFE. Appendix D has a list of DACA RFE call ups. |
| **Identity** | Acceptable evidence may consist of, but is not limited to:<br>• A passport,<br>• A birth certificate accompanied by some type of photo identification,<br>• Any national identity document from the requestor's country of origin bearing the requestor's photo and/or fingerprint;<br>• Any U.S.-government immigration or other document bearing the requestor's name and photograph (e.g., Employment Authorization Documents (EADs), expired visas, driver's licenses, non-driver cards);<br>• Any school-issued form of identification with photo;<br>• Military identification document with photo<br>• State-issued Photo ID showing date of birth; or<br>• Any document that the requestor believes is relevant.<br><br>The Matricular Consular or other form of consular identification issued by a consulate or embassy in the United States will be accepted as proof of identity.<br><br>Expired documents are acceptable.<br><br>If identity is not established, then issue RFE DACA 100 call up from Appendix D. |
| **Age at Time of Filing** | If the DACA requestor is not in removal proceedings, does not have a final removal order, or does not have voluntary departure, he/she is to be age 15 or older to file the DACA request. To determine the requestor's age at the time of filing, review the requestor's birth certificate or other acceptable secondary evidence establishing the requestor's date of birth.<br><br>If the DACA requestor is in removal proceedings (including cases that have been administratively closed), which includes having an order of voluntary departure after proceedings were initiated or a final order, he/she may be under age 15 at the time of filing the DACA request.<br><br>Regardless of whether the DACA requestor is in removal proceedings or not, he/she was born after June 15, 1981 and meets the remaining guidelines in the Secretary's memorandum. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## C. Determining if Guidelines are Met, Continued

**Arrived in the United States Prior to 16th Birthday**

The Secretary's memorandum states as one of the guidelines to be met before an individual is considered for DACA is that he/she arrived in the United States prior to reaching his/her 16th birthday. To determine the date of arrival, review the response to Part 1, questions 13 through 17 of Form I-821D for the date and place of initial entry into the United States and status at entry. In addition, review question 6 in Part 1 and the requestor's birth certificate or other acceptable evidence establishing the requestor's date of birth.

If the requestor indicates a status in response to question 15 of Form I-821D, but does not provide the I-94# or a copy of the I-94 or any other document, such as a copy of his/her passport showing the date of initial entry, perform a systems check (SQ94/Arrival Departure Information System (ADIS)) to validate the date of entry, if needed.

If the requestor entered "no status" in response to question 15 of Form I-821D, or if the requestor indicates that he/she arrived with a status or was paroled into the United States, but this cannot be validated through a systems check, review the totality of the evidence submitted to establish whether the individual entered before age 16.

If the totality of the evidence does not establish that the requestor arrived in the United States before his/her 16th birthday, issue RFE DACA 103 call up from Appendix D for evidence of the date of arrival.

**Present in the United States on June 15, 2012**

The Secretary's memorandum states as one of the guidelines to be met before an individual may be considered for DACA that the individual was present in the United States on June 15, 2012. To determine if the requestor was present in the United States on June 15, 2012, review the responses to Part 1 regarding the date of entry, status at entry and date authorized stay expired, and the responses to the questions in Part 2 regarding all absences from the United States since June 15, 2007. Review the totality of the evidence submitted. The evidentiary standards are discussed in Chapter 1. If the requestor arrived before June 15, 2007, and there is no indication of any departure and the evidence submitted establishing his/her presence in the United States on June 15, 2012 is credible, then this guideline has been met.

If a given document does not specifically refer to June 15, 2012, review the dates on all the documentation submitted in its totality to establish presence in the United States on that date.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013      49

AR1492

## C. Determining if Guidelines are Met, Continued

**Present in the United States on June 15, 2012** (continued)

The following are examples of acceptable evidence to establish presence in the United States on June 15, 2012. This list of examples is not exhaustive.

| Evidence | Acceptable Documentation |
|---|---|
| Employment Records | • Pay stubs;<br>• W-2 Forms;<br>• Federal, State, or local income tax returns; or<br>• Letters from employer(s) or, if the DACA requestor has been self-employed, letters from banks, and other firms with whom he/she has done business.<br><br>In all of these documents, the employee's name and the name of the requestor's employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters from employers must be signed by the employer and must include the employer's contact information.<br><br>Such letters must include: **(1)** the requestor's address(es) at the time of employment; **(2)** the exact period(s) of employment; **(3)** period(s) of layoff; and **(4)** a brief summary of the requestor's duties with the company. |
| Receipts, Bills, Letters | • Rent receipts;<br>• Utility bills (gas, electric, telephone, etc.) bearing the requestor's name (or family name if residing at same address) and address; or<br>• Receipts or letters from companies showing the dates during which the requestor received service. |
| School Records | Transcripts, letters, report cards, etc., from the school(s) that the requestor attended in the United States showing the name of school(s) and the period(s) of school attendance. |
| Medical Records | Hospital or medical records showing medical treatment or hospitalization of the requestor. Such records should show the name of the medical facility or physician, as well as the date(s) of the treatment or hospitalization. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

AR1493

## C. Determining if Guidelines are Met, Continued

| | Evidence | Acceptable Documentation |
|---|---|---|
| **Present in the United States on June 15, 2012** (continued) | Memberships | • Official records from a religious entity in the United States confirming the requestor's membership or attendance in the entity, attendance at entity events, or participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.).<br>• Documentation showing membership in community organizations (e.g. Scouts). |
| | Military Records | Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records). |
| | Additional Documents | Additional documents to support the requestor's claim may include:<br>• Money order receipts for money sent in or out of the country;<br>• Passport entries;<br>• Birth certificates of children born in the United States;<br>• Dated bank transactions;<br>• Correspondence between the DACA requestor and other persons or organizations;<br>• U.S. Social Security card;<br>• Selective Service card;<br>• Automobile license receipts, title, vehicle registration, etc.;<br>• Deeds, mortgages, contracts to which the DACA requestor has been a party;<br>• Tax receipts;<br>• Insurance policies, receipts, or postmarked letters; and/or<br>• Any other relevant document. |

If the totality of the evidence does not establish that the requestor was present in the United States on June 15, 2012, issue RFE DACA 105 call up from Appendix D for additional evidence.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

## C. Determining if Guidelines are Met, Continued

**Unlawful Immigration Status on June 15, 2012**

To be considered for DACA, the requestor is to demonstrate that he/she was in an unlawful status on June 15, 2012. For DACA purposes, the phrase "in unlawful status" means that the requestor never had a lawful immigration status on or before June 15, 2012, or any lawful immigration status or parole that he/she obtained prior to June 15, 2012, had expired before June 15, 2012.

To determine whether the requestor was in an unlawful status on June 15, 2012, review the responses to Part 1 of Form I-821D regarding date of entry, status at entry, and any date that authorized stay or parole expired, if such authorized stay or parole existed. If the requestor was admitted for duration of status or for a period of time that extended past June 14, 2012, but violated his/her immigration status (e.g., by engaging in unauthorized employment, failing to report to his/her employer, or failing to pursue a full course of study) before June 15, 2012, USCIS will not consider his/her case for DACA unless the Executive Office for Immigration Review terminated his/her status by issuing a final order of removal against you before June 15, 2012.

Examples of documents that may show the requestor's immigration status on June 15, 2012 include, but are not limited to the following:

- I-94/I-95/I-94W Arrival/Departure Record showing the date the requestor's authorized stay expired;
- If the requestor has a final order of exclusion, deportation, or removal issued on or before June 15, 2012, a copy of that order and related charging documents, if available;
- An INS or DHS charging document placing the requestor into deportation, exclusion, or removal proceedings;
- Any other document that is relevant to show that the requestor lacked lawful immigration status on June 15, 2012; or
- Any document relating to parole.

If needed, officers should conduct a systems check (i.e., to determine if a record exists) for the DACA requestor that will help in establishing his/her unlawful status on June 15, 2012.

If the evidence submitted does not establish that the requestor was in an unlawful status on June 15, 2012, issue RFE DACA 104 call up from Appendix D for additional evidence.

An individual who had Temporary Protected Status (TPS) on June 15, 2012, will not be considered for deferred action for childhood arrivals.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Appeal: 18-1521   Document: 28-2   Filed: 07/02/2018   Pg: 244 of 572
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 244 of 1026 PageID #: 9835

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 231 of 442

**Not Age 31 or Older on June 15, 2012**

The Secretary's memorandum provides that one of the guidelines to be met before an individual is considered for DACA is that the individual was not age 31 or older on June 15, 2012. In other words, the DACA requestor was born after June 15, 1981. To determine whether the requestor was born after June 15, 1981, review the requestor's birth certificate or other acceptable secondary evidence establishing the requestor's date of birth.

If there is no evidence establishing the requestor's date of birth, issue DACA RFE 140 call up from Appendix D.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013**    53

## C. Determining if Guidelines are Met, Continued

**Continuous Residence (CR)**

The individual requesting DACA is to submit evidence that he/she has resided continuously in the United States since June 15, 2007, or earlier, and up to the present time. Present time means the date of filing.

If the answers to any of the questions on page 3 (Part 2, Arrival/Residence Information) of the Form I-821D are blank or if page 3 of the form is missing and no documentation was submitted, or the documentation submitted does not reasonably show when the requestor arrived and that the requestor meets the continuous residence (CR) guideline, issue an RFE. Include a copy of the original Form I-821D (if page 3 is missing, also include a blank page 3) with the RFE asking the requestor to provide the missing answers and to provide documentation that may establish CR.

The following are examples of acceptable evidence of (CR). This list of examples is not exhaustive.

| Evidence | Acceptable Documentation |
|---|---|
| Employment Records | • Pay stubs;<br>• W-2 Forms;<br>• Federal, State, or local income tax returns; or<br>• Letters from employer(s) or, if the DACA requestor has been self-employed, letters from banks, and other firms with whom he/she has done business.<br><br>In all of these documents, the employee's name and the name of the requestor's employer or other interested organization is to appear on the form or letter, as well as relevant dates. Letters from employers are to be signed by the employer and are to include the employer's contact information.<br><br>• Such letters are to include: **(1)** the requestor's address(es) at the time of employment; **(2)** the exact period(s) of employment; **(3)** period(s) of layoff; **(4)** and a brief summary of the requestor's duties with the company |
| Receipts, Bills, Letters | • Rent receipts;<br>• Utility bills (gas, electric, telephone, etc.) bearing the requestor's name (or family name if residing at same address) and address; or<br>• Receipts or letters from companies showing the dates during which the requestor received service. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

AR1497

## C. Determining if Guidelines are Met, Continued

| | Evidence | Acceptable Documentation |
|---|---|---|
| Continuous Residence (CR) (continued) | School Records | • Transcripts, letters, report cards, etc., from the school(s) that the requestor attended in the United States showing the name(s) of the school(s) and periods of school attendance. |
| | Medical Records | Hospital or medical records showing medical treatment or hospitalization of the requestor. Such records are to show the name of the medical facility or physician, as well as the date(s) of the treatment or hospitalization. |
| | Memberships | • Official records from a religious entity in the United States confirming the requestor's membership or attendance in the entity, attendance at entity events, or participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.).<br>• Documentation showing membership in community organizations (e.g. Scouts). |
| | Military Records | Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records). |
| | Additional Documents | Additional documents to support the requestor's claim may include:<br>• Money order receipts for money sent in or out of the country;<br>• Passport entries;<br>• Birth certificates of children born in the United States;<br>• Dated bank transactions;<br>• Correspondence between the DACA requestor and other persons or organizations;<br>• U.S. Social Security card;<br>• Selective Service card;<br>• Automobile license receipts, title, vehicle registration, etc.;<br>• Deeds, mortgages, contracts to which the DACA requestor has been a party;<br>• Tax receipts;<br>• Insurance policies, receipts, or postmarked letters; and/or<br>• Any other relevant document. |

*Continued on next page*

J.A. 768    AR1498

## C. Determining if Guidelines are Met, Continued

**Brief, Casual and Innocent (BCI) Absence on CR**

A brief, casual, and innocent absence from the United States will not interrupt the DACA requestor's continuous residence. A departure made before August 15, 2012, will not be disqualifying if the departure was "brief, casual, and innocent." Travel occurring after August 15, 2012, will not be considered brief, casual, and innocent, unless removal has been deferred under DACA and advance parole have been granted.

If the requestor indicated in Part 2 of the Form I-821D that he/she has been absent before August 15, 2012, review the reason for the absence and any evidence submitted to show that it was brief, casual, and innocent.

Examples of evidence establishing that an absence was brief, casual, and innocent and therefore did not interrupt the requestor's continuous residence include, but are not limited to:

- Plane or other transportation tickets or itinerary showing the travel dates;
- Passport entries;
- Hotel receipts showing the dates the requestor was abroad;
- Evidence of the purpose of the travel (e.g., the requestor attended a wedding or funeral);
- Copy of any advance parole documents; or
- Any other relevant/probative evidence that could support a brief, casual, and innocent absence, as that term is defined in the definitions section of this SOP.

**Note that a departure made while under an order of voluntary departure or deportation, exclusion, or removal is not brief, casual, and innocent.**

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) Information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013      56

AR1499

## C. Determining if Guidelines are Met, Continued

**Effect of Travel Outside of the United States After August 15, 2012**

- Travel outside the United States after August 15, 2012 and before the DACA request is filed:
  - The departure interrupts a requestor's continuous residence in the United States. The requestor cannot meet the continuous residence guideline for DACA and removal action should not be deferred.
- Travel outside the United States while the DACA request is pending:
  - The departure shall be deemed an abandonment of the DACA request; therefore, the request will be denied for abandonment.
- Travel outside the United States after removal action has been deferred under DACA, but without advance parole:
  - Deferred action under DACA is terminated automatically.

**CR/BCI Not Met**

If CR is not met, issue the following RFE DACA 101 call up from Appendix D.

If no documentation is submitted to show that a departure was brief, casual, and innocent, or the documentation is not sufficient, issue the following RFE DACA 102 call up from Appendix D.

If routine systems checks, documentation submitted with the DACA request, or evidence in the A-file indicate that a departure was made while under an order of voluntary departure or deportation, exclusion, or removal, issue a Notice of Intent to Deny (NOID) with the opportunity for the requestor to rebut the derogatory information. See Appendix E for NOID Template.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid 'need-to-know' basis without prior approval from the originator

AR1500

# C. Determining if Guidelines are Met, Continued

**Education**

To meet the educational guideline for DACA consideration, a DACA requestor may show that he/she is currently in school, has graduated or obtained a certificate of completion from a U.S. high school or has a recognized equivalent of a high school diploma under State law, public or private college, or university or community college, or has obtained a General Educational Development (GED) certificate or equivalent State-authorized exam in the United States. Note that evidence of enrollment in on-line courses is acceptable. When reviewing such evidence, the completeness, credibility, relevance, and sufficiency are germane and take precedence over the electronic medium over which the education was received.

Each component of this guideline is discussed in more detail below.

**Currently In School**

To be considered "currently in school," a requestor is to be enrolled in:
- a public or private elementary school, junior high or middle school, high school, or secondary school;
- an education, literacy, or career training program (including vocational training or an English as a Second Language (ESL) course) that is designed to lead to placement in post-secondary education, job training, or employment;
- an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under State law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other equivalent State-authorized exam; or
- a public or private college or university or a community college;

For ease of reading, education, literacy, and career training programs will be referenced collectively as "alternative educational programs." When the DACA requestor seeks to meet the "currently in school" component of the educational guideline based on enrollment in an alternative educational program, the requestor's current enrollment in that program is to be in preparation for the requestor's anticipated subsequent placement in post-secondary education, job training, or employment (new employment or advancement within existing employment). Evidence of such subsequent placement is not required.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## C. Determining if Guidelines are Met, Continued

**Currently In School** (continued)

A DACA requestor who is enrolled in a personal enrichment class (such as arts and crafts) or who is enrolled in a recreational class (such as canoeing) is not in an alternative educational program and thus not considered to be "currently in school" for DACA purposes.

In determining whether enrollment in an alternative educational program meets the "currently in school" component of the educational guideline for DACA consideration, first, review the documentary evidence provided to see whether the alternative educational program is an education, literacy, or career training program (including vocational training and ESL) and whether it is publicly funded in whole or in part (State, Federal, county, or municipal funds.) If it is an alternative educational program and it receives public funding, no further evaluation is required. As long as the information is provided by the school/program, it is not necessary to RFE for copies of the actual funding documents. If this information is not provided, the RFE should request the information, but not require copies of the actual funding documents. If it is a literacy program that is run by a non-profit entity, no further evaluation is required with respect to the first part of the analysis. If, however, it is an alternative educational program that does not receive any public funding and it is not a non-profit literacy program, then officers are also to assess whether the program is of demonstrated effectiveness and are to look for such evidence, as described in more detail below.

Some of the ways a DACA requestor can meet the "currently in school" component of the educational guideline for DACA consideration and the different types of evidence that can be submitted, depending on the type of program in which he/she is enrolled, are discussed separately below. The examples and types of evidence listed here are illustrative, and not exhaustive.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013     59

AR1502

| Public or Private Elementary, Junior High/Middle School, or High School/Secondary School | **Currently in School**<br>**Public or Private Elementary, Junior High/Middle School, or High School/Secondary School**<br>Evidence of enrollment in a public or private elementary, junior high/middle school, or high school/secondary school may include, but are not limited to, copies of: |
|---|---|

- **Accepted for Enrollment:**  Evidence of acceptance for enrollment may include, but is not limited to:
  - An acceptance letter on school letterhead from the school's authorized representative, if the requestor was accepted for enrollment, but the classes have not yet commenced.  Such acceptance letter is to include the name and address of the school, the requestor's grade level, and the date that the classes are scheduled to commence.  The letter is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
  - A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, for a student with a disability, would also be acceptable evidence of enrollment;
  - A copy of the current tuition bill;
  - A current class schedule containing the student's name, the list of courses, and the day and time of each class; or
  - Any other relevant evidence.

- **Already Attending Classes:**  For DACA requestors already enrolled and attending classes, evidence may include, but is not limited to, current school registration cards, current transcripts, report cards, and progress reports.  The document(s) presented are to show the name of the student, the name of the school, the time period or semester covered by the document, and the current grade level.  A current IEP showing the student's progress to date would also be acceptable evidence that the DACA requestor has been accepted for enrollment and is attending classes.

A claim of homeschooling is not necessarily an indicator of fraud; however, because homeschool programs and their requirements vary widely from state to state, refer the case to CFDO for further research and evaluation.  Even if the file contains documents including transcripts, a diploma or a certificate of completion as a result of homeschooling, the case must be referred to CFDO for further research and evaluation prior to final adjudication.  CFDO referrals on "homeschooling" are only mandatory prior to adjudication if the homeschooling is the basis for meeting the education guideline; if not, then the case can be processed normally and is then referred to the CFDO after final adjudication for tracking purposes.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

J.A. 773    AR1503

## C. Determining if Guidelines are Met, Continued

**Public or Private College or University, or Community College**

<u>Currently in School</u>
<u>Public or Private College or University, or Community College</u>
Evidence of enrollment in a public or private college or university or a community college may include, but is not limited to, copies of:

- **Accepted for Enrollment:** Evidence of acceptance for enrollment may include, but is not limited to:
  - An acceptance package or other related material on school letterhead from the school's authorized representative, if the requestor was accepted for enrollment, but the classes have not yet commenced. Such acceptance package or other related material is to include the name and address of the school, the requestor's grade level or class year, and the date or term when the classes are scheduled to commence, and is to be accompanied by evidence that the student has registered for class. In addition, the acceptance package or other related material is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
  - A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, for a student with a disability, would also be acceptable evidence of enrollment;
  - A copy of the student's current tuition bill;
  - The student's current class schedule containing the list of courses, and the day and time of each class; or
  - Any other relevant evidence.

- **Already Attending Classes:** For DACA requestors already enrolled and attending classes, evidence may include, but is not limited to, current school registration cards, current transcripts, report cards, and progress reports. The submitted document(s) are to show the name of the student, the name of the school, the time period or semester covered by the document, and the current grade level or class year. A current IEP showing the student's progress to date would also be acceptable evidence that the DACA requestor has been accepted for enrollment and is attending classes.

It is not necessary to RFE for a copy of the high school diploma or GED, unless there are articulable reasons to question the evidence of acceptance and enrollment or attendance in a public or private college or university, or community college.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## C. Determining if Guidelines are Met, Continued

General
Education
Development
(GED)

**Currently in School**
**GED**
If a DACA requestor claims that he/she is enrolled in a course of study to pass a GED exam or other equivalent State-authorized exam, the DACA request is to include a letter or other documentation from an authorized representative of the program, that includes information such as:
- The requestor's name and date of enrollment;
- The duration of the program and expected completion date;
- Whether the course of study is for a GED exam or other equivalent State-authorized exam;
- The program's source of public funding (Federal, State, county, or municipal), if any; and
- The program's authorized representative's contact information.

If the GED/Equivalency program is <u>not</u> publicly funded in whole or in part, documentation from the program should is also to provide information about the program's demonstrated effectiveness  Such information could include, but is not limited to, information relating to:
- The duration of the program's existence;
- The program's track record in assisting students in obtaining a GED, or a recognized equivalent certificate;
- Receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or
- Any other information indicating the program's overall quality.

---

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013        62

AR1505

## C. Determining if Guidelines are Met, Continued

| | |
|---|---|
| **Educational or Career Training Program (Including Vocational Training)** | <u>**Currently in School**</u><br>**Educational or Career Training Program (Including Vocational Training)**<br>The documentary evidence submitted in support of the "currently in school" guideline based on enrollment in an educational or career training program (including vocational training) may include, but is not limited to: |

- **Accepted for Enrollment:**  An acceptance letter on school letterhead from the school registrar/authorized school representative, if the requestor was accepted for enrollment, but the classes have not yet commenced.  Such acceptance letter is to include the name and address of the program, a brief description of the program, the duration of the program, and state  the date the classes are scheduled to commence, and is to be accompanied by evidence that the student has registered for the program.  Evidence of the requestor's acceptance for enrollment may also include a copy of his/her current year registration (intake form/enrollment form), or any other relevant documentation.  The DACA request is also to be supported by evidence of the school or program's public funding or its demonstrated effectiveness, as described below.

- **Already Attending Classes:**
   - Current attendance records, transcripts, report cards, test reports, progress reports showing the name of the school, the name of the requestor, the time period or semester covered by the document, and, if relevant, the current educational or grade level;
   - A letter from the school registrar/authorized school representative, with contact information, providing information related to the program's public funding or its demonstrated excellence:

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013      63

AR1506

## C. Determining if Guidelines are Met, Continued

| | |
|---|---|
| **Educational or Career Training Program (Including Vocational Training)** (continued) | **Public Funding:** If the educational or career training program is publicly funded in whole, or in part, the above-referenced letter from the school registrar/authorized school representative is to provide basic details about the funding, such as the source(s) of the funding; or,<br><br>**Demonstrated Effectiveness:** If the educational or career training program is <u>not</u> publicly funded in whole, or in part, the school registrar/authorized school representative is to provide information about the program's demonstrated effectiveness, with supporting documentation, if available. Such information could include, but is not limited to: information relating to:<br>   ➢ The duration of the program's existence;<br>   ➢ The program's track record in placing students in employment, job training, or post-secondary education; Receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or<br>   ➢ Any other information indicating the program's overall quality. |
| **Literacy Training** | **<u>Currently in School</u>**<br>The documentary evidence submitted in support of the "currently in school" guideline based on enrollment in a literacy program is to include, but is not limited to:<br>• A letter from the literacy program administrator or authorized representative providing information such as:<br>  o The requestor's name;<br>  o The date of the requestor's enrollment;<br>  o The duration of the literacy program and the expected completion date;<br>  o The program administrator or authorized representative's contact information;<br>  o Information about the literacy program's non-profit status, if applicable, and evidence of such status:<br>    ■ Evidence of the literacy program's non-profit status is to include a copy of a valid letter from the Internal Revenue Service confirming exemption from taxation under section 501(c)(3) of the Internal Revenue Service Code of 1986, as amended, or equivalent section of prior code; or<br>• If the literacy program is not administered by a non-profit organization, information related to the literacy program's source of public funding <u>or</u> its demonstrated effectiveness: |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Appeal 18-1521 cv-02282 CG-VMS Filed 07/02/2019 Page 256 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 256 of 1026 PageID #:
9847

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 243 of 442

## C. Determining if Guidelines are Met, Continued

**Literacy Training (continued)**

o **Public Funding:** If the literacy program is publicly funded in whole, or in part, the letter from the literacy program administrator or authorized representative is to provide basic details about the funding, such as the source(s) of the funding. ; or

o **Demonstrated Effectiveness:** If the literacy program is <u>not</u> publicly funded in whole or in part, or <u>not</u> administered by a non-profit entity, the literacy program administrator or authorized representative is to provide information about the program's demonstrated effectiveness.  Such information could include, but is not limited to:

- The duration of the program's existence;
- The program's track record in placing students in employment, job training, or post-secondary education;
- Receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or
- Any other information indicating the program's overall quality.

It should be noted that many literacy programs may not track statistics on placement rates following completion of the program.  Therefore, the lack of such data, standing alone, does not diminish the literacy program's record.  Evaluate all of the information and evidence provided in its totality for credibility and sufficiency.

A claim of enrollment in a literacy class run by a for-profit entity that does not receive any public funding is not necessarily an indicator of fraud; however, a vast number of literacy programs are offered for free or at a minimal cost.  Therefore, if the literacy program is a **for-profit** entity and does <u>not</u> receive any public funds, refer the case to CFDO for further research and evaluation.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

**Version April 4, 2013**   65

Appeal: 18-1521 Case 1:17-cv-02528-GG-VMS Filed: 07/03/2018 Document 282-7 Pg: 257 of 502 Filed 09/04/20 Page 257 of 1026 PageID #: 9848

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 244 of 442

## C. Determining if Guidelines are Met, Continued

| English as a Second Language (ESL) | **Currently in School**<br>**English as a Second Language (ESL)**<br>The documentary evidence submitted in support of the "currently in school" guideline based on enrollment in an ESL class is to include, but is not limited to: |
|---|---|

- A letter from the ESL program administrator or authorized representative providing information such as:
  - o The requestor's name;
  - o The date of the requestor's enrollment;
  - o The duration of the ESL program and the expected completion date;
  - o The program administrator or authorized representative's contact information;
  - o Information/documentation related to the ESL program's public funding or its demonstrated effectiveness:
    - ▪ **Public Funding:** If the ESL program is publicly funded in whole, or in part, the letter from the ESL program administrator or authorized representative is also to provide specific details about the funding, such as the source(s) of the funding;
    - ▪ **Non-Profit Status:** If the ESL program non-profit status, the ESL program administrator or authorized representative is to provide evidence that the ESL program has non-profit status; or
    - ▪ **Demonstrated Effectiveness:** If the ESL program is not publicly funded in whole or in part, the ESL program administrator or authorized representative is to provide information about the program's demonstrated effectiveness. Such information could include, but is not limited to:
      - ▪ The duration of the program's existence;
      - ➢ The program's track record in placing students in post-secondary education, job training, or employment; Receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or
      - ➢ Any other information indicating the program's overall quality.

It should be noted that many ESL programs may not track statistics on placement rates following completion of the program. Therefore, the lack of such data, standing alone, does not diminish the school's record. Evaluate all of the information and evidence provided in its totality for credibility and sufficiency.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

# C. Determining if Guidelines are Met, Continued

| | |
|---|---|
| **School Breaks and Medical Leave** | At the time of filing, it is possible that school may not be in session due to a holiday or a semester (or quarter or trimester) break. A break may occur during a course, for example spring break, or it may occur between semesters, for example summer break. If a DACA request is filed between semesters, the requestor is considered to be currently in school if he/she is enrolled for the next semester and submits evidence of such enrollment. Note that a requestor on temporary medical leave from school is considered to be currently in school. Evidence of the medical leave and the expected return date to school are to be provided. |
| **Graduated From School** | A DACA requestor can also meet the educational guideline if he/she has graduated from school. To meet the "graduated from school" component of the educational guideline, the DACA requestor may show that he/she has graduated or obtained a certificate of completion from a U.S. high school or has a recognized equivalent of a high school diploma under State law, public or private college or university or community college, or has obtained a GED certificate or other equivalent State-authorized exam in the United States. For the purpose of considering an initial DACA request, the phrase "graduated from school" does not include graduation from an education, literacy or career training program (including vocational training or an ESL course). Evidence of graduation may include copies of:<br>• A diploma;<br>• A recognized equivalent of high school diploma under State law;<br>• Transcripts showing the date of graduation;<br>• A GED Certificate<br>  • Documentation sufficient to demonstrate that the DACA requestor obtained a GED includes, but is not limited to, evidence the he/she passed a GED exam, or other comparable State-authorized exam, and, as a result, he/she received the recognized equivalent of a regular high school diploma under State law;<br>• A certificate of completion or certificate of attendance that is equivalent to a high school diploma under state law<br>  • A certificate of completion or certificate of attendance may or may not be equivalent to a high school diploma. Because the definition of these types of certificate varies widely from state to state, it is important to seek information about how the state's school district defines a certificate of completion or certificate of attendance and make the determination if it meets the "Graduated from School" guideline; |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

**Graduated
From
School**
*(continued)*

- If there is uncertainty about whether the certificate of completion or certificate of attendance meets the "Graduated from School" guideline, in this instance a requestor may be able to meet the "Currently Enrolled in School" guideline if the requestor shows enrollment in an education program assisting students either in obtaining a high school diploma or its recognized equivalent under State law;

- An alternate award from a public or private high school or secondary school.

A claim of homeschooling is not necessarily an indicator of fraud; however, because homeschool programs and their requirements vary widely from state to state, refer the case to CFDO for further research and evaluation. Even if the file contains documents including transcripts, a diploma or a certificate of completion as a result of homeschooling, the case must be referred to CFDO for further research and evaluation prior to final adjudication. CFDO referrals on "homeschooling" are only mandatory prior to adjudication if the homeschooling is the basis for meeting the education guideline; if not, then the case can be processed normally and is then referred to the CFDO after final adjudication for tracking purposes.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013**   68

| Military Service | The Secretary's memorandum states that, in lieu of being currently in school, or having graduated from school (including a GED), the requestor may be an honorably discharged veteran of the U.S. Coast Guard or U.S. Armed Forces. This may include reservists who were honorably discharged. |
|---|---|

Examples of acceptable evidence include, but is not limited to the following:
- Form DD-214, Certificate of Release or Discharge from Active Duty;
- NGB Form 22, National Guard Report of Separation and Record of Service;
- Military personnel records;
- Military health records; or
- Any other relevant document.

If the requestor indicated in question 24 of Part 1 that he/she was a member of the U. S. Armed Forces or Coast Guard, but did not submit evidence of an honorable discharge and does not otherwise meet the educational guidelines, issue RFE DACA 107 call up from Appendix D.

The Form DD-214 and NGB Form 22 both contain a section, "Character of Service" listing the type of discharge a service member obtained. The main types of discharges include the following:
(1) Honorable:
(2) General (Under Honorable Conditions);
(3) Under Other Than Honorable Conditions;
(4) Bad Conduct;
(5) Dishonorable; or
(6) Uncharacterized.

For purposes of DACA, if Character of Service is Honorable or General (Under Honorable Conditions) the requestor has satisfied the military service guideline.

Currently serving in the U.S. Coast Guard or U.S. Armed Forces does not qualify.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

# D. Economic Necessity

**Reviewing Economic Necessity**

An EAD based on a grant of deferred action requires a showing of economic necessity. To facilitate this economic necessity review, a separate worksheet was created, Form I-765WS. To streamline adjudication of the DACA request and the I-765, officers will review the I-765WS during the adjudication of Form I-821D. During file set-up, the I-765WS will be put in ROP order immediately behind the Form I-821D.

If Form I-765WS is completely blank or is missing, issue an RFE on the I-765 (not the Form I-821D) using DACA 180 call up from Appendix D, but only if the requestor does not include evidence that a fee exemption was granted. The fee exemption will be indicated in C3 as "Fee Waiver Granted." If an officer issues an RFE on the I-765, he/she should proceed with adjudication of the I-821D. When the response to the I-765 RFE is received and the I-765 is approved, the expiration date of the EAD should not exceed the end date of the deferred removal under DACA.

If the requestor does not respond to the I-765 RFE, the I-765 should be denied for abandonment; however, the Form I-821D can be approved for DACA if the guidelines have been met. When denying the Form I-765 for abandonment, an officer should use the standard abandonment denial used at his/her center.

If/when Form I-765WS has been completed, review the information provided regarding current income, assets, and expenses to determine whether economic necessity has been established. The requestor may, but need not, include supporting documents with Form I-765WS.

There is a general presumption that DACA requestors will need to work given their undocumented circumstances and the fact that they are not generally anticipated to have independent means. Absent evidence of sufficient independent financial resources, the Form I-765WS is sufficient to establish economic need, without any further economic analysis.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## D. Removal Proceedings

**Removal Proceedings**

Individuals in removal proceedings may file a DACA request, even if they are under age 15, as long as they were born after June 15, 1981.  As explained more fully below, removal proceedings commence with the filing of Form I-862, Notice to Appear, with the Immigration Court and terminate in one of several ways.  See 8 C.F.R. §245.1(c)(8)

If a DACA requestor has been or is currently in deportation, exclusion, or removal proceedings, he/she may have another A-file, which should have been discovered by the officer during the initial review of the I-821D and/or Record of Arrest and Prosecution (RAP) sheet (if any).  Please see the "A-File" section.

There are several ways to determine if the DACA requestor:
- Was or is in proceedings;
- What the outcome of the proceeding was; and
- If he/she was previously removed.



(b) (7)(E)

See the charts below for an overview of the electronic systems to check.

(b) (7)(E)

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Removal Proceedings, Continued

**Removal Proceedings (continued)**



**Effects of Deportation or Removal Proceedings**

The existence of deportation, exclusion, or removal proceedings may have an effect on the exercise of prosecutorial discretion for DACA. If the DACA requestor is in proceedings, the A-file is likely with the ICE office. Before a DACA request may be adjudicated by the Center, the Center should make every attempt to obtain all A-File(s).

**Determining Whether an Individual is in Removal Proceedings**

Deportation, exclusion, and removal proceedings begin with the filing of the charging document with the Immigration Court. Currently, the charging document used is Form I-862, Notice to Appear. Over the years, proceedings commenced in other ways, including:

1. With the issuance of Form I-221, Order to Show Cause and Notice of Hearing, prior to June 20, 1991;
2. With the filing of Form I-221, Order to Show Cause and Notice of Hearing, issued on or after June 20, 1991, with the immigration court;
3. With the issuance of Form I-122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge, prior to April 1, 1997; and
4. With the issuance and service of Form I-860, Notice and Order of Expedited Removal.

It is possible for an individual to have voluntary departure and be in removal proceedings. See Voluntary Departure section below for more information.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013** 72

AR1515

Appeal: 18-1521  Case 1:17-cv-05228-NGG-VMS  Document 82-7  Filed 07/02/2018  Doc: 264/372  Pg: 264 of 1026  Page 264 of 1026 PageID #: 9855

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 251 of 442

## E. Removal Proceedings, Continued

| | |
|---|---|
| **Determining Removal Proceedings have been Terminated** | Deportation, exclusion, or removal proceedings terminate when one of the following occurs:<br><br>1. The individual leaves the United States under an outstanding order of deportation, exclusion, or removal;<br>2. The individual is found not to be inadmissible or deportable from the United States;<br>3. The individual leaves the United States before the expiration of his/her voluntary departure, which was granted in connection with an alternate order of deportation or removal;<br>4. The charging document is canceled (Form I-122, I-221, I-860, or I-862);<br>5. The immigration judge or the Board of Immigration Appeals terminates the proceedings; or<br>6. A Federal court grants a petition for review or an action for habeas corpus.<br><br>See 8 C.F.R. §245.1(c)(8) |
| **Voluntary Departure** | An individual with voluntary departure may or may not be in removal proceedings. Voluntary departure may be issued before the commencement of proceedings, during proceedings, or at the conclusion of proceedings. When voluntary departure is issued during or at the conclusion of proceedings, it is normally issued as an alternate order of voluntary departure/removal or deportation. An alternate order of voluntary departure converts automatically to an order of removal/deportation when the individual does not leave the United States voluntarily by the specified date. |
| **Administratively Closed** | Administratively closed proceedings means that proceedings have commenced, but the parties subsequently agreed to remove the matter from the immigration court's docket. Administratively closed does not mean terminated, and thus the individual remains in proceedings. Either party may file a motion to place the case on the court's active docket at any time. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

**Version April 4, 2013**    73

AR1516

## E. Removal Proceedings, Continued

Use the chart below to assist in determining if a DACA requestor is in removal proceedings:

| If... | Then... | And... |
| --- | --- | --- |



**Note:** The guideline that the individual is under age 31 on June 15, 2012 applies to all DACA requestors regardless of whether they are in deportation, exclusion, or removal proceedings. If the individual was age 31 or older on June 15, 2012, issue a NOID.

| | |
| --- | --- |
| **Individuals With Final Removal Orders (FRO)** | An individual with an unexecuted final removal order is still in removal proceedings. See 8 C.F.R. § 245.1(c)(8). Although the final removal order may have been issued before, on, or after June 15, 2012, the volume of individuals that could be considered for DACA with a post-June 15th final removal order should be small, because ICE began applying the DACA guidelines upon publication of the Secretary's memorandum. Final removal orders issued after June 15, 2012 should be reviewed carefully to examine the underlying grounds for removal.

If the requestor is the subject of an FRO, then determine the requestor's age on June 15, 2012. Review the answer provided to question #9 in Part 1 of Form I-821D and review the requestor's birth certificate or other acceptable secondary evidence submitted to show the date of birth. If the evidence submitted does not show that the requestor satisfies the upper age limit, issue RFE DACA 140 call up from Appendix D. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

    AR1517

## E. Removal Proceedings, Continued

| | |
|---|---|
| **Subject to the Reinstatement of a Prior Removal Order** | When an individual reenters the United States illegally after having been removed or after leaving voluntarily under an order of removal, the individual is subject to reinstatement of the prior removal order from its original date. See INA § 241 (a)(5).

An individual who is subject to reinstatement of their prior removal order under the provisions of § 241 (a)(5) of the Act may file a DACA request; however, the removal **and** the illegal reentry must have occurred before June 15, 2007. This is because a DACA requestor must have resided continuously in the United States for at least five years before June 15, 2012, the date of Secretary's memorandum. Additionally, a removal is not deemed to be a brief, casual, and innocent departure and, therefore, it interrupts the period of continuous residence. |
| **Underlying Removal Ground Adversely Impacts Prosecutorial Discretion** | If the DACA requestor indicates in Question #3.a. in Part 1 of Form I-821D that he/she has been in removal proceedings, and/or routine systems, background, and fingerprint checks indicate that the requestor is in removal proceedings, proceed as follows:
• Review the underlying removal charges; and
• Review the derogatory information obtained through routine checks.

Do not rely solely on the grounds listed in the charging document and/or EARM, as not all issues may have necessarily been captured, or new issues may have arisen since the charging document was issued. It is necessary to review all derogatory information in its totality and then make an informed assessment regarding the appropriate exercise of prosecutorial discretion for DACA. |
| **Underlying Removal Ground Does Not Adversely Impact Prosecutorial Discretion** | If a DACA requestor has been placed in proceedings on a ground that does not adversely impact the exercise of prosecutorial discretion, review the results of all routine systems, background, and fingerprint checks. If those routine checks did not reveal any additional derogatory information that impacts the exercise of prosecutorial discretion, the case may proceed for adjudication.

Do not rely solely on the grounds listed in the charging document and/or EARM, as not all issues may have necessarily been captured, or new issues may have arisen since the charging document was issued. It is necessary to review all derogatory information in its totality and then make an informed assessment regarding the appropriate exercise of prosecutorial discretion for DACA. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013      75

## E. Removal Proceedings, Continued

Removal
During
Continuous
Residence
Period

A departure from the United States pursuant to an order of deportation, exclusion, or removal that occurred during the required continuous residence period is not "brief, casual, and innocent." Therefore any absence caused by such a departure meaningfully interrupts such continuous residence. This also includes a departure made "voluntarily," for example, the individual leaves the United States on his/her own volition while under an order of deportation, exclusion, or removal.

In these instances, issue a NOID.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

## F. Fingerprints and RAP Sheets

| | |
|---|---|
| **Fingerprint Requirements** | Fingerprints (ten print) are required for every DACA requestor 14 years of age and older to determine if they have a criminal history. Submissions of prior fingerprint results will not be accepted. |
| **FBI Fingerprint Response** | At the time of adjudication, the file should contain a (b) (7)(E)  <br><br> A definitive response from the FBI regarding fingerprint clearances is required before any DACA request for an individual 14 years of age and older may be approved. <br><br> Fingerprint results for the requestor obtained as a result of a previous filing with USCIS within the last 15 months are not valid for DACA purposes. Each DACA requestor must obtain a new fingerprint check upon the filing of a DACA request. Officers should utilize FD-258 to verify that the fingerprint check was completed for the DACA request. |
| **Performing an FBI Query** | The fingerprint clearance should be complete before the case is sent for adjudication. If there is no fingerprint result printout in the file, officers must perform a query of FBI Fingerprint Tracking in CLAIMS Mainframe and also check SNAP to see if the requestor has been scheduled for an appointment at an ASC. <br><br>  |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 07/02/2018 Filed 09/04/20 Pg 269 of 572 Page 269 of 1026 PageID #: 9860

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 256 of 442

## F. Fingerprints and RAP Sheets, Continued

**Introduction**   There are four possible results of a fingerprint query:



This section instructs officers on how to proceed based on the fingerprint results.



*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

**Version April 4, 2013**   78

## F. Fingerprints and RAP Sheets, Continued



| | |
|---|---|
| **A-numbers Found on the RAP Sheet** | If any other A-numbers are found on the RAP sheet, the files must be requested, reviewed, and consolidated prior to any final action. |
| **Updated RAP Sheets** | Although biometrics will not be cloned from other filings, if the requestor has a criminal history ▓▓▓ (b) (7)(E) ▓▓▓ the file, request updated ▓(b)(7)(E)▓ sheets through the ▓▓ (b) (7)(E) ▓▓ |

## G. Evaluating Issues of Criminality, Public Safety, and National Security

**Criminal Ineligibilities**

The Secretary's memorandum provides as one of the guidelines that should be met before an individual is considered for DACA that the individual not have been convicted of a felony offense, a significant misdemeanor offense, three or more non-significant misdemeanor offenses, or otherwise pose a threat to national security or public safety.  If the evidence establishes that an individual has a conviction for one of the above or may be a national security or public safety threat, USCIS will deny the request for deferred action, unless exceptional circumstances are found.  The requestor must specifically ask to be evaluated under this exception and must fully document the exceptional circumstances.

The decision whether to defer action in a particular case is individualized and discretionary, taking into account the nature and severity of the underlying criminal, national security, or public safety concerns.  By their very nature, felonies, significant misdemeanors, a history of other misdemeanors, and activities compromising national security and public safety are particularly serious and carry considerable weight in the totality of the circumstances analysis.  As a result, it would take a truly exceptional circumstance to overcome the underlying criminal, national security, and public safety grounds that would otherwise result in not considering an individual for DACA, which would be rare.   Deferring removal under DACA shall not be considered under this very limited exception without concurrence from HQSCOPS.   In these instances the case shall come to HQSCOPS from the Service Center Director, through the appropriate chain of command.

**Felony**

A felony is a federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## G. Evaluating Issues of Criminality, Public Safety, and National Security, Continued

| Misdemeanors | **Significant Misdemeanor:**<br>For DACA only, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:<br>1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,<br>2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days.<br><br>The sentence must involve time to be served in custody, and therefore does not include a suspended sentence. The time to be served in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE). Notwithstanding whether the offense is categorized as a significant or non-significant misdemeanor, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence or presence of a criminal history, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion. DHS retains the discretion to determine that an individual does not warrant deferred action on the basis of a single criminal offense for which the individual was sentenced to time in custody of 90 days or less. |
|---|---|

**FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)**
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

Version April 4, 2013        81

J.A. 794        AR1524

Appeal: 18-1521 Document: 28-3 Filed: 07/03/2018 Pg: 273 of 572   Case 1:17-cv-05228-NGG-VMS Document 28-7 Filed 09/04/20 Page 273 of 1026 PageID #: 9864

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 260 of 442

| Misdemeanors (continued) | **Non-Significant Misdemeanor:** |
|---|---|

**Non-Significant Misdemeanor:**

For DACA only, a non-significant misdemeanor is any misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Is not an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; and
2. Is one for which the individual was sentenced to time in custody of 90 days or less.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by ICE. Notwithstanding whether the offense is categorized as a significant or non-significant misdemeanor, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## G. Evaluating Issues of Criminality, Public Safety, and National Security, Continued

**Misdemeanors (continued)**

> **Multiple Misdemeanors:**
>
> Absent exceptional circumstances, a person is not eligible for consideration of DACA if he/she has been convicted of three or more non-significant misdemeanors that did not occur on the same day and did not arise out of the same act, omission, or scheme of misconduct.
>
> When evaluating a request for consideration for deferred action for childhood arrivals, a minor traffic offense, such as driving without a license, will not be considered a misdemeanor that counts towards the "three or more non-significant misdemeanors." However, the requestor's entire offense history can be considered along with other facts to determine whether, under the totality of the circumstances, he/she warrants an exercise of prosecutorial discretion.

**State Law Immigration Offenses**

Immigration-related offenses characterized as felonies or misdemeanors by state immigration laws will not be treated as disqualifying felonies or misdemeanors for the purpose of considering a request for consideration of deferred action pursuant to this process.

**Foreign Convictions**

When evaluating a request for consideration of deferred action for childhood arrival, a foreign conviction, standing alone, will generally not be treated as a disqualifying felony or misdemeanor. Such convictions, however, may be considered when addressing whether the person poses a threat to public safety and whether, under the particular circumstances, the exercise of prosecutorial discretion is warranted. Cases involving foreign convictions should be elevated for supervisory review.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Court Dispositions

**Requesting Certified Court Dispositions**

Using RFE DACA 151 call up from Appendix D, request a certified court disposition a certified court disposition, arrest record, charging document, sentencing record, etc. for each arrest, unless disclosure if prohibited under state law.

If the requestor is unable to provide such records because the case was expunged or sealed, RFE DACA 151 informs the requestor that he or she must provide information about his or her arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. It is not necessary for the officer to issue an RFE if he/she is able to readily obtain the dispositions on line.

**Free Online Court Dispositions**

There are many online sites that can be searched and the disposition printed for a file copy. These sites are open to the public; therefore, USCIS can gain the final disposition without doing an RFE or ITD if all the charges in question are found, or if enough evidence can be gathered to deny without the remaining charges.

The AAO has upheld prior decisions made using these court dispositions, even though these dispositions are not "certified" by the court, since the information is made available to the public.

**Reading Court Dispositions**

Court dispositions take as many different forms as there are courts in the United States. There is no way to give specific instructions on how to read such dispositions. Usually the state criminal statutes cite is used to indicate which charge the applicant was actually convicted of. Adjudicators should consult with their supervisor if they have any questions about how to read a court disposition.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

AR1527

| | |
|---|---|
| **Convictions** | Pursuant to INA § 101(a)(48)(A), a conviction is a formal judgment of guilt entered by a court or, if adjudication of guilt has been withheld, where:<br>1) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt; and<br>2) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.<br><br>Nolo contendere means the individual is unwilling to contend.  This subjects the individual to some form of punishment, penalty, or restraint as if he/she was found guilty.<br><br>An adjudication of juvenile delinquency is not a conviction. |
| **Formal Adjudication of Guilt Withheld** | Court orders in criminal proceedings sometimes include, as part of the disposition, terms such as:  Continued without a finding (CWOF); adjudication withheld; deferred adjudication, etc.  Different jurisdictions use different terminology.<br><br>Where there is no formal adjudication of guilt, officers must determine whether:<br><br>1. A judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt; AND<br><br>2. the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty, such as jail, a fine, parole, probation, community service, etc.<br><br>The officer must dissect the law, the statute, court order, and conviction, and put all the pieces together to determine whether these requirements for a conviction are met in the absence of a formal adjudication of guilt. |
| **Imposition of Costs as Punishment** | Imposition of costs (such as fines, court costs, etc.) in a criminal case constitutes a form of punishment, and therefore satisfies the second prong of the conviction definition. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

**Version April 4, 2013**   85

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 277 of 572
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20   Page 277 of 1026 PageID #: 9868

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 264 of 442

## Court Dispositions, Continued

| | |
|---|---|
| **Deferred Prosecution** | Deferred prosecution or pretrial diversion programs that do not require the defendant to plead guilty or nolo contendere or require the court to make any finding of guilt do not constitute a conviction for immigration purposes. |
| **Dismissals, Dropped, Set Aside** | In many cases, the charges may be dropped or set aside in exchange for the DACA requestor agreeing to attend various self-help courses and programs, or if the person who filed the complaint against him/her fails to appear or chooses to drop the case.<br><br>These are not considered convictions for immigration purposes. |
| **Nolle Prosequi** | A decision of "nolle prosequi" is a Latin legal term for "declined to prosecute".<br><br>This is not considered a conviction for immigration purposes. |
| **Convictions on Appeal** | A conviction is effective for immigration purposes, including DACA, while it is on direct appeal.  See Plane v. Holder, 652 F.3d 991 (9th Cir. 2011), rehearing en banc denied, 2012 WL 1994862 (2012).  If the conviction is ultimately reversed on appeal, the DACA requestor is free to file a new request for DACA if otherwise eligible. |
| **Expunged or Vacated Convictions** | For DACA purposes only, expunged convictions will not be treated as disqualifying felonies or misdemeanors.  Expunged convictions, however, will be assessed on a case-by-case basis to determine whether the person poses a threat to public safety and whether, under the particular circumstances, the exercise of prosecutorial discretion is warranted. Cases involving expunged convictions should be elevated for supervisory review.<br><br>Sealed and expunged records will be evaluated according to the nature and severity of the criminal offense. |
| **STET** | The entry of "STET" in a criminal case simply means that the state (Maryland and West Virginia) will NOT proceed against an accused on that indictment at that time.  As long as the STET order is still in place and the individual is in compliance, the STET is not a conviction for immigration purposes.<br><br>NOTE:  Carefully review the file for J&Cs, orders, etc., to determine if a subsequent decision on the offense has been made. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013          86

# Arrests and Convictions

| | |
|---|---|
| **Criminal Arrests** | When a DACA requestor's RAP sheet indicates an arrest, it is necessary to determine whether the DACA requestor has been convicted of the crime. |
| | The only way to know if the DACA requestor has been convicted of the charge for which he/she was arrested is to obtain the certified court disposition.  Occasionally the disposition of the arrest is shown on the RAP sheet.  **However, in all cases, the officer must review the court disposition. This may be done by obtaining the disposition online or by issuing an RFE.** |
| **Juvenile Delinquency** | Juvenile delinquency will not automatically disqualify a DACA requestor. Such criminal history will be evaluated on a case-by-case basis to determine whether, under the particular circumstances, discretion is warranted to defer removal under DACA. |
| | If a requestor was a juvenile, but tried and convicted as an adult he/she will be treated as an adult for purposes of the DACA process.  Individuals must provide a certified court disposition, arrest record, charging document, sentencing record, etc. for each arrest, unless disclosure is prohibited under state law. |
| | Sealed and expunged records will be evaluated according to the nature and severity of the criminal offense. |
| **Pardons** | A full and unconditional pardon by the President of the United States or by the Governor of a U.S. State eliminates a conviction for purposes of DACA. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

# Public Safety Concerns

| Evaluating Public Safety Concerns | The scope of criminal offenses deemed to be EPS are described in the November 7, 2011, NTA memorandum and the accompanying MOA between USCIS and ICE. |

A DACA requestor's criminal record may give rise to significant public safety concerns even where there is not a disposition of conviction. Therefore, when the disposition is pending, it is not necessary to hold the case. For example, an individual with multiple DUI arrests, but no convictions, could pose a significant public safety concern. Similarly, an individual arrested for multiple assaults or other violent crimes could be deemed a public safety risk even if he/she was never convicted for those crimes. Arrests and/or convictions that took place outside of the United States are also significant unfavorable factors in evaluating public safety concerns, under the totality of the circumstances.

# National Security Concerns

| Evaluating National Security Concerns | A case posing national security concerns is handled through the CARRP process according to existing protocols. |

# DACA Requestors in Immigration Detention

| DACA Requestors in Immigration Detention | USCIS lacks the authority to consider requests from individuals who are in immigration detention under the custody of ICE at the time of filing Form I-821D and remain in immigration detention as of the date Form I-821D is adjudicated. If upon receipt of Form I-821, a review of DHS electronic systems or information received from ICE identifies the requestor as detained, the Center should follow the below procedures. |

The BCU will contact local ICE operations having jurisdiction over the requestor to determine if the requestor is an ICE enforcement priority or if ICE intends on administratively closing the proceedings and/or physically releasing the requestor within 30 days.

1. If ICE indicates that it does not intend to physically release the requestor within 30 days, USCIS will deny the DACA request using the checkbox within Appendix F (Denial Template) that states "USCIS lacks the authority to consider your request because you were in immigration detention at the time you filed your Form I-821D and

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

you remain in immigration detention as of the date of this notice." USCIS will notify ICE once the denial notice is issued.

2. If ICE indicates that the requestor is an ICE enforcement priority but ICE intends on physically releasing the requestor, USCIS will deny the DACA request using the checkbox within Appendix F (Denial Template) that states "…exercising prosecutorial discretion in your case would not be consistent with the Department of Homeland Security's enforcement priorities." USCIS will notify ICE once the denial notice is issued

3. If ICE indicates that the case is not an ICE enforcement priority and ICE intends to physically release the requestor, the case will be adjudicated on its merits. **A review of DHS electronic systems must be performed to ensure the requestor is physically released before the case is adjudicated on its merits.**

If a BCU supervisor disagrees with ICE's determination of whether or not the requestor is an enforcement priority, the BCU should ask local counsel for assistance in contacting local ICE operations to discuss the reasons why USCIS believes this individual is an enforcement priority. The Service Center's local counsel can seek assistance from USCIS Headquarters' Office of the Chief Counsel to contact ICE, if necessary.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

## Handling Procedures

**General**    The evaluation of criminal issues with respect to a DACA request is done
after BCU vetting of the ▮(b) (7)(E)▮ check and the ▮ (b) (7)(E) ▮ results from
the FBI. If the up-front ▮(b) (7)(E)▮ check reveals a hit, the DACA request goes to
BCU/Triage. If the hit relates, BCU triage routes the DACA request to the
BCU. BCU documents the ▮(b)(7)(E)▮ hit and the resolution in the ROIQ. While
the DACA request is undergoing the up-front ▮(b)(7)(E)▮ check, the DACA
requestor is placed in the scheduling queue for an ASC appointment to have
his/her biometrics captured. If the ▮ (b) (7)(E) ▮ results return an
IDENT, the BCU reviews the results to determine whether they are germane
to the DACA request and the exercise of prosecutorial discretion. The officer
may issue an RFE at any point along the way, if necessary to establish
whether the issues of criminality relate to a misdemeanor, a significant
misdemeanor, a felony, or whether the criminal issues pose a public safety
threat. When a DACA request is denied, the denial shall be issued using the
standard denial template, which provides a list of checkboxes. The standard
denial template is found at Appendix F. Select the box or boxes that apply.
For guidance on when to seek supervisory review of a denial involving issues
of criminality, see Chapter 9, Section D.

**Categorization**    If the BCU determines that the case presents issues of criminality, processing
of the DACA request must be categorized as either EPS or non-EPS, as
defined in the November 7, 2011 NTA memorandum.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator.

| Non-EPS Cases | A DACA request posing issues of criminality that are based on (b)(7)(E) non-EPS, as per the NTA policy memorandum, is handled by the BCU DACA Team as follows: |
|---|---|

- The BCU DACA Team will adjudicate Form I-821D, taking into account all issues of criminality.
- If the case is approvable, the BCU DACA Team will approve the I-821D for DACA and adjudicate the I-765 for employment authorization.
- If an approval is not warranted, a denial for Form I-821D and Form I-765 will be issued, pending supervisory review.
- After the decisions have been rendered on Forms I-821D and I-765, the A-file shall be routed to the NRC.

In non-EPS cases where the requestor has been arrested for a potentially disqualifying criminal offense, but the court disposition is currently unavailable because the criminal proceedings are pending, the BCU DACA Team will issue RFE DACA 151 call up from Appendix D.  The BCU DACA Team will withhold adjudication until the requestor submits the court disposition or receives SCOPS authorization to deny the case absent the court disposition.  The BCU DACA Team will initially provide 87 days for the requestor to respond, but may issue a second RFE DACA 151 call up if the requestor fails to provide the final court disposition within 87 days because the criminal proceedings have not concluded.

*Continued on next page*

**FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)**
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Handling Procedures, Continued

**EPS Cases**    A DACA request presenting issues of criminality that are deemed to be EPS, as per the NTA policy memorandum, is handled by the BCU DACA Team. The BCU DACA Team shall refer the case to ICE prior to adjudicating the case, even if USCIS can deny the DACA request on its merits.  The BCU DACA Team will refer the DACA request to ICE using the RTI process. The BCU DACA Team will suspend adjudication of the DACA request for 60 days, or until ICE provides notification of its action on the case, whichever is earlier.

- **ICE Takes No Action or Does Not Respond:**  If ICE does <u>not</u> accept the referral request or otherwise provide any notification of its action within 60 days of the RTI:
  - The BCU DACA Team will adjudicate Form I-821D, taking into account all issues of criminality, and in particular, the issues presenting an EPS concern.
  - If the disposition of the criminal charges against the DACA requestor is **pending**, the BCU DACA Team will deny the DACA request on public safety grounds, because the underlying issues of criminality are deemed to pose an EPS concern, pursuant to the November 7, 2011 NTA memorandum. The BCU DACA Team will also deny Form I-765, requesting employment authorization.
  - If the disposition of the criminal charges against the DACA requestor are **final**, the BCU DACA Team will deny Form I-821D based on the issues of criminality and the conviction. The BCU DACA Team will also deny Form I-765, requesting employment authorization.
  - Upon denial, the BCU DACA Team shall refer the DACA request to ERO, in accordance with the agreed upon method, and update FDNS-DS.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

## Handling Procedures, Continued

**EPS Cases**
(continued)

- **ICE Accepts the Referral:** If ICE accepts the case, the BCU DACA Team will follow the standard protocols outlined in the November 7, 2011 NTA memorandum.

**Note:** Requests involving issues of criminality that normally would not meet the guidelines for consideration of deferred action will be denied, unless the requestor is claiming that consideration is warranted due to exceptional circumstances and fully documents such claim. Removal shall not be deferred under DACA pursuant to this very limited exception without concurrence from HQSCOPS.   In these instances the case shall come to HQSCOPS from the Service Center Director, through the appropriate chain of command.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

## H. Adjudicating Form I-821D, Part 3, Criminal, National Security, and Public Safety Information

**Introduction**

When adjudicating Part 3 of Form I-821D, it is necessary to ensure that clear information and evidence are present to make a final determination. Refer to Chapter 6 for Background and Security Checks and Chapter 8, Section H, for evaluating and handling criminality, public safety, and national security issues.

**Questions 1 and 2: Arrested for, charged with, or convicted of a felony or misdemeanor, or significant misdemeanor in the United States (includes drug offenses and driving under the influence of drugs or alcohol)**

**OR**

**arrested for, charged with, or convicted of a crime in any country other than the United States**

**If the requestor answers "No":**

| If... | And... | Then... |
|---|---|---|
| There is no derogatory information in the A-File(s) (b) (7)(E) etc., | | Case stays in regular workflow. Continue to adjudicate. |
| There is derogatory information in the A-File(s) (b) (7)(E) etc., | The derogatory information clearly shows that the requestor does not meet the DACA guidelines, | Case is handled by the BCU DACA Team. |
| There is derogatory information in the A-File(s) (b) (7)(E) etc., | The derogatory information is unclear, | |
| There is derogatory information in the A-File(s) (b) (7)(E) etc., | There are clear charges or clear derogatory information, but no clear judgment or conviction, | |

**If the requestor answers "Yes":**

| If... | Then... |
|---|---|
| There is clear derogatory information provided by the requestor and/or in our records, | Case is handled by the BCU DACA Team. |
| No derogatory information can be found in our records or it is unclear, and the requestor did not provide any additional information or documentation, | |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

Version April 4, 2013 94

## H. Adjudicating Form I-821D, Part 3, Criminal, National Security, and Public Safety Information, Continued

| Questions 3 and 5: Security and Related Issues – Engaging in Terrorist Activities; or Engaging in Ordering, Inciting, Assisting, or Otherwise Participating in Genocide, Human Trafficking, and Other Violent Crimes Involving the persecution of Others | **If the requestor answers "No":** | | |
|---|---|---|---|
| | **If…** | **And…** | **Then…** |
| | There is no derogatory information in the A-File(s), (b) (7)(E) etc. | | Case stays in regular workflow. Continue to adjudicate. |
| | There is derogatory information in the A-File(s), (b) (7)(E) etc. | The derogatory information clearly shows that the requestor did or may have engaged in terrorist activities or human rights violations. | Put the case through the CARRP process per standard protocols. |
| | There is derogatory information in the A-File(s) (b) (7)(E) etc., | The derogatory information is unclear, | **(b) (5)** |

**If the requestor answers "Yes":**

| **If…** | **Then…** |
|---|---|
| There is clear derogatory information provided by the requestor and/or in our records, | Put the case through the CARRP process per standard protocols. |
| No derogatory information can be found in our records or it is unclear and the requestor did not provide information, | |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

Version April 4, 2013

Appeal: 18-1521 cv-05228-NGG-VMS Filed: 07/02/2018 Document 282-7 Filed 09/04/20 Pg: 287 of 572 Page 287 of 1026 PageID #: 9878

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 274 of 442

## H. Adjudicating Form I-821D, Part 3, Criminal, National Security, and Public Safety Information, Continued

**Question 4: Current and Past Gang Membership**

**If the requestor answers "No":**

| If... | And... | Then... |
|---|---|---|
| There is no derogatory information in the A-File(s), (b)(7)(E) etc., | | Case stays in regular workflow. Continue to adjudicate. |
| There is derogatory information in the A-File(s), (b)(7)(E) etc., | The derogatory information clearly shows that the requestor is or may be a gang member, | Case is handled by the BCU DACA Team. |
| There is derogatory information in the A-File(s), (b)(7)(E) etc., | The derogatory information is unclear, | |

**If the requestor answers "Yes":**

| If... | Then... |
|---|---|
| There is clear derogatory information provided by the requestor and/or in our records, | Case is handled by the BCU DACA Team. |
| No derogatory information can be found in our records or it is unclear and the requestor did not provide information, | |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

Version April 4, 2013      96

# I. Fraud Review and Fraud Referrals

**Immigration Fraud**

In the normal course of adjudication, officers should be aware of fraud indicators. Fraud related concerns that arise during the course of background and security checks should be addressed according to the March 2011 Fraud Detection SOP and the 2008 ICE/USCIS Investigation of Immigration Benefit Fraud MOA.

Fraud encompasses any material representation or omission, accompanied by an intent to deceive. Establishing the elements of fraud is at the core of the work performed during a fraud investigation. In the immigration context, fraud is a willful misrepresentation of a material fact. An omission of a material fact can also constitute a willful misrepresentation, rising to the level of fraud. When reviewing an immigration request, a finding of fraud is generally supported by the presence of the following three elements.

- There must have been a **misrepresentation** or concealment of a fact;
- The misrepresentation or concealment must have been **willful**; and
- The fact must be **material**. See Kungys v. U.S., 485 U.S. 759 (1988) which indicates that a fact is considered material if it had a tendency to influence the decision for the application or petition or shut off a relevant line of inquiry.

A finding of fraud is also supported when the immigration filing contains fraudulent documents that are germane.

The Fraud Detection and National Security (FDNS) Directorate administratively investigates allegations of immigration benefit fraud and produces a Statement of Findings (SOF) that adjudicators use to render their decisions. Most fraud investigations are conducted under the authority of § 212(a)(6)(C)(i) of the Act. In the DACA context, the SOF will document all fraud findings and underlying issues impacting the favorable exercise of prosecutorial discretion.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## I. Fraud Review and Fraud Referrals, Continued

**Immigration Fraud** (continued)

Individuals requesting DACA are not subject to the 212 inadmissibility grounds, because they are neither applying for a visa nor seeking admission to the United States. They are, instead, seeking the administrative exercise of prosecutorial discretion. Nevertheless, the presence of confirmed or suspected fraud issues are germane in deciding whether the DACA requestor merits the exercise of prosecutorial discretion. As a result, when an individual is found to have committed fraud in connection with a DACA request, the DACA request is denied not because the individual is inadmissible due to fraud, but rather, because the fraud negates the exercise of prosecutorial discretion to defer removal. Denials based on confirmed fraud findings will be supported by a properly documented SOF generated by CFDO. FDNS-DS must be updated to show that the DACA request was actually denied for confirmed fraud. The officer must provide information on the final outcome of a DACA request (e.g., approved, denied, NTA) to the BCU/CFDO so they may update FDNS-DS, accordingly.

When adjudicating Forms I-821D and I-765 for DACA, officers will complete a fraud referral sheet when there are articulable elements of fraud found within the filing. When articulable fraud indicators exist, the officer should refer the filing with a fraud referral sheet prior to taking any adjudication action even if there are other issues which negate the exercise of prosecutorial discretion to defer removal.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

J.A. 811

AR1541

## I. Fraud Review and Fraud Referrals, Continued

**Immigration Fraud** (continued)



If the CFDO is to resolve the articulated fraud after exhausting all reasonable efforts and resources, the CFDO may refer the cases to appropriate field office for interview, *if an interview may resolve outstanding concerns.*

The findings of the administrative or criminal investigation will be recorded in FDNS-DS and reported in an SOF and placed in the A-file to enable officers to make accurate and informed decisions on the DACA requests.

The CFDO will adhere to the Fraud Detection Standard Operating Procedures for referring fraud cases filed under the DACA program to ICE.

DACA cases denied due to a confirmed finding of fraud shall be updated in C3 as "Denial Notice with a Finding of Fraud Ordered" [EC] for tracking purposes. In addition, DACA cases denied due to a confirmed finding of fraud shall be referred for NTA issuance in accordance with the NTA memorandum dated November 7, 2011. The appropriate NTA charge will be determined on a case-by-case basis in consultation with local counsel.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) Information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

Appeal: 18-1521    Doc: 28-2    Filed: 07/02/2018    Pg: 291 of 572    Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 291 of 1026 PageID #: 9882

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 278 of 442

# I. Fraud Review and Fraud Referrals, Continued

**System Updates for DACA File Movement Into and Out of CFDO**

For reporting purposes, DACA file movement into and out of the CFDO will require the following updates in C3:

- "Sent to the Fraud Detection Unit (FDU) for Analysis" (b)(7)(E) when sending a DACA request to the CFDO; and
- "Return from Fraud Detection Unit (FDU) with Results" (b)(7)(E) when receiving a DACA request from CFDO for final processing.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Appeal: 18-1521    Document: 28-7    Filed: 07/02/2018    Pg: 292 of 572
Case 1:17-cv-05228-NGG-VMS    Document 82-7    Filed 09/04/20    Page 292 of 1026 PageID #:
9883
Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 279 of 442

# Chapter 9: Decisions

## A. Requests for Evidence

**Request for Evidence (RFE)**

For DACA requests, when requesting additional evidence, an RFE will be used. A NOID will rarely be used. Appendix D has a list of DACA RFE call ups to be used when processing a DACA request.

Follow the steps below to process an RFE.

| Step | Action |
|------|--------|
| 1 |  |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid 'need-to-know' basis without prior approval from the
originator

Appeal: 18-1521   Doc: 28-2   Filed: 07/02/2018   Pg: 293 of 572
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20   Page 293 of 1026 PageID #: 9884

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 280 of 442

## B. Notice of Intent to Deny

**Notice of Intent to Deny (NOID)**

Follow the steps below to process a NOID:

| Step | Action |
|------|--------|
| 1 |  |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |

**Notice of Intent to Deny (NOID) –Local Counsel and HQ SCOPS Review**

See Appendix J for current Notice of Intent to Deny review policy.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

Version April 4, 2013    102

# C. Approvals

**Approvals: CLAIMS Verification**

Follow the steps below to verify information in C3 prior to processing an approval.



| Step | Action |
|---|---|
| 1 | (b) (7)(E) |
| 2 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | Check the fee payment information for Form I-765. See Chapter 5 regarding NSF processing and handling procedures. |
| 10 | (b) (7)(E) |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## C. Approvals, Continued

**Approval Processing for Initial I-821D**

Follow the steps below to process an approval for a DACA request.

| Step | Action |
|---|---|
| 1 | |
| 2 | (b) (7)(E) |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | Put in ROP order and place a pink coversheet on the left-hand side of the file. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

# D. Denials —

**Denials –**
**After RFE or**
**NOID**

In general, the officer shall issue a denial whenever the requestor's response to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) is insufficient to establish eligibility.  There may be exceptions when a NOID or second RFE is appropriate after an initial RFE.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

AR1548

| | |
|---|---|
| **Denials – Supervisory Review** | When the denial involves one of the grounds listed below, obtain supervisory review before issuing the denial when the requestor: |

- Has a conviction for any crime committed before reaching age 18, and was tried as an adult; or
- Has been convicted of a "significant misdemeanor;" or
- Has no criminal convictions and outwardly appears to meet the guidelines in the Secretary's June 15, 2012 memorandum; however, based on other derogatory information obtained through routine systems and background/security checks, there are credible reasons to believe that the requestor poses a threat to national security or public safety. If the requestor poses a threat to national security, the officer should refer the proposed denial for supervisory review <u>after</u> the case has been processed through the CARRP process; or
- Has one or more departures which he/she claims were "brief, casual, and innocent" and therefore are not disruptive of the continuous residence requirement; or
- Has not met the educational guideline; or
- Is in immigration detention at the time of filing Form I-821D and remains in immigration detention; or
- Cannot receive prosecutorial discretion because it is not consistent with the Department of Homeland Security's enforcement priorities.

If the convictions and/or arrests occurred before the requestor filed the Form I-821D and the requestor did not disclose this derogatory information, include the withholding of the material fact(s) as one of the reasons for not exercising prosecutorial discretion in the case.

When a DACA request is denied, the denial shall be issued using the Appendix F. In instances where an individual is unable to establish he or she warrants a favorable exercise of prosecutorial discretion under this process, and no other checkbox applies except "You have not established that you warrant a favorable exercise of prosecutorial discretion," supervisors must refer the case to HQSCOPS through the normal chain of command.

Before routing the A-file to a supervisor, the officer should place a supervisory hold on the case in C3. After the supervisor concurs with the issuance of a denial, the officer shall check the appropriate box on the denial template and process the cases in the system for denial. <u>See</u> Appendix F for the DACA Denial Template. If the supervisor determines that the case should be approved, process for approval and document the file as appropriate.

In novel, complex, or sensitive cases, or cases that require a paragraph denial, supervisors will refer the case to HQSCOPS, through the normal chain of command.

*Continued on next page*
**Version April 4, 2013** 106

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Appeal: 18-1521   Doc: 2823-2   Filed: 07/02/2018   Pg: 298 of 572
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 298 of 1026 PageID #: 9889

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 285 of 442

## D. Denials, Continued

**Denial**
(continued)

When the denial falls under one of the categories that requires supervisory review, ensure that concurrence has been obtained before processing the DACA request for denial.

| Step | Action |
|------|--------|
| 1 |  |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | Prepare and send the denial. |
| 9 | Put in ROP order and place a pink coversheet on the left-hand side of the file over the denial letter. |
| 10 | Process Form I-765 for denial.  See Chapter 12. |

*Continued on next page*

**FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)**
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## D. Denials, Continued

**Abandonment Denial Letters**

Abandonment denials do not require supervisory review. Abandonment denials are initiated on Form I-821D in the following:

- The requestor fails to respond to an RFE or NOID;
- The requestor fails to appear at an ASC for biometrics collection within the specified time frame, after failure to respond to an RFE,   Refer to Chapter 5 of this SOP.

**Abandonment Denials**

After **ALL** A-files have been retrieved when processing an I-821D (unless adjudicating in a T-file if unable to obtain the A-file), follow the steps below to process an abandonment denial.

| Step | Action |
|------|--------|
| 1 | Ensure that no other addresses exist: <br> 1. Review the file for any correspondence received; <br> 2. Review the returned envelope for any changes from the post office; <br> 3. Check C3, National Claims, and AR11 for an alternate address or an address change; <br> 4. Check the systems to see if a more recent DACA request was submitted with updated address; and <br> 5. Check Forms I-821D and I-765 to ensure that there is no different address provided between the two forms. |
| 2 | (b) (7)(E) |
| 3 | |
| 4 | |
| 5 | |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## D. Denials, Continued

**Abandonment Denials**
(continued)

| Step | Action |
|------|--------|
| 6 | (b) (7)(E) |
| 7 | |
| 8 | |
| 9 | Prepare and send the denial. |
| 10 | Put in ROP order and place a pink coversheet on the left-hand side of the file over the denial letter. |
| 11 | Process the Form I-765 for denial. See Chapter 12. |

**NOTE:** If the RFE/NOID was not stamped as a "No Response," the officer should write it on the document. A "No Response" will **ALWAYS** remain on top of the application for proper ROP and the officer will place the denial/withdrawal letter on top of the "No Response."

**Denial for NSF**

When Form I-765 has been "rejected" for NSF, for the $380 I-765 fee and/or the $85 biometrics fee, Form I-821D shall be denied as the DACA filing did not include a concurrently filed I-765 and I-821D. The officer shall select the appropriate denial box on the denial template and update C3 to reflect the denial. After processing the case for denial and updating the system, hold the A-file for 45 days and then forward to the NRC, if a request to review is not received through SRMT.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

# Chapter 10: Post Denial Process

**Determining Appropriate Action After Denial**

1.  Review the grounds for denial.

2.  If the denial grounds do not involve criminal, national security, or public safety issues, hold the A-file for 45 days and then forward to the NRC, if a request to review is not received through SRMT.

3.  If the denial involves criminal, national security, or public safety issues, refer to the November 7, 2011, memorandum entitled, <u>Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens.</u>  Confirmed fraud denials also warrant NTA issuance. <u>See</u> Appendix B.

4.  The NTA unit will determine whether NTA issuance is appropriate under the NTA memorandum referenced above.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

# Chapter 11: Returned Mail

| | |
|---|---|
| **Check for Address Changes** | When notices are returned as undeliverable, the officer should:<br>1. Review the file for any correspondence received;<br>2. Review the returned envelope for any changes from the post office, Check C3, National Claims, and AR11 for an alternate address or an address change;<br>3. Check the systems to see if a more recent DACA request was submitted with an updated address; and<br>4. Check both Form I-821D and the I-765 to ensure that there is no different address provided between the two forms. |
| **RFE, NOID, Intent to Terminate** | When an RFE, NOID, or Intent to Terminate is returned to the Service Center as undeliverable, follow all procedures above to locate a new address and re-mail the RFE, NOIT or Intent to Terminate after updating C3.<br><br>If there is no other address to use and the response time indicated has not passed, the file should be placed on hold in accordance with local procedures for the remainder of the response time. |

| If there is no other address found and the response time has passed on the... | Then... |
|---|---|
| RFE | Deny as an abandonment denial. |
| NOID (with NO criminal content), | Deny for cause. |
| Intent to Terminate, | Terminate DACA. |

| | |
|---|---|
| **Denial Notice** | When a denial is returned to the Service Center as undeliverable, follow all procedures above to locate a new address and re-mail the denial. |

| If there is no new address and the 45 days... | Then... |
|---|---|
| Have **NOT** passed, | Hold file |
| Have passed, | Send to the NRC if no further communication is received |

**FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)**
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

Appeal 18-1521 Document 28-7 Page 303 of 572

# Chapter 12: Employment Authorization

## A. General Information

| | |
|---|---|
| **(c)(33) Eligibility Category** | The eligibility category for employment authorization based on a grant of deferred action is 8 C.F.R. § 274a.12(c)(14). To distinguish DACA-related EADs from other deferred action EADs, the (c)(33) code will be used. |
| **Evidentiary Requirements** | For a (c)(33) EAD, the individual must be approved for DACA.<br><br>The information needed to assess economic necessity is collected on the Form I-765WS. This worksheet should have been reviewed during the adjudication of Form I-821D.<br><br>Before proceeding with the adjudication of the Form I-765, review C3 to ensure that there is no outstanding RFE, as the RFE would have been issued during the adjudication of Form I-821D. |
| **Validity Period of (c)(33) EAD** | The "valid from" date is the date of approval and the "valid to" date is 2 years minus one day from the date of approval or to the end date of the deferred removal date under DACA, whichever is earlier. |
| **8 C.F.R. § 274a.13(d) – 90 Day Time Period to Issue an EAD** | Pursuant to 8 C.F.R. § 274.12(c)(14), the EAD is predicated on a grant of deferred action. Since Forms I-821D and I-765 are filed concurrently for DACA, Form I-821D will be adjudicated first. If Form I-821D is approved, then Form I-765 would be approved under the (c)(33) code to distinguish the DACA related EADs from other deferred action EADs. Since approval of the Form I-821D is a prerequisite, and since the EAD is based upon a grant of DACA, the 90-day EAD clock begins after Form I-821D is approved for DACA. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

AR1555

Appeal: 18-1521    Doc: 28-2    Filed: 07/02/2018    Pg: 304 of 572
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 304 of 1026 PageID #: 9895

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 291 of 442

## A. General Information, Continued

**Reasons for Filing**

The DACA requestor should indicate one of the following reasons for filing:

- Permission to accept employment: The initial request for employment authorization under an eligibility category; or
- Replacement (of lost or stolen employment authorization document): A request to replace a lost, stolen, mutilated, or incorrect EAD.

If neither of these boxes is checked, verify the Form I-821D approval in C3 to ensure that removal has been deferred under DACA and then check the Form I-765 history in C3 to see if a prior EAD has been issued under the (c)(33) eligibility category. If yes, process the Form I-765 EAD as a replacement. If no, process the Form I-765 EAD as an initial EAD. If a prior replacement EAD under the (c)(33) eligibility category has been issued, refer the case to CFDO.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

Version April 4, 2013        113

J.A. 826                                          AR1556

## B. Adjudication

**Verification of Forms I-821D and I-765**

Access C3 and follow the steps below to verify the information:

| Step | Action |
|---|---|
| 1 | Verify that the requestor has a pending or an approved initial I-821D on file.  (If no, see the denial section for processing instructions.) |
| 3 | • Check the signatures on Form I-765. <br> • Verify that the biometrics are present. |

**Biometrics**

Officers must check the **(b) (7)(E)** to determine if the requestor's biometrics (photograph, fingerprints, signature) have been received. (b) (7)(E)

| If ... | Then ... |
|---|---|
| **(b) (7)(E)** | the biometrics have been received. |
| | the biometric(s) have been waived. |
| | then the data was not captured and a card will not print. |

If the requestor is a child less than 14 years of age, there should be a **Waiver (W)** for fingerprint and signature.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

**Version April 4, 2013**      114

## B. Adjudication, Continued

**Approvals**    All corrections made to the information contained on Form I-765 must be made on the face of the application in **red**.

**Application Annotations**    When approving Form I-765, follow the steps below for proper annotation of the form:

| Step | Action |
|---|---|
| 1 | |
| 2 | |
| | |
| 3 | |
| 4 | |
| 5 | |



*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid 'need-to-know' basis without prior approval from the originator.

AR1558

## B. Adjudication, Continued

**CLAIMS Updating for Approvals**

Follow the steps below to update C3 for I-765 approval.

| Step | Action |
|------|--------|
| 1 | **(b) (7)(E)** |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | Place a pink coversheet on the left-hand side of the file. |
| 10 | In the alternative, the approval may be updated using I-765 Express per existing protocols. |

**NOTE:** If you go back into the approval screen to view the data before exiting the form after approving, then you must press the "save" button again to retain the approval. If the information is not saved, then a card will not be generated.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013      116

AR1559

Appeal: 18-1521   Doc: 28-2   Filed: 07/02/2018   Pg: 309 of 572
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 308 of 1026 PageID #: 9899

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 295 of 442

## B. Adjudication, Continued

**Notice of Intent to Deny (NOID)**

Officers will prepare the intent to deny letter, annotate the worksheet, and update CLAIMS as follows:

| Step | Action |
|------|--------|
| 1 | (b) (7)(E) |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | Prepare and send the NOID.<br><br>**NOTE:** Make certain all letters are spell checked and previewed prior to sending. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013    117

## B. Adjudication, Continued

**Denials**        Follow the steps below when denying a case.

| Step | Action |
|------|--------|
| 1 |  |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| | **NOTE:** The date on the denial stamp should be date of adjudication. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

AR1561

## B. Adjudication, Continued

**Denials**
(continued)

| Step | Action |
|------|--------|
| 10 | For cases NOT going to the NTA team:<br><br>• The denial for the Form I-765 is included in the DACA Denial Template.  See Appendix F.<br>• Place a pink coversheet on the left-hand side of the file over the denial letter.<br><br>**NOTE:** When denying only the Form I-765 for abandonment, an officer should use the DACA Form I-765 Abandonment Denial. |
| 11 | Charge out the file using local procedure. |

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## C. Replacement Cards

**Evidence Required**

The following evidence is required for replacement cards:
- Biometrics from the applicant's most recent ASC visit.
- Original signature. All applicants age 14 and over must sign their own application. The contractor can obtain the signature from Form I-765 and waive the fingerprint when scanning and producing an EAD.
- Current card issued with validity dates that have NOT expired.
- Valid fingerprints are not required in order to issue a replacement EAD.

**Validity Dates**

When issuing a replacement card the validity period should mirror the dates authorized under the previous card.

**Biometrics**

Upon receipt, the contractor will clone from biometrics from the applicant's most recent ASC visit.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013          120

Appeal: 18-1521 Document 29-2 Filed: 07/02/2018 Pg: 312 of 572

# Chapter 13: Use of Service Request Management Tool (SRMT) to

| | |
|---|---|
| **Introduction** | USCIS will accept SRMTs from DACA denials based on a claim that the denial is incorrect <u>and</u> the denial is based on an <u>administrative error</u>.  Specifically, USCIS will accept SRMTs where the requestor believes that USCIS incorrectly denied his/her DACA request for one or more of the reasons listed in this chapter of the DACA SOP. |
| **History Action Codes (HAC)** | When responding to a request to review a denied DACA request, C3 must be updated with the appropriate History Action Code (HAC) created to track the specific action taken and to denote that the SRMT involved a denied DACA request.  The following HACs will be used: |



| | |
|---|---|
| **Templates** | When providing an interim response to review a denied DACA request, standard response templates must be used for the interim response and when the denial is affirmed.  When the denied DACA request is approved on Service Motion, the standard approval notice will be generated from C3.  Appendix G contains the following templates:<br><br>• DACA SRMT call-ups for interim SRMT responses.<br>• DACA SRMT call-ups to respond that the denial was correct and is affirmed. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid 'need-to-know' basis without prior approval from the originator

Version April 4, 2013      121

# Use of SRMT to Respond to Request to Review Certain Denials

| **Administrative Errors related to Material Facts** | Follow the steps below when an SRMT is filed due to a **claimed** administrative error related to: |

- The denial of the DACA request on the grounds that the requestor did not come to the United States prior to reaching his/her 16th birthday, but the evidence submitted at the time of filing shows that the requestor did, in fact, arrive before the required age; or
- The denial of the DACA request on the grounds that the requestor was under age 15 at the time of filing, but not in removal proceedings, but the evidence submitted at the time of filing and/or systems checks show that the requestor was, in fact, in removal proceedings when the DACA request was filed; or
- The denial of the DACA request on the grounds that the requestor was not under the age of 31 on June 15, 2012, but the evidence submitted at the time of filing shows that the requestor did not exceed the upper age limit on June 15, 2012; or
- The denial of the DACA request on the grounds that the requestor was not in an unlawful immigration status on June 15, 2012, but the evidence submitted at the time of filing shows that the requestor was, in fact, in a lawful status on June 15, 2012; or
- The denial of the DACA request on the grounds that the requestor was not physically present in the United States on June 15, 2012, up through the date of filing, but the evidence submitted at the time of filing establishes that the requestor was, in fact, present.

| Step | Action |
|------|--------|
| 1 | Request the file. |
| 2 | Respond to the SRMT with an interim response. |
| 3 | Update C3 (with HAC code). (b) (7)(E) |
| 4 | (b) (7)(E) |
| 5 | Route the file to the reviewing ISO. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

Version April 4, 2013      122

AR1565

# Use of SRMT to Respond to Request to Review Certain Denials, Continued

**Administrative Errors Related to Material Facts (continued)**

| Step | Action |
|---|---|
| 6 | The ISO will review the claimed administrative error. |

| If the denial... | Then... |
|---|---|
| Was correct, | • The ISO will route the filing to the SISO for concurrence.<br>• The SISO will concur or not concur and route back to the ISO for appropriate systems updating.<br>• If SISO concurs, the ISO updates C3 with HAC code *SRMT DACA Denial Affirmed* and respond to the DACA requestor using the appropriate DACA SRMT call-up found in Appendix G.<br>• If SISO does not concur, follow the instructions below (Was Not Correct). |
| Was not correct, | • The SISO routes the filing to the ISO for review.<br>• The ISO approves Forms I-821D and I-765.<br>• The ISO updates C3 with the HAC code ██████ (b)(7)(E) for each form to show that the case to show that the case was approved on Service Motion. |
| Was not correct, but other reasons for denial still exist, | • The ISO will route the filing to the SISO for concurrence.<br>• If the SISO concurs, the ISO will re-deny the case.<br>• The ISO updates C3 with the HAC code ██ (b)(7)(E) DACA Denial Affirmed for each form.<br>• The ISO produces a new denial using the ██ (b)(7)(E) denial template found in Appendix H. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid 'need-to-know' basis without prior approval from the originator

Version April 4, 2013     123

J.A. 836     AR1566

## Use of SRMT to Respond to Request to Review Certain Denials, Continued

**Requestor did Appear to Have Biometrics Collected at a USCIS ASC**

Follow the steps below when an SRMT is filed due to a claimed administrative error related to the requestor's biometrics collection.

| Step | Action |
|------|--------|
| 1 | Review the electronic systems to see whether the requestor had his/her biometrics taken. Request the A-file (if needed). |
| 2 | Reopen Forms I-821D and I-765 on Service Motion. |
| 3 | Update C3 with HAC codes ████ (b) (7)(E) ████ , for both forms. |
| 4 | Send an interim (b) (7)(E) response using ████ (b) (7)(E) ████ . |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Use of SRMT to Respond to Request to Review Certain Denials, Continued

**Requestor did Appear to Have Biometrics Collected at a USCIS ASC** (continued)

| If the requestor... | Then... |
|---|---|
| Did not have his/her biometrics taken, | The reviewing officer should check:<br>• Returned Mail<br>• Address Changes<br>• Rescheduling Requests<br>• The BPU ASC Reschedule Spreadsheet |

| If you... | Then... |
|---|---|
| Locate returned mail, an address change, or a rescheduling request, | • Initiate ASC appointment rescheduling.<br>• After the biometrics results are received, adjudicate the case.<br>• If Form I-821D is approved, approve Form I-765.<br>• Update C3 with HAC (b)(7)(E) ████ for each form.<br>• If denied, issue a denial using the (b)(7)(E) denial template.<br>• Update C3 with HAC (b)(7)(E) Denial Affirmed for each form. |
| Do not locate any returned mail, address change, or rescheduling request. | • Respond to the SRMT that the denial stands, using the SRMT denial template. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

## Use of SRMT to Respond to Request to Review Certain Denials, Continued

**Requestor did Appear to Have Biometrics Collected at a USCIS ASC (continued)**

| If the requestor... | Then... |
|---|---|
| Did have his/her biometrics taken, | • The ISO will adjudicate Forms I-821D and I-765.<br>• If Form I-821 is approved, ISO approves Form I-765.<br>• ISO updates C3 with HAC (b)(7)(E) for each form.<br>• If denied, ISO issues a denial using the (b)(7)(E) denial template.<br>• ISO updates C3 with HAC (b)(7)(E) for each form. |

**Requestor requested that His/Her Biometrics Appointment at a USCIS ASC be Rescheduled Prior to the Scheduled Date**

Follow the steps below when an SRMT is filed due to a claimed administrative error related to the request to reschedule the ASC appointment.

| Step | Action |
|---|---|
| 1 | Request the A-file. |
| 2 | Reopen Forms I-821D and I-765 on Service Motion. |
| 3 | Update C3 with HAC code (b)(7)(E) DACA Reopened on Service Motion for both forms. |
| 4 | Send an interim (b)(7)(E) response using (b)(7)(E) |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013    126

J.A. 839                AR1569

## Use of SRMT to Respond to Request to Review Certain Denials, Continued

| Requestor requested that His/Her Biometrics Appointment at a USCIS ASC be Rescheduled Prior to the Scheduled Date (continued) | Step | Action |
|---|---|---|
| | 5 | Review the filing and SRMT to determine if a request was received to reschedule the ASC Appointment. |

| If the requestor... | Then... |
|---|---|
| Requested to have his/her biometrics appointment rescheduled, prior to the scheduled date, | • The ISO will schedule a new ASC appointment and route the A-file to the appropriate holding shelf to await the biometrics results.<br>• Adjudicate the case after the biometrics results are received.<br>• If Form I-821D is approved, approve Form I-765.<br>• Update C3 with HAC (b) (7)(E) Approved on Service Motion for each form.<br>• If denied, issue a denial using the (b)(7)(E) denial template.<br>• Update C3 with HAC (b) (7)(E) |
| Did not request to have his/her biometrics appointment rescheduled, prior to the scheduled date. | • Respond to the SRMT that the denial stands, using the SRMT denial template. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)

Version April 4, 2013     127

J.A. 840     **AR1570**

## Use of SRMT to Respond to Request to Review Certain Denials, Continued

**Requestor Paid the Filing and Biometric fees for the I-765**

Follow the steps below when an SRMT is filed due to a claimed administrative error related to Non-Sufficient Funds.

Review the electronic systems to see whether the requestor paid the associated fees with the filing.

| Step | Action |
|------|--------|
| 1 | Records Division reviews electronic systems to determine if the fee was paid timely and properly (if necessary, Request the A-file) |
| 2 | Reopen Forms I-821D and I-765 on Service motion. |
| 3 | Update C3 with HAC code ████ (b) (7)(E) ████, for both forms. |
| 4 | Send an interim ██(b) (7)(E)██ response using ████ (b) (7)(E) ████ |

| If the Records Division determines... | Then... |
|---------------------------------------|---------|
| The appropriate fees were not paid, | • Respond to the SRMT that the denial stands, using the SRMT denial template. |
| The appropriate fees were paid, | • The ISO obtains the file and schedules a new ASC appointment and routes the A-file to the appropriate holding shelf to await the biometrics results.<br>• Adjudicate the case after the biometrics results are received.<br>• If Form I-821 is approved, approve Form I-765.<br>• Update C3 with HAC code ████ (b) (7)(E) ████ for each form.<br>• If denied, issue a denial using the ██(b) (7)(E)██ denial template.<br>• Update C3 with HAC code ████ (b) (7)(E) ████ each form. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

## Use of SRMT to Respond to Request to Review Certain Denials, Continued

| | |
|---|---|
| **USCIS Denied the Request for DACA Based on Abandonment and the Requestor Claims He/She did Respond to a RFE Within the Prescribed Time** | Follow the steps below when an SRMT is filed due to a claimed administrative error related to the requestor's response to a RFE. |

| Step | Action |
|---|---|
| 1 | Request the A-file. |
| 2 | Reopen Forms I-821D and I-765 on Service motion. |
| 3 | Update C3 with HAC code (b) (7)(E) for both forms. |
| 4 | Send an interim (b) (7)(E) response using (b) (7)(E) |
| 5 | Review A-file and local systems to determine if a response to the RFE was received before the due date. |

| If the requestor ... | Then ... |
|---|---|
| Responded to the RFE within the prescribed time, | • Route the filing to the reviewing officer. <br> • Adjudicate based on the evidence submitted initially and the RFE response. <br> • If Form I-821D is approved, approve Form I-765. <br> • Update C3 with HAC code (b) (7)(E) (b) (7)(E) for each form. <br> • If denied, issue a denial using the (b) (7)(E) denial template. <br> • Route to SISO for denial concurrence <br> • Update C3 with HAC code (b) (7)(E) (b) (7)(E) for each form. |
| Did not respond within the required time, or no response was received. | • Respond to the SRMT that the denial stands, using the SRMT denial template. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)

This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator.

Version April 4, 2013   129

AR1572

Appeal: 18-1521 Document: 22-7 Filed: 07/02/2018 Page: 321 of 572
Case 1:17-cv-05228-NGG-VMS Document 28-7 Filed 09/04/20 Page 321 of 1026 PageID #: 9912

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 308 of 442

# Use of SRMT to Respond to Request to Review Certain Denials, Continued

**USCIS Mailed the RFE to the Wrong Address and the Requestor Submitted a COA Prior to the RFE Issuance**

Follow the steps below when an SRMT is filed due to a claimed administrative error related to the requestor's change of address.

| Step | Action |
|------|--------|
| 1 | Request the A-file. |
| 2 | Reopen Forms I-821D and I-765 on Service Motion. |
| 3 | Update C3 with HAC code SRMT D ▮▮ (b) (7)(E) ▮▮ for both forms. |
| 4 | Send an interim (b) (7)(E) response using ▮▮ (b) (7)(E) ▮▮ |
| 5 | Verify the requestor's address. |

| If the requestor... | Then... |
|---------------------|---------|
| Filed a change of address, prior to the issuance of an RFE, | • Re-issue the RFE with a new 87-day response time to the correct address and route the A-file to the RFE hold shelf.<br>• After the RFE response is received, adjudicate Forms I-821D and I-765 based on the evidence submitted initially and the RFE response.<br>• If Form I-821 is approved, approve Form I-765.<br>• Update C3 with HAC code ▮▮ (b) (7)(E) ▮▮ for each form.<br>• If denied, issue a denial using the (b) (7)(E) denial template.<br>• Update C3 with HAC code ▮▮ (b) (7)(E) ▮▮ for each form. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013   130

## Use of SRMT to Respond to Request to Review Certain Denials, Continued

**USCIS Mailed the RFE to the Wrong address and the Requester Submitted a COA Prior to the RFE Issuance** (continued)

| If the requestor… | Then… | | |
|---|---|---|---|
| Did not file a COA prior to the issuance of an RFE. | Review that the RFE was sent to the correct address. | | |
| | **If the RFE was sent to,** | **Then,** | |
| | The correct address, | • Respond to the SRMT stating that the denial stands, using the SRMT denial template. | |
| | An incorrect address. | • Route the filing to the SISO.<br>• The ISO shall re-issue the RFE with a new 87-day response time to the correct address and route the A-file to the RFE hold shelf.<br>• After the RFE response is received, adjudicate Forms I-821D and I-765 based on the evidence submitted initially and the RFE response.<br>• If Form I-821D is approved, approve Form I-765.<br>• Update C3 with HAC code (b)(7)(E) for each form.<br>• If denied, issue a denial using the SRMT denial template.<br>• Update C3 with HAC code (b)(7)(E) for each form. | |

# Chapter 14: DACA Termination

| | |
|---|---|
| **Removal Deferred Under DACA in Error** | If it comes to the attention of an officer that removal was deferred under DACA in error, the officer should reopen the case on Service motion and issue a Notice of Intent to Terminate, unless there are criminal, national security, or public safety concerns (see below). The individual should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate. The Notice of Intent to Terminate should include a statement that if deferred action for childhood arrivals is terminated, any associated employment authorization granted during the period of deferred action will be terminated for cause. |
| | If the adverse grounds are not overcome, or no response is received to the Notice of Intent to Terminate, the officer should prepare a Termination Notice and seek supervisory review of the draft Termination Notice, prior to issuance. The Termination Notice should indicate that the individual's employment authorization is terminated for cause as of the date of the notice. |
| **Fraud** | If it comes to the attention of an officer that an individual committed fraud in seeking deferral of removal under DACA, the officer should reopen the case on Service motion and issue a Notice of Intent to Terminate. The individual should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate. The Notice of Intent to Terminate should include a statement that if deferred action for childhood arrivals is terminated, any associated employment authorization granted during the period of deferred action will be terminated for cause. |
| | If the adverse grounds are not overcome, or no response is received to the Notice of Intent to Terminate, the officer should prepare a Termination Notice and seek supervisory review of the draft Termination Notice prior to issuance. The Termination Notice should indicate that the individual's employment authorization is terminated for cause as of the date of the notice. |
| | The decision to issue a Notice of Intent to Terminate based on fraud should be supported by a fully documented SOF and any other relevant documents/information. The terminated DACA case must also be appropriately recorded in FDNS-DS. |

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

**Version April 4, 2013**   132

**AR1575**

## DACA Termination, Continued

**Criminal, National Security, or Public Safety Issues**

If disqualifying criminal offenses or public safety concerns, which are deemed to be EPS, arise after removal has been deferred under DACA, the officer should forward the case to the BCU DACA Team who, in turn, will refer the case to ICE and follow the handling procedures outlined in the November 7, 2011 NTA memorandum for EPS cases. If ICE accepts the case, the issuance of the NTA will result in the termination of DACA. Upon the filing of the NTA with EOIR, the individual's employment authorization terminates automatically.

If ICE does not accept the case or if the disqualifying criminal offense is non-EPS per the November 7, 2011 NTA memorandum, the BCU DACA Team should reopen the case on Service motion and issue a Notice of Intent to Terminate. The individual should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate. The Notice of Intent to Terminate should include a statement that if deferred action for childhood arrivals is terminated, any associated employment authorization granted during the period of deferred action will be terminated for cause.

If the adverse grounds are not overcome, or no response is received to the Notice of Intent to Terminate, the officer should prepare a Termination Notice and seek supervisory review of the draft Termination Notice prior to issuance. The Termination Notice should indicate that the individual's employment authorization is terminated for cause as of the date of the notice. Consequently, the Class of Admission (COA) code in CIS should be changed to DAT (Deferred Action Terminated) for employment verification purposes. Additionally, the BCU DACA Team should forward the individual's name to ERO.

If national security concerns arise after removal has been deferred under DACA, the case should go through the CARRP process, per established CARRP protocols.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt
from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed,
and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or
other personnel who do not have a valid "need-to-know" basis without prior approval from the
originator

**Version April 4, 2013**   133

Appeal: 18-1521   Document: 26-3   Filed: 07/02/2018   Pg: 325 of 572
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 325 of 1026 PageID #: 9916

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 312 of 442

## DACA Termination, Continued

**System Updates**

The following new HACs must be used as appropriate when updating a Notice of Intent to Terminate DACA and a DACA Termination Notice in C3:



After terminating DACA, the Class of Admission (COA) code in CIS should be changed to DAT (Deferred Action Terminated) for employment verification purposes.

<u>See</u> Appendix I for Notice of Intent to Terminate and Termination Notice.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

AR1577

# Chapter 15: Processing Form I-131, Application for Travel Document for Individuals With Approved Form I-821D, Consideration of Deferred Action for Childhood Arrivals (DACA)

| | |
|---|---|
| **Introduction** | Parole is the authorization to allow an otherwise inadmissible person to physically proceed into the United States under certain safeguards and controls. Parole is not an admission. The legal authority for parole is found in § 212(d)(5)(A) of the Act. Under this statutory authority, DHS may, as a matter of discretion, parole an individual into the United States under prescribed conditions. Parole is granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Advance parole is generally granted prior to the individual's departure from the United States. Form I-512L evidencing such a grant is generally the document accepted by a transportation company to allow individuals travelling without a visa to return to the United States. |
| **Prescribed Conditions for Advance Parole** | In accordance with the discretionary authority provided in § 212(d)(5)(A) of the Act, USCIS will determine whether a DACA recipient's purpose for international travel is justifiable based on the circumstances he or she describes in his or her request. Generally, USCIS will only grant advance parole if the applicant's travel abroad will be in furtherance of: |

- humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;

- educational purposes, such as semester-abroad programs and academic research, or;

- employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Travel for vacation is not a valid basis for advance parole.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

AR1578

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 327 of 572    Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 327 of 1026 PageID #: 9918

Case 8:17-cv-02942-RWT    Document 29-2    Filed 11/28/17    Page 314 of 442

| **Advance Parole Requested for Humanitarian Purposes** | For humanitarian purposes the applicant must show that the travel is for the purpose of: |
| --- | --- |

For humanitarian purposes the applicant must show that the travel is for the purpose of:

* Obtaining medical treatment;
* Attending funeral services for a family member; or
* Visiting an ailing relative.

Evidence to demonstrate this purpose includes, but is not limited to:

- A letter from the applicant's physician explaining the nature of his or her medical condition, the specific medical treatment to be sought outside of the United States, and a brief explanation why travel outside the U.S. is medically necessary; or
* Documentation of a family member's serious illness or death.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

# Processing Form I-131, Application for Travel Document for Individuals With Approved Form I-821D, Continued

**Advance Parole Requested for Educational Purposes**

For educational purposes the applicant must show that the travel will be undertaken for educational pursuits.

- Examples include semester abroad programs or travel necessary to conduct academic research.
- Travel during an academic year unrelated to academics (e.g., a vacation) is insufficient to qualify as an educational purpose.
- Evidence to demonstrate this purpose includes, but is not limited to:
  - A letter from a school employee acting in an official capacity describing the purpose of the travel and explaining why travel is required or beneficial; or
  - A document showing enrollment in an educational program requiring travel.

**Advance Parole Requested for Employment Purposes**

For employment purposes the applicant must show that the travel relates to fulfilling job requirements.

- These purposes will also include the pursuit of a position in the United States with a foreign employer.
- Examples include an overseas assignment, an interview, a conference, training, or a meeting with overseas clients.
- Evidence to demonstrate employment purposes includes, but is not limited to:
  - A letter from the applicant's employer or conference host describing the need for travel; or
  - A document showing a specific employment need, such as a conference program, that also shows the applicant's participation.

**Expedites**

As a general matter of course, expedite requests will not be granted, because USCIS will make every effort to process the advance parole request quickly; however, in a dire emergency, and if properly documented, if an individual were to appear at a local office and the local office were to deem the need for an expedite to be compelling such that an expedite would be warranted, the local office has the option of processing the advance parole or working through established POCs at the Service Center under normal protocols.

*Continued on next page*

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Appeal: 18-1521   Document: 28-3   Filed: 07/03/2018   Pg: 329 of 572
Case 1:17-cv-05228-NGG-VMS   Document 82-7   Filed 09/04/20   Page 329 of 1026 PageID #: 9920

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 316 of 442

## Processing Form I-131, Application for Travel Document for Individuals With Approved Form I-821D, Continued

| | |
|---|---|
| **Filing Location** | A DACA recipient seeking advance parole files Form I-131 with the USICS Lockbox Facility according to the instruction on the form. The Lockbox Facility will forward the application to the appropriate Service Center according to the agreed upon routing. |
| **DACA Recipients in Removal Proceedings** | Individuals in removal proceedings, including those with a final removal order, may seek advance parole if the request meets the guidelines for advance parole consideration under DACA.   Notwithstanding the advance parole, a departure made while under a final order of removal (including a voluntary departure that converted automatically to a final removal order) renders that individual inadmissible under  § 212(a)(9)(A) of the Act. |

**Processing Steps**

**Step 1:**  Determine whether the applicant is in removal proceedings and/or has a final removal order.

**Step 2:**  Captured digital photos from the recent ASC visit should be used in creating the travel document within the I-512L program.

**Step 3:**  Review the results of the initial ▮(b) (7)(E)▮ checks.
- If there is no ▮(b) (7)(E)▮, or the ▮(b) (7)(E)▮ shows the hit does not relate (DNR), or the hit has already been resolved, go to step 4.
- If there is an unresolved ▮(b) (7)(E)▮ hit, follow the instructions in the NaBISCOP.

**Step 4:**  Adjudicate the I-131.
- If the criteria have been met, issue the advance parole valid for the duration of the event, as documented in the advance parole application.  For multiple events, issue the advance parole valid for the duration of all the documented events, not to exceed the duration of the deferral of removal under DACA.
- Update the I-131 in C3 for approval and issuance of an I-512L Advance Parole Document.
- If the criteria have not been met, issue a denial and update C3.

Update RFEs, approvals and denials in C3 using current procedures.

FOR OFFICIAL USE ONLY (FOUO) - LAW ENFORCEMENT SENSITIVE (LES)
This document is FOR OFFICIAL USE ONLY. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to Sensitive But Unclassified (SBU) information, and is not to be released to the public or other personnel who do not have a valid "need-to-know" basis without prior approval from the originator

Version April 4, 2013   138

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 29-2 Filed 07/02/2018 Doc ID: 330/04/502 Page 330 of 1026 PageID #: 9921

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 317 of 442

# Appendix A



*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528

# Homeland Security

June 15, 2012

MEMORANDUM FOR:     David V. Aguilar
                    Acting Commissioner, U.S. Customs and Border Protection

                    Alejandro Mayorkas
                    Director, U.S. Citizenship and Immigration Services

                    John Morton
                    Director, U.S. Immigration and Customs Enforcement

FROM:               Janet Napolitano
                    Secretary of Homeland Security

SUBJECT:            Exercising Prosecutorial Discretion with Respect to Individuals
                    Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

AR1583

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

* The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.

* USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

AR1584

# Appendix B

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship and Immigration Services**

November 7, 2011                                                PM-602-0050

## Policy Memorandum

SUBJECT:   Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens

**Purpose**

This Policy Memorandum (PM) establishes new USCIS guidelines for referring cases and issuing Notices to Appear (NTAs) in a manner that promotes the sound use of the resources of the Department of Homeland Security and the Department of Justice to enhance national security, public safety, and the integrity of the immigration system. This PM supersedes Policy Memorandum No. 110, *Disposition of Cases Involving Removable Aliens,* dated July 11, 2006.

**Scope**

This PM applies to and is binding on all USCIS employees unless otherwise specifically provided in this PM.

**Authority**

Immigration and Nationality Act (INA) sections 101(a)(43), 103(a), 239, 240 and 318; Title 8, Code of Federal Regulations (8 CFR) parts/sections 2.1, 103, 204, 207.9, 208, 216.3(a), 216.6(a)(5), 236.14(c), and 239; Adjudicator's Field Manual Chapter 10.11(a).

**Background**

U.S. Citizenship and Immigration Services (USCIS) has authority, under the immigration laws, *see, e.g.,* INA §§ 103(a), 239; 8 CFR §§ 2.1, 239.1, to issue Form I-862, Notice to Appear, to initiate removal proceedings.[1] U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) also have authority to issue NTAs. Accordingly, USCIS must ensure that its issuance of NTAs fits within and supports the Government's overall removal priorities, while also ensuring that its NTA policies promote national security and the integrity of the nation's immigration system.

To those ends, this PM identifies the circumstances under which USCIS will issue an NTA, or will refer the case to ICE for NTA issuance, in order to effectively handle cases that involve public safety threats, criminals, and aliens engaged in fraud.

---

[1] *Delegation by the Secretary of the Department of Homeland Security to the Bureau of Citizenship and Immigration Services,* Delegation Number 0150.1; Paragraph 2(N). However, international District Directors and officers are not authorized to issue NTAs.

AR1585

Appeal: 18-1521  Case 1:17-cv-02282-GG-VMS  Filed: 07/02/2018  Document 2827  Filed 09/04/20  Pg: 334 of 572  Page 334 of 1026 PageID #:
9925

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 321 of 442

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 2

**Policy**

I. National Security Cases

This PM does not affect the handling of cases involving national security concerns.[2]
Guidance from the Fraud Detection and National Security Directorate (FDNS)[3] will continue
to govern the definition of these cases and the procedures for resolution and NTA issuance.

II. NTA Issuance Required by Statute or Regulation

USCIS will issue an NTA in the following circumstances:[4]

A. Termination of Conditional Permanent Resident Status and Denials of Form I-751,
Petition to Remove the Conditions of Residence (8 CFR 216.3, 216.4, 216.5)[5]
B. Denials of Form I-829, Petition by Entrepreneur to Remove Conditions (8 CFR 216.6)
C. Termination of refugee status by the District Director (8 CFR 207.9)
D. Denials of NACARA 202 and HRIFA adjustments
   1. NACARA 202 adjustment denials (8 CFR 245.13(m));
   2. HRIFA adjustment denials (8 CFR 245.15(r)(2)(i)).
E. Asylum[6], NACARA 203, and Credible Fear cases:[7]
   1. Asylum referrals (8 CFR 208.14(c)(1));
   2. Termination of asylum or termination of withholding of removal or deportation
   (8 CFR 208.24(e));[8]
   3. Positive credible fear findings (8 CFR 208.30(f));
   4. NACARA 203 cases where suspension of deportation or cancellation of removal
   is not granted, and the applicant does not have asylum status, or lawful immigrant
   or non-immigrant status (8 CFR 240.70(d)).

This PM does not apply to, or change, NTA or notification procedures for Temporary
Protected Status cases.[9]  Further, Form I-360, Petition for Amerasian, Widow(er), or Special
Immigrant, processed under the Violence Against Women Act (VAWA), should continue to

---

[2] National Security Cases include cases involving Terrorist Related Grounds of Inadmissibility (TRIG) pursuant to
sections 212(a)(3)(B) and 212(a)(3)(F) of the INA.
[3] See, e.g., *Policy for Vetting and Adjudicating Cases with National Security Concerns* (April 11, 2008).
[4] If any Form I-751 or I-829 cases are also Egregious Public Safety cases, they will be referred to ICE in accordance
with Section IV.A.1 of this PM.
[5] See the October 9, 2009 internal memo, *Adjudication of Form I-751, Petition to Remove Conditions on Residence
Where the CPR Has a Final Order of Removal, Is in Removal Proceedings, or Has Filed an Unexcused Untimely
Petition or Multiple Petitions.*  See also the April 3, 2009 memo, *I-751 Filed Prior to Termination of Marriage.*
[6] USCIS may issue an NTA when an asylum applicant withdraws his or her asylum application.
[7] This memo does not apply to the Asylum Division's issuance of Form I-863, Notice of Referral to Immigration
Judge, to certain stowaways, crewmembers, and VWP individuals who are requesting asylum or withholding of
removal; reasonable fear screenings and negative credible fear screenings.
[8] See also section 208(c)(3) of the INA describing removal when asylum is terminated.
[9] See the September 12, 2003 internal memo, *Service Center Issuance of Notice to Appear (Form I-862).*

AR1586

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 3

be processed under existing protocols.  If the VAWA applicant's Form I-485 is denied, this
memorandum is applicable in terms of NTA issuance.[10]

III. Fraud Cases with a Statement of Findings Substantiating Fraud

To protect the integrity of the immigration system and address fraud, USCIS will issue NTAs
when a Statement of Findings (SOF) substantiating fraud is part of the record.[11]  An NTA
will be issued upon final adjudicative action on the petition and/or application or other
appropriate eligibility determination.[12]  NTAs will be issued even if the petition and/or
application is denied for a ground other than fraud, such as lack of prosecution or
abandonment, is terminated based on a withdrawal by the petitioner/applicant, or where an
approval is revoked, so long as an SOF substantiating fraud is in the record.

The NTA should include the charge of fraud or misrepresentation, if possible.  The
appropriate charge(s) will be determined on a case-by-case basis.  Consultation with local
USCIS counsel to determine the appropriate charge(s) is recommended.

IV. Cases to be Referred to ICE for a Decision on NTA Issuance

A. Criminal Cases:  Criminal aliens are a top immigration enforcement priority for the
government.  The following guidance recognizes the prioritization and requires USCIS to
refer criminals to ICE for action or issue an NTA in accordance with this PM.

1. Egregious Public Safety (EPS) Cases

USCIS will refer all EPS cases, including cases with pending N-400s, to ICE
prior to adjudicating the case even if USCIS can deny the petition and/or
application on its merits.  An EPS case is defined by USCIS and ICE as a case
where information indicates the alien is under investigation for, has been arrested
for (without disposition), or has been convicted of, any of the following:
a. Murder, rape, or sexual abuse of a minor as defined in
section 101(a)(43)(A) of the INA.
b. Illicit trafficking in firearms or destructive devices as defined in
section 101(a)(43)(C) of the INA.
c. Offenses relating to explosive materials or firearms as defined in
section 101(a)(43)(E) of the INA.

[10] When making determinations, employees must keep in mind USCIS's obligations under 8 USC § 1367, which
prohibits the release of any information, outside of DHS, relating to aliens who are seeking or have been approved
for immigration benefit(s) under the provisions for battered spouses, children, and parents in the Violence Against
Women Act.
[11] Alternatively, ICE will determine whether to issue the NTA if a criminal investigation is conducted, fraud is
found, and the investigation results in criminal prosecution.
[12] This includes, but is not limited to, aliens that were granted asylum status by USCIS, adjusted to Lawful
Permanent Resident status, presented fraud indicators, were subject to the Post Adjustment Eligibility Review
(PAER) process in an Asylum Office, and met the PAER criteria for NTA issuance.

AR1587

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 4

    d. Crimes of violence for which the term of imprisonment imposed, or where
       the penalty for a pending case, is at least one year as defined in
       section 101(a)(43)(F) of the INA.
    e. An offense relating to the demand for, or receipt of, ransom as defined in
       section 101(a)(43)(H) of the INA.
    f. An offense relating to child pornography as defined in
       section 101(a)(43)(I) of the INA.
    g. An offense relating to peonage, slavery, involuntary servitude, and
       trafficking in persons as defined in section 101(a)(43)(K)(iii) of the INA.
    h. An offense relating to alien smuggling as described in
       section 101(a)(43)(N) of the INA
    i. Human Rights Violators, known or suspected street gang members, or
       Interpol hits.
    j. Re-entry after an order of exclusion, deportation or removal subsequent to
       conviction for a felony where a Form I-212, Application for Permission to
       Reapply for Admission into the U.S. after Deportation or Removal, has
       not been approved.

All EPS cases must be referred to ICE using the procedures outlined below. The
case will be referred as soon as it is identified.  ICE will have an opportunity to
decide if, when, and how to issue an NTA and/or detain the alien.  USCIS will not
issue an NTA in these cases if ICE declines to issue an NTA.  If some other basis
unrelated to the EPS concern becomes apparent during the course of adjudication,
an NTA may be issued in accordance with this memo.

<u>Referral Process</u>

This referral process is utilized in order to give ICE the opportunity to determine
the appropriate course of action before USCIS adjudicates the case.  A decision to
issue an NTA may directly affect the processing of the pending petition and/or
application.  Upon issuing the Referral to Immigration and Customs Enforcement
(RTI), USCIS will suspend adjudication for 60 days, or until ICE provides
notification of its action on the case, whichever is earlier.

In response to the RTI –

    1.  ICE may issue an NTA.  ICE's issuance of an NTA allows USCIS to
       proceed with adjudication (unless jurisdiction transfers to EOIR or the
       pending application is an N-400), taking into account the basis for the
       NTA.

    2.  If ICE does not issue an NTA or otherwise provide notification of its
       action on the case within 60 days of the RTI, USCIS may resume its
       adjudication of the case, taking into account the referral grounds.

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 5

      a. If the case is approvable, USCIS will consult with ICE prior to
      adjudication.

      b. Once adjudicated, regardless of the decision, USCIS will notify
      ICE of the result by sending a copy of the original RTI to ICE with
      a cover memorandum advising of the outcome of the case.

EPS cases referred to ICE prior to adjudication should be called up and reviewed
no later than 60 days after referral. Normally, the case should be adjudicated by
USCIS. However, USCIS retains discretion to place the case on hold for more
than 60 days if ICE requests additional time to conduct an investigation.[13]

Office-Specific Processes

1. Cases to be adjudicated by Service Centers and the National Benefits
Center. Adjudication will be suspended and the case will immediately be
sent to the appropriate Service Center Background Check Unit (BCU).
The BCU will refer the case to the ICE Benefit Fraud Unit (BFU) via an
RTI. A hard copy of the RTI will be placed in the A-file and/or receipt
file. The BCU will retain the file unless ICE requests it or the 60 days
expire.

2. Cases to be adjudicated by Field Offices. The Immigration Services
Officer (ISO) will suspend adjudication and the case will immediately be
referred to the local ICE Special Agent in Charge (SAC) via an RTI. A
hard copy of the RTI will be placed in the A-file and/or receipt file. A
copy of the RTI must also be sent to the ICE BFU. USCIS will retain the
file unless ICE requests the file for their review.

An RTI should include any relevant attachments that USCIS has at the time, such
as a copy of the RAP sheet and a copy of the petition and/or application.

2. Non-Egregious Public Safety Criminal Cases

If it appears that the alien is inadmissible or removable for a criminal offense not
included on the EPS list, USCIS will complete the adjudication and then refer the
case to ICE. This section applies to N-400 cases if the N-400 has been denied on
good moral character (GMC) grounds based on the criminal offense.[14] ICE will
decide if, and how, it will institute removal proceedings and whether or not it will
detain the alien. USCIS will not issue an NTA if ICE declines to issue an NTA.

---

[13] Pursuant to 8 CFR 274a.13(d), USCIS must complete processing of an Employment Authorization Document
(EAD) within 90 days or issue an interim EAD card valid up to 240 days. Officers should be mindful of this
regulatory timeframe when cases with a pending Form I-765, Application for Employment Authorization, are
referred to ICE.
[14] See Section V of this memo addressing N-400 cases.

     **AR1589**

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 6

      If some other basis unrelated to the criminal offense becomes apparent upon
return of the case to USCIS, an NTA may be issued in accordance with this
memo.

Referral Process

      The referral process is used to allow ICE to make a determination whether to
issue an NTA, based on the totality of circumstances and its priorities. ICE will
determine the appropriate grounds for removal if an NTA is issued.

      Once adjudication is complete, USCIS will send an RTI to ICE. USCIS will
concurrently transmit a copy of the RTI to ICE Headquarters (HQ) Enforcement
and Removal Operations (ERO) Criminal Alien Division for statistical monitoring
purposes. If there is any confusion or uncertainty about classifying a case as
egregious versus non-egregious, the USCIS ISO should refer the matter as an EPS
case using the process described above.

      The accompanying A-file will be referred to ICE with the RTI, if the file is in the
possession of the referring USCIS office or center. If the file is not at the
referring USCIS office or center, the RTI should include any relevant attachments
that USCIS has, such as a copy of the RAP sheet and a copy of the petition and/or
application. Where USCIS obtained certified conviction records through normal
processing of the case, USCIS will include the records with the RTI, but it will
not hold the RTI on a completed case solely to obtain disposition records. Instead
ICE will decide whether, and how, it will obtain such records as part of its
decision to issue an NTA.

Office-Specific Processes

    1. Cases adjudicated by Service Centers and the National Benefits Center.
       Once adjudication is completed, if the alien is removable on a criminal
       charge, regardless of the reason for the denial, the file will be referred to
       the BCU. The BCU will refer the case, along with the A-file and/or receipt
       file, to the appropriate ERO Field Office Director (FOD) via an RTI.

    2. Cases adjudicated by Field Offices. Once adjudication is completed, if the
       alien is removable on a criminal charge, regardless of the reason for the
       denial, USCIS will prepare an RTI and refer the case, along with the
       A-file and/or receipt file, to the local ERO FOD.

B.  National Security Entry Exit Registration System (NSEERS) Violator Cases

      USCIS will refer all cases in which an application is denied based on an NSEERS
violation to ICE for possible NTA issuance.

AR1590

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 7

V.  Underline: Cases Involving Form N-400, Application for Naturalization

The following guidance applies to the issuance of NTAs in cases in which applicants for
naturalization are removable.  There are two primary situations in which NTAs may be
issued in connection with a filed Form N-400.  If the N-400 case involves fraud (documented
in the SOF) the procedures found in this section must be followed, rather than the procedures
found in Section III (Fraud Cases with a Statement of Findings Substantiating Fraud).
However, the below guidance does not apply to EPS cases.  EPS cases must be referred in
accordance with Section IV.A.1 (Egregious Public Safety Cases) of this memo.
Additionally, the below guidance does not apply to non-EPS criminal cases when the N-400
can be denied on GMC grounds based on the criminal act.  These cases must be denied and
referred in accordance with Section IV.A.2 (Non-Egregious Public Safety Criminal Cases).

A.  The first situation occurs when the applicant may be eligible to naturalize but is also
deportable under section 237 of the INA.  Examples include applicants convicted of
aggravated felonies prior to November 29, 1990, or applicants convicted of deportable
offenses after obtaining Lawful Permanent Resident (LPR) status that do not fall within
the GMC period.  The ISO should:

1.  Make a written recommendation on the issuance of an NTA through a review of
the totality of the circumstances to include factors such as: severity of crime, time
since crime committed, other criminal conduct, reformation, immigration history
including method of entry, length of presence in the U.S., and prior immigration
violations, and contributions to society to include the pursuit of education and
military service.[15]

2.  Once the ISO has made a recommendation on whether or not to issue an NTA, the
case should be forwarded to the N-400 NTA Review Panel (Review Panel), along
with the written recommendation.  A Review Panel must be formed in each Field
Office and include a local Supervisory Immigration Services Officer (SISO), a
local USCIS Office of Chief Counsel attorney, and a district representative.  An
attorney from ICE's local Office of Chief Counsel will be invited to participate
and will have an advisory role on the panel.  The Review Panel will make the
final determination on NTA issuance.  If consensus cannot be reached by the
Review Panel, the case will be elevated to the District Director, through the
district representative, for a final decision.

3.  If the Review Panel decides to issue an NTA, place the N-400 on hold until
removal proceedings have concluded.  Once proceedings have concluded, or if the
Review Panel declines to issue an NTA, adjudicate the case appropriately.

---

[15] Additional factors to be taken under consideration can be found in the June 17, 2011 ICE memo, *Exercising
Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the
Apprehension, Detention, and Removal of Aliens.*

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases Involving Inadmissible and Removable Aliens
Page 8

  B.  The second situation occurs when it is determined that the applicant was inadmissible at the time of adjustment or admission to the United States, thus deportable under section 237 of the INA and not eligible for naturalization under section 318 of the INA.[16]  The ISO should:

      1.  Make a written recommendation on the issuance of an NTA through a review of the totality of the circumstances to include factors such as: willfulness of actions, fraud factors, length of LPR status, criminal history, and officer error at time of adjustment.

      2.  Once the ISO has made a recommendation on the issuance of the NTA, the case should be forwarded to the Review Panel (see Section V.A.2), along with the written recommendation.  The Review Panel will make the final determination on NTA issuance.  If consensus cannot be reached by the Review Panel, the case will be elevated to the District Director, through the district representative, for a final decision.

      3.  If the Review Panel decides to issue an NTA, place the N-400 on hold until removal proceedings have concluded.  Once removal proceedings have concluded, adjudicate the case appropriately.  If the Review Panel declines to issue an NTA, deny the case under section 318 of the INA.

VI.  Other Cases

  A.  An alien may request NTA issuance to renew an application for adjustment or in certain cases with a denied N-400.  The request must be made in writing.[17]

  B.  An asylum applicant issued an NTA may request NTA issuance for family members not included on the asylum application as dependents for family unification purposes.  The request must be made in writing.[18]

VII.  Exceptions

Exceptions to the guidance in this PM require concurrence from Regional or Center Directors, who will consult with ICE before issuing an NTA.

---

[16] In the Third Circuit *only* (Pennsylvania, New Jersey, Delaware, and the U.S. Virgin Islands), based on the holding in *Garcia v. Att'y Gen.*, 553 F.3d 724 (3d Cir. 2009), if the alien has been an LPR for at least five years, the alien cannot be placed in removal proceedings for fraud or willful misrepresentation of a material fact at time of adjustment, if USCIS could have learned of the fraud or misrepresentation through reasonable diligence before the five year rescission period expired.  Please consult with USCIS counsel if there are questions regarding the applicability of this precedent.
[17] USCIS retains discretion to deny a request.  USCIS should consider ICE actions and determinations when making an NTA issuance decision under this section.
[18] USCIS retains discretion to deny a request.

AR1592

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 9

VIII. Coordination with ICE

According to the June 2011 ICE memo regarding the exercise of prosecutorial discretion
consistent with priorities,[19] USCIS will receive notice before an ICE attorney exercises
prosecutorial discretion and dismisses, suspends, or closes a case. The local N-400 NTA
Review Panel will work with ICE to come to a resolution if USCIS does not agree with
ICE's use of prosecutorial discretion in a particular case. If concurrence cannot be reached,
the case should be elevated to the USCIS Office of Chief Counsel in headquarters.

**Implementation**
Each field office must form an N-400 NTA Review Panel and create a process to complete RTIs
and refer EPS and non-EPS criminal cases to ICE. A written list enumerating the members of
the Review Panel and a document outlining the process of referral must be sent to the appropriate
district office within 30 days of the issuance of this memorandum.

**Use**
This PM is intended solely for the guidance of USCIS personnel in the performance of their
official duties. It is not intended to, does not, and may not be relied upon to create any right or
benefit, substantive or procedural, enforceable at law, or by any individual or other party in
removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**
Questions or suggestions regarding this PM should be addressed through appropriate channels to
the Field Operations Directorate, Service Center Operations Directorate, or the Refugee,
Asylum, and International Operations Directorate.

---

[19] *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency
for the Apprehension, Detention, and Removal of Aliens*, signed June 17, 2011.

AR1593

## Appendix C

### Overview of the Background Check Process



AR1594

# **Appendix D**

## DEFERRED ACTION FOR CHILDHOOD ARRIVALS
## RFE CALL-UPS

NOTE: Text highlighted in **YELLOW** and bracketed by [ ] is hidden text that requires ISO input. The ISO should delete the highlighted bracketed *[Text]* and type in the necessary information, or choose the appropriate information from choices and delete the information that does not apply. Text only highlighted in **YELLOW** and not bracketed is directive in nature and should not be printed in the letter being sent but should be deleted. Please mix call-ups into a single RFE as needed.

NOTE: Please add call-ups **DACA 300 – FOREIGN LANGUAGE DOCUMENT MUST BE ACCOMPANIED BY AN ENGLISH TRANSLATION** and **DACA 301 – YOU MAY SUBMIT PHOTOCOPIES** to any other call-ups below as needed.

I. **GUIDELINES**

**DACA 100 – IDENTITY**
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to prove your identity is insufficient *(ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly)*. You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

- Passport;
- Birth certificate accompanied by photo identification:
- Any national identity documents from your country of origin bearing your photo and/or fingerprint;
- Any U.S.-government immigration or other document bearing your name and photograph (e.g., Employment Authorization Documents (EADs), expired visas, driver's licenses, non-driver cards, etc.);
- Any school-issued form of identification with photo;
- Military identification document with photo;
- State-issued photo ID showing date of birth; or
- Any other document that you believe is relevant.

Expired documents are acceptable.

**DACA 101 – CONTINUOUS RESIDENCE**
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to establish that you have continuously resided in the United States during the 5-year period immediately before June 15, 2012 and up to the time of filing is insufficient. *(ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly)*. You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

    a. Employment records (e.g., pay stubs, W-2 Forms, Federal and State income tax returns, letters from employer(s), or, if you are self employed, letters from banks and other firms with whom you have done business);

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 28-27 Filed 07/03/2018 Pg 344 of 702 Page 344 of 1026 PageID #: 9935

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 331 of 442

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters from employers must be signed by the employer and must include the employer's contact information.

Such letters must include: **(1)** your address(es) at the time of employment; **(2)** the exact period(s) of employment; **(3)** period(s) of layoff; and **(4)** duties with the company.

b.  Rent receipts, utility bills (gas, electric, phone, etc.), receipts or letters from companies showing the dates during which you received service;

c.  School records (transcripts, letters, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and periods of school attendance;

d.  Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

e.  Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization;

f.  Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.);

g.  Money order receipts for money sent into or out of the country; passport entries; birth certificates of children born in the United States; dated bank transactions; correspondence between you and another person or organization; U.S. Social Security card; Selective Service card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

h.  Any other relevant document.

*(ISO: Add the appropriate language below to the RFE if any of the questions on page 3 (Part 2, Arrival/Residence Information) of the Form I-821D are blank OR if page 3 of the Form I-821D is missing.)*

In addition, you did not answer question(s) *(ISO should list the questions on page 3 (Part 2, Arrival/Residence Information) of the Form I-821D that were not answered)* in Part 2, Arrival/Residence Information, of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to answer these question(s) on the enclosed copy of your original Form I-821D.

Please re-sign and date page four (4) of the completed form; the completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

*(Include a copy of the requestor's Form I-821D with the RFE)*

**OR**

In addition, you did not submit page three (3) with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to complete the enclosed page three (3) of the form.

Also enclosed is a copy of your original Form I-821D. Please re-sign and date page four (4) of the completed form; the completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

Page 2 4/4/2013

*(Include a copy of the requestor's Form I-821D and a blank page 3 of the form with the RFE)*

## DACA 102 - BRIEF, CASUAL, AND INNOCENT ABSENCE

To be considered for deferred action as a childhood arrival, you must have continuously resided in the United States during the 5 years period immediately before June 15, 2012 and up to the date you filed your request for deferred action. A brief, casual, and innocent absence from the United States will not interrupt your continuous residence.

An absence will be considered brief, casual, and innocent, if:

(1) The absence was short and reasonably calculated to accomplish the purpose of the absence;
(2) The absence was not the result of an order of exclusion, deportation, or removal;
(3) The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and
(4) The purpose of the absence from the United States or actions while outside of the United States were not contrary to law.

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for each departure you made from the United States since June 15, 2007 to show that each departure you made from the United States since June 15, 2007 was brief, casual, and innocent is insufficient. *(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence, modify RFE call up accordingly).* You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

- Plane or other transportation tickets or itinerary showing the travel dates;
- Passport entries;
- Hotel receipts showing the dates you were abroad;
- Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);
- Advance parole document; or
- Any other evidence that could support a brief, casual, and innocent absence.

## DACA 103A – ARRIVED IN THE UNITED STATES BEFORE AGE 16

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to establish that you came to the United States prior to your 16th birthday is insufficient. *(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly).* You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

- Passport with an admission stamp indicating when you entered the United States;
- I-94/I-95/I-94W Arrival/Departure Record;
- Any INS or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);
- Travel records, such as transportation tickets showing your dates of travel to the United States;
- School records (transcripts, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and the periods of school attendance;
- Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization;
- Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.); or
- Any other document that you believe is relevant.

Page 3 4/4/2013

AR1597

**ACA 103B – ESTABLISHED RESIDENCE IN THE UNITED STATES PRIOR TO AGE 16**
The record indicates that you left the United States for some period of time before returning on or after your 16th birthday and beginning your current period of continuous residence. Please submit evidence that you established residence in the United States before your 16th birthday. You can demonstrate that you established residence in the United States before your 16th birthday by, for example, submitting records showing that you attended school or worked in the United States during that time, or that you lived in the United States for multiple years during that time.

Evidence of establishing residence in the United States before your 16th birthday may include, but is not limited to, copies of:

**a.** School records (transcripts, report cards, etc.) from the schools that you attended in the United States before turning 16 years old, showing the name(s) of the schools and periods of school attended;

**b.** Employment records showing that you worked in the United States before turning 16 years old (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, State verification of the filing of state income tax returns, letters from employer(s) or, if you are self-employed, letters from banks and other firms with whom you have done business);

**c.** Documents evidencing that you were physically present in the United States for multiple years prior to your 16th birthday; or

d. Any other relevant document.


**DACA 104A – IN UNLAWFUL STATUS ON JUNE 15, 2012**
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you were in unlawful status on June 15, 2012 is insufficient. (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- I-94/I-95/I-94W Arrival/Departure Record showing the date your authorized stay expired;
- If you have a final order of exclusion, deportation, or removal issued on or before June 15, 2012, submit a copy of that order and related charging documents, if available;
- An INS or DHS charging document placing you into removal proceedings;
- Any other document that you believe is relevant to show that you lacked lawful immigration status on June 15, 2012; or
- Any document relating to parole.

**DACA 104B – STUDENT IN UNLAWFUL STATUS ON JUNE 15, 2012**
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you were in unlawful status on June 15, 2012 is insufficient. (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- I-94/I-95/I-94W Arrival/Departure Record showing the date your authorized stay expired;
- If you have a final order of exclusion, deportation, or removal issued on or before June 15, 2012, submit a copy of that order and related charging documents, if available;
- An INS or DHS charging document placing you into removal proceedings;
- Copies of your transcripts showing your student status from (ISO should insert dates);

Page 4 4/4/2013

- Copies of all properly completed old I-120AB/I-20ID forms or new SEVIS I-20 forms (required since August 1, 2003) for all schools attended;
- Proof of reinstatement;
- Any other document that you believe is relevant to show that you lacked lawful immigration status on June 15, 2012;
- Any document relating to parole.

## DACA 105 – PROOF OF PRESENCE IN THE UNITED STATES ON JUNE 15, 2012

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you were present in the United States on June 15, 2012 is insufficient. *(ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly).* You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

a. Employment records (e.g., pay stubs, W-2 Forms, Federal and State income tax returns, letters from employer(s), or, if you are self employed, letters from banks and other firms with whom you have done business).

   NOTE: In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters from employers must be signed by the employer and must include the employer's contact information.

   Such letters must include: **(1)** your address(es) at the time of employment; **(2)** the exact period(s) of employment; **(3)** period(s) of layoff; and **(4)** duties with the company.

b. Rent receipts, utility bills (gas, electric, phone, etc.), receipts or letters from companies showing the dates during which you received service.

c. School records (transcripts, letters, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and periods of school attendance.

d. Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records).

e. Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization.

f. Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.).

g. Money order receipts for money sent into or out of the country; passport entries; birth certificates of children born in the United States; dated bank transactions; correspondence between you and another person or organization; U.S. Social Security card; Selective Service card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

h. Any other relevant document.

## DACA 106 – CURRENTLY ENROLLED IN SCHOOL

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, showing that you have been accepted for enrollment or are already attending classes in one of the following is insufficient:

Page 5 4/4/2013

- A public or private elementary, junior high/middle school or high school/secondary school;
- A public or private college or university, or community college;
- A course of study to pass a General Education Development (GED) Certificate exam or other State-authorized exam;
- An educational or career training program (including vocational training);
- Literacy training; or
- An English as a Second Language (ESL) program.

*(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the documents provided by the requestor are incomplete (i.e. no identifying information) or illegible, the ISO should note this in the RFE. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly)*

You may still submit evidence, which may include the following: *(ISO should delete any of the following that were already provided by the requestor)*

- **A public or private elementary, junior high/middle school or high school/secondary school;**
  - Such evidence may include, but is not limited to:
    - If accepted for enrollment, but classes have not yet commenced:
      - An acceptance letter on school letterhead from the school's authorized representative. Such acceptance letter is to include the name and address of the school, your grade level, and the date that classes are scheduled to commence. The letter is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
      - A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, if you have a disability;
      - A current class schedule containing the student's name, the list of courses, and the day and time of each class; or
      - Any other relevant evidence.
    - If already enrolled – Current school registration cards; current transcripts; report cards; progress reports showing the name of the school, the time period or semester covered by the document, and the current grade; or a current IEP showing your process to date.
- **A public or private college or university, or community college;**
  - Such evidence may include, but is not limited to:
    - If accepted for enrollment, but classes have not yet commenced:
      - An acceptance package or related material on school letterhead from the school's authorized representative. Such acceptance package or related material is to include the name and address of the school, your grade level or class year, and the date or term when classes are scheduled to commence. In addition, the acceptance package or related material is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
      - A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, if you have a disability;
      - A copy of your current tuition bill;
      - A current class schedule containing your name, the list of courses, and the day and time of each class; or
      - Any other relevant evidence.
    - If already enrolled – Current school registration cards; current transcripts; report cards; progress reports showing the name of the school, the time period or semester covered by the document, and the current grade or class year; or a current IEP showing your process to date.

*Page 6 4/4/2013*

- **A course of study to pass a General Education Development (GED) Certificate exam or other equivalent State-authorized exam;**

  Such evidence is to include a letter from the authorized representative of the program that includes information such as:
  - Your name and date of enrollment;
  - The duration of the program and expected completion date;
  - Whether the course of study is for a regular high school diploma or recognized equivalent under State law or a GED exam or other equivalent State-authorized exam;
  - The program's source and amount of funding;
  - The program's authorized representative's contact information; and
  - The program's demonstrated effectiveness *if* it is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part.

  - **An educational or career training program (including vocational training);**

    Such evidence may include, but is not limited to:
    - If accepted for enrollment, but classes have not yet commenced:
      ○ An acceptance letter on school letterhead from the school registrar/authorized school representative. Such acceptance letter is to include the name and address of the program, a brief description of the program, the duration of the program, and state when the classes are scheduled to commence. The letter is to be accompanied by evidence that the student has registered for the program;
      ○ A copy of your current year registration (intake form/enrollment form); or
      ○ Any other relevant documentation.
    - If already attending classes– Current transcripts, report cards, or progress reports showing the name of the school, the time period or semester covered by the document, and if relevant, the current educational or grade level.
    - The program's demonstrated effectiveness *if* it is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part.

- **Literacy training; or**

  Such evidence is to include a letter from the literacy program administrator or authorized representative providing information such as:
  - Your name;
  - The date of your enrollment;
  - The duration of the literacy program and the expected completion date;
  - The program administrator or authorized representative's contact information; and
  - The program's demonstrated effectiveness *if* it is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part.

- **An English as a Second Language (ESL) program.**

  Such evidence is to include a letter from the ESL program administrator or authorized representative. This letter is to include the following:
  - Your name;
  - The date of your enrollment;
  - The duration of the ESL program and the expected completion date;
  - The program administrator or authorized representative's contact information; and
  - The program's demonstrated effectiveness *if* it is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part.

## DACA 106A – EVIDENCE OF ACCEPTANCE BUT NO EVIDENCE OF REGISTERING FOR CLASSES:

You have provided an acceptance letter or other related material indicating that you have been accepted at *(ISO should list the name of the private elementary/junior high/middle school/high school/secondary school or public or private college/university/community college)*. However, you did not include evidence that you have enrolled in that school. Therefore, you are requested to submit such evidence

Page 7 4/4/2013

which is to include, but is not limited to paid tuition bills or evidence that you have registered for class at that school.

### DACA 106B – LITERACY PROGRAM'S NON-PROFIT STATUS

If the literacy program in which you are enrolled has non-profit status, please provide evidence of such status. Evidence of the literacy program's non-profit status is to include a copy of a valid letter from the Internal Revenue Service confirming exemption from taxation under section 501(c)(3) of the Internal Revenue Service Code of 1986, as amended, or equivalent section of prior code.

### DACA 106C –PUBLIC FUNDING (GED; Educational or Career Training Program (Including Vocational Training); ESL)

If the (*ISO should insert GED; Educational or Career Training Program (Including Vocational Training); Literacy Program; or English as a Second Language*) in which you are enrolled is funded in whole or in part by public funds (Federal, State, county or municipal), you are requested to submit a letter from the (*ISO should insert GED program administrator/authorized representative; school registrar/authorized school representative if requestor is enrolled in Career Training Program (Including Vocational Training); literacy program administrator/authorized representative; or ESL program administrator/authorized representative*) providing basic details about the funding, such as the source(s) of the funding.

### DACA 106D – PUBLIC FUNDING – (Literacy Program)

If the literacy program in which you are enrolled is <u>not</u> funded in whole or in part by public funds (Federal, State, county, or municipal) or not administered by a non-profit entity you are requested to submit a letter from the program administrator or authorized representative providing basic details about the funding, such as the amount and the source(s) of the funding.

### DACA 106E – DEMONSTRATED EFFECTIVENESS (GED; Educational or Career Training Program (Including Vocational Training); Literacy Program; ESL)

*(ISO should select the correct RFE paragraph below depending upon the program in which the requestor is enrolled)*

If the **GED/Equivalency program,** in which you are enrolled, is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part, you are requested to submit information from the GED program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;
- The program's track record in assisting students in obtaining a regular high school diploma, GED, or a recognized equivalent certificate, or passing a GED or recognized equivalent exam;
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

If the **educational or career training program (including vocational training), in** which you are enrolled, is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part, you are requested to submit information, with supporting documentation, if available, from the school registrar/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;
- The program's track record in placing students in employment, job training, or post-secondary education; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

*Page 8 4/4/2013*

If the **literacy program** in which you are enrolled, is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part, you are requested to submit information from the literary program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:
- The duration of the program's existence;
- The program's track record in placing students in post-secondary education, job training programs, or employment; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

If the **English as a Second Language (ESL)** program in which you are enrolled is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part, you are requested to submit information from the ESL program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:
- The length of the program's existence;
- The program's track record in assisting students in obtaining placement in postsecondary schools, job training programs, or employment; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

## DACA 106F– GRADUATED FROM SCHOOL
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you graduated or obtained a General Educational Development (GED) Certificate or equivalent State authorized exam in the United States is insufficient (*ISO should  list what evidence was submitted for this guideline and briefly state why the evidence is insufficient.  If the documents provided by the requestor are incomplete (i.e. no identifying information) or illegible, the ISO should note this in the RFE. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*).  You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)
- A diploma;
- Transcripts showing the date of graduation; or
- A GED certificate, certificate of completion, certificate of attendance, or alternate award from a public or private high school or secondary school.

Documentation sufficient to demonstrate that you obtained a GED includes, but is not limited to, evidence you passed a GED exam, or other comparable State-authorized exam, and, as a result, you received the recognized equivalent of a regular high school diploma under State law.

## DACA 107 – MEDICAL LEAVE
You indicate in your filing that you are currently on medical leave from school.  Therefore, you are requested to submit evidence of your medical leave and indicate the date you expect to return to school. Evidence of your medical leave may include, but is not limited to, an explanation from a medical doctor on official letterhead stating the diagnosis and prognosis, and how long your treatment is expected to last.

## DACA 108 - MILITARY
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States is insufficient. (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*).  You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- Form DD-214, Certificate of Release or Discharge from Active Duty;
- NGB Form 22, National Guard Report of Separation and Record of Service;
- Military personnel records; or
- Military health records.

## DACA 109- REMOVAL PROCEEDINGS

Submit documents that you have been issued an order of exclusion, deportation or removal. Such documentation could include copies of:

- Any removal, deportation, or exclusion order issued by an Immigration Judge;
- Final decision from the Board of Immigration Appeals (BIA); or
- Final decision from a U.S. Court of Appeals in your case.

## II.   APPLICATION SUPPORT CENTER (ASC) RELATED

### DACA 130 – SCHEDULE ASC APPOINTMENT

Your request cannot be processed until you have appeared at an Application Support Center (ASC) for the collection of a digital photograph, signature, and fingerprint(s). Our records indicate that you have not yet appeared at an ASC for this purpose. Follow the instructions on the appointment notice for biometrics capture [enclosed with this notice/that will be mailed to you separately]. Additional information regarding the location of the ASC can be found on the USCIS web site at www.USCIS.gov. Please bring this notice with you to your appointment.

If you have appeared at an ASC for biometrics capture, please return this notice to the address below with the appointment information.

Date of Appointment:  _____

Location of Appointment:  _____

### DACA 131– RESCHEDULE ASC APPOINTMENT (TECHNICAL DIFFICULTIES)

Our records indicate that you have already appeared at an Application Support Center (ASC) as previously scheduled. However, due to technical problems, your previously-acquired biometrics from the ASC cannot be used.

[USCIS will mail a separate notice to you containing information for a new appointment for biometrics capture at the ASC nearest you/Follow the instructions of the enclosed appointment for biometrics capture at the ASC nearest you.] Additional information regarding the location of the ASC can be found on the USCIS web site at www.USCIS.gov. Please bring this notice with you to your appointment in addition to any other required documents as stated in the new appointment notice.

We sincerely regret any inconvenience this has caused you.

## III.   NAME, DATE OF BIRTH DISCREPANCY

### DACA 140 – DATE OF BIRTH DISCREPANCY

USCIS records indicate that you were born on [DATE]. You indicated on your request for consideration of deferred action for childhood arrivals that you were born on [DATE]. Submit documentary evidence to establish your true date of birth. Such evidence may include your birth certificate and/or passport. If you submit a copy of your birth certificate, you must submit copies of the front and back (if there is information on the back).

*Page 10 4/4/2013*

### DACA 142 – NAME CHANGE/DISCREPANCY

USCIS records and/or evidence you submitted indicate that your name is [NAME].  You indicated on your request for consideration of deferred action for childhood arrivals that your name is [NAME].  Submit documentary evidence to establish your true name.  Such evidence may include a birth certificate, adoption records, marriage certificate, passport, or government documentation showing that you have officially changed your name.

### DACA143 – SUBMIT EVIDENCE OF NAME CHANGE

Submit proof of your name change.  Such proof would normally be a marriage certificate, termination of marriage (divorce or annulment decree), adoption decree, or court order.

### IV.    FINGERPRINTING / CRIMINALITY

### DACA 150A – 2 UNCLASSIFIABLE PRINTS – SUBMIT LOCAL POLICE CLEARANCES

To date, you have been fingerprinted twice and USCIS has been unable to get a required clearance for you because both sets of fingerprints were rejected as unclassifiable by the Federal Bureau of Investigation.  At this time you must submit a local police clearance certificate for each jurisdiction (city, town, county, or municipality) in which you have lived for six months or more within the past five years.

**Important Note**: The police clearance certificate(s) must show your name and date of birth, and all aliases, if applicable, for all names researched.  You must supply the law enforcement agency with all aliases you listed on your Form I-821D [ISO should list ONLY those names provided in Part1. Other Names Used (including maiden name) of the Form I-821D. Aliases obtained from any other source should not be listed in the RFE], including maiden name, [If applicable, insert maiden name unless it was included in the list of names in Part 1. Other Names Used (including maiden name) of the Form I-821D] if applicable.  Fingerprint cards are not acceptable evidence of a police clearance certificate.

If the police clearance shows you have been arrested for, charged with, or convicted of a felony or misdemeanor, you must provide a certified court disposition, arrest record, charging document, sentencing record, etc. for each arrest, unless disclosure is prohibited under state law within the United States.  If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction.  The charge and disposition of each arrest must be specifically identified (not just numeric citations or codes).  Additionally, if you were convicted, you may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department identifying the statute under which you were convicted and the sentence you received.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

### DACA 150B – FINGERPRINT WAIVER

The Application Support Center (ASC) granted a fingerprint waiver on your case. At this time you must submit a local police clearance certificate for each jurisdiction (city, town, county, or municipality) in which you have lived for six months or more within the past five years.

**Important Note**:  The police clearance certificate(s) must show your name and date of birth, and all aliases, if applicable, for all names researched.  You must supply the law enforcement agency with all aliases you listed on your Form I-821D [ISO should list ONLY those names provided in Part1. Other Names Used (including maiden name) of the Form I-821D. Aliases obtained from any other source should not be listed in the RFE], including maiden name, [If applicable, insert maiden name unless it was included in the list of names in Part 1. Other Names Used (including maiden name) of the Form I-821D] if applicable.  Fingerprint cards are not acceptable evidence of a police clearance certificate.

If the police clearance shows you have ever been arrested for, charged with, or convicted of a felony or misdemeanor, you must provide a certified court disposition, arrest record, charging document,

sentencing record, etc. for each arrest, unless disclosure is prohibited under state law within the United States. If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. The charge and disposition of each arrest must be specifically identified (not just numeric citations or codes). Additionally, if you were convicted, you may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department identifying the statute under which you were convicted and the sentence you received.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

### DACA 151– SUBMIT JUDGMENT AND CONVICTION DOCUMENTS
A background check has been conducted based upon the fingerprints you provided at the Application Support Center. Your criminal history check has revealed that you were arrested on [DATE], in [JURISDICTION] and charged with [CHARGES].
(Where appropriate, Service Center may also need to include the name under which the arrest took place if different from name being used by requestor on Form I-821D. If there are multiple charges, you may bullet each charge.)

At this time you must provide a certified court disposition, arrest record, charging document, sentencing record, etc. for each arrest, unless disclosure is prohibited under state law within the United States. If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. The charge and disposition of each arrest must be specifically identified (not just numeric citations or codes). Additionally, if you were convicted, you may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department identifying the statute under which you were convicted and the sentence you received.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

## V.    I-821D PART 3 INCOMPLETE

### DACA 155 – FORM I-821D INCOMPLETE
You did not answer question(s)(ISO should list the question numbers in Part 3 of the Form I-821D that the requestor did not answer) in Part 3 of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to answer these question(s) on the enclosed copy of your original Form I-821D.

After you answer these questions, you must re-sign and date page four (4) of the enclosed copy of your original Form I-821D. The completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

As stated in the instructions on Part 3 of the Form I-821D, if any of the questions apply to you, please describe the circumstances and include a full explanation in Part 7 of the Form I-821D. To view the instructions of the Form I-821D, please visit the USCIS website at http://www.uscis.gov/USCIS/files/form/i-821d.pdf or call toll-free (800) 870-3676 to request this form by mail.

(Include a copy of the requestor's Form I-821D with the RFE)

Page 12 4/4/2013

VI.   **I-821D PART 3, CRIMINAL, NATIONAL SECURITY AND PUBLIC SAFETY INFORMATION AFFIRMATIVE RESPONSES POSSIBLE INELIGIBILITY ISSUES**

**DACA 160 – ANSWERED "YES" TO QUESTION 1 AND 2 IN PART 3 – DOCUMENTS NEEDED AND EXPLANATION**
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question(s) in Part 3, Criminal, National Security and Public Safety Information: DELETE THOSE THAT DON'T APPLY

> 1. Have you been arrested for, charged with, or convicted of a felony or misdemeanor in the United States?

> 2. Have you been arrested for, charged with, or convicted of any crime in any country other than the United States?

You did not provide a full explanation in Part 7 of your Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D. Therefore, please provide a full explanation describing the circumstances. DELETE IF AN EXPLANATION WAS PROVIDED

At this time you must provide a certified court disposition, arrest record, charging document, sentencing record, etc. for each arrest, unless disclosure is prohibited under state law within the United States. If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. The charge and disposition of each arrest must be specifically identified (not just numeric citations or codes). Additionally, if you were convicted, you may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department identifying the statute under which you were convicted and the sentence you received.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

**DACA 161 – ANSWERED "YES" TO QUESTION 3 IN PART 3 – SUBMIT EXPLANATION**
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question in Part 3, Criminal, National Security and Public Safety Information:

> 3. Have you ever engaged in or do you continue to engage in or plan to engage in terrorist activities?

You did not provide a full explanation in Part 7 of your Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation of the terrorist activities you have ever engaged in, continue to engage in, or plan to engage in. Your explanation should include:

> Whether other people were engaged in terrorist activities with you;
> The names of the other people with whom you engaged in terrorists activities;
> The role you played in terrorist activities;
> The role that others played in terrorist activities;
> Whether you planned or actually carried out the terrorist activities;
> Whether you engaged in, continued to engage, or planned to engage in terrorist activities in the United States or abroad; and
> Describe the type of terrorist activities you engaged in, continue to engage in, or plan to engage in.

Page 13 4/4/2013

**DACA 162 – ANSWERED "YES" TO QUESTION 4 IN PART 3 – SUBMIT EXPLANATION**
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question in Part 3, Criminal, National Security and Public Safety Information:

> 4. Are you now or have you ever been a member of a gang?

You did not provide a full explanation in Part 7 of the Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation of your gang membership, including:

> When you joined the gang(s);
> How long you were a member of the gang(s);
> The name of the gang(s); and
> The criminal activities you participated in with the gang(s).

**DACA163 – ANSWERED "YES" TO QUESTIONS 5a, 5b, 5c, AND 5d IN PART 3– SUBMIT EXPLANATION**
On your Request for Deferred Action for Childhood Arrivals (Form I-821D) you checked "Yes" to the following question(s) in Part 3, Criminal, National Security and Public Safety Information: **DELETE THOSE THAT DON'T APPLY**

> 5. Have you EVER engaged in, ordered, incited, assisted, or otherwise participated in any of the following:
> a. acts involving torture, genocide, or human trafficking?
> b. killing any person?
> c. severely injuring a person?
> d. any kind of sexual contact or relations with any person who was being forced or threatened?

You did not provide a full explanation in Part 7 of the Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation describing your participation in activities involving torture, genocide, human trafficking, killing any person, severely injuring any person, or any sexual contact or relations with any person who was being forced or threatened.

VII.   **I-821D PART 3, CRIMINAL, NATIONAL SECURITY AND PUBLIC SAFETY INFORMATION**

**DACA 170– ANSWERED "NO" TO QUESTIONS 1 AND 2 IN PART 3– USCIS FOUND CLEAR CHARGES OR OTHER DEROGATORY INFORMATION, SUBMIT JUDGMENT AND CONVICTION DOCUMENTS**
A background check has been conducted based upon the fingerprints you provided at the Application Support Center. Your background check revealed that you were arrested on **[DATE]**, in **[JURISDICTION]** and charged with **[CHARGES]**.
**Where appropriate, Service Center may also need to include the name under which the arrest took place if different from name being used by requestor on Form I-821D. If there are multiple charges, you may bullet each charge.)**

At this time you must provide a certified court disposition, arrest record, charging document, sentencing record, etc. for each arrest, unless disclosure is prohibited under state law within the United States. If you are unable to provide such records because your case was expunged or sealed, you must provide

Page 14 4/4/2013

information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. The charge and disposition of each arrest must be specifically identified (not just numeric citations or codes). Additionally, if you were convicted, you may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department identifying the statute under which you were convicted and the sentence you received.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

**DACA 171– ANSWERED "NO" TO QUESTIONS 1 AND 2 IN PART 3 - CRIMINAL ACTIVITY UNCLEAR TO USCIS, SUBMIT JUDGMENT AND CONVICTION DOCUMENTS**
Based on a review of your case, it appears that you have some type of criminal record/interaction with law enforcement authorities. It appears that on [DATE] the following occurred:

[Provide explanation of findings, to include name of police dept. If applicable, charges if applicable, etc. NOTE: Do not inform the applicant where the information came from systems that are not our records (ex. IBIS)]

(Where appropriate, you may also need to include the name under which the arrest took place if different from name being used by the requestor on Form I-821D. If there are multiple interactions, you may bullet each interaction.)

At this time you must provide a certified court disposition, arrest record, charging document, sentencing record, etc. for each arrest, unless disclosure is prohibited under state law within the United States. If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. The charge and disposition of each arrest must be specifically identified (not just numeric citations or codes). Additionally, if you were convicted, you may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department identifying the statute under which you were convicted and the sentence you received.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

**DACA 172– ANSWERED "NO" TO QUESTIONS 3, 4, 5a. 5b, 5c, AND 5d IN PART 3 – USCIS DISCOVERED UNCLEAR INFORMATION, SUBMIT EXPLANATION**
Based on a review of your case, the following was discovered: (Delete those that do not apply)

3. you engaged in or do you continue to engage or plan to engage in terrorist activities?

4. you are now or have been a member of gang?

5. you engaged in, ordered, incited, assisted, or otherwise participated in any of the following:
a. acts involving torture, genocide, or human trafficking?
b. killing any person?
c. severely injuring a person?
d. any kind of sexual contact or relations with any person who was being forced or threatened?

[Provide explanation of findings. This can include where the information was found if it is knowledge that can be shared with the requestor. NOTE: Do not inform the requestor where the information came from systems that are not our records (ex. IBIS).]

Page 15 4/4/2013

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 28-2 Filed 07/02/2018 Pg: 359 of 572 Page 358 of 1026 PageID #: 9949

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 345 of 442

Therefore, you must submit a statement explaining and/or refuting the information/circumstances found in USCIS records. Please note that if you refute the above information, and USCIS later receives information that the above does relate to you, USCIS may terminate deferred action and you may be barred from other immigration benefits.

## VIII.   FORM I-765

### DACA 180 – FAILURE TO SUBMIT OR COMPLETE FORM I-765WS
USCIS is unable to complete the adjudication of your Form I-765, Application for Employment Authorization, because you did not submit or complete the Form I-765WS. Please provide a response to Part 1 (Full Name), and Part 2 (Financial Information), and if applicable, Part 3 (Additional Information) of Form I-765WS to indicate whether or not you have an economic need to work and return it to the address provided within the specified time.

To obtain Form I-765WS, please visit the USCIS website at http:www.uscis.gov/files/form/i-765ws.pdf or call toll-free (800) 870-3676 to request this form by mail.

### DACA 190 – SUBMIT PASSPORT PHOTOS
Please submit **two (2)** passport-style **color** photo(s) of [NAME] taken within 30 days of the date of this notice, which conform(s) to the specifications below. Using a pencil or felt pen, lightly print name (and Alien Registration Number, if known) on the back of each photograph.

Please do not staple through any part of the photo(s). Enclose the photo(s) in a plastic or paper envelope and staple the envelope to this notice when returning it to this office.

Passport-style photos must be 2 inches by 2 inches:
- Frame subject with full face, front view, eyes open.
- Make sure photo presents full head from top of hair to bottom of chin; height of head should measure 1 inch to 1 3/8 inch (25 mm to 35 mm).
- Center head within frame.
- Make sure eye level is between 1 1/8 inch and 1 3/8 inch (28 mm and 35 mm) from bottom of photo.
- Photograph subject against a plain white or off-white background.
- Position subject and lighting so that there are no distracting shadows on the face or background.
- Encourage subject to have a natural expression.
- Include headpieces if worn daily for religious purposes; they should not obscure or cast shadows on the eyes or any other part of the face.

For more information on photo requirements, please see the Department of State website at: http://www.travel.state.gov/passport/pptphotos/index.html, or contact the USCIS National Customer Service Center at 1-800-375-5283.

## IX.   FORM 131

### DACA 200 – PROOF OF DACA
To be considered for advance parole you must submit evidence to establish that you have been granted deferred action for childhood arrivals. Submit a copy of the approval notice issued by USCIS for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

### DACA 201 – GENERAL

On [insert filing date], you filed an Application for Travel Document (Form I-131) based on an approved Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Under section 212(d)(5)(A) of the Immigration and Nationality Act (INA), the Secretary of Homeland Security may, in her discretion,

Page 16 4/4/2013

Appeal: 18-1521 Case 1:17-cv-02228-GCG-VMS Filed: 07/02/2018 Pg: 359 of 502 Document 28-7 Filed 09/04/20 Page 359 of 1026 PageID #: 9950

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 346 of 442

parole into the United States any alien applying for admission to the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit. To assist USCIS in adjudicating your application, please provide additional information about your proposed travel, including the reasons for requesting advance parole in order to travel outside the United States. In response to this notice, you should also submit evidence in support of your request (e.g., documentation showing that your proposed travel is related to your current employment or education or a humanitarian purpose).

**DACA 202 – PROOF OF EDUCATIONAL NEED**
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individuals granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for education purposes. Examples of travel abroad for education purposes include study abroad programs, school-sponsored trips abroad, or travel necessary to conduct academic research.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for education purposes is insufficient. *(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for educational purposes, modify RFE call up accordingly).* You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

- A letter from the educational institution, or from an employee of the institution acting in his or her official capacity, describing the purpose of the travel, or documentation showing enrollment in a specific program or class coupled with documentary evidence showing that you will benefit from, or are required to travel for the specific program or class; or

**NOTE**: Travel during an academic year unrelated to academics (i.e., a vacation) is insufficient to qualify as an educational purpose.

*(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application. For multiple events, the advance parole is valid for the duration of all the documented events)*

**DACA 203 – PROOF OF HUMANITARIAN NEED**
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individuals granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for humanitarian reasons. Examples of travel abroad for humanitarian reasons include medical reasons, to visit a family member, or to attend funeral services for a family member.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for humanitarian purposes is insufficient. *(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for humanitarian, modify RFE call up accordingly).* You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

- An explanation from a medical doctor on official letterhead stating the diagnosis and prognosis, and how long the treatment is expected to last;
- Information on the reasons why you cannot obtain treatment in the United States;
- An explanation from a medical doctor on official letterhead stating the diagnosis and prognosis of the family member's condition; or
- A death certificate or newspaper obituary of the family member or other document evidencing the death of the family member.

Page 17 4/4/2013

*(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application. For multiple events, the advance parole is valid for the duration of all the documented events)*

### DACA 204 – PROOF OF EMPLOYMENT NEED

In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individual granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for employment purposes. Examples of travel abroad for employment purposes include: pursuit of a position in the United States with a foreign employer;
an overseas assignment, interview, conference, or training; a meeting with overseas clients or others with whom you interact professionally; or a trip to cultivate business or sales overseas or any other overseas trip taken in furtherance of the applicant's professional responsibilities.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for employment purposes is insufficient. *(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for employment purposes, modify RFE call up accordingly)*. You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

- A letter on official letterhead from your employer describing the need for your travel; or
- A document showing a specific employment need, such as a conference program, that also shows your participation.

*(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application. For multiple events, the advance parole is valid for the duration of all the documented events)*

## X.   ASSORTED OTHERS

### DACA 300 – FOREIGN LANGUAGE DOCUMENT MUST BE ACCOMPANIED BY AN ENGLISH TRANSLATION

All foreign language documents must be accompanied by a full English language translation which the interpreter has certified as complete and accurate, and by the interpreter's certification that he or she is competent to translate from the foreign language into English. Please submit a full English translation of *(ISO should list the document(s))*. You must submit the requested foreign language document along with the translation.

### DACA 301– YOU MAY SUBMIT PHOTOCOPIES

You may submit either the original documents or legible photocopies of the originals, including copies of the front and back of each document. If you choose to submit original documents, they will not be returned to you. **(Not for use when USCIS is requesting original documents**.)

### DACA 302– AFFIDAVITS

Affidavits can support two of the DACA guidelines:
- Brief, casual, and innocent departures during the five years of required continuous presence in the United States; and
- Any minor gap in the five year continuous residence requirement.

In support of your DACA request, you submitted affidavits, but you did not indicate that:
- primary and secondary evidence cannot be obtained; and
- what effort you undertook to obtain that evidence.

Page 18 4/4/2013

Therefore, you are requested to provide the following:
- A written statement from the appropriate issuing authority attesting to the fact that no record exists or can be located, or that the record sought was part of some segment of records which were lost or destroyed; or
- Evidence (such as an affidavit) "that repeated good faith attempts were made to obtain the required document or record."

## DACA 303A – SIGNATURE ON FORM I-821D

As stated in the Form I-821D instructions, each request must be properly signed.  Part 4 of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals is not properly signed because (*ISO should indicate why the form was incorrectly signed.  For example, the preparer signed Part 4 instead of Part 5 of the form or the requestor is over the age of 14, but the requestor's parent or legal guardian signed Part 4*).  Therefore, a copy of your original Form I-821D is enclosed so that you can sign and date Part 4, 2.a. and 2.b. of your Form I-821D.  The completed form must contain a new original signature.  Attach your properly signed Form I-821D to this Request for Evidence and return to the address listed on this notice.

*(Include a copy of the requestor's Form I-821D with the RFE)*

## DACA 303B - SIGNATURE ON FORM I-765

As stated in the Form I-765 instructions, each application must be properly signed. Form I-765, Application for Employment Authorization is not properly signed because (*ISO should indicate why the form was incorrectly signed. For example, the preparer signed the form or the requestor is over the age of 14, but the requestor's parent or legal guardian signed the signature area*). Therefore, a copy of your original Form I-765 is enclosed so that you can sign and date. The completed form must contain a new original signature.  Attach your properly signed Form I-765 to this Request for Evidence and return to the address listed on this notice.

*(Include a copy of the requestor's Form I-765 with the RFE)*

## DACA 304 – FORM I-821D MISSING PAGE(S)

You did not submit page(s) (*ISO should list the missing page number(s)*) with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals.  In addition to submitting these missing pages, you must sign and date page four (4) of the Form I-821D.  The completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice

To obtain Form I-821D, please visit the USCIS website at http://www.uscis.gov/USCIS/files/form/i-821d.pdf or call toll-free (800) 870-3676 to request this form by mail.

## XI.    ACKNOWLEDGEMENT OF WITHDRAWAL

## DACA 350  FORM I-821D ACKNOWLEDGEMENT OF WITHDRAWAL

On [DATE] you filed a request for deferred action under the Secretary of Homeland Security's June 15, 2012, directive concerning Deferred Action for Childhood Arrivals.  Your filing included a Form I-821D, Consideration of Deferred Action for Childhood Arrivals, a Form I-765, Application for Employment Authorization, and a Form I-765WS, Form I-765 Worksheet, together with the required filing fee.

Appeal: 18-1521   Document: 28-2   Filed: 07/02/2018   Pg: 362 of 572
Case 1:17-cv-05228-NGG-VMS   Document 29-2   Filed 09/04/20   Page 362 of 1026 PageID #: 9953

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 349 of 442

On [DATE], you withdrew your Form I-821D. This withdrawal applies equally to the forms I-765 and I-765WS that you concurrently filed with the Form I-821D.

USCIS hereby acknowledges your withdrawal. USCIS will not take any further action on your Form I-821D or the related forms I-765 and I-765WS. If you later wish to request Consideration of Deferred Action for Childhood Arrivals, you may file a new Form I-821D concurrently with a new Form I-765 and Form I-765WS, with a new fee.

## DACA 351 FORMS I-765/I-765WS ACKNOWLEDGEMENT OF WITHDRAWAL

On [DATE] you filed a request for deferred action under the Secretary of Homeland Security's June 15, 2012, directive concerning Deferred Action for Childhood Arrivals. Your filing included a Form I-821D, Consideration of Deferred Action for Childhood Arrivals, a Form I-765, Application for Employment Authorization, and a Form I-765WS, Form I-765 Worksheet, together with the required filing fee.

On [DATE], you withdrew your Form I-821D. This withdrawal applies equally to the forms I-765 and I-765WS that you concurrently filed with the Form I-821D.

USCIS hereby acknowledges your withdrawal. USCIS will not take any further action on your forms I-765 and I-765WS or the related Form I-821D. The filing fee is not refundable. If you later wish to request Consideration of Deferred Action for Childhood Arrivals, you may file a new Form I-821D concurrently with a new Form I-765 and Form I-765WS, with a new fee.

*Page 20 4/4/2013*

AR1614

# Appendix D

## DEFERRED ACTION FOR CHILDHOOD ARRIVALS
## RFE CALL-UPS

NOTE: Text highlighted in YELLOW and bracketed by [ ] is hidden text that requires ISO input. The ISO should delete the highlighted bracketed [*Text*] and type in the necessary information, or choose the appropriate information from choices and delete the information that does not apply. Text only highlighted in YELLOW and not bracketed is directive in nature and should not be printed in the letter being sent but should be deleted. Please mix call-ups into a single RFE as needed.

NOTE: Please add call-ups **DACA 300 – FOREIGN LANGUAGE DOCUMENT MUST BE ACCOMPANIED BY AN ENGLISH TRANSLATION** and **DACA 301 – YOU MAY SUBMIT PHOTOCOPIES** to any other call-ups below as needed.

I.   **GUIDELINES**

**DACA 100 – IDENTITY**
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to prove your identity is insufficient (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- Passport;
- Birth certificate accompanied by photo identification:
- Any national identity documents from your country of origin bearing your photo and/or fingerprint;
- Any U.S.-government immigration or other document bearing your name and photograph (e.g., Employment Authorization Documents (EADs), expired visas, driver's licenses, non-driver cards, etc.);
- Any school-issued form of identification with photo;
- Military identification document with photo;
- State-issued photo ID showing date of birth; or
- Any other document that you believe is relevant.

Expired documents are acceptable.

**DACA 101 – CONTINUOUS RESIDENCE**
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to establish that you have continuously resided in the United States during the 5-year period immediately before June 15, 2012 and up to the time of filing is insufficient. (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

a.   Employment records (e.g., pay stubs, W-2 Forms, Federal and State income tax returns, letters from employer(s), or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters from employers must be signed by the employer and must include the employer's contact information.

Such letters must include: **(1)** your address(es) at the time of employment; **(2)** the exact period(s) of employment; **(3)** period(s) of layoff; and **(4)** duties with the company.

b.   Rent receipts, utility bills (gas, electric, phone, etc.), receipts or letters from companies showing the dates during which you received service;

c.   School records (transcripts, letters, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and periods of school attendance;

d.   Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

e.   Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization;

f.   Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.);

g.   Money order receipts for money sent into or out of the country; passport entries; birth certificates of children born in the United States; dated bank transactions; correspondence between you and another person or organization; U.S. Social Security card; Selective Service card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

h.   Any other relevant document.

*(ISO: Add the appropriate language below to the RFE if any of the questions on page 3 (Part 2, Arrival/Residence Information) of the Form I-821D are blank **OR** if page 3 of the Form I-821D is missing.)*

In addition, you did not answer question(s)(*ISO should list the questions on page 3 (Part 2, Arrival/Residence Information) of the Form I-821D that were not answered*) in Part 2, Arrival/Residence Information, of your Form I-821, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to answer these question(s) on the enclosed copy of your original Form I-821D.

Please re-sign and date page four (4) of the completed form; the completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

*(Include a copy of the requestor's Form I-821D with the RFE)*

**OR**

In addition, you did not submit page three (3) with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to complete the enclosed page three (3) of the form.

Also enclosed is a copy of your original Form I-821D. Please re-sign and date page four (4) of the completed form; the completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

*Page 2 01/18/2013*

*(Include a copy of the requestor's Form I-821D and a blank page 3 of the form with the RFE)*

## DACA 102 - BRIEF, CASUAL, AND INNOCENT ABSENCE

To be considered for deferred action as a childhood arrival, you must have continuously resided in the United States during the 5 years period immediately before June 15, 2012 and up to the date you filed your request for deferred action. A brief, casual, and innocent absence from the United States will not interrupt your continuous residence.

An absence will be considered brief, casual, and innocent, if:

(1) The absence was short and reasonably calculated to accomplish the purpose of the absence;
(2) The absence was not the result of an order of exclusion, deportation, or removal;
(3) The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and
(4) The purpose of the absence from the United States or actions while outside of the United States were not contrary to law.

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for each departure you made from the United States since June 15, 2007 to show that each departure you made from the United States since June 15, 2007 was brief, casual, and innocent is insufficient. *(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence, modify RFE call up accordingly).* You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

- Plane or other transportation tickets or itinerary showing the travel dates;
- Passport entries;
- Hotel receipts showing the dates you were abroad;
- Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);
- Advance parole document; or
- Any other evidence that could support a brief, casual, and innocent absence.

## DACA 103 – ARRIVED IN THE UNITED STATES BEFORE AGE 16

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to establish that you came to the United States prior to your 16th birthday is insufficient. *(ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly).* You may still submit evidence, which may include, but is not limited to, copies of: *(ISO should delete any of the following that were already provided by the requestor)*

- Passport with an admission stamp indicating when you entered the United States;
- I-94/I-95/I-94W Arrival/Departure Record;
- Any INS or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);
- Travel records, such as transportation tickets showing your dates of travel to the United States;
- School records (transcripts, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and the periods of school attendance;
- Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization;
- Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.); or
- Any other document that you believe is relevant.

Page 3 01/18/2013

## DACA 104A –IN UNLAWFUL STATUS ON JUNE 15, 2012

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you were in unlawful status on June 15, 2012 is insufficient. (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- I-94/I-95/I-94W Arrival/Departure Record showing the date your authorized stay expired;
- If you have a final order of exclusion, deportation, or removal issued on or before June 15, 2012, submit a copy of that order and related charging documents, if available;
- An INS or DHS charging document placing you into removal proceedings;
- Any other document that you believe is relevant to show that you lacked lawful immigration status on June 15, 2012; or
- Any document relating to parole.

## DACA 104B –STUDENT IN UNLAWFUL STATUS ON JUNE 15, 2012

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you were in unlawful status on June 15, 2012 is insufficient. (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- I-94/I-95/I-94W Arrival/Departure Record showing the date your authorized stay expired;
- If you have a final order of exclusion, deportation, or removal issued on or before June 15, 2012, submit a copy of that order and related charging documents, if available;
- An INS or DHS charging document placing you into removal proceedings;
- Copies of your transcripts showing your student status from (ISO should insert dates);
- Copies of all properly completed old I-120AB/I-20ID forms or new SEVIS I-20 forms (required since August 1, 2003) for all schools attended;
- Proof of reinstatement;
- Any other document that you believe is relevant to show that you lacked lawful immigration status on June 15, 2012;
- Any document relating to parole.

## DACA 105 – PROOF OF PRESENCE IN THE UNITED STATES ON JUNE 15, 2012

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you were present in the United States on June 15, 2012 is insufficient. (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

a. Employment records (e.g., pay stubs, W-2 Forms, Federal and State income tax returns, letters from employer(s), or, if you are self employed, letters from banks and other firms with whom you have done business).

   **NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters from employers must be signed by the employer and must include the employer's contact information.

   Such letters must include: (**1**) your address(es) at the time of employment; (**2**) the exact period(s) of employment; (**3**) period(s) of layoff; and (**4**) duties with the company.

Page 4 01/18/2013

b. Rent receipts, utility bills (gas, electric, phone, etc.), receipts or letters from companies showing the dates during which you received service.

c. School records (transcripts, letters, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and periods of school attendance.

d. Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records).

e. Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization.

f. Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.).

g. Money order receipts for money sent into or out of the country; passport entries; birth certificates of children born in the United States; dated bank transactions; correspondence between you and another person or organization; U.S. Social Security card; Selective Service card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

h. Any other relevant document.

## DACA 106 – CURRENTLY ENROLLED IN SCHOOL

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, showing that you have been accepted for enrollment or are already attending classes in one of the following is insufficient:

- A public or private elementary, junior high/middle school or high school/secondary school;
- A public or private college or university, or community college;
- A course of study to pass a General Education Development (GED) Certificate exam or other State-authorized exam;
- An educational or career training program (including vocational training);
- Literacy training; or
- An English as a Second Language (ESL) program.

*(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the documents provided by the requestor are incomplete (i.e. no identifying information) or illegible, the ISO should note this in the RFE. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly)*

You may still submit evidence, which may include the following: *(ISO should delete any of the following that were already provided by the requestor)*

- **A public or private elementary, junior high/middle school or high school/secondary school;**
  Such evidence may include, but is not limited to:
  - If accepted for enrollment, but classes have not yet commenced:
    - o An acceptance letter on school letterhead from the school's authorized representative. Such acceptance letter is to include the name and address of the school, your grade level, and the date that classes are scheduled to commence. The letter is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
    - o A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, if you have a disability;

Page 5 01/18/2013

AR1619

- o A current class schedule containing the student's name, the list of courses, and the day and time of each class; or
- o Any other relevant evidence.
  - ▪ If already enrolled – Current school registration cards; current transcripts; report cards; progress reports showing the name of the school, the time period or semester covered by the document, and the current grade; or a current IEP showing your process to date.

- **A public or private college or university, or community college;**
  - Such evidence may include, but is not limited to:
    - ▪ If accepted for enrollment, but classes have not yet commenced:
      - o An acceptance package or related material on school letterhead from the school's authorized representative. Such acceptance package or related material is to include the name and address of the school, your grade level or class year, and the date or term when classes are scheduled to commence.  In addition, the acceptance package or related material is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
      - o A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, if you have a disability;
      - o A copy of your current tuition bill;
      - o A current class schedule containing your name, the list of courses, and the day and time of each class; or
      - o Any other relevant evidence.

    - ▪ If already enrolled – Current school registration cards; current transcripts; report cards; progress reports showing the name of the school, the time period or semester covered by the document, and the current grade or class year; or a current IEP showing your process to date.
- **A course of study to pass a General Education Development (GED) Certificate exam or other equivalent State-authorized exam;**
  - Such evidence is to include a letter from the authorized representative of the program that includes information such as:
    - ▪ Your name and date of enrollment;
    - ▪ The duration of the program and expected completion date;
    - ▪ Whether the course of study is for a regular high school diploma or recognized equivalent under State law or a GED exam or other equivalent State-authorized exam;
    - ▪ The program's source and amount of funding; and
    - ▪ The program's authorized representative's contact information.
- **An educational or career training program (including vocational training);**
  - Such evidence may include, but is not limited to:
    - ▪ If accepted for enrollment, but classes have not yet commenced:
      - o An acceptance letter on school letterhead from the school registrar/authorized school representative. Such acceptance letter is to include the name and address of the program, a brief description of the program, the duration of the program, and state when the classes are scheduled to commence.  The letter is to be accompanied by evidence that the student has registered for the program;
      - o A copy of your current year registration (intake form/enrollment form); or
      - o Any other relevant documentation.
    - ▪ If already attending classes– Current transcripts, report cards, or progress reports showing the name of the school, the time period or semester covered by the document, and if relevant, the current educational or grade level.
- **Literacy training; or**
  - Such evidence is to include a letter from the literacy program administrator or authorized representative providing information such as:

Page 6 01/18/2013

- Your name;
- The date of your enrollment;
- The duration of the literacy program and the expected completion date;  and
- The program administrator or authorized representative's contact information.
- **An English as a Second Language (ESL) program.**
  Such evidence is to include a letter from the ESL program administrator or authorized representative.   This letter is to include the following:
  - Your name;
  - The date of your enrollment;
  - The duration of the ESL program and the expected completion date;
  - The program administrator or authorized representative's contact information.

## DACA 106A – EVIDENCE OF ACCEPTANCE BUT NO EVIDENCE OF REGISTERING FOR CLASSES:

You have provided an acceptance letter or other related material indicating that you have been accepted at (*ISO should list the name of the private elementary/junior high/middle school/high school/secondary school or public or private college/university/community college*).  However, you did not include evidence that you have enrolled in that school.  Therefore, you are requested to submit such evidence which is to include, but is not limited to paid tuition bills or evidence that you have registered for class at that school.

## DACA 106B – LITERACY PROGRAM'S NON-PROFIT STATUS

If the literacy program in which you are enrolled has non-profit status, please provide evidence of such status. Evidence of the literacy program's non-profit status is to include a copy of a valid letter from the Internal Revenue Service confirming exemption from taxation under section 501(c)(3) of the Internal Revenue Service Code of 1986, as amended, or equivalent section of prior code.

## DACA 106C –PUBLIC FUNDING (GED; Educational or Career Training Program (Including Vocational Training); ESL)

If the (*ISO should insert GED; Educational or Career Training Program (Including Vocational Training); Literacy Program; or English as a Second Language*) in which you are enrolled is funded in whole or in part by public funds (Federal, State, county or municipal), you are requested to submit a letter from the (*ISO should insert GED program administrator/authorized representative; school registrar/authorized school representative if requestor is enrolled in Educational or Career Training Program (Including Vocational Training); literacy program administrator/authorized representative; or ESL program administrator/authorized representative*) providing basic details about the funding, such as the source(s) of the funding.

## DACA 106D – PUBLIC FUNDING – (Literacy Program)

If the literacy program in which you are enrolled is <u>not</u> funded in whole or in part by public funds (Federal, State, county, or municipal) or not administered by a non-profit entity you are requested to submit a letter from the program administrator or authorized representative providing basic details about the funding, such as the amount and the source(s) of the funding.

## DACA 106E – DEMONSTRATED EFFECTIVENESS (GED; Educational or Career Training Program (Including Vocational Training); Literacy Program; ESL)

(*ISO should select the correct RFE paragraph below depending upon the program in which the request is enrolled*)

Your record shows that the **GED/Equivalency program**, in which you are enrolled, is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information from the GED program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;

- The program's track record in assisting students in obtaining a regular high school diploma, GED, or a recognized equivalent certificate, or passing a GED or recognized equivalent exam;
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

Your record shows that the **educational or career training program (including vocational training), in** which you are enrolled, is not publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information, with supporting documentation, if available, from the school registrar/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:
- The duration of the program's existence;
- The program's track record in placing students in employment, job training, or post-secondary education; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

Your record shows that the **literacy program** in which you are enrolled, is not publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information from the literary program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:
- The duration of the program's existence;
- The program's track record in placing students in post-secondary education, job training programs, or employment; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

Your record shows that the **English as a Second Language (ESL)** program in which you are enrolled is not publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information from the ESL program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:
- The length of the program's existence;
- The program's track record in assisting students in obtaining placement in postsecondary schools, job training programs, or employment; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

### DACA 106F– GRADUATED FROM SCHOOL
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you graduated or obtained a General Educational Development (GED) Certificate or equivalent State authorized exam in the United States is insufficient (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the documents provided by the requestor are incomplete (i.e. no identifying information) or illegible, the ISO should note this in the RFE. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)
- A diploma;
- Transcripts showing the date of graduation; or
- A GED certificate, certificate of completion, certificate of attendance, or alternate award from a public or private high school or secondary school.

Page 8 01/18/2013

AR1622

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 358 of 442

Documentation sufficient to demonstrate that you obtained a GED includes, but is not limited to, evidence you passed a GED exam, or other comparable State-authorized exam, and, as a result, you received the recognized equivalent of a regular high school diploma under State law.

## DACA 107 – MEDICAL LEAVE

You indicate in your filing that you are currently on medical leave from school. Therefore, you are requested to submit evidence of your medical leave and indicate the date you expect to return to school. Evidence of your medical leave may include, but is not limited to, an explanation from a medical doctor on official letterhead stating the diagnosis and prognosis, and how long your treatment is expected to last.

## DACA 108 - MILITARY

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States is insufficient. (*ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- Form DD-214, Certificate of Release or Discharge from Active Duty;
- NGB Form 22, National Guard Report of Separation and Record of Service;
- Military personnel records; or
- Military health records.

## DACA 109- REMOVAL PROCEEDINGS

Submit documents that you have been issued an order of exclusion, deportation or removal. Such documentation could include copies of:
- Any removal, deportation, or exclusion order issued by an Immigration Judge;
- Final decision from the Board of Immigration Appeals (BIA); or
- Final decision from a U.S. Court of Appeals in your case.

## II.    APPLICATION SUPPORT CENTER (ASC) RELATED

### DACA 130 – SCHEDULE ASC APPOINTMENT

Your request cannot be processed until you have appeared at an Application Support Center (ASC) for the collection of a digital photograph, signature, and fingerprint(s). Our records indicate that you have not yet appeared at an ASC for this purpose. Follow the instructions on the appointment notice for biometrics capture [enclosed with this notice/that will be mailed to you separately]. Additional information regarding the location of the ASC can be found on the USCIS web site at www.USCIS.gov. Please bring this notice with you to your appointment.

If you have appeared at an ASC for biometrics capture, please return this notice to the address below with the appointment information.

Date of Appointment:    _____

Location of Appointment:    _____

AR1623

**DACA 131– RESCHEDULE ASC APPOINTMENT (TECHNICAL DIFFICULTIES)**
Our records indicate that you have already appeared at an Application Support Center (ASC) as previously scheduled. However, due to technical problems, your previously-acquired biometrics from the ASC cannot be used.

[USCIS will mail a separate notice to you containing information for a new appointment for biometrics capture at the ASC nearest you/Follow the instructions of the enclosed appointment for biometrics capture at the ASC nearest you.] Additional information regarding the location of the ASC can be found on the USCIS web site at www.USCIS.gov. Please bring this notice with you to your appointment in addition to any other required documents as stated in the new appointment notice.

We sincerely regret any inconvenience this has caused you.

III.   **NAME, DATE OF BIRTH DISCREPANCY**

**DACA 140 – DATE OF BIRTH DISCREPANCY**
USCIS records indicate that you were born on [DATE]. You indicated on your request for consideration of deferred action for childhood arrivals that you were born on [DATE]. Submit documentary evidence to establish your true date of birth. Such evidence may include your birth certificate and/or passport. If you submit a copy of your birth certificate, you must submit copies of the front and back (if there is information on the back).

**DACA 142 – NAME CHANGE/DISCREPANCY**
USCIS records and/or evidence you submitted indicate that your name is [NAME]. You indicated on your request for consideration of deferred action for childhood arrivals that your name is [NAME]. Submit documentary evidence to establish your true name. Such evidence may include a birth certificate, adoption records, marriage certificate, passport, or government documentation showing that you have officially changed your name.

**DACA143 – SUBMIT EVIDENCE OF NAME CHANGE**
Submit proof of your name change. Such proof would normally be a marriage certificate, termination of marriage (divorce or annulment decree), adoption decree, or court order.

IV.   **FINGERPRINTING / CRIMINALITY**

**DACA 150A – 2 UNCLASSIFIABLE PRINTS – SUBMIT LOCAL POLICE CLEARANCES**
To date, you have been fingerprinted twice and USCIS has been unable to get a required clearance for you because both sets of fingerprints were rejected as unclassifiable by the Federal Bureau of Investigation. Instead of a fingerprint clearance, you must submit a local police clearance certificate for each jurisdiction (city, town, county, or municipality) in which you have lived for six months or more within the past five years.

**Please note**: The police clearance certificate(s) must be researched by name and date of birth. You must supply the law enforcement agency with all aliases you have used, including maiden name, if applicable. Fingerprint cards are not acceptable evidence of a police clearance certificate.

If any record indicates that you have been arrested, you must provide documentation of each of the following:

    a.  The final disposition (your sentence, probation, dismissal, etc.) of **every** charge against you. The charge and disposition must be specifically identified (not merely numeric citations or codes).

    b.  If you were convicted of **any** charge, you must also provide evidence showing whether the charge for which you were convicted was classified as a **felony or misdemeanor**. You may submit a

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 29-2 Filed 07/03/2018 Pg: 373 of 572 Page 373 of 1026 PageID #: 9964

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 360 of 442

copy of the pertinent statute, sentencing guidelines, and/or statement from the court clerk or police department for this purpose.

Along with the above information, you must also answer the following questions. You should respond to this notice and sign your name where it asks for your signature. If more space is needed, you may respond to the following questions on separate sheet(s) of paper. Please sign every separate sheet of paper.

1)  Have you ever been arrested or detained by a law enforcement officer? If yes, please explain.

    Answer: _____

    _____

2)  Have you had your fingerprints taken for any reason by a law enforcement officer for a criminal offense? If yes, please explain.

    Answer:          _____

    _____

3)  Have you been issued a ticket or been taken into custody by a law enforcement officer? If yes, please explain.

    Answer: _____

    _____

4)  Have you ever been ordered by a court to: pay a fine; serve a probationary sentence; perform community service; make restitution; or have your wages garnished (e.g., for failure to make child support payments)? If yes, please explain.

    Answer: _____

    _____

5)  Have you ever received an expungement, parole, pardon, or successfully completed a diversion or rehabilitation program? If yes, please explain.

    Answer:          _____

    _____

I certify, under penalties of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release from my records that USCIS needs to determine my eligibility for deferred action of childhood arrivals.

Signature of Requestor: _____

Page 11 01/18/2013

AR1625

## DACA 150B – FINGERPRINT WAIVER

The ASC granted a fingerprint waiver on your case, and provided you with a Police Clearance Notice instructing you to obtain police clearances and arrest reports (if any) for every U.S. residence during the past (5) five years.

**Please note**: The police clearance certificate(s) must be researched by name and date of birth.  You must supply the law enforcement agency with all aliases you have used, including maiden name, if applicable. Fingerprint cards are not acceptable evidence of a police clearance certificate.

If any record indicates that you have been arrested, you must provide documentation of each of the following:

    a.  The final disposition (your sentence, probation, dismissal, etc.) of **every** charge against you.  The charge and disposition must be specifically identified (not merely numeric citations or codes).

    b.  If you were convicted of **any** charge, you must also provide evidence showing whether the charge for which you were convicted was classified as a **felony or misdemeanor.**  You may submit a copy of the pertinent statute, sentencing guidelines, and/or statement from the court clerk or police department for this purpose.

Along with the above information, you must also answer the following questions.  You should respond on this notice and sign your name where it asks for your signature.  If more space is needed, you may respond to the following questions on separate sheet(s) of paper.  Please sign every separate sheet of paper.

    1)  Have you ever been arrested or detained by a law enforcement officer?  If yes, please explain.

        Answer: _____

        _____

    2)  Have you had your fingerprints taken for any reason by a law enforcement officer for a criminal offense?  If yes, please explain.

        Answer: _____

        _____

    3)  Have you been issued a ticket or been taken into custody by a law enforcement officer?  If yes, please explain.

        Answer: _____

        _____

    4)  Have you ever been ordered by a court to:  pay a fine; serve a probationary sentence; perform community service; make restitution; or have your wages garnished (e.g., for failure to make child support payments)?  If yes, please explain.

        Answer: _____

        _____

5) Have you ever received an expungement, parole, pardon, or successfully completed a diversion or rehabilitation program?  If yes, please explain.

Answer:  _____

_____

I certify, under penalties of perjury under the laws of the United States of America, that the foregoing is true and correct.  Furthermore, I authorize the release from my records that USCIS needs to determine my eligibility for deferred action of childhood arrivals.

Signature of Requestor:  _____

## DACA 151– SUBMIT JUDGMENT AND CONVICTION DOCUMENTS

A background check has been conducted based upon the fingerprints you provided at the Application Support Center.  Your criminal history check has revealed that you were arrested on [DATE], in [JURISDICTION] and charged with [CHARGES].

(Where appropriate, Service Center may also need to include the name under which the arrest took place if different from name being used by requestor on Form I-821D.  If there are multiple charges, you may bullet each charge.)

You must provide certified judgment and conviction/disposition documents from the court(s) for all of your arrests, including but not limited to, the charges listed above.  If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction.  The certified judgment and conviction/disposition documents must address the following:

    a.  The final disposition (*e.g.,* your sentence, probation, dismissal, etc.) of every charge against you.  The charge and disposition must be specifically identified (not just numeric citations or codes).

    b.  If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony, misdemeanor or other type of offense.  Please submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

## V.   I-821D PART 3 INCOMPLETE

## DACA 155 – FORM I-821D INCOMPLETE

You did not answer question(s)(*ISO should list the question numbers in Part 3 of the Form I-821D that the requestor did not answer*) in Part 3 of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to answer these question(s) on the enclosed copy of your original Form I-821D.

As stated in the instructions on Part 3 of the Form I-821D, if any of the questions apply to you, please describe the circumstances and include a full explanation in Part 7 of the Form I-821D.  Re-sign and date page four (4) of the completed form; the completed form must contain a new original signature.  Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

(Include a copy of the requestor's Form I-821D with the RFE)

Page 13 01/18/2013

## VI.   I-821D PART 3, CRIMINAL, NATIONAL SECURITY AND PUBLIC SAFETY INFORMATION AFFIRMATIVE RESPONSES POSSIBLE INELIGIBILITY ISSUES

### DACA 160 – ANSWERED "YES" to QUESTION 1 AND 2 IN PART 3 –DOCUMENTS NEEDED AND EXPLANATION

On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question(s) in Part 3, Criminal, National Security and Public Safety Information: DELETE THOSE THAT DON'T APPLY

> 1. Have you been arrested for, charged with, or convicted of a felony or misdemeanor in the United States?

> 2. Have you been arrested for, charged with, or convicted of any crime in any country other than the United States?

You did not provide a full explanation in Part 7 of your Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D. Therefore, please provide a full explanation describing the circumstances. DELETE IF AN EXPLANATION WAS PROVIDED

You must provide certified judgment and conviction/disposition documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. The certified judgment and conviction/disposition documents must address the following:

    a.  The final disposition (*e.g.,* your sentence, probation, dismissal, etc.) of every charge against you. The charge and disposition must be specifically identified (not just numeric citations or codes).

    b.  If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony, misdemeanor, or some other type of offense. You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

### DACA 161 – ANSWERED "YES" TO QUESTION 3 IN PART 3 – SUBMIT EXPLANATION

On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question in Part 3, Criminal, National Security and Public Safety Information:

> 3. Have you ever engaged in or do you continue to engage in or plan to engage in terrorist activities?

You did not provide a full explanation in Part 7 of your Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation of the terrorist activities you have ever engaged in, continue to engage in, or plan to engage in. Your explanation should include:

    Whether other people were engaged in terrorist activities with you;
    The names of the other people with whom you engaged in terrorists activities;
    The role you played in terrorist activities;
    The role that others played in terrorist activities;

Page 14 01/18/2013

Whether you planned or actually carried out the terrorist activities;
Whether you engaged in, continued to engage, or planned to engage in terrorist activities in the United States or abroad; and
Describe the type of terrorist activities you engaged in, continue to engage in, or plan to engage in.

### DACA 162 – ANSWERED "YES" TO QUESTION 4 IN PART 3 – SUBMIT EXPLANATION

On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question in Part 3, Criminal, National Security and Public Safety Information:

4. Are you now or have you ever been a member of a gang?

You did not provide a full explanation in Part 7 of the Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation of your gang membership, including:

When you joined the gang(s);
How long you were a member of the gang(s);
The name of the gang(s); and
The criminal activities you participated in with the gang(s).

### DACA163 – ANSWERED "YES" TO QUESTIONS 5a, 5b, 5c, AND 5d IN PART 3– SUBMIT EXPLANATION

On your Request for Deferred Action for Childhood Arrivals (Form I-821D) you checked "Yes" to the following question(s) in Part 3, Criminal, National Security and Public Safety Information: DELETE THOSE THAT DON'T APPLY

5. Have you EVER engaged in, ordered, incited, assisted, or otherwise participated in any of the following:
   a. acts involving torture, genocide, or human trafficking?
   b. killing any person?
   c. severely injuring a person?
   d. any kind of sexual contact or relations with any person who was being forced or threatened?

You did not provide a full explanation in Part 7 of the Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation describing your participation in activities involving torture, genocide, human trafficking, killing any person, severely injuring any person, or any sexual contact or relations with any person who was being forced or threatened.

## VII.  I-821D PART 3, CRIMINAL, NATIONAL SECURITY AND PUBLIC SAFETY INFORMATION

### DACA 170– ANSWERED "NO" TO QUESTIONS 1 AND 2 IN PART 3– USCIS FOUND CLEAR CHARGES OR OTHER DEROGATORY INFORMATION, SUBMIT JUDGMENT AND CONVICTION DOCUMENTS

A background check has been conducted based upon the fingerprints you provided at the Application Support Center.  Your background check revealed that you were arrested on [DATE], in [JURISDICTION] and charged with [CHARGES].
Where appropriate, Service Center may also need to include the name under which the arrest took place if different from name being used by requestor on Form I-821D. If there are multiple charges, you may bullet each charge.)

Page 15 01/18/2013

You must provide certified judgment and conviction/disposition documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. The certified judgment and conviction/disposition documents must address the following:

    a. The final disposition (your sentence, probation, dismissal, etc.) of every charge against you. The charge and disposition must be specifically identified (not just numeric citations or codes).

    b. If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony or misdemeanor. You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

### DACA 171– ANSWERED "NO"TO QUESTIONS 1 AND 2 IN PART 3 - CRIMINAL ACTIVITY UNCLEAR TO USCIS, SUBMIT JUDGMENT AND CONVICTION DOCUMENTS

Based on a review of your case, it appears that you have some type of criminal record/interaction with law enforcement authorities. It appears that on [DATE] the following occurred:

[Provide explanation of findings, to include name of police dept. If applicable, charges if applicable, etc. NOTE: Do not inform the applicant where the information came from systems that are not our records (ex. IBIS)]

(Where appropriate, you may also need to include the name under which the arrest took place if different from name being used by the requestor on Form I-821D. If there are multiple interactions, you may bullet each interaction.)

Submit a statement explaining the results of this interaction with law enforcement authorities. You must provide certified judgment and conviction/disposition documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. If you are unable to provide such records because your case was expunged or sealed, you must provide information about your arrest and evidence demonstrating that such records are unavailable under the law of the particular jurisdiction. The certified judgment and conviction/disposition documents must address the following:

    a. The final disposition (your sentence, probation, dismissal, etc.) of every charge against you. The charge and disposition must be specifically identified (not just numeric citations or codes).

    b. If you were convicted of any charge, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony or misdemeanor. You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

### DACA 172– ANSWERED "NO" TO QUESTIONS 3, 4, 5a. 5b, 5c, AND 5d IN PART 3 – USCIS DISCOVERED UNCLEAR INFORMATION, SUBMIT EXPLANATION

Based on a review of your case, the following was discovered: (Delete those that do not apply)

Page 16 01/18/2013

AR1630

3. you engaged in or do you continue to engage or plan to engage in terrorist activities?

4. you are now or have been a member of gang?

5. you engaged in, ordered, incited, assisted, or otherwise participated in any of the following:
    a. acts involving torture, genocide, or human trafficking?
    b. killing any person?
    c. severely injuring a person?
    d. any kind of sexual contact or relations with any person who was being forced or threatened?

[Provide explanation of findings.  This can include where the information was found if it is knowledge that can be shared with the requestor. NOTE:  Do not inform the requestor where the information came from systems that are not our records (ex. IBIS).]

Therefore, you must submit a statement explaining and/or refuting the information/circumstances found in USCIS records.  Please note that if you refute the above information, and USCIS later receives information that the above does relate to you, USCIS may terminate deferred action and you may be barred from other immigration benefits.

## VIII.    FORM I-765

### DACA 180 – FAILURE TO SUBMIT OR COMPLETE FORM I-765WS
USCIS is unable to complete your Form I-765, Application for Employment Authorization because you failed to submit or complete the Form I-765WS.  Please complete the worksheet and return it to the address provided within the specified time.

### DACA 190 – SUBMIT PASSPORT PHOTOS
Please submit **two (2)** passport-style <u>**color**</u> photo(s) of [NAME] taken within 30 days of the date of this notice, which conform(s) to the specifications below. Using a pencil or felt pen, lightly print name (and Alien Registration Number, if known) on the back of each photograph.

Please do not staple through any part of the photo(s).  Enclose the photo(s) in a plastic or paper envelope and staple the envelope to this notice when returning it to this office.

Passport-style photos must be 2 inches by 2 inches:
- Frame subject with full face, front view, eyes open.
- Make sure photo presents full head from top of hair to bottom of chin; height of head should measure 1 inch to 1 3/8 inch (25 mm to 35 mm).
- Center head within frame.
- Make sure eye level is between 1 1/8 inch and 1 3/8 inch (28 mm and 35 mm) from bottom of photo.
- Photograph subject against a plain white or off-white background.
- Position subject and lighting so that there are no distracting shadows on the face or background.
- Encourage subject to have a natural expression.
- Include headpieces if worn daily for religious purposes; they should not obscure or cast shadows on the eyes or any other part of the face.

For more information on photo requirements, please see the Department of State website at: http://www.travel.state.gov/passport/pptphotos/index.html, or contact the USCIS National Customer Service Center at 1-800-375-5283.

Page 17 01/18/2013

## IX.   FORM 131

### DACA 200 – PROOF OF DACA
To be considered for advance parole you must submit evidence to establish that you have been granted deferred action for childhood arrivals. Submit a copy of the approval notice issued by USCIS for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

### DACA 201 – GENERAL

On [*insert filing date*], you filed an Application for Travel Document (Form I-131) based on an approved Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Under section 212(d)(5)(A) of the Immigration and Nationality Act (INA), the Secretary of Homeland Security may, in her discretion, parole into the United States any alien applying for admission to the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit.   To assist USCIS in adjudicating your application, please provide additional information about your proposed travel, including the reasons for requesting advance parole in order to travel outside the United States.  In response to this notice, you should also submit evidence in support of your request (e.g., documentation showing that your proposed travel is related to your current employment or education or a humanitarian purpose).

### DACA 202 – PROOF OF EDUCATIONAL NEED
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individuals granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes.  You claim that you need to travel abroad for education purposes.  Examples of travel abroad for education purposes include study abroad programs, school-sponsored trips abroad, or travel necessary to conduct academic research.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for education purposes is insufficient.  (*ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for educational purposes, modify RFE call up accordingly*). You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- A letter from the educational institution, or from an employee of the institution acting in his or her official capacity, describing the purpose of the travel, or documentation showing enrollment in a specific program or class coupled with documentary evidence showing that you will benefit from, or are required to travel for the specific program or class; or

**NOTE**: Travel during an academic year unrelated to academics (i.e., a vacation) is insufficient to qualify as an educational purpose.

(*ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application. For multiple events, the advance parole is valid for the duration of all the documented events*)

### DACA 203 – PROOF OF HUMANITARIAN NEED
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individuals granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes.  You claim that you need to travel abroad for humanitarian reasons.  Examples of travel abroad for humanitarian reasons include medical reasons, to visit a family member, or to attend funeral services for a family member.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for humanitarian purposes is insufficient. (*ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to*

Page 18 01/18/2013

AR1632

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 29-2 Filed 07/02/2018 Pg: 381 of 572 Page 381 of 1026 PageID #: 9972

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 368 of 442

*support his/her need to travel abroad for humanitarian, modify RFE call up accordingly*).  You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- An explanation from a medical doctor on official letterhead stating the diagnosis and prognosis, and how long the treatment is expected to last;
- Information on the reasons why you cannot obtain treatment in the United States;
- An explanation from a medical doctor on official letterhead stating the diagnosis and prognosis of the family member's condition; or
- A death certificate or newspaper obituary of the family member or other document evidencing the death of the family member.

(*ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application.  For multiple events, the advance parole is valid for the duration of all the documented events*)

## DACA 204 – PROOF OF EMPLOYMENT NEED

In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individual granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for employment purposes.  Examples of travel abroad for employment purposes include: pursuit of a position in the United States with a foreign employer;
an overseas assignment, interview, conference, or training; a meeting with overseas clients or others with whom you interact professionally; or a trip to cultivate business or sales overseas  or any other overseas trip taken in furtherance of the applicant's professional responsibilities.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for employment purposes is insufficient.  (*ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for employment purposes, modify RFE call up accordingly*).  You may still submit evidence, which may include, but is not limited to, copies of: (*ISO should delete any of the following that were already provided by the requestor*)

- A letter on official letterhead from your employer describing the need for your travel; or
- A document showing a specific employment need, such as a conference program, that also shows your participation.

(*ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application.  For multiple events, the advance parole is valid for the duration of all the documented events*)

## X.   ASSORTED OTHERS

## DACA 300 – FOREIGN LANGUAGE DOCUMENT MUST BE ACCOMPANIED BY AN ENGLISH TRANSLATION

All foreign language documents must be accompanied by a full English language translation which the interpreter has certified as complete and accurate, and by the interpreter's certification that he or she is competent to translate from the foreign language into English.  Please submit a full English translation of (*ISO should list the document(s)*).  You must submit the requested foreign language document along with the translation.

Page 19 01/18/2013

## DACA 301– YOU MAY SUBMIT PHOTOCOPIES
You may submit either the original documents or legible photocopies of the originals, including copies of the front and back of each document. If you choose to submit original documents, they will not be returned to you. (Not for use when USCIS is requesting original documents.)

## DACA 302– AFFIDAVITS
Affidavits can support two of the DACA guidelines:
- Brief, casual, and innocent departures during the five years of required continuous presence in the United States: and
- Any minor gap in the five year continuous residence requirement.

In support of your DACA request, you submitted affidavits, but you did not indicate that:
- primary and secondary evidence cannot be obtained; and
- what effort you undertook to obtain that evidence.

Therefore, you are requested to provide the following:
- A written statement from the appropriate issuing authority attesting to the fact that no record exists or can be located, or that the record sought was part of some segment of records which were lost or destroyed; or
- Evidence (such as an affidavit) "that repeated good faith attempts were made to obtain the required document or record."

## DACA 303A – SIGNATURE ON FORM I-821D
As stated in the Form I-821D instructions, each request must be properly signed. Part 4 of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals is not properly signed because *(ISO should indicate why the form was incorrectly signed. For example, the preparer signed Part 4 instead of Part 5 of the form or the requestor is over the age of 14, but the requestor's parent or legal guardian signed Part 4)* Therefore, a copy of your Form I-821D is enclosed so that you can sign and date Part 4, 2.a. and 2.b. of your Form I-821D. Please note that a photocopy of a signed request or a typewritten name in place of a signature is not acceptable. Please attach your properly signed Form I-821D to this Request for Evidence and return to the address listed on this notice.

*(Include a copy of the requestor's Form I-821D with the RFE)*

## DACA 303B – SIGNATURE ON FORM I-765
As stated in the Form I-765 instructions, each application must be properly signed. Form I-765, Application for Employment Authorization is not properly signed because *(ISO should indicate why the form was incorrectly signed. For example, the preparer signed the form or the requestor is over the age of 14, but the requestor's parent or legal guardian signed the signature area)*. Therefore, a copy of your Form I-765 is enclosed so that you can sign and date. Please note that a photocopy of a signed application or a typewritten name in place of a signature is not acceptable. Please attach your properly signed Form I-765 to this Request for Evidence and return to the address listed on this notice.

*(Include a copy of the requestor's Form I-765 with the RFE)*

## DACA 304 – FORM I-821D MISSING PAGE(S)

You did not submit page (*ISO should list the missing page number(s)*) with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to complete the enclosed page (*ISO should list the missing page number(s)*) of the form.

Also enclosed is a copy of your original Form I-821D. Please re-sign and date page four (4) of the completed form; the completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

(*Include a copy of the requestor's Form I-821D and the blank missing page(s) of the form with the RFE*)

## XI.   ACKNOWLEDGEMENT OF WITHDRAWAL

### DACA 350  FORM I-821D ACKNOWLEDGEMENT OF WITHDRAWAL

On [DATE] you filed a request for deferred action under the Secretary of Homeland Security's June 15, 2012, directive concerning Deferred Action for Childhood Arrivals. Your filing included a Form I-821D, Consideration of Deferred Action for Childhood Arrivals, a Form I-765, Application for Employment Authorization, and a Form I-765WS, Form I-765 Worksheet, together with the required filing fee.

On [DATE], you withdrew your Form I-821D. This withdrawal applies equally to the forms I-765 and I-765WS that you concurrently filed with the Form I-821D.

USCIS hereby acknowledges your withdrawal. USCIS will not take any further action on your Form I-821D or the related forms I-765 and I-765WS. If you later wish to request Consideration of Deferred Action for Childhood Arrivals, you may file a new Form I-821D concurrently with a new Form I-765 and Form I-765WS, with a new fee.

### DACA 351 FORMS I-765/I-765WS ACKNOWLEDGEMENT OF WITHDRAWAL

On [DATE] you filed a request for deferred action under the Secretary of Homeland Security's June 15, 2012, directive concerning Deferred Action for Childhood Arrivals. Your filing included a Form I-821D, Consideration of Deferred Action for Childhood Arrivals, a Form I-765, Application for Employment Authorization, and a Form I-765WS, Form I-765 Worksheet, together with the required filing fee.

On [DATE], you withdrew your Form I-821D. This withdrawal applies equally to the forms I-765 and I-765WS that you concurrently filed with the Form I-821D.

USCIS hereby acknowledges your withdrawal. USCIS will not take any further action on your forms I-765 and I-765WS or the related Form I-821D. The filing fee is not refundable. If you later wish to request Consideration of Deferred Action for Childhood Arrivals, you may file a new Form I-821D concurrently with a new Form I-765 and Form I-765WS, with a new fee.

AR1635

# **Appendix D**

## DEFERRED ACTION FOR CHILDHOOD ARRIVALS RFE CALL-UPS

NOTE: Text highlighted in YELLOW and bracketed by [ ] is hidden text that requires ISO input. The ISO should delete the highlighted bracketed [Text] and type in the necessary information, or choose the appropriate information from choices and delete the information that does not apply. Text only highlighted in YELLOW and not bracketed is directive in nature and should not be printed in the letter being sent but should be deleted. Please mix call-ups into a single RFE as needed.

NOTE:  Please add call-ups **DACA 300 – FOREIGN LANGUAGE DOCUMENT MUST BE ACCOMPANIED BY AN ENGLISH TRANSLATION** and **DACA 301 – YOU MAY SUBMIT PHOTOCOPIES** to any other call-ups below as needed.

### DACA 100 – IDENTITY
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to prove your identity is insufficient (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- Passport;
- Birth certificate accompanied by photo identification;
- Any national identity documents from your country of origin bearing your photo and/or fingerprint;
- Any U.S.-government immigration or other document bearing your name and photograph (e.g., Employment Authorization Documents (EADs), expired visas, driver's licenses, non-driver cards, etc.);
- Any school-issued form of identification with photo;
- Military identification document with photo; or
- Any other document that you believe is relevant.

### DACA 101 – CONTINUOUS RESIDENCE
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to establish that you have continuously resided in the United States during the 5-year period immediately before June 15, 2012 and up to the time of filing is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

a. Employment records (e.g., pay stubs, W-2 Forms, Federal and State income tax returns, letters from employer(s), or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters from employers must be signed by the employer and must include the employer's contact information.

Such letters must include: **(1)** your address(es) at the time of employment; **(2)** the exact period(s) of employment; **(3)** period(s) of layoff; and **(4)** duties with the company.

AR1636

b.   Rent receipts, utility bills (gas, electric, phone, etc.), receipts or letters from companies showing the dates during which you received service;

c.   School records (transcripts, letters, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and periods of school attendance;

d.   Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

e.   Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization;

f.   Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.);

g.   Money order receipts for money sent into or out of the country; passport entries; birth certificates of children born in the United States; dated bank transactions; correspondence between you and another person or organization; U.S. Social Security card; Selective Service card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

h.   Any other relevant document.

(ISO: Add the appropriate language below to the RFE if any of the questions on page 3 (Part 2, Arrival/Residence Information) of the Form I-821D are blank **OR** if page 3 of the Form I-821D is missing.)

In addition, you did not answer question(s) (ISO should list the questions on page 3 (Part 2, Arrival/Residence Information) of the Form I-821D that were not answered) in Part 2, Arrival/Residence Information, of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to answer these question(s) on the enclosed copy of your original Form I-821D.

Please re-sign and date page four (4) of the completed form; the completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

(Include a copy of the requestor's Form I-821D with the RFE)

**OR**

In addition, you did not submit page three (3) with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to complete the enclosed page three (3) of the form.

Also enclosed is a copy of your original Form I-821D. Please re-sign and date page four (4) of the completed form; the completed form must contain a new original signature. Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

(Include a copy of the requestor's Form I-821D and a blank page 3 of the form with the RFE)

J.A. 907

AR1637

## DACA 102 – BRIEF, CASUAL, AND INNOCENT ABSENCE

To be considered for deferred action as a childhood arrival, you must have continuously resided in the United States during the 5 years period immediately before June 15, 2012 and up to the date you filed your request for deferred action. A brief, casual, and innocent absence from the United States will not interrupt your continuous residence.

An absence will be considered brief, casual, and innocent, if:

(1) The absence was short and reasonably calculated to accomplish the purpose of the absence;
(2) The absence was not the result of an order of exclusion, deportation, or removal;
(3) The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and
(4) The purpose of the absence from the United States or actions while outside of the United States were not contrary to law.

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for each departure you made from the United States since June 15, 2007 to show that each departure you made from the United States since June 15, 2012 were brief, casual, and innocent is insufficient. (ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- Plane or other transportation tickets or itinerary showing the travel dates;
- Passport entries;
- Hotel receipts showing the dates you were abroad;
- Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);
- Advance parole document; or
- Any other evidence that could support a brief, casual, and innocent absence.


## DACA 103 – ARRIVED IN THE UNITED STATES BEFORE AGE 16

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to establish that you came to the United States prior to your 16th birthday is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- Passport with an admission stamp indicating when you entered the United States;
- I-94/I-95/I-94W Arrival/Departure Record;
- Any INS or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);
- Travel records, such as transportation tickets showing your dates of travel to the United States;
- School records (transcripts, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and the periods of school attendance;
- Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization;
- Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.); or
- Any other document that you believe is relevant.

**DACA 104 – IN UNLAWFUL STATUS AS OF JUNE 15, 2012**

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you were in unlawful status as of June 15, 2012 is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- I-94/I-95/I-94W Arrival/Departure Record showing the date your authorized stay expired;
- If you have a final order of exclusion, deportation, or removal issued on or before June 15, 2012, submit a copy of that order and related charging documents, if available;
- An INS or DHS charging document placing you into removal proceedings;
- Any other document that you believe is relevant to show that you lacked lawful immigration status on June 15, 2012; or
- Any document relating to parole.

**DACA 105 – PROOF OF PRESENCE IN THE UNITED STATES ON JUNE 15, 2012**

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you were present in the United States on June 15, 2012 is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

a. Employment records (e.g., pay stubs, W-2 Forms, Federal and State income tax returns, letters from employer(s), or, if you are self employed, letters from banks and other firms with whom you have done business).

   **NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters from employers must be signed by the employer and must include the employer's contact information.

   Such letters must include: **(1)** your address(es) at the time of employment; **(2)** the exact period(s) of employment; **(3)** period(s) of layoff; and **(4)** duties with the company.

b. Rent receipts, utility bills (gas, electric, phone, etc.), receipts or letters from companies showing the dates during which you received service.

c. School records (transcripts, letters, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and periods of school attendance.

d. Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records).

e. Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization.

f. Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.).

g. Money order receipts for money sent into or out of the country; passport entries; birth certificates of children born in the United States; dated bank transactions; correspondence between you and another person or organization; U.S. Social Security card; Selective Service card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

h. Any other relevant document.

**DACA 106 – CURRENTLY ENROLLED IN SCHOOL**
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, showing that you have been accepted for enrollment or are already attending classes in one of the following is insufficient:

- A public or private elementary, junior high/middle school or high school/secondary school;
- A public college or university, or community college;
- A course of study to pass a General Education Development (GED) Certificate exam or other State-authorized exam;
- An educational or career training program (including vocational training);
- Literacy training; or
- An English as a Second Language (ESL) program.

(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the documents provided by the requestor are incomplete (i.e. no identifying information) or illegible, the ISO should note this in the RFE. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly)

You may still submit evidence, which may include the following: (ISO should delete any of the following that were already provided by the requestor.

- **A public or private elementary, junior high/middle school or high school/secondary school;**
  Such evidence may include, but is not limited to:
  - If accepted for enrollment, but classes have not yet commenced:
    - An acceptance letter on school letterhead from the school's authorized representative. Such acceptance letter is to include the name and address of the school, your grade level, and the date that classes are scheduled to commence. The letter is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
    - A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, if you have a disability;
    - A current class schedule containing the student's name, the list of courses, and the day and time of each class; or
    - Any other relevant evidence.
  - If already enrolled -- Current school registration cards; current transcripts; report cards; progress reports showing the name of the school, the time period or semester covered by the document, and the current grade; or a current IEP showing your process to date.
- **A public or private college or university, or community college;**
  Such evidence may include, but is not limited to:
  - If accepted for enrollment, but classes have not yet commenced:
    - An acceptance package or related material on school letterhead from the school's authorized representative. Such acceptance package or related material is to include the name and address of the school, your grade level or class year, and the date or term when classes are scheduled to commence.  In addition, the acceptance package or related material is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
    - A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, if you have a disability;
    - A copy of your current tuition bill;
    - A current class schedule containing your name, the list of courses, and the day and time of each class; or
    - Any other relevant evidence.

- If already enrolled – Current school registration cards; current transcripts; report cards; progress reports showing the name of the school, the time period or semester covered by the document, and the current grade or class year; or a current IEP showing your process to date.

- **A course of study to pass a General Education Development (GED) Certificate exam or other equivalent State-authorized exam;**

  Such evidence is to include a letter from the authorized representative of the program that includes information such as:
  - Your name and date of enrollment;
  - The duration of the program and expected completion date;
  - Whether the course of study is for a regular high school diploma or recognized equivalent under State law or a GED exam or other equivalent State-authorized exam;
  - The program's source and amount of funding; and
  - The program's authorized representative's contact information.

- **An educational or career training program (including vocational training);**

  Such evidence may include, but is not limited to:
  - If accepted for enrollment, but classes have not yet commenced:
    o An acceptance letter on school letterhead from the school registrar/authorized school representative. Such acceptance letter is to include the name and address of the program, a brief description of the program, the duration of the program, and state when the classes are scheduled to commence. The letter is to be accompanied by evidence that the student has registered for the program;
    o A copy of your current year registration (intake form/enrollment form); or
    o Any other relevant documentation.
  - If already attending classes– Current transcripts, report cards, or progress reports showing the name of the school, the time period or semester covered by the document, and if relevant, the current educational or grade level.

- **Literacy training; or**

  Such evidence is to include a letter from the literary program administrator or authorized representative providing information such as:
  - Your name;
  - The date of your enrollment;
  - The duration of the literacy program and the expected completion date; and
  - The program administrator or authorized representative's contact information.

- **An English as a Second Language (ESL) program.**

  Such evidence is to include a letter from the ESL program administrator or authorized representative.   This letter is to include the following:
  - Your name;
  - The date of your enrollment;
  - The duration of the ESL program and the expected completion date;
  - The program administrator or authorized representative's contact information.

**DACA 106A – EVIDENCE OF ACCEPTANCE BUT NO EVIDENCE OF REGISTERING FOR CLASSES:**
You have provided an acceptance letter or other related material indicating that you have been accepted at [ISO should list the name of the private elementary/junior high/middle school/high school/secondary school or public or private college/university/community college].  However, you did not include evidence that you have enrolled in that school.  Therefore, you are requested to submit such evidence which is to include, but is not limited to paid tuition bills or evidence that you have registered for class at that school.

**DACA 106B – LITERACY PROGRAM'S NON-PROFIT STATUS**
If the literacy program in which you are enrolled has non-profit status, please provide evidence of such status. Evidence of the literacy program's non-profit status is to include a copy of a valid letter from the Internal Revenue Service confirming exemption from taxation under section 501(c)(3) of the Internal Revenue Service Code of 1986, as amended, or equivalent section of prior code.

**DACA 106C –PUBLIC FUNDING (GED; Educational or Career Training Program (Including Vocational Training); ESL)**

If the [ISO should insert GED; Educational or Career Training Program (Including Vocational Training); Literacy Program; or English as a Second Language ] in which you are enrolled is funded in whole or in part by public funds (Federal, State, county or municipal), you are requested to submit a letter from the [ISO should insert GED program administrator/authorized representative; school registrar/authorized school representative if requestor is enrolled in Career Training Program (Including Vocational Training); literacy program administrator/authorized representative; or ESL program administrator/authorized representative] providing basic details about the funding, such as the source(s) of the funding.

**DACA 106D – PUBLIC FUNDING – (Literacy Program)**

If the literacy program in which you are enrolled is <u>not</u> funded in whole or in part by public funds (Federal, State, county, or municipal) or not administered by a non-profit entity you are requested to submit a letter from the program administrator or authorized representative providing basic details about the funding, such as the amount and the source(s) of the funding.

**DACA 106E – DEMONSTRATED EFFECTIVENESS (GED; Educational or Career Training Program (Including Vocational Training); Literacy Program; ESL)**

**(ISO SHOULD SELECT THE CORRECT RFE PARAGRAPH BELOW DEPENDING UPON THE PROGRAM IN WHICH THE REQUESTOR IS ENROLLED)**

Your record shows that the **GED/Equivalency program,** in which you are enrolled, is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information from the GED program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;
- The program's track record in assisting students in obtaining a regular high school diploma, GED, or a recognized equivalent certificate, or passing a GED or recognized equivalent exam;
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

Your record shows that the **educational or career training program (including vocational training), in** which you are enrolled, is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information, with supporting documentation, if available, from the school registrar/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;
- The program's track record in placing students in employment, job training, or post-secondary education; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

Your record shows that the **literacy program** in which you are enrolled, is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information from the literary program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;
- The program's track record in placing students in post-secondary education, job training programs, or employment; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

AR1642

Your record shows that the **English as a Second Language (ESL)** program in which you are enrolled is <u>not</u> publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information from the ESL program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The length of the program's existence;
- The program's track record in assisting students in obtaining placement in postsecondary schools, job training programs, or employment; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

## DACA 106F– GRADUATED FROM SCHOOL
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you graduated from school is insufficient (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the documents provided by the requestor are incomplete (i.e. no identifying information) or illegible, the ISO should note this in the RFE. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- A diploma;
- Transcripts showing the date of graduation; or
- A GED certificate, certificate of completion, certificate of attendance, or alternate award from a public or private high school or secondary school.

Documentation sufficient to demonstrate that you obtained a GED includes, but is not limited to, evidence you passed a GED exam, or other comparable State-authorized exam and, as a result, you received the recognized equivalent of a regular high school diploma under State law.

## DACA 107G – MEDICAL LEAVE
You indicate in your filing that you are currently on medical leave from school. Therefore, you are requested to submit evidence of your medical leave and indicate the date you expect to return to school. Evidence of your medical leave may include, but is not limited to, an explanation from a medical doctor on official letterhead stating the diagnosis and prognosis, and how long your treatment is expected to last.

## DACA 107 - MILITARY
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- Form DD-214, Certificate of Release or Discharge from Active Duty;
- NGB Form 22, National Guard Report of Separation and Record of Service;
- Military personnel records; or
- Military health records.

## DACA 108 - REMOVAL PROCEEDINGS
Submit documents that you have been issued an order of exclusion, deportation or removal. Such documentation could include copies of:

- Any removal, deportation, or exclusion order issued by an Immigration Judge;
- Final decision from the Board of Immigration Appeals (BIA); or
- Final decision from a U.S. Court of Appeals in your case.

AR1643

Appeal: 18-1521   Doc: 52-2   Filed: 07/02/2018   Pg: 392 of 502
Case 1:17-cv-05228-NGG-VMS   Document 29-7   Filed 09/04/20   Page 392 of 1026 PageID #: 9983

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 379 of 442

## APPLICATION SUPPORT CENTER (ASC) RELATED

### DACA 130 – SCHEDULE ASC APPOINTMENT

Your request cannot be processed until you have appeared at an Application Support Center (ASC) for the collection of a digital photograph, signature, and fingerprint(s). Our records indicate that you have not yet appeared at an ASC for this purpose. Please schedule an appointment at the ASC nearest you by calling the USCIS National Customer Service Center at 1-800-375-5283 (TTY 1-800-767-1833). You also can find the location of the ASC nearest you on the USCIS web site at www.USCIS.gov.

Once you have scheduled an appointment, or if you have a scheduled appointment, please return this notice to the address below with the appointment information.

Date of Appointment:     _____

Location of Appointment:     _____

### DACA 131– RESCHEDULE ASC APPOINTMENT (TECHNICAL DIFFICULTIES)

On [DATE], USCIS asked you to schedule an appointment at an Application Support Center (ASC) for the collection of a digital photograph, signature and fingerprint(s). In response to that request, you indicated that you already appeared at an ASC as required. However, due to technical problems, your previously-acquired biometrics from the ASC cannot be used.

USCIS will mail a separate notice to you containing information for a new appointment for biometrics capture at the ASC nearest you and listing identity documents that you must bring with you to your ASC appointment. Once you receive that notice, additional information regarding the location of the ASC can be found on the USCIS web site at www.USCIS.gov. Please bring this notice with you to your appointment.

Once you have provided your biometrics to the ASC, respond to this request with evidence of your attendance of the ASC appointment. Such evidence typically consists of a copy of your appointment notice, bearing a stamp from the ASC technician. Along with the evidence of your appointment, please include all other evidence requested in this notice.

We sincerely regret any inconvenience this has caused you.

## NAME, DATE OF BIRTH DISCREPANCY

### DACA 140 – DATE OF BIRTH DISCREPANCY

USCIS records indicate that you were born on [DATE]. You indicated on your request for consideration of deferred action for childhood arrivals that you were born on [DATE]. Submit documentary evidence to establish your true date of birth. Such evidence may include your birth certificate and/or passport. If you submit a copy of your birth certificate, you must submit copies of the front and back (if there is information on the back).

### DACA 142 – NAME CHANGE/DISCREPANCY

USCIS records and/or evidence you submitted indicate that your name is [NAME]. You indicated on your request for consideration of deferred action for childhood arrivals that your name is [NAME]. Submit documentary evidence to establish your true name. Such evidence may include a birth certificate, adoption records, marriage certificate, passport, or government documentation showing that you have officially changed your name.

### DACA143 – SUBMIT EVIDENCE OF NAME CHANGE

Submit proof of your name change. Such proof would normally be a marriage certificate, termination of marriage (divorce or annulment decree), adoption decree, or court order.

## FINGERPRINTING / CRIMINALITY

**DACA 150 – 2 UNCLASSIFIABLE PRINTS – SUBMIT LOCAL POLICE CLEARANCES**

To date, you have been fingerprinted twice and USCIS has been unable to get a required clearance for you because both sets of fingerprints were rejected as unclassifiable by the Federal Bureau of Investigation. Instead of a fingerprint clearance, you must submit a local police clearance certificate for each jurisdiction (city, town, county, or municipality) in which you have lived for six months or more within the past five years.

**Please note**: The police clearance certificate(s) must be researched by name and date of birth.  You must supply the law enforcement agency with all aliases you have used, including maiden name, if applicable. Fingerprint cards are not acceptable evidence of a police clearance certificate.

If any record indicates that you have been arrested, you must provide documentation of each of the following:

a. The final disposition (your sentence, probation, dismissal, etc.) of **every** charge against you.  The charge and disposition must be specifically identified (not merely numeric citations or codes).

b. If you were convicted of **any** charge, you must also provide evidence showing whether the charge for which you were convicted was classified as a **felony or misdemeanor.**  You may submit a copy of the pertinent statute, sentencing guidelines, and/or statement from the court clerk or police department for this purpose.

Along with the above information, you must also answer the following questions.  You should respond on this notice and sign your name where it asks for your signature.  If more space is needed, you may respond to the following questions on separate sheet(s) of paper.  Please sign every separate sheet of paper.

1) Have you ever been arrested or detained by a law enforcement officer?  If yes, please explain.

    Answer: _____

    _____

2) Have you had your fingerprints taken for any reason by a law enforcement officer for a criminal offense?  If yes, please explain.

    Answer: _____

    _____

3) Have you been issued a ticket or been taken into custody by a law enforcement officer?  If yes, please explain.

    Answer: _____

    _____

4) Have you ever been ordered by a court to:  pay a fine; serve a probationary sentence; perform community service; make restitution; or have your wages garnished (e.g., for failure to make child support payments)?  If yes, please explain.

    Answer: _____

    _____

Appeal 18-1521 cv-02284-GG-VMS Filed 07/02/2019 Document 28-7 Filed 09/04/20 Page 394 of 502 Page 394 of 1026 PageID #: 9985

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 381 of 442

5) Have you ever received an expungement, parole, pardon, or successfully completed a diversion or rehabilitation program?  If yes, please explain.

Answer: _____

_____

I certify, under penalties of perjury under the laws of the United States of America, that the foregoing is true and correct.  Furthermore, I authorize the release from my records that USCIS needs to determine my eligibility for deferred action of childhood arrivals.

Signature of Requestor: _____

## DACA 151– SUBMIT JUDGMENT AND CONVICTION DOCUMENTS

A criminal history check has been conducted based upon the fingerprints you provided at the Application Support Center.  Your criminal history check has revealed that you were arrested on [DATE], in [JURISDICTION] and charged with [CHARGES]. (WHERE APPROPRIATE, SERVICE CENTER MAY ALSO NEED TO INCLUDE THE NAME UNDER WHICH THE ARREST TOOK PLACE IF DIFFERENT FROM NAME BEING USED BY REQUESTOR ON FORM I-821D.  IF THERE ARE MULTIPLE CHARGES, YOU MAY BULLET EACH CHARGE.)

You must provide certified judgment and conviction documents from the court(s) for all of your arrests, including but not limited to, the charges listed above.  The certified judgment and conviction documents must address the following:

a.  The final disposition (e.g., your sentence, probation, dismissal, etc.) of every charge against you.  The charge and disposition must be specifically identified (not just numeric citations or codes).

b.  If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony, misdemeanor or other type of offense.  Please submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

## I-821D PART 3 INCOMPLETE

## DACA 155 – FORM I-821D INCOMPLETE

You did not answer question(s) (ISO should list the question numbers in Part 3 of the Form I-821D that the requestor did not answer) in Part 3 of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to answer these question(s) on the enclosed copy of your original Form I-821D.

As stated in the instructions on Part 3 of the Form I-821D, if any of the questions apply to you, please describe the circumstances and include a full explanation in Part 7 of the Form I-821D.  Re-sign and date page four (4) of the completed form; the completed form must contain a new original signature.  Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

(Include a copy of the requestor's Form I-821D with the RFE)

## I-821D PART 3, CRIMINAL, NATIONAL SECURITY
## AND PUBLIC SAFETY INFORMATION
## AFFIRMATIVE RESPONSES
## POSSIBLE INELIGIBILITY ISSUES

### DACA 160 – ANSWERED "YES" to QUESTION 1 AND 2 IN PART 3 –DOCUMENTS NEEDED AND EXPLANATION
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question(s) in Part 3, Criminal, National Security and Public Safety Information: DELETE THOSE THAT DON'T APPLY

> 1. Have you been arrested for, charged with, or convicted of a felony or misdemeanor in the United States?

> 2. Have you been arrested for, charged with, or convicted of any crime in any country other than the United States?

You did not provide a full explanation in Part 7 of your Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D. Therefore, please provide a full explanation describing the circumstances. DELETE IF AN EXPLANATION WAS PROVIDED

You must provide certified judgment and conviction documents from the court(s) for all of your arrests, including but not limited to, the charges listed above.  The certified judgment and conviction documents must address the following:

> a.   The final disposition (e.g., your sentence, probation, dismissal, etc.) of every charge against you.  The charge and disposition must be specifically identified (not just numeric citations or codes).

> b.   If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony, misdemeanor, or some other type of offense. You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

### DACA 161 – ANSWERED "YES" TO QUESTION 3 IN PART 3 – SUBMIT EXPLANATION
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question in Part 3, Criminal, National Security and Public Safety Information:

> 3. Have you ever engaged in or do you continue to engage in or plan to engage in terrorist activities?

You did not provide a full explanation in Part 7 of your Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation of the terrorist activities you have ever engaged in, continue to engage in, or plan to engage in.  Your explanation should include:

> Whether other people were engaged in terrorist activities with you;
> The names of the other people with whom you engaged in terrorists activities;
> The role you played in terrorist activities;
> The role that others played in terrorist activities;
> Whether you planned or actually carried out the terrorist activities;
> Whether you engaged in, continued to engage, or planned to engage in terrorist activities in the United States or abroad; and
> Describe the type of terrorist activities you engaged in, continue to engage in, or plan to engage in.

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 383 of 442

**DACA 162 – ANSWERED "YES" TO QUESTION 4 IN PART 3 – SUBMIT EXPLANATION**
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question in Part 3, Criminal, National Security and Public Safety Information:

> 4. Are you now or have you ever been a member of a gang?

You did not provide a full explanation in Part 7 of the Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation of your gang membership, including:

> When you joined the gang(s);
> How long you were a member of the gang(s);
> The name of the gang(s); and
> The criminal activities you participated in with the gang(s).

**DACA 163 – ANSWERED "YES" TO QUESTIONS 5a. 5b, 5c, AND 5d IN PART 3 – SUBMIT EXPLANATION**
On your Request for Deferred Action for Childhood Arrivals (Form I-821D) you checked "Yes" to the following question(s) in Part 3, Criminal, National Security and Public Safety Information: DELETE THOSE THAT DON'T APPLY

> 5. Have you EVER engaged in, ordered, incited, assisted, or otherwise participated in any of the following:
>     a. acts involving torture, genocide, or human trafficking?
>     b. killing any person?
>     c. severely injuring a person?
>     d. any kind of sexual contact or relations with any person who was being forced or threatened?

You did not provide a full explanation in Part 7 of the Form I-821D describing the circumstances, as requested in the instructions on Part 3 of the Form I-821D.

Please provide a full and complete explanation describing your participation in activities involving torture, genocide, human trafficking, killing any person, severely injuring any person, or any sexual contact or relations with any person who was being forced or threatened.

## I-821D PART 3, CRIMINAL, NATIONAL SECURITY AND PUBLIC SAFETY INFORMATION

**DACA 170– ANSWERED "NO" TO QUESTIONS 1 AND 2 IN PART 3– USCIS FOUND CLEAR CHARGES OR OTHER DEROGATORY INFORMATION, SUBMIT JUDGMENT AND CONVICTION DOCUMENTS**
A background check has been conducted based upon the fingerprints you provided at the Application Support Center. Your background check revealed that you were arrested on [DATE], in [JURISDICTION] and charged with [CHARGES].
(WHERE APPROPRIATE, YOU MAY ALSO NEED TO INCLUDE THE NAME UNDER WHICH THE ARREST TOOK PLACE IF DIFFERENT FROM NAME BEING USED BY THE REQUESTOR ON FORM I-821D. IF THERE ARE MULTIPLE CHARGES, YOU MAY BULLET EACH CHARGE.)

You must provide certified judgment and/or conviction documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. The certified judgment and conviction documents must address the following:

> a. The final disposition (your sentence, probation, dismissal, etc.) of every charge against you.
>    The charge and disposition must be specifically identified (not just numeric citations or codes).

AR1648

   b.  If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony or misdemeanor. You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

**DACA 171– ANSWERED "NO" TO QUESTIONS 1 AND 2 IN PART 3 - CRIMINAL ACTIVITY UNCLEAR TO USCIS, SUBMIT JUDGMENT AND CONVICTION DOCUMENTS**
Based on a review of your case, it appears that you have some type of criminal record/interaction with law enforcement authorities. It appears that on [DATE] the following occurred:

[PROVIDE EXPLANATION OF FINDINGS, TO INCLUDE NAME OF POLICE DEPT. IF APPLICABLE, CHARGES IF APPLICABLE, ETC. NOTE: DO NOT INFORM THE APPLICANT WHERE THE INFORMATION CAME FROM SYSTEMS THAT ARE NOT OUR RECORDS (EX. IBIS)]

(WHERE APPROPRIATE, YOU MAY ALSO NEED TO INCLUDE THE NAME UNDER WHICH THE ARREST TOOK PLACE IF DIFFERENT FROM NAME BEING USED BY THE REQUESTOR ON FORM I-821D. IF THERE ARE MULTIPLE INTERACTIONS, YOU MAY BULLET EACH INTERACTION.)

Submit a statement explaining the results of this interaction with law enforcement authorities. You must provide certified judgment and conviction documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. The certified judgment and conviction documents must address the following:

   a.  The final disposition (your sentence, probation, dismissal, etc.) of every charge against you. The charge and disposition must be specifically identified (not just numeric citations or codes).

   b.  If you were convicted of any charge, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony or misdemeanor. You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

**DACA 172– ANSWERED "NO" TO QUESTIONS 3, 4, 5a. 5b, 5c, AND 5d IN PART 3 – USCIS DISCOVERED UNCLEAR INFORMATION, SUBMIT EXPLANATION**
Based on a review of your case, the following was discovered: DELETE THOSE THAT DON'T APPLY

   3.  you engaged in or do you continue to engage or plan to engage in terrorist activities?

   4.  you are now or have been a member of gang?

   5.  you engaged in, ordered, incited, assisted, or otherwise participated in any of the following:
       a. acts involving torture, genocide, or human trafficking?
       b. killing any person?
       c. severely injuring a person?
       d. any kind of sexual contact or relations with any person who was being forced or threatened?

[PROVIDE EXPLANATION OF FINDINGS. THIS CAN INCLUDE WHERE THE INFORMATION WAS FOUND IF IT IS KNOWLEDGE THAT CAN BE SHARED WITH THE REQUESTOR. NOTE: DO NOT INFORM THE REQUESTOR WHERE THE INFORMATION CAME FROM SYSTEMS THAT ARE NOT OUR RECORDS (EX. IBIS).]

Therefore, you must submit a statement explaining and/or refuting the information/circumstances found in USCIS records. Please note that if you refute the above information, and USCIS later receives information that the above does relate to you, USCIS may terminate deferred action and you may be barred from other immigration benefits.

## FORM I-765

### DACA 180 – FAILURE TO SUBMIT OR COMPLETE FORM I-765WS
USCIS is unable to complete your Form I-765, Application for Employment Authorization because you failed to submit or complete the Form I-765WS. Please complete the worksheet and return it to the address provided within the specified time.

### DACA 190 – SUBMIT PASSPORT PHOTOS
Please submit **two (2)** passport-style **color** photo(s) of [NAME] taken within 30 days of the date of this notice, which conform(s) to the specifications below. Using a pencil or felt pen, lightly print name (and Alien Registration Number, if known) on the back of each photograph.

Please do not staple through any part of the photo(s). Enclose the photo(s) in a plastic or paper envelope and staple the envelope to this notice when returning it to this office.

Passport-style photos must be 2 inches by 2 inches:
* Frame subject with full face, front view, eyes open.
* Make sure photo presents full head from top of hair to bottom of chin; height of head should measure 1 inch to 1 3/8 inch (25 mm to 35 mm).
* Center head within frame.
* Make sure eye level is between 1 1/8 inch and 1 3/8 inch (28 mm and 35 mm) from bottom of photo.
* Photograph subject against a plain white or off-white background.
* Position subject and lighting so that there are no distracting shadows on the face or background.
* Encourage subject to have a natural expression.
* Include headpieces if worn daily for religious purposes; they should not obscure or cast shadows on the eyes or any other part of the face.

For more information on photo requirements, please see the Department of State website at: http://www.travel.state.gov/passport/pptphotos/index.html, or contact the USCIS National Customer Service Center at 1-800-375-5283.

## FORM 131

### DACA 200 – PROOF OF DACA
To be considered for advance parole you must submit evidence to establish that you have been granted deferred action for childhood arrivals. Submit a copy of the approval notice issued by USCIS for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

### DACA 201 – PROOF OF EDUCATIONAL NEED
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individuals granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for education purposes. Examples of travel abroad for education purposes include study abroad programs, school-sponsored trips abroad, or travel necessary to conduct academic research.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for education purposes is insufficient. (ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support

his/her need to travel abroad for educational purposes, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- A letter from the educational institution, or from an employee of the institution acting in his or her official capacity, describing the purpose of the travel, or documentation showing enrollment in a specific program or class coupled with documentary evidence showing that you will benefit from, or are required to travel for the specific program or class; or

NOTE: Travel during an academic year unrelated to academics (i.e., a vacation) is insufficient to qualify as an educational purpose.

(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application. For multiple events, the advance parole is valid for the duration of all the documented events)

### DACA 202 – PROOF OF HUMANITARIAN NEED
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individuals granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for humanitarian reasons. Examples of travel abroad for humanitarian reasons include medical reasons, to visit a family member, or to attend funeral services for a family member.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for humanitarian purposes is insufficient. (ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for humanitarian, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- An explanation from a medical doctor on official letterhead stating the diagnosis and prognosis, and how long the treatment is expected to last;
- Information on the reasons why you cannot obtain treatment in the United States;
- An explanation from a medical doctor on official letterhead stating the diagnosis and prognosis of the family member's condition; or
- A death certificate or newspaper obituary of the family member or other document evidencing the death of the family member.

(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application. For multiple events, the advance parole is valid for the duration of all the documented events)

### DACA 203 – PROOF OF EMPLOYMENT NEED
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individual granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for employment purposes. Examples of travel abroad for employment purposes include: pursuit of a position in the United States with a foreign employer;
an overseas assignment, interview, conference, or training; a meeting with overseas clients or others with whom you interact professionally; or a trip to cultivate business or sales overseas or any other overseas trip taken in furtherance of the applicant's professional responsibilities.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for employment purposes is insufficient.  (ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for employment purposes, modify RFE call up accordingly.) You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- A letter on official letterhead from your employer describing the need for your travel; or
- A document showing a specific employment need, such as a conference program, that also shows your participation.

(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application.  For multiple events, the advance parole is valid for the duration of all the documented events)

## **ASSORTED OTHERS**

### DACA 300 – FOREIGN LANGUAGE DOCUMENT MUST BE ACCOMPANIED BY AN ENGLISH TRANSLATION
If you submit a document in any language other than English, it must be **completely** translated word-for-word.  The translator must certify that the translation is accurate and that he or she is competent to translate.  Note:  You must submit the requested foreign language document along with the translation.

### DACA 301– YOU MAY SUBMIT PHOTOCOPIES
You may submit either the original documents or legible photocopies of the originals, including copies of the front and back of each document.  If you choose to submit original documents, they will not be returned to you. [NOT FOR USE WHEN USCIS IS REQUESTING ORIGINAL DOCUMENTS.]

### DACA 302– AFFIDAVITS
Affidavits can support two of the DACA guidelines:
- Brief, casual, and innocent departures during the five years of required continuous presence in the United States: and
- Any minor gap in the five year continuous residence requirement.

In support of your DACA request, you submitted affidavits, but you did not indicate that:
- primary and secondary evidence cannot be obtained; and
- what effort you undertook to obtain that evidence.

Therefore, you are requested to provide the following:
- A written statement from the appropriate issuing authority attesting to the fact that no record exists or can be located, or that the record sought was part of some segment of records which were lost or destroyed; or
- Evidence (such as an affidavit) "that repeated good faith attempts were made to obtain the required document or record."

### DACA 303 – SIGNATURE ON FORM I-821D

As stated in the Form I-821D instructions, each request must be properly signed.  Part 4 of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals is not properly signed because (ISO should indicate why the form was incorrectly signed. For example, the preparer signed Part 4 instead of Part 5 of the form or the requestor is over the age of 14, but the requestor's parent or legal guardian signed Part 4) Therefore, your Form I-821D is enclosed so that you can sign and date Part 4, 2.a. and 2.b. of your Form I-821D.  Please note that a photocopy of a signed request or a typewritten name in place of a signature is not acceptable. Please attach your properly signed Form I-821D to this Request for Evidence and return to the address listed on this notice.

(Include a copy of the requestor's Form I-821D with the RFE)

### DACA 304 – Form I-821D Missing Page(s)

You did not submit page (ISO should list the missing page number(s)) with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Therefore, you are requested to complete the enclosed page (ISO should list the missing page number(s)) of the form.

Also enclosed is a copy of your original Form I-821D. Please re-sign and date page four (4) of the completed form; the completed form must contain a new original signature.  Attach your completed Form I-821D to this Request for Evidence and send to the address as listed on this notice.

(Include a copy of the requestor's Form I-821D and the blank missing page(s) of the form with the RFE)

## ACKNOWLEDGEMENT OF WITHDRAWAL

### DACA Acknowledgement of Withdrawal

On [DATE] you filed a request for deferred action under the Secretary of Homeland Security's June 15, 2012, directive concerning Deferred Action for Childhood Arrivals. The complete DACA package included Form I-821D, Consideration of Deferred Action for Childhood Arrivals, a Form I-765, Application for Employment Authorization, and a Form I-765WS, Form I-765 Worksheet, together with the required filing fee ("DACA Package").

On [DATE], you withdrew your DACA Package.  This withdrawal applies equally to the Form I-821D, the Form I-765, and the Form I-765WS.

USCIS hereby acknowledges your withdrawal of your DACA Package.  Your withdrawal terminates each separate request that is part of your DACA Package.  USCIS will not take any further action on your Form I-821D or the related Form I-765.  The filing fee is not refundable.

This acknowledgement of your withdrawal of your DACA Package is not a "decision" that is subject to administrative appeal or to the filing of a motion to reopen/reconsider.  However, if you later believe you are eligible and wish to request Consideration of Deferred Action for Childhood Arrivals, you may file a new Form I-821D concurrently with a new Form I-765 and Form I-765WS, with a new fee.

# **Appendix D**

# DEFERRED ACTION FOR
# CHILDHOOD ARRIVALS
# RFE CALL–UPS

NOTE: Text highlighted in YELLOW and bracketed by [ ] is hidden text that requires ISO input.  The ISO should delete the highlighted bracketed [Text] and type in the necessary information, or choose the appropriate information from choices and delete the information that does not apply.  Text only highlighted in YELLOW and not bracketed is directive in nature and should not be printed in the letter being sent but should be deleted.  Please mix call-ups into a single RFE as needed.

NOTE:  Please add call-ups **DACA 300 – FOREIGN LANGUAGE DOCUMENT MUST BE ACCOMPANIED BY AN ENGLISH TRANSLATION** and **DACA 301 – YOU MAY SUBMIT PHOTOCOPIES** to any other call-ups below as needed.

**DACA 100 – IDENTITY**
The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to prove your identity is insufficient (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient.  If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly).  You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- Passport;
- Birth certificate accompanied by photo identification:
- Any national identity documents from your country of origin bearing your photo and/or fingerprint;
- Any U.S.-government immigration or other document bearing your name and photograph (e.g., Employment Authorization Documents (EADs), expired visas, driver's licenses, non-driver cards, etc.);
- Any school-issued form of identification with photo;
- Military identification document with photo; or
- Any other document that you believe is relevant.

AR1654

**DACA 101 – CONTINUOUS RESIDENCE**

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to that establish that you have continuously resided in the United States during the 5-year period immediately before June 15, 2012 and up to the time of filing is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly).  You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

   a.  Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal
       income tax returns, State verification of the filing of state income tax returns, letters from
       employer(s), or, if you are self employed, letters from banks and other firms with whom
       you have done business);

       **NOTE:** In all of these documents, your name and the name of the employer or other
       interested organization must appear on the form or letter, as well as relevant dates. Letters
       from employers must be signed by the employer and must include the employer's contact
       information.

       Such letters must include: **(1)** your address(es) at the time of employment; **(2)** the exact
       period(s) of employment; **(3)** period(s) of layoff; and **(4)** duties with the company.

   b.  Rent receipts, utility bills (gas, electric, phone, etc.), receipts or letters from companies
       showing the dates during which you received service;

   c.  School records (transcripts, letters, report cards, etc.) from the schools that you have
       attended in the United States, showing the name(s) of the schools and periods of school
       attendance;

   d.  Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty;
       NGB Form 22, National Guard Report of Separation and Record of Service; military
       personnel records; or military health records);

   e.  Hospital or medical records concerning treatment or hospitalization, showing the name of
       the medical facility or physician and the date(s) of the treatment or hospitalization;

   f.  Official records from a religious entity in the United States confirming your participation in
       a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.);

   g.  Money order receipts for money sent into or out of the country; passport entries; birth
       certificates of children born in the United States; dated bank transactions; correspondence
       between you and another person or organization; U.S. Social Security card; Selective Service
       card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental
       agreements, contracts to which you have been a party; tax receipts; insurance policies;
       receipts; postmarked letters; or

   h.  Any other relevant document.

AR1655

### DACA 102 – BRIEF, CASUAL, AND INNOCENT ABSENCE

To be considered for deferred action as a childhood arrival, you must have continuously resided in the United States during the 5 years period immediately before June 15, 2012 and date you filed your request for deferred action. A brief, casual, and innocent absence from the United States will not interrupt your continuous residence.

An absence will be considered brief, casual, and innocent, if:

    (1) The absence was short and reasonably calculated to accomplish the purpose of the absence;

    (2) The absence was not the result of an order of exclusion, deportation, or removal;

    (3) The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and

    (4) The purpose of the absence from the United States or actions while outside of the United States were not contrary to law.

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for each departure you made from the United States since June 15, 2007 to show that each departure you made from the United States since June 15, 2012 were brief, casual, and innocent is insufficient. (ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- Plane or other transportation tickets or itinerary showing the travel dates;
- Passport entries;
- Hotel receipts showing the dates you were abroad;
- Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);
- Advance parole document; or
- Any other evidence that could support a brief, casual, and innocent absence.

### DACA 103 – ARRIVED IN THE UNITED STATES BEFORE AGE 16

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to that establish you came to the United States prior to your 16th birthday is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- Passport with an admission stamp indicating when you entered the United States;
- I-94/I-95/I-94W Arrival/Departure Record;
- Any INS or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);
- Travel records, such as transportation tickets showing your dates of travel to the United States;
- School records (transcripts, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and the periods of school attendance;
- Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization;

- Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.); or
- Any other document that you believe is relevant.

### DACA 104 –IN UNLAWFUL STATUS AS OF JUNE 15, 2012

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to that show that you were in unlawful status as of June 15, 2012 is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- I-94/I-95/I-94W Arrival/Departure Record showing the date your authorized stay expired;
- If you have a final order of exclusion, deportation, or removal issued on or before June 15, 2012, submit a copy of that order and related charging documents, if available;
- An INS or DHS charging document placing you into removal proceedings;
- Any other document that you believe is relevant to show that you lacked lawful immigration status on June 15, 2012; or
- Any document relating to parole.

### DACA 105 – PROOF OF PRESENCE IN THE UNITED STATES ON JUNE 15, 2012

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to that show that you were present in the United States on June 15, 2012 is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

a. Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, State verification of the filing of state income tax returns, letters from employer(s), or, if you are self employed, letters from banks and other firms with whom you have done business).

   **NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters from employers must be signed by the employer and must include the employer's contact information.

   Such letters must include: **(1)** your address(es) at the time of employment; **(2)** the exact period(s) of employment; **(3)** period(s) of layoff; and **(4)** duties with the company.

b. Rent receipts, utility bills (gas, electric, phone, etc.), receipts or letters from companies showing the dates during which you received service.

c. School records (transcripts, letters, report cards, etc.) from the schools that you have attended in the United States, showing the name(s) of the schools and periods of school attendance.

d. Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records).

e. Hospital or medical records concerning treatment or hospitalization, showing the name of the medical facility or physician and the date(s) of the treatment or hospitalization.

f. Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.).

g. Money order receipts for money sent into or out of the country; passport entries; birth certificates of children born in the United States; dated bank transactions; correspondence between you and another person or organization; U.S. Social Security card; Selective Service card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

h. Any other relevant document.

## DACA 106 – CURRENTLY ENROLLED IN SCHOOL

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, showing that you have been accepted for enrollment or are already attending classes in one of the following is insufficient:
- A public or private elementary, junior high/middle school or high school/secondary school;
- A public or private college or university, or community college;
- A course of study to pass a General Education Development (GED) Certificate exam or other State-authorized exam;
- An educational or career training program (including vocational training);
- Literacy training; or
- An English as a Second Language (ESL) program.

(ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the documents provided by the requestor are incomplete (i.e. no identifying information) or illegible, the ISO should note this in the RFE. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly)

You may still submit evidence, which may include the following: (ISO should delete any of the following that were already provided by the requestor.

- **A public or private elementary, junior high/middle school or high school/secondary school;**
  - If accepted for enrollment, but classes have not yet commenced:
    - An acceptance letter on school letterhead from the school's authorized representative. Such acceptance letter is to include the name and address of the school, your grade level, and the date that classes are scheduled to commence. The letter is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
    - A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, if you have a disability;

AR1658

      ○ A current class schedule containing the student's name, the list of courses, and the day and time of each class; or
      ○ Any other relevant evidence.
    ▪ If already enrolled – Current school registration cards; current  transcripts; report cards; progress reports showing the name of the school, the time period or semester covered by the document, and the current grade; or a current IEP showing your process to date.

- **A public or private college or university, or community college;**
  Such evidence may include, but is not limited to:
  - ▪ If accepted for enrollment, but classes have not yet commenced:
    - ○ An acceptance package or related material on school letterhead from the school's authorized representative. Such acceptance package or related material is to include the name and address of the school, your grade level or class year, and the date or term when classes are scheduled to commence.   In addition, the acceptance package or related material is to be accompanied by evidence that the student has registered for classes, or other evidence showing the student has accepted the offer and has committed to start classes on a certain date;
    - ○ A current individualized education program (IEP), as required under the Individuals with Disabilities Education Act, if you have a disability;
    - ○ A copy of your current tuition bill;
    - ○ A current class schedule containing your name, the list of courses, and the day and time of each class; or
    - ○ Any other relevant evidence.
  - ▪ If already enrolled – Current school registration cards; current  transcripts; report cards; progress reports showing the name of the school, the time period or semester covered by the document, and the current grade or class year; or a current IEP showing your process to date.

- **A course of study to pass a General Education Development (GED) Certificate exam or other equivalent State-authorized exam;**
  Such evidence is to include a letter from the authorized representative of the program that includes information such as:
  - ▪ Your name and date of enrollment;
  - ▪ The duration of the program and expected completion date;
  - ▪ Whether the course of study is for a regular high school diploma or recognized equivalent under State law or a GED exam or other equivalent State-authorized exam;
  - ▪ The program's source and amount of funding; and
  - ▪ The program's authorized representative's contact information.

- **An educational or career training program (including vocational training);**
  Such evidence may include, but is not limited to:
  - ▪ If accepted for enrollment, but classes have not yet commenced:
    - ○ An acceptance letter on school letterhead from the school registrar/authorized school representative. Such acceptance letter is to include the name and address of the program, a brief description of the program, the duration of the program, and state when the classes are scheduled to commence.  The letter is to be accompanied by evidence that the student has registered for the program;
    - ○ A copy of your current year registration (intake form/enrollment form); or
    - ○ Any other relevant documentation.

- If already attending classes– Current transcripts, report cards, or progress reports showing the name of the school, the time period or semester covered by the document, and if relevant, the current educational or grade level.
- **Literacy training; or**
  Such evidence is to include a letter from the literary program administrator or authorized representative providing information such as:
  - Your name;
  - The date of your enrollment;
  - The duration of the literacy program and the expected completion date; and
  - The program administrator or authorized representative's contact information.
- **An English as a Second Language (ESL) program.**
  Such evidence is to include a letter from the ESL program administrator or authorized representative. This letter is to include the following:
  - Your name;
  - The date of your enrollment;
  - The duration of the ESL program and the expected completion date;
  - The program administrator or authorized representative's contact information.

**DACA 106A – EVIDENCE OF ACCEPTANCE BUT NO EVIDENCE OF REGISTERING FOR CLASSES:**
You have provided an acceptance letter or other related material indicating that you have been accepted at [ISO should list the name of the private elementary/junior high/middle school/high school/secondary school or public or private college/university/community college]. However, you did not include evidence that you have enrolled in that school. Therefore, you are requested to submit such evidence which is to include, but is not limited to paid tuition bills or evidence that you have registered for class at that school.

**DACA 106B – LITERACY PROGRAM'S NON-PROFIT STATUS**
If the literacy program in which you are enrolled has non-profit status, please provide evidence of such status. Evidence of the literacy program's non-profit status is to include a copy of a valid letter from the Internal Revenue Service confirming exemption from taxation under section 501(c)(3) of the Internal Revenue Service Code of 1986, as amended, or equivalent section of prior code.

**DACA 106C –PUBLIC FUNDING (GED; Educational or Career Training Program (Including Vocational Training); ESL)**
If the [ISO should insert GED; Educational or Career Training Program (Including Vocational Training); Literacy Program; or English as a Second Language] in which you are enrolled is funded in whole or in part by public funds (Federal, State, county or municipal), you are requested to submit a letter from the [ISO should insert GED program administrator/authorized representative; school registrar/authorized school representative if requestor is enrolled in Career Training Program (Including Vocational Training); literacy program administrator/authorized representative; or ESL program administrator/authorized representative] providing basic details about the funding, such as the source(s) of the funding.

**DACA 106D – PUBLIC FUNDING – (Literacy Program)**
If the literacy program in which you are enrolled is not funded in whole or in part by public funds (Federal, State, county, or municipal) or not administered by a non-profit entity you are requested to submit a letter from the program administrator or authorized representative providing basic details about the funding, such as the amount and the source(s) of the funding.

**DACA 106E – DEMONSTRATED EFFECTIVENESS (GED; Educational or Career Training Program (Including Vocational Training); Literacy Program; ESL)**

(ISO SHOULD SELECT THE CORRECT RFE PARAGRAPH BELOW DEPENDING UPON THE PROGRAM IN WHICH THE REQUESTOR IS ENROLLED)

Your record shows that the **GED/Equivalency program,** in which you are enrolled, is not publicly funded (Federal, State, county, or municipal) in whole or in part.  Therefore, you are requested to submit information from the GED program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;
- The program's track record in assisting students in obtaining a regular high school diploma, GED,  or a recognized equivalent certificate, or passing a GED or recognized equivalent exam;
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

Your record shows that the **educational or career training program (including vocational training),** in which you are enrolled, is not publicly funded (Federal, State, county, or municipal) in whole or in part.  Therefore, you are requested to submit information, with supporting documentation, if available, from the school registrar/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;
- The program's track record in placing students in employment, job training, or post-secondary education; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

Your record shows that the **literacy program** in which you are enrolled, is not publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to information from the literary program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The duration of the program's existence;
- The program's track record in placing students in post-secondary education, job training programs, or employment; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or
- Any other relevant information indicating the program's overall quality.

Your record shows that the **English as a Second Language (ESL)** program in which you are enrolled is not publicly funded (Federal, State, county, or municipal) in whole or in part. Therefore, you are requested to submit information from the ESL program administrator/authorized representative relating to the program's demonstrated effectiveness. Such information can include, but is not limited to:

- The length of the program's existence;
- The program's track record in assisting students in obtaining placement in postsecondary schools, job training programs, or employment; and
- Receipt of awards or special achievement or recognition, that indicate the program's overall quality; and/or

- Any other relevant information indicating the program's overall quality.

**DACA 106F– GRADUATE D FROM SCHOOL**

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to show that you graduated from school is insufficient (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the documents provided by the requestor are incomplete (i.e. no identifying information) or illegible, the ISO should note this in the RFE. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- A diploma;
- Transcripts showing the date of graduation; or
- A GED certificate, certificate of completion, certificate of attendance, or alternate award from a public or private high school or secondary school.

Documentation sufficient to demonstrate that you obtained a GED includes, but is not limited to, evidence you passed a GED exam, or other comparable State-authorized exam, and, as a result, you received the recognized equivalent of a regular high school diploma under State law.

**DACA 107G – MEDICAL LEAVE**

You indicate in your filing that you are currently on medical leave from school. Therefore, you are requested to submit evidence of your medical leave and indicate the date you expect to return to school. Evidence of your medical leave may include, but is not limited to, an explanation from a medical doctor on official letterhead stating the diagnosis and prognosis, and how long your treatment is expected to last.

**DACA 107 - MILITARY**

The evidence you submitted with your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to that show that you are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States is insufficient. (ISO should list what evidence was submitted for this guideline and briefly state why the evidence is insufficient. If the requestor did not submit any evidence for this guideline, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- Form DD-214, Certificate of Release or Discharge from Active Duty;
- NGB Form 22, National Guard Report of Separation and Record of Service;
- Military personnel records; or
- Military health records.

**DACA 108- REMOVAL PROCEEDINGS**

Submit documents that you have been issued an order of exclusion, deportation or removal. Such documentation could include copies of:

- Any removal, deportation, or exclusion order issued by an Immigration Judge;
- Final decision from the Board of Immigration Appeals (BIA); or
- Final decision from a U.S. Court of Appeals in your case.

## APPLICATION SUPPORT CENTER (ASC) RELATED

**DACA 130 – SCHEDULE ASC APPOINTMENT**
Your request cannot be processed until you have appeared at an Application Support Center (ASC) for the collection of a digital photograph, signature, and fingerprint(s). Our records indicate that you have not yet appeared at an ASC for this purpose. Please schedule an appointment at the ASC nearest you by calling the USCIS National Customer Service Center at 1-800-375-5283 (TTY 1-800-767-1833). You also can find the location of the ASC nearest you on the USCIS web site at www.USCIS.gov.

Once you have scheduled an appointment, or if you have a scheduled appointment, please return this notice to the address below with the appointment information.

Date of Appointment: _____

Location of Appointment: _____

**DACA 131 – RESCHEDULE ASC APPOINTMENT (TECHNICAL DIFFICULTIES)**
On [DATE], USCIS asked you to schedule an appointment at an Application Support Center (ASC) for the collection of a digital photograph, signature and fingerprint(s). In response to that request, you indicated that you already appeared at an ASC as required. However, due to technical problems, your previously-acquired biometrics from the ASC cannot be used.

USCIS will mail a separate notice to you containing information for a new appointment for biometrics capture at the ASC nearest you and listing identity documents that you must bring with you to your ASC appointment. Once you receive that notice, additional information regarding the location of the ASC can be found on the USCIS web site at www.USCIS.gov. Please bring this notice with you to your appointment.

Once you have provided your biometrics to the ASC, respond to this request with evidence of your attendance of the ASC appointment. Such evidence typically consists of a copy of your appointment notice, bearing a stamp from the ASC technician. Along with the evidence of your appointment, please include all other evidence requested in this notice.

We sincerely regret any inconvenience this has caused you.

## NAME, DATE OF BIRTH DISCREPANCY

**DACA 140 – DATE OF BIRTH DISCREPANCY**
USCIS records indicate that you were born on [DATE]. You indicated on your request for consideration of deferred action for childhood arrivals that you were born on [DATE]. Submit documentary evidence to establish your true date of birth. Such evidence may include your birth certificate and/or passport. If you submit a copy of your birth certificate, you must submit copies of the front and back (if there is information on the back).

**DACA 142 – NAME CHANGE/DISCREPANCY**
USCIS records and/or evidence you submitted indicate that your name is [NAME]. You indicated on your request for consideration of deferred action for childhood arrivals that your name is [NAME]. Submit documentary evidence to establish your true name. Such evidence may include a birth certificate, adoption records, marriage certificate, passport, or government documentation showing that you have officially changed your name.

**DACA143 – SUBMIT EVIDENCE OF NAME CHANGE**

AR1663

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Document 29-2   Filed 07/02/2018   Pg: 412 of 502   Page 412 of 1026 PageID #: 10003

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 399 of 442

Submit proof of your name change. Such proof would normally be a marriage certificate, termination of marriage (divorce or annulment decree), adoption decree, or court order.

## FINGERPRINTING / CRIMINALITY

### DACA 150 – 2 UNCLASSIFIABLE PRINTS – SUBMIT LOCAL POLICE CLEARANCES

To date, you have been fingerprinted twice and USCIS has been unable to get a required clearance for you because both sets of fingerprints were rejected as unclassifiable by the Federal Bureau of Investigation. Instead of a fingerprint clearance, you must submit a local police clearance certificate for each jurisdiction (city, town, county, or municipality) in which you have lived for six months or more within the past five years.

**Please note:** The police clearance certificate(s) must be researched by name and date of birth. You must supply the law enforcement agency with all aliases you have used, including maiden name, if applicable. Fingerprint cards are not acceptable evidence of a police clearance certificate.

If any record indicates that you have been arrested, you must provide documentation of each of the following:

   a. The final disposition (your sentence, probation, dismissal, etc.) of **every** charge against you. The charge and disposition must be specifically identified (not merely numeric citations or codes).

   b. If you were convicted of **any** charge, you must also provide evidence showing whether the charge for which you were convicted was classified as a **felony or misdemeanor**. You may submit a copy of the pertinent statute, sentencing guidelines, and/or statement from the court clerk or police department for this purpose.

Along with the above information, you must also answer the following questions. You should respond on this notice and sign your name where it asks for your signature. If more space is needed, you may respond to the following questions on separate sheet(s) of paper. Please sign every separate sheet of paper.

   1) Have you ever been arrested or detained by a law enforcement officer? If yes, please explain.

      Answer: _____

      _____

   2) Have you had your fingerprints taken for any reason by a law enforcement officer for a criminal offense? If yes, please explain.

      Answer: _____

      _____

   3) Have you been issued a ticket or been taken into custody by a law enforcement officer? If yes, please explain.

      Answer: _____

4) Have you ever been ordered by a court to: pay a fine; serve a probationary sentence; perform community service; make restitution; or have your wages garnished (e.g., for failure to make child support payments)? If yes, please explain.

Answer: _____

_____

5) Have you ever received an expungement, parole, pardon, or successfully completed a diversion or rehabilitation program? If yes, please explain.

Answer: _____

_____

I certify, under penalties of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release from my records that USCIS needs to determine my eligibility for deferred action of childhood arrivals.

Signature of Requestor: _____

**DACA 151– SUBMIT JUDGMENT AND CONVICTION DOCUMENTS**
A criminal history check has been conducted based upon the fingerprints you provided at the Application Support Center. Your criminal history check has revealed that you were arrested on [DATE], in [JURISDICTION] and charged with [CHARGES].
(WHERE APPROPRIATE, SERVICE CENTER MAY ALSO NEED TO INCLUDE THE NAME UNDER WHICH THE ARREST TOOK PLACE IF DIFFERENT FROM NAME BEING USED BY REQUESTOR ON FORM I-821D. IF THERE ARE MULTIPLE CHARGES, YOU MAY BULLET EACH CHARGE.)

You must provide certified judgment and conviction documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. The certified judgment and conviction documents must address the following:

a. The final disposition (e.g., your sentence, probation, dismissal, etc.) of every charge against you. The charge and disposition must be specifically identified (not just numeric citations or codes).

b. If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony, misdemeanor or other type of offense. Please submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

**I-821D PART 3. CRIMINAL, NATIONAL SECURITY**

AR1665

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 414 of 572   Page 414 of 1026 PageID #:
10005
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 401 of 442

### AND PUBLIC SAFETY INFORMATION
### AFFIRMATIVE RESPONSES
### POSSIBLE INELIGIBILITY ISSUES

**DACA 160 – ANSWERED "YES" to QUESTION 1 AND 2 IN PART 3 –DOCUMENTS NEEDED AND EXPLANATION**
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821), you checked "Yes" to the following question(s) in Part 3, Criminal, National Security and Public Safety Information: DELETE THOSE THAT DON'T APPLY

>   1. Have you been arrested for, charged with, or convicted of a felony or misdemeanor in the United States?

>   2. Have you been arrested for, charged with, or convicted of any crime in any country other than the United States?

You did not provide a full explanation on a separate sheet of paper(s) describing the circumstances, as requested by the Form I-821D instructions. Therefore, please provide a full explanation describing the circumstances. DELETE IF AN EXPLANATION WAS PROVIDED

You must provide certified judgment and conviction documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. The certified judgment and conviction documents must address the following:

>   a. The final disposition (*e.g.*, your sentence, probation, dismissal, etc.) of every charge against you. The charge and disposition must be specifically identified (not just numeric citations or codes).

>   b. If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony, misdemeanor, or some other type of offense. You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

**DACA 161 – ANSWERED "YES" TO QUESTION 3 IN PART 3 – SUBMIT EXPLANATION**
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question in Part 3, Criminal, National Security and Public Safety Information:

>   3. Have you ever engaged in or do you continue to engage in or plan to engage in terrorist activities?

You did not provide a full explanation on a separate sheet of paper(s) describing the circumstances, as requested by the Form I-821D instructions.

Please provide a full and complete explanation of the terrorist activities you have ever engaged in, continue to engage in, or plan to engage in. Your explanation should include:

AR1666

Whether other people were engaged in terrorist activities with you;
The names of the other people with whom you engaged in terrorists activities;
The role you played in terrorist activities;
The role that others played in terrorist activities;
Whether you planned or actually carried out the terrorist activities;
Whether you engaged in, continued to engage, or planned to engage in terrorist activities in the United States or abroad; and
Describe the type of terrorist activities you engaged in, continue to engage in, or plan to engage in.

**DACA 162 – ANSWERED "YES" TO QUESTION 4 IN PART 3 – SUBMIT EXPLANATION**
On your Consideration of Deferred Action for Childhood Arrivals (Form I-821D), you checked "Yes" to the following question in Part 3, Criminal, National Security and Public Safety Information:

4. Are you now or have you ever been a member of a gang?

You did not provide a full explanation on a separate sheet of paper(s) describing the circumstances, as requested by the Form I-821D instructions.

Please provide a full and complete explanation of your gang membership, including:

When you joined the gang(s);
How long you were a member of the gang(s);
The name of the gang(s); and
The criminal activities you participated in with the gang(s).

**DACA163 – ANSWERED "YES" TO QUESTIONS 5a, 5b, 5c, AND 5d IN PART 3– SUBMIT EXPLANATION**
On your Request for Deferred Action for Childhood Arrivals (Form I-821D) you checked "Yes" to the following question(s) in Part 3, Criminal, National Security and Public Safety Information: DELETE THOSE THAT DON'T APPLY

5. Have you EVER engaged in, ordered, incited, assisted, or otherwise participated in any of the following:
   a. acts involving torture, genocide, or human trafficking?
   b. killing any person?
   c. severely injuring a person?
   d. any kind of sexual contact or relations with any person who was being forced or threatened?

You did not provide a full explanation on a separate sheet(s) of paper describing the circumstances, as requested by the Form I-821D instructions.

Please provide a full and complete explanation describing your participation in activities involving torture, genocide, human trafficking, killing any person, severely injuring any person, or any sexual contact or relations with any person who was being forced or threatened.


# I-821D PART 3. CRIMINAL, NATIONAL SECURITY AND PUBLIC SAFETY INFORMATION

AR1667

**DACA 170– ANSWERED "NO" TO QUESTIONS 1 AND 2 IN PART 3– USCIS FOUND CLEAR CHARGES OR OTHER DEROGATORY INFORMATION, SUBMIT JUDGMENT AND CONVICTION DOCUMENTS**

A background check has been conducted based upon the fingerprints you provided at the Application Support Center. Your background check revealed that you were arrested on [DATE], in [JURISDICTION] and charged with [CHARGES].

(WHERE APPROPRIATE, YOU MAY ALSO NEED TO INCLUDE THE NAME UNDER WHICH THE ARREST TOOK PLACE IF DIFFERENT FROM NAME BEING USED BY THE REQUESTOR ON FORM I-821D. IF THERE ARE MULTIPLE CHARGES, YOU MAY BULLET EACH CHARGE.)

You must provide certified judgment and/or conviction documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. The certified judgment and conviction documents must address the following:

    a. The final disposition (your sentence, probation, dismissal, etc.) of every charge against you. The charge and disposition must be specifically identified (not just numeric citations or codes).

    b. If you were convicted, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony or misdemeanor. You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

**DACA 171– ANSWERED "NO" TO QUESTIONS 1 AND 2 IN PART 3 - CRIMINAL ACTIVITY UNCLEAR TO USCIS, SUBMIT JUDGMENT AND CONVICTION DOCUMENTS**

Based on a review of your case, it appears that you have some type of criminal record/interaction with law enforcement authorities. It appears that on [DATE] the following occurred:

[PROVIDE EXPLANATION OF FINDINGS, TO INCLUDE NAME OF POLICE DEPT. IF APPLICABLE, CHARGES IF APPLICABLE, ETC. NOTE: DO NOT INFORM THE APPLICANT WHERE THE INFORMATION CAME FROM SYSTEMS THAT ARE NOT OUR RECORDS (EX. IBIS)]

(WHERE APPROPRIATE, YOU MAY ALSO NEED TO INCLUDE THE NAME UNDER WHICH THE ARREST TOOK PLACE IF DIFFERENT FROM NAME BEING USED BY THE REQUESTOR ON FORM I-821D. IF THERE ARE MULTIPLE INTERACTIONS, YOU MAY BULLET EACH INTERACTION.)

Submit a statement explaining the results of this interaction with law enforcement authorities. You must provide certified judgment and conviction documents from the court(s) for all of your arrests, including but not limited to, the charges listed above. The certified judgment and conviction documents must address the following:

    a. The final disposition (your sentence, probation, dismissal, etc.) of every charge against you. The charge and disposition must be specifically identified (not just numeric citations or codes).

    b. If you were convicted of any charge, you must also provide evidence showing whether the charge for which you were convicted was classified as a felony or misdemeanor.

Appeal: 18-1521   Doc: 32-2   Filed: 07/02/2018   Pg: 417 of 572
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 417 of 1026 PageID #: 10008

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 404 of 442

You may submit a copy of the pertinent statute, sentencing guide, or statement from the court clerk or police department for this purpose.

If you fail to submit such evidence, USCIS may deny your request for consideration of deferred action for childhood arrivals.

### DACA 172– ANSWERED "NO" TO QUESTIONS 3, 4, 5a. 5b, 5c, AND 5d IN PART 3 – USCIS DISCOVERED UNCLEAR INFORMATION, SUBMIT EXPLANATION

Based on a review of your case, the following was discovered: DELETE THOSE THAT DON'T APPLY

> 3. you engaged in or do you continue to engage or plan to engage in terrorist activities?

> 4. you are now or have been a member of gang?

> 5. you engaged in, ordered, incited, assisted, or otherwise participated in any of the following:
> a. acts involving torture, genocide, or human trafficking?
> b. killing any person?
> c. severely injuring a person?
> d. any kind of sexual contact or relations with any person who was being forced or threatened?

> [PROVIDE EXPLANATION OF FINDINGS. THIS CAN INCLUDE WHERE THE INFORMATION WAS FOUND IF IT IS KNOWLEDGE THAT CAN BE SHARED WITH THE REQUESTOR. NOTE: DO NOT INFORM THE REQUESTOR WHERE THE INFORMATION CAME FROM SYSTEMS THAT ARE NOT OUR RECORDS (EX. IBIS).]

Therefore, you must submit a statement explaining and/or refuting the information/circumstances found in USCIS records. Please note that if you refute the above information, and USCIS later receives information that the above does relate to you, USCIS may terminate deferred action and you may be barred from other immigration benefits.


## FORM I-765


### DACA 180 – FAILURE TO SUBMIT OR COMPLETE FORM I-765WS

USCIS is unable to complete your Form I-765, Application for Employment Authorization because you failed to submit or complete the Form I-765WS. Please complete the worksheet and return it to the address provided within the specified time.


### DACA 190 – SUBMIT PASSPORT PHOTOS

Please submit **two (2)** passport-style **color** photo(s) of [NAME] taken within 30 days of the date of this notice, which conform(s) to the specifications below. Using a pencil or felt pen, lightly print name (and Alien Registration Number, if known) on the back of each photograph.

Please do not staple through any part of the photo(s). Enclose the photo(s) in a plastic or paper envelope and staple the envelope to this notice when returning it to this office.

Passport-style photos must be 2 inches by 2 inches:

AR1669

- Frame subject with full face, front view, eyes open.
- Make sure photo presents full head from top of hair to bottom of chin; height of head should measure 1 inch to 1 3/8 inch (25 mm to 35 mm).
- Center head within frame.
- Make sure eye level is between 1 1/8 inch and 1 3/8 inch (28 mm and 35 mm) from bottom of photo.
- Photograph subject against a plain white or off-white background.
- Position subject and lighting so that there are no distracting shadows on the face or background.
- Encourage subject to have a natural expression.
- Include headpieces if worn daily for religious purposes; they should not obscure or cast shadows on the eyes or any other part of the face.

For more information on photo requirements, please see the Department of State website at: http://www.travel.state.gov/passport/pptphotos/index.html, or contact the USCIS National Customer Service Center at 1-800-375-5283.

## FORM 131

### DACA 200 – PROOF OF DACA
To be considered for advance parole you must submit evidence to establish that you have been granted deferred action for childhood arrivals. Submit a copy of the approval notice issued by USCIS for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

### DACA 201 – PROOF OF EDUCATIONAL NEED
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individuals granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes.  You claim that you need to travel abroad for education purposes.  Examples of travel abroad for education purposes include study abroad programs, school-sponsored trips abroad, or travel necessary to conduct academic research.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for education purposes is insufficient.  (ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for educational purposes, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- A letter from the educational institution, or from an employee of the institution acting in his or her official capacity, describing the purpose of the travel, or documentation showing enrollment in a specific program or class coupled with documentary evidence showing that you will benefit from, or are required to travel for the specific program or class; or

**NOTE**: Travel during an academic year unrelated to academics (i.e., a vacation) is insufficient to qualify as an educational purpose.

(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application.  For multiple events, the advance parole is valid for the duration of all the documented events)

**DACA 202 – PROOF OF HUMANITARIAN NEED**
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individuals granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for humanitarian reasons. Examples of travel abroad for humanitarian reasons include medical reasons, to visit a family member, or to attend funeral services for a family member.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for humanitarian purposes is insufficient. (ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for humanitarian, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

- An explanation from a medical doctor on official letterhead stating the diagnosis and prognosis, and how long the treatment is expected to last;
- Information on the reasons why you cannot obtain treatment in the United States;
- An explanation from a medical doctor on official letterhead stating the diagnosis and prognosis of the family member's condition; or
- A death certificate or newspaper obituary of the family member or other document evidencing the death of the family member.

(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application. For multiple events, the advance parole is valid for the duration of all the documented events)

**DACA 203 – PROOF OF EMPLOYMENT NEED**
In accordance with the discretionary authority provided in section 212(d)(5)(A) of the Act, grants of advance parole to individual granted deferred action for childhood arrivals may be made based on the need to travel abroad for educational, employment, or humanitarian purposes. You claim that you need to travel abroad for employment purposes. Examples of travel abroad for employment purposes include: pursuit of a position in the United States with a foreign employer; an overseas assignment, interview, conference, or training; a meeting with overseas clients or others with whom you interact professionally; or a trip to cultivate business or sales overseas or any other overseas trip taken in furtherance of the applicant's professional responsibilities.

The evidence you submitted with your Form I-131, Application for Travel Document, to establish your need to travel abroad for employment purposes is insufficient. (ISO should list what evidence was submitted and briefly state why the evidence is insufficient. If the requestor did not submit any evidence to support his/her need to travel abroad for employment purposes, modify RFE call up accordingly). You may still submit evidence, which may include, but is not limited to, copies of: (ISO should delete any of the following that were already provided by the requestor)

AR1671

- A letter on official letterhead from your employer describing the need for your travel; or
- A document showing a specific employment need, such as a conference program, that also shows your participation.

(ISO: If the applicant did not establish the dates of travel, please include in the RFE as advance parole is valid for the duration of the event, as documented in the advance parole application. For multiple events, the advance parole is valid for the duration of all the documented events)

## ASSORTED OTHERS

### DACA 200 – FOREIGN LANGUAGE DOCUMENT MUST BE ACCOMPANIED BY AN ENGLISH TRANSLATION

If you submit a document in any language other than English, it must be **completely** translated word-for-word. The translator must certify that the translation is accurate and that he or she is competent to translate. Note: You must submit the requested foreign language document along with the translation.

### DACA 201– YOU MAY SUBMIT PHOTOCOPIES

You may submit either the original documents or legible photocopies of the originals, including copies of the front and back of each document. If you choose to submit original documents, they will not be returned to you. [NOT FOR USE WHEN USCIS IS REQUESTING ORIGINAL DOCUMENTS.]

### DACA 202– AFFIDAVITS

Affidavits can support two of the DACA guidelines:

- Brief, casual, and innocent departures during the five years of required continuous presence in the United States: and
- Any minor gap in the five year continuous residence requirement.

In support of your DACA request, you submitted affidavits, but you did not indicate that:

- primary and secondary evidence cannot be obtained; and
- what effort you undertook to obtain that evidence.

Therefore, you are requested to provide the following:

- A written statement from the appropriate issuing authority attesting to the fact that no record exists or can be located, or that the record sought was part of some segment of records which were lost or destroyed; or
- Evidence (such as an affidavit) "that repeated good faith attempts were made to obtain the required document or record."

AR1672

# Appendix E

## DEFERRED ACTION FOR CHILDHOOD ARRIVALS NOIDs

NOTE: Text highlighted in **YELLOW** and bracketed by [ ] is hidden text that requires ISO input. The ISO should delete the highlighted bracketed [*Text*] and type in the necessary information, or choose the appropriate information from choices and delete the information that does not apply.

**DACA 400 -NOTICE OF INTENT TO DENY – NOT A BCI DEPARTURE – UNDER VOLUNTARY DEPARTURE OR FINAL EXCLUSION, DEPORTATION, OR REMOVAL ORDER**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have been residing continuously in the United States since June 15, 2007, to the present time. A brief, casual, and innocent departure from the United States does not meaningfully disrupt the period of continuous residence. A departure is deemed to be brief, casual, and innocent if:

  (1) It was short and reasonably calculated to accomplish the purpose of the absence;
  (2) It was not the result of an order of exclusion, deportation, or removal;
  (3) It was not because of an order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and
  (4) Its purpose or the actions taken while outside of the United States were not contrary to law.

PICK PARAGRAPH (A) OR (B) BELOW, AS APPLICABLE:

A. USE THIS PARAGRAPH IF THE DISQUALIFYING TRAVEL OCCURRED BEFORE 8/15/12, THEN PROCEED TO THE CLOSING PARAGRAPH:

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you departed the United States on or about *[insert date; this date should be before 8/15/2012]*. It also appears that, at the time of your departure, you *[INSERT WHICEVER IS APPROPRIATE: departed under an order of voluntary departure; departed under an administrative grant of voluntary departure prior to the commencement of removal proceedings; your departure was the result of an order of exclusion, deportation, or removal (including an order of voluntary departure that converted automatically to a final order of exclusion, deportation or removal).]* Because such a departure is not brief, casual, or innocent, you have not established that you have resided continuously in the United States since at least June 15, 2007, until the present time.

*[Proceed to the closing paragraph.]*

**OR**

B. USE THIS PARAGRAPH IF THE DISQUALIFYING TRAVEL OCCURRED ON OR AFTER 8/15/12 AND BEFORE FORM I-821D WAS APPROVED

Page 1   4/4/2013

AR1673

Appeal: 18-1521 Document: 32-3 Filed: 07/02/2018 Pg: 422 of 502
Case 1:17-cv-05228-NGG-VMS Document 82-7 Filed 09/04/20 Page 422 of 1026 PageID #: 10013

Case 8:17-cv-02942-RWT Document 29-2 Filed 11/28/17 Page 409 of 442

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you departed the United States on or about *[insert date – this date should be on or after 8/15/12 ]*. A departure made on or after August 15, 2012 is not brief, casual, or innocent unless removal action has been deferred, as evidenced by an approved Form I-821D. Because your departure occurred after August 15, 2012, but before USCIS has determined whether to defer action in your case, your departure from the United States was not brief, casual, or innocent. Therefore, you have not established that you have resided continuously in the United States since at least June 15, 2007, until the present time.

*[CLOSING PARAGRAPH]*

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

Page 2   4/4/2013

AR1674

## DACA 401 NOTICE OF INTENT TO DENY – DRIVING UNDER THE INFLUENCE OF ALCOHOL OR DRUGS

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and you do not otherwise pose a threat to national security or public safety.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you have a criminal conviction.

The court disposition that you submitted indicates that you were convicted on:

> *[Insert date of conviction, court name, city/state, crime, and statute]*

Driving under the influence of alcohol or drugs constitutes a significant misdemeanor.[1]  Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

---

[1] For the purposes of the DACA process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1   Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

2   If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days  The sentence must involve time to be served in custody, and therefore does not include a suspended sentence

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U S  Immigration and Customs Enforcement (ICE)

See www.uscis.gov/childhoodarrivals.

Page 3   4/4/2013

J.A. 945                                                                AR1675

## DACA 402 NOTICE OF INTENT TO DENY – DOMESTIC VIOLENCE

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and you do not otherwise pose a threat to national security or public safety.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you have a criminal conviction.

The court disposition that you submitted indicates that you were convicted on:

> *[Insert date of conviction, court name, city/state, crime, and statute]*

An offense of domestic violence constitutes a significant misdemeanor. [1] Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred

---

[1] For the purposes of the DACA process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE).

See www.uscis.gov/childhoodarrivals.

Page 4   4/4/2013

AR1676

**DACA 403 NOTICE OF INTENT TO DENY – BURGLARY**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and you do not otherwise pose a threat to national security or public safety.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you have a criminal conviction.

The court disposition that you submitted indicates that you were convicted on:

*[Insert date of conviction, court name, city/state, crime, and statute]*

Burglary constitutes a significant misdemeanor.[1] Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred

---

[1] For the purposes of the DACA process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE).

See www.uscis.gov/childhoodarrivals.

Page 5    4/4/2013

AR1677

### DACA 404 NOTICE OF INTENT TO DENY –NO ENTRY BEFORE 16

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you came to the United States before reaching your 16th birthday.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you initially entered the United States when you were [*insert age*] years old.  On [*insert date Form I-821D received*], you submitted Form I-821D, Consideration of Deferred Action for Childhood Arrivals.  You indicated on your Form I-821D that you were born on [*insert date of birth*], and that your initial entry into the United States was on [*insert date of entry*].  Your date of birth is supported by your [*identify the document (e.g. birth certificate, passport, etc.) that establishes the requestor's DOB*], and you did not submit evidence that you entered the United States before reaching the age of 16.

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals.  You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

### DACA 405 NOTICE OF INTENT TO DENY –STUDENT IN LAWFUL STATUS ON JUNE 15, 2012 [Updated 2/27/2013]

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you were in unlawful immigration status as of June 15, 2012.  For deferred action for childhood arrivals, the phrase "in unlawful immigration status as of June 15, 2012" means that you never had a lawful immigration status on or before June 15, 2012, or any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired before June 15, 2012.

According to the information provided with your request, and based on information obtained during routine systems checks, your current F-1 nonimmigrant status is active in Student & Exchange Visitor Information System (SEVIS). [*Identify other facts e.g. Employment Authorization Card validity date*].  Based on these facts, USCIS has determined that you were not in an unlawful status on June 15, 2012.

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals.  You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

Page 6   4/4/2013

AR1678

**DACA 406 NOTICE OF INTENT TO DENY –ARRIVED AFTER JUNE 15, 2007**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have continuously resided in the United States since June 15, 2007.

According to the information you provided with your request, and/or based on information obtained during routine systems checks, it appears that you initially arrived in the United States on or about [*insert date of initial entry*].

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals.  You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

**DACA 407 NOTICE OF INTENT TO DENY – NOT IN SCHOOL**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

On your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, you indicated that you are currently in school.  However, according to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you are not currently enrolled in school.  [*Insert specific information; e.g., official transcripts showing enrollment status as "Removed for Lack of Attendance" or school enrollment history listing requestor as a "No Show".*]

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals.  You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

**DACA 408 NOTICE OF INTENT TO DENY – NONIMMIGRANT STATUS ON JUNE 15, 2012**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you were in unlawful immigration status as of June 15, 2012.  For deferred action for childhood arrivals, the phrase "in unlawful immigration status as of June 15, 2012" means that you never had a lawful immigration status on or before June 15, 2012, or any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired before June 15, 2012.

Page 7   4/4/2013

AR1679

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you entered the United States on [*Date*] as [*insert nonimmigrant classification. For example,* "an E-2 Nonimmigrant Treaty Investor or as the spouse or child of a Nonimmigrant Treaty Investor"]. It appears that your lawful immigration status [*insert "is" or "was" depending if still in status*] valid until [*Date*], and therefore had not expired before June 15, 2012.

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

## DACA 409 NOTICE OF INTENT TO DENY – TEMPORARY PROTECTED STATUS ON JUNE 15, 2012

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you were in unlawful immigration status as of June 15, 2012. For deferred action for childhood arrivals, the phrase "in unlawful immigration status as of June 15, 2012" means that you never had a lawful immigration status on or before June 15, 2012, or any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired before June 15, 2012.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you had Temporary Protected Status (TPS) on June 15, 2012. USCIS has no record that your status as a TPS beneficiary was withdrawn or terminated before June 15, 2012, therefore it appears you were not in unlawful status on June 15, 2012.

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

Page 8   4/4/2013

AR1680

## DACA 410 NOTICE OF INTENT TO DENY – MULTIPLE MISDEMEANORS

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and you do not otherwise pose a threat to national security or public safety. According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you have multiple criminal convictions.

The court dispositions that you submitted indicate that you were convicted on:

- [Insert date of conviction, court name, city/state, crime, and statute]
- [Insert date of conviction, court name, city/state, crime, and statute]
- [Insert date of conviction, court name, city/state, crime, and statute]

You have been convicted of three or more non-significant misdemeanors.[1] Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

---

[1] For the purposes of the DACA process, a "non-significant misdemeanor" is any misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Is not an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; and

2. Is one for which the individual was sentenced to time in custody of 90 days or less.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE).

Page 9    4/4/2013

AR1681

**DACA 411 NOTICE OF INTENT TO DENY – FELONY CONVICTION**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and you do not otherwise pose a threat to national security or public safety.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you have a criminal conviction.

The court disposition indicates that you were convicted on:

*[Insert date of conviction, court name, city/state, crime, and statute]*

*[Explain why the offense is a felony under federal law.  For example, "Possession of drug paraphernalia is classified as a Class 6 felony under Arizona law, with a maximum term of imprisonment of 1.5 years.  See A.R.S. §§ 13-702(D), 13-3415."]* Therefore, the offense is a felony for purposes of deferred action for childhood arrivals.[1]   Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

---

[1] For the purposes of the DACA process, a felony is a federal, state, or local criminal offense for which the maximum term of imprisonment authorized is for a period of more than one year.

See www.uscis.gov/childhoodarrivals.

# <u>Appendix E</u>

## DEFERRED ACTION FOR CHILDHOOD ARRIVALS
## NOIDs

NOTE: Text highlighted in **YELLOW** and bracketed by [ ] is hidden text that requires ISO input. The ISO should delete the highlighted bracketed [*Text*] and type in the necessary information, or choose the appropriate information from choices and delete the information that does not apply.

### DACA 400 -NOTICE OF INTENT TO DENY – NOT A BCI DEPARTURE – UNDER VOLUNTARY DEPARTURE OR FINAL EXCLUSION, DEPORTATION, OR REMOVAL ORDER

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have been residing continuously in the United States since June 15, 2007, to the present time. A brief, casual, and innocent departure from the United States does not meaningfully disrupt the period of continuous residence. A departure is deemed to be brief, casual, and innocent if:

(1) It was short and reasonably calculated to accomplish the purpose of the absence;
(2) It was not the result of an order of exclusion, deportation, or removal;
(3) It was not because of an order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and
(4) Its purpose or the actions taken while outside of the United States were not contrary to law.

PICK PARAGRAPH (A) OR (B) BELOW, AS APPLICABLE:

A. USE THIS PARAGRAPH IF THE DISQUALIFYING TRAVEL OCCURRED BEFORE 8/15/12, THEN PROCEED TO THE CLOSING PARAGRAPH:

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you departed the United States on or about *[insert date; this date should be before 8/15/2012].* It also appears that, at the time of your departure, you *[INSERT WHICEVER IS APPROPRIATE: departed under an order of voluntary departure; departed under an administrative grant of voluntary departure prior to the commencement of removal proceedings; your departure was the result of an order of exclusion, deportation, or removal (including an order of voluntary departure that converted automatically to a final order of exclusion, deportation or removal).]* Because such a departure is not brief, casual, or innocent, you have not established that you have resided continuously in the United States since at least June 15, 2007, until the present time.

*[Proceed to the closing paragraph.]*

**OR**

B. USE THIS PARAGRAPH IF THE DISQUALIFYING TRAVEL OCCURRED ON OR AFTER 8/15/12 AND BEFORE FORM I-821D WAS APPROVED

Page 1 01/18/2013

AR1683

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you departed the United States on or about *[insert date – this date should be on or after 8/15/12 ]*.  A departure made on or after August 15, 2012 is not brief, casual, or innocent unless removal action has been deferred, as evidenced by an approved Form I-821D.  Because your departure occurred after August 15, 2012, but before USCIS has determined whether to defer action in your case, your departure from the United States was not brief, casual, or innocent.  Therefore, you have not established that you have resided continuously in the United States since at least June 15, 2007, until the present time.

*[CLOSING PARAGRAPH]*

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals.  You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

AR1684

<u>**DACA 401 NOTICE OF INTENT TO DENY – DRIVING UNDER THE INFLUENCE OF ALCOHOL OR DRUGS**</u>

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and you do not otherwise pose a threat to national security or public safety.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you have a criminal conviction.

The court disposition that you submitted indicates that you were convicted on:

*[Insert date of conviction, court name, city/state, crime, and statute]*

Driving under the influence of alcohol or drugs constitutes a significant misdemeanor.[1]  Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

---

[1] For the purposes of the DACA process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

    1    Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

    2    If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days  The sentence must involve time to be served in custody, and therefore does not include a suspended sentence

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U S  Immigration and Customs Enforcement (ICE)

See www.uscis.gov/childhoodarrivals.

Page 3 01/18/2013

**DACA 402 NOTICE OF INTENT TO DENY – DOMESTIC VIOLENCE**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and you do not otherwise pose a threat to national security or public safety.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you have a criminal conviction.

The court disposition that you submitted indicates that you were convicted on:

*[Insert date of conviction, court name, city/state, crime, and statute]*

An offense of domestic violence constitutes a significant misdemeanor. [1] Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred

---

[1] For the purposes of the DACA process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

    1    Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

    2    If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days  The sentence must involve time to be served in custody, and therefore does not include a suspended sentence

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U S  Immigration and Customs Enforcement (ICE)

See www.uscis.gov/childhoodarrivals.

Page 4 01/18/2013

AR1686

**DACA 403 NOTICE OF INTENT TO DENY – BURGLARY**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and you do not otherwise pose a threat to national security or public safety.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you have a criminal conviction.

The court disposition that you submitted indicates that you were convicted on:

*[Insert date of conviction, court name, city/state, crime, and statute]*

Burglary constitutes a significant misdemeanor.[1] Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred

---

[1] For the purposes of the DACA process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

    1    Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

    2    If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days  The sentence must involve time to be served in custody, and therefore does not include a suspended sentence

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U S  Immigration and Customs Enforcement (ICE)

See www.uscis.gov/childhoodarrivals.

Page 5 01/18/2013

**DACA 404 NOTICE OF INTENT TO DENY –NO ENTRY BEFORE 16**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you came to the United States before reaching your 16th birthday.

According to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you initially entered the United States when you were [*insert age*] years old.  On [*insert date Form I-821D received*], you submitted Form I-821D, Consideration of Deferred Action for Childhood Arrivals.  You indicated on your Form I-821D that you were born on [*insert date of birth*], and that your initial entry into the United States was on [*insert date of entry*].  Your date of birth is supported by your [*identify the document (e.g. birth certificate, passport, etc.) that establishes the requestor's DOB*], and you did not submit evidence that you entered the United States before reaching the age of 16.

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals.  You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

**DACA 405 NOTICE OF INTENT TO DENY –STUDENT IN LAWFUL STATUS ON JUNE 15, 2012 [Updated 2/27/2013]**

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you were in unlawful immigration status as of June 15, 2012.  For deferred action for childhood arrivals, the phrase "in unlawful immigration status as of June 15, 2012" means that you never had a lawful immigration status on or before June 15, 2012, or any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired before June 15, 2012.

According to the information provided with your request, and based on information obtained during routine systems checks, your current F-1 nonimmigrant status is active in Student & Exchange Visitor Information System (SEVIS).  [*Identify other facts e.g. Employment Authorization Card validity date*].  Based on these facts, USCIS has determined that you were not in an unlawful status on June 15, 2012.

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals.  You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial.  Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

**DACA 406 NOTICE OF INTENT TO DENY –ARRIVED AFTER JUNE 15, 2007**

Page 6 01/18/2013

AR1688

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you have continuously resided in the United States since June 15, 2007.

According to the information you provided with your request, and/or based on information obtained during routine systems checks, it appears that you initially arrived in the United States on or about [*insert date of initial entry*].

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

## DACA 407 NOTICE OF INTENT TO DENY – NOT IN SCHOOL

USCIS has reviewed your request for consideration of deferred action for childhood arrivals.

In order to be considered for deferred action as a childhood arrival, you are to demonstrate that you are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

On your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, you indicated that you are currently in school. However, according to the information provided with your request, and/or based on information obtained during routine systems checks, it appears that you are not currently enrolled in school. [*Insert specific information; e.g., official transcripts showing enrollment status as "Removed for Lack of Attendance" or school enrollment history listing requestor as a "No Show".*]

Accordingly, USCIS intends to deny your request for consideration of deferred action for childhood arrivals. You are afforded thirty-three (33) days from the date of this notice of intent to deny to submit additional information, evidence, or arguments overcoming the grounds for the intended denial. Failure to respond to this notice of intent to deny will result in the denial of your request for consideration of deferred action for childhood arrivals.

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 29-2 Filed 07/02/2018 Filed 09/04/20 Pg: 438 of 572 Page 438 of 1026 PageID #: 10029

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 425 of 442

## Appendix F

### NOTICE OF DENIAL OF CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS, FORM I-821D

USCIS has evaluated your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. For the reason(s) indicated below, USCIS has, in its unreviewable discretion, determined that it will not defer action in your matter. Accordingly, your Form I-765, Application for Employment Authorization, has also been denied. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. You may not file an appeal or motion to reopen/reconsider this decision.

☐ At the time of filing, you were under the age of fifteen (15) and were not in removal proceedings, did not have a final removal order, or did not have a voluntary departure order.

☐ You have not established that you came to the United States under the age of sixteen (16).

☐ You have not established that you were under age 31 on June 15, 2012.

☐ You have not established that you have continuously resided in the United States since June 15, 2007, until the date of filing your request.

☐ During your period of residence in the United States, you had one or more absences that did not qualify as "brief, casual, and innocent."

☐ You have not established that you were present in the United States on June 15, 2012.

☐ You have not established that you were in an unlawful immigration status in the United States on June 15, 2012.

☐ You have not established that you are currently in school at the time of filing your request, have graduated or obtained a certificate of completion from a U.S. high school, or have obtained a general educational development (GED) certificate or other equivalent State-authorized exam in the United States, or that you are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

☐ You have been convicted of a felony or a significant misdemeanor, or you have been convicted of three or more misdemeanors, or you do not warrant a favorable exercise of prosecutorial discretion because of public safety concerns, or exercising prosecutorial discretion in your case would not be consistent with the Department of Homeland Security's enforcement priorities.

☐ You have not established that you warrant a favorable exercise of prosecutorial discretion.

☐ You have not paid the fee for your concurrently filed Application for Employment Authorization, Form I-765, and/or your biometrics fee, because your payment has been rejected for insufficient funds and you have failed to correct the fee deficiency within the allotted time.

☐ USCIS was unable to conduct a background check on you because you did not appear for your scheduled appointment at an Application Support Center for the collection of biometrics, or your fingerprints were rejected as unclassifiable and you did not submit a local police clearance certificate for each jurisdiction in which you have lived for six months or more within the past five years.

☐ You did not respond to a Request for Evidence or Notice of Intent to Deny within the time prescribed.

☐ You have abandoned your Form I-821D, Consideration of Deferred Action for Childhood Arrivals because you departed the United States while the form was pending.

☐ USCIS lacks the authority to consider your request because you were in immigration detention at the time you filed your Form I-821D and you remain in immigration detention as of the date of this notice.

5/2/2013

AR1690

**Appendix F**

## NOTICE OF DENIAL OF CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS, FORM I-821D

USCIS has evaluated your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. For the reason(s) indicated below, USCIS has, in its unreviewable discretion, determined that it will not defer action in your matter. Accordingly, your Form I-765, Application for Employment Authorization, has also been denied. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. You may not file an appeal or motion to reopen/reconsider this decision.

⊔   You are under the age of fifteen (15) and are not in removal proceedings, do not have a final removal order, or do not have a voluntary departure order.

⊔   You have not established that you came to the United States under the age of sixteen (16).

⊔   You have not established that you were under age 31 on June 15, 2012.

⊔   You have not established that you have continuously resided in the United States since June 15, 2007, until the date of filing your request.

⊔   During your period of residence in the United States, you had one or more absences that did not qualify as "brief, casual, and innocent."

⊔   You have not established that you were present in the United States on June 15, 2012.

⊔   You have not established that you were in an unlawful immigration status in the United States on June 15, 2012.

⊔   You have not established that you are currently in school at the time of filing your request, have graduated or obtained a certificate of completion from a U.S. high school, or have obtained a general educational development (GED) certificate or other equivalent State-authorized exam in the United States, or that you are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

⊔   You have been convicted of a felony or a significant misdemeanor, or you have been convicted of three or more misdemeanors, or you do not warrant a favorable exercise of prosecutorial discretion because of public safety concerns, or exercising prosecutorial discretion in your case would not be consistent with the Department of Homeland Security's enforcement priorities.

⊔   You have not established that you warrant a favorable exercise of prosecutorial discretion.

⊔   You have not paid the fee for your concurrently filed Application for Employment Authorization, Form I-765, and/or your biometrics fee, because your payment has been rejected for insufficient funds and you have failed to correct the fee deficiency within the allotted time.

⊔   USCIS was unable to conduct a background check on you because you failed to appear for your scheduled appointment at an Application Support Center for the collection of biometrics, or your fingerprints were rejected as unclassifiable and you did not submit a local police clearance certificate for each jurisdiction in which you have lived for six months or more within the past five years.

⊔   You did not respond to a Request for Evidence or Notice of Intent to Deny within the time prescribed.

⊔   You have abandoned your Form I-821D, Consideration of Deferred Action for Childhood Arrivals because you departed the United States while the form was pending.

⊔   USCIS lacks the authority to consider your request because you were in immigration detention at the time you filed your Form I-821D and you remain in immigration detention as of the date of this notice.

3/13/2013

## Appendix F

### NOTICE OF DENIAL OF CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS, FORM I-821D

USCIS has evaluated your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. For the reason(s) indicated below, USCIS has, in its unreviewable discretion, determined that that it will not defer action in your matter. Accordingly, your Form I-765, Application for Employment Authorization, has also been denied. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. You may not file an appeal or motion to reopen/reconsider this decision.

☐   You are under the age of fifteen (15) and are not in removal proceedings, do not have a final removal order, or do not have a voluntary departure order.

☐   You have failed to establish that you came to the United States under the age of sixteen (16).

☐   You have failed to establish that you were under age 31 on June 15, 2012.

☐   You have failed to establish that you have continuously resided in the United States since June 15, 2007, until the date of filing your request.

☐   During your period of residence in the United States, you had one or more absences that did not qualify as 'brief, casual, and innocent."

☐   You have failed to establish that you were present in the United States on June 15, 2012 and that you were unlawfully present in the United States on that date.

☐   You have failed to establish that you are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or that you are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

☐   You have been convicted of a felony or a significant misdemeanor, or you have been convicted of three or more misdemeanors, or you do not warrant a favorable exercise of prosecutorial discretion because of public safety concerns.

☐   You do not warrant a favorable exercise of prosecutorial discretion because of other concerns.

☐   You have failed to pay the fee for your concurrently filed Application for Employment Authorization, Form I-765, and/or your biometrics fee, because your payment has been rejected for insufficient funds and you have failed to correct the fee deficiency within the allotted time.

☐   You failed to appear for the collection of biometrics at an Application Support Center.

☐   You failed to respond to a Request for Evidence or Notice of Intent to Deny within the time prescribed.

☐   You have abandoned your Form I-821D, Consideration of Deferred Action for Childhood Arrivals because you departed the United States while the form was pending.

AR1692

# **Appendix G**

**SRMT Call Ups Pertaining to Denied Form I-821D,
Consideration of Deferred Action for Childhood Arrivals**

**Administrative Errors**

1. **Denial of Form I-821D on the grounds that the requestor did not come to the United States prior to reaching his/her 16th birthday.**

   *Final response if denial was correct:*
   Use SRMT Denial Template

   *Final response if denial was incorrect:*
   Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

   We have corrected the error in our records. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and if your Form I-765, Application for Employment Authorization is approved, you will receive an Employment Authorization Document.

2. **Denial of Form I-821D on the grounds that the requestor was under the age of 15 at the time of filing, but not in removal proceedings.**

   *Final response if denial was correct:*
   Use SRMT Denial Template

   *Final response if denial was incorrect:*
   Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

   We have corrected the error in our records. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and if your Form I-765, Application for Employment Authorization is approved, you will receive an Employment Authorization Document.

AR1693

3. **Denial of Form I-821D on the grounds that the requestor was not under the age of 31 on June 15, 2012.**

   *Final response if denial was correct:*
   Use SRMT Denial Template

   *Final response if denial was incorrect:*
   Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

   We have corrected the error in our records. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and if your Form I-765, Application for Employment Authorization is approved, you will receive an Employment Authorization Document.

4. **Denial of Form I-821D on the grounds that the requestor was not in an unlawful immigration status as of June 15, 2012.**

   *Final response if denial was correct:*
   Use SRMT Denial Template

   *Final response if denial was incorrect:*
   Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

   We have corrected the error in our records. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and if your Form I-765, Application for Employment Authorization is approved, you will receive an Employment Authorization Document.

5. **Denial of Form I-821D on the grounds that the requestor was not physically present in the United States on June 15, 2012.**

   *Final response if denial was correct:*
   Use SRMT Denial Template

   *Final response if denial was incorrect:*
   Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

   We have corrected the error in our records. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and if your Form I-765, Application for Employment is approved, you will receive an Employment Authorization Document.

J.A. 964

AR1694

6. **Denial of Form I-821D on the grounds that the requestor did not appear to have biometrics collected at a USCIS ASC**

*SRMT DACA 1 Interim Response:*
We have received your request to review the denial of your Form I-821, Consideration of Deferred Action for Childhood Arrivals on the grounds that you failed to appear for the collection of biometrics at an Application Support Center. We have reopened your case on a service motion and will review your file. You will receive a notice that your case is reopened on a service motion and a response once our review is complete.

*Final response if denial was correct:*
Use SRMT Denial Template

*Final response if denial was incorrect:*
Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

We have corrected the error in our records and have routed your file for adjudication. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and your Form I-765, Application for Employment after adjudication is complete.

7. **Denial of Form I-821D on the grounds that the requestor did not request to have his/her biometrics appointment at a USCIS ASC rescheduled prior to the scheduled date**

*SRMT DACA 2 Interim Response:*
We have received your request to review the denial of your Form I-821, Consideration of Deferred Action for Childhood Arrivals on the grounds that you failed to appear for the collection of biometrics at an Application Support Center nor did you request to have your biometrics appointment rescheduled prior to the date you were scheduled to appear. We have reopened your case on a service motion and will review your file. You will receive a notice that your case is reopened on a service motion and a response once our review is complete.

*Final Response if denial was correct:*
Use SRMT Denial Template

*Final response if denial was incorrect:*
Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

We have corrected the error in our records. Your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and your Form I-765, Application for Employment have resumed processing. Once adjudication is complete, you will receive a decision.

AR1695

8. **Denial of Form I-821D on the grounds that the requestor failed to pay the filing and biometric fees for the Form I-765**

*SRMT DACA 3 Interim Response:*
We have received your request to review the denial of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals on the grounds that you failed to pay the fee for your concurrently filed Form I-765, Application for Employment Authorization, and/or your biometrics fee because your payment has been rejected for insufficient funds and you have failed to correct the fee deficiency within the allotted time. We have reopened your case on a service motion and will review your file. You will receive a notice that your case is reopened on a service motion and a response once our review is complete.

*Final Response if denial was correct:*
Use SRMT Denial Template

*Final response if denial was incorrect:*
Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

We have corrected the error in our records and have routed your file for adjudication. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and your Form I-765, Application for Employment after adjudication is complete.

9. **Denial of Form I-821D due to abandonment and the requestor claims he/she did respond to RFE within the prescribed time**

*SRMT DACA 4 Interim Response:*
We have received your request to review the denial of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals on the grounds that you failed to respond to a Request for Evidence within the time prescribed. We reopened your case on a service motion and will review your file. You will receive a notice that your case is reopened on a service motion and a response once our review is complete.

*Final Response if denial was correct:*
Use SRMT Denial Template

*Final response if denial was incorrect:*
Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case. Upon review, it has been determined that the denial was issued in error.

We have corrected the error in our records and have routed your file for adjudication. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and your Form I-765, Application for Employment after adjudication is complete.

AR1696

Appeal: 18-1521 Document: 28-3 Filed: 07/02/2018 Page: 445 of 572
Case 1:17-cv-05228-NGG-VMS Document 28-7 Filed 09/04/20 Page 445 of 1026 PageID #: 10036

Case 8:17-cv-02942-RWT   Document 29-2   Filed 11/28/17   Page 432 of 442

10. <u>**Denial of Form I-821D due to abandonment – USCIS mailed the RFE to the wrong address and the requestor submitted a change of address prior to the issuance of RFE**</u>.

*SRMT DACA 5 Interim Response:*
We have received your request to review the denial of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals on the grounds that you failed to respond to a Request for Evidence (RFE) within the time prescribed. In your request to review the denial of your Form I-821D, you indicated that the RFE was mailed to the wrong address and you had submitted a Change of Address prior to the RFE issuance.  We have reopened your case on a service motion and will review your file. You will receive a notice that your case is reopened on a service motion and a response once our review is complete.

*Final Response if denial was correct:*
Use SRMT Denial Template

*Final response if denial was incorrect:*
Since the date we received your request, we have reopened your case on a service motion and reviewed the decision made on your case.  Upon review, it has been determined that the denial was issued in error.

We have corrected the error in our records and have routed your file for adjudication. You will receive an approval notice for your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and your Form I-765, Application for Employment after adjudication is complete.

AR1697

# Appendix H

### SRMT Denial Template

We have received your request to review the denial of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and the accompanying Form I-765, Application for Employment Authorization. Your request was based on your belief that the denial involved one or more of the administrative errors, as indicated below:

☐ You claimed that your DACA request was denied on the grounds that you did not come to the United States prior to reaching your 16th birthday and that the evidence you submitted at the time of filing shows that you did, in fact, arrive before the required age.

☐ You claimed that your DACA request was denied on the grounds that you were under the age of 15 at the time of filing, but not in removal proceedings, or did not have a final removal order or a voluntary departure order, and that the evidence submitted at the time of filing shows that you were, in fact, in removal proceedings or had a final removal order or a voluntary departure order.

☐ You claimed that your DACA request was denied on the grounds that you were over the age of 31 on June 15, 2012 and that the evidence you submitted at the time of filing shows that you were, in fact, under age 31 on June 15, 2012.

☐ You claimed that your DACA request was denied on the grounds that you were in a lawful immigration status as of June 15, 2012, and that the evidence you submitted at the time of filing shows that you were, in fact, in an unlawful status on June 15, 2012.

☐ You claimed that your DACA request was denied on the grounds that you were not physically present in the United States on June 15, 2012, up through the date of filing, and that the evidence you submitted at the time of filing establishes that you were, in fact, present.

☐ You claimed that your DACA request was denied because you did not appear for biometrics collection at an Application Support Center, but you did appear.

☐ You claimed that your DACA request was denied because you did not appear for biometrics collection at an Application Support Center, but you asked for the appointment to be rescheduled before the originally scheduled date.

☐ You claimed that your DACA request was denied because you did not pay the required fees, but you have evidence that you paid (including evidence that you remitted payment to rectify any Nonsufficient Funds notice on the initial payment).

☐ You claimed that your DACA request was denied because you did not respond to a request for evidence (RFE) within the prescribed time (includes a request to submit additional evidence or appear at an ASC for biometrics collection following a prior failure to appear) and that you did, in fact respond timely.

☐ You claimed that your DACA request was denied because USCIS mailed the RFE to the wrong address even though you filed a change of address request before the RFE was issued.

Upon review of your request, the evidence in the file at the time of filing, and upon performing all relevant records and systems checks, it has been determined that your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, and the accompanying Form I-765, Application for Employment Authorization, were properly denied and that the denial did not involve an administrative error.

AR1698

# **Appendix H**

### **SRMT Denial Template**

We have received your request to review the denial of your Form I-821D, Consideration of Deferred Action for Childhood Arrivals and the accompanying Form I-765, Application for Employment Authorization.  Your request was based on your belief that the denial involved one or more of the administrative errors, as indicated below:

☐  You claimed that your DACA request was denied on the grounds that you did not come to the United States prior to reaching your 16th birthday and that the evidence you submitted at the time of filing shows that you did, in fact, arrive before the required age.

☐  You claimed that your DACA request was denied on the grounds that you were under the age of 15 at the time of filing, but not in removal proceedings, or did not have a final removal order or a voluntary departure order, and that the evidence submitted at the time of filing shows that you were, in fact, in removal proceedings or had a final removal order or a voluntary departure order.

☐  You claimed that your DACA request was denied on the grounds that you were over the age of 31 on June 15, 2012 and that the evidence you submitted at the time of filing shows that you were, in fact, under age 31 on June 15, 2012.

☐  You claimed that your DACA request was denied on the grounds that you were in a lawful immigration status as of June 15, 2012, and that the evidence you submitted at the time of filing shows that you were, in fact, in an unlawful status on June 15, 2012.

☐  You claimed that your DACA request was denied on the grounds that you were not physically present in the United States on June 15, 2012, up through the date of filing, and that the evidence you submitted at the time of filing establishes that you were, in fact, present.

☐  You claimed that your DACA request was denied because you did not appear for biometrics collection at an Application Support Center, but you did appear.

☐  You claimed that your DACA request was denied because you did not appear for biometrics collection at an Application Support Center, but you asked for the appointment to be rescheduled before the originally scheduled date.

☐  You claimed that your DACA request was denied because you did not pay the required fees, but you have evidence that you paid (including evidence that you remitted payment to rectify any Nonsufficient Funds notice on the initial payment).

☐  You claimed that your DACA request was denied because you did not respond to a request for evidence (RFE) within the prescribed time (includes a request to submit additional evidence or appear at an ASC for biometrics collection following a prior failure to appear) and that you did, in fact respond timely.

☐  You claimed that your DACA request was denied because USCIS mailed the RFE to the wrong address even though you filed a change of address request before the RFE was issued.

Upon review of your request, the evidence in the file at the time of filing, and upon performing all relevant records and systems checks, it has been determined that your Form I-821D, Consideration of Deferred Action for Childhood Arrivals, and the accompanying Form I-765, Application for Employment Authorization, were properly denied and that the denial did not involve an administrative error.

AR1699

# Appendix I

NOTE: Text highlighted in **YELLOW** and bracketed by [ ] is hidden text that requires ISO input. The ISO should delete the highlighted bracketed [*Text*] and type in the necessary information, or choose the appropriate information from choices and delete the information that does not apply.

### DACA 600 – Notice of Intent to Terminate

On [Date], you filed Form I-821D, Consideration of Deferred Action for Childhood Arrivals. USCIS approved your Form I-821D on [Date] deferring your removal from the United States. A review of your records reveals that [ISO should thoroughly explain why the removal was deferred under DACA in error or that is has come to the attention of USCIS that the individual committed fraud in seeking deferral of removal under DACA. If the decision to issue a Notice of Intent to Terminate is based on fraud, it should be supported by a fully documented SOF and any other relevant documents/information.]

Based on the information outlined above, USCIS is notifying you of its intent to terminate your deferred action for childhood arrivals. A final decision to terminate your deferred action for childhood arrivals will not be made for 33 days. During that time, you may submit any evidence that you feel will overcome the grounds for termination. If your response is not received within the allotted time or if your response to this notice does not overcome the grounds for termination, USCIS will terminate your deferred action for childhood arrivals. If your deferred action for childhood arrivals is terminated, any associated employment authorization granted during the period of your deferred action will be terminated for cause

### DACA 601 – Termination Notice [After NOIT]

On [Date], you were notified that it was the intent of USCIS to terminate your deferred action for childhood arrivals. In response to the Intent to Terminate, you [ISO should summarize the individual's response to the Intent to Terminate or indicate that the individual did not respond within the allotted time].

Your response does not overcome the grounds for termination. [If the individual's response does not overcome the reason for the termination as outlined in the Notice of Intent to Terminate, the ISO should explain why]. Therefore, your deferred action for childhood arrivals is terminated as of the date of this notice. In addition, your employment authorization is terminated for cause as of the date of this notice.

You must return your Employment Authorization Document (EAD) to USCIS immediately. Fraudulent use of your EAD could result in a referral to law enforcement. Send a copy of this notice and your EAD to:

[Insert Service Center Address]

Page 1  5/2/2013

AR1700

## DACA 602 – Termination Notice [NTA Issuance]

On [Date], you filed Form I-821D, Consideration of Deferred Action for Childhood Arrivals. USCIS approved your Form I-821D on [Date] deferring your removal from the United States.

On [Date NTA served on alien], [U.S. Citizenship & Immigration Services (USCIS)/Immigration & Customs Enforcement (ICE)] issued you a Notice to Appear (NTA).

Your deferred action as a childhood arrival and your employment authorization automatically terminated as of the date your NTA was issued. You must return your Employment Authorization Document (EAD) to USCIS immediately. Fraudulent use of your EAD could result in a referral to law enforcement. Send a copy of this notice and your EAD to:

> [Insert Service Center Address]

## DACA 603 – Termination Notice [Enforcement Priority; Not Automatically Terminated]

On [Date], you filed Form I-821D, Consideration of Deferred Action for Childhood Arrivals. USCIS approved your Form I-821D on [Date] deferring your removal from the United States.

After consulting with U.S. Immigration & Customs Enforcement, USCIS has determined that exercising prosecutorial discretion in your case is not consistent with the Department of Homeland Security's enforcement priorities. Therefore, your deferred action for childhood arrivals is terminated as of the date of this notice. In addition, your employment authorization is terminated for cause as of the date of this notice.

You must return your Employment Authorization Document (EAD) to USCIS immediately. Fraudulent use of your EAD could result in a referral to law enforcement. Send a copy of this notice and your EAD to:

> [Insert Service Center Address]

Page 2  5/2/2013

# **Appendix I**

### **Notice of Intent to Terminate**

On [Date], you filed Form I-821D, Consideration of Deferred Action for Childhood Arrivals. USCIS approved your Form I-821D on [Date] deferring your removal from the United States. A review of your records reveals that [ISO should thoroughly explain why the removal was deferred under DACA in error or that is has come to the attention of USCIS that the individual committed fraud in seeking deferral of removal under DACA. If the decision to issue a Notice of Intent to Terminate is based on fraud, it should be supported by a fully documented SOF and any other relevant documents/information.]

Based on the information outlined above, USCIS is notifying you of its intent to terminate your deferred action for childhood arrivals. A final decision to terminate your deferred action for childhood arrivals will not be made for 33 days. During that time, you may submit any evidence that you feel will overcome the grounds for termination. If your response is not received within the allotted time or if your response to this notice does not overcome the grounds for termination, USCIS will terminate your deferred action for childhood arrivals. If your deferred action for childhood arrivals is terminated, any associated employment authorization granted during the period of your deferred action will be terminated for cause

### **Termination Notice**

On [Date], you were notified that it was the intent of USCIS to terminate your deferred action for childhood arrivals. In response to the Intent to Terminate, you [ISO should summarize the individual's response to the Intent to Terminate or indicate that the individual did not respond within the allotted time].

Your response does not overcome the grounds for termination. [If the individual's response does not overcome the reason for the termination as outlined in the Notice of Intent to Terminate, the ISO should explain why]. Therefore, your deferred action for childhood arrivals is terminated as of the date of this notice. In addition, your employment authorization is terminated for cause as of the date of this notice.

AR1702

# **APPENDIX J**

## NOTICE OF INTENT TO DENY POLICY

1. NOIDs for the following guideline must be sent to HQSCOPSDACA for SPB review, but no longer require local counsel review:
   - Under 31 on 6/15/12

2. Local OCC Legal Review: NOIDS for the following guidelines must be sent to HQSCOPSDACA for SPB review, but no longer require local counsel review **unless** the Center encounters a novel, complex, or sensitive case:
   - CR Since 06/15/2007
   - Physically Present on 6/15/2012
   - Out of Status as of 06/15/2012

3. NOIDs for the following guidelines require local counsel review *prior* to being sent to HQSCOPSDACA for SPB review:
   - Education
   - Criminal, Public Safety & National Security
   - Fraud Concerns
   - All other NOIDs not categorized in Appendix J

4. NOIDs issued on the following templates *do not require* local counsel or SPB review prior to issuance. The SPB will institute a random sampling of casework as a quality assurance measure in the near future on the following templates:
   - Appendix E (NOID Templates) Published 4/4/2013
   - *Appendix E when combined with language in Appendix D (RFE Templates) Published 4/4/2013

   **\*Note:** When an Appendix E NOID is combined with language in Appendix D and it creates a complicated NOID decision, Centers should issue the NOID decision without the Appendix D language. Once the response to the NOID is received and if the reason for the intended denial is overcome, Centers may issue an RFE with the Appendix D call-ups to establish the requestor's eligibility.

AR1703

## Operational Guidance as of April 3, 2013

| NOID for DACA | Local OCC Review | SCOPS SPB Review | HQOCC Review Required |
|---|---|---|---|
| Appendix E (NOID Templates) **Published 04/04/2013** | No. | No. Will implement QA review. | No. |
| *Appendix E combined with Appendix D (RFE Templates) | No. | No. Will implement QA review. | No. |
| **\*Note:** When an Appendix E NOID is combined with language in Appendix D and it creates a complicated NOID decision, Centers should issue the NOID decision without the Appendix D language. Once the response to the NOID is received and if the reason for the intended denial is overcome, Centers may issue an RFE with the Appendix D call-ups to establish the requestor's eligibility. | | | |
| Under 31 on 6/15/12 | No. | Yes. | No. |
| CR Since 6/15/07 | Whenever the Center encounters a novel, complex, or sensitive case. | Yes. | Whenever the Center encounters a novel, complex, or sensitive case. |
| Physically Present on 6/15/12 | Whenever the Center encounters a novel, complex, or sensitive case. | Yes. | Whenever the Center encounters a novel, complex, or sensitive case. |
| Out of Status as of 6/15/12 | Whenever the Center encounters a novel, complex, or sensitive case. | Yes. | Whenever the Center encounters a novel, complex, or sensitive case. |
| Criminal, Public Safety & NS | Yes. | Yes. | Yes. |
| Education | Yes. | Yes. | Yes. |
| Fraud Concerns | Yes. | Yes. | Yes. |
| All other NOIDs not categorized above. | Yes. | Yes. | Yes. |

Page 2   4/4/2013

J.A. 974

AR1704

| Operational Guidance as of May 22, 2013 | | | |
|---|---|---|---|
| NOID for DACA | Local OCC Review Required | SCOPS Review Required | HQOCC Review Required |
| Appendix E (NOID Templates) | No. | No. Will implement QA Review. | No. |
| *Appendix E combined with Appendix D (RFE Templates) | No. | No. Will implement QA Review. | No. |
| *Note: When an Appendix E NOID is combined with language in Appendix D and it creates a complicated NOID decision, Centers should issue the NOID decision without the Appendix D language. Once the response to the NOID is received and if the reason for the intended denial is overcome, Centers may issue an RFE with the Appendix D call-ups to establish the requestor's eligibility. | | | |
| Under 31 on 6/15/12 | No. | Whenever the Center encounters a novel, complex, or sensitive case. | No. |
| CR Since 6/15/07 | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever local OCC or SCOPS encounters a novel, complex, or sensitive case. |
| Physically Present on 6/15/12 | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever local OCC or SCOPS encounters a novel, complex, or sensitive case. |
| Out of Status on 6/15/12 | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever local OCC or SCOPS encounters a novel, complex, or sensitive case. |
| Education | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever local OCC or SCOPS encounters a novel, complex, or sensitive case. |
| Criminal | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever local OCC or SCOPS encounters a novel, complex, or sensitive case. |
| Juvenile Delinquency | Yes. | Yes. | Yes. |
| Public Safety & National Security | Yes. | Yes. | Yes. |
| Fraud Concerns | Yes. | Yes. | Yes. |
| Favorable Exercise of Prosecutorial Discretion Not Warranted | Yes. | Yes. | Yes. |
| All Other NOIDs Not Categorized Above | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever the Center encounters a novel, complex, or sensitive case. | Whenever local OCC or SCOPS encounters a novel, complex, or sensitive case. |

# APPENDIX K

# DEFERRED ACTION FOR CHILDHOOD ARRIVALS DENIAL CALL-UPS

### DACA 500 -NOTICE OF DENIAL – REQUESTOR IS DECEASED

USCIS has evaluated the Form I-821D, Consideration of Deferred Action for Childhood Arrivals, filed by [insert name] ("the requestor") on [insert date].

On [insert date], USCIS received notification that the requestor is now deceased. Please accept our deepest sympathies for your loss.

USCIS is hereby denying the requestor's Form I-821D. Accordingly, the requestor's Form I-765, Application for Employment Authorization, has also been denied. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. An appeal or motion to reopen/reconsider this decision may not be filed on behalf of the requestor.

### DACA 501 -NOTICE OF DENIAL – ACQUIRED LAWFUL STATUS AFTER JUNE 15, 2012

USCIS has evaluated your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Based on a review of your case, it appears that the following occurred:

On [insert date] you filed Form I-821D. According to information obtained during routine systems checks, it appears that Form [insert USCIS form number and title] that [you filed / was filed on your behalf] was approved on [insert date]. Your status as [insert status acquired after 6/16/2012] is valid since [insert period of validity].

In view of the fact that you are currently in a lawful immigration status, USCIS has, in its unreviewable discretion, determined that deferred action is not appropriate under these circumstances and is hereby denying your Form I-821D. Accordingly, your Form I-765, Application for Employment Authorization, has also been denied. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. You may not file an appeal or motion to reopen/reconsider this decision.

### DACA 502A -NOTICE OF DENIAL – ICE ALREADY DEFERRED ACTION

USCIS has evaluated your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Based on a review of your case, it appears that the following occurred:

The record reveals that on [Date ICE deferred action], U.S. Immigration and Customs Enforcement (ICE) deferred action in your case as a childhood arrival until [Date deferred action expires]. ICE notified you that action was deferred on your case and instructed you to request employment authorization from USCIS. On [Date I-821D filed], you submitted Form I-821D to USCIS, together with Form I-765, Application for Employment Authorization.

It was not necessary for you to file Form I-821D with USCIS because ICE has already deferred action on your case. Therefore, USCIS has denied your Form I-821D. The denial of your Form I-821D does not affect the determination that ICE made on your case.

If granted, you will receive your Employment Authorization Document separately by mail.

**DACA 502B -- NOTICE OF DENIAL - USCIS ALREADY DEFERRED ACTION**

USCIS has evaluated your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Based on a review of your case, it appears that the following occurred:

The record reveals that on [Filing date for approved case], you submitted a Form I-821D (Receipt number XXXXX) to USCIS, together with a Form I-765, Application for Employment Authorization (Receipt number XXXXX). On [Date], USCIS determined that you meet the guidelines for deferred action for childhood arrivals and deferred action on your case until [Date]. USCIS notified you that action was deferred on your case and mailed to you an Employment Authorization Document valid until [Date].

On [Filing date for pending case], you submitted the instant Form I-821D (Receipt number XXXXX) to USCIS, together with a Form I-765 (Receipt number XXXXX). In view of the fact that USCIS has already deferred action on your case, USCIS is hereby denying your Forms I-821D (Receipt number XXXXX) and I-765 (Receipt number XXXXX). The denial of the instant Forms I-821D and I-765 does not affect the previous determination that USCIS made to defer action on your case until [Date].

**DACA 503 -NOTICE OF DENIAL --- INSUFFICIENT RFE RESPONSE FOR CRIMINAL RECORDS**

USCIS has evaluated your Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Based on a review of your case, it appears that the following occurred:

The record reveals that you have been arrested or detained by law enforcement officials. On [Date RFE issued], USCIS sent you a notice requesting you to submit certified court dispositions for all of your arrests, including an arrest(s) specifically identified on the request. In response to the request for evidence, you submitted [indicate what was submitted]. However, the response was insufficient because [indicate why it was insufficient. For example: "the document was not certified by the court"].

USCIS was unable to conduct a sufficient background check on you because you did not provide the requested certified court dispositions. Accordingly, USCIS has determined, in its unreviewable discretion, that you have not demonstrated that you warrant a favorable exercise of prosecutorial discretion and it will not defer action in your matter. Accordingly, your Form I-765, Application for Employment Authorization, has also been denied. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. You may not file an appeal or motion to reopen/reconsider this decision.

Page 2   5/2/2013

J.A. 977

AR1707

# EXHIBIT 10

AR1708

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Document 29-3   Filed 07/02/2018   Pg: 457 of 572   Page 457 of 1026 PageID #: 10048

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 2 of 116

*the* WHITE HOUSE



From the Press Office

Speeches & Remarks

Press Briefings

**Statements & Releases**

Nominations & Appointments

Presidential Actions

Legislation

Disclosures

**The White House**

Office of the Press Secretary

For Immediate Release                                    September 05, 2017

# President Donald J. Trump Restores Responsibility and the Rule of Law to Immigration

*"I believe that real and positive immigration reform is possible, as long as we focus on the following goals: To improve jobs and wages for Americans; to strengthen our nation's security; and to restore respect for our laws." – President Donald J. Trump*

**RESPONSIBLY ENDING UNLAWFUL IMMIGRATION POLICY: Today, the Trump Administration is rescinding the previous Administration's memorandum creating the unlawful Deferred Action for Childhood Arrivals (DACA) program and has begun to end the program responsibly.**

- Attorney General Jeff Sessions sent a letter to the Department of Homeland Security explaining that DACA was not statutorily authorized and was therefore an unconstitutional exercise of discretion by the executive branch.
  - Attorney General Sessions found that DACA, given pending litigation, would likely face the same outcome as the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program, which was enjoined by the courts.
- The Trump Administration is taking responsible action to wind down DACA in an orderly and minimally disruptive manner.
  - If President Trump allowed DACA to go to court, it is likely that the court would abruptly enjoin the program.
    - If President Trump had refused to act, many States were prepared to pursue litigation to end DACA by court order.
  - Under the change announced today, current DACA recipients generally will not be impacted until after March 5, 2018, six months from now. That period of time gives Congress the opportunity to consider appropriate legislative solutions.
- DHS's enforcement priorities remain in place. However, absent a law enforcement interest —which is largely the standard that has been in place since the inception of the program— the Department will generally not take actions to remove active DACA recipients.
  - DACA recipients range from ages 15 to 36, with the overwhelming majority being of adult age.
- Initial requests for Employment Authorization Documents under DACA properly filed and accepted through today will be processed.
  - Additional DACA initial applications filed after today will not be accepted.
- Renewal applications for DACA Employment Authorization Documents properly filed and accepted by October 5, 2017, for people whose current Employment Authorization Documents expire between today and March 5, 2018, will be processed.
  - Any such requests filed after October 5, 2017 will not be accepted.
- Currently approved applications for advance parole for DACA recipients will generally be honored, but new applications will not be approved.
  - All pending applications for advance parole by DACA recipients will be closed and associated fees will be refunded.

**RESTORING LAW AND ORDER TO OUR IMMIGRATION SYSTEM: The DACA program was never intended to be permanent—even President Obama admitted it was a temporary, extraordinary measure. And President Obama repeatedly recognized that such unilateral actions were in excess of the Executive's appropriate role.**

- President Obama admitted publicly on at least a 22 occasions that creating a DACA-like program was beyond his authority. President Obama said:

- In 2011, that "there are enough laws on the books by Congress that are very clear in terms of how we have to enforce our immigration system that for me to simply through Executive order ignore those congressional mandates would not conform with my appropriate role as President."
  - In 2010, that providing people in America illegally with legal status and ignoring the laws on the books "would be both unwise and unfair."
- President Obama admitted in 2012 that DACA, implemented in an election year, was "a temporary stopgap measure."
- Partly because of DACA, the United States saw a surge in illegal immigration by minors in 2013-2014, because they hoped to take advantage of the program.
  - President Obama knew this would be a problem, admitting in 2010 that a DACA-like policy "could lead to a surge in illegal immigration."
- President Trump refuses to allow criminal activity to dominate our immigration system, taking action to restore the law and protect all Americans.
  - One of President Trump's first Executive orders informed sanctuary jurisdictions that failure to fully abide by Federal immigration laws would jeopardize access to certain Federal grant money.
    - As a result, Miami-Dade County reversed its years-long sanctuary policy.
  - The DOJ issued new charging guidelines in April to bring to an end the previous Administration's catch-and-release policies by prioritizing criminal immigration enforcement.
  - Since President Trump's inauguration, illegal immigration on the southwest border is down by 47 percent compared to the same period last year.
  - Illegal alien removals resulting from to U.S. Immigration and Customs Enforcement (ICE) arrests have increased by over 32 percent.
  - So far in Fiscal Year 2017, ICE has arrested at least 3,641 criminal gang members compared to 2,057 criminal gang members in all of Fiscal Year 2016.

**REFORMING IMMIGRATION TO MAKE AMERICA GREAT AGAIN: DACA made it impossible for President Trump to pursue the reforms needed to restore fairness to our immigration system and protect American workers.**

- President Trump's highest obligation is to uphold the laws of the United States. So long as the unlawful policies of the previous Administration remain—especially those that incentivize further illegal immigration—there is no realistic chance of achieving principled pro-worker immigration reform. His priorities include:
  - **Controlling the Border:** President Trump intends to secure the southwest border with a border wall and a robust law enforcement presence on the border.
  - **Improving Vetting and Immigration Security:** Our immigration system, including our asylum and refugee system, make the United States potentially exposed to

terrorist and public safety threats. We need to improve vetting and set limits that allow for proper vetting.

- o **Enforcing Our Laws:** President Trump supports the swift removal of those who illegally enter the United States or violate the conditions of their visas.
- o **Protecting Our Workers:** President Trump is working to encourage companies to raise wages and recruit American workers. This means stopping the practice of hiring illegal workers who unlawfully deprive American workers of jobs and higher wages.
- o **Establishing a Merit-Based System for Entry:** President Trump supports efforts to prioritize immigrants based on skills and thereby prevent the displacement of American workers.



**HOME    BRIEFING ROOM    ISSUES    THE ADMINISTRATION    PARTICIPATE    1600 PENN**

USA.gov | Privacy Policy | Copyright Policy

AR1712

# EXHIBIT 11

AR1713

JUSTICE NEWS

**Attorney General Sessions Delivers Remarks on DACA**

Washington, DC ~ Tuesday, September 5, 2017

---

**Remarks as prepared for delivery**

Good morning. I am here today to announce that the program known as DACA that was effectuated under the Obama Administration is being rescinded.

The DACA program was implemented in 2012 and essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program, to 800,000 mostly-adult illegal aliens.

This policy was implemented unilaterally to great controversy and legal concern after Congress rejected legislative proposals to extend similar benefits on numerous occasions to this same group of illegal aliens.

In other words, the executive branch, through DACA, deliberately sought to achieve what the legislative branch specifically refused to authorize on multiple occasions. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens.

We inherited from our Founders—and have advanced—an unsurpassed legal heritage, which is the foundation of our freedom, safety, and prosperity.

As the Attorney General, it is my duty to ensure that the laws of the United States are enforced and that the Constitutional order is upheld.

No greater good can be done for the overall health and well-being of our Republic, than preserving and strengthening the impartial rule of law. Societies where the rule of law is treasured are societies that tend to flourish and succeed.

Societies where the rule of law is subject to political whims and personal biases tend to become societies afflicted by corruption, poverty, and human suffering.

To have a lawful system of immigration that serves the national interest, we cannot admit everyone who would like to come here. That is an open border policy and the American people have rightly rejected it.

Therefore, the nation must set and enforce a limit on how many immigrants we admit each year and that means all can not be accepted.

This does not mean they are bad people or that our nation disrespects or demeans them in any way. It means we are properly enforcing our laws as Congress has passed them.

It is with these principles and duties in mind, and in light of imminent litigation, that we reviewed the Obama Administration's DACA policy.

Our collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program, which was enjoined on a nationwide basis in a decision affirmed by the

Fifth Circuit.

The Fifth Circuit specifically concluded that DACA had not been implemented in a fashion that allowed sufficient discretion, and that DAPA was "foreclosed by Congress's careful plan."

In other words, it was inconsistent with the Constitution's separation of powers. That decision was affirmed by the Supreme Court by an equally divided vote.

If we were to keep the Obama Administration's executive amnesty policy, the likeliest outcome is that it would be enjoined just as was DAPA. The Department of Justice has advised the President and the Department of Homeland Security that DHS should begin an orderly, lawful wind down, including the cancellation of the memo that authorized this program.

Acting Secretary Duke has chosen, appropriately, to initiate a wind down process. This will enable DHS to conduct an orderly change and fulfill the desire of this administration to create a time period for Congress to act—should it so choose. We firmly believe this is the responsible path.

Simply put, if we are to further our goal of strengthening the constitutional order and the rule of law in America, the Department of Justice cannot defend this type of overreach.

George Washington University Law School Professor Jonathan Turley in testimony before the House Judiciary Committee was clear about the enormous constitutional infirmities raised by these policies.

He said: "In ordering this blanket exception, President Obama was nullifying part of a law that he simply disagreed with. ….If a president can claim sweeping discretion to suspend key federal laws, the entire legislative process becomes little more than a pretense…The circumvention of the legislative process not only undermines the authority of this branch but destabilizes the tripartite system as a whole."

Ending the previous Administration's disrespect for the legislative process is an important first step. All immigration policies should serve the interests of the people of the United States—lawful immigrant and native born alike.

Congress should carefully and thoughtfully pursue the types of reforms that are right for the American people. Our nation is comprised of good and decent people who want their government's leaders to fulfill their promises and advance an immigration policy that serves the national interest.

We are a people of compassion and we are a people of law. But there is nothing compassionate about the failure to enforce immigration laws.

Enforcing the law saves lives, protects communities and taxpayers, and prevents human suffering. Failure to enforce the laws in the past has put our nation at risk of crime, violence and even terrorism.

The compassionate thing is to end the lawlessness, enforce our laws, and, if Congress chooses to make changes to those laws, to do so through the process set forth by our Founders in a way that advances the interest of the nation.

That is what the President has promised to do and has delivered to the American people.

Under President Trump's leadership, this administration has made great progress in the last few months toward establishing a lawful and constitutional immigration system. This makes us safer and more secure.

It will further economically the lives of millions who are struggling. And it will enable our country to more effectively teach new immigrants about our system of government and assimilate them to the cultural understandings that support it.

The substantial progress in reducing illegal immigration at our border seen in recent months is almost entirely the product of the leadership of President Trump and his inspired federal immigration officers. But the problem is not solved. And without more action, we could see illegality rise again rather than be eliminated.

As a candidate, and now in office, President Trump has offered specific ideas and legislative solutions that will protect American workers, increase wages and salaries, defend our national security, ensure the public safety, and increase

the general well-being of the American people.

He has worked closely with many members of Congress, including in the introduction of the RAISE Act, which would produce enormous benefits for our country. This is how our democratic process works.

There are many powerful interest groups in this country and every one of them has a constitutional right to advocate their views and represent whomever they choose.

But the Department of Justice does not represent any narrow interest or any subset of the American people. We represent all of the American people and protect the integrity of our Constitution. That is our charge.

We at Department of Justice are proud and honored to work to advance this vision for America and to do our best each day to ensure the safety and security of the American people.

Thank you.

................................................................................................................

**Speaker:**
Attorney General Jeff Sessions

**Attachment(s):**
Download ag_letter_re_daca.pdf

**Topic(s):**
Immigration

**Component(s):**
Office of the Attorney General

*Updated September 5, 2017*

# EXHIBIT 12

AR1717



**Donald J. Trump** ✔
@realDonaldTrump

Follow ⌄

Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!

5:38 PM - 5 Sep 2017

24,028 Retweets  91,930 Likes

💬 39K  🔁 24K  ♡ 92K  ✉

Appeal: 18-1521    Doc: 28-2    Filed: 07/02/2018    Pg: 467 of 572

# EXHIBIT 13

AR1719

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 07/03/2018   Pg: 468 of 572   Page 468 of 1026 PageID #: 10059

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 13 of 116



**U.S. Citizenship and Immigration Services**

## USCIS Guidance on DACA Renewal Requests Affected by Mail Service Issues

*Versión en español*

U.S. Citizenship and Immigration Services (USCIS) has received reports that the U.S. Postal Service (USPS) has identified USPS mail service delays that affected a number of DACA renewal requests. Because the DACA policy has been rescinded and individuals can no longer request deferred action under DACA, and in light of the mail service delays identified by USPS, Acting Secretary of Homeland Security Elaine Duke has directed USCIS to accept DACA renewal requests from individuals who resubmit their DACA renewal request with individualized proof that the request was originally mailed in a timely manner and that the cause for receipt after the Oct. 5, 2017, deadline was the result of USPS mail service error. Affected DACA requestors who do not have such proof may contact USPS, which will review the cases on an individual basis and provide a letter if appropriate. USCIS will not accept requests that do not include individualized proof that the request was originally mailed in a timely manner to be received by the October 5 deadline, and that the cause for receipt after the Oct. 5, 2017, deadline was the result of USPS mail service error.

In addition, USCIS had discovered certain cases in which the DACA requests were received at the designated filing location (*e.g.*, at the applicable P.O. Box) by the filing deadline, but were rejected. USCIS will proactively reach out to those DACA requestors to inform them that they may resubmit their DACA request. If a DACA requestor does not receive such a notification and believes that his or her DACA request was received at the designated filing location by the filing deadline, he or she may resubmit his or her DACA request with proof that the request was previously received at the designated filing location on or before the filing deadline.

Additional guidance will be forthcoming.

Last Reviewed/Updated: 11/27/2017

AR1720

# EXHIBIT 14

AR1721



## Instructions for Consideration of Deferred Action for Childhood Arrivals

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-821D**
OMB No. 1615-0124
Expires 01/31/2019

### What is the Purpose of this Form?

An individual may file Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to request that U.S. Citizenship and Immigration Services (USCIS) exercise prosecutorial discretion in his or her favor under the Deferred Action for Childhood Arrivals (DACA) process, including consideration for Renewal of deferred action. USCIS considers deferring action (including Renewal of deferred action) on a case-by-case basis, based on the guidelines in the **What is a Childhood Arrival for Purposes of This Form** section of these instructions. Deferred action is a discretionary determination to defer removal of an individual as an act of prosecutorial discretion. Individuals who receive deferred action will not be placed into removal proceedings or removed from the United States for a specified period of time, unless the Department of Homeland Security (DHS) chooses to terminate the deferral. See the Secretary of Homeland Security's memorandum issued on June 15, 2012 (Secretary's memorandum), upon which the DACA process is based, at **www.uscis.gov/childhoodarrivals**.

### When Should I Use Form I-821D?

Use this form to request consideration of Initial DACA or Renewal of DACA. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. All individuals filing Form I-821D, whether for an Initial or a Renewal of deferred action, must also file Form I-765, Application for Employment Authorization, and Form I-765 Worksheet, Form I-765WS. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more information.

**CAUTION:** If you file this request more than 150 days prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date. **USCIS encourages renewal requestors to file as early in the 150-day period as possible - ideally, at least 120 days prior to the DACA expiration date.**

**NOTE:** If you have received DACA and you are filing within one year after your last period of deferred action expired, please follow the instructions provided below for renewal requestors.

**NOTE:** If U.S. Immigration and Customs Enforcement (ICE) initially deferred action in your case and you are seeking a Renewal, you must file Form I-821D and select and complete **Item Number 2.** in **Part 1.** of Form I-821D. You must also respond to ALL subsequent questions on the form. You must also submit documentation to establish how you satisfy the guidelines as if you were filing an Initial request for consideration of deferred action.

If you are currently in immigration detention, you may not request consideration of DACA or Renewal of DACA from USCIS. If you think you meet the guidelines of this process, you should identify yourself to your deportation officer.

### What is a Childhood Arrival for Purposes of This Form?

An individual may be considered for Initial DACA if he or she:

1. Was under 31 years of age as of June 15, 2012;

2. Came to the United States before reaching his or her 16th birthday;

3. Has continuously resided in the United States since June 15, 2007, up to the present time;

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Document 29-3   Filed 07/02/2018   Pg: 471 of 572   Page 471 of 1026 PageID #: 10062

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 16 of 116

4. Was present in the United States on June 15, 2012 and at the time of making his or her request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012;

   **NOTE:** No lawful status on June 15, 2012 means that:

   **A.** You never had a lawful immigration status on or before June 15, 2012; or

   **B.** Any lawful immigration status or parole that you obtained prior to June 15, 2012 had expired as of June 15, 2012.

6. Is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a general educational development (GED) certificate, or is an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard; and

7. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

An individual may be considered for **Renewal** of DACA if he or she met the guidelines for consideration of Initial DACA (see above) AND he or she:

1. Did not depart the United States on or after August 15, 2012 without advance parole;

2. Has continuously resided in the United States since he or she submitted his or her most recent request for DACA that was approved up to the present time; and

3. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

---

## Who May File Form I-821D?

1. **Childhood Arrivals Who Have Never Been in Removal Proceedings.** If you have never been in removal proceedings, submit this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the guidelines described in the Secretary's memorandum to be considered for deferred action.

2. **Childhood Arrivals Whose Removal Proceedings Were Terminated.** If you were in removal proceedings which have been terminated by the immigration judge prior to this request, you may use this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the guidelines described in the Secretary's memorandum to be considered for deferred action.

3. **Childhood Arrivals In Removal Proceedings, With a Final Removal Order, or With Voluntary Departure.** If you are in removal proceedings, have a final order of removal, exclusion, or deportation issued in any other context, have a voluntary departure order, or if your proceedings have been administratively closed, you may use this form to request that USCIS consider deferring action in your case, even if you are under 15 years of age at the time of filing. For the purpose of this form, "removal proceedings" includes exclusion or deportation proceedings initiated before April 1, 1997, an Immigration and Nationality Act (INA) section 240 removal proceeding, expedited removal, reinstatement of a final order of exclusion, deportation, or removal, an INA section 217 removal after admission under the Visa Waiver Program, removal as a criminal alien under INA section 238, or any other kind of removal proceeding under U.S. immigration law in any other context (e.g., at the border or within the United States by an immigration agent).

4. **Childhood Arrivals Whose Case Was Deferred and Who Are Seeking Renewal of DACA.** If USCIS or ICE deferred action in your case under DACA, you may use this form to request consideration of Renewal of DACA from USCIS.

---

## General Instructions

USCIS provides forms free of charge through the USCIS website. In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which can be downloaded for free at http://get.adobe.com/reader/.

Each request must be properly signed and accompanied by Form I-765 with fees and Form I-765WS. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment. A photocopy of a signed request or typewritten name in place of a signature is not acceptable. This request is not considered properly filed until accepted by USCIS.

**Evidence.** You must submit all required evidence and supporting documentation with your request at the time of filing. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more details.

You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

**NOTE:** If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

**Biometric Services Appointment.** Individuals requesting DACA must provide fingerprints, photographs, and signatures (biometrics). You may receive a notice scheduling you to appear at an Application Support Center (ASC) for biometrics collection. Failure to comply with the notice may result in the denial of your deferred action request. USCIS may, in its discretion, waive the collection of certain biometrics.

**Copies.** You may submit a legible photocopy of any document, unless you are specifically required to file an original document with this request. Original documents submitted when not required may remain a part of the record, and USCIS will not automatically return them to you.

**Translations.** Any document you submit to USCIS that contains a foreign language must have a full English translation. The translator must certify that the English translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.

An example of a certification would read, "I [typed name], certify that I am fluent (conversant) in the English and [insert other language] languages, and that the above/attached document is an accurate translation of the document attached entitled [name of document]." The certification should also include the date, the translator's signature and typed name, and the translator's address.

**Advance Parole.** If you wish to file a request for Advance Parole, please follow the instructions for filing Form I-131, Application for Travel Document. You can get the most current information on how to apply for advance parole by visiting the USCIS website at **www.uscis.gov/i-131** or calling the National Customer Service Line at **1-800-375-5283** or **1-800-767-1833** (TTY for the hearing impaired). Customer service officers are available Monday - Friday from 8 a.m. - 6 p.m. in each U.S. time zone.

**Travel Warning.** On or after August 15, 2012, if you travel outside of the United States before USCIS has determined whether to defer action in your case, you will not be considered for deferred action. Even after USCIS has deferred action in your case under DACA, you should not travel outside the United States unless you have been issued an Advance Parole Document by USCIS. Deferred action will terminate automatically if you travel outside the United States without obtaining an Advance Parole Document from USCIS. In addition, leaving the United States, even with an Advance Parole Document, may impact your ability to return to the United States.

**How To Fill Out Form I-821D**

1.  This form consists of eight parts. Requestors for Initial DACA and those requestors seeking Renewal of DACA should fill out most parts. However, only requestors for Initial DACA should complete **Part 3.** See below for greater detail.

    **Part 1. Information About You.** All requestors must complete this part.

    **Part 2. Residence and Travel Information.** All requestors must complete this part. Please be aware that Initial requestors must provide more extensive information than Renewal requestors.

    **Part 3. For Initial Requests Only.** Renewal requestors should skip this part.

    **Part 4. Criminal, National Security, and Public Safety Information.** All requestors must complete this part.

    **Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.** All requestors must complete this part.

    **Part 6. Contact Information, Certification, and Signature of the Interpreter.** Any requestor using an interpreter must complete this part.

    **Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other than the Requestor.** If you had someone else prepare your request, he or she must complete this part.

    **Part 8. Additional Information.** Any requestor may complete this part if additional space is needed.

2.  Further Information on filling out Form I-821D:

    A.  Type or print legibly in black ink.

    B.  If you need extra space to complete any item within this request, use **Part 8. Additional Information** and make additional copies of this sheet as needed. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number, Part Number,** and **Item Number** to which your answer refers; and sign and date each sheet.

    C.  Answer all questions fully and accurately. If an item is not applicable or the answer is "none," type or print "N/ A," unless otherwise directed.

    D.  All dates must be entered as mm/dd/yyyy. You may provide approximate dates if you do not know the exact date. Do not leave a date response blank.

    E.  **Processing Information.** You must provide the biometrics information requested in **Part 1., Item Numbers 15. - 20.** Providing this information as part of your request may reduce the time you spend at your USCIS ASC appointment.

    F.  **Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.** Select the box that indicates whether someone interpreted this form for you. If applicable, the attorney, accredited representative, or other individual who helped prepare this form for you must complete **Part 7.** and sign and date the form. Every request must contain the requestor's original signature. A photocopy of a signed request or a typewritten name in place of a signature is **not** acceptable. Sign and date the form and provide your daytime telephone number, mobile telephone number, and email address. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment.

    G.  **Part 6. Contact Information, Certification, and Signature of the Interpreter.** If you used an interpreter to read the instructions and complete the questions on this form, the interpreter must fill out **Part 6.** The interpreter must provide his or her full name, the name of his or her business or organization, an address, a daytime telephone number, and an email address. He or she must also sign and date the form.

---

J.A. 995

AR1725

H. **Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other Than the Requestor.** If the person who completed this request, is someone other than the person named in **Part 1.**, he or she must complete this section of the request, provide his or her name, the address of his or her business or organization (if any), and his or her contact information. If the person completing this request is an attorney or accredited representative, he or she must submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with this request. Further, the attorney or accredited representative, and anyone who assisted in preparing your request, must sign and date the request. This section of the request **MUST** contain the original signature of the attorney or accredited representative, and anyone who assisted in preparing your request. A typewritten name in place of a signature is not acceptable.

## Evidence for Initial Requests Only

**NOTE:** If you are submitting an **Initial Request** for consideration of DACA to USCIS, you will need to submit documents showing how you believe you have satisfied each DACA guideline.

1. What documents should you submit with your Form I-821D?

   A. You do not need to submit original documents unless USCIS requests them.

   B. Evidence and supporting documents that you file with your Form I-821D should show that you are at least 15 years of age at the time of filing, if required (see the **Who May File Form I-821D** section of these instructions for more information), and that you meet all of the following:

      (1) Were born after June 15, 1981 (i.e., You were not age 31 or older on June 15, 2012);

      (2) Arrived in the United States before 16 years of age;

      (3) Have continuously resided in the United States since June 15, 2007, up to the present time;

      (4) Were present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

      (5) Had no lawful status on June 15, 2012; and

      (6) Are currently in school, graduated or received a certificate of completion from high school, obtained a GED certificate or other equivalent state-authorized exam in the United States, or that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard.

2. What documents do you need to provide to prove identity?

   Submit copies of any of the following:

   A. Passport;

   B. Birth certificate accompanied by photo identification;

   C. Any national identity document from your country of origin bearing your photo and/or fingerprint;

   D. Any U.S. government immigration or other document bearing your name and photograph (e.g., EADs, visas, driver's licenses, non-driver cards);

   E. Any school-issued form of identification with photo;

   F. Military identification document with photo;

   G. State-issued photo ID showing date of birth; or

   H. Any other document with photo that you believe is relevant.

   **NOTE:** Expired documents are acceptable.

AR1726

3. **What documents may show that you came to the United States before your 16th birthday?**

Submit copies of any of the following documents:

A. Passport with an admission stamp indicating when you entered the United States;

B. Form I-94, I-94W, or I-95 Arrival-Departure Record;

C. Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);

D. Travel records, such as transportation tickets showing your dates of travel to the United States;

E. School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

F. Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

G. Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding); or

H. Any other document that you believe is relevant.

4. **If you left the United States for some period of time before your 16th birthday and returned on or after your 16th birthday to begin your current period of continuous residence, what documents may show that you established residence before your 16th birthday?**

Submit copies of any of the following documents:

A. School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

B. Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

C. Documents evidencing that you were physically present in the United States for multiple years prior to your 16th birthday; or

D. Any other relevant document.

5. **What documents may show that you continuously resided in the United States since June 15, 2007, up to the present date?**

Submit copies of any relevant documents such as:

A. Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

B. Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

C. School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

J.A. 997                                    AR1727

    **D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

    **E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

    **F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

    **G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

    **H.** Any other relevant document.

**6.   Do brief departures interrupt continuous residence?**

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States for any period of time, your absence will be considered brief, casual, and innocent, if it was on or after June 15, 2007, and before August 15, 2012, and:

    **A.** The absence was short and reasonably calculated to accomplish the purpose for the absence;

    **B.** The absence was not because of an order of exclusion, deportation, or removal;

    **C.** The absence was not because of an order of voluntary departure or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

    **D.** The purpose of the absence and/or your actions while outside of the United States were not contrary to law.

**In Part 3. Arrival/Residence Information,** list all your absences from the United States since June 15, 2007. Include information about all your departure and return dates, and the reason for your departures. Documents you can submit that may show your absence was brief, casual, and innocent include, but are not limited to:

    **A.** Plane or other transportation tickets or itinerary showing the travel dates;

    **B.** Passport entries;

    **C.** Hotel receipts showing the dates you were abroad;

    **D.** Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);

    **E.** Copy of Advance Parole Document issued by USCIS; and

    **F.** Any other evidence that could support a brief, casual, and innocent absence.

**7.   What documents may demonstrate that you were present in the United States on June 15, 2012?**

Submit copies of any relevant documents such as:

    **A.** Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

    **B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

    **NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

**C.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

**E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

**G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

**H.** Any other relevant document.

**8. What documents may show you had no lawful status on June 15, 2012?** (Submit documents if you were admitted or paroled, or otherwise obtained a lawful immigration status, on or before June 15, 2012, or you were or are in removal proceedings.)

Submit copies of any of the following documents:

**A.** Form I-94, I-94W, or I-95 Arrival/Departure Record showing the date your authorized stay expired;

**B.** If you have a final order of exclusion, deportation, or removal issued as of June 15, 2012, submit a copy of that order and related charging documents, if available;

**C.** An INS or DHS charging document placing you into removal proceedings, if available; or

**D.** Any other document that you believe is relevant to show that on June 15, 2012, you had no lawful status.

**9. What documents may demonstrate that you: a) are currently in school in the United States at the time of filing; b) have graduated or received a certificate of completion or a certificate of attendance from a U.S. high school, a U.S. public or private college or university, including community college; or c) have obtained a GED certificate or other equivalent state-authorized exam in the United States? (If applicable)**

USCIS recognizes that schools, educational programs, school districts, and state education agencies around the country issue educational records in a variety of formats. USCIS does not require educational records to be presented in any particular format.

**A.** To be considered "currently in school," you are to demonstrate that you are currently enrolled in one of the following:

   **(1)** A U.S. public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or home school program meeting state requirements;

   **(2)** An education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in post-secondary education, job training, or employment, and where you are working toward such placement, and that the program:

      **(a)** Is administered by a non-profit entity; or

      **(b)** Is funded in whole or in part by Federal, state, local, or municipal funds; or

      **(c)** Is of demonstrated effectiveness;

(3) An education program in the U.S. assisting students in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other equivalent state-authorized exam, and that the program:

    (a) Is administered by a non-profit entity; or

    (b) Is funded in whole or in part by Federal, state, local, or municipal funds; or

    (c) Is of demonstrated effectiveness;

(4) A U.S. public or private college or university including community college.

Evidence of enrollment may include, but is not limited to: school registration cards, acceptance or other letters demonstrating enrollment or attendance, current transcripts, report cards, progress reports, or other documents issued by a school district, state education agency, school, or program. These documents should show your name; the name of the school district, or state educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your current educational or grade level.

If you have been accepted for enrollment and your classes have not yet begun, you may submit an acceptance letter with evidence that you have registered for classes or any other relevant evidence showing you have committed to starting classes on a certain date, including, for example, a copy of your tuition bill, your class schedule, or your Individualized Educational Program.

If you are enrolled in an educational, literacy, or career training program (including vocational training or an ESL course), evidence that the program is funded in whole or in part by Federal, state, local, or municipal funds includes a letter or other documentation from an authorized representative of the program that includes information such as: your name and date of enrollment, the duration of the program and expected completion date, the program's source of public funding, and the program's authorized representative's contact information.

If you are enrolled in an education, literacy, or career training program that is not publicly funded, evidence that the program is of demonstrated effectiveness may include information from an authorized school representative relating to: the duration of the program's existence; the program's track record in placing students in employment, job training, or post-secondary education; receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or any other information indicating the program's overall quality.

**B.** Evidence to show that you meet the educational guideline because you have "graduated from school" or "obtained a GED certificate" or other equivalent state-authorized exam in the United States includes, but is not limited to:

(1) A high school diploma from a U.S. public or private high school or secondary school;

(2) A recognized equivalent of a U.S. high school diploma under state law, including a GED certificate or other equivalent state-authorized exam, a certificate of completion, or a certificate of attendance;

(3) A transcript that identifies the date of graduation or program completion;

(4) An enrollment history that shows the date of graduation or program completion;

(5) A degree from a public or private college or university or a community college; or

(6) An alternate award from a U.S. public or private high school or secondary school.

These documents should show your name; the name of the U.S. school district, educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your date of graduation or completion.

**10. What documents may demonstrate that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?** (If applicable)

Submit copies of the following documents:

**A.** Form DD-214, Certificate of Release or Discharge from Active Duty;

**B.** NGB Form 22, National Guard Report of Separation and Record of Service;

Appeal 18-1521 Case 1:17-cv-02528-CCG-VMS Filed: 07/03/2018 Document 28-7 Pg: 479 of 502 Filed 09/04/20 Page 479 of 1026 PageID #: 10070

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 24 of 116

**C.** Military personnel records;

**D.** Military health records; or

**E.** Any other relevant document.

**11. What additional documents should you submit if you are currently or have been in removal proceedings?**

Submit a copy of the removal order, any document issued by the immigration judge, or the final decision of the Board of Immigration Appeals (BIA), if available.  If you have not been in removal proceedings, this question does not apply to you.

**12. What evidence should I submit to demonstrate my criminal history?**

If you have been arrested for or charged with any felony (i.e., a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year) or misdemeanor (i.e., a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days) in the United States, or a crime in any country other than the United States, you must submit evidence demonstrating the results of the arrest or charges brought against you.  If the charges against you were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

**A.** If you have ever been arrested for any felony or misdemeanor in the United States, or a crime in any country other than the United States, and no charges were filed, submit an original official statement by the arresting agency or applicable court order confirming that no charges were filed for each arrest.  If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**B.** If you have ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any country other than the United States, submit an original or court-certified copy of the complete arrest record and disposition for each incident (e.g., dismissal order, conviction and sentencing record, acquittal order).  If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**C.** If you have ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record, submit:

   **(1)** An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or

   **(2)** An original statement from the court that no record exists of your arrest or conviction.

If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**NOTE:  You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol - or drug-related.**

---

### Evidence for Renewal Requests Only

**NOTE:**  If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

If you are seeking a **Renewal** of DACA, respond to all questions, except where the section or question indicates "For Initial Requests Only."

If you are currently in exclusion, deportation, or removal proceedings, see **Item Number 11.** (above) for additional guidance.

If you have any criminal history, see **Item Number 12.** (above) for additional guidance.

---

With your Renewal request, you only need to submit any new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS. If USCIS needs more documentation from you, USCIS will send a Request for Evidence to you explaining the needed information. However, you should submit new documents if any of the following situations apply to you:

1.  You are currently in exclusion, deportation, or removal proceedings (please note, you do not need to submit these documents if your case was administratively closed); or

2.  You have been charged with, or convicted of, a felony or misdemeanor (please note, you do not need to submit these documents if you already submitted them with a previous DACA request).

**NOTE:** You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

If ICE initially deferred action in your case and you are seeking a Renewal, you must select and complete **Item Number 2. in Part 1.** of Form I-821D. You must also respond to **ALL** subsequent questions on the form. You must also submit documentation to establish how you satisfy the guidelines as if you were filing an Initial request for consideration of deferred action.

**NOTE:** You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol-or drug- related.

## Additional Information Relevant to ALL Requests for DACA

1.  **What other factors will USCIS consider when making a determination on deferred action?**

    USCIS will also conduct a background check. USCIS may consider deferring action in your case even if you have been arrested or detained by any law enforcement officer and charges were filed, or if charges were filed against you without an arrest. USCIS will evaluate the totality of the circumstances in reaching a decision on deferred action.

    In accordance with the Secretary's memorandum, if USCIS determines that you have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or that you otherwise pose a threat to national security or public safety, USCIS is unlikely to defer action in your case. See the Frequently Asked Questions at **www.uscis.gov/childhoodarrivals**.

    Even if you satisfy the threshold criteria for consideration of DACA, USCIS may deny your request if it determines, in its unreviewable discretion, that an exercise of prosecutorial discretion is not warranted in your case.

2.  **What else should you submit with Form I-821D?**

    USCIS will not consider deferring action in your case unless your Form I-821D is accompanied by Form I-765, with fees, and Form I-765WS. If you do not include Form I-765 with all applicable fees with your Form I-821D, your entire submission will be rejected.

    **Optional E-Notification of Request Acceptance.** You may submit Form G-1145, Notification of Application/ Petition Acceptance, an optional form, which will notify you electronically when USCIS accepts your request for DACA.

## What is the Filing Fee?

There is no filing fee for Form I-821D. However, you must submit both filing and biometric services fees with Form I-765. Read Form I-765 filing instructions for complete information at **www.uscis.gov/I-765**.

## Where to File?

Please see our USCIS website at **www.uscis.gov/I-821D** or call the USCIS National Customer Service Center at **1-800-375-5283** for the most current information about where to file this form. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

## Address Changes

You must inform USCIS if you change your address. For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:** Do not submit a change of address request to USCIS Lockbox facilities because these facilities do not process change of address requests.

## Processing Information

**Initial Processing.** Once your request has been received by USCIS, USCIS will check the request for completeness. If you do not completely fill out the form, USCIS may deny or reject your request.

**Requests for More Information, Including Biometrics or Interview.** We may request more information or evidence, or we may request that you appear at a USCIS office for an interview. We may also request that you provide the originals of any copies you submit. We will return these originals when they are no longer needed.

If the same documents are required for both Form I-821D and Form I-765 that are filed together, the documents only have to be submitted once.

At the time of any interview or other appearance at a USCIS office, USCIS may require that you provide biometric information (e.g., photograph, fingerprints, signature) to verify your identity and update your background information.

**Decision.** USCIS will review your request to determine whether the exercise of prosecutorial discretion is appropriate in your case. Each case will be considered on an individual, case-by-case basis. Even if you satisfy the threshold criteria for consideration of DACA, USCIS may determine, in its unreviewable discretion, that deferred action is not warranted in your case. You will be notified of the decision in writing. There is no motion to reopen/reconsider the decision and there is no right to appeal.

## USCIS Forms and Information

To ensure you are using the latest version of this form, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information. If you do not have Internet access, you may order USCIS forms by calling our toll-free number at **1-800-870-3676**. You may also obtain forms and information by calling the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

As an alternative to waiting in line for assistance at your local USCIS office, you can now schedule an appointment through our Internet-based system, **InfoPass**. To access the system, visit our website at **infopass.uscis.gov**. Use the **InfoPass** appointment scheduler and follow the screen prompts to set up your appointment. **InfoPass** generates an electronic appointment notice that appears on the screen.

## Penalties

If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a Federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

## USCIS Privacy Act Statement

**AUTHORITIES:** The information requested on this form, and the associated evidence, is collected under the Immigration and Nationality Act, section 101, et seq.

**PURPOSE:** The primary purpose for providing the requested information on this form is to determine if you should be considered for deferred action as a childhood arrival. The information you provide will be used in making a decision whether to defer removal action in your case as an exercise of prosecutorial discretion.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your request.

**ROUTINE USES:** The information you provide on this form may be shared with other Federal, state, local, and foreign government agencies and authorized organizations following approved routine uses described in the associated published system of records notices [DHS/USCIS-007 - Benefits Information System and DHS/USCIS-001 - Alien File, Index, and National File Tracking System of Records which can be found at **www.dhs.gov/privacy**].

## Other Disclosure Information

Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (**www.uscis.gov/NTA**). The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. **The above information sharing clause covers family members and guardians, in addition to the requestor.**

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid OMB control number. The public reporting burden for this collection of information is estimated at 3 hours per response, including the time for reviewing instructions and completing and submitting the form. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 20 Massachusetts Ave NW, Washington, DC 20529-2140; OMB No. 1615-0124. **Do not mail your completed Form I-821D to this address.**

| **Reminder** |
|---|

### For Initial and Renewal Request

- [ ] Did you submit Form I-765 along with the filing and biometric services fees ($495) required for the application or employment authorization, and did you also submit a completed Form I-765WS?
- [ ] Did you answer every relevant **Item Number**?
- [ ] Did you provide an original, handwritten signature and date your request?
- [ ] Did you submit the necessary documents? For Initial requests, did you submit documents to meet each guideline? For Renewal requests, see the section titled Evidence for Renewal Requests Only.
- [ ] If you were issued a final order of exclusion, deportation, or removal, did you include a copy of that final order (if available and if you had not already submitted it to USCIS)?
- [ ] If your exclusion, deportation, or removal proceedings were terminated by an immigration judge, did you include a copy of the immigration judge's termination order (if available and if you had not already submitted it to USCIS)?
- [ ] If you have ever been arrested for, charged with, or convicted of any felony or misdemeanor in the United States or any crime in any country other than the United States, did you submit an original, official, or court-certified document that shows your complete arrest record and final disposition for each incident (if available and if you had not already submitted it to USCIS)?

### For Initial Requests Only

- [ ] Did you submit evidence to show that you came to the United States while under 16 years of age?
- [ ] Did you submit evidence to prove your identity, date of initial entry, and continuous residence from June 15, 2007 (or earlier) up to the present time?
- [ ] Did you submit evidence that you are currently in school, have a GED certificate, have graduated or received a certificate of completion from high school, or are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?
- [ ] Did you provide evidence showing that you had no lawful status as of June 15, 2012?

Appeal: 18-1521   Document: 3   Filed: 07/03/2018   Pg: 484 of 572
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 484 of 1026 PageID #: 10075

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 29 of 116

# EXHIBIT 15

AR1736



**U.S. Citizenship and
Immigration Services**

---

### Archived Content

**This page contains information that is no longer current but remains on our site for reference purposes.**

---

## Frequently Asked Questions

*DHS DACA FAQs*

<hr>

### DACA is Ending

- **We are no longer accepting initial or renewal requests for Deferred Action for Childhood Arrivals. We will consider DACA requests received from residents of the U.S. Virgin Islands and Puerto Rico on a case-by-case basis.**
- **If you are a current DACA recipient and your still-valid Employment Authorization Document (EAD) has been lost, stolen or destroyed, you may request a replacement EAD by filing a new Form I-765 at any time, if the EAD is still valid.**
- **We will no longer approve advance parole requests associated with DACA.**
- **Read the 2017 DACA announcement.**

<hr>

DACA ProcessWhat is Deferred Action for Childhood Arrivals?General Information for All Requestors

- Background Checks
- After USCIS Makes a Decision

Initial Requests for DACA
Renewal of DACA
Travel
Criminal Convictions
Miscellaneous

## I. General Information for All Requestors

### A. What is Deferred Action for Childhood Arrivals?

As the Department of Homeland Security (DHS) continues to focus its enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety, DHS will exercise prosecutorial discretion as appropriate to ensure that enforcement resources are not expended on low priority cases, such as individuals who came to the United States as children and meet other key guidelines. Individuals who demonstrate that they meet the guidelines below may request consideration of deferred action for childhood arrivals (DACA) for a period of two years, subject to renewal for a period of two years, and may be eligible for employment authorization.

You may request consideration of DACA if you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012, meaning that:

   - You never had a lawful immigration status on or before June 15, 2012, or
   - Any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, a significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

**Individuals can call U.S. Citizenship and Immigration Services (USCIS) at 1-800-375-5283 with questions or to request more information on DACA.** Those with pending requests can also use a number of online self-help tools which include the ability to check case status and processing times, change your address, and send an inquiry about a case pending longer than posted processing times or non-delivery of a card or document.

**Q1: What is deferred action?**
A1: Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon **unlawful presence**, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer **lawful status** upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence.

Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment." DHS can terminate or renew deferred action at any time, at the agency's discretion.

**Q2: What is DACA?**
A2: On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of two years, subject to renewal, and would then be eligible for work authorization.

Individuals who can demonstrate through verifiable documentation that they meet these guidelines will be considered for deferred action. Determinations will be made on a case-by-case basis under the DACA guidelines.

**Q3: Is there any difference between "deferred action" and DACA under this process?**
A3: DACA is one form of deferred action. The relief an individual receives under DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.

**Q4: If my removal is deferred under the consideration of DACA, am I eligible for employment authorization?**
A4: Yes. Under existing regulations, if your case is deferred, you may obtain employment authorization from USCIS provided you can demonstrate an economic necessity for employment.

**Q5: If my case is deferred, am I in lawful status for the period of deferral?**
A5: No. Although action on your case has been deferred and you do not accrue unlawful presence (for

admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status.

The fact that you are not accruing unlawful presence does not change whether you are in lawful status while you remain in the United States. However, although deferred action does not confer a lawful immigration status, your period of stay is authorized by the Department of Homeland Security while your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time. **Individuals granted deferred action are not precluded by federal law from establishing domicile in the U.S.**

Apart from the immigration laws, "lawful presence," "lawful status" and similar terms are used in various other federal and state laws. For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state or local authorities.

**Q6: Can I renew my period of deferred action and employment authorization under DACA?**
A6: Yes. You may request consideration for a renewal of your DACA. Your request for consideration will be considered on a case-by-case basis. If USCIS renews its exercise of discretion under DACA for your case, you will receive deferred action for another two years, and if you demonstrate an economic necessity for employment, you may receive employment authorization throughout that period.

Return to top.

B. DACA Process

**Q7: How do I request consideration of DACA?**
A7: To request consideration of DACA (either as an initial request or to request a renewal), you must submit Form I-821D, Consideration of Deferred Action for Childhood Arrivals to USCIS. Please visit uscis.gov/i-821d before you begin the process to make sure you are using the most current version of the form available. This form must be completed, properly signed and accompanied by a Form I-765, Application for Employment Authorization, and a Form I-765WS, Worksheet (PDF, 235 KB), establishing your economic need for employment. If you fail to submit a completed Form I-765 (along with the accompanying filing fees for that form, please see the Form I-821D page for more information), USCIS will not consider your request for deferred action. Please read the form instructions to ensure that you answer the appropriate questions (determined by whether you are submitting an initial or renewal request) and that you submit all the required documentation to support your initial request.

You must file your request for consideration of DACA at the USCIS Lockbox. You can find the mailing address and instructions at www.uscis.gov/i-821d. As of June 5, 2014, requestors must use the new version of the form. After your Form I-821D, Form I-765, and Form I-765 Worksheet have been received, USCIS will review them for completeness, including submission of the required fee, initial evidence and supporting documents (for initial filings).

If it is determined that the request is complete, USCIS will send you a receipt notice. USCIS will then send you an appointment notice to visit an Application Support Center (ASC) for biometric services, if an appointment is required. Please make sure you read and follow the directions in the notice. Failure to attend your biometrics appointment may delay processing of your request for consideration of deferred action, or may result in a denial of your request. You may also choose to receive an email and/or text message notifying you that your form has been accepted by completing a Form G-1145, E-Notification of Application/Petition Acceptance.

Each request for consideration of DACA will be reviewed on an individual, case-by-case basis. USCIS may request more information or evidence from you, or request that you appear at a USCIS office. USCIS will notify you of its determination in writing.

**Note:** All individuals who believe they meet the guidelines, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS through this process. Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their deportation officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information visit ICE's website at www.ice.gov/daca.

J.A. 1009                                              AR1739

**Q8: Can I obtain a fee waiver or fee exemption for this process?**
A8: There are no fee waivers available for employment authorization applications connected to DACA. There are very limited fee exemptions available. Requests for fee exemptions must be filed and favorably adjudicated before an individual files his/her request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must submit a letter and supporting documentation to USCIS demonstrating that you meet one of the following conditions:

- You are under 18 years of age, have an income that is less than 150 percent of the U.S. poverty level, and are in foster care or otherwise lacking any parental or other familial support; or
- You are under 18 years of age and homeless; or
- You cannot care for yourself because you suffer from a serious, chronic disability and your income is less than 150 percent of the U.S. poverty level; or,
- You have, at the time of the request, accumulated **$10,000** or more in debt in the past 12 months as a result of unreimbursed medical expenses for yourself or an immediate family member, and your income is less than 150 percent of the U.S. poverty level.

You can find additional information on our Fee Exemption Guidance Web page. Your request must be submitted and decided before you submit a request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must provide documentary evidence to demonstrate that you meet any of the above conditions at the time that you make the request. For evidence, USCIS will:

- Accept affidavits from community-based or religious organizations to establish a requestor's homelessness or lack of parental or other familial financial support.
- Accept copies of tax returns, bank statement, pay stubs, or other reliable evidence of income level. Evidence can also include an affidavit from the applicant or a responsible third party attesting that the applicant does not file tax returns, has no bank accounts, and/or has no income to prove income level.
- Accept copies of medical records, insurance records, bank statements, or other reliable evidence of unreimbursed medical expenses of at least **$10,000**.
- Address factual questions through Requests for Evidence (RFEs).

**Q9: If individuals meet the guidelines for consideration of DACA and are encountered by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE), will they be placed into removal proceedings?**
A9: DACA is intended, in part, to allow CBP and ICE to focus on priority cases. Under the direction of the Secretary of Homeland Security, if an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended, placed into removal proceedings, or removed. If individuals believe that, in light of this policy, they should not have been apprehended or placed into removal proceedings, contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q10: Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?**
A10: This process is open to any individual who can demonstrate he or she meets the guidelines for consideration, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention).

**Q11: If I am not in removal proceedings but believe I meet the guidelines for consideration of DACA, should I seek to place myself into removal proceedings through encounters with CBP or ICE?**
A11: No. If you are not in removal proceedings but believe that you meet the guidelines, you should submit your DACA request to USCIS under the process outlined below.

**Q12: Can I request consideration of DACA from USCIS if I am in immigration detention under the custody of ICE?**
A12: No. If you are currently in immigration detention, you may not request consideration of DACA from USCIS. If you think you may meet the guidelines of this process, you should identify yourself to your deportation officer

or Jail Liaison. You may also contact the ICE Field Office Director. For more information, visit ICE's website at www.ice.gov/daca.

**Q13: If I am about to be removed by ICE and believe that I meet the guidelines for consideration of DACA, what steps should I take to seek review of my case before removal?**
A13: If you believe you can demonstrate that you meet the guidelines and are about to be removed, you should immediately contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q14: What should I do if I meet the guidelines of this process and have been issued an ICE detainer following an arrest by a state or local law enforcement officer?**
A14: If you meet the guidelines and have been served a detainer, you should immediately contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q15: If I accepted an offer of administrative closure under the case-by-case review process or my case was terminated as part of the case-by-case review process, can I be considered for deferred action under this process?**
A15: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you have accepted an offer of administrative closure or termination under the case-by-case review process.

**Q16: If I declined an offer of administrative closure under the case-by-case review process, can I be considered for deferred action under this process?**
A16: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you declined an offer of administrative closure under the case-by-case review process.

**Q17: If my case was reviewed as part of the case-by-case review process but I was not offered administrative closure, can I be considered for deferred action under this process?**
A17: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you were not offered administrative closure following review of your case as part of the case-by-case review process.

**Q18: Can I request consideration of DACA under this process if I am currently in a nonimmigrant status (e.g. F-1, E-2, H-4) or have Temporary Protected Status (TPS)?**
A18: No. You can only request consideration of DACA under this process if you currently have no immigration status and were not in any lawful status on June 15, 2012.

**Q19: Will the information I share in my request for consideration of DACA be used for immigration enforcement purposes?**
A19: Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

**Q20: If my case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?**
A20: If your case is referred to ICE for purposes of immigration enforcement or you receive an NTA, information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians. However, that information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than

J.A. 1011

AR1741

removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

**Q21: Will USCIS verify documents or statements that I provide in support of a request for DACA?**

A21: USCIS has the authority to verify documents, facts, and statements that are provided in support of requests for DACA. USCIS may contact education institutions, other government agencies, employers, or other entities in order to verify information.

<div align="right"><u>Return to top.</u></div>

**C. Background Checks**

**Q22: Will USCIS conduct a background check when reviewing my request for consideration of DACA?**
A22: Yes. You must undergo biographic and biometric background checks before USCIS will consider your DACA request.

**Q23: What do background checks involve?**
A23: Background checks involve checking biographic and biometric information provided by the individuals against a variety of databases maintained by DHS and other federal government agencies.

**Q24: What steps will USCIS and ICE take if I engage in fraud through the new process?**
A24: If you knowingly make a misrepresentation, or knowingly fail to disclose facts, in an effort to obtain DACA or work authorization through this process, you will be treated as an immigration enforcement priority to the fullest extent permitted by law, and be subject to criminal prosecution and/or removal from the United States.

<div align="right"><u>Return to top.</u></div>

**D. After USCIS Makes a Decision**

**Q25: Can I appeal USCIS' determination?**
A25: No. You cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies your request for consideration of DACA.

You may request a review of your I-821D denial by contacting USCIS' National Customer Service Center at 1-800-375-5283 to have a service request created if you believe that you actually did meet all of the DACA guidelines and you believe that your request was denied because USCIS:

- Denied the request based on abandonment, when you actually responded to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) within the prescribed time;
- Mailed the RFE or NOID to the wrong address although you had changed your address online at www.uscis.gov **or** with a customer service representative on the phone and submitted a Form AR-11, Change of Address, before USCIS issued the RFE or NOID.
  - To ensure the address is updated on a pending case as quickly as possible, we recommend that customers submit a change of address request at www.uscis.gov/addresschange. Please note that only an online change of address or a Form AR-11 submission will satisfy the legal requirements for notifying the agency of an address change. Therefore, if you called a customer service representative to change your address, please be sure you have also submitted your address change online or with a Form AR-11.
- Denied the request on the grounds that you did not come to the United States prior to your 16th birthday, but the evidence submitted at the time of filing shows that you did arrive before reaching that age.
- Denied the request on the grounds that you were under age 15 at the time of filing but not in removal proceedings, while the evidence submitted at the time of filing show that you indeed were in removal proceedings when the request was filed;

Appeal 18-1521 Case 1:17-cv-05228-NGG-VMS Filed 07/02/2018 Document 29-7 Filed 09/04/20 Page 491 of 1026 PageID #: 10082

Case 8:17-cv-02942-RWT Document 29-3 Filed 11/28/17 Page 36 of 116

Frequently Asked Questions | USCIS

- Denied the request on the grounds that you were 31 or older as of June 15, 2012, but the evidence submitted at the time of filing shows that you were under the age of 31 as of June 15, 2012;
- Denied the request on the grounds that you had lawful status on June 15, 2012, but the evidence submitted at the time of filing shows that you indeed were in an unlawful immigration status on that date;
- Denied the request on the grounds that you were not physically present in the United States on June 15, 2012, and up through the date of filing, but the evidence submitted at the time of filing shows that you were, in fact, present;
- Denied the request due to your failure to appear at a USCIS Application Support Center (ASC) to have your biometrics collected, when you in fact either did appear at a USCIS ASC to have this done or requested prior to the scheduled date of your biometrics appointment to have the appointment rescheduled; or
- Denied the request because you did not pay the filing fees for Form I-765, Application for Employment Authorization, when you actually did pay these fees

If you believe your request was denied due to any of these administrative errors, you may contact our National Customer Service Center at 1-800-375-5283 or 1-800-767-1833 (TDD for the hearing impaired). Customer service officers are available Monday – Friday from 8 a.m. – 6 p.m. in each U.S. time zone.

**Q26: If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?**
A26: If you have submitted a request for consideration of DACA and USCIS decides not to defer action in your case, USCIS will apply its policy guidance governing the referral of cases to ICE and the issuance of Notices to Appear (NTA). If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, your case will not be referred to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances. For more detailed information on the applicable NTA policy, visit www.uscis.gov/NTA. If after a review of the totality of circumstances USCIS determines to defer action in your case, USCIS will likewise exercise its discretion and will not issue you an NTA.

**Q27: Can my deferred action under the DACA process be terminated before it expires?**

A27: Yes.

DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.

Return to top.

## II. Initial Requests for DACA

**Q28: What guidelines must I meet to be considered for deferred action for childhood arrivals (DACA)?**
A28: Under the Secretary of Homeland Security's June 15, 2012 memorandum, in order to be considered for DACA, you must submit evidence, including supporting documents, showing that you:

1. Were under the age of 31 as of June 15, 2012;
2. Came to the United States before reaching your 16th birthday;
3. Have continuously resided in the United States since June 15, 2007, up to the present time;
4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;
5. Had no lawful status on June 15, 2012;
6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and
7. Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA. U.S. Citizenship and Immigration Services (USCIS) retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the

guidelines are met.

**Q29: How old must I be in order to be considered for deferred action under this process?**
A29:

- If you have never been in removal proceedings, or your proceedings have been terminated before your request for consideration of DACA, you must be at least 15 years of age or older at the time of filing and meet the other guidelines.
- If you are in removal proceedings, have a final removal order, or have a voluntary departure order, and are not in immigration detention, you can request consideration of DACA even if you are under the age of 15 at the time of filing and meet the other guidelines.
- In all instances, you must have been under the age of 31 as of June 15, 2012, to be considered for DACA.

**Q30: I first came to the United States before I turned 16 years old and have been continuously residing in the United States since at least June 15, 2007. Before I turned 16 years old, however, I left the United States for some period of time before returning and beginning my current period of continuous residence. May I be considered for deferred action under this process?**
A30: Yes, but only if you established residence in the United States during the period before you turned 16 years old, as evidenced, for example, by records showing you attended school or worked in the United States during that time, or that you lived in the United States for multiple years during that time. In addition to establishing that you initially resided in the United States before you turned 16 years old, you must also have maintained continuous residence in the United States from June 15, 2007, until the present time to be considered for deferred action under this process.

**Q31: To prove my continuous residence in the United States since June 15, 2007, must I provide evidence documenting my presence for every day, or every month, of that period?**
A31: To meet the continuous residence guideline, you must submit documentation that shows you have been living in the United States from June 15, 2007, up until the time of your request. You should provide documentation to account for as much of the period as reasonably possible, but there is no requirement that every day or month of that period be specifically accounted for through direct evidence.

It is helpful to USCIS if you can submit evidence of your residence during at least each year of the period. USCIS will review the documentation in its totality to determine whether it is more likely than not that you were continuously residing in the United States for the period since June 15, 2007. Gaps in the documentation as to certain periods may raise doubts as to your continued residence if, for example, the gaps are lengthy or the record otherwise indicates that you may have been outside the United States for a period of time that was not brief, casual or innocent.

If gaps in your documentation raise questions, USCIS may issue a Request for Evidence to allow you to submit additional documentation that supports your claimed continuous residence.

Affidavits may be submitted to explain a gap in the documentation demonstrating that you meet the five-year continuous residence requirement. If you submit affidavits related to the continuous residence requirement, you must submit two or more affidavits, sworn to or affirmed by people other than yourself who have direct personal knowledge of the events and circumstances during the period as to which there is a gap in the documentation. Affidavits may only be used to explain gaps in your continuous residence; they cannot be used as evidence that you meet the entire five-year continuous residence requirement.

**Q32: Does "currently in school" refer to the date on which the request for consideration of deferred action is filed?**
A32: To be considered "currently in school" under the guidelines, you must be enrolled in school on the date you submit a request for consideration of deferred action under this process.

**Q33: Who is considered to be "currently in school" under the guidelines?**
A33: To be considered "currently in school" under the guidelines, you must be enrolled in:

- a public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets state requirements;

J.A. 1014

AR1744

- an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; or

- an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other state-authorized exam (e.g., HiSet or TASC) in the United States.

Such education, literacy, career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under state law, or in passing a GED exam or other state-authorized exam in the United States, include, but are not limited to, programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations. Programs funded by other sources may qualify if they are programs of demonstrated effectiveness.

In assessing whether such programs not funded in whole or in part by federal, state, county or municipal grants or administered by non-profit organizations are of demonstrated effectiveness, USCIS will consider the duration of the program's existence; the program's track record in assisting students in obtaining a regular high school diploma or its recognized equivalent, in passing a GED or other state-authorized exam (e.g., HiSet or TASC), or in placing students in postsecondary education, job training, or employment; and other indicators of the program's overall quality. For individuals seeking to demonstrate that they are "currently in school" through enrollment in such a program, the burden is on the requestor to show the program's demonstrated effectiveness.

**Q34: How do I establish that I am currently in school?**

A34: Documentation sufficient for you to demonstrate that you are currently in school may include, but is not limited to:

- evidence that you are enrolled in a public, private, or charter elementary school, junior high or middle school, high school or secondary school; alternative program, or homeschool program that meets state requirements; or

- evidence that you are enrolled in an education, literacy, or career training program (including vocational training) that:
  - has a purpose of improving literacy, mathematics, or English, or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; and
  - is funded, in whole or in part, by federal, state, county or municipal grants or is administered by non-profit organizations, or if funded by other sources, is a program of demonstrated effectiveness; or

- evidence that you are enrolled in an education program assisting students in obtaining a high school equivalency diploma or certificate recognized under state law (such as by passing a GED exam or other such state-authorized exam [for example, HiSet or TASC]), and that the program is funded in whole or in part by federal, state, county or municipal grants or is administered by non-profit organizations or if funded by other sources, is of demonstrated effectiveness.

Such evidence of enrollment may include: acceptance letters, school registration cards, letters from a school or program, transcripts, report cards, or progress reports which may show the name of the school or program, date of enrollment, and current educational or grade level, if relevant.

**Q35: What documentation may be sufficient to demonstrate that I have graduated from high school?**
A35: Documentation sufficient for you to demonstrate that you have graduated from high school may include, but is not limited to, a high school diploma from a public or private high school or secondary school, a certificate of completion, a certificate of attendance, or an alternate award from a public or private high school or secondary school, or a recognized equivalent of a high school diploma under state law, or a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC) in the United States.

**Q36: What documentation may be sufficient to demonstrate that I have obtained a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC)?**
A36: Documentation may include, but is not limited to, evidence that you have passed a GED exam, or other state-authorized exam (e.g., HiSet or TASC), and, as a result, have received the recognized equivalent of a regular high school diploma under state law.

**Q37: If I am enrolled in a literacy or career training program, can I meet the guidelines?**
A37: Yes, in certain circumstances. You may meet the guidelines if you are enrolled in an education, literacy, or career training program that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement. Such programs include, but are not limited to, programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations, or if funded by other sources, are programs of demonstrated effectiveness.

**Q38: If I am enrolled in an English as a Second Language (ESL) program, can I meet the guidelines?**
A38: Yes, in certain circumstances. Enrollment in an ESL program may be used to meet the guidelines if the ESL program is funded in whole or in part by federal, state, county or municipal grants, or administered by non-profit organizations, or if funded by other sources is a program of demonstrated effectiveness. You must submit direct documentary evidence that the program is funded in whole or part by federal, state, county or municipal grants, administered by a non-profit organization, or of demonstrated effectiveness.

**Q39: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met the education guidelines?**
A39: No. Evidence not listed in Chart #1 will not be accepted to establish that you are currently in school, have graduated or obtained a certificate of completion from high school, or have obtained a GED or passed another state-authorized exam (e.g., HiSet or TASC). You must submit any of the documentary evidence listed in Chart #1 to show that you meet the education guidelines.

**Q40: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met certain initial guidelines?**
A40: Evidence other than those documents listed in Chart #1 may be used to establish the following guidelines and factual showings if available documentary evidence is insufficient or lacking and shows that:

- You were physically present in the United States on June 15, 2012;
- You came to the United States before reaching your 16th birthday;
- You satisfy the continuous residence requirement, as long as you present direct evidence of your continued residence in the United States for a portion of the required period and the circumstantial evidence is used only to fill in gaps in the length of continuous residence demonstrated by the direct evidence; and
- Any travel outside the United States during the period of required continuous presence was brief, casual, and innocent.

However, USCIS will not accept evidence other than the documents listed in Chart #1 as proof of any of the following guidelines to demonstrate that you:

- Were under the age of 31 on June 15, 2012; and
- Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

For example, even if you do not have documentary proof of your presence in the United States on June 15, 2012, you may still be able to satisfy the guideline. You may do so by submitting credible documentary evidence that you were present in the United States shortly before and shortly after June 15, 2012, which, under the facts presented, may give rise to an inference of your presence on June 15, 2012 as well. However, evidence other than that listed in Chart #1 will not be accepted to establish that you have graduated high school. You must submit the designated documentary evidence to satisfy that you meet this guideline.

Chart #1 provides examples of documentation you may submit to demonstrate you meet the initial guidelines for consideration of deferred action under this process. Please see the instructions of Form I-821D.

Frequently Asked Questions | USCIS

Consideration of Deferred Action for Childhood Arrivals, for additional details of acceptable documentation.

| Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines | |
|---|---|
| Proof of identity | • Passport or national identity document from your country of origin<br>• Birth certificate with photo identification<br>• School or military ID with photo<br>• Any U.S. government immigration or other document bearing your name and photo |
| Proof you came to U.S. before your 16th birthday | • Passport with admission stamp<br>• Form I-94/I-95/I-94W<br>• School records from the U.S. schools you have attended<br>• Any Immigration and Naturalization Service or DHS document stating your date of entry (Form I-862, Notice to Appear)<br>• Travel records<br>• Hospital or medical records<br>• Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Birth certificates of children born in the U.S.<br>• Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of immigration status | • Form I-94/I-95/I-94W with authorized stay expiration date<br>• Final order of exclusion, deportation, or removal issued as of June 15, 2012<br>• A charging document placing you into removal proceedings |
| Proof of presence in U.S. on June 15, 2012 | • Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• School records (letters, report cards, etc.)<br>• Military records (Form DD-214 or NGB Form 22)<br>• Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Passport entries<br>• Birth certificates of children born in the U.S.<br>• Dated bank transactions<br>• Automobile license receipts or registration |

| Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines | |
|---|---|
| Proof you continuously resided in U.S. since June 15, 2007 | • Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of your education status at the time of requesting consideration of DACA | • School records (transcripts, report cards, etc.) from the school that you are currently attending in the United States showing the name(s) of the school(s) and periods of school attendance and the current educational or grade level<br>• U.S. high school diploma, certificate of completion, or other alternate award<br>• High school equivalency diploma or certificate recognized under state law<br>• Evidence that you passed a state-authorized exam, including the GED or other state-authorized exam (for example, HiSet or TASC) in the United States |
| Proof you are an honorably discharged veteran of the U.S. Armed Forces or the U.S. Coast Guard | • Form DD-214, Certificate of Release or Discharge from Active Duty<br>• NGB Form 22, National Guard Report of Separation and Record of Service<br>• Military personnel records<br>• Military health records |

**Q41: May I file affidavits as proof that I meet the initial guidelines for consideration of DACA?**
A41: Affidavits generally will not be sufficient on their own to demonstrate that you meet the guidelines for USCIS to consider you for DACA. However, affidavits may be used to support meeting the following guidelines only if the documentary evidence available to you is insufficient or lacking:

• Demonstrating that you meet the five year continuous residence requirement; and

• Establishing that departures during the required period of continuous residence were brief, casual and innocent.

If you submit affidavits related to the above criteria, you must submit two or more affidavits, sworn to or affirmed by people other than yourself, who have direct personal knowledge of the events and circumstances. Should USCIS determine that the affidavits are insufficient to overcome the unavailability or the lack of documentary evidence with respect to either of these guidelines, it will issue a Request for Evidence, indicating that further evidence must be submitted to demonstrate that you meet these guidelines.

USCIS will not accept affidavits as proof of satisfying the following guidelines:

• You are currently in school, have graduated or obtained a certificate of completion or other alternate award from high school, have obtained a high school equivalency diploma or certificate (such as by passing the GED exam or other state-authorized exam [for example, HiSet or TASC]), or are an honorably discharged veteran from the Coast Guard or Armed Forces of the United States;

• You were physically present in the United States on June 15, 2012;

• You came to the United States before reaching your 16th birthday;

• You were under the age of 31 on June 15, 2012; and

• Your criminal history, if applicable.

If the only evidence you submit to demonstrate you meet any of the above guidelines is an affidavit, USCIS will issue a Request for Evidence, indicating that you have not demonstrated that you meet these guidelines and that you must do so in order to demonstrate that you meet that guideline.

**Q42: Will I be considered to be in unlawful status if I had an application for asylum or cancellation of removal pending before either USCIS or the Executive Office for Immigration Review (EOIR) on June 15, 2012?**
A42: Yes. If you had an application for asylum or cancellation of removal, or similar relief, pending before either USCIS or EOIR as of June 15, 2012, but had no lawful status, you may request consideration of DACA.

**Q43: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but violated my immigration status (e.g., by engaging in unauthorized employment, failing to report to my employer, or failing to pursue a full course of study) before June 15, 2012. May I be considered for deferred action under this process?**
A43: No, unless the Executive Office for Immigration Review terminated your status by issuing a final order of removal against you before June 15, 2012.

**Q44: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012 but "aged out" of my dependent nonimmigrant status as of June 15, 2012. May I be considered for deferred action under this process?**
A44: Yes. For purposes of satisfying the "had no lawful status on June 15, 2012," guideline alone, if you were admitted for "duration of status" or for a period of time that extended past June 14, 2012 but "aged out" of your dependent nonimmigrant status, on or before June 15, 2012, (meaning you turned 21 years old on or before June 15, 2012), you may be considered for deferred action under this process.

**Q45: I was admitted for "duration of status" but my status in SEVIS is listed as terminated on or before June 15, 2012. May I be considered for deferred action under this process?**
A45: Yes. For the purposes of satisfying the ""had no lawful status on June 15, 2012," guideline alone, if your status as of June 15, 2012, is listed as "terminated" in SEVIS, you may be considered for deferred action under this process.

**Q46: I am a Canadian citizen who was inspected by CBP but was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**

A46: In general, a Canadian citizen who was admitted as a visitor for business or pleasure and not issued an I-94, Arrival/Departure Record, (also known as a "non-controlled" Canadian nonimmigrant) is lawfully admitted for a period of six months. For that reason, unless there is evidence, including verifiable evidence provided by the individual, that he or she was specifically advised that his or her admission would be for a different length of time, the Department of Homeland Security (DHS) will consider for DACA purposes only, that the alien was lawfully admitted for a period of six months. Therefore, if DHS is able to verify from its records that your last non-controlled entry occurred on or before Dec. 14, 2011, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012 and you may be considered for deferred action under this process.

**Q47: I used my Border Crossing Card (BCC) to obtain admission to the United States and was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**

A47: Because the limitations on entry for a BCC holder vary based on location of admission and travel, DHS will assume that the BCC holder who was not provided an I-94 was admitted for the longest period legally possible—30 days—unless the individual can demonstrate, through verifiable evidence, that he or she was specifically advised that his or her admission would be for a different length of time. Accordingly, if DHS is able to verify from its records that your last admission was using a BCC, you were not issued an I-94 at the time of admission, and it occurred on or before May 14, 2012, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under this process.

**Q48: Do I accrue unlawful presence if I have a pending initial request for consideration of DACA?**
A48: You will continue to accrue unlawful presence while the request for consideration of DACA is pending unless you are under 18 years of age at the time of the request. If you are under 18 years of age at the time you submit your request, you will not accrue unlawful presence while the request is pending, even if you turn 18

J.A. 1019

AR1749

while your request is pending with USCIS. If action on your case is deferred, you will not accrue unlawful presence during the period of deferred action. However, having action deferred on your case will not excuse previously accrued unlawful presence.

<u>Return to top.</u>

## III. Renewal of DACA

### Q49: When should I file my renewal request with U.S. Citizenship and Immigration Services (USCIS)?

A49: USCIS strongly encourages you to submit your Deferred Action for Childhood Arrivals (DACA) renewal request between 150 days and 120 days before the expiration date located on your current Form I-797 DACA approval notice and Employment Authorization Document (EAD). Filing during this window will minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request.

USCIS' current goal is to process DACA renewal requests within 120 days. You may submit an inquiry about the status of your renewal request after it has been pending more than 105 days. To submit an inquiry online, please visit egov.uscis.gov/e-request.

- **Please Note:** Factors that may affect the timely processing of your DACA renewal request include, but are not limited to:
  - Failure to appear at an Application Support Center (ASC) for a scheduled biometrics appointment to obtain fingerprints and photographs. No-shows or rescheduling appointments will require additional processing time.
  - Issues of national security, criminality or public safety discovered during the background check process that require further vetting.
  - Issues of travel abroad that need additional evidence/clarification.
  - Name/date of birth discrepancies that may require additional evidence/clarification.
  - The renewal submission was incomplete or contained evidence that suggests a requestor may not satisfy the DACA renewal guidelines and USCIS must send a request for additional evidence or explanation

### Q50: Can I file a renewal request outside the recommended filing period of 150 days to 120 days before my current DACA expires?

A50: USCIS strongly encourages you to file your renewal request within the recommended 150-120 day filing period to minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request. Requests received earlier than 150 days in advance will be accepted; however, this could result in an overlap between your current DACA and your renewal. This means your renewal period may extend for less than a full two years from the date that your current DACA period expires..

If you file after the recommended filing period (meaning less than 120 days before your current period of DACA expires), there is an increased possibility that your current period of DACA and employment authorization will expire before you receive a decision on your renewal request. If you file after your most recent DACA period expired, but within one year of its expiration, you may submit a request to renew your DACA. If you are filing beyond one year after your most recent period of DACA expired, you may still request DACA by submitting a new initial request.

### Q51: How will USCIS evaluate my request for renewal of DACA:

A51: You may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you:

- Did not depart the United States on or after Aug. 15, 2012, without advance parole;
- Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and
- Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA renewal. USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

**Q52 Do I accrue unlawful presence if I am seeking renewal and my previous period of DACA expires before I receive a renewal of deferred action under DACA? Similarly, what would happen to my work authorization?**

A52: Yes, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will accrue unlawful presence for any time between the periods of deferred action unless you are under 18 years of age at the time you submit your renewal request.

Similarly, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will not be authorized to work in the United States regardless of your age at time of filing until and unless you receive a new employment authorization document from USCIS.

**Q53. Do I need to provide additional documents when I request renewal of deferred action under DACA?**

A53. No, unless you have *new* documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS in a previously approved DACA request. USCIS, however, reserves the authority to request at its discretion additional documents, information or statements relating to a DACA renewal request determination.

CAUTION: If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

**Q54.  If I am no longer in school, can I still request to renew my DACA?**
A54.  Yes. Neither Form I-821D nor the instructions ask renewal requestors for information about continued school enrollment or graduation. The instructions for renewal requests specify that you may be considered for DACA renewal if you met the guidelines for consideration of initial DACA, including the educational guidelines and:

1. Did not depart the United States on or after August 15, 2012, without advance parole;
2. Have continuously resided in the United States, up to the present time, since you submitted your most recent request for DACA that was approved; and
3. Have not been convicted of a felony, a significant misdemeanor or three or more misdemeanors, and are not a threat to national security or public safety.

**Q55.  If I initially received DACA and was under the age of 31 on June 15, 2012, but have since become 31 or older, can I still request a DACA renewal?**
A55. Yes. You may request consideration for a renewal of DACA as long as you were under the age of 31 as of June 15, 2012.

## IV. Travel

**Q56: May I travel outside of the United States before I submit an initial Deferred Action for Childhood Arrivals (DACA) request or while my initial DACA request remains pending with the Department of Homeland Security (DHS)?**
A56: Any unauthorized travel outside of the United States on or after Aug. 15, 2012, will interrupt your continuous residence and you will not be considered for deferred action under this process. Any travel outside of the United States that occurred on or after June 15, 2007, but before Aug. 15, 2012, will be assessed by U.S. Citizenship and Immigration Services (USCIS) to determine whether the travel qualifies as brief, casual and innocent. (See Chart #2.)

CAUTION: You should be aware that if you have been ordered deported or removed, and you then leave the United States, your departure will likely result in your being considered deported or removed, with potentially

serious future immigration consequences.

**Q57: If my case is deferred under DACA, will I be able to travel outside of the United States?**
A57: Not automatically. If USCIS has decided to defer action in your case and you want to travel outside the United States, you must apply for advance parole by filing a _Form I-131, Application for Travel Document_ and paying the applicable fee ($575). USCIS will determine whether your purpose for international travel is justifiable based on the circumstances you describe in your request. Generally, USCIS will only grant advance parole if your travel abroad will be in furtherance of:

- humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- educational purposes, such as semester-abroad programs and academic research, or;
- employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Travel for vacation is not a valid basis for advance parole.

You may not apply for advance parole unless and until USCIS defers action in your case under the consideration of DACA. You cannot apply for advance parole at the same time as you submit your request for consideration of DACA. All advance parole requests will be considered on a case-by-case basis.

If USCIS has deferred action in your case under the DACA process after you have been ordered deported or removed, you may still request advance parole if you meet the guidelines for advance parole described above.

**CAUTION:** However, for those individuals who have been ordered deported or removed, before you actually leave the United States, you should seek to reopen your case before the Executive Office for Immigration Review (EOIR) and obtain administrative closure or termination of your removal proceeding. Even after you have asked EOIR to reopen your case, you should not leave the United States until after EOIR has granted your request. If you depart after being ordered deported or removed, and your removal proceeding has not been reopened and administratively closed or terminated, your departure may result in your being considered deported or removed, with potentially serious future immigration consequences. If you have any questions about this process, you may contact U.S. Immigration and Customs Enforcement (ICE) through the local ICE Office of the Chief Counsel with jurisdiction over your case.

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Q58: Do brief departures from the United States interrupt the continuous residence requirement?**
A58: A brief, casual and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States, your absence will be considered brief, casual and innocent if it was on or after June 15, 2007, and before Aug. 15, 2012, and:

1. The absence was short and reasonably calculated to accomplish the purpose for the absence;
2. The absence was not because of an order of exclusion, deportation or removal;
3. The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation or removal proceedings; and
4. The purpose of the absence and/or your actions while outside the United States were not contrary to law.

Once USCIS has approved your request for DACA, you may file _Form I-131_, Application for Travel Document, to request advance parole to travel outside of the United States.

CAUTION: If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Travel Guidelines (Chart #2)**

J.A. 1022    AR1752

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| On or after June 15, 2007, but before Aug. 15, 2012 | Brief, casual and innocent | No |
| | For an extended time | Yes |
| | Because of an order of exclusion, deportation, voluntary departure, or removal | |
| | To participate in criminal activity | |
| On or after Aug. 15, 2012, and before you have requested deferred action | Any | Yes. You cannot apply for advance parole unless and until DHS has determined whether to defer action in your case and you cannot travel until you receive advance parole.<br><br>In addition, if you have previously been ordered deported and removed and you depart the United States without taking additional steps to address your removal proceedings, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences. |
| On or after Aug. 15, 2012, and after you have requested deferred action | Any | |
| On or after Aug. 15, 2012 and after receiving DACA | Any | It depends. If you travel after receiving advance parole, the travel will not interrupt your continuous residence. However, if you travel *without* receiving advance parole, the travel *will* interrupt your continuous residence. |

J.A. 1023

AR1753

**Q59: May I file a request for advance parole concurrently with my DACA package?**

A59: Concurrent filing of advance parole is not an option at this time. DHS is, however, reviewing its policy on concurrent filing of advance parole with a DACA request. In addition, DHS is also reviewing eligibility criteria for advance parole. If any changes to this policy are made, USCIS will update this FAQ and inform the public accordingly.

Return to top.

## V. Criminal Convictions

**Q60: If I have a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors, can I receive an exercise of prosecutorial discretion under this new process?**

A60: No. If you have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, you will not be considered for Deferred Action for Childhood Arrivals (DACA) except where the Department of Homeland Security (DHS) determines there are exceptional circumstances.

**Q61: What offenses qualify as a felony?**

A61: A felony is a federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year.

**Q62: What offenses constitute a significant misdemeanor?**

A62: For the purposes of this process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE). Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion. DHS retains the discretion to determine that an individual does not warrant deferred action on the basis of a single criminal offense for which the individual was sentenced to time in custody of 90 days or less.

**Q63: What offenses constitute a non-significant misdemeanor?**

A63: For purposes of this process, a non-significant misdemeanor is any misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Is not an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; and

2. Is one for which the individual was sentenced to time in custody of 90 days or less. The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by ICE.

Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Filed: 07/02/2018 Document 2828-7 Pg: 503 of 1026 Filed 09/04/20 Page 503 of 1026 PageID #: 10094

Case 8:17-cv-02942-RWT   Document 28-3   Filed 11/28/17   Page 48 of 116

the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.

**Q64: If I have a minor traffic offense, such as driving without a license, will it be considered a non-significant misdemeanor that counts towards the "three or more non-significant misdemeanors" making me unable to receive consideration for an exercise of prosecutorial discretion under this new process?**
A64: A minor traffic offense will not be considered a misdemeanor for purposes of this process. However, your entire offense history can be considered along with other facts to determine whether, under the totality of the circumstances, you warrant an exercise of prosecutorial discretion.

It is important to emphasize that driving under the influence is a significant misdemeanor regardless of the sentence imposed.

**Q65: What qualifies as a national security or public safety threat?**
A65: If the background check or other information uncovered during the review of your request for deferred action indicates that your presence in the United States threatens public safety or national security, you will not be able to receive consideration for an exercise of prosecutorial discretion except where DHS determines there are exceptional circumstances. Indicators that you pose such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States.

**Q66: Will offenses criminalized as felonies or misdemeanors by state immigration laws be considered felonies or misdemeanors for purpose of this process?**
A66: No. Immigration-related offenses characterized as felonies or misdemeanors by state immigration laws will not be treated as disqualifying felonies or misdemeanors for the purpose of considering a request for consideration of deferred action under this process.

**Q67: Will DHS consider my expunged or juvenile conviction as an offense making me unable to receive an exercise of prosecutorial discretion?**
A67: Expunged convictions and juvenile convictions will not automatically disqualify you. Your request will be assessed on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted. If you were a juvenile, but tried and convicted as an adult, you will be treated as an adult for purposes of the DACA process.

Return to top.

## VI. Miscellaneous

**Q68: Does deferred action provide me with a path to permanent resident status or citizenship?**
A68: No. Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

**Q69: Can I be considered for deferred action even if I do not meet the guidelines to be considered for DACA?**
A69: This process is only for individuals who meet the specific guidelines for DACA. Other individuals may, on a case-by-case basis, request deferred action from U.S. Citizenship and Immigration Services (USCIS) or U.S. Immigration and Customs Enforcement (ICE) in certain circumstances, consistent with longstanding practice.

**Q70: How will ICE and USCIS handle cases involving individuals who do not satisfy the guidelines of this process but believe they may warrant an exercise of prosecutorial discretion under the June 2011 Prosecutorial Discretion Memoranda?**
A70: If USCIS determines that you do not satisfy the guidelines or otherwise determines you do not warrant an exercise of prosecutorial discretion, then it will decline to defer action in your case. If you are currently in removal proceedings, have a final order, or have a voluntary departure order, you may then request ICE consider whether to exercise prosecutorial discretion.

**Q71: How should I fill out question 9 on Form I-765, Application for Employment Authorization?**
A71. When you are filing a Form I-765 as part of a DACA request, question 9 is asking you to list those Social Security numbers that were officially issued to you by the Social Security Administration.

J.A. 1025                                          AR1755

# EXHIBIT 16

AR1756

U.S. Citizenship and Immigration Service                    I-797, Notice of Action

# THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE | |
| LIN-12-909- | | I821 /I-821D | |

| RECEIPT DATE September 18, 2012 | PRIORITY DATE | APPLICANT |
| NOTICE DATE November 21, 2012 | PAGE 1 of 1 | NAME |

Notice Type: Approval Notice
Valid from 11/20/2012 to 11/19/2014

RECEIVED 11/26/12

**Notice of Deferred Action:**

This notice is to inform you regarding U.S. Citizenship and Immigration Services's (USCIS) decision on your Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

USCIS, in the exercise of its prosecutorial discretion, has decided to defer action in your case. Deferred action is an exercise of prosecutorial discretion by USCIS not to pursue the removal of an individual from the United States for a specific period. Deferred action does not confer or alter any immigration status.

Unless terminated, this decision to defer removal action will remain in effect for 2 years from the date of this notice.

This form does not constitute employment authorization, nor may it be used in place of an Employment Authorization Document. If granted, you will receive your Employment Authorization Document separately by mail. Subsequent criminal activity after your case has been deferred is likely to result in termination of your deferred action. This notice does not provide permission to travel outside of the United States.

You are required to notify USCIS if you change your address. You may use the Alien's Change of Address Card, Form AR-11, to report a new address. That form may be found at www.uscis.gov. There is no fee for this change of address form.

NOTICE: USCIS and the U.S. Department of Homeland Security (DHS) reserve the right to verify the information submitted in this request and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of the verification will be used to determine whether termination of deferred action and/or removal proceedings are appropriate if, for example, the requestor committed fraud or misrepresentation in his or her request for consideration of deferred action for childhood arrivals, or engaged in subsequent criminal activity following the submission of his or her request. Individuals for whom removal action is deferred under Deferred Action for Childhood Arrivals may, in the sole discretion of USCIS and DHS, be provided an opportunity to address derogatory information before deferred action is terminated and/or removal proceedings are initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
NEBRASKA SERVICE CENTER
U. S. CITIZENSHIP & IMMIG SERVICE
P.O. BOX 82521
LINCOLN   NE   68501-2521
Customer Service Telephone: 800-375-5283

Form I-797 (Rev. 01/31/05) N

# EXHIBIT 17

AR1758

Appeal 18-1521 - Document 28 - Filed 07/02/2018 - Pg 507 of 572 Case 1:17-cv-05228-NGG-VMS Document 28-27 Filed 09/04/20 Page 507 of 1026 PageID #: 10098

Case 8:17-cv-02942-RWT Document 29-3 Filed 11/28/17 Page 52 of 116



Privacy Impact Assessment
for the

# Deferred Action for Childhood Arrivals

# (DACA)

**DHS/USCIS/PIA-045**

**August 15, 2012**

**<u>Contact Point</u>**
**Donald K. Hawkins**
**Privacy Office**
**United States Citizenship and Immigration Services**
**(202) 272-8000**

**<u>Reviewing Official</u>**
**Jonathan R. Cantor**
**Acting Chief Privacy Officer**
**Department of Homeland Security**
**(202) 343-1717**

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Document 82-7   Filed 07/02/2018   Pg: 508 of 572   Page 508 of 1026 PageID #: 10099

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 53 of 116



**Homeland Security**

## Abstract

On June 15, 2012, Secretary of Homeland Security Janet Napolitano (the Secretary) issued a Department of Homeland Security (DHS) memorandum entitled, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (the Secretary's memorandum). The Secretary addressed the memorandum to the Acting Commissioner of U.S. Customs and Border Protection (CBP), and the Directors of U.S. Citizenship and Immigration Services (USCIS) and U.S. Immigration and Customs Enforcement (ICE).   The Secretary's memorandum sets forth how prosecutorial discretion may be exercised in cases involving certain people who arrived in the United States as children.  The Secretary emphasized that generally, this population lacked the intent to violate the law, and that her memorandum would ensure enforcement resources would not be expended on these low priority cases.

The basis for the Secretary's memorandum is the Secretary's authority to exercise prosecutorial discretion by deferring action in appropriate cases.  Prosecutorial discretion is the authority to determine how and when to exercise enforcement authority in line with agency priorities.  Deferred action is an exercise of this prosecutorial discretion to defer removal action against certain individuals who are unlawfully present in the United States in order to devote scarce enforcement resources to the highest priority removal cases, including individuals who pose a danger to national security or public safety or have been convicted of specific crimes.  USCIS is publishing this Privacy Impact Assessment (PIA) because the deferred action for childhood arrivals process associated with this memorandum involves the collection and use of personally identifiable information (PII).

## Overview

The Secretary of Homeland Security issued a memorandum that permits the Department to exercise prosecutorial discretion with respect to individuals who came to the United States as children.[1] DHS plans to exercise prosecutorial discretion when enforcing immigration laws against certain people who were brought to this country as children.  This policy allows DHS to ensure that enforcement resources are not expended on low priority cases, such as individuals who were illegally brought into this country as children, have not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and meet other key guidelines.  Furthermore, DHS is able to focus greater attention on the removal of individuals who pose a danger to national security or a risk to public safety.

USCIS developed and implemented a formal process for individuals who believe they meet the deferred action for childhood arrivals guidelines to request consideration of deferred action. This process is open to any individual who can demonstrate that he or she meets the guidelines for consideration, as

---

[1] On June 15, 2012, Secretary of Homeland Security Janet Napolitano (the Secretary) issued a Department of Homeland Security (DHS) memorandum entitled, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (the Secretary's memorandum). The Secretary's memorandum is available at http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

AR1760

Appeal: 18-1521   Doc: 28   Filed: 07/02/2018   Pg: 509 of 572
Case 1:17-cv-05228-NGG-VMS   Document 88-7   Filed 09/04/20   Page 509 of 1026 PageID #: 10100

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 54 of 116



**Homeland Security**

outlined in the June 15th Secretary's memorandum, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention). Pursuant to the direction of the Secretary, if an individual meets the guidelines of this process, CBP or ICE are to exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended, placed into removal proceedings, or removed.

Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. Deferred action does not confer lawful status upon an individual. In addition, although an individual whose case is deferred will not be considered to be accruing unlawful presence in the United States during the period deferred action is in effect, deferred action does not excuse individuals of any previous or subsequent periods of unlawful presence. Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment." DHS can terminate or renew deferred action at any time at the agency's discretion.

### Deferred Action for Childhood Arrivals

Pursuant to the guidelines for deferred action for childhood arrivals set forth by the Secretary of Homeland Security, individuals requesting consideration of deferred action are to:

- Be under the age of 31 as of June 15, 2012;

- Have come to the United States before reaching their 16th birthday;

- Have continuously resided in the United States since June 15, 2007, up to the date of filing;

- Have been physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action with USCIS;[2]

- Have entered without inspection before June 15, 2012, or had a lawful immigration status that expired as of June 15, 2012;

- Be currently in school,[3] have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

- Not have been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

Individuals who meet the guidelines above are eligible for consideration to receive deferred action for a period of two years, subject to renewal. The new process is open only to those who satisfy the guidelines. As such, immediate relatives, including dependents of individuals whose cases are deferred pursuant to the consideration of deferred action for childhood arrivals process, may not be considered for deferred action as part of this process unless they independently satisfy the guidelines.

---

[2] A brief, casual, and innocent absence from the United States does not interrupt continuous residence if it was before August 15, 2012.
[3] To be considered "currently in school" under the guidelines, the individual must be enrolled in school on the date the individual submits a request for consideration of deferred action under this process.

AR1761

 **Homeland Security**

### Forms to File for Deferred Action for Childhood Arrivals

Individuals seeking consideration of deferred action for childhood arrivals are to submit their request to USCIS through the consideration form, along with a form requesting employment authorization. Specifically, these forms include:

- Form I-821D, *Consideration of Deferred Action for Childhood Arrivals,* is used to request that USCIS consider deferring action, on a case-by-case basis, based on the guidelines set forth by the Secretary of Homeland Security in the memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,* published on June 15, 2012.

- Form I-765, *Application for Employment Authorization,* is used to apply for employment authorization.

- Form I-765, *Worksheet,* is used to establish economic necessity for employment.

Individuals are to concurrently file the Form I-821D, the Form I-765, and the I-765 Worksheet (I-765WS) with the appropriate fees to request consideration of deferred action for childhood arrivals. There is no fee to file Form I-821D or Form I-765WS. The Form I-765 fee for the Employment Authorization Document (EAD) is $465, which includes a $380 form fee and $85 for biometric services. USCIS plans to reject any Form I-821D submitted without Form I-765.

### Employment Authorization Eligibility under Deferred Action for Childhood Arrivals

Individuals who meet the guidelines for consideration of deferred action established above are also eligible for employment authorization under Title 8 Code of Federal Regulations (CFR), Section 274.a.12(c)(14). Those individuals seeking deferred action for childhood arrivals must also apply for an Employment Authorization Document (EAD) by completing Form I-765, *Application for Employment Authorization* with appropriate fees. An EAD is the document USCIS issues to individuals granted temporary employment authorization in the United States.[4] The validity period is two years, not to exceed the expiration date of the approval of deferred action. Although individuals seeking deferred action for childhood arrivals must apply for an EAD regardless of whether they have economic necessity, an EAD will not be approved without a showing of economic necessity. Individuals must demonstrate economic necessity by completing the I-765 Worksheet.

### Fee Exemption

There are no fee waivers available for employment authorization applications connected to the deferred action for childhood arrivals process. There are very limited fee exemptions available.[5] Requests for fee exemptions must be filed and favorably adjudicated before individuals file their requests for consideration of deferred action for childhood arrivals without a fee. In order to be considered for a fee exemption, the individual must submit a written letter and supporting documentation to USCIS demonstrating that he or she meets one of the following conditions:

---

[4] Form I-688, Form I-688A, Form I-688B, Form I-766, or any successor document issued by USCIS as evidence that the holder is authorized to work in the United States.
[5] 8 CFR section 103.7(c, d).


- Is under 18 and homeless, in foster care, or under 18 years of age and otherwise lacking any parental or other familial support, and with income less than 150% of the U.S. poverty level;
- Cannot care for him or herself due to suffering from a serious, chronic disability and having an income less than 150% of the U.S. poverty level; or
- Have, at the time of the request, accumulated $25,000 or more in debt in the past 12 months as a result of unreimbursed medical expenses for him or herself or an immediate family member, and having an income less than 150% of the U.S. poverty level.

The fee exemption request must be submitted and decided prior to the individual submitting a request for consideration of deferred action for childhood arrivals without a fee. Fee exemption requests submitted along with the deferred action filings are rejected.

In order to be considered for a fee exemption, the individual must provide documentary evidence to demonstrate that he or she meets any of the above conditions at the time of the request. For evidence USCIS will:

- Accept affidavits from community-based or religious organizations to establish an individual's homelessness or lack of parental or other familial financial support.
- Accept copies of tax returns, bank statements, pay stubs, or other reliable evidence of income level. Evidence can also include an affidavit from the individual or a responsible third party attesting that the individual does not file tax returns, has no bank accounts, and/or has no income to prove income level.
- Accept copies of medical records, insurance records, bank statements, or other reliable evidence of unreimbursed medical expenses of at least $25,000.
- Address factual questions through requests for evidence (RFEs).

USCIS mails a written notice to the individual indicating whether the fee exemption was approved or denied. The individual is also notified to supply the fee exemption approval notice along with his or her completed forms in order for USCIS to process the request for deferred action consideration.

**<u>Deferred Action for Childhood Arrivals Approval Process</u>**

The deferred action for childhood arrival approval process begins with an individual downloading Forms I-821D, I-765, and the I-765 Worksheet from the USCIS website. The request for consideration of deferred action must be mailed along with a separate application for employment authorization. All requests for consideration of deferred action for childhood arrivals filings, which include the completed forms, supporting evidence, and applicable fee or fee exemption approval, are submitted to the USCIS Lockbox facility (Lockbox) for initial intake processing. [6]

---

[6] Lockbox facilities are operated by a financial agent authorized by the Department of Treasury. This financial agent manages the intake of USCIS applications, petitions and requests and the collection of associated fees submitted directly by mail. It provides the mechanisms to capture information electronically from USCIS applications, petitions and requests, deposit associated fees, forward the information to USCIS systems via an interface, and generate receipt and rejection notices to individuals. The financial agent is also responsible for preparing the files in accordance with USCIS guidance and sending the files to the next processing site. The

**Homeland Security**

All requests for consideration of deferred action for childhood arrivals, and employment authorization applications, must be filed with the appropriate Lockbox. Individuals determine the appropriate Lockbox facility from the USCIS website and downloaded forms. This process is designed to accelerate incoming applications and petitions by electronically capturing data and images from these forms, and by performing fee receipting and fee deposit. The Lockbox receives mail directly on-site. Any deferred action for childhood arrival filings mistakenly mailed to a Service Center are forwarded to the appropriate Lockbox for initial intake processing.

The Lockbox personnel review newly received filings to ensure they are properly filed. The Lockbox verifies the completion of the following items: basic biographical information, signature on the form, jurisdiction of the submitted form, correct fee, and basic eligibility of the individual. Filings that are not properly completed are rejected with an explanation of why the deferred action for childhood arrivals package is rejected and the corrective action needed. Rejected requests do not retain their filing date. Individuals may resubmit rejected filings for review as long as the initial issue was resolved.

Successfully completed filings are accepted through the Lockbox intake process and the information is transmitted electronically to the Computer Linked Application Information Management System (CLAIMS 3).[7] The data on each form is entered into CLAIMS 3. USCIS uses CLAIMS 3 to process the I-821D and I-765. USCIS also issues a receipt number for filings and sends a receipt notice to the individual. The receipt letter notifies the individual that a case has been received by USCIS and is currently being processed. The Lockbox assembles and ships A-Files, containing Form I-821D, I-765, and I-765WS, to one of the four regional Service Centers.[8]

The Service Centers receive the filings, perform file intake functions, and distribute the files to adjudicators for processing. USCIS adjudicators perform an initial quality assurance review on incoming filings against the information in CLAIMS 3 by comparing it against the form. Any identified errors are corrected at the Service Center. Once the information is verified, adjudicators validate each A-Number in the Central Index System (CIS) based on the name, date of birth, and existing A-Number.[9]

---

financial agent does not approve or deny petitions/applications/requests received. USCIS has a business arrangement with the Department of the Treasury to allow Bank One, N.A. to serve as the USCIS financial agent. Bank One, N.A. provides USCIS lockbox imaging, check collection, and initial processing services. For more information regarding the Lockbox services provided by the Department of Treasury and appropriate financial agents, please see the Department of Treasury Electronic Check Processing PIA, available at http://www.fms.treas.gov/pia/ECP_PIA.pdf and the accompanying system of records notice, Treasury/FMS.017 - Collections Records -Treasury/Financial Management Service, May 15, 2009 (74 FR 23019) available at http://www.treasury.gov/FOIA/Pages/fmspa.aspx.
[7] Please see the DHS/USCIS/PIA-016 USCIS Benefits Processing of Applicants other than Petitioners for Naturalization, Refugee Status, and Asylum (CLAIMS 3) for additional information regarding the administration and adjudication of immigration and naturalization applications available at http://www.dhs.gov/uscis-pias-and-sorns#top.
[8] "A-files" are a series of records consisting of numbered files prefixed with an "A" used to document the complete history of USCIS' interaction with an individual as prescribed by the Immigration and Nationality Act, prior laws, and other regulations. The records consist of various forms, correspondence and pre-existing files related to or supplied by the individual and/or documentation supporting action considered by USCIS or its predecessor agencies.
[9] Please see the DHS/USCIS/PIA-009 Central Index System (CIS) for additional information on the A-number validation searches, available at http://www.dhs.gov/uscis-pias-and-sorns#top.



**Homeland Security**

In a parallel process, individuals who filed a request for consideration of deferred action for childhood arrivals are scheduled for mandatory biometrics capture (photo, fingerprint, and signature) at an Application Support Center (ASC) regardless of whether biometrics were captured for a previous filing with USCIS. ASC appointments are scheduled through the Scheduling and Notification of Applicant Processing (SNAP) system.[10] USCIS contacts the individual with an appointment time to have his or her biometrics taken at a specified ASC. At the ASC, USCIS electronically captures the individual's full fingerprints (hereafter referred to as the 10-prints) and related biographic data. Individuals under the age of 14 have their press prints captured instead of full fingerprints. A press print is a fingerprint that is collected electronically.

USCIS uses the collected biometrics to conduct background and security checks. The purposes of these checks are to enhance national security and ensure the integrity of the immigration process. All individuals seeking consideration of deferred action as childhood arrivals are subject to security background checks. As part of the background check, USCIS requires that specific security checks or a combination of checks are completed for Forms I-821D and I-765. Specifically, USCIS uses the following background checks for individuals requesting deferred action:

- Federal Bureau of Investigation (FBI) Fingerprint Check is conducted on individuals over the age of 14 when the request, if favorably disposed, would allow them to remain in the United States beyond one year. The FBI Fingerprint Check is a search of the FBI's Integrated Automated Fingerprint Identification System (IAFIS) to identify applicants who have an arrest record. If there is a criminal history record, FBI also sends the FBI Record of Arrests and Prosecutions (commonly referred to as the "RAP Sheet") to USCIS electronically. The RAP Sheet is stored in Biometric Background Storage System.[11] A hard copy of the RAP Sheet is also sent to the respective Service Center and is stored in the A-File.[12]

- CBP TECS Name Check is conducted on all applicants over 14 years of age. The TECS Name Check query consists of a name-based search of a multi-agency database containing information from 26 different Federal agencies. The information in TECS includes records of known and suspected terrorists, sex offenders, people who are public safety risks and other individuals that may be of interest (e.g., individuals who have warrants issued against them, people involved in illegal gang activity) to the law enforcement community. If there are positive results from the TECS Name Check, the results are stored in Interagency Border Inspection System (IBIS) Manifest and may be placed in the A-File.[13]

---

[10] Please see the DHS/USCIS/PIA-020 Scheduling and Notification of Applicant Processing (SNAP) for additional information about the USCIS automated scheduling process for immigration benefits, available at http://www.dhs.gov/uscis-pias-and-sorns#top.

[11] Please see the DHS/USCIS/PIA-033 Immigration Benefits Background Check Systems (IBBCS) PIA for more information on the Biometric Background Storage System, available at http://www.dhs.gov/uscis-pias-and-sorns#top.

[12] Please see the Fingerprint Identification Records System (FIRS) Integrated Automated Fingerprint Identification System (IAFIS) Outsourcing for Noncriminal Justice Purposes - Channeling PIA and the corresponding Justice/FBI-009 - Fingerprint Identification Records System (64 FR 52343) SORN for more information on the fingerprint search.

[13] Please see the DHS/CBP/PIA-009(a) TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative, available at http://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-cbp-tecs-sar-update.pdf, and the



**Homeland Security**

USCIS uses the information it yields from these checks to screen out individuals who seek deferred action for childhood arrivals improperly or fraudulently.[14]

Individuals who have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct will not be considered for deferred action under the new process except where DHS determines there are exceptional circumstances[15]

At any point during the adjudication process, the USCIS adjudication officer may issue a Request for Evidence (RFE) directly to the individual or his or her representative to request additional information on the pending case.  An RFE is made when the deferred action for childhood arrivals filing is lacking required documentation/evidence (initial evidence) or the officer needs more documentation/evidence (additional evidence) to make a determination.  The RFE indicates what evidence or information is needed to fully evaluate the particular response.  The notice explains where to send the evidence and a deadline for the response.

USCIS personnel review all the information provided by the individual along with any additional information compiled during the case review and background check process.  Once approved for deferred action as a childhood arrival, the individual receives an approval letter indicating the duration of the deferred action and, if appropriate, an employment authorization document.  If USCIS determines that the individual does not satisfy the guidelines or otherwise determines that the individual does not warrant an exercise of prosecutorial discretion, then USCIS declines to defer action for that particular case.  USCIS issues a denial notice with an explanation citing the reason(s) USCIS declined the request.  The individual cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies the request.  The final decision is recorded in CLAIMS 3.  Notices are either mailed or emailed to the individual.

## Section 1.0 Authorities and Other Requirements

### 1.1   What specific legal authorities and/or agreements permit and define the collection of information by the project in question?

The Immigration Nationality Act, 8 U.S.C. § 1101, et seq. provides the legal authority to collect information used for the adjudication of immigration applications, petitions, and requests.  The Secretary of Homeland Security issued the *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* memorandum, published on June 15, 2012, establishing guidelines that should be satisfied before an individual is considered for an exercise of prosecutorial discretion as a childhood arrival.

---

corresponding DHS/CBP-011 - U.S. Customs and Border Protection TECS (73 FR 77778) SORN, available at http://edocket.access.gpo.gov/2008/E8-29807.htm, for more information on the TECS name check search.
[14] See DHS/USCIS/PIA-033 Immigration Benefits Background Check Systems (IBBCS) PIA in footnote 12 above.
[15] In very rare circumstances, USCIS may exercise its discretionary authority to defer action in a particular case where the individual does not meet the criminal history guidelines for consideration of deferred action for childhood arrivals.  These exceptional circumstances are extremely rare and would require very compelling equities to be presented. Please see the *Consideration of Deferred Action for Childhood Arrivals Process Frequently Asked Questions* for more information at www.uscis.gov.

Appeal: 18-1521    Case 1:17-cv-02842-GG-VMS    Document 29-3    Filed 07/02/2018    Pg 515 of 570    Page 515 of 1026 PageID #: 10106



**Homeland Security**

### 1.2 What Privacy Act System of Records Notice(s) (SORN(s)) apply to the information?

The following system of records notices cover the collection, maintenance, and use of deferred action of childhood arrivals requests:

- DHS/USCIS/ICE/CBP-001 - Alien File, Index, and National File Tracking System of Records (June 13, 2011, 76 FR 34233) covers the consideration for deferred action for childhood arrivals requests, employment authorization applications, and supplemental evidence;

- DHS/USCIS-002 - Background Check Service (June 5, 2007, 72 FR 31082) covers the status and results of background checks;

- DHS/USCIS-003 - Biometric Storage System (April 6, 2007, 72 FR 17172) covers the collection, use, and storage of biometric data; and

- DHS/USCIS-007 - Benefits Information System (September 29, 2008, 73 FR 56596) covers the consideration of deferred action for childhood arrivals request data, employment authorization application data, decision data, and fee exemption data.

### 1.3 Has a system security plan been completed for the information system(s) supporting the project?

CLAIMS 3 is the information technology system that supports benefits processing of applicants other than petitioners for naturalization, refugee status, and asylum and maintains records from the SORNs listed above. CLAIMS 3 was authorized for operation on March 30, 2012, for a period of three years. The CLAIMS 3 Authority to Operate (ATO) is set to expire on March 30, 2015. The CLAIMS 3 Security Plan was completed on February 22, 2012.

### 1.4 Does a records retention schedule approved by the National Archives and Records Administration (NARA) exist?

NARA approved the Alien File [N1-566-08-11] and CLAIMS 3 [N1-566-08-13] retention schedules.

### 1.5 If the information is covered by the Paperwork Reduction Act (PRA), provide the OMB Control number and the agency number for the collection. If there are multiple forms, include a list in an appendix.

The collection of information for deferred action for childhood arrivals is subject to the Paperwork Reduction Act. USCIS obtained approval from OMB for Form I-821D (OMB No. 1615-0124) and Form I-765 (OMB No. 1615-0040).

## Section 2.0 Characterization of the Information

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Document 29-3   Filed 07/02/2018   Pg: 516 of 572   Page 516 of 1026 PageID #: 10107



**Homeland Security**

The following questions are intended to define the scope of the information requested and/or collected, as well as reasons for its collection.

## 2.1   Identify the information the project collects, uses, disseminates, or maintains.

USCIS collects biographic, biometric, verifiable evidence,[16] and applicable fees from individuals for consideration of deferred action and employment authorization eligibility. Specifically, individuals seeking consideration of deferred action for childhood arrivals must complete Form I-821D, *Consideration of Deferred Action for Childhood Arrivals,* Form I-765, *Application for Employment Authorization,* and the I-765WS, *I-765 Worksheet.* USCIS may also collect information from the individual's representative through the G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative.* Requests for fee exemptions must be filed and favorably adjudicated before an individual files his or her request for consideration of deferred action for childhood arrivals without a fee. In order to be considered for a fee exemption, the individual is to submit a letter and supporting documentation. The information from these forms is extracted and retained in CLAIMS 3. Verifiable evidence is stored in the individual's A-File.[17]

The individual must undergo biographic and biometric background checks before USCIS will consider whether to exercise prosecutorial discretion under the consideration of deferred action for childhood arrivals process. The ASC captures fingerprints for individuals required to undergo a full biometrics capture. The fingerprints are transmitted daily to the FBI's IAFIS database. This query submits fingerprints, without any names associated with the prints. Results of this query are all the names of individuals that match the prints in the FBI's system. These results[18] are loaded into BBSS.[19] The USCIS BBSS maintains copies of the responses to the FBI Fingerprint Check and the FBI RAP Sheets. In certain instances, the RAP Sheets are also placed in the A-File.[20] The CBP TECS Name Check uses the individual's name to obtain criminal history information. This information is stored in the USCIS IBIS Manifest and the A-File.[21]

---

[16] Verifiable evidence is documentation submitted by the individual sufficient for consideration of deferred action for childhood arrivals, employment necessity, and fee exemption needs. Please see Appendix B for a full listing of acceptable evidence.

[17] Please see Appendix A for a full listing of data elements collected through Form I-821D, I-765, and G-26 and Appendix B for a list of accepted documents to establish eligibility.

[18] If there is no match in Integrated Automated Fingerprint Identification System, the FBI's response is "NON-IDENT." If a criminal history record does not exist, the FBI provides USCIS a response (IDENT) indicating that there was a match on the fingerprints submitted.

[19] Please see the DHS/USCIS/PIA-033 IBBCS PIA on the results and systems used to store the fingerprint check results.

[20] See footnote 17 above.

[21] Please see the DHS/USCIS/PIA-033 IBBCS PIA on the results and systems used to store the fingerprint check results and name check, available at http://www.dhs.gov/uscis-pias-and-sorns#top.

AR1768

Appeal: 18-1521   Case 1:17-cv-02942-NCG-VMS   Filed: 07/02/2018   Doc: 50/04/20   Page 517 of 1026 PageID #: 10108

 **Homeland Security**

## 2.2 What are the sources of the information and how is the information collected for the project?

USCIS collects the completed forms and the associated evidence directly from the individual or his or her representative. The biometric information is provided by the individual for the FBI Fingerprint Check. The responses from the FBI Fingerprint check are stored in BBSS and may be placed in the A-File. The response from the TECS Name Check is stored in IBIS Manifest and may be placed in the A-File. Also the history action code is placed in CLAIMS 3 if there is no derogatory information.

## 2.3 Does the project use information from commercial sources or publicly available data? If so, explain why and how this information is used.

USCIS does not collect information from commercial or publicly available data sources to determine deferred action for childhood arrivals.

## 2.4 Discuss how accuracy of the data is ensured.

USCIS collects information directly from the individual or his or her representative; therefore, USCIS is dependent upon the accuracy of the information provided by the individual or their representative. The accuracy of the information is also determined by the fingerprint and name checks.

## 2.5 Privacy Impact Analysis: Related to Characterization of the Information.

**Privacy Risk**: There is a privacy risk that more PII than is necessary may be collected.

**Mitigation:** To mitigate this risk, USCIS developed a detailed process to review what information is necessary to determine deferred action for childhood arrivals. The USCIS Privacy Office reviewed all the data elements that are collected on I-821D to ensure that only the minimum amount of information needed to consider deferred action status was collected. USCIS reviewed the data to ensure that it would increase processing efficiency, provide better customer service, and ensure deferred action for childhood arrivals is provided to only those who were qualified to receive it. Data that did not meet these guidelines were not included in the form. All information requested on Form I-821D is necessary to process requests for consideration of deferred action for childhood arrivals. All data elements collected were negotiated with and approved by OMB during Paperwork Reduction Act collection review.

**Privacy Risk:** Data entry errors that might occur when transferring information from the deferred action forms submitted by individuals into the CLAIMS 3.

**Mitigation:** USCIS mitigates this risk by requiring adjudication officers to conduct a quality assurance check in CLAIMS 3 to verify the accuracy of the information. This is completed by comparing the information from the form against the system. Any data errors are manually updated to reflect the correct information.

AR1769



# Section 3.0 Uses of the Information

The following questions require a clear description of the project's use of information.

## 3.1   Describe how and why the project uses the information.

USCIS begins processing deferred action requests after they are received through the intake process. USCIS uses information provided in the request, response to an RFE, through an ASC biometrics collection, and from the background check results to:

- Gather any missing information;
- Manage workflow;
- Generate reports;
- Assist USCIS in making a final determination;
- Provide a repository of data to assist with future requests;
- Schedule appointments; and
- Issue decision notices.

The main purpose for collecting this information is to determine whether to approve requests for deferred action for childhood arrivals. All information collected from the individual requesting deferred action that is processed by CLAIMS 3 is necessary to establish the individual's identity and history with USCIS, as well as appropriateness for consideration of deferred action. In addition, USCIS uses the information to determine suitability for consideration of deferred action using criminal, immigration, or terrorism-related history.

## 3.2   Does the project use technology to conduct electronic searches, queries, or analyses in an electronic database to discover or locate a predictive pattern or an anomaly? If so, state how DHS plans to use such results.

USCIS does not use technology to conduct pattern based queries or searches in considering deferred action requests. USCIS only runs reports to allow employees to analyze data relating to cases involving suspected fraud, public safety, or national security for consideration of deferred action based on the guidelines for eligibility for deferred action for childhood request. USCIS may use the results to facilitate the identification of fraud patterns or trends, as well as previously unknown associations between applicants involved in fraud who pose national security and public safety concerns.[22] USCIS places the information it collects, derogatory or not, in a record for each individual for several purposes, including future immigration status verification, evaluating subsequent requests made by an individual, and for litigation.

---

[22] Please see DHS/USCIS/PIA-044 Fraud Detection and National Security Directorate (FDNS) for more information on how USCIS detects, identifies, and combats threats to the security of the United States and the integrity of its legal immigration system, available at http://www.dhs.gov/uscis-pias-and-sorns#top.



**Homeland Security**

### 3.3 Are there other components with assigned roles and responsibilities within the system?

Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the individual meets the guidelines for the issuance of a Notice to Appear (NTA) or a referral to ICE under the guidelines set forth in USCIS's Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to the consideration of deferred action for childhood arrivals process will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of the deferred action for childhood arrivals request, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the individual.

### 3.4 Privacy Impact Analysis: Related to the Uses of Information

**Privacy Risk:** Individuals who have legitimate access to PII could exceed their authority and use the data for unofficial purposes.

**Mitigation:** USCIS developed a Deferred Action for Childhood Arrivals Standard Operating Procedure to ensure accurate data entry and proper handling and the appropriate use of information. Prior to any system access, all DHS employees are required to take annual computer security and privacy awareness training, which addresses this issue. DHS also maintains rules of behavior for employees who use DHS systems. USCIS also limits access to PII by employing role-based access (only allowing access to users who need particular PII to perform their duties). USCIS also deploys user logs to ensure users are only accessing information related to their job functions. Additionally, disciplinary rules are in place to ensure the appropriate use of information.

## Section 4.0 Notice

The following questions seek information about the project's notice to the individual about the information collected, the right to consent to uses of said information, and the right to decline to provide information.

### 4.1 How does the project provide individuals notice prior to the collection of information? If notice is not provided, explain why not.

USCIS provides individuals notice throughout the request process for deferred action for childhood arrivals. Prior to the submission of any information, individuals are presented with a Privacy Act Statement, as required by Section (e)(3) of the Privacy Act. The Privacy Act Statement notifies the individual about the authority to collect the information requested, purposes, routine uses, and consequences of providing or declining to provide the information to USCIS. Individuals are also provided general notice through the publication of this PIA, and DHS/USCIS/ICE/CBP-001 - Alien File, Index, and National File Tracking System of Records (June 13, 2011, 76 FR 34233), DHS-USCIS-002 - Background Check Service (June 5, 2007, 72 FR 31082), DHS-USCIS-003 - Biometric Storage System

 **Homeland Security**

(April 6, 2007, 72 FR 17172), and DHS/USCIS-0007 - Benefit Information System (September 29, 2008, 73 FR 56596) SORNs cover the collection, maintenance, and use of this information. Additional information about deferred action for childhood arrivals is available at www.uscis.gov.

### 4.2 What opportunities are available for individuals to consent to uses, decline to provide information, or opt out of the project?

Individuals are informed at the point of data collection that it is within their legal right to decline to provide the requested information. However, failure to provide the requested information may result in the delay of a final decision and result in the denial of the form. Declining to provide all of the required information on the Form I-765, I-765WS, or the I-821D, or to provide payment, may result in USCIS declining the request.

### 4.3 Privacy Impact Analysis: Related to Notice

**Privacy Risk:** Insufficient notice is provided to the individual describing the purpose and use of the collected information.

**Mitigation:** USCIS mitigates this risk by providing notice to the individual prior to the collection of information through the publication of SORNs in the Federal Register, PIAs, its public outreach efforts, and information on www.uscis.gov/childhoodarrivals. Individuals seeking deferred action are made aware that the information they are providing is being collected to determine whether they are eligible to be considered for deferred action as a childhood arrival. Each immigration form, specifically Form I-821D and Form I-765, contains a Privacy Act Statement describing the legal authority to collect information, purpose, routine uses, and right to decline to provide information. In the spirit of transparency, USCIS is also publishing this PIA to provide additional notice to the individual of how the deferred action for childhood arrivals process operates, about the information collected, the right to consent to uses of said information, and the right to decline to provide information.

## Section 5.0 Data Retention by the project

The following questions are intended to outline how long the project retains the information after the initial collection.

### 5.1 Explain how long and for what reason the information is retained.

USCIS enters the information from the completed deferred action for childhood arrivals and employment authorization forms into CLAIMS 3 for processing and adjudication. Information in CLAIMS 3 is destroyed 15 years after the last completed action with respect to the request. Supplemental evidence submitted along with the application is stored in the A-File. The A-File records are permanent whether hard copy or electronic. DHS transfers the A-Files to the custody of the National Archives 100 years after the individual's date of birth.

AR1772



**Homeland Security**

### 5.2 Privacy Impact Analysis: Related to Retention

**Privacy Risk:** There is a risk that USCIS may retain information longer than is necessary to approve or deny the request.

**Mitigation:** USCIS retains data beyond the approval or denial of a request in order to ensure the information is available for several purposes, including future immigration status verification, evaluating subsequent requests by an individual, and for litigation. Many records serve the same purpose as the paper-based A-File, which NARA has determined to be of permanent historical value. When information is no longer necessary, USCIS retires the records according to the retention period described in the applicable SORNs.

## Section 6.0 Information Sharing

The following questions are intended to describe the scope of the project information sharing external to the Department. External sharing encompasses sharing with other federal, state and local government, and private sector entities.

### 6.1 Is information shared outside of DHS as part of the normal agency operations? If so, identify the organization(s) and how the information is accessed and how it is to be used.

USCIS shares 10-print records with the FBI to conduct a criminal background check for all individuals requesting deferred action for childhood arrivals. The FBI Fingerprint Check requests and responses are electronically transmitted through BBSS to and from the FBI's IAFIS system. FBI fingerprints, other biometric information, and the criminal history check responses are encrypted when electronically transmitted between BBSS and the FBI. The data exchange between USCIS and the FBI for the purpose of FBI Name Check occurs via zipped and encrypted email.[23]

### 6.2 Describe how the external sharing noted in 6.1 is compatible with the SORN noted in 1.2.

USCIS only shares information outside of DHS as permitted under the routine uses outlined in the applicable SORNs in Section 1.2. USCIS may share information with other agencies to assist in making a determination on a deferred action request. USCIS also shares information with other agencies for law enforcement purposes, or other uses compatible with applicable SORNs.

### 6.3 Does the project place limitations on re-dissemination?

USCIS has signed an Information Sharing Agreement (ISA) and Memorandum of Understanding (MOU) with the FBI that set forth the terms and conditions for the transfer and use of information pertaining to background checks and associated systems. The transfer of data is conducted pursuant to

---

[23] Please see the DHS/USCIS/PIA-033 IBBCS PIA on the results and systems used to store the fingerprint check results and name check, available at http://www.dhs.gov/uscis-pias-and-sorns#top.



**Privacy Impact Assessment**
USCIS, Deferred Action for Childhood Arrivals
Page 16

the MOU between USCIS and the FBI. In addition, the FBI has policies and procedures in place to ensure that information is not inappropriately disseminated.

### 6.4 Describe how the project maintains a record of any disclosures outside of the Department.

In addition to the MOU described above, for data sharing on an ad hoc basis, USCIS requires a representative from the outside agency to establish, in writing, what specific information they need on particular individuals. USCIS also requires the representative to sign a non-disclosure statement before the information is released. USCIS maintains a record of any ad hoc information sharing activities.

### 6.5 Privacy Impact Analysis: Related to Information Sharing

**Privacy Risk:** The privacy risk in external sharing is the sharing of data for purposes that are not in accord with the stated purpose and use of the original collection.

**Mitigation:** USCIS is careful to share data only with external agencies that have a need-to-know, and put the information to a use that is compatible with USCIS SORNs. All external sharing arrangements are reviewed prior to the sharing of information to ensure such uses are consistent with existing published routine uses in the applicable SORNs and/or performed with the consent of the individual whose information is being shared. The Privacy Act Statement included in Form I-821D notifies the individual that USCIS may provide information from their request to other government agencies. As required by DHS procedures and policies, all current external sharing arrangements are consistent with the original purpose for which the information was collected.

## Section 7.0 Redress

The following questions seek information about processes in place for individuals to seek redress which may include access to records about themselves, ensuring the accuracy of the information collected about them, and/or filing complaints.

### 7.1 What are the procedures that allow individuals to access their information?

The Privacy Act of 1974, 5 U.S.C. § 552a, as amended, provides statutory privacy rights to U.S. citizens and Legal Permanent Residents (LPRs). The Privacy Act does not cover visitors or aliens. As a matter of DHS policy, any PII that is collected, used, maintained, and/or disseminated in connection with a mixed system by DHS are to be treated as a System of Records subject to the Privacy Act regardless of whether the information pertains to a U.S. citizen, Legal Permanent Resident, visitor, or alien. Under this policy, DHS components are to handle non-U.S. person PII held in mixed systems in accordance with the fair information practices, as set forth in the Privacy Act. Non-U.S. persons have the right of access to their PII and the right to amend their records, absent an exemption under the Privacy Act; however, this policy does not extend or create a right of judicial review for non-U.S. persons.

 **Homeland Security**

An individual seeking consideration of deferred action for childhood arrivals may gain access to their USCIS records by filing a Freedom of Information Act (FOIA) or Privacy Act request. Any individual seeking access to their USCIS record may submit the aforementioned requests to following address:

> USCIS National Records Center
> Freedom of Information Act/Privacy Act Program
> P. O. Box 648010,
> Lee's Summit, MO 64064-8010

The information requested may, however, be exempt from disclosure under the Privacy Act because sometimes files contain law enforcement sensitive information and the release of such information could possibly compromise ongoing criminal investigations. Further information for Privacy Act and FOIA requests for USCIS records can also be found at http://www.uscis.gov.

### 7.2    What procedures are in place to allow the subject individual to correct inaccurate or erroneous information?

USCIS treats all requests for amendment of information in a system of records as Privacy Act amendment requests. Individuals may direct all requests to contest or amend information to the FOIA/PA Office at USCIS at the address listed above. They must state clearly and concisely in the redress request the information being contested, the reason for contesting it, and the proposed amendment thereof. However, there is no appeals process for deferred action for childhood arrivals final determinations. The individual cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies his or her request for consideration of deferred action for childhood arrivals. USCIS will not review its discretionary determinations on considering deferred action for childhood arrivals.

### 7.3    How does the project notify individuals about the procedures for correcting their information?

The procedures for individuals to amend their information are outlined in this PIA and SORNs associated with the deferred action for childhood arrivals process.

### 7.4    <u>Privacy Impact Analysis</u>: Related to Redress

**Privacy Risk:** There is a privacy risk that an individual's opportunity for redress may be limited by Privacy Act exemptions or limited avenues for seeking redress.

**Mitigation:** Individuals are given numerous opportunities during and after the completion of the processing to correct information they have provided and to respond to information received from other sources. USCIS does not claim any Privacy Act exemptions for deferred action for childhood arrivals individuals, and therefore individuals may submit a redress request or appeal as stated in the DHS Privacy Act regulations (found at Title 6 Code of Federal Regulations, Section 5.21).

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 21-7 Filed 07/02/2018 Pg: 524 of 572 Page 524 of 1026 PageID #: 10115

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 69 of 116



**Privacy Risk:** There is a privacy risk that individuals seeking consideration of deferred action for childhood arrivals will be deterred from filing a Privacy Act request due to their non-U.S. citizen status.

**Mitigation:** Under the DHS mixed-system policy, non-U.S. persons have the right of access to their information and the right to amend their records, absent an exemption under the Privacy Act; however, this policy does not extend or create a right of judicial review for non-U.S. persons. Due to the inherent difficulties in determining an individual's current citizenship status, which may change over time through naturalization or adjustment, USCIS defines the system of records covering deferred action for childhood arrivals as a mixed system, meaning it collects information on U.S. persons and non-U.S. persons and extends the rights of the Privacy Act to these individuals. Therefore, individuals seeking consideration of deferred action for childhood arrivals may submit a Privacy Act request.

Although individuals requesting consideration of deferred action for childhood arrivals are provided the right to access and amendment of their records, there is no appeals process for deferred action for childhood arrivals final determinations. The individual cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies his or her request for consideration of deferred action for childhood arrivals. USCIS will not review its discretionary determinations.

## Section 8.0 Auditing and Accountability

The following questions are intended to describe technical and policy based safeguards and security measures.

### 8.1   How does the project ensure that the information is used in accordance with stated practices in this PIA?

DHS security specifications require auditing capabilities that log the activity of each user in order to reduce the possibility of misuse and inappropriate dissemination of information. In accordance with DHS security guidelines, USCIS systems use auditing capabilities that log user activity. All user actions are tracked via audit logs to identify audit information by user identification, network terminal identification, date, time, and data accessed. All USCIS systems employ auditing measures and technical safeguards to prevent the misuse of data. Engineers assigned to maintain the USCIS systems have legitimate job duties that require them to design, develop, and optimize the system within the security accreditation environment. This work is performed under supervisory oversight. Furthermore, each employee is required to undergo annual security awareness training that addresses their duties and responsibilities to protect the data. In addition, USCIS systems have internal audits separate from the domain security audits; therefore, a double layer of audit trails exist.

### 8.2   Describe what privacy training is provided to users either generally or specifically relevant to the project.

USCIS provides annual privacy and security awareness training to all employees and contractors. The Culture of Privacy Awareness training addresses appropriate privacy concerns, including Privacy Act obligations (e.g., SORNs and Privacy Act Statements). The Computer Security Awareness training examines appropriate technical, physical, personnel, and administrative controls to safeguard information.

AR1776

Appeal: 18-1521    Case 1:17-cv-05228-NGG-VMS    Document 28-7    Filed 09/04/20    Page 525 of 1026 PageID #: 10116



Additionally, USCIS personnel responsible for considering requests for consideration of deferred action for childhood arrivals will receive special training specific to this process.

### 8.3 What procedures are in place to determine which users may access the information and how does the project determine who has access?

USCIS deploys role-based access controls and enforces a separation of duties throughout the processing and adjudication of deferred action for childhood arrival requests to limit access to only those persons who have a need-to-know in order to perform their duties. This need-to-know is determined by the respective responsibilities of the employee. In compliance with federal law and regulations, user access privileges are also limited by establishing role-based user accounts in CLAIMS 3 and its associated systems to minimize access to information that is needed view and edit the data.

### 8.4 How does the project review and approve information sharing agreements, MOUs, new uses of the information, new access to the system by organizations within DHS and outside?

USCIS has a formal review and approval process in place for new sharing agreements. Any new sharing agreements, use of information, and/or new access requests for USCIS systems must go through the USCIS change control process and must be approved by the proper authorities prior to sharing information within and outside of DHS.

## Responsible Officials

Donald K. Hawkins

Chief Privacy Officer

United States Citizenship and Immigration Services

## Approval Signature

[Original signed copy on file with DHS Privacy Office.]

———————————————————

Jonathan R. Cantor
Acting Chief Privacy Officer
Department of Homeland Security

AR1777

Appeal: 18-1521    Case 1:17-cv-05228-NGG-VMS    Document 29-3    Filed 07/02/2018    Pg: 526 of 572    Page 526 of 1026 PageID #: 10117

Case 8:17-cv-02942-RWT    Document 29-3    Filed 11/28/17    Page 71 of 116



**Privacy Impact Assessment**
USCIS, Deferred Action for Childhood Arrivals
Page 20

APPENDIX A: Deferred Action Forms and Collected Data Elements

**Form I-821D,** *Consideration of Deferred Action for Childhood Arrivals*

Information about consideration of deferred action for childhood arrivals individuals may include:

- First Name
- Middle Name
- Last Name
- Alias(es)
- Current and Past Mailing address(es)
- Alien Number (A-Number)
- Social Security Number
- Date of Birth
- Gender
- City/Town/Village of Birth
- Country of Birth
- County of Residence
- Country of Citizenship/Nationality
- Date of initial entry into the United States
- Place of Entry into the United States
- Status of Entry
- I-94 Number
- I-94 Expiration Date
- Current Education Status
- Military Status
- Arrival/Residence information
- Criminal, National Security and Public Safety Information
- Signature

Preparer information includes:
- Name
- Organization
- Physical, Mailing, and Email Addresses
- Phone and Fax Numbers
- Relationship to the individual
- Signature

**Homeland Security**

**Form I-765,** *Application for Employment Authorization*

Information about consideration of deferred action for childhood arrivals individuals may include:

- First Name
- Middle Name
- Last Name
- Alias(es)
- Country of Citizenship/Nationality
- Place and date of Birth
- Marital Status
- Social Security Number, if any
- Alien Number or I-94
- Date of Last Entry into the United States
- Place of Last Entry into the United States
- Manner of Last Entry
- Current Immigration Status
- Signature

Preparer information includes:

- Name
- Organization
- Physical, Mailing, and Email Addresses
- Phone and Fax Numbers
- Relationship to the individual
- Signature

Form I-765, Worksheet

Information on the worksheet includes:

- Name
- Annual Income
- Annual Expenses
- Current Assets

**G-28,** *Notice of Entry of Appearance as an Attorney or Accredited Represented*

Representative information includes:

AR1779

Appeal: 18-1521   Document: 263   Filed: 07/02/2018   Pg: 528 of 572


# Homeland Security

- Name
- Law Firm/Recognized Organization
- Physical and Mailing Addresses
- Phone and Fax Numbers
- Email Address
- Attorney Bar Card Number or Equivalent
- Bar Membership
- Accreditation Date
- Board of Immigration Appeals (BIA) Representative Accreditation Expiration Date
- Law Practice Restriction Explanation
- Signature

Appeal: 18-1521    Case 1:17-cv-05228-NGG-VMS    Document 2827    Filed 09/04/20    Page 529 of 572    Page 529 of 1026 PageID #: 10120

Case 8:17-cv-02942-RWT    Document 29-3    Filed 11/28/17    Page 74 of 116

**Homeland Security**

APPENDIX B: Examples of Verifiable Evidence

Acceptable evidence may consist of, but is not limited to:

### Identity

- A passport,
- A birth certificate accompanied by photo identification,
- Any national identity document from the individual's country of origin bearing the individual's photo and/or fingerprint,
- Any U.S.-government immigration or other document bearing the individual's name and photograph (e.g., Employment Authorization Documents (EADs), expired visas, driver's licenses, non-driver cards),
- Any school-issued form of identification with photo, or
- Military identification document with photo.

### Age at the time of filing

- Birth Certificate,
- Other acceptable secondary evidence establishing the individual's date of birth.

### Arrived in United States Prior to 16th Birthday

- I-94

### Present in the United States on June 15, 2012 and Continuous Residence

#### Employment Records

- Pay stubs,
- W-2 Forms,
- Certification of the filing of Federal, State, or local income tax returns,
- Letters from employer(s) or, if the deferred action for childhood arrivals individual has been self-employed, letters from banks, and other firms with whom he/she has done business.

#### Receipts, Bills, Letters

- Rent receipts,
- Utility bills (gas, electric, telephone, etc.) bearing the individual's name (or family name if residing at same address) and address,
- Receipts or letters from companies showing the dates during which the individual received service.

#### School Records

- Transcripts,
- Letters,

AR1781

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 2822-7 Filed 07/02/2018 Filed 09/04/20 Pg: 530 of 572 Page 530 of 1026 PageID #: 10121

Case 8:17-cv-02942-RWT Document 29-3 Filed 11/28/17 Page 75 of 116

 **Homeland Security**

- Report cards from the school(s) that the individual attended in the United States showing the name of school(s) and the period(s) of school attendance.

*Medical Records*

- Hospital or medical records showing medical treatment or hospitalization of the individual. Such records should show the name of the medical facility or physician, as well as the date(s) of the treatment or hospitalization.

*Memberships*

- Official records from a religious entity in the United States confirming the individual's participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding, etc.),
- Documentation showing membership in community organizations (e.g., Scouts).

*Military Records*

- Form DD-214,
- Certificate of Release or Discharge from Active Duty,
- NGB Form 22,
- National Guard Report of Separation and Record of Service,
- Military personnel records or military health records.

*Additional Accepted Documents*

- Money order receipts for money sent in or out of the country,
- Passport entries,
- Birth certificates of children born in the United States,
- Bank books with dated transactions,
- Social Security card,
- Selective Service card,
- Automobile license receipts, title, vehicle registration,
- Deeds, mortgages, contracts to which the deferred action for childhood arrivals individual has been a party,
- Tax receipts,
- Insurance policies, receipts, or postmarked letters.

***Lacked Lawful Immigration Status on June 15, 2012***

- I-94/I-95/I-94W Arrival/Departure Record showing the date the individual's authorized stay expired,
- If the individual has a final order of exclusion, deportation, or removal issued on or before June 15, 2012, a copy of that order and related charging documents, if available,

Appeal: 18-1521   Document 28-3   Filed: 07/02/2018   Pg: 531 of 572
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 531 of 1026 PageID #: 10122

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 76 of 116

**Homeland Security**

- An INS or DHS charging document placing the individual into deportation, exclusion, or removal proceedings,

- Any other document that is relevant to show that the individual lacked lawful immigration status on June 15, 2012.

# EXHIBIT 18

AR1784

## PRIVACY POLICY GUIDANCE MEMORANDUM

### April 27, 2017

*Memorandum Number: 2017-01*

| | |
|---|---|
| MEMORANDUM FOR: | DISTRIBUTION LIST |
| FROM: | Jonathan R. Cantor<br>Acting Chief Privacy Officer |
| SUBJECT: | DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information |

## I.    PURPOSE AND SCOPE

In 2007, the Department of Homeland Security (DHS) announced that it would treat all persons' personally identifiable information (PII),[1] regardless of citizenship, the same under the Privacy Act and extend its protections accordingly ("Mixed Systems policy").[2] President Trump issued Executive Order (E.O.) No. 13,768, *Enhancing Public Safety in the Interior of the United States* on January 25, 2017, which states that agencies may no longer extend the protections of the Privacy Act to those other than U.S. citizens and Lawful Permanent Residents (LPR). As such, DHS must change its 2007 policy. Instead, DHS will now treat all persons, regardless of immigration status, consistent with the Fair Information Practice Principles (FIPPs) and applicable law.[3] All DHS personnel must follow the legal and policy obligations outlined below.

---

[1] DHS defines PII as "any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual, regardless of whether the individual is a U.S. citizen, [lawful] permanent resident, visitor to the U.S., or employee or contractor to the Department." DHS Handbook for Safeguarding Sensitive Personally Identifiable Information/Privacy Policy Directive 140-10, *available at* www.dhs.gov/privacy.

[2] The Mixed System policy states "Mixed System" or "Mixed Systems" shall mean any System of Records that collects, maintains, or disseminates information, which is in an identifiable form, and which contains information about U.S. Persons and non-U.S. Persons. *See* DHS Privacy Policy Guidance Memorandum No. 2007-01/Privacy Policy Directive 262-12, *DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons, as amended, available at* www.dhs.gov/privacy.

[3] The FIPPs form the basis of the Department's privacy compliance policies and procedures governing the use of personally identifiable information (PII). These principles are: Transparency, Individual Participation, Purpose Specification, Data Minimization, Use Limitation, Data Quality and Integrity, Security, and Accountability and Auditing. *See* DHS Privacy Policy Guidance Memorandum No. 2008-01/Privacy Policy Directive 140-06, *The Fair Information Practice Principles: Framework for Privacy Policy at the Department of Homeland Security, available at* www.dhs.gov/privacy.

1

Appeal: 18-1521    Case 1:17-cv-02028-GCG-VMS    Filed: 07/02/2028    Doc: 59-4    Filed 09/04/20    Pg: 534 of 572    Page 534 of 1026 PageID #: 10125

Case 8:17-cv-02942-RWT    Document 29-3    Filed 11/28/17    Page 79 of 116

## II.    BACKGROUND

As a matter of law, the Privacy Act of 1974 (Privacy Act), as amended,[4] provides statutory privacy rights only to U.S. citizens and LPRs. In 2007, the DHS Privacy Office released Privacy Policy Guidance Memorandum 2007-01/Privacy Policy Directive 262-12, *DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons* ("Mixed Systems policy"). Under this policy, DHS extended Privacy Act protections to PII that was collected, used, maintained, or disseminated, and was to be retrieved by a personal identifier, in connection with a mixed system as a System of Records subject to the Privacy Act regardless of whether the information pertained to a U.S. citizen, LPR, immigrant, or non-immigrant. DHS extended these protections because of inherent difficulties in determining a person's current immigration status, which may change over time through naturalization or adjustment. Out of operational necessity and administrative efficiency, DHS continues to have systems that maintain information on both U.S. citizens and LPRs, as well as immigrants and non-immigrants to meet its mission requirements.

Section 14 of E.O. No. 13,768 requires that "[a]gencies shall, to the extent consistent with applicable law, ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information." Privacy Policy Guidance Memorandum 2007-01/Privacy Policy Directive 262-12 is inconsistent with Section 14 of E.O. 13,768.

## III.    AUTHORITY

The Chief Privacy Officer (CPO) has primary responsibility under Section 222 of the Homeland Security Act of 2002, as amended,[5] for privacy policy at DHS. This responsibility includes assuring that the use of technologies sustains and does not erode privacy protections relating to the use, collection, or disclosure of personal information. The CPO requires DHS employees to comply with this updated policy to ensure suitable privacy protections are appropriately afforded to all persons, regardless of citizenship and immigration status, in compliance with E.O. 13,768, for PII collected, used, retained, or disseminated by DHS. Pursuant to this responsibility, the CPO requires that the FIPPs serve as the framework for privacy policy and implementation at DHS.

Further, the CPO may investigate or report to the Secretary the Department's programs and operations as the CPO deems necessary or desirable.[6] This includes investigation of or reports regarding compliance with all policies established by the CPO, including the FIPPs.

---

[4] 5 U.S.C. § 552a.
[5] Homeland Security Act of 2002, Pub. L. No. 107-296, § 222, 116 Stat. 2135, 2155 (2002) (amended 2013).
[6] 6 U.S.C. § 142(b)(1)(B).

2

AR1786

## IV.    PRIVACY POLICY

### A.  Fair Information Practice Principles (FIPPs)[7]

The CPO determined that the FIPPs serve as the foundational principles for privacy policy and implementation at DHS, regardless of immigration status. The FIPPs are a widely recognized framework for privacy law and policy used in many parts of the world.[8] The FIPPs help serve as a useful framework for the Department to analyze how to handle PII, comply with its continuing responsibilities under the numerous legal obligations that apply, as well as adhere to its commitments to its partners. The Department uses the eight FIPPs below to assess and enhance privacy protections by analyzing the nature and purpose of the collection and use of PII to fulfill DHS's mission. Nothing in E.O. 13,678 changes this responsibility.

### i.    Transparency

The Department must provide transparency for how it handles PII through various mechanisms, including Privacy Impact Assessments (PIA),[9] System of Records Notices (SORN),[10] Privacy Act Statements,[11] Privacy Compliance Reviews (PCR),[12] general notices, reports, investigations,[13] public meetings,[14] and the Freedom of Information Act (FOIA).[15] The DHS Privacy Office determines for the Department how to provide appropriate transparency for information collected, used, maintained, or disseminated. Even when not required by the Privacy Act or other legal obligations, DHS endeavors to include privacy notices on all information

---

[7] The FIPPs first originated in the following report: Dep't of Health, Education, and Welfare (HEW), *Records, Computers, and the Rights of Citizens: Report of the Secretary's Advisory Committee on Automated Personal Data Systems* (1973), *available at* https://www.justice.gov/opcl/docs/rec-com-rights.pdf.

[8] The background and history of the FIPPs as a privacy policy framework is discussed in depth in Privacy Policy Guidance Memorandum No. 2008-01/Privacy Policy Directive 140-06, *The Fair Information Practice Principles: Framework for Privacy Policy at the Department of Homeland Security, available at* www.dhs.gov/privacy. Nothing in this memorandum supersedes or replaces information and guidance that is provided by Privacy Policy Guidance Memorandum No. 2008-01. DHS uses the FIPPs in Privacy Impact Assessments, oversight activities, information sharing agreements, privacy policies, redress activities, and its other privacy responsibilities. The FIPPs have been expressly adopted by the Office of Management and Budget (OMB) and made applicable to the Federal Government in (1) OMB Circular No. A-130, *Managing Information as a Strategic Resource,* Appendix II, *Responsibilities for Managing Personally Identifiable Information,* 81 Fed. Reg. 49,689 (July 28, 2016); and (2) the National Institutes for Standards and Technology (NIST) Risk Management Framework, specifically described in NIST Special Publication (SP) 800-53 Rev. 4, App. J, *available at* http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf.

[9] 6 U.S.C. § 142(a)(4); 44 U.S.C. § 3501 note.

[10] 5 U.S.C. § 552a(e)(4).

[11] 5 U.S.C. § 552a(e)(3).

[12] 6 U.S.C. § 142. *See also* https://www.dhs.gov/investigations-reviews. The CPO and the DHS Privacy Office conducts PCRs pursuant to its responsibility under Section 222 of the Homeland Security Act to assure that technologies sustain and do not erode privacy protections, and that the FIPPs are followed in handling PII.

[13] 6 U.S.C. § 142(b)(1)(B). *See also* https://www.dhs.gov/investigations-reviews.

[14] *See, e.g.,* the DHS Data Privacy and Integrity Advisory Committee (DPIAC), *available at* https://www.dhs.gov/privacy-advisory-committee.

[15] 5 U.S.C. § 552.

3

Appeal: 18-1521 Case 1:17-cv-02280-CG-VMS Document 29-3 Doc: 37 Filed 07/02/2018 Pg: 536 of 572 Page 536 of 1026 PageID #: 10127

Case 8:17-cv-02942-RWT Document 29-3 Filed 11/28/17 Page 81 of 116

collections. The DHS Privacy Office is developing a template to guide Components when drafting privacy notices or privacy statements for information collections and will determine when such notice is required.

### ii. Individual Participation

The Department should involve the person in the process of using PII and, to the extent practicable, seek the person's consent for the collection, use, dissemination, or maintenance of PII. People seeking access to any record held by DHS containing personal information or seeking to contest the accuracy of its content, may submit a FOIA request or Privacy Act request, as permitted by law, to DHS. Given the nature of some of the information in DHS systems (e.g., sensitive law enforcement or intelligence information), DHS may not always permit the person to gain access to or amend his or her record. Requests processed under the Privacy Act are also processed under FOIA; requesters covered by both statutes are always given the benefit of the statute with the more liberal release requirements. People not covered by the Privacy Act or Judicial Redress Act (JRA)[16] still may obtain access to records consistent with FOIA unless disclosure is prohibited by law or if the agency reasonably foresees that disclosure would harm an interest protected by an exemption.[17]

Components should also take note of other statutory, regulatory, or other information sharing agreements that provide access and amendment of Department records. For example, DHS has established the Traveler Redress Inquiry Program (DHS TRIP) to address perceived watchlist-related and other traveler screening redress inquiries. Additional processes exist that permit updating and correcting records held by the Department, consistent with other authorities.[18] Information sharing and systems that often aggregate data from multiple sources and increasingly look to newer tools such as data analytics should take advantage of opportunities to counter possible errors. These activities are consistent with the principle of individual participation; allowing people to update and amend records can reduce unnecessary errors, improve effectiveness and outcomes, and prevent waste at partner agencies that often rely on the same information.

### iii. Purpose Specification

Purpose specification is linked to the Department's authorities to take action; in the absence of legal authority to act on the information, the Department should not collect the information. The Department must articulate the authorities that permit the collection of information about all persons maintained in DHS systems. The Department must also clearly state the purposes for which the information is intended to be used in applicable SORNs, PIAs, and notices. Planned uses must be compatible with the purpose for which DHS originally collected the information; the PIA must identify and explain this compatibility.

---

[16] *See* Appendix A, Judicial Redress Act of 2015.
[17] 5 U.S.C. § 552 (2016), *amended* by FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 (June 30, 2016).
[18] *See, e.g.,* the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x, which also provides persons with the ability to amend records.

AR1788

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 537 of 1072

### iv. Data Minimization

The Department collects only information that is relevant and necessary to accomplish the purposes specified in its notices and retains such information for only as long as is necessary to fulfill the purposes specified in its notices. Other laws, such as the Federal Records Act,[19] require agencies to determine schedules for record retention that are justified based on the purpose for which the information is collected and used.[20] The FRA process seeks to minimize the collection of information. DHS also places a special emphasis on reducing the use of sensitive PII, when practicable and possible, including Social Security numbers (SSN) and Alien Registration Numbers (A-Numbers).[21] DHS does not collect, use, maintain, and disseminate SSNs unless required by statute or regulation, or when pursuant to a specific authorized purpose.[22]

While Section 14 of E.O. 13,768 requires that "[a]gencies ... ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information"; it does not require the collection of additional data specifically targeted at determining citizenship status when not otherwise required. Collecting additional data or building new systems interfaces to capture this information creates its own risks; reconfiguring systems in this manner would divert needed, limited resources from other priorities and could create cybersecurity risks. All of these factors must be considered when determining what data to include in a system. Through the Privacy Threshold Analysis (PTA) process, the DHS Privacy Office and the Component Privacy Officer help the Department determine the appropriate approach to ensure that only the needed data elements are collected.

### v. Use Limitation

The Department uses information for the purposes specified in its SORNs, PIAs, and notices, and any sharing of such information outside the agency must be compatible with the purposes for which the information was originally collected. With respect to records covered under the Privacy Act or JRA, the Department may only use and share records with the written consent of the individual, unless one of twelve exceptions applies.[23] Consent for use and onward sharing must also be described in PIAs when required pursuant to the CPO's authority under the Homeland Security Act or under section 208 of the E-Government Act of 2002, which may apply to people other than U.S. citizens and LPRs.[24] Thus, seeking consent is always a preferable privacy practice, and consent should be sought when practical. The Privacy Act also requires that

---

[19] *See* Federal Records Act of 1950, Pub. L. No. 81-754, 64 Stat. 585 (codified as amended in Chapters 21, 29, 31, and 33 of 44 U.S.C.).
[20] 44 U.S.C. § 3303.
[21] DHS Handbook for Safeguarding Sensitive Personally Identifiable Information/Privacy Policy Directive 140-10, *available at* www.dhs.gov/privacy.
[22] DHS Privacy Policy Guidance Memorandum No. 2007-02/Privacy Policy Directive 140-11, *Use of Social Security Numbers at the Department of Homeland Security*, *available at* www.dhs.gov/privacy.
[23] 5 U.S.C. § 552a(b).
[24] *See* 44 U.S.C § 3501 note; OMB Memorandum M-03-22, *OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002* (Sept. 26, 2003).

AR1789

Appeal: 18-1521    Case 1:17-cv-02280-GCG-VMS    Document 29-3    Filed 07/02/2018    Pg: 538 of 1026    Page 538 of 1026 PageID #: 10129

Case 8:17-cv-02942-RWT    Document 29-3    Filed 11/28/17    Page 83 of 116

DHS describe how it uses and shares information external to the Department, known as "routine uses" in its SORNs, and ensure that such uses are compatible with the purpose for why the Department collected the records.[25] As a part of the DHS PIA process and privacy notice process, the Department must articulate the purpose and authorities for the collection of information as well as identify the categories of internal and external entities with whom it shares PII.

There is a risk of violating the Privacy Act when sharing or disclosing records if the immigration status of the subject is uncertain or simply not included in the individual record. Further, once a person changes status to a U.S. citizen or LPR, all records pertaining to that individual maintained in DHS records systems are subject to the Privacy Act. This includes all records maintained by the Department on that individual prior to him or her becoming a U.S. citizen or LPR. Thus, when developing and negotiating information sharing and access agreements—particularly those that share data in bulk—the Department should take appropriate steps to account for the fact that a person's status, and therefore whether he or she is protected by the Privacy Act, may change during the life of the agreement.[26]

Absent a statutory requirement to disclose specific information, sharing decisions should be made with care. The DHS Privacy Office and component Privacy Officers work very closely with senior leadership and program managers not only to ensure that appropriate data are collected, but also to ensure that appropriate sharing, even on records not covered by the Privacy Act or JRA, may take place consistent with or when required by law to help accomplish mission objectives. All information sharing that relates to immigrants and non-immigrants must be described and justified in the appropriate PIA based on the FIPPs. There are other authorities in addition to the Privacy Act and JRA that can operate to limit how information is shared, depending on what the records are and with what entity the Department would like to share the records.[27] DHS employees should continue to exercise due diligence, and review the appropriate PIA or SORN for guidance with respect to sharing PII.[28] When in doubt, seek advice from appropriate component counsel, component privacy and FOIA officials, or the DHS Privacy Office.

## vi. Data Quality and Integrity

The Department should rely on information only when it is reasonably considered accurate, relevant, timely, and complete. Failure to maintain accurate records serves to undermine efficient decision making, and can create the risk of errors. While the Privacy Act itself requires DHS to maintain accurate records, the Department should strive to maintain accurate records to the extent doing so would not otherwise interfere with ongoing enforcement investigation operations or intelligence activities. Further, PIAs are published, in part, to ensure that projects, programs, and systems maintain accurate data. In addition, collecting, maintaining, using, and

---

[25] 5 U.S.C. § 552a(a)(7), (e)(4)(D). *See* Britt v. Naval Investigative Service, 886 F.2d 544 (3d Cir. 1987) (defining "compatibility" to require a "more concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure" than simple relevance.)

[26] *See* DHS Directive No. 262-05, *Information Sharing and Safeguarding* (Sept. 4, 2014); DHS Instruction No. 262-05-001, *DHS Information Sharing Environment* (Sept. 12, 2014).

[27] *See, e.g.,* Appendix A.

[28] All PIAs and SORNs are available at www.dhs.gov/privacy.

disseminating accurate information helps the Department to efficiently meet its operational goals, prevent waste, and improve outcomes.

### vii.   Security

The Department protects all PII from inappropriate, unauthorized, or unlawful access, use, disclosure, or destruction. DHS complies with the Federal Information Security Modernization Act of 2014 (FISMA),[29] and has implemented an information security program to ensure appropriate safeguards are in place. Additional information security requirements may be defined in information sharing access agreements, interconnection security agreements, and the provisions of service contracts that contain specific security requirements. DHS SORNs and PIAs contain specific sections to address the manner in which information is securely maintained and protected. FISMA protects all sensitive information, including PII, regardless of the citizenship status of the person.

### viii.   Accountability and Auditing

The Department must be accountable for the use of information collected, maintained, and used in its systems. The Department demonstrates this accountability through a variety of mechanisms including those listed below:

- DHS provides transparency through various notice mechanisms including SORNs, PIAs, Privacy Act Statements, public meetings, and general notices.
- DHS conducts PCRs and Component Privacy Officers conduct privacy reviews of programs and operations.
- DHS provides training to all employees and contractors who have access to or use PII. DHS provides specific role-based training on systems that manage PII.
- DHS provides supplemental guidance including handbooks for handling and Safeguarding Sensitive Personally Identifiable Information at DHS[30] and the Privacy Incident Handling Guidance (PIHG).[31]
- DHS takes appropriate action, which can include investigations, when violations of its privacy policies are found.

### B.   Privacy Impact Assessments

The Department conducts PIAs to help implement privacy protections into new and existing programs, and to help develop strategies for mitigating identified privacy risks. As Privacy Policy Guidance Memorandum No. 2008-02/Privacy Policy Directive 140-09, *DHS Policy Regarding Privacy Impact Assessments* notes, senior leadership and program managers have the

---

[29] Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (Dec. 18, 2014) (primarily codified at 44 U.S.C. chapter 35, subchapter II).
[30] *See* DHS Handbook for Safeguarding Sensitive Personally Identifiable Information/Privacy Policy Directive 140-10, *available at* www.dhs.gov/privacy.
[31] *See* DHS Privacy Incident Handling Guidance (PIHG)/Privacy Policy Directive 140-07, *available at* www.dhs.gov/privacy.

AR1791

overall responsibility and commitment to ensure that DHS programs and initiatives protect privacy. The PIA process helps identify the privacy issues and risks and evaluate whether the programs and initiatives have adequately addressed these issues and risks. When conducting PIAs, Component Privacy Officers must address how the Department proposes to mitigate privacy risks that may arise with respect to different populations.[32] Any planned routine disclosures and sharing must be discussed in the PIA. In addition, as directed by the CPO, program managers must conduct PIAs on privacy-sensitive programs, initiatives, activities, or technologies that are not otherwise covered by the Privacy Act or E-Government Act.[33]

### C.  Privacy Compliance Reviews

The DHS Privacy Office and Component Privacy Officers conduct PCRs, which are designed to provide a constructive mechanism to improve a DHS program's ability to comply with assurances made in existing privacy compliance documentation and DHS Privacy Policies.[34]

All Component Privacy Officers must create a review mechanism for their programs, similar to the DHS PCR process. Within one year of a request by the CPO, all Component Privacy Officers must conduct a Component privacy review of any programs identified by the CPO and report its findings and recommendations to the CPO. These reviews are designed to be public-facing to the extent they do not contain classified, law enforcement sensitive, or other sensitive information. Thereafter, Component Privacy Officers must conduct a privacy review or compliance evaluation on identified relevant programs and initiatives with outstanding recommendations, and coordinate activities and findings with the DHS Privacy Office.

### D.  Third Party Disclosure

When responding to an inquiry from a third party (i.e., a party who is not the subject of the record(s), a representative of the subject, or a party who is not covered under Official Sharing below) involving the disclosure of PII, all DHS personnel must perform an analysis under applicable law that ensures that the information being shared is appropriate for release to the public.[35] Such an analysis seeks to balance the public's right to know about the functions and operations of the Government—in other words how DHS enforced the law or complied with a legal obligation—as compared to the interest of the subject of the request in keeping his or her identity and activities private. Depending upon the nature of the encounter between DHS and the subject, the notoriety of the subject's actions may diminish the extent to which those actions may remain private.[36] Third party disclosures include responses to individual members of the public, members of the U.S. Congress who are not Committee chairs acting on behalf of the

---

[32] See DHS Privacy Policy Instruction No. 047-01-005, Component Privacy Officer (Feb. 2, 2017), *available at* www.dhs.gov/privacy.
[33] 6 U.S.C. § 142(a)(1),(4). *See also* Privacy Policy Guidance Memorandum No. 2008-02/Privacy Policy Directive 140-09, *DHS Policy Regarding Privacy Impact Assessments, available at* www.dhs.gov/privacy.
[34] The DHS Chief Privacy Officer conducts PCRs pursuant to 6 U.S.C. § 142(b). Component Privacy Officers conduct PCRs pursuant to DHS Privacy Policy Instruction No. 047-01-004, *Chief Privacy Officer Privacy Compliance Reviews* (Jan. 19, 2017), *available at* www.dhs.gov/privacy.
[35] *See* Appendix A.
[36] *See* 5 U.S.C. §§ 552(b)(6), (b)(7)(C).

AR1792

Committee,[37] and the media. Questions concerning the analysis should be referred to Component Privacy Officers and FOIA Officers.

Discretionary disclosure of confirmed non-U.S. citizen and non-LPR PII is permitted when no other restrictions or prohibitions on the disclosure apply, subject to review under the balancing analysis described above. Components must develop specific processes to manage these disclosures and submit these procedures to the DHS Privacy Office for approval prior to implementation.

### E. Official Sharing

Official Sharing means disclosures that take place pursuant to requests from Congressional Committee Chairpersons acting on behalf of their committees, federal courts, federal, state, local, tribal, and foreign law enforcement and other administrative agencies having a need for information from DHS files for the performance of their official duties. For U.S. citizens, LPRs, and those covered by the JRA, these disclosures are generally made pursuant to routine uses that are listed in SORNs or pursuant to another authorized disclosure stated in the Privacy Act.[38] All official sharing requests that apply to U.S. citizens, LPRs, and those covered by the JRA must still be analyzed to determine whether a routine use or other exception to the Privacy Act disclosure provisions applies.

With respect to persons who are not covered by the Privacy Act or JRA, employees must use a FIPPs analysis when reviewing official sharing requests. This analysis requires a determination that the use of the records proposed is consistent with the purpose for which DHS collected the records. Any routine or regular sharing must be described in the applicable PIA and privacy notice. Although E.O. 13,768 excludes information relating to persons not covered by the Privacy Act from being subject to the Privacy Act, the authorized disclosure exceptions, including routine uses listed in the applicable SORNs of the Privacy Act, may continue to be good guidance as to whether a disclosure is consistent with the purpose for the collection of the information, and generally the FIPPs framework.

With respect to information sharing activities, Department employees must confirm whether an agreement (e.g., information sharing access agreement, memorandum of understanding, memorandum of agreement), federal statute, or other legal authority permits the sharing and follows the terms of any applicable agreement or arrangement. Also, notwithstanding specific authority permitting the sharing of information, there may exist other policy considerations that would affect DHS's decisions whether to share information. Finally, the Department requires protections on further dissemination of the records beyond the requestor's agency or organization, and coordination with the DHS Office or Component responsible for acquiring the records subject to being shared to avoid operational conflicts.

---

[37] *See* 5 U.S.C § 552a(b)(9).
[38] 5 U.S.C. § 552a(b).

9

AR1793

Appeal: 18-1521  Case 1:17-cv-02228-GCG-VMS  Filed: 07/02/2018  Pg: 542 of 572  Page 542 of 1026 PageID #: 10133

### F.  Breaches of Personally Identifiable Information

The Department has a duty to safeguard PII in its possession, and to prevent the compromise of PII in order to maintain the public's trust in DHS. The Department has established policy and procedures for DHS personnel to follow upon the detection or discovery of a suspected or confirmed cybersecurity or non-cybersecurity incident involving the loss of PII (regardless of citizenship or immigration status of the subject[s]). The Department's Privacy Incident Handling Guidance (PIHG) serves this purpose by informing DHS and its components, employees, senior officials, and contractors of their obligation to protect PII, and by establishing procedures defining how they must respond to a breach of PII.[39] The PIHG also imposes individual accountability for compliance. Finally, OMB sets forth federal agency policy[40] on incidents and breaches of PII in accordance with FISMA. This policy is applicable to all individuals' information, regardless of citizenship or immigration status.

### G.  Component-Level Implementing Guidance

Component Privacy and FOIA Officers, in coordination with appropriate personnel, must create component-level guidance documents—consistent with this policy—to address their unique uses of PII. All component-level guidance documents must be approved by the DHS Privacy Office.

## V.    CANCELLATION

Privacy Policy Guidance Memorandum 2007-01/Privacy Policy Directive 262-12, *DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons* is hereby cancelled.

---

[39] *See* DHS Privacy Incident Handling Guidance (PIHG)/Privacy Policy Directive 140-07, *available at* www.dhs.gov/privacy.
[40] OMB Memorandum M-17-12, *Preparing for and Responding to a Breach of Personally Identifiable Information* (Jan. 3, 2017). PII is defined in M-17-12 as it is in OMB Circular A-130. Further, incidents and breaches are defined in M-17-12.

Appeal: 18-1521   Doc: 29-3   Filed: 07/02/2018   Pg: 543 of 572
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20   Page 543 of 1026 PageID #: 10134

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 88 of 116

## Appendix A

## Applicable Laws and Other Authorities

There are Constitutional, statutory, and regulatory authorities that may grant people rights of privacy or restrict disclosure of PII that continue to bind DHS. These authorities may apply regardless of the subject's immigration status. These authorities described in Appendix A do not constitute an exhaustive list. DHS must use due diligence to determine whether people have privacy rights under authorities not listed in Appendix A.

    1.  U.S. Constitution

A right to privacy has been found in a number of Amendments to the United States Constitution. For example, people have a right to the privacy of their associations and beliefs under the First Amendment.[41] In addition, people have a reasonable expectation of privacy in their homes and personal effects.[42] Additionally, privacy rights have been found to exist as a matter of liberty and due process in both the Fifth and Fourteenth Amendments.[43] The right to privacy has also been found to exist in the Ninth Amendment.[44] With some exceptions, constitutional rights apply to all people in the United States and to U.S. citizens wherever they may be.[45]

    2.  Privacy Act

The Privacy Act provides a number of statutory privacy rights to individuals, which it defines as U.S. citizens and LPRs.[46] Individuals have the right to access and amend their records contained in a DHS system of records, unless properly exempted from one or more provisions of the Privacy Act because of national security, criminal, investigatory, civil, and administrative enforcement requirements. DHS may not disclose an individual's records in a system of records without consent unless permitted by an authorized disclosure exception.[47] The Privacy Act also provides notice to individuals about the existence of the system and the Department's authority for collecting, maintaining, using, and disseminating PII through the use of Privacy Act notices, published SORNs, and published Privacy Act rulemakings.

The Department has established procedures and published rules implementing the Privacy Act on how, for instance, individuals can request access and amendment of their records, and requirements placed upon the Department with regard to data security and integrity and

---

[41] *See* National Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449 (1958). "This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. [...] Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." Cf. United States v. Rumely, 345 U.S. 41, 56-58 (1953) (concurring opinion).
[42] Katz v. U.S., 389 U.S. 347 (1967) (Harlan, J. concurring); Kyllo v. U.S., 533 U.S. 27 (2001).
[43] Griswold v. Connecticut, 381 U.S. 479 (1965); Lawrence v. Texas, 539 U.S. 558 (2003).
[44] Griswold v. Connecticut, 381 U.S. 479 (1965) (Goldberg, J. concurring).
[45] U.S. v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936)
[46] 5 U.S.C. § 552a(a)(2).
[47] 5 U.S.C. § 552a(b).

11

Appeal: 18-1521    Case 1:17-cv-05228-NGG-VMS    Document 29-3    Filed 07/02/2018    Pg: 544 of 702    Page 544 of 1026 PageID #: 10135

Case 8:17-cv-02942-RWT    Document 29-3    Filed 11/28/17    Page 89 of 116

information management.[48] The Department is obligated to ensure that records are accurate, relevant, timely, and complete as is reasonably necessary to assure fairness to the individual as part of a Department determination.[49] DHS must maintain only information that is relevant and necessary to accomplish its statutory mission under law.[50] Individuals may seek judicial redress for Privacy Act violations, including wrongful disclosure.[51] Certain exemptions to these requirements exist and may be claimed in the case of national security, law enforcement, or other bases.[52]

Once a person changes status to a U.S. citizen or LPR, all records on that individual maintained by DHS are subject to the Privacy Act. This includes all records maintained by the Department on that individual prior to the individual becoming a U.S. citizen or LPR. Employees and contractors may be charged criminally for certain willful violations of the Privacy Act.[53]

### 3.    Judicial Redress Act of 2015

The Judicial Redress Act of 2015, Pub. L. 114-126 (JRA) (February 24, 2016), codified at 5 U.S.C. § 552a note, extends provisions of the Privacy Act to non-U.S. citizens and non-LPRs who are citizens of countries that have been designated pursuant to procedures identified within the JRA.[54] The JRA applies only to information shared with the U.S. Government by a public or private entity from a designated country for purposes of preventing, investigating, detecting, or prosecuting criminal offenses, known as "covered records" under the JRA. Information collected from other sources or for other purposes is not covered. Further, the JRA provides the civil remedies of the Privacy Act to citizens of such designated covered countries for wrongful disclosure of their records by designated federal agencies, including DHS. Individuals covered by the JRA have been granted the same administrative rights for access and amendment for records at those designated federal agencies; and may bring suit in the U.S. district courts for denying access or amendment, or for wrongfully disclosing information contained in a Privacy Act protected system of records. The exemptions contained in the Privacy Act itself limiting access, amendment, and judicial redress in certain situations continue to apply to citizens of designated countries.

---

[48] 6 C.F.R. §§ 5.20-5.36. *See generally* 5 U.S.C. § 552a(e).
[49] 5 U.S.C. § 552a(e)(5).
[50] 5 U.S.C. § 552a(e)(1).
[51] 5 U.S.C. § 552a(g).
[52] 5 U.S.C. § 552a(j) & (k).
[53] 5 U.S.C. § 552a(i).
[54] The JRA implements the judicial redress provisions of the *Agreement between the United States of America and the European Union on the Protection of Personal Information Relating to the Prevention, Investigation, Detection, and Prosecution of Criminal Offenses*, June 2, 2016, known as the Data Protection and Privacy Agreement (DPPA) or "Umbrella Agreement." This agreement, like the JRA, also constitutes applicable law for purposes of Executive Order 13,768. As of the date of this memorandum, the European Union and most of its Member States (the Department of Justice has not received notice from the United Kingdom and Denmark to date and is not designated) have been designated by the Attorney General as "covered countries," and DHS has been designated in its entirety as a designated agency pursuant to the JRA. *See* Judicial Redress Act of 2015; Attorney General Designations, 82 Fed. Reg. 7860 (Jan. 23, 2017).

12

AR1796

4. <u>Freedom of Information Act</u>

The Freedom of Information Act (FOIA), 5 U.S.C. § 552, provides that any person regardless of citizenship or immigration status has a right to obtain records, including by seeking access to records held about oneself, maintained by a federal agency, subject to nine exemptions.[55] DHS processes all requests for records using a FOIA analysis, as opposed to other official sharing channels (e.g., law enforcement and investigations[56], intelligence).[57] This analysis does not change as a result of cancellation of the Mixed Systems policy.

Prior to releasing a person's PII pursuant to a FOIA request from a third party, or when DHS proactively discloses records to a member of the general public and the person has not expressly consented to or approved of the disclosure,[58] the personal privacy interests of the subject, regardless of immigration status, must be balanced against the public interest in the requested information.[59] The Supreme Court has determined that the privacy interest inherent in exemptions 6 and 7(C) belongs to the person and not the agency.[60] The only public interest to be considered is whether the requested information would shed light on the agency's performance of its statutory duties. Information that does not reveal the operations and activities of the Government does not satisfy the public interest requirement.[61]

---

[55] *See generally* 5 U.S.C. § 552. Exemptions 6 and 7(C) limit personal information from disclosure to third party requesters. 5 U.S.C. §§ 552(b)(6), (b)(7)(C).

[56] For example, when information is being disclosed proactively to a witness, who is a member of the public, in furtherance of an investigation, there is no need for a FOIA analysis.

[57] A FOIA request is a written request to a federal agency for access to records. When the subject of the records is the requestor, this is a "first party" request. When the subject of the requested records is another person, organization, or a topic of interest, and the requestor is a member of the public, media, or a member of Congress acting on behalf of another or in his or her individual capacity, this is a "third party" request. Moreover, requesters covered by the Privacy Act or JRA who seek records concerning themselves are afforded the benefit of the access provisions of both FOIA and the Privacy Act and obtain the benefit of whichever statute affords the most access. The term "FOIA request" also includes any such "first party" requests when an agency determines that it must search beyond its Privacy Act systems of records or when the agency applies a Privacy Act exemption and therefore looks to FOIA to afford the greatest possible access. Entities within the Federal Government, such as other agencies, courts, and Congress and its committees, do not file FOIA requests. *See* 5 U.S.C. § 551(2) (defining person for purposes of the Administrative Procedure Act (APA), which is incorporated into the FOIA). Requests for records from individual members of Congress, however, acting on behalf of themselves and not in their capacity as a Committee Chair, are reviewed and analyzed pursuant to the FOIA. *See* Dep't of Justice FOIA Update, Vol. V, No. 1, at 3-4 (distinguishing between individual members of Congress and Congress as an institutional entity, which exercises its authority through its committee chairs).

[58] Because the privacy interests protected by FOIA belong to the person, courts have held that people can sue to prevent agencies from disclosing records pursuant to a request under the APA, 5 U.S.C. §§ 701-706 (2006). *See* Campaign for Family Farms v. Glickman, 200 F.3d 1180, 1187-89 (8th Cir. 2000) (deciding that judicial review based on administrative record according to "arbitrary, capricious, or not in accordance with law" standard applies to so-called "reverse FOIA" cases protecting identities of those who signed petition, because release of the records would reveal position on referendum and "would vitiate petitioners' privacy interest in secret ballot").

[59] *See* U.S. Dep't of State v. Ray, 502 U.S. 164, 175-79 (applying the traditional analysis of privacy interests under FOIA to Haitian nationals).

[60] DOJ v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 763-65 (1989).

[61] *Id.*

13

AR1797

5.   The E-Government Act of 2002

Section 208 of the E-Government Act of 2002[62] provides privacy protections for all PII held electronically by the U.S. Government, regardless of whether it pertains to a U.S. citizen, LPR, immigrant, or non-immigrant. Section 208 requires that all Executive Branch agencies, such as DHS, address privacy risks when agencies develop or procure new or modified technologies to collect, maintain, use, or disseminate a PII by publicly posting a PIA.[63] Section 208 also requires the Department to develop privacy policies on all public-facing webpages that inform visitors to the website about information collection activities on those pages, including whether those collections are voluntary and how to consent to the uses of information provided.[64] These guidelines apply not only to the webpage itself, but also to the use of all web measurement and customization technologies on the webpages[65] and to the Department's use of third-party websites and applications for these purposes, such as social media.[66]

6.   The Paperwork Reduction Act

Before requiring or requesting information from the public, the Paperwork Reduction Act (PRA)[67] requires federal departments and agencies to seek public review and comment before submitting forms and information collections for review and approval by the Office of Management and Budget (OMB). As part of the PRA package, the Department must submit applicable privacy compliance documentation. In 44 U.S.C. § 3502(3) and 5 C.F.R. 1320.3(c), the PRA applies to collections of information from the public using identical questions posed to, or reporting or recordkeeping requirements imposed on, ten or more persons, regardless of citizenship. The requirements of the PRA apply to voluntary collections as well as mandatory collections. These procedures help limit the amount of information agencies collect.

---

[62] 44 U.S.C. § 3501 note. Section 202(i) of the E-Government Act exempts "national security systems", as defined by 40 U.S.C. § 11103(b), from certain provisions of the Act, including the publishing of PIAs. *See also* OMB Memorandum M-03-22, *OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002* (Sept. 26, 2003). However, the CPO may require an office to draft and complete a PIA on a national security system. Although these PIAs are not made public because of national security concerns they serve as a key component of ensuring that classified programs have appropriately considered and implemented privacy protections. *See* Privacy Policy Guidance Memorandum No. 2008-02/Privacy Policy Directive 140-09, *DHS Policy Regarding Privacy Impact Assessments, available at* www.dhs.gov/privacy.
[63] For more information on PIAs, *see* Privacy Policy Guidance Memorandum No. 2008-02/Privacy Policy Directive 140-09, *DHS Policy Regarding Privacy Impact Assessments, available at* www.dhs.gov/privacy.
[64] *See* 44 U.S.C § 3501 note; *see also* OMB Memorandum M-03-22, *OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002* (Sept. 26, 2003); OMB Memorandum M-17-06, *Policies for Federal Agency Public Websites and Digital Services* (Nov. 8, 2016).
[65] *See* OMB Memorandum M-10-22, *Guidance for Online Use of Web Measurement and Customization Technologies* (June 25, 2010).
[66] *See* OMB Memorandum M-10-23, *Guidance for Agency Use of Third-Party Websites and Applications* (June 25, 2010)
[67] 44 U.S.C. §§ 3501-3521.

AR1798

7. <u>Federal Records Act</u>

The Federal Records Act of 1950 (FRA)[68] requires that "the head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities."[69]

The Federal Records Act provides historical support for several FIPPs, including individual participation by ensuring the appropriate maintenance of a record that allows access rights to the subject of the record and data minimization by limiting the collection of PII and ensuring the destruction of PII when there is no longer a business, legal, or historical need for the record.

8. <u>Homeland Security Act</u>

Section 221 of the Homeland Security Act, 6 U.S.C. § 141, requires DHS to establish procedures to limit re-dissemination of information, ensure confidentiality and security of shared information, protect the constitutional and statutory rights of subjects of shared information, and provide data integrity through the timely removal and destruction of obsolete or erroneous information.

9. <u>The Violence Against Women Act</u>

The Violence Against Women Act (VAWA), 8 U.S.C. § 1367, generally prohibits DHS from disclosing any information regarding individuals who have applied for or received immigration benefits under the VAWA, T non-immigrant status, or U non-immigrant status, unless a statutory exception applies (e.g., for legitimate law enforcement or national security purposes). This prohibition against disclosure applies to any information about the individual, not simply the information maintained in the specific petition or application for the benefit.

10. <u>Child Victims' and Child Witnesses' Rights</u>

Section 225 of the Crime Control Act of 1990, 18 U.S.C. § 3509(d)(1), provides for the confidentiality of information about child witnesses. It does this by mandating: 1) that all documents containing the name or any other identifying information about a child be kept in a secure place; and 2) prohibiting the disclosure of any of those documents except in certain circumstances, such as disclosures to persons who, by reason of their participation in the proceedings have a reasons to know such information. These provisions can, in part, be complied with by filing documents under seal or requesting a protective order under subsections 3509(d)(2) and (3). In addition, these mandates are applicable to all law enforcement, government employees or their agents as well as court personnel, the defendant, defendant's employees and members of the jury.

---

[68] Federal Records Act of 1950, Pub. L. No. 81-754, 64 Stat. 585 (codified as amended in Chapters 21, 29, 31, and 33 of 44 U.S.C.).
[69] 44 U.S.C. § 3101.

15

AR1799

11. Use of Juvenile Records

Section 508 of the Juvenile Justice and Delinquency Prevention Act of 1974, 18 U.S.C. § 5038 protects the disclosure of information related to federal juvenile delinquency records. Federal agencies may not release information about federal juvenile delinquency records, except in limited circumstances. The statute requires agencies to respond to any inquiry about juvenile records in the same manner as responses made about persons who have never been involved in delinquency proceedings. The prohibitions on disclosure of federal delinquency records do not apply to state juvenile delinquency records.

12. Immigration and Nationality Act

Section 264 of the Immigration and Nationality Act, 8 U.S.C. § 1304(b), protects from disclosure registration and fingerprint records collected under 8 U.S.C. §§ 1301 and 1302. The statute allows for an exception to provide fingerprints and photographs to federal, state, and local law enforcement agencies, upon request. Federal law also restricts the disclosure of information relating to persons who have Temporary Protected Status (TPS),[70] 8 U.S.C. § 1254a(c)(6), or Legalization claims, 8 U.S.C. § 1255a(c)(4), including Seasonal Agricultural Worker (SAW) claims, 8 U.S.C. § 1160(b)(5) and (6). Likewise, visa information is protected by Section 222(f) of the Immigration and Nationality Act, 8 U.S.C. § 1202(f).

13. Cybersecurity Information Sharing Act (CISA)

CISA[71] creates a voluntary cybersecurity information sharing process that encourages public and private entities to share cyber threat information while protecting classified information, intelligence sources and methods, and privacy and civil liberties. On June 15, 2016, DHS and the Department of Justice (DOJ) jointly issued Privacy and Civil Liberties Final Guidelines, which are based on the FIPPs.[72]

14. International Arrangements, Agreements, and Mechanisms[73]

The United States is a party to numerous binding international agreements that similarly affect the manner in which DHS may disclose information.[74] The Department will continue to comply

---

[70] 8 C.F.R. § 244.16 is the implementing regulation for TPS confidentiality.
[71] Cybersecurity Act of 2015, Pub. L. No. 114-113, Division N § 104(c), 129 Stat. 2242, 2942 (2015).
[72] https://www.us-cert.gov/sites/default/files/ais_files/
Privacy_and_Civil_Liberties_Guidelines_(Sec%20105(b)).pdf.
[73] Reciprocity is a fundamental condition of international relations and one the U.S. Government has followed with the treatment of persons and exchanges of information. Indeed, it is a fundamental structure of many international agreements including arms control, trade and commerce, and law enforcement. Arthur Nussbaum, *A Concise History of the Law of Nations* (The Macmillion Co., New York, 1954); Robert O. Keohane, *Reciprocity in International Relations*, 40 INT'L. ORG. 1 (1986). Even the Supreme Court has observed, "Public officials should bear in mind that 'international law is founded upon mutuality and reciprocity. . . .'" Breard v. Pruett, 134 F.3d 615, 622 (4th Cir.), cert. denied sub nom. Breard v. Greene, 118 S.Ct. 1352 (1998) quoting Hilton v. Guyot, 159 U.S. 113, 130 (1895).
[74] Applicable laws include international agreements. *See, e.g.,* Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 398 (2003) (international agreements preempt state law).These include the Data Protection and Privacy Agreement

16

with the provisions contained in such legally binding agreements, including privacy protections such as access, rectification, or judicial redress to records containing PII. In addition, DHS will continue to comply with any provisions that place restrictions on the use and further sharing by DHS of records covered under the agreement or other information sharing arrangements or mechanisms. Further, DHS components may develop their own protocols for discretionary sharing of PII for administrative, law enforcement, or intelligence purposes. Questions regarding the applicability and restrictions of any agreement or information sharing arrangement should be referred to the appropriate DHS counsel and privacy officer.

15. Regulatory Restrictions

Subject to certain exceptions, the asylum regulations at 8 C.F.R. § 208.6 generally prohibit the disclosure of information contained in or pertaining to asylum applications, any credible fear determinations conducted under 8 C.F.R. § 208.30, or any reasonable fear determinations conducted under 8 C.F.R. § 208.31. DHS has extended the application of the asylum confidentiality regulations to information contained in or pertaining to refugee applications. Executive Order No. 13,768 does not affect that policy.

In addition, DHS regulations protect information regarding pre and post order detainees, 8 C.F.R. § 236.6, and protect from disclosure information that is subject to an Immigration Judge's protective order, 8 C.F.R. § 1003.46. Although not an exhaustive list, these regulations are an indicia of regulatory restrictions on disclosure applicable to all persons regardless of immigration status. These authorities are not changed by E.O. 13,768.

---

(DPPA), the Passenger Name Record (PNR) Agreement with the European Union, as well as numerous Mutual Legal Assistance Treaties (MLATs), Preventing and Combating Serious Crime (PCSC) Agreements, and Customs Mutual Assistance Agreements (CMAAs) with foreign governments.

AR1801

# EXHIBIT 19

AR1802



 U.S. Department of
Homeland Security

# Frequently Asked Questions: Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

En español (https://www.dhs.gov/news/2017/09/05/preguntas-frecuentes-anulaci-n-de-la-acci-n-diferida-para-los-llegados-en-la)

The following are frequently asked questions on the September 5, 2017 Rescission of the Deferred Action for Childhood Arrivals (DACA) Program.

## Q1: Why is DHS phasing out the DACA program?

A1: Taking into consideration the federal court rulings in ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that program should be terminated. As such, the Acting Secretary of Homeland Security rescinded the June 15, 2012 memorandum establishing the DACA program. Please see the Attorney General's letter and the Acting Secretary of Homeland Security's memorandum for further information on how this decision was reached.

## Q2: What is going to happen to current DACA holders?

A2: Current DACA recipients will be permitted to retain both the period of deferred action and their employment authorization documents (EADs) until they expire, unless terminated or revoked. DACA benefits are generally valid for two years from the date of issuance.

## Q3: What happens to individuals who currently have an initial DACA request pending?

A3: Due to the anticipated costs and administrative burdens associated with rejecting all pending initial requests, USCIS will adjudicate—on an individual, case-by-case basis—all

properly filed DACA initial requests and associated applications for EADs that have been accepted as of September 5, 2017.

## Q4: What happens to individuals who currently have a request for renewal of DACA pending?

A4: Due to the anticipated costs and administrative burdens associated with rejecting all pending renewal requests, USCIS adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of September 5, 2017, and from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017. USCIS will reject all requests to renew DACA and associated applications for EADs filed after October 5, 2017.

## Q5: Is there still time for current DACA recipients to file a request to renew their DACA?

A5: USCIS will only accept renewal requests and associated applications for EADs for the class of individuals described above in the time period described above.

## Q6: What happens when an individual's DACA benefits expire over the course of the next two years? Will individuals with expired DACA be considered illegally present in the country?

A6: Current law does not grant any legal status for the class of individuals who are current recipients of DACA. Recipients of DACA are currently unlawfully present in the U.S. with their removal deferred. When their period of deferred action expires or is terminated, their removal will no longer be deferred and they will no longer be eligible for lawful employment.

Only Congress has the authority to amend the existing immigration laws.

## Q7: Once an individual's DACA expires, will their case be referred to ICE for enforcement purposes?

A7: Information provided to USCIS in DACA requests will not be proactively provided to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA (http://www.uscis.gov/NTA)). This policy, which may be modified, superseded, or rescinded at any time without notice, is not

intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

## Q8: Will USCIS share the personal information of individuals whose pending requests are denied proactively with ICE for enforcement purposes?

A8: Generally, information provided in DACA requests will not be proactively provided to other law enforcement entities (including ICE and CBP) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security or public safety, or meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

## Q9: Can deferred action received pursuant to DACA be terminated before it expires?

A9: Yes. DACA is an exercise of deferred action which is a form of prosecutorial discretion. Hence, DHS will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

## Q10: Can DACA recipients whose valid EAD is lost, stolen or destroyed request a new EAD during the phase out?

A10: If an individual's still-valid EAD is lost, stolen, or destroyed, they may request a replacement EAD by filing a new Form I-765.

## Q11: Will DACA recipients still be able to travel outside of the United States while their DACA is valid?

A11: Effective September 5, 2017, USCIS will no longer approve any new Form I-131 applications for advance parole under standards associated with the DACA program. Those with a current advance parole validity period from a previously-approved advance parole application will generally retain the benefit until it expires. However, CBP will retain the authority it has always exercised in determining the admissibility of any person presenting at the border. Further, USCIS retains the authority to revoke or terminate an advance parole document at any time.

## Q12: What happens to individuals who have pending requests for advance parole to travel outside of the United States?

A12: USCIS will administratively close all pending Form I-131 applications for advance parole under standards associated with the DACA program, and will refund all associated fees.

## Q13: How many DACA requests are currently pending that will be impacted by this change? Do you have a breakdown of these numbers by state?

A13:  There were 106,341 requests pending as of August 20, 2017 – 34,487 initial requests and 71,854 renewals.  We do not currently have the state-specific breakouts.

## Q14: Is there a grace period for DACA recipients with EADs that will soon expire to make appropriate plans to leave the country?

A14: As noted above, once an individual's DACA and EAD expire—unless in the limited class of beneficiaries above who are found eligible to renew their benefits—the individual is no longer considered lawfully present in the United States and is not authorized to work.  Persons whose DACA permits will expire between September 5, 2017 and March 5, 2018 are eligible to renew their permits. No person should lose benefits under this memorandum prior to March 5, 2018 if they properly file a renewal request and associated application for employment authorization.

## Q15: Can you provide a breakdown of how many DACA EADs expire in 2017, 2018, and 2019?

A15:  From August through December 2017, 201,678 individuals are set to have their DACA/EADs expire. Of these individuals, 55,258 already have submitted requests for renewal of DACA to USCIS.

In calendar year 2018, 275,344 individuals are set to have their DACA/EADs expire. Of these 275,344 individuals, 7,271 have submitted requests for renewal to USCIS.

From January through August 2019, 321,920 individuals are set to have their DACA/EADs expire. Of these 321,920 individuals, eight have submitted requests for renewal of DACA to USCIS.

AR1806

Appeal: 18-1521    Case 1:17-cv-02528-NGG-VMS    Document 282-7    Filed 07/02/2018    Pg: 555 of 572    Page 555 of 1026 PageID #: 10146

Case 8:17-cv-02942-RWT    Document 29-3    Filed 11/28/17    Page 100 of 116

# Q16: What were the previous guidelines for USCIS to grant DACA?

A16: Individuals meeting the following categorical criteria could apply for DACA if they:

- Were under the age of 31 as of June 15, 2012;

- Came to the United States before reaching their 16th birthday;

- Have continuously resided in the United States since June 15, 2007, up to the present time;

- Were physically present in the United States on June 15, 2012, and at the time of making their request for consideration of deferred action with USCIS;

- Had no lawful status on June 15, 2012;

- Are currently in school, have graduated, or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

- Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

Topics: Border Security (/topics/border-security), Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca), Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

Appeal: 18-1521   Document 28-2   Filed: 07/02/2018   Pg: 556 of 572
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 556 of 1026 PageID #: 10147

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 101 of 116

# EXHIBIT 20

AR1808



Privacy Office
**U.S. Department of Homeland Security**
Washington, DC 20528

Homeland
Security

January 7, 2009

**PRIVACY POLICY GUIDANCE MEMORANDUM**
*Memorandum Number: 2007-1 (As amended from January 19, 2007)*

| | |
|---|---|
| MEMORANDUM FOR: | DISTRIBUTION LIST |
| FROM: | Hugo Teufel III<br>Chief Privacy Officer |
| SUBJECT: | DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons |

## I. PURPOSE

This memorandum sets forth the policy of the DHS Privacy Office regarding privacy protections afforded to non-U.S. persons for information collected, used, retained, and/or disseminated by the Department of Homeland Security in so-called "mixed systems."[1]

## II. AUTHORITY

The Chief Privacy Officer has primary authority under Section 222 of the Homeland Security Act of 2002[2] for privacy policy at DHS. Section 222 gives the Chief Privacy Officer plenary authority to ensure that the use of technologies sustain, and do not erode, privacy protections relating to the use, collection, and disclosure of personal information, and to ensure that personal information in Privacy Act systems is handled in full compliance with the fair information practices as set out in the Privacy Act. In addition, Section 222 requires the Chief Privacy Officer to conduct privacy impact assessments on proposed rules of the Department. The policy that the Chief Privacy Officer has developed for the treatment of information about all persons is consistent with and derives from this statutory authority.

---

[1] This document represents the views of the DHS Privacy Office pursuant to its statutory mandate under Section 222 of the Homeland Security Act of 2002, as amended.

[2] Homeland Security Act of 2002, P.L. 107-296, 116 Stat. 2155 (November 25, 2002) (enacted in general by Congress to create the Department of Homeland Security).

Privacy Policy: Mixed Systems
January 7, 2009
Page 2

## III. PRIVACY POLICY

As a matter of law, the Privacy Act of 1974 ("Privacy Act"), 5 U.S.C. § 552a, as amended, provides statutory privacy rights to U.S. citizens and Legal Permanent Residents (LPRs). The Privacy Act does not cover visitors or aliens. As a matter of DHS policy, any personally identifiable information (PII) that is collected, used, maintained, and/or disseminated in connection with a mixed system by DHS shall be treated as a System of Records subject to the Privacy Act regardless of whether the information pertains to a U.S. citizen, Legal Permanent Resident, visitor, or alien.

Under this policy, DHS components will handle non-U.S. person PII held in mixed systems in accordance with the fair information practices, as set forth in the Privacy Act. Non-U.S. persons have the right of access to their PII and the right to amend their records, absent an exemption under the Privacy Act; however, this policy does not extend or create a right of judicial review for non-U.S. persons.

DHS components shall develop mixed systems in conformity with the fair information practices embodied in the Privacy Act, keeping in mind the Act's exemptions for law enforcement systems or in cases of any national security need as determined by the Secretary, and shall be analyzed pursuant to the requirements of Section 208 of the E-Government Act to ensure that privacy protections are built into the systems. This policy shall be applied consistent with the Privacy Act's exemption of intelligence files and data systems devoted solely to foreign nationals or maintained for the purpose of intelligence activities made subject to the provisions and protections of Executive Order 12333.

For the purposes of this policy the following terms shall have the following meanings:

- "DHS Information Systems" shall mean an Information System operated, controlled, or directed by the U.S. Department of Homeland Security. This definition shall include information systems that other entities, including private sector organizations, operate on behalf of or for the benefit of the Department of Homeland Security;
- "E-Government Act" shall mean Public Law, P.L. 107-347, 116 Stat. 2899, as enrolled on December 17, 2002, and any amendments;
- "Identifiable Form" shall have the same meaning as under Section 208 of the E-Government Act of 2002, as amended;
- "Information System" shall have the same meaning as defined under 44 U.S.C. § 3502(8), as amended.
- "Mixed System" or "Mixed Systems" shall mean any System of Records that collects, maintains, or disseminates information, which is in an identifiable form, and which contains information about U.S. Persons and non-U.S. Persons.
- "Non-U.S. Person" shall mean any individual that is not a United States Citizen or LPR;

Appeal: 18-1521 Case 1:17-cv-02228-GJG-VMS Document 29-3 Filed 07/03/2018 Filed 09/04/20 Pg: 559 of 572 Page 559 of 1026 PageID #: 10150

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 104 of 116

Privacy Policy: Mixed Systems
January 7, 2009
Page 3

- "Privacy Act" shall mean 5 U.S.C. § 552a, as amended. "System of Records" shall have the same meaning as found in the Privacy Act, 5 U.S.C. § 552a(a)(5). "The term 'system of records' means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."

## IV. ESSENTIAL BACKGROUND

Under the Privacy Act, a federal agency must provide certain protections to personally identifiable information that is collected, maintained, and used by a Federal agency. The language of the Privacy Act states that "[n]o agency shall disclose any record which is contained in a 'System of Records' by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains...." A "system of records" is defined by the Act as a collection of records about an "individual from which information is retrieved by name or personal identifier," and, importantly, an "individual," is defined by the Act to be a citizen of the United States or a Legal Permanent Resident.[3]

### A.  Consistent with OMB Guidance

Shortly after the enactment of the Privacy Act, the Office of Management and Budget (OMB), the entity responsible for overseeing implementation of the Act, issued a comprehensive set of guidelines to the heads of all Executive Departments on their responsibilities under the Act. In cases where agencies maintain mixed system of records -- that is a system of records with information about both U.S. persons and non-U.S. persons -- OMB encouraged Federal agencies to treat the entire system as covered under the Privacy Act. In its 1975 guidance, OMB provided: "Where a system of records covers both [U.S. persons] and [non-U.S. persons], only that portion, which relates to [U.S. persons] is subject to the Act, but agencies are encouraged to treat such systems as if they were, in their entirety, subject to the Act."[4]

An agency treats mixed systems as Privacy Act systems, in part, because of inherent difficulties in determining an individual's current citizenship status, which may change over time through naturalization or adjustment. While an agency may apply the Privacy Act to a mixed system, such a policy decision does not and cannot extend all Privacy Act rights to non-U.S. persons. Thus, while all individuals would benefit from the transparency that accompanies notice of an agency's system of records as well as the access and correction opportunities, a non-U.S. person does not have legal standing to seek a judicial remedy, based on the statutory definition of "individual" for Privacy Act

---

[3]   5 U.S.C. § 552a(a)(2), which provides:
      "(2) the term "individual" means a citizen of the United States or an alien lawfully admitted for permanent residence;"
[4]   Circular A-108, Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28951 (July 9, 1975).

AR1811

Appeal 18-1521 Case 1:17-cv-02228 CG-VMS Filed 07/02/2018 Document 282-7 Filed 09/04/20 Page 560 of 1026 PageID #: 10151

Case 8:17-cv-02942-RWT    Document 29-3    Filed 11/28/17    Page 105 of 116

Privacy Policy: Mixed Systems
January 7, 2009
Page 4

purposes. Nevertheless, by publishing system notices that apply to mixed systems and provide means of access and correction, agencies demonstrate tangible implementation of the fair information practices that are reflected in the Privacy Act and that also form the basis of international privacy frameworks promoted by the U.S. (*e.g.*, the 1980 OECD Guidelines on the Protection of Transborder Information Flows of Personal Data and the 2003 APEC Privacy Framework).

### B. Consistent with DHS and Other Agency Practice

Many legacy agencies of DHS have maintained mixed systems and, pursuant to their discretion under OMB guidance, have treated the systems as covered by the Privacy Act. By treating these systems as Privacy Act systems, component agencies have implemented efficient and uniform business practices concerning information handling, eliminating the need to maintain two parallel systems serving much the same purpose, for U.S. citizens and LPRs and all other individuals. The U.S. Citizenship and Immigration Services, one DHS component created from the former Immigration and Naturalization Service, is an example of a component that has published Privacy Act system notices covering mixed systems.

DHS is not unique in its application of Privacy Act coverage to mixed systems. Other agencies such as the Departments of Justice and State also apply the Act to mixed systems.[5]

## V. POLICY IMPLICATIONS: ADVANCES DHS GOALS

### A. Standardizing Existing Department Practice Supports Data Integrity

Department-wide adoption of this policy will standardize an existing practice and sub-agency policy that currently exists in DHS programs such as US-VISIT. Application of fair information practices to mixed systems supports the Department's interest in data integrity. For example, allowing for access and correction will reduce inaccuracies and, as an operational matter, false positives.

### B. Advances Cross Border Information Sharing and Facilitates Travel and Trade

Early in DHS's existence, the Chief Privacy Officer committed to following OMB guidance on mixed systems. Major programs such as US-VISIT, for example, embedded Privacy Act coverage in its mixed system.[6] DHS was mindful that such a policy would not only build trust in the traveling public, but it would also advance our strategic goal of

---

[5] Examples for the Department of Justice include the following systems: Executive Office of Immigration Review Records (EOIR) Records, INTERPOL (USNCB) Records, and International Prisoner Transfer Case Files/International Prisoner Transfer Tracking Records. Examples for the Department of State include Visa Records and Refugee Case Records.

[6] As of January 2006, the US-VISIT system contains records on 51 million individuals who at the time of their enrollment were not U.S. persons.

Privacy Policy: Mixed Systems
January 7, 2009
Page 5

cross-border information sharing. Since the Department intended to rely heavily on access to foreign visitor information, this policy assured foreign partners that their citizens' information would be safeguarded, which would make information sharing more likely. As with the U.S. system, our allies and friends have their own obligations to ensure the privacy of their citizens' information. Failure to offer DHS's partners such commitments could have adverse implications for long-term Department objectives.

### C. Protection of U.S. Persons' Privacy Overseas

Formalizing the Department's mixed use privacy policy will have direct benefits for DHS's obligation to protect information on U.S. persons traveling abroad. Reciprocity is a fundamental condition of international relations and one the U.S. Government has followed with the treatment of persons and exchanges of information. Indeed, it is a fundamental structure of many international agreements[7] including arms control, trade and commerce, and law enforcement. Even the Supreme Court has observed, "Public officials should bear in mind that 'international law is founded upon mutuality and reciprocity. . . .'"[8]

Reciprocity is relevant here because various foreign partners are expected to request personally identifiable information on U.S. persons entering their countries. Indeed, the United Kingdom and France are in the preliminary stages of implementing their own programs for using Passenger Name Records data on travelers entering their countries. If DHS wants foreign partners to afford protections to data collected about U.S. citizens, a positive commitment to honor privacy protections for non-U.S. persons, as demonstrated through application of the Privacy Act to mixed systems, will improve the chances for success. In short, DHS wants to be in a position to be able to say "we'll give your people the same privacy you give our people." To do otherwise, would put the Department in an untenable position of seeking a double standard.

### D. E-Government Act of 2002 Reinforcement

Separate from the Privacy Act and its coverage, Section 208 of the E-Government Act of 2002 ("E-Gov Act") requires that privacy impact assessments be conducted on all new Federal systems collecting information in identifiable form[9] and on any existing Federal systems that are making major changes, collecting new types of information, or changing system uses.[10] The E-Gov Act does not limit its coverage only to U.S. persons; instead, it focuses on information systems. Thus, the E-Gov Act requires that an information system be analyzed for privacy risks based on the architecture of the system itself and its associated collections and uses, without regard to whom the system covers. And the

---

[7] Arthur Nussbaum, *A Concise History of the Law of Nations* (The Macmillion Co., New York, 1954); Robert O. Keohane, *Reciprocity in International Relations*, 40 INT'L ORG. 1 (1986).

[8] *Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir.), cert. denied sub nom. *Breard v. Greene*, 118 S.Ct. 1352 (1998) quoting *Hilton v. Guyot*, 159 U.S. 113, 130 (1895).

[9] § 208(d) DEFINITION.—In this section, the term ''identifiable form'' means any representation of information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means. (44 U.S.C. § 3501, note)

[10] *Id.*, § 208(b)(1)(A).

AR1813

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 29-3 Filed 07/02/2018 Pg: 562 of 572 Page 562 of 1026 PageID #: 10153

Privacy Policy: Mixed Systems
January 7, 2009
Page 6

OMB guidance on Section 208 of the E-Gov Act expressly recognizes that agencies may extend coverage to other than U.S. citizens.[11]  The Privacy Office's policy and guidance for conducting a Privacy Impact Assessment ("PIA") on DHS systems is to review the privacy impact of all new or changing data systems and not to limit such reviews to those systems that solely collect information about U.S. persons. This policy regarding mixed systems is consistent with our policy on PIAs.

---

[11]   Office of Management and Budget, M03-22, Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002,  at n.1 (Sept. 26, 2003).

AR1814

# EXHIBIT 21

AR1815



AR1816

Appeal: 18-1521    Doc: 28-2    17-cv-05228-NGG-VMS    Document 282-2    Filed 07/02/2018    Pg: 565 of 572    Filed 09/04/20    Page 565 of 1026 PageID #: 10156

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 110 of 116



AR1817

# Background

- On June 15, 2012, DHS announced that certain people who came to the U.S. as children may request consideration of deferred action for childhood arrivals (DACA).

- On August 15, 2012, USCIS began a new process to review requests for deferred action for childhood arrivals, and to grant work authorization, on a case by case basis.



U.S. Citizenship
and Immigration
Services

www.uscis.gov/childhoodarrivals                    June 2014

3

AR1818



AR1819

# Protecting Your Information

We will not share any information about you with
ICE or U.S. Customs and Border Protection (CBP) for
the purpose of immigration enforcement proceedings
unless you meet the criteria for:

- the issuance of an NTA; or
- a referral to ICE under the criteria set forth in our NTA
  guidance.



U.S. Citizenship
and Immigration
Services

www.uscis.gov/childhoodarrivals

June 2014

30

AR1820

Appeal: 18-1521   Document: 2   Filed: 07/02/2018   Pg: 569 of 572   Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 569 of 1026 PageID #: 10160

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 114 of 116

# EXHIBIT 22

AR1821

Appeal 18-1521 Case 1:17-cv-05228-NGG-VMS Filed 07/02/2018 Document 282-7 Filed 09/04/20 Page 570 of 1026 PageID #: 10161

Case 8:17-cv-02942-RWT   Document 29-3   Filed 11/28/17   Page 115 of 116



Secretary
U.S. Department of Homeland Security
Washington, DC 20528

# Homeland Security

December 30, 2016

The Honorable Judy Chu
U.S. House of Representatives
Washington, DC  20515

Dear Representative Chu:

On behalf of the Administration, I write in response to the letter you and 110 other members of Congress sent the President on December 5. In your letter, you ask us "to do everything within [our] power to safeguard the personal identifying information of DACA enrollees." We share your concerns.

Today there are 750,000 young people enrolled in DACA who, when they applied for enrollment, relied on the U.S. government's representations about the use of their personal identifying information. Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and requests and would be safeguarded from other immigration-related purposes. More specifically, the U.S. government represented to applicants that the personal information they provided will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law.

We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored.

For decades, even dating back before DACA, it has been the long-standing and consistent practice of DHS (and its predecessor INS) to use information submitted by people seeking deferred action or other benefits for the limited purpose of adjudicating their requests, and not for immigration enforcement purposes except in the kinds of specified circumstances described above. This was true, for example, under the deferred action policies extended to victims of human trafficking, to foreign students affected by Hurricane Katrina, to battered immigrants under the Violence Against Women Act, and to widows and widowers of American citizens. Accordingly, people who requested to be considered under DACA, like those who requested deferred action in the past, have relied on our consistent practice concerning the information they provide about themselves and others.

AR1822

The Honorable Judy Chu
Page 2

The U.S. government's practice of adhering to the assurances it makes to applicants
for deferred action is also consistent with the way USCIS (and the INS before it) has long
protected information submitted by those seeking other benefits or relief. This includes
but is not limited to individuals requesting temporary protected status, deferred enforced
departure, or extended voluntary departure. In these circumstances, as with deferred action
requests, USCIS and INS have abided by a longstanding and consistent practice of using
information to adjudicate specific applications, but not for immigration enforcement
purposes absent the limited circumstances described above.

Since DACA began, thousands of Dreamers have been able to enroll in colleges and
universities, complete their education, start businesses that help improve our economy, and
give back to our communities as teachers, medical professionals, engineers, and
entrepreneurs—all on the books. We continue to benefit as a country from the
contributions of those young people who have come forward and want nothing more than
to contribute to our country and our shared future.

The co-signers of your letter will receive separate, identical responses. Should you
wish to discuss this further, please do not hesitate to contact me.

Sincerely,

Jeh Charles Johnson

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2018, I electronically filed the foregoing Joint Appendix with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  July 2, 2018                        /s/  John A. Freedman
                                            John A. Freedman

**AR1824**

No. 18-1521 (L), No. 18-1522

# In the United States Court of Appeals for the Fourth Circuit

---

CASA DE MARYLAND, *et al.*,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Maryland, Greenbelt Division
Case No. 8:17-cv-02942 (Hon. Roger W. Titus)

---

**JOINT APPENDIX VOLUME III OF III**

---

John A. Freedman
Emily Newhouse Dillingham
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@arnoldporter.com
emily.dillingham@arnoldporter.com

*Counsel for Plaintiffs-Appellants*

(additional counsel listed on inside cover)

Mark B. Stern
Abby C. Wright
Thomas Pulham
U.S. DEPARTMENT OF JUSTICE
Civil Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000
(202) 514-8151 (fax)
Mark.Stern@usdoj.gov
Abby.Wright@usdoj.gov
Thomas.Pulham@usdoj.gov

*Counsel for Defendants-Appellees*

AR1825

Elizabeth J. Bower
Kevin B. Clark
Priya R. Aiyar
WILLKIE FARR & GALLAGHER
   LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000
(202) 303-2252 (fax)
ebower@willkie.com
kclark@willkie.com
paiyar@willkie.com

Dennis A. Corkery
WASHINGTON LAWYERS'
   COMMITTEE FOR CIVIL
   RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, NW
Suite 400
Washington, DC 20036
(202) 319-1000
(202) 319-1010 (fax)
dennis_corkery@washlaw.org

Ajmel A. Quereshi
HOWARD UNIVERSITY SCHOOL
   OF LAW
2900 Van Ness Street, NW
Washington, DC 20008
(202) 216-5574
(202) 682-1312 (fax)
aquereshi@naacpldf.org

*Counsel for Plaintiffs-Appellants*

**AR1826**

**JOINT APPENDIX**
**TABLE OF CONTENTS**

| ECF No. | Date | Document | Page |
|---|---|---|---|
| | | **VOLUME I** | |
| N/A | N/A | MD District Court Docket Report in 8:17-cv-02942 | J.A. 1 |
| 1 | 10/05/2017 | Complaint (redacted version) | J.A. 37 |
| 8 | 10/10/2017 | Letter Requesting Conference | J.A. 98 |
| 62 | 11/01/2017 | Transcript of Status Conference before Judge Roger W. Titus | J.A. 100 |
| 20 | 11/01/2017 | Order Granting Motion to Omit Individual Plaintiffs' Home Addresses from Caption | J.A. 124 |
| 26 | 11/15/2017 | Notice of Filing Administrative Record | J.A. 125 |
| 26-1 | 11/15/2017 | Ex. 1: Administrative Record | J.A. 129 |
| 27 | 11/15/2017 | Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment | J.A. 385 |
| 27-1 | 11/15/2017 | Memorandum of Law in Support of Motion to Dismiss | J.A. 387 |
| 27-2 | 11/15/2017 | Proposed Order in Support of Motion to Dismiss | J.A. 459 |
| 28 | 11/21/2017 | Order re: Motion to Dismiss | J.A. 460 |
| 29 | 11/28/2017 | Plaintiffs' Opposition to Motion to Dismiss or, in the Alternative for Summary Judgment | J.A. 461 |

**AR1827**

| ECF No. | Date | Document | Page |
|---------|------|----------|------|
| | | **VOLUME II** | |
| 29-1 | 11/28/2017 | Declaration of John A. Freedman | J.A. 531 |
| 29-2 | 11/28/2017 | Exhibits 1-9 to Declaration of John Freedman | J.A. 536 |
| 29-2 | 11/28/2017 | Ex. 1:  November 9, 2017 Memorandum & Order, *Batalla Vidal v. Duke* | J.A. 536 |
| 29-2 | 11/28/2017 | Ex. 2:  Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories, *Batalla Vidal v. Duke* | J.A. 559 |
| 29-2 | 11/28/2017 | Ex. 3:  February 20, 2017 Memorandum by John Kelly | J.A. 600 |
| 29-2 | 11/28/2017 | Ex. 4:  June 15, 2017 Memorandum by John Kelly | J.A. 607 |
| 29-2 | 11/28/2017 | Ex. 5:  October 20, 2017 Deposition of Gene Hamilton | J.A. 611 |
| 29-2 | 11/28/2017 | Ex. 6:  September 14, 2017 Pre-Motion Status Conference, *Batalla Vidal v. Duke* | J.A. 619 |
| 29-2 | 11/28/2017 | Ex. 7:  October 23, 2017 Memorandum Opinion, *Int'l Refugee Assistance Project v. Trump* | J.A. 655 |
| 29-2 | 11/28/2017 | Ex. 8:  October 19, 2017 Memorandum & Order, *Batalla Vidal v. Duke* | J.A. 709 |
| 29-2 | 11/28/2017 | Ex. 9:  National Standard Operating Procedures on Deferred Action for Childhood Arrivals | J.A. 713 |
| 29-3 | 11/28/2017 | Exhibits 10-22 to Declaration of John A. Freedman | J.A. 978 |

AR1828

| ECF No. | Date | Document | | Page |
|---|---|---|---|---|
| 29-3 | 11/28/2017 | Ex. 10:  September 5, 2017 White House Press Release | | J.A. 978 |
| 29-3 | 11/28/2017 | Ex. 11:  September 5, 2017 remarks by Attorney General Jeff Sessions | | J.A. 983 |
| 29-3 | 11/28/2017 | Ex. 12:  September 5, 2017 Twitter post | | J.A. 987 |
| 29-3 | 11/28/2017 | Ex. 13:  November 17, 2017 USCIS guidance | | J.A. 989 |
| 29-3 | 11/28/2017 | Ex. 14:  Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I-821D 13 | | J.A. 991 |
| 29-3 | 11/28/2017 | Ex. 15:  USCIS DACA FAQs page | | J.A. 1006 |
| 29-3 | 11/28/2017 | Ex. 16:  Sample DACA Approval Notice from USCIS | | J.A. 1026 |
| 29-3 | 11/28/2017 | Ex. 17:  DHS Privacy Impact Assessment for DACA, DHS/USCIS/PIA-045 | | J.A. 1028 |
| 29-3 | 11/28/2017 | Ex. 18:  April 27, 2017 Privacy Policy Guidance Memorandum | | J.A. 1054 |
| 29-3 | 11/28/2017 | Ex. 19:  September 5, 2017 DHS Press Release | | J.A. 1072 |
| 29-3 | 11/28/2017 | Ex. 20:  January 7, 2009 Privacy Policy Guidance Memorandum | | J.A. 1078 |
| 29-3 | 11/28/2017 | Ex. 21:  DHS PowerPoint presentation on DACA | | J.A. 1085 |
| 29-3 | 11/28/2017 | Ex. 22:  December 30, 2016 letter sent by Secretary of Homeland Security Jeh Johnson | | J.A. 1091 |

**AR1829**

| ECF No. | Date | Document | Page |
|---------|------|----------|------|
| | | **VOLUME III** | |
| 29-4 | 11/28/2017 | Declaration of Elizabeth Bower | J.A. 1094 |
| 29-5 | 11/28/2017 | Exhibits to Declaration of Elizabeth Bower | J.A. 1106 |
| 29-5 | 11/28/2017 | Ex. 1: Plaintiffs' First Set of Interrogatories and Requests for Production | J.A. 1106 |
| 29-5 | 11/28/2017 | Ex. 2A: ND. Cal. Requests for Production | J.A. 1124 |
| 29-5 | 11/28/2017 | Ex. 2B: ND. Cal. Requests for Admission | J.A. 1151 |
| 29-5 | 11/28/2017 | Ex. 2C: ND. Cal. Interrogatories | J.A. 1168 |
| 29-5 | 11/28/2017 | Ex. 3A: E.D.N.Y. Requests for Admission | J.A. 1179 |
| 29-5 | 11/28/2017 | Ex. 3B: E.D.N.Y. Requests for Admission | J.A. 1192 |
| 29-5 | 11/28/2017 | Ex. 3C: E.D.N.Y. Requests for Production | J.A. 1207 |
| 29-5 | 11/28/2017 | Ex. 3D: E.D.N.Y. Requests for Production, Set Two | J.A. 1226 |
| 29-6 | 11/28/2017 | Declaration of Casa de Maryland | J.A. 1235 |
| 29-7 | 11/28/2017 | Declaration of OneAmerica | J.A. 1240 |
| 29-8 | 11/28/2017 | Declaration of Junta for Progressive Action, Inc. | J.A. 1247 |

**AR1830**

| ECF No. | Date | Document | Page |
|---|---|---|---|
| 30 | 12/05/2017 | Defendants' Reply in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment | J.A. 1253 |
| 30-1 | 12/05/2017 | Ex. 1: Declaration of Rachel Westmoreland | J.A. 1286 |
| 31 | 12/11/2017 | Order Giving Notification of Federal Rule of Civil Procedure 56(f) | J.A. 1290 |
| 33 | 12/14/2017 | Correspondence re: Response to Court's 56(f) Notice | J.A. 1291 |
| 63 | 12/15/2017 | Transcript of Motion Hearing on Motion to Dismiss | J.A. 1292 |
| 36 | 01/17/2018 | Plaintiffs' Notice of Supplemental Authority | J.A. 1359 |
| 36-1 | 01/17/2018 | Ex. 1: January 9, 2018 Opinion in the consolidated Northern District of California DACA cases | J.A. 1362 |
| 36-2 | 01/17/2018 | Ex. 2: January 12, 2018 Opinion in the consolidated Northern District of California DACA cases | J.A. 1411 |
| 37 | 01/19/2018 | Defendants' Response to Plaintiffs' Notice of Supplemental Authority | J.A. 1425 |
| 40 | 02/14/2018 | Plaintiffs' Notice of Supplemental Authority | J.A. 1429 |
| 40-1 | 02/14/2018 | Ex. 1: February 13, 2018 Opinion in the consolidated Eastern District of New York DACA cases | J.A. 1431 |
| 41 | 02/21/2018 | Defendants' Response to Plaintiffs' Second Notice of Supplemental Authority | J.A. 1486 |
| 42 | 03/05/2018 | Memorandum Opinion | J.A. 1489 |

**AR1831**

| ECF No. | Date | Document | Page |
|---|---|---|---|
| 43 | 03/05/2018 | Order Granting in Part and Denying in Part Motion to Dismiss or, in the Alternative, for Summary Judgment | J.A. 1519 |
| 45 | 03/09/2018 | Notice Regarding the Permanent Injunction | J.A. 1521 |
| 46 | 03/12/2018 | Memorandum Order re: Injunction | J.A. 1527 |
| 47 | 03/14/2018 | Joint Status Report | J.A. 1528 |
| 48 | 03/15/2018 | Memorandum/Order Granting Status Report | J.A. 1531 |
| 49 | 03/15/2018 | Amended Order Granting in Part and Denying in Part Motion to Dismiss or, in the Alternative, for Summary Judgment | J.A. 1532 |
| 52 | 04/27/2018 | Notice of Appeal by Plaintiffs | J.A. 1534 |
| 53 | 05/04/2018 | Notice of Appeal by Defendants | J.A. 1537 |

**AR1832**

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 90 of 454
Case 1:17-cv-05228-NGG-VMS    Document 28-7    Filed 09/04/20    Page 581 of 1026 PageID #: 10172

Case 8:17-cv-02942-RWT    Document 29-4    Filed 11/28/17    Page 1 of 12

<div align="center">

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

</div>

|  |  |  |
|---|---|---|
| CASA DE MARYLAND, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 8:17-cv-02942 (RWT) |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<div align="center">

**DECLARATION OF ELIAZABETH BOWER
PURSUANT TO FED. R. CIV. P. 56(d)**

</div>

Pursuant to Title 28 U.S.C. § 1746, I, Elizabeth J. Bower, hereby declare as follows:

1.      I am a partner at Willkie Farr & Gallagher LLP and counsel for Plaintiffs in this action.  I submit this declaration pursuant to Rule 56(d) of the Federal Rules of Civil Procedure in connection with Plaintiffs Opposition to Defendants Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.  This declaration is based on personal knowledge and my review of documents and filings relevant to this action.

2.      Defendants seek summary judgment on all of Plaintiffs' claims for relief, and although not stated explicitly, Defendants are apparently seeking judgment based on the factual averments made in the "Background" section of their brief.  Gov. Br. at 5-11.

3.      In making its factual averments, the Government has not met the procedural prerequisites for seeking summary judgment.  Notably, Defendants have failed to file a statement of material facts as to which there is no genuine dispute, or any evidentiary support for such assertions, as required by FCRP 56(a) and 56(c).

<div align="center">

J.A. 1094                                                **AR1833**

</div>

Appeal: 18-1521    Doc: 52    Filed: 07/02/2018    Pg: 10 of 454    Page 582 of 1026 PageID #:
10173
Case 1:17-cv-05228-NGG-VMS    Document 28-27    Filed 09/04/20

Case 8:17-cv-02942-RWT    Document 29-4    Filed 11/28/17    Page 2 of 12

4.      Many of the Government's factual averments are based on facts uniquely in the Government's control; or are predicated on disputed factual assertions; or omit material facts relevant to Plaintiffs' claims.  Because Plaintiffs have not yet had the opportunity to conduct discovery into these matters, Plaintiffs do not believe they yet know all essential facts and, therefore, presently are unable to present essential facts that Plaintiffs anticipate will support their claims.  Accordingly, Plaintiffs require discovery to learn and to present additional facts essential to their opposition to the Government's motion.

5.      For example, the Government's Memorandum acknowledges that there have been over 20 deferred action programs established by the Government covering different classes of individuals.  Gov. Br. at 6.  Plaintiffs' Equal Protection Claim (Count III) is predicated on the legal theory that the Defendants' decision to terminate DACA while allowing these other deferred action programs to continue is impermissibly based on the animus of key government officials against Mexicans, Central Americans and Latinos, who constitute the overwhelming majority of DACA recipients.  *See* Complaint ¶¶ 24-25, 68, 94-96, 125-126, 154-161.

a.      To oppose the request for summary judgment, Plaintiffs need discovery into the discriminatory impact of the rescission of DACA as opposed to other programs DHS is maintaining, as well as into the Government's decision to maintain other deferred action programs.  Such discovery has been sought in the Northern District of California cases.  *See* Ex. 2A (ND. Cal. RFPs) No. 9.  Assuming such discovery is produced in the California cases and is made available to the parties in this case, Plaintiffs intend to rely on the Government's responses to that discovery and do not intend to propound duplicative discovery in this case regarding these other programs.

AR1834

b.      In this case, focused discovery into motive is necessary in light of Plaintiffs'

constitutional claims, in order to show whether discriminatory intent was a substantial or

motivating factor behind the DACA rescission.  *See, e.g., Hunter v. Underwood*, 471 U.S. 222,

228 (1985).  Although the complaint contains a sampling of evidence of the public statements of

Defendants exhibiting their animus against Mexicans, Central Americans and Latinos (e.g.,

Complaint ¶¶ 94-96), Plaintiffs require additional discovery to probe the underlying motivations

for these statements and to confirm the evidence summarized in the Complaint.  Courts "allow

inquiry into motive where a bad one could transform an official's otherwise reasonable conduct"

into a constitutional violation.  *Crawford-El. v. Britton*, 951 F.2d 1314, 1317 (D.C. Cir. 1991).

Among the relevant sources of evidence of discriminatory motive are:  "The historical

background of the decision[,] . . . [t]he specific sequence of events leading up to the challenged

decision[,] . . . [and t]he legislative or administrative history[, which] may be highly relevant,

especially where there are contemporary statements by members of the decisionmaking body,

minutes of its meetings, or reports."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429

U.S. 252, 267-68 (1977).  Plaintiffs have attached proposed discovery to inquire into

discriminatory intent as Exhibit 1 at RFP Nos. 8 & 10-15, Interrogatories Nos. 1 & 5.

6.      Similarly, the Government's Memorandum acknowledges that deferred action

recipients are granted the "ability to apply for work authorization." Gov. Br. at 6.  But the

Government's proffer fails to discuss or otherwise acknowledge that one of Plaintiffs' Due

Process Claims (Count I) is predicated on, among other things, the Government's actions to strip

DACA recipients of their protected interests in the right to work, the right to obtain an education,

the right to travel internationally, and the right to family integrity.  Complaint ¶¶ 20, 71-78, 101-

106, 129-143.  In this case, certain of the evidence necessary to evaluate whether the

Appeal: 18-1521    Document: 28-7    Filed: 07/03/2018    Pg: 59 of 454    Page 584 of 1026 PageID #:
10175
Case 1:17-cv-05228-NGG-VMS    Document 29-4    Filed 09/04/20

Case 8:17-cv-02942-RWT    Document 29-4    Filed 11/28/17    Page 4 of 12

Government has deprived DACA recipients of a liberty or property interest without due process

is only available to the Government; Plaintiffs need discovery into matters such as the value of

additional procedural safeguards and the fiscal and administrative burdens that such additional

procedures would entail.  Such discovery has been sought in the Northern District of California

and Eastern District of New York cases.  *See* Exs. 2A Nos. 4, 5, 2B Nos.. 4, 9, 18, 3A No. 12, &

3B  No. 43.  Plaintiffs have attached proposed discovery to inquire into the Defendants'

understanding of this deprivation as Exhibit 1 at Interrogatory No. 3.  Among other things,

discovery in those cases has shown that the Government did not send individualized notices to

DACA recipients in conjunction with the September 5 announcement and arbitrarily stopped

issuing renewal notices to DACA recipients on or about July 2017, prior to termination of the

DACA program, ostensibly because the Government changed its notification system.  Additional

discovery is necessary to understand the motivations behind this decision to change the

notification system in place for DACA.  Plaintiffs have attached proposed discovery to inquire

into the change in notification policy as Exhibit 1 at RFP Nos. 8 & 9.  In addition to this

discovery, assuming such discovery is produced in the California and New York cases and is

made available to the parties in this case, Plaintiffs intend to rely on the Government's responses

to related discovery propounded in the Northern District of California and Eastern District of

New York cases.

      7.      The Government's Memorandum also acknowledges that public guidance

regarding the DACA program informed DACA applicants that their application information

would be "protected from disclosure" for purposes of immigration enforcement proceedings,

Gov. Br. at 7, but then asserts that prohibition could be "modified, suspended, or rescinded at

any time without notice."  Gov. Br. at 8.  The Government's Memorandum fails to discuss or

AR1836

otherwise acknowledge that Plaintiffs' Due Process Claim directed toward that prohibition (Count II) is predicated on the government having made unequivocal commitments that application information would not be used for immigration enforcement proceedings; that the Government communicated this commitment on numerous occasions without the reservation of rights described in its Memorandum; that the Government expressly waived certain provisions of the Privacy Act (that are cited elsewhere in its brief); that the Government intended DACA recipients to rely on the commitment in participating in the program; and that the Defendants have stated they are no longer bound by the commitment.  Complaint ¶¶ 9-16, 21-22, 79-91, 107-117, 144-153.  Plaintiffs believe additional focused discovery into this topic is necessary because the Government's argument disputes certain of these allegations.  Plaintiffs have attached proposed discovery to inquire into these topics as Exhibit 1 at RFP Nos.2-7 & 16, Interrogatories 4, 6 & 7. In addition to this discovery, Plaintiffs intend to rely on the Government's responses to related discovery propounded in the Northern District of California and Eastern District of New York cases.  *See* Exs. 2A No. 4, 2C Nos. 5, 6, 2C Nos. 7,12-13, & 3B Nos. 66-72, 74-75.

       8.      The Government's proffer asserts that the DACA rescission announcement "says nothing about (and makes no changes to) DHS's information-sharing policy regarding information provided to USCIS in a DACA request."  Gov. Br. at 11.  The Government's proffer, however, does not address the allegations in the Complaint about the repeated, unqualified representations made by the Government to DACA applicants that their personal information would not be used for enforcement purposes, Compl. ¶¶ 79-91, nor does it acknowledge or otherwise address the Government's statements that it was modifying the representation, including in the guidance materials released at the same time as the rescission announcement.  Compl. ¶¶ 108, 111.  Plaintiffs believe additional focused discovery is necessary

AR1837

Appeal: 18-1521    Document: 28-7    Filed: 07/02/2018    Pg: 586 of 1026
Case 1:17-cv-05228-NGG-VMS    Document 28-7    Filed 09/04/20    Page 586 of 1026 PageID #:
10177
Case 8:17-cv-02942-RWT    Document 29-4    Filed 11/28/17    Page 6 of 12

on the Government's commitment not to use personal information for enforcement purposes, on the extent to which the Government encouraged DACA applicants to apply for this program based on these representations, on the extent of the Government's understanding that DACA applicants relied upon these representations, and on the change in the Government's policy on this issue, because the Government's argument disputes certain of these allegations.  Plaintiffs have attached proposed discovery to inquire into these topics as Exhibit 1 at RFP Nos.2-7 & 16, Interrogatories Nos. 4, 6 & 7.  In addition to this discovery, Plaintiffs intend to rely on the Government's responses to related discovery propounded in the Northern District of California and Eastern District of New York cases.  *See* Exs. 2A No. 4, 2B Nos. 5, 6, 2C Nos. 7,12-13, & 3B Nos. 66-72, 74-75.

9.    With respect to the Administrative Procedure Act, the Government contends that its Administrative Record (ECF No. 26) is complete and provides a basis to grant summary judgment.  Gov. Br. at 3, 32.  Additional discovery concerning that topic is appropriate for four reasons.

a.    First, as two other courts have found, and as explained below, the Administrative Record submitted by Defendants (ECF No. 26) is woefully deficient.

i.    The Administrative Record submitted by Defendants (ECF No. 26) is fourteen documents comprising 256 pages, all of which are publicly available and consist primarily of court decisions, and 185 of which relate to a different deferred action program.

ii.    In the certification of the Administrative Record, the Defendants state that the record is a "copy of the non-privileged documents that were actually considered by Elaine C. Duke . . . in connection with her September 5, 2017 decision to rescind" DACA.

**AR1838**

iii.       The Administrative Record does not contain materials from other agency officials at DHS involved in the decision to rescind DACA.  From discovery produced in the other cases, the other agency officials involved include:  Chad Wolf, Elizabeth Neuman, Eugene Hamilton, Dimple Shah, Joe Maher, Nader Baroukh, Thomas Homan, Tracy Short, John Feere, Kevin McAleenan, Julie Koller, James Nealon, James McCament, Kathy Neubel-Kovarik, Craig Symons, Francis Cisnna, Ben Cassidy, and Jonathan Hoffman .  There are no materials in the Administrative Record from these officials.  The case law is clear that "[I]f the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included as well." *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1579127, at *2 (D. Md. Apr. 8, 2015) (citing *Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F.Supp.2d 7, 12 (D.D.C. 2001) (collecting cases)) (brackets in original).

iv.       The Administrative Record does not contain materials from other government agencies that were involved in the decision to rescind DACA, such as the Department of Justice. From discovery produced in the other cases, DOJ officials involved in the decision to rescind DACA include:  Attorney General Sessions, Jody Hunt, Rachel Brand, Danielle Cutrona, Chad Readler, and Jesse Panuccio.  The case law is clear that the administrative record must include materials "from other agencies."  *See, e.g.*, *In re United States*, No. 17-72917, 2017 WL 5505730, at *4 (9th Cir. Nov. 16, 2017) (citing DOJ guidance).

v.       The Administrative Record lacks materials that do not support or challenge the agency decision.  For example, the Administrative Record does not include DHS or DOJ materials where those agencies took the position that DACA was legal.  The Administrative Record similarly does not include materials from former DHS Secretary John Kelly's decisions on February 20, 2017 or June 15, 2017 to keep DACA in place.  The Administrative Record does

not include any materials or analysis explaining why DHS or DOJ departed from the prior

agency analysis and determinations that DACA was legal.  And the Administrative Record does

not include any materials explaining why DHS is keeping a program it claims is illegal in

operation for six additional months.  The case law is clear that the administrative record must

include "pertinent but unfavorable information, and an agency may not exclude information on

the ground that it did not 'rely' on that information in its final decision. . . .  [T]he administrative

record consists of all documents and materials directly or indirectly considered by the

agency. . . .  The agency may not . . . skew the 'record' for review in its favor by excluding from

that 'record' information in its own files which has great pertinence to the proceeding in

question." *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't Homeland Sec.*, No. CV ELH-16-1015,

2017 WL 3189446, at *7 (D. Md. July 27, 2017) (collecting cases).

      vi.        Discovery regarding the completeness of the Administrative Record has been

sought in the Northern District of California and Eastern District of New York cases.  *See* Exs.

2A No. 1, 2B  Nos. 19-52, 3B Nos. 27-31, 3C Nos. 1, 4 & 3D No. 1 .  Assuming such discovery

is produced in the California and New York cases and is made available to the parties in this

case, Plaintiffs intend to rely on the Government's responses to that discovery and do not intend

to propound duplicative discovery in this case regarding these topics.

      b.        Second, the Defendants have misconstrued the allegations of the Complaint to

focus solely on Defendants' September 5 decision.  The Defendants have not produced an

administrative record for any of the following discrete administrative decisions:

      i.        the decision by DHS on February 20, 2017 to maintain the DACA program;

      ii.        the decision by DHS on June 15, 2017 to maintain the DACA program;

      iii.        the decision by DHS on or about July 15, 2017 to stop sending renewal notices to
                DACA recipients;

Appeal: 18-1521   Doc: 28-3   Filed: 07/03/2018   Pg: 57 of 454   Page 589 of 1026 PageID #: 10180
Case 1:17-cv-05228-NGG-VMS   Document 55-4   Filed 09/04/20

Case 8:17-cv-02942-RWT   Document 29-4   Filed 11/28/17   Page 9 of 12

iv.     the decision on September 5, 2017 to not send notices to DACA recipients alerting them of the October 5 renewal deadline;

v.      the decision to change DHS policy regarding the applicability of the Privacy Act to DACA recipients; and

vi.     the decision to change DHS policy regarding the prohibition on sharing DACA applicant information with immigration enforcement authorities.

Plaintiffs believe additional focused discovery into this topic is necessary to ensure there is a full and complete Administrative Record concerning each of these challenged administrative actions. Plaintiffs have attached proposed discovery to inquire into these topics as Exhibit 1 at RFP No. 8 & Interrogatory No. 2.

        c.      Third, because the Defendants have argued that their current positions are consistent with their historical position regarding the prohibition on sharing DACA applicant information with immigration enforcement authorities and the extension of the Privacy Act to DACA applicants, Gov. Br. 7, 37-39, discovery is appropriate into the full range of agency materials regarding the prohibition (including its history and development) and how it was communicated to DACA recipients.  Plaintiffs believe additional focused discovery into this topic is necessary because the Government's argument disputes certain of these allegations. Plaintiffs have attached proposed discovery to inquire into these topics as Exhibits 1 at RFP Nos. 2-7 & 16, Interrogatories Nos. 4, 6 & 7.   In addition to this discovery, Plaintiffs intend to rely on the Government's responses to related discovery propounded in the Northern District of California and Eastern District of New York cases, assuming the Government provides substantive responses to that discovery and they are made available to Plaintiffs.  *See* Exs. 2A No. 4, 2B No. 5, 6, 2C Nos. 7,12-13; & 3B No. 66-72, 74-75.

        d.      Fourth, the Defendants have averred that questions about the legality of DACA required rescission of the program, notwithstanding Plaintiffs' allegations these arguments are

AR1841

pretextual and motivated by the animus of key government officials against Mexicans, Central Americans and Latinos, who constitute the overwhelming majority of DACA recipients. *See* Complaint ¶¶ 24-25, 68, 94-96, 125-126, 154-161. Gov. Br. 10. Because it would be arbitrary and capricious for the Government to undertake administrative action for a discriminatory motive (or for any reason not documented in the Administrative Record), additional discovery is appropriate to understand he motivations behind the decision to rescind DACA. Plaintiffs have attached proposed discovery to inquire into these topics as Exhibit 1 at RFP Nos. 10-13, Interrogatories Nos. 1 & 5.

10. Unlike the Northern District of California and the Eastern District of New York Cases, the Individual Plaintiffs also propose discovery specifically related to them. Plaintiffs intend to seek discovery into whether or not the Government has shared or is not safeguarding their own private information. The Government complains that Plaintiffs have not alleged that "personal information contained in the DACA application has in fact been impermissibly shared." Gov. Br. at 51. Yet, the extent of any sharing of that information is completely within the Government's custody and control and can all be accessed through discovery mechanisms. Such discovery is also necessary to understand the extent of what relief is necessary should Plaintiffs prevail. Plaintiffs have attached proposed discovery to inquire into the use of their individual information as Exhibit 1 at RFP Nos. 15 & 16, Interrogatory No. 4.

11. The Government contends that the decision to rescind DACA is exempt from APA requirements and a proper exercise of agency discretion under constitutional powers, and therefore a legal action to undertake. Gov. Br. at 15-21, 41-44. Plaintiffs' Equal Protection Claim (Count III) is predicated on the legal theory that the Defendants' decision to terminate DACA is impermissibly based on the animus of key government officials against Mexicans,

AR1842

Appeal: 18-1521    Document: 28-7    Filed: 07/02/2018    Pg: 109 of 454    Page 591 of 1026 PageID #: 10182
Case 1:17-cv-05228-NGG-VMS    Document 29-4    Filed 09/04/20
Case 8:17-cv-02942-RWT    Document 29-4    Filed 11/28/17    Page 11 of 12

Central Americans and Latinos, who constitute the overwhelming majority of DACA recipients. *See* Complaint ¶¶ 24-25, 68, 94-96, 125-126, 154-161. The Government's proffer fails to discuss or otherwise acknowledge that one of Plaintiffs' Due Process Claims (Count I) is predicated on, among other things, the Government's actions to strip DACA recipients of their protected interests in the right to work, the right to obtain an education, the right to travel internationally, and the right to family integrity without fair notice. Complaint ¶¶ 20, 71-78, 101-106, 129-143. Additional discovery is necessary to understand the shift in the Government's position on the legality of the DACA program to support the APA, equal protection, and due process claims. Defendants assert that the illegality of DACA required the Secretary of DHS to rescind the program. Gov. Br. 32-36. Plaintiffs have attached proposed discovery to inquire into the change in the legality of DACA as Exhibit 1 at RFP No. 8 & 10-14, Interrogatories 1 & 2.

12.    In addition to the written discovery attached hereto as Exhibit 1, Plaintiffs also request limited testimonial discovery. To date, there have been five depositions conducted by the Plaintiffs in the Northern District of California and Eastern District of New York cases. In addition to relying on this discovery, Plaintiffs request the right (i) to participate in future depositions conducted in these cases, and (ii) to conduct focused depositions pursuant to FCRP 30(b)(6).

13.    At a minimum, the information Plaintiffs seek to discover is essential to opposing the Defendants' motion. Plaintiffs cannot learn all of the relevant details about this matter, or obtain evidence about them in admissible form, without discovery.

**J.A. 1104**                                                                 **AR1843**

14.     As referenced above, the proposed discovery requests are attached hereto as

Exhibit 1.  Should the Court allow discovery to proceed, Plaintiffs request that Defendants' time

to respond be shortened to 14 days as reflected in the proposed discovery.

I declare under penalty of perjury, as required by 28 U.S.C. § 1746, that the foregoing is true and

correct.

Dated: November 28, 2017

Elizabeth J. Bower (pro hac vice)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C.  20006
Tel: (202) 303-1000
Fax: (202) 303-2000
ebower@willkie.com

12

  AR1844

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 26 of 454
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 593 of 1026 PageID #: 10184

Case 8:17-cv-02942-RWT    Document 29-5    Filed 11/28/17    Page 1 of 129

# EXHIBIT 1

AR1845

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Case No. 8:17-cv-02942 (RWT) |
| | ) |
| U.S. DEPARTMENT OF HOMELAND | ) |
| SECURITY, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

Pursuant to Federal Rules of Civil Procedure 33 ("Rule 33") and 34 ("Rule 34"), L.R. 104, and Appendix A to the Local Rules (Discovery Guidelines), Plaintiffs, by and through their attorneys of record, request that Defendants, or those authorized to act on behalf of Defendants, respond to the following Interrogatories, answering separately and fully in writing and under oath, and produce for inspection, copying and use all responsive documents requested herein. Documents and interrogatory answers should be produced, within 14 days after service of these Requests for Production of Documents ("Requests") and Interrogatories, to the offices of Arnold & Porter Kaye Scholer LLP.

Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests and Interrogatories is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. As used in these Requests and Interrogatories, the following terms are to be interpreted in accordance with the following definitions.

AR1846

## DEFINITIONS

1.      COMMUNICATION or COMMUNICATIONS includes any contact between two or more PERSONS by which any information, knowledge or opinion is transmitted or conveyed, or attempted to be transmitted or conveyed, and shall include, without limitation, written contact by means such as letters, memoranda, e-mails, text messages, instant messages, tweets, social networking sites, or any other DOCUMENT, and oral contact, such as face-to-face meetings, video conferences, or telephonic conversations.

2.      CONSIDERED shall be construed in the broadest sense and means reviewed, examined, analyzed, developed, relied upon, or noted.

3.      DACA or DACA PROGRAM means the Deferred Action for Childhood Arrivals program, established in the memorandum issued on June 15, 2012 by former DHS Secretary Janet Napolitano.

4.      DACA RECIPIENT or DACA RECIPIENTS means a PERSON or PERSONS who received deferred action through DACA.

5.      DACA TERMINATION means the course of action taken by DEFENDANTS individually and/or collectively to end DACA, including, but not limited to, Acting Secretary Duke's September 5, 2017 Memorandum entitled "Memorandum on the Rescission of Deferred Action For Childhood Arrivals;" Attorney General Sessions's September 5, 2017 Letter regarding DACA; and all internal actions within the DEFENDANTS' agencies to implement the end of DACA.

6.      DATE means the exact date, month, and year, if ascertainable; otherwise, the word DATE shall mean the best available approximation, including relationship to other events. If the day given is the best available approximation, DEFENDANTS should identify it as such.

**J.A. 1108**

**AR1847**

7.     DEFENDANTS means the defendants in the above-captioned action unless one or more specific defendants are listed.

8.     DHS means the U.S. Department of Homeland Security, as well as Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and Immigration and Customs Enforcement (ICE).

9.     DHS EMPLOYEE or DHS EMPLOYEES means any PERSON or PERSONS currently or formerly employed by DHS.

10.     DISCUSSION or DISCUSSIONS includes meetings (in person, over the telephone, by video conference, or by electronic means), conversations (in person, over the telephone, or by electronic means), and any COMMUNICATIONS.

11.     DOCUMENT has the meaning provided in Fed. R. Civ. P. 34(a)(1)(A).

12.     DOJ EMPLOYEE or DOJ EMPLOYEES means any PERSON or PERSONS currently or formerly employed by the U.S. Department of Justice (DOJ).

13.     EXECUTIVE BRANCH means the TRUMP ADMINISTRATION, the OBAMA ADMINISTRATION, or all Executive agencies, as defined by 5 U.S.C. § 105.

14.     IDENTIFY when used in reference to: (a) an individual, means to state his/her full name, present or last known address, and present or last known business affiliation, job title, employment address, and telephone number, if known; (b) a firm, partnership, corporation, proprietorship, association, trust, estate, or other organization, means to state its full name, present or last known address, and telephone number; and (c) a DOCUMENT, means to state the title (if any), the DATE, author, sender, recipient, the identity of the PERSON signing, and the type of DOCUMENT; or, where such information does not exist or is not available, such other

AR1848

information sufficient to describe its contents to a level adequate to frame a request to seek further discovery with respect thereto.

15.  INDIVIDUAL PLAINTIFFS means Angel Aguiluz, Estefany Rodriguez, Heymi Elvir Maldonado, Nathaly Uribe Robledo, Eliseo Mages, Jesus Eusebio Perez, Josue Aguiluz, Missael Garcia, Jose Aguiliz, Maricruz Abarca, Annabelle Martines Herra, Maria Joseline Cuellar Baldelomar, Brenda Martinez Moreno Martinez, Luis Aguilar, J.M.O., and A.M.

16.  OBAMA ADMINISTRATION means President Barack H. Obama and any PERSON or PERSONS employed at or for the White House at any point between January 20, 2009 and January 20, 2017.

17.  PERSON or PERSONS means any natural person, firm, partnership, association, joint venture, public or private corporation, individual, proprietorship, governmental entity, organization, other enterprise, group of natural persons or other entity that has a separate legal existence.

18.  PRESENT FOR includes physical presence, telephonic presence, or any form of electronic presence.

19.  PRIVACY ACT means the Privacy Act of 1974 as codified in 5 U.S.C. § 552a.

20.  PROCESS includes, but is not limited to, all COMMUNICATIONS, meetings, and/or DISCUSSIONS that DEFENDANTS or other PERSONS were PRESENT FOR or participated in during the formulation of a decision.

21.  REASON or REASONS means any and all legal or factual causes, explanations, or justifications.

22.  RELATE TO, RELATED TO, or RELATING TO shall be construed in the broadest sense and means describing, setting forth, discussing, mentioning, commenting upon,

AR1849

supporting, contradicting, or referring to the subject or topic in question, either in whole or in part.

23.    STAFF means employees, officials, subordinates, contractors for services, and consultants, including, but not limited to, any individual who has an email address at the domain of the entity's office or agency.

24.    TRUMP ADMINISTRATION means President Donald J. Trump and any PERSON or PERSONS currently or formerly employed at or for the White House at any time since January 20, 2017.

25.    TRUMP CAMPAIGN means then candidate for President of the United States, Donald J. Trump, and any PERSON or PERSONS authorized to speak on behalf of then candidate Donald J. Trump, including, but not limited to, employees of the presidential campaign committee, Donald J. Trump for President, Inc.

26.    TRUMP TRANSITION TEAM means then President-Elect, Donald J. Trump, and any PERSON or PERSONS authorized to speak on behalf of then President-Elect Donald J. Trump, including, but not limited to, employees of Trump for America, Inc.

27.    USCIS EMPLOYEE or USCIS EMPLOYEES means any PERSON or PERSONS currently or formerly employed by USCIS.

28.    USCIS LOCKBOX means the post office box (or boxes) indicated as the mailing address for DACA renewal applications sent to USCIS.

29.    USPS means the United States Postal Service.

30.    The disjunctive includes the conjunctive and vice versa as necessary to bring within the scope of these Requests and Interrogatories all responses that might otherwise be construed to be outside of its scope.

AR1850

Appeal: 18-1521    Document: 28-7    Filed: 07/02/2018    Pg: 27 of 454
Case 1:17-cv-05228-NGG-VMS    Document 28-7    Filed 09/04/20    Page 599 of 1026 PageID #:
10190
Case 8:17-cv-02942-RWT    Document 29-5    Filed 11/28/17    Page 7 of 129

31.    The use of the singular form of any word shall include the plural and vice versa.

32.    All personal pronouns shall refer to PERSONS or matters of  all genders and neutral (e.g., he also means she and his also means hers).  References to the masculine include the feminine and neutral, and references to the feminine include the masculine and neutral.

33.    Any verb tense includes all tenses (e.g., the past verb tense includes the present or future verb tense, and the present verb tense includes the past or future verb tense).

34.    The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses which might otherwise be construed outside the scope.

## INSTRUCTIONS

1.  The word "any" includes all and the word "all" includes any.

2.  These Requests require the production of all responsive DOCUMENTS within the sole or joint possession, custody, or control of DEFENDANTS including, but not limited to, any such DOCUMENT or thing that is within the possession, custody, or control of any agents, agencies, departments, attorneys, employees, consultants, investigators, representatives,  or other PERSONS or entities acting for, or otherwise subject to the control of, DEFENDANTS.  These Interrogatories require the disclosure of knowledge and information (whether hearsay or admissible) in the possession, custody or control of, or reasonably available to, DEFENDANTS.

3.  These Requests and Interrogatories shall be deemed continuing in nature, and DEFENDANTS shall supplement their responses or answers promptly if and when they obtain or acquire responsive information in addition to or in any way inconsistent with responses or answers previously provided.

AR1851

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 29 of 454   Page 600 of 1026 PageID #:
10191
Case 1:17-cv-02588-GG-VMS   Document 28-3   Filed 09/04/20

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 8 of 129

4.   Unless explicitly stated or otherwise defined, the relevant time period for the purpose of answering these Requests or Interrogatories is from January 20, 2017 to present and going forward.

5.   Any list of individuals or agencies should be read as inclusive of all potential combinations of individuals or agencies in that list.

6.   DEFENDANTS shall answer each Request or Interrogatory and each part or subpart of a Request or Interrogatory separately.   DEFENDANTS shall leave no part of a Request or Interrogatory unanswered merely because an objection is interposed to another part of the Request or Interrogatory.  If DEFENDANTS are unable to answer fully any of these Requests or Interrogatories, after exercising due diligence to secure the information to do so, DEFENDANTS should so state, answer to the extent possible, specify DEFENDANTS' inability to answer the remainder and provide or state whatever information is in DEFENDANTS' possession, custody, control, or knowledge concerning any unanswered portion.

7.   If DEFENDANTS object to or otherwise decline to answer any portion of a Request or Interrogatory, DEFENDANTS shall IDENTIFY the portion of the Request or Interrogatory to which they object or otherwise decline to answer, state with particularity the REASON for such objection or declination, and IDENTIFY each PERSON or organization having knowledge of the factual basis, if any, upon which the objection, privilege, or other ground is asserted.

8.   If DEFENDANTS object to any Request or Interrogatory on the ground that it is overbroad, DEFENDANTS shall provide such requested information as DEFENDANTS concede is discoverable.   If DEFENDANTS object to any Request or Interrogatory on the ground that providing such information would constitute an undue burden, DEFENDANTS shall

AR1852

Appeal: 18-1521 Document: 22-7 Filed: 07/02/2018 Pg: 601 of 454 Case 1:17-cv-02289-GG-VMS Document 28 Filed 09/04/20 Page 601 of 1026 PageID #: 10192

Case 8:17-cv-02942-RWT Document 29-5 Filed 11/28/17 Page 9 of 129

provide such requested DOCUMENTS and information that DEFENDANTS can provide without undue burden.

9.  For any responsive DOCUMENT or portion thereof that is either reacted or withheld, in whole or in part, on the basis of any assertion of privilege or other asserted exemptions from discovery, IDENTIFY each DOCUMENT so redacted or withheld.  With regard to all DOCUMENTS or portions of DOCUMENTS redacted or withhold on this basis, IDENTIFY all information described in Guideline 10 of Appendix A to the Local Rules.

10. If DEFENDANTS refuse to provide any information demanded herein on the ground that said information is protected from discovery by a privilege or other protection (including work product doctrine), then DEFENDANTS shall provide all information described in Guideline 10 of Appendix A to the Local Rules.

11. If any DOCUMENT has been lost, discarded, or destroyed, IDENTIFY such DOCUMENT.  State the type of DOCUMENT, its DATE, the approximate DATE it was lost, discarded, or destroyed, the REASON it was lost, discarded, or destroyed, a summary of its substance, and the identity of each PERSON having knowledge of the contents thereof.

12. Whenever throughout these Interrogatories DEFENDANTS do not have knowledge of or access to the requested information, DEFENDANTS should IDENTIFY the PERSON who or entity that can provide said information.

13. Whenever an Interrogatory may be answered by referring to a DOCUMENT, the DOCUMENT may be attached as an exhibit to the response and referred to in the response. If the DOCUMENT has more than one page, refer to the page and section where the answer to the Interrogatory can be found.

AR1853

14. These Requests and Interrogatories are not intended to be duplicative. All Requests or Interrogatories should be responded to fully and to the extent not covered by other Requests or Interrogatories.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Please IDENTIFY (by DATE, author, title, and subject matter) all analyses, memoranda, studies, reports, statistics, or other DOCUMENTS created by DHS, DOJ, the TRUMP ADMINISTRATION, or any combination thereof, RELATING TO the DACA PROGRAM created between June 15, 2017 and September 5, 2017.

### INTERROGATORY NO. 2:

Please describe in detail each step undertaken to determine whether the rescission of DACA was a final agency determination that required notice and comment, IDENTIFY each DOCUMENT addressing or analyzing that issue, and IDENTIFY each PERSON with knowledge of that PROCESS.

### INTERROGATORY NO. 3:

Please describe in detail DEFENDANTS' understanding, from June 15, 2012 to present, of the benefits or rights conferred on a PERSON accepted into the DACA PROGRAM and which benefits or rights RELATED TO DACA status a DACA RECIPIENT will lose after his or her DACA status expires.

AR1854

Appeal 18-1521, Document 28-7, Filed 09/04/20, Page 603 of 1026 PageID #: 10194
Case 1:17-cv-05228-NGG-VMS Filed 07/03/2018 Page 35 of 454

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 11 of 129

**INTERROGATORY NO. 4:**

Please state whether, and under what circumstances, information provided by DACA RECIPIENTS, including specifically the INDIVIDUAL PLAINTIFFS, to DEFENDANTS in connection with their applications to the DACA PROGRAM has been provided or will or may be provided to ICE, to CBP, to any other U.S. agency with authority to enforce immigration laws, or to any foreign government.

**INTERROGATORY NO. 5:**

Please state the bases for:

(a) Attorney General Sessions's March 27, 2017 remarks, as described in paragraphs 96 and 125 of Plaintiffs' Complaint, concerning connections between crime and immigration, specifically that:

1.  countless Americans would be alive today with different immigration policies;

2.  the President was right to say that this disregard for the law must end; and

3.  immigrants have denied jobs to hundreds of thousands of Americans; and

(b) White House Senior Policy Advisor Stephen Miller's July 28, 2017 comments, as described in paragraph 96 of Plaintiffs' Complaint, that:

1.  massive human rights violations are associated with the Central American migrant surge;

2.  the immigration policy in place at the time was creating "deadly and horrific" results; and

3.  there existed a need for expedited removal for illegal immigrants from Central America.

AR1855

## INTERROGATORY NO. 6:

Please state all policies that RELATE TO safeguarding confidential information received from or RELATING TO DACA RECIPIENTS.

## INERROGATORY NO. 7:

Please state any immigration enforcement proceedings that have been initiated against any DACA RECIPIENTS including the REASONS for such proceedings.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1:

The DOCUMENTS CONSIDERED in formulating your Answers to Plaintiffs' First Set of Interrogatories to Defendants  and any other interrogatories served in this case.

### REQUEST FOR PRODUCTION NO. 2:

Any and all DOCUMENTS and COMMUNICATIONS published publicly or sent by DEFENDANTS directly to DACA RECIPIENTS or potential DACA applicants (a) concerning the information needed to apply for the DACA PROGRAM; or (b) explaining the advantages of the program, from the time the DACA PROGRAM was first mentioned publicly to the present. To the extent a substantively identical DOCUMENT was published many times or sent to multiple PERSONS, a single copy of that DOCUMENT may be produced.

### REQUEST FOR PRODUCTION NO. 3:

Any and all DOCUMENTS and COMMUNICATIONS either within or between DHS or DOJ, or between DHS or DOJ, on the one hand, and, on the other hand, the TRUMP ADMINISTRATION, the OBAMA ADMINISTRATION or any other EXECUTIVE BRANCH agency, members of the public, or state government officials and their staff members,

**AR1856**

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 39 of 454    Page 605 of 1026 PageID #:
10196
Case 1:17-cv-05228-NGG-VMS    Document 29-5    Filed 09/04/20
Case 8:17-cv-02942-RWT    Document 29-5    Filed 11/28/17    Page 13 of 129

RELATING TO (a) strategies for enrolling individuals into DACA; or (b) encouragements, promises, public representations, or any other form of inducement to encourage eligible individuals to enroll in the DACA PROGRAM, including, but not limited to, promises on the confidentiality of the information that would be provided by DACA applicants and DACA RECIPIENTS for the DACA PROGRAM.

## REQUEST FOR PRODUCTION NO. 4:

Any and all DOCUMENTS or COMMUNICATIONS that RELATE TO the actual or potential sharing of DACA application information with ICE, CBP, any other U.S. agency with authority to enforce immigration laws, or any foreign government, including, but not limited to, plans, analyses, goals, or policies.

## REQUEST FOR PRODUCTION NO. 5:

Any and all DOCUMENTS and COMMUNICATIONS within or between DOJ, DHS, and the TRUMP ADMINISTRATION that refer or relate in any way to contemplated or initiated immigration enforcement or deportation proceedings against DACA RECIPIENTS, individually or collectively.  For purposes of this Request, DEFENDANTS may substitute unique identifiers for names or other identifying information of specific recipients.

## REQUEST FOR PRODUCTION NO. 6:

Any and all DOCUMENTS and COMMUNICATIONS within and between DHS, DOJ, the EXECUTIVE BRANCH, and any combination thereof, or between the EXECUTIVE BRANCH and the public at large RELATED TO (a) the applicability or non-applicability of the PRIVACY ACT to the DACA PROGRAM; or (b) any actual or potential waiver of the PRIVACY ACT exemptions for information provided by DACA applicants.

AR1857

**REQUEST FOR PRODUCTION NO. 7:**

Any and all DOCUMENTS and COMMUNICATIONS within and between DHS, DOJ, the EXECUTIVE BRANCH, and any combination thereof, or between the EXECUTIVE BRANCH and individual DACA RECIPIENTS, private organizations or the public at large RELATED TO reliance on the DEFENDANTS' representations concerning the confidentiality or restricted uses of information provided in applying to the DACA PROGRAM.

**REQUEST FOR PRODUCTION NO. 8:**

The administrative records and/or any DOCUMENTS or COMMUNICATIONS RELATING TO:

(a) former DHS Secretary Kelly's decision on DACA as announced in his February 20, 2017 memorandum entitled "Enforcement of the Immigration Laws to Serve the National Interest,"

(b) former DHS Secretary Kelly's decision on DACA as announced in his June 15, 2017 memorandum entitled "Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ('DAPA'),"

(c) the PROCESS or the decision to terminate or forego the practice of notifying DACA enrollees that the deadline for their renewal application was forthcoming., or

(d) the decision to require renewal application to be physically accepted by October 5, 2017 at 5 PM instead of postmarked by October 5, 2017.  This includes, but is not limited to, any regulations or guidelines relied upon in making this decision.

**REQUEST FOR PRODUCTION NO. 9:**

Any and all DOCUMENTS and COMMUNICATIONS involving the decision to or effect of the switch to the Electronic Print Management System (EPMS) from the CLAIMS3

system for the DACA PROGRAM.    This request includes any DOCUMENTS or COMMUNICATIONS RELATED TO considerations about notice or the ability to provide notice to DACA RECIPIENTS as a result of the switch.

### REQUEST FOR PRODUCTION NO. 10:

Any and all DOCUMENTS and COMMUNICATIONS, either within or between the TRUMP ADMINISTRATION, DHS, and DOJ, or any combination thereof, or between DHS, DOJ, or the TRUMP ADMINISTRATION, or any combination thereof, on the one hand, and, on the other hand, any EXECUTIVE BRANCH agency, members of the public, or state government officials and their staff members, or any combination thereof, on the decision to continue, modify, or rescind DACA as it RELATES TO the demographics, ethnic composition, or national origin of DACA applicants and/or DACA RECIPIENTS.

### REQUEST FOR PRODUCTION NO. 11:

Any and all DOCUMENTS and COMMUNICATIONS, including, but not limited to, public statements, within or between DEFENDANTS and the EXECUTIVE BRANCH, and any combination thereof, RELATED TO the presence in the United States of Mexicans, Central Americans, or Latinos generally.

### REQUEST FOR PRODUCTION NO. 12:

Any and all DOCUMENTS and COMMUNICATIONS within or between DHS, DOJ, or the TRUMP ADMINISTRATION, or any combination thereof, from January 20, 2017 to the present RELATED TO general immigration policy goals or objectives which refer or RELATE TO the race, ethnicity, or national origin of PERSONS potentially affected by such policy goals or objectives.  This request includes, but is not limited to, any policy directives issued by DHS, DOJ, or the TRUMP ADMINISTRATION either written or oral.

- 14 -

**AR1859**

## REQUEST FOR PRODUCTION NO. 13:

Any and all DOCUMENTS and COMMUNICATIONS within or between DHS, DOJ, and the TRUMP ADMINISTRATION, or any combination thereof, RELATING TO:

(a) President Trump's statements about immigrants from Mexico, Central America, or Latinos generally, including, but not limited to, those statements referenced in paragraphs 2, 94, and 125 of Plaintiffs' Complaint;

(b) Attorney General Sessions's March 27, 2017 remarks, as described in paragraphs 96 and 125 of Plaintiffs' Complaint, concerning connections between crime and immigration, specifically that:

1. countless Americans would be alive today with different immigration policies;

2. the President was right to say that this disregard for the law must end; and

3. immigrants have denied jobs to hundreds of thousands of Americans.

(c) White House Senior Policy Advisor Stephen Miller's July 28, 2017 comments, as described in paragraph 96 of Plaintiffs' Complaint, that:

1. massive human rights violations are associated with the Central American migrant surge;

2. the immigration policy in place at the time was creating "deadly and horrific" results; and

3. there existed a need for expedited removal for illegal immigrants from Central America.

## REQUEST FOR PRODUCTION NO. 14:

Any and all DOCUMENTS and COMMUNICATIONS from DHS, DOJ, the TRUMP ADMINISTRATION, or the EXECUTIVE BRANCH that reference statements made by the TRUMP CAMPAIGN or TRUMP TRANSITION TEAM RELATED TO immigration,

Appeal: 18-1521 Document: 28-3 Filed: 07/02/2018 Pg: 33 of 454
Case 1:17-cv-05228-NGG-VMS Document 28-7 Filed 09/04/20 Page 609 of 1026 PageID #:
10200
Case 8:17-cv-02942-RWT Document 29-5 Filed 11/28/17 Page 17 of 129

including, but not limited to, those described in paragraphs 25, 94, and 124 of Plaintiffs'

Complaint.

## REQUEST FOR PRODUCTION NO. 15:

Any and all DOCUMENTS and COMMUNICATIONS within or between DOJ, DHS,

and the TRUMP ADMINISTRATION, or any combination thereof, about, or that refer in any

way to, any of the Plaintiffs in this action.

## REQUEST FOR PRODUCTION NO. 16:

Any and all DOCUMENTS and COMMUNICATIONS within or between ICE, CBP,

DHS or DOJ that:

(a) contain or refer to information provided by any of the INDIVIDUAL PLAINTIFFS in

connection with their application for DACA eligibility; or

(b) RELATE TO contemplated or initiated immigration enforcement, deportation or

criminal actions against any of the INDIVIDUAL PLAINTIFFS.


Dated: November 28, 2017      Respectfully submitted,

By:/s/ Dennis A. Corkery
Dennis A. Corkery (D. Md. 19076)
Matthew K. Handley (D. Md. 18636)
WASHINGTON LAWYERS' COMMITTEE FOR
    CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, Suite 400
Washington, DC 20036
Tel: 202-319-1000
matthew_handley@washlaw.org
dennis_corkery@washlaw.org

Elizabeth J. Bower (pro hac vice)
Kevin B. Clark (D. Md. 04471)

Priya Aiyar (pro hac vice)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 303-1000
Fax: (202) 303-2000
ebower@willkie.com
kclark@willkie.com
paiyar@willkie.com

Nicholas Katz (pro hac vice forthcoming)
CASA DE MARYLAND
8151 15th Ave.
Hyattsville, MD 20783
Tel: 9240) 491-5743
NKatz@wearecasa.org

John A. Freedman (pro hac vice)
Gaela Gehring Flores (D. Md. 14559)
Ronald A. Schechter (pro hac vice forthcoming)
Nancy L. Perkins (pro hac vice)
Jeremy Karpatkin (pro hac vice forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
John.freedman@apks.com

Steven L. Mayer (pro hac vice forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
10th Floor
Three Embarcadero Center
San Francisco, CA 94111-4024
Tel: (415) 471-3100

Ajmel Quereshi (D. Md. 28882)
HOWARD UNIVERSITY SCHOOL OF LAW
CIVIL RIGHTS CLINIC
2900 Van Ness Street, NW
Washington, DC 20008
Tel: (202) 806-8000
aquereshi@law.howard.edu

*Attorneys for Plaintiffs*

- 17 -

# EXHIBIT 2A

AR1863

| | |
|---|---|
| 1 | Jeffrey M. Davidson (SBN 248620) |
| | Alan Bersin (SBN 63874) |
| 2 | COVINGTON & BURLING LLP |
| | One Front Street, 35th Floor |
| 3 | San Francisco, CA 94111-5356 |
| | Telephone: (415) 591-6000 |
| 4 | Facsimile: (415) 591-6091 |
| | Email: jdavidson@cov.com, |
| 5 | abersin@cov.com |

1 Jeffrey M. Davidson (SBN 248620)
  Alan Bersin (SBN 63874)
2 COVINGTON & BURLING LLP
  One Front Street, 35th Floor
3 San Francisco, CA 94111-5356
  Telephone: (415) 591-6000
4 Facsimile: (415) 591-6091
  Email: jdavidson@cov.com,
5 abersin@cov.com

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
E-mail: James.Zahradka@doj.ca.gov

6 *Attorneys for Plaintiffs THE REGENTS OF THE*
*UNIVERSITY OF CALIFORNIA and JANET*
7 *NAPOLITANO, in her official capacity as President*
*of the University of California*
8

*Attorneys for Plaintiff STATE OF CALIFORNIA*

9 GIBSON, DUNN & CRUTCHER LLP
  Theodore J. Boutrous, Jr. (SBN 132099)
10 tboutrous@gibsondunn.com
   Ethan D. Dettmer (SBN 196046)
11 edettmer@gibsondunn.com
   Jesse S. Gabriel (SBN 263137)
12 jgabriel@gibsondunn.com
   333 South Grand Avenue
13 Los Angeles, CA 90071-3197
   Telephone: (213) 229-7000
14 Facsimile: (213) 229-7520

Joseph W. Cotchett (SBN 36324)
jcotchett@cpmlegal.com
Nancy L. Fineman (SBN 124870)
nfineman@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for Plaintiff CITY OF SAN JOSE*

15 *Attorneys for Plaintiffs DULCE GARCIA,*
*MIRIAM GONZALEZ AVILA, SAUL*
16 *JIMENEZ SUAREZ, VIRIDIANA CHABOLLA*
*MENDOZA, NORMA RAMIREZ, and JIRAYUT*
17 *LATTHIVONGSKORN*

18 [*Additional Counsel Listed on Signature Pages*]

19 **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
20 **SAN FRANCISCO DIVISION**

21

22 THE REGENTS OF THE UNIVERSITY OF
   CALIFORNIA and JANET NAPOLITANO,
23 in her official capacity as President of the
   University of California,
24                    Plaintiffs,
25        v.
26 U.S. DEPARTMENT OF HOMELAND
   SECURITY and ELAINE DUKE, in her
27 official capacity as Acting Secretary of the
   Department of Homeland Security,
28
                   Defendants.

CASE NO. 17-CV-05211-WHA
**PLAINTIFFS' FIRST SET OF REQUESTS**
**FOR PRODUCTION OF DOCUMENTS TO**
**DEFENDANTS**

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05235-WHA<br>**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS** |
| CITY OF SAN JOSE, a municipal corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO. 17-CV-05329-WHA<br>**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS** |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05380-WHA<br>**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS** |

J.A. 1126

AR1865

1

2        Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs in the above-captioned

3 and related cases propound the following Requests for the Production of Documents to Defendants in

4 the above captioned cases.  Per Federal Rules of Civil Procedure, Rule 34(b)(2)(A) and the Court's Case

5 Management Order For All DACA Actions In This District (Dkt. 49), Defendants shall have fifteen (15)

6 days from the service of these Requests to respond.  For each document withheld or redacted on the

7 grounds of privilege, Defendants must comply with Judge Alsup's Supplemental Order To Order Setting

8 Initial Case Management Conference In Civil Cases, paragraphs 15 and 18.

9                                    **REQUESTS FOR PRODUCTION OF DOCUMENTS**

10                                          **REQUEST FOR PRODUCTION NO. 1:**

11        Any and all documents and communications[1] considered or created by Department of Homeland

12 Security ("DHS") or the Department of Justice ("DOJ") as part of the process of determining whether to

13 continue, modify, or rescind DACA,[2] including, but not limited to, any documents and communications

14 relating to the legality of DACA.  This request includes, but is not limited to, documents and

15 communications between DHS or DOJ and: any official at the White House or any other Executive

16 Branch agency, members of the public, members of Congress and congressional staff members, and

17 state government officials and their staff members.  The documents and communications include, but are

18 not limited to, any and all notices, minutes, agendas, list(s) of attendees, notes, memoranda, or other

19 communications from meetings relating to the decision of whether to continue, modify, or rescind

20 DACA; any and all evaluations of the costs and benefits, direct or indirect, of continuing, modifying, or

21 rescinding DACA, and any materials relating to the internal review, inter-agency review, or experts'

22

23 ───────────────

24 [1] As used in these requests, "communications" includes any contact between two or more persons
(including any individual, corporation, proprietorship, partnership, association, government agency or
25 any other entity) by which any information or knowledge is transmitted or conveyed, or attempted to be
transmitted or conveyed, and shall include, without limitation, written contact by means such as letters,
26 memoranda, e-mails, text messages, instant messages, tweets, social networking sites, or any other
document, and oral contact, such as face-to-face meetings, video conferences, or telephone
27 conversations.

[2] "DACA" refers to the June 15, 2012 Memorandum from former Secretary of Homeland Security Janet
28 Napolitano, titled "Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the
United States as Children," and any and all implementations of the Memorandum.

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)

J.A. 1127                                                                    AR1866

feedback regarding those evaluations; and any and all documents and communications discussing policy

alternatives to rescinding DACA, including, but not limited to, any materials relating to the internal

review, inter-agency review, or experts' feedback regarding those alternatives.

### REQUEST FOR PRODUCTION NO. 2:

Any and all documents and communications, including, but not limited to, internal guidance

documents, policies, FAQs, or directives—including those distributed to DHS enforcement agents and

other federal employees—regarding the decisions to continue DACA in February 2017 and June 2017

and to rescind DACA in September 2017.

### REQUEST FOR PRODUCTION NO. 3:

The templates for any and all documents and communications, including, but not limited to,

forms, notices, and letters, sent to DACA recipients, from the beginning of the DACA program on June

15, 2012, to the present, regarding applying for, receiving, or renewing their deferred action status or

work authorization under DACA.

### REQUEST FOR PRODUCTION NO. 4:

Any and all documents related to any benefits for which DACA recipients are eligible.

### REQUEST FOR PRODUCTION NO. 5:

Any and all documents and communications concerning the policies and practices, from June 15,

2012, until the present, for:

a. The adjudication of initial DACA applications;

b. The adjudication of renewals of DACA applications; and

c. Allowing DACA recipients who do not file for renewal before the expiration date

stated on their Notice of Action to file for renewal without requiring them to file another initial

DACA application.

### REQUEST FOR PRODUCTION NO. 6:

Any and all documents referenced in, or relied on in drafting, Defendants' responses to

Plaintiffs' First Set of Interrogatories and Plaintiffs' First Set of Requests for Admissions.

**REQUEST FOR PRODUCTION NO. 7:**

Any and all documents and communications concerning the development, preparation, or production of documents and remarks related to the announcement of the rescission of DACA, including, but not limited to:

    a. Fact Sheet: Rescission of Deferred Action for Childhood Arrivals (DACA) (attached hereto as Exhibit A);

    b. Frequently Asked Questions on the September 5, 2017 Rescission of the Deferred Action for Childhood Arrivals (DACA) Program (attached hereto as Exhibit B);

    c. Talking Points – DACA Rescission and Talking Points – President Trump Directs Phased Ending of DACA (attached hereto as Exhibit C);

    d. Top Five Messages (attached hereto as Exhibit D);

    e. Attorney General Sessions' remarks at a press conference on the rescission of DACA on September 5, 2017. *See* Attorney General Sessions Delivers Remarks on DACA, Dep't of Justice, Office of Public Affairs (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

    f. President Trump's statement on the rescission of DACA on September 5, 2017. See White House Office of the Press Secretary, "Statement from President Donald J. Trump" (Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president-donald-j-trump.

    g. White House Press Release on the rescission of DACA on September 5, 2017. See White House Office of the Press Secretary, "President Donald J. Trump Restores Responsibility and the Rule of Law to Immigration" (Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/president-donald-j-trump-restores-responsibility-and-rule-law.

    h. White House statement on rescission of DACA on September 7, 2017. See White House blog post, "Former Administration's Failed Record On Crime, Immigration And Security Are What's Cruel" (Sept. 7, 2017), https://www.whitehouse.gov/blog/2017/09/07/former-administrations-failed-record-crime-immigration-and-security-are-whats-cruel.

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
3

J.A. 1129                                                                 AR1868

**REQUEST FOR PRODUCTION NO. 8:**

Any and all documents and communications concerning any policies, procedures, guidance, memoranda, or instructions, relating to how information provided by DACA applicants is maintained at U.S. Citizenship and Immigration Services ("USCIS"), including, but not limited to, how such information is protected from disclosure to U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), and how USCIS, ICE, and CBP use information provided by former DACA recipients whose deferred action has expired. The relevant time period for this request is June 15, 2012, to the present.

**REQUEST FOR PRODUCTION NO. 9:**

Any and all documents relating to the establishment, operation, continuation, modification, discontinuation, or rescission of previous parole, non-priority status, deferred action and/or extended voluntary departure programs, including, but not limited to, the Eisenhower Administration's parole of foreign-born orphans into the custody of U.S. military families seeking to adopt them; the Eisenhower Administration's parole of Hungarian refugees; the 1956 policy under which the Immigration and Naturalization Service ("INS") granted extended voluntary departure to aliens who were physically present in the United States and had filed a satisfactory Third Preference visa petition; the Cuban Refugee Program; the Hong Kong Parole Program; the routine grants of extended stays of departure by the INS District Director of New York between 1968 and 1972 where a Western Hemisphere alien was married to a resident alien; the grants of extended voluntary departure to Southeast Asian refugees starting in 1975; the grants of extended voluntary departure to nurses who were eligible for H-1 visas, starting in 1978; the grants of voluntary departure provided to certain Polish refugees in 1981; the 1987 Family Fairness Program and the 1990 expansion of that program; the grants of deferred enforced departure provided in 1990 to certain Chinese nationals after the Tiananmen Square protests; the Temporary Protected Status designation for certain Salvadorans starting in 1992; the Temporary Protected Status designation for certain Haitians starting in 1997; the deferred action program for self-petitioners under the Violence Against Women Act of 1994, starting in 1997; the deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000, starting in 2001; the automatic stays of removal provided to T visa

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
4

J.A. 1130                                     AR1869

Appeal 18-1521, Document 28-7, Filed 09/04/20, Page 618 of 1026 PageID #: 10209
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20   Page 618 of 1026 PageID #: 10209

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 26 of 129

applicants starting in 2002; the deferred action or parole provided to U visa applicants starting in 2003; the 2005 deferred action program for foreign students affected by Hurricane Katrina; the 2007 deferred enforced departure program for certain Liberian nationals; the 2009 deferred action program for surviving spouses of U.S. citizens; and the grant of temporary protected status for nationals of Guinea, Liberia and Sierra Leone, starting in 2014.  This request includes any and all documents and communications related to the consideration of whether the establishment, continuation, modification, discontinuation or rescission of the programs was subject to the Administrative Procedure Act.  This request includes any and all templates for, or specimens of, forms, applications, and documents used by individuals to apply for or obtain deferred action, extended voluntary departure, non-priority status, parole or other similar benefits under the above programs.

Dated:  October 9, 2017

COVINGTON & BURLING LLP

/s/ Jeffrey M. Davidson
Jeffrey M. Davidson (SBN 248620)
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email:  jdavidson@cov.com

Attorneys for Plaintiffs THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and Janet Napolitano, in her official capacity as President of the University of California

Lanny A. Breuer (*pro hac vice*)
Mark H. Lynch (*pro hac vice*)
Alexander A. Berengaut (*pro hac vice*)
Megan A. Crowley (*pro hac vice*)
Ashley Anguas Nyquist (*pro hac vice*)
Jonathan Y. Mincer (Bar No. 298795)
Ivano M. Ventresca (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General

/s/ James F. Zahradka II
JAMES F. ZAHRADKA II
Deputy Attorney General

CHRISTINE CHUANG
REBEKAH A. FRETZ
RONALD H. LEE
KATHLEEN VERMAZEN RADEZ
SHUBHRA SHIVPURI
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone: (510) 879-1247

*Attorneys for Plaintiff State of California*

JANET T. MILLS
Attorney General of Maine
SUSAN P. HERMAN (*pro hac vice*)

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
5

J.A. 1131                    AR1870

1

2 Facsimile: (202) 662-6291
E-mail: lbreuer@cov.com, mlynch@cov.com,
3 aberengaut@cov.com, mcrowley@cov.com,
anyquist@cov.com, iventresca@cov.com

4 Mónica Ramírez Almadani (SBN 234893)
COVINGTON & BURLING LLP
5 1999 Avenue of the Stars
Los Angeles, CA 90067-4643
6 Telephone: (424) 332-4800
Facsimile: (424) 332-4749
7 Email: mralmadani@cov.com

8 Erika Douglas (SBN 314531)
COVINGTON & BURLING LLP
9 333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94061-1418
10 Telephone: (650) 632-4700
Facsimile: (650) 632-4800
11 Email: edouglas@cov.com

12 Charles F. Robinson (SBN 113197)
Margaret Wu (Bar No. 184167)
13 Julia M. C. Friedlander (SBN 165767)
Sonya Sanchez (SBN 247541)
14 Norman Hamill (SBN 154272)
Harpreet Chahal (SBN 233268)
15 Michael Troncoso (SBN 221180)
University of California
16 Office of the General Counsel
1111 Franklin Street, 8th Floor
17 Oakland, CA 94607-5200
Telephone: + 1 (510) 987-9800
18 Facsimile: + 1 (510) 987-9757
Email: charles.robinson@ucop.edu
19

20 *Attorneys for Plaintiffs THE REGENTS OF
THE UNIVERSITY OF CALIFORNIA and
21 JANET NAPOLITANO, in her official capacity
as President of the University of California*

22

23 GIBSON, DUNN & CRUTCHER LLP

24 /s/ Theodore J. Boutrous, Jr.

25 Theodore J. Boutrous, Jr., SBN 132099
tboutrous@gibsondunn.com
26 Katherine M. Marquart, SBN 248043
kmarquart@gibsondunn.com
27 Jesse S. Gabriel, SBN 263137
jgabriel@gibsondunn.com
28 333 South Grand Avenue
Los Angeles, CA 90071-3197

Deputy Attorney General
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8814
Email: susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN (*pro hac vice*)
Solicitor General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 576-6325
Email: ssullivan@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

LORI SWANSON
Attorney General
State of Minnesota
JULIANNA F. PASSE (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1136
Email: julianna.passe@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

COTCHETT, PITRE & McCARTHY, LLP
OFFICE OF THE CITY ATTORNEY
/s/ Nancy L. Fineman
Nancy L. Fineman
Brian Danitz (SBN 247403)
bdanitz@cpmlegal.com
Tamarah P. Prevost (SBN 313422)
tprevost@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
6

J.A. 1132                                    AR1871

1

2  Telephone: (213) 229-7000
   Facsimile: (213) 229-7520

3  Ethan D. Dettmer, SBN 196046
   edettmer@gibsondunn.com
4  555 Mission Street
   San Francisco, CA 94105
5  Telephone: (415) 393-8200
   Facsimile: (415) 393-8306

6

7  PUBLIC COUNSEL
   Mark D. Rosenbaum, SBN 59940
   mrosenbaum@publiccounsel.org
8  Judy London, SBN 149431
   jlondon@publiccounsel.org
9  610 South Ardmore Avenue
   Los Angeles, CA 90005
10 Telephone: (213) 385-2977
   Facsimile: (213) 385-9089

11

12 BARRERA LEGAL GROUP, PLLC
   Luis Cortes Romero, SBN 310852
   lcortes@barreralegal.com
13 19309 68th Avenue South, Suite R102
   Kent, WA 98032
14 Telephone: (253) 872-4730
   Facsimile: (253) 237-1591
15 Laurence H. Tribe, SBN 39441
   larry@tribelaw.com
16 Harvard Law School
   *Affiliation for identification purposes only
17 1575 Massachusetts Avenue
   Cambridge, MA 02138
18 Telephone: (617) 495-1767

19 Erwin Chemerinsky, *pro hac vice* forthcoming
   echemerinsky@law.berkeley.edu
20 University of California, Berkeley School of
   Law
21 *Affiliation for identification purposes only
   215 Boalt Hall
22 Berkeley, CA 94720-7200
   Telephone: (510) 642-6483

23

24 Leah M. Litman, *pro hac vice* forthcoming
   llitman@law.uci.edu
   University of California, Irvine School of Law
25 *Affiliation for identification purposes only
   401 East Peltason Drive
26 Irvine, CA 92697
   Telephone: (949) 824-7722

27

28 *Attorneys for Plaintiffs DULCE GARCIA,*
   *MIRIAM GONZALEZ AVILA, SAUL*
   *JIMENEZ SUAREZ, VIRIDIANA CHABOLLA*

Facsimile:   (650) 697-0577

Richard Doyle (SBN 88625)
Nora Frimann (SBN 93249)
OFFICE OF THE CITY ATTORNEY
200 East Santa Clara Street, 16th Floor
San Jose, California 95113
Telephone: (408) 535-1900
Facsimile: (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov
*Attorneys for Plaintiff City of San Jose*

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
7

J.A. 1133                                          AR1872

1    *MENDOZA, NORMA RAMIREZ, and JIRAYUT*
2    *LATTHIVONGSKORN*
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
8

J.A. 1134

AR1873

<table>
<tr><td>1</td><td></td></tr>
<tr><td>2</td><td></td></tr>
</table>

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2017, I served a true and correct copy of

**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO**

**DEFENDANTS** on the parties in this action by electronic mail transmission to the

e-mail addresses listed below.

| | |
|---|---|
| BRAD P. ROSENBERG | JAMES ZAHRADKA |
| Senior Trial Counsel | james.zahradka@doj.ca.gov |
| United States Department of Justice | RONALD LEE |
| Email: brad.rosenberg@usdoj.gov | ronald.lee@doj.ca.gov |
| STEPHEN M. PEZZI | |
| Trial Attorney | NANCY L. FINEMAN |
| United States Department of Justice | nfineman@cpmlegal.com; |
| Email: stephen.pezzi@usdoj.gov | BRIAN DANITZ |
| | bdanitz@cpmlegal.com; |
| *Attorneys for Defendants* | TAMARAH P. PREVOST |
| | tprevost@cpmlegal.com |
| | pluc@cpmlegal.com |
| | |
| | ETHAN D. DETTMER |
| | edettmer@gibsondunn.com |
| | JESSE S. GABRIEL |
| | jgabriel@gibsondunn.com |
| | KATIE M. MARQUART |
| | kmarquart@gibsondunn.com |
| | KELSEY J. HELLAND |
| | khelland@gibsondunn.com |
| | MARK D. ROSENBAUM |
| | mrosenbaum@publiccounsel.org |
| | |
| | *Attorneys for Plaintiffs* |

This the 9th day of October, 2017                    /s/  Mark H. Lynch

                                                                  Mark H. Lynch

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)

J.A. 1135                                                    AR1874

# EXHIBIT A

AR1875

Official website of the Department of Homeland Security



**U.S. Department of Homeland Security**

# Fact Sheet: Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," creating a non-congressionally authorized administrative program that permitted certain individuals who came to the United States as juveniles and meet several criteria—including lacking any current lawful immigration status—to request consideration of deferred action for a period of two years, subject to renewal, and eligibility for work authorization.  This program became known as Deferred Action for Childhood Arrivals (DACA).

The Obama administration chose to deploy DACA by Executive Branch memorandum—despite the fact that Congress affirmatively rejected such a program in the normal legislative process on multiple occasions. The constitutionality of this action has been widely questioned since its inception.

DACA's criteria were overly broad, and not intended to apply only to children. Under the categorical criteria established in the June 15, 2012 memorandum, individuals could apply for deferred action if they had come to the U.S. before their 16th birthday; were under age 31; had continuously resided in the United States since June 15, 2007; and were in school, graduated or had obtained a certificate of completion from high school, obtained a General Educational Development (GED) certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United States. Significantly, individuals were ineligible if they had been convicted of a felony or a significant misdemeanor, but were considered eligible even if they had been convicted of up to two other misdemeanors.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."

Based on this analysis, the President was faced with a stark choice: do nothing and allow for the probability that the entire DACA program could be immediately enjoined by a court in a disruptive manner, or instead phase out the program in an orderly fashion. Today, Acting Secretary of Homeland Security Duke issued a memorandum (1) rescinding the June 2012 memo that established DACA, and (2) setting forward a plan for phasing out DACA. The result of this phased approach is that the Department of Homeland Security will provide a limited window in which it will adjudicate certain requests for DACA and associated applications for Employment Authorization Documents meeting parameters specified below.

Effective immediately, DHS:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted as of the date of this memorandum.

- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted as of October 5, 2017.

- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the

stated validity period for previously approved applications for advance parole.

Notwithstanding the continued validity of advance parole approvals previously granted, U.S. Customs and Border Protection will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, U.S. Citizenship and Immigration Services will—of course—retain the authority to revoke or terminate an advance parole document at any time.

• Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

• Will continue to exercise its discretionary authority to terminate or deny deferred action for any reason, at any time, with or without notice.

It should be noted that DACA was not intended to be available to persons who entered illegally after 2007.  Thus, persons entering the country illegally today, tomorrow or in the future will not be eligible for the wind down of DACA.

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

J.A. 1139

AR1878

Appeal: 18-1521    Doc: 28-3    Filed: 07/03/2018    Pg: 55 of 454
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 627 of 1026 PageID #: 10218

Case 8:17-cv-02942-RWT    Document 29-5    Filed 11/28/17    Page 35 of 129

# EXHIBIT B

AR1879

Appeal: 18-1521    Doc: 29-3    Filed: 07/02/2018    Pg: 50 of 454
Case 1:17-cv-05228-NGG-VMS    Document 28-27    Filed 09/04/20    Page 628 of 1026 PageID #: 10219

9/29/2017                    Frequently Asked Questions: Rescission Of Deferred Action For Childhood Arrivals (DACA) | Homeland Security
                    Case 8:17-cv-02942-RWT    Document 29-5    Filed 11/28/17    Page 36 of 129

 Official website of the Department of Homeland Security

**U.S. Department of
Homeland Security**

# Frequently Asked Questions: Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

En español (https://www.dhs.gov/news/2017/09/05/preguntas-frecuentes-anulaci-n-de-la-acci-n-diferida-para-los-llegados-en-la)

The following are frequently asked questions on the September 5, 2017 Rescission of the Deferred Action for Childhood Arrivals (DACA) Program.

## Q1: Why is DHS phasing out the DACA program?

A1: Taking into consideration the federal court rulings in ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that program should be terminated. As such, the Acting Secretary of Homeland Security rescinded the June 15, 2012 memorandum establishing the DACA program. Please see the Attorney General's letter and the Acting Secretary of Homeland Security's memorandum for further information on how this decision was reached.

## Q2: What is going to happen to current DACA holders?

A2: Current DACA recipients will be permitted to retain both the period of deferred action and their employment authorization documents (EADs) until they expire, unless terminated or revoked. DACA benefits are generally valid for two years from the date of issuance.

## Q3: What happens to individuals who currently have an initial DACA request pending?

A3:  Due to the anticipated costs and administrative burdens associated with rejecting all pending initial requests, USCIS will adjudicate—on an individual, case-by-case basis—all

J.A. 1141                                                                AR1880

properly filed DACA initial requests and associated applications for EADs that have been accepted as of September 5, 2017.

## Q4: What happens to individuals who currently have a request for renewal of DACA pending?

A4: Due to the anticipated costs and administrative burdens associated with rejecting all pending renewal requests, USCIS adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of September 5, 2017, and from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017.  USCIS will reject all requests to renew DACA and associated applications for EADs filed after October 5, 2017.

## Q5: Is there still time for current DACA recipients to file a request to renew their DACA?

A5: USCIS will only accept renewal requests and associated applications for EADs for the class of individuals described above in the time period described above.

## Q6: What happens when an individual's DACA benefits expire over the course of the next two years? Will individuals with expired DACA be considered illegally present in the country?

A6: Current law does not grant any legal status for the class of individuals who are current recipients of DACA. Recipients of DACA are currently unlawfully present in the U.S. with their removal deferred.  When their period of deferred action expires or is terminated, their removal will no longer be deferred and they will no longer be eligible for lawful employment.

Only Congress has the authority to amend the existing immigration laws.

## Q7: Once an individual's DACA expires, will their case be referred to ICE for enforcement purposes?

A7: Information provided to USCIS in DACA requests will not be proactively provided to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA (http://www.uscis.gov/NTA)). This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended

J.A. 1142

AR1881

to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

## Q8: Will USCIS share the personal information of individuals whose pending requests are denied proactively with ICE for enforcement purposes?

A8: Generally, information provided in DACA requests will not be proactively provided to other law enforcement entities (including ICE and CBP) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security or public safety, or meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

## Q9: Can deferred action received pursuant to DACA be terminated before it expires?

A9: Yes. DACA is an exercise of deferred action which is a form of prosecutorial discretion. Hence, DHS will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

## Q10: Can DACA recipients whose valid EAD is lost, stolen or destroyed request a new EAD during the phase out?

A10: If an individual's still-valid EAD is lost, stolen, or destroyed, they may request a replacement EAD by filing a new Form I-765.

## Q11: Will DACA recipients still be able to travel outside of the United States while their DACA is valid?

A11: Effective September 5, 2017, USCIS will no longer approve any new Form I-131 applications for advance parole under standards associated with the DACA program. Those with a current advance parole validity period from a previously-approved advance parole application will generally retain the benefit until it expires. However, CBP will retain the authority it has always exercised in determining the admissibility of any person presenting at the border. Further, USCIS retains the authority to revoke or terminate an advance parole document at any time.

J.A. 1143                          AR1882

## Q12: What happens to individuals who have pending requests for advance parole to travel outside of the United States?

A12: USCIS will administratively close all pending Form I-131 applications for advance parole under standards associated with the DACA program, and will refund all associated fees.

## Q13: How many DACA requests are currently pending that will be impacted by this change? Do you have a breakdown of these numbers by state?

A13:  There were 106,341 requests pending as of August 20, 2017 – 34,487 initial requests and 71,854 renewals.  We do not currently have the state-specific breakouts.

## Q14: Is there a grace period for DACA recipients with EADs that will soon expire to make appropriate plans to leave the country?

A14: As noted above, once an individual's DACA and EAD expire—unless in the limited class of beneficiaries above who are found eligible to renew their benefits—the individual is no longer considered lawfully present in the United States and is not authorized to work.  Persons whose DACA permits will expire between September 5, 2017 and March 5, 2018 are eligible to renew their permits. No person should lose benefits under this memorandum prior to March 5, 2018 if they properly file a renewal request and associated application for employment authorization.

## Q15: Can you provide a breakdown of how many DACA EADs expire in 2017, 2018, and 2019?

A15:  From August through December 2017, 201,678 individuals are set to have their DACA/EADs expire. Of these individuals, 55,258 already have submitted requests for renewal of DACA to USCIS.

In calendar year 2018, 275,344 individuals are set to have their DACA/EADs expire. Of these 275,344 individuals, 7,271 have submitted requests for renewal to USCIS.

From January through August 2019, 321,920 individuals are set to have their DACA/EADs expire. Of these 321,920 individuals, eight have submitted requests for renewal of DACA to USCIS.

J.A. 1144

AR1883

## Q16: What were the previous guidelines for USCIS to grant DACA?

A16: Individuals meeting the following categorical criteria could apply for DACA if they:

- Were under the age of 31 as of June 15, 2012;

- Came to the United States before reaching their 16th birthday;

- Have continuously resided in the United States since June 15, 2007, up to the present time;

- Were physically present in the United States on June 15, 2012, and at the time of making their request for consideration of deferred action with USCIS;

- Had no lawful status on June 15, 2012;

- Are currently in school, have graduated, or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

- Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

J.A. 1145

AR1884

# EXHIBIT C

AR1885

**Talking Points - DACA Rescission**

**BACKGROUND**

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," establishing an administrative program that permitted certain individuals who came to the United States as juveniles and met several criteria-including lacking any lawful immigration status-to request consideration of deferred action for a period of two years, subject to renewal and eligibility for work authorization.

Recognizing the complexities associated with terminating the program, the Department will provide a limited window during which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below.

**TALKING POINTS: President Trump Directs Phased Ending of DACA**

- Acting Secretary Duke issued a memo rescinding the June 15, 2012 memorandum that created the Deferred Action for Childhood Arrivals (DACA) program.

- President Donald J. Trump, in close coordination with the Department of Homeland Security and the Department of Justice, considered a number of factors, including the legality of the DACA program, the likely outcome of imminent litigation, and the administrative complexities associated with ending the program.

- We are a nation of laws. DACA was an unconstitutional, unwarranted exercise of authority by the Executive Branch. Only the U.S. Congress has the authority to pass legislation to provide immigration benefits to individuals.

- President Obama noted repeatedly in the months and years leading up to the creation of DACA that the President of the United States does not have the authority to create such a an open-ended, wide-ranging program without Congressional authorization.

- DACA will be phased out. All DACA benefits are provided on a two-year basis, so individuals who currently have DACA will be allowed to retain both DACA and their work authorizations (EADs) until they expire.

- U.S. Citizenship and Immigration Services will adjudicate-on an individual, case-by- case basis-properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted as of September 5, 2017.

- USCIS will adjudicate-on an individual, case-by-case basis-properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of the date of this memorandum, and from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017.

- Individuals who have not submitted a request by September 5th, for an initial grant under DACA may no longer do so. All requests for initial grants received after September 5th will be rejected.

- In general, individuals who will no longer have DACA will not proactively be referred to ICE and placed in removal proceedings unless they satisfy one of the Department's enforcement priorities.

- The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States-including

AR1886

Appeal: 18-1521   Doc: 22-3   Filed: 07/02/2018   Pg: 636 of 754
Case 1:17-cv-05228-NGG-VMS   Document 82-7   Filed 09/04/20   Page 635 of 1026 PageID #: 10226

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 43 of 129

proactively seeking travel documentation-or to apply for other immigration benefits for which they may be eligible.

- As of September 4, 2017, there are 689,821 individuals with current valid DACA.

- It should be noted that DACA was not intended to be available to persons who entered illegally after 2007. Thus, persons entering the country illegally today, tomorrow or in the future will not be eligible for the wind down of DACA.

AR1887

# EXHIBIT D

AR1888

Appeal: 18-1521   Doc: 29-3   Filed: 07/02/2018   Pg: 637 of 454
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20   Page 637 of 1026 PageID #: 10228

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 45 of 129

**TOP FIVE MESSAGES**

1. The Obama Administration instituted an unconstitutional program.  The Attorney General sent a letter to the Department of Homeland Security on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."

2. Given the Attorney General's findings on the legality of the DACA program, the President had two stark options.  He could: 1) Do nothing and allow for the probability that the entire DACA program could be immediately enjoined by a court in a disruptive manner or 2) phase out the program in an orderly fashion.

3. All current DACA beneficiaries are eligible to retain their benefits at least until March 5, 2018.  Deferred action is always temporary in nature.  The DACA program only gave recipients the ability to defer action on their immigration case for two-year increments with the potential for renewal.  Should Congress decide to develop a permanent legislative solution for current beneficiaries while addressing the need for immigration enforcement, this action will allow them time to do so.

4. Individuals who have properly filed DACA initial requests and associated applications for Employment Authorization Documents that have been accepted as of the date of this memorandum, will have their applications adjudicated.

5. Properly filed DACA renewal applications and associated applications for Employment Authorization Documents from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017 will be adjudicated.

**AR1889**

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 66 of 454
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 638 of 1026 PageID #: 10229

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 46 of 129

# EXHIBIT 2B

AR1890

1   Jeffrey M. Davidson (SBN 248620)          Xavier Becerra
    Alan Bersin (SBN 63874)                   Attorney General of California
2   COVINGTON & BURLING LLP                    Michael L. Newman
    One Front Street, 35th Floor              Supervising Deputy Attorney General
3   San Francisco, CA 94111-5356              James F. Zahradka II (SBN 196822)
    Telephone: (415) 591-6000                 1515 Clay Street, 20th Floor
4   Facsimile: (415) 591-6091                 P.O. Box 70550
    Email: jdavidson@cov.com,                 Oakland, CA  94612-0550
5   abersin@cov.com                           Telephone: (510) 879-1247
                                              E-mail: James.Zahradka@doj.ca.gov
6   *Attorneys for Plaintiff THE REGENTS OF THE*
    *UNIVERSITY OF CALIFORNIA and JANET*      *Attorneys for Plaintiff STATE OF CALIFORNIA*
7   *NAPOLITANO, in her official capacity as President*
    *of the University of California*
8
    GIBSON, DUNN & CRUTCHER LLP               JOSEPH W. COTCHETT (SBN 36324)
9   THEODORE J. BOUTROUS, JR. (SBN 132099)    jcotchett@cpmlegal.com
    tboutrous@gibsondunn.com                  NANCY L. FINEMAN (SBN 124870)
10  ETHAN D. DETTMER (SBN 196046)             nfineman@cpmlegal.com
    edettmer@gibsondunn.com                   COTCHETT, PITRE & McCARTHY, LLP
11  JESSE S. GABRIEL (SBN 263137)             San Francisco Airport Office Center
    jgabriel@gibsondunn.com                   840 Malcolm Road, Suite 200
12  333 South Grand Avenue                    Burlingame, CA  94010
    Los Angeles, CA 90071-3197                Telephone: (650) 697-6000
13  Telephone: (213) 229-7000                 Facsimile: (650) 697-0577
    Facsimile: (213) 229-7520
14                                            *Attorneys for Plaintiff CITY OF SAN JOSE*

15  *Attorneys for Plaintiffs DULCE GARCIA,*
    *MIRIAM GONZALEZ AVILA, SAUL*
16  *JIMENEZ SUAREZ, VIRIDIANA CHABOLLA*
    *MENDOZA, NORMA RAMIREZ, and JIRAYUT*
    *LATTHIVONGSKORN*
17

18  [*Additional Counsel Listed on Signature Pages*]

19              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
20

21  THE REGENTS OF THE UNIVERSITY OF          CASE NO. 17-CV-05211-WHA
    CALIFORNIA and JANET NAPOLITANO,
22  in her official capacity as President of the  **PLAINTIFFS' FIRST SET OF REQUESTS**
    University of California,                  **FOR ADMISSION**
23
                    Plaintiffs,
24
            v.
25
    U.S. DEPARTMENT OF HOMELAND
26  SECURITY and ELAINE DUKE, in her
    official capacity as Acting Secretary of the
27  Department of Homeland Security,

28                  Defendants.

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>        Plaintiffs,<br><br>     v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>        Defendants. | CASE NO. 17-CV-05235-WHA<br><br>**PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION** |
| CITY OF SAN JOSE, a municipal corporation,<br><br>        Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>        Defendants. | CASE NO. 17-CV-05329-WHA<br><br>**PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION** |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>        Plaintiffs,<br><br>     v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>        Defendants. | CASE NO. 17-CV-05380-WHA<br><br>**PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION** |

J.A. 1153

AR1892

1    Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, plaintiffs from *Regents*
2  *of the Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec., et al.*, No. 3:17-cv-05211-WHA; *State of*
3  *Cal., et al. v. U.S. Dep't of Homeland Sec., et al.*, No. 3:17-cv-05235-WHA; *City of San Jose v.*
4  *Donald J. Trump, et al.*, No. 3:17-cv-05329-WHA; and *Garcia, et al. v. United States of America, et*
5  *al.*, No. 3:17-cv-05380-WHA (collectively, "Plaintiffs") hereby request that defendants in the above-
6  captioned actions (collectively, "Defendants") answer the following Requests for Admission within
7  fifteen (15) days pursuant to the Court's September 22, 2017 Case Management Order (Dkt. #12).
8  **REQUESTS FOR ADMISSION**
9  **REQUEST FOR ADMISSION NO. 1:**
10    Admit that you did not analyze the impact on small entities of the September 5, 2017
11  memorandum rescinding the Deferred Action for Childhood Arrivals ("DACA") program nor certify
12  that such an analysis was not applicable to the rescission of the DACA program.  For purposes of this
13  request, the term "you" refers to Defendants in the above-captioned actions and the term "small
14  entities" shall have the meaning provided for in 5 U.S.C. § 601(6).
15  **REQUEST FOR ADMISSION NO. 2:**
16    Admit that it is your position that one reason the DACA program was unlawful is because it
17  was implemented without notice and comment as required by the Administrative Procedure Act.  For
18  purposes of this request, the term "your" refers to Defendants in the above-captioned actions.
19  **REQUEST FOR ADMISSION NO. 3:**
20    Admit that it is your position that the DACA program would have been subject to judicial
21  review in the action threatened by certain state attorneys general because it was an agency action that
22  was not "committed to agency discretion by law" as that phrase is used in 5 U.S.C. § 701(a)(2).  For
23  purposes of this request, the term "your" refers to Defendants in the above-captioned actions
24  **REQUEST FOR ADMISSION NO. 4:**
25    Admit that individuals who are granted deferred action pursuant to the DACA program are
26  eligible to receive certain benefits that would not otherwise be available to them.
27
28

PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
1

J.A. 1154                                    AR1893

1    **REQUEST FOR ADMISSION NO. 5:**

2         Admit that in order to apply for the DACA program individuals are required to provide the

3    government with information that can be used for immigration enforcement purposes.

4    **REQUEST FOR ADMISSION NO. 6:**

5         Admit that the standard for sharing information about current or former DACA applicants or

6    recipients with any component of DHS, including, but not limited to, Immigration and Customs

7    Enforcement and Customs and Border Patrol, or other law enforcement agencies, for immigration

8    enforcement purposes, has changed since January 20, 2017.

9    **REQUEST FOR ADMISSION NO. 7:**

10        Admit that individuals who are granted deferred action pursuant to the DACA program are

11   protected from arrest or detention based solely on their immigration status during the time period that

12   their deferred action is in effect.

13   **REQUEST FOR ADMISSION NO. 8:**

14        Admit that individuals granted deferred action under the DACA program have been

15   determined by the government not to pose a threat to national security or public safety.

16   **REQUEST FOR ADMISSION NO. 9:**

17        Admit that rescission of the DACA program will cause hundreds of thousands of individuals

18   to lose work authorization and other benefits.

19   **REQUEST FOR ADMISSION NO. 10:**

20        Admit that the decision by the Department of Homeland Security ("DHS") to rescind DACA

21   was based on the Attorney General's position that DACA is unlawful.

22   **REQUEST FOR ADMISSION NO. 11:**

23        Admit that DHS, in deciding to rescind DACA, did not consider any factors, interests, costs,

24   or benefits apart from DACA's legality.

25   **REQUEST FOR ADMISSION NO. 12:**

26        Admit that the November 19, 2014 Office of Legal Counsel Memorandum, entitled "The

27   Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully

28   Present in the United States and to Defer Removal of Others," has not been rescinded.

Appeal: 18-1521 cv-02824-GG-VMS Filed: 07/02/2018 Page 75 of 454 Page 643 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS Document 29-5 Filed 09/04/20 10234

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 51 of 129

**REQUEST FOR ADMISSION NO. 13:**

Admit that the position of DHS and the United States before the Supreme Court in *United States v. Texas*, No. 15-674, was that DAPA was a lawful exercise of enforcement discretion.  *See* Brief for Petitioners, *United States v. Texas*, 2016 WL 836758 (2016) (No. 15-674).

**REQUEST FOR ADMISSION NO. 14:**

Admit that the position of DHS and the United States before the Supreme Court in *United States v. Texas* was that the Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), was incorrect.

**REQUEST FOR ADMISSION NO. 15:**

Admit that, with a limited, case-by-case exception of DACA requests received from residents of the U.S. Virgin Islands and Puerto Rico, DHS will categorically reject all renewal applications for DACA received after October 5, 2017, and DHS agents have no discretion to accept such applications.

**REQUEST FOR ADMISSION NO. 16:**

Admit that DHS does not intend to continue to offer deferred action status to current DACA recipients whose deferred action status under DACA expires after March 5, 2018 or whose renewal applications were submitted after October 5, 2017.

**REQUEST FOR ADMISSION NO. 17:**

Admit that, as of September 5, 2017, DHS does not accept initial applications for DACA and DHS agents have no discretion to accept such applications.

**REQUEST FOR ADMISSION NO. 18:**

Admit that, as of September 5, 2017, DHS does not accept applications for advance parole from DACA recipients and DHS agents have no discretion to accept such applications.

Appeal 18-1521, Document 282-7, Page 72 of 454
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 644 of 1026 PageID #: 10235

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 52 of 129

**REQUEST FOR ADMISSION NO. 19:**

Admit that Jared Kushner, senior advisor to President Trump, generated communications[1] in addition to those included in the Administrative Record filed in this case on October 6, 2017, related to the process of determining whether to modify, continue, or rescind DACA.

**REQUEST FOR ADMISSION NO. 20:**

Admit that Stephen Bannon, former White House strategist, generated communications in addition to those included in the Administrative Record filed in this case on October 6, 2017, related to the process of determining whether to modify, continue, or rescind DACA.

**REQUEST FOR ADMISSION NO. 21:**

Admit that Reince Priebus, former Chief of Staff to President Trump, generated communications in addition to those included in the Administrative Record filed in this case on October 6, 2017, related to the process of determining whether to modify, continue, or rescind DACA.

**REQUEST FOR ADMISSION NO. 22:**

Admit that John Kelly, current White House Chief of Staff and former Secretary of Homeland Security, generated communications in addition to those included in the Administrative Record filed in this case on October 6, 2017, related to the process of determining whether to modify, continue, or rescind DACA.

**REQUEST FOR ADMISSION NO. 23:**

Admit that Stephen Miller, senior advisor to President Trump, generated communications in addition to those included in the Administrative Record filed in this case on October 6, 2017, related to the process of determining whether to modify, continue, or rescind DACA.

---

[1] As used in these requests, "communications" includes any contact between two or more persons (including any individual, corporation, proprietorship, partnership, association, government agency or any other entity) by which any information or knowledge is transmitted or conveyed, or attempted to be transmitted or conveyed, and shall include, without limitation, written contact by means such as letters, memoranda, e-mails, text messages, instant messages, tweets, social networking sites, or any other document, and oral contact, such as face-to-face meetings, video conferences, or telephone conversations.

Appeal: 18-1521    Document 29-3    Filed: 07/03/2018    Pg: 79 of 454

1   **REQUEST FOR ADMISSION NO. 24:**

2       Admit that Ivanka Trump, advisor to President Trump, generated communications in addition

3   to those included in the Administrative Record filed in this case on October 6, 2017, related to the

4   process of determining whether to modify, continue, or rescind DACA.

5   **REQUEST FOR ADMISSION NO. 25:**

6       Admit that Lee Francis Cissna, Director of U.S. Citizenship and Immigration Services and

7   former Director of Immigration Policy at DHS, generated communications, including while detailed

8   to Senator Grassley's staff, related to the process of determining whether to modify, continue, or

9   rescind DACA.

10  **REQUEST FOR ADMISSION NO. 26:**

11      Admit that Thomas P. Bossert, Homeland Security Advisor, generated communications in

12  addition to those included in the Administrative Record filed in this case on October 6, 2017, related

13  to the process of determining whether to modify, continue, or rescind DACA.

14  **REQUEST FOR ADMISSION NO. 27:**

15      Admit that Elaine C. Duke, Acting Secretary of Homeland Security, generated

16  communications in addition to those included in the Administrative Record filed in this case on

17  October 6, 2017, related to the process of determining whether to modify, continue, or rescind

18  DACA.

19  **REQUEST FOR ADMISSION NO. 28:**

20      Admit that Michael Dougherty, DHS Assistant Secretary, generated communications in

21  addition to those included in the Administrative Record filed in this case on October 6, 2017, related

22  to the process of determining whether to modify, continue, or rescind DACA.

23  **REQUEST FOR ADMISSION NO. 29:**

24      Admit that Jon Feere, Immigration and Customs Enforcement Senior Advisor, generated

25  communications in addition to those included in the Administrative Record filed in this case on

26  October 6, 2017, related to the process of determining whether to modify, continue, or rescind

27  DACA.

28

1  **REQUEST FOR ADMISSION NO. 30:**

2    Admit that Thomas Homan, Acting Director of Immigration and Customs Enforcement,

3  generated communications in addition to those included in the Administrative Record filed in this

4  case on October 6, 2017, related to the process of determining whether to modify, continue, or

5  rescind DACA.

6  **REQUEST FOR ADMISSION NO. 31:**

7    Admit that Julie Kirchner, U.S. Citizenship and Immigration Services Ombudsman, generated

8  communications in addition to those included in the Administrative Record filed in this case on

9  October 6, 2017, related to the process of determining whether to modify, continue, or rescind

10  DACA.

11  **REQUEST FOR ADMISSION NO. 32:**

12    Admit that James McCament, Acting Director of U.S. Citizenship and Immigration Services,

13  generated communications in addition to those included in the Administrative Record filed in this

14  case on October 6, 2017, related to the process of determining whether to modify, continue, or

15  rescind DACA.

16  **REQUEST FOR ADMISSION NO. 33:**

17    Admit that James D. Nealon, Assistant Secretary for International Engagement, generated

18  communications in addition to those included in the Administrative Record filed in this case on

19  October 6, 2017, related to the process of determining whether to modify, continue, or rescind

20  DACA.

21  **REQUEST FOR ADMISSION NO. 34:**

22    Admit that Attorney General Jefferson B. Sessions generated communications in addition to

23  those included in the Administrative Record filed in this case on October 6, 2017, related to the

24  process of determining whether to modify, continue, or rescind DACA.

25  **REQUEST FOR ADMISSION NO. 35:**

26    Admit that Dimple Shah, DHS Deputy General Counsel, generated communications in

27  addition to those included in the Administrative Record filed in this case on October 6, 2017, related

28  to the process of determining whether to modify, continue, or rescind DACA.

1 **REQUEST FOR ADMISSION NO. 36:**

2      Admit that Chad Wolf, Acting DHS Chief of Staff, generated communications in addition to

3 those included in the Administrative Record filed in this case on October 6, 2017, related to the

4 process of determining whether to modify, continue, or rescind DACA.

5 **REQUEST FOR ADMISSION NO. 37:**

6      Admit that Kellyanne Conway, counselor to President Trump, generated communications in

7 addition to those included in the Administrative Record filed in this case on October 6, 2017, related

8 to the process of determining whether to modify, continue, or rescind DACA.

9 **REQUEST FOR ADMISSION NO. 38:**

10      Admit that Kris Kobach, Secretary of State of Kansas, generated communications with federal

11 officials, in addition to those included in the Administrative Record filed in this case on October 6,

12 2017, related to the process of determining whether to modify, continue, or rescind DACA.

13 **REQUEST FOR ADMISSION NO. 39:**

14      Admit that Jessica Vaughan, Director of Policy Studies at Center of Immigration Studies,

15 generated communications with federal officials, in addition to those included in the Administrative

16 Record filed in this case on October 6, 2017, related to the process of determining whether to modify,

17 continue, or rescind DACA.

18 **REQUEST FOR ADMISSION NO. 40:**

19      Admit that Ken Paxton, Attorney General of Texas, generated communications with federal

20 officials, in addition to those included in the Administrative Record filed in this case on October 6,

21 2017, related to the process of determining whether to modify, continue, or rescind DACA.

22 **REQUEST FOR ADMISSION NO. 41:**

23      Admit that Jeff Landry, Attorney General of Louisiana, generated communications with

24 federal officials, in addition to those included in the Administrative Record filed in this case on

25 October 6, 2017, related to the process of determining whether to modify, continue, or rescind

26 DACA.

27

28

J.A. 1160                                                        AR1899

Appeal: 18-1521    Document: 29-3    Filed: 07/02/2018    Pg: 70 of 454
Case 1:17-cv-05228-NGG-VMS   Document 28-27   Filed 09/04/26   Page 648 of 1026 PageID #: 10239

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 56 of 129

1    **REQUEST FOR ADMISSION NO. 42:**

2         Admit that Steve Marshall, Attorney General of Alabama, generated communications with

3    federal officials, in addition to those included in the Administrative Record filed in this case on

4    October 6, 2017, related to the process of determining whether to modify, continue, or rescind

5    DACA.

6    **REQUEST FOR ADMISSION NO. 43:**

7         Admit that Doug Peterson, Attorney General of Nebraska, generated communications with

8    federal officials, in addition to those included in the Administrative Record filed in this case on

9    October 6, 2017, related to the process of determining whether to modify, continue, or rescind

10   DACA.

11   **REQUEST FOR ADMISSION NO. 44:**

12        Admit that Leslie Rutledge, Attorney General of Arkansas, generated communications with

13   federal officials, in addition to those included in the Administrative Record filed in this case on

14   October 6, 2017, related to the process of determining whether to modify, continue, or rescind

15   DACA.

16   **REQUEST FOR ADMISSION NO. 45:**

17        Admit that Alan Wilson, Attorney General of South Carolina, generated communications with

18   federal officials, in addition to those included in the Administrative Record filed in this case on

19   October 6, 2017, related to the process of determining whether to modify, continue, or rescind

20   DACA.

21   **REQUEST FOR ADMISSION NO. 46:**

22        Admit that Lawrence G. Wasden, Attorney General of Idaho, generated communications with

23   federal officials, in addition to those included in the Administrative Record filed in this case on

24   October 6, 2017, related to the process of determining whether to modify, continue, or rescind

25   DACA.

26   **REQUEST FOR ADMISSION NO. 47:**

27        Admit that Herbert Slatery, III, Attorney General and Reporter of Tennessee, generated

28   communications with federal officials, in addition to those included in the Administrative Record

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 29-5 Filed 07/02/2018 Pg: 73 of 454 Page 649 of 1026 PageID #: 10240

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 57 of 129

1   filed in this case on October 6, 2017, related to the process of determining whether to modify,

2   continue, or rescind DACA.

3   **REQUEST FOR ADMISSION NO. 48:**

4        Admit that C.L. Otter, Governor of Idaho, generated communications with federal officials, in

5   addition to those included in the Administrative Record filed in this case on October 6, 2017, related

6   to the process of determining whether to modify, continue, or rescind DACA.

7   **REQUEST FOR ADMISSION NO. 49:**

8        Admit that Patrick Morrisey, Attorney General of West Virginia, generated communications

9   with federal officials, in addition to those included in the Administrative Record filed in this case on

10  October 6, 2017, related to the process of determining whether to modify, continue, or rescind

11  DACA.

12  **REQUEST FOR ADMISSION NO. 50:**

13       Admit that Derek Schmidt, Attorney General of Kansas, generated communications with

14  federal officials, in addition to those included in the Administrative Record filed in this case on

15  October 6, 2017, related to the process of determining whether to modify, continue, or rescind

16  DACA.

17  **REQUEST FOR ADMISSION NO. 51:**

18       Admit that Andrew Bremberger, Director of the Domestic Policy Council, generated

19  communications in addition to those included in the Administrative Record filed in this case on

20  October 6, 2017, related to the process of determining whether to modify, continue, or rescind

21  DACA.

22  **REQUEST FOR ADMISSION NO. 52:**

23       Admit that Zina Bash, member of the Domestic Policy Council, generated communications in

24  addition to those included in the Administrative Record filed in this case on October 6, 2017, related

25  to the process of determining whether to modify, continue, or rescind DACA.

26

27

28

Appeal: 18-1521    Document: 28-7    Filed: 07/02/2018    Pg: 79 of 454

1  **REQUEST FOR ADMISSION NO. 53:**

2      Admit that DHS has no evidence supporting Attorney General Sessions' statement, in a

3  September 5, 2017 press conference, that DACA "contributed to a surge of unaccompanied minors

4  on the southern border that yielded terrible humanitarian consequences."

5  **REQUEST FOR ADMISSION NO. 54:**

6      Admit that DHS has no evidence supporting Attorney General Sessions' statement, in a

7  September 5, 2017 press conference, that DACA "denied jobs to hundreds of thousands of Americans

8  by allowing those same jobs to go to illegal aliens."

9  **REQUEST FOR ADMISSION NO. 55:**

10     Admit that DHS did not send out any documents, notices, or communications to individual

11  DACA recipients regarding the rescission of DACA, the opportunity to apply for DACA renewal by

12  October 5, 2017, for individuals whose DACA status expired before March 5, 2018, or the ban on

13  advance parole.

14  **REQUEST FOR ADMISSION NO. 56:**

15     Admit that one of the reasons for the rescission of DACA was to create political leverage to

16  persuade some Members of Congress to support the enactment of other immigration-related measures

17  in exchange for legislation involving DACA.

18

19

20

21

22

23

24

25

26

27

28

AR1902

| | | |
|---|---|---|
| 1 | Dated:  October 9, 2017 | Respectfully Submitted, |
| 2 | COVINGTON & BURLING LLP | XAVIER BECERRA<br>Attorney General of California |
| 3 | */s/ Jeffrey M. Davidson*<br>Jeffrey M. Davidson (SBN 248620) | MICHAEL L. NEWMAN<br>Supervising Deputy Attorney General |
| 4 | One Front Street, 35th Floor<br>San Francisco, CA 94111-5356 | */s/ James F. Zahradka II* |
| 5 | Telephone: (415) 591-6000<br>Facsimile: (415) 591-6091 | JAMES F. ZAHRADKA II<br>Deputy Attorney General |
| 6 | Email:  jdavidson@cov.com | |
| 7 | Attorneys for Plaintiffs THE REGENTS OF THE | CHRISTINE CHUANG<br>REBEKAH A. FRETZ |
| | UNIVERSITY OF CALIFORNIA and Janet | RONALD H. LEE |
| 8 | Napolitano, in her official capacity as President of<br>the University of California | KATHLEEN VERMAZEN RADEZ<br>SHUBHRA SHIVPURI |
| 9 | | 1515 Clay Street, 20th Floor<br>P.O. Box 70550 |
| 10 | Lanny A. Breuer (*pro hac vice*)<br>Mark H. Lynch (*pro hac vice*) | Oakland, CA  94612-0550<br>Telephone: (510) 879-1247 |
| 11 | Alexander A. Berengaut (*pro hac vice*)<br>Megan A. Crowley (*pro hac vice*) | |
| 12 | Ashley Anguas Nyquist (*pro hac vice*)<br>Jonathan Y. Mincer (Bar No. 298795) | *Attorneys for Plaintiff State of California* |
| 13 | Ivano M. Ventresca (*pro hac vice*)<br>COVINGTON & BURLING LLP | JANET T. MILLS<br>Attorney General of Maine |
| 14 | One CityCenter<br>850 Tenth Street, NW | SUSAN P. HERMAN (*pro hac vice*)<br>Deputy Attorney General |
| 15 | Washington, DC 20001-4956<br>Telephone: (202) 662-6000 | 6 State House Station<br>Augusta, Maine 04333 |
| 16 | Facsimile: (202) 662-6291<br>E-mail: lbreuer@cov.com, mlynch@cov.com, | Telephone: (207) 626-8814<br>Email: susan.herman@maine.gov |
| 17 | aberengaut@cov.com, mcrowley@cov.com,<br>anyquist@cov.com, iventresca@cov.com | *Attorneys for Plaintiff State of Maine* |
| 18 | Mónica Ramírez Almadani (SBN 234893) | BRIAN E. FROSH |
| 19 | COVINGTON & BURLING LLP<br>1999 Avenue of the Stars | Attorney General of Maryland<br>STEVEN M. SULLIVAN (*pro hac vice*) |
| 20 | Los Angeles, CA 90067-4643<br>Telephone: (424) 332-4800 | Solicitor General<br>200 Saint Paul Place, 20th Floor |
| 21 | Facsimile: (424) 332-4749<br>Email: mralmadani@cov.com | Baltimore, Maryland 21202<br>Telephone: (410) 576-6325 |
| 22 | Erika Douglas (SBN 314531) | Email:  ssullivan@oag.state.md.us |
| 23 | COVINGTON & BURLING LLP<br>333 Twin Dolphin Drive, Suite 700 | *Attorneys for Plaintiff State of Maryland* |
| 24 | Redwood Shores, CA 94061-1418<br>Telephone: (650) 632-4700 | LORI SWANSON<br>Attorney General |
| 25 | Facsimile: (650) 632-4800<br>Email: edouglas@cov.com | State of Minnesota<br>JULIANNA F. PASSE (*pro hac vice*) |
| 26 | Charles F. Robinson (SBN 113197) | Assistant Attorney General<br>445 Minnesota Street, Suite 1100 |
| 27 | Margaret Wu (Bar No. 184167)<br>Julia M. C. Friedlander (SBN 165767) | St. Paul, Minnesota 55101-2128<br>Telephone: (651) 757-1136 |
| | Sonya Sanchez (SBN 247541) | Email: julianna.passe@ag.state.mn.us |
| 28 | Norman Hamill (SBN 154272)<br>Harpreet Chahal (SBN 233268) | *Attorneys for Plaintiff State of Minnesota* |

PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
11

AR1903

Appeal 18-1521, Document 20-3, Filed 07/03/2018, Page 80 of 454
Case 1:17-cv-05228-NGG-VMS Document 28-7 Filed 09/04/20 Page 652 of 1026 PageID #: 10243

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 60 of 129

1   Michael Troncoso (SBN 221180)
    University of California
2   Office of the General Counsel
    1111 Franklin Street, 8th Floor
3   Oakland, CA 94607-5200
    Telephone: + 1 (510) 987-9800
4   Facsimile: + 1 (510) 987-9757
    Email: charles.robinson@ucop.edu
5
    *Attorneys for Plaintiffs THE REGENTS OF THE*
6   *UNIVERSITY OF CALIFORNIA and JANET*
    *NAPOLITANO, in her official capacity as President*
7   *of the University of California*

8

9

    GIBSON, DUNN & CRUTCHER LLP              COTCHETT, PITRE & McCARTHY, LLP
10                                           OFFICE OF THE CITY ATTORNEY

11  */s/ Theodore J. Boutrous, Jr.*          */s/ Nancy L. Fineman*

    THEODORE J. BOUTROUS, JR., SBN 132099
12  tboutrous@gibsondunn.com                 NANCY L. FINEMAN
    KATHERINE M. MARQUART, SBN 248043        BRIAN DANITZ (SBN 247403)
13  kmarquart@gibsondunn.com                 bdanitz@cpmlegal.com
    JESSE S. GABRIEL, SBN 263137             TAMARAH P. PREVOST (SBN 313422)
14  jgabriel@gibsondunn.com                  tprevost@cpmlegal.com
    333 South Grand Avenue                   San Francisco Airport Office Center
15  Los Angeles, CA 90071-3197               840 Malcolm Road, Suite 200
    Telephone: (213) 229-7000                Burlingame, CA  94010
16  Facsimile: (213) 229-7520                Telephone:  (650) 697-6000
                                             Facsimile:  (650) 697-0577
17  ETHAN D. DETTMER, SBN 196046
    edettmer@gibsondunn.com                  RICHARD DOYLE (SBN 88625)
18  555 Mission Street                       NORA FRIMANN (SBN 93249)
    San Francisco, CA 94105                  OFFICE OF THE CITY ATTORNEY
19  Telephone: (415) 393-8200                200 East Santa Clara Street, 16th Floor
    Facsimile: (415) 393-8306                San José, California 95113
20                                           Telephone: (408) 535-1900
    PUBLIC COUNSEL                           Facsimile: (408) 998-3131
21  MARK D. ROSENBAUM, SBN 59940             E-Mail Address:  cao.main@sanjoséca.gov
    mrosenbaum@publiccounsel.org
22  JUDY LONDON, SBN 149431                  *Attorneys for Plaintiff City of San Jose*
    jlondon@publiccounsel.org
23  610 South Ardmore Avenue
    Los Angeles, CA 90005
24  Telephone: (213) 385-2977
    Facsimile: (213) 385-9089
25
    BARRERA LEGAL GROUP, PLLC
26  LUIS CORTES ROMERO, SBN 310852
    lcortes@barreralegal.com
27  19309 68th Avenue South, Suite R102
    Kent, WA 98032
28  Telephone: (253) 872-4730
    Facsimile: (253) 237-1591

                 PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
                 All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
                                          12

Appeal 18-1521, Document 28-3, Filed 07/03/2018, Page 85 of 454
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 653 of 1026 PageID #: 10244

Case 8:17-cv-02942-RWT Document 29-5 Filed 11/28/17 Page 61 of 129

1  LAURENCE H. TRIBE, SBN 39441
   larry@tribelaw.com
2  Harvard Law School
   *Affiliation for identification purposes only
3  1575 Massachusetts Avenue
   Cambridge, MA 02138
4  Telephone: (617) 495-1767

5  ERWIN CHEMERINSKY, *pro hac vice*
   forthcoming
6  echemerinsky@law.berkeley.edu
   University of California, Berkeley School of Law
7  *Affiliation for identification purposes only
   215 Boalt Hall
8  Berkeley, CA 94720-7200
   Telephone: (510) 642-6483
9
   LEAH M. LITMAN, *pro hac vice* forthcoming
10 llitman@law.uci.edu
   University of California, Irvine School of Law
11 *Affiliation for identification purposes only
   401 East Peltason Drive
12 Irvine, CA 92697
   Telephone: (949) 824-7722
13
   *Attorneys for Plaintiffs DULCE GARCIA,*
14 *MIRIAM GONZALEZ AVILA, SAUL*
   *JIMENEZ SUAREZ, VIRIDIANA CHABOLLA*
15 *MENDOZA, NORMA RAMIREZ, and JIRAYUT*
   *LATTHIVONGSKORN*
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
13

J.A. 1166                                          AR1905

Appeal 18-1521, Document 28-3, Filed 07/02/2018, Page 82 of 454
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 654 of 1026 PageID #: 10245
Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 62 of 129

CERTIFICATE OF SERVICE

I, Shailey Jain, declare as follows:

I am employed in the County of San Francisco, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 555 Mission Street, San Francisco, CA 94105-0920, in said County and State.

On **Oct. 9, 2017**, I caused the following document(s) to be served:

**PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION**

via electronic mail delivery to the person(s) and email address(es) set forth below:

Brad Rosenberg (brad.rosenberg@usdoj.gov);

Stephen Pezzi (stephen.pezzi@usdoj.gov)

The party on whom this electronic mail has been served has agreed in writing to such form of service pursuant to agreement.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on **October 9, 2017** at San Francisco, California.

_____
Shailey Jain

PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
14

# EXHIBIT 2C

AR1907

Appeal 18-1521, Document 28-7, Filed 07/02/2018, Page 64 of 454
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 656 of 1026 PageID #: 10247

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 64 of 129

| | |
|---|---|
| 1  Jeffrey M. Davidson (SBN 248620) | XAVIER BECERRA |
|     Alan Bersin (SBN 63874) | Attorney General of California |
| 2  COVINGTON & BURLING LLP | MICHAEL L. NEWMAN |
|     One Front Street, 35th Floor | Supervising Deputy Attorney General |
| 3  San Francisco, CA 94111-5356 | JAMES F. ZAHRADKA II (SBN 196822) |
|     Telephone: (415) 591-6000 | 1515 Clay Street, 20th Floor |
| 4  Facsimile: (415) 591-6091 | P.O. Box 70550 |
|     Email: jdavidson@cov.com, | Oakland, CA  94612-0550 |
| 5  abersin@cov.com | Telephone: (510) 879-1247 |
| | E-mail: James.Zahradka@doj.ca.gov |

*Attorneys for Plaintiffs THE REGENTS OF THE*
*UNIVERSITY OF CALIFORNIA and JANET*
*NAPOLITANO, in her official capacity as President*      *Attorneys for Plaintiff STATE OF CALIFORNIA*
*of the University of California*

| | |
|---|---|
| GIBSON, DUNN & CRUTCHER LLP | JOSEPH W. COTCHETT (SBN 36324) |
| THEODORE J. BOUTROUS, JR. (SBN 132099) | jcotchett@cpmlegal.com |
| tboutrous@gibsondunn.com | NANCY L. FINEMAN (SBN 124870) |
| ETHAN D. DETTMER (SBN 196046) | nfineman@cpmlegal.com |
| edettmer@gibsondunn.com | COTCHETT, PITRE & McCARTHY, LLP |
| JESSE S. GABRIEL (SBN 263137) | San Francisco Airport Office Center |
| jgabriel@gibsondunn.com | 840 Malcolm Road, Suite 200 |
| 333 South Grand Avenue | Burlingame, CA  94010 |
| Los Angeles, CA 90071-3197 | Telephone: (650) 697-6000 |
| Telephone: (213) 229-7000 | Facsimile: (650) 697-0577 |
| Facsimile: (213) 229-7520 | |

*Attorneys for Plaintiffs DULCE GARCIA,*      *Attorneys for Plaintiff CITY OF SAN JOSE*
*MIRIAM GONZALEZ AVILA, SAUL*
*JIMENEZ SUAREZ, VIRIDIANA CHABOLLA*
*MENDOZA, NORMA RAMIREZ, and JIRAYUT*
*LATTHIVONGSKORN*

*[Additional Counsel Listed on Signature Pages]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, | CASE NO. 17-CV-05211-WHA |
| | **PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS** |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

DC: 6540781-2

PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)

| | | |
|---|---|---|
| 1 | | |
| 2 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 3 | | **PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS** |
| 4 | Plaintiffs, | |
| 5 | v. | |
| 6 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| 7 | | |
| 8 | | |
| 9 | Defendants. | |

| | | |
|---|---|---|
| 10 | | |
| 11 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 12 | Plaintiffs, | **PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS** |
| 13 | v. | |
| 14 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 15 | | |
| 16 | Defendants. | |

| | | |
|---|---|---|
| 17 | | |
| 18 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 19 | | **PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS** |
| 20 | | |
| 21 | Plaintiffs, | |
| 22 | v. | |
| 23 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 24 | | |
| 25 | | |
| 26 | Defendants. | |
| 27 | | |
| 28 | | |

PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
2

1    Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs in the above-captioned

2    and related cases hereby propound the following First Set of Interrogatories to Defendants United

3    States of America, U.S. Department of Homeland Security ("DHS"), Acting Secretary of Homeland

4    Security Elaine C. Duke, in her official capacity; and President Donald J. Trump, in his official

5    capacity (collectively, "Defendants"), and request that Defendants answer these Interrogatories,

6    separately and under oath, within fifteen (15) days pursuant to Rule 33(b)(2) of the Federal Rules of

7    Civil Procedure and the Court's Case Management Order dated September 22, 2017 (Dkt. No. 49).

8    Unless otherwise specified in the individual interrogatory, the relevant time period for these

9    interrogatories is between January 20, 2017, and September 5, 2017.

10   **INTERROGATORIES**

11   **INTERROGATORY NO. 1:**

12   Please state the reason or reasons for Defendants' decision to rescind the Deferred Action for

13   Childhood Arrivals program ("DACA").  Please further identify all documents relied upon for, or

14   considered as part of, this decision.

15   **INTERROGATORY NO. 2:**

16   Please identify all individuals who were consulted for, participated in, or contributed to any

17   analysis undertaken by Defendants pertaining to the legality of DACA, and provide a description of

18   each person's involvement.  When identifying an individual for purposes of these Interrogatories,

19   please provide their full name, title, work address, and business phone number.

20   **INTERROGATORY NO. 3:**

21   Please identify the date, time, location, participants, and subject of any meetings,

22   conversations, or communications, whether in-person or via means of telecommunication or

23   electronic communication, involving any federal government official (defined, for purposes of these

24   Interrogatories, as employees of DHS, U.S. Department of Justice, or White House), during which

25   participants discussed the legality of DACA.

26   **INTERROGATORY NO. 4:**

27   Please identify the date, time, location, participants, and subject of any meetings,

28   conversations, or communications, whether in-person or via means of telecommunication or

PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
1

1 electronic communication, involving any federal government official, during which participants
2 discussed matters resulting in the decisions relating to the handling of DACA set forth in the
3 February 20, 2017, Memorandum entitled "Enforcement of the Immigration Laws to Serve the
4 National Interest" and the June 15, 2017, Memorandum entitled "Rescission of November 20, 2014,
5 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent
6 Residents ('DAPA')," which expressly left DACA in place.

7 **INTERROGATORY NO. 5:**

8      Please identify the date, time, location, participants, and subject of any meetings,
9 conversations, or communications, whether in-person or via means of telecommunication or
10 electronic communication, involving any federal government official with anyone within the
11 Executive Branch or the Legislative Branch, any state or local government official, or any individuals
12 affiliated with organizations opposed to or supporting DACA, during which participants discussed
13 the policy merits of DACA, including, but not limited to, the facts and circumstances that underlay or
14 were engendered by the adoption of DACA in June 2012.

15 **INTERROGATORY NO. 6:**

16      Please identify the date, time, location, participants, and subject of any meetings,
17 conversations, or communications, whether in-person or via means of telecommunication or
18 electronic communication, involving any federal government official with anyone within the
19 Executive Branch or the Legislative Branch, any state or local government official, or any individuals
20 affiliated with organizations opposed to or supporting DACA, regarding the continuation,
21 modification, or rescission of DACA.

22 **INTERROGATORY NO. 7:**

23      Please identify the date, time, location, participants, and subject of any meetings,
24 conversations, or communications, whether in-person or via means of telecommunication or
25 electronic communication, involving any federal government official with anyone within the
26 Executive Branch or the Legislative Branch, any state or local government official, or any individuals
27 affiliated with organizations opposed to or supporting DACA, during which participants discussed
28 the content of DHS's "Frequently Asked Questions: Rescission of Deferred Action for Childhood

Appeal: 18-1521 · CBaasee 11:1C7y--O05228228-NGCSG--VVMMSS · Filoid: 0D7o/c0u2m/2e0n1t728228-7 · PRg. 68 o0f 4454 · Page 660 of 1026 PageID #:
10251

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 68 of 129

1   Arrivals (DACA)" ("DACA Rescission FAQs"), including, but not limited to, the response to

2   question 8 of the DACA Rescission FAQs.

3   **INTERROGATORY NO. 8:**

4        For each meeting, conversation, or communication identified in your response to

5   Interrogatories Numbers 3-7, please identify (by date, author, title, and subject matter) all analyses,

6   memoranda, studies, reports, statistics, or other documents containing evidence, facts, or

7   circumstances relating to the individual, local, state, and/or national impact of DACA, and/or the

8   rescission of DACA, including, but not limited to, the reliance interests of DACA recipients and

9   other affected parties, that any federal government official relied upon, considered, analyzed,

10   consulted, or exchanged.

11   **INTERROGATORY NO. 9:**

12        Please state the reason or reasons for Defendants' decision to establish the deadlines and cut-

13   off dates that were part of the DACA rescission, as well as Defendants' decision to not issue

14   individualized notices to DACA recipients regarding these dates, including:

15        a.  March 5, 2018, as the end date for renewals;

16        b.  October 5, 2017, as the deadline for renewal applications;

17        c.  September 5, 2017, as the cut-off date for initial applications or renewal applications from

18           DACA recipients whose status expired on or before that date; and

19        d.  September 5, 2017, as the cut-off date for any new applications for advance parole and the

20           date upon which all pending advance parole applications filed under standards associated

21           with the DACA program were administratively closed.

22        Please further identify all documents relied upon for, or considered as part of, this decision.

23   **INTERROGATORY NO. 10:**

24        Please identify the date, time, location, participants, and subject of any meetings,

25   conversations, or communications, whether in-person or via means of telecommunication or

26   electronic communication, involving any federal government official during which participants

27   discussed the political implications of rescinding DACA, including, but not limited to, (a) discussions

28   relating to whether and how to fulfill President Trump's August 2016 statement of his intent, if

1    elected, to terminate "illegal executive amnesties"; and (b) discussions relating to rescinding DACA

2    in order to create political leverage to persuade some members of Congress to support the enactment

3    of other immigration-related measures in exchange for legislation involving DACA.  Please further

4    identify all documents considered as part of these discussions.

5    **<u>INTERROGATORY NO. 11</u>:**

6         Please identify all individuals involved in vetting, approving, reviewing, or authorizing the

7    rescission of DACA and/or the deadlines and cut-off dates associated with the wind-down of DACA,

8    including, but not limited to, those individuals involved in reviewing any of the drafts of the

9    following documents:

10        a.  September 5, 2017 Memorandum entitled "Rescission of the June 15, 2012 Memorandum

11            Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to

12            the United States as Children'";

13        b.  Fact Sheet: Rescission of Deferred Action for Childhood Arrivals (DACA) (attached as

14            Exhibit A to Plaintiffs' First Set of Requests for Production of Documents to Defendants

15            ("RFPD"));

16        c.  Frequently Asked Questions on the September 5, 2017 Rescission of the Deferred Action

17            for Childhood Arrivals (DACA) Program (attached as Exhibit B to RFPD);

18        d.  Talking Points – DACA Rescission and Talking Points – President Trump Directs Phased

19            Ending of DACA (attached as Exhibit C to RFPD);

20        e.  Top Five Messages (attached as Exhibit D to RFPD);

21        f.  Attorney General Sessions' remarks at a press conference on the rescission of DACA on

22            September 5, 2017.  *See* Attorney General Sessions Delivers Remarks on DACA, Dep't of

23            Justice, Office of Public Affairs (Sept. 5, 2017),

24            https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca;

25        g.  President Trump's statement on the rescission of DACA on September 5, 2017.  *See*

26            White House Office of the Press Secretary, "Statement from President Donald J. Trump"

27            (Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/statement-

28            president-donald-j-trump;

PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
4

1        h.   White House Press Release on the rescission of DACA on September 5, 2017. *See* White

2              House Office of the Press Secretary, "President Donald J. Trump Restores Responsibility

3              and the Rule of Law to Immigration" (Sept. 5, 2017), https://www.whitehouse.gov/the-

4              press-office/2017/09/05/president-donald-j-trump-restores-responsibility-and-rule-law;

5              and

6        i.   White House statement on rescission of DACA on September 7, 2017. *See* White House

7              blog post, "Former Administration's Failed Record On Crime, Immigration And Security

8              Are What's Cruel" (Sept. 7, 2017), https://www.whitehouse.gov/blog/2017/09/07/former-

9              administrations-failed-record-crime-immigration-and-security-are-whats-cruel.

10     Please describe each individual's involvement.

11     **INTERROGATORY NO. 12:**

12        Please describe with specificity the circumstances under which the United States Citizenship

13   and Immigration Services may provide information about current or former DACA applicants or

14   recipients to any other component of DHS, including, but not limited to, Immigration and Customs

15   Enforcement and Customs and Border Patrol, or other law enforcement agencies for immigration

16   enforcement purposes, and whether and how these circumstances have changed since January 20,

17   2017.

18     **INTERROGATORY NO. 13:**

19        Please describe with specificity all instances, since January 20, 2017, in which a federal

20   government official has provided information about current or former DACA applicants or recipients

21   to any component of DHS, including, but not limited to, Immigration and Customs Enforcement and

22   Customs and Border Patrol, or other law enforcement agencies, for immigration enforcement

23   purposes, in circumstances outside of those identified in Interrogatory Number 11. For each instance,

24   please describe (a) whether any action(s) were taken to address such instances (including, but not

25   limited to, providing training and/or disciplinary actions); (b) describe those action(s), if any; and (c)

26   identify who took those action(s). Please further identify all documents related to these instances.

27

28

1    **INTERROGATORY NO. 14:**

2        Please list all instances, since January 20, 2017, in which a DACA recipient's deferred action

3    was revoked or terminated prior to the expiration date provided in that recipient's DACA approval

4    notice.  For each instance, please describe (a) the specific factual basis for the revocation or

5    termination; (b) whether legal or administrative proceedings were initiated and the disposition of such

6    proceedings; and (c) whether the revocation or termination was successfully challenged.  Please

7    further identify all documents related to these instances.

8    Dated: October 9, 2017                                        Respectfully Submitted,

9    COVINGTON & BURLING LLP                          XAVIER BECERRA
                                                                      Attorney General of California
10   /s/ Jeffrey M. Davidson                                MICHAEL L. NEWMAN
     Jeffrey M. Davidson (SBN 248620)                Supervising Deputy Attorney General
11   One Front Street, 35th Floor
     San Francisco, CA 94111-5356                      /s/ James F. Zahradka II
12   Telephone: (415) 591-6000                          JAMES F. ZAHRADKA II
     Facsimile: (415) 591-6091                            Deputy Attorney General
13   Email:  jdavidson@cov.com
                                                                      CHRISTINE CHUANG
14   Attorneys for Plaintiffs THE REGENTS OF THE    REBEKAH A. FRETZ
     UNIVERSITY OF CALIFORNIA and Janet            RONALD H. LEE
15   Napolitano, in her official capacity as President of   KATHLEEN VERMAZEN RADEZ
     the University of California                           SHUBHRA SHIVPURI
16                                                                   1515 Clay Street, 20th Floor
     Lanny A. Breuer (pro hac vice)                      P.O. Box 70550
17   Mark H. Lynch (pro hac vice)                        Oakland, CA  94612-0550
     Alexander A. Berengaut (pro hac vice)           Telephone: (510) 879-1247
18   Megan A. Crowley (pro hac vice)
     Ashley Anguas Nyquist (pro hac vice)           Attorneys for Plaintiff State of California
19   Jonathan Y. Mincer (Bar No. 298795)
     Ivano M. Ventresca (pro hac vice)               JANET T. MILLS
20   COVINGTON & BURLING LLP                       Attorney General of Maine
     One CityCenter                                            SUSAN P. HERMAN (pro hac vice)
21   850 Tenth Street, NW                                  Deputy Attorney General
     Washington, DC 20001-4956                        6 State House Station
22   Telephone: (202) 662-6000                          Augusta, Maine 04333
     Facsimile: (202) 662-6291                            Telephone: (207) 626-8814
23   E-mail: lbreuer@cov.com, mlynch@cov.com,    Email: susan.herman@maine.gov
     aberengaut@cov.com, mcrowley@cov.com,
24   anyquist@cov.com, iventresca@cov.com        Attorneys for Plaintiff State of Maine

25   Mónica Ramírez Almadani (SBN 234893)        BRIAN E. FROSH
     COVINGTON & BURLING LLP                       Attorney General of Maryland
26   1999 Avenue of the Stars                            STEVEN M. SULLIVAN (pro hac vice)
     Los Angeles, CA 90067-4643                        Solicitor General
27   Telephone: (424) 332-4800                          200 Saint Paul Place, 20th Floor
     Facsimile: (424) 332-4749                            Baltimore, Maryland 21202
28   Email: mralmadani@cov.com                        Telephone: (410) 576-6325

PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
6

| | | |
|---|---|---|
| 1 | Erika Douglas (SBN 314531) | Email:  ssullivan@oag.state.md.us |
| 2 | COVINGTON & BURLING LLP | *Attorneys for Plaintiff State of Maryland* |
| | 333 Twin Dolphin Drive, Suite 700 | |
| 3 | Redwood Shores, CA 94061-1418 | LORI SWANSON |
| | Telephone: (650) 632-4700 | Attorney General |
| 4 | Facsimile: (650) 632-4800 | State of Minnesota |
| | Email: edouglas@cov.com | JULIANNA F. PASSE (*pro hac vice*) |
| 5 | | Assistant Attorney General |
| | Charles F. Robinson (SBN 113197) | 445 Minnesota Street, Suite 1100 |
| 6 | Margaret Wu (Bar No. 184167) | St. Paul, Minnesota 55101-2128 |
| | Julia M. C. Friedlander (SBN 165767) | Telephone: (651) 757-1136 |
| 7 | Sonya Sanchez (SBN 247541) | Email: julianna.passe@ag.state.mn.us |
| | Norman Hamill (SBN 154272) | |
| 8 | Harpreet Chahal (SBN 233268) | *Attorneys for Plaintiff State of Minnesota* |
| | Michael Troncoso (SBN 221180) | |
| 9 | University of California | |
| | Office of the General Counsel | |
| 10 | 1111 Franklin Street, 8th Floor | |
| | Oakland, CA 94607-5200 | |
| 11 | Telephone: + 1 (510) 987-9800 | |
| | Facsimile: + 1 (510) 987-9757 | |
| 12 | Email: charles.robinson@ucop.edu | |
| 13 | *Attorneys for Plaintiffs THE REGENTS OF THE* | |
| | *UNIVERSITY OF CALIFORNIA and JANET* | |
| 14 | *NAPOLITANO, in her official capacity as President* | |
| | *of the University of California* | |
| 15 | | |
| 16 | | |
| 17 | GIBSON, DUNN & CRUTCHER LLP | COTCHETT, PITRE & McCARTHY, LLP |
| | | OFFICE OF THE CITY ATTORNEY |
| 18 | */s/ Theodore J. Boutrous, Jr.* | */s/ Nancy L. Fineman* |
| 19 | THEODORE J. BOUTROUS, JR., SBN 132099 | |
| | tboutrous@gibsondunn.com | NANCY L. FINEMAN |
| 20 | KATHERINE M. MARQUART, SBN 248043 | BRIAN DANITZ (SBN 247403) |
| | kmarquart@gibsondunn.com | bdanitz@cpmlegal.com |
| 21 | JESSE S. GABRIEL, SBN 263137 | TAMARAH P. PREVOST (SBN 313422) |
| | jgabriel@gibsondunn.com | tprevost@cpmlegal.com |
| 22 | 333 South Grand Avenue | San Francisco Airport Office Center |
| | Los Angeles, CA 90071-3197 | 840 Malcolm Road, Suite 200 |
| 23 | Telephone: (213) 229-7000 | Burlingame, CA  94010 |
| | Facsimile: (213) 229-7520 | Telephone: (650) 697-6000 |
| 24 | | Facsimile: (650) 697-0577 |
| 25 | ETHAN D. DETTMER, SBN 196046 | |
| | edettmer@gibsondunn.com | |
| 26 | 555 Mission Street | |
| | San Francisco, CA 94105 | |
| 27 | Telephone: (415) 393-8200 | |
| | Facsimile: (415) 393-8306 | |
| 28 | PUBLIC COUNSEL | |
| | MARK D. ROSENBAUM, SBN 59940 | |

PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
7

AR1916

| | | |
|---|---|---|
| 1 | mrosenbaum@publiccounsel.org | RICHARD DOYLE (SBN 88625) |
| | JUDY LONDON, SBN 149431 | NORA FRIMANN (SBN 93249) |
| 2 | jlondon@publiccounsel.org | OFFICE OF THE CITY ATTORNEY |
| | 610 South Ardmore Avenue | 200 East Santa Clara Street, 16th Floor |
| 3 | Los Angeles, CA 90005 | San José, California 95113 |
| | Telephone: (213) 385-2977 | Telephone: (408) 535-1900 |
| 4 | Facsimile: (213) 385-9089 | Facsimile: (408) 998-3131 |
| | | E-Mail Address:  cao.main@sanJoséca.gov |
| 5 | BARRERA LEGAL GROUP, PLLC | |
| | LUIS CORTES ROMERO, SBN 310852 | *Attorneys for Plaintiff City of San Jose* |
| 6 | lcortes@barreralegal.com | |
| | 19309 68th Avenue South, Suite R102 | |
| 7 | Kent, WA 98032 | |
| | Telephone: (253) 872-4730 | |
| 8 | Facsimile: (253) 237-1591 | |
| | LAURENCE H. TRIBE, SBN 39441 | |
| 9 | larry@tribelaw.com | |
| | Harvard Law School | |
| 10 | *Affiliation for identification purposes only* | |
| | 1575 Massachusetts Avenue | |
| 11 | Cambridge, MA 02138 | |
| | Telephone: (617) 495-1767 | |
| 12 | | |
| | ERWIN CHEMERINSKY, *pro hac vice* | |
| 13 | forthcoming | |
| | echemerinsky@law.berkeley.edu | |
| 14 | University of California, Berkeley School of Law | |
| | *Affiliation for identification purposes only* | |
| 15 | 215 Boalt Hall | |
| | Berkeley, CA 94720-7200 | |
| 16 | Telephone: (510) 642-6483 | |
| 17 | LEAH M. LITMAN, *pro hac vice* forthcoming | |
| | llitman@law.uci.edu | |
| 18 | University of California, Irvine School of Law | |
| | *Affiliation for identification purposes only* | |
| 19 | 401 East Peltason Drive | |
| | Irvine, CA 92697 | |
| 20 | Telephone: (949) 824-7722 | |
| 21 | *Attorneys for Plaintiffs DULCE GARCIA,* | |
| | *MIRIAM GONZALEZ AVILA, SAUL* | |
| 22 | *JIMENEZ SUAREZ, VIRIDIANA CHABOLLA* | |
| | *MENDOZA, NORMA RAMIREZ, and JIRAYUT* | |
| 23 | *LATTHIVONGSKORN* | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)
8

# EXHIBIT 3A

AR1918

Appeal: 18-1521 Document: 28-7 Filed: 07/02/2018 Pg: 95 of 454
Case 1:17-cv-05228-NGG-VMS Document 29-7 Filed 09/04/20 Page 667 of 1026 PageID #: 10258
Case 8:17-cv-02942-RWT Document 29-5 Filed 11/28/17 Page 75 of 129

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern*
Healy Ko, Law Student Intern*
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Melissa Keaney, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW
Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States, <br><br> *Defendants*. | **PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES** <br><br> Case No. 1:16-cv-04756 (NGG) (JO) |

**PROPOUNDING PARTY:** MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, CAROLINA FUNG FENG, and MAKE THE ROAD NEW YORK

**RESPONDING PARTY:** ELAINE C. DUKE, ACTING SECRETARY, DEPARTMENT OF HOMELAND SECURITY, JEFFERSON BEAUREGARD

Appeal 18-1521, Document 20, 07/02/2018, 2339387, Page 668 of 1026

1    SESSIONS III, ATTORNEY GENERAL OF THE UNITED
     STATES, AND DONALD J. TRUMP, PRESIDENT OF THE
2    UNITED STATES

3    **SET NUMBER:**              ONE

4

5    **TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

6        **PLEASE TAKE NOTICE** that, pursuant to Rule 36 of the Federal Rules of Civil

7    Procedure, Plaintiffs hereby propound the following Requests for Admissions. As provided in

8    Magistrate Judge Orenstein's September 27, 2017 Scheduling Order, the admissions requested

9    shall be responded to, under oath, within fourteen (14) days of the service of these Requests, and

10   any objections to these requests shall be made within seven (7) days of service of these requests.

11   See Case Management and Scheduling Order 1, ECF No. 67. Defendant Sessions's admissions

12   must be in accordance with the Definitions and Instructions set forth below, Fed. R. Civ. P. 36,

13   and the Local Rules of the United States District Court for the Eastern District of New York.

14                                    **DEFINITIONS**

15       1.    The word "Plaintiffs" or "Plaintiff" shall mean Martín Batalla Vidal, Antonio

16   Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, Carolina Fung Feng, and Make

17   the Road New York, or any one or combination of those listed.

18       2.    The phrase "Individual Plaintiffs" or "Individual Plaintiff" shall mean Martín

19   Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and

20   Carolina Fung Feng, or any one or combination of these individuals.

21       3.    The term "Defendant" means Attorney General of the United States Jefferson

22   Beauregard Sessions III, in his official capacity, and shall include all officers, directors,

23   attorneys, agents, employees, and representatives acting on his behalf, or any one or combination

24   of the foregoing.

25       4.    The word "Defendants" shall mean President Donald J. Trump, Attorney General

26   Jefferson Sessions, and Acting Secretary Elaine Duke, and shall include all officers, directors,

27   attorneys, agents, employees and representatives acting on behalf of Defendants, or any one or

28   combination of the foregoing.

                                          2

AR1920

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 29-5 Filed 07/03/2018 Filed 09/04/20 Page 97 of 454 Page 669 of 1026 PageID #: 10260

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 77 of 129

5.     The word "persons" shall include individuals, firms, partnerships, corporations, proprietorships, associations, trusts, estates, governmental units, and every other type of organization or entity.

6.     The word "date" shall mean the exact date, month, and year if ascertainable; otherwise, the word "date" shall mean the best available approximation, including relationship to other events. If the day given is the best available approximation, Defendant Sessions should identify it as such.

7.     The word "identify" when used in reference to: (a) an individual, shall mean to state his/her full name, present or last known address and present or last known business affiliation, job title, employment address and telephone number, if known; (b) a firm, partnership, corporation, proprietorship, association, trust, estate or other organization, shall mean to state its full name, present or last known address and telephone number; and (c) a document, shall mean to state the title (if any), the date, author, sender, recipient, the identity of the person signing, the type of document or such means as to identify it sufficiently to produce it pursuant to Rule 34 of the Federal Rules of Civil Procedure, a summary of its contents, its present location and custodian.

8.     "Department of Homeland Security" or "DHS" includes the Department of Homeland Security, Customs and Border Protection (CBP), Citizenship and Immigration Services (USCIS) and Immigration and Customs Enforcement (ICE).

9.     The word "you" or "your" shall refer to Defendant, as defined above.

10.     The acronym "DHS employee" or "DHS employees" shall refer to any person or people currently or formerly employed by the U.S. Department of Homeland Security.

11.     The acronym "DOJ employee" or "DOJ employees" shall refer to any person or people currently or formerly employed by the U.S. Department of Justice.

12.     The phrase "USCIS employee" or "USCIS employees" shall refer to any person or people currently or formerly employed by USCIS.

//

//

3

AR1921

Appeal: 18-1521   Document: 28-7   Filed: 07/02/2018   Pg: 99 of 454
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/18   Page 670 of 1026 PageID #: 10261
Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 78 of 129

13. The phrase "Trump Administration" shall refer to President Donald J. Trump and any person or people currently or formerly employed by the White House at any time since January 20, 2017.

14. The phrase "DACA program" shall mean the Deferred Action for Childhood Arrivals program, established in a memorandum issued on June 15, 2012 by former Department of Homeland Security Secretary Janet Napolitano.

15. The phrase "DAPA program" shall mean the Deferred Action for Parents of Americans and Lawful Permanent Residents program, established in a memorandum issued on November 20, 2014 by former Department of Homeland Security Secretary Jeh Charles Johnson.

16. The phrase "expanded-DACA program" shall mean the expanded version of the Deferred Action for Childhood Arrivals program that was announced in the same memorandum as the DAPA program.

17. The phrase "DACA termination" shall mean the course of action taken by Defendants individually and/or collectively to end DACA, including Acting Secretary Duke's September 5, 2017, Memorandum entitled "Memorandum on the Rescission Of Deferred Action For Childhood Arrivals"; Attorney General Sessions's September 4, 2017, Letter regarding DACA; and all internal actions within the defendants' agencies to implement the end of DACA.

18. The phrase "DACA termination memorandum" shall mean Acting Secretary Duke's September 5, 2017, Memorandum entitled "Memorandum on the Rescission Of Deferred Action For Childhood Arrivals."

19. The word "document" shall mean any "documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A); Local Rule 26.3(c)(2).

20. The phrase "present for" shall include physical presence, telephone presence, or any form of electronic presence.

4

21.     The term "discussion" or "discussions" shall include meetings (in person, over the telephone, by video teleconference, or by electronic means), conversations (in person, over the telephone, or by electronic means), and any communication, including oral conversations (telephonic or in person), electronic communication (chat, e-mail, or otherwise), and paper communication.

22.     The phrases "relating to" and "relate to" shall be construed in the broadest sense and shall mean describing, setting forth, discussing, mentioning, commenting upon, supporting, contradicting, or referring to the subject or topic in question, either in whole or in part.

23.     The singular includes the plural and vice versa; "any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; "and" should be understood to include and encompass "or"; "any" should be understood to include and encompass "any" and "every;" and "among" should be understood to include and encompass "between" and "within."

24.     The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

25.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses, whenever necessary to bring into the scope of the specification all responses which might otherwise be construed outside the scope.

26.     The use of any masculine or feminine pronoun includes both the masculine and feminine.

**INSTRUCTIONS**

1.     Answer each Request for Admission separately and as completely as possible. The omission of any name, fact, or other item of information from the answers shall be deemed a representation that such information is not known to you or your agents, attorneys, other representatives, or otherwise within your possession, custody, or control, at the time of the service of the answers or thereafter. If a Request for Admission cannot be answered completely, answer it to the greatest extent possible.

5

J.A. 1184                                                                    AR1923

2.    If you cannot answer any Request for Admission fully within the prescribed time limit despite the exercise of reasonable diligence, furnish as complete an answer as possible and explain in detail the reasons why a complete answer cannot be provided.

3.    If you claim that a Request for Admission is in any way objectionable, respond to the portion of the Request for Admission believed to be unobjectionable and specifically identify that aspect of the Request for Admission that you claim to be objectionable and explain why such aspect is objectionable.

4.    If you object to any Request for Admission on the ground that it is vague and/or ambiguous, identify the language you consider vague and/or ambiguous and state the interpretation you are using in answering the Request for Admission.

5.    Separately, with respect to each piece of information called for by these Requests for Admission that you withhold under a claim of privilege or otherwise, state that you are withholding it and explain why, including a description of the information withheld.

6.    These Requests are not intended to be duplicative. All requests should be responded to fully and to the extent not covered by other requests. If you claim that information requested or required in response to a given Request for Admission is also responsive to another Request for Admission, you may not answer the Request for Admission by referring to the answer to another Request for Admission unless the answer to the Request for Admission being referred to supplies a complete and accurate response to the Request for Admission being answered.

7.    These Requests are continuing in nature and require prompt supplemental responses for any and all responsive documents that come into Defendants' sole or joint possession, custody, or control after the service of any initial responses hereto.

8.    All Requests are for the time period from January 1, 2012, through the present and going forward, unless otherwise indicated.

**REQUESTS FOR ADMISSIONS**

1.    Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision to terminate the DACA program.

6

J.A. 1185

AR1924

Appeal: 18-1521    Document: 28-7    Filed: 07/02/2018    Pg: 001 of 454    Page 673 of 1026    PageID #:
10264
Case 8:17-cv-02942-RWT    Document 29-5    Filed 11/28/17    Page 81 of 129

2.   Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision to announce the DACA termination on September 5, 2017.

3.   Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to stop accepting DACA applications from individuals without valid DACA as of September 5, 2017.

4.   Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to stop accepting DACA renewals from individuals whose DACA will expire on or after March 6, 2018.

5.   Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to set a deadline of October 5, 2017, for DACA renewal applications.

6.   Admit that the DACA termination decision is not under continued consideration by DOJ.

7.   Admit that the DACA termination reflects the end of the agency decision-making process concerning the DACA program.

8.   Admit that Acting Secretary Duke's September 5, 2017 memorandum requires DHS to deny all DACA applications from individuals who do not hold DACA as of September 5, 2017.

9.   Admit that Acting Secretary Duke's September 5, 2017 memorandum requires DHS to deny all DACA renewal applications after October 5, 2017.

10.  Admit that Acting Secretary Duke's September 5, 2017 memorandum limits DACA renewals to those individuals with DACA as of September 5, 2017 whose DACA would expire between September 6, 2017 and March 5, 2018.

11.  Admit that DACA recipients are immediately subject to apprehension and deportation upon expiration of their DACA status.

12.  Admit that an individual who loses DACA status is no longer eligible to apply for employment authorization pursuant to 8 C.F.R. § 274a.12(c)(14).

13.  Admit that the DACA termination is likely to have a more than de minimus economic impact on at least one small non-profit.

7

AR1925

14.    Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 100 small non-profits.

15.    Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 500 small non-profits.

16.    Admit that the DACA termination is likely to have a more than de minimus economic impact on at least one small business.

17.    Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 100 small businesses.

18.    Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 1000 small businesses.

19.    Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 5000 small businesses.

20.    Admit that the DACA termination is likely to have a more than de minimus economic impact on at least one small governmental jurisdiction.

21.    Admit that prior to September 5, 2017, DOJ did not evaluate the economic impact of terminating DACA on small non-profits.

22.    Admit that prior to September 5, 2017, DOJ did not evaluate the economic impact of terminating DACA on small businesses.

23.    Admit that prior to September 5, 2017, DOJ did not evaluate the economic impact of terminating DACA on small governmental jurisdictions.

24.     Admit that prior to September 5, 2017, DOJ did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small non-profits.

25.    Admit that prior to September 5, 2017, DOJ did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small businesses.

//

//

8

AR1926

26.     Admit that prior to September 5, 2017, DOJ did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small governmental jurisdictions.

27.     Admit that prior to September 5, 2017, Attorney General Sessions did not certify that the DACA termination would not have a significant economic impact on a substantial number of small non-profits, small businesses, or small governmental jurisdictions.

28.     Admit that prior to September 5, 2017, DOJ did not consider whether one month was a sufficient time for small non-profits to assist their clients in submitting renewal applications for the DACA program.

29.     Admit that prior to September 5, 2017, DOJ did not consider whether one month was a sufficient time for small non-profits to assist their members in submitting renewal applications for the DACA program.

30.     Admit that prior to September 5, 2017, DOJ did not consider whether one month was a sufficient time for small businesses, small non-profits, and small governmental jurisdictions to assist their employees in submitting renewal applications for the DACA program.

31.     Admit that prior to September 5, 2017, DOJ made no effort to determine the cost to small businesses, small non-profits, or small governmental jurisdictions of employees who will lose work authorization due to the end of the DACA program.

32.     Admit that prior to September 5, 2017, DOJ did not assess the costs of rehiring or replacing employees who will lose work authorization due to the termination of the DACA program.

33.     Admit that prior to September 5, 2017, DOJ did not assess the potential costs to small businesses, small non-profits, and small governmental jurisdictions of losing experienced employees due to the termination of the DACA program.

34.     Admit that the November 19, 2014, Department of Justice, Office of Legal Counsel memorandum on legality of DAPA remains operative.  *See* Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the United States & to Defer Removal of Others, 2014 WL 10788677 (O.L.C. Nov. 19, 2014).

9

AR1927

Appeal 18-1521, Document 28-7, 07/02/2018, 2337187, Page 676 of 1026 PageID #: 10267
Case 1:17-cv-05228-NGG-VMS Filed 09/04/18 Page 676 of 1026 PageID #: 10267

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 84 of 129

1       35.    Admit that the November 19, 2014, Department of Justice, Office of Legal

2  Counsel memorandum on legality of DAPA has not been superseded by any subsequent OLC

3  memorandum. *See* Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens

4  Unlawfully Present in the United States & to Defer Removal of Others, 2014 WL 10788677

5  (O.L.C. Nov. 19, 2014).

6       36.    Admit that Office of Legal Counsel has not drafted a written memorandum on the

7  legality of DACA.

8       37.    Admit that Office of Legal Counsel has orally opined that DACA was a lawful

9  exercise of executive authority.

10       38.    Admit that DOJ employees had discussions with plaintiffs in *Texas v. United*

11  *States*, No. 1:14-cv-00254 (S.D. Tex.), regarding the decision to terminate the DACA program

12  before the DACA termination.

13       39.    Admit that DOJ considered the arguments raised by plaintiffs in *Texas v. United*

14  *States*, No. 1:14-cv-00254 (S.D. Tex.), in terminating the DACA program.

Dated: October 4, 2017     By: */s/ Joshua A. Rosenthal*

David Chen, Law Student Intern | Jessica R. Hanson, Esq. (*pro hac vice*)
Susanna D. Evarts, Law Student Intern | Mayra B. Joachin, Esq. (*pro hac vice*)
Victoria Roeck, Law Student Intern[*] | Melissa Keaney, Esq. (*pro hac vice*)
Healy Ko, Law Student Intern[*] | Karen C. Tumlin, Esq. (*pro hac vice*)
Hannah Schoen, Law Student Intern | NATIONAL IMMIGRATION LAW CENTER
Emily Villano, Law Student Intern | P.O. Box 70067
Muneer I. Ahmad, Esq. (*pro hac vice*) | Los Angeles, CA 90070
Marisol Orihuela, Esq. (*pro hac vice*) | Phone: (213) 639-3900
Michael J. Wishnie, Esq. (MW 1952) |
JEROME N. FRANK LEGAL SVCS. ORG. | Justin B. Cox, Esq. (*pro hac vice*)
michael.wishnie@yale.edu | NATIONAL IMMIGRATION LAW CENTER
Phone: (203) 432-4800 | PO Box 170208
 | Atlanta, GA 30317
Amy S. Taylor, Esq. (AT 2056) | Phone: (678) 279-5441
Deborah Axt, Esq. (DA 4885) |
MAKE THE ROAD NEW YORK | Joshua A. Rosenthal, Esq.[†]
301 Grove Street | NATIONAL IMMIGRATION LAW CENTER
Brooklyn, NY 11237 | 1121 14th Street NW
Phone: (718) 418-7690 | Suite 200
 | Washington, DC 20005
 | Phone: (202) 216-0261

*Attorneys for Plaintiffs*

10

1    \* Motion for law-student appearance forthcoming
     † Motion for *pro hac vice* admission forthcoming

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AR1929

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I hereby certify that on October 4, 2017, I served a true and correct copy of **PLAINTIFFS' MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, and MAKE THE ROAD NEW YORK'S FIRST SET OF REQUESTS FOR ADMISSION TO JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES** on the parties in this action by electronic mail transmission to the e-mail addresses listed below. |

1
2
3
4
5

BRAD P. ROSENBERG
Senior Trial Counsel
United States Department of Justice
Email: brad.rosenberg@usdoj.gov

6
7
8

STEPHEN M. PEZZI (D.C. Bar # 995500)
Trial Attorney
United States Department of Justice
Email: stephen.pezzi@usdoj.gov

9
10

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
Email: joseph.marutollo@usdoj.gov

11
12
13
14

*Attorneys for Defendants*

15
16
17

This the 4th day of October, 2017

18
19

By    */s/*Joshua A. Rosenthal

20
21
22
23
24
25
26
27
28

Appeal: 18-1521   Doc: 28-3   Filed: 07/03/2018   Pg: 107 of 454
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 679 of 1026 PageID #: 10270

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 87 of 129

# EXHIBIT 3B

AR1931

Appeal: 18-1521   Doc: 22-8   Filed: 07/02/2018   Pg: 109 of 454
Case 1:17-cv-05228-NGG-VMS   Document 82-7   Filed 09/04/20   Page 680 of 1026 PageID #: 10271

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 88 of 129

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern*
Healy Ko, Law Student Intern*
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Melissa Keaney, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW
Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals, | **PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO ELAINE DUKE, ACTING SECRETARY OF HOMELAND SECURITY** |
| *Plaintiffs*, | Case No. 1:16-cv-04756 (NGG) (JO) |
| *v.* | |
| ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States, | |
| *Defendants.* | |

**PROPOUNDING PARTY:** MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, CAROLINA FUNG FENG, and MAKE THE ROAD NEW YORK

**RESPONDING PARTY:** ELAINE C. DUKE, ACTING SECRETARY, DEPARTMENT OF HOMELAND SECURITY, JEFFERSON BEAUREGARD

AR1932

SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES, AND DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES

**SET NUMBER:**          ONE

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiffs hereby propound the following Requests for Admissions. As provided in Magistrate Judge Orenstein's September 27, 2017 Scheduling Order, the admissions requested shall be responded to, under oath, within fourteen (14) days of the service of these Requests, and any objections to these requests shall be made within seven (7) days of the service of these Requests. *See* Case Management and Scheduling Order 1, ECF No. 67. Defendant Duke's admissions must be in accordance with the Definitions and Instructions set forth below, Fed. R. Civ. P. 36, and the Local Rules of the United States District Court for the Eastern District of New York.

**<u>DEFINITIONS</u>**

1. The word "Plaintiffs" or "Plaintiff" shall mean Martín Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, Carolina Fung Feng, and Make the Road New York, or any one or combination of those listed.

2. The phrase "Individual Plaintiffs" or "Individual Plaintiff" shall mean Martín Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and Carolina Fung Feng, or any one or combination of these individuals.

3. The term "Defendant" means Acting Secretary of Homeland Security Elaine Duke, in her official capacity, and shall include all officers, directors, attorneys, agents, employees, and representatives acting on her behalf, or any one or combination of the foregoing.

4. The word "Defendants" shall mean President Donald J. Trump, Attorney General Jefferson Sessions, and Acting Secretary Elaine Duke, and shall include all officers, directors, attorneys, agents, employees and representatives acting on behalf of Defendants, or any one or combination of the foregoing.

2

1        5.       The word "persons" shall include individuals, firms, partnerships, corporations,

2  proprietorships, associations, trusts, estates, governmental units, and every other type of

3  organization or entity.

4        6.       The word "date" shall mean the exact date, month, and year if ascertainable;

5  otherwise, the word "date" shall mean the best available approximation, including relationship to

6  other events. If the day given is the best available approximation, Defendant Duke should

7  identify it as such.

8        7.       The word "identify" when used in reference to: (a) an individual, shall mean to

9  state his/her full name, present or last known address and present or last known business

10  affiliation, job title, employment address and telephone number, if known; (b) a firm,

11  partnership, corporation, proprietorship, association, trust, estate or other organization, shall

12  mean to state its full name, present or last known address and telephone number; and (c) a

13  document, shall mean to state the title (if any), the date, author, sender, recipient, the identity of

14  the person signing, the type of document or such means as to identify it sufficiently to produce it

15  pursuant to Rule 34 of the Federal Rules of Civil Procedure, a summary of its contents, its

16  present location and custodian.

17        8.       "Department of Homeland Security" or "DHS" includes the Department of

18  Homeland Security, Customs and Border Protection (CBP), Citizenship and Immigration Services

19  (USCIS) and Immigration and Customs Enforcement (ICE).

20        9.       The word "you" or "your" shall refer to Defendant, as defined above.

21        10.     The acronym "DHS employee" or "DHS employees" shall refer to any person or

22  people currently or formerly employed by the U.S. Department of Homeland Security.

23        11.     The acronym "DOJ employee" or "DOJ employees" shall refer to any person or

24  people currently or formerly employed by the U.S. Department of Justice.

25        12.     The phrase "USCIS employee" or "USCIS employees" shall refer to any person

26  or people currently or formerly employed by USCIS.

27        //

28        //

3

AR1934

1    13.    The phrase "Trump Administration" shall refer to President Donald J. Trump and

2    any person or people currently or formerly employed by the White House at any time since

3    January 20, 2017.

4    14.    The phrase "DACA program" shall mean the Deferred Action for Childhood

5    Arrivals program, established in a memorandum issued on June 15, 2012 by former Department

6    of Homeland Security Secretary Janet Napolitano.

7    15.    The phrase "DAPA program" shall mean the Deferred Action for Parents of

8    Americans and Lawful Permanent Residents program, established in a memorandum issued on

9    November 20, 2014 by former Department of Homeland Security Secretary Jeh Charles Johnson.

10    16.    The phrase "expanded-DACA program" shall mean the expanded version of the

11    Deferred Action for Childhood Arrivals program that was announced in the same memorandum

12    as the DAPA program.

13    17.    The phrase "DACA termination" shall mean the course of action taken by

14    Defendants individually and/or collectively to end DACA, including Acting Secretary Duke's

15    September 5, 2017, Memorandum entitled "Memorandum on the Rescission Of Deferred Action

16    For Childhood Arrivals"; Attorney General Sessions's September 4, 2017, Letter regarding

17    DACA; and all internal actions within the defendants' agencies to implement the end of DACA.

18    18.    The phrase "DACA termination memorandum" shall mean Acting Secretary

19    Duke's September 5, 2017, Memorandum entitled "Memorandum on the Rescission Of Deferred

20    Action For Childhood Arrivals."

21    19.    The word "document" shall mean any "documents or electronically stored

22    information—including writings, drawings, graphs, charts, photographs, sound recordings,

23    images, and other data or data compilations—stored in any medium from which information can

24    be obtained either directly or, if necessary, after translation by the responding party into a

25    reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A); Local Rule 26.3(c)(2).

26    20.    The phrase "present for" shall include physical presence, telephone presence, or

27    any form of electronic presence.

28

4

21.     The term "discussion" or "discussions" shall include meetings (in person, over the telephone, by video teleconference, or by electronic means), conversations (in person, over the telephone, or by electronic means), and any communication, including oral conversations (telephonic or in person), electronic communication (chat, e-mail, or otherwise), and paper communication.

22.     The phrases "relating to" and "relate to" shall be construed in the broadest sense and shall mean describing, setting forth, discussing, mentioning, commenting upon, supporting, contradicting, or referring to the subject or topic in question, either in whole or in part.

23.     The singular includes the plural and vice versa; "any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; "and" should be understood to include and encompass "or"; "any" should be understood to include and encompass "any" and "every;" and "among" should be understood to include and encompass "between" and "within."

24.     The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

25.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses, whenever necessary to bring into the scope of the specification all responses which might otherwise be construed outside the scope.

26.     The use of any masculine or feminine pronoun includes both the masculine and feminine.

## **INSTRUCTIONS**

1.     Answer each Request for Admission separately and as completely as possible. The omission of any name, fact, or other item of information from the answers shall be deemed a representation that such information is not known to you or your agents, attorneys, other representatives, or otherwise within your possession, custody, or control, at the time of the service of the answers or thereafter. If a Request for Admission cannot be answered completely, answer it to the greatest extent possible.

5

AR1936

1      2.     If you cannot answer any Request for Admission fully within the prescribed time

2  limit despite the exercise of reasonable diligence, furnish as complete an answer as possible and

3  explain in detail the reasons why a complete answer cannot be provided.

4      3.     If you claim that a Request for Admission is in any way objectionable, respond to

5  the portion of the Request for Admission believed to be unobjectionable and specifically identify

6  that aspect of the Request for Admission that you claim to be objectionable and explain why

7  such aspect is objectionable.

8      4.     If you object to any Request for Admission on the ground that it is vague and/or

9  ambiguous, identify the language you consider vague and/or ambiguous and state the

10  interpretation you are using in answering the Request for Admission.

11      5.     Separately, with respect to each piece of information called for by these Requests

12  for Admission that you withhold under a claim of privilege or otherwise, state that you are

13  withholding it and explain why, including a description of the information withheld.

14      6.     These Requests are not intended to be duplicative. All requests should be

15  responded to fully and to the extent not covered by other requests. If you claim that information

16  requested or required in response to a given Request for Admission is also responsive to another

17  Request for Admission, you may not answer the Request for Admission by referring to the

18  answer to another Request for Admission unless the answer to the Request for Admission being

19  referred to supplies a complete and accurate response to the Request for Admission being

20  answered.

21      7.     These Requests are continuing in nature and require prompt supplemental

22  responses for any and all responsive documents that come into Defendants' sole or joint

23  possession, custody, or control after the service of any initial responses hereto.

24      8.     All Requests are for the time period from January 1, 2012, through the present

25  and going forward, unless otherwise indicated.

26  //

27  //

28  //

6

AR1937

**REQUESTS FOR ADMISSIONS**

1.     Admit that USCIS is aware of the expiration date for the DACA status of every DACA recipient.

2.     Admit that USCIS has a policy and practice of mailing individualized renewal notices to DACA recipients approximately 180 days before their DACA status expires.

3.     Admit that the policy and practice in #2 has been in place since at least 2015.

4.     Admit that prior to September 5, 2017, USCIS provided individualized renewal notices to some individuals whose DACA eligibility will expire between September  5, 2017 and March 5, 2018.

5.     Admit that the renewal notices sent by USCIS to the individuals described in #4 did not state that the deadline for submitting a renewal application is October 5, 2017.

6.     Admit that USCIS has not provided corrected renewal notices to the individuals described in #4 stating that the deadline for submitting a renewal application is October 5, 2017.

7.     Admit that USCIS has provided no individual renewal notice to some individuals whose DACA eligibility will expire before March 5, 2018.

8.     Admit that providing no individual written notice for DACA renewal is a departure from prior practice.

9.     Admit that providing only 30 days notice of a DACA renewal deadline is a departure from prior practice.

10.    Admit that Defendants did not mail the DACA termination memorandum to DACA recipients.

11.    Admit that Defendants did not mail any explanatory material concerning the DACA termination to DACA recipients.

12.    Admit that Defendants did not translate the DACA termination memorandum into Spanish.

13.    Admit that, if the DACA termination memorandum was translated into Spanish, such Spanish translation was not posted publicly on DHS's website.

7

    **AR1938**

14.    Admit that the only information about the DACA termination that Defendants provided in Spanish were a "Frequently Asked Questions" document and a press release.

15.    Admit that the Spanish translations of the materials referenced in #14 were not immediately available when the English-language materials were published on September 5, 2017.

16.    Admit that Defendants did not translate the DACA termination memorandum into Korean.

17.    Admit that Defendants did not translate explanatory materials regarding the DACA termination into Korean.

18.    Admit that Defendants did not translate the DACA termination memorandum into Chinese.

19.    Admit that Defendants did not translate explanatory materials regarding the DACA termination into Chinese.

20.    Admit that Defendants did not translate the DACA termination memorandum into Tagalog.

21.    Admit that Defendants did not translate explanatory materials regarding the DACA termination into Tagalog.

22.    Admit that Defendants did not translate the DACA termination memorandum into Vietnamese.

23.    Admit that Defendants did not translate explanatory materials regarding the DACA termination into Vietnamese.

24.    Admit that Defendants did not translate the DACA termination memorandum into Portugese.

25.    Admit that Defendants did not translate explanatory materials regarding the DACA termination into Portugese.

26.    Admit that a notice of availability of the DACA termination memorandum was not published in the Federal Register until September 18, 2017.

8

J.A. 1200

AR1939

27.    Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision to terminate the DACA program.

28.    Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision to announce the DACA termination on September 5, 2017.

29.    Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to stop accepting DACA applications from individuals without valid DACA as of September 5, 2017.

30.    Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to stop accepting DACA renewals from individuals whose DACA will expire on or after March 6, 2018.

31.    Admit that Attorney General Sessions and Acting Secretary Duke jointly made the decision for USCIS to set a deadline of October 5, 2017, for DACA renewal applications.

32.    Admit that the DACA termination decision is not under continued consideration by DHS.

33.    Admit that the DACA termination reflects the end of the agency decision-making process concerning the DACA program.

34.    Admit that Acting Secretary Duke's September 5, 2017 memorandum requires DHS to deny all DACA applications from individuals who do not hold DACA as of September 5, 2017.

35.    Admit that Acting Secretary Duke's September 5, 2017 memorandum requires DHS to deny all DACA renewal applications after October 5, 2017.

36.    Admit that Acting Secretary Duke's September 5, 2017 memorandum limits DACA renewals to those individuals with DACA as of September 5, 2017 whose DACA would expire between September 6, 2017 and March 5, 2018.

37.    Admit that prior to September 5, 2017, it was the publicly stated policy of DHS to allow DACA applicants to submit renewal applications, rather than full DACA applications, within one year of their expiration date.

9

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 690 of 954    Page 689 of 1026 PageID #:

1       38.     Admit that prior to September 5, 2017, USCIS accepted and adjudicated renewal

2    applications from DACA applicants whose DACA status had lapsed within one year of their

3    expiration date.

4       39.     Admit that prior to September 5, 2017, it was the publicly stated policy of DHS to

5    allow initial DACA applicants to be accepted and adjudicated without regard to how long the

6    applicant had been eligible to apply for DACA.

7       40.     Admit that prior to September 5, 2017, USCIS accepted and adjudicated initial

8    DACA applications without regard to how long the applicant had been eligible to apply for

9    DACA.

10       41.     Admit that DACA recipients are immediately subject to apprehension and

11    deportation upon expiration of their DACA status.

12       42.     Admit that, since September 5, 2017, DHS has increased its apprehension and

13    deportation of DACA recipients whose statuses have lapsed.

14       43.     Admit that an individual who loses DACA status is no longer eligible to apply for

15    employment authorization pursuant to 8 C.F.R. § 274a.12(c)(14).

16       44.     Admit that the DACA termination is likely to have a more than de minimus

17    economic impact on at least one small non-profit.

18       45.     Admit that the DACA termination is likely to have a more than de minimus

19    economic impact on at least 100 small non-profits.

20       46.     Admit that the DACA termination is likely to have a more than de minimus

21    economic impact on at least 500 small non-profits.

22       47.     Admit that the DACA termination is likely to have a more than de minimus

23    economic impact on at least one small business.

24       48.     Admit that the DACA termination is likely to have a more than de minimus

25    economic impact on at least 100 small businesses.

26       49.     Admit that the DACA termination is likely to have a more than de minimus

27    economic impact on at least 1000 small businesses.

28

AR1941

50.     Admit that the DACA termination is likely to have a more than de minimus economic impact on at least 5000 small businesses.

51.     Admit that the DACA termination is likely to have a more than de minimus economic impact on at least one small governmental jurisdiction.

52.     Admit that prior to September 5, 2017, DHS did not evaluate the economic impact of terminating DACA on small non-profits.

53.     Admit that prior to September 5, 2017, DHS did not evaluate the economic impact of terminating DACA on small businesses.

54.     Admit that prior to September 5, 2017, DHS did not evaluate the economic impact of terminating DACA on small governmental jurisdictions.

55.      Admit that prior to September 5, 2017, DHS did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small non-profits.

56.     Admit that prior to prior to September 5, 2017, DHS did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small businesses.

57.     Admit that prior to prior to September 5, 2017, DHS did not consider regulatory alternatives to the DACA termination that would reduce the economic impact on small governmental jurisdictions.

58.     Admit that prior to September 5, 2017, former Secretary Kelly did not certify that the DACA termination would not have a significant economic impact on a substantial number of small non-profits, small businesses, or small governmental jurisdictions.

59.     Admit that prior to September 5, 2017, Acting Secretary Duke did not certify that the DACA termination would not have a significant economic impact on a substantial number of small non-profits, small businesses, or small governmental jurisdictions.

60.     Admit that prior to September 5, 2017, DHS did not consider whether one month was a sufficient time for small non-profits to assist their clients in submitting renewal applications for the DACA program.

11

AR1942

Appeal: 18-1521   Doc: 50   Filed: 07/02/2018   Pg: 691 of 1026

61.     Admit that prior to September 5, 2017, DHS did not consider whether one month was a sufficient time for small non-profits to assist their members in submitting renewal applications for the DACA program.

62.     Admit that prior to September 5, 2017, DHS did not consider whether one month was a sufficient time for small businesses, small non-profits, and small governmental jurisdictions to assist their employees in submitting renewal applications for the DACA program.

63.     Admit that prior to September 5, 2017, DHS made no effort to determine the cost to small businesses, small non-profits, or small governmental jurisdictions of employees who will lose work authorization due to the end of the DACA program.

64.     Admit that prior to September 5, 2017, DHS did not assess the costs of rehiring or replacing employees who lose work authorization due to the termination of the DACA program.

65.     Admit that prior to September 5, 2017, DHS did not assess the potential costs to small businesses, small non-profits, and small governmental jurisdictions of losing experienced employees due to the termination of the DACA program.

66.     Admit that pursuant to the 2012 DACA memorandum, applicants for DACA were required to disclose their lack of immigration status as of June 15, 2012, as a condition of consideration for DACA.

67.     Admit that pursuant to the 2012 DACA memorandum, applicants for DACA were required to disclose their current and previous mailing addresses as a condition of consideration for DACA.

68.     Admit that pursuant to the 2012 DACA memorandum, applicants for DACA were required to disclose their country of birth as a condition of consideration for DACA.

69.     Admit that pursuant to the 2012 DACA memorandum, certain applicants for DACA were required to disclose criminal arrests, charges, or convictions as a condition of consideration for DACA.

70.     Admit that pursuant to the 2012 DACA memorandum, applicants for DACA were required to disclose their means of entering the United States as a condition of consideration for DACA.

12

AR1943

1    71.    Admit that the information DACA applicants provided with their applications

2 sometimes includes the immigration status, or lack thereof, of third parties, including family

3 members.

4    72.    Admit that the information DACA applicants provided with their applications

5 sometimes includes the country of birth of third parties, including family members.

6    73.    Admit that at least one DACA applicant who met the guidelines of the 2012

7 DACA memorandum was nonetheless denied DACA.

8    74.    Admit that DHS policy before September 5, 2017 was not to use the information

9 provided in DACA applications for immigration-enforcement purposes except in narrow

10 circumstances, including to identify fraudulent claims, for national security purposes, to

11 adjudicate DACA requests, or for the investigation or prosecution of a criminal offense.

12    75.    Admit that DHS has changed its policy, since September 2017, regarding the

13 permissible uses of the information provided in DACA applications.

14

15    Dated: October 4, 2017                    By: /s/ Joshua A. Rosenthal

16 David Chen, Law Student Intern              Jessica R. Hanson, Esq. (*pro hac vice*)
   Susanna D. Evarts, Law Student Intern       Mayra B. Joachin, Esq. (*pro hac vice*)
   Victoria Roeck, Law Student Intern*         Melissa Keaney, Esq. (*pro hac vice*)
17 Healy Ko, Law Student Intern*               Karen C. Tumlin, Esq. (*pro hac vice*)
18 Hannah Schoen, Law Student Intern           NATIONAL IMMIGRATION LAW CENTER
   Emily Villano, Law Student Intern           P.O. Box 70067
   Muneer I. Ahmad, Esq. (*pro hac vice*)      Los Angeles, CA 90070
19 Marisol Orihuela, Esq. (*pro hac vice*)     Phone: (213) 639-3900
   Michael J. Wishnie, Esq. (MW 1952)
20 JEROME N. FRANK LEGAL SVCS. ORG.            Justin B. Cox, Esq. (*pro hac vice*)
   michael.wishnie@yale.edu                    NATIONAL IMMIGRATION LAW CENTER
21 Phone: (203) 432-4800                       PO Box 170208
                                               Atlanta, GA 30317
22 Amy S. Taylor, Esq. (AT 2056)               Phone: (678) 279-5441
   Deborah Axt, Esq. (DA 4885)
23 MAKE THE ROAD NEW YORK                      Joshua A. Rosenthal, Esq.†
24 301 Grove Street                            NATIONAL IMMIGRATION LAW CENTER
   Brooklyn, NY 11237                          1121 14th Street NW
   Phone: (718) 418-7690                       Suite 200
25                                             Washington, DC 20005
                                               Phone: (202) 216-0261
26
27                                             *Attorneys for Plaintiffs*

28 * Motion for law-student appearance forthcoming
   † Motion for *pro hac vice* admission forthcoming

13

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I hereby certify that on October 4, 2017, I served a true and correct copy of **PLAINTIFFS' MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON,** |
| 3 | **ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, and MAKE THE ROAD NEW YORK'S FIRST SET OF** |
| 4 | **REQUESTS FOR ADMISSION TO JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES** on the parties in this action by |
| 5 | electronic mail transmission to the e-mail addresses listed below. |
| 6 | BRAD P. ROSENBERG |
| 7 | Senior Trial Counsel United States Department of Justice |
| 8 | Email: brad.rosenberg@usdoj.gov |
| 9 | STEPHEN M. PEZZI (D.C. Bar # 995500) Trial Attorney |
| 10 | United States Department of Justice Email: stephen.pezzi@usdoj.gov |
| 11 | |
| 12 | JOSEPH A. MARUTOLLO Assistant U.S. Attorney |
| 13 | United States Attorney's Office Eastern District of New York |
| 14 | Email: joseph.marutollo@usdoj.gov |
| 15 | *Attorneys for Defendants* |
| 16 | |
| 17 | This the 4th day of October, 2017 |
| 18 | |
| 19 | By /s/Joshua A. Rosenthal |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

14

AR1945

# EXHIBIT 3C

AR1946

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern*
Healy Ko, Law Student Intern*
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Melissa Keaney, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW
Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States, <br><br> *Defendants*. | **PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT JEFFERSON BEAUREGARD SESSIONS III PURSUANT TO RULE 34 OF THE FEDERAL RULES OF CIVIL PROCEDURE, SET ONE** <br><br> Case No. 1:16-cv-04756 (NGG) (JO) |

**PROPOUNDING PARTY:** MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, CAROLINA FUNG FENG, and MAKE THE ROAD NEW YORK

**RESPONDING PARTY:**   JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY

1    GENERAL OF THE UNITED STATES

2    **SET NUMBER:**          ONE

3        **PLEASE TAKE NOTICE** that, pursuant to Rule 34 of the Federal Rules of Civil

4    Procedure, Plaintiffs request that Defendant Sessions, in his official capacity as Attorney General

5    of the United States, produce for inspection, copying, and use all responsive documents

6    requested herein. As provided in Magistrate Judge Orenstein's September 27, 2017 Scheduling

7    Order, the documents requested shall be produced for inspection within fourteen (14) days of the

8    service of these Requests, and any objections to these requests shall be made within seven (7)

9    days of service of these requests. *See* Case Management and Scheduling Order 1, ECF No. 67.

10   Defendant Sessions's production of documents shall be in accordance with the Definitions and

11   Instructions set forth below, Fed. R. Civ. P. 34, and the Local Rules of the United States District

12   Court for the Eastern District of New York.

13                                      **Definitions:**

14        1.      The word "Plaintiffs" or "Plaintiff" shall mean Martín Batalla Vidal, Antonio

15   Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, Carolina Fung Feng, and Make

16   the Road New York, or any one or combination of those listed.

17        2.      The phrase "Individual Plaintiffs" or "Individual Plaintiff" shall mean Martín

18   Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and

19   Carolina Fung Feng, or any one or combination of these individuals.

20        3.      The term "Defendant" means Attorney General Jeff Sessions, in his official

21   capacity, and shall include all officers, directors, attorneys, agents, employees, and

22   representatives acting on his behalf, or any one or combination of the foregoing.

23        4.      The word "Defendants" shall mean President Donald J. Trump, Attorney General

24   Jeff Sessions, and Acting Secretary Elaine Duke, and shall include all officers, directors,

25   attorneys, agents, employees and representatives acting on behalf of Defendants, or any one or

26   combination of the foregoing.

27

28

1        5.     The word "persons" shall include individuals, firms, partnerships, corporations,

2   proprietorships, associations, trusts, estates, governmental units, and every other type of

3   organization or entity.

4        6.     The word "date" shall mean the exact date, month, and year if ascertainable;

5   otherwise, the word "date" shall mean the best available approximation, including relationship to

6   other events. If the day given is the best available approximation, Defendant Sessions should

7   identify it as such.

8        7.     The word "identify" when used in reference to: (a) an individual, shall mean to

9   state his/her full name, present or last known address and present or last known business

10  affiliation, job title, employment address and telephone number, if known; (b) a firm,

11  partnership, corporation, proprietorship, association, trust, estate or other organization, shall

12  mean to state its full name, present or last known address and telephone number; and (c) a

13  document, shall mean to state the title (if any), the date, author, sender, recipient, the identity of

14  the person signing, the type of document or such means as to identify it sufficiently to produce it

15  pursuant to Rule 34 of the Federal Rules of Civil Procedure, a summary of its contents, its

16  present location and custodian.

17       8.     "Department of Homeland Security" or "DHS" includes the Department of

18  Homeland Security, Customs and Border Protection (CBP), Citizenship and Immigration

19  Services (USCIS) and Immigration and Customs Enforcement (ICE).

20       9.     The word "you" or "your" shall refer to Defendant, as defined above.

21       10.     The acronym "DOJ employee" or "DOJ employees" shall refer to any person or

22  people currently or formerly employed by the U.S. Department of Justice.

23       11.     The acronym "DHS employee" or "DHS employees" shall refer to any person or

24  people currently or formerly employed by the U.S. Department of Homeland Security.

25       12.     The phrase "USCIS employee" or "USCIS employees" shall refer to any person

26  or people currently or formerly employed by USCIS.

27

28

J.A. 1210

AR1949

13.     The phrase "Trump Administration" shall refer to President Donald J. Trump and any person or people currently or formerly employed by the White House at any time since January 20, 2017.

14.     The phrase "DACA program" shall mean the Deferred Action for Childhood Arrivals program, established in a memorandum issued on June 15, 2012 by former Department of Homeland Security Secretary Janet Napolitano.

15.     The phrase "DAPA program" shall mean the Deferred Action for Parents of Americans and Lawful Permanent Residents program, established in a memorandum issued on November 20, 2014 by former Department of Homeland Security Secretary Jeh Charles Johnson.

16.     The phrase "expanded-DACA program" shall mean the expanded version of the Deferred Action for Childhood Arrivals program that was announced in the same memorandum as the DAPA program.

17.     The word "document" shall mean any "documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A); Local Rule 26.3(c)(2).

18.     The phrase "present for" shall include physical presence, telephone presence, or any form of electronic presence.

19.     The term "discussion" or "discussions" shall include meetings (in person, over the telephone, by video teleconference, or by electronic means), conversations (in person, over the telephone, or by electronic means), and any communication, including oral conversations (telephonic or in person), electronic communication (chat, e-mail, or otherwise), and paper communication.

20.     The phrases "relating to" and "relate to" shall be construed in the broadest sense and shall mean describing, setting forth, discussing, mentioning, commenting upon, supporting, contradicting or referring to the subject or topic in question, either in whole or in part.

4

AR1950

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 197 of 454    Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 699 of 1026 PageID #: 10290

Case 8:17-cv-02942-RWT    Document 29-5    Filed 11/28/17    Page 107 of 129

1    21.    The singular includes the plural and vice versa; "any" or "each" should be

2    understood to include and encompass "all"; "or" should be understood to include and encompass

3    "and"; "and" should be understood to include and encompass "or"; and "any" should be

4    understood to include and encompass "any" and "every;" "among" should be understood to

5    include and encompass "between" and "within."

6    22.    The connectives "and," "or," and "and/or" shall be construed either disjunctively

7    or conjunctively as necessary to bring within the scope of the discovery request all responses that

8    might otherwise be construed to be outside its scope.

9    23.    The use of a verb in any tense shall be construed as the use of the verb in all other

10    tenses, whenever necessary to bring into the scope of the specification all responses which might

11    otherwise be construed outside the scope.

12    24.    The use of any masculine or feminine pronoun includes both the masculine and

13    feminine.

14    **Instructions:**

15    1.    These Requests require the production of all responsive documents within the sole

16    or joint possession, custody, or control of Defendant including, but not limited to, any such

17    documents or things that lie within the possession, custody, or control of any agents, agencies,

18    departments, attorneys, employees, consultants, investigators, representatives, or other persons or

19    entities acting for, or otherwise subject to the control of, Defendant.

20    2.    These Requests are continuing in nature and require prompt supplemental

21    responses for any and all responsive documents that come into Defendant's sole or joint

22    possession, custody, or control after the service of any initial responses hereto.

23    3.    Each of these Requests requires a separate answer. For each document, indicate

24    the Request to which it responds.

25    4.    For any responsive document or portion thereof that is either redacted or

26    withheld, in whole or in part, on the basis of any assertion of privilege or other asserted

27    exemptions from discovery, identify each document so redacted or withheld. Under Local Rule

28

AR1951

1   26.2, with regard to all documents or portions of documents redacted or withheld on this basis,

2   identify:

3         a.     The type of document (e.g., letter or memorandum);

4         b.     The subject matter of the document;

5         c.     The date of the document;

6         d.     The author of the document, the addressees of the document, and any

7   other recipients, and, where not apparent, the relationship of the author, addressees, and

8   recipients to each other;

9         e.     The contents or subject matter of the document, with sufficient detail to

10   explain the basis for the privilege or exemption asserted, *see* Fed. R. Civ. P. 26(b)(5); and

11         f.     A detailed statement of the specific basis on which the privilege or

12   exemption is claimed.

13        5.     For any such responsive document or portion thereof that may not properly be

14   redacted or withheld in its entirety, produce each and every portion thereof to which the claims

15   of privilege or exemption do not apply and specify, on the face of each such page or portion, the

16   fact and reason for the redaction or withholding.

17        6.     If any document requested has been lost, discarded, or destroyed, identify such

18   document. State the type of document, its date, the approximate date it was lost, discarded, or

19   destroyed, the reason it was lost, discarded or destroyed, a summary of its substance, and the

20   identity of each person having knowledge of the contents thereof.

21        7.     These Requests are not intended to be duplicative. All requests should be

22   responded to fully and to the extent not covered by other requests. If there are documents or

23   tangible things that are responsive to more than one Request, please note which Requests the

24   document or thing is responsive to and produce the document or thing in response to the first

25   Request.

26        8.     All Requests are for the time period from January 1, 2012, through the present

27   and going forward, unless otherwise indicated.

28

AR1952

1    **DOCUMENTS REQUESTED:**

2       1.      All documents developed in whole or in part by the U.S. Department of Justice

3    ("DOJ") relating to the DACA program, including the decision to terminate it, from January 20,

4    2017, until the present, including:

5               a.      Any documents concerning the legality, lawfulness, or perceived legal

6           infirmities of the DACA program;

7               b.      Any document concerning the DOJ Office of Legal Counsel November

8           19, 2014 Memorandum entitled "The Department of Homeland Security's Authority to

9           Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to

10          Defer Removal of Others";

11              c.      Any documents concerning alternative proposals for the DACA program,

12          other than termination of the June 15, 2012 memorandum; and

13              d.      Any documents concerning Defendants' decisions (a) to terminate the

14          DACA program on September 5, 2017; (b) to set March 5, 2018, as the end date for

15          renewals; (c) to set October 5, 2017, as the deadline for renewal applications; and (d) to

16          stop accepting initial applications or renewal applications, from DACA recipients whose

17          status expired by September 5, 2017, as of September 5, 2017.

18      2.      Any documents that either were created or came into the possession of DOJ from

19    January 20, 2017, until the present, regarding *Texas, et al., v. United States, et al.*, No. 1:14-cv-

20    00254 (S.D. Tex.), including but not limited to:

21              a.      Any communications between DOJ and DHS, or between DHS and the

22          state attorney-general plaintiffs or their staff, offices, and affiliates regarding the *Texas v.*

23          *United States* litigation, the DACA program, and the DAPA and expanded-DACA

24          programs; and

25              b.      All discovery requests and responses.

26      3.      Any written or electronic communications, either created or that came into the

27    possession of DOJ from January 20, 2017 until the present, relating to the decision to terminate

28    the DACA program sent to or received from any of the following individuals:

7

**J.A. 1214**                                                                        **AR1953**

Appeal: 18-1521 Doc: 52-7 Filed: 07/02/2018 Pg: 590 of 754 Case 1:17-cv-05228-NGG-VMS Document 29-5 Filed 09/04/20 Page 702 of 1026 PageID #: 10293

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 110 of 129

1          a.      Gene Hamilton;

2          b.      Donald Neufeld.

3      4.      Any documents relating to the development or production of the following

4  documents:

5          a.      Deferred Action for Childhood Arrivals (DACA) Recipients: Learn About

6      Your Right to Work! (attached hereto as Exhibit A);

7          b.      Attorney General Sessions's letter to Secretary of Homeland Security

8      Elaine Duke regarding the DACA program (attached hereto as Exhibit B);

9          c.      Attorney General Sessions's remarks on September 5, 2017, announcing

10     the termination of the DACA program (attached hereto as Exhibit C).

11     5.      Any records describing the process, procedures, channels of review, or allocations

12 of responsibility for policy development, including for promulgating a legislative rule,

13 interpretive rule, general statement of policy, or guidance that was in effect from January 20,

14 2017 until the present. For this item, Plaintiffs seek policies that were in effect during the review

15 period, even if they were created prior to the review period.

16     6.      All guidance, memos, or other records developed in whole or in part by DOJ

17 regarding:

18         a.      The adjudication of initial DACA applications filed on or after September

19             6, 2017;

20         b.      The adjudication of renewals of DACA applications filed on or after

21             September 6, 2017; and

22         c.      Communications sent to those who filed initial DACA applications or

23             renewals of DACA applications on or after September 6, 2017.

24

25  Dated: September 30, 2017              By: /s/ Michael J. Wishnie

26  David Chen, Law Student Intern         Jessica R. Hanson, Esq. (*pro hac vice*)
    Susanna D. Evarts, Law Student Intern  Mayra B. Joachin, Esq. (*pro hac vice*)
27  Victoria Roeck, Law Student Intern*    Melissa Keaney, Esq. (*pro hac vice*)
    Healy Ko, Law Student Intern*          Karen C. Tumlin, Esq. (*pro hac vice*)
28  Hannah Schoen, Law Student Intern      NATIONAL IMMIGRATION LAW CENTER

8

AR1954

| | |
|---|---|
| 1 | Emily Villano, Law Student Intern* |
| | Muneer I. Ahmad, Esq. (*pro hac vice*) |
| 2 | Marisol Orihuela, Esq. (*pro hac vice*) |
| | Michael J. Wishnie, Esq. (MW 1952) |
| 3 | JEROME N. FRANK LEGAL SVCS. ORG. |
| | michael.wishnie@yale.edu |
| 4 | Phone: (203) 432-4800 |

P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW
Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[*] Motion for law-student appearance forthcoming
[†] Motion for *pro hac vice* admission forthcoming

AR1955

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2017, I served a true and correct copy of **PLAINTIFFS MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, and MAKE THE ROAD NEW YORK'S  REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT JEFFERSON BEAUREGARD SESSIONS III PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 34, SET ONE** on the parties in this action by electronic mail transmission to the e-mail addresses listed below.

BRAD P. ROSENBERG
Senior Trial Counsel
United States Department of Justice
Email: brad.rosenberg@usdoj.gov

STEPHEN M. PEZZI (D.C. Bar #995500)
Trial Attorney
United States Department of Justice
Email: stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
Email: joseph.marutollo@usdoj.gov

Attorneys for Defendants


This the 30th day of September, 2017


By   _/s/ Michael J Wishnie_

AR1956

# EXHIBIT A

AR1957

Appeal: 18-1521  Doc: 28-3  Filed: 07/02/2018  Pg: 594 of 754
Case 1:17-cv-05228-NGG-VMS  Document 82-7  Filed 09/04/20  Page 706 of 1026 PageID #: 10297
Case 8:17-cv-02942-RWT  Document 29-5  Filed 11/28/17  Page 114 of 129

![Office of Special Counsel for Immigration-Related Unfair Employment Practices — U.S. Department of Justice, Civil Rights Division]

## Deferred Action for Childhood Arrivals (DACA) Recipients:
## Learn About Your Right to Work!

The Civil Rights Division of the U.S. Department of Justice has an office dedicated to ensuring that employers do not discriminate against individuals who are permitted to work in the U.S., including DACA recipients who have been granted work-authorization.  Employers cannot ask DACA recipients for more or different work-authorization documents than what is permitted for the Form I-9 and cannot reject valid work-authorization documents because of a DACA recipient's citizenship status or national origin. It is also unlawful for an employer to fire or refuse to hire DACA recipients because of their national origin.

**1.  How can I tell if an employer is discriminating against me?**
An employer may be discriminating if the employer:
- Demands that certain workers show specific documents in order to complete the Form I-9, such as a driver's license or a "green card."
- Asks certain workers for more documents than necessary to complete the Form I-9.
- Rejects documents that appear to be genuine and are listed on the Form I-9, such as an unexpired Employment Authorization Document (EAD).
- Rejects a work-authorization document because it has a future expiration date.
- Refuses to hire an applicant because the worker has an accent.

**2.  What if my employer fires me for coming forward with new employment authorization and/or identity documents?**
In cases where a worker was using a false identity but has obtained work authorization status, the law does not require that the employee be terminated.  However, the employer may need to update or complete a new Form I-9.

**3.  Must I disclose my DACA status?**
You are usually not required to disclose your DACA status, but there are some exceptions.  Contact the Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) if your employer is requiring you to disclose your DACA status.

**4.  How will I be affected if my employer uses E-Verify?**
E-Verify is an electronic program that some employers use to confirm that their workers have permission to work.  An employer's use of E-Verify may be discriminatory on the basis of national origin or immigration status if the employer:
- Uses E-Verify to check only some new hires.
- Uses E-Verify to check only some existing workers (E-Verify should generally only be used at the time of hire.)
- Uses E-Verify to check only some applicants. (E-Verify should never be used before hire.)
- Refuses to allow certain workers with Tentative Non Confirmations (TNC) to work or delays their start dates while those workers are correcting their TNCs.
- Asks certain workers to run themselves through E-Verify's "Self Check" system.

**5.  Who should I call if I have questions or concerns?**
Call OSC's worker hotline at **1-800-255-7688,** 9am-5pm, ET (TTY for the hearing impaired: 1-800-237-2515). Your call can be anonymous, and interpreters are available.  In appropriate circumstances, OSC can call employers and inform them of the law and help get you back on the job quickly.  Note that it is illegal for an employer to intimidate, threaten, or retaliate against anyone for contacting the hotline. For more information, you may also visit http://www.justice.gov/crt/about/osc.

AR1958

# EXHIBIT B

AR1959

Appeal: 18-1521    Doc: 32-3    Filed: 07/02/2018    Pg: 537 of 454    Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 708 of 1026 PageID #: 10299

Case 8:17-cv-02942-RWT    Document 29-5    Filed 11/28/17    Page 116 of 129



## Office of the Attorney General
### Washington, D. C. 20530

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

J.A. 1221                                    AR1960

# EXHIBIT C

AR1961

# JUSTICE NEWS

### Attorney General Sessions Delivers Remarks on DACA

Washington, DC ~ Tuesday, September 5, 2017

---

### Remarks as prepared for delivery

Good morning. I am here today to announce that the program known as DACA that was effectuated under the Obama Administration is being rescinded.

The DACA program was implemented in 2012 and essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program, to 800,000 mostly-adult illegal aliens.

This policy was implemented unilaterally to great controversy and legal concern after Congress rejected legislative proposals to extend similar benefits on numerous occasions to this same group of illegal aliens.

In other words, the executive branch, through DACA, deliberately sought to achieve what the legislative branch specifically refused to authorize on multiple occasions. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens.

We inherited from our Founders—and have advanced—an unsurpassed legal heritage, which is the foundation of our freedom, safety, and prosperity.

As the Attorney General, it is my duty to ensure that the laws of the United States are enforced and that the Constitutional order is upheld.

No greater good can be done for the overall health and well-being of our Republic, than preserving and strengthening the impartial rule of law. Societies where the rule of law is treasured are societies that tend to flourish and succeed.

Societies where the rule of law is subject to political whims and personal biases tend to become societies afflicted by corruption, poverty, and human suffering.

To have a lawful system of immigration that serves the national interest, we cannot admit everyone who would like to come here. That is an open border policy and the American people have rightly rejected it.

Therefore, the nation must set and enforce a limit on how many immigrants we admit each year and that means all can not be accepted.

This does not mean they are bad people or that our nation disrespects or demeans them in any way. It means we are properly enforcing our laws as Congress has passed them.

It is with these principles and duties in mind, and in light of imminent litigation, that we reviewed the Obama Administration's DACA policy.

Our collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program, which was enjoined on a nationwide basis in a decision affirmed by the

J.A. 1223

AR1962

Fifth Circuit.

The Fifth Circuit specifically concluded that DACA had not been implemented in a fashion that allowed sufficient discretion, and that DAPA was "foreclosed by Congress's careful plan."

In other words, it was inconsistent with the Constitution's separation of powers. That decision was affirmed by the Supreme Court by an equally divided vote.

If we were to keep the Obama Administration's executive amnesty policy, the likeliest outcome is that it would be enjoined just as was DAPA. The Department of Justice has advised the President and the Department of Homeland Security that DHS should begin an orderly, lawful wind down, including the cancellation of the memo that authorized this program.

Acting Secretary Duke has chosen, appropriately, to initiate a wind down process. This will enable DHS to conduct an orderly change and fulfill the desire of this administration to create a time period for Congress to act—should it so choose. We firmly believe this is the responsible path.

Simply put, if we are to further our goal of strengthening the constitutional order and the rule of law in America, the Department of Justice cannot defend this type of overreach.

George Washington University Law School Professor Jonathan Turley in testimony before the House Judiciary Committee was clear about the enormous constitutional infirmities raised by these policies.

He said: "In ordering this blanket exception, President Obama was nullifying part of a law that he simply disagreed with. ….If a president can claim sweeping discretion to suspend key federal laws, the entire legislative process becomes little more than a pretense…The circumvention of the legislative process not only undermines the authority of this branch but destabilizes the tripartite system as a whole."

Ending the previous Administration's disrespect for the legislative process is an important first step. All immigration policies should serve the interests of the people of the United States—lawful immigrant and native born alike.

Congress should carefully and thoughtfully pursue the types of reforms that are right for the American people. Our nation is comprised of good and decent people who want their government's leaders to fulfill their promises and advance an immigration policy that serves the national interest.

We are a people of compassion and we are a people of law. But there is nothing compassionate about the failure to enforce immigration laws.

Enforcing the law saves lives, protects communities and taxpayers, and prevents human suffering. Failure to enforce the laws in the past has put our nation at risk of crime, violence and even terrorism.

The compassionate thing is to end the lawlessness, enforce our laws, and, if Congress chooses to make changes to those laws, to do so through the process set forth by our Founders in a way that advances the interest of the nation.

That is what the President has promised to do and has delivered to the American people.

Under President Trump's leadership, this administration has made great progress in the last few months toward establishing a lawful and constitutional immigration system. This makes us safer and more secure.

It will further economically the lives of millions who are struggling. And it will enable our country to more effectively teach new immigrants about our system of government and assimilate them to the cultural understandings that support it.

The substantial progress in reducing illegal immigration at our border seen in recent months is almost entirely the product of the leadership of President Trump and his inspired federal immigration officers. But the problem is not solved. And without more action, we could see illegality rise again rather than be eliminated.

As a candidate, and now in office, President Trump has offered specific ideas and legislative solutions that will protect American workers, increase wages and salaries, defend our national security, ensure the public safety, and increase the

J.A. 1224

AR1963

general well-being of the American people.

He has worked closely with many members of Congress, including in the introduction of the RAISE Act, which would produce enormous benefits for our country. This is how our democratic process works.

There are many powerful interest groups in this country and every one of them has a constitutional right to advocate their views and represent whomever they choose.

But the Department of Justice does not represent any narrow interest or any subset of the American people. We represent all of the American people and protect the integrity of our Constitution. That is our charge.

We at Department of Justice are proud and honored to work to advance this vision for America and to do our best each day to ensure the safety and security of the American people.

Thank you.

---

**Speaker:**
Attorney General Jeff Sessions

**Attachment(s):**
Download ag_letter_re_daca.pdf

**Topic(s):**
Immigration

**Component(s):**
Office of the Attorney General

*Updated September 5, 2017*

J.A. 1225

AR1964

# EXHIBIT 3D

AR1965

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern[*]
Healy Ko, Law Student Intern[*]
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq. (Bar No. 5343314)[†]
Alexia Schapira, Esq. (Bar No. 4625547)[†]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[*] Motion for law-student appearances forthcoming.
[†] Application for admission in the Eastern District of New York forthcoming.

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals,

*Plaintiffs,*

v.

ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFREY BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States,

*Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT JEFFERSON BEAUREGARD SESSIONS III PURSUANT TO RULE 34 OF THE FEDERAL RULES OF CIVIL PROCEDURE, SET TWO**

Case No. 1:16-cv-04756 (NGG) (JO)

**PROPOUNDING PARTY:** MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, CAROLINA FUNG

Appeal 18-1521, Document 28-7 Page 715 of 1026
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 715 of 1026 PageID #: 10306
Case 8:17-cv-02942-RWT Document 29-5 Filed 11/28/17 Page 123 of 129

1    FENG, and MAKE THE ROAD NEW YORK

2    **RESPONDING PARTY:**    JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY
                              GENERAL OF THE UNITED STATES
3
     **SET NUMBER:**    TWO
4

5          **PLEASE TAKE NOTICE** that, pursuant to Rule 34 of the Federal Rules of Civil

6    Procedure, Plaintiffs request that Defendant Sessions, in his official capacity as Attorney General

7    of the United States, produce for inspection, copying, and use all responsive documents

8    requested herein. As provided in Magistrate Judge Orenstein's September 27, 2017 Scheduling

9    Order, the documents requested shall be produced for inspection within fourteen (14) days of the

10   service of these Requests, and any objections to these requests shall be made within seven (7)

     days of service of these requests. *See* Case Management and Scheduling Order 1, ECF No. 67.
11
     Defendant Sessions's production of documents shall be in accordance with the Definitions and
12
     Instructions set forth below, Fed. R. Civ. P. 34, and the Local Rules of the United States District

13   Court for the Eastern District of New York.

14         The following Definitions and Instructions shall apply to each and every part of this

     Second Set of Request for Production.
15

16                                        **Definitions:**

17         1.    The word "Plaintiffs" or "Plaintiff" shall mean Martín Batalla Vidal, Antonio

18   Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, Carolina Fung Feng, and Make

19   the Road New York, or any one or combination of those listed.

20         2.    The phrase "Individual Plaintiffs" or "Individual Plaintiff" shall mean Martín

21   Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and

     Carolina Fung Feng, or any one or combination of these individuals.
22
           3.    The word "Defendant" means Attorney General Jefferson Beauregard Sessions
23
     III, in his official capacity, and shall include all officers, directors, attorneys, agents, employees,
24
     and representatives acting on his behalf, or any one or combination of the foregoing.
25
           4.    The word "Defendants" shall mean President Donald J. Trump, Attorney General
26
     Jefferson Beauregard Sessions III, and Acting Secretary Elaine Duke, and shall include all
27
     officers, directors, attorneys, agents, employees and representatives acting on behalf of

28   Defendants, or any one or combination of the foregoing.

                                             2

AR1967

5.      The word "persons" shall include individuals, firms, partnerships, corporations, proprietorships, associations, trusts, estates, governmental units, and every other type of organization or entity.

6.      The word "date" shall mean the exact date, month, and year if ascertainable; otherwise, the word "date" shall mean the best available approximation, including relationship to other events. If the day given is the best available approximation, Defendant Duke should identify it as such.

7.      The word "identify" when used in reference to: (a) an individual, shall mean to state his/her full name, present or last known address, and present or last known business affiliation, job title, employment address, and telephone number, if known; (b) a firm, partnership, corporation, proprietorship, association, trust, estate, or other organization, shall mean to state its full name, present or last known address, and telephone number; and (c) a document, shall mean to state the title (if any), the date, author, sender, recipient, the identity of the person signing, the type of document or such means as to identify it sufficiently to produce it pursuant to Rule 34 of the Federal Rules of Civil Procedure, a summary of its contents, its present location, and custodian.

8.      "Department of Homeland Security" or "DHS" includes the Department of Homeland Security, Customs and Border Protection (CBP), Citizenship and Immigration Services (USCIS) and Immigration and Customs Enforcement (ICE).

9.      The word "you" or "your" shall refer to Defendant, as defined above.

10.      The phrase "DHS employee" or "DHS employees" shall refer to any person or people currently or formerly employed by the U.S. Department of Homeland Security.

11.      The phrase "DOJ employee" or "DOJ employees" shall refer to any person or people currently or formerly employed by the U.S. Department of Justice.

12.      The phrase "USCIS employee" or "USCIS employees" shall refer to any person or people currently or formerly employed by USCIS.

13.      The phrase "Trump Administration" shall refer to President Donald J. Trump and any person or people currently or formerly employed by the White House at any time since January 20, 2017.

3

J.A. 1229

AR1968

Appeal: 18-1521 Document: 28 Filed: 07/02/2018 Pg: 457 of 454
Case 1:17-cv-05228-NGG-VMS Document 28-17 Filed 09/04/20 Page 717 of 1026 PageID #: 10308

Case 8:17-cv-02942-RWT   Document 29-5   Filed 11/28/17   Page 125 of 129

14.     The phrase "DACA program" shall mean the Deferred Action for Childhood Arrivals program, established in a memorandum issued on June 15, 2012 by former Department of Homeland Security Secretary Janet Napolitano.

15.     The phrase "executive branch" shall mean the Trump Administration and all Executive agencies, as defined by 5 U.S.C. § 105.

16.     The term "policy" shall mean the DACA program, the lawfulness of the DACA program, and the decision on whether to continue or terminate the DACA program.

17.     The term "actions" shall mean: the termination of the DACA program on September 5, 2017; setting March 5, 2018 as the last DACA-status expiration date for individuals allowed to renew DACA-status; setting October 5, 2017 as the end date for renewal applications; having stopped accepting initial applications or renewal applications from DACA recipients whose status expired by September 5, 2017, as of September 5, 2017; any notices that were sent to DACA recipients regarding renewal of DACA status, whether such notice reflected the termination of the DACA program; and the use of information provided by DACA applicants.

18.     The term "process" shall include, but not be limited to, all communications, meetings, and/or discussions that Defendants or other persons were present for or participated in relating to the lawfulness of DACA, the decision to terminate the DACA program, and the nature of the DACA termination.

19.     The word "document" shall mean any "documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A); Local Rule 26.3(c)(2).

20.     The phrase "present for" shall include physical presence, telephone presence, or any form of electronic presence.

21.     The term "discussion" or "discussions" shall include meetings (in person, over the telephone, by video teleconference, or by electronic means), conversations (in person, over the telephone, or by electronic means), and any communication, including oral conversations

4

AR1969

(telephonic or in person), electronic communication (chat, e-mail, or otherwise), and paper communication.

22.    The phrases "relating to" and "relate to" shall be construed in the broadest sense and shall mean describing, setting forth, discussing, mentioning, commenting upon, supporting, contradicting, or referring to the subject or topic in question, either in whole or in part.

23.    The term "considered" shall be construed in the broadest sense and shall mean reviewed, examined, analyzed, developed, relied upon, or noted.

24.    The singular includes the plural and vice versa; "any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; "and" should be understood to include and encompass "or"; and "any" should be understood to include and encompass "any" and "every"; "among" should be understood to include and encompass "between" and "within."

25.    The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

26.    The use of a verb in any tense shall be construed as the use of the verb in all other tenses, whenever necessary to bring into the scope of the specification all responses which might otherwise be construed outside the scope.

27.    The use of any masculine or feminine pronoun includes both the masculine and feminine.

**Instructions:**

1.    These Requests require the production of all responsive documents within the sole or joint possession, custody, or control of Defendant including, but not limited to, any such documents or things that lie within the possession, custody, or control of any agents, agencies, departments, attorneys, employees, consultants, investigators, representatives, or other persons or entities acting for, or otherwise subject to the control of, Defendant.

2.    These Requests are continuing in nature and require prompt supplemental responses for any and all responsive documents that come into Defendant's sole or joint possession, custody, or control after the service of any initial responses hereto.

3.    Each of these Requests requires a separate answer. For each document, indicate the Request to which it responds.

4.    For any responsive document or portion thereof that is either redacted or withheld, in whole or in part, on the basis of any assertion of privilege or other asserted exemptions from discovery, identify each document so redacted or withheld. Under Local Rule 26.2, with regard to all documents or portions of documents redacted or withheld on this basis, identify:

a.    The type of document (e.g., letter or memorandum);

b.    The subject matter of the document;

c.    The date of the document;

d.    The author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other;

e.    The contents or subject matter of the document, with sufficient detail to explain the basis for the privilege or exemption asserted, *see* Fed. R. Civ. P. 26(b)(5); and

f.    A detailed statement of the specific basis on which the privilege or exemption is claimed.

5.    For any such responsive document or portion thereof that may not properly be redacted or withheld in its entirety, produce each and every portion thereof to which the claims of privilege or exemption do not apply and specify, on the face of each such page or portion, the fact and reason for the redaction or withholding.

6.    If any document requested has been lost, discarded, or destroyed, identify such document. State the type of document, its date, the approximate date it was lost, discarded, or destroyed, the reason it was lost, discarded or destroyed, a summary of its substance, and the identity of each person having knowledge of the contents thereof.

7.    These Requests are not intended to be duplicative. All requests should be responded to fully and to the extent not covered by other requests. If there are documents or tangible things that are responsive to more than one Request, please note which Requests the

6

1    document or thing is responsive to and produce the document or thing in response to the first

2    Request.

3          8.      All Requests are for the time period from January 1, 2012, through the present

4    and going forward, unless otherwise indicated.

5                                    **Documents Requested:**

6

7          1.      All documents considered within any component of the executive branch as part

     of the process of determining the policy and actions at issue in *Batalla Vidal*.

8

9

     Dated: October 3, 2017              By:      /s/ Justin B. Cox

10

11   David Chen, Law Student Intern                 Jessica R. Hanson, Esq. (*pro hac vice*)
     Susanna D. Evarts, Law Student Intern          Mayra B. Joachin, Esq. (*pro hac vice*)
     Victoria Roeck, Law Student Intern*            Karen C. Tumlin, Esq. (*pro hac vice*)

12   Healy Ko, Law Student Intern*                  NATIONAL IMMIGRATION LAW CENTER
     Hannah Schoen, Law Student Intern              P.O. Box 70067

13   Emily Villano, Law Student Intern              Los Angeles, CA 90070
     Muneer I. Ahmad, Esq. (*pro hac vice*)         Phone: (213) 639-3900

14   Marisol Orihuela, Esq. (*pro hac vice*)
     Michael J. Wishnie, Esq. (MW 1952)             Justin B. Cox, Esq. (*pro hac vice*)

15   JEROME N. FRANK LEGAL SVCS. ORG.               NATIONAL IMMIGRATION LAW CENTER
     michael.wishnie@yale.edu                       PO Box 170208

16   Phone: (203) 432-4800                          Atlanta, GA 30317
                                                     Phone: (678) 279-5441

17   Amy S. Taylor, Esq. (AT 2056)
     Deborah Axt, Esq. (DA 4885)                    Joshua A. Rosenthal, Esq. (*pro hac vice*)

18   Scott Foletta, Esq. (Bar No. 5343314)†         NATIONAL IMMIGRATION LAW CENTER
     Alexia Schapira, Esq. (Bar No. 4625547)†       1121 14th Street NW, Suite 200

19   MAKE THE ROAD NEW YORK                         Washington, DC 20005
     301 Grove Street                               Phone: (202) 216-0261

20   Brooklyn, NY 11237
     Phone: (718) 418-7690                          *Attorneys for Plaintiffs*

21

22   * Motion for law-student appearances forthcoming.
     † Application for admission in the Eastern District of New York forthcoming.

23

24

25

26

27

28

                                              7

<center>**CERTIFICATE OF SERVICE**</center>

1

2          I hereby certify that on October 3, 2017, I served a true and correct copy of
3    **PLAINTIFFS MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON,**
     **ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and**
4    **CAROLINA FUNG FENG, and MAKE THE ROAD NEW YORK'S  REQUESTS FOR**
     **PRODUCTION OF DOCUMENTS TO DEFENDANT JEFFERSON SESSIONS**
5    **PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 34, SET TWO** on the parties
     in this action by electronic mail transmission to the e-mail addresses listed below.

6    BRAD P. ROSENBERG
     Senior Trial Counsel
7    United States Department of Justice
     Email: brad.rosenberg@usdoj.gov
8
     STEPHEN M. PEZZI (D.C. Bar # 995500)
9    Trial Attorney
     United States Department of Justice
10   Email: stephen.pezzi@usdoj.gov

11   JOSEPH A. MARUTOLLO
     Assistant U.S. Attorney
12   United States Attorney's Office
     Eastern District of New York
13   Email: joseph.marutollo@usdoj.gov

14   *Attorneys for Defendants*

15

16          This the 3rd day of October, 2017

17
                    By          /s/ Justin B. Cox
18                              Justin B. Cox, Esq. (*pro hac vice*)
                                NATIONAL IMMIGRATION LAW CENTER
19                              PO Box 170208
                                Atlanta, GA 30317
20                              Phone: (678) 279-5441

21

22

23

24

25

26

27

28

<center>8</center>

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND, et al., | |
| Plaintiffs, | |
| v. | Case Number 17-02942 |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | |
| Defendants. | |

## DECLARATION OF GEORGE ESCOBAR, SENIOR DIRECTOR OF HUMAN SERVICES FOR CASA DE MARYLAND

I, George Escobar, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.    I am the Senior Direct of Human Services of CASA de Maryland, Inc. ("CASA").

2.    CASA is a non-profit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, and Pennsylvania.

3.    Founded in 1979, CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 90,000 members.

4.    The mission of CASA is "[t]o create a more just society by building power and improving the quality of life in low-income immigrant communities." At CASA, we envision "[a] future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all."

5.    In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, as well as the greater Washington DC metropolitan area, Virginia, and Pennsylvania. CASA also conducts

campaigns to inform members of immigrant communities of their rights, to establish sanctuary cities, and to persuade state legislators to support bills providing driver's licenses to undocumented immigrants.

6.      CASA has provided assistance on nearly 4,000 DACA and DACA renewal applications since 2012, and counts more than 2,300 DACA beneficiaries as members, including several members of CASA's staff.

7.      After the September 5, 2017 DACA rescission, CASA has had to reallocate significant resources to counsel and assist Dreamers who are eligible to renew their DACA in the arbitrarily narrow window the administration announced.

8.      CASA's small legal team, composed of three attorneys and five support staff, suspended the majority of their work to assist DACA renewal applicants, depriving community members of access to other vital legal services.

9.      In addition, members of CASA's community organizing department, as well as other CASA departments, reprioritized their work to engage with the community and educate them about the rescission of DACA and connect eligible individuals to application assistance services.

10.     Since October 5, 2017, CASA staff have put considerable resources into advocating for a legislative solution for those who are going to lose their DACA status. Although CASA has long advocated for passage of the DREAM Act, that advocacy has taken on significantly greater intensity, and required massive additional staff time, due to the impending end of the DACA program.

11.     The rescission of DACA has caused significant disruption in CASA's legal program, forcing our organization to develop new priorities, begin to revise staff work plans to

AR1975

Appeal: 18-1521 Document: 28-7 Filed: 07/02/2018 Pg: 557 of 754
Case 1:17-cv-05228-NGG-VMS Document 2827 Filed 09/04/20 Page 724 of 1026 PageID #: 10315

Case 8:17-cv-02942-RWT   Document 29-6   Filed 11/28/17   Page 3 of 5

prioritize providing a wider array of support to DACA beneficiaries whose status will expire, and

focus additional resources on providing DACA recipients with comprehensive immigration

consultations.  As we move closer to March 5, 2018, CASA will be forced to engage in massive

public education about the implications of DACA ending, and provide individuals whose status

is expiring with comprehensive immigration screenings and additional case management

assistance not previously contemplated.

   12.     As our more than 2,300 members who currently benefit from DACA begin to lose

their status, CASA may be required to employ additional resources to defend those individuals

who will now be potential targets for deportation.  This will require expensive and time-

consuming professional development of CASA staff.

   13.     In addition to CASA members who are affected by the DACA rescission, CASA

also has several staff with DACA status.  Named Plaintiff Luis Aguilar is a 29-year-old DACA

recipient, employed by CASA as an Advocacy & Elections Manager in Virginia.  Luis's DACA

and work permit are scheduled to expire in March 2019.  Named Plaintiff Eliseo Mages is a 23

year old resident of Capital Heights, Maryland.  In April 2004, at  the age of 11, he was brought

to the United States from Mexico so that he and his brother could have a better education and a

better life.  Eliseo applied for and received DACA.  Following receipt of his  work permit, he

worked in a paint store (ultimately being promoted to manager) while he earned a college degree

as a Veterinarian's Assistant.  He is currently employed at CASA.  His DACA is due to expire in

2019.  Due to the DACA  rescission, he is concerned he will not be able to keep his current job at

CASA and will not be able to obtain employment with a veterinarian.  Luis and Eliseo are also

CASA members.

- 3 -

**AR1976**

14.     CASA also employs Daniel Nino, a 23-year-old DACA recipient, as a Human Resources Program Assistant.  Daniel's DACA is scheduled to expire in October 2019.  In addition to being a CASA employee, Daniel has also been a CASA member since 2013.  Daniel relied on the government's assurances that his information would not be shared with immigration enforcement agents when he initially applied for, and subsequently renewed, his DACA status. Daniel is one of the approximately 2,300 CASA members who will be negatively impacted by the rescission of DACA.

15.     Because of the rescission of DACA, CASA stands to lose several valuable employees and will be forced to spend resources to find and train replacements for Luis, Eliseo, and Daniel.

16.     Another CASA member, and DACA recipient, affected by the rescission is Z.R. Z.R. has been a CASA member since 2016.  She is 35 years old and a single mother to a 7-year-old United States citizen son.  Z.R.'s DACA is set to expire in April 2018, and as such she was not eligible to renew her DACA under the conditions of the rescission memo.  On September 5, 2017, the day the government announced the rescission of DACA, Z.R. was in the process of closing on a new home in Virginia.  Due to the fact that she was unable to renew her DACA status, her bank delayed processing her home loan and she was subsequently forced to scramble to find alternative housing arrangements, since she had already made plans to move out of the apartment she was renting.  Although the bank eventually agreed to process the loan, with two co-signers who have permanent immigration status, Z.R. likely will not move forward with the purchase due to the uncertainty surrounding her immigration status.  Z.R. also relied on the government's assurances that it would not share her information with immigration enforcement authorities when she applied for, and subsequently renewed, her DACA.  Now Z.R. faces

- 4 -

J.A. 1238                                                                                          AR1977

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 156 of 454
Case 1:17-cv-05228-NGG-VMS    Document 2-27    Filed 09/04/20    Page 726 of 1026 PageID #: 10317

Case 8:17-cv-02942-RWT    Document 29-6    Filed 11/28/17    Page 5 of 5

uncertain employment prospects when her work authorization expires with her DACA in April, and she fears that she will be subject to deportation, which could permanently separate her from her son.  With her DACA expiring, Z.R. will also lose her driver's license in Virginia, making it incredibly difficult for her to access basic services, drop her son off at school, or even just go the grocery store.

17.    Individual Plaintiffs Missael Garcia, Esteffany Rodriguez, A.M., J.M.O., Jose Aguiluz, Angel Aguiluz, Brenda Moreno Martinez, Nathaly Uribe Robledo, Jesus Eusebio Perez, and Annabelle Martinez Herra are also CASA members.

18.    The rescission of DACA has had a significant negative impact on CASA's mission, as DACA members and their families who live in our communities face an uncertain future that may include loss of employment and potential permanent separation from their families.

I hereby declare under penalty of perjury that the foregoing is true and correct.

DATED:  November 28, 2017

George Escobar
Senior Director of Human Services
CASA

- 5 -

    AR1978

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, et al.,

    Plaintiffs,

        v.

Case Number 17-02942

U.S. DEPARTMENT OF
HOMELAND SECURITY, et al.,

    Defendants.

## DECLARATION OF RICHARD STOLZ

    I, Richard Stolz, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.    I am the Executive Director of OneAmerica.

    2.    OneAmerica is located in Seattle, Washington.  Formed directly after September 11, 2001 in response to hate crimes and discrimination targeting Arabs, Muslims, South Asians, and undocumented immigrants, OneAmerica serves immigrant and refugee communities, including undocumented immigrants and legal permanent residents living in Washington State, with a geographic focus on King, Clark, Yakima and Skagit counties.

    3.    OneAmerica has grown into a leading force for immigrant, civil and human rights.  The mission of OneAmerica is to "advance[] the fundamental principles of democracy and justice at the local, state and national levels by building power within immigrant communities in collaboration with key allies."

    4.    OneAmerica has five primary goals: (1) to increase and enhance the participation of immigrants in civic life; (2) to win positive policy change for immigrant communities locally and nationally; (3) to improve the public climate for immigrant communities locally and

nationally; (4) to increase the capacity of immigrant leaders and organizations across Washington to lead and advocate for change; and (5) to increase OneAmerica's organizational capacity to achieve its mission effectively, efficiently, and sustainably. It achieves these goals by focusing on community organizing, civic engagement, and advocacy.

5.      OneAmerica advocates for immigration policies and practices to best address the needs of immigrant and refugee communities in partnership with immigrant and refugee community members.

6.      Fighting for immigrants and immigration reform is not new to OneAmerica. At the national level, OneAmerica has advocated for the DREAM Act, for Comprehensive Immigration Reform, and for administrative policies important to immigrant and refugee communities through the Department of Justice, Department of Homeland Security, the Department of Human Services, and the Department of Education. At the local and State level, OneAmerica has driven significant immigration-related reforms as well. In 2014, OneAmerica led a coalition of organizations to successfully convince the King County Council to enact a policy to prevent local law enforcement agencies from honoring detainer requests for undocumented immigrant inmates that were not accompanied by a judicial warrant. OneAmerica also succeeded in working with a bipartisan coalition of legislators to pass the Washington State Dream Act, which extended student need grants to undocumented youth in Washington State. Both of these campaigns were selected by and led by undocumented youth (many of whom are DACA recipients or DACA eligible) members of OneAmerica in Washington State.

7.      OneAmerica has 125 active members and 400 volunteers and 35,000 supporters. Membership in OneAmerica is not based on dues but rather consistent participation in a "base

- 2 -

**AR1980**

community," which are recurring community meetings in Vancouver, South King County, Mount Vernon and Yakima, and community trainings.

8.    Members play a key role in our organization. Members are involved in our decision-making as to what issues, how, and for whom we advocate, and also provide grassroots leadership to further our organizational goals.

9.    Thirty-three of OneAmerica's 125 members are DACA recipients who will be directly affected by the rescission of DACA. OneAmerica is very concerned that if these members lose their DACA status they will also lose their employment and face deportation, putting them and their family members at risk of lost income and separation.

10.    This rescission of DACA has greatly increased the stress on our members, their families, and our community. It has made it more difficult for them to plan their lives, particularly with regard to future educational and employment opportunities and has discouraged them from engaging in advocacy out of fear that they will face retaliation from immigration officials.

11.    For example, Sharon is a leader at OneAmerica actively involved in our leadership team and base community in King County. Sharon started volunteering at OneAmerica about a year ago. As a leader, she has canvassed to help turn out the vote in predominantly Latino and immigrant communities, she has organized rallies and events, and she has trained other community members on key organizing tools she has learned in OneAmerica trainings. In August 2012 she was granted DACA and she has renewed her permit ever since. Her current Employment Authorization Card expires August 28, 2018. Ending DACA would affect not only her but her family as well. One of the reasons Sharon felt comfortable signing up for DACA was because of the promise that her personal information would not be shared with

- 3 -

AR1981

immigration enforcement. Because this promise has been rescinded, she is now living in fear of deportation. In her own words, "The thought of being deported is a horrendous feeling of uncertainty. The stress and anxiety I have is shared with my immediate family who don't know how to help. The fear of being sent to an unknown country where organized crime reigns is basically a death sentence. I would lose my job after four years of employment and I would lose the opportunity to grow in a career that I love. Through DACA, I was able to earn my Bachelor's degree in Business Management and I am currently studying for a certificate in International Trade and Logistics at Highline College. My goal is to continue my education and eventually earn my Master's degree in Supply Chain Management. I am also a volunteer for other nonprofit organizations like the Junior League, which helps the community and supports women in becoming leaders."

12.     Another example is Angel, who is an active youth leader with OneAmerica and a student in a south King County school district. Angel was motivated by the opportunity created by DACA, and his grades, motivation and involvement in school drastically increased. That spark also inspired his mother to become more involved in his and his younger siblings' studies. Without DACA, Angel's educational opportunities and career options will be limited. He's worried about how this will impact his eligibility for programs and schools, scholarships and opportunities for higher education. Importantly, Angel felt comfortable signing up for DACA because of the promise that his personal information would not be shared with immigration enforcement, and as a result of the rescission of this promise, he is now also living in fear of deportation.

- 4 -

13.     Even those OneAmerica members who are not DACA recipients will likely be affected by DACA's rescission, as they are active community leaders in immigrant communities or are members of families that have a family member participating in DACA.

14.     OneAmerica offers Community Organizing and Leadership Development, Naturalization Services, Know Your Rights Training, Referral Services, Issue Advocacy around education, immigration, and environmental justice, Civic Engagement programs, and English Innovations, which includes English as a Second Language and digital education for Limited English Proficiency adults.

15.     Due to the rescission of DACA, OneAmerica has had to increase its Know Your Rights programming and Referral Services.  The Referral Services are particularly busy, as OneAmerica is receiving two to three inquiries per day from people seeking advice on whether they should apply to renew their DACA and other DACA-related concerns, meaning a total of approximately 200 since the rescission of DACA.  OneAmerica is unable to keep pace with all of these inquiries, and has referred many questions to other organizations providing direct legal services.

16.     This increased need for DACA-related programming has stretched OneAmerica's limited resources and forced it to pull back from its other work, particularly its environmental justice advocacy programming, in order to address the needs of DACA recipients in Washington State.  In response to a study that showed that low-income immigrant and refugee communities are particularly impacted by pollution, OneAmerica had been working to affect change with regard to pollution at the state and local levels, but because of the need for increased focus on DACA, it has diverted its financial resources and staff away from those environmental issues and towards DACA.  The anti-pollution campaign is now on hold.

- 5 -

17.    In addition, OneAmerica employs a DACA recipient, Dania, as a book keeper. Due to the rescission of DACA, Dania has been under greater stress and has therefore been less productive. In the next eighteen months, Dania will lose her work authorization, and at that time OneAmerica will need to terminate her employment. Terminating this employee would mean expending additional limited resources to find, hire, and train a replacement, or pushing our current staff to cover her duties. Prior to employment with OneAmerica, Dania was also an active leader and education advocate. She is also an aspiring early learning educator, and community leader. Dania has been a DACA recipient since 2013. The DACA rescission has impacted and will continue to impact Dania through limiting her access to education funds to continue to pursue her academic and career goals. She is currently enrolled in community college and continues to take courses to pursue her career as a bilingual dual language teacher. This rescission will also impact and limit her job opportunities. Since having DACA she was able to find employment in spaces that paid higher wages and were connected to career paths that she had an interest in pursuing. She also loves to travel, whether it's to go to her favorite place on earth "Disneyland", travel to another state for a concert or attend conferences related to education equity, immigration reform and her career goals. This decision will impact her ability to travel.

18.    The announcement of the rescission of DACA has had a significant impact on our organization. OneAmerica is accountable to its members who participate in all aspects of the organization from decision-making to setting policies to leading our grass roots efforts. The added stress and uncertainty as to their status affects the choices we make as an organization and strains our already stretched organizational capacity. Risk of deportation only further impedes our ability to serve and empower the immigrant communities in Washington.

- 6 -

AR1984

I hereby declare under penalty of perjury that the foregoing is true and correct.

DATED:  November 26, 2017

_____

Richard Stolz

AR1985

Appeal: 18-1521    Doc: 52-6    Filed: 07/02/2018    Pg: 662 of 454    Page 734 of 1026 PageID #:
10325
Case 1:17-cv-02942-RWT   Document 29-8   Filed 11/28/17   Page 1 of 6
Case 8:17-cv-02942-RWT   Document 29-8   Filed 11/28/17   Page 1 of 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CASA DE MARYLAND, et al., | |
| Plaintiffs, | |
| v. | Case Number 17-02942 |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | |
| Defendants. | |

**DECLARATION OF SERGIO OLMEDO RAMIREZ**

I, Sergio Olmedo Ramirez, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.      I am a community and youth organizer in the advocacy department of Junta for Progressive Action, Inc. ("Junta").

2.      Junta is a direct services organization located in New Haven, CT, with a mission to "provide services, programs and advocacy that improve the social, political and economic conditions of the Latino community in greater New Haven while nurturing and promoting its cultural traditions as it builds bridges with other communities."  To this end, it primarily focuses on adult education, economic development, and family development.

3.      To improve the lives of community members, Junta provides programs such as six levels of English as a Second Language classes, G.E.D. classes in English and Spanish, citizenship/naturalization tutoring, job preparation workshops, computer literacy classes, legal referral services, tax preparation and arts and crafts (for business development).

4.      Junta also provides a free after-school arts program, a summer program, and a free sleep-away summer camp.  Junta supports families in need by providing referrals to service

**AR1986**

providers and benefit application assistance, as well as free diapers, free or reduced price furniture, free internet service, and holiday toys.

5.  Through its advocacy department, Junta provides legal information on topics including but not limited to divorce, pregnancy leave, child support, child custody, LGBTQ rights, workplace discrimination, and hate crimes.  When necessary, Junta also provides referrals to other legal services.

6.  Since 2012, Junta worked as the lead organization with other organizations to help community members obtain DACA.  In fact, before I was working at Junta, they helped me translate my birth certificate so that I could obtain DACA.  I was not aware of Junta's contributions until I reopened my initial application file and found a business card of Junta. Junta has helped approximately two hundred individuals sign up for DACA. Here is the testimony of a few who agreed to share their stories:

7.  For example, Luis Coto paid a fee of $1,000 dollars to file his initial DACA application through a private attorney. Through DACA and the government's promise that his personal information would not be shared with immigration enforcement, Luis was given an opportunity without fear; opportunity to get a good job, and qualify for employment based benefits.  For the second renewal, Luis was referred to Junta through a church in the neighborhood where the organization is located, where through a follow up and free cost service Luis filed his application renewal (covering his own filing fee) and signed up for the Learner Permit Tests to obtain his driver's license.  Most importantly, Luis and his friends that filed together could be happy and grateful to the government for allowing them to prove that "we are not criminals but that we pay our taxes, and help the country."  Without DACA it feels unjust to see us as back as "criminals when we have given evidence and vast history of wanting to do

AR1987

things by the law I feel discriminated, even though we have been given plenty documentation." Luis does not know what will happen one DACA status disappears—especially since he was not eligible for a renewal and knows that, despite the initial promise, his personal information is at risk of being shared with immigration enforcement.

8.      Another example, Soledad Ramirez, is a single mother of a seven-year-old US citizen boy, in the first grade. With DACA, since 2012, she could grow in her field of manufacturing, utilizing her technical diploma in manufacturing. Thanks to the government's promise that it would not give her personal information to immigration enforcement, she was able to obtain DACA without fear of deportation. Prior to DACA, she could not enter manufacturing without a work permit to work legally, so she had to work in cleaning, off her field, and off the formal economy. DACA allows her to be independent and provide for her child and her household. Soledad has been without DACA for about three months, and as a result, is out of work, making her feel unworthy and unable to provide for herself. She lost DACA because she was unable to obtain the money in time and send the application last minute with the extra $5.00 charge ($500 instead of $495). This period without work authorization has made her see the consequences of losing DACA. She was laid-off her Quality Control position, and unable to qualify for the health benefits she was supposed to obtain (if her work authorization was not interrupted). She also fears the government will share personal information, leading to her deportation.

9.      In September 2017, prior to the rescission of DACA, we were planning on conducting a campaign to help community members apply for citizenship, but after the announcement of the rescission, we had to focus on DACA. I am currently the only staff member working in the advocacy department, and we lacked the capacity to do both.

AR1988

Appeal: 18-1521    Document: 28-7    Filed: 09/04/20    Page 737 of 1026 PageID #:
10328
Case 1:17-cv-05228-NGG-VMS    Document 28-7    Filed 06/04/20    Page 737 of 1026 PageID #:
10328
Case 8:17-cv-02942-RWT    Document 29-8    Filed 11/28/17    Page 4 of 6

10.     Running a campaign to help people renew DACA is not easy.  For example, it is expensive to renew DACA, so a lot of people lacked the means to renew on such short notice. Additionally, many were afraid of the new administration and did not want to provide any information.  This made it very difficult to find all the people who may have been eligible.

11.     There is a lot of confusion about DACA, so many non-DACA recipients came forward with questions.  One individual was a recipient of another type of deferred action.  We had to refer him to another organization for legal services because we did not have the capacity to address his inquiry in addition to all of the DACA work are doing.

12.     There were also lots of people who were ineligible for renewal because their DACA was not set to expire during the narrow window announced by the government, September 5, 2017-March 5, 2018.  About half of the people who came forward were ineligible because their DACA status expires after March 5, 2018.  This was very difficult for us because we wanted to help them in some way but there was little we could do.

13.     In addition, we had other community members reaching out to us about their immigration concerns.  Unfortunately, we had to be so focused on DACA at the time that we were unable to assist them.  We are still trying to catch up with those individuals.

14.     We continue to be overwhelmed by the rescission of DACA.  While we are no longer able to assist with renewals, the questions are still there so people keep calling.  Many do not know what will happen to their work authorization or if they will be deported, and we struggle to provide answers.  Since the rescission, we have been working beyond our normal hours to meet with attorneys, find information, and disseminate to a more scared community.  As a service organization, we try to help so we do not have to turn people away.  Their needs do not

go away.  We still answer the phones.  We are also currently conducting a campaign to reach

DACA recipients to see if we can help the find some other form of immigration relief.

15.     Junta may lose a lot as a result of the rescission of DACA.  Junta had obtained

funds for outreach and now that money may go away.  As an established, grassroots

organization, Junta often relies on sub-grants to continue their work.  Various grants have

supported our immigration advocacy work, with DACA being a particular attraction for the

potential benefits of investing in this sub-population.  Junta had received grants from the

following foundations; Fairfield County's Community Foundation,  Community Foundation for

Greater New Haven, Center for Community Change, CASA de Maryland, and the William

Caspar Graustein Foundation.  Now these funds will likely go away.

16.     Additionally, I am the only member of my department and Junta could be forced

to let me go when my DACA and work authorization expire.  Both are currently set to expire in

March and I am awaiting my renewal.  If and when I lose my DACA status, Junta will lose its

whole department and have to spend money finding and training a replacement.  Also, because

Junta is very leanly staffed, it relies on several DACA recipient volunteers.  With the loss of

myself and these volunteers, Junta will have its programming constricted.

17.     Other departments will also be burdened with the new needs of these population

that without employment authorization will need assistance for food, shelter, clothing, and other

basic needs.  At Junta this means moving resources to provide relief.

18.     Furthermore, the organization itself will be deeply harmed by the rescission.

Junta empowers people and gives them opportunities to succeed, including by offering

employment opportunities for people, like me, who they serve.  Junta will be less able to provide

such opportunities to current DACA recipients as they lose their status.

AR1990

DATED:  November 28, 2017

Sergio Olmedo Ramirez

6

AR1991

Appeal: 18-1521    Doc: 20-3    Filed: 07/03/2018    Pg: 109 of 454
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 740 of 1026 PageID #:
10331

Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 1 of 33

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

        *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        *Defendants*.

No. 17-cv-2942 (RWT)

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.   THIS CASE IS NOT JUSTICIABLE ................................................................ 1

   A.   The Rescission Policy Is Unreviewable Under the APA ........................ 1

   B.   Plaintiffs Misinterpret The INA's Jurisdictional Bar............................. 6

   C.   Plaintiff-Organizations Lack Standing .................................................. 7

II.   PLAINTIFFS HAVE NOT ADEQUATELY PLEADED ANY CLAIM
     TO RELIEF ...................................................................................................... 8

   A.   Plaintiffs' APA Claims Fail .................................................................. 8

   B.   Plaintiffs Fail to State an Equal Protection Claim ................................ 16

   C.   Plaintiffs Fail to Plead Procedural Due Process Violations.................. 18

   D.   Plaintiffs Fail to Establish Substantive Due Process Violations........... 19

   E.   Equitable Estoppel Principles Do Not Apply Here............................... 20

   F.   Nationwide Declaratory and Injunctive Relief is Impermissible........... 21

III.   NOTHING MORE IS NEEDED TO RULE ON DEFENDANTS' MOTION ............... 22

CONCLUSION........................................................................................................... 25

J.A. 1254

AR1993

Appeal: 18-1521   Doc: 52-4   Filed: 07/02/2018   Pg: 570 of 754   Page 742 of 1026 PageID #:
Case 1:17-cv-02280-CG-VMS   Document 28-7   Filed 09/04/20   10333
Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 3 of 33

## TABLE OF AUTHORITIES

**CASES**

*Abourezk v. Reagan,*
   785 F.2d 1043 (D.C. Cir. 1986) ................................................................ 8

*Air Courier Conference v. Am. Postal Workers Union,*
   498 U.S. 517 (1991) ................................................................................ 8

*Am. Med. Ass'n v. Reno,*
   57 F.3d 1129 (D.C. Cir. 1995) ............................................................... 6

*Angeles v. Dist. Dir., INS,*
   729 F. Supp. 479 (D. Md. 1990) ........................................................... 21

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ........................................................... 19, 20

*Bennett v. Spear,*
   520 U.S. 154 (1997) .............................................................................. 13

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
   239 U.S. 441 (1915) .............................................................................. 19

*Botezatu v. INS,*
   195 F.3d 311 (7th Cir. 1999) ................................................................. 7

*Califano v. Sanders,*
   430 U.S. 99, 105 (1997) ....................................................................... 23

*Camp v. Pitts,*
   411 U.S. 138 (1973) ....................................................................... 10, 23

*Chiayu Chang v. U.S. Citizenship and Immigration Servs.,*
   254 F. Supp. 3d 160 (D.D.C. 2017) ..................................................... 24

*Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,*
   802 F. Supp. 1325 (D. Md. 1991),
   *aff'd,* No. 91-1267, 1992 WL 180138 (4th Cir. July 29, 1992) ......... 22-23

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) .............................................................................. 23

*Ctr. for Law & Educ. v. Dep't of Educ.,*
   396 F.3d 1152 (D.C. Cir. 2005) ............................................................. 8

Appeal: 18-1521    Doc: 52-3    Filed: 07/03/2018    Pg: 551 of 454    Page 743 of 1026 PageID #:
10334
Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 4 of 33

*Cty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ........................................................................................ 19

*Emery Min. Corp. v. Sec'y of Labor*,
   744 F.2d 1411 (10th Cir. 1984) ..................................................................... 20

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) ........................................................................... 8

*Fierce v. Burwell*,
   101 F. Supp. 3d 543 (D. Md. 2015) .............................................................. 25

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ........................................................................................ 23

*Greene v. Carson*,
   256 F. Supp. 3d 411 (S.D.N.Y. 2017) ............................................................. 9

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................... 1, 3, 4, 5

*Heckler v. Cmty. Health Sers.*,
   467 U.S. 51 (1984) ......................................................................................... 20

*Heikkila v. Barber*,
   345 U.S. 229 (1953) .......................................................................................... 4

*ICC v. Bhd. of Locomotive Eng'rs (BLE)*,
   482 U.S. 270 (1987) .......................................................................................... 2

*In re United States*,
   No. 17-72917, 2017 WL 5505730 (9th Cir. Nov. 16, 2017) ........................... 9

*Int'l Refugee Assistance Project v. Trump (IRAP)*,
   No. 17-cv-00361, 2017 WL 4674314 (D. Md. Oct. 17, 2017) ....................... 3

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest. Serv.*,
   58 F. Supp. 3d 1191 (D.N.M. 2014) ............................................................. 23

*Kenney v. Glickman*,
   96 F.3d 1118 (8th Cir. 1996) ........................................................................... 3

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................... 5, 15

*Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990) ............................................................................................... 8

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ........................................................................... 15

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................................. 21

*Marsh v. United States*,
   No. 14-cv-3559-TDC, 2016 WL 247563 (D. Md. Jan. 20, 2016) ........................... 22

*McNary v. Haitian Refugee Ctr., Inc.*,
   498 U.S. 479 (1991) ............................................................................................... 4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................... 10

*Mylan Lab. v. Akzo*,
   770 F. Supp. 1053 (D. Md. 1991) ....................................................................... 14

*Nader v. Blair*,
   549 F.3d 953 (4th Cir. 2008) .............................................................................. 24

*OPM v. Richmond*,
   496 U.S. 414 (1990) ............................................................................................. 20

*Organized Vill. of Kake v. U.S. Dep't of Agriculture*,
   795 F.3d 956 (9th Cir. 2015) .............................................................................. 12

*Perales v. Casillas*,
   903 F.2d 1043 (5th Cir. 1990) .............................................................................. 3

*Perez v. Mortg. Bankers Ass'n*,
   135 S.Ct. 1199 (2015) ......................................................................................... 15

*Pisano v. Strach*,
   743 F.3d 927 (4th Cir. 2014) .............................................................................. 24

*Poindexter v. Mercedes-Benz Credit Corp.*,
   792 F.3d 406 (4th Cir. 2015) .............................................................................. 25

*Reno v. American-Arab Anti-Discrimination Committee (AADC)*,
   525 U.S. 471 (1999) ................................................................................... *passim*

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 537 of 454    Case 1:17-cv-02280-CG-VMS    Document 28-7    Filed 09/04/20    Page 745 of 1026 PageID #: 10336

Case 8:17-cv-02942-RWT    Document 30    Filed 12/05/17    Page 6 of 33

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ................................................................................. 4

*Saucier v. Katz*,
    533 U.S. 194 (2001) ........................................................................................... 19

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012) ...................................................................... 12

*Tafas v. Dudas*,
    530 F. Supp. 2d 786 (E.D. Va. 2008) ................................................................. 23

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ....................................................................... 4, 7, 11

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) ...................................................................................... 18, 19

*United States v. Armstrong*,
    517 U.S. 456 (1996) ................................................................................ 16, 17, 28

*United States v. Owens*,
    54 F.3d 271 (6th Cir. 1995) ................................................................................ 20

*Vasquez v. Aviles*,
    639 F. App'x 898 (3d Cir. 2016) .......................................................................... 7

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ............................................................................................. 9

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ...................................................................................... 16, 17

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................. 7

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ........................................................................................... 19

*Zimmerman v. Novartis Pharm. Corp.*,
    287 F.R.D. 357 (D. Md. 2012) ............................................................................ 25

**STATUTES**

5 U.S.C. § 552a ........................................................................................................... 14

v

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Filed: 07/02/2018 Document 28-7 Pg: 574 of 454 Filed 09/04/20 Page 746 of 1026 PageID #: 10337

Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 7 of 33

5 U.S.C. § 701 ................................................................................................ 1, 5

5 U.S.C. § 706 ...................................................................................................... 5

8 U.S.C. § 1103 .................................................................................................... 17

8 U.S.C. § 1252 .......................................................................................... 1, 5, 6, 7

**RULES**

Fed. R. Civ. P. 12 ........................................................................................... 22, 23

Fed. R. Civ. P. 56 ................................................................................. 22, 23, 24, 25

**OTHER AUTHORITIES**

Br. for the Pet'r's, *Texas v. United States*, U.S. S. Ct. Docket No. 15-674 (March 1, 2016),
   https://www.justice.gov/sites/default/files/ osg/briefs/2016/03/03/15-674tsunitedstates.pdf ... 11

DHS, *Frequently Asked Questions: Rejected DACA Requests* (Nov. 30, 2017),
   https://www.uscis.gov/daca2017/mail-faqs ............................................................... 13

DHS, *Frequently Asked Questions: Rescission of Deferred Action For Childhood Arrivals
   (DACA)* (Sept. 5, 2017),
   https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-
   childhood-arrivals-daca........................................................................................... 8

DHS, *Privacy Impact Assessment for the Deferred Action for Childhood
   Arrivals (DACA)* (Aug. 15, 2012),
   https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf .............. 14

J.A. 1259

AR1998

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 577 of 454    Total Pages:(747 of 1026)
Case 1:17-cv-05228-NGG-VMS    Document 28-27    Filed 09/04/20    Page 747 of 1026 PageID #: 10338
Case 8:17-cv-02942-RWT    Document 30    Filed 12/05/17    Page 8 of 33

## INTRODUCTION

The Rescission Policy challenged here provides for an orderly wind-down of Deferred Action for Childhood Arrivals ("DACA"), an exercise of prosecutorial discretion that, from the start, confers no rights and has been subject to change. The Executive's discretionary enforcement decisions, especially in the immigration context, are presumptively unreviewable and, in this case, the Immigration and Nationality Act (INA) specifically precludes judicial review. 5 U.S.C. § 701; 8 U.S.C. § 1252(g). Plaintiffs fail to show that this case falls within the jurisdiction of this Court.

Even if the Court had jurisdiction, Plaintiffs have not pleaded any colorable claims. The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction abruptly ending deferred action for roughly 800,000 individuals. Plaintiffs' constitutional claims fail because they have not pleaded a clear case of discriminatory animus, nor have they plausibly alleged a protected property or liberty interest in the continuation of DACA. Accordingly, the Court should dismiss this case or, in the alternative, grant summary judgment to Defendants.

## ARGUMENT

### I.    THIS CASE IS NOT JUSTICIABLE

#### A.    The Rescission Policy Is Unreviewable Under the APA

The Acting Secretary's decision to rescind DACA was an exercise of enforcement power that is committed to agency discretion and, thus unreviewable under the APA. Mem. in Support of Defendants' Motion to Dismiss or, In the Alternative, for Summary Judgment, 15-21, ECF No. 27-1 (Defs.' Motion or Mot.); 5 U.S.C. § 701; *Heckler v. Chaney*, 470 U.S. 821 (1985). Plaintiffs' contrary claim is premised on a misunderstanding of the basis for and nature of the Policy itself. Pls.' Opp'n to Defs.' Mot. 10, ECF No. 29.

AR1999

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 750 of 1054   Total Pages:(748 of 1026)
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20   Page 748 of 1026 PageID #: 10339
Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 9 of 33

Plaintiffs' claim that the Rescission Policy is "grounded on DACA's alleged illegality," which is "squarely within the competence of this Court to review," *id.* at 11, misunderstands the reasons underlying the Policy. Although they point principally to the Attorney General's September 4th letter, which advised that the Acting Secretary "should" rescind DACA, they ignore that an independent basis for his recommendation was that a "likely" legal challenge to DACA "would yield similar results" to the successful challenge of a similar deferred action policy known as Deferred Action for Parents of Americans (DAPA). Sessions Letter at 1 (AR 251). Plaintiffs also overlook the language of the Rescission Policy itself, which makes clear that the Acting Secretary relied on considerations other than DACA's legality in the abstract, such as the history of the *Texas* litigation and the significant risk of an immediate injunction enjoining DACA, as well as the complexities of ending such a large-scale policy. *See* Rescission Policy 2-4 (AR 253-55). After discussing in detail the various considerations relevant to her decision, the Acting Secretary determined that she "should" (*not* "must") wind down DACA. *Id.* at 4 (AR 255).[1]

Next, Plaintiffs' attempt to make an end-run around the discretionary nature of the rescission decision is blocked by Supreme Court precedent. *Interstate Commerce Commission v. Brotherhood of Locomotive Engineers (BLE)* rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." 482 U.S. 270, 283 (1987). Plaintiffs argue that *BLE* applies only when a court is already satisfied that a decision is unreviewable; a court need not ignore the agency's asserted basis for its decision in the first instance. Opp'n 12. But *BLE* rejected the same argument. *See BLE* 482 U.S. at 283 (Scalia, J.). Indeed, as the Court reasoned: Prosecutors commonly decline to prosecute alleged criminal

---

[1] The Policy's detailed discussion of these factors, *see* Rescission Policy 2-4 (AR 253-55), also refutes Plaintiffs' claim that evidence of "balancing 'costs and benefits' of maintaining or rescinding the program[]" is "entirely missing" from the record. Opp'n 11.

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 570 of 754
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 749 of 1026 PageID #: 10340
Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 10 of 33

violations based on substantive legal reasons, but it is "entirely clear" that the refusal to prosecute is committed to agency discretion and not subject to judicial review, even though courts are "well qualified to consider," for example, whether a conviction was likely or the evidence was sufficient. *Id.* at 283. "[I]t is the [agency's] formal action, rather than its discussion, that is dispositive." *Id.* at 281.

Plaintiffs also argue that, because the Rescission Policy is a broad enforcement policy, it is not presumptively immune from review under *Chaney*. Opp'n 12. But *Chaney* itself involved a broad enforcement policy, and the Court held that the FDA's decision "[g]enerally" not to pursue enforcement actions in the "area" of "unapproved use of approved drugs for human execution," 470 U.S. at 824, was a presumptively unreviewable exercise of discretion, *id.* at 833. Although *Chaney* concerned individuals facing lethal injection in only two states, the relief sought would have affected entire segments of the drug market, *id.* at 824, not to mention at least "several other[]" states that had adopted the same method of capital punishment, *id.* at 823. Likewise, *Perales v. Casillas* addressed a broad enforcement policy; there, the Fifth Circuit held that a class action challenge to an Immigration & Naturalization Service (INS) decision not to grant pre-hearing voluntary departure and work authorization to eligible aliens for a roughly three-year period was an unreviewable exercise of agency discretion. 903 F.2d 1043, 1046 (5th Cir. 1990), reh'g denied, 912 F.2d 1465 (5th Cir. 1990).[2]

_____

[2] Plaintiffs claim that courts have "consistently concluded" that broad enforcement policies are reviewable, Opp'n at 12, but neither case they cite for that proposition involves an enforcement policy. *See Kenney v. Glickman*, 96 F.3d 1118, 1123-24 (8th Cir. 1996) (challenge to USDA directive setting standards implementing poultry processing regulation); *Int'l Refugee Assistance Project v. Trump (IRAP)*, No. 17-cv-0361, 2017 WL 4674314, at 1-2 (D. Md. Oct. 17, 2017) (challenge to Executive Order relating to the issuance of visas to applicants from particular countries). Moreover, unlike the standards in *Kenney*, which were based on USDA's interpretation of the implementing statute, the Rescission Policy does not contain an embedded interpretative rule that would be otherwise reviewable. Rather, it merely contains a non-reviewable decision about the scope of its enforcement discretion. *See BLE*, 482 U.S. at 283. Nor does the decision in

**AR2001**

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 750 of 454
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 750 of 1026 PageID #: 10341
Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 11 of 33

In an attempt to distinguish *Chaney*, Plaintiffs mischaracterize the nature of the Rescission Policy.  That Policy does not, as Plaintiffs claim, prevent DHS officials from later exercising their delegated discretion to confer deferred action on an individual former DACA recipient.  The Acting Secretary remains free to establish (or revoke) other deferred action policies; to grant (or deny) deferred action under other policies, or no policy at all; to revoke a grant of deferred action; and to pursue removal, all in her discretion.

Nor is the Policy a "[r]escission[] of prior obligations" providing a "clear focus for judicial review."  Opp'n 15 (quoting *Robbins v. Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985)).  Plaintiffs' reliance on *Robbins*—a case challenging the government's decision to close a federal building it had agreed to lease out and renovate for use as a homeless shelter—is strained.  780 F.2d at 39-40.  A failed public-private venture "shares virtually none of the characteristics that led the Court in *Chaney* to apply a presumption of nonreviewability."  *Id.* at 46.  The Rescission Policy does.

Plaintiffs argue that a strong presumption of judicial review of agency action applies even in the immigration context, Opp'n 15, but they ignore the strong presumption of non-reviewability of agency enforcement decisions, *see Chaney*, 470 U.S. at 824.  Most of the cases they cite involve habeas corpus review of removal decisions, which the Supreme Court has long recognized as distinct from and narrower than APA review.[3]  *See Heikkila v. Barber,* 345 U.S. 229, 234-35 (1953) (finding section of the Immigration Act of 1917 making Attorney General's decision "final" was a statute precluding judicial review under the APA, but nevertheless acknowledging right to

---

*Texas v. United States* support such a claim.  *Compare* 809 F.3d 134, 178 n.156 (5th Cir. 2015) (finding DAPA reviewable) *with id.* at 168 (noting that a traditional nonenforcement policy presumptively would be committed to agency action and that "denial of voluntary departure and work authorization" would have been nonjusticiable).

[3] *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479 (1991), is also inapposite, as it involved a procedural attack on the implementation of the Special Agricultural Workers (SAW) amnesty, not a substantive challenge a SAW application denial or rescission of the policy itself.  *Id.* at 482-83.

4

AR2002

habeas corpus review of deportation order).  This suit involves a challenge "outside the streamlined process that Congress has designed" to the Executive's broad discretion to enforce the nation's immigration laws, the invasion of which raises "greatly magnified" concerns.  *Reno v. Am. Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 490 (1999).  Those concerns are not dispelled by the preemptive nature of this challenge:  Plaintiffs seek not merely to delay the effects of the Acting Secretary's enforcement decision, but to enjoin its implementation altogether.  In the immigration context, however, judicial management of the Executive's enforcement discretion would prolong ongoing violations of the INA in just the way that the Supreme Court has warned against.  *See id.*

Finally, Plaintiffs erroneously contend that review of their notice-and-comment and constitutional claims is not foreclosed.  But the APA's plain text bars review of agency action falling within the scope of Section 701, whether the challenges raised are substantive or procedural, and whether statutory or constitutional.  *See* 5 U.S.C. § 701 (bar on review "applies" throughout "[t]his chapter"); *id.* § 706 ("[s]cope of review" includes "agency action" "contrary to constitutional right" or "without observance of procedure required by law").  Indeed, Plaintiffs themselves invoked these very provisions in asserting their constitutional claims.  Compl. ¶ 165(a) (citing 5 U.S.C. § 706).  Because all of Plaintiffs' claims challenge agency action that is "committed to agency discretion by law" under Section 701, all of their claims are barred from review—a limitation they cannot avoid by including meritless constitutional claims in their complaint, as *Chaney* itself recognized.  470 U.S. at 838 (bar on review stands absent a "colorable claim . . . that the agency's [action] violated any constitutional rights").[4]

---

[4] Although Plaintiffs cite two decisions suggesting that substantively unreviewable decisions remain procedurally reviewable under the APA, neither case addressed the text of Sections 701 and 706.  Opp'n at 10.  In any event, for the same reasons the Policy is not substantively unreviewable under the APA, it is necessarily exempted from the APA's rulemaking requirements.  *See infra*, 16-18; *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (finding exemption "surely includes" agency decision to discontinue a discretionary allocation of funds); *Am. Med. Ass'n v. Reno*, 57 F.3d 1129,

## B. Plaintiffs Misinterpret The INA's Jurisdictional Bar

Even if there were doubt about the Court's ability to review Plaintiffs' constitutional claims, the breadth of the 1252(g) bar removes it. 8 U.S.C. § 1252(g) (barring review "notwithstanding any other provision of law (statutory or nonstatutory)" of "any cause or claim") (emphasis added). Plaintiffs do not dispute that Section 1252(g) eliminates federal court jurisdiction over denials of deferred action. Instead, they claim that Section 1252(g) is inapplicable because this suit does not arise from one of the three actions enumerated in that section—*i.e.*, "the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders." Opp'n 16 (quoting 8 U.S.C. § 1252(g)). That crabbed view ignores the purpose of this provision and the Supreme Court's holding in *AADC*.

Plaintiffs misread the Court's statement that Section 1252(g) is not intended to act as "a sort of 'zipper' clause" covering "all claims arising from deportation proceedings." *AADC*, 525 U.S. at 482. Defendants argue no such broad reading here, and the Court's interpretation of Section 1252(g)'s scope is entirely consistent with the section's application to the Rescission Policy, which is precisely the type of "no deferred action' decision[] [or] similarly discretionary determination[]" that this provision "seems clearly designed" to protect. *Id.* at 485. Indeed, this suit raises the same concern that prompted the enactment of Section 1252(g)—that discretionary decisions, to the extent "they are reviewable at all," should not be "the bases for separate rounds of judicial intervention outside the streamlined process that Congress . . . designed." *Id.*

The fact that the Acting Secretary exercised her enforcement discretion before any

---

1135 (D.C. Cir. 1995) (implicitly recognizing that, "in the absence of statutory standards, certain resource allocation choices [such as] whether or not to prosecute a case . . . are committed to agency discretion by law" and thus are "screened from comment and review."" 57 F.3d 1129, 1135 (D.C. Cir. 1995) (internal citations omitted).

6

individual removal proceeding and with respect to a class of individuals does not prevent the

application of Section 1252(g).  As *AADC* made clear, "Section 1252(g) was directed against a

particular evil:  attempts to impose judicial constraints upon prosecutorial discretion."  525 U.S at

485 n.9.  The decision to rescind deferred action, regardless of when it is made and how many

individuals it involves, is an action leading up to the commencement of removal proceedings at

some future date, and a person cannot circumvent the bar in Section 1252(g) by singling out that

single step for a preemptive challenge.  *See* 8 U.S.C. § 1252(g) (precluding review of "decision[s]

*or action[s]*" "to commence proceedings" (emphasis added)); *see also Botezatu v. INS*, 195 F.3d

311, 314 (7th Cir. 1999) (applying Section 1252(g) to INS's refusal to grant alien deferred action

in "[post-]deportation procedures" even though such action was not on Section 1252(g)'s "list of

precluded items").[5]

### C.  Plaintiff-Organizations Lack Standing

Plaintiffs' Complaint fails to adequately plead standing for the organizations in either an

organizational or representational capacity.  Plaintiffs attempt to rectify those deficiencies with

declarations submitted by three of the nine plaintiff organizations (CASA de Maryland, Junta for

Progressive Action, and OneAmerica).  *See* ECF Nos. 29-6 to 8.  The remaining six do not even

attempt to meet their burden "clearly to allege facts demonstrating" each element of standing.

*Warth v. Seldin*, 422 U.S. 490, 518 (1975).

In any event, all the plaintiff organizations lack standing because immigration advocacy

groups are not within the INA's zone of interests in this context.  Claims that Plaintiffs' members,

clients, or employees (or that organizational functions or missions) have been affected by the

---

[5] The Fifth Circuit's holding in *Texas* that Section 1252(g) did not bar judicial review of DAPA is inapposite.  *See Texas*, 809 F.3d at 164.  DAPA involved the Executive's discretionary decision to *grant* deferred action to a class of aliens, which *Texas* held did not implicate one of Section 1252(g)'s enumerated actions.  *Id.*

7

**AR2005**

Rescission Policy are insufficient.  A plaintiff cannot meet the zone-of-interests test merely by alleging that an agency has acted against someone else's interests in a way that might indirectly affect his own. *See Air Courier Conference v. Am. Postal Workers Union*, 498 U.S. 517, 522-31 (1991); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).  Instead, a plaintiff must show that "the [actions] in question are *designed* to protect [or regulate] some . . . concrete interest of *his* that is the ultimate basis of his standing." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (citation omitted).

In enacting the INA—and in particular, the provisions of the INA addressing removal—Congress made no mention of immigration advocacy organizations, and the statutory scheme does not regulate the conduct of such groups.  Nor does the INA evince Congress' intent to permit advocacy groups to police immigration enforcement.[6] *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) ("The immigration context suggests the comparative improbability of any congressional intent to embrace as suitable challengers in court all who successfully identify themselves as likely to suffer from the generic negative features of immigration.").  Thus, even assuming the plaintiff organizations have been injured, it would be only an indirect and incidental effect of the Rescission Policy.

## II.   PLAINTIFFS HAVE NOT ADEQUATELY PLEADED ANY CLAIM TO RELIEF

### A.   Plaintiffs' APA Claims Fail

**1.**  The Acting Secretary's decision to wind down DACA was both eminently reasonable and adequately explained in the Rescission Memo.  Defs' Mot 31-37.  In response, Plaintiffs attempt to pigeonhole an attack on the adequacy of the *Administrative Record* into a ground for

---

[6] The cases Plaintiffs cite addressed a different part of the INA pertaining to the issuance of visas. *See Abourezk v. Reagan*, 785 F.2d 1043, 1047 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987); *IRAP*, 2017 WL 4674314, at *12.

Appeal: 18-1521    Doc: 52-8    Filed: 07/02/2018    Pg: 1 of 454    Page 755 of 1026  PageID #:
10346
Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 16 of 33

upholding the sufficiency of their *Complaint*.  Plaintiffs' arguments fail.

Plaintiffs lead by "emphasi[zing] that two other courts considering the Government's decision to rescind DACA have concluded that this Administrative Record is incomplete." Opp'n, 25-26.  To be sure, a California district court ordered Defendants to "complete" the administrative record, *see the Regents of the University of California*, et al. *v. U.S. Dep't of Homeland Sec.*, et al., No. 3:17-cv-05211, Order on Mtn. to Complete the Admin. Rec. (N.D. Cal. Oct. 17, 2017) (ECF 79), and the Ninth Circuit denied the government's petition for a writ of mandamus over a vigorous dissent. *In re United States*, No. 17-72917, 2017 WL 5505730, at *6 (9th Cir. Nov. 16, 2017) (Watford, J., dissenting); *see id.* at 6, 8 (finding a "clear abuse of discretion," in a "classic case in which mandamus relief is warranted") *denying stay*, 2017 WL 5589671 (9th Cir. Nov. 21, 2017). The government has now filed a petition for a writ of mandamus in the Supreme Court.  *In re United States*, (U.S. Dec. 1, 2017) (No. 17-801) (Mandamus Pet.).  Plaintiffs also invoke an order to "complete" the Administrative Record issued by a New York district court, but the Second Circuit has stayed that decision pending resolution of a separate mandamus petition. Order, *In re Elaine Duke*, No. 17-3345 (2d Cir. Oct. 24, 2017), ECF No. 41.[7]

In any event, Plaintiffs' contention that the supposed inadequacy of the Administrative Record is "reason alone" to deny Defendants' Motion and allow the case to proceed to discovery is wrong.  Opp'n 27.  The sole authority Plaintiffs cite for this proposition, *Greene v. Carson*, 256

---

[7] Plaintiffs also attack the administrative record as a departure from "guidance promulgated by the Department of Justice," citing a 1999 memorandum from DOJ's Environment and Natural Resources Division. *See* Opp'n at 26 n.18.  But that former guidance by ENRD on what its client agencies should include in the administrative record is not the same as what the APA requires or what a court may order an agency to produce. *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978).  In any event, the guidance has been superseded. *See, e.g.*, Memorandum from Ronald J. Tenpas, Assistant Att'y Gen., Dep't of Justice (Dec. 23, 2008) (noting that the 1999 guidance is a non-binding internal document, which does not "limit the otherwise lawful prerogatives of the Department of Justice or any other federal agency") (attached hereto as Ex. 1).

F. Supp. 3d 411 (S.D.N.Y. 2017), *appeal docketed*, No. 17-2785 (2d Cir. Sept. 7, 2017), demonstrates the flaw in their reasoning. After concluding that the challenged decision was not supported by an administrative record (and was thus arbitrary and capricious), the *Greene* court explained that "the proper result is to *remand* the case to [the agency] for further proceedings." *Id.* at 431-32 (emphasis added); *see also Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam). While the Acting Secretary's decision here was plainly not arbitrary and capricious, should this Court disagree, the proper remedy is to simply set aside the Rescission Policy and remand to the agency.

Plaintiffs' substantive attacks on the Acting Secretary's rationale for rescinding DACA are equally flawed. By insisting that "the proffered explanation is implausible," Opp'n 27, Plaintiffs ask this Court to second-guess her assessment and substitute its own judgment for that of the Acting Secretary. Not only is that request improper, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), but none of the grounds on which Plaintiffs challenge the Rescission Policy withstand scrutiny. Plaintiffs make much of the fact that the government previously defended the legality of DACA and insist that the agency has "not provided any explanation, let alone a reasoned analysis, for [its] change in position" before rescinding the policy based on the risk of a nationwide injunction. Opp'n 28-29. That argument strains credulity, given that the government's arguments in support of DAPA and expanded DACA were rejected by every court to which they were presented on the merits, including an equally divided Supreme Court, and that the Rescission Memo itself referenced those losses. AR 253–54. No mystery underlies the government's change in position. In any case, whether or not the government has been consistent with respect to its position on the *legality* of DACA, it has undoubtedly been consistent with respect to the *revocability* of deferred action policies like DACA, which is the only agency action at issue here. *See, e.g.*, DACA Memo 3 (AR 3); *see also* Br. for the Pet'r's 67, *Texas v.*

*United States*, U.S. S. Ct. Docket No. 15-674 (March 1, 2016), https://www.justice.gov/sites/default/files/osg/briefs/2016/03/03/15-674tsunitedstates.pdf.

Plaintiffs' assertion that "[t]here was nothing imminent about risk to DACA," is demonstrably false. Opp'n at 29. Although they claim that "[n]o litigation ever sought to enjoin DACA, no litigant has successfully challenged DACA … and no Court ever enjoined DACA," *id.*, the expansion of DACA announced in the DAPA Memo *was* enjoined in *Texas*, affirmed on appeal, and the plaintiff states threatened to amend their complaint in the ongoing litigation to directly challenge the original DACA Policy. The distinctions between expanded and original DACA were immaterial—specifically, the expansion enjoined in *Texas* would have included a wider range of arrival dates and ages, and lengthened the deferred action period by one year. And despite Plaintiffs' insistence that DAPA and DACA are "entirely different immigration program[s]," *id.*, the Fifth Circuit found that the policies would be substantially similar in execution. *Texas*, 809 F.3d at 134. Plaintiffs' contention that the government's defense of the original DACA Policy would have fared better than did its defense of DAPA and expanded DACA (before the same court) is simply speculation untethered from reality.

Plaintiffs also claim an inconsistency between Defendants' reliance on litigation risk to rescind DACA and the argument that, contrary to the Fifth Circuit's rulings, the decision is neither justiciable nor subject to notice-and-comment requirements. But there is no inconsistency here: Considering that the Fifth Circuit's decision was upheld by an equally divided Supreme Court, the Acting Secretary's conclusion that the impending challenge to DACA *in the same case* would likely prove successful was eminently rational whether or not she personally agreed with the Fifth Circuit's justiciability determination. Notably, neither the Acting Secretary's memo, nor the Attorney General's letter, expressly relied upon or gave any indication that they agreed with the

AR2009

Fifth Circuit's *justiciability* rulings, as opposed to its merits rulings.

Finally, Plaintiffs cite two inapposite, out-of-circuit decisions as purported authority for the proposition that litigation risk does not justify agency action. Neither deals with circumstances comparable to those presented here, where the agency explained that binding precedent effectively made the outcome of further litigation in the same court preordained. In *Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012), the court rejected the agency's reliance on "litigation risk" because the decision on review made "no mention" of that rationale, and the administrative record "belie[d] EPA's purported concern" on that score. *Id*. at 34. And in *Organized Village of Kake v. United States Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015) (en banc), the court dismissed as "implausible" the agency's explanation that the challenged rule—which exempted the Tongass National Forest from certain construction and logging restrictions—would "reduce[] the potential for conflicts" in other lawsuits, as those lawsuits involved forests other than the Tongass, so it is impossible to discern how an exemption for Tongass would affect them. *Id*. at 969–70.

**2.** Plaintiffs also attempt to challenge, under the APA, a purported change in DHS's information-sharing policy. This claim fails for the simple reason that the alleged agency action does not exist. The Rescission Policy says nothing about, and makes no changes to, DHS's information-sharing policy. AR 252-56. DHS recently confirmed publicly that "[t]his information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." Nov. 30, 2017 FAQs No. 5, https://www.uscis.gov/daca2017/mail-faqs. Plaintiffs thus cannot identify any "final agency action" to challenge under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Even at the

**J.A. 1271**

**AR2010**

pleadings stage, their conclusory allegations are not entitled to the presumption of truth in the face of such judicially noticeable documents.

Plaintiffs point to older FAQs issued along with the rescission of DACA, which say "[g]enerally, information provided in DACA requests will not be proactively provided to other law enforcement entities (including [Immigrations and Customs Enforcement] and [Customs and Border Protection]) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security or public safety, or meets the criteria for the issuance of a Notice To Appear ['NTA'] or a referral to ICE under the [NTA] criteria." Compl. ¶ 108, ECF No. 1 (emphasis omitted) (quoting DHS, FAQ: Rescission of DACA Q8).[8] That was true when the DACA policy was first announced in 2012, and it remains true today. In any case, more recent FAQs unequivocally confirm that fact. Nov. 30, 2017 FAQs No. 5.[9]

**3.** Plaintiffs also claim that the purported "change" in DHS's information-sharing policy violates the Privacy and E-Government Acts. Even assuming there was a change, any such change could not conceivably have violated either statute.

The Privacy Act clearly states that it applies only to records pertaining to "citizen[s] of the United States or . . . alien[s] lawfully admitted for permanent residence." 5 U.S.C. § 552a(a)(2). Plaintiffs do not contest that DACA recipients are, by definition, excluded from Privacy Act protections because they are neither U.S. Citizens nor lawful permanent residents. Instead,

---

[8]   https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca

[9] Plaintiffs also claim that "Acting Secretary Duke[] publicly denied that there was any information sharing prohibition." Opp'n 33 (citation omitted). But their Complaint actually contains a far less dramatic allegation: "Acting Secretary Duke testified that she had never seen DHS's guidance assuring Dreamers their information would not be used for immigration purposes." Compl. ¶ 111. Even accepting that allegation as true—and ignoring that it materially mischaracterizes the policy, which has always contained a number of exceptions—the extent of the Acting Secretary's personal knowledge is irrelevant to whether the policy has actually changed.

13

**AR2011**

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 760 of 1054   Page 760 of 1026 PageID #:
10351
Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 21 of 33

Plaintiffs insist that DHS violated the Privacy Act by "waiv[ing]" the plain text of the statute in its 2012 Privacy Impact Assessment (PIA).  Opp'n 34.  To begin, Plaintiffs point to no authority permitting DHS to create judicially enforceable rights simply by "waiv[ing]" statutory text. Regardless, DHS specifically noted that its policy of applying greater privacy protections to individuals who fall outside the scope of the Privacy Act—a policy which has since been rescinded[10]—"does not extend or create a right of judicial review for non-U.S. persons."[11]

In a tacit acknowledgement that the E-Government Act does not, in fact, "requir[e] an agency [to] abide by its [PIA]," Compl. ¶ 165(c)(ii), Plaintiffs' brief now asserts—for the first time—that DHS violated the Act by changing its information-sharing policy "without updating or replacing the 2012 PIA."  Opp'n 35.  However, a "complaint may not be amended by the briefs in opposition to a motion to dismiss."  *Mylan Labs. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (internal quotation omitted).  In any event, a new PIA would not be required because DHS's information sharing policy has not changed.

**4.**  Plaintiffs' argument that "the Rescission Memo is a substantive rule that should have complied with the APA's notice-and-comment requirements because it binds DHS and substantially affects the rights of DACA recipients," Opp'n 37, mischaracterizes the nature of the Rescission Policy and its effect on the availability of deferred action.  Deferred action remains available today, just as it was available on an individualized, discretionary basis before the DACA policy.  That one particular policy permitting a class of individuals to seek deferred action based on certain criteria has been rescinded does not mean that DHS officials are prohibited from later extending that status on an individualized basis.  *See supra* 6.

---

[10] *See* Memorandum from John F. Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) (AR 229-34)
[11] DHS, *PIA for DACA* 16 (Aug. 15, 2012), https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf

14

Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 761 of 1026 PageID #: 10352
Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 189 of 454

Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 22 of 33

Plaintiffs' unsupported assertion that "the DACA Rescission Memo also has the 'force and effect of law'" is unconvincing. Opp'n 39. Because the Rescission Policy "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Vigil*, 508 U.S. at 197 (citation omitted), it does not impose any rights or obligations on regulated parties, *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). Accordingly, the Secretary may use statements of policy, like the Rescission Memo, to advise the public as to the manner in which she intends to exercise that discretion. *See Vigil*, 508 U.S. at 197.[12] Her predecessor did the same when DACA was originally adopted—critically, without notice and comment. Thus, under Plaintiffs' theory, DACA would be void *ab initio*.

Finally, Plaintiffs' argument elides persuasive, on-point appellate authority that squarely rejected a contention that an INS deferred-action directive was void for failure to abide by notice-and-comment requirements. The petitioner in *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1009 (9th Cir. 1987), challenged the validity of an INS Operating Instruction (*i.e.*, guidelines for the exercise of discretion in considering requests for deferred action). Petitioner argued that the Operating Instruction, which purported to rescind an earlier directive, was "invalid because the INS promulgated it without the notice-and-comment procedures required" by the APA, and that the agency was thus required to review his application under the "more 'generous' standard" contained in the earlier guidance. *Id.* (citation omitted). After thorough consideration of the distinctions between a substantive rule and a general policy statement, and "focus[ing] upon the effect of the regulation or directive upon *agency decisionmaking*, not the public at large," *id.* at 1016, the court held the Operating Instruction to be "a clear[] case of a general statement of policy," *id.* at 1017.

---

[12] Equally flawed is Plaintiffs' attempt to transform the unavailability of advance parole under DACA guidelines into a substantive rule. The possible availability of advance parole, under separate guidance not otherwise at issue in this case, is a discretionary *consequence* of receiving deferred action—meaning that it is an aspect of the Secretary's authority under the INA.

15

J.A. 1274

Appeal: 18-1521    Document/28237      Filed: 07/02/2018      Pg: 762 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS    Document 30    Filed 09/04/2018    Page 762 of 1026 PageID #:
10353
Case 8:17-cv-02942-RWT    Document 30    Filed 12/05/17    Page 23 of 33

Soo too here.

### B.    Plaintiffs Fail to State an Equal Protection Claim

Plaintiffs fail to allege a plausible Equal Protection claim, even considering their factual allegations against the factors discussed in *Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252 (1977). Their claim is premised on the belief that the rescission of DACA "was motivated by racial and national origin animus." Opp'n 46. It is not, however, sufficient that Plaintiffs simply "plead" that "an actual and specific discriminatory intent" existed. *Id*. at 44. Rather, to overcome the presumption that government officials "properly discharged their official duties" when making prosecutorial decisions, challengers must proffer factual allegations that demonstrate "clear evidence to the contrary." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Plaintiffs do not satisfy this "particularly demanding" standard. *AADC*, 525 U.S. at 489.

Plaintiffs rely on an asserted disparate impact on Mexicans, Central Americans, and Latinos, Opp'n 42, but "a racially disproportionate impact" is insufficient alone to establish discriminatory intent. *Arlington Heights*, 429 U.S. at 264–65, *see also Armstrong*, 517 U.S. at 470 (finding no discriminatory intent where study showed that all twenty-four defendants prosecuted for dealing cocaine and crack in twenty-four cases were African American). Nor does the disparate impact cited by Plaintiffs provide any circumstantial support for such an intent. As Plaintiffs note, many DACA recipients "crossed the border of the United States" while they were children, and it is thus unsurprising that individuals from countries at or near that border, constitute a high percentage of those previously granted DACA status. Compl. ¶ 2. And because DACA recipients "are mostly of Mexican and Central American origin," *id*. ¶ 94, *any* change to the DACA program at all would likely have had a disparate impact on those communities—as would nearly any change

Appeal: 18-1521   Doc: 52-7   Filed: 07/02/2018   Pg: 101 of 454   Case 1:17-cv-05228-NGG-VMS   Document 28-27   Filed 09/04/20   Page 763 of 1026 PageID #: 10354

Case 8:17-cv-02942-RWT   Document 30   Filed 12/05/17   Page 24 of 33

to the immigration policies of the United States.

Plaintiffs also cite allegations pertaining to the "historical background" and "sequence of events" that preceded the Acting Secretary's decision, Opp'n 42, but none of those allegations "reveals a series of official actions taken for invidious purposes," which the Supreme Court suggested would be probative on this factor in *Arlington Heights*. 429 U.S. at 267. More importantly, none of the allegations to which Plaintiffs point "shed[s] [any] light on the decisionmaker's purposes." *Id.* Rather, they simply characterize the status of the policy prior to September 5, 2017, and demonstrate that the policy has changed, without illuminating in any way the *reasons* behind the change. *See* Compl. ¶¶ 2-17, 93.

The same is true of Plaintiffs' arguments regarding the ways in which the Acting Secretary's decision allegedly constituted a "departure from normal procedures." Opp'n 42. Many of the allegations on which Plaintiffs rely simply reflect the agency's changed approach to deferred action without providing any explanation for how or why a discriminatory intent secretly motivated the change. *See* Compl. ¶¶ 18, 21-22. Plaintiffs' other allegations rely on their substantive claim that the agency was required to undergo notice-and-comment rulemaking before rescinding DACA. *See id.* ¶¶ 118-122, 126-128. It was not, as discussed above, and that does not demonstrate a departure from normal procedures. "DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment," Mot. 42, including DACA itself.

Finally, Plaintiffs reference allegations of an "ongoing pattern of statements revealing a discriminatory intent" from three individuals (President Trump, Attorney General Sessions, and White House Senior Policy Advisor Stephen Miller), Opp'n 42, but none of those statements provides any evidence of a secret discriminatory motive for the rescission of DACA by the Acting

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 109 of 454    Total Pages:(764 of 1026)
Case 1:17-cv-05228-NGG-VMS    Document 30-7    Filed 09/04/20    Page 764 of 1026 PageID #: 10355
Case 8:17-cv-02942-RWT    Document 30    Filed 12/05/17    Page 25 of 33

Secretary, let alone the sort of clear evidence that would be required to state such a claim. The statements do not address the actual decision at issue—the rescission of DACA—nor were they made by the Acting Secretary, the only official vested with authority under the INA to make the decision at issue. 8 U.S.C. § 1103(a)(1). The identity of the relevant decisionmaker here is not a "contested issue of fact," Opp'n at 45, but a settled issue of law.

### C.    Plaintiffs Fail to Plead Procedural Due Process Violations

Plaintiffs erroneously claim that "the panoply of work, travel, educational and family benefits that flowed from DACA are protected interests" under the Due Process Clause. Opp'n 47. As Defendants have explained, however, "DACA recipients have no protected liberty or property interest in deferred action entitling them to due process protections," Mot. 48, nor can any indirect benefits that may flow from a grant of deferred action be constitutionally protected interests. Plaintiffs' sweeping theory is impossible to square with the Supreme Court's holding that the "Due Process Clause does not protect everything that might be described as a 'benefit,'" and that a benefit "is not a protected entitlement" where, as here, "government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).

To be sure, if the Government had made binding "*promises* that DACA recipients would enjoy interests enjoyed by legal residents of the United States," Opp'n 48-49 (emphasis added)— say, by enacting a federal statute—Plaintiffs might have a stronger case. But a discretionary policy of non-enforcement is something that "government officials may grant or deny . . . in their discretion," *Castle Rock*, 545 U.S. at 756, and therefore creates no protected "entitlement." *See Arpaio v. Obama*, 797 F.3d 11, 17 (D.C. Cir. 2015) (DACA "remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship'").[13]

---

[13] Plaintiffs' procedural due process claims regarding the alleged change in DHS's information-sharing policy fail for all the same reasons.

Finally, even accepting the flawed premise that DACA (or any related downstream benefits that might accrue to DACA recipients) creates some constitutionally protected interest, Plaintiffs' claimed desire for notice and some "individualized process," Opp'n 51, is hard to understand. The Rescission Policy itself provided notice that DACA was to be gradually wound-down over a two-and-a-half-year period. The idea that some sort of individualized "hearing" was required for each of the hundreds of thousands of potentially affected individuals is inconsistent with *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, which held that the Due Process Clause does not require individualized pre-deprivation notice when a policy "applies to more than a few people," because "it is impracticable that everyone should have a direct voice in its adoption." 239 U.S. 441, 445 (1915). Plaintiffs' only distinction of *Bi-Metallic* is that "the affected individuals were 'protected' by the political process," Opp'n 51.

### D.      Plaintiffs Fail to Establish Substantive Due Process Violations

To prevail on their substantive due process claims, Plaintiffs must allege government action that is "so egregious" and "outrageous" that it "shock[s] the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). Such a claim is reserved for only those "fundamental" rights that are "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted).

The gradual wind-down of a prosecutorial discretion policy in the immigration context, in the face of substantial questions about whether the original policy *itself* is unconstitutional, cannot satisfy this standard. As explained in the original DACA memo, a grant of DACA "confers no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress,

19

acting through its legislative authority, can confer these rights." DACA Memo, AR at 3. Indeed, because even under DACA "deferred action remains discretionary and reversible," *Arpaio*, 797 F.3d at 17, the Acting Secretary could have ended the policy immediately, and such action would have been permissible as a matter of substantive due process. Instead, she opted for a gradual wind-down and a return to a traditional enforcement policy.[14]

Plaintiffs' allegations that an alleged change to DHS's information-sharing policy also violates substantive due process similarly fail. Even if DHS had modified that policy, the policy has always explicitly noted that it was subject to change at any time. *See supra* at 14-15.

### E.    Equitable Estoppel Principles Do Not Apply Here

Principles of equitable estoppel at a minimum do not apply to the *policy* decisions of the federal government. *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984). Plaintiffs fail to address these cases, and the Supreme Court cases they cite do not support the type of policy-based estoppel claim that they press here. To the contrary, those cases reserved for another day the question of whether estoppel could ever run against the Government. *See Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60-61 (1984); *OPM v. Richmond*, 496 U.S. 414, 423 (1990).

Regardless, Plaintiffs could not meet the high bar of an estoppel claim here. Their claim is based on the false premise that "the Government has intentionally abandoned its commitment that it would not take enforcement actions against individuals who relied upon assurances by the Government that their personal information would not be used in furtherance of enforcement proceedings." Opp'n 55. That is incorrect. *See*, *supra* 14-15.

Nor was there ever any "commitment" as Plaintiffs describe it. To the contrary, the

---

[14] Plaintiffs' conclusory allegations that the rescission was motivated by a discriminatory purpose do not save this claim. *See supra* 18-20.

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 767 of 454    Page 767 of 1026 PageID #: 10358
Case 1:17-cv-05228-NGG-VMS    Document 30    Filed 09/04/20

Case 8:17-cv-02942-RWT    Document 30    Filed 12/05/17    Page 28 of 33

Complaint makes clear that USCIS's policies on information sharing have always been subject to numerous exceptions. *See* Compl. ¶ 81. The instructions for completing the form used by individuals seeking DACA status that is referenced in the Complaint—and that Plaintiffs have provided as an exhibit—also state that USCIS's information-sharing policy "may be *modified, superseded, or rescinded at any time without notice*, [and] is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural." USCIS Form I-821D, Ex. 14, ECF No. 29-3, at 27 (emphasis added). That statement—which appears right below the information-sharing policy which Plaintiffs invoke—precludes any claim that the Government has engaged in "affirmative misconduct going beyond mere negligence." *Angeles v. Dist. Dir., INS*, 729 F. Supp. 479, 485 (D. Md. 1990).

## F.    Nationwide Declaratory and Injunctive Relief is Impermissible

The Complaint contains a separate cause of action seeking a declaratory judgment that DACA is "lawful." Compl. ¶¶ 182-185 (Count 7). Plaintiffs do not dispute that the Declaratory Judgment Act merely provides a remedy, and is not a separate source of rights independent of substantive federal law. *See* Mot. 57. Nor do Plaintiffs explain how a declaratory judgment by this Court that DACA is "lawful" would bear upon the rescission, which was based on the litigation risk that the Government faced in the Southern District of Texas. Plaintiffs instead brush aside these arguments as "premature." Opp'n 56. Because there is no actual controversy between the parties in this regard, this Court should dismiss Plaintiffs' Declaratory Judgment Act "claim" now.

Nor should this Court entertain any request for nationwide injunctive relief. Plaintiffs contend otherwise, noting that they reside "throughout the United States." *Id.* at 57. The relevant question is not where Plaintiffs reside; it is whether any relief that this Court may provide is tailored so as to "be no more burdensome to the defendant than necessary to provide complete

21

Appeal: 18-1521    Doc: 28-6    Filed: 07/02/2018    Pg: 769 of 454    Case 1:17-cv-05228-NGG-VMS    Document 28-27    Filed 09/04/20    Page 768 of 1026 PageID #: 10359

Case 8:17-cv-02942-RWT    Document 30    Filed 12/05/17    Page 29 of 33

relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (internal citations omitted). Accordingly, any injunction must be limited to the particular Plaintiffs here.

### III.    NOTHING MORE IS NEEDED TO RULE ON DEFENDANTS' MOTION

Plaintiffs attempt to avoid dismissal by arguing that Defendants have moved for summary judgment without complying with the requirements of Rule 56, and by suggesting the need for discovery under Rule 56(d) in search of facts to oppose summary judgment. *See* (Decl. of Elizabeth Bower), ECF No. 29-4. Plaintiffs, however, mischaracterize the nature of the motion before the Court. First and foremost, Defendants moved to dismiss Plaintiffs' Complaint in its entirety both for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Mot. 12-14; *see Marsh v. United States*, No. 14-cv-3559, 2016 WL 247563, at *2 (D. Md. Jan. 20, 2016) (APA claims resolved on Rule 12(b)(6) motion where, beyond the complaint and its attachments, the only documents submitted were matters of public record). Defendants also noted that, if the Court wished to convert its motion "[w]ith respect to Plaintiffs' APA claims" to a motion for summary judgment, such conversion would also be procedurally proper. Mot. 13.

Even if the Court were to convert Defendants' Motion into a motion for summary judgment, Defendants did not need to provide a separate statement of material facts. With respect to Plaintiffs' APA claims, assuming those claims are justiciable, the Court's review is limited to the *legal question* of whether the Agency's decision is arbitrary and capricious based on the administrative record. *See Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,* 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd*, No. 91-1267, 1992 WL 180138 (4th Cir. July 29, 1992). The Court need not look beyond the same record (and judicially noticeable documents) to determine that Plaintiffs' non-APA claims fail as a matter of law. Because this is a record-review case for which there are no genuine issues of material fact in dispute, Defendants properly

AR2020

supported the factual assertions in their Motion with particularized citations to the record. Nothing more is required by Rule 56 or the Local Civil Rules.[15]

Although the Court could resolve Defendants' Motion under Rule 12, Plaintiffs ask the Court to allow them to take discovery pursuant to Rule 56(d). As a threshold matter, Plaintiffs' efforts to use Rule 56(d) discovery to supplement the record indicate a misunderstanding of the proper scope of that record. In APA cases, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (internal citation omitted). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially" in the district court. *Camp*, 411 U.S. at 142. Because Plaintiffs have not attempted to make a "strong showing" that the agency acted in bad faith, or put forth any colorable argument as to why the Administrative Record should not be accorded deference, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other ground by Califano v. Sanders*, 430 U.S. 99, 105 (1997), they have not rebutted the strong presumption against discovery in APA cases, *see Tafas v. Dudas*, 530 F. Supp. 2d 786, 795 (E.D. Va. 2008).

Plaintiffs' Rule 56(d) request with respect to their constitutional claims is a thinly veiled attempt to evade the APA. *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1238 (D.N.M. 2014) ("[A]llow[ing] fresh discovery . . . would be to incentivize every unsuccessful party to agency action to allege bad faith, retaliatory animus, and constitutional

---

[15] Plaintiffs' supposed "Statement of Material Facts to Which There is a Genuine Dispute" does not in fact identify any "material" facts for which there is a "genuine" dispute that would preclude summary judgment in this matter. Additionally, rather than responding to the Government's arguments with citations to the Administrative Record or to other evidence, Plaintiffs largely cite to *allegations* in their Complaint, which of course are not "facts."

violations to trade in the APA's restrictive procedures. . . ."). The Court need not look further than Plaintiffs' own Rule 56(d) declaration to discern such intent, as Plaintiffs seek to use the same written discovery requests both to supplement the Administrative Record and to fish for constitutional violations. (*See, e.g.*, Bower Decl. ¶¶ 8, 9(b)). Where, as here, "a plaintiff's constitutional claims fundamentally overlap with their other APA claims, discovery is neither needed nor appropriate." *Chiayu Chang v. U.S. Citizenship and Immigration Servs.*, 254 F. Supp. 3d 160, 162 (D.D.C. 2017).

Even if Plaintiffs' request for discovery were otherwise appropriate, the request does not meet the stringent requirements of Rule 56(d). Rule 56(d) motions should be denied "when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Plaintiffs' discovery requests are grossly overbroad[16] and unnecessary to oppose the threshold *legal* arguments Defendants made in seeking dismissal. For example, with respect to Plaintiffs' procedural due process claims, Plaintiffs state that they "need discovery into matters such as the value of additional procedural safeguards and the fiscal and administrative burdens that such additional procedures would entail." Bower Decl. ¶ 6. Yet Defendants' Motion argues that Plaintiffs' procedural due process claims fail as a matter of law because Plaintiffs have not identified a protected liberty or property interest. *See* Mot. 48-52. Any discovery related to procedural safeguards cannot possibly rebut Defendants' argument that there is no protected

---

[16] For example, Plaintiffs broadly seek "*any and all* documents and communications, including but not limited to, public statements, *within or between* Defendants and the Executive Branch, and *any combination thereof*, related to the presence in the United States of Mexicans, Central Americans, or Latinos generally," Pls.' Req for Produc. No. 11, ECF No. 29-5 (emphasis added), without demonstrating why such broad discovery is necessary. Similarly, Plaintiffs' broad request for an unspecified number of "focused depositions," Bower Decl. ¶ 12, is wholly deficient under Rule 56(d), as Plaintiffs make no attempt to specify the scope, purpose, or necessity of such depositions.

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 100 of 454
Case 1:17-cv-05228-NGG-VMS    Document 2827    Filed 09/04/20    Page 771 of 1026 PageID #: 10362
Case 8:17-cv-02942-RWT    Document 30    Filed 12/05/17    Page 32 of 33

liberty or property interest implicated by the Rescission Policy. *See Nader v. Blair*, 549 F.3d 953, 961-62 (4th Cir. 2008) (denying Rule 56(d) motion when Plaintiffs sought "unnecessary" discovery on topics "not at issue in the motion for summary judgment").

The discovery Plaintiffs seek on their equal protection claim is a classic example of an improper "fishing expedition" and foreclosed by the Supreme Court's decision in *Armstrong*. *See Zimmerman v. Novartis Pharm. Corp.*, 287 F.R.D. 357, 363 (D. Md. 2012) ("Rule 56(d) does not allow parties to engage in a fishing expedition" (internal quotations omitted)). In their Motion, Defendants argue that Plaintiffs failed to state an equal protection claim because they did not allege a clear case of discriminatory animus. *See* Mot. 45-48. Plaintiffs now seek discovery to "inquire into discriminatory intent." Bower Decl. ¶ 5(b). Plaintiffs' request to probe the mental processes of high-level government officials is "nothing more than a request that [Plaintiffs] be allowed to find out if [they] ha[ve] a claim, rather than that [they] ha[ve] a claim for which [they] need[] discovery." *Fierce v. Burwell*, 101 F. Supp. 3d 543, 554 (D. Md. 2015) (internal quotation omitted).[17] But such discovery would be particularly unwarranted given that Plaintiffs failed to meet the initially high standard of showing "clear" discrimination in order to overcome the presumption that Defendants have faithfully executed the laws. *See Armstrong*, 517 U.S. at 464.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss this case or, in the alternative, summary judgment in Defendants' favor on all of Plaintiffs' claims.

---

[17] Moreover, to the extent that Plaintiffs seeks discovery related to the motives behind other deferred action programs and related to the intent of government officials other than the Acting Secretary, their request is vastly overbroad, and Plaintiffs do not sufficiently explain how such discovery would "affect the court's analysis." *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015).

J.A. 1284

AR2023

Appeal: 18-1521    Doc: 20-3    Filed: 07/02/2018    Pg: 200 of 454    Page 772 of 1026 PageID #:
10363
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20

Case 8:17-cv-02942-RWT    Document 30    Filed 12/05/17    Page 33 of 33

Dated: December 5, 2017                    Respectfully submitted,

                                           CHAD A. READLER
                                           Principal Deputy Assistant Attorney General

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           JENNIFER D. RICKETTS
                                           Director

                                           JOHN R. TYLER
                                           Assistant Branch Director

                                           */s/   Kathryn C. Davis*
                                           KATHRYN C. DAVIS
                                           RACHAEL WESTMORELAND
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Avenue NW
                                           Washington, DC 20530
                                           Phone: (202) 616-8298
                                           Fax: (202) 616-8470
                                           Email: Kathryn.C.Davis@usdoj.gov

                                           *Counsel for Defendants*

J.A. 1285                                                          AR2024

# EXHIBIT 1

AR2025

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

---

CASA DE MARYLAND, *et al.*,

        *Plaintiffs*,

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        *Defendants*.

No. 17-cv-2942 (RWT)

---

### DECLARATION OF RACHAEL WESTMORELAND

I, Rachael Westmoreland, do hereby declare and state as follows:

1.    I am a Trial Attorney for the United States Department of Justice, Civil Division, Federal Programs Branch. I am one of the attorneys who is responsible for the litigation of this matter. I make the following statements based on my personal knowledge and upon information furnished to me in the course of my official duties.

2.    Attached to this declaration is a true and correct copy of December 23, 2008 Department of Justice, Environment and Natural Resources Division memorandum entitled "Guidance to Federal Agencies on Compiling the Administrative Record."

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 5, 2017.

 

                                Rachael L. Westmoreland
                                Trial Attorney

Appeal: 18-1521 cv-03228 GG-VMS Filed: 07/03/2022 7 Pg: 775 of 1026 PageID #: 10366

Case 3:17-cv-05211-WHA Document 71-1 Filed 10/12/17 Page 3 of 4
Case 8:17-cv-02942-RWT Document 30-1 Filed 12/05/17 Page 3 of 4

**U.S. Department of Justice**

Environment and Natural Resources Division

*Assistant Attorney General*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530-0001*

*Telephone (202) 514-2701*
*Facsimile (202) 514-0557*

December 23, 2008

**MEMORANDUM**

To:      Selected Agency Counsel

From:    Ronald J. Tenpas
          Assistant Attorney General

Re:      "Guidance to Federal Agencies on Compiling the Administrative Record"
        (January 1999)


      In January 1999, the Environment and Natural Resources Division authored a document entitled "Guidance to Federal Agencies on Compiling the Administrative Record." That document identified issues that agencies may confront in assembling an administrative record. As explicitly stated in the document, it was intended only as internal Department of Justice guidance, and did not create any rights, substantive or procedural, nor did it limit the "otherwise lawful prerogatives of the Department of Justice or any other federal agency." As was stated in a recent brief by the Department of Justice, the 1999 memorandum "does not represent a formal policy of the Department of Justice, nor even an official directive of the Environment and Natural Resources Division (ENRD). The memorandum focuses on the compilation of an administrative record in the absence of a contemporaneous docket."

      It has come to our attention, however, that outside parties have sought to use this 1999 document in litigation against federal agencies, and have argued that it supports a particular composition of the administrative record, or a particular process for its assembly. This memorandum serves to clarify that the January 1999 document does not dictate any requirement for, or otherwise provide binding guidance to, federal agencies on the assembly of the administrative record. The composition of an administrative record is left to the sound discretion of the relevant federal agency, within the bounds of controlling law. This is an agency responsibility in the first instance and the Supreme Court has made clear that an agency has discretion in how to create the record to make and explain its decisions. *See, e.g., Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council, Inc.*, 435 U.S. 519, 544 (1978) (in rejecting the need for adjudicatory hearing in the context of rulemaking, the Court refers to the "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure" and noting that "the agency should normally be allowed to 'exercise its administrative discretion in deciding how, in light of internal organization considerations, it may best proceed to develop the needed evidence. . . .'").

      The Department of Justice has defended in litigation the legal position that deliberative documents are not generally required in an administrative record, and thus has also defended the position that in such circumstances no privilege log reflecting such documents would need to be prepared. The 1999 document should not be read as casting doubt on this legal position. Obviously,

AR2027

Appeal: 18-1521 - cv-05228-NGG-VMS Filed: 07/03/2018 Pg: 209 of 254 Page 776 of 1026 PageID #: 10367

Case 3:17-cv-05211-WHA Document 71-1 Filed 10/12/17 Page 4 of 4
Case 8:17-cv-02942-RWT Document 30-1 Filed 12/05/17 Page 4 of 4

specific statutory provisions and/or case law in the jurisdiction will play a significant role in determining the appropriate approach in a particular case. Agencies would likely benefit from having their own internal guidance regarding the contents and compilation of the record. An agency's guidance should, of course, be informed by applicable case law and the agency's experience and internal procedures.

Should you have any question about the development of agency procedures for compiling an administrative record, or the preparation of a particular administrative record, the Division would be pleased to consult with you. This memorandum is being sent to agencies with whom the Division frequently works, although it is available for use or reference by any federal agency.

- 2 -

AR2028

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**ROGER W. TITUS**
UNITED STATES DISTRICT JUDGE

**6500 CHERRYWOOD LANE**
**GREENBELT, MARYLAND 20770**
**301-344-0052**

## M E M O R A N D U M

TO:         Counsel of Record

FROM:    Judge Roger W. Titus

RE:         *Casa de Maryland, et al., v. United States Dept. of Homeland Security, et al.*
              Civil No. RWT-17-2942

DATE:    December 11, 2017

\* \* \* \* \* \* \* \* \*

Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.  *See* ECF No. 27.  Plaintiffs have responded in opposition.  *See* ECF No. 29.  Defendants have replied in support of their original Motion.  *See* ECF No. 30.  A hearing on the Motion is currently scheduled for December 15, 2017 at 9:30 a.m.

Pursuant to Fed. R. Civ. P. 56(f), the Court is providing notice that it may grant summary judgment for the nonmovants.

Despite the informal nature of this ruling, it shall constitute an Order of the Court, and the Clerk is directed to docket it accordingly.

_____
/s/
Roger W. Titus
United States District Judge

Case 1:17-cv-05228-NGG-VMS   Document 2827   Filed 09/04/20   Page 778 of 1026 PageID #: 10369
Appeal 18-1521  Document 37  Filed 07/02/2018  Pg 206 of 454
Case 8:17-cv-02942-RWT   Document 33   Filed 12/14/17   Page 1 of 1

# WILLKIE FARR & GALLAGHER LLP

Elizabeth Bower
202-303-1252
ebower@willkie.com

1875 K Street, N.W.
Washington, DC 20006-1238
Tel: 202 303 1000
Fax: 202 303 2000

December 14, 2017

**VIA ECF**
The Honorable Roger W. Titus
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Re:  *CASA de Maryland, et al., v. United States Department of Homeland Security, et al.*, Case No. 8:17-cv-02942-RWT

Dear Judge Titus:

We write on behalf of Plaintiffs in response to the Court's 56(f) notice. Plaintiffs are prepared to discuss an expedited schedule for the parties' responses to any such motion made by the Court at tomorrow's hearing on the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment, such that the matter may be fully submitted by December 22, 2017.

Sincerely,


/s/  *Elizabeth J. Bower*
Elizabeth J. Bower (*pro hac vice*)
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC  20006
Tel: (202) 303-1000
ebower@willkie.com

/s/ *Dennis A. Corkery*
Dennis A. Corkery (D. Md. 19076)
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, Suite 400
Washington, DC 20036
Tel: (202) 319-1000
dennis_corkery@washlaw.org


Counsel for Plaintiffs


cc:    Counsel of Record via ECF


NEW YORK   WASHINGTON   HOUSTON   PARIS   LONDON   FRANKFURT   BRUSSELS   MILAN   ROME
in alliance with Dickson Minto W.S., London and Edinburgh

J.A. 1291                                                          AR2030

```
 1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     SOUTHERN DIVISION

 3   CASA DE MARYLAND, et al.,    Civil No. RWT-17-2942

 4            Plaintiffs,

 5        v.                      Greenbelt, Maryland

 6   U.S. DEPARTMENT OF HOMELAND   December 15, 2017
     SECURITY, et al.,
 7
              Defendants.          9:30 a.m.
 8   -------------------------/

 9            TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE ROGER W. TITUS
10            UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiffs:   Willkie Farr and Gallagher LLP
                           By: ELIZABETH J. BOWER, ESQUIRE
13                             NICOLE CASSIDY, ESQUIRE
                           1875 K Street, NW
14                         Washington, D.C. 20006

15                         Arnold and Porter Kaye Scholer LLP
                           By: JOHN A. FREEDMAN, ESQUIRE
16                         601 Massachusetts Avenue, NW
                           Washington, D.C. 20001
17
                           Washington Lawyers Committee for
18                         Civil Rights and Urban Affairs
                           By: DENNIS A. CORKERY, ESQUIRE
19                         11 Dupont Circle NW - Suite 400
                           Washington, D.C.  20036
20

21   For the Defendants:   U.S. Department of Justice
                           By: BRETT SHUMATE, ESQUIRE
22                             KATHRYN DAVIS, ESQUIRE
                               RACHAEL WESTMORELAND, ESQUIRE
23                             JOHN TYLER, ESQUIRE
                               BRAD ROSENBURG, ESQUIRE
24                             STEVEN PEZZI, ESQUIRE

25
```

1

AR2031

```
1    Court Reporter          Lisa K. Bankins RMR FCRR
                             United States District Court
2                            6500 Cherrywood Lane
                             Greenbelt, Maryland 20770
3

4    Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

AR2032

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The matter now pending before the
 3    Court is Civil Case Number RWT-17-2942.  Casa de Maryland,
 4    et al. versus U.S. Department of Homeland Security, et al.
 5    The matter comes before this Court for a motions hearing.
 6    Counsel, please identify yourselves for the record.
 7              MS. BOWER:  Good morning, Your Honor. Elizabeth
 8    Bower, Willkie Farr and Gallagher on behalf of the
 9    plaintiffs.
10              THE COURT:  Good morning.
11              MS. CASSIDY:  Good morning, Your Honor.  Nicole
12    Cassidy, Willkie Farr and Gallagher for the plaintiffs.
13              MR. FREEDMAN:  Good morning, Your Honor.  John
14    Freedman from Arnold and Porter Kaye Scholer for the
15    plaintiffs.
16              MR. CORKERY:  Good morning, Your Honor.  Dennis
17    Corkery for the Washington Lawyers Committee for Civil
18    Rights and Urban Affairs.
19              THE COURT:  Good morning.
20              MR. SHUMATE:  Good morning, Your Honor.  Brett
21    Shumate from the Department of Justice on behalf of the
22    defendants.
23              THE COURT:  Good morning.
24              MS. DAVIS:  Good morning.  Kathryn Davis from
25    the Department of Justice.
```

```
 1          MS. WESTMORELAND:  Good morning.  Rachael
 2   Westmoreland from the Department of Justice.
 3          THE COURT:  Good morning.  We've got some back
 4   benchers.
 5          MR. TYLER:  John Tyler, Department of Justice on
 6   behalf of the defendants, Your Honor.
 7          MR. ROSENBURG:  Brad Rosenberg of the Department
 8   of Justice also on behalf of the defendants.
 9          MR. PEZZI:  Steven Pezzi on behalf of the
10   Department of Justice for defendants.
11          THE COURT:  Good morning.  All right.  I see
12   we're well represented from the Justice Department.
13          All right.  We are here on the defense motion.
14   I'll be glad to hear from you.  Are you going to argue,
15   Mr. Shumate?
16          MR. SHUMATE:  Yes, Your Honor.
17          THE COURT:  Thank you.
18          MR. SHUMATE:  May it please the Court.  The
19   Court should dismiss this challenge to DHS' rescission of
20   the deferred action policy known as DACA for three
21   reasons.  First, the Court lacks jurisdiction because the
22   rescission of DACA is an unreviewable exercise of
23   prosecutorial discretion to deny deferred action to
24   persons who are removable; second, DHS reasonably
25   explained its decision to rescind DACA in an orderly
```

4

AR2034

1    fashion rather than risk an immediate nationwide

2    injunction by the same Texas district court that had

3    enjoined expanded DAPA in an opinion that had been

4    affirmed by the Fifth Circuit and the Supreme Court; and,

5    third, that plaintiffs have not alleged a clear case that

6    the rescission of DACA was motivated by animus nor have

7    they alleged any due process right to the continuation of

8    DACA.

9             If I could first speak to the question of the

10   Court's jurisdiction, Your Honor?  The Court should

11   dismiss the case because Congress has --

12            THE COURT:  Were you comfortable that the Texas

13   court had jurisdiction?

14            MR. SHUMATE:  Well, that involved a very

15   different situation, Your Honor.  That was a case and the

16   Texas court said this is a case where the government is

17   affirmatively taking some action.  It would be very

18   different if it were government inaction to deny deferred

19   action or voluntary departure and they distinguished that

20   case from the Perales case which involved denial of work

21   authorization and voluntary departure.  And the court said

22   in that situation there is no law to apply.  When the

23   government is taking some action -- in that case it was

24   granting DACA -- there is a danger that the government may

25   be abdicating its statutory responsibilities.  But it's a

1    very different case in a situation like this where the

2    government is not taking action.  It's denying deferred

3    action.  In a case like this one, there is simply no law

4    to apply.

5            And Section 701(a)(2) of the APA strips the

6    court of jurisdiction in a case involving a denial of

7    deferred action because it is an exercise of prosecutorial

8    discretion that is committed by law to the executive

9    branch.

10           In addition, there is a second statute that

11   strips the court of jurisdiction.  That is Section 1252(g)

12   of the INA.  That statute strips the court of jurisdiction

13   to review the rescission of DACA because Congress intended

14   to prevent courts from reviewing denials of deferred

15   action.

16           The plaintiffs try to circumvent these

17   jurisdictional bars in a number of ways and I'm happy to

18   respond to each of those.  Each of those arguments are

19   meritless.  And the first point I'd like to make is that

20   the rescission of DACA does not become reviewable simply

21   because the Acting Secretary gave a reviewable reason in

22   her decision.  The Supreme Court explained in a case

23   called BLE that the exercise of prosecutorial discretion

24   does not become reviewable simply because the agency gives

25   a reviewable reason.

J.A. 1297

AR2036

```
 1              So it's important not to confuse the agency

 2    action here with the reason given for that action.  The

 3    agency action that is being challenged here is a denial of

 4    deferred action.  That is inherently an exercise of

 5    prosecutorial discretion.

 6              THE COURT:  Well, is a denial a deferred action

 7    or is it simply rescinding the program of prosecutorial

 8    discretion that was put in place previously?

 9              MR. SHUMATE:  The rescission of DACA is a

10    decision by DHS not to grant deferred action.  So DACA

11    established a policy whereby the government would grant

12    deferred action status on a class-wide basis --

13              THE COURT:  Allegedly on the basis of

14    prosecutorial discretion.

15              MR. SHUMATE:  That's correct.

16              THE COURT:  Right.

17              MR. SHUMATE:  And the rescission of that

18    decision is also --

19              THE COURT:  Also an exercise of prosecutorial

20    discretion.

21              MR. SHUMATE:  Right.

22              THE COURT:  Right.  Okay.

23              MR. SHUMATE:  Exactly right.  And what makes it

24    an exercise of prosecutorial discretion is that denial of

25    deferred action, there is simply nothing in the INA that
```

1    the plaintiffs can point to that would give the court a

2    meaningful standard to evaluate whether the denial of

3    deferred action was reasonable or not.

4         The Supreme Court in the AADC case explained

5    that.  Denials of deferred action, that is a discretionary

6    determination by the government.

7         In the Mada-Luna case from the Ninth Circuit,

8    that court also explained denial of deferred action status

9    is not something that is reviewable because there is not a

10   standard in the INA.  That decision to deny deferred

11   action does not, therefore, become reviewable simply

12   because the Acting Secretary said we have concerns about

13   the legality of DACA.

14        Imagine if in this case the Acting Secretary had

15   just said I'm rescinding the 2012 DACA memorandum full

16   stop.  There would be no explanation about the legality --

17   of her concerns about the legality of the policy or the

18   Attorney General's views about the legality.  There would

19   be nothing in the record that the court would even

20   potentially be able to review.  The reviewability and

21   justiciability question shouldn't be any different merely

22   because she gave a reviewable reason and that is she had

23   concerns about the legality of the policy.

24        The second reason the plaintiffs have pointed to

25   is that this was a class-wide decision rather than an

1    individualized denial of deferred action.  But that is a

2    distinction without a difference.

3              The Heckler case, which is a 1985 Supreme Court

4    decision involved a decision to deny enforcement on a

5    class-wide basis, not to go after manufacturers of drugs

6    using the capital punishment.

7              The bottom line question is whether there is law

8    to apply to evaluate the denial of deferred action and

9    they have not pointed to anything.  It doesn't matter

10   whether that decision is taken on a class-wide basis or on

11   an individualized basis.  The point of our Section 701

12   argument is that there is simply no law to apply in the

13   INA to evaluate whether the denial of deferred action

14   status is something that the Court can review.

15             I'd also like to address Section 1252(g) and the

16   plaintiffs' argument really does miss the forest for the

17   trees.  The statute applies here to the rescission of DACA

18   because this was a decision to deny deferred action to

19   individuals who are otherwise removable.  And the Supreme

20   Court spoke to this in the AADC case and they said the

21   entire point of the statute is to insulate decisions to

22   deny deferred action and other discretionary

23   determinations from judicial review.  There is an inherent

24   danger when courts exercise review over decisions to take

25   prosecutorial discretion.

1           And so there are two circuits that have already

2     weighed in on this question.  The Seventh Circuit in a

3     case called Botezatu said "review of refusal to grant

4     deferred action is excluded from the jurisdiction of the

5     district court."  And the Third Circuit in a case called

6     Vasquez, which we cited in our brief says courts do not

7     have "jurisdiction to review a denial of DACA relief

8     because that decision involves the exercise of

9     prosecutorial discretion not to grant deferred action."

10          At the end of the day, what the plaintiffs are

11    asking the Court to do is gut the entire purpose of that

12    statute by reviewing a denial of deferred action and the

13    Court should not do that.

14          One of the other points that the plaintiffs have

15    made is that their constitutional claims are not covered

16    by either of these jurisdictional bars and that even if

17    the Court were to dismiss their statutory claims, their

18    other claims would survive.  But that is not true, Your

19    Honor.  Section 1252(g) expressly applies to any cause or

20    claim.  So therefore, it insulates denial of deferred

21    action from any challenges.

22          And to be sure, the Supreme Court has indicated

23    there may be some cases that fall within Section 701 that

24    may allow constitutional claims to be brought.  But those

25    are not cases involving prosecutorial discretion and

10

AR2040

```
1    certainly not in the immigration context.  In that

2    specific --

3            THE COURT:  Well, if they're alleging here that

4    prosecutorial discretion is being exercised in an

5    unconstitutional manner, doesn't that get review before

6    this court?

7            MR. SHUMATE:  Well, what the Supreme Court said

8    in AADC is that there may be a rare case involving

9    outrageous discrimination where the presumption against

10   reviewing exercises of prosecutorial discretion may be

11   overcome.  We respectfully submit that is not even close

12   to that case here.

13           But what the court said is that in a case

14   involving an equal protection challenge and in AADC, it

15   was a selective prosecution claim.  These are claims by

16   individuals who are unlawfully in the country and it's

17   just the courts do not allow those individuals to bring

18   these types of claims lightly.  And so, therefore, there

19   is a very high hurdle to bring those claims.  So in our

20   view, Your Honor, the jurisdictional bar is applied

21   equally to all of their claims.

22           If I can next turn to -- even if the Court were

23   to decide that these claims were reviewable, Your Honor,

24   we think the Secretary's decision easily survives the APA

25   standard of review for a couple of reasons.  First is that
```

1    she rationally explained her decision to rescind the 2012

2    DACA memorandum.  I think it's important to first

3    recognize there is no statutory challenge to the Acting

4    Secretary's decision.  There is no dispute that the action

5    she took here is consistent with the INA.  Is not in any

6    way in conflict with the statute or foreclosed by the

7    statute.

8            The only question is whether she gave a rational

9    explanation for her decision under the deferential APA

10   standard of view and here she plainly did.  She explained

11   that DACA would likely be enjoined by the same Texas

12   district court that had enjoined expanded DACA on a

13   nationwide basis.  That decision was affirmed by the Fifth

14   Circuit and it was affirmed by the Supreme Court.

15           And so her calculus was I can either rescind

16   DACA in an orderly fashion, allow for a wind-down or I can

17   take the risk that the Texas plaintiffs who had already

18   threatened to bring a lawsuit against DACA would do so in

19   the same Texas district court that had enjoined expanded

20   DACA, in which case there very likely would have been an

21   immediate injunction ending the program and allowing --

22   and throwing the entire DACA policy into chaos.  She chose

23   the least disruptive option.  She chose to wind down DACA

24   in an orderly fashion.  She did not strip any DACA

25   recipient of their DACA status immediately.  She allowed

1  for there to be a process whereby the policy would be

2  wound down over the course of six months.  She allowed

3  renewals to take place.  There is nothing irrational about

4  that in any way.

5         She also relied on the Attorney General's view

6  that DACA is unlawful.  That conclusion follows naturally

7  from the Fifth Circuit's decision that expanded DACA was

8  unlawful, conflicted with the statute, conflicted with

9  other principles in the INA that -- and the Supreme Court

10  had affirmed that decision.

11         Here, the Attorney General concluded that DACA

12  has the same legal and constitutional defects as expanded

13  DACA and that's quite clear.  DACA like expanded DACA had

14  been created by DHS as an exercise of discretion without

15  proper statutory authority.  The Fifth Circuit has said

16  quite clearly that Congress had spoken to this question

17  and had not allowed DHS to create this type of deferred

18  action policy.

19         Another thing that troubled the Attorney General

20  is that DACA had no established end date.  It allowed

21  class-wide relief of -- for class-wide grants of deferred

22  action status.  I think it's essential here to remember

23  the APA standard of review.  This is not a situation where

24  the Court should substitute its judgment for the Acting

25  Secretary's.  Under the deferential APA standard of

13

AR2043

```
 1    review, the only question is whether her decision is

 2    rational and we submit that it respectfully is.

 3             Now the second reason they have alleged that the

 4    Acting Secretary's decision conflicts with the APA is that

 5    rescission of DACA did not go through the APA's notice and

 6    comment rule-making requirements.

 7             I just have two points to make on that, Your

 8    Honor.  The first is that the creation of DACA did not go

 9    through notice and comment rule-making.  And the Fourth

10    Circuit has spoken to a situation just like this.  Where

11    an agency adopts a policy and it does not do so through

12    notice and comment rule-making, the agency does not have

13    to go through those strict procedures to rescind a policy

14    that did not go through notice and comment rule-making.

15    That's the Carroll case, 48 F.3rd 1331 at Footnote 9.  I

16    can just read from the opinion.  "If the interim rule were

17    a substantive rule, it would have been invalid from the

18    date of its issuance for failure to comply with the notice

19    requirements under 5 USC 553."

20             So even if the rescission of DACA were a

21    substantive legislative rule that should have gone through

22    notice and comment rule-making, DACA was also a

23    legislative rule and did not go through notice and comment

24    rule-making procedures and therefore, would have been

25    invalid from the start.
```

14

AR2044

```
 1              Now the second reason why notice and comment

 2    rule-making procedures are not required is that this is a

 3    statement of policy exempt from the notice and comment

 4    rule-making requirements in the APA because this explains

 5    to the public how DHS intends to exercise its discretion

 6    in the future with respect to deferred action.

 7              Now there's a test that the Fourth Circuit uses

 8    to evaluate whether something is a legislative rule or a

 9    statement of policy and we satisfy both of those.  Number

10    one, the memo that rescinds the DACA policy establishes no

11    binding legal norms.  It does not in any way strip anyone

12    of their DACA status immediately.  It imposes no binding

13    legal norms on DACA recipients and it doesn't affect any

14    rights of DACA recipients because the 2012 DACA memorandum

15    was quite clear that it created no rights in any -- no

16    substantive right in any of the recipients of DACA.

17              Moreover, DHS remains free to exercise its

18    discretion to grant deferred action status in the future.

19    The memo describes how DHS will adjudicate requests for

20    deferred action in the future on an individualized

21    case-by-case basis.  It quite clearly says that DHS will

22    continue to exercise its discretionary authority over

23    deferred action and it also says that the memo places "no

24    limitations on the agency's otherwise lawful enforcement

25    prerogatives."  So it's quite clear that this is a
```

15

AR2045

1    statement of policy.  It did not have to go through notice
2    and comment rule-making procedures.
3            And the third APA issue I'd like to address,
4    Your Honor, goes to the information-sharing claims.  One
5    of the allegations is that the government has decided to
6    change the policy on a sharing of information that DACA
7    recipients have submitted to ICE and CBP for enforcement
8    purposes.  But those claims fail for one simple reason.
9    There has been no change in the policy on
10   information-sharing.  So therefore, there's no final
11   agency action and the plaintiffs have no standing.
12           The rescission policy that is being challenged
13   here says nothing about the sharing of information for
14   enforcement purposes.  There's nothing more that the
15   plaintiffs have raised other than a speculative fear that
16   this might happen in the future.  But DHS has been quite
17   clear and they said on the FAQ section --
18           THE COURT:  Are you prepared to say that from
19   representing the defendants that there is no intention of
20   changing the information-sharing assurances that were
21   given in connection with DACA?
22           MR. SHUMATE:  No.  I'm not making that
23   representation, Your Honor.  Even from the beginning, DHS
24   has been quite clear that this policy on
25   information-sharing can change.  But the question for the

J.A. 1307                                          **AR2046**

```
1    Court is has it changed.  Have they alleged final agency
2    action that the Court would thus have jurisdiction to
3    review it and they have not.  And DHS said quite clearly
4    "this information-sharing policy has not changed in any
5    way since it was first announced including as a result of
6    the September 5, 2017 memo starting a wind-down of the
7    DACA policy."  So there has been no change.  DHS has been
8    clear from the start that there has been no change.
9          But they also I think take liberties with what
10   that policy is.  There has never been a promise or
11   assurance that that information would never be changed.
12   FAQ 19 quite clearly says that the information is
13   generally protected and will not be shared for enforcement
14   purposes, but there may be circumstances where it will be
15   to adjudicate a DACA application or for law enforcement
16   purposes if the individual meets the status of the test
17   for notice to appear.  But also quite clearly, DHS has
18   said from the start that the information policy -- sharing
19   policy can change, but it has not.  So that really should
20   be the end of the debate about information-sharing.
21          If there are no other questions about the APA
22   claims, I'd like to say a few things about the
23   constitutional claims that are --
24          THE COURT:  Okay.  You may proceed.
25          MR. SHUMATE:  The equal protection claims are
```

1    the ones that are primarily being brought by the

2    plaintiffs, those should be dismissed, Your Honor, because

3    the plaintiffs have come nowhere close to meeting the high

4    standard for alleging an equal protection challenge to the

5    exercise of prosecutorial discretion.

6         The standard is quite high.  The Supreme Court

7    has been quite clear on this in Armstrong and AADC is that

8    to overcome the presumption of regularity that attaches to

9    an exercise of prosecutorial discretion, the plaintiff has

10   to allege a clear case that the government's action was

11   motivated by discriminatory animus.  And in the AADC case,

12   the Supreme Court spoke clearly to the exercise of

13   prosecutorial discretion in the immigration context and

14   they said there has to be a rare case indeed involving

15   outrageous discrimination to overcome that presumption

16   because there are dangers inherent with courts

17   second-guessing the exercise of prosecutorial discretion.

18        And the plaintiffs failed to meet that standard

19   here for a couple of reasons.  They really only point to

20   two things.  One is the alleged disparate impact on

21   Mexicans and Latin Americans from the rescission of DACA.

22   But the fact that the policy may affect those individuals

23   is an accident of geography, not an example of

24   discriminatory animus.  And I think the case law is pretty

25   clear that just because something may impact a group of

J.A. 1309                                          **AR2048**

1    individuals does not suggest that action was taken with

2    some sort of ill motivation toward those individuals.

3           They also point to a number of statements, but

4    they cannot attach any of those statements to the actual

5    decision maker here who was Elaine Duke, the Acting

6    Secretary of DHS.  There is no suggestion that she

7    harbored any animus when she took this decision to -- made

8    this decision to rescind the 2012 DACA memorandum.

9           The other set of claims are due process claims,

10   Your Honor, but those should also be dismissed because

11   there is no due process right to the continuation of DACA.

12   The 2012 memo was clear and I'll quote "this memorandum

13   confers no right immigration status or pathway to

14   citizenship.  Only the Congress acting through its

15   legislative authority can confer those rights."  If there

16   is no right, there is no due process claim because they

17   have not sufficiently alleged a property or liberty

18   interest in their deferred action status.

19           The other reason is that this is entirely

20   discretionary.  The decision by the government to grant

21   deferred action status is something that is inherent in

22   the government's discretion.  Likewise the denial of that

23   deferred action status is not something that confers any

24   rights.  It is not something that is conferred by statute

25   or regulation.  This is something that is inherent to the

```
1    agency's prosecutorial discretion.

2              The last thing I'd like to address, Your Honor,

3    is the request for Rule 56(d) discovery.  I can just make

4    a few brief points on that.  This is really nothing more

5    than a fishing expedition and I think if you take a look

6    at some of the discovery requests, it will be quite clear.

7    One thing they are asking for is "any and all documents

8    and communications within the entire executive branch

9    related to the presence in the United States of Mexicans,

10   Central Americans or Latinos."  That is nothing more than

11   a fishing expedition.

12             I think it's important to remember what the

13   standard is for Rule 56(d).  It is the fact that they have

14   to show that they cannot oppose the motion for summary

15   judgment because they do not have facts that are essential

16   to opposing the motion.  They do not lack any of those

17   facts, Your Honor.  This is a record review case involving

18   the Acting Secretary's decision to rescind the 2012 DACA

19   memorandum.  Her reasons are quite clear on the face of

20   that document.  There is no reason or need for the Court

21   to engage in discovery to evaluate the legal questions

22   that are now before the Court.

23             It would also be improper for them to use Rule

24   56(d) to overcome the high bar on discovery of equal

25   protection claims, Your Honor.  As I mentioned Armstrong
```

20

```
 1   involved an equal protection challenge to the exercise of
 2   prosecutorial discretion.  And the court said to get
 3   discovery on that claim, a plaintiff has to overcome a
 4   very high bar and to demonstrate -- make a threshold
 5   showing that there has been a clear case of
 6   discrimination.  They have not met that bar here.
 7   Therefore, discovery would be inappropriate, Your Honor.
 8   Those are the only points I'd like to make, Your Honor.
 9   I'm happy to answer any other questions.
10            THE COURT:  All right.  Let me hear from the
11   plaintiffs.
12            MR. SHUMATE:  Thank you.
13            MS. BOWER:  Good morning, Your Honor.  Elizabeth
14   Bower, as I said earlier, on behalf of the plaintiffs.
15            We need to take a step back.  What we did not
16   hear from the government's presentation is anything that
17   was alleged in the complaint.  As we state specifically in
18   our complaint and as apparent from the caption and the
19   facts in the complaint, I represent 16 individuals and
20   nine organizations who filed this lawsuit to challenge not
21   a denial of deferred action, but to challenge the
22   government's decision that was announced on September 5th
23   to rescind a program, the DACA program and all of its
24   protections after a chorus of derogatory and threatening
25   public statements by senior government officials directed
```

1    at Mexican and Latino immigrants.

2           The organizational plaintiffs provide services,

3    support and advocate on behalf of immigrants including

4    DACA recipients and as the complaint makes clear, they

5    have collectively assisted tens of thousands of

6    individuals to apply for DACA and have several thousand

7    DACA members.  The individuals are young men and women and

8    some teenagers of Mexican and Latino descent brought here

9    to this country as children and raised here.  They have

10   built their lives in this country.  This is their home.

11          THE COURT:  Well, I understand what the program

12   is all about and why it was put together and those are

13   very, you know, meritorious reasons for trying to protect

14   people of this nature.  If I understand some of the

15   contentions that the plaintiffs are making is that the

16   President through the use of his statements via Twitter

17   and other things, which make life very interesting for

18   judges and lawyers, has expressed some views about

19   immigration and people coming here from Mexico and that

20   some of them may be rapists and murderers and so forth.

21   He also said some of them are very nice people.  So he's

22   not made all Mexicans into this category.

23          But if I understand with respect to the question

24   of DACA, the specific program, the Secretary in this case

25   has decided to rescind it because of announced questions

1    as to its legality based upon the Fifth Circuit opinion

2    and the affirmance by an equally divided Supreme Court and

3    that the program needs to be wound down, not abruptly

4    stopped.  And if I recall correctly, the President said

5    something to the effect he wanted Congress to do something

6    within that six months to regularize it from a legal

7    standpoint by enacting it as a congressional act.  Isn't

8    that the background that I have to examine this case on?

9             MS. BOWER:  Well, that is part of the

10   background, Your Honor.  But the reliance element, which

11   is why the implementation of the program and the

12   individuals who were eligible for and applied for and in

13   good faith relied on the government in coming forward and

14   applying and taking advantage of the benefits provided by

15   the program is important to the decision-making process

16   that Secretary Duke applied and others within the

17   administration including individuals within the White

18   House and the Department of Justice.  That the reliance by

19   these individuals is a critical component and a salient

20   problem of the agency's decision to rescind DACA that is

21   completely absent from this record that the government has

22   put forth to support the rescission decision.

23             And on the congressional point, we would love

24   for Congress to act on this issue, but --

25             THE COURT:  There's still time.

J.A. 1314                                          AR2053

```
1                MS. BOWER:  -- we're not here.

2                THE COURT:  They are still negotiating.

3     Congress is in session.

4                MS. BOWER:  Congress is in session.

5                THE COURT:  Hope springs eternal.

6                MS. BOWER:  It does.  It certainly does.  But

7     until that time --

8                THE COURT:  I would like nothing better than to

9     have this case become moot.

10               (Laughter.)

11               MS. BOWER:  But today, it's not.

12               THE COURT:  My understanding is that that is

13    being talked about on Capitol Hill.  Now whether they do

14    anything before the wind-down of this program or not, we

15    don't know.

16               MS. BOWER:  That is correct, Your Honor.

17               THE COURT:  Okay.

18               MS. BOWER:  And given the significant impact

19    that this rescission memo has and will continue to have on

20    both recipients of DACA and those who are eligible for and

21    now are no longer under the rescission memo able to apply

22    for DACA, it's important to move forward with --

23               THE COURT:  Well, how did they get all these

24    rights that you're describing when the initial memorandum

25    that established the program in the first place said that
```

```
1    there's no rights being established by virtue of the
2    deferred action in their exercise of discretion?  It was
3    spelled out loudly and clearly in the original decision,
4    wasn't it?
5            MS. BOWER:  The savings clause, if you will,
6    Your Honor, does not negate the substantial benefits that
7    were conferred through the operation of the program.  DACA
8    was pushed out.  There was a concerted outreach effort by
9    the government to go and encourage individuals to apply
10   and when they pitched the program, they pitched it as a
11   package of benefits.  It provided the tool kit not only to
12   stay in this country, but it provided the tool kit for a
13   livelihood.  Recipients were told that they would have the
14   ability to work, that they would have the ability --
15           THE COURT:  Is it your position that that
16   language in the original decision to establish DACA was
17   simply providing legal cover for the government's
18   intention to set up some real permanent benefits for
19   people and that they were really trying to cover their
20   tracks by saying you're not getting any permanent rights
21   by this program?
22           MS. BOWER:  I wouldn't call it legal cover, Your
23   Honor, and I don't know what their intention was obviously
24   for providing that.  But I will say that a general savings
25   clause cannot trump the specific rights that were
```

25

J.A. 1316                                          AR2055

1       conferred through the program.

2               And the 150-page standard operating procedures

3       that the government ruled out in connection with DACA

4       spelled out specific steps that would need to occur in

5       order for an individual to be terminated from the benefits

6       and the program, the DACA program itself.  So the

7       government also acted in a way and reflected as the Perry

8       case supports a mutual understanding between the

9       government and the DACA recipients that it was conferring

10      benefits and that they had legal protection to live in

11      this country.

12              THE COURT:  Let me ask you this.  The original

13      program was expressed in terms of prosecutorial discretion

14      and that we're going to exercise the discretion not to

15      prosecute people who are here illegally provided you do

16      the following things.  That's essentially what it's

17      saying.

18              Prosecutors' offices throughout the country have

19      to make decisions like that.  A state legislature can pass

20      laws and say we want to prohibit the possession of various

21      types of drugs and the maximum punishment is X, Y and Z

22      and you, prosecutors, you faithfully execute the laws and

23      prosecute these people.  There's not a prosecutor's office

24      around this country that I'm aware of that doesn't have

25      some kind of a deferred or diversionary program for

26

```
 1   low-grade drug offenses.  And they will tell people come

 2   to us with your low grade -- you've been charged by the

 3   police with possession of some particularly small quantity

 4   of drugs.  We got better -- more important fish to fry in

 5   this prosecutor's office, the murderers and the robbers

 6   and rapists and we're not going to -- and we don't want to

 7   use our resources on these cases.  But if you want to have

 8   deferred prosecution or non-prosecution or nolle prosequi

 9   or anything of that nature, we want to make certain you're

10   addressing your drug problem.  So we have established a

11   drug court or a drug problem, treatment programs.  So

12   you've been caught and we could prosecute you, but we

13   won't.  But you must go into this treatment program.

14         Now do the people -- a prosecutor's office could

15   say I'm the new guy in town, I'm going to prosecute all of

16   these cases, we're no longer going to have the deferral

17   programs, we're no longer going to have the option of drug

18   treatment.  Do they have a right to come in and say,

19   uh-huh, no, I'm entitled to a drug treatment program?  How

20   is that any different than this?

21         MS. BOWER:  It's different than this because the

22   program itself said come out of the shadows and we will

23   provide you with the tools you need to live here.  Right?

24   It wasn't saying provided you do X, Y and Z.  Now there

25   were exceptions.  If there were subsequent criminal
```

27

1    activities, if there was fraud or misrepresentations, they

2    could be terminated from the program and that was set

3    forth specifically in the standard operating procedures.

4         But the act of prosecutorial discretion at the

5    time that they were approved, it wasn't just we're going

6    to look the other way, we know you're violating the law,

7    we are going to look the other way.  It is we want you to

8    come forward, we want you to be successful here and they

9    have been.  These DACA recipients took advantage of these

10   programs and are valuable contributors to the economy and

11   our communities.  They have literally built their lives

12   around the status and the promises made by the government.

13        Now if there were violations, as I said, if

14   there was subsequent criminal activity, if they didn't

15   abide, then there are procedures in place in the DACA

16   program itself to terminate those individuals and they

17   were told that they would be provided notice of

18   termination and they would have an opportunity to respond.

19   And that did not occur here, Your Honor.

20        So I'm going to go back to the points that the

21   government made with respect to justiciability.  I think

22   it's quite clear from the case law, Your Honor, that the

23   presumption is in favor of judicial review of

24   administrative action even in the immigration context and

25   there are plenty of cases, Texas v. U.S. is one of those

```
1    cases where the court has made clear that there is a

2    strong presumption of judicial review of agency action.

3    The government relies on two what the Supreme Court in

4    Overton Park has called very narrow exceptions to judicial

5    review and they, frankly, do not apply here.

6              The first is that the matter is committed to

7    agency discretion as a matter of law.  And their as you

8    heard from the government this morning, their basis for

9    that conclusion is solely that this rescission memo is an

10   exercise of prosecutorial discretion.  But it is not.  The

11   exercise occurred as Your Honor pointed out when the

12   program was initiated and the individuals who applied for

13   and were granted deferred action received that deferred

14   action status.  What the rescission memo does is eliminate

15   the opportunity for prosecutorial discretion with respect

16   to these individuals as it relates to the current --

17             THE COURT:  Isn't it simply an exercise of

18   discretion just like the original program was?

19             MS. BOWER:  It is not because it's eliminating

20   the entirety -- it's stripping them of their legal

21   protection provided by the original program.  And as

22   Cheney and the subsequent cases make clear, there's a

23   distinction between when the government chooses to act and

24   when it chooses not to act.  And the exercise of

25   discretion in connection with the deferred action decision
```

AR2059

1   at the outset is a decision not to act.

2         THE COURT:  Well, one could argue and looking at

3   the Fifth Circuit decision, you could argue forcefully

4   that calling this an exercise of prosecutorial discretion

5   is disguising what it really is and that is basically

6   trying to change the law, which is the function of

7   Congress to do, not for an agency and especially in light

8   of the legislative history of efforts made in Congress to

9   do what DACA did that failed and they are saying wait a

10  minute, whether you call this an exercise of discretion or

11  not, in good faith as a legal matter, it is on very shaky

12  ground because of the Fifth Circuit decision.  We don't

13  like to be on shaky ground.  And, therefore, and calling

14  it an exercise of prosecutorial discretion when in fact at

15  least the argument goes this is trying to do at the agency

16  level what Congress refused to do and you can't do that

17  and this is a shaky ground.  We want to get this program

18  on proper ground, but we can't continue to do something

19  that the Attorney General's office has advised is

20  unconstitutional or illegal.  Therefore, we're going to

21  wind down the program, but give Congress plenty of time to

22  fix it.  Isn't that a reasonable argument?

23         MS. BOWER:  Well, it may be a reasonable

24  argument, Your Honor, but a reasonable argument is not

25  sufficient.  Under the APA, the agency has to provide a

```
 1   reasoned analysis and the court in reviewing --
 2           THE COURT:  Well, where was the reasoned
 3   analysis provided for DACA in the first place?  It just
 4   came out of the blue, didn't it?
 5           MS. BOWER:  Well, the DACA program itself
 6   obviously was not an issue in either Texas and certainly,
 7   it's not an issue with respect --
 8           THE COURT:  Understood.  But the basic theory of
 9   both programs is very similar.  The basic legal
10   justification for both of them.
11           MS. BOWER:  You're saying for both programs,
12   DACA and DAPA?
13           THE COURT:  Yes.
14           MS. BOWER:  Well, a significance difference,
15   which is not at all reflected in the administrative record
16   is that the administration at the time that it implemented
17   DACA took into consideration that the individuals who were
18   eligible to receive DACA did not have the requisite mens
19   rea to violate the immigration laws in the first place
20   because these are individuals who came -- who were brought
21   here as children.  And there is a significant difference
22   when you are considering the legality and other factors
23   under the agency's decision making process and none of
24   that was considered according to the administrative record
25   that the government has submitted to this court.
```

1    With respect to whether the agency has the

2  discretion to enter the rescission memo in the first

3  place, the agency is capable of undertaking a reasoned

4  analysis and rendering decisions as to how it sees fit to

5  exercise its authority, issues that fall under its domain.

6  But there are processes and procedures in place for how

7  that needs to occur.

8    And with respect to the decision in the first

9  instance, it needs to be supported by the evidence.  And

10  the government submitted on November 15th, the same day as

11  it submitted its motion for summary judgment an

12  administrative record in this court that is woefully

13  incomplete.  And the government acknowledges under the

14  Fourth Circuit precedent that it's incomplete because it

15  is only including documents actually considered by then

16  Acting Secretary Duke and that is not the law in this

17  circuit.  The administrative record needs to include all

18  information that was in front of the decision -- in front

19  of the agency when it rendered its decision and the

20  government simply has not done that.  And, you know,

21  without that record, it is difficult to undertake the

22  analysis that Your Honor is being asked to do here on the

23  government's motion in connecting the dots between the

24  rationality or reasonableness of the agency's decision and

25  the information it had in front of it at the time that it

AR2062

1   rendered that decision.  The record is completely devoid

2   of that evidence.

3        With respect to the 1252(g) as a potential

4   jurisdictional bar, the AADC case is clear, Your Honor,

5   that 1252(g) applies in three discreet situations, all in

6   involving the actual proceedings.  The decision to

7   commence, the decision to continue and the decision to

8   terminate a proceeding, a deportation proceeding or

9   removal proceeding and that's simply not the case here.

10        This was as I said earlier an affirmative act by

11   the government to eliminate a program that conferred

12   benefits and legal protection on 800,000 people.  This is

13   not an individualized assessment as Cheney and even AADC

14   considered because those were individual decisions of

15   prosecutorial discretion or agency enforcement discretion

16   with respect to the specific individuals and the specific

17   violations of the law and that is not what this is.  This

18   is a broad policy affecting an entire class of immigrants.

19        Turning then to the APA claims, both the whether

20   the claim is arbitrary and capricious as well as the rule

21   making, our notice and comment rule-making claim.  The

22   case law under Greater Boston and even FCC versus Fox

23   Television make clear that the agency has to explain not

24   just her rationale for the decision, but a reasoned

25   analysis for a change in policy after taking a hard look

```
 1    at all of the salient problems.  And as I said earlier,

 2    reliance is a significant salient problem.

 3              THE COURT:  Well, didn't the Acting Secretary in

 4    this case explain that there was great concern about the

 5    legal validity of the program and that it should be wound

 6    down in favor of congressional action?  Isn't that what it

 7    amounts to?

 8              MS. BOWER:  She stated three reasons.  She

 9    relied on the Attorney General's conclusion that DACA --

10              THE COURT:  Which was in turn based upon the

11    Fifth Circuit decision.  Right?

12              MS. BOWER:  Correct.  But there is no analysis

13    in the administrative record of that litigation risk

14    assessment, Your Honor.  There is simply not --

15              THE COURT:  If you're concerned that what you

16    are doing is illegal and you decide you want to eliminate

17    something that you believe is illegal based upon a

18    published decision of an appellate court.  What's the

19    matter with that?

20              MS. BOWER:  Because there -- several things.

21    First is that the record itself contains 14 documents, all

22    of which are publicly available documents.  None of which

23    include an assessment, independent assessment by the

24    executive branch of the validity of that one case and it

25    flies in the face of precedent from the agency that the
```

34

AR2064

```
 1    decision --
 2             THE COURT:  I mean are you saying that it's
 3    arbitrary for her to believe in the validity of an
 4    appellate court's decision?
 5             MS. BOWER:  It's not that it's arbitrary for her
 6    to believe in the validity.  It is arbitrary for her not
 7    to have considered the alternates.  There was no analysis.
 8             Former Secretary Kelly in February and June of
 9    this year twelve months after the conclusion in the Texas
10    v. U.S. litigation reached the conclusion that the program
11    could continue.  That is an inherent acceptance that it is
12    not an illegal program and that is well after the Texas
13    versus U.S. litigation was completed.
14             And there is no evidence in the administrative
15    record that the agency considered that Secretary Kelly's
16    decisions or the reasoning or the basis in which he
17    reached those decisions at the time.  They simply accepted
18    the threat from the Texas Attorney General that he and
19    perhaps some of the plaintiffs in the Texas litigation
20    would amend their complaint and that it would be
21    successful.  But that is putting the cart before the
22    horse.  You have to analyze that.
23             And the government's practice in the DACA
24    litigation undermines their view that the Texas litigation
25    could mean an eminent injunction of the entirety of the
```

```
 1    DACA program.
 2            The government didn't accept the Northern
 3    District of California's conclusion that the
 4    administrative record was incomplete.  They challenged it
 5    in the Eastern District of New York and now they're
 6    challenging it to the Supreme Court and then they
 7    submitted the same record here.
 8            THE COURT:  Well, the Supreme Court put a kibosh
 9    on that last week, didn't it?
10            MS. BOWER:  They stayed while they considered
11    the merits of the claim.  That is correct.
12            THE COURT:  Well, they stayed an order directing
13    them to expand the record.  Correct?
14            MS. BOWER:  They did.  Just last week.
15            THE COURT:  I know.
16            MS. BOWER:  They stayed it.  Yes.  While they
17    consider.  My point is they didn't accept any of those
18    decisions as gospel.  They considered -- they continued to
19    press what they believed was the correct conclusion and
20    that is completely absent from the administrative record
21    with respect to their conclusion on the rescission memo.
22    They merely accepted that conclusion and moved forward.
23            There's no analysis of either their own internal
24    decision making and how their position has changed and
25    that is arbitrary and capricious.  You have to -- when you
```

J.A. 1327

AR2066

1    are undertaking a change of policy, you have to address

2    the fact that you have changed the policy and you need to

3    explain why it is that your decision has changed.  And

4    there is no evidence that that consideration occurred

5    here.

6              THE COURT:  Well, was any of that done in

7    connection with the original adoption of DACA?

8              MS. BOWER:  I don't have the original

9    administrative record with respect to the decision of DACA

10   in front of me, Your Honor.

11             But the fact that DACA may or may not have --

12   may or may not have gone through a notice and rule-making

13   process does not mean that the rescission memo did not

14   have to abide by the APA both arbitrary and capricious

15   analysis and the notice and comment rule-making analysis.

16             The action that the Court considers, the action

17   that the Court looks at is the action at issue here, which

18   is the rescission memo.  And contrary to the government's

19   representation, no court has held that the character of

20   the original action carries through on every subsequent

21   action.  To the contrary, the Court must consider the

22   specific action at issue whether that's an initial

23   implementation of a rule or a policy, whether that's an

24   amendment or a modification or if it's a rescission.  You

25   have to look at the parameters of the decision in front of

1    the Court at the time.

2         And the rescission memo when doing so is a

3    substantive rule making that did require notice and

4    comment and did require independently the reasoned

5    analysis.

6         And it's important to note, too, Your Honor,

7    that there has not been a suit challenging DACA.  The

8    Texas litigation did not challenge the original -- DACA as

9    originally implemented.  And so by not considering the

10   fact that no challenge directly to DACA had occurred, that

11   also renders a decision arbitrary and capricious.

12        With respect to the rescission memo itself, as

13   we state in the papers, it is in fact a substantive rule

14   making and the fact that it does apply to a broad swath of

15   individuals is relevant to the Court's consideration

16   because it binds DHS with respect to how to handle

17   deferred action status with respect to this class of

18   individuals going forward.

19        The rescission memo itself dictates the outcome

20   of Dreamers DACA status at the administrative record, page

21   255.  It specifically requires DHS to reject any deferred

22   action applications under DACA coming in on or after

23   September 5th.

24        And with respect to current DACA recipients, the

25   government said earlier it didn't strip any of them of

```
 1    their DACA status, but in fact it did.  The DACA program
 2    as implemented allowed for renewals and according to the
 3    rescission memo, any renewal must be rejected if not
 4    submitted before October 5th.  Renewals for -- and then to
 5    the extent it considers renewals at all, it's only for a
 6    small window of time between September 5th and --
 7    September 5, 2017 and those that expire March 5, 2018.
 8         So there is no consideration given to renewals
 9    although it was included in their understanding of the
10    DACA program at the outset for individuals whose DACA
11    status had expired prior to September 5th or expires like
12    our named plaintiff, J.M.O., after March 5th.  One day
13    after.  His expires on March 6th.
14         And the fact that the government provides no
15    analysis or discussion or reference to the selection of
16    these arbitrary deadlines also supports our claim that the
17    decision was arbitrary and capricious.
18         It also, Your Honor, requires the DHS to reject
19    all pending or new advanced parole applications for DACA
20    recipients.  That is a clear, present effect that is one
21    of the factors the Court has to consider when deciding
22    whether a agency action is a substantive rule or a
23    discretion -- a broad statement of policy.  And here,
24    there is no discretion and it has present effects which
25    means it is a substantive rule and needs to go through
```

1    notice and rule making.

2          The C and I court also made clear that the

3    language of the agency action is also indicative of

4    whether the action is a substantive rule making or a

5    general statement of policy and noted that where the

6    agency uses the word "will" versus "may" is a strong

7    indicator, if not dispositive.  And every bullet point in

8    the rescission memo starts with the word "will" stripping

9    DHS of any discretion to render any decisions other than

10   what is specifically set forth in the rescission memo.

11   And the only discretion with respect to deferred action

12   that the rescission memo retains for DHS is to terminate

13   or deny deferred action status.

14          With respect to our equal protection claims,

15   Your Honor, the government is mistaken that Armstrong

16   creates a heightened burden on a Rule 12(b)(6) motion to

17   plead equal protection claim in this context.

18          THE COURT:  Well, at the heart of an equal

19   protection claim is a classification.  What is the

20   classification that elimination of DACA establishes and

21   how -- what is your attack on the classification make?

22          MS. BOWER:  As we allege in the complaint, Your

23   Honor, the government has retained other deferred action

24   programs that are not predominantly utilized by

25   individuals of Mexican or Latino descent.  As stated in

1  the complaint and the government has conceded, more than

2  90% of recipients of DACA status are in fact Mexican or

3  Latino immigrants.  Other deferred action programs are

4  going forward and the government has not explained why

5  it's treating differently similarly-situated individuals.

6       So the requirement in Armstrong to allege that

7  similarly-situated individuals are being treated

8  differently is satisfied in our complaint, Your Honor, and

9  the impact as well -- as well as the animus, excuse me.

10 The animus is sufficiently alleged as well.

11      The government has taken the position in the

12 papers and here today that Acting Secretary Duke was the

13 only decision maker.  And that is simply just contrary to

14 the evidence that they put forward in the past and as

15 we've alleged in the complaint.

16      Moreover, Acting Secretary Duke works for the

17 President and Attorney General Sessions.  So to say that

18 comments made by her bosses can't be imputed to or

19 potentially affect the decision making of that agency is

20 just -- is simply incredible.

21      And the government and testimony provided in the

22 Northern District of California case has made clear that

23 multiple individuals, including senior government

24 officials who have made the derogatory statements that are

25 alleged in the complaint were individuals who participated

41

J.A. 1332                                    AR2071

```
1    in the decision-making process.  President Trump and

2    Attorney General Sessions themselves issued press releases

3    announcing the rescission of DACA in which they took

4    credit for the rescission.  So our complaint clearly

5    satisfies the pleading requirements of discriminatory

6    animus and discriminatory --

7            THE COURT:  Didn't those same statements say

8    that they would urge Congress to regularize it by enacting

9    it?

10           MS. BOWER:  President Trump issued a tweet later

11   saying he would urge Congress to act, but that doesn't

12   remove all of the other direct and derogatory statements

13   regarding Mexicans and Latino immigrants that were made.

14           Our complaint also alleges, Your Honor, due

15   process violations.  As I stated earlier and as set forth

16   in our papers --

17           THE COURT:  Let me go back to your equal

18   protection thing.

19           MS. BOWER:  Yes.

20           THE COURT:  Tell me again your best case for why

21   there's an equal protection denial and how the

22   classification works and how this fails under any one of

23   the three standards for denial of equal protection.

24           MS. BOWER:  I'm sorry.  How the DACA rescission

25   fails under a denial?
```

```
1          THE COURT:  Yes.  Tell me how it violates equal
2   protection.
3          MS. BOWER:  It violates equal protection because
4   we've alleged that it was motivated by discriminatory
5   animus as reflected in the 18 statements set forth in the
6   complaint --
7          THE COURT:  The classification you are saying is
8   is that they selected one program out of a lot of other
9   programs and that the other programs are not
10  discriminatory and this one is?
11         MS. BOWER:  Well, that's one of the grounds in
12  which we were attempting to seek discovery, Your Honor,
13  that the government is trying to foreclose.  But we allege
14  in the complaint that there are other deferred action
15  programs that are not predominantly utilized by
16  individuals of Mexican and Latino descent --
17         THE COURT:  Well, wait a minute.  This is a
18  facially neutral program.  Applies to anybody coming from
19  Canada, Germany, South America, North America, anywhere.
20  It's not limited to those coming across the Mexican
21  border, is it?
22         MS. BOWER:  The program itself is not, Your
23  Honor.  But in implementation and in effect, it does
24  include a near majority.
25         THE COURT:  Isn't that just an accident of
```

1    geography?

2         MS. BOWER:  It may be that the program is an

3    accident of geography.  But that doesn't mean that we

4    haven't sufficiently pled a claim.  You have to look

5    beyond -- that's why you have to look into the allegations

6    of animus and implementation when considering an equal

7    protection claim.  If you could just look at a facially

8    neutral action and leave it at that in the face of

9    specific and repeated derogatory comments, it would

10   undermine the entire review and would render --

11        THE COURT:  Well, as I said, our President and

12   his use of Twitter has made life very interesting for all

13   of us.  But if you look at all of the statements

14   attributed to him directly or through Twitter, you've got

15   a group of statements, including when he announced he was

16   going to run that they are murderers and rapists and

17   there's some very good people, too.  He put that in for

18   good measure.  He said some people are bad hombres and

19   there are in this world bad hombres.  I mean not everybody

20   is a bad hombre.  And I assume when he says bad hombres,

21   he is referring to those who are criminals.

22        But I'm not sure that his inopportune comments

23   necessarily call into question a program, the legal

24   sufficiency of which has been called into question by his

25   Attorney General and by an appellate court and translates

1    that into an improper animus towards Mexican-Americans and

2    other people of Latin American origin.  Help me out with

3    that.

4            MS. BOWER:  Well, other statements as we've

5    alleged in the complaint, Your Honor, reflect that

6    Attorney General Sessions has also made comments about

7    getting all of them out.  That wasn't tied to --

8            THE COURT:  Well, that's people who are here

9    illegally.  Isn't that what he's saying?

10           MS. BOWER:  But that would cover the individuals

11   with DACA status, Your Honor.  But it also goes to -- he

12   was referring to not only individuals who are here

13   illegally.  But he's referring specifically to those of

14   Mexican and Latino descent, who are here illegally.

15           And so against that backdrop, we have

16   sufficiently alleged that animus was at play or may have

17   been at play in rendering the -- in reaching the

18   conclusion to rescind DACA.  We have alleged that

19   similarly-situated individuals are being treated

20   differently and that is all we need to allege in

21   connection with a 12(b)(6) challenge to the equal

22   protection claim.

23           With respect to the due process claim, I also

24   heard the government challenge the due process claims on

25   the basis that there are no rights and they are relying on

1    the savings clause that we discussed earlier that it

2    cannot --

3              THE COURT:  Well, am I to disregard that?  Are

4    you telling me that I should take that -- just ignore that

5    it's there?

6              MS. BOWER:  That's not what precludes the

7    creation of rights, Your Honor.  That provision has to be

8    read as a whole in terms of what the --

9              THE COURT:  Well, I mean the memo pretty clear

10   says this memorandum confers no substantive right,

11   immigration status or pathway to citizenship.  Only the

12   Congress acting to its legislative authority can confer

13   these rights.  Remains for the executive branch, however,

14   to set forth policy for the exercise of discretion within

15   the framework of the existing law.  I have done so here.

16   You want me to disregard that?

17             MS. BOWER:  You don't need to disregard it, Your

18   Honor.  But you need to take it into context.

19             THE COURT:  What you're saying is even though

20   she said that in her memorandum, she turned right around

21   and gave substantive rights to these people.  Not

22   withstanding what she is saying here.  The Lord giveth,

23   the Lord taketh away.  She can't take these things away

24   because she gave them.  Right?

25             MS. BOWER:  They developed a mutual

1    understanding between the government and DACA applicants

2    that conferred the protected interests.  That was the

3    government's repeated outreach and representations that

4    they had legal protection provided they followed the

5    procedures set forth in the DACA program.  That they had

6    legal protection from deportation and could live and could

7    create a livelihood here in this country and that program

8    was subject to renewal again provided they met the

9    requirements.

10        And that mutual understanding between the

11   government and the individuals created protected property

12   interests and liberty interests.  And there's no dispute

13   that the actual interests are protected interests.  The

14   only dispute is whether they could have been created in

15   the first instance and here they were.

16        Under Perry, there was a mutual understanding

17   between the government and the recipients that they were

18   protected from deportation and that they had the right to

19   work, to travel, to attend school and they had eligibility

20   for certain benefits as well.  That they could live safely

21   and comfortably in the United States without fear of

22   deportation and that is sufficient to create a protected

23   interest under the due process clause.

24        And we've alleged that the decision to rescind

25   those protections does rise to the level of shocking the

```
1    conscience.  We've alleged that it was based on
2    discriminatory animus.  And if that is established to be
3    true through the course of discovery and further
4    proceedings in this case, then that does shock the
5    conscience because it's an abuse of executive power.
6              It also shocks the conscience that the
7    government made repeated promises and assurances to these
8    individuals both with respect to the benefits, but also
9    specifically with respect to the use of the personal
10   information that was provided to the government in
11   connection with their applications.  And it shocks the
12   conscience, that the government would induce these
13   individuals to turn over all of the information that the
14   government would need to deport these individuals and to
15   then say we're taking it back.  It's a constitutional bait
16   and switch and that's protected under the substantive due
17   process clause.
18             THE COURT:  Well, what information do you have
19   that the government is getting ready to break its promise
20   as to the use that they would put the information to that
21   they were given by these people?
22             MS. BOWER:  The statements --
23             THE COURT:  I mean the government is saying that
24   they haven't done anything.
25             MS. BOWER:  Well, the government's updated FAQs
```

1    say that they won't proactively share.  They've given no

2    information of what access ICE or CBP now have to the

3    information that was previously guaranteed would not be

4    shared with ICE and CBP provided certain circumstances

5    were not present and there's no allegation that any of

6    those exceptions apply to any of the individual plaintiffs

7    in this case.  So with respect to our plaintiffs, the

8    promise not to share that information or use that

9    information for deportation purposes was unequivocal.

10              The complaint also alleges six instances in

11   which individuals with DACA status were deported.  We're

12   entitled to discovery to determine whether and to the

13   extent of which that information is being shared or access

14   is being granted contrary to the promises made to the

15   recipients when they applied for DACA.

16              And in April of this year, Your Honor, the

17   government rolled out I believe it was an executive order.

18   There was a privacy memo that said that it would not

19   continue to maintain privacy over information collected by

20   the government with respect to --

21              THE COURT:  Is that prospectively or

22   retroactively or both?

23              MS. BOWER:  Both.  It's my understanding that

24   the memo says it's no longer providing -- it will not

25   apply the privacy act to immigrants, undocumented

1     immigrants, people here illegally and that is contrary to

2     the position that the government has taken for decades

3     with respect to this type of personal information.

4          And you asked the government point blank this

5     morning whether they were prepared to make a

6     representation that they do not intend to use information

7     contrary to the assurances provided to the DACA applicants

8     and he was not able to say that.  They reserve the right

9     to change it and that is a constitutional --

10         THE COURT:  They haven't done anything yet as

11    far as with what they're telling me.

12         MS. BOWER:  We don't know, Your Honor.  As we

13    said in the complaint, there are six individuals who have

14    been subjected to deportation attempts.  Discovery may

15    tell us how it is or why it is that those individuals were

16    picked up.  The relief that the plaintiffs are seeking in

17    this case without the protection, all of DACA recipients

18    remain at risk and live in constant fear of deportation

19    activities because of the information that they've

20    provided to this government based on its promises that it

21    would not use it against them.  Thank you, Your Honor.

22         THE COURT:  Thank you.  All right.  Mr. Shumate?

23         MR. SHUMATE:  Your Honor, I think the plaintiffs

24    have a fundamental misunderstanding of DACA.  It is not a

25    government benefits program.  It did not make promises and

J.A. 1341                                    AR2080

1    assurances.  You've already read the last paragraph of

2    Secretary Napolitano's memo and I'll read it again.  "This

3    memorandum confers no substantive right, immigration

4    status or pathway to citizenship."

5         Another piece of information I'd like to read to

6    the Court is from DHS' FAQs.  This is -- it's Document

7    12-14, page 8 on this court's docket.  Question 27.  "Can

8    my deferred action under the DACA process be terminated

9    before it expires?  Answer:  Yes.  DACA is an exercise of

10   prosecutorial discretion and deferred action may be

11   terminated at any time with or without a notice of intent

12   to terminate at DHS' discretion."  That has been DACA from

13   the beginning.  It has not been a government benefits

14   program.  To be sure, there may be a collateral

15   consequences from the grant of deferred action status,

16   which is work authorization, advanced parole.  That sort

17   of thing.  But DACA itself was not a government benefits

18   program.

19        I think the Court used a good analogy.  Here's

20   another one.  Imagine if the Attorney General had said the

21   prior administration had not done a sufficient job of

22   prosecuting drug crimes and we're going to institute a new

23   enforcement policy to charge more drug crimes because this

24   is a real problem.  No court would subject that to

25   judicial review.  That is an enforcement policy.  It is

51

J.A. 1342                                        AR2081

not a substantive rule.  It is an exercise of discretion.
If the Attorney General were then to rescind that
memorandum and say we don't think that's a good policy,
we're going to go in a different direction, that would not
be reviewable either.

That is what we have here.  We have the DACA
memorandum from 2012 was an exercise of discretion.  This
is how we intend to enforce the law.  We are going to
grant deferred action status.  This administration
rescinded that.  That is an exercise of discretion.

If I could speak to the justiciability
questions -- issues just for a few moments?  We don't
dispute that there is an ordinary presumption of judicial
review under the APA of agency action.  But there is an
equally strong presumption that the exercises of
prosecutorial discretion are not subject to judicial
review.  That is from the Heckler case and from the AADC
case.

They dispute that this was an exercise of
prosecutorial discretion.  But that argument is foreclosed
by AADC, which quite clearly describes denials of deferred
action status as a discretionary determination.  And there
are two circuit courts that have addressed this question.
Mada-Luna, the Ninth Circuit and the Fifth Circuit in
Texas, which has subscribed that the denial of voluntary

1    departure and work authorization is not something that's

2    reviewable because there's no statutory standard by which

3    to judge that.

4         There was an argument that the plaintiffs made

5    that DACA was not at issue in the Texas litigation, but

6    that is not entirely accurate.  The Texas litigation

7    involved a challenge to the 2014 memorandum.  That

8    memorandum expanded DACA and directed DHS to create an

9    additional deferred action policy, which became to be

10   known as DAPA.  In the Fifth Circuit opinion, they

11   described it as DAPA.  But they said in a footnote, this

12   analysis applies to expanded DACA and DAPA itself.  And so

13   the analysis that the Fifth Circuit went through of

14   expanded DACA and DAPA applies four square with this case

15   and that's why the Attorney General explained that DACA

16   itself, the original DACA, has the same problems both

17   constitutionally and legally as expanded DACA.

18        I think it's interesting, Your Honor, that they

19   point to the APA standard of review for all of their APA

20   claims.  So our argument under Section 701 and Heckler is

21   that there is no law to apply for the Court to judge and

22   evaluate the reasonableness or the rationality of the

23   Secretary's decision to rescind the memorandum and deny

24   deferred action.

25        So they point to the APA as a standard to apply.

1    The Court can just ordinarily apply arbitrary and

2    capricious review.  Well, if that's right, then Section

3    701 of the APA has no meaning at all because Section 701

4    says all claims brought pursuant to this chapter.  You

5    know, if the agency's decision is committed to the

6    agency's discretion, it's not reviewable.  So they can't

7    then bootstrap their way around Section 701 with claims

8    brought pursuant to Section 706, which is the arbitrary

9    and capricious standard.

10         We have not conceded that the record is

11   incomplete.  I'm glad Your Honor brought up the Supreme

12   Court stay.  The Supreme Court, as Your Honor noted last

13   week, granted a stay.  But implicit in the stay is that

14   five justices are likely to reverse the order from the

15   District Court in California to supplement the record.

16         Now the Court's inquiry here is merely to decide

17   whether the agency's decision is rational based on the

18   record she has provided.  If the Court is not satisfied

19   with that decision and again, we think it is eminently

20   reasonable what she did here.  But if the Court does not

21   believe that the administrative record supports her

22   decision, the remedy is not to supplement the record or

23   grant discovery to find out what was really going on.  The

24   remedy is to set aside the rescission memo and remand the

25   decision to the Acting Secretary.

J.A. 1345                                    AR2084

```
 1              With respect to 1252(g), Your Honor, their
 2     argument was that AADC doesn't apply because this
 3     particular case does not fit within the three articulated
 4     provisions of that statute.  But this is an action by the
 5     Secretary to commence proceedings.  It's not very
 6     different than if the agency had issued a notice to
 7     appear, which is an ingredient to the commencement of
 8     enforcement proceedings.  So is this.  This is a denial of
 9     deferred action and that is plainly what the Supreme Court
10     intended to insulate from judicial review.
11              On the APA claims, Your Honor, the argument is
12     that there was just simply no analysis from the Acting
13     Secretary.  But again, she gave reasons for her decisions
14     that is entirely rational.  And to the extent the
15     plaintiffs say she didn't consider this factor or that
16     factor or this alternative or that alternative, well, they
17     point to nothing in the INA that would give a standard for
18     the Court to evaluate whether this was unreasonable or not
19     because the INA itself does not provide any standard by
20     which to evaluate the reasonableness of her actions.  So
21     that's why we do not believe that this is something that
22     the Court should review.
23              On the equal protection claims, Your Honor, you
24     are right.  There is no classification here.  The memo --
25              THE COURT:  Well, I think the response they gave
```

1    me was, well, this deferred action program that you're

2    junking is a violation of equal protection because there's

3    a lot of other deferred action programs that they're not

4    junking and that when we look at those classifications, we

5    discover that this one is aimed primarily at Hispanics.

6    What's your answer to that?

7              MR. SHUMATE:  Well, the answer to that, Your

8    Honor, is that this is neutral on its face.  It says

9    nothing about the national origin of those individuals

10   that the government is trying to target in any way.  Even

11   if you look at the Armstrong case, Your Honor, that was a

12   case involved where a hundred percent of the individuals

13   affected by the government's action there were

14   African-American.  The court was not troubled by that.  It

15   said just because there is a disparate impact on a certain

16   group of individuals doesn't make it an equal protection

17   violation.

18             Really, their primary argument is animus and

19   there is nothing that they can point to from the decision

20   maker in this case, the Acting Secretary of Homeland

21   Security, who does not work for the Attorney General.  She

22   is the head of a separate department within the

23   government.  There's nothing to suggest that she in any

24   way acted --

25             THE COURT:  But she's relying upon the advice of

1       the Attorney General, isn't she?

2              MR. SHUMATE:  To be sure.  To be sure.  She

3       relied on the Attorney General's view that DACA is

4       unlawful.  And in the face of that letter, in the face of

5       the letter from the Texas plaintiffs that they intended to

6       challenge DACA in light of the Fifth Circuit's decision

7       affirmed by the Supreme Court, it was entirely rational

8       for her to decide we need to wind this policy down in an

9       orderly fashion rather than allow the Texas District Court

10      to end it immediately.

11             On the information-sharing claims, Your Honor,

12      again there has been no change.  But DHS has always been

13      clear that information can be shared under certain

14      circumstances and those policies can change in the future.

15      To the extent that policy does change, the plaintiffs can

16      come back and they can bring an APA challenge at that

17      time.  But as of right now, there's no final agency action

18      that would give them standing or this Court jurisdiction

19      to challenge the information-sharing policy.

20             If there are no other questions, Your Honor,

21      thank you.

22             THE COURT:  All right.  Any desire to -- I don't

23      ordinarily permit this, but this is a very important case.

24      If you have something additional you want to say, you can

25      say it.

J.A. 1348                                              **AR2087**

```
 1              MS. BOWER:  Well, if you're giving me the
 2    opportunity, I can't turn it down.
 3              THE COURT:  I can't hear you.
 4              MS. BOWER:  I said if you're giving me the
 5    opportunity, I can't turn it down.
 6              THE COURT:  I'll give you an opportunity.  Like
 7    the Vy Metallic case, there must be an end to individual
 8    argument in such matters for the government to go on -- I
 9    know that case from way back.  It's an oldie, but goodie.
10    But I'm always happy -- this is a very important case to
11    both sides and very important issues.  I want to make sure
12    that you don't go home and say I forgot to tell Judge
13    Titus X.  So this is your chance to tell me X.
14              MS. BOWER:  Thank you, Your Honor.  So picking
15    up with the analogy theme.  I mean a better analogy than
16    that offered by the government is the analogy of parole.
17    So the government decides it's going to get rid of parole
18    and --
19              THE COURT:  We did that a long time ago in 1984.
20              MS. BOWER:  Right.  Well, the solution was not
21    to send everyone back to jail and there was individualized
22    process in evaluating parolees' status.  Again that is
23    completely absent from this case.
24              With respect to the 1252(g) under AADC, Your
25    Honor, Justice Scalia writing for the court expressly
```

58

AR2088

1    states that 1252(g) does not cover every step in the

2    process or every stage leading up to and through

3    deportation.  And I heard the government say that this was

4    commencing an action.  However, you're rescinding deferred

5    action status is not commencing an action.  So this does

6    not fit under the three discreet steps in the deferred

7    deportation process that AADC says is precluded under

8    1252(g).

9            And both Cheney and the Robbins v. Reagan cases

10   cited in our papers make clear, they distinguish the

11   situation where commitments are given and the impact of

12   those commitments and as Robbins v. Reagan expressly

13   states when there is a rescission of a prior commitment as

14   we have in this case, that the courts -- that it is an

15   action and the Court should review it to ensure that there

16   is some fidelity to the agency's decision to go back on a

17   decision they had made that they felt was a proper

18   exercise of its discretion at the time.  And that's the

19   same case here, Your Honor.

20           With respect to the information-sharing, you

21   know, the -- you just have to look at Exhibit 21 of the

22   Freedman declaration, which is a Power Point presentation

23   on -- a DHS Power Point presentation and there's nothing

24   in that slide that refers to the fact that the policy

25   could be changed or rescinded and it makes clear to DACA

1    applicants that the government will continue to keep --

2    will not disclose and will continue to keep secret the

3    personal information provided.

4         It specifically says under Protecting Your

5    Information, we will not share any information about you

6    with ICE or U.S. Customs and Border Protection for the

7    purpose of immigration enforcement proceedings unless you

8    meet the criterior for and then it lists two criterior.

9    There is nothing underneath that that says this policy can

10   be changed or rescinded at any point in time.  So to say

11   that the government has always told people that it could

12   be rescinded is just simply not true and is contrary to

13   the allegations in the complaint.

14        And I'd just remind you that this was on a

15   12(b)(6) motion.  Obviously,the government has made clear

16   that its request for summary judgment was focused on the

17   APA claim.

18        With respect to whether DACA was at issue in the

19   Texas litigation, the rescission memo itself states that

20   DACA was not at issue in the Texas v. U.S. litigation.  It

21   specifically says although the original DACA policy was

22   not challenged in the lawsuit, referring to the Texas

23   litigation.  So when the government said that DACA was at

24   issue in the Texas case, the DACA program --

25        THE COURT:  Well, I think they're referring to

60

J.A. 1351

AR2090

```
1    the legal analysis.  Obviously, DACA was not specifically
2    before the court for a decision.
3              MS. BOWER:  Correct.
4              THE COURT:  But they referred to it in the
5    decision, didn't they?
6              MS. BOWER:  They referred to it in the factual
7    discussions and they referred to it to the extent that it
8    relates to that part of DACA expansion that was at issue
9    in the Texas litigation.  But that was not an analysis of
10   the original DACA program.  And as we said earlier, there
11   are differences, not the least of which is the procedural
12   posture.  The Texas litigation, that program had not yet
13   even been implemented.  Here, DACA has been in place and
14   people have relied upon it for over five years and that
15   reliance is completely absent from this record.
16             THE COURT:  Let me ask you this.  You want me to
17   consider a lot of statements made by our talkative
18   President.  Aren't there some concerns that the Supreme
19   Court has expressed about evaluating things in light of
20   statements like that like in Hamdan versus Rumsfeld?
21             MS. BOWER:  Well, courts have taken into
22   consideration -- the travel ban cases courts have taken
23   into consideration all of the public statements and I
24   think the --
25             THE COURT:  Well, there's been criticism of
```

1    that.  I mean some courts have said that shouldn't happen

2    or some judges have said it shouldn't happen.  You

3    shouldn't be referring to campaign statements made by a

4    candidate.

5             MS. BOWER:  We don't just have campaign

6    statements, Your Honor.  We have statements made when the

7    President was in office.  We have post-election statements

8    we've alleged in the complaint and we have

9    post-inauguration statements alleged in the complaint from

10   senior government officials.  So you don't have to rely on

11   campaign statements.

12            And with respect to the equal protection claim,

13   the classification is DACA recipients.  And the Armstrong

14   case didn't address animus at all.  The problem with the

15   Armstrong case was it was just focused on discriminatory

16   effect.  And there is no evidence that there were

17   allegations in that complaint of discriminatory animus as

18   we have here.  Thank you, Your Honor.

19            THE COURT:  Okay.  Anything further, Mr.

20   Shumate?  I'll give you another shot.

21            MR. SHUMATE:  Very briefly, Your Honor.  I also

22   can't help myself.  With respect to --

23            THE COURT:  I don't want you to go home thinking

24   you forgot to tell me something.  So take your time.

25            MR. SHUMATE:  The AADC case, there was a --

J.A. 1353

AR2092

```
 1                THE COURT:  Say again.  What?

 2                MR. SHUMATE:  Sorry.  The Reno versus AADC case.

 3                THE COURT:  Okay.  Okay.

 4                MR. SHUMATE:  To be sure, the statute does not

 5      apply to everything that may be at issue in a deportation

 6      proceeding, but the Supreme Court said what it was meant

 7      to protect.  "To give some measure of protection to no

 8      deferred action decisions in similar discretionary

 9      determinations."  That is the rescission of DACA, a

10      decision to not grant deferred action.  So we fall within

11      the purpose and the letter and the precedent involving

12      Section 1252(g).

13                There's also been a couple of references in the

14      complaint to a Privacy Impact Statement and that would

15      have created some kind of a reliance interest and things

16      like that.  The privacy interest itself or -- sorry.  The

17      Privacy Impact Statement says "USCIS may share information

18      with other agencies to assist in making a determination on

19      a deferred action request.  USCIS also shares information

20      with other agencies for law enforcement purposes."  That

21      policy has not changed.

22                They also point to some form instructions, Form

23      I-82-ID.  As we explained in page 21 of our brief, the

24      instructions quite clearly say that the

25      information-sharing policy may change.  It says "that
```

```
1    policy may be modified, superseded or rescinded at any
2    time without notice.
3           And, finally, with respect to the President's
4    statements, Your Honor, he was not the decision maker
5    here.  The one individual with the legal authority to
6    rescind the 2012 memo was Acting Secretary Duke.  There is
7    nothing tying her to any animus toward the plaintiffs.
8    And it would be improper for the Court to impute any
9    motive from anybody else within the government to her.
10          With respect to the President's statements as I
11   think you have recognized, Your Honor, there is nothing
12   there that is related to DACA or DACA recipients at all.
13   He has indicated that the government is working towards
14   seeking some type of legislative solution.  That does not
15   reflect animus whatsoever.
16          THE COURT:  Okay.  All right.  Thank you very
17   much.
18          Now I'm praying for Congress to moot this case
19   and if while I'm considering what to do in this case,
20   Congress does take some action, I will notify the parties
21   that I've been advised that action has been taken and ask
22   the parties to tell me whether that moots the case.  The
23   plaintiffs may take the position that what Congress did
24   does not fix the problem or does fix the problem.  So I
25   will need to potentially have supplemental briefing on
```

J.A. 1355

1   whether it's moot or not if -- I'm praying -- Congress

2   decides to take action to re-establish this program

3   without the deficiencies that the President believes or

4   the Secretary believes are applicable to the existing

5   program that she's decided to wind down.

6           So I can't predict what's going to happen.  But

7   hopefully, they will steal the thunder from this case and

8   re-establish it because the vast majority of the American

9   public believes we ought to make protections for this type

10  of person that came here through no fault of their own at

11  age 2 and so forth and so on.  So it's a motherhood and

12  apple pie type program.  Then to be in favor of a program

13  like this, the question here is whether terminating a

14  program, the legal sufficiency of which has been called

15  into question, is appropriate and that's the question that

16  I'll have to sort out.

17          So I will be in touch with you if Congress does

18  act in the holiday season.  Hopefully, they will.  But if

19  they don't, I have it under advisement and I'll get a

20  decision to you as promptly as I can.

21          Now if I understand in terms of the time

22  sensitivity here, March is when the program would come

23  wind down.  And so if Congress does not act in the

24  intervening period, then it would be essential to have a

25  decision by then.  Am I correct on my timing?

65

**AR2095**

```
 1              MS. BOWER:  That is correct, Your Honor.

 2              THE COURT:  Okay.  All right.  Well, I will do

 3    the best I can to get you a decision as promptly as

 4    possible and consistent with the timetable that we're all

 5    facing in this case.  So thank you very much.  I enjoyed

 6    your arguments very much.

 7              MS. BOWER:  Thank you, Your Honor.

 8              MR. SHUMATE:  Thank you, Your Honor.

 9              (Proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

66

**AR2096**

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, Lisa K. Bankins, an Official Court Reporter

 4    for the United States District Court for the District of

 5    Maryland, do hereby certify that I reported, by machine

 6    shorthand, in my official capacity, the proceedings had

 7    and testimony adduced upon the motions hearing in the case

 8    of the Casa De Maryland, et al. versus U.S. Department of

 9    Homeland Security, et al., Civil Action Number

10    RWT-17-2942, in said court on the 15th day of December,

11    2017.

12            I further certify that the foregoing 66 pages

13    constitute the official transcript of said proceedings, as

14    taken from my machine shorthand notes, together with the

15    backup tape of said proceedings to the best of my ability.

16            In witness whereof, I have hereto subscribed my

17    name, this 17th day of December, 2017.

18

19

20                              Lisa K. Bankins

21                              Lisa K. Bankins
                                Official Court Reporter
22

23

24

25
```

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,              )
                                         )
        Plaintiffs,               )
                                         )
    v.                                 )      Civil Case No. 17-cv-2942 (RWT)
                                         )
U.S. DEPARTMENT OF HOMELAND              )
SECURITY, *et al.*,                      )
                                         )
        Defendants.               )

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

In further support of the Plaintiffs' November 28, 2017 Opposition to Defendants'

Motion to Dismiss (ECF No. 29), Plaintiffs attach a copy of the January 9 and January 12, 2018

opinions in the consolidated Northern District of California DACA cases. Exs. 1 & 2. The

January 9 opinion represents the second court to deny the Government's Rule 12(b)(1) motion.

The January 12 opinion similarly denied in part the Government's Rule 12(b)(6) motion as to

certain claims under the Administrative Procedure Act, the Due Process Clause, and the Equal

Protection Clause.[1]  For the reasons cited in this decision, as well as the November 9, 2017

decision in *Batalla Vidal v. Duke*, No. 16-4756, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017)

(ECF No. 29-2 Ex. 1), this Court should deny the Government's pending motion.

---

[1] The Northern District of California Court dismissed certain claims, subject to leave to amend, including the promissory estoppel claim and that the rescission of DACA violated the Administrative Procedure Act because it was issued without notice or comment. There are certain important differences between the claims presented in this case and the Northern District of California cases that warrant a different outcome. For example, the Northern District of California was bound by *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987), and therefore held that the DACA Rescission did not need to go through notice and comment, although the Court recognized that the rescission "contains mandatory language on its face" and "categorically eliminates advance parole for DACA recipients," which "comes closer to resembling a substantive rule." Plaintiffs respectfully submit that this Court should follow the DC Circuit precedent, which confirms notice and comment was required to rescind DACA. *See Am. Bus Ass'n v. U.S.*, 627 F.2d 525, 531-32 (D.C. Cir. 1980) (finding agency's statement, which was "finally determinative of the issues or rights to which it is addressed" and "unequivocally couched in terms of command," constituted a binding norm that required notice and comment rulemaking).

**AR2098**

The Northern District of California also entered a nationwide preliminary injunction requiring the Government "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments" subject to certain exceptions.  Ex. 1 at 46.

The Northern District of California opinion contemplates that the case will proceed to a full litigation on the merits which will not be completed by the March 5 deadline set by the DACA Rescission Memorandum.  In order to minimize duplication of discovery efforts across multiple cases and recalling Government witnesses for multiple depositions, Plaintiffs request the opportunity to participate in any discovery that is permitted to go forward in other cases, and while the Government's motion is *sub judice*.  Plaintiffs further request that the Court set a scheduling conference promptly once the pending motion to dismiss has been resolved to set a schedule for discovery in this case.

AR2099

Dated:  January 17, 2018                    Respectfully submitted,


_____/s/_____
Matthew K. Handley (D. Md. 18636)          John A. Freedman[†]
Dennis A. Corkery (D. Md. 19076)           Gaela Gehring Flores (D. Md.14559)
WASHINGTON LAWYERS'                         Ronald A. Schechter (pro hac vice
   COMMITTEE FOR CIVIL RIGHTS               forthcoming)
AND                                         Nancy L. Perkins[†]
   URBAN AFFAIRS                            Jeremy Karpatkin (pro hac vice forthcoming)
11 Dupont Circle, Suite 400                 ARNOLD & PORTER KAYE SCHOLER LLP
Washington, DC 20036                        601 Massachusetts Ave., NW
(202) 319-1000                              Washington, DC  20001-3743
matthew_handley@washlaw.org                 (202) 942-5000
dennis_corkery@washlaw.org                  John.Freedman@apks.com

Elizabeth J. Bower[†]                        Steven L. Mayer (pro hac vice forthcoming)
Kevin B. Clark (D. Md. Bar No. 04771)       ARNOLD & PORTER KAYE SCHOLER LLP
Priya Aiyar[†]                               10th Floor
WILLKIE FARR & GALLAGHER LLP                Three Embarcadero Center
1875 K Street, NW                           San Francisco, CA 94111-4024
Washington, DC  20006-1238                  +1 415.471.3100
EBower@willkie.com
                                            Ajmel Quereshi (D. Md. 28882)
Nicholas Katz (pro hac vice forthcoming)    HOWARD UNIVERSITY SCHOOL OF
CASA DE MARYLAND                              LAW CIVIL RIGHS CLINIC
8151 15th Ave.                              2900 Van Ness Street, NW
Hyattsville, MD 20783                       Washington, DC 20008
(240) 491-5743                              (202) 806-8000
NKatz@wearecasa.org                         aquereshi@law.howard.edu

[†]*Appearing* pro hac vice                  *Attorneys for Plaintiffs*

J.A. 1361

AR2100

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 277 of 454
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 849 of 1026 PageID #:
10440
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 1 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 1 of 49

1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   THE REGENTS OF THE UNIVERSITY OF
     CALIFORNIA and JANET NAPOLITANO,
11   in her official capacity as President of the         No. C 17-05211 WHA
     University of California,                            No. C 17-05235 WHA
12                                                        No. C 17-05329 WHA
                    Plaintiffs,                           No. C 17-05380 WHA
13                                                        No. C 17-05813 WHA
14        v.

15   UNITED STATES DEPARTMENT OF
     HOMELAND SECURITY and KIRSTJEN                       **ORDER DENYING**
16   NIELSEN, in her official capacity as Secretary       **FRCP 12(b)(1) DISMISSAL**
     of the Department of Homeland Security,              **AND GRANTING**
17                                                        **PROVISIONAL RELIEF**
                    Defendants.
18   _____/

19                        **INTRODUCTION**

20        In these challenges to the government's rescission of the Deferred Action for Childhood

21   Arrivals program, plaintiffs move for provisional relief while the government moves to dismiss

22   for lack of jurisdiction.  For the reasons below, dismissal is **DENIED** and some provisional relief

23   is **GRANTED**.

24                         **STATEMENT**

25        In 2012, the United States Department of Homeland Security adopted a program to

26   postpone deportation of undocumented immigrants brought to America as children and, pending

27   action in their cases, to assign them work permits allowing them to obtain social security

28   numbers, pay taxes, and become part of the mainstream economy.  This program received the

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1      title "Deferred Action for Childhood Arrivals" — DACA for short.  In 2017, however, after the

2      national election and change in administrations, the agency eventually reversed itself and began

3      a phase-out of DACA.  All agree that a new administration is entitled to replace old policies

4      with new policies so long as they comply with the law.  One question presented in these related

5      actions is whether the new administration terminated DACA based on a mistake of law rather

6      than in compliance with the law.

7          **1.    HISTORY OF DEFERRED ACTION.**

8          At the core of these cases is an administrative practice known as "deferred action."

9      A primary question presented concerns the extent to which the Department of Homeland

10      Security could lawfully use deferred action to implement DACA, and so it is important to review

11      the history of deferred action as well as of other features of the DACA program.

12          Congress has the constitutional power to "establish an uniform Rule of Naturalization."

13      Art. I, § 8, cl. 4.  Pursuant thereto, Congress has established a comprehensive scheme governing

14      immigration and naturalization through the Immigration and Nationality Act.  8 U.S.C. §§ 1101,

15      *et seq.*  The Secretary of Homeland Security is "charged with the administration and enforcement

16      of [the INA] and all other laws relating to the immigration and naturalization of aliens."

17      8 U.S.C. § 1103(a)(1).  The Secretary is further charged with "establishing national immigration

18      enforcement policies and priorities."  6 U.S.C. § 202(5).

19          One of the key enforcement tools under the INA is removal, *i.e.*, deportation.  In turn,

20      "[a] principal feature of the removal system is the broad discretion exercised by immigration

21      officials."  *Arizona v. United States*, 567 U.S. 387, 396 (2012).  As an initial matter, in any given

22      case, immigration officials "must decide whether it makes sense to pursue removal at all."  *Ibid.*

23      At each stage of the removal process, they have "discretion to abandon the endeavor."  *Reno v.*

24      *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) ("*AADC*").

25          Beginning as early as 1975, one way to exercise this discretion became "deferred action."

26      By deferred action, immigration officials could postpone, seemingly indefinitely, the removal of

27      individuals unlawfully present in the United States "for humanitarian reasons or simply for [the

28

2

United States District Court

For the Northern District of California

1    Executive's] own convenience." *Id.* at 483–84.  Immigration officials could also grant parole,

2    temporary protected status, deferred enforced departure, or extended voluntary departure.

3          Some of these discretionary powers have flowed from statute.  Parole, for example,

4    has allowed otherwise inadmissible aliens to temporarily enter the United States "for urgent

5    humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  Temporary

6    protected status, also created by statute, has been available to nationals of designated foreign

7    states affected by armed conflicts, environmental disasters, and other extraordinary conditions.

8    8 U.S.C. § 1254a.

9          Some of these discretionary powers, however, have flowed from nonstatutory powers.

10    Deferred enforced departure had no statutory basis but, instead, grew out of "the President's

11    constitutional powers to conduct foreign relations."  USCIS, *Adjudicator's Field Manual*

12    § 38.2(a) (2014).  Nor has extended voluntary departure been anchored in any statute.  Rather,

13    it has been recognized as part of the discretion of the Attorney General.  *Hotel & Restaurant*

14    *Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc).

15          Deferred action, originally known as "nonpriority" status, also began "without express

16    statutory authorization" but has since been recognized by the Supreme Court as a "regular

17    practice."  *AADC*, 525 U.S. at 484.  Congress has also acknowledged deferred action by explicit

18    reference to it in the INA (8 U.S.C. § 1227(d)(2)):

19              The denial of a request for an administrative stay of removal under
          this subsection shall not preclude the alien from applying for a stay

20              of removal, deferred action, or a continuance or abeyance of
          removal proceedings under any other provision of the immigration

21              laws of the United States.

22          Another federal statute, the REAL ID Act, also acknowledged deferred action.  REAL ID

23    Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231.  This law provided that states could issue

24    a temporary driver's license or identification card to persons who can demonstrate an

25    "authorized stay in the United States."  *Id.* §§ 202(c)(2)(C)(i)–(ii).  Persons with "approved

26    deferred action status" were expressly identified as being present in the United States during a

27    "period of authorized stay," for the purpose of issuing state identification cards.  *Id.* §§

28    202(c)(2)(B)(viii), (C)(ii).

3

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 280 of 454
Case 1:17-cv-05228-NGG-VMS   Document 28-7   Filed 09/04/20   Page 852 of 1026 PageID #: 10443
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 4 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 4 of 49

**United States District Court**
For the Northern District of California

1    Congress has also given the Executive Branch broad discretion to determine when

2    noncitizens may work in the United States.  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053,

3    1062 (9th Cir. 2014) ("*Brewer I*"); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien"

4    not entitled to work in the United States as an alien who is neither a legal permanent resident

5    nor "authorized to be . . . employed by [the INA] or by the [Secretary of Homeland Security]").

6    Pursuant to this statutory authority, regulations promulgated in the 1980s allowed recipients of

7    deferred action to apply for work authorization if they could demonstrate an "economic necessity

8    for employment."  8 C.F.R. § 274a.12(c)(14).

9    The George W. Bush Administration began to use deferred action to mitigate a harsh

10   statutory provision involving "unlawful presence."  The Illegal Immigration Reform and

11   Immigrant Responsibility Act of 1996 created three- and ten-year bars on the admission of

12   aliens who departed or were removed from the United States after periods of "unlawful

13   presence" of between 180 days and one year, or more than one year, respectively.  8 U.S.C.

14   § 1182(a)(9)(B)(i).  It also imposed a permanent bar on the admission of any alien who,

15   without being admitted, entered or attempted to reenter the United States after having been

16   unlawfully present for an aggregate period of more than one year.  8 U.S.C. § 1182(a)(9)(C)(i).

17   Beginning in 2007, however, DHS regulations and policy guidance provided that deferred action

18   recipients did not accrue "unlawful presence" for purposes of the INA's bars on re-entry.

19   8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership,

20   from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS,

21   *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections*

22   *212(a)(9)(B)(i) and 212(a)(9)(C)(i)(i) of the Act* at 42 (May 6, 2009).  DHS excluded recipients

23   of deferred action from being "unlawfully present" because their deferred action is a period of

24   stay authorized by the government.  *Brewer I*, 757 F.3d at 1059 (citing 8 U.S.C.

25   § 1182(a)(9)(B)(ii)).  This nonaccrual practice arose well before DACA.[1]

26

27

28    [1]  Undocumented aliens do not begin to accrue "unlawful presence" for purposes of Section 1182(a)(9)(B)(i) until they reach the age of eighteen.  8 U.S.C. § 1182(a)(9)(B)(iii).

4

Appeal 18-1521-cv-02228-GG-VMS Filed 07/02/2018 Rec 301 of 454 Page 853 of 1026 PageID #: 10444

Case 3:17-cv-05211-WHA    Document 234    Filed 01/09/18    Page 5 of 49
Case 8:17-cv-02942-RWT    Document 36-1    Filed 01/17/18    Page 5 of 49

1      DACA grew out of a long agency history of discretionary relief programs.  In 1956, the

2    Eisenhower Administration paroled roughly one thousand foreign-born orphans who had been

3    adopted by American citizens but were precluded from entering the United States because of

4    statutory quotas.  That same administration later granted parole to tens of thousands of

5    Hungarian refugees after the unsuccessful Hungarian revolution.  Both programs flowed from

6    presidential statements, and the programs later ended (in 1959 and 1958, respectively) when

7    Congress passed laws enabling the paroled individuals to become lawful permanent residents

8    (App. 1602–03, 1948–57; AR 33).[2]

9      In 1987, President Ronald Reagan instituted the Family Fairness Program, a non-

10    statutory program that provided extended voluntary departure to children whose parents were in

11    the process of legalizing their immigration status under the Immigration Reform and Control Act

12    of 1986.  President George H.W. Bush extended the non-statutory program in 1990 to cover

13    spouses of such legalized aliens, and the program ultimately provided immigration relief to

14    approximately 1.5 million people.  The need for the program ended with the passage of the

15    Immigration Act of 1990 (App. 1607, 1612–13, 1703).

16      On at least four occasions prior to the creation of DACA, immigration officials have

17    extended deferred action programs to certain classes of aliens, none of which programs was

18    expressly authorized by statute:

19      •      In 1997, INS established a deferred action program for individuals

20            self-petitioning for relief under the Violence Against Women Act of

21            1994.  This program is still in place today.  As originally enacted, the

22            Act did not mention deferred action, but instead provided a pathway

23            to lawful permanent residency.  Deferred action allowed applicants

24            to remain in the country pending a decision on their applications.

---

26      [2] "App." refers to the appendix submitted in support of plaintiffs' motion for provisional relief (Dkt.
27    Nos. 113, 117–19, 121, 124).  In connection with their motion for provisional relief, plaintiffs seek judicial
     notice of thirty-nine exhibits submitted with the appendix (Dkt. No. 111-2).  The request is unopposed.
28    These exhibits consist of congressional testimony and government publications, memoranda, and press releases.
     Plaintiffs' request for judicial notice is **GRANTED**.

**United States District Court**
For the Northern District of California

5

**United States District Court**
For the Northern District of California

1      Congress later expanded the deferred action program in the 2000

2      VAWA reauthorization legislation (App. at 1640–46).

3    •    In 2002 and 2003, INS issued memoranda instructing officers to make

4      deferred action assessments for T visa applicants (victims of human

5      trafficking) and U visa applicants (victims of crimes such as domestic

6      violence) (App. 1650–58). These programs have since been codified in

7      regulations promulgated by INS and DHS. 8 C.F.R. §§ 214.11(k)(1),

8      (k)(4), (m)(2); 8 C.F.R. § 214.14(d)(2).

9    •    After Hurricane Katrina in 2005, USCIS announced a deferred action

10      program for certain foreign students (F-1 visa holders) who, because of

11      the hurricane, could not satisfy the requirements of their student visas.

12      In announcing the program, USCIS stated that "[t]he interim relief

13      [would] remain in effect until February 1, 2006" (App. 1661–62).

14    •    In 2009, to fill a gap under the law, USCIS established a deferred

15      action program for widowed spouses who had been married to United

16      States citizens for less than two years. Congress later eliminated the

17      statutory requirement that an alien be married to a United States citizen

18      for at least two years at the time of the citizen's death to retain

19      eligibility for lawful immigration status, and USCIS accordingly

20      withdrew the deferred action program as "obsolete" (App. 1664–82).

21      In sum, by the time DACA arrived in 2012, deferred action programs had become a

22  well-accepted feature of the executive's enforcement of our immigration laws, recognized as

23  such by Congress and the Supreme Court.

24      **2.    DACA.**

25      On June 15, 2012, Secretary of Homeland Security Janet Napolitano issued a

26  memorandum establishing Deferred Action for Childhood Arrivals. Under DACA, immigrants

27  brought to the United States as children could apply for deferred action for a two-year period,

28  subject to renewal. To qualify for DACA, an individual must: (1) have come to the United

6

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 267 of 454
Case 1:17-cv-05228-NGG-VMS   Document 58-7   Filed 09/04/20   Page 855 of 1026 PageID #: 10446
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 7 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 7 of 49

States before the age of sixteen and been under the age of thirty-one on June 15, 2012;
(2) have been present in the United States on June 15, 2012; (3) have been continuously residing
in the United States for at least the prior five years; (4) have been enrolled in school, graduated
from high school, obtained a GED, or been honorably discharged from the United States military
or Coast Guard; and (5) not pose a threat to national security or public safety (AR 1).

The 2012 DACA memo described the program as an exercise of "prosecutorial
discretion." Secretary Napolitano found leniency "especially justified" for the DACA-eligible,
whom she described as "productive young people" who "have already contributed to our country
in significant ways." The memo further stated that these individuals "lacked the intent to violate
the law" and were low priority cases for deportation (AR 1–2).

DACA applicants had to pass a DHS background check and applications had to be
"decided on a case by case basis." To apply for DACA, eligible individuals completed USCIS
Form I-821D. The application called for substantial personal information, such as biographical
information, date of entry into the United States, immigration status or lack thereof, educational
history, and all prior residential addresses since entering the United States.

Form I-821D also required substantial documentary support, including proof of identity
and proof of continuous residence in the United States through rent receipts, utility bills,
employment documents, or similar records. Applicants also appeared at a USCIS field office
to provide fingerprints, photographs, and signatures. The form's instructions stated (App. 1820):

> Information provided in this request is protected from disclosure
> to ICE and U.S. Customs and Border Protection (CBP) for the
> purpose of immigration enforcement proceedings unless the
> requestor meets the criteria for the issuance of a Notice To Appear
> or a referral to ICE under the criteria set forth in USCIS' Notice to
> Appear guidance (www.uscis.gov/NTA). The information may be
> shared with national security and law enforcement agencies,
> including ICE and CBP, for purposes other than removal,
> including for assistance in the consideration of deferred action for
> childhood arrivals request itself, to identify or prevent fraudulent
> claims, for national security purposes, or for the investigation or
> prosecution of a criminal offense. The above information sharing
> clause covers family members and guardians, in addition to the
> requestor.

United States District Court
For the Northern District of California

7

Appeal: 18-1521    Document: 28-7    Filed: 07/02/2018    Pg: 294 of 454
Case 1:17-cv-02325-GG-VMS    Document 92-7    Filed 09/04/20    Page 856 of 1026 PageID #:
10447
Case 3:17-cv-05211-WHA    Document 234    Filed 01/09/18    Page 8 of 49
Case 8:17-cv-02942-RWT    Document 36-1    Filed 01/17/18    Page 8 of 49

1    The form's instructions also stated (App. 1808):

2        Individuals who receive deferred action will not be placed into
3        removal proceedings or removed from the United States for a
         specified period of time, unless the Department of Homeland
4        Security (DHS) chooses to terminate the deferral.

5        DACA applicants also submitted a Form I-765, Application for Employment

6    Authorization, a Form I-765WS, Worksheet, and the accompanying fees.  To determine an

7    applicant's eligibility for work authorization, USCIS reviewed the applicant's current annual

8    income, current annual expenses, and the total current value of his or her assets (App. 1762,

9    1801–21, 2067–87).

10       If approved, the recipient received a Form I-797, Notice of Action, stating (App. 585):

11       USCIS, in the exercise of its prosecutorial discretion, has decided
         to defer action in your case.  Deferred action is an exercise of
12       prosecutorial discretion by USCIS not to pursue the removal of an
         individual from the United States for a specific period.  Deferred
13       action does not confer or alter any immigration status.

14       Significantly, DHS could terminate a recipient's deferred action at any time, at the

15   agency's discretion, and DACA paved no pathway to lawful permanent residency, much less

16   citizenship (App. 1774, 1808).  Secretary Napolitano concluded her DACA memorandum

17   (AR 1–3):

18       This memorandum confers no substantive right, immigration status
         or pathway to citizenship.  Only the Congress, acting through its
19       legislative authority, can confer these rights.  It remains for the
         executive branch, however, to set forth policy for the exercise of
20       discretion within the framework of the existing law.  I have done
         so here.

21       But DACA did provide important benefits.  *First,* under pre-existing regulations, DACA

22   recipients became eligible to receive employment authorization for the period of deferred action,

23   thereby allowing them to obtain social security numbers and to become legitimate taxpayers and

24   contributing members of our open economy.  8 C.F.R. § 274a.12(c)(14).  *Second*, deferred action

25   provided a measure of safety for a period of two years from detention and removal, albeit always

26   subject to termination at any time in any individual case.  *Third,* DACA recipients could apply

27   for "advance parole" to obtain permission to travel overseas and be paroled back into the United

28   States.  8 C.F.R. § 212.5(f).  *Fourth*, also pursuant to pre-existing regulations, DACA recipients

8

1   avoided accrual of time for "unlawful presence" under the INA's bar on re-entry.  8 U.S.C.

2   § 1182(a)(9)(B)–(C) (establishing three-year, ten-year, and permanent bars on the admission

3   of aliens after specified periods of "unlawful presence").

4         USCIS "strongly encourage[d]" DACA recipients to submit renewal requests between

5   120 and 150 days before the expiration date-stamped on the recipient's Form I-797.  According

6   to the "Frequently Asked Questions" posted on the agency's website, recipients were eligible for

7   renewal under DACA so long as they:  (1) did not depart the United States on or after August 15,

8   2012, without advance parole; (2) continuously resided in the United States since submitting

9   their most recent DACA request; and (3) had not received criminal convictions (with minor

10  exceptions).  Renewal requests did not require additional documentary support (App. 1756–57).

11        The agency adopted DACA without any notice or opportunity for public comment.

12        According to data published by USCIS, 793,026 applicants received deferred action

13  under DACA since its inception.  As of September 2017, there remained approximately 689,800

14  active DACA recipients.  Their average age was 23.8.  Based on a survey completed by

15  Associate Professor Tom K. Wong in August 2017, 91 percent of DACA recipients had jobs,

16  and 45 percent of DACA recipients were enrolled in school (App. 1494–1522, 1533–52).

17        **3.   THE DAPA LITIGATION**.

18        In 2014, DHS announced a different deferred action program for parents of United States

19  citizens or lawful permanent residents, titled "Deferred Action for Parents of Americans and

20  Lawful Permanent Residents" — shortened to the confusingly-similar acronym DAPA.

21        For our purposes, DAPA is important because the United States Court of Appeals for

22  the Fifth Circuit promptly held that DAPA exceeded the statutory authority of DHS, a holding

23  that eventually moved Attorney General Jeff Sessions to rule that DACA too had exceeded the

24  agency's authority.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

25        The 2014 DAPA memo directed USCIS "to establish a process, similar to DACA, for

26  exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis,"

27  for aliens who had a son or daughter who was a United States citizen or lawful permanent

28  resident and:  (1) were not an enforcement priority under DHS policy; (2) had continuously

*United States District Court*
*For the Northern District of California*

9

Case 1:17-cv-02123-GLR   Document 36-1   Filed 07/02/2018   Page 296 of 454   Page 858 of 1026 PageID #: 10449
Appeal: 18-1521   Document 28-2
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 10 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 10 of 49

1   resided in the United States since before January 1, 2010; (3) had been physically present in the

2   United States both when DHS announced DAPA and at the time of application to the program;

3   and (4) presented "no other factors that, in the exercise of discretion, [made] the grant of

4   deferred action inappropriate" (AR 37–41).

5          That same 2014 announcement also expanded DACA in three minor ways:  (1) allowing

6   otherwise eligible immigrants to apply for DACA even if they were older than 31 on the day

7   DACA was earlier announced; (2) extending DACA renewals and work authorizations from

8   two- to three-year periods; and (3) adjusting DACA's date-of-entry requirement from June 15,

9   2007, to January 1, 2010 (AR 37–41).

10         DAPA was also adopted without notice or opportunity for public comment.

11         A coalition of twenty-six states immediately filed suit in the United States District Court

12   for the Southern District of Texas to challenge DAPA.  The district court preliminarily enjoined

13   its implementation on the ground that DHS had failed to comply with the APA's

14   notice-and-comment requirements.  *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

15   The district court's order stated that "with three minor exceptions," the case did not involve

16   DACA (*id.* at 606):

17              The Complaint in this matter does not include the actions taken by
                Secretary Napolitano, which have to date formalized the status of
18              approximately 700,000 teenagers and young adults.  Therefore,
                those actions are not before the Court and will not be addressed
19              by this opinion.  Having said that, DACA will necessarily be
                discussed in this opinion as it is relevant to many legal issues in
20              the present case.  For example, the States maintain that the DAPA
                applications will undergo a process identical to that used for
21              DACA applications and, therefore, DACA's policies and
                procedures will be instructive for the Court as to DAPA's
22              implementation.

23         In holding that DAPA violated notice-and-comment procedures, the district court held

24   that it constituted "a new rule that substantially change[d] both the status and employability of

25   millions" and inflicted "major costs on both states and federal government."  It therefore should

26   have been issued, the district court held, after notice and opportunity for public comment.  *Id.* at

27   671.  Though the order focused on DAPA, it also preliminarily enjoined everything in the 2014

28

United States District Court
For the Northern District of California

10

1    memorandum, including the three minor ways in which DACA had been modified (but left alone

2    the 2012 DACA program).

3            The Fifth Circuit affirmed in a split decision but added a further ground for affirmance.

4    *Texas*, 809 F.3d at 178.  Over a dissent, the appellate panel added the ground that DAPA was

5    substantively foreclosed by statute because the INA contained "an intricate process for illegal

6    aliens to derive a lawful immigration classification from their children's immigration status,"

7    and that DAPA, by providing "the benefits of lawful presence" to undocumented immigrants

8    "solely on account of their children's immigration status," was inconsistent with this statutory

9    scheme, which provided its own pathway for lawful presence to parents of children lawfully

10   in the United States.  *Id*. at 179–80, 186.  The Fifth Circuit's holding was also based on its

11   observation that "the INA does not grant the Secretary discretion to grant deferred action and

12   lawful presence on a class-wide basis to 4.3 million otherwise removable aliens."  *Id.* at 186

13   n.202.  The decision was later affirmed without opinion by an equally divided Supreme Court.

14   *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).[3]

15           In February 2017, DHS Secretary John Kelly issued guidance regarding the Trump

16   Administration's immigration enforcement priorities.  Although the guidance rescinded "all

17   existing conflicting directives, memoranda, or field guidance regarding the enforcement of our

18   immigration laws and priorities for removal," the 2012 DACA memo and 2014 DAPA memo

19   were explicitly left in place.  The guidance also said that the 2014 DAPA memo would "be

20   addressed in future guidance" (AR 229–34).

21           In June 2017, Secretary Kelly rescinded the 2014 DAPA memo, which rescission

22   included the 2014 expansions of DACA.  He explained:

23               I have considered a number of factors, including the preliminary
                 injunction in this matter, the ongoing litigation, the fact that DAPA
24               never took effect, and our new immigration enforcement priorities.
                 After consulting with the Attorney General, and in the exercise of
25               my discretion in establishing national immigration enforcement
                 policies and priorities, I hereby rescind the November 20, 2014,
26               memorandum.

27

28   ─────────────────
        [3]  Such an affirmance has no precedential value.  *Neil v. Biggers*, 409 U.S. 188, 192 (1972).

11

United States District Court

For the Northern District of California

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 289 of 454    Page 860 of 1026 PageID #:
10451
Case 1:17-cv-05228-NGG-VMS    Document 234    Filed 09/04/20    Page 860 of 1026 PageID #:
Case 3:17-cv-05211-WHA    Document 234    Filed 01/09/18    Page 12 of 49
Case 8:17-cv-02942-RWT    Document 36-1    Filed 01/17/18    Page 12 of 49

1    Again, however, Secretary Kelly declared that the 2012 DACA memo would remain in effect

2    (AR 235–37).

3        **4.    RESCISSION OF DACA.**

4        Also in June 2017, ten of the twenty-six plaintiffs from the DAPA litigation wrote to

5    Attorney General Jeff Sessions to demand rescission of the 2012 DACA memo.  Their letter

6    stated that if DACA was rescinded by September 5, they would dismiss the still-pending DAPA

7    litigation.  Otherwise, the letter threatened to try to amend their complaint to additionally

8    challenge the legality of DACA (AR 238–40).

9        A day before the deadline, the Attorney General advised Acting Secretary of Homeland

10    Security Elaine Duke via a short letter that the Obama Administration had created DACA

11    "without proper statutory authority and with no established end-date, after Congress' repeated

12    rejection of proposed legislation that would have accomplished a similar result," and that

13    therefore the program was an "unconstitutional exercise of authority by the Executive Branch."

14    The Attorney General's letter also referenced the preliminary injunction against DAPA, then

15    stated that "[b]ecause the DACA policy has the same legal and constitutional defects that the

16    courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar

17    results with respect to DACA" (AR 251).

18        The following day, without prior notice, the Acting Secretary rescinded DACA.

19    The rescission was not based on any policy criticism.  Instead, it was based on the legal

20    determination by the Attorney General.  The Acting Secretary explained that after "[t]aking into

21    consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and

22    the September 4, 2017, letter from the Attorney General, it is clear that the June 15, 2012,

23    DACA program should be terminated."  She said that "[r]ecognizing the complexities associated

24    with winding down the program," DHS would "provide a limited window" in which it would

25    adjudicate certain requests, but that new DACA requests and applications for employment

26    authorization would be rejected starting immediately.  DHS would adjudicate, on a case-by-case

27    basis, DACA renewal requests received within thirty days from beneficiaries whose DACA

28    status would expire before March 5, 2018.  She also instructed DHS to immediately stop

*United States District Court*
For the Northern District of California

12

AR2112

1    approving new applications for advance parole. The rescission left in place all extant grants of

2    deferred action and work authorizations for the remainder of their validity periods (AR 252–56).

3    Consequently, starting in March 2018, the DACA population will, over two years, dwindle down

4    to zero.

5          On the night of the rescission, President Trump called upon Congress specifically to

6    enact DACA, tweeting, "Congress now has 6 months to legalize DACA (something the Obama

7    Administration was unable to do). If they can't, I will revisit this issue!" During an interview

8    earlier in 2017, President Trump had stated "we are not after the dreamers, we are after the

9    criminals" and that "the dreamers should rest easy" (App. 1852–53, 1958).

10          In sum, the new administration didn't terminate DACA on policy grounds. It terminated

11    DACA over a point of law, a pithy conclusion that the agency had exceeded its statutory and

12    constitutional authority. An important question now presented is whether that conclusion was a

13    mistake of law.

14         **5.    THE INSTANT LITIGATION.**

15          Plaintiffs herein filed five related non-class lawsuits in this district, all now before the

16    undersigned judge. The first commenced on September 8, brought by The Regents of the

17    University of California, on its own behalf and on behalf of its students, and Janet Napolitano,

18    in her official capacity as President of the University. UC Plaintiffs allege they have invested

19    considerable resources in recruiting students and staff who are DACA recipients, and that these

20    individuals make important contributions to the University. As DACA recipients lose their work

21    authorizations, UC Plaintiffs allege that the University will lose significant intellectual capital

22    and productivity. They further allege that students who lose DACA protections will be unable

23    "to plan for the future, apply for and obtain internships and certain financial aid and

24    scholarships, study abroad, or work to pay their tuition and other expenses," and as a result may

25    withdraw from the University altogether (UC Compl. ¶¶ 4–6, 34–37, 48–49).[4]

26

27         [4] Two additional DACA lawsuits proceed in the Eastern District of New York before Judge Nicholas Garaufis, *State of New York v. Trump*, Case No. 17-cv-05228 NGG, and *Vidal v. Baran*, Case No. 16-cv-04756 NGG.

28

United States District Court
For the Northern District of California

Appeal 18-1521, Document 287, 09/04/20, 2902454, Page 862 of 1026 PageID #:
10453
Case 1:17-cv-05228-NGG-VMS   Document 234   Filed 01/09/18   Page 14 of 49
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 14 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 14 of 49

**United States District Court**
For the Northern District of California

1    On September 11, the States of California, Maine, Maryland, and Minnesota filed suit.

2  Plaintiff States allege that they are home to more than 238,000 DACA recipients, and that the

3  loss of their residents' DACA status and work authorizations will injure their public colleges

4  and universities, upset the States' workforces, disrupt the States' statutory and regulatory

5  interests, cause harm to hundreds of thousands of their residents, damage their economies,

6  and hurt companies based in Plaintiff States (States Compl. ¶¶ 1–10).

7    The City of San Jose, on its own behalf and on behalf of its employees who are DACA

8  recipients, filed its action on September 14.  San Jose alleges that it has hired DACA recipients

9  into vital City jobs, that substantial resources were invested in training these employees, and that

10  the City will be harmed when these employees are forced to leave the workforce (when they lose

11  their work authorizations).  San Jose further alleges that it will continue to lose tax revenue as

12  DACA recipients lose work authorizations and can no longer contribute to the City's tax base

13  (San Jose Compl. ¶¶ 10, 28, 49–51).

14    On September 18, Individual DACA recipients Dulce Garcia, Miriam Gonzalez Avila,

15  Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut

16  Latthivongskorn brought suit to challenge the termination of DACA.  Individual Plaintiffs work

17  and study in the fields of law, medicine, education, and psychology.  They allege that the loss of

18  DACA will frustrate their professional goals and accomplishments.  They further allege that as a

19  result of the rescission, they will lose access to numerous federal and state benefits, and may not

20  be able to reside in the United States with their families.  They applied for DACA in reliance on

21  the government's representations that information provided under the program would not be

22  used for purposes of immigration enforcement (Garcia Compl. ¶¶ 4–9, 55, 59, 72, 78, 85, 95,

23  128).

24    Finally, the County of Santa Clara and the Service Employees International Union Local

25  521 filed their complaint on October 10.  The County alleges that it employs DACA recipients,

26  including union members, in key positions, such as in its In-Home Supportive Services Program

27  and New Americans Fellowship Program.  The County alleges that it has expended time and

28  money in training these employees, and that it relies on them to provide important services.

14

<div style="text-align:center; writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

1   As DACA recipients leave the workforce, the County will lose important employees, will incur

2   harm to its economy and suffer decreased tax revenue, and will incur the costs of increased

3   dependency on subsidized health care and other County services.  Local 521 sues as an

4   associational plaintiff on behalf of its members who are DACA recipients, and alleges that the

5   Union's organizational mission is to organize, represent, and empower employees, as well as

6   mobilize immigration reform (Santa Clara Compl. ¶¶ 1, 15–20, 32, 37, 43–52).

7          Collectively, plaintiffs assert the following claims:

8   •      The rescission violated the Administrative Procedure Act because it

9          was arbitrary, capricious, an abuse of discretion, and otherwise not in

10         accordance with law (UC Compl. ¶¶ 50–58; State Compl. ¶¶ 152–55;

11         Garcia Compl. ¶¶ 165–84; Santa Clara Compl. ¶¶ 67–73).

12  •      The rescission violated the APA because it was a substantive rule that

13         did not comply with the APA's notice-and-comment requirements or

14         the Regulatory Flexibility Act's mandate under 5 U.S.C. § 604 that

15         an agency publish analysis of a rule's impact on small businesses

16         (UC Compl. ¶¶ 59–66; State Compl. ¶¶ 146–63; San Jose Compl.

17         ¶¶ 59–63; Garcia Compl. ¶¶ 177–84).

18  •      The rescission deprived DACA recipients of constitutionally-protected

19         property and liberty interests without due process of law.  Plaintiffs also

20         allege that the rescission violated due process because the government

21         changed its policy regarding agency use of DACA-related information

22         (UC Compl. ¶¶ 67–73; State Compl. ¶¶ 141–45; Garcia Compl.

23         ¶¶ 133–47; Santa Clara Compl. ¶¶ 59–66).

24  •      The rescission violates equal protection of the law because it was

25         motivated by discriminatory animus and because it deprived DACA

26         grantees of their substantial interests in supporting themselves and

27         furthering their education (State Compl. ¶¶ 172–77; San Jose Compl.

28         ¶¶ 52–58; Garcia Compl. ¶¶ 148–59; Santa Clara Compl. ¶¶ 74–78).

<div style="text-align:center">15</div>

Appeal: 18-1521   Document: 28-7   Filed: 07/02/2018   Pg: 297 of 454
Case 1:17-cv-05228-NGG-VMS   Document 102-7   Filed 09/04/20   Page 864 of 1026 PageID #: 10455
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 16 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 16 of 49

<div style="margin-left:2em;">

1        •    The rescission violates equitable estoppel. DACA recipients provided
2              detailed personal information to the government and rearranged their
3              lives based on the government's representations, but now face the
4              possibility of removal. Plaintiffs argue that the government should
5              therefore be equitably estopped from terminating DACA or from using
6              their DACA information for immigration enforcement purposes (State
7              Compl. ¶¶ 164–71; Garcia Compl. ¶¶ 192–99; Santa Clara Compl.
8              ¶¶ 79–86).
9        •    Plaintiffs seek a declaration that the rescission was unlawful and an
10            order restoring DACA (UC Compl. at 16, State Compl. at 35–36;
11            San Jose Compl. at 15–16; Garcia Compl. at 43; Santa Clara Compl.
12            at 26–27).

13      On September 21, an initial case management conference occurred for all DACA actions
14 in our district. At the conference, all counsel, including government counsel, presented a joint
15 proposal whereby the government would file the administrative record by October 13.
16 Significantly, although the government argued that discovery would be premature, it agreed to
17 submit the administrative record without any condition that it be done before any decision on its
18 threshold jurisdictional motion (presumably because it knew its jurisdictional motion would be
19 premised on the administrative record) (*see* Dkt. No. 114 at 16; Tr. at 17:3, 22:2). The Court
20 made only slight revisions to the joint proposal, all in aid of a stated goal of providing a full
21 record and final decision for our court of appeals prior to the March 5 expiration date. Pursuant
22 to FRCP 26, a case management order then set a October 6 deadline for the government to file
23 the administrative record, set a briefing schedule for the parties' motions to dismiss, for
24 provisional relief, or for summary judgment, and permitted the parties to proceed with
25 reasonable, limited, and narrowly-directed discovery (Dkt. No. 49).
26      The government filed an administrative record on October 6. It was merely, however,
27 fourteen documents comprising 256 pages of which 187 consisted of published opinions from
28 the DAPA litigation, and all of which already resided in the public domain. All non-public

</div>

16

United States District Court
For the Northern District of California

1  materials, some eighty-four documents, actually reviewed by the Acting Secretary remained

2  withheld as privileged (Dkt. No. 71). In other words, of the ninety-eight DACA-related

3  documents personally considered by the decisionmaker, all but the fourteen already known to

4  the public were withheld as privileged. Although government counsel further indicated, upon

5  inquiry by the district judge, that the decisionmaker had also likely received verbal input,

6  nothing was included in the administrative record to capture this input. Nor were there any

7  materials regarding the agency's earlier, recent decisions to leave DACA in place.

8      On October 9, plaintiffs moved to require the government to complete the administrative

9  record, seeking all materials considered directly or indirectly by the Acting Secretary in

10  reaching her decision to rescind DACA, which motion was granted in part and denied in part.

11  The government, having earlier consented to filing the administrative record, was ordered to

12  keep its word and to file a complete administrative record (Dkt. Nos. 65, 79–80).

13      Instead, the government filed a petition for writ of mandamus with our court of appeals,

14  seeking relief from having to complete the administrative record until after its jurisdictional

15  arguments were determined, a turnabout from its earlier voluntary proposal and stipulation to

16  file the administrative record as part of an agreed-upon schedule. After full briefing and oral

17  argument, our court of appeals denied the government's mandamus petition and vacated the

18  stay (over one dissent).[5]

19      The government was again ordered to complete the administrative record, this time by

20  November 22, later extended to December 22 to accommodate the government's claim of

21  burden. On December 1, however, the government filed a petition for writ of mandamus and

22  application for a stay in the United States Supreme Court. Ultimately, the Supreme Court did

23  not reach the merits of the government's petition but required that defendants' jurisdictional

24  defenses be adjudicated prior to consideration of discovery or completing the administrative

25  _____

26      [5] Recently, the United States Court of Appeals for the Second Circuit denied the government's petition for a writ of mandamus to stay an order to supplement the same administrative record. The court of appeals found that there was "a strong suggestion that the record before the District Court was not complete" and, noting

27  that nearly 200 pages of the record consisted of published opinions from various federal courts, "[i]t is difficult to imagine that a decision as important as whether to repeal DACA would be made based upon a factual record of little more than 56 pages, even accepting that litigation risk was the reason for repeal." In Re: Kirstjen M.

28  Nielsen, No. 17-3345 (2d. Cir. Dec. 27, 2017).

Appeal 18-1521 Document 20-3 Filed 07/03/2018 Pg 204 of 454 Page 866 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS Document 231-7 Filed 09/04/20 10457
Case 3:17-cv-05211-WHA Document 234 Filed 01/09/18 Page 18 of 49
Case 8:17-cv-02942-RWT Document 36-1 Filed 01/17/18 Page 18 of 49

1    record (Dkt. Nos. 86, 188, 197, 214, 224), a decision the district judge himself might have made

2    at the outset save for the government's own proposal and agreement to file the administrative

3    record in October.

4         Consequently, this action has proceeded on the incomplete administrative record

5    initially filed by the government. Plaintiffs have been forced to draw on other materials.

6    Ironically, even the government in these motions relies on material outside of the administrative

7    record to defend the agency decision (Dkt. No. 204 at 10, 12, 19–20). The parties have now

8    fully briefed motions to dismiss and a motion for provisional relief, all argued on December 20

9    (Dkt. Nos. 111, 114). This order now follows.

10                                    **ANALYSIS**

11      **1.**        **MOTION TO DISMISS.**

12         Defendants raise three jurisdictional arguments under FRCP 12(b)(1). *First*, they argue

13    that the decision to rescind DACA was a discretionary act barred from judicial review under

14    the APA. *Second*, they contend that the INA bars judicial review. *Third*, although defendants

15    concede that Individual Plaintiffs have standing, they contend that no others do. Each is

16    now addressed in turn. A separate order will consider defendants' motion to dismiss under

17    FRCP 12(b)(6).

18                 **A.**      **The DACA Rescission Was Not Committed**
                                    **To Agency Discretion by Law.**

19

20         Congress has instructed our district courts to review and set aside agency action found

21    to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

22    5 U.S.C. § 706(2)(A). Under the APA, however, our district courts lack subject-matter

23    jurisdiction to review agency action that is "committed to agency discretion by law." 5 U.S.C.

24    § 701(a)(2).

25         In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), the

26    Supreme Court explained that the jurisdictional bar of Section 701(a)(2) is "very narrow" and

27    "applicable in those rare instances where statutes are drawn in such broad terms that in a given

    case there is no law to apply." The Supreme Court held that because the statute there at issue

28    contained "clear and specific directives" guiding the agency's decision, there was "'law to

**United States District Court**
For the Northern District of California

apply,' so the exemption for action 'committed to agency discretion' [was] inapplicable." *Id.* at 411–13 (quotations and citations omitted).

When it next revisited the exception in *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), the Supreme Court reiterated that the exception applies only where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." There, condemned inmates asked the FDA to bring an enforcement action to prevent purported violations of the Federal Food, Drug, and Cosmetic Act through the administration of death-penalty drugs. The FDA Commissioner, however, refused to do so on the ground that the FDA lacked jurisdiction and otherwise should not interfere with the state criminal justice system. Skipping over the agency jurisdiction issue, the Supreme Court held that such decisions not to prosecute or initiate enforcement actions are generally not reviewable as they are "committed to an agency's absolute discretion." *Id.* at 824–25, 831.

*Chaney* identified several characteristics of non-enforcement decisions as key to its holding. *First*, non-enforcement decisions require a complicated balancing of factors "peculiarly within [the agency's] expertise," including whether "resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831. *Second*, in refusing to act, an agency "does not exercise its coercive power over an individual's liberty" and accordingly "does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. When an agency *does* act to enforce, however, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. *Third*, a refusal to institute enforcement proceedings is similar to a prosecutor's decision not to indict, which decision "has long been regarded as the special province of the Executive Branch." *Ibid.*

Our case is different from *Chaney*. There, the agency simply refused to initiate an enforcement proceeding. Here, by contrast, the agency has ended a program which has existed for five years affecting 689,800 enrollees. Importantly, major policy decisions are "quite different from day-to-day agency nonenforcement decisions." *National Treasury Employees*

19

AR2119

1   *Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988). Rather, broad enforcement policies "are

2   more likely to be direct interpretations of the commands of the substantive statute rather than

3   the sort of mingled assessments of fact, policy, and law that drive an individual enforcement

4   decision." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994).

5   Even defendants concede that where "the agency's interpretation of a statute is embedded in a

6   non-reviewable enforcement policy, the former may be reviewable as such" (Dkt. No. 218 at 3

7   n.4). Although they contend that the rescission memorandum "does not contain an embedded

8   interpretation of the INA," that assertion is incompatible with the Acting Secretary's explicit

9   references to the INA and the Attorney General's determination that DACA was effectuated

10  without "statutory authority." The first and third *Chaney* factors, accordingly, do not apply to

11  the instant case.[6]

12      *Chaney* is also distinguishable because, unlike there, here the government reversed

13  course after five years of inviting DACA recipients out of the shadows. In contrast to

14  nonenforcement decisions, "rescissions of commitments, whether or not they technically

15  implicate liberty and property interests as defined under the fifth and fourteenth amendments,

16  exert much more direct influence on the individuals or entities to whom the repudiated

17  commitments were made." *Robbins v. Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985). Through

18  DACA, the government has invited undocumented aliens who meet threshold criteria to step

19  forward, disclose substantial personal information, pay a hefty fee, and comply with ongoing

20  conditions, all in expectation of (though not a right to) continued deferred action. DACA

21  allows enrollees to better plan their careers and lives with a reduced fear of removal. DACA

22  work authorizations, for example, allow recipients to join in the mainstream economy (and pay

23  taxes). DACA covers a class of immigrants whose presence, seemingly all agree, pose the least,

24  if any, threat and allows them to sign up for honest labor on the condition of continued good

25  behavior. This has become an important program for DACA recipients and their families, for

26  _____

27      [6] Contrary to defendants, *Perales v. Casillas*, 903 F.2d 1043, 1050 (5th Cir. 1990), is distinguishable
    on its facts. There, the Fifth Circuit addressed a class action stemming from the Immigration and Naturalization
    Service's failure to adjudicate requests for voluntary departure. The court of appeals determined that the district

28  court had improperly issued an injunction directing INS to consider particular grounds in deciding individual
    requests for voluntary departure and employment authorization. *Id.* at 1046.

20

the employers who hire them, for our tax treasuries, and for our economy. An agency action to terminate it bears no resemblance to an agency decision not to regulate something never before regulated.

Finally, there *is* law to apply. The main, if not exclusive, rationale for ending DACA was its supposed illegality. But determining illegality is a quintessential role of the courts.[7]

**B.    The INA Does Not Bar Review.**

The principle that courts owe substantial deference to the immigration determinations of the political branches is important and undisputed. *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017). That deference, however, does not remove the decision to rescind DACA from the ambit of judicial review. Rather, the Supreme Court has applied the "strong presumption in favor of judicial review of administration action" in the immigration context. *See INS v. St. Cyr*, 533 U.S. 289, 298–99 (2001).

In this connection, defendants raise two arguments. *First*, they contend that review of discretionary enforcement decisions results in the inappropriate delay of removal, and accordingly prolongs violations of our immigration laws. This argument, however, again ignores that plaintiffs do not challenge any particular removal but, rather, challenge the abrupt end to a nationwide deferred-action and work-authorization program. In any individual case, DACA allows DHS to revoke deferred status and to deport. *Second*, defendants assert that review of such decisions may involve disclosure of law enforcement priorities and foreign-policy objectives. Neither concern is implicated here, as defendants' stated reasons for the rescission all relate to the across-the-board cancellation of DACA based on supposed illegality, not to the facts particular to any proposed removal.

---

[7] Defendants are correct, of course, that a presumptively unreviewable agency action does not become reviewable simply because "the agency gives a reviewable reason for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng's*, 482 U.S. 270, 283 (1987). As discussed above, however, the rescission of DACA was not such an unreviewable decision.

United States District Court
For the Northern District of California

21

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 209 of 454   Page 870 of 1026 PageID #: 10461
Case 1:17-cv-05228-NGG-VMS   Document 234   Filed 09/04/20
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 22 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 22 of 49

1  Nor does Section 1252(g) bar judicial review of the agency action in question.  8 U.S.C.

2  § 1252(g) provides:

3  Except as provided in this section and notwithstanding any other
provision of law (statutory or nonstatutory) . . . no court shall have

4  jurisdiction to hear any cause or claim by or on behalf of any alien
arising from the decision or action by the Attorney General to

5  commence proceedings, adjudicate cases, or execute removal
orders against any alien under this chapter.

6

7  As explained by the Supreme Court, this provision applies only to the three discrete

decisions or actions named in Section 1252(g).  *AADC*, 525 U.S. at 482.  Plaintiffs' claims do

8  not involve such decisions, but rather the challenge here is to the across-the-board cancellation

9  of a nationwide program.[8]

10  Defendants recognize that these actions were brought prior to the commencement of

11  any removal proceedings.  Nevertheless, they argue that Section 1252(g) precludes review of

12  plaintiffs' claims because the decision to discontinue deferred action is "an ingredient to the

13  commencement of enforcement proceedings."  It is true that eliminating DACA draws its

14  enrollees one step closer to deportation, but the Supreme Court rejected the argument that

15  Section 1252(g) somehow precludes review of the "many other decisions or actions that may be

16  part of the deportation process."  As *AADC* emphasized, "[i]t is implausible that the mention of

17  three discrete events along the road to deportation was a shorthand way of referring to all claims

18  arising from deportation proceedings."  *Ibid.*

19  Defendants cite two decisions.  *Importantly, however, both stemmed from already-

20  commenced deportation or removal proceedings.  See Botezatu v. I.N.S.*, 195 F.3d 311, 312

21  (7th Cir. 1999) (declining to review a decision to deny deferred action after plaintiff had been

22  found deportable); *Vasquez v. Aviles*, 639 F. App'x 898, 899–900 (3d Cir. 2016) (district court

23  lacked jurisdiction to hear habeas corpus petition that claimed plaintiff was improperly denied

24  DACA relief).

25  By comparison, our court of appeals has held, following *AADC*, that Section 1252(g)

26  does not bar review of actions that occur "prior to any decision to 'commence proceedings.'"

27

28  _____

[8]  The district court in *Batalla Vidal* also concluded that Section 1252(g) did not bar judicial review of
challenges to the DACA rescission.  *Batalla Vidal v. Duke*, 2017 WL 5201116, at *13.

United States District Court
For the Northern District of California

22

AR2122

1    *Kwai Fun Wong v. United States*, 373 F.3d 952, 965 (9th Cir. 2004). The claims in *Kwai Fun*

2    *Wong* challenged the revocation of the plaintiff's parole without first deciding her application

3    for immigration relief, conduct which "*resulted in* the INS's decision to commence removal

4    proceedings and ultimately to remove" the plaintiff from the United States. *Id*. at 959, 964.

5    Contrary to defendants, it is immaterial that *Kwai Fun Wong* did not involve deferred action,

6    as both the revocation of parole and the revocation of deferred action are "an ingredient" to the

7    commencement of enforcement proceedings. The jurisdictional limits of Section 1252(g) were

8    instead "directed at the deconstruction, fragmentation, and hence prolongation of removal

9    proceedings." *AADC*, 525 U.S. at 482.

10                              **C.     Most Plaintiffs Have Standing.**

11           To establish standing, Article III of the United States Constitution requires plaintiffs

12    to show "(1) they suffered an injury in fact, (2) that is fairly traceable to the challenged conduct

13    of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,*

14    *Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

15    560–61 (1992)). The standing inquiry is focused on whether the plaintiff has a sufficient

16    personal stake in the outcome of the controversy to ensure that the parties will be truly adverse

17    and their legal presentations sharpened. *Massachusetts v. EPA*, 549 U.S. 497 (2007). Standing

18    must be assessed on a claim-by-claim basis. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352

19    (2006).

20           Defendants do not dispute that the Individual Plaintiffs have standing. Rather, they argue

21    in brief that the entity plaintiffs (the state and local governments, UC Plaintiffs, and SEIU Local

22    521) lack Article III standing because the rescission does not regulate or restrict them in any

23    way. Defendants therefore posit that the entity plaintiffs' claimed injuries are due only to

24    "incidental effects" of the rescission, which defendants contend are insufficient to establish

25    injury-in-fact. As set forth below, these arguments lack merit.

26           *First*, California, Maryland, the City of San Jose, and the County of Santa Clara each

27    employ DACA recipients, in connection with whom they have invested substantial resources

28    in hiring and training. Plaintiffs allege that they will not only lose these employees as work

United States District Court
For the Northern District of California

23

Case 1:17-cv-05228-NGG-VMS   Document 234   Filed 09/04/20   Page 872 of 1026 PageID #: 10463
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 24 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 24 of 49

<div style="text-align:right">**United States District Court**
For the Northern District of California</div>

1  authorizations expire, but that they will also need to expend additional resources to hire and train

2  replacements.  San Jose further alleges that as a result of the rescission, the City has had

3  decreased productivity, and that it has had to expend time and resources to deal with decreased

4  employee morale (States Compl. ¶¶ 26–27, 32, 53; San Jose Compl. ¶¶ 49–50; Santa Clara

5  Compl. ¶¶ 32–37; App. 11, 95–97, 706–07, 798, 1575–76).

6  *Second*, Plaintiff States, including Maine and Maryland, stand to lose significant tax

7  revenue as a result of the rescission (States Compl. ¶¶ 28–30, 37, 49–50, 70–71).  Although

8  general allegations of injury to a state's economy and the associated decline in general tax

9  revenues may not be sufficient to establish standing, here, Plaintiff States sufficiently allege a

10  "direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S.

11  437, 448 (1992).  They allege, for example, that Maine stands to lose $96,000 in annual state

12  and local taxes as DACA recipients leave the workforce (States Compl. ¶¶ 30, 38).  Evidence

13  submitted by plaintiffs supports these allegations, and demonstrates that DACA's rescission

14  would reduce state and local tax contributions by DACA-eligible individuals by at least half

15  (App. 68–74, 218–30).

16  *Third*, the University of California has also established that it will suffer injury to its

17  proprietary interests.  As declarations submitted by the University demonstrate, the rescission

18  has harmed the University in multiple ways.  Because DACA recipients can no longer seek

19  advance parole, these students are unable to travel outside of the United States for research and

20  educational conferences.  DACA recipients have also decided to cancel their enrollment in the

21  University, and additional recipients are at risk of dropping out, because they would not be able

22  to pay the cost of attendance without work authorizations. The University has also invested

23  resources in recruiting and retaining DACA recipients as employees in various roles, including

24  as teaching assistants and health care providers.  Such investments would be lost should these

25  employees lose their ability to work in the United States.

26  California, Maryland, and Minnesota also allege injury to their public universities

27  through harm to their educational missions and the loss of students and teachers.  According to

28  the declarations filed by plaintiffs, the rescission, and the resulting loss of work authorization

<div style="text-align:center">24</div>

<div style="text-align:right">**AR2124**</div>

Appeal: 18-1521    Doc: 28-2      Filed: 07/02/2018    Pg: 801 of 454
Case 1:17-cv-05228-NGG-VMS    Document 234    Filed 01/09/18    Page 873 of 1026 PageID #: 10464
Case 3:17-cv-05211-WHA    Document 234    Filed 01/09/18    Page 25 of 49
Case 8:17-cv-02942-RWT    Document 36-1    Filed 01/17/18    Page 25 of 49

1    and potential for deportation, will adversely impact the diversity of the talent pool of potential

2    students, which will make it more difficult for the universities to fulfill their missions of

3    increasing diversity (States Compl. ¶¶ 27, 55, 64–66; App. 12–16, 496–514, 884–90).  Our court

4    of appeals recently affirmed the standing of two state governments to challenge an immigration

5    policy that similarly harmed the plaintiffs' public universities.  *Washington v. Trump*, 847 F.3d

6    1151, 1160–01 (9th Cir. 2017).  These injuries accordingly give the University of California and

7    the States of California, Maryland, and Minnesota Article III standing.  *Ibid.* (citing *Singleton v.*

8    *Wulff*, 428 U.S. 106, 114–16 (1976)).[9]

9         *Fourth*, State Plaintiffs Maryland and Minnesota further allege that the rescission will

10   negatively impact their public health programs.  In particular, Maryland and Minnesota allege

11   that rescinding DACA will cause many DACA grantees to lose their employer-based health

12   insurance, imposing higher healthcare costs on the state (State Compl. ¶¶ 51, 62).  These injuries

13   are also sufficient to confer Article III standing.[10]

14        *Finally*, SEIU Local 521 has associational standing to bring its claims on behalf of its

15   members who are DACA recipients.  An association has standing to bring suit on behalf of its

16   members when:  (1) its members would otherwise have standing to sue in their own right;

17   (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the

18   claim asserted nor the relief requested requires the participation of individual members in the

19   lawsuit.  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,

20

21        [9]  The public universities of California, Maryland, and Minnesota are branches of the states under state
22   law.  *Campbell v. Regents of Univ. of California*, 35 Cal. 4th 311, 321 (2005)*; Hanauer v. Elkins*, 217 Md. 213,
     219, 141 A.2d 903, 906 (Md. 1958)*; Univ. of Minn. v. Raygor*, 620 N.W.2d 680, 683 (Minn. 2001).

23        [10]  Although not discussed by the parties, the District of Columbia Circuit held that Joe Arpaio, Sheriff
24   of Maricopa County, Arizona, lacked Article III standing to challenge DACA.  *Arpaio v. Obama*, 797 F.3d 11
     (D.C. Cir. 2015).  While the court of appeals found that the plaintiff's alleged harm — increased spending on
25   criminal investigation, apprehension, and incarceration — was sufficiently concrete, his theory that DACA
     would lead to an increased number of undocumented immigrants committing crimes in his jurisdiction was too
26   speculative.  *Id.* at 19–20.  Here, by contrast, plaintiffs allege that the rescission will cause DACA recipients to
     lose their work authorizations, and that plaintiffs will lose employees and students, suffer decreased tax revenue,
27   and otherwise incur increased costs as a direct result.  This case is also different from *Crane v. Johnson*,
     783 F.3d 244, 252 (5th Cir. 2015), where the Fifth Circuit held that Mississippi lacked standing to challenge
28   DACA because it failed to submit evidence that DACA eligible immigrants resided in the state.  Defendants do
     not dispute State Plaintiffs' allegations that hundreds of thousands of DACA recipients live in Plaintiff States.

United States District Court
For the Northern District of California

AR2125

Appeal: 18-1521  Document: 28-7  Filed: 07/02/2018  Pg: 302 of 454
Case 1:17-cv-05228-NGG-VMS  Document 234  Filed 09/04/20  Page 874 of 1026 PageID #:
10465
Case 3:17-cv-05211-WHA  Document 234  Filed 01/09/18  Page 26 of 49
Case 8:17-cv-02942-RWT  Document 36-1  Filed 01/17/18  Page 26 of 49

**United States District Court**
For the Northern District of California

1  477 U.S. 274, 282 (1986) (quoting *Hunt v. Washington State Apple Advertising Comm'n*,

2  432 U.S. 333, 343 (1977)). SEIU has established all three elements here. SEIU has members

3  who are DACA recipients. Its constitution states that part of its mission is to provide its

4  members with a voice in the larger community, and that its members should be treated equally

5  with dignity regardless of immigration status or national origin. SEIU has also formed a

6  Committee on Comprehensive Immigration Reform, a member-based committee that engages in

7  organizing, advocacy, and education to help undocumented workers. Its members' interests in

8  these actions are therefore germane to SEIU's stated purpose (App. 801–09). Furthermore, this

9  action does not require the participation of SEIU's individual members.

10  Defendants, in arguing that the entity plaintiffs lack standing, rely solely on *Linda R.S. v.*

11  *Richard D.*, 410 U.S. 614, 619 (1973). There, the plaintiff lacked standing to challenge a Texas

12  state court's interpretation of a child support statute. *Ibid.* The Supreme Court held that,

13  although the plaintiff had alleged an injury, she had not shown "a direct nexus between the

14  vindication of her interest and the enforcement of the State's criminal laws" because the

15  relationship between the state's decision not to prosecute and the father's decision not to pay

16  under the statute could "at best, be termed only speculative." *Id.* at 618–19. *Linda R.S.* has no

17  application here. As explained above, the entity plaintiffs have alleged harm to their proprietary

18  interests as a direct result of defendants' decision to terminate the DACA program, most notably

19  through its termination of work authorizations. Accordingly, the entity plaintiffs have

20  sufficiently alleged injury-in-fact traceable to the termination of DACA, and have demonstrated

21  that these harms are redressable by their requested relief.[11]

22  Turning to prudential standing under the APA, a plaintiff must show that it has suffered

23  or will suffer sufficient injury-in-fact, and that "the interest[s] sought to be protected by the

24  complainant [are] arguably within the zone of interests to be protected or regulated by the

25  statute . . . in question." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S.

26  479, 488 (1998).

27

28  [11] Because defendants' conduct imposes direct injury on the State Plaintiffs' proprietary interests, this order need not reach defendants' argument that the State Plaintiffs lack standing as *parens patriae*.

26

1    A plaintiff that is not itself the subject of the contested regulatory action lacks prudential

2    standing only where its interests "are so marginally related to or inconsistent with the purposes

3    implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

4    suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). This test is "not meant to be

5    especially demanding," and must be applied "in keeping with Congress's evident intent when

6    enacting the APA to make agency action presumably reviewable." *Match-E-Be-Nash-She-Wish*

7    *Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quotations and citations

8    omitted).

9    The parties' briefs include only a cursory discussion of plaintiffs' prudential standing

10   under the APA. Again, defendants do not dispute that the Individual Plaintiffs also have

11   statutory standing. SEIU, which asserts the rights of its members who are DACA recipients,

12   likewise seeks the protection of interests regulated by the INA. Not all of the entity plaintiffs,

13   however, have established prudential standing to proceed on their APA claims.

14   Plaintiffs primarily rely on our court of appeals' recent decision in *Hawaii v. Trump*,

15   859 F.3d 741, 765 (9th Cir. 2017), as well as on various provisions of the INA which provide for

16   student- and employment-related immigrant visas. Plaintiffs do not contend, however, that their

17   DACA-recipient students or employees qualify for such visas. Nor do plaintiffs point to

18   any provisions of the INA which indicate a protected interest in enrolling students with deferred

19   action in their schools or universities. Plaintiffs are also unable to point to any provision of the

20   INA indicating that Congress intend to protected Plaintiff States' interests in maintaining income

21   tax revenue or avoiding increased healthcare costs.

22   By contrast, local and state governments San Jose, Santa Clara, California, and

23   Maryland, as well as the University of California, have all identified injuries resulting from their

24   status as employers, and allege harm caused by their employees' future loss of deferred action

25   and associated work authorization. The INA gives the Executive Branch broad discretion to

26   determine when noncitizens may work in the United States, 8 U.S.C. § 1324a(h)(3), and

27   regulations promulgated pursuant to this authority allow recipients of deferred action to apply

28   for work authorization if they can demonstrate an "economic necessity for employment."

27

AR2127

**United States District Court**
For the Northern District of California

Case 1:17-cv-05228-NGG-VMS   Document 202-7   Filed 09/04/20   Page 876 of 1026 PageID #: 10467
Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 304 of 454
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 28 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 28 of 49

1   8 C.F.R. § 274a.12(c)(14).  Moreover, the INA contains detailed provisions which subject

2   employers to criminal and civil liability for knowingly hiring unauthorized aliens, *see* 8 U.S.C.

3   § 1324a(a)(1)(A), and for "continu[ing] to employ the alien in the United States knowing

4   the alien is (or has become) an unauthorized alien with respect to such employment," *id.*

5   § 1324a(a)(2).  The work authorization document that the agency issues to DACA recipients

6   is one of the documents that is acceptable for Form I-9, Employment Eligibility Verification,

7   which employers must complete and retain for each individual they hire for employment in the

8   United States (App. 2061–62).  Plaintiffs' interest in their employees' continued authorization

9   to work in the United States is therefore "arguably within the zone of interests" that the INA

10  protects.  *Hawaii*, 859 F.3d at 765*; Nat'l Credit Union Admin.*, 522 U.S. at 488.[12]

11       Accordingly, even though the zone of interests inquiry is not demanding, this order

12  concludes that Maine and Minnesota's interests are "so marginally related" to the purposes

13  implicit in the INA that it cannot reasonably be assumed that Congress intended to permit the

14  suit.  Maine and Minnesota's APA claims are accordingly DISMISSED WITH LEAVE TO AMEND.

15  The remaining entity plaintiffs, however, have established that their interests that support

16  Article III standing also satisfy the APA's zone of interests test.

17                    *              *              *

18       Apart from the holding that Maine and Minnesota do not have statutory standing, the

19  foregoing rejects all of the government's jurisdictional arguments to dismiss plaintiffs'

20  challenges under the Administrative Procedure Act.

21       **2.       PROVISIONAL RELIEF.**

22       Plaintiffs seek a preliminary injunction to restore DACA.  To support a preliminary

23  injunction, plaintiffs must establish four elements:  (1) likelihood of success on the merits;

24  (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in

25

26       [12]  Defendants' sole argument against the entity plaintiffs' prudential standing is that no provision of the INA protects the entity plaintiffs from "bearing the incidental effects" of a denial of deferred action.

27  The case on which defendants rely, however, dealt with a private anti-immigration organization whose members were not impacted by the immigration policy at issue.  *See Fed'n for Am. Immigration Reform, Inc. v. Reno*,

28  93 F.3d 897, 899 (D.C. Cir. 1996).

28

Case 1:17-cv-05228-NGG-VMS   Document 234   Filed 09/04/20   Page 877 of 1026 PageID #: 10468
Appeal 18-1521, Document 207, 07/02/2018, 2337, Page 305 of 454
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 29 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 29 of 49

1   their favor; and (4) that the injunction is in the public interest. *Winter v. Natural Resources*

2   *Defense Council Inc.*, 555 U.S. 7, 20 (2008). As now explained, the record warrants most of the

3   provisional relief requested.

4             **A.    Likelihood of Success on the Merits.**

5         Plaintiffs have shown a likelihood of success on their claim that the rescission

6   was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.

7   Specifically, plaintiffs are likely to succeed on their claims that:  (1) the agency's decision to

8   rescind DACA was based on a flawed legal premise; and (2) government counsel's supposed

9   "litigation risk" rationale is a post hoc rationalization and would be, in any event, arbitrary and

10   capricious.

11             *(1)    The Rescission was Based on a Flawed Legal Premise.*

12         The agency action was "not in accordance with law" because it was based on the flawed

13   legal premise that the agency lacked authority to implement DACA.  When agency action is

14   based on a flawed legal premise, it may be set as aside as "arbitrary, capricious, an abuse of

15   discretion, or otherwise not in accordance with law." *See Massachusetts*, 549 U.S. at 532

16   (setting aside the EPA's denial of a petition for rulemaking under the Clean Air Act for

17   supposed lack of authority); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007).

18   This order holds that DACA fell within the agency's enforcement authority.  The contrary

19   conclusion was flawed and should be set aside.

20         The administrative record includes the 2014 determination of the Office of Legal Counsel

21   of the United States Department of Justice that programmatic deferred action is a permissible

22   exercise of DHS's enforcement discretion.  OLC noted that deferred action programs such as

23   DACA are permissible so long as immigration officials retain discretion to evaluate each

24   application on an individualized basis and so long as the concerns animating the program were

25   consistent with the types of concerns that have customarily guided the exercise of immigration

26   enforcement discretion.  OLC recognized that the "practice of granting deferred action date[d]

27   back several decades," and that "Congress has long been aware of the practice of granting

28   deferred action, including in its categorical variety, and of its salient features; and it has never

29

Appeal: 18-1521   Doc: 28-2   Filed: 07/02/2018   Pg: 306 of 454
Case 1:17-cv-05228-NGG-VMS   Document 28-27   Filed 09/04/20   Page 878 of 1026 PageID #: 10469
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 30 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 30 of 49

United States District Court
For the Northern District of California

1  acted to disapprove or limit the practice."  Indeed, not only has Congress not limited the practice,

2  but it has "enacted several pieces of legislation that have either assumed that deferred action

3  would be available in certain circumstances, or expressly directed that deferred action be

4  extended to certain categories of aliens" (AR 15–27).

5  As explained in OLC's opinion, each feature of the DACA program is anchored in

6  authority granted or recognized by Congress or the Supreme Court.  Because this is the heart

7  of the problem, and with apology for some repetition, this order will now examine each feature

8  in turn.

9  The Secretary of Homeland Security is responsible under the INA for "establishing

10  national immigration enforcement policies and priorities."  6 U.S.C. § 202(5).  The Secretary is

11  also charged with the administration and enforcement of the INA.  8 U.S.C. § 1103.  In making

12  immigration enforcement decisions, the executive "considers a variety of factors such as the

13  danger posed to the United States of an individual's unlawful presence, the impact of removal

14  on the nation's international relations, and the 'human concerns' of whether the individual 'has

15  children born in the United States, long ties to the community, or a record of distinguished

16  military service.'"  *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citing *Arizona v. United*

17  *States*, 132 S. Ct. 2492, 2499 (2012)).  In instituting DACA, Secretary Napolitano explained that

18  the program was "necessary to ensure that [DHS's] enforcement resources are not expended on

19  [] low priority cases but are instead appropriately focused on people who meet our enforcement

20  priorities" (AR 1).[13]

21  As set forth above, deferred action originated without any statutory basis apart from the

22  discretion vested by Congress in connection with the agency's enforcement of the immigration

23  laws.  Over the decades, however, deferred action became such a fixture that Congress referred

24  to it by name in several INA amendments.  *See*, *e.g.*, 8 U.S.C. § 1227(d)(2) (stating that U visa

25  and T visa applicants who were denied an administrative stay of removal were not precluded

26  from applying for "deferred action"); 8 U.S.C. § 1154(a)(1)(D)(i)(II) (stating that eligible

27

28  [13] The United States Court of Appeals for the District of Columbia Circuit did not reach the merits of Sheriff Joe Arpaio's challenges to DACA and DAPA but instead dismissed the case for lack of Article III standing.  *Arpaio*, 797 F.3d at 15.

30

1    derivatives of VAWA petitioners were eligible for "deferred action" and work authorization); 8

2    U.S.C. § 1151 note (stating that certain immediate family members of certain United States

3    citizens "shall be eligible for deferred action").  Congress has also acknowledged deferred action

4    in enactments outside of the INA.  *See*, *e.g.*, 49 U.S.C. § 30301 note (specifying that evidence of

5    lawful status includes proof of "deferred action status"); USA PATRIOT Act of 2001, Pub. L.

6    No. 107-56, § 423(b), 115 Stat. 272, 361 (stating that immediate family members of legal

7    permanent residents killed on September 11, 2001 "may be eligible for deferred action").

8    Congress has been free to constrain DHS's discretion with respect to granting deferred action,

9    but it has yet to do so.

10         The Supreme Court has recognized the authority of DHS to grant relief from removal,

11   *Arizona*, 567 U.S. at 396, and has specifically recognized deferred action as a way to exercise

12   that discretion — "for humanitarian reasons or simply for [the Executive's] own convenience."

13   *AADC*, 525 U.S. at 484.  Notably, our court of appeals has said that "the exercise of

14   prosecutorial discretion in deferred action flows from the authority conferred on the Secretary by

15   the INA."  *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 968 (9th Cir. 2017) ("*Brewer

16   II*").[14]

17         In extending programmatic deferred action to DACA enrollees, the agency acted within

18   the scope of this long and recognized practice.  In the exercise of its enforcement discretion and

19   policy-making, the agency simply found that DACA enrollees represented low priority cases

20   for removal and instituted DACA to manage that population while it redirected its resources

21   elsewhere.  Even for enrollees approved under the program, DHS expressly retained the

22   authority to terminate their deferred action at any time, in the agency's discretion.  DACA

23   provided no guarantee against removal.

24         Nevertheless, DACA has provided recipients with a major benefit, namely work

25   authorizations for the period of deferral upon a demonstration of economic need.  This has

26

27         [14]  In *Brewer II*, our court of appeals denied a petition for rehearing en banc.  Circuit Judge Kozinski,
      joined by five other Circuit Judges, filed a dissent to the denial of the petition, expressing the view that DACA

28   did not preempt Arizona's law refusing to issue drivers' licenses to DACA recipients.  855 F.3d at 958–62.

1    allowed DACA recipients to become part of the mainstream workforce and contribute openly

2    to our economy.  Significantly, Section 1324a(h)(3) defines an "unauthorized alien" not entitled

3    to work in the United States as an alien who is neither a legal permanent resident nor "authorized

4    to be . . . employed by [the INA] or by the [Secretary of Homeland Security]."  In turn, the

5    Secretary of Homeland Security has allowed work authorizations in cases of deferred action

6    under 8 C.F.R. § 274a.12(c)(14).  As our court of appeals has stated, "the Executive Branch has

7    determined that deferred action recipients — including DACA recipients — are ordinarily

8    authorized to work in the United States."  *See Brewer I*, 757 F.3d at 1062.

9        It is also within the lawful authority of the agency to determine that DACA recipients

10   do not accrue "unlawful presence" for purposes of the INA's bars on re-entry.  Pursuant to

11   pre-existent DHS regulations and policy guidance, deferred action recipients already avoided

12   accrual of "unlawful presence."  8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2);

13   Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic

14   Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence*

15   *for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(i) of the Act* at 42 (May 6, 2009).

16   Importantly, DHS excludes recipients of deferred action from being "unlawfully present"

17   because their deferred action is considered a period of stay authorized by the government.  *See* 8

18   U.S.C. § 1182(a)(9)(B)(ii) (an alien is deemed to be unlawfully present if the alien is present "in

19   the United States after the expiration of the period of stay authorized by the Attorney General

20   [and now the Secretary of Homeland Security]"); *Brewer I*, 757 F.3d at 1059.

21       Allowing DACA recipients to apply for and obtain advance parole to travel overseas and

22   return to the United States is also in accord with pre-existing regulations.  8 C.F.R. § 212.5(f);

23   8 U.S.C. § 1182(d)(5)(A) (the Attorney General [and now the Secretary of Homeland Security]

24   may "in his discretion parole into the United States temporarily under such conditions as he

25   may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public

26   benefit").

27       In short, what exactly is the part of DACA that oversteps the authority of the agency?

28   Is it the granting of deferred action itself?  No, deferred action has been blessed by both the

United States District Court
For the Northern District of California

32

AR2132

Appeal: 18-1521   Doc: 28-2   Filed: 07/03/2018   Pg: 309 of 454
Case 1:17-cv-02228-GG-VMS   Document 28-27   Filed 09/04/20   Page 881 of 1026 PageID #: 10472
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 33 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 33 of 49

United States District Court
For the Northern District of California

1  Supreme Court and Congress as a means to exercise enforcement discretion.  Is it the granting

2  of deferred action via a program (as apposed to ad hoc individual grants)?  No, programmatic

3  deferred action has been in use since at least 1997, and other forms of programmatic

4  discretionary relief date back to at least 1956.  Is it granting work authorizations coextensive

5  with the two-year period of deferred action?  No, aliens receiving deferred action have been able

6  to apply for work authorization for decades.  Is it granting relief from accruing "unlawful

7  presence" for purposes of the INA's bars on reentry?  No, such relief dates back to the George

8  W. Bush Administration for those receiving deferred action.  Is it allowing recipients to apply for

9  and obtain advance parole?  No, once again, granting advance parole has all been in accord

10  with pre-existing law.  Is it combining all these elements into a program?  No, if each step is

11  within the authority of the agency, then how can combining them in one program be outside its

12  authority, so long as the agency vets each applicant and exercises its discretion on a case-by-case

13  basis?

14  Significantly, the government makes no effort in its briefs to challenge any of the

15  foregoing reasons why DACA was and remains within the authority of the agency.  Nor does the

16  government challenge any of the statutes and regulations under which deferred action recipients

17  obtain the foregoing benefits.

18  Instead, the administrative record shows that the Attorney General told the Acting

19  Secretary that DACA was illegal.  *First*, the Attorney General said that DACA had been

20  improperly adopted by the Obama Administration after "Congress' repeated rejection of

21  proposed legislation that would have accomplished a similar result."  But the proposals rejected

22  by Congress markedly differ from DACA.  *Importantly, while the proposed legislation would*

23  *have offered Dreamers the ability to become lawful permanent residents, no comparable*

24  *pathway was offered by DACA.*  Our court of appeals recognized this distinction, noting that "the

25  DREAM Act and the DACA program are not interchangeable policies because they provided

26  different forms of relief."  *Brewer II*, 855 F.3d at 976 n.10.  In fact, the 2012 DACA memo

27  made explicit that DACA offered no pathway to lawful permanent residency, much less

28  citizenship.  Secretary Napolitano concluded her memo by stating that DACA "confer[ed] no

33

Appeal: 18-1521    Doc: 57-2    Filed: 07/02/2018    Pg: 310 of 454
Case 1:17-cv-05228-NGG-VMS    Document 234-7    Filed 09/04/20    Page 882 of 1026 PageID #:
10473
Case 3:17-cv-05211-WHA    Document 234    Filed 01/09/18    Page 34 of 49
Case 8:17-cv-02942-RWT    Document 36-1    Filed 01/17/18    Page 34 of 49

1  substantive right, immigration status or pathway to citizenship."  To claim that DACA was

2  rejected by Congress, therefore, is unfair.[15]

3      *Second*, another criticism of DACA was that applications received mechanical, routine

4  approval without individualized consideration.  In her rescission memorandum, the Acting

5  Secretary indicated that "[United States Citizenship and Immigration Services] has not been

6  able to identify specific denial cases where an applicant appeared to satisfy the programmatic

7  categorical criteria as outlined in the [original DACA] memorandum, but still had his or her

8  application denied based solely upon discretion."  The simple answer to this, if true, would be

9  for the agency to instruct its adjudicators to exercise discretion, on a individualized basis, to

10  make sure applicants do not pose a threat to national security or public safety and are otherwise

11  deserving of deferred action.

12      It appears, moreover, that the Acting Secretary was in error when she said that USCIS

13  has been unable to identify discretionary denials of DACA applications.  She cited no evidence

14  for this fact, and none is found in the administrative record.  Possibly, the Acting Secretary relied

15  on findings made in the DAPA litigation.  There, the majority panel noted that USCIS could not

16  produce any applications that satisfied the guidelines of the original DACA memorandum but

17  were nonetheless refused through an exercise of discretion.  *Texas*, 809 F.3d at 172.  As the

18  dissent pointed out, however, the district court may have conflated *rejections* of DACA

19  applications with *denials*, and as a result suggested that most denials were made for mechanical,

20  administrative reasons.  *Id.* at 210 (King, J., dissenting).  A declaration submitted in that case by

21  Donald Neufeld, then-Associate Director for Service Center Operations for USCIS, pointed to

22  several instances of discretionary denials.  *Id.* at 175.  That same declaration explained that while

23  a DACA application was *rejected* when it was "determined upon intake that the application [had]

24  a fatal flaw," an application was *denied* when a USCIS adjudicator, on a case-by-case basis,

25  determined that the requestor either had not demonstrated that they satisfied the guidelines for

26

27      [15] *See, e.g.*, S. 1291, 107th Congress (2001); S. 1545, 108th Congress (2003); S. 2075, 109th Congress
   (2005); H.R. 5131, 109th Congress (2006); H.R. 1275, 110th Congress (2007); S. 2205, 110th Congress (2007);
   H.R. 1751, 111th Congress (2009); S. 3827, 111th Congress (2010); S. 3962, 111th Congress (2010); S. 3992,
28  111th Congress (2010); H.R. 6497, 111th Congress (2010); S. 952, 112th Congress (2011).

United States District Court
For the Northern District of California

34

J.A. 1395                                                    AR2134

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 361 of 454
Case 1:17-cv-02325-GG-VMS   Document 234   Filed 09/04/20   Page 883 of 1026 PageID #: 10474
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 35 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 35 of 49

DACA *or* when an adjudicator determined that deferred action should be denied even though the threshold guidelines were met. *Id.* at 210–11 (dissent). The United States District Court for the District of Columbia, in addressing nearly identical statistics, recognized the distinction. The district court noted that as of December 2014, 36,860 requests for deferred action under DACA were denied and another 42,632 applicants were rejected as not eligible, and concluded that such statistics "reflect that [] case-by-case review is in operation." *Arpaio*, 27 F. Supp. 3d at 209 n.13. The administrative record tendered in our case completely fails to explain this apparent discrepancy.

*Third*, the main ground given by the Attorney General for illegality was the Fifth Circuit's decision in the DAPA litigation. DACA, the Attorney General said, suffered from the same "legal and constitutional defects" leveled against DAPA in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). Upon consideration of the full history of that case, however, this was an overstatement.

In the DAPA litigation, the district court held that DAPA violated the APA's notice-and-comment procedures because it constituted "a new rule that substantially change[d] both the status and employability of millions" and inflicted "major costs on both states and federal government." The district court found that the discretionary aspects of DAPA were "merely pretext," based on its finding that DACA had been implemented in such a mechanical way as to prevent the exercise of discretion on a case-by-case basis, and DAPA would therefore be implemented in the same manner. Notice and opportunity for public comment, it held, should have accordingly been given. *Texas,* 86 F. Supp. 3d at 671.

Although the Fifth Circuit recognized that "there was conflicting evidence on the degree to which DACA allowed discretion," because the government had failed to produce any applications that satisfied all of the criteria but were refused deferred action by an exercise of discretion, it was "not error — clear or otherwise —" for the district court to have concluded that DHS had only issued denials under mechanical formulae. The appellate court also pointed to DACA's Operating Procedures, which contained "nearly 150 pages of specific instructions for

35

1    granting or denying deferred action," as supporting the conclusion that DACA did not leave the

2    agency free to exercise discretion.

3          It cautioned, however, that "*[f]or a number of reasons, any extrapolation from DACA*

4    *must be done carefully.*" *Texas*, 809 F.3d at 173 (emphasis added). In particular, the appellate

5    court recognized that DACA involved self-selecting applicants, and those who expected to be

6    denied relief were unlikely to apply. *Id.* at 174. The court also recognized that "*DACA and*

7    *DAPA are not identical*" and that because eligibility for DACA was restricted to a younger and

8    less numerous population, DACA applicants were less likely to have backgrounds that would

9    warrant a discretionary denial. *Ibid.*

10         In addition to affirming the notice-and-comment holding (over one dissent), two of the

11   judges on the Fifth Circuit panel went a large step further and held that DAPA conflicted with

12   the INA. The majority pointed out that the INA already had a specific provision through which

13   aliens could derive lawful status from their children's immigration status. *Id.* at 180 n.167

14   (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). DAPA, the majority

15   said, circumvented this statutory pathway.

16         The Fifth Circuit also pointed out that the INA had specific provisions through which

17   aliens could be classified as "lawfully present," could obtain discretionary relief from removal,

18   or could obtain eligibility for work authorization. Because DAPA could make 4.3 million

19   removable aliens eligible for lawful presence, employment authorization, and associated

20   benefits, the Fifth Circuit concluded that DAPA implicated "questions of deep 'economic and

21   political significance' that are central to [the INA's] statutory scheme," and therefore had

22   Congress wished to assign that decision to an agency, "it surely would have done so expressly."

23         The Fifth Circuit rejected the argument that various provisions of the INA, such as the

24   broad grant of authority to the agency in 6 U.S.C. § 202(5) (providing that the Secretary "shall

25   be responsible for establishing national immigration enforcement policies and priorities"),

26   provided the authority to implement DAPA. Rather, it found that such grants of authority could

27   not reasonably be construed as assigning the agency decisions of such massive "economic and

28   political significance." Such an interpretation, the majority said, would allow the agency to

36

**United States District Court**

For the Northern District of California

AR2136

Appeal: 18-1521    Doc: 32-2    Filed: 07/02/2018    Pg: 886 of 454
Case 1:17-cv-05228-NGG-VMS    Document 234    Filed 09/04/20    Page 885 of 1026 PageID #: 10476
Case 3:17-cv-05211-WHA    Document 234    Filed 01/09/18    Page 37 of 49
Case 8:17-cv-02942-RWT    Document 36-1    Filed 01/17/18    Page 37 of 49

1  grant lawful presence and work authorization to any illegal alien in the United States.  It
2  concluded that "even with 'special deference' to the Secretary," the INA did not permit the
3  reclassification of 4.3 million aliens as "lawfully present," thereby making them newly eligible
4  for a host of federal and state benefits, including work authorization.

5      The majority also rejected the argument that DAPA was moored in historical practice,
6  finding that such historical practice "does not, by itself, create power," and that in any event,
7  previous deferred-action programs were not analogous to DAPA because most discretionary
8  deferrals had been done on a country-specific basis, usually in response to war, civil unrest, or
9  natural disasters, or had been bridges from one legal status to another.  It found that "[n]othing
10  like DAPA, which alters the status of more than four million aliens, has ever been contemplated
11  absent direct statutory authorization."

12      The majority concluded that Congress had "directly addressed the precise question
13  at issue" in DAPA because the INA "prescribes how parents may derive an immigration
14  classification on the basis of their child's status and which classes of aliens can achieve deferred
15  action and eligibility for work authorization." *Texas*, 809 F.3d at 186.  Because it found that
16  DAPA was foreclosed by Congress's "careful plan," the majority held that the program was
17  "manifestly contrary to the statute."

18      While at least some of the majority's reasons for holding DAPA illegal would apply to
19  DACA, fairness requires saying that DACA and DAPA were different, as the panel opinion
20  stated.  An important criticism against DAPA would *not* apply against DACA, namely the fact
21  that Congress had already established a pathway to lawful presence for alien parents of citizens
22  (so that DAPA simply constituted a more lenient substitute route).  DACA, by contrast, has no
23  such analogue in the INA.  And, there is a difference between 4.3 million and 689,800.  Finally,
24  the criticism that DACA had been mechanically administered without the exercise of discretion
25  in individual cases, if true, could be fixed by simply insisting on exercise of discretion.  In sum,
26  the DAPA litigation was not a death knell for DACA.

27      This order holds that, in light of our own court of appeals' reasoning in *Brewer I* and
28  *Brewer II*, in light of the analysis of the Office of Legal Counsel of the United States Department

37

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 36 of 454    Page 886 of 1026 PageID #: 10477
Case 1:17-cv-05228-NGG-VMS    Document 262-7    Filed 09/04/20
Case 3:17-cv-05211-WHA    Document 234    Filed 01/09/18    Page 38 of 49
Case 8:17-cv-02942-RWT    Document 36-1    Filed 01/17/18    Page 38 of 49

1  of Justice, and the reasoning set forth above, our court of appeals will likely hold that DACA

2  was and remains a lawful exercise of authority by DHS.  Plaintiffs are therefore likely to succeed

3  on the merits of their claim that the rescission was based on a flawed legal premise and must be

4  set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

5  law."  *Massachusetts*, 549 U.S. at 528; *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94

6  (1943); *Safe Air for Everyone*, 488 F.3d at 1101.[16]

7              ***(2)    Government Counsel's Alternative Rationale***
                        ***Is Post Hoc and, in Any Event, Arbitrary,***
8                       ***Capricious, and an Abuse of Discretion.***

9          Government counsel now advances an alternative rationale for the Secretary's decision to

10  rescind DACA.  Counsel contends that DHS acted within its discretion in managing its litigation

11  exposure in the Fifth Circuit, weighing its options, and deciding on an orderly wind down of the

12  program so as to avoid a potentially disastrous injunction in the Fifth Circuit.  This, they say,

13  constituted a reasonable judgment call involving management of litigation risk and agency

14  resources.

15         Courts, of course, may not accept post hoc rationalizations for agency action, *see*

16  *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962), nor may they "supply a

17  reasoned basis for the agency's action that the agency itself has not given."  *Bowman Transp.,*

18  *Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285–86 (1974); *see also Cal. Pub. Util. Comm'n v.*

19  *Fed. Energy Regulatory Comm'n*, No. 16-70481 at 15 (9th Cir. Jan. 8, 2018).  Rather, "an

20  agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Motor*

21  *Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50

22  (1983).

23

24  _____

25         [16]  Defendants argue that if the Acting Secretary *had relied* on DACA's purported illegality in terminating the program, that reliance should be presumed to be a "reasonable policy judgment that immigration decisions of this magnitude should be left to Congress."  This argument finds no support in the administrative

26  record.  In *Syracuse Peace Council v. F.C.C.*, upon which defendants rely, the agency explicitly based its decision on the independent grounds that a policy was both unconstitutional and contrary to the public interest.

27  867 F.2d 654, 656 (D.C. Cir. 1989).  Although the court of appeals elected to review only the agency's policy determination under the APA, it noted that "if the Commission had written its opinion in purely constitutional

28  terms, we would have no choice but to address the constitutional issue."  *Id.* at 659.

United States District Court
For the Northern District of California

AR2138

Case 1:17-cv-05228-NGG-VMS   Document 234-7   Filed 09/04/20   Page 887 of 1026 PageID #: 10478
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 39 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 39 of 49

Appeal: 18-1521   Doc: 22-3   Filed: 07/02/2018   Pg: 305 of 454

1    The reason actually given in the administrative record for the rescission was DACA's

2    purported illegality. The Attorney General's letter and the Acting Secretary's memorandum can

3    only be reasonably read as stating DACA was illegal and that, *given that DACA must, therefore,*

4    *be ended,* the best course was "an orderly and efficient wind-down process," rather than a

5    potentially harsh shutdown in the Fifth Circuit. Nowhere in the administrative record did

6    the Attorney General or the agency consider whether defending the program in court would

7    (or would not) be worth the litigation risk. The new spin by government counsel is a classic

8    post hoc rationalization. That alone is dispositive of the new "litigation risk" rationale.

9    Significantly, the INA itself makes clear that once the Attorney General had determined

10   that DACA was illegal, the Acting Secretary had to accept his ruling as "controlling." Section

11   1103(a)(1) of Title 8, a provision that allocates immigration power and duties among the

12   Secretary of Homeland Security, the Secretary of State, and the Attorney General, provides that

13   "determinations and rulings by the Attorney General with respect to all questions of law shall be

14   controlling." Therefore, once the Attorney General advised the Acting Secretary that DACA

15   was illegal, that ruling became "controlling" upon her. She had no choice other than to end

16   DACA. She had no room to push back with arguments for the program, to weigh litigation risks,

17   or to consider whether DACA recipients warranted fighting for. The ruling of law by the

18   Attorney General, controlling upon her, made all such considerations moot. Therefore, the new

19   spin by government counsel that the decisionmaker here indulged in a litigation risk assessment

20   and, out of caution, chose not to fight for the program in favor of an orderly wind-down is

21   foreclosed by the INA itself. Her wind-down references plainly presuppose that DACA had to

22   end and the only question was how.

23   Nevertheless, this order now indulges government counsel's new explanation and

24   addresses whether it holds up even if taken as authentic. In that event, two major criticisms can

25   and should be made of the "litigation risk management" rationale.

26   *First*, even as to the risk in the Fifth Circuit, the administrative record mentions only

27   similarities between DAPA and DACA (and even then only in an exceedingly conclusory way).

28   No mention appears concerning the *differences* between DAPA and DACA that might have led

United States District Court
For the Northern District of California

Appeal 18-1521 Case 1:17-cv-05228-NGG-VMS Document 2027 Filed 07/02/2018 Document 234 Filed 06/04/18 Page 888 of 1026 PageID #: 10479
Case 3:17-cv-05211-WHA Document 234 Filed 01/09/18 Page 40 of 49
Case 8:17-cv-02942-RWT Document 36-1 Filed 01/17/18 Page 40 of 49

**United States District Court**
For the Northern District of California

1   to a different result.  In addition to the distinctions made above, one powerful consideration

2   should have been the doctrine of laches.  Unlike the DAPA challenge filed immediately after

3   DAPA was announced, the threatened DACA challenge by ten states would have come *five*

4   *years after the program began and after hundreds of thousands of young adults had enrolled and*

5   *entered the workforce.  See Abbott Labs., Inc. v. Gardner*, 387 U.S. 136, 155 (1967) (adopting

6   laches in APA context); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 210 (D.D.C. 2014),

7   aff'd, 797 F.3d 11 (D.C. Cir. 2015) (noting that even if plaintiff did have standing he could not

8   demonstrate irreparable harm since he waited two years to challenge DACA).  Another

9   difference was that DACA was precisely the kind of interstitial program of deferred action

10   seemingly approved even by the Fifth Circuit, *Texas*, 809 F.3d at 185, given that both sides of

11   the aisle and our two most recent presidents have called for Dreamer legislation.  Nor was there

12   any mention of our own circuit's more recent decision in *Brewer II* that favored DACA, or of

13   recognition by the district court in the District of Columbia that DACA had, contrary to the

14   Fifth Circuit, involved discretionary denials of DACA relief.

15       *Second*, if we are to indulge the spin that the decision to end DACA rested on a

16   litigation-management assessment (rather than on a ruling of illegality), then the Acting

17   Secretary committed a serious error.  Against the litigation risk the Acting Secretary should

18   have — but did not — weigh DACA's programmatic objectives as well as the reliance interests

19   of DACA recipients.  *Encino Motorcars, LLC v. Navarro*, — U.S. —, 136 S. Ct. 2117, 2126–27

20   (2016).  This responsibility lay with the Acting Secretary, not the Attorney General.  That is,

21   once the Acting Secretary was informed of the supposed litigation risk, it remained her

22   responsibility to balance it against competing policy considerations.  It remained her

23   responsibility to recognize the litigation risk, yet still ask whether the program was worth

24   fighting for.  The administrative record is utterly silent in this regard.

25       The agency reversed over five years of DHS policy, did so only one day after the

26   Attorney General's letter, and did so just three months after Secretary Kelly had continued the

27   program (despite the Fifth Circuit's decision and affirmance).  The Acting Secretary failed to

28   provide a "reasoned explanation" as to why she was "disregarding facts and circumstances

40

Appeal: 18-1521   Doc: 68   Filed: 07/03/2018   Pg: 370 of 454
Case 1:17-cv-05228-NGG-VMS   Document 233-7   Filed 09/04/20   Page 889 of 1026 PageID #: 10480
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 41 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 41 of 49

1    which underlay or were engendered by the prior policy." *See F.C.C. v. Fox Television Stations,*

2    *Inc.*, 556 U.S. 502, 516 (2009).

3         *Encino Motorcars* seems very close on point. There, the Supreme Court addressed the

4    Department of Labor's reversal of an interpretive regulation construing the Fair Labor Standard

5    Act's minimum wage and overtime provisions for car dealership employees. Our court of

6    appeals gave *Chevron* deference to the new interpretation. The Supreme Court reversed.

7    In determining whether the regulation was "procedurally defective" — and accordingly whether

8    the agency's regulation warranted *Chevron* deference — the Supreme Court evaluated whether

9    the agency had given adequate reasons for its decision to reverse course. *Encino Motorcars*,

10   136 S. Ct. at 2125 (citing *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43). The Supreme Court

11   explained (at page 2126) that while agencies are free to change their existing policies, they must

12   provide a reasoned explanation for a change (quotes and citations omitted):

13            In explaining its changed position, an agency must also be
             cognizant that longstanding policies may have engendered serious
14           reliance interests that must be taken into account. In such cases
             it is not that further justification is demanded by the mere fact
15           of policy change; but that a reasoned explanation is needed for
             disregarding facts and circumstances that underlay or were
16           engendered by the prior policy. It follows that an unexplained
             inconsistency in agency policy is a reason for holding an
17           interpretation to be an arbitrary and capricious change from agency
             practice.
18
19   Because the agency "gave almost no reason at all" for its change in position, the Supreme Court

20   concluded that the agency had failed to provide the sort of reasoned explanation required in light

21   of the "significant reliance issues involved." *Id.* at 2126–27.

22        So too here.

23        As there, the agency here reversed its interpretation of its statutory authority. As there,

24   the administrative record here includes no analysis of the "significant reliance issues involved."

25   The parallel is striking. In terminating DACA, the administrative record failed to address the

26   689,800 young people who had come to rely on DACA to live and to work in this country.

27   These individuals had submitted substantial personal identifying information to the government,

28   paid hefty fees, and planned their lives according to the dictates of DACA. The administrative

*United States District Court*
For the Northern District of California

41

Appeal: 18-1521 Case 1:17-cv-05228-NGG-VMS Document 284-7 Filed 07/03/2018 Document 36-1 Filed 09/04/20 Pg 319 of 454 Page 890 of 1026 PageID #: 10481
Case 3:17-cv-05211-WHA Document 234 Filed 01/09/18 Page 42 of 49
Case 8:17-cv-02942-RWT Document 36-1 Filed 01/17/18 Page 42 of 49

1    record includes no consideration to the disruption a rescission would have on the lives of DACA

2    recipients, let alone their families, employers and employees, schools and communities.[17]

3        Ironically, government counsel now cite material *outside* of the administrative record in

4    an attempt to show the Acting Secretary considered the plight of DACA recipients (Dkt. 204 at

5    10, 12, 19–20).  This press release came after the fact and was not part of the administrative

6    record, and therefore cannot now rescue the agency.  In that respect, *Cal. Pub. Util. Comm'n*,

7    No. 16-70481 at 17 n.4 is analogous.  There, our court appeals refused to consider an agency's

8    position which was not advanced in connection with the decision under review but, rather, was

9    offered for the first time afterwards.

10       Defendants next argue that because no statute here dictated the factors for an agency to

11   consider in granting or rescinding deferred action, the agency need not have given weight to the

12   benefits of the DACA program or the harm that would be caused to its recipients upon its

13   rescission.  The Supreme Court has recognized, however, that "[c]onsideration of cost reflects

14   the understanding that reasonable regulation ordinarily requires paying attention to the

15   advantages *and* the disadvantages of agency decision."  *Michigan v. EPA*, — U.S. —, 135 S. Ct.

16   2699, 2707 (2015).  While defendants attempt to distinguish *Michigan* on the ground that the

17   text of the statute required regulation there to be "appropriate and necessary," they ignore that a

18   change in agency policy requires the agency to have "good reasons for it."  *Fox TV Stations,*

19   *Inc.*, 556 U.S. at 515.

20       Defendants, of course, are correct that when an agency reverses policy it "need not

21   demonstrate to a court's satisfaction that the reasons for the new policy are better than the

22   reasons for the old one."  *Ibid*.  Where, however, an agency abruptly changes course and

23   terminates a program on which so many people rely, the APA requires "a more detailed

24   justification."  *Ibid*.  Indeed, "[i]t would be arbitrary and capricious to ignore such matters."

25   *Ibid*.  In such cases, "it is not that further justification is demanded by the mere fact of policy

26   change; but that a reasoned explanation is needed for disregarding facts and circumstances that

27

28      [17] Here, perhaps in light of *Encino Motors*, the government does not argue that *Chevron* deference
should be afforded to the Attorney General's legal conclusion that DACA exceeded the agency's authority.

United States District Court

For the Northern District of California

42

Appeal: 18-1521    Document: 28-2    Filed: 07/02/2018    Pg: 319 of 454    Page 891 of 1026 PageID #: 10482
Case 1:17-cv-05228-NGG-VMS    Document 234    Filed 09/04/20
Case 3:17-cv-05211-WHA    Document 234    Filed 01/09/18    Page 43 of 49
Case 8:17-cv-02942-RWT    Document 36-1    Filed 01/17/18    Page 43 of 49

1   underlay or were engendered by the prior policy." *Id.* at 515–16.  Defendants' attempt to portray

2   DACA as a program that did not generate reliance interests is unconvincing.  As plaintiffs'

3   evidence shows, DACA recipients, their employers, their colleges, and their communities all

4   developed expectations based on the possibility that DACA recipients could renew their deferred

5   action and work authorizations for additional two-year periods.

6            In sum, government counsel's alternative spin on the administrative record is just a post

7   hoc rationalization.  But, even if it had been the actual rationale, it was arbitrary, capricious, and

8   an abuse of discretion under *Encino Motors*.

9                              *              *              *

10           Accordingly, plaintiffs have shown that they are likely to succeed on the merits of their

11  claim that the rescission was arbitrary and capricious and must be set aside under the APA.

12                    **B.        Irreparable Harm.**

13           Plaintiffs have clearly demonstrated that they are likely to suffer serious irreparable harm

14  absent an injunction.  Before DACA, Individual Plaintiffs, brought to America as children, faced

15  a tough set of life and career choices turning on the comparative probabilities of being deported

16  versus remaining here.  DACA gave them a more tolerable set of choices, including joining the

17  mainstream workforce.  Now, absent an injunction, they will slide back to the pre-DACA era and

18  associated hardship.

19           The University of California and other entity plaintiffs have also demonstrated that they

20  face irreparable harm as they begin to lose valuable students and employees in whom they have

21  invested, and that loss of DACA recipients from the workforce will have a detrimental impact on

22  their organization interests, economic output, public health, and safety.

23           Our court of appeals recently confirmed that "prolonged separation from family

24  members" and "constraints to recruiting and retaining faculty members to foster diversity and

25  quality within the University community" are harms which are not compensable with monetary

26  damages and therefore weigh in favor of finding irreparable harm.  *Hawaii v. Trump*,

27  No. 17-17168, 2017 WL 6554184, at *22 (9th Cir. Dec. 22, 2017).  These showings accordingly

28

**United States District Court**
For the Northern District of California

43

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 330 of 454
Case 1:17-cv-05228-NGG-VMS   Document 227   Filed 09/04/20   Page 892 of 1026 PageID #: 10483
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 44 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 44 of 49

United States District Court
For the Northern District of California

1    demonstrate that preliminary relief is appropriate. *Ibid.*; *see also Valle del Sol Inc. v. Whiting*,

2    732 F.3d 1006, 1029 (9th Cir. 2013).

3         Defendants do not dispute that plaintiffs are likely to suffer such harms. Rather, they

4    argue that these harms will not happen *before* the phase-out begins on March 5, 2018, the date

5    by which the undersigned judge had wanted to present a final record and final decision for

6    appellate review.

7         Delays in this case, however, have made it impossible to send a final judgment to our

8    court of appeals by March 5. To take only one example, it would be unfair to reach a conclusion

9    without giving plaintiffs an opportunity to examine the complete administrative record.

10   Government counsel, however, succeeded in obtaining an order from the Supreme Court

11   postponing proceedings on completing the administrative record until after ruling on its

12   FRCP 12(b)(1) motion to dismiss. As a result, we have yet to receive a complete administrative

13   record. Although plaintiffs are likely to prevail on even the truncated administrative record, as

14   set forth above, our appellate court might disagree with that conclusion or the agency might seek

15   to cure the flaws in its process via a fresh agency action. Plaintiffs are entitled to learn of all

16   flaws, if any more there be, lurking in the whole record. One such possibility suggested by

17   plaintiffs is that the rescission was contrived to give the administration a bargaining chip to

18   demand funding for a border wall in exchange for reviving DACA. A presidential tweet after

19   our hearing gives credence to this claim. Another possibility raised by plaintiffs is racial animus.

20   These theories deserve the benefit of the full administrative record. It will be impossible to

21   litigate this case to a fair and final conclusion before March 5.[18]

22

23

24

25   _____

26       [18] On December 29, 2017, President Trump tweeted: "The Democrats have been told, and fully
     understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an

27   END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc. We must protect our
     Country at all cost!" (Dkt. No. 227-2). Plaintiffs separately request judicial notice of this tweet. Defendants

28   object to judicial notice on various relevancy grounds, but do not argue that it is not properly subject to judicial
     notice under FRE 201 (Dkt. Nos. 227, 230). Plaintiffs' request is accordingly **GRANTED**.

AR2144

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 391 of 454   Page 893 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS   Document 232-7   Filed 09/04/20
10484
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 45 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 45 of 49

**C.      Balance of Equities and Public Interest.**

On provisional relief motions, district judges must consider whether (or not) such relief would be in the public interest.  On this point, we seem to be in the unusual position wherein the ultimate authority over the agency, the Chief Executive, publicly favors the very program the agency has ended.  In September, President Trump stated his support for DACA, tweeting: "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military?  Really! . . . ."  He has also called upon Congress to ratify DACA, tweeting, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do).  If they can't, I will revisit this issue!" (App. 1958).

For the reasons DACA was instituted, and for the reasons tweeted by President Trump, this order finds that the public interest will be served by DACA's continuation (on the conditions and exceptions set out below).  Beginning March 5, absent an injunction, one thousand individuals per day, on average, will lose their DACA protection.  The rescission will result in hundreds of thousands of individuals losing their work authorizations and deferred action status.  This would tear authorized workers from our nation's economy and would prejudice their being able to support themselves and their families, not to mention paying taxes to support our nation.  Too, authorized workers will lose the benefit of their employer-provided healthcare plans and thus place a greater burden on emergency healthcare services.

On provisional relief motions, district judges must also weigh the balance of hardships flowing from a grant versus denial of provisional relief.  The hardship to plaintiffs need not be repeated.  The only hardship raised by defendants is interference with the agency's judgment on how best to allocate its resources in keeping our homeland secure, as well as its judgment in phasing out DACA.  Significantly, however, the agency's judgment here was not based on a policy change.  It was based on a mistake of law.  If the instant order is correct that DACA fell within the statutory and constitutional powers of the Executive Branch, then a policy supported

**United States District Court**
For the Northern District of California

45

Appeal 18-1521 cv-05228 GCG-VMS Filed 07/02/2018 7 Page 292 of 454 Page 894 of 1026 PageID #:
10485
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 46 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 46 of 49

1   as high up as our Chief Executive has been the victim of a colossal blunder.  A preliminary

2   injunction will set that right without imposing any policy unwanted by the Executive Branch.[19]

3             **D.**    **Scope of Provisional Relief.**

4        For the foregoing reasons, defendants **ARE HEREBY ORDERED AND ENJOINED**, pending

5   final judgment herein or other order, to maintain the DACA program on a nationwide basis on

6   the same terms and conditions as were in effect before the rescission on September 5, 2017,

7   including allowing DACA enrollees to renew their enrollments, with the exceptions (1) that new

8   applications from applicants who have never before received deferred action need not be

9   processed; (2) that the advance parole feature need not be continued for the time being for

10   anyone; and (3) that defendants may take administrative steps to make sure fair discretion is

11   exercised on an individualized basis for each renewal application.

12        Nothing in this order prohibits the agency from proceeding to remove any individual,

13   including any DACA enrollee, who it determines poses a risk to national security or public

14   safety, or otherwise deserves, in its judgment, to be removed.  Nor does this order bar the agency

15   from granting advance parole in individual cases it finds deserving, or from granting deferred

16   action to new individuals on an ad hoc basis.

17        The agency shall post reasonable public notice that it will resume receiving DACA

18   renewal applications and prescribe a process consistent with this order.  The agency shall keep

19   records of its actions on all DACA-related applications and provide summary reports to the

20   Court (and counsel) on the first business day of each quarter.[20]

21

22        [19]  If a likelihood of irreparable injury is shown and an injunction is in the public interest, a preliminary
23   injunction is also appropriate when a plaintiff demonstrates that serious questions going to the merits are raised
and the balance of hardships tips sharply in the plaintiff's favor. *Alliance for the Wild Rockies v. Cottrell*,
24   632 F.3d 1127, 1134–35 (9th Cir. 2011).  Because plaintiffs have clearly demonstrated a likelihood of
irreparable injury and that the balance of hardships tips sharply in plaintiffs' favor, preliminary relief would also
25   be appropriate under this alternative standard of review.

26        [20]  A mandatory injunction orders a responsible party to take action, while "[a] prohibitory injunction
prohibits a party from taking action and preserves the status quo pending a determination of the action on the
27   merits." *Brewer I*, 757 F.3d at 1060.  The relevant status quo is the legally relevant relationship between the
parties before the controversy arose. *Id.* at 1061.  Here, plaintiffs contest the validity of defendants' rescission
28   of DACA, the status quo before which was that DACA was fully implemented.  Accordingly, plaintiffs'
requested preliminary injunction is not mandatory.  But even if it were, plaintiffs have demonstrated that
sufficiently serious irreparable harm would result to warrant even a mandatory injunction.

         **AR2146**

*United States District Court*
For the Northern District of California

Case 1:17-cv-05228-NGG-VMS   Document 82-27   Filed 09/04/2454   Page 895 of 1026 PageID #:
10486
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 47 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 47 of 49

Appeal: 18-1521   Document 29-3   Filed: 07/02/2018   Pg: 337 of 454

1        By way of explanation, while plaintiffs have demonstrated that DACA recipients,

2  as well as their families, schools, employers, and communities, are likely to suffer substantial,

3  irreparable harm as a result of the rescission, they have not made a comparable showing as to

4  individuals who have never applied for or obtained DACA.

5        This order will not require advance parole.  Unlike the widespread harm to plaintiffs and

6  our economy that would result were the 689,800 DACA enrollees to lose their ability to work in

7  this country, plaintiffs have not demonstrated that comparable harm will occur as a result of

8  DACA recipients' inability to travel abroad.  True, Individual Plaintiffs Jirayut Latthivongskorn

9  and Norma Ramirez describe professional disadvantages that may result if they are unable to

10  travel internationally.  These, however, do not amount to hardships justifying a provisional

11  injunction requiring DHS to resume accepting applications for advance parole.  However, as

12  stated, nothing in this order would bar individuals from asking for such agency relief or bar the

13  agency from granting it in deserving cases.

14        With respect to geographical scope, this order finds a nationwide injunction is

15  appropriate.  Our country has a strong interest in the uniform application of immigration law

16  and policy.  Plaintiffs have established injury that reaches beyond the geographical bounds

17  of the Northern District of California.  The problem affects every state and territory of the

18  United States.

19        In February 2017, our court of appeals considered this very issue in *Washington v.*

20  *Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017), and upheld a nationwide injunction imposed by a

21  single district court, observing that limiting the geographic scope of an injunction on an

22  immigration enforcement policy "would run afoul of the constitutional and statutory

23  requirements for uniform immigration law and policy" and that, as here, "the government ha[d]

24  not proposed a workable alternative."  Indeed, the Fifth Circuit reached the same conclusion in

25  determining the appropriate scope of an injunction over DAPA, *Texas*, 809 F.3d at 187–88,

26

27

28

**United States District Court**
For the Northern District of California

47

AR2147

1    holding that uniform application of the immigration laws justified a nationwide injunction. So

2    too here.[21]

3          Limiting relief to the States in suit or the Individual Plaintiffs would result in

4    administrative confusion and simply provoke many thousands of individual lawsuits all over the

5    country. The most practical relief is to maintain DACA in the same manner to which the agency

6    and recipients are accustomed, subject to the exceptions above noted.

7                         **CONCLUSION**

8          Defendants' motion to dismiss under FRCP 12(b)(1) is **GRANTED IN PART** only to the

9    limited extent stated above and is otherwise **DENIED**. Maine and Minnesota's APA claims are

10   hereby **DISMISSED**. Maine or Minnesota may seek leave to amend and will have **21 CALENDAR**

11   **DAYS** from the date of this order to file a motion, noticed on the normal 35-day track, for leave to

12   file an amended complaint. A proposed amended complaint must be appended to the motion and

13   plaintiffs must plead their best case. Any such motion should clearly explain how the

14   amendments to the complaint cure the deficiencies identified herein. To the extent stated above,

15   plaintiffs' motion for provisional relief is **GRANTED**. A separate order will address defendants'

16   motion to dismiss pursuant to FRCP 12(b)(6).

17              **CERTIFICATION UNDER 28 U.S.C. § 1292(b)**

18         Pursuant to our court of appeals' order dated December 21, 2017, the district court

19   hereby certifies for interlocutory appeal the issues decided herein (i) whether (or not) the

20   rescission of DACA is unreviewable as committed to agency discretion or by reason of 8 U.S.C.

21   § 1252(g), (ii) whether (or not) plaintiffs have standing, and (iii) all other questions interposed

22   by the government in its motion to dismiss under FRCP 12(b)(1). This order finds that these are

23   controlling questions of law as to which there is substantial ground for difference of opinion and

24

25         [21] Oddly, the government's contrary authority is *Bresgal v. Brock*, 843 F.2d 1163, 1169–70 (9th Cir.

26   1987), a decision in which our court of appeals upheld a nationwide injunction and held, "[t]here is no general requirement that an injunction affect only the parties in the suit," and "nationwide relief in federal district or circuit court [is permitted] when it is appropriate." *Bresgal* merely observed that "[w]here relief can be

27   structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *Id.* at 1170. Here, it cannot be so structured. Nor are any of the government's other authorities, which restate the general

28   proposition that a remedy should match the injury alleged, *see, e.g.*, *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), to the contrary.

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 325 of 454   Page 897 of 1026 PageID #:
10488
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20
Case 3:17-cv-05211-WHA   Document 234   Filed 01/09/18   Page 49 of 49
Case 8:17-cv-02942-RWT   Document 36-1   Filed 01/17/18   Page 49 of 49

1    that their resolution by the court of appeals will materially advance the litigation. This order

2    realizes that the same issues are reviewable upon appeal of this injunction. Nevertheless, out of

3    caution and to avoid any problem concerning scope of review, the district court so certifies.

4

5         **IT IS SO ORDERED.**

6

7    Dated: January 9, 2018.

8                                                    WILLIAM ALSUP
                                                     UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

49

Appeal 18-1521 Case 1:17-cv-05228-NGG-VMS Document 182-7 Filed 07/02/2018 Document 295 Page 898 of 1026 PageID #: 10489
Case 3:17-cv-05211-WHA Document 239 Filed 01/12/18 Page 1 of 14
Case 8:17-cv-02942-RWT Document 36-2 Filed 01/17/18 Page 1 of 14

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO,
in her official capacity as President of the
University of California,

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and KIRSTJEN
NIELSEN, in her official capacity as
Secretary of the Department of Homeland
Security,

    Defendants.

No. C 17-05211 WHA
No. C 17-05235 WHA
No. C 17-05329 WHA
No. C 17-05380 WHA
No. C 17-05813 WHA

**ORDER GRANTING IN PART
DEFENDANTS' MOTION TO
DISMISS UNDER FRCP 12(b)(6)**

**INTRODUCTION**

In these challenges to the government's rescission of the Deferred Action for Childhood Arrivals program, the government moves to dismiss plaintiffs' complaints for failure to state a claim. For the reasons discussed below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

This order incorporates the statement set forth in the order dated January 9, 2018, largely denying dismissal under FRCP 12(b)(1) and largely granting plaintiffs' motion for provisional relief (Dkt. No. 234). This order, however, addresses a separate motion by the government to dismiss all claims for failure to state a claim for relief under FRCP 12(b)(6). This order sustains three claims for relief but finds that the rest fall short.

**ANALYSIS**

1.      **APA CLAIMS UNDER 5 U.S.C. § 706(2)(A).**

For the same reasons that plaintiffs are likely to succeed on their claim that the rescission of DACA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act, as explained in the January 9 order, the government's motion to dismiss plaintiffs' APA claims under 5 U.S.C. § 706(2)(A) is **DENIED.**

2.      **APA CLAIMS UNDER 5 U.S.C. § 706(2)(D).**

The original DACA program began in 2012 without any notice or opportunity for public comment. Likewise, the rescission in question ended DACA without notice or opportunity for public comment. One issue now presented is whether the rescission is invalid for having been carried out without notice-and-comment procedures.

Under the APA, an agency action must be set aside if it was done "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). An agency is required to follow prescribed notice-and-comment procedures before promulgating certain rules. 5 U.S.C. § 553. The Regulatory Flexibility Act further requires that notice-and-comment rulemaking include an assessment of the impact on small entities. 5 U.S.C. § 604(a). These requirements do not apply, however, to general statements of policy. 5 U.S.C. § 553(b)(A).

A general statement of policy "advis[es] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012–13 (9th Cir. 1987). Such policies also "serve to educate and provide direction to the agency's personnel in the field, who are required to implement its policies and exercise its discretionary power in specific cases." *Id.* at 1013 (quotes and citations omitted). "The critical factor" in determining whether a directive constitutes a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Ibid.* Thus, to qualify as a statement of policy two requirements must be satisfied: (1) the policy operates only prospectively, and (2) the policy does "not establish a binding norm," and

2

1    is not "finally determinative of the issues or rights to which [it] address[es]," but instead leaves

2    officials "free to consider the individual facts in the various cases that arise." *Id.* at 1014

3    (quotes and citations omitted).  Under this standard, the rescission memorandum is a general

4    statement of policy.

5          This order rejects plaintiffs' contention that the rescission could only be done through

6    notice and comment.  For the same reasons that the promulgation of DACA needed no notice

7    and comment, its rescission needed no notice and comment.

8          Almost this exact problem was addressed in *Mada-Luna*.  There, our court of appeals

9    held that the repeal of an INS policy under which applicants could seek deferred action was not

10   subject to notice and comment.  It rejected the argument that the repeal could not constitute a

11   general statement of policy because it diminished the likelihood of receiving deferred action for

12   a class of individuals.  *Id.* at 1016.  Rather, because the original policy allowed for discretion

13   and failed to establish a "binding norm," the repeal of that policy also did not require notice and

14   comment.  *Id.* at 1017.  So too here.  The DACA program allowed but did not require the

15   agency to grant deferred action, and upon separate application, travel authorization, on a case-

16   by-case basis at the agency's discretion.  Therefore, neither its promulgation nor its rescission

17   required notice and comment.

18         *Parco v. Morris*, 426 F. Supp. 976 (E.D. Pa. 1977), on which plaintiffs heavily rely,

19   does not warrant the conclusion that the rescission policy is a substantive rule.  *Parco* also

20   addressed whether the rescission of an INS policy required notice and comment.  Notably, the

21   government in *Parco* stipulated that the policy's precipitous rescission was the sole reason for

22   denial of the plaintiff's application for immigration relief.  *Id.* at 984.  The district court

23   determined that the repeal therefore left no discretion, explaining that "discretion" was stripped

24   of all meaning where "one contends that under a certain regulation 'discretion' was exercised

25   favorably in all cases of a certain kind and then, after repeal of the regulation, unfavorably in

26   each such case."  *Ibid.*  Here, by contrast, plaintiffs do not allege that all deferred action

27   applications under DACA were approved but now, after the rescission, all requests for deferred

28   action will be denied.

3

Appeal: 18-1521  Document: 28-7  Filed: 07/02/2018  Pg: 339 of 454  Page 901 of 1026 PageID #:
Case 1:17-cv-02325-GJH  Document 44-7  Filed 09/04/20  10492
Case 3:17-cv-05211-WHA  Document 239  Filed 01/12/18  Page 4 of 14
Case 8:17-cv-02942-RWT  Document 36-2  Filed 01/17/18  Page 4 of 14

1        Plaintiffs argue that the rescission memorandum is more than a policy because it creates

2    a blanket prohibition against granting deferred action to DACA applicants.  Plaintiffs are

3    correct that the rescission policy contains mandatory language on its face.  It is also true that the

4    rescission memorandum categorically eliminates advance parole for DACA recipients.

5    This comes closer to resembling a substantive rule.  However, it remains the case that because

6    the original promulgation of the discretionary program did not require notice and comment,

7    a return to the status quo ante also does not require notice and comment.  *Mada-Luna*, 813 F.2d

8    at 1017.

9        Defendants' motion to dismiss plaintiffs' claims pursuant to Section 706(2)(D) of the

10    APA and the Regulatory Flexibility Act is accordingly **GRANTED**.

11    **3.**    **DUE PROCESS CLAIMS.**

12        To assert a due process claim, a plaintiff must first show that he or she has an interest in

13    liberty or property protected by the Constitution.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 569

14    (1972).  Plaintiffs fail to make the threshold showing that they have a protected interest in the

15    continuation of DACA and, accordingly, their due process claims based on the rescission must

16    be dismissed.  Plaintiffs have adequately alleged, however, that the agency's changes to its

17    information-sharing policy are "fundamentally unfair."

18        **A.**    **Deferred Action.**

19        Because discretionary immigration relief "is a privilege created by Congress, denial of

20    such relief cannot violate a substantive interest protected by the Due Process clause."  *Munoz v.*

21    *Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003) (citing *INS v. Yang*, 519 U.S. 26, 30 (1996)).

22    Moreover, "aliens have no fundamental right to discretionary relief from removal" for purposes

23    of due process.  *Tovar-Landin v. Ashcroft*, 361 F.3d 1164, 1167 (9th Cir. 2004).  Our court of

24    appeals has accordingly held there is no protected interest in temporary parole, since such relief

25    is "entirely within the discretion of the Attorney General."  *Kwai Fun Wong v. United States*,

26    373 F.3d 952, 967–68 (9th Cir. 2004).  Nor did an INS policy which allowed the agency to

27    recommend deferred action as "an act of administrative choice" create substantive liberty

28    interests.  *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985).  These authorities

*United States District Court*
*For the Northern District of California*

4

Appeal: 18-1521   Doc: 228   Filed: 07/02/2018   Pg: 330 of 454
Case 1:17-cv-05228-NGG-VMS   Document 88-7   Filed 09/04/20   Page 902 of 1026 PageID #: 10493
Case 3:17-cv-05211-WHA   Document 239   Filed 01/12/18   Page 5 of 14
Case 8:17-cv-02942-RWT   Document 36-2   Filed 01/17/18   Page 5 of 14

1    foreclose any argument that plaintiffs have a protected interest in continued deferred action or

2    advance parole under DACA.[1]

3          Plaintiffs reply that even absent a protected interest in the initial, discretionary grant of

4    deferred action, there is a protected interest in the *renewal* of DACA and its associated benefits.

5    Yet a benefit is not a "protected entitlement" where "government officials may grant or deny it

6    in their discretion." *Castle Rock*, 545 U.S. 748, 756 (2005).  Rather, an individual has a

7    protected property right in public benefits where the rules conferring those benefits "greatly

8    restrict the discretion" of the people who administer them.  *Nozzi v. Hous. Auth. of City of Los

9    Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015).  Plaintiffs' authorities confirm that the same

10   principle applies in the context of renewing or retaining existing benefits.  *Wedges/Ledges of

11   California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 64 (9th Cir. 1994); *Stauch v. City of

12   Columbia Heights*, 212 F.3d 425, 430 (8th Cir. 2000).  No such limitations on agency discretion

13   are alleged to have applied under DACA.  Rather, the USCIS DACA FAQs referenced by

14   plaintiffs in their complaints make clear that "USCIS retain[ed] the ultimate discretion to

15   determine whether deferred action [was] appropriate in any given case even if the guidelines

16   [were] met" (Garcia Compl. ¶ 24 n.16; Santa Clara Compl. ¶ 58; UC Compl., Exh. B; State

17   Compl., Exh. E).

18          Next, plaintiffs argue that once DACA status was conferred, and recipients organized

19   their lives in reliance on the program's protections and benefits, they developed interests

20   protected by the Constitution.  Plaintiffs' authorities, however, stand only for the

21   uncontroversial proposition that once in possession of a particular benefit, the alteration,

22   revocation or suspension of that benefit may implicate due process.[2]  Such a principle has no

23   application where, as here, extant benefits are *not* impacted by a change in policy.  *Indeed, there

24   is no dispute that the rescission acts only prospectively*.  That is, all existing DACA recipients

25   ────────────────

26   [1] Plaintiffs' attempt to distinguish *Romeiro de Silva* on the ground that the INS policy there involved
     "unfettered discretion," whereas the exercise of prosecutorial discretion under DACA was guided by standard
27   operating procedures, is unconvincing.

28   [2] *See Bell v. Burson*, 402 U.S. 535, 539 (1971); *Gallo v. U.S. Dist. Court For Dist. of Arizona*,
     349 F.3d 1169, 1179 (9th Cir. 2003); *Medina v. U.S. Dep't of Homeland Sec.*, 2017 WL 5176720, at *9
     (W.D. Wash. Nov. 8, 2017).

United States District Court
For the Northern District of California

5

1   will receive deferred action through the end of their two-year terms.  What they will not receive,

2   if the rescission endures, will be DACA renewal, thereafter.  For this reason, *Ixcot v. Holder*,

3   646 F.3d 1202 (9th Cir. 2011), and *Arevalo v. Ashcroft*, 344 F.3d 1 (1st Cir. 2003), which

4   addressed whether amendments to the INA were impermissibly retroactive, do not compel a

5   different result.

6          Plaintiffs contend that the government's communications with plaintiffs regarding

7   renewals, its operation of the program, and the public promises of government officials

8   "together created an understanding that DACA recipients were entitled to the continued benefits

9   of the program so long as they met the renewal criteria" (Dkt. No. 205 at 29).  Plaintiffs are

10  correct, of course, that claims of entitlement can be defined by "rules or mutually explicit

11  understandings."  *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).  Importantly, however, a

12  person's belief of entitlement to a government benefit, no matter how sincerely or reasonably

13  held, does not create a protected right if that belief is not mutually held by the government.

14  *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1020 (9th Cir. 2011).  An agency's past practice of

15  generally granting a government benefit is also insufficient to establish a legal entitlement.

16  *Ibid.*

17         This order empathizes with those DACA recipients who have built their lives around

18  the expectation that DACA, and its associated benefits, would continue to be available to them

19  if they played by the rules.  That expectation, however, remains insufficient to give rise to a

20  constitutional claim under the Fifth Amendment.  Because plaintiffs have failed to allege facts

21  demonstrating a protected interest in DACA's continuation or the renewal of benefits

22  thereunder, defendants' motion to dismiss plaintiffs' due process claims based on the rescission

23  must be **GRANTED**.

24                   **B.      Information-Sharing Policy.**

25         Plaintiffs fare better with their substantive due process claim that DHS allegedly

26  changed its policy with respect to the personal information provided by DACA recipients

27  during the application process.  Plaintiffs allege that the government repeatedly represented

28  that information provided by DACA applicants would not be used for immigration enforcement

**United States District Court**
For the Northern District of California

6

Appeal: 18-1521    Document: 28-7    Filed: 07/02/2018    Pg: 332 of 454
Case 1:17-cv-05228-NGG-VMS    Document 239-7    Filed 09/04/20    Page 904 of 1026 PageID #:
10495
Case 3:17-cv-05211-WHA    Document 239    Filed 01/12/18    Page 7 of 14
Case 8:17-cv-02942-RWT    Document 36-2    Filed 01/17/18    Page 7 of 14

1    purposes absent special circumstances, and that DACA recipients relied on these promises in

2    submitting the extensive personal information needed to meet the program's requirements.

3        Defendants insist that the agency's information-sharing policy remains unchanged.

4    On a motion to dismiss, however, the well-pled factual allegations in a complaint must be

5    accepted as true. *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir.

6    2008). Plaintiffs have clearly alleged that DHS changed its information-sharing policy such

7    that now, rather than affirmatively protecting DACA recipients' information from disclosure,

8    the government will only refrain from "proactively" providing their information for purposes of

9    immigration enforcement proceedings (Garcia Compl. ¶ 126; Santa Clara Compl. ¶ 58; State

10   Compl. ¶ 122).

11       Plaintiffs have also adequately alleged a "mutually explicit understanding" giving rise

12   to a protected interest in the confidentiality of DACA recipients' personal information.

13   They allege that throughout DACA's existence, DHS made affirmative representations as to

14   how this information would (and would not) be used. The policy stated (Garcia Compl. ¶ 126;

15   Santa Clara Compl. ¶ 58; State Compl. ¶ 121 (citing USCIS DACA FAQs)):

16           Information provided in this request is protected from disclosure
             to ICE and CBP for the purpose of immigration enforcement
17           proceedings unless the requestor meets the criteria for the issuance
             of a Notice to Appear or a referral to ICE under the criteria set
18           forth in USCIS' Notice to Appear guidance
             (www.uscis.gov/NTA). Individuals whose cases are deferred
19           pursuant to DACA will not be referred to ICE. The information
             may be shared with national security and law enforcement
20           agencies, including ICE and CBP, for purposes other than removal,
             including for assistance in the consideration of DACA, to identify
21           or prevent fraudulent claims, for national security purposes, or for
             the investigation or prosecution of a criminal offense. The above
22           information sharing policy covers family members and guardians,
             in addition to the requestor. This policy, which may be modified,
23           superseded, or rescinded at any time without notice, is not intended
             to, does not, and may not be relied upon to create any right or
24           benefit, substantive or procedural, enforceable by law by any party
             in any administrative, civil, or criminal matter.
25
         The language contained in the policy's caveat, that it could "be modified, superseded,
26
     or rescinded at any time," is ambiguous. One reading advanced by the government is that this
27
     caveat allows the agency to change how it treats information already received from DACA
28
     applicants. Another reading, however, is that it simply allows the government to change its

7

United States District Court
For the Northern District of California

Appeal: 18-1521 Doc: 29-3 Filed: 07/03/2018 Pg: 907 of 454
Case 1:17-cv-05228-NGG-VMS Document 88-27 Filed 09/04/20 Page 905 of 1026 PageID #: 10496
Case 3:17-cv-05211-WHA Document 239 Filed 01/12/18 Page 8 of 14
Case 8:17-cv-02942-RWT Document 36-2 Filed 01/17/18 Page 8 of 14

1  policy in connection with future applicants. Secretary of Homeland Security Jeh Johnson's

2  December 2016 letter to United States Representative Judy Chu supports the later reading.

3  He stated that, "[s]ince DACA was announced in 2012, DHS has consistently made clear that

4  information provided by applicants . . . will not later be used for immigration enforcement

5  purposes except where it is independently determined that a case involves a national security

6  or public safety threat, criminal activity, fraud, or limited other circumstances where issuance

7  of a notice to appear is required by law" (Garcia Compl. ¶¶ 36–37; State Compl. ¶ 98, Exh. F).

8  This ambiguity presents a question of fact that cannot be resolved on the pleadings.

9  Taken as true at this stage, as must be done on a FRCP 12(b)(6) motion, plaintiffs'

10  allegations regarding the government's broken promise as to how DACA recipients' personal

11  information will be used — and its potentially profound consequences — "shock[s] the

12  conscience and offend[s] the community's sense of fair play and decency." *Marsh v. County of*

13  *San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012) (quotes and citations omitted). Defendants'

14  motion to dismiss plaintiffs' due process claims based on changes to the government's

15  information-use policy is **DENIED**.

16  **4.    EQUITABLE ESTOPPEL.**

17  Plaintiffs bring claims for equitable estoppel, arguing that the government should not be

18  permitted to terminate DACA or use the information collected from applicants for immigration

19  enforcement purposes.

20  Defendants first contend that plaintiffs' equitable estoppel claims fail because there is no

21  recognized claim for relief based on estoppel. The Supreme Court has refused to adopt,

22  however, "a flat rule that estoppel may not in any circumstances run against the Government,"

23  noting that "the public interest in ensuring that the Government can enforce the law free from

24  estoppel might be outweighed by the countervailing interest of citizens in some minimum

25  standard of decency, honor, and reliability in their dealings with their Government." *Heckler v.*

26  *Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60–61 (1984). Moreover, our court of

27  appeals has addressed such claims on the merits, and has held that the government may be

28

1    subject to equitable estoppel if it has engaged in "affirmative misconduct." *Watkins v. U.S.*

2    *Army*, 875 F.2d 699, 706–07 (9th Cir. 1989).

3        To state an equitable estoppel claim against the government, a party must show

4    (1) that the government engaged in "affirmative conduct going beyond mere negligence"; and

5    (2) "the government's wrongful act will cause a serious injustice, and the public's interest will

6    not suffer undue damage" if the requested relief is granted.  *Id.* at 707.  "Neither the failure to

7    inform an individual of his or her legal rights nor the negligent provision of misinformation

8    constitute affirmative misconduct." *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000).

9    Moreover, our court of appeals has defined "affirmative misconduct" to mean a "deliberate lie"

10   or "a pattern of false promises." *Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1184 (9th Cir. 2001).

11   The allegations in the complaints fail to meet this standard, inasmuch as no affirmative instances

12   of misrepresentation or concealment have been plausibly alleged.

13       Plaintiffs are correct that estoppel "does not require that the government *intend* to

14   mislead a party," *Watkins*, 875 F.2d 707, but plaintiffs fail to explain how contradictory policies

15   under two different administrations add up to "affirmative misconduct beyond mere negligence."

16    Plaintiffs fail to allege, for example, that the government's past statements regarding DACA's

17   legality were a "deliberate lie" or more than mere negligence.  Nor have plaintiffs pleaded that

18   the alleged change in the agency's information-use policy was the result of an affirmative

19   misrepresentation.  Rather, they have merely alleged a change in policy.  Under plaintiffs' theory

20   new administrations would almost never be able to change prior policies because someone could

21   always assert reliance upon the old policy.  Defendants' motion to dismiss plaintiffs' equitable

22   estoppel claims is **GRANTED**.

23       **5.    EQUAL PROTECTION CLAIMS.**

24       To state an equal protection claim plaintiffs must show that the rescission was motivated

25   by a discriminatory purpose. *Arce v. Douglas*, 793 F.3d 968, 977 (2015) (citing *Vill. of*

26   *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)).  Determining

27   whether discrimination is a motivating factor "demands a sensitive inquiry into such

28   circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at

United States District Court
For the Northern District of California

9

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 337 of 454   Page 907 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS   Document 239-7   Filed 09/04/20
10498
Case 3:17-cv-05211-WHA   Document 239   Filed 01/12/18   Page 10 of 14
Case 8:17-cv-02942-RWT   Document 36-2   Filed 01/17/18   Page 10 of 14

<div style="float:left;">United States District Court<br/>For the Northern District of California</div>

266.  A plaintiff need not show that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a "motivating factor." *Ibid.*  In analyzing whether a facially-neutral policy was motivated by a discriminatory purpose, district courts must consider factors such as whether the policy creates a disparate impact, the historical background and sequence of events leading up to the decision, and any relevant legislative or administrative history.  *Id.* at 266–68.[3]

*First,* Individual Plaintiffs and Santa Clara clearly allege that the rescission had a disproportionate impact on Latinos and Mexican nationals.  Indeed, such individuals account for 93 percent of DACA recipients (Garcia Compl. ¶¶ 100, 151; Santa Clara Compl. ¶¶ 9, 75).  Defendants reply that this disparate impact is an accident of geography, not evidence of discrimination.  True, a disparate impact of a facially-neutral rule, standing alone, cannot establish discriminatory intent.  *See Washington v. Davis*, 426 U.S. 229, 242 (1976).  Individual Plaintiffs and Santa Clara, however, have alleged a discriminatory impact only as a starting point.  They also allege a history of bias leading up to the rescission of DACA in the form of campaign statements and other public comments by President Trump, as next discussed.[4]

*Second*, plaintiffs allege that President Trump has, on multiple occasions since he announced his presidential campaign, expressed racial animus towards Latinos and Mexicans.  When President Trump announced his candidacy on June 16, 2015, for example, he characterized Mexicans as criminals, rapists, and "people that have lots of problems."  Three days later, President Trump tweeted that "[d]ruggies, drug dealers, rapists and killers are coming across the southern border," and asked, "When will the U.S. get smart and stop this travesty?"

---

[3]  The Supreme Court's decision in *United States v. Armstrong*, 517 U.S. 456 (1996), which addressed the showing necessary for a defendant to be entitled to discovery on a selective-prosecution claim, has no application here.  Plaintiffs' claims cannot fairly be characterized as selective-prosecution claims because they do not "implicate the Attorney General's prosecutorial discretion — that is, in this context, his discretion to choose to deport one person rather than another among those who are illegally in the country." *Kwai Fun Wong*, 373 F.3d at 970.  Rather, plaintiffs allege that the agency's decision to end a nationwide deferred action program was motivated by racial animus towards a protected class.

[4]  The City of San Jose's equal protection claim falls a little short.  Rather than alleging a disparate impact on a protected class, it alleges only that "[d]efendants' actions target individuals for discriminatory treatment based on their national origin, without lawful justification" (San Jose Compl. ¶ 54).  For this reason, defendants' motion to dismiss San Jose's equal protection claim is **GRANTED**.

10

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 336 of 454
Case 1:17-cv-05228-NGG-VMS   Document 239-7   Filed 09/04/20   Page 908 of 1026 PageID #: 10499
Case 3:17-cv-05211-WHA   Document 239   Filed 01/12/18   Page 11 of 14
Case 8:17-cv-02942-RWT   Document 36-2   Filed 01/17/18   Page 11 of 14

1   During the first Republican presidential debate, President Trump claimed that the Mexican

2   government "send[s] the bad ones over because they don't want to pay for them."  And in

3   August 2017, he referred to undocumented immigrants as "animals" who are responsible for "the

4   drugs, the gangs, the cartels, the crisis of smuggling and trafficking, MS 13" (Garcia Compl. ¶¶

5   102–13, 124; Santa Clara Compl. ¶¶ 75–76).

6          Circumstantial evidence of intent, including statements by a decisionmaker, may be

7   considered in evaluating whether government action was motivated by a discriminatory purpose.

8   *Arlington Heights*, 429 U.S. at 266–68.  These statements were not about the rescission (which

9   came later) but they still have relevance to show racial animus against people south of our

10  border.

11         Should campaign rhetoric be admissible to undermine later agency action by the victors?

12  This order recognizes that such admissibility can readily lead to mischief in challenging the

13  policies of a new administration.  We should proceed with caution and give wide berth to the

14  democratic process.  Yet are clear cut indications of racial prejudice on the campaign trail to be

15  forgotten altogether?

16         Our court of appeals recently confirmed that "evidence of purpose beyond the face of the

17  challenged law may be considered in evaluating Establishment and Equal Protection Clause

18  claims."  *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017).  *Washington* found that

19  President Trump's statements regarding a "Muslim ban" raised "serious allegations and

20  presented significant constitutional questions," although it ultimately reserved consideration of

21  plaintiffs' equal protection claim.  *Id.* at 1167–68.  Citing to *Washington*, at least two district

22  courts have since considered President Trump's campaign statements in finding a likelihood of

23  success on Establishment Clause claims.  *See, e.g.*, *Aziz v. Trump*, 234 F. Supp. 3d 724, 736

24  (E.D. Va. 2017) (Judge Leonie Brinkema); *Hawai'i v. Trump*, 245 F. Supp. 3d 1227, 1236 (D.

25  Haw. 2017) (Judge Derrick Watson).  This order will follow these decisions and hold that, at

26  least at the pleading stage, campaign rhetoric so closely tied to the challenged executive action is

27  admissible to show racial animus.

28

**United States District Court**
For the Northern District of California

11

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 397 of 454
Case 1:17-cv-05228-NGG-VMS   Document 28127   Filed 09/04/20   Page 909 of 1026 PageID #:
10500
Case 3:17-cv-05211-WHA   Document 239   Filed 01/12/18   Page 12 of 14
Case 8:17-cv-02942-RWT   Document 36-2   Filed 01/17/18   Page 12 of 14

*Third*, a final consideration is the unusual history behind the rescission. DACA received reaffirmation by the agency as recently as three months before the rescission, only to be hurriedly cast aside on what seems to have been a contrived excuse (its purported illegality). This strange about-face, done at lightning speed, suggests that the normal care and consideration within the agency was bypassed (Garcia Compl. ¶ 154; Santa Clara Compl. ¶¶ 8, 77).

That President Trump has at other times shown support for DACA recipients cannot wipe the slate clean as a matter of law at the pleading stage. Although the government argues that these allegations fail to suggest that the Acting Secretary (as the purported decisionmaker) terminated DACA due to racial animus, plaintiffs have alleged that it was President Trump himself who, in line with his campaign rhetoric, directed the decision to end the program (Garcia Compl. ¶¶ 11, 124; Santa Clara Compl. ¶ 21).

Construed in the light most favorable to plaintiffs, as must be done at the pleading stage, these allegations raise a plausible inference that racial animus towards Mexicans and Latinos was a motivating factor in the decision to end DACA. The fact-intensive inquiry needed to determine whether defendants acted with discriminatory intent cannot be made on the pleadings. Accordingly, defendants' motion to dismiss Santa Clara's and Individual Plaintiffs' equal protection claims must be **DENIED.**

State Plaintiffs allege an equal protection claim on the alternative theory that the rescission "violates fundamental conceptions of justice by depriving DACA grantees, as a class, of their substantial interests in pursuing a livelihood to support themselves and further their education" (State Compl. ¶¶ 172–77). Plaintiffs do not respond to the government's arguments that this theory fails to state a claim under FRCP 12(b)(6). Defendants' motion to dismiss State Plaintiffs' equal protection claim is accordingly **GRANTED**.

### 6. DECLARATORY RELIEF.

Defendants move to dismiss the Individual Plaintiffs' claim for declaratory relief. Individual Plaintiffs' request for declaratory relief is also contained in their prayer for relief and, accordingly, the standalone claim is superfluous. Defendants' motion to dismiss this claim is **GRANTED.**

12

**CONCLUSION**

Consistent with the foregoing, defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Plaintiffs' APA claims are sustained, except for the following: Garcia Complaint – Fifth Claim for Relief; UC Complaint – Second Claim for Relief; State Complaint – Second Claim for Relief; San Jose Complaint – Second Claim for Relief.

- Plaintiffs' Regulatory Flexibility Act claims are dismissed.

- Plaintiffs' due process claims are sustained, except for the following: UC Complaint – Third Claim for Relief; Garcia Complaint – First Claim for Relief (to the extent based on the rescission); Santa Clara Complaint – First Claim for Relief (to the extent based on the rescission).

- Plaintiffs' equal protection claims are sustained, except for the following: State Complaint – Sixth Claim for Relief; San Jose Complaint – First Claim for Relief.

- Plaintiffs' equitable estoppel claims are dismissed.

- Individual Plaintiffs' declaratory relief claim is dismissed.

Plaintiffs may seek leave to amend and will have **21 CALENDAR DAYS** from the date of this order to file motions, noticed on the normal 35-day track, seeking leave to amend solely as to the claims dismissed above. Proposed amended complaints must be appended to each motion and plaintiffs must plead their best case. Any such motion should clearly explain how the amendments to the complaints cure the deficiencies identified herein and should include as an exhibit a redlined or highlighted version of the complaints identifying all changes.

**CERTIFICATION UNDER 28 U.S.C. § 1292(b)**

The district court hereby certifies for interlocutory appeal the issues of whether (i) President Trump's campaign statements are properly considered in evaluating plaintiffs' equal protection claims, (ii) whether the Individual Plaintiffs' and County of Santa Clara's

13

AR2162

1  allegations as pleaded state an equal protection claim, (iii) whether plaintiffs' allegations

2  concerning changes to the government's information-sharing policy state a due process claim;

3  (iv) whether plaintiffs have failed to state a claim under 5 U.S.C. § 553; and (v) whether

4  plaintiffs have failed to state a due process claim based on the rescission of DACA.  This order

5  finds that these are controlling questions of law as to which there is substantial ground for

6  difference of opinion and that their resolution by the court of appeals will materially advance the

7  litigation.

8

9        **IT IS SO ORDERED.**

10

11  Dated:  January 12, 2018.

12                                                   WILLIAM ALSUP
                                                     UNITED STATES DISTRICT JUDGE

13

United States District Court

For the Northern District of California

14

Appeal: 18-1521 Doc: 2822-7 Filed: 07/03/2018 Pg: 369 of 454 Case 1:17-cv-02528-NGG-VMS Document 282-7 Filed 09/04/20 Page 912 of 1026 PageID #: 10503

Case 8:17-cv-02942-RWT Document 37 Filed 01/19/18 Page 1 of 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

CASA DE MARYLAND, *et al.*,

               *Plaintiffs*,

     v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

               *Defendants*.

No. 17-cv-2942 (RWT)

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants hereby respond to Plaintiffs' Notice of Supplemental Authority. With that notice, Plaintiffs attached copies of two orders recently issued by a judge in the United States District Court for the Northern District of California in *Regents of the University of California v. U.S. Department of Homeland Security*, No. C 17-05211, and four other related cases challenging the rescission of DACA: the first mostly denying Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and granting Plaintiffs' motion for a preliminary injunction, the second granting in part and denying in part Defendants' motion to dismiss under Rule 12(b)(6). *See* Pls.' Notice of Suppl. Authority ("Pls.' Notice"), ECF No. 36-1 & 36-2. The court's orders also certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) all issues raised in Defendants' Rule 12(b)(1) motion, ECF No. 36-1 at 48-49, and several issues raised in Defendants' Rule 12(b)(6) motion, ECF No. 36-2 at 13-14.

Defendants are pursuing several appeals in the Northern District of California cases. On January 16, 2018, Defendants filed a notice of appeal of the order granting a preliminary injunction requiring Defendants to "maintain the DACA program on a nationwide basis on the

AR2164

same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments, with [certain] exceptions," ECF No. 36-1 at 46. That same day, pursuant to the court's Section 1292(b) certifications, Defendants filed in the United States Court of Appeals for the Ninth Circuit a petition for permission to appeal the district court's orders denying in part Defendants' Rule 12(b) motions.[1] Further, given the need for its immediate review of the entirety of the two orders, on January 18, 2018, the Solicitor General, on behalf of Defendants, filed a petition for a writ of certiorari before judgment with the United States Supreme Court. *See* Pet. For A Writ of Cert. Before J., https://www.supremecourt.gov/DocketPDF/17/17-1003/28381/20180119100226711_DACA%20Rule%2011%20Petition.pdf.

Given Defendants' pending requests for appellate review of threshold legal questions that may dispose of the cases or significantly narrow disputed issues, Defendants have requested a stay of proceedings in the Northern District of California cases. *See* Defs.' Resp. to Order Regarding the Admin. Record & Discovery at 3, *Regents of the Univ. of Cal.*, No. C 17-05211, ECF No. 243. Defendants do not, however, intend to seek a stay of the preliminary injunction pending resolution of appellate proceedings, and the Government is already fully complying with the injunction entered. *Id.* Plaintiffs have indicated that they do not oppose a stay of discovery, so long as the preliminary injunction remains in place and the Government does not seek a stay of that injunction. *See* Pls.' Memo. in Resp. to Follow-Up Re Completion of Admin. Record & Discovery at 3, *Regents of the Univ. of Cal.*, No. C 17-05211, ECF No. 242. Defendants,

---

[1] On the same date, pursuant to Section 1292(b), Defendants filed in the United States Court of Appeals for the Second Circuit a petition for permission to appeal the November 9, 2017 order issued in another DACA-rescission case, *Batalla Vidal v. Nielsen*, No. 16-cv-4756 (E.D.N.Y.), denying Defendants' Rule 12(b)(1) motion.

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 367 of 454    Case 1:17-cv-05228-NGG-VMS    Document 82-7    Filed 09/04/20    Page 914 of 1026 PageID #: 10505

Case 8:17-cv-02942-RWT    Document 37    Filed 01/19/18    Page 3 of 4

therefore, do not anticipate any discovery in the near-term in which Plaintiffs in this case could "participate," as they request.[2]  *See* Pls.' Notice at 2.

For many of the same reasons explained in the briefs in support of Defendants' Motion to Dismiss Or, In the Alternative, For Summary Judgment (ECF Nos. 27-1 & 30), the orders recently entered in *Regents* are incorrect and this Court should dismiss the instant case or, in the alternative, grant summary judgment to Defendants.[3]

Dated: January 19, 2018                    Respectfully submitted,

                                           CHAD A. READLER
                                           Principal Deputy Assistant Attorney General

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           JENNIFER D. RICKETTS
                                           Director

                                           JOHN R. TYLER
                                           Assistant Branch Director

                                           */s/   Kathryn C. Davis*
                                           KATHRYN C. DAVIS
                                           RACHAEL WESTMORELAND
                                           Trial Attorneys

---

[2] Plaintiffs request to "participate" in any discovery permitted to go forward in other DACA-rescission cases, and "while the Government's motion is *sub judice*." Pls.' Notice at 2.  No discovery is ongoing in any of the DACA-rescission matters.  Moreover, Defendants maintain that discovery is both unnecessary and improper in this and the other cases, and especially where this Court has yet not ruled that Plaintiffs have sufficiently demonstrated a need for discovery under Federal Rule of Civil Procedure 56(d).

[3] Plaintiffs argue that this Court should not follow the *Regents* court in dismissing their Administrative Procedure Act notice-and-comment claims because this Court is not bound by the Ninth Circuit case law applied in *Regents*.  Pls.' Notice at 2 n.2 (citing *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987)).  This Court is bound by Fourth Circuit precedent, which also compels the same conclusion that the DACA Rescission Policy is exempt from notice and comment rulemaking.  *See* Defs.' Mot. at 41-44 (citing *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340-41 (4th Cir. 1995)).

**AR2166**

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

J.A. 1428

AR2167

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Case No. 17-cv-2942 (RWT) |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF HOMELAND | ) |
| SECURITY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

In further support of the Plaintiffs' November 28, 2017 Opposition to Defendants'

Motion to Dismiss (ECF No. 29), Plaintiffs attach a copy of the February 13, 2018 opinion in the

consolidated Eastern District of New York cases.  Ex. 1.  The Eastern District of New York

entered a nationwide preliminary injunction requiring the Government "to maintain the DACA

program on the same terms and conditions that existed prior to the promulgation of the DACA

rescission memo" subject to certain exceptions.  Ex. 1 at 53.  The Court specifically concluded

that Plaintiffs were substantially likely to succeed on the merits of their claim that the

government's decision to rescind DACA violated the Administrative Procedures Act.  Ex. 1 at

23-39.

The February 13, 2018 decision represents the second court to grant a preliminary

injunction against the rescission of DACA.  For the reasons cited in this decision, as well as the

January 2018 decisions from the Northern District of California, this Court should deny the

Government's pending motion.

AR2168

Appeal: 18-1521   Doc: 28-3   Filed: 07/03/2018   Pg: 347 of 454   Case 1:17-cv-05228-NGG-VMS   Document 55-27   Filed 09/04/20   Page 917 of 1026 PageID #: 10508

Case 8:17-cv-02942-RWT   Document 40   Filed 02/14/18   Page 2 of 2

Dated: February 14, 2018                    Respectfully submitted,


    /s/

Matthew K. Handley (D. Md. 18636)          John A. Freedman (D. Md. 20276)
Dennis A. Corkery (D. Md. 19076)           Gaela Gehring Flores (D. Md.14559)
WASHINGTON LAWYERS'                         Ronald A. Schechter[†]
  COMMITTEE FOR CIVIL RIGHTS          Nancy L. Perkins[†]
AND                                         Jeremy Karpatkin (pro hac vice forthcoming)
  URBAN AFFAIRS                        ARNOLD & PORTER KAYE SCHOLER LLP
11 Dupont Circle, Suite 400                 601 Massachusetts Ave., NW
Washington, DC 20036                        Washington, DC  20001-3743
(202) 319-1000                              (202) 942-5000
matthew_handley@washlaw.org                 John.Freedman@apks.com
dennis_corkery@washlaw.org

                                            Steven L. Mayer (pro hac vice forthcoming)
Elizabeth J. Bower[†]                       ARNOLD & PORTER KAYE SCHOLER LLP
Kevin B. Clark (D. Md. 04771)               10th Floor
Priya Aiyar[†]                              Three Embarcadero Center
WILLKIE FARR & GALLAGHER LLP                San Francisco, CA 94111-4024
1875 K Street, NW                           +1 415.471.3100
Washington, DC  20006-1238
EBower@willkie.com
                                            Ajmel Quereshi (D. Md. 28882)
                                            HOWARD UNIVERSITY SCHOOL OF
Nicholas Katz (pro hac vice forthcoming)      LAW CIVIL RIGHS CLINIC
CASA DE MARYLAND                            2900 Van Ness Street, NW
8151 15th Ave.                              Washington, DC 20008
Hyattsville, MD 20783                       (202) 806-8000
(240) 491-5743                              aquereshi@law.howard.edu
NKatz@wearecasa.org

                                            *Attorneys for Plaintiffs*

[†]*Appearing* pro hac vice

AR2169

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

MARTÍN JONATHAN BATALLA VIDAL et al.,

                        Plaintiffs,

          -against-

KIRSTJEN M. NIELSEN, Secretary, Department of
Homeland Security, et al.,

                        Defendants.

-------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                        Plaintiffs,

          -against-

DONALD TRUMP, President of the United States, et al.,

                        Defendants.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-4756 (NGG) (JO)**

**MEMORANDUM & ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

      In 2012, the Department of Homeland Security created the Deferred Action for

Childhood Arrivals ("DACA") program. That program permitted certain individuals without

lawful immigration status who entered the United States as children to obtain "deferred

action"— contingent, discretionary relief from deportation—and authorization to work legally in

this country. Since 2012, nearly 800,000 DACA recipients have relied on this program to work,

study, and keep building lives in this country.

1

AR2170

On September 5, 2017, Defendants announced that they would gradually end the DACA program.[1] (Letter from Jefferson B. Sessions III to Elaine C. Duke (Admin. R. (Dkt. 77-1)[2] 251) ("Sessions Ltr."); Mem. from Elaine C. Duke, Acting Sec'y, DHS, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (Admin. R. 252) ("DACA Rescission Memo").) The Department of Homeland Security ("DHS") would consider pending DACA applications and renewal requests, as well as promptly filed renewal requests by DACA beneficiaries whose benefits were set to expire within six months, but would reject all other applications and renewal requests. (DACA Rescission Memo at 4.) Plaintiffs in the above-captioned cases promptly challenged Defendants' decision on a number of grounds, including, most relevant for purposes of this Memorandum and Order, that the decision violated the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (the "APA"). (2d Am. Compl. (Dkt. 60)); Compl. (Dkt. 1, No. 17-CV-5228).) Plaintiffs now seek a preliminary injunction barring Defendants from ending the DACA program pending a final adjudication of these cases on the merits. (Mem. in Supp. of Mot. for Prelim. Inj. (Dkt. 123-1) ("BV Pls. Mot."); Mem. in Supp. of Mot. for Prelim. Inj. (Dkt. 96-1, No. 17-CV-5228) ("State Pls. Mot.").)

"Congress passed the [APA] to ensure that agencies follow constraints even as they exercise their powers. One of these constraints is the duty of agencies to find and formulate

---

[1] Plaintiffs have named as defendants President Donald J. Trump, Secretary of the Department of Homeland Security Kristjen Nielsen, and Attorney General Jefferson B. Sessions III. Plaintiffs allege that the President terminated the DACA program because of unlawful discriminatory animus, in violation of the Fifth Amendment to the U.S. Constitution. (3d Am. Compl. (Dkt. 113, No. 16-CV-4756) ¶¶ 89-100, 195-98; Am. Compl. (Dkt. 54, No. 17-CV-5228) ¶¶ 57-70, 233-39.) Because the APA does not permit direct review of Presidential decisionmaking, Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992), only the Attorney General and Secretary Nielsen are defendants with respect to Plaintiffs' substantive APA claims, which are the focus of this opinion. (3d Am. Compl. (Dkt. 113, No. 16-CV-4756) at ECF p.40.)

[2] All record citations refer to the docket in Batalla Vidal v. Nielsen, No. 16-CV-4756, except as otherwise noted.

AR2171

Case 1:17-cv-05228-NGG-VMS Document 2827 Filed 09/04/25 Page 920 of 1026 PageID #: 10511

Case 1:16-cv-04756-NGG-JO Document 254 Filed 02/13/18 Page 3 of 55 PageID #: 4169
Case 8:17-cv-02942-RWT Document 40-1 Filed 02/14/18 Page 3 of 55

policies that can be justified by neutral principles." FCC v. Fox Television Stations, Inc., 556

U.S. 502, 537 (2009) (Kennedy, J., concurring in part and in the judgment). To that end, the

APA authorizes parties harmed by federal agencies to obtain judicial review of agency decisions.

5 U.S.C. § 702. The reviewing court must set aside "action, findings, [or] conclusions" that are,

among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." Id. § 706(2)(A).[3] Review under this "arbitrary and capricious" standard is "narrow,"

and the court may not "substitute its judgment for that of the agency"; instead, the court

considers only whether the agency's decision "was the product of reasoned decisionmaking."

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 52

(1983) ("State Farm"). If the agency decision "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made,'" the court will uphold the agency's decision. Id. at 43 (quoting Burlington

Truck Lines v. United States, 371 U.S. 156, 168 (1962)). If, however, the agency's decision

"relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise," that decision must be set aside. Id.

Review under the arbitrary-and-capricious standard is generally limited to the agency's

stated rationale for its decision, State Farm, 463 U.S. at 43; Camp v. Pitts, 411 U.S. 138, 143

(1973) (per curiam), and to the "full administrative record that was before the [agency] at the

time [it] made [its] decision," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,

---

[3] On November 9, 2017, the court rejected Defendants' arguments that judicial review under the APA was unavailable because the decision to rescind the DACA program was "committed to agency discretion by law." (Nov. 9, 2017, Mem. & Order (Dkt. 104) at 20-28.)

3

420 (1971) ("Overton Park"). The court "may not supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("Chenery II")); SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("Chenery I"). Nor may the court uphold agency action based on "post hoc rationalizations of agency action." State Farm, 463 U.S. at 50; see also Williams Gas Processing – Gulf Coast Co., L.P. v. FERC, 373 F.3d 1335, 1345 (D.C. Cir. 2004) (Roberts, J.) ("It is axiomatic that [the court] may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review; post hoc rationalizations by agency counsel will not suffice." (internal quotation marks and citation omitted)).

The APA thus sometimes places courts in the formalistic, even perverse, position of setting aside action that was clearly within the responsible agency's authority, simply because the agency gave the wrong reasons for, or failed to adequately explain, its decision. E.g., State Farm, 463 U.S. at 42-43, 48-56; Overton Park, 401 U.S. at 416, 420. Based on the present record, these appears to be just such cases.

Defendants indisputably can end the DACA program. Nothing in the Constitution or the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. (the "INA"), requires immigration authorities to grant deferred action or work authorization to individuals without lawful immigration status. The DACA program, like prior deferred-action and similar discretionary relief programs, simply reflected the Obama Administration's determination that DHS's limited enforcement resources generally should not be used to deport individuals who were brought to the United States as children, met educational or military-service requirements, and lacked meaningful criminal records. (Mem. from Janet Napolitano, Sec'y, DHS, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children

4

AR2173

at 1-2 (June 15, 2012) (Admin. R. 1-2) (the "2012 DACA Memo").)  New Administrations may, however, alter or abandon their predecessors' policies, even if these policy shifts may impose staggering personal, social, and economic costs.[4]

    The question before the court is thus not whether Defendants could end the DACA program, but whether they offered legally adequate reasons for doing so.  Based on its review of the record before it, the court concludes that Defendants have not done so.  First, the decision to end the DACA program appears to rest exclusively on a legal conclusion that the program was unconstitutional and violated the APA and INA.  Because that conclusion was erroneous, the decision to end the DACA program cannot stand.  Second, this erroneous conclusion appears to have relied in part on the plainly incorrect factual premise that courts have recognized "constitutional defects" in the somewhat analogous Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program.  Third, Defendants' decision appears to be internally contradictory, as the means by which Defendants chose to "wind down" the program (namely, by continuing to adjudicate certain DACA renewal applications) cannot be reconciled with their stated rationale for ending the program (namely, that DACA was unconstitutional).  Any of these flaws would support invalidating the DACA rescission as arbitrary and capricious.

    Before this court, Defendants have attempted to reframe their decision as motivated by "litigation risk."  They contend that the decision to end the DACA program was reasonable in light of the prospect that Texas and several other states would seek to amend their complaint in Texas v. United States, No. 14-CV-254 (S.D. Tex.), to challenge the DACA program; that the

---

[4] These costs are detailed in greater length in the exhibits to Plaintiffs' motions for preliminary injunction, and in the many helpful briefs filed by amici in these cases.  (See, e.g., Brief of Amici Curiae 114 Companies (Dkt. 160) (estimating the costs of the DACA rescission over the next decade at $460.3 billion in lost GDP and $24.6 billion in lost Social Security and Medicare tax contributions).)

AR2174

U.S. District Court for the Southern District of Texas would issue a nationwide injunction ending the program; and that the U.S. Court of Appeals for the Fifth Circuit and the U.S. Supreme Court would affirm that injunction. (Defs. Opp'n to Pls. Mots. for Prelim. Inj. (Dkt. 239) at 1, 10-11, 21-24.) The Administrative Record does not support Defendants' contention that they decided to end the DACA program for this reason. Even if it did, reliance on this "litigation risk" rationale would have been arbitrary and capricious, in light of Defendants' failure to explain their decision or to consider any factors that might have weighed against ending the DACA program. And even if this "litigation risk" rationale were both supported by the Administrative Record and a reasonable basis for rescinding the DACA program, the court would nevertheless likely set Defendants' decision aside, as the court cannot say that any of the aforementioned errors were harmless, for purposes of review under the APA.

Accordingly, the court concludes that Plaintiffs are likely to succeed on the merits of their substantive APA claims. Because Plaintiffs also satisfy the remaining requirements for the court to issue a preliminary injunction, the court ENJOINS Defendants from rescinding the DACA program, pending a decision on the merits of these cases. Defendants thus must continue processing both initial DACA applications and DACA renewal requests under the same terms and conditions that applied before September 5, 2017, subject to the limitations described below. The scope of this preliminary injunction conforms to that previously issued by the U.S. District Court of the Northern District of California. See Order Denying Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction and Granting Provisional Relief (Dkt. 234), Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Sec., No. 3:17-CV-5211 (N.D. Cal. Jan. 9, 2018) ("Regents") (Alsup, J.), pet. for cert. before judgment filed, No. 17-1003.

J.A. 1436

AR2175

The court makes clear, however, what this order is not.

- **This order does not hold that the rescission of DACA was unlawful.** That question is for summary judgment, not motions for a preliminary injunction. Cf. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953) ("[A] preliminary injunction . . . is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness.").

- **This order does not hold that Defendants may not rescind the DACA program.** Even if the court ultimately finds that Defendants' stated rationale for ending the DACA program was legally deficient, the ordinary remedy is for the court to remand the decision to DHS for reconsideration. See Chenery I, 318 U.S. at 94-95. On remand, DHS "might later, in the exercise of its lawful discretion, reach the same result for a different reason." FEC v. Akins, 524 U.S. 11, 25 (1998).

- **This order does not require Defendants to grant any particular DACA applications or renewal requests.** Restoring the DACA program to the status quo as of September 4, 2017, does not mean that every DACA recipient who requests renewal of his or her deferred action and work authorization will receive it. The DACA program identified "criteria [that] should be satisfied before an individual is considered for an exercise of prosecutorial discretion." (2012 DACA Memo at 1.) It did not require immigration officials to defer action against any individuals who met these criteria; to the contrary, the 2012 DACA Memo stated that DHS would exercise prosecutorial discretion "on an individual basis" and would not "provide any assurance that relief will be granted in all cases." (Id. at 2-3.) Preserving the status quo means only that Defendants must continue considering DACA applications and renewal requests, not that they must grant all such applications and requests. (See U.S. Citizenship & Immigration Servs., Frequently Asked Questions at Q6 (Apr. 25, 2017) ("Apr. 25 DACA FAQs"), Ex. 41 to State Pls. Mot. (Dkt. 97-2, No. 17-CV-5228) at ECF p.186.)

- **This order does not prevent Defendants' from revoking individual DACA recipients' deferred action or work authorization.** Under the 2012 DACA Memo, DHS may terminate a DACA recipient's deferred action "at any time, with or without a Notice of Intent to Terminate, at [its] discretion." (Apr. 25 DACA FAQs at Q27.) Maintaining the status quo does nothing to alter that.

Because the court issues the preliminary injunction requested by Plaintiffs, the Batalla Vidal Plaintiffs' Motion for Class Certification (Dkt. 124) is DENIED as moot. The court will address by separate order Defendants' motions to dismiss Plaintiffs' operative complaints.

AR2176

(Defs. Mot. to Dismiss Third Am. Compl. (Dkt. 207); Defs. Mot. to Dismiss (Dkt. 71, No. 17-CV-5228).)

## I.  BACKGROUND

The court provides a brief history of immigration authorities' use of "deferred action" and similar discretionary-relief programs, the DACA and DAPA programs, and this litigation to offer context for the discussion that follows. For further background, the reader may consult this court's prior orders (see Oct. 3, 2017, Order (Dkt. 72); Oct. 17, 2017, Mem. & Order (Dkt. 86); Oct. 19, 2017, Mem. & Order (Dkt. 90); Nov. 9, 2017, Mem. & Order (Dkt. 104); Nov. 20, 2017, Order (Dkt. 109); Dec. 15, 2017, Order (Dkt. 122); Jan. 8, 2018, Mem. & Order (Dkt. 233)), the Northern District of California's opinion in Regents, 2018 WL 339144, at *1-8, and the opinion of the Office of Legal Counsel regarding DAPA (see The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. at 1 (2014) (Admin. R. 4) ("OLC Op.")).

### A.  History of Deferred Action

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." Arizona v. United States, 567 U.S. 387, 394 (2012). That power derives from the Constitution, which authorizes Congress "[t]o establish a uniform Rule of Naturalization," U.S. Const. art. I., § 8, cl. 4, and from the Government's "inherent power as sovereign to control and conduct relations with foreign nations." Arizona, 567 U.S. at 395. Acting under this authority, the Government has created an "extensive and complex" statutory and regulatory regime governing, among other things, who may be admitted to the United States, who may work here, and who may be removed from the country. Id.; see id. at 395-97.

Not all "removable" aliens are, in fact, deported from this country. Immigration officials "cannot act against each technical violation of the statute[s they are] charged with enforcing,"

8

AR2177

but must determine which enforcement actions are worthwhile. Heckler v. Chaney, 470 U.S. 821, 831 (1985); Arpaio v. Obama, 797 F.3d 11, 15-16 (D.C. Cir. 2015). "A principal feature of the removal system is the broad discretion exercised by immigration officials," who "as an initial matter, must decide whether it makes sense to pursue removal at all," and, "[i]f removal proceedings commence," may decide whether removable aliens warrant asylum or "other discretionary relief allowing them to remain in the country or at least to leave without formal removal." Arizona, 567 U.S. at 396; see also Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483 (1999) ("AAADC") (observing that throughout the removal process, immigration officials have "discretion to abandon the endeavor"). Immigration officials' enforcement discretion is a practical necessity as well as a legal reality: By one recent estimate, there are approximately 11.3 million undocumented aliens present in the United States, of whom DHS has the resources to remove fewer than 400,000 per year—about 3.5 percent of the total. (OLC Op. at 1.)

Over the years, Congress and the Executive Branch have developed a number of means by which immigration officials may exercise their discretion not to deport removable aliens. "Some of these discretionary powers have flowed from statute," such as "parole," see 8 U.S.C. § 1182(d)(5)(A), and "temporary protected status," see id. § 1254a. Regents, 2018 WL 339144, at *2; see also, e.g., 8 U.S.C. § 1229b (cancellation of removal); id. § 1229c (voluntary departure). Others, such as "deferred enforced departure" or "extended voluntary departure," have been ad hoc exercises of executive authority, grounded in the Executive Branch's responsibility for conducting foreign relations and enforcing immigration laws, rather than in express congressional authorization. Regents, 2018 WL 339144, at *2; OLC Op. at 12 & n.5.

9

AR2178

The cases before this court concern one such form of discretionary relief. "Deferred action" is a longstanding practice by which the Executive Branch exercises its discretion to abandon, or to decline to undertake, deportation proceedings "for humanitarian reasons or simply for its own convenience." AAADC, 525 U.S. at 484; see also Arpaio, 797 F.3d at 16 ("'[D]eferred action' . . . entails temporarily postponing the removal of individuals unlawfully present in the United States."). By granting a removable alien deferred action, immigration officials convey that they do not currently intend to remove that individual from the country. As such, deferred action offers the recipient some assurance—however non-binding, unenforceable, and contingent on the recipient's continued good behavior—that he or she may remain, at least for now, in the United States. Additionally, recipients of deferred action may apply for authorization to work legally in the United States, provided that they "establish[] an economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); see also 8 U.S.C. § 1324a(h)(3) (excluding from the definition of "unauthorized aliens," who may not be knowingly employed in the United States, aliens "authorized to be . . . employed . . . by the Attorney General"). Deferred action does not, however, confer lawful immigration status, a pathway to citizenship, or a defense to removal, and is revocable by immigration authorities. United States v. Arrieta, 862 F.3d 512, 514 (5th Cir. 2017); Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1058 (9th Cir. 2014). (2012 DACA Memo at 3.)

"Although the practice of granting deferred action 'developed without express statutory authorization,' it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court." (OLC Op. at 13 (quoting AAADC, 525 U.S. at 484).) DHS and its predecessor, the Immigration and Naturalization Service, have employed deferred action and similar discretionary-relief programs, such as "nonpriority status"

AR2179

and "extended voluntary departure," since at least the 1960s. <u>Arpaio</u>, 797 F.3d at 16 (citing OLC

Op. at 7-8, 12-13). (Br. of Amicus Curiae Former Federal Immigration and Homeland Security

Officials (Dkt. 198-1) ("Former Fed. Officials Amicus Br.") at 6-11; Andorra Bruno et al., Cong.

Res. Serv., Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion

with Respect to Individuals Who Came to the United States as Children, at 20-23 (July 13,

2012), https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-

Service-Report1.pdf ("CRS Rep.").)  These programs were used to provide relief to, among

dozens of examples, refugees from war-torn and communist countries; spouses and children of

aliens granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No.

99-603, 100 Stat. 3359; aliens eligible for relief under the Violence Against Women Act

("VAWA") or the Victims of Trafficking and Violence Protection Act of 2000; foreign students

affected by Hurricane Katrina; and certain widows and widowers of U.S. citizens.  (OLC Op. at

14-17; Former Fed. Officials Amicus Br. at 8-10.)

　　　Congress has repeatedly ratified immigration officials' practice of according deferred

action to certain aliens without lawful immigration status.  <u>See, e.g.</u>, 8 U.S.C. § 1151 note

(certain immediate family members of certain alien U.S. combat veterans are "eligible for

deferred action, advance parole, and work authorization"); <u>id.</u> § 1154(a)(1)(D)(i)(II) (VAWA

petitioners "eligible for deferred action and work authorization"); <u>id.</u> § 1227(d)(2) (denial of

administrative stay of removal "shall not preclude the alien from applying for . . . deferred

action"); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (certain

immediate family members of lawful permanent residents killed in the terrorist attacks of

September 11, 2001, "may be eligible for deferred action and work authorization").

11

AR2180

**B. DACA and DAPA**

On June 15, 2012, then-DHS Secretary Janet Napolitano issued the 2012 DACA Memo, which stated that DHS would consider granting deferred action to certain individuals without lawful immigration status who entered the United States as children. (2012 DACA Memo at 1.) Secretary Napolitano stated that DHS was implementing this program as an "exercise of prosecutorial discretion" in the enforcement of immigration laws, to "ensure that . . . enforcement resources are not expended on . . . low priority cases." (Id.) Under the 2012 DACA Memo, individuals were eligible for consideration for deferred action if they (1) "came to the United States under the age of sixteen"; (2) had "continuously resided in the United States for a[t] least five years preceding the date of this memorandum and [were] present in the United States" on that date; (3) were "in school," had "graduated from high school," had obtained GEDs, or were honorably discharged veterans of the Armed Forces or Coast Guard; (4) had not been convicted of felonies, significant misdemeanors, or multiple misdemeanors, or been deemed to "otherwise pose[] a threat to national security or public safety"; and (5) were not above the age of thirty. (Id.) DACA applications from individuals meeting these criteria would be evaluated "on an individual" or "case-by-case" basis and would not necessarily be "granted in all cases." (Id. at 2.) The 2012 DACA Memo "confer[red] no substantive right, immigration status or pathway to citizenship." (Id. at 2-3.)

In late 2014, DHS announced the DAPA program, which would have granted deferred action to certain parents of U.S. citizens and lawful permanent residents. (Mem. from Jeh Charles Johnson, Sec'y of DHS, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (the "2014 DAPA Memo") (Admin R. 40).) As part of that program, then-DHS Secretary Jeh Johnson directed U.S.

12

AR2181

Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain individuals who, among other things, lacked formal immigration status and had a son or daughter who was a U.S. citizen or lawful permanent resident. (Id. at 1.)  Secretary Johnson also announced that the DACA program would be expanded by (1) removing the requirement that DACA applicants be under the age of 30 as of June 2012; (2) extending the duration of the deferred action and work authorization obtained through the program from two to three years; and (3) adjusting the date-of-entry requirement to open DACA to individuals brought to the United States between June 15, 2007, and January 1, 2010.  (Id. at 3-4 (the "DACA Expansion").)

### C. The Texas Litigation

Following DHS's issuance of the 2014 DAPA Memo, Texas and 25 other states filed suit in the U.S. District Court for the Southern District of Texas, alleging that the DAPA program violated the APA and the Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 3.  See Texas v. United States, 86 F. Supp. 3d 591, 598 (S.D. Tex. 2015).  On February 16, 2015, after concluding that Texas and its fellow plaintiffs had standing to sue, Judge Andrew Hanen determined that they were likely to succeed on the merits of their claim that DAPA constituted a "legislative" or "substantive" rule that, under the APA, should have been made through notice-and-comment rulemaking procedures.  Id. at 664-72.  In particular, Judge Hanen found that the 2014 DAPA Memo, "[a]t a minimum, . . . 'severely restrict[ed]' any discretion that Defendants argue exists" in the adjudication of DAPA applications, and that DHS had not genuinely exercised discretion in reviewing DACA applications.  Id. at 669 & n.101.  The court issued a nationwide injunction against the implementation of both the DAPA program and the DACA Expansion.  Id. at 677-78.

AR2182

The Fifth Circuit denied a stay of the preliminary injunction, 787 F.3d 733, 743 (5th Cir. 2015), and affirmed the district court on two independent, alternative grounds, 809 F.3d 134, 178 (5th Cir. 2015) (revised).  First, the Fifth Circuit upheld the district court's ruling that the plaintiff states were likely to prevail on the merits of their claim that the DAPA program was invalid because it was not developed through notice-and-comment rulemaking.  See id. at 170-78.  In particular, the Fifth Circuit found that Judge Hanen did not clearly err in finding that "[n]othing about DAPA genuinely leaves the agency and its [employees] free to exercise discretion," based partly on evidence that supposedly showed that USCIS exercised little case-by-case discretion in adjudicating DACA applications.  Id. at 172 (quoting 86 F. Supp. 3d at 670 (alterations in original)); see id. at 172-78.

Second, the Fifth Circuit concluded that the plaintiff states were likely to prevail on the merits of their claim that the DAPA program was substantively arbitrary and capricious because, in that court's view, the program was contrary to the INA.  See id. at 178-86.  The Fifth Circuit observed that "Congress has enacted an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status," in the form of family-preference visas, id. at 179, and cancellation of removal and adjustment of status, id. at 180.  While admitting that DAPA did not "confer the full panoply of benefits that a visa gives," the Fifth Circuit held that DAPA nevertheless conflicted with these statutory forms of relief by permitting "illegal aliens to receive the benefits of lawful presence" without meeting the stringent requirements applicable to these provisions.  See id. at 180.  Similarly, the Fifth Circuit held that DAPA conflicted with the INA by providing an easier path to "lawful presence" and work authorization for approximately four million undocumented immigrants—a question of great national importance that Congress could not have intended to delegate implicitly to DHS.

14

See id. at 180-81. The Fifth Circuit acknowledged that there was a long history of discretionary-relief programs but held that past practice was not dispositive of DAPA's legality and distinguished DAPA from past programs on the grounds that such programs were "'done on a country-specific basis, usually in response to war, civil unrest, or natural disasters,'" id. at 184 (quoting CRS Rep. at 9); used as a "bridge[] from one legal status to another," id.; or "interstitial to a statutory legalization scheme," such as the Family Fairness program enacted by the Reagan and George H.W. Bush Administrations, id. at 185. Accordingly, "DAPA [wa]s foreclosed by Congress's careful plan . . . and therefore was properly enjoined." Id. at 186.

The Supreme Court granted the Government's petition for a writ of certiorari, 136 S. Ct. 906 (2016), and affirmed the decision of the Fifth Circuit by an equally divided court, 136 S. Ct. 2271 (Mem.).

### D. The DACA Rescission

On January 25, 2017, the newly inaugurated President Donald Trump issued an executive order stating that "[i]t is the policy of the executive branch to . . . [e]nsure the faithful execution of the immigration laws of the United States," and that "[w]e cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement." Exec. Order 13,768, Enhancing Public Safety in the Interior of the United States (Jan. 25, 2017), 82 Fed. Reg. 8799. Shortly thereafter, then-DHS Secretary John F. Kelly issued a memorandum implementing this executive order by rescinding "all existing conflicting directives, memoranda, or field guidance regarding enforcement of our immigration laws and priorities for removal," except for the DACA and DAPA programs, which he left in place. (Mem. from John F. Kelly, Sec'y, DHS, Enforcement of the Immigration Laws to Serve the National Interest at 2 (Feb. 20, 2017) (Admin. R. 230).)

15

AR2184

Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 06/04/20   Page 933 of 1026 PageID #: 10524

Case 1:16-cv-04756-NGG-JO   Document 254   Filed 02/13/18   Page 16 of 55 PageID #: 4182
Case 8:17-cv-02942-RWT   Document 40-1   Filed 02/14/18   Page 16 of 55

Four months later, Secretary Kelly issued another memorandum rescinding DAPA and the DACA Expansion in light of "the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities." (Mem. from John F. Kelly, Sec'y, DHS, Rescission of November 20, 2014, Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") at 3 (June 15, 2017) (Admin. R. 237).) This memo left the original DACA program in place and did not affect the remaining three-year grants of deferred action that were issued under the DACA Expansion prior to Judge Hanen's issuance of a preliminary injunction in Texas. (Id. at 2 & n.3).

Following the rescission of the 2014 DAPA Memo, Texas Attorney General Ken Paxton, joined by the attorneys-general of ten other states, wrote to Attorney General Jefferson B. Sessions to insist that the Executive Branch rescind the 2012 DACA Memo. (Ltr. from Ken Paxton, Att'y Gen. of Tex., to Hon. Jeff Sessions, Att'y Gen. of the U.S. (June 29, 2017) (Admin. R. 238).) Paxton threatened that if DHS did not stop issuing or renewing deferred action and work authorization under DACA or the DACA Expansion, the plaintiff states would amend their complaint in the Texas litigation "to challenge both the DACA program and the remaining Expanded DACA permits." (Id. at 2.) If, however, Defendants agreed to rescind the 2012 DACA Memo and to cease "renew[ing] or issu[ing] any new DACA or Expanded DACA permits in the future," the plaintiffs would voluntarily dismiss their complaint. (Id.)

On September 5, 2017, Defendants announced that the DACA program would be brought to a gradual end. In an undated letter (the "Sessions Letter"), the Attorney General wrote to then-Acting DHS Secretary Elaine C. Duke to "advise that [DHS] should rescind" the 2012

16

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 06/04/18   Page 934 of 1026 PageID #: 10525

Case 1:16-cv-04756-NGG-JO   Document 254   Filed 02/13/18   Page 17 of 55 PageID #: 4183
Case 8:17-cv-02942-RWT   Document 40-1   Filed 02/14/18   Page 17 of 55

DACA Memo.[5]  (Sessions Ltr.)  The Attorney General opined that DACA was unlawful,

unconstitutional, and likely to be invalidated in court:

> DACA was effectuated by the previous administration through
> executive action, without proper statutory authority and with no
> established end-date, after Congress' repeated rejection of proposed
> legislation that would have accomplished a similar result.  Such an
> open-ended circumvention of immigration laws was an
> unconstitutional exercise of authority by the Executive Branch. The
> related Deferred Action for Parents of Americans and Lawful
> Permanent Residents (DAPA) policy was enjoined on a nationwide
> basis in a decision affirmed by the Fifth Circuit on the basis of
> multiple legal grounds and then by the Supreme Court by an equally
> divided vote.  Then Secretary of Homeland Security John Kelly
> rescinded the DAPA policy in June.  Because the DACA policy has
> the same legal and constitutional defects that the courts recognized
> as to DAPA, it is likely that potentially imminent litigation would
> yield similar results with respect to DACA.

(Id. (citation omitted).)

Thereafter, Acting Secretary Duke issued a memorandum (the "DACA Rescission

Memo") instructing her subordinates to "execute a wind-down of the program."  (DACA

Rescission Memo at 1.)  Acting Secretary Duke briefly summarized the creation of the DACA

and DAPA programs and stated that, although the DACA program "purported to use deferred

action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-

case basis," "USCIS has not been able to identify specific denial cases where an applicant

appeared to satisfy the programmatic categorical criteria as outlined in the [2012 DACA Memo]

but still had his or her application denied based solely upon discretion."  (Id. at 2 & n.1.)  Acting

Secretary Duke then described the history of the Texas litigation, noting that the Fifth Circuit had

affirmed the injunction against the implementation of the DAPA program based on the finding

---

[5] While the Sessions Letter is not dated, the bookmarks in the electronic PDF file of the Administrative Record ascribe a date of September 4, 2017, to this letter.

17

"that DACA decisions were not truly discretionary," and observed that Secretary Kelly had acted to end categorical or class-based exemptions of aliens from potential enforcement of the immigration laws and to rescind the DAPA program while leaving the DACA program "temporarily . . . in place." (Id. at 2; see id. at 2-3.)

The Acting Secretary then noted that Texas and several other states had threatened to challenge the DACA program, and she briefly summarized the Attorney General's opinion that DACA was unconstitutional, unlawful, and likely to be struck down because it shared "the same legal and constitutional defects that the courts recognized as to DAPA." (Id. at 3 (quoting Sessions Ltr.).) "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General," she concluded, "it is clear that the June 15, 2012, DACA program should be terminated." (Id. at 4.)

In light of "the complexities associated with winding down the program," however, Acting Secretary Duke directed that the program should be wound down gradually. (Id.) Initial applications, renewal requests, and associated applications for work authorization that had been "accepted" by DHS by September 5, 2017, would be adjudicated "on an individual, case-by-case basis." (Id.) Likewise, all DACA renewal requests and associated applications for work authorization submitted by "current beneficiaries whose benefits will expire between [September 5, 2017] and March 5, 2018," would be adjudicated, provided that these requests were "accepted by [DHS] as of October 5, 2017." (Id.) DHS would, however, "reject all DACA initial requests and associated applications for [work authorization] filed after the date of this memorandum" and "all DACA renewal requests and associated applications for [work authorization] filed outside of the[se] parameters." (Id.) Existing DACA benefits would not be terminated

18

J.A. 1448

AR2187

immediately but would not be renewed, and DHS would no longer approve further applications for advance parole." (Id.)

### E. Procedural History

The court will not restate the procedural history of these cases prior to November 2017, which is set forth in the court's November 9 Memorandum and Order. The court will, however, provide the following timeline of recent developments in these cases.

On December 11, 2017, the Batalla Vidal Plaintiffs filed their Third Amended Complaint (Dkt. 113), which largely tracked their Second Amended Complaint but added a claim that Defendants Nielsen and Sessions violated the Due Process Clause of the Fifth Amendment by rejecting DACA renewal applications that (1) were promptly mailed but received by USCIS after October 5, 2017, due to U.S. Postal Service delays; (2) were delivered to USCIS by October 5, 2017, but rejected because they arrived too late in the day; or (3) contained "minor perceived or actual clerical errors." (Third Am. Compl. (Dkt. 113) ¶ 203; see id. ¶¶ 199-205.)

On December 20, 2017, the Supreme Court vacated the decision of the U.S. Court of Appeals for the Ninth Circuit denying Defendants' petition for a writ of mandamus to the Northern District of California in similar litigation challenging Defendants' decision to end the DACA program. In re United States, No. 17-801 (U.S. Dec. 20, 2017) (per curiam). The Supreme Court held that the "Government [has made] serious arguments that at least portions of the District Court's order are overly broad" and that, "[u]nder the specific facts of [that] case," the district court should have resolved the Government's arguments that the decision to rescind the DACA program was not subject to judicial review before ordering the Government to produce a complete administrative record. Id. (slip op. at 3). The Court suggested that the district court "may consider certifying that ruling for interlocutory appeal under 28 U.S.C. § 1292(b) if appropriate." Id. (slip op. at 4).

19

AR2188

One week later, the U.S. Court of Appeals for the Second Circuit denied Defendants' petition for a writ of mandamus to this court and lifted its stay of record-related orders entered by this court and by Magistrate Judge James Orenstein. (Dec. 27, 2017, USCA Order (Dkt. 210).) The Second Circuit rejected Defendants' position that they could unilaterally determine which portions of the administrative record the court could consider, and determined that, in light of the "strong suggestion that the record before the [District Court] was not complete," plaintiffs were entitled to discovery as to whether Defendants had produced a full administrative record. (Id. at 2 (quoting Dopico v. Goldschmidt, 687 F.2d 644, 654 (2d Cir. 1982)) (alteration in original).) Rejecting Defendants' contention that compliance with this court's and Judge Orenstein's record-related orders would burden the Executive Branch, the Second Circuit noted that this court had repeatedly limited the scope of those orders, such that, as the Government conceded, "the number of documents, covered by the order, as modified, is approximately 20,000, a far smaller number than the Government's papers led this court to believe." (Id. at 3-4.) The Second Circuit distinguished In re United States on the grounds that this court had already considered and rejected Defendants' jurisdictional arguments, clarified that the orders in question did not apply to White House documents, and limited the orders to apply to dramatically fewer documents than were at issue in the cases before the Northern District of California. (Id. at 4-5.)

Defendants then moved for the court to certify its November 9 Memorandum and Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). (Mot. to Certify Order for Appeal (Dkt. 219).) They argued that certification would "materially advance the disposition of the litigation" by either "terminat[ing] the litigation" or "clarify[ing] the rights of the parties" and "limiting the claims going forward in this litigation." (Mem. in Supp. of Mot. to Certify Order for Appeal (Dkt. 219-1) at 14.) On January 8, 2018, the court granted Defendants' motion to

J.A. 1450

AR2189

certify the November 9 Memorandum and Order for interlocutory appeal because, among other things, there was "substantial ground for difference of opinion" on the question of whether the DACA rescission was committed to agency discretion by law.  (Jan. 8, 2018, Mem. & Order (Dkt. 233) at 4-6.)  Defendants then argued that the court should delay an oral argument scheduled for January 18, 2018, pending the Second Circuit's consideration of the interlocutory appeal, as "all (or at least most) of [the] district-court proceedings [regarding Defendants' motions to dismiss, Plaintiffs' motions for a preliminary injunction, and the Batalla Vidal Plaintiffs' motion for class certification] will be unnecessary if the Second Circuit accepts some or all of the government's arguments on jurisdiction and justiciability." (Defs. Jan. 11, 2018, Ltr. (Dkt. 236) at 1.)  Before the Second Circuit, however, Defendants abruptly changed tack, agreeing with Plaintiffs "that holding the petition [for interlocutory appeal] in abeyance would be the most efficient course of action," pending this court's consideration of Defendants' motion to dismiss and Plaintiffs' motions for preliminary relief and class certification.  (Reply in Supp. of Pet. for Permission to Appeal (Dkt. 28, Nielsen v. Vidal, No. 18-122 (2d Cir.)) at 2.)[6]

On January 9, 2018, the Northern District of California denied Defendants' motion to dismiss Regents and its companion cases and granted the plaintiffs a preliminary injunction. (Nov. 9, 2018, Order Denying FRCP 12(b)(1) Dismissal and Granting Provisional Relief (Dkt. 234, Regents).)  Like this court, Judge William Alsup rejected Defendants' contentions that the decision to end the DACA program was committed to agency discretion by law and that 8 U.S.C. § 1252(g) barred judicial review of that decision.  (Id. at 18-23.)  Judge Alsup further concluded

---

[6] Defendants' new litigation position is thus directly at odds with its arguments for why this court should certify the November 9 Memorandum and Order.  The court is uncertain whether the inconsistency in Defendants' position should be ascribed to lack of coordination between the Department of Justice's Federal Programs Branch and Civil Appellate staff, or instead to a deliberate attempt to delay the resolution of these cases.  In any event, the court is not pleased that Defendant have requisitioned judicial resources to decide a motion for relief that they seem not to have actually wanted.

21

that the plaintiffs were entitled to a preliminary injunction because they were likely to prevail on the merits of their claim that the decision to rescind the DACA program was substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," because that decision "was based on a flawed legal premise" that the DACA program was illegal. (Id. at 29; see id. at 29-38.) Judge Alsup rejected Defendants' argument that "DHS acted within its discretion in managing its litigation exposure in the Fifth Circuit, weighing its options, and deciding on an orderly wind down of the program so as to avoid a potentially disastrous injunction in the Fifth Circuit" as a "classic post hoc rationalization" and, in any event, insufficient to support the decision to rescind the DACA program because Defendants had neither considered defenses to Texas's potentially imminent suit nor weighed supposed litigation risks against "DACA's programmatic objectives as well as the reliance interests of DACA recipients." (Id. at 38-43.)

## II.    LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A Charles A. Wright et al., Federal Practice and Procedure § 2948, at 130 (2d ed. 1995)) (emphasis omitted). A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).[7] To establish a likelihood of success on the merits, the

---

[7] The Second Circuit has, at times, formulated this standard differently. For example, a party seeking a preliminary injunction may demonstrate the existence of "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in [its] favor," rather than a likelihood of success on the merits. Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010); see

AR2191

party seeking an injunction "need only make a showing that the probability of his prevailing is better than fifty percent." Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988); see also Nken v. Holder, 556 U.S. 418, 434 (2009) ("It is not enough that the chance of success on the merits be 'better than negligible.'" (quoting Sofinet v. INS, 188 F.3d 703, 707 (7th Cir. 1999))). When an injunction is "mandatory," however—that is, when the injunction "alter[s] the status quo by commanding some positive act"—the movant must demonstrate a "clear" or "substantial" showing of likelihood of success. Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995). To obtain a mandatory injunction, a movant must also "make a strong showing of irreparable harm." State of New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citations omitted).

## III. DISCUSSION

For the reasons that follow, Plaintiffs have demonstrated that they are entitled to a preliminary injunction against implementation of the DACA Rescission Memo.

### A. Likelihood of Success on the Merits

First, Plaintiffs are substantially likely to succeed on the merits of their claim that Defendants' decision to end the DACA program was substantively arbitrary and capricious.[8]

---

also id. at 35-38 (holding that this "serious questions" standard survives Winter and other Supreme Court cases applying a "likelihood of success on the merits" standard). The Second Circuit's "serious questions" standard does not apply, however, "[w]hen . . . a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme." Friends of the East Hampton Airport, Inc. v. Town of East Hampton, 841 F.3d 133, 143 (2d Cir. 2016) (internal quotation marks and citation omitted). The court need not decide whether the more permissive "serious questions" standard applies here, as Plaintiffs concede that the "likelihood of success" standard applies here and have met this standard. See generally Haitian Ctrs. Council, Inc. v. McNary, 969 F.2d 1326, 1338-39 (2d Cir. 1992) ("serious questions" standard applies when challenged governmental action is not specifically authorized by statute or regulation), cert. granted and judgment vacated as moot, Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 918 (1993).

[8] The court need not decide whether the injunction sought by Plaintiffs is "mandatory," in that it would compel Defendants to take affirmative acts to adjudicate DACA applications and renewal requests, or non-mandatory, in that it would only preserve the status quo as of September 4, 2017. Because Plaintiffs have demonstrated a "clear" or "substantial" likelihood of success on the merits, they are entitled to a preliminary injunction regardless of the standard that applies.

AR2192

Plaintiffs contend that this decision violated APA § 706(2)(A) because, among other things, it was based on an erroneous legal conclusion that DACA was unlawful, failed to consider important aspects of the problem, and was internally contradictory. (BV Pls. Mot. at 11-20, 23-27; State Pls. Mot. at 5-13.) Defendants aver, however, that the decision reflects a reasonable assessment of litigation risk. (Defs. Opp'n at 1, 10-13, 15-24.) Based on the record before it, the court concludes that Plaintiffs, not Defendants, are substantially likely to be correct.

1. The Stated Rationale for Rescinding DACA Appears To Be Arbitrary and Capricious

Plaintiffs have identified at least three respects in which Defendants' decision to rescind the DACA program appears to be arbitrary, capricious, and an abuse of discretion. First, the decision rests on the erroneous legal conclusion that the DACA program is unlawful and unconstitutional. Second, the decision rests on the erroneous factual premise that courts have determined that the DACA program violates the Constitution. Third, the stated rationale for that decision is internally contradictory, as Defendants have continued to grant DACA renewal requests despite ending the DACA program on the grounds that it is, by their lights, unconstitutional. The court addresses each of these reasons in turn.

a. *The Decision Relies on the Legally Erroneous Premise that DACA Is Illegal*

An agency decision that is based on an erroneous legal premise cannot withstand arbitrary-and-capricious review. See 5 U.S.C. § 706(2)(A). It is well-established that when "[agency] action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law." Chenery I, 318 U.S. at 94. Accordingly, numerous courts have recognized that agency action based on a misconception of the applicable law is arbitrary and capricious in substance. See, e.g., Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 86-87 (2d Cir. 2006); Transitional Hosps.

24

AR2193

Corp. of La., Inc. v. Shalala, 222 F.3d 1019, 1029 (D.C. Cir. 2000) (Garland, J.); see also

Planned Parenthood Fed. of Am., Inc. v. Heckler, 712 F.2d 650, 666 (D.C. Cir. 1983) (Bork, J.,

concurring in part and dissenting in part) ("If a regulation is based on an incorrect view of

applicable law, the regulation cannot stand as promulgated . . . ." (internal quotation marks and

citation omitted)).  That is no less true when an agency takes some action based on an erroneous

view that the action is compelled by law, notwithstanding that the agency could have taken the

same action on policy grounds.  "An agency action, however permissible as an exercise of

discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an

erroneous view of the law.'"  Sea-Land Serv., Inc. v. Dep't of Transp., 137 F.3d 640, 646 (D.C.

Cir. 1998) (quoting Prill v. NLRB, 755 F.2d 941, 947 (D.C. Cir. 1985)).  This rule is consistent

with cases from outside the administrative-law context, which make clear that a decision based

on "an erroneous view of the law" is "by definition" or "necessarily" an abuse of discretion.

Koon v. United States, 518 U.S. 81, 100 (1996); Cooter & Gell v. Hartmarx Corp., 496 U.S. 384,

405 (1990).  This rule also ensures that agencies are accountable for their decisions:  If an agency

makes a decision on policy grounds, it must say so, not act as if courts have tied its hands.  The

court therefore considers whether Defendants' decision to rescind the DACA program relied on

25

AR2194

an erroneous view of the law. This review is de novo. 5 U.S.C. § 706; J. Andrew Lange, Inc. v. FAA, 208 F.3d 389, 391 (2d Cir. 2000).[9]

Fairly read, the Sessions Letter and DACA Rescission Memo indicate only that Defendants decided to end the DACA program because they believed that it was illegal. (While Defendants now argue that the decision was based on "litigation risk," the record does not support this contention, as the court explains below.) The DACA Rescission Memo offers no independent legal reasoning as to why Defendants believed the DACA program to be unlawful, so the court turns to the Sessions Letter. In that letter, the Attorney General offered two discernible bases for his opinion that the DACA program violated the law and should end: first, that it was unconstitutional, and second, that it "has the same legal and constitutional defects that the courts recognized as to DAPA." (Sessions Ltr.) Neither conclusion is sustainable.

_____

[9] While in other contexts, an agency's interpretation of a statute it is charged with administering may be entitled to deference, Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984), Defendants have not argued that their interpretation of the legality of the DACA program is entitled to formal or controlling deference. That is for good reason. Because neither the Sessions Letter nor the DACA Rescission Memo carry the "force of law," they do not warrant Chevron deference. United States v. Mead Corp., 533 U.S. 218, 226-27 (2001). Moreover, Defendants' views about the legality of the DACA program turn not only on whether that program was consistent with the INA (their interpretations of which are entitled to deference, see INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999)), but also whether that program constituted a "substantive rule" under the APA. Because Defendants are not charged with implementing the APA, their views about whether the DACA program should have been implemented through notice-and-comment rulemaking are not entitled to deference. See Shell Offshore Inc. v. Babbitt, 238 F.3d 622, 627 (5th Cir. 2001). Finally, it almost goes without saying that, to the extent Defendants determined that the DACA program was unconstitutional, that determination does not warrant Chevron deference.

Some academic commentators have offered interesting arguments as to why courts should review deferentially Defendants' decision to end the DACA program. See, e.g., Josh Blackman, Understanding Sessions's Justification to Rescind DACA, Lawfare (Jan. 16, 2018, 8:00 AM), https://www.lawfareblog.com/understanding-sessionss-justification-rescind-daca (arguing, based on an "admittedly charitable" reading of the Sessions Letter, that Regents erred by, among other things, failing to consider how the Attorney General's independent duty to defend the Constitution supported his decision to recommend ending the DACA program); Zachary Price, Why Enjoining DACA's Cancellation Is Wrong, Take Care Blog (Jan. 12, 2018), https://takecareblog.com/blog/why-enjoining-daca-s-cancellation-is-wrong (arguing that "[i]nsofar as DACA was simply an exercise of enforcement discretion, any explanatory burden with respect to its reversal must be minimal"). Defendants themselves have not pressed these arguments before this court, arguing instead that, if their decision is indeed subject to judicial review, it should be reviewed under the ordinary arbitrary-and-capricious standard of APA § 706(2)(A). (Defs. Opp'n at 10-11.)

26

i.   The Attorney General Erred in Concluding that DACA Is
     Unconstitutional

As noted above, the Attorney General concluded that DACA was unconstitutional

because it "was effectuated by the previous administration through executive action, without

proper statutory authority and with no established end-date, after Congress' repeated rejection of

proposed legislation that would have accomplished a similar result" and "an open-ended

circumvention of immigration laws." (Sessions Ltr.)  This conclusory statement does not

support the proposition that DACA is unconstitutional.

DACA is not unconstitutional simply because it was implemented by unilateral,

executive action without express congressional authorization.  The Executive Branch has wide

discretion not to initiate or pursue specific enforcement actions.  Chaney, 470 U.S. at 831-32.

Immigration officials have particularly "broad discretion" in deciding whom to deport, deriving

both from the considerations specific to the Executive Branch in the foreign-policy arena,

Arizona, 567 U.S. at 396, and from the fact that far more removable aliens reside in this country

than DHS has resources to deport, OLC Op. at 1; see also Adam B. Cox & Cristina M.

Rodríguez, The President and Immigration Law, 119 Yale L.J. 458, 510-19 (2009).  Every

modern presidential administration has relied on extra-statutory discretionary-relief programs to

shield certain removable aliens from deportation.  Far from cabining this authority, Congress has

amended the INA in ways that expressly acknowledge the Executive Branch's power to decline

to initiate removal proceedings against certain removable aliens.  It thus cannot be the case that,

by recognizing that certain removable aliens represented lower enforcement priorities than

others, the DACA program violates the Constitution.

Nor is DACA unconstitutional because it identified a certain category of removable

aliens—individuals who were brought to the United States as children, lacked meaningful

27

AR2196

criminal histories, and had met educational or military-service requirements—as eligible for favorable treatment. The court is aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action. It is surely within DHS's discretion to determine that certain categories of removable alien—felons and gang members, for example—are better uses of the agency's limited enforcement resources than law-abiding individuals who entered the United States as children. Indeed, unless deferred-action decisions are to be entirely random, they necessarily must be based at least in part on "categorical" or "class-based" distinctions. See Arpaio v. Obama, 27 F. Supp. 3d 185, 210 (D.D.C. 2014) (DACA "helps to ensure that the exercise of deferred action is not arbitrary and capricious, as might be the case if the executive branch offered no guidance to enforcement officials. It would make little sense for a Court to strike down as arbitrary and capricious guidelines that help ensure that the Nation's immigration enforcement is not arbitrary but rather reflective of congressionally-directed priorities."). The court cannot see how the use of such distinctions to define eligibility for a deferred-action program transforms such a program from discretionary agency action into substantive lawmaking and (somehow) an encroachment on the separation of powers.

Lastly, DACA is not unconstitutional because, as the Attorney General put it, that program was implemented "after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." (Sessions Ltr.) The "proposed legislation" to which the Attorney General referred would not have "accomplished a similar result" to DACA. The DREAM Act, in its many variations, would have offered its beneficiaries a formal immigration status and a pathway to lawful permanent residency. See, e.g., Development, Relief, and

28

Education for Alien Minors Act of 2011, S. 952 (112th Cong.); <u>Regents</u>, 2018 WL 339144, at 20

n.15 (collecting proposed legislation).  DACA, on the other hand, offers only forbearance from

deportation, along with work authorization, and does <u>not</u> provide an immigration status or a

pathway to citizenship.  (2012 DACA Memo at 4.)

  Even if the DREAM Act had offered benefits similar to those conveyed by DACA, it

does not follow that Congress's failure to enact a DREAM Act precluded the Executive Branch

from enacting the DACA program.  The court does not see how executive action, taken either

"pursuant to an express or implied authorization of Congress" or "in the absence of either a

congressional grant or denial of authority," becomes unconstitutional simply because Congress

has considered and failed to enact legislation that would accomplish similar ends.  <u>See</u>

<u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 635-37 (1952) (Jackson, J.,

concurring).  Fruitless congressional consideration of legislation is not itself law, <u>see</u> U.S. Const.

art. I, § 7, cl. 2, and is an unconvincing basis for ascertaining the "implied will of Congress" to

oust the President from acting in the space contemplated by the proposed but un-enacted

legislation, <u>see</u> <u>Youngstown Sheet & Tube</u>, 343 U.S. at 637 (Jackson, J., concurring).  It strikes

the court as improbable that, if the President has some authority, any Member of Congress can

divest the President of that authority by introducing unsuccessful legislation on the same subject.

  To the extent the decision to end the DACA program was based on the Attorney

General's determination that the program is unconstitutional, that determination was legally

erroneous, and the decision was therefore arbitrary and capricious.  The court does not address

whether the DACA program might be unconstitutional on grounds other than those identified by

the Attorney General, as any such grounds are not fairly before the court.

<div align="center">29</div>

AR2198

ii. The Attorney General Erred in Concluding that DACA Has the
"Same Legal and Constitutional Defects that the Courts
Recognized as to DAPA"

Nor can the Attorney General's determination that DACA is unlawful rest on the ground

that "the DACA policy has the same legal and constitutional defects that the courts recognized as

to DAPA." (Sessions Ltr.) That rationale is arbitrary and capricious not only because it is

premised on an obvious factual mistake that courts had recognized "constitutional defects" in

DAPA, as the court explains in the next subsection, but also because it is legally erroneous. The

Southern District of Texas enjoined the implementation of the DAPA program on the grounds

that DAPA was not promulgated through notice-and-comment rulemaking, and the Fifth Circuit

affirmed, adding the additional ground for affirmance that DAPA was substantively arbitrary and

capricious because it conflicted with the INA. The court is unpersuaded that either ground

applies to DACA.

*(I) DACA Was Not a Legislative Rule.*

DACA does not appear to have been a "legislative" rule that was subject to notice-and-

comment rulemaking. The APA generally requires agencies to make "rules" through notice-and-

comment procedures, but provides an exception for "interpretative rules, general statements of

policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553. The line

between legislative rules (which are subject to notice and comment) and non-legislative rules

(which are not) is not always clear. See Chrysler Corp. v. Brown, 441 U.S. 281, 301-03 (1979);

Noel v. Chapman, 508 F.2d 1013, 1029-30 (2d Cir. 1975) (characterizing this distinction as

"enshrouded in considerable smog"). In general, however, "legislative rules are those that

'create new law, rights, or duties, in what amounts to a legislative act.'" Sweet v. Sheahan, 235

F.3d 80, 91 (2d Cir. 2000) (quoting White v. Shalala, 7 F.3d 296, 303 (2d Cir. 1993)). A rule is

AR2199

legislative if it creates a "binding norm." <u>Bellarno Int'l Ltd. v. FDA</u>, 678 F. Supp. 410, 412

(E.D.N.Y. 1988) (quoting <u>Am. Bus Ass'n v. United States</u>, 627 F.2d 525, 529 (D.C. Cir. 1980)).

General statements of policy, on the other hand, do not "change 'existing rights and obligations'"

of those regulated, but instead state the agency's "general policy" or "are rules directed primarily

at the staff of an agency describing how it will conduct agency discretionary functions." <u>Noel</u>,

508 F.2d at 1030 (quoting <u>Lewis-Mota v. Sec'y of Labor</u>, 469 F.2d 478, 482 (2d Cir. 1972))

(internal quotation marks and additional citation omitted); <u>see also</u> <u>Chrysler</u>, 441 U.S. at 302

n.31 ("General statements of policy are statements issued by an agency to advise the public

prospectively of the manner in which the agency proposes to exercise a discretionary power."

(internal quotation marks and citation omitted)).

On its face, the 2012 DACA Memo is plainly a "general statement of policy," not a

substantive rule. That memo described how, as a matter of agency policy, DHS would exercise

its prosecutorial discretion with respect to a discrete class of individuals without lawful

immigration status, and directed DHS staff to implement procedures to facilitate that exercise of

discretion. Most importantly, the memo stated that it created no substantive right, that all DACA

applications would be adjudicated on an individualized basis, and that the agency retained

discretion to deny or revoke deferred action or work authorization. Based on the text of the 2012

DACA Memo, the court cannot say that the creation of the DACA program either "imposed any

rights and obligations" on DHS or the public, or did not "genuinely [leave] the agency and its

decisionmakers free to exercise discretion." <u>Clarian Health W., LLC v. Hargan</u>, 878 F.3d 346,

357 (D.C. Cir. 2017) (internal quotation marks and citation omitted).

To determine whether a rule is properly classed as "legislative" or as a "general statement

of policy," some courts have also considered whether the agency has characterized or treated the

31

J.A. 1461

AR2200

rule as binding. Id. In determining that the DAPA program constituted a legislative rule, the

Southern District of Texas focused on the purportedly binding effect that DAPA would have on

the agency. Texas, 86 F. Supp. 3d at 668-72. Judge Hanen reached that conclusion by

determining that DACA had been implemented in such a way as to deprive agency employees of

true discretion to evaluate DACA applications on a case-by-case basis, including that (1) the

"operating procedures" for implementing DACA were quite long; (2) DACA applications were

adjudicated by service-center staff, not field-office employees, using a check-the-box form; (3)

certain DACA denials were subject to review by a supervisor; (4) "there is no option for granting

DAPA to an individual who does not meet each criterion"; and (5) nearly all DACA applications

were granted, and those that were denied were uniformly denied for mechanical reasons or fraud.

Id. at 669 & nn.98-101.

     The court respectfully finds the Southern District of Texas's analysis unpersuasive. First,

that court appears to have conflated the discretion of the agency with that of individual USCIS

employees. (See Br. for the United States at 68-71, Texas v. United States, 136 S. Ct. 2271

(2016) (No. 15-674).) The 2012 DACA Memo indicated how DHS would exercise its discretion

by treating certain individuals as lower priorities for removal. Because the 2012 DACA Memo

created no substantive rights, it in no way constrained the agency's discretion in the enforcement

of immigration laws, even if it might have affected how rank-and-file USCIS employees

reviewed specific requests for deferred action. (See id.) Second, even accepting that the relevant

focus of this inquiry is the discretion of rank-and-file employees, the court views the first four

factors on which the Southern District of Texas relied as insufficient to support an inference that

DHS did not exercise discretion in adjudicating DACA applications. As for the fifth factor—that

DHS supposedly granted too many DACA applications—the court finds persuasive the

AR2201

observation by the dissenting judge in the Fifth Circuit that the district court appears to have erroneously conflated <u>rejections</u> of DACA applications, which were made on intake for mechanical reasons, and <u>denials</u>, which were made "when a USCIS adjudicator, on a case-by-case basis, determines that the requestor has not demonstrated that they satisfy the guidelines for DACA or when an adjudicator determines that deferred action should be denied even though the threshold guidelines are met." <u>Texas</u>, 809 F.3d at 210 (King, J., dissenting). To the contrary, as of December 2014, DHS had denied nearly 40,000 DACA applications out of the more than 700,000 applications accepted for processing at USCIS service centers, and rejected more than 40,000 applications for administrative reasons. <u>Id.</u> at 210 n.44. This rejection rate hardly "suggests an agency on autopilot" and is "unsurprising given the self-selecting nature of the program." <u>Id.</u> at 210 & n.44; <u>see also</u> <u>Arpaio</u>, 27 F. Supp. 3d at 209 n.13 (noting that similar statistics "reflect that . . . case-by-case review is in operation"). To the extent Defendants rely on <u>Texas</u> for the proposition that the DACA program (which was not challenged in that litigation) was illegal because it was not made through notice-and-comment rulemaking, such reliance is arbitrary and capricious.

### (II) DACA Does Not Conflict with the INA

Nor may Defendants rely on <u>Texas</u> for the proposition that the DACA program conflicts with the INA. As noted above, the Fifth Circuit held that the DAPA program was not only procedurally invalid, but also substantively arbitrary and capricious because it conflicted with the INA. <u>Texas</u>, 809 F.3d at 178-86. That is because, in the view of the Fifth Circuit, the INA prescribes the exclusive means by which aliens may obtain "lawful immigration classification from their children's immigration status," and because Congress could not have intended to delegate to DHS the authority to designate approximately four million undocumented

33

AR2202

Appeal: 18-1521    Doc: 5228-3    Filed: 07/02/2018    Pg: 870 of 2054    Page 951 of 1026 PageID #:
10542
Case 1:16-cv-04756-NGG-JO    Document 254    Filed 02/13/18    Page 34 of 55 PageID #: 4200
Case 8:17-cv-02942-RWT    Document 40-1    Filed 02/14/18    Page 34 of 55

immigrants as lawfully present and able to work in this country.  See id.  To the extent
Defendants relied, without additional explanation, on this decision as grounds for ending the
DACA program, they acted arbitrarily and capriciously, for two reasons.

First, not all the grounds on which the Fifth Circuit decided that DAPA was substantively
arbitrary and capricious apply to the DACA program.  For example, the Fifth Circuit inferred
that by creating procedures by which alien parents of U.S. citizens may obtain lawful status,
Congress implicitly prohibited the Executive Branch from granting deferred action and work
authorization to such individuals based on more permissive criteria.  Even if the court were to
accept that dubious logic, it would not apply to DACA, because there is no analogous procedure
by which aliens brought to the United States as children may seek to obtain lawful status on that
basis.  (BV Pls. Mot. at 25; Br. of Amicus Curiae Legal Services Organizations (Dkt. 193) at 6.)
The Fifth Circuit also relied extensively on the magnitude of the DAPA program, reasoning that
Congress could not have intended the Executive Branch to decide whether more than four
million undocumented immigrants could obtain deferred action and work authorization.  Texas,
809 F.3d at 179, 181-82, 184 & n.197.  Again, even accepting that proposition, it is not clear
why it would apply to the DACA program, which is open to far fewer individuals than DAPA
would have been, and which is roughly the same scale as the Family Fairness program enacted
by the Reagan and George H.W. Bush Administrations in the 1980s.

Second, to the extent that the Fifth Circuit's rationale applies to the DACA program, the
court finds it unpersuasive.  It does not follow that by prescribing procedures by which some
aliens may obtain lawful status, Congress implicitly barred the Executive Branch from granting
those or other aliens deferred action and work authorization, a relatively meager and unstable set
of benefits (if, indeed, they can even be described as such).  Nor is the court convinced that by

J.A. 1464

AR2203

Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 952 of 1026 PageID #: 10543
Case 1:16-cv-04756-NGG-JO   Document 254   Filed 02/13/18   Page 35 of 55 PageID #: 4201
Case 8:17-cv-02942-RWT   Document 40-1   Filed 02/14/18   Page 35 of 55

expressly recognizing that certain discrete populations of aliens are eligible for deferred action, Congress implicitly precluded the Executive Branch from according deferred action to other aliens; to the contrary, the court views these enactments as ratifying the Executive Branch's longstanding historical practice, rooted in the INA, of forbearing from pursuing deportation proceedings against particular aliens and categories of alien. The court respectfully finds the Fifth Circuit's attempts to distinguish DAPA from prior discretionary-relief programs unpersuasive, as this court does not see what in the INA permits immigration officials to accord discretionary relief "on a country-specific basis," as a "bridge[] from one legal status to another," or as an adjunct to "a statutory legalization scheme," id. at 184, but not to generally law-abiding parents of U.S. citizens or lawful permanent residents—or, for that matter, individuals who were brought to the United States as children.

For these reasons, and for the reasons stated by the Office of Legal Counsel, the dissent in Texas, and by the Office of the Solicitor General in its brief to the U.S. Supreme Court in Texas, the court concludes that DACA is lawful and not arbitrary, capricious, or contrary to the INA. See Texas, 809 F.3d at 214-18 (King, J., dissenting); OLC Op.; Br. for the United States at 61-65, Texas v. United States, 136 S. Ct. 2271 (2016) (No. 15-674). Defendants acted arbitrarily and capriciously by ending the DACA program based on the erroneous legal conclusion that DACA is either unconstitutional or "has the same legal and constitutional defects that the courts recognized as to DAPA."

> b. *The Decision Relies on a Factually Erroneous Premise that Courts Have Determined that DACA Is Unconstitutional*

This conclusion was also arbitrary and capricious because it is based on an obvious factual mistake. In concluding that the Southern District of Texas and Fifth Circuit would enjoin the continued operation of the DACA program, Defendants appear to have relied on the premise

J.A. 1465                                                          AR2204

that those courts have recognized "constitutional defects . . . as to DAPA." (Sessions Ltr.; DACA Rescission Memo at 3.) This premise is flatly incorrect. The Southern District of Texas enjoined the implementation of DAPA, and the Fifth Circuit affirmed that injunction, on the grounds that DAPA violated the APA. 809 F.3d at 170-86; 86 F. Supp. 3d at 665-72. Both courts expressly declined to reach the plaintiffs' constitutional claim that DAPA violated the Take Care Clause of the U.S. Constitution, see U.S. Const. art. II, § 3, or the separation of powers. 809 F.3d at 154; 86 F. Supp. 3d at 677. Defendants do not attempt to defend this factual premise as correct. (Cf. Defs. Opp'n at 26-27.)

This error alone is grounds for setting aside Defendants' decision. "[A]n agency decision is arbitrary and must be set aside when it rests on a crucial factual premise shown by the agency's records to be indisputably incorrect." Mizerak v. Adams, 682 F.2d 374, 376 (2d Cir. 1982); see also State Farm, 463 U.S. at 43 (agency acts arbitrarily and capriciously by "offer[ing] an explanation for its decision that runs counter to the evidence before the agency"); City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev., 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard."). Because neither the Southern District of Texas nor the Fifth Circuit "recognized" any "constitutional defects" in the DAPA policy, Defendants' reliance on this erroneous factual premise was arbitrary and capricious.

Nor was this error harmless. Although judicial review under the APA takes "due account . . . of the rule of prejudicial error," 5 U.S.C. § 706, "the standard for demonstrating lack of prejudicial error is strict. 'Agency mistakes constitute harmless error [under APA § 706] only where they clearly had no bearing on the procedure used or the substance of decision reached.'"

N.Y. Pub. Interest Research Grp. v. Whitman, 321 F.3d 316, 334 n.13 (2d Cir. 2003) (alteration in original) (quoting Sierra Club v. U.S. Fish & Wildlife Serv., 245 F.3d 434, 444 (5th Cir. 2001)).  That cannot be said here, as the Attorney General's opinion that DACA was unlawful appears to have been based in significant part on his judgment that the program was unconstitutional and on the Texas courts' decision to enjoin implementation of DAPA.  The current record furnishes no basis for this court to conclude that the Attorney General would have reached the same conclusion had he correctly understood the holdings of the Texas courts.

<p style="text-align:center"><em>c.  The Decision's Rationale Is Internally Contradictory</em></p>

Finally, Defendants' decision to rescind the DACA program was arbitrary and capricious because it appears to be internally inconsistent.  See, e.g., Nat'l Res. Def. Council v. U.S. Nuclear Regulatory Comm'n, — F.3d —, 2018 WL 472547, at *9 (D.C. Cir. 2018) ("Of course, it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'" (citation omitted)); Gen. Chem. Corp. v. United States, 817 F.2d 844, 846 (D.C. Cir. 1978) (per curiam) (vacating decision based on "internally inconsistent and inadequately explained" analysis).  Defendants clearly ended the DACA program at least partly because the Attorney General viewed the program as unconstitutional.[10]  (Sessions Ltr.; DACA Rescission

---

[10] It is not clear that the Attorney General's views are those of the Administration he serves.  On September 5, 2017, President Trump tweeted that "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do).  If they can't, I will revisit this issue!"  (Donald J. Trump, @realdonaldtrump, Twitter.com (Sept. 5, 2017, 7:38 PM), https://twitter.com/realdonaldtrump/status/905228667336499200.)  It is not clear how the President would "revisit" the decision to rescind the DACA program if the DACA program were, as the Attorney General has stated, "an unconstitutional exercise of authority by the Executive Branch."  (Sessions Ltr.)  See Josh Blackman, Trump's DACA Decision Defies All Norms: The President's Incompetence Continues to Temper His Malevolence, Foreign Policy (Sept. 7, 2017, 1:26 PM), http://foreignpolicy.com/2017/09/07/trumps-daca-decision-defies-all-norms/.  Defendants' contention that the President simply "emphasized the need for legislative action and expressed [his] intention to revisit Administration policies on childhood arrivals—not the legality and defensibility of the DACA program—if Congress did not timely act" (Defs. Opp'n at 33) is unsupported by the text of the President's tweet.

<p style="text-align:center">37</p>

<p style="text-align:center">J.A. 1467</p>

<p style="text-align:right">AR2206</p>

Memo at 3.)[11]  Rather than terminating the program forthwith, however, Acting Secretary Duke directed her subordinates to begin a phased "wind-down of the program," under which DHS would continue to renew DACA applications that were set to expire in the next six months and would honor existing DACA benefits until they expired.  The means by which Defendants ended the DACA program thus appear to conflict with their stated rationale for doing so.  If the DACA program was, in fact, unconstitutional, the court does not understand (nor have Defendants explained) why Defendants would have the authority to continue to violate the Constitution, albeit at a reduced scale and only for a limited time.

It is true but immaterial that the DACA Rescission memo provided that DHS would adjudicate all remaining DACA applications and renewal requests "on an individual, case-by-case basis."  (DACA Rescission Memo at 4.)  The 2012 DACA Memo also stated that all DACA applications and renewal requests would be considered on an individual, case-by-case basis (2012 DACA Memo at 1-3), but, in Defendants' view, that was insufficient to render the program lawful.  More importantly, if DHS could render the DACA program constitutional by adjudicating the remaining DACA applications and renewal requests on an "individual, case-by-case" basis, then there was nothing inherently unconstitutional about the DACA program—only how rank-and-file USCIS employees were implementing that program—and a key reason for ending that program would disappear.

Defendants attempt to sidestep this problem by arguing that there was nothing inherently contradictory about Acting Secretary Duke's decision to allow the DACA program "to gradually sunset" despite having "concern[s] about [the program]'s legality."  (Defs. Opp'n at 30.)  The

---

[11] Defendants' arguments that "Plaintiffs identify nothing contradictory about the <u>Acting Secretary's</u> stated justification for the [decision to rescind the DACA program]" (<u>cf.</u> Defs. Opp'n at 29-30) are thus once again belied by the record.

AR2207

record makes clear, however, that Defendants ended the program because they believed it to be unconstitutional and unlawful, not because they had "concern[s]" about its legality. (Sessions Ltr.; DACA Rescission Memo at 3-4.) Defendants' post hoc rationalization is thus unavailing. At the very least, Defendants' failure to acknowledge and explain the apparent conflict between their determination that the DACA program was unconstitutional and their plan to continue adjudicating a subset of DACA renewal requests renders their decision arbitrary and capricious.

2. <u>Defendants' Alternative Grounds for Upholding the DACA Rescission Are Unpersuasive</u>

Defendants offer two reasons why the court should uphold the decision to end the DACA program. First, they argue, that decision was reasonable in light of the risk that the plaintiffs in the <u>Texas</u> litigation would amend their complaint to challenge the DACA program and that the Southern District of Texas would strike down the DACA program. (<u>E.g.</u>, Defs. Opp'n at 11.) Second, they argue that the court should construe the Attorney General's legal judgment that the DACA program was unlawful as an "independent policy judgment . . . that immigration decisions of this magnitude should be left to Congress." (Defs. Opp'n at 25.) Neither argument is persuasive.

a. *The DACA Rescission Cannot Be Sustained on the Basis of Defendants' "Litigation Risk" Argument*

Defendants frame the decision to end the DACA program as motivated primarily by "litigation risk." (Id. at 1, 10-13, 15-24.) In their view, Acting Secretary Duke considered the Government's losses in the <u>Texas v. United States</u> litigation and the threat by some of the plaintiffs in that litigation to challenge the DACA program and ultimately "concluded that maintaining the DACA [program] would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty."

39

AR2208

(Id. at 11.)  That decision, they argue, was reasonable, not arbitrary or capricious, "particularly in view of the near-certain litigation loss in the pending Texas lawsuit."  (Id.)

The record does not support Defendants' contention that they based their decision on a reasonable assessment of litigation risk.  As the court has previously noted, the record, fairly read, indicates that Defendants ended the DACA program because they believed it to be illegal. The only basis for Defendants' "litigation risk" argument is the Attorney General's statement that, because DACA shared the flaws of the DAPA program, "it is likely that potentially imminent litigation would yield similar results with respect to DACA."  (Sessions Ltr.)  This is too thin a reed to bear the weight of Defendants' "litigation risk" argument.  While the court must uphold an agency decision "of less than ideal clarity . . . if the agency's path may reasonably be discerned," Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), the court cannot discern a reasoned assessment of "litigation risk" in this conclusory statement.  See also Chenery II, 332 U.S. at 196-97 (stating that the grounds on which an agency reaches its decision "must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.").  The Administrative Record does not indicate, for example, that the Attorney General made any reasoned assessment of the likelihood that DACA would be struck down in light of its similarities to, or differences from DAPA; that he considered any potential defenses to the "potentially imminent litigation"; that he acknowledged contrary rulings by other courts; or that he assessed whether Department of Justice resources would be better spent elsewhere.  The court thus cannot conclude that the Attorney General actually considered "litigation risk" in any

40

AR2209

meaningful sense. Absent Defendants' post hoc explanations, the court would not have guessed that Defendants made their decision for this reason.

The court views this "litigation risk" rationale as a mere post hoc rationalization, which is insufficient to withstand arbitrary-and-capricious review. State Farm, 463 U.S. at 50; Burlington Truck Lines, 371 U.S. at 168-69. Indeed, it is telling that, to substantiate their argument that the DACA rescission was motivated by concern for DACA recipients and a desire to avoid a disorderly shut-down of the program, Defendants resort to a press release, issued by Acting Secretary Duke, that fleshes out her reasons for ending the DACA program. (Defs. Opp'n at 12 (quoting Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/statement-acting-secretary-duke-rescission-deferred-action-childhood-arrivals-daca).) That press release is not in the record, however, so the court may not consider it. See Overton Park, 401 U.S. at 419-20. While Defendants assert that this rationale is reasonably discernible because Plaintiffs addressed it in their briefs (Defs. Opp'n at 12), Plaintiffs cannot be faulted for responding to an argument that Defendants have made throughout this litigation.[12]

Even if the record indicated that Defendants made their decision based on "litigation risk," they acted arbitrarily and capriciously in doing so. The Attorney General's conclusory statement that it was "likely that potentially imminent litigation would yield similar results with respect to DACA" falls well short of the APA's "requirement that an agency provide reasoned explanation for its action." Fox Television Stations, 556 U.S. at 516. For example, the record

---

[12] Judge Alsup found in Regents that "[n]owhere in the administrative record did the Attorney General or [DHS] consider whether defending the program in court would (or would not) be worth the litigation risk." Regents, 2018 WL 339144, at *23. As such, "[t]he new spin by government counsel is a classic post hoc rationalization," which "alone is dispositive of the new 'litigation risk' rationale." Id.

Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 959 of 1026 PageID #: 10550

Case 1:16-cv-04756-NGG-JO   Document 254   Filed 02/13/18   Page 42 of 55 PageID #: 4208
Case 8:17-cv-02942-RWT   Document 40-1   Filed 02/14/18   Page 42 of 55

before the court offers no indication that Defendants considered <u>why</u> the Southern District of Texas would strike down the DACA program (which was not initially challenged in <u>Texas</u> and which lacked certain attributes of the DAPA program that were critical to the Fifth Circuit's decision that that program was contrary to the INA). Nor does the record indicate that Defendants considered—independent of their opinion that DACA was illegal—why litigating the rescission of DACA was preferable to litigating the decision to maintain the program. <u>See</u> <u>Organized Vill. of Kake v. U.S. Dep't of Agric.</u>, 795 F.3d 956, 970 (9th Cir. 2015) (en banc) (litigation-risk rationale was arbitrary and capricious where agency's decision "predictably led to . . . lawsuit" and "[a]t most . . . deliberately traded one lawsuit for another"). To the extent that Defendants now argue that their decision was based on a desire to avoid the harms that could result to DACA beneficiaries from a disorderly end to the program, the record offers absolutely no indication that Defendants considered these impacts. While Defendants ask the court to infer a persuasive rationale from their conclusory statements and from the Southern District of Texas's and Fifth Circuit's opinions in <u>Texas</u>, it is not the court's job to "supply a reasoned basis for the agency's action that the agency itself has not given." <u>State Farm</u>, 463 U.S. at 43. Even accepting for the sake of argument that the record provides some support for Defendants' "litigation risk" rationale, that rationale is so inscrutable and unexplained that reliance upon it was arbitrary and capricious.

Even accepting for the sake of argument that "litigation risk" furnished a discernible, reasoned basis for Defendants' decision to end the DACA program, Defendants nevertheless acted arbitrarily and capriciously by ending that program without taking any account of reliance interests that program has engendered. To withstand review under the APA's arbitrary-and-capricious standard, an agency that is changing its policy need not explain why the reasons for

42

AR2211

the new policy are better than the reasons for the old policy. Fox Television Stations, 556 U.S. at 514-15. The agency must nevertheless engage in reasoned decisionmaking, which, among other things, means that the agency must consider "serious reliance interests" engendered by the previous policy. Id. at 515; see also Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125-27 (2016).

Plaintiffs identify a number of reliance interests engendered by the DACA program, including that, in reliance on the continued existence of the program, DACA recipients have "raised families, invested in their education, purchased homes and cars, and started careers" (BV Pls. Mot. at 16; State Pls. Mot. at 9-10); employers have hired, trained, and invested time in their DACA-recipient employees (BV Pls. Mot. at 17; State Pls. Mot. at 10); educational institutions have enrolled DACA recipients who, if they lose their DACA benefits, may be forced to leave the United States or may see little need to continue pursuing educational opportunities (BV Pls. Mot. at 17; State Pls. Mot. at 10); and states have expended resources modifying their motor-vehicle and occupational licensing regimes to accommodate DACA recipients (State Pls. Mot. at 10 & n.18). The record does not indicate that Defendants acknowledged, let alone considered, these or any other reliance interests engendered by the DACA program. That alone is sufficient to render their supposedly discretionary decision to end the DACA program arbitrary and capricious.

Defendants' arguments to the contrary are unpersuasive. First, Defendants appear to argue that they did not need to discuss reliance interests because "controlling legal precedent" had changed. (Defs. Opp'n at 15.) That argument confuses the requirement that the agency show "that there are good reasons for the new policy" with the requirement that it not ignore "serious reliance interests that must be taken into account" when amending or rescinding an

43

AR2212

existing policy. <u>Fox Television Stations</u>, 556 U.S. at 515. In any event, it is hard to reconcile this argument—in effect, that Defendants were compelled to terminate the DACA program—with their insistence elsewhere that the decision to end the DACA program was discretionary and the product of reasoned deliberation.

Next, Defendants appear to contend that they did not need to consider reliance interests engendered by the DACA policy because those interests were not "longstanding" or serious, to the extent they existed. (Defs. Opp'n at 16-17.) It is true that DACA recipients received deferred action and work authorization for only two years at a time, that DHS retained discretion to revoke those benefits at any time, and that the 2012 DACA Memo "confer[red] no substantive right." (2012 DACA Memo at 3; Defs. Opp'n at 17.) As a practical matter, however, it is obvious that hundreds of thousands of DACA recipients and those close to them planned their lives around the program. It is unrealistic to suggest that these reliance interests were not "serious" or "substantial" simply because DHS retained the ability to terminate DACA recipients' deferred action at its discretion.

Moreover, the court does not see why the contingent, discretionary nature of DACA benefits means that, as Defendants argue, DACA recipients had no "legally cognizable reliance interests—and certainly not beyond the stated duration" in the continued existence of the DACA program. (Defs. Opp'n at 17.) In so contending, Defendants cross-reference their argument, made in their October 27 Motion to Dismiss, that DACA beneficiaries had no "'protected entitlement' <u>for due process purposes</u>" because "'government officials may grant or deny [DACA benefits] in their discretion.'" (Defs. Oct. 27, 2017, Mot. to Dismiss (Dkt. 95) ("Defs. Oct. 27 MTD") at 35 (quoting <u>Town of Castle Rock v. Gonzales</u>, 545 U.S. 748, 756 (2005)) (emphasis added).) Even accepting for the sake of argument that DACA recipients had no

44

AR2213

constitutionally protected liberty or property interests in the continued existence of the DACA program and the renewal of their particular DACA applications, it does not follow that they had no <u>reliance</u> interests therein, such that Defendants were free to end the DACA program without considering such interests. <u>Encino Motorcars</u> is instructive: A car dealer may have not have a Fifth Amendment entitlement to the Department of Labor's hewing to a particular interpretation of the Fair Labor Standards Act, but that does not mean that the Department is free to disregard reliance interests engendered by the longstanding interpretation of the Act when it alters its regulations. <u>See</u> 136 S. Ct. at 2124-26.

Finally, Defendants argue that Acting Secretary Duke effectively considered the relevant reliance interests by adopting a policy that resulted in an orderly wind-down, rather than an immediate shut-down of the DACA program. (Defs. Opp'n at 17-18.) This is sleight-of-hand and further post hoc rationalization. The record does not indicate that the Acting Secretary actually considered how the end of the DACA program would affect DACA recipients. That her chosen policy may, in practice, ameliorate the impact of the DACA rescission on DACA recipients, as compared to an immediate and disorderly shut-down of the program following a hypothetical injunction in the <u>Texas</u> litigation, does not mean that she actually <u>considered</u> this possibility. While the Acting Secretary stated that she "[r]ecogniz[ed] the complexities associated with winding down the program," the Sessions Letter makes clear that these complexities referred to the burdens <u>on DHS</u> of winding down the DACA program. (<u>Compare</u> DACA Rescission Memo at 4, <u>with</u> Sessions Ltr. ("In light of the costs and burdens that will be imposed <u>on DHS</u> associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process." (emphasis added)).)

J.A. 1475

AR2214

Accordingly, even if the record were to support Defendants' "litigation risk" rationale, that rationale would be arbitrary and capricious. Finally, even if this rationale were not arbitrary and capricious, the court would nevertheless likely vacate Defendants' decision because it is tainted by the errors discussed in Section III.A.1 above. "When an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and 'the agency would clearly have acted on that ground even if the other were unavailable.'" Mail Order Ass'n of Am. v. U.S. Postal Serv., 2 F.3d 408, 434 (D.C. Cir. 1993) (quoting Syracuse Peace Council v. FCC, 867 F.2d 654, 657 (D.C. Cir. 1989)). To the extent that Defendants' "litigation risk" rationale can be discerned from the Administrative Record and the parties' submissions in these cases, that rationale appears to be intertwined with Defendants' erroneous legal conclusion that the DACA program was unlawful. Because the court cannot say that Defendants clearly would have made the same decision even had they correctly understood the law and the holdings of the Texas courts, that decision is nevertheless likely arbitrary and capricious. See also N.Y. Pub. Interest Research Grp., 321 F.3d at 334 n.13.

> b. *The Court Cannot Construe This Decision as an "Independent Policy Judgment"*

Defendants also contend that, even if the court disagrees with the Attorney General's conclusion that DACA is unconstitutional, the court may nevertheless uphold the decision to end the DACA program because the same facts that led the Attorney General to conclude that the DACA program is unconstitutional "equally support a policy judgment by the Acting Secretary that deferred action should be applied only on an individualized case-by-case basis rather than used as a tool to confer certain benefits that Congress had not otherwise acted to provide by law." (Defs. Opp'n at 25 (internal quotation marks and citation omitted).) The record, however, offers no support for the notion that Defendants based their decision on any "policy judgment

46

J.A. 1476

AR2215

Appeal 18-1521 Case 1:17-cv-05228-NGG-VMS Filed 07/02/2018 Document 254-7 Filed 09/04/2018 Page 964 of 1026 PageID #: 10555

Case 1:16-cv-04756-NGG-JO Document 254 Filed 02/13/18 Page 47 of 55 PageID #: 4213

Case 8:17-cv-02942-RWT Document 40-1 Filed 02/14/18 Page 47 of 55

that immigration decisions of this magnitude should be left to Congress." (Id.) Defendants' argument therefore conflicts with fundamental principles of judicial review of agency action— namely that the court reviews the agency's stated reasons for its decision and "may not supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43; see also Chenery II, 332 U.S. at 196; Chenery I, 318 U.S. at 87.

Defendants' only authority for this novel argument, Syracuse Peace Council, 867 F.2d at 654, is inapposite. In that case, the D.C. Circuit held that when an agency bases its decision on both a judgment about constitutionality and policy reasons, the reviewing court may uphold the decision if the agency clearly would have reached the same decision for policy reasons alone, even if the agency stated that its constitutional and policy rationales were "intertwined." Id. at 655-57. Syracuse Peace Council does not stand for the proposition that, when an agency bases its decision on constitutional grounds, a reviewing court may, in the first instance, construe that decision as having been based on a "policy judgment" found nowhere in the administrative record.

\*   \*   \*

For the reasons stated above, the court concludes that Plaintiffs are substantially likely to prevail on the merits of their claim that the decision to rescind the DACA program was arbitrary, capricious, and an abuse of discretion.

**B. Irreparable Harm**

Plaintiffs have also demonstrated that they are likely to suffer irreparable harm if the court does not enjoin Defendants from fully implementing the DACA rescission.

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve

47

J.A. 1477                                    AR2216

the harm." <u>Grand River Enter. Six Nations, Ltd. v. Pryor</u>, 481 F.3d 60, 66 (2d Cir. 2007) (quoting <u>Freedom Holdings, Inc. v. Spitzer</u>, 408 F.3d 112, 114 (2d Cir. 2005)). Irreparable harm "cannot be remedied by an award of monetary damages." <u>State of New York ex rel. Schneiderman</u>, 787 F.3d at 660.

Plaintiffs have extensively documented the irreparable harms they will suffer if the DACA program ends. Each day, approximately 122 DACA recipients who failed (or were unable) to renew their DACA status before October 5, 2017, lose their deferred action and work authorization. (BV Pls. Mot at 1-2, 35; State Pls. Mot. at 28.) If the implementation of the DACA Rescission Memo is not enjoined, approximately 1,400 DACA recipients will lose deferred action each work day, beginning on March 5, 2018. (State Pls. Mot. at 28.) As a result, these individuals will face the possibility of deportation from the country. While this possibility of deportation is clearly extremely worrisome to DACA recipients, the court declines to grant a preliminary injunction on this basis. <u>See</u> <u>Winter</u>, 555 U.S. at 21-22; <u>see also</u> <u>Carlsson v. U.S. Citizenship & Immigration Servs.</u>, No. 12-CV-7893 (CAS), 2012 WL 4758118, at *9 (C.D. Cal. Oct. 3, 2012) (risk of deportation speculative, not imminent, when there were no pending removal proceedings against the plaintiffs).[13] Nor may the court grant a preliminary injunction on the grounds that DACA recipients may, for fear of deportation, suffer from anxiety or depression, lose the "abilit[y] to plan for the future and make commitments, whether familial, career-based, academic, or otherwise" (BV Pls. Mot. at 37-38), or be required to turn their U.S. citizen children over to the care of the State Plaintiffs' child welfare systems, or that public

---

[13] The court notes that Secretary Nielsen recently stated that, even if the DACA program ended, DHS would not prioritize the removal of DACA recipients who had not committed crimes. <u>See</u> Louis Nelson, <u>DHS Chief: Deporting Dreamers Won't Be a Priority for ICE If Talks Fail</u>, Politico (Jan. 16, 2018, 8:30 AM), https://www.politico.com/story/2018/01/16/dhs-dreamers-deportation-not-priority-340681.

AR2217

safety will be harmed because former DACA recipients will be less likely to report crimes and other harms to the community (State Pls. Mot. at 28). Because deportation is, at this point, not sufficiently "likely" for purposes of establishing irreparable harm, harms accruing from the fear of deportation are also too speculative to support the grant of a preliminary injunction.

Concomitant with the loss of deferred action, however, DACA recipients will also lose their work authorization. As a result, they will be legally unemployable in this country. Some DACA recipients will lose their employer-sponsored healthcare coverage, which will endanger DACA recipients and their families (BV Pls. Mot. at 36-37) and impose tremendous burdens on the State Plaintiffs' public health systems (State Pls. Mot. at 31-32). Other DACA recipients, due to the imminent loss of their employment, may lose their homes or need to drop out of school. (BV Pls. Mot. at 37.) Employers will suffer due to the inability to hire or retain erstwhile DACA recipients, affecting their operations on an ongoing basis and causing them to incur unrecoverable economic losses. (Id. at 38; State Pls. Mot. at 29-30.) Finally, the DACA rescission will result in "staggering" adverse economic impacts, including, by the State Plaintiffs' best lights, $215 billion in lost GDP over the next decade, and $797 million in lost state and local tax revenue. (State Pls. Mot. at 33 & nn.77-78.) Thus, while it may be true that "[l]oss of employment does not in and of itself constitute irreparable injury," Savage v. Gorski, 850 F.2d 64, 67 (2d Cir. 1988), these cases present a "genuinely extraordinary situation" warranting injunctive relief, Sampson v. Murray, 415 U.S. 61, 92 n.68 (1974).

While the above is sufficient to demonstrate irreparable harm, the court also notes the obvious fact that the decision to rescind DACA, if carried into effect, will have profound and irreversible economic and social implications. That decision "will profoundly disrupt the lives of hundreds of thousands of people." In re United States, 875 F.3d 1200, 1210 (9th Cir. 2017)

AR2218

(Watford, J., dissenting). It may force one out of every four hundred U.S. workers out of the lawful workforce. See Jie Zong et al., "A Profile of Current DACA Recipients by Education, Industry, and Occupation," Migration Policy Institute (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation. Former DACA recipients will be separated from their families and communities. It is impossible to understand the full consequences of a decision of this magnitude. If the decision is allowed to go into effect prior to a full adjudication on the merits, there is no way the court can "unscramble the egg" and undo the damage caused by what, on the record before it, appears to have been a patently arbitrary and capricious decision.

Moreover, it is also impossible for the court to adjudicate this dispute on the merits before March 5, 2018, when these harms will begin to materialize in earnest. Defendants set an aggressive timetable for ending the DACA program and have pursued various dilatory tactics throughout this litigation. Notably, they have yet to produce a plausible administrative record in these cases, without which the court cannot render a merits decision. Overton Park, 401 U.S. at 420. For these reasons, it is clear that Plaintiffs will suffer substantial and imminent irreparable harm if the court does not preliminarily enjoin the DACA rescission.

Defendants argue that Plaintiffs have not shown that irreparable harm is "imminent, or even likely, given the preliminary injunction recently issued" in Regents. (Defs. Opp'n at 48.) Defendants are, however, vigorously contesting that injunction before both the U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court. If Judge Alsup or the Ninth Circuit were to lift the injunction in Regents, then Plaintiffs would no doubt suffer irreparable harm. Defendants cite no authority for the proposition that Plaintiffs cannot establish irreparable harm simply because another court has already enjoined the same challenged action.

AR2219

## C.  Balancing the Equities and the Public Interest

Finally, the court must consider whether "the balance of equities tips in [Plaintiffs'] favor" and if "an injunction is in the public interest." Winter, 555 U.S. at 20.  To make this decision, the court "balance[s] the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences of employing the extraordinary remedy of injunction." Id. at 24 (internal quotation marks and citation omitted).  "These factors merge when the Government is the opposing party." Nken, 556 U.S. at 435.  The court concludes that these factors weigh firmly in Plaintiffs' favor.

The court need not restate at length the consequences of the DACA rescission for Plaintiffs, other DACA recipients, those close to them, and the public at large.  Allowing the DACA rescission to take immediate effect would quickly cost many DACA recipients the opportunity to work legally in this country, and hence to support themselves and their families.  Enjoining the implementation of the DACA Rescission Memo would also preserve the status quo, enabling a full resolution of this matter on the merits, rather than allowing severe social dislocations to unfold based on an agency decision that, as noted above, strongly appears to have been arbitrary and capricious.  The public interest is not served by allowing Defendants to proceed with arbitrary and capricious action.

Against these considerations, the court weighs the effect on Defendants of initiating a wind-down of the DACA program on their predetermined timetable.  The court does not step in this area lightly.  Defendants have broad discretion to set immigration-enforcement priorities. Arizona, 567 U.S. at 394.  Moreover, the DACA program was originally created by the Executive Branch, and the Trump Administration should be able to alter the policies and priorities set by its predecessor.

51

AR2220

Appeal 18-1521 cv-05228-NGG-VMS Filed 07/02/2018 Filed 08/04/254 Page 969 of 1026 PageID #: 10560

Case 1:16-cv-04756-NGG-JO Document 254 Filed 02/13/18 Page 52 of 55 PageID #: 4218
Case 8:17-cv-02942-RWT Document 40-1 Filed 02/14/18 Page 52 of 55

There are, however, several factors that lead the court to conclude that the balance of the equities favors granting an injunction. Defendants do not appear to have rescinded the DACA program as an exercise of their discretion, or because of a reasoned policy judgment, but instead, at least in significant part, because they erroneously concluded that the program was unconstitutional and unlawful. Enjoining Defendants from rescinding the DACA program on erroneous legal grounds therefore does not intrude on their discretion or well-established authority to set immigration-enforcement policies. Moreover, although the Government generally has a substantial interest in the speedy deportation of removable aliens because their presence here "permit[s] and prolong[s] a continuing violation of United States law," Nken, 556 U.S. at 436 (quoting AAADC, 525 U.S. at 490), the court finds that the Government's interest in ending the DACA program is not so compelling. For one thing, the President has stated his support for keeping DACA recipients in the country (albeit preferably pursuant to legislation rather than executive action). Donald J. Trump, @realdonaldtrump, Twitter.com (Sept. 14, 2017 3:28 AM), https://twitter.com/realdonaldtrump/status/908276308265795585 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!....."). The current DHS Secretary has also stated that the erstwhile DACA recipients would not be a priority for immigration enforcement. Louis Nelson, DHS Chief: Deporting Dreamers Won't Be a Priority for ICE If Talks Fail, Politico (Jan. 16, 2018), https://www.politico.com/story/2018/01/16/dhs-dreamers-deportation-not-priority-340681. Even if deporting DACA recipients were a priority of the Administration, an injunction against the end of the DACA program would not impede this policy, as, under the 2012 DACA

52

J.A. 1482

AR2221

Memo, DHS retains discretion to revoke specific DACA recipients' deferred action and work authorization.[14]

Accordingly, the court finds that the balance of the equities tip decidedly in Plaintiffs' favor, and that the public interest would be well-served by an injunction.

**D. Scope of Relief**

For the foregoing reasons, the court finds that Plaintiffs have demonstrated that they are entitled to a preliminary injunction. Defendants are therefore ORDERED to maintain the DACA program on the same terms and conditions that existed prior to the promulgation of the DACA Rescission Memo, subject to the following limitations. Defendants need not consider new applications by individuals who have never before obtained DACA benefits; need not continue granting "advanced parole" to DACA beneficiaries; and, of course, may adjudicate DACA renewal requests on a case-by-case, individualized basis. See Regents, 2018 WL 339144, at *28.

Plaintiffs contend that the court should require Defendants to restore the DACA program as it existed on September 4, 2017, in particular by requiring Defendants to adjudicate initial DACA applications submitted by individuals who only became eligible for DACA after that date. (Jan. 30, 2018, Hr'g Tr. (Dkt. Number Pending) 8:24-25.) As in Regents, however, the court finds that the irreparable harms identified by Plaintiffs largely result from Defendants' expected failure to renew existing grants of deferred action and especially work authorization, not from Defendants' refusal to adjudicate new initial DACA applications. While the court is sympathetic to the plight of individuals who were unable to apply for DACA before September 5, 2017, it cannot say that Plaintiffs have demonstrated either that these individuals would be

---

[14] The court expresses no view as to whether the revocation of existing DACA benefits would be consistent with the Due Process Clause or other potentially applicable protections.

53

AR2222

irreparably harmed without injunctive relief or that the balance of equities favors these individuals to the same extent it favors existing DACA beneficiaries.

The court enjoins rescission of the DACA program on a universal or "nationwide" basis. Again, it does not do so lightly. As Defendants correctly note, equitable principles provide that the court should not enter an injunction that is broader than "necessary to provide complete relief to the plaintiffs." (Defs. Opp'n at 50 (quoting Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994)).) See also Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 72 (2d Cir. 2016) ("[I]njunctive relief should be no broader than necessary to cure the effects of the harm caused by the violation . . . ." (internal quotation marks and citations omitted)). Moreover, several academic commentators have insightfully observed various problems with the practice of granting nationwide injunctions against the Government, including that such injunctions thwart the development of law in different courts, encourage forum-shopping, and create the possibility that different courts will issue conflicting nationwide injunctions. See Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417 (2017); Michael T. Morley, Nationwide Injunctions, Rule 23(b)(2), and the Remedial Powers of the Lower Courts, 97 B.U. L. Rev. 611 (2017); Zayn Siddique, Nationwide Injunctions, 117 Colum. L. Rev. 2095 (2017); Getzel Berger, Note, Nationwide Injunctions Against the Federal Government: A Structural Approach, 92 N.Y.U. L. Rev. 1068 (2017).

Nevertheless, the court finds that a nationwide injunction is warranted in these cases. First, it is hard to conceive of how the court would craft a narrower injunction that would adequately protect Plaintiffs' interests. Plaintiffs include not only several individuals and a nonprofit organization, but also sixteen states and the District of Columbia. To protect the State Plaintiffs' interests, the court would presumably need to enjoin Defendants from rescinding the

54

AR2223

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 972 of 1026
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20 Page 972 of 1026 PageID #: 10563

Case 1:16-cv-04756-NGG-JO   Document 254   Filed 02/13/18   Page 55 of 55 PageID #: 4221
Case 8:17-cv-02942-RWT   Document 40-1   Filed 02/14/18   Page 55 of 55

DACA program with respect to the State Plaintiffs' residents and employees, including the employees of any instrumentalities of the state, such as public hospitals, schools, and universities. Such an injunction would be unworkable, partly in light of the simple fact that people move from state to state and job to job, and would likely create administrative problems for Defendants. Furthermore, there is a strong federal interest in the uniformity of federal immigration law. See U.S. Const. art. I, § 8, cl. 4 (empowering Congress to "establish a uniform Rule of Naturalization"); Texas, 809 F.3d at 187-88. Because the decision to rescind the DACA program had a "systemwide impact," the court will preliminarily impose a "systemwide remedy." Lewis v. Casey, 518 U.S. 343, 359 (1996) (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420 (1977)).

## IV. CONCLUSION

Plaintiffs' motions for a preliminary injunction (Dkt. 123 in No. 16-CV-4756; Dkt. 96 in No. 17-CV-5228) are GRANTED. The Batalla Vidal Plaintiffs' motion for class certification (Dkt. 124) is DENIED as moot.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      February 13, 2018

NICHOLAS G. GARAUFIS
United States District Judge

55

Appeal: 18-1521   Doc: 32-20   Filed: 07/02/2018   Pg: 601 of 454   Page 973 of 1026 PageID #:
10564
Case 8:17-cv-02942-RWT   Document 41   Filed 02/21/18   Page 1 of 3

<div align="center">

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

</div>

|  |  |
|---|---|
| CASA DE MARYLAND, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 17-cv-2942 (RWT) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| *Defendants*. | |

<div align="center">

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
SECOND NOTICE OF SUPPLEMENTAL AUTHORITY**

</div>

Defendants hereby respond to Plaintiffs' second Notice of Supplemental Authority.  With

that notice, Plaintiffs attached a copy of an order recently issued by a judge in the United States

District Court for the Eastern District of New York in two cases challenging the rescission of the

Deferred Action for Childhood Arrivals (DACA) policy, *Batalla Vidal v. Nielsen*, 16-CV-4756

and *State of New York v. Trump*, 17-CV-5228.  *See* Pls.' Notice of Suppl. Authority ("Pls.'

Notice"), ECF No. 40-1.  The order granted the plaintiffs' motions for a preliminary injunction.

On the same day, however, the order was withdrawn and replaced by an amended order, which

clarified that the scope of the preliminary injunction was co-extensive with the injunction

previously issued by the United States District Court for the Northern District of California.[1]  *See*

*Batalla Vidal v. Nielsen*, No. 16-CV-4756, 2018 WL 834074, at *3 (E.D.N.Y. Feb. 13, 2018).

---

[1] As this Court is aware, Defendants have appealed to the United States Court of Appeals for the
Ninth Circuit the orders issued in the Northern District of California cases granting plaintiffs'
motions for a preliminary injunction and denying Defendants' Rule 12(b)(1) and 12(b)(6)
motions.  Further, given the need for its immediate review of those orders, Defendants have filed
a petition for a writ of certiorari before judgment with the United States Supreme Court.  *See*
Defs.' Resp. to Pls.' Notice of Suppl. Authority, ECF No. 37.

<div align="center">

**J.A. 1486**                                                        **AR2225**

</div>

Appeal: 18-1521   Doc: 32-6   Filed: 07/02/2018   Pg: 402 of 454   Case 1:17-cv-05228-NGG-VMS   Document 88-27   Filed 09/04/20   Page 974 of 1026 PageID #: 10565

Case 8:17-cv-02942-RWT   Document 41   Filed 02/21/18   Page 2 of 3

Specifically, the court ordered Defendants to "continue processing DACA renewal requests under the same terms and conditions that applied before September 5, 2017, subject to [certain] limitations." *Id.*

On February 20, 2018, Defendants filed a notice of appeal of the order granting a preliminary injunction in the Eastern District of New York cases. As previously reported, on January 16, 2018, Defendants filed a petition pursuant to 28 U.S.C. § 1292(b) for permission to appeal the court's prior order denying Defendants' Rule 12(b)(1) motion. *See* ECF No. 37. On January 31, 2018, the United States Court of Appeals for the Second Circuit held in abeyance the government's petition for interlocutory review pending the district court's resolution of the plaintiffs' motions for preliminary injunction and Defendants' Rule 12(b)(6) motion.

For many of the same reasons explained in the briefs in support of Defendants' Motion to Dismiss Or, In the Alternative, For Summary Judgment (ECF Nos. 27-1 & 30), the order recently entered in *Batalla Vidal* and *State of New York* is incorrect and this Court should dismiss the instant case or, in the alternative, grant summary judgment to Defendants.

Dated: February 21, 2018                  Respectfully submitted,

                                          CHAD A. READLER
                                          Acting Assistant Attorney General

                                          BRETT A. SHUMATE
                                          Deputy Assistant Attorney General

                                          JENNIFER D. RICKETTS
                                          Director

                                          JOHN R. TYLER
                                          Assistant Branch Director

                                          */s/   Kathryn C. Davis*
                                          KATHRYN C. DAVIS

2

J.A. 1487

AR2226

RACHAEL WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

J.A. 1488

AR2227

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CASA DE MARYLAND,** *et al.* | * | |
| *Plaintiffs* | * | |
| v. | * | Civil No. RWT-17-2942 |
| **U.S. DEPARTMENT OF HOMELAND SECURITY,** *et al.* | * | |
| | * | |
| *Defendants* | | |
| | *** | |

## <u>MEMORANDUM OPINION</u>

On October 5, 2017, Plaintiffs filed a Complaint seeking to enjoin rescission of a program known as Deferred Action for Childhood Arrivals ("DACA"), asserting a variety of claims as to why the rescission was unlawful. *See* ECF No. 1. Plaintiffs are a number of individual participants in that program known as "Dreamers," as well as a series of special interest organizations that deal with immigration policy issues and work directly with immigrants in the community. *Id.* at 11–21. Defendants are President Donald Trump, Attorney General Jeff Sessions, and a series of government agencies—the Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP")—as well as each agency's acting leader (secretary, director, or commissioner). Defendants collectively will be referred to as the "Government." Each individual defendant is being sued in his or her official capacity. *Id.* at 21–22.

Plaintiffs' Complaint alleges a number of causes of action—both administrative and constitutional—which they believe are proper grounds for relief. Plaintiffs assert that rescission

of the DACA program was unlawful under the Administrative Procedure Act ("APA") both (1) as an arbitrary and capricious decision and (2) for failure to follow notice-and-comment procedures. *Id.* at 54–58. Plaintiffs further allege that the DACA rescission was a violation of the Fifth Amendment on the grounds of procedural due process, substantive due process, and equal protection. *Id.* at 49–54. Plaintiffs seek injunctive relief on the basis of equitable estoppel both as to the DACA rescission itself and its information sharing policy. *Id.* at 58–59. Lastly, Plaintiffs seek declaratory relief that the DACA program is lawful. *Id.* at 59–60.

On November 1, 2017, the Court held an in-person status conference in order to resolve the scheduling and logistical issues of this case. ECF No. 19. Thereafter on November 15, 2017, the Government filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 27. On November 28, 2017, Plaintiffs responded in opposition, ECF No. 29, and on December 5, 2017, the Government replied in support of its Motion, ECF No. 30. The Court issued an Order on December 11, 2017 giving notice to the parties in accordance with Rule 56(f) that it may grant summary judgment for the non-moving party. *See* ECF No. 31. On December 15, 2017, the Court held a hearing on the Motion. ECF No. 34.

## I.     BACKGROUND

*"Can we all get along?" – Rodney King[1]*

In recent years, many Americans have found themselves sharing Mr. King's sentiment. This Court previously noted, albeit in the context of congressional gerrymandering, that "[n]ever before has the United States seen such deep political divisions as exist today, and while the courts are struggling in their efforts to find a standard [for the adjudication of gerrymandering claims], the fires of excessive partisanship are burning and our national government is

---

[1] *See* Richard A. Serrano, *Rodney King: 'Truth will come out'*, L.A. Times (May 2, 1992), http://www.latimes.com/local/california/la-me-king-case-aftermath-city-in-crisis-19920502-story.html.

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 400 of 454
Case 1:17-cv-05228-NGG-VMS   Document 42-27   Filed 09/04/20   Page 978 of 1026 PageID #: 10569
Case 8:17-cv-02942-RWT   Document 42   Filed 03/05/18   Page 3 of 30

encountering deadlock as never before." *Fletcher v. Lamone*, 831 F. Supp. 2d 887, 905 (D. Md. 2011) (Titus, J., concurring), *aff'd*, 567 U.S. 930 (2012). Unfortunately, that 2011 observation still holds true today—perhaps even more so.

This case is yet another example of the damaging fallout that results from excessive political partisanship. The highly politicized debate surrounding the DACA program has thus far produced only rancor and accusations. During the recent debate over the rescission of DACA, the program even turned into a bargaining chip that resulted in a brief shutdown of the entire federal government earlier this year.[2] In order to adequately resolve the legal issues of this case, it is important to step back from the heated rhetoric and understand the context under which DACA was promulgated and rescinded.

***The Dream Act—a Lengthy History of Failed Legislation***

The Constitution reserves the power to enact immigration policy to the legislative branch. U.S. Const. art. I, § 8 ("[T]o establish a uniform rule of naturalization"). However, the "supervision of the admission of aliens into the United States may be intrusted by [C]ongress" to the executive branch. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). For over a decade at the start of the 21st century, Congress quarreled over policies regarding illegal aliens who entered the country as children, and who may have no memory or connection with their country of origin. Would the world's beacon of freedom—a nation founded by immigrants— cast out an immigrant population that was likely brought here without choice and who likely now knows no other home? While "no" would seem to be the obvious answer, ordinary logic has eluded our Congress.

---

[2] *See* Gregory Krieg, *The DACA shutdown is over. Now What?*, CNN (Jan. 22, 2018), https://www.cnn.com/2018/01/22/politics/shutdown-immigration-daca-outcomes/index.html.

**J.A. 1491**

**AR2230**

"Dreamers" are neither constitutionally nor statutorily defined. Rather, the concept of protection for "Dreamers" arises from repeated congressional failures to act, and presidential action taken in their wake. A series of congressional sessions marked by bitter strife and inaction left the country without any protections for persons brought here illegally as children. The first attempt at a Development, Relief, and Education for Alien Minors ("DREAM") Act came in 2001, and although it took on many names in subsequent years, the repeated attempts to pass this legislation were filibustered, abandoned, or defeated on the floor.[3] As illustrated by the frequency of bills proposed, Dreamer legislation reached its zenith during late 2010 in the 111th Session of Congress. On December 8, 2010, the House of Representatives actually passed the DREAM Act.[4] However, like all other iterations of this controversial legislation, its fate was doomed—this time, less than two weeks later on the Senate floor.[5]

### DACA—an Act of Desperation Born of Frustration with a Paralyzed Congress

President Obama's administration, faced with the reality that Congress could do little more than squabble regarding the Dreamers, decided to take action on its own. On June 15, 2012, then-Secretary of Homeland Security, Janet Napolitano, issued a memorandum promulgating by executive action what is now known as DACA ("DACA Memo").[6] DACA

---

[3] *See* Immigrant Children's Educational Advancement and Dropout Prevention Act of 2001, H.R. 1582, 107th Cong. (2001); Student Adjustment Act of 2001, H.R. 1918, 107th Cong. (2001); DREAM Act, S. 1291, 107th Cong. (2002); DREAM Act, S. 1545, 108th Cong. (2003); DREAM Act of 2005, S. 2075, 109th Cong. (2005); Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. (2006); American Dream Act, H.R. 5131, 109th Cong. (2006); DREAM Act, S. 2205, 110th Cong. (2007); Comprehensive Immigration Reform Act of 2007, S. 1348, 110th Cong. (2007); DREAM Act of 2009, S. 729, 111th Cong. (2009); DREAM Act of 2010, S. 3827, 111th Cong. (2010); DREAM Act of 2010, S. 3962, 111th Cong. (2010); DREAM Act of 2010, S. 3963, 111th Cong. (2010); DREAM Act of 2010, S. 3992, 111th Cong. (2010); DREAM Act of 2010, H.R. 6497, 111th Cong. (2010); DREAM Act of 2011, S. 952, 112th Cong. (2011).

[4] *See* John Brandt, *House Passes DREAM Act Immigration Measures*, Fox News (Dec. 8, 2010), http://www.foxnews.com/politics/2010/12/08/house-passes-dream-act-immigration-measures.html.

[5] *See DREAM Act Goes Down in Flames in Senate*, Fox News (Dec. 18, 2010), http://www.foxnews.com/politics/2010/12/18/senate-tries-pass-dream-act.html.

[6] Memorandum from U.S. Dep't of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).

4

protections were afforded to the same class of immigrants foreseen by the various failed iterations of Dreamer legislation. The primary qualifications for DACA protections were that an individual must (1) have come to the U.S. before the age of sixteen, (2) meet various education or military service requirements, (3) not have a criminal record, and (4) register prior to the age of thirty.[7]

DACA was issued under a theory of "prosecutorial discretion" and "deferred action" and essentially permitted otherwise illegal aliens to remain in the United States without fear of deportation.[8] While some heralded DACA as a victory, others decried it as executive overreach—usurping the powers of Congress to promulgate immigration policy.[9] Over the course of the next five years, approximately 800,000 Dreamers registered for DACA protections.

***Phase II: DAPA***

Soon thereafter, the executive branch sought to expand its use of deferred action beyond the Dreamers. On November 20, 2014, then-Secretary of Homeland Security, Jeh Charles Johnson, issued a pair of memoranda in an attempt to promulgate what is now known as Deferred Action for Parents of Americans ("DAPA"), as well as a series of minor expansions for DACA.[10]

Less than a month later, DAPA was met with a legal challenge when Texas and twenty-five other states sued to enjoin implementation of the program. *See generally Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). In that case, DAPA was struck down by the

---

[7] *See id.*
[8] *See id.*
[9] *See Obama suspends deportation for thousands of illegals, tells GOP to pass DREAM Act*, Fox News (June 15, 2012), http://www.foxnews.com/politics/2012/06/15/obama-administration-to-offer-immunity-to-younger-immigrants.html.
[10] Memorandum from U.S. Dep't of Homeland Sec., Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants (Nov. 20, 2014); Memorandum from U.S. Dep't of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014).

AR2232

district court, *see id.*, and a divided Fifth Circuit panel affirmed the decision, *see* 809 F.3d 134 (5th Cir. 2015). In June 2016, an equally divided Supreme Court affirmed the decision. *See United States v. Texas*, 136 S. Ct. 2271, 2272 (2016). In addition to finding DAPA and the expansions of DACA unlawful, the judicial decisions throughout the DAPA litigation illustrate two key realities: (1) challenges to DAPA or analogous immigration programs promulgated by DHS without approval by Congress are justiciable; and (2) reasonable legal minds may differ regarding their lawfulness.

Aside from the classes of immigrants to which each applies, DACA and DAPA are largely similar programs addressing different classes or subcategories of immigrants. While DACA affects a population of approximately 800,000 otherwise illegal aliens, DAPA would have affected nearly half of the 11,000,000 immigrants currently in the United States unlawfully. *See Texas v. United States*, 787 F.3d 733, 745 (5th Cir. 2015). DAPA was challenged and defeated before the program was ever successfully promulgated, while DACA has run for approximately half of a decade before the threat of any litigation.

*A Change in Administration and a Corresponding Change in Immigration Philosophy*

The 2016 presidential election brought a change in leadership of the executive branch and, with it, significant changes in immigration views and philosophies.[11] In June of 2017, and with the defeat of DAPA directly in the rear-view mirror, Texas and other state plaintiffs sent a letter threatening to challenge DACA if it were not rescinded by September 6, 2017.[12] Attorney General Jeff Sessions advised the Acting Secretary of Homeland Security, Elaine Duke, that

---

[11] *See, e.g.*, Tessa Berenson, *Middle Schoolers in Michigan Chant 'Build That Wall' After Trump Victory*, TIME (Nov. 11, 2016), http://time.com/4567812/donald-trump-middle-school-build-wall/.
[12] *See* Admin. R., ECF No. 26-1 at 238–40.

    AR2233

DACA was likely unlawful and headed for another legal battle.[13]  On September 5, 2017, Acting Secretary Duke issued a memorandum ("DACA Rescission Memo") outlining a six-month wind down of DACA to expire March 5, 2018.[14]

According to the Administrative Record, the basis for the decision to rescind DACA was its presumed unlawfulness in the wake of the DAPA litigation and the threat of imminent legal challenge.  The agency's reasoning is substantiated by the legal advice of the Attorney General and the fact that the memorandum was issued the day before the state parties had threatened to act.  A six-month wind down period was provided to avoid the potential for chaos if a court decision resulted in immediate termination, and the President urged Congress to pass Dreamer-protection legislation.[15]

Complicating the picture for some observers is the unfortunate and often inflammatory rhetoric used by President Trump during the campaign, as well as his Twitter pronouncements, both before and after his election.  Thoughtful and careful judicial review is not aided when the President lobs verbal hand grenades at the federal courts, the Department of Justice, and anyone else with whom he disagrees.

As disheartening or inappropriate as the President's occasionally disparaging remarks may be, they are not relevant to the larger issues governing the DACA rescission.  The DACA Rescission Memo is clear as to its purpose and reasoning, and its decision is rationally supported by the Administrative Record.  *See generally Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) ("[W]hen the Executive exercises [a congressionally delegated power of immigration policies

---

[13] *See* Admin. R., ECF No. 26-1 at 251.

[14] Memorandum from U.S. Dep't of Homeland Sec., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017).

[15] *See* Michael D. Shear & Julie Hirschfeld Davis, *Trump Moves to End DACA and Calls on Congress to Act*, N.Y. Times (Sept. 5, 2017), https://www.nytimes.com/2017/09/05/us/politics/trump-daca-dreamers-immigration.html.

**J.A. 1495**                                                                 **AR2234**

Appeal: 18-1521 Doc: 28-3 Filed: 07/02/2018 Pg: 983 of 1026
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 983 of 1026 PageID #: 10574
Case 8:17-cv-02942-RWT Document 42 Filed 03/05/18 Page 8 of 30

and rules for the exclusion of aliens] negatively on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion."); *Hamdan v. Rumsfeld*, 548 U.S. 557, 623–24 n.52 (2006) ("We have not heretofore, in evaluating the legality of executive action, deferred to comments made by such officials to the media.").[16]

The executive branch may have the authority to exercise or not exercise prosecutorial discretion as it sees fit, and an agency certainly may refrain from action it reasonably believes to be unlawful. Under the Constitution, it is the responsibility of Congress to determine immigration policy, and the executive branch must only act within its constitutional and delegated legislative authority. Although Congress has repeatedly failed to pass Dreamer legislation in the past, the ball is again in its court. And with 87 percent of Americans favoring some sort of DACA-esque protections, the elected members of Congress should understandably feel the pressure now that the President has deferred to them—in short, Congress needs to get the job done now that their authority has been recognized by court decisions and the President.[17]

***Other DACA Litigation***

Various plaintiffs have filed lawsuits seeking to enjoin the DACA rescission throughout the country—specifically in this Court, the Eastern District of New York, the Northern District of California, and the District of the District of Columbia. These cases are at various stages, but

---

[16] *See also Washington v. Trump*, 858 F.3d 1168, 1174 (9th Cir. 2017) (Kozinski, J., dissenting):

> Even if a politician's past statements were utterly clear and consistent, using them to yield a specific constitutional violation would suggest an absurd result—namely, that the policies of an elected official can be forever held hostage by the unguarded declarations of a candidate. If a court were to find that campaign skeletons prevented an official from pursuing otherwise constitutional policies, what could he do to cure the defect? Could he stand up and recant it all ("just kidding!") and try again? Or would we also need a court to police the sincerity of that mea culpa—piercing into the public official's "heart of hearts" to divine whether he really changed his mind, just as the Supreme Court has warned us not to? *See McCreary*, 545 U.S. at 862, 125 S. Ct. 2722.

[17] *See* Jennifer De Pinto, Fred Backus, Kabir Khanna & Anthony Salvanto, *Most Americans support DACA, but oppose border wall*, CBS News (Jan. 20, 2018), https://www.cbsnews.com/news/most-americans-support-daca-but-oppose-border-wall-cbs-news-poll/.

8

J.A. 1496

AR2235

preliminary injunctions have already been granted by the Eastern District of New York and the Northern District of California.[18]  With regard to the California case, the Government attempted to bypass the Ninth Circuit and directly petitioned the Supreme Court for a writ of certiorari before judgment.[19]   On February 26, 2018, the Supreme Court denied the petition without prejudice, and noted that "[i]t is assumed that the Court of Appeals [for the Ninth Circuit] will proceed expeditiously to decide this case."[20]

All courts reviewing the DACA rescission would benefit from a prior generation's wisdom regarding the separation of powers:  "A sturdy judiciary should not be swayed by the unpleasantness or unpopularity of necessary executive action, but must independently determine for itself whether the President was acting, as required by the Constitution, to 'take Care that the Laws be faithfully executed.'"  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 709 (1952).[21]

The decisions to date by courts in California and New York are premised on the legal conclusion that DACA is lawful, and therefore, a decision to rescind DACA on the basis of unlawfulness is necessarily arbitrary and capricious.   Respectfully, this Court disagrees. Regardless of the lawfulness of DACA, the appropriate inquiry is whether or not DHS made a

---

[18] *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. CV 17-05211 WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018); *Batalla Vidal v. Nielsen*, No. CV 16-4756 NGG JO, 2018 WL 834074 (E.D.N.Y. Feb. 13, 2018).

[19] *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. CV 17-05211 WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018), *petition for cert. before judgment filed*, 2018 WL 509822 (U.S. Jan 18, 2018) (No. 17-1003).

[20] Docket, *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 17-1003, (U.S. Feb. 26, 2018).

[21] Or, more directly, as Judge Niemeyer notes in his recent dissent in the "travel ban" case.

> The public debate over the Administration's foreign policy and, in particular, its immigration policy, is indeed intense and thereby seductively tempts courts to effect a politically preferred result when confronted with such issues.  But public respect for Article III courts calls for heightened discipline and sharpened focus on only the applicable legal principles to avoid substituting judicial judgment for that of elected representatives.

*Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *104 (4th Cir. Feb. 15, 2018) (Niemeyer, J., dissenting).

J.A. 1497

AR2236

reasoned decision to rescind DACA based on the Administrative Record. Any alternative inquiry would impermissibly require a court to "substitute its judgment for that of the agency." *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Given the fate of DAPA, the legal advice provided by the Attorney General, and the threat of imminent litigation, it was reasonable for DHS to have concluded—right or wrong—that DACA was unlawful and should be wound down in an orderly manner. Therefore, its decision to rescind DACA cannot be arbitrary and capricious.

## II.     STANDARD OF REVIEW

*Motion to Dismiss.* The purpose of a motion to dismiss under Rule 12(b)(6) is "to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The Supreme Court has further articulated the standard applicable to Rule 12(b)(6) motions. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3. To survive a motion to dismiss, a complaint must put forth "plausible claim[s] for relief." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

*Motion for Summary Judgment.* Summary judgment is proper under Fed. R. Civ. P. Rule 56(a) if there is no genuine dispute over any material facts, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*,

AR2237

477 U.S. 242, 248 (1986).  A dispute of material fact is genuine if the evidence would allow the trier of fact to return a verdict for the nonmoving party.  *Id.*  When considering a summary judgment motion, the court has "an affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial."  *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323-24).  Thus, the court may only rely on facts supported in the record, not assertions made in the pleading.  *Id.*  Moreover, the court must view all facts and make all reasonable inferences in the light most favorable to the nonmoving party.  *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party must present more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact that would preclude summary judgment.  *Anderson*, 477 U.S. at 252.

## III.    ANALYSIS

### a.  Justiciability

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute."  *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  Congress has the authority to expand or limit federal district court jurisdiction by statute.  However, federal courts possess an inherent jurisdiction (under Article III and the fundamental principles of due process) over certain cases relating to the enforcement of the Constitution that cannot be limited by Congress.  *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (permitting federal district court jurisdiction when necessary "to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.").

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  However, federal courts may only review "cases and controversies" if

J.A. 1499                                    AR2238

they are justiciable. *See generally Flast v. Cohen*, 392 U.S. 83, 94–99 (1968) (discussing the doctrine of justiciability as "a blend of constitutional requirements and policy considerations"). A case may lack justiciability when it involves a political question and implicates concerns regarding the separation of powers between the judiciary and one of the other branches of government. *See, e.g., Baker v. Carr*, 369 U.S. 186, 210–11 (1962) ("Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed . . . is a responsibility of this Court as ultimate interpreter of the Constitution."). While executive actions may often involve otherwise unreviewable political questions, federal courts always retain the power to review matters of constitutional violations. *See id.* Accordingly, the Court need not reach back to *Marbury v. Madison*, 5 U.S. 137 (1803), to support the conclusion that Plaintiffs' constitutional claims are justiciable.

Turning to Plaintiffs' remaining claims, the Court is required to determine if judicial review has been limited by Congress under the APA. The plain language of the APA—specifically, 5 U.S.C. §§ 701, 702—indicates a presumption for judicial review, at least to the procedures surrounding agency decision-making (but not necessarily to the substance of those decisions). *See generally Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (restating "the basic presumption of judicial review" for APA claims "so long as no statute precludes such relief or the action is not one committed by law to agency discretion").[22] Under 5 U.S.C. § 701(a), the only two exceptions are when: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

---

[22] *abrogated on other grounds by statute*, Pub. L. 94-574, 90 Stat. 2721, *as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977) (finding the statutory amendment to "eliminate the requirement of a specified amount in controversy as a prerequisite to the maintenance of any (§ 1331) action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity").

AR2239

The Government argues both exceptions—that 8 U.S.C. § 1252(g) precludes judicial review, and that the DACA rescission is "committed to agency discretion" because it is a matter of prosecutorial discretion, *see United States v. Armstrong*, 517 U.S. 456, 464 (1996), immigration enforcement, *see Arizona v. United States*, 567 U.S. 387, 396–97 (2012), and deferred action generally, *see Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 485 (1999).  *See* ECF No. 27-1 at 29–30.

However, the notion that 8 U.S.C. § 1252(g) precludes judicial review has been rejected repeatedly.  *See, e.g.*, *AADC*, 525 U.S. at 482 (explicitly rejecting that § 1252(g) serves as a zipper clause that functions to prohibit all judicial review).  Furthermore, while DHS possesses specified delegated authority over immigration enforcement, Congress never explicitly granted DHS a blanket authority to disparately enforce policies.

Plaintiffs' APA claims are justiciable because they relate to *the procedures* followed by DHS—not to *the substance* of its policy or its decision of a specific case.  The Court may review whether the repeal of DACA followed the correct APA procedures.  Furthermore, it is important to note that the Government's explanation for rescinding DACA was the Secretary's belief that the program was unlawful and would face lengthy legal challenges.  The similarities between DACA and DAPA support justiciability in this case because review of DAPA was also found to be justiciable.  *See Texas v. United States*, 809 F.3d 134, 155–64 (5th Cir. 2015) ("Congress has expressly limited or precluded judicial review of many immigration decisions . . . but DAPA is not one of them."), *aff'd,* 136 S. Ct. 2271 (2016).[23]

---

[23] *See also Texas v. United States*, 809 F.3d 134, 165–170 (5th Cir. 2015), *aff'd*, 136 S. Ct. 906 (2016).

Congress did not intend to make immune from judicial review an agency action that reclassifies millions of illegal aliens in a way that imposes substantial costs on states that have relied on the protections conferred by § 1621. . . .

AR2240

Accordingly, the Court finds all claims in Plaintiffs' Complaint are justiciable.

### b. *Standing*

Direct standing exists for plaintiffs who have an injury-in-fact that is traceable to the defendants and which is redressable through adjudication. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992). The injury must be more than a generalized grievance, which is an ideological objection or an injury widely shared by all members of the public. *See id.* at 575. Organizations have direct standing when government action has impaired the organization's own legal rights. *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (U.S. 1977). However, association standing also exists for organizational plaintiffs when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the purpose of the organization, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See id.* at 343.

The Government does not contest the standing of the individual plaintiffs. However, it argues that the organizational plaintiffs lack direct standing because they are not "the object of any government policy" and are merely seeking to "vindicate their own value preferences." *See* ECF No. 27-1 at 38–39 (equating the organizational plaintiffs' injury to a mere "generalized

---

*(continued from previous page)*

> *Chaney*'s presumption against judicial review of agency inaction [exists] because there are no meaningful standards against which to judge the agency's exercise of discretion. But where there is affirmative agency action—as with DAPA's issuance of lawful presence and employment authorization—and in light of the INA's intricate regulatory scheme for changing immigration classifications and issuing employment authorization, the action at least can be reviewed to determine whether the agency exceeded its statutory powers. . . .

> At its core, this case is about the Secretary's decision to change the immigration classification of millions of illegal aliens on a class-wide basis. The states properly maintain that DAPA's grant of lawful presence and accompanying eligibility for benefits is a substantive rule that must go through notice and comment, before it imposes substantial costs on them, and that DAPA is substantively contrary to law. The federal courts are fully capable of adjudicating those disputes. Because the interests that Texas seeks to protect are within the INA's zone of interests, and judicial review is available, we address whether Texas has established a substantial likelihood of success on its claim that DAPA must be submitted for notice and comment.

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 690 of 454

grievance"). The Government also argues that the organizational plaintiffs lack representational standing for failing to identify members of their organizations who are directly harmed by the repeal of DACA, *see id*. at 41–42, or reside within DACA's zone-of-interests, *see id.* at 42 (citing *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395–96 (1987)).

The Government's challenges to the standing of the organizational plaintiffs miss the mark. Casa De Maryland and the rest of the organizational plaintiffs are special interest groups directly focused on aiding immigrants and their communities. The fact that one of their primary functions has been assisting their members with "tens of thousands of DACA initial and renewal applications" is sufficient for standing in and of itself. *See* ECF No. 29 at 33. In addition to direct standing, the organizational plaintiffs possess association standing. Each organization has identified a number of its members who are Dreamers, and who unquestionably would have standing in this case. Furthermore, the purpose of these organizations is to aid and represent immigrants in their communities, including compliance with immigration procedures. Therefore, the rescission of DACA has an absolute nexus to the organizations' purpose. Additionally, the relief sought is injunctive and declaratory relief—not damages or any other remedy requiring the individual Dreamers. Hence, these organizational plaintiffs are the prototypical examples of possessing association standing.

Accordingly, the Court finds all Plaintiffs have standing in the instant case.

### c. *APA Claims*

Rulemaking is a common method federal agencies use to promulgate decisions. *See generally Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445–46 (1915); *Londoner v. City & Cty. of Denver*, 210 U.S. 373, 385 (1908). Informal rulemaking is standardized under the APA and requires notice-and-comment procedures. *See* 5 U.S.C. § 553;

J.A. 1503

AR2242

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 610 of 454
Case 1:17-cv-05228-NGG-VMS   Document 88-7   Filed 09/04/20   Page 991 of 1026 PageID #:
10582
Case 8:17-cv-02942-RWT   Document 42   Filed 03/05/18   Page 16 of 30

*e.g.*, *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 253 (2d Cir. 1977).  Informal rulemaking does not include non-legislative rulemaking, such as procedural rules, interpretive rules, or policy statements.  *See* 5 U.S.C. § 553(b); *e.g.*, *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1324–25 (D.C. Cir. 1988).

After the notice-and-comment requirements, if applicable, have been met, courts must take a hard look at whether the decision to promulgate or repeal a rule is "arbitrary or capricious"—which is to say that there must be a rational correlation between the facts reviewed and the decision made.  *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–44 (1983) (explaining that an agency must examine relevant data, articulate a satisfactory explanation contemporaneously with its decision, using rationale that comes from the agency (and not from a court inferring after the fact logic that is not explicitly stated in the record)).  *See id.*  However, even when notice-and-comment requirements do not apply, agency decisions are subject to judicial review under 5 U.S.C. § 706.  By statute, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

The DACA program is a deferral of action, which by definition is an exercise of discretion rather than a rule with the force of law.  Furthermore, the DACA Rescission Memo was not immediately binding, but rather a statement of intended policy beginning March 5, 2018. To the extent that Plaintiffs aver that, in practice, immigration reviews absent DACA protections lack individualized discretion, their dispute is merely with how the agency applies its policy, and

AR2243

not with the policy itself.[24]  Although a substantial paradigm shift, the DACA Rescission Memo neither curtails DHS's discretion regarding individual immigration reviews, nor does it prevent the agency from granting Dreamers deferred action status again in the future.  Hence, DACA and its rescission are more akin to non-binding policy statements, and thus not subject to notice-and-comment requirements.

Plaintiffs argue that the decision to rescind DACA must be arbitrary and capricious because the Administrative Record is "insufficient" to make a decision of such magnitude.  *See* ECF No. 29 at 35–39 (noting that the Administrative Record is only 256 pages long—192 of which are court opinions related to DAPA); *see also In re United States*, No. 17-72917, 2017 WL 5505730, at *2 (9th Cir. Nov. 16, 2017) ("The notion that the head of a United States agency would decide to terminate a program giving legal protection to roughly 800,000 people based on 256 pages of publicly available documents is not credible.").

However, based on the historical and political context outlined in the introductory pages of this Opinion, the decision to rescind DACA was neither arbitrary nor capricious, but rather was a carefully crafted decision supported by the Administrative Record.  It is well established that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. 29, 43 (1983).  Therefore, it is irrelevant whether this Court, a judge in California or New York, or even a justice on the Supreme Court might have made a different decision while standing in the shoes of DHS on September 5, 2017.  Rather, the relevant inquiry is whether the decision was made with a

---

[24] Plaintiffs' APA claim regarding DACA's information sharing policy also lacks merit.  Nothing in the DACA Rescission Memo outlines any change—let alone implements a substantive rule—with regard to the use of any individual's information gathered during DACA's implementation.

"satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotations omitted).

DHS's rationale provided in the DACA Rescission Memo was a belief, based on recent court decisions and the advice of the Attorney General, that DACA was unlawful. Assuming that a reasonable basis for that belief exists in the Administrative Record, how could trying to avoid unlawful action possibly be arbitrary and capricious? Quite simply, it cannot. Regardless of whether DACA is, in fact, lawful or unlawful, the belief that it was unlawful and subject to serious legal challenge is completely rational.

DAPA—an analogous program, promulgated by analogous means—had been defeated less than a year prior. The litigation that stopped DAPA included expansions of DACA itself. The same plaintiffs who defeated DAPA threatened to challenge DACA imminently. The Attorney General of the United States—the nation's chief legal officer—provided legal advice that DACA was likewise unlawful and likely ill-fated against a legal challenge. All of this is in the Administrative Record—the remnants of the DAPA litigation,[25] the threatened legal challenge,[26] and the Attorney General's advisory letter.[27]

Therefore, what did the Acting Secretary of DHS do? She opted for a six-month wind-down period instead of the chaotic possibility of an immediate termination, which would come at a time known only to the judge resolving a future challenge to the DACA program. This decision took control of a pell-mell situation and provided Congress—the branch of government charged with determining immigration policy—an opportunity to remedy it. Given the

---

[25] *See* Admin. R., ECF No. 26-1 at 42–228.
[26] *See* Admin. R., ECF No. 26-1 at 238–40.
[27] *See* Admin. R., ECF No. 26-1 at 251.

J.A. 1506                                                          AR2245

reasonable belief that DACA was unlawful, the decision to wind down DACA in an orderly manner was rational.

Accordingly, the Court finds Plaintiffs' APA claims to lack merit; the rescission of DACA neither required notice-and-comment procedures, nor was it decided arbitrarily or capriciously.

### d. *Equal Protection*

Equal protection is the legal mechanism by which the law prevents disparate treatment between groups. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A violative statute or action may provide for disparate treatment facially or in its application. *See id.* at 447–48. In reviewing legislation, which creates disparate impacts 'as applied,' courts review whether the action is covertly based on a suspect classification or if it can be plausibly explained on neutral grounds. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Probative considerations include a history of hostility towards the group, the sequence of events leading to the government action, departures from previous policies, and the legislative history. *See id.* at 265–67. The level of judicial scrutiny depends on the nature of the class targeted for disparate treatment.

The Complaint asserts that strict scrutiny should apply because the disparate treatment allegedly involves suspect classes—race, alienage, and national origin. *See, e.g., Ambach v. Norwick*, 441 U.S. 68, 84 (1979) (finding alienage as a suspect class). When strict scrutiny applies, the government has the burden to demonstrate a compelling state interest, for which the governmental action is narrowly tailored and the least restrictive means. *See, e.g., Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 308 (2013).

The Government's equal protection argument analogizes the rescission of DACA to "selective prosecution"—which is afforded a presumption of non-discriminatory motives absent "clear evidence to the contrary." *See* ECF No. 27-1 at 58–61 (citing *United States v. Armstrong*, 517 U.S. 456, 463–68 (1996) where the court denied discovery on a selective prosecution claim regarding 24 drug-trafficking offenses (all of which were against African-American defendants)). Plaintiffs correctly note that the *Armstrong* court accepted the proposition that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (1996). Plaintiffs aver that the DACA rescission was "a discriminatory policy decision (not a challenge to a particular prosecution) that has a discriminatory impact and was motivated by discriminatory animus." *See* ECF No. 29 at 55 (noting that Hispanics comprise 93 percent of the 800,000 immigrants affected by DACA). To substantiate their claim, Plaintiffs cite to some of President Trump's unfortunate, less-than-politically-correct, statements. *See* ECF No. 29 at 54.

Both sides miss the mark. While DACA was promulgated under a theory of prosecutorial discretion, its rescission was not based on an exercise of that discretion. Rather, its rescission was premised on a legitimate belief that DACA was unlawful and should be wound down in an orderly manner, while giving Congress a window to act and adopt an appropriate legislative solution. The Administrative Record—the basis from which the Court must make its judicial review—does not support the notion that it was targeting a subset of the immigrant population, and it does not support any supposition that the decision was derived on a racial animus. That is where the judicial inquiry should end.

The Court rejects Plaintiffs' reliance on the President's misguided, inconsistent, and occasionally irrational comments made to the media to establish an ulterior motive. *See*

J.A. 1508

AR2247

*generally Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (finding that courts should defer to any "facially legitimate and bona fide reason" for executive action and not "look behind the exercise of that discretion"); *Hamdan v. Rumsfeld*, 548 U.S. 557, 623–24 n.52 (2006) (noting that courts have never, "in evaluating the legality of executive action, deferred to comments made by such officials to the media"); *County of McCreary v. ACLU of Kentucky*, 545 U.S. 844, 845 (2005) (warning courts, albeit in the context of the First Amendment, to refrain from "scrutinizing purpose" when it requires "judicial psychoanalysis of a drafter's heart of hearts").[28]

Although the DACA Rescission Memo is facially clear as to its purpose and reasoning, Plaintiffs urge the Court to look behind it and find an allegedly discriminatory motivation—one that Plaintiffs attempt to establish with some of the President's remarks and statements. However, Plaintiffs here fail to make the necessary factual showing to permit this Court to do so. Albeit in the context of an Establishment Clause challenge, the Fourth Circuit recently explained in the "travel ban" case that there is "a heavy burden on Plaintiffs, but not an insurmountable one [in seeking to introduce such statements]. [Precedent] clearly affords the political branches substantial deference," but "also accounts for those very rare instances in which a challenger plausibly alleges that a government action runs so contrary to the basic premises of our Constitution as to warrant more probing review." *Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *12 (4th Cir. Feb. 15, 2018) (reviewing the standard set forth

---

[28] *See also Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *102 (4th Cir. Feb. 15, 2018) (Niemeyer, J., dissenting):

> Because of their nature, campaign statements and other similar statements, including Tweets, are unbounded resources by which to find intent of various kinds. They are often short-hand for larger ideas; they are explained, modified, retracted, and amplified as they are repeated and as new circumstances and arguments arise. And they are often susceptible to multiple interpretations, depending on the outlook of the recipient. . . .

> At bottom, the danger of this new rule is that it will enable a court to justify its decision to strike down any executive action with which it disagrees. It need only find one statement that contradicts the official reasons given for a subsequent executive action and thereby pronounce that the official reasons were a pretext.

J.A. 1509

AR2248

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 625 of 454    Case 1:17-cv-05228-NGG-VMS    Document 42-7    Filed 09/04/20    Page 997 of 1026 PageID #: 10588

Case 8:17-cv-02942-RWT    Document 42    Filed 03/05/18    Page 22 of 30

in *Kleindienst v. Mandel*, 408 U.S. 753 (1972) "through the lens of Justice Kennedy's [concurring] opinion in" *Kerry v. Din*, 135 S. Ct. 2128 (2015)).

In that case, Chief Judge Gregory, writing for the majority, explained that *Mandel* requires courts to "first ask whether the proffered reason for the Proclamation is 'facially legitimate and bona fide.'" *Id.* (citing *Mandel*, 408 U.S. at 770). Under *Din*, however, a district court "may 'look behind' the Government's proffered justification for its action" upon "an 'affirmative showing of bad faith,' which [plaintiffs] must 'plausibly allege with sufficient particularity.'" *Id.* (citing *Din*, 135 S. Ct. at 2139–41 (Kennedy, J., concurring)). However, while the plaintiffs in the "travel ban" case offered "undisputed evidence" of an "anti-Muslim bias," *see id.* at *13, the Plaintiffs cannot here make a similarly substantial showing. The Fourth Circuit found that then-candidate Trump regularly disparaged Islam as a religion and repeatedly proposed banning Muslims from the United States. *See id.* at *13–*16. Implicit to the issue was a direct nexus between the discriminatory statements and the executive action in question in that case—a travel ban targeting predominantly Muslim nations.

The instant case is factually very different. The President certainly made statements of his strong views on immigration policy, including advocacy for the rescission of the DACA program.[29] However, his statements have frequently shifted but have moderated since his election. He has referred to the Dreamers as "terrific people;" he has pledged to "show great heart;" and he has referred to Dreamers as "incredible kids."[30] He referred to the "DACA

---

[29] *See* Gregory Krieg, *Trump's many shifting positions on DACA, from the campaign to right now*, CNN (Jan. 25, 2018), https://www.cnn.com/2018/01/25/politics/donald-trump-positions-daca/index.html.

[30] *See id.*

Appeal: 18-1521    Document: 29-3    Filed: 07/02/2018    Pg: 666 of 754    Total Pages:(998 of 1054)
Case 1:17-cv-05228-NGG-VMS    Document 42-27    Filed 09/04/20    Page 998 of 1026 PageID #: 10589
Case 8:17-cv-02942-RWT    Document 42    Filed 03/05/18    Page 23 of 30

situation" as a "very difficult thing for me.  Because, you know, I love these kids."[31]  He added that "the existing law is very rough.  It's very, very rough."[32]

The rescission of the DACA program merely fulfills the duty of the executive branch to faithfully enforce the laws passed by Congress.  Accordingly, no affirmative showing of bad faith can follow.  In fact, the President actually urged Congress to pass Dreamer-protection legislation during DACA's wind down period[33]—simply put, this case is wholly dissimilar to the "extraordinary case" regarding the recent "travel ban."[34]  As a result, the Court need not go further than the facially legitimate motivation offered in the DACA Rescission Memo and supported by the Administrative Record.

Accordingly, the Court finds Plaintiffs' equal protection claims to lack merit

### e.  *Procedural Due Process*

Procedural due process ensures that the government must satisfy certain procedures prior to depriving a person of his or her rights.  *See Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976).  Procedural due process applies whenever the government seeks to deprive a person of a liberty or property interest.  *See id.*  Liberty interests include physical restraint, a substantial infringement of a fundamental right, harm to one's reputation affecting another tangible interest, or the unjustified intrusion of one's personal security.  *See, e.g.*, *Vitek v. Jones*, 445 U.S. 480, 488 (1980).  Property interests include real property, personal property, intellectual property, or any legitimate claim of entitlement.  *See, e.g.*, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422,

---

[31] *See id.*

[32] *See id.*

[33] *See supra* Note 15.

[34] *Accord Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *13 (4th Cir. Feb. 15, 2018) ("In the extraordinary case before us, resolution of that question [regarding pretext] presents little difficulty. Unlike *Din* and *Mandel*, in which the Government had a "bona fide factual basis" for its actions, *Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in the judgment), here the Government's proffered rationale for the Proclamation lies at odds with the statements of the President himself.").

AR2250

Appeal: 18-1521    Doc: 28-3    Filed: 07/02/2018    Pg: 692 of 454    Page 999 of 1026 PageID #:
Case 1:17-cv-05228-NGG-VMS    Document 82-7    Filed 09/04/20    Page 999 of 1026 PageID #:
10590

Case 8:17-cv-02942-RWT    Document 42    Filed 03/05/18    Page 24 of 30

429 (1982). Entitlements—rights to things like education, public employment, and welfare—are grounded in the law and cannot be removed except for cause. *See id.* In determining the amount of process owed, courts balance (1) the importance of the right the individual is trying to preserve, (2) the risk of erroneous deprivation of that right given the existing level of due process, and (3) the level of governmental burden for the additional levels of due process sought. *See Eldridge*, 424 U.S. at 334–35.

Plaintiffs allege that under DACA, Dreamers were afforded, and are now being deprived of, a number of protected interests, including the ability to (1) obtain employment authorization, (2) travel internationally, (3) attend schools, (4) pay into and receive payment from Social Security and disability, (5) secure other opportunities like obtaining bank accounts or credit cards, and (6) otherwise be considered "lawfully present." *See* ECF No. 29 at 58.

First, Plaintiffs' claim fails because procedural due process only applies to individualized deprivations, not policy-based deprivations for an entire class. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (holding that individualized hearings are unnecessary when impractical and when the challenged policy affects a large number of people; in these instances, the political process serves as an effective alternative).

Second, even assuming *arguendo* that due process did attach to class-wide policy deprivations, Plaintiffs' due process claim would fail because DACA did not create an entitlement. Facially, the June 15, 2012 DACA Memo explicitly denied the creation of any such rights:

> This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

J.A. 1512

AR2251

Memorandum from U.S. Dep't of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).

While entitlements are not always self-labeled or created with bright flashing lights, the exercise or restraint of prosecutorial discretion is not traditionally the sort of governmental action that creates substantive rights. The DACA Memo did not guarantee any individual immigrant particular benefits, and the DACA Rescission Memo did not curtail DHS's discretion regarding individual immigration reviews. Therefore, even if due process could attach to DACA, no *de facto* entitlements were created by the program itself.

Accordingly, the Court finds Plaintiffs' procedural due process claim to lack merit.

### f. *Substantive Due Process*

While procedural due process outlines the manner by which the government may deprive a person of his or her rights, substantive due process bars the government from depriving a person of a right altogether. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 167–68 (1973) (Stewart, J., concurring). If the right being deprived is a "fundamental right," courts apply strict scrutiny; if the right being deprived is not fundamental, courts apply rational basis.

Certain rights have been adjudicated formally as fundamental (right to associate, right to educate one's children, right to procreate, right to marry, etc.). *E.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 482–86 (1965). In determining whether a non-previously-adjudicated right is fundamental, courts have applied different approaches—whether the absence of the right would make other fundamental rights "less secure," *see id.* at 482–83, whether the right is "deeply rooted in this Nation's history and tradition," *see Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977)), and whether the

J.A. 1513

AR2252

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 1001 of 1026
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 1001 of 1026 PageID #: 10592
Case 8:17-cv-02942-RWT   Document 42   Filed 03/05/18   Page 26 of 30

right is a basic value "implicit in the concept of ordered liberty," *see Glucksberg*, 521 U.S. at 720–21 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).

In the instant case, Plaintiffs claim a "denial of fundamental fairness." *See* ECF No. 29 at 63–64. However, for the "denial of fundamental fairness" to rise to the level of a substantive due process violation, it must be "so egregious" and "so outrageous" as "to shock the contemporary conscience." *See Manion v. N. Carolina Med. Bd.*, 693 F. App'x 178, 181 (4th Cir. 2017) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). Plaintiffs believe they have met this burden by alleging a discriminatory intent in DACA's rescission—an allegation unsupported by the record before this Court.

The rescission of a policy relating to prosecutorial discretion does not shock the conscience of this Court. Absent congressional action, the benefits given to Dreamers by DACA were in potential violation of congressional immigration laws; the only thing that has changed is that deferred status will expire, and enforcement of immigration laws may recommence in the absence of action by Congress, which the President has requested. There is nothing surprising or unfair about policies, laws, or enforcement thereof changing with an election cycle. Furthermore, the election process, and not federal litigation, is the appropriate method for resolving any fairness implicated in DACA's rescission.

Accordingly, the Court finds Plaintiffs' substantive due process claim to lack merit.

### g. *Estoppel*

The doctrine of estoppel is traditionally founded in the principles of fraud as applied in contract law, but the doctrine may be applied elsewhere in the law as well. *See generally W. Augusta Dev. Corp. v. Giuffrida*, 717 F.2d 139, 141 (4th Cir. 1983) (discussing the outgrowth of

the doctrine of estoppel as a claim against the government).  In general, "equitable estoppel is comprised of three basic elements: (1) a voluntary misrepresentation of one party, (2) that is relied on by the other party, (3) to the other party's detriment."  *Chawla v. Transamerica Occidental Life Ins. Co.*, 440 F.3d 639, 646 (4th Cir. 2006).  In this Circuit, when raising such a claim against the government, there is a heightened standard for the first element, and an additional showing of "affirmative misconduct" by the government actors.  *See Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003).

As with Plaintiffs' substantive due process claim, estoppel cannot apply to DACA's rescission.  The rescission of a policy relating to prosecutorial discretion does not amount to a misrepresentation by the government.  DACA was promulgated with an express disclaimer that it was not conferring any rights.  Nothing in the DACA Memo or in DACA's implementation suggested to Dreamers that the program was permanent, and individuals in the program were aware that their protections were subject to renewal every two years.  DACA's rescission lacks any serious injustice—let alone, affirmative misconduct by any of the defendants.

However, while estoppel does not apply to DACA's rescission, it potentially would apply to any use for immigration enforcement of the information collected from Dreamers during DACA registrations.  With regard to this narrow issue, and based on the evidence before it, the Court finds that the Government promised not to transfer or use the information gathered from Dreamers for immigration enforcement.  *See* ECF No. 29 at 42–44, 60–61; ECF No. 29-3 at 15–27, 32–41, 52–76, 96–98, 109–13.  And now that the government is in possession of this information, the potential for use or sharing of it is theoretically possible.

J.A. 1515                                                                                                 AR2254

On the one hand, the Government claims that no changes have been made to the information-sharing policy. However, at oral argument, counsel for the Government was unable to provide any assurance that the Government would not make changes.

> [*Mr. Shumate:*] The rescission policy that is being challenged here says nothing about the sharing of information for enforcement purposes. There's nothing more that the plaintiffs have raised other than a speculative fear that this might happen in the future. But DHS has been quite clear and they said on the FAQ section –
>
> *The Court:* Are you prepared to say that from representing the defendants that there is no intention of changing the information-sharing assurances that were given in connection with DACA?
>
> *Mr. Shumate:* No. I'm not making that representation, Your Honor. Even from the beginning, DHS has been quite clear that this policy on information-sharing can change. . . . But they also I think take liberties with what that policy is. There has never been a promise or assurance that that information would never be changed. FAQ 19 quite clearly says that the information is generally protected and will not be shared for enforcement purposes, but there may be circumstances where it will be to adjudicate a DACA application or for law enforcement purposes if the individual meets the status of the test for notice to appear. But also quite clearly, DHS has said from the start that the information policy – sharing policy can change, but it has not. So that really should be the end of the debate about the information-sharing.

Tr. of Mot. Hr'g (Dec. 15, 2017) at 16–17.

The Court disagrees that this "should be the end of the debate about the information-sharing." *Id.* Logic would dictate that it is possible that the government, having induced these immigrants to share their personal information under the guise of immigration protections, could now use that same information to track and remove them. This potentially would be "affirmative misconduct" by the government, and the Dreamers' detrimental reliance would be self-evident in the information-sharing itself.

Therefore, while the Government will not be enjoined from rescinding DACA, given the substantial risk for irreparable harm in using Dreamers' DACA-provided information, the Court

28

AR2255

Appeal 18-1521   Case 1:17-cv-05228-NGG-VMS   Filed 07/02/2018   Filed 09/04/454   Page 1004 of 1026 PageID
#: 10595
Case 8:17-cv-02942-RWT   Document 42   Filed 03/05/18   Page 29 of 30

will enjoin the Government from using information provided by Dreamers through the DACA program for enforcement purposes.  In the event that the Government needs to make use of an individual Dreamer's information for national security or some purpose implicating public safety or public interest, the Government may petition the Court for permission to do so on a case-by-case basis with *in camera* review.

## IV.    CONCLUSION

In concluding this Opinion, the Court notes the recent opinion of Judge Gonzalo P. Curiel, of the Southern District of California, in which he made observations that aptly apply to this case.  In a case involving a challenge to President Trump's proposed "border wall," he noted that the case was "currently the subject of heated political debate," but that in its review of the case, "the Court cannot and does not consider whether underlying decisions . . . are politically wise or prudent."  *In re Border Infrastructure Envtl. Litig.*, No. CV 17-1215 GPC (WVG), 2018 WL 1071702, at *1 (S.D. Cal. Feb. 27, 2018).  For this proposition, he cited the opinion of his fellow Indiana native, Chief Justice Roberts, in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012):  "Court[s] are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments.  Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them.  It is not our job to protect the people from the consequences of their political choices."

The result of this case is not one that this Court would choose if it were a member of a different branch of our government.  An overwhelming percentage of Americans support protections for "Dreamers," yet it is not the province of the judiciary to provide legislative or executive actions when those entrusted with those responsibilities fail to act.  As Justice Gorsuch noted during his confirmation hearing, "a judge who likes every outcome he reaches is probably

J.A. 1517

AR2256

a pretty bad judge, stretching for the policy results he prefers rather than those the law compels."[35]

This Court does not like the outcome of this case, but is constrained by its constitutionally limited role to the result that it has reached. Hopefully, the Congress and the President will finally get their job done.


Date:  March 5, 2018                                        _____
                                                                             /s/
                                                              ROGER W. TITUS
                                                    UNITED STATES DISTRICT JUDGE

---

[35] Neil Gorsuch, Transcript of Opening Remarks at Confirmation Hearing, Comm. on the Judiciary (Mar. 20, 2017), https://www.judiciary.senate.gov/imo/media/doc/03-20-17%20Gorsuch%20Testimony.pdf.

J.A. 1518                                                                    AR2257

Appeal: 18-1521    Doc: 52    Filed: 07/02/2018    Pg: 1006 of 1454
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 1006 of 1026 PageID #: 10597

Case 8:17-cv-02942-RWT    Document 43    Filed 03/05/18    Page 1 of 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **CASA DE MARYLAND,** *et al.* | * |
| *Plaintiffs* | * |
| v. | *    Civil No. RWT-17-2942 |
| **U.S. DEPARTMENT OF** | * |
| **HOMELAND SECURITY,** *et al.* | |
| | * |
| *Defendants* | |
| | *** |

## <u>ORDER</u>

It is, for the reasons stated in the accompanying Memorandum Opinion, this 5th day of March, 2018, by the United States District Court for the District of Maryland,

**ORDERED**, that Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment [ECF No. 27] is hereby **GRANTED-IN-PART** and **DENIED-IN-PART**; and it is further

**ORDERED**, that Summary Judgment is hereby **GRANTED** in favor of Plaintiffs only with regard to their estoppel claim as it pertains to DACA's information-sharing policy; and it is further

**ORDERED**, that Defendants are hereby **ENJOINED** from using or sharing Dreamer-provided information obtained through the DACA program for enforcement or deportation purposes; any requests for deviations from this Order **SHALL BE SUBMITTED** on a case-by-case basis to this Court for **IN-CAMERA REVIEW**; and it is further

**ORDERED**, that Summary Judgment is hereby **GRANTED** in favor of Defendants with regard to all other claims; and it is further

**ORDERED**, that the Court **ADJUDGES AND DECLARES** that the DACA Rescission

Memo is valid and constitutional in all respects; and it is further

**ORDERED**, that the Clerk of this Court is hereby directed to **CLOSE** this case.

<div align="center">
/s/
_____
ROGER W. TITUS
UNITED STATES DISTRICT JUDGE
</div>

J.A. 1520

**AR2259**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 17-cv-2942 (RWT) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| *Defendants*. | |

## NOTICE

The United States Department of Homeland Security ("DHS"), several DHS components and officials sued in their official capacity, the President of the United States, the Attorney General of the United States, and the United States of America (collectively, "Defendants") respectfully provide this notice to the Court regarding the permanent injunction entered on March 5, 2018:

1.    Earlier this week, the Court issued an Order granting in part and denying in part Defendants' dispositive motion and entering final judgment in the above-captioned challenge to DHS's rescission of the Deferred Action for Childhood Arrivals ("DACA") policy.  March 5, 2018 Order at 1, ECF No. 43 ("Order").  For the reasons stated in its accompanying Memorandum Opinion, ECF No. 42 ("Op."), the Court entered summary judgment in favor of Defendants in substantial part.

2.    However, as for Plaintiffs' "estoppel claim as it pertains to DACA's information-sharing policy," Order at 1, the Court entered summary judgment in favor of Plaintiffs.  On that claim, the Court ordered the following permanent injunctive relief:

> Defendants are hereby **ENJOINED** from using or sharing Dreamer-provided information obtained through the DACA program for

AR2260

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 437 of 454   Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 1009 of 1026 PageID #: 10600

Case 8:17-cv-02942-RWT   Document 45   Filed 03/09/18   Page 2 of 6

enforcement or deportation purposes; any requests for deviations
from this Order **SHALL BE SUBMITTED** on a case-by-case basis
to this Court for **IN-CAMERA REVIEW**.

Order at 1.

3.       Although Defendants respectfully submit that the Court's estoppel holding is in
error, counsel for Defendants have been conferring with representatives of DHS and each of its
relevant subcomponents—U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs
and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE")—about
the process of ensuring prompt compliance with the Court's order to the fullest possible extent.
Defendants face significant challenges in coming into full compliance with the Court's order, as
written.

4.       Plaintiffs' estoppel claim was based on the premise that the government might use
information provided by DACA recipients, to their detriment, in a manner inconsistent with the
information-sharing policy established at DACA's creation in 2012.   *See* Compl. ¶ 179, ECF No.
1 ("Defendants should be equitably estopped from terminating DACA or from using information
provided pursuant to DACA for immigration enforcement purposes, except as previously
authorized under DACA."); *see also id.*, Prayer for Relief ¶ E (seeking an order that would "enjoin
and restrain Defendants . . . from disclosing any DACA applicant information to immigration
enforcement activities in a manner inconsistent with their prior commitments").  But the plain text
of the Court's order, if interpreted literally, sweeps far broader than the relief actually requested in
Plaintiffs' complaint.

5.       For example, a literal reading of the text of the Order might prohibit the routine
agency use of certain information, provided to USCIS by DACA recipients, to verify that they are
actual and current DACA recipients, when encountered by ICE or CBP in the field during
enforcement activity or during routine immigration processing, such as at a port of entry.  In that

AR2261

sense, a literal interpretation of the Order would work to the serious *detriment* of DACA recipients—as a routine query of certain DHS-operated databases containing DACA-related information is the process by which an immigration officer confirms that an individual encountered in the field who claims to be a DACA recipient *actually is* a DACA recipient, and therefore is unlikely to warrant much (if any) additional scrutiny. Defendants presume that neither Plaintiffs nor the Court wish to foreclose the use or sharing of DACA-related information in this way, but the text of the Court's order might have that effect.

6.      The Order also permanently prevents any sharing or use of any "Dreamer-provided information" for enforcement purposes, under any circumstances, without this Court's advance approval—even in circumstances in which the sharing of such information is necessary for reasons of public safety or national security. Yet some information-sharing in those instances, where there is a threat to public safety or national security, is fully consistent with the USCIS information-sharing policy (first announced in 2012, and still in effect in unchanged form today).[1] Plaintiffs' complaint, on the other hand, explicitly contemplated that in certain circumstances—*i.e.*, those "previously authorized under DACA," Compl. ¶ 179—limited information-sharing might still be permitted, as it has been since the policy was first enacted in 2012.

7.      The Court's order might also have the effect of preventing (at least without this Court's prior approval) removal of *any* individual DACA recipient or former DACA recipient— even those convicted of serious felonies or with other disqualifying criminal convictions under the

---

[1] *See* USCIS Form I-821D Instructions at 13 ("Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings *unless* the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance. (www.uscis.gov/NTA).") (emphasis added), *available at* https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction/

AR2262

DACA guidelines.  DACA-related information is routinely used in removal litigation—litigation that is initiated for reasons entirely unrelated to any information provided in a DACA request.

8.      Finally, the use of the phrase "Dreamer-provided information," is vague, but might be interpreted to include information provided by certain individuals who never actually requested or received DACA.  As the Court acknowledged in its opinion, the word "Dreamer" is "neither constitutionally nor statutorily defined."  Op. at 4.  In fact, the word "Dreamer" is often used, colloquially, to refer to a broad set of individuals—*e.g.*, all individuals brought to the United States in violation of the immigration laws as minors—including hundreds of thousands of individuals who would have been ineligible for DACA, say, because of DACA's date-of-entry cut-off, or disqualifying criminal offenses.

9.      Setting aside the literal text of the order, Defendants assume that the sort of conduct that both Plaintiffs and the Court are actually concerned about is a hypothetical future scenario in which USCIS would affirmatively provide DACA-related information to ICE for the intended purpose of using that information to target DACA recipients (or their family members) for enforcement activity, for the sole reason that they are (or were) DACA recipients.  *See* Op. at 28 ("Logic would dictate that it is possible that the government, having induced these immigrants to share their personal information under the guise of immigration protections, could now use that same information to track and remove them.").  In such a hypothetical circumstance, unlike the real-world examples discussed above, it is the *use or sharing of the information* that leads to the enforcement activity—not the pre-existing enforcement activity itself that necessitates some incidental use or sharing of information.

10.     DHS has no plans to engage in such conduct in the future, as the Court's opinion appears to acknowledge.  *See* Op. at 28-29.  But the text of the Court's order is not limited to this

J.A. 1524

AR2263

sort of hypothetical conduct—notwithstanding that the legal theory adopted by the Court's estoppel holding requires some "voluntary misrepresentation" and "affirmative misconduct" by the government.  And the Order's breadth will disrupt routine, necessary, and appropriate agency functions—unchanged across administrations, and since the beginning of the DACA policy—in ways that Defendants doubt that either the Court or Plaintiffs truly intended.

11.     For these and other reasons, Defendants intend to seek relief from this portion of the Court's order, in a motion to be filed no later than March 23, 2018, which will include additional detail provided in declarations from the relevant DHS components.  Defendants also intend to discuss these matters with counsel for Plaintiffs, to seek their consent to some or all of Defendants' forthcoming request for relief, particularly with respect to the applications of the Court's order that would work to the detriment of DACA recipients, or that sweep beyond the relief that Plaintiffs requested.

12.     Defendants are filing this notice now so that the Court is aware of the significant difficulty that Defendants will face in endeavoring to comply fully with a literal reading of the text of the Court's order while it remains in effect—indeed, full compliance may prove to be impossible.  Of course, unless and until Defendants obtain relief, Defendants will work in good faith to comply to the greatest extent that is reasonably possible.  In particular, Defendants will ensure, at a minimum, that absent further order of the Court, DHS's existing information-sharing policy, unchanged since 2012, will remain unchanged.  *Cf.* Op. at 26-29; Compl. ¶ 179, Prayer for Relief ¶ E.  To the extent that the Court intended its order to prohibit only such changes, the Court may now wish to clarify the Order's scope, even before Defendants' forthcoming filing.

13.     If the Court wishes to discuss these issues further before Defendants' forthcoming filing, Defendants are available for a status conference between now and March 23, 2018.

J.A. 1525

AR2264

Appeal 18-1521, Document 28-3, Filed 07/02/2018, Page 454 of 454
Case 1:17-cv-05228-NGG-VMS Document 282-7 Filed 09/04/20 Page 1013 of 1026 PageID #: 10604
Case 8:17-cv-02942-RWT Document 45 Filed 03/09/18 Page 6 of 6

Dated: March 9, 2018        Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

/s/ Rachael L. Westmoreland
RACHAEL L. WESTMORELAND
KATHRYN C. DAVIS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-1280
Fax: (202) 616-8470
Email: Rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

6

J.A. 1526

AR2265

Appeal: 18-1521   Doc: 28-3   Filed: 07/02/2018   Pg: 449 of 454
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 1014 of 1026 PageID #: 10605

Case 8:17-cv-02942-RWT   Document 46   Filed 03/12/18   Page 1 of 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**ROGER W. TITUS**
**UNITED STATES DISTRICT JUDGE**

**6500 CHERRYWOOD LANE**
**GREENBELT, MARYLAND 20770**
**301-344-0052**

## M E M O R A N D U M

TO:        Counsel of Record

FROM:     Judge Roger W. Titus

RE:        *Casa De Maryland, et al., v. United States Dept. of Homeland Security, et al.*
            Civil No. RWT-17-2942

DATE:     March 12, 2018

\* \* \* \* \* \* \* \* \*

The Court takes notice of Defendants' March 9, 2018 filing [ECF No. 45] expressing concerns as to the scope of the injunction imposed by this Court on March 5, 2018. Plaintiffs and Defendants are hereby **DIRECTED** to work together in an effort to resolve or reach agreement on these issues.

In the event that the parties can reach a consensus,

- Defendants **SHALL FILE** a status report with the Court to inform it of the mutually agreeable terms due **no later than Noon on Wednesday March 14, 2018**.

In the event that the parties cannot reach a consensus,

- Defendants **SHALL FILE** any Motion to Alter or Amend the Injunction by **no later than Noon on Wednesday March 14, 2018**.
- Plaintiffs **SHALL FILE** any response in opposition **no later than 9:00 a.m. on Thursday March, 15, 2018**.
- The Court will hear oral argument in court on any Motion to Alter or Amend the Injunction **at 11:00 a.m. on Thursday March, 15, 2018**.

Despite the informal nature of this ruling, it shall constitute an Order of the Court, and the Clerk is directed to docket it accordingly.

_____
/s/
Roger W. Titus
United States District Judge

Appeal: 18-1521   Doc: 52-2   Filed: 07/02/2018   Pg: 449 of 454
Case 1:17-cv-05228-NGG-VMS   Document 283-7   Filed 09/04/20   Page 1015 of 1026 PageID #: 10606

Case 8:17-cv-02942-RWT   Document 47   Filed 03/14/18   Page 1 of 3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND, *et al.*,<br><br>     *Plaintiffs*,<br><br> v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>     *Defendants*. | No. 17-cv-2942 (RWT) |

## JOINT STATUS REPORT

Pursuant to the Court's March 12, 2018 Order, ECF No. 46, the parties, having conferred, jointly and respectfully notify the Court that they have reached an agreement regarding the scope of the injunction entered by the Court on March 5, 2018.

Without waiving any objections to the Court's March 5, 2018 Order, ECF No. 43, and reserving their rights to any appeal, the parties jointly and respectfully request that the fourth paragraph of the Court's March 5, 2018 Order be amended to read as follows:

> **ORDERED**, that DHS and USCIS are **ENJOINED** to comply with the policy, first announced in 2012 (and as set forth in the response to archived USCIS DACA FAQ No. 19 and the Form I-821D instructions and policies referenced therein) (collectively, the "Policy") restricting the use or sharing of information provided by DACA requestors; except that (1) the language in the Policy specifying that it "may be modified, superseded, or rescinded at any time without notice" is hereby **ENJOINED** pending further order of this Court or relief on appeal; and (2) any requests for deviation from this Order **SHALL BE SUBMITTED** on a case-by-case basis to this Court for **IN-CAMERA REVIEW**.

Dated: March 14, 2018     Respectfully submitted,

             CHAD A. READLER
             Acting Assistant Attorney General

Appeal: 18-1521   Doc: 55-3   Filed: 07/02/2018   Pg: 1016 of 1026
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 1016 of 1026 PageID #: 10607
Case 8:17-cv-02942-RWT   Document 47   Filed 03/14/18   Page 2 of 3

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

/s/  Kathryn C. Davis
KATHRYN C. DAVIS
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

/s/  John A. Freedman
John A. Freedman (D. Md. 20276)
Gaela Gehring Flores (D. Md. 14559)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
(202) 942-5000
John.Freedman@apks.com

Elizabeth J. Bower (pro hac vice)
Kevin B. Clark (D. Md. 04771)
Priya Aiyar (pro hac vice)
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006-1238
(202) 303-1000
EBower@willkie.com

Matthew K. Handley (D. Md. 18636)
Dennis A. Corkery (D. Md. 19076)
WASHINGTON LAWYERS'

2

AR2268

Appeal: 18-1521    Doc: 55-2    Filed: 07/02/2018    Pg: 1045 of 1454
Case 1:17-cv-05228-NGG-VMS    Document 282-7    Filed 09/04/20    Page 1017 of 1026 PageID #: 10608
Case 8:17-cv-02942-RWT    Document 47    Filed 03/14/18    Page 3 of 3

COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, Suite 400
Washington, DC 20036
(202) 319-1000
matthew_handley@washlaw.org
dennis_corkery@washlaw.org

Ajmel Quereshi (D. Md. 28882)
HOWARD UNIVERSITY SCHOOL OF
LAW CIVIL RIGHS CLINIC
2900 Van Ness Street, NW
Washington, DC 20008
(202) 806-8000
aquereshi@law.howard.edu

*Counsel for Plaintiffs*

AR2269

Appeal: 18-1521   Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 07/02/2018   Filed 06/01/454   Page 1018 of 1026 PageID
#: 10609

Case 8:17-cv-02942-RWT   Document 48   Filed 03/15/18   Page 1 of 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**ROGER W. TITUS**
**UNITED STATES DISTRICT JUDGE**

**6500 CHERRYWOOD LANE**
**GREENBELT, MARYLAND 20770**
**301-344-0052**

## M E M O R A N D U M

| | |
|---|---|
| TO: | Counsel of Record |
| FROM: | Judge Roger W. Titus |
| RE: | *Casa De Maryland, et al. v. United States Dept. of Homeland Security, et al.*<br>Civil No. RWT-17-2942 |
| DATE: | March 15, 2018 |

\* \* \* \* \* \* \* \* \*

On March 5, 2018, the Court entered an Order in this case which included an injunction preventing the government's use or sharing of information obtained through the DACA program for enforcement or deportation purposes. *See* ECF No. 43. On March 9, 2018, the Government filed a notice expressing concerns as to the scope of the injunction. *See* ECF No. 45. The Court ordered the parties to work together in an effort to resolve or reach agreement regarding those concerns. *See* ECF No. 46. If the parties were able to reach consensus, they were directed to submit mutually agreeable text, and if the parties were unable to do so, the Court would hold a hearing to resolve the disagreement. *See id.*

On March 14, 2018, the parties filed a joint status report with proposed textual revisions to the ordered injunction. *See* ECF No. 47. The Court will treat this filing as a Consent Motion to Alter or Amend the Injunction, which is hereby **GRANTED**. A separate Amended Order will follow.

Despite the informal nature of this ruling, it shall constitute an Order of the Court, and the Clerk is directed to docket it accordingly.

_____/s/_____
Roger W. Titus
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **CASA DE MARYLAND,** *et al.* | * |
| *Plaintiffs* | * |
| v. | *   Civil No. RWT-17-2942 |
| **U.S. DEPARTMENT OF HOMELAND SECURITY,** *et al.* | * |
| | * |
| *Defendants* | *** |

## <u>AMENDED ORDER</u>

It is, for the reasons stated in the March 5, 2018 Memorandum Opinion [ECF No. 42] and today's accompanying Memorandum, this 15th day of March, 2018, by the United States District Court for the District of Maryland,

**ORDERED**, that Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment [ECF No. 27] is hereby **GRANTED-IN-PART** and **DENIED-IN-PART**; and it is further

**ORDERED**, that Summary Judgment is hereby **GRANTED** in favor of Plaintiffs only with regard to their estoppel claim as it pertains to DACA's information-sharing policy; and it is further

**ORDERED**, that the Department of Homeland Security ("DHS") and U.S. Citizenship and Immigration Services ("USCIS") are **ENJOINED** to comply with the policy, first announced in 2012 (and as set forth in the response to archived USCIS DACA FAQ No. 19 and the Form I-821D instructions and policies referenced therein) (collectively, the "Policy") restricting the use or sharing of information provided by DACA requestors; except that (1) the language in the Policy specifying that it "may be modified, superseded, or rescinded at any time

without notice" is hereby **ENJOINED** pending further order of this Court or relief on appeal;

and (2) any requests for deviation from this Order **SHALL BE SUBMITTED** on a case-by-case

basis to this Court for **IN-CAMERA REVIEW**; and it is further

      **ORDERED**, that Summary Judgment is hereby **GRANTED** in favor of Defendants with

regard to all other claims; and it is further

      **ORDERED**, that the Court **ADJUDGES AND DECLARES** that the DACA Rescission

Memo is valid and constitutional in all respects; and it is further

      **ORDERED**, that the Clerk of this Court is hereby directed to **CLOSE** this case.

/s/
_____
ROGER W. TITUS
UNITED STATES DISTRICT JUDGE

AR2272

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND, THE COALITION FOR HUMANE IMMIGRANT RIGHTS, FAIR IMMIGRATION MOVEMENT, ONE AMERICA, PROMISE ARIZONA, MAKE THE ROAD PENNSYLVANIA, MICHIGAN UNITED, ARKANSAS UNITED COMMUNITY COALITION, JUNTA FOR PROGRESSIVE ACTION, INC., ANGEL AGUILUZ, ESTEFANY RODRIGUEZ, HEYMI ELVIR MALDONADO, NATHALY URIBE ROBLEDO, ELISEO MAGES, JESUS EUSEBIO PEREZ, JOSUE AGUILUZ, MISSAEL GARCIA, JOSE AGUILUZ, MARICRUZ ABARCA, ANNABELLE MARTINES HERRA, MARIA JOSELINE CUELLAR BALDELOMAR, BRENDA MORENO MARTINEZ, LUIS AGUILAR, J.M.O., a minor child, ADRIANA GONZALES MAGOS, next of friend to J.M.O., A.M., a minor child, and ISABEL CRISTINA AGUILAR ARCE, next of friend to A.M., | Civil Case No. 17-cv-2942 (RWT) Electronically Filed |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. CUSTOMS AND BORDER PROTECTION, DONALD J. TRUMP, JEFFERSON BEAUREGARD SESSIONS III, ELAINE C. DUKE, JAMES W. MCCAMENT, THOMAS D. HOMAN, KEVIN K. MCALEENAN, and UNITED STATES OF AMERICA, | |
| Defendants. | |

Appeal: 18-1521   Doc: 52-3   Filed: 07/02/2018   Pg: 450 of 454
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 1022 of 1026 PageID #: 10613

Case 8:17-cv-02942-RWT   Document 52   Filed 04/27/18   Page 2 of 3

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs  in the above-named case hereby appeal to the United States Court of Appeals for the Fourth Circuit from this Court's Memorandum Opinion (ECF No. 42) of March 5, 2018 and Amended Order (ECF No. 49) of March 15, 2018: and Memorandum and Order (ECF No. 28) of November 21, 2017 granting in part Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment; ordering that summary judgment is granted in favor of Defendants on all claims other than Plaintiffs' estoppel claim as it pertains to DACA's information-sharing policy; and adjudging and declaring that the DACA Rescission Memo is valid and constitutional in all respects.

AR2274

Dated:  April 27, 2018

Respectfully submitted,


_/s/ John A. Freedman_____

Matthew K. Handley (D. Md. 18636)
Dennis A. Corkery (D. Md. 19076)
WASHINGTON LAWYERS'
  COMMITTEE FOR CIVIL RIGHTS
AND
  URBAN AFFAIRS
11 Dupont Circle, Suite 400
Washington, DC 20036
(202) 319-1000
matthew_handley@washlaw.org
dennis_corkery@washlaw.org

Elizabeth J. Bower[†]
Kevin B. Clark (D. Md. 04771)
Priya Aiyar[†]
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC  20006-1238
EBower@willkie.com

Nicholas Katz (pro hac vice forthcoming)
CASA DE MARYLAND
8151 15th Ave.
Hyattsville, MD 20783
(240) 491-5743
NKatz@wearecasa.org

[†]*Appearing* pro hac vice

John A. Freedman (D. Md. 20276)
Gaela Gehring Flores (D. Md.14559)
Ronald A. Schechter[†]
Nancy L. Perkins[†]
Jeremy Karpatkin (pro hac vice forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

Steven L. Mayer (pro hac vice forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
10th Floor
Three Embarcadero Center
San Francisco, CA 94111-4024
+1 415.471.3100

Emily Newhouse Dillingham (pro hac vice forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
70 W. Madison St., Suite 4200
Chicago, IL 60602-4231
(312) 583-2435
emily.dillingham@arnoldporter.com

Ajmel Quereshi (D. Md. 28882)
HOWARD UNIVERSITY SCHOOL OF
  LAW CIVIL RIGHS CLINIC
2900 Van Ness Street, NW
Washington, DC 20008
(202) 806-8000
aquereshi@law.howard.edu

*Attorneys for Plaintiffs*

J.A. 1536

**AR2275**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

                  *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

                  *Defendants*.

No. 17-cv-2942 (RWT)

## NOTICE OF APPEAL

Notice is hereby given that all Defendants in the above-captioned matter hereby appeal to the United States Court of Appeals for the Fourth Circuit from the March 5, 2018 Memorandum Opinion and Order and the March 15, 2018 Amended Order of the Honorable Roger W. Titus, United States District Judge (ECF Nos. 42, 43, 49). This appeal includes all prior orders and decisions that merge into the Court's March 5 and 15, 2018 orders.

Dated: May 4, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/   Kathryn C. Davis*
KATHRYN C. DAVIS

AR2276

Appeal: 18-1521   Doc: 52-3   Filed: 07/02/2018   Pg: 459 of 464
Case 1:17-cv-05228-NGG-VMS   Document 282-7   Filed 09/04/20   Page 1025 of 1026 PageID #: 10616
Case 8:17-cv-02942-RWT   Document 53   Filed 05/04/18   Page 2 of 2

RACHAEL WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2018, I electronically filed the foregoing Joint

Appendix with the United States Court of Appeals for the Fourth Circuit by using

the appellate CM/ECF system. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.


Dated: July 2, 2018                      /s/ John A. Freedman
                                        John A. Freedman

**AR2278**