Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

———

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

———

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

———

**JOINT APPENDIX
(VOLUME 1)**

———

NOEL J. FRANCISCO
*Solicitor General
Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217*

*Counsel of Record
 for Petitioners*

ROBERT ALLEN LONG, JR.
*Covington & Burling, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
rlong@cov.com
(202) 662-5612*

*Counsel of Record
 for Respondents
 Regents of the University
 of California and
 Janet Napolitano
 (No. 18-587)*

**PETITIONS FOR A WRIT OF CERTIORARI FILED: NOV. 5, 2018
CERTIORARI GRANTED: JUNE 28, 2019**

Additional Captions and Counsel Listed on Inside Cover

**AR2279**

———

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.

———

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

———

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

———

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

———

## Additional Counsel For Respondents

THEODORE J. BOUTROUS, JR.
*Gibson, Dunn & Crutcher
LLP
333 South Grand Ave.
Los Angeles, CA. 90071
tboutrous@gibsondunn.com
(213) 229-7804*

*Counsel of Record
for Respondents
  Dulce Garcia, Miriam
  Gonzalez Avila, Saul
  Jimenez Suarez, Viridiana
  Chabolla Mendoza, Norma
  Ramirez, and Jirayut
  Latthivongskorn
(No. 18-587)*

MICHAEL JAMES MONGAN
*Solicitor General
California Department of
  Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA. 94102
michael.mongan@doj.ca.gov
(415) 510-3920*

*Counsel of Record
for Respondents
  States of California, Maine,
  Maryland, and Minnesota
(No. 18-587)*

**AR2280**

STACEY M. LEYTON
*Altshuler Berzon, LLP*
*177 Post St., Suite 300*
*San Francisco, CA. 94108*
*sleyton@altshulerberzon.com*
*(415) 421-7151*

*Counsel of Record for Respondents County of Santa Clara and Service Employees International Union Local 521 (No. 18-587)*

JAMES R. WILLIAMS
*Office of the County Counsel*
*County of Santa Clara*
*70 West Hedding St.*
*East Wing, Ninth Floor*
*San Jose, CA. 95110*
*(408) 299-5900*

*Counsel of Record for Respondents County of Santa Clara (No. 18-587)*

LINDSAY C. HARRISON
*Jenner & Block, LLP*
*1099 New York Ave., N.W.*
*Suite 900*
*Washington, D.C. 20001*
*lharrison@jenner.com*
*(202) 639-6000*

*Counsel of Record for Respondents Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez (No. 18-588)*

JOSEPH M. SELLERS
*Cohen Milsten Sellers & Toll PLLC*
*1100 New York Ave., N.W.*
*Fifth Floor*
*Washington, D.C. 20005*
*jsellers@cohenmilstein.com*
*(202) 408-4600*

*Counsel of Record for Respondents NAACP, American Federation of Teachers, and United Food and Commercial Workers International Union (No. 18-588)*

MICHAEL J. WISHNIE
*William O. Douglas Clinical Professor of Law and Counselor to the Dean*
*Yale Law School*
*127 Wall Street*
*New Haven, CT. 06511*
*michael.wishnie@yale.edu*
*(203) 436-4780*

*Counsel of Record for Respondents Martin Jonathan Batalla Vidal, et al. (No. 18-589)*

BARBARA DALE UNDERWOOD
*Solicitor General*
*New York Attorney General's Office*
*28 Liberty St.*
*New York, N.Y. 10005*
*barbara.underwood@ag.ny.gov*
*(212) 416-8016*

*Counsel of Record for Respondents State of New York, et al. (No. 18-589)*

# TABLE OF CONTENTS

Page

## Volume 1

Relevant docket entries (18-587):

    Court of appeals docket entries (18-15068) ..................... 1

    Court of appeals docket entries (18-15069) ................. 28

    Court of appeals docket entries (18-15070) ................. 55

    Court of appeals docket entries (18-15071) ................. 82

    Court of appeals docket entries (18-15072) ............... 108

    Court of appeals docket entries (18-15128) ............... 136

    Court of appeals docket entries (18-15133) ............... 162

    Court of appeals docket entries (18-15134) ............... 188

    District court docket entries (17-cv-05211) ............... 214

    District court docket entries (17-cv-05235) ............... 222

    District court docket entries (17-cv-05329) ............... 225

    District court docket entries (17-cv-05380) ............... 229

    District court docket entries (17-cv-05813) ............... 233

Relevant docket entries (18-588):

    Court of appeals docket entries (18-5243) ................. 237

    District court docket entries (17-cv-01907) ............... 241

    District court docket entries (17-cv-02325)  ............... 246

Relevant docket entries (18-589):

    Court of appeals docket entries (18-122) ................... 258

    Court of appeals docket entries (18-123) ................... 262

    Court of appeals docket entries (18-485) ................... 267

    Court of appeals docket entries (18-488) ................... 292

    Court of appeals docket entries (18-1313) ................. 314

    Court of appeals docket entries (18-1314) ................. 317

    Court of appeals docket entries (18-1521) ................. 320

    Court of appeals docket entries (18-1525) ................. 327

(I)

II

| Table of Contents—Continued: | Page |
|---|---|
| Court of appeals docket entries (18-1985) | 333 |
| Court of appeals docket entries (18-1986) | 338 |
| Court of appeals docket entries (18-1987) | 343 |
| Court of appeals docket entries (18-1988) | 349 |
| District court docket entries (16-cv-04756) | 354 |
| District court docket entries (17-cv-05228) | 365 |

**Volume 2**

Relevant pleadings (18-587):
Complaint (17-cv-05813) (Oct. 10, 2017) ...... 376
Complaint (17-cv-05380) (Sept. 18, 2017) ...... 416
Complaint (17-cv-05329) (Sept. 14, 2017) ...... 480
Complaint (17-cv-05235) (Sept. 11, 2017) ...... 504
Complaint (17-cv-05211) (Sept. 8, 2017) ...... 555
Relevant pleadings (18-588):
Complaint (17-cv-02325) (Nov. 3, 2017) ...... 580
Amended complaint (17-cv-01907)
(Oct. 23, 2017) ...... 630
Relevant pleadings (18-589):
Third amended complaint (16-cv-04756)
(Dec. 11, 2017) ...... 652
Amended complaint (17-cv-05228)
(Oct. 4, 2017) ...... 706

Excerpts from administrative record:
Office of Legal Counsel, Memorandum on
The Department of Homeland Security's
Authority to Prioritize Removal of Certain
Aliens Unlawfully Present in the United
States and to Defer Removal of Others
(Nov. 19, 2014) ...... 797

**AR2283**

III

Table of Contents—Continued:                    Page

Memorandum on Enforcement of the
    Immigration Laws to Serve the National
    Interest (Feb. 20, 2017)............................................ 857
Memorandum on Rescission of Memorandum
    Providing for Deferred Action for Parents of
    Americans and Lawful Permanent Residents
    (June 15, 2017) ........................................................ 868
Letter from State Attorneys General to
    Attorney General of the United States
    (June 29, 2017) ........................................................ 872
Letter from Attorney General to Acting
    Secretary of Homeland Security
    (Sept. 4, 2017) .......................................................... 877

Other materials from the record:
Declaration of Maria De La Cruz Perales
    Sanchez in support of motion for summary
    judgment and motion for preliminary injunc-
    tion (17-cv-02325 D. Ct. Doc. 28-8)
    (Dec. 15, 2017) ......................................................... 879
Declaration of Eliana Fernandez in support of
    motion for preliminary injunction
    (16-cv-04756 D. Ct. Doc. 123-13)
    (Dec. 15, 2017) ......................................................... 889
Declaration of Carolina Fung Feng in support of
    motion for preliminary injunction
    (16-cv-04756 D. Ct. Doc. 123-13)
    (Dec. 15, 2017) ......................................................... 894
Declaration of Martin Batalla Vidal in support of
    motion for preliminary injunction
    (16-cv-04756 D. Ct. Doc. 123-13)
    (Dec. 15, 2017) ......................................................... 902

AR2284

IV

Table of Contents—Continued:                                   Page

Declaration of Jirayut Latthivongskorn in
    support of motion for provisional relief
    (17-cv-05211 D. Ct. Doc. 118-1)
    (Nov. 1, 2017)............................................................. 915

Declaration of Dulce Garcia in support of motion
    for provisional relief
    (17-cv-05211 D. Ct. Doc. 117)
    (Nov. 1, 2017)............................................................. 932

Declaration of Mitchell Santos Toledo in support
    of motion for provisional relief
    (17-cv-05211 D. Ct. Doc. 119-1)
    (Nov. 1, 2017)............................................................. 953

Declaration of Joel Sati in support of motion for
    provisional relief
    (17-cv-05211 D. Ct. Doc. 119-1)
    (Nov. 1, 2017)............................................................. 965

Letter from President to House and Senate lead-
    ers, attached to motion for provisional relief
    (17-cv-05211 D. Ct. Doc. 124)
    (Nov. 1, 2017)............................................................. 981

U.S. Citizenship and Immigration Services,
    Number of Form I-821D, Consideration of
    Deferred Action for Childhood Arrivals, Fis-
    cal Year 2012-2017, attached to complaint
    (17-cv-05235 D. Ct. Doc. 1-3)
    (Sept. 11, 2017)........................................................... 996

Justice News:  Attorney General Sessions Deliv-
    ers Remarks on DACA, attached to motion
    for provisional relief
    (17-cv-05211 D. Ct. Doc. 121-2)
    (Nov. 1, 2017)............................................................. 999

AR2285

V

Table of Contents—Continued:                                    Page

Excerpt from deposition of Gene Hamilton, at-
    tached to motion for preliminary injunction
    (16-cv-04756 D. Ct. Doc. 123-9)
    (Dec. 15, 2017) ....................................................... 1005

Excerpt from defendant's objections and re-
    sponses to plaintiffs' first set of requests for
    admission to Acting Secretary of Homeland
    Security, attached to motion for preliminary
    injunction
    (16-cv-04756 D. Ct. Doc. 123-4)
    (Dec. 15, 2017) ....................................................... 1008

Excerpt from defendant's objections and re-
    sponses to plaintiffs' first set of requests for
    admission to Attorney General, attached to
    motion for preliminary injunction
    (16-cv-04756 D. Ct. Doc. 123-4)
    (Dec. 15, 2017) ....................................................... 1012

AR2286

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

Docket No. 18-15068

REGENTS OF THE UNIVERSITY OF OF CALIFORNIA;
JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA,
PLAINTIFFS-APPELLEES

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY;
KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY, DEFENDANTS-APPELLANTS

———

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| 1/16/18 | 1 | DOCKETED CAUSE AND ENTERED APPEARANCES OF COUNSEL. SEND MQ: Yes. The schedule is set as follows: To be set. Preliminary Injunction, C. R. 3-3 [10725634] (JBS) [Entered: 01/16/2018 01:25 PM] |
| 1/17/18 | 2 | Filed clerk order (Deputy Clerk: SLL): The court sua sponte consolidates appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the dockets accordingly. Consolidated appeal Nos. 18-15068, 18-15069, |

(1)

**AR2287**

2

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | 18-15070, 18-15071, and 18-15072, filed on January 16, 2018, are preliminary injunction appeals. Accordingly, Ninth Circuit Rule 3-3 shall apply.  The mediation questionnaire is due three days after the date of this order.  If they have not already done so, within 7 calendar days after the filing date of this order, the parties shall make arrangement3 to obtain from the court reporter an official transcript of proceedings in the district court that will be included in the record on appeal. The briefing schedule shall proceed as follows:  the consolidated opening brief(s) and excerpts of record are due not later than February 13, 2018; the consolidated answering brief(s) is due March 13, 2018 or 28 days after service of the opening brief, whichever is earlier; and the optional consolidated reply brief(s) is due within 21 days after service of the answering brief.  See 9th Cir. R. 3-3(b).  All parties on a side are encouraged to join in a single brief to the greatest extent practicable.  See 9th Cir. R. 28-4.  The parties are reminded that streamlined requests for ex- |

AR2288

3

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | tensions of time are not available in preliminary injunction appeals. See http://www.ca9.uscourts.gov/content/view.php?pk_id=0000000 638.  Any request for an extension of time must be requested under Ninth Circuit Rule 31-2.2(b).  Failure to file timely the opening brief shall result in the automatic dismissal of this appeal by the Clerk for failure to prosecute.  See 9th Cir. R. 42-1. [10726638] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072] (OC) [Entered: 01/17/2018 09:06 AM] |
| | | *   *   *   *   * |
| 1/26/18 | 21 | Filed clerk order (Deputy Clerk: MCD):  The court sua sponte expedites appeal Nos. 18-15128, 18-15133, 18-15134, and consolidates them with pending consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072.  The Clerk shall update the docket accordingly. The following briefing schedule shall apply to the consolidated appeals:  the consolidated first brief on cross-appeal by Defendants is due February 13, 2018. The consolidated second brief on |

4

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | cross-appeal by Plaintiffs is due March 13, 2018. The consolidated third brief on cross-appeal by Defendants is due April 10, 2018. The consolidated optional fourth brief on cross-appeal by Plaintiffs is due within 21 days after service of the third brief on cross-appeal. All parties on a side are encouraged to join in a single brief to the greatest extent practicable. See 9th Cir. R. 28-4. This order is without prejudice to any party moving for appropriate relief following resolution of the petition for a writ of certiorari in Supreme Court Case No. 17-1003. [10740072] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (AF) [Entered: 01/26/2018 11:43 AM] |
| | | *  *  *  *  * |
| 2/13/18 | 31 | Submitted (ECF) First Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Don- |

**AR2290**

5

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | ald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128. Date of service: 02/13/2018. [10762501] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected PDF of brief. 02/15/2018 by RY] (Stern, Mark) [Entered: 02/13/2018 01:40 PM] |
| 2/13/18 | 32 | Submitted (ECF) excerpts of record. Submitted by Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 02/13/2018. [10762529] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 02/13/2018 01:50 PM] |
| | | * * * * * |
| 3/13/18 | 43 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota |

6

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | in 18-15069, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133, 18-15128. Date of service: 03/13/2018. [10797115] [18-15068, 18-15069, 18-15133, 18-15128]—[COURT UPDATE: Spread docket text to 18-15070, 18-15071, 18-15072, 18-15134. 03/14/2018 by RY] (Mongan, Michael) [Entered: 03/13/2018 04:24 PM] |
| 3/13/18 | 44 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128, Appellants Janet Napolitano, Regents of the University of California and City of San Jose in 18-15133. Date of service: 03/13/2018. [10797237] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:14 PM] |

AR2292

7

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 3/13/18 | <u>45</u> | Submitted (ECF) supplemental excerpts of record. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee State of California in 18-15069, Appellee City of San Jose in 18-15070, Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, City of San Jose, County of Santa Clara, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521 and State of California in 18-15128, Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California and State of California in |

8

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797304] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:53 PM] |
| 3/13/18 | 46 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Viridiana Chabolla Mendoza, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Dulce Garcia in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, County of Santa Clara, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez, Service Employees International Union Local 521 and Dulce Garcia in 18-15128, Appellants Viridiana |

9

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.   Date of service:   03/13/2018.   [10797416] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Spread docket text to 18-15069, 18-15070. 03/14/2018 by RY] (Boutrous, Theodore) [Entered:   03/13/2018 08:41 PM] |
| | | *   *   *   *   * |
| 4/3/18 | <u>134</u> | Submitted (ECF) Third Brief on Cross-Appeal for review.   Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appel- |

10

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | lants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
| | | * * * * * |
| 4/17/18 | <u>139</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 04/17/2018. [10839746] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 04/17/2018 12:02 PM] |
| | | * * * * * |
| 4/17/18 | <u>141</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submit- |

**AR2296**

11

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | ted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128. Date of service: 04/17/2018. [10840021] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/17/2018 01:41 PM] |
| | | *  *  *  *  * |
| 4/17/18 | 143 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15128, Appellants Viridiana |

12

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.  Date of service: 04/17/2018.  [10840409] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-15069, 18-15070] (Boutrous, Theodore) [Entered:  04/17/2018 03:49 PM] |
| | | *   *   *   *   * |
| 4/25/18 | 149 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities.  Date of service:  04/25/2018. |

**AR2298**

13

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
|  |  | [10849629] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 04/25/2018 08:55 AM] |
|  |  | *   *   *   *   * |
| 4/25/18 | 151 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities.   Date of service: 04/25/2018.   [10851189] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT ENTERED FILING to correct entry [149].] (RY) [Entered:  04/25/2018 04:36 PM] |
| 4/26/18 | 152 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 |

14

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | citation of supplemental authorities.   Date of service:   04/26/2018. [10852623] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/26/2018 03:05 PM] |
| | | *   *   *   *   * |
| 5/1/18 | 157 | Filed clerk order (Deputy Clerk: OC):   The parties are ordered to submit supplemental briefs of no more than fifteen double-spaced pages addressing the effect of Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), and Montana Air Chapter No. 29 v. FLRA, 898 F.2d 753, 756–57 (9th Cir. 1990), on the question whether 5 U.S.C. § 701(a)(2) bars judicial review of the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals program.   The parties should consider whether the rescission is judicially reviewable as a general enforcement policy, rather than as a single-shot non-enforcement decision.   See Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994); NAACP v. Trump, Nos. 17-1907 & 17-2325, 2018 WL |

15

| DATE | DOCKET NUMBER | PROCEEDINGS |
| --- | --- | --- |
| | | 1920079, at *11–17 (D.D.C. Apr. 24, 2018) (interpreting the standard in Crowley). The briefs shall be filed on or before May 11, 2018. [10857346] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-80037] (OC) [Entered: 05/01/2018 12:58 PM] |
| | | *   *   *   *   * |
| 5/11/18 | 166 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134. Date of service: 05/11/2018. [10870059] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 05/11/2018 02:28 PM] |
| 5/11/18 | 167 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellants Kirstjen Nielsen and |

16

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 05/11/2018. [10870142] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 05/11/2018 03:04 PM] |
| 5/11/18 | 168 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees City of San Jose, Janet Napolitano and Regents of the University of California in 18-15128. Date of service: 05/11/2018. [10870151] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] |

17

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | (Davidson, Jeffrey) [Entered: 05/11/2018 03:11 PM] |
| | | *   *   *   *   * |
| 5/11/18 | <u>172</u> | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 05/11/2018. [10870452] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected brief. 5/14/2018 by TYL] (Mongan, Michael) [Entered: 05/11/2018 05:10 PM] |
| | | *   *   *   *   * |
| 5/15/18 | <u>179</u> | ARGUED AND SUBMITTED TO KIM MCLANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS. [10873596] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Witt, Dusty) [Entered: 05/15/2018 04:18 PM] |

**AR2303**

18

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | * * * * * |
| 5/21/18 | 182 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15071, 18-15128, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 05/21/2018. [10880216] [18-15068, 18-15069, 18-15071, 18-15070, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT UPDATE: Attached searchable version of letter. 05/21/2018 by RY]—[Edited 05/21/2018 by RY] (Rosenbaum, Mark) [Entered: 05/21/2018 02:59 PM] |
| | | * * * * * |
| 6/22/18 | 184 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, |

**AR2304**

19

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Donald J. Trump, Jefferson B. Sessions, III and USDHS in 18-15072, 18-15128 citation of supplemental authorities.   Date of service: 06/22/2018.   [10919589] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered:   06/22/2018 04:04 PM] |
| 6/28/18 | 185 | Filed (ECF) Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities.   Date of service: 06/28/2018.   [10925146] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered:   06/28/2018 08:29 AM] |
| 7/2/18 | 186 | Filed (ECF) Appellees Regents of the University of California and Janet Napolitano in 18-15068, 18-15128, Appellants Regents of the University of California and Janet Napolitano in 18-15133 citation of supplemental authorities.  Date of service:  07/02/2018. [10928492] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, |

**AR2305**

20

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/02/2018 09:51 AM] |
| 7/2/18 | 187 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928647] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 07/02/2018 10:39 AM] |
| 7/2/18 | 188 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of service: 07/02/2018. [10928704] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Spread |

21

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | to cases 18-15069, 18-15070, 18-15072, 18-15128, and 18-15133. 7/2/2018 by TYL] (Boutrous, Theodore) [Entered: 07/02/2018 10:58 AM] |
| 7/9/18 | 189 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 07/09/2018. [10935080] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/09/2018 12:20 PM] |
| 7/9/18 | 190 | Filed (ECF) Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, Jirayut Latthivongskorn, County of Santa |

22

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Clara and Service Employees International Union Local 521 in 18-15134 citation of supplemental authorities. Date of service: 07/09/2018. [10935549] [18-15068, 18-15072, 18-15071, 18-15134]— [COURT UPDATE: Spread docket text to 18-15069, 18-15128, 18-15070, 18-15133. 07/09/2018 by SLM] (Boutrous, Theodore) [Entered: 07/09/2018 02:56 PM] |
| 8/3/18 | 191 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/03/2018. [10964686] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] |

23

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | (Wright, Abby) [Entered: 08/03/2018 06:34 AM] |
| 8/6/18 | <u>192</u> | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 08/06/2018. [10967075] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 08/06/2018 11:31 AM] |
| 8/7/18 | <u>193</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of service: 08/07/2018. [10968935] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Corrected order of PDF's. |

24

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 08/07/2018 by SLM]—[Edited: spread docket text to 18-15069, 18-15070, 18-15072, 18-15128, 18-15133. 08/07/2018 by RY] (Boutrous, Theodore) [Entered: 08/07/2018 01:19 PM] |
| 8/7/18 | <u>194</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 08/07/2018. [10969011] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 08/07/2018 01:37 PM] |
| 8/10/18 | <u>195</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen |

25

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/10/2018. [10972953] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/10/2018 10:43 AM] |
| 9/13/18 | 196 | Filed (ECF) Appellants USDHS and Kirstjen Nielsen in 18-15068, Appellants USDHS, USA and Kirstjen Nielsen in 18-15069, Appellants USA, Donald J. Trump and Kirstjen Nielsen in 18-15070, Appellants USDHS, USA, Donald J. Trump and Kirstjen Nielsen in 18-15071, Appellants USDHS, Donald J. Trump, Jefferson B. Sessions, III and Kirstjen Nielsen in 18-15072, 18-15128, Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 09/13/2018. [11010690] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 09/13/2018 01:33 PM] |

26

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 9/17/18 | 197 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128 citation of supplemental authorities. Date of service: 09/17/2018. [11014639] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 09/17/2018 04:40 PM] |
| 10/17/18 | 198 | Filed (ECF) Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 Correspondence: Notice of intent to petition the Supreme Court for a writ of certiorari before judgment absent ruling from this Court.. Date of service: 10/17/2018 [11049590] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 10/17/2018 07:15 AM] |
| 11/8/18 | 199 | FILED OPINION (KIM MC-LANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS) AFFIRMED. Judge: KMW Authoring, Judge: JBO Concurring. FILED AND |

27

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | ENTERED JUDGMENT. [11081386] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (RMM) [Entered: 11/08/2018 09:44 AM] |
| | | *  *  *  *  * |
| 2/25/19 | <u>204</u> | MANDATE ISSUED. (KMW, JHN and JBO) [11206269] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (QDL) [Entered: 02/25/2019 01:06 PM] |
| | | *  *  *  *  * |

AR2313

28

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————

Docket No. 18-15069

STATE OF CALIFORNIA; STATE OF MAINE; STATE OF
MINNESOTA; STATE OF MARYLAND,
PLAINTIFFS-APPELLEES

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY,
KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES OF AMERICA,
DEFENDANTS-APPELLANTS

————————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 1/16/18 | <u>1</u> | DOCKETED CAUSE AND ENTERED APPEARANCES OF COUNSEL. SEND MQ: Yes. The schedule is set as follows: To be set. Preliminary Injunction, C. R. 3-3 [10725663] (JBS) [Entered: 01/16/2018 01:37 PM] |
| 1/17/18 | <u>2</u> | Filed clerk order (Deputy Clerk: SLL): The court sua sponte consolidates appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the dockets accordingly. Consolidated appeal Nos. 18-15068, 18-15069, |

29

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | 18-15070, 18-15071, and 18-15072, filed on January 16, 2018, are preliminary injunction appeals. Accordingly, Ninth Circuit Rule 3-3 shall apply.  The mediation questionnaire is due three days after the date of this order.  If they have not already done so, within 7 calendar days after the filing date of this order, the parties shall make arrangement3 to obtain from the court reporter an official transcript of proceedings in the district court that will be included in the record on appeal. The briefing schedule shall proceed as follows:   the consolidated opening brief(s) and excerpts of record are due not later than February 13, 2018; the consolidated answering brief(s) is due March 13, 2018 or 28 days after service of the opening brief, whichever is earlier; and the optional consolidated reply brief(s) is due within 21 days after service of the answering brief.   See 9th Cir. R. 3-3(b).   All parties on a side are encouraged to join in a single brief to the greatest extent practicable.   See 9th Cir. R. 28-4.   The parties are reminded that streamlined requests for ex- |

30

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | tensions of time are not available in preliminary injunction appeals. See http://www.ca9.uscourts.gov/ content/view.php?pk_id=0000000 638. Any request for an extension of time must be requested under Ninth Circuit Rule 31-2.2(b). Failure to file timely the opening brief shall result in the automatic dismissal of this appeal by the Clerk for failure to prosecute. See 9th Cir. R. 42-1. [10726638] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072] (OC) [Entered: 01/17/2018 09:06 AM] |
| | | *   *   *   *   * |
| 1/26/18 | <u>22</u> | Filed clerk order (Deputy Clerk: MCD): The court sua sponte expedites appeal Nos. 18-15128, 18-15133, 18-15134, and consolidates them with pending consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the docket accordingly. The following briefing schedule shall apply to the consolidated appeals: the consolidated first brief on cross-appeal by Defendants is due February 13, 2018. The consolidated second brief on |

31

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | cross-appeal by Plaintiffs is due March 13, 2018. The consolidated third brief on cross-appeal by Defendants is due April 10, 2018. The consolidated optional fourth brief on cross-appeal by Plaintiffs is due within 21 days after service of the third brief on cross-appeal. All parties on a side are encouraged to join in a single brief to the greatest extent practicable. See 9th Cir. R. 28-4. This order is without prejudice to any party moving for appropriate relief following resolution of the petition for a writ of certiorari in Supreme Court Case No. 17-1003. [10740072] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (AF) [Entered: 01/26/2018 11:43 AM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 2/13/18 | <u>32</u> | Submitted (ECF) First Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Don- |

**AR2317**

32

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | ald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128. Date of service: 02/13/2018. [10762501] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected PDF of brief. 02/15/2018 by RY] (Stern, Mark) [Entered: 02/13/2018 01:40 PM] |
| 2/13/18 | 33 | Submitted (ECF) excerpts of record. Submitted by Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 02/13/2018. [10762529] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 02/13/2018 01:50 PM] |
| | | *   *   *   *   * |
| 3/13/18 | 41 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota |

AR2318

33

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | in 18-15069, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133, 18-15128. Date of service: 03/13/2018. [10797115] [18-15068, 18-15069, 18-15133, 18-15128]—[COURT UPDATE: Spread docket text to 18-15070, 18-15071, 18-15072, 18-15134. 03/14/2018 by RY] (Mongan, Michael) [Entered: 03/13/2018 04:24 PM] |
| 3/13/18 | 42 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128, Appellants Janet Napolitano, Regents of the University of California and City of San Jose in 18-15133. Date of service: 03/13/2018. [10797237] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:14 PM] |

34

| DATE | DOCKET NUMBER | PROCEEDINGS |
| --- | --- | --- |
| 3/13/18 | <u>43</u> | Submitted (ECF) supplemental excerpts of record. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee State of California in 18-15069, Appellee City of San Jose in 18-15070, Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, City of San Jose, County of Santa Clara, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521 and State of California in 18-15128, Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California and State of California in |

35

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797304] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:53 PM] |
| | | * * * * * |
| 3/13/18 | 46 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Viridiana Chabolla Mendoza, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Dulce Garcia in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, County of Santa Clara, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez, Service Employees International Union |

**AR2321**

36

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Local 521 and Dulce Garcia in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.   Date of service: 03/13/2018.   [10797416] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Spread docket text to 18-15069, 18-15070. 03/14/2018 by RY] (Boutrous, Theodore) [Entered: 03/13/2018 08:41 PM] |
| | | *   *   *   *   * |
| 4/3/18 | <u>133</u> | Submitted (ECF) Third Brief on Cross-Appeal for review.   Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants   Kirstjen |

37

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
| | | *   *   *   *   * |
| 4/17/18 | 138 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 04/17/2018. [10839746] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 04/17/2018 12:02 PM] |
| | | *   *   *   *   * |

**AR2323**

38

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 4/17/18 | <u>140</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128. Date of service: 04/17/2018. [10840021] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/17/2018 01:41 PM] |

<p style="text-align:center">*   *   *   *   *</p>

| 4/17/18 | <u>142</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees In- |

**AR2324**

39

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | ternational Union Local 521 in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 04/17/2018. [10840409] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-15069, 18-15070] (Boutrous, Theodore) [Entered: 04/17/2018 03:49 PM] |
| | | * * * * * |
| 4/25/18 | 148 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 ci- |

**AR2325**

40

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | tation of supplemental authorities. Date of service: 04/25/2018. [10849629] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 04/25/2018 08:55 AM] |

     *   *   *   *   *

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/25/18 | 150 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10851189] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT ENTERED FILING to correct entry [149].] (RY) [Entered: 04/25/2018 04:36 PM] |
| 4/26/18 | 151 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Na- |

41

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | politano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 04/26/2018. [10852623] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/26/2018 03:05 PM] |
|      |               | *   *   *   *   * |
| 5/1/18 | <u>156</u> | Filed clerk order (Deputy Clerk: OC):   The parties are ordered to submit supplemental briefs of no more than fifteen double-spaced pages addressing the effect of Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), and Montana Air Chapter No. 29 v. FLRA, 898 F.2d 753, 756–57 (9th Cir. 1990), on the question whether 5 U.S.C. § 701(a)(2) bars judicial review of the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals program.   The parties should consider whether the rescission is judicially reviewable as a general enforcement policy, rather than as a single-shot non-enforcement decision.   See Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. |

42

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Cir. 1994); NAACP v. Trump, Nos. 17-1907 & 17-2325, 2018 WL 1920079, at *11–17 (D.D.C. Apr. 24, 2018) (interpreting the standard in Crowley). The briefs shall be filed on or before May 11, 2018. [10857346] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-80037] (OC) [Entered: 05/01/2018 12:58 PM] |

*   *   *   *   *

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 5/11/18 | 165 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134. Date of service: 05/11/2018. [10870059] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 05/11/2018 02:28 PM] |

43

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 5/11/18 | <u>166</u> | Submitted (ECF) Supplemental Brief for review.  Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134.  Date of service:  05/11/2018.  [10870142] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered:  05/11/2018 03:04 PM] |
| 5/11/18 | <u>167</u> | Submitted (ECF) Supplemental Brief for review.  Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees City of San Jose, Janet Napolitano and Regents of the University of California in 18-15128.  Date of service:  05/11/2018. |

AR2329

44

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | [10870151] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 05/11/2018 03:11 PM] |
| | | * * * * * |
| 5/11/18 | 171 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 05/11/2018. [10870452] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected brief. 5/14/2018 by TYL] (Mongan, Michael) [Entered: 05/11/2018 05:10 PM] |
| | | * * * * * |
| 5/15/18 | 178 | ARGUED AND SUBMITTED TO KIM MCLANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS. [10873596] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, |

45

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15134] (Witt, Dusty) [Entered: 05/15/2018 04:18 PM] |
| | | * * * * * |
| 5/21/18 | <u>181</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15071, 18-15128, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 05/21/2018. [10880216] [18-15068, 18-15069, 18-15071, 18-15070, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT UPDATE: Attached searchable version of letter. 05/21/2018 by RY]—[Edited 05/21/2018 by RY] (Rosenbaum, Mark) [Entered: 05/21/2018 02:59 PM] |
| | | * * * * * |
| 6/22/18 | <u>183</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. |

46

| DATE | DOCKET NUMBER | PROCEEDINGS |
| --- | --- | --- |
| | | Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Donald J. Trump, Jefferson B. Sessions, III and USDHS in 18-15072, 18-15128 citation of supplemental authorities.   Date of service: 06/22/2018.   [10919589] [18-15068, 18-15069,   18-15070,   18-15071, 18-15072,   18-15128,   18-15133, 18-15134] (Wright, Abby) [Entered:   06/22/2018 04:04 PM] |
| 6/28/18 | 184 | Filed (ECF) Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities.   Date of service: 06/28/2018.   [10925146] [18-15068, 18-15069,   18-15070,   18-15071, 18-15072,   18-15128,   18-15133, 18-15134] (Wright, Abby) [Entered:   06/28/2018 08:29 AM] |
| 7/2/18 | 185 | Filed (ECF) Appellees Regents of the University of California and Janet Napolitano in 18-15068, 18-15128, Appellants Regents of the University of California and Janet Napolitano in 18-15133 citation of supplemental authorities.   Date of service:   07/02/2018. |

**AR2332**

47

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | [10928492] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/02/2018 09:51 AM] |
| 7/2/18 | 186 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities.  Date of service: 07/02/2018. [10928647] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 07/02/2018 10:39 AM] |
| 7/2/18 | 187 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities.  Date of service: 07/02/2018. [10928704] |

AR2333

48

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Spread to cases 18-15069, 18-15070, 18-15072, 18-15128, and 18-15133. 7/2/2018 by TYL] (Boutrous, Theodore) [Entered: 07/02/2018 10:58 AM] |
| 7/9/18 | 188 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 07/09/2018. [10935080] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/09/2018 12:20 PM] |
| 7/9/18 | 189 | Filed (ECF) Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, |

49

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Norma Ramirez, Jirayut Lat-thivongskorn, County of Santa Clara and Service Employees International Union Local 521 in 18-15134 citation of supplemental authorities. Date of service: 07/09/2018. [10935549] [18-15068, 18-15072, 18-15071, 18-15134]—[COURT UPDATE: Spread docket text to 18-15069, 18-15128, 18-15070, 18-15133. 07/09/2018 by SLM] (Boutrous, Theodore) [Entered: 07/09/2018 02:56 PM] |
| 8/3/18 | 190 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/03/2018. [10964686] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] |

**AR2335**

50

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | (Wright, Abby) [Entered: 08/03/2018 06:34 AM] |
| 8/6/18 | 191 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 08/06/2018. [10967075] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 08/06/2018 11:31 AM] |
| 8/7/18 | 192 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 08/07/2018. [10969011] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 08/07/2018 01:37 PM] |
| 8/7/18 | 193 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana |

51

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities.  Date of service: 08/07/2018.  [10968935] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Corrected order of PDF's. 08/07/2018 by SLM]—[Edited: spread docket text to 18-15069, 18-15070, 18-15072, 18-15128, 18-15133.   08/07/2018 by RY] (Boutrous, Theodore) [Entered: 08/07/2018 01:19 PM] |
| 8/10/18 | 194 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA |

52

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/10/2018. [10972953] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/10/2018 10:43 AM] |
| 9/13/18 | 195 | Filed (ECF) Appellants USDHS and Kirstjen Nielsen in 18-15068, Appellants USDHS, USA and Kirstjen Nielsen in 18-15069, Appellants USA, Donald J. Trump and Kirstjen Nielsen in 18-15070, Appellants USDHS, USA, Donald J. Trump and Kirstjen Nielsen in 18-15071, Appellants USDHS, Donald J. Trump, Jefferson B. Sessions, III and Kirstjen Nielsen in 18-15072, 18-15128, Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 09/13/2018. [11010690] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 09/13/2018 01:33 PM] |
| 9/17/18 | 196 | Filed (ECF) Appellees Janet Napolitano and Regents of the Uni- |

53

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | versity of California in 18-15068, 18-15128 citation of supplemental authorities.   Date of service: 09/17/2018.   [11014639] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered:   09/17/2018 04:40 PM] |
| 10/17/18 | 197 | Filed (ECF) Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 Correspondence:   Notice of intent to petition the Supreme Court for a writ of certiorari before judgment absent ruling from this Court..   Date of service: 10/17/2018 [11049590] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered:   10/17/2018 07:15 AM] |
| 11/8/18 | 198 | FILED OPINION (KIM MC-LANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS) AFFIRMED.   Judge: KMW Authoring, Judge:   JBO Concurring.   FILED AND ENTERED   JUDGMENT. [11081386] [18-15068, 18-15069, |

54

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15070,    18-15071,    18-15072, 18-15128,    18-15133,    18-15134] (RMM) [Entered:      11/08/2018 09:44 AM] |
| | | * * * * * |
| 2/25/19 | 203 | MANDATE ISSUED. (KMW, JHN   and   JBO)   [11206269] [18-15068,   18-15069,   18-15070, 18-15071,   18-15072,   18-15128, 18-15133, 18-15134] (QDL) [Entered:   02/25/2019 01:06 PM] |
| | | * * * * * |

AR2340

55

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

Docket No. 18-15070

CITY OF SAN JOSE, PLAINTIFF-APPELLEE

*v.*

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, IN HIS OFFICIAL CAPACITY;
KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY
AS ACTING SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES OF AMERICA,
DEFENDANTS-APPELLANTS

———

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 1/16/18 | 1 | DOCKETED CAUSE AND ENTERED APPEARANCES OF COUNSEL. SEND MQ: Yes. The schedule is set as follows: To be set. Preliminary Injunction, C. R. 3-3 [10725678] (JBS) [Entered: 01/16/2018 01:46 PM] |
| 1/17/18 | 2 | Filed clerk order (Deputy Clerk: SLL): The court sua sponte consolidates appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the dockets accordingly. Consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072, |

56

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | filed on January 16, 2018, are preliminary injunction appeals. Accordingly, Ninth Circuit Rule 3-3 shall apply. The mediation questionnaire is due three days after the date of this order. If they have not already done so, within 7 calendar days after the filing date of this order, the parties shall make arrangement3 to obtain from the court reporter an official transcript of proceedings in the district court that will be included in the record on appeal. The briefing schedule shall proceed as follows: the consolidated opening brief(s) and excerpts of record are due not later than February 13, 2018; the consolidated answering brief(s) is due March 13, 2018 or 28 days after service of the opening brief, whichever is earlier; and the optional consolidated reply brief(s) is due within 21 days after service of the answering brief. See 9th Cir. R. 3-3(b). All parties on a side are encouraged to join in a single brief to the greatest extent practicable. See 9th Cir. R. 28-4. The parties are reminded that streamlined requests for extensions of time are not available |

**AR2342**

57

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | in preliminary injunction appeals. See http://www.ca9.uscourts.gov/content/view.php?pk_id=0000000 638. Any request for an extension of time must be requested under Ninth Circuit Rule 31-2.2(b). Failure to file timely the opening brief shall result in the automatic dismissal of this appeal by the Clerk for failure to prosecute. See 9th Cir. R. 42-1. [10726638] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072] (OC) [Entered: 01/17/2018 09:06 AM] |
| | | *   *   *   *   * |
| 1/26/18 | 21 | Filed clerk order (Deputy Clerk: MCD): The court sua sponte expedites appeal Nos. 18-15128, 18-15133, 18-15134, and consolidates them with pending consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the docket accordingly. The following briefing schedule shall apply to the consolidated appeals: the consolidated first brief on cross-appeal by Defendants is due February 13, 2018. The consolidated second brief on cross-appeal by Plaintiffs is due |

58

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | March 13, 2018. The consolidated third brief on cross-appeal by Defendants is due April 10, 2018. The consolidated optional fourth brief on cross-appeal by Plaintiffs is due within 21 days after service of the third brief on cross-appeal. All parties on a side are encouraged to join in a single brief to the greatest extent practicable. See 9th Cir. R. 28-4. This order is without prejudice to any party moving for appropriate relief following resolution of the petition for a writ of certiorari in Supreme Court Case No. 17-1003. [10740072] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (AF) [Entered: 01/26/2018 11:43 AM] |
| | | * * * * * |
| 2/13/18 | 31 | Submitted (ECF) First Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS |

59

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128. Date of service: 02/13/2018. [10762501] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected PDF of brief. 02/15/2018 by RY] (Stern, Mark) [Entered: 02/13/2018 01:40 PM] |
| 2/13/18 | 32 | Submitted (ECF) excerpts of record. Submitted by Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 02/13/2018. [10762529] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 02/13/2018 01:50 PM] |
| | | *   *   *   *   * |
| 3/13/18 | 40 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San |

60

| DATE | DOCKET NUMBER | PROCEEDINGS |
| --- | --- | --- |
| | | Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128, Appellants Janet Napolitano, Regents of the University of California and City of San Jose in 18-15133.   Date of service:   03/13/2018.   [10797237] [18-15068,   18-15069,   18-15070, 18-15071,   18-15072,   18-15128, 18-15133,   18-15134]   (Davidson, Jeffrey) [Entered:   03/13/2018 05:14 PM] |
| 3/13/18 | 41 | Submitted (ECF) supplemental excerpts of record.   Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee State of California in 18-15069, Appellee City of San Jose in 18-15070, Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, City of San Jose, County of Santa Clara, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet |

**AR2346**

61

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521 and State of California in 18-15128, Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California and State of California in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797304] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:53 PM] |
| | | * * * * * |
| 3/13/18 | 44 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees State of California, State of Maine, State |

62

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | of Maryland and State of Minnesota in 18-15069, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133, 18-15128. Date of service: 03/13/2018. [10797115] [18-15068, 18-15069, 18-15133, 18-15128] —[COURT UPDATE: Spread docket text to 18-15070, 18-15071, 18-15072, 18-15134. 03/14/2018 by RY] (Mongan, Michael) [Entered: 03/13/2018 04:24 PM] |
| 3/13/18 | <u>45</u> | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Viridiana Chabolla Mendoza, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Dulce Garcia in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, County of Santa Clara, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez, Service Employees International Union Local 521 and Dulce Garcia in 18-15128, Appellants Viridiana |

**AR2348**

63

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797416] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Spread docket text to 18-15069, 18-15070. 03/14/2018 by RY] (Boutrous, Theodore) [Entered: 03/13/2018 08:41 PM] |
| | | *  *  *  *  * |
| 4/3/18 | 132 | Submitted (ECF) Third Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appel- |

**AR2349**

64

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | lants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
| | | * * * * * |
| 4/17/18 | 137 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 04/17/2018. [10839746] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 04/17/2018 12:02 PM] |
| | | * * * * * |
| 4/17/18 | 139 | Submitted (ECF) Cross-Appeal Reply Brief for review. Sub- |

65

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | mitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128. Date of service: 04/17/2018. [10840021] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/17/2018 01:41 PM] |
| | | * * * * * |
| 4/17/18 | 141 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15128, Appellants Viridiana |

66

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.  Date of service: 04/17/2018.  [10840409] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-15069, 18-15070] (Boutrous, Theodore) [Entered:  04/17/2018 03:49 PM] |
| | | * * * * * |
| 4/25/18 | 147 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities.  Date of service:  04/25/2018. |

AR2352

67

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | [10849629] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 04/25/2018 08:55 AM] |
| | | * * * * * |
| 4/25/18 | 149 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10851189] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT ENTERED FILING to correct entry [149].] (RY) [Entered: 04/25/2018 04:36 PM] |
| 4/26/18 | 150 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 |

68

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | citation of supplemental authorities.   Date of service:   04/26/2018. [10852623] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/26/2018 03:05 PM] |

<div align="center">*   *   *   *   *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 5/1/18 | <u>155</u> | Filed clerk order (Deputy Clerk: OC):   The parties are ordered to submit supplemental briefs of no more than fifteen double-spaced pages addressing the effect of Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), and Montana Air Chapter No. 29 v. FLRA, 898 F.2d 753, 756–57 (9th Cir. 1990), on the question whether 5 U.S.C. § 701(a)(2) bars judicial review of the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals program.   The parties should consider whether the rescission is judicially reviewable as a general enforcement policy, rather than as a single-shot non-enforcement decision.   See Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994); NAACP v. Trump, Nos. 17-1907 & 17-2325, 2018 WL |

69

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 1920079, at *11–17 (D.D.C. Apr. 24, 2018) (interpreting the standard in Crowley). The briefs shall be filed on or before May 11, 2018. [10857346] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-80037] (OC) [Entered: 05/01/2018 12:58 PM] |
| | | \*   \*   \*   \*   \* |
| 5/11/18 | 164 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134. Date of service: 05/11/2018. [10870059] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 05/11/2018 02:28 PM] |
| 5/11/18 | 165 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellants Kirstjen Nielsen and |

**AR2355**

70

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 05/11/2018. [10870142] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 05/11/2018 03:04 PM] |
| 5/11/18 | 166 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees City of San Jose, Janet Napolitano and Regents of the University of California in 18-15128. Date of service: 05/11/2018. [10870151] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] |

71

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | (Davidson, Jeffrey) [Entered: 05/11/2018 03:11 PM] |
| | | *   *   *   *   * |
| 5/11/18 | <u>170</u> | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 05/11/2018. [10870452] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected brief. 5/14/2018 by TYL] (Mongan, Michael) [Entered: 05/11/2018 05:10 PM] |
| | | *   *   *   *   * |
| 5/15/18 | <u>177</u> | ARGUED AND SUBMITTED TO KIM MCLANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS. [10873596] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Witt, Dusty) [Entered: 05/15/2018 04:18 PM] |

72

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | *    *    *    *    * |
| 5/21/18 | <u>180</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15071, 18-15128, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15133, 18-15134 citation of supplemental authorities.  Date of service: 05/21/2018.  [10880216] [18-15068, 18-15069, 18-15071, 18-15070, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT UPDATE: Attached searchable version of letter.  05/21/2018 by RY]—[Edited 05/21/2018 by RY] (Rosenbaum, Mark)  [Entered: 05/21/2018 02:59 PM] |
| | | *    *    *    *    * |
| 6/22/18 | <u>182</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, |

73

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Donald J. Trump, Jefferson B. Sessions, III and USDHS in 18-15072, 18-15128 citation of supplemental authorities. Date of service: 06/22/2018. [10919589] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 06/22/2018 04:04 PM] |
| 6/28/18 | 183 | Filed (ECF) Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 06/28/2018. [10925146] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 06/28/2018 08:29 AM] |
| 7/2/18 | 184 | Filed (ECF) Appellees Regents of the University of California and Janet Napolitano in 18-15068, 18-15128, Appellants Regents of the University of California and Janet Napolitano in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928492] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, |

74

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/02/2018 09:51 AM] |
| 7/2/18 | 185 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928647] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 07/02/2018 10:39 AM] |
| 7/2/18 | 186 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of service: 07/02/2018. [10928704] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Spread |

75

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | to cases 18-15069, 18-15070, 18-15072, 18-15128, and 18-15133. 7/2/2018 by TYL] (Boutrous, Theodore) [Entered: 07/02/2018 10:58 AM] |
| 7/9/18 | 187 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 07/09/2018. [10935080] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/09/2018 12:20 PM] |
| 7/9/18 | 188 | Filed (ECF) Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, Jirayut Latthivongskorn, County of Santa |

AR2361

76

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Clara and Service Employees International Union Local 521 in 18-15134 citation of supplemental authorities. Date of service: 07/09/2018. [10935549] [18-15068, 18-15072, 18-15071, 18-15134]—[COURT UPDATE: Spread docket text to 18-15069, 18-15128, 18-15070, 18-15133. 07/09/2018 by SLM] (Boutrous, Theodore) [Entered: 07/09/2018 02:56 PM] |
| 8/3/18 | <u>189</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/03/2018. [10964686] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] |

**AR2362**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | (Wright, Abby) [Entered: 08/03/2018 06:34 AM] |
| 8/6/18 | <u>190</u> | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 08/06/2018. [10967075] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 08/06/2018 11:31 AM] |
| 8/7/18 | <u>191</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 08/07/2018. [10969011] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 08/07/2018 01:37 PM] |
| 8/7/18 | <u>192</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana |

78

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities.   Date of service:   08/07/2018.   [10968935] [18-15068, 18-15071, 18-15134] —[COURT UPDATE:   Corrected order of PDF's. 08/07/2018 by SLM]—[Edited: spread docket text to 18-15069, 18-15070, 18-15072, 18-15128, 18-15133.   08/07/2018 by RY] (Boutrous, Theodore) [Entered: 08/07/2018 01:19 PM] |
| 8/10/18 | 193 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA |

79

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/10/2018. [10972953] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/10/2018 10:43 AM] |
| 9/13/18 | 194 | Filed (ECF) Appellants USDHS and Kirstjen Nielsen in 18-15068, Appellants USDHS, USA and Kirstjen Nielsen in 18-15069, Appellants USA, Donald J. Trump and Kirstjen Nielsen in 18-15070, Appellants USDHS, USA, Donald J. Trump and Kirstjen Nielsen in 18-15071, Appellants USDHS, Donald J. Trump, Jefferson B. Sessions, III and Kirstjen Nielsen in 18-15072, 18-15128, Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 09/13/2018. [11010690] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 09/13/2018 01:33 PM] |
| 9/17/18 | 195 | Filed (ECF) Appellees Janet Napolitano and Regents of the Uni- |

80

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | versity of California in 18-15068, 18-15128 citation of supplemental authorities. Date of service: 09/17/2018. [11014639] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 09/17/2018 04:40 PM] |
| 10/17/18 | 196 | Filed (ECF) Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 Correspondence: Notice of intent to petition the Supreme Court for a writ of certiorari before judgment absent ruling from this Court.. Date of service: 10/17/2018 [11049590] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 10/17/2018 07:15 AM] |
| 11/8/18 | 197 | FILED OPINION (KIM MCLANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS) AFFIRMED. Judge: KMW Authoring, Judge: JBO Concurring. FILED AND ENTERED JUDGMENT. [11081386] [18-15068, 18-15069, |

**AR2366**

81

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (RMM) [Entered: 11/08/2018 09:44 AM] |
| | | * * * * * |
| 2/25/19 | 202 | MANDATE ISSUED. (KMW, JHN and JBO) [11206269] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (QDL) [Entered: 02/25/2019 01:06 PM] |
| | | * * * * * |

AR2367

82

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————

Docket No. 18-15071

DULCE GARCIA; MIRIAM GONZALEZ AVILA;
SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA
MENDOZA; JIRAYUT LATTHIVONGSKORN; NORMA
RAMIREZ, PLAINTIFFS-APPELLEES

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES; U.S. DEPARTMENT OF HOMELAND
SECURITY; KIRSTJEN NIELSEN, IN HER OFFICIAL
CAPACITY AS ACTING SECRETARY OF THE
DEPARTMENT OF HOMELAND SECURITY,
DEFENDANTS-APPELLANTS

————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 1/16/18 | 1 | DOCKETED CAUSE AND ENTERED APPEARANCES OF COUNSEL. SEND MQ: Yes. The schedule is set as follows: To be set. Preliminary Injunction, C.R. 3-3 [10725713] (JBS) [Entered: 01/16/2018 01:58 PM] |
| 1/17/18 | 2 | Filed clerk order (Deputy Clerk: SLL): The court sua sponte consolidates appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the dockets |

AR2368

83

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | accordingly. Consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072, filed on January 16, 2018, are preliminary injunction appeals. Accordingly, Ninth Circuit Rule 3-3 shall apply. The mediation questionnaire is due three days after the date of this order. If they have not already done so, within 7 calendar days after the filing date of this order, the parties shall make arrangement3 to obtain from the court reporter an official transcript of proceedings in the district court that will be included in the record on appeal. The briefing schedule shall proceed as follows: the consolidated opening brief(s) and excerpts of record are due not later than February 13, 2018; the consolidated answering brief(s) is due March 13, 2018 or 28 days after service of the opening brief, whichever is earlier; and the optional consolidated reply brief(s) is due within 21 days after service of the answering brief. See 9th Cir. R. 3-3(b). All parties on a side are encouraged to join in a single brief to the greatest extent practicable. See 9th Cir. R. |

AR2369

84

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 28-4. The parties are reminded that streamlined requests for extensions of time are not available in preliminary injunction appeals. See http://www.ca9.uscourts.gov/content/view.php?pk_id=0000000 638. Any request for an extension of time must be requested under Ninth Circuit Rule 31-2.2(b). Failure to file timely the opening brief shall result in the automatic dismissal of this appeal by the Clerk for failure to prosecute. See 9th Cir. R. 42-1. [10726638] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072] (OC) [Entered: 01/17/2018 09:06 AM] |
| | | * * * * * |
| 1/26/18 | 21 | Filed clerk order (Deputy Clerk: MCD): The court sua sponte expedites appeal Nos. 18-15128, 18-15133, 18-15134, and consolidates them with pending consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the docket accordingly. The following briefing schedule shall apply to the consolidated appeals: the consolidated first brief on cross-appeal by Defen- |

85

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | dants is due February 13, 2018. The consolidated second brief on cross-appeal by Plaintiffs is due March 13, 2018. The consolidated third brief on cross-appeal by Defendants is due April 10, 2018. The consolidated optional fourth brief on cross-appeal by Plaintiffs is due within 21 days after service of the third brief on cross-appeal. All parties on a side are encouraged to join in a single brief to the greatest extent practicable. See 9th Cir. R. 28-4. This order is without prejudice to any party moving for appropriate relief following resolution of the petition for a writ of certiorari in Supreme Court Case No. 17-1003. [10740072] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (AF) [Entered: 01/26/2018 11:43 AM] |
| | | *   *   *   *   * |
| 2/13/18 | 31 | Submitted (ECF) First Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. |

86

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128. Date of service: 02/13/2018. [10762501] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected PDF of brief. 02/15/2018 by RY] (Stern, Mark) [Entered: 02/13/2018 01:40 PM] |
| 2/13/18 | 32 | Submitted (ECF) excerpts of record. Submitted by Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 02/13/2018. [10762529] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 02/13/2018 01:50 PM] |
| | | *    *    *    *    * |
| 3/13/18 | 40 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Janet |

**AR2372**

87

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128, Appellants Janet Napolitano, Regents of the University of California and City of San Jose in 18-15133. Date of service: 03/13/2018. [10797237] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:14 PM] |
| 3/13/18 | 41 | Submitted (ECF) supplemental excerpts of record. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee State of California in 18-15069, Appellee City of San Jose in 18-15070, Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, City of San Jose, |

88

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | County of Santa Clara, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521 and State of California in 18-15128, Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California and State of California in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797304] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:53 PM] |
|      |               | *  *  *  *  * |

89

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 3/13/18 | <u>43</u> | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Viridiana Chabolla Mendoza, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Dulce Garcia in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, County of Santa Clara, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez, Service Employees International Union Local 521 and Dulce Garcia in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797416] |

AR2375

90

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Spread docket text to 18-15069, 18-15070. 03/14/2018 by RY] (Boutrous, Theodore) [Entered: 03/13/2018 08:41 PM] |
| 3/13/18 | 45 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133, 18-15128. Date of service: 03/13/2018. [10797115] [18-15068, 18-15069, 18-15133, 18-15128] —[COURT UPDATE: Spread docket text to 18-15070, 18-15071, 18-15072, 18-15134. 03/14/2018 by RY] (Mongan, Michael) [Entered: 03/13/2018 04:24 PM] |
| | | * * * * * |
| 4/3/8 | 132 | Submitted (ECF) Third Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, |

**AR2376**

91

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| | | Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
| | | * * * * * |
| 4/17/18 | <u>137</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 04/17/2018. [10839746] [18-15068, 18-15069, 18-15070, 18-18-15071, 18-15072, 18-15128, 18-15133, |

**AR2377**

92

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15134] (Mongan, Michael) [Entered: 04/17/2018 12:02 PM] |

\*   \*   \*   \*   \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/17/18 | <u>139</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128. Date of service: 04/17/2018. [10840021] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/17/2018 01:41 PM] |

\*   \*   \*   \*   \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/17/18 | <u>141</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees County of Santa Clara, |

**AR2378**

93

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.   Date of service: 04/17/2018. [10840409] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-15069, 18-15070] (Boutrous, Theodore) [Entered:  04/17/2018 03:49 PM] |
| | | * * * * * |
| 4/25/18 | 147 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla |

94

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities.  Date of service: 04/25/2018.  [10849629] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered:  04/25/2018 08:55 AM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/25/18 | <u>149</u> | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities.  Date of service: 04/25/2018.  [10851189] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 15134]—[COURT ENTERED FILING to correct entry [148].] (RY) [Entered:  04/25/2018 04:36 PM] |

95

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/26/18 | <u>150</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities.  Date of service:  04/26/2018. [10852623] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/26/2018 03:05 PM] |

<div align="center">*   *   *   *   *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 5/1/18 | <u>155</u> | Filed clerk order (Deputy Clerk: OC):  The parties are ordered to submit supplemental briefs of no more than fifteen double-spaced pages addressing the effect of Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), and Montana Air Chapter No. 29 v. FLRA, 898 F.2d 753, 756–57 (9th Cir. 1990), on the question whether 5 U.S.C. § 701(a)(2) bars judicial review of the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals program.  The parties should consider whether the rescission is judicially reviewable as a general enforcement policy, |

96

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | rather than as a single-shot non-enforcement decision. See Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994); NAACP v. Trump, Nos. 17-1907 & 17-2325, 2018 WL 1920079, at *11–17 (D.D.C. Apr. 24, 2018) (interpreting the standard in Crowley). The briefs shall be filed on or before May 11, 2018. [10857346] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-80037] (OC) [Entered: 05/01/2018 12:58 PM] |
| | | *   *   *   *   * |
| 5/11/18 | 164 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134. Date of service: 05/11/2018. [10870059] [18-15068, 18-15069, 18-15070, |

97

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 05/11/2018 02:28 PM] |
| 5/11/18 | <u>165</u> | Submitted (ECF) Supplemental Brief for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 05/11/2018. [10870142] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 05/11/2018 03:04 PM] |
| 5/11/18 | <u>166</u> | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appel- |

**AR2383**

98

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | lees City of San Jose, Janet Napolitano and Regents of the University of California in 18-15128. Date of service: 05/11/2018. [10870151] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 05/11/2018 03:11 PM] |
| | | *   *   *   *   * |
| 5/11/18 | 170 | Submitted (ECF) Supplemental Brief for review.  Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 05/11/2018. [10870452] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected brief.  5/14/2018 by TYL] (Mongan, Michael) [Entered: 05/11/2018 05:10 PM] |
| | | *   *   *   *   * |
| 5/15/18 | 177 | ARGUED AND SUBMITTED TO KIM MCLANE WARDLAW, JACQUELINE H. |

**AR2384**

99

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | NGUYEN and JOHN B. OWENS. [10873596] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Witt, Dusty) [Entered: 05/15/2018 04:18 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 5/21/18 | 180 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15071, 18-15128, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 05/21/2018. [10880216] [18-15068, 18-15069, 18-15071, 18-15070, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT UPDATE: Attached searchable version of letter. 05/21/2018 by RY]—[Edited 05/21/2018 by RY] (Rosenbaum, Mark) [Entered: 05/21/2018 02:59 PM] |

\* \* \* \* \*

**AR2385**

100

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 6/22/18 | 182 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Donald J. Trump, Jefferson B. Sessions, III and USDHS in 18-15072, 18-15128 citation of supplemental authorities.   Date of service: 06/22/2018.   [10919589] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered:   06/22/2018 04:04 PM] |
| 6/28/18 | 183 | Filed (ECF) Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities.   Date of service: 06/28/2018.   [10925146] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered:   06/28/2018 08:29 AM] |
| 7/2/18 | 184 | Filed (ECF) Appellees Regents of the University of California and Janet Napolitano in 18-15068, |

**AR2386**

101

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15128, Appellants Regents of the University of California and Janet Napolitano in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928492] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/02/2018 09:51 AM] |
| 7/2/18 | 185 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928647] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 07/02/2018 10:39 AM] |
| 7/2/18 | 186 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana |

102

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of service: 07/02/2018. [10928704] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Spread to cases 18-15069, 18-15070, 18-15072, 18-15128, and 18-15133. 7/2/2018 by TYL] (Boutrous, Theodore) [Entered: 07/02/2018 10:58 AM] |
| 7/9/18 | 187 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 07/09/2018. [10935080] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/09/2018 12:20 PM] |
| 7/9/18 | 188 | Filed (ECF) Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma |

**AR2388**

103

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, Jirayut Latthivongskorn, County of Santa Clara and Service Employees International Union Local 521 in 18-15134 citation of supplemental authorities. Date of service: 07/09/2018. [10935549] [18-15068, 18-15072, 18-15071, 18-15134]—[COURT UPDATE: Spread docket text to 18-15069, 18-15128, 18-15070, 18-15133. 07/09/2018 by SLM] (Boutrous, Theodore) [Entered: 07/09/2018 02:56 PM] |
| 8/3/18 | 189 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation |

104

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | of supplemental authorities. Date of service: 08/03/2018. [10964686] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/03/2018 06:34 AM] |
| 8/6/18 | 190 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 08/06/2018. [10967075] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 08/06/2018 11:31 AM] |
| 8/7/18 | 191 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supple- |

**AR2390**

105

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | mental authorities. Date of service: 08/07/2018. [10968935] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Corrected order of PDF's. 08/07/2018 by SLM]—[Edited: spread docket text to 18-15069, 18-15070, 18-15072, 18-15128, 18-15133. 08/07/2018 by RY] (Boutrous, Theodore) [Entered: 08/07/2018 01:19 PM] |
| 8/7/18 | 192 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 08/07/2018. [10969011] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 08/07/2018 01:37 PM] |
| 8/10/18 | 194 | Filed (ECF) Appellants USDHS and Kirstjen Nielsen in 18-15068, Appellants USDHS, USA and Kirstjen Nielsen in 18-15069, Appellants USA, Donald J. Trump and Kirstjen Nielsen in 18-15070, Appellants USDHS, USA, Donald J. Trump and Kirstjen Niel- |

106

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | sen in 18-15071, Appellants USDHS, Donald J. Trump, Jefferson B. Sessions, III and Kirstjen Nielsen in 18-15072, 18-15128, Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 09/13/2018. [11010690] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 09/13/2018 01:33 PM] |
| 9/17/18 | 195 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128 citation of supplemental authorities. Date of service: 09/17/2018. [11014639] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 09/17/2018 04:40 PM] |
| 10/17/18 | 196 | Filed (ECF) Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 Correspondence: Notice of intent to petition the Supreme Court for a |

**AR2392**

107

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | writ of certiorari before judgment absent ruling from this Court.. Date of service: 10/17/2018 [11049590] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 10/17/2018 07:15 AM] |
| | | * * * * * |
| 11/8/18 | 198 | FILED OPINION (KIM MC-LANE WARDLAW, JACQUE-LINE H. NGUYEN and JOHN B. OWENS) AFFIRMED. Judge: KMW Authoring, Judge: JBO Concurring. FILED AND ENTERED JUDGMENT. [11081386] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (RMM) [Entered: 11/08/2018 09:44 AM] |
| | | * * * * * |
| 2/25/19 | 203 | MANDATE ISSUED. (KMW, JHN and JBO) [11206269] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (QDL) [Entered: 02/25/2019 01:06 PM] |
| | | * * * * * |

AR2393

108

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

Docket No. 18-15072

COUNTY OF SANTA CLARA; SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521,
PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES; JEFFERSON B.
SESSIONS III, ATTORNEY GENERAL; KIRSTJEN
NIELSEN, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY; U.S. DEPARTMENT OF HOMELAND
SECURITY; DEFENDANTS-APPELLANTS

———

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 1/16/18 | 1 | DOCKETED CAUSE AND EN-TERED APPEARANCES OF COUNSEL. SEND MQ: Yes. The schedule is set as follows: To be set. Preliminary Injunction, C. R. 3-3 [10725735] (JBS) [Entered: 01/16/2018 02:07 PM] |
| 1/17/18 | 2 | Filed clerk order (Deputy Clerk: SLL): The court sua sponte consolidates appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the dockets accordingly. Consolidated ap- |

109

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | peal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072, filed on January 16, 2018, are preliminary injunction appeals. Accordingly, Ninth Circuit Rule 3-3 shall apply. The mediation questionnaire is due three days after the date of this order. If they have not already done so, within 7 calendar days after the filing date of this order, the parties shall make arrangement3 to obtain from the court reporter an official transcript of proceedings in the district court that will be included in the record on appeal. The briefing schedule shall proceed as follows: the consolidated opening brief(s) and excerpts of record are due not later than February 13, 2018; the consolidated answering brief(s) is due March 13, 2018 or 28 days after service of the opening brief, whichever is earlier; and the optional consolidated reply brief(s) is due within 21 days after service of the answering brief. See 9th Cir. R. 3-3(b). All parties on a side are encouraged to join in a single brief to the greatest extent practicable. See 9th Cir. R. 28-4. The parties are reminded |

110

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | that streamlined requests for extensions of time are not available in preliminary injunction appeals. See http://www.ca9.uscourts.gov/content/view.php?pk_id=0000000638. Any request for an extension of time must be requested under Ninth Circuit Rule 31-2.2(b). Failure to file timely the opening brief shall result in the automatic dismissal of this appeal by the Clerk for failure to prosecute. See 9th Cir. R. 42-1. [10726638] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072] (OC) [Entered: 01/17/2018 09:06 AM] |
| | | *  *  *  *  * |
| 1/26/18 | <u>21</u> | Filed clerk order (Deputy Clerk: MCD): The court sua sponte expedites appeal Nos. 18-15128, 18-15133, 18-15134, and consolidates them with pending consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072. The Clerk shall update the docket accordingly. The following briefing schedule shall apply to the consolidated appeals: the consolidated first brief on cross-appeal by Defendants is due February 13, 2018. |

111

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | The consolidated second brief on cross-appeal by Plaintiffs is due March 13, 2018. The consolidated third brief on cross-appeal by Defendants is due April 10, 2018. The consolidated optional fourth brief on cross-appeal by Plaintiffs is due within 21 days after service of the third brief on cross-appeal. All parties on a side are encouraged to join in a single brief to the greatest extent practicable. See 9th Cir. R. 28-4. This order is without prejudice to any party moving for appropriate relief following resolution of the petition for a writ of certiorari in Supreme Court Case No. 17-1003. [10740072] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (AF) [Entered: 01/26/2018 11:43 AM] |
| | | *   *   *   *   * |
| 2/13/18 | 31 | Submitted (ECF) First Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Ap- |

112

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | pellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128. Date of service: 02/13/2018. [10762501] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected PDF of brief. 02/15/2018 by RY] (Stern, Mark) [Entered: 02/13/2018 01:40 PM] |
| 2/13/18 | 32 | Submitted (ECF) excerpts of record. Submitted by Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 02/13/2018. [10762529] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 02/13/2018 01:50 PM] |
| | | * * * * * |
| 3/13/18 | 41 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Janet Napolitano and Regents of the |

**AR2398**

113

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| | | University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128, Appellants Janet Napolitano, Regents of the University of California and City of San Jose in 18-15133. Date of service: 03/13/2018. [10797237] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:14 PM] |
| 3/13/18 | <u>42</u> | Submitted (ECF) supplemental excerpts of record. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee State of California in 18-15069, Appellee City of San Jose in 18-15070, Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, City of San Jose, County of Santa Clara, Dulce |

**AR2399**

114

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521 and State of California in 18-15128, Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California and State of California in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797304] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:53 PM] |
| 3/13/18 | 43 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Viridiana Chabolla Mendoza, Miriam |

115

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Dulce Garcia in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, County of Santa Clara, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez, Service Employees International Union Local 521 and Dulce Garcia in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.   Date of service: 03/13/2018.   [10797416] [18-15068, 18-15071,   18-15072,   18-15128, 18-15133,   18-15134]—[COURT UPDATE: Spread docket text to 18-15069, 18-15070.   03/14/2018 |

116

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | by RY] (Boutrous, Theodore) [Entered: 03/13/2018 08:41 PM] |
| | | *  *  *  *  * |
| 4/3/18 | <u>133</u> | Submitted (ECF) Third Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
| 3/13/18 | <u>45</u> | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, Appellants |

117

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133, 18-15128. Date of service: 03/13/2018. [10797115] [18-15068, 18-15069, 18-15133, 18-15128]—[COURT UPDATE: Spread docket text to 18-15070, 18-15071, 18-15072, 18-15134. 03/14/2018 by RY] (Mongan, Michael) [Entered: 03/13/2018 04:24 PM] |
| | | *   *   *   *   * |
| 4/3/18 | <u>132</u> | Submitted (ECF) Third Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, |

118

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|  |  | 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
|  | * * * * * |  |
| 4/17/18 | 137 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 04/17/2018. [10839746] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 04/17/2018 12:02 PM] |
|  | * * * * * |  |
| 4/17/18 | 139 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128. Date of ser- |

119

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | vice: 04/17/2018. [10840021] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/17/2018 01:41 PM] |

<p style="text-align:center">*　*　*　*　*</p>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/17/18 | <u>141</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul |

120

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 04/17/2018. [10840409] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-15069, 18-15070] (Boutrous, Theodore) [Entered: 04/17/2018 03:49 PM] |
| | | *   *   *   *   * |
| 4/25/18 | <u>147</u> | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10849629] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 04/25/2018 08:55 AM] |
| | | *   *   *   *   * |

**AR2406**

121

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 4/25/18 | <u>149</u> | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10851189] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT ENTERED FILING to correct entry [149].] (RY) [Entered: 04/25/2018 04:36 PM] |
| 4/26/18 | <u>150</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 04/26/2018. [10852623] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] |

122

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | (Davidson, Jeffrey) [Entered: 04/26/2018 03:05 PM] |
| | | *   *   *   *   * |
| 5/1/18 | <u>155</u> | Filed clerk order (Deputy Clerk: OC): The parties are ordered to submit supplemental briefs of no more than fifteen double-spaced pages addressing the effect of Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), and Montana Air Chapter No. 29 v. FLRA, 898 F.2d 753, 756–57 (9th Cir. 1990), on the question whether 5 U.S.C. § 701(a)(2) bars judicial review of the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals program. The parties should consider whether the rescission is judicially reviewable as a general enforcement policy, rather than as a single-shot non-enforcement decision. See Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994); NAACP v. Trump, Nos. 17-1907 & 17-2325, 2018 WL 1920079, at *11–17 (D.D.C. Apr. 24, 2018) (interpreting the standard in Crowley). The briefs shall be filed on or before May 11, 2018. [10857346] [18-15068, |

123

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-80037] (OC) [Entered:   05/01/2018 12:58 PM] |
| | | *   *   *   *   * |
| 5/11/18 | 164 | Submitted (ECF) Supplemental Brief for review.   Submitted by Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134.   Date of service:   05/11/2018.   [10870059] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered:   05/11/2018 02:28 PM] |
| 5/11/18 | 165 | Submitted (ECF) Supplemental Brief for review.   Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Ap- |

124

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | pellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 05/11/2018. [10870142] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 05/11/2018 03:04 PM] |
| 5/11/18 | <u>166</u> | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees City of San Jose, Janet Napolitano and Regents of the University of California in 18-15128. Date of service: 05/11/2018. [10870151] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 05/11/2018 03:11 PM] |
| | | *   *   *   *   * |
| 5/11/18 | <u>170</u> | Submitted (ECF) Supplemental Brief for review. Submitted by |

**AR2410**

125

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 05/11/2018. [10870452] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected brief. 5/14/2018 by TYL] (Mongan, Michael) [Entered: 05/11/2018 05:10 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| 5/15/18 | 177 | ARGUED AND SUBMITTED TO KIM MCLANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS. [10873596] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Witt, Dusty) [Entered: 05/15/2018 04:18 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| 5/21/18 | 180 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Men- |

126

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | doza in 18-15071, 18-15128, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 05/21/2018. [10880216] [18-15068, 18-15069, 18-15071, 18-15070, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT UPDATE: Attached searchable version of letter. 05/21/2018 by RY]—[Edited 05/21/2018 by RY) (Rosenbaum, Mark) [Entered: 05/21/2018 02:59 PM] |
| | | * * * * * |
| 6/22/18 | 182 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Donald J. Trump, Jefferson B. Sessions, III and USDHS in 18-15072, 18-15128 citation of supplemental authorities. Date of service: |

**AR2412**

127

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 06/22/2018.   [10919589] [18-15068, 18-15069,   18-15070,   18-15071, 18-15072,   18-15128,   18-15133, 18-15134] (Wright, Abby) [Entered:   06/22/2018 04:04 PM] |
| 6/28/18 | 183 | Filed (ECF) Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities.   Date of service: 06/28/2018.   [10925146] [18-15068, 18-15069,   18-15070,   18-15071, 18-15072,   18-15128,   18-15133, 18-15134] (Wright, Abby) [Entered:   06/28/2018 08:29 AM] |
| 7/2/18 | 184 | Filed (ECF) Appellees Regents of the University of California and Janet Napolitano in 18-15068, 18-15128, Appellants Regents of the University of California and Janet Napolitano in 18-15133 citation of supplemental authorities.   Date of service:   07/02/2018. [10928492]  [18-15068,  18-15069, 18-15070,   18-15071,   18-15072, 18-15128,   18-15133,   18-15134] (Davidson,   Jeffrey)   [Entered: 07/02/2018 09:51 AM] |
| 7/2/18 | 185 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Ap- |

128

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | pellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928647] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 07/02/2018 10:39 AM] |
| 7/2/18 | 186 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of service: 07/02/2018. [10928704] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Spread to cases 18-15069, 18-15070, 18-15072, 18-15128, and 18-15133. 7/2/2018 by TYL] (Boutrous, Theodore) [Entered: 07/02/2018 10:58 AM] |
| 7/9/18 | 187 | Filed (ECF) Appellees Janet Napolitano and Regents of the Uni- |

**AR2414**

129

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | versity of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service:  07/09/2018. [10935080] [18-15068,  18-15069, 18-15070,  18-15071,  18-15072, 18-15128,  18-15133,  18-15134] (Davidson,  Jeffrey)  [Entered: 07/09/2018 12:20 PM] |
| 7/9/18 | 188 | Filed (ECF) Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez  and  Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana  Chabolla  Mendoza, Norma Ramirez, Jirayut Latthivongskorn, County of Santa Clara  and  Service Employees International Union Local 521 in 18-15134 citation of supplemental authorities.  Date  of  service: 07/09/2018.  [10935549] [18-15068, 18-15072, 18-15071, 18-15134]— [COURT  UPDATE:  Spread docket text to 18-15069, 18-15128, |

130

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15070, 18-15133.   07/09/2018 by SLM] (Boutrous, Theodore) [Entered:   07/09/2018 02:56 PM] |
| 8/3/18 | 189 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants   Kirstjen   Nielsen, USA and USDHS in 18-15069, Appellants   Kirstjen   Nielsen, Donald J. Trump and USA in 18-15070,   Appellants   Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in   18-15133,   18-15134   citation of   supplemental   authorities. Date of service:   08/03/2018. [10964686] [18-15068, 18-15069, 18-15070,   18-15071,   18-15072, 18-15128,   18-15133,   18-15134] (Wright,   Abby)   [Entered: 08/03/2018 06:34 AM] |
| 8/6/18 | 190 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in |

**AR2416**

131

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
|  |  | 18-15133 citation of supplemental authorities. Date of service: 08/06/2018. [10967075] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 08/06/2018 11:31 AM] |
| 8/7/18 | 191 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 08/07/2018. [10969011] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 08/07/2018 01:37 PM] |
| 8/7/18 | 192 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of ser- |

AR2417

132

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | vice: 08/07/2018. [10968935] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Corrected order of PDF's. 08/07/2018 by SLM]—[Edited: spread docket text to 18-15069, 18-15070, 18-15072, 18-15128, 18-15133. 08/07/2018 by RY] (Boutrous, Theodore) [Entered: 08/07/2018 01:19 PM] |
| 8/10/18 | <u>193</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/10/2018. [10972953] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/10/2018 10:43 AM] |

133

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 9/13/18 | 194 | Filed (ECF) Appellants USDHS and Kirstjen Nielsen in 18-15068, Appellants USDHS, USA and Kirstjen Nielsen in 18-15069, Appellants USA, Donald J. Trump and Kirstjen Nielsen in 18-15070, Appellants USDHS, USA, Donald J. Trump and Kirstjen Nielsen in 18-15071, Appellants USDHS, Donald J. Trump, Jefferson B. Sessions, III and Kirstjen Nielsen in 18-15072, 18-15128, Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 09/13/2018.  [11010690] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered:  09/13/2018 01:33 PM] |
| 9/17/18 | 195 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128 citation of supplemental authorities.  Date of service: 09/17/2018.  [11014639] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered:  09/17/2018 04:40 PM] |

134

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 10/17/18 | <u>196</u> | Filed (ECF) Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 Correspondence:  Notice of intent to petition the Supreme Court for a writ of certiorari before judgment absent ruling from this Court..   Date of service: 10/17/2018 [11049590] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered:   10/17/2018 07:15 AM] |
| 11/8/18 | <u>197</u> | FILED OPINION (KIM MC-LANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS) AFFIRMED.   Judge: KMW Authoring, Judge:   JBO Concurring.   FILED AND ENTERED   JUDGMENT. [11081386] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (RMM) [Entered:   11/08/2018 09:44 AM] |
|  |  | *    *    *    *    * |
| 2/25/19 | <u>202</u> | MANDATE ISSUED.   (KMW, JHN   and   JBO) [11206269] [18-15068,   18-15069,   18-15070, |

135

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (QDL) [Entered: 02/25/2019 01:06 PM] |

<p style="text-align:center">* * * * *</p>

136

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Docket No. 18-15128

REGENTS OF THE UNIVERSITY OF CALIFORNIA; JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS PRESIDENT OF THE UNIVERSITY OF CALIFORNIA; STATE OF CALIFORNIA; STATE OF MAINE; STATE OF MINNESOTTA; STATE OF MARYLAND; CITY OF SAN JOSE; DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA MENDOZA; JIRAYUT LATTHIVONGSKORN; NORMA RAMIREZ; COUNTY OF SANTA CLARA; SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, PLAINTIFFS-APPELLEES

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, DEFENDANTS-APPELLANTS

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 1/25/18 | 1 | Filed in 18-80004: Filed order (CARLOS T. BEA and RICHARD A. PAEZ) The petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) is granted. Within 14 days after the date of this order, petitioners shall per- |

**AR2422**

137

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | fect the appeal in accordance with Federal Rule of Appellate Procedure 5(d). [10738869] (HC) [Entered: 01/25/2018 02:41 PM] |
| 1/25/18 | <u>2</u> | DOCKETED CAUSE AND ENTERED APPEARANCES OF COUNSEL. SEND MQ: Yes. The schedule is set as follows: Mediation Questionnaire due on 02/01/2018. Transcript ordered by 02/26/2018. Transcript due 03/26/2018. Appellants Kirstjen Nielsen, Donald J. Trump, U.S. Department of Homeland Security and United States of America opening brief due 05/07/2018. Appellees Viridiana Chabolla Mendoza, City of San Jose, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521, State of California, State of Maine, State of Maryland and State of Minnesota answering brief due 06/04/2018. Appellant's optional reply brief is due 21 days after service of the answering brief. [10738887] |

138

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | (HC)   [Entered:   01/25/2018 02:42 PM] |
| 1/26/18 | <u>3</u> | Filed clerk order (Deputy Clerk: MCD):   The court sua sponte expedites appeal Nos. 18-15128, 18-15133, 18-15134, and consolidates them with pending consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072.   The Clerk shall update the docket accordingly. The following briefing schedule shall apply to the consolidated appeals:   the consolidated first brief on cross-appeal by Defendants is due February 13, 2018. The consolidated second brief on cross-appeal by Plaintiffs is due March 13, 2018.   The consolidated third brief on cross-appeal by Defendants is due April 10, 2018.   The consolidated optional fourth brief on cross-appeal by Plaintiffs is due within 21 days after service of the third brief on cross-appeal.   All parties on a side are encouraged to join in a single brief to the greatest extent practicable.   See 9th Cir. R. 28-4.   This order is without prejudice to any party moving for appropriate relief following resolution of the petition for a writ |

139

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | of certiorari in Supreme Court Case No. 17-1003.   [10740072] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (AF) [Entered:   01/26/2018 11:43 AM] |
| | | *   *   *   *   * |
| 2/13/18 | 17 | Submitted (ECF) First Brief on Cross-Appeal for review.   Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128.   Date of service: 02/13/2018.   [10762501] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT UPDATE: Attached corrected PDF of brief. 02/15/2018 by RY] (Stern, Mark) [Entered:   02/13/2018 01:40 PM] |
| 2/13/18 | 18 | Submitted (ECF) excerpts of record.   Submitted by Appellants Kirstjen Nielsen, Donald J. |

140

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 02/13/2018. [10762529] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 02/13/2018 01:50 PM] |

<div align="center">*  *  *  *  *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| 3/13/18 | <u>25</u> | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133, 18-15128. Date of service: 03/13/2018. [10797115] [18-15068, 18-15069, 18-15133, 18-15128]—[COURT UPDATE: Spread docket text to 18-15070, 18-15071, 18-15072, 18-15134. 03/14/2018 by RY] (Mongan, Michael) [Entered: 03/13/2018 04:24 PM] |
| 3/13/18 | <u>26</u> | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Janet Napolitano and Regents of the |

**AR2426**

141

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|  |  | University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128, Appellants Janet Napolitano, Regents of the University of California and City of San Jose in 18-15133.   Date of service:   03/13/2018.   [10797237] [18-15068,  18-15069,  18-15070, 18-15071,  18-15072,  18-15128, 18-15133,  18-15134]  (Davidson, Jeffrey)  [Entered:   03/13/2018 05:14 PM] |
| 3/13/18 | 27 | Submitted (ECF) supplemental excerpts of record.   Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee State of California in 18-15069, Appellee City of San Jose in 18-15070, Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, City of San Jose, County of Santa Clara, Dulce |

142

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521 and State of California in 18-15128, Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California and State of California in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797304] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:53 PM] |
| | | * * * * * |
| 3/13/18 | 29 | Submitted (ECF) Second Brief on Cross-Appeal for review. |

**AR2428**

143

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Submitted by Appellees Viridiana Chabolla Mendoza, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Dulce Garcia in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, County of Santa Clara, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez, Service Employees International Union Local 521 and Dulce Garcia in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.   Date of service:   03/13/2018.   [10797416] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE:   Spread |

AR2429

144

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | docket text to 18-15069, 18-15070. 03/14/2018 by RY] (Boutrous, Theodore) [Entered: 03/13/2018 08:41 PM] |
| | | * * * * * |
| 4/3/18 | <u>117</u> | Submitted (ECF) Third Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
| | | * * * * * |
| 4/17/18 | <u>122</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Sub- |

145

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | mitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 04/17/2018. [10839746] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 04/17/2018 12:02 PM] |

<div align="center">*  *  *  *  *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/17/18 | 124 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128. Date of service: 04/17/2018. [10840021] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/17/2018 01:41 PM] |

<div align="center">*  *  *  *  *</div>

**AR2431**

146

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/17/18 | <u>126</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.   Date of service: 04/17/2018.   [10840409] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-15069, |

147

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15070] (Boutrous, Theodore) [Entered: 04/17/2018 03:49 PM] |
| | | * * * * * |
| 4/25/18 | 132 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10849629] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 04/25/2018 08:55 AM] |
| | | * * * * * |
| 4/25/18 | 134 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, |

**AR2433**

148

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10851189] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT ENTERED FILING to correct entry [149].] (RY) [Entered: 04/25/2018 04:36 PM] |
| 4/26/18 | 135 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 04/26/2018. [10852623] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/26/2018 03:05 PM] |
| | | * * * * * |
| 5/1/18 | 140 | Filed clerk order (Deputy Clerk: OC): The parties are ordered to submit supplemental briefs of no more than fifteen double-spaced pages addressing the effect of Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), and Montana Air |

**AR2434**

149

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Chapter No. 29 v. FLRA, 898 F.2d 753, 756–57 (9th Cir. 1990), on the question whether 5 U.S.C. § 701(a)(2) bars judicial review of the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals program. The parties should consider whether the rescission is judicially reviewable as a general enforcement policy, rather than as a single-shot non-enforcement decision. See Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994); NAACP v. Trump, Nos. 17-1907 & 17-2325, 2018 WL 1920079, at *11–17 (D.D.C. Apr. 24, 2018) (interpreting the standard in Crowley). The briefs shall be filed on or before May 11, 2018. [10857346] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-80037] (OC) [Entered: 05/01/2018 12:58 PM] |
| | | * * * * * |
| 5/11/18 | 149 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez |

150

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134. Date of service: 05/11/2018. [10870059] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 05/11/2018 02:28 PM] |
| 5/11/18 | 150 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 05/11/2018. [10870142] [18-15068, 18-15069, 18-15070, |

**AR2436**

151

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 05/11/2018 03:04 PM] |
| 5/11/18 | 151 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees City of San Jose, Janet Napolitano and Regents of the University of California in 18-15128. Date of service: 05/11/2018. [10870151] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 05/11/2018 03:11 PM] |
| | | *   *   *   *   * |
| 5/11/18 | 155 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 05/11/2018. [10870452] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] |

AR2437

152

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | —[COURT UPDATE: Attached corrected brief. 5/14/2018 by TYL] (Mongan, Michael) [Entered: 05/11/2018 05:10 PM] |
| | | *   *   *   *   * |
| 5/15/18 | 162 | ARGUED AND SUBMITTED TO KIM MCLANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS. [10873596] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Witt, Dusty) [Entered: 05/15/2018 04:18 PM] |
| | | *   *   *   *   * |
| 5/21/18 | 165 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15071, 18-15128, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 05/21/2018. [10880216] [18-15068, 18-15069, 18-15071, 18-15070, 18-15072, 18-15128, 18-15133, |

153

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15134]—[COURT UPDATE: Attached searchable version of letter. 05/21/2018 by RY]—[Edited 05/21/2018 by RY] (Rosenbaum, Mark) [Entered: 05/21/2018 02:59 PM] |
| | | *   *   *   *   * |
| 6/22/18 | <u>167</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Donald J. Trump, Jefferson B. Sessions, III and USDHS in 18-15072, 18-15128 citation of supplemental authorities.   Date of service: 06/22/2018.   [10919589] [18-15068, 18-15069,   18-15070,   18-15071, 18-15072,   18-15128,   18-15133, 18-15134] (Wright, Abby) [Entered:   06/22/2018 04:04 PM] |
| 6/28/18 | <u>168</u> | Filed (ECF) Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities.   Date of service: 06/28/2018.   [10925146] [18-15068, |

**AR2439**

154

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 06/28/2018 08:29 AM] |
| 7/2/18 | 169 | Filed (ECF) Appellees Regents of the University of California and Janet Napolitano in 18-15068, 18-15128, Appellants Regents of the University of California and Janet Napolitano in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928492] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/02/2018 09:51 AM] |
| 7/2/18 | 170 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928647] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 07/02/2018 10:39 AM] |

155

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 7/2/18 | <u>171</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities.  Date of service:  07/02/2018.  [10928704] [18-15068, 18-15071, 18-15134] —[COURT UPDATE:  Spread to cases 18-15069, 18-15070, 18-15072, 18-15128, and 18-15133. 7/2/2018 by TYL] (Boutrous, Theodore) [Entered:  07/02/2018 10:58 AM] |
| 7/9/18 | <u>172</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service:  07/09/2018. [10935080]  [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] |

AR2441

156

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | (Davidson, Jeffrey) [Entered: 07/09/2018 12:20 PM] |
| 7/9/18 | <u>173</u> | Filed (ECF) Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, Jirayut Latthivongskorn, County of Santa Clara and Service Employees International Union Local 521 in 18-15134 citation of supplemental authorities. Date of service: 07/09/2018. [10935549] [18-15068, 18-15072, 18-15071, 18-15134]— [COURT UPDATE: Spread docket text to 18-15069, 18-15128, 18-15070, 18-15133. 07/09/2018 by SLM] (Boutrous, Theodore) [Entered: 07/09/2018 02:56 PM] |
| 8/3/18 | <u>174</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, |

**AR2442**

157

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/03/2018. [10964686] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/03/2018 06:34 AM] |
| 8/6/18 | 175 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 08/06/2018. [10967075] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 08/06/2018 11:31 AM] |

158

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 8/7/18 | <u>176</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 08/07/2018. [10969011] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 08/07/2018 01:37 PM] |
| 8/7/18 | <u>1177</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of service: 08/07/2018. [10968935] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Corrected order of PDF's. 08/07/2018 by SLM]—[Edited: spread docket text to 18-15069, 18-15070, 18-15072, 18-15128, |

159

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15133.   08/07/2018 by RY] (Boutrous, Theodore) [Entered: 08/07/2018 01:19 PM] |
| 8/10/18 | 178 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities.   Date of service: 08/10/2018.   [10972953] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered:   08/10/2018 10:43 AM] |
| 9/13/18 | 179 | Filed (ECF) Appellants USDHS and Kirstjen Nielsen in 18-15068, Appellants USDHS, USA and Kirstjen Nielsen in 18-15069, Appellants USA, Donald J. Trump and Kirstjen Nielsen in 18-15070, Appellants USDHS, USA, Don- |

**AR2445**

160

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | ald J. Trump and Kirstjen Nielsen in 18-15071, Appellants USDHS, Donald J. Trump, Jefferson B. Sessions, III and Kirstjen Nielsen in 18-15072, 18-15128, Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 09/13/2018. [11010690] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 09/13/2018 01:33 PM] |
| 9/17/18 | 180 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128 citation of supplemental authorities. Date of service: 09/17/2018. [11014639] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 09/17/2018 04:40 PM] |
| 10/17/18 | 181 | Filed (ECF) Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 Correspondence: Notice of intent to peti- |

**AR2446**

161

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | tion the Supreme Court for a writ of certiorari before judgment absent ruling from this Court.. Date of service: 10/17/2018 [11049590] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 10/17/2018 07:15 AM] |
| | | * * * * * |
| 11/8/18 | 183 | FILED OPINION (KIM MC-LANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS) AFFIRMED. Judge: KMW Authoring, Judge: JBO Concurring. FILED AND ENTERED JUDGMENT. [11081386] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (RMM) [Entered: 11/08/2018 09:44 AM] |
| | | * * * * * |
| 2/25/19 | 188 | MANDATE ISSUED. (KMW, JHN and JBO) [11206269] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (QDL) [Entered: 02/25/2019 01:06 PM] |
| | | * * * * * |

162

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

––––––––––

Docket No. 18-15133

REGENTS OF THE UNIVERSITY OF OF CALIFORNIA;
JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA;
STATE OF CALIFORNIA; STATE OF MAINE; STATE OF
MINNESOTA; STATE OF MARYLAND; CITY OF SAN JOSE;
DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL
JIMENEZ SUAREZ; VIRIDIANA CHABOLLA MENDOZA;
JIRAYUT LATTHIVONGSKORN; NORMA RAMIREZ,
PLAINTIFFS-APPELLEES

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES; U.S. DEPARTMENT OF HOMELAND
SECURITY; KIRSTJEN NIELSEN, IN HER OFFICIAL
CAPACITY AS ACTING SECRETARY OF THE
DEPARTMENT OF HOMELAND SECURITY,
DEFENDANTS-APPELLANTS

––––––––––

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 1/25/18 | 1 | Filed in 18-80007: Filed order (CARLOS T. BEA and RICH-ARD A. PAEZ) The petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) is granted. Within 14 days after the date of this order, petitioners shall perfect the appeal in accordance with Federal Rule of Appellate |

AR2448

163

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Procedure 5(d). [10739055] (HC) [Entered:  01/25/2018 03:36 PM] |
| 1/25/18 | 2 | DOCKETED CAUSE AND ENTERED APPEARANCES OF COUNSEL.  SEND MQ: Yes.  The schedule is set as follows:  Mediation Questionnaire due on 02/01/2018.  Transcript ordered by 02/26/2018.  Transcript due 03/26/2018. Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California, State of California, State of Maine, State of Maryland and State of Minnesota opening brief due 05/07/2018.  Appellees Kirstjen Nielsen, Donald J. Trump, U.S. Department of Homeland Security and United States of America answering brief due 06/04/2018.  Appellant's optional reply brief is due 21 days after service of the answering brief.  [10739066] (HC) [Entered:  01/25/2018 03:38 PM] |

*    *    *    *    *

164

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 1/26/18 | 3 | Filed clerk order (Deputy Clerk: MCD):  The court sua sponte expedites appeal Nos. 18-15128, 18-15133, 18-15134, and consolidates them with pending consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and 18-15072.  The Clerk shall update the docket accordingly. The following briefing schedule shall apply to the consolidated appeals:  the consolidated first brief on cross-appeal by Defendants is due February 13, 2018. The consolidated second brief on cross-appeal by Plaintiffs is due March 13, 2018.  The consolidated third brief on cross-appeal by Defendants is due April 10, 2018.  The consolidated optional fourth brief on cross-appeal by Plaintiffs is due within 21 days after service of the third brief on cross-appeal.  All parties on a side are encouraged to join in a single brief to the greatest extent practicable.  See 9th Cir. R. 28-4.  This order is without prejudice to any party moving for appropriate relief following resolution of the petition for a writ of certiorari in Supreme Court Case No. 17-1003. [10740072] |

165

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (AF) [Entered: 01/26/2018 11:43 AM] |
| | | * * * * * |
| 2/13/18 | 18 | Submitted (ECF) First Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128. Date of service: 02/13/2018. [10762501] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected PDF of brief. 02/15/2018 by RY] (Stern, Mark) [Entered: 02/13/2018 01:40 PM] |
| 2/13/18 | 19 | Submitted (ECF) excerpts of record. Submitted by Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen |

166

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 02/13/2018. [10762529] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 02/13/2018 01:50 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 3/13/18 | 26 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133, 18-15128. Date of service: 03/13/2018. [10797115] [18-15068, 18-15069, 18-15133, 18-15128]—[COURT UPDATE: Spread docket text to 18-15070, 18-15071, 18-15072, 18-15134. 03/14/2018 by RY] (Mongan, Michael) [Entered: 03/13/2018 04:24 PM] |
| 3/13/18 | 27 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San |

**AR2452**

167

| DATE | DOCKET NUMBER | PROCEEDINGS |
| --- | --- | --- |
| | | Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128, Appellants Janet Napolitano, Regents of the University of California and City of San Jose in 18-15133. Date of service: 03/13/2018. [10797237] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:14 PM] |
| 3/13/18 | 28 | Submitted (ECF) supplemental excerpts of record. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee State of California in 18-15069, Appellee City of San Jose in 18-15070, Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, City of San Jose, County of Santa Clara, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet |

168

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521 and State of California in 18-15128, Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California and State of California in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797304] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:53 PM] |
| | | *   *   *   *   * |
| 3/13/18 | <u>30</u> | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Viridiana Chabolla Mendoza, Miriam |

169

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Dulce Garcia in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, County of Santa Clara, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez, Service Employees International Union Local 521 and Dulce Garcia in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134. Date of service: 03/13/2018. [10797416] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Spread docket text to 18-15069, 18-15070. 03/14/2018 by RY] (Boutrous, |

170

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Theodore) [Entered: 03/13/2018 08:41 PM] |
| | | * * * * * |
| 4/3/18 | <u>118</u> | Submitted (ECF) Third Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
| | | * * * * * |
| 4/17/18 | <u>123</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees State of California, State of Maine, State |

**AR2456**

171

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 04/17/2018. [10839746] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 04/17/2018 12:02 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 4/17/18 | 125 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128. Date of service: 04/17/2018. [10840021] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/17/2018 01:41 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 4/17/18 | 127 | Submitted (ECF) Cross-Appeal Reply Brief for review. Sub- |

172

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | mitted by Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.   Date of service: 04/17/2018.   [10840409] [18-15068, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-15069, 18-15070] (Boutrous, Theodore) [Entered:   04/17/2018 03:49 PM] |

AR2458

173

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | * * * * * |
| 4/25/18 | 133 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10849629] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 04/25/2018 08:55 AM] |
| | | * * * * * |
| 4/25/18 | 135 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, |

**AR2459**

174

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10851189] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT ENTERED FILING to correct entry [149].] (RY) [Entered: 04/25/2018 04:36 PM] |
| 4/26/18 | 136 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 04/26/2018. [10852623] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/26/2018 03:05 PM] |
| | | *   *   *   *   * |
| 5/1/18 | 141 | Filed clerk order (Deputy Clerk: OC): The parties are ordered to submit supplemental briefs of no more than fifteen double-spaced pages addressing the effect of Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), and Montana Air Chapter No. 29 v. FLRA, 898 F.2d 753, 756–57 (9th Cir. 1990), |

AR2460

175

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | on the question whether 5 U.S.C. § 701(a)(2) bars judicial review of the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals program. The parties should consider whether the rescission is judicially reviewable as a general enforcement policy, rather than as a single-shot non-enforcement decision. See Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994); NAACP v. Trump, Nos. 17-1907 & 17-2325, 2018 WL 1920079, at *11–17 (D.D.C. Apr. 24, 2018) (interpreting the standard in Crowley). The briefs shall be filed on or before May 11, 2018. [10857346] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-80037] (OC) [Entered: 05/01/2018 12:58 PM] |
| | | * * * * * |
| 5/11/18 | 150 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, |

176

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134. Date of service: 05/11/2018. [10870059] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 05/11/2018 02:28 PM] |
| 5/11/18 | 151 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 05/11/2018. [10870142] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, |

**AR2462**

177

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-15133, 18-15134] (Stern, Mark) [Entered: 05/11/2018 03:04 PM] |
| 5/11/18 | <u>152</u> | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees City of San Jose, Janet Napolitano and Regents of the University of California in 18-15128. Date of service: 05/11/2018. [10870151] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 05/11/2018 03:11 PM] |
| | | * * * * * |
| 5/11/18 | <u>156</u> | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 05/11/2018. [10870452] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: At- |

178

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | tached corrected brief. 5/14/2018 by TYL] (Mongan, Michael) [Entered: 05/11/2018 05:10 PM] |
| | | * * * * * |
| 5/15/18 | <u>163</u> | ARGUED AND SUBMITTED TO KIM MCLANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS. [10873596] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Witt, Dusty) [Entered: 05/15/2018 04:18 PM] |
| | | * * * * * |
| 5/21/18 | <u>166</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15071, 18-15128, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 05/21/2018. [10880216] [18-15068, 18-15069, 18-15071, 18-15070, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT UPDATE: |

179

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | Attached searchable version of letter. 05/21/2018 by RY]— [Edited 05/21/2018 by RY] (Rosenbaum, Mark) [Entered: 05/21/2018 02:59 PM] |

\*   \*   \*   \*   \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 6/22/18 | <u>168</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Donald J. Trump, Jefferson B. Sessions, III and USDHS in 18-15072, 18-15128 citation of supplemental authorities. Date of service: 06/22/2018. [10919589] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 06/22/2018 04:04 PM] |
| 6/28/18 | <u>169</u> | Filed (ECF) Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 06/28/2018. [10925146] [18-15068, 18-15069, 18-15070, 18-15071, |

**AR2465**

180

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 06/28/2018 08:29 AM] |
| 7/2/18 | 170 | Filed (ECF) Appellees Regents of the University of California and Janet Napolitano in 18-15068, 18-15128, Appellants Regents of the University of California and Janet Napolitano in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928492] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/02/2018 09:51 AM] |
| 7/2/18 | 171 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928647] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 07/02/2018 10:39 AM] |
| 7/2/18 | 172 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, |

181

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of service: 07/02/2018. [10928704] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Spread to cases 18-15069, 18-15070, 18-15072, 18-15128, and 18-15133. 7/2/2018 by TYL] (Boutrous, Theodore) [Entered: 07/02/2018 10:58 AM] |
| 7/9/18 | 173 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 07/09/2018. [10935080] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/09/2018 12:20 PM] |

182

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 7/9/18 | 174 | Filed (ECF) Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, Jirayut Latthivongskorn, County of Santa Clara and Service Employees International Union Local 521 in 18-15134 citation of supplemental authorities. Date of service: 07/09/2018. [10935549] [18-15068, 18-15072, 18-15071, 18-15134]— [COURT UPDATE: Spread docket text to 18-15069, 18-15128, 18-15070, 18-15133. 07/09/2018 by SLM] (Boutrous, Theodore) [Entered: 07/09/2018 02:56 PM] |
| 8/3/18 | 175 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen |

AR2468

183

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/03/2018. [10964686] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/03/2018 06:34 AM] |
| 8/6/18 | <u>176</u> | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 08/06/2018. [10967075] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 08/06/2018 11:31 AM] |
| 8/7/18 | <u>177</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in |

**AR2469**

184

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities.   Date of service: 08/07/2018.   [10969011] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered:   08/07/2018 01:37 PM] |
| 8/7/18 | 178 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Rami-rez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Rami-rez and Jirayut Latthivongskorn in 18-15134 citation of supple-mental authorities.   Date of ser-vice:   08/07/2018.   [10968935] [18-15068, 18-15071, 18-15134] —[COURT UPDATE:   Cor-rected order of PDF's. 08/07/2018 by SLM]—[Edited: spread docket text to 18-15069, 18-15070, 18-15072, 18-15128, 18-15133.   08/07/2018 by RY] (Boutrous, Theodore) [Entered: 08/07/2018 01:19 PM] |

**AR2470**

185

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 8/10/18 | <u>179</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities.   Date of service: 08/10/2018.   [10972953] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered:   08/10/2018 10:43 AM] |
| 9/13/18 | <u>180</u> | Filed (ECF) Appellants USDHS and Kirstjen Nielsen in 18-15068, Appellants USDHS, USA and Kirstjen Nielsen in 18-15069, Appellants USA, Donald J. Trump and Kirstjen Nielsen in 18-15070, Appellants USDHS, USA, Donald J. Trump and Kirstjen Nielsen in 18-15071, Appellants USDHS, Donald J. Trump, Jef- |

186

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| | | ferson B. Sessions, III and Kirstjen Nielsen in 18-15072, 18-15128, Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 09/13/2018. [11010690] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 09/13/2018 01:33 PM] |
| 9/17/18 | 181 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128 citation of supplemental authorities. Date of service: 09/17/2018. [11014639] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 09/17/2018 04:40 PM] |
| 10/17/18 | 182 | Filed (ECF) Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 Correspondence: Notice of intent to petition the Supreme Court for a writ of certiorari before judgment absent ruling from this |

187

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Court.. Date of service: 10/17/2018 [11049590] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 10/17/2018 07:15 AM] |
| 11/8/18 | 183 | FILED OPINION (KIM MC-LANE WARDLAW, JACQUELINE H. NGUYEN and JOHN B. OWENS) AFFIRMED. Judge: KMW Authoring, Judge: JBO Concurring. FILED AND ENTERED JUDGMENT. [11081386] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (RMM) [Entered: 11/08/2018 09:44 AM] |
| | | *   *   *   *   * |
| 2/25/19 | 188 | MANDATE ISSUED. (KMW, JHN and JBO) [11206269] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (QDL) [Entered: 02/25/2019 01:06 PM] |
| | | *   *   *   *   * |

AR2473

188

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———

Docket No. 18-15134

DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA MENDOZA; NORMA RAMIREZ; JIRAYUT LATTHIVONGSKORN; COUNTY OF SANTA CLARA; SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, PLAINTIFFS-APPELLEES

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, IN HER OFFICIAL CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, DEFENDANTS-APPELLANTS

———

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 1/25/18 | 1 | Filed in 18-80008: Filed order (RICHARD A. PAEZ and CARLOS T. BEA) The petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) is granted. Within 14 days after the date of this order, petitioners shall perfect the appeal in accordance with Federal Rule of Appellate Procedure 5(d). [10739139] (HC) [Entered: 01/25/2018 04:01 PM] |

189

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 1/25/18 | 2 | DOCKETED CAUSE AND ENTERED APPEARANCES OF COUNSEL. SEND MQ: Yes. The schedule is set as follows: Mediation Questionnaire due on 02/01/2018. Transcript ordered by 02/26/2018. Transcript due 03/26/2018. Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 opening brief due 05/07/2018. Appellees Kirstjen Nielsen, Donald J. Trump, U.S. Department of Homeland Security and United States of America answering brief due 06/04/2018. Appellant's optional reply brief is due 21 days after service of the answering brief. [10739148] (HC) [Entered: 01/25/2018 04:03 PM] |
| 1/26/18 | 3 | Filed clerk order (Deputy Clerk: MCD): The court sua sponte expedites appeal Nos. 18-15128, 18-15133, 18-15134, and consolidates them with pending consolidated appeal Nos. 18-15068, 18-15069, 18-15070, 18-15071, and |

**AR2475**

190

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | 18-15072.   The Clerk shall update the docket accordingly. The following briefing schedule shall apply to the consolidated appeals:   the consolidated first brief on cross-appeal by Defendants is due February 13, 2018. The consolidated second brief on cross-appeal by Plaintiffs is due March 13, 2018.   The consolidated third brief on cross-appeal by Defendants is due April 10, 2018.   The consolidated optional fourth brief on cross-appeal by Plaintiffs is due within 21 days after service of the third brief on cross-appeal.   All parties on a side are encouraged to join in a single brief to the greatest extent practicable.   See 9th Cir. R. 28-4.   This order is without prejudice to any party moving for appropriate relief following resolution of the petition for a writ of certiorari in Supreme Court Case   No.   17-1003.   [10740072] [18-15068,   18-15069,   18-15070, 18-15071,   18-15072,   18-15128, 18-15133,  18-15134)  (AF) [Entered:   01/26/2018 11:43 AM] |

\*   \*   \*   \*   \*

191

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 2/13/18 | <u>17</u> | Submitted (ECF) First Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128. Date of service: 02/13/2018. [10762501] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected PDF of brief. 02/15/2018 by RY] (Stern, Mark) [Entered: 02/13/2018 01:40 PM] |
| 2/13/18 | <u>18</u> | Submitted (ECF) excerpts of record. Submitted by Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 02/13/2018. [10762529] [18-15068, 18-15069, 18-15070, 18-15071, |

192

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 02/13/2018 01:50 PM] |
| | | * * * * * |
| 3/13/18 | 25 | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128, Appellants Janet Napolitano, Regents of the University of California and City of San Jose in 18-15133. Date of service: 03/13/2018. [10797237] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:14 PM] |
| 3/13/18 | 26 | Submitted (ECF) supplemental excerpts of record. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee State of California in 18-15069, Appellee City of San Jose in 18-15070, Appellees Viridiana Chabolla Mendoza, Dulce Garcia, |

193

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, City of San Jose, County of Santa Clara, Dulce Garcia, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California, Service Employees International Union Local 521 and State of California in 18-15128, Appellants Viridiana Chabolla Mendoza, City of San Jose, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Janet Napolitano, Norma Ramirez, Regents of the University of California and State of California in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.  Date of service:  03/13/2018.  [10797304] |

194

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 03/13/2018 05:53 PM] |

<div align="center">*   *   *   *   *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 3/13/18 | <u>28</u> | Submitted (ECF) Second Brief on Cross-Appeal for review. Submitted by Appellees Viridiana Chabolla Mendoza, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Dulce Garcia in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees Viridiana Chabolla Mendoza, County of Santa Clara, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez, Service Employees International Union Local 521 and Dulce Garcia in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Mir- |

**AR2480**

195

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | iam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.  Date of service:  03/13/2018.  [10797416] [18-15068,  18-15071,  18-15072, 18-15128,  18-15133,  18-15134] —[COURT UPDATE:  Spread docket text to 18-15069, 18-15070. 03/14/2018  by  RY]  (Boutrous, Theodore) [Entered:  03/13/2018 08:41 PM] |
| 3/13/18 | <u>30</u> | Submitted (ECF) Second Brief on  Cross-Appeal  for  review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, Appellants State  of  California,  State  of Maine, State of Maryland and State of Minnesota in 18-15133, 18-15128.  Date  of  service: 03/13/2018.  [10797115] [18-15068, 18-15069, 18-15133, 18-15128]— [COURT  UPDATE:  Spread docket  text  to  18-15070, 18-15071,  18-15072,  18-15134. 03/14/2018  by  RY]  (Mongan, Michael) [Entered:  03/13/2018 04:24 PM] |

\*   \*   \*   \*   \*

196

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 4/3/18 | 117 | Submitted (ECF) Third Brief on Cross-Appeal for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 04/03/2018. [10822811] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 04/03/2018 01:55 PM] |
| | | *   *   *   *   * |
| 4/17/18 | 122 | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and |

**AR2482**

197

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | State of Minnesota in 18-15133. Date of service: 04/17/2018. [10839746] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 04/17/2018 12:02 PM] |

<p align="center">* * * * *</p>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 4/17/18 | <u>124</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees Janet Napolitano, Regents of the University of California and City of San Jose in 18-15128. Date of service: 04/17/2018. [10840021] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/17/2018 01:41 PM] |

<p align="center">* * * * *</p>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 4/17/18 | <u>126</u> | Submitted (ECF) Cross-Appeal Reply Brief for review. Submitted by Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez |

198

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | in 18-15071, Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, Appellants Viridiana Chabolla Mendoza, County of Santa Clara, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Service Employees International Union Local 521 in 18-15134.   Date of service: 04/17/2018.   [10840409] [18-15068, 18-15071,   18-15072,   18-15128, 18-15133,   18-15134,   18-15069, 18-15070] (Boutrous, Theodore) [Entered:   04/17/2018 03:49 PM] |
| | | * * * * * |
| 4/25/18 | 132 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, |

199

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10849629] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 04/25/2018 08:55 AM] |
| | | * * * * * |
| 4/25/18 | 134 | Filed (ECF) Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 04/25/2018. [10851189] [18-15068, 18-15069, 18-15070, 18-15071, |

200

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | 18-15072, 18-15128, 18-15133, 18-15134]—[COURT ENTERED FILING to correct entry [149].] (RY) [Entered: 04/25/2018 04:36 PM] |
| 4/26/18 | <u>135</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 04/26/2018. [10852623] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 04/26/2018 03:05 PM] |
| | | *   *   *   *   * |
| 5/1/18 | <u>140</u> | Filed clerk order (Deputy Clerk: OC): The parties are ordered to submit supplemental briefs of no more than fifteen double-spaced pages addressing the effect of Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), and Montana Air Chapter No. 29 v. FLRA, 898 F.2d 753, 756–57 (9th Cir. 1990), on the question whether 5 U.S.C. § 701(a)(2) bars judicial review of the Department of Homeland Security's rescission of the De- |

201

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | ferred Action for Childhood Arrivals program. The parties should consider whether the rescission is judicially reviewable as a general enforcement policy, rather than as a single-shot non-enforcement decision. See Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994); NAACP v. Trump, Nos. 17-1907 & 17-2325, 2018 WL 1920079, at *11–17 (D.D.C. Apr. 24, 2018) (interpreting the standard in Crowley). The briefs shall be filed on or before May 11, 2018. [10857346] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134, 18-80037] (OC) [Entered: 05/01/2018 12:58 PM] |
| | | *   *   *   *   * |
| 5/11/18 | 149 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn and Norma Ramirez in 18-15071, 18-15128, Appellants Viridiana Chabolla Mendoza, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthi- |

202

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | vongskorn and Norma Ramirez in 18-15133, 18-15134. Date of service: 05/11/2018. [10870059] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Boutrous, Theodore) [Entered: 05/11/2018 02:28 PM] |
| 5/11/18 | 150 | Submitted (ECF) Supplemental Brief for review. Submitted by Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134. Date of service: 05/11/2018. [10870142] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 05/11/2018 03:04 PM] |
| 5/11/18 | 151 | Submitted (ECF) Supplemental Brief for review. Submitted by |

203

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Appellees Janet Napolitano and Regents of the University of California in 18-15068, Appellee City of San Jose in 18-15070, Appellees City of San Jose, Janet Napolitano and Regents of the University of California in 18-15128. Date of service: 05/11/2018. [10870151] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 05/11/2018 03:11 PM] |
| | | * * * * * |
| 5/11/18 | <u>155</u> | Submitted (ECF) Supplemental Brief for review. Submitted by Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133. Date of service: 05/11/2018. [10870452] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] —[COURT UPDATE: Attached corrected brief. 5/14/2018 by TYL] (Mongan, Michael) [Entered: 05/11/2018 05:10 PM] |

204

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | \*   \*   \*   \*   \* |
| 5/15/18 | <u>162</u> | ARGUED AND SUBMITTED TO KIM MCLANE WARD-LAW, JACQUELINE H. NGUYEN and JOHN B. OW-ENS. [10873596] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Witt, Dusty) [Entered: 05/15/2018 04:18 PM] |
| | | \*   \*   \*   \*   \* |
| 5/21/18 | <u>165</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15071, 18-15128, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Jirayut Latthivongskorn, Norma Ramirez and Viridiana Chabolla Mendoza in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 05/21/2018. [10880216] [18-15068, 18-15069, 18-15071, 18-15070, 18-15072, 18-15128, 18-15133, 18-15134]—[COURT UPDATE: Attached searchable version of letter. 05/21/2018 by RY]—[Edited 05/21/2018 by RY] (Ros- |

**AR2490**

205

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | enbaum, Mark) [Entered: 05/21/2018 02:59 PM] |
| | | *   *   *   *   * |
| 6/22/18 | <u>167</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Donald J. Trump, Jefferson B. Sessions, III and USDHS in 18-15072, 18-15128 citation of supplemental authorities. Date of service: 06/22/2018. [10919589] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 06/22/2018 04:04 PM] |
| 6/28/18 | <u>168</u> | Filed (ECF) Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 06/28/2018. [10925146] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 06/28/2018 08:29 AM] |

206

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 7/2/18 | <u>169</u> | Filed (ECF) Appellees Regents of the University of California and Janet Napolitano in 18-15068, 18-15128, Appellants Regents of the University of California and Janet Napolitano in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928492] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/02/2018 09:51 AM] |
| 7/2/18 | <u>170</u> | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 07/02/2018. [10928647] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 07/02/2018 10:39 AM] |
| 7/2/18 | <u>171</u> | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn |

**AR2492**

207

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities. Date of service: 07/02/2018. [10928704] [18-15068, 18-15071, 18-15134] —[COURT UPDATE: Spread to cases 18-15069, 18-15070, 18-15072, 18-15128, and 18-15133. 7/2/2018 by TYL] (Boutrous, Theodore) [Entered: 07/02/2018 10:58 AM] |
| 7/9/18 | 172 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities. Date of service: 07/09/2018. [10935080] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 07/09/2018 12:20 PM] |
| 7/9/18 | 173 | Filed (ECF) Appellees County of Santa Clara and Service Employees International Union Local 521 in 18-15072, Appellees |

AR2493

208

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, Jirayut Latthivongskorn, County of Santa Clara and Service Employees International Union Local 521 in 18-15134 citation of supplemental authorities. Date of service: 07/09/2018. [10935549] [18-15068, 18-15072, 18-15071, 18-15134]— [COURT UPDATE: Spread docket text to 18-15069, 18-15128, 18-15070, 18-15133. 07/09/2018 by SLM] (Boutrous, Theodore) [Entered: 07/09/2018 02:56 PM] |
| 8/3/18 | 174 | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants Kirstjen Nielsen, USA and USDHS in 18-15069, Appellants Kirstjen Nielsen, Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, |

**AR2494**

209

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/03/2018. [10964686] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/03/2018 06:34 AM] |
| 8/6/18 | 175 | Filed (ECF) Appellees State of California, State of Maine, State of Maryland and State of Minnesota in 18-15069, 18-15128, Appellants State of California, State of Maine, State of Maryland and State of Minnesota in 18-15133 citation of supplemental authorities. Date of service: 08/06/2018. [10967075] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Mongan, Michael) [Entered: 08/06/2018 11:31 AM] |
| 8/7/18 | 176 | Filed (ECF) Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15071, Appellants Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana |

**AR2495**

210

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Chabolla Mendoza, Norma Ramirez and Jirayut Latthivongskorn in 18-15134 citation of supplemental authorities.   Date of service:   08/07/2018.   [10968935] [18-15068, 18-15071, 18-15134] —[COURT UPDATE:   Corrected order of PDF's. 08/07/2018 by SLM]—[Edited: spread docket text to 18-15069, 18-15070, 18-15072, 18-15128, 18-15133.   08/07/2018 by RY] (Boutrous, Theodore) [Entered: 08/07/2018 01:19 PM] |
| 8/7/18 | <u>177</u> | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128, Appellants Janet Napolitano and Regents of the University of California in 18-15133 citation of supplemental authorities.   Date of service: 08/07/2018.   [10969011] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134]   (Davidson,   Jeffrey) [Entered:   08/07/2018 01:37 PM] |
| 8/10/18 | <u>178</u> | Filed (ECF) Appellants Kirstjen Nielsen and USDHS in 18-15068, Appellants   Kirstjen   Nielsen, USA and USDHS in 18-15069, Appellants   Kirstjen   Nielsen, |

211

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Donald J. Trump and USA in 18-15070, Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15071, Appellants Kirstjen Nielsen, Jefferson B. Sessions, III, Donald J. Trump and USDHS in 18-15072, 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 citation of supplemental authorities. Date of service: 08/10/2018. [10972953] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 08/10/2018 10:43 AM] |
| 9/13/18 | 179 | Filed (ECF) Appellants USDHS and Kirstjen Nielsen in 18-15068, Appellants USDHS, USA and Kirstjen Nielsen in 18-15069, Appellants USA, Donald J. Trump and Kirstjen Nielsen in 18-15070, Appellants USDHS, USA, Donald J. Trump and Kirstjen Nielsen in 18-15071, Appellants USDHS, Donald J. Trump, Jefferson B. Sessions, III and Kirstjen Nielsen in 18-15072, 18-15128, Appellees USA, USDHS, Donald J. Trump and Kirstjen Nielsen in 18-15133, 18-15134 citation of supplemental |

**AR2497**

212

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | authorities. Date of service: 09/13/2018. [11010690] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Wright, Abby) [Entered: 09/13/2018 01:33 PM] |
| 9/17/18 | 180 | Filed (ECF) Appellees Janet Napolitano and Regents of the University of California in 18-15068, 18-15128 citation of supplemental authorities. Date of service: 09/17/2018. [11014639] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Davidson, Jeffrey) [Entered: 09/17/2018 04:40 PM] |
| 10/17/18 | 181 | Filed (ECF) Appellants Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15128, Appellees Kirstjen Nielsen, Donald J. Trump, USA and USDHS in 18-15133, 18-15134 Correspondence: Notice of intent to petition the Supreme Court for a writ of certiorari before judgment absent ruling from this Court.. Date of service: 10/17/2018 [11049590] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (Stern, Mark) [Entered: 10/17/2018 07:15 AM] |

213

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 11/8/18 | 182 | FILED OPINION (KIM MC-LANE WARDLAW, JACQUE-LINE H. NGUYEN and JOHN B. OWENS) AFFIRMED. Judge: KMW Authoring, Judge: JBO Concurring. FILED AND ENTERED JUDGMENT. [11081386] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (RMM) [Entered: 11/08/2018 09:44 AM] |

\*   \*   \*   \*   \*

| | | |
|---|---|---|
| 2/25/19 | 187 | MANDATE ISSUED. (KMW, JHN and JBO) [11206269] [18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134] (QDL) [Entered: 02/25/2019 01:06 PM] |

\*   \*   \*   \*   \*

AR2499

214

UNITED STATES DISTRICT COURT
FOR THE CALIFORNIA NORTHERN DISTRICT
(SAN FRANCISCO)

————

Docket No. 3:17-cv-05211-WHA

UC REGENTS; JANET NAPOLITANO, IN HER OFFICIAL
CAPACITY AS PRESIDENT OF THE UNIVERSITY OF
CALIFORNIA, PLAINTIFFS

*v.*

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY; KIRSTJEN NIELSON, IN HER OFFICAL
CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT
OF HOMELAND SECURITY; ASSOCIATION OF
CALIFORNIA SCHOOL ADMINISTRATORS; SAN DIEGO
UNIFIED SCHOOL DISTRICT; FORMER FEDERAL
IMMIGRATION AND HOMELAND SECURITY OFFICIALS,
DEFENDANTS

————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 9/8/17 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against Elaine Duke, United States Department of Homeland Security (Filing fee $ 400, receipt number 0971-11699295). Filed by Regents of University of California, Janet Napolitano. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Civil Cover Sheet) (Davidson, Jeffrey) (Filed on 9/8/2017) Modified on |

215

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 9/11/2017 (slhS, COURT STAFF). (Entered: 09/08/2017) |
| | | * * * * * |
| 9/18/17 | 36 | **ORDER RELATING CASES by Judge Alsup granting** 33 **Motion to Relate Case; granting** 34 **Stipulation (whalc1, COURT STAFF) (Filed on 9/18/2017) (Entered: 09/18/2017)** |
| | | * * * * * |
| 9/20/17 | 41 | **ORDER RELATING CASES by Hon. William Alsup granting (39) Motion to Relate Case in case 3:17-cv-05211-WHA. Associated Cases: 3:17-cv-05211-WHA, 3:17-cv-05235-WHA (whalc1, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/20/2017)** |
| | | * * * * * |
| 9/20/17 | 43 | **ORDER RELATING CASES by Judge Alsup granting (38) Motion to Relate Case; granting (42) Stipulation in case 3:17-cv-05211-WHA (whalc1, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/20/2017)** |
| | | * * * * * |
| 10/16/17 | 76 | **ORDER RELATING CASE by Judge William Alsup granting (69) Motion to Relate Case in case** |

**AR2501**

216

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 3:17-cv-05211-WHA.Associated Cases: 3:17-cv-05211-WHA, 3:17-cv-05235-WHA, 3:17-cv-05329-WHA, 3:17-cv-05380-WHA(whalc1, COURT STAFF) (Filed on 10/16/2017) (Entered: 10/16/2017) |
| 11/1/17 | <u>111</u> | MOTION for Preliminary Injunction—*Plaintiffs' Motion for Provisional Relie* filed by Janet Napolitano, UC Regents. Motion Hearing set for 12/20/2017 08:00 AM in Courtroom 8, 19th Floor, San Francisco before Judge William Alsup. Responses due by 11/22/2017. Replies due by 12/8/2017. (Attachments: #<u>1</u> Addendum A—History of Deferred Action, #<u>2</u> Request for Judicial Notice in Support of Plaintiffs' Motion for Provisional Relief, #<u>3</u> Proposed Order) (Davidson, Jeffrey) (Filed on 11/1/2017) (Entered: 11/01/2017) |
| | | *   *   *   *   * |
| 11/1/17 | <u>114</u> | MOTION to Dismiss *All N.D. Cal. DACA Cases and Memorandum in Support* filed by Elaine Duke, United States Department of Homeland Security. Motion Hearing set for 12/20/2017 08:00 AM in Courtroom 8, 19th Floor, San Francisco before Judge Wil- |

217

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | liam Alsup.   Responses due by 11/22/2017.   Replies due by 12/8/2017.   (Attachments:   #1 Proposed Order) (Rosenberg, Brad) (Filed on 11/1/2017) (Entered:   11/01/2017) |
| | | * * * * * |
| 11/22/17 | 204 | OPPOSITION/RESPONSE   (re 111 MOTION for Preliminary Injunction—*Plaintiffs' Motion for Provisional Relie*) filed by Elaine Duke, United States Department of Homeland Security.   (Attachments:   #1 Proposed Order) (Bailey, Kate) (Filed on 11/22/2017) (Entered:   11/22/2017) |
| 11/22/17 | 205 | OPPOSITION/RESPONSE   (re 114 MOTION to Dismiss *All N.D. Cal. DACA Cases and Memorandum in Support* ) filed by Janet Napolitano, UC Regents.   (Davidson,   Jeffrey)   (Filed on 11/22/2017) (Entered:   11/22/2017) |
| | | * * * * * |
| 12/8/17 | 218 | REPLY (re 114 MOTION to Dismiss *All N.D. Cal. DACA Cases and Memorandum in Support*) filed by Elaine Duke, United States Department of Homeland Security.   (Rosenberg, Brad) (Filed on 12/8/2017) (Entered:   12/08/2017) |

**AR2503**

218

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 12/8/17 | 219 | REPLY (re 111 MOTION for Preliminary Injunction—*Plaintiffs' Motion for Provisional Relie*) filed by Janet Napolitano, UC Regents. (Davidson, Jeffrey) (Filed on 12/8/2017) Modified on 12/8/2017 (sxbS, COURT STAFF). (Entered: 12/08/2017) |
| | | *   *   *   *   * |
| 12/20/17 | 221 | **Minute Entry for proceedings held before Judge William Alsup:** |
| | | **Motion Hearing held on 12/20/2017 re 114 MOTION to Dismiss *All N.D. Cal. DACA Cases and Memorandum in Support* filed by Elaine Duke, United States Department of Homeland Security; 111 MOTION for Preliminary Injunction—*Plaintiffs' Motion for Provisional Relie* filed by UC Regents, Janet Napolitano.  Motions are submitted.** |
| | | **Total Time in Court:  3 Hours; 40 Minutes.** **Court Reporter:  Lydia Zinn.** |
| | | **Plaintiff Attorneys:  Jeffrey Davidson, Megan Crowley, Alexander Berengaut, Mark Lynch, Lanny Breuer, James Zahradka, Brian Danitz, Mark Rosenbaum, Ethan Dettmer, Eric Brown.** |

**AR2504**

219

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | **Defendant Attorneys: Brad Rosenberg, Kate Bailey, Brett Shumate.** |
| | | ***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(afmS, COURT STAFF) (Date Filed: 12/20/2017) (Entered: 12/20/2017)** |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 1/2/18 | <u>227</u> | Request for Judicial Notice re <u>205</u> Opposition/Response to Motion, <u>111</u> MOTION for Preliminary Injunction—*Plaintiffs' Motion for Provisional Relie* filed by Janet Napolitano, UC Regents. (Attachments: #<u>1</u> Declaration of Jeffrey M. Davidson, #<u>2</u> Exhibit A to Davidson Declaration, #<u>3</u> Proposed Order) (Related document(s) <u>205</u>, <u>111</u>) (Davidson, Jeffrey) (Filed on 1/2/2018) (Entered: 01/02/2018) |

\* \* \* \* \*

| 1/5/18 | <u>230</u> | RESPONSE to re <u>227</u> Request for Judicial Notice, <u>228</u> Order by Kirstjen Nielson, United States Department of Homeland Security. (Attachments: #<u>1</u> Declaration of Brad P. Rosenberg (attaching exhibit), #<u>2</u> Proposed |

**AR2505**

220

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Order) (Rosenberg, Brad) (Filed on 1/5/2018) (Entered: 01/05/2018) |
| | | * * * * * |
| 1/8/18 | 232 | Supplemental Brief re 229 Order *Regarding the Ninth Circuit's Decision in Hawaii v. Trump* filed by Kirstjen Nielson, United States Department of Homeland Security. (Related document(s) 229) (Rosenberg, Brad) (Filed on 1/8/2018) (Entered: 01/08/2018) |
| 1/8/18 | 233 | Supplemental Brief *Re Hawaii v. Trump* filed by State of California, State of Maine, State of Maryland, State of Minnesota. (Zahradka, James) (Filed on 1/8/2018) (Entered: 01/08/2018) |
| 1/9/18 | 234 | **ORDER DENYING 114 FRCP 12(b)(1) DISMISSAL AND GRANTING 111 PROVISIONAL RELIEF (granting 227) by Judge William Alsup. (whalc1, COURT STAFF) (Filed on 1/9/2018) (Entered: 01/09/2018)** |
| | | * * * * * |
| 1/12/18 | 239 | **ORDER GRANTING IN PART 114 DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(b)(6) by Judge William Alsup. (whalc1,** |

**AR2506**

221

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| | | COURT STAFF) (Filed on 1/12/2018) (Entered: 01/12/2018) |
| | | * * * * * |
| 1/16/18 | <u>241</u> | NOTICE OF APPEAL to the 9th Circuit Court of Appeals (**case# 18-15068**) filed by Kirstjen Nielson, United States Department of Homeland Security. Appeal of Order on Motion for Preliminary Injunction <u>234</u>, Order on Motion to Dismiss <u>239</u> (Appeal fee FEE WAIVED.) (Rosenberg, Brad) (Filed on 1/16/2018) Modified on 1/26/2018 (sxbS, COURT STAFF). (Entered: 01/16/2018) |
| | | * * * * * |

222

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

———————

Docket No. 3:17-cv-05235-WHA

STATE OF CALIFORNIA; STATE OF MAINE; STATE OF
MINNESOTA; STATE OF MARYLAND, PLAINTIFFS

*v.*

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; KIRSTJEN NIELSEN, IN HER
OFFICIAL CAPACITY AS ACTING SECRETARY OF THE
DEPARTMENT OF HOMELAND SECURITY; UNITED
STATES OF AMERICA, DEFENDANTS

———————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| 9/11/17 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants (Filing fee $400, receipt number 0971-11704330.). Filed by State of Minnesota, State of California, State of Maryland, State of Maine. (Attachments: # 1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F, #7 Exhibit G, #8 Exhibit H, #9 Exhibit I, #10 Exhibit J, #11 Exhibit K, #12 Exhibit L, #13 Exhibit M, #14 Exhibit N, #15 Exhibit O, #16 Exhibit P) (Zahradka, James) |

**AR2508**

223

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | (Filed on 9/11/2017) (Entered: 09/11/2017) |
| | | * * * * * |
| 9/18/17 | 18 | **ORDER RELATING CASE. Signed by Judge Alsup on 9/18/2017. (whalc1, COURT STAFF) (Filed on 9/18/2017) (Entered: 09/18/2017)** |
| | | * * * * * |
| 9/20/17 | 22 | **ORDER RELATING CASES by Hon. William Alsup granting (39) Motion to Relate Case in case 3:17-cv-05211-WHA. Associated Cases: 3:17-cv-05211-WHA, 3:17-cv-05235-WHA (whalc1, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/20/2017)** |
| 9/20/17 | 23 | **ORDER RELATING CASES by Judge Alsup granting (38) Motion to Relate Case; granting (42) Stipulation in case 3:17-cv-05211-WHA (whalc1, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/20/2017)** |
| | | * * * * * |
| 10/16/17 | 37 | **ORDER RELATING CASE by Judge William Alsup granting (69) Motion to Relate Case in case 3:17-cv-05211-WHA. Associated Cases: 3:17-cv-05211-WHA, 3:17-cv-05235-WHA, 3:17-cv-05329-WHA, 3:17-cv-05380-WHA (whalc1,** |

**AR2509**

224

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | COURT STAFF) (Filed on 10/16/2017) (Entered: 10/16/2017) |
| | | * * * * * |
| 1/9/17 | <u>83</u> | ORDER DENYING <u>114</u> FRCP 12(b)(1) DISMISSAL AND GRANTING <u>111</u> PROVISIONAL RELIEF (granting 227) by Judge William Alsup. (whalc1, COURT STAFF) (Filed on 1/9/2018) (Entered: 01/09/2018) |
| | | * * * * * |
| 1/12/18 | <u>88</u> | ORDER GRANTING IN PART <u>114</u> DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(b)(6) by Judge William Alsup. (whalc1, COURT STAFF) (Filed on 1/12/2018) (Entered: 01/12/2018) |
| | | * * * * * |

225

UNITED STATES DISTRICT COURT
FOR THE CALIFORNIA NORTHERN DISTRICT
(SAN FRANCISCO)

Docket No. 3:17-cv-05329-WHA

CITY OF SAN JOSE, A MUNICIPAL CORPORATION, PLAINTIFF

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY; KIRSTJE NIELSEN, IN HER OFFICIAL CAPACITY AS ACTING SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; UNITED STATES OF AMERICA; SAN DIEGO UNIFIED, DEFENDANTS

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 9/14/17 | 1 | COMPLAINT against Elaine C. Duke, Donald J. Trump, UNITED STATES OF AMERICA ( Filing fee $ 400, receipt number 0971-11714888.). Filed by City Of San Jose. (Attachments: # 1 Civil Cover Sheet, # 2 CERTIFICATE OF INTERESTED ENTITIES OR PERSONS) (Fineman, Nancy) (Filed on 9/14/2017) (Entered: 09/14/2017) |

\* \* \* \* \*

AR2511

226

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 9/20/17 | 13 | **ORDER RELATING CASES Signed by Judge Alsup on 9/20/2017. (whalc1, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/20/2017)** |
| 9/20/17 | | **Related cases: Create association to 3:17-cv-05211-WHA. (sxbS, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/21/2017)** |
| 9/20/17 | | **Related cases: Create association to 3:17-cv-05235-WHA. (sxbS, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/21/2017)** |
| 9/20/17 | | **Related cases: Create association to 3:17-cv-05380-WHA. (sxbS, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/21/2017)** |
| | | **\* \* \* \* \*** |
| 10/16/17 | 28 | **ORDER RELATING CASE by Judge William Alsup granting (69) Motion to Relate Case in case 3:17-cv-05211-WHA.Associated Cases: 3:17-cv-05211-WHA, 3:17-cv-05235-WHA, 3:17-cv-05329-WHA, 3:17-cv-05380-WHA (whalc1, COURT STAFF) (Filed on 10/16/2017) (Entered: 10/16/2017)** |
| | | **\* \* \* \* \*** |
| 12/20/17 | 61 | **Minute Entry for proceedings held before Judge William Alsup:** |

**AR2512**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | **Motion Hearing held on 12/20/2017 re 114 MOTION to Dismiss *All N.D. Cal. DACA Cases and Memorandum in Support* filed by Elaine Duke, United States Department of Homeland Security; 111 MOTION for Preliminary Injunction—*Plaintiffs' Motion for Provisional Relie* filed by UC Regents, Janet Napolitano. Motions are submitted.** |
|      |               | **Total Time in Court: 3 Hours; 40 Minutes.** |
|      |               | **Court Reporter: Lydia Zinn.** |
|      |               | **Plaintiff Attorneys: Jeffrey Davidson, Megan Crowley, Alexander Berengaut, Mark Lynch, Lanny Breuer, James Zahradka, Brian Danitz, Mark Rosenbaum, Ethan Dettmer, Eric Brown. Defendant Attorneys: Brad Rosenberg, Kate Bailey, Brett Shumate.** |
|      |               | **(*This is a text-only entry generated by the court. There is no document associated with this entry*.) (afmS, COURT STAFF) (Date Filed: 12/20/2017) (Entered: 12/20/2017)** |

\* \* \* \* \* \*

228

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 1/9/18 | <u>66</u> | **ORDER DENYING 114 FRCP 12(b)(1) DISMISSAL AND GRANTING 111 PROVISIONAL RELIEF (granting 227) by Judge William Alsup. (whalc1, COURT STAFF) (Filed on 1/9/2018) (Entered: 01/09/2018)** |
| | | * * * * * |
| 1/12/18 | <u>71</u> | **ORDER GRANTING IN PART 114 DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(b)(6) by Judge William Alsup. (whalc1, COURT STAFF) (Filed on 1/12/2018) (Entered: 01/12/2018)** |
| 1/16/18 | <u>72</u> | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Kirstjen Nielson, Donald J. Trump, United States of America. Appeal of Order on Motion for Preliminary Injunction <u>66</u>, Order on Motion to Dismiss <u>71</u> (Appeal fee FEE WAIVED.) (Rosenberg, Brad) (Filed on 1/16/2018) (Entered: 01/16/2018) |
| | | * * * * * |

229

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

───────

Docket No. 3:17-cv-05380-WHA

DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL
JIMENEZ SUAREZ; VIRIDIANA CHABOLLA MENDOZA;
JIRAYUT LATTHIVONGSKORN; NORMA RAMIREZ,
PLAINTIFFS

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP, IN HIS
OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES; U.S. DEPARTMENT OF HOMELAND SECURITY;
KIRSTJEN NIELSON, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

───────

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 9/18/17 | 1 | COMPLAINT for Declaratory and Injunctive Relief against All Defendants. Filed by Saul Jimenez Suarez, Miriam Gonzalez Avila, Viridiana Chabolla Mendoza, Dulce Garcia, Jirayut Latthivongskorn. (Attachments: # 1 Civil Cover Sheet, # 2 Payment of Fees) (Boutrous, Theodore) (Filed on 9/18/2017) (Filing fee $400.00, receipt # 0971-11722776) Modified on 9/18/2017 (haS, COURT STAFF). Modified on 9/20/2017 |

**AR2515**

230

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | (gbaS, COURT STAFF). (Entered: 09/18/2017) |
| | | * * * * * |
| 9/20/17 | <u>6</u> | **ORDER RELATING CASES Signed by Judge Alsup on 9/20/2017. (whalc1, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/20/2017)** |
| | | * * * * * |
| 9/20/17 | | **Related cases: Create association to 3:17-cv-05211-WHA. (sxbS, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/21/2017)** |
| 9/20/17 | | **Related cases: Create association to 3:17-cv-05235-WHA. (sxbS, COURT STAFF) (Filed on 9/20/2017) (Entered: 09/21/2017)** |
| | | * * * * * |
| 10/16/17 | <u>24</u> | **ORDER RELATING CASE by Judge William Alsup granting (69) Motion to Relate Case in case 3:17-cv-05211-WHA. Associated Cases: 3:17-cv-05211-WHA, 3:17-cv-05235-WHA, 3:17-cv-05329-WHA, 3:17-cv-05380-WHA (whalc1, COURT STAFF) (Filed on 10/16/2017) (Entered: 10/16/2017)** |
| | | * * * * * |
| 12/20/17 | 55 | **Minute Entry for proceedings held before Judge William Alsup:** |

**AR2516**

231

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Motion Hearing held on 12/20/2017 re 114 MOTION to Dismiss *All N.D. Cal. DACA Cases and Memorandum in Support* filed by Elaine Duke, United States Department of Homeland Security; 111 MOTION for Preliminary Injunction— *Plaintiffs' Motion for Provisional Relie* filed by UC Regents, Janet Napolitano. Motions are submitted. |
| | | Total Time in Court: 3 Hours; 40 Minutes. |
| | | Court Reporter: Lydia Zinn. |
| | | Plaintiff Attorneys: Jeffrey Davidson, Megan Crowley, Alexander Berengaut, Mark Lynch, Lanny Breuer, James Zahradka, Brian Danitz, Mark Rosenbaum, Ethan Dettmer, Eric Brown. |
| | | Defendant Attorneys: Brad Rosenberg, Kate Bailey, Brett Shumate. |
| | | *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (afmS, COURT STAFF) (Date Filed: 12/20/2017) (Entered: 12/20/2017) |

<div align="center">*   *   *   *   *</div>

232

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 1/9/18 | 60 | **ORDER DENYING 114 FRCP 12(b)(1) DISMISSAL AND GRANTING 111 PROVISIONAL RELIEF (granting 227) by Judge William Alsup. (whalc1, COURT STAFF) (Filed on 1/9/2018) (Entered: 01/09/2018)** |
| | | * * * * * |
| 1/12/18 | 65 | **ORDER GRANTING IN PART 114 DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(b)(6) by Judge William Alsup. (whalc1, COURT STAFF) (Filed on 1/12/2018) (Entered: 01/12/2018)** |
| 1/16/18 | 66 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Kirstjen Nielson, Donald J. Trump, U.S. Department of Homeland Security, United States of America. Appeal of Order on Motion for Preliminary Injunction 60, Order on Motion to Dismiss 65 (Appeal fee FEE WAIVED.) (Rosenberg, Brad) (Filed on 1/16/2018) (Entered: 01/16/2018) |
| | | * * * * * |

**AR2518**

233

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

———————

Docket No. 3:17-cv-05813-WHA

COUNTY OF SANTA CLARA; SERVICE EMPLOYEES IN-
TERNATIONAL UNION LOCAL 521, PLAINTIFFS

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES; JEFFERSON
BEAUREGARD SESSIONS, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE UNITED STATES; KIRSTJEN
NIELSON, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY,
DEFENDANTS

———————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| | | *   *   *   *   * |
| 10/10/17 | 1 | COMPLAINT *FOR DECLARA-TORY AND INJUNCTIVE RE-LIEF* against All Defendants (Filing fee $400, receipt number 0971-11783372.). Filed by County of Santa Clara, SEIU Local 521. (Attachments: # 1 Civil Cover Sheet) (Brown, Eric) (Filed on 10/10/2017) (Entered: 10/10/2017) |

AR2519

234

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | *    *    *    *    * |
| 10/16/17 | <u>10</u> | **ORDER RELATING CASE.** Signed by Judge Alsup on 10/16/2017. (whalc1, COURT STAFF) (Filed on 10/16/2017) (Entered: 10/16/2017) Related cases: Create association to 3:17-cv-05211-WHA. (sxbS, COURT STAFF) (Filed on 10/16/2017) (Entered: 10/17/2017) |
| 10/16/17 | | **Related cases: Create association to 3:17-cv-05235-WHA. (sxbS, COURT STAFF) (Filed on 10/16/2017) (Entered: 10/17/2017)** |
| 10/16/17 | | **Related cases: Create association to 3:17-cv-05380-WHA. (sxbS, COURT STAFF) (Filed on 10/16/2017) (Entered: 10/17/2017)** |
| 10/16/17 | | **Related cases: Create association to 3:17-cv-05329-WHA. (sxbS, COURT STAFF) (Filed on 10/16/2017) (Entered: 10/17/2017)** |
| | | *    *    *    *    * |
| 12/20/17 | 43 | **Minute Entry for proceedings held before Judge William Alsup:** **Motion Hearing held on 12/20/2017 re 114 MOTION to Dismiss *All N.D. Cal. DACA Cases and Memorandum in Support* filed by Elaine Duke, United States Department of Homeland Security; 111 MOTION** |

**AR2520**

235

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | for Preliminary Injunction—**Plaintiffs' Motion for Provisional Relie** filed by UC Regents, Janet Napolitano. Motions are submitted. |
| | | **Total Time in Court: 3 Hours; 40 Minutes.** **Court Reporter: Lydia Zinn.** |
| | | **Plaintiff Attorneys: Jeffrey Davidson, Megan Crowley, Alexander Berengaut, Mark Lynch, Lanny Breuer, James Zahradka, Brian Danitz, Mark Rosenbaum, Ethan Dettmer, Eric Brown. Defendant Attorneys: Brad Rosenberg, Kate Bailey, Brett Shumate.** |
| | | ***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(afmS, COURT STAFF) (Date Filed: 12/20/2017) (Entered: 12/20/2017)** |
| | | \* \* \* \* \* |
| 1/9/18 | <u>48</u> | **ORDER DENYING 114 FRCP 12(b)(1) DISMISSAL AND GRANTING 111 PROVISIONAL RELIEF (granting 227) by Judge William Alsup. (whalc1, COURT STAFF) (Filed on 1/9/2018) (Entered: 01/09/2018)** |

**AR2521**

236

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | * * * * * |
| 1/12/18 | <u>53</u> | **ORDER GRANTING IN PART 114 DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(b)(6) by Judge William Alsup.   (whalc1, COURT STAFF) (Filed on 1/12/2018) (Entered: 01/12/2018)** |
| 1/16/18 | <u>54</u> | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Kirstjen Nielson, Jefferson Beauregard Sessions, Donald J. Trump, U.S. Department of Homeland Security.   Appeal of Order on Motion for Preliminary Injunction <u>48</u>, Order on Motion to Dismiss <u>53</u> (Appeal fee FEE WAIVED.) (Rosenberg, Brad) (Filed on 1/16/2018) (Entered: 01/16/2018) |
| | | * * * * * |

**AR2522**

237

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────────

Docket No. 18-5243

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, (NAACP), NATIONAL
HEADQUARTERS; AMERICAN FEDERATION OF TEACH-
ERS, AFL-CIO; UNITED FOOD AND COMMERCIAL
INTERNATIONAL UNION, AFL-CIO, CLC,
PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES; WILLIAM P. BARR,
IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF
THE UNITED STATES; KEVIN K. MCALEENAN, IN HIS
OFFICIAL CAPACITY AS ACTING SECRETARY OF HOME-
LAND SECURITY; UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; IMMIGRATION AND CUSTOMS
ENFORCEMENT; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES OF AMERICA,
DEFENDANTS-APPELLANTS

─────────

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 8/10/18 | | US CIVIL CASE docketed. [18-5243] [Entered: 08/10/2018 01:05 PM] |
| | | * * * * * |
| 8/13/18 | | CLERK'S ORDER [1745168] filed consolidating cases 18-5245 (Consolidation started 08/13/2018) |

238

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | with 18-5243 [18-5243, 18-5245] [Entered:  08/13/2018 11:08 AM] |

<div align="center">*   *   *   *   *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 11/26/18 | | *JOINT* APPENDIX [1761389] filed by DHS, Immigration and Customs Enforcement, Kirstjen M. Nielsen, Jefferson B. Sessions, III, Donald J. Trump, United States Citizenship and Immigration Services and USA in 18-5243, DHS, Kirstjen M. Nielsen and USA in 18-5245. [Volumes:  2] [Service Date: 11/26/2018] [18-5243, 18-5245] (Stern,  Mark)  [Entered: 11/26/2018 04:42 PM] |
| 11/26/18 | | APPELLANT BRIEF [1761428] filed by DHS, Immigration and Customs Enforcement, Kirstjen M. Nielsen, Jefferson B. Sessions, III, Donald J. Trump, United States Citizenship and Immigration Services and USA in 18-5243, DHS, Kirstjen M. Nielsen and USA in 18-5245 [Service Date:  11/26/2018] Length of Brief:  11,622 words. [18-5243, 18-5245] (Stern, Mark) [Entered:  11/26/2018 07:22 PM] |

<div align="center">*   *   *   *   *</div>

**AR2524**

239

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 1/7/19 | | APPELLEE BRIEF [1767318] filed by American Federation of Teachers, AFL-CIO, NAACP and United Food and Commercial International Union, AFL-CIO, CLC in 18-5243, Maria De La Cruz Perales Sanchez, Microsoft Corporation and Trustees of Princeton University in 18-5245 [Service Date: 01/07/2019] Length of Brief: 12,993 Words. [18-5243, 18-5245] (Perrelli, Thomas) [Entered: 01/07/2019 10:35 PM] |
| 1/9/19 | | CORRECTED APPELLEE BRIEF [1767662] filed by American Federation of Teachers, AFL-CIO, NAACP and United Food and Commercial International Union, AFL-CIO, CLC in 18-5243, Maria De La Cruz Perales Sanchez, Microsoft Corporation and Trustees of Princeton University in 18-5245 [Service Date: 01/09/2019] Length of Brief: 12,993 words. [18-5243, 18-5245] (Perrelli, Thomas) [Entered: 01/09/2019 02:30 PM] |
| | | *   *   *   *   * |
| 1/22/19 | | APPELLANT REPLY BRIEF [1769602] filed by DHS, Immigration and Customs Enforcement, Kirstjen M. Nielsen, Don- |

**AR2525**

240

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | ald J. Trump, United States Citizenship and Immigration Services, USA and Matthew G. Whitaker in 18-5243, DHS, Kirstjen M. Nielsen and USA in 18-5245 [Service Date: 01/22/2019] Length of Brief: 6,500 words. [18-5243, 18-5245] (Stern, Mark) [Entered: 01/22/2019 04:43 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 2/22/19 | | ORAL ARGUMENT HELD before Judges Griffith, Millett and Edwards. [18-5243, 18-5245] [Entered: 02/22/2019 09:43 AM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 5/21/19 | | LETTER [1788881] pursuant to FRAP 28j advising of additional authorities filed by American Federation of Teachers, AFL-CIO, NAACP and United Food and Commercial International Union, AFL-CIO, CLC in 18-5243, Maria De La Cruz Perales Sanchez, Microsoft Corporation and Trustees of Princeton University in 18-5245 [Service Date: 05/21/2019] [18-5243, 18-5245] (Harrison, Lindsay) [Entered: 05/21/2019 11:46 PM] |

\* \* \* \* \*

**AR2526**

241

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA CIRCUIT
(WASHINGTON, D.C.)

Docket No. 1:17-cv-01907-JDB

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE (NAACP), NATIONAL
HEADQUARTERS; AMERICAN FEDERATION OF
TEACHERS, AFL-CIO; UNITED FOOD AND COMMERCIAL
INTERNATIONAL UNION, AFL-CIO, CLC, PLAINTIFFS

*v.*

DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES; JEFFERSON B.
SESSIONS, III, IN HIS OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF THE UNITED STATES; ELAINE C. DUKE, IN
HER OFFICIAL CAPACITY AS ACTING SECRETARY OF
HOMELAND SECURITY; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES OF AMERICA,
DEFENDANTS

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 9/18/17 | 1 | COMPLAINT *by NAACP* against DONALD TRUMP, JEFFERSON BEAUREGARD SESSIONS III, ELAINE C. DUKE, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND |

**AR2527**

242

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | SECURITY, UNITED STATES OF AMERICA (Filing fee $ 400 receipt number 0090-5120614) filed by NATIONAL ASSOCIA-TION FOR THE ADVANCE-MENT OF COLORED PEO-PLE. (Attachments: # 1 Civil Cover Sheet, # 2 Summons US Attorneys Office) (Sellers, Joseph) (Entered: 09/18/2017) |
| | | * * * * * |
| 10/24/17 | 10 | FIRST AMENDED COM-PLAINT against DEPART-MENT OF HOMELAND SE-CURITY, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SER-VICES, U.S. IMMIGRATION AND CUSTOMS ENFORCE-MENT, UNITED STATES OF AMERICA filed by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COL-ORED PEOPLE, AMERICAN FEDERATION OF TEACH-ERS, AFL-CIO, UNITED FOOD AND COMMERCIAL INTERNATIONAL UNION, AFL-CIO, CLC. (znmw) (En-tered: 10/25/2017) |

243

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | * * * * * |
| 11/8/17 | <u>15</u> | MOTION to Dismiss, MOTION for Summary Judgment by DE-PARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, JEFFERSON BEAU-REGARD SESSIONS, III, DONALD TRUMP, U.S. CITI-ZENSHIP AND IMMIGRA-TION SERVICES, U.S. IMMI-GRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA (At-tachments:  # <u>1</u> Certified Index of Administrative Record, # <u>2</u> Text of Proposed Order) (Bailey, Kate) Modified event title on 11/9/2017 (znmw).  (Entered: 11/08/2017) |
| | | * * * * * |
| 1/18/18 | | MINUTE ORDER:  On the Court's own motion, and upon consideration of the entire record herein, it is hereby ORDERED that this case is CONSOLI-DATED with Civil Action No. 17-2325 for purposes of the dis-positive motions currently pend-ing in both cases; it is further ORDERED that all filings with respect to those motions shall be |

244

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | made jointly and shall be filed only in 17-2325; it is further ORDERED that counsel of record in both cases shall receive electronic notice of any filings made in either case; and it is further ORDERED that counsel in both cases shall determine how to divide their argument time at the motions hearing currently set for Friday, February 2, 2018 at 9:30 a.m. before Judge John D. Bates.   SO   ORDERED—by Judge John D. Bates on 1/18/2018. (tb) (Entered:   01/18/2018) |

<p style="text-align:center">*   *   *   *   *</p>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 4/24/18 | 22 | ORDER granting in part, denying in part, and deferring in part 15 the government's motion to dismiss; granting in part and denying in part plaintiffs' motion for   summary   judgment;   and disposing of the remaining motions pending in this case.   See text of Order for details.   Signed by   Judge   John   D.   Bates   on 4/24/2018.    (lcjdb1)   (Entered: 04/24/2018) |
| 4/24/18 | 23 | MEMORANDUM   OPINION. Signed by Judge John D. Bates on 4/24/2018.    (lcjdb1)   (Main Document   23   replaced   on |

245

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 4/26/2018) (ztd). (Entered: 04/24/2018) |
| | | * * * * * |
| 8/3/18 | 26 | ORDER denying defendants' motion to revise the Court's April 24, 2018 Order.  See text of Order for details.  Signed by Judge John D. Bates on 8/3/2018. (lcjdb1) (Entered:  08/03/2018) |
| 8/3/18 | 27 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 8/3/2018.  (lcjdb1) (Entered: 08/03/2018) |
| | | * * * * * |
| 8/17/18 | 31 | ORDER granting the government's motion to clarify and granting in part and denying in part the government's motion to stay.  See text of Order for details.  Signed by Judge John D. Bates on 8/17/2018.  (lcjdb1) (Entered:  08/17/2018) |
| 8/17/18 | 32 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 8/17/2018.  (lcjdb1) (Entered: 08/17/2018) |

246

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA CIRCUIT
(WASHINGTON, D.C.)

————

Docket No. 1:17-cv-02325-JDB

TRUSTEES OF PRINCETON UNIVERSITY; MICROSOFT
CORPORATION; MARIA DE LA CRUZ PERALES SANCHEZ;
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE; UNITED FOOD AND COMMERCIAL
INTERNATIONAL UNION, AFL-CIO, CLC, PLAINTIFFS

*v.*

UNITED STATES OF AMERICA; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE C. DUKE, IN HER
OFFICIAL CAPACITY AS ACTING SECRETARY OF THE
DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT
OF HOMELAND SECURITY; ELAINE C. DUKE, IN HER
OFFICIAL CAPACITY AS ACTING SECRETARY OF
HOMELAND SECURITY; JEFFERSON B. SESSIONS, III,
IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL
OF THE UNITED STATES; DONALD J. TRUMP, IN HIS
OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES; U.S. CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; UNITED STATES OF AMERICA,
DEFENDANTS

————

**DOCKET ENTRIES**

————

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 11/3/17 | 1 | COMPLAINT against U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, ELAINE C. DUKE (Filing fee $400 receipt |

AR2532

247

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | number 0090-5190077) filed by TRUSTEES OF PRINCETON UNIVERSITY, MARIA DE LA CRUZ PERALES SANCHEZ, MICROSOFT CORPORATION. (Attachments:  # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons) (Perrelli, Thomas) (Entered:  11/03/2017) |
| | | *   *   *   *   * |
| 11/22/17 | 8 | MOTION to Dismiss by ELAINE C. DUKE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Certified Index of Administrative Record) (Westmoreland, Rachael). Added MOTION for Summary Judgment on 11/27/2017 (znmw). (Entered:  11/22/2017) |
| | | *   *   *   *   * |
| 12/15/17 | 23 | Memorandum in opposition to re 8 MOTION to Dismiss MOTION for Summary Judgment filed by MARIA DE LA CRUZ PERALES SANCHEZ, MICROSOFT CORPORATION, TRUSTEES OF PRINCETON UNIVERSITY. (Attachments:  # 1 |

**AR2533**

248

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Text of Proposed Order, # 2 Certificate of Service) (Perrelli, Thomas) (Entered: 12/15/2017) |
| | | *   *   *   *   * |
| 12/15/17 | 28 | MOTION for Summary Judgment *and/or,* MOTION for Preliminary Injunction by MARIA DE LA CRUZ PERALES SANCHEZ, MICROSOFT CORPORATION, TRUSTEES OF PRINCETON UNIVERSITY (Attachments: # 1 Memorandum in Support, # 2 Declaration of Lindsay C. Harrison, # 3 Request for Judicial Notice, # 4 Text of Proposed Order on Motion for Summary Judgment, # 5 Text of Proposed Order on Motion for Preliminary Injunction, # 6 Certificate of Service, # 7 Appendix A.  Table of Contents, # 8 Appendix B.  Declarations—Exhibits A-Q, # 9 Appendix C. Exhibits 1-24, # 10 Appendix D. Exhibits 25-43, # 11 Appendix E. Exhibits 44-59, # 12 Appendix F. Exhibits 60-78, # 13 Appendix G. Exhibits 79-98, # 14 Appendix H. Exhibits 99-108 and ND Cal Topical Index, # 15 Appendix I. Exhibits 109-120, # 16 Appendix J.  Exhibits 121-141, # 17 Ap- |

**AR2534**

249

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | pendix K. Declarations—Exhibits R-CC, # <u>18</u> Appendix L. Exhibits 142-143 and Topical Index) (Perrelli, Thomas) (Entered: 12/15/2017) |
| | | *   *   *   *   * |
| 1/18/18 | | MINUTE ORDER: On the Court's own motion, and upon consideration of the entire record herein, it is hereby ORDERED that this case is CONSOLIDATED with Civil Action No. 17-1907 for purposes of the dispositive motions currently pending in both cases; it is further ORDERED that all filings with respect to those motions shall be made jointly and shall be filed only in this case; it is further ORDERED that counsel of record in both cases shall receive electronic notice of any filings made in either case; and it is further ORDERED that counsel in both cases shall determine how to divide their argument time at the motions hearing currently set for Friday, February 2, 2018. SO ORDERED. Signed by Judge John D. Bates on 1/18/2018. (lcjdb1) (Entered: 01/18/2018) |

**AR2535**

250

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | * * * * * |
| 1/22/18 | <u>55</u> | Memorandum in opposition to re <u>28</u> MOTION for Summary Judgment *and/or* MOTION for Preliminary Injunction filed by DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA (17-cv-1902), UNITED STATES OF AMERICA. (Westmoreland, Rachael) (Entered: 01/22/2018) |
| 1/22/18 | <u>56</u> | REPLY to opposition to motion re <u>8</u> MOTION to Dismiss MOTION for Summary Judgment filed by DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SE- |

AR2536

251

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | CURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCE-MENT, UNITED STATES OF AMERICA (17-cv-1902), UNIT-ED STATES OF AMERICA. (Westmoreland, Rachael) (Entered: 01/22/2018) |
| | | * * * * * |
| 2/6/18 | 58 | REPLY to opposition to motion re 28 MOTION for Summary Judgment *and/or* MOTION for Preliminary Injunction filed by MARIA DE LA CRUZ PER-ALES SANCHEZ, MICRO-SOFT CORPORATION, TRUS-TEES OF PRINCETON UNI-VERSITY. (Attachments: # 1 Appendix M. Exhibit DD, # 2 Certificate of Service) (Perrelli, Thomas) (Entered: 02/06/2018) |
| | | * * * * * |
| 3/14/18 | | Minute Entry: Motions Hearing held on 3/14/2018 before Judge John D. Bates re: 8 MOTION to Dismiss MOTION for Summary Judgment filed by UNIT-ED STATES OF AMERICA, ELAINE C. DUKE, U.S. DE-PARTMENT OF HOMELAND SECURITY and 28 MOTION for Summary Judgment *and/or* MO- |

252

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|  |  | TION for Preliminary Injunction filed by MARIA DE LA CRUZ PERALES SANCHEZ, TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION.  Motions heard and taken under advisement.  (Court Reporter Bryan Wayne) (tb) (Entered:  03/14/2018) |
|  |  | *   *   *   *   * |
| 4/24/18 | 69 | ORDER granting in part, denying in part, and deferring in part 8 defendants' motion to dismiss; granting in part and denying in part 28 plaintiffs' motion for summary judgment; and disposing of the remaining motions pending in this case.  See text of Order for details.  Signed by Judge John D. Bates on 4/24/2018.  (lcjdb1) (Entered:  04/24/2018) |
| 4/24/18 | 70 | MEMORANDUM AND OPINION.  Signed by Judge John D. Bates on 4/24/2018.  (lcjdb1) (Main Document 70 replaced on 4/26/2018) (ztd).  (Entered: 04/24/2018) |
| 6/22/18 | 71 | NOTICE *of Filing* by DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, ELAINE C. DUKE, JEFFER- |

AR2538

253

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| | | SON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA(17-cv-1902), UNITED STATES OF AMERICA (Attachments: # 1 Exhibit A—Memorandum) (Davis, Kathryn) (Entered: 06/22/2018) |
| | | *   *   *   *   * |
| 7/11/18 | 74 | MOTION for Order *Revising the Court's April 24, 2018 Order* by DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA (17-cv-1902), UNITED STATES OF AMERICA (Attachments: # 1 Text of Pro- |

254

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | posed Order) (Davis, Kathryn) (Entered: 07/11/2018) |
| 7/23/18 | 75 | Memorandum in opposition to re 74 MOTION for Order *Revising the Court's April 24, 2018 Order* filed by MARIA DE LA CRUZ PERALES SANCHEZ, MICROSOFT CORPORATION, TRUSTEES OF PRINCETON UNIVERSITY. (Perrelli, Thomas) (Entered: 07/23/2018) |
| 7/27/18 | 76 | REPLY to opposition to motion re 74 MOTION for Order *Revising the Court's April 24, 2018 Order* filed by DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA (17-cv-1902), UNITED STATES OF AMERICA. (Davis, Kathryn) (Entered: 07/27/2018) |
| 8/3/18 | 77 | ORDER denying 74 defendants' motion to revise 69 the Court's April 24, 2018 Order. See text |

AR2540

255

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | of Order for details.  Signed by Judge John D. Bates on 8/3/2018. (lcjdb1) (Entered:   08/03/2018) |
| 8/3/18 | 78 | MEMORANDUM   OPINION. Signed by Judge John D. Bates on 8/3/2018.   (lcjdb1) (Entered: 08/03/2018) |
| | | *    *    *    *    * |
| 8/14/18 | 82 | MOTION to Stay re 77 Order on Motion for Order, 69 Order on Motion for Miscellaneous Relief,, Order on Motion for Summary Judgment,, Order on Motion for Preliminary Injunction,  Order on Motion to Dismiss,,,, Order on Motion for Leave to File,, Order on Motion for Leave to Appear Pro Hac Vice,,,,,,,,,,,,,,,,,,,,,, Order on Motion to Withdraw as Attorney, *Pending Appeal* by DEPARTMENT OF HOME-LAND SECURITY, ELAINE C. DUKE, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SER-VICES, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMER- |

256

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | ICA (17-cv-1902), UNITED STATES OF AMERICA (Attachments: # 1 Exhibit 1— Renaud Decl., # 2 Text of Proposed Order) (Davis, Kathryn) (Entered: 08/14/2018) |
| 8/15/18 | 83 | RESPONSE re 82 MOTION to Stay re 77 Order on Motion for Order, 69 Order on Motion for Miscellaneous Relief,, Order on Motion for Summary Judgment,, Order on Motion for Preliminary Injunction,, Order on Motion to Dismiss,,,, Order on Motion for Leave to File,, filed by MARIA DE LA CRUZ PERALES SANCHEZ, MICROSOFT CORPORATION, TRUSTEES OF PRINCETON UNIVERSITY. (Attachments: # 1 Exhibit A) (Perrelli, Thomas) (Entered: 08/15/2018) |
| 8/16/18 | 84 | REPLY to opposition to motion re 82 MOTION to Stay re 77 Order on Motion for Order, 69 Order on Motion for Miscellaneous Relief,, Order on Motion for Summary Judgment,, Order on Motion for Preliminary Injunction,, Order on Motion to Dismiss,,,, Order on Motion for Leave to File,, filed by DE- |

**AR2542**

257

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | PARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA (17-cv-1902), UNITED STATES OF AMERICA. (Davis, Kathryn) (Entered: 08/16/2018) |
| 8/17/18 | 85 | ORDER granting 81 the government's motion to clarify and granting in part and denying in part 82 the government's motion to stay. See text of Order for details. Signed by Judge John D. Bates on 8/17/2018. (lcjdb1) (Entered: 08/17/2018) |
| 8/17/18 | 86 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 8/17/2018. (lcjdb1) (Entered: 08/17/2018) |

**AR2543**

258

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

Docket No. 18-122

Kirstjen M. Nielsen, Secretary of Homeland Security; Jefferson B. Sessions III, United States Attorney General; Donald J. Trump, petitioners

*v.*

Martin Jonathan Batall Vidal; Make the Road New York, on behalf of itself, its members, its clients, and all similarly situated individuals; Antonio Alarcon; Eliana Fernandez; Carlos Vargas; Mariano Mondragon; Carolina Fung Feng, on behalf of themselves and all other similarly situated individuals, respondents

———————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 1/16/18 | 1 | MOTION, for leave to appeal (28 U.S.C. 1292(b)), on behalf of Petitioner Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, FILED. Service date 01/16/2018 by email. [2214662] [18-122] [Entered: 01/17/2018 09:17 AM] |
| | | *   *   *   *   * |
| 1/19/18 | 13 | OPPOSITION TO THE MOTION FOR LEAVE TO APPEAL, [1], on behalf of Respon- |

**AR2544**

259

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | dent Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal, FILED. Service date 01/19/2018 by CM/ECF. [2217875] [18-122]—[Edited 01/22/2018 by DGB] [Entered: 01/19/2018 11:44 PM] |
| | | *   *   *   *   * |
| 1/24/18 | 28 | REPLY TO OPPOSITION [13], on behalf of Petitioner Kirstjen M. Nielsen, Donald J. Trump and Jefferson B. Sessions III, FILED. Service date 01/24/2018 by CM/ECF. [2220723] [28] [18-122] [Entered: 01/24/2018 03:56 PM] |
| 1/26/18 | 41 | LETTER, on behalf of Petitioner Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, informing the court that the 9th circuit granted a similar petition on 01/25/18, RECEIVED. Service date 01/26/2018 by CM/ECF. [2223074] [18-122]—[Edited 01/29/2018 by DGB] [Entered: 01/26/2018 04:43 PM] |
| | | *   *   *   *   * |

260

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 2/14/18 | <u>47</u> | FRAP 28(j) LETTER, dated 02/14/2018, on behalf of Respondent Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal, RECEIVED. Service date 02/14/2018 by CM/ECF. [2236431] [18-122] [Entered: 02/14/2018 06:22 PM] |

<div align="center">*   *   *   *   *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 4/10/18 | <u>51</u> | FRAP 28(j) LETTER, dated 04/10/2018, on behalf of Respondent Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal, RECEIVED. Service date 04/10/2018 by CM/ECF. [2275792] [18-122] [Entered: 04/10/2018 01:40 PM] |
| 4/10/18 | <u>53</u> | FRAP 28(j) LETTER, dated 04/10/2018, on behalf of Petitioner Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, RECEIVED. Service date 04/10/2018 by CM/ECF. [2275969] [18-122] [Entered: 04/10/2018 03:36 PM] |

AR2546

261

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 5/4/18 | <u>59</u> | ORDER, directing appeals 18-122, 18-123, 18-1313, 18-1314, to be heard in tandem, FILED. [2295623] [18-122] [Entered: 05/04/2018 01:52 PM] |
| | | * * * * * |
| 5/22/18 | <u>68</u> | ORDER, that the appeals docketed under 18-1521 and 18-1525 shall be heard on the merits in tandem with the four petitions for leave to appeal docketed under 18-122, 18-123, 18-1313, and 18-1314, in the event the Court grants the petitions for leave to appeal. Appellants must file a scheduling notification letter within 14 days after the Court determines the petitions for leave to appeal, FILED. [2309267] [18-122]—[Edited 05/23/2018 by RD] [Entered: 05/23/2018 09:09 AM] |
| | | * * * * * |
| 7/5/18 | <u>75</u> | LEAVE TO APPEAL, pursuant to court order, dated 07/05/2018, GRANTED. The appeal docket number is 18-1985. [2338974] [18-122] [Entered: 07/05/2018 03:37 PM] |
| | | * * * * * |

**AR2547**

262

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

Docket No. 18-123

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES;
KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT; UNITED STATES OF
AMERICA; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, PETITIONERS

*v.*

STATE OF NEW YORK; STATE OF MASSACHUSETTS;
STATE OF WASHINGTON; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE
OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA;
STATE OF NEW MEXICO; STATE OF NORTH CAROLINA;
STATE OF OREGON; STATE OF PENNSYLVANIA; STATE
OF RHODE ISLAND; STATE OF VERMONT; STATE OF
VIRGINIA; STATE OF COLORADO, RESPONDENTS

————————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 1/16/18 | <u>1</u> | MOTION, for leave to appeal (28 U.S.C. 1292(b)), on behalf of Petitioner Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, FILED. |

263

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Service date 01/16/2018 by email. [2214735] [18-123] [Entered: 01/17/2018 09:56 AM] |
| | | * * * * * |
| 1/20/18 | <u>12</u> | OPPOSITION TO MOTION, for leave to appeal (28 U.S.C. 1292(b)) [<u>1</u>], on behalf of Respondent District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington, FILED.   Service date 01/20/2018 by CM/ECF. [2217877] [18-123] [Entered: 01/20/2018 04:34 AM] |
| 1/24/18 | <u>16</u> | REPLY TO OPPOSITION [<u>12</u>], on behalf of Petitioner Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, FILED.   Service date |

AR2549

264

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 01/24/2018 by CM/ECF. [2220729] [16] [18-123] [Entered: 01/24/2018 03:58 PM] |
| | | * * * * * |
| 1/26/18 | <u>27</u> | LETTER, on behalf of Petitioner Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, informing the court that the 9th circuit granted a similar petition on 01/25/18, RECEIVED. Service date 01/26/2018 by CM/ECF. [2223078] [18-123]—[Edited 01/29/2018 by DGB] [Entered: 01/26/2018 04:43 PM] |
| | | * * * * * |
| 4/10/18 | <u>33</u> | FRAP 28(j) LETTER, dated 04/10/2018, on behalf of Petitioner Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, RECEIVED. Ser- |

AR2550

265

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | vice date 04/10/2018 by CM/ECF. [2275972] [18-123] [Entered: 04/10/2018 03:37 PM] |
| 5/4/18 | 39 | ORDER, directing appeals 18-122, 18-123, 18-1313, 18-1314, to be heard in tandem, FILED. [2295627] [18-123] [Entered: 05/04/2018 01:54 PM] |
| | | *   *   *   *   * |
| 5/22/18 | 48 | ORDER, that the appeals docketed under 18-1521 and 18-1525 shall be heard on the merits in tandem with the four petitions for leave to appeal docketed under 18-122, 18-123, 18-1313, and 18-1314, in the event the Court grants the petitions for leave to appeal. Appellants must file a scheduling notification letter within 14 days after the Court determines the petitions for leave to appeal. FILED [2309269] [18-123]— [Edited 05/23/2018 by RD] [Entered:   05/23/2018 09:09 AM] |
| 7/5/18 | 54 | LEAVE TO APPEAL, pursuant to court order, dated 07/05/2018, GRANTED.  The appeal docket number is 18-1987.  [2338964] [18-123]—[Edited 07/06/2018 by |

**AR2551**

266

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | YL] [Entered:   07/05/2018 03:34 PM] |

<div align="center">*   *   *   *   *</div>

AR2552

267

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

Docket No. 18-485

MARTIN JONATHAN BATALL VIDAL; MAKE THE ROAD
NEW YORK, ON BEHALF OF ITSELF, ITS MEMBERS, ITS
CLIENTS, AND ALL SIMILARLY SITUATED INDIVIDUALS;
ANTONIO ALARCON; ELIANA FERNANDEZ; CARLOS
VARGAS; MARIANO MONDRAGON; CAROLINA FUNG
FENG, ON BEHALF OF THEMSELVES AND ALL OTHER
SIMILARLY SITUATED INDIVIDUALS; STATE OF NEW
YORK; STATE OF MASSACHUSETTS; STATE OF
WASHINGTON; STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA; STATE OF
HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE
OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE
OF OREGON; STATE OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF VERMONT; STATE OF VIR-
GINIA; STATE OF COLORADO, PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES;
UNITED STATES CITIZENSHIP AND IMMIGRATION
SERVICES; UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; UNITED STATES OF AMERICA; UNITED
STATES DEPARTMENT OF HOMELAND SECURITY;
KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; MATTHEW G. WHITAKER, ACTING UNITED
STATES ATTORNEY GENERAL,
DEFENDANTS-APPELLANTS

———————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 2/20/18 | 1 | NOTICE OF CIVIL APPEAL, with district court docket, on |

268

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, FILED.   [2240954]   [18-485] [Entered:   02/22/2018 10:21 AM] |

<div align="center">*   *   *   *   *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 3/8/18 | 61 | MOTION   ORDER,   granting motion to consolidate appeals [26] filed by Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen, granting motion to expedite appeal [26] filed by Appellant Donald J. Trump, Jefferson B. Sessions III and   Kirstjen   M.   Nielsen;   to the following extent:   Plaintiff-Appellees' response briefs are due   04/04/2018,   Government's reply brief is due 04/16/2018, and the optional cross-appeal reply briefs are due 05/07/2018, by CFD,   Circuit Judge,   FILED. [2252300] [61] [18-485] [Entered: 03/08/2018 02:37 PM] |
| 3/8/18 | 62 | MOTION   ORDER,   granting motion to consolidate appeals [2249984-4] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United |

269

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|  |  | States Department of Homeland Security and Kirstjen M. Nielsen in 18-488; granting motion to expedite appeal [2249984-2] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-488; to the following extent: Plaintiff-Appellees' response briefs are due 04/04/2018, Government's reply brief is due 04/16/2018, and the optional cross-appeal reply briefs are due 05/07/2018, by CFD, Circuit Judge, FILED. [2252311] [62] [18-488, 18-485] [Entered: 03/08/2018 02:43 PM] |
| 3/8/18 | 63 | NOTE: See lead case, 18-485, containing complete set of docket entries. [2252315] [18-488, 18-485] [Entered: 03/08/2018 02:45 PM] |
|  |  | *    *    *    *    * |
| 3/16/18 | 114 | JOINT APPENDIX, volume 1 of 14, (pp. 1-208), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citi- |

**AR2555**

270

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|  |  | zenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259112] [18-485, 18-488] [Entered: 03/16/2018 05:06 PM] |
| 3/16/18 | 115 | JOINT APPENDIX, volume 2 of 14, (pp. 209-468), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of |

AR2556

271

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259116] [18-485, 18-488] [Entered: 03/16/2018 05:08 PM] |
| 3/16/18 | 116 | JOINT APPENDIX, volume 3 of 14, (pp. 469-768), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259117] [18-485, 18-488] [Entered: 03/16/2018 05:10 PM] |
| 3/16/18 | 117 | JOINT APPENDIX, volume 4 of 14, (pp. 769-1068), on behalf of |

272

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| | | Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259118] [18-485, 18-488] [Entered:   03/16/2018 05:12 PM] |
| 3/16/18 | 118 | JOINT APPENDIX, volume 5 of 14, (pp. 1069-1368), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizen- |

273

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | ship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259124] [18-485, 18-488] [Entered: 03/16/2018 05:26 PM] |
| 3/16/18 | <u>119</u> | BRIEF & SPECIAL APPEN-DIX, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259125] [18-485, |

AR2559

274

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-488] [Entered: 03/16/2018 05:27 PM] |
| 3/16/18 | 120 | JOINT APPENDIX, volume 6 of 14, (pp. 1369-1668), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259129] [18-485, 18-488] [Entered: 03/16/2018 05:29 PM] |
| 3/16/18 | 121 | JOINT APPENDIX, volume 7 of 14, (pp. 1669-1968), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of |

**AR2560**

275

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259131] [18-485, 18-488] [Entered: 03/16/2018 05:31 PM] |
| 3/16/18 | 122 | JOINT APPENDIX, volume 8 of 14, (pp. 1969-2268), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs En- |

276

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | forcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259132] [18-485, 18-488] [Entered: 03/16/2018 05:32 PM] |
| 3/16/18 | <u>123</u> | JOINT APPENDIX, volume 9 of 14, (pp. 2269-2568), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259135] [18-485, 18-488] [Entered: 03/16/2018 05:34 PM] |
| 3/16/18 | <u>124</u> | JOINT APPENDIX, volume 10 of 14, (pp. 2569-2868), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald |

277

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|  |  | J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259136] [18-485, 18-488] [Entered: 03/16/2018 05:35 PM] |
| 3/16/18 | 125 | JOINT APPENDIX, volume 11 of 14, (pp. 2869-3168), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, |

278

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259137] [18-485, 18-488] [Entered: 03/16/2018 05:36 PM] |
| 3/16/18 | 126 | JOINT APPENDIX, volume 12 of 14, (pp. 3169-3468), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259139] [18-485, 18-488] [Entered: 03/16/2018 05:38 PM] |

**AR2564**

279

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| 3/16/18 | <u>127</u> | JOINT APPENDIX, volume 13 of 14, (pp. 3469-3768), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259141] [18-485, 18-488] [Entered: 03/16/2018 05:39 PM] |
| 3/16/18 | <u>128</u> | JOINT APPENDIX, volume 14 of 14, (pp. 3769-4036), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs |

**AR2565**

280

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259142] [18-485, 18-488] [Entered: 03/16/2018 05:41 PM] |
| | | *  *  *  *  * |
| 4/5/18 | <u>157</u> | BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-488, FILED. Service date 04/05/2018 by CM/ECF. [2272595] [18-485, 18-488] [Entered: 04/05/2018 11:09 AM] |

AR2566

281

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | * * * * * |
| 4/12/18 | 255 | BRIEF, on behalf of Appellee Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal in 18-485, FILED. Service date 04/12/2018 by CM/ECF. [2278130] [18-485, 18-488] [Entered: 04/12/2018 03:48 PM] |
| 4/12/18 | 256 | SUPPLEMENTAL APPENDIX, on behalf of Appellee Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal in 18-485, FILED. Service date 04/12/2018 by CM/ECF. [2278134] [18-485, 18-488] [Entered: 04/12/2018 03:49 PM] |
| | | * * * * * |
| 4/16/18 | 290 | REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs En- |

**AR2567**

282

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | forcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 04/16/2018 by CM/ECF. [2280256] [18-485, 18-488] [Entered: 04/16/2018 03:11 PM] |
| | | *   *   *   *   * |
| 4/23/18 | 354 | FRAP 28(j) LETTER, dated 04/23/2018, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington, RECEIVED. Service date 04/23/2018 by CM/ECF. [2286081] [18-485] [Entered: 04/23/2018 04:10 PM] |

**AR2568**

283

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | *   *   *   *   * |
| 4/30/18 | <u>424</u> | FRAP 28(j) LETTER, dated 04/30/2018, on behalf of Appellee Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal, RECEIVED. Service date 04/30/2018 by CM/ECF. [2291675] [18-485] [Entered: 04/30/2018 05:49 PM] |
| | | *   *   *   *   * |
| 6/1/18 | <u>483</u> | FRAP 28(j) LETTER, dated 06/01/2018, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, RECEIVED. Service date 06/01/2018 by CM/ECF. [2316179] [18-485] [Entered: 06/01/2018 03:25 PM] |
| 6/22/18 | <u>486</u> | FRAP 28(j) LETTER, dated 06/22/2018, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. |

AR2569

284

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, RECEIVED. Service date 06/22/2018 by CM/ECF. [2331355] [18-485] [Entered: 06/22/2018 07:08 PM] |
| 7/5/18 | 490 | ORDER, directing appeals 18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988 to be heard in tandem, FILED. [2339212] [18-485, 18-488] [Entered: 07/06/2018 08:27 AM] |
| 7/23/18 | 492 | MOTION, to consolidate appeals, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security and United States Immigration and Customs Enforcement in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security and United States Immigra- |

285

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | tion and Customs Enforcement in 18-488, FILED.  Service date 07/23/2018 by CM/ECF. [2350832] [18-485, 18-488] [Entered:  07/23/2018 03:55 PM] |
| 7/25/18 | 496 | MOTION ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [492] filed by Appellant Donald J. Trump, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security, Jefferson B. Sessions III and Kirstjen M. Nielsen, Appellant Donald J. Trump, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen, by DC, Circuit Judge, FILED.  [2352641] [496] [18-485, 18-488] [Entered: 07/25/2018 01:20 PM] |

*    *    *    *    *

| 7/25/18 | 499 | MOTION ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [2350786-2] filed |

286

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | by Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen in 18-1521, granting motion to consolidate appeals [2350790-2] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-1525, by DC, Circuit Judge, FILED. [2352673] [499] [18-1521, 18-485, 18-488, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 07/25/2018 01:40 PM] |
| | | * * * * * |
| 7/27/18 | 504 | CORRECTED BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-488, |

287

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | FILED.   Service date 07/27/2018 by CM/ECF.   [2354626] [18-485, 18-488] [Entered:   07/27/2018 02:51 PM] |
| | | *   *   *   *   * |
| 8/15/18 | 507 | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED.   Service date 08/15/2018   by   CM/ECF. [2368771]   [18-485,   18-1521, 18-1525,   18-1985,   18-1986, 18-1987, 18-1988, 18-488] [Entered:   08/15/2018 02:44 PM] |
| | | *   *   *   *   * |

**AR2573**

288

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 9/25/18 | <u>538</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee Martin Jonathan Batall Vidal in 18-485, 18-1521, FILED. Service date 09/25/2018 by CM/ECF. [2396808] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/25/2018 03:34 PM] |

\*   \*   \*   \*   \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 9/27/18 | <u>540</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-1987, 18-1988, 18-488, FILED. Service date 09/27/2018 by CM/ECF. [2398834] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/27/2018 04:57 PM] |

\*   \*   \*   \*   \*

AR2574

289

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 10/30/18 | <u>561</u> | SUPPLEMENTAL REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED.   Service date 10/05/2018 by CM/ECF. [2421686] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 10/30/2018 01:07 PM] |
| | | * * * * * |
| 1/25/19 | 618 | CASE, before DJ, RDS, DC, HEARD.   [2482363] [18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered:   01/25/2019 11:18 AM] |
| | | * * * * * |

290

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 5/18/19 | 635 | FRAP 28(j) LETTER, dated 05/18/2019, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington, RECEIVED. Service date 05/18/2019 by CM/ECF. [2567046] [18-485] [Entered: 05/18/2019 01:16 PM] |
| 5/20/19 | 638 | FRAP 28(j) LETTER, dated 05/20/2019, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington, RECEIVED. Service date 05/20/2019 by CM/ECF. |

AR2576

291

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | [2568209]   [18-485]   [Entered: 05/20/2019 06:04 PM] |

* * * * *

**AR2577**

292

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————

Docket No. 18-488

STATE OF NEW YORK; STATE OF MASSACHUSETTS;
STATE OF WASHINGTON; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA;
STATE OF NEW MEXICO; STATE OF NORTH CAROLINA;
STATE OF OREGON; STATE OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF VERMONT; STATE OF
VIRGINIA; STATE OF COLORADO, PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES;
KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT; UNITED STATES OF
AMERICA; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, DEFENDANTS-APPELLANTS

————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 2/20/18 | 1 | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, |

293

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | FILED. [2241054] [18-488] [Entered: 02/22/2018 11:07 AM] |
| | | *   *   *   *   * |
| 3/8/18 | 47 | MOTION ORDER, granting motion to consolidate appeals [17] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-488; granting motion to expedite appeal [17] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-488; to the following extent: Plaintiff-Appellees' response briefs are due 04/04/2018, Government's reply brief is due 04/16/2018, and the optional cross-appeal reply briefs are due 05/07/2018, by CFD, Circuit Judge, FILED. [2252311] [47] [18-488, 18-485] [Entered: 03/08/2018 02:43 PM] |

AR2579

294

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 3/8/18 | 48 | NOTE: See lead case, 18-485, containing complete set of docket entries. [2252315] [18-488, 18-485] [Entered: 03/08/2018 02:45 PM] |

*    *    *    *    *

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 3/16/18 | <u>76</u> | JOINT APPENDIX, volume 1 of 14, (pp. 1-208), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259112] [18-485, 18-488] [Entered: 03/16/2018 05:06 PM] |
| 3/16/18 | <u>77</u> | JOINT APPENDIX, volume 2 of 14, (pp. 209-468), on behalf of Appellant Kirstjen M. Nielsen, |

**AR2580**

295

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259116] [18-485, 18-488] [Entered: 03/16/2018 05:08 PM] |
| 3/16/18 | 78 | JOINT APPENDIX, volume 3 of 14, (pp. 469-768), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizen- |

296

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | ship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259117] [18-485, 18-488] [Entered: 03/16/2018 05:10 PM] |
| 3/16/18 | <u>79</u> | JOINT APPENDIX, volume 4 of 14, (pp. 769-1068), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259118] [18-485, |

AR2582

297

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-488] [Entered: 03/16/2018 05:12 PM] |
| 3/16/18 | 80 | JOINT APPENDIX, volume 5 of 14, (pp. 1069-1368), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259124] [18-485, 18-488] [Entered: 03/16/2018 05:26 PM] |
| 3/16/18 | 81 | BRIEF & SPECIAL APPENDIX, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland |

298

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|  |  | Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259125] [18-485, 18-488] [Entered: 03/16/2018 05:27 PM] |
| 3/16/18 | 82 | JOINT APPENDIX, volume 6 of 14, (pp. 1369-1668), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States |

299

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259129] [18-485, 18-488] [Entered: 03/16/2018 05:29 PM] |
| 3/16/18 | 83 | JOINT APPENDIX, volume 7 of 14, (pp. 1669-1968), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259131] [18-485, 18-488] [Entered: 03/16/2018 05:31 PM] |
| 3/16/18 | 84 | JOINT APPENDIX, volume 8 of 14, (pp. 1969-2268), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald |

AR2585

300

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259132] [18-485, 18-488] [Entered: 03/16/2018 05:32 PM] |
| 3/16/18 | 85 | JOINT APPENDIX, volume 9 of 14, (pp. 2269-2568), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, |

**AR2586**

301

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259135] [18-485, 18-488] [Entered: 03/16/2018 05:34 PM] |
| 3/16/18 | 86 | JOINT APPENDIX, volume 10 of 14, (pp. 2569-2868), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259136] [18-485, 18-488] [Entered: 03/16/2018 05:35 PM] |

**AR2587**

302

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 3/16/18 | <u>87</u> | JOINT APPENDIX, volume 11 of 14, (pp. 2869-3168), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259137] [18-485, 18-488] [Entered: 03/16/2018 05:36 PM] |
| 3/16/18 | <u>88</u> | JOINT APPENDIX, volume 12 of 14, (pp. 3169-3468), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs |

303

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259139] [18-485, 18-488] [Entered: 03/16/2018 05:38 PM] |
| 3/16/18 | 89 | JOINT APPENDIX, volume 13 of 14, (pp. 3469-3768), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. |

304

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Service date 03/07/2018 by CM/ECF. [2259141] [18-485, 18-488] [Entered: 03/16/2018 05:39 PM] |
| 3/16/18 | <u>90</u> | JOINT APPENDIX, volume 14 of 14, (pp. 3769-4036), on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 03/07/2018 by CM/ECF. [2259142] [18-485, 18-488] [Entered: 03/16/2018 05:41 PM] |
| | | *  *  *  *  * |
| 4/5/18 | <u>119</u> | BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of |

**AR2590**

305

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-488, FILED. Service date 04/05/2018 by CM/ECF. [2272595] [18-485, 18-488] [Entered:   04/05/2018 11:09 AM] |
| | | *   *   *   *   * |
| 4/12/18 | 207 | BRIEF, on behalf of Appellee Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal in 18-485, FILED.   Service date 04/12/2018    by    CM/ECF. [2278130] [18-485, 18-488] [Entered:   04/12/2018 03:48 PM] |
| 4/12/18 | 208 | SUPPLEMENTAL   APPENDIX, on behalf of Appellee Antonio Alarcon, Carolina Fung Feng, Eliana  Fernandez,  Make  the Road    New    York,    Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal in 18-485,  FILED.   Service date 04/12/2018       by       CM/ECF. |

306

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | [2278134] [18-485, 18-488] [Entered: 04/12/2018 03:49 PM] |
| | * * * * * | |
| 4/16/18 | <u>241</u> | REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 04/16/2018 by CM/ECF. [2280256] [18-485, 18-488] [Entered: 04/16/2018 03:11 PM] |
| | * * * * * | |
| 4/23/18 | <u>302</u> | FRAP 28(j) LETTER, dated 04/23/2018, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Ha- |

307

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | waii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington, RECEIVED.  Service date 04/23/2018 by CM/ECF. [2286075] [18-488] [Entered: 04/23/2018 04:07 PM] |
| | | *   *   *   *   * |
| 6/22/18 | 427 | FRAP 28(j) LETTER, dated 06/22/2018, on behalf of Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, RECEIVED.  Service date 06/22/2018 by CM/ECF. [2331356] [18-488] [Entered: 06/22/2018 07:10 PM] |
| 7/5/18 | 431 | ORDER, directing appeals 18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988 to be heard in tandem, FILED. [2339212] [18-485, |

AR2593

308

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-488] [Entered: 07/06/2018 08:27 AM] |
| 7/23/18 | 433 | MOTION, to consolidate appeals, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security and United States Immigration and Customs Enforcement in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security and United States Immigration and Customs Enforcement in 18-488, FILED. Service date 07/23/2018 by CM/ECF. [2350832] [18-485, 18-488] [Entered: 07/23/2018 03:55 PM] |
| 7/25/18 | 437 | MOTION ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [433] filed by Appellant Donald J. Trump, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security, Jefferson |

**AR2594**

309

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | B. Sessions III and Kirstjen M. Nielsen, Appellant Donald J. Trump, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen, by DC, Circuit Judge, FILED. [2352641] [437] [18-485, 18-488] [Entered: 07/25/2018 01:20 PM] |

*   *   *   *   *

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| 7/25/18 | 440 | MOTION ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [2350786-2] filed by Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen in 18-1521, granting motion to consolidate appeals [2350790-2] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-1525, by DC, Circuit Judge, FILED. [2352673] [440] [18-1521, 18-485, 18-488, 18-1525, 18-1985, 18-1986, |

310

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-1987, 18-1988] [Entered: 07/25/2018 01:40 PM] |

\* \* \* \* \*

| 7/27/18 | 443 | CORRECTED BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-488, FILED. Service date 07/27/2018 by CM/ECF. [2354626] [18-485, 18-488] [Entered: 07/27/2018 02:51 PM] |
|---|---|---|

\* \* \* \* \*

| 8/15/18 | 445 | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, |
|---|---|---|

311

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 08/15/2018 by CM/ECF. [2368771] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 08/15/2018 02:44 PM] |
| | | *   *   *   *   * |
| 9/25/18 | 462 | SUPPLEMENTAL BRIEF, on behalf of Appellee Martin Jonathan Batall Vidal in 18-485, 18-1521, FILED. Service date 09/25/2018 by CM/ECF. [2396808] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/25/2018 03:34 PM] |
| | | *   *   *   *   * |
| 9/27/18 | 464 | SUPPLEMENTAL BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State |

312

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-1987, 18-1988, 18-488, FILED. Service date 09/27/2018 by CM/ECF. [2398834] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/27/2018 04:57 PM] |
| | | *   *   *   *   * |
| 10/30/18 | 477 | SUPPLEMENTAL REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 10/05/2018 by |

**AR2598**

313

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | CM/ECF. [2421686] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 10/30/2018 01:07 PM] |
| | | * * * * * |
| 1/25/19 | 520 | CASE, before DJ, RDS, DC, HEARD. [2482363] [18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 01/25/2019 11:18 AM] |
| | | * * * * * |

314

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

––––––––––

Docket No. 18-1313

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; JEFFERSON B. SESSIONS III, UNITED
STATES ATTORNEY GENERAL; DONALD J. TRUMP,
PETITIONERS

*v.*

MARTIN JONATHAN BATALL VIDAL; MAKE THE ROAD
NEW YORK, ON BEHALF OF ITSELF, ITS MEMBERS, ITS
CLIENTS, AND ALL SIMILARLY SITUATED INDIVIDUALS;
ANTONIO ALARCON; ELIANA FERNANDEZ; CARLOS
VARGAS; MARIANO MONDRAGON; CAROLINA FUNG
FENG, ON BEHALF OF THEMSELVES AND ALL OTHER
SIMILARLY SITUATED INDIVIDUALS, RESPONDENTS

––––––––––

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 5/3/18 | <u>1</u> | MOTION, for leave to appeal (28 U.S.C. 1292(b)), on behalf of Petitioner Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump in 18-1313, FILED.  Service date 05/03/2018 by email.  [2294201] [18-1313] [Entered:  05/03/2018 10:18 AM] |
| 5/4/18 | <u>6</u> | ORDER, directing appeals 18-122, 18-123, 18-1313, 18-1314, to be heard in tandem, FILED. [2295650]  [18-1313]  [Entered: 05/04/2018 02:07 PM] |

**AR2600**

315

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|  |  | *  *  *  *  * |
| 5/8/18 | 14 | BRIEF, on behalf of Respondent Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal, FILED.  Service date 05/08/2018 by CM/ECF.  [2298397] [18-1313] [Entered:  05/08/2018 08:37 PM] |
|  |  | *  *  *  *  * |
| 5/9/18 | 16 | NON-OPPOSITION RESPONSE TO MOTION, for leave to appeal (28 U.S.C. 1292(b)) [1], on behalf of Respondent Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas and Martin Jonathan Batall Vidal, FILED.  Service date 05/09/2018 by CM/ECF.  [2298764] [18-1313] —[Edited 05/09/2018 by DGB] [Entered:  05/09/2018 11:35 AM] |
|  |  | *  *  *  *  * |

AR2601

316

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 5/22/18 | 38 | ORDER, that the appeals docketed under 18-1521 and 18-1525 shall be heard on the merits in tandem with the four petitions for leave to appeal docketed under 18-122, 18-123, 18-1313, and 18-1314, in the event the Court grants the petitions for leave to appeal.   Appellants must file a scheduling notification letter within 14 days after the Court determines the petitions for leave to appeal.   FILED. [2309275]   [18-1313]   [Entered: 05/23/2018 09:13 AM] |
| | | *   *   *   *   * |
| 7/5/18 | 44 | LEAVE TO APPEAL, pursuant to court order, dated 07/05/2018, GRANTED.   The appeal docket number is 18-1986.   [2338986] [18-1313] [Entered:   07/05/2018 03:41 PM] |
| | | *   *   *   *   * |

AR2602

317

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

————

Docket No. 18-1314

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES; KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF HOMELAND SECURITY, PETITIONERS

*v.*

STATE OF NEW YORK; STATE OF MASSACHUSETTS; STATE OF WASHINGTON; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF VIRGINIA; STATE OF COLORADO, RESPONDENTS

————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 5/3/18 | 1 | MOTION, for leave to appeal (28 U.S.C. 1292(b)), on behalf of Petitioner Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in |

318

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
| | | 18-1314, FILED. Service date 05/03/2018 by email. [2294229] [18-1314] [Entered: 05/03/2018 10:34 AM] |
| 5/4/18 | 6 | ORDER, directing appeals 18-122, 18-123, 18-1313, 18-1314, to be heard in tandem, FILED. [2295653] [18-1314] [Entered: 05/04/2018 02:08 PM] |
| | | * * * * * |
| 5/22/18 | 17 | ORDER, that the appeals docketed under 18-1521 and 18-1525 shall be heard on the merits in tandem with the four petitions for leave to appeal docketed under 18-122, 18-123, 18-1313, and 18-1314, in the event the Court grants the petitions for leave to appeal. Appellants must file a scheduling notification letter within 14 days after the Court determines the petitions for leave to appeal. FILED. [2309278] [18-1314] [Entered: 05/23/2018 09:16 AM] |
| 7/5/18 | 22 | LEAVE TO APPEAL, pursuant to court order, dated 07/05/2018, GRANTED. The appeal docket number is 18-1988. [2338979] [18-1314]—[Edited 07/06/2018 by |

**AR2604**

319

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
|      |               | YL] [Entered:   07/05/2018 03:39 PM] |

* * * * *

320

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————

Docket No. 18-1521

MARTIN JONATHAN BATALL VIDAL; MAKE THE ROAD
NEW YORK, ON BEHALF OF ITSELF, ITS MEMBERS, ITS
CLIENTS, AND ALL SIMILARLY SITUATED INDIVIDUALS;
ANTONIO ALARCON; ELIANA FERNANDEZ; CARLOS
VARGAS; MARIANO MONDRAGON; CAROLINA FUNG
FENG, ON BEHALF OF THEMSELVES AND ALL OTHER
SIMILARLY SITUATED INDIVIDUALS,
PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES;
KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; JEFFERSON B. SESSIONS III;
MATTHEW G. WHITAKER, DEFENDANTS-APPELLANTS

————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 5/21/18 | <u>1</u> | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, FILED. [2308060] [18-1521] [Entered: 05/21/2018 04:42 PM] |
| | | *   *   *   *   * |
| 5/22/18 | <u>8</u> | ORDER, that the appeals docketed under 18-1521 and 18-1525 shall be heard on the merits in |

**AR2606**

321

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | tandem with the four petitions for leave to appeal docketed under 18-122, 18-123, 18-1313, and 18-1314, in the event the Court grants the petitions for leave to appeal. Appellants must file a scheduling notification letter within 14 days after the Court determines the petitions for leave to appeal. FILED. [2308658] [18-1521] [Entered: 05/22/2018 01:12 PM] |
| | | * * * * * |
| 7/5/18 | 22 | ORDER, directing appeals 18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988 to be heard in tandem, FILED. [2339213] [18-1521] [Entered: 07/06/2018 08:29 AM] |
| 7/23/18 | 24 | MOTION, to consolidate appeals, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, FILED. Service date 07/23/2018 by CM/ECF. [2350786] [18-1521] [Entered: 07/23/2018 03:42 PM] |
| | | * * * * * |
| 7/25/18 | 32 | MOTION ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [24] filed by |

322

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen in 18-1521, granting motion to consolidate appeals [2350790-2] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-1525, by DC, Circuit Judge, FILED. [2352673] [32] [18-1521, 18-485, 18-488, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 07/25/2018 01:40 PM] |
| | | *   *   *   *   * |
| 8/15/18 | 35 | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, |

323

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 08/15/2018 by CM/ECF. [2368771] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 08/15/2018 02:44 PM] |

<p align="center">* * * * *</p>

| 9/25/18 | <u>53</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee Martin Jonathan Batall Vidal in 18-485, 18-1521, FILED. Service date 09/25/2018 by CM/ECF. [2396808] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/25/2018 03:34 PM] |

<p align="center">* * * * *</p>

| 9/27/18 | <u>55</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State |

AR2609

324

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------------|-------------|
|  |  | of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-1987, 18-1988, 18-488, FILED. Service date 09/27/2018 by CM/ECF. [2398834] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/27/2018 04:57 PM] |
|  |  | * * * * * |
| 10/5/18 | 63 | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 10/05/2018 by CM/ECF. [2404586] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, |

**AR2610**

325

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-1987, 18-1988, 18-488] [Entered: 10/05/2018 01:19 PM] |
| | | *   *   *   *   * |
| 10/30/18 | <u>67</u> | SUPPLEMENTAL REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 10/05/2018 by CM/ECF. [2421686] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 10/30/2018 01:07 PM] |
| | | *   *   *   *   * |
| 1/25/19 | <u>111</u> | CASE, before DJ, RDS, DC, HEARD. [2482363] [18-485, 18-488, 18-1521, 18-1525, 18-1985, |

326

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-1986, 18-1987, 18-1988] [Entered: 01/25/2019 11:18 AM] |

<div align="center">*  *  *  *  *</div>

AR2612

327

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

Docket No. 18-1525

STATE OF NEW YORK; STATE OF MASSACHUSETTS;
STATE OF WASHINGTON; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA;
STATE OF NEW MEXICO; STATE OF NORTH CAROLINA;
STATE OF OREGON; STATE OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF VERMONT; STATE OF
VIRGINIA; STATE OF COLORADO, PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN M.
NIELSEN, IN HER OFFICIAL CAPACITY; UNITED STATES
CITIZENSHIP AND IMMIGRATION SERVICES; UNITED
STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;
UNITED STATES OF AMERICA,
DEFENDANTS-APPELLANTS

———————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 5/21/18 | 1 | NOTICE OF INTERLOCUTORY CIVIL APPEAL, with district court docket, on behalf of Appellants Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs |

AR2613

328

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| | | Enforcement and United States of America, FILED. [2308064] [18-1525]—[Edited 05/21/2018 by TT] [Entered: 05/21/2018 04:44 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 5/22/18 | <u>6</u> | ORDER, that the appeals docketed under 18-1521 and 18-1525 shall be heard on the merits in tandem with the four petitions for leave to appeal docketed under 18-122, 18-123, 18-1313, and 18-1314, in the event the Court grants the petitions for leave to appeal. Appellants must file a scheduling notification letter within 14 days after the Court determines the petitions for leave to appeal. FILED. [2308644] [18-1525]—[Edited 05/23/2018 by RD] [Entered: 05/22/2018 01:04 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 7/5/18 | <u>16</u> | ORDER, directing appeals 18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988 to be heard in tandem, FILED. [2339214] [18-1525] [Entered: 07/06/2018 08:29 AM] |

\* \* \* \* \*

AR2614

329

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 7/23/18 | 23 | MOTION, to consolidate appeals, on behalf of Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, FILED.  Service date 07/23/2018 by CM/ECF. [2350790] [18-1525] [Entered: 07/23/2018 03:44 PM] |

\* \* \* \* \*

| | | |
|---|---|---|
| 7/25/18 | 29 | MOTION ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [2350786-2] filed by Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen in 18-1521, granting motion to consolidate appeals [23] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-1525, by DC, Circuit Judge, FILED. |

**AR2615**

330

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | [2352673] [29] [18-1521, 18-485, 18-488, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 07/25/2018 01:40 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 8/15/18 | <u>32</u> | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 08/15/2018 by CM/ECF. [2368771] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 08/15/2018 02:44 PM] |

\* \* \* \* \*

331

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 9/25/18 | <u>48</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee Martin Jonathan Batall Vidal in 18-485, 18-1521, FILED.  Service date 09/25/2018 by CM/ECF. [2396808] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered:  09/25/2018 03:34 PM] |
| | | *   *   *   *   * |
| 9/27/18 | <u>50</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-1987, 18-1988, 18-488, FILED.  Service date 09/27/2018 by CM/ECF. [2398834] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered:  09/27/2018 04:57 PM] |
| | | *   *   *   *   * |

**AR2617**

332

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 10/30/18 | <u>62</u> | SUPPLEMENTAL REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 10/05/2018 by CM/ECF. [2421686] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 10/30/2018 01:07 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 1/25/19 | 105 | CASE, before DJ, RDS, DC, HEARD. [2482363] [18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 01/25/2019 11:18 AM] |

\* \* \* \* \*

**AR2618**

333

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

Docket No. 18-1985

MARTIN JONATHAN BATALL VIDAL; MAKE THE ROAD
NEW YORK, ON BEHALF OF ITSELF, ITS MEMBERS, ITS
CLIENTS, AND ALL SIMILARLY SITUATED INDIVIDUALS;
ANTONIO ALARCON; ELIANA FERNANDEZ; CARLOS
VARGAS; MARIANO MONDRAGON; CAROLINA FUNG
FENG, ON BEHALF OF THEMSELVES AND ALL OTHER
SIMILARLY SITUATED INDIVIDUALS,
PLAINTIFFS-APPELLEES

*v.*

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; JEFFERSON B. SESSIONS III, UNITED
STATES ATTORNEY GENERAL; DONALD J. TRUMP,
PRESIDENT OF THE UNITED STATES,
DEFENDANTS-APPELLANTS

———————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 7/5/18 | 1 | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, FILED. [2338991] [18-1985] [Entered: 07/05/2018 03:44 PM] |
| 7/5/18 | 2 | ORDER, directing appeals 18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988 to be heard in tandem, |

**AR2619**

334

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | FILED.   [2339207]  [18-1985] [Entered:   07/06/2018 08:21 AM] |
| 7/23/18 | <u>8</u> | MOTION, to consolidate appeals, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, FILED.  Service date 07/23/2018 by CM/ECF.  [2350782] [18-1985] [Entered:   07/23/2018 03:42 PM] |
| | | *   *   *   *   * |
| 7/25/18 | <u>14</u> | MOTION   ORDER,   granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [<u>2350786-2</u>] filed by Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen in 18-1521, granting motion to consolidate appeals [<u>2350790-2</u>] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-1525, by DC, Circuit Judge, FILED. [2352673] [14] [18-1521, 18-485, 18-488, 18-1525, 18-1985, 18-1986, 18-1987,   18-1988]   [Entered: 07/25/2018 01:40 PM] |

**AR2620**

335

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | * * * * * |
| 8/15/18 | <u>18</u> | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 08/15/2018 by CM/ECF. [2368771] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 08/15/2018 02:44 PM] |
| | | * * * * * |
| 9/25/18 | <u>36</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee Martin Jonathan Batall Vidal in 18-485, 18-1521, FILED. Service date 09/25/2018 by CM/ECF. |

336

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | [2396808]   [18-485,   18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988,   18-488]   [Entered: 09/25/2018 03:34 PM] |

\*   \*   \*   \*   \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 9/27/18 | 38 | SUPPLEMENTAL BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-1987, 18-1988, 18-488, FILED. Service date 09/27/2018 by CM/ECF. [2398834]   [18-485,   18-1521, 18-1525,   18-1985,   18-1986, 18-1987,  18-1988,  18-488] [Entered:   09/27/2018 04:57 PM] |

\*   \*   \*   \*   \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 10/30/18 | 49 | SUPPLEMENTAL   REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration   Services,   United |

337

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 10/05/2018 by CM/ECF. [2421686] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 10/30/2018 01:07 PM] |
| | | *   *   *   *   * |
| 1/25/19 | 95 | CASE, before DJ, RDS, DC, HEARD. [2482363] [18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 01/25/2019 11:18 AM] |
| | | *   *   *   *   * |

338

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———

Docket No. 18-1986

MARTIN JONATHAN BATALL VIDAL; MAKE THE ROAD
NEW YORK, ON BEHALF OF ITSELF, ITS MEMBERS, ITS
CLIENTS, AND ALL SIMILARLY SITUATED INDIVIDUALS;
ANTONIO ALARCON; ELIANA FERNANDEZ; CARLOS
VARGAS; MARIANO MONDRAGON; CAROLINA FUNG
FENG, ON BEHALF OF THEMSELVES AND ALL OTHER
SIMILARLY SITUATED INDIVIDUALS,
PLAINTIFFS-APPELLEES

*v.*

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; JEFFERSON B. SESSIONS III, UNITED
STATES ATTORNEY GENERAL; MATTHEW G.
WHITAKER, UNITED STATES ATTORNEY GENERAL;
DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, DEFENDANTS-APPELLANTS

———

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 7/5/18 | 1 | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, FILED. [2339035] [18-1986] [Entered: 07/05/2018 04:06 PM] |
| 7/5/18 | 2 | ORDER, directing appeals 18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988 to be |

AR2624

339

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | heard in tandem, FILED. [2339208] [18-1986] [Entered: 07/06/2018 08:23 AM] |
| | | * * * * * |
| 7/23/18 | <u>7</u> | MOTION, to consolidate appeals, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III and Donald J. Trump, FILED. Service date 07/23/2018 by CM/ ECF. [2350780] [18-1986] [Entered: 07/23/2018 03:41 PM] |
| | | * * * * * |
| 7/25/18 | <u>13</u> | MOTION ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [2350786-2] filed by Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen in 18-1521, granting motion to consolidate appeals [2350790-2] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-1525, by DC, Circuit Judge, FILED. [2352673] [13] [18-1521, 18-485, |

AR2625

340

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | 18-488, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 07/25/2018 01:40 PM] |

<div align="center">*   *   *   *   *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 8/15/18 | <u>17</u> | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED.  Service date 08/15/2018 by CM/ECF.  [2368771] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered:  08/15/2018 02:44 PM] |

<div align="center">*   *   *   *   *</div>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 9/25/18 | <u>35</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee Martin Jonathan Batall Vidal in 18-485, |

AR2626

341

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | 18-1521, FILED. Service date 09/25/2018 by CM/ECF. [2396808] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/25/2018 03:34 PM] |
| | | * * * * * |
| 9/27/18 | <u>37</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-1987, 18-1988, 18-488, FILED. Service date 09/27/2018 by CM/ECF. [2398834] [18-485, 18-1521, 18-1525, 18-1985,18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/27/2018 04:57 PM] |
| | | * * * * * |
| 10/30/18 | <u>48</u> | SUPPLEMENTAL REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, |

**AR2627**

342

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 10/05/2018 by CM/ECF. [2421686] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 10/30/2018 01:07 PM] |
| | | *   *   *   *   * |
| 1/25/19 | <u>94</u> | CASE, before DJ, RDS, DC, HEARD. [2482363] [18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 01/25/2019 11:18 AM] |
| | | *   *   *   *   * |

343

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

───────────

Docket No. 18-1987

STATE OF NEW YORK; STATE OF MASSACHUSETTS;
STATE OF WASHINGTON; STATE OF DELAWARE;
DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF
ILLINOIS; STATE OF IOWA; STATE OF NEW MEXICO;
STATE OF NORTH CAROLINA; STATE OF OREGON; STATE
OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF
VERMONT; STATE OF VIRGINIA; STATE OF COLORADO;
STATE OF CONNECTICUT, PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES;
KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT; UNITED STATES OF
AMERICA; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, DEFENDANTS-APPELLANTS

───────────

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 7/5/18 | 1 | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, |

**AR2629**

344

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | FILED.   [2339108]   [18-1987] [Entered:   07/05/2018 04:41 PM] |
| 7/5/18 | 2 | ORDER, directing appeals 18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988 to be heard in tandem, FILED.   [2339209]   [18-1987] [Entered:   07/06/2018 08:24 AM] |
| | | *   *   *   *   * |
| 7/23/18 | 9 | MOTION, to consolidate appeals, on behalf of Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America, FILED.   Service date 07/23/2018 by CM/ECF.   [2350747] [18-1987] [Entered:   07/23/2018 03:28 PM] |
| | | *   *   *   *   * |
| 7/25/18 | 15 | MOTION   ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [2350786-2] filed by Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen in 18-1521, granting motion to consolidate appeals [2350790-2] filed |

**AR2630**

345

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-1525, by DC, Circuit Judge, FILED. [2352673] [15] [18-1521, 18-485, 18-488, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 07/25/2018 01:40 PM] |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 8/15/18 | <u>18</u> | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. |

346

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Service date 08/15/2018 by CM/ECF. [2368771] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 08/15/2018 02:44 PM] |
| | | * * * * * |
| 9/25/18 | <u>34</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee Martin Jonathan Batall Vidal in 18-485, 18-1521, FILED. Service date 09/25/2018 by CM/ECF. [2396808] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/25/2018 03:34 PM] |
| | | * * * * * |
| 9/27/18 | <u>36</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-1987, 18-1988, 18-488, FILED. Service date 09/27/2018 by CM/ECF. |

347

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | [2398834] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/27/2018 04:57 PM] |
| | | * * * * * |
| 10/30/18 | 47 | SUPPLEMENTAL REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 10/05/2018 by CM/ECF. [2421686] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 10/30/2018 01:07 PM] |
| | | * * * * * |

AR2633

348

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 1/25/19 | 92 | CASE, before DJ, RDS, DC, HEARD.   [2482363]  [18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered:   01/25/2019 11:18 AM] |

<div align="center">*   *   *   *   *</div>

349

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

Docket No. 18-1988

STATE OF NEW YORK; STATE OF MASSACHUSETTS;
STATE OF WASHINGTON; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA;
STATE OF NEW MEXICO; STATE OF NORTH CAROLINA;
STATE OF OREGON; STATE OF PENNSYLVANIA; STATE
OF RHODE ISLAND; STATE OF VERMONT; STATE OF
VIRGINIA; STATE OF COLORADO; STATE OF
CONNECTICUT, PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES;
KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY; UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT; UNITED STATES OF
AMERICA; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, DEFENDANTS-APPELLANTS

———————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 7/5/18 | 1 | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and |

350

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | United States of America, FILED. [2339153] [18-1988] [Entered: 07/05/2018 05:06 PM] |
| 7/5/18 | 2 | ORDER, directing appeals 18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988 to be heard in tandem, FILED. [2339211] [18-1988] [Entered: 07/06/2018 08:25 AM] |
| | | *   *   *   *   * |
| 7/25/18 | 15 | MOTION ORDER, granting motion to consolidate appeals, to expedite and for reduced word limits in the briefs [2350786-2] filed by Appellant Donald J. Trump, Jefferson B. Sessions III and Kirstjen M. Nielsen in 18-1521, granting motion to consolidate appeals [2350790-2] filed by Appellant Donald J. Trump, United States of America, United States Immigration and Customs Enforcement, United States Citizenship and Immigration Services, United States Department of Homeland Security and Kirstjen M. Nielsen in 18-1525, by DC, Circuit Judge, FILED. [2352673] [15] [18-1521, 18-485, 18-488, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 07/25/2018 01:40 PM] |

**AR2636**

351

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | *   *   *   *   * |
| 8/15/18 | 18 | SUPPLEMENTAL BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED.   Service date 08/15/2018 by CM/ECF.   [2368771] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered:   08/15/2018 02:44 PM] |
| | | *   *   *   *   * |
| 9/25/18 | 34 | SUPPLEMENTAL BRIEF, on behalf of Appellee Martin Jonathan Batall Vidal in 18-485, 18-1521, FILED.   Service date 09/25/2018   by   CM/ECF. [2396808]   [18-485,   18-1521, |

**AR2637**

352

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/25/2018 03:34 PM] |
| | | * * * * * |
| 9/27/18 | <u>36</u> | SUPPLEMENTAL BRIEF, on behalf of Appellee District of Columbia, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia and State of Washington in 18-485, 18-1987, 18-1988, 18-488, FILED. Service date 09/27/2018 by CM/ECF. [2398834] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 09/27/2018 04:57 PM] |
| | | * * * * * |
| 10/30/18 | <u>47</u> | SUPPLEMENTAL REPLY BRIEF, on behalf of Appellant Kirstjen M. Nielsen, Jefferson B. Sessions III, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland |

**AR2638**

353

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Security, United States Immigration and Customs Enforcement and United States of America in 18-485, Appellant Kirstjen M. Nielsen, Donald J. Trump, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States Immigration and Customs Enforcement and United States of America in 18-488, FILED. Service date 10/05/2018 by CM/ECF. [2421686] [18-485, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988, 18-488] [Entered: 10/30/2018 01:07 PM] |

\*   \*   \*   \*   \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 1/25/19 | 93 | CASE, before DJ, RDS, DC, HEARD. [2482363] [18-485, 18-488, 18-1521, 18-1525, 18-1985, 18-1986, 18-1987, 18-1988] [Entered: 01/25/2019 11:18 AM] |

\*   \*   \*   \*   \*

**AR2639**

354

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
(BROOKLYN)

————

Docket No. 1:16-cv-04756-NGG-JO

MARTIN JONATHAN BATALL VIDAL; MAKE THE ROAD
NEW YORK, ON BEHALF OF ITSELF, ITS MEMBERS, ITS
CLIENTS, AND ALL SIMILARLY SITUATED INDIVIDUALS;
ANTONIO ALARCON; ELIANA FERNANDEZ; CARLOS
VARGAS; MARIANO MONDRAGON; CAROLINA FUNG
FENG, ON BEHALF OF THEMSELVES AND ALL OTHER
SIMILARLY SITUATED INDIVIDUALS, PLAINTIFFS

*v.*

KATHY A. BARAN, DIRECTOR CALIFORNIA SERVICE
CENTER; KELVIN MEDLOCK, ASSOCIATE DIRECTOR,
CALIFORNIA SERVICE CENTER; SUSAN M. CURDA,
DISTRICT DIRECTOR; DONALD W. NEUFIELD,
ASSOCIATE DIRECTOR, SERVICE CENTER
OPERATIONS, U.S. CITIZENSHIP AND IMMIGRATION
SERVICES; LEON RODRIGUEZ, DIRECTOR, U.S.
CITIZENSHIP AND IMMIGRATION SERVICES; KIRSTJEN
M. NIELSEN, SECRETARY, DEPARTMENT OF
HOMELAND SECURITY; JEFFERSON B. SESSIONS,
ATTORNEY GENERAL OF THE UNITED STATES;
DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, DEFENDANTS

————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|--------|-------------|
| 8/25/16 | <u>1</u> | COMPLAINT against All Defendants filing fee $ 400, receipt number 0207-8866017 Was the Disclosure Statement on Civil |

**AR2640**

355

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | Cover Sheet completed—YES,, filed by Martin Jonathan Batalla Vidal. (Attachments: #1 Exhibit, #2 Exhibit, #3 Exhibit, #4 Exhibit, #5 Exhibit, #6 Civil Cover Sheet) (Taylor, Amy) (Entered: 08/25/2016) |
| | | * * * * * |
| 9/29/16 | 29 | AMENDED COMPLAINT against All Defendants, filed by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: #1 Exhibit, #2 Exhibit, #3 Exhibit, #4 Exhibit, #5 Exhibit, #6 Exhibit) (Wishnie, Michael) (Entered: 09/29/2016) |
| | | * * * * * |
| 9/19/17 | 60 | AMENDED COMPLAINT *Second* against Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump, filed by Make the Road New York, Martin Jonathan Batalla Vidal. (Attachments: #1 Exhibit A-G) (Wishnie, Michael) (Entered: 09/19/2017) |
| | | * * * * * |
| 10/27/17 | 95 | MOTION to Dismiss by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump. Re- |

356

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | sponses due by 11/1/2017 (Attachments: #1 Memorandum in Support) (Pezzi, Stephen). (Entered: 10/27/2017) |
| | | * * * * * |
| 11/1/17 | 102 | RESPONSE in Opposition re 95 MOTION to Dismiss filed by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas. (Attachments: #1 Certificate of Service) (Hanson, Jessica) (Entered: 11/01/2017) |
| | | * * * * * |
| 11/9/17 | 104 | MEMORANDUM & ORDER, For the reasons stated above. Defendants' motion to dismiss for lack of subject-matter jurisdiction (Dkt. 95) is GRANTED IN PART and DENIED IN PART. The following claims are dismissed: Batalla Vidal v. Duke, No. 16-CV-4756: Fourth claim for relief (Due Process Clause—Notice); New York v. Trump, No. 17-CV-5228: Second claim for relief (Due Process Clause—Information-Use Policy); Third claim for relief (Equitable |

357

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | Estoppel—Information-Use Policy); Seventh claim for relief (Due Process Clause—Notice). Defendants' motion to dismiss for lack of subject-matter jurisdiction is denied with respect to all other claims. The court RESERVES RULING on Defendants' motion to dismiss for failure to state a claim. So Ordered by Judge Nicholas G. Garaufis on 11/9/2017. (Lee, Tiffeny) (Entered: 11/09/2017) |
| | | * * * * * |
| 12/11/17 | 113 | AMENDED COMPLAINT *THIRD* against Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump, filed by Mariano Mondragon, Make the Road New York, Carlos Vargas, Antonio Alarcon, Carolina Fung Feng, Eliana Fernandez, Martin Jonathan Batalla Vidal. (Attachments: #1 Exhibit A-M) (Hanson, Jessica) (Entered: 12/11/2017) |
| | | * * * * * |
| 12/15/17 | 123 | MOTION for Preliminary Injunction by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, |

358

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Make the Road New York, Mariano Mondragon, Carlos Vargas. (Attachments: #1 Memorandum in Support, #2 Table of Exhibits, #3 Exhibit Exhibit A-M, Part 1, #4 Exhibit Exhibit A-M, Part 2, # 5 Exhibit Exhibit N-Z, #6 Exhibit Exhibit AA-MM, Part 1, #7 Exhibit Exhibit AA-MM, Part 2, #8 Exhibit Exhibit AA-MM, Part 3, #9 Exhibit Exhibit AA-MM, Part 4, #10 Exhibit Exhibit NN-ZZ, Part 1, #11 Exhibit Exhibit NN-ZZ, Part 2, #12 Exhibit Exhibit NN-ZZ, Part 3, #13 Exhibit Exhibit AAA-RRR) (Tumlin, Karen) (Entered: 12/15/2017) |
| | | * * * * * |
| 12/26/17 | 207 | MOTION to Dismiss *Third Amended Complaint* by Kirstjen M. Nielsen, Jefferson Beauregard Sessions, Donald J. Trump. Responses due by 1/13/2018 (Attachments: #1 Memorandum in Support) (Pezzi, Stephen) (Entered: 12/26/2017) |
| | | * * * * * |
| 12/28/17 | 219 | MOTION for Certificate of Appealability by Kathy A. Baran, Susan M. Curda, Kelvin Medlock, |

**AR2644**

359

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Donald W. Neufeld, Kirstjen M. Nielsen, Leon Rodriguez, Jefferson Beauregard Sessions, Donald J. Trump. (Attachments: #1 Memorandum in Support) (Westmoreland, Rachael) (Entered: 12/28/2017) |
| | | * * * * * |
| 1/3/18 | 226 | MEMORANDUM in Opposition re 219 MOTION for Certificate of Appealability filed by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas. (Joachin, Mayra) (Entered: 01/03/2018) |
| | | * * * * * |
| 1/5/18 | 231 | REPLY in Support re 219 MOTION for Certificate of Appealability filed by All Defendants. (Westmoreland, Rachael) (Entered: 01/05/2018) |
| | | * * * * * |
| 1/8/18 | 233 | MEMORANDUM & ORDER, For the reasons stated above, Defendants' motion for the court to certify its November 9th M&O for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (Dkt. 219 |

360

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | in No. 16-CV-4756; Dkt 184 in No. 17-CV-5228) is GRANTED. Discovery and record supplementation in these cases are stayed pending the Second Circuit's decision on Defendants' anticipated interlocutory appeal. (See Dec. 27, 2017, USCA Order at 4.) So Ordered by Judge Nicholas G. Garaufis on 1/8/2018. (Lee, Tiffeny) (Entered: 01/08/2018) |
| 1/8/18 | 234 | NOTICE OF INTERLOCUTORY APPEAL as to 104 Order on Motion to Dismiss,,,,,,, by Kirstjen M. Nielsen, Jefferson Beauregard Sessions, Donald J. Trump. (Pezzi, Stephen) (Entered: 01/08/2018) |
| | | *   *   *   *   * |
| 1/13/18 | 239 | MEMORANDUM in Opposition re 123 MOTION for Preliminary Injunction filed by Kirstjen M. Nielsen, Jefferson Beauregard Sessions, Donald J. Trump. (Pezzi, Stephen) (Entered: 01/13/2018) |
| 1/13/18 | 240 | MEMORANDUM in Opposition re 207 MOTION to Dismiss *Third Amended Complaint* filed by All Plaintiffs. (Attachments: # 1 Exhibit Exhibits A-L) |

361

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | (Wishnie, Michael) (Entered: 01/13/2018) |
| | | *   *   *   *   * |
| 1/30/18 | | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Argument held on 1/30/2018 on Plaintiffs' motions for preliminary injunction (Dkt. 123 in No. 16-CV-4756; Dkt. 96 in No. 17-CV-5228); Defendants' motion to dismiss (Dkt. 207 in No. 16-CV-4756; Dkt. 71 in No. 17-CV-5228); and the <u>Batalla Vidal</u> Plaintiffs' motion for class certification (Dkt. 124 in No. 16-CV-4756). Counsel for all parties present. The court reserved decision on the motions. (Court Reporter Holly Driscoll) (Scott, Conrad) (Entered: 01/30/2018) |
| | | *   *   *   *   * |
| 2/13/18 | <u>254</u> | MEMORANDUM & ORDER, Plaintiffs' motions for preliminary injunction (Dkt. 123 in No. 16-CV-4756; Dkt. 96 in No. 17-CV-5228) are GRANTED. The <u>Batalla Vidal</u> Plaintiffs' motion for class certification (Dkt. 124) is DENIED as moot. So Ordered by Judge Nicholas G. |

AR2647

362

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Garaufis on 2/13/2018. (Lee, Tiffeny) (Entered: 02/13/2018) |
| 2/13/18 | 255 | AMENDED MEMORANDUM & ORDER AND PRELIMINARY INJUNCTION. The Memorandum & Order filed earlier today is withdrawn. Ordered by Judge Nicholas G. Garaufis on 2/13/2018. (Scott, Conrad) (Entered: 02/13/2018) |
| | | * * * * * |
| 2/20/18 | 257 | NOTICE OF INTERLOCUTORY APPEAL as to 255 Order by Kirstjen M. Nielsen, Jefferson Beauregard Sessions, Donald J. Trump. (Pezzi, Stephen) (Entered: 02/20/2018) |
| | | * * * * * |
| 3/29/18 | 260 | MEMORANDUM & ORDER, For the reasons stated above, Defendants' motions to dismiss the Batalla Vidal Plaintiffs' third amended complaint and the State Plaintiffs' amended complaint (Dkt. 207 in No. 16-CV-4756; No. 71 in No. 17-CV-5228) are GRANTED IN PART and DENIED IN PART. The Batalla Vidal Plaintiffs' first, third, and fourth claims for relief are dismissed, and the second claim for |

**AR2648**

363

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | relief is dismissed to the extent it alleges that Defendants weakened DHS's information-use policy. The sixth claim for relief is dismissed in part, as stated above. The State Plaintiffs' fifth and sixth claims for relief are dismissed. So Ordered by Judge Nicholas G. Garaufis on 3/29/2018. (Lee, Tiffeny) (Entered: 03/29/2018) |
| | | * * * * * |
| 4/13/18 | 264 | MOTION for Leave to Appeal, *Pursuant to 28 U.S.C. 1292(b), the Court's March 29, 2018 Order* by Kirstjen M. Nielsen, Jefferson Beauregard Sessions, Donald J. Trump. (Attachments: #1 Memorandum in Support) (Pezzi, Stephen) (Entered: 04/13/2018) |
| | | * * * * * |
| 4/18/18 | 265 | RESPONSE in Opposition re 264 MOTION for Leave to Appeal, *Pursuant to 28 U.S.C. 1292(b), the Court's March 29, 2018 Order* filed by All Plaintiffs. (Hanson, Jessica) (Entered: 04/18/2018) |
| | | * * * * * |
| 4/30/18 | 269 | ORDER, Defendants' motion to certify the court's March 29 M&O |

**AR2649**

364

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| | | for interlocutory appeal (Dkt. 264 in No. 16-CV-4756; Dkt. 217 in No. I7-CV-5228) is granted. So Ordered by Judge Nicholas G. Garaufis on 4/30/2018. (Lee, Tiffeny) (Entered: 04/30/2018) |
| | | * * * * * |
| 5/21/18 | 271 | NOTICE OF INTERLOCU-TORY APPEAL as to 260 Order on Motion to Dismiss for Failure to State a Claim,,,,, by Kirstjen M. Nielsen, Jefferson Beauregard Sessions, Donald J. Trump. (Pezzi, Stephen) (Entered: 05/21/2018) |
| | | * * * * * |
| 5/29/18 | 273 | ANSWER to 113 Amended Complaint, *(Third)* by Kirstjen M. Nielsen, Jefferson Beauregard Sessions, Donald J. Trump. (Pezzi, Stephen) (Entered: 05/29/2018) |
| | | * * * * * |

**AR2650**

Case 1:17-cv-05228-NGG-VMS   Document 282-8   Filed 09/04/20   Page 373 of 1030 PageID #: 10990

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
(BROOKLYN)

———————

Docket No. 1:17-cv-05228-NGG-JO

STATE OF NEW YORK; STATE OF MASSACHUSETTS;
STATE OF WASHINGTON; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE
OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE
OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE
OF OREGON; STATE OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF VERMONT; STATE OF
VIRGINIA, STATE OF COLORADO, PLAINTIFFS

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES;
U.S. DEPARTMENT OF HOMELAND SECURITY;
KIRSTJEN M. NIELSEN, IN HER OFFICIAL CAPACITY;
U.S. CITIZENSHIP AND IMMIGRATION SERVICES;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
UNITED STATES OF AMERICA, DEFENDANTS

———————

**DOCKET ENTRIES**

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 9/6/17 | 1 | COMPLAINT *State of New York, et al.* against All Defendants filing fee $ 400, receipt number 0207-9807840 Was the Disclosure Statement on Civil Cover Sheet completed—NO,, filed by State of North Carolina, State of Hawaii, State of Massachussetts, State Of New York, State of |

AR2651

366

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Virginia, State of Pennsylvania, District of Columbia, State of Washington, State of Iowa, State of Oregon, State of Rhode Island, State of Vermont, State of Illinois, State of Connecticut, State of New Mexico, State of Delaware. (Attachments: # 1 Civil Cover Sheet, # 2 Appendix, # 3 Proposed Summons Elaine C. Duke, # 4 Proposed Summons DHS HQ, # 5 Proposed Summons Donald Trump, # 6 Proposed Summons ICE, # 7 Proposed Summons USCIS HQ, # 8 Proposed Summons USCIS NYC, # 9 Proposed Summons USA (DOJ)) (Rosado, Lourdes) (Entered: 09/06/2017) |
| | | *   *   *   *   * |
| 10/4/17 | 54 | AMENDED COMPLAINT *from Plaintiff States* against All Defendants, filed by State of North Carolina, State of Hawaii, State of Massachusetts, State Of New York, State of Virginia, State of Pennsylvania, District of Columbia, State of Washington, State of Iowa, State of Oregon, State of Rhode Island, State of Vermont, State of Illinois, State of Connecticut, State of New Mexico, |

367

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | State of Delaware, State of Colorado. (Attachments: # 1 Appendix Exhibit List) (Khan, Sania) (Entered: 10/04/2017) |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 10/27/17 | 71 | MOTION to Dismiss by U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, United States of America. Responses due by 11/1/2017 (Attachments: # 1 Memorandum in Support) (Pezzi, Stephen). (Entered: 10/27/2017) |

\* \* \* \* \*

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| 10/27/17 | 74 | NOTICE by Donald Trump, Elaine C. Duke, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, United States of America re 71 MOTION to Dismiss—*Errata to Memorandum of Law in support of Defendants' Motion to Dismiss* (Marutollo, Joseph) (Entered: 10/27/2017) |

\* \* \* \* \*

**AR2653**

368

| DATE | DOCKET NUMBER | PROCEEDINGS |
|---|---|---|
| 11/1/17 | 81 | MEMORANDUM in Opposition re 71 MOTION to Dismiss Re: *FRCP12(b) (1)* filed by All Plaintiffs. (Khan, Sania) (Entered: 11/01/2017) |
| 11/1/17 | 82 | MEMORANDUM in Opposition re 71 MOTION to Dismiss *CORRECTED* filed by All Plaintiffs. (Khan, Sania) (Entered: 11/01/2017) |
| | | * * * * * |
| 11/9/17 | 85 | MEMORANDUM & ORDER, For the reasons stated above. Defendants' motion to dismiss for lack of subject-matter jurisdiction (Dkt. 95 ) is GRANTED IN PART and DENIED IN PART. The following claims are dismissed: Batalla Vidal v. Duke, No. 16-CV-4756: Fourth claim for relief (Due Process Clause—Notice); New York v. Trump, No. 17-CV-5228: Second claim for relief (Due Process Clause—Information-Use Policy); Third claim for relief (Equitable Estoppel—Information-Use Policy); Seventh claim for relief (Due Process Clause—Notice). Defendants' motion to dismiss for lack of subject-matter jurisdiction is denied with re- |

369

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | spect to all other claims. The court RESERVES RULING on Defendants' motion to dismiss for failure to state a claim. So Ordered by Judge Nicholas G. Garaufis on 11/9/2017. (Lee, Tiffeny) (Entered: 11/09/2017) |
| | | *   *   *   *   * |
| 12/15/17 | 96 | First MOTION for Preliminary Injunction by District of Columbia, State Of New York, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Iowa, State of Massachusetts, State of New Mexico, State of North Carolina, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia, State of Washington. (Attachments: # 1 Memorandum in Support Preliminary Injunction, # 2 Appendix Exhibit List, # 3 Proposed Order for Preliminary Injunction) (Khan, Sania) (Entered: 12/15/2017) |
| | | *   *   *   *   * |
| 12/28/17 | 184 | MOTION for Certificate of Appealability by Donald Trump, Kirstjen M. Nielsen, U.S. Citi- |

370

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | zenship and Immigration Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, United States of America. (Attachments: # 1 Memorandum in Support) (Westmoreland, Rachael) (Entered: 12/28/2017) |
| | | * * * * * |
| 1/3/18 | 193 | MEMORANDUM in Opposition re 184 MOTION for Certificate of Appealability *And Motion for Stay* filed by All Plaintiffs. (Lucas, Diane) (Entered: 01/03/2018) |
| | | * * * * * |
| 1/5/18 | 196 | REPLY in Support re 184 MOTION for Certificate of Appealability filed by All Defendants. (Westmoreland, Rachael) (Entered: 01/05/2018) |
| | | * * * * * |
| 1/8/18 | 198 | MEMORANDUM & ORDER, For the reasons stated above, Defendants' motion for the court to certify its November 9th M&O for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (Dkt. 219 in No. 16-CV-4756; Dkt 184 in No. 17-CV-5228) is GRANTED. |

**AR2656**

371

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | Discovery and record supplementation in these cases are stayed pending the Second Circuit's decision on Defendants' anticipated interlocutory appeal. (See Dec. 27, 2017, USCA Order at 4.) So Ordered by Judge Nicholas G. Garaufis on 1/8/2018. (Lee, Tiffeny) (Entered: 01/08/2018) |
| 1/8/18 | 199 | NOTICE OF INTERLOCUTORY APPEAL as to 85 Order on Motion to Dismiss,,,,,,, by Donald Trump, Kirstjen M. Nielsen, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, United States of America. (Pezzi, Stephen) (Entered: 01/08/2018) |
| | | * * * * * |
| 1/12/18 | 202 | MEMORANDUM in Opposition re 71 MOTION to Dismiss Motion to Dismiss for Failure to State a Claim filed by All Plaintiffs. (Lucas, Diane) (Entered: 01/12/2018) |
| | | * * * * * |
| 1/13/18 | 204 | MEMORANDUM in Opposition re 96 First MOTION for Prelim- |

**AR2657**

372

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | inary Injunction filed by All Defendants.  (Pezzi, Stephen) (Entered:  01/13/2018) |
| | | *   *   *   *   * |
| 2/13/18 | 208 | MEMORANDUM & ORDER, Plaintiffs' motions for preliminary injunction (Dkt. 123 in No. 16-CV-4756; Dkt. 96 in No. 17-CV-5228) are GRANTED. The Batalla Vidal Plaintiffs' motion for class certification (Dkt. 124) is DENIED as moot. So Ordered by Judge Nicholas G. Garaufis on 2/13/2018. (Lee, Tiffeny) (Entered:  02/13/2018) |
| 2/13/18 | 209 | AMENDED MEMORANDUM & ORDER AND PRELIMINARY INJUNCTION.  The Memorandum & Order filed earlier today is withdrawn.  Ordered by Judge Nicholas G. Garaufis on 2/13/2018.  (Scott, Conrad) (Entered:  02/13/2018) |
| 2/20/18 | 210 | NOTICE OF INTERLOCUTORY APPEAL as to 209 Order by Donald Trump, Kirstjen M. Nielsen, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, United States of |

**AR2658**

373

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | America.   (Pezzi, Stephen) (Entered:   02/20/2018) |
| | | *   *   *   *   * |
| 3/29/18 | <u>215</u> | MEMORANDUM & ORDER, For the reasons stated above, Defendants' motions to dismiss the <u>Batalla Vidal</u> Plaintiffs' third amended complaint and the State Plaintiffs' amended complaint (Dkt. <u>207</u> in No. 16-CV-4756; No. <u>71</u> in No. 17-CV-5228) are GRANTED IN PART and DENIED IN PART.   The <u>Batalla Vidal</u> Plaintiffs' first, third, and fourth claims for relief are dismissed, and the second claim for relief is dismissed to the extent it alleges that Defendants weakened DHS's information-use policy.   The sixth claim for relief is dismissed in part, as stated above.   The State Plaintiffs' fifth and sixth claims for relief are dismissed.   So Ordered by Judge Nicholas G. Garaufis on 3/29/2018.   (Lee, Tiffany) (Entered:   03/29/2018) |
| | | *   *   *   *   * |
| 4/13/18 | <u>217</u> | MOTION for Leave to Appeal, *Pursuant to 28 U.S.C. 1292(b), the Court's March 29, 2018 Order* |

AR2659

374

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| | | by Donald Trump, Kirstjen M. Nielsen, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, United States of America. (Attachments: # 1 Memorandum in Support) (Pezzi, Stephen) (Entered: 04/13/2018) |

<p align="center">* * * * *</p>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 4/19/18 | 218 | Letter *Regarding Motion for Certification Under 28 U.S.C. 1292(b)* by Donald Trump, Kirstjen M. Nielsen, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, United States of America (Pezzi, Stephen) (Entered: 04/19/2018) |

<p align="center">* * * * *</p>

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|------|------|
| 4/30/18 | 220 | ORDER, Defendants' motion to certify the court's March 29 M&O for interlocutory appeal (Dkt. 264 in No. 16-CV-4756; Dkt. 217 in No. I7-CV- 5228) is granted. So Ordered by Judge Nicholas G. Garaufis on 4/30/2018. (Lee, Tiffeny) (Entered: 04/30/2018) |

375

| DATE | DOCKET NUMBER | PROCEEDINGS |
|------|---------------|-------------|
| | | * * * * * |
| 5/21/18 | 225 | NOTICE OF INTERLOCU-TORY APPEAL as to 215 Order on Motion to Dismiss,,, Order on Motion to Dismiss for Failure to State a Claim,, by Donald Trump, Kirstjen M. Nielsen, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, United States of America. (Pezzi, Stephen) (Entered: 05/21/2018) |
| | | * * * * * |
| 5/29/18 | 227 | ANSWER to 54 Amended Complaint, by All Defendants. (Pezzi, Stephen) (Entered: 05/29/2018) |
| | | * * * * * |

AR2661

Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

———

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

———

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

———

**JOINT APPENDIX**
**(VOLUME 2)**

———

NOEL J. FRANCISCO
*Solicitor General*
*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*


*Counsel of Record*
 *for Petitioners*

ROBERT ALLEN LONG, JR.
*Covington & Burling, LLP*
*One CityCenter*
*850 Tenth St., N.W.*
*Washington, D.C. 20001*
*rlong@cov.com*
*(202) 662-5612*


*Counsel of Record*
 *for Respondents*
  *Regents of the University*
  *of California and*
  *Janet Napolitano*
  *(No. 18-587)*

**PETITIONS FOR A WRIT OF CERTIORARI FILED: NOV. 5, 2018**
**CERTIORARI GRANTED: JUNE 28, 2019**

Additional Captions and Counsel Listed on Inside Cover

**AR2662**

———

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.

———

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

———

KEVIN K. MCALEENAN, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

———

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

———

### Additional Counsel For Respondents

THEODORE J. BOUTROUS, JR.
*Gibson, Dunn & Crutcher LLP*
*333 South Grand Ave.*
*Los Angeles, CA. 90071*
*tboutrous@gibsondunn.com*
*(213) 229-7804*

*Counsel of Record*
*for Respondents*
*  Dulce Garcia, Miriam*
*  Gonzalez Avila, Saul*
*  Jimenez Suarez, Viridiana*
*  Chabolla Mendoza, Norma*
*  Ramirez, and Jirayut*
*  Latthivongskorn*
*  (No. 18-587)*

MICHAEL JAMES MONGAN
*Solicitor General*
*California Department of Justice*
*455 Golden Gate Ave., Suite 11000*
*San Francisco, CA. 94102*
*michael.mongan@doj.ca.gov*
*(415) 510-3920*

*Counsel of Record*
*for Respondents*
*  States of California, Maine,*
*  Maryland, and Minnesota*
*  (No. 18-587)*

**AR2663**

STACEY M. LEYTON
  *Altshuler Berzon, LLP*
  *177 Post St., Suite 300*
  *San Francisco, CA. 94108*
  *sleyton@altshulerberzon.com*
  *(415) 421-7151*

  *Counsel of Record*
   *for Respondents*
    *County of Santa Clara and*
      *Service Employees*
      *International Union*
      *Local 521 (No. 18-587)*

JAMES R. WILLIAMS
  *Office of the County Counsel*
  *County of Santa Clara*
  *70 West Hedding St.*
  *East Wing, Ninth Floor*
  *San Jose, CA. 95110*
  *(408) 299-5900*

  *Counsel of Record*
   *for Respondents*
    *County of Santa Clara*
    *(No. 18-587)*

LINDSAY C. HARRISON
  *Jenner & Block, LLP*
  *1099 New York Ave., N.W.*
  *Suite 900*
  *Washington, D.C. 20001*
  *lharrison@jenner.com*
  *(202) 639-6000*

  *Counsel of Record*
   *for Respondents*
    *Princeton University,*
      *Microsoft Corporation, and*
      *Maria De La Cruz Perales*
      *Sanchez (No. 18-588)*

JOSEPH M. SELLERS
  *Cohen Milsten Sellers & Toll*
    *PLLC*
  *1100 New York Ave., N.W.*
  *Fifth Floor*
  *Washington, D.C. 20005*
  *jsellers@cohenmilstein.com*
  *(202) 408-4600*

  *Counsel of Record*
   *for Respondents*
    *NAACP, American Federation*
      *of Teachers, and United Food*
      *and Commercial Workers*
      *International Union*
      *(No. 18-588)*

MICHAEL J. WISHNIE
  *William O. Douglas Clinical*
    *Professor of Law and*
    *Counselor to the Dean*
  *Yale Law School*
  *127 Wall Street*
  *New Haven, CT. 06511*
  *michael.wishnie@yale.edu*
  *(203) 436-4780*

  *Counsel of Record*
   *for Respondents*
    *Martin Jonathan Batalla*
      *Vidal, et al. (No. 18-589)*

BARBARA DALE UNDERWOOD
  *Solicitor General*
  *New York Attorney General's*
    *Office*
  *28 Liberty St.*
  *New York, N.Y. 10005*
  *barbara.underwood@ag.ny.gov*
  *(212) 416-8016*

  *Counsel of Record*
   *for Respondents*
    *State of New York, et al.*
    *(No. 18-589)*

**AR2664**

## TABLE OF CONTENTS

Page

**Volume 1**

Relevant docket entries (18-587):
Court of appeals docket entries (18-15068) .................... 1
Court of appeals docket entries (18-15069) .................. 28
Court of appeals docket entries (18-15070) .................. 55
Court of appeals docket entries (18-15071) .................. 82
Court of appeals docket entries (18-15072) ............... 108
Court of appeals docket entries (18-15128) ............... 136
Court of appeals docket entries (18-15133) ............... 162
Court of appeals docket entries (18-15134) ............... 188
District court docket entries (17-cv-05211) ............... 214
District court docket entries (17-cv-05235) ............... 222
District court docket entries (17-cv-05329) ............... 225
District court docket entries (17-cv-05380) ............... 229
District court docket entries (17-cv-05813) ............... 233
Relevant docket entries (18-588):
Court of appeals docket entries (18-5243) .................. 237
District court docket entries (17-cv-01907) ............... 241
District court docket entries (17-cv-02325)  ............... 246
Relevant docket entries (18-589):
Court of appeals docket entries (18-122) .................... 258
Court of appeals docket entries (18-123) .................... 262
Court of appeals docket entries (18-485) .................... 267
Court of appeals docket entries (18-488) .................... 292
Court of appeals docket entries (18-1313) .................. 314
Court of appeals docket entries (18-1314) .................. 317
Court of appeals docket entries (18-1521) .................. 320
Court of appeals docket entries (18-1525) .................. 327

(I)

**AR2665**

II

Table of Contents—Continued:                                    Page

Court of appeals docket entries (18-1985) ................. 333
Court of appeals docket entries (18-1986) ................. 338
Court of appeals docket entries (18-1987) ................. 343
Court of appeals docket entries (18-1988) ................. 349
District court docket entries (16-cv-04756) ............... 354
District court docket entries (17-cv-05228) ............... 365

**Volume 2**

Relevant pleadings (18-587):
Complaint (17-cv-05813) (Oct. 10, 2017)...................... 376
Complaint (17-cv-05380) (Sept. 18, 2017).................... 416
Complaint (17-cv-05329) (Sept. 14, 2017).................... 480
Complaint (17-cv-05235) (Sept. 11, 2017)................... 504
Complaint (17-cv-05211) (Sept. 8, 2017)..................... 555
Relevant pleadings (18-588):
Complaint (17-cv-02325) (Nov. 3, 2017)...................... 580
Amended complaint (17-cv-01907)
(Oct. 23, 2017)............................................. 630
Relevant pleadings (18-589):
Third amended complaint (16-cv-04756)
(Dec. 11, 2017).......................................... 652
Amended complaint (17-cv-05228)
(Oct. 4, 2017)............................................ 706

Excerpts from administrative record:
Office of Legal Counsel, Memorandum on
The Department of Homeland Security's
Authority to Prioritize Removal of Certain
Aliens Unlawfully Present in the United
States and to Defer Removal of Others
(Nov. 19, 2014)......................................... 797

**AR2666**

III

Table of Contents—Continued:                                    Page

    Memorandum on Enforcement of the
        Immigration Laws to Serve the National
        Interest (Feb. 20, 2017)............................................ 857

    Memorandum on Rescission of Memorandum
        Providing for Deferred Action for Parents of
        Americans and Lawful Permanent Residents
        (June 15, 2017) ...................................................... 868

    Letter from State Attorneys General to
        Attorney General of the United States
        (June 29, 2017) ....................................................... 872

    Letter from Attorney General to Acting
        Secretary of Homeland Security
        (Sept. 4, 2017).......................................................... 877


Other materials from the record:

    Declaration of Maria De La Cruz Perales
        Sanchez in support of motion for summary
        judgment and motion for preliminary injunc-
        tion (17-cv-02325 D. Ct. Doc. 28-8)
        (Dec. 15, 2017) ........................................................ 879

    Declaration of Eliana Fernandez in support of
        motion for preliminary injunction
        (16-cv-04756 D. Ct. Doc. 123-13)
        (Dec. 15, 2017) ........................................................ 889

    Declaration of Carolina Fung Feng in support of
        motion for preliminary injunction
        (16-cv-04756 D. Ct. Doc. 123-13)
        (Dec. 15, 2017) ........................................................ 894

    Declaration of Martin Batalla Vidal in support of
        motion for preliminary injunction
        (16-cv-04756 D. Ct. Doc. 123-13)
        (Dec. 15, 2017) ........................................................ 902

AR2667

IV

Table of Contents—Continued:                                    Page

Declaration of Jirayut Latthivongskorn in
    support of motion for provisional relief
    (17-cv-05211 D. Ct. Doc. 118-1)
    (Nov. 1, 2017)...........................................................915

Declaration of Dulce Garcia in support of motion
    for provisional relief
    (17-cv-05211 D. Ct. Doc. 117)
    (Nov. 1, 2017)...........................................................932

Declaration of Mitchell Santos Toledo in support
    of motion for provisional relief
    (17-cv-05211 D. Ct. Doc. 119-1)
    (Nov. 1, 2017)...........................................................953

Declaration of Joel Sati in support of motion for
    provisional relief
    (17-cv-05211 D. Ct. Doc. 119-1)
    (Nov. 1, 2017)...........................................................965

Letter from President to House and Senate lead-
    ers, attached to motion for provisional relief
    (17-cv-05211 D. Ct. Doc. 124)
    (Nov. 1, 2017)...........................................................981

U.S. Citizenship and Immigration Services,
    Number of Form I-821D, Consideration of
    Deferred Action for Childhood Arrivals, Fis-
    cal Year 2012-2017, attached to complaint
    (17-cv-05235 D. Ct. Doc. 1-3)
    (Sept. 11, 2017).........................................................996

Justice News:  Attorney General Sessions Deliv-
    ers Remarks on DACA, attached to motion
    for provisional relief
    (17-cv-05211 D. Ct. Doc. 121-2)
    (Nov. 1, 2017)...........................................................999

AR2668

V

Table of Contents—Continued:                        Page

Excerpt from deposition of Gene Hamilton, at-
    tached to motion for preliminary injunction
    (16-cv-04756 D. Ct. Doc. 123-9)
    (Dec. 15, 2017) ..................................................... 1005

Excerpt from defendant's objections and re-
    sponses to plaintiffs' first set of requests for
    admission to Acting Secretary of Homeland
    Security, attached to motion for preliminary
    injunction
    (16-cv-04756 D. Ct. Doc. 123-4)
    (Dec. 15, 2017) ..................................................... 1008

Excerpt from defendant's objections and re-
    sponses to plaintiffs' first set of requests for
    admission to Attorney General, attached to
    motion for preliminary injunction
    (16-cv-04756 D. Ct. Doc. 123-4)
    (Dec. 15, 2017) ..................................................... 1012

**AR2669**

376

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN JOSE)

———————

Case No. 3:17-cv-05813-WHA

COUNTY OF SANTA CLARA AND SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521, PLAINTIFFS

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES; JEFFERSON
BEAUREGARD SESSIONS, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE UNITED STATES; AND
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY; AND U.S. DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

———————

Filed: Oct. 10, 2017

———————

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

———————

**INTRODUCTION**

1. Plaintiffs County of Santa Clara ("County") and Service Employees International Union Local 521 ("Local 521"), acting in its capacity as the representative of more than 10,000 County employees, challenge the actions of Defendants President Donald J. Trump, Attorney General Jefferson Beauregard Sessions, and Acting Department of Homeland Security ("DHS") Secretary Elaine Duke related to the rescission of the Deferred Action for Childhood Arrivals ("DACA") program. DACA affords a two-year period of "deferred

**AR2670**

377

action" status for young people who were brought to this country as children, meaning that recipients are not subject to immigration enforcement actions during that time.   Recipients are also afforded the opportunity to receive work authorization, allowing them to work legally, report income, and pay taxes.   Because of DACA, approximately 800,000 young people, brought to this country as children, have been able to come out of the shadows of American life, work legally to support themselves and their families, go to school, pay taxes, and participate more fully in their communities. The DACA program has been hugely successful.   But the benefits the program provided communities locally and nationally are now at risk, as are the futures of DACA recipients.

2.    Because of the stringent requirements governing eligibility for the DACA program from its inception, DACA recipients are undeniably contributing members of society who pose no threat to public safety or national security.   These individuals find themselves on the wrong side of America's immigration laws through no fault of their own, and have made substantial contributions to their communities despite the constant threat of removal they faced prior to receiving DACA status.

3.    DACA has conferred innumerable benefits on recipients, their families, and their communities.   DACA recipients can live their lives in the open and more fully participate in civic life, including by working legally, attending college (and receiving financial aid to do so), opening bank accounts, paying taxes, and living free of the daily fear of deportation.   The families of DACA recipients benefit from the higher wages many recipients are able to earn and the stability of knowing that loved ones will not be separated.   The communities in

378

which DACA recipients live benefit not only from the taxes paid by recipients as they work legally and report income, but also from DACA recipients' increased willingness to interact with government institutions, such as by contacting and cooperating with law enforcement.

4. To induce individuals to apply for DACA, the federal government assured potential applicants that the information they provided in connection with the program would not be used for immigration enforcement. These representations, made consistently throughout the life of the DACA program, were crucial to encouraging participation. The government asked DACA applicants to take a leap of faith in identifying themselves and, indirectly, their families, to the very government agency that possesses the authority to detain them and ultimately to deport them from the country. DACA applicants were asked to provide information concerning, among other things, their names, addresses, places of birth, dates of entry to the United States, and any criminal histories. Because of the huge risk undertaken by DACA applicants in providing this information to the federal government, most were willing to do so only in reliance on the government's repeated assurances that this information would not be used for immigration enforcement purposes.

5. The DACA program also provided recipients the opportunity to renew their deferred action status at the end of each two-year period for which status is granted. From the time that DACA was implemented until Defendants' recent actions, the federal government has consistently assured DACA applicants that they will remain eligible for renewed status and work authorization as long as they comply with all of the conditions of the program. This opportunity to renew

379

is a critical aspect of the program because it would make little sense for individuals to risk coming forward to identify themselves as lacking regular immigration status in exchange for a temporary benefit. Similarly, it would make little sense for employers, like the County, to expend the time and resources to hire and train DACA recipients if their work authorization were so limited.

6. Despite the program's extensive benefits, on September 5, 2017, Acting Secretary Duke issued a memorandum formally rescinding DACA. The memorandum stated that DHS would not consider any initial DACA applications received after September 5, 2017 and explained that those individuals who currently have DACA status and work authorization would no longer be able to renew that status after October 5, 2017. Unlike the administrative actions creating the DACA program, which afforded officials significant discretion to decide on a case-by-case basis when it is appropriate to grant deferred action status and work authorization, the policy announced by Acting Secretary Duke's September 5 memorandum is categorical— the DACA program is discontinued and no individual, no matter how deserving, will be able to apply for deferred action and work authorization pursuant to DACA. Acting Secretary Duke's memorandum did not explain the administration's reasons for rescinding DACA (other than to speculate that it may be held unlawful, despite the federal government's previous position to the contrary), and gave no indication that the administration had considered the benefits of the program before ending it so abruptly.

7. Defendants' actions in rescinding the DACA program are unlawful. First, they violate the Due

380

Process Clause of the Fifth Amendment because they deprive Plaintiffs of constitutionally protected interests, including Plaintiffs' interests in their mutual employment agreements and DACA recipients' interest in the continuation of the DACA program, upon which they have been induced to rely.   Indeed, the DACA program permitted recipients to work legally, to participate in other government programs, to open bank accounts, and to participate in civic life in myriad ways which will now be unavailable to them.   Each of these activities gives rise to an interest protected by the Due Process Clause.   Yet, deprivation of these interests has been accomplished without the due process required by law.   Moreover, insofar as the government uses the information provided by DACA applicants for immigration enforcement purposes—and having broken one promise, there is no reason to believe that Defendants intend to keep this subsidiary promise—such use will independently violate the Due Process Clause.   Under the Due Process Clause the government may not induce vulnerable individuals to share information to obtain a benefit with the promise that such information will not be used against them, only to turn around and use that information against them.   Immigration enforcement, like all government law enforcement, must be fundamentally fair.

8.   Second, Defendants' actions violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), because they constitute arbitrary and capricious decision-making.   Indeed, this case presents an archetypal example of arbitrary decision-making in that Defendants have terminated a program implemented five years ago, and upon which millions of Americans (DACA recipients, their families, and employers) have come to rely, with no explanation whatsoever for the abrupt

**AR2674**

381

about-face, much less the type of careful analysis one would expect before such a consequential action is taken.   The APA requires that administrative agencies provide a reasoned explanation for their actions, and this obligation is especially important where the agency action in question reverses a prior policy that has engendered reliance by affected parties.   Defendants' total disregard for Plaintiffs' and similarly situated parties' reliance on the DACA program is evident in their failure to provide any reasoned explanation for the rescission that takes into account the program's benefits.

9.   Third, Defendants' actions violate the Equal Protection component of the Fifth Amendment.   The Fifth Amendment requires that the federal government afford all individuals equal protection of the laws and refrain from discriminating against disfavored classes.   In this case, it is inarguable that the rescission of DACA falls most heavily on two historically persecuted minorities, Latinos and Mexican immigrants.   Indeed, 93% of the approved DACA applications (initial and renewal) since the program was implemented are from immigrants from Latin America and almost 80% are from immigrants from Mexico. Moreover, there is extensive evidence, not least of which are the President's own statements, that the rescission was motivated by impermissible animus.   Two years ago, the President launched his campaign by announcing:   "When Mexico sends its people, they're not sending their best.  .  .  .   They're sending people that have lots of problems, and they're bring those problems with us [sic].   They're bringing drugs.   They're bringing crime.   They're rapists."   This hostility toward immigrants, and particularly Mexican immigrants, remained a theme throughout his campaign and the

382

first months of his administration. Coupled with the lack of a legitimate explanation for the rescission and the irregular (and unlawful) process by which the rescission was accomplished, the President's repeated statements of animus show that the rescission was motivated by animus in violation of the Fifth Amendment.

10. For all of these reasons, Plaintiffs ask this Court to declare the rescission of DACA unlawful and unenforceable, and to enjoin and restrain Defendants from taking further steps to rescind the program. Further, the Court should declare that Defendants are equitably estopped from rescinding the program or using information provided in connection with DACA applications for purposes of immigration enforcement, and should enjoin and restrain Defendants from doing so. The DACA program has worked to the benefit of DACA recipients, their employers, local communities, and American society as a whole. All of these stakeholders deserve better.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201-2202, because this action arises under the Due Process Clause and Equal Protection component of the Fifth Amendment and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* This Court has additional remedial authority under the APA, 5 U.S.C. §§ 701-06.

12. There exists an actual and justiciable controversy between Plaintiffs and Defendants requiring resolution by this Court. Plaintiffs have no adequate remedy at law.

AR2676

383

13.   Venue is proper in the Northern District of California because Plaintiff County of Santa Clara is a public entity in this judicial district and a substantial part of the events or omissions giving rise to this action have occurred or will occur in this District.   28 U.S.C. §§ 1391(b)(2), 1391(e)(1).   Plaintiff Local 521 is located in the Northern District of California and many of its members, on behalf of whom it brings this lawsuit, reside and are employed within the Northern District of California.   This is a civil action in which Defendants are agencies of the United States or officers thereof and no real property is involved in this action.

14.   Intra-district assignment is proper in San Jose pursuant to Local Rules 3-2(c) and (e) because a substantial part of the events or omissions which give rise to Plaintiffs' claims occurred in Santa Clara County.

## PARTIES

15.   Plaintiff County of Santa Clara is a charter county organized and existing under the laws of the State of California.   With an estimated population of more than 1.9 million people, Santa Clara County is the largest county in the Bay Area and the sixth largest county in California.   As a county of immigrants, the County has especially benefited from DACA and is especially harmed by the program's rescission.   Thirty-eight percent of Santa Clara County residents are foreign born, and approximately sixty percent of children in the county have at least one parent who is foreign born.   Santa Clara County has the highest percentage of foreign-born residents of all counties in California. More than half of county residents speak a language other than English at home, and more than 100 languages and dialects are spoken within the county.

**AR2677**

384

16.   The County is the level of government tasked with provision of core safety-net services to this diverse community; it employs a workforce of more than 18,000, and must ensure that this workforce possesses the skills necessary to effectively serve this community. The County employs DACA recipients in key positions throughout the organization, providing upward mobility to young people who deserve the opportunity to serve their communities through the public sector, and leveraging the unique experience and skills these employees bring to the County government.

17.   The County also operates the In-Home Supportive Services ("IHSS") program, which provides in-home care in the form of assistance with activities of daily living, to eligible aged, blind, and disabled individuals who would otherwise be unable to remain safely in their own homes.   The IHSS program is funded through a combination of federal, state, and county funds, and provides services to over 22,000 IHSS beneficiaries in Santa Clara County.

18.   Plaintiff Service Employees International Union Local 521 is a labor union that represents approximately 40,000 public- and private-sector workers in the central Bay Area and California's Central Valley, including more than 10,000 who are employed by the County of Santa Clara.   Local 521 is an affiliate of the Service Employees International Union ("SEIU"), which represents 2.2 million working men and women around the world.   A large percentage of Local 521's membership is Latino and many are first-generation immigrants.   The primary mission of Local 521 is to organize, represent, and empower employees.

**AR2678**

385

19.   In addition, Local 521 works in partnership with SEIU and other groups to combat discrimination and mobilize for immigration reform at the national level.   Local 521's efforts include its Committee on Comprehensive Immigration Reform, a member-based committee that engages in organizing, advocacy, and education to help undocumented workers.   Local 521 has conducted "know your rights" information sessions and workshops, engaged in legislative advocacy on immigration-related bills at the state level, held community forums on DACA and Deferred Action for Parents of Americans and Lawful Permanent Residents in conjunction with the California Attorney General, and participated as an amicus in litigation brought by the County of Santa Clara and others challenging the Trump administration's threat to cut off federal funding to sanctuary cities and counties.   Local 521 has members who are DACA recipients, including members who work for the County of Santa Clara. These members are able to work and, thus, to be Local 521 members, because of the work authorization they obtain through the DACA program.

20.   Local 521 brings this action as an associational plaintiff on behalf of its members who are DACA recipients, asserting claims on behalf of those members. Local 521 also brings this lawsuit to protect the rights and interests of its members and prospective members, to preserve its ability to organize new members who are DACA recipients, and to preserve its representational relationship with current DACA recipients.

21.   Defendant Donald J. Trump is the President of the United States.   President Trump made the decision to rescind the DACA program and is sued in his official capacity.

AR2679

386

22. Defendant Jefferson Beauregard Sessions is the Attorney General of the United States. Attorney General Sessions announced the rescission of the DACA program and has ultimate authority over the Department of Justice's prosecution of violations of immigration laws. He is sued in his official capacity.

23. Defendant Elaine Duke is the Acting Secretary of the Department of Homeland Security ("DHS"). Acting Secretary Duke is responsible for managing DHS, and oversees the United States Citizenship and Immigration Service ("USCIS") and the Immigration and Customs Enforcement ("ICE"). Her responsibilities include the administration and enforcement of policies and practices related to DACA. She is sued in her official capacity.

24. Defendant DHS is a federal agency responsible for implementing, administering and enforcing the nation's immigration laws and policies, including the DACA program. DHS is a Department of the Executive Branch and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## FACTUAL BACKGROUND

### The DACA Program

25. DHS announced the DACA program in 2012, in a memorandum issued by former DHS Secretary Janet Napolitano. The reasoning behind the program was that it made no sense to punish individuals who were brought to the United States as children, through no fault of their own, and who had proven themselves to be trustworthy, contributing members of their communities. DACA was also intended to generate the wide-reaching benefits that would accrue to recipients, their families and their communities, as undocumented

387

individuals were permitted to live and work without the ever-present threat of deportation.

26.   DACA allows people who were brought to the United States as children and who meet certain criteria to apply for temporary deferral of deportation (sometimes referred to as "deferred action") and for work authorization.   According to USCIS, as of March 31, 2017, approximately 800,000 young people have been granted deferred action under DACA in the five years the program has been in place.   Applicants are eligible for deferred action status under DACA only if they: (i) were under the age of 31 on June 15, 2012; (ii) were brought to the United States before their 16th birthday; (iii) continuously resided in the United States since June 15, 2007 to the present; (iv) were physically present in the United States on June 15, 2012, and at the time they made their DACA application; (v) did not have lawful immigration status on June 15, 2012; (vi) are currently in school, have graduated or obtained a GED, or were honorably discharged from the United States military or Coast Guard; and (vii) have not been convicted of a felony, significant misdemeanor, or three or more misdemeanors, and do not pose a threat to national security or public safety.

27.   To apply for deferred action status under DACA, applicants are required to pay a substantial fee of $495, submit a detailed application, and submit to a background check and any other screening that DHS deems necessary.

28.   Pursuant to DACA, deferred action status, as well as work authorization, is granted for two-year periods.   From the time DACA was first implemented, however, applicants were told that they would have the opportunity to apply for renewal of deferred action sta-

388

tus and were given detailed instructions for doing so. In particular, recipients were instructed that they should apply for renewal approximately 120 days (but no more than 150 days) before the expiration of their 2-year period.   Recipients were told that they would be eligible for renewal if they met the requirements for an initial DACA application and also:   (i) had not departed the United States on or after June 15, 2007; (ii) continuously resided in the United States since submission of their most recent DACA application; and (iii) had not in the interim been convicted of a disqualifying crime or otherwise posed a threat to national security or public safety.   The opportunity to renew is a crucial aspect of the DACA program.   There is little reason for eligible individuals to run the risk of identifying themselves as lacking regular immigration status for a temporary benefit and, similarly, there is little reason for employers to take the time and effort to hire and train DACA recipients who have received work authorization unless there is some assurance that those individuals will be eligible to renew that authorization.

29.   As part of the DACA application process, Defendants solicited extensive information from DACA recipients, including names, addresses, birthdates, country of origin, and educational and criminal history. Most significantly, by issuing an open invitation to apply for DACA, the government asked undocumented immigrants to take a leap of faith and identify themselves and, indirectly, their families to the federal government and acknowledge their undocumented status. To assuage fears that the DACA program was a cynical trap, Defendants expressly promised that the information provided by DACA applicants would not be used against them or their families for immigration enforcement purposes, except in narrow, specified cir-

389

cumstances that would not normally apply to individuals eligible for DACA.

30.     The DACA program has been tremendously successful, creating much-needed stability for DACA recipients, their families and their communities, which has resulted in extensive benefits to all of those groups. Under DACA, law-abiding, long-term U.S. residents who lack legal immigration status have access to better jobs and improved working conditions.   Because undocumented immigrants who lack work authorization must seek jobs that minimize their risk of being identified and deported, they often do not work in jobs that best fit their education, skills, and abilities, or those that would maximize their earning potential.   Patrick Oakford, Center for American Progress, *Administrative Action on Immigration Reform, The Fiscal Benefits of Temporary Work Permits*, at 6 (September 2014), available at: https://cdn.americanprogress.org/wp-content/uploads/2014/09/OakfordAdminRelief.pdf  (last  visited Oct. 9, 2017).   Making workers eligible to apply for deferred action and work permits allows them greater occupational mobility, enabling them to seek out a wider range of potential career opportunities.   Moreover, "[t]he interaction between our broken immigration system and employment and labor laws have made undocumented workers more susceptible to exploitation in the workplace, leading them to earn lower wages than they otherwise could."   *Id.* at 5.   Eliminating the fear of retaliatory reporting of immigration violations and potential deportation allows these workers to better protect their own workplace rights and those of their co-workers, leading to higher real wages and fewer violations of employment and labor laws and regulations.

390

31.   Those who have received DACA status enjoy increased earning potential, producing a positive multiplier effect on local economies.   Fiscal Policy Institute, *President's Immigration Action Expected to Benefit Economy* (Nov. 21, 2014), available at:   http://bit.ly/1FbnS7q (last visited Oct. 9, 2017) (estimating that wages for those eligible for work authorization will increase by five to 10 percent); Oakford, *Administrative Action on Immigration Reform, The Fiscal Benefits of Temporary Work Permits*, at 3 ("Temporary work permits would increase the earnings of undocumented immigrants by about 8.5 percent as they are able to work legally and find jobs that match their skills.").   Indeed, the upward mobility afforded by DACA is apparent from the results of a national survey of 1,402 young adults who were approved for DACA through June 2013:

> Since receiving DACA, young adult immigrants have become more integrated into the nation's economic institutions.   Approximately 61% of DACA recipients surveyed have obtained a new job since receiving DACA.   Meanwhile, over half have opened their first bank account, and 38% have obtained their first credit card.

Roberto G. Gonzales and Veronica Terriquez, American Immigration Council, *How DACA is Impacting the Lives of Those who are now DACAmented:   Preliminary Findings from the National UnDACAmented Research Project* (Aug. 15, 2013), available at:   http://bit.ly/1jaS0tq (last visited Oct. 9, 2017).   In short, DACA created significant economic benefits for qualifying individuals and for the nation at large by permitting greater levels of contribution to the workforce by edu-

AR2684

391

cated individuals who previously had limited employment opportunities.

**The County's Employment Relationships With DACA Recipients**

32.  The County is one of the largest employers in the region, with more than 18,000 employees performing a vast array of functions to meet the needs of this diverse community.  One of the main ways in which the County has benefited from the DACA program is through its employment relationships with DACA recipients.  In particular, the County currently employs many DACA recipients as full-time employees.  The County has expended significant resources, both time and money, in training these employees and relies upon them to provide County services.  Because DACA recipients are under no obligation to identify themselves as such when they apply for a job, and they present the same form of work authorization card as other categories of immigrants, the County cannot determine with certainty the total number of DACA recipients it employs.

33.  DACA recipients are also employed through the County's In-Home Supportive Services program, which is funded through a combination of federal, state, and county funds.

34.  DACA recipients have special skills that make them especially valuable employees of the County. For example, over ninety-five percent of DACA recipients are bilingual.  The County values this skill because it must employ a workforce that is able to meet residents' language needs to ensure meaningful access to County services, programs, and benefits.  *See* County of Santa Clara, Board Policy 3.58.  Indeed, forty-six percent of clients currently receiving health, financial,

AR2685

392

or employment assistance through the County Department of Employment and Benefit Services speak a primary language other than English. Santa Clara Valley Medical Center, a public hospital owned and operated by the County, is required by law to provide qualified interpreters to limited-English-proficient individuals and relies on medical interpreters to satisfy that requirement. It takes an average of five to six months to fill interpreter vacancies for the County's hospital and clinics, and the County has had difficulty filling several open positions.

35. If the DACA recipients currently employed by the County were to lose their work authorization, the County would be forced to expend significant resources to temporarily cover those employees' responsibilities, conduct searches for replacements, and train new employees. On average, it takes the County 81 days to fill a vacancy. Nearly all County employees, including Local 521 members, are covered by merit system rules and collective bargaining agreements that protect them against arbitrary dismissal and other adverse employment actions, and that include anti-discrimination provisions. Despite these protections, County employment is contingent on valid work authorization. Without the DACA program, these valued employees will be unable to work for the County or, indeed, to work in any legal capacity for any employer, public or private, within Santa Clara County or the United States.

36. The County also employs at least three DACA recipients in its New Americans Fellowship Program. This program aims to identify, recruit, develop, and equip DACA-eligible youth with the skills and tools to serve as ambassadors to the Santa Clara County community. Fellows commit to working at least 20 hours

AR2686

393

per week, for a period of no less than 10 weeks, on a project-based fellowship under the supervision of a County Department, the County Office of Immigrant Relations, or a Member of the Board of Supervisors' Office.   Examples of the types of projects on which fellows work include:

- Research on improving/bridging relationships between law enforcement and the immigrant community;

- Developing a plan for a "Community Safety Initiative" focused on establishing problem-solving relationships between the immigrant and refugee population and local law enforcement;

- Developing the framework for a "Civics Empowerment Education Program" to establish the curriculum for immigrants and refugees who want to learn more about law and policy;

- Creating a training in civic participation to inform the community about federal, state, and county government structures and delivering presentations to decision-making bodies;

- Providing information to the undocumented population, including the following:  know your rights at home, in the work place, and when seeking services via immigration consultants;

- Fraud prevention and education;

- Drafting or updating existing resources on family emergency plans;

- Increasing awareness of public services programs such as Medi-Cal, CalFresh, and Covered California;

394

- Launching a countywide campaign to promote financial literacy among immigrants and refugees; and

- Collaborating with banking institutions on providing financial planning tools for immigrants and refugees.

37.    The County began the New Americans Fellowship Program in July 2017.   Since that time, 20 fellows have participated in the program and contributed significantly to the County and their communities.   The County assigned ten fellows to County departments and community-based organizations throughout Santa Clara County and ten fellows participated in the "Silicon Valley Dream Summer," a fellowship program that places immigrant youth at community-based and social justice organizations.    The County has allocated funding to support additional fellows during the 2017-2018 fiscal year, but planning for the next cohort of fellows has been put on hold due to Defendants' actions.    Like other forms of County employment, the New Americans Fellowship Program cannot survive Defendants' rescission of DACA, for once existing work authorizations expire, DACA participant-employees will no longer be able to work for the County and the County will lose this bridge to their communities.

**Reliance on the DACA Program and the Government's Representations**

38.    Trusting the federal government's representations about the program, hundreds of thousands of young people from across the country have applied for and received DACA status since the program was initiated in 2012.   The DACA program has changed the lives of DACA recipients.   Prior to DACA, many law-abiding undocumented young people saw little pur-

AR2688

395

pose to completing higher education because they would be unable to work legally upon graduation. DACA gave them the ability to attend college, work to earn money to pay for higher education, and to utilize their degrees to attain high-skilled jobs.   It also gave them access to health care, and the opportunity to become more integrated into their communities.   DACA gave these young people hope that a better life was possible, and allowed them to emerge from the shadows of society to serve their communities, including through work for government agencies like the County of Santa Clara.

39.   Loss of DACA status and work authorization would be devastating for County workers who depend on the DACA program to maintain employment, health insurance, and other benefits.   Indeed, several County employees with DACA status desired to join as individual plaintiffs in this litigation challenging the DACA rescission, but ultimately chose not to come forward out of fear that Defendants would retaliate against them or their families.

40.   The County has also relied on the government's representations concerning the DACA program. The County has expended significant time and financial resources in hiring and training DACA recipients for various positions in County.   Those employees carry out important functions in County government and make significant contributions in providing services to County residents.   There is little reason for employers like the County to take the time and effort to hire and train DACA recipients who have received work authorization unless there is some assurance that those individuals will be eligible to renew that authorization.

396

**Other Benefits to the County from the DACA Program**

41.   Santa Clara County is home to Silicon Valley, where many of the country's leading high-tech and Internet-based companies are located.   Technology companies based in the county, including Apple and Google, employ tens of thousands of workers.   Similarly, health care providers, including Kaiser Permanente, Stanford Hospital and Clinics, and the County's own hospital and clinics, employ additional tens of thousands.   Many of these organizations employ DACA recipients.   For example, Tim Cook, CEO of Apple, recently noted that 250 Apple employees are "Dreamers," or DACA recipients.   Silicon Valley is projected to face a shortfall of 72,500 private sector workers by the year 2020, and immigration policies such as DACA, which increase the availability of skilled workers, help address this shortfall.   Indeed, Silicon Valley has long been reliant on the contributions of immigrants.   One study noted that immigrants launched a quarter of all engineering and technology companies in the United States from 1995 to 2005, Vivek Wadhwa et al., *America's New Immigrant Entrepreneurs: Part I*, Duke Science, Tech. & Innovation Paper No. 23 (Jan. 4, 2007), available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=990152## (last visited Oct. 9, 2017), and over half of Silicon Valley start-ups in the same period count at least one immigrant as a key founder, Richard T. Herman, Immigrant, Inc.:   Why Immigrant Entrepreneurs Are Driving the New Economy (and how they will save the American worker) 5 (2009).

42.   In 2016, the Migration Policy Institute (MPI) estimated that there were 23,000 DACA-eligible individuals in Santa Clara County, including 15,000 who

397

were immediately eligible. MPI, Deferred Action for Childhood Arrivals Data Tools, available at: http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles (last visited Oct. 9, 2017). According to MPI's estimates, Santa Clara County has the twelfth largest DACA-eligible population among counties nationwide, and the largest DACA-eligible population of all northern California counties. MPI, National and County Estimates of Populations Eligible for Deferred Action for Childhood Arrivals Program, 2016, available at: http://www.migrationpolicy.org/sites/default/files/datahub/State-County-DACA-Estimates.xlsx (last visited Oct. 9, 2017).

43. Ninety-one percent of DACA recipients are employed. John W. Schoen, *DACA Deportations Could Cost US Economy More than $400 Billion*, CNBC.com (Sept. 5, 2017), available at: https://www.cnbc.com/2017/09/05/daca-deportations-could-cost-us-economy-more-than-400-billion.html (last visited Oct. 9, 2017). It is estimated that if DACA recipients lose the ability to work legally, California alone would suffer a GDP loss of approximately $11.3 billion a year. *Id.* As one of the counties with the largest number of DACA recipients, much of this negative economic effect will be felt in Santa Clara County.

44. Moreover, because they are able to work legally, DACA recipients are employed in more highly compensated jobs and contribute more in state and local taxes than they would without DACA. One recent study estimates that the 1.3 million young people immediately eligible for DACA contribute $2 billion a year in state and local taxes. Institute on Taxation and Economic Policy, *State & Local Tax Contributions of Young Undocumented Immigrants* (Apr. 25, 2017),

398

available at: https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants/ (last visited Oct. 9, 2017). Indeed, "DACA-eligible individuals pay on average 8.9 percent of their income in state and local taxes. Their effective tax rate is higher than the average rate paid by the top 1% of taxpayers in state and local taxes. . . . " *Id.* "Repealing the temporary legal status and work authorizations permitted by DACA would reduce estimated state and local revenues by nearly $800 million. . . . " *Id.* The same study estimates that DACA eligible individuals contribute more than $530 million in state and local taxes in California alone and, because Santa Clara County has a large number of DACA-eligible residents, the County stands to lose significant tax revenue because of the rescission of DACA.

45. In addition to its broad negative effects on the County's economy and fisc, the rescission of DACA will make it more difficult and expensive for the County to provide services to its residents. For example, DACA recipients who do not have employer-sponsored insurance and who satisfy income-eligibility requirements qualify for "full-scope" coverage under Medi-Cal, California's Medicaid program. Through Medi-Cal, DACA recipients receive coverage for a core set of health benefits, including preventative care, doctor's visits, immunizations, prescriptions, and mental health and substance abuse services. If these individuals lose deferred action status, they will be eligible only for very limited Medi-Cal coverage of emergency and pregnancy-related services, increasing their reliance on other safety-net health care services provided by the County.

399

46.   The County operates the Santa Clara Valley Medical Center ("SCVMC"), a public safety-net Level I trauma hospital that provides critical health care services to poor and uninsured County residents.   Payments from these patients and from public insurance programs such as Medi-Cal do not cover the costs of services they receive at SCVMC.   As a result, each year the County provides a substantial subsidy to SCVMC to cover deficits incurred by SCVMC in serving these patients.   During the first three quarters of Fiscal Year 2017, SCVMC operated at a deficit of well over $90 million.   Rescission of the DACA program will negatively affect SCVMC.   Because DACA recipients who are now employed pursuant to work authorization granted under the program will lose their jobs— and their employer-sponsored health insurance— former DACA recipients, and family members who were covered by the recipient's insurance, are more likely to fall back on safety-net hospitals like SCVMC. Additionally, lacking employer-sponsored health insurance, unable to access full-scope Medi-Cal, and burdened with a fear of detention and deportation, these individuals are less likely to obtain regular check-ups and routine, preventative care.   As a result, they will be more likely to seek medical care only when health problems worsen—often at SCVMC's Emergency Department—at which point care becomes more difficult and more expensive.   The rescission of DACA will increase the County's costs in subsidizing free and below-cost care at SCVMC.

47.   In addition to health care, the County provides (and is often required to provide) many other services to community members regardless of immigration status, and it will become more difficult to provide these services to DACA recipients after they lose deferred

400

action status because of their renewed hesitancy to interact with the government for fear of detention and deportation.   At the same time, it will be even more critical for individuals who lose DACA status to access County services—and the County will need to spend more to support them—because the same individuals will be losing work authorization and, thus, the ability to work legally to support themselves and their families.

48.   For example, the County invests significant resources in programs to provide housing to the homeless and to prevent homelessness.   In fiscal year (FY) 2015, the County allocated over $73.8 million in resources to housing and related services countywide and, in 2015, the Board of Supervisors approved increasing these expenditures by a total of $33.9 million over FY 2016-2018.   In addition to providing housing to homeless individuals and families who utilize other County services, the County also funds homelessness prevention and emergency housing programs, including homeless shelters, a cold weather shelter program, interim housing for the chronically homeless, and 24-hour care shelter placements.   Because DACA recipients are able to obtain work authorization and work legally, the program has helped recipients support themselves and their families, greatly reducing their risk of homelessness and reliance on County services. These benefits are lost with rescission of the DACA program.

49.   The DACA program also reduces reliance on the County's safety-net services by keeping families together.   Twenty-five percent of DACA recipients have at least one U.S.-born child.   Dara Lind, *9 facts that explain DACA, the immigration program Trump*

*is threatening to end*, Vox.com (Sept. 5, 2017), available at: https://www.vox.com/policy-and-politics/2017/8/31/16226934/daca-trump-dreamers-immigration (last visited Oct. 9, 2017). If these parents lose DACA status and are subject to deportation, some of their U.S. citizen children may enter the foster care system. The County provides financial support to foster parents to meet the basic needs of foster youth placed in their care. In the 2017 fiscal year, the County invested $25 million in foster care youth, and rescission of the DACA program could bring more young people into the system, increasing costs and placing greater strains on County resources.

50. Rescission of DACA would also hinder the County's ability to protect the public health and the safety of its residents. The County's Public Health Department ("PHD") runs numerous programs that protect the health not only of the individual served, but of the wider community. PHD provides immunization clinics, tuberculosis testing, STD testing, and other services that prevent the spread of communicable diseases. DACA has improved PHD's ability to provide these critical services to immigrant communities by alleviating the fear of deportation that often prevents undocumented immigrants from seeking government services. If DACA recipients lose their deferred action status, they—and their U.S. citizen children—may be less likely to receive necessary immunizations and testing, thereby increasing health risks for the community as a whole.

51. For similar reasons, DACA has had a positive effect on the relationship between immigrant communities and local law enforcement. Because of a justified fear of detention and deportation, undocumented

402

individuals are often hesitant to contact law enforcement even when they are victims of crimes. By providing an assurance that they are protected from immigration enforcement actions, DACA has permitted recipients to be more willing to report crimes, act as witnesses, and otherwise cooperate with local law enforcement, as well as with other emergency services and first responders. This improved relationship is invaluable not just to DACA recipients themselves, but also to their communities and the County.

52.    DACA has had a similar effect on the County's Code Enforcement Division, which enforces zoning and building ordinances to ensure safe living conditions for county residents. The County has received reports that some tenants are reluctant to come forward with reports of code violations because landlords have threatened to report immigrants to ICE. DACA status substantially reduces that threat, thereby helping the County ensure that unsafe or unsanitary housing conditions are abated for the safety and benefit of the entire community.

53.    DACA's benefits to the County are also evidenced by the County's willingness to invest in DACA recipients. For example, the County previously allocated $200,000 for outreach and education concerning the DACA program, to ensure that eligible County residents know of and have support necessary to apply for DACA status. Just after the administration's announcement that DACA would be rescinded, the County allocated an additional $200,000 from its emergency reserve to establish an emergency program to help DACA recipients submit renewal applications before the administration's arbitrary October 5, 2017 deadline. Additionally, the County has allocated

403

$400,000 to the New Americans Fellowship Program, described above.

54. In light of the many ways in which the County has benefited from the DACA program, on August 15, 2017, the County's Board of Supervisors unanimously adopted a resolution affirming its support for the DACA program and its commitment to immigrant youth and young adults.

**Rescission of the DACA Program**

55. The administration's decision to rescind the DACA program was announced by Attorney General Jefferson Sessions at a press conference on September 5, 2017. In his statement, Attorney General Sessions made a number of factual assertions concerning the DACA program that are demonstrably false, including the statement that DACA had "denied jobs to hundreds of thousands of Americans" and that DACA "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences." Notably, the Attorney General provided no evidence to support these assertions and gave no indication that the administration had studied DACA or its effects in any meaningful or systematic fashion. Rather, he simply assumed that DACA had negative effects, completely ignored the program's positive effects, and concluded that "[o]ur collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the [Deferred Action for Parents of Americans and Lawful Permanent Residents] program."

56. Shortly after the press conference, Acting Secretary Duke issued a memorandum formally rescinding DACA. The memorandum stated that DHS would not consider any initial DACA applications received after

**AR2697**

404

September 5, 2017. As for individuals who currently have DACA status and work authorization, the memorandum stated that DHS would adjudicate pending renewal requests properly filed and accepted by DHS as of September 5, 2017, and renewal requests properly filed and accepted by DHS by October 5, 2017 from individuals whose DACA benefits expire between September 5, 2017 and March 5, 2018. All other DACA renewal requests, including any requests received after October 5, 2017, would be rejected.

57. Acting Secretary Duke's memorandum did not explain the administration's reasons for rescinding DACA and gave no indication that the administration had considered the benefits of the program before abruptly ending it. Rather, the memorandum simply refers to the Attorney General's speculation that the DACA program may be held unlawful, explaining that the Fifth Circuit had held *different* programs (Deferred Action for the Parents of Americans and Lawful Permanent Residents ("DAPA") and an expansion of the DACA) to be unlawful, and that this decision was affirmed by an equally divided Supreme Court. Secretary Duke's memorandum cites a September 4, 2017 letter from Attorney General Sessions, which provides no legal analysis whatsoever and simply concludes that "it is likely that potentially imminent litigation would yield similar results with respect to DACA."

58. On the same day that Attorney General Sessions announced the rescission of DACA, DHS published guidance in the form of "frequently asked questions" ("FAQs") concerning the rescission of DACA. These FAQs reflect a changed orientation toward the use of DACA applicants' information for immigration enforcement. Previously, applicants had been told

405

that "Information provided in [a DACA] request is protected from disclosure to ICE and CBP [U.S. Customs and Border Protection] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance. . . . " USCIS, DACA Frequently Asked Questions, available at: https://www.uscis.gov/archive/frequently-asked-questions (last visited Oct. 9, 2017). By contrast, the September 5, 2017 guidance provides: "Information provided to USCIS in DACA requests will not be *proactively provided* to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance. . . . " DHS, Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017) (emphasis added), available at: https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca (last visited Oct. 9, 2017). This change appears to indicate that information provided by DACA applicants *will* be used for immigration enforcement purposes, and made available to ICE and CBP upon request, even if not "proactively provided."

### FIRST CLAIM FOR RELIEF
### Violation of Due Process
### U.S. Const. amend. V

59.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

60.   The County has a constitutionally protected interest in its employment relationships with its employees, including DACA recipients, as well as protected

406

interests in the benefits that flow from those relation-ships. The County employs DACA recipients as full-time and part-time employees, and as fellows in the County's New Americans Fellowship Program. The County has made significant investments of employee-time and money to hire and train those employees. The rescission of the DACA program, and DACA re-cipients' consequent inability to apply for renewed work authorization, will necessarily result in the ter-mination of those employment relationships. The County will therefore lose not only its investment in these employees, but also the benefit of their expertise and experience.

61. County employees and others who participate in the DACA program, including Local 521 members, have a constitutionally protected interest in their jobs. As a result of the rescission, when their current two-year authorization expires, employees who participate in the DACA program will no longer be able to keep their jobs with the County or with other employers.

62. The County has a constitutionally protected interest in the programs and services it offers to County residents, including the funds expended to support those programs. It will become more difficult to provide these services to DACA recipients after they lose de-ferred action status because of their renewed hesitancy to interact with the government for fear of detention and deportation. At the same time, it will be even more critical for individuals who lose DACA status to access County services—and the County will need to spend more to support them—because the same indi-viduals will be losing work authorization and, thus, the ability to work legally to support themselves and their families.

407

63.   Rescission of the DACA program and Defendants' actions in accordance therewith unlawfully deprive the County, its employees and its residents of these and other constitutionally protected interests without due process of law.   Such deprivation occurred with no notice or opportunity to be heard.

64.   Moreover, to the extent that Defendants seek to use for purposes of immigration enforcement the information that DACA recipients provided in connection with their applications, such use would also violate due process.   The Due Process Clause of the Fifth Amendment requires that the federal government's immigration enforcement actions be fundamentally fair. Defendants induced DACA applicants to provide this information with the express promise that it would not be used against the applicant in immigration enforcement proceedings.   For Defendants to turn around and now use this information as they previously promised they would not, would abuse DACA applicants' trust in government and offend fundamental principles of fairness and justice.

65.   Rescission of the DACA program violated the Due Process Clause of the Fifth Amendment to the United States Constitution.   Likewise, use of the information DACA recipients provided to Defendants as part of their DACA applications to target DACA recipients or their families for removal or to support removal proceedings would violate the Due Process Clause of the Fifth Amendment.

66.   The County, its employees and its residents, and Local 521 and its members have been harmed and continue to be harmed by these unlawful acts.

**AR2701**

408

### SECOND CLAIM FOR RELIEF
#### Violation of Administrative Procedure Act
#### Arbitrary and Capricious Agency Action
#### 5 U.S.C. § 706

67.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

68.   The Department of Homeland Security is subject to the requirements of the APA.   *See* 5 U.S.C. § 703.   The termination of the DACA program is final agency action subject to judicial review because it marks the "consummation of the   .  .  .   decisionmaking process" and is one "from which legal consequences will flow."   *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).

69.   Under 5 U.S.C. § 706(2), courts shall "hold unlawful and set aside" agency action found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law; contrary to a constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law.

70.   Rescission of the DACA program is final agency action subject to APA review by this Court.

71.   Defendants' actions rescinding DACA are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, Defendants have not identified a reasonable explanation for their decision to do so.   Nor in rescinding the DACA program did Defendants consider all relevant factors, including the benefits provided by the program.   Not only have Defendants failed to meaningfully assess the benefits of the DACA program, but

**AR2702**

409

they have not addressed the comprehensive legal arguments previously developed by DHS itself and the Department of Justice's Office of Legal Counsel as to why the DACA program is a lawful exercise of prosecutorial discretion.   The failure to address these legal opinions, or offer any legal reasoning, is especially egregious in this case, given that the only rationale for rescinding DACA offered in Defendant Duke's September 5 memorandum is that the program is likely to be found unlawful.   Defendants have committed a clear error in judgment.

72.   Defendants also disregarded the serious reliance interests created by the DACA program, including those of the County and DACA recipients.   On the basis of Defendants' representations that the DACA program would provide them an avenue to come out of the shadows and participate more fully in their communities, and that the information they provided to Defendants would not be used against them in immigration proceedings, DACA recipients applied for deferred action status and organized their lives around the expectation that they would be permitted to maintain that status as long as they were in compliance with program requirements.   Where "longstanding policies may have 'engendered serious reliance interests,'" those interests "must be taken into account."   *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009)).   "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *id.* (quoting *Fox*, 556 U.S. at 516), and "[i]t follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'"   *Id.* (quoting *Nat'l Cable*

410

*& Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

73.   The County, its employees, and its residents, and Local 521 and its members have been harmed and continue to be harmed by these unlawful acts.

### THIRD CLAIM FOR RELIEF
### Violation of Equal Protection
### U.S. Const. amend. V

74.   Plaintiffs re-allege and incorporate by reference all of the allegations set forth in this Complaint.

75.   Defendants' actions rescinding DACA target Latinos and, specifically, immigrants from Mexico, and are motivated by animus toward these groups.   Of the approximately 1.59 million DACA applications (both initial and renewal) that were approved from the beginning of the program through March 2017, approximately 1.48 million, or approximately 93%, were submitted by people from countries in Latin America and approximately, 1.24 million, or approximately 80%, were from Mexican immigrants.   Accordingly, the overwhelming majority of the direct beneficiaries of the DACA program have been Latinos and Mexican immigrants.   There is no question but that rescission of the DACA program imposes a disproportionate burden on Latinos generally and, specifically, persons from Mexico.

76.   The rescission is motivated by impermissible animus.   From the moment he launched his campaign, President Trump has publicly announced his animus toward Latinos and Mexican immigrants.   Indeed, such animus was a feature of his campaign, in which President Trump distinguished himself with his hardline stance on immigration, highlighted by harsh rhetoric disparaging Mexican immigrants.   In the speech

**AR2704**

411

in which he announced his candidacy, President Trump stated: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bring those problems with us [sic]. They're bringing drugs. They're bringing crime. They're rapists." As an afterthought, he added, "[a]nd some, I assume, are good people." Later, then-candidate Trump repeatedly disparaged the federal district judge presiding over a case brought by students alleging they were defrauded by Trump University, calling the judge a "hater" who is "very hostile" to President Trump because, as the President has explained on different occasions, he "happens to be Spanish," is "Hispanic," or "happens to be, we believe, Mexican." More recently, in August 2017, at a rally in Phoenix, President Trump referred to undocumented immigrants as "animals" who are responsible for "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking." Throughout his campaign and in his first months in office, the President has maintained this attitude, culminating in the decision to rescind the DACA program.

77. Moreover, other factors indicative of an intent to discriminate are present in this case. In rescinding the DACA program, Defendants departed significantly from normal procedures. In particular, Defendants elected to entirely forego the APA procedures required for implementation of a categorical rule such as the rescission of DACA. Additionally, the purported justifications offered for the rescission are plainly pretextual. The September 5, 2017 memorandum from Defendant Secretary Duke announcing the rescission explains only that the Fifth Circuit had held the *different* DAPA program and an expansion of DACA to be unlawful, and that this decision was affirmed by an equally di-

412

vided Supreme Court.   Secretary Duke's memorandum cites a September 4, 2017 letter from Attorney General Sessions, which provides no legal analysis whatsoever and simply concludes that "it is likely that potentially imminent litigation would yield similar results with respect to DACA."   No court has considered the lawfulness of the DACA program at issue here.

78.   As such, the rescission of DACA deprives Latino DACA recipients of equal protection of the laws, guaranteed by the Fifth Amendment.   The County, Local 521, and its members are harmed and continue to be harmed by Defendants' actions.

### FOURTH CLAIM FOR RELIEF
### Declaratory Relief—Equitable Estoppel

79.   Plaintiffs re-allege and incorporate by reference all of the allegations set forth in this Complaint.

80.   The federal government, by its conduct and explicit statements, represented to eligible applicants that the information applicants provided in connection with applications for deferred action status would not be used in immigration enforcement proceedings, except in certain limited circumstances, and that DACA recipients would have the opportunity to apply for renewed deferred action status at the end of their respective two-year authorization periods.

81.   In reliance on these assurances, DACA applicants identified themselves to the government, acknowledging their undocumented status, and provided important information about themselves and their family members that exposed them to the risk of deportation.

82.   From the initial implementation of DACA to the announcement rescinding the program, the government continuously made representations about the val-

**AR2706**

413

idity and legality of the program, the use of information provided by applicants, and the continuing opportunity to apply for renewal of deferred action status.

83.   DACA recipients rearranged their lives, daring to become more visible and more integrated into the fabric of their communities, including by seeking employment, pursuing higher education, and paying taxes.   But now they are at a heightened risk of removal and deportation because of their reliance on the government's prior statements.

84.   Therefore, Defendants should be equitably estopped from terminating the DACA program and from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under DACA.

85.   An actual controversy between Plaintiffs and Defendants exists as to whether Defendants should be equitably estopped.

86.   Plaintiffs are entitled to a declaration that Defendants are equitably estopped.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.   Vacate and set aside the rescission of the DACA program and any other action taken by Defendants in furtherance of the rescission;

B.   Declare that the rescission of DACA and Defendants' actions in connection therewith are void and without legal force or effect;

**AR2707**

414

C.   Declare that the rescission of DACA and Defendants' actions in connection therewith are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law in violation of 5 U.S.C. §§ 702-06;

D.   Declare that the rescission of DACA and Defendants' action in connection therewith violate the Constitution and laws of the United States;

E.   Declare that Defendants are equitably estopped from terminating the DACA program or from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under the program;

F.   Preliminarily and permanently enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the rescission of DACA and from taking any other action that is not in compliance with applicable law;

G.   Preliminarily and permanently enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from sharing or otherwise using information provided pursuant to the DACA program for immigration enforcement purposes, except as previously authorized under the program;

H.   Award Plaintiffs reasonable attorneys' fees and costs; and

I.   Grant Plaintiffs such further and additional relief as the Court deems just and proper.

AR2708

415

Dated:   Oct. 10, 2017

Respectfully submitted,

/s/   JAMES R. WILLIAMS
JAMES R. WILLIAMS, County
    Counsel
GRETA S. HANSEN
LAURA S. TRICE
MARCELO QUIÑONES
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110-1770
Telephone:  (408) 299-5900
Facsimile:   (408) 292-7240
laura.trice@cco.sccgov.org
marcelo.quinones@cco.sccgov.org
*Attorneys for Plaintiff County of Santa Clara*

/s/   ERIC P. BROWN
JONATHAN WEISSGLASS
STACEY M. LEYTON
ERIC P. BROWN
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone:   (415) 421-7151
jweissglass@altber.com;
sleyton@altber.com;
ebrown@altber.com

*Attorneys for all Plaintiffs*

**AR2709**

416

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

———

Case No. 3:17-cv-05380

DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL
JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA,
NORMA RAMIREZ, AND JIRAYUT LATTHIVONGSKORN,
PLAINTIFFS

*v.*

UNITED STATES OF AMERICA; DONALD J. TRUMP, IN
HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES; U.S. DEPARTMENT OF HOMELAND SECURITY;
AND ELAINE DUKE, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF HOMELAND SECURITY,
DEFENDANTS

———

Filed:  Sept. 18, 2017

———

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

———

**INTRODUCTION**

The young women and men filing this lawsuit embody the American Dream. Brought to this country as children and raised in families that often struggled with poverty and homelessness, each has achieved remarkable success through hard work, fierce determination, and incredible resilience. These are characteristics that have defined Americans throughout our Nation's history. Plaintiffs in this case are also alike in that each has committed to helping others, choosing to direct their time, energy, and considerable talents

**AR2710**

417

toward defending, healing, educating, and uplifting in-dividuals and communities that are too often ignored. While each of the Plaintiffs is remarkable in his or her own right, their stories of success—and their commit-ment to serving others—are common among the nearly 800,000 young people who have come to rely on the Deferred Action for Childhood Arrivals ("DACA") program.

The decision to end the DACA program is a broken promise and an unprecedented violation of the consti-tutional rights of Plaintiffs and other young people who relied on the federal government to honor that prom-ise.   The government established the DACA program with great fanfare in 2012.   Under DACA, individuals who were brought to the United States as children and meet certain criteria, and who are investigated and found to pose no threat to public safety or national security, are granted deferred action and work author-ization for a two-year period, subject to renewal.   These young people are commonly referred to as "Dreamers" in recognition of the fact that they have long called this country home and aspire to be part of the American Dream.

To apply for DACA, eligible individuals are required to provide the government with highly sensitive per-sonal information, pay a substantial fee, and submit to a rigorous Department of Homeland Security back-ground check.   Initially, the DACA program was met with skepticism in immigrant communities, as many Dreamers were understandably reluctant to voluntarily disclose information (including their current home ad-dress) that could facilitate their removal from the United States and place their family members at risk. To combat this fear the government launched an ex-

418

tensive outreach campaign urging Dreamers to apply for DACA, repeatedly promising that they would be able to renew their DACA status and that information they provided in connection with the program would not be used for immigration enforcement purposes. As a result, hundreds of thousands of young people applied for, and were granted, DACA status.  The government quickly realized the administrative, law enforcement, public safety, and economic benefits it sought in establishing the program.

In creating DACA, the government offered Plaintiffs and other Dreamers a straightforward deal—if they stepped forward, shared sensitive personal information, and passed a background check, they would be granted renewable protection and would be allowed to live and work in the United States provided that they played by the rules.  DACA also provided access to important benefits, and enabled recipients to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that were otherwise often unavailable to them.  In so doing, DACA has allowed Plaintiffs and nearly 800,000 young people to become contributing members of society and pursue the American Dream.

In taking the irreversible step of identifying themselves to the government, Plaintiffs and other Dreamers trusted the government to honor its word and uphold its end of the bargain.  In reliance on the government's promises, DACA recipients took out student loans, accepted job offers, moved to new cities, started businesses, bought homes and cars, and made numerous other life changing decisions.  They allowed themselves to fall in love, get married, and start families, trusting that the security and work authorization pro-

419

vided under DACA would enable them to care for (and remain in this country with) their spouses and children.

The transformative impact DACA had for Plaintiffs cannot be overstated. Brought to this country as young children, Plaintiffs have spent virtually their entire lives in the United States. They consider themselves to be Americans and call our nation home. Yet for much of their lives, Plaintiffs were denied basic opportunities and prohibited from realizing their full potential. But DACA changed everything. Beyond a work permit and access to a professional license, DACA provided Plaintiffs the certainty and security necessary to enroll in graduate programs, open businesses, hire employees, build relationships with clients, patients, and students, and begin to start families of their own. Plaintiffs were able to take these risks, and enjoy the benefits of their hard work, because they trusted the government to honor its promises and live up to its word.

Notwithstanding the severe harm it will inflict, the government arbitrarily decided to break its promises to Plaintiffs and hundreds of thousands of other Dreamers by terminating the DACA program. This cruel bait and switch, which was motivated by unconstitutional bias against Mexicans and Latinos, violates the equal protection component of the Fifth Amendment, the due process rights of Plaintiffs and other DACA recipients, and federal law, including the Administrative Procedure Act. Plaintiffs therefore seek equitable and injunctive relief to enjoin this unlawful and unconstitutional action, and respectfully request that the Court compel the government to honor its promises and uphold its end of the DACA bargain.

420

## JURISDICTION, VENUE, AND
## INTRADISTRICT ASSIGNMENT

1.    This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.   This Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

2.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because at least one plaintiff resides in this District, a substantial part of the events or omissions giving rise to this action occurred in this District, and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

3.    Pursuant to Local Rules 3-2(c) and (d), intradistrict assignment is proper in San Francisco or Oakland because a substantial part of the events or omissions which give rise to the claim occurred in the Counties of San Francisco and Alameda.

## PARTIES

4.    Plaintiff Dulce Garcia ("Ms. Garcia") is a DACA recipient and an attorney in San Diego, California.   Ms. Garcia earned her bachelor's degree from the University of California, San Diego and her law degree from the Cleveland-Marshall College of Law. She was brought to the United States from Mexico when she was four years old.   The government's decision to terminate the DACA program will deprive Ms. Garcia of her DACA status and the numerous valuable benefits she is entitled to by virtue of that status.   The termination of DACA also will frustrate Ms. Garcia's

421

ability to represent her clients and harm the dozens of individuals who rely on her counsel.

5.    Plaintiff Viridiana Chabolla Mendoza ("Ms. Chabolla") is a DACA recipient and a first-year law student at the University of California, Irvine School of Law.   Ms. Chabolla was brought to the United States from Mexico when she was two years old.   The government's decision to terminate the DACA program will deprive Ms. Mendoza of her DACA status and the numerous valuable benefits she is entitled to by virtue of that status.   The termination of DACA also will frustrate Ms. Chabolla's ability to fulfill her dream of working as a lawyer and helping individuals from disadvantaged and underrepresented communities obtain justice through the legal system.

6.    Plaintiff Jirayut ("New") Latthivongskorn ("Mr. Latthivongskorn") is a DACA recipient and a fourth-year medical student at the University of California, San Francisco ("UCSF") School of Medicine. He is also a candidate for a Master of Public Health degree from the T.H. Chan School of Public Health at Harvard University.   Mr. Latthivongskorn was brought to the United States from Thailand when he was nine years old.   The government's decision to terminate the DACA program will deprive Mr. Latthivongskorn of his DACA status and the numerous valuable benefits he is entitled to by virtue of that status.    The termination of DACA also will frustrate Mr. Latthivongskorn's ability to fulfill his dream of becoming a doctor and providing care to underserved and unprivileged communities.

7.    Plaintiff Norma Ramirez ("Ms. Ramirez") is a DACA recipient and a candidate for a Ph.D. in Clinical Psychology from the Fuller Theological Seminary in

AR2715

422

Pasadena, California.   Ms. Ramirez was brought to the United States from Mexico when she was five years old.   The government's decision to terminate the DACA program will deprive Ms. Ramirez of her DACA status and the numerous valuable benefits she is entitled to by virtue of that status.   The termination of DACA also will frustrate Ms. Ramirez's ability to realize her dream of opening a free multidisciplinary therapy clinic to immigrant youth and their families.

8.    Plaintiff Miriam Gonzalez Avila ("Ms. Gonzalez") is a DACA recipient and a teacher at Crown Preparatory Academy in Los Angeles, California.   She is also a candidate for a Master of Arts in Urban Education from Loyola Marymount University.   Ms. Gonzalez was brought to the United States from Mexico when she was six years old.   The government's decision to terminate the DACA program will deprive Ms. Gonzalez of her DACA status and the numerous valuable benefits she is entitled to by virtue of that status.   The termination of DACA also will frustrate Ms. Gonzalez's ability to teach children in underserved communities, thereby harming the children, families, and community who have come to rely on her.

9.    Plaintiff Saul Jimenez Suarez ("Mr. Jimenez") is a DACA recipient and a special education teacher, coach, and mentor in Los Angeles, California.   Mr. Jimenez was brought to the United States from Mexico when he was one year old.   The government's decision to terminate the DACA program will deprive Mr. Jimenez of his DACA status and the numerous valuable benefits he is entitled to by virtue of that status.   The termination of DACA also will frustrate Mr. Jimenez's ability to teach and coach young people, including those with special needs, thereby harming dozens of families

**AR2716**

423

and making poorer the community that he is serving and making a better place.

10.    Defendant United States of America includes all government agencies and departments responsible for the implementation, administration, and termination of the DACA program.

11.    Defendant Donald J. Trump is the President of the United States.  President Trump made the decision to terminate the DACA program and is sued in his official capacity.

12.    Defendant Department of Homeland Security ("DHS") is a cabinet department of the federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws.

13.    Defendant Elaine Duke is the Acting Secretary of Homeland Security and is sued in her official capacity.  Secretary Duke is responsible for managing DHS, including the administration and enforcement of policies and practices related to DACA.

## STATEMENT OF FACTS

**Establishment of the DACA Program**

14.    On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum").    Under DACA, individuals who were brought to the United States as young children and who met certain specific criteria could request deferred action for a period of two years, subject to renewal. In exchange, DACA applicants were required to provide the government with highly sensitive personal

424

information, submit to a rigorous background check, and pay a considerable fee.[1]

15.   Deferred action is a well-established form of prosecutorial discretion under which the government defers removal action against an individual for a specified period, subject to renewal.   The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."[2]

16.   The 2012 DACA Memorandum established specific criteria that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."[3]   They are that the applicant:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for at least five years preceding the date of the memorandum and is present in the United States on the date of the memorandum;

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably dis-

---

[1] Memorandum from Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, at 1-2 (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (hereinafter "2012 DACA Memorandum").

[2] *Id.*

[3] *Id.* at 1.

425

charged veteran of the Coast Guard or Armed Forces of the United States;

- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- is not above the age of thirty.[4]

17.   The 2012 DACA Memorandum further provided that "[n]o individual should receive deferred action   .  .  .   unless they first pass a background check and requests for relief   .  .  .   are to be decided on a case by case basis."[5]

18.   USCIS describes DACA as follows:   "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion.   For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect.   An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect.   However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."[6]

---

[4]  *Id.*

[5]  *Id.* at 2.

[6]  USCIS DACA FAQs (Archived), Question 1, https://www.uscis.gov/archive/frequently-asked-questions (hereinafter "USCIS DACA FAQs").

426

19. Like other forms of deferred action, DACA serves the government's interests by allowing the government to prioritize resources and exercise discretion for its own convenience. DACA also has provided the government with tremendous law enforcement, public safety, and economic benefits. As the government has recognized, our nation "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future."[7]

**The DACA Application and Renewal Process**

20. To apply for DACA, applicants must submit extensive documentation establishing that they meet the relevant criteria.[8] Applicants must also submit a Form I-765 Application for Employment Authorization, and pay $495 in fees.[9]

21. DACA applicants must also undergo biometric and biographic background checks. When conducting these checks, DHS reviews the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies."[10] If any information "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant

---

[7] Letter from Secretary Jeh Charles Johnson to U.S. Representative Judy Chu (Dec. 30, 2016), https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf (hereinafter "Secretary Johnson Letter").

[8] USCIS DACA FAQs, Questions 28-41

[9] *Id.*, Question 7; *see also* USCIS, I-821D, Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d.

[10] USCIS DACA FAQs, Question 23.

427

will be ineligible for DACA absent "exceptional circumstances."[11]

22. DACA is not limited to a single, two-year deferral of action. On the contrary, the ability to renew DACA status is an essential element of the program and one of the main benefits used to induce Dreamers to step forward, subject themselves to a rigorous background investigation, and share sensitive personal information with the government. Indeed, the government clearly understood from the very beginning that Dreamers would not apply for DACA, and the program would not be successful, unless they were promised the opportunity to renew their DACA status.

23. To that end, the 2012 DACA Memorandum explicitly directs that DACA be "*subject to renewal*, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States."[12] That memorandum also makes clear that DACA is meant to protect "productive young people" who "were brought to this country as children and know only this country as home" and not merely postpone their removal for two years.[13]

24. DHS also established a straightforward renewal process for DACA and "strongly encourage[d]" DACA recipients to submit their renewal request in advance of the relevant expiration date.[14] Moreover, DACA renewal does not require DACA recipients to meet all of the initial criteria for the program, nor does

---

[11] *Id.*, Question 65.

[12] 2012 DACA Memorandum, at 3 (emphasis added).

[13] *Id.*

[14] USCIS DACA FAQs, Question 49.

428

it require them to submit additional documents.[15]   On the contrary, to qualify for renewal, DACA recipients are required to meet three basic criteria:   (1) they must not have left the United States without advance parole; (2) they must have continuously resided in the United States after submitting their DACA application; and (3) they must not have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, or otherwise pose a threat to national security or public safety.[16]

25.   DHS "Standard Operating Procedures" also provide that, absent an "Egregious Public Safety" issue or other special circumstances, DACA status should not be revoked until the government has provided a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the termination.[17]   DHS policy further provides that the recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of DACA status.[18]

26.   Collectively, these policies and procedures, and the representations of numerous government officials, created a clear and reasonable expectation among DACA recipients that they would be entitled to continuously renew their DACA status so long as they stayed out of trouble and played by the rules.

---

[15] *Id.*, Questions 53-54.

[16] *Id.*, Question 51.

[17] *See* DHS National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA), at 132, 144-45 (Apr. 4, 2013), https://cliniclegal.org/sites/default/files/attachments/daca_sop_4-4-13.pdf (the "DACA SOP").

[18] *Id.*

429

**Benefits Provided Under the DACA Program**

27.    DACA confers numerous important benefits on those who apply for and are granted DACA status. Notably, DACA recipients are granted the right not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect.[19]

28.    DACA recipients are also eligible for work authorization under longstanding regulations.   As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action.   . . .  "[20]

29.    DACA recipients are eligible to receive certain public benefits.   These include Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses, health care, financial aid, tuition benefits, and unemployment insurance.[21]

30.    DACA also serves as a gateway to numerous other important public and private practical benefits, and enables recipients to open bank accounts, obtain credit cards, start businesses, purchase homes and

---

[19] *See* USCIS DACA FAQs, Question 9 ("[I]f an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended."); 2012 DACA Memorandum, at 2; *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1058-59 (9th Cir. 2014).

[20] USCIS DACA FAQs, Question 1.

[21] *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d); *Texas v. United States*, 809 F.3d 134, 148 (5th Cir. 2015); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015); *see also, e.g.*, Cal. Educ. Code §§ 66021.6-66021.7, 68130.5, 76300.5; Cal. Code Regs. tit. 22, § 50301.3.

430

cars, and conduct other aspects of daily life that would otherwise often be unavailable to them.

31.   DACA also confers certain immigration benefits and the ability to travel abroad.   For example, DACA recipients do not accrue time under 8 U.S.C. § 1182(a)(9)(B)(i), and may briefly depart the U.S. and legally return under certain circumstances.[22]

32.   As the government has recognized, DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."[23]

**The Government's Promises and Its Efforts to Promote DACA**

33.   When the DACA program was first launched, many eligible Dreamers were understandably reluctant to step forward and voluntarily disclose sensitive personal information (including their current home address) that could facilitate their removal from the United States and place their family members at risk. In response, the government launched an extensive outreach campaign and vigorously promoted the DACA program.   Among other efforts, the government provided advice and guidance to civic organizations and education professionals about "best practices" they could use to encourage eligible individuals to apply for the program.   The government also hosted informational workshops, and senior government officials—

---

[22] *See* USCIS DACA FAQs, Question 57.

[23] Secretary Johnson Letter, at 2.

431

including President Obama—encouraged young people to apply for the program.

34.   The government reiterated these promises in its official correspondence, vowing that DACA recipients would not lose their benefits—including the ability to renew their DACA status—absent specified misconduct.   For example, the approval notice granting deferred action under DACA lists only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA.[24]

35.   The government also made promises about information provided by DACA recipients as part of its efforts to promote the program.   In particular, since the inception of the DACA program, the government has repeatedly represented to applicants, Congress, and the general public that information provided by DACA applicants about themselves or others (including family members) would not be used for immigration enforcement purposes absent special circumstances.

36.   As then-Secretary of Homeland Security Jeh Johnson explained, "[s]ince DACA was announced in 2012, DHS has consistently made clear that information provided by applicants  . . .  will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law."[25]

---

[24]  The University of Washington, I-797 DACA Approval Sample, https://registrar.washington.edu/i-797-daca-approval_sample.

[25]  Secretary Johnson Letter, at 1.

432

37.   Secretary Johnson further explained that this approach was the "long-standing and consistent practice of DHS (and its predecessor INS)" for many "decades" in the use of information "submitted by people seeking deferred action" under a wide variety of programs, as well as applicants seeking immigration "benefits or relief" under a number of other programs.[26] According to Secretary Johnson, "DACA applicants most assuredly relied" upon "these representations" and the agency's "consistent practice" stretching back decades.[27]

38.   The government's promise not to use information provided by applicants for immigration enforcement purposes also appears in the USCIS's official instructions regarding the DACA application process.   Those instructions provide:

> *Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings* unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).   The information may be shared with national security and law enforcement agencies, including ICE and CBP, *for purposes other than removal,* including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.   The above

---

[26] *Id.* 1-2.

[27] *Id.* at 1.

433

information sharing clause covers family members and guardians, in addition to the requestor.[28]

39.    The same promise appears on the DHS website, which states that "[i]nformation provided in this request [for DACA] *is protected from disclosure* to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).   Individuals whose cases are deferred pursuant to DACA will not be referred to ICE."[29]

40.    That same promise is also included in DHS's official, and statutorily-required, Privacy Impact Assessment for the DACA program.[30]

41.    Numerous public officials from both political parties have reinforced these promises and have recognized that Dreamers have relied on the government to keep its word.   For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson

---

[28] Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I-821D at 13 (Jan. 9, 2017 ed.), https://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf (emphasis added).

[29] USCIS DACA FAQs, Question 19.   The referenced Notice to Appearance guidance is USCIS Policy Memorandum 602-0050 (Nov. 7, 2011) ("Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens").

[30] DHS, *Privacy Impact Assessment, USCIS, Deferred Action for Childhood Arrivals* 13 (Aug. 15, 2012), https://www.dhs.gov/sites/default/files/publications/privacy/privacy_pia_uscis_daca.pdf;  *see* E-Government Act of 2002 Sec. 208(b), Pub L. No. 107-347, 116 Stat. 2899, 2921 (codified as amended at 44 U.S.C. § 3501 note).

434

acknowledged that there are hundreds of thousands of Dreamers who have "relied on the U.S. government's representations" about DACA, and he asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."[31]

42.   In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" Dreamers, who have "organize[d] [their] li[ves] around" the DACA program.[32]

43.   Also in January 2017, Senator Lindsey Graham stated that the government should not "pull the rug out and push these young men and women—who came out of the shadows and registered with the federal government—back into the darkness."[33]

44.   In February 2017, Congressman Raúl Grijalva described DACA as a "commitment," and called for "the federal government to honor its word to protect" Dreamers.[34]

45.   On February 20, 2017, then-Secretary of Homeland Security John F. Kelly issued a memorandum that

---

[31]  Secretary Johnson Letter, at 1.

[32]  Transcript of CNN Town Hall Meeting with House Speaker Paul Ryan, CNN (Jan. 12, 2017), http://cnn.it/2oyJXJJ.

[33]  Lindsey Graham, *Graham, Durbin Reintroduce BRIDGE Act To Protect Undocumented Youth From Deportation* (Jan. 12, 2017), https://www.lgraham.senate.gov/public/index.cfm/2017/1/graham-durbin-reintroduce-bridge-act-to-protect-undocumented-youth-from-deportation.

[34]  Congressional Progressive Caucus Leaders Respond to ICE Arrest of DACA Recipient (Feb. 16, 2017), https://cpc-grijalva.house.gov/press-releases/congressional-progressive-caucus-leaders-respond-to-ice-arrest-of-daca-recipient.

AR2728

435

"immediately rescinded" all "conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," but specifically exempted the 2012 DACA Memorandum.[35]

46.   On March 29, 2017, then-Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer."[36]

47.   On April 21, 2017, President Trump said that his administration is "not after the dreamers" and suggested that "[t]he dreamers should rest easy."   When asked if "the policy of [his] administration [is] to allow the dreamers to stay," President Trump answered, "Yes."[37]

**Ms. Garcia Relied on the Government's Promises Regarding DACA**

48.   Dulce Garcia was brought to the United States from Mexico when she was four years old.   Ms. Garcia was raised in a low-income, underserved neighborhood in San Diego, California.   Throughout her childhood, Ms. Garcia lacked health care and her family struggled with poverty and occasional periods of homelessness.

---

[35] Memorandum from Secretary John Kelly, Enforcement of the Immigration Laws to Serve the National Interest, at 2 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf (hereinafter "Secretary Kelly Memo").

[36] Ted Hesson & Seung Min Kim, Wary Democrats Look to Kelly for Answers on Immigration, Politico (Mar. 29, 2017), http://politi.co/2mR3gSN.

[37] *Transcript of AP Interview With Trump*, CBS News (Associated Press) (Apr. 24, 2017), https://www.cbsnews.com/news/transcript-of-ap-interview-with-trump.

436

49.   Although she grew up fearing the police and immigration authorities, Ms. Garcia did not learn that she was undocumented until high school.   Around this time, Ms. Garcia began to discover the limitations of being undocumented and was advised by her high school guidance counselor that she would be unable to enroll in college or secure federal financial aid despite her academic record.

50.   Refusing to yield to these limitations, Ms. Garcia continuously sought to enroll at a local community college, despite repeatedly being denied admission because of her immigration status.   Eventually, Ms. Garcia secured admission to the school.   Ms. Garcia later transferred to the University of California, San Diego ("UCSD"), graduating in 2009 with a bachelor's degree in political science and securing honors every quarter she was enrolled at UCSD.   During this time, Ms. Garcia worked full time as a legal assistant at a small law firm, which solidified her childhood dream of becoming an attorney, and often sought out second and third jobs in order to pay for tuition and books.

51.   Ms. Garcia matriculated at the Cleveland-Marshall College of Law in Cleveland, Ohio in 2011. Because tuition was a flat rate regardless of the number of units, Ms. Garcia sought the Dean's approval to take extra classes during her second and third years. Ms. Garcia also worked throughout law school as legal assistant to cover tuition and her living expenses.

52.   During her last year of law school, when money was especially tight, Ms. Garcia's mother gave her $5,000 to help pay for tuition.   This sum represented most of Ms. Garcia's mother's life savings, which she had earned working the night shift as a hotel housekeeper.

437

53.   During Ms. Garcia's second year of law school, the government announced the DACA program.   Ms. Garcia was overjoyed and broke down in tears when she heard the announcement.   Although she was initially skeptical, Ms. Garcia decided that she could trust the government to honor its promises.   In reliance on the government's promises, she applied for DACA, providing the government with her personal information and the required fees.   Ms. Garcia passed the background check and was granted DACA status in 2014.   In reliance on the government's promises, Ms. Garcia successfully reapplied for DACA status and work authorization in 2016.   Ms. Garcia was admitted to the California Bar in May 2016.

54.   Being granted DACA status was a transformative experience for Ms. Garcia.   DACA freed Ms. Garcia from the constant worry that she would be detained and deported every time she stepped outside her home.   It also gave her the confidence to hire several employees, build a thriving law practice, and represent dozens of clients in immigration, civil litigation, and criminal defense cases.   Finally, DACA enabled Ms. Garcia to dream about becoming a mother, allowing her to take the first steps toward becoming a foster parent, with the ultimate goal of adopting a child.

55.   Ms. Garcia trusted the government to honor its promises and advised others that information provided as part of DACA would not be used for immigration enforcement purposes.   Even after the new administration was sworn into office, Ms. Garcia continued to trust the government, helping to create a video encouraging eligible young people to apply for DACA.

438

**Ms. Chabolla Relied on the Government's Promises Regarding DACA**

56.   Viridiana Chabolla was brought to the United States from Mexico when she was two years old.   Ms. Chabolla grew up in Los Angeles, California.   Ms. Chabolla confronted the reality of her undocumented status from an early age, and was unable to participate in certain club and community activities that required a Social Security number.

57.   Ms. Chabolla was inspired to pursue a career in law by her grandfather, who suggested that becoming an attorney would give her "the power to fight injustice with words."   Ms. Chabolla was further inspired after meeting a Latino judge from East Los Angeles, whose eloquence, impressive academic credentials, and commitment to the community left a deep impression on her.

58.   Ms. Chabolla enrolled in Pomona College in the fall of 2009 and graduated with a Bachelor of Arts degree in Sociology and Chicana/o-Latina/o Studies in May 2013.   Ms. Chabolla received numerous honors and awards and was deeply involved in campus life. At the same time, Ms. Chabolla sought out ways to give back to her community, helping to coordinate academic and enrichment activities, SAT preparation classes, and college information sessions for hundreds of students from economically disadvantaged and underrepresented backgrounds.   Ms. Chabolla also created and taught an elective course on the U.S. Civil Rights Movement to high school students.

59.   In 2012, during her final year of college, Ms. Chabolla applied for and was granted DACA status. In reliance on the promises made by the government, Ms. Chabolla disclosed personal information about her-

439

self and her family, paid the required fee, and submitted to a DHS background check.   In reliance on the government's promises, Ms. Chabolla successfully reapplied for DACA status in 2014 and again in 2016.

60.   After graduating from Pomona, Ms. Chabolla was hired as a community organizer at Public Counsel, the nation's largest pro bono law firm.   In that capacity, Ms. Chabolla assisted with landmark civil rights litigation involving educational inequities in the public education system, as well as with efforts to provide essential services to homeless veterans, women, and youth in Los Angeles County.

61.   Ms. Chabolla's experiences at Public Counsel solidified her interest in helping underserved individuals and communities obtain justice through the legal system.   In pursuit of this goal, Ms. Chabolla secured a special fellowship from the law firm of Munger, Tolles & Olson LLP, and enrolled earlier this year as a Public Interest Scholar at the University of California, Irvine School of Law.

**Mr. Latthivongskorn Relied on the Government's Promises Regarding DACA**

62.   New Latthivongskorn was brought to the United States from Thailand when he was nine years old.   Mr. Latthivongskorn was raised in California. His parents first settled in Fremont, California, where they worked cleaning toilets and mopping floors, and later waiting tables at various restaurants.   In 2004, Mr. Latthivongskorn's parents moved the family to Sacramento to open their own restaurant, hoping that it would allow them to earn enough money to be able to send their children to college.

440

63.   Growing up, Mr. Latthivongskorn lived with the constant fear that he or his parents might be deported.   Mr. Latthivongskorn began to more acutely experience the challenges of being undocumented as he grew older, often searching for excuses such as being "deathly afraid of driving" to explain to classmates why he lacked a driver's license.

64.   Mr. Latthivongskorn was inspired to become a doctor after his mother was diagnosed with ovarian tumors during his junior year of high school.   Not only did Mr. Latthivongskorn witness the incredible power of medicine to help those in need, but he also experienced the barriers that low-income immigrants face in navigating the health care system.   After this experience, Mr. Latthivongskorn decided that he wanted to devote his life to improving access to health care for immigrant and low-income communities.

65.   Mr. Latthivongskorn's parents taught him that hard work and education were the keys to success.   In addition to waiting tables, washing dishes, and mopping floors in his family's restaurant on nights and weekends, Mr. Latthivongskorn immersed himself in his studies, taking honors and AP classes.   As a result of his hard work, Mr. Latthivongskorn graduated as salutatorian of his high school class and was accepted to UC Berkeley.

66.   Because he lacked a Social Security number, Mr. Latthivongskorn was ineligible for federal financial aid.   However, due to his record of achievement, Mr. Latthivongskorn was offered a prestigious scholarship that promised to cover a significant portion of his educational expenses for four years.   This scholarship was revoked only weeks before classes began after UC Berkeley learned that Mr. Latthivongskorn lacked legal

**AR2734**

441

status.   Mr. Latthivongskorn was devastated and considered attending a community college, but his family insisted that he enroll at UC Berkeley.

67.   While Mr. Latthivongskorn thrived at UC Berkeley, he constantly worried about how to finance his education.   To help pay for school, Mr. Latthivongskorn worked as a busboy at a Thai restaurant and secured scholarships from several nonprofit organizations.   Despite his demanding academic and work commitments, Mr. Latthivongskorn devoted significant time to volunteering with several local nonprofit organizations.

68.   In 2011, Mr. Latthivongskorn was robbed at gun point just five blocks from the UC Berkeley campus.   He decided not to report the crime to the police out of fear that stepping forward to law enforcement might lead to him being deported.

69.   While at UC Berkeley, Mr. Latthivongskorn also developed into an activist and learned the power of grassroots community organizing.   Among other efforts, Mr. Latthivongskorn advocated for federal legislation to assist Dreamers, and testified before the California Legislature in support of the California DREAM Act in 2011 and the California TRUST Act in 2013.

70.   In 2012, Mr. Latthivongskorn co-founded Pre-Health Dreamers ("PHD"), a national nonprofit organization that provides advising, resources, and advocacy for undocumented students interested in pursuing careers in health care and science.   In January 2017, *Forbes* Magazine named Mr. Latthivongskorn to its "30 Under 30 in Education" list, commending him for being "on the frontline of getting undocumented stu-

442

dents into medical professions and on the path to be-
coming physicians and health care professionals.”

71.   In 2012, Mr. Latthivongskorn graduated with
honors from UC Berkeley, earning a degree in Molec-
ular & Cellular Biology and Distinction in General
Scholarship.   In spite of his excellent academic record,
Mr. Latthivongskorn was told by the deans of admis-
sions at several medical schools that he should not ap-
ply to their programs because he was undocumented
and that no medical school would invest their resources
in training someone who might not be able to stay in
the United States.   Refusing to take “no” for an an-
swer, Mr. Latthivongskorn applied to medical school
anyway, but was initially turned down.

72.   Exactly one month after Mr. Latthivongskorn
graduated from UC Berkeley, the government an-
nounced the DACA program.   Believing that he could
rely on the government to honor its promises, Mr.
Latthivongskorn applied for DACA in the fall of 2012.
He passed the background check and was granted
DACA status on January 24, 2013.   In reliance on the
government’s promises, Mr. Latthivongskorn success-
fully reapplied for DACA status and work authoriza-
tion in 2014 and then again in 2016.

73.   Being granted DACA status changed Mr.
Latthivongskorn’s life.   Because DACA recipients
were granted permission to stay in the United States
on a renewable basis, medical schools became willing to
invest in these students for the several years it takes to
complete medical school and residency programs.   Mr.
Latthivongskorn reapplied to medical schools, and in
2014, he enrolled at UCSF, one of the most prestigious
and selective medical schools in the country.   Mr.
Latthivongskorn is part of the Program in Medical

AR2736

443

Education for the Urban Underserved ("PRIME-US"), and is committed to using his degree to improve health care delivery systems and assist urban underserved communities.

74.   In April 2017, Mr. Latthivongskorn was awarded a prestigious U.S. Public Health Service Excellence in Public Health Award, which is given to medical students who have helped to advance the U.S. Public Health Service's mission to "protect, promote, and advance the health and safety of our Nation."

75.   In August 2017, Mr. Latthivongskorn began pursuing a Master of Public Health at Harvard University.   His goal is to develop a better understanding of health care policy so that he can help to end health disparities and increase access to affordable, quality health care, particularly for immigrants and other underserved communities.

**Ms. Ramirez Relied on the Government's Promises Regarding DACA**

76.   Norma Ramirez was brought to the United States from Mexico when she was five years old.   Ms. Ramirez attended public high school, where she was an honor roll student.   Her undocumented status made an impact on her in high school when she was denied a driver's license and learned that her dreams of going to college might be out of reach.

77.   Ms. Ramirez attended the College of Southern Nevada, and later the University of Nevada, Las Vegas, where she earned a bachelor's degree in psychology in 2014.

78.   Ms. Ramirez could not believe the news in 2012 when her pastor sent her a text message telling her about the DACA program.   Relying on the govern-

AR2737

444

ment's promises under the DACA program, Ms. Ramirez applied for DACA status on August 15, 2012. Her application was approved on November 1, 2012. In further reliance on the government's promises, Ms. Ramirez twice reapplied for DACA status and work authorization, and was reapproved in September 2014 and October 2016.

79.   Ms. Ramirez has been inspired to continue her education in clinical psychology in part because her experiences as a volunteer mentor have exposed her to the suffering of countless individuals who do not have access to mental health services, much less access to practitioners who speak their native language or share an understanding of the immigrant experience.   Her motivation also stems from her own difficulties in finding a supportive environment to discuss the challenges and barriers she has faced as an undocumented immigrant.

80.   In 2015, Ms. Ramirez began her graduate work at the Fuller Theological Seminary in Pasadena, California.   She earned her Master's degree in Clinical Psychology in 2017 and is currently pursuing her Ph.D. in Clinical Psychology.   Since 2016, Ms. Ramirez has worked at an outpatient clinic in Monrovia, California, providing school and home-based therapy to patients in English and Spanish, and also has served as a member of the Board of Directors for the Immigration Resource Center of San Gabriel Valley.

81.   DACA enabled Ms. Ramirez to pursue her dream of establishing a free clinic that provides mental health services to immigrant youth, Latinos, and their families.   As a Dreamer, Ms. Ramirez understands the challenges faced by many of her patients, and is able to

445

secure their trust in a way that many other mental health practitioners cannot.

**Ms. Gonzalez Relied on the Government's Promises Regarding DACA**

82. Miriam Gonzalez was brought to the United States from Mexico when she was six years old. She was raised in Los Angeles, California, and graduated from Roosevelt High School in 2011.

83. Ms. Gonzalez first learned she was undocumented in the seventh grade, after talking with her friends about getting a summer job at an elementary school. When she asked her parents for her Social Security number so that she could apply to work with her friends, they informed her that she was undocumented and had no Social Security number.

84. In spite of their undocumented status, Ms. Gonzalez's parents pushed her to get good grades, with the hope that she would go to college. In high school, Ms. Gonzalez began telling her teachers that she was undocumented, and they provided her with resources about the application process and about a California law allowing undocumented students to pay in-state tuition.

85. Relying on the government's promises under the DACA program, Ms. Gonzalez applied for DACA status and work authorization in December 2012. Her application was approved in February 2013. In further reliance on the government's promises, Ms. Gonzalez successfully reapplied for DACA status and work authorization in December 2014 and October 2016.

86. Ms. Gonzalez attended college at the University of California, Los Angeles ("UCLA"), graduating in 2016 with a Bachelor of Arts in Anthropology and a

AR2739

446

minor in Classical Civilizations. She was named to the Dean's Honors List for her academic performance in the spring of 2015. While at UCLA, Ms. Gonzalez earned money by tutoring elementary, middle, and high school students, and by working as a campus parking assistant.

87. Ms. Gonzalez has been active in community service since a young age, focusing her energy on immigrants' rights and education for the underserved. While at UCLA, she helped to host the 2014 Immigrant Youth Empowerment Conference—the largest immigrant youth conference in the country—as well as an Educators Conference, a DACA clinic, and several additional immigrants' rights workshops. Ms. Gonzalez also mentored two students at Van Nuys High School, motivating them to pursue a higher education and advising them on the college application process.

88. Ms. Gonzalez ultimately decided that she could give the most to her community by teaching students in underserved communities. After graduating from UCLA in 2016, Ms. Gonzalez was accepted into the selective Teach For America ("TFA") program. Through TFA, Ms. Gonzalez currently teaches Math and Reading Intervention to struggling middle school students at Crown Preparatory Academy in Los Angeles.

89. In 2017, Ms. Gonzalez received her Preliminary Multiple Subject Teaching Credential from Loyola Marymount University, which is valid until 2022. Ms. Gonzalez is currently studying at Loyola Marymount to obtain a Master of Arts degree in Urban Education, with a focus in Policy and Administration. Upon her expected completion of her master's program and her service with TFA in the spring of 2018, Ms. Gonzalez hopes to continue to teach in the Los Angeles area,

447

mentoring and inspiring young students from disadvantaged communities to pursue a higher education and achieve their full potential.

**Mr. Jimenez Relied on the Government's Promises Regarding DACA**

90.   Saul Jimenez was brought to the United States from Mexico when he was one year old.   Mr. Jimenez was raised in the Boyle Heights neighborhood of Los Angeles, California.   He attended Roosevelt High School, where he was a star athlete.   Among other achievements, he was captain of the football team and an all-league wide receiver.   Mr. Jimenez worked throughout high school, helping his parents make ends meet by delivering newspapers and washing dishes at an Italian restaurant.

91.   Following high school, Mr. Jimenez played football for two years at East Los Angeles Community College, viewing his commitment to the game as a ticket to a four-year university.   At the same time, Mr. Jimenez was also working two or three jobs, and often struggled to stay awake during practice and team meetings.   Mr. Jimenez explored becoming a firefighter and considered a career in law enforcement, but learned that his legal status prevented him from serving his community in these ways.

92.   In 2007, Mr. Jimenez's hard work paid off and he was awarded a football scholarship to Oklahoma Panhandle State University.   Mr. Jimenez again served as team captain and was chosen by his teammates as defensive MVP—now playing as an outside linebacker.

93.   In Oklahoma, Mr. Jimenez began mentoring high school students through the U.S. Department of

448

Education's Upward Bound program.   Mr. Jimenez quickly found that he enjoyed working with young people and was able to connect with and help many of his students.

94.   In 2010, Mr. Jimenez returned to Boyle Heights, working in low-wage jobs in warehouses and restaurants to support his parents and himself. However, after the government announced the DACA program in 2012, Mr. Jimenez began to believe that he could build a career for himself, and worked to improve his resume.

95.   Relying on the government's promises under the DACA program, Mr. Jimenez successfully applied for DACA status in 2012.   In further reliance on the government's promises, Mr. Jimenez successfully re-applied for DACA status and work authorization in 2014.

96.   Shortly after receiving DACA status, Mr. Jimenez secured three part-time teaching and mentorship positions, working as a tutor, a sports coach in an after- school program, and as a manager at an adolescent rehabilitation center at night.   After a few months, Mr. Jimenez accepted a full-time position as a program coordinator with the national nonprofit HealthCorps, which enabled him to continue to pursue his interest in teaching and mentorship.

97.   In August 2016, Mr. Jimenez began working as a substitute teacher in the Los Angeles Unified School District.   Mr. Jimenez is now a full-time special education teacher at Stevenson Middle School, where he helps students with learning disabilities overcome their challenges.

449

98.   Mr. Jimenez has also pursued coaching as a further means to inspire and uplift young people.   In recent years, Mr. Jimenez has also served as the head junior varsity football coach, the head girls junior varsity soccer coach, and an assistant varsity football coach at Roosevelt High School.   Through coaching, Mr. Jimenez seeks to teach young people skills and lessons that will apply broadly and benefit them throughout their lives.

**President Trump's Statements and Actions Prior to Ending DACA**

99.   The government's decision to end the DACA program was motivated by improper discriminatory intent and animus toward Mexican nationals, individuals of Mexican heritage, and Latinos, who together account for 93 percent of approved DACA applications.

100.  According to USCIS, approximately 79 percent of approved DACA applications through March 31, 2017, have been submitted by Mexican nationals.[38]   No other nationality makes up more than 4 percent of approved DACA applications.[39]   93 percent of approved DACA applications have been submitted by individuals from Latin American countries.[40]

101.  President Trump's statements and actions reflect a pattern of bias against Mexicans and Latinos.

---

[38] USCIS, Form I-821D Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (Mar. 31, 2017), https://www. uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20 Studies/Immigration%20Forms%20Data/All%20Form%20Types/ DACA/daca_performancedata_fy2017_qtr2.pdf.

[39] *Id.*

[40] *Id.*

450

For example, on February 24, 2015, President Trump demanded that Mexico "stop sending criminals over our border."[41]   On March 5, 2015, President Trump tweeted that he "want[ed] nothing to do with Mexico other than to build an impenetrable WALL.  . . .  "[42]

102.  On June 16, 2015, during his speech launching his presidential campaign, President Trump characterized immigrants from Mexico as criminals, "rapists," and "people that have lots of problems."[43]   President Trump later asserted that these remarks were "100 percent correct."[44]

103.  Three days later, President Trump tweeted that "[d]ruggies, drug dealers, rapists and killers are coming across the southern border," and asked, "When will the U.S. get smart and stop this travesty?"[45]

104.  On August 6, 2015, during the first Republican presidential debate, President Trump said "the Mexican government is much smarter, much sharper, much more cunning.   And they send the bad ones over be-

---

[41]  Donald J. Trump, Tweet on February 24, 2015 at 4:47 PM.

[42]  Donald J. Trump, Tweet on March 5, 2015 at 4:50 PM.

[43]  Donald J. Trump, Presidential Announcement Speech (June 16, 2015), *available at* http://time.com/3923128/donald-trump-announcement-speech/.

[44]  Sandra Guy, *Trump in Chicago:  Says he's '100 percent correct' about Mexicans, blasts U.S. as 'laughingstock'—'we're all a bunch of clowns'*, Chicago Sun Times (June 24, 2016), http://chicago.suntimes.com/news/trump-in-chicago-says-hes-100-percent-correct-about-mexicans-blasts-u-s-as-laughingstock-were-all-a-bunch-of-clowns/.

[45]  Donald J. Trump, Tweet on June 19, 2015, at 7:22 PM.

451

cause they don't want to pay for them, they don't want to take care of them."[46]

105.  On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole.  At the police station, they stated "Donald Trump was right; all these illegals need to be deported."  When asked about the incident, President Trump failed to condemn the men, instead stating that they were "passionate."  Specifically, President Trump said, "[i]t would be a shame  .  .  .  I will say that people who are following me are very passionate.  They love this country and they want this country to be great again.  They are passionate."[47]

106.  On August 24, 2015, President Trump tweeted, "Jeb Bush is crazy, who cares that he speaks Mexican, this is America, English!!"[48]

107.  On September 25, 2015, President Trump suggested that the United States would no longer "take care" of "anchor babies" from Mexico.[49]

108.  In May and June 2016, President Trump repeatedly attacked United States District Judge Gonzalo

---

[46]  Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News (Aug. 6, 2015), http://www.foxnews.com/politics/2015/08/06/at-republican-debate-trump-says-mexico-is-sending-criminals-because-us.html.

[47]  Adrian Walker, *'Passionate' Trump fans behind homeless man's beating?*, The Boston Globe (Aug. 21, 2015), https://www.bostonglobe.com/metro/2015/08/20/after-two-brothers-allegedly-beat-homeless-man-one-them-admiringly-quote-donald-trump-deporting-illegals/I4NXR3Dr7litLi2NB4f9TN/story.html.

[48]  Donald J. Trump, Tweet on August 24, 2015 at 7:14 PM.

[49]  Donald J. Trump, Speech in Oklahoma City, OK at 41:31-42:30 YouTube (Sept. 25, 2015), https://www.youtube.com/watch?v=2j4bY7NAFww.

452

Curiel, asserting that because he was "of Mexican heritage" he had "an absolute" and "inherent conflict of interest" that precluded him from hearing a lawsuit against President Trump's eponymous university.[50] Speaker of the House Paul Ryan characterized President Trump's comments as "the textbook definition of a racist comment."[51]  Senator Susan Collins similarly asserted that President Trump's "statement that Judge Curiel could not rule fairly because of his Mexican heritage" was "absolutely unacceptable."[52]

109.  On August 31, 2016, President Trump raised concerns about immigrants, saying "we have no idea who these people are, where they come from.  I always say Trojan Horse."[53]

110.  In August 2017, President Trump asserted that a group of white supremacists marching in Charlottesville, Virginia included "some very fine people."[54]

---

[50]  Daniel White, *Donald Trump Ramps Up Attacks Against Judge in Trump University Case*, Time (June 2, 2016), http://time.com/4356045/donald-trump-judge-gonzalo-curiel/.

[51]  Sarah McCammon, *Trump Says Comments About Judge 'Have Been Misconstrued'*, Nat'l Pub. Radio (June 7, 2016), http://www.npr.org/2016/06/07/481013560/ryan-trumps-criticism-of-judge-textbook-definition-of-a-racist-comment.

[52]  Susan Collins, *U.S. Senator Susan Collins' Statement on Donald Trump's Comments on the Judiciary* (June 6, 2016), https://www.collins.senate.gov/newsroom/us-senator-susan-collins%E2%80%99-statement-donald-trump%E2%80%99s-comments-judiciary.

[53]  *Transcript of Donald Trump's Immigration Speech*, N.Y. Times (Sept. 1, 2016), https://www.nytimes.com/2016/09/02/us/politics/transcript-trump-immigration-speech.html?mcubz=0.

[54]  Meghan Keneally, *Trump lashes out at 'alt-left' in Charlottesville, says 'fine people on both sides'*, ABC News (Aug. 15, 2017), http://abcnews.go.com/Politics/trump-lashes-alt-left-charlottesville-fine-people-sides/story?id=49235032.

453

Former Massachusetts Governor Mitt Romney suggested that these comments "caused racists to rejoice,"[55] while Senator Lindsay Graham noted that the President was "now receiving praise from some of the most racist and hate-filled individuals and groups in our country."[56]   Former Ku Klux Klan leader David Duke thanked President Trump for his "honesty and courage."[57]

111.   On August 22, 2017, during a rally in Phoenix, Arizona, President Trump described unauthorized immigrants as "animals" who bring "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking."[58]

112.   On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joseph Arpaio, who had been convicted of criminal contempt by United States District Judge Susan R. Bolton for intentionally disobeying a federal court order to cease targeting Latinos.   A comprehensive investigation by the United

[55] Emma Kinery, *Mitt Romney:   President Trump's Charlottesville comments 'caused racists to rejoice'*, USA Today (Aug. 18, 2017), https://www.usatoday.com/story/news/politics/onpolitics/2017/08/18/mitt-romney-criticizes-president-trump-charlottesville-statement/579410001/.

[56] Eugene Scott & Miranda Green, *Trump, Graham feud over President's Charlottesville response*, CNN Politics (Aug. 17, 2017), http://www.cnn.com/2017/08/16/politics/lindsey-graham-donald-trump-charlottesville/index.html.

[57] Z. Byron Wolf, *Trump's defense of the 'very fine people' at Charlottesville white nationalist march has David Duke gushing*, CNN Politics (Aug. 15, 2017), http://www.cnn.com/2017/08/15/politics/donald-trump-david-duke-charlottesville/index.html.

[58] *President Trump Speaks Live in Phoenix, Arizona with Campaign-Style Rally*, CNN (Aug. 22, 2017), http://www.cnn.com/TRANSCRIPTS/1708/22/cnnt.01.html.

454

States Department of Justice found that under Sheriff Arpaio's leadership the Maricopa County Sheriff's Office engaged in a pattern and practice of unconstitutional conduct and violations of federal law based on its blatantly discriminatory practices against Latinos.[59] Among other conclusions, the Justice Department investigation uncovered "a pervasive culture of discriminatory bias against Latinos" and noted that Sheriff Arpaio's officers routinely referred to Latinos as "wetbacks," "Mexican bitches," "fucking Mexicans," and "stupid Mexicans."   In pardoning Sheriff Arpaio, President Trump praised him as an "American patriot"[60] and suggested that he was "convicted for doing his job."[61]

113.  President Trump's recent comments and actions reflect an ongoing pattern and practice of bias stretching back decades.   In 1973, the United States Department of Justice sued President Trump after a federal investigation found that his company had engaged in systematic racial discrimination.   To settle this lawsuit, President Trump agreed to a settlement in

[59] U.S. Dep't of Justice, Office of Pub. Affairs, D*epartment of Justice Releases Investigative Findings on the Maricopa County Sheriff's Office* (Dec. 15, 2011), https://www.justice.gov/opa/pr/department-justice-releases-investigative-findings-maricopa-county-sheriff-s-office.

[60] Donald J. Trump, Tweet on August 25, 2017, at 7:00 PM.

[61] Julie Hirschfeld Davis & Maggie Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration*, N.Y. Times (Aug. 25, 2017), https://www.nytimes.com/2017/08/25/us/politics/joe-arpaio-trump-pardon-sheriff-arizona.html.

455

which he promised not to discriminate further against people of color.[62]

**The Termination of the DACA Program**

114. Throughout the first eight months of 2017, the Trump Administration sent strong signals that Dreamers could and should continue to rely on the government's promises regarding the DACA program. As noted above, then-Secretary of Homeland Security John D. Kelly specifically exempted DACA from the Administration's broad repeal of other immigration programs, and reaffirmed that DACA status is a "commitment" by the government.[63]   On April 21, 2017, President Trump said that his administration is "not after the dreamers," suggested that "[t]he dreamers should rest easy," and responded to the question of whether "the policy of [his] administration [is] to allow the dreamers to stay," by answering "Yes."[64]

115. On June 29, 2017, officials from ten states[65] that had previously challenged another deferred action

---

[62] Michael Kranish & Robert O'Harrow, Jr., *Inside the government's racial bias case against Donald Trump's company, and how he fought it*, The Washington Post (Jan. 23, 2016), https://www.washingtonpost.com/politics/inside-the-governments-racial-bias-case-against-donald-trumps-company-and-how-he-fought-it/2016/01/23/fb90163e-bfbe-11e5-bcda-62a36b394160_story.html?utm_term=.b640592cbc5a.

[63] *Secretary Kelly Memo*, *supra* note 35; Hesson & Kim, *supra* note 36.

[64] Transcript of AP Interview With Trump, supra note 37.

[65] On September 1, 2017, Tennessee Attorney General Herbert H. Slattery III reversed course and decided Tennessee would not join the suit, citing "a human element to this [issue]" that "should not be ignored."   *See* Letter from Tennessee Attorney General Herbert H. Slattery III to Sens. Lamar Alexander and Bob Corker (Sept. 1, 2017), http://static1.1.sqspcdn.com/static/f/373699/2767305

456

program, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), sent a letter to Attorney General Jeff Sessions, asserting that the DACA program is unlawful. The states threatened to challenge DACA in court unless the federal government rescinded the DACA program by September 5, 2017.[66]

116. On July 21, 2017, attorneys general from twenty states sent a letter to President Trump urging him to maintain DACA and defend the program in court, asserting that the arguments of the states which were threatening to bring suit were "wrong as a matter of law and policy."[67]

117. On August 31, 2017, hundreds of America's leading business executives sent a letter to President Trump urging him to preserve the DACA program.[68] The letter explains that "Dreamers are vital to the fu-

---

8/1504293882007/DACA%2Bletter%2B9-1-2017.pdf. Attorney General Slattery further acknowledged that DACA recipients "have an appreciation for the opportunities afforded them by our country," and that "[m]any . . . have outstanding accomplishments and laudable ambitions, which if achieved, will be of great benefit and service" to the United States. *Id.*

[66] Letter from Texas Attorney General Ken Paxton, *et al.*, to U.S. Attorney General Jeff Sessions (June 29, 2017), https://www. texasattorneygeneral.gov/files/epress/DACA_letter_6_29_2017.pdf.

[67] Letter from California Attorney General Xavier Becerra, *et al.*, to President Donald J. Trump (July 21, 2017), https://oag.ca.gov/ system/files/attachments/press_releases/7-21-17%20%20Letter% 20 from%20State%20AGs%20to%20President%20Trump%20re%20 DACA.final_.pdf.

[68] Letter to President Donald J. Trump, *et al.*, (Aug. 31, 2017), https://dreamers.fwd.us/business-leaders.

457

ture of our companies and our economy" and are part of America's "global competitive advantage."[69]

118. On September 4, 2017, Attorney General Sessions wrote to Acting Secretary of Homeland Security Duke, describing his assessment that "DACA was effectuated by the previous administration through executive action, without proper statutory authority;" that DACA "was an unconstitutional exercise of authority by the Executive Branch;" and that "it is likely that potentially imminent litigation would yield similar results [as the DAPA litigation] with respect to DACA."[70]

119. On September 5, 2017, Attorney General Sessions announced the government's decision to end the DACA program.  In his remarks, Attorney General Sessions recognized that DACA "essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program," but asserted that the program "is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program."[71]

120. Attorney General Sessions's comments regarding the legality of the DACA program contradict conclusions previously reached by both the Department of Justice and the Department of Homeland Security.

---

[69] *Id.*

[70] Letter from U.S. Attorney General Jefferson B. Sessions to Acting Secretary of Homeland Security Elaine C. Duke (Sept. 4, 2017), https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf.

[71] U.S. Dep't of Justice, Office of Pub. Affairs, *Attorney General Sessions Delivers Remarks on DACA* (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

AR2751

458

Specifically, the Department of Justice's Office of Legal Counsel ("OLC") provided a detailed analysis of DAPA in 2014, concluding that DAPA—as well as DACA—was a lawful exercise of the Executive Branch's "discretion to enforce the immigration laws."[72]   More recently, in its brief before the U.S. Supreme Court in *United States v. Texas*, DHS concluded that programs like DACA are "lawful exercise[s]" of the Executive Branch's "broad statutory authority" to administer and enforce the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.*[73]

121. Nonetheless, on the same date as Attorney General Sessions's announcement, Acting Secretary of Homeland Security Duke issued a memorandum formally rescinding the DACA program (the "Rescission Memorandum").[74]   Unlike OLC's 2014 analysis, the Rescission Memorandum provides no reasoned evaluation of the legality and merits of the program.   Instead, it states that the threat of litigation by numerous state attorneys general provoked the decision to terminate DACA.

122. In addition to the Rescission Memorandum, Secretary Duke also issued an accompanying statement asserting that the government had decided to end

---

[72] Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. & to Defer Removal of Others, 2014 WL 10788677 (Op. O.L.C. Nov. 19, 2014).

[73] *See* Brief for Petitioners at 42, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 836758 at *42.

[74] Memorandum from Acting Secretary Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

459

DACA rather than "allow the judiciary to *potentially* shut the program down completely and immediately."[75] Secretary Duke also expressed "sympath[y]" and "frustrat[ion]" on "behalf" of DACA recipients, candidly acknowledging that "DACA was fundamentally a lie."[76]

123. Under the Rescission Memorandum, the federal government will continue to process DACA applications received by September 5, 2017. Furthermore, the federal government will issue renewals for recipients whose permits expire before March 5, 2018, provided they apply for renewal by October 5, 2017. The government will not approve any new or pending applications for advanced parole.

124. In a statement also issued on September 5, 2017, President Trump claimed that he decided to end DACA because he had been advised that "the program is unlawful and unconstitutional and cannot be successfully defended in court," and because DACA "helped spur a humanitarian crisis—the massive surge of unaccompanied minors from Central America including, in some cases, young people who would become members of violent gangs throughout our country, such as MS-13."[77]

125. The government also has taken affirmative steps to reduce the protections applicable to infor-

---

[75] Statement from Acting Secretary Duke on the Rescission Of Deferred Action For Childhood Arrivals (DACA) (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/statement-acting-secretary-duke-rescission-deferred-action-childhood-arrivals-daca (emphasis added).

[76] *Id.*

[77] Statement from President Donald J. Trump (Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president-donald-j-trump.

460

mation provided in connection with the DACA pro-
gram. In January 2017, President Trump issued an
Executive Order directing all agencies, including DHS,
to "ensure that their privacy policies exclude persons
who are not United States citizens or lawful permanent
residents from the protections of the Privacy Act re-
garding personally identifiable information."[78]  DHS
has confirmed that its new privacy policy "permits the
sharing of information about immigrants and non-
immigrants with federal, state, and local law enforce-
ment."[79]

126.  The Rescission Memorandum also provides no
assurance that information provided in connection with
DACA applications or renewal requests will not be
used for immigration enforcement purposes.  To the
contrary, DHS posted public guidance about the impact
of the rescission on the same day that the Rescission
Memorandum was issued.  This guidance backtracks
on the government's prior repeated assurances that
"[i]nformation provided in [a DACA] request *is pro-
tected from disclosure* to ICE and CBP for the purpose
of immigration enforcement proceedings. . . . "[80]

---

[78] Exec. Order No. 13768, "Enhancing Public Safety in the Inte-
rior of the United States" (Jan. 25, 2017), https://www.whitehouse.gov/
the-press-office/2017/01/25/presidential-executive-order-enhancing-
public-safety-interior-united.

[79] DHS, Privacy Policy 2017-01 Questions & Answers, at 3 (Apr.
27, 2017), https://www.dhs.gov/sites/default/files/publications/Privacy
%20Policy%20Questions%20%20Answers%2C%2020170427%2C%20
Final.pdf.

[80] USCIS DACA FAQs, Question 19 (emphasis added).  The ref-
erenced Notice to Appearance guidance is USCIS Policy Memoran-
dum 602-0050 (Nov. 7, 2011) ("Revised Guidance for the Referral of
Cases and Issuance of Notices to Appear (NTAs) in Cases Involv-
ing Inadmissible and Removable Aliens").

461

Now, rather than affirmatively "protect[ing] [this information] from disclosure," the government represents only that such sensitive information "*will not be proactively provided* to ICE and CBP for the purpose of immigration enforcement proceedings. . . . "[81] And even this policy "may not be relied upon" by any party and can be changed "at any time without notice."[82]

127. Despite terminating DACA, other uses of deferred action and programs benefitting other groups of immigrants remain in effect.

**The Termination of the DACA Program Will Inflict Severe Harm**

128. The termination of the DACA program will severely harm Plaintiffs and hundreds of thousands of other young Dreamers. Among other things, Plaintiffs stand to lose their ability to access numerous federal, state, and practical benefits, and to reside in the United States with their families. Nearly 800,000 other young people will similarly face the prospect of losing their jobs, being denied vital benefits, and being separated from the family, friends, colleagues, and communities that love and rely on them. The termination of the DACA program will also harm the students, patients, clients, community members, family, and friends who have come to rely on Plaintiffs for essential services and emotional and financial support.

129. With the sensitive personal information they provided to the federal government no longer "pro-

---

[81] DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017) (emphasis added), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca.

[82] *Id.*

462

tected from disclosure," Plaintiffs and other DACA recipients face the imminent risk that such information could be used against them "at any time," "without notice," for purposes of immigration enforcement, including detention or deportation.

130.  Terminating DACA will also cause widespread economic harm.[83]  DACA has enabled approximately 800,000 hardworking, ambitious, and educated young people to enter the labor force.  Over 90 percent of DACA recipients are employed, and over 95 percent are bilingual, a valuable skill that is increasingly needed by American companies.[84]

131.  Terminating the DACA program will also have a negative impact on the economy and American competitiveness.[85]

132.  On August 31, 2017, in recognition of these costs and their concern for Dreamers, hundreds of America's most important business leaders sent a letter to President Trump emphasizing the benefits of the DACA program and urging him to preserve it.  The letter explains that "Dreamers are vital to the future of

---

[83] *See, e.g.*, Ike Brannon & Logan Albright, The Economic and Fiscal Impact of Repealing DACA, The Cato Institute (Jan. 18, 2017), https://www.cato.org/blog/economic-fiscal-impact-repealing-daca; Immigrant Legal Resource Center, Money on the Table: The Economic Cost of Ending DACA (Dec. 2016), https://www.ilrc.org/sites/default/files/resources/2016-12-13_ilrc_report_-_money_on_the_table_economic_costs_of_ending_daca.pdf.

[84] *Id.*

[85] *See* Ike Brannon & Logan Albright, *supra* note 83 (concluding that terminating DACA will cost the federal government $60 billion in lost revenue and reduce GDP by $215 billion).

our companies and our economy" and part of America's "global competitive advantage."[86]

## CAUSES OF ACTION

### FIRST COUNT

### FIFTH AMENDMENT—DUE PROCESS

133.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

134.  Immigrants who are physically present in the United States are guaranteed the protections of the Due Process Clause.  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

135.  The Constitution "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). A threshold inquiry in any case involving a violation of procedural due process "is whether the plaintiffs have a protected property or liberty interest and, if so, the extent or scope of that interest."  *Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178, 1190-91 (9th Cir. 2015) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569-70 (1972)).

136.  The property interests protected by the Due Process Clause "extend beyond tangible property and include anything to which a plaintiff has a 'legitimate claim of entitlement.'"  *Nozzi*, 806 F.3d at 1191 (quot-

---

[86] Letter to President Donald J. Trump, Speaker Paul Ryan, Leader Nancy Pelosi, Leader Mitch McConnell, and Leader Charles E. Schumer (Aug. 31, 2017), https://dreamers.fwd.us/business-leaders.

464

ing *Roth*, 408 U.S. at 576-77). "A legitimate claim of entitlement is created [by] . . . 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Id.* (quoting *Roth*, 408 U.S. at 577).

137. In addition to freedom from detention, *Zadvydas*, 533 U.S. at 690, the term "liberty" also encompasses the ability to work, raise a family, and "form the other enduring attachments of normal life." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (citing *Roth*, 408 U.S. at 572).

138. DACA recipients, including Plaintiffs, have constitutionally protected liberty and property interests in their DACA status and the numerous benefits conferred thereunder, including the ability to renew their DACA status every two years. These protected interests exist by virtue of the government's decision to grant DACA recipients certain benefits and its repeated representations and promises regarding the DACA program. *See Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.").

139. In establishing and continuously operating DACA under a well-defined framework of highly specific criteria—including nearly 150 pages of specific instructions for managing the program—the government created a reasonable expectation among Plaintiffs and other DACA recipients that they are entitled to the benefits provided under the program, including the ability to seek renewal of their DACA status, as long as

465

they continue to play by the rules and meet the program's nondiscretionary criteria for renewal.

140.  DACA status is uniquely valuable to Plaintiffs and other Dreamers in that it serves as a gateway to numerous essential benefits.   Revocation of DACA effectively deprives these young people of the ability to be fully contributing members of society.

141.  The ability to renew DACA status at regular intervals has always been an essential element of the program and part of the deal offered by the government.   The prospect of renewal was one of the primary benefits the government used to induce Plaintiffs and other Dreamers to step forward, disclose highly sensitive personal information, and subject themselves to a rigorous background investigation.

142.  The government's arbitrary termination of the DACA program and deprivation of the opportunity to renew DACA status violates the due process rights of Plaintiffs and other DACA recipients.

143.  The government's decision to terminate DACA after vigorously promoting the program and coaxing hundreds of thousands of highly vulnerable young people to step forward is an unconstitutional bait-and-switch.   *See, e.g., Cox v. State of La.*, 379 U.S. 559, 571 (1965); *Raley v. State of Ohio*, 360 U.S. 423, 438-39 (1959).   The government promised Plaintiffs and other young people that if they disclosed highly sensitive personal information, passed a background check, and played by the rules, they would be able to live and work in the United States.   The government's termination of the DACA program is a breach of that promise.   For the government to now "say  . . .  'The joke is on you.   You shouldn't have trusted us,' is hardly worthy of our great government."   *Moda Health Plan,*

**AR2759**

466

*Inc. v. United States*, 130 Fed. Cl. 436, 466 (Fed. Cl. 2017) (quoting *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)).

144. The Due Process Clause also forbids the government from breaking its promises, especially where, as here, individuals, have been induced to undertake actions with potentially devastating consequences in reliance on those promises.

145. The use of information provided by Plaintiffs and other DACA applicants for immigration enforcement actions has particularly egregious due process implications. These individuals disclosed sensitive personal information in reliance on the government's explicit and repeated assurances that it would not be used for immigration enforcement purposes and would in fact be "protected from disclosure" to ICE and CBP. The government has already violated its promises regarding DACA, and there is little reason to believe it will not similarly breach its representations regarding information sharing. *Cf. Raley*, 360 U.S. at 438 ("convicting a citizen for exercising a privilege which the State clearly had told him was available to him," was the "most indefensible sort of entrapment by the State"). Indeed, the government already has breached its prior commitments to affirmatively "protect[] [sensitive information] from disclosure," now asserting only that it will not "proactively provide[]" such information to ICE and CBP for the purpose of immigration enforcement proceedings.

146. The Due Process Clause also requires that the federal government's immigration enforcement actions be fundamentally fair. Here, the government's arbitrary decisions to terminate DACA and change the

AR2760

467

policy regarding the use of information provided by DACA applicants are fundamentally unfair.

147. Defendants' violations of the Due Process Clause have harmed Plaintiffs and will continue to cause ongoing harm to Plaintiffs.

## SECOND COUNT

## FIFTH AMENDMENT—EQUAL PROTECTION

148. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149. The Fifth Amendment forbids federal officials from acting with a discriminatory intent or purpose. *See United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

150. To succeed on an equal protection claim, plaintiffs must show that the defendants "discriminated against them as members of an identifiable class and that the discrimination was intentional." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003) (citation omitted). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "The court analyzes whether a discriminatory purpose motivated the defendant by examining the events leading up to the challenged decision and the legislative history behind it, the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision and whether it creates a disparate impact." *Avenue 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016).

468

151.  As set forth above, the termination of DACA was motivated by improper discriminatory intent and bias against Mexican nationals, individuals of Mexican descent, and Latinos, who together account for 93 percent of approved DACA applications.

152.  President Trump has a history of tweets, campaign speeches, debate responses, and other statements alleging that Mexican and Latino immigrants are rapists, criminals, and otherwise bad people.   Moreover, shortly before terminating DACA, President Trump pardoned former Maricopa County Sheriff Joe Arpaio for a criminal contempt of court conviction related to Sheriff Arpaio's discriminatory practices against Latinos, asserting that the Sheriff had been convicted of contempt merely for "doing his job."

153.  President Trump's statements and actions, including the termination of the DACA program, appealed to voters who harbor hostility toward Mexican and Latino immigrants.

154.  The government did not follow its normal procedures in reversing course and terminating the DACA program.   In 2014, the OLC concluded, after conducting a detailed analysis, that DACA was a lawful exercise of the Executive Branch's discretion.   The government has made similar arguments to the Supreme Court.   By contrast, Attorney General Sessions's one-page letter to Acting Secretary Duke contained virtually no legal analysis, and Acting Secretary Duke's Rescission Memorandum relied largely on Attorney General Sessions's letter.

155.  There are many strong policy reasons to maintain the DACA program.   DACA has provided the government with enormous benefits, including an efficient allocation of immigration enforcement resources.

**AR2762**

469

DACA has also provided enormous benefits to American businesses and the broader economy. And DACA has helped communities throughout the United States, who are able to benefit from the talents and contributions of DACA recipients.

156. DACA is a promise from the government to DACA recipients and those who rely on them. Separate from the policy rationales set forth above, the government is obligated to honor its commitments under the DACA program.

157. The government continues to operate programs that benefit other groups of immigrants. Because Mexicans and Latinos account for 93 percent of approved DACA applications, they will be disproportionately impacted by the termination of the DACA program.

158. The history, procedure, substance, context, and impact of the decision to terminate DACA demonstrate that the decision was motivated by discriminatory animus against Mexican and Latino immigrants. Because it was motivated by a discriminatory purpose, the decision to terminate DACA violates the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

159. Defendants' violations have caused ongoing harm to Plaintiffs and other Dreamers.

### THIRD COUNT

### ADMINISTRATIVE PROCEDURE ACT— CONSTITUTIONAL VIOLATIONS

160. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

AR2763

470

161.  Defendants are subject to the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 703.  The termination of the DACA program is final agency action subject to judicial review because it marks the "consummation of the  . . .  decisionmaking process" and is one "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).

162.  The "comprehensive" scope of the APA provides a "default" "remed[y] for all interactions between individuals and all federal agencies."  *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009).

163.  The APA requires that courts "shall  . . .  hold unlawful and set aside agency action, findings, and conclusions found to be  . . .  not in accordance with law  . . .  [or] contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(A), (B).

164.  For the reasons set forth above, the decision to terminate the DACA program is unconstitutional in numerous respects and therefore must be vacated.

## FOURTH COUNT

### ADMINISTRATIVE PROCEDURE ACT—ARBITRARY AND CAPRICIOUS ACTION

165.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

166.  Defendants are subject to the APA.  *See* 5 U.S.C. § 703.  The termination of the DACA program is final agency action subject to judicial review because it marks the "consummation of the  . . .  decisionmaking process" and is one "from which legal

**AR2764**

471

consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).

167. The "comprehensive" scope of the APA provides a "default" "remed[y] for all interactions between individuals and all federal agencies." *W. Radio Servs. Co.*, 578 F.3d at 1123.

168. The APA requires that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (E).

169. In creating DACA, the government promised Plaintiffs that if they stepped forward, shared highly sensitive personal information, and passed a background check, they would be granted renewable protection and would be allowed to live and work in the United States as long as they played by the rules. The government also specifically and consistently promised that information disclosed through the DACA program would not be used for immigration enforcement purposes outside certain limited circumstances.

170. Plaintiffs and nearly 800,000 vulnerable young people reasonably relied on the government's assurances and promises in taking the irreversible step of identifying themselves and providing the government with highly sensitive and potentially compromising personal information. DACA recipients also made numerous life-altering personal and professional decisions in reliance on the government's promises regarding DACA.

171. A government decision reversing a prior policy is "arbitrary and capricious" when it fails "tak[e] into

472

account" these types of "serious reliance interests." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015).

172.   The government's disregard for the reasonable reliance of Plaintiffs and hundreds of thousands of other vulnerable young people is the hallmark of arbitrary and capricious action and an abuse of discretion, and the decision to terminate the DACA program is therefore in violation of the APA and must be vacated.

173.   The government's decision to terminate the DACA program is also arbitrary and capricious because the purported rationale for that decision is inconsistent with DHS's new policy.   *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 55-56 (1983) (holding that the agency "failed to offer the rational connection between facts and judgment required to pass muster under the arbitrary capricious standard").   In particular, the government terminated DACA because it purportedly concluded that the Executive Branch lacks authority to continue the program, yet DHS will continue to adjudicate pending DACA applications, as well as renewal applications it receives before October 5, 2017 (for individuals whose benefits expire before March 5, 2018), thereby extending DACA for an additional two and a half years.

174.   The government's decision to set an October 5, 2017 deadline for accepting DACA renewal applications is also arbitrary.   The Rescission Memorandum does not provide a reasoned analysis to support this short deadline, and the government has failed to provide sufficient time and notice to DACA recipients.   On information and belief, the government has sent false and misleading renewal notices to certain DACA recipients,

473

which have failed to advise them of the October 5, 2017 deadline. Moreover, this short deadline is especially troubling for low-income DACA recipients, who have little time to gather the significant funds required to submit a DACA renewal application.

175. Moreover, the decision to terminate DACA is also arbitrary and capricious because the government itself previously determined that DACA is a lawful exercise of the Executive Branch's immigration enforcement authority, and the government failed to conduct or provide a reasoned analysis for its change of policy. *See Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989) ("a shift from settled policy requires a showing of reasoned analysis").

176. The government's decision to terminate DACA is also in violation of the APA because the stated rationale for ending the program is pretextual and incorrect as a matter of law.

### FIFTH COUNT

### ADMINISTRATIVE PROCEDURE ACT— NOTICE-AND-COMMENT RULEMAKING

177. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178. The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct rulemaking before engaging in action that impacts substantive rights.

179. DHS is an "agency" under the APA, and the Rescission Memorandum and the actions that DHS has taken to implement the Rescission Memorandum are "rules" under the APA. *See* 5 U.S.C. § 551(1), (4).

474

180. In implementing the Rescission Memorandum, federal agencies have changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States. Defendants did not follow the procedures required by the APA before taking action impacting these substantive rights.

181. With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking. *See* 5 U.S.C. § 553.

182. Defendants promulgated and implemented these rules without authority and without notice-and-comment rulemaking in violation of the APA.

183. Plaintiffs will be impacted because they have not had the opportunity to comment on the rescission of DACA.

184. Defendants' violation has caused ongoing harm to Plaintiffs and other Dreamers.

### SIXTH COUNT

### REGULATORY FLEXIBILITY ACT— REGULATORY FLEXIBILITY ANALYSES

185. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

186. The Regulatory Flexibility Act, 5 U.S.C. §§ 601-12 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment. 5 U.S.C. §§ 603-04.

**AR2768**

475

187. "Small entit[ies]" for purposes of the RFA includes "small organization[s]" and "small business[es]." *See* 5 U.S.C. §§ 601(3), (4), (6).

188. The actions that DHS has taken to implement the DHS Memorandum are "rules" under the RFA. *See* 5 U.S.C. § 601(2).

189. Defendants have not issued the required analyses of DHS's new rules.

190. Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

191. Defendants' violations cause ongoing harm to Plaintiffs and other Dreamers.

### SEVENTH COUNT

### EQUITABLE ESTOPPEL

192. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

193. Through its conduct and statements, the government represented to Plaintiffs and other DACA applicants that DACA was lawful and that information collected in connection with the DACA program would not be used for immigration enforcement purposes absent special circumstances.

194. In reliance on the government's repeated assurances, Plaintiffs and other DACA applicants risked removal and deportation and came forward and identified themselves to the government, and provided sensitive personal information, including their fingerprints and personal history, in order to participate in DACA.

476

195.  Throughout the life of DACA, the government has continued to make affirmative representations about the use of information as well as the validity and legality of DACA.  Plaintiffs and other DACA applicants relied on the government's continuing representations to their detriment.

196.  DACA beneficiaries rearranged their lives to become fully visible and contributing members of society, including by seeking employment, pursuing higher education, and paying taxes, but are now at real risk of removal and deportation.

197.  Accordingly, Defendants should be equitably estopped from terminating the DACA program or from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under DACA.

198.  An actual controversy between Plaintiffs and Defendants exists as to whether Defendants should be equitably estopped.

199.  Plaintiffs are entitled to a declaration that Defendants are equitably estopped.

### EIGHTH COUNT

### DECLARATORY JUDGMENT THAT
### DACA IS LAWFUL

200.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

201.  The DACA program was a lawful exercise of the Executive Branch's discretion to enforce the immigration laws.  Indeed, after performing a thorough analysis, the government itself concluded that DACA

**AR2770**

477

was lawful.[87]   However, the government now claims, as the basis for its rescission of the program, that DACA is unlawful.[88]

202. The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."   28 U.S.C. § 2201(a).

203. As DACA beneficiaries, Plaintiffs have an interest in the legality of the DACA program.   The government's decision to terminate DACA on the purported basis that the DACA program was unlawful has harmed Plaintiffs and continues to cause ongoing harm to Plaintiffs.

204. There is an actual controversy regarding whether the DACA program is lawful.

205. Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the DACA program was lawful and is lawful today.

---

[87] *See* Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. & to Defer Removal of Others, 2014 WL 10788677 (Op. O.L.C. Nov. 19, 2014).

[88] *See* Memorandum from Acting Secretary Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

478

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

(1) Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the DACA program is lawful and constitutional;

(2) Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) and 5 U.S.C. § 706(2) that the termination of the DACA program was unlawful and unconstitutional;

(3) Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that Defendants are equitably estopped from terminating the DACA program or from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under the program;

(4) Issue an injunction invalidating the Rescission Memorandum, preserving the status quo, and enjoining Defendants from terminating the DACA program;

(5) Issue an injunction enjoining Defendants from sharing or otherwise using information provided pursuant to the DACA program for immigration enforcement purposes except as previously authorized under the DACA program; and

(6) Grant any other and further relief that this Court may deem just and proper.

DATED:   Sept. 18, 2017
San Francisco, California

479

Respectfully submitted,

/s/   THEODORE J. BOUTROUS, JR.
      GIBSON, DUNN & CRUTCHER LLP

/s/   MARK D. ROSENBAUM
      PUBLIC COUNSEL

/s/   LUIS CORTES ROMERO
      BARRERA LEGAL GROUP, PLLC

/s/   LAURENCE H. TRIBE

/s/   ERWIN CHEMERINSKY

/s/   LEAH LITMAN

Attorneys for Plaintiffs DULCE GAR-
CIA, MIRIAM GONZALEZ, AVILA,
SAUL JIMENEZ SUAREZ, VIRIDI-
ANA CHABOLLA MENDOZA, NOR-
MA RAMIREZ, and JIRAYUT LAT-
THIVONGSKORN

**AR2773**

480

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN JOSE)

———

Case No. 3:17-cv-05329-WHA

CITY OF SAN JOSE, A MUNICIPAL CORPORATION, PLAINTIFF

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY, ELAINE C. DUKE, IN HER OFFICIAL CAPACITY, AND THE UNITED STATES OF AMERICA, DEFENDANTS

———

Filed:   Sept. 14, 2017

———

**COMPLAINT FOR:**

1. **VIOLATION OF FIFTH AMENDMENT EQUAL PROTECTION**

2. **VIOLATION OF 5 U.S.C. §§ 553 & 706(2)(D)**

———

481

## TABLE OF CONTENT

I.   INTRODUCTION ...............................................[1]

II.  JURISDICTION AND VENUE .......................[2]

III. PARTIES .............................................................[2]

    A.  Plaintiff .......................................................[2]

    B.  Defendants ...................................................[3]

IV.  FACTUAL ALLEGATIONS.............................[4]

    A.  Immigrants Contribute to the Success of the United States and California Cities.....[4]

    B.  In 2012, DACA Is Implemented..................[5]

    C.  DACA Has Provided 800,000 Young People Who Have Known No Other Country than the United States a Chance to Attend College and/or Work......[7]

    D.  San Jose and Silicon Valley Have Benefitted From DACA...............................[7]

    E.  While President Trump Has Been Ant-Immigrant, He Has Been Supportive of DACA Recipients .................[8]

        1.  Anti-Immigrant Statements by the President and His Administration ........[8]

        2.  Despite His Anti-Immigration Rhetoric, Trump Has Demonstrated His Support of DACA..........................[10]

    F.  The Rescission of DACA ...........................[11]

    G.  San Jose Has Taken Action to Try to Help Its Immigrant Residents, But Has Limited Ability to Effectuate Change, Except With this Lawsuit.........................[11]

**AR2775**

482

H.  The Rescission of DACA Has Harmed
    San Jose ........................................................ [12]
V.  CLAIMS FOR RELIEF .................................. [14]
VI.  PRAYER FOR RELIEF ................................. [15]

AR2776

483

I.   **INTRODUCTION**

1.   For the last five years, young people who have lived in the United States since they were children, even though they were born in another country, have had the right to live, work and attend college if they met stringent requirements as set forth by the Deferred Action for Childhood Arrivals ("DACA"). **Exhibit 1**.   The success of these DREAMers, as they are known, has been an incredible story.   About 800,000 people who otherwise would not have had the opportunity to attend college or work have now had that ability, thus enriching the lives of themselves, their families, and their communities.   Under DACA, Plaintiff, the City of San Jose ("San Jose") has been able to hire these DACA recipients, which has benefited the cities and their residents.

2.   During the 2016 election campaign, rhetoric about immigration became nasty.   One of the candidates who made extremely outrageous and false statements about immigrants was defendant Donald J. Trump as he ran for the office of President.   After he was elected and sworn into office, President Trump's anti-immigrant rhetoric continued.   Both he and senior members of this administration have made anti-immigrant statements.

3.   Yet, throughout the campaign and President Trump's presidency, he has made positive and reassuring comments about DACA and the DREAMers. On April 24, 2017 in an interview with the Associated Press, for example, President Trump told undocumented immigrants who were brought to the United States as children that they could rest easy.

**AR2777**

484

> AP:   A lot of the dreamers have been hoping to hear something from you.  I don't want to give them the wrong message with this.
>
> TRUMP:   Here is what they can hear:  **The dreamers should rest easy**.  OK?  I'll give you that.  **The dreamers should rest easy**.   . . .

4.     President Trump's stated opinion is shared by most Americans.   Since the United States is a land of immigrants, most Americans realize the importance of immigrants to this country.

5.     Despite President Trump's promises to DREAMers, he broke his promise.   He directed his Attorney General to make an announcement on September 5, 2017, that DACA would be rescinded, **Exhibit 2** and then Defendant Elaine C. Duke ("Secretary Duke") as the Acting Secretary of the Department of Homeland Security, issued a memorandum that rescinded DACA, although it deferred rescission for six months.   **Exhibit 3**.   Secretary Duke's memorandum, contrary to law, was issued without providing notice of the change and an opportunity to be heard.   The reasons for the issuance were contrary to the facts, and arbitrary and capricious.

6.     As a result of Defendants' actions, the lives of the DACA recipients, over a quarter of whom live in California, have been sent into upheaval.   Fear and uncertainty have invaded their lives.   Not only have they been injured, but so too has San Jose.

## II.   <u>JURISDICTION AND VENUE</u>

7.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.   This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*

**AR2778**

485

8.     Venue properly lies within the Northern District of California because Plaintiff, the City of San Jose, is a public entity in this judicial district and a substantial part of the events or omissions giving rise to this action will occur or have occurred in this District.   28 U.S.C. § 1391(e).

## III.  PARTIES

### A.    Plaintiff

9.     Plaintiff San Jose is a municipal corporation, organized as a Charter City under the California Constitution and the laws of the State of California and is located in the County of Santa Clara.   It is the tenth largest city in the United States.   San Jose has always been a place for immigrants with almost 40% of its current population having been born in another country.   San Jose, which had been home to the Ohlone Indians for hundreds of years, was founded by Spain on November 29, 1777, as El Pueblo de San Jose de Guadalupe.   In 1821, San Jose became part of Mexico. After the Treaty of Guadalupe Hidalgo ceded California to the United States at the end of the Mexican-American War in 1848, San Jose became its first incorporated U.S. city.

10.     San Jose is bringing this action on its own behalf and on the behalf of its employees who are DACA recipients.   As described below, San Jose has suffered its own injury in fact.   It also has third party standing to bring this action on behalf of its employees because San Jose has a concrete interest in the outcome of the dispute; San Jose has a close relationship with its employees, whose rights it is asserting, and there is a hindrance to the employees to protect their own interests. *Powers v. Ohio*, 499 U.S. 400, 410-11, (1991); *Singleton v. Wulff*, 428 U.S. 106, 113-16 (1976); *Wedges/Ledges of*

AR2779

486

*Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994). Where here, San Jose is asserting the same right, to allow DACA recipient employees to have the right to legally work for San Jose, San Jose's and its employees rights are inextricably bound up, which satisfies the requirement that San Jose's interest is sufficiently aligned with that of its employees. *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488-89 (9th Cir. 1996). The fact that the employees are undocumented immigrants with fear of provoking the attention of the immigration authorities or creating other legal risks satisfies the requirement that there is a hindrance to San Jose's employees protecting their own interests, especially in light of Defendants' demonstrated hostility to them. *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1044 (11th Cir. 2008).

### B. Defendants

11. Defendant **Donald J. Trump** has been since January 20, 2017, the President of the United States. He is sued in his official capacity. As a candidate, he railed against immigrants. When he announced his candidacy in June 2015, for example, he stated: "The U.S. has become a dumping ground for everybody else's problems. Thank you. It's true, and these are the best and the finest. When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems to us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people." There was no factual support for this statement. Despite his animus towards immigrants, he has consistently indicated his support for DACA, including tweeting on September 7, 2017, after DACA

**AR2780**

487

was rescinded, that "For all those (DACA) that are concerned about status during the 6 month period, you have nothing to worry about—No action!"

12.   Defendant **Elaine C. Duke** is the acting Secretary of the Department of Homeland Security, a cabinet department of the United States government with the primary mission of securing borders of the United States.   Acting Secretary Duke issued the memorandum rescinding DACA, and she and the Department of Homeland Security are responsible for implementing the rescission of DACA.

13.   Defendant United States of America is sued under 28 U.S.C. § 1346.

## IV.   <u>FACTUAL ALLEGATIONS</u>

14.   The Statue of Liberty has stood as a welcoming beacon of hope and inspiration to the millions of immigrants who have come to the United States through New York.   Inscribed on the statue are the stirring words of Emma Lazarus to:   "Give me your tired, your poor, your huddled masses yearning to breathe free."

15.   The reality has been far different than the Statue of Liberty's inscription as some groups in the United States have, throughout the nation's history, tried to limit citizenship to groups of people some found undesirable:   Irish, Italians, Jews, Chinese, Mexicans and the list goes on.   Yet, most of the immigrants who have come to the United States simply want to make a better life for themselves and their families and to fit in to their new country.   Our country would not be the greatest country in the world without the diversity of its citizenship achieved through immigration.

**AR2781**

488

### A. Immigrants Contribute to the Success of the United States and California Cities

16.  Studies demonstrate the positive impact immigrants, even undocumented immigrants, have on the United States.  In April of 2016, the U.S. Chamber of Commerce published a report entitled Immigration Myths and Faces, www.uschamber.com/reports/immigration-myths.  The report demonstrates that most common negative contentions regarding immigrants are false.  For example, with citation to evidence, the Chamber of Commerce demonstrates that immigrants do not take away jobs from U.S. citizens, do not drive down the wages of the U.S. workers, but to the contrary, immigrants are necessary for the U.S. economy.  The Chamber also demonstrates that immigrants, even undocumented immigrants, pay taxes.  Undocumented immigrants are not eligible for federal public benefit programs like Social Security, Medicaid, Medicare, and food stamps.  The Chamber report demonstrates that undocumented immigrants do not commit more crime than citizens.  FBI data demonstrates that as the number of undocumented immigrants tripled from 1990, violent crime declined 48% and property crime declined 41%.  A report from the conservative Americas Majority Foundation found that crime rates are lowest in states with the highest immigration growth rates.  Immigrants are less likely than people born in the United States to commit crimes or be incarcerated.

17.  San Jose has been an extremely diverse region since the mid-1800s, which has led to immigrants gravitating to such areas where there are already established immigrant communities.  Waves of immigrants, from China and Mexico, Vietnam, India, and Northern

**AR2782**

489

Europe, have played a fundamental role in the creation of three profoundly different industries:   first mining, then agriculture, and finally technology in San Jose and the Silicon Valley.   http://www.sanjoseca.gov/Document Center/View/19862.

**B.   In 2012, DACA Is Implemented**

18.   Throughout the later part of the last century and the first part of this century, politicians could not agree on a comprehensive immigration policy.   Immigrants who would have had a clear path to citizenship in the past found citizenship almost impossible to achieve.   Yet, immigrants who had no hope in their country of birth came to the United States without documentation for a better life.   In the process, they have enriched our country.   Many of these immigrants brought their entire families, including their young children.

19.   By 2012, there were millions of residents who came here as children, but they did not have documentation to remain in this country.   As Congress stalled in enacting any meaningful immigration reform, there was a groundswell to protect these young people from deportation and allow them to live productive lives to enrich themselves, their families and their adopted country.

20.   In June of 2012, President Barack Obama, through an Executive Order, enacted DACA.   He stated that he believed it was "the right thing to do" to protect young people who do not know any country but America. On June 15, 2012, then Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program.   **Exhibit 1**.   DACA is in essence a deferred prosecution agreement.

**AR2783**

490

21.   The 2012 DACA Memorandum established that an applicant would be considered for an exercise of prosecutorial discretion only by satisfying each of the following criteria:

- came to the United States under the age of sixteen;

- had continuously resided in the United States for at least five years preceding the date of the memorandum and is present in the United States on the date of the memorandum;

- was currently in school, had graduated from high school, had obtained a general education development certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- had not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- was not above the age of thirty.

22.   In addition to simply being eligible for this program, undocumented immigrants must also pay a $495 application fee, submit several forms, and produce documents showing they meet the requirements. Moreover, if a DACA qualifying immigrant wants to travel abroad there is an additional fee and application requirement required.   Those applying are also vetted for any criminal history or threat to national security and must be students or have completed school or military service.   If approved, action to deport them is deferred for two years, along with the opportunity to renew, along with gaining eligibility for basics like a driving license, college enrollment or a work permit.

491

23. In exchange for DACA applicants providing sensitive and private information regarding their entire lives, the United States government promised to keep the information confidential and not to use it, except in limited circumstances, for any purposes except for DACA purposes.

### C. DACA Has Provided 800,000 Young People Who Have Known No Other Country than the United States a Chance to Attend College and/or Work

24. The rewards of DACA have been enormous, not only to the immigrants who came to this country as children, but to the nation. First-generation immigrants who enter the United States as children tend to pay, on average, more in taxes over their lifetimes than they receive in benefits, regardless of their education level. DACA recipients end up contributing more than the average, because they are not eligible for any federal means-tested welfare: cash assistance, food stamps, Medicaid, health-care tax credits or anything else.

25. Moreover, DACA recipients also are better educated than the average immigrant. Applicants must have at least a high school degree to enter the program. An additional 36 percent of DACA recipients who are older than 25 have a bachelor's degree, and an additional 32 percent are pursuing a bachelor's degree.

26. Further, while studies show that undocumented immigrants are much less likely to end up in prison, this fact is especially true for DACA recipients since applicants must also pass a background check, indicating even lower levels of criminal behavior than the average American citizen.

492

27.   DACA has been a success as it has allowed over 800,000 recipients to work and go to college in the United States thus enriching our economy and security.

### D.   San Jose and Silicon Valley Have Benefitted From DACA

28.   For San Jose, the ability to hire DACA recipients has been extremely beneficial.   San Jose, like the rest of the Silicon Valley, has the need for a skilled work force.   Unemployment in Santa Clara County is low and competition for employees is fierce.   When DACA was enacted, San Jose was able to hire DACA grantees.   San Jose spent time and resources training these employees and they hold jobs vital to the operation of San Jose.

29.   San Jose is also home to tech companies, like Cisco and Adobe, who need skilled workers.   These companies also hired DACA recipients as did other Silicon Valley companies, like Apple, Facebook, and Google, and many employees live in San Jose.

### E.   While President Trump Has Been Ant-Immigrant, He Has Been Supportive of DACA Recipients

#### 1.   Anti-Immigrant Statements by the President and His Administration

30.   Donald Trump during his campaign for President and since becoming President has demonstrated an animus to immigrants.   His administration, especially people in the Department of Justice and Department of Homeland Security, has been just as anti-immigrant as the President.   Their statements demonstrate this discrimination.

**AR2786**

493

31.   Candidate Trump's statements against immigrants were bombastic and incorrect.   For example, Trump repeatedly denigrated Mexican immigrants in particular, even comparing them to rapists in his presidential bid announcement "When Mexico send its people, they're not sending their best.   They're not sending you.   They're not sending you.   They're sending people that have lots of problems and they're bringing those problems with us.   They're bringing drugs.   They're bringing crime.   They're rapists.   And some, I assume are good people."   (https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.f6c79452d595)

32.   During the first Republican presidential debate, candidate Trump doubled down on his disparaging thoughts about Mexican immigrants, claiming that "The Mexican government is much smarter, much sharper, much more cunning.   And they send the bad ones over because they don't want to pay for them. They don't want to take care of them."   (https://www.nbcnews.com/news/latino/trump-claims-debate-mexico-sends-bad-ones-u-sn405661)

33.   During another presidential debate in October 2016, candidate Trump once again broadly assaulted immigrant families and communities with his views on immigration by declaring "We have some bad hombres here and we're going to get them out."   (https:www.cnce.com/2016/10/19/trump-we-have-some-bad-hombres-and-were-going-to-get-them-out.html)

34.   After becoming President, President Trump's statements have not become Presidential, but continue to be bombastic and incorrect.   For example, President Trump again negatively referred to Mexicans as

**AR2787**

494

'hombres' in a phone call with Mexico's President, condemning these immigrants by saying "You have some pretty tough hombres in Mexico that you may need help with, and we are willing to help you with that big-league.   But they have to be knocked out and you have not done a good job of knocking them out."   (http://www.cnn.com/2017/08/09/politics/best-lines-trump-mexico-australia-call/index.html)

35.   President Trump and his administration further clarified their stance on immigration, as Immigration and Customs Enforcement Acting Director Thomas Homan testified that "every immigrant in this country without papers should be uncomfortable.   You should look over your shoulder.   And you need to be worried."   These sentiments were once again repeated in an interview later that week, when Homan stated that "Trump and his administration have made clear that any undocumented immigrant could be arrested and face deportation proceedings at any time, unless they have current and valid protection under DACA." (http://www.cnn.com/2017/06/16/politics/ice-immigrants-should-be-afraid-homan/index.html)

36.   United States Attorney General Jeff Sessions further reiterated these sentiments coming from the Trump administration as he responded to immigration on Fox News in April 2017 by stating "Everybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported—well, they are.   The policy is that if people are here unlawfully, they're subject to being deported. Our priority is clear  .  .  .   we can't promise people who are here unlawfully that they're not going to be deported."   http://www.foxnews.com/polticis/2017/04/19/

**AR2788**

495

sessions-defends-immigration-policies-after-reported-dreamer-deportation.html).

### 2. Despite His Anti-Immigration Rhetoric, Trump Has Demonstrated His Support of DACA

37.   Even as he has railed at immigrants, President Trump has repeatedly stated his support for DACA recipients.   For example, in an interview with *TIME* magazine on the campaign trail in December 2016, President Trump signaled that he could find a way to accommodate the DREAMers "We're going to work something out that's going to make people happy and proud.   They got brought here at a very young age, they've worked here, they've gone to school here.   Some were good students.   Some have wonderful jobs.   And they're in never-never land because they don't know what's going to happen."   (http://time.com/time-person-of-the-year-2016-donald-trump/?iid=buttonrecirc)

38.   President Trump made statements in an interview with Fox & Friends on January 18, 2017, promising "It's a plan that's going to be very firm, but it's going to have a lot of heart.   And we're going to be looking into that situation.   . . .   That's a very tough situation, but I think they're going to end up being very happy."   (http://wwwpolitico.com/story/2017/01/trump-immigration-plan-233748)

39.   President Trump reiterated this position the next week in an interview with David Muir of ABC News, claiming that "[DACA grantees] shouldn't be very worried.   I do have a big heart.   We're going to take care of everybody."   (http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602)

**AR2789**

496

40.   At a press conference in February of 2017, President Trump announced "We're going to show great heart  .  .  .  you have some absolutely incredible kids—I would say mostly.   They were brought here in such a way.   It's a very—it's a very very tough subject.   We are going to deal with DACA with heart. I have to deal with a lot of politicians, don't forget. And I have to convince them that what I'm saying is, is right  .  .  .  But the DACA situation is a very very— it's a very difficult thing for me because you know, I love these kids.   I love kids.   I have kids and grandkids and I find it very, very hard doing what the law says exactly to do."   (https://www.whitehouse.gov/the-press-office/2017/02/16/remarks-president-trump-press-conference)

41.   In an *Associated Press* interview in April of 2017, President Trump said his administration is "not after the dreamers, we are after the criminals" and that "The dreamers should rest easy" since his Administration's policy is not to deport DACA grantees.   (https//apnews.com/79f2c79805f14c3f8ac878c5df21cdfd/Trump-tells-'dreamers'-to-rest-easy,%20-targets-criminaks)

42.   Even in a written statement issued shortly after the Attorney General, Jeff Sessions, announced the policy to terminate DACA, President Trump declared "I do not favor punishing children, most of whom are now adults, for the actions of their parents.   But we must also recognize that we are [a] nation of opportunity because we are a nation of laws."   (http://deadline.com/2017/09/donald-trump-daca-statement-punishing-children-1202161542/)

43.   In addition to his written statement after Secretary Sessions' announcement terminating DACA, President Trump also tweeted that he "will revisit this

497

issue!" if DACA was not legalized by Congress in the allotted 6 month time span.  (https://twitter.com/real Donald Trump)

### F.  **The Rescission of DACA**

44.  On September 5, 2017, President Trump, through Attorney General Sessions announced the rescission of DACA.  **Exhibit 2**.  On the same day, Elaine Duke, the Acting Secretary of the Department of Homeland Security, issued a memorandum rescinding DACA.  **Exhibit 3**.  The memo was issued without compliance with the Administrative Procedures Act. There was no notification that there was going to be a change in DACA, no notice to be heard, and no factual findings or analysis to demonstrate that DACA should be rescinded.

### G.  **San Jose Has Taken Action to Try to Help Its Immigrant Residents, But Has Limited Ability to Effectuate Change, Except With this Lawsuit**

45.  When Donald Trump was elected President, residents of San Jose were concerned about the President-elect's immigration positions.  In response, in January of 2017, the City Council, approved a plan proposed by Mayor Sam Liccardo to educate immigrants about their rights, helping schools with "safety plans," and allowing churches to provide sanctuary to undocumented residents if needed.  The plan also created "safe spaces" in city-owned facilities, such as libraries, to provide pro-bono legal services.

46.  In response to the Defendants' rescission of DACA, San Jose confirmed its support of its immigrant residents and DACA recipients specifically.  Mayor Sam Liccardo, for example, issued the following statement:

498

The Attorney Generals announcement of the Trump Administration's rescission of DACA abandons 800,000 of America's hardest-working, most patriotic residents.   Punting the issue to Congress, without any affirmative leadership to enact a legislative solution, amounts to a cowardly cop-out, placing the futures of these young women and men in serious jeopardy.

To San Jose's tens of thousands of DREAMers, we reiterate:   "We've got your back."   I will seek to challenge the Administration's actions in court, after consulting with our Council and City Attorney regarding our options in the week ahead.

History will not forgive Donald Trump for abandoning our DREAMers.

47.   Santa Clara County Board of Supervisor's Chair Dave Cortese stated:   "Trump's plan to eliminate DACA is by far his most callous attempt as of yet. The lives, dreams, and futures of thousands of DACA recipients are not a bargaining chip for this Administration to play with.   I remain committed to them and to their cause.   I urge every DREAMer out there to remain resilient and hopeful.   Because together, we will rise."

48.   The Silicon Valley Organization, stated through its Executive Vice President:   "Not only is the rollback of DACA immoral, but it is also terrible for America's competitive economic advantage.   Our economic strength is our diversity; it is its greatest asset and our key difference maker.   To put 800,000 Americans, whose sole 'infraction' was arriving here as children, on a path to lose citizenship will upend a large portion of this key strength.   Rescinding DACA sends the message that America's door to opportunity is slammed

499

tighter, and that is not the message that Silicon Valley business leaders want our government to send to the world at a time when expanding opportunity is the key to long-term innovative success."

### H.  The Rescission of DACA Has Harmed San Jose

49.  The rescission of DACA has already had and will continue to have an impact, not only on the lives of the DACA recipients, but on San Jose who has suffered a concrete and specific injury by the rescission.  Based upon the rescission of DACA, San Jose has had to take steps to deal with the fact that starting on March 5, 2018, the date that the DACA rescission goes into effect, it will lose employees, who are DACA recipients. In order for an employer to hire an employee, the employer must confirm that the employee has the legal right to work in the United States.  See 8 C.F.R. § 274A.1 *et seq*.  Cities who employ people without the right to work face steep penalties and criminal penalties. However, it is also illegal for the cities to terminate employees because of their nationality or immigration status.  Thus San Jose is facing the uncertainty of not knowing whether they will be able to continue to retain these valuable employees in their work force.  With the rescission of DACA, the DACA recipients will be losing their right to work for San Jose.  In order for San Jose to end the employment relationship with an employee and to make sure that there is a smooth transition without the loss of city services, San Jose must start planning now.  Accordingly, even though the DACA rescission allows DACA recipients to work until March 5, 2018, San Jose has not been able to wait until then to make plans to have this change in work force.  It has expended and will continue to extend

500

time and resources to react to this loss of experienced employees.

50.    The acts of Defendants have decreased the efficiency of the work performed by San Jose.   The impact of the DACA rescission on DACA recipients has been catastrophic as they face a future of uncertainty and fear.   San Jose has had to expend time and resources to deal with the loss of productivity and employee morale because of the rescission of DACA, which is another injury.   *FPL Food, LLC v. United States Dep't of Agric.*, 671 F. Supp. 2d 1339, 1358 (S.D. Ga. 2009).

51.    Additionally, because of the taxes that DACA recipients pay, San Jose is facing the loss of tax revenues.   It has had to start expending time and resources to deal with this loss of funds.

## V.   CLAIMS FOR RELIEF

### (All Claims Are Against All Defendants)

### FIRST CLAIM FOR RELIEF

### (Violation of Fifth Amendment—Equal Protection)

52.    San Jose repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

53.    The Due Process Clause of the Fifth Amendment of the United States Constitution prohibits the federal government from denying equal protection of the laws.

54.    As set forth above, Defendants' actions target individuals for discriminatory treatment based on their national origin, without lawful justification.   Defendants' actions were motivated, at least in part, by a

**AR2794**

501

discriminatory intent to harm a particular group and treat them differently under the law.

55.   Defendants' discriminatory actions cannot be sufficiently justified by federal interests.

56.   Through their actions as set forth above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

57.   Defendants' actions has caused and continues to cause ongoing harm to San Jose including their DACA employees, as hereinbefore described.

58.   The City of San Jose seeks a declaration that the rescission of DACA is unconstitutional and a temporary, preliminary, and permanent injunction enjoining the rescission of DACA and enjoining the deportation of any DACA recipient.

WHEREFORE, San Jose prays for relief as hereinafter set forth.

### SECOND CLAIM FOR RELIEF

### (Violation of 5 U.S.C. §§ 553 & 706(2)(D))

59.   San Jose repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

60.   DACCA is a federal rule and therefore, before rescinding DACA, Defendants were required to comply with the Administrative Procedure Act, which requires that federal agencies go through a process of notice and comment before repealing any substantive rule. 5 U.S.C. § 553.

61.   By rescinding DACA without providing proper notice and an opportunity to comment, Defendants have violated 5 U.S.C. § 706(2)(D) because the rescis-

**AR2795**

502

sion was done without proper observance of the procedure of law.

62.    Even if Defendants believed that DACA itself was defective for not complying with the Administrative Procedure Act, which it was not, Defendants were required to comply with the Administrative Procedure Act.  *Consumer Energy Council v. Fed. Energy Regulatory Com.*, 673 F.2d 425, 447 and n.79 (D.C. Cir. 1982); *Hou Ching Chow v. Attorney General*, 362 F. Supp. 1288 (D.D.C. 1973).

63.    Accordingly, San Jose seeks a declaration that Defendants' actions violate 5 U.S.C. § 553 and § 706 and finding that the rescission of DACA is contrary to law.   San Jose also seeks a temporary preliminary and permanent injunction enjoining the rescission of DACA and enjoining the deportation of any DACA recipient.

WHEREFORE, San Jose prays for relief as hereinafter set forth

## VI.  **PRAYER FOR RELIEF**

Wherefore, San Jose prays for the following relief:

1.    A declaration that Defendants' action are unconstitutional and/or violate 5 U.S.C. §§ 553 and 706 and finding that the rescission of DACA is contrary to law;

2.    Enjoin Defendants from rescinding the DACA program and enjoin Defendants from taking any steps to deport any DACA recipients

3.    The costs of bringing this suit, including reasonable attorneys' fees; and

4.    All other relief to which San Jose may be entitled at law or in equity.

503

Dated:   Sept. 14, 2017

**COTCHETT, PITRE & McCARTHY, LLP**

By:   /s/   <u>JOSEPH W. COTCHETT</u>
Joseph W. Cotchett

**OFFICE OF THE CITY ATTORNEY**

By:   /s/   <u>RICHARD DOYLE</u>
Richard Doyle

*Attorneys for Plaintiff City of San Jose*

### ATTESTATION OF FILING

I, Nancy L. Fineman, hereby attest, pursuant to Northern District of California, Local Rule 5-1(i)(3) that concurrence to the filing of this document has been obtained from each signatory hereto.

/s/   <u>NANCY L. FINEMAN</u>
Nancy L. Fineman
*Attorney for Plaintiff City of San Jose*

504

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

————

Civil Case No. 3:17-cv-05235

STATE OF CALIFORNIA, STATE OF MAINE, STATE OF
MARYLAND, AND STATE OF MINNESOTA, PLAINTIFFS

*v.*

U.S. DEPARMTENT OF HOMELAND SECURITY;
ELAINE C. DUKE, IN HER OFFICIAL CAPACITY
AS ACTING SECRETARY OF HOMELAND SECURITY;
AND UNITED STATES OF AMERICA, DEFENDANTS

————

Filed:   Sept. 11, 2017

————

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

————

## INTRODUCTION

1.    The State of California is home to, by far, more grantees of Deferred Action for Childhood Arrivals ("DACA") than any other state, and the States of California, Maine, Maryland, and Minnesota (collectively, "Plaintiff States") combined are home to more than 238,000 DACA grantees.   Defendants' actions in rescinding DACA are illegal and seriously harm Plaintiff States' interests in ways that have already started to materialize and that threaten to last for generations. This program has allowed nearly 800,000 young people (including over 220,000 Californians) who have come of age in the United States—many of whom have known no other home—to come out of the shadows and study and work here without fear of deportation, enriching

**AR2798**

505

our States and communities.    DACA is a humane pol-
icy with a proven track record of success, and Defend-
ants' rescission of DACA violates fundamental notions
of justice.

2.    On September 5, 2017, Defendant Acting Sec-
retary of the Department of Homeland Security Elaine
Duke ("Duke") issued a memorandum rescinding
DACA.    Ex. A, Memorandum from Elaine C. Duke,
Acting Sec'y of Homeland Security to James W. McCa-
ment, Acting Dir., U.S. Citizenship and Immigration
Services ("USCIS"), et al., Rescission of the June 15,
2012 Memorandum Entitled "Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to
the United States as Children" (Sept. 5, 2017) ("DACA
Rescission Memorandum").    Pursuant to that memo-
randum, Defendant Department of Homeland Security
("DHS") immediately ceased accepting new applica-
tions under the DACA program, immediately ceased
granting advance parole (i.e., authorization for DACA
grantees to leave the country), and declared that it will
only issue renewals for current grantees whose DACA
protection expires on or before March 5, 2018; these
current grantees must apply for renewal by October 5,
2017.

3.    The Trump Administration's elimination of
DACA was unlawful on a number of grounds.    First,
the DACA Rescission Memorandum violates the due
process guarantee of the Fifth Amendment to the
United States Constitution by substantially altering
DHS's prior assurances regarding the use of infor-
mation contained in DACA applications; Defendants
should be equitably estopped from acting contrary to
these assurances.    Second, DHS promulgated this rule
without providing notice or the opportunity to comment

506

as required by the Administrative Procedure Act ("APA"), thereby depriving Plaintiff States of the opportunity to present important evidence to DHS about the overwhelming success of the DACA program in Plaintiff States as part of the rulemaking process. Third, DHS violated the substantive requirements of the APA by proffering a legally insufficient justification for rescinding DACA, obscuring the true policy rationale for this substantial change, and otherwise violating independent constitutional and statutory provisions. Fourth, federal law does not permit this substantive change in DHS policy to be made without an analysis of the negative impact of rescinding DACA on small businesses, non-profits, and local government entities, including those in Plaintiff States. Finally, Defendants have discriminated against this class of young immigrants in violation of the equal protection guarantee of the Fifth Amendment by depriving them of their interests in pursuing a livelihood and furthering their education. These interests are substantial, and Defendants deprived DACA grantees of them without a sufficient justification.

4.    DACA grantees residing in Plaintiff States are employed by companies and non-profits, large and small, as well as State and municipal agencies, all of which benefit from their skills and productivity. Through their employment and broader participation in the economy, DACA grantees contribute to the economic activity of Plaintiff States and the United States generally. As residents of Plaintiff States, DACA grantees have also pursued educational opportunities at post-secondary institutions, enriching the educational experiences of all students and faculty by contributing their diverse life experiences and perspectives, while building upward career mobility for themselves. In

507

addition to substantially benefitting from DACA them-selves, DACA grantees have taken advantage of the opportunities available to them under this program in a manner that has significantly enhanced Plaintiff States in a number of ways, helping to advance their sover-eign, quasi-sovereign, and proprietary interests.

5.   As a direct result of the decision to eliminate DACA, DACA grantees will lose their work authoriza-tion, requiring their employers to terminate them as employees.   As a result of losing employment, DACA grantees face the loss of employer-based health insur-ance, which has not only benefited them personally, but has reduced Plaintiff States' expenditures on health-care to uninsured people and enhanced public health overall.   While education laws in California and other states will permit most DACA grantees who are in school to maintain their enrollment in post-secondary educational institutions even if they lose DACA protec-tion, many are expected to disenroll because their in-ability to work will create financial obstacles to main-taining enrollment.   And others will disenroll simply because they may no longer be able to achieve career objectives commensurate with their skills and qualifi-cations; still others may be afraid to interact with any government entity, even public schools or hospitals, once they lose DACA's protection from deportation. Those DACA grantees who choose to remain enrolled will be unable to participate equally in other opportuni-ties generally available to students, such as paid in-ternships and externships, as well as study abroad pro-grams.

6.   Under the DACA program, grantees were au-thorized to apply for advance parole, which allowed many of them to return to the United States after visit-

**AR2801**

508

ing their families outside the country when family emergencies arose. Defendants have abruptly terminated this authorization, even refusing to adjudicate already pending applications submitted by DACA grantees. As a result of the termination, thousands of residents will be unable to visit family members or travel outside the United States for educational or employment purposes. It is also uncertain whether residents whose advance parole requests were previously approved and who are currently traveling abroad will face greater difficulty in being permitted to return home to the United States.

7.   DACA grantees came to the United States through no volition of their own. They grew up in this country and many have known no other home. Prior to DACA, they faced fear of deportation, hardship, and stigma due to their status. DACA has allowed them the stability and security they need to build their lives in the open. Through their sudden and unlawful actions, Defendants are attempting to push DACA grantees back into the shadows of American life.

8.   Due to Defendants' actions and representations, DACA grantees face risks as a result of their very participation in DACA—particularly if the DACA Rescission Memorandum is fully implemented. When they applied for DACA, applicants were required to provide sensitive information to DHS—including their fingerprints, photos, home address, school location, and criminal records, however minor—in reliance on the government's repeated promises that it would not use the information against them to conduct enforcement actions. The DACA Rescission Memorandum and associated Frequently Asked Questions dated September 5, 2017 ("Rescission FAQs"), attached hereto as Ex. B,

substantively change DHS's policy in a manner that places current and former DACA grantees at risk of deportation based on information previously disclosed to DHS in good faith.

9.    Further, DHS's prior assurances to employers regarding the employment verification information they provided to employees to aid prospective DACA applicants are not discussed in the DACA Rescission Memorandum or Rescission FAQs, indicating that employers might now be subject to actions for unlawful employment practices despite DHS's earlier assurances that they would not be.

10.    Defendants' rescission of DACA will injure Plaintiff States' state-run colleges and universities, upset the States' workforces, disrupt the States' statutory and regulatory interests, cause harm to hundreds of thousands of their residents, damage their economies, and hurt companies based in Plaintiff States.

11.    The States of California, Maine, Maryland, and Minnesota respectfully request that this Court enjoin DHS from rescinding DACA and declare that DHS is equitably estopped from using information gathered pursuant to the DACA program in immigration enforcement actions against current and former DACA applicants and grantees, and in actions against their current or former employers except as authorized previously under DACA.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

12.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

13.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).   A substantial

510

part of the events or omissions giving rise to this action occurred in this district; Plaintiff State of California resides in this district; and no real property is involved in the action.   This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

14.   Intradistrict assignment is proper in San Francisco or Oakland pursuant to Local Rules 3-2(c) and (d) because a substantial part of the events or omissions which give rise to the claim occurred in the City and County of San Francisco.

## PARTIES

### PLAINTIFF STATE OF CALIFORNIA

15.   The State of California, represented by and through its Attorney General, is a sovereign State of the United States of America.

16.   Governor Edmund G. Brown, Jr., is the chief executive officer of the State.   The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.   As the leader of the executive branch, the Governor is the chief of California's executive branch agencies, including those whose injuries are discussed in this Complaint.   Cal. Const. art V, § 1.

17.   Attorney General Xavier Becerra is the chief law officer of the State.   The Attorney General is responsible for protecting California's sovereign interests, including the sovereign interest in enforcing California laws.   Cal. Const. art V, § 13.

18.   California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused by Defen-

511

dants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests, and its interests as *parens patriae*.

19.    California is home to more than 379,000 DACA-eligible residents.   As of March 2017, USCIS had approved 222,795 DACA applications from immigrants residing in California.   Ex. C, USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake Biometrics and Case Status Fiscal Year 2012-2017 (Mar. 31, 2017) ("USCIS Numbers").   More than 30 percent of all DACA grantees in the entire country reside in California, giving California by far the largest population of DACA grantees of any state.

20.    Indeed, in the first year of DACA, 13 percent of DACA requests nationwide (78,000) came from individuals in the Los Angeles area alone.

21.    California has an interest, reflected in its Constitution and state law, in prohibiting discrimination on the basis of race, color, national origin, and immigration status.   California's Constitution prohibits any discrimination on the basis of race, color, or national origin.   *See* Cal. Const. art. I, §§ 8, 31.   California recognizes as civil rights an individual's opportunity to obtain employment, housing, real estate, full and equal utilization of public accommodations, public services, and education institutions without such discrimination. *See, e.g.,* Cal. Gov. Code §§ 11135, 12900-12907; Cal. Civ. Code § 51(b).   California has a further interest, as evidenced by its Constitution, in prohibiting the deprivation of life, liberty, or property without due process, and in preventing any practice that denies equal protection of the laws.   *See* Cal. Const. art. I, § 7.

AR2805

512

22.  California's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, extends to all residents, regardless of immigration status.  *See, e.g.*, Cal. Civ. Code § 3339(a); Cal. Gov. Code § 7285(a); Cal. Health & Safety Code § 24000(a); Cal. Labor Code § 1171.5(a).

23.  California has an interest in ensuring public safety within its borders and protecting the rights of its residents by maintaining an effective law enforcement system.   Like many local law enforcement agencies in California and throughout the nation, the State has concluded that public safety is best protected when all members of our community—regardless of immigration status—are encouraged to report crimes and participate in policing efforts without fear of immigration consequences.   California has further determined that the interests of public safety are best served by promoting trust between law enforcement and California residents, including members of the immigrant community.   By deferring the possibility of immediate deportation, the DACA program has removed a significant deterrent to immigrants approaching law enforcement for assistance when they have been victimized or have witnessed crimes.

24.  California has an interest in promoting and preserving the public health of California residents. Defendants' rescission of DACA will create serious public health problems.   These include worsening the existing shortage of physicians and gutting the home healthcare workforce for seniors and people with disabilities.   Further, former DACA grantees will face increasing mental health problems like depression, anxiety, and suicide attempts when they suddenly find

**AR2806**

513

themselves once again members of an underclass with an uncertain future.

25.   The rescission of the DACA program will also harm California's interests in, and expenditures on, its educational priorities.   California's state universities and colleges have made significant investments in financial aid and in other programs to support these students, consistent with the interests of those institutions —and those of the State itself—in diversity and non-discrimination.   California will lose that investment because of the rescission of DACA.   The University of California ("UC") system estimates that it alone has approximately 4,000 undocumented students enrolled, of whom a substantial number are DACA recipients. An estimated 60,000 undocumented students attend California's community colleges, and 8,300 attend the California State Universities; a significant number of these students are DACA grantees.

26.   UC also employs many DACA recipients at UC campuses and in UC medical centers as teaching assistants, research assistants, post-doctoral researchers, and health care providers.   DACA recipients often possess valuable foreign language skills.   As a result of DACA's termination, UC will lose the skills and talents of these employees.

27.   Similarly, the loss of DACA grantees as professors, teachers, teachers' aides, administrators, and nurses from our primary and secondary schools, as well as the California State University and California Community College systems, will frustrate California's interests in the education of all its residents and harm Californians.

514

28. Immigration is an important economic driver in California. California is the sixth largest economy in the world, and it is home to many small businesses, large corporations, non-profit organizations, public and private hospitals, and colleges and universities that will be adversely affected by the termination of DACA.

29. The cumulative economic harm to California from the rescission of DACA is significant. According to one estimate, the State of California alone would suffer $65.8 billion in economic losses over a ten-year window as a result of DACA's rescission.

30. DACA grantees contribute significantly to state and local tax revenues. DACA grantees average higher earning capacities than their undocumented peers and are able to better contribute to our economy. Studies show that after receiving DACA, many grantees purchase houses and cars for the first time, boosting the economy and generating state and local tax revenues. According to one estimate, DACA-eligible residents contribute more than $534 million annually in state and local taxes in California alone; those annual state and local tax contributions are projected to decrease by $199 million when Defendants' rescission of DACA is complete. The State of California stands to lose an estimated $18.4 billion in taxes over ten years when the full impact of Defendants' rescission of DACA has taken effect.

31. Executives at some of the largest companies in California, and indeed, the nation, including Apple, Facebook, and Google, have been vocal in support of DACA grantees and have urged the President to retain DACA. Many have also been vocal about the harm that DACA's repeal will cause to their companies and employees. For example, the Chief Executive Officer

**AR2808**

515

of Apple, Tim Cook, noted that "250 of my Apple co-workers are #Dreamers," later adding, "#Dreamers contribute to our companies and our communities just as much as you and I."   Tim Cook, Twitter (Sept. 3 & 5, 2017).   Mark Zuckerberg and Sundar Pichai, the Chief Executive Officers of Facebook and Google, respectively, have expressed similar sentiments.   *See, e.g.,* Mark Zuckerberg, Facebook (Sept. 5, 2017) ("The young people covered by DACA are our friends and neighbors.   They contribute to our communities and to the economy."); Sundar Pichai, Twitter (Sept. 5, 2017) ("Dreamers are our neighbors, our friends and our co-workers.").

32.   California, too, has an interest in securing the best possible employees and in managing its workforce. California state agencies and institutions employ at least 48 DACA grantees, many of whom were hired because of their specialized skills and qualifications and who will be affected by the termination of DACA. DACA grantees help further California's priorities to ensure, *inter alia*:   public safety at the Departments of Corrections, Rehabilitation, Forestry, and Fire Protection; public health at the Departments of State Hospitals and Developmental Services; and infra-structure at the Departments of Transportation and Water Resources.   California has expended time and funds to hire, train, and manage these DACA grantees, and stands to lose the value of that investment—and the employees' ongoing labor—due to Defendants' re-scission of DACA.

33.   In sum, Defendants' rescission of DACA harms the State of California directly as well as indirectly through its effects on California residents, families, businesses, and institutions.

516

### PLAINTIFF STATE OF MAINE

34.   The State of Maine is a sovereign State of the United States of America.   The Attorney General of Maine, Janet Mills, is a constitutional officer with the authority to represent the State in all matters, and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.   The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

35.   Maine is aggrieved by Defendants' actions and has standing to bring this action because of the injuries to the State caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

36.   At the end of the first quarter of 2017, USCIS had accepted 134 initial applications and 410 renewal applications since 2012 for the DACA program in Maine, and in that same time had approved 95 initial applications and 334 renewal applications.   Ex. C, USCIS Numbers.   The DACA population in Maine makes up 4 percent of Maine's estimated undocumented population.

37.   An estimated 83 of Maine's DACA recipients are employed.   The estimated annual GDP loss in Maine from removing DACA workers is $3.97 million.

38.   DACA-eligible individuals currently contribute $330,000 a year in state and local taxes.   If 100 percent of eligible individuals were enrolled, tax revenues

**AR2810**

517

would increase by $74,000.   If DACA protections are lost, Maine would lose an estimated $96,000 in state and local taxes.

39.   Defendants' rescission of DACA will result in Maine's grantees losing their jobs and ability to attend college and graduate institutions.   Many businesses will lose valued workers.   Rescission of work authorization will threaten DACA grantees' ability to support themselves and their families, and the forced separation of Maine families that will result from DACA's rescission will further jeopardize the health and well-being of Maine residents.

40.   Maine's population demographics demonstrate particular benefits that immigrants bring to the State's work force.   In 2014, almost one in five Mainers was already older than age 65—the third highest share in any state in the country.   From 2011 to 2014, Maine experienced more deaths than births, one of only two states in the country to do so.   Many Maine employers —from electronics manufacturers to meat processors —have struggled to find the workers they need in recent years to expand and keep growing in the State. Jessica Lowell, *Maine Employers Face a New Challenge:  Not Enough Workers,* Portland Press Herald, July 23, 2016, https://tinyurl.com/y7gs6lan.

41.   Maine has a strong public policy interest in prohibiting discrimination on the basis of race, color, or national origin.   *See* Me. Rev. Stat. tit. 5, §§ 4681-4685.

### PLAINTIFF STATE OF MARYLAND

42.   The State of Maryland is a sovereign State of the United States of America.

43.   The State is represented by and through the Attorney General of Maryland, Brian Frosh, its chief

518

legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

44.   Maryland is aggrieved by Defendants' actions and has standing to bring this action because of the injury to its State sovereignty caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

45.   Maryland is home to more than 20,000 young people who are immediately eligible for DACA, an additional 6,000 who may become eligible through enrollment in school, and an additional 7,000 who may become eligible on their 15th birthdays.

46.   At the end of the first quarter of 2017, 11,513 initial applications and 12,357 renewal applications for the DACA program in Maryland had been accepted by USCIS.

47.   If DACA is rescinded, Maryland will lose millions of dollars in state and local tax revenues. DACA-eligible individuals currently contribute $40.8 million a year in state and local taxes. If 100 percent of eligible individuals were enrolled, tax revenues would increase by $16.1 million.

519

48.   Maryland has a quasi-sovereign interest in protecting the health and well-being, both economic and physical, of all its residents.

49.   Fifty-five percent of DACA-eligible individuals in Maryland are employed.   DACA grantees work for both large and small businesses, which are critical to the State's economic viability.   In addition, DACA grantees in Maryland work in a wide array of fields, including healthcare, education, law, and social services.

50.   Rescinding DACA will result in disruptions in each of these fields, as companies and non-profits will be forced to terminate qualified and trained employees without employment authorization.   Estimates are that rescinding the DACA program will cost Maryland $509.4 million in annual GDP losses.

51.   Additionally, rescinding DACA will cause many DACA grantees to lose their employer-based health insurance.   Without employer-based benefits, more Maryland residents are likely to refrain from seeking needed medical care.   As a result of foregoing treatment, including for preventative purposes, these residents will impose higher healthcare costs on Maine.

52.   The rescission of DACA also threatens the welfare of both DACA grantees and their families, including some households with family members who are United States citizens.   Rescission of work authorization will threaten DACA grantees' ability to support themselves and their families, and the forced separation of Maryland families that results from DACA's rescission will further jeopardize the health and well-being of Maryland residents.

53.   Maryland also has a proprietary interest in hiring and training a qualified workforce.   Both the

AR2813

520

State and local jurisdictions employ DACA grantees, many of whom have specialized skills and qualifications. The State and local governments will lose not only these employees, but also their significant investments in hiring and training the DACA grantees who work for them.

54. Rescinding DACA will adversely impact current DACA grantees enrolled in colleges and universities. Without DACA's employment authorization, these students' educational and employment plans will be disrupted, if not aborted.

55. Disenrollment by DACA grantees will also harm Maryland's public colleges and universities. The University of Maryland has emphasized the importance of its students who are DACA grantees. *See* Wallace D. Loh, *President's Statement on DACA Students*, University of Maryland (Sept. 5, 2017), https://tinyurl.com/y6ulklrz. In 2011, Maryland passed a law allowing undocumented students brought to the United States as children, or "dreamers," to pay in-state tuition rates at the State's public institutions, and voters later approved the law in a referendum. 2011 Md. Laws, Ch. 191. In the 2015-16 academic year, over 500 dreamers were enrolled in Maryland public colleges at in-state tuition rates. Rescinding DACA will result in many of these students leaving school, which harms both the individual students as well as the schools. Maryland's public institutions will lose the diversity and enrichment this population brings to the school community.

56. Maryland has a strong public policy interest in prohibiting discrimination on the basis of race, color, or national origin. *See* Md. Code Ann., State Gov't §§ 20-302, 20-304, 20-401, 20-402, 20-602, 20-702, 20-705, 20-707, 20-901. The Maryland General As-

**AR2814**

521

sembly has declared that "assur[ing] all persons equal opportunity" is necessary "for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers."   Md. Code Ann., State Gov't § 20-602.

### PLAINTIFF STATE OF MINNESOTA

57.   The State of Minnesota, which is a sovereign State of the United States of America, is aggrieved by Defendants' actions.   Minnesota has standing to bring this action because of the injuries caused by Defendants' rescission of the DACA program, including injuries to its sovereign, quasi-sovereign, and proprietary interests.

58.   Attorney General Lori Swanson brings this action on behalf of Minnesota to protect the interests of Minnesota and its residents.   The Attorney General's powers and duties include acting in federal court in matters of State concern.   Minn. Stat. § 8.01.

59.   It is estimated that in 2016 there were 16,000 DACA-eligible individuals living in Minnesota.   As of March 31, 2017, USCIS had approved 6,255 initial DACA applications and 6,236 renewals for residents of Minnesota.   Ex. C, USCIS Numbers.   In addition to these DACA grantees, Minnesota has many residents who would have become eligible for DACA in the future.

60.   Minnesota has a quasi-sovereign interest in protecting the health and well-being, both economic and physical, of all its residents.

61.   DACA has allowed grantees to access a number of important benefits, including working legally and obtaining employer-based health insurance.

**AR2815**

522

62. Rescinding DACA will cause many DACA grantees to lose their employer-based health insurance. Without employer-based benefits, more Minnesota residents are likely to refrain from seeking out needed medical care. As a result of foregoing treatment, including for preventative issues, these residents will impose higher healthcare costs on Minnesota.

63. The rescission of DACA also threatens the welfare of both Minnesota DACA grantees and their families. Many Minnesota DACA grantees live in households with family members who are American citizens. Rescission of work authorization will threaten DACA grantees' ability to financially support themselves and their families, endangering the financial security of these families. It will also force separation of Minnesota families, jeopardizing their health and stability.

64. Rescinding DACA will harm Minnesota's colleges and universities. Minnesota law encourages attendance by DACA grantees at public universities within Minnesota. *See, e.g.*, Minn. Stat. § 135A.043, .044.

65. The University of Minnesota has emphasized the importance of its DACA students. Eric W. Kaler, *DACA Decision and the University's Stance*, Office of the President, University of Minnesota, (Sept. 5, 2017), https://tinyurl.com/y9khzd2w. Similarly, Minnesota State University, a system of 37 colleges and universities within Minnesota, has expressed its support for DACA and noted the significant contributions of DACA students to its institutions and the State economy. Macalester College, a nationally ranked private liberal arts college in St. Paul, Minnesota, has also issued a statement emphasizing the importance of DACA students to the college community and the economy at

AR2816

523

large.   President Brian Rosenberg, *Message to the Community on the Elimination of DACA,* Macalester College (Sept. 5, 2017), https://tinyurl.com/y79yyhhr.

66.   Rescinding DACA will impair the ability of Minnesota universities to fulfill their educational missions and provide Minnesota residents with the skills necessary to become valued members of the Minnesota workforce.

67.   One recent study found that 94 percent of the DACA grantees surveyed who were in school agreed that, because of DACA, they pursued educational opportunities that they previously could not.

68.   The rescission of DACA will likely cause some grantees to leave Minnesota colleges and universities because they will be unable to work to meet their educational expenses.   Furthermore, DACA students may determine that the cost of a college education is not a good investment because they will be unable to work after graduation.   Those grantees who stay in school may take longer to complete their studies because of their inability to work.   Future DACA students may be deterred from enrolling at all.   As a result, Minnesota's universities will lose the diversity, enrichment, and new perspectives that this population brings to the school community, undermining the educational missions of the universities.   These harms will also negatively affect the tuition revenues of Minnesota universities.

69.   A large number of Minnesota's postsecondary graduates remain in Minnesota after graduation. Of Minnesota's 2013 postsecondary graduating class, 72 percent were employed in Minnesota two years after graduation.   Rescinding DACA will deprive Minnesota of the skills, earning, and tax-paying potential of those

**AR2817**

524

graduates of Minnesota universities who would stay in the State to join the State's workforce.

70. The Minnesota economy will also be negatively affected by the rescission of DACA. Approximately 5,442 DACA grantees are employed in Minnesota. If DACA is eliminated, these grantees will lose their work authorization and the State economy will lose approximately $376.7 million in annual GDP.

71. In addition, rescinding DACA will negatively affect Minnesota tax revenue because DACA grantees make significant contributions to Minnesota state and local taxes. One study estimates that the loss of employment caused by the rescission of DACA will result in Minnesota losing approximately $6.9 million annually in state and local tax revenue.

72. The rescission of DACA will also adversely impact Minnesota employers. Minnesota businesses and other employers have hired DACA grantees because of the skills and other contributions they bring to these organizations. Various Minnesota business leaders, including the Chief Executive Officer of Best Buy and the Senior Vice President of the Minnesota Chamber of Commerce, signed a letter to the President stressing the importance of DACA to their organizations and the economy. *Open Letter from Leaders of American Industry* (Aug. 31, 2017), https://www.businessleaders dacaletter.com/.

73. Minnesota has a strong public policy interest in prohibiting discrimination on the basis of race, color, or national origin. *See* Minn. Stat. § 363A.02. Minnesota has stated that such discrimination "threatens the rights and privileges of the inhabitants of this state and menaces the institutions and foundations of democracy." *Id.* Minnesota recognizes an individual's

525

opportunity to obtain employment, housing, real estate, full and equal utilization of public accommodations, public services, and educational institutions without such discrimination as a "civil right." *Id.*

74.   In sum, the rescission of DACA substantially and adversely affects Minnesota's residents, educational institutions, economy, and families.

## DEFENDANTS

75.   Defendant DHS is a federal cabinet agency responsible for implementing the DACA program.   DHS is a Department of the Executive Branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

76.   Defendant Elaine C. Duke is the Acting Secretary of Homeland Security.   She is responsible for implementing and enforcing immigration laws, and oversees DHS.   She is the author of the September 5, 2017 memorandum rescinding DACA.   She is sued in her official capacity.

77.   Defendant United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

## ALLEGATIONS

### I.   ESTABLISHMENT OF DACA

78.   Then-Secretary of Homeland Security Janet Napolitano issued a memorandum on June 15, 2012 establishing the DACA program.   Ex. D, Memorandum from Janet Napolitano, Sec'y of DHS, to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Protection ("CBP"), et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to

**AR2819**

526

the United States as Children (June 15, 2012) ("DACA Memorandum").   Under DACA, individuals who were brought to the United States as children and meet specific criteria may request deferred action for a period of two years, subject to renewal.

79.   Deferred action is a long-standing mechanism under which the government forbears from taking removal action against an individual for a period of time. The purpose of deferred action, a form of prosecutorial discretion, is to allow DHS to utilize its resources effectively and humanely.

80.   The DACA Memorandum systematized the application of existing prosecutorial discretion for any applicant who satisfied each of the following criteria:

a.   came to the United States under the age of sixteen;

b.   had continuously resided in the United States for at least five years preceding the date of the memorandum and was present in the United States on the date of the memorandum;

c.   was currently in school, had graduated from high school, had obtained a general education development certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

d.   had not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise posed a threat to national security or public safety; and

e.   was not above the age of thirty.

*Id.* at 1.

527

81.  According to the DACA Memorandum, DACA's purpose was to ensure that DHS's resources were appropriately allocated to individuals who were higher priorities for immigration enforcement, recognizing among other things that young people brought here as children lacked the intent to violate the law.  DACA recognizes that there are "certain young people who were brought to this country as children and know only this country as home" and that immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."  *Id.* at 1-2.

## II.  DACA PROVIDES NUMEROUS BENEFITS

82.  DACA grantees are provided with numerous benefits.  Most importantly, they are granted the right not to be arrested or detained based solely on their immigration status during the designated period of their deferred action.  *See id.* at 2-3.

83.  DACA grantees are granted eligibility to receive employment authorization.

84.  DACA also opened the door to allow travel for DACA grantees.  For example, DACA grantees were allowed to briefly depart the U.S. and legally return under certain circumstances, such as to visit an ailing relative, attend funeral services for a family member, seek medical treatment, or further educational or employment purposes.  8 U.S.C. § 1182(a)(9)(B)(i); *see also* Ex. E, USCIS, Frequently Asked Questions, DHS DACA FAQs ("DACA FAQs") (Apr. 25, 2017) Q57. Travel for vacation is not permitted.

85.  Unlike other undocumented immigrants, DACA grantees are not disqualified on the basis of their immigration status from receiving certain public benefits.

528

These include federal Social Security, retirement, and disability benefits. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). As a result, and in reliance on DHS's oft-stated position that DACA and similar programs are a lawful exercise of the agency's authority, Plaintiff States have structured some schemes around DACA which allow, for example, applicants to demonstrate eligibility for state programs by producing documentation that they have been approved under DACA. The rescission of DACA undermines such regulatory frameworks.

86.    DACA grantees are able to secure equal access to other benefits and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

87.    DACA fundamentally changed the lives of DACA grantees. By no longer having to hide in the shadows, they obtained employment, sought higher education, pursued career paths, and became fully contributing members of society who paid taxes and participated in civic life.

88.    These positive personal outcomes have also generated benefits to many sectors of the Plaintiff States' economies. Defendants' decision to rescind DACA both terminates the ability of hundreds of thousands of the States' residents to remain part of the mainstream economy and harms the States and the communities that DACA recipients are part of, including large and small businesses, non-profits, and government entities where they work and do business.

**AR2822**

529

89.   The federal government has recognized that the United States "continue[s] to benefit  . . .  from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future."  Ex. F, Letter from Jeh Charles Johnson, DHS Sec'y, to Judy Chu, U.S. House of Representatives (CA-27) (Dec. 30, 2016) ("Johnson Letter").

### III. DEFENDANTS' PROMISES TO DACA GRANTEES: DACA GRANTEES RELIED ON REPEATED ASSURANCES THAT INFORMATION WOULD BE KEPT CONFIDENTIAL AND NOT USED FOR ENFORCEMENT

90.   In an effort to encourage reluctant people to apply for DACA, DHS promised applicants on numerous occasions that information they provided as part of the DACA application process would be "protected" from use for immigration enforcement purposes.

91.   In fact, only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" are grounds for revocation of DACA.  Ex. G, USCIS Approval Notice, Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

92.   The government's commitment to DACA grantees was further communicated to young people through its publication entitled "National Standard Operating Procedures (SOP):  Deferred Action for Childhood Arrivals (DACA)."  This document sets forth the standards that DHS applies to DACA applications with nearly 150 pages of specific instructions for granting or denying deferred action.

93   USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]nformation provided in [a DACA request] is protected from

**AR2823**

530

disclosure to [Immigration and Customs Enforcement ("ICE")] and CBP for the purpose of immigration enforcement proceedings."   Ex. E, DACA FAQs Q19.

94.   USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]f you have submitted a request for consideration of DACA and USCIS decides not to defer your case   .  .  .   your case will not be referred to ICE for purposes of removal proceedings."   *Id.* at Q26.

95.   In the exceptional circumstances under which USCIS would refer a DACA applicant to ICE, USCIS has affirmatively represented to DACA applicants that "information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians."   *Id.* at Q20.

96.   The government's representations that information provided by a DACA grantee would not be used against him or her for later immigration enforcement proceedings are unequivocal and atypical.   For example, the federal government does not make the same representations for participants in other similar programs, such as Temporary Protected Status.   *See, e.g.,* USCIS, *Temporary Protected Status,* https://www.uscis.gov/humanitarian/temporary-protected-status (last updated May 24, 2017).

97.   Similarly, USCIS affirmatively represented to employers of DACA applicants that, except in limited circumstances, if they provide their employees "with information regarding his or her employment to support a request for consideration of DACA.   .  .  .   This information will not be shared with ICE for civil immigration enforcement purposes."   Ex. E, DACA FAQs Q76.

531

98.   Additionally, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson sent a letter to U.S. Representative Judy Chu (CA-27) regarding her concerns about the need to protect DACA-related information, acknowledging that there were, at the time, 750,000 DACA grantees who had "relied on the U.S. government's representations" about prohibitions on the use of such information for immigration enforcement purposes.   Johnson unequivocally stated:   "We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."   Ex. F, Johnson Letter at 1.   DHS cannot now seek to renege on these explicit assurances and promises.

99.   These assurances were key to DACA's success. By making repeated, unique, and unequivocal representations, DHS induced individuals to rely on those representations and divulge sensitive personal information to apply for DACA despite the potential risk of deportation and removal, and induced employers to provide information to their employees to assist the latter's DACA applications, despite the potential risk of liability for the employers.   From January to March 2017 (the most recent period for which statistics are publicly available), USCIS accepted 132,790 combined initial and renewal requests to grant deferred action under the DACA program.

100.  Indeed, in February 2017, then-Secretary of Homeland Security John Kelly authored a DHS memorandum relating to enforcement priorities.   Ex. H, Memorandum from John Kelly, Sec'y of Homeland Security to Kevin McAleenan, Acting Comm'r, CPB, Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017) ("Enforcement Prior-

ities Memorandum"). The Enforcement Priorities Memorandum rescinded "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," including prior enforcement priorities, but specifically left DACA in place, unchanged.

## IV.  DHS RESCINDS DACA WITHOUT NOTICE, COMMENT, OR ANY SUFFICIENT EXPLANATION FOR ITS CHANGE IN POSITION

101. On September 5, 2017—more than five years after first encouraging individuals to participate in DACA—DHS abruptly rescinded DACA by announcing that it would immediately cease accepting new applications. DHS also announced it would only issue renewals for grantees whose deferrals expire before March 5, 2018, and only if they applied for renewal within one month of DHS's announcement, i.e., by October 5, 2017. Ex. A, DACA Rescission Memorandum.

102. Based on this announcement, thousands of DACA grantees will lose their work authorization each day on a rolling basis beginning March 6, 2018.

103. The DACA Rescission Memorandum is a final, substantive agency action that required DHS to comply with the notice and comment requirements set forth in 5 U.S.C. § 553(b). *See Hemp Industries Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). But the agency provided no opportunity for notice and comment before adopting this rule.

104. By failing to comply with these notice and comment requirements, DHS deprived Plaintiff States, their agencies and residents, and all other interested

533

parties, of the opportunity to present important evidence to the agency about the DACA program.

105. In the DACA Rescission Memorandum, DHS did not sufficiently explain its abrupt departure from prior agency statements regarding the necessity and legality of DACA.   The single paragraph in the DACA Rescission Memorandum explaining the rationale behind this sudden shift merely asserts that DACA "should be terminated" based on consideration of two factors:   (1) the appellate rulings in a case regarding a 2014 memorandum from then-DHS Secretary Johnson that expanded DACA and created a new program, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court sub nom.   United States v. Texas*, __ U.S. __, 136 S. Ct. 2271 (2016); and (2) a September 4, 2017, letter from Attorney General Jefferson B. Sessions arguing that DACA was "unconstitutional" and was invalid for the same reasons the Fifth Circuit struck down DAPA in the *Texas* case.   Ex. I, Letter from Jefferson B. Sessions to Duke (Sept. 4, 2017) ("Sessions Letter").

106. DHS ignored obvious differences between DACA and DAPA when reaching this conclusion. Further, DHS ignored the fact that the legality of DACA was never directly at issue in the *Texas* case, and not ruled on by the Fifth Circuit.   The DACA Rescission Memorandum also erroneously implied that the Supreme Court's summary affirmance of the *Texas* decision by an equally divided court has precedential effect.   The DACA Rescission Memorandum cannot survive judicial review under the APA when it is predicated on an incorrect legal premise.   *See, e.g.*, *Mas-*

534

*sachusetts v. EPA,* 549 U.S. 497, 532-535 (2007); *Safe Air For Everyone v. U.S. EPA,* 488 F.3d 1088, 1101 (9th Cir. 2007).

107.  Notably, in the DACA Rescission Memorandum, DHS did not offer its own considered legal views, and neither the Sessions Letter nor the DACA Rescission Memorandum addressed any of the findings articulated in support of the DACA Memorandum or explained why the agency is so sharply departing from both its prior legal position that programs like DACA are lawful and guidance from the U.S. Department of Justice Office of Legal Counsel that supported DACA's lawfulness.  Ex. J, Memorandum Opinion, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. __ (Nov. 19, 2014).

108.  Other than the above conclusory assertions of DACA's legal infirmity, DHS failed to offer any explanation of why it believed that rescinding DACA was warranted.  The DACA Rescission Memorandum did not even address the rationale that DHS expressed in 2012 in the DACA Memorandum regarding the use of prosecutorial discretion to focus resources and priorities on lowest priority individuals, much less offer any explanation as to why those factors have changed so radically as to justify rescinding DACA now.

109.  Hours after the DACA program was rescinded, purportedly due to its illegality, President Trump tweeted that, if Congress fails to provide similar protections through legislation, "I will revisit this issue!" Ex. K, Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 p.m.).  This statement suggests that he believes he has authority to reinstate some or all of

535

the DACA program without Congressional authorization, further undermining DHS's ostensible rationale for rescinding.

## V. TRUMP ADMINISTRATION STATEMENTS FURTHER DEMONSTRATE ILLEGALITY OF DACA RESCISSION

110. Defendants' stated justification for rescinding DACA—that is, its purported legal infirmity—has been contravened by a number of their own statements regarding undocumented immigrants, many of which are false and/or misleading, and as such provide an impermissible basis for rescinding DACA. In doing so, Defendants abused their discretion and acted in an arbitrary and capricious manner in violation of the APA.

111. On September 5, 2017, just prior to Attorney General Sessions's announcement rescinding the DACA program, President Trump tweeted, "Congress, get ready to do your job—DACA!" Donald J. Trump, Twitter (Sep. 5, 2017 5:04 a.m.). *Id.* at 2. A few minutes thereafter, President Trump retweeted a statement that "We are a nation of laws. No longer will we incentivize illegal immigration. LAW AND ORDER! #MAGA," and "Make no mistake, we are going to put the interest of AMERICAN CITIZENS FIRST!" Donald J. Trump, Twitter (Sep. 5, 2017.). *Id.* at 3. The DACA Rescission Memorandum makes no reference to such interests to explain the agency's action.

112. On the same day, President Trump issued a written statement on the rescission of the DACA program that stated: "The temporary implementation of DACA . . . helped spur a humanitarian crisis—the massive surge of unaccompanied minors from Central America including, in some cases, young people who would become members of violent gangs throughout our country, such as MS-13. Only by the reliable en-

536

forcement of immigration law can we produce safe communities, a robust middle class, and economic fairness for all Americans."   Ex. L, Statement from President Donald J. Trump (Sept. 5, 2017).   The DACA Rescission Memorandum makes no reference to unaccompanied minors, public safety concerns, or economic interests to explain the agency's action.

113. During his announcement rescinding the DACA program, Attorney General Sessions justified the decision by stating that the DACA program "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences.   It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens."   Ex. M, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017). Again, the DACA Rescission Memorandum makes no reference to humanitarian or economic interests to explain the agency's action.

114. Attorney General Sessions, while a United States Senator from Alabama, made similar statements regarding undocumented individuals seeking employment ("I'm a minority in the U.S. Senate  . . .  in questioning whether we should reward people who came into the country illegally with jobs that Americans would like to do.").   Seung Min Kim, *The Senate's Anti-Immigration Warrior*, Politico (Mar. 5, 2015) https://tinyurl.com/znog262.   That same year, then-senator Sessions praised the 1924 Johnson-Reed Act, whose namesake, Representative Albert Johnson, used racial theory as the basis for its severe immigration restrictions, which included barring Asian immigration entirely.   *See* Interview by Stephen Bannon with Sen. Jefferson B. Sessions, Brietbart News (Oct. 5, 2015),

537

audio available at https://tinyurl.com/y8gbj6vk; *see also* Adam Serwer, *Jeff Sessions's Unqualified Praise for a 1924 Immigration Law*, The Atlantic (Jan. 10, 2017), https://tinyurl.com/ybzdo96u.

115. These statements by the Trump Administration in the context of its decision to rescind DACA —that DACA created a surge in illegal immigration, and that DACA grantees take jobs away from other American workers and weaken the middle class— suggest that the DACA Rescission Memorandum's cursory statements regarding the legality of DACA do not set forth the agency's true rationale for rescission. The APA requires governmental agencies to publicly state a sufficient justification for their actions, particularly where, as here, Plaintiff States, as well as their agencies, institutions, and residents, have relied upon DHS's prior statements to their detriment.   *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015); *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).   Defendants have failed to do so.

116.   Moreover, these statements are wholly controverted by available evidence demonstrating the contributions of DACA grantees to Plaintiff States and to the United States as a whole, as explained above.   *See Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency rule is arbitrary and capricious when the explanation offered by the agency "runs counter to the evidence before the agency").

538

### VI. FORMER DACA GRANTEES ARE AT RISK OF IMMI-GRATION ENFORCEMENT BASED ON INFORMATION THEY ENTRUSTED TO DEFENDANTS AS PART OF DACA APPLICATIONS

117.  In rescinding the DACA Memorandum, Defendants have created a confusing and threatening situation for Plaintiff States and their residents, including for DACA grantees who will soon begin losing their DACA protection under the DACA Rescission Memorandum.

118.  The DACA application form requires applicants to provide a wealth of personal, sensitive information, including the applicant's lack of lawful immigration status, address, Social Security number, and the name and location of his or her school, if applicable. Ex. N, USCIS, Form I-821D, Consideration of Deferred Action for Childhood Arrivals.  The application process also required that all DACA applicants undergo biographic and biometric background checks, which includes fingerprinting, before USCIS considered their DACA requests.  DACA applicants provided this information based on Defendants' representations about the terms of the program and the manner in which information would be protected.

119.  Former DACA grantees now face a real risk of having the sensitive information that they provided to DHS in their applications or renewal requests (for example, fingerprints) used against them for future immigration enforcement proceedings.  This, despite the repeated assurances discussed above that Defendants would do no such thing.

120.  The DACA Rescission Memorandum does not provide adequate assurances that this information will

**AR2832**

539

not be used for enforcement purposes following DACA's termination.

121. The former FAQs to the DACA Memorandum —government representations under which all DACA grantees submitted their applications—unequivocally stated: "Information provided in this request is **protected** from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings," with limited exceptions where "the requestor meets the criteria for the issuance of a Notice To Appear ["NTA"] or a referral to ICE under the [NTA] criteria" (emphasis added). Ex. E, DACA FAQs Q19.

122. The Rescission FAQs that DHS produced to accompany the DACA Rescission Memorandum provide inadequate assurances that information will be protected, and state: "**Generally**, information provided in DACA requests will not be **proactively provided** to other law enforcement entities (including ICE and CBP) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security or public safety, or meets the criteria for the issuance of a Notice To Appear ["NTA"] or a referral to ICE under the [NTA] criteria." Ex. B, Rescission FAQs Q8 (emphasis added).

123. The addition of the qualifier "generally"— devoid of any apparent criteria for when DHS would deviate from the "general" policy of non-referral to ICE—and removal of the unequivocal statement that information is "protected" strongly suggests that, in fact, DHS now views DACA grantees' sensitive information as available to ICE for previously prohibited purposes, including immigration enforcement.

124. DACA applicants are also required to provide DHS with a detailed history of their criminal arrests

540

and convictions, including all misdemeanors, however minor.

125.  DACA applicants have relied in good faith on DHS's promises not to use the information against them and forthrightly informed DHS of minor criminal offenses of which they had been convicted (or for which they were only arrested, regardless of whether they were ultimately convicted).   Individuals who applied for DACA with only minor criminal offenses could gain approval under DACA nonetheless because DHS did not regard them as a threat or bar to DACA, since they were of the very lowest enforcement priority.   They are now under even more threat than other DACA grantees.

126. President Trump also has taken affirmative steps to set the table for eliminating privacy protections applicable to DACA data.   In January 2017, President Trump issued an Executive Order entitled "Enhancing Public Safety in the Interior of the United States," directing all agencies, including DHS, to "ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information."   Ex. O, Exec. Order No. 13,768, 82 Fed. Reg. 8799 § 14 (Jan. 25, 2017).   DHS has confirmed that its new privacy policy, adopted in response to the Executive Order, "permits the sharing of information about immigrants and non- immigrants with federal, state, and local law enforcement."   Ex. P, DHS Privacy Policy 2017-01 Questions & Answers No. 6 (Apr. 27, 2017).

127.  Until February 2017, DHS's enforcement priorities were generally consistent with the DACA Memorandum, prioritizing people who had committed felo-

541

nies, serious misdemeanors, or multiple less serious misdemeanors, and making DACA grantees (and others similarly situated) the lowest enforcement priority.

128. The February 2017 Enforcement Priorities Memorandum substantively changed policy with respect to how DHS treats individuals with criminal history and radically broadened the categories of people who are to be prioritized for removal.   Whereas DHS previously prioritized individuals who had been convicted of serious criminal offenses, the new categories now include, among others, those who:

(1)   Have been convicted of any criminal offense;

(2)   Have been charged with any criminal offense that has not been resolved; [and]

(3)   Have committed acts which constitute a chargeable criminal offense[.]

Ex. H, Enforcement Priorities Memorandum at 2.

Thus, people who have not been convicted of, but only charged with, **any** criminal offense (or even never charged, but somehow determined to have committed an act constituting a chargeable criminal offense), no matter how low-level, are now prioritized for immigration enforcement.   Because any offense triggers priority enforcement, this includes various lower level offenses that DACA applicants were required to disclose but that did not make them ineligible for DACA.

129.   The sweeping Enforcement Priorities Memorandum replaced DHS's previous, more targeted enforcement priorities.   Although this memorandum specifically exempted the DACA program from these new priorities, it is not clear whether or how they apply to DACA grantees and those who lose their protections

**AR2835**

542

on a rolling basis in light of the DACA Rescission Memorandum.

130. Given these development—particularly the Enforcement Priorities Memorandum significantly broadening enforcement priorities and the Rescission FAQs changing DHS's prior policy to shield DACA applicants' information from ICE—the criteria under which current and former DACA grantees with minor criminal histories are considered for referral to ICE have substantively changed.   These individuals are now in danger of being placed in removal proceedings based on information they provided in reliance on DHS's promises.

131.   These changes signal Defendants' intent to re-nege on their assurances and promises and subject DACA applicants to immigration enforcement.   At the very least, these changes create confusion about the new risk faced by current and former DACA grantees and former applicants, patticularly those whose DACA protection is ending under the DACA Rescission Memorandum.

132.   Indeed, on June 13, 2017, in testimony before the House Appropriations Committee's Subcommittee on Homeland Security, Acting ICE Director Thomas Homan stated as to "**every** immigrant in the country without papers," that they "should be uncomfortable. You should look over your shoulder.   And you need to be worried."   *Immigration and Customs Enforcement & Customs and Border Protection FY18 Budget Request Before the H. Comm. on Appropriations,* 115th Cong. (2017) 2017 WLNR 18737622 (emphasis added).

133.   CNN reported that Homan "doubled down" on these statements in an interview later that week, quot-

543

ing him to state that "'Trump and his administration have made clear that any undocumented immigrant could be arrested and face deportation proceedings at any time, unless they have *current and valid* protection under DACA.'"  Tai Kopan, *ICE Director:  Undocumented Immigrants 'Should Be Afraid,'* CNN (June 6, 2017), https://tinyurl.com/y88h6zuo (quoting Acting ICE Director Thomas Homan) (emphasis added).

134.   On April 19, 2017, Attorney General Sessions stated in an interview on Fox News' "Happening Now" program—in response to a question regarding the deportation of a DACA grantee—that "'[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported—well, they are  . . .  we can't promise people who are here unlawfully that they aren't going to be deported.'"  Adam Shaw, Sessions Defends Immigration Policies After Reported 'DREAMer' Deportation, Fox News (Apr. 19, 2017), https://tinyurl.com/kym82ce (quoting Attorney General Jefferson B. Sessions).

135.   Moreover, current litigation in federal court in Georgia demonstrates that even before the DACA Rescission Memorandum, DHS was terminating individuals' DACA due to the Enforcement Priorities Memorandum's changed priorities.  In that case, *Colotl v. Kelly,* DHS admitted on the record that Ms. Colotl had met and continued to meet all five DACA criteria.  Order [on Preliminary Injunction Motion], *Colotl Coyotl v. Kelly,* No. 17-1670 (N.D. Ga., June 12, 2017) ECF No. 28 at 17-18.   The only reason for the change in DHS's decision was that—despite the previous assurances by DHS that DACA-related history would not be used against applicants and with no change in Ms.

544

Colotl's criminal history since her application—she had become an enforcement priority under the Enforcement Priorities Memorandum "[d]ue to [her] criminal history." *Id.* at 6, 18.   That criminal history, stemming from a 2010 arrest for allegedly blocking traffic while waiting for a parking space, had been disclosed on Ms. Colotl's initial DACA application and subsequent renewal requests, each of which were approved until the denial based solely on the Enforcement Priorities Memorandum.   The court ruled in favor of Ms. Colotl, granting her request for a preliminary injunction and holding that since DACA was still in effect at the time DHS sought to revoke her DACA, and DHS had established procedures with respect to notice and termination, she was likely to prevail on her claim that DHS violated the APA by failing to comply with its own administrative processes and procedures.   *Id.* at 30-33.

136.   Defendants' conduct in inducing DACA applicants to provide sensitive personal information and then removing that protection impacts all DACA grantees, not just those with minor criminal histories. DACA applicants were not only required to provide information that could be used to easily find and arrest them; they were required to undergo fingerprinting regardless of criminal history.   DACA grantees are now at risk that this type of biometric information will be used against them for immigration enforcement purposes.

## VII.   DACA GRANTEES CAN NO LONGER TRAVEL OUTSIDE THE COUNTRY

137.   Under DACA, DACA grantees were allowed to apply to receive authorization from USCIS for "advance parole" to travel outside of the United States by submitting Form I-131, Application for Travel Docu-

545

ment and paying a filing fee of $575.   USCIS approves advance parole on a case-by-case basis.

138.   USCIS affirmatively represented to DACA applicants that, if USCIS decides to defer action, the applicant may request advance parole to travel outside the United States for educational, employment, or humanitarian purposes.   Ex. E, DACA FAQs Q57.

139.   The DACA Rescission Memorandum terminated the ability of DACA grantees to travel outside the United States during their renewed benefit period, including for those who have already submitted requests for advance parole in reliance on DHS's prior representations that advance parole was available to them. Under the DACA Rescission Memorandum, DHS is now categorically prohibited from granting advance parole for DACA grantees and "[w]ill not approve any new Form I-131 applications for advance parole under standards associated with the DACA program[.]"   Ex. A, DACA Rescission Memorandum.   In addition, DHS "[w]ill administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees."   *Id.*   Those who have pending applications are therefore denied advance parole without any assessment being conducted using the criteria set forth previously by DHS for advance parole requests.

140.   Many DACA grantees have applied for and received advance parole from USCIS and have paid the required fees.   The DACA Rescission Memorandum states that DHS will "generally" honor the previously approved applications for advance parole, clearly signaling that sometimes it will not.   Many of those DACA grantees who relied on USCIS authorization of advance parole are currently travelling abroad visiting

546

family or for other authorized reasons.   Given DHS's unambiguous shift in policy towards prohibiting the case-by-case determination of advance parole for other DACA grantees, DACA grantees with approved advance parole now face uncertainty and risk of not being able to return to their homes in the United States.

## FIRST CAUSE OF ACTION

### (Violation of Fifth Amendment—Due Process— Information Use)

141. Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

142. The Due Process Clause of the Fifth Amendment requires that immigration enforcement actions taken by the federal government be fundamentally fair.

143. Given the federal government's representations about the allowable uses of information provided by DACA applicants, Defendants' change in policy on when to allow the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement, including identifying, apprehending, detaining, or deporting non-citizens, is fundamentally unfair.

144. Through their actions above, Defendants have violated the due process guarantee of the Fifth Amendment.

145. Defendants' violation causes ongoing harm to Plaintiff States and their residents.

547

## SECOND CAUSE OF ACTION

### (Violation of Administrative Procedure Act—
### 5 U.S.C. § 553)

146. Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

147. The APA requires the Court to " hold unlawful and set aside agency action" taken "without observance of procedure required by law."   5 U.S.C. § 706(2)(D).

148. DHS is an "agency" under the APA.   5 U.S.C. § 551(1).   The DACA Rescission Memorandum is a "rule" and an "agency action" under the APA, 5 U.S.C. § 551(4), (13), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

149. With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking.   5 U.S.C. § 553.

150. Defendants promulgated and have relied upon the DACA Rescission Memorandum without notice-and-comment rulemaking in violation of the APA.

151. Defendants' violation causes ongoing harm to Plaintiff States and their residents, who have been denied the opportunity to comment about Defendants' decision to repeal DACA.   These injuries, including specific harms alleged above to the Plaintiff States' universities, agencies and institutions, and their economies and healthcare systems, all fall within the zone of interests encompassed by the broad scope of the Immigration and Naturalization Act ("INA"), 8 U.S.C. *et seq.*

**AR2841**

548

### THIRD CAUSE OF ACTION

#### (Violation of Administrative Procedure Act— 5 U.S.C. § 706)

152.  Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

153.  The APA requires the Court to "hold unlawful and set aside agency action" that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"   5 U.S.C. § 706(2).

154.  In implementing the DACA Rescission Memorandum without a proper basis, Defendants have acted arbitrarily and capriciously, have abused their discretion, have acted otherwise not in accordance with law, and have taken unconstitutional and unlawful action in violation of the APA.

155.  Defendants' violation causes ongoing harm to Plaintiff States and their residents.   These injuries fall within the zone of interests encompassed by the INA.

### FOURTH CAUSE OF ACTION

#### (Violation of the Regulatory Flexibility Act)

156.  Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

157.  The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small enti-

**AR2842**

549

ties and publish initial and final versions of those analyses for public comment.   5 U.S.C. §§ 603-604.

158.  "Small entities" for purposes of the RFA include small businesses, small nonprofits, and small governmental jurisdictions.   5 U.S.C. § 601(6).

159.  The DACA Rescission Memorandum is a "rule" under the RFA.   5 U.S.C. § 601(2).

160.  The actions that DHS has taken to implement the DACA Rescission Memorandum are likely to have a significant economic impact on a substantial number of small entities.   5 U.S.C. § 602(a)(1).

161.  Defendants have not issued the required analyses of the rule.

162.  Defendants' failure to issue the initial and final regulatory flexibility analyses violates the RFA and is unlawful.

163.  Defendants' violation causes ongoing harm to Plaintiff States and to their residents, who have been denied the ability to comment on the impact of DACA's rescission on small entities.

### FIFTH CAUSE OF ACTION

#### (Declaratory Relief—Equitable Estoppel)

164.  Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

165.  Through its conduct and statements, DHS represented to DACA applicants that information collected as part of their applications would not be used against them in future immigration proceedings and that DACA was a lawful exercise of its discretion.

550

166. In reliance on DHS's repeated assurances, DACA applicants, risking removal and deportation, came forward and identified themselves to DHS and provided detailed information, including fingerprints and criminal history, in order to participate in DACA.

167. Throughout the life of DACA, DHS continued to make affirmative representations about the use of information as well as the validity and legality of programs like DACA. DACA applicants relied on DHS's continuing representations to their detriment.

168. DACA grantees rearranged their lives to become fully visible and contributing members of society by seeking employment, pursuing higher education, and paying taxes, but are now at real risk of removal and deportation, particularly those with minor criminal histories who fall squarely within the new enforcement priorities set forth in the Enforcement Priorities Memorandum.

169. Accordingly, Defendants should be equitably estopped from using information provided to DHS pursuant to DACA for immigration enforcement purposes, except as previously authorized under DACA.

170. An actual controversy between Plaintiff States and Defendants exists as to whether Defendants should be equitably estopped.

171. Plaintiff States are entitled to a declaration that Defendants are equitably estopped.

### SIXTH CAUSE OF ACTION

#### (Violation of Fifth Amendment—Equal Protection)

172. The Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

**AR2844**

551

173. The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

174. The rescission of DACA violates fundamental conceptions of justice by depriving DACA grantees, as a class, of their substantial interests in pursuing a livelihood to support themselves and further their education.

175. The deprivation of these interests is directly traceable to the Defendants' rescission of DACA and cannot be sufficiently justified by federal interests.

176. Through the above actions, Defendants have discriminated against DACA grantees in violation of the equal protection guarantee of the Fifth Amendment.

177. Defendants' violation causes ongoing harm to the Plaintiff States and their residents.   Among other things, the Plaintiff States will be impacted because DACA grantees will no longer be able to work as State employees, contribute to the States' economies, or attend the States' educational institutions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor, and grant the following relief:

1.   Declare that the DACA Rescission Memorandum is unauthorized by and contrary to the Constitution and laws of the United States;

2.   Declare that the actions that Defendants have taken to implement the DACA Rescission Memorandum were taken without observance of procedure re-

**AR2845**

552

quired by law in violation of 5 U.S.C. §§ 702-706 (the APA);

3.  Declare that the actions that Defendants have taken to implement the DACA Rescission Memorandum are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of 5 U.S.C. §§ 702-706 (the APA);

4.  Declare that Defendants' failure to analyze the impact of the actions they have taken to implement the DACA Rescission Memorandum on small entities, and Defendants' failure to publish initial and final versions of those analyses for public comment, are unlawful under 5 U.S.C. §§ 601-612 (the RFA);

5.  Declare that Defendants are equitably estopped from using information provided to Defendants pursuant to DACA for immigration enforcement purposes except as previously authorized under the DACA Memorandum;

6.  Enjoin Defendants from rescinding DACA or engaging in any action to frustrate its full and continued implementation;

7.  Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA applicant or member of any DACA applicant's family, or take any action against a DACA applicant's current or former employer; and

8.  Award such additional relief as the interests of justice may require.

553

Dated:    Sept. 11, 2017

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General

/s/   JAMES F. ZAHRADKA II
JAMES F. ZAHRADKA II
Deputy Attorney General

*Attorneys for Plaintiff State of California*

JANET T. MILLS
Attorney General of Maine
SUSAN P. HERMAN *(pro hac vice pending)*
Deputy Attorney General
6 State House Station
Augusta, Maine 04333
Telephone:    (207) 626-8814
Email:    susan.herman@maine.gov

*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN
Solicitor General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone:    (410) 576-6325
Email:    ssulivan@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

**AR2847**

554

LORI SWANSON
Attorney General
State of Minnesota
JULIANNA F. PASSE (*pro hac vice pending*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota, 55101-2128
Telephone:   (651) 757-1136
Email:   julianna.passe@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

**AR2848**

555

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

———————

Civil Case No. 3:17-cv-05211

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
AND JANET NAPOLITANO, IN HER OFFICIAL CAPACITY
AS PRESIDENT OF THE UNIVERSITY OF CALIFORNIA,
PLAINTIFFS

*v.*

U.S. DEPARMTENT OF HOMELAND SECURITY AND
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

———————

Filed:   Sept. 8, 2017

———————

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

———————

Plaintiffs The Regents of the University of California ("UC" or "the University"), on its own behalf and on behalf of all students currently enrolled at the University, and Janet Napolitano, in her official capacity as President of the University of California (together "Plaintiffs"), bring this action for declaratory and injunctive relief against the Department of Homeland Security ("DHS") and Acting Secretary of Homeland Security, Elaine Duke (together, "Defendants"), and allege as follows:

INTRODUCTION

1.    This lawsuit, brought under the Due Process Clause of the Fifth Amendment to the United States

**AR2849**

556

Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenges Defendants' unlawful decision to rescind the Deferred Action for Childhood Arrivals ("DACA") program, which protected from deportation nearly 800,000 individuals brought to this country as children, known as Dreamers.   Under DACA, the Dreamers, who came to the United States through no choice of their own, who have clean records, and who have lived continuously in the United States since 2007, were permitted to live, work, and study in this country without fear of deportation.   The United States, and the University, have benefited enormously from the presence of the Dreamers, accomplished young men and women who are our students, and colleagues, and neighbors.   They are Americans, a fact that Defendants' precipitous decision cannot change.

2.   As a result of Defendants' actions, the Dreamers face expulsion from the only country that they call home, based on nothing more than unreasoned executive whim.   The University faces the loss of vital members of its community, students and employees.   It is hard to imagine a decision less reasoned, more damaging, or undertaken with less care.   As explained below, Defendants' capricious rescission of the DACA program violates both the procedural and substantive requirements of the APA, as well as the Due Process Clause of the Fifth Amendment.   Accordingly, Defendants' unconstitutional, unjust, and unlawful action must be set aside.

3.   On June 15, 2012, former Secretary of Homeland Security Janet Napolitano announced that individuals who arrived in the United States as children and met certain criteria, and who otherwise satisfied DHS's exercise of discretion, could apply for deferred

557

action for two-year periods, subject to renewal. *See* Memorandum from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Servs. et al., Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children (June 15, 2012) ("DACA Memorandum").   DACA allowed these individuals to live, study, and work in the United States without fear that they could be arrested and deported at any time.   Because of the program, DACA recipients were able to pursue opportunities in higher education, to more readily obtain driver's licenses and access lines of credit, to obtain jobs and access to certain Social Security and Medicare benefits, and to contribute to their communities and American society in countless ways.

4.   The University directly benefited from the DACA program, in its capacities as educator and employer.   UC has approximately 4,000 undocumented students, a substantial number of whom are DACA recipients.   Many of its staff members are also DACA recipients.   These individuals make important contributions to University life, expanding the intellectual vitality of the school, filling crucial roles as medical residents, research assistants, and student government leaders, and increasing the diversity of the community.

5.   Over the past five years, DACA recipients have structured their lives—and the University has made significant investments—on the government's express assurances that if they self-identified, registered with federal law enforcement agencies, and passed an extensive background investigation, they would be shielded from deportation and allowed to work in the United States for renewable two-year

AR2851

558

periods. Yet despite the substantial and well-founded reliance that these individuals and the University placed in the continuation of the DACA program, on September 5, 2017, Defendants suddenly and unilaterally rescinded it. *See* Ex. A, Memorandum on Rescission Of Deferred Action For Childhood Arrivals (Sept. 5, 2017) (hereinafter the "Rescission").

6. The Rescission, which renders DACA recipients once more subject to deportation, has profound consequences for the University and its students. As a result of Defendants' actions, DACA recipients face the loss of their livelihood, education, and country. The University and all of its students will lose the contributions of valued colleagues and employees. The University also will lose intellectual capital and productivity, as DACA recipients are deprived of the work authorizations needed to serve in the professional roles in which both they and the University have so heavily invested.

7. In the Rescission, Defendants offered no reasoned basis for their cancellation of DACA, instead merely pointing to the purported illegality of another program known as Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), and stating that in light of the Fifth Circuit's conclusion that DAPA is unlawful, "it is clear that [DACA] should be terminated." As explained below, rescinding DACA on this specious basis was procedurally and substantively invalid under the APA and violated the Due Process Clause of the Fifth Amendment.

8. Agency action is invalid under the APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if it is taken "without observance of procedure required by law." 5 U.S.C.

559

§ 706(2).   To survive judicial review under the APA, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"   *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   In determining whether an agency has complied with this requirement, a court must conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision.   *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971).   Here, in multiple respects, Defendants failed to "articulate a satisfactory explanation" for their action that would enable a court to conclude that the decision was "the product of reasoned decisionmaking."   *State Farm*, 463 U.S. at 52.

9.   As an initial matter, Defendants' reliance on the purported illegality of DAPA is an entirely insufficient basis on which to terminate DACA.   DAPA is a separate program from DACA.   The two programs were governed by different sets of rules, applied to different individuals, and conferred different benefits. Therefore, the alleged illegality of DAPA does not justify the rescission of DACA, and Defendants' failure to recognize the many differences between the programs renders their decision unreasonable.

10.   Because the Rescission is based on an incorrect legal premise—the purported illegality of DACA— it cannot survive judicial review under the APA.   *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (holding that action was unlawful under the APA because agency based its decision on incorrect legal conclusion); *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) ("Because that flawed premise is

**AR2853**

560

fundamental to EPA's determination . . . EPA's outcome on those statutory interpretation questions is arbitrary, capricious, or otherwise not in accordance with law.").

11. Despite Defendants' conclusory assertion that DACA "has the same legal and constitutional defects" as DAPA, no court has held that DACA is unlawful. Instead, DHS has previously concluded that programs like DACA are a lawful exercise of the Executive Branch's broad statutory authority to administer and enforce the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.* *See* Brief for Petitioners, *United States v. Texas*, 2016 WL 836758 (2016) (No. 15-674). Similarly, the Department of Justice's Office of Legal Counsel ("OLC")—whose legal advice is binding on the Executive Branch—provided a thoughtful and nuanced analysis of DAPA in 2014, concluding that DAPA, as well as DACA, was a lawful exercise of the Executive Branch's prosecutorial discretion. Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the United States & to Defer Removal of Others, 2014 WL 10788677 (O.L.C. Nov. 19, 2014).

12. The Rescission fails to acknowledge—let alone explain—the government's departure from its own prior interpretations of the law. Indeed, DHS vigorously defended the legality of DAPA in the Supreme Court less than two years ago. *See* Brief for Petitioners, *supra.* Yet in making the unfounded assertion that DACA is illegal for the same reasons that DAPA is illegal, Defendants neither addressed the compelling arguments set forth in DHS's own brief before the Supreme Court and in OLC's 2014 Opinion, nor offered a reasonable explanation for why their current view of

AR2854

561

the law is superior to the view they and OLC previously espoused. Those failures, standing alone, are enough to render their decision unlawful under the APA.

13. Defendants compound the irrationality of their decision by failing to acknowledge the profound reliance interests implicated by DACA and the hundreds of thousands of individuals, employers, and universities who will be substantially harmed by the termination of the program. The Supreme Court has emphasized that the presence of serious reliance interests requires an agency to proffer a "more substantial justification" than otherwise would be required when the agency changes course. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015); *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). Here, Defendants entirely failed to comply with that directive.

14. Defendants did not analyze the actual costs and benefits of allowing DACA recipients to live and work in this country, nor did they acknowledge the manifold benefits that have resulted from the program or the harm that institutions like the University—as well as its students—would suffer as a result of the Rescission. By failing to consider these factors and the interests at stake, Defendants have failed to satisfy the APA's requirement of reasoned decision-making.

15. The Rescission also should be set aside because it is procedurally invalid. By prohibiting DHS from granting advance parole or renewing recipients' DACA status after October 5, 2017, the Rescission circumscribes DHS's discretion and therefore constitutes a substantive rule. *See W.C. v. Bowen*, 807 F.2d 1502, 1505 (9th Cir. 1987), *opinion amended on denial of reh'g*, 819 F.2d 237 (9th Cir. 1987) ("Rules which substantially limit an agency's discretion are generally

562

substantive rules."). Additionally, in contrast to the case-by-case assessment of individual applicants provided under DACA, the Rescission is a categorical rule, which applies to all DACA recipients. This too underscores the substantive nature of the Rescission, which is subject to the full range of the APA's rule-making requirements, including the notice-and-comment requirement of 5 U.S.C. § 553. *See Paulsen v. Daniels*, 413 F.3d 999, 1003-04 (9th Cir. 2005) (holding that Bureau of Prisons "plainly violated the APA" by promulgating a rule that barred category of prisoners from relief without notice). Defendants' failure to abide by these mandatory procedural requirements renders their action unlawful.

16. Finally, in rescinding DACA, Defendants violated the Due Process Clause of the United States Constitution by failing to provide the University with any process before depriving it of the value of the public resources it invested in DACA recipients, and the benefits flowing from DACA recipients' contributions to the University. More fundamentally, they failed to provide DACA recipients with any process before depriving them of their work authorizations and DACA status, and the benefits that flow from that status.

### THE PARTIES

17. Plaintiff The Regents of the University of California is a California public corporation, authorized and empowered to administer a public trust known as the University of California, pursuant to Article IX, Section 9, subdivisions (a) and (f) of the California Constitution. Its principal place of business is in Oakland, Alameda County, California. The University brings this complaint on behalf of itself and on behalf of all students currently enrolled at the University. Ap-

**AR2856**

563

proximately 4,000 undocumented students are enrolled at the University, a substantial number of whom are DACA recipients. Some of these recipients are also employed by the University.

18. Plaintiff Janet Napolitano is a resident of California. She brings this complaint in her official capacity as President of the University of California.

19. Defendant DHS is a federal cabinet agency responsible for implementing and enforcing the Immigration and Nationality Act ("INA"). DHS is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551(1). DHS, as well as its component agencies U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"), have responsibility for, among other things, administering and enforcing the nation's immigration laws and policies, including the DACA program.

20. Defendant Elaine Duke is the Acting Secretary of DHS and, in the absence of a Secretary, is the senior official of DHS. She is sued in her official capacity. Acting Secretary Duke issued the Rescission on September 5, 2017.

## JURISDICTION

21. This action arises under the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V; and the APA, 5 U.S.C. § 550 *et seq.* This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201-2202.

564

22.   There exists an actual and justiciable controversy between Plaintiffs and Defendants requiring resolution by this Court.   Plaintiffs have no adequate remedy at law.

<div align="center">

**VENUE**

</div>

23.   Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e), because this is a civil action in which Defendants are an agency, or officers of an agency, of the United States, because a substantial part of the events or omissions giving rise to this action occurred in the District, and, further, because Plaintiffs reside in this District and no real property is involved in the action.

<div align="center">

**INTRADISTRICT ASSIGNMENT**

</div>

24.   Pursuant to Local Rule 3-2(c), intradistrict assignment is proper in San Francisco or Oakland because a substantial part of the events or omissions which give rise to the claim occurred in the County of Alameda.

<div align="center">

**BACKGROUND**

</div>

### A.   The DACA Program

25.   On June 15, 2012, the Secretary of Homeland Security Janet Napolitano announced that individuals who arrived in the United States as children and met certain criteria could apply for deferred action for two-year periods, subject to renewal.   *See* DACA Memorandum.   In establishing the program, the Secretary elected to extend deferred action to "certain young people who were brought to this country as children and know only this country as home."   *Id.*   The Secretary emphasized that federal immigration laws are "not designed  . . .  to remove productive young people to countries where they may not have lived or

<div align="right">

**AR2858**

</div>

565

even speak the language. Indeed, many of these young people have already contributed to our country in significant ways." *Id.* This program is known as Deferred Action for Childhood Arrivals ("DACA").

26. Individuals were eligible for the program if they (1) came to the United States when they were under the age of sixteen; (2) continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012, and on the date they requested DACA; (3) were currently in school, had graduated from high school, had obtained a general education development certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) had not been convicted of a felony, a significant misdemeanor, or three or more other misdemeanors, and otherwise did not pose a threat to national security or public safety; (5) did not have lawful immigration status on June 15, 2012; and (6) were under the age of 31 as of June 15, 2012. *See id.*; *see also* Ex. B, U.S. Citizenship & Immigration Servs.: Consideration of Deferred Action for Childhood Arrivals Process (Aug. 26, 2017) (hereinafter "USCIS FAQs"). Individuals who met these criteria were then eligible for an exercise of prosecutorial discretion, following an individualized review of their applications. *See* DACA Memorandum.

27. When they applied for admission to the program, DACA recipients were required to disclose sensitive, personal information to Defendants, including their lack of lawful immigration status as of June 15, 2012, their date of initial entry into the United States, their country of birth, their current and previous mailing addresses, and other contact information. *See*

566

USCIS Form I-821D; USCIS Form I-821D Instructions.

28.   Continuing their longstanding practice with respect to deferred-action applications, Defendants repeatedly promised DACA applicants that the information they submitted as part of their applications would not be used for civil immigration enforcement purposes against DACA applicants or their families.   *See* USCIS FAQs; Form I-821D Instructions.   Because only individuals who might be subject to removal proceedings would apply for DACA, this promise was necessary for individuals to submit applications without fear that the Executive Branch was using DACA as a way to find and remove undocumented immigrants.

29.   Individuals who received deferred action under DACA were not subject to removal for a period of two years, subject to renewal.   *See* DACA Memorandum.

30.   DACA recipients also were eligible for work authorizations that allowed them to work legally in the United States, pursuant to a long-standing federal regulation.   *See id.*; 8 C.F.R. § 274a.12(c)(14) (providing that "an alien who has been granted deferred action" may obtain work authorization upon demonstrating economic necessity); USCIS FAQs ("Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate 'an economic necessity for employment.'"). An individual's work authorization expires at the same time as his or her DACA status and could be renewed upon a renewal of DACA status.

31.   Individuals with DACA status were "not considered to be unlawfully present during the period in which deferred action [was] in effect."   USCIS FAQs.

567

32.   Since the program was first introduced in 2012, nearly 800,000 individuals received DACA status. This includes an estimated 242,339 residents of the State of California.   *See* Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status:   2012-2017 (Mar. 31, 2017); Carolyn Jones, California Colleges Undaunted by Trump's Decision to Phase out DACA, EDSOURCE (Sept. 1, 2017), https://edsource.org/2017/california-colleges-undaunted-by-trumps-threat-to-end-daca/586746.

**B.   *The Many Benefits of DACA***

33.   As noted above, DACA recipients have contributed in innumerable ways to the intellectual and social fabric of the University.

34.   As an institution whose core mission is serving the interests of the State of California, the University seeks "to achieve diversity among its student bodies and among its employees."   *See* Academic Senate of the Univ. of Cal., *Regents Policy 4400:   Policy of University of California Diversity Statement*, UNIV. OF CAL.:   BOARD OF REGENTS, http://regents.universityofcalifornia.edu/governance/policies/4400.html.   The University recognizes the importance of diversity to its academic mission, as it allows "students and faculty [to] learn to interact effectively with each other, preparing them to participate in an increasingly complex and pluralistic society."   *Id.*   The educational experience of all University students is fuller and more enriching when ideas are "born and nurtured in a diverse community."   *Id.*   DACA students at the University are an integral part of that community.   Their talent, perspectives, and experiences are invaluable contributions to University life.

**AR2861**

568

35.   DACA recipients also make significant contributions to University life in their role as employees. They work at UC campuses and in UC medical centers as teaching assistants, research assistants, post-docs, and health care providers.   DACA recipients often possess valuable foreign language skills.   By allowing DACA recipients to work lawfully, DACA moved recipients out of the informal economy, increasing the pool of talent from which UC could fill positions at the University.

36.   Additional DACA recipients who are enrolled as students support themselves and cover a portion of their tuition through their part-time work for the University.   For many of these students, DACA work authorization plays a significant role in their ability to attend UC and continue each year with their chosen program of study.

37.   The University has invested considerable resources in recruiting and retaining these individuals— as students and employees.   It has made scarce enrollment space available to these students on the basis of their individual achievements.   It also has invested substantial time, financial aid, research dollars, housing benefits, and other resources in them on the expectation that these students will complete their course of study and become productive members of the communities in which the University operates, and other communities throughout the nation.   The University has significant interests in retaining this wealth of talent and in continuing to enjoy the many benefits of their participation in University life.

38.   Furthermore, by allowing recipients to receive deferred action and obtain work authorization, DACA opened myriad opportunities to them.   As noted above,

569

DACA recipients became eligible for federal work authorization, which significantly improved their opportunities for employment and higher paying jobs.   Under the program, DACA recipients received social security numbers and therefore were able to access credit more easily.   DACA also enabled recipients to obtain driver's licenses in a number of states where they otherwise could not.   It also protected these individuals' right to travel freely by making them eligible to receive "advance parole," which allowed them to travel abroad temporarily for humanitarian, educational, or employment purposes, and to return to the United States lawfully.   *See* 8 C.F.R. § 212.5(f); USCIS FAQs.

### C.   *Defendants Unlawfully Rescind DACA*

39.   As recently as February 20, 2017, Defendants had reaffirmed the administration's commitment to DACA, *see* Memorandum from John Kelly, Sec'y of Homeland Security, Enforcement of the Immigration Laws to Serve the National Interest, at 2 (Feb. 20 2017), and up until September 5, 2017, Defendants had continued to approve DACA requests and renewals. Despite President Trump's claim that DACA recipients "shouldn't be very worried" and that the Administration would treat DACA recipients "with great heart," on September 5, 2017, Defendants announced that they were rescinding the program.   *See* Transcript: ABC News anchor David Muir interviews President Trump, ABC NEWS (Jan. 25, 2017) http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602; *see also* Madeline Conway, Trump Tells Dreamers To "Rest Easy," Politico.com (Apr. 21, 2017), http://www.politico.com/story/2017/04/21/trump-dreamers-rest-easy-immigration-237463.

**AR2863**

570

40.   Defendants announced their decision on the same day as a "deadline" imposed by ten states that threatened to sue the Trump administration if DACA were not rescinded.   *See* Letter from Gov. Abbott to U.S. Att'y General Sessions (June 29, 2017).   The Rescission expressly states that this threat—rather than any reasoned evaluation of the legality and merits of the program—provoked the decision to terminate DACA.

41.   Prior to DHS's issuance of the Rescission, Attorney General Jeff Sessions held a press conference in which he asserted that "[o]ur collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program."   *See* Ex. C, Attorney General Sessions Delivers Remarks On DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca ("Press Conference"). Similarly, a September 4, 2017 letter from the Attorney General to Acting Secretary of DHS Duke reiterated that DACA "was effectuated  . . .  without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch."   *See* Ex. D, Letter from Att'y General Sessions to Acting Sec'y of DHS Duke (Sept. 4, 2017).   The Attorney General also noted the potential of litigation from several states and that DACA was "likely" to be enjoined in that yet-to-be-filed litigation.

42.   In addition, in his press conference Attorney General Sessions alleged, without offering any evidence, that DACA had "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens."   He also made the specious claim that DACA "contributed to a surge of unaccompanied

571

minors on the southern border that yielded terrible humanitarian consequences." *See* Press Conference. That claim is facially false. DACA by its terms applies only to individuals resident in the United States since June 15, 2007—five years before the program began.

43. After the press conference, Acting Secretary of Homeland Security Duke, purporting to act "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," formally rescinded the DACA Memorandum. The Rescission states that "it is clear" that DACA "should be terminated" in light of the Fifth Circuit's ruling in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), regarding DAPA, the Supreme Court's non-precedential affirmance of that ruling by an equally divided court, and the Attorney General's September 4 letter.

44. The President, however, does not appear to share the views of DHS or his Attorney General regarding the legality of DACA. In direct contradiction to Defendants' and Attorney General Sessions' position that the prior administration had exceeded the authority of the Executive Branch in establishing DACA, *see* Ex. A and Press Conference, the President tweeted on the night of the Rescission, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" *See* Donald J. Trump (@realDonaldTrump), Twitter (Sep. 5, 2017, 8:38 PM), https://twitter.com/realDonaldTrump/status/9052286 67336499200.

45. Although the Rescission concludes that DACA is unlawful, it does not immediately revoke any individual's DACA status or work authorization. Instead,

**AR2865**

572

it instructs that "the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications."  Specifically, the Rescission explains that DHS will adjudicate pending DACA requests and associated work authorization applications that already had been accepted by the agency as of September 5, 2017, but will reject new requests and applications filed after September 5, 2017.  It further states that DHS will adjudicate pending renewal requests and applications from current DACA recipients, as well as renewal requests and applications from current DACA recipients for grants of deferred action that expire between September 5, 2017, and March 5, 2018, and that are accepted by the agency as of October 5, 2017.  Any renewal requests filed after October 5, 2017, or any renewal requests for benefits that expire after March 5, 2018, will be rejected.  DHS will not terminate the current grants of deferred action to DACA recipients, but instead will allow individuals' DACA status to expire.  DHS will not approve any new applications for advance parole and will administratively close all pending applications for advance parole. *See* Ex. A at 4-5.

46.  Defendants' decision to rescind the program will have immense and devastating effects on the University and all of its students.  As a result of the termination of the program, the University and its students will lose the vital contributions that DACA recipients have made as students and employees.  *See Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017) ("[S]chools have been permitted to assert the rights of their students.").  The civic life of the school will be diminished, the exchange of ideas will be reduced, teaching and research will be impaired, and diversity will be more difficult to achieve.  The Univer-

573

sity and its students benefit from cohesive family units, robust civic participation, and the strength of social and educational communities. The Rescission damages each of these interests, in California and nationwide.

47. Moreover, UC students and employees have friends or family members who are DACA recipients, and the University will have to expend resources to address the detrimental effects that the rescission of DACA will have on these individuals' lives. The University also will lose the resources it has spent educating students who ultimately do not graduate.

48. As a result of the Rescission, DACA students will be unable to plan for the future, apply for and obtain internships and certain financial aid and scholarships, study abroad, or work to pay their tuition and other expenses. Students subject to these hardships may choose to withdraw from UC altogether.

49. DACA recipients also will be at risk of removal. Indeed, in a set of "Talking Points" released the same day of the Rescission, DHS "urge[d] DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States." *See* Talking Points—DACA Rescission. Removal will self-evidently result in the loss of employment, education, and relationships with others in the United States.

### FIRST CLAIM FOR RELIEF
### Agency Action That Is Arbitrary and Capricious, An Abuse of Discretion, and Otherwise Not In Accordance with Law in Violation of 5 U.S.C. § 706(2)(A)

50. The above paragraphs are incorporated herein by reference.

574

51.   DHS is an agency subject to the requirements of the APA.   5 U.S.C. § 701(b)(1).

52.   Under 5 U.S.C. § 706(2), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law.

53.   The Rescission constitutes final agency action that is reviewable by this Court.

54.   The Rescission and actions taken by Defendants to rescind DACA are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, Defendants failed to articulate a reasonable explanation for their actions.   In assessing Defendants' actions under the arbitrary-and-capricious standard, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citation omitted).   Here, Defendants have not considered the relevant factors in deciding to revoke DACA. They also have failed to consider important aspects of the issue, including the arguments previously set forth by OLC and DHS as to why DACA is lawful.

55.   Defendants also disregarded the serious reliance interests engendered by the DACA program. Where, as here, significant reliance interests are at stake, Defendants must, in addition to demonstrating that "there are good reasons" for the new policy, offer "a reasoned explanation  .  .  .  for disregarding facts and circumstances that underlay or were engendered

**AR2868**

575

by the prior policy." *Fox*, 556 U.S. at 515.   Defendants here have utterly failed in these obligations.

56.   The Rescission and actions taken by Defendants to rescind DACA are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, they are based on the legally incorrect premise that DACA is unlawful.

57.   The Rescission and actions taken by Defendants to rescind DACA are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, they are contrary to the constitutional protections of the Fifth Amendment.

58.   The University and its students were harmed and continue to be harmed by these unlawful acts.

### SECOND CLAIM FOR RELIEF
### Agency Action Without Observance of Procedure Required by Law in Violation of 5 U.S.C. § 706(2)(D)

59.   The above paragraphs are incorporated herein by reference.

60.   The APA requires administrative agencies to follow notice-and-comment rulemaking procedures to promulgate substantive rules.   *See* 5 U.S.C. § 553. The APA defines "rule" broadly to include:

> the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages.   . . .

5 U.S.C. § 551(4).

AR2869

576

61. The Rescission constitutes a substantive rule subject to APA's notice-and-comment requirements.

62. The Rescission constitutes a substantive rule because it affirmatively circumscribes DHS's statutory authority in providing deferred action and prohibits DHS from renewing recipients' DACA status after October 5, 2017.

63. The Rescission constitutes a substantive rule because it includes a ban on current DACA recipients with work authorizations travelling on advance parole.

64. The Rescission constitutes a substantive rule because it is a categorical rule, which applies to all DACA recipients.

65. In issuing the Rescission and rescinding DACA, Defendants impermissibly announced a new rule without undertaking notice-and-comment rulemaking.

66. The University and its students were harmed and continue to be harmed by these unlawful acts.

### THIRD CLAIM FOR RELIEF
### Violation of Procedural Due Process
### Under the Fifth Amendment

67. The above paragraphs are incorporated herein by reference.

68. Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law.

69. The University has constitutionally-protected interests in the multiple educational benefits that flow from a diverse student body. Thousands of DACA students have earned prized places as undergraduate and graduate students at the University of California through their record of high—even extraordinary—

577

personal achievement in high school and college. In reliance on DACA, the University has chosen to make scarce enrollment space available to these students and to invest in them substantial time, financial aid, research dollars, housing benefits, and other resources, on the expectation that these students will complete their course of study and become productive members of the communities in which the University operates, and other communities throughout the nation. If these students leave the University before completing their education, UC will lose the benefits it derives from their contributions, as well as the value of the time and money it invested in these students with the expectation that they would be allowed to graduate and apply their talents in the United States job market.

70. UC students who are DACA recipients also have constitutionally-protected interests in their DACA status and the benefits that come from that status, including the ability to work, to pursue opportunities in higher education, to more readily obtain driver's licenses and access lines of credit, to obtain jobs, and to access certain Social Security and Medicare benefits.

71. The Rescission and actions taken by Defendants to rescind DACA unlawfully deprive the University and its students of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or opportunity to be heard.

72. Defendants therefore have violated the Fifth Amendment to the United States Constitution.

73. The University and its students were harmed and continue to be harmed by these unlawful acts.

578

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

    A.  Vacate and set aside the Rescission and any other action taken by Defendants to rescind DACA;

    B.  Declare that the Rescission and actions taken by Defendants to rescind DACA are void and without legal force or effect;

    C.  Declare that the Rescission and actions taken by Defendants to rescind DACA are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law in violation of 5 U.S.C. §§ 702-706;

    D.  Declare that the Rescission and actions taken by Defendants to rescind DACA are in violation of the Constitution and contrary to the laws of the United States;

    E.  Preliminarily and permanently enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the Rescission and from taking any other action to rescind DACA that is not in compliance with applicable law;

    F.  Grant such further relief as this Court deems just and proper.

**AR2872**

579

DATED:   Sept. 8, 2017

COVINGTON & BURLING LLP

By:  /s/  JEFFREY M. DAVIDSON
JEFFREY M. DAVIDSON (Bar No. 248620)
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone:   + 1 (415) 591-6000
Facsimile:   + 1 (415) 591-6091
Email:   jdavidson@cov.com

Attorneys for Plaintiffs THE REGENTS
OF THE UNIVERSITY OF CALIFOR-
NIA and JANET NAPOLITANO, in her
official capacity as President of the Uni-
versity of California

**AR2873**

580

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———

Civil Action No. 1:17-cv-02325-JDB

THE TRUSTEES OF PRINCETON UNIVERSITY
PRINCETON, NEW JERSEY 08544; MICROSOFT
CORPORATION; ONE MICROSOFT WAY REDMOND,
WA 98052; MARIA DE LA CRUZ PERALES SANCHEZ
PRINCETON, NEW JERSEY 08544, PLAINTIFFS

*v.*

UNITED STATES OF AMERICA; U.S. DEPARTMENT OF
HOMELAND SECURITY, 650 MASSACHUSETTS AVENUE,
NW WASHINGTON, DC 20001 AND ELAINE C. DUKE, IN
HER OFFICIAL CAPACITY AS ACTING SECRETARY OF
THE DEPARTMENT OF HOMELAND SECURITY,
650 MASSACHUSETTS AVENUE, NW WASHINGTON, DC
20001, DEFENDANTS

———

Filed:  Nov. 3, 2017

———

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

———

**COMPLAINT**

Plaintiff The Trustees of Princeton University ("Princeton" or "the University")—suing on its own behalf and on behalf of its students—Plaintiff Microsoft Corporation ("Microsoft"), and Plaintiff Maria De La Cruz Perales Sanchez ("Perales Sanchez") (collectively, "Plaintiffs") bring this action for declaratory and injunctive relief against Defendants the United States of America; the U.S. Department of Homeland Security ("DHS"); and Elaine C. Duke, in her official capacity as

**AR2874**

581

Acting Secretary of DHS ("Duke") (collectively, "Defendants"), and allege as follows:

## **INTRODUCTION**

1.     Millions of young people arrived in the United States as children, brought here by immigrant parents searching for safety, stability, and opportunity.   Known as Dreamers, these young people were raised here as Americans:   they were educated in American communities, surrounded by American friends, struggling and striving alongside their American peers.   Many have grown up to be impressive leaders:   star students, educators, soldiers, architects, entrepreneurs, lawyers, and scholars,[1] each advancing on their own merit and making considerable contributions to American society. By any measure, these achievements are extraordinary.   They are all the more impressive considering the uncertainty that long defined their lives.   Until 2012, Dreamers lived in pervasive fear that they might return home from school or work one day to find immigration authorities on their doorstep, prepared to take them into custody.   Instead of turning to the normal routines of their personal lives—dinner, family, homework—they might be suddenly deported to a country that is in no sense their home.

2.     DHS finally addressed that untenable situation in 2012 when it created DACA—Deferred Action for

---

[1] *See, e.g.*, *American Dreamers*, N.Y. TIMES (2017), https://www.nytimes.com/interactive/projects/storywall/american-dreamers/ (featuring stories from individuals who were able to work and study in the United States under DACA); Gregory Korte et al., *Trump Administration Struggles with Fate of 900 DREAMers Serving in the Military*, USA TODAY (Sept. 7, 2017), https://www.usatoday.com/story/news/politics/2017/09/07/trump-administration-struggles-fate-900-dreamers-serving-military/640637001/.

Case 1:17-cv-05228-NGG-VMS   Document 282-8   Filed 09/04/20   Page 598 of 1030 PageID #: 11215

Childhood Arrivals. DACA provided up to 2 million Dreamers the chance to obtain protection from deportation and the opportunity to develop their skills through education. Individuals who received deferred action under DACA were not subject to removal for a period of two years, subject to renewal. DACA also rendered recipients eligible for work authorization that allowed them to work legally anywhere in the United States. To qualify for DACA, Dreamers were required to meet strict conditions: they must have entered this country prior to age sixteen, have resided here continuously since 2007 and been present in the United States on June 15, 2012, and on the date they requested deferred action; be in school, have graduated, or have been discharged honorably from the Armed Forces or Coast Guard; pose no threat to public safety or national security; and have been under the age of 31 as of June 15, 2012. To demonstrate their eligibility, Dreamers had to provide the government with detailed and highly sensitive personal information, pay a significant fee, and submit to a rigorous background check.

3. Given that most Dreamers had lived for years in fear of federal immigration authorities, asking them to turn over their private information to those same authorities was a bold request. The government was aware that Dreamers might reasonably be reluctant to sign up. It accordingly devoted significant resources to an outreach campaign calling on Dreamers to apply for DACA, assuring potential applicants that it would protect their information (and the information of their families and guardians) from disclosure to other agencies for purposes of immigration enforcement proceedings.

AR2876

583

4.   The government's efforts to encourage Dreamers to apply for DACA worked.  Since 2012, nearly 800,000 young people—including Perales Sanchez—have come to rely on DACA.[2]  They have made educational plans, pursued career paths, and invested in their lives here based on the government's promise that they would be safe from deportation so long as they complied with DACA's rules and procedures.  Many Dreamers have gotten married and started families here in the belief that DACA would allow them to remain in the United States to raise their children.  Other Dreamers have taken out significant student loans to pursue higher education and advanced degrees that make them better able to contribute to a growing American economy.  They have launched and invested in companies, purchased homes and cars, paid taxes, pursued opportunities to serve our country in the military, and generally lived full and productive lives out of the shadows that many undocumented immigrants were forced into by the uncertainty that preceded DACA.

5.   Princeton and Microsoft also have benefited from—and relied upon—DACA.  As one of the nation's premiere universities, Princeton devotes substantial resources to recruiting and admitting the most promising students.  Since 2012, Princeton has admitted and enrolled at least 21 Dreamers who have relied on the government's promises regarding DACA, and 15 DACA beneficiaries are currently enrolled as undergraduate students at the University.  Similarly,

---

[2] Jens Manuel Krogstad, Pew Research Ctr., *DACA Has Shielded Nearly 790,000 Young Unauthorized Immigrants from Deportation* (Sept. 1, 2017), http://www.pewresearch.org/fact-tank/2017/09/01/unauthorized-immigrants-covered-by-daca-face-uncertain-future/.

584

Microsoft has invested significant resources in Dreamers, who serve in critical roles at the company. Together with its subsidiary LinkedIn Corporation, Microsoft employs at least 45 DACA recipients as software engineers, financial analysts, inventory control experts, and in core technical and operations positions and other specialized functions and internships. The company has invested significant resources in recruiting, retaining, and supporting these individuals, and in training them to develop within the organization.

6. Dreamers are particularly promising students and employees because of the significant barriers they have overcome in order to excel. As children, they were forced not only to navigate a new country, culture, and language, but also to do so knowing that at any moment, they might be taken into custody and sent far from their homes and lives here in the United States. To have achieved educational and career successes under such precarious circumstances suggests that Dreamers have grit and perseverance, can overcome obstacles, and will exceed expectations—all qualities that Princeton values in its students and Microsoft values in its employees.

7. DACA recipients have made countless contributions to Microsoft in their diverse roles within a number of the company's divisions, including the Office Products Group, Windows and Devices Group, Cloud & Enterprise, Artificial Intelligence and Research Group, LinkedIn, Finance, Worldwide Commercial Business, and Retail division. Microsoft has significant interests in retaining these employees and in reaping the benefits of their talent over time. It has conducted its business operations on the understanding that DACA

585

recipients would continue to be eligible to work at the company.

8.   At the University, DACA beneficiaries study in a diverse array of fields, including computer science, molecular biology, mechanical and aerospace engineering, psychology, and politics.   They serve as mentors and peer advisors, class representatives in student government, and as community organizers and campus leaders.   They have earned numerous academic honors, awards, and fellowships, including several competitive and prestigious national or University fellowships. They have collaborated on important research projects, including as part of the University's Computer Science Summer Programming Experience,[3] and through the University's Keller Center for Innovation.[4]   They have published in campus publications.   They have secured highly competitive internships, including with the United Nations.   They are among the most accomplished and respected students studying at the University.

9.   Among the DACA beneficiaries at Princeton is Plaintiff Maria De La Cruz Perales Sanchez.   Perales Sanchez is an impressive student.   She has received the Arthur Liman public interest summer fellowship, the Fred Fox Fund grant for independent projects, and the Princeton Institute for International and Regional Studies undergraduate fellowship for summer thesis research.   She has also served as a peer academic advisor, as the co-director of the Princeton Dream Team

---

[3] Princeton University, Princeton Summer Programming Experiences (SPE), http://www.cs.princeton.edu/academics/ugradpgm/spe/home/ (last visited Nov. 3, 2017).

[4] Princeton University, Keller Center, https://kellercenter.princeton.edu/ (last visited Nov. 3, 2017).

AR2879

586

(an immigrants' rights organization), as a member of her undergraduate department's advisory council, and as a volunteer and leader of Community House, a tutoring organization serving underprivileged students.

10.   Dreamers' presence on Princeton's campus also benefits other students and helps fulfill the University's educational mission.   Princeton has long made clear that diversity and inclusion are central to its mission for many reasons:   First, diverse environments are more intellectually and socially stimulating, with research from the fields of psychology, sociology, and economics showing that experiences with diversity improve one's own intellectual skills and performance, improve self-confidence, decrease negative stereotypes and biases, and create awareness of inequalities and discrimination.[5]   Second, because fundamental fairness is a core value of the University, Princeton believes that students of all backgrounds should have an equal opportunity to earn a position at Princeton, and then to contribute and succeed in their subsequent endeavors.   And third, core to its educational mission is the idea that Princeton students should live and learn in an environment that reflects U.S. society and introduces them to the world beyond.   In broadening the range of perspectives to which they are exposed, Princeton offers students a better understanding of the world

---

[5] Deborah Son Holoien, *Do Differences Make a Difference?   The Effects of Diversity on Learning, Intergroup Outcomes, and Civic Engagement* (2003), http://www.princeton.edu/reports/2013/diversity/report/PU-report-diversity-outcomes.pdf.

587

and renders them better equipped to lead and serve others in today's pluralistic society.[6]

11.   Microsoft similarly benefits greatly from a workforce that reflects the diversity of the United States—and the world.   As a worldwide leader in software, services, devices and solutions that help people and businesses reach their full potential, it places a high priority on having a diverse workforce that can reflect the global customer base that it serves. Similarly, Microsoft's subsidiary LinkedIn benefits from a diverse workforce as the world's largest professional network with members in more than 200 countries and territories worldwide.   DACA helped advance this interest by increasing the breadth of experiences, perspectives, and approaches to problem-solving represented in the workforce through the lenses of the highly qualified and talented DACA beneficiaries hired into the companies.

12.   Because fostering a diversity of perspectives is crucial to Princeton's mission of teaching and research and to Microsoft's core business functions, these two institutions have invested in many initiatives to make their campus and workplaces more welcoming to people of all backgrounds.[7]   DACA recipients are no exception.

13.   For example, Princeton has provided faculty time, attention, privately-funded financial aid for tuition, room and board, and more to DACA recipients

---

[6] Princeton University, Our Commitment to Diversity, https://inclusive.princeton.edu/about/our-commitment-diversity (last visited Nov. 3, 2017).

[7] See Princeton University, Initiatives, https://inclusive.princeton.edu/initiatives (last visited Nov. 3, 2017).

588

with the expectation that they would be allowed to complete their studies at the University and make contributions in the "nation's service and in service of humanity."[8]   Without DACA, Perales Sanchez and other Dreamers have significantly fewer opportunities to work and contribute, substantially diminishing the value of their Princeton education.   And Princeton will have to make up the difference in financial aid to compensate for their inability to contribute through on-campus work.

14.   Princeton's President, Christopher Eisgruber, has described Princeton's significant interest in DACA, noting that DACA "enables law-abiding young people who have grown up in the United States to develop their talents and contribute productively to this country, which is their home."[9]   President Eisgruber joined a group of more than 700 college and university presidents in issuing a statement supporting DACA.[10]   As that statement explains, since the advent of DACA in 2012, universities like Princeton "have seen the critical benefits of this program for our students, and the

---

[8] This is Princeton's informal motto.  *See* Princeton University, In Service of Humanity, https://www.princeton.edu/meet-princeton/service-humanity (last visited Nov. 3, 2017).

[9] President Eisgruber's Statement on Deferred Action for Childhood Arrivals (DACA), Office of the President, Princeton, http://www.princeton.edu/president/eisgruber/speeches-writings/archive/?id=17355 (last visited Nov. 3, 2017).

[10] Pomona College, College & University Presidents Call for U.S. to Uphold and Continue DACA (Nov. 21, 2016), https://www.pomona.edu/news/2016/11/21-college-university-presidents-call-us-uphold-and-continue-daca.

589

highly positive impacts on our institutions and communities."[11]   The statement continues:

> DACA beneficiaries on our campuses have been exemplary student scholars and student leaders, working across campus and in the community.   With DACA, our students and alumni have been able to pursue opportunities in business, education, high tech, and the non-profit sector; they have gone to medical school, law school, and graduate schools in numerous disciplines.   They are actively contributing to their local communities and economies.[12]

Because Princeton has already invested in students based on the expectation that DACA would facilitate their studying and working in this country, and because it desires to continue to so invest due to the significant contributions of DACA beneficiaries, Princeton has significant interests in retaining the DACA program.[13]

15.   Similarly, Microsoft has made significant investments to foster an inclusive and diverse workplace environment, including by recruiting, retaining, and developing its employees who are Dreamers.   Given the persistent demand for high-skilled talent and the tightness of the labor supply for professionals in Microsoft's industry, the costs of recruiting employees are high and unanticipated turnover is incredibly disruptive to business plans.   Microsoft has significant interests in retaining the Dreamers it employs, and in

---

[11] *Id.*

[12] *Id.*

[13] Princeton is also interested as an employer in retaining the DACA program because it enables DACA beneficiaries to obtain work authorization.

590

reaping the benefits of their talent over time.   It has conducted its business operations on the understanding that these individuals would continue to be eligible to work at the company.

16.   As Microsoft's President Brad Smith has explained, "DACA recipients bring a wide array of educational and professional backgrounds that enable them to contribute in crucial ways to our nation's workforce."[14]   He continued:

> We experience this in a very real way at Microsoft. . . .   [E]mployees who are beneficiaries of DACA . . .   are software engineers with top technical skills; finance professionals driving our business ambitions forward; and retail and sales associates connecting customers to our technologies.   Each of them is actively participating in our collective mission to empower every person and every organization on the planet to achieve more.   They are not only our colleagues, but our friends, our neighbors and valued members of the Microsoft community.[15]

17.   Microsoft's CEO Satya Nadella has also underscored the importance of Microsoft's DACA-beneficiary employees to its business, explaining that he "see[s] each day the direct contributions that talented employees from around the world bring to our company, our customers and to the broader econo-

---

[14]  Microsoft President Brad Smith, DREAMers make our country and communities stronger (Aug. 31, 2017), https://blogs.microsoft.com/on-the-issues/2017/08/31/dreamers-make-country-communities-stronger?lipi=urn%3Ali%3Apage%3Ad_flagship3_pulse_read%3B VGllRxrxTBirfzbdYk4jSg%3D%3D.

[15]  *Id.*

my."[16]    As he stated, "[w]e care deeply about the DREAMers who work at Microsoft and fully support them.  We will always stand for diversity and economic opportunity for everyone.  It is core to who we are at Microsoft and I believe it is core to what America is."[17]

18.    The government has also benefited from Dreamers' willingness to participate in the DACA program.  Many DACA recipients have pursued professions in fields suffering from serious labor shortages, such as nursing and home health care; removing them from the economy could dramatically escalate costs that are in large part covered by Medicaid and Medicare.[18]  DACA recipients have also contributed to national security, with approximately 900 DACA recipients serving in the military under a program for persons who possess skills "vital to the national interest."[19]  More broadly, using their education and work authorizations, Dreamers have helped American companies grow and thrive.  They have contributed to

---

[16] Satya Nadella, CEO, Microsoft, DREAMers Make Our Country and Communities Stronger (Aug. 31, 2017), https://www.linkedin.com/pulse/dreamers-make-our-country-communities-stronger-satya-nadella/.

[17] *Id.*

[18] Noam Scheiber & Rachel Adams, *What Older Americans Stand to Lose if 'Dreamers' Are Deported*, N.Y. TIMES (Sept. 6, 2007), https://www.nytimes.com/2017/09/06/business/economy/daca-dreamers-home-health-care.html.

[19] Alex Horton, *The Military Looked to 'Dreamers' to Use Their Vital Skills.  Now the U.S. Might Deport Them*, WASH. POST (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/?utm_term=.be8c41bb71ef; Korte, *supra* n.1.

592

valuable technological innovations, promising medical and scientific research, and creative artistic endeavors.

19.   The Dreamers have held up their end of the bargain.   But the same cannot be said of the United States.   Although the Trump Administration continued to induce Dreamers to rely on the DACA program for the Administration's first eight months, on September 5, 2017, Attorney General Sessions announced Defendants' decision to end the DACA program.   That same day, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum formally rescinding DACA.

20.   The termination of the DACA program severely harms Perales Sanchez and other Dreamers, as well as the employers and educational institutions that rely on and benefit from their contributions.   For example, as a result of the rescission of the program, Princeton will suffer the loss of critical members of its community—students who lead vital student organizations, contribute to important research projects, participate in study-abroad programs, and perform on-campus work that aids the activities of the University. Similarly, Microsoft will lose employees who fill critical positions in the company's workforce and in whom the company has invested—leaving gaps that cannot easily be filled.

21.   Accordingly, the University, Microsoft, and Perales Sanchez bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Fifth Amendment of the U.S. Constitution, to enjoin the rescission of DACA and to obtain a declaration that the DACA program was lawful as initially promulgated and remains lawful today.

593

## **VENUE AND JURISDICTION**

22. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706; the Fifth Amendment of the U.S. Constitution; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

23. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e). A substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia. Defendant Duke is a United States officer sued in her official capacity, and her official residence is in the District of Columbia. Defendant DHS is a U.S. agency with its principal office in the District of Columbia.

## **PARTIES**

24. The University is a private, non-profit educational institution with its principal place of business at Princeton University, Princeton, New Jersey 08544. The University is a "person" within the meaning of 5 U.S.C. § 551(2).

25. Microsoft is a technology corporation organized and existing under the laws of the State of Washington, with its principal place of business in Redmond, Washington. Microsoft is a "person" within the meaning of 5 U.S.C. § 551(2).

26. Maria De La Cruz Perales Sanchez is a DACA beneficiary and a current undergraduate student at Princeton University. Perales Sanchez is a "person" within the meaning of 5 U.S.C. § 551(2).

594

27.   Defendant the United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

28.   Defendant DHS is an "agency" within the meaning of 5 U.S.C. § 551(1) and § 552(f). The Department of Homeland Security has its principal place of business at 650 Massachusetts Avenue NW, Washington, DC 20001.

29.   Defendant Elaine C. Duke is the Acting Secretary of DHS. She is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees the U.S. Citizenship and Immigration Services and Immigration and Customs Enforcement. She issued the DHS Memorandum that purports to rescind DACA. She is being sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.   The DACA Program

30.   On June 15, 2012, the then-Secretary of Homeland Security issued a memorandum establishing the DACA program ("DACA Memorandum").[20] Under the program, individuals who were brought to the United States as children and met certain criteria could apply for deferred action for a period of two years, subject to renewal. Deferred action means that the government

---

[20] *See* Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

595

agrees in its discretion to defer the removal[21] of an individual for a specified period, subject to renewal. The DACA Memorandum explained that it was intended to set forth "how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home." Because "these individuals lacked the intent to violate the law," and because this country's immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language," the DACA Memorandum advised that "[p]rosecutorial discretion, which is used in so many other areas, is especially justified here." The DACA Memorandum acknowledged that it "confers no substantive right," but rather "set[s] forth policy for the exercise of discretion within the framework of the existing law."

31. The DACA Memorandum also set forth a series of stringent criteria individuals had to meet to qualify for the DACA program. Individuals were eligible only if they: (1) came to this country when they were under the age of sixteen; (2) continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012; (3) were currently in school, had graduated from high school, had obtained a general education development certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) had not been convicted of a felony, a significant

---

[21] Removal is the legal term used in the Immigration and Naturalization Act for what is commonly known as deportation. *See generally* 8 U.S.C. § 240.

596

misdemeanor offense, multiple misdemeanor offenses, and otherwise did not pose a threat to national security or public safety; and, (5) were not above the age of 30 as of June 15, 2012.

32.   The government prepared answers to Frequently Asked Questions about the DACA program and posted them online.[22]   They explained that individuals who were granted deferred action are "not considered to be unlawfully present during the period in which deferred action is in effect."[23]   Likewise, despite not having received "lawful status," "[a]n individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect."[24]

33.   In order to apply for the DACA program, individuals including Perales Sanchez were required to pay a substantial fee, submit to biometric and biographical background checks, and hand over highly sensitive personal information, including their date of entry into the United States, their country of birth, their current and previous mailing addresses, and other contact information.[25]

34.   Many Dreamers, including Perales Sanchez, were reluctant to hand over their personal information to the government.   Accordingly, the government as-

---

[22] USCIS DACA FAQs, https://www.uscis.gov/archive/frequently-asked-questions (Archived).

[23] *Id.*, Question 1.

[24] *Id.*

[25] *See* Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I-821D at 13 (Jan. 9, 2017), https://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf.

597

sured them that their information would not be used for other immigration-related purposes, including to facilitate their removal.   The official instructions accompanying USCIS's DACA application form stated:

> *Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings* unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). The information may be shared with national security and law enforcement agencies, including ICE and CBP, *for purposes other than removal*, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing clause covers family members and guardians, in addition to the requestor.[26]

35.   In the DACA Memorandum, the government also assuaged concerns that it might use information obtained through DACA to facilitate removal.   DHS emphasized that the country's immigration laws are not designed "to remove productive young people to countries where they may not have lived or even speak the language."   DHS also acknowledged that many DACA eligible individuals "have already contributed to [the United States] in significant ways" and that, as a result, the exercise of prosecutorial discretion is "espe-

---

[26] *Id.* at 13 (emphasis added).

AR2891

598

cially justified" as to those eligible for relief under DACA.

36.  In 2016, then-Secretary of Homeland Security Jeh Johnson further explained the government's assurances to Dreamers in a letter to Representative Judy Chu:

> Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes.  More specifically, the U.S. government represented to applicants that the personal information they provided will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law.

> We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored.[27]

Secretary Johnson represented that this practice of not sharing information supplied by people seeking deferred action for immigration enforcement purposes had consistently been applied by DHS and its predecessor INS even before DACA was established.  He also acknowledged that "people who requested to be

---

[27] Letter from Secretary Jeh Charles Johnson to The Honorable Judy Chu (Dec. 30, 2016),  https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.

599

considered under DACA, like those who requested deferred action in the past, have relied on our consistent practice concerning the information they provide about themselves and others."[28]

37.   The government devoted significant time and effort to encourage Dreamers to apply for the DACA program, vigorously promoting the program in a variety of ways.   Among other initiatives, the government advised universities on how best to encourage eligible individuals to apply.[29]   The government also promoted the DACA program by, among other things, honoring ten DACA recipients as White House Champions of Change and inviting some of them to the White House to meet with President Obama.[30]   Cecilia Muñoz, Director of the White House Domestic Policy Council, wrote in a blog post preserved in the Obama White House archives that "[b]ecause the Administration acted, hundreds of thousands of ambitious, hardworking young people have been able to emerge from the shadows, no longer living in fear of deportation."[31]

---

[28]   *Id.*

[29]   *See, e.g.*, U.S. Dep't of Education, Resource Guide:  Supporting Undocumented Youth (Oct. 20, 2015), https://www2.ed.gov/about/overview/focus/supporting-undocumented-youth.pdf.

[30]   *See* Champions of Change:  DACA Champions of Change, Obama White House Archives, https://obamawhitehouse.archives.gov/champions/daca-champions-of-change (last visited Nov. 3, 2017); Lindsay Holst, *Meet the 6 DREAMers the President Met with in the Oval Office Yesterday* (Feb. 5, 2015), https://obamawhitehouse.archives.gov/blog/2015/02/05/meet-6-dreamers-president-met-oval-office-yesterday.

[31]   Cecilia Muñoz, *One Year Anniversary of Implementation of Deferred Action Policy for DREAMers* (Aug. 15, 2013), https://obamawhitehouse.archives.gov/blog/2013/08/15/one-year-anniversary-implementation-deferred-action-policy-dreamers.

600

38.   In order to entice Dreamers to apply, the government also promised that, if eligible, DACA recipients would be entitled not only to a single, two-year deferral of action but also to the ability to renew their deferred action for the foreseeable future.   *See* 2012 DACA Memorandum (noting that deferred action was "subject to renewal").   Indeed, the government "strongly encourage[d]" DACA recipients to submit their renewal requests well in advance of the relevant expiration date.[32]   To qualify for renewal, DACA recipients must not have left the United States without advance parole, must have continuously resided in the United States after submitting their initial DACA application, and must not have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, or otherwise pose a threat to national security or public safety.[33]

39.   DHS also made it difficult to terminate a Dreamer's deferred action under DACA.   DHS's Standard Operating Procedures implementing the DACA program provided that, absent a disqualifying criminal offense, national security concern, or other extraordinary circumstance, an individual's deferred action under DACA could not be removed until the government provided a "Notice of Intent to Terminate" that "thoroughly explain[ed]" the grounds for termination.[34]   DHS Standard Operating Procedures further provided that recipients of such notice "should be al-

---

[32] USCIS DACA FAQs, Question 49, https://www.uscis.gov/archive/frequently-asked-questions (Archived).

[33] *Id.*, Question 51.

[34] National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA), at 132, Appendix I (Apr. 4, 2013),   https://cliniclegal.org/sites/default/files/attachments/daca_sop_4-4-13.pdf.

601

lowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of deferred action under DACA.[35]

40.   As a result of these policies and procedures, along with other government actions and representations, Perales Sanchez and other Dreamers reasonably expected that they would be allowed to maintain and continue renewing their deferred status, so long as they complied with the government's straightforward rules.

41.   Since its inception in 2012, the DACA program has provided nearly 800,000 young people with the ability to live, study, and work in the United States without hiding in the shadows.   For the first time in their lives, DACA recipients, including Perales Sanchez, received Social Security numbers, enabling them to access credit and apply for student loans, obtain driver's licenses, and apply for federal work authorization.   In reliance on the DACA program, Perales Sanchez and other Dreamers have made considerable investments in their American lives, pursuing jobs, and educational programs that cost money, time, and energy, and require a commitment to a future here.   For example, after obtaining her federal work authorization, Perales Sanchez worked as a tutor, a research assistant, a dining hall employee, an office assistant, and an associate for an on-campus center for civic engagement.

42.   Some Dreamers may not have been able or may not have chosen to study at Princeton without DACA, which, among other things, allowed them to obtain a government-issued photo identification and

---

[35] *Id.*

602

thus travel back and forth to campus by airplane, and to dream of a future that includes legitimate employment in the United States, helping to justify the dedication and work that goes into a Princeton education. For example, before the DACA program was implemented, Perales Sanchez believed she would never be able to leave her state of residence.  After obtaining relief under the DACA program, she was able to fly not only to Princeton as an entering freshman, but also to travel abroad twice—once for a summer internship and once for a study-abroad program.[36]  DACA has enabled her to pursue those internships and programs to further her dream of going to law school.

43.    While Dreamers have certainly benefited from DACA, so too has the government.  "By removing the threat of deportation for young people brought to this country as children," Cecilia Muñoz acknowledged, "DHS has been able to focus its enforcement efforts on those who endanger our communities rather than students pursuing an education and seeking to better themselves and their communities."[37]  Then-Secretary Johnson acknowledged additional benefits from the program in 2016, explaining:

> Since DACA began, thousands of Dreamers have been able to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books.  We continue to benefit as a country from the contributions of

---

[36] Perales Sanchez obtained advance parole for her extraterritorial travel.

[37] *Id.*

603

those young people who have come forward and want nothing more than to contribute to our country and our shared future.[38]

## B. Defendants' Unlawful and Unconstitutional Rescission of DACA

44.    On September 5, 2017, Attorney General Sessions announced Defendants' decision to end the DACA program, and Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum formally rescinding the DACA program ("DACA Rescission Memorandum").

45.    President Trump's statements about the DACA program—both before and after its rescission—have been less consistent.   In the speech that launched his campaign, then-candidate Trump promised to "immediately terminate President Obama's illegal executive order on immigration," referring to DACA.[39]   On the same day that he met with the Mexican president in August 2016, he again announced his intent to "immediately terminate" DACA.[40]   But after the election, he told Time magazine:   "We're going to work something out that's going to make people happy and proud.   They got brought here at a very young age, they've worked here, they've gone to school here.   Some were good students.   Some have wonderful jobs.   And they're in never-never land because they don't know what's going

---

[38]  Johnson, *supra* n.27.

[39]  Anu Joshi, *Donald Trump and DACA:  A Confusing History*, HUFFINGTON POST (Mar. 3, 2017), http://www.huffingtonpost.com/entry/donald-trump-and-daca-a-confusing-history_us_58b9960be4b0fa65b844b24a.

[40]  *Id.*

604

to happen."[41]   And a few days after his inauguration, President Trump told ABC's David Muir that DACA recipients "shouldn't be very worried."[42]   At a February 16, 2017 press conference, President Trump explained his thinking on the subject:   "The DACA situation is a very difficult thing for me as I love these kids, I love kids, I have kids and grandkids and I find it very, very hard doing what the law says exactly to do and, you know, the law is rough.   It's rough, very very rough."[43]

46.   On June 29, 2017, officials from ten States, led by Texas Attorney General Ken Paxton, sent a letter to U.S. Attorney General Jeff Sessions, asserting that the DACA program is unlawful and requesting that it be "phase[d] out."[44]   The States threatened to challenge DACA in court unless DACA was rescinded by September 5, 2017.

---

[41] Michael Scherer, *2016 Person of the Year Donald Trump*, TIME (Dec. 8, 2016), http://time.com/time-person-of-the-year-2016-donald- trump/.

[42] Joshi, *supra* n.39.

[43] *Id.*

[44] *See* Chris Geidner, *Texas Attorney General Threatens to Sue Trump If He Doesn't End DACA*, BUZZFEED NEWS (June 29, 2017), https://www.buzzfeed.com/chrisgeidner/texas-attorney-general-threatens-to-sue-trump-if-he-doesnt?utm_term=.umwR4L105#.it 7d1JGWx.   The Tennessee Attorney General later reversed course and withdrew Tennessee's threat to sue.   *See* Letter from Tennessee Attorney General Herbert H. Slattery III to Sens. Lamar Alexander and Bob Corker (Sept. 1, 2017), https://www.vox.com/policy-and-politics/2017/9/1/16243944/daca-tennessee-dream-act.   He explained that he had changed his mind because "[t]here is a human element to this," and "[m]any of the DACA recipients, some of whose records I reviewed, have outstanding accomplishments and laudable ambitions, which if achieved, will be of great benefit and service to our country."   *Id.*

605

47.   In response to that letter, other stakeholders weighed in.   A letter from the attorneys general of twenty States, led by California, described how DACA has "been a boon to the communities, universities, and employers with which these Dreamers are connected, and for the American economy as a whole."[45]   A separate, open letter from hundreds of entrepreneurs and business leaders noted that "[a]t least 72 percent of the top 25 Fortune 500 companies count DACA recipients among their employees."   It explained that "Dreamers are vital to the future of our companies and our economy.   With them, we grow and create jobs.   They are part of why we will continue to have a global competitive advantage."   If the DACA program were rescinded, "[o]ur economy would lose $460.3 billion from the national GDP and $24.6 billion in Social Security and Medicare tax contributions."[46]   The letter was signed by, among many others, Satya Nadella and Brad Smith of Microsoft, Jeff Bezos of Amazon, Tim Cook of Apple, Mark Zuckerberg and Sheryl Sandberg of Facebook, and Sundar Pichai of Google.

48.   Despite the overwhelming evidence of DACA's benefits, DACA was rescinded on September 5, 2017—the deadline provided in Texas Attorney General Paxton's letter.   Unlike the DACA program itself, which required case-by-case assessment of individual applications, DACA's rescission is a categorical rule, applicable to all DACA recipients.   The rationale provided by

---

[45]  Letter from Xavier Becerra (July 21, 2017), https://oag.ca.gov/system/files/attachments/press_releases/7-21-17%20%20Letter%20from%20State%20AGs%20to%20President%20Trump%20re%20DACA.final_.pdf.

[46]  Leaders of American Industry on DACA (Aug. 31, 2017), https://dreamers.fwd.us/business-leaders.

606

Attorney General Sessions for rescinding DACA, which was echoed by Acting Secretary Duke, was that it is vulnerable to the "same legal and constitutional defects that the courts recognized as to DAPA [Deferred Action for Parents of Americans and Lawful Permanent Residents]," which is a separate program that DHS introduced in November 2014, and which was enjoined prior to its effective date.   Accordingly, the Attorney General and Acting Secretary stated that "it is likely that potentially imminent litigation would yield similar results with respect to DACA."[47]

49.   DHS's rationale is directly at odds with new policies that the agency announced in connection with its rescission of DACA.   For example, when it announced rescission, DHS declared that it would continue to adjudicate pending DACA applications.   DHS also asserted that it would adjudicate any applications for renewal filed by individuals whose deferred status under DACA would expire before March 5, 2018, so long as those applications were filed by October 5, 2017.[48]   This announcement effectively extended DACA for an additional two and a half years.

50.   DHS's asserted basis for rescinding DACA also conflicts with the position previously taken by the United States, including in an opinion by the Office of

---

[47] Letter on Rescission of Deferred Action for Childhood Arrivals (Sept. 4, 2017), https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf; Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca#.

[48] Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca#.

607

Legal Counsel ("OLC") that has not been withdrawn.[49] Its credibility is further undermined by President Trump's own tweet, published less than nine hours after the announcement of DACA's rescission, promising that if Congress does not "legalize DACA" in six months, "I will revisit this issue!"[50]

51.   In addition, the government has provided no assurance or commitment that the information collected from DACA applicants will not be used to pursue their deportation.  The DACA Rescission Memorandum is silent on the issue.  DHS has adopted a new privacy policy pursuant to an Executive Order issued in January 2017 that "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement."[51]  And whereas the government in the past had promised that information provided by DACA applicants "*is protected* from disclosure,"[52] it now states only that such information

---

[49] *See* Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. & to Defer Removal of Others, 2014 WL 10788677 (Op. O.L.C. Nov. 19, 2014).

[50] *See* Donald J. Trump (@realDonaldTrump), Twitter (Sep. 5, 2017, 8:38 PM), https://twitter.com/realDonaldTrump/status/ 90522 8667336499200; Josh Blackman, *Trump's DACA Decision Defies All Norms*, LawFare@FP (Sept. 7, 2017), http://foreignpolicy. com/2017/09/07/trumps-daca-decision-defies-all-norms/ ("[T]his latest constitutional whiplash undermines that defense on an even more profound level.").

[51] DHS, Privacy Policy 2017-01 Questions & Answers, at 3 (Apr. 27, 2017), https://www.dhs.gov/sites/default/files/publications/Privacy %20Policy%20Questions%20%20Answers%2C%2020170427%2C% 20Final.pdf.

[52] USCIS DACA FAQs, Question 19 (emphasis added).  The referenced Notice to Appearance guidance is USCIS Policy Memorandum 602-0050 (Nov. 7, 2011) ("Revised Guidance for the Referral

608

"will not be *proactively* provided to ICE and CBP for the purpose of immigration enforcement proceedings."[53]   Accordingly, Dreamers reasonably anticipate that the information they provided to the government in order to enroll in the DACA program will be used against them, including to pursue their removal from this country.   Indeed, DHS has already "urge[d] DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States."[54]

### C.   Plaintiffs' Interest in the DACA Program

#### a.   *Princeton University and Perales Sanchez Have Benefited from DACA.*

52.   Plaintiff Princeton is a private, non-profit educational institution that advances learning through scholarship, research, and teaching of extraordinary quality, with an emphasis on undergraduate and doctoral education and a pervasive commitment to serve the nation and the world.   The University's defining characteristics and aspirations include, among other things, a commitment to welcome, support, and engage

---

of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens").

[53] DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017) (emphasis added), https://www.dhs.gov/news/2017/09/05/frequently-askedquestions -rescission-deferred-action-childhood-arrivals-daca.

[54] Talking Points—DACA Rescission, MSNBC, http://msnbcmedia. msn.com/i/MSNBC/Sections/NEWS/z-pdf-archive/170905-DACA-Talking-Points.pdf; *see also* Kristen Welker & Daniel Arkin, *Trump Administration Memo: DACA Recipients Should Prepare for 'Departure,'* NBC NEWS (Sept. 5, 2007), https://www.nbcnews.com/ news/us-news/white-house-memo-daca-recipients-should-prepare-departure-n799026.

609

students, faculty, and staff with a broad range of back-grounds and experiences, and to encourage all members of the University community to learn from the robust expression of diverse perspectives.[55]

53.   Every year, the University accepts applications for admission to its undergraduate program from both domestic and international students who have completed or are soon to complete secondary education programs.   To achieve the excellence to which it aspires, Princeton must find, attract, and support talented people from a wide range of demographic groups, and it must provide a campus climate in which people from all backgrounds learn from and share experiences and perspectives with each other.   A diverse, inclusive, and collaborative learning community sparks creativity and insight, generates meaningful conversation, and facilitates intercultural connection and understanding. Diversity is essential to Princeton's efforts to meet the needs of a world that requires leaders who come from a wide variety of backgrounds and groups and who are able to work effectively across cultures and political and social divides.   Accordingly, the University expends considerable time and resources recruiting high-achieving students from diverse backgrounds to create an exceptional learning community for each incoming class.

54.   Undergraduate admission to the University is highly competitive.   For the University's graduating class of 2021 (matriculating in the fall of 2017), 1,991

-----

[55] *See* Princeton University, Our Commitment to Diversity, https://inclusive.princeton.edu/about/our-commitment-diversity (last visited Nov. 3, 2017); Princeton University, Academics, https://www.princeton.edu/academics (last visited Nov. 3, 2017).

610

applicants were admitted out of 31,056 total applicants, for an admissions rate of 6.4 percent.[56]

55.  Since 2012, Princeton has admitted and enrolled at least 21 DACA recipients as students.  These students have enrolled in both undergraduate and graduate programs in a diverse array of fields, including sciences, engineering, politics, psychology, and public policy.  These individuals have been among the greatest contributors to the campus community.  For example, a member of the class of 2015 and a DACA beneficiary, Yessica Martinez, was a co-recipient of the 2015 Pyne Prize, the University's highest general honor for an undergraduate.  She was recognized for her "excellent scholarship, strength of character, and effective leadership in support of the best interests of Princeton University."[57]  Among her accomplishments at Princeton, Martinez was "a standout student and writer, and an exceptional community organizer and leader," who served as a residential advisor and excelled in studying comparative literature, creative writing, and Latin American studies.[58]  University President Eisgruber

---

[56] *See* Princeton University, Statistics for Applicants to the Class of 2021, *available at* https://admission.princeton.edu/how-apply/admission-statistics (last visited Nov. 3, 2017).

[57] *See* Princeton University, Introduction by President Christopher L. Eisgruber, *available at* http://alumni.princeton.edu/learntravel/lectures/videodetail/index.xml?videoid=409 (last visited Nov. 3, 2017); Princeton University, Seniors Martinez, Robertson Named Pyne Prize Winners (Feb. 12, 2005), *available at* https://undergraduateresearch.princeton.edu/news/seniors-martinez-robertson-named-pyne-prize-winners (last visited Nov. 3, 2017).

[58] *Id.*

611

stated in awarding her the Pyne Prize that Martinez had a "profound impact on the Princeton community."[59]

56.   As explained in the Introduction to this Complaint, Princeton benefits from DACA in many ways. Princeton's DACA recipients—including Perales Sanchez—are exceptionally resilient students who have overcome varied, serious life obstacles in the course of achieving great success.   They have unique insights because of their backgrounds, and they contribute diverse perspectives on a range of issues on campus—both inside and outside the classroom.   Their presence in the classroom, student housing, student organizations, and other campus activities enhances the intellectual experience of all students and faculty at Princeton.   Their membership in Princeton's community helps the University to realize its educational mission.

b.   *Microsoft Has Benefited from DACA.*

57.   Similarly, Microsoft benefits in myriad ways from the DACA recipients whom it employs as software engineers, financial analysts, inventory control experts, and core technical and operations positions. Microsoft's mission on behalf of its customers around the world creates a substantial business need for finding, developing, and attracting the brightest and most promising talent from around the country and around the world.   As Microsoft CEO Satya Nadella explained, "smart immigration can help our economic growth and global competitiveness."[60]

58.   The company places a high priority on having a diverse workforce that can reflect the global customer

---

[59]   *Id.*

[60]   Nadella, *supra* n.16.

612

base Microsoft serves. The company's products and services—and ultimately its customers—benefit from input and contributions that draw from the diverse backgrounds found among the company's employees. Microsoft has significant interests in retaining its employees and in reaping the benefits of their talent over time.

59. DACA beneficiaries are working across a range of Microsoft's business divisions, employing their "tremendous talent" to develop the next generations of Microsoft products and services.[61]   While Microsoft's DACA employees are generally early in their careers, their past accomplishments and promise for the future reflect their significant value to the company. The company employs DACA beneficiaries in its Office Products Group, which produces its industry-leading suite of productivity applications; the Windows and Devices Group, which is responsible for the software platform, apps, games, store, and devices that power the Windows ecosystem; the Cloud & Enterprise Group, which builds the infrastructure software and developer tools that power the company's cloud platform and services; the Artificial Intelligence and Research Group, which drives the company's strategy for artificial intelligence and forward-looking research and development; and LinkedIn, its online professional network designed to help members find jobs, connect with other professionals, and locate business opportunities. DACA beneficiaries are also employed in posi-

---

[61] Brad Smith, President, Microsoft, DREAMers Make Our Country and Communities Stronger (Aug. 31, 2017), https://blogs.microsoft.com/on-the-issues/2017/08/31/dreamers-make-country-communities stronger?lipi=urn%3Ali%3Apage%3Ad_flagship3_pulse_read%3B VGlIRxrxTBirfzbdYk4jSg%3D%3D.

613

tions within Microsoft's Finance organization as well as its Worldwide Commercial Business and Retail divisions, which engage directly with its customers.  As Microsoft President Brad Smith has explained, these individuals are an integral part of the fabric of Microsoft's business and its "collective mission to empower every person and organization on the planet to achieve more."[62]

60.   Moreover, by allowing Dreamers to work lawfully, DACA moved these individuals out of the informal economy, increasing the pool of talent from which Microsoft could fill supply gaps in the U.S. job market. The United States faces a shortage of skilled workers that is only projected to intensify over the next decade, as workers from the baby-boom generation retire from the workforce.   As these gaps continue to widen, DACA recipients play a critical role in filling positions for which there are not enough U.S.-born applicants. DACA recipients also often possess skills—including foreign language skills—that businesses like Microsoft need.

c.   *Plaintiffs Will Be Harmed by the Rescission of DACA.*

61.   With DACA's rescission, Princeton and Microsoft will be harmed in several ways.   Princeton has devoted substantial resources to recruiting, retaining, and educating Dreamers—including, among other things, investments in financial aid to cover tuition, housing, and other educational expenses, as well as faculty and administrative time.   Those resources were invested with the expectation that those students would be able to deploy their Princeton degree in varied suc-

---

[62] *Id.*

614

cessful careers.   The loss of DACA diminishes the likelihood that Dreamers will be authorized to work in the United States, thus also diminishing the economic value of their education and Princeton's investment in them.   Princeton has also spent additional resources to address the harms of DACA's rescission on Princeton's students and employees, and reasonably expects to spend further resources addressing this issue. Furthermore, Princeton will lose the opportunity to matriculate new Dreamers, as many may be deterred from studying at Princeton because the tremendous investment of time, effort, and money required to pursue that education may not yield employment prospects without the work authorization provided by DACA.

62.   Microsoft also has expended significant resources in recruiting and training Dreamers, with the expectation that they would continue to be eligible to work at the company.   By eliminating a valuable pool of employees, rescission of DACA will cause Microsoft to lose at least 45 employees and interns who make significant contributions to the company.   This loss will hinder the company's productivity, leading to a less robust and diverse workforce.   Moreover, as a consequence of Defendants' actions, Microsoft will have to spend additional resources to recruit, train, and promote replacement employees.   The pool of workers from which to fill these positions will be smaller, inhibiting Microsoft's productivity, reducing the diversity of its workforce, and making it harder to compete globally. Microsoft's corporate interests are best served by a stable, fair, and efficient business environment.   Defendants' rescission of DACA injures each of these interests.

615

63.  DACA's rescission of course inflicts grave harm on not only the University and Microsoft, but also the Dreamers themselves.  Some feel that DACA's rescission will impede or diminish their educational experience.  For example, they may not be able to pursue research or study abroad, which are important parts of many academic programs.  In addition, they may not be able to receive work authorization, which will hinder their ability to enhance their skills, build their resumes, network with campus administrators, professors, and other students, and earn money that can be used to further their educations.  For all, the future value of their Princeton education is seriously diminished because they cannot obtain a legitimate job in the United States after graduation.  Perales Sanchez, for example, will not be able to obtain financial aid to support her planned law school education—and even if she could, her inability to work legally in the United States as a lawyer undermines the viability of that planned career path.

64.  Of course, the ultimate consequence of DACA's rescission is not just the loss of opportunity in the United States, but the very real threat of deportation from the United States.  If that threat is realized, the Dreamers, including Perales Sanchez, stand to lose everything:  their homes, their families and friends, and the lives that they have finally been free to live in this country because of DACA.  If deported, they will be sent to countries where they have not lived since they were very young, where they have no friends and no known prospects, and that are in every meaningful sense foreign to them.  Perales Sanchez, for example, left her native country of Mexico at the age of eight and has only returned once for a single week.  Her family,

616

friends, and career prospects are all here in the United States.

<u>**COUNT I**</u>

**PROCEDURAL VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT**

*Brought By All Plaintiffs Against All Defendants*

65.   Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

66.   The APA requires that federal agencies conduct notice-and-comment rulemaking before promulgating a substantive rule.   *See* 5 U.S.C. § 553.   Agency action is unlawful where it is made "without observance of procedure required by law."   5 U.S.C. § 706(2)(D).

67.   DHS is an "agency" within the meaning of the APA, and the DACA Rescission Memorandum and the actions that DHS has taken to implement the DACA Rescission Memorandum are a substantive rule within the meaning of the APA.   *See* 5 U.S.C. § 551(1), (4).

68.   Defendants' actions affirmatively circumscribe DHS's statutory authority in providing deferred action as they bind DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria, prohibit DHS from renewing recipients' deferred status under DACA after October 5, 2017, and prohibit DHS from granting advance parole to DACA recipients.

69.   The DACA Rescission Memorandum and the actions that DHS has taken to implement the DACA Rescission Memorandum have affected the rights and interests of all DACA recipients by changing the sub-

617

stantive criteria by which these individuals work, live, attend school, obtain credit, and travel. Defendants did not follow the procedures required by the APA before taking action affecting these substantive rights.

70. Defendants promulgated and implemented these substantive rules without authority and without notice-and-comment rulemaking in violation of the APA.

71. Plaintiffs have been harmed by these unlawful acts, including because they have not had the opportunity to comment on the rescission of DACA.

72. Defendants' violation causes ongoing harm to the University, Microsoft, Perales Sanchez, and other members of the University community. These injuries, including the specific harms alleged above to the University and Microsoft, fall within the zone of interests encompassed by the broad scope of the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*

## COUNT II

### SUBSTANTIVE VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT

*Brought By All Plaintiffs Against All Defendants*

73. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

74. Defendants are subject to the APA. *See* 5 U.S.C. §§ 701(b)(1), 703. Defendants' rescission of DACA is final agency action subject to judicial review because it consummates DHS's decision-making process and is a decision from which legal consequences will flow.

618

75.   The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."   5 U.S.C. § 706(2)(A), (B), (C).

76.   In creating and implementing DACA, over the course of years, the government repeatedly made promises and assurances to DACA recipients (including Princeton alumni and current students, and Microsoft employees) that if they stepped forward, shared highly sensitive personal information, and passed a background check, they would be granted renewable protection and would be allowed to live and work in the United States as long as they abided by the conditions of the program.   The government also specifically and consistently promised that information disclosed through the DACA program would not be used for immigration enforcement purposes outside certain limited circumstances.

77.   The University, Microsoft, Perales Sanchez, and nearly 800,000 other vulnerable young people reasonably relied on the government's assurances and promises in taking the irreversible step of identifying themselves and providing the government with highly sensitive and potentially compromising personal information.   DACA recipients, including Perales Sanchez, also made numerous life-altering personal and professional decisions in reliance on the government's promises regarding DACA.

78.   The establishment and implementation of DACA engendered serious reliance interests by Perales Sanchez and other DACA recipients, their families,

619

and others affected, including the University and Microsoft. Defendants failed to take these interests into account and failed to provide a rational explanation for the change in policy on which such individuals and institutions have reasonably relied.

79. Defendants' disregard for the reasonable reliance of Perales Sanchez and hundreds of thousands of other vulnerable young people, and others affected by DACA's rescission is the hallmark of arbitrary and capricious action and an abuse of discretion. The decision to rescind DACA is therefore in violation of the APA and must be vacated.

80. Defendants' rescission of DACA also must be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the agency failed to articulate a reasoned explanation for its decision that considered all important aspects of the issue.

81. For example, Defendants provided no justification for many of the details of the rescission of DACA, including but not limited to the September 5, 2017 deadline for initial applications; the October 5, 2017 deadline to file certain renewal applications; and the March 5, 2018 cut-off for renewal eligibility. These deadlines are arbitrary, and they fail to provide sufficient time and notice to DACA recipients.

82. Defendants also failed to provide any reasoned analysis to support the changes to the confidentiality of applicant information.

83. Defendants' purported grounds for rescinding DACA are inadequate to justify termination, are legally erroneous, pretextual, and internally inconsistent, and fail to consider or address relevant factors such as

620

the government's previous conclusion that the DACA program was lawful or other government statements that contradict the agency's stated rationale.

84.   Defendants' rescission of DACA and the steps taken to implement that determination are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, they are based on the legally incorrect premise that DACA is unlawful.

85.   Defendants' assertion that the Executive Branch lacks authority to continue the DACA program ignores the fact that the government itself previously concluded that it did have the authority to implement the program, including in an OLC opinion that has not been withdrawn or amended.   Defendants' failure to conduct or provide a reasoned analysis for its decision to rescind DACA constitutes a violation of the APA.

86.   Defendants' decision to rescind DACA is also arbitrary and capricious because its purported rationale is inconsistent with DHS's new policy.   In particular, Defendants terminated the program because they purportedly concluded that the Executive Branch lacks authority to continue the program, yet DHS continued to adjudicate pending DACA applications and renewal applications received before October 5, 2017 (for individuals whose benefits would expire before March 5, 2018), effectively extending DACA for an additional two and a half years.   Likewise, the President suggested that he may renew DACA if Congress does not act within six months, which is an inherent admission that the stated rationale for DACA's rescission is arbitrary and capricious.

87.   The rescission of DACA also violates the APA because it is "contrary to constitutional right, power,

621

privilege, or immunity." 5 U.S.C. § 706(2)(B).   For the reasons set forth in this complaint, Defendants' actions in promulgating and implementing the rescission of DACA are unconstitutional and therefore must be vacated.

88.    For all of the reasons stated above and throughout this complaint, Defendants' actions violate the APA.

89.    Defendants' violation causes ongoing harm to the University, Microsoft, Perales Sanchez, and other DACA recipients.   These injuries fall within the zone of interests of the INA, which is intimately related to the ability of Perales Sanchez and other Dreamers to study and work in the United States and to the University and Microsoft's ability to enroll and hire Dreamers.

## COUNT III

### VIOLATIONS OF THE FIFTH AMENDMENT (EQUAL PROTECTION)

*Brought By All Plaintiffs Against All Defendants*

90.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying equal protection of the laws.

92.    Rescission of DACA impermissibly discriminates against DACA recipients on the basis of a characteristic over which they have little control—namely, their undocumented status.   Defendants' decision to deprive DACA recipients of their interest in furthering their education or pursuing a livelihood presents unreasonable obstacles to advancement based on individ-

622

ual merit, and cannot be sufficiently justified by federal interests.

93.   The University, DACA recipients enrolled at the University, other University students, Microsoft, and Perales Sanchez, have been and continue to be harmed by this violation of the equal protection guarantee of the Fifth Amendment.

## COUNT IV

### VIOLATIONS OF THE FIFTH AMENDMENT (DUE PROCESS—RESCISSION)

*Brought By All Plaintiffs Against All Defendants*

94.   Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

95.   DACA recipients—including Perales Sanchez, other University students and alumni, and Microsoft employees—are physically present in the United States and have developed deep and meaningful connections to their communities, including through pursuit of education, occupation, entrepreneurial enterprise, financial and other support for family, friends, and members of the public, and other activities enabled by the government's decision to grant deferred status.

96.   The Due Process Clause applies to individuals and entities present in the United States.   *See Zadvydas v. Davis*, 533 U.S. 678, 682, 693-94 (2001) ("[A]liens who were admitted to the United States but subsequently ordered removed" have constitutional due process rights, "whether their presence here is lawful, unlawful, temporary, or permanent.").

97.   The Due Process Clause imposes limits on federal government decisions that deprive individuals of

**AR2916**

623

liberty or property interests protected by the Fifth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319, 331 (1976). Protected liberty and property interests may take many forms. *E.g., Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

98. Rescission will, without due process of law, deprive the University of several interests cognizable under the Constitution. For example, the University currently has enrolled 16 DACA recipients, including 1 graduate student and 15 undergraduate students. The University has incurred substantial cost to support each student, including costs associated with faculty time and attention, privately-funded financial aid, research grants, housing, and other resources. The University has made these investments on the basis of individual merit, and with the firm belief that each student will make significant contributions to communities within and beyond the University. Were DACA enrollees to leave the University before completing their program of study, the University stands to forfeit the important contributions that the students make on campus, the resources the University has invested in their education, and the benefits associated with their future success, including their continued contributions—socially, academically, and monetarily—to the University.

99. Rescission also will, without due process of law, deprive Microsoft of several interests cognizable under the Constitution. Microsoft has made significant investments in recruiting, training, and supporting DACA enrollees, and has conducted its business operations based on the well-founded expectation that they would continue to be eligible to work at the company. If

624

DACA enrollees become ineligible to work at Microsoft, the company will lose this crucial talent in which it has heavily invested, as well as the time, money, and resources that it has spent cultivating this human capital. It also will suffer business disruptions as a result of the loss of these employees and will have to spend additional resources to recruit, train, and promote replacement employees.

100. DACA recipients, including Perales Sanchez, also have constitutionally-cognizable liberty and property interests in their deferred status, as well as rights, benefits, and property that they could not have obtained but for DACA. Because of DACA, some of these individuals, including Perales Sanchez, have become eligible for and obtained work authorization, become able to open bank accounts, to obtain credit, to secure driver's licenses, to pursue higher education, and to access various federal government benefits, such as Social Security.

101. The government, through its introduction, implementation, and operation of DACA, cultivated a reasonable expectation among the University, Microsoft, Perales Sanchez, and other DACA recipients that DACA recipients would have an opportunity to maintain and renew their deferred status.

102. The rescission of DACA occurred with inadequate notice and without any opportunity to be heard and does not provide for any opportunity to be heard. As a result, rescission and actions taken by Defendants in connection with rescission unlawfully deprive the University, Microsoft, Perales Sanchez, other DACA recipients enrolled at the University, and all other University students of constitutionally-protected interests without due process of law.

625

103. The University, Microsoft, Perales Sanchez, other DACA recipients enrolled at the University, and other University students have been and continue to be harmed by these violations of the Due Process Clause of the Fifth Amendment.

## COUNT V

**VIOLATIONS OF THE FIFTH AMENDMENT (DUE PROCESS—INFORMATION SHARING)**

*Brought By The University and Perales Sanchez Against All Defendants*

104. The University and Perales Sanchez repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105. The Due Process Clause also requires fundamental fairness and limits the government's discretion to make and break assurances, particularly when the government offers benefits to induce conduct that may have severe repercussions.

106. After introducing DACA, the government invited undocumented individuals brought to the United States as children to apply for deferred status and, in the event an individual was granted relief, work authorization.  Applications for deferred status and for work authorization required that individuals provide sensitive and detailed personal information.  To induce otherwise vulnerable individuals to disclose this information, the government made clear and consistent assurances that it would not be used to facilitate removal.  For example, in official instructions provided to potential applicants, the government represented that information supplied in a request for consideration under DACA "is protected from disclosure to ICE and

**AR2919**

626

U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement."

107. In reliance on the government's assurances about information sharing, and the potential to secure relief under DACA, Perales Sanchez, and other individuals enrolled at the University provided the government with sensitive and detailed personal information.

108. In addition to rescinding DACA, the Defendants have revised assurances about information sharing. Defendants no longer promise to protect information from use for immigration enforcement. Instead, they offer only to prevent personal information from being provided "proactively" to agencies responsible for facilitating removal. Except as previously provided under the DACA program, the use of information obtained through implementation and operation of DACA—information that was provided at the government's invitation, to facilitate an assessment of eligibility for deferred status, and based on assurances that it would be protected—for any purpose related to immigration enforcement violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

109. The University, Perales Sanchez, other DACA recipients enrolled at the University, and all other University students have been and continue to be harmed by these violations of the Due Process Clause of the Fifth Amendment.

**REQUEST FOR DECLARATORY JUDGMENT**

110. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

627

111. The DACA program was a lawful exercise of the President's discretion to enforce the immigration laws. The government, through OLC, concluded that DACA was lawful. Defendants now claim, as the basis for rescission of the program, that DACA is unlawful. There is therefore an actual controversy regarding whether the DACA program is lawful.

112. The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

113. Because it is a direct beneficiary of the program through its Dreamer students and employees, Princeton and Microsoft have interests in the legality of the DACA program. Perales Sanchez, as a DACA beneficiary, also has an interest in the legality of the DACA program. Defendants' decision to terminate DACA on the purported basis that the DACA program was unlawful has harmed Plaintiffs and continues to cause ongoing harm to Plaintiffs.

114. Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the DACA program was lawful and is lawful today.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez respectfully request that judgment be entered against the Defendants, and that this Court:

628

A. Declare pursuant to 28 U.S.C. § 2201(a) that the DACA program is lawful and constitutional;

B. Declare pursuant to 28 U.S.C. § 2201(a) that the termination of the DACA program was unlawful and unconstitutional;

C. Issue an injunction against enforcement and implementation of the DACA Rescission Memorandum, and enjoining Defendants from terminating or rescinding the DACA program;

D. Issue an injunction enjoining Defendants from sharing or otherwise using information furnished by Dreamers, including Perales Sanchez, pursuant to the DACA program for purposes of immigration enforcement, except as previously provided under the DACA program;

E. In the alternative, remand the action to the Defendants for reconsideration; and

F. Grant such other and further relief as may be just and proper.

Dated:   Nov. 3, 2017

Respectfully submitted,

THE TRUSTEES OF
PRINCETON UNIVERSITY;
MICROSOFT CORPORATION;
MARIA DE LA CRUZ
PERALES SANCHEZ

AR2922

629

By: /s/ <u>THOMAS J. PERRELLI</u>
THOMAS J. PERRELLI
    D.C. Bar No. 438929
Lindsay C. Harrison
    D.C. Bar No. 977407

Marina Jenkins
    D.C. Bar No. 988059
Alex Trepp
    D.C. Bar No. 1031036*


JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone 202 639-6000
Fax 202 639-6066
Email:  tperrelli@jenner.com
            lharrison@jenner.com
            mjenkins@jenner.com
            atrepp@jenner.com

*Attorneys for The Trustees of Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez*

*\* Application for Admission to District Court for District of Columbia Pending*

630

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

––––––––––

Case No. 1:17-cv-01907

THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE (NAACP), AMERICAN
FEDERATION OF TEACHERS, AFL-CIO, AND
THE UNITED FOOD AND COMMERCIAL WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC, PLAINTIFFS

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, JEFFERSON
BEAUREGARD SESSIONS III, IN HIS OFFICIAL CAPACITY
AS THE ATTORNEY GENERAL OF THE UNITED STATES,
ELAINE C. DUKE, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF HOMELAND SECURITY,
U.S. CITIZENSHIP AND IMMIGRATION SERVICES;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
DEPARTMENT OF HOMELAND SECURITY; AND THE
UNITED STATES OF AMERICA, DEFENDANTS

––––––––––

Filed:   Oct. 23, 2017

––––––––––

**[PROPOSED] FIRST AMENDED COMPLAINT**

––––––––––

## I.   INTRODUCTION

1.   The National Association for the Advancement of Colored People ("NAACP"), the American Federation of Teachers ("AFT"), and the United Food and Commercial Workers International Union, AFL-CIO, CLC ("UFCW") bring this action in their organizational capacities against the President of the United States and the federal government for unlawfully reneging on their promise to protect young, undocumented immi-

AR2924

631

grants of color living in the United States. This action alleges violations of the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, and the Regulatory Flexibility Act. This action also seeks declaratory relief pursuant to 28 U.S.C. § 2201.

2. The Deferred Action for Childhood Arrivals ("DACA") refers to the United States' immigration policy concerning undocumented immigrants who arrived in America as children. Under this policy, people who immigrated to the United States when they were younger than 16 and have lived in the United States continuously since 2007 were eligible to defer deportation indefinitely, attend school, and receive two-year work permits, among other benefits.

3. The vast majority of DACA registrants are people of color. More than 80% of registrants are of Mexican origin.

4. In exchange for providing the federal government with extensive biographic and biometric information, DACA registrants[1] received the United States' promise that they could build lives for themselves in the United States without fear of prosecution or deportation.

5. However, a little less than two weeks ago, the President of the United States and the United States Attorney General announced their intention to renege on those promises.

---

[1] The children of undocumented parents who were brought to this country and grew up here became known as DREAMers, after the DREAM Act, a piece of legislation meant to give them a path to citizenship that was first introduced in 2001. Approximately 1.3 million Dreamers were eligible to enroll in DACA, and to date approximately 800,000 have done so.

632

6.     On September 5, 2017, Attorney General Jeff Sessions, on behalf of President Donald Trump, announced that the Trump Administration was rescinding the DACA program.   The same day, the Department of Homeland Security ("DHS") issued a memorandum memorializing the rescission.   The Attorney General announced that, effective immediately, DHS would stop processing or accepting new DACA applications, cease allowing DACA registrants to visit their families abroad and return to the United States, and issue renewals only for registrants whose terms expired before March 5, 2018 as long as they applied for renewal by October 5, 2018.

7.     The Trump Administration announced this rescission without regards to the Due Process rights of the DACA registrants, and without engaging in the required analysis or rulemaking procedures required by the Regulatory Flexibility Act and the Administrative Procedure Act, both of which are laws put into place to safeguard the public against this very type of impulsiveness by leaders in powerful positions.

8.     As a result, the NAACP, AFT, and UFCW, whose respective memberships include DACA registrants across the United States, respectfully requests that this Court declare the termination of the DACA program unlawful, and enjoin the Trump Administration from effectuating its rescission.

## II.   JURISDICTION AND VENUE

9.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).   Defendants are United States agencies or officers sued in their

**AR2926**

633

official capacities.    Several Defendant agencies are residents of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Columbia.

### III.   PARTIES

11.    The National Association for the Advancement of Colored People is the nation's largest and oldest civil rights grassroots organization.    Since its founding in 1909, the mission of the NAACP has been to ensure the political, educational, social, and economic equality of all persons and to eliminate race-based discrimination. The NAACP has fought in the courts for decades to protect the guarantee of equal protection under law. To advance its mission, the NAACP has represented parties in landmark civil rights cases, perhaps most famously in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954), which outlawed segregation in public schools.    The NAACP also has filed numerous *amicus* briefs over its decades of existence in cases that significantly impact people of color.

12.    NAACP has members throughout the country who are enrolled in the DACA Program.    Accordingly, the NAACP brings this action on behalf of those members who are currently enrolled in, and who applied to enroll in, the DACA Program.    NAACP members who are DACA registrants reside throughout the United States, including in California, Florida, New York, and Rhode Island, as well as other States.

13.    The American Federation of Teachers ("AFT"), an affiliate of the AFL-CIO, was founded in 1916, and today represents approximately 1.7 million members who are employed across the nation in K-12 and higher education, public employment, and healthcare.    The AFT has a longstanding history of supporting and

**AR2927**

634

advocating for the civil rights of its members and the communities they serve.

14.   The AFT has members throughout the country that have received work permits through the DACA program.   These members have utilized DACA work permits to obtain employment in institutions that provide essential and necessary services, such as healthcare and education, to the public.   AFT members also teach students who have received DACA benefits. These students are integral members of their educational institutions.   They contribute to the diversity of experience and viewpoint in classrooms, engage in valuable research projects, and play leadership roles in student life.

15.   The United Food and Commercial Workers International Union, AFL-CIO, CLC is a labor organization which represents working men and women across the United States.   UFCW's 1.3 million members work in a range of industries, with the majority working in retail food, non-food retail, meatpacking and poultry, food processing, and manufacturing. UFCW is the largest union of young workers with 40% of its members under the age of 30.   UFCW's objective is the elevation of its members and other employees engaged in the performance of work through improving their wages, hours, benefits, and working conditions.   More broadly, UFCW fights to advance and safeguard full employment, economic security, and social welfare of its members and their communities.

16.   UFCW and its predecessor unions have represented immigrants from around the world since the beginning of the last century, particularly workers in the packinghouses and stockyards.   Immigrant workers continue to form a vital part of these and other

AR2928

635

workforces that UFCW represents. In particular, UFCW has members who are DACA recipients across industries in which it represents employees. UFCW is proud that its representation enables DACA recipients to personally advance and contribute to their families and American society generally.

17. Defendant Donald J. Trump is the President of the United States. He authorized the issuance of the Department of Homeland Security Memorandum that purports to rescind DACA. He is being sued in his official capacity.

18. Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States, and announced the purported rescission of DACA on September 5, 2017. He has ultimate authority over prosecutions by the Department of Justice for violation of the immigration laws. He is being sued in his official capacity.

19. Defendant Elaine C. Duke is the Acting Secretary of the Department of Homeland Security. She is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees the United States Citizenship and Immigration Service ("USCIS") and the Immigration and Customs Enforcement ("ICE"). She is being sued in her official capacity.

20. Defendant DHS is a federal cabinet agency responsible for implementing the DACA program. DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

21. Defendant USCIS is an Operational and Support Component agency within DHS. USCIS is the

636

sub-agency responsible for administering the DACA program.

22.   Defendant ICE is an Operational and Support Component agency within DHS.   ICE is responsible for enforcing federal immigration law, including identifying, apprehending, detaining, and removing noncitizens.

23.   Defendant the United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

## IV.   FACTUAL ALLEGATIONS

### A.   <u>The DACA Program Promised Young Immigrants Opportunities and Peace of Mind in Exchange for Extensive Personal Data</u>

24.   On June 15, 2012, former Secretary of Homeland Security, Janet Napolitano, issued a memorandum establishing a deferred prosecution program.   She inveighed against "blindly enforc[ing]" immigration laws to deport those who came to the United States as children, and who have been productive Americans.   As part of exercising prosecutorial discretion, the government developed extensive criteria that must be meet by Dreamers

   a.   That they were under the age of 31 as of June 15, 2012;

   b.   That they entered the United States prior to their 16th birthday;

   c.   That they had resided in the United States since June 15, 2007 and currently are present in the U.S.;

**AR2930**

637

d. That they were in the United States on June 15, 2012 and must be physically in the U.S. at the time of filing for your request for deferred action;

e. That they entered the United States without border inspection before June 15, 2012, or their immigration status expired prior to June 15, 2012;

f. That they must be currently in school, have graduated, or obtained an equivalent certificate of completion from high school, successfully obtained a general education development (GED) certificate, or must have been honorably discharged from the Armed Forces of the United States; and

g. That they must not have been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and must not pose a threat to national security or public safety.[2]

25.   In addition to meeting these requirements, DACA recipients had to provide the following as part of the application process:   financial records, medical records, school records (diploma, report card, GED certificate, high-school transcript), employment records, or military records (personnel records, health record).

26.   Applicants are required to provide biographical information, including their arrival in the country, previous departures, previous addresses of both themselves and those they traveled with.

27.   Applicants were required to send all the forms (including the I-821D form, the I-765 form, the I-765

---

[2] *Prepare Your Deferred Action for Childhood Arrivals (DACA) Application Online!*, Am. Immigration Ctr., https://www.us-immigration.com/deferred-action-application-I-821D.jsp (last visited Sept. 18, 2017).

638

worksheet and the G-1145 notification) to the USCIS for processing.   The Application Package Fee cost $170; processing the USCIS Application Fee cost $495. There was also a Biometrics Fee of $85.[3]   With over 800,000 DACA registrants, those fees exceeded $604,000,000 in revenue for the United States.

28.   After submitting all documentation to USCIS, applicants were then scheduled for a "Biometric Services Appointment."   At this appointment, USCIS agents captured applicants' signatures, photographs, and fingerprints, using special machines designed to collect these biometrics.[4]

29.   USCIS Agents sometimes requested DNA testing from applicants from developing countries who did not have birth certificates, or "when there are suspicious discrepancies within the case."[5]

30.   The successful DACA registrant received a "DACA Approval Notice" that lists only "fraud or misrepresentation" as a basis for revoking their "lawful presence" in the country.

31.   Once accepted into DACA, a registrant's removal could not occur without justification and notice. The 2013 standard operating procedure (SOP) for the USCIS for DACA states that removal needed to be based upon criminal, national security, or public safety

---

[3] *Id.*

[4] *Preparing for Your Biometric Services Appointment*, USCIS, https://www.uscis.gov/forms/forms-information/preparing-your-biometric-service-sappointment#What%20to%20Expect (last accessed Sept. 18, 2017).

[5] *What Happens at a USCIS Biometrics Appointment*, Citizen Path, https://citizenpath.com/uscis-biometrics-appointment (last accessed Sept. 18, 2017).

639

issues, or fraud.   Furthermore, and consistent with due process, the DACA registrant had to receive a "Notice of Intent to Terminate" that would thoroughly explain why USCIS was intending to terminate the registrant from the program.   The Notice would need to include a "fully documented SOF and any other relevant documents/information."   The DACA registrant then had 33 days to submit any evidence that he or she felt could "overcome the grounds for termination."

32.   The U.S. also promised DACA applicants that the information they provided **would not be used against them in deportation proceedings, or against their family members whose undocumented status could also be revealed by applying to the program.**[6]

33.   The commitment not to use biographical information against applicants was reiterated by then DHS Secretary Jeh Johnson in 2016:  "Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes. **More specifically, the U.S. government represented to applicants that personal information they provided will not later be used for immigration enforcement purposes except where it independently determines that a case involves a national security threat, criminal activity,**

---

[6] *Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions, (last accessed Sept. 18, 2017).

640

**fraud, or limited other circumstances where issuance of a notice to appear is required by law."**[7]

34.   Secretary Johnson explained that this was not just a DACA-related policy by DHS, but even its predecessor (INS) had a "long-standing and consistent practice" of not using information submitted by people seeking deferred action in enforcement actions.

35.   Relying on these promises, DACA Program applicants and registrants provided the federal government with extensive personal identifying information with the understanding it would not be used to deport them.

**B.   DACA Recipients Relied on the Government's Promises When Investing in Their Own Futures**

36.   Assured of indefinite deferral of any risk of deportation, immigrants who enrolled in DACA made investments in their education, property, and careers.

37.   In an August 2017 survey, researcher Tom K. Wong found that:

- Annual earnings had increased 80 percent under DACA—from an average of $20,000 to an average of $36,000;

- 65 percent of DACA recipients had purchased a first car;

- 16 percent had become homeowners;

- 5 percent had started their own businesses;

---

[7] Letter from Jeh Johnson, Sec'y, SEC, to Hon. Judy Chu (Dec. 30, 2016), https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.

AR2934

641

- 60 percent of DACA recipients above the age of 25 said that with DACA they'd been able to find jobs that better suited the education and training they already had; and

- 61 percent said they'd been able to find jobs that suited the careers they wanted to have.[8]

38.   In addition, about 900 DACA registrants are enrolled in the military.[9]   These enlistees are part of a Pentagon pilot project called Military Accessions Vital to the National Interest.   The program waives certain citizenship requirements for green card holders, refugees and DACA recipients with skills that the military considers essential to the national interest.

39.   Some of the DACA registrants who are members of the military are also members of the NAACP.

40.   DACA registrants have thrived under DACA's protections, in reliance on the United States' promises.

41.   DACA-recipients will be unable to sustain the lives they have built once their ability to work legally is taken away with the rescission of DACA.   In addition, the rescission will place severe burdens on employers, putting them in a position of having to terminate valuable and productive employees while scrambling to fill

---

[8] *See* Tom K. Wong, et al., *Results from T. Wong, et al. 2017 National DACA Study*, Ctr for Am Progress, https://cdn.american progress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf (last accessed Sept. 18, 2017).

[9] Gregory Korte, Alan Gomez and Kevin Johnson, *Trump administration struggles with fate of 900 DREAMers serving in the military*, USA Today (Sept. 7, 2017, 3:10 p.m.), https://www.usatoday.com/story/news/politics/2017/09/07/trump-administration-struggles-fate-900-dreamers-serving-military/640637001/.

642

both high-skilled and entry-level vacancies in their labor force.

## C. DACA Registrants and Applicants Now Face Imminent Threat of Deportation

42. Despite the United States' promises and DACA registrants' reliance on those promises, on September 5, 2017, Defendant Sessions announced that the DACA program was being terminated, and the Trump administration began the countdown to deportment for DACA registrants and applicants.

### 1. DACA Applicants

43. As of the date of Defendant Sessions' announcement on September 5, 2017, no new DACA applications will be accepted or processed.[10]

44. Thus, potential registrants who have submitted an application, but whose application has not yet been processed, will not enjoy *any* DACA protection.

45. Nevertheless, because USCIS has access to an enormous amount of DACA applicants' personally identifying information, including the fact that they are otherwise undocumented, these applicants are at a dramatically increased risk of deportation.

### 2. DACA Registrants

46. Following the September 5, 2017 announcement, DACA and work permits will only remain valid for registrants until their expiration date.[11]

---

[10] *Deferred Action for Childhood Arrivals 2017 Announcement*, USCIS, https://www.uscis.gov/daca2017 (last accessed Sept. 18, 2017).

[11] *Id.*

643

47.   Registrants whose permits are set to expire before March 5, 2018 must apply for a two-year renewal by October 5, 2017.[12]

48.   Following the September 5, 2017 announcement, the Department of Homeland Security will no longer grant DACA registrants permission to travel abroad through DACA's "Advance Parole" program. Moreover, any pending applications for Advance Parole will not be processed.[13]

### D.   DACA Registrants Consist Mostly of Immigrants of Color

49.   Nearly all of the DACA registrants—more than 95%—are people of color.   These 95% of DACA registrants come from Africa and the Caribbean, Central and South America, East.

50.   The termination of DACA will disproportionately affect immigrants of color..

## V.   CAUSES OF ACTION

### COUNT I

### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201

51.   Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

52.   DACA applicants and registrants provided biographical and biometric information about themselves and family members to USCIS and DHS at the time of their application.

---

[12] *Id.*

[13] *Id.*

AR2937

644

53.   DACA applicants have been told that they must provide any renewals for work authorizations by October 5, 2017.

54.   Defendants have heretofore made assurances that information provided to them as part of the DACA program would not be used against them or their family in any deportation proceedings.

55.   As former DHS Secretary Jeh Johnson assured:   "Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes.   More specifically, the U.S. government represented to applicants that personal information they provided will not later be used for immigration enforcement purposes except where it independently determine that a case involves a national security threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law."

56.   In the current version of Frequently Asked Questions published by USCIS and DHS, DACA applicants are told that "Individuals whose cases are deferred pursuant to DACA will not be referred to ICE," and that, "information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians."

57.   Notwithstanding these assurances, termination of DACA Program is accompanied by withdrawal of the guarantee that information provided by DACA applicants and registrants in deportation proceedings.

645

58.   Plaintiffs, on behalf of their respective members who are DACA applicants and registrants, seek a declaration that the Defendants may not use information about their immigration status and means of contacting them and their families in any deportation proceedings that may ensue after the DACA program has ended.

## COUNT II

## VIOLATION OF THE DUE PROCESS CLAUSES OF THE FIFTH AMENDMENT

59.   Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

60.   The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Government from depriving any person of life, liberty, or property without due process of law.

61.   All DACA registrants relied upon promises made by Federal immigration authorities and the Department of Justice.   These included promises not to use information against them or family members in enforcement proceedings; promises not to terminate them from the DACA program without justification and notice; and a promise to provide employment authorization to those eligible.

62.   As a result of the Defendants' promises regarding the DACA program, DACA applicants voluntarily provided potentially incriminating information to the Defendants that they would not have otherwise provided.

63.   As a result of the Defendants' promises regarding the DACA Program, DACA registrants ob-

646

tained employment authorizations, and purchased pro-
perty, such as cars and homes. Some also paid college
tuition with the expectation that it would eventually
lead to graduation with a degree.

64. The Due Process Clause of the Fifth Amend-
ment also requires that immigration enforcement ac-
tions taken by the federal government be fundamen-
tally fair and neither arbitrary nor capricious.

65. Defendants will violate the Due Process Clause
when they use in deportation proceedings any infor-
mation provided by DACA applicants that the Defend-
ants elicited through promises that such information
would not be used for that purpose.

66. Defendants have also violated the Due Process
Clause by reneging on promises that applicants allowed
to register in the DACA program could only be de-
prived of their status as lawfully present if there was
an issue of fraud, criminal, national security, or public
safety issue. Moreover, termination required a "no-
tice of an intent to terminate" that provided all reasons
and documents supporting the determination. Fur-
ther, DACA registrants were to be given an oppor-
tunity to submit evidence rebutting that determination.
The DHS rescission memorandum removes the lawful
presence status afforded the DACA registrant and
subjects them to an imminent risk of deportation.

67. Defendants' rescission of the DACA program
and safeguards to immigrants who qualified as lawfully
present residents, absent any cause or justification
particular to them, renders this action arbitrary and
capricious, in violation of the guarantee of due process
by the Fifth Amendment.

647

68.   Defendants' rescission of the DACA program, and the imminent threat of deportation to its registrants and applicants, causes ongoing harm to those DACA program registrants and applicants who are members of the Plaintiffs' organizations.

## COUNT III

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. § 706(2)(A) AND (D)

69.   Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

70.   Rescission of the DACA program is governed by the Administrative Procedure Act, as it constitutes an agency action, pursuant to 5 U.S.C. § 551(13), and constitutes a rule making, pursuant to 5 U.S.C. § 551(5).

71.   As the action to rescind the DACA program fails to be supported by, or even accompanied by, a rationale that justifies the withdrawal of a longstanding program lawfully instituted and which engendered serious reliance interests by its participants, it is arbitrary, capricious and an abuse of discretion in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2).

72.   In addition, the action to rescind the DACA program constitutes a rulemaking within the meaning of the Administrative Procedure Act because it forbids DHS from continuing to defer deportation of individuals who were lawful registrants of the DACA program.

73.   As rescission of the DACA program was undertaken without first submitting the action for notice and public comment, it violates Section 553 of the Ad-

648

ministrative Procedure Act and constitutes an unlawful rulemaking.

74.    Defendants' violation of the APA causes ongoing harm to the Plaintiffs and DACA registrants and applicants that are members of Plaintiffs' organizations.

## COUNT IV

## VIOLATION OF THE REGULATORY FLEXIBILITY ACT, 5 U.S.C. § 601

75.    Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

76.    The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment.   5 U.S.C. §§ 603-604.

77.    "Small entities" for purposes of the RFA includes small businesses, small nonprofits, and small governmental jurisdictions.   5 U.S.C. § 601(6).

78.    The actions that DHS has taken to implement the DHS Memorandum are "rules" under the RFA. 5 U.S.C. § 601(2).

79.    The actions that DHS has taken to implement the DACA rescission are likely to have a significant economic impact on a substantial number of small entities, like the Plaintiff organizations.   5 U.S.C. § 602(a)(1).

80.    Defendants have not issued the required analyses of DHS's new rules.

**AR2942**

649

81.   Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

82.   Defendants' violation causes ongoing harm to the DACA registrants and applicants employed by or members of Plaintiffs' non-profit organizations.

### **PRAYER FOR RELIEF**

Wherefore, the Plaintiffs pray that the Court:

a)   Declare that the DHS Memorandum rescinding the DACA program is unauthorized by and contrary to the Constitution and laws of the United States;

b)   Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are procedurally unlawful under the APA;

c)   Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are substantively unlawful under the APA;

d)   Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are unlawful under the RFA;

e)   Enjoin Defendants from rescinding the DACA program, pending further orders from this Court;

f)   Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA registrant or applicant or member of any DACA applicant's family, or take any action

**AR2943**

650

against a DACA applicant's current or former employer; and

g) Award such additional relief as deemed just and appropriate.

Oct. 23, 2017

Respectfully submitted,

/s/   JOSEPH M. SELLERS
JOSEPH M. SELLERS (DC # 318410)
Douglas J. McNamara (DC # 494567)
Julia A. Horwitz (DC # 1018561)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Telephone:   (202) 408-4600
Fax:   (202) 408-4699
Email:   jsellers@cohenmilstein.com
          dmcnamara@cohenmilstein.com
          jhorwitz@cohenmilstein.com

Bradford Berry (DC # 426326)
Janette Louard
NAACP National Headquarters
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone:   (410) 580-5787
Email:   bberry@naacpnet.org
          jlouard@naacpnet.org

*Attorneys for Plaintiff, NAACP*

651

David J. Strom (DC # 376233)
Channing Cooper
Jessica Rutter
American Federation of Teachers
555 New Jersey Ave. NW
Washington, DC 20001
Telephone:   202-879-4400
Email:   dstrom@aft.org
            ccooper@aft.org
            jrutter@aft.org

*Attorneys for Plaintiff, AFT*

Nicholas W. Clark, General Counsel
Renee L. Bowser, Assistant General Counsel
United Food & Commercial Workers
International Union, AFL-CIO, CLC
1775 K Street, NW
Washington, DC 20006
Telephone:   (202) 466-1522
Email:   nclark@ufcw.org
            rbowser@ufcw.org

*Attorneys for Plaintiff, UFCW*

AR2945

652

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———

Case No. 1:16-cv-04756 (NGG) (JO)

Martín Jonathan Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Varas, Mriano Mondragon, and Carolina Fung Feng, on behalf of themselves and all other similarly situated individuals, and Make the Road New York, on behalf of itself, its members, its clients, and all similarly situated individuals, Plaintiffs

*v.*

Kirstjen M. Nielsen,[14] Secretary, Department of Homeland Security, Jefferson Beauregard Sessions III, Attorney General of the United States, and Donald J. Trump, President of the United States, defendants

———

Filed:   Dec. 11, 2017

———

**THIRD AMENDED COMPLAINT**

———

### INTRODUCTION

Plaintiffs Martín Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and Carolina Fung Feng ("Individual Plaintiffs"), on behalf of themselves and all other similarly situated individuals, and Make the Road New York ("MRNY"),

---

[14] Kirstjen M. Nielsen was sworn in as Secretary of Homeland Security on December 6, 2017 and is automatically substituted for Acting Secretary Duke as a defendant in this action.   Fed. R. Civ. P. 25(d).

653

on behalf of itself, its members and clients, and all other similarly situated individuals (collectively "Plaintiffs" or "Named Plaintiffs"), bring this action to challenge the Trump Administration's unlawful termination of the Deferred Action for Childhood Arrivals ("DACA") program.   Nearly one million young immigrants rely on DACA to work, study, hold driver's licenses, serve in the military, support their families, and live securely in the only country they know as home.   Defendants' arbitrary decision to terminate this established and successful program upends the lives of these individuals and threatens to destabilize their families, communities, and workplaces.   The termination of DACA violates federal statutes and the Constitution, necessitating this Court's intervention to protect against imminent and devastating harm.

The termination of DACA will prevent Mr. Batalla Vidal from caring for patients at the nursing home where he works.   It will prohibit Ms. Fernandez from working to support her two U.S. citizen children, making her mortgage payments, and paying for health insurance for her family.   It will throw into disarray the lives of Mr. Mondragon's two young children and pregnant wife, who depend on his ability to make a living wage.   It will bar Mr. Vargas, who recently started attending night classes at City University of New York School of Law, from fulfilling his dream of becoming a lawyer.   Defendants' decision to abruptly end the program will force nearly 800,000 people to live with the persistent fear of being separated from their families.

Defendants impose these harms in violation of the procedural requirements meant to protect individuals from arbitrary government action.   The termination of DACA binds the Department of Homeland Security

**AR2947**

654

("DHS") to categorically deny deferred action to new applicants as of September 5, 2017, and to deny all renewal applications received after October 5, 2017, without following public notice-and-comment procedures required by the Administrative Procedure Act ("APA"), and without the analysis required by the Regulatory Flexibility Act ("RFA").

Separately, Defendants' DACA termination reverses longstanding agency policy on which nearly 800,000 people have relied, including assurances to DACA applicants that the information they provided would not be used against them or their loved ones. Under the APA, Defendants must provide a reasoned explanation for choosing to terminate this program. Rather than do so, Defendants have justified the reversal based on fear of a hypothetical lawsuit, the legally erroneous claim that DACA is unlawful, and a variety of inaccurate factual assertions.

Defendants' termination of DACA additionally violates the Fifth Amendment. Defendants failed to correct misleading notices previously sent to many DACA recipients who were required to submit renewal applications by October 5, 2017, in violation of procedural due process requirements. Defendants further deprived DACA renewal applicants of procedural due process in their implementation of the DACA termination, particularly in their arbitrary and haphazard implementation of the October 5 deadline. Finally, Defendants' contradictory, illogical, and false explanations for terminating DACA evidence that the true reasons for ending this highly successful program are pretextual, in violation of the guarantee of equal protection under law.

655

Because Plaintiffs and other similarly situated individuals are already beginning to lose eligibility for DACA status due to Defendants' unlawful actions, Plaintiffs ask this Court to declare the termination of DACA unlawful and to enjoin its enforcement.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the U.S. Constitution, the APA, 5 U.S.C. §§ 551 *et seq.*, and the RFA, 5 U.S.C. §§ 601 *et seq.*

2. Venue properly lies in this district because Individual Plaintiffs reside in the district, and Plaintiff Make the Road New York ("MRNY") operates community centers in Bushwick, Brooklyn; Jackson Heights, Queens; Port Richmond, Staten Island; and Brentwood, Long Island. 28 U.S.C. § 1391(e)(1). Venue also properly lies in this district because a substantial part of the events or omissions giving rise to this action occurred in the district. *Id.* § 1391(b).

## PARTIES

### Plaintiff Martín Batalla Vidal

3. Plaintiff Martín Jonathan Batalla Vidal ("Mr. Batalla Vidal") is a recipient of DACA. He has resided in Queens, New York for twenty years.

4. Mr. Batalla Vidal was born in Mexico and raised in New York since he was a young child. Mr. Batalla Vidal has a younger brother who has also received DACA, and two younger brothers who were born in the United States. Mr. Batalla Vidal considers New York his home, as it is the only place he has lived in since he was a child.

656

5. Mr. Batalla Vidal attended Bushwick Leaders High School for Academic Excellence in Brooklyn, New York from September 2004 until his graduation in June 2008.

6. After graduating from high school, Mr. Batalla Vidal hoped to attend a nursing program at a school such as the City University of New York ("CUNY"), but could not seriously consider these programs because those universities did not offer financial aid to undocumented students. His guidance counselor and other advisors also stressed the difficulty of finding work in the medical field without employment authorization, in light of which Mr. Batalla Vidal chose not to pursue a degree he might not be able to use in the future.

7. In November 2012, the Obama Administration created DACA. In November 2014, Mr. Batalla Vidal applied for DACA with the assistance of MRNY. To prepare his application, Mr. Batalla Vidal attended a workshop at MRNY's Brooklyn office, where he made follow-up visits. To prove his eligibility for DACA, Mr. Batalla Vidal spent many hours over the course of several months gathering paperwork and obtaining documents from his high school, hospital, and bank. On February 17, 2015, DHS approved Mr. Batalla Vidal's application.

8. Receiving DACA reinvigorated Mr. Batalla Vidal's dreams of working in the medical profession, and in fall 2015, he enrolled at ASA College in a medical assistant's degree program. With DACA, Mr. Batalla Vidal was able to raise money for school and support his mother and younger siblings. He worked two jobs at the same time, full time at Bocca Catering and part time at the New York Sports Club. He currently

AR2950

works full time at Park Terrace Rehabilitation and Nursing Center, where he cares for patients with serious health needs.   Mr. Batalla Vidal also received a scholarship for DACA recipients from ASA College.

9.   Defendants approved Mr. Batalla Vidal's DACA renewal on February 16, 2017.   His current grant will expire on February 15, 2019.   Because of Defendants' termination of DACA, Mr. Batalla Vidal is ineligible to apply to renew DACA.

10.   When Mr. Batalla Vidal found out about the termination of the DACA program, he obtained a third job in order to save money prior to the expiration of his period of deferred action and work authorization.

11.   Through employment he was able to obtain with DACA, Mr. Batalla Vidal can financially support himself, his mother, and his younger siblings.   Since his mother has severe arthritis and cannot work, Mr. Batalla Vidal pays the rent and the majority of the bills for his household.   Mr. Batalla Vidal's ability to pursue his career and provide for his family has been thrown into jeopardy due to Defendants' termination of DACA.   Without Mr. Batalla Vidal's income, he and his family will face significant financial hardship.   Mr. Batalla Vidal has also developed anxiety and stress related to the termination of the DACA program.   If Mr. Batalla Vidal is deported, his family will also lose his emotional support and be irreparably harmed.

**Plaintiff Antonio Alarcon**

12.   Plaintiff Antonio Alarcon ("Mr. Alarcon") is a recipient of DACA.   He resides in Queens, New York.

13.   Mr. Alarcon was born in Mexico and has lived in New York since he was eleven years old.   As a child, he lived in New York with his parents, while his young-

658

er brother stayed behind in Mexico with their grand-parents.   When Mr. Alarcon was seventeen, his grand-parents passed away, and his parents felt compelled to return to Mexico to care for his younger brother. When his parents left, Mr. Alarcon moved in with his aunt and uncle.

14.   Mr. Alarcon received DACA on March 26, 2013, with the assistance of MRNY, which then hired Mr. Alarcon as an Immigrant Youth Organizer.   Employment by virtue of DACA enabled Mr. Alarcon to financially support himself, his aunt, and his uncle as he pursued his education.

15.   Mr. Alarcon graduated from Flushing High School, and received his associate's degree from LaGuardia Community College in 2015.   He is currently pursuing a Bachelor of Arts degree in Film Studies from Queens College, where he is on track to graduate in December 2017.

16.   Through his employment and volunteer activities, Mr. Alarcon has become a leading voice for youth in his community and beyond.   From facilitating local youth meetings and retreats, to serving as a regional coordinator on national campaigns, he has worked to expand educational opportunities for immigrant youth throughout New York and the United States.

17.   Defendants granted Mr. Alarcon DACA renewals on March 6, 2015 and again on January 26, 2017. His current grant will expire on January 25, 2019.   He is ineligible to renew his DACA because of Defendants' termination of the program, thereby jeopardizing his and his family's wellbeing.

659

**Plaintiff Eliana Fernandez**

18.   Plaintiff Eliana Fernandez ("Ms. Fernandez") is a recipient of DACA.   She resides in Suffolk County, New York.

19.   Ms. Fernandez was born in Ecuador and came to the United States at the age of fourteen, where she was finally able to reunite with her parents after not seeing them for many years.   She has lived in New York since she was fourteen years old.   She has two New York-born, U.S. citizen, children of elementary-school age, whom she is raising.

20.   Ms. Fernandez first received DACA on December 11, 2012 and renewed her status on November 4, 2016.   Her current grant will expire on November 20, 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

21.   Ms. Fernandez has worked hard to build a life for herself and her family.   Despite being ineligible for financial aid and other types of support, she attended St. Joseph's College, where she was on the Dean's List many semesters and earned a degree in Sociology in 2015.   She now works as an Immigration Case Manager in MRNY's Long Island office.   This semester she started graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law.

22.   Ms. Fernandez is a mother and homeowner who contributes every day to the state of New York by working, studying, and giving back to her community. She was able to achieve these goals because of DACA, which allowed her to go back to school, earn a living wage, and purchase a home in which her children can grow up.

660

23.   Without DACA, Ms. Fernandez would no longer have a driver's license to drive her children to the doctor or to school.   Without the employment authorization that her DACA status provides, she could not afford her mortgage or her family's health insurance.   Defendants' termination of the DACA program puts Ms. Fernandez at risk of being separated from her children, as she was from her parents as a child.   As a result, Ms. Fernandez has developed anxiety and stress, as well as physical ailments.   She was recently diagnosed with migraines for the first time and has developed severe neck pain which she attributes to the stress and emotional toll of her uncertain future.

**Plaintiff Carlos Vargas**

24.   Plaintiff Carlos Vargas ("Mr. Vargas") is a recipient of DACA.   He resides in Staten Island, New York.

25.   Mr. Vargas was born in Puebla, Mexico.   He came to the United States with his mother, who was struggling to raise Mr. Vargas and his siblings after Mr. Vargas's father passed away two months before he was born.   Mr. Vargas has lived in New York City since he was four, and in Staten Island since he was sixteen.

26.   Mr. Vargas began working in restaurants at age thirteen to help his family, leaving school at 3 P.M. and working shifts from 4 P.M. to midnight, five days a week.   He had hoped to attend college but was told by a school counselor that he could not attend because he was undocumented.

27.   After graduating from James Madison High School in Brooklyn, Mr. Vargas began working sixty hours per week to support his family, while remaining

AR2954

661

committed to going to college and earning a degree. Mr. Vargas learned that his undocumented status would not prevent him from enrolling in CUNY College of Staten Island ("CUNY CSI"), provided he could pay his tuition without government loans. He applied for admission and was accepted. By taking classes at night and working full time during the day, Mr. Vargas obtained his Bachelor of Science degree in Business in 2014.

28. Mr. Vargas applied for DACA in August 2012. His application was granted on December 13, 2012. DHS renewed his DACA on November 14, 2014 and again on September 14, 2016, with his current grant expiring on September 13, 2018. Mr. Vargas is no longer eligible to renew DACA as a result of Defendants' termination of the program.

29. DACA allowed Mr. Vargas to obtain work authorization and a New York driver's license for the first time in his life, thereby opening up new employment and life opportunities.

30. After volunteering for many years in Staten Island for Make the Road New York, El Centro del Inmigrante, and the Staten Island Community Job Center, Mr. Vargas became accredited as a U.S. Department of Justice Accredited Representative, authorizing him to represent individuals before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, the component of the Department of Justice that hears immigration cases.

31. Mr. Vargas now works at MRNY, where he screens individuals and provides assistance applying for DACA and other forms of immigration relief. He plans to become a lawyer so that he can be a more effective advocate for his community. In fall 2017, he

662

began attending evening classes at CUNY School of Law.

32.   Mr. Vargas financially supports himself and his elderly mother who is unable to work due to depression, anxiety, vision and other medical issues.   Mr. Vargas is the primary person who cares for his mother, accompanies her to her many medical appointments, and pays for her medical expenses.   He is also financially responsible for multiple mortgages on homes he owns with his brother.

**Plaintiff Mariano Mondragon**

33.   Plaintiff Mariano Mondragon ("Mr. Mondragon") is a recipient of DACA.   He resides in Queens, New York.

34.   Mr. Mondragon was born in Mexico and first came to the United States with his father in 1999, when he was fourteen years old.   Six months after they arrived, his father returned to Mexico while Mr. Mondragon remained in the United States with his aunt. He has not seen his parents in seventeen years.

35.   Mr. Mondragon began working at the age of sixteen.   Since graduating from Flushing High School in 2005, he has worked in the restaurant industry.

36.   Mr. Mondragon has been married for five years.   He and his wife have two U.S.-born children together, ages eight and eighteen months, and his wife is six months pregnant with their third child.

37.   Mr. Mondragon also has a ten-year-old daughter from a previous relationship.   Her mother moved to Mexico when she was pregnant.   While Mr. Mondragon has never met his daughter in person, he provides financial support for her.

663

38.  Mr. Mondragon received DACA on April 14, 2014 and renewed it on February 25, 2016.  His DACA status will expire on February 24, 2018.  In addition, two of Mr. Mondragon's brothers are DACA recipients.

39.  DACA has allowed Mr. Mondragon to support his family by working as a bartender in Manhattan and it has provided assurance that he will not be separated from his children and wife.

40.  Mr. Mondragon applied to renew his deferred action under DACA in September 2017.  He had to rush to get his application completed and submitted because the September 5, 2017, announcement only gave him until October 5, 2017 to apply.

**Plaintiff Carolina Fung Feng**

41.  Plaintiff Carolina Fung Feng ("Ms. Fung Feng") is a recipient of DACA.  She resides in Middle Village, Queens.

42.  Ms. Fung Feng was born in Costa Rica and came to the United States to live with her aunt in 2001 when she was twelve.  She has not seen her father— her only living parent—since she left Costa Rica sixteen years ago.  Ms. Fung Feng first applied for DACA around September 2012 and was approved around December 2012.  She has successfully renewed DACA twice, in July 2014 and June 2016.  Her status expires in August 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

43.  Ms. Fung Feng graduated from Hunter College in January 2013 with a Bachelorof Arts in English-Spanish Translation and Interpretation, and English Language Arts.  She also received an English teaching certification from Teaching House in 2015.

**AR2957**

664

44.   Ms. Fung Feng has worked for MRNY since 2015 as a Program Assistant for the Adult Literacy Program.   She supports her younger brother, a U.S. citizen who graduated from CUNY City College in 2017, and her younger cousin, who came to the U.S. to study.   Ms. Fung Feng recently enrolled in a GRE prep class in order to eventually attend graduate school.

**Plaintiff Make the Road New York**

45.   Plaintiff Make the Road New York ("MRNY") brings this action on behalf of itself, as well as on behalf of its clients and members and all similarly situated individuals.   MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to empowering immigrant, Latino, and working-class communities in New York.   With offices in Brooklyn, Queens, Staten Island, and Suffolk County, MRNY integrates adult and youth education, legal and survival services, and community and civic engagement, in order to assist low-income New Yorkers improve their lives and neighborhoods.

46.   MRNY has a legal department staffed by twenty-three attorneys and eleven advocates who provide a broad range of civil legal services to immigrant New Yorkers.   MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as in affirmative applications for immigration relief.   MRNY also directly assists individuals prepare the documentation and paperwork necessary for DACA applications and renewals.   Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

665

47.   Consistently from June of 2012 until the last day that DACA renewal applications were accepted, MRNY held weekly DACA screening workshops at its Queens office and similar services at its other sites on an as-needed basis, escalating the number of workshops, screenings, and appointments in the final month that U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS, accepted DACA renewal applications.

48.   MRNY also assisted DACA-eligible individuals through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers. In addition, MRNY provided assistance with DACA renewals in its Brooklyn, Staten Island, and Long Island offices, and continues to provide ongoing assistance to its clients and members whose initial and renewal applications were rejected by DHS.   Since fall 2012, MRNY has conducted approximately 392 DACA clinics and has opened 4,560 DACA cases for clients, assisting a total of 3,323 individuals.   MRNY assisted its DACA-eligible clients with initial applications as well as renewals.

49.   MRNY has more than 21,000 dues-paying members residing in New York City and Long Island, primarily in the boroughs of Queens and Brooklyn. Its members include Plaintiffs Batalla Vidal, Alarcon, Fernandez, Vargas, Mondragon, and Fung Feng, along with many other members who are already beginning to lose their DACA status as a result of Defendants' termination of the program.

50.   Approximately twelve current MRNY employees have DACA, including Plaintiffs Alarcon, Fernandez, Fung Feng, and Vargas.

**AR2959**

666

51.   Approximately forty MRNY members, and a significant additional number of MRNY clients, have DACA that expires between September 5, 2017 and March 5, 2018 and were therefore subject to the mandatory October 5, 2017 renewal deadline.   Of these members, MRNY was unable to reach four DACA recipients to inform them they needed to renew before October 5.   Some MRNY members and clients had received notices from Defendants advising them to renew "as soon as possible" and within 120 to 150 days before their status expires.   Defendants' notices made no mention of the October 5, 2017 deadline.   None of these MRNY members or clients received a corrected notice from Defendants informing them of the mandatory October 5, 2017 deadline for renewals.

52.   At least seven MRNY members, and an additional number of clients, were eligible for DACA as of September 5, 2017, but had not yet submitted their initial applications.   Most of them were in the process of assembling the documentation necessary to satisfy the DACA eligibility requirements.

53.   Still other youth members of MRNY, and an additional number of clients, were not eligible for DACA on September 5, 2017 but will become eligible for DACA in the future, under the terms of the 2012 Guidance.   One client received a letter from his high school indicating he met the education requirement of DACA on September 7, 2017—two days after he lost the ability to apply for DACA.

54.   At least nine members and/or clients of MRNY submitted renewal applications that arrived on October 5, 2017 at the Post Office Box designated by DHS, but DHS rejected these applications as untimely because

667

DHS or its agents did not retrieve the applications from the U.S. Postal Service facility until the next day.

55.   In addition, DHS rejected the renewal applications of at least three members and/or clients of MRNY due to unexpected mail delivery delays, notwithstanding that the applications were mailed well in advance of the October 5 deadline.

56.   DHS rejected at least one MRNY member (Maria Santamaria Rivas)'s timely renewal application on the ground that a DHS employee misread the date on the accompanying $495 check as "2012," when actually it read "2017."   By the time DHS returned the rejected application, it was past October 5.   The MRNY member resubmitted her renewal application with an explanation of DHS's mistake in reviewing her original timely-submitted renewal, but DHS rejected the resubmission as untimely.

57.   Plaintiff MRNY, its staff, its members, and its clients are aggrieved by Defendants' final agency action and have exhausted their administrative remedies.

58.   The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program terminated unlawfully, and in having their DACA applications and renewals considered, are germane to MRNY's purpose of advocating for the rights of low-income immigrant communities, to its role as an employer of individuals with DACA, and are inextricably bound up with the legal services that MRNY attorneys provide the organization's clients.

59.   MRNY's clients face hindrances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of re-

668

taliation (against themselves and/or their families), language barriers, and lack of resources.

60.   Defendants' unlawful termination of the DACA program has already directly harmed MRNY by causing the organization to divert its resources from other time-sensitive immigration cases to assist individuals to apply for renewals by October 5, 2017, to conduct additional screenings of its clients who are DACA recipients (members and non-members) to determine whether they are eligible for other forms of immigration relief, and to manage the fallout of the October 5 deadline —including advocating on behalf of its clients whose renewal applications were rejected despite being timely filed.

61.   Since September 5, 2017, MRNY hosted twelve workshops on DACA renewal that they would not have had to host if Defendants had not terminated the program.   MRNY's ActionNYC program in Queens, part of an initiative co-sponsored by the N.Y.C. Office of Immigrant Affairs and CUNY that connects New Yorkers with free and safe immigration services, has had to significantly shift its focus to addressing the needs of DACA-eligible clients above all others.   Five Accredited Representative staff members who each do screenings and immigration application assistance had to cancel all of their September appointments and reschedule them for October and later, in order to schedule DACA renewal applications in their September slots.   This also involved the extra administrative burden of calling and rescheduling numerous appointments and delaying work on their other active cases.

62.   MRNY has also expended significant resources since the October 5 deadline because its clients' and members' applications were rejected by DHS.   This

669

has included:  tracking the packages; investigating mail delays; contacting USCIS (the component of DHS that adjudicates requests for deferred action under DACA) about each individual application to request reconsideration of the rejection; and communicating with anxious clients about advocacy efforts and next steps.

63.  In addition, MRNY's legal team has expended its limited resources creating Know-Your-Rights materials, answering calls, addressing walk-in questions, mailing renewal applications, and coordinating an emergency support plan, including mental health support, for members, clients, and staff due to the DACA Termination.

64.  MRNY spent additional money on priority and overnight shipping fees for renewal applications to ensure they would arrive by the October 5 deadline.  Notwithstanding these expenditures, some renewal applications did not arrive by the October 5 deadline because of unreasonable U.S. Postal Service delays.

65.  MRNY expended time and resources advocating on several members' and clients' behalf to ask USCIS to reconsider their applications that were rejected unreasonably.

66.  MRNY will sustain further injuries when its DACA employees lose work authorization as a result of the Defendants' actions.

67.  MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

670

68.    These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court.

69.    As a New York-focused, non-profit organization, MRNY is a "small organization" under the RFA. 5 U.S.C. § 601(4).    MRNY is directly affected by Defendants' termination of DACA, as the Agency's final action has adversely affected it.    *Id.* § 611(a)(1).

**Defendants**

70.    Defendant Kirstjen M. Nielsen is the Secretary of the U.S. Department of Homeland Security. She is sued in her official capacity.

71.    Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and the head of the U.S. Department of Justice.    He is sued in his official capacity.

72.    Defendant Donald J. Trump is the President of the United States.    He is sued in his official capacity.

## STATEMENT OF FACTS

**The 2012 DACA Memorandum**

73.    On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano ("the Secretary") announced the creation of the DACA program, which set out guidelines for U.S. Citizenship and Immigration Services ("USCIS") to use its prosecutorial discretion to extend deferred action to certain young immigrants "who were brought to this country as children and know only this country as home."    Mem. from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15,

671

2012 ("DACA Memorandum") (attached hereto as Exhibit A).  Those granted deferred action also became eligible for employment authorization.   8 C.F.R. § 274a.12(c)(14).

74.  The DACA Memorandum states that individuals who came to the United States as children, lack a serious criminal history, attend school or participate in the Armed Services, and meet other criteria may request that the Secretary grant deferred action, a discretionary form of relief from removal, for a period of two years, subject to renewal.  Those granted deferred action in this manner could also obtain employment authorization and a social security card.  *See* Ex. A, DACA Memorandum.

75.  The Secretary made findings that the individuals eligible to apply for DACA "have already contributed to our country in significant ways" and "lacked the intent to violate the law."  *Id.* at 1.  She found that our nation's immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case," and that the limited resources of DHS must be "focused on people who meet our enforcement priorities."  *Id.*

76.  Individuals who met the criteria listed in the DACA Memorandum did not automatically receive deferred action.  Instead, DHS was directed to exercise its discretion to consider grants of deferred action "on a case by case basis."  *Id.*

77.  Pursuant to the DACA Memorandum, USCIS established an application and background-check procedure to evaluate whether individuals would qualify for deferred action.  Applicants were required to disclose extensive sensitive and personal information to Defendants, including their lack of lawful immigration

**AR2965**

672

status as of June 15, 2012, current and previous mailing addresses, country of birth, dates of initial and subsequent entries, and contact information. *See* USCIS Form I-821D and Instructions (attached hereto as Exhibit B).

78.   In order to prove that they met the eligibility criteria, DACA applicants also routinely provided Defendants documents containing personal information, including copies of school records, pay stubs, bank statements, passports, birth certificates, and similar records.

79.   The information and records DACA applicants provided Defendants frequently included sensitive and personal information about third parties as well, including family members of DACA applicants.

80.   Defendants consistently represented to DACA applicants that the information they provided would be protected from disclosure to U.S. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") for immigration enforcement proceedings against them and their family members or guardians, except in limited, delineated circumstances. *Id.* at 20; U.S. Citizenship & Immigration Servs.: Frequently Asked Questions (excerpt attached hereto as Exhibit C); Letter from Jeh Johnson, Sec'y of Homeland Sec., to Judy Chu, U.S. House Representative (Dec. 30, 2016) ("[T]he U.S. government represented to [DACA] applicants that the personal information they provided will not later be used for immigration enforcement purposes.  . . .  We believe these representations  . . .  must continue to be honored.") (attached hereto as Exhibit D).   These assurances allowed applicants to apply for deferred action without fear that the information they provided would

673

later be used by Defendants to deport them or their families.

**Impact of the DACA Program**

81.   Since the program was first introduced in 2012, nearly 800,000 individuals have received deferred action and employment authorization under DACA.   Close to 42,000 DACA recipients live in New York State alone.

82.   As a result of the DACA program, these young immigrants have been able to enroll in colleges and universities, and to obtain jobs, driver's licenses, bank accounts, and health insurance (through employment, college, or state-run programs).   DACA recipients have come to rely on the program to allow them to work, study, and live without the constant threat of deportation.   Indeed, in reliance on the program, DACA recipients have made significant investments in their futures, such as enrolling in higher education and graduate programs; pursuing employment opportunities; marrying and having children of their own; and purchasing homes and automobiles, to name a few examples.

83.   They have also relied on the availability of renewing DACA.   New York DACA recipients have submitted more than 53,000 renewal applications since DACA began—10,000 more than initial applications, meaning that some recipients have renewed more than once.

84.   This reliance has continued since Defendant President Trump took office, because he maintained the program for nearly eight months, accepting both first-time applications and renewals while assuring

**AR2967**

674

DACA-eligible immigrants that he would "take care of" them.

85.    The Trump Administration's arbitrary decision to terminate DACA reverberates well beyond the nearly 800,000 DACA recipients.   The opportunities DACA recipients acquired and created as a result of the program benefitted their families, communities, and employers, as well.   All of these groups stand to lose these gains, on which they have come to rely, if Defendants' arbitrary decision to end DACA stands.

86.    For example, Ms. Fernandez works as an immigration advocate with MRNY and is enrolled in a graduate program at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law.   Without DACA, she will be forced to leave her job and cease her studies.   If Ms. Fernandez is deported, her two U.S.-citizen sons will be left without their primary caretaker.   Like Ms. Fernandez, many DACA recipients depend on their work authorization to financially support family members, including U.S.-citizen children and siblings.

87.    The positive impact DACA has made on the overall U.S. economy would disappear if the Administration's arbitrary decision to terminate the program holds.   Economists calculate that DACA has boosted labor-force participation, raised DACA recipients' purchasing power, and increased state and federal tax revenues.

88.    Economists estimate that the U.S. economy would lose tens of billions of dollars if the program is terminated.   New York state alone stands to lose nearly $2.6 billion if DACA recipients leave the workforce.   Terminating the program will have a signifi-

675

cant fiscal and economic cost—estimated to be more than $60 billion—borne by the entire U.S. population.

**The Trump Administration's Animus Toward Individuals of Latino and Mexican Heritage**

89. A hallmark of Defendant Trump's campaign and presidency has been unabashed nativism, in both words and deeds, rarely seen in this country's recent history. As part of that nativist platform, Defendant Trump and some members of his Administration have portrayed immigrants as imminent threats to the health, safety, and wellbeing of the United States.

90. One group that Defendant Trump has repeatedly targeted is Latinos, especially those of Mexican heritage. When Defendant Trump announced his candidacy in June 2015, he labeled Latinos and Mexicans as "criminals," a characterization he used to justify his harsh immigration proposals.

91. In his presidential announcement speech, then-candidate Trump stated: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."

92. Defending these remarks, then-candidate Trump explained: "I can't apologize for the truth. I said tremendous crime is coming across." He later added: "What can be simpler or more accurately stated? The Mexican Government is forcing their most unwanted people into the United States. They are, in many cases, criminals, drug dealers, [and] rapists. . . . "

93. A few weeks after he announced his candidacy, Defendant Trump again described Mexicans as mur-

**AR2969**

676

derers and rapists, stating, "I do business with the Mexican people, but you have people coming through the border that are from all over.   And they're bad. They're really bad."   He labeled the people who were coming in as "killers and rapists."

94.   During a Republican presidential debate in August 2015, then-candidate Trump again characterized Mexicans as criminals.   He stated that "the Mexican government is much smarter, much sharper, much more cunning and they send the bad ones over because they don't want to pay for them, they don't want to take care of them."

95.   Later that same month, Defendant Trump criticized fellow-candidate Jeb Bush because his wife is Latina, retweeting a post criticizing Governor Bush, which told him to stop speaking "Mexican" and instead speak English.

96.   In May 2016, then-candidate Trump criticized U.S. District Judge Gonzalo Curiel for his Mexican heritage.   Judge Curiel was born a U.S. citizen in Indiana.   While Judge Curiel was presiding over a lawsuit against Trump University, then-candidate Trump complained that the jurist would not be able to fairly adjudicate the case because of his ancestry:   "He's a Mexican.   We're building a wall between here and Mexico.   The answer is, he is giving us very unfair rulings—rulings that people can't even believe."

97.   Since his inauguration, Defendant Trump has continued to express animus toward Mexicans and Latinos through both his words and actions.   In August 2017, in a speech in Arizona, Defendant Trump described some undocumented immigrants as "animals."

**AR2970**

677

98.   That same month, Defendant Trump pardoned former Sheriff Joe Arpaio for contempt of court.   Sheriff Arpaio had violated an injunction barring the Maricopa County Sheriff's Office from implementing a policy that allowed officers to arrest someone on suspicion of illegal presence and directed officers to consider "race or 'Mexican ancestry'" as a factor.   *United States v. Arpaio*, 2017 WL 3268180 (D. Ariz. 2017).   By pardoning Sheriff Arpaio, Defendant Trump implicitly approved of unconstitutional discrimination against Latinos and Mexicans, and stated that Sheriff Arpaio was convicted merely for "doing his job."

99.   In his speeches since the Inauguration, when discussing the undocumented Latino community, Defendant Trump has characterized them as criminals and gang members.

100.  In his April 2017 prepared remarks announcing the Department of Justice's "Renewed Commitment to Criminal Immigration Enforcement," Defendant Sessions argued for securing the borders by taking a stand against "filth."

**The Trump Administration's Decision to Terminate the DACA Program**

101.  On June 29, 2017, Texas Attorney General Ken Paxton, along with the attorneys general of nine other states, wrote Defendant Sessions threatening to amend their complaint in *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), to challenge the DACA program if Defendants did not terminate DACA by September 5, 2017.

102.  On September 5, 2017, Elaine Duke, then-Acting Secretary of DHS, issued a memorandum announcing that DHS would terminate the DACA pro-

678

gram.   *See* Mem. from Elaine C. Duke, Acting Sec'y of Homeland Sec., to James W. McCament, Acting Dir., U.S. Citizenship and Immigration Servs., *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)*, Sept. 5, 2017 ("Duke Memorandum") (attached hereto as Exhibit E).

103.  Defendants Sessions and Trump and the Acting Secretary jointly made the decision to end DACA and jointly prepared the Duke Memorandum.

104.  The Duke Memorandum directed DHS to categorically reject all new applications for deferred action received after September 5, 2017.   It also directed DHS to only consider deferred action renewal applications from existing DACA recipients whose status expires on or before March 5, 2018, but only if such renewal applications were received by October 5, 2017. DHS is categorically rejecting deferred action renewal applications from DACA recipients whose deferred action expires after March 5, 2018 and has already started categorically rejecting renewal applications received after October 5, 2017.

105.  The Acting Secretary stated that the decision was based on two reasons:   (1) the preliminary injunction issued against a separate program, *see Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam); and (2) Defendant Sessions' opinion that DACA "was an unconstitutional exercise of authority by the Executive Branch," *see* Ex. E, Duke Memorandum.

106.  DHS provided no other explanation for its decision to terminate DACA.

**AR2972**

679

107. The preliminary injunction issued by a Texas court does not reach the original DACA program. Rather, it enjoins the Deferred Action for Parents of Americans and Lawful Permanent Residents program, a different program that was never implemented.

108. On September 5, 2017, Defendant Sessions held a press conference, falsely asserting that DACA "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences." He stated further, "It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *Attorney General Sessions Delivers Remarks on DACA*, Dep't of Justice (Sept. 5, 2017) (attached hereto as Exhibit F).

109. While then-Secretary Duke based the decision to terminate DACA on the legally erroneous conclusion that DHS lacks authority to exercise its discretion in granting deferred action under DACA, Defendant Trump has made contradictory statements that suggest he believes it is within his executive authority. On September 5, 2017, shortly after the DACA Termination was published, Defendant Trump tweeted that if Congress did not act before March 5, 2018, he would "revisit this issue." If the unlawfulness of DACA were the true reason for terminating the program, then the President would lack authority to "revisit" ending DACA.

110. In addition, on September 14, 2017, a week after the Administration's announcement terminating DACA, and facing multiple suits challenging his actions, Defendant Trump tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!. . . . ." This statement is inconsistent

680

with previous statements by Defendant Trump and the Trump Administration, and reflects the arbitrariness of the Administration's decision to end the program.

111.  The DACA status of more than 150,000 DACA recipients will expire before March 5, 2018.   Many of those individuals received the standard DHS renewal notice directing the recipient to submit a renewal application "as soon as possible," and to avoid a lapse in status by submitting the renewal application 120 to 150 days before expiration.   *See* Dep't Homeland Sec., I-797C Notice of Action, July 15, 2017 (attached hereto as Exhibit G).

112.  Defendants' renewal notices did not advise recipients whose status will expire before March 5, 2018 that they, in fact, had to submit a renewal application by the October 5, 2017 deadline.

113.  On information and belief, DHS did not provide accurate or corrected individualized notices to those DACA recipients who had to renew by October 5, 2017, including those individuals whom Defendants had previously advised to renew "as soon as possible" but without mention of the October 5, 2017 deadline.

**The Trump Administration's Unfair and Arbitrary Implementation of the DACA "Wind Down" Process**

114.  The Duke Memorandum provided that DHS would consider renewal applications from DACA recipients whose status was set to expire on or before March 5, 2018 and had not already expired before the date of the announcement, if DHS received the application by October 5.   However, DHS refused to consider many renewal applications on the basis of factors over which the renewal applicants had no control, and with-

681

out providing notice of the additional grounds for rejection.

115.  USCIS directed DACA renewal applicants to send applications to one of three "Lockboxes," located in Chicago, Dallas, and Phoenix.   Each "Lockbox" has an address that receives applications sent via the U.S. Postal Service (a Post Office box) and a separate address that receives applications sent via FedEx, UPS, and DHL.   DACA renewal applicants were each given one designated address to which to mail their renewal application based on their home address; this was the exclusive address to which they could mail their renewal application and no hand-delivered applications were accepted.

116.  At each Lockbox, upon information and belief, government agents retrieve applications, collect applicable fees, and verify that the applications do not have any facial clerical errors.   Upon information and belief, USCIS staff then either forwards an application to a Service Center for adjudication or rejects the application and returns it to the applicant.   New York DACA recipients were directed to send their renewal applications to the Chicago Lockbox, with a Chicago Post Office box address.

117.  USCIS never announced a time on October 5 by which renewal applications had to be delivered to the Lockbox.   However, on information and belief, Lockbox staff stopped retrieving renewal applications from the designated Post Office box locations at some point in the afternoon or evening of October 5.   USCIS did not collect renewal applications that arrived at the Post Office boxes after that point until October 6, and USCIS subsequently rejected them as untimely.

682

118.  For example, Varlene Cooper is a DACA recipient and a member of MRNY.  She came to the United States when she was about 12 years old and works two jobs, as an EMT and a dialysis technician, in order to support her two children and her ill mother. Ms. Cooper's renewal application arrived at the Chicago Lockbox's Post Office box address at 6:01 PM local time on October 5 and was available for pickup by 6:38 PM.   However, the Lockbox staff did not retrieve the application until 7:21 the next morning.   DHS rejected her renewal application as untimely, refusing to adjudicate it even though it arrived at the designated Post Office box on October 5.   Ms. Cooper's deferred action grant expired on November 24, 2017.

119.  MRNY has eight other clients whose renewal applications arrived at the designated Post Office box address on October 5, but were not retrieved by USCIS staff until the next day and were subsequently rejected by USCIS as untimely.

120.  After MRNY sent a letter to Counsel for Defendants in this case, USCIS decided to reconsider Ms. Cooper's renewal application, and it was approved on November 30, 2017.

121.  Other DACA recipients mailed their renewal applications well in advance of the October 5 deadline, but the U.S. Postal Service unreasonably delayed the delivery of those applications.  As a result, their applications arrived after October 5, and USCIS rejected them as untimely.   *See* Liz Robbins, *Post Office Fails to Deliver on Time, and DACA Applications Get Rejected*, N.Y. TIMES (Nov. 11, 2017), attached hereto as Exhibit H.

122. For example, Jorge Gonzalez Alvarado is a MRNY member and Staten Island resident who has

**AR2976**

683

lived in the United States since he was two years old. DACA has enabled him to obtain a driver's license and begin a career in plumbing, through which he can support his parents. He just finished the first year of a plumbing apprenticeship program. Mr. Gonzalez Alvarado mailed his renewal application on September 14, 2017, but due to unforeseeable U.S. Postal Service delays, the renewal application was not delivered to the designated Post Office box until October 6, and USCIS did not retrieve the application until October 10. USCIS rejected Mr. Gonzalez Alvarado's application as untimely. Plaintiffs' counsel informed Counsel for Defendants of Mr. Gonzalez Alvarado's circumstances, but has yet to receive a response.

123. DHS also rejected renewal applications that originally had been received by the October 5 deadline, but had been returned to the applicant due to real or perceived clerical errors. The rejection notices contained a sentence inviting the applicant to correct the error and re-file. In addition, many of these individuals received a separate document with their rejection notice and rejected applications, printed on a green piece of paper, inviting them to correct the error and re-apply with the green sheet on top of their re-submission packet, even if the applicant did not receive their rejection itself until after October 5. *See, e.g.*, Sample Invitation to Reapply, attached hereto as Exhibit I. Previous to Defendants' DACA Termination, individuals whose applications were rejected for minor clerical errors were allowed to correct those errors and re-submit, or in some cases, instead of outright rejecting an application, USCIS would issue a Request for Further Evidence ("RFE") and allow the applicant to provide that evidence within a designated period of time. However, in all cases rejected between Sep-

684

tember 6 and October 5, 2017, by the time applicants received their rejected applications and were able to resubmit with corrections, USCIS rejected their applications as untimely as having been filed after October 5.   Upon information and belief, USCIS did not issue any RFEs to correct these minor errors, instead outright rejecting entire application filings.

124. For example, Maria Santamaria Rivas is a MRNY member who has lived in the United States since she was 3 years old.   She timely submitted her DACA renewal application   after   the   announcement   of   the DACA Termination, with a check for her fees that was dated September 28, 2017.   USCIS received the application on October 2, but a USCIS employee misread her check and rejected her entire application on that basis, stating, "The date on the check/money order is not current."   Ms. Rivas's attorney received the Rejection Notice on October 10, 2017, and provided a new check as requested.   USCIS rejected the resubmitted application as untimely.   She was not considered for renewal of her DACA status.   On November 17, 2017, a MRNY attorney emailed the USCIS Lockbox Support email to request that USCIS consider the corrected application with the original received date of October 2, 2017.   *See* Copy of Email Exchange between Alexandra S. Lee, Esq., and Hillary, attached hereto as Exhibit J.   On November 22, 2017, a USCIS Lockbox Support staff member, Hillary, responded in relevant part:   "The original received date cannot be assigned to a resubmission.   .  .  .   USCIS is *currently not accepting* initial or renewal filings for DACA requests."   *Id.* (emphasis in original).   Subsequently, undersigned counsel requested reconsideration of Ms. Rivas's case, along with thirteen other individuals whose cases were rejected for minor perceived or actual cler-

685

ical errors, on December 4, 2017, but have yet to receive a response from USCIS.

125.  In addition, some applications were affected by both the U.S. Postal Service delays and also contained real or perceived clerical errors, and were therefore rejected for either or both reasons, and not allowed to reapply.

126.  USCIS's arbitrary and unfair rejections of deferred action renewal applications were not limited to the Chicago Lockbox.

127.  The Phoenix Lockbox rejected at least seven California applicants whose applications were received before October 5 on the basis of perceived or actual clerical errors.  At least one of these applicants received a separate document printed on a green piece of paper, inviting them to correct the error and resubmit their application, with no deadline for the resubmission.  *See* Ex. I (Sample Invitation to Reapply). All of these individuals' re-submissions were subsequently rejected as untimely despite their attempts to resubmit corrected applications.

128.  Twelve applicants from Texas mailed their renewal applications to the Dallas Lockbox's designated Post Office box address on September 25 via certified mail, but the U.S. Postal Service delayed the delivery until October 6, 2017.  USCIS rejected the applications as untimely.  The attorney for those twelve clients has contacted their Congress member and has attempted to re-submit them with USCIS, but has not yet received any response from USCIS.

129.  On November 15, 2017, counsel for Defendants announced that USCIS would, in fact, reconsider some DACA renewal applications that had been rejected, if

686

they were delayed unreasonably by the U.S. Postal Service and the individual could provide "individualized proof" of the mail delay, or if the application was improperly rejected. *See* ECF No. 108, attached hereto as Exhibit K. While USCIS announced it would release further guidance on November 20, it did not do so until November 30.

130. The November 30 USCIS website publication —a paragraph and a Frequently Asked Questions ("FAQs") on Rejected DACA Requests—was incomplete and still did not explain how individuals were supposed to re-submit their applications. *See* U.S. Citizenship and Immigr. Servs., *Frequently Asked Questions: Rejected DACA Requests* (Nov. 30, 2017) ("Specific guidance will be provided soon about the steps that a DACA recipient must take to resubmit his or her renewal request to USCIS if the filing was rejected due to U.S. Postal Service mail-service delays.") ("Nov. 30 FAQs"), attached hereto as Exhibit L. The Nov. 30 FAQs state that USCIS will directly contact individuals whose applications were received and erroneously rejected on October 5, and provides a 33-day period for resubmission once contacted by USCIS.

131. On December 7, 2017, USCIS updated its FAQs to include information stating that individuals who were affected by mail delays will be contacted by USCIS by mid-December, and providing instructions on what to submit when they are invited to reapply. *See* U.S. Citizenship and Immigr. Servs., *Frequently Asked Questions: Rejected DACA Requests* (Dec. 7, 2017) ("Dec. 7 FAQs"), attached hereto as Exhibit M.

132. The Nov. 30 FAQs and Dec. 7 FAQs do not address applications that were rejected for minor perceived or actual clerical errors. Both documents

687

state, "If USCIS rejected your timely filed renewal request because it was not properly filed, that is a valid reason for rejection and it will not be reconsidered." Nov. 30 FAQs; Dec. 7 FAQs. These individuals, as well as individuals whose applications were affected by both mail delays and minor perceived or actual clerical errors, remain without relief.

133. Because USCIS's November 15 and November 30 announcements did not provide guidance on how rejected applicants could re-submit and did not provide any relief for those rejected for real or perceived minor clerical errors, undersigned counsel sent a letter to Defendants' counsel on December 4, 2017, bringing the cases of 16 individuals to USCIS's attention and requesting reconsideration. While USCIS's subsequent December 7 FAQs provide some guidance to individuals whose applications were rejected due to mail delays, it still does not address individuals whose applications were rejected due to minor clerical errors or those affected both by mail delays and minor clerical errors.

134. Individuals who had their applications rejected for perceived or actual minorclerical errors, including Ms. Rivas, are currently being harmed because USCIS is not accepting re-submission of their applications.

**Impact of the DACA Termination on Named Plaintiffs and the Putative Class**

135. The DACA Termination has already begun to upend the lives of the nearly 800,000 DACA recipients, as well as those of their families, communities, and employers. Without DACA, the Individual Plaintiffs will soon lose their work authorization, preventing them from supporting themselves and their families. MRNY will lose approximately a dozen highly valued employees.

AR2981

688

136. For example, Mr. Batalla Vidal relies on his work authorization through DACA to work at a rehabilitation center caring for elderly and disabled patients; he supports himself, his mother, and his younger siblings. Without Mr. Batalla Vidal's income, he and his family will face substantial financial hardship.

137. Ms. Fernandez depends on her work authorization to support herself and her two U.S.-citizen children.

138. Additionally, the DACA Termination will prevent DACA recipients from enrolling in university and graduate programs since they will be unable to secure employment after graduating, blocking all future opportunities for professional or educational advancement. Similarly, their inability to secure employment while in school will severely hinder their financial ability to afford their education.

139. For example, Mr. Alarcon relies on DACA to allow him to enroll as a Bachelor of Arts candidate at Queens College, where he is on track to graduate in December 2017.

140. Ms. Fernandez has also relied on DACA to graduate from college and in September 2017 enrolled in graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law.

141. The October 5, 2017 renewal deadline imposed on DACA recipients whose deferred action and work permit expire before March 5, 2018 was untenable for many DACA recipients for various reasons, including financial ones. The rush to file an important application on less than a month's notice also led to many individuals making minor errors, such as forgetting to

**AR2982**

689

check a box, forgetting to sign or signing in the wrong place, or submitting a check for what applicants previously had to pay for DACA renewal—$465, instead of the new fee of $495—or for some other erroneous amount.

142. The October 5, 2017 renewal deadline imposed on DACA recipients was also administered in an arbitrary manner. Many DACA recipients submitted their renewal applications as soon as they could before the October 5 deadline, but were nonetheless rejected for reasons outside of their control. The harms of this are already beginning to be felt: for example, four MRNY members' current grants of DACA expire in December 2017: a father of five U.S. citizen children; a twenty-one-year-old who has lived in the U.S. since he was six years old; a young man who is both working and going to college full time; and a nineteen-year-old college student who has been in the U.S. since she was three years old. These four individuals—along with many others across the country—stand to lose everything they have worked for in the only country they know as home.

143. In addition, the September 5, 2017 cutoff for initial applicants has inflicted severe harm on those who were unable to file by September 5, 2017.

144. For example, Jose Rangel is DACA eligible, lives in Houston, Texas, and is thirty-four years old. He arrived in the United States from Mexico when he was six. He is married and has a seven-year-old U.S.-citizen daughter.

145. Mr. Rangel did not apply for DACA in 2012 because he received erroneous legal advice that he was not eligible. Years later, a friend insisted he was eligible and encouraged him to apply.

690

146.  In mid-to-late August 2017, Mr. Rangel and his lawyer completed his initial application, which was ready to be finalized and mailed.  On September 5, 2017, when Mr. Rangel heard Defendant Sessions' announcement, he was relieved that he had finished his DACA application two-weeks earlier and assumed it had been submitted.

147.  After calling his lawyer to confirm, Mr. Rangel found out that due to Hurricane Harvey, his lawyer's office had been closed and they were behind on mailing out applications—preventing his initial DACA application from being filed by September 5, 2017 and depriving him of the opportunity to receive deferred action.

148.  Similarly, M.J. is an eighteen-year-old Mexican national who has lived in the United States for almost all of her life.  M.J.'s U.S.-citizen stepfather had been in the process of petitioning for her to receive permanent resident status.  However, her stepfather became abusive and recently abandoned the family petition, leaving M.J. without status.

149.  M.J. met with non-profit attorneys who advised her to apply for DACA.  The attorneys started work on the case, but Hurricane Harvey prevented them from completing the application because their homes and offices were flooded and closed.

150.  On the day Harvey landed, the attorneys tried to work with M.J. to get documents together and file for DACA prior to the expected announcement of the program's termination, but Houston was largely under water and the schools were closed, preventing M.J. from getting the requisite documents, the attorneys from getting into the office, and the postal service from sending any mail.  There was no viable way for M.J. to file her DACA before September 5th.

AR2984

691

151. The DACA Termination, in most states, including New York, will prevent individuals from obtaining driver's licenses or state identification cards. For example, Ms. Fernandez relies on her driver's license to bring her children to school every day and the doctor when needed.  Many DACA recipients rely on driver's licenses or state identification cards as a form of photo identification for banking, insurance, notarizations, and other everyday services.

152. Moreover, the DACA Termination places these individuals at risk of immediate apprehension and deportation.  Under Defendant Trump, DHS has significantly increased its targeting of DACA recipients whose statuses have lapsed for deportation.

153. The Trump Administration's new enforcement priorities, which are so all encompassing that they cannot in earnest be called "priorities," target individuals who would qualify for DACA.  Trump has directed DHS to prioritize for removal anyone present in the United States without admission or parole, including those eligible for DACA under the 2012 guidance.

154. In fact, at the same time the DACA Termination was announced, the government issued "talking points" stating, *inter alia*, that:  "The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorization to prepare for and arrange their departure from the United States. . . .  "  Similarly, a DHS "Frequently Asked Questions" document issued the same day refers to the time period prior to March 5, 2018 as a "grace period for DACA recipients" whose grants of deferred action will soon expire "to make appropriate plans to leave the country."

692

155. DHS can easily deport the Plaintiffs because the Department already has their personal information. Plaintiffs and other DACA recipients provided extensive personal information to DHS in reliance on the agency's repeated promises to use the information only to grant them protection from deportation, and not to use that information for immigration-enforcement purposes except in narrow, delineated circumstances.

156. Notwithstanding those prior assurances, DHS has changed its policy regarding the permissible uses of the information provided by DACA applicants to remove the limitations on using that information for immigration-enforcement purposes. This policy change constitutes final agency action.

157. If they are deported from the United States, Plaintiffs and others similarly situated face grievous harm. The Individual Plaintiffs, as well as the members and clients of MRNY, will be forced to leave the only country that many of them have known as home; they have grown up in American neighborhoods, attended American schools, and have structured their lives around living in the United States.

158. The termination of DACA is already having profound impacts on the lives of DACA recipients. DACA recipients, including Individual Plaintiffs, fear deportation. Some have started to make provisions for what happens if they were deported, such as having difficult conversations with their parents and children about emergency plans.

159. Faced with the loss of their work authorization, many DACA recipients, including Mr. Batalla Vidal, have taken on additional jobs while they still have work authorization.

693

## **CLASS ACTION ALLEGATIONS**

160.  Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Named Plaintiffs seek to represent a certified Plaintiff class consisting of (1) all persons with deferred action through DACA as of September 5, 2017; and (2) all persons who are or will be eligible for deferred action under the terms of the original DACA guidance issued by the Department of Homeland Security ("DHS") in 2012; (3) *except* the individual recipients of, or applicants for, deferred action through DACA who are Plaintiffs in other actions challenging the DACA Termination in a U.S. District Court as of December 11, 2017.[15]

161.  Plaintiffs seek to represent the above-described class for all claims except that under the Regulatory Flexibility Act.

162.  This action meets all the Rule 23(a) prerequisites for maintaining a class action.

163.  The class members are sufficiently numerous as to render joinder impracticable, satisfying Rule (23)(a)(1).   Defendants' decision to terminate the DACA

---

[15] Other cases challenging the DACA termination currently before a U.S. district court as of December 11, 2017 include *New York v. Trump*, No. 17-cv-5228 (E.D.N.Y. filed Sept. 6, 2017); *Regents of Univ. of California v. DHS*, No. 17-cv-05211 (N.D. Cal. filed Sept. 8, 2017); *State of California v. DHS*, No. 17-cv-05235 (N.D. Cal. filed Sept. 11, 2017); *City of San Jose v. Trump*, No. 17-cv-05329 (N.D. Cal. filed Sept. 14, 2017); *Garcia v. United States of America*, No 17-cv-05380 (N.D. Cal. filed Sept. 18, 2017); *County of Santa Clara v. Trump*, No. 17-cv-05813 (N.D. Cal. filed Oct. 10, 2017); *CASA de Maryland v. DHS*, No. 17-cv-02942 (D. Md. filed Oct. 5, 2017); *NAACP v. Trump*, No. 17-v-01907 (D.D.C. filed Sept. 18, 2017); and *Park v. Sessions*, No. 17-cv-01332 (E.D. Va. filed Nov. 21, 2017).

694

program without providing adequate reasons and based on legal error, without going through the proper notice-and-comment procedure, without providing corrected notices to individual recipients subject to the October 5, 2017 renewal deadline, and based on animus toward individuals of Latino and Mexican origin, harms millions of individuals residing throughout the United States.  In addition, the class action is the only appropriate procedural avenue for the protection of the class members' constitutional rights and rights under the APA.

164.  This action presents common questions of law and fact, resolution of which will not require individualized determinations of the circumstances to any plaintiff, satisfying Rule 23(a)(2).   Such common questions of law and fact include, but are not limited to:

    a.  whether the DACA Termination constituted a substantive rule, such that notice-and-comment rulemaking was required under 5 U.S.C. § 706(2)(D);

    b.  whether Defendants' DACA Termination and change in the policy regarding the permissible uses of the sensitive information DACA applicants provided was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A);

    c.  whether Defendants failed to provide corrected notices to individuals whom Defendants had previously written advising them to renew "as soon as possible" but without mention of the October 5, 2017 deadline, in violation of procedural due process;

**AR2988**

695

    d.  whether Defendants unfairly and arbitrarily rejected deferred action renewal applications in violation of procedural due process; and

    e.  whether the termination of DACA was substantially motivated by animus toward individuals of Latino and Mexican origin, and whether it had a disparate impact on such individuals in violation of the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

165.  The Named Plaintiffs' claims are typical of the putative class, satisfying Rule 23(a)(3).  Like the other members of the class, the Defendants' termination of the DACA program and change to the confidentiality policy without providing adequate reasons, in violation of 5 U.S.C. § 706(2)(A); failure to go through the proper notice-and-comment procedure, in violation of 5 U.S.C. § 706(2)(D); having its decision substantially motivated by animus, in violation of the equal protection guarantee of the Fifth Amendment; failure to provide adequate notice to individuals who were obligated to renew by October 5, 2017, in violation of the Due Process Clause of the Fifth Amendment; and arbitrarily and unfairly rejecting renewal applications, in violation of the Due Process Clause of the Fifth Amendment, harms the Named Plaintiffs.

166.  The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys, satisfying Rule 23(a)(4).

167.  The Named Plaintiffs' interests do not conflict with other members of the class.   Instead, the Named Plaintiffs' interests are the same as those of the class: not to be subjected to agency rules that are promulgated without adequate basis, without undergoing the required notice-and-comment procedure, and that are

**AR2989**

696

implemented without fair notice and based on animus toward individuals of Latino and Mexican origin.

168. The legal theories under which the Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class would rely, and the harms suffered by the Named Plaintiffs are typical of those suffered by the class members.

169. With respect to Rule 23(a)(4) adequacy, undersigned counsel are qualified, experienced, and able to conduct the litigation.   The attorneys have the necessary knowledge, experience, and resources to litigate this matter.   In addition, attorneys have expended the time and effort necessary to identify the class.

170. Counsel for Plaintiffs do not anticipate any conflicts of interest between the Named Plaintiffs and the other class members, nor does Counsel anticipate any reason that the other class members would dispute the adequacy of Counsel's representation.

171. This action also meets all the requirements of, and is brought in accordance with, Rule 23(b)(2). Defendants' unlawful termination of the DACA program and changes to the confidentiality policy pose a real and immediate threat generally applicable to each member of the class, thus making final declaratory and injunctive relief with respect to the class as a whole appropriate.

697

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Administrative Procedure Act:   Agency Action Without Observance of Procedure Required By Law By all Plaintiffs against Defendants Nielsen and Sessions**

172.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

173.  The APA requires that agency action that is substantive in nature follow notice-and-comment procedures.   5 U.S.C. § 706(2)(D).

174.  The DACA Termination constitutes a substantive rule, as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria.

175.  It is undisputed that Defendants failed to follow notice-and-comment rulemaking procedures prior to issuing the DACA Termination.

176.  Defendants' termination of DACA violated the APA.

### SECOND CLAIM FOR RELIEF
**Administrative Procedure Act:   Agency Action that is Arbitrary and Capricious, An Abuse of Discretion, and Otherwise Not In Accordance with Law By all Plaintiffs against Defendants Nielsen and Sessions**

177.  Plaintiffs repeat and incorporate by reference each and every allegation containedin the preceding paragraphs as if fully set forth herein.

**AR2991**

698

178.  The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

179.  Defendants' DACA Termination and its change to the confidentiality of DACA applicant information constitute final agency action, and are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law because they (a) lack a rational explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors.

180.  Defendants justified the DACA Termination on the grounds of litigation risk and the legal conclusion that the program is unlawful.  These grounds are inadequate to justify termination, are legally erroneous, and fail to address the government's previous conclusion that the DACA program was lawful.  These justifications are also contradicted by Defendant Trump's own subsequent statement that he would "revisit" the termination if necessary.

181.  Defendants provided no justification for many of the details of the DACA Termination, including the September 5, 2017 deadline for initial applications; the October 5, 2017 deadline to file renewal applications; the March 5, 2018 cut-off for renewal eligibility; and changes to the confidentiality of applicant information.

182.  Defendants' termination of DACA and changes to the confidentiality of DACA-applicant information violated the APA.

699

### THIRD CLAIM FOR RELIEF
### Regulatory Flexibility Act
### By Plaintiff MRNY
### against Defendants Nielsen and Sessions

183.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.  DHS failed to conduct any regulatory flexibility analysis to determine how the DACA Termination will affect small entities, such as MRNY, in violation of the Regulatory Flexibility Act.   5 U.S.C. §§ 601 *et seq.*

185.  MRNY, as a "small organization" within the meaning of 5 U.S.C. § 601(4), is directly affected by the DACA Termination, and therefore DHS was required to conduct a regulatory flexibility analysis prior to promulgating the rule.

186.  It is undisputed that Defendants failed to conduct a regulatory flexibility analysis.

187.  Defendants' termination of DACA violated the RFA.

### FOURTH CLAIM FOR RELIEF
### Fifth Amendment (Procedural Due Process)
### By all Plaintiffs against Defendants Nielsen
### and Sessions

188.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

189.  The hallmark of due process is notice and a meaningful opportunity to be heard.

190. The Due Process Clause of the Fifth Amendment prohibits the federal government, including De-

**AR2993**

700

fendants, from depriving individuals of their liberty or property interests without due process of law.

191.  Defendants have not provided DACA recipients with the process to which they are entitled.

192.  Defendants, in individualized written notices, advised many DACA recipients whose status expires by March 5, 2018 to apply to renew "as soon as possible" and, to ensure no lapse in status, to renew between 120 to 150 days before expiration.

193.  Defendants did not send corrected notices to these DACA recipients advising them that they needed to apply to renew DACA by October 5, 2017 or be forever ineligible to renew their status.

194.  Defendants' failure to issue corrected notices advising of the October 5, 2017 deadline violates the Due Process Clause of the Fifth Amendment.

### FIFTH CLAIM FOR RELIEF
**Fifth Amendment (Equal Protection)**
**By all Plaintiffs against All Defendants**

195.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

196.  The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying to any person equal protection of the laws.

197.  The DACA Termination targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups.

198.  Defendants Sessions, Nielsen, and Trump have violated the equal protection guarantee of the Fifth

AR2994

701

Amendment because the DACA Termination was substantially motivated by animus toward Latinos and, in particular, Mexicans.

**SIXTH CLAIM FOR RELIEF**
**Fifth Amendment (Procedural Due Process)**
**By Plaintiff MRNY against Defendants Nielsen and Sessions**

199.  Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

200.  The hallmark of due process is notice and a meaningful opportunity to be heard.

201.  The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law.

202.  In the implementation of the October 5 deadline for renewal applications, Defendants have not provided DACA recipients with the process to which they are entitled.

203.  Defendants did not provide any notice of additional specific requirements that USCIS imposed for receiving and rejecting renewal applications or their resubmissions under the November 15 and November 30 USCIS guidance and FAQs.   While the December 7 FAQs add some instructions for individuals who were affected by unreasonable mail delay, they still do not address individuals whose applications were rejected unfairly for minor perceived or actual clerical errors, or who were affected both by U.S. Postal Service mail delays and minor perceived or actual clerical errors.

AR2995

702

204.  For example, Defendants rejected renewal applications that arrived at the designated Post Office box in the late afternoon and evening of October 5 without notifying DACA recipients of a specific time deadline other than the date of October 5.   Defendants failed to specify that applications that arrived at their Post Office box would not be considered "received" until the applications had been transferred to the appropriate Lockbox or service center, such that the address Defendants provided for applicants to meet the October 5 deadline was not actually an address that allowed a person to meet the "received by" deadline imposed by DHS.   Defendants likewise ignored the postmark dates on renewal applications, notwithstanding that the postmarks showed significant delays that were attributable to the U.S. Postal Service and not the applicants themselves.   Moreover, Defendants rejected renewal applications on the basis of real or perceived clerical errors, and in many cases provided rejected applicants with a green document inviting them to correct the error and reapply; yet Defendants again rejected as untimely applicants' resubmitted renewal applications that had corrected or clarified those errors.

205.  Defendants' arbitrary and unfair implementation of the October 5, 2017 deadline violates the Due Process Clause of the Fifth Amendment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

206.  Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are void and without legal force or effect;

**AR2996**

703

207. Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 702-706;

208. Declare that the DACA Termination and actions taken by Defendants to terminate DACA are in violation of the equal protection and due process guarantees of the Fifth Amendment of the U.S. Constitution and contrary to the law of the United States;

209. Vacate and set aside the DACA Termination and any other action taken by Defendants to terminate DACA, including the change to the confidentiality of DACA-applicant information;

210. Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from implementing or enforcing the DACA Termination and the change in confidentiality of DACA-applicant information, and from taking any other action to terminate DACA that is not in compliance with applicable law or the U.S. Constitution;

211. Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from denying individuals who were eligible to renew their deferred action under the terms of the DACA Termination Memo the opportunity to re-submit their renewal applications; and

212. Grant such other relief as this Court deems just and proper.

**AR2997**

704

Dated:    Dec. 11, 2017

Respectfully submitted,

/s/   JESSICA R. HANSON

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern
Healy Ko, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.†
Marisol Orihuela, Esq.†
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
Phone:   (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq.*
Alexia Schapira, Esq.*
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone:   (718) 418-7690

Jessica R. Hanson, Esq.†
Mayra B. Joachin, Esq.†
Karen C. Tumlin, Esq.†
Trudy S. Rebert, Esq.*+
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd, #108-62
Los Angeles, CA 90010
Phone:   (213) 639-3900

**AR2998**

705

Justin Cox, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone:   (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW
Suite 200
Washington, DC 20005
Phone:   (202) 216-0261

*Attorneys for Plaintiffs*


[†]   *Appearing* pro hac vice
[*]   *Pro hac vice* motion forthcoming
+   Admitted only in Louisiana

**AR2999**

706

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———————

Civil Action No. 1:17-cv-05228 (NGG) (JO)

STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND VIRGINIA, PLAINTIFFS

*v.*

DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, IN HER OFFICIAL CAPACITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; AND THE UNITED STATES OF AMERICA, DEFENDANTS

———————

Filed:   Oct. 4, 2017

———————

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

———————

## **INTRODUCTION**

1.   The States of New York, Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and the District of Columbia (the "States") bring this action to protect the States—including their residents, employers, small governmental jurisdictions, regulatory systems, and educational institutions—against the unlaw-

**AR3000**

707

ful actions of the President of the United States and the federal government.

2.   Since 2012, the Deferred Action for Childhood Arrivals ("DACA") program has protected from deportation and extended work authorization to approximately 800,000 young people who grew up in this country, most of whom have known no home other than the United States.

3.   DACA has allowed these young people to live, study, and work in the States (and throughout the country) as contributors and leaders in their communities.   DACA grantees attend public and private universities, and are employed by companies, nonprofit organizations, and governmental agencies and institutions, all of which benefit from their skills and productivity.   DACA grantees also provide financial support to their families, help to grow the economy, and contribute significantly to State and local revenues and tax bases.

4.   On September 5, 2017, the Defendants definitively and categorically terminated the DACA program, as detailed in a U.S. Department of Homeland Security ("DHS") Memorandum ("DHS Memorandum").   *See* Ex. 74 (Memorandum from Acting Secretary Elaine Kelly to James McCament, Acting Director of U.S. Citizenship and Immigration Services, *Rescission of Deferred Action for Childhood Arrivals*, September 5, 2017).

5.   Pursuant to the DHS Memorandum, the federal government will only issue renewals for grantees whose benefits expire before March 5, 2018, provided they apply for renewal by October 5, 2018.   DHS immediately ceased accepting all new applications under DACA.

708

6.    Ending DACA is a culmination of President's Trump's oft-stated commitments—whether personally held, stated to appease some portion of his constituency, or some combination thereof—to punish and disparage immigrants, especially those with Mexican roots, who make up more than 78 percent of DACA grantees. *See* Ex. 1 (Updated USCIS, *Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017*, June 8, 2017).

7.    The consequence of the President's decision is that hundreds of thousands of young people who have availed themselves of the program will ultimately lose its protections, and will be exposed to removal when their authorizations expire.

8.    Individuals who have relied on DACA are now even more vulnerable to removal than before the program was initiated, as they turned over sensitive information to the federal government in their applications.  Despite the federal government's repeated promises that it would not use such information to conduct enforcement measures, the DHS Memorandum does not explain how the government will keep that information secure, nor does it provide any assurances that immigration enforcement agents will not use such information to find and remove those who applied for DACA.

9.    Terminating DACA will harm hundreds of thousands of the States' residents, injure State-run colleges and universities, upset the States' workplaces, damage the States' economies, hurt State-based businesses and nonprofits, negatively affect the States' small governmental jurisdictions, and disrupt the States' statutory and regulatory interests.

**AR3002**

709

10.    The States respectfully request that the Court invalidate the portions of the DHS Memorandum challenged here.   Further, the States ask that the Court enjoin the federal government from using personal information gathered for the DACA program in immigration enforcement.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

12.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).   Defendants are United States agencies or officers sued in their official capacities.   The State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Eastern District of New York.

13.    The States bring this action to redress harms to their proprietary and sovereign interests and their interests as *parens patriae*.

## PARTIES

### PLAINTIFFS

14.    The Plaintiff States of New York,[1] Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and the District of Columbia, represented by and

---

[1] The State of New York is represented by and through its Attorney General, Eric T. Schneiderman.   Governor Andrew M. Cuomo is the chief executive officer of the State of New York and is responsible for overseeing the operations of the State of New York and ensuring that its laws are faithfully executed.

710

through their Attorneys General,[2] are sovereign states[3] of the United States of America.

15.   The States are aggrieved and have standing to bring this action because of the injuries to the States caused by the termination of DACA, including immediate and irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests.

### DEFENDANTS

16.   Defendant Donald Trump is the President of the United States, and authorized the issuance of the DHS Memorandum that purports to terminate DACA. He is sued in his official capacity.

17.   Defendant DHS is a federal cabinet agency responsible for implementing the DACA program. DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

18.   Defendant United States Citizenship and Immigration Services ("USCIS") is an Operational and Support Component agency within DHS.   USCIS is the sub-agency responsible for administering the DACA program.

19.   Defendant U.S. Immigration and Customs Enforcement ("ICE") is an Operational and Support Com-

---

[2] Colorado is represented by and through Governor John W. Hickenlooper's Chief Legal Counsel, who has been designated a Special Assistant Attorney General for purposes of representing Colorado in this matter.

[3] The District of Columbia, which is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government of the United States, shall be included herein as a "State" for ease of reference.

AR3004

711

ponent agency within DHS.   ICE is responsible for en-
forcing federal immigration law, including identifying,
apprehending, detaining, and removing non-citizens.

20.   Defendant Elaine C. Duke is the Acting Sec-
retary of the DHS.   She is responsible for implement-
ing and enforcing the Immigration and Nationality Act,
and oversees USCIS and ICE.   She is sued in her offi-
cial capacity.

21.   Defendant the United States of America in-
cludes all government agencies and departments re-
sponsible for the implementation and termination of
the DACA program.

## GENERAL ALLEGATIONS

**Establishment of the DACA Program.**

22.   On June 15, 2012, then-Secretary of Homeland
Security Janet Napolitano issued a memorandum es-
tablishing the DACA program (the "2012 DACA Mem-
orandum").   *See* Ex. 13 (2012 DACA Memorandum).
Under DACA, "certain young people who were brought
to this country as children and know only this country
as home" could request deferred action for a period
of two years, subject to renewal.   *Id.* at 1-2.   DACA
grantees also were eligible for work authorizations
so that they could work legally in the United States
during the deferred action period, pursuant to
long-standing federal regulation.   *See id.*; 8 C.F.R.
§ 274a.12(c)(14) (providing that "an alien who has been
granted deferred action" may obtain work authoriza-
tion upon demonstrating economic necessity).

23.   Deferred action is a well-established form of
prosecutorial discretion under which the federal gov-
ernment forbears from taking removal action against
an individual for a designated period of time.   Accor-

**AR3005**

712

ding to the 2012 DACA memorandum, it was appropriate for the government to exercise such discretion for DACA grantees because immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *See* Ex. 13 at 1.

24.   The 2012 DACA Memorandum provided that an applicant could be considered for an exercise of prosecutorial discretion only if he or she:

  a.   came to the United States before the age of sixteen;

  b.   continuously resided in the United States for at least five years preceding June 15, 2012, and was present in the United States on that date;

  c.   was in enrolled in school on the date of his/her application, had graduated from high school, had obtained a general education development certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

  d.   had not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and did not otherwise pose a threat to national security or public safety; and

  e.   was not over the age of thirty on June 15, 2012.

*Id.* at 1.

25.   USCIS described DACA as follows:   "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion.   For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlaw-

713

fully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence." *See* Ex. 14, Question 1 (USCIS Help Center, *DACA FAQs*).

**The DACA Application Process.**

26. Under DACA, "[a]ll individuals who believe[d] they [met] the guidelines" could "affirmatively request consideration of DACA from USCIS" through an established process. After receiving the applicant's forms, evidence, supporting documents and application fee, USCIS "review[ed] them for completeness," considered complete applications "on an individual, case-by-case basis," and notified applicants of its determination in writing. *See* Ex. 16 (USCIS Help Center, *How do I request consideration of DACA?*).

27. In order to apply for the DACA program, applicants had to submit extensive documentation establishing that they met the eligibility criteria. Applicants also had to submit a Form I-765 Application for Employment Authorization, and pay a $495 fee. *See* Ex. 14 at Questions 28-41; *see also* Ex. 17 (USCIS, I-821D, *Consideration of Deferred Action for Childhood Arrivals*) (explaining that the filing fee for a DACA application could not be waived).

28. DACA applicants were required to undergo biometric and biographic background checks. When conducting these checks, DHS reviewed the applicant's biometric and biographic information "against a variety

**AR3007**

714

of databases maintained by DHS and other federal government agencies." *See* Ex. 14 at Question 23. If any information "indicate[d] that [the applicant's] presence in the United States threaten[ed] public safety or national security," the applicant was ineligible for DACA absent "exceptional circumstances." *Id.* at Question 65.

29. Once individuals were admitted into the DACA program, internal USCIS "Standard Operating Procedures" dictated that, absent an "Egregious Public Safety" issue, DACA grantees were not to be terminated from the program until the government provided a "Notice of Intent to Terminate" which "thoroughly explain[ed]" the grounds for the termination." *See* Ex. 18 at 132, Appendix I (DHS, *National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals*, Apr. 4, 2013). DHS policy further provided that recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of participation in the DACA program. *Id.*

30. At the expiration of their two-year DACA term, grantees could seek renewal, and were considered for renewal if they met the guidelines for consideration as well as other specified criteria. *See* Ex. 19 (USCIS Help Center, *How will USCIS evaluate my request for renewal of DACA?*).

**Benefits Provided Under the DACA Program.**

31. DACA confers numerous benefits on its grantees.

32. Notably, DACA grantees are granted the right not to be arrested or detained based solely on their immigration status during the time period during

715

which their deferred action is in effect.  *See* Ex. 14 at Question 9.

33.  DACA grantees also are granted eligibility for work authorization.  As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action.  . . .  '"  *Id.* at Question 1.

34.  DACA grantees are eligible to receive certain public benefits.  These include Social Security, retirement, and disability benefits.  *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d).

35.  DACA enables grantees to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants.  *See* Ex. 5 ¶¶ 12, 16, 22 (Decl. Wong).

36.  DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."  *See* Ex. 15 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu, Dec. 30, 2016).

37.  These positive effects have rippled throughout the States' economies.  As DHS recognized more than four years after the implementation of DACA, our nation "continue[s] to benefit  . . .  from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future."  *Id.*

38.  Terminating DACA would not only rip away the life-changing benefits to individual DACA grantees,

716

but would also reverse the benefits to the community at large, including to innumerable small businesses, non-profits, and governments.[4]

**The Government's Assurances That the Information Provided by DACA Applicants Would be Kept Confidential and Not Used for Enforcement.**

39.   When the DACA program was first implemented, many eligible young people were reluctant to voluntarily disclose information that could help facilitate their removal from the United States.   To encourage applications, DHS repeatedly promised applicants that information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes."   *See* Ex. 15 (Letter from Sec'y Johnson).

40.   USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]nfor-

---

[4] *See* e.g., Ex. 20 (Ike Brannon, *The Economic and Fiscal Impact of Repealing DACA*, the Cato Institute, Jan. 18, 2017) ("The deportation of DACA participants would cost the American economy billions of dollars, as well as billions of tax dollars foregone, while doing little to address the true concerns that Americans may have about unauthorized immigrants."); Ex. 21 (Tom Wong, *et al.*, *DACA Grantees' Economic and Educational Gains Continue to Grow*, Center for American Progress, Aug. 28, 2017) (quoting multiple DACA grantees whose small businesses will suffer or even close if DACA is terminated); Ex. 22 (Tom Wong *et al.*, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Center for American Progress, Oct. 18, 2016) (study showing that 9 percent of DACA grantees work at non-profits, a significant percentage work in education, and 6 percent started their own business, including one owner who employs nine people and hopes to continue to grow and "hire even more people from the community" [internal brackets and quotation marks omitted]).

717

mation provided in [a DACA request] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings." *See* Ex. 25 (USCIS Help Center, *Will the information I share in my request for DACA be used for immigration enforcement purposes?*).

41.    USCIS affirmatively represented to DACA applicants that, except in limited circumstances, their case would not be "referred to ICE for purposes of removal proceedings" even if UCSIS decided not to defer action on a case.   *See* Ex. 26 (USCIS Help Center, *If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?*).

42.    In the exceptional circumstance in which USCIS referred a DACA applicant to ICE, USCIS affirmatively represented to DACA applicants that "information related to [their] family members or guardians that is contained in [their] request [would] not be referred to ICE for purposes of immigration enforcement against family members or guardians."   *See* Ex. 27 (USCIS Help Center, *If my DACA case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?*).

43.    USCIS affirmatively represented to employers of DACA applicants that, except in limited circumstances, if they provided an employee "with information regarding his or her employment to support a request for consideration of DACA," the information would not be "shared with ICE for civil immigration enforcement purposes."   *See* Ex. 28 (USCIS Help Center, *If I provide my employee with information regarding his or her employment to support a request for consideration*

**AR3011**

718

*of DACA, will that information be used for immigration enforcement purposes against me and/or my company?*).

44.   The government's representations that, absent exceptional circumstances, information provided by a DACA grantee would not be used against him or her for later immigration enforcement proceedings were unequivocal and atypical.   For example, the federal government does not make the same representations for participants in other similar programs, such as Temporary Protected Status.   These assurances were key to the success of the DACA program.   By making repeated, unique, and strong representations, the federal government induced persons to rely on those representations and apply to become DACA grantees despite the potential risks.

**The Government's Commitment to Continuity and Fair Treatment for DACA Grantees.**

45.   Numerous public officials from both political parties have reinforced the federal government's promise to provide continuity and fair treatment to DACA grantees, and have recognized that DACA grantees have relied on the government's representations in applying for DACA.   For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are hundreds of thousands of DACA grantees who have "relied on the U.S. government's representations" about DACA, and asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."   *See* Ex. 15.

46.   On December 19, 2016, then-President-elect Trump stated in an interview with Time magazine that he would find an accommodation for DACA grantees,

**AR3012**

719

stating, "We're going to work something out that's going to make people happy and proud." *See* Ex. 29 (Michael Scherer, *Person of the Year 2016*, TIME Magazine, Dec. 19, 2016). He further recognized, "[DACA grantees] got brought here at a very young age, they've worked here, they've gone to school here. Some were good students. Some have wonderful jobs. And they're in never-never land because they don't know what's going to happen." Id.

47. Again, on January 18, 2017, then President-elect Trump promised in an interview with Fox & Friends that he was working on a plan to make DACA grantees "very happy." *See* Ex. 30 (Francesca Chambers, *Trump signals he's softening on immigration as he says he's 'working on a plan' that will make DREAMers 'very happy,'* Daily Mail, Jan. 18, 2017). He further stated, "We're working on a plan right now. And that plan, over the next two to three months, is going to come out. And it's a plan that's going to be very firm, but it's going to have a lot of heart." Id.

48. In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" DACA grantees, who have "organize[d] [their] li[ves] around" the DACA program. *See* Ex. 31 (CNN, *Transcript of CNN Town Hall with Speaker Paul Ryan*, Jan. 12, 2017).

49. On January 25, 2017, President Trump again stated in an interview with David Muir that "[DACA grantees] shouldn't be very worried. I do have a big heart." *See* Ex. 32 (ABC News, *Transcript of ABC News anchor David Muir interview with Donald Trump*, Jan. 25, 2017).

**AR3013**

720

50. In February 2017, then-Secretary of DHS John Kelly issued a memorandum relating to enforcement priorities. This memorandum terminated "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," including prior enforcement priorities, but left DACA unchanged. *See* Ex. 2 (Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Enforcement of the Immigration Laws to Serve the National Interest*, Feb. 20, 2017); *see also* Ex. 10 (*Q&A: DHS Implementation of the Executive Order on Enhancing Public Safety in the Interior of the United States*, Feb. 21, 2017) ("Q22: Do these memoranda affect recipients of Deferred Action for Childhood Arrivals (DACA)? A22: No.").

51. On March 29, 2017, Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer." *See* Ex. 33 (Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico, Mar. 29, 2017).

52. On April 21, 2017, President Trump represented that his Administration's policy was not to deport DACA grantees, and suggested that they "should rest easy." *See* Ex. 34 (The Associated Press, Interview Transcript, Apr. 21, 2017).

53. On June 15, 2017, Secretary Kelly issued a memo terminating the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program created in 2014, but keeping DACA in place. *See* Ex. 23 (Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Rescission of November 20, 2014 Memorandum Providing*

721

*for Deferred Action for Parents of Americans and Lawful Permanent Residents*, June 15, 2017).

54.   The government's commitment to the DACA program was further communicated to young people through DHS's publication entitled "National Standard Operating Procedures (SOP):  Deferred Action for Childhood Arrivals (DACA)" (the "DACA SOP").  *See* Ex. 18.   This document includes more than 150 pages of specific instructions for granting or denying deferred action.

55.   Moreover, the approval notice granting deferred action under DACA listed only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA.   *See* Ex. 24 (USCIS, DACA Approval Notice).

56.   In reliance on these representations, hundreds of thousands of young people applied to participate in the DACA program, or sought renewal of their benefits since 2017.   *See* Ex. 1.

**President Trump's Statements about Mexicans.**

57.   Despite these various and repeated promises to DACA grantees made by the federal government and by President Trump, including a recognition of DACA's continued legal viability, value, and successes, President Trump has a long history of disparaging Mexicans, who comprise the vast majority of DACA grantees.

58.   In announcing his presidential campaign, then-candidate Trump compared Mexican immigrants to rapists, stating:  "When Mexico sends its people, they're not sending their best.  They're not sending you.  They're sending people that have lots of problems, and they're bringing those problems with us.

**AR3015**

722

They're bringing drugs.   They're bringing crime. They're rapists.   And some, I assume, are good people."   *See* Ex. 35 (Washington Post, *Transcript of Donald Trump's Presidential Bid Announcement*, June 16, 2015).

59.   During the first Republican presidential debate, then-candidate Trump again stated his distaste for immigrants from Mexico:   "The Mexican government is much smarter, much sharper, much more cunning.   And they send the bad ones over because they don't want to pay for them.   They don't want to take care of them."   *See* Ex. 36 (Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News, Aug. 6, 2015).

60.   Soon after, on August 25, 2015, then-candidate Trump refused to answer questions about immigration posed by Jorge Ramos, a Mexican-American and the top news anchor at Univision, a Spanish-language news network.   After sending his bodyguard to physically remove Mr. Ramos, then-candidate Trump derisively told Mr. Ramos to "Go back to Univision."   *See* Ex. 37 (Phillip Rucker, *First, Trump booted Univision anchor Jorge Ramos out of his news conference.   Then things got interesting*, The Washington Post, Aug. 25, 2015).

61.   In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag as "criminals" and "thugs."   *See* Ex. 38 (Donald Trump, "The protestors in New Mexico were thugs who were flying the Mexican Flag," Twitter, May 25, 2016); *See* Ex. 39 (Donald Trump, "Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals," Twitter, June 4, 2016).

62.   In June 2016, then-candidate Trump impugned the integrity of a federal judge presiding over a lawsuit

**AR3016**

723

against one of his businesses because the judge is Hispanic.   Trump commented that Judge Gonzalo Curiel's rulings against him "[H]as to do with perhaps that I'm very, very strong on the border  .  .  .  Now, he is Hispanic, I believe.   He is a very hostile judge to me." *See* Ex. 40 (Jose A. DelReal and Katie Zezima, *Trump's personal, racially tinged attacks on federal judge alarm legal experts*, The Washington Post, June 1, 2016).

63.   In an interview with CBS News on June 5, 2016, then-candidate Trump again reiterated his anti-Mexican views, noting that "[Judge Curiel]'s a member of a club or society very strongly, pro-Mexican, which is all fine.   But I say he's got bias."   *See* Ex. 41 (CBS News, Transcript of Face the Nation, June 5, 2016). Judge Curiel is a member of the San Diego Chapter of the La Raza Lawyers Association.   *See* Ex. 42 (Michelle Ye Hee Lee, *Trump supporters' false claim that Trump U judge is a member of a pro-immigrant group*, The Washington Post, June 7, 2016).

64.   On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole.   They later told police that "Donald Trump was right; all these illegals need to be deported."   When asked about the incident, then-candidate Trump failed to condemn the men, instead describing them as "passionate."   *See* Ex. 43 (Adrian Walker, *'Passionate' Trump fans behind homeless man's beating?*, The Boston Globe, Aug. 21, 2015).   Specifically, Trump stated, "[i]t would be a shame  .  .  .  I will say that people who are following me are very passionate. They love this country and they want this country to be great again.   They are passionate.   Id.

65.   In October 2016, during a presidential debate, then-candidate Trump responded to a question about

**AR3017**

724

immigration by stating: "We have some bad hombres here and we're going to get them out."  *See* Ex. 44 (Katie Zezima, *Trump on immigration:  There are 'bad hombres' in the United States*, The Washington Post, Aug. 30, 2017).

66.   On January 27, 2017, newly-inaugurated President Trump and Mexico's President Peña Nieto discussed President Trump's proposal for a border wall over the phone.   During that transcribed conversation, President Trump again referred to "hombres" stating:   "You have some pretty tough hombres in Mexico that you may need help with, and we are willing to help you with that big-league.   But they have to be knocked out and you have not done a good job of knocking them out."  *See* Ex. 45 (Greg Miller *et. al.*, *Full Transcripts of Trump's Calls with Mexico and Australia*, The Washington Post, Aug. 3, 2017).

67.   On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal judge's order to stop racially profiling Latinos.   *See* Ex. 46 (Julie Hirschfield Davis and Maggie Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration*, The N.Y. Times, Aug. 25, 2017).

68.   Sheriff Arpaio had been detaining people ostensibly because they had violated the law.   But in practice, his office detained huge numbers of individuals solely because they looked Latino, without any reasonable suspicion of illegal conduct.   *See generally Melendres v. Arpaio*, Findings of Fact & Conclusions of Law, 2:07-cv-02513-GMS, ECF Doc. No. 579 (D. Az. May 24, 2013).   After a federal court enjoined that practice in 2011, Arpaio continued his unlawful and dis-

725

criminatory practices unabated, "announc[ing] to the world and to his subordinates that he was going to continue business as usual no matter who said otherwise." *United States v. Arpaio*, Findings of Fact & Conclusions of Law, 2:16-cr-01012-SRB, ECF Doc. No. 210 at 13 (D. Az. July 31, 2017). On July 31, 2017, a federal court held Arpaio in criminal contempt, holding that he had willfully acted in "flagrant disregard" of the injunction. *Id.*

69. Before issuing the pardon, President Trump asked, "Was Sheriff Joe convicted for doing his job?" *See* Ex. 46. (Davis and Haberman, *Trump Pardons Joe Arpaio*). After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio "an American patriot." *Id.*

70. As President Trump's statements about Mexico and those with Mexican origins demonstrate, the President is willing to disparage Mexicans in a misguided attempt to secure support from his constituency.

**Trump Administration's Threatening Statements about Deporting Immigrants.**

71. On June 13, 2017, Acting ICE Director Thomas Homan testified in front of the House Appropriations Committee's Subcommittee on Homeland Security, stating as to "every immigrant in the country without papers," that they "should be uncomfortable. You should look over your shoulder. And you need to be worried." *Hearing on the ICE and CBP F.Y. 2018 Budget Before the Subcomm. on Homeland Security of the H. Comm. on Appropriations*, 115th Cong. (2017) 2017 WLNR 18737622.

72. On April 19, 2017, United States Attorney General Jefferson B. Sessions stated in an interview on

726

Fox News' "Happening Now," program—in response to a question regarding the deportation of a DACA recipient—that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported—well, they are. . . .  we can't promise people who are here unlawfully that they aren't going to be deported."  Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017).

**President Trump Terminates DACA in Response to the Litigation Threats of a State Found To Have Discriminated Against Latinos/Hispanics Nine Times Since 2012.**

73.   On June 29, 2017, the Attorneys General of ten states, led by the State of Texas, sent U.S. Attorney General Sessions a letter threatening to add claims to litigation currently pending in the Southern District of Texas "to challenge both the DACA program and the remaining expanded DACA permits," if the Executive Branch did not agree to end the DACA program by September 5, 2017.  Ex. 177 (Letter from Ken Paxton *et.al.* to Attorney General Jeff Sessions, June 29, 2017).

74.   The demand that President Trump eliminate DACA is part of a history of intentional discrimination against Latinos/Hispanics by the State of Texas.

75.   Over the preceding decade, federal courts have repeatedly found the State of Texas liable for engaging in unlawful discrimination based on race and/or national origin.

76.   For example, in *Texas v. United States*, 887 F. Supp. 2d 133, 161 (D.D.C. 2012), three federal judges blocked a Congressional and State House re-

**AR3020**

727

districting plan after finding that it "was enacted with discriminatory purpose."

77.    The litigation eventually culminated in a ruling by a three-judge panel on August 15, 2017 finding, again, that the 2010 congressional districts had been created with "racially discriminatory intent" against Latinos and African American voters.  *Perez v. Abbott*, SA-11-CV-360, 2017 U.S. Dist. LEXIS 129982, at *55 (W.D. Tex. Aug. 15, 2017).

78.    On October 9, 2014, in separate litigation challenging a state voter photo identification ("ID") law, a Texas federal district court judge found that the provision had been "imposed with an unconstitutional discriminatory purpose" and "constitute[d] an unconstitutional poll tax."  *Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014).

79.    On remand from the Fifth Circuit, a federal district court concluded that the 2011 Legislature intentionally discriminated against minority voters by requiring presentation of a photo ID when casting their ballots.  *Veasey v. Abbott*, 2017 U.S. Dist. LEXIS 54253, at *14-18 (S.D. Tex. Apr. 10, 2017).

80.    DHS issued the DHS Memorandum terminating DACA on September 5, 2017, in direct response to the threats of the State of Texas and the other ten states, fulfilling the demand of a State marked with a history of racial and national origin discrimination.

**President Trump Backtracks on His Promise and Terminates DACA.**

81.    Attorney General Sessions announced the termination of DACA via a live press conference.   He explained, without evidence, "The effect of this unilateral executive amnesty, among other things, contributed to

728

a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *See* Ex. 75 (DOJ, *Attorney General Sessions Delivers Remarks on DACA*, Prepared Remarks, Sept. 5, 2017).

82.    Under the DHS Memorandum, which accompanied this announcement, the government's new policy provides no discretion to approve new applications on a case-by-case basis.    Instead, the DHS Memorandum is a final decision that an entire class of people is no longer eligible for deferred action, employment authorization, and other benefits.    Per the DHS Memorandum, DHS "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum."    DHS will also reject all renewal applications it receives after October 5, 2017, and all renewal applications for authorizations that expire after March 5, 2018.    *See* Ex. 74 (DHS Memorandum).

83.    In issuing the DHS Memorandum, the federal government misleadingly claimed that DACA was unconstitutional, *see* Ex. 74, despite the fact that no court has made that determination, and despite previous determinations by DOJ and DHS, including under the Trump administration, that DACA is lawful and should be left in place.    In fact, as recently as June 15, 2017, then-Secretary of Homeland Security John Kelly chose to allow DACA to continue (while terminating the DAPA program) "after consulting with the Attorney General."    *See* Ex. 23

84.    Even after the announcement, the government's position on the reasoning for the termination has been unclear and inconsistent.    On the day of the

729

termination, President Trump re-tweeted a statement that "We are a nation of laws.   No longer will we incentivize illegal immigration."   *See* Ex. 47 (Josh Saul, *Jeff Sessions Always Wanted to Deport Undocumented Immigrant Youth.   Now He Can*, Newsweek, Sept. 5, 2017).   The President appears to have deleted this tweet.   Later on September 5, the President tweeted, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do).   If they can't, I will revisit this issue!"   *See* Ex. 48 (Donald J. Trump, Twitter, Sept. 5, 2017).   On September 14, 2017, he tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military?   Really! . . . . ."   *See* Ex. 50 (Donald J. Trump, Twitter, Sept. 14, 2017).

85.   As a result of the DHS Memorandum, DACA grantees whose benefits expire after March 5, 2018 will immediately lose their employment authorization, as well as other vital benefits, such as social security cards, driver's licenses, financial aid, disability and health benefits, among others.

86.   They also may lose their homes and communities if the program is allowed to expire.   An internal White House memo reported on by CNN stated that DHS now is urging DACA grantees "to prepare for and arrange their departure from the United States" when their DACA terms end.   *See* Ex. 88 (Tal Kopan & Jim Acosta, *Admin Memo:   DACA recipients should prepare for departure from the United States*, CNN, Sept. 5, 2017).   This threat of deportation is consistent with past references to deportation of DACA grantees, such as a statement by Attorney General Sessions in response to a question regarding the deportation of a

**AR3023**

730

DACA grantee that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported—well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported." *See* Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017).

87.    President Trump also has taken affirmative steps to reduce the privacy protections applicable to DACA grantee information.   In January 2017, President Trump issued an Executive Order directing all agencies, including DHS, to "ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information."   *See* Ex. 76 (Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," Jan. 25, 2017).   In response to the Executive Order, DHS adopted a privacy policy that "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement."   *See* Ex. 51 (DHS, *Privacy Policy 2017-01 Questions & Answers*, Apr. 27, 2017).

88.    The DHS Memorandum provides no assurance to DACA grantees, or direction to USCIS and ICE, that information contained in DACA applications cannot be used for the purpose of future immigration enforcement proceedings.

89.    To the contrary, on the same day that the DHS Memorandum was issued, DHS changed its public guidance about the use of DACA application data for immigration enforcement.   DHS removed the webpage con-

**AR3024**

731

taining the assurance that, absent exceptional circumstances, DACA application data "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings." *Cf.* Ex. 25 (containing link to USCIS webpage that now contains an error alert and a message stating, "The page you are looking for may not exist or is temporarily unavailable."). The same day, DHS posted a new policy governing the use of information provided by DACA applicants. DHS now states that USCIS "[g]enerally" will not "proactively provid[e] information obtained through DACA to ICE and CBP. *See* Ex. 89 (DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals,* Sept. 5, 2017). The new policy imposes no restrictions on USCIS providing DACA data at the request of ICE, CBP, or any other law enforcement entity. *Id.* DHS also reserves the right to change its new policy "at any time without notice" and states that the policy "may not be relied upon" by any party. *Id.*

90.   DACA grantees thus immediately face the risk that information they provided to the federal government could be used against them at any time, without notice, for purposes of immigration enforcement, including detention or removal.

**The Defendants' Failure to Notify Certain DACA Grantees of the October 5, 2017 Renewal Deadline.**

91.   Before the termination of DACA, Defendants had a written policy and practice allowing DACA grantees to submit their renewal application up to one year after the date of expiration of their participation in DACA. If DACA grantees failed to renew within one year of the expiration date, they had the option to re-apply as initial applicants. *See* Ex. 14 (USCIS FAQs-Q50).

732

92.   In addition, USCIS and DHS had a long-standing practice of using the address information they maintain for DACA grantees to send individualized notices to those grantees regarding their renewal expiration dates.   *See* Ex. 178 (DACA Renewal Notice).

93.   On information and belief, no standard renewal notices have been provided to DACA grantees whose participation in DACA expires between February 6, 2018 and March 5, 2018.   Prior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120-150 days prior to expiration, i.e., by November 2017, in order to avoid a lapse in deferred action and employment authorization.   *See, e.g., id.* However, since the termination, Defendants have not yet sent this group of DACA grantees any notices regarding when and how they can renew.

94.   On information and belief, the government sent standard renewal notices up until August 1, 2017 for DACA grantees whose participation in DACA expires by January 2018, informing the grantees they had the standard 120-150 days prior to the expiration date to renew if they wished to "avoid a lapse in [their] period of deferred action and employment authorization".   *See, e.g., id.* However, in light of DHS's decision to impose an absolute cut-off date of October 5, 2017 for all renewal applications, the information conveyed in these notices is now incorrect.   The notices misleadingly suggest to DACA grantees that they have several additional months beyond October 5 to renew their DACA status without a gap in employment authorization.   Moreover, the faulty renewal notices were not followed with individualized corrected notices

AR3026

733

informing this group of grantees that there is a new, absolute October 5 deadline for renewal, and that DACA grantees will no longer have up to one year after the date of expiration of their DACA to submit a renewal application.

95.   As a result of Defendants' failure to provide individualized notice regarding the new October 5, 2017 renewal deadline to DACA grantees whose participation expires before March 5, 2018, individuals who received no notice or incorrect notice of the new deadline may be forever ineligible to renew their participation in DACA.   These DACA grantees will no longer be protected from deportation and will lose work authorization that they may have otherwise had.   They may also lose health insurance, social security cards, driver's licenses and other benefits.

96.   On October 3, 2017, DHS issued a press release stating that "[o]f the approximately 154,200 individuals whose DACA is set to expire between Sept. 5, 2017, and March 5, 2018, just over 106,000 either have renewal requests currently pending with USCIS, or have already had USCIS adjudicate their renewal request."   *See* Ex. 82 (DHS Press Release *Department of Homeland Security Acting Secretary Elaine Duke Reminds Eligible DACA Recipients to File Renewal Requests,* October 3, 2017).   Therefore, up to one third of DACA grantees who are eligible for renewal had not applied as of two days before the October 5, 2017 deadline.

**The Government's Failure to Notify DACA Grantees of their Inability to Renew Their DACA Status If It Expires After March 5, 2018.**

97.   On information and belief, Defendants' termination of DACA was solely communicated to DACA

734

grantees through the publication of DHS's memorandum on September 5, 2017 on the DHS website and by a concurrent television announcement from Attorney General Sessions.  *See* Ex. 74 (DHS Memo); *See* Ex. 75 (*Attorney General Sessions Delivers Remarks on DACA*).

98.   On information and belief, the government did not and does not plan to issue individualized notices to any DACA grantees informing them of the termination of DACA and their inability to renew if their DACA status expires after March 5, 2018.

99.   Many DACA grantees relied upon their ability to apply to renew DACA in making important decisions related to their employment, education and families, among other things.

## HARM TO PLAINTIFF STATES

100.   The States will suffer harm as a result of the termination of the DACA program, including immediate and irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests.

### PLAINTIFF STATE OF NEW YORK

101.   The State of New York is home to an estimated 76,000 or more DACA-eligible residents.  *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

102.   As of June 30, 2017, USCIS had approved 42,503 initial DACA applications and 62,850 renewals for residents of New York.  *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 63 (Decl. Wong).

103.   Obtaining DACA status has allowed these individuals, many of whom are long-term residents of New York, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain

735

employer-based health insurance, among other bene-fits.

104. An estimated 38,848 New York DACA grant-ees are employed. *See* Ex. 5 ¶ 64 (Decl. Wong). An estimated 2,295 are business owners. *Id.* An esti-mated 19,084 are in school, and 13,645 are currently pursuing a bachelor's degree or higher. *Id.* ¶ 65.

105. In addition to the many harms identified be-low, *see* ¶¶ 188-233, terminating DACA will hurt the New York economy generally. Stripping DACA grant-ees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $140 million annually in state and local taxes in New York—a contribution that may drop by $55 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the New York economy with $10.7 billion in budgetary costs and $38.6 billion economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF COMMONWEALTH OF MASSACHUSETTS

106. The Commonwealth of Massachusetts is home to an estimated 19,000 or more DACA-eligible resi-dents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

107. As of June 30, 2017, USCIS had approved 8,053 initial DACA applications and 12,857 renewals for residents of Massachusetts. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 55 (Decl. Wong).

108. Obtaining DACA status has allowed these in-dividuals, many of whom are long-term residents of

736

Massachusetts, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

109. An estimated 7,360 Massachusetts DACA grantees are employed. *See* Ex. 5 ¶ 56 (Decl. Wong). An estimated 435 are business owners. *Id.* An estimated 3,616 are in school, and 2,585 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 57.

110. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Massachusetts economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $24.2 million annually in state and local taxes in Massachusetts—a contribution that may drop by $9.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Massachusetts economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF WASHINGTON

111. The State of Washington is home to an estimated 27,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

112. As of June 30, 2017, USCIS had approved 17,937 initial DACA applications and 17,906 renewals for residents of Washington. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 87 (Decl. Wong).

737

113. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Washington, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

114. An estimated 16,394 Washington DACA grantees are employed. *See* Ex. 5 ¶ 88 (Decl. Wong). An estimated 969 are business owners. *Id.* An estimated 8,054 are in school, and 5,758 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 89.

115. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Washington economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $51 million annually in state and local taxes in Washington —a contribution that may drop by $19 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Washington economy with $1.8 billion in budgetary costs and $6.4 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF STATE OF COLORADO

116. The State of Colorado is home to an estimated 23,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

117. As of June 30, 2017, USCIS had approved 17,310 initial DACA applications and 15,322 renewals

**AR3031**

738

for residents of Colorado.   *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 27 (Decl. Wong).

118.  Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Colorado, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

119.  An estimated 15,281 Colorado DACA grantees are employed.   *See* Ex. 5 ¶ 28 (Decl. Wong).   An estimated 935 are business owners.   *Id.*   An estimated 7,772 are in school, and 5,557 currently are pursuing a bachelor's degree or higher.   *Id.* ¶ 29.

120.  In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Colorado economy generally.   Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.   According to one estimate, DACA-eligible residents contribute approximately $33.9 million annually in state and local taxes in Colorado—a contribution that may drop by $16.4 million without DACA.   *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).   Another estimate suggests that terminating DACA would, over a ten-year period, impact the Colorado economy with $768 million in budgetary costs and $2.7 billion in economic costs.   *See* Ex. 4, Table 1 (Decl. Brannon).

**PLAINTIFF STATE OF CONNECTICUT**

121.  The State of Connecticut is home to an estimated 11,000 or more DACA-eligible residents.   *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

**AR3032**

739

122. As of June 30, 2017, USCIS had approved 4,989 initial DACA applications and 6,764 renewals for residents of Connecticut.   *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 31 (Decl. Wong).

123. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Connecticut, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

124. An estimated 4,560 Connecticut DACA grantees are employed.   *See* Ex. 5 ¶ 32 (Decl. Wong).   An estimated 269 are business owners.   *Id.*   An estimated 2,240 are in school, and 1,602 currently are pursuing a bachelor's degree or higher.   *Id.* ¶ 33.

125. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Connecticut economy generally.   Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.   According to one estimate, DACA-eligible residents contribute approximately $17 million annually in state and local taxes in Connecticut —a contribution that may drop by $5 million without DACA.   *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Connecticut economy with $642 million in budgetary costs and $2.3 billion in economic costs.   *See* Ex. 4, Table 1 (Decl. Brannon).

740

**PLAINTIFF STATE OF DELAWARE**

126. The State of Delaware is home to an estimated 3,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

127. As of June 30, 2017, USCIS had approved 1,451 initial DACA applications and 1,583 renewals for residents of Delaware. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 35 (Decl. Wong).

128. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Delaware, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

129. An estimated 1,326 Delaware DACA grantees are employed. *See* Ex. 5 ¶ 36 (Decl. Wong). An estimated 651 are in school, and 466 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 37.

130. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Delaware economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $2.4 million annually in state and local taxes in Delaware—a contribution that may drop by $1 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Delaware economy with $258 million in budgetary costs and $924

**AR3034**

741

million in economic costs.   *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF THE DISTRICT OF COLUMBIA

131.  The District of Columbia ("District") is home to an estimated 2,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

132.  As of June 30, 2017, USCIS had approved 773 initial DACA applications and 1,299 renewals for residents of the District.   *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 39 (Decl. Wong).

133.  Obtaining DACA status has allowed these individuals, many of whom are long-term residents of the District, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

134.  An estimated 707 District DACA grantees are employed.   *See* Ex. 5 ¶ 40 (Decl. Wong).   An estimated 347 are in school, and 248 currently are pursuing a bachelor's degree or higher.   *Id.* ¶ 41.

135.  In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the District's economy generally.   Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.   According to one estimate, DACA-eligible residents contribute approximately $2.7 million annually in state and local taxes in the District—a contribution that may drop by $946,000 without DACA.   *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the District's economy $900 million in budgetary costs and $3.2 bil-

**AR3035**

lion in economic costs.   *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF STATE OF HAWAII

136.   The State of Hawaii is home to an estimated 2,000 or more DACA-eligible residents.   *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

137.   As of June 30, 2017, USCIS had approved 582 initial DACA applications and 2,179 renewals for residents of Hawaii.   *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 43 (Decl. Wong).

138.   Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Hawaii, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

139.   An estimated 532 Hawaii DACA grantees are employed.   *See* Ex. 5 ¶ 44 (Decl. Wong).   An estimated 261 are in school, and 187 currently are pursuing a bachelor's degree or higher.   *Id.* ¶ 45.

140.   In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Hawaii economy generally.   Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in a loss of tax revenue for the State.   According to one estimate, DACA-eligible residents contribute approximately $3.2 million annually in state and local taxes in Hawaii—a contribution that may drop by $870,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).   Another estimate suggests that terminating DACA would, over a ten-year period, impact the Hawaii economy $126

million in budgetary costs and $451.5 million economic costs.   *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF ILLINOIS

141. The State of Illinois is home to an estimated 68,000 or more DACA-eligible residents.   *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

142. As of June 30, 2017, USCIS had approved 42,537 initial DACA applications and 39,702 renewals for residents of Illinois.   *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 47 (Decl. Wong).

143. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Illinois, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

144. An estimated 38,879 Illinois DACA grantees are employed.   *See* Ex. 5 ¶ 48 (Decl. Wong).   An estimated 2,297 are business owners.   *Id.*   An estimated 19,099 are in school, and 13,656 currently are pursuing a bachelor's degree or higher.   *Id.* ¶ 49.

145. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Illinois economy generally.   Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.   According to one estimate, DACA-eligible residents contribute approximately $131 million annually in state and local taxes in Illinois—a contribution that may drop by $54.7 million without DACA.   *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, cost the Illinois economy

744

$1.9 billion in lost tax revenue and $6.9 billion overall. *See* Ex. 4, Table 1 (Decl. Brannon).

**PLAINTIFF STATE OF IOWA**

146. The State of Iowa is home to an estimated 4,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

147. As of June 30, 2017, USCIS had approved 2,812 initial DACA applications and 3,120 renewals for residents of Iowa. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 51 (Decl. Wong).

148. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Iowa, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

149. An estimated 2,570 Iowa DACA grantees are employed. *See* Ex. 5 ¶ 52 (Decl. Wong). An estimated 152 are business owners. *Id.* An estimated 1,263 are in school, and 903 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 53.

150. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Iowa economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $6.8 million annually in state and local taxes in Iowa—a contribution that may drop by $3.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA

745

would, over a ten-year period, impact the Iowa economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). Yet another estimate predicts that the state's GDP would contract by $55.83 million if DACA is terminated. *See* Ex. 85 ¶ 9 (Decl. Swenson, Iowa St. University).

### PLAINTIFF STATE OF NEW MEXICO

151. The State of New Mexico is home to an estimated 10,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

152. As of June 30, 2017, USCIS had approved 6,838 initial DACA applications and 5,622 renewals for residents of New Mexico. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 59 (Decl. Wong).

153. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of New Mexico, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits. An estimated 6,250 New Mexico DACA grantees are employed. *See* Ex. 5 ¶ 60 (Decl. Wong). An estimated 369 are business owners. *Id.* An estimated 3,070 are in school, and 2,195 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 61. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the New Mexico economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $18.8 million annually in state and local taxes in New Mexico—a

**AR3039**

746

contribution that may drop by $7.5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the New Mexico economy with $258 million in budget costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF STATE OF NORTH CAROLINA

154.  The State of North Carolina is home to an estimated 41,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

155.  As of June 30, 2017, USCIS had approved 27,455 initial DACA applications and 23,619 renewals for residents of North Carolina. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 67 (Decl. Wong).

156.  Obtaining DACA status has allowed these individuals, many of whom are long-term residents of North Carolina, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

157.  An estimated 24,094 North Carolina DACA grantees are employed. *See* Ex. 5 ¶ 68 (Decl. Wong). An estimated 1,483 are business owners. *Id.* An estimated 12,327 are in school, and 8,814 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 69.

158.  In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the North Carolina economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately

**AR3040**

$63.6 million annually in state and local taxes in North Carolina—a contribution that may drop by $29 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the North Carolina economy with $2.1 billion in budgetary costs and $7.8 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF STATE OF OREGON

159. The State of Oregon is home to an estimated 15,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

160. As of June 30, 2017, USCIS had approved 11,321 initial DACA applications and 10,275 renewals for residents of Oregon. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 71 (Decl. Wong).

161. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Oregon, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, have more ready access to in-state tuition, and obtain employer-based health insurance, among other benefits.

162. An estimated 10,347 Oregon DACA grantees are employed. *See* Ex. 5 ¶ 72 (Decl. Wong). An estimated 611 are business owners. *Id.* An estimated 5,083 are in school, and 3,634 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 73.

163. The State of Oregon's revenue structure relies heavily on income taxes, including capital gains for investors, wages paid to workers, and corporate taxes that are directly linked to profitability. *See* Ex. 126 ¶ 9 (Decl. Read).

AR3041

748

164.  Eliminating DACA grantee Oregonians' ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the state and impairment of the state's economic health. See, e.g., Ex. 100 ¶ 6 (Decl. Nicolas).   According to one estimate, DACA-eligible residents contribute approximately $20 million annually in state and local taxes in Oregon—a contribution that may drop by $11 million without DACA.   *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).   Another estimate suggests that terminating DACA would, over a ten-year period, impact the Oregon economy with $384 million in budgetary costs and $1.3 billion in economic costs.   *See* Ex. 4, Table 1 (Decl. Brannon).

165.  In addition, the inability to work legally and enjoy the other benefits of legal status such as better access to credit and the banking system will make it more difficult, if not impossible, for DACA grantee Oregonians to start businesses that contribute to the State's economy and overall financial health.   *See* Ex. 126 ¶ 12 (Decl. Read).

166.  In addition to the direct benefits to state programs of increased state revenues, the State is also an investor and a borrower.   *See* Ex. 126 ¶¶ 5-9 (Decl. Read).   The State's credit rating, cost of borrowing, and the performance of the State's investments are all tied to the overall economic health of the State.   *See* Ex. 126 ¶ 9 (Decl. Read).   A reduced state tax base, and potential downward pressure on corporate performance, has the potential to adversely affect these interests as well.   Many of the companies in which Oregon and Oregonians have holdings have expressed concern that the rescission of the DACA program is a threat and will be disruptive to their employees, their

749

productivity, and their competitiveness. Any such disruption or downward pressure on corporate profits also potentially affects Oregon as a taxing entity and a shareholder.

**PLAINTIFF COMMONWEALTH OF PENNSYLVANIA**

167. The Commonwealth of Pennsylvania is home to an estimated 15,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

168. As of June 30, 2017, USCIS had approved 5,982 initial DACA applications and 9,875 renewals for residents of Pennsylvania. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 75 (Decl. Wong).

169. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Pennsylvania, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

170. An estimated 5,468 Pennsylvania DACA grantees are employed. *See* Ex. 5 ¶ 76 (Decl. Wong). An estimated 323 are business owners. *Id.* An estimated 2,686 are in school, and 1,920 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 77.

171. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Pennsylvania economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $20.7 million annually in state and local taxes in Pennsylvania—a contribution that may drop by $7.5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

750

Another estimate suggests that terminating DACA would, over a ten-year period, impact the Pennsylvania economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF STATE OF RHODE ISLAND

172. The State of Rhode Island is home to an estimated 3,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

173. As of June 30, 2017, USCIS had approved 1,248 initial DACA applications and 2,019 renewals for residents of Rhode Island. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 79 (Decl. Wong).

174. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Rhode Island, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

175. An estimated 1,141 Rhode Island DACA grantees are employed. *See* Ex. 5 ¶ 80 (Decl. Wong). An estimated 560 are in school, and 401 currently are pursuing a bachelor's degree or higher. *Id*. ¶ 81.

176. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Rhode Island economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. The Rhode Island Office of Management and Budget ("RIOMB") estimates that the termination of DACA could lead to over $1 million in lost state and local income, real estate and vehicle taxes. *See* Ex. 128 ¶ 3 (Decl. Womer, RIOMB). Ac-

751

cording to one estimate, DACA-eligible residents contribute approximately $3.8 million annually in state and local taxes in Rhode Island—a contribution that may drop by $1.2 million without DACA.  *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).  According to the Institute on Taxation and Economic Policy ("ITEP"), the State of Rhode Island alone will lose $2.6 million in state and local taxes if DACA protections are lost. *See* Ex. 54.  (Misha Hill and Meg Wiehe, *State and Local Contributions of Young Undocumented Immigrants*, Institute on Taxation and Economic Policy, April 25, 2017).  According to the Center for American Progress, Rhode Island will lose over $61 million in annual GDP loss from removing DACA workers.  *See id.*

## PLAINTIFF STATE OF VERMONT

177.  The State of Vermont is home to an estimated 100 or more DACA-eligible residents.  *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

178.  As of June 30, 2017, USCIS had approved 44 initial DACA applications and 199 renewals for residents of Vermont.  *See* Ex. 1 (Updated USCIS Data).

179.  Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Vermont, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

180.  An estimated 37 DACA grantees are employed in Vermont.  *See* Ex. 53 (Nicole Prchal Svajlenka, *et. al.*, A New Threat to DACA Could Cost States Billions of Dollars, Center for American Progress, July, 21, 2017).

**AR3045**

752

181. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Vermont economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $140,000 annually in state and local taxes in Vermont— a contribution that may drop by $48,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, cost the Vermont economy $2.4 million in Gross Domestic Product. *See* Ex. 53 (Prchal Svajlenka, *et. al.*, *A New Threat to DACA*).

### PLAINTIFF COMMONWEALTH OF VIRGINIA

182. The Commonwealth of Virginia is home to an estimated 30,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

183. As of June 30, 2017, USCIS had approved 12,248 initial DACA applications and 15,296 renewals for residents of Virginia. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 83 (Decl. Wong).

184. Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Virginia, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

185. An estimated 11,195 Virginia DACA grantees are employed. *See* Ex. 5 ¶ 84 (Decl. Wong). An estimated 661 are business owners. *Id.* An estimated 5,499 are in school, and 3,932 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 85.

**AR3046**

753

186. In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Virginia economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $34.7 million annually in state and local taxes in Virginia—a contribution that may drop by $12.7 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Virginia economy with $1 billion in budgetary costs and $3.6 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## HARM TO PLAINTIFF STATES BY CATEGORY

### *Diversity, Inclusion, and Constitutional Values.*

187. The States have an interest in prohibiting the deprivation of life, liberty or property without due process, and in preventing any practice that denies equal protection of the laws or otherwise discriminates on the basis of race, color, or national origin. For example:

a. New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. And New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. *See* N.Y. Exec. Law § 290.

b. Washington has declared that practices that discriminate against any of its inhabitants because of race, color, or national origin are matters of public concern that threaten the rights

AR3047

754

and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code 49.60.010.

c. Colorado welcomes people of all backgrounds. Colorado law prohibits unlawful discrimination against people based on, among other things, race, national origin, and ancestry. *See* C.R.S. § 24-34-601; C.R.S. § 24-34-402; C.R.S. § 24-34-502.

d. The Illinois Human Rights Act, 775 ILCS 5/1 *et seq.*, establishes a public policy "to secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her . . . national origin." *See* 775 ILCS 5/1-102(A). It further establishes a public policy "to prevent discrimination based on citizenship status in employment." *See* 775 ILCS 5/1-102(C).

e. The Council of the District of Columbia enacted the District's Human Rights Act "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit," including discrimination based on national origin. *See* D.C. Code Ann. § 2-1401.01. The District's Human Rights Act prohibits discrimination in a broad range of areas including employment, education, places of public accommodation, public services, housing and commercial space accommodations, the sale of motor vehicle insurance and the rental of motor vehicles.

f. Through a long tradition of including and incorporating foreign-born persons into its institutions, businesses, and governments, New Mexico has become one of the most socially and politi-

**AR3048**

755

cally diverse states.   New Mexico enshrined in its state constitution three provisions protecting the Spanish language and those who speak it. *See* N.M. Const. art. VII, § 3 (stating that "[t]he right of any citizen of the state to vote, hold office or sit upon juries shall never be restricted, abridged or impaired on account of  . . .  language  . . .  or inability to speak, read or write the English or Spanish languages except as otherwise provided in this constitution"); N.M. Const. art. XII, § 8 (requiring teachers to become proficient in English and Spanish); and N.M. Const. art. XII. § 10 (guaranteeing that "[c]hildren of Spanish descent in the state of New Mexico shall never be denied the right and privilege of admission and attendance in the public schools or other public educational institutions of the state, and they shall never be classed in separate schools, but shall forever enjoy perfect equality with other children in all public schools and educational institutions of the state").

g.  Oregon has codified its state policy that practices of unlawful discrimination against any of its inhabitants because of religion or national origin are "a matter of state concern," and that such discrimination "menaces the institutions and foundation of a free democratic state."  *See* ORS § 659A.006.

h.  Pennsylvania's laws reflect its commitment to values of diversity, multiculturalism and openness to others of different races and nationalities.   For example, Pennsylvania's Human Relations Act recognizes that an individual's op-

756

portunity to obtain employment, public accommodation, housing accommodation and commercial property without discrimination on the basis of "race, color, familial status . . . ancestry [and] national origin" is a "civil right" that is "enforceable" under Pennsylvania law. *See* 43 P.S. § 953. *See also* 43 P.S. § 955.

i. In keeping with its history of freedom of conscience, equality and tolerance, Rhode Island has prohibited practices that discriminate against any of its inhabitants because of race, color, or national origin. *See* R.I. Constitution Article 1, section 2; R.I. Gen. Laws 12-19-38 (Hate Crimes Sentencing Act); R.I. Gen. Laws § 42-112-1 (The Civil Rights Act of 1990); R.I. Gen. Laws 28-5-1 (Fair Employment Practices Act); R.I. Gen. Laws 34-37-1 (Fair Housing Practices Act).

188. The States also have an interest in ensuring that their residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

***Harm to States as Employers.***

189. The States have an interest in maintaining qualified, trained workforces.

190. Terminating DACA will cause the States to lose qualified State employees. Many DACA recipients work in government or at state-run institutions, and they were hired because of their specialized skills and qualifications. The States expended time and funds to hire, train, and manage DACA recipients. If these individuals become ineligible to work, the States will lose the value of their investment and the services

**AR3050**

757

of employees who perform important functions for the States. They will also incur the costs associated with the need to recruit, hire, and train replacements. *See, e.g.*, Ex. 52 ¶ 8 (Decl. Mostofi, NYC Mayor's Office of Immigrant Affairs); Ex. 56 ¶¶ 2-4 (Decl. Quinonez); Ex. 70 ¶ 6 (Decl. I.V.); Ex. 61 ¶ 10 (Decl. Heatwole, UMass); Ex. 62 ¶ 3 (Decl. Monroe, Wash. Dept. of Ecology); Ex. 65 ¶ 3 (Decl. Kaplan, WA Dept. of Social and Health Svcs.); Ex. 92 ¶ 3 (Decl. Jones, Wash. Treasury); Ex. 91 ¶ 3 (Decl. Garza, Big Bend Community College); Ex. 64 ¶ 3 (Decl. Glatt, Columbia Basin College); Ex. 58 ¶ 4 (Decl. Loera, Wash. State Univ.); Ex. 130 ¶ 3 (Decl. Conly, WA Dept. of Veterans Affairs); Ex. 113 ¶ 3 (Decl. Schuh, City of Anacortes, WA); Ex. 157 ¶ 9-10 (Decl. Ridder, Portland State Univ.); Ex. 154 ¶ 11 (Decl. Cuprill-Comas, Oregon Health and Science Univ.); Ex. 153 ¶¶ 6, 9 (Decl. Karpilo, Eastern Oregon Univ.); Ex. 156 ¶¶ 9-10 (Decl. Mitsui, Portland Community College); Ex. 167 ¶¶ 3-6 (Decl. Reveley, College of William & Mary); Ex. 134 ¶¶ 31, 37 (Decl. Herbst, Univ. of Conn.); Ex. 124 ¶¶ 4, 11 (Decl. Salaveria, Hawaii Dept. of Business, Economic Development and Tourism); Ex. 168 ¶¶ 3-7 (Decl. Cabrera, George Mason Univ.).

### Harm to State Colleges and Universities.

191. The States have an interest in the special contributions that DACA grantees make to State colleges and universities as students, employees, and alumni.

192. Terminating DACA will harm the ability of the States' colleges and universities, including public universities, to satisfy their educational missions and prepare the States' residents for the workforce. *See* Ex. 61 ¶¶ 5-7 (Decl. Heatwole); Ex. 146 ¶¶ 12-13 (Decl. Clark *et al.*, Mass. State Univ. Pres.); Ex. 134 ¶¶ 15-38

758

(Decl. Herbst); Ex. 133 ¶¶ 15-24 (Decl. Pachis, Eastern Conn. State Univ.); Ex. 136 ¶¶ 1, 4 (Decl. Hardwick, Univ. of the District of Columbia); Ex. 166 ¶¶ 4-7 (Decl. Sullivan, Univ. of Vermont); Ex. 167 ¶¶ 5-6 (Decl. Reveley); Ex. 137 ¶¶ 4-10 (Decl. Straney, Univ. of Hawaii); Ex. 131 ¶¶ 4-9 (Decl. Miranda, Colorado State Univ.); Ex. 132 ¶¶ 3-10 (Decl. Allen, Univ. of Colorado); Ex. 135 ¶¶ 3-14 (Decl. Rakes, Delaware Tech. Community College); Ex. 152 ¶¶ 10-11, 21 (Decl. Mathewson & Pareja, Univ. of New Mexico School of Law); Ex. 149 (New Mexico Council of Univ. Presidents Letter); Ex. 157 ¶ 6 (Decl. Ridder); Ex 159 ¶ 5 (Decl. Galvan, Univ. of Oregon); Ex. 155 ¶ 5 (Decl. Alexander, Oregon State Univ.); Ex. 154 ¶¶ 7, 10 (Decl. Cuprill-Comas); Ex. 153 ¶ 7 (Decl. Karpilo); Ex. 160 ¶¶ 7-8 (Decl. Hagemann, Western Oregon Univ.); Ex. 158 ¶ 6 (Decl. Trueblood-Gamble, Southern Oregon Univ.); Ex. 168 ¶¶ 3-7 (Decl. Cabrera); Ex. 86 ¶¶ 7-9 (Decl. Wadhia, Penn. St. University); Ex. 142 ¶¶ 4-5 (Decl. Edgehill-Walden, Northern Illinois Univ.); Ex. 145 ¶ 15 (Decl. Kennedy, Mass. Community Colleges' Presidents' Council).

193. DACA has made it possible for many young people to attend colleges and universities in the States, as work authorization allows DACA grantees to work both while they pursue their education and after graduation. More than 90% of DACA grantees report that DACA allowed them to pursue educational opportunities previously unavailable to them. *See* Ex. 5 ¶ 18 (Decl. Wong). For example:

a. The University of Colorado estimates that there are over 200 DACA grantees enrolled across the University. Ex. 132 ¶ 5 (Decl. Allen). Colorado State University has approximately 189 DACA grantees. Ex. 131 ¶ 8 (Decl. Miranda).

759

b. Delaware Technical and Community College ("DTCC") has at least 148 DACA students and at least another 242 graduates who are DACA grantees.   *See* Ex. 135 ¶ 5 (Decl. Rakes). Many of DTCC's DACA students are nontraditional learners who support their families in addition to pursuing their education.   *Id.* ¶ 8.   Another approximate 75 DACA grantees currently attend Delaware State University ("DSU").   *See* Ex. 66 (Scott Gross, *DSU immigrant students fear Trump's DACA decision*, Delawareonline, Sept. 2, 2017).

c. Presently, there are 16 students who have reported their DACA status to the University of Hawaii and who are pursuing various degrees at multiple University campuses.   Ex. 137 ¶ 6 (Decl. Straney).

d. In the University of Illinois System, approximately 350 of its students and 100 of its employees would be affected by the termination of DACA.   Ex. 143 ¶ 8 (Decl. Wilson, Univ. of Illinois System).

e. In New York, both the State University of New York ("SUNY") and the City University of New York ("CUNY") have encouraged DACA grantees to apply as part of their strong commitment to diversity, equity, and inclusion.   *See* Ex. 12 ¶ 10 (Decl. Milliken, CUNY); Ex. 99 (Decl. Johnson, SUNY).   At CUNY, hundreds of DACA grantees have enrolled in the university, many with the benefit of full scholarships.   *See* Ex. 12 ¶ 6 (Decl. Milliken); Ex. 171 ¶8 (Decl. Park).

f. Many of Oregon's public colleges and universities, including Portland State University, the

760

University of Oregon, Oregon State University, Oregon Health and Science University, Eastern Oregon University, Western Oregon University, Southern Oregon University and Portland Community College enroll, and in some cases employ, DACA grantees. *See* Ex. 157 ¶ 4 (Decl. Ridder); Ex. 159 ¶ 5 (Decl. Galvan); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 154 ¶ 5 (Decl. Cuprill-Comas); Ex. 153 ¶¶ 5-6 (Decl. Karpilo); Ex. 160 ¶¶ 6-7 (Decl. Hagemann); Ex. 158 ¶¶ 4-5 (Decl. Trueblood-Gamble); Ex. 156 ¶¶ 6, 9 (Decl. Mitsui); Ex. 94 ¶¶ 5-8 8 (Decl. Ramirez Cuevas); Ex. 101 ¶¶ 1, 3 (Decl. Preciado).

g.  Many institutions of higher education in Virginia have students presently enrolled in their educational programs who are DACA grantees. According to the State Council of Higher Education for Virginia ("SCHEV"), the Commonwealth's coordinating body for higher education, there are more than 1,300 DACA students in Virginia attending institutions of higher education. *See* Ex. 127 ¶¶ 4 (Decl. Blake, SCHEV).

h.  According to the Washington Student Achievement Council ("WSAC"), the state agency that advances educational opportunities in Washington, there are more than 1,400 DACA students in Washington attending institutions of higher education. *See* Ex. 59 ¶ 9 (Decl. Thompson, WSAC). More than one hundred DACA grantees attend the University of Washington, based in Seattle. *See* Ex. 57 ¶ 4 (Decl. Ballinger, Univ. of Wash.). More than 150 DACA grantees attend Washington State University, based

**AR3054**

761

in Pullman.   *See* Ex. 58 ¶ 4 (Decl. Loera, Wash. State Univ.).

i.   Many public colleges and universities in the States have diverse student populations, including a high percentage of Latino/Hispanic students and students who are first generation Americans and first in their families to attend college, as well as undocumented students. *See, e.g.*, Ex. 162 (Letter from Meghan Hughes, Community College of Rhode Island); Ex. 150 ¶ 7 (Decl. Abdallah, University of New Mexico). Although many such schools do not keep data on immigration status, they know that they have DACA grantees as alumni and current students. *See* Ex. 163 (Letter from Frank Sánchez, Rhode Island College President); Ex. 164 ¶ 6 (Decl. Farish, Roger Williams University); Ex. 161 (Letter from Richard M. Locke, Brown University Provost); Ex. 86 ¶ 6 (Decl. Wadhia); Ex. 146 ¶ 9 (Decl. Clark et al.).

194.  DACA grantees who are residents of Connecticut, Delaware, District of Columbia, Hawaii, Illinois, New Mexico, Massachusetts, Virginia, or Washington receive in-state tuition at public universities and/or are eligible for other financial assistance.   *See* C.R.S. § 23-7-110; Ex. 132 ¶ 4 (Decl. Allen); Ex. 131 ¶ 7 (Decl. Miranda); Ex. 134 ¶ 8 (Decl. Herbst); Ex. 7 (Mass. Dept. of Higher Education Memorandum, *Residency Status for Tuition Classification Purposes—Deferred Action for Childhood Arrivals*, Nov. 21, 2012); Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 146 ¶ 7 (Decl. Clark et al.); Ex. 133 ¶¶ 8-12 (Decl. Pachis); Conn. Gen. Stat. § 10a-29; Ex. 135 ¶¶ 11-12 (Decl. Rakes); Ex. 136 ¶ 6 (Decl. Hardwick); Ex. 150 ¶ 12 (Decl. Abdallah); Or.

762

Rev. Stat. § 352.287; Ex. 167 ¶ 4 (Decl. Reveley); Ex. 106 ¶ 5 (Decl. Suria); Ex. 137 ¶ 5 (Decl. Straney); Ex. 157 ¶ 4 (Decl. Ridder); Ex. 94 ¶ 7 (Decl. Ramirez Cuevas).

195. Without the DACA program, talented young immigrants will be less likely to apply to and attend State schools because they will not be able to afford tuition given the loss of available financial assistance (in some of the States) and the likelihood that they will not be able to work legally upon graduation (in all the States). Those already enrolled will be less likely to finish their education at State schools due to the loss of current and future earning potential. *See* Ex. 12 ¶ 7-8 (Decl. Milliken); Ex. 56 ¶ 7 (Decl. Quinonez); Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 146 ¶¶ 8, 12 (Decl. Clark *et al.*); Ex. 72 ¶ 5 (Decl. Teodoro); Ex. 132 ¶ 7 (Decl. Allen); Ex. 131 ¶ 8 (Decl. Miranda); Ex. 136 ¶ 6 (Decl. Hardwick); Ex. 69 ¶¶ 8, 10 (Decl. Mendes); Ex. 60 ¶¶ 6, 9 (Decl. Guevara); Ex. 145 ¶ 8 (Decl. Kennedy); Ex. 135 ¶¶ 7-10 (Decl. Rakes); Ex. 139 ¶ 6 (Decl. Dietz, Illinois State Univ.); Ex. 143 ¶ 8 (Decl. Wilson); Ex. 106 ¶ 7 (Decl. Suria); Ex. 105 ¶ 5 (Decl. Oduyoye); Ex. 134 ¶¶ 16-17 (Decl. Herbst); Ex. 137 ¶ 7 (Decl. Straney); Ex. 152 ¶¶ 18-20 (Decl. Mathewson & Pareja); Ex. 101 ¶ 4 (Decl. Preciado); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 168 ¶ 6 (Decl. Cabrera); Ex. 160 ¶¶ 7-8 (Decl. Hagemann); Ex. 153 ¶¶ 7-8 (Decl. Karpilo); Ex. 95 ¶ 8 (Decl. Solano); Ex. 157 ¶¶ 6-7 (Decl. Ridder); Ex. 159 ¶¶ 5-6 (Decl. Galvan); Ex. 158 ¶¶ 6, 8, 11 (Decl. Trueblood-Gamble); Ex. 154 ¶¶ 7-10 (Decl. Cuprill-Comas); Ex. 133 ¶ 13 (Decl. Pachis); Ex. 57 ¶ 4 (Decl. Ballinger); Ex. 58 ¶ 5 (Decl. Loera); Ex. 163 (Sánchez Letter, Rhode Island College); Ex. 165 ¶ 4 (Decl. Linde, Rhode Island College); Ex. 166 ¶ 6 (Decl. Sullivan); Ex. 167 ¶¶ 4-5

AR3056

763

(Decl. Reveley); Ex. 164 ¶ 7 (Decl. Farish); Ex. 171 ¶¶7-9 (Decl. Park).

196. Additionally, DACA students enrolled in programs that require employment authorization or entail licensing requirements to complete elements of the program—such as paid internships, clinical placement, residency training, or programs that require significant lab or field work—will be severely and adversely impacted if DACA is terminated. Indeed, these students may not be able to complete the academic requirements of their degrees. *See, e.g.*, Ex. 12 ¶ 8 (Decl. Milliken); Ex. 61 ¶ 6 (Decl. Heatwole); Ex. 135 ¶ 9 (Decl. Rakes); Ex. 136 ¶ 7 (Decl. Hardwick); Ex. 166 ¶¶ 6-7 (Decl. Sullivan); Ex. 134 ¶ 33 (Decl. Herbst); Ex. 132 ¶ 7 (Decl. Allen); Ex. 131 ¶ 8 (Decl. Miranda); Ex. 152 ¶ 19 (Decl. Mathewson & Pareja); Ex. 145 ¶ 9 (Decl. Kennedy); Ex 6 ¶¶ 13-15 (Decl. C. Andrade).

197. DACA students in graduate programs at public universities in the States will be significantly affected because the loss of employment authorization needed for graduate assistantship (research or teaching) will likely mean the loss of tuition waivers and other benefits such as subsidized health, dental, and vision insurance for the students and their families. The loss of graduate assistants also is a significant harm to the States because of the services they provide in assisting faculty and instructing students. *See* Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 134 ¶¶ 31-32 (Decl. Herbst).

198. Losing these talented young immigrants will deprive the States' schools of the special and unique contributions and perspectives they bring to campus communities, both as students and alumni. *See, e.g.*, Ex. 57 ¶¶ 4-6 (Decl. Ballinger); Ex. 58 ¶¶ 4-8 (Decl. Loera); Ex. 61 ¶ 7 (Decl. Heatwole); Ex. 132 ¶¶ 6-7

AR3057

764

(Decl. Allen); Ex. 131 ¶ 9 (Decl. Miranda); Ex. 134 ¶¶ 19-26, 36-38 (Decl. Herbst); Ex. 133 ¶¶ 23-24 (Decl. Pachis); Ex. 135 ¶¶ 3, 13 (Decl. Rakes); Ex. 137 ¶¶ 7-8, 10 (Decl. Straney); Ex. 139 ¶¶ 3, 4, 7 (Decl. Dietz); Ex. 152 ¶¶ 10, 18, 21 (Decl. Mathewson & Pareja); Ex. 157 ¶ 11 (Decl. Ridder); Ex. 159 ¶¶ 8-9 (Decl. Galvan); Ex. 155 ¶¶ 6, 8 (Decl. Alexander); Ex. 154 ¶ 7 (Decl. Cuprill-Comas); Ex. 153 ¶ 10 (Decl. Karpilo); Ex. 160 ¶ 5 (Decl. Hagemann); Ex. 158 ¶ 9 (Decl. Trueblood-Gamble); Ex. 163 (Sánchez Letter); Ex. 165 ¶ 4 (Decl. Linde); Ex. 166 ¶¶ 6-7 (Decl. Sullivan); Ex. 167 ¶¶ 4-5 (Decl. Reveley); Ex. 136 ¶ 8 (Decl. Hardwick); Ex. 145 ¶¶ 10-11 (Decl. Kennedy).

199.  The States' public universities and colleges will also suffer direct financial harm, including lost tuition revenue and scholarship funds, if DACA students are forced to withdraw or are unable to enroll.  *See, e.g.*, Ex. 57 ¶¶ 4-6 (Decl. Ballinger); Ex. 58 ¶¶ 4-8 (Decl. Loera,); Ex. 61 ¶ 7 (Decl. Heatwole); Ex. 134 ¶¶ 27-28 (Decl. Herbst); Ex. 133 ¶¶ 17-18 (Decl. Pachis); Ex. 136 ¶ 8 (Decl. Hardwick); Ex. 137 ¶ 9 (Decl. Straney); Ex. 157 ¶¶ 6-7 (Decl. Ridder); Ex. 159 ¶ 5 (Decl. Galvan); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 154 ¶ 8 (Decl. Cuprill-Comas); Ex. 153 ¶¶ 7-8 (Decl. Karpilo); Ex. 160 ¶¶ 6-8 (Decl. Hagemann); Ex. 158 ¶ 6 (Decl. Trueblood-Gamble); Ex. 163 (Sánchez Letter); Ex. 164 ¶ 9 (Decl. Farish); Ex. 132 ¶ 10 (Decl. Allen); Ex. 131 ¶ 9 (Decl. Miranda); Ex. 145 ¶¶ 10-14 (Decl. Kennedy).  In at least one state (Oregon), current demographic and enrollment trends and other factors suggest that this lost revenue will not be replaced by other students for many universities, and will represent an absolute loss of revenue.  *See* Ex. 160 ¶ 8 (Decl. Hagemann); Ex. 158 ¶ 7 (Decl. Trueblood-Gamble); Ex. 157 ¶ 7 (Decl. Ridder).

AR3058

765

200.  Terminating DACA also will impose additional tangible costs on our public colleges and universities, which already have begun to experience disruption as a result of uncertainty over the future of the program and are preparing for the likelihood of expending additional resources to address the detrimental effects of DACA termination. *See, e.g.*, Ex. 61 ¶¶ 8-9 (Decl. Heatwole); Ex. 134 ¶¶ 35, 38 (Decl. Herbst); Ex. 136 ¶¶ 8-9 (Decl. Hardwick); Ex. 157 ¶ 12 (Decl. Ridder); Ex. 155 ¶ 7 (Decl. Alexander); Ex. 153 ¶ 11 (Decl. Karpilo); Ex. 160 ¶ 9 (Decl. Hagemann); Ex. 158 ¶¶ 10, 12 (Decl. Trueblood-Gamble); Ex. 132 ¶ 9 (Decl. Allen); Ex. 167 ¶ 6 (Decl. Reveley).

201.  Terminating DACA will further deprive the States of the earning potential of graduates from public colleges and universities who are most likely to stay in-State and join the States' workforces. *See, e.g.*, Ex. 132 ¶ 9 (Decl. Allen).   For example:

a.  Nine out of ten Massachusetts public higher education graduates remain in the State, working or pursuing further education. *See* Ex. 93 (Mass. Dept. of Higher Education, *Time to Lead, The Need for Excellence in Public Higher Education*, Sept. 2012).

b.  The majority of Iowa public higher education graduates remain in Iowa, working or pursuing further education. *See* Ex. 67 at 26 (The University of Iowa Pomerantz Career Center, 2015-2016 Annual Report); Ex. 68 (Iowa State University 6-Month Post Graduation Status, 2014-2015; Ex. 73 at 2 (Career Ready, University of Northern Iowa Career Services, 2016).

c.  Nearly 90% of Community College of Rhode Island graduates stay in Rhode Island after grad-

766

uation to live and raise their families.   Ex. 162 (Hughes Letter).

d.  Approximately 85 to 87 percent of Eastern Connecticut State University graduates stay in Connecticut after graduation to "contribute[] to the growth and vitality of Connecticut's economy."   Ex. 133 ¶ 16 (Decl. Pachis).

202.  Terminating DACA will also undermine the investment in and efforts to develop a well-educated workforce that can contribute to the States' overall economies and competitiveness, and the States' ability to meet certain critical workforce needs such as healthcare in rural areas.   *See, e.g.*, Ex. 159 ¶ 6 (Decl. Galvan); Ex. 154 ¶¶ 6, 10 (Decl. Cuprill-Comas); Ex. 156 ¶ 11 (Decl. Mitsui).   Currently, 100 DACA grantees are medical students and medical resident physicians at schools that are members of the Association of American Medical Colleges, and approximately two-thirds of these DACA grantees are pursuing their medical education in one of the States.   *See* Ex. 114 ¶ 4 (Decl. Prescott, Association of American Medical Colleges).   Aspiring DACA-grantee physicians contribute to a diverse and culturally responsive workforce to meet the needs of underserved populations.   *See id.* ¶¶ 5-6.   Terminating DACA will cause the States to lose specific investments that they have made in this workforce and will leave significant gaps in the States' healthcare workforce.   *See id.* ¶ 7; Ex. 85 ¶¶ 5-6 (Decl. Swenson).   For example:

a.  In Illinois, DACA grantees have participated in a loan program, through the Illinois Finance Authority, in which students receive interest-free loans so long as they agree to repay the principal and commit to four years of work in an under-

**AR3060**

767

served Illinois community following their gradua-
tion. Ex. 141 ¶ 6 (Decl. Pelissero & Callahan,
Loyola Univ. of Chicago). Without DACA, un-
derserved Illinois communities will lose access to
these committed medical professionals. *Id.* ¶ 8.

b. Oregon's legislature has established a program
to provide scholarships to health professional
students who commit to practicing in rural and
underserved areas of the state for a period of
time following graduation. *See* ORS 348.303.
At least one dental student participant in this
program is a DACA recipient who will likely not
be able to complete his commitment to practice
dentistry in an underserved area of Oregon.
*See* Ex. 94 ¶¶ 4, 9-18 (Decl. Ramirez Cuevas).

203. The nation's leading private universities will
suffer harms if DACA is terminated. Harvard Uni-
versity, for example, has more than 50 DACA students
currently enrolled. *See* Ex. 96 ¶ 6 (Decl. Madsen,
Harvard Univ.). Tufts University has more than 25
DACA students. *See* Ex. 97 ¶ 8 (Decl. Jeka, Tufts
Univ.). Brown University has approximately 12 DACA
students. *See* Ex. 161 (Locke Letter). Roger Williams
University, home to Rhode Island's only law school, has
at least six DACA students. *See* Ex. 164 ¶ 6 (Decl.
Farish). These students often have had to overcome
significant challenges in order to gain acceptance and
bring critical perspectives, insights, and experiences to
their universities. They make important and lasting
contributions, including through their classroom par-
ticipation, their extracurricular engagements, and their
commitment to independent study and research. *See,
e.g.*, Ex. 97 ¶ 5 (Decl. Jeka); Ex. 96 ¶¶ 5, 7, 12 (Decl.
Madsen); Ex. 144 ¶¶ 4-5 (Decl. Martin, Amherst Col-

768

lege); Ex. 147 ¶ 7 (Decl. Stephens, Mount Holyoke College); Ex. 140 ¶¶ 4, 6, 9 (Decl. Jensen, Illinois Wesleyan Univ.); Ex. 141 ¶¶ 4, 5, 6, 7,8 (Decl. Pelissero & Callahan); Ex. 138 ¶¶ 6, 11 (Decl. Salgado, City Colleges of Chicago); Ex. 164 ¶¶ 8-9 (Decl. Farish); Ex. 161 (Locke Letter).

204. Employment authorization gives these students and their universities an assurance that they may put their talents to use in the United States job market after graduation, benefitting the States and the nation as a whole.  *See, e.g.*, Ex. 96 ¶¶ 12-15 (Decl. Madsen); Ex. 161 (Locke Letter); Ex. 144 ¶ 9 (Decl. Martin, Amherst); Ex. 147 ¶¶ 8-9 (Decl. Stephens).

205.  DACA has allowed these students to step outside the shadow of their immigration status and to participate fully as members of academic and campus communities in ways that likely would not be possible otherwise.  *See, e.g.*, Ex. 140 ¶¶ 7, 8 (Decl. Jensen); Ex. 97 ¶ 7 (Decl. Jeka); Ex. 96 ¶ 12 (Decl. Madsen); Ex. ¶ 7 (Decl. Martin, Amherst).  Terminating DACA will take important opportunities away from DACA students and reintroduce fear and uncertainty into their lives, with significant adverse effects on these students, their universities, and the broader community.  *See* Ex. 140 ¶¶ 7, 8 (Decl. Jensen); Ex. 97 ¶¶ 8-10 (Decl. Jeka); Ex. 96 ¶ 13 (Decl. Madsen); Ex. 144 ¶ 10 (Decl. Martin, Amherst); Ex. 148 ¶ 6 (Decl. Martin, Northeastern Univ.); Ex. 147 ¶ 10 (Decl. Stephens); Ex. 161 (Locke Letter); Ex. 103 ¶ 8 (Decl. Perla); Ex. 106 ¶ 7 (Decl. Suria); Ex. 105 ¶ 5 (Decl. Oduyoye); Ex. 104 ¶ 7 (Decl. G.L.); Ex. 102 ¶¶ 12-14 (Decl. Juarez); Ex. 152 ¶ 19 (Decl. Mathewson & Pareja); Ex. 151 ¶¶ 14, 16 (Decl. Roth, UNMHSC); Ex. 107 ¶¶ 7-8 (Decl. Torrez).

769

*Harm to State Law, Regulation, and Policy.*

206. The States have an interest in preserving their legal, regulatory, and policy frameworks that take the DACA program into account.

207. Many of the States have enacted laws, promulgated regulations, and/or established policies that contemplate and rely on the DACA program. If DACA is terminated, these legal, regulatory, and policy regimes will be harmed. For example:

a. Since 2012, Connecticut has granted driver's licenses to approximately 5,000 DACA grantees who are Connecticut residents, many of whom have also purchased and registered vehicles in Connecticut. *See* Ex. 121 ¶¶ 6-7 (Decl. Bzdyra). DACA grantees who have purchased and registered vehicles will have paid Connecticut sales tax and local property taxes for such vehicles. *Id.* ¶¶ 8-9.

b. Illinois has enacted laws to enable DACA grantees to participate in the economy professionally. These include providing that no person in Illinois shall be prohibited from receiving a law license solely because he or she is not a citizen and explicitly allowing DACA grantees to apply for a license to practice law. *See* 705 Ill. Comp. Stat. 205/2. DACA grantees are also eligible to receive state-issued identification cards and drivers' licenses; own motor vehicles which are registered, titled and licensed in the state of Illinois; and own businesses and property in Illinois. *See* Ex. 125 ¶ 6 (Decl. White, Illinois Secretary of State). The Office of the Illinois Secretary of State will be adversely impacted if DACA is terminated by the loss of revenue from

**AR3063**

770

licensing fees and taxes, as well as costs and system disruptions related to eligibility determinations of license renewals for DACA recipients. *Id.* ¶ 7. Illinois administrative rules, regulations and laws will also need to be amended to conform to the changes in the DACA program. *Id.*

c. Under DACA, thousands of young Massachusetts and Oregon residents are able to receive social security cards and thereby have access to driver's licenses, which they depend on to attend heath care appointments, to commute to work and school, and to attend to other necessities for themselves and their family members. *See* Ex. 9 (Mass. Registry of Motor Vehicles, *Social Security Number (SSN) Requirements*); ORS 807.021 (proof of legal presence required to issue, renew or replace driver license); Ex. 175 (Attorney General Advisory Letter to Acting Commissioner J. Eric Boyette, Jan. 17, 2013); Ex. 101 ¶ 3 (Decl. Preciado); Ex. 71 ¶¶ 5-7, 9 (Decl. I.T.); Ex. 69 ¶¶ 7-8 (Decl. Mendes); Ex. 70 ¶¶ 5, 8 (Decl. I.V.). Terminating DACA will make it impossible for these individuals to apply for new licenses or renew the licenses they have, leading to a number of adverse outcomes, including a decrease in licensing fees paid to the States, a decrease in productivity of these residents, and an increase in unlicensed drivers on the road.

***Harm to Public Health and Health Care Costs.***

208. The States have an interest in protecting the public health and in minimizing health care costs expended by the States.

771

209.  Terminating DACA will harm public health and impose additional health care costs on the States. Work authorization allows DACA grantees to access employer-sponsored health benefits.  *See, e.g.*, Ex. 72 ¶ 4 (Decl. Teodoro); Ex. 69 ¶¶ 6, 10 (Decl. Mendes); Ex. 171 ¶ 18 (Decl. Park); Ex. 172 ¶ 8 (Decl. Morales); Ex. 110 ¶ 8 (Decl. Schlosberg, District of Columbia Department of Health Care Finance).   In fact, more than 50% of DACA grantees have obtained employer-provided insurance.   *See* Ex. 5 ¶ 12 (Decl. Wong). Without these benefits, more of the States' residents are likely to forgo needed health care, including preventive care, which will create more costly health problems in the long run.   It also will cause more people to rely on state-funded and/or state-administered public health care and other benefits and thus impose additional costs on the States.   For example:

a.  Colorado provides emergency Medicaid regardless of immigration status, which covers the hospital delivery of children for qualified undocumented immigrants.  *See* Ex. 78 at 1-2 (Colorado Department of Health Care Policy and Financing letter dated June 28, 2005).

b.  Delaware provides limited emergency and labor/delivery services to residents whose immigration status otherwise keeps them from accessing health care benefits and services.  *See* Ex. 122 ¶¶ 6-7 (Decl. Groff).

c.  The D.C. HealthCare Alliance is the District of Columbia's state-sponsored insurance program of last resort.  *See* Ex. 110 ¶¶ 6, 9 (Decl. Schlosberg); *see also* D.C. Code § 7-771.07(2).   The placement of all of the individuals in the District participating in the DACA program in 2017 onto

772

the D.C. HealthCare Alliance would require the District to spend additional money on that program, harm District finances, and prevent the District from spending that money on other public health priorities. *See* Ex. 110 ¶ 10 (Decl. Schlosberg). In fact, the placement of these individuals onto the D.C. HealthCare Alliance could cost the District an additional $283,000 per month in District of Columbia Fiscal Year 2018. *See id.* ¶ 12.

d. Under Hawaii's Prepaid Health Care Act, Haw. Rev. Stat. ch. 393, Hawaii employers are required to provide regular employees who meet wage requirements with coverage under a qualifying prepaid group health care plan. *See* Haw. Rev. Stat. § 393-11. The termination of DACA will likely cause more people to rely on Hawaii's state-administered Medicaid One-Time Emergency services. Hawaii reimburses hospitals for emergency and urgent services provided to qualifying uninsured Hawaii patients, including undocumented immigrants. Ex. 123 ¶¶ 5-6 (Decl. Peterson, Med-QUEST Division, Hawaii Department of Human Services).

e. In Massachusetts, DACA grantees who lose employer-based coverage may be eligible for MassHealth, a state-funded health insurance program. *See* Ex. 83 ¶¶ 5-7 (Decl. Caplan, Mass. Executive Office of Health and Human Services). In addition, Massachusetts will very likely have to cover some, if not all, of the costs of health care visits for these individuals through its state-administered Health Safety Net program or other programs. *Id.* ¶¶ 8-9. Finally,

AR3066

773

some DACA grantees who lose employer-based coverage will likely use providers, like community based health centers, that are funded in part by grants and other funding streams available through the state. *Id.* ¶¶ 10-14.

210. New York State currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 (Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013). Terminating DACA may reduce access to Medicaid for current DACA grantees. New York State currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See Id.* Individuals in New York who are not DACA grantees may only qualify for Medicaid coverage of care and services necessary to treat an emergency condition. Terminating DACA will require New York to either seek a State legislative change to maintain current Medicaid coverage formerly DACA-eligible immigrants with state dollars only or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

### *Harm to Small Cities, Counties, and Towns.*

211. The States have an interest in preventing economic and other harm to their small cities, towns, counties, and other small governmental jurisdictions.

212. Terminating DACA will harm small governmental jurisdictions in the States. If DACA is terminated, small governmental jurisdictions will lose talented and trained employees, adversely affecting operations and costing time, money, and effort to replace

774

and retrain these employees. *See, e.g.*, Ex. 111 ¶¶ 10-11 (Decl. Ambrosino & Bourque, City of Chelsea, MA and Chelsea Public Schools); Ex. 113 ¶¶ 4-6 (Decl. Schuh). Many of these employees are highly skilled workers, including in critical fields such as nursing. *See, e.g.*, Ex. 135 ¶¶ 10, 13 (Decl. Rakes); Ex. 98 ¶ 7, 10-11 (Naveed).

213. Terminating DACA will have a direct, adverse effect on economies and sales tax revenues of small cities and towns, as DACA grantees will lose their jobs and refrain from buying goods and services from local vendors. *See, e.g.*, Ex. 111 ¶ 16 (Decl. Ambrosino & Bourque); Ex. 176 ¶¶ 8-10, 13 (Decl. Kennedy, City of Newburgh).

214. DACA grantees average higher earning capacities than their undocumented peers and are able to better participate in the States' economies, for example by purchasing homes and cars that are taxed by our state and local authorities. *See* Ex. 5 ¶ 16 (Decl. Wong). If DACA is terminated, cities and towns will lose other local tax revenue, including real estate taxes and motor vehicle excise taxes, from DACA grantees who can no longer access lines of credit or afford to buy cars or homes.

215. If DACA is terminated, small governmental jurisdictions will lose the benefits that full access by and participation of a diverse community fosters through community activities, including, for example, activities in libraries and local government-sponsored recreational camps or sports leagues. *See, e.g*, Ex. 109 ¶¶ 5-6 (Decl. Meyer, New Castle County, Del.). The termination of DACA will also have a destructive effect on local industries of small governmental jurisdictions that rely on the work of highly qualified and trained

**AR3068**

775

DACA recipients.   Ex. 176 ¶¶ 4, 8-10, 13 (Decl. Kennedy, City of Newburgh).

216.  Terminating DACA will also adversely affect public safety, health, and wellbeing in the States' cities, towns, and schools.   Without DACA status, DACA grantees afraid of deportation will be less likely to report violence, abuse, crimes or other harms to the community.   If DACA is terminated, 53% of current DACA grantees may be less likely to report a crime they witnessed; 47% may be less likely to report a crime even if they were the victim; 48% may be less likely to go to the hospital if they suffered an injury, and 60% may be less likely to report wage theft by their employer.  *See* Ex. 5 ¶ 24 (Decl. Wong).   This will make it harder for local police and other officials to provide for the public safety and welfare.  *See, e.g.*, Ex. 111 ¶ 15 (Decl. Ambrosino & Bourque); Ex. 108 ¶¶ 7-10 (Decl. Hughes); Ex. 109 ¶ 6 (Decl. Meyer); Ex. 116 ¶¶ 10-13 (Decl. Graham, Delaware Community Legal Aid Society, Inc.).   For example, since the Trump Administration announced plans to end DACA, Delaware law enforcement and legal aid have recognized an increased reluctance among Delaware immigrants to engage with aspects of the criminal justice system—even when that interaction would have been to protect their own victim rights.  *See, e.g.*, Ex. 108 ¶¶ 7-10 (Decl. Hughes); Ex. 116 ¶¶ 10-13 (Decl. Graham).

***Harm to School Districts, Including Small School Districts.***

217.  The States have an interest in effectively educating elementary and secondary students and in preventing economic harm to small and large school districts.

AR3069

776

218.  If DACA is terminated, public school districts will suffer financial harm as well as harm to their educational missions.

219.  The termination of DACA will cause school districts to lose talented and experienced teachers and other staff members who are DACA grantees, adversely affecting student education and costing time, money, and effort to replace and retrain these employees.  *See* Ex. 111 ¶ 11 (Decl. Ambrosino & Bourque); Ex. 79 (Whaley, *Denver Public Schools say ending DACA would have "catastrophic" effect*, Denver Post, Aug. 31, 2017).

220.  In Connecticut, Colorado, Illinois, Massachusetts, New Mexico, and New York, Teach for America has placed teachers who are DACA grantees in shortage-area subjects and hard-to-staff schools in low- income communities.  *See* Ex. 11 ¶¶ 3, 11 (Decl. Carrizales, Teach For America).   Terminating DACA will not only deprive schools of their employees, but also deprive students of teachers whose live experiences may mirror their own lives.  *Id.* ¶¶ 10, 11.

221.  Public elementary and secondary schools have a constitutional obligation to educate students irrespective of immigration status.  *See Plyler v. Doe*, 457 U.S. 202 (1982).  The termination of DACA will harm the States' ability to educate DACA-eligible students as required by federal law.  *See* Ex. 111 ¶¶ 12,14 (Decl. Ambrosino & Bourque); Ex. 112 ¶ 3-4 (Decl. Kanninen, Arlington, VA Public Schools).

222.  If DACA-eligible students are no longer able to work legally after high school or cannot afford to go to college, these students will be less motivated to achieve in school.  *See* Ex. 111 ¶ 12 (Decl. Ambrosino & Bourque); Ex. 112 ¶ 3 (Decl. Kanninen).  This will

**AR3070**

777

result in lower scores and higher dropout rates for these students.   *See* Ex. 111 ¶ 12 (Decl. Ambrosino & Bourque).

223.  Poorer performance will impact school districts' accountability ratings and could require removal of administrators and teachers as well as increased state funding to flow to these school districts.   *See, e.g.*, Ex. 179 (Mass. Dep't of Early and Secondary Educ., *School Leader's Guide to the 2017 Accountability Determinations*, Sept. 2017). Decreased school performance will also negatively impact the community, with families not wanting to buy homes in a lower-performing district. *See* Ex. 111 ¶ 13 (Decl. Ambrosino & Bourque).

224.  Finally, DACA-eligible students will experience higher levels of anxiety about their futures and their families' futures, and will require additional counseling and support from guidance counselors and other school personnel, costing school districts time and money.   *See* Ex. 111 ¶ 14 (Decl. Ambrosino & Bourque).

*Harm to Businesses and Nonprofits.*

225.  The States have an interest in their tax revenues, economies, and the financial well-being of their businesses and nonprofits.

226.  Immigration is an important economic driver in the States.   Many of the States' workers are immigrants, and many of those immigrant workers are DACA grantees.  *See, e.g.*, Ex. 5 ¶ ¶ 28, 32, 36, 40, 44, 48, 52, 56, 60, 64, 68, 72, 76, 80, 84, 88 (Decl. Wong); Ex. 126 ¶ 11 (Decl. Read, Oregon State Treasurer); Ex. 95 ¶ 7 (Decl. Solano); Ex. 101 ¶ 4 (Decl. Preciado); Ex. 100 ¶ 6 (Decl. Nicolas); Ex. 124 ¶¶ 4, 10-11 (Decl. Sa-

778

laveria); Ex. 168 ¶ 3 (Decl. Cabrera); Ex. 120 ¶ 4 (Decl. Romero, Barrera Legal Group, PLLC); Ex. 174 ¶¶ 4,6,8 (Decl. Wylde, Partnership for NYC); Ex. 81 ¶¶ 2-3, 5-6 (Decl. Pinsky, ABNY).   Many companies in the States are dependent on DACA grantees to operate and grow their businesses.   The market for highly skilled workers and employees is extremely competitive.   Terminating DACA grantees' work authorization will inhibit the States' companies' ability to adequately staff their organizations, develop their workforces, recruit talent, and maintain trained employees.   The Center for American Progress estimates that it costs businesses roughly one-fifth of a worker's salary to replace a worker due to productivity loss, the cost of hiring and training a new employee, and ramp-up periods for new employees. *See* Ex. 80 (Heather Boushey and Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Center for American Progress, November 16, 2012).

227. If companies lose employees and recruiting efforts are less successful, their ability to develop and deliver successful products and services may be adversely affected.   *See e.g.*, Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90 ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks); Ex. 84 ¶¶ 4-11 (Decl. Kalvert, TripAdvisor); Ex. 119 ¶¶ 5-6 (Decl. Tingen, Tingen & Williams, PLLC); Ex. 174 ¶¶ 5-8 (Decl. Wylde, Partnership for NYC).   For example:

   a.  Colorado's talented workforce has attracted major industries to the State, including aerospace, high-tech, start-ups, and STEM-based employers.   Many companies in Colorado rely heavily on immigrants to operate their business.   Ter-

**AR3072**

779

minating DACA will disrupt these companies with DACA employees that are forced to terminate qualified and talented employees.

b. In Hawaii, businesses rely heavily on immigrants who bring their talent, knowledge, and expertise to Hawaii's labor force.  *See* Ex. 124 ¶ 4 (Decl. Salaveria).   Because of Hawaii's low unemployment rate, the state's businesses have had difficulty filling their vacant positions.  *Id.* ¶ 8. The departure of the DACA population from Hawaii's workforce will cause even greater difficulty for Hawaii employers, and have a negative impact on Hawaii's economy.  *Id.* ¶ 11.   Agriculture and forestry are two of Virginia's largest private industries.   The Virginia Department of Agriculture and Consumer Services estimates that approximately 1,944 of Virginia's DACA grantees employed in primary agricultural production.  *See* Ex. 129 ¶ 3 (Decl. Gooden, Virginia Sec'y of Agriculture and Forestry).   Further, a percentage of DACA recipients are also likely to be regulated pesticide applicators.   The loss of DACA status for these individuals would harm agricultural production and reduce income to Virginia from pesticide applicator licensing fees.  *See id.* ¶ 7.

c. In Washington, DACA grantees work for the largest companies as software engineers, finance professionals, and retail and sales associates, including for Amazon, Microsoft and Starbucks. *See* Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90 ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks).

AR3073

780

    d. In New York, businesses depend on the work of DACA grantees. *See* Ex. 170 ¶¶ 3, 7-8, 10 (Decl. Schwartz, Univision); Ex. 169 ¶ 7 (Decl. Greenberg, Warby Parker); Ex. 172 ¶¶ 4-5 (Decl. Morales); Ex. 174 ¶¶ 4-8 (Decl. Wylde, Partnership for NYC). DACA recipients are the consumer base for many New York businesses. Ex. 170 ¶¶ 5-6 (Decl. Schwartz, Univision); Ex. 169 ¶¶ 6-7 (Decl. Greenberg, Warby Parker). DACA grantees also provide diverse perspectives, and promote inclusiveness. Ex. 170 ¶¶ 3-9 (Decl. Schwartz, Univision); Ex. 169 ¶¶ 8-11 (Decl. Greenberg, Warby Parker); Ex. 174 ¶¶ 5,8 (Decl. Wylde, Partnership for NYC); ; Ex. 81 ¶¶ 2-8 (Decl. Pinsky, ABNY).

228. The impact on small businesses and nonprofit organizations will be especially stark. For entities with limited staff and operating budgets, losing even one skilled and trained DACA grantee employee will place an economic strain on operations, hiring, and training. *See, e.g*, Ex. 118 ¶¶ 9-11 (Decl. Igneri); Ex. 117 ¶¶ 5-8 (Decl. Tracy); Ex. 120 ¶ 4 (Decl. Romero); Ex. 119 ¶¶ 5-6 (Decl. Tingen). Further, many DACA grantees contribute their talents to nonprofits in a range of fields, including education and civic engagement. *See, e.g*, Ex. 55 ¶¶ 8-9 (Decl. Perez); Ex 98 ¶ 12 (Decl. 98 Naveed).

229. The mission of nonprofit organizations in the States will also be adversely affected. Ex. 174 ¶¶ 3-8 (Decl. Wylde, Partnership for NYC). Many nonprofit organizations in the States serve immigrant communities, including by providing legal services and advocacy. Termination of DACA will throw families into crisis, creating higher demand for services from or-

781

ganizations with limited resources. *See* Ex. 117 ¶¶ 12-14 (Decl. Tracy, Brazilian Worker Center); Ex. 115 ¶¶ 2-7 (Decl. Tack-Hooper, Am. Civil Liberties Union of Delaware); Ex. 116 ¶¶ 2-8 (Decl. Graham).

### *Harm to Families.*

230. The States have an interest in protecting the welfare of all of their residents, including the families of DACA grantees.

231. Terminating DACA will harm the general welfare of the States' DACA grantees and their families in profound ways. Most DACA grantees live in households with family members who are American citizens. One expert survey estimates that 73% percent of DACA grantees in the country live with a citizen sibling, spouse, or child. *See* Ex. 5 ¶ 34 (Decl. Wong). Terminating DACA will lead to increased uncertainty in these mixed-status families, and it will increase the likelihood of splitting DACA grantees from their citizen family members. *See e.g.*, Ex. 176 ¶ 12 (Decl. Kennedy, City of Newburgh). Moreover, many of these families rely on the income of a DACA grantee, and DACA termination will threaten their financial and housing security. *See, e.g.*, Ex. 87 ¶ 8 (Decl. Rubin); Ex. 135 ¶ 8 (Decl. Rakes); Ex. 157 ¶¶ 12-13 (Decl. Ridder); Ex. 172 ¶¶ 4-5, 7-8 (Decl. Morales); Ex. 173 ¶¶ 3, 5-6 (Decl. Hidalgo Hernandez).

232. Many DACA grantees also have families overseas, including parents and siblings. DACA had made it possible for these grantees to visit family members, often for the first time in years. *See, e.g.*, Ex. 72 ¶ 7 (Decl. Teodoro); Ex. 70 ¶ 5 (Decl. I.V.). Terminating DACA will cause DACA grantees to lose touch with these family members and become further estranged from their countries of origin, making the prospect of

782

deportation even more injurious to DACA grantees and their families.

### FIRST CAUSE OF ACTION

#### (Fifth Amendment - Equal Protection)

233. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

234. The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

235. The DHS Memorandum target individuals for discriminatory treatment, without lawful justification.

236. The DHS Memorandum was motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group.

237. The discriminatory terms and application of the DHS Memorandum cannot be sufficiently justified by federal interests, under any standard of review.

238. Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

239. Defendants' violation causes ongoing harm to the States and their residents.

### SECOND CAUSE OF ACTION

#### (Fifth Amendment - Due Process - Information Use)

240. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

**AR3076**

783

241. The Due Process Clause of the Fifth Amendment requires that actions taken by the federal government be fundamentally fair.

242. Given the federal government's prior representations about the allowable uses of information provided by DACA applicants, the change to DHS's policy of protecting against the disclosure of information in DACA applications and renewal requests is fundamentally unfair.

243. Also given the federal government's prior representations about the allowable uses of information provided by DACA applicants, the new policy's refusal to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement—including identifying, apprehending, detaining, or deporting non-citizens—is fundamentally unfair.

244. Through their actions above, Defendants have violated the due process guarantee of the Fifth Amendment.

245. Defendants' violation causes ongoing harm to the States and their residents.

### THIRD CAUSE OF ACTION

#### (Equitable Estoppel)

246. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

247. The doctrine of equitable estoppel prevents injustice where the government has made representations on which individuals have reasonably and detrimentally relied.

**AR3077**

784

248. In order to encourage DACA applications, Defendants made repeated, affirmative statements about the protections that would be given to the personal information provided by DACA applicants. Defendants also placed affirmative restrictions on the use of such information for purposes of immigration enforcement.

249. In submitting DACA applications and renewal requests, DACA applicants reasonably and detrimentally relied on Defendants' affirmative representations and conduct.

250. Defendants should be equitably estopped from revoking DHS's longstanding, affirmative policy of protecting against the disclosure of information in DACA applications and renewal requests.

251. Equitable estoppel should also bar Defendants from implementing DHS's new policy of refusing to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement, including to identify, apprehend, detain, or deport non-citizens.

252. Failure to estop Defendants from revoking DHS's previous policy and imposing the new policy will harm the States and their residents.

## FOURTH CAUSE OF ACTION

**(Administrative Procedure Act - Substantively Arbitrary and Capricious, Abuse of Discretion, Contrary to Constitution or Statute)**

253. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

**AR3078**

785

254. The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute. In implementing the DHS Memorandum and terminating DACA with minimal formal guidance, federal agencies have taken unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

255. In promulgating and implementing the DHS Memorandum, federal agencies have abused their discretion, and acted arbitrarily and capriciously and otherwise not in accordance with law, in violation of the APA.

256. Defendants' violation causes ongoing harm to the States and their residents.

## FIFTH CAUSE OF ACTION

**(Administrative Procedure Act - Procedurally Arbitrary and Capricious, Notice and Comment)**

257. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

258. The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

259. DHS is an "agency" under the APA.   5 U.S.C. § 551(1).

260. The actions that DHS has taken to implement the DHS Memorandum are "rules" under the APA. 5 U.S.C. § 551(4).

AR3079

786

261. In promulgating and implementing the DHS Memorandum, federal agencies have categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States.   Federal agencies did not follow the procedures required by the APA before taking action impacting these substantive rights.

262. With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking.   5 U.S.C. § 553.

263. The Defendants promulgated and relied upon the rules established by the DHS Memorandum without authority and without notice-and-comment rulemaking in violation of the APA.

264. The States will be impacted because they have not had the opportunity to comment on the termination of DACA.

265. Defendants' violation causes ongoing harm to the States and their residents.

### SIXTH CAUSE OF ACTION

**(Regulatory Flexibility Act - Failure to Issue Regulatory Flexibility Analyses)**

266. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

267. The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment.   5 U.S.C. §§ 603-604.

**AR3080**

268. "Small entities" for purposes of the RFA includes small businesses, small nonprofits, and small governmental jurisdictions. 5 U.S.C. § 601(6).

269. The promulgation and implementation of the DHS Memorandum established "rules" under the RFA. 5 U.S.C. § 601(2).

270. Implementation of the DHS Memorandum is likely to have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 602(a)(1).

271. Defendants have not issued the required analyses of DHS's new rules.

272. Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

273. Defendants' violation causes ongoing harm to the States, their small governmental jurisdictions, nonprofits, and businesses, and their residents.

## SEVENTH CAUSE OF ACTION

### (Fifth Amendment-Procedural Due Process)

274. The Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

275. The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests or property interests without due process of law.

276. Defendants have failed to provide DACA grantees with the due process to which they are entitled, by failing to provide them with adequate notice about the procedures and timeline for renewing their DACA status.

788

277. Defendants have failed to provide DACA grantees with the due process to which they are entitled, by failing to give them adequate notice about the general termination of the DACA program after March 5, 2018 and by failing to provide DACA grantees adequate notice of their inability to apply for renewal of their DACA status after March 5, 2018.

278. Defendants are thus depriving Plaintiff States' residents of their liberty and property interests in living and working in the United States without providing them adequate notice or opportunity to be heard.

279. Defendants' conduct violates the Due Process Clause of the Fifth Amendment.

280. Defendants' violations cause ongoing harm to the States and their residents.

## **PRAYER FOR RELIEF**

281. Wherefore, the States pray that the Court:

    a. Declare that the DHS Memorandum terminating the DACA program is unauthorized by and contrary to the Constitution and laws of the United States;

    b. Declare that the actions that DHS has taken to implement the DHS Memorandum terminating the DACA program are procedurally unlawful under the APA;

    c. Declare that the actions that DHS has taken to implement the DHS Memorandum terminating the DACA program are substantively unlawful under the APA;

    d. Declare that the actions that DHS has taken to implement the DHS Memoran-

789

dum terminating the DACA program are unlawful under the RFA;

e. Enjoin Defendants from terminating the DACA program, including enjoining the Defendants from limiting rights to submit applications to renew DACA benefits, pending further orders from this Court;

f. Enjoin Defendants from revoking the DHS policy protecting DACA application and renewal data from disclosure to ICE, CBP, or any other agency for purposes of immigration enforcement;

g. Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA applicant or member of any DACA applicant's family, or take any action against a DACA applicant's current or former employer; and

h. Award such additional relief as the interests of justice may require.

DATED:   Oct. 4, 2017

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York

By:   /s/   LOURDES M. ROSADO
        LOURDES M. ROSADO, Bureau Chief
        Sania Khan, Assistant Attorney General
        Diane Lucas, Assistant Attorney General
        Ajay Saini, Assistant Attorney General
        Civil Rights Bureau
        Office of the New York State Attorney General
        120 Broadway, 23rd Floor

790

New York, NY 10271
Lourdes.Rosado@ag.ny.gov
Sania.Khan@ag.ny.gov
Diane.Lucas@ag.ny.gov
Ajay.Saini@ag.ny.gov
Tel. (212) 416-6348
Fax (212) 416-8074

**MAURA HEALEY**
Attorney General for the Commonwealth of Massachusetts

By:   /s/   ABIGAIL B. TAYLOR
        ABIGAIL B. TAYLOR
        Jonathan B. Miller
        Genevieve C. Nadeau (*pro hac vice*)
        Abigail B. Taylor (*pro hac vice*)
        Assistant Attorneys General
        Office of the Attorney General
        One Ashburton Place
        Boston, MA 02108
        Jonathan.Miller@state.ma.us
        Genevieve.Nadeau@state.ma.us
        Abigail.Taylor@state.ma.us
        Tel. (617) 727-2200

**BOB FERGUSON**
Attorney General of the State of Washington

By:   /s/   ROBERT W FERGUSON
        ROBERT W. FERGUSON (*pro hac vice*)
        Attorney General
        Colleen M. Melody (*pro hac vice*)
        Civil Rights Unit Chief
        Marsha Chien (*pro hac vice*)
        Assistant Attorney General
        Office of the Attorney General

**AR3084**

791

800 Fifth Avenue, Suite 2000
Seattle, WA 98104
ColleenM1@atg.wa.gov
MarshaC@atg.wa.gov
Tel. (206) 464-7744

**GEORGE JEPSEN**
Attorney General of the State of Connecticut

By:   /s/   <u>MARK K. KOHLER</u>
          Mark F. Kohler (*pro hac vice*)
          Assistant Attorney General
          Connecticut Office of the Attorney General
          55 Elm Street, P.O. Box 120
          Hartford, CT 06106
          Mark.Kohler@ct.gov
          Tel. (860) 808-5020

**KARL A. RACINE**
Attorney General for the District of Columbia

By:   /s/   <u>ROBYN R. BENDER</u>
          Robyn R. Bender*
          Deputy Attorney General
          Public Advocacy Division
          441 4th Street, NW
          Suite 650 North
          Washington, DC 20001
          Robyn.Bender@dc.gov
          Tel. (202) 724-6610
          Fax (202) 730-0650

**AR3085**

792

**DOUGLAS S. CHIN**
Attorney General of the State of Hawaii

By:   /s/   DONNA H. KALAMA
            DONNA H. KALAMA (*pro hac vice*)
            Deputy Attorney General
            State of Hawaii, Department of the Attorney
               General
            425 Queen Street
            Honolulu, HI 96813
            Donna.H.Kalama@hawaii.gov
            Tel. (808) 586-1224

**LISA MADIGAN**
Attorney General of the State of Illinois

By:   /s/   ANNA P. CRANE
            ANNA P. CRANE, Assistant Attorney
               General (*pro hac vice*)
            Karyn L. Bass Ehler,
            Chief, Civil Rights Bureau
            Harpreet Khera, Deputy Bureau Chief,
            Special Litigation Bureau
            Caitlyn McEllis, Assistant Attorney General
            Jeff VanDam, Assistant Attorney General
            Civil Rights Bureau
            Office of the Illinois Attorney General
            100 W. Randolph Street
            Chicago, IL 60601
            Anna.Crane@atg.state.il.us
            Tel. (312) 814-3400
            Fax (312) 814-3212

**AR3086**

793

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By:   /s/   NATHAN BLAKE
      NATHAN BLAKE (*pro hac vice*)
      Deputy Attorney General
      Office of the Attorney General of Iowa
      1305 E. Walnut Street
      Des Moines, IA 50319
      Nathan.Blake@iowa.gov
      Tel. (515) 281-4325
      Fax (515) 281-4209

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By:   /s/   TANIA MAESTAS
      TANIA MAESTAS, (*pro hac vice*)
      Deputy Attorney General
      Ari Biernoff, Assistant Attorney General
      Jennie Lusk, Assistant Attorney General
      New Mexico Office of the Attorney General
      408 Galisteo St.
      Santa Fe, NM 87501
      ABiernoff@nmag.gov
      Tel. (505) 490-4060
      Fax (505) 490-4883

794

**MATTHEW DENN**
Attorney General of the State of Delaware

By:   /s/   AARON GOLDSTEIN
           AARON GOLDSTEIN[*]
           State Solicitor
           Aleine Cohen[*]
           Deputy Attorney General
           Delaware Department of Justice
           820 N. French St.
           Wilmington, DE 19801
           Aaron.Goldstein@state.de.us
           Aleine.Cohen@state.de.us
           Tel. (302) 577-8400

**PETER KILMARTIN**
Attorney General of the State of Rhode Island

By:   /s/   REBECCA T. PARTINGTON
           REBECCA T. PARTINGTON (*pro hac vice*)
           Chief, Civil Division
           Michael W. Field (*pro hac vice*)
           Assistant Atorney General
           Adam D. Roch (*pro hac vice*)
           Special Assistant Attorney General
           RI Office of the Attorney General
           150 South Main Street
           Providence, RI 02903
           RPartington@riag.ri.gov
           MField@riag.ri.gov
           ARoach@riag.ri.gov
           Tel. (401) 274-4400

795

**JOSH STEIN**
Attorney General of the State of North Carolina

By:   /s/   SRIPRIYA NARASIMHAN
                SRIPRIYA NARASIMHAN[*]
                North Carolina Department of Justice
                114 W. Edenton Street
                Raleigh, NC 27603
                SNarasimhan@ncdoj.gov
                Te. (919) 716-6400

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By:   /s/   BRIAN DE HAAN
                BRIAN DE HANN[*]
                Assistant Attorney General
                Trial Attorney
                Brian.A.DeHaan@doj.state.or.us
                Tel. (971) 673-1880
                Fax (971) 673-5000

**JOSH SHAPIRO**
Attorney General of the Commonwealth of Pennsylvania

By:   /s/   JONATHAN SCOTT GOLDMAN
                JONATHAN SCOTT GOLDMAN[*]
                Executive Deputy Attorney General,
                Civil Law Division
                Michael J. Fischer, (*pro hac vice*)
                Chief Deputy Attorney General, Impact
                Litigation Section
                Office of Attorney General
                16th Floor, Strawbery Square
                Harrisburg, PA 17120
                MFischer@attorneygeneral.gov
                Tel. (717) 787-3391

**AR3089**

796

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

By: /s/ <u>BENJAMIN D. BATTLES</u>
   BENJAMIN D. BATTLES, (*pro hac vice*)
   Solicitor General
   Julio A. Thompson*, Assistant Attorney
   General, Civil Rights Unit
   Office of the Vermont Attorney General
   109 State Street
   Montpelier, VT 05609
   Benjamin. Battles@vermont.gov
   Tel. (802) 828-5500
   Fax (802) 828-3187

**MARK R. HERRING**
Attorney General of the Commonwealth of Virginia

By: /s/ <u>MATTHEW R. MCGUIRE</u>
   MATTHEW R. MCGUIRE (*pro hac vice*)
   Acting Deputy Solicitor General
   202 North Ninth Street
   Richmond, VA 23219
   MMcguire@oag.state.va.us
   Tel. (804) 786-7773

**JOHN W. HICKENLOOPER**
Governor of the State of Colorado

By: /s/ <u>JACKI COOPER MELMED</u>
   JACKI COOPER MELMED
   Special Assistant Attorney General*
   Chief Legal Counsel
   136 State Capitol Building
   Denver, Colorado 80203
   Jackic.Melmed@state.co.us
   Tel. (303) 866-3788
   (* Limited Appointment)

**AR3090**

797

**The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others**

The Department of Homeland Security's proposed policy to prioritize the removal of certain aliens unlawfully present in the United States would be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of U.S. citizens and legal permanent residents would also be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of recipients o deferred action under the Deferred Action for Childhood Arrivals program would not be a permissible exercise of DHS' s enforcement discretion.

Nov. 19, 2014

MEMORANDUM OPINION FOR THE SECRETARY
OF HOMELAND SECURITY AND THE COUNSEL
TO THE PRESIDENT

You have asked two questions concerning the scope of the Department of Homeland Security's discretion to enforce the immigration laws.  First, you have asked whether, in light of the limited resources available to the Department ("DHS") to remove aliens unlawfully present in the United States, it would be legally permissible for the Department to implement a policy prioritizing the removal of certain categories of aliens over others.  DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than

AR3091

798

400,000 such aliens each year. DHS's proposed policy would prioritize the removal of aliens who present threats to national security, public safety, or border security. Under the proposed policy, DHS officials could remove an alien who did not fall into one of these categories provided that an Immigration and Customs Enforcement ("ICE") Field Office Director determined that "removing such an alien would serve an important federal interest." Draft Memorandum for Thomas S. Winkowski, Acting Director, ICE, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* at 5 (Nov. 17, 2014) ("Johnson Prioritization Memorandum").

Second, you have asked whether it would be permissible for DHS to extend deferred action, a form of temporary administrative relief from removal, to certain aliens who are the parents of children who are present in the United States. Specifically, DHS has proposed to implement a program under which an alien could apply for, and would be eligible to receive, deferred action if he or she is not a DHS removal priority under the policy described above; has continuously resided in the United States since before January 1, 2010; has a child who is either a U.S. citizen or a lawful permanent resident; is physically present in the United States both when DHS announces its program and at the time of application for deferred action; and presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Draft Memorandum for Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United*

**AR3092**

799

*States as Children and Others* at 4 (Nov. 17, 2014) ("Johnson Deferred Action Memorandum"). You have also asked whether DHS could implement a similar program for parents of individuals who have received deferred action under the Deferred Action for Childhood Arrivals ("DACA") program.

As has historically been true of deferred action, these proposed deferred action programs would not "legalize" any aliens who are unlawfully present in the United States: Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time. *See generally Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483-84 (1999) (describing deferred action). Under decades-old regulations promulgated pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ l 103(a)(3), 1324a(h)(3), aliens who are granted deferred action— like certain other categories of aliens who do not have lawful immigration status, such as asylum applicants —may apply for authorization to work in the United States in certain circumstances, 8 C.F.R. § 274a.12(c)(14) (providing that deferred action recipients may apply for work authorization if they can show an "economic necessity for employment"); *see also* 8 C.F.R. § 109.1(b)(7) (1982). Under DHS policy guidance, a grant of deferred action also suspends an alien's accrual of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I), provisions that restrict the admission of aliens who have departed the United States after having been unlawfully present for specified periods of time. A grant of deferred action under the proposed programs would remain in effect for three years,

**AR3093**

800

subject to renewal, and could be terminated at any time at DHS's discretion. *See* Johnson Deferred Action Memorandum at 2, 5.

For the reasons discussed below, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be permissible exercises of DHS's discretion to enforce the immigration laws. We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion.

## I.

We first address DHS's authority to prioritize the removal of certain categories of aliens over others. We begin by discussing some of the sources and limits of DHS's enforcement discretion under the immigration laws, and then analyze DHS's proposed prioritization policy in light of these considerations.

## A.

DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, Congress established a comprehensive scheme governing immigration and naturalization. The INA specifies certain categories of aliens who are inadmissible to the United States. *See* 8 U.S.C. § 1182. It also specifies "which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Id.*

801

(citing 8 U.S.C. § 1227); *see* 8 U.S.C. § 1227(a) (providing that "[a]ny alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien" falls within one or more classes of deportable aliens); *see also* 8 U.S.C. § 1182(a) (listing classes of aliens ineligible to receive visas or be admitted to the United States).   Removal proceedings ordinarily take place in federal immigration courts administered by the Executive Office for Immigration Review, a component of the Department of Justice.  *See id.* § 1229a (governing removal proceedings); *see also id.* §§ 1225(b)(1)(A), 1228(b) (setting out expedited removal procedures for certain arriving aliens and certain aliens convicted of aggravated felonies).

Before 2003, the Department of Justice, through the Immigration and Naturalization Service ("INS"), was also responsible for providing immigration-related administrative services and generally enforcing the immigration laws.   In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress transferred most of these functions to DHS, giving it primary responsibility both for initiating removal proceedings and for carrying out final orders of removal. *See* 6 U.S.C. §§ 101 *et seq.*; *see also Clark v. Martinez,* 543 U.S. 371, 374 n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS "now reside" in the Secretary of Homeland Security and DHS).   The Act divided INS's functions among three different agencies within DHS: U.S. Citizenship and Immigration Services ("USCIS"), which oversees legal immigration into the United States and provides immigration and naturalization services to aliens; ICE, which enforces federal laws governing customs, trade, and immigration; and U.S.

**AR3095**

802

Customs and Border Protection ("CBP"), which monitors and secures the nation's borders and ports of entry.  *See* Pub. L. No. 107-296, §§ 403, 442, 451, 471, 116 Stat. 2135, 2178, 2193, 2195, 2205; *see also Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services,* 69 Fed. Reg. 60938, 60938 (Oct. 13, 2004); *Name Change of Two DHS Components,* 75 Fed. Reg. 12445, 12445 (Mar. 16, 2010).   The Secretary of Homeland Security is thus now "charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens."  8 U.S.C. § 1103(a)(1).

As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action.   This discretion is rooted in the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and it reflects a recognition that the "faithful[]" execution of the law does not necessarily entail "act[ing] against each technical violation of the statute" that an agency is charged with enforcing.   *Heckler v. Chaney,* 470 U.S. 821, 831 (1985).   Rather, as the Supreme Court explained in *Chaney,* the decision whether to initiate enforcement proceedings is a complex judgment that calls on the agency to "balanc[e]  . . .  a number of factors which are peculiarly within its expertise."  *Id.*   These factors include "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and  . . .  whether the agency has enough resources to undertake the action at all."  *Id.* at 831; *cf*

803

*United States v. Armstrong,* 517 U.S. 456, 465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "'[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan'" (quoting *Wayte v. United States,* 470 U.S. 598, 607 (1985))).   In *Chaney,* the Court considered and rejected a challenge to the Food and Drug Administration's refusal to initiate enforcement proceedings with respect to alleged violations of the Federal Food, Drug, and Cosmetic Act, concluding that an agency's decision not to initiate enforcement proceedings is presumptively immune from judicial review.   *See* 470 U.S. at 832.   The Court explained that, while Congress may "provide[] guidelines for the agency to follow in exercising its enforcement powers," in the absence of such "legislative direction," an agency's non-enforcement determination is, much like a prosecutor's decision not to indict, a "special province of the Executive."   *Id.* at 832-33.

The principles of enforcement discretion discussed in *Chaney* apply with particular force in the context of immigration.   Congress enacted the INA against a background understanding that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program."   *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 543 (1950) (internal quotation marks omitted).   Consistent with this understanding, the INA vested the Attorney General (now the Secretary of Homeland Security) with broad authority to "establish such regulations;  .  .  .  issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under

**AR3097**

804

the statute.  8 U.S.C. § 1103(a)(3).  Years later, when Congress created the Department of Homeland Security, it expressly charged DHS with responsibility for "[e]stablishing national immigration enforcement policies and priorities."  Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA *Arizona*, 132 S. Ct. at 2499.  The INA expressly authorizes immigration officials to grant certain forms of discretionary relief from removal for aliens, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b.  But in addition to administering these statutory forms of relief, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499.  And, as the Court has explained, "[a]t each stage" of the removal process —"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—immigration officials have "discretion to abandon the endeavor." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483 (quoting 8 U.S.C. § 1252(g) (alterations in original)). Deciding whether to pursue removal at each of these stages implicates a wide range of considerations.  As the Court observed in *Arizona*:

Discretion in the enforcement of immigration law embraces immediate human concerns.  Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime.  The

**AR3098**

805

equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service.   Some discretionary decisions involve policy choices that bear on this Nation's international relations.  . . .   The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return.   The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

132 S. Ct. at 2499.

Immigration officials' discretion in enforcing the laws is not, however, unlimited.   Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches.   *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587-88 (1952).   These limits, however, are not clearly defined.   The open-ended nature of the inquiry under the Take Care Clause—whether a particular exercise of discretion is "faithful[]" to the law enacted by Congress—does not lend itself easily to the application of set formulas or bright-line rules.   And because the exercise of enforcement discretion generally is not subject to judicial review, *see Chaney,* 470 U.S. at 831-33, neither the Supreme Court nor the lower federal courts have squarely addressed its constitutional bounds. Rather, the political branches have addressed the proper allocation of enforcement authority through the political process.   As the Court noted in *Chaney,* Con-

806

gress "may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. The history of immigration policy illustrates this principle: Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons. When Congress has been dissatisfied with Executive action, it has responded, as *Chaney* suggests, by enacting legislation to limit the Executive's discretion in enforcing the immigration laws.[1]

Nonetheless, the nature of the Take Care duty does point to at least four general (and closely related) principles governing the permissible scope of enforcement discretion that we believe are particularly relevant here. First, enforcement decisions should reflect "factors which are peculiarly within [the enforcing agency's] expertise." *Chaney,* 470 U.S. at 831. Those factors may include considerations related to agency resources, such as "whether the agency has enough resources to undertake the action," or "whether agency resources are best spent on this violation or another." *Id.* Other relevant considerations may include "the proper ordering of [the agency's] priorities," *id.* at 832, and the agency's assessment of "whether the particular en-

---

[1] *See, e.g.,* Adam B. Cox & Cristina M. Rodriguez, *The President and Immigration Law,* 119 Yale L.J. 458, 503-05 (2009) (describing Congress's response to its dissatisfaction with the Executive's use of parole power for refugee populations in the 1960s and 1970s); *see also, e.g., infra* note 5 (discussing legislative limitations on voluntary departure and extended voluntary departure).

AR3100

807

forcement action [at issue] best fits the agency's overall policies," *id.* at 831.

Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences.  *See id.* at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers").   In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering.  *Cf. Youngstown,* 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983))).

Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney,* "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities."   470 U.S. at 833 n.4 (quoting *Adams v. Richardson,* 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'").

808

Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws.  *But see, e.g., Presidential Authority to Decline to Execute Unconstitutional Statutes,* 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

Finally, lower courts, following *Chaney,* have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis.  *See, e.g., Kenney v. Glickman,* 96 F.3d 1118, 1123 (8th Cir. 1996); *Crowley Caribbean Transp., Inc. v. Peña,* 37 F.3d 671, 676-77 (D.C. Cir. 1994).  That reading of *Chaney* reflects a conclusion that case-by-case enforcement decisions generally avoid the concerns mentioned above.  Courts have noted that "single-shot non-enforcement decisions" almost inevitably rest on "the sort of mingled assessments of fact, policy, and law  . . .  that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion."  *Crowley Caribbean Transp.,* 37 F.3d at 676-77 (emphasis omitted).  Individual enforcement decisions made on the basis of case-specific factors are also unlikely to constitute "general polic[ies] that [are] so extreme as to amount to an abdication of [the agency's] statutory responsibilities."  *Id.* at 677 (quoting *Chaney,* 477 U.S. at 833 n.4).  That does not mean that all "general policies" respecting non-enforcement are categorically forbidden:  Some "general policies" may, for example, merely provide a framework for making individualized, discretionary assessments about whether to initiate en-

forcement actions in particular cases. *Cf. Reno v. Flores,* 507 U.S. 292, 313 (1993) (explaining that an agency's use of "reasonable presumptions and generic rules" is not incompatible with a requirement to make individualized determinations). But a general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses "special risks" that the agency has exceeded the bounds of its enforcement discretion. *Crowley Caribbean Transp.,* 37 F.3d at 677.

## B.

We now turn, against this backdrop, to DHS's proposed prioritization policy. In their exercise of enforcement discretion, DHS and its predecessor, INS, have long employed guidance instructing immigration officers to prioritize the enforcement of the immigration laws against certain categories of aliens and to deprioritize their enforcement against others. *See, e.g.,* INS Operating Instructions § 103(a)(l)(i) (1962); Memorandum for All Field Office Directors, ICE, et al., from John Morton, Director, ICE, *Re: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011); Memorandum for All ICE Employees, from John Morton, Director, ICE, *Re: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); Memorandum for Regional Directors, INS, et al., from Doris Meissner, Commissioner, INS, *Re: Exercising Prosecutorial Discretion* (Nov. 17, 2000). The policy DHS proposes, which is similar to but would supersede earlier policy guidance, is designed to "provide clearer and more effective guidance in the pursuit" of DHS's enforcement priorities; namely, "threats to national

810

security, public safety and border security."   Johnson Prioritization Memorandum at 1.

Under the proposed policy, DHS would identify three categories of undocumented aliens who would be priorities for removal from the United States.   *See generally id.* at 3-5.   The highest priority category would include aliens who pose particularly serious threats to national security, border security, or public safety, including aliens engaged in or suspected of espionage or terrorism, aliens convicted of offenses related to participation in criminal street gangs, aliens convicted of certain felony offenses, and aliens apprehended at the border while attempting to enter the United States unlawfully.   *See id.* at 3.   The second-highest priority would include aliens convicted of multiple or significant misdemeanor offenses; aliens who are apprehended after unlawfully entering the United States who cannot establish that they have been continuously present in the United States since January 1, 2014; and aliens determined to have significantly abused the visa or visa waiver programs.   *See id.* at 3-4.   The third priority category would include other aliens who have been issued a final order of removal on or after January 1, 2014.   *See id.* at 4.   The policy would also provide that none of these aliens should be prioritized for removal if they "qualify for asylum or another form of relief under our laws."   *Id.* at 3-5.

The policy would instruct that resources should be directed to these priority categories in a manner "commensurate with the level of prioritization identified."   *Id.* at 5.   It would, however, also leave significant room for immigration officials to evaluate the circumstances of individual cases.   *See id.* (stating that the policy "requires DHS personnel to exercise discretion based

811

on individual circumstances").   For example, the policy would permit an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations to deprioritize the removal of an alien falling in the highest priority category if, in her judgment, "there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority."   *Id.* at 3.   Similar discretionary provisions would apply to aliens in the second and third priority categories.[2]   The policy would also provide a non-exhaustive list of factors DHS personnel should consider in making such deprioritization judgments.[3]   In addition, the policy would expressly state that its terms should not be construed "to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities," and would further provide that

---

[2] Under the proposed policy, aliens in the second tier could be deprioritized if, "in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority."   Johnson Prioritization Memorandum at 4.   Aliens in the third tier could be deprioritized if, "in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority."   *Id.* at 5.

[3] These factors include "extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child or a seriously ill relative."   Johnson Prioritization Memorandum at 6.

812

"[i]mmigration officers and attorneys may pursue removal of an alien not identified as a priority" if, "in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id.* at 5.

DHS has explained that the proposed policy is designed to respond to the practical reality that the number of aliens who are removable under the INA vastly exceeds the resources Congress has made available to DHS for processing and carrying out removals. The resource constraints are striking. As noted, DHS has informed us that there are approximately 11.3 million undocumented aliens in the country, but that Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country. *See* E-mail for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Shahoulian, Deputy General Counsel, DHS, *Re: Immigration Opinion* (Nov. 19, 2014) ("Shahoulian E-mail"). The proposed policy explains that, because DHS "cannot respond to all immigration violations or remove all persons illegally in the United States," it seeks to "prioritize the use of enforcement personnel, detention space, and removal assets" to "ensure that use of its limited resources is devoted to the pursuit of' DHS's highest priorities. Johnson Prioritization Memorandum at 2.

In our view, DHS's proposed prioritization policy falls within the scope of its lawful discretion to enforce the immigration laws. To begin with, the policy is based on a factor clearly "within [DHS's] expertise." *Chaney,* 470 U.S. at 831. Faced with sharply limited

813

resources, DHS necessarily must make choices about which removals to pursue and which removals to defer. DHS's organic statute itself recognizes this inevitable fact, instructing the Secretary to establish "national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).   And an agency's need to ensure that scarce enforcement resources are used in an effective manner is a quintessential basis for the use of prosecutorial discretion.   *See Chaney,* 470 U.S. at 831 (among the factors "peculiarly within [an agency's] expertise" are "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all").

The policy DHS has proposed, moreover, is consistent with the removal priorities established by Congress.   In appropriating funds for DHS's enforcement activities—which, as noted, are sufficient to permit the removal of only a fraction of the undocumented aliens currently in the country—Congress has directed DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Security Appropriations Act, 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251 ("DHS Appropriations Act").   Consistent with this directive, the proposed policy prioritizes individuals convicted of criminal offenses involving active participation in a criminal street gang, most offenses classified as felonies in the convicting jurisdiction, offenses classified as "aggravated felonies" under the INA, and certain misdemeanor offenses.   Johnson Prioritization Memorandum at 3-4.   The policy ranks these priority categories according to the severity of the crime of conviction.   The policy also prioritizes the removal of other categories of aliens who pose threats to national secu-

814

rity or border security, matters about which Congress has demonstrated particular concern. *See, e.g.,* 8 U.S.C. § 1226(c)(l)(D) (providing for detention of aliens charged with removability on national security grounds); *id.* § 1225(b) & (c) (providing for an expedited removal process for certain aliens apprehended at the border). The policy thus raises no concern that DHS has relied "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders,* 551 U.S. at 658.

Further, although the proposed policy is not a "single-shot non-enforcement decision," neither does it amount to an abdication of DHS's statutory responsibilities, or constitute a legislative rule overriding the commands of the substantive statute. *Crowley Caribbean Transp.,* 37 F.3d at 676-77. The proposed policy provides a general framework for exercising enforcement discretion in individual cases, rather than establishing an absolute, inflexible policy of not enforcing the immigration laws in certain categories of cases. Given that the resources Congress has allocated to DHS are sufficient to remove only a small fraction of the total population of undocumented aliens in the United States, setting forth written guidance about how resources should presumptively be allocated in particular cases is a reasonable means of ensuring that DHS's severely limited resources are systematically directed to its highest priorities across a large and diverse agency, as well as ensuring consistency in the administration of the removal system. The proposed policy's identification of categories of aliens who constitute removal priorities is also consistent with the categorical nature of Congress's instruction to prioritize the removal of criminal aliens in the DHS Appropriations Act.

815

And, significantly, the proposed policy does not identify any category of removable aliens whose removal may not be pursued under any circumstances. Although the proposed policy limits the discretion of immigration officials to expend resources to remove non-priority aliens, it does not eliminate that discretion entirely. It directs immigration officials to use their resources to remove aliens in a manner "commensurate with the level of prioritization identified," but (as noted above) it does not "prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." Johnson Prioritization Memorandum at 5. Instead, it authorizes the removal of even non-priority aliens if, in the judgment of an ICE Field Office Director, "removing such an alien would serve an important federal interest," a standard the policy leaves open-ended. *Id.* Accordingly, the policy provides for case-by-case determinations about whether an individual alien's circumstances warrant the expenditure of removal resources, employing a broad standard that leaves ample room for the exercise of individualized discretion by responsible officials. For these reasons, the proposed policy avoids the difficulties that might be raised by a more inflexible prioritization policy and dispels any concern that DHS has either undertaken to rewrite the immigration laws or abdicated its statutory responsibilities with respect to non-priority aliens.[4]

---

[4] In *Crane v. Napolitano*, a district court recently concluded in a non-precedential opinion that the INA "mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not 'clearly and beyond a doubt entitled to be admitted.'" Opinion and Order Respecting Pl. App. for Prelim. Inj. Relief, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23) (quoting 8 U.S.C. § 1225(b)(2)(A)). The court later dis-

816

## II.

We turn next to the permissibility of DHS's proposed deferred action programs for certain aliens who are parents of U.S. citizens, lawful permanent residents ("LPRs"), or DACA recipients, and who are not removal priorities under the proposed policy discussed above. We begin by discussing the history and current practice of deferred action. We then discuss the legal authorities on which deferred action relies and identify legal principles against which the proposed use of deferred action can be evaluated. Finally, we turn to an analysis of the proposed deferred action programs themselves, beginning with the program for parents of U.S. citizens and LPRs, and concluding with the program for parents of DACA recipients.

### A.

In immigration law, the term "deferred action" refers to an exercise of administrative discretion in which

---

missed the case for lack of jurisdiction. *See Crane v. Napolitano,* No. 3:12-cv-03247-O, 2013 WL 8211660, at *4 (N.D. Tex. July 31). Although the opinion lacks precedential value, we have nevertheless considered whether, as it suggests, the text of the INA categorically forecloses the exercise of enforcement discretion with respect to aliens who have not been formally admitted. The district court's conclusion is, in our view, inconsistent with the Supreme Court's reading of the INA as permitting immigration officials to exercise enforcement discretion at any stage of the removal process, including when deciding whether to initiate removal proceedings against a particular alien. *See Arizona,* 132 S. Ct. at 2499; *Am.-Arab Anti-Discrim. Comm.,* 525 U.S. at 483-84. It is also difficult to square with authority holding that the presence of mandatory language in a statute, standing alone, does not necessarily limit the Executive Branch's enforcement discretion, *see, e.g., Chaney,* 470 U.S. at 835; *Inmates of Attica Corr. Facility v. Rockefeller,* 477 F.2d 375, 381 (2d Cir. 1973).

817

immigration officials temporarily defer the removal of an alien unlawfully present in the United States. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)); *see* USCIS, *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ("USCIS SOP"); INS Operating Instructions § 103.1(a)(1)(ii) (1977).   It is one of a number of forms of discretionary relief—in addition to such statutory and non-statutory measures as parole, temporary protected status, deferred enforced departure, and extended voluntary departure—that immigration officials have used over the years to temporarily prevent the removal of undocumented aliens.[5]

---

[5] Parole is available to aliens by statute "for urgent humanitarian reasons or significant public benefit."   8 U.S.C. § 1182(d)(5)(A). Among other things, parole gives aliens the ability to adjust their status without leaving the United States if they are otherwise eligible for adjustment of status, *see id.* § 1255(a), and may eventually qualify them for Federal means-tested benefits, *see id.* §§ 1613, 1641(b)(4).   Temporary protected status is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions.   *Id.* § 1254a. Deferred enforced departure, which "has no statutory basis" but rather is an exercise of "the President's constitutional powers to conduct foreign relations," may be granted to nationals of appropriate foreign states.   USCIS, Adjudicator's Field Manual § 38.2(a) (2014).   Extended voluntary departure was a remedy derived from the voluntary departure statute, which, before its amendment in 1996, permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure.   *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days).   Some commentators, however, suggested that extended voluntary depar-

818

The practice of granting deferred action dates back several decades.   For many years after the INA was enacted, INS exercised prosecutorial discretion to grant "non-priority" status to removable aliens who presented "appealing humanitarian factors."   Letter for Leon Wildes, from E. A. Loughran, Associate Commissioner, INS at 2 (July 16, 1973) (defining a "non-priority case" as "one in which the Service in the exercise of discretion determines that adverse action would be unconscionable because of appealing humanitarian factors"); *see* INS Operating Instructions § 103.l(a)(l)(ii) (1962). This form of administrative discretion was later termed "deferred action."   *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484; *see* INS Operating Instructions § 103.1(a)(l)(ii) (1977) (instructing immigration officers to recommend deferred action whenever "adverse ac-

---

ture was in fact a form of "discretionary relief formulated administratively under the Attorney General's general authority for enforcing immigration law."   Sharon Stephan, Cong. Research Serv., 85-599 EPW, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation* at 1 (Feb. 23, 1985).   It appears that extended voluntary departure is no longer used following enactment of the Immigration Act of 1990, which established the temporary protected status program.   *See U.S. Citizenship and Immigration Services Fee Schedule,* 75 Fed. Reg. 33446, 33457 (June 11, 2010) (proposed rule) (noting that "since 1990 neither the Attorney General nor the Secretary have designated a class of aliens for nationality-based 'extended voluntary departure,' and there no longer are aliens in the United States benefiting from such a designation," but noting that deferred enforced departure is still used); H.R. Rep. No. 102-123, at 2 (1991) (indicating that in establishing temporary protected status, Congress was "codif[ying] and supersed[ing]" extended voluntary departure).   *See generally* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum,* Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children at 5-10 (July 13, 2012) ("CRS Immigration Report").

819

tion would be unconscionable because of the existence of appealing humanitarian factors").

Although the practice of granting deferred action "developed without express statutory authorization," it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (internal quotation marks omitted); *see id.* at 485 (noting that a congressional enactment limiting judicial review of decisions "to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]" in 8 U.S.C. § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations"); *see also, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"). Deferred action "does not confer any immigration status"—i.e., it does not establish any enforceable legal right to remain in the United States—and it may be revoked by immigration authorities at their discretion. USCIS SOP at 3, 7. Assuming it is not revoked, however, it represents DHS's decision not to seek the alien's removal for a specified period of time.

Under longstanding regulations and policy guidance promulgated pursuant to statutory authority in the INA, deferred action recipients may receive two additional benefits. First, relying on DHS's statutory authority to authorize certain aliens to work in the United States, DHS regulations permit recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work

**AR3113**

820

in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]").   Second, DHS has promulgated regulations and issued policy guidance providing that aliens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I).   8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re:   Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42 (May 6, 2009) ("USCIS Consolidation of Guidance") (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (providing that an alien is "unlawfully present" if, among other things, he "is present in the United States after the expiration of the period of stay authorized by the Attorney General").[6]

Immigration officials today continue to grant deferred action in individual cases for humanitarian and other purposes, a practice we will refer to as "ad hoc deferred action."   Recent USCIS guidance provides that personnel may recommend ad hoc deferred action

---

[6]  Section 1182(a)(9)(B)(i) imposes three- and ten-year bars on the admission of aliens (other than aliens admitted to permanent residence) who departed or were removed from the United States after periods of unlawful presence of between 180 days and one year, or one year or more.   Section 1182(a)(9)(C)(i)(I) imposes an indefinite bar on the admission of any alien who, without being admitted, enters or attempts to reenter the United States after previously having been unlawfully present in the United States for an aggregate period of more than one year.

821

if they "encounter cases during [their] normal course of business that they feel warrant deferred action." USCIS SOP at 4.   An alien may also apply for ad hoc deferred action by submitting a signed, written request to USCIS containing "[a]n explanation as to why he or she is seeking deferred action" along with supporting documentation, proof of identity, and other records. *Id.* at 3.

For decades, INS and later DHS have also implemented broader programs that make discretionary relief from removal available for particular classes of aliens.   In many instances, these agencies have made such broad-based relief available through the use of parole, temporary protected status, deferred enforced departure, or extended voluntary departure.   For example, from 1956 to 1972, INS implemented an extended voluntary departure program for physically present aliens who were beneficiaries of approved visa petitions—known as "Third Preference" visa petitions—relating to a specific class of visas for Eastern Hemisphere natives.   *See United States ex rel. Parco v. Morris,* 426 F. Supp. 976, 979-80 (E.D. Pa. 1977). Similarly, for several years beginning in 1978, INS granted extended voluntary departure to nurses who were eligible for H-1 visas.   *Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses,* 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978).   In addition, in more than two dozen instances dating to 1956, INS and later DHS granted parole, temporary protected status, deferred enforced departure, or extended voluntary departure to large numbers of nationals of designated foreign states.   *See, e.g.,* CRS Immigration Report at 20-23; Cong. Research Serv., ED206779, *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12-14 (1980).   And in 1990, INS implemented a "Family Fair-

822

ness" program that authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ("IRCA"). *See* Memorandum for Regional Commissioners, INS, from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) ("Family Fairness Memorandum"); *see also* CRS Immigration Report at 10.

On at least five occasions since the late 1990s, INS and later DHS have also made discretionary relief available to certain classes of aliens through the use of deferred action:

*1. Deferred Action for Battered Aliens Under the Violence Against Women Act.* INS established a class-based deferred action program in 1997 for the benefit of self-petitioners under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902. VAWA authorized certain aliens who have been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf. *Id.* § 4070l(a) (codified as amended at 8 U.S.C. § 1154(a)(1)(A)(iii)-(iv), (vii)). The INS program required immigration officers who approved a VAWA self-petition to assess, "on a case-by-case basis, whether to place the alien in deferred action status" while the alien waited for a visa to become available. Memorandum for Regional Directors et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guid-*

**AR3116**

823

ance on Battered Alien Self-Petitioning Process and Related Issues at 3 (May 6, 1997). INS noted that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action." *Id.* But because "[i]n an unusual case, there may be factors present that would militate against deferred action," the agency instructed officers that requests for deferred action should still "receive individual scrutiny." *Id.* In 2000, INS reported to Congress that, because of this program, no approved VAWA self-petitioner had been removed from the country. *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary,* 106th Cong. at 43 (July 20, 2000) ("H.R. 3083 Hearings").

2. *Deferred Action for T and U Visa Applicants.* Several years later, INS instituted a similar deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464. That Act created two new nonimmigrant classifications: a "T visa" available to victims of human trafficking and their family members, and a "U visa" for victims of certain other crimes and their family members. *Id.* §§ 107(e), 1513(b)(3) (codified at 8 U.S.C. § 1101(a)(15)(T)(i), (U)(i)). In 2001, INS issued a memorandum directing immigration officers to locate "possible victims in the above categories," and to use "[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal" to prevent those victims' removal "until they have had the opportunity to avail themselves of the provisions of the VTVP A." Memorandum for Michael A. Pearson, Executive Associate Commission-

824

er, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001). In subsequent memoranda, INS instructed officers to make "deferred action assessment[s]" for "all [T visa] applicants whose applications have been determined to be bona fide," Memorandum for Johnny N. Williams, Executive Associate Commissioner, INS, from Stuart Anderson, Executive Associate Commissioner, INS, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002), as well as for all U visa applicants "determined to have submitted *prima facie* evidence of [their] eligibility," Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* at 5 (Oct. 8, 2003). In 2002 and 2007, INS and DHS promulgated regulations embodying these policies. *See* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (promulgated by *New Classification For Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status,* 67 Fed. Reg. 4784, 4800-01 (Jan. 31, 2002)) (providing that any T visa applicant who presents *"prima facie* evidence" of his eligibility should have his removal "automatically stay[ed]" and that applicants placed on a waiting list for visas "shall maintain [their] current means to prevent removal (deferred action, parole, or stay of removal)"); *id.* § 214.14(d)(2) (promulgated by *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status,* 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007)) ("USCIS will grant deferred action or parole to U-1 petitioners and qualifying fami-

825

ly members while the U-1 petitioners are on the waiting list" for visas.).

3. *Deferred Action for Foreign Students Affected by Hurricane Katrina.* As a consequence of the devastation caused by Hurricane Katrina in 2005, several thousand foreign students became temporarily unable to satisfy the requirements for maintaining their lawful status as F-1 nonimmigrant students, which include "pursuit of a 'full course of study.'" USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005) (quoting 8 C.F.R. § 214.2(f)(6)), *available at* http//www.uscis.gov/ sites/default/files/USCIS/Humanitarian/Special%20 Situations/Previous%20Special%20Situations%20By% 20Topic/faq-interim-student-relief-hurricane-katrina.pdf (last visited Nov. 19, 2014). DHS announced that it would grant deferred action to these students "based on the fact that [their] failure to maintain status is directly due to Hurricane Katrina." *Id.* at 7. To apply for deferred action under this program, students were required to send a letter substantiating their need for deferred action, along with an application for work authorization. Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* at 1-2 (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/ files/files/pressrelease/F1Student_11_25_05_PR.pdf (last visited Nov. 19, 2014). USCIS explained that such requests for deferred action would be "decided on a case-by-case basis" and that it could not "provide any assurance that all such requests will be granted." *Id.* at 1.

4. *Deferred Action for Widows and Widowers of U.S. Citizens.* In 2009, DHS implemented a deferred

826

action program for certain widows and widowers of U.S. citizens.    USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated a visa petition on the spouse's behalf.    Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009). "In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens," USCIS issued guidance permitting covered surviving spouses and "their qualifying children who are residing in the United States" to apply for deferred action.    *Id.* at 2, 6.    USCIS clarified that such relief would not be automatic, but rather would be unavailable in the presence of, for example, "serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons."    *Id.* at 6.[7]

---

[7] Several months after the deferred action program was announced, Congress eliminated the requirement that an alien be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain his or her eligibility for lawful immigration status.    Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009). Concluding that this legislation rendered its surviving spouse guidance "obsolete," USCIS withdrew its earlier guidance and treated all pending applications for deferred action as visa petitions.    *See* Memorandum for Executive Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, et al., *Re: Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

827

5.   *Deferred Action for Childhood Arrivals.*   Announced by DHS in 2012, DACA makes deferred action available to "certain young people who were brought to this country as children" and therefore "[a]s a general matter . . . lacked the intent to violate the law." Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re:   Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("Napolitano Memorandum").   An alien is eligible for DACA if she was under the age of 31 when the program began; arrived in the United States before the age of 16; continuously resided in the United States for at least 5 years immediately preceding June 15, 2012; was physically present on June 15, 2012; satisfies certain educational or military service requirements; and neither has a serious criminal history nor "poses a threat to national security or public safety."   *See id.* DHS evaluates applicants' eligibility for DACA on a case-by-case basis.   *See id.* at 2; USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit:   Resources for Community Partners* at 11 ("DACA Toolkit").   Successful DACA applicants receive deferred action for a period of two years, subject to renewal.   *See* DACA Toolkit at 11.   DHS has stated that grants of deferred action under DACA may be terminated at any time, *id.* at 16, and "confer[] no substantive right, immigration status or pathway to citizenship," Napolitano Memorandum at 3.[8]

---

[8] Before DACA was announced, our Office was consulted about whether such a program would be legally permissible.   As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis.   We noted

828

Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice.[9] On the contrary, it has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly direc-

---

that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

[9] Congress has considered legislation that would limit the practice of granting deferred action, but it has never enacted such a measure. In 2011, a bill was introduced in both the House and the Senate that would have temporarily suspended DHS's authority to grant deferred action except in narrow circumstances. *See* H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011). Neither chamber, however, voted on the bill. This year, the House passed a bill that purported to bar any funding for DACA or other class-wide deferred action programs, H.R. 5272, 113th Cong. (2014), but the Senate has not considered the legislation. Because the Supreme Court has instructed that unenacted legislation is an unreliable indicator of legislative intent, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969), we do not draw any inference regarding congressional policy from these unenacted bills.

829

ted that deferred action be extended to certain categories of aliens. For example, as Congress was considering VAWA reauthorization legislation in 2000, INS officials testified before Congress about their deferred action program for VAWA self-petitioners, explaining that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," such that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." H.R. 3083 Hearings at 43. Congress responded by not only acknowledging but also expanding the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be "eligible for deferred action and work authorization." Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(l)(D)(i)(II), (IV)).[10]

Congress demonstrated a similar awareness of INS's (and later DHS's) deferred action program for bona fide T and U visa applicants. As discussed above, that program made deferred action available to nearly all individuals who could make a prima facie showing of

_____

[10] Five years later, in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960, Congress specified that, "[u]pon the approval of a petition as a VAWA self-petitioner, the alien . . . is eligible for work authorization." *Id.* § 814(b) (codified at 8 U.S.C. § 1154(a)(1)(K)). One of the Act's sponsors explained that while this provision was intended to "give[] DHS statutory authority to grant work authorization . . . without having to rely upon deferred action . . . [t]he current practice of granting deferred action to approved VAWA self-petitioners should continue." 151 Cong. Rec. 29334 (2005) (statement of Rep. Conyers).

830

eligibility for a T or U visa.   In 2008 legislation, Congress authorized DHS to "grant  . . .  an administrative stay of a final order of removal" to any such individual.   William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)).   Congress further clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for  . . .  deferred action."  *Id.*   It also directed DHS to compile a report detailing, among other things, how long DHS's "specially trained [VAWA] Unit at the [USCIS] Vermont Service Center" took to adjudicate victim-based immigration applications for "deferred action," along with "steps taken to improve in this area."  *Id.* § 238.   Representative Berman, the bill's sponsor, explained that the Vermont Service Center should "strive to issue work authorization and deferred action" to "[i]mmigrant victims of domestic violence, sexual assault and other violence crimes  . . .  in most instances within 60 days of filing."   154 Cong. Rec. 24603 (2008).

In addition, in other enactments, Congress has specified that certain classes of individuals should be made "eligible for deferred action."   These classes include certain immediate family members of LPRs who were killed on September 11, 2001, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain immediate family members of certain U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694.   In the same legislation, Congress made these individuals eligible to obtain lawful status as "family-sponsored immigrant[s]" or "immediate relative[s]" of U.S. citizens.   Pub. L. No.

831

107-56, § 423(b), 115 Stat. 272, 361; Pub. L. No. 108-136, § 1703(c)(1)(A), 117 Stat. 1392, 1694; *see generally Sci-alabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2197 (2014) (plurality opinion) (explaining which aliens typically qualify as family-sponsored immigrants or immediate relatives).

Finally, Congress acknowledged the practice of granting deferred action in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (codified at 49 U.S.C. § 30301 note), which makes a state-issued driver's license or identification card acceptable for federal purposes only if the state verifies, among other things, that the card's recipient has "[e]vidence of [l]awful [s]tatus." Congress specified that, for this purpose, acceptable evidence of lawful status includes proof of, among other things, citizenship, lawful permanent or temporary residence, or "approved deferred action status." *Id.* § 202(c)(2)(B)(viii).

## B.

The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed. It is one of several mechanisms by which immigration officials, against a backdrop of limited enforcement resources, exercise their "broad discretion" to administer the removal system—and, more specifically, their discretion to determine whether "it makes sense to pursue removal" in particular circumstances. *Arizona*, 132 S. Ct. at 2499.

Deferred action, however, differs in at least three respects from more familiar and widespread exercises of enforcement discretion. First, unlike (for example)

832

the paradigmatic exercise of prosecutorial discretion in a criminal case, the conferral of deferred action does not represent a decision not to prosecute an individual for past unlawful conduct; it instead represents a decision to openly tolerate an undocumented alien's continued presence in the United States for a fixed period (subject to revocation at the agency's discretion). Second, unlike most exercises of enforcement discretion, deferred action carries with it benefits in addition to non-enforcement itself; specifically, the ability to seek employment authorization and suspension of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). Third, class-based deferred action programs, like those for VAWA recipients and victims of Hurricane Katrina, do not merely enable individual immigration officials to select deserving beneficiaries from among those aliens who have been identified or apprehended for possible removal—as is the case with ad hoc deferred action—but rather set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status.

While these features of deferred action are somewhat unusual among exercises of enforcement discretion, the differences between deferred action and other exercises of enforcement discretion are less significant than they might initially appear. The first feature—the toleration of an alien's continued unlawful presence—is an inevitable element of almost any exercise of discretion in immigration enforcement. Any decision not to remove an unlawfully present alien—even through an exercise of routine enforcement discretion—necessarily carries with it a tacit acknowledgment that the alien will continue to be present in the United States without legal status. Deferred action arguably goes beyond

833

such tacit acknowledgment by expressly communicating to the alien that his or her unlawful presence will be tolerated for a prescribed period of time. This difference is not, in our view, insignificant. But neither does it fundamentally transform deferred action into something other than an exercise of enforcement discretion: As we have previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residence or citizenship, and is revocable at any time in the agency's discretion.

With respect to the second feature, the additional benefits deferred action confers—the ability to apply for work authorization and the tolling of unlawful presence—do not depend on background principles of agency discretion under DHS's general immigration authorities or the Take Care Clause at all, but rather depend on independent and more specific statutory authority rooted in the text of the INA. The first of those authorities, DHS's power to prescribe which aliens are authorized to work in the United States, is grounded in 8 U.S.C. § 1324a(h)(3), which defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]." This statutory provision has long been understood to recognize the authority of the Secretary (and the Attorney General before him) to grant work authorization to particular classes of aliens. *See* 8 C.F.R. § 274a.12; *see also Perales v. Casillas,* 903 F.2d 1043, 1048-50 (5th Cir. 1990) (describing the authority recognized by section 1324a(h)(3) as "permis-

834

sive" and largely "unfettered").[11]   Although the INA requires the Secretary to grant work authorization to

---

[11] Section 1324a(h)(3) was enacted in 1986 as part of IRCA.   Before then, the INA contained no provisions comprehensively addressing the employment of aliens or expressly delegating the authority to regulate the employment of aliens to a responsible federal agency.   INS assumed the authority to prescribe the classes of aliens authorized to work in the United States under its general responsibility to administer the immigration laws.   In 1981, INS promulgated regulations codifying its existing procedures and criteria for granting employment authorization.   *See Employment Authorization to Aliens in the United States,* 46 Fed. Reg. 25079, 25080-81 (May 5, 1981) (citing 8 U.S.C. § 1103(a)).   Those regulations permitted certain categories of aliens who lacked lawful immigration status, including deferred action recipients, to apply for work authorization under certain circumstances.   8 C.F.R. § 109.1(b)(7) (1982).   In IRCA, Congress introduced a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 147 (2002), to be enforced primarily through criminal and civil penalties on employers who knowingly employ an "unauthorized alien."   As relevant here, Congress defined an "unauthorized alien" barred from employment in the United States as an alien who "is not  . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General."*   8 U.S.C. § 1324a(h)(3) (emphasis added).   Shortly after IRCA was enacted, INS denied a petition to rescind its employment authorization regulation, rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act."   *Employment Authorization; Classes of Aliens Eligible,* 52 Fed. Reg. 46092, 46093 (Dec. 4, 1987).   Because the same statutory phrase refers both to aliens authorized to be employed by the INA and aliens authorized to be employed by the Attorney General, INS concluded that the only way to give effect to both references is to conclude "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien'

835

particular classes of aliens, *see, e.g.,* 8 U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's authority to grant work authorization to other classes of aliens. Further, and notably, additional provisions of the INA expressly contemplate that the Secretary may grant work authorization to aliens lacking lawful immigration status —even those who are in active removal proceedings or, in certain circumstances, those who have already received final orders of removal. *See id.* § 1226(a)(3) (permitting the Secretary to grant work authorization to an otherwise work-eligible alien who has been arrested and detained pending a decision whether to remove the alien from the United States); *id.* § 1231(a)(7) (permitting the Secretary under certain narrow circumstances to grant work authorization to aliens who have received final orders of removal). Consistent with these provisions, the Secretary has long permitted certain additional classes of aliens who lack lawful immigration status to apply for work authorization, including deferred action recipients who can demonstrate an economic necessity for employment. *See* 8 C.F.R. § 274a.12(c)(14); *see also id.* § 274a.12(c)(8) (applicants for asylum), (c)(10) (applicants for cancellation of removal); *supra* note 11 (discussing 1981 regulations).

The Secretary's authority to suspend the accrual of unlawful presence of deferred action recipients is simi-

---

in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute." *Id.; see Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

836

larly grounded in the INA.  The relevant statutory provision treats an alien as "unlawfully present" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I) if he "is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii).  That language contemplates that the Attorney General (and now the Secretary) may authorize an alien to stay in the United States without accruing unlawful presence under section 1182(a)(9)(B)(i) or section 1182(a)(9)(C)(i).  And DHS regulations and policy guidance interpret a "period of stay authorized by the Attorney General" to include periods during which an alien has been granted deferred action.  *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); USCIS Consolidation of Guidance at 42.

The final unusual feature of deferred action programs is particular to class-based programs.  The breadth of such programs, in combination with the first two features of deferred action, may raise particular concerns about whether immigration officials have undertaken to substantively change the statutory removal system rather than simply adapting its application to individual circumstances.  But the salient feature of class-based programs—the establishment of an affirmative application process with threshold eligibility criteria—does not in and of itself cross the line between executing the law and rewriting it.  Although every class-wide deferred action program that has been implemented to date has established certain threshold eligibility criteria, each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria.  *See supra* pp. 15-18.  Like the establishment of enforcement priorities discussed in Part I, the establishment of thres-

837

hold eligibility criteria can serve to avoid arbitrary enforcement decisions by individual officers, thereby furthering the goal of ensuring consistency across a large agency. The guarantee of individualized, case-by-case review helps avoid potential concerns that, in establishing such eligibility criteria, the Executive is attempting to rewrite the law by defining new categories of aliens who are automatically entitled to particular immigration relief. *See Crowley Caribbean Transp.*, 37 F.3d at 676-77; *see also Chaney*, 470 U.S. at 833 n.4. Furthermore, while permitting potentially eligible individuals to apply for an exercise of enforcement discretion is not especially common, many law enforcement agencies have developed programs that invite violators of the law to identify themselves to the authorities in exchange for leniency.[12] Much as is the case with those programs, inviting eligible aliens to identify themselves through an application process may serve the agency's law enforcement interests by encouraging lower-

---

[12] For example, since 1978, the Department of Justice's Antitrust Division has implemented a "leniency program" under which a corporation that reveals an antitrust conspiracy in which it participated may receive a conditional promise that it will not be prosecuted. *See* Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008), available at* http://www.justice.gov/atr/public/criminal/239583.pdf (last visited Nov. 19, 2014); *see also* Internal Revenue Manual § 9.5.11.9(2) (Revised IRS Voluntary Disclosure Practice), *available at* http://www.irs.gov/uac/Revised-IRS-Voluntary-Disclosure-Practice (last visited Nov. 19, 2014) (explaining that a taxpayer's voluntary disclosure of misreported tax information "may result in prosecution not being recommended"); U.S. Marshals Service, *Fugitive Safe Surrender FAQs, available at* http://www.usmarshals.gov/safesurrender/faqs.html (last visited Nov. 19, 2014) (stating that fugitives who surrender at designated sites and times under the "Fugitive Safe Surrender" program are likely to receive "favorable consideration").

838

priority individuals to identify themselves to the agency. In so doing, the process may enable the agency to better focus its scarce resources on higher enforcement priorities.

Apart from the considerations just discussed, perhaps the clearest indication that these features of deferred action programs are not per se impermissible is the fact that Congress, aware of these features, has repeatedly enacted legislation appearing to endorse such programs. As discussed above, Congress has not only directed that certain classes of aliens be made eligible for deferred action programs—and in at least one instance, in the case of VAWA beneficiaries, directed the expansion of an existing program—but also ranked evidence of approved deferred action status as evidence of "lawful status" for purposes of the REAL ID Act. These enactments strongly suggest that when DHS in the past has decided to grant deferred action to an individual or class of individuals, it has been acting in a manner consistent with congressional policy "'rather than embarking on a frolic of its own.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139 (1985) (quoting *Red Lion Broad Co. v. FCC*, 395 U.S. 367, 375 (1969)); *cf. id.* at 137-39 (concluding that Congress acquiesced in an agency's assertion of regulatory authority by "refus[ing] . . . to overrule" the agency's view after it was specifically "brought to Congress'[s] attention," and further finding implicit congressional approval in legislation that appeared to acknowledge the regulatory authority in question); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (finding that Congress "implicitly approved the practice of claim settlement by executive agreement" by enacting the International Claims Settlement Act of 1949, which "cre-

839

ate[d] a procedure to implement" those very agreements).

Congress's apparent endorsement of certain deferred action programs does not mean, of course, that a deferred action program can be lawfully extended to any group of aliens, no matter its characteristics or its scope, and no matter the circumstances in which the program is implemented.  Because deferred action, like the prioritization policy discussed above, is an exercise of enforcement discretion rooted in the Secretary's broad authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed, it is subject to the same four general principles previously discussed.  *See supra* pp. 6-7.  Thus, any expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects considerations within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute. *See supra* pp. 6-7 (citing *Youngstown*, 343 U.S. at 637, and *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). Immigration officials cannot abdicate their statutory responsibilities under the guise of exercising enforcement discretion.  *See supra* p. 7 (citing *Chaney*, 470 U.S. at 833 n.4).  And any new deferred action program should leave room for individualized evaluation of whether a particular case warrants the expenditure of resources for enforcement.  *See supra* p. 7 (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37 F.3d at 676-77).

Furthermore, because deferred action programs depart in certain respects from more familiar and wide-

**AR3133**

840

spread exercises of enforcement discretion, particularly careful examination is needed to ensure that any proposed expansion of deferred action complies with these general principles, so that the proposed program does not, in effect, cross the line between executing the law and rewriting it.   In analyzing whether the proposed programs cross this line, we will draw substantial guidance from Congress's history of legislation concerning deferred action.   In the absence of express statutory guidance, the nature of deferred action programs Congress has implicitly approved by statute helps to shed light on Congress's own understandings about the permissible uses of deferred action.   Those understandings, in turn, help to inform our consideration of whether the proposed deferred action programs are "faithful[]" to the statutory scheme Congress has enacted.   U.S. Const. art. II, § 3.

## C.

We now turn to the specifics of DHS's proposed deferred action programs.   DHS has proposed implementing a policy under which an alien could apply for, and would be eligible to receive, deferred action if he or she:   (1) is not an enforcement priority under DHS policy; (2) has continuously resided in the United States since before January 1, 2010; (3) is physically present in the United States both when DHS announces its program and at the time of application for deferred action; (4) has a child who is a U.S. citizen or LPR; and (5) presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate."   Johnson Deferred Action Memorandum at 4.   You have also asked about the permissibility of a similar program that would be open to parents of children who have received deferred ac-

841

tion under the DACA program. We first address DHS's proposal to implement a deferred action program for the parents of U.S. citizens and LPRs, and then turn to the permissibility of the program for parents of DACA recipients in the next section.

**1.**

We begin by considering whether the proposed program for the parents of U.S. citizens and LPRs reflects considerations within the agency's expertise. DHS has offered two justifications for the proposed program for the parents of U.S. citizens and LPRs. First, as noted above, severe resource constraints make it inevitable that DHS will not remove the vast majority of aliens who are unlawfully present in the United States. Consistent with Congress's instruction, DHS prioritizes the removal of individuals who have significant criminal records, as well as others who present dangers to national security, public safety, or border security. *See supra* p. 10. Parents with longstanding ties to the country and who have no significant criminal records or other risk factors rank among the agency's lowest enforcement priorities; absent significant increases in funding, the likelihood that any individual in that category will be determined to warrant the expenditure of severely limited enforcement resources is very low. Second, DHS has explained that the program would serve an important humanitarian interest in keeping parents together with children who are lawfully present in the United States, in situations where such parents have demonstrated significant ties to community and family in this country. *See* Shahoulian E-mail.

With respect to DHS's first justification, the need to efficiently allocate scarce enforcement resources is a

842

quintessential basis for an agency's exercise of enforcement discretion. *See Chaney*, 470 U.S. at 831. Because, as discussed earlier, Congress has appropriated only a small fraction of the funds needed for full enforcement, DHS can remove no more than a small fraction of the individuals who are removable under the immigration laws. *See supra* p. 9. The agency must therefore make choices about which violations of the immigration laws it will prioritize and pursue. And as *Chaney* makes clear, such choices are entrusted largely to the Executive's discretion. 470 U.S. at 831.

The deferred action program DHS proposes would not, of course, be costless. Processing applications for deferred action and its renewal requires manpower and resources. *See Arizona*, 132 S. Ct. at 2521 (Scalia, J., concurring in part and dissenting in part). But DHS has informed us that the costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees. *See* Shahoulian E-mail; *see also* 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH). DHS has indicated that the costs of administering the deferred action program would therefore not detract in any significant way from the resources available to ICE and CBP—the enforcement arms of DHS—which rely on money appropriated by Congress to fund their operations. *See* Shahoulian E-mail. DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify nonpriority aliens and focus their resources on pursuing aliens who are strong candidates for removal. *See id.* The proposed program, in short, might help DHS ad-

843

dress its severe resource limitations, and at the very least likely would not exacerbate them.   *See id.*

DHS does not, however, attempt to justify the proposed program solely as a cost-saving measure, or suggest that its lack of resources alone is sufficient to justify creating a deferred action program for the proposed class.   Rather, as noted above, DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity by enabling those parents of U.S. citizens and LPRs who are not otherwise enforcement priorities and who have demonstrated community and family ties in the United States (as evidenced by the length of time they have remained in the country) to remain united with their children in the United States.   Like determining how best to respond to resource constraints, determining how to address such "human concerns" in the immigration context is a consideration that is generally understood to fall within DHS's expertise.   *Arizona*, 132 S. Ct. at 2499.

This second justification for the program also appears consonant with congressional policy embodied in the INA.   Numerous provisions of the statute reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States.   *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 85-1199, at 7 (1957)). The INA provides a path to lawful status for the parents, as well as other immediate relatives, of U.S. citi-

844

zens:   U.S. citizens aged twenty-one or over may petition for parents to obtain visas that would permit them to enter and permanently reside in the United States, and there is no limit on the overall number of such petitions that may be granted.   *See* 8 U.S.C. § 1151(b)(2)(A)(i); *see also Cuellar de Osorio*, 134 S. Ct. at 2197-99 (describing the process for obtaining a family-based immigrant visa).   And although the INA contains no parallel provision permitting LPRs to petition on behalf of their parents, it does provide a path for LPRs to become citizens, at which point they too can petition to obtain visas for their parents.   *See, e.g.,* 8 U.S.C. § 1427(a) (providing that aliens are generally eligible to become naturalized citizens after five years of lawful permanent residence); *id.* § 1430(a) (alien spouses of U.S. citizens become eligible after three years of lawful permanent residence); *Demore v. Kim*, 538 U.S. 510, 544 (2003).[13]   Additionally, the INA empowers the At-

---

[13] The INA does permit LPRs to petition on behalf of their spouses and children even before they have attained citizenship.   *See* 8 U.S.C. § 1153(a)(2).   However, the exclusion of LPRs' parents from this provision does not appear to reflect a congressional judgment that, until they attain citizenship, LPRs lack an interest in being united with their parents comparable to their interest in being united with their other immediate relatives.   The distinction between parents and other relatives originated with a 1924 statute that exempted the wives and minor children of U.S. citizens from immigration quotas, gave "preference status"—eligibility for a specially designated pool of immigrant visas—to other relatives of U.S. citizens, and gave no favorable treatment to the relatives of LPRs.   Immigration Act of 1924, Pub. L. No. 68-139, §§ 4(a), 6, 43 Stat. 153, 155-56.   In 1928, Congress extended preference status to LPRs' wives and minor children, reasoning that because such relatives would be eligible for visas without regard to any quota when their LPR relatives became citizens, granting preference status to LPRs' wives and minor children would "hasten[]" the "family reunion."   S. Rep. No. 70-245, at 2 (1928); *see* Act of May 29, 1928, ch. 914, 45

845

torney General to cancel the removal of, and adjust to lawful permanent resident status, aliens who have been physically present in the United States for a continuous period of not less than ten years, exhibit good moral character, have not been convicted of specified offenses, and have immediate relatives who are U.S. citizens or LPRs and who would suffer exceptional hardship from the alien's removal.   8 U.S.C. § 1229b(b)(1). DHS's proposal to focus on the parents of U.S. citizens and LPRs thus tracks a congressional concern, expressed in the INA, with uniting the immediate families of individuals who have permanent legal ties to the United States.

At the same time, because the temporary relief DHS's proposed program would confer to such parents is sharply limited in comparison to the benefits Congress has made available through statute, DHS's proposed program would not operate to circumvent the limits Congress has placed on the availability of those benefits.   The statutory provisions discussed above offer the parents of U.S. citizens and LPRs the prospect of permanent lawful status in the United States.   The cancellation of removal provision, moreover, offers the prospect of receiving such status immediately, without the delays generally associated with the family-based

---

Stat. 1009, 1009-10.   The special visa status for wives and children of LPRs thus mirrored, and was designed to complement, the special visa status given to wives and minor children of U.S. citizens. In 1965, Congress eliminated the basis on which the distinction had rested by exempting all "immediate relatives" of U.S. citizens, including parents, from numerical restrictions on immigration.   Pub. L. No. 89-236, § 1, 79 Stat. 911, 911.   But it did not amend eligibility for preference status for relatives of LPRs to reflect that change. We have not been able to discern any rationale for this omission in the legislative history or statutory text of the 1965 law.

846

immigrant visa process.   DHS's proposed program, in contrast, would not grant the parents of U.S. citizens and LPRs any lawful immigration status, provide a path to permanent residence or citizenship, or otherwise confer any legally enforceable entitlement to remain in the United States.   *See* USCIS SOP at 3. It is true that, as we have discussed, a grant of deferred action would confer eligibility to apply for and obtain work authorization, pursuant to the Secretary's statutory authority to grant such authorization and the longstanding regulations promulgated thereunder. *See supra* pp. 13, 21-22.   But unlike the automatic employment eligibility that accompanies LPR status, *see* 8 U.S.C. § 1324a(h)(3), this authorization could be granted only on a showing of economic necessity, and would last only for the limited duration of the deferred action grant, *see* 8 C.F.R. § 274a.12(c)(14).

The other salient features of the proposal are similarly consonant with congressional policy.   The proposed program would focus on parents who are not enforcement priorities under the prioritization policy discussed above—a policy that, as explained earlier, comports with the removal priorities set by Congress. *See supra* p. 10.   The continuous residence requirement is likewise consistent with legislative judgments that extended periods of continuous residence are indicative of strong family and community ties.   *See* IRCA, Pub. L. No. 99-603, § 201(a), 100 Stat. 3359, 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a)(2)) (granting lawful status to certain aliens unlawfully present in the United States since January 1, 1982); *id.* § 302(a) (codified as amended at 8 U.S.C. § 1160) (granting similar relief to certain agricultural workers); H.R. Rep. No. 99-682, pt. 1, at 49 (1986) (stating that aliens present in the United States for five years

847

"have become a part of their communities[,] . . . have strong family ties here which include U.S. citizens and lawful residents[,] . . . have built social networks in this country[, and] . . . have contributed to the United States in myriad ways"); S. Rep. No. 99-132, at 16 (1985) (deporting aliens who "have become well settled in this country" would be a "wasteful use of the Immigration and Naturalization Service's limited enforcement resources"); *see also Arizona*, 132 S. Ct. at 2499 (noting that "[t]he equities of an individual case" turn on factors "including whether the alien has . . . long ties to the community").

We also do not believe DHS's proposed program amounts to an abdication of its statutory responsibilities, or a legislative rule overriding the commands of the statute. As discussed earlier, DHS's severe resource constraints mean that, unless circumstances change, it could not as a practical matter remove the vast majority of removable aliens present in the United States. The fact that the proposed program would defer the removal of a subset of these removable aliens— a subset that ranks near the bottom of the list of the agency's removal priorities—thus does not, by itself, demonstrate that the program amounts to an abdication of DHS's responsibilities. And the case-by-case discretion given to immigration officials under DHS's proposed program alleviates potential concerns that DHS has abdicated its statutory enforcement responsibilities with respect to, or created a categorical, rule-like entitlement to immigration relief for, the particular class of aliens eligible for the program. An alien who meets all the criteria for deferred action under the program would receive deferred action only if he or she "present[ed] no other factors that, in the exercise of discretion," would "make[] the grant of deferred action

848

inappropriate."   Johnson Deferred Action Memorandum at 4.   The proposed policy does not specify what would count as such a factor; it thus leaves the relevant USCIS official with substantial discretion to determine whether a grant of deferred action is warranted.   In other words, even if an alien is not a removal priority under the proposed policy discussed in Part I, has continuously resided in the United States since before January 1, 2010, is physically present in the country, and is a parent of an LPR or a U.S. citizen, the USCIS official evaluating the alien's deferred action application must still make a judgment, in the exercise of her discretion, about whether that alien presents any other factor that would make a grant of deferred action inappropriate.   This feature of the proposed program ensures that it does not create a categorical entitlement to deferred action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

Finally, the proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action.   As noted above, the program uses deferred action as an interim measure for a group of aliens to whom Congress has given a prospective entitlement to lawful immigration status.   While Congress has provided a path to lawful status for the parents of U.S. citizens and LPRs, the process of obtaining that status "takes time."   *Cuellar de Osorio*, 134 S. Ct. at 2199.   The proposed program would pro-

849

vide a mechanism for families to remain together, depending on their circumstances, for some or all of the intervening period.[14]   Immigration officials have on several occasions deployed deferred action programs as interim measures for other classes of aliens with prospective entitlements to lawful immigration status, including VAWA self-petitioners, bona fide T and U visa applicants, certain immediate family members of certain U.S. citizens killed in combat, and certain immediate family members of aliens killed on September 11, 2001.   As noted above, each of these programs has received Congress's implicit approval—and, indeed, in the case of VAWA self-petitioners, a direction to expand the program beyond its original bounds.   *See*

---

[14]  DHS's proposed program would likely not permit all potentially eligible parents to remain together with their children for the entire duration of the time until a visa is awarded.   In particular, undocumented parents of adult citizens who are physically present in the country would be ineligible to adjust their status without first leaving the country if they had never been "inspected and admitted or paroled into the United States."   8 U.S.C. § 1255(a) (permitting the Attorney General to adjust to permanent resident status certain aliens present in the United States if they become eligible for immigrant visas).   They would thus need to leave the country to obtain a visa at a U.S. consulate abroad.   *See id.* § 120l(a); *Cuellar de Osorio*, 134 S. Ct. at 2197-99.   But once such parents left the country, they would in most instances become subject to the 3- or 10-year bar under 8 U.S.C. § 1182(a)(9)(B)(i) and therefore unable to obtain a visa unless they remained outside the country for the duration of the bar.   DHS's proposed program would nevertheless enable other families to stay together without regard to the 3- or 10-year bar.   And even as to those families with parents who would become subject to that bar, the proposed deferred action program would have the effect of reducing the amount of time the family had to spend apart, and could enable them to adjust the timing of their separation according to, for example, their children's needs for care and support.

**AR3143**

850

*supra* pp. 18-20.[15]  In addition, much like these and other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests.  Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States— would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided.  During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs.  Although DHS has indicated that there is

---

[15] Several extended voluntary departure programs have been animated by a similar rationale, and the most prominent of these programs also received Congress's implicit approval.  In particular, as noted above, the Family Fairness policy, implemented in 1990, authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens granted legal status under IRCA—aliens who would eventually "acquire lawful permanent resident status" and be able to petition on behalf of their family members.  Family Fairness Memorandum at 1; *see supra* pp. 14-15.  Later that year, Congress granted the beneficiaries of the Family Fairness program an indefinite stay of deportation.  *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030.  Although it did not make that grant of relief effective for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date."  *Id.* § 301(g).  INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status.  *See supra* p. 14.

851

no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail.   We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause.   In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion.   But because the size of DHS's proposed program corresponds to the size of a population to which Congress has granted a prospective entitlement to lawful status without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is nevertheless only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy.   There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence.   And although we are aware of no prior exercises of deferred action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten—

852

potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5 & 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considerations—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community—that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed

853

program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

**2.**

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those discussed above: Like the program for the parents of U.S. citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.,* 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses and children); *id* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for

854

uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition— as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the proposed program,

**AR3148**

855

because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congres-

856

sional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

### III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.


KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

857



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

Feb. 20, 2017

MEMORANDUM FOR:

Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International
    Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM:

/s/ JOHN KELLY
John Kelly
Secretary

858

SUBJECT:

**Enforcement of the Immigration Laws to Serve the National Interest**

This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017.   It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS).   As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Appre-

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

859

hension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

### A.   The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States.   Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement.   In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law.   In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources.   However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who:   (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in con-

860

nection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of lCE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

### B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing

**AR3154**

861

in the United States.   As such, criminal aliens are a priority for removal.   The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States.   Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored.   To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies.   However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States.   To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

862

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law.   Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g) Program.   In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements.   In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

### C.   Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum.   Department personnel have full

**AR3156**

863

authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

### D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not pro-

864

vided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender.   Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice.   Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens.   The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or

AR3158

865

disclosures that are reasonably likely to cause harm to any person.

### E.   Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary.  The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities.  Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F.   Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G.   Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents.  The DHS

**AR3159**

866

Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum,* dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

## H. Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and Location of their release, aliens ordered removed, and aliens physically removed or returned.

867

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

### I.   No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

868



*Secretary*
**U.S. Department of Homeland Security** ity
Washington, DC 20528

June 15, 2017

MEMORANDUM FOR:

> Kevin McAleenan
> Acting Commissioner
> U.S. Customs and Border Protection
>
> James W. McCament
> Acting Director
> U.S. Citizenship and Immigration Services
>
> Thomas D. Homan
> Acting Director
> U.S. Immigration and Customs Enforcement
>
> Joseph B. Maher
> Acting General Counsel
>
> Michael T. Dougherty
> Assistant Secretary for Border, Immigration,
>   and Trade Policy

FROM:

/s/  <u>JOHN KELLY</u>
     JOHN KELLY

SUBJECT:

> Rescission of November 20, 2014 Memorandum
> Providing for Deferred Action for Parents of
> Americans and Lawful Permanent Residents
> ("DAPA")

**AR3162**

869

On January 25, 2017, President Trump issued Executive Order No. 13768, "Enhancing Public Safety in the Interior of the United States."  In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities.  On February 20, 2017.  I issued an implementing memorandum, stating that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing the Deferred Action for Childhood Arrivals ("DACA") policy[1] and November 20, 2014 memorandum providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and for the expansion of DACA[2].  After consulting with the Attorney General, I have decided to rescind the November 20, 2014 DAPA memorandum and the policies announced therein.[3]  The

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[2] Memorandum from Jeh Johnson, Sec'y, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain lndividuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

[3] This Memorandum does not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time.  I remind our officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis, and (2)

870

June 15, 2012 DACA memorandum, however, will remain in effect.

**Background**

The November 20, 2014 memorandum directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident." This process was to be known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA."

To request consideration for deferred action under DAPA, the alien must have satisfied the following criteria: (1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[ ] the grant of deferred action inappropriate." The Memorandum also directed USCIS to expand the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and to lengthen the period of deferred action and work authorization from two years to three ("Expanded DACA").

Prior to implementation of DAPA, twenty-six states —led by Texas—challenged the policies announced in

---

such a grant may be terminated at any time at the agency's discretion.

871

the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas.   In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide on the ground that the plaintiff states were likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") by failing to comply with notice-and-comment rulemaking requirements.   *Texas* v. *United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). The Fifth Circuit Court of Appeals affirmed, holding that Texas had standing, demonstrated a substantial likelihood of success on the merits of its APA claims, and satisfied the other requirements for a preliminary injunction.   *Texas* v. *United States*, 809 F.3d 134 (5th Cir. 2015).   The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4) and did not issue a substantive opinion.   *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

The litigation remains pending before the district court.

I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities.   After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum.

**AR3165**

872



KEN PAXTON
ATTORNEY GENERAL OF TEXAS

June 29, 2017

The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

 Re: *Texas, et al. v. United States, et al.* No. 1:14-cv-00254 (S.D. Tex.)

Dear Attorney General Sessions:

The State plaintiffs that successfully challenged the Obama Administration's DAPA and Expanded DACA programs commend the Secretary of Homeland Security for issuing his June 15, 2017 memorandum rescinding, in large part, his predecessor's November 20, 2014 memorandum creating those DAPA and Expanded DACA programs.

As you know, this November 20, 2014 memorandum creating DAPA and Expanded DACA would have granted eligibility for lawful presence and work authorization to over four million unlawfully present aliens. Courts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present

**AR3166**

873

aliens simply because the Executive chooses not to re-move them.   Rather, "[i]n specific and detailed provi-sions, the [Immigration and Nationality Act] expressly and carefully provides legal designations allowing de-fined classes of aliens to be lawfully present."   *Texas v. United States,* 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court,* 136 S. Ct. 2271 (2016) (per curiam).   "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA."   *Id.*   Like-wise, "[t]he INA also specifies classes of aliens eligible and ineligible for work authorization  . . .  with no mention of the class of persons whom DAPA would make eligible for work authorization."   *Id.* at 180-81. Thus, "DAPA is not authorized by statute," *id.* at 184, and "DAPA is foreclosed by Congress's careful plan," *id.* at 186.

For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligi-bility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memoran-dum is also unlawful.   The original 2012 DACA pro-gram covers over one million otherwise unlawfully pre-sent aliens.   *Id.* at 147.   And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authori-zation from Congress.[1]

Nevertheless, the Secretary of Homeland Security's June 15, 2017 memorandum provided that "[t]he June 15, 2012 DACA memorandum, however, will remain in

---

[1] *See, e.g.,* USCIS, DACA Frequently Asked Questions, https://www. uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited June 29, 2017) (DACA recipients "are considered to be lawfully present").

874

effect," and some "Expanded DACA" permits will also remain in effect.

We respectfully request that the Secretary of Homeland Security phase out the DACA program. Specifically, we request that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future. This request does not require the Executive Branch to immediately rescind DACA or Expanded DACA permits that have already been issued. This request does not require the Secretary to alter the immigration enforcement priorities contained in his separate February 20, 2017 memorandum.[2] And this request does not require the federal government to remove any alien.

If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise, the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits.

We appreciate the opportunity to continue working with you, and the entire Presidential Administration, to cooperatively enforce federal immigration laws.

---

[2] *See* DHS, Enforcement of Immigration Laws to Serve the National Interest, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

AR3168

875

Sincerely,

/s/   KEN PAXTON
KEN PAXTON
Attorney General of Texas

/s/   JEFF LANDRY
JEFF LANDRY
Attorney General of Louisiana

/s/   STEVE MARSHALL
STEVEN MARSHALL
Attorney General of Alabama

/s/   DOUG PETERSON
DOUG PETERSON
Attorney General of Nebraska

/s/   LESLIE RUTLEDGE
LESLIE RUTLEDGE
Attorney General of Arkansas

/s/   ALAN WILSON
ALAN WILSON
Attorney General of South Carolina

/s/   LAWRENCE G. WASDEN
LAWRENCE G. WASDEN
Attorney General of Idaho

/s/   HERBERT SLATERY III
HERBERT SLATERY III
Attorney General and Reporter of Tennessee

/s/   C.L. "BUTCH" OTTER
C.L. "BUTCH" OTTER
Governor of Idaho

**AR3169**

876

/s/ PATRICK MORRISEY
PATRICK MORRISEY
Attorney General of West Virigina

/s/ DEREK SCHMIDT
DEREK SCHMIDT
Attorney General of Kansas

AR3170

877



**Office of the Attorney General**
**Washington, D.C. 20530**

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of

**AR3171**

878

Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

/s/   JEFFERSON B. SESSIONS III
JEFFERSON B. SESSIONS III

AR3172

879

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————

Civil Action No. 17-cv-1907 (CRC)

THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE (NAACP),
AMERICAN FEDERATION OF TEACHERS, AFL-CIO,
AND UNITED FOOD AND COMMERCIAL WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC, PLAINTIFFS

*v.*

DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES,
JEFFERSON BEAUREGARD SESSIONS, III, IN HIS
OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE
UNITED STATES, ELAINE C. DUKE, IN HER OFFICIAL
CAPACITY AS ACTING SECRETARY OF HOMELAND
SECURITY, U.S. CITIZENSHIP AND IMMIGRATION
SERVICES, U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF HOMELAND
SECURITY, UNITED STATES OF AMERICA, DEFENDANTS

————

Civil Action No. 17-cv-2325 (CRC)

THE TRUSTEES OF PRINCETON UNIVERSITY,
MICROSOFT CORPORATION, AND MARIA DE LA CRUZ
PERALES SANCHEZ, PLAINTIFFS

*v.*

UNITED STATES OF AMERICA, U.S. DEPARTMENT OF
HOMELAND SECURITY, AND ELAINE C. DUKE, IN HER
OFFICIAL CAPACITY AS ACTING SECRETARY OF THE
DEPARTMENT OF HOMELAND SECURITY, DEFENDANTS

————

**DECLARATION OF MARIA DE LA CRUZ
PERALES SANCHEZ**

————

**AR3173**

880

I, Maria De La Cruz Perales Sanchez, declare:

1.  I am a recipient of DACA and a plaintiff in the above-captioned action. I am over the age of 18 and make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently to the facts in this declaration.

2.  I was born September 10, 1995, in Mexico. In January 2004, at the age of eight, I was brought to the United States. There I joined my parents, who had already immigrated to the United States in search of opportunities for themselves and their children. I grew up in the United States as an undocumented immigrant.

3.  In the United States, my family shared a small two-bedroom apartment. My father worked for his brother doing construction. My mother took care of him and their nine children, including me.

4.  Being able to grow up in the United States made an enormous difference in my family's life. In particular, those of us who came to the United States at a young age were able to pursue our education in a way that older members of our family could not.

5.  I have been fortunate to be a DACA beneficiary since graduating high school. But, until DACA, the fear and possibility of deportation were more of a reality. We could not drive very far, and were afraid to travel south of San Antonio. We avoided the police, and would not have contacted them unless it was a life or death situation. We were reluctant to seek out medical

**AR3174**

881

treatment, and in several instances decided to forego healthcare.   And I, for one, was also scared in some circumstances to socialize.   For example, when my friends in Texas crossed the border into Mexico, I was too nervous and had to explain why I could not join them.

6.   When I began school, I did not speak English and was enrolled in English as a Second Language (ESL) courses.   The ESL classes, unlike the regular and advanced classrooms, were more often held behind at recesses.   This experience was stigmatizing.

7.   Within two full years of beginning school in the United States, I was removed from the ESL program and placed in courses for advanced and gifted students.   In high school, however, this also led to experiences that left me feeling marginalized and vulnerable.   Instructors frequently asked whether I had entered the correct classroom and also failed to learn my name until after I had performed well on the first exam.   In class discussion, classmates regularly disregarded my point of view.   Some even use the word "illegal."   This continued after I raised concerns about the dehumanizing nature of that word.   Few if any of my peers spoke up for me inside the classroom.

8.   Notwithstanding these dehumanizing experiences, and the fact that other students were dismissive of my ideas, I pressed on.   In between attending school, participating in extracurricular activities, and completing homework, I researched academic summer camps and scholarships for undocumented students.   I also re-

882

searched opportunities to continue pursuing my education.

9.   As a result of my research, I resolved to attend a four-year university.  I had always loved learning, and my mother had encouraged this love throughout my life.  She had only been able to attend school through the second or third grade; then she had to work in the fields because her family needed money.  She told me that we came to the United States to succeed, and that education is the key to success. I knew I had opportunities here that I would not have had in Mexico, and I was inspired to take advantage of them by my mother, who passed away in 2011.  Her memory, her sacrifices, and her resilience continue to give me strength.

10.  I learned about DACA through the news, and then I researched it on the United States Citizenship and Immigration Services website. Although some members of my family thought DACA was a scam to collect our information and deport us, I trusted the government's promise not to provide our information to immigration enforcement authorities.

11.  The decision to apply for DACA was not, however, an easy one.  The application required that I provide personal and identifying information, including my mailing address, my contact information, and other sensitive materials. Ultimately, I decided to provide all of this information because I wanted to have a legal status that would allow me to live a more normal life.  This included being able to pursue my

**AR3176**

883

education without being scared every day about little things, like travelling to and from campus.

12. DACA has had a profound effect on my life. But for DACA, I would not have been able to travel freely to and from Princeton. Moreover, I would not have been able to work or open a bank account. DACA has also enabled me to enjoy a more normal, less anxious life: In addition to traveling without fear, I have been able to socialize more freely, including in simple ways like going to movies that require identification.

13. Since arriving on campus, I have applied myself academically. Through hard work, I have also secured several fellowships and grants. Following a competitive selection process, I received the Arthur Liman Public Interest Fellowship, through which I did legal work with labor migrants in Mexico. This was the first time I visited Mexico since I left as a child. I have also been awarded the Fred Fox Grant for independent projects, which allowed me to work with an organization that provides legal services to women seeking asylum in Texas. And I have been chosen for the Princeton Institute for International and Regional Studies Undergraduate Fellowship for summer thesis research. (At Princeton, conducting an independent research project and documenting it through a written senior thesis is a requirement for graduation.) With that fellowship, I planned to do my thesis research outside of the United States. Unfortunately, I did not get advance parole approved prior to DACA's rescission,

884

and now there is no mechanism by which I can obtain advance parole.

14. My inability to conduct research abroad was immediately problematic. I had been working hard to design a research plan and develop my thesis for a very long time. And I had designed my undergraduate studies to prepare me for the project. Because the international research was essential to my thesis, learning I could not obtain advance parole forced me to revise my project completely. While attending to all of my other academic and co-curricular obligations, I had to develop and execute an entirely new research plan. I also had to do that on a tighter budget because I was unable to recover some of the grant money that I had already committed to travel and lodging for my previous project. All of these modifications needed to be completed within six to eight weeks, an incredibly abbreviated timeline that also coincided with the termination of DACA. The process of reworking my thesis project was incredibly stressful, not to mention disappointing, but I worked through it. I am using my remaining fellowship money to conduct research on the institutional response to DACA's rescission within the United States.

15. At Princeton, I have also identified and dedicated myself to a number of extracurricular activities. I have served as a peer-academic advisor for fellow students and as an elected member of the Woodrow Wilson School's advisory council. In the latter role, I advocate for students who are studying in the Woodrow

AR3178

885

Wilson department, including by providing feedback on curricular issues, on the sufficiency of student resources, and about other critical issues.

16. Community engagement is also very important to me.   When I arrived at Princeton, the summer before my freshman year, the Director of the University's Pace Center for Civic Engagement told me about Community House, a tutoring organization for underserved students. I have served as a volunteer and leader of Community House since that time, and in this role I have developed meaningful relationships with the local Princeton community and my students.   Additionally, I serve as the co-director of the Princeton Dream team, an immigrants' rights organization.   My work with this organization has given me a community of allies and has allowed me to develop my interest in immigrants' rights.

17. At Princeton, DACA has enabled me to pursue other opportunities that I believe are incredibly valuable.   For example, DACA enabled me to obtain advance parole for international travel. As a result, I was able to do a fellowship assisting labor migrants in Mexico and to participate in a study-abroad program at the University of Oxford in England.   DACA has also made me less feel less afraid and more like I am a part of the country.

18. DACA has also enabled me to obtain work authorization.   That work authorization has allowed me to be financially independent and to help my father pay the modest mortgage on my

AR3179

886

family's house.   It has also allowed me to work as a research assistant for a professor at Princeton and as an associate at the Pace Center for Civic Engagement.   In the first role, I have researched whether certain practices at home, and prior to preschool, influence a child's educational attainment.   This research has taught me how to think about education policy from a scholarly perspective and how to abide by best research practices.   At the Pace Center, I have handled logistics for events and volunteer activities.   These positions have had a substantial impact on my personal, academic, and professional development, and allowed me to form meaningful relationships with several mentors.

19.  In addition to holding these positions, I have also worked in other capacities on campus, including in the campus dining hall and as an office assistant.

20.  When I applied for DACA, based on the Government's representations, I expected that I would have an opportunity to continue renewing my deferred status.

21.  I am very worried about the termination of DACA, for a number of reasons.   In addition to disrupting my thesis research plans, the rescission of the DACA program disrupts my post-graduation plans.   After graduation, I had wanted to do a one-year fellowship, called the Labouisse Fellowship, to conduct research in Mexico.   Because of DACA's rescission, that is no longer feasible because I cannot obtain advance parole.   I will also be ineligible for an-

887

other fellowship of interest:  the Sachs Fellowship, which has an international component for which I am now ineligible.

22. The termination of DACA will also make it harder to fulfill my dream of attending law school. Even if I were able to attend law school without being able to work or to access loans or other financial aid, the termination of DACA means that I will be unable to work legally in the United States.   Currently, because of the DACA rescission, the possibility to carry out my dream and practice immigration law is non-existent.

23. As noted above, I have held several jobs during my time at Princeton to provide my family and me with additional income.   However, never before has my need to work been as pressing as it is right now.   Because my DACA status expires immediately after I graduate from Princeton, I have been working as many hours as possible given my academic and extracurricular load.   This situation is far from ideal, as I am also writing a thesis, doing school work, and figuring out my post-graduation plans.   I had to drop a core requirement course earlier this semester because I had more responsibilities—including my jobs—than I could manage.

24. I am also very concerned about whether the information I provided in my DACA application will be used to initiate proceedings to deport me or my family members.   This is something that I have been worrying about a lot, despite my best effort to put it out of my head.

**AR3181**

888

25. As a result of the rescission of DACA, I have at times felt depressed or anxious. The stress generated by the uncertainty of my future causes me to be frequently tired, and I sometimes feel debilitated when I think about the negative impact DACA's rescission will have on my life. I have focused on my studies and worked even harder in every endeavor to try to distract myself from thinking about the fact that I have to reconfigure my life plan. And I feel very privileged to have the support that Princeton provides. Because of that, it is incredibly important to me to advocate for others who have even fewer resources to address the consequences of losing deferred status under DACA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on Dec. <u>13</u>, 2017 in Princeton, New Jersey.

/s/  <u>MARIA DE LA CRUZ PERALES SANCHEZ</u>
     Maria De La Cruz Perales Sanchez

**AR3182**

889

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

————

Case No. 1:16-cv-04756 (NGG) (JO)

BATALLA VIDAL ET AL., PLAINTIFFS

*v.*

NIELSEN ET AL., DEFENDANTS

————

**DECLARATION OF ELIANA FERNANDEZ**

————

I, Eliana Fernandez, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.   I was born in Ecuador and came to the United States when I was fourteen years old.   Coming to the United States meant that I was finally able to reunite with my parents whom I had not seen for many years. I have lived in New York ever since, where I am now raising two U.S. citizen children of elementary-school age.

2.   I lived in New York as an undocumented immigrant until 2012, when Deferred Action for Childhood Arrivals ("DACA") was announced.   I applied as soon as I could and obtained DACA on December 11, 2012. I have renewed my status twice.   My current grant will expire on November 20, 2018, and so I am no longer eligible to renew DACA as a result of Defendants' termination of the program.

**AR3183**

890

**How DACA Changed My Life and My Family's Trajectory**

3.    Having a grant of deferred action under DACA changed my life.   After many years of living in uncertainty and fear, I finally gained temporary peace of mind.   Having DACA allowed me to go back to school, earn a living wage, and purchase a home in which my children can grow up.

4.    Despite being ineligible for financial aid and other types of support because of my immigration status, I attended St. Joseph's College and earned a degree in Sociology in 2015.   While attending school full-time, I also worked full-time.   My family and I made many sacrifices in order for me to be able to pursue a higher education, including hours away from my children and financial challenges due to the fact that most of my paycheck was going toward my college tuition, books, and transportation.

5.    Having a work permit allowed me to obtain a driver's license.   I remember being so excited about obtaining a driver's license because it meant that I could drive to other cities, fly, and take out-of-state vacations.   But most importantly, it meant that I could drive my children wherever they needed to go, including to medical appointments.

6.    I now work as an Immigration Case Manager at Make the Road New York's Long Island office.   Until recently, an important part of my job was helping DACA recipients like myself renew their status. Through my job, I also help clients with other immigration matters, most frequently with their citizenship applications.

**AR3184**

891

7.    I am always looking for opportunities to further my professional development.   To that end, I started graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate in Immigration Law.   I also applied to become a Department of Justice accredited representative in order to be able to represent people in their immigration matters.

8.    By opening the door to increased educational and professional opportunities, having deferred action under DACA ultimately allowed me to become a homeowner.   For me, this meant securing permanent housing for my children where they can thrive and build their childhood memories.   As a tenant, I was not able to have pets, something my children always wanted. But as a homeowner, I was able to grant my children's wish for a pet.

**How DACA Turned Me into an Advocate**

9.    Through DACA, I gained hope that through activism, change could happen.   After receiving my first work permit, I became so empowered by witnessing the power of people to effect change, that I decided to become an advocate and join the immigrants' rights movement.   My spirit, desire for a better future, and professional ambitions grew stronger at that moment.

10.   Thanks to DACA, I have been able to develop a stronger voice and become a community leader.   I frequently reach out to and talk to youth to motivate them to consider pursuing higher education.   I also connect people to social programs and educate them about their rights.   I have volunteered in many places including schools, churches, and community organizations with the purpose of helping families improve their lives.   I have been recognized by several elected officials and schools for my work and commitment to the

**AR3185**

892

community. They include: Congressman Lee Zeldin, Town Supervisor Ed Romaine, County Legislator Gregory DuWayne, and St. Joseph's College.

11. I strive to transmit this spirit of activism and community engagement to my children. In November of this year, I brought my daughter to a meeting with Senator Schumer in Washington, D.C., where we advocated for the passage of a clean Dream Act. I was so proud to be able to share that moment with my daughter.

**Devastating Effects of the Termination of DACA**

12. Ever since Attorney General Jeff Sessions announced the termination of DACA on September 5th, my life has been a rollercoaster of emotions. I constantly worry about my children, their future, and my future. The thought of being separated from my children gives me a lot of anxiety and stress.

13. When I think about my life without DACA, I think about not being able to afford my mortgage, not being able earn a decent living and provide for my children, losing my family's health insurance, and losing my driver's license.

14. I live in the New York suburbs, where you need a car to get around. Without a driver's license, I will not be able to drive my children to school or to their medical appointments. My youngest child suffers from asthma, while my oldest suffers from severe allergies. During the winter, my youngest child's asthma tends to worsen, while my oldest child's allergies worsen during the spring. In case of an emergency, or if they need to see their specialist, I would not be able to drive them to the necessary medical appointments.

**AR3186**

893

15.   The anxiety and stress of losing DACA, with all its implications, has had a physical impact on my body. For example, I recently went to an urgent care clinic to get treated for severe headaches, and I was diagnosed with migraines for the first time.   I have also been experiencing extreme neck pain, for which I recently started physical therapy.

16.   I have lived most of my life here in United States, and the thought of having to return to Ecuador terrifies me.   Most of my immediate family members and friends currently reside in the United States. Both of my children are currently attending school here, they barely speak Spanish, and all their family and friends live here.   I would not want my children to experience any type of trauma by being separated from me, their family, or their friends.

**Hope for the Future**

17.   I sincerely hope that I, and Dreamers like me, can gain a pathway to citizenship—it would be life changing for us, our families, and our communities.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED Dec. 13, 2017 in Suffolk County, NY

/s/   <u>ELIANA FERNANDEZ</u>
ELIANA FERNANDEZ

**AR3187**

894

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———

Case No. 1:16-cv-04756 (NGG) (JO)

BATALLA VIDAL ET AL., PLAINTIFFS

*v.*

NIELSEN ET AL., DEFENDANTS

———

**<u>DECLARATION OF CAROLINA FUNG FENG</u>**

———

I, Carolina Fung Feng, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.   I was born and raised in Costa Rica to Chinese parents, and came to the United States on my own when I was twelve years old.   It has been sixteen years since I left my home country and made New York City my new home.

2.   I lived in New York as an undocumented immigrant until December 6, 2012, when I received deferred action through the Deferred Action for Childhood Arrivals program ("DACA").   My current grant will expire in August 2018, and I am no longer eligible to renew DACA as a result of Defendants' termination of the program.

**Childhood and the Beginning of a New Life in a Foreign Land**

3.   When I was four years old, my mother passed away, and I was sent to live with my dad's younger sister in another city in Costa Rica.   Since then, I have

**AR3188**

895

not lived with my immediate family, and I only ever saw them during holidays and school closings.

4.   On one of those family visits, we went on a trip to China to visit my grandparents.   That was my first trip outside of Costa Rica, and I thought it would be my last since my family was not financially stable at the time.   However, to my surprise, a few years later, my father told me I was going to New York City to visit his older sister, my Big Aunt.

5.   My dad sent me to live with my aunt in New York City to give me a better life, and opportunities that he did not think I would have if I remained in Costa Rica.   He convinced me to go, and in early December 2001 I boarded a plane to New York.   I did not know at the time how difficult this decision was for my father or the difficulties I would face because of it.

**Life in New York City as an Undocumented Young Person**

6.   Growing up in New York City was difficult.   I did not quite fit in with any group, but I was not shunned either.   I grew up in Washington Heights, a community that was familiar yet foreign to me.   At the time, there were not many Asian families and it felt like my family was the only one in that Latino community. That was not any different from my life in Costa Rica. However, the language barrier was difficult to overcome, and I was constantly bullied my first year of school in the United States.

7.   I remember that I cried a lot that first year because I was homesick and could not adjust to life in the United States.   The bullying from my peers did not make it any easier, and I hated learning English with a passion.

**AR3189**

896

8.    Living as an undocumented youth was hard.    I was in seventh grade, and was a member of the Boost Project, my middle school's honor group.   We were given the opportunity to work with NASA, and the school had planned a trip for us to go to Turkey and visit their space camp.   Everyone was excited to go and was preparing for the trip.   I was the only one who could not participate, and while the school tried to help me they could not do anything about it.   It was just too risky to leave the country without the guarantee that I would be able to come back.   That was the first time I was denied an opportunity as a result of my legal status, and it would not be the last.   I resented my father because of it.   After all, he sent me to this country so I could have opportunities, yet I was missing out on those opportunities because I was undocumented.

9.    I did not know other kids like me who were in the same position.   I was too scared to say anything to any of my friends.   Only a select group of teachers knew of my situation, and tried their best to help me solve it without success.   I had support from the counselors in my school which helped me feel that I was not alone and that I had people who were looking out for me.

10.   My teachers and counselors helped me gain entry to a good high school.   They encouraged me to apply for the Student Sponsor Partners program, and I did.   I was accepted into a private Catholic high school in Manhattan.   And while it was not my first choice, it was the best four years of my school life in New York. Things did not get easier for me, but I was lucky to have a sponsor pay for my high school education.

**AR3190**

897

When I was preparing to graduate, I was once again faced with the hard decision of where to go from there.

11.  I did not know if I wanted to go back to Costa Rica or continue with my education here in the United States.   I still missed my country a lot, but I was already accustomed to the American way of life.   It took me a while to decide, and I waited until the last possible moment to apply for college in New York.   I thought about my father's decision to send me here to study, and decided to honor it because it gave me the life I have now.   I may not have thought of it as something good, but now I do.

12.  Paying for college was hard.   I could not apply for financial aid, and the few scholarships I received I could not accept because I could not provide them with a Social Security Number.   I also had to show proof of my residency status in order to get in-state tuition.   I had done my research, and I knew that I qualified for in-state tuition because I had graduated from a NYC high school.   Even so, my university refused to give it to me at first because the power of attorney that I had submitted did not state in the English translation that my Big Aunt was my legal guardian.   I could not believe that such a tiny error in the English translation of such an important legal document was going to set me back.   However, I was prepared to argue my case, and pointed out that the original Spanish document did contain the phrase they were looking for.   They had no choice but to make the change and let me pay in-state tuition.   That was the first time I was able to win something for myself.

13.  Since I could not get financial aid, my father had to help me pay for my college education.   I felt guilty because I was not the only child he had that was

AR3191

898

still in school.   I had four younger siblings who were still in school, and I felt bad that he had to work so hard to help me.   I could not work because I did not have work authorization and because my dad wanted me to focus on school.   But I also could not get any scholarships.

14.   Whenever I won a monetary award, I could not accept it.   I could only accept the paper certificate that said I was being honored for my academic performance.   It was frustrating to me because I wanted to be able to pay for my own college education but I could not.   It was not until my last semester of college, when I had moved out of my aunt's house with my younger brother, that a new opportunity was available to me:   DACA.

**Life with Deferred Action Through DACA**

15.   When President Obama made the announcement that he created the deferred action under DACA program to provide relief and protection for undocumented youth, I was skeptical.   I did not trust that the program was going to be helpful, and I was scared that the information I provided would be used against me. It was a college friend who was undocumented like me that encouraged me to apply.

16.   I was still unsure, and did not know if the benefits of the program outweighed the risks.   I looked for free legal help, and came across a Legal Aid Society flyer for free DACA workshops.   I took advantage of it and showed up on the last day.   I went alone and brought all the documents they mentioned in the flyer. It was the first time I saw so many people who wanted the help.   I did not know if their stories were similar to mine or not, but I was glad to know I was not the only one there.

899

17.   The process was not difficult for me.   I had all the documents needed to prove I qualified for DACA, and my dad had sent some money to pay for the application fee.   In fact, he was the first one to tell me to apply when he heard the news on TV, but I was more reluctant and hesitant about it.

18.   I felt uncomfortable with the Legal Aid lawyers who asked me a lot of questions, some of which I could not answer.   It was the first time that I was exposing so much of my life to anyone.   I remember I kept holding my breath and I could not stop shaking from all the nervousness I felt until I dropped off my application at the post office.

19.   When I started receiving letters from U.S. Citizenship and Immigration Services, I was too scared to open them at first.   I was scared that they would reject my application and would come looking for me. The day I received the approval notice I felt relief and happy that I was finally going to be able to start living my life to its greatest potential.   I started planning for my future and thinking about what my next steps were going to be.

20.   The first thing I did after I got my employment authorization card in the mail was go to the social security office and get my own number.   I was finally able to get that coveted number that everyone seemed to ask for.   Then I went to the DMV and got my New York State ID.

21.   I got my first job in December 2013, and have worked in several jobs since then.   I have been able to financially support myself and my younger brother.   I took driving lessons and got my driver's license in 2015. I obtained a teaching certification and started my teaching career.

**AR3193**

900

22.   I later successfully renewed my request for deferred action under DACA two more times.   And when I heard the news about the termination of the program, I could not see what my future was going to look like.

**The Uncertainty of the Future**

23.   My dad's younger sister, Little Aunt, passed away recently, and her daughter, my cousin, came to live with my brother and me.   Unlike her or any of my family members here in New York, I am the only one who is undocumented.   Everyone else was either born here or came with a green card.

24.   Since my aunt's passing, I have been financially supporting my younger brother and my cousin.   It has been very stressful, and I have not come to terms with any of it.   My family does not seem to understand the uncertainty and worry I feel.

25.   I will not be able to work once my DACA grant expires at the end of August 2018, and while I am scared of being deported and I cannot see what the future holds, I cannot let myself sink into depression.

26.   I cannot just sit back and do nothing.   I have always wanted to go back to school to get a master's degree or a doctorate.   I recently decided to take GRE prep classes and will apply for graduate school next year.   I do not know if I will be able to finish my graduate studies, if I will face deportation, or how I will be able to financially support myself.

27.   I am scared of not being able to live an independent life, and that I will have to once again rely on my family to support me.   I am going to continue with my life plans even after my DACA grant expires, because I know that through this lawsuit we will be able to find a solution.   I and many Dreamers out there

901

cannot go back.   We will make change happen, and I want to be there to make it happen.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED Dec. 13, 2017 in Queens, NY

/s/   CAROLINA FUNG FENG
Carolina Fung Feng

902

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———

Case No. 1:16-cv-04756 (NGG) (JO)

BATALLA VIDAL ET AL., PLAINTIFFS

*v.*

NIELSEN ET AL., DEFENDANTS

———

**<u>DECLARATION OF MARTIN BATALLA VIDAL</u>**

———

I, Martín Batalla Vidal, declare, pursuant to 28 U.S.C. § 1746, and subject to penalties of perjury, that the following is true and correct:

1.   I was born in Mexico and have lived in the United States since May 1997, when I was four years old.   This country is my home.

2.   I am currently studying Criminal Justice at LaGuardia Community College ("LaGuardia").   I have had DACA since 2015 and renewed DACA one time. My current grant expires February 15, 2019.

**Early Life**

3.   I grew up in Bushwick, a low-income, working-class neighborhood in Brooklyn, New York with my mother and three younger siblings.   We shared a two-bedroom apartment, where my siblings and I slept in one bedroom while my mother slept in the other.   We moved around many times because our landlords sold the buildings and kicked us.   In total, I remember moving six times.   The constant change took a toll on our family, but I tried my best to support my mother who raised us by herself.

903

4.   I helped my mother take care of my siblings as the oldest of her four children.   As soon as school ended, I would go home and look after my siblings while my mom was working.   I spent most of this time doing my homework and getting ready for the next school day.

5.   My favorite subject growing up was English. I loved these classes because I could write about anything I felt.   I could express how I felt in many different forms.   But school was tough because kids fought every day.   It seemed that any disagreement in school could turn into a fistfight and, unfortunately, many times it did.   I tried my hardest to stay out of trouble and keep a clean record, especially when I got to high school where there were police officers.

6.   I had a teacher in middle school that made me and the rest of my classmates believe in ourselves. He told us that life in our neighborhood was hard and that we all struggled.   He emphasized that we should not give up and instead should continue to pursue our dreams because our parents were also struggling and making sacrifices for us.   These words keep me going even after all these years.

7.   My mother always told me I was different from the other kids, but she never told me why.   I now know that she was referring to my immigration status.

8.   When I was a teenager my paternal grandparents passed away in Mexico one month apart, first my grandmother, then my grandfather.   I was the last person my grandmother spoke to before she passed away and I really wanted to say goodbye to her in person.   When I told my mom that I wanted to say goodbye to my grandmother before she was buried, she told me I could not go because of my status.   My

904

grandparents raised me when I was in Mexico and not being able to attend the funerals of loved ones is something I do not wish upon anyone.

9.   I am the oldest of four children.   I have three brothers; the two youngest are U.S. citizens.   My other brother was a DACA recipient too, who now has a green card:   so all of my brothers have status or are citizens now

10.  My closest relationship is with my mother. She no longer works due to severe arthritis so I take care of her.   We live together and I pay rent and most of our bills.   My brothers help with the remaining bills.

11.  I first learned exactly how my immigration status affected me when I was in high school.   My interest in college grew when I entered the tenth grade and I was eager to know more about the process of going to a university.   I was most interested in what options were available to me and I reached out to my school counselor.   Sadly, she informed me that I was not eligible for any scholarships or grants due to my undocumented status.   She also explained to me that not many resources for undocumented students existed and that my options were so limited that it would be almost impossible for me to go to college.   I remember feeling extremely, deeply disappointed.   This was a huge blow to me; my dreams of attending a university seemed too far outside of my reach.

12.  The next big implication of my immigration status also came in high school.   Our school helped students get a work permit so they could work part-time during weekends.   With the money earned, my classmates and friends could afford to have a phone, go to the movies, and other things that I could not do.   I wanted to work so badly, but I did not have a Social

905

Security Number and the school would not help me get a work permit.   I lost out on this opportunity to lead a life similar to those of my friends and classmates and I felt like a loser.

13.   I wanted to have a normal life, go to the movies, own a phone so I could communicate with my friends, but I could not afford these things because of my immigration status and all the obstacles it placed in front of me.

**Getting My Education:   Struggles and Pauses**

14.   I graduated high school in 2008.   Without any scholarships or grants, I had to save money to go to college.   As an undocumented student, I did not know how to navigate my way into college; I just knew that I had to save as much money as I could.   Eventually, I was able to save up enough to apply and attend LaGuardia Community College in 2010.

15.   Despite my savings, I could not pay for school in full because I paid out-of-state tuition due to my immigrations status.   However, LaGuardia offered a payment plan and I signed up for it.   As a college freshman, I started studying business administration.

16.   Soon after I started college, however, my mom became very ill and I had to quit school to be with her in the hospital.   It took a long time before I managed to go back to school.   My mother recovered slowly and I had to care for her while working to support her, myself, and my younger siblings.

17.   In 2015, I was able to finally return to school. At that time, I was able to attend ASA College because I received DACA and qualified for a scholarship for DACA recipients.   My mother recovered and returned to work.   However, her health suffered again after she

906

began working and I had to leave college again to take care after her.

18.   I started attending LaGuardia again in the Fall of 2017.   I changed my major from Medicine to Criminal Justice because of what is happening in my community due to the current Administration and because I firmly believe everyone should know their rights.

19.   If I had had the opportunities afforded to me by DACA right after my high school graduation, I believe I would have graduated college already.   It is very tough for me to attend school now because I still have to work full-time and take care of my mother.

**The DACA Program**

20.   I remember President Obama announced the DACA program in 2012 when I was not attending school.   My feelings were a mixture of excitement, happiness, and fear.   I was home when I watched the announcement and I was happy, but scared at the same time because I did not know how long this program would last.

21.   My mother was very happy when she heard the news.   She knew that my brother and I could get a Social Security Number, a work permit, and a state identification card with this program.   She was also happy that we could enroll in health insurance, and go back to college.

22.   Before I applied for DACA, I studied all the requirements and felt unsure about my eligibility since the guidelines stated one had to be enrolled in school. I was not enrolled in any school at the time and it took me about one year before I decided to apply.   I wanted to go back to school and knew that having something like DACA would allow me to study again, but I could

**AR3200**

907

not go back right away. I had to take care of my mother and work.

23. I remember feeling afraid that this program would be taken away and I was especially worried about the consequences of immigration authorities having all my information. I did not want to get my hopes up for this program only to be denied or have it ripped away from me.

24. My brother encouraged me to go speak with a lawyer. I consulted with an attorney in Manhattan who was charging $2,000 for DACA applications, not including filing and other fees. The decision before me was: pay rent or apply for DACA. I decided to pay rent so that I could keep a roof over my mother's head.

25. One day a friend told me about Make the Road New York ("MRNY") and the help they were offering to people who wanted to apply for deferred action through DACA. When I reached out for help at MRNY, they screened me and gave me a list of documents to collect for my application. Obtaining these documents and proof of my presence in this country was a difficult task because it is often hard to get these types of official documents. I started from scratch and had to look for these documents at my old schools, my bank, my dentist's office, and on Facebook.

26. I submitted my initial DACA application in December 2014 with the help of MRNY after finally collecting all the documents required. MRNY also helped me obtain a grant to pay the filing and other fees of my submission.

27. My initial request for deferred action under DACA was approved in February 2015. I applied for

**AR3201**

908

renewal of my deferred action under DACA and work authorization on October 11, 2016.   My DACA request was approved and I received work authorization from February 16, 2017 to February 15, 2019.

28.   When my DACA renewal request was granted, I decided to go back to school because DACA opened doors for me and made it easier to stay in school. With DACA, I could apply to more scholarships.   After my brother was granted deferred action through DACA shortly after the program's implementation, he was promoted at his workplace to the position of manager and was relocated to a store in Washington, D.C., a job he absolutely loves.   With my brother realizing his potential through DACA, I dreamt even bigger than before.

**My American Dream**

29.   In simple terms, DACA has allowed me to live a more fulfilling and proactive life.   Growing up in this country has been a struggle, but my mother taught me and my siblings from an early age that we came to this country to search for a better life and achieve our dreams.   Without DACA, this opportunity might not be available to me.

30.   With my initial DACA approval, and the knowledge that I could continue to renew it, came a sense of control over my future and enough stability to build my career.   DACA has impacted my life significantly and has allowed me to see myself and my family in a better place as we move forward.

*Daily Life*

31.   DACA allowed me to obtain a Social Security Number, a driver's license, scholarships to pay for school, the ability to travel outside of the United States, the

**AR3202**

909

means to continue to provide for my mother and myself, and the tranquility of protection from deportation.

32.   I am currently attending LaGuardia.   I pay my tuition with the money I earn as a physical therapist aide and scholarships.   I would not be eligible for some of my scholarships without DACA.   If I lose my DACA my scholarship options will be severely limited. Because DACA has been around for years now, most of the scholarships available to undocumented students are for those with deferred action under DACA.   I run the risk of losing my opportunity at higher education if I lose my DACA.

33.   I travelled to Mexico to visit my grandmother due to her ailing health.   I hate to think that the next time I will be allowed to go see her she will be underground—just like my other grandmother.   I wish I could see my family in Mexico more often because I am close to three cousins and my great-grandmother. However, without deferred action under DACA, I might not be able to see them at all.

34.   I currently work at Park Terrace Rehabilitation and Nursing Center as a physical therapist aide.   I could have only done this with the reinvigorated passion for the medical profession that having a grant of DACA awoke in me.   I love my work because I get to help and support people in difficult situations who are experiencing serious health needs.   My patients led normal lives before they suffered strokes or had traumatic brain injuries due to something like an accident. I take care of them as if they were my own family because often this is how they perceive me and how I think of them.   The care and support I offer my patients has an effect that reaches their families because

**AR3203**

910

their families trust me and my co-workers to care and
protect their loved ones.

35.  Being a part of the support system that people
rely on to return to their normal lives is an incredibly
fulfilling experience and one that I cherish every day.
I speak to my patients' families regularly and they
always express how my helping their loved ones is
reassuring for them.   Whether it is a hug or a smile,
they feel the support.

36. Our monthly rent is $2,300 for a small,
2-bedroom apartment in Ridgewood that I share with
my mother.   My payments help my landlord pay
property taxes and I see this as another way that I
support my community.

*Peace of Mind*

37.  DACA has given me the tranquility and peace
of mind that I will not face the threat of deportation as
long as my DACA grant is valid.   I now have the abil-
ity to travel within this great country, but if I lose my
DACA, I will no longer have that peace of mind that my
family and I will not be ripped apart.   My mother
needs me and if I were to be detained or deported, my
mother would have an incredibly tough time getting by
without me.

38.  The work permit I received under DACA has
allowed me to work and earn enough to take care of my
sick mother.   This stability has allowed me to apply
myself at work and try to be the best physical therapist
aide I can be.

39.  Not having to worry about deportation has also
allowed me to provide the best support I can to my
patients at work.   The simple and important fact that
I am protected from removal through DACA helps me

**AR3204**

911

through the day and allows me to focus on my work and build relationships with my patients without the fear that we could be ripped apart.

*My Dream Career*

40. Since my return to college, I have decided to change my major from Medicine to Criminal Justice. This change in career paths came as a result of the current Administration's game of playing with the lives of DACA recipients.   Is it my hope that majoring in Criminal Justice will allow me to help my community, by learning about and teaching others about the rights that we have.   I firmly believe we are all entitled to be well informed of our relationship with the law and the decisions made by those in power.

41. I ultimately want to pursue a law degree and become a lawyer.   I believe this will be the best way for me to contribute to my community and to the country I call home.   DACA has allowed me to dream bigger and reach for goals that seemed unattainable before.

**Devastating Impact of the DACA Rescission**

42. When I heard that the President would deal with DACA recipients "with great heart," I felt an uneasy assurance.   It was difficult, but I believed that the President would deal with the issue in good faith and not rescind the DACA program.   However, on September 5, 2017, when Attorney General Jeff Sessions announced the rescission of the program, I felt lied to and betrayed.

43. The Administration's rescission has taken a physical and emotional toll on my family and me.   The uncertainty has caused me to have high levels of stress

AR3205

912

and anxiety that stem solely from the DACA termina-
tion.

44.  If I lose my work permit, I will lose my job.
One of my worries is that I will not be able to provide
for my mother, who has severe arthritis and cannot
work.  I pay our rent and a majority of our bills and
my mother depends on me to provide her food, shelter,
and other things.

45.  Once I learned about the termination of the
DACA program, I became very worried about my abil-
ity to provide for myself and my mom.  I picked up an
additional job, in addition to my work as a physical
therapist aide, in order to save money to try to contin-
ue to support my mother and myself after my work
permit expires.  I currently work approximately
57 hours a week in addition to being a full-time student.

46.  Another worry for me is that my patients will
lose the support system that I provide for them and
their families.  My patients depend on me to get
through the rough patches they are going through and
if I lose DACA, this would have a negative impact on
them.  I have spent my time building relationships
with my patients to best be able to help them and even
if my workplace could employ someone else, that per-
son would not have the foundations of trust and sup-
port that I share with my patients.

47.  When my DACA grant expires, I will lose eligi-
bility for most scholarships and grants that I can re-
ceive now.  It would be impossible for me to continue
studying and obtain my degree in Criminal Justice.
Not only would I lose my job, but I would also be in-
debted as well to LaGuardia.  My educational pros-
pects seemed bright due to the fact that I can work
legally and not worry about deportation, but now my

**AR3206**

913

prospects seem bleak and dark because without DACA I will have trouble navigating access to higher education.

48.  Without DACA, my dreams will have to be put on hold once again.   My mother and my family cannot afford this.   I want to contribute to this country and to my community, the only place that I know as home.

49.  I have feelings of betrayal, disappointment, uncertainty, and worry due to Administration's decision to terminate DACA.   In order to have DACA, you need to have a clean record, and I have kept a clean record, and also thrived under DACA.   Because there seems to be no other good reason to terminate DACA, it makes me feel like we are being punished for doing so well.   This is a terrible reason deprive us of the stability, opportunities, and peace of mind that this program offers.

50.  I am afraid that immigration authorities will target me for removal once my DACA grant expires. I stand to lose my job and my mother will lose her principal provider for almost everything.   I do not know how I could continue to pay my rent or the rest of my bills.

51.  For now, I am trying to stay positive about what will happen next, but it is difficult to think that way because this Administration continues to ramp up attacks against immigrants.   I do not want to put my life on hold again, I want to live a fulfilling life and give back to my community and this country.

52.  I do not know what will happen next or if Congress will act to provide us with the protection that DACA gave us.   However, I believe that this country will do the right thing and finally accept us as its own.

AR3207

914

This is the country I know as home and this is the country I want to contribute to.   I believe in the American Dream and that belief is stronger than this Administration's attacks on immigrant communities, the DACA program, and me.   I am putting my faith in this country's judicial system to act in the name of the ideals that make this country great.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct.

EXECUTED Dec. 13, 2017 in Queens, NY

/s/   MARTIN BATALLA VIDAL
MARTIN BATALLA VIDAL

**AR3208**

915

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

———————

Case No. 17-CV-05211-WHA

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA AND
JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA,
PLAINTIFFS

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY AND
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

———————

Case No. 17-CV-05235-WHA

STATE OF CALIFORNIA, STATE OF MAINE, STATE OF
MARYLAND, AND STATE OF MINNESOTA, PLAINTIFFS

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE
DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, AND THE UNITED STATES OF AMERICA,
DEFENDANTS

———————

Case No. 17-CV-05329-WHA

CITY OF SAN JOSE, A MUNICIPAL CORPORATION,
PLAINTIFFS

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
IN HIS OFFICIAL CAPACITY, ELAINE C. DUKE, IN HER
OFFICIAL CAPACITY, AND THE UNITED STATES OF
AMERICA, DEFENDANTS

**AR3209**

Case 1:17-cv-05228-NGG-VMS   Document 282-8   Filed 09/04/20   Page 932 of 1030 PageID #: 11549

916

----------

Case No. 17-CV-05380-WHA

DULCE GARCIA, MIRIAM GONZALEZ AVILA,
SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA
MENDOZA, NORMA RAMIREZ, AND JIRAYUT
LATHIVONGSKORN, PLAINTIFFS

*v.*

UNITED STATES OF AMERICA, DONALD J. TRUMP, IN HIS
OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES, U.S. DEPARTMENT OF HOMELAND SECURITY,
AND ELAINE DUKE, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF HOMELAND SECURITY,
DEFENDANTS

----------

Case No. 17-CV-05813-WHA

COUNTY OF SANTA CLARA AND SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521, PLAINTIFFS

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, JEFFERSON
BEAUREGARD SESSIONS, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE UNITED STATES;
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY; AND U.S. DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

----------

**DECLARATION OF JIRAYUT LATTHIVONGSKORN**

----------

I, JIRAYUT LATTHIVONGSKORN, DECLARE:

1.   I am a party in the above-captioned action.   I make this declaration based on my personal knowledge.

**AR3210**

917

If called as a witness, I could and would testify competently to the facts stated herein.

### Arrival in United States & Early Life

2.   I was born in Thailand in 1989.   My name is Jirayut Latthivongskorn, but everyone calls me New, which I have gone by since birth.   My parents grew up poor, but they both worked hard and through that hard work made their way into the Thai middle class by becoming business owners.   I was nine years old when I moved to the United States with my parents.   There was a severe economic crash in Southeast Asia in the mid-1990s, and my family lost almost everything.

3.   Quality academic and career opportunities in Thailand are often dependent on private schooling. After the crash, my parents realized that even if my family could find a way to survive, there was no way they could pay for school for my two siblings and me. My aunt, who was living in Fremont, California, at the time, told us that in the United States, the K-12 public education system might be available and accessible to immigrant children.   My parents decided to move our family to California with the hope that we would be able to realize our full potential in the United States and in order to find stable work in the restaurant industry.

4.   I was raised in Northern California, which I consider to be my home.   My family first settled in Fremont, California, where my parents worked cleaning toilets, mopping floors, and waiting tables at various restaurants.   In 2004, we moved to Sacramento, where my parents hoped to make more money by opening a restaurant so they could send my siblings and me to college.

AR3211

918

5.   My family is very close.   My siblings and I worked alongside our parents for most of our childhoods.   We still share one car when we are at home. My parents are dependent on my siblings and me for basic tasks in daily living, including paying bills, writing résumés, assisting them in applying to jobs, and accompanying them to doctors' appointments in order to act as their interpreters.

6.   My parents became U.S. Legal Permanent Residents in 2012 (through my brother) and are on track to becoming naturalized U.S. citizens.   They have great pride in the United States and I feel at home here.

7.   Growing up, I often felt isolated and lived with the constant fear that I or someone in my family might be deported.   My parents always told me just to walk away if anyone asked me any questions about my citizenship status.   I vividly remember the fear I felt one time when we were stopped by a police officer for a traffic violation.   As the red and blue lights flashed through our back window, I held my breath, hoping that a simple traffic stop would not jeopardize our life in the United States.   Every time I came across some sort of government authority, I was reminded that I—unlike my peers or any average American—was deemed as different and therefore vulnerable.

8.   As I grew older, I continued to experience the challenges of being undocumented and those challenges became more daunting.   Most importantly, I could not help contribute financially to my family.   After working for years as waiters in restaurants, my parents hoped to realize the American dream by opening their own small business, a restaurant of their own. In 2004, they opened Muang Thai restaurant in Rose-

**AR3212**

919

ville, California.  Given the challenges of starting a new business, compounded by the ensuing economic recession, I wanted to help supplement our family's income and help us succeed by working myself.  I watched as friends of mine obtained jobs at In-N-Out Burger, Coldstone Creamery, or at other restaurants; the type of jobs sought by any other American teenager.

9.  In addition, my friends started getting their driver's licenses when we turned sixteen.  There was no public transportation in west Sacramento, and, without my own license, my ability to travel freely was curtailed.  I could not spend much time with my friends, who could drive where they pleased.  I was also embarrassed about why I did not have a driver's license and would make up excuses to cover my shame.  Another time, my friends and I went to watch an R-rated movie, and, although I was old enough to buy a ticket to the film, I did not have an ID to prove my age, and so I was turned away at the box office.  I left embarrassed, frustrated, and demoralized.

10.  The first time I took an airplane, since flying to the United States at age 9, was in June 2010.  I feared using my Thai passport to get through airport security, and I was so anxious that I had my lawyer on speed-dial.  Airports are dangerous places for undocumented people like myself.

11.  I did not tell anyone I was undocumented until I was in high school, when my close friend noticed that I left my Social Security Number off my college application to the UC schools.  I had remained silent all those years because I did not want to risk everything my parents had sacrificed—I hold the lives of my family in my hands every time I make the decision to trust

AR3213

920

someone enough to tell them about our undocumented status.   This made it difficult to form close relationships and it deeply impacted my social and emotional well-being growing up.

12.   When I was a junior in high school, my mother was diagnosed with ovarian tumors.   I was the primary person coordinating her care.   As she does not speak English, the language barrier posed a real problem for her care, and, although I was helping her, I had no experience accessing the healthcare system.   We had no support navigating the insurance system either.   This was a very traumatic experience for me, and I felt very helpless and powerless.   Fearing that engaging in negotiations or asking too many questions could lead to negative immigration-related consequences, we often settled for less than excellent care for my mother.   We all felt as though we had to settle for whatever we were given.   I consider this to be a formative experience in my life.   It was after living through my mother's illness that I was determined to become a doctor and devote my life to helping immigrant and low-income communities improve their access to health care.

13.   My parents always emphasized the importance of hard work and education.   While I was in high school, I helped work in my family's restaurant on nights and weekends—cooking, waiting tables, mopping floors, and washing dishes—always balancing these jobs and chores with my schoolwork.   I took honors and AP classes with the hope that I could one day achieve my parents' dream for me of receiving higher education here in the United States.

921

### Applying to College, Attending UC Berkeley, and Community Service

14.  I graduated as salutatorian of my high school class and was accepted to a number of colleges within the University of California.  It was a very proud moment for me and my family, and it reflected my parents' hopes for us when they uprooted our lives to move us here so many years ago.  I felt like I was achieving the American Dream.

15.  As excited as I was by the prospect of attending college, I was worried about being able to pay for it.  My family was struggling financially, and we were losing a lot of money from the restaurant.  As an undocumented immigrant without a Social Security Number, I did not qualify for federal financial aid, and even some institutional funding that is available to documented applicants.

16.  In March 2008, I learned that I had been offered the Regents Scholarship for UC Davis—the most prestigious scholarship offered to undergraduates, awarded to students based solely on their academic and personal achievements—which would have covered most my tuition costs for all four years.  I was so happy and proud, and I thought that, for the first time in my life, I would finally be able to focus only on my schoolwork and not lie awake at night worrying about money.  I was optimistic that my family would not have to bear the complete financial burden of my college education.

17.  That optimism was short-lived.  My Regents Scholarship was revoked after the school learned that I was undocumented, and that as such I was ineligible to receive such financial aid under the rules as they existed at that time.  The university expressed their

**AR3215**

922

regret, and said they hoped that I would let them know if I became eligible for aid in the future.

18.  I was devastated, but still determined to get a college education.   I considered attending community college with the plan of eventually transferring into a 4-year university.   However, my family was determined to not let my acceptances to competitive universities go unfulfilled, and to not let financial concerns stand in my way.   My family, including my extended family, pitched in and managed to find a way to put together enough funds for my first year at UC Berkeley.

19.  I was constantly worried about how to pay for the rest of my education and living expenses.   To help pay for school, I worked nights as a busboy at a Thai restaurant and secured scholarships from several non-profit organizations.   One of those organizations, Educators for Fair Consideration, introduced me to a community of undocumented individuals and supporters, eventually inspiring me to become an activist organizing for immigrant rights.

20.  Despite maintaining the rigorous academic schedule necessary to get into medical school and working to pay for my education, I made time to volunteer with several local nonprofit organizations. Among other things, I cared for disabled patients at a local hospital (Alta Bates in I Berkeley, CA), assisted low-income and homeless community members through a running a student health organization called the Suitcase Clinic, and provided health and wellness seminars to East Oakland youth as a trained "Healthy Ambassador".

21. While at UC Berkeley, I also advocated for federal and state legislation to assist undocumented

AR3216

923

communities, and testified before the California Legislature in support of the California Dream Act, which was enacted into law in 2012.

22. Even though I was becoming more vocal about my identity as an undocumented person, I still continued to suffer the consequences of that status.   In 2011, I was robbed at gunpoint just five blocks from the UC Berkeley campus.   I decided not to report the crime to the police out of fear that stepping forward might lead to me being deported.   I felt suffocated.   An awful, violent act had been perpetrated on me and, yet, I was not able to report the crime or rely on law enforcement to bring me justice.   I felt that there was nothing I could do, so I just went back to studying.

23. In 2012, I co-founded Pre-Health Dreamers ("PHD"), a national nonprofit organization with over 700 members that provides advice, resources, and advocacy for undocumented students interested in pursuing careers in health care and science.   In January 2017, Forbes Magazine named me and my co-founder to its "30 Under 30 in Education" list, commending me for being "on the frontline of getting undocumented students into medical professions and on the path to becoming physicians and health care professionals."

24. In 2012, I graduated from UC Berkeley, earning a bachelor's degree with honors in Molecular & Cellular Biology and Distinction in General Scholarship.

**Receiving DACA Status & Applying to Medical School**

25. In spite of my excellent academic record, I was told by the Deans of Admissions at several medical schools that I should not apply to their programs because I was undocumented.   Dr. Gabriel Garcia of

924

Stanford School of Medicine told me that if he were me, he would not apply to medical school at that time because medical schools did not want to invest their resources in training me if I might not be able to stay in the United States to practice medicine.   Refusing to take "no" for an answer, I applied to medical school anyway, but was turned down, as the Deans of Admissions had predicted would happen.

26.   Exactly one month after I graduated from UC Berkeley, the federal government announced the DACA program on June 15, 2012.   I was skeptical at the beginning, so I decided to wait several months before applying.   I was nervous about giving my information to the government because I did not know what they would do with it.   After observing that the government was living up to its promises to undocumented individuals like me, I decided that I could trust the government and complied with the requirements of the application process, including giving them my identifying information and submitting to a rigorous background check. I trusted that the government would not use my information against me and my family, and I took the government up on the chance to walk on the path of economic and academic opportunity that was paved by the DACA program.

27.   The ability to renew DACA was particularly important to me.   The risk-benefit analysis that I undertook before applying for DACA led me to conclude that it was only worth it if I was able to renew for the foreseeable future.   It would not make any sense to give the government my information if I only received DACA for two years, or if after each renewal I faced an uncertain prospect for my future DACA status.   Medical school is a long path—I would have at least 4 years

AR3218

of school and 3+ years of residency. I would not be able to be a resident trainee without work authorization. So DACA had to be a long-term solution for me, and the government indicated that it very well could be. Throughout the process of applying for and receiving DACA benefits, I understood that I would be eligible to receive DACA and continue to renew it as long as I continued to play by the rules.

28. I applied for DACA in the Fall of 2012. Attached as Exhibit A is a true and correct copy of my initial DACA application, Form I-821D. I paid $465 dollars for the application. Attached as Exhibit B is a true and correct copy of the payment receipt notice I received from the U.S. government. In connection with my DACA application, I went to a USCIS application support center on October 3, 2012 to have my biometrics taken. Attached as Exhibit C is a true and correct copy of my ASC Appointment Notice dated October 3, 2012.

29. I passed the background check and was granted DACA status on January 24, 2013. Attached as Exhibit D is a true and correct copy of my first Notice Of Action that I received from the U.S. government granting my DACA status until October 15, 2014.

30. I also applied for and was granted employment authorization at the same time. Attached as Exhibit E is a true and correct copy of my first I-765, Application for Employment Authorization. Attached as Exhibit F is a true and correct copy of the Notice of Action I received from the U.S. government granting me employment authorization until October 15, 2014.

31. I applied for renewal of my DACA status on July 18, 2014. Attached as Exhibit G is a true and correct copy of my DACA renewal application, Form

926

I-812D.   Attached is <u>Exhibit H</u> is the Notice Of Action that I received from the U.S. government renewing my DACA status until September 25, 2016.

32.   I again applied for renewal of my DACA status in 2016.   Attached as <u>Exhibit I</u> is a true and correct copy of my DACA renewal application, Form I-812D. Attached is <u>Exhibit J</u> is the Notice Of Action that I received from the U.S. government renewing my DACA status until January 12, 2019.

**Benefits of My DACA Status**

33. Being granted DACA status was a "game changer" for me.   It immediately opened doors at the medical schools I wanted to apply to.   I reapplied to medical schools and, in 2014, I enrolled at the school that I always dreamed of attending—UCSF.   I was the first undocumented medical student at UCSF.   I am on a five-year track in the Program in Medical Education for the Urban Underserved ("PRIME-US"), which is for students committed to working with urban underserved communities.

34. Because of DACA, I was also able to apply for and be granted Advance Parole to visit my 87-year-old grandmother in Thailand, when she was ill in December 2014, my first visit to Thailand since I arrived in the U.S.   On that trip, I traveled with my mother and siblings to see my grandmother after she suffered an acute fall, requiring emergency surgery, which compounded her already advanced chronic diseases.   The ability to travel back to Thailand was invaluable, and allowed us to be there with her in her most vulnerable moments, and made possible the reunification of our family.   Attached as <u>Exhibit K</u> is a true and correct copy of the Authorization for Parole of an Alien Into

**AR3220**

927

the United States that I received from the U.S. government.

35. DACA also allowed me to immediately start working. I contracted with PHD as an independent contractor from January 2013 to September 2015. I also completed a two-month internship with Health Access California through Health Career Connection during the summer of 2013 to advocate for expanding health care access to undocumented Californians. I paid taxes for both these jobs.

36. DACA has also allowed me to start building credit. I participated in a Lending Circle through the Mission Asset Fund, which I would not have been able to do without a Social Security Number. I was able to apply for and be approved for credit cards, which allowed me to become more economically flexible and stable.

37. Receiving DACA was also life-changing on a more fundamental, personal level. I felt like I could finally breathe easy. I was finally able to do things that I had never been able to do before, and that other people take for granted. After years of lying to my friends, I obtained a driver's license, which helped me commute from Fremont while I was working after college to build PHD.

38. I am continuing my work in helping under-served communities. I volunteered at the UCSF student-run homeless clinic, helped to implement a quality improvement project at the San Francisco Department of Public Health's community health center, am involved with several organizations that provide support for undocumented students and other immigrants, and serve on the Board of Directors for Asian Health Services (Oakland, CA) as well as UC

928

President Janet Napolitano's Advisory Council for Undocumented Students.

39.  Being undocumented helps me relate to my underserved and undocumented patients in ways that many other medical students and doctors cannot.  Because of my personal experiences with my mother's health issues, I can understand—and help overcome—the barriers to healthcare access and trust that my patients experience.  My personal knowledge of these barriers also helps me to advocate for changes in public health policy.

40.  In December 2016, in my third year of medical school, I was working at the Zuckerberg San Francisco General Hospital for my pediatrics rotation.  A patient came to the urgent care clinic and was having an asthma attack.  He was a fifteen-year-old undocumented teenager who had just arrived as an unaccompanied minor from Guatemala.  He was shocked to hear that I was undocumented as well.  I spoke to his brother and sister and explained how he could still enroll in high school and college.  Because of my background, I was not only able to help him with him physical symptoms, but also with social determinants that affect health, like education and housing.  That is the different type of provider I and other undocumented students can become.

41.  In February 2017, I applied for Legal Permanent Resident status.  I hoped that this step would continue my road to inclusion in U.S. society.

42.  In April 2017, I was awarded the U.S. Public Health Service's prestigious Excellence in Public Health Award, which is given to medical students who are involved in local public health issues and advance the U.S. Public Health Service's mission to "protect,

**AR3222**

929

promote, and advance the health and safety of our Nation."

43.  In August 2017, I began pursuing a Masters of Public Health in Health Policy at the Harvard T.H. Chan School of Public Health.   I knew that clinical medicine alone would not be enough for me to make the impact that I envisioned.   Since I have begun medical school, my story has not changed—and the needs of the communities that I want to help have not changed, in fact they are stronger than ever.   I plan to become a physician who influences health policy and changes the status quo of healthcare delivery, thereby reducing health disparities and expanding access to affordable, quality care for the uninsured, low-income, homeless, immigrant communities—just like the ones in which I grew up and those that I have worked with.

**Impact of Announcement of Rescission of DACA**

44.  While there had been political talk about impact to the DACA program under the current administration, I took comfort in events following the transition from the Obama Administration to the Trump Administration, and actions taken and statements made by the President and others.   First, in February 2017, the Trump Administration exempted DACA from the early repeal of other immigration actions.   That was a positive sign for DACA recipients.   Next, I read President Trump's words in an April 2017 interview that "dreamers should rest easy," and his answer that his administration's policy was to allow DACA recipients to stay.   I also read reports issued on June 15, 2017 that the administration would continue to allow for DACA renewals and that the DACA program would remain in effect.   Those reports provided hope that the DACA program would continue.

930

45. Less than three months later, however, on September 5, 2017, the Administration announced the rescission of the DACA program. That announcement threw my life into chaos and has been a shock to my world: educationally, professionally, emotionally, and physically. Since the rescission of DACA was announced, I have not been sleeping well because of the anxiety the announcement caused and the frustration about not knowing where my future stands. In fact, I have suffered sleeplessness for the first time in my life. I wanted to make the most out of my year at Harvard by immersing myself in study of health policy and by developing connections for my future career. But that career was put in jeopardy just a week after I started school, with the announcement of the end of the DACA program upending my life. As a result, I have been paralyzed by the fear that I will lose everything that I had worked so hard to achieve—that my future would vanish in a flash. My focus has been taken away from the important opportunities available to me at Harvard.

46. The announcement of the rescission of DACA has consumed significant emotional energy, and I live in fear of the loss of the future my parents and I had worked so hard to create. The stress is unbearable. Following the announcement that the DACA program would be ended, I have suffered headaches for the first time in my life, and I have no doubt that the stress and headaches are due to the chaos that the announcement of the rescission of DACA has caused me.

47. The announcement of the end of the DACA program is already affecting my education and professional prospects. I was planning to travel internationally as part of my MPH studies at Harvard. Dur-

931

ing the month of January, international travel for MPH students is common, and I hoped and planned to travel as part of the program, in January 2018.   Without the ability to do so, I would be one of the few students not to travel internationally as part of my MPH program, which would place me at a disadvantage against my colleagues.

48.   And, in my fourth year of medical school, I was planning on completing an away rotation in an international country, to be able to have more experience with global health work, serving needy communities abroad. This will be impossible if my DACA is rescinded.

49.  I am due to apply for residency next year. Without DACA and without my work authorization, however, I will become ineligible to apply for and be considered by residency programs across the country. I have spent years of my life working tirelessly towards this goal, and having my dream snatched away from me so close to the finish line hurts emotionally more than I imagined, and causes me great stress on a daily basis ever since the government announced that DACA would be rescinded.

50.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on [Oct. 30], 2017, in Cambridge, Massachusetts.

/s/  <u>JIRAYUT LATTHIVONGSKORN</u>
JIRAYUT LATTHIVONGSKORN

932

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

———————

Case No. 17-CV-05211-WHA

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA AND
JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA,
PLAINTIFFS

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY AND
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

———————

Case No. 17-CV-05235-WHA

STATE OF CALIFORNIA, STATE OF MAINE, STATE OF
MARYLAND, AND STATE OF MINNESOTA, PLAINTIFFS

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE
DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, AND THE UNITED STATES OF AMERICA,
DEFENDANTS

———————

Case No. 17-CV-05329-WHA

CITY OF SAN JOSE, A MUNICIPAL CORPORATION,
PLAINTIFFS

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
IN HIS OFFICIAL CAPACITY, ELAINE C. DUKE, IN HER
OFFICIAL CAPACITY, AND THE UNITED STATES OF
AMERICA, DEFENDANTS

**AR3226**

933

---

Case No. 17-CV-05380-WHA

DULCE GARCIA, MIRIAM GONZALEZ AVILA,
SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA
MENDOZA, NORMA RAMIREZ, AND JIRAYUT
LATHIVONGSKORN, PLAINTIFFS

*v.*

UNITED STATES OF AMERICA, DONALD J. TRUMP, IN HIS
OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES, U.S. DEPARTMENT OF HOMELAND SECURITY,
AND ELAINE DUKE, IN HER OFFICIAL CAPACITY AS
ACTING SECRETARY OF HOMELAND SECURITY,
DEFENDANTS

---

Case No. 17-CV-05813-WHA

COUNT OF SANTA CLARA AND SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521, PLAINTIFFS

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, JEFFERSON
BEAUREGARD SESSIONS, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE UNITED STATES;
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY; AND U.S. DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

---

**DECLARATION OF DULCE GARCIA**

---

I, Dulce Garcia, declare as follows:

1.   I am a party in the above-captioned action.   I make this declaration based on my personal knowledge.

**AR3227**

934

If called as a witness, I could and would testify competently on the facts stated herein.

## My Early Life

2.   I was born in Mexico and was brought to the United States by my parents when I was four years old.   Since then, I have never left the United States. It is my home.

3.   I grew up in Logan Heights, a low-income, predominately Latino community in San Diego, California. Throughout my childhood, my family was quite poor and, from time to time, was forced to deal with homelessness.   For a time, we shared a home with multiple families in order to save money on rent.   I remember at one point in time my siblings and I were sleeping under a table in a home, because that was the part of the home my family had rented out.

4.   We also lacked access to healthcare.   I never stepped into a dentist's office, for example, until I was an adult.   And I remember one time, as a young child, my father hurt his arm at work (he was a welder).   He shattered his arm and wrist in several places.   We didn't have health insurance, so he tried to just bear the pain.   Plus, the thought of going to the hospital was frightening for my family.   We were nervous that the doctors would ask about our immigration status or ask him to file a report about where he was working. But, after about a week, we realized it was getting infected and he was forced to go see a doctor.   The doctor told us if we'd waited any longer, he would have had to have it amputated.   That was terrifying—but it was also terrifying to leave the walls of our home and expose ourselves to the outside world—we were always scared of what could happen to us.

**AR3228**

935

5.   I certainly didn't have the typical San Diego experience as a child.   I didn't do any of the things that I heard my friends and classmates talk about.   For many years growing up, I didn't go to the beach or the park, the movies, and I certainly didn't get to go to Disneyland like my friends did.   We felt scared every time we stepped out of the house.

6.   I don't remember when I first learned that I was an undocumented immigrant.   I know that even when I first learned this about myself, I didn't fully understand the implications of that on my life.   I do remember that from a very young age, my family and I feared the local police and immigration authorities. We led a very sheltered life and were afraid to leave the security of our home.   However, I can remember seeing federal agents raid homes in my neighborhood and arrest one or more of the individuals living in a house.   Often times, multiple families would be living in one home.

7.   When I was seven years old, my grandmother passed away.   I remember not understanding why my family couldn't return to Mexico to attend her funeral. I didn't understand that our lack of documentation made that impossible.

8.   I am one of four children.   I have three brothers, the youngest of which is a United States citizen. One of my brothers, like me, is a DACA recipient.   I am incredibly close to my immediate family.   I also have an uncle and three cousins who are U.S. citizens, living in Colorado, who I have seen a few times over the course of my life.   After thirty years of living here in the United States, we have lost touch completely with any extended family in Mexico.   My parents and siblings are really the only close family I know.

AR3229

936

9.   The first tangible experience I had with my un-documented status impacting my daily life was when I was in high school and I wanted to apply for a driver's license.   I had taken a course in high school with all my friends to prepare us for taking the exam.   After taking the class, an exam was to be administered and all passing students would receive a driving permit. My father had warned me that I would not be able to apply for a driver's license because I didn't have a so-cial security number or any of the proper documenta-tion.   I didn't understand this—or believe him.   Unfor-tunately, he was correct.   After taking the class, my teacher asked us all to provide her with our social se-curity numbers.   When I was unable to provide one, I was not able to take get a drivers permit.   I remember feeling angry, embarrassed, confused, and incredibly frustrated by the situation.

10.   My next experience dealing with the ramifica-tions of my undocumented status, which was even more devastating, came when I was preparing to apply for college.   I was excited at the prospect of going to col-lege.   I thought the most daunting part of the process would be deciding which university to attend.   One day, I made an appointment with my high school coun-selor to discuss my choices of potential colleges, having already been accepted to quite a few that sounded interesting to me.   At that meeting, my counselor told me that not only was I not going to be able to attend any of the colleges I had been accepted to attend, and that I wouldn't even be able to enroll in the local com-munity college.   I remember he delivered the news very bluntly, at one point calling me "an illegal."

11.   When I went home from school that day I asked my mother if what my counselor had told me was true.

937

My mother confirmed that my counselor was correct. I remember how sad my mother was, and how she went out of her way to tell me how proud of me she was for how hard I worked in school but that my family would not be able to afford to send me to school.

12.   I was devastated when I thought that college might be out of reach for me.   I had pushed myself throughout high school to excel academically and had always been driven by the idea of a college education and a chance to go to law school and become a lawyer.

13.   Before learning about my undocumented status, I can remember feeling like I was going to conquer the world.   After learning about my status, I remember being confronted for the first time with the harsh reality that some of my dreams might not come true.

### Getting an Education:   College and Law School

14.   I graduated high school in 2001.   I had applied to and gotten accepted at my dream school:   the University of California, Davis.   However, without a social security number, I couldn't apply for student loans and my parents certainly could not afford to put me through school.

15.   Instead, I enrolled at a local community college and stayed in San Diego.

16.   Eventually, after graduating from community college, I was able to transfer to the University of California, San Diego ("UCSD").   I managed to secure honors every quarter I attended UCSD, despite working full time as a legal assistant at the same time.   I also often had to find other part time jobs to supplement my income and pay for tuition and books.   I graduated college in 2009.   I was, and remain to this day, incredibly proud to be a college graduate.

**AR3231**

938

17.  For me, the next step was law school.  I have wanted to be a lawyer for as long as I can remember. From a very young age, I can remember witnessing injustice, intolerance, and aggression against members of my community.  For example, I can remember seeing overzealous police officers pull over individuals simply because of the color of their skin.  I knew this wasn't right and I wanted to be able to do something about it.

18.  In fact, my younger brother was once pulled over for suspicious driving.  As a result of a traffic stop, he was turned over to immigration officials and placed in a detention center.  I remember going to visit him at the detention center.  I saw how crushed he was, and I was devastated.  I knew then that I had to continue to work hard and become an immigration attorney, so I could help people like my brother.

19.  I was invited by the Cleveland Marshall School of Law to apply, and was offered a private scholarship to attend.  For my first year, I had a full scholarship and received some much smaller scholarships in subsequent years.  During law school I worked hard to help pay for tuition and living expenses.

20.  During my last year of law school, money was especially tight for me.  My mother gave me $5,000 to help pay for my tuition.  This money represented almost her entire life's savings, which she had earned working the night shift as a hotel housekeeper.  She was so proud of me and she wanted me to achieve my dreams.  I was, and remain, so grateful to her for her all her sacrifices for me.

**The DACA Program**

21.  The government announced the creation of the DACA program my during my second year in law

939

school.   I remember that when I heard the announce-
ment, I was so overjoyed that I immediately broke down
in tears.   I recall vividly hearing President Obama an-
nounce the program and talk about the need to protect
immigrant youth, like myself, and I felt deeply grateful
and encouraged to apply.

22.  I remember reading up on the program and re-
viewing the various guidelines and requirements very
closely.   I remember specifically noting that the gov-
ernment promised that USCIS would not refer appli-
cants to ICE or use the information provided to the
government against an applicant, unless of course
there was some sort of national security threat.   I also
watched some informational videos on the USCIS web-
site dedicated to the DACA program.   After studying
the program and watching these videos, I felt encour-
aged to apply and safe in doing so.

23.  Although initially skeptical, I decided that I
could trust the government to honor its promise and I
decided to apply.   Ultimately, it was the only option
available to me that would allow me to work lawfully
here in the United States—my home.   And I knew
that so long as I continued to renew my DACA status, I
would not be deportable.   That also lifted a huge weight
off of my shoulders.   I knew that as long as I followed
the very explicit rules laid out in the DACA program, I
would be able to maintain and renew my DACA status.

24.  One of the critical factors was that it was re-
newable.   I would never have stepped forward out of
the shadows, borrowed money, submitted to a back-
ground check, and provided all of my sensitive infor-
mation to the government without a guarantee that I
could renew my status every two years.

940

25.  On January 24, 2014, I submitted my application for DACA status and work authorization.  Attached herein as Exhibit A is a true and correct copy of my initial DACA Application (Form I-821D) that I submitted to USCIS on January 24, 2014.  Attached herein as Exhibit B is a true and correct copy of my Application for Employment Authorization (Form I-765) that I submitted to USCIS on January 24, 2014.  Attached herein as Exhibit C is a true and correct copy of my Application for Employment Authorization Worksheet (Form I-765WS) that I submitted to USCIS on January 24, 2014.  Attached as Exhibit D is a true and correct copy of the Form I-797C Notice of Action that I received from USCIS on January 29, 2014, acknowledging receipt of my 2014 DACA Application.  Attached as Exhibit E is a true and correct copy of the Form I-797C Notice of Action that I received from USCIS on January 29, 2014, acknowledging receipt of my Application for Employment Authorization.

26.  Coming up with the fee required for the initial application was difficult.  It was very difficult to come up with this money.  I was already running low on money at this point, since I was in the midst of law school and unable to find a job without valid authorization. All of my money was going towards tuition, books and other school expenses.  Ultimately, I had to borrow the money to pay for the application fee.  When I applied for DACA status I submitted to all of the government's requirements, including paying the required fee, providing my personal information to the government, and submitting to a government background check.

27.  The application process was extremely burdensome.  As an undocumented immigrant, who had lived

941

her life in the shadows, it was difficult to pull together enough documentation to meet all the requirements of the program.   It took exhaustive efforts on my part to gather all the necessary information, but, of course, I was willing to do it if it meant that I could be living here lawfully and be allowed to work.

28.  In connection with my DACA application, I went to a USCIS application support center on February 26, 2014 to have my biometrics taken so that the government could perform a background check on me. Attached as Exhibit F is a true and correct copy of my ASC Appointment Notice dated February 7, 2014. The experience of appearing for and submitting to this background check was both I surreal and terrifying. After living in the shadows for so long, voluntarily coming forward and stepping in to the light in this manner—especially when I didn't really know what to expect—was unnerving to say the least.   I remember feeling almost as though I was a criminal being put through processing—even though I knew that I hadn't committed any crimes.

29.  I received approval of my DACA application on April 16, 2014.   Attached as Exhibit G is a true and correct copy of the Form I-797 DACA Application Approval Notice that I received from USCIS on April 16, 2014.

30.  I also received employment authorization at this time.   Attached as Exhibit H is a true and correct copy of the mailing that I received from USCIS on April 18, 2014 with my employment authorization card.

31.  I applied for renewal of my DACA status and work authorization on December 8, 2015.   Attached as Exhibit I is a true and correct copy of the Form I-821D DACA Application that I submitted to USCIS on De-

942

cember 8, 2015. Attached as Exhibit J is a true and correct copy of the Form I-765 Application for Employment Authorization that I submitted to USCIS on December 8, 2015. Attached as Exhibit K is a true and correct copy of the Form I-765WS (Application for Employment Authorization Worksheet) that I submitted to USCIS on December 8, 2015. I remember that before my DACA status was set to expire, I received a notice from USCIS alerting me to the fact that my status was set to expire, and encouraging me to apply to renew my status 120-150 days before expiration, in order to avoid any lapse. I experienced this as an encouragement on the part of the government to continue to rely on the program. Attached as Exhibit L is a true and correct copy of the Form I-797C Notice of Action reminding me to renew my DACA Application that I received from USCIS on November 1, 2015.

32. In my employment renewal application worksheet, I provided an explanation of my current financial situation to justify my need for employment authorization as follows: "I need employment authorization to work to pay off the debt currently totaling about $34,000 and to continue to pay for living expenses." See Exhibit K. This debt was from college and law school tuition, books, other school-related expenses, and other debts incurred while I was enrolled in college and law school and unable to work without a valid work permit.

33. In connection with my renewal DACA application, I again went to a USCIS application support center on January 6, 2016 to have my biometrics taken. Attached as Exhibit M is a true and correct copy of my ASC Appointment Notice dated December 18, 2015.

943

34.  I received approval of my DACA renewal application on February 17, 2016, and also received a renewed employment authorization card around that time.   Attached as Exhibit N is a true and correct copy of the Form I-797 DACA Application Approval Notice that I received from USCIS on February 17, 2016.   I received my work authorization renewal on February 17, 2016.   Attached as Exhibit O is a true and correct copy of the Form I-797 Application for Employment Authorization Approval Notice that I received from USCIS on February 17, 2016.

35.  I applied for renewal of my DACA status and work authorization a second time on September 27, 2017.   Attached as Exhibit P is a true and correct copy of my second renewal application, including the Form I-281D DACA Application, Form I-765 Application for Employment Authorization, Form I-765WS Application for Employment Authorization Worksheet, and supporting materials.   I have not yet received approval of this second renewal application.

36.  My DACA status currently expires on February 16, 2018

### The American Dream

37.  Simply put, DACA has allowed me to realize the American Dream.   Growing up, my parents instilled in me and my siblings that they had come to this country and overcome numerous obstacles in so doing, so that my brothers and I could live the American Dream.

38.  Being granted DACA status and being able to renew that status (and rely on a promise of future renewals to come) has had an empowering and transformative impact on my life.   For the first time in my

**AR3237**

944

life, I came to believe that nothing could hold me back —that anything was possible.   I believed that I would finally be able to achieve all the things I had always dreamed of, including becoming a lawyer, setting up a thriving law practice, and serving my community.   I once again believed in that American Dream that my parents had taught me to aspire to.

39.   For me, the American Dream means being able to get a good education, to own a car, to buy a house, to pursue the career of your dreams, and to fall in love and start a family.   It means that anyone and everyone, if they work hard, play by the rules, contribute to society, and generally look out for their friends, family and community at large, can succeed.   I have always lived my life that way and I am devastated to think that might not be enough.

### *Peace of Mind and Freedom*

40.   Having DACA status has also provided me with a more peaceful state of mind.   I have finally come to trust that I can travel beyond the four corners of my home without the constant fear of being picked up by the police or immigration authorities.

41.   Before having DACA status, I used to have to take a Greyhound bus ride whenever I traveled between San Diego and law school (in Cleveland, Ohio), which took anywhere between 54 and 62 hours.

42.   Just last week, my fiancé and I flew to Washington, D.C. together.   It felt incredible to hand over our California driver's licenses and board the plane, just like every other American waiting in line with us.

AR3238

945

### Home Ownership

43.  Even before DACA, my fiancé and I had taken one step towards achieving the American Dream—we bought our first home.   The process of buying the home, however, was fraught with difficulties and road-blocks as a result of our undocumented status.   We spent well-over one year trying unsuccessfully to apply for a home loan.   While our applications always looked good, including our credit history and employment his-tory, without a social security number we were never able to secure a loan.   As such, we had to wait until we had saved up enough cash to purchase a home without a loan.   This was incredibly difficult to do, and we also had to borrow about $10,000 from my fiancé's mother.

44.  In May 2009, we were able to pull together enough to buy a condo in San Diego, California.   We have been paying property taxes on the condo ever since.

45.  Becoming a homeowner was a pivotal moment in my life.   I felt like I was an American.   I felt like I was achieving the American Dream that my parents had set out for me and that I myself had imagined.

### Driving and Buying a Car

46.  As soon as I was granted DACA status, I ap-plied for a social security number.   Using my social security number, I was able to open a credit card. This allowed me to start building up a credit history, which I knew would be crucial both for my personal and professional future.

47.  After receiving DACA, I immediately applied for a social security number.   As soon as I received my social security number, I applied for a driver's license. I got my driver's license on May 1, 2014.   It is hard to

**AR3239**

946

put in words how much that license meant—and means —to me.   For one thing, it meant that I could drive around—to visit family and friends, to go to work, and to see clients—without fear of being pulled over and arrested.   And it meant that I was like every other American.

48.   Driving and owning an "American muscle car" has always featured prominently in my vision of what it meant to live the American Dream.   My fiancé Luis and I had purchased a 1965 Ford Mustang that we spent a long time restoring.   We love that car.   The thought of being able to drive around in that car, without feeling like I was breaking the law or like I had to be scared, was truly a dream come true.   Again, it felt like I was an American.

### *My Dream Career*

49.   I was admitted to the California Bar in May 2016.

50.   I opened up my own law practice immediately thereafter, in San Diego, California in June 2016.   As soon as I knew that I wanted to be a lawyer, I knew that I wanted to open my own practice.   That has always been my dream.   I wanted to be able to help my community and to have the freedom to decide what types of cases and clients I took on.   I knew that there were many people in my community who needed access to competent legal representation and I wanted to be able to help them in a meaningful way.   For me, being a lawyer was always about providing access to justice for those who needed it most.

51.   Today, I have over 50 clients, two offices, and I employ 2 people (until the filing of this lawsuit I employed 3 people but one employee has since resigned).

**AR3240**

947

I pay taxes and consider myself to be a valuable contributor to the American economy.

52.  Many of my most rewarding cases as a lawyer have been on behalf of low-income and, sometimes, undocumented individuals.  Being able to provide legal representation to these people—and being able to prevail in a David vs. Goliath type of case, is why I went to law school and why it is so important to me that I am able to continue practicing.

53.  One case I remember in particular involved the representation of an undocumented woman who fell prey to an unscrupulous notario.  The woman had paid the notario a fee of $2000 to prepare a DAPA application, at a point in time when DAPA was not even available.  Ultimately, I was able to recover all of the woman's money.  Moreover, I formed a close bond with the woman who now turns to me for advice whenever she is concerned that she might be falling prey to another scam.  Because she knows my history as an undocumented immigrant, I believe that she is more likely to feel comfortable coming to me and is more likely to trust my advice.

54.  In May 2017, I opened a second office in Chula Vista, California.  After the 2016 presidential election, President Trump made a number of public statements promising that the Dreamers would be safe and that he would deal with DACA "with heart."  These sorts of statements led me to believe that—despite the negative, anti-immigrant rhetoric he engaged in during the campaign, he actually had no intention of rescinding DACA, and that he and his administration would live up to the government's promises to Dreamers like myself.  When I signed the lease on my second office, I was convinced that—while the new administration

948

might increase deportations of undocumented immigrants, Dreamers like myself would be safe.   As such, I signed a new five-year lease on my new office.

55.  My status as a DACA recipient gave me the confidence to do all this—to open and expand my own law practice, to hire employees, and to represent dozens of clients in immigration proceedings, civil litigation, and criminal defense.

56.  And it is my status or identity as a Latina Dreamer that has allowed me to relate to the underserved, undocumented individuals who I represent. This allows me to represent them more effectively, I believe, than many other lawyers would be able to.

### *My Fiancé's Career*

57.  My fiancé Luis Tinoco also has DACA status. Like me, he has had to overcome incredible hardships in his life to get where he is today.   And, like me, DACA has opened up so many doors for him.

58.  Among other things, he has become a very successful small business owner.   He owns a mechanics shop, where he employs 3 full-time U.S. citizen employees as independent contractors.

59.  He also spends a considerable amount of time and energy giving back to the community.   He has contracted with several of the local schools to create an internship program, whereby the schools send young children (often from low-income, immigrant communities) to intern at his business.   The purpose of the program is to keep these children off the street, to teach them a valuable trade, and to inspire them to stay in school and find a career they are passionate about.   I am very proud of him.

949

*Marriage and Children*

60.  Finally, and most importantly, I had always dreamed that one day I would fall in love, get married and start a family here in this country.   And, until the announcement of the DACA recission, that dream was also becoming a reality.

61.  My fiancé, Luis, and I have actually known each other since we were just small children in elementary school.   I remember that Luis always did exceptionally well in school, ultimately graduating with a 4.0 or close to that.   He wanted to join the military and go to college.   However, because he was also undocumented, that dream was foreclosed for him.

62.  It was the year after we graduated high school that Luis and I really connected and, ultimately, fell in love.   Most of our friends had left town to go to college.   He and I were left behind.   I remember how surprised I was that he hadn't gone off to college, given what a strong student he had been.   We immediately bonded over what it meant to be undocumented.

63.  Luis proposed to me during my second year in law school, right before the DACA program was announced.   He came to my law school and proposed to me in the law library, which is where I was spending most of my time those days.   Since then we have built a life together.   We bought a car together, a home together, and began to plan for our wedding and our future.   We were very excited at the prospect getting married.   Of course, the announcement terminating DACA has put all of that on hold.

64.  Part of that future has, for me, always included children.   Specifically, I have always dreamed of fostering and eventually adopting a child.   Growing up I

AR3243

950

saw so many children in my community in need of a good home.   It was always a dream of mine to be a person to provide one of those children with a safe, secure, happy place to grow up.   Luis and I had done all the research necessary to become foster parents and had started putting the pieces in place.   I even attended an orientation session on what was entailed with the process.   DACA allowed us believe that we could, in fact, become foster parents—and eventually adoptive parents.   We were very excited at the prospect of becoming parents.   But, again, the announcement terminating DACA has put all of that on hold.

### Devastating Impact of the DACA Recission

65.   Today, in the wake of the administration's September 5, 2017 announcement terminating the DACA program, all that I have worked for my entire life is at risk.   My entire life feels uncertain and I can already feel the American Dream that I worked so hard to achieve slipping away.   I am terrified.

66.   The administration's announcement of the recission of the DACA program has left me emotionally and physically drained.   I have already had physical manifestations of the anxiety and stress related to the termination, including finding my first gray hair just the other day.

67.   I am very scared about what will happen to my house if DACA is rescinded.   Nearly all of our assets are tied up in that house.   If we are deported, all of my assets would be tied up in this country and I would not be able to access it.   I have already started considering the very real possibility that we may need to sell our condo—and sell it quickly—if either one of us is served with removal papers.   Of course, we might not be able to sell it at all and, even if we could, we might

**AR3244**

951

not be able to afford to hold out for the best deal.   I think it is very likely that we would end up losing at least some, if not all of the money that we put into the home if that were to happen.

68.   If DACA is terminated I think it is likely that my practice—that I am so proud of—will collapse.   At the very least, I will have to shut down a significant portion of it.   For one thing, I would be could span many months or years, when my status in this country was tenuous.   Even thinking about losing my practice has completely overwhelmed and devastated me.

69.   As I mentioned earlier, I have also put my plans to get married on hold.   While we were having fun planning and saving for a wedding, those plans have had to take a back seat to our new focus on finding a way to ensure that our documented status here in the United States is preserved.

70.   Similarly, while DACA had enabled me to finally dream about becoming a mother, that dream is also being put on hold.   My fiancé and I just do not think that it would be fair to bring a child into our lives if we can't guarantee that child a stable, safe home.

71.   For now I am still trying to live my life, do my job, and support my family.   However, I am terrified that the life I have built for myself here in this country that I call home is about to be entirely uprooted.   I am counting on this lawsuit to ensure that does not happen to me and to thousands of other Dreamers.

72.   This lawsuit is especially meaningful to me as a lawyer, in addition of course to how much it means to me to do this on behalf of Dreamers around the country.   As a lawyer, I am trusting in this country's judicial system to do the right thing.   As I have become

952

increasingly engaged in fighting for the rights of fellow Dreamers in the recent weeks and months, I have become increasingly disheartened at the politicized nature of so many of the discussions.   However, I firmly believe that we can rely on this nation's judicial system to protect my rights and the rights of my fellow Americans, my fellow Dreamers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on Oct. 30, 2017, in San Diego, California.

/s/   <u>DULCE GARCIA</u>
DULCE GARCIA

AR3246

953

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

————

Case No. 17-CV-05211-WHA

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA AND
JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA,
PLAINTIFFS

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY AND
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

————

Case No. 17-CV-05235-WHA

STATE OF CALIFORNIA, STATE OF MAINE, STATE OF
MARYLAND, AND STATE OF MINNESOTA, PLAINTIFFS

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY,
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, AND THE UNITED STATES OF AMERICA,
DEFENDANTS

————

Case No. 17-CV-05329-WHA

CITY OF SAN JOSE, A MUNICIPAL CORPORATION,
PLAINTIFFS

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
IN HIS OFFICIAL CAPACITY, ELAINE C. DUKE, IN HER
OFFICIAL CAPACITY, AND THE UNITED STATES OF
AMERICA, DEFENDANTS

**AR3247**

954

---

Case No. 17-CV-05380-WHA

DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, AND JIRAYUT LATTHIVONGSKORN, PLAINTIFFS

*v.*

UNITED STATES OF AMERICA, DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, U.S. DEPARTMENT OF HOMELAND SECURITY, AND ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING SECRETARY OF HOMELAND SECURITY, DEFENDANTS

---

**DECLARATION OF MITCHELL SANTOS TOLEDO**

---

I, MITCHELL SANTOS TOLEDO, DECLARE:

1.  I am an immigrant to the United States who was born in Mexico.  I am a Harvard Law School student and also a Deferred Action for Childhood Arrivals ("DACA") recipient.  The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

**My Life Before DACA**

2.  I came to the United States when I was almost two years old, in 1993.  I am now 26 years old.  I grew up in South Central Los Angeles.  Our neighborhood was dangerous and violent.  I saw driveby shootings, gang violence and drug deals being done from the house next door.  When I was little, this was just life.  As I got older, I started to understand that we lived there because my parents were undocument-

955

ed, which meant it was hard for them to get the jobs and earn the wages needed to afford to live in a safer neighborhood.

3.   When I was growing up, my parents made it clear that education was the key to success for me and my siblings.   I always worked hard in school and got good grades because of my parents.

4.   I remember when I was about to enter high school, a private school recruiter contacted me and another student in my class.   He wanted to talk about attending a private high school on a scholarship.   I was excited and felt that my hard work and academic success were starting to pay off and be recognized. However, the prospect of applying and going to a private school scared my parents.   They worried that the school would ask for my identification and information about where we lived and what my parents did for a living.   My parents did not allow me to apply to this private school, which at the time confused and disappointed me, particularly because the other student did get to go on a scholarship.   I only understood later that my parents were trying to protect me because of our immigration status.   I did not know that I was undocumented at the time.

5.   My parents advocated for my sister and me to be able to attend a public high school in Venice, California, which was a safer and better than the schools in our neighborhood.   Our daily bus ride to school was over an hour long.

6.   High school was the first time in my life that I was surrounded by kids whose parents had college degrees.   Some of their mothers and fathers worked as professionals.   I figured I needed to do whatever these kids were doing to get into college, since they had

AR3249

956

knowledge from their parents about the process. I started taking honors and Advanced Placement ("AP") classes and engaging in extracurricular activities, just like my friends.

7.   About a year into high school, my parents knew that I was focusing and preparing for college. That was when sat me down and told me for the first time that I was undocumented. They tried to explain what that meant. What I remember most is my mom apologizing to me. It felt like she was saying sorry for the hopes they had built up. My parents had always said, "keep going to school," "keep getting good grades," as a promise to get ahead, and I did that. Now it seemed like none of that was true.

8.   I did not understand right away what it meant to be undocumented, but I was motivated to get involved in the immigrants' rights movement. Around the time I learned I was undocumented, I began volunteering at grassroots immigration advocacy organizations and student chapters of larger immigrants' rights organizations. I also started to realize in hindsight what being undocumented meant for my family and childhood, where we lived, and why my dad worked the jobs that he did.

9.   I kept at the AP courses and continued earning good grades. Part of me still believed what my parents had always taught me about hard work—that school was the answer. My dad takes the view that something will come along and life will work out if you stick to it. I had this same sense that if I continued to work harder academically, then maybe something would happen that would make college possible.

10.   In high school I often felt like an outsider because of how my immigration status shaped my life.

AR3250

957

For instance, people around me would study abroad or go on vacations and I did not.   I studied Italian with the same cohort of students in all four years of high school, but then my parents would not allow me to go on a trip to Italy with that group of students when we got to senior year.   I could not travel because I was undocumented.

11.  Towards the end of high school, I applied to colleges like my friends.   I knew in my heart that there was no way I could afford college.   But I applied as a way to keep my immigration status hidden from my friends and teachers.   Not even my closest friends knew I was undocumented.   I had always done well academically, so I did not want to raise suspicion by not applying.

12.  I was accepted at multiple schools, including the University of California Riverside ("UC Riverside), the University of California Irvine ("UC Irvine"), and the University of California Berkeley ("UC Berkeley"). My parents thought I should stay close to home at UC Riverside or UC Irvine, but UC Berkeley captured my imagination.   I grew up thinking of UC Berkeley as the Harvard of the West Coast, that if you were accepted by UC Berkeley it meant you were smart.   I also heard that UC Berkeley might be open to students like me.

13.  I sent in my statement of intent to register at UC Berkeley and I was even assigned a student ID number.   As far as UC Berkeley was concerned, I was going to attend in the fall.   I knew, though, that due to my undocumented status, it would not be possible for me to afford school right away.   To buy myself some time to try to figure out a way to attend, I asked the admissions office if I could delay my enrollment.

958

They gave me a semester. This was not long enough, and I knew there was no way I could afford the cost of attendance. It was too expensive for me and my family.

14. I was very discouraged and disillusioned about not being able to attend college like my friends. I had done everything right; I had the grades and I got accepted. It was frustrating not to be able to go because I did not have some piece of paper or government recognition beyond my control.

15. My parents, always the champions of education, still pushed me to go to community college. I was able to secure some funding from Santa Monica Community College and I started to attend in 2010. I felt a bit rudderless at this point; my main reason for taking classes was to appease my parents.

16. I first heard about the DACA program in 2012, about two years in to my community college studies. I was part of some online immigrants' rights groups and there was buzz about it. I was skeptical. When DACA was first announced, it was not clear what information was going to be required, and I did not know how the government would use my information if I gave it to them. There were some mentions in the media that Immigrations and Customs Enforcement would not have access to the United States Citizenship and Immigration Service information, but I was not ready to trust that promise.

17. Later, I remember downloading an application form to find out more. It asked all kinds of questions that, when you grow up undocumented, you are taught never to answer, such as where do you live, where do you go to school, what was your point of entry into the United States, and when did you enter the United States. The form includes a section where applicants

**AR3252**

959

can provide a statement about how DACA status would benefit them.   For me, a major reason was getting work authorization to financially support my family. But including information like that concerned me even more, because then the government would have information about my family.   Looking at the form, it felt like I would be giving the government all the information it needed to build a case against me and possibly my family.

18.   I waited for a few months to see what happened to other people who applied.   I heard from attorneys at non-profit immigration workshops and DACA town halls about the benefits of the DACA policy.   People posted updates to the online forums I visited, explaining that they had received DACA status and were now getting certain forms of identification and student loans.   It seemed real.   The risk seemed big but so did the benefits.   I finally decided to apply.

**My Life with DACA**

19.   I applied for DACA status in December of 2012 and received DACA status and employment authorization in April 2013.

20.   As soon as I got my DACA status for the first time, I went to the Social Security Administration and got a social security number.   I then quickly got a California driver's license.   Getting this legal identification was an important benefit of DACA status for me. It was physical proof that I belonged in the country, and it meant a lot to me.   It gave me a sense of comfort and security I never had before.   I could live my life in a more normal way, and if I was stopped by authorities, I could show them my identification.

960

21.   My DACA status employment authorization also made it possible for me to transfer from community college to UC Berkeley.   I would never have been able to get a job to afford UC Berkeley without DACA. While I was still in community college, I worked as a bank teller at Chase Bank and then at a law firm in Los Angeles.   I knew that UC Berkeley—or any four year college—would be expensive, so I worked for over a year to build up my savings so that I would be able to afford tuition and living expenses.   I wanted to reclaim my spot at UC Berkeley, which I knew I had earned.

22.   I re-applied to UC Berkeley and, in 2014, was accepted into the Legal Studies program in early 2014. UC Berkeley was a big deal to me as somewhere I had dreamed of going before.   My parents were nervous, though, about me leaving home and going to Northern California.   They worried I would not have the same support network.   But I got the information and resources I needed from UC Berkeley to feel comfortable that I could move there and thrive.

23.   I moved to Berkeley in early August 2014.   I immediately began working at an immigration law firm.   Later I had a work-study job with UC Berkeley's athletic department to earn money.   During my two years at UC Berkeley, I always had a job and worked about 10 to 15 hours a week.   My employment authorization, through DACA, was necessary for me to have these jobs, which paid for my tuition and living expenses.

24.   Having a work authorization that enabled me to work also helped my family.   The money I earned went to our family's living expenses, including rent, food and bills.   My sister and I have been the only ones in our

**AR3254**

961

immediate family of six working during certain periods of time.   I have been able to help my family financially because of DACA.

25.   DACA also made it possible for me to fly home to Los Angeles from school at UC Berkeley.   This was the first time I had travelled by plane, and I was 23 years old.   I was raised to not go to airports.   Growing up as an undocumented person, the law enforcement checkpoints at airports were up there with driving through the Gates of Hell.   With my DACA status, I had a state driver's license that meant I could go to the airport and fly home.   Sitting on the plane as it took off toward Los Angeles was an emotional experience.   It felt like something I accomplished because of DACA.

26.   It is because of my DACA status that I have health insurance.   I get my insurance because I am a student at Harvard, and I could never have continued in school without DACA status.   When I became a student at UC Berkeley, it was the first time I ever had health insurance.   It was the first time in my life I could just go to the doctor or dentist for a checkup. When I was growing up undocumented, we went to the doctor only for real emergencies.   We would have hesitated even if we had medical insurance coverage. Medical treatment was a danger, triggering anxiety and fear, because it meant interacting with a hospital or doctor and providing your personal information.   With DACA status, I can get medical care without this worry.

27.  Significantly, my DACA status made me feel safer and more welcome in this country, like a security blanket.   It was a huge relief and reassurance day-to-day.   I knew that the government knew of my existence and had decided that I could still be in this coun-

962

try. With DACA status, I did not have to be so afraid of being deported, and that meant I could travel safely to school and work.   When I spoke with friends who were eligible for DACA status but who did not apply, it made me realize just what a source of relief DACA status was.

28.   For my undergraduate thesis in legal studies, I wrote about how DACA contributes to the legal consciousness of its recipients, meaning our awareness of our societal role relative to laws and legal institutions. My research involved speaking to DACA recipients, and I observed how DACA made individuals more able to interact with legal institutions in a comfortable, assertive manner.   As a DACA recipient, being able to create scholarship about DACA was very meaningful to me.   It is still one of my proudest achievements.   My thesis advisor even nominated my paper for the Law and Society Association's Undergraduate Student Paper Prize, which I won.

29.   I kept my immigration status mostly to myself during my time at UC Berkeley.   Even though I was studying DACA, my own status was still something I hesitated to share.   This changed when I was selected as the commencement speaker for my graduating class of Legal Studies majors.   My parents were excited and agreed to come up to UC Berkeley for the first time ever, despite their fears of traveling because of their immigration status.   For weeks, I balanced writing my speech and the logistics of getting my family up to Northern California, renting them a car and helping them.   I realized then that I wanted to tell my story to my classmates, with my parents there so that I could thank them.   With my family in the audience, I finally told all of my classmates that I was a DACA recipient.

AR3256

963

This speech was for my parents, and it was a proud and emotional moment for our family.

30.  I graduated from UC Berkeley with Highest Distinction in Legal Studies in 2016.   Since then, I have gone on to Harvard Law School where I am now in my first year.   DACA made this possible for me.   I would not have been able to continue with school, supporting myself and my family, without the benefits of DACA status.

**Harms to Me from the Rescission of DACA**

31.  It was shocking when the rescission of the DACA policy was announced this September.   DACA had become a central part of my life.   The announcement came just days after I signed a law school loan agreement for my first year at Harvard, taking on a significant amount of debt.   I expect to have about $50,000 in law school debt by the end of my first year alone, and at least three times that by the time I graduate.

32.  I would not have gone to law school or taken out tens of thousands of dollars in loans had I known that DACA was going to be rescinded so quickly.   By the time I applied to law school, I was in my third cycle of renewing DACA.   My DACA status has been renewed twice, once in April 2015 and again in December 2016 (I applied for renewal early to make sure I got it in time). DACA status had become a part of my long-term plans, and I expected to be able to renew going forward.

33.  Now my DACA work authorization will expire in the middle of my second year of law school in December 2018.   During law school summers, I need to work to learn how to be an attorney, earn money for my loans, and open doors for an associate position when I

964

graduate. I have past legal experience, and by adding that to a Harvard Law degree, I thought I would become a strong candidate to work at a law firm. The plan was that I could pay off the loans I had for school through a job as a legal associate. Without DACA status, all of this will be impossible.

34. Without DACA, I will lose the security, comfort and sense of belonging that enabled me to fully participate in my education. The stability DACA brought and continues to bring to my life has been essential to my health and achievement as I worked my way up from Community College to Harvard Law School. DACA gave and continues to give me a strong sense of purpose, has eased the daily fear and anxiety I once had over immigration status, and has made more comfortable with my own identity. DACA has been and continues to be central to my ability to financially support myself and my family. The rescission of DACA means suddenly returning to a state of anxiety and stress about my everyday life and what will come next for me and my family.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October [29th], 2017 in Cambridge, Massachusetts.

/s/   MITCHELL SANTOS TOLEDO
MITCHELL SANTOS TOLEDO

965

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

———————

Case No. 17-CV-05211-WHA

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA AND
JANET NAPOLITANO, IN HER OFFICIAL CAPACITY AS
PRESIDENT OF THE UNIVERSITY OF CALIFORNIA,
PLAINTIFFS

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY AND
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, DEFENDANTS

———————

Case No. 17-CV-05235-WHA

STATE OF CALIFORNIA, STATE OF MAINE, STATE OF
MARYLAND, AND STATE OF MINNESOTA, PLAINTIFFS

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY,
ELAINE DUKE, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, AND THE UNITED STATES OF AMERICA,
DEFENDANTS

———————

Case No. 17-CV-05329-WHA

CITY OF SAN JOSE, A MUNICIPAL CORPORATION,
PLAINTIFFS

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
IN HIS OFFICIAL CAPACITY, ELAINE C. DUKE, IN HER
OFFICIAL CAPACITY, AND THE UNITED STATES OF
AMERICA, DEFENDANTS

**AR3259**

966

———————

Case No. 17-CV-05380-WHA

Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn, Plaintiffs

*v.*

United States of America, Donald J. Trump, in his official capacity as President of the United States, U.S. Department of Homeland Security, and Elaine Duke, in her official capacity as Acting Secretary of Homeland Security, Defendants

———————

Case No. 17-CV-05813-WHA

County of Santa Clara and Service Employees International Union Local 521, Plaintiffs

*v.*

Donald J. Trump, in his official capacity as President of the United States, Jefferson Beauregard Sessions, in his official capacity as Attorney General of the United States; Elaine Duke, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. Department of Homeland Security, Defendants

———————

**DECLARATION OF JOEL SATI**

———————

I, JOEL SATI, DECLARE:

   1.  I am an immigrant to the United States who was born in Kenya.   The matters set forth herein are true and correct of my own personal knowledge and, if

**AR3260**

967

called as a witness, I could and would testify competently thereto.

2.    I came to the Unites States at the age of nine, in 2002, and have not left the country since then.   I am now 24 years old and a second year Ph.D. candidate in Jurisprudence and Social Policy at University of California, Berkeley.

3.    I entered the United States with a family friend. My mother was already in the United States.   I have one older sister who is an American citizen through marriage.   My mother explained to me that we moved here because there is more to be achieved in the United States.   She came here to create more opportunities for our family.

4.    My first American home was Kennesaw, Georgia, where I lived for five years.   I started school there as a fourth grader.   After that, we moved to Maryland, which is where I attended high school.

5.    Growing up in an American suburb, I felt like an outsider.   Not only was I a bit of a nerd who enjoyed school, but I felt that I stood out because of my background.   I tried to assimilate into the culture but could not quite understand what precisely made me different.

6.    As a child, I remember puzzling over why I could not participate in activities my friends could. One memory from my 8th grade Spanish class stands out.   The class was going on a trip to Spain, and I of course wanted to go, too.   It was expensive, but I thought if I could somehow convince my mom that it was a great idea for me to go, then we could somehow figure out a way to pay for it.   I was surprised that my mother would not even discuss the idea of me going.

AR3261

968

It was not clear to me why she would not want me to travel and enjoy this opportunity.

7. As a high school student, I always assumed I would go to college. Academic achievement seemed like a way I could move up in the world even though I was not born in America. It seemed like education was going to be my way to the life I wanted.

8. My dream in high school was to become a neurosurgeon. To prepare for this path, I took AP biology, physiology, and chemistry. I also volunteered at Suburban Hospital in Maryland from about 2008 to 2011. The volunteer position was through a club called Medical Venturing Program that was composed of students interested in going to medical school. I vividly recall having the opportunity to watch an open heart surgery at another hospital, too. It stands out as the moment when I first had the idea that I wanted to be a doctor.

9. I took the SAT in anticipation of heading to college and began filling out my college applications in fall 2010. That was when I first found out I was undocumented. College applications required a social security number, which I had "forgotten"—or so I thought. When I asked my mother for my social security number, she told me that I did not have one because I had no immigration documents.

10. I tried to apply to whichever colleges might accept me even though I was undocumented. Had I been a documented immigrant or citizen, I would have been accepted to higher caliber schools because of my grades and performance. Eventually, I was admitted to Mount St. Mary's University in Emmitsburg, Maryland. I planned to major in biology there. But the first tuition bill landed on my doorstep in summer 2011,

AR3262

969

before classes started.   It was over $10,000.   I asked my sister and mother for help, but the tuition was significantly more than we were able to afford.   My lack of legal immigration status meant I could not obtain the financial aid or loans I needed.   I could not start college because of the cost.

11.   Over the next year, I watched my friends apply to colleges and get scholarships.   A lot of people thought I was going to college; I thought I was going to college, too.   I did not know what to tell friends who asked why I was not going to college.   I did not want to admit that I was undocumented, because it was something I felt ashamed about.

12.   I went from being a college-bound senior one moment to having no idea what to do next.   From July to December 2011, I lived with my sister in Georgia. It was frustrating and depressing not being able to go to college.   My friends started college at places like the University of Maryland and Princeton.   It felt unfair, because I could be there too, if it was not for my immigration status.   I was also not able to work without work authorization.   So I stayed home, trying to figure out what to do with my life and feeling defeated.

13.   My mother saw how discouraged and unhappy I had become over the loss of my college dream.   She helped me figure out how to sign up for community college at Montgomery College in Rockville, Maryland. I began attending in January 2012.

14.   I looked at the course calendar and philosophy seemed like the most difficult thing I could imagine. Since this seemed like my one shot at a semester in college, I wanted to take the hardest, most difficult subject.   It did not matter if it got too difficult; I

AR3263

970

would never have the money to continue with college anyway, so I signed up for four philosophy courses.

15.   While I was at Montgomery College, I campaigned in support of the Maryland DREAM Act. The Act enables DACA recipients who meet certain requirements, including attendance at a Maryland high school for several years, to qualify for lower ("in-state") tuition rates.   The difference between in-state and out-of-state tuition rates was significant.   I canvassed door-to-door in support of the Act and interviewed with a local ABC affiliate to encourage support for the legislation.

16.   Around the same time, I remember telling my story about being undocumented in public for the first time.   It was at a rally in Maryland outside an Immigration and Customs Enforcement (ICE) building.   I stood up in front of the crowd and told them about my life.   It stands out to me because after that moment, I started to feel comfortable in my own skin, with my own immigration status and my decision to commit myself to the immigrant rights movement.

**The Impact of Obtaining DACA Status on My Life**

17.   I applied for DACA status in September 2012, as soon as I could afford the application fee.   I received it around January 2013.   This was after my first semester of community college.

18.   Receiving DACA status made my day-to-day life much easier in innumerable ways.   Because of DACA, I got a social security number.   That enabled me to obtain my learner's driving permit/state ID card in New York and later my learner's permit in California.   I was also able to open a bank account.

AR3264

971

19.   I was able to finish my community college degree because DACA status meant I could work to support myself.   Without DACA status, I also would have had to pay a higher tuition rate.   I earned my general Associate of Arts from Montgomery College in 2013.

20.   Because I had DACA status and the associated employment authorization, I was able to support myself and pursue my college education further.   I entered into the Skadden Arps Honors Program in Legal Studies at City College of New York (CCNY) as a philosophy major in 2013.   DACA made it possible for me to work in New York, which was necessary to pay for my college tuition and housing costs while I was at CCNY.   I worked at a lot of different jobs, at a coffee shop, in a restaurant and as a paralegal, all to help pay for college.

21.   Even though I was working about 30 hours per week, on top of going to school, I had trouble making rent in winter 2014.   Living costs are incredibly high in New York City.   I faced homelessness for several weeks.   I relied on a friend for temporary housing in his student dorm.   Although this was a violation of his student housing rule, he bent the rules to keep me from having to live on the street.   Supporting myself as a student in New York was difficult, but it would have been impossible without DACA.

22.   While I was a CCNY student, I volunteered with African Communities Together, mobilizing African youth around the New York State DREAM Act, which made it easier for undocumented students to pursue higher education by making them eligible for in-state tuition and state financial aid.   This was important because only 5-10 percent of the estimated 4,500 undocumented students who graduated from

**AR3265**

972

New York high schools annually when the legislation was passed were able to pursue a college education due to financial hardship.[1]

23.   At CCNY, I also co-developed the syllabus and taught a course entitled *African American Political Thought* with Professor Richard Bernstein, a leading philosophy, constitutional law, and political science scholar.   I delivered lectures in this course to approximately 35 students throughout a semester.   The course has since become a permanent offering under Professor Bernstein, having a lasting impact on the curriculum at CCNY.

24.   My DACA status opened the door to an amazing opportunity offered to me by CCNY; I was selected for and participated in an exchange with Stanford University over the summer of 2014.   The exchange program covered my travel costs and a stipend.   The state ID I had because of DACA made it possible for me to fly domestically in the United States to get to Stanford.   I could travel without fear of getting in trouble with immigration authorities.   I also needed to provide my DACA employment authorization to be paid the exchange program stipend.   Being on the West Coast at Stanford was a transformative experience for me.   I started to think about pursuing a graduate degree in California, and how exciting it would be to take this next step in my education.

25.   In 2016, I graduated *summa cum laude* and Phi Beta Kappa with a B.A. in philosophy from CCNY.

---

[1]  *See* Press Release, New York Assembly Speaker Carl E. Heastie, Assembly to Pass New York State Liberty Act & DREAM Act, (February 6, 2017), http://nyassembly.gov/Press/20170206/.

AR3266

973

## My Current Work at UC Berkeley

26. In 2016, I was accepted into UC Berkeley Law School's Jurisprudence and Social Policy ("JSP") program. I am currently pursuing my Ph.D. in the JSP program, which is an interdisciplinary graduate program for students interested in the scholarly study of the law, philosophy (or other interdisciplinary pursuits), and policy analysis and in teaching law. Around the same time, I was also accepted into similar programs in philosophy or political science at Rutgers and the University of Pennsylvania, and I was wait-listed at Princeton.

27. I was able to travel to Berkeley to visit the University of California campus during admitted students weekend for the JSP program because of my DACA status. I met Professor Sarah Song, whose influential research on democratic theory and issues of migration and citizenship was the reason I decided to come to Berkeley. She and Professor Chris Kutz are now my faculty advisors at Berkeley. My academic achievement and eventual admission into the doctorate JSP program were predicated on the benefits of the DACA policy.

28. At Berkeley, I am currently a second-year Jurisprudence and Social Policy Ph.D. student, a Research Assistant with the Haas Institute's Global Justice Program, and a William K. Coblentz Civil Rights Endowment Research Fellow. My faculty advisors are Professors Song and Kutz, and the head of my program is Dean Calvin Morrill. Dean Morrill and Professor Kutz have also submitted declarations in this litigation.

29. My research is about legal, political and moral philosophy, with a focus on immigration and citizen-

**AR3267**

974

ship.   I examine the political situation of undocumented immigrants along with marginalized people's positions in the ongoing debate on normative citizenship. My research sheds light on the undocumented immigrant experience and develops theories of undocumented immigrant forms of citizenship.   I use my advanced training in philosophy and my personal experience to frame the discussions on undocumented immigrants in a way that calls out the dehumanizing, ahistorical rhetoric that we face.

30.   Professor Kutz was my first year advisor, and I have been engaging in an independent study project in legal philosophy with him for a year.   I first spoke to Professor Kutz when he called to encourage me to accept Berkeley's offer to join the JSP program.   His support has been significant to me on an academic and personal level.   After the election of President Donald Trump, uncertainty and stress dominated my life. Professor Kutz went out of his way to check-in and reassured me "you belong here" at Berkeley.

31.   I currently work part time in two Graduate Student Instructor (GSI) roles at Berkeley, both for the Legal Studies Department.   I am a Graduate Student Instructor for Professor Song in Theories of Justice (Legal Studies 107), an undergraduate course.   In this role, I develop instructional plans, teach discussion sections, and grade papers for approximately 60 students.

32.   I am also a GSI for Professor Kathryn Abrams for the class *Law and Social Change:   The Immigrant Rights Movement and Constitutional Law* this semester.   The class meets once a week for three hours, for approximately 13 weeks.   My role is to help Professor Abrams prepare for classes.   When she was unex-

AR3268

975

pectedly absent to be with her ill father, I stepped up to teach the class for her.

33.   I rely on my DACA employment authorization for both of these GSI roles.   Both require employment authorization.   I am paid a monthly salary for my work as a GSI.   More importantly, working in this GSI position also means I receive a credit (remission) that covers all of my tuition and some of the UC Berkeley fees.   Without DACA status, I will lose these GSI positions and the tuition and fee credit that comes with them.   This would make it difficult to continue in my JSP program.

34.   I am also writing a report on case studies of noncitizen groups and the conceptualization of citizenship, as part of my William K. Coblentz Civil Rights Endowment Research Fellowship.   This is via the Global Justice Program at Haas Institute for a Fair and Inclusive Society.   The report will analyze the contemporary crisis of non-citizenship in the American, European, and global contexts.   I am using case studies to examine how the lack of legal recognition contributes to the marginalization of noncitizen groups, including the Rohingya in Myanmar, refugee groups in Australia, Somali refugees in Kenya, and undocumented immigrants in America.   The report is expected to be released this year.

35.   I am also serving on the UC Office of the President's Advisory Council on the Undocumented Community & Immigration in 2017.   The purpose of the Council is to provide input for the UC Office of the President from students on undocumented community issues and immigration related to the UC community. I understand that I am the only Ph.D. student on the Council.

AR3269

976

36.   Finally, I am also in the process of founding a non-profit that I hope to launch officially in November 2017.   It is called "Undocumental" and is centered around a website where undocumented migrants can publish their political analysis.   I have recruited a Board of Directors and filed incorporation paperwork for this project.   My goal is to promote dialogue on the political situation of illegalized immigrants by amplifying the voice of those rendered "illegal" by the state in one way or other.

**Impact of the DACA Policy Rescission on Me**

37.   My dream is to become a law professor.   I knew this was my long term goal and that I would apply to law school, but I was not as sure about when that would happen until President Trump was elected. Witnessing the immigration policies of the Trump Administration made it clear to me that I needed to act with urgency.   I submitted law school applications this fall to several J.D. programs.

38.   I understand that many candidates from Berkeley's JSP program go on to become law professors.   I hope very much to attend Yale, Berkeley or Stanford Law School.   I plan to complete both my Juris Doctor and my Ph.D. program.   I know I can bring a new, diverse perspective to the legal professoriate.   Becoming a law professor will be more challenging for me now given the DACA policy rescission.

39.   The rescission of DACA on September 5, 2017 had an immediate impact on my ability to pursue my education and career because it ended advance parole with no warning.   I was preparing to present my research at the *International Law and Philosophy Conference: Engaging the Contemporary in Social and Political Philosophy* in Malta in Fall 2017 ("Malta

**AR3270**

977

Conference"). I was invited to this prestigious conference in my field and had received special funding to go. I understand that it is rare for students to be invited to this conference to present their research. I was also invited to Hamburg, Germany to a conference entitled *Migration and Media Awareness 2017: Telling our Story in a World Gone Mad* occurring in November 2017.

40. I applied for advance parole in August 2017 so that I could travel to these and other academic conferences. A grant of advance parole would have enabled me to travel abroad temporarily for educational purposes, take advantage of great opportunities to present my research, and then to return to the United States lawfully.

41. My application for advance parole was denied in September 2017. I received a letter that said advance parole was being denied because of the rescission of the DACA policy earlier in September. Since I was denied advance parole, I cannot attend any of these conferences. Doing so would jeopardize my ability to re-enter the United States and therefore my entire life here. The rescission of the DACA policy has made it impossible for me to travel internationally, limiting my ability to present my research and forge an academic network.

42. I am trying to present my research to the audiences in Malta and in Germany via teleconference, but Germany has refused to allow this. Malta is still considering it. This would be a poor substitute for attending in person. It would make it more difficult to provide a compelling presentation of my research. It also means I cannot meet and make connections with important researchers in my field who attend these

978

conferences.   Such connections are essential to the furtherance of my research and for my future success in academia.

43.   I have presented my research at several domestic conferences in the past.   Most notably, I presented my research entitled *Othered Borders:   The Illegal as Normative Metaphor* at the Brown Graduate Legal Studies Conference in Providence, Rhode Island in April 2017.   Another accomplishment I am proud of is my presentation of my work titled *Other Borders: On Regularizing Undocumented Immigrants* at the Stanford/CCNY Exchange Research Colloquium in August 2014.   I have also been a panelist and speaker on several occasions at conferences and other events on the subject of undocumented persons.   As part of my research and writing, I also published an opinion piece in the Washington Post entitled "*How DACA pits 'good immigrants' against millions of others*" in September 2017.   I argued that DACA is a piecemeal victory in immigration on a policy level, although one I am grateful for on a personal level.

44.   The DACA policy rescission has made my future uncertain.   I have applied to law schools, but without DACA I may not be able to complete my J.D. My work authorization currently expires in 2019, making it very difficult for me to work to support myself during school.   The rescission of my DACA status will also expose me to the stress and constant risk of deportation.

45.   DACA allowed me to set and start to achieve my career goals.   I am trying to continue on, but the uncertainty of whether I can complete my education is making it difficult to persist in investing the significant time and money it takes to earn a Ph.D. and a J.D.   It

979

is not clear that the significant effort and investment will pay off with the impending reality of the end of my DACA status.

46. My mother applied for me to obtain lawful permanent resident ("LPR") status in 2015, when I was 19. This is not a significant consideration in my life plan, however, because the time frame is so lengthy and the outcome uncertain for LPR applications like mine. I know the number of people granted LPR status is limited. I understand that Kenyan LPR petitions similar to mine are only now being considered in chronological order for those filed back in 2011. I have no legal backstop to protect me; my friends, family and community are my only defense. I am fearful of the toll that will be exacted on my relationships from relying so heavily on these people in my life to keep me safe.

47. I have always been able to renew my DACA status in the past, ever since I obtained it in 2013. I renewed it in February 2015, and again in February 2017. The renewals seemed like a matter of course, and I relied on them in starting graduate school, because I knew I needed employment authorization to teach as a GSI. DACA status has enabled me to plan my life, and understand what options were open to me.

48. I am experiencing increased anxiety and stress related to the uncertainty of my DACA status, my future and the broader recent animus against immigrants. This has contributed to my need to see a therapist. I am also taking anxiety medication to try and address this anxiety. I rely on the health insurance I receive as a student through UC Berkeley to be able to obtain the mental health services I need. If I

AR3273

980

can no longer continue as a student, I will also lose my health care coverage.

49.   I am fearful of what will happen to my future without DACA status.   It is hard to feel like I belong in this country; I do not feel safe here anymore, if I ever was. I am scared that my work—focused on giving a voice to undocumented immigrants in policy contexts —will not be worth the intense effort I pour into it because I will never be able to achieve outcomes that matter to me or other undocumented immigrants.   I know how depressed and unhappy I was before I went to college when I did not have DACA status.   DACA changed the future available to me.   I do not want to return to that state of uncertainty, sadness and day-to-day worry.   I am determined to persevere in my plans, but with DACA under threat, that future is again beginning to seem out of reach.

50.   I have not been back to Kenya since I moved here as a nine-year-old.   My life and future are here. I have worked hard for years now to build the foundation for that future and, without DACA, it will disappear.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on Oct. 26, 2017 in Berkeley, California.

/s/   JOEL SATI
JOEL SATI

**AR3274**

981

**The White House**
Office of the Press Secretary

For Immediate Release                    Oct. 08, 2017

**President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies**

President Donald J. Trump's Letter to House and Senate Leaders:

I am pleased to transmit to you my Administration's principles for reforming our Nation's immigration system.  In 2012, after the Congress rejected legislation offering legal status and work permits to illegal immigrants, the previous Administration bypassed the Congress and granted those same benefits unilaterally.  These actions threatened Congress's status as a coequal branch of Government and have resulted in a surge of illegal immigration.

As President, I took an oath to uphold the Constitution, which makes clear that all legislative powers are vested in the Congress, not the President.

I, therefore, tasked the relevant executive departments and agencies to conduct a bottom-up review of all immigration policies to determine what legislative reforms are essential for America's economic and national security.  Rather than asking what policies are supported by special interests, we asked America's law enforcement professionals to identify reforms that are vital to protect the national interest.  In response, they identified dangerous loopholes, outdated laws, and easily exploited vulnerabilities in our immigration system —current policies that are harming our country and our communities.

**AR3275**

982

I have enclosed the detailed findings of this effort. These findings outline reforms that must be included as part of any legislation addressing the status of Deferred Action for Childhood Arrivals (DACA) recipients. Without these reforms, illegal immigration and chain migration, which severely and unfairly burden American workers and taxpayers, will continue without end.

Immigration reform must create more jobs, higher wages, and greater security for Americans—now and for future generations. The reforms outlined in the enclosure are necessary to ensure prosperity, opportunity, and safety for every member of our national family.

Sincerely,

Donald J. Trump

### IMMIGRATION PRINCIPLES & POLICIES

**1. BORDER SECURITY**

**A. Border Wall.** Our porous southern border presents a clear threat to our national security and public safety, and is exploited by drug traffickers and criminal cartels. The Administration therefore proposes completing construction of a wall along the southern border of the United States.

i. Ensure funding for the southern border wall and associated infrastructure.

ii. Authorize the Department of Homeland Security (DHS) to raise, collect, and use certain processing fees from immigration benefit applications and border cross-

**AR3276**

983

ings for functions related to border security, physical infrastructure, and law enforcement.

iii.  Improve infrastructure and security on the northern border.

**B. Unaccompanied Alien Children.**   Loopholes in current law prevent "Unaccompanied Alien Children" (UACs) that arrive in the country illegally from being removed.   Rather than being deported, they are instead sheltered by the Department of Health and Human Services at taxpayer expense, and subsequently released to the custody of a parent or family member —who often lack lawful status in the United States themselves.   These loopholes in current law create a dramatic pull factor for additional illegal immigration and in recent years, there has been a significant increase in the apprehensions of UACs at our southern border.   Therefore, the Administration proposes amending current law to ensure the expeditious return of UACs and family units.

i.   Amend the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVRPA) to treat all UACs the same regardless of their country of origin, so long as they are not victims of human trafficking and can be safely returned home or removed to safe third countries.

ii.   Clarify that alien minors who are not UACs (accompanied by a parent or legal guardian or have a parent or legal guardian in the United States available to provide care and physical custody) are not entitled to the presumptions or protections granted to UACs.

iii. Terminate the Flores Settlement Agreement (FSA) by passing legislation stipulating care standards

984

for minors in custody and clarify corresponding provisions of the TVPRA that supersede the FSA.

iv.   Amend the definition of "special immigrant," as it pertains to juveniles, to require that the applicant prove that reunification with both parents are not viable due to abuse, neglect, or abandonment and that the applicant is a victim of trafficking.   The current legal definition is abused, and provides another avenue for illicit entry.

v.   Repeal the requirement that an asylum officer have initial jurisdiction over UAC asylum applications to expedite processing.

**C.   Asylum Reform.**   The massive asylum backlog has allowed illegal immigrants to enter and stay in the United States by exploiting asylum loopholes.   There are more than 270,000 pending cases in the asylum backlog before USCIS, and approximately 250,000 asylum cases before EOIR.   Therefore, the Administration proposes correcting the systemic deficiencies that created that backlog.

i.   Significantly tighten standards and eliminate loopholes in our asylum system.

ii.   Elevate the threshold standard of proof in credible fear interviews

iii.   Impose and enforce penalties for the filing of frivolous, baseless, or fraudulent asylum applications, and expand the use of expedited removal as appropriate.

iv.   Close loopholes in the law to bar terrorist aliens from entering the country and receiving any immigration benefits.

985

v.  Clarify and enhance the legal definition of "aggravated felony" to ensure that criminal aliens do not receive certain immigration benefits.

vi.  Expand the ability to return asylum seekers to safe third countries.

vii.  Ensure only appropriate use of parole authority for aliens with credible fear or asylum claims, to deter meritless claims and ensure the swift removal of those whose claims are denied.

viii. Prevent aliens who have been granted asylum or who entered as refugees from obtaining lawful permanent resident status if they are convicted of an aggravated felony.

ix.  Require review of the asylee or refugee status of an alien who returns to their home country absent a material change in circumstances or country conditions.

**D.  Ensure Swift Border Returns.**  Immigration judges and supporting personnel face an enormous case backlog, which cripples our ability to remove illegal immigrants in a timely manner.  The Administration therefore proposes providing additional resources to reduce the immigration court backlog and ensure swift return of illegal border crossers.

i.  Seek appropriations to hire an additional 370 immigration judges.

ii.  Establish performance metrics for immigration judges.

iii. Seek appropriations to hire an additional 1,000 U.S. Immigration and Customs Enforcement (ICE) attorneys, with sufficient support personnel.

986

iv.  Ensure sufficient resources for detention.

**E.  Inadmissible Aliens.**  The current statutory grounds for inadmissibility are too narrow, and allow for the admission of individuals who threaten our public safety. Therefore, the Administration proposes expanding the criteria that render aliens inadmissible and ensure that such aliens are maintained in continuous custody until removal.

i.  Expand the grounds of inadmissibility to include gang membership.

ii.  Expand the grounds of inadmissibility to include those who have been convicted of an aggravated felony; identity theft; fraud related to Social Security benefits; domestic violence; child abuse; drunk driving offenses; failure to register as a sex offender; or certain firearm offenses, including the unlawful purchase, sale, possession, or carrying of a firearm.

iii.  Expand the grounds of inadmissibility to include former spouses and children of individuals engaged in drug trafficking and trafficking in persons, if the official determines the divorce was a sham or the family members continue to receive benefits from the illicit activity.

F.  Discourage Illegal Re-entry.  Many Americans are victims of crime committed by individuals who have repeatedly entered the United States illegally, which also undermines the integrity of the entire immigration system.  Therefore, the Administration proposes increasing penalties for repeat illegal border crossers and those with prior deportations.

G.  Facilitate the Removal of Illegal Aliens from Partner Nations.  Current barriers prevent the Federal Government from providing assistance to partner

AR3280

987

nations for the purpose of removing aliens from third countries whose ultimate intent is entering the United States. Therefore, the Administration proposes authorizing DHS to provide foreign assistance to partner nations to support migration management efforts conducted by those nations. This will allow DHS to improve the ability of Central and South American countries to curb northbound migration flows and to interrupt ongoing human smuggling, which will also substantially reduce pressures on U.S. taxpayers.

H. Expedited Removal. Limited categories of aliens are currently subject to expedited removal, which erodes border integrity and control by impeding the ability of the Federal Government to efficiently and quickly remove inadmissible and deportable aliens from the United States. The Administration seeks to expand the grounds of removability and the categories of aliens subject to expedited removal and by ensuring that only aliens with meritorious valid claims of persecution can circumvent expedited removal.

**2. INTERIOR ENFORCEMENT**

**A. Sanctuary Cities.** Hundreds of sanctuary jurisdictions release dangerous criminals and empower violent cartels like MS-13 by refusing to turn over incarcerated criminal aliens to Federal authorities. Therefore, the Administration proposes blocking sanctuary cities from receiving certain grants or cooperative agreements administered or awarded by the Departments of Justice and Homeland Security

i. Restrict such grants from being issued to:

a. Any state or local jurisdiction that fails to cooperate with any United States government entity regarding enforcement of federal immigration laws;

**AR3281**

988

b.   Any entity that provides services or benefits to aliens not entitled to receive them under existing Federal law; and

c.   Any state or local jurisdiction that provides more favorable plea agreements or sentencing for alien criminal defendants for the purpose of immigration consequences of convictions.

ii.   Clarify ICE's detainer authority, and States' and localities' ability to honor that authority, so that States will continue to detain an individual pursuant to civil immigration law for up to 48 hours so that ICE may assume custody.

iii.   Provide indemnification for State and local governments to protect them from civil liability based solely on compliance with immigration detainers and transportation of alien detainees.

iv.   Require State and local jurisdictions to provide all information requested by ICE relating to aliens in their custody and the circumstances surrounding their detention.

v.   Clarify the definition of a criminal conviction for immigration purposes, to prevent jurisdictions from vacating or modifying criminal convictions to protect illegal immigrants, and roll back erosion of the criminal grounds of removal by courts under the "categorical approach."

**B. Immigration Authority for States and Localities.**   The prior Administration suppressed cooperative partnerships between the Federal Government and State or local governments that wanted to help with immigration enforcement, undermining the security of our communities.   Therefore, the Administration proposes enhancing State and local cooperation with Fed-

989

eral immigration law enforcement in order to ensure national security and public safety.

i.   Clarify the authority of State and local governments to investigate, arrest, detain, or transfer to Federal custody aliens for purposes of enforcing Federal immigration laws when done in cooperation with DHS.

ii.   Authorize State and local governments to pass legislation that will support Federal law enforcement efforts.

iii.   Incentivize State and local governments to enter into agreements with the Federal Government regarding immigration enforcement efforts.

iv.   Provide the same extent of immunity to State and local law enforcement agencies performing immigration enforcement duties within the scope of their official role as is provided to Federal law enforcement agencies.

**C.  Visa Overstays.**   Visa overstays account for roughly 40 percent of illegal immigration.   The Administration therefore proposes strengthening the removal processes for those who overstay or otherwise violate the terms of their visas, and implementing measures to prevent future visa overstays which may account for a growing percentage of illegal immigration.

i.   Discourage visa overstays by classifying such conduct as a misdemeanor.

ii.   Require that all nonimmigrant visas held by an alien be cancelled when any one nonimmigrant visa held by that alien is cancelled, to ensure that if an alien abuses one type of visa, he cannot circumvent the immigration

990

system by then relying on another type of visa to enter the United States.

iii.  Bar all visa overstays from immigration benefits for a certain period of time with no waiver.

iv.  Clarify that the government does not bear any expense for legal counsel for any visa overstay in removal or related proceedings.

v.  Require DHS to provide all available data relating to any deportable alien to the Department of Justice's National Crime Information Center for purposes of that alien's inclusion in the Immigration Violators File, with the exception of aliens who cooperate with DHS on criminal investigations.

vi.  Enhance the vetting of bond sponsors for those aliens who enter without inspection, to ensure that bond sponsors undergo thorough background checks prior to being eligible to post or receive a bond.

vii.  Permit the Department of State to release certain visa records to foreign governments on a case-by-case basis when sharing is in the U.S. national interest.

viii. Permit the Department of State to review the criminal background of foreign diplomats or government officials contained in the National Crime Information Center database before visa adjudication, regardless of whether the applicant's fingerprints are in the database.

**D.  Necessary Resources.**   The relatively small number of ICE officers is grossly inadequate to serve a nation of 320 million people with tens of millions of tourists and visitors crossing U.S. ports of entry every year. Therefore, the Administration proposes providing more resources that are vitally needed to enforce visa laws,

AR3284

991

restore immigration enforcement, and dismantle criminal gangs, networks and cartels.

i.   Seek appropriations to hire an additional 10,000 ICE officers.

ii.   Seek appropriations to hire an additional 300 Federal prosecutors to support Federal immigration prosecution efforts.

iii.   Reforms to help expedite the responsible addition of new ICE personnel.

**E.   Detention Authority.**   Various laws and judicial rulings have eroded ICE's ability to detain illegal immigrants (including criminal aliens), such that criminal aliens are released from ICE custody into our communities.   Therefore, the Administration proposes terminating outdated catch-and-release laws that make it difficult to remove illegal immigrants.

i.   Ensure public safety and national security by providing a legislative fix for the Zadvydas loophole, and authorizing ICE, consistent with the Constitution, to retain custody of illegal aliens whose home countries will not accept their repatriation.

ii.   Require the detention of an alien:   (1) who was not inspected and admitted into the United States, who holds a revoked nonimmigrant visa (or other nonimmigrant admission document), or who is deportable for failing to maintain nonimmigrant status; and (2) who has been charged in the United States with a crime that resulted in the death or serious bodily injury of another person.

**F.   Legal Workforce.**   Immigrants who come here illegally and enter the workforce undermine job opportunities and reduce wages for American workers, as does

**AR3285**

992

the abuse of visa programs.   Therefore, the Administration increasing employment verification and other protections for U.S. workers.

i.   Require the use of the electronic status-verification system ("E-Verify") to ensure the maintenance of a legal workforce in the United States.

ii.   Preempt any State or local law relating to employment of unauthorized aliens.

iii.   Impose strong penalties, including debarment of Federal contractors, for failure to comply with E-Verify.

iv.   Increase penalties for any person or entity engaging in a pattern or practice of violations.

v.   Require the Social Security Administration to disclose information to DHS to be used in the enforcement of immigration laws.

vi.   Expand the definition of unlawful employment discrimination to include replacement of U.S. citizen workers by nonimmigrant workers or the preferential hiring of such foreign workers over U.S. citizen workers.

vii. Strengthen laws prohibiting document fraud related to employment or to any other immigration benefit.

**G.   Deportable Aliens.**   The categories of aliens that currently qualify for deportation are insufficiently broad to remove aliens who pose a threat to the security of the American public.   Therefore, the Administration proposes expanding and clarifying the type of aliens who present a danger to Americans and should therefore be removable on an expedited basis.

**AR3286**

993

i.  Expand grounds of deportability to explicitly include gang members.

ii.  Expand the grounds of deportability to include those convicted of multiple drunk driving offenses or a single offense involving death or serious injury.

iii.  Expand the grounds of deportability to include those who fail to register as a sex offender.

iv.  Clarify the technical definition of "aggravated felony" by referring to "an offense relating to" each of the categories of crimes, rather than specifying the crimes themselves.  This will ensure certain kinds of homicide, sex offenses, and trafficking offenses are encompassed within the statutory definition.

**H.  Gang Members.**  Today, known gang members are still able to win immigration benefits despite the dangers they pose to American society.  As such, the Administration proposes implementing measures that would deny gang members and those associated with criminal gangs from receiving immigration benefits.

I.  Visa Security Improvements.  Without sufficient resources, the State Department is hindered from adequately vetting visa applicants.  As such, the Administration proposes enhancing State Department visa and traveler security resources and authorities.

i.  Expand the Department of State's authority to use fraud prevention and detection fees for programs and activities to combat all classes of visa fraud within the United States and abroad.

ii.  Ensure funding for the Visa Security Program and facilitate its expansion to all high-risk posts.

iii.  Increase the border crossing card fee.

**AR3287**

994

iv.  Grant the Department of State authority to apply the Passport Security Surcharge to the costs of protecting U.S. citizens and their interests overseas, and to include those costs when adjusting the surcharge.

v.  Strengthen laws prohibiting civil and criminal immigration fraud and encourage the use of advanced analytics to proactively detect fraud in immigration benefit applications.

### 3.  MERIT-BASED IMMIGRATION SYSTEM

**A.  Merit-Based Immigration.**  The current immigration system prioritizes extended family-based chain migration over skills-based immigration and does not serve the national interest.  Decades of low-skilled immigration has suppressed wages, fueled unemployment and strained federal resources.  Therefore, the Administration proposes establishing a merit-based immigration system that protects U.S. workers and taxpayers, and ending chain migration, to promote financial success and assimilation for newcomers.

i.  End extended-family chain migration by limiting family-based green cards to spouses and minor children and replace it with a merit-based system that prioritizes skills and economic contributions over family connections.

ii.  Establish a new, points-based system for the awarding of Green Cards (lawful permanent residents) based on factors that allow individuals to successfully assimilate and support themselves financially.

iii.  Eliminate the "Diversity Visa Lottery."

**AR3288**

995

iv.   Limit the number of refugees to prevent abuse of the generous U.S. Refugee Admissions Program and allow for effective assimilation of admitted refugees into the fabric of our society.

**AR3289**

996

**U.S. Citizenship and Immigration Services**

Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (March 31)

| Period | Requests Accepted[2] | Requests Rejected[3] | Total Requests | Average Accepted/Da | Biometrics Scheduled[7] | Requests Under | Approved[10] | Denied[11] | Pending[12] |
|---|---|---|---|---|---|---|---|---|---|
| **Fiscal Year - Total[9]** | | | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 124,055 | 38,024 | 1,684 | - | 150,747 |
| 2013 | 427,616 | 16,351 | 443,967 | 1,697 | 445,013 | 77,524 | 470,521 | 11,025 | 96,817 |
| 2014 | 238,899 | 24,888 | 263,787 | 952 | 209,670 | 101,568 | 158,397 | 21,087 | 156,232 |
| 2014 Initial | 122,424 | 19,127 | 141,551 | 488 | - | - | 136,161 | 21,084 | 61,996 |
| 2014 Renewal | 116,475 | 5,761 | 122,236 | 464 | | | 22,236 | 0 | 94,236 |
| 2015 | 448,850 | 35,479 | 484,329 | 1,781 | 525,499 | 48,355 | 510,289 | 21,452 | 73,341 |
| 2015 Initial | 85,300 | 7,481 | 92,781 | 338 | - | - | 90,746 | 19,158 | 37,392 |
| 2015 Renewal | 363,550 | 27,998 | 391,548 | 1,443 | | | 419,543 | 2,294 | 35,949 |
| 2016 | 260,700 | 12,325 | 273,025 | 1,035 | 68,140 | | 198,916 | 14,503 | 120,622 |
| 2016 Initial | 73,387 | 1,205 | 74,592 | 291 | | | 52,882 | 11,445 | 46,452 |
| 2016 Renewal | 187,313 | 11,120 | 198,433 | 743 | | | 146,034 | 3,058 | 74,170 |
| 2017 | 242,976 | 23,358 | 266,377 | 1,060 | | | 246,850 | 6,930 | 109,821 |
| 2017 Initial | 25,656 | 21 | 25,677 | 207 | | | 35,586 | 5,155 | 31,367 |
| 2017 Renewal | 217,323 | 23,377 | 240,700 | 1,753 | | | 211,264 | 1,775 | 78,454 |
| Total Cumulative | 1,771,475 | 117,836 | 1,889,311 | 1,510 | 1,372,377 | | 1,586,657 | 74,997 | 109,821 |
| Total Cumulative Initial | 886,814 | 49,580 | 936,394 | 756 | | | 787,580 | 67,867 | 31,367 |
| Total Cumulative Renewal | 884,661 | 68,256 | 952,917 | 754 | | | 799,077 | 7,130 | 78,454 |
| **Fiscal Year 2017 by Quarter[13]** | | | | | | | | | |
| Q1. October - December | 110,189 | 4,138 | 114,327 | 1,777 | | | 122,051 | 2,754 | 109,821 |
| Q1. October - December Initial | 15,294 | 15 | 15,309 | 247 | | | 18,311 | 2,106 | 31,367 |
| Q1. October - December Renewal | 94,895 | 4,123 | 99,018 | 1,531 | | | 103,740 | 648 | 78,454 |
| Q2. January - March | 132,790 | 19,260 | 152,050 | 2,142 | | | 124,799 | 4,176 | 124,437 |
| Q2. January - March Initial | 10,362 | 0 | 10,368 | 167 | | | 17,275 | 3,049 | 36,490 |
| Q2. January - March Renewal | 122,428 | 19,254 | 141,682 | 1,975 | | | 107,524 | 1,127 | 87,947 |
| Q3. April - June | | | | | | | | | |
| Q3. April - June Initial | | | | | | | | | |
| Q3. April - June Renewal | | | | | | | | | |
| Q4. July - September | | | | | | | | | |
| Q4. July - September Initial | | | | | | | | | |
| Q4. July - September Renewal | | | | | | | | | |

997

---

D - Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described

in the Secretary of Homeland Security's memorandum issued June 15, 2012.

   Each request is considered on a case-by-case basis.

   See http://www.uscis.gov/childhoodarrivals.

[2] The number of new requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period.

Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] Refers to capture of requestors' biometrics.

[7] The number of appointments scheduled to capture requestors' biometrics during the reporting period.

[8] Refers to consideration of deferring action on a case-by-case basis during the reporting period.

[9] The number of new requests received and entered into a case-tracking system during the reporting period.

[10] The number of requests approved during the reporting period.

[11] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[12] The number of requests awaiting a decision as of the end of the reporting period.

[13] Data on biometrics scheduled is not available past January 31, 2016. Totals reflect up to January 31, 2016.

NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.

   2. The report reflects the most up-to-date estimate available at the time the report is generated.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems,
CIS Consolidated Operational Repository (CISCOR), December 31, 2016

AR3291

### Top Countries of Origin

| Top Countries of Origin | Accepted to Date — Initials | Accepted to Date — Renewals | Accepted to Date — Total | Approved to Date — Initials | Approved to Date — Renewals | Approved to Date — Total |
|---|---|---|---|---|---|---|
| Mexico | 689,003 | 685,235 | 1,378,264 | 818,342 | 622,170 | 1,340,512 |
| El Salvador | 33,561 | 33,787 | 67,448 | 28,371 | 30,262 | 58,633 |
| Guatemala | 24,247 | 21,837 | 46,084 | 19,792 | 19,456 | 39,258 |
| Honduras | 22,114 | 21,107 | 43,221 | 18,262 | 18,526 | 36,788 |
| Peru | 9,721 | 11,061 | 20,782 | 9,066 | 10,245 | 19,311 |
| South Korea | 7,813 | 11,038 | 18,851 | 7,750 | 10,375 | 17,625 |
| Brazil | 8,447 | 8,351 | 16,698 | 7,361 | 7,542 | 14,903 |
| Ecuador | 7,669 | 7,787 | 15,456 | 6,696 | 7,037 | 13,733 |
| Colombia | 7,217 | 7,776 | 14,993 | 6,591 | 7,100 | 13,691 |
| Philippines | 5,055 | 5,774 | 10,829 | 4,655 | 5,444 | 10,099 |
| Argentina | 5,180 | 5,112 | 10,292 | 4,774 | 4,723 | 9,497 |
| India | 3,741 | 4,140 | 7,881 | 3,182 | 3,846 | 7,028 |
| Jamaica | 4,375 | 3,581 | 7,956 | 3,435 | 3,192 | 6,627 |
| Venezuela | 3,441 | 3,523 | 6,964 | 3,099 | 3,236 | 6,335 |
| Dominican Republic | 3,744 | 3,050 | 6,794 | 3,115 | 2,722 | 5,837 |
| Uruguay | 2,556 | 2,419 | 4,975 | 2,361 | 2,201 | 4,562 |
| Unknown | 2,589 | 2,535 | 5,124 | 1,960 | 2,238 | 4,198 |
| Bolivia | 2,202 | 2,469 | 4,671 | 2,062 | 2,246 | 4,308 |
| Costa Rica | 2,262 | 2,387 | 4,649 | 2,047 | 2,169 | 4,216 |
| Trinidad and Tobago | 2,440 | 1,707 | 4,147 | 2,056 | 1,691 | 3,787 |
| Poland | 1,951 | 1,997 | 3,948 | 1,782 | 1,827 | 3,609 |
| Chile | 1,874 | 2,009 | 3,883 | 1,736 | 1,854 | 3,590 |
| Pakistan | 1,927 | 1,975 | 3,902 | 1,685 | 1,791 | 3,476 |
| Nicaragua | 1,860 | 1,730 | 3,590 | 1,576 | 1,565 | 3,141 |
| Guyana | 1,467 | 1,462 | 2,929 | 1,266 | 1,347 | 2,613 |

### Residence

| Residence | Accepted to Date — Initials | Accepted to Date — Renewals | Accepted to Date — Total | Approved to Date — Initials | Approved to Date — Renewals | Approved to Date — Total |
|---|---|---|---|---|---|---|
| California | 342,339 | 217,023 | 559,362 | 223,793 | 202,260 | 424,955 |
| Texas | 140,688 | 117,369 | 258,057 | 124,590 | 110,060 | 234,650 |
| New York | 45,693 | 39,607 | 85,300 | 42,376 | 37,095 | 79,471 |
| Illinois | 39,843 | 48,461 | 88,304 | 32,795 | 41,526 | 74,321 |
| Florida | 13,691 | 70,681 | 84,372 | 7,140 | 53,276 | 60,416 |
| Georgia | 30,652 | 25,314 | 55,966 | 27,865 | 23,638 | 51,503 |
| New Jersey | 29,584 | 23,576 | 53,160 | 27,385 | 22,327 | 49,712 |
| North Carolina | 25,650 | 28,580 | 54,230 | 22,024 | 25,106 | 47,130 |
| Arizona | 19,581 | 17,696 | 37,277 | 17,843 | 16,275 | 34,118 |
| Virginia | 19,103 | 15,321 | 34,424 | 17,258 | 14,302 | 31,560 |
| Washington | 13,967 | 14,595 | 28,562 | 12,134 | 13,272 | 25,406 |
| Colorado | 14,139 | 12,587 | 26,726 | 13,070 | 11,771 | 24,841 |
| Maryland | 11,513 | 12,357 | 23,870 | 9,785 | 10,917 | 20,702 |
| Nevada | 12,049 | 10,185 | 22,234 | 11,281 | 9,610 | 20,891 |
| Oregon | 9,517 | 12,449 | 21,966 | 7,934 | 10,854 | 18,788 |
| Massachusetts | 10,709 | 8,559 | 19,268 | 9,840 | 8,076 | 17,916 |
| Indiana | 10,512 | 7,897 | 18,409 | 9,711 | 7,474 | 17,185 |
| Tennessee | 9,321 | 7,416 | 16,737 | 8,340 | 6,950 | 15,290 |
| Pennsylvania | 7,144 | 9,625 | 16,769 | 5,889 | 8,178 | 14,067 |
| Michigan | 7,339 | 8,450 | 15,789 | 7,443 | 6,430 | 13,873 |
| Wisconsin | 8,144 | 6,679 | 14,823 | 7,555 | 6,298 | 13,863 |
| Minnesota | 6,930 | 6,898 | 13,828 | 6,255 | 6,236 | 12,491 |
| Oklahoma | 7,488 | 6,157 | 13,645 | 6,865 | 5,771 | 12,636 |
| Kansas | 7,301 | 5,997 | 13,298 | 6,803 | 5,647 | 12,450 |
| New Mexico | 7,410 | 5,557 | 12,967 | 6,815 | 5,236 | 12,051 |
| South Carolina | 7,150 | 5,702 | 12,852 | 6,406 | 5,382 | 11,788 |

### Residence (continued)

| Residence | Accepted to Date — Initials | Accepted to Date — Renewals | Accepted to Date — Total | Approved to Date — Initials | Approved to Date — Renewals | Approved to Date — Total |
|---|---|---|---|---|---|---|
| Connecticut | 5,876 | 6,675 | 12,551 | 4,979 | 5,882 | 10,811 |
| Ohio | 5,249 | 5,855 | 11,144 | 4,442 | 5,124 | 9,566 |
| Arkansas | 5,606 | 4,475 | 10,081 | 5,099 | 4,255 | 9,354 |
| Alabama | 4,803 | 3,844 | 8,647 | 4,270 | 3,584 | 7,854 |
| Missouri | 3,883 | 3,747 | 7,630 | 3,524 | 3,407 | 6,931 |
| Nebraska | 3,759 | 3,223 | 6,982 | 3,371 | 2,970 | 6,341 |
| Kentucky | 3,448 | 3,055 | 6,504 | 3,062 | 2,786 | 5,848 |
| Idaho | 3,383 | 2,845 | 6,228 | 3,132 | 2,694 | 5,826 |
| Iowa | 3,131 | 3,074 | 6,205 | 2,798 | 2,780 | 5,578 |
| Louisiana | 2,421 | 2,499 | 4,920 | 2,049 | 2,219 | 4,268 |
| Rhode Island | 1,460 | 1,979 | 3,439 | 1,235 | 1,733 | 2,960 |
| Delaware | 1,603 | 1,561 | 3,164 | 1,444 | 1,417 | 2,861 |
| Mississippi | 1,669 | 1,421 | 3,114 | 1,460 | 1,326 | 2,786 |
| Hawaii | 774 | 2,096 | 2,870 | 558 | 1,740 | 2,298 |
| District of Columbia | 943 | 1,240 | 2,183 | 764 | 1,049 | 1,813 |
| Puerto Rico | 519 | 1,275 | 1,794 | 325 | 1,080 | 1,405 |
| Unknown | 185 | 1,197 | 1,382 | 104 | 952 | 1,056 |
| Wyoming | 694 | 563 | 1,257 | 621 | 520 | 1,141 |
| New Hampshire | 450 | 729 | 1,179 | 367 | 599 | 966 |
| Alaska | 195 | 508 | 703 | 138 | 419 | 557 |
| South Dakota | 345 | 377 | 682 | 252 | 311 | 563 |
| Maine | 134 | 410 | 544 | 95 | 334 | 429 |
| Guam | 95 | 413 | 508 | 59 | 352 | 411 |
| North Dakota | 130 | 332 | 462 | 98 | 260 | 358 |
| Virgin Islands | 159 | 252 | 411 | 94 | 204 | 298 |
| West Virginia | 144 | 232 | 376 | 117 | 200 | 317 |
| Montana | 88 | 188 | 275 | 72 | 164 | 236 |
| Vermont | 56 | 192 | 248 | 42 | 162 | 204 |

D  Data withheld to protect requestors' privacy.

- Represents zero.

[a] The number of requests that were accepted to date of the reporting period.

[b] The number of requests that were accepted to date of the reporting period.

[c] All fields with less than 10 or a blank in the state field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.
2) The report reflects the most up-to-date estimate data available at the time the report is generated.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (DACOR), March 2017

AR3292

999

JUSTICE NEWS

**Attorney General Sessions Delivers Remarks on DACA**

Washington, DC ~ Tuesday, Sept. 5, 2017

_____

**Remarks as prepared for delivery**

Good morning.   I am here today to announce that the program known as DACA that was effectuated under the Obama Administration is being rescinded.

The DACA program was implemented in 2012 and essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program, to 800,000 mostly-adult illegal aliens.

This policy was implemented unilaterally to great controversy and legal concern after Congress rejected legislative proposals to extend similar benefits on numerous occasions to this same group of illegal aliens.

In other words, the executive branch, through DACA, deliberately sought to achieve what the legislative branch specifically refused to authorize on multiple occasions.  Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences.  It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens.

**AR3293**

1000

We inherited from our Founders—and have advanced—an unsurpassed legal heritage, which is the foundation of our freedom, safety, and prosperity.

As the Attorney General, it is my duty to ensure that the laws of the United States are enforced and that the Constitutional order is upheld.

No greater good can be done for the overall health and well-being of our Republic, than preserving and strengthening the impartial rule of law.   Societies where the rule of law is treasured are societies that tend to flourish and succeed.

Societies where the rule of law is subject to political whims and personal biases tend to become societies afflicted by corruption, poverty, and human suffering.

To have a lawful system of immigration that serves the national interest, we cannot admit everyone who would like to come here.   That is an open border policy and the American people have rightly rejected it.

Therefore, the nation must set and enforce a limit on how many immigrants we admit each year and that means all can not be accepted.

This does not mean they are bad people or that our nation disrespects or demeans them in any way.   It means we are properly enforcing our laws as Congress has passed them.

It is with these principles and duties in mind, and in light of imminent litigation, that we reviewed the Obama Administration's DACA policy.

Our collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program,

**AR3294**

1001

which was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit.

The Fifth Circuit specifically concluded that DACA had not been implemented in a fashion that allowed sufficient discretion, and that DAPA was "foreclosed by Congress's careful plan."

In other words, it was inconsistent with the Constitution's separation of powers. That decision was affirmed by the Supreme Court by an equally divided vote.

If we were to keep the Obama Administration's executive amnesty policy, the likeliest outcome is that it would be enjoined just as was DAPA. The Department of Justice has advised the President and the Department of Homeland Security that DHS should begin an orderly, lawful wind down, including the cancellation of the memo that authorized this program.

Acting Secretary Duke has chosen, appropriately, to initiate a wind down process. This will enable DHS to conduct an orderly change and fulfill the desire of this administration to create a time period for Congress to act—should it so choose. We firmly believe this is the responsible path.

Simply put, if we are to further our goal of strengthening the constitutional order and the rule of law in America, the Department of Justice cannot defend this type of overreach.

George Washington University Law School Professor Jonathan Turley in testimony before the House Judiciary Committee was clear about the enormous constitutional infirmities raised by these policies.

He said: "In ordering this blanket exception, President Obama was nullifying part of a law that he simply

1002

disagreed with.  . . . .  If a president can claim sweeping discretion to suspend key federal laws, the entire legislative process becomes little more than a pretense.  . .  The circumvention of the legislative process not only undermines the authority of this branch but destabilizes the tripartite system as a whole."

Ending the previous Administration's disrespect for the legislative process is an important first step.  All immigration policies should serve the interests of the people of the United States—lawful immigrant and native born alike.

Congress should carefully and thoughtfully pursue the types of reforms that are right for the American people.  Our nation is comprised of good and decent people who want their government's leaders to fulfill their promises and advance an immigration policy that serves the national interest.

We are a people of compassion and we are a people of law.  But there is nothing compassionate about the failure to enforce immigration laws.

Enforcing the law saves lives, protects communities and taxpayers, and prevents human suffering.  Failure to enforce the laws in the past has put our nation at risk of crime, violence and even terrorism.

The compassionate thing is to end the lawlessness, enforce our laws, and, if Congress chooses to make changes to those laws, to do so through the process set forth by our Founders in a way that advances the interest of the nation.

That is what the President has promised to do and has delivered to the American people.

1003

Under President Trump's leadership, this administration has made great progress in the last few months toward establishing a lawful and constitutional immigration system.   This makes us safer and more secure.

It will further economically the lives of millions who are struggling.   And it will enable our country to more effectively teach new immigrants about our system of government and assimilate them to the cultural understandings that support it.

The substantial progress in reducing illegal immigration at our border seen in recent months is almost entirely the product of the leadership of President Trump and his inspired federal immigration officers. But the problem is not solved.   And without more action, we could see illegality rise again rather than be eliminated.

As a candidate, and now in office, President Trump has offered specific ideas and legislative solutions that will protect American workers, increase wages and salaries, defend our national security, ensure the public safety, and increase the general well-being of the American people.

He has worked closely with many members of Congress, including in the introduction of the RAISE Act, which would produce enormous benefits for our country.   This is how our democratic process works.

There are many powerful interest groups in this country and every one of them has a constitutional right to advocate their views and represent whomever they choose.

But the Department of Justice does not represent any narrow interest or any subset of the American people.

**AR3297**

1004

We represent all of the American people and protect the integrity of our Constitution.    That is our charge.

We at Department of Justice are proud and honored to work to advance this vision for America and to do our best each day to ensure the safety and security of the American people.

Thank you.

**Speaker:**
Attorney General Jeff Sessions

**Attachment(s):**
Download_ag_letter_daca.pdf

**Topic(s):**
Immigration

**Component(s):**
Office of the Attorney General

*Updated Sept. 5, 2017*

**AR3298**

1005

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———

Case Nos. 1:16-CV-04756 (NGG) (JO)
3:17-CV-05211

MARTIN JONATHAN BATALLA VIDAL, ET AL., PLAINTIFFS

*v.*

ELAINE C. DUKE, ACTING SECRETARY DEPARTMENT
OF HOMELAND SECURITY, JEFFERSON BEAUREGARD
SESSIONS III, ATTORNEY GENERAL OF THE UNITED
STATES, AND DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, DEFENDANTS

———

Washington, D.C.
Friday, Oct. 20, 2017
9:17 a.m.

———

**DEPOSITION OF GENE HAMILTON**

———

\* \* \* \* \*

[205]

\* \* \*   multiple edits made to the document.

   **Q**   **Did you draft that memorandum?**

     MR. GARDNER:   You can answer that yes or no.

     THE WITNESS:   Principally, yes.

BY MS. TUMLIN:

   **Q**   **On what date did you first draft that memo?**

   A   I don't know.

AR3299

1006

**Q    What month?**

A    August or September.   I don't remember it was late August, early September.

**Q    Okay.   You previously testified that the final decision to terminate DACA was not made until Acting Secretary Duke signed the memorandum which you principally drafted.   Is that correct?**

A    That is correct.

**Q    Did you also draft an alternative memorandum that kept the DACA program in place?**

MR GARDNER:   Objection.   Calls for information subject to the deliberateive process privilege.   I instruct the witness not to answer.

\*    \*    \*    \*    \*

[207]

\* \* \*    **the DACA program had been made.   Correct?**

A    That—that is generally correct although I will say again no final decision is ever made until there is ink on paper.   That is the fundamental difference. There may have been tentative decision, but until a secretary of a cabinet department makes a decision in writing or in whatever method is appropriate for the circumstances the decision is technically not final.

**Q    Was there a substantively alternative version of a DACA memorandum that was circulating prior to September 5th that could have been signed by Acting Secretary Duke?**

MR. GARDNER:   Objection.   Calls for disclosure of information subject to deliberative process privilege.   I instruct the witness not the answer.

1007

BY MS. TUMLIN:

   Q   **Okay.   Does DHS have a policy on how the deal with litigation risk?**

[208]

   A   Do we have a policy how to deal with litigation risk.

   Q   **Uh huh.**

   A   Nothing in writing.

   Q   **Okay.   So there is—is there any policy on how to deal with threats to sue by state or local officials?**

   A   No.   And that sounds like the craziest policy you could have in a department.   You could never do anything if you were always worried about being sued.

   Q   **Are you familiar with the executive order issued by President Trump with respect to sanctuary jurisdiction?**

   A   That—I believe that is in Executive Order 13768.   I am familiar.

   Q   **And are you far lay that several municipalities have sued the federal government on the basis of that executive order?**

   A   In general I am, yes.

   Q   **Are you aware that some of these lawsuits have successfully blocked part of the executive   * * ***

*   *   *   *   *   *

1008

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

———

Civil Action No. 16-cv-4756

MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, AND CAROLINA FUNG FENG, ON BEHALF OF THEMSELVES AND ALL OTHER SIMILARLY SITUATED INDIVIDUALS, AND MAKE THE ROAD NEW YORK, ON BEHALF OF ITSELF, ITS MEMBERS, ITS CLIENTS, AND ALL SIMILARLY SITUATED INDIVIDUALS, PLAINTIFFS

*v.*

ELAINE C. DUKE, ACTING SECRETARY, DEPARTMENT OF HOMELAND SECURITY, JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES, AND DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, DEFENDANTS

———

Filed:   Dec. 15, 2017

———

## DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO ELAINE DUKE, ACTING SECRETARY OF HOMELAND SECURITY

———

(GARAUFIS, J.)

(ORENSTEIN, M.J.)

Pursuant to Federal Rules of Civil Procedure 26 and 36 and the Local Rules of this Court Defendant Elaine Duke, in her official capacity as the Acting Secretary of the Department of Homeland Security ("Defendant"), by and through counsel, provides the follow-

**AR3302**

1009

ing Objections and Responses to Plaintiffs' First Set of Requests for Admission.   Defendant's Objections and Responses are based on information known to Defendant at this time, and are made without prejudice to additional objections should Defendant subsequently identify additional grounds for objection.   The information submitted   * * *

\* \* \* \* \*

for DACA" as misleading to the extent DACA is not an immigration benefit.   Defendant objects to the request as vague and undefined to the extent plaintiffs failed to provide a definition for the phrase "third parties."

**RESPONSE TO REQUEST NO. 72:**   Defendant admits RFA No. 72 only to the extent that certain DACA requestors may have submitted supplementary documentation that contains information about third parties, including family members and that such information, on occasion, may have concerned the country of birth information of such other individuals.   Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 73:**   Admit that at least one DACA applicant who met the guidelines of the 2012 DACA memorandum was nonetheless denied DACA.

**OBJECTION TO REQUEST NO. 73:**   Defendant incorporates by reference the above objections to the definitions and instructions.   Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA is not an immigration benefit.

1010

**RESPONSE TO REQUEST NO. 73:**   Defendant admits only that USCIS has denied a DACA request from at least one DACA requestor who met the threshold criteria for consideration for DACA outlined in the June 15, 2012 memorandum from former Secretary of Homeland Security Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,* and the USCIS DACA FAQs archived at https://www.uscis.gov/archive/ frequently-asked-questions (last visited October 17, 2017)).   Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 74:**   Admit that DHS policy before September 5, 2017 was not to use the information provided in DACA applications for immigration-enforcement purposes except in narrow circumstances, including to identify fraudulent claims, for national security purposes, to adjudicate DACA requests, or for the investigation or prosecution of a criminal offense

**OBJECTION TO REQUEST NO. 74:**   Defendant incorporates by reference the above objections to the definitions and instructions.   Defendant objects to the extent the request mischaracterizes or otherwise fails to fully describe the policy at issue.   Defendant objects to the request as vague and confusing to the extent plaintiffs have failed to define the phrase "immigration-enforcement purposes," and "narrow circumstances."

**RESPONSE TO REQUEST NO. 74:**   Defendant admits RFA No. 74 only to the extent that that the current policy on sharing information provided by DACA requestors and recipients is reflected in USCIS DACA FAQs numbers 19, 20, and 26 (archived at https://www. uscis.gov/archive/frequently-asked-questions (last visi-

**AR3304**

1011

ted October 17, 2017)), DHS DACA FAQs numbers 7 and 8 (at https://www.dhs.gov/news/2017/09/05/ frequentlyasked-   * * *

* * * * * *

AR3305

1012

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

————

Civil Action No. 16-cv-4756

MARTÍN JONATHAN BATALLA VIDAL, ANTONIO
ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS,
MARIANO MONDRAGON, AND CAROLINA FUNG FENG,
ON BEHALF OF THEMSELVES AND ALL OTHER SIMILARLY
SITUATED INDIVIDUALS, AND MAKE THE ROAD NEW
YORK, ON BEHALF OF ITSELF, ITS MEMBERS, ITS
CLIENTS, AND ALL SIMILARLY SITUATED INDIVIDUALS,
PLAINTIFFS

*v.*

ELAINE C. DUKE, ACTING SECRETARY, DEPARTMENT
OF HOMELAND SECURITY, JEFFERSON BEAUREGARD
SESSIONS III, ATTORNEY GENERAL OF THE UNITED
STATES, AND DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, DEFENDANTS

————

Dated:   Oct. 18, 2017
Filed:   Dec. 15, 2017

————

**DEFENDANT'S OBJECTIONS AND RESPONSES
TO PLAINTIFFS' FIRST SET OF REQUESTS
FOR ADMISSION TO JEFFERSON BEAUREGARD
SESSIONS III, ATTORNEY GENERAL
OF THE UNITED STATES**

————

(GARAUFIS, J.)

(ORENSTEIN, M.J.)

Pursuant to Federal Rules of Civil Procedure 26 and 36 and the Local Rules of the United States District Courts for the Southern and Eastern Districts

1013

of New York, in accordance with the Order of the Honorable James Orenstein, U.S. Magistrate Judge, dated September 27, 2017, Defendant Jefferson Beauregard Sessions III, in his official capacity as the Attorney General of the United States ("Defendant"), by and through counsel, provides the following Objections and Responses to Plaintiffs' First Set of Requests for Admission.   Defendant's Objections and Responses are based on information known to Defendant at this time, and are made without prejudice to additional objections should Defendant subsequently identify additional grounds for objection.   The information submitted herewith is being provided in accordance with the Federal  * * *

* * * * *

**REQUEST NO. 38:**   Admit that DOJ employees had discussions with plaintiffs in *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), regarding the decision to terminate the DACA program before the DACA termination.

**OBJECTION TO REQUEST NO. 38:**   Defendant incorporates by reference the above objections to the definitions and instructions.

**RESPONSE TO REQUEST NO. 38:**   Defendant admits RFA No. 38, to the extent that the possibility of terminating the DACA program was raised in conversations with counsel for plaintiffs in *Texas v. United States*, No. 14-cv-254 (S.D. Tex.).

**REQUEST NO. 39:**   Admit that DOJ considered the arguments raised by plaintiffs in *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), in terminating the DACA program.

**AR3307**

1014

**OBJECTION TO REQUEST NO. 39:**   Defendant incorporates by reference the above objections to the definitions and instructions.   Defendant objects to this request as calling for information protected by the attorney work product doctrine.

**RESPONSE TO REQUEST NO. 39:**   Defendant admits RFA No. 39, to the extent that, in arriving at its opinion on the lawfulness of DACA, DOJ considered arguments raised by plaintiffs to the extent those arguments were adopted by the United States District Court of the Southern District of Texas, the United States Court of Appeals for the Fifth Circuit, or the United States Supreme Court in their respective opinions in the *Texas v. United States* litigation, except states that DHS, not DOJ, rescinded the DACA program.

Dated:   Oct. 18, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

/s/   BRAD P. ROSENBERG
Brad P. Rosenberg (DC Bar #467513)

**AR3308**